## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (___) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Joint Administration Requested |
| | ) |
| Debtors. | ) |
| | ) |

## DECLARATION OF ALLEN WILEN
## IN SUPPORT OF FIRST DAY RELIEF

I, Allen Wilen, hereby declare the following, under the penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of Philadelphia Academic Health

System, LLC and certain of its subsidiaries, each a debtor and debtor-in-possession (each,

individually, a "**Debtor**" and, collectively, the "**Debtors**") in the above-captioned chapter 11

cases.

2.      I have served as CRO for the Debtors since April 8, 2019.  In such capacity, I am

generally familiar with the Debtors' day-to-day operations, business and financial affairs, and

books and records.  I am above 18 years of age, and I am competent to testify.

3.      I am a Partner at EisnerAmper LLP ("**EisnerAmper**") and serve as the national

director of EisnerAmper's financial advisory services group.  I have more than twenty-five years

of financial and accounting experience, as well as extensive experience advising insolvent and

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

troubled companies, including several companies in the healthcare industry, in turnaround and crisis situations and navigating such companies through turnaround, sale and liquidation processes.  I have frequently been involved in complex matters requiring expertise in forensic accounting and operational analysis and have been qualified as an expert in numerous state and federal courts throughout the United States, including the district of Delaware.

4.    I submit this declaration to assist this Court and parties in interest in understanding the circumstances leading to the commencement of these chapter 11 cases, the capital structure of the Debtors, the Debtors' prepetition debt facilities and the Debtors' prepetition restructuring efforts, and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the emergency "first day" relief that the Debtors have requested from the Court pursuant to the motions and applications described herein.

5.    This declaration is organized into seven sections.  Sections 1-4 describe the Debtors' history and operational and capital structure.  Sections 5 and 6 detail the circumstances surrounding the commencement of these chapter 11 cases.  The seventh section sets forth the evidentiary basis for the relief requested in each of the pleadings filed in connection with these chapter 11 cases.

6.    Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, and my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and refinancing and restructuring initiatives.  If called upon to testify, I could and would testify competently to the facts set forth herein.

**Background**

## I.    Introduction

7.    The Debtors' cases include, among other entities, two major hospitals in Philadelphia, PA – St. Christopher's Hospital for Children ("**STC**") and Hahnemann University Hospital ("**Hahnemann**" or "**HUH**") – as well as a number of affiliated physician practice groups.  Each of these entities is directly or indirectly owned by Philadelphia Academic Health System, LLC ("**PAHS**"), one of the Debtors herein.

8.    As explained in greater detail below, the Debtors believe that STC and its related physician practices are viable and valuable entities that can be preserved and reorganized through a sale pursuant to section 363 of the Bankruptcy Code or a chapter 11 plan.  That is not the case for HUH and its related physician practices, which the Debtors have concluded are not viable or saleable as a going concern.  Given the bleak financial picture for HUH, the Debtors, prior to the Petition Date, issued WARN Act notices to HUH employees and began the process of shutting down HUH.  The Debtors intend to use these chapter 11 cases to conduct an orderly closure and wind-down of HUH.

## II.    The Debtors' History and Operations

### A.    The Debtors' Corporate History and Business Operations

9.    PAHS is a Delaware limited liability company that is the direct or indirect parent company of (i) Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**"), a Delaware limited liability company that operates HUH, (ii) St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children ("**SCH**"), a Delaware limited liability company that operates STC (together with HUH, the "**Hospitals**"), and (iii) the Hospitals' affiliated physician

groups (the "**Physician Groups**").  An organizational chart describing the Debtors' ownership structure is attached hereto as **Exhibit A**.

        **(1)**      **CCH (Hahnemann)**

10.     As noted above, CCH operates HUH.  HUH is a 496-bed tertiary care academic medical center in center city Philadelphia.  It has a long history of providing healthcare services, dating back to 1848.  HUH is fully accredited by the Joint Commission and historically has provided a range of specialty services, including Level I adult trauma, kidney and liver transplantation, OB/GYN services, medical and radiation oncology, minimally invasive robotic surgery, neonatal intensive care unit services, bariatric surgery, bloodless medicine and surgery and renal dialysis, among other inpatient and outpatient services.  CCH leases the real property on which HUH is located, for nominal consideration, from Broad Street Healthcare Properties, LLC, a non-Debtor affiliate, and subleases certain other properties (namely, portions of the Bobst/Feinstein properties) from STC.

11.     HUH is also the primary teaching hospital for Drexel University d/b/a Drexel University College of Medicine ("**DUCOM**").  HUH's Graduate Medical Education Residency Program is one of the largest in the United States, comprising approximately 573 residents and more than 100 fellows practicing in a wide range of medical specialties.  HUH also has operated an RN residency program consisting of didactic, clinical skills, and team-building/delegation activities and a pharmacy residency program that prepares pharmacists for positions in clinical practice, academia, and advanced practice.  Each year, in addition to training the residents and fellows, HUH and the DUCOM faculty physicians train approximately 500 rotating medical students and 800 rotating nursing students.  In the aggregate, the teaching program is immense and costly in light of a census at HUH that has ranged between 200 and 250 total patients.

12.     CCH has approximately 65 employed physicians and 2,375 other non-physician employees, and approximately 1,000 people work on site but are employed by third parties. Approximately 1,131 of CCH's employees are unionized.   Specifically, CCH is party to collective bargaining agreements ("**CBAs**") with the following unions: (i) District 1199C, National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO (Technical Unit); (ii) District 1199C, National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO (Service and Maintenance Unit); and (iii) the Pennsylvania Association of Staff Nurses and Allied Professionals ("**PASNAP**").   On June 26, 2019, the Debtors provided notice to these unions of their prior mailing of WARN Act notices to HUH employees.

**(2)     STC**

13.     SCH operates STC, which is a 188-bed free-standing pediatric hospital in North Philadelphia.   STC has been a leader in pediatric care since 1875.   STC's pediatric specialists provide exceptional care to children throughout the Greater Philadelphia area and around the world.   Indeed, STC is widely regarded as one of the best children's hospitals in the country, as evidenced by its A-rating by Leapfrog and designation by Women's Choice as one of the top children's hospitals in the nation.   STC leases the facilities from which it operates its hospital from Front Street Healthcare Properties, LLC and Front Street Healthcare Properties II, LLC, which are non-Debtor affiliates.   STC also is the lessee under master leases with a series of entities owned by HSRE-PAHH I, LLC, a non-debtor affiliate.   STC sub-leases a majority of the properties to DUCOM or to DUCOM affiliates, as well as to HUH and other tenants.

14.     STC's medical staff includes pediatric experts on staff (including numerous award-winning physicians), who support a wide array of pediatric specialties such as cardiology, endocrinology, gastroenterology, nephrology, neurology, pulmonary, oncology, and

rheumatology. STC also provides pediatric surgical services such as cardiothoracic surgery, general surgery, neurosurgery, orthopedic surgery, and plastic and reconstructive surgery.  STC operates a Level I Pediatric Trauma Center, a Level III Neonatal Intensive Care Unit and a certified pediatric burn center.

15.     STC is an academic medical center, supporting academic programs in partnership with DUCOM, Lewis Katz School of Medicine of Temple University and Albert Einstein Healthcare Network.  STC's pediatric residency program includes approximately 125 residents per year and is consistently top ranked.  In addition, STC maintains pediatric dentistry and child neurology residency programs, a medical laboratory science program, a radiologic technology program, and various fellowship programs and clinical rotations.

16.     SCH currently has approximately 237 physician employees and 1,272 other non-physician employees.  Approximately 730 of SCH's employees are unionized.  SCH is party to CBAs with the following unions: (i) the International Brotherhood of Electrical Workers, Local 98; (ii) PASNAP; and (iii) the National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and District 1199C.

### (3)     Other Debtors / Practice Groups

17.     The remaining Debtors in these cases are Philadelphia Academic Medical Associates, LLC ("**PAMA**"), a holding company that directly or indirectly owns the following entities, which are practice groups associated with either STC or HUH; (i) HPS of PA, L.L.C., which provides three physicians to Philadelphia Nursing Home to provide care for residents at the nursing home; (ii) SCHC Pediatric Associates, L.L.C., which serves as the employer for nearly all of the physicians working at STC (approximately 180 physician employees); (iii) St. Christopher's Pediatric Urgent Care Center, L.L.C., which operates an urgent care facility in

Abington, PA; (iv) SCHC Pediatric Anesthesia Associates, L.L.C., which provides anesthesia services at STC; (v) StChris Care at Northeast Pediatrics, L.L.C., which operates a Physician Group specializing in pediatrics and orthopedics in Northeast Philadelphia and Langhorne, PA, respectively; (vi) TPS of PA, L.L.C., which is a holding company that was historically used as a contract party for certain leases; (vii) TPS II of PA, L.L.C., which employs approximately 20 anesthesiologists working at HUH; (viii) TPS III of PA, L.L.C., which operated a Physician Group specializing in family and internal medicine and primary care, but ceased operations in April 2019; (ix) TPS IV of PA, L.L.C., which is a Physician Group that employs approximately 40 physicians working at HUH in a variety of specialties, including cardiology, CT surgery, orthopedic surgery, radiology and trauma surgery; and (x) TPS V of PA, L.L.C, which operates STC-affiliated facilities in various locations, including Abington, PA, Yardley, PA and Washington Township, NJ, that offer a variety of specialties.

