## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (___) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Joint Administration Requested |
| | ) |
| Debtors. | ) |
| | ) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO PAY OR HONOR
PREPETITION OBLIGATIONS TO CERTAIN CRITICAL VENDORS AND
(II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECKS AND
<u>TRANSFERS RELATED TO SUCH CRITICAL VENDOR OBLIGATIONS</u>**

Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**") and its

affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned

chapter 11 cases (the "**Chapter 11 Cases**"), by and through their proposed undersigned counsel,

file this motion (this "**Motion**") for entry of interim and final orders, substantially in the forms

attached hereto as **<u>Exhibit A</u>** (the "**Interim Order**") and **<u>Exhibit B</u>** (the "**Final Order**," and

together, the "**Proposed Orders**"): (i) authorizing the Debtors to pay prepetition claims of

certain critical vendors up to $125,000 on an interim basis (the "**Interim Cap**") prior to the date

of the final hearing on the Motion (the "**Interim Period**"), and up to $250,000 in the aggregate

(inclusive of the Interim Cap) on a final basis, following the final hearing on the Motion (the

"**Final Cap**"); and (ii) authorizing and directing the applicable banks and financial institutions to

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St.
Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of
PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care
Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast
Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C.
(5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is
230 North Broad Street, Philadelphia, Pennsylvania 19102.

honor all related checks and electronic payment requests.  In support of this Motion, the Debtors submit and incorporate by reference the *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**").[2]  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**")*,* the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested in this Motion are sections 105(a), 363(b), 364, 1107(a), 1107(a), and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 9013-1(m).

## BACKGROUND

**A.      General Background Regarding the Debtors**

3.      On June 30, 2019 and the date hereof (together, the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating

---

[2]      Capitalized terms not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

4.     A description of the Debtors' businesses, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Declaration filed contemporaneously herewith.

**B.     The Debtors' Critical Vendors**

5.     In the ordinary course of their business, the Debtors purchase goods and/or services from certain vendors or suppliers whose continued, uninterrupted provision of such goods and/or services will play a crucial role in maintaining the Debtors' ongoing business operations as a long-term, acute-care healthcare provider and to facilitate a safe closure of Hahnemann (such vendors, the "**Critical Vendors**").  The Critical Vendors provide a variety of goods and services, all of which are required to continue the daily operations of Debtors' businesses. In addition, certain Critical Vendors are essential in order to maintain patient care and safety at the Debtors' facilities.

6.     The Debtors and their advisors spent significant time and effort identifying business relationships which, if lost, could materially harm the Debtors' business, result in harm to patients, reduce their enterprise value, and/or affect the Debtors' reorganization strategy.  In this Critical Vendor Pre-Screening Process, the Debtors and their advisors considered a variety of factors, including the following: the goods or services provided; the Debtors' business needs for the goods or services provided; the consequences of non-payment; and the potential to move to an alternative vendor.

7.      Based on their consideration of these factors, the Debtors anticipate that most Critical Vendors will be medical supply or service providers, IT providers, laboratories, staffing or ambulatory service providers that do not have a contractual relationship with the Debtors and are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtors' operations or adversely affecting patient safety.[3]

8.      Based on the Debtors' review, the Debtors believe that a $250,000 Critical Vendor Cap will enable the Debtors to satisfy the prepetition claims of Critical Vendors. Regardless of amount owed, the potential impact upon the Debtors' operations and patient safety in the event that any of the Critical Vendors ceased providing services to the Debtors would be significant.  Without the continued service of the Critical Vendors, the Debtors may be forced to abruptly suspend or even cease operations, which suspension or cessations would cripple the Debtors' business operations.

