## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
|  | Joint Administration Requested |
| Debtors. | |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), by and through their proposed undersigned counsel, file this motion for entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1, 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). In support of

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**")[2] filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.      On June 30, 2019 and the date hereof (the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

3.      A description of the Debtors' businesses, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Declaration filed contemporaneously herewith.

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

355510918

**RELIEF REQUESTED**

4.      By this motion, the Debtors seek entry of an interim order substantially in the

form attached hereto as **Exhibit A** (the "**Interim Order**") and a final order (the "**Final Order**,"

and together with the Interim Order, the "**DIP Orders**") pursuant to sections 105, 361, 362, 363,

364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rules

2002-1, 4001-2, and 9013-1(m):

(i)      authorizing the Debtors to obtain postpetition financing on a superpriority basis through a senior secured credit facility (the "**DIP Facility**") consisting, in turn, of (a) a revolving loan facility of up to $50,000,000 (the "**DIP Revolver**") and (b) a $15,000,000 in principal term loan (the "**DIP Term Loan**," and together with the DIP Revolver, the "**DIP Loans**"), pursuant to the terms and conditions of that certain First Priority Secured Priming Superpriority Debtor in Possession Credit and Security Agreement, by and among the Debtors, as borrowers and guarantors, and MidCap Financial Trust, as administrative agent (in such capacity, the "**DIP Agent**") for and on behalf of itself and the other lenders party thereto (such lenders, collectively with the DIP Agent, the "**DIP Lenders**"), substantially in the form of **Exhibit B**, attached hereto (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**DIP Agreement**")[3];

(ii)     authorizing the Debtors to execute and deliver the DIP Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other Loan Documents (as defined in the DIP Agreement) and documents related thereto, including any security agreements, or notes (each as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Agreement and the DIP Orders, the "**DIP Documents**") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, on account of the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents (collectively, and including all "*Obligations*" as described in the DIP Agreement, the "**DIP Obligations**") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases, subject only to the Carve Out (as defined below);

---

[3]      The DIP Agreement will be filed with the Court as a supplement to this Motion. Pending the completion of the DIP Agreement, the Debtors have attached, as **Exhibit B**, a signed term sheet describing the principle terms of the proposed financing.

(iv)     granting to the DIP Agent, subject to the Carve Out, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), which liens shall be subject to the priorities described herein;

(v)     authorizing the Debtors to pay the interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable, to the extent provided in, and in accordance with, the DIP Documents;

(vi)     authorizing the Debtors to use the assets or property granted as collateral with respect to the Prepetition Credit Facility (as defined herein) (the "**Prepetition Collateral**"), including the Cash Collateral of MidCap (as defined herein) as Prepetition Lender (as defined herein) under the prepetition Loan Documents (as defined herein) and, solely in the event and to the extent that Prepetition Loan Obligations (as defined herein) remain outstanding, providing adequate protection (including payments of non-default interest monthly, payment of certain deferred origination fees, other fees, and professional fees and expenses in respect of the Prepetition Loan Obligations, granting of replacements liens in the Debtors' postpetition assets and superpriority liens, which liens shall be subject to the priorities described herein) to the Prepetition Lender for any diminution in value of its interests in the Prepetition Collateral, including Cash Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral ("**Diminution in Value**");

(vii)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order; and

(viii)     scheduling a final hearing (the "**Final Hearing**") within twenty-four (24) days of the Petition Date to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

## PREPETITION DEBT

## A.     The MidCap Prepetition Credit Facility

5.     Each of the Debtors, as well as certain non-debtor entities,[4] is a party to a Credit and Security Agreement dated January 11, 2018, which was subsequently amended on

---

[4]     The borrowers under the Prepetition Credit Agreement (as amended) are St. Christopher's Healthcare,

355510091.8

September 20, 2018 (as amended, the "**Prepetition Credit Agreement**"), with MidCap Funding IV Trust and MidCap Funding H Trust (together, "**MidCap**" or the "**Prepetition Lender**").  The Prepetition Credit Agreement provides for credit facilities consisting of: (i) a revolving loan facility of up to $100 million (the "**Prepetition Revolver**"); and (ii) a term loan facility of $20 million (the "**Prepetition Term Loan**" and, with the Prepetition Revolver, collectively, the "**Prepetition Credit Facility**").  As of the Petition Date, the principal amounts outstanding under the Prepetition Revolver and Prepetition Term Loan are approximately $38.6 million and $20 million, respectively.

6.     The Prepetition Credit Facility is secured by a security interest in substantially all of the Borrowers' assets, including accounts receivable.  Although, as of the Petition Date, the amount of the Debtors' net eligible accounts receivable is approximately $63.6 million, availability under the Prepetition Credit Facility is based on various formulas that take into account a host of factors and apply various reserves and blocks.  Non-Debtors PAHH and Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (together, the "**Broad Street Entities**")[5] have guaranteed the obligations of the Borrowers under the Prepetition Credit Facility. The Broad Street Entities' guarantees are secured by liens or mortgages on all their real estate and other assets.

7.     On or about May 8, 2019, MidCap sent the Debtors a Notice of Default and Reservation of Rights under the Prepetition Credit Facility, and imposed a default rate of interest

---

LLC, CCH, PAHS, Physicians Clinical Network, LLC,  Philadelphia Academic Medical Associates, LLC, HPS of PA, LLC, SCHC Pediatric Associates, LLC, St. Christopher's Pediatric Urgent Care Center, LLC, StChris Care at Northeast Pediatrics, LLC, SCHC Pediatric Anesthesia Associates, LLC, TPS of PA, LLC, TPS II of PA, LLC, TPS III of PA, LLC, TPS IV of PA, LLC, TPS V of PA, LLC and Physician Performance Network of Philadelphia, LLC (together, the "**Borrowers**").

