**Exhibit A**

**<u>Proposed Interim Order</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, | ) | |
| *et al.*,[1] | ) | Joint Administration Requested |
| | ) | |
| Debtors. | ) | |
| | ) | |

**INTERIM ORDER UNDER 11 U.S.C. §§105, 361, 362, 363(C), 363(D), 364(C), 364(D), 364(E) AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014; (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(B) AND 4001(C)**

This matter comes before the Court pursuant to the motion (the "Motion") dated July 1, 2019 of Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases") commenced on June 30, 2019 and July 1, 2019 (the "Petition Date") pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

"Bankruptcy Rules"), Rule 4001(b) and (c) of the Local Bankruptcy Rules for the United States

Bankruptcy Court for the District of Delaware (this "Court"), seeking, among other things:

**I. Postpetition Financing**

(A)     authorization for the Debtors to obtain up to $65,000,000 in senior secured super-

priority debtor-in-possession financing (the "DIP Facility"), from MidCap Funding Financial

Trust, as Agent (together with its successors and assigns, "Agent") and as a Lender and the

additional financing institutions from time to time party thereto (collectively, the "Lenders")

consisting of (i) a revolving facility in the aggregate principal amount of $50,000,000 (of which

an additional $3,750,000,000 would be made available upon entry of the Interim Order, subject

to any applicable limitations in the DIP Agreement as defined below, including, without

limitation, Borrowing Base limitations) (the "DIP Revolving Facility," and all extensions of

credit under the DIP Revolving Facility, the "DIP Revolving Loans") (**IT BEING**

**UNDERSTOOD AND AGREED THAT IN NO EVENT SHALL THE AGGREGATE**

**OUTSTANDING PRINCIPAL BALANCE OF THE DIP REVOLVING LOANS EXCEED**

**AT ANY TIME THE REVOLVING LOAN LIMIT**) and (ii) a term loan facility in the

principal amount of $15,000,000 (the "DIP Term Loan Facility"; all extensions of credit under

the DIP Term Loan Facility, the "DIP Term Loan" and, together with the DIP Revolving Loans,

the "DIP Loans") on the terms and conditions set forth in:

(i)     this interim order (this "Interim Order");

(ii)     that certain First Priority Secured Priming Super-Priority Debtor In Possession

Credit And Security Agreement, substantially in the form annexed to this Order as Exhibit 1

among the Debtors, Agents and Lenders (as such agreement may be amended, restated,

supplemented or otherwise modified from time to time, the "DIP Credit Agreement", and

35559484.4

together with any exhibits attached thereto and other agreements related thereto, including all notices, guarantees, security agreements, related or ancillary documents and agreements, and any mortgages contemplated thereby, including those entered into by Physicians Clinical, Network, LLC, Physician Performance Network of Philadelphia, L.L.C., Philadelphia Academic Health Holdings, LLC., Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (collectively the "non-Debtor Guarantors") (or any of them) (the "DIP Documents");

(B)     authorization for the Debtors to execute and deliver the DIP Documents and to perform all other and further acts as may be necessary or appropriate in connection therewith;[2]

(C)     authorization for the Debtors to use Cash Collateral and an advance of $3,750,000 (the "Interim Advance Amount") in loan proceeds resulting from the reduction of the existing Liquidity Reserve in the Borrowing Base as set forth in the DIP Documents and in accordance with the budget annexed hereto as Exhibit 2 (the "DIP Budget") to avoid immediate and irreparable harm;

(D)     authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(E)     authorization for the Debtors to (a) use proceeds of the initial borrowing under the DIP Facility as required pursuant to the DIP Credit Agreement to repay the Prepetition Obligations (as defined in paragraph 4 below) arising under the Credit and Security Agreement,

---

[2]     Terms not otherwise defined in this Order shall have the meaning ascribed to them in the DIP Credit Agreement.

35559484.4

dated as of January 11, 2018 (as amended, supplemented or otherwise modified prior to the Petition Date, the "Prepetition Credit Agreement") (but excluding, for purposes of this clause (a) only, $15,000,000 of the Term Loan (as defined in the Prepetition Credit Agreement, the "Prepetition Term Loan") and together with all security, pledge, mortgages and guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified prior to the Petition Date, the "Prepetition Financing Documents"), among each of the Debtors in their respective capacities as borrowers thereunder, the Lenders party thereto from time to time and MidCap Funding IV Trust, successor-by-assignment to MidCap Financial Trust, as Agent, and (b) to reaffirm and roll over the remaining Prepetition Term Loan pursuant to the terms of the DIP Credit Facility at such time as Agent is able to obtain loan title insurance policies in form and substance acceptable to Agent encumbering the Broad Street Mortgages (as defined in the Prepetition Credit Agreement) which title insurance shall be substantially identical to the title insurance policies currently in place with respect to the Prepetition Credit Agreement;

(F)     authorization for the Debtors to grant security interests, liens, and superpriority claims to the Agent, for the ratable benefit of itself and the Lenders, to secure the Debtors' obligations under and with respect to the DIP Facility (the "DIP Obligations");

(G)     authorization for the Debtors to use proceeds of the DIP Facility in accordance with, for the purposes of, and in the amounts set forth in, the DIP Budget, subject to a permitted Variance of not more than ten percent (10%) with respect to aggregate expenditures, provided, however, that payment of professionals may not exceed the weekly line item amount set forth in the DIP Budget and provided, further, that any unused portion of the weekly budgeted professional fees can be used in a subsequent week of the DIP Budget (each as defined in the

35559484.4

DIP Credit Agreement) (**IT BEING UNDERSTOOD AND AGREED THAT WHILE THE DIP BUDGET REFLECTS NEGATIVE AVAILABILITY UNDER THE DIP FACILITY BEGINNING IN SEPTEMBER, 2019,  AGENT AND LENDER SHALL NOT PERMIT THE AGGREGATE OUTSTANDING PRINCIPAL BALANCE OF THE DIP REVOLVING LOANS TO EXCEED AT ANY TIME THE REVOLVING LOAN LIMIT**);

## II.  Use of Collateral

(A)      authorization for the Debtors to use the Cash Collateral[3]  pursuant to sections 361, 362 and 363 of the Bankruptcy Code, in accordance with the DIP Budget;

(B)      authorization for the Debtors to use all Prepetition Collateral (as defined in paragraph 4(b) below);

## III.      Adequate Protection

(A)      authorization for the Debtors to provide adequate protection to the DIP Lenders in accordance with the DIP Budget to, among other things, make the Adequate Protection Payments (as defined below);

(B)      authorization for the DIP Lenders to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement);

(C)      authorization for the Debtors to perform their obligations under, and pay the deferred fees set forth in the Fee Letters relative to the Prepetition Financing Documents;

(D)      subject to entry of the Final Order (as defined in clause (V) below), authorization for the Debtors to grant liens to the Agent and the Lenders on the proceeds of the Debtors'

---

[3] " Cash Collateral" shall have the meaning assigned to the term "cash collateral" under Bankruptcy Code section 363(a), and consists of the Debtors' cash in which the Agent and Lenders have an interest to secured the Obligations as that term is defined in the Prepetition Credit Agreement.

