# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
|  | Jointly Administered |
| Debtors. |  |

## DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (III) GRANTING RELATED RELIEF

Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), by and through their proposed undersigned counsel, file this motion (the "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "**Bankruptcy Code**"), for the entry of:  (I) an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Order"), (a) establishing bidding procedures (the "**Bidding Procedures**") relating to the sale of certain of the Debtors' assets (as defined in paragraph 26 below, the "**Residents Program Assets**"), including approving a break-up fee, (b) establishing procedures (the "**Assumption and Assignment Procedures**") relating to the assumption and assignment of certain executory contracts (the "**Assumed Contracts**"), including notice of proposed cure amounts, (c) approving the form and manner of notice relating thereto, and (d) scheduling a hearing (the "**Sale Hearing**") for approval of a sale (the "**Sale**"); and (II) an order (the "**Sale Order**"),[2] (a) approving the Sale of the Residents Program Assets free and clear of all liens, claims, encumbrances and interests (collectively, "**Interests**"); (b) authorizing the assumption and assignment of the Assumed Contracts in connection therewith; and (c) granting related relief.  In support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      This Motion is designed the facilitate the transition of the Debtors' residents and fellows who are currently training at Hahnemann University Hospital ("**Hahnemann**") to alternative hospitals and provides the best opportunity for the continuity of programs for the residents and fellows.

2.      As detailed in the First Day Declaration (defined below), the Debtors' operations primarily consist of two hospital facilities in Philadelphia, Pennsylvania – Hahnemann and St. Christopher's Hospital for Children.

3.      The Debtors commenced these cases, among other reasons, because of ongoing, unsustainable losses at Hahnemann, and therefore to implement and facilitate an orderly closure of Hahnemann while ensuring patient safety and quality patient care.

---

[2] The Debtors will file the applicable form of Sale Order as soon as practicable after such documents are negotiated with the purchaser in consultation with the Official Committee of Unsecured Creditors (if any).

4.      Attendant with the myriad of issues involved in the closure of Hahnemann is the effect such closure has had and will continue to have on the approximately 583 residents and fellows (collectively, the "**Residents**") training as part of the 35 accredited residency and fellowship programs at Hahnemann.

5.      With these concerns in mind, a prompt postpetition marketing and sale process for the Residents Program Assets is essential to ensure that Hahnemann's Residents are afforded an opportunity to continue their training without significant interruption while also maximizing the value of the Residents Program Assets for the benefit of the Debtors' estates, creditors and other stakeholders.  Approval of the Bidding Procedures is a critical and necessary step, which is designed to permit a fair and reasonable marketing process, on an accelerated basis, to obtain the best offer for the Debtors' Residents Program Assets while protecting the interests of patients and the Residents.

6.      The Debtors, with the assistance of their advisors, considered all strategic options and concluded that a sale in accordance with the Bidding Procedures set forth herein is the best way to maximize the value of the Residents Program Assets, yield the best recovery for creditors, and promote and ensure the best interests of Residents.

7.      As a result of these efforts, the Debtors executed a letter of intent (the "**Stalking Horse LOI**") with Tower Health ("**Tower Health**" or the "**Stalking Horse Bidder**") for the purchase of the Residents Program Assets, which include Hahnemann's: (a) National provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) Hahnemann's programs for training Residents (the "**Program**s").  The Stalking Horse LOI provides for a purchase price of $7.5 million, subject to certain adjustments, and includes a

3

guarantee that Tower Health will assume responsibility for the training of all Hahnemann's Residents, including the right to be placed in one of six of Tower Health's hospitals, except for a limited number of Programs to be specified in the definitive purchase documentation that will be closed by Hahnemann prior to the consummation of the transaction.  Alternatively, the Stalking Horse LOI contemplates that Residents may voluntarily accept a position elsewhere.

8.      As described herein, the Debtors seek approval of the Bidding Procedures and the Sale on an expedited timeline as required by the Stalking Horse Bidder as necessary to effectuate the transition of the Residents.  The Debtors submit that the nature of the relief requested and the protections proposed to be granted herein to the Residents supports this accelerated timeframe and should be approved.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules.

