## Exhibit C

**Stalking Horse LOI**

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E



July 9, 2019

Mr. Joel Freedman, President
Mr. Allen Wilen, Chief Restructuring Officer - Finance
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
230 N Broad Street
Philadelphia, PA 19102

**Re: Acquisition of Certain Assets of Hahnemann University Hospital**

Dear Messrs. Freedman and Wilen:

This letter ("Letter") evidences the intent of Tower Health or one of its subsidiary entities (the "Buyer") to acquire certain assets (the "Proposed Transaction" or "Transaction") of Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "Seller" or "Hahnemann") in the Hahnemann bankruptcy process on the essential terms and conditions as set forth herein.

Tower Health is uniquely positioned to facilitate this Transaction because, in its view, this Transaction offers the best opportunity for the continuity of programs for the medical residents and fellows who are currently training at Hahnemann (collectively, "Residents"). Tower Health has six hospitals, many of which are in close proximity to Hahnemann, and additional information about Tower Health is set forth in the attached Appendix A. Tower Health will provide housing to those Residents who are doing rotations at Reading Hospital, which is sixty miles from Hahnemann. Tower Health will also seek to hire the faculty who are currently training the Residents at Hahnemann to ensure continuity of the Hahnemann training programs ("Programs"). Tower Health recognizes that the Residents have a choice as to where to do their training and will agree to release, or if the release must occur prior to Closing, will agree that Seller may release, the related cap on Medicare reimbursement on a temporary basis for those current Residents who elect to complete their training elsewhere.

The essential terms of the Transaction include, but are not limited to:

1.    Purchase of Certain Assets/ Assumption and Assignment of Contracts.

At the Closing (as defined in Paragraph 16 below) Seller will sell and assign and Buyer will buy and assume all of Sellers' rights in the following assets owned or used in connection with the operation of Hahnemann (collectively, the "Purchased Assets"): (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) to the extent assignable or transferrable, the Programs so that one or more of Tower Health hospitals will become the principal training site for all

DocuSign Envelope ID: FB7C4A00-F007-40ED-A698-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019

Programs except for a limited number of Programs to be specified in the Purchase Agreement (defined in Paragraph 6 below) that will be closed by Hahnemann prior to the Closing.

2.    Excluded Assets and Liabilities.

(a)    The Purchased Assets will not include any assets other than those described in Paragraph 1 of this Letter and specifically exclude Seller's cash and accounts receivable.

(b)    Except as expressly set forth herein and in the Purchase Agreement, the Buyer will not acquire or assume any present or future obligation or liability of Seller, including, any obligation or liability associated with:

(i)    Seller's trade accounts payable;

(ii)    Seller's relationship with its employees (sick pay, paid time off, severance pay, vacation pay, etc.) except that Buyer shall give Residents credit for unused paid time off earned by the Residents prior to the Closing Date; provided that subject to Buyer's completion of due diligence, Buyer may elect to assume Seller's employment agreements with Continuing Residents;

(iii)    Seller's obligations under contracts not expressly assumed by Buyer;

(iv)    Seller's debt obligations regardless of the creditor;

(v)    Seller's obligations to any taxing authority;

(vi)    Seller's obligations under federal or state environmental laws; or

(vii)    any liability, obligation, contingency or duty of Seller for or relating to any period ending on or prior to the Closing Date to any governmental authority or third party payor (including, without limitation, Medicare, Medical Assistance or any other agency charged with the administration of payments on behalf of any other third party payor) or arising from any report or other filing made by or on behalf of Seller to any such governmental authority or third party payor.

