1        UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF DELAWARE
2

3                                    .   Chapter 11
    IN RE:                           .
                                     .   Case No. 19-11466 (KG)
4   CENTER CITY HEALTHCARE, LLC,     .
    d/b/a HAHNEMANN UNIVERSITY       .
5   HOSPITAL, *et al.,*              .
                                     .   Courtroom No. 3
6                                    .   824 North Market Street
                                     .   Wilmington, Delaware 19801
7                                    .
                                     .
8              Debtors.             .   July 12, 2019
    . . . . . . . . . . . . . . . .   1:30 P.M.
9

10                   TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE KEVIN GROSS
11            UNITED STATES BANKRUPTCY JUDGE

12  APPEARANCES:

13  For the Debtors:        Mark Minuti, Esquire
                            SAUL EWING ARNSTEIN & LEHR LLP
14                          1201 N. Market Street
                            Wilmington, Delaware 19801
15
    For U.S. Trustee:       Benjamin Hackman, Esquire
16                          OFFICE OF THE UNITED STATES TRUSTEE
                            844 King Street
17                          Wilmington, Delaware 19801

18

19

20
    Audio Operator:         GINGER MACE
21
    Transcription Company:  Reliable
22                          1007 N. Orange Street
                            Wilmington, Delaware 19801
23                          Email:  gmatthews@reliable-co.com

24
    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.

1  APPEARANCES (Continued)

2  For HSRE:                    Stuart Brown, Esquire
                                 DLA PIPER
3                               1201 North Market Street
                                 Wilmington, Delaware 19801
4
5  For MidCap:                  Deborah Reperowitz, Esquire
                                 STRADLEY RONON
6                               100 Park Avenue
                                 New York, New York 10017
7

8  TELEPHONIC APPEARANCE:

9  For City of Philadelphia: Megan Harper, Esquire
                                 WILSON ELSER MOSKOWITZ EDELMAN DICKER
10                              The Curtis Center
                                 Independence Square West
11                              Suite 1130 East
                                 Philadelphia, Pennsylvania 19106
12

13 For Salzberg:                Mark Salzberg, Esquire
                                 SQUIRE PATTON BOGGS (US) LLP
14                              2550 M Street NW
                                 Washington, DC 20037
15

16 For U.S. of America:         Marc Sacks, Esquire
                                 U.S. DEPARTMENT OF JUSTICE
17                              Washington, D.C.

18

19

20

21

22

23

24

25

1         (Proceedings commenced at 1:39 p.m.)

2              THE CLERK:  Please rise.

3              THE COURT:  Thank you, everyone.  You may be

4    seated.  Mr. Minuti, I see you're still in one piece.

5              MR. MINUTI:  Your Honor, I'm still in one piece.

6    I would be lying if I said that I wasn't being tested.

7              THE COURT:  Yes.

8              MR. MINUTI:  I'm going try to give Your Honor a

9    detailed presentation today.  There's no doubt I'll get a

10   couple of pieces wrong and others in the back will tug on my

11   coat and correct me.  So, but I think we'll get through it,

12   Your Honor.

13             THE COURT:  That's fine.

14             MR. MINUTI:  For the record, Mark Minuti, from

15   Saul Ewing Arnstein & Lehr.  I'm here today on behalf of the

16   debtors.  With me at counsel table, again, Your Honor, are my

17   partners, Monique DiSabatino and Jeffrey Hampton.

18             Again, I want to thank the court for making time

19   available for us today to postponing the hearing until 1:30.

20   Also, obviously, I want to thank the court's staff as well.

21   I know it's hard on them as well when we keep moving

22   schedules, so we appreciate their indulgence.

23             But we are here today to go forward, Your Honor,

24   with our interim use of cash collateral and seek debtor-in-

25   possession financing.

1        Just one note, Your Honor, at the outset, we are

2   finalizing the order and credit agreement.  In fact, I think

3   it just got on the docket about a minute ago.  We're having

4   copies brought over.  So what may make some sense is when I'm

5   done my presentation, hopefully, the order will be here and

6   the credit agreement will be here.  And then maybe take a

7   break, give folks time to review it, give Your Honor a chance

8   to review it --

9        THE COURT:  Absolutely.

10       MR. MINUTI:  -- and then we can come back and deal

11  with any questions.

12       We did provide --

13       THE COURT:  Is it consensual at this point, Mr.

14  Minuti?

15       MR. MINUTI:  Your Honor, we have a deal with our

16  lenders, there's no doubt about that.  I believe we have an

17  agreement with the Department of Justice which was the last-

18  minute issue.  I highlighted yesterday.

19       THE COURT:  Right.

20       MR. MINUTI:  Mr. Brown's clients, I believe, we

21  have agreement on.  I think he wants to put a statement on

22  the record.  The only party I think we still have an issue

23  with is Tenet and we will deal with their objection.  And

24  Your Honor I think is going to need to rule with respect to

25  that.

1           THE COURT:  Okay.

2           MR. MINUTI:  And then finally, I think, the City

3   of Philadelphia had objected, but I believe we resolved -- I

4   think they confirmed for me last night, Your Honor, that

5   their issues were resolved based upon some language we've

6   added to the interim order.

7           THE COURT:  Okay.

8           MR. MINUTI:  So, there have been some changes.  In

9   my presentation, I'll walk you through those and that will

10  help inform the court, as well as the other parties in the

11  courtroom.

12          THE COURT:  Wonderful.

13          MR. MINUTI:  If that's acceptable.

14          THE COURT:  Thank you, sir.

15          MR. MINUTI:  So, Your Honor, again, we're here

16  today seeking interim approval of the use of cash collateral

17  and a debtor-in-possession financing.  We filed this motion

18  on July 1 with a term sheet, Your Honor.

19          When we were here before you on the first day

20  hearing, we weren't fully ready to go forward so Your Honor,

21  at that time, entered an order allowing us to continue to use

22  cash collateral with the idea that we would finalize the

23  credit agreement, hopefully resolve objections or negotiate

24  and narrow the issues and come back here earlier today.

25          I'm pleased to report, Your Honor, that we used

1   that time to reach agreement with our proposed lenders in

2   these cases.  We've also used that time to narrow some of the

3   issues with some of our objectors, as they indicated a few

4   minutes ago.  That did require some changes to the order and

5   when the order gets here, I will walk Your Honor through the

6   order.

7          THE COURT:  Okay.

8          MR. MINUTI:  But let me describe what we're asking

9   the court to do today and, again, as we go through, I'll tell

10  Your Honor where the changes are.

11          We're seeking court approval of post-petition

12  financing with MidCap Financial Trust and use of the

13  prepetition lender's cash collateral consistent with the

14  debtor-in-possession credit agreement and the revised

15  proposed interim order and the budget that's attached

16  thereto.

17          We're also asking for certain protections for our

18  post-petition and prepetition lenders, all as set forth in

19  the motion and the credit agreement.

20          By way of background, each of the debtors, as well

21  as certain non-debtor entities are parties to a credit and

22  security agreement dated July 11th, 2018 which was

23  subsequently amended on September 20, 2018 with MidCap

24  Funding IV Trust and MidCap Funding H Trust who I will refer

25  to as MidCap.

1        That prepetition credit agreement provided for

2   credit facilities of a revolving facility of up to $100

3   million dollars and a $20 million dollar term loan.  As of

4   the petition date, the principle outstanding on those loans,

5   the revolver was at $38.6 million and the term loan was at

6   $20 million dollars.

7        The credit facility is secured by security

8   interest in substantially all of the borrower's assets.  In

9   addition, Your Honor, certain non-debtor parties guaranteed

10  those loans.  That includes Broad Street Healthcare

11  properties, Broad Street Healthcare Properties II, and Broad

12  Street Healthcare Properties III.

13       They guarantee those obligations and they granted

14  our lenders, Your Honor, our prepetition lenders security

15  interest for mortgages on real estate and liens and other

16  assets.

17       On May 8th, 2019, our lender sent us a notice of

18  default and reservation of rights letters.  They imposed

19  default rate of interest, Your Honor.  And while the lenders

20  called a default and reserved their rights, they continue to

21  provide funding under the credit facility prepetition after

22  the default, but the level of funding, Your Honor,

23  significantly declined as a result of blocks placed on the

24  accounts.

25       This strained the debtors' availability to procure

1  needed supplies and to pay for important services and

2  vendors.  And it threatened the ongoing operation of the

3  Healthcare business.

4          The level of funding available, Your Honor, simply

5  was not sufficient to sustain the debtors' businesses outside

6  of bankruptcy.  Therefore, we had no choice, Your Honor, but

7  to file these bankruptcies and negotiate or try to get

8  debtor-in-possession financing that will allow us to move

9  forward and execute our plan in these bankruptcy cases.

10          There is an immediate need for financing and use

11  of cash collateral to protect and care for our patients, to

12  operate the debtors' business during the bankruptcy cases and

13  to effectuate an orderly closing of Hahnemann University

14  Hospital.

15          This is all set forth in Mr. Weiland's declaration

16  that we filed on the first day of the case.  Your Honor, we

17  did move that into evidence on the first day and I will be

18  relying on that declaration today.

19          THE COURT:  Okay.

20          MR. MINUTI:  I will point out, Your Honor, for the

21  record and for Your Honor that Mr. Weiland is in the

22  courtroom and is available for cross-examination and to

23  testify.

24          THE COURT:  Yes.

25          MR. MINUTI:  As set forth in Mr. Weiland's

1  declaration, the debtors with the assistance of SSG Capital

2  Advisors, their investment banker, contacted MidCap and three

3  other parties about potential debtor-in-possession financing.