**B.      Acquisition from Tenet**

18.      On January 11, 2018, Philadelphia Academic Health Holdings, LLC ("**PAHH**") – the holding company that is the sole member of PAHS – as purchaser's representative, along with PAHS and other purchasers (the "**Buyers**"), consummated the purchase of the businesses of the Hospitals and certain related assets, including the Physician Groups (together, the "**Healthcare Businesses**"), from Tenet Business Services Corporation ("**Tenet**") and its affiliates pursuant to an Asset Sale Agreement dated August 31, 2017, as amended (the "**Acquisition**").  Tenet had owned and operated the Healthcare Businesses since 1998, when it purchased them from Allegheny Health, Education, and Research Foundation (AHERF).  Upon information and belief, Tenet had marketed the Healthcare Businesses for sale starting in 2016, and PAHH was the only viable and interested buyer.

19.     The Acquisition was financed through a variety of sources, including: (i) a credit facility with MidCap (as defined below); (ii) an approximately $51 million loan from an affiliate of Harrison Street Real Estate; and (iii) a $17.5 million loan from Tenet to two non-debtor affiliates, Front Street Healthcare Properties, LLC and Front Street Healthcare Properties II, LLC, which is secured by real property owned by such affiliates in Philadelphia and guaranteed by PAHH.

20.     In connection with their purchase of the Healthcare Businesses, the Buyers allocated the acquired assets among themselves, with several of them being operating entities (generally, the Debtors herein) and other entities (non-Debtors) generally owning the realty upon which the Hospital Businesses are operated.  The Acquisition included the purchase of certain accounts receivables and payables expected to yield a targeted amount of net working capital.

21.     In addition, at the time of the Acquisition, PAHS and Tenet entered into a Transition Services Agreement ("**TSA**") pursuant to which Tenet agreed to provide certain services to PAHS for a two-year period to assist in the orderly transition of the Healthcare Businesses.  These services included Information Services (as defined in the TSA) such as software and IT support, and the use of Tenet's IT platform (the "**Tenet IT Platform**"), in exchange for which Tenet was entitled to certain fees.  PAHS also entered into a Master Services Agreement (the "**MSA**") with Conifer Revenue Cycle Solutions, LLC ("**Conifer**"), an affiliate of Tenet, pursuant to which Conifer agreed to provide revenue cycle services in exchange for payment.

35276740.8 07/01/2019

### III.   Disputes and Operational Challenges Following the Acquisition

22.   Immediately upon or shortly after the Acquisition, the Debtors' financial performance was adversely affected by a number of disputes and operational challenges, including the following:

23.   **Tenet and Conifer Issues**.  Disputes arose between the Debtors and Tenet with regards to, among other things, the "Net Working Capital Adjustment" provided for under the parties' Asset Sale Agreement, most notably, for overstated amounts of accounts receivable totaling approximately $21 million.  The Debtors also learned that approximately $5 million of amounts received by Tenet at closing in order for it to pay certain accounts payable was never in fact paid.  These issues resulted in a significant liquidity shortfall that adversely affected the Debtors' operations almost immediately after closing of the Acquisition[2].

24.   Disputes also arose between the parties regarding the financial condition of the Debtors' businesses, wherein the Debtors asserted that they were led to believe during due diligence process for the Acquisition that the business, as a whole, was essentially breaking even through November 2017 on an EBITDA basis.  In fact, the business lost more than $6 million during its first full operational month in February 2018, and continues to experience substantial losses.  The Debtors and their affiliates have asserted indemnity and fraud claims against Tenet on these grounds, which Tenet disputes.

25.   Further disputes arose between the parties regarding services provided by Tenet under the TSA.  In this regard, the Debtors believe that the Tenet IT Platform – upon which the Debtors' operations and ability to provide patient care is highly dependent – is outdated and

---

[2]   In September 2018, PAHS filed suit against Tenet in an attempt to compel arbitration of the working capital dispute.  Tenet has asserted counterclaims to PAHS's claims.  The litigation is captioned *Philadelphia Academic Health Holdings, LLC v. Tenet Business Services Corporation*, and is currently pending in the Chancery Court of Delaware, Case No. 2018-0684-KSJM (the "**Chancery Court Lawsuit**").

contains functionality gaps that impair (i) the efficient management of patients and patient data production of standard key performance indicators, (ii) financial management functions, and (iii) revenue cycle, supply chain and other important customary functions.

26.     Disputes also arose among the parties regarding the Conifer MSA.  Among other contentions, the Debtors believe and have asserted that Conifer's performance under the MSA has led to an abundance of downgrades and denials by payors, and that such downgrades and denials have adversely and materially affected the Debtors' ability to collect from payors for services rendered.  Conifer has disputed these assertions.

27.     The Debtors have sought to transition their IT system to a new configuration.  In the meantime, beginning in August 2018, Tenet and Conifer sent multiple notices to the Debtors of their intent to terminate services to the Debtors under the TSA and MSA absent cure of the Debtors' alleged defaults thereunder.  As of the date hereof, Tenet and Conifer assert claims against PAHS in an amount in excess of $41 million.  The Debtors responded to each of the notices sent by Tenet and Conifer with their own notices of material breach, disputed invoices and termination of services, and eventually refrained from paying Tenet or Conifer amounts claimed to be due under the TSA, the MSA, and the related documents. [3]

28.     The Debtors, Tenet and Conifer are currently operating under a short-term interim agreement that runs through July 5, 2019, by which the Debtors have made payments of approximately $125,000 per week (with the exception of the most recent week, in which $200,000 was paid) in exchange for Tenet and Conifer's agreement to defer further efforts to terminate services provided under the TSA, the MSA and the related statement of work.  The

---

[3]     The Debtors and certain of their non-debtor affiliates, including PAHH, have asserted claims against Tenet for fraud and breach of contract/indemnification under the Asset Sale Agreement in a lawsuit pending in the Superior Court of Delaware, which is captioned as *Philadelphia Academic Health Holdings, LLC et al v. Tenet Business Services Corporation*, Superior Court of Delaware, Case No. N19C-04-035EMDCCLD.

35276740.8 07/01/2019

Debtors have entered into this interim agreement because an abrupt termination of Tenet's and Conifer's services, before the Debtors have completed their transition to new platforms, would severely disrupt the Debtors' businesses and the Debtors' ability to properly serve their patients. The Debtors and Tenet/Conifer have been engaged in settlement negotiations and the Debtors hope to resolve the issues in chapter 11.

29.    **DUCOM Issues**.  As described above, HUH and DUCOM have been closely linked for many years.  HUH has served as the primary teaching hospital for DUCOM since 2002.  In addition, DUCOM's medical school, as well as several other related medical and research facilities, are physically contiguous to HUH in Philadelphia.  In fact, DUCOM subleases several buildings from certain of the Debtors.

30.    DUCOM and PAHS are parties to an academic affiliation agreement with respect to HUH, the term of which runs through June 2022, and a supplemental academic affiliation agreement with respect to STC, the term of which runs through 2037.  Under these agreements, HUH and STC serve as DUCOM's primary academic affiliate for medical student clinical rotations.  Additionally, DUCOM is a co-sponsor for HUH's graduate medical education programs.

31.    Pursuant to the arrangements with DUCOM, DUCOM employees not only serve in key academic and leadership positions in HUH's educational programs but also play a critical role in providing patient care.  DUCOM employees and/or contractors provide, among other things, emergency department staff and educational services at HUH in exchange for the payment of fees.

32.    A number of operational and other disputes have arisen between the Debtors and DUCOM.  As a result of these disputes, and due to the Debtors' ongoing liquidity shortages, the

Debtors initially included reservations of rights with their payments to DUCOM and later withheld payments to DUCOM, which asserts it is owed amounts in excess of $13 million. The Debtors believe that they hold claims against DUCOM in excess of what DUCOM claims to be owed. Among other claims, the Debtors believe that they were prevented from implementing numerous initiatives designed to improve the clinical and financial performance of HUH due to DUCOM's resistance to any initiatives that called for adjustments to physician staffing and clinical processes (including clinical documentation improvements).

33.     **Other Issues**. A host of other issues have contributed to the Debtors' financial circumstances, including: (a)   delays in payment of supplemental payments from the Commonwealth of Pennsylvania to the Debtors and/or their affiliates, as well as a reduction of such payments of approximately $17 million per year; (b) a significant reduction in patient volumes in 2018; (c) increased losses by certain Physician Groups; (d) material declines in outpatient procedures and surgeries; and (e) reductions in average daily census, partly due to a reduction in average length of stay and reduced direct admissions. HUH's facilities are also in need of significant capital improvements.

34.     These circumstances have resulted in material and unsustainable losses, particularly at HUH. In calendar year 2018 (since the Acquisition), HUH's pre-tax losses exceeded $69 million (unaudited).[4] Although STC was profitable (its unaudited pre-tax income in 2018 was approximately $54 million), due to losses at HUH, PAHS and Physician Group levels, the Debtors' overall pre-tax losses in 2018 exceeded $85 million (unaudited).

35.     These losses have continued in 2019. For the month of March 2019, HUH's pre-tax losses exceeded $5.8 million (unaudited). Although STC was profitable (showing pre-tax

---

[4]     Notably, even prior to the Acquisition, financial information revealed downward trends at HUH; however, the Debtors believed that with certain structural and operational changes, these trends could be reversed over time.

income of approximately $3.0 million (unaudited)), the Debtors' overall pre-tax losses for March

2019, on an aggregate basis, exceeded $9.0 million.

**IV.    The Debtors' Capital Structure and Primary Obligations**

36.    **MidCap.** Each of the Debtors, as well as certain non-debtor entities,[5] is a party to

a Credit and Security Agreement dated January 11, 2018, which was subsequently amended on

September 20, 2018 (as amended, the "**Credit Agreement**"), with MidCap Funding IV Trust and

MidCap Funding H Trust (together, "**MidCap**" or the "**Lender**").   The Credit Agreement

provides for credit facilities consisting of: (i) a revolving loan facility of up to $100 million (the

"**Revolver**"); and (ii) a term loan facility of $20 million (the "**Term Loan**" and, with the

Revolver, collectively, the "**Credit Facility**").   As of the Petition Date, the principal amounts

outstanding under the Revolver and Term Loan are approximately $38.6 million and $20 million,

respectively.