9.      The Debtors' failure to pay these Critical Vendors their prepetition claims, to the extent that such claims are fixed, non-contingent, liquidated, and undisputed (the "**Critical Vendor Claims**"), may extinguish the Debtors' access to necessary goods and services in the event that a vendor (i) is unfamiliar with the bankruptcy process, (ii) may be put out of business by the Debtors' nonpayment, (iii) will refuse to continue doing business with the Debtors if its prepetition claim remains unpaid, or (iv) may choose to continue doing business with the

---

[3]      The Debtors believe that keeping the identity of potential Critical Vendors confidential may assist them in reducing the number of prepetition claims that they must pay in order to continue receiving critical goods and services. Accordingly, a schedule of Critical Vendors has not been filed with this Motion and will not be made publicly available. Upon request by (a) the Office of the United States Trustee (b) the chambers of the United States Bankruptcy Judge assigned to the Chapter 11 Cases; or (c) any official committee appointed in these cases, the Debtors will provide, on a confidential basis, a schedule of payments made in accordance with any order entered by the Court approving this Motion. In addition, the Debtors will provide counsel and financial advisors to their postpetition DIP Lender (as defined herein) information regarding Critical Vendor payments as requested.

Debtors only upon the condition that the Debtors provide trade term accommodations such as advance deposits or payment by wire transfer prior to delivery. Any disruption in the supply of goods or services from these Critical Vendors may not only substantially impair the Debtors' reorganization efforts but, due to the nature of the Debtors' business, risk patient safety.

**C.**    **Proposed Terms and Conditions for Payment of Critical Vendor Claims**

10.    The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtors on trade terms that are the same or better than the trade terms that were most favorable in the 12 months prior to the Petition Date (the "**Customary Trade Terms**"). The Debtors reserve the right to, as a condition to payment of any Critical Vendor Claim, negotiate new trade terms (the "**Minimum Credit Terms**") with any Critical Vendor, that vary from the Customary Trade Terms, to the extent the Debtors determine that such terms are necessary to procure essential goods or services or otherwise in the best interests of the Debtors' estates.

11.    To ensure that the Critical Vendors deal with the Debtors on either Customary Trade Terms or Minimum Credit Terms, the Debtors will require execution by a Critical Vendor of a letter agreement (a "**Trade Agreement**")[4] substantially in the form attached to the Proposed Order as **Exhibit 1**.

12.    The Debtors propose that each Trade Agreement include, without limitation, the following terms:

> (a)    the amount of the relevant Critical Vendor's estimated Critical Vendor Claims, accounting for any setoffs, other credits and discounts thereto; *provided*, *however*, that such amount shall be used only for the purposes of determining such Critical Vendor's claim under the Order and shall not be deemed a claim allowed by the Court, and the rights of all interested

---

[4]    The Debtors' entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims and shall not constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor.

persons to object to such claim shall be fully preserved until further order of this Court;

(b)    the Critical Vendor's agreement to accept payment under the Trade Agreement in full and complete satisfaction of any and all amounts owed to the Critical Vendor by the Debtors for the period ending on the Petition Date;

(c)    the Customary Trade Terms or Minimum Credit Terms applicable to such Critical Vendor, or such other terms as the Critical Vendor and the Debtors may agree, and the Critical Vendor's agreement to provide goods or services to the Debtors under such terms for the duration of the Chapter 11 Cases unless the Debtors fail to make timely payments under the agreed-upon trade terms;

(d)    the Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates, any of the non-Debtor affiliates, or any other person or entity or any of their respective assets or property (real or personal) any lien (a "**Lien**"), a claim for reclamation (a "**Reclamation Claim**") or a claim under section 503(b)(9) of the Bankruptcy Code (a "**503(b)(9) Claim**"), regardless of the statute or other legal authority upon which such Lien, Reclamation Claim or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date; and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien, Reclamation Claim or 503(b)(9) Claim, the Critical Vendor shall take (at such vendor's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim, unless the Critical Vendor's participation in the program to pay Critical Vendor Claims authorized by the Order is terminated;

(e)    the Critical Vendor's agreement not to file a motion to compel assumption or rejection of any contract under which the Critical Vendor Claim arises; and/or

(f)    the Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Proposed Orders sought hereby and is bound thereby.