[5]     As previously noted, one or more of these entities own the real estate where HUH is located.

355510091.8

thereunder.  This Notice was based on a number of alleged violations of the Prepetition Credit Facility, including the Debtors' alleged defaults to Tenet and Conifer under the TSA and MSA.

## THE DIP FINANCING AND USE OF PROCEEDS IS NECESSARY

**A.      Immediate Need for Postpetition Financing and Use of Cash Collateral**

8.      The Debtors' need to obtain credit pursuant to the DIP Facility is immediate and critical in order to ensure patient safety, serve patient needs, enable the Debtors to effectuate an orderly closure, subject to Court approval,[6] of Hahnemann University Hospital ("**HUH**"), continue operations at St. Christopher's Hospital for Children ("**STC**"), and to administer and preserve the value of their estates.  The events leading up to the Debtors' financial circumstances are more fully described in the First Day Declaration.  The Debtors do not have sufficient available sources of working capital and financing without the DIP Facility and authorized use  of Cash Collateral.  The DIP Lender is willing to provide necessary and adequate liquidity on the terms provided in the DIP Documents and the Interim Order.

**B.      Prepetition Efforts to Obtain Financing**

9.      Before agreeing to enter into the DIP Agreement, the Debtors, with the assistance of SSG Advisors, LLC ("**SSG**"), their investment banker, made inquiries into alternatives for financing and solicited proposals for debtor-in-possession financing from other financial institutions.  The Debtors and their advisors received two indicative term sheets prior to determining that the DIP Lender's proposal was highest or otherwise best.

**C.      No Credit Available on More Favorable Terms**

10.      The Debtors evaluated the prospective lenders and their proposals on a number of factors, including economic terms, impact on the Debtors' businesses, restrictions on the use of proceeds and the collateral and security packages requested.  Given their current financial

---

[6]      The Debtors are seeking Court approval to continue implementation of the closure plan by separate motion.

355510091.8

condition, financing arrangements and capital structure, the Debtors were unable to obtain financing from sources other than the DIP Lender on better terms than those reflected in the DIP Facility. Additionally, as the Debtors' prepetition secured lender, the DIP Lender is familiar with the Debtors, their businesses and their capital structure. This familiarity has enabled the DIP Lender to act more quickly and limit diligence risk, both of which are crucial in light the Debtors' critical need for liquidity.

11.     The Debtors are unable to obtain unsecured financing allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to the liens securing the Prepetition Credit Facility. Financing on a postpetition basis is not otherwise available without granting the DIP Lender (1) perfected security interests in and liens on all of the Debtors' existing and after-acquired assets with the priorities set forth in the Interim Order, (2) superpriority claims, and (3) the other protections set forth in the Interim Order.

**D.     Use of Proceeds of the DIP Facility**

12.     As a condition to entry into the DIP Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Lenders require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the Interim Order and the DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such variances as permitted in the DIP Agreement,

355510918

the "**Budget**" to be attached as **<u>Schedule 1</u>** to the Interim Order)[7], solely for: (a) the repayment in cash from the proceeds of the DIP Loans of $5 million of the Prepetition Term Loan and the conversion of the Prepetition Term Loan into the DIP Term Loan to the extent provided for in the Interim Order, the Final Order and the DIP Documents; (b) the payment from the proceeds of the DIP Loans to MidCap of origination fees totaling $1 million that were deferred under the Prepetition Credit Facility; (c) working capital; (d) permitted payment of costs of administering these Chapter 11 Cases and the Carve Out; (e) payment of such prepetition obligations as set forth in the Budget or otherwise approved by the DIP Lender and as approved by the Court; (f) payment of interest, fees, expenses and other amounts (including legal and other professionals' fees and expenses of the DIP Lender) owed under the DIP Documents; (g) payment of interest, fees, expenses and other amounts, including legal fees and other professionals' fees and expenses, owing in respect of the Prepetition Credit Facility; and (h) other general corporate purposes of the Debtors permitted by the Budget and the DIP Documents.

13.    The use of a portion of the DIP Facility proceeds for the repayment of the Prepetition Credit Facility, payment of deferred origination fees under the Prepetition Credit Facility, and conversion of the balance of the Prepetition Term Loan, are material components of the structure of the DIP Facility and were required by the DIP Lender as a condition to its commitment to provide postpetition financing.  Pursuant to the DIP Documents and Interim Order, the DIP Facility will "roll-up" the full  amount outstanding under the Prepetition Revolver and $5 million of the Prepetition Term Loan in addition to providing the Debtors with approximately $10 million in additional liquidity, subject to applicable minimum liquidity

---

[7]        As noted, the proposed Interim Order will be provided prior to the hearing on this Motion.  The Budget referred to above will be attached to the Interim Order.