35559484.4

claims and causes of action, excluding any claims and causes of action arising under chapter 5 of the Bankruptcy Code (collectively, the "Causes of Action");

(E)    authorization for the Debtors to waive their rights, if any, to surcharge the DIP Collateral as defined in paragraph 8 below pursuant to section 506(c) of the Bankruptcy Code;

(F)    subject to certain challenge rights of parties in interest, approval of certain stipulations by the Debtors with respect to the Prepetition Financing Documents and the liens and security interests arising therefrom;

## IV.    Certain Modifications and Waivers

(A)    modification of the automatic stay under Bankruptcy Code section 362 on the terms and conditions set forth herein to the extent necessary to implement and effectuate the terms of the DIP Documents and the DIP Orders (as defined below);

(B)    waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order, including under Bankruptcy Rule 6004;

## V.    Final Hearing

the scheduling of a final hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held within twenty-eight (28) days of the entry of this Interim Order for this Court to consider entry of a final order authorizing and approving on a final basis the relief requested in the Motion (the "Final Order", and together with the Interim Order, the "DIP Orders").

The interim hearing on the Motion having been held by this Court on July 2, 2019 (the "Interim Hearing"), and upon the pleadings and declarations filed with the Bankruptcy Court, the evidence presented at the Interim Hearing and the entire record of the Chapter 11 Cases; and there being no objections to the relief sought in the Motion that have not been withdrawn,

35559484.4

waived, settled, or resolved; and the Bankruptcy Court having noted the appearances of the parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and the Debtors' estates and creditors; and the Debtors having provided notice of the Motion as set forth in the Motion, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      <u>Approval of Motion</u>. The relief requested in the Motion is granted on an interim basis, subject to the terms and conditions set forth in this Interim Order.  This Interim Order shall become effective immediately upon its entry.  To the extent the terms of the DIP Documents or the Motion differ in any respect from the terms of this Interim Order, this Interim Order shall control.

2.      <u>Jurisdiction</u>. This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      <u>Notice</u>. Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on (i) the Office of the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Agent; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Human Services; (xi) the City of Philadelphia; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing complies

35559484.4

with Bankruptcy Rules 4001(b) and (c) and 9014, Bankruptcy Code section 1514 and applicable Local Rules.

4.    <u>Debtor Stipulations</u>. Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraph 12 below), the Debtors admit, stipulate, acknowledge and agree that:

(a)    *Prepetition Indebtedness.* As of the Petition Date, the Debtors and the non-Debtor Guarantors were truly and justly indebted and liable to Agent and Lenders under the Prepetition Financing Documents, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $58.5 million in respect of loans and other extensions of credit made pursuant to the Prepetition Financing Documents, plus accrued and unpaid interest thereon and any fees and expenses (including fees and expenses of attorneys) related thereto, to the extent provided in the Prepetition Financing Documents, plus all other outstanding amounts that would constitute Obligations under and as defined in the Prepetition Credit Agreement (collectively, the "<u>Prepetition Obligations</u>"). The aggregate value of the Prepetition Collateral exceeds the aggregate amount of the Prepetition Obligations.

(b)    *Prepetition Liens and Collateral.*    As more fully set forth in the Prepetition Financing Documents, the Debtors granted liens and security interests to Agent (for the ratable benefit of the Lenders) to secure the Prepetition Obligations (the "<u>Prepetition Liens</u>") in the Collateral, as that term is defined in the Prepetition Financing Documents (the "<u>Prepetition Collateral</u>"), which liens and security interests are (i) valid, binding, perfected, and enforceable first priority liens on and security interests in the Prepetition Collateral[4], (ii) not subject to

---

[4]    The terms "Prepetition Liens" and "Prepetition Collateral" are defined by reference only to assets and property of the Debtors (and liens thereon), and therefore, the terms Prepetition Liens and Prepetition Collateral exclude

35559484.4

avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or other applicable law, and (iv) subject and subordinate only to liens permitted by section 546(b) of the Bankruptcy Code to the extent such liens are senior to the liens securing the Prepetition Obligations;

(c)     *Guarantor Liens.* The liens and security interests granted to the Agent (for the ratable benefit of the Lenders) by the non-Debtor Guarantors party to or otherwise obligated under the Prepetition Financing Documents to secure the Prepetition Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the Prepetition Financing Documents) liens on and security interests in such non-Debtor Guarantors' personal and real property constituting Collateral (as defined in the Prepetition Credit Agreement), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or other applicable law, and (iii) subject and subordinate only to liens and security interests granted to Agent and Lenders pursuant to the terms of the DIP Documents;

(d)     *Claims Waiver.* The Debtors do not have any claims, counterclaims, causes of action, defenses, setoff rights or entitlements to equitable relief related to the Prepetition Collateral, whether arising on or prior to the date hereof, under the Bankruptcy Code, other applicable insolvency law, or applicable non-insolvency law, against the Agent and Lenders and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors.

(e)     *Lien Validity.* The Debtors hereby waive and release any right to, and shall be forever barred from any attempt to object to, challenge or seek to avoid, the amount, validity, or

---

any assets or property of any  non-Debtor affiliate of any Debtor that may be pledged.as collateral (and liens thereon).

35559484.4

enforceability of the Prepetition Obligations or Agent's and Lenders' liens and security interests in the Prepetition Collateral securing the Prepetition Obligations.

5. <u>Findings Regarding the DIP Facility, Use of Cash Collateral, and Adequate Protection</u>.

(a) Good cause has been shown for the entry of this Interim Order.

(b) In consideration of the Diminution in Value of their interests in the Prepetition Collateral as a result of the granting of and subordination to the DIP Liens and security interests, subordination to the Carve Out, the Debtors' use of Cash Collateral, and other decline in value arising out of the imposition of the automatic stay or the Debtors' use, sale, depreciation, or disposition of such, the Prepetition Lender shall receive adequate protection effective as of the commencement of the Cases in the form of: (i) the roll-up described herein; (ii) valid, enforceable, fully perfected security interests in and replacement liens on the DIP Collateral, subordinate only to the DIP Liens and subject to the Carve-Out (the "<u>Adequate Protection Liens</u>"); monthly payments of interest at the non-default rate of interest, certain deferred origination fees, other fees and expenses and professional fees and expenses, with respect to the Prepetition Credit facility (the "<u>Adequate Protection Payments</u>"); and, to the extent of diminution in the value of the Prepetition Cash Collateral, a super priority claim under sections 503 and 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or after arising, *provided, however,* that such superpriority claim shall be junior and subject to the Superpriority Claim of the DIP Agent for the benefit of the DIP Lenders in respect of the DIP Facility and the Carve-Out   (the "<u>Adequate Protection Superpriority Claims</u>").