## BACKGROUND

11.     On June 30, 2019 and July 1, 2019 (the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

12.     A description of the Debtors' businesses, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**")[3] [D.I. 2].

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**: (a) approving the proposed Bidding Procedures attached hereto as **Exhibit B**, including approval of the Break-Up Fee as allowed administrative expenses with priority pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code; (b) establishing the Assumption and Assignment Procedures, including notice of proposed cure amounts; (c) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (d) scheduling the Sale Hearing to approve the Sale.

14.     The Debtors also seek entry of the Sale Order:[4] (a) approving the sale of the Debtors' Residents Program Assets free and clear of all Interests; and (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases.

---

[3]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

[4]     The proposed form of Sale Order will be filed with the Court on the date that is one (1) calendar day prior to the Sale Hearing.

15.     Contemporaneously herewith, the Debtors have filed a motion seeking to have this motion heard on shortened notice pursuant to Rule 2002 and Local Rules 6004-1(c) and 9006-1(e) (the "**Motion to Shorten**").

## THE PROPOSED SALE

**A.      The Debtors' Marketing Efforts**

16.     As set forth more fully in the First Day Declaration, Hahnemann is a 496-bed tertiary care academic medical center in center city Philadelphia.  It has a long history of providing healthcare services, dating back to 1848.  Hahnemann is fully accredited by the Joint Commission and historically has provided a range of specialty services, including Level I adult trauma, kidney and liver transplantation, OB/GYN services, medical and radiation oncology, minimally invasive robotic surgery, neonatal intensive care unit services, bariatric surgery, bloodless medicine and surgery and renal dialysis, among other inpatient and outpatient services.

17.     Hahnemann is also the primary teaching hospital for Drexel University d/b/a Drexel University College of Medicine ("**DUCOM**").   Hahnemann's Graduate Medical Education Residency Program is one of the largest in the United States, including approximately 583 residents and fellows practicing in a wide range of medical specialties, as well as training numerous rotating medical students and nursing students.

18.     In early June, 2019, the Debtors retained SSG Advisors, LLC ("**SSG**") to assist in pursuing a financing, sale or restructuring transaction.  Immediately upon its retention, SSG developed marketing materials, including a "teaser" and a confidential information memorandum.  SSG also established an electronic data room containing key information for parties to conduct in depth due diligence on Hahnemann.

35587432.3 07/09/2019

19.     As described in the First Day Declaration, to date, no party has expressed an interest in acquiring Hahnemann's assets as a going concern, leading to the Debtors' determination that it is necessary and appropriate to implement an orderly closure of Hahnemann.  However, while the Debtors' prepetition marketing efforts did not result in a going concern buyer for Hahnemann, they did result in the successful execution of the Stalking Horse LOI with respect to the Residents Program Assets, which includes critical protections for the Residents as described herein.

20.     Through  the Stalking Horse LOI, and subject to the execution of a definitive asset purchase agreement, Tower Health agreed to act as the Stalking Horse Bidder for the sale of the Residents Program Assets for a purchase price of $7.5 million, subject to adjustments, including, notably, guaranteed placement opportunities for Residents.  A copy of the Stalking Horse LOI is attached hereto as **Exhibit C**.[5]

21.     Tower Health operates six (6) hospitals in the region, including Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania (collectively, the "**Tower Health Hospitals**").

**B.      The Primary Terms of the Stalking Horse LOI**

22.     The Stalking Horse LOI contemplates the sale of the Residents Program Assets to the Stalking Horse Bidder, subject to higher and better bids, on the following material terms:

23.     <u>Seller</u>:  Debtor CCH (in such capacity, "**Seller**").

---

[5]      To preserve confidentiality, Schedules A and B to the Stalking Horse LOI are not included with the filing. The information contained therein will be addressed in connection with the confidentiality provisions of the proposed Bidding Procedures and, as applicable, the filing of the Stalking Horse Sale Agreement.

24.    <u>Purchaser</u>:  Tower Health or one of its subsidiary entities (in such capacity, the "**Purchaser**").

25.    <u>Purchase Price</u> (Stalking Horse LOI ¶4):  $7.5 million ("**Base Purchase Price**") in cash at closing, subject to a $500,000 purchase price adjustment on account of the amount paid by Purchaser to Seller on June 28, 2019 as consideration for the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020,  In addition, the amount of $3 million (the "**Escrow Amount**") will be withheld from the Base Purchase Price and placed into an escrow account with a third-party financial institution (the "**Escrow Account**") to cover the following losses, damages and expenses: (a) the Tail Coverage Costs,[6] (b) the CMS Discharge Amount,[7] (c) the Cure Amounts,[8] and (d) the Indemnity Amounts.[9]  To the extent there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, the remaining funds will be returned to the Seller.  If the sum of the Tail Coverage Costs, the CMS Discharge Amount and the Cure Amounts exceeds the Escrow Amount, each of the Purchaser and Seller has the right to terminate the Stalking Horse Sale Agreement (defined below).