3.    Residents. Tower Health will assume responsibility for the continued training of all 583 Hahnemann residents and fellows and will give each Resident who desires to continue his or her training at Tower Health the right to be placed in one of Tower Health's six (6) hospitals (collectively, "Continuing Residents") or to accept a position elsewhere. Tower Health will agree to release, or if the release must occur prior to Closing, will agree that Seller may release, the related cap on Medicare reimbursement on a temporary basis for those current Residents who elect to complete their training elsewhere. In order to make the transition as easy as possible for the Residents, Tower Health will provide free housing (subject to the parameters to be defined in the Purchase Agreement) for the remainder of the academic year or during the term of a Resident's existing vacated lease if it is necessary for the Residents to relocate during the current academic year. Tower Health will also seek to transfer the faculty with whom the Residents have been training to ensure that the Residents' training cohort remains intact. The Residents will receive free meals while in any Tower Health hospital. Tower Health will provide additional amenities, to be described in the Purchase Agreement, to the Residents to assist them and their families with the transition. Seller and Buyer shall work cooperatively to determine clinical rotation assignments for Continuing Residents, with such

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019

assignments to commence as soon as practicable after the Purchase Agreement is entered into. For the avoidance of doubt, neither the existence of this Letter nor any provisions set forth herein shall be interpreted to restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those current Residents who elect to complete their training elsewhere.

4.    <u>Purchase Price and Related Terms</u>.  The Purchase Price shall be Seven Million Five Hundred Thousand Dollars ($7,500,000) ("Base Purchase Price") and shall be paid in cash at Closing subject to the purchase price adjustment of Five Hundred Thousand Dollars ($500,000), which was paid by Buyer to Seller on June 28, 2019 as consideration for the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Seller and Buyer (the "Tower GME Affiliation Agreement"), that shall be subtracted from the Base Purchase Price.  In addition, the amount of Three Million Dollars ($3,000,000) (the "Escrow Amount") will be withheld from the Base Purchase Price and placed into an escrow account with a third party financial institution mutually agreed to by Buyer and Seller (the "Escrow Account") to be released to Buyer, subject to the procedures to be agreed in the Purchase Agreement, to cover the following losses, damages and expenses (collectively, the "Permitted Escrow Withdrawals"): (a) the Tail Coverage Costs, (b) the CMS Discharge Amount, (c) the Cure Amounts (each as defined in Paragraph 7 below), and (d) the Indemnity Amounts (as defined in Paragraph 9 below).  To the extent that there are any funds remaining in the Escrow Account on the date that is a one-year anniversary of the Closing Date after the Permitted Escrow Withdrawals, such remaining funds shall be returned to Seller.

5.    <u>Break-Up Fee</u>.  The Purchase Agreement shall provide that, if it is not approved by the Bankruptcy Court and the offer of a third party for the Purchased Assets is approved by the Bankruptcy Court and closes instead of the Purchase Agreement, then Buyer will be entitled to receive solely from the proceeds of such transaction, a flat fee payment (not dependent on amounts actually expended or incurred by Buyer) in immediately available funds in the amount equal to Two Hundred Twenty Five Thousand Dollars ($225,000) (the "Break-Up Fee"), without any deduction or offset of any nature, which payment shall be made to Buyer concurrently with the consummation of such third-party sale. The Break-Up Fee shall be approved by the Bankruptcy Court prior to the commencement of any solicitation of competing bids and at least 5 days prior to the date set for a hearing on the Purchase Agreement pursuant to an order approving bid procedures with respect to the Transaction (the "Bid Procedures Order") in form and substance acceptable to Buyer.

6.    <u>Definitive Purchase Agreement</u>.  The terms and conditions of the Transaction shall be set forth in a definitive asset purchase agreement (the "Purchase Agreement") between Seller and Buyer, which will contain the essential terms described in this letter, plus such other additional terms and provisions as are usual and customary in connection with transactions similar to those described herein and will be filed with the Bankruptcy Court prior to the hearing seeking approval of the bidding procedures. The final version of the Purchase Agreement will be subject to the approval of the Board of Directors of Tower Health and the Board of Managers of Philadelphia Academic Health Systems, LLC, the manager of the Seller.

7.    <u>Contingencies</u>.  The consummation of the Transaction will be subject to the satisfaction of each of the following contingencies:

        (a)    A material portion of the Programs shall not have been transferred to other academic medical centers or hospitals, except as otherwise agreed to by Tower Health; it being understood that

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019

the foregoing does not prohibit Hahnemann from, on an individual basis, granting consent to the transfer of those current Residents who elected to continue their training elsewhere and the release of the related cap on Medicare reimbursement on a temporary basis for such Residents.