4         The debtors received two indicative term sheets

5  from proposed lenders.  They evaluated those term sheets and

6  determined that the proposal of MidCap provided the best

7  option for the debtors under the circumstances to execute on

8  their plans in these bankruptcy cases.

9         The terms and conditions of the DIP financing is

10  set forth in the motion that we filed last week, Your Honor,

11  and the credit agreement, Your Honor, that Your Honor will

12  see during the break, it's all going to be tied to a budget.

13  That budget is attached, was attached to the interim order.

14  It's been updated.  And when we bring the order later today,

15  Your Honor, I'll walk you through that.  But all of the

16  lending, obviously is tied to the budget itself.

17         The material terms of the DIP loan and the use of

18  cash collateral are summarized at paragraph 14 of our motion.

19  I'm not going to repeat all of those, Your Honor, but I'm

20  going to hit some of the highlights.

21         In terms of new money lent, Your Honor, the amount

22  of new money lent, originally it was going to be $10 million

23  dollars.  That actually is going to go up, Your Honor, and

24  let me explain that now.

25         Originally, it was contemplated that we would

1  receive $3.75 million dollars' worth of new money in the

2  interim period.

3          THE COURT:  Right.

4          MR. MINUTI:  In addition, Your Honor, on day one,

5  if Your Honor approves the DIP on an interim basis, we would

6  receive $2.5 million dollars or, excuse me.  There was a

7  reserve created that was the carve-out for the professionals

8  and the U.S. Trustee's fees in the case.

9          THE COURT:  That's right.

10          MR. MINUTI:  In light of the Department of

11  Justice's objection and the Department of Justice's

12  objection, Your Honor, was that the super-priority claim and

13  liens being granted to our lenders couldn't trump their

14  setoff and recoupment rights with regard to Medicaid and

15  Medicare receivables.

16          We've added language now to the order that makes

17  it clear that the liens and super-priority claims that we are

18  granting our lenders are not going to trump those recoupment

19  and setoff rights to the government.  Okay.  But because of

20  that, Your Honor, our lender is not going to lend to us based

21  on Medicare and Medicaid receivables.  That left a little bit

22  of a hole.

23          And the way we're filling that hole, Your Honor,

24  is that the lender during the interim period, instead of

25  $3.75 million dollars is going to allow us to borrow up to

1 $5.5 million dollars.  So that's a change from the term sheet

2 and the interim motion based on the objection that was filed

3 and the resolution that we've reached.

4          I would just pause there for a moment, Your Honor,

5 and say that as part of the sale of the residency programs

6 that we have our bid procedures hearing on next week, there

7 is -- the idea that the receivables or, I should say, more

8 the setoff and recoupment rights travel with the numbers as

9 part of that sale.

10          That's been contemplated that our buyer there will

11 ultimately be reasonable to the extent there is any issues.

12 And so, we're hoping that there's a resolution of this issue

13 as part of that sale which will then allow additional

14 borrowings in the case, but that's got to shake out later.

15 But I just want Your Honor to know we think there's a

16 solution in the --

17          THE COURT:  And I assume that will affect the

18 purchase price, will it not?

19          MR. MINUTI:  Well I think it's already been

20 factored into the purchase price of our stalking horse

21 bidder, Your Honor; definitely has.

22          THE COURT:  Okay.  All right.

23          MR. MINUTI:  Okay.  Continuing on, Your Honor,

24 just describing the terms of the DIP facility.  It is a

25 secured super-priority post-petition credit facility.  We are

1   priming our prepetition lenders under that facility by

2   consent, obviously.

3          The interest rate here on the revolver is 30-day

4   Libor plus 425 basis points reset monthly.  The DIP term loan

5   is 30-day Libor plus 1,000 basis points, reset monthly.

6          There are fees, Your Honor, built in here.

7   There's an unused line fee, a collateral management fee, all

8   is spelled out in the motion.

9          There's a debtor-in-possession financing

10  origination fee of a half a million dollars.  That's payable

11  upon the entry of the initial funding under the DIP revolver.

12         And then we have two deferred original fees under

13  our prepetition loans of $500,000 dollars which we are going

14  to be paying with the DIP loan if Your Honor approves this

15  order.

16         In terms of use of the proceeds, Your Honor, we

17  are going to use those proceeds, obviously, to operate.  It's

18  all tied to the budget.  We're going to pay the fees as I

19  just indicated. We're going to pay the lender's cost as we go

20  forward, as is fairly typical in these situations.

21         In terms of security, Your Honor, again, it's a

22  priming position here for our DIP lenders.  In addition to

23  that, they're going to receive a super-priority claim.  Both

24  their lien position and their super-priority claim, however,

25  are subject to the carve-out.

1              The DIP collateral here is, Your Honor,

2   substantially all of the debtors' assets.  There are some

3   carve-outs that I'll discuss in a moment; at least, until the

4   final order in certain cases.

5              And in terms of termination date, Your Honor, we

6   have the termination date is twelve months from the date of

7   closing or the occurrence of a termination event under the

8   DIP facility.  The DIP agreement does come with milestones,

9   Your Honor.  Those milestones I'll just put into the record

10  right now.

11             By 7/11, Your Honor, we have to have filed a

12  motion to implement a discontinuation of Hahnemann University

13  Hospital.  We, obviously, met that condition.

14             By August 7th, we have to file a motion for our

15  authority to implement sales procedures for sale of the DIP

16  collateral including St. Christopher's Hospital. We do intend

17  to do that.

18             Fourteen days after the sale procedures motion,

19  we're looking for the entry of the sale procedures order. One

20  of the requirements is a complete closure of Hahnemann

21  University Hospital by September 6th.  That actually was

22  contemplated by our plan to begin with.

23             By September 27th is the deadline to receive one

24  or more bids, sufficient to indefeasibly pay in full in cash

25  all amounts owed to our lenders.

1              By October 2nd, we have to have an auction.

2              By October 4, we have to have our sale hearing.

3              And, finally, the outside closing date for

4    transaction would be October 14.

5              The DIP loan, like every DIP loan, Your Honor,

6    comes with a number of events of default.  I'm not going to

7    mention them all.  I will point out a few, Your Honor, is if

8    we fail to obtain entry of our final debtor-in-possession

9    financing order on or before a date that is 30-days after the

10   entry of our interim order, it is a default if we fail to hit

11   the milestones I just indicated.  And the DIP budget does

12   have a variance, Your Honor.  And the variance is 10 percent

13   in any week, I believe, on an aggregate amount.  I'm looking

14   at Mr. Hampton.  And so that would be a default as well.

15             In terms of the carve-out, Your Honor, as I

16   indicated at the top of my presentation, there's a $2.5

17   million dollar carve-out.  That reserve is created

18   essentially on day one.  Those funds are available for

19   professional fees for both the committee and the debtor.  And

20   the debtor, Your Honor, and, again, to remind the court, the

21   formation meeting for the committee is Monday.  We do expect

22   there to be a committee formed in this case based upon, at

23   least, the phone calls we've received, so we anticipate there

24   will be committee counsel as part of the mix going forward.

25             In terms of challenge period, Your Honor, we've

1   complied with the local rule.  The order will provide that

2   any committee formed has 75-days -- excuse me.  Any party

3   other than the committee will have 75-days from the petition

4   date to obtain standing and pursue a challenge of our

5   prepetition liens or lender's liens and claims.  With respect

6   to the committee, Your Honor, it is 60-days from committee

7   formation.  Again, consistent with the local rule.

8            In terms of cross-collateralization, Your Honor

9   I'm sure no doubt saw in the DIP loan that we were providing

10  for a rollup of both --

11           THE COURT:  Yes.

12           MR. MINUTI:  -- the term and the revolver.  What

13  Your Honor will see -- and this was an issue or an objection

14  raised by a number of parties to the immediate rollup.  What

15  Your Honor will see when we hand up the revised interim order

16  is the rollup now is going to be reserved to the final

17  hearing.

18           THE COURT:  Okay.  All right.

19           MR. MINUTI:  So in addition, Your Honor, in

20  addition to lending new money, we are asking for the

21  authority to use our prepetition lender's cash collateral.

22  The use of cash collateral is in conjunction with the new

23  money is necessary, Your Honor, for go forward operations as

24  adequate protection solely with respect to diminution and the

25  value of our prepetition lender's collateral.

1          The prepetition secured parties are going to

2    receive adequate protection in the forms of the rollup upon

3    the final order, if Your Honor enters that; liens on our

4    assets subject to the DIP loans; a carve-out subject to the

5    carve-outs; and super-priority administrative claims.  And as

6    I indicated before, we're going to pay their fees and costs

7    going forward.

8          Pursuant to Bankruptcy Rule 4001 and Local Rule

9    4001-2, we are required to highlight a number of provisions,

10   all of those appear at paragraph 15 of our motion.  I did

11   mention some of those already, but let me hit a couple, Your

12   Honor, that you see a lot raised in these circumstances.

13         There is no 506(c) waiver as part of the interim

14   order.  The order makes clear, Your Honor, that that will

15   await a final order.

16         There is no 552(b) equities of the case waiver in

17   the interim order.  There is no liens being provided on

18   avoidance actions in the interim order.  There is no

19   disparate treatment between the professionals of the

20   committee or the professionals of the debtor; however, under

21   the budget, we have allocated different amounts based on the

22   anticipated workload divided between the debtors'

23   professionals and the committee's professionals.

24         We certainly expect the committee, once up and

25   running, Your Honor, to take a look at that and to have a

1  conversation with us if they are any issues there.

2         As is typical in these situations, Your Honor, the

3  debtors have stipulated to the claims and the liens of our

4  prepetition lenders.  But the interim order does provide, as

5  I've already indicated, a challenge period for parties in

6  interest as well as the committee that's consistent with the

7  local rules.