37.    The Credit Facility is secured by a security interest in substantially all of the

Borrowers' assets, including accounts receivable.  Although, as of June 27, 2019, the amount of

the Debtors' net eligible accounts receivable is approximately $63.6 million, availability under

the Credit Facility is based on various formulas that take into account of host of factors and

apply various reserves and/or blocks.   Non-Debtors PAHH and Broad Street Healthcare

Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare

Properties III, LLC (together, the "**Broad Street Entities**")[6] have guaranteed the obligations of

---

[5]    The borrowers under the Credit Agreement (as amended) are St. Christopher's Healthcare, LLC, CCH, PAHS, Physicians Clinical Network, LLC, Philadelphia Academic Medical Associates, LLC, HPS of PA, L.L.C., SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., StChris Care at Northeast Pediatrics, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., TPS of PA, L.L.C., TPS II of PA, L.L.C., TPS III of PA, L.L.C., TPS IV of PA, L.L.C., TPS V of PA, L.L.C. and Physician Performance Network of Philadelphia, L.L.C (together, the "**Borrowers**").

[6]    As previously noted, one of these entities (Broad Street Healthcare Properties, LLC) owns the real estate where HUH is located.

the Borrowers under the Credit Facility. The Broad Street Entities' guarantees are secured by mortgages on all of their real estate and other assets.

38.    On or about May 8, 2019, MidCap sent the Debtors a Notice of Default and Reservation of Rights under the Credit Facility, and imposed a default rate of interest thereunder. This Notice was based on a number of alleged violations of the Credit Facility, including the Debtors' alleged defaults to Tenet and Conifer under the TSA and MSA.  Although MidCap has continued to provide funding under the Credit Facility, the level of funding that has been available under the Credit Facility has significantly strained the Debtors' ability to procure needed supplies and pay important vendors for services necessary to the ongoing operation of the Healthcare Businesses.[7]

39.    **Withdrawal Liability**.  In addition to the Credit Facility, some or all of the Debtors may have significant liability in connection with a multi-employer pension plan. Following the Acquisition, CCH participated in a multi-employer pension plan entitled "Pension Plan for Hospital and Health Care Employees – Philadelphia and Vicinity" (the "**Multi-Employer Plan**").  According to an Annual Funding Notice issued in April 2019, the Multi-Employer Plan was in critical status in the Plan Year ending December 31, 2018.  Given the Debtors' intent to close HUH, the Debtors expect to withdraw from the Multi-Employer Plan, thereby giving rise to potentially significant withdrawal liability.

40.    **Tenet/Conifer**.  As previously noted, Tenet and Confer assert claims of over $41 million against PAHS.

41.    **DUCOM**.  As stated above, DUCOM asserts a claim against certain of the Debtors in the amount in excess of $13 million.

---

[7]     The Debtors' liquidity also has been adversely affected by unanticipated delays in certain payments from the Commonwealth of Pennsylvania.

35276740.8 07/01/2019

42.    **Trade Debt**.  The Debtors estimate that they owe approximately $87 million to vendors and other parties in trade debt as of the Petition Date, excluding Tenet/Conifer and DUCOM and any pension liability.

V.    **Events Leading to Filing – DUCOM Discussions**

43.    As noted above, the Debtors have encountered a host of challenges and disputes, and have suffered unsustainable losses, since the Acquisition.  Certain of these disputes – particularly those involving Tenet/Conifer – have resulted in litigation.  In April 2019, the Debtors engaged EisnerAmper to provide assistance in, *inter alia*, exploring various transaction alternatives, including restructuring and refinancing alternatives.  The Debtors also engaged in intense, arms-length discussions with DUCOM regarding a potential transaction in which DUCOM would acquire STC, as well as HUH and its hospital towers for nominal consideration, including the assumption of debt and certain other obligations.  These discussions were unsuccessful; in late May 2019, DUCOM informed the Debtors that it was not interested in acquiring HUH, stating "we do not believe that HUH has any financial value."

44.    In early June, 2019, the Debtors retained SSG Advisors, LLC ("**SSG**") to assist in pursuing a financing, sale or restructuring transaction.  Immediately upon its retention, SSG developed marketing materials, including a "teaser" and a confidential information memorandum.  SSG also established an electronic data room containing key information for parties to conduct in depth due diligence on HUH.  To date, SSG has sent the teaser to approximately 33 potentially interested strategic parties.  A total of 4 parties executed non-disclosure agreements and conducted preliminary due diligence.  To date, no party has expressed interest in acquiring HUH's assets as a going concern.

45.    Under these circumstances, and given the severity of the Debtors' financial challenges – and in particular the financial performance of HUH as described above – the Debtors, in consultation with their professionals, have determined that it is necessary and appropriate to shut down HUH.  The Debtors have thus filed the chapter 11 cases with the goal of pursuing an orderly wind down of HUH that, at the same time, upholds patient safety and preserves maximum value.

## VI.    The DIP Financing

46.    In the time period leading up to the filing of these chapter 11 cases, the Debtors undertook to solicit offers for and negotiate a debtor-in-possession financing facility. Specifically, the Debtors, with the assistance of SSG, made inquiry into alternatives for financing and solicited proposals for debtor-in-possession financing from other financial institutions.  The Debtors and their advisors received two indicative term sheets prior to determining that the DIP Lender's proposal was highest or otherwise best.

47.    The Debtors evaluated the prospective lenders and their proposals on a number of factors, including economic terms, impact on the Debtors' businesses, restrictions on the use of proceeds and the collateral and security packages requested.  Given their current financial condition, financing arrangements and capital structure, the Debtors were unable to obtain financing from sources other than the DIP Lender on better terms than those reflected in the DIP Facility.  Additionally, as the Debtors' prepetition secured lender, the DIP Lender is familiar with the Debtors, their businesses and their capital structure.  This familiarity has enabled the DIP Lender to act more quickly and limit diligence risk, both of which are crucial in light the Debtors' critical need for liquidity.

35276740.8 07/01/2019

48.     Following extensive good faith, arms' length negotiations, the Debtors agreed to enter into a DIP Agreement[8] (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**DIP Agreement**"), by and among the Debtors, as borrowers and MidCap Financial Trust as administrative agent (in such capacity, the "**DIP Administrative Agent**") for and on behalf of itself and the other lenders party thereto (such lenders, collectively with the DIP Administrative Agent, the "**DIP Lenders**").

49.     Pursuant to the DIP Agreement, the Debtors will have access to a revolving loan facility of up to $50,000,000 (the "**DIP Revolver**") and (b) a $15,000,000 in principal term loan (the "**DIP Term Loan**," and together with the DIP Revolver, the "**DIP Loans**"), with a roll-up of the Debtors' pre-petition Credit Facility.  Subject to Court approval of the DIP Motion (as defined below), the DIP Loans shall be secured by superpriority liens that will prime the existing prepetition liens under the Credit Facility.

50.     I believe that the filing of these chapter 11 cases and the incurrence of indebtedness under the DIP Facility offers the best available option for the Debtors, as it provides the necessary liquidity and forum to close HUH in an orderly fashion and sell or restructure STC.  Accordingly, I believe that these chapter 11 cases are in the best interests of the Debtors' estates and will maximize value for all parties in interest.

## VII.   Evidentiary Support for First Day Motions.[9]

51.     The Debtors have filed or will file a number of "first day" and "second day" motions seeking orders granting various forms of relief. I believe the forms of relief requested

---

[8]     The DIP Agreement will be filed with the Court as a supplement to the DIP Motion (as defined below). Pending the completion of the DIP Agreement, the Debtors have attached a signed term sheet describing the principle terms of the proposed financing to the DIP Motion.

[9]     Capitalized terms used in this section but not defined have the meaning ascribed to them in the applicable motion.

are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases and to ensure the best outcome for the Debtors, their estates, their creditors, and all other parties in interest.  A description of the relief requested and the facts supporting each of the first day motions is set forth below.

52.     I have reviewed each of the first day motions, including the exhibits thereto. The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the first day motions and that the Court's grant of the requested relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the first day motions should be approved.

A.     ***Motion of the Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases* (the "*Joint Administration Motion*")**

53.     Pursuant to the Joint Administration Motion, the Debtors seek the entry of an order (a) authorizing consolidation and joint administration of the Debtors' chapter 11 cases, for procedural purposes only, and (b) directing parties in interest to use a consolidated caption, indicating that any pleading they file relates to the jointly administered bankruptcy cases of "Center City Healthcare, LLC, *et al.*"  Many of the motions, hearings and other matters involved in the chapter 11 cases will affect all of the Debtors, and joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.  Accordingly, I believe the Court should approve the joint administration of these chapter 11 cases.

B.      *Application of Debtors for Order Authorizing Retention and Employment of Omni Management Group as Claims and Noticing Agent to the Debtors, Nunc Pro Tunc to the Petition Date, Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f)* (**the "*Claims Agent Application*"**)

54.      Pursuant to the Claims Agent Application, the Debtors seek the entry of an order appointing Omni Management Group ("**Omni**") as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  The Debtors' selection of Omni to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* (the "**Claims Agent Protocol**") in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Omni's rates are competitive and reasonable given Omni's quality of services and expertise.  The terms of Omni's retention are set  forth in the Services Agreement attached to the Claims Agent Application as <u>Exhibit C</u> (the "**Services Agreement**"); <u>provided</u>, <u>however</u>, that, by the Claims Agent Application, the Debtors are seeking approval solely of the terms and provisions set forth in the Claims Agent Application and the proposed order attached to the Claims Agent Application.