13.    By this Motion, the Debtors seek only the authority to enter into Trade Agreements when the Debtors determine that payment of such Critical Vendor Claims is necessary to their postpetition operations and that such agreements are advisable. The Debtors also hereby seek authority to make payments on account of Critical Vendor Claims in the

absence of a Trade Agreement if the Debtors determine, in their business judgment, that failure to pay such Critical Vendor Claims presents a material risk of irreparable harm to the Debtors' businesses and there is no reasonable likelihood that the Debtors will negotiate an acceptable Trade Agreement with the applicable vendors and/or service providers.

14.     By agreeing to provide Customary Trade Terms or Minimum Credit Terms under a Trade Agreement, the Critical Vendors are extending unsecured postpetition credit to the Debtors for the benefit of all creditors.  Such Customary Trade Terms or Minimum Credit Terms maintain the credit terms that the Debtors had prior to the Petition Date, or provide other acceptable credit terms, and may provide the Debtors with more favorable terms for unsecured credit than currently provided by the Critical Vendors or available elsewhere.  Accordingly, the treatment of the valid Critical Vendor Claims set forth in this Motion in exchange for Customary Trade Terms or Minimum Credit Terms is in the best interests of the Debtors and their estates and should be approved in accordance with section 364(b) of the Bankruptcy Code.

15.     In the event that a Critical Vendor under a Trade Agreement refuses to supply goods and/or services to the Debtors on Customary Trade Terms or Minimum Credit Terms following receipt of payment on its Critical Vendor Claim, or otherwise fails to comply with its Trade Agreement with the Debtors, the Debtors seek authority to return the parties to the positions they held immediately prior to entry of any Order approving this Motion with respect to all prepetition claims.  Further, the Debtors seek authority, in consultation with the DIP Lender (as defined herein) and without further order of the Court: (a) to declare that any Trade Agreement between the Debtors and such Critical Vendor is terminated, (b) to declare that payments made to such Critical Vendor on account of its Critical Vendor Claims be deemed to have been in payment of then- outstanding (or subsequently accruing) postpetition claims of such

35380910.6 07/01/2019

Critical Vendor without further order of the Court or action by any person or entity, and (c) to recover or seek disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceed the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.  In addition, the Debtors reserve the right to seek damages or other appropriate remedies against any breaching Critical Vendor.

16.     The Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor of such a default; or the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor.

17.     The Debtors will also maintain a matrix summarizing (a) the name of each Critical Vendor, (b) the amount paid to each Critical Vendor on account of its Claim and (c) the goods or services provided by such Critical Vendor.

**RELIEF REQUESTED**

18.     Pursuant to sections 105(a), 363(b), 364, 1107(a), and 1108 of the Bankruptcy Code, the Debtors seek entry of the Proposed Orders: (i) authorizing, but not directing, on an interim and final basis, the Debtors to pay prepetition claims, not to exceed the Interim Cap and Final Cap, as applicable, of certain of the Debtors' suppliers that are essential to the uninterrupted Debtors' business operations, and (ii) authorizing the applicable banks and financial institutions to honor all related checks and electronic payment requests.

35380910.6 07/01/2019

## BASES FOR RELIEF REQUESTED

19.     The relief requested in this Motion is supported by several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain circumstances.  Courts have recognized each of these statutory provisions as valid authority for critical vendor payments.

**A.     This Court May Authorize Payment of the Critical Vendor Claims under Sections 363 and 364 of the Bankruptcy Code.**

20.     Courts in this and other districts consistently authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. In authorizing such payments, those courts generally rely on legal theories rooted in sections 363 and 364 of the Bankruptcy Code.  Specifically, section 363(b)(1) of the Bankruptcy Code authorizes the debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b)(1); *see, also*, *In re MPC Computers, LLC*, Case No. 08-12667 (PJW) (Bankr. D. Del. Nov. 10, 2008) (authorizing, pursuant to section 363, the payment of prepetition claims of some suppliers); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (affirming bankruptcy court's decision under section 363 authorizing contractor to pay prepetition claims of some suppliers who were potential lien claimants).