355510091.8

reserves; provided, however that, only $3.75 million of liquidity will be available upon the entry of an Interim Order with the balance thereof deferred until the entry of Final Order, in each case subject to the limitations in the DIP Documents and satisfaction of all of the terms and conditions of the DIP Documents.  Because MidCap, in its capacity as Prepetition Lender, is oversecured, no detriment to the estates or creditors will result from the roll-up or from the conversion of the remaining balance of the Prepetition Term Loan into a postpetition loan in the same amount. Without access to the DIP Revolver, and the substantial additional liquidity thereunder, patient safety would be put at risk, the Debtors' orderly closure of HUH would be impossible, and the Debtors' other patient services and business would cease.  The DIP Loans will allow the Debtors to complete their restructuring objectives, including an orderly and appropriate closure of HUH.

## MATERIAL TERMS OF THE DIP FACILITY[8]

14.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the Debtors set forth significant elements of the DIP Facility, as follows:

---

[8]    This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents or the Interim Order, as applicable. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents, the provisions of the DIP Documents shall control, and the Interim Order shall control over the DIP Documents.

355510918

| Summary of Material Terms | |
|---|---|
| **Parties to DIP Agreement**<br><br>Term Sheet<br>Page 2 | <u>Borrowers</u>: Center City Healthcare, LLC; Philadelphia Academic Health System, LLC; St. Christopher's Healthcare, LLC; Philadelphia Academic Medical Associates, LLC; HPS of PA, L.L.C.; SCHC Pediatric Associates, L.L.C.; St. Christopher's Pediatric Urgent Care Center, L.L.C.; SCHC Pediatric Anesthesia Associates, L.L.C.; StChris Care at Northeast Pediatrics, L.L.C.; TPS of PA, L.L.C.; TPS II of PA, L.L.C.; TPS III of PA, L.L.C.; TPS IV of PA, L.L.C.; and TPS V of PA, L.L.C.<br><br><u>Guarantors</u>: Broad Street Healthcare Properties, LLC; Broad Street Healthcare Properties II, LLC; Broad Street Healthcare Properties III, LLC; Physicians Clinical Network, LLC; Physician Performance Network of Philadelphia, L.L.C.; and Philadelphia Academic Health Holdings, LLC<br><br><u>Agent</u>: MidCap Financial Trust<br><br><u>Servicer</u>:  MidCap Financial Services, LLC<br><br><u>Lenders</u>: MidCap Financial Trust |
| **DIP Facility**<br><br>Term Sheet<br>Page 2 | Senior secured, superpriority postpetition credit facility consisting, in turn, of (a) a revolving loan facility of up to $50,000,000 (the "**DIP Revolver**") and (b) a $15,000,000 in principal term loan (the "**DIP Term Loan**"). |
| **Interest Rate**<br><br>Term Sheet<br>Page 8 | <u>DIP Revolver</u>: 30-day LIBOR, 50 basis point floor, plus 425 basis points, reset monthly.<br><br><u>DIP Term Loan</u>: 30-day LIBOR, 50 basis point floor, plus 1,000 basis points, reset monthly. |
| **Fees**<br><br>Term Sheet<br>Page 9 | <u>Unused Line Fee</u>:  0.50% per annum of the average unused portion of DIP Revolver.<br><br><u>Collateral Management Fee</u>:  1.20% per annum on outstanding balance of DIP Revolver.<br><br><u>DIP Origination Fee</u>:  $500,00 (1.0% of Commitment Amount), payable  upon entry of initial funding of DIP Revolver.<br><br><u>Deferred HUH Origination Fee</u>:  $500,000, payable upon closing of DIP Facility.<br><br><u>Deferred STC Origination Fee</u>:  $500,000, payable upon closing of DIP Facility. |
| **Use of Proceeds**<br>Term Sheet<br>Page 3<br>Interim Order<br>¶6(g) | The Borrowers shall use all proceeds of DIP Loans and any Cash Collateral, and shall operate, strictly in accordance with the Budget attached as **<u>Schedule 1</u>** to the Interim Order, as the Budget may be modified and subject to permitted variances, in each case subject to the terms of the DIP Agreement |

355510918

| | |
|---|---|
| **Security**<br><br>Term Sheet<br>Page 10<br><br>Interim Order<br>¶8 | After the entry of the Interim Order and pursuant to and to the extent provided in the DIP Orders, the Obligations will be secured by, subject to the Carve Out: (a) valid first priority perfected and priming security interests and liens in and pledges of all assets of the Debtors; (b) valid, perfected and priming security interests, liens in and pledges of all assets of the Guarantors (other than Holdings); and (c) all proceeds and products of the foregoing (collectively, the "**DIP Collateral**").<br><br>All obligations secured by, subject to the Carve Out, a first priority, senior priming perfected lien on, and security interest in, the DIP Collateral whether, pursuant to section 364(d), subject to a valid duly perfected lien of any party or, pursuant to section 364(c), not subject to any valid, duly perfected lien of any party. |
| **DIP Collateral**<br>Term Sheet<br>Page 10<br>Interim Order<br>¶8 | All assets of the Debtors and all proceeds and products thereof. |
| **Superpriority Claim**<br>Term Sheet<br>Page 11<br>Interim Order<br>¶7 | Subject to the Carve Out, the DIP Liens shall be accorded superpriority status under section 364(c) of the Bankruptcy Code, including over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code. |
| **Termination Date**<br><br>Term Sheet<br>Page 4 | The earlier of (a) twelve (12) months from the date of closing or (b) the occurrence of a DIP Credit Facility Termination Event (as defined in the DIP Agreement). |
| **Conditions Precedent**<br><br>Term Sheet<br>Pages 13-14 | In addition to customary conditions, certain additional bankruptcy-related conditions, including:<br><br>• All orders entered in the Chapter 11 Cases shall be in form and substance satisfactory to the DIP Agent and its counsel;<br>• DIP Agent shall have reviewed and have no objection to all of the first day and other motions filed by the Debtors;<br>• Entry of the Interim Order in form and substance acceptable to the DIP Agent and granting to the DIP Agent the security interests and liens and superpriority administrative claims described above and modifying the automatic stay as provided herein. |