(c)      The Debtors have an immediate need to directly or indirectly obtain the DIP Facility and to use the Prepetition Collateral, including the Cash Collateral, in order to, among other things, ensure patient safety, permit the orderly continuation of their businesses, implement the closure of HUH, preserve the going concern value of the Debtors and their non-Debtor affiliates, make payroll, maintain business relationships with vendors and suppliers, and satisfy other working capital and general corporate purposes of the Debtors (including costs related to the Cases) and repay in full the Prepetition Obligations, a critical step to permit the Debtors to obtain this financing.

(d)      Repayment of the Prepetition Obligations to the extent provided for herein with the initial proceeds of the DIP Facility is appropriate because (i) the aggregate value of the Prepetition Collateral securing the Prepetition Obligations exceeds the aggregate amount of the Prepetition Obligations, and (ii) it is a condition to closing under the DIP Credit Agreement that the initial proceeds of the DIP Loan be used to repay the Prepetition Obligations to the extent provided herein so that the Debtors' assets that secure the Prepetition Obligations on a first lien basis will be available to secure on a first lien basis the DIP Facility; provided, however, that due to unforeseen circumstances relating to the Philadelphia County Recorder of Deeds, the DIP Term Loan will be added to the DIP Facility by way of amendment or amendment and restatement (in either case, the "DIP Term Loan Amendment") and the remaining principal balance of the Prepetition Term Loan will be deemed repaid in full upon entry into the DIP Term Loan Amendment at such time as Agent is able to obtain loan title insurance policies in form and substance acceptable to Agent covering the property currently encumbered by the Broad Street Mortgages (as defined in the Prepetition Credit Agreement), which title insurance policies shall

be substantially identical to the title insurance policies currently in place with respect to the Prepetition Credit Agreement.

(e)        The Debtors are unable to obtain financing on more favorable terms from sources other than the Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain sufficient asset-based revolving credit without: (i) granting the priming DIP Liens to secure the DIP Facility under section 364(d)(l) of the Bankruptcy Code; (ii) granting the Superpriority Claims (as defined in paragraph 7(a) below); and (iii) repaying in full the Prepetition Obligations, in each case on the terms and conditions set forth in this Interim Order and the DIP Documents.

(f)        The terms of the DIP Facility and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(g)        The DIP Financing and the use of the Prepetition Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the Agent and the Lenders. All of the Debtors' Obligations and indebtedness arising under or in connection with the DIP Documents, this Interim Order and the DIP Facility (collectively, the "DIP Obligations"), shall be deemed to have been extended by the applicable Agent and Lenders in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

The Agent and Lenders have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates, ensure patient safety, and continued operation of their businesses, in accordance with the terms hereof, and the Agent and Lenders (and the successors and assigns thereof), shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. Therefore, the claims, superpriority claims, security interests, liens, and other protection granted pursuant to this Interim Order (and, subject to entry by the Court, the Final Order) and the DIP Documents should be preserved to the extent provided for by paragraph 6 of this Interim Order.

(h)    The adequate protection provided to the Agent and Lenders with regard to the Prepetition Collateral, as set forth more fully in this Interim Order, for any diminution in the value of the Agent and Lenders' interests in the Prepetition Collateral (including the Cash Collateral) from and after the Petition Date resulting from, *inter alia*, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use of any Prepetition Collateral (including the Cash Collateral) pursuant to section 363 of the Bankruptcy Code, and the granting of the priming DIP Liens pursuant to section 364(d) of the Bankruptcy Code, in each case in accordance with this Interim Order, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect the Agent's and Lenders' interests in the Prepetition Collateral (including the Cash Collateral) in accordance with sections 361, 362, 363, and 364 of the Bankruptcy Code. As of the date of this Interim Order, and without prejudice to the rights of the Agent and Lenders to seek additional adequate protection, the adequate protection provided herein and other benefits and privileges contained

13

herein are sufficient to protect the Agent and Lenders from diminution in value of their respective interests in their Prepetition Collateral (including the Cash Collateral) resulting from the imposition of the Automatic Stay, the incurrence of the DIP Facility and the use of the Prepetition Collateral (including the Cash Collateral) contemplated by this Interim Order.

(i)      The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 400l(b)(2) and 4001(c)(2). Absent granting the interim relief set forth in this Interim Order, the Debtors' estates and their business operations will be immediately and irreparably harmed and patient safety will be jeopardized. The borrowing of the DIP Facility and the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

6.      <u>Authorization of the DIP Obligations and the DIP Financing Documents</u>.

(a)      The Debtors are hereby authorized (i) to enter into and perform under the DIP Documents in accordance with the DIP Budget, (ii) to incur debt up to an aggregate principal amount of $50,000,000 with respect to the DIP Revolver, including, without limitation, the Interim Advance Amount, and $15,000,000 with respect to the DIP Term Loan, the proceeds of which shall be used for, subject to the terms of the DIP Documents and the DIP Budget, working capital and other general corporate purposes of the Debtors (including costs related to the Cases), including, without limitation, (1) to pay interest, fees and expenses in connection with the DIP Facility, (2) to repay the Prepetition Obligations to the extent provided herein (including $1,000,000 of the deferred origination fees and $5,000,000 toward repayment of the Prepetition Term Loan), and (3) to make the Adequate Protection Payments; and (iii) to enter into and perform the DIP Term Loan Amendment when Agent is able to obtain loan title insurance policies in form and substance acceptable to Agent encumbering the Broad Street Mortgages (as

defined in the Prepetition Credit Agreement) which title insurance shall be substantially identical to the title insurance policies currently in place with respect to the Prepetition Credit Agreement.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and empowered to perform, and to cause any non-Debtor to perform, all acts and to execute and deliver all instruments and documents that the Agent determines to be reasonably required or necessary for the Debtors' performance of their obligations under the applicable DIP Documents, including without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in accordance with the terms of the DIP Documents and in such form as the Debtors, the Agent and the Lenders may agree, and no further approval of this Court shall be required for any amendment, waiver, consent or other modification to and under the DIP Documents (and any fees paid in connection therewith) that do not materially or adversely affect the Debtors or which do not (A) shorten the maturity of the DIP Revolving Facility, (B) increase the principal amount of, the rate of interest on, or fees payable in connection with, the DIP Facility, other than customary amendment or consent fees, or (C) change any Event of Default, add any covenants or amend or otherwise modify the covenants therein, in any such case to be materially more restrictive; provided, however, that a copy of any such amendment, waiver, consent or other modification shall be filed by the Debtors with this Court and served by the Debtors on the U.S. Trustee and counsel to any statutory committee of unsecured creditors appointed in the Cases (the "Committee") two business days in advance of its effectiveness.