26.    <u>Residents Program Assets</u> (Stalking Horse LOI ¶ 1):  The Stalking Horse LOI provides that the Purchaser will acquire Hahnemann's: (a) National Provider Identifiers (general

---

[6]    As set forth in the Stalking Horse LOI, the Tail Coverage Costs refer to certain of the Stalking Horse Bidder's cost of a reporting endorsement (tail coverage) to insure against professional liabilities of Continuing Residents related to the period of Seller's ownership and operation of Hahnemann.  If the cost of such endorsement exceeds $100,000 in the aggregate, any and all amounts in excess of $100,000 are deemed "Tail Coverage Costs."  *See* Stalking Horse LOI at ¶ 7(b).

[7]    As set forth in the Stalking Horse LOI, the CMS Discharge Amount refers to the limitation agreed to by the Centers for Medicare and Medicaid Services (the "**CMS**") with respect to the amount of claims of offset or recoupment.  *See* Stalking Horse LOI at ¶ 7(d).

[8]    As set forth in the Stalking Horse LOI, the Cure Amounts refer to the cure amounts related to assumed and assigned contracts that are part of the Assets.  *See* Stalking Horse LOI at ¶ 7(c).

[9]    As set forth in the Stalking Horse LOI, the Indemnity Amounts refers to all loss, damages and expense arising out of third party claims for Seller's acts or omissions arising out of the Residents Program Assets.  *See* Stalking Horse LOI at ¶ 9.

and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, Hahnemann's Programs, so that one or more of the Tower Health Hospitals will become the principal training site for all the Programs, except for a limited number of Programs that will be closed by Hahnemann prior to Closing.

27.    <u>Excluded Assets</u> (Stalking Horse LOI ¶ 2):  The Stalking Horse LOI provides that the Purchaser will not acquire any assets other than those described in section 1, and specifically excludes cash and accounts receivable.  The Stalking Horse LOI also provides that the Purchaser will not acquire or assume any present or future obligation or liability of Seller, including with respect to trade accounts payable, employee obligations,[10] obligations under contracts other than Assumed Contracts, debt obligations, tax obligations, environmental obligations and any other obligations arising prior to the Closing Date (defined below).

28.    <u>Residents</u> (Stalking Horse LOI ¶ 3):  Most importantly, the Purchaser will assume responsibility for the continued training of the Residents, and will give each Resident the right to be placed in one of the Tower Health Hospitals or to accept a position elsewhere.  Either the Debtors or the Purchaser, as applicable, will release the related cap on Medicare reimbursement on a temporary basis for those current Residents who elect to complete their training elsewhere. Purchaser will provide free housing for applicable Residents who continue with the Purchaser (as defined in the Stalking Horse LOI, the "**Continuing Residents**").  Purchaser will also seek to transfer the faculty with whom the Residents have been training to ensure that the Residents' training cohort remains intact.

---

[10]    Notwithstanding the exclusion of employee-related obligations, the Stalking Horse LOI provides that, subject to the Stalking Horse Bidder's completion of due diligence, Stalking Horse Bidder may elect to assume Seller's employment agreements with Continuing Residents.

29.     The Stalking Horse LOI further provides that the Seller and Stalking Horse Bidder will work cooperatively to determine clinical rotation assignments for Continuing Residents, with such assignments to commence as soon as practicable after the execution of the Stalking Horse Sale Agreement.

30.     <u>Closing and Other Deadlines</u> (Stalking Horse LOI ¶¶ 8 and 16): The Stalking Horse LOI requires the execution of a definitive purchase agreement (the "**Stalking Horse Sale Agreement**")[11] by July 12, 2019 and entry of the Bidding Procedures Order by July 17, 2019. The Stalking Horse LOI provides that closing shall occur by August 1, 2019 or such later date as is required to obtain necessary government and regulatory approvals as the Stalking Horse Bidder and Seller shall mutually agree.