(b)     Buyer, at its sole cost and expense, shall have purchased a reporting endorsement (tail coverage) to insure against professional liabilities of Continuing Residents relating to the period of the Seller's ownership and operation of Hahnemann until the Closing Date. If the cost of such endorsement exceeds $100,000 in the aggregate, any and all amounts in excess of $100,000 shall be referred to herein the "Tail Coverage Costs".

(c)     The Bankruptcy Court shall have entered the Bid Procedures Order and an order (the "Sale/Assumption and Assignment Order") in form and substance satisfactory to Buyer (i) approving the assumption and assignment to Tower of the Purchased Assets which are executory contracts, (ii) approving the sale of all of the Purchased Assets (including executory contracts) to Tower free and clear of all claims and encumbrances, and (iii) setting forth any cure amounts related to assumed and assigned contracts that are part of the Purchased Assets (collectively, the "Cure Amounts").

(d)     The Centers for Medicare and Medicaid Services ("CMS"), the Pennsylvania Department of Health and Human Services ("DOH"), and the Accreditation Council for Graduate Medical Education ("ACGME") and any other applicable regulatory authority or governmental body, in each case, to the extent required, shall have consented to the Transaction, and with respect to the CMS only, the CMS shall have agreed to limit the amount of claims of offset or recoupment (the "CMS Discharge Amount") and to discharge Buyer from any liabilities, penalties and claims in excess of the CMS Discharge Amount for any period prior to the Closing Date with respect to the Purchased Assets over which the CMS exercises authority.

(e)     If the sum of the Tail Coverage Costs, the CMS Discharge Amount and the Cure Amounts exceeds Three Million Dollars ($3,000,000), each of Buyer and Seller shall have the right to terminate the Purchase Agreement, in its sole and absolute discretion.

(f)     Unless waived by Tower, the Sale/Assumption and Assignment Order shall have become a final order.

8.    Termination. This Letter may be canceled, terminated or voided as set forth immediately below:

(a)     By mutual consent of Buyer and Seller at any time; or

(b)     By Buyer or Seller in the event a Purchase Agreement is not executed by July 12, 2019, or for failure to obtain entry of the Bid Procedures Order by July 17, 2019.

9.    Indemnification. Seller will indemnify, hold harmless and defend the Buyer from all loss, damage, and expense (collectively, "Indemnity Amounts") arising out of third party claims for Seller's acts or omissions arising out of or related to the Purchased Assets, ownership of the Purchased Assets, or any liability or obligation of the Seller with respect to the Purchased Assets excluding any acts, omissions, liabilities or obligations arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Buyer of the Purchased Assets following the Closing Date. The indemnification period will be limited to claims made within one (1) year after the

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019

Closing Date with the exception of claims by a taxing authority or third party payors, which claims shall be subject to the applicable statute of limitations. Seller's indemnification obligations shall be subject to a de-minimis basket of $25,000 per claim and with respect to any breaches of representations and warranties, shall be subject to an aggregate non-tipping/deductible basket of $200,000. Notwithstanding anything to the contrary contained herein, Buyer's sole recourse under the indemnification provisions shall be to the Escrow Amount and subject to the escrow procedures to be agreed in the Purchase Agreement and shall not extend to Seller's any other assets or interests, including, without limitation, the Base Purchase Price (other than the Escrow Amount).

10.    Medicare GME Affiliation Agreements.

(a)    St. Christopher's Hospital for Children.  For the period of 20 years after the Closing Date, Tower Health agrees to, and to cause any successor or assignee of any Purchased Assets to agree to: (i) enter into an agreement to continue participating in a "Medicare GME affiliated group," as that term is defined in 42 CFR § 413.75(b), with St. Christopher's Hospital for Children ("STC"), whereby Buyer will continue sharing full time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between STC and Seller (the "STC GME Affiliation Agreement") or enter into a new GME affiliation agreement substantially in the form of the STC GME Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation arrangement" each such academic year.