8         I've already discussed the rollup, Your Honor, and

9  the fact that it's now awaiting a final hearing.

10         THE COURT:  Yes.

11         MR. MINUTI:  And as I've already indicated, Your

12  Honor, the DIP loan does include a number of milestones which

13  we need to hit and we anticipate we are going to be able to

14  hit.

15         In support of the motion, Your Honor, again, we

16  rely upon the declaration of Mr. Weiland, the proposed CRO.

17  He is in the courtroom, Your Honor, and available to testify

18  for cross-examination or to answer any questions the court

19  may have.  So before turning to the objections, it may be a

20  good time now to pause to see if anybody needs or wants to

21  cross-examine Mr. Weiland or if Your Honor has any questions.

22         THE COURT:  All right.  Thank you, Mr. Minuti.

23         Does anyone wish to cross-examine Mr. Weiland, at

24  this time?

25         Mr. Brown.

1      MR. BROWN:  Stuart Brown on behalf of the HSRE
2 entities, Your Honor.

3      I do not wish to cross-examine Mr. Weiland unless
4 there's a conflict or contradiction about the extent of the
5 budget for the payment of the leases.

6      THE COURT:  All right.  Then in that case, you're
7 reserving the right to cross-examine?

8      MR. BROWN:  Yes, Your Honor.

9      THE COURT:  Understood.  Yes.

10      MR. MINUTI:  Very well.

11      Your Honor, would you give me just one moment,
12 please?

13      THE COURT:  Sure.  I don't have any questions for
14 Mr. Weiland.  I certainly understand your presentation, Mr.
15 Minuti and I'm anxious, of course, you know, to look at the
16 order myself.

17      MR. MINUTI:  Very well.  Your Honor, I'm told that
18 the order and the credit agreement are now in the courtroom.
19 So before we turn to the objections, maybe it makes sense to
20 take a break, give Your Honor a chance to review.  We do have
21 blackline versions for Your Honor that are blacklined against
22 the interim order that were filed with the motion last week.

23      THE COURT:  Good.

24      MR. MINUTI:  So, Your Honor, will have those.
25 Folks in the courtroom will have those.  I'm hoping that that

1  will go a long way to narrow the issues to the extent we do

2  have issues remaining.  So maybe right now is a good time to

3  take a break, to review the order, and then we can go back on

4  the record.

5          THE COURT:  I think that's right, Mr. Minuti.  Do

6  you think a half an hour will do it?

7          MR. MINUTI:  I think that would be fine, Your

8  Honor.

9          THE COURT:  All right, let's take a half hour

10 recess.  If I need more time, I will let you all know.  And

11 if you need more time, you'll let me know.

12         MR. MINUTI:  Very well, Your Honor.  Thank you so

13 much.

14         THE COURT:  Thank you.

15     (Recess at 1:57 p.m.)

16     (Proceedings resume at 2:39 p.m.)

17         THE CLERK:  Please rise.

18         THE COURT:  Thank you, everyone.  You may be

19 seated.  Mr. Minute.

20         MR. MINUTI:  Your Honor, thank you for the time.

21         THE COURT:  I needed it to.

22         MR. MINUTI:  Your Honor, we clarified a few things

23 and so this is the portion of the record where I correct a

24 couple of things, I said a few minutes ago.

25         THE COURT:  Okay.

1          MR. MINUTI:  First, Your Honor, one of the things

2  I talked about in terms of the resolution of the Department

3  of Justice's objection.  What I said was that our lender was

4  not going to lend on Medicare and Medicaid receivables.  I

5  want to correct that.  What they are not going to lend on is

6  Hahnemann University Hospital Medicare in-patient AR only.

7          THE COURT:  Okay.

8          MR. MINUTI:  Just that.

9          THE COURT:  That's a more limited amount --

10          MR. MINUTI:  Correct.  That's a good clarification

11  from the debtors' perspective.

12          THE COURT:  All right.

13          MR. MINUTI:  Number two, Your Honor, I know we

14  handed Your Honor a credit agreement before we took a break.

15  Does Your Honor have that?

16          THE COURT:  I do.

17          MR. MINUTI:  Okay.  Can you turn to page 68 in

18  that credit agreement?

19          THE COURT:  Yes.

20          MR. MINUTI:  I just want to make sure that the

21  version we handed Your Honor includes some handwritten

22  changes.

23          THE COURT:  It did not.

24          MR. MINUTI:  It did not. Okay.  May I approach and

25  show Your Honor these changes?

1          THE COURT:  Yes.  Yes, Mr. Minuti.

2          MR. MINUTI:  I think this was in response to, I

3   think, Mr. Brown's objection and this change has been agreed

4   to, but I wanted Your Honor to be aware of it.

5          THE COURT:  That's fine.  Thank you.  Thank you.

6          All right and I'll give it right back to you.  Oh,

7   this is mine.  All right.  Very good.

8          MR. MINUTI:  And, Your Honor, one more change.  I

9   think I misstated the prepetition balance when I was

10  describing the amounts due prepetition.  And if you give me

11  one minute, I will tell you what that is.

12         THE COURT:  All right.  You had said $38.6 million

13  and $20 million, I believe.

14         MR. MINUTI:  Yes, that's just a little bit

15  different than that, Your Honor.  It is -- the total is $57.4

16  million of the term and the revolver.  And that actually I'm

17  looking at the redline of the proposed DIP order that appears

18  on page 9.

19         THE COURT:  Okay.

20         MR. MINUTI:  Actually, I think I said -- I think

21  the numbers I gave you added up to $58.5.  I think it was

22  just an error, Your Honor.

23         THE COURT:  Yes.

24         MR. MINUTI:  Your Honor, and that brings us to the

25  final clarification that I wanted to mention.  And, Your

1  Honor, this one I think is one that's a little more
2  controversial for some of our objectors in the courtroom.

3         What I said to Your Honor with respect to the
4  aspects of the loan that include the rollup of both the
5  prepetition term and the revolver.  What I thought the
6  understanding was and what the debtors thought the
7  understanding was, what or prepetition lender was, that the
8  rollup would await the final hearing.  And there's language
9  in the proposed order to that effect.

10        THE COURT:  Yes.

11        MR. MINUTI:  the lender's understanding of that,
12 Your Honor, is that no, the rollup would happen immediately,
13 but that rollup would be subject to being undone at the final
14 hearing if somebody objected.  And that is their position,
15 Your Honor.

16        They've stated to us that that has been their
17 position since day one.  They are not prepared to move
18 forward unless that is the case.  We don't have any other
19 option, Your Honor, than to move forward with this loan.

20        We do think the loan is certainly necessary for us
21 to move forward and execute our plan.  If we don't have the
22 loan, Your Honor, we don't have the ability to survive on
23 cash collateral.  And so, we are -- while I appreciate that
24 there objectors in the room that don't like it, and we
25 certainly negotiated hard for the best terms that we could

1  get, we are at a point now where we have a DIP loan that's

2  before Your Honor that we've pushed our lender as far as we

3  could push them.  And that is where we wound up.

4          And so, before Your Honor took the bench, I tried

5  to clarify that for the objectors.  I think they're all aware

6  of that.  I did touch base with folks.  I don't believe folks

7  have a desire or a need to cross-examine Mr. Weiland based on

8  that change.  And so, I think, we're prepared to move for

9  argument.  So, with Your Honor's permission, I'd like to do

10  that and then, obviously, I'd like to respond to the

11  objectors.

12          THE COURT:  I just had a couple of questions for

13  you, Mr. Minuti, and let me see -- let's see.

14          On page 24 --

15          MR. MINUTI:  Are you looking at the clean version

16  or --

17          THE COURT:  I'm looking at the redline.  I'm

18  sorry.

19          MR. MINUTI:  Thank you, Your Honor.

20          THE COURT:  Yes, yes.

21          MR. MINUTI:  Page 24.

22          THE COURT:  Yes.  Is that at all inconsistent with

23  what others understand as far as this lien being senior to

24  any governmental authority or -- in other words, does the

25  City of Philadelphia agree with that provision?

 1          MR. MINUTI:  Your Honor, the language in this

 2  section deals, I believe, only with accounts, number one.

 3  The City would not have a lien on accounts.  Their issue, I

 4  think, was real estate basically.

 5          THE COURT:  I'm sorry.  Yes.

 6          MR. MINUTI:  And we have language elsewhere in the

 7  order --

 8          THE COURT:  Yes.

 9          MR. MINUTI:  -- which makes it clear.  So, I

10  believe -- I don't know if they're here, but I believe

11  they're satisfied with this language.

12          THE COURT:  That's fine.  I see that now.

13          MS. HARPER:  Your Honor.

14          THE COURT:  Yes.

15          MS. HARPER:  Pardon my interruption.  Megan Harper

16  for the City of Philadelphia and, yes, Mr. Minuti's

17  statements are correct.  We were concerned with language

18  elsewhere in the order which we are now satisfied with.

19          THE COURT:  All right, thank you.

20          MS. HARPER:  You're welcome.

21          THE COURT:  Yes.  I was just -- all right, that.

22  Oh, I'm sorry.  I do have a couple of others.

23          On page 5, at the bottom of the page, it being

24  understood and agreed that if the DIP budget reflects

25  negative availability under the -- how could that arise that

1  there would be negative availability?

2          MR. MINUTI:  I'll need a moment for that, Your

3  Honor?

4          THE COURT:  Yes, sure.

5          MR. MINUTI:  What I'm being told, Your Honor, is

6  that was the original budget we have and that does not apply

7  anymore.