55.      Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be thousands of entities to be noticed.  Local Rule 2002-1(f) provides that "[i]n all cases with more than 200 creditors or parties in interest listed on the creditor matrix, unless the Court orders otherwise, the debtor shall file [a] motion [to retain a claims and noticing agent] on the first day of the case or within seven (7) days thereafter."

56.     In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes, and is in the best interests of both the Debtors' estates and their creditors. Accordingly, I believe that appointing Omni as the claims, noticing and balloting agent in these chapter 11 cases will maximize the value of the Debtors' estates for all of their stakeholders.

**C.**     ***Motions of Debtors for Entry of an Order Extending the Time within which Debtors Must File their Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "*Schedule Extension Motion*")**

57.     Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order (i) extending the deadline by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") by eighteen days (18) days, for a total of forty-five (45) days from the Petition Date, without prejudice to the Debtors' rights to request additional time; and (ii) granting such other and further relief as is just and proper.

58.     I believe cause exists to extend the Debtors' time to file the Schedules and Statements to the date requested.  Given the size and complexity of the Debtors' operations, a significant amount of information must be accumulated, reviewed and analyzed to properly prepare the Schedules and Statements.  The Debtors and their professionals have been consumed with a multitude of critical administrative and operational decisions arising in conjunction with the commencement and early administration of these chapter 11 cases, including preparing for the Debtors' entry into chapter 11, and addressing multiple critical operational and strategic matters.  In addition, the Debtors have prepared and filed a number of motions and applications to ensure that the Debtors successfully prosecute these cases in a timely and efficient manner.

59.     Moreover, due to the complexity of the Debtors' businesses, compiling and consolidating the data required for the Schedules and Statements presents a complex and time-consuming task.  Although the Debtors and their professionals have been working diligently on completing the Schedules and Statements as early as possible, it will be extremely challenging to complete this undertaking without the requested extension.

60.     In light of the above, an extension of the deadline to file Schedules and Statements by an additional eighteen (18) days, for a total of forty-five (45) days from the Petition Date, without prejudice to the Debtors' right to seek further extensions if necessary, is appropriate because the Debtors believe, and I agree, that this extension will provide the necessary time for the Debtors to complete accurate Schedules and Statements.

     **D.**     ***Motion of the Debtors for Entry of an Order Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules* (the "*Patient Confidentiality Motion*")**

61.     Pursuant to the Patient Confidentiality Motion, the Debtors seek the entry of an order authorizing certain procedures to maintain the confidentiality of patient information as required by the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), while providing required disclosure in these chapter 11 cases.

62.     HIPAA and its corresponding regulations impose stringent standards on health care providers and establish significant penalties for any health care provider that uses or discloses patient information.  *See* 42 U.S.C. § 1302d, *et. seq.*, 45 C.F.R. § 164.502.

63.     Because the Debtors qualify as health care providers that transmit health information, they are considered "covered entities" under 45 C.F.R. § 160.103.  This designation prevents the Debtors from disclosing, except in limited circumstances, "individually identifiable health information."   45 C.F.R.  § 164.502.  HIPAA defines "individually identifiable health

information" as any information relating to the individual's "past, present or future physical or mental health or condition, the provision of health care to the individual, or the past, present or future payment for the provision of health care to the individual" that also "identifies the individual or for which there is a reasonable basis to believe that the information can be used to identify the individual."  42 U.S.C. § 1302d(6).  Individually identifiable health information is referred to as PHI under HIPAA.

64.     The Debtors could be subjected to significant monetary penalties for the unauthorized disclosure of PHI.  *See* 45 C.F.R. § 160.402.  Such penalties can be imposed even if a person "did not know and, by exercising reasonable diligence, would not have known" that a violation occurred.  *See id.* at § 160.404(b)(2)(i).

65.     The Debtors believe, and I agree, that the requirements to maintain patient confidentiality under HIPAA conflict with the requirements to disclose information under the Bankruptcy Code, specifically the duty to file a list of all creditors under Bankruptcy Code section 521(a)(1)(A) and the duty to file schedules of all assets and liabilities under Bankruptcy Code section 521(a)(1)(B)(i). The Debtors therefore respectfully request that such patient information be protected through the privacy procedures set forth in the Patient Confidentiality Motion pursuant to Bankruptcy Code section 107(c), which allows a bankruptcy court, for cause, to protect an individual if disclosure would create an undue risk of unlawful injury. *See also* Bankruptcy Rule 9018 (allowing a bankruptcy court to protect governmental matters that are made confidential by statute or regulation).

66.     I believe that the relief requested in the Patient Confidentiality Motion appropriately balances the need to maintain confidential patient information under HIPAA with the need for adequate disclosure under the Bankruptcy Code. Given the nature of any

information that may reveal even the identity of patients, confidentiality in this context is of paramount importance.

   **E.**  ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts, (II) Authorizing Continued Performance of Intercompany Transactions, (III) Granting Administrative Expense Priority to Postpetition Intercompany Claims, and (IV) Granting Related Relief (the "Cash Management Motion")***

67.    Pursuant to the Cash Management Motion, the Debtors seek the entry of interim and final orders (i) authorizing the Debtors to continue to use their cash management system (the "**Cash Management System**") and bank accounts, as set forth below and in the Cash Management Motion; (ii) authorizing the Debtors to continue their existing deposit practices under the Cash Management System (subject to certain reasonable changes to the Cash Management System that the Debtors may implement); and (iii) authorizing the Debtors to continue to perform Intercompany Transactions (as defined below) consistent with historical practice and granting administrative expense priority to Intercompany Claims.

68.    The Cash Management System is an integrated network of bank accounts that is critical to the Debtors' operations during these cases.  The Debtors have designed the Cash Management System to meet their operating needs, enable management to control and monitor corporate funds, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances.  The Debtors have maintained their Cash Management System since their inception, and the Cash Management System has served as the primary cash flow mechanism for the Debtors' ordinary, usual, and essential business operations.

69.    As of the Petition Date, the Cash Management System includes fifty-five (55) bank accounts listed on <u>Exhibit C</u> to the Cash Management Motion (each a "**Bank Account**" and collectively the "**Bank Accounts**"), which are located at Wells Fargo, N.A. ("**Wells Fargo**"),

Bank of America, N.A., Capital One Bank, N.A. ("**Capital One**") and PNC Bank, N.A. (collectively, the "**Banks**") and used in the ordinary course of the Debtors' businesses. The Debtors routinely deposit, withdraw, and otherwise transfer money to, from, and between the Bank Accounts by various methods (collectively, the "**Ordinary Transfer Methods**"), including by checks, drafts, ACH transfers, and other electronic funds transfers.

70.     The Debtors' primary accounts are held at Wells Fargo. These include master deposit and concentration accounts held by Debtor PAHS, government and non-government lockbox accounts for each operating entity, operating disbursement accounts for CCH, SCH and PAMA, and payroll accounts for CCH and SCH. PAHS also maintains separate accounts for funding medical and dental benefits claims, voluntary benefits and merchant credit card deposits.

71.     Receipts are deposited into the applicable deposit accounts, and then aggregated on a daily basis into PAHS's master deposit account (the "**Master Deposit Account**") via zero balance accounts. Cash on hand in the Master Deposit Account and in the lockbox accounts is swept daily by MidCap under the Debtors' prepetition senior secured credit facility in order to pay down the  facility. The Debtors submit advance requests to MidCap via borrowing base certificate, typically on a weekly basis, and proceeds are funded into the master concentration account held by PAHS (the "**Master Concentration Account**"). Intercompany transfers are then made through the Master Concentration Account to other accounts maintained by the Debtors.

72.     STC utilizes the bank accounts at Capital One to facilitate rent payments from subtenants, who sublease space from STC, to STC's landlords (which are non-debtor affiliates of the Debtors). Each of the accounts is subject to a deposit account control agreement with Capital One and the relevant landlord. Subtenants deposit their rent payments into the Capital One

accounts.  Such amounts are then swept into accounts maintained by STC's landlords.  The rent from the subtenants is credited against STC's primary lease obligations to the landlords.

73.    A general overview of the movement of cash through the Debtors' Cash Management System is illustrated by the flow of funds charts is attached to the Cash Management Motion as <u>Exhibit D</u>.

74.    In the ordinary course of business, the Debtors use a variety of checks, correspondence, and business forms. To minimize expenses to their estates and avoid unnecessarily confusing their employees and creditors, the Debtors believe it is appropriate to continue to use the existing stock of checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "**Business Forms**") as such forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors-in-possession – rather than disposing of the existing forms and delaying operations until new Business Forms are obtained, or requiring the Debtors to include a legend on their Business Forms that would cause unnecessary confusion. After existing Business Forms are depleted, the Debtors' Business Forms will identify the Debtors' status as debtors-in-possession.

75.    The Debtors incur periodic service charges and other fees, which are paid daily, in connection with the maintenance of the Cash Management System (the "**Bank Fees**").  Bank Fees are typically paid on a monthly basis, and the Debtors have historically incurred Bank Fees of approximately $56,443 per month.  Such amounts are paid by way of debit from the respective Bank Account for which the Bank Fee is incurred.  As of the Petition Date, the Debtors estimate that approximately $34,000 in Bank Fees have accrued and remain unpaid.  The Debtors seek

permission through the Cash Management Motion to pay these Bank Fees in the ordinary course and to continue paying the Bank Fees in accordance with past practices.