21.     Courts in this and other circuits have indicated that the use of property of the estate outside of the ordinary course of business is proper where the debtor has a sound business purpose for doing so.  *See e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (recognizing that courts routinely grant orders allowing payment to essential suppliers in order to preserve and maximize the debtors' estates); *see also Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986)

(holding that section 363(b) requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *U.S. Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*), No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the bankruptcy court must find that there is a good business reason to allow the transaction"); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions.").

22.     Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction. *In re ALH Holdings LLC*, 675 F. Supp.2d 462, 477 (D. Del. 2009) ("[A] court will not disturb the business decisions of loyal and informed directors 'if they can be attributed to any rational business purpose.'") citing *Sinclair Oil Corp. v. Levien*, 280 A. 2d 717, 720 (Del. 1971); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'").

23.     Additionally, where, as here, the relief at issue involves a request impacting the trade terms among the Debtors and the vendor, the relief may, where the appropriate showing has been made, be approved pursuant to section 364 of the Bankruptcy Code. *See In re UAL*

*Corp.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002) (holding that, "completely consistent with the Bankruptcy Code," payments to critical trade vendors have further support when debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation").

24.     In the instant case, the Debtors have assumed that they will be able to obtain trade terms from their Critical Vendors in developing their projections.  Further, it is the Debtors' business judgment that the failure to pay the Critical Vendor Claims would have a material adverse impact on the day-to-day operations of their businesses, thereby prejudicing the Debtors' estates and all parties in interest.  Indeed, failure to pay the Critical Vendor Claims would very likely significantly disrupt the Debtors' operations by inhibiting the Debtors' access to the goods and services they need the most.

25.     Further, the relief requested in this Motion contemplates payments to be made to Critical Vendors that agree to provide goods or services on Customary Trade Terms or Minimum Credit Terms, to the extent possible.  As a result, the payment of such Critical Vendor Claims is consistent with and appropriate under sections 363 and 364 of the Bankruptcy Code.  As detailed above, the goods and services provided by the Critical Vendors are vital to the Debtors' continuing business operations.

**B.      The Court May Rely on the "Necessity of Payment" Doctrine and Its General Equitable Powers to Grant the Relief Sought in the Motion.**

26.     The Court may authorize payment of prepetition claims to Critical Vendors under section 105(a) of the Bankruptcy Code and the "doctrine of necessity."  Under section 105 of the Bankruptcy Code, this Court "may issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  For the reasons set forth above, and in light of the need for the Debtors to preserve the going concern value of their

businesses and ensure patient safety, the relief requested in this Motion is proper and should be

granted.[5]  *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. at 985 (noting that courts are

authorized to approve orders allowing payment of prepetition claims, which is necessary for the

debtors to have a successful reorganization).

27.     The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court

to authorize payment of certain prepetition claims prior to the completion of the chapter 11 case

where the payment of such claims is necessary to the continued operations of a debtor's

businesses and restructuring efforts.  *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del.

1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition

claims, the doctrine of necessity should be invoked to permit payment); *In re Columbia Gas Sys.,*

*Inc.*, 171 B.R. 189, 191-192 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition

claims that are essential to continued operation of business) (citing *In re Lehigh & New England*

*Ry. Co.*, 657 F.2d at 581).  The doctrine of necessity is a widely accepted component of modern

bankruptcy jurisprudence.  *See Just For Feet*, 242 B.R. at 826 (approving payment of key

inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by

refusing to deliver new inventory on eve of debtor's key sales season).

28.     The Debtors have narrowly tailored the definition of Critical Vendors to include

only those (virtually irreplaceable) suppliers who provide goods and services that are essential to

preserve patient safety and the value of the Debtors' business as a going concern and

nonpayment to which, in the Debtors' business judgment, would very likely result in those

suppliers halting their provision of goods or services to the Debtors.  In turn, the maintenance of

---

[5]      While the Debtors are not presently aware of any such circumstances, it is possible that certain of the
Critical Vendors may be able to assert possessory liens under applicable state law with respect to goods in
their possession, in which case they may be entitled to payment ahead of other general unsecured creditors
in any event.

the Debtors' businesses during these Chapter 11 Cases is crucial to the Debtors' ability to preserve patient safety and value for the benefit of all of the Debtors' stakeholders.  Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

**C.    The Court Should Authorize Payment of the Critical Vendor Claims as a Valid Exercise of the Debtors' Fiduciary Duties.**

29.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors, operating their businesses as debtors in possession, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *Id.*

30.    The *CoServ* court has noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "by the preplan satisfaction of a prepetition claim."  *Id.*  That court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product."  *Id.* at 498.