11

355510091.8

| | |
|---|---|
| **Milestones**<br><br>Term Sheet<br>Pages 7-8 | •       7/11/19 - Filing of motion to implement a discontinuation of services at HUH<br><br>•       8/7/19 – Filing of motion for authority to implement sales procedures for sale of the DIP Collateral, including the St. Christopher's Hospital Property<br><br>•       Fourteen (14) days after filing of Sales Procedure Motion – Entry of Sales Procedure Order<br><br>•       9/6/19 – Completion of the closure of HUH<br><br>•       9/27/19 – Deadline to receive one or more bids sufficient to indefeasibly pay in full, in cash, all amounts due and owing Lenders<br><br>•       10/2/19 – Auction for DIP Collateral, including the St. Christopher's Hospital Property<br><br>•       10/4/19 - Sale Hearing<br><br>•       10/14/19 – Sale closing; Repayment of DIP Facility |
| **Reporting**<br><br>Term Sheet<br>Page 12 | Loan Parties will deliver to the DIP Agent substantially similar to those required by the Prepetition Credit Agreement, including a line by line variance report for the preceding week and on a cumulative basis comparing actual and budgeted cash receipts and cash disbursements and other reporting reasonably requested by DIP Agent. |

355551091.8

| | |
|---|---|
| **Events of Default**<br><br>Term Sheet Pages 4-8 | In addition to customary events of default, the Term Sheet includes certain additional bankruptcy-related termination events, (DIP Credit Facility Termination Events), including:<br><br>a) the conversion of the Chapter 11 Case to a case under Chapter 7 or any filing by any Debtor requesting such relief;<br><br>b) the dismissal of the Chapter 11 Case or any filing by any Debtor requesting such relief;<br><br>c) appointment of a trustee or examiner;<br><br>d) the effective date of a Plan (as defined below) confirmed by a final order in the Chapter 11 Case;<br><br>e) failure of Borrowers to obtain the entry of the Final DIP Order on or before the date is thirty (30) days after the entry of the Interim Order;<br><br>f) any party in interest or other Person files a Motion for Reconsideration of, or appeals, the Final Order or seeks to modify the Final Order or if the Final Order is modified in any way not acceptable to Agent or the Final Order is vacated or if any party in interest or other Person takes action in contravention of or that is inconsistent with the Final Order;<br><br>g) if any person other than Agent is granted relief from the automatic stay in the Chapter 11 Case to take action that is adverse to the Agent, the Lenders or their respective Collateral under the DIP Loan Documents;<br><br>h) any Borrower (or any of its successors or assigns) filing a motion or application or adversary proceeding challenging the validity, enforceability, perfection or priority of any claim or lien securing or pertaining to the DIP Loan Documents and the DIP Facility evidenced thereby or the obligations evidenced thereby;<br><br>i) except (1) as agreed in writing by the Agent, (2) pursuant to motions or orders or arrangements approved by the Bankruptcy Court or effected and disclosed to the Agent prior to the date hereof, (i) any Debtor Borrower shall make, or file a motion seeking, or the Bankruptcy Court shall enter, an order approving, any prepetition payment, (ii) any Debtor Borrower shall file a motion seeking, or the Bankruptcy Court shall enter, an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets having a book value in excess of $10,000 in the aggregate, excluding relief from stay to set off prepetition deposits or to pursue insured claims against insurance companies to the extent such deposits or claims do not constitute Collateral, or (iii) any Debtor Borrower shall enter into or file a motion seeking approval of, or the Bankruptcy Court shall enter an order approving, any other settlement or other stipulation with any creditor of any Borrower, other than the Agent and the Lenders, or otherwise providing for payments as adequate protection or otherwise to such creditor;<br><br>j) if any Borrower's or Guarantor's Board of Directors shall authorize the liquidation of such Borrower's or Guarantor's business pursuant to one or more section 363 sales or otherwise or shall file any motion under section 363 of the Bankruptcy Code, other than as consented to by Agent and the Lenders;<br><br>k) if any Borrower or Guarantor shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under an interim order and/or the final order related to the DIP Facility;<br><br>l) any assumption or rejection of any executory contract without the prior written consent of the Agent that has a material adverse effect on Lenders;<br><br>m) the Borrowers or any Credit Party or any of their subsidiaries, shall seek, obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the Lenders relating to the DIP Facility or against the administrative agent or other holders of obligations under the Prepetition Credit Agreement, unless such suit or other proceeding is in connection with the enforcement of the Financing Documents against Agent or Lenders; |