35559484.4

(iii)    the non-refundable payment to the Agent and the Lenders of the fees set forth in the applicable DIP Documents as described in the Motion; and

(iv)    the performance of all other acts required or that the Debtors determine to be advisable under or in connection with the DIP Documents.

(c)    Upon the execution thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Interim Order and the DIP Documents. No obligation, payment, transfer or grant of security by the Debtors under the DIP Documents or this Interim Order shall be voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(d)    The DIP Budget is hereby approved. The Debtors shall use the proceeds of the DIP Financing and Cash Collateral in accordance with the DIP Budget.

(e)    The Debtors shall maintain and comply with the existing cash management systems required and established pursuant to the Prepetition Credit Agreement, including, without limitation, all provisions concerning the Lockbox, Lockbox Account and Payment Account (owned by Agent) set forth in the Prepetition Credit Agreement (as continued by the DIP Credit Agreement). The Debtors will continue to deposit, sequester, and segregate all of the proceeds from the Debtors' Accounts and other Collateral in the existing Lockbox as provided in the DIP Credit Agreement. All funds paid into the Lockbox shall be deposited into the related Lockbox Account, and then immediately transferred into the Payment Account. Agent shall be

16

entitled to apply all funds from the Payment Account as provided in the DIP Credit Agreement and this Order. Without limiting the foregoing in any way, the Debtors immediately and continuously will direct their Account Debtors to send directly to the Lockbox all proceeds of Accounts of the Debtors.

(f) As provided in the DIP Credit Agreement, Agent is authorized to apply, on a daily basis, all funds transferred into the Payment Account to reduce permanently the outstanding Prepetition Obligations.

7. <u>Superpriority Claims</u>.

(a)    Except to the extent expressly set forth in this Interim Order in respect of the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "<u>Superpriority Claims</u>") against the Debtors with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 328, 330, 331, 503(b), 507(a) (other than 507(a)(l)), 507(b), 1113 or 1114 of the Bankruptcy Code;

(b)    For purposes hereof, the "<u>Carve-Out</u>" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee pursuant to section 1930(a)(6) of title 28 of the United States Code, (ii) up to $2,500,000 of allowed and unpaid fees, expenses and disbursements of professionals retained pursuant to Bankruptcy Code §§327 or 1103(a), by the Debtors and any statutory committees, patient care ombudsman, trustee, examiner or other representative or professional appointed in the Bankruptcy Cases, incurred

35559484.4

after the occurrence of a Carve-Out Event (defined below) plus all unpaid professional fees, expenses and disbursements allowed by this Court that were incurred prior to the occurrence of a Carve-Out Event (regardless of when such fees, expenses and disbursements become allowed by order of this Court). For the purposes hereof, a "Carve-Out Event" shall occur upon the occurrence and during the continuance of an Event of Default under DIP Credit Agreement; provided, that, no Carve-Out Event shall be deemed to have occurred for purposes of this Interim Order if any such Event of Default is subsequently waived by the Agent providing notice of, or who is entitled to receive notice of (as applicable), such Event of Default. The Carve-Out shall not be reduced or increased by any amount of any fees, expenses and disbursements paid prior to a Carve-Out Event to professionals retained by order of this Court, including amounts paid pursuant to the DIP Budget. Upon the occurrence of a Carve-Out Event, the right of the Debtors to pay professional fees incurred under clause (ii) above shall terminate (unless the underlying Event of Default giving rise to the Carve-Out Event is subsequently waived by the Agent) and upon the occurrence of the Carve-Out Event, the Debtors shall provide immediate notice by facsimile and email to all retained professionals informing them that a Carve-Out Event has occurred and that the Debtors' ability to pay professionals is subject to and shall be payable from the Carve-Out; provided, that (A) the Carve-Out shall not be available to pay any professional fees and expenses incurred in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Agent or the Lenders, and (B) nothing in this Interim Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates. Except with respect to the Carve-Out, none of the Agent or Lenders shall be responsible for the payment or reimbursement of any fees or disbursements of any professional person retained in the Cases

18

incurred in connection with the Cases or any successor cases under the Bankruptcy Code, and nothing in this Interim Order or otherwise shall be construed to obligate the Agents or DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any professional person retained in the Cases or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

8.      <u>DIP Liens and Adequate Protection Liens</u>. As security for the DIP Obligations and for the Prepetition Obligations, and as provided in the DIP Documents, Agent, for itself and the benefit of the Lenders, shall have and is hereby granted (effective as of the commencement of the Cases, and continuing without the necessity of the execution, filing and/or recordation of mortgages, security agreements, patent security agreements, trademarks security agreements, pledge agreements, financing statements or otherwise), valid and perfected security interests and liens (the "<u>DIP Liens</u>") in all present and after-acquired personal and real property of the Debtors as described in the DIP Credit Agreement (defined in the DIP Credit Agreement as the "<u>Collateral</u>"); *provided, however, that* the Collateral does not include any claims or causes of action arising under chapter 5 of the Bankruptcy Code. The DIP Liens in the Collateral held by or granted to Agent as security for the Obligations and <u>Adequate Protection Liens</u> granted to Agent as security. For the Prepetition Obligations shall have the following priority, subject to the Carve-Out:

> (a)      Agent's Liens in the Collateral in which Agent holds existing first priority liens and security interests under the Prepetition Financing Documents (whether such Collateral was existing on the Petition Date or thereafter arises) shall continue as first priority, senior, perfected Liens securing the full amount of the Obligations and the Prepetition Obligations. Without limiting the foregoing, and notwithstanding any other provision of the DIP Credit Agreement or this Order, Agent's Liens shall include, *inter alia*, first priority, senior, perfected liens and security interests in

19

all of the Debtors' pre-petition and post-petition Accounts (as defined in the DIP Credit Agreement), and all proceeds therefrom.

(b)      Agent's Liens in the Collateral that is not otherwise encumbered by a valid and perfected, non-avoidable security interest or lien prior and superior to the liens and security interests held by Agent under the Prepetition Loan Documents shall be first priority, senior, perfected Liens securing the Obligations and the Prepetition Obligations.

(c)      Agent's Liens in the Collateral in which any other creditor holds a valid and perfected, non-avoidable security interest or lien prior and superior to the liens and security interests held by Agent under the Prepetition Loan Documents shall be perfected Liens securing the Obligations and the Prepetition Obligations junior only to such existing valid and perfected, non-avoidable security interest or lien in that Collateral (the "Prepetition Senior Liens").