31.     <u>Break-Up Fee</u> (Stalking Horse LOI ¶5):  The Stalking Horse LOI provides that, subject to Court approval as part of the Bidding Procedures Order, the Debtors will be required to pay the Stalking Horse Bidder a fee (the "**Break-Up Fee**") in the amount of $225,000, if the Stalking Horse Sale Agreement is not approved by the Court and the offer of a third party for the Residents Program Assets is approved by the Court and the Debtors close on such third-party sale instead of the Sale to the Stalking Horse Bidder.

32.     <u>"Fiduciary Duty" Out</u>: The Bidding Procedures provide that, "[n]othing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Debtors' board of managers determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law . . . ."

---

[11]     The Debtors will file a copy of the Stalking Horse Sale Agreement promptly after it is executed.

C.      **The Bidding Procedures**

33.     The Bidding Procedures, which are attached hereto as **Exhibit B**, are designed to maximize value for the Debtors' estates and promote the interest of Residents, while effectuating an expeditious sale of the Residents Program Assets.   Among other things, the Bidding Procedures set forth procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of an ultimately successful bidder (the "**Successful Bidder**"), and the deadlines with respect to the foregoing.

34.     Certain of the salient terms of the Bidding Procedures are highlighted below:[12]

- **Key Proposed Dates (subject to the Court's availability):**

| Milestone | Proposed Date |
|---|---|
| Deadline for Entry of the Bidding Procedures Order | July 17, 2019 |
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder | 4:00 p.m. (prevailing Eastern Time) on July 26, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on July 26, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on July 30, 2019 |
| Sale Hearing | July 31, 2019 |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidder | (may be raised at the Sale Hearing) |

---

[12]     The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary set forth herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

| Sale Closing (*i.e.*, the Outside Date) | August 1, 2019[13] |
|---|---|

- **Auction Qualification Process:** As set forth in further detail in the Bidding Procedures, a Qualified Bidder must, among other requirements, (a) deliver financial statements demonstrating the financial capability of the bidder to consummate the sale, (b) propose a purchase price for the Residents Program Assets, that in the Debtors' reasonable business judgment, has a value that equals or exceeds $7,725,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse LOI plus the Break-Up Fee); (c) provide a good faith deposit in the amount of ten percent (10%) of the purchase price; (d) provide an executed non-contingent sale agreement on the same or better terms as those contained in the Stalking Horse Sale Agreement to be filed with the Court; and (e) include a detailed proposal with regard to the treatment and protections proposed for Residents.

- **Auction and Sale Procedures:** If the Debtors receive more than one Qualified Bid by the Bid Deadline, the Debtors shall conduct an Auction at the offices of proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, or such other place and time as the Debtors shall notify in writing all Qualified Bidders that have submitted Qualified Bids. If the Debtors do not receive any Qualified Bid (other than the Stalking Horse Bid) on or prior to the Bid Deadline, the Debtors shall promptly cancel the Auction and seek approval of the Sale of the Residents Program Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement at the Sale Hearing.

**D.    The Notice Procedures**

35.    Within one (1) business day following entry of an order approving the Bidding Procedures, or as soon as practicable thereafter (the "**Mailing Date**"), in accordance with Bankruptcy Rule 2002(a) and (c), the Debtors (or their agents) shall serve the auction and sale notice (the "**Auction and Sale Notice**"), substantially in the form attached hereto as **Exhibit D**, by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets during the past six (6) months; (b) all entities known to have asserted any interest in or upon any of the Debtors' assets; (c) all

---

[13]    As noted above, under the terms of the Stalking Horse LOI, the Closing Date may be extended as required to obtain necessary governmental and regulatory approvals as the Stalking Horse Bidder and Seller shall mutually agree.

federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the Accreditation Council for Graduation Medical Education (the "**ACGME**"); and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").

36.     The Auction and Sale Notice shall indicate that copies of the Motion, the Stalking Horse Sale Agreement, the Bidding Procedures Order, and all other documents filed with the Court can be obtained on the website of the Debtors' proposed claims and noticing agent, Omni Management Group.  The Auction and Sale Notice will also indicate the proposed deadline for objecting to the Sale to the Successful Bidder and the anticipated date and time of the Sale Hearing, subject to the Court's availability.  In addition, the Auction and Sale Notice shall provide notice that the Debtors will seek to assume and assign certain executory contracts to be identified in accordance with the Assumption and Assignment Procedures (as described further below) at the Sale Hearing.  The Debtors request that such notice be deemed to be sufficient and proper notice of the Sale with respect to known interested parties.