(b)    Other GME Affiliation Agreements.  Seller is (i) party to the GME affiliation agreements identified on Schedule A attached hereto ("Current GME Affiliation Agreements"); it being understood that Schedule A does not include the Tower GME Affiliation Agreement or the STC GME Affiliation Agreement, and (ii) is the member of several "Medicare GME affiliated groups," as that term is defined in 42 CFR § 413.75(b), which share full time equivalent resident caps for direct graduate medical education and indirect medical education.  Buyer shall (x) for the remainder of the current academic year, accept assignment of the Current GME Affiliation Agreements or enter into new GME affiliation agreements substantially in the form of the Current GME Affiliation Agreements; and (y) subject to Buyer's completion of due diligence, accept assignment of the agreements identified on Schedule B to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements. Any cure amounts with respect to any agreements assumed pursuant to this Paragraph 10(b) shall be reflected in the Cure Amounts and if not so reflected, shall be subject to Seller's indemnification obligations set forth in Paragraph 9.

11.    Noncompetition.  The Purchase Agreement will provide that Seller shall not engage, directly or indirectly, in the ownership or operation of an acute care hospital for a three (3) year period within a ten (10) mile radius of Hahnemann following the Closing.

12.    Exclusive Negotiations.  Hahnemann agrees that, for a period of time commencing on the date of this Letter and ending on the earlier of (a) entry of the Bid Procedures Order, and (b) the date of termination of this Letter pursuant to Paragraph 8 hereof, neither the Seller nor any of its affiliates, officers, employees or agents will negotiate or engage in any discussions with any other person or entity and will not sign any other agreement relating to: (A) except for collateral purposes with respect to any debtor-in-possession financing that contemplates an "all asset" collateral grant, an offer to sell or purchase or assume and assign the Purchased Assets, (B) the transfer of or other change in the

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 7, 2019
9

ownership of Hahnemann, (C) the merger or affiliation of Hahnemann with or into any other entity, or (D) any other transaction involving a change in control or affiliation of Hahnemann. For the avoidance of doubt, the provisions set forth in this Paragraph 12 shall not restrict (i) Seller from soliciting offers for sale or purchase of any of the Purchased Assets after the date on which the motion for the Bid Procedures Order is filed; or (ii) Seller from extending its existing clinical rotation agreements.

13.    Public Announcements. Any and all public announcements or releases related to the Proposed Transaction by either party shall be approved by both parties prior to dissemination.

14.    Expenses. Each party will bear its own legal, consulting, accounting and other expenses connected with the Proposed Transaction (including any broker's or finder's fees and the expenses of its representatives).

15.    Government Approvals. Buyer and Seller will mutually agree on a methodology for contacting and obtaining necessary governmental and regulatory approvals regarding the Proposed Transaction.

16.    Closing Date. The Purchase Agreement shall provide that the closing thereunder (the "Closing") shall occur by August 1, 2019 or such later date (the "Closing Date") as is required to obtain necessary governmental and regulatory approvals as Buyer and Seller shall mutually agree.

17.    Binding Effect. This Letter is subject, in all respects, to the negotiation, execution and delivery of the Purchase Agreement. Except for the provisions of Paragraphs 5, 12, 13, 14, 19, 20 and 21, no party shall have any obligation regarding any matter herein until the Purchase Agreement is executed.

18.    Best Efforts. Seller shall use its best efforts to assist Buyer in obtaining and Buyer shall use its best efforts to obtain all necessary approvals by the CMS, DOH and ACGME, to the extent required, with respect to the Transaction.

19.    Counterparts. This Letter may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. This Letter may be executed by facsimile, electronically or by telecopy.

20.    Third-Party Beneficiary. None of the provisions contained in this Letter are intended by the parties hereto, nor shall they be deemed, to confer any benefit on any person that is not a party executing this Letter.

21.    Governing Law. This Letter shall be construed in accordance with and governed by the laws of the Commonwealth of Pennsylvania. In the event an action is brought by any party under this Letter to enforce any of its terms, it is agreed that the non-prevailing party shall bear the cost and expense of such proceeding and the prevailing party shall be entitled to reasonable attorney fees to be fixed by the court and shall be set forth in the award.

If this letter meets with your approval, please indicate your acceptance by signing a copy of it and returning it to me at your earliest convenience but not later than by the close of business on July 8, 2019.