8          THE COURT:  Okay.  All right.  So that language

9  will then be removed from the final version, I assume?

10          MR. MINUTI:  Need to confirm with our lender, Your

11  Honor.

12          THE COURT:  Okay.

13          MS. REPEROWITZ:  Your Honor, that language was put

14  -- good afternoon, Your Honor --

15          THE COURT:  Ms. Reperowitz, good afternoon, yes.

16  I know it's been a tough couple of days.

17          MS. REPEROWITZ:  That language was put in there

18  because there originally was a shortfall in the budget.

19          THE COURT:  Yes.

20          MS. REPEROWITZ:  And regardless of whether there

21  is one reflected today in the budget, this has been an

22  extremely fluid case.  There have been negotiations ongoing

23  and issues coming up that right up until yesterday when we

24  got the Medicare/Medicaid DOJ word, if I will.

25          So, Your Honor, I would like to keep that language

1  in there because all it is saying is that we, the lender, is

2  not going to lend up in the event that any type of shortfall

3  should occur.

4           THE COURT:  Okay.

5           MS. REPEROWITZ:  Thank you, Your Honor.

6           THE COURT:  All right, I understand your point.

7           All right, Mr. Minuti, you may proceed.

8           MR. MINUTI:  Thank you, Your Honor.

9           MR. BROWN:  Your Honor.

10          THE COURT:  Mr. Brown, yes.

11          MR. BROWN:  Sorry.

12          THE COURT:  You can speak from there if you like,

13  but it's nice to see you at the podium.

14          MR. BROWN:  Thank you, Your Honor.

15          I just want to make sure I understand what was

16  just said.  So as I understand it, there is a credit limit

17  which is $50 million dollars.  And within the $50 million

18  dollars, there's a borrowing base.  And I think what Ms.

19  Reperowitz just said is that the DIP lender will neither

20  permit an over-advance, even if it's below $50 million

21  dollars nor an advance beyond $50 million dollars, even

22  though the DIP order authority is only to go up to $50

23  million dollars.

24          I'm just wondering if it's both of those things or

25  whether the DIP lender will permit an over-advance within the

1  cap of the $50 million dollar loan.

2           THE COURT:  Okay.  All right, that's fair.

3           MS. REPEROWITZ:  Your Honor, it is both of those

4  things.  We do not want to go out of formula.  This is a

5  formulaic loan.

6           THE COURT:  Yes.

7           MS. REPEROWITZ:  And, Your Honor, prepetition one

8  of the things as a little -- well, Mr. Minuti discussed it

9  earlier.  There was a reserve prepetition.

10           THE COURT:  Yes.

11           MS. REPEROWITZ:  There are no covenants. We are

12  releasing that reserve.  We do not have anything on the

13  backside to protect us.  And so, therefore, Your Honor, we

14  want to stay within the formula that has been agreed to under

15  this loan and certainly not go above the cap on this loan.

16           THE COURT:  All right.

17           MS. REPEROWITZ:  Thank you.

18           THE COURT:  I understand that.

19           MR. MINUTI:  Did Your Honor have further

20  questions?

21           THE COURT:  No, no that's fine.

22           MR. MINUTI:  All right, again, for the record,

23  Your Honor.  Mark Minuti on behalf of the debtors.

24           Your Honor, to sum up in terms of argument, our

25  negotiations with our lenders -- and Your Honor may have

1  gotten a flavor for this over the last few days -- they have

2  been hard-fought, arm's length and in good faith.

3          We did our best to negotiate the best deal

4  possible for the debtor and its estates.  The terms that are

5  set forth before Your Honor are required of our lender in

6  order for us to obtain the DIP loan and the use of cash

7  collateral that we need in order to fund operations and move

8  forward.

9          I would remind the court, although I note don't

10  need to remind the court, you know, we don't make widgets.

11  We care for patients, Your Honor.  This is obviously a

12  serious case.  They're all serious, but when you're talking

13  about patients and human lives, it's perhaps heightened.  And

14  I know Your Honor feels that way based on some of the

15  comments you've provided to us throughout, you know, so far

16  in these cases.

17          THE COURT:  Yes.

18          MR. MINUTI:  We have an immediate need for the

19  financing and use of cash collateral to operate and execute.

20  Would we have liked more availability, Your Honor or more

21  money?  You bet you.  Is the DIP budget here tight?  There's

22  no question about that but we believe it is sufficient to get

23  us through the Hahnemann University Hospital shutdown and the

24  St. Chris sale process.

25          Absent financing and the use of cash collateral

1  which is before Your Honor and which is the only option

2  available for these hospitals, we really have no option but

3  to shut down, to liquidate immediately.  Patient care will

4  suffer.  I don't want to even think about how we would

5  possibly do that and turn the lights out and move the

6  patients.

7           There would be loss of significant value.  The

8  Philadelphia community would be seriously disrupted.

9  Obviously, the employees at St. Christopher's would lose

10  their jobs.  It would not be a good situation.

11           So is this a perfect DIP loan?  Is this a perfect

12  use of cash collateral?  I'm not sure there ever are, Your

13  Honor from a debtor's perspective.  But this is what we have.

14  This is the best we could do.  This is what we need to get

15  through.

16           So under the circumstances, we believe the

17  proposal that we have before Your Honor and we're asking

18  approval for is fair, it's reasonable, it's necessary to

19  preserve value.  And, therefore, we believe that the loan

20  should be approved on an interim basis as a valid exercise of

21  the debtors' business judgment.

22           Let me turn to the objections, Your Honor, and

23  talk about those.  We did --

24           THE COURT:  Let me just interrupt you with one

25  question.  The fees.  There are a number of fees being

1  charged.

2          MR. MINUTI:  Yes.

3          THE COURT:  And those fees, as I understand it,

4  are being charged on the full amount, is that correct?  The

5  full amount of the lending?

6          MR. MINUTI:  I believe that's correct, but Ms.

7  Reperowitz will correct me.

8          THE COURT:  Ms. Reperowitz, yes.

9          MS. REPEROWITZ:   I'm sorry, Your Honor.  Yes, the

10 fees are being charged on the revolver.  There's no fee being

11 charged on the terms.

12         THE COURT:  Right.  Terms, that's right.

13         MS. REPEROWITZ:  And it is being charged on the

14 full $50 million.

15         THE COURT:  All right.  All right.

16         Yes, sir.  You may proceed, Mr. Minuti, with the

17 objections.

18         MR. MINUTI:  Thank you, Your Honor.

19         The first response we received was -- and let me

20 just pause here and ask Your Honor what may make sense.  Why

21 don't I give our position on each objection and then I'll

22 pause and let the objectors respond, does that make sense?

23         THE COURT:  Yeah, that's fine in this situation,

24 yes.

25         MR. MINUTI:  Thank you, Your Honor.

1           So, the first response we received, Your Honor,

2   was that of HSREP VI Holding LLC.  Your Honor may recall from

3   their papers that they are the master landlord to St.

4   Christopher's Healthcare LLC.

5           THE COURT:  Right.

6           MR. MINUTI:  St. Christopher's, in turn, leases

7   the subject properties to subtenants.  Those subtenants pay

8   rent into a lockbox.  It's subject to a control agreement in

9   favor of HSRE.

10          HSRE filed a formal response.  I'm sure Your Honor

11  has seen.

12          THE COURT:  Yes.

13          MR. MINUTI:  And they raised two issues in that

14  formal response.

15          The first issue they raised, Your Honor, was that

16  there was not sufficient money in the budget to pay the

17  master lease agreement.  I understand, and Mr. Brown's not

18  shy.  He's going to correct me if I'm wrong.  But I

19  understand that they are reserving rights.  But I think in

20  the interim period, we resolved that issue, at least for

21  today.

22          The second issue they had raised, Your Honor, in

23  their informal objection -- or excuse me; their formal

24  objection was that we can't grant our lenders a lien or

25  super-priority claim that would affect the money that goes

1  into the lockbox.

2            THE COURT:  Right.

3            MR. MINUTI:  To be clear on the record, Your

4  Honor, we're not doing that.  That would not be property of

5  the estate.  And, therefore, we obviously can't grant a lien

6  or provide a super-priority claim that's not our property.

7            THE COURT:  Good.

8            MR. MINUTI:  This morning, Your Honor, Mr. Brown

9  sent us a fairly detailed email with a number of other

10 issues.  We've resolved some of them based on some changes to

11 the order, but I do think Mr. Brown has an issue with the

12 current state of the rollup as we presented it to Your Honor.

13 So with that, why don't I cede the podium to Mr. Brown and

14 hear what he has to say.

15           THE COURT:  All right, thank you, Mr. Minuti.

16           MR. MINUTI:  Thank you.

17           THE COURT:  Mr. Brown, yes.

18           MR. BROWN:  For the record, Stuart Brown.  DLA

19 Piper on behalf of HSREP VI LLC, Your Honor.

20           THE COURT:  Right.

21           MR. BROWN:  And the various Harrison Street

22 affiliates.

23           Your Honor, before I get into the rollup issue, I

24 don't know whether I need to do that first or last, but there

25 are a couple of clarifications.

1          First, Mr. Minuti is correct.  I sent him about

2   two pages worth of comments. And based on the time that we

3   had to look at the documents, they hit a substantial number

4   of them and I appreciate that, and thank you for your

5   accommodations in that regard.

6          Two, they did not hit, but I don't think that

7   they're controversial.  That is in paragraph 23 of the order.