76.     The Debtors have historically and in the ordinary course of business engaged in routine business relationships with each other and certain of their affiliates.  For example, each operating entity has its own lockbox accounts to collect cash receipts, which are then aggregated into the Master Deposit Account held by PAHS.  Likewise, the Master Concentration Account held by PAHS receives proceeds of the Debtors' prepetition credit facility and distributes the cash to various other disbursement accounts, including petty cash accounts held by subsidiaries. The Debtors track all fund transfers in their accounting systems and can ascertain, trace, and account for all Intercompany Transactions. If the Intercompany Transactions were discontinued, the Cash Management System and the Debtors' operations could be unnecessarily disrupted, to the detriment of the Debtors' estates, their creditors, and other stakeholders.

77.     As the foregoing overview reflects, I believe the Cash Management System is specifically designed for administering the Debtors' businesses, and cannot be altered without significant disruption to the Debtors' business operations and material distraction to the Debtors' management.  Therefore, I believe it is in the best interests of the Debtors to request that the Court authorize them to continue using the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System using the Ordinary Transfer Methods in accordance with the agreements governing the Bank Accounts.

78.     The Cash Management System is an ordinary course, customary and essential business practice, the continued use of which is essential to the Debtors' business operations during the chapter 11 cases and their goal of maximizing value for the benefit of all parties in interest.  I believe that requiring the Debtors to adopt a new cash management system at this

early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely affect the Debtors' ability to maximize estate value.  Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements.

79.    For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties.

F.    ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Benefits and Other Compensation, and (B) Continue Employee Compensation and Employee Benefits Programs, and (II) Granting Related Relief*** (**the "*Employees and Wages Motion*"**)

80.    Pursuant to the Employees and Wages Motion, the Debtors request the entry of the Proposed Orders authorizing the Debtors to (i) pay, in their discretion, all prepetition amounts required under or related to Employee Compensation, Deductions and Payroll Taxes, and Employee Benefits (each as defined below and together with all fees, costs, and expenses incident thereto, including amounts owed to third-party administrators, the "**Employee Obligations**"); and (ii) maintain, and continue honoring and paying, in their discretion, all amounts with respect to the Employee Obligations as such were in effect as of the commencement of these chapter 11 cases and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, including amounts owed to third-party administrators.

81.    As of the Petition Date, the Debtors employ approximately 4,652 employees (the "**Employees**"), on full, part-time or per diem (as needed) bases.  In the ordinary course of business, the Debtors pay Employees, among other things, salary, expense reimbursements, and

certain other forms of compensation that are described herein, depending on the services provided by the Employees to the Debtors.

82.     The Employees perform a variety of critical functions including operating the Debtors' medical treatment centers, providing acute, post-acute, and primary care, and recruiting and training physicians and technicians.  Employees also engage in various functions to manage and support the operations of the Debtors' medical facilities, including various administrative, marketing, legal, accounting, finance, and management-related tasks.  A majority of Employees are highly skilled medical professionals. The skills and experience of the Employees are essential to the Debtors' ongoing operations.

83.     Certain of the Debtors are party to five (5) collective bargaining agreement ("**CBAs**") that govern, *inter alia*, rates of pay, hours of work, and conditions of employment for their union employees: (a) an agreement with National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and District 1199C ("**1199C**"), covering service and maintenance employees at Hahnemann University Hospital ("**HUH**"); (b) an agreement with 1199C, covering technical unit employees at HUH; (c) an agreement with Pennsylvania Association of Staff Nurses and Allied Professionals ("**PASNAP**") covering nurses at HUH; (d) an agreement with PASNAP covering nurses at St. Christopher's Hospital for Children ("**SCH**"); and (e) an agreement with International Brotherhood of Electrical Workers, Local 98 ("**IBEW 98**") covering maintenance employees at STC.

84.     The following summarizes the various types of Employee compensation offered by the Debtors (collectively, the "**Employee Compensation**").

85.     <u>Wages</u>.  The Debtors pay the majority of their Employees' wage and salary obligations (collectively, the "**Wages**") on either a salaried or hourly basis.  Nearly all of the

Employees receive their wages, salaries, and other compensation by direct deposit, with the remaining Employees receiving checks.  Employees are paid one week in arrears.

86.     In the ordinary course of business, Employees generally are paid on a bi-weekly basis.  The Debtors' last payroll was paid to Employees on June 21, 2019 for the period from June 2, 2019 through June 15, 2019.  The next scheduled payroll is due to be paid on July 5, 2019 for the period from June 16, 2019 through June 29, 2019.  The Debtors estimate that the total amount of the July 5, 2019 payroll will be approximately $13.5 million.  This pay period will include fourteen (14) prepetition days (the "**Prepetition Pay Period**"), and thus all of the $13.5 million total payroll relates to the Prepetition Pay Period.  Accordingly, the Debtors seek authority to pay their Employees the amounts owed for Wages for those prepetition days in the next scheduled payroll.  No single individual will be paid in excess of the statutory cap of $12,850 on account of any prepetition claim for wages, benefits, or other compensation, absent further order of the Court.[10]

87.     <u>Reimbursable Expenses</u>.  Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed Employees, subject to manager approval, for certain allowed expenses incurred on behalf of the Debtors (the "**Reimbursable Expenses**").  Reimbursable Expenses generally include, among other things, business travel (e.g., airfare/rail, gas mileage, taxis, hotel and telephone/internet) and meals (e.g., business travel-related and onsite).  Employees pay for such expenses directly from their own funds and are reimbursed upon the submission of an expense reimbursement form itemizing the applicable business expenses.  Reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.

---

[10]     To ensure that no Employee would be owed wages in excess of the statutory cap of $12,850, the Debtors processed an interim payroll in the gross amount of approximately $500,000 on June 28, 2019, prior to commencement of these chapter 11 cases, with respect to certain Employees.

35276740.8 07/01/2019

88.     Reimbursable Expenses typically are approximately $80,000 per month, although the Debtors' incurrence of Reimbursable Expenses varies from month to month; as a result, the Debtors cannot precisely estimate prepetition, unpaid Reimbursable Expenses.  Nevertheless, as of the Petition Date, the Debtors estimate that they owe approximately $40,000 in outstanding prepetition Reimbursable Expenses.

89.     Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed.  To avoid harming Employees who incurred the Reimbursable Expenses, the Debtors, by the Employees and Wages Motion, request authority to: (a) continue paying the Reimbursable Expenses in accordance with prepetition practices in accordance with the Debtors' policy for reimbursing such expenses, and continue honoring any prepetition obligations related thereto to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses; and (b) modify their prepetition policy relating thereto as they deem appropriate without the need for further court approval.

90.     The Debtors request authority to pay up to $40,000 on an interim basis and $80,000 on a final basis on behalf of prepetition Reimbursement Expenses.  The Debtors also seek authority to continue their expense reimbursement policy in the ordinary course during the administration of the chapter 11 cases.

91.     <u>Holidays/Paid Time-Off and Leaves of Absence.</u>   The Debtors' unionized employees receive holiday pay, paid time-off and other paid time away from work pursuant to the terms of their respective CBAs.  The Debtors seek authority to continue honoring the obligations to their unionized employees pursuant to the CBAs in the ordinary course of business, consistent with applicable requirements of the Bankruptcy Code.  For non-unionized

employees, the Debtors offer full-time Employees pay for predetermined holidays ("**Paid Holidays**").  In addition, Employees are eligible for paid time away from work based length of service.  These absences include personal illness, family illness, personal days and vacation (collectively, "**Paid Time Off**").  Paid Time Off can be carried over from year to year, and non-managerial Employees have the option of redeeming accrued Paid Time Off for cash.  Redemption of Paid Time Off by non-unionized Employees results in such Employees not accruing additional Paid Time Off for the next six pay periods.  The Debtors anticipate that after the Petition Date, certain Employees will seek to use or redeem for cash Paid Time Off accrued during the prepetition period ("**PTO Payouts**").  As of the Petition Date, the Debtors estimate that their accrued liability in connection with unused Paid Time Off equaled approximately $11 million.

92.    By the Employees and Wages Motion, the Debtors request authority to honor all unused Paid Time Off that accrued prior to the Petition Date in accordance with their historical practices and in the ordinary course of business.  The Debtors also seek authority to continue to incur and pay eligible Employees for Paid Holidays consistent with past practices.

93.    During each applicable payroll period, the Debtors routinely deduct certain amounts from their Employees' gross pay, including, without limitation, (a) pre-tax and after-tax deductions payable pursuant to the Employee benefit plans discussed herein (e.g., garnishments, contributions relating to health care benefits, insurance premiums and flexible spending programs) and (b) other miscellaneous deductions (collectively, the "**Deductions**").  Out of an abundance of caution, by the Employees and Wages Motion, the Debtors request authority to remit any unpaid prepetition Deductions that exist. Additionally, the Debtors seek authority to continue deducting amounts from the applicable Employee's wages and salaries and forwarding

Deductions to the appropriate third-party recipients on a postpetition basis, in the ordinary course of business, and consistent with past practices. The Deductions represent earnings that applicable authorities have designated for deduction from Employees' paychecks and thus may not be property of the Debtors' estates.

94.     In addition to the Deductions, the Debtors are required by law to withhold amounts related to federal income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate taxing authority (collectively, the "**Withheld Amounts**"). The Debtors are also required to pay additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "**Payroll Taxes**"). On a bi-weekly basis, the Debtors remit approximately $4.7 million in Payroll Taxes, which amount includes employer taxes plus what is withheld and remitted on behalf of the employee.

95.     As of the Petition Date, the Debtors estimate that they have approximately $4,443,541 in accrued and unpaid Payroll Taxes. Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize the Debtors to transmit these amounts, all of which will become due within the first 21 days of these chapter 11 cases, to the appropriate parties in the ordinary course of business.