31.    The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty: first, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor must risk the probability of harm, or, alternatively, the loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.  Third, there must be no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.  *Id.*

35380910.6 07/01/2019

32.     In the present case, payment of the Critical Vendor Claims meets each element of the *CoServ* court's standard.  As described above, the Debtors have narrowly tailored the Critical Vendor Claims to encompass only those vendors and service providers that satisfy the specific criteria described above and that refuse to, or demand pricing or trade terms that constitute an effective refusal to, provide goods or services to the Debtors on a postpetition basis if their prepetition balances are not paid.  The potential harm and economic disadvantage that would stem from the failure of any of the Critical Vendors to perform is grossly disproportionate to the amount of any prepetition claim that may be paid.  Finally, prior to making a payment on account of a Critical Vendor Claim, the Debtors will have examined other options short of payment of Critical Vendor Claims and will have determined that, to avoid significant disruption of the Debtors' business operations, there exists no practical or legal alternative to payment of the Critical Vendor Claims.  Therefore, the Debtors believe that paying the Critical Vendor Claims will allow them to discharge their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

33.     Procedures substantially similar to the proposed Critical Vendor Payment Procedures have been authorized in other recent cases.  *See, e.g.*, *In re Hospital Acquisition LLC*, Case No. 19-10998 (BLS) (Bankr. D. Del. May 29, 2019) [D.I. 167]; *In re Promise Healthcare Group, LLC*, Case No. 18-12491 (CSS) (Bankr. D. Del. Dec. 4, 2018) [D.I. 216]; *In re ATD Corporation*, Case No. 18-12221 (KJC) (Bankr. D. Del. Oct. 5, 2018) [D.I. 102] (authorizing critical vendor payment procedures); and *In re Welded Construction, L.P.*, Case No. 18-12378 (KG) (Bankr. D. Del. Oct. 23, 2018) [D.I. 41] (same).

35380910.6 07/01/2019

**D.** **The Court Should Authorize Applicable Financial Institutions to Honor and Process Related Checks and Transfers.**

34.     The Debtors also request that all applicable banks and other financial institutions (the "**Banks**") be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, and (b) rely on the Debtors' designation of any particular check as approved by this Court's order.

<u>**REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY**</u>

35.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  As set forth above, the payments proposed in this Motion are essential to prevent potentially irreparable damage to the Debtors' operations, value, and ability to reorganize.  Accordingly, the Debtors submit that ample  cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it  applies.

<u>**BANKRUPTCY RULE 6003 IS SATISFIED**</u>

36.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  The Debtors require smooth coordination across their supply chain to ensure quality patient care and otherwise protect the

value of the Debtors' businesses as a going concern. To do so, the Debtors depend heavily on the goods and services provided by the Critical Vendors. Non-payment of Critical Vendor Claims could jeopardize patient health, patient safety, and these Chapter 11 Cases, exposing the Debtors to immediate and irreparable harm far in excess of the relief requested herein. Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

## RESERVATION OF RIGHTS

37.     Nothing contained in this Motion is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law. Likewise, if this Court grants the relief sought in this Motion, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## NOTICE

38.     The Debtors have provided notice of the filing of the Motion to: (i) the Office of the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Human Services; (xi) the City of Philadelphia; (xii) the Banks; and (xiii) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, notice of

this Motion and any order entered in connection with the Motion will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE, the Debtors respectfully request entry of the Interim Order, and pending a final hearing, the Final Order, granting the relief requested herein and such other and further relief as the Court may deem just and  proper.

Dated: July 1, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:  */s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Proposed Counsel for Debtors and Debtors in Possession*

35380910.6 07/01/2019