355510091.8

| **Events of Default**<br><br>**Term Sheet Pages 4-7** | n) | the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the (i) any interim order or final order related to the DIP Facility, or any other order of the Bankruptcy Court affecting the DIP Loan Documents or the transactions contemplated thereby, in each case, in any manner not acceptable to Agent and the Required Lenders or (ii) a plan of liquidation to the extent such amendment, modification, reversal, revocation, issuance or supplement results in the obligations owing to the Agent and Lenders not being paid in full in cash on or before any liquidation effective date any obligations owing to the Agent and Lenders will not be paid in full in cash on or before any such liquidation effective date; |
|---|---|---|
| | o) | the filing of a motion, pleading, or proceeding by Debtor Borrower, or any of its Affiliates, that could reasonably be expected to result in a material impairment of the rights or interests of the Agent or any Lender; or a determination by the Bankruptcy Court or any other Governmental Authority with respect to a motion, pleading or proceeding brought by another party that results in a material impairment of the rights, claims and liens relating to the DIP Loan Documents and the DIP Facility and related obligations; |
| | p) | if any order of the Bankruptcy Court shall fail to provide for the payment in full, in cash of all Obligations owing under the Prepetition Credit Agreement and all obligations arising under the DIP Facility on or before the effective date of any liquidation or reorganization; |
| | q) | the circulation or distribution by or on behalf of the Borrowers of any plan of liquidation and/or disclosure statement, or draft thereof (or term sheet or similar indicative statements of terms thereof), that does not provide for repayment in full in cash of all Obligations owing under the Prepetition Credit Agreement (to the extent not already paid in full in cash) and all obligations arising under the DIP Facility on or before the effective date of any liquidation; |
| | r) | the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the DIP Facility provided hereunder or the Carve-Out, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code, pari passu or senior to the Obligations, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any lien on the Collateral having a priority senior to or pari passu with the liens and security interests granted to Agent, except as expressly consent to by Agent; |
| | s) | if there is a stay or injunction of any confirmation order precluding the consummation of the transactions contemplated by such confirmation order; |
| | t) | any lien securing or superpriority claim in respect of the obligations under the DIP Facility shall cease to be valid, perfected (if applicable) and enforceable in all respects or to have the priority described in the DIP Facility; |
| | u) | if a variance occurs with respect to aggregate expenditures in any week under the Budget in an amount exceeding ten percent (10%) without the prior written consent of Agent,; |
| | v) | notwithstanding the foregoing, any variance above the weekly professional fees set forth in the Budget; provided that any unused portion of the budgeted professional fees  can be used in a subsequent week of the Budget; |
| | w) | the failure, no later than ten days after the commencement of the Chapter 11 Cases of Debtor Borrowers to file a motion to implement a discontinuation of operations at the Hahnemann Project (as defined in the Prepetition Credit Agreement); |
| | x) | the failure, no later than September 6, 2019, for the HUH Closure (as will be defined in the Loan Documents) to be complete; |

355510091.8

| | |
|---|---|
| **Events of Default**<br><br>Term Sheet<br>Pages 4-7 | y)  the failure, no later than August 7, 2019, for Debtor Borrowers to file a motion for authority to implement sales procedures, that provide for the sale of the Collateral and St. Christopher's Hospital Property (as defined in the DIP Loan Documents), or a portion thereof, for cash at a price sufficient to indefeasibly pay in full all amounts due and owing to the Lenders (the "Sales Procedure Motion");<br>z)  the failure no later than fourteen days after the filing of the Sales Procedure Motion for an order approving the Sales Procedure Motion (the "Sales Procedure Order"), which shall provide for a reserve price sufficient to pay in full all amounts due and owing to the Lenders to be approved by the Bankruptcy Court;<br>aa) the failure to receive one or more bids under the Sales Procedure Order on or before September 27, 2019, each of which bid or bids is sufficient to indefeasibly pay in full, in cash, all amounts due and owing Lenders;<br>bb) the failure of the Sales Procedure Order to provide that an auction in respect of the Collateral and the St. Christopher's Hospital Property, or a portion thereof (the "Auction") shall be conducted on or before October 2, 2019;<br>cc) the failure of the Auction to be conducted on or before October 2, 2019;<br>dd) the failure of a hearing approving the results of the Auction to be held on or before October 4, 2019;<br>ee) the failure no later than October 4, 2019 for entry of an Order approving the sale of the Collateral and St. Christopher's Hospital Property for a price sufficient to pay in full all amounts due and owing to Lenders; and<br>ff) the failure to repay the DIP Credit Facility and any other prepetition or post-petition Obligations to Agent and Lenders, through the sale of the Borrowers' business or on a refinancing of such Obligations on or before October 14, 2019. |
| **Carve-Out**<br><br>Term Sheet<br>Page 9<br><br>Interim Order<br>¶7(b) | The DIP Liens, the DIP Superpriority Claim, the liens and security interests securing the "Obligations" as defined in the Prepetition Credit Agreement (such obligations, the "**Prepetition Obligations**"), the Prepetition Replacement Liens, and the Prepetition Superpriority Claims will be subordinate to the following (collectively, the "**Carve-Out**"):<br>(a)  allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee (collectively, the "**U.S. Trustee Fees**"); and<br><br>(b)  to the extent allowed, whether by interim or final order, or Bankruptcy Court authorized procedures for payment of interim compensation, all accrued professional fees (the "**Allowed Professional Fees**") incurred by (i) persons or firms retained by the Debtors pursuant to sections 327 or 328 of the Bankruptcy Code (the "**Debtors' Professionals**") and (ii) persons or firms retained pursuant to section 328 or 1103 of the Bankruptcy Code by any Committee(s) appointed pursuant to section 1102 of the Bankruptcy Code ("**Committee(s) Professionals**") and in either case not yet paid at or prior to the time of the Carve-Out Trigger, and with respect to clauses (i) and (ii), such aggregate amount of Allowed Professional Fees not to exceed $2,500,000. |