(d)      Pursuant to Bankruptcy Code Section 364(d)(1), Agent's first priority Lien in pre-petition and post-petition Accounts of the Debtors (and proceeds therefrom) will be senior to and prime any valid lien (if any) asserted by any Governmental Authority or any other creditor with respect to the Accounts of the Debtors.

Without limiting the foregoing, Agent's first priority Lien on the Debtors' Accounts (and proceeds therefrom) shall be senior to any right of a holder of a claim, including without limitation, any mortgagee, Governmental Authority or landlord, that arose, or is deemed to arise, prior to the Petition Date, of any right of set off, tax lien, tax levy, or to otherwise assert a charge against, or to recoup, such claim against any such Accounts. ("Governmental Authority," as used in this Order, means and includes any "governmental unit" as defined in Bankruptcy Code §101(27) and specifically includes, without limitation, the federal and state agencies and their intermediaries administering the Medicare and Medicaid programs with which the Debtors deal.) In addition, pursuant to Bankruptcy Code §§105 and 362, any such holder shall be stayed and

35559484.4

prohibited from asserting any such setoff or other charge, or recoupment rights against the Debtors' Accounts.

9.  <u>The Cash Collateral</u>. Substantially all of the Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained by the Debtors in any account or accounts with Agent or any Lender and any cash proceeds of the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore, are Cash Collateral of the Agent and Lenders, within the meaning of section 363(a) of the Bankruptcy Code.

10.  <u>Perfection of DIP Lien</u>.

(a)  The Agent and Lenders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens. Whether or not the Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens, such DIP Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.

(b)  A certified copy of this Interim Order may, in the discretion of the Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)  The Debtors shall execute and deliver to the Agent all such agreements, financing statements, instruments and other documents as the applicable Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens and any Adequate Protection Liens. The

Debtors shall cause each of the non-Debtor Guarantors to use commercially reasonable efforts to take such actions necessary to grant and perfect or otherwise reaffirm the perfection of the liens contemplated in the DIP Documents to be granted or so reaffirmed by such non-Debtor Guarantors.

.

11.    <u>Preservation of Rights Granted Under the Order</u>.

(a)    Unless all DIP Obligations shall have been indefeasibly paid in full in cash, it shall constitute an Event of Default under the DIP Credit Agreement and a termination of the right to use the Cash Collateral if any of the Debtors seeks, or if an order is entered converting or dismissing any of the Cases or there is entered, any modification of this Interim Order without the prior written consent of the Agent, and no such consent shall be implied by any action, inaction or acquiescence by the Agent.

(b)    The Agent and the Lenders have acted in good faith in connection with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the Agent and the Lenders are entitled to the fullest extent to the protections provided in section 364(e) of the Bankruptcy Code.

(c)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the 507(b) claims and all other rights and remedies of the Agent and the Lenders granted by this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the

Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Cases, or (ii) the entry of an order confirming a plan of reorganization or liquidation in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Obligations, the Superpriority Claims, the 507(b) Claims, and the other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the Agent or Lenders and granted by this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash.

12. <u>Effect of Stipulations on Third Parties</u>. The stipulations and admissions contained in this Interim Order, including without limitation, in paragraph 4 of this Interim Order, shall be binding upon all parties in interest (including any Committee) under all circumstances and for all purposes unless (a) any party-in-interest (including any Committee) that successfully seeks and obtains standing to do so has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including without limitation, in this paragraph 12) by no later than (i) in the case of a party in interest with requisite standing other than a Committee, seventy-five (75) days after entry of this Interim Order, or (ii) in the case of a Committee, sixty (60) days after the filing of notice of appointment of the Committee); provided, however, that if, prior to the end of the challenge period, the cases convert to chapter 7, or if a chapter 11 trustee is appointed, the trustee shall have the later of the remaining challenge period or 10 days.

13. <u>Limitation on Use of DIP Loans, DIP Collateral and Prepetition Collateral</u>. The Debtors shall use the DIP Facility and the Prepetition Collateral (including the Cash Collateral)

35559484.4

solely as provided in this Interim Order and the DIP Documents. Notwithstanding anything herein or in any other order of this Court to the contrary, no DIP Facility, no DIP Collateral, no Prepetition Collateral (including the Cash Collateral) nor the Carve-Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Documents or the liens or claims granted under this Interim Order, the DIP Documents, the Prepetition Documents, (b) assert any claims, defenses or any other causes of action against the Agent, the Lenders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Agent's or Prepetition Agent's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Documents or this Interim Order, (d) seek to modify any of the rights granted to the Agent or the Lenders hereunder or under the DIP Documents or the Prepetition Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents. As long as any portion of the DIP Obligations or the Prepetition Obligations remains unpaid, or any of the DIP Documents or Prepetition Financing Documents remain in effect, the Debtors shall not request, and the Bankruptcy Court will not enter any Order approving or authorizing (under Bankruptcy Code §§105 or 364, or otherwise) (i) the granting of any lien or security interest in any of the Collateral in favor of any party other than Agent, or (ii) the obtaining of credit or the incurring of indebtedness that is entitled to super-priority administrative status, in either case equal or superior to that granted to Agent pursuant to this Order, unless, in connection with any transaction cited in clause (i) or (ii) of this Paragraph, such request by the Debtors seeks to

24

authorize and direct and such Order requires that the full amount of the Obligations and the Prepetition Obligations shall first be paid indefeasibly and in full.

14.    <u>Rights Upon Default</u>. Prior to entry of a Final Order, and upon the occurrence of and during the continuance of an Event of Default, Agent may, acting pursuant to the DIP Credit Agreement, and without further notice to or action by the Court, immediately cease making any DIP Revolving Loan to the Debtors, and charge a default rate of interest as provided in the DIP Credit Agreement. Upon entry of a Final Order, and upon the occurrence and during the continuance of an Event of Default, Agent may, acting pursuant to the DIP Credit Agreement, exercise its rights and remedies and take all or any of the following actions without further relief from the automatic stay pursuant to Bankruptcy Code §362(a) or any other applicable stay or injunction, or further order of or application to this Court: (a) cease making DIP Loans to the Debtors; (b) declare the principal and accrued interest, fees, and other liabilities constituting the Obligations to be immediately due and payable; (c) enforce its rights against any Collateral, including taking possession thereof; (d) charge a default rate of interest as set forth in the DIP Credit Agreement; and (e) take any other action or exercise any other right or remedy permitted to Agent under the DIP Documents, this Order, or by operation of law. Notwithstanding modification of the stay, it shall not be terminated, and Agent shall not complete the enforcement of its remedies, pending a final stay relief hearing before this Court which Agent may obtain as an emergency hearing upon five (5) business days' notice. At such hearing, the Debtors or other parties in interest will have the limited right to challenge the occurrence of an Event of Default. The hearing will be limited strictly to the issue of whether an Event of Default has occurred.  No other arguments or issues relating to Agent's enforcement of its rights or remedies may be presented for adjudication by the Court and no other relief against Agent may be requested.