37.     The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1(E)(5), to publish the Auction and Sale Notice on the Mailing Date, or as soon thereafter as is practicable, in the *Philadelphia Inquirer* and an industry publication on one

occasion. The Debtors request that such publication notice be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

38.     As soon as reasonably practicable after the conclusion of the Auction, if any, the Debtors shall file on the docket, but not serve, a notice identifying the Successful Bidder, (the "**Post-Auction Notice**").

**E.      The Assumption and Assignment Procedures**

39.     At the closing of the Sale, the Debtors anticipate that they will assume certain executory contracts designated by the Stalking Horse Bidder (or other Successful Bidder) ("**Designated Contracts**") pursuant to section 365(b) of the Bankruptcy Code and assign such Designated Contracts to the Stalking Horse Bidder (or other Successful Bidder). The Debtors accordingly are seeking approval of proposed procedures to govern the assumption and assignment of all Designated Contracts (the "**Assumption and Assignment Procedures**"). Because the Assumption and Assignment Procedures are set forth in detail in the attached Bidding Procedures Order, they are not restated herein. Generally speaking, however, the Assumption and Assignment Procedures: (a) outline the process by which the Debtors will serve notice, in substantially the form attached hereto as **Exhibit E** (the "**Assumption and Assignment Notice**"), to all counterparties to the Designated Contracts regarding the proposed assumption and assignment and related cure amounts, if any; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of Designated Contracts.

## BASIS FOR RELIEF

**A.    Approval of the Sale Is Appropriate Under Section 363 of the Bankruptcy Code**

40.    The Sale should be approved as a sound exercise of the Debtors' business judgment.  Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ."  11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).  Once a court determines that a valid business justification exists for a sale outside of the ordinary course of business, the court must determine whether (a) adequate and reasonable notice of the sale was given to interested parties, (b) the sale will produce a fair and reasonable price for the property, and (c) the parties have acted in good faith.  *See In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).  As described below, the proposed Sale meets each of these requirements.

**1.    The Sale Represents a Sound Exercise of the Debtors' Business Judgment**

41.    Here, a strong business justification exists for the Sale.  As described above and in the First Day Declaration, the Debtors have concluded that Hahnemann must be closed.  Conducting a sale with respect to the Residents Program Assets not only preserves value for the Debtors' estates, but  represents the best, if not the <u>only</u>, opportunity for the Debtors to protect the interests of nearly 600 Residents who, without such a transaction, might suffer severe disruption to their professional development and family lives as a result of the closure.  As a

result, an expeditious sale of the Debtors' Residents Program Assets is a reasonable exercise of the Debtors' business judgment and is in the best interests of all of the Debtors' stakeholders, including both creditors and the Residents.

> **2.      The Bidding Procedures are Fair and Designed to Maximize Value**

42.      The Debtors believe that the Bidding Procedures satisfy each of the remaining requirements for approval of a sale under section 363 of the Bankruptcy Code by (a) providing sufficient notice of each element of the proposed sale process, (b) facilitating a value-maximizing sale, and (c) ensuring an unbiased and good faith sale process.  The detailed Bidding Procedures outlined above and set forth in **Exhibit B** provide notice designed to fully inform all parties with a stake in the sale process regarding the portions of the sale process most relevant to their interests.  For example, the Bidding Procedures ensure that any entities asserting an interest in the Debtors' Residents Program Assets and parties to the Designated Contracts will receive notice of the proposed Sale, the procedures for objecting to the Sale, and the proposed assumption and assignment of their respective contracts.  Similarly, the Bidding Procedures outline all material aspects of the potential purchaser notification, bid qualification, due diligence, bid submission, bid selection, and auction process, including the timing for each. Thus, the Bidding Procedures provide assurance to each entity potentially interested in purchasing the Debtors' Residents Program Assets that their respective rights will be protected and the Sale process will be fair and reasonable.

43.      Further, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, the highest and best offer for the Residents Program Assets.  Moreover, the Bidding Procedures provide the Debtors with the flexibility to modify the Bidding Procedures, if necessary, to maximize value

for the Debtors' estates.  Accordingly, the Debtors believe the Court should approve the Bidding Procedures.