Sincerely,
TOWER HEALTH

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 9, 2019

By: _____
Clint Matthews
President and Chief Executive Officer

Center City Healthcare, LLC d/b/a Hahnemann University Hospital accepts and agrees to the foregoing terms and conditions and approve and accept the foregoing letter of intent on this 9 day of July, 2019.

Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital

By: _____
Joel Freedman
President

By: _____
Allen Wilen
Chief Restructuring Officer - Finance

DocuSign Envelope ID: FB7C4A00-F007-40ED-A696-DA0956AFCC9E

Messrs. Joel Freedman and Allen Wilen
Center City Healthcare, LLC d/b/a Hahnemann University Hospital
July 9, 2019

## **APPENDIX A**

**Tower Health Overview**

[attached]



TOWER HEALTH OVERVIEW

JUNE 24, 2019





## THE TOWER HEALTH EVOLUTION
### The Building Blocks of an Integrated Delivery System

# TOWER HEALTH MISSION, VISION, AND VALUES

## MISSION

Tower Health is committed to providing compassionate, accessible, high quality, cost effective healthcare to the community without distinction as to race, color, age, creed, handicap, sex, national origin, or economic status; to promote health; to educate healthcare professionals and the public; and to participate in appropriate clinical research.

## VISION

Tower Health will be an innovative, leading health system dedicated to advancing the health and transforming the lives of the people we serve through excellent clinical quality; accessible, patient-centered, caring service; and unmatched physician and employee commitment.

## VALUES

- **Advancement**
  We're committed to setting ambitious goals to move healthcare and our communities forward.
- **Inclusiveness**
  Everyone working together collaboratively.
- **Respect**
  In our regard for, and actions toward, our communities, patients, and each other.
- **Responsibility**
  Acting in honest, forthright, and fiscally responsible ways.

# TOWER HEALTH OVERVIEW

## WHO WE ARE

Tower Health is an innovative, leading health system dedicated to advancing the health and transforming the lives of the people we serve through compassionate, accessible, high quality, cost-effective healthcare.

Together, our six hospitals and extensive network of outpatient facilities provides a full range of medical care – from prevention, screenings, and education; to the latest clinical services and surgeries available; to rehabilitation.

## ACADEMICS

Through a 20-year academic agreement, Tower Health is partnering with Drexel University to build a new regional campus of Drexel University College of Medicine less than a mile from Reading Hospital, creating a top-choice destination for physicians of the future. Students of this new regional campus will receive education in a brand new, state-of-the-art facility, and complete their clinical rotations and training at Reading Hospital, the flagship Magnet-recognized hospital of Tower Health.

Tower Health's Residency Program will be expanded to include more than 300 residents.

# A STRONG AND INTEGRATED HEALTH SYSTEM

Tower Health was formed in September 2017 when Reading Health System completed the acquisition of five community hospitals located in southeastern Pennsylvania. Today, the health system is comprised of:

- Brandywine Hospital in Coatesville (171 licensed beds*)
- Chestnut Hill Hospital in Philadelphia (148 licensed beds*)
- Jennersville Hospital in West Grove (63 licensed beds*)
- Phoenixville Hospital in Phoenixville (139 licensed beds*)
- Pottstown Hospital in Pottstown (232 licensed beds*)
- Reading Hospital, a teaching hospital in West Reading (714 licensed beds*, including 62 beds at a dedicated rehabilitation hospital)
- Several outpatient and ambulatory facilities, including ambulatory surgery centers, rehab, lab, and imaging
- Tower Health Behavioral Care Campus, a behavioral health facility slated to open in Berks County in 2020 in partnership with Acadia Healthcare
- Tower Health Medical Group, a network of more than 100 primary care and specialty care practices, that includes >500 physicians and >250 APPs
- Tower Health Urgent Care, a network of 21 urgent care locations with an expansion plan for 22 additional sites over 3 years
- Tower Health at Home, one of the nation's largest regional home health and hospice organizations
- Tower Health Partners, a clinically integrated physician network with more than 2,400 providers
- Tower Health – UPMC Health Plan, a joint venture with UPMC Health Plan that offers affordable health insurance coverage and access to high quality care in nine counties, with over 50,000 member lives in all lines of business including Medicare Advantage, Administrative Services Only (ASO) for self-insured employers, Individual (Exchange), as well as Commercial Group, Special Needs Plans (SNP), Managed Medical Assistance, and Children's Health Insurance Program (CHIP).