8          THE COURT:  Yes.

9          MR. BROWN:  And paragraph 26(b).  Both of them

10  have language that seeks to restrict and imposition against

11  the DIP lenders and DIP agent.  One could construe that

12  language as a backdoor 506(c) and 552(b) waiver.  The debtors

13  have confirmed that that's not their intention.  And so, to

14  the extent that that language might be a little overbroad or

15  a little loose, they would be willing to clarify and confirm

16  on the record that it's not their intent to backdoor those

17  waivers through those two provisions.

18         THE COURT:  All right, Mr. Minuti, and you can

19  speak right from your seat if you like.

20         MR. MINUTI:  Just as easy for me to come to the

21  podium, Your Honor.

22         THE COURT:  Yes.

23         MR. MINUTI:  Your Honor, from the debtors'

24  perspective we would confirm that.

25         THE COURT:  All right.

1          MR. BROWN:  Thank you, Your Honor.  Thank you, Mr.

2   Minuti.

3          The other clarification, Your Honor, is if you'll

4   recall when I stood at the podium at the first hearing, I

5   referenced and read to Your Honor from Schedule 9.1 of the

6   prepetition credit agreement which had a paragraph excluding

7   expressly the HSRE cash management system, if you will, that

8   Mr. Minuti referred to earlier.

9          THE COURT:  Yes.

10          MR. BROWN:  Your Honor, these documents continue

11   that exclusion from the DIP collateral description.  In

12   addition, I believe, the lenders have also agreed not to

13   include in DIP collateral the HSRE master leases or the

14   subleases.  Similar to in a retail case, lenders don't get

15   liens on leases and so to they wouldn't get a lien here on

16   the leases.

17          THE COURT:  Ms. Reperowitz, yes.

18          MS. REPEROWITZ:  On the leases themselves?

19          MR. BROWN:  On the leases themselves; you know,

20   the proceeds, but not the leases.

21          THE COURT:  Right.

22          MS. REPEROWITZ:  Oh, that's fine, Your Honor.

23          THE COURT:  Okay.  That's fine.

24          MS. REPEROWITZ:  But on the proceeds, yes.

25          MR. BROWN:  Yeah, if my comment didn't make the

1  record on the proceeds, we have no comment about, but on the

2  leases themselves.

3           THE COURT:  Right.

4           MR. BROWN:  And in the event they were to exercise

5  remedies that would require them to come talk to us and have

6  some understanding with us to do what they need to do.

7           THE COURT:  Is there going to be language

8  somewhere expressing that or is this just a confirmation on

9  the record?

10          MR. BROWN:  I think to the extent that there may

11  have to be a turn of the order -- I don't want to speak for

12  the debtors, but if there is a turn of the order then we

13  would appreciate that inclusion.  If there's not going to be

14  a turn of the order then let's the record prevail so that the

15  order can be entered as quickly as possible.

16          THE COURT:  All right.

17          MR. BROWN:  I'm not looking to stand in the way of

18  that.

19          That's a nice segue to my next comment, Your

20  Honor, which is Harrison Street is happy to be among the

21  first people in willing to help here.  The budget is short.

22  It does not include enough money on the rent line item to

23  fulfill St. Christopher's obligations as the primary tenant

24  under the master leases which is about a million three a

25  month.  It includes $650,000 dollars per month which

1  represents the 650 is for -- some of it is for Harrison

2  Street lockboxes under the master leases and leases, and some

3  of it is for other people.

4         So, there is some portion of that which is, I'll

5  say earmarked, for the debtor's obligations under the leases

6  with Harrison Street.  And the sub-tenants pay directly into

7  the lockboxes.

8         THE COURT:  Right.

9         MR. BROWN:  And so the gap amount, the difference

10 between the full amount of the monthly obligation and what

11 the sub-tenants pay, is not completely made up in the

12 $650,000 dollars.  So, there is about a $250 to $300,000

13 dollar shortfall.

14        And what I mean by Harrison Street is happy to be

15 among those first to help is that for today's purposes we

16 will let that go subject to a full reservation of rights to

17 recoup that shortfall.

18        THE COURT:  Of course.

19        MR. BROWN:  Based upon the debtor's

20 representations to us that notwithstanding that the debtors

21 have not made any July payment under the leases to us that it

22 is budgeted and they will make that payment during the week

23 of July 22nd, just to confirm the date.

24        MR. WEILAND:  Yes.

25        MR. BROWN:  And then they have --

1        THE COURT:  Mr. Weiland said yes.

2        MR. BROWN:  Yes.  And then they have budgeted the

3  August payment for payment to be made out of that shortfall

4  the second week of August, which I presume would be by August

5  10th.

6        THE COURT:  Okay.

7        MR. BROWN:  But still, it's a deficient amount.

8  So, we reserve our rights to challenge the amount, complain

9  to Your Honor that the amount is deficient.  We're putting

10 Your Honor on notice that there is an administrative claim

11 that may not be provided for as early as today.  And are

12 reserving all of our rights with respect to that shortfall.

13       THE COURT:  Okay.  All right.

14       MR. BROWN:  With that, Your Honor --

15       THE COURT:  You were going to speak to the roll-

16 up, I think, were you not, Mr. Brown?

17       MR. BROWN:  I do, but I don't, Your Honor.  The

18 debtor needs the money.  When I say that we're among the

19 first to help Midcap is helping as well by virtue of being at

20 the table for the DIP.  I am not here to shoot arrows at them

21 for that.  I don't like the terms, but it's not my money.

22 So, we will wait to see what the committee decides to do

23 about the roll-up.

24       THE COURT:  Right.

25       MR. BROWN:  I think Your Honor understands all

1    those issues and you don't need me to weigh-in on them and

2    waste more time this afternoon.

3            THE COURT:  All right.

4            MR. BROWN:  Thank you, Your Honor.

5            THE COURT:  Thank you, Mr. Brown.

6            MR. MINUTI:  Your Honor, again, for the record,

7    Mark Minuti.

8            I appreciate Mr. Brown's comments.  The only thing

9    that I want to say, Your Honor, his leases, all the debtor's

10   leases we are evaluating.  We, obviously, reserve our rights

11   in terms of what we're going to do wiht those leases.

12           THE COURT:  Of course.

13           MR. MINUTI:  So, I don't think I need to say

14   anything more with respect to that.

15           THE COURT:  Right.

16           MR. MINUTI:  Your Honor, the second objection that

17   we received was that the objection of the City of

18   Philadelphia.  Counsel spoke earlier.  I believe their

19   objection is resolved, but let me pause and ask counsel to

20   confirm that on the record.

21           MS. HARPER:  Again, Your Honor, Megan Harper for

22   the City of Philadelphia.

23           Counsel is correct, our issue is resolved.

24           THE COURT:  All right.  Thank you, Ms. Harper.

25           MS. HARPER:  You're welcome.

1          THE COURT:  All right.

2          MR. MINUTI:  Your Honor, next I guess I want to

3  give Mr. Hackman from the United States Trustees Office an

4  opportunity to weigh-in.  We had, I believe, fully resolved

5  the United States Trustees issues with respect to the order

6  and the interim DIP loan.  I think his understanding with

7  respect to the carve-out issue was similar to mine at the

8  outset of the hearing.  So, in light of the change why don't

9  I give Mr. Hackman an opportunity to see if he's got a

10  comment he'd like to make.

11          THE COURT:  All right.  Thank you, Mr. Minuti.

12          MR. MINUTI:  I'm sorry.  I didn't mean carve-out,

13  Your Honor; I meant roll-up.

14          THE COURT:  All right.  I understood that too.  I

15  guess we're thinking on the same wave length.

16          MR. MINUTI:  Thank you.

17          THE COURT:  Mr. Hackman, yes.

18          MR. HACKMAN:  Good afternoon, Your Honor.

19          THE COURT:  Good afternoon.

20          MR. HACKMAN:  May I please the court, Ben Hackman

21  for the U.S. Trustee.

22          THE COURT:  Yes.

23          MR. HACKMAN:  The only issue for us is the roll-

24  up.  It's provided for in Paragraph 6(c), 10(a) and at the

25  bottom of Paragraph 15 in the order.

1          We don't take a position on prepetition debt being

2 rolled up today in this case; however, if that happens our

3 position is that the order should be clear that whatever

4 prepetition debt is rolled up should remain subject to the

5 challenge period, to the challenge investigation mechanism

6 provided for in the order.

7          I think what the lender is proposing is that

8 instead of doing that the roll-up would happen between now

9 and the final hearing --

10          THE COURT:  Yes.  That's my understanding, Mr.

11 Hackman.

12          MR. HACKMAN:  -- but any challenge to the

13 prepetition liens that are being rolled up would need to be

14 asserted by the final hearing.  And our concern is that if

15 that happens what it, effectively, does is it significantly

16 abridges a committee's ability to do one of its main

17 functions in the case.  And it does that before a committee

18 is even appointed.

19          THE COURT:  Yes.

20          MR. HACKMAN:  I understand that there are unique

21 circumstances in this case.  I think one of them is, as

22 referenced in Paragraph 4, at the end of Paragraph 4(a) of

23 this order, that there appears to be an equity cushion for

24 the prepetition secured debt.  The aggregate value of the

25 prepetition collateral exceeds the aggregate amount of the

1  prepetition obligations.  So, we would submit that there is

2  protection here for the prepetition lender.

3          We respectfully submit that if there is a roll-up

4  that happens before the final hearing that the prepetition

5  liens should remain subject to the investigation period.

6          THE COURT:  All right.

7          MR. HACKMAN:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          Mr. Brown, why don't you speak first and then I'll

10  hear from Ms. Reperowitz.

11          MR. BROWN:  I think Mr. Minuti said I'm not shy,

12  so I'll take advantage of that.