96.     The Debtors offer their Employees the opportunity to participate in a number of insurance and benefit programs, including medical insurance, life and disability insurance, and other employee benefit plans as described below (collectively, the "**Employee Benefits**"). Maintaining these benefits and honoring obligations thereunder is necessary to preserve employee morale and maintain the stability of the Debtors' workforce during the chapter 11 cases.

35276740.8 07/01/2019

97.    <u>Medical, Dental and Vision Plans</u>.  The Debtors provide health care coverage and dental care to all of their non-unionized full-time Employees and their dependents under various benefit plans, as described below (collectively, the "**Medical, Dental and Vision Plans**").  In addition, certain of the Debtors' unionized Employees, including all Employees covered by the CBAs with PASNAP and IBEW 98 and certain Employees covered by the CBAs with 1199C, also obtain employee benefits from the Debtors under the Medical, Dental and Vision Plans. The Debtors offer Employees the following Medical, Dental and Vision Plans:

- *Medical Plan.* The Debtors' eligible Employees may enroll in one of several medical/prescription plans through Independence Blue Cross Blue Shield.  Employees may generally choose from among Platinum, Gold or Bronze plan options, which offer varying premiums, deductibles and other benefit options.  The plans include pharmaceutical coverage, access to Health Advocate and a vision plan through VSP Individual Vision Plans. The net monthly cost to the Debtors for the Medical Plan, net of Employee contributions, is approximately $2,220,800.

- *Dental Plan.* The Debtors offer eligible Employees dental coverage through one of two plans offered by Delta Dental insurance.  The rates, deductibles and benefit options vary by plan. The net monthly cost to the Debtors for the Dental Plan is approximately $41,000.

98.    In the aggregate, the Debtors estimate that they incur approximately $2,264,000 in aggregate monthly premiums and administrative costs associated with the Medical, Dental and Vision Plans described above.

99.    By the Employees and Wages Motion, the Debtors request authority to (a) continue the Medical, Dental and Vision Plans in the ordinary course of business, (b) continue making the above-described contributions to the Medical, Dental and Vision Plans, and (c) pay any amounts related thereto, including premiums, claims amounts and administration fees, to the extent that they remain unpaid as of the Petition Date, in the ordinary course of business. The

Debtors estimate that the total amount accrued and unpaid for the Medical, Dental and Vision Plans as of the Petition Date is approximately $1,100,000.

100.     <u>Insurance and Disability Benefits</u>.  The Debtors provide certain Employees with life insurance, accidental death and dismemberment and short-term and long-term disability coverage (collectively, the "**Insurance and Disability Benefits**").   The Debtors pay the premiums for Employees' basic life insurance and certain short-term disability coverage, and Employees pay for all other coverages related thereto.  The monthly premium for the Debtors' Insurance and Disability Benefits, net of amounts paid by Employees, is approximately $69,356. The Debtors request authority under the Employees and Wages Motion to continue paying premiums for the Insurance and Disability Benefits in the ordinary course of business.

101.     The Debtors also provide certain insurance coverage to certain eligible Employees (the "**Supplemental Insurance Benefits**").   The premiums for this coverage are paid by participating Employees.   This insurance includes  hospital, accident and critical illness coverage.  The Debtors withhold from participating Employees' paychecks amounts sufficient to pay these premiums, although the Debtors pay certain related fees and administrative costs. The Debtors remit a total of approximately $52,210 per month in aggregate premiums for the Supplemental Insurance Benefits.

102.     By the Employees and Wages Motion, the Debtors request authority to pay approximately $122,000 for prepetition unpaid Insurance and Disability Benefits and unremitted Supplemental Insurance Benefits premiums on an interim basis, and any remaining amounts not included therein on a final basis.   Additionally, the Debtors seek authority to maintain the Insurance and Disability Benefits and Supplemental Insurance Benefits on a postpetition basis.

103.     The Debtors also provide certain benefits pursuant to the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), flexible spending accounts ("**FSAs**"), health savings accounts ("**HSAs**") and commuter benefits to Employees in the ordinary course of business.  On a monthly basis, the Debtors' current obligations under COBRA are approximately $2,051 and the Debtors' current monthly obligations for FSA, HSAs and commuter benefits total approximately $3,741.  The Debtors seek authority to continue providing these benefits in the ordinary course of business, including any amounts accruing prepetition.

104.     <u>Employee Savings Plans</u>.     The Debtors maintain for the benefit of eligible Employees an employee savings plan, which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "**401(k) Plan**").   There are approximately 2,678 participants in this plan, which is administered by Debtor Philadelphia Academic Health System, LLC.  The Debtors withhold certain amounts from participating Employees' paychecks and contribute such amounts to the 401(k) Plan (the "**Employee 401(k) Contributions**").    The Debtors withhold a total of approximately $670,000 per pay period in Employee 401(k) Contributions.  The Debtors request authority to continue the Employee 401(k) Contributions on a postpetition basis.  The Debtors also have historically matched certain contributions to the 401(k) Plan, which the Debtors believe is discretionary.[11]

105.     <u>Workers' Compensation</u>.  In the ordinary course of business, the Debtors maintain workers' compensation insurance through ACE American Insurance Company and contract with ESIS Inc., a subsidiary of Chubb Insurance Company, as third party administrator.   Under the terms of the Debtors' workers' compensation policy, the Debtors fund, on an installment basis, a

---

[11]     The Debtors have not paid such match for calendar year 2018, which the Debtors estimate to be approximately $5.1 million.

prefunded loss account for workers' compensation obligations.  The total amount of the prefunded loss account for 2019 is $1,842,866.  The Debtors make installment payments, which include both the prefunded loss account as well as premiums (for both the workers' compensation insurance and auto insurance) as well as administrative fees.  To the extent applicable losses exceed the amount of the prefunded loss account, the Debtors are subject to a $500,000 deductible per accident, after which all additional losses are fully insured.  The Debtors are current with respect to their obligations in connection with the prefunded loss account, and respectfully request authority to continue making the installment payments with respect thereto in the ordinary course of business.  As of the Petition Date, the Debtors were also obligated to pay $9,987 with respect to the workers' compensation policy as a result of the most recent payroll audit, which the Debtors seek authority to pay by the Employees and Wages Motion. The Debtors also seek authority to continue honoring all applicable obligations with respect to their relationship with ESIS as third party administrator in the ordinary course of business.

G.     ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service*** (the "*Utilities Motion*")

106.    Pursuant to the Utilities Motion, the Debtors seek the entry of an order (i) authorizing Debtors' proposed form of adequate assurance of payment to utility companies, (ii) establishing procedures for resolving objections by utility companies, and (iii) prohibiting utility companies from altering, refusing, or discontinuing service.

107.    In the ordinary course of business, the Debtors obtain traditional utility services related to the day-to-day operation and/or maintenance of their businesses from approximately twenty-three (23) different utility providers (each a "**Utility Company**" and collectively, the "**Utility Companies**"), for water, electricity, gas, steam, telephone and internet services (the

"**Utility Services**").  The Utility Companies include, without limitation, the entities set forth on the list attached to the Utilities Motion as <u>Exhibit C</u> (the "**Utility Companies List**").

108.    Uninterrupted Utility Services are essential to the continued operation of the Debtors' businesses and, consequently, to the success of their chapter 11 cases.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts and patient safety.  Accordingly, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to function as a going concern.

109.    The Debtors estimate that the cost for the Utility Services during the next two weeks (not including any deposits to be paid) will be approximately $350,000.

110.    The Debtors intend to pay their undisputed postpetition obligations to the Utility Companies on a timely basis and have the ability to do so.  The Debtors anticipate that they will have sufficient funds to pay the amounts described in this Motion.

111.    I believe that uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these chapter 11 cases.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' reorganization efforts and patient safety. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to maintain operations. I am informed and believe that the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District.  Accordingly, based on the foregoing and those additional

reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**H.** ***Motion of the Debtors for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief** (the "**Tax Motion**")*

112.    Pursuant to the Tax Motion, the Debtors seek the entry of interim and final orders (i) authorizing, but not directing, the Debtors to remit and pay (or use tax credits to offset) the Taxes and Fees (as defined in the Tax Motion) in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the Petition Date and (ii) granting related relief

113.    The Debtors collect, withhold, and incur a variety of taxes, including property taxes, bed taxes, business use and occupancy taxes, sales and use taxes and healthcare assessments, as well as annual report filing fees, license and regulatory fees, and other fees.  The Debtors remit the taxes and fees described in the Tax Motion to the Commonwealth of Pennsylvania and the City of Philadelphia (collectively, the "**Authorities**").[12]  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.  The Debtors pay taxes and fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually or annually of each year, depending on the nature and incurrence of a particular tax or fee.

114.    The Debtors are obligated to pay sales and use taxes (the "**Sales and Use Taxes**") on a monthly basis to the Commonwealth of Pennsylvania for the retail sale, consumption, rental or use of tangible personal property in the ordinary course of their operations.  The Debtors

---

[12]    The Debtors pay taxes to taxing authorities in several other jurisdictions for payroll and other related obligations.  The Authorities listed herein are only those to which the Debtors are seeking authority to pay taxes pursuant to the Tax Motion.

typically pay approximately $220,000 per month in Sales and Use Taxes.  The Debtors estimate

that they have accrued, as of the Petition Date, approximately $695,521.79 in Sales and Use

Taxes, of which $219,457.40 is expected to come due within the first 21 days following the

Petition Date (the "**Interim Period**").  The Debtors request authority, but not direction, to pay

the Sales and Use Taxes and to continue to pay such taxes if and when they become due and

payable during the pendency of these chapter 11 cases.