355510918

| | |
|---|---|
| **Challenges**<br><br>Interim Order<br>¶12 | The stipulations and admissions contained in the Interim Order, including without limitation, in paragraph 4 of the Interim Order, shall be binding upon all parties in interest (including any Committee) under all circumstances and for all purposes unless (a) any party-in-interest (including any Committee) that successfully seeks and obtains standing to do so has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including without limitation, in this paragraph 12) by no later than (i) in the case of a party in interest with requisite standing other than a Committee, seventy-five (75) days after entry of the Interim Order, or (ii) in the case of a Committee, sixty (60) days after the filing of notice of appointment of the Committee); provided, however, that if, prior to the end of the challenge period, the cases convert to chapter 7, or if a chapter 11 trustee is appointed, the trustee shall have the later of the remaining challenge period or 10 days |
| **Cross-Collateralization**<br><br>Term Sheet<br>Page 10<br><br>Interim Order<br>¶8 | As noted above, the Debtors will apply proceeds from the DIP Facility towards repayment of the Prepetition Credit Facility.  In addition, as noted above, both the revolving and term loan components of the DIP Facility will be secured by valid Bankruptcy Court-authorized first priority perfected and priming security interests and liens in and pledges of all assets of the Debtors, subject to the Carve Out. |
| **Indemnification**<br>Term Sheet<br>Page 14 | The Borrowers shall indemnify the Lenders and Agent and all agents and sub-agents thereof (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any of the Debtors arising out of, in connection with, or as a result of the execution or delivery of the DIP Credit Agreement, any other DIP Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder, the consummation of the transactions contemplated thereby, or the administration of the DIP Credit Agreement, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee |

## **HIGHLIGHTED PROVISIONS UNDER LOCAL RULE 4001-2(a)(1)**

15.    The Interim Order will include certain terms that constitute material provisions requiring explicit disclosure under the Local Rules.[9]    The following provisions described in Local Rule 4001-2(a)(i), to the extent applicable, will be included in the Interim Order:

      a.    **Local Rule 4001-2(a)(i)(A) – Cross Collateralization.** The DIP Orders provide for cross collateralization in that both the revolving and term components of the DIP Facility will be secured by postpetition liens on all of the Debtors' assets. *See* Interim Order, ¶8.

---

[9]    While the Debtors have attempted to highlight the provisions required by the Bankruptcy Rules and  Local Rules, as well as certain other material provisions, the Debtors reserve the right to supplement this list at the hearing to consider this Motion on an interim basis.

355510091.8

b.     **Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens**. The DIP Orders contain stipulations regarding the validity, perfection, and amount of the Prepetition Lenders' liens. *See* Interim Order, ¶4.

c.     **Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.** The DIP Orders contain a waiver of the provisions of section 506(c) of the Bankruptcy Code. *See* Interim Order, ¶15.

d.     **Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.** The DIP Orders do not contain a grant of any liens on avoidance actions; however, the DIP Lender reserves the right to seek liens on avoidance actions in the event of any Event of Default under the DIP Credit Facility.

e.     **Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.** The Prepetition Revolver will be rolled-up and exchanged for the DIP Revolving Loan, and the balance of the Prepetition Term Loan will be converted and deemed to be a postpetition DIP Term Loan. *See* Interim Order, ¶6.

f.     **Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee.** The Interim Order contains no provisions that provide for disparate treatment for professionals retained by a creditors' committee, if any, with respect to the Carve-Out. *See* Interim Order, ¶7(a).

g.     **Local Rule 4001-2(a)(i)(G) – Non-Consensual Priming.** The Interim Order does not provide for non-consensual priming of any existing lien.

h.     **Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.** The DIP Orders provide that the Agent will not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral (*see* Interim Order, ¶15), and further contains the following  provisions affecting the Court's power to consider the equities of the case:

"Limitation on Use of DIP Loans, DIP Collateral and Prepetition Collateral. The Debtors shall use the DIP Facility and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Interim Order and the DIP Documents. Notwithstanding anything herein or in any other order of this Court to the contrary, no DIP Facility, no DIP Collateral, no Prepetition Collateral (including the Cash Collateral) nor the Carve-Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Documents or the liens or claims granted under this Interim Order, the DIP Documents, the

355510091.8

Prepetition Documents, (b) assert any claims, defenses or any other causes of action against the Agent, the Lenders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Agent's or Prepetition Agent's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Documents or this Interim Order, (d) seek to modify any of the rights granted to the Agent or the Lenders hereunder or under the DIP Documents or the Prepetition Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents. As long as any portion of the DIP Obligations or the Prepetition Obligations remains unpaid, or any of the DIP Documents or Prepetition Financing Documents remain in effect, the Debtors shall not request, and the Bankruptcy Court will not enter any Order approving or authorizing (under Bankruptcy Code §§105 or 364, or otherwise) (i) the granting of any lien or security interest in any of the Collateral in favor of any party other than Agent, or (ii) the obtaining of credit or the incurring of indebtedness that is entitled to super-priority administrative status, in either case equal or superior to that granted to Agent pursuant to this Order, unless, in connection with any transaction cited in clause (i) or (ii) of this Paragraph, such request by the Debtors seeks to authorize and direct and such Order requires that the full amount of the Obligations and the Prepetition Obligations shall first be paid indefeasibly and in full."

*See* Interim Order, ¶13.