Pending the outcome of the hearing, Agent will refrain from completing enforcement of its remedies with respect to the Collateral; *provided, however, that,* Agent's rights to accelerate the Obligations and/or cease making DIP Loans shall not be delayed or otherwise limited and Agent shall be entitled to take all actions which it considers, in good faith, to be necessary to protect against loss or diminution of its Collateral.

15.    Waiver of Section 506. Upon entry of a Final Order, and except as expressly provided in this paragraph, no Person will be permitted to surcharge the Collateral under Bankruptcy Code §506(c) or to obtain a lien with respect to the Collateral which is equal or senior to the Liens of Agent on the Collateral (other than with respect to the Prepetition Senior Liens as stated herein). Except as expressly provided in this paragraph, the prohibition on surcharging or priming of the liens of Agent on the Collateral will survive the termination of the DIP Credit Agreement such that no Person, including, but not limited to, Governmental Authorities, will be permitted to obtain a lien (through any means, including recoupment or setoff) which is equal or senior to the liens of Agent on the Collateral. Upon the termination of the DIP Credit Agreement, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this paragraph. The Debtors have waived and released, and are barred from asserting a claim under Bankruptcy Code §506(c) for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by Agent upon, the Collateral. Agent will not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral. Upon entry of this Interim Order, the post-petition Liens granted to Agent on the Collateral by virtue of this Interim Order and the DIP Credit Agreement will be (and hereby are) adjudicated as first, valid, and perfected as against all third parties, without regard to applicable federal, state, or local filing or recording

35559484.4

statutes, *nunc pro tunc* as of the Petition Date, and without further action of any party, including Agent; *provided*, that Agent may, but need not, take such steps as it deems desirable and applicable to comply with such statutes, and all financing statements which are filed listing Debtors as debtor and Agent as secured party, all mortgages or similar instruments which are filed granting to Agent liens upon and security interests in Collateral shall be deemed to have been filed and the security interest and liens evidenced thereby will be deemed perfected *nunc pro tunc* as of the Petition Date.  To the extent Agent determines to take such steps, Debtors are hereby authorized and directed to cooperate with Agent, including execution of any documents reasonably request by Agent.

16. <u>Term</u>.  All Loans made available to the Debtors pursuant to this Interim Order will be due and payable, and the Revolving Loan Commitment shall terminate, on the date that is 45 days after the entry of this Interim Order unless the Final Order shall have been entered by the Bankruptcy Court on or before such date.  Upon the Bankruptcy Court's entry of the Final Order and satisfaction of any other conditions precedent, the full Revolving Loan Commitment shall be used when calculating the Revolving Loan Limit, as defined in the DIP Credit Agreement and approved by the Bankruptcy Court in the Final Order, subject to compliance with the terms, conditions and covenants of this Interim Order, the Final Order and the other Financing Documents.

17. <u>Survival of the Order</u>.  The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in the Bankruptcy Cases (and, to the extent not satisfied in full, the Obligations shall not be discharged by the entry of any such order, or pursuant to Bankruptcy Code §1141(d)(4), the Debtors having hereby waived such discharge); (b) converting any of the

35559484.4

Bankruptcy Cases to a Chapter 7 case; or (c) dismissing any of the Bankruptcy Cases, and the terms and provisions of this Order as well as the Super-Priority Claims and Liens granted pursuant to this Order and the DIP Documents shall continue in full force and effect notwithstanding the entry of such order, and such Super-Priority Claims and Liens shall maintain their priority as provided by this Order until all of the Obligations are paid indefeasibly and in full.

18.    <u>Plan</u>.  Any plan of reorganization or liquidation filed by the Debtors (including, but not limited to, any amendment or modification of a plan of reorganization or liquidation, whether before or after confirmation) shall provide for payment and performance in full of all of the Obligations on the earlier of the effective date or thirty (30) days after confirmation of the plan of reorganization or liquidation. Nothing in the DIP Credit Agreement or this Interim Order shall be construed as a consent by Agent, or an approval by Agent, of the terms of any Plan of Reorganization or any amendment or modification thereto.

19.    <u>Provider Agreements</u>. As long as any portion of the Obligations remains unpaid, or any DIP Document remains in effect, absent Agent's prior written consent, which shall not be unreasonably withheld, the Debtors shall not assume or reject, and no order shall be entered authorizing the Debtors to assume or reject, any material provider agreements between the Debtors and any revenue service provider, including, any governmental authority, Conifer Revenue Cycle Solutions, LLC and Tenet Business Services Corp.

20.    <u>Post-petition Assets</u>. Except as otherwise provided in this Order, pursuant to Bankruptcy Code §552(a), all property acquired by the Debtors after the Petition Date, including, without limitation, all Collateral pledged to Agent pursuant to the DIP Credit Agreement and this Interim Order, is not and shall not be subject to a lien of any other entity resulting from any

35559484.4

security agreement entered into by the Debtors prior to the Petition Date or otherwise, except only to the extent that such property constitutes proceeds of property of the Debtors existing on or before the Petition Date.

21.    <u>Appearance by Agent</u>.   Agent shall be deemed to be a party-in-interest for all purposes in the Bankruptcy Cases with the right and opportunity to appear and be heard on all matters arising in the Cases, including, without limitation, (i) the employment and payment of professionals by the Debtors' estates, (ii) the sale of any estate property, (iii) any plan of reorganization or liquidation proposed in the Cases, and (iv) any proposed conversion or dismissal of any of the Bankruptcy Cases.

22.    <u>Insurance</u>. The Agent is deemed to be the loss payee or lender loss payee under the Debtors' property insurance policies and shall act in that capacity and subject to the terms of the DIP Documents, distribute any proceeds recovered or received in respect of any such insurance policies, to the payment in full of the DIP Obligations.

23.    <u>Loss or Damage of Collateral</u>. Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon any of the Agent or Lenders of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the Agent and the Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the Agent and the Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any earner, servicer, bailee,

35559484.4

custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors and any non-Debtor Guarantors.

24.     <u>Order Governs</u>.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

25.     <u>Binding Effect; Successors and Assigns</u>. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties-in-interest in the Cases, including without limitation, the Agent, the Lenders, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Agent, the Lenders, and the Debtors and their respective successors and assigns; provided that, except to the extent expressly set forth in this Interim Order or the DIP Documents, the Agent and the Lenders, shall have no obligation to permit the use of the DIP Facility or the Prepetition Collateral (including the Cash Collateral) or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

26.     <u>Limitation of Liability</u>.