44.      Similar bidding procedures have been approved in the Third Circuit.  *See, e.g.*, *In re Sungevity, Inc., et al.*, No. 17-10561 (KG) (Bankr. D. Del. Mar. 29, 2019), ECF No. 124; *In re DirectBuy Holdings, Inc., et al.,* No. 16-12435 (CSS) (Bankr. D. Del. Dec. 1, 2016), ECF No. 126; *In re BPS US Holdings, Inc., et al.,* No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233; *In re Emerald Oil, Inc., et al.*, No. 16-10704 (KG) (Bankr. D. Del. Aug. 31, 2016), ECF No. 664; *Savient Pharms., Inc.*, No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013, ECF No. 110.

### 3.      The Break-Up Fee is Necessary

45.      The Debtors believe that approval of the Break-Up Fee to the Stalking Horse Bidder will ensure the Debtors' ability to maximize the realizable value of the Debtors' Residents Program Assets for the benefit of the Debtors' estates, their creditors, and other parties in interest.  The Stalking Horse Bidder conditioned its willingness to serve as a stalking horse bidder on the inclusion of the Break-Up Fee.  If approved by the Court, the Debtors would be required to pay the Stalking Horse Bidder a Break-Up Fee of $225,000 only in the event that the Debtors sell the Residents Program Assets to a third-party buyer instead of the Stalking Horse Bidder, payable solely from the proceeds of such third-party transaction.

46.      The United States Court of Appeals for the Third Circuit has held that break-up fees and expense reimbursements must meet the standards applicable to the allowance of administrative expenses under section 503(b) of the Bankruptcy Code.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)).  The Third

Circuit has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien*, 181 F.3d at 537. Second, "if the availability of break-up fees and expense [reimbursements] were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

47.    The Break-Up Fee should be approved and afforded priority administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code because it provides a clear benefit to the Debtors' estates. By conducting due diligence, participating in negotiations for a potential transaction and ultimately signing the Stalking Horse Sale Agreement, the Stalking Horse Bidder has established a bid standard, including a price floor, and initiated a sales process that will serve as a catalyst for other bidders to submit higher and better bids. Further, the Stalking Horse LOI and Stalking Horse Sale Agreement should provide some degree of comfort to the Debtors' Residents regarding their future. The Debtors submit that the amount of the Break-Up Fee is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder, including conducting the legal and financial diligence necessary to negotiate and enter into the Stalking Horse Sale Agreement, which will serve as the baseline for other bids for the Residents Program Assets.

48.     Moreover, the Debtors believe that the execution of the Stalking Horse LOI, and ultimately the Stalking Horse Sale Agreement, provides an incentive for others to consider expending the time and effort to do so now.  To the extent that the Stalking Horse Sale Agreement entices other potentially interested purchasers to participate in the bidding and auction process, the Break-Up Fee will provide a material benefit to the Debtors' estates in the form of an increased sale price.  On the other hand, in the event that others are not encouraged by the Stalking Horse Bid to undertake additional efforts and participate in the Auction, the Break-Up Fee will not be paid and, thus, should not affect the value received by the Debtors for the Residents Program Assets.  As such, the Debtors submit that it is appropriate to enter into the Stalking Horse Sale Agreement containing the Break-Up Fee.

49.     Here, the Stalking Horse Bidder has conditioned its willingness to enter into the Stalking Horse Sale Agreement on the Court's approval of the Break-Up Fee.  The proposed Break-Up Fee was the result of arms'-length negotiations between representatives of the Debtors and the Stalking Horse Bidder, which is not an insider of the Debtors.  The Debtors submit that the Break-Up Fee is justified to induce the Stalking Horse Bidder to enter into the Stalking Horse Sale Agreement and to adequately compensate it for the risks it is taking.  The proposed transaction with the Stalking Horse Bidder ensures that the Debtors will have at least one substantial offer for the Residents Program Assets, which includes not only monetary value for the Debtors' estates but also a guarantee of placement for all of Hahnemann's nearly 600 Residents.