*Number of licensed beds, excludes nursery





## TOWER HEALTH AT A GLANCE

**902,024** PSA Population[1]

**44%** PSA Inpatient Market Share[2]

**$1.78 Bn** Revenues[7]

**1,467** Licensed Beds[3]

**327,128** Patient Days[5]

**4,637** Newborn Deliveries

**11,385** Employees[4] (10,256 FTEs)

**>755** Employed Physicians and Healthcare Providers[6]

**>1.5 million** Physician Office Visits[8]

**279,968** Emergency Room Visits•

**37,105** Total Surgeries[9]

**64,426** Total Admissions[5]

**132,957** Adjusted Admissions

1.  2019 Environics Analytics Estimate based on Tower Health combined PSA
2.  FY2018 market share based on Tower Health combined PSA
3.  Excludes nursery beds; Includes 62 beds at Reading Hospital Rehabilitation at Wyomissing
4.  Current as of June 30 2018; FTEs based on hours worked; Includes hospitals, THMG, THP, Clinics, and Foundation
5.  Excludes normal newborns
6.  >500 physicians and 255 APCs; source THMG; current as of June 30, 2018
7.  Includes THMG, THP, Clinics and Foundation
8.  Excludes anesthesia and radiology visits
9.  Includes 13,808 inpatient and 23,297 outpatient surgeries

• Reading Hospital ED is the largest in Commonwealth of PA; 8th largest in U.S.
** All data is CY2018 unless otherwise noted.

**TOWER HEALTH**
**3rd LARGEST HEALTH SYSTEM IN PHILADELPHIA REGION**

**T H E  L I S T**

# Largest Health Systems and Hospitals in the Philadelphia region

Ranked by Total licensed beds

| Rank | Name | Total Licensed Beds |
|---|---|---|
| 1 | Thomas Jefferson University and Jefferson Health | 2,824 |
| 2 | Penn Medicine (University of Pennsylvania Health System) | 2,546 |
| 3 | Tower Health | 1,458 |

# TOWER HEALTH SERVICE AREA POPULATION

| YEAR | TOTAL POPULATION | |
| --- | --- | --- |
| | PENNSYLVANIA | TOWER HEALTH TSA |
| 2000 | 12,281,026 | 1,248,602 |
| 2010 | 12,702,379 | 1,374,555 |
| 2019 est. | 12,820,587 | 1,429,567 |
| 2024 proj. | 12,903,225 | 1,456,789 |
| CY19-CY24 POPULATION CHANGE | 0.6% | 1.9% |

Environics Analytics (EA). Source: Claritas - Pop-Facts Premier 2019

# FY2018 INPATIENT DISCHARGES
## IN THE TOWER HEALTH TOTAL SERVICE AREA

| TOWER HEALTH HOSPITAL | FY2018 DISCHARGES | FY2018 MARKET SHARE |
|---|---|---|
| Reading Hospital | 28,965 | 18.2% |
| Pottstown Hospital | 7,832 | 4.9% |
| Phoenixville Hospital | 6,193 | 3.9% |
| Chestnut Hill Hospital | 5,806 | 3.7% |
| Brandywine Hospital | 5,473 | 3.4% |
| Jennersville Hospital | 1,821 | 1.1% |
| **Total Tower Health DSC in TSA** | **56,090** | **35.3%** |

Source: PHC4

# 9-COUNTY TOWER HEALTH – UPMC HEALTH PLAN
## SERVICE AREA

**Lines of Business**

- Medicare Advantage
- Special Needs Plans
- Managed Medical Assistance
- Children's Health Insurance Program (CHIP)
- Administrative Services Only (ASO)
- Individual (Exchange)
- Commercial Group



**Integrated Delivery and Financial System (IDFS)**

- 2018/2019 Membership is 45,000; goal of 200,000 in 2023
- Network development across the region
- Access Tower Health facilities at lowest available rate