13          Again, the clarification.  I didn't understand

14  that the unwinding of the roll-up was limited to the capital

15  seat challenge.  And we all know what that means in the

16  context of a challenge.  I understood that if any party in

17  interest, including the committee, was able to make an

18  argument that the roll-up should not have been granted today

19  on any basis, not just a challenge, that it was open for Your

20  Honor to reconsider at the final hearing.

21          THE COURT:  That is my understanding, Mr. Brown.

22          MR. BROWN:  Thank you, Your Honor.

23          THE COURT:  But I think Mr. Hackman has a more

24  specific objection within what you have just said.

25          MR. BROWN:  And I understood what Mr. Hackman was

1  saying.  So, to one extent his issue is narrower, mine is

2  broader.

3          THE COURT:  Yes.

4          MR. BROWN:  To another extent my issue is narrower

5  and his is broader.  I think if Your Honor understands what

6  I'm saying and we all understand what Mr.  Hackman is saying

7  then, at least, the three of us are on the same page.

8          THE COURT:  That's right.  And that may be all.

9          Ms. Reperowitz, is that correct?  Has Mr. Brown

10 correctly stated that any party on any basis may challenge

11 that roll-up at the final hearing?

12         MS. REPEROWITZ:  Challenge with a capital C, Your

13 Honor; challenge the liens at the final hearing.  Yes, Your

14 Honor.  That was our intent, Your Honor.  And my

15 understanding is those were the conversations that were had,

16 but I know that the way the language is written some people

17 understand it to be saying that the roll-up doesn't happen to

18 the final order.

19         Some people think its saying anybody can come in

20 and raise any objection ever that they want to raise at the

21 final hearing, but it was our understanding that we'd get the

22 roll-up today, it's a case with extraordinary circumstances,

23 Your Honor, and it is true we are fully secured today.  As

24 far as we know we are fully secured.

25         THE COURT:  Right.

1          MS. REPEROWITZ:  Your Honor, you can appreciate,

2     as can everyone else in the courtroom, it is a serious case.

3     I think Mr. Minuti made it very clear that when we're talking

4     about people's lives its very different then when we're

5     talking about a widget manufacturer.

6          We have worked very, very hard, Your Honor, to get

7     to the point that we are at today.  We have worked with the

8     debtors and various constituents with respect to their

9     objections.  We have compromised in numerous ways, Your

10    Honor.  I don't whether we'd be standing here today if this

11    was a widget manufacturer.  I suspect we would not.

12         Midcap has taken into account and very seriously

13    taken into account, of course, the lives that are at risk or

14    potentially at risk and keeping these debtors open so that

15    patients can be cared for properly.  We want to protect them.

16    We have also taken into account the students who have worked

17    so terribly hard to make it through medical school, which

18    many of the people in this room are lawyers, that wasn't fun,

19    but I understand that medical school is much more difficult.

20    To not be able to find their location to finish-up that

21    education, we have taken that into account.

22         And so, Your Honor -- and, of course, the City's

23    concerns about the population.  And so, Your Honor, we are

24    standing here and the terms that we are seeking are to

25    protect us, but also to protect and assist the debtor to be

1  able to execute its plan, to keep the -- to wind-down in an

2  efficient, careful and safe manner the Hahnemann operations

3  and to protect and promote the value of St. Chris so that

4  that facility can be sold, Your Honor.

5          So, these are the terms that we are willing to

6  lend on.  It may seem stringent, but, again, this is an

7  extraordinary case.  And just as a matter of fact, Your

8  Honor, the receivables that form a large portion of our

9  borrowing base have historically been generated.  More of

10  them have been generated by the Hahnemann Hospital then by

11  the St. Chris Hospital.  So, there have been a lot of factors

12  that we have taken into consideration, a lot of change and

13  certainly since my involvement in this case, which is just

14  several weeks, Your Honor, the fluidity of this case is

15  greater than any case I think I've ever worked on.

16          So, we have tried to be nimble.  We have seen

17  numerous budgets.  We have jumped to try and figure out a way

18  to finance those budgets.  And we are here today, Your Honor,

19  asking for what some to be saying is extraordinary relief,

20  but it is because we are in an extraordinary case, Your

21  Honor.

22          THE COURT:  Well, here is my understanding.  My

23  understanding is that there is a roll-up on an interim basis,

24  but that a party, any party, can come at the final hearing

25  and say that roll-up should now be reversed.  Is that not

1  your understanding?

2          MS. REPEROWITZ:  That was not our client's

3  understanding, Your Honor.  And in the negotiations they

4  thought roll-up today because of the situation, et cetera.

5  And then challenge would be to extent, validity and priority

6  of liens by the final hearing, Your Honor.

7          THE COURT:  All right.  Because, you know, a roll-

8  up at an interim point state is unusual.  It's extraordinary

9  already to allow that roll-up to occur.  It just causes me a

10  lot of concern that that roll-up cannot be reversed at the

11  request of any party or at the objection of any party.  But I

12  understand your position.

13          MS. REPEROWITZ:  Thank you, Your Honor.

14          THE COURT:  I still have to decide if I'm going to

15  allow it or not.

16          MS. REPEROWITZ:  I do understand that, Your Honor.

17  I think there may be more people that might want to be heard

18  on that.  There may be -- maybe we should take a five minute

19  break before Your Honor rules on that.

20          THE COURT:  Of course.

21          MS. REPEROWITZ:  And maybe try again to talk it

22  through with the parties and see if objections, where we

23  stand.

24          THE COURT:  All right.

25          MS. REPEROWITZ:  Thank you, Your Honor.

1          THE COURT:  Mr. Minuti, yes.  That's right, you

2   were going to raise the next objection.

3          MR. MINUTI:  Your Honor, I had some -- the next

4   objection is from Tenet and Conifer.

5          THE COURT:  Yes.

6          MR. MINUTI:  I actually had some comments, but

7   maybe it would be more efficient to hear from Tenet and

8   Conifer then have me respond if that's acceptable.

9          THE COURT:  That's fine, Mr. Minuti.

10          MR. MINUTI:  Thank you, Your Honor.

11          MR. PESCE:  Good afternoon.

12          THE COURT:  Good afternoon.

13          MR. PESCE:  Gregory Pesce, Kirkland & Ellis, on

14   behalf of Tenet and Conifer.

15          THE COURT:  Yes.

16          MR. PESCE:  As Mr. Minuti noted -- and first off I

17   should thank Mr. Minuti for all of the time he spent with us

18   over the last few days, particularly with Kirkland and with

19   the Pachulski Firm.

20          I rise to have a limited objection to the DIP

21   facility, but if you would indulge me for a moment I just

22   want to make a clarifying statement.

23          THE COURT:  All right.

24          MR. PESCE:  I, unfortunately, wasn't here

25   yesterday.  I was tied up with the bad weather and was

1  grounded in Chicago, but, you know, over the course of the

2  last week or so in this very unusual Chapter 11 case I keep

3  hearing of Tenet as the seller of the hospitals that, sort

4  of, washed its hands, and I hear of Conifer as this billing

5  outfit, you know, this faceless billing outfit and nothing

6  could be further from the truth.

7          Tenet, the former owner, today, provides all of

8  the information, technology and related transition services

9  to the hospitals.  Information technology in our day in age

10 is absolutely critical to any business, but in the health

11 services field with the critical HIPPA and other patient

12 privacy concerns it is absolutely critical.  And Tenet's

13 ability to continue providing those services literally

14 permits the hospitals to open.

15         Conifer, far from being just the collection

16 agency, is the lifeblood of the hospital.  Its employees, who

17 are paid by Conifer, not by the hospitals themselves, are

18 responsible for billing, patient intake, check-outs and all

19 manner of administrative services at the hospital.

20         THE COURT:  I did hear that at one of the

21 hearings, Mr. Pesce.

22         MR. PESCE:  Prepetition, as is today, we are ready

23 and willing to help the hospitals survive and St.

24 Christopher's to thrive.  We have, effectively, funded the

25 debtor's prepetition restructuring process by advancing $55

1  million dollars in receivables that have not been collected.

2         THE COURT:  Yes.

3         MR. PESCE:  I venture to say that if this were any

4  other corporation other then one of the nation's largest

5  hospital operators that would not be the case.  My client has

6  an unquestioned commitment to patient health and safety, and

7  in good conscience could not step away from the patients, the

8  residents and the people of the City of Philadelphia given

9  its twenty year relationship with the hospitals.

10        That said --

11        THE COURT:  I know you've committed to remain on

12  the scene through July 12th, through today.  Has that been

13  extended at this point?

14        MR. PESCE:  We are willing, for the time being, to

15  extend to next Friday, July 19th on the present terms.

16        THE COURT:  Okay.

17        MR. PESCE:  Our people will not be leaving on

18  Monday, as I know was the concern.  That said there is no

19  assurance of a further extension and, candidly, given the

20  record that is here today, it is questionable whether we will

21  provide such an assurance.

22        One of the bedrock foundations of Chapter 11 is

23  the debtor, notwithstanding what its prepetition creditors

24  can get, can pay the freight of the Chapter 11 case.  What we

25  have here, with HSRE, myself -- and I've very confident,

1  based on the calls I received ahead of the committee meeting,

2  other vendors out there, the debtor is unable to pay its

3  post-petition accounts receivable as they come due.

4          This is a case that demonstratively objectively on

5  paper is administrative insolvent today.  At the same time,

6  notwithstanding this district's well establish local rule

7  against full roll-ups on the first day and whatever it is

8  exactly is being proposed for the roll-up here today, which I

9  continue to not quite understand, the people who fund the

10 operations of the hospital are not going to be paid; yet the

11 DIP lender and other constituents in the case are seeking the

12 full protections of Chapter 11.  It's unfair.