115.    Next, the Commonwealth of Pennsylvania imposes an assessment (the "**Quality**

**Care Assessment**," and together with the Sales and Use Taxes, the "**Taxes**")[13] on the net patient

revenue of the Debtors, as well as other licensed hospitals, on a quarterly basis, to ensure access

to quality hospital services for Pennsylvania Medicaid beneficiaries.  The Debtors estimate that,

as of the Petition Date, STC has accrued approximately $1,580.655.45 in unpaid assessments

under the Quality Care Assessment program.  By the Tax Motion, the Debtors request authority,

but not direction, to pay STC's assessments under the Quality Care Assessment and to continue

to pay STC's assessments if and when they become due and payable during the pendency of

these chapter 11 cases.[14]

116.    In the ordinary course of the Debtors' operations, the Debtors are obligated to pay

a variety of regulatory and licensing Fees, as well as Fees related to the operation of the

healthcare business (each a "**Fee**," and collectively, the "**Fees**").  These Fees include annual

report filing fees, which are required for the Debtors to conduct their businesses in Pennsylvania.

Moreover, examples of regulatory fees paid by the Debtors include hospital license fees,

---

[13]    The Debtors acknowledge that their tax obligations as of the Petition Date exceed the amounts described in the Tax Motion.  The Debtors have limited the relief sought by the Tax Motion in a manner consistent with what they anticipate will be their cash availability in the initial portion of these cases.

[14]    Additional Quality Care Assessments may be due and owing by HUH.  The Debtors do not currently have the funding necessary, and therefore do not by the Tax Motion seek authority, to pay HUH's Quality Care Assessments.

pharmacy license fees and lab license fees.  To the best of Debtors' knowledge, no Fees are outstanding as of the Petition Date.  However, in an abundance of caution, the Debtors request authority to pay any Fees that may be owed as of the Petition Date, and to continue to pay such Fees as they become due in the ordinary course of the Debtors' businesses

117.    I believe that any failure to pay the Taxes and Fees may materially disrupt the Debtors' business operations in several ways: (i) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (ii) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (iii) certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both.  For the foregoing reasons, I believe that it is in the best interests of the Debtors' estates that the Debtors be authorized to pay the Taxes and Fees.

**I.**      ***Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, and (IV) Enter Into New Premium Financing Agreements in the Ordinary Course of Business* (the "*Insurance Motion*")**

118.    Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto; (ii) renew, amend, supplement, extend, or purchase Insurance Policies (as defined below); (iii) honor the terms of the Premium Financing Agreements (as defined below) and pay premiums thereunder; and (iv) enter into new Premium Financing Agreements in the ordinary course of business.

119.    In the ordinary course of business, the Debtors maintain approximately twenty-one (21) insurance policies that are administered by various insurance carriers (collectively, the "**Insurance Carriers**").  These policies provide coverage for, among other things, the Debtors' property, general liability, professional liability, automobile, excess umbrella liability, workers' compensation, terrorism, pollution, storage tank, volunteer/student accident, cyber, crime, fiduciary liability, directors' and officers' liability, and employed lawyers liability (collectively, the "**Insurance Policies**").  A schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit C.

120.    The Debtors' coverage under the Insurance Policies is provided in connection with a global insurance program providing coverage for both the Debtors as well as certain non-debtor affiliates of the Debtors.  Each of the Debtors are covered under each Insurance Policy, other than the aviation policy, which only covers certain applicable Debtors.

121.    The aggregate annual premium for the Insurance Policies is approximately $19,932,485, including applicable taxes and fees.  The cost of such premiums are allocated among the covered Debtors and non-debtor entities in a manner dependent on the type of coverage provided.  For example, fiduciary, crime, D&O and employment practices Insurance Policies are allocated based on the total number of employees per entity, general liability, terrorism and pollution coverages are allocated based on square footage, workers' compensation insurance is allocated based on payroll, and risk retention group coverage is allocated based on actuarial reports (occupied bed equivalents).

122.    The premiums for eighteen (18) of the Insurance Policies are financed (collectively, the "**Financed Policies**") because it is not economically advantageous to pay the premiums on the Financed Policies, in full, on a lump-sum, quarterly, or monthly basis. The

premiums on the Financed Policies are financed pursuant to a premium financing agreement between PAHH and Premium Assignment Corporation (the "**Premium Financing Agreement**").  In consideration for Premium Assignment Corporation's obligation to pay the premiums on account of the Financed Policies, the Premium Financing Agreement requires payment of an initial down payment, followed by 10 monthly payments in the amount of $681,733.00.  Of the total annual premiums associated with the Insurance Policies, $6,657,037 is financed by PAHH through Premium Assignment Corporation, and the down payment and monthly payments associated therewith are allocated among the Debtors and the covered non-debtor affiliates.  The Insurance Policies that are subject to the Premium Financing Agreement are indicated on <u>Exhibit C</u> to the Insurance Motion.

123.    As of the Petition Date, the Debtors are current with respect to their obligations relating to the Premium Financing Agreement.  The Debtors respectfully request authority to pay all outstanding installment payments in connection with the Premium Financing Agreement (which the Debtors believe to be approximately $3.4 million) in the ordinary course of business.

124.    With respect to premiums for non-financed policies, the Debtors request authority to pay $500,000 on account of premiums that came due prior to the Petition Date and remain outstanding, and to continue to pay such premiums coming due postpetition in the ordinary course of business.[15]  By the Insurance Motion, the Debtors request authority to pay up to $500,000 in the aggregate, on an interim basis, on account of prepetition amounts outstanding under the non-financed Insurance Policies, and to continue honoring all obligations thereunder on a postpetition basis in the ordinary course of business.

---

[15]    The $500,000 premium payment is payable to Philadelphia Academic Risk Retention Group, LLC, a non-debtor affiliate of the Debtors that acts as a captive insurer for the Debtors.

35276740.8 07/01/2019

125.    The obligations under the Premium Financing Agreement are secured by all sums payable to the applicable Debtor under the Financed Policies, including, among other things, any gross unearned premiums and any payment on account of loss that results in a reduction of unearned premiums in accordance with the terms of the Financed Policies.  If the Debtors were unable to continue honoring their obligations related to the Premium Financing Agreement, Premium Assignment Corporation may seek relief from the automatic stay to terminate the Financed Policies to recoup their losses.  The Debtors could then be required to obtain replacement insurance on an expedited basis and likely at significant cost to their estates.  The Debtors likely would face great hardship if they were required to obtain replacement insurance and pay a lump-sum premium for the Financed Policies in advance.  Even if the Financed Policies were not terminated, any interruption in the Debtors' payments could have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

126.    Continuation of the Debtors' Insurance Policies, and entry into new insurance policies in the ordinary course of business, is essential to the preservation of the value of the Debtors' business and operations.  Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, to ensure uninterrupted coverage, by the Insurance Motion, the Debtors request authority to maintain their existing Insurance Policies, pay any prepetition obligations related thereto, honor their obligations related to the Premium Financing Agreement, and enter into new Insurance Policies in the ordinary course of business.

127.    To the extent that the Premium Financing Agreement expires during the course of these chapter 11 cases, the Debtors seek authority to renew the Premium Financing Agreement

without further Court approval.  The Debtors respectfully submit that renewal of the Premium Financing Agreement falls squarely within their ordinary course of business and, but for the constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the Premium Financing Agreement.  To reduce the administrative burden, as well as to confirm their ability to satisfy one of their obligations of operating as debtors in possession, the Debtors seek the Court's authority now to renew the Premium Financing Agreement when and as necessary in the Debtors' business judgment.

128.    Pursuant to the Insurance Policies, the Debtors may be required to pay various deductibles or retention amounts (the "**Insurance Deductibles**"*),* depending upon the type of claim and insurance policy involved.  Under certain policies, the Insurance Carriers may pay claimants and then invoice the Debtors for any Insurance Deductible.  In such situations, the Insurance Carriers may have prepetition claims against the Debtors.  While the Debtors are not aware of any Insurance Deductibles that are due and owing as of the Petition Date, the Debtors seek authority to honor any amounts owed to the Insurance Carriers to ensure uninterrupted coverage under their Insurance Policies

129.    In addition to the foregoing, the Debtors also incur obligations in connection with Pennsylvania's Medical Care Availability and Reduction of Error Fund ("**Mcare**"), created by Act 13 of 2002 as the successor to the Medical Professional Liability Catastrophe Loss Fund.  As of the Petition Date, the Debtors believe they may owe up to $12,000 on account of Mcare obligations, which amount is expected to come due within the first twenty-one days after the Petition Date.  Through the Insurance Motion, the Debtors seek authority to pay the prepetition Mcare obligations, and to continue to make payments on account of Mcare obligations in the ordinary course of business on a postpetition basis.

130.    The Debtors utilize the services of Lockton Companies as insurance broker (the "**Insurance Broker**") to obtain their Insurance Policies.  The Insurance Broker primarily assists the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates.  The Debtors pay fees (the "**Brokerage Fees**") to the Insurance Broker on a commission basis as policies are renewed.  While the Debtors are not aware of any Brokerage Fees that are due and owing as of the Petition Date, the Debtors seek authority under the Insurance Motion to honor any amounts owed to the Insurance Broker to ensure uninterrupted coverage under their Insurance Policies.

131.    The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations.  If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks that, I believe, would cause serious harm to the Debtors' businesses.