## **ADEQUATE PROTECTION**

16.      In consideration of the Diminution in Value of their interests in the Prepetition Collateral as a result of the granting of and subordination to the DIP Liens and security interests, subordination to the Carve Out, the Debtors' use of Cash Collateral, and other decline in value arising out of the imposition of the automatic stay or the Debtors' use, sale, depreciation, or disposition of such, the Prepetition Lender shall receive adequate protection in the form of—

i.      The roll-up described above;

ii.      valid, enforceable, fully perfected security interests in and replacement liens on the DIP Collateral, subordinate only to the DIP Liens and subject to the Carve out (the "**Adequate Protection Liens**");

18

      iii.     monthly payments of interest at the non-default rate of interest, certain deferred origination fees, other fees and expenses and professional fees and expenses, with respect to the Prepetition Credit Facility (the "**Adequate Protection Payments**"); and

      iv.     to the extent of the diminution in the value of the prepetition Cash Collateral, a superpriority claim under sections 503 and 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or after arising, provided, however, that such superpriority claim shall be junior and subject to the superpriority claim of the DIP Agent for the benefit of the DIP Lenders in respect of the DIP Facility and the Carve-Out (the "**Adequate Protection Superpriority Claims**").

17.     The foregoing adequate protection liens shall be deemed automatically perfected as of the Petition Date without further action.

18.     The provisions of the DIP Facility and the Interim Order were extensively negotiated and, under the present circumstances, are the most favorable that the Debtors were able to negotiate. The DIP Facility enables the Debtors to obtain financing necessary to maintain patient care and implement their restructuring objectives, including a sale or reorganization with respect to SCH and an orderly closure of HUH.

## **BASIS FOR RELIEF REQUESTED**

### I.     The Court Should Authorize the Debtors to Provide Adequate Protection to the Prepetition Lender

19.     The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part:

> the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

355510091.8

20.     To the extent any prepetition secured creditor has a lien on a debtor's assets and does not consent to the debtor's use of those assets, such creditor must be adequately protected. The propriety of adequate protection is determined on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Grp (In re Swedeland Dev. Grp)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

21.     Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus.,* 58 B.R. at 736; *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

22.     Adequate protection is not expressly defined in the Bankruptcy Code. Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection.  The flexibility provided by section 361 provides the Court with discretion in fashioning the protection provided to a secured party.  *See Resolution Trust (In re Swedeland)*, 16 F.3d at 564. Adequate protection may be provided through a "replacement lien" or "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. *See* 11 U.S.C. § 361(2), (3).

23.     The Debtors are providing the Prepetition Lender with adequate protection for their consent to the priming liens as follows: by the provision of Adequate Protection Liens,

355510091.8

Adequate Protection Superpriority Claims, and the provisions of the Adequate Protection Payments. The Debtors believe that this form of adequate protection reasonably balances the Debtors' need to use the Prepetition Collateral and the Prepetition Lender's right to adequate protection under the Bankruptcy Code. As a result, the Debtors submit that the proposed terms of the Debtors' use of Prepetition Collateral should be approved in their entirety.

## II.     Entering into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment

24.     The Court should authorize the Debtors to enter into the DIP Documents and obtain access to the DIP Facility and the Cash Collateral as an exercise of the Debtors' sound business judgment.

25.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See In re Estrada*, 16- 80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be

355510091.8

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

26.     Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

27.     The Debtors' execution of the DIP Documents is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Petition Date, the Debtors and their advisors undertook a thorough investigation as to the Debtors' projected financing needs during the pendency of any chapter 11 case, and determined that the Debtors would require postpetition financing to support their operational and restructuring activities. Significantly, the Debtors determined that they required substantial additional liquidity to maintain operations while implementing an orderly closure plan for HUH that ensures the continued provision of patient care and the protection of patients throughout the closure. Accordingly, the Debtors negotiated the DIP Facility with the DIP Lenders in good faith, at

355510091.8

arm's-length, and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to the Debtors and their restructuring objectives.

28.     The Debtors and their advisors have determined in their sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative.  As noted above, the DIP Facility will provide the Debtors with access to the necessary liquidity, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations and restructuring objectives through the pendency of the Chapter 11 Cases.  Additionally, the DIP Facility provides the Debtors with access to existing Cash Collateral, which preserves the status quo and relieves the Debtors of the cost of borrowing additional amounts to replace that cash. Thus, the Debtors submit that entering into the DIP Documents constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

## III.    The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured, Priming and Superpriority Basis

29.     The Debtors are authorized to operate their businesses under section 1108 of the Bankruptcy Code. As part of that operation, the Debtors may incur unsecured debt in the ordinary course of business.  11 U.S.C. § 364(a).  The Bankruptcy Code offers a debtor in possession additional flexibility to the extent it needs additional credit, but cannot obtain such credit on unsecured terms. Section 364 of the Bankruptcy Code provides a progression of various protections to induce a postpetition lender to extend credit to a debtor in possession. Specifically, a postpetition lender can be granted a superpriority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property.  11 U.S.C. § 364(c), (d).

30.     The business necessity for obtaining the DIP Facility is described above.   The Debtors believe, in the reasonable exercise of their business judgment, that they need the additional liquidity provided by the DIP Facility to address the added expense of operating their businesses while in chapter 11 and the substantial costs of safely implementing the closure plan for HUH.

31.     Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is not available.   *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).   This is true especially when time is of the essence. *See, e.g., id.; In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987).   Here, as described in the First Day Declaration, the Debtors searched for debtor-in-possession financing on the most favorable terms.   The Debtors submit that the terms and conditions of the DIP Facility are fair, reasonable and consistent with market terms.   Further, given the regulatory complexity of the Debtors' healthcare business, and the DIP Lenders' experience in working with and financing the Debtors' prepetition operations, the Debtors believe that the DIP Facility provides its needed financing on the most favorable terms.