(a)     In determining to make any loan or other extension of credit under the DIP Documents, permitting the use of the Prepetition Collateral (including the Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the Agent and the Lenders shall not (i) be deemed to be in "control" of the operations of the Debtors, (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates, or (iii) be deemed to be acting as a "responsible person" or "owner or

35559484.4

operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq*. as amended, or any similar federal or state statute).

(b)      Nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the Agent or the Lenders of any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtors.

27.      <u>Effectiveness</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Interim Order.

29.      <u>Final Hearing Notice</u>. The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to the Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. The final hearing on the Motion shall be held on _____, 2019 at _____ (Prevailing Eastern Time), and any objections or responses to the Motion shall be in writing, filed with the court, and served on: (a) counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, Attn: Mark Minuti, P.O. Box 1266, Wilmington, DE 19899, and by email at mark.minuti@saul.com; (b) counsel to the Agent, Stradley Ronon Stevens & Young, LLP, Attn: Gretchen M. Santamour, 2005 Market Street, Suite 2600, Philadelphia, PA 19103, and by email at gsantamour@stradley.com; and (c) counsel to the Committee, if any, so

35559484.4

as to be actually received on or before _____, 2019 at 4:00 p.m. (Prevailing

Eastern Time).

Dated: _____, 2019
       Wilmington, Delaware

                                    _____
                                      Honorable Kevin Gross
                                      United States Bankruptcy Judge

35559484.4

# EXHIBIT 1

**DIP CREDIT AGREEMENT**

(to be provided)

## **EXHIBIT 2**

**DIP BUDGET**

PAHS - Consolidated (including most subsidiaries)
DIP Financing Report - Consolidated
($ in 000s)