50.     The Break-Up fee of $225,000 is 3% of the proposed purchase price (before adjustments) of $7.5 million.  This falls within the range of bid protections regularly approved by bankruptcy courts in the Third Circuit.  *See, e.g.*, *In re American Apparel, LLC, et al.*, No. 16-

12551 (BLS) (Bankr. D. Del. Dec. 5, 2016), ECF No. 216 (approving break-up fee of 3.0% in connection with a $66 million sale of assets); *In re BPS US Holdings Inc., et al.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233 (approving break-up fee of 3.5% in connection with a $575 million sale of assets); *In re SynCardia Systems, Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Aug. 5, 2016), ECF No. 175 (approving break-up fee of 3.0% in connection with a $19 million sale of assets); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013), ECF No. 137 (approving break-up fee of 3.0% in connection with a $455 million sale of assets); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012), ECF No. 206 (approving break-up fee of 3.0% in connection with a $258 million sale of assets).

**B.    The Sale Satisfies the Requirements for a Sale Free and Clear of Interests**

48.    The Sale also meets the requirements to be a sale free and clear of Interests. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in *bona fide* dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

49.    The Debtors submit that the Sale will satisfy the requirements of section 363(f) of the Bankruptcy Code.  The Debtors will provide all parties asserting claims against the Residents

Program Assets, including, but not limited to, all creditors and interest holders of the Debtors, with notice of, and an opportunity to object to, the Sale.  Absent objection, each such party will be deemed to have consented to the Sale.  *See, e.g.*, *FutureSource LLC v. Reuters, Ltd.*, 312 F.3d 281 (7th Cir. 2002) (failure to object may constitute consent, if there was adequate notice; *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) ("Silence by affected claim holders may constitute consent for purposes of section 363(f)(2)"). In addition, the Debtors believe that certain of the parties asserting claims against the Residents Program Assets could be compelled to accept a monetary satisfaction of such Interests. Accordingly, approval of the sale of the Residents Program Assets free and clear of all Interests is warranted.

## C.    A Successful Bidder Should be Afforded the Protections of Sections 363(m) and 363(n) of the Bankruptcy Code

50.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd.* (*In re Mark Bell Furniture Warehouse, Inc.*), 992 F.2d 7, 8 (1st Cir. 1993).

51.    As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the terms of the Sale and the assignment of the Designated Contracts related thereto.  Moreover, at the Sale Hearing, the Debtors will present evidence that the terms of Sale were negotiated at arms'-length, with both parties represented by their own counsel.  Accordingly, the Debtors request that the Sale Order include a provision concluding that the Successful Bidder is a "good faith" purchaser within the meaning of section 363(m) of

the Bankruptcy Code.  The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors and that the sale will close promptly.

52.     Moreover, neither the Debtors nor the Stalking Horse Bidder have engaged in any conduct that would cause or permit the Stalking Horse Sale Agreement to be avoided under section 363(n) of the Bankruptcy Code. If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, the Debtors will have negotiated an alternative asset purchase agreement with the Successful Bidder in good faith and at arms'-length. The Bidding Procedures are designed to prevent the Debtors or the Successful Bidder from engaging in any conduct that would cause or permit the Stalking Horse Sale Agreement or the Sale to be avoided under section 363(n) of the Bankruptcy Code.

53.     Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Stalking Horse Bidder or other Successful Bidder (a) is purchasing the Residents Program Assets in good faith, (b) is entitled to the full protections of section 363(m) of the Bankruptcy Code, and (c) has not entered into an agreement with other potential bidders or otherwise engaged in conduct that violates section 363(n) of the Bankruptcy Code.

**D.     Assumption and Assignment of the Designated Contracts Should be Authorized**

54.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Further, section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance . . . is provided. . . ."  11 U.S.C.

35587432.3 07/09/2019

§ 365(f)(2). Assumption and assignment of the Designated Contracts in connection with the Sale is appropriate.

### 1. Assumption of the Designated Contracts is a Reasonable Exercise of the Debtors' Business Judgment

55. Assumption or rejection of a contract is a matter of the debtor's business judgment. *See Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom.*, *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test"); *In re Physiotherapy Holdings, Inc.*, 506 B.R. 619, 622 (Bankr. D. Del. 2014) (citing *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003)). A debtor's decision in this regard is "entitled to great deference from the Court." *See In re Armstrong World Indus.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006). In order to satisfy the business judgment test, a debtor must only show that assumption or rejection of an executory contract will benefit the estate. *See Bildisco*, 682 F.2d at 79; *see also In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("Under the business judgment standard, the sole issue is whether the rejection benefits the estate").

56. To facilitate the Sale and to maximize the value received for the Debtors' Residents Program Assets, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Designated Contracts to the Successful Bidder. Certain of the Debtors' executory contracts will be necessary for the Successful Bidder's continued operation of the Residents Program Assets.

57. The Debtors further request that the Sale Order provide that the Designated Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Designated Contracts, including those

described in sections 365(b)(2), 365(f)(1), and 365(f)(3) of the Bankruptcy Code that prohibit such assignment.

58.     The Debtors also request that the Sale Order provide that to the extent any provision in any Designated Contract assumed and assigned (a) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment (including, without limitation, any "change of control" provision), or (b) is modified, breached, terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of the Cases, (ii) the insolvency or financial condition of the Debtors at any time before the closing of the Cases, (iii) the Debtors' assumption and assignment of such Designated Contract, or (iv) the consummation of the Sale, then such provisions shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or condition such assumption or assignment, to modify, terminate or declare a breach or default under such Designated Contract, or to exercise any other default-related rights or remedies with respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture such Designated Contracts, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.  The Debtors request that all such provisions be deemed to constitute unenforceable anti-assignment provisions and are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

## 2.     Any Defaults Under the Designated Contracts will be Cured and Evidence of Adequate Assurance of Future Performance Provided

59.     Once an executory contract or unexpired lease is assumed, the trustee or debtor in possession may generally elect to assign such contract, so long as it cures any defaults and provides adequate assurance of future performance. *See* 11 U.S.C. § 365(f)(2)(B) (a debtor may

assign an executory contract or unexpired lease of nonresidential property if "adequate assurance of future performance by the assignee of such contract or lease is provided. . . ."). The requirements to show "adequate assurance of future performance" will depend on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001); *In re Decora Indus.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guaranty of payment"). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

60.    The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any Designated Contracts because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale. The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder to perform under the Designated Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Designated Contracts, as required under section 365(f)(2)(B) of the Bankruptcy Code.

61.     The Debtors submit that implementation of the Assumption and Assignment Procedures regarding assumption and assignment of the Designated Contracts is appropriate in this case.  The Court, therefore, will have a sufficient basis to authorize the Debtors to assume and assign the Designated Contracts to the Successful Bidder.

## SATISFACTION OF BANKRUPTCY RULE 6003

62.     Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ."  *See* Fed. R. Bankr. P. 6003.  As described herein, a rapid sale process is critical to the Debtors' ability to realize value with respect to the Residents Program Assets and minimize the negative impact of the closure of Hahnemann with respect to Residents, as well as the Debtors' academic affiliation partner, Drexel University.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)

63.     To implement the foregoing immediately, the Debtors seeks a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and the assumption and assignment of the Designated Contracts under Bankruptcy Rule 6006(d).

64.     Here, a waiver of the stay is appropriate because the Residents Program Assets were adequately marketed and notice of the Sale was and will be adequately provided to all parties in interest.  Likewise, the non-Debtor parties to the Designated Contracts will be provided with adequate notice of, and opportunity to object to, the assumption and assignment of the Designated Contracts.

35587432.3 07/09/2019

## NOTICE

The Debtors have provided notice of the filing of the Motion via facsimile and/or email or, if neither is available, by overnight mail to: (i) the Office of the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Human Services; (xi) the City of Philadelphia; (xii) the CMS; (xiii) the ACGME; and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

35587432.3 07/09/2019

**WHEREFORE**, the Debtors respectfully request entry of the Bidding Procedures Order and the Sale Order granting the relief requested herein and such other and further relief as the Court deems just and warranted.

Dated: July 9, 2019                **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
　　Mark Minuti (DE Bar No. 2659)
　　Monique B. DiSabatino (DE Bar No. 6027)
　　1201 N. Market Street, Suite 2300
　　P.O. Box 1266
　　Wilmington, DE  19899
　　Telephone: (302) 421-6800
　　Fax: (302) 421-5873
　　mark.minuti@saul.com
　　monique.disabatino@saul.com

　　　　　　-and-

　　Jeffrey C. Hampton
　　Adam H. Isenberg
　　Aaron S. Applebaum (DE Bar No. 5587)
　　Centre Square West
　　1500 Market Street, 38th Floor
　　Philadelphia, PA 19102
　　Telephone: (215) 972-7700
　　Fax: (215) 972-7725
　　jeffrey.hampton@saul.com
　　adam.isenberg@saul.com
　　aaron.applebaum@saul.com

　　*Proposed Counsel for Debtors and*
　　*Debtors in Possession*