## TOWER HEALTH AND DREXEL UNIVERSITY
## 20-YEAR ACADEMIC AGREEMENT

- Regional medical school campus of Drexel University College of Medicine located 0.6 miles from Reading Hospital
- Opening 2021-2022 academic year
- When fully operational, will have up to 200 medical students
- Enhances Tower Health's ongoing commitment to its academic mission to educate the physicians of tomorrow
- Enhances economic development within Berks County



## TOWER HEALTH
## AND INDEPENDENCE BLUE CROSS LOI

### Manage care, improve outcomes, and lower costs for patients across southeastern Pennsylvania

- Explore new programs that drive access to higher quality, more affordable care
- Participate in the Independence Facilitated Health Networks model
- Explore opportunities to engage with Tandigm Health and Tower Health Partners®
- Engage physicians in new ways to put patient, physician, and employer satisfaction at the center of care transformation






# READING HOSPITAL **AWARDS**

      

    



    

    

**Verras' Medical Value Index™:** One of 10 Best Value Hospitals in Pennsylvania

**Healthgrades**
- Distinguished Hospital for Clinical Excellence Award™ (2014-2019)
- America's 100 Best Hospitals

**US News & World Report:** 6th Best Hospital in PA (2018-19)

**Becker's Hospital Review:** One of 50 of the Greenest Hospitals in America

**Centers for Medicare & Medicaid Services:** 5-Star Rating for Overall Hospital Quality

**Leapfrog Hospital Safety Grade A** Spring 2019

- 15 -

## READING HOSPITAL
## SERVICE LINE HIGHLIGHTS

### CARDIAC, VASCULAR, AND THORACIC (CVT)

- Perform TransCarotid Artery Revascularization (TCAR), Transcatheter Valve Replacement (TAVR), and Endovascular Aortic Repair (TEVAR)
- Treat more patients with heart and vascular disorders than most regional hospitals
- First hospital in PA to offer Ex-Maze and CardioMEMS™
- Only hospital in Berks County to perform minimally invasive CABG procedures
- Specialized programs for heart failure, pulmonary hypertension, aortic aneurysms, electrophysiology device management, high-risk valve disorders, and aortic disease

### GENERAL SURGERY

- First in the region to have a hybrid operating room
- Comprehensive surgical and medical weight management program
- Adolescent weight management program coming October 2019
- Only hospital in Berks County to offer robotic bariatric surgery
- Only hospital-based Plastic Surgery and MedSpa practice in the region

### ORTHOPEDICS

- Robust inpatient and same-day joint replacement program
- Only facility in Berks County to receive the Joint Commission's Gold Seal in Disease-Specific Care Certification for Total Knee and Total Hip Replacement

# READING HOSPITAL
## SERVICE LINE HIGHLIGHTS

### ONCOLOGY

- Region's largest Infusion Center, providing treatment for 80 to 100 patients per day
- First in PA to have a MRI Linear Accelerator, coming October 2019
- Surgical program that is accredited by the American College of Surgeons' Commission on Cancer
- Arctic Cold Cap therapy available to patients

### WOMENS' SERVICES

- Only the Level III NICU in Berks County
- Region's only fellowship-trained minimally invasive gynecologic surgeon
- Urogynecology program that offers both medical and minimally invasive surgical treatment options
- Birthing Center and Obstetrical Urgent Care staffed by certified nurse midwives

## READING HOSPITAL
## SERVICE LINE HIGHLIGHTS

### NEUROSCIENCES

- Award-winning stroke program that has received the GOLD PLUS Achievement Award from the American Heart Association/American Stroke Association for 13 consecutive years (2007-2019) for compliance with evidence-based clinical practice and the Target Stroke Elite Plus award for two years (2018-2019) for reducing Door-to-Needle times for IV t-PA.
- Only certified electrodiagnostic lab in Berks County
- Dually trained endovascular and cerebral vascular surgeon
- Comprehensive subspecialty care for headaches, sleep disorders, neuromuscular conditions, epilepsy, Spine Clinic with surgical and non-surgical treatments
- Teleneurology services

### TRAUMA AND EMERGENCY MEDICINE

- Level I Trauma designation
- Busiest Emergency Department in Pennsylvania; 8th largest in U.S.