13          As I said, my client is unwilling to put patient

14 health and safety at risk for the time being.  We will

15 continue to stand-up through July 19th.  That said, it is

16 inappropriate at this time, we think, to have a full roll-up.

17 This should be, if anything, a standard roll-up.  To the

18 extent there is new money advanced that portion of the roll-

19 up will be sacrosanct and not subject to challenge.  Other

20 portions of the roll-up, if any, if the court thinks are

21 appropriate should be subject to a full challenge not just to

22 the liens, but to the roll-up itself and the ability to roll-

23 up prepetition debt.

24          THE COURT:  Yes.

25          MR. PESCE:  My client is an unsecured creditor.

1  We would love to have a roll-up.  It's impermissible as a

2  matter of bankruptcy law as should be the same for Midcap.

3          Finally, as Your Honor has noted and we really

4  appreciate the flexibility you've provided given the work

5  it's taken to appoint a committee in this case a committee is

6  being appointed on Monday.

7          THE COURT:  Yes.

8          MR. PESCE:  The committee will have something to

9  say about this case.

10          That said, there is one other technical point I

11  just would like to flag for the court which is while there is

12  a challenge rights for at least some piece of the prepetition

13  debt, I'm not quite sure where that is based on the

14  conversations that preceded my presentation, the DIP order,

15  Paragraph 7(b), at least what I was reviewing, says that none

16  of the cash collateral can be used for any reason to

17  investigate or conduct discovery or challenge the prepetition

18  debt.

19          I imagine the committee will have something to say

20  about this in the next couple of weeks, but if that language

21  persists I think the challenge right is somewhat toothless,

22  at least, until the final hearing.  And we would urge the

23  court to require that at, a minimum, the committee be allowed

24  to conduct discovery and challenges while reserving their

25  right to use cash collateral for litigation and contested

1  matters.  They have to, at least, understand and be able to

2  investigate what is out there.

3            THE COURT:  All right.

4            MR. PESCE:  Finally, I think, just the final

5  point, not necessarily an objection to today.   Like I said,

6  we will be on site until July the 19th.  But at some point

7  the bleeding must stop here.  We cannot be asked to continue

8  to provide services for free, effectively, to the hospital

9  or, at least, at a significant discount and one that doesn't

10 even cover the costs of paying our employees that are on

11 site.  We are eating that cost internally.

12           THE COURT:  Yes.

13           MR. PESCE:  That cannot continue.  And like Mr.

14 Brown reserving his rights, sooner rather than later, perhaps

15 much sooner than later, we may be before the court to talk

16 about the appropriateness and permission of our client to

17 cease providing services.  We're not going to have that fight

18 today, but it is one which Your Honor should be prepared for,

19 maybe coming sooner than later unless the constituents,

20 including the DIP lender, and the equity holder who has kept

21 the largest most valuable assets the Hahnemann property, half

22 a city block in Center City Philadelphia, St. Christopher's

23 real property out of this bankruptcy which we think is

24 inappropriate and something that we hope the committee

25 investigates and sees the appropriateness.

1          THE COURT:  Yes.

2          MR. PESCE:  So, that's all I have to say for

3    today.  I appreciate the court's time and debtor's counsel's

4    time over the last few days.  I'm happy to answer any

5    questions or I can take my seat.

6          THE COURT:  No.  I understand your objection.  I

7    share your concern about the equity holder here and what

8    parties are not debtors.  I think the committee will have

9    something to say about that, but we will see that later.

10          MR. PESCE:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. MINUTI:  Your Honor, will you permit me to

13    briefly respond?

14          THE COURT:  Yes.

15          MR. MINUTI:  Just a couple of points, Your Honor,

16    that counsel raised that I want to correct for the record.

17    Counsel said that they had advanced the debtor $55 million

18    dollars prepetition to help the debtor survive.  That was not

19    an advance, Your Honor.  Those are fees that the debtor owes

20    or, arguably, owes to Tenet/Conifer prepetition, but as Your

21    Honor is aware from the first-day declaration and our

22    discussion last week the parties are in significant

23    litigation revolving around the services that have been

24    provided, the asset purchase agreement, reps and warranties,

25    so on and so forth.

1        So, the debtors, as we sit here today, Your Honor,

2   believe we have significant and meritorious claims.  All of

3   those, Your Honor, are currently in the Delaware Superior

4   Court and the Delaware Chancery Court.  So, those issues will

5   continue.

6        Number two, Your Honor, counsel has indicated that

7   they have extended the services for a period of time, but

8   they're going to cut those services off.  Again, Your Honor,

9   we have a prepetition executory contract.  We filed

10  bankruptcy before it terminated.  The debtor's positon is

11  crystal clear which is they cannot terminate without court

12  approval.

13        THE COURT:  Right.

14        MR. MINUTI:  Termination, Your Honor, and I don't

15  think counsel will deny this, means the lights get shut-off

16  and we are in immediate evacuation mode where patients will

17  suffer.  So, we don't believe they have the ability to

18  terminate, certainly, without Your Honor having something to

19  say about that.  And if they file a motion, Your Honor, we

20  will be back before you.

21        As I said before, Your Honor, we will be back

22  before you.  And as I said before, Your Honor, we've had

23  discussions, we will continue to have discussions.  Make no

24  mistake, Your Honor, this budget includes $800,000 dollars a

25  month for Tenet and Conifer on a post-petition basis.  It's

1  not as much as they claim they're entitled to, but as much as

2  we can afford, Your Honor, it is actually more than we were

3  paying on a prepetition basis while we were having

4  discussions, and we are in litigation and we are continuing

5  that.

6          Finally, Your Honor, counsel said that he's heard

7  from a bunch of trade folks that we haven't been paying.

8  Your Honor, that is hearsay.  I would ask that that be

9  stricken or, at least, Your Honor not consider that.  The

10 testimony of Mr. Weiland, Your Honor, is very clear.  Putting

11 Tenet aside and with regard to HSRE, Your Honor, the issue

12 there is that with regard to the leases HSRE purported to

13 exercise their right under their leases prepetition to

14 require additional tax payments.

15         Putting those aside, Your Honor, to my knowledge,

16 we are paying all of our vendors on a post-petition basis

17 currently.  We believe the budget has sufficient funds to do

18 that and so we do believe we have the ability to operate on a

19 post-petition basis.  I just said this a minute ago, Your

20 Honor, and I will say it again so that everybody understands

21 it; this budget is extremely tight.  There is no doubt about

22 that, Your Honor.

23         THE COURT:  Yes.

24         MR. MINUTI:  We do believe we have the ability to

25 make those payments.

1        Finally, Your Honor, on the roll-up I do think it

2   would make sense to have a few minutes to talk about the

3   roll-up, Your Honor.

4        THE COURT:  I do too.

5        MR. MINUTI:  Let me just say this, Your Honor,

6   given the nature of these businesses and what would happen if

7   we don't have these funds, in a situation where we can't

8   survive on cash collateral the results here would be

9   catastrophic if we don't have the funding we need to move

10  forward.  We have a payroll next Tuesday.  If we don't make

11  that payroll, Your Honor, even if I want to keep the

12  hospitals open, people are not going to show-up.  So, I have

13  a serious emergency situation on my hand if this doesn't

14  happen.

15       I understand that we've got to sort of balance,

16  okay, what's the damage here that could happen or what's the

17  harm going to be to the estate and the community with

18  people's rights to challenge and people's rights to attack.

19  And we're trying to do that the best we can, Your Honor.  The

20  loan we have before you and the terms are what we need to

21  survive.

22       So, if we could have a few minutes let's talk to

23  our lender, let's come back and clarify exactly what it is

24  and Your Honor is going to rule.  Then we are going to live

25  with those consequences.  That is what I think makes sense.

1          THE COURT:  All right.  Ms. Reperowitz, yes.

2          MS. REPEROWITZ:  Yes.  Your Honor, I did not

3    actually make a presentation.  I simply have been responding

4    to questions from the court.  So, I would just like to,

5    first, thank the court so much for your indulgence and for

6    giving us so much time to work through the various issues

7    that I feel that we have come down to one, seems to me, very

8    big issue which is the roll-up.  It is a very big issue to my

9    client.

10          I am Debbie Reperowitz from Stradley Ronin.  We

11   represent both the prepetition lender, Midcap Funding IV

12   Trust, and the DIP lender, potential DIP lender, Midcap

13   Financial Trust.

14          Your Honor, I think when you look at the roll-up

15   situation it is a case where it's appropriate, Your Honor.  I

16   understand people don't like it, but this is an extraordinary

17   case.  And, in fact, we are subordinating to the carve-out

18   for the professionals in this case.  We are, basically,

19   funding this case, Your Honor.  If we weren't here there

20   wouldn't be a case because the professionals won't work for

21   free.

22          So, that is a very big issue and its allowing the

23   Saul Firm and the other parties in interest to work through

24   these issues to, as Mr. Minuti has just described, service

25   the patients safely and also to preserve and protect the

1  value of the St. Chris Hospital which we hope is going to

2  sell and be able to satisfy creditors in this case.

3            THE COURT:  It's not just the other parties that

4  don't like the roll-up, Ms. Reperowitz.  The court doesn't

5  like it.  Our local rules don't like it.  And to a large

6  extent this is an emergency situation for the debtors and it

7  almost appears that Midcap is taking advantage of that.

8            MS. REPEROWITZ:  That is not the intention, Your

9  Honor.

10           THE COURT:  That is the effect of this roll-up if

11  there isn't the right.  Look, I might be prepared to allow it

12  on an interim basis if it can be challenged at the final

13  hearing.  But the way you are proposing it I don't know that

14  I'm going to approve it.

15           MS. REPEROWITZ:  Thank you, Your Honor, for that

16  insight.

17           I was going to say that the existing creditors are

18  really not affected because we are fully secured from a

19  prepetition -- the prepetition lender is fully secured.

20           THE COURT:  Yes.

21           MS. REPEROWITZ:  Therefore, Your Honor, we are not

22  imposing upon any of the other creditors who have voiced

23  objection here today.

24           THE COURT:  How about Paragraph 7(b)? I don't

25  remember now who pointed it out, I think it was Mr. Pesce who

1  pointed out that there are no fees for investigation and for

2  discovery. I know that we often see that type of exclusion

3  for litigation.  I didn't pick-up on that.  I'm sorry and I'm

4  glad that Mr. Pesce did.  It's on -- I have the redline, Page

5  20.

6            MS. REPEROWITZ:  Your Honor, we did try to go

7  through the court's history and rules.  We did not take liens

8  on avoidance actions.  So, it seems to me that there are

9  other sources of funding for those types of actions

10            THE COURT:  What other sources of funding would

11  there be for the committee to investigate?

12            MS. REPEROWITZ:  The avoidance actions, Your

13  Honor.

14            THE COURT:  Well, the avoidance actions won't take

15  place during the challenge period and the recovery under

16  avoidance actions won't.

17            MS. REPEROWITZ:  We can discuss it --

18            THE COURT:  Yes.

19            MS. REPEROWITZ:  When we take a break, Your Honor,

20  we will discuss that.

21            THE COURT:  Please do.

22            MS. REPEROWITZ:  I'm just quickly going through my

23  notes because I think we did cover a lot of the things

24  already.

25            THE COURT:  Yes.

1        MS. REPEROWITZ:  I think Mr. Minuti covered the

2  urgency of the situation.

3        Your Honor, with that I think I'd like to rest

4  now, have our conversations and then come back to the court

5  after a brief recess.

6        THE COURT:  All right.  Well, I certainly

7  recognize the emergency nature of this hearing and of this

8  loan, but I don't think that that should enable a lender to

9  take advantage of the process.  So, have your conversations

10  and I will be back when you're ready for me.

11        MS. REPEROWITZ:  Thank you, Your Honor.

12        THE COURT:  Thank you.

13     (Recess taken at 3:27 p.m.)

14     (Proceedings resumed at 4:12 p.m.)

15     (Call to Order of the Court)

16        THE COURT:  Thank you everyone.  You may be

17  seated.

18        Mr. Minuti?

19        MR. MINUTI:  Your Honor, Mark Minuti, again, on

20  behalf of the debtors.

21        THE COURT:  Yes.

22        MR. MINUTI:  Your Honor, during the break I can

23  tell you the debtors certainly heard what Your Honor said.

24  Our lender was talking to some of the objectors.  I think

25  there was a compromise that they were discussing.  I think I

 1  will cede the podium to Ms. Reperowitz and she can tell Your

 2  Honor where the lenders are.

 3          THE COURT:  All right.  Thank you, Mr. Minuti.

 4          Ms. Reperowitz, yes.

 5          MS. REPEROWITZ:  Yes, Your Honor.  What we have

 6  been discussing, and I hope that this would be something that

 7  is more palatable to the court, would be a more creeping

 8  roll-up.  So, the roll-up would be approved today, subject to

 9  challenge, Your Honor, at the final hearing --

10          THE COURT:  Yes.

11          MS. REPEROWITZ:  -- but, of course, to the extent

12  that new dollars come in, because we have the approval today,

13  they will be applied to prepetition dollars on a -- to reduce

14  the prepetition debt on a dollar for dollar basis for new

15  money coming in or money made available to the debtor post-

16  petition.

17          THE COURT:  Right.

18          MS. REPEROWITZ:  And to the extent that there has

19  been dollar for dollar reduction of the prepetition debt

20  whatever challenge occurs at the final hearing, if any, would

21  not -- they would not be able to undo the new dollars that

22  have come in and the pay-down that has occurred to that date

23  because it would be dollar for dollar.

24          THE COURT:  Right.

25          MS. REPEROWITZ:  New in, pay-down pre-dollar for

1  dollar.

2          THE COURT:  All right.  I don't know if anyone

3  wishes to be heard.  Let me ask you this; how about Paragraph

4  7(b) because --

5          MS. REPEROWITZ:  Is Paragraph 7(b), Your Honor,

6  the --

7          THE COURT:  The investigation.

8          MS. REPEROWITZ:  Yes, Your Honor.  We would make

9  $25,000 dollars available for the unsecured creditors

10 committee.

11         THE COURT:  Fine.

12         MS. REPEROWITZ:  And, Your Honor, we will send

13 them a disc with --

14         THE COURT:  That's right.  They may not have to do

15 any investigation; who knows.

16         MS. REPEROWITZ:  Right.

17         THE COURT:  That's fine.  All right.  Good.

18         MS. REPEROWITZ:  So, I should say up to. It's not

19 a fixed fee of $25,000 dollars.

20         THE COURT:  Understood.  I understand.  All right.

21         MS. REPEROWITZ:  Okay.

22         THE COURT:  Does anyone wish to be heard on the

23 proposal?

24     (No verbal response)

25         THE COURT:  No one wishes to be heard.  It's

1  acceptable to the court.

2          MS. REPEROWITZ:  Thank you, Your Honor.

3          THE COURT:  Thank you, Ms. Reperowitz.

4          Yes?

5          MR. MINUTI:  So, Your Honor, what I think we need

6  to do is -- just let me consult with Mr. Eisenberg for one

7  moment.

8          THE COURT:  Of course.

9      (Participants confer)

10          THE COURT:  We can get this done tonight.

11          MR. MINUTI:  Your Honor, I'm just checking to see

12  if we could interlineate it or we need to go back and do it

13  by certification.

14          THE COURT:  Okay.

15          MR. MINUTI:  If you give me one moment I will

16  answer that.

17          THE COURT:  That's fine.

18      (Participants confer)

19          MR. MINUTI:  Let me ask, Your Honor, how late will

20  Your Honor be here?

21          THE COURT:  Well, I, frankly, could stay until --

22  I'm already beyond my safe time.

23          MR. MINUTI:  I'm aware of that, Your Honor.

24          THE COURT:  But I could stay until 6:30 or so, or

25  you could email it to me later, I could review it and we

1   could get it docketed that way.

2           MR. MINUTI:  We will -- Your Honor, its very kind

3   of the court.  We very much appreciate that.  We'd like to

4   take you up on that offer.  We will endeavor to go back to

5   our office, change the order, we will file it under

6   certification, send it Your Honor by email as well if that's

7   acceptable.

8           THE COURT:  That's fine.

9           MR. MINUTI:  Then if Your Honor could get it

10  entered today that would be most helpful.

11          THE COURT:  Yes.  We will do that.

12          MR. MINUTI:  Your Honor, I know I speak for the

13  debtor, I speak for the lenders, we very much appreciate the

14  court's patience with us and attention to this matter.

15          THE COURT:  Well, it's a difficult case.  I

16  recognize that.  I know how hard everyone is working.  I

17  appreciate that fact as well.

18          MR. SACKS:  Your Honor?

19          THE COURT:  Yes.

20          MR. SACKS:  I'm sorry to interject here.  My name

21  is Marc Sacks.  I'm an attorney with the Department of

22  Justice and representing here the five other agencies,

23  certainly HHS and CMS.

24          I want to thank Mr. Minuti and his colleagues for

25  working with us on changing some language in the order, but

1  there is one small request I have about the language of the

2  order.  I've communicated that by email to Mr. Minuti.  I'm

3  not sure he has had a chance to look at it or had a chance to

4  tell us whether he agrees or not.

5        If I could communicate it to the court briefly.

6  It's a very small change.  I think it's called for by the

7  law.  It's on Page 22 of the draft order or 24 of the redline

8  order, whichever one Your Honor is looking at.

9        THE COURT:  Yes, I have the redline.

10        MR. SACKS:  Okay.  So, if you look at the

11  paragraph -- sorry, it's actually Page 25, the following

12  page.

13        THE COURT:  All right.

14        MR. SACKS:  The paragraph that begins nothing in

15  this order --

16        THE COURT:  Yes.

17        MR. SACKS:  -- which is the first full paragraph,

18  I think.  So, that is language that we requested to be added.

19  The provided, however, language is language that Mr. Minuti

20  added.  It says,

21        "Prior to the exercise of any such recoupment or

22        set-off any governmental authority must obtain,

23        essentially, relief from the stay from the court."

24        And we recognize that as true for set-off if,

25  indeed, that's what the government wants to do.  For

1  recoupment, however, I think under <u>University Medical Center</u>

2  that is not the law.  Recoupment is a defense that we have

3  the right to do without approval of the court as long as it

4  is the same transaction.  And we understand the difference

5  there.

6        So, we would ask that the two words recoupment or

7  be deleted from that sentence.

8        THE COURT:  Mr. Minuti is talking to others.  So,

9  let's give him a minute.

10        MR. MINUTI:  That is acceptable to the debtor,

11  Your Honor.

12        THE COURT:  Mr. Minuti has said that is

13  acceptable.

14        MR. SACKS:  Okay.  We appreciate that very much.

15  Thank you.

16        THE COURT:  Yes, sir.

17        MR. MINUTI:  I think with that, Your Honor, we're

18  done.  Again, we thank the court for its attention.

19        THE COURT:  Thank you all.  With that we will

20  stand in recess until Tuesday.  Good evening.  Good weekend.

21        (Proceedings concluded at 4:19 p.m.)

22

23

24

25

1                              CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6
     /s/Mary Zajaczkowski_____            July 12, 2019
7    Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25