**J.**    ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Vendors Obligations*** **(the "*Critical Vendor Motion*")**

132.    Pursuant to the Critical Vendor Motion, the Debtors seek the entry of an interim and final order (i) authorizing the Debtors to pay prepetition claims of certain critical vendors up to $125,000 on an interim basis (the "**Interim Cap**") prior to the date of the final hearing on the Motion (the "**Interim Period**"), and up to $250,000 in the aggregate (inclusive of the Interim Cap) on a final basis, following the final hearing on the Motion (the "**Final Cap**"); and (ii) authorizing and directing the applicable banks and financial institutions to honor all related checks and electronic payment requests.

133.    In the ordinary course of their business, the Debtors purchase goods and/or services from certain vendors or suppliers whose continued, uninterrupted provision of such goods and/or services will play a crucial role in maintaining the Debtors' ongoing business operations as a long-term, acute-care healthcare provider and to facilitate a safe closure of Hahnemann (such vendors, the "**Critical Vendors**").  The Critical Vendors provide a variety of goods and services, all of which are required to continue the daily operations of Debtors' businesses. In addition, certain Critical Vendors are essential in order to maintain patient care and safety at the Debtors' facilities.

134.    The Debtors and their advisors spent significant time and effort identifying business relationships which, if lost, could materially harm the Debtors' business, result in harm to patients, reduce their enterprise value, and/or affect the Debtors' reorganization strategy.  In this Critical Vendor Pre-Screening Process, the Debtors and their advisors considered a variety of factors, including the following: the goods or services provided; the Debtors' business needs for the goods or services provided; the consequences of non-payment; and the potential to move to an alternative vendor.

135.    Based on their consideration of these factors, the Debtors anticipate that most Critical Vendors will be medical supply or service providers, IT providers, laboratories, staffing or ambulatory service providers that do not have a contractual relationship with the Debtors and are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtors' operations or adversely affecting patient safety.

136.    Based on the Debtors' review, the Debtors believe that a $250,000 Critical Vendor Cap will enable the Debtors to satisfy the prepetition claims of Critical Vendors. Regardless of amount owed, the potential impact upon the Debtors' operations and patient safety

in the event that any of the Critical Vendors ceased providing services to the Debtors would be significant.  Without the continued service of the Critical Vendors, the Debtors may be forced to abruptly suspend or even cease operations, which suspension or cessations would cripple the Debtors' business operations.

137.    The Debtors' failure to pay these Critical Vendors their prepetition claims, to the extent that such claims are fixed, non-contingent, liquidated, and undisputed (the "**Critical Vendor Claims**"), may extinguish the Debtors' access to necessary goods and services in the event that a vendor (i) is unfamiliar with the bankruptcy process, (ii) may be put out of business by the Debtors' nonpayment, (iii) will refuse to continue doing business with the Debtors if its prepetition claim remains unpaid, or (iv) may choose to continue doing business with the Debtors only upon the condition that the Debtors provide trade term accommodations such as advance deposits or payment by wire transfer prior to delivery.  Any disruption in the supply of goods or services from these Critical Vendors may not only substantially impair the Debtors' reorganization efforts but, due to the nature of the Debtors' business, risk patient safety.

138.    I believe that the Critical Vendors are so essential to the Debtors' business that the absence of any of their particular goods or services, even for a short duration, could disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, and  client satisfaction. I believe that this irreparable harm to the Debtors and to the recovery of all of the Debtors' creditors will far outweigh the cost of payment of the Critical Vendor Claims.

35276740.8 07/01/2019

**K.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Secured Superpriority Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lender, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion")**

139.    Pursuant to the DIP Motion, the Debtors seek the entry of interim and final orders authorizing the Debtors to obtain a senior secured superpriority credit facility in the aggregate principal amount of up to $65 million (the "**DIP Facility**"), consisting of the DIP Revolver and the DIP Term Loan, pursuant to the terms and conditions of the DIP Agreement. The Debtors further seek the Court's authorization to, *inter alia*, (a) use cash collateral (b) grant the DIP Lenders the forms of adequate protection described in the DIP Motion, and (c) modify the automatic stay to the extent necessary to effectuate the terms of the proposed interim and final orders.

140.    The DIP Facility will supply the Debtors with critical and necessary postpetition debtor-in-possession financing and consent to the use of cash collateral. Obtaining access to the DIP Facility, including the use of cash collateral, on the first day of these chapter 11 cases is critical for the success of the Debtors' reorganization efforts and for the orderly closure of HUH. The Debtors believe, in the reasonable exercise of their business judgment, that they need the additional liquidity provided by the DIP Facility to address the added expense of operating their businesses while in chapter 11 and the substantial costs of safely implementing the closure plan for HUH.

141.    I believe that the DIP Facility pending approval before the Court represents the Debtors' best available financing option and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their

businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the DIP Motion should be approved.

> **L.** ***Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a), 363, and 1108 of the Bankruptcy Code (A) Authorizing the Debtors to Implement a Plan of Closure for Hahnemann University Hospital and (B) Scheduling a Final Hearing* (the *"Motion to Close"*)**

142. Pursuant to the Motion to Close, the Debtors seek the entry of an order authorizing the implementation of the Closure Plan (as defined in the Motion to Close) for the closure of HUH (the "**Closure**") in coordination with the DOH, other regulatory agencies and applicable law.

143. In late June 2019, with no meaningful prospect of a sale and no viable sources for additional funding, closure became the only option for HUH. Accordingly, to protect the health and safety of Hospital patients, on June 25, 2019, the Board of Managers of PAHS, the parent and manager of CCH and one of the Debtors herein, voted to approve the closure of HUH.

144. On June 25, 2019 the Debtors caused WARN Act notifications to be mailed to all HUH employees, providing them with sixty (60) days' advance written notification of the Closure, as required by federal law. City of Philadelphia and state government officials were copied on the WARN Act notifications. In addition, on June 26, 2019, HUH provided notice of the Closure and its mailing of WARN Act notices to the appropriate labor unions (i.e., Pennsylvania Association of Staff Nurses and Allied Professionals, National Union of Hospital and Health Care Employees and AFSCME AFL-CIO, District 1199C).

145. On June 27, 2019, the Debtors provided notice of the Closure Plan to the Health Commissioner of the Philadelphia Department of Health (the "**Philadelphia Health Commissioner**"). The Debtors also provided notice of the Closure to the City of Philadelphia's Fire and EMS Department.

146.    Although the DOH has issued a cease and desist directive instructing the Debtors not to close HUH or eliminate services (particularly emergency department services) pending DOH's approval of a closure plan, the Debtors believe that DOH's concerns relate primarily to timing, and intend to continue discussions with DOH and other authorities.  The Debtors hope and expect that they will reach agreement on the Closure Plan prior to the hearing on the Motion to Close.

147.    The Closure Plan contemplates, *inter alia*, the transfer and discharge patients, the transfer and storage of medical records, the disposal of pharmaceuticals and inventory, the disposal of medical waste and hazardous materials, and the cessation of operations at HUH by September 6, 2019.

148.    The business reasons for the Closure are both sound and compelling.  Put simply, the Debtors have no alternative but to close HUH.  The Debtors' financial condition has rapidly deteriorated over the course of the past several months.  Although the Debtors have taken a number of steps to address their liquidity crisis and search for a strategic partner for continued operation of HUH outside of bankruptcy, they have been unable to find a buyer for HUH and lack sufficient cash to continue operating HUH on a standalone basis other than in accordance with the Closure Plan.

149.    Without access to financing or a potential transaction, the Debtors have no choice but to close HUH.  For these reasons, I believe that granting the relief requested in the Motion to Close is necessary and appropriate.

35276740.8 07/01/2019

**M.**    ***Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, and (III) Establishing Patient Notice Procedures (the "Consolidation Motion")***

150.    Pursuant to the Consolidation Motion, the Debtors seek entry of an order (i) authorizing the Debtors to file a consolidated list of creditors (the "**Creditor Matrix**"), (ii) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors, and (iii) establishing patient notice procedures.

151.    Given the affiliated nature of the Debtors, the Debtors submit that permitting them to maintain a single consolidated Creditor Matrix, in lieu of filing a separate creditor matrix for each Debtor, is warranted.  Segregating the Debtors' records to a specific creditor matrix format, in particular given the size and scope of these chapter 11 cases and the number of the Debtors' creditors, would be an unnecessarily burdensome task and would serve no practice purpose.  Indeed, because many creditors are creditors of more than one Debtor, failure to maintain a single consolidated Creditor Matrix would result in duplicate mailings.  In addition, filing a single consolidated Creditor Matrix would facilitate the U.S. Trustee's review of creditors' claims and its appointment of a single creditors' committee in these cases.  Based on the foregoing, in the absence of any corresponding benefit, the Debtors request authority to file the consolidated Creditor Matrix in lieu of filing separate lists for each Debtor.  I believe that such relief is appropriate under the circumstances for the efficient and orderly administration of these cases.

152.    Furthermore, the Debtors respectfully request authority to file a single consolidated list of their 30 largest general unsecured creditors (the "**Top 30 List**").  As explained above, a large number of creditors are shared amongst the Debtors.  Therefore, the Top 30 List will help alleviate administrative burdens, costs and the possibility of duplicative service.

153.    In addition, although it is possible for the Debtors to identify which creditors have actual claims against the Debtors, it is impracticable for them to identify former patients that may have unknown claims that have not yet manifested.  Providing individual notice to every current and former patient of the Debtors since the Acquisition would be impractical and unnecessary expensive given that the Debtors have seen tens of thousands of patients since that time.  I therefore believe that it is in the best interests of the Debtors' estates and all creditors and other interested parties to adopt the foregoing patient notice procedures.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 1, 2019                                   Respectfully submitted,


                                                      _/s/ Allen Wilen_____
                                                      Allen Wilen
                                                      Chief Restructuring Officer