32.     As a condition to extending the DIP Facility that the Debtors need, the DIP Lenders require the protections contained in subsections 364(c) and (d) of the Bankruptcy Code, as well as the cross-collateralization features of the DIP Facility, which the facts in these Chapter 11 Cases support.   Specifically, upon entry of the Interim Order, the DIP Agent, on behalf of itself and the DIP Lenders will be granted, pursuant to section 364(c)(l) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases for all DIP Obligations: (a) subject only to the Carve Out, having priority over any and all

administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

33.    The DIP Facility provides the funding needed for the Debtors to successfully emerge from chapter 11.  Without the DIP Facility, the Debtors would be unable to implement an orderly closure of HUH or continue operations at STC.  Preservation of value generally constitutes the "adequate protection" needed to prime existing liens.  *See, e.g., Norton, et al., 2 Norton Bankruptcy Law and Practice 3d. § 45:7* (2008) (addressing the § 364(d) determination, and providing that "[f]actors influencing a court's decision will be the viability of the debtor's business and the need to protect assets against a sharp decline in value"); *Bray (In re Snowshoe Co. Inc.)*, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (finding that funds from lender given "priming" lien used to improve collateral will be transferred into value "[that] will serve as adequate protection. . . ."); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).  In any event, the only parties of which the Debtors are aware whose liens are being primed are the Prepetition Lenders, and they have consented to the priming lien to preserve the going concern value of their collateral.  The Debtors believe that the provisions of the DIP

25

Facility are appropriate in light of, among other factors, the significant and immediate additional liquidity that the DIP Facility provides.

**IV.     The Repayment Feature of the DIP Facility is Appropriate**

34.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 1.43 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 61.2, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

35.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements. Courts in this jurisdiction have approved similar DIP features, including on the first day of the case. *See, e.g., In Re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90

26

million DIP that included a full ABL roll-up of approximately $22 million prepetition debt pursuant to interim order); *In re Real Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP and a roll-up of approximately $250 million. prepetition debt, including a full ABL roll-up of $215 million, pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included a full roll-up of approximately $144 million prepetition debt pursuant to interim order).

36.    The DIP Facility will "roll-up" the full amount outstanding under the Prepetition Revolver and a portion of the Prepetition Term Loan, in addition to providing the Debtors with approximately $10 million in additional liquidity.  Pursuant to the Interim Order, approximately $38.6 million owed to the Prepetition Lender under the Prepetition Revolver will be "rolled-up" into the DIP Obligations, and $5 million will be repaid toward the Prepetition Term Loan (with the balance of the Prepetition Term Loan restated as the DIP Term Loan).  As stated above, the roll-up of the Prepetition Credit Facility is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing.  Without continued access to the DIP Revolving Loan and the approximately $10 million in incremental liquidity to fund operations and the administration of these Chapter 11 Cases, patient safety would be jeopardized, the Debtors' businesses would cease and they would likely be forced to liquidate – without the ability to first implement an appropriate and orderly closure of HUH.

355510091.8

37.     The conversion of the remaining balance owed under the Prepetition Term Loan into the DIP Term Loan was also a requirement of the DIP Lenders, allowing the Debtors to implement their restructuring objectives.  In addition, the conversion has no material impact on recovery to other creditors because the Debtors believe that these obligations are fully secured by perfected, first priority liens on substantially all of the Debtors' assets, with a value in excess of outstanding borrowings, such that the Debtors are merely exchanging one oversecured debt for another and on similar economic terms.  Due to the senior priority of the Prepetition Lenders' loans, they are likely to receive a full recovery on their prepetition claims in any event.  Thus, after careful consideration of all available alternatives, the Debtors have determined that conversion of the Prepetition Term Loan into DIP Obligations is necessary to obtain access to the liquidity necessary to preserve the value of their business and implement a closure plan for HUH, for the benefit of all stakeholders.

38.     The roll-up of the Prepetition Credit Facility merely affects the timing, not the amount or certainty, of the Prepetition Lender's recovery—the secured claims arising as a result of the Prepetition Credit Facility are required to be fully satisfied before recoveries to junior creditors may be provided, absent consent of such secured parties (which consent the Debtors do not have here).

39.     Given these circumstances, repayment of the Prepetition Revolver and conversion of the balance of the Prepetition Term Loan into the DIP Facility is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

## **REQUEST FOR WAIVER OF STAY**

40.     Under Federal Rule of Bankruptcy Procedure 6003, the Court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose

355510918

before the filing of the petition" within 21 days after the chapter 11 case's commencement to the extent "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003. Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as set forth in the First Day Declaration, and relief on an interim basis is therefore appropriate under Federal Rule of Bankruptcy Procedure 6003, if applicable.

41.    To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## NOTICE

42.    The Debtors have provided notice of the filing of the Motion to: (i) the Office of the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Human Services; (xi) the City of Philadelphia; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, notice of this Motion and any order entered in connection with the Motion will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

355510091.8

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order, and pending a final hearing, the Final Order, granting the relief requested herein and such other and further relief as the Court may deem just and  proper.

Dated: July 1, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By:*/s/  Aaron S. Applebaum*

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Proposed Counsel for Debtors and
Debtors in Possession*

355510918