| Act./Fcst. | Fcst. 1 | Fcst. 2 | Fcst. 3 | Fcst. 4 | Fcst. 5 | Fcst. 6 | Fcst. 7 | Fcst. 8 | Fcst. 9 | Fcst. 10 | Fcst. 11 | Fcst. 12 | Fcst. 13 | Fcst. 14 | Forecast Post-Petition Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
| Week Ending | 5-Jul | 12-Jul | 19-Jul | 26-Jul | 2-Aug | 9-Aug | 16-Aug | 23-Aug | 30-Aug | 6-Sep | 13-Sep | 20-Sep | 27-Sep | 4-Oct | |
| **Cash Flow** | | | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | | | |
| **Patient Cash** | | | | | | | | | | | | | | | |
| HUH | 5,851 | 7,314 | 3,396 | 3,396 | 3,396 | 3,396 | 3,396 | 3,396 | 1,396 | 1,396 | 1,396 | 1,396 | 1,396 | 1,396 | |
| HUH - POs | 286 | 358 | 358 | 358 | 358 | 358 | 358 | 358 | 358 | 358 | 358 | 358 | 358 | 358 | |
| STC | 3,396 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | 4,245 | |
| STC - POs | 849 | 1,061 | 1,061 | 1,061 | 1,061 | 1,061 | 1,061 | 1,061 | 1,061 | 849 | 1,061 | 1,061 | 1,061 | 1,061 | |
| Unallocated | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 42 | 42 | 42 | 42 | |
| Patient Cash | 10,462 | 13,058 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 7,141 | 6,079 | 7,103 | 7,103 | 7,103 | 7,103 | 119,995 |
| Supplemental Cash | 547 | | | | | 4,612 | | | 961 | | | | 902 | | 7,022 |
| Other (HPP) | | | | 7,100 | | | | | | | | | | | 7,100 |
| **Total Cash Receipts** | 11,009 | 13,058 | 9,141 | 16,241 | 9,141 | 13,752 | 9,141 | 9,141 | 8,102 | 6,079 | 7,103 | 7,103 | 8,005 | 7,103 | 134,117 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| **Employee Costs** | | | | | | | | | | | | | | | |
| Salaries and Wages | 13,507 | - | 14,000 | - | 12,000 | - | 10,000 | - | 9,000 | - | 6,000 | - | 6,000 | - | 70,507 |
| HUH Employee Separation Costs | | | 250 | | 250 | | 250 | | 250 | | 250 | | 250 | | 1,500 |
| Independence Blue Cross | 464 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 4,364 |
| 401(k) Funding | 685 | - | 685 | - | 500 | - | 429 | - | 280 | - | 280 | - | 280 | - | 3,140 |
| Caremark (CVS) | 201 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 90 | 75 | 75 | 75 | 75 | 1,791 |
| Benefit/Pension Funding | | 980 | | | | 980 | | | | 980 | | | | | 2,940 |
| Delta Dental/Voluntary | 82 | 60 | 60 | 60 | 60 | 60 | 50 | 46 | 46 | 46 | 46 | 46 | 32 | 32 | 726 |
| **Total Salaries/Benefits** | 14,939 | 1,490 | 15,445 | 510 | 13,260 | 1,490 | 11,179 | 496 | 10,026 | 1,416 | 6,951 | 421 | 6,937 | 407 | 84,969 |
| **Vendor Payments** | | | | | | | | | | | | | | | |
| Amerisource Prepay | 604 | 604 | 604 | 604 | 527 | 376 | 376 | 285 | 285 | 285 | 285 | 285 | 285 | 285 | 6,011 |
| Physicians | - | 350 | 350 | 350 | 350 | 200 | 200 | 200 | 150 | 150 | - | - | - | - | 2,297 |
| Crothall Patient Transport | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 85 | 85 | 85 | 85 | 85 | 85 | 2,670 |
| RevCycle Support | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | - | - | - | - | 500 |
| Sodexo | - | - | - | 1,185 | - | - | - | 250 | - | - | - | - | - | 250 | 1,685 |
| Insurance (Other) | - | 682 | - | 500 | - | - | 360 | - | - | - | 360 | - | 360 | - | 2,264 |
| Utilities | - | 800 | 500 | 500 | - | 800 | - | - | - | - | 800 | - | - | - | 3,400 |
| Rent | 650 | - | - | - | 650 | - | - | - | - | - | 650 | - | - | - | 1,950 |
| ADP Stop Loss | - | - | 500 | - | - | - | 500 | - | - | - | - | 500 | - | - | 1,501 |
| Lockton (Workers Comp) | - | 325 | - | - | - | 325 | - | - | - | - | 202 | - | - | - | 851 |
| Allied Universal - Security | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 2,240 |
| Tenet/Conifer | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,800 |
| Vendors Pool Payments | 1,225 | 566 | 566 | 566 | 566 | 566 | 566 | 566 | 566 | 566 | 566 | 566 | 216 | 566 | 8,233 |
| **Information Technology** | | | | | | | | | | | | | | | |
| IT - NTT | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 1,683 |
| **Total Operating Disbursements** | 18,218 | 5,617 | 18,765 | 5,015 | 16,230 | 4,383 | 14,307 | 2,688 | 11,642 | 4,843 | 8,569 | 2,698 | 8,003 | 2,073 | 123,053 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| MidCap Interest | 650 | - | - | - | - | 366 | - | - | - | 348 | - | - | - | 738 | 2,101 |
| MidCap Term Paydown | 5,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,000 |
| Taxes | - | - | 50 | 300 | - | - | - | 50 | 300 | - | - | 50 | 300 | - | 1,050 |
| Consultants | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,400 |
| Debtor Professionals (Legal, CPA, etc.) | - | - | - | - | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 288 | 288 | 2,175 |
| Investment Banking Fees | - | 50 | - | - | - | - | 50 | - | - | - | 50 | - | - | - | 150 |
| Committee Professionals | - | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 325 |
| Public Relations Firm | - | - | - | - | 15 | - | - | - | 15 | - | - | - | 15 | 15 | 75 |
| Court Fees (Trustee, Claims Agent, etc.) | - | 50 | 50 | 50 | 25 | - | - | - | - | - | - | - | - | 550 | 725 |
| Lender Professional Fees | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 350 |
| Patient Care Ombudsman | - | 58 | - | - | - | 58 | - | - | - | - | 58 | - | - | - | 175 |
| Publication/Notice | - | - | - | 75 | - | - | - | - | - | - | - | - | - | - | 75 |
| Hospital Shutdown Plan (non-labor) | - | - | 150 | 150 | 150 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,500 |
| Other | 100 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 200 | 200 | 100 | 100 | 200 | 3,050 |
| **Total Non-Operating Disbursements** | 5,875 | 708 | 650 | 975 | 790 | 1,066 | 858 | 1,000 | 715 | 1,063 | 808 | 950 | 653 | 2,040 | 18,151 |
| **Total Disbursements** | 24,093 | 6,326 | 19,415 | 5,990 | 17,020 | 5,449 | 15,165 | 3,688 | 12,357 | 5,905 | 9,378 | 3,648 | 8,656 | 4,114 | 141,204 |
| **Total Collections** | 11,009 | 13,058 | 9,141 | 16,241 | 9,141 | 13,752 | 9,141 | 9,141 | 8,102 | 6,079 | 7,103 | 7,103 | 8,005 | 7,103 | 134,117 |
| **Total Disbursements** | 24,093 | 6,326 | 19,415 | 5,990 | 17,020 | 5,449 | 15,165 | 3,688 | 12,357 | 5,905 | 9,378 | 3,648 | 8,656 | 4,114 | 141,204 |
| **Net Cash Flow before Assessments** | (13,084) | 6,732 | (10,275) | 10,251 | (7,880) | 8,304 | (6,024) | 5,453 | (4,256) | 174 | (2,275) | 3,455 | (651) | 2,989 | (7,087) |
| **Assessments** | | | | | | | | | | | | | | | |
| PA Quality Care Assessment | - | 1,575 | | | | | | | | | | | | | 1,575 |
| Philadelphia Hospital Assessment | | | | | | | | | | | | | | | - |
| **Net Cash Flow after Assessments** | (13,084) | 5,157 | (10,275) | 10,251 | (7,880) | 8,304 | (6,024) | 5,453 | (4,256) | 174 | (2,275) | 3,455 | (651) | 2,989 | (8,662) |
| **Financing** | | | | | | | | | | | | | | | |
| **Operating Cash** | | | | | | | | | | | | | | | |
| Beginning Book Balance | 18,444 | | | | | | | | | | | | | | 18,444 |
| Net Cash Flow | (13,084) | 5,157 | (10,275) | 10,251 | (7,880) | 8,304 | (6,024) | 5,453 | (4,256) | 174 | (2,275) | 3,455 | (651) | 2,989 | (8,662) |
| Repayments | (11,009) | (13,058) | (9,141) | (16,241) | (9,141) | (13,752) | (9,141) | (9,141) | (8,102) | (6,079) | (7,103) | (7,103) | (8,005) | (7,103) | (134,117) |
| Borrowings | 5,650 | 7,901 | 19,415 | 5,990 | 17,020 | 5,449 | 15,165 | 3,688 | 12,357 | 5,905 | 9,378 | 3,648 | 8,656 | 4,114 | 124,335 |
| Ending Book Balance | - | | | | | | | | | | | | | | - |
| Ending Outstanding Checks | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Ending Book Balance | - | | | | | | | | | | | | | | - |
| **Post-Petition DIP Revolver** | | | | | | | | | | | | | | | |
| Beginning DIP Revolver Balance | - | 34,282 | 29,124 | 39,399 | 29,148 | 37,028 | 28,725 | 34,749 | 29,297 | 33,552 | 33,379 | 35,653 | 32,198 | 32,849 | 32,849 |
| DIP Revolver Repayments | (11,009) | (13,058) | (9,141) | (16,241) | (9,141) | (13,752) | (9,141) | (9,141) | (8,102) | (6,079) | (7,103) | (7,103) | (8,005) | (7,103) | (7,103) |
| DIP Revolver Borrowings | 5,650 | 7,901 | 19,415 | 5,990 | 17,020 | 5,449 | 15,165 | 3,688 | 12,357 | 5,905 | 9,378 | 3,648 | 8,656 | 4,114 | 4,114 |
| DIP Revolver Balance Transfer | 39,642 | | | | | | | | | | | | | | - |
| Ending DIP Revolver Balance | 34,282 | 29,124 | 39,399 | 29,148 | 37,028 | 28,725 | 34,749 | 29,297 | 33,552 | 33,379 | 35,653 | 32,198 | 32,849 | 29,860 | 29,860 |
| Net Borrowing Base - DIP Revolver | 45,609 | 43,402 | 43,472 | 41,877 | 44,031 | 42,436 | 40,840 | 39,245 | 39,349 | 38,760 | 36,368 | 34,877 | 33,386 | 31,895 | 31,895 |
| Availability - DIP Revolver | 11,327 | 14,278 | 4,073 | 12,728 | 7,003 | 13,711 | 6,091 | 9,948 | 5,797 | 5,382 | 714 | 2,678 | 536 | 2,035 | 2,035 |
| **Post-Petition DIP Term Loan** | | | | | | | | | | | | | | | |
| Beginning DIP Term Loan | - | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| DIP Term Loan Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Term Loan Borrowings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Term Loan Balance Transfer | 15,000 | | | | | | | | | | | | | | - |
| Ending DIP Term Loan | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |