**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11466 (KG)<br><br>(Jointly Administered)<br><br>**Related D.I.: 142** |

**LIMITED OBJECTION OF THE ASSOCIATION OF
AMERICAN MEDICAL COLLEGES AND THE EDUCATIONAL
COMMISSION FOR FOREIGN MEDICAL GRADUATES TO THE
RESIDENT PROGRAM BID PROCEDURES MOTION**

The Association of American Medical Colleges ("AAMC") and the Educational Commission for Foreign Medical Graduates ("ECFMG"), by and through their undersigned counsel, hereby submit this limited objection (this "Limited Objection")[1] to *the Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II) A) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief* [D.I. 142] (the "Bid Procedures Motion"). In support hereof, the AAMC and the ECFMG respectfully state as follows:

---

[1] The AAMC and the ECFMG reserve their rights to amend or supplement this Limited Objection at a later date.

**INTRODUCTION**

1.  The AAMC is a not-for-profit association dedicated to transforming health care through innovative medical education, cutting-edge patient care, and groundbreaking medical research. Its members are 154 accredited U.S. and 17 accredited Canadian medical schools; nearly 400 major teaching hospitals and health systems; and more than 80 academic societies. Through these institutions and organizations, the AAMC serves the leaders of America's medical schools and teaching hospitals and their more than 173,000 full-time faculty members, 89,000 medical students, 129,000 resident physicians, and 60,000 graduate students and postdoctoral researchers in the biomedical sciences. Hahnemann University Hospital ("Hahnemann") is a member of the AAMC.

2.  The ECFMG is a private non-profit organization that promotes quality medical education and health care worldwide. ECFMG and its foundation, based in Philadelphia, are leading experts on the world's medical education systems and their graduates, the authenticity of physician credentials, and the assessment of physicians. ECFMG is the sole agency that evaluates the qualifications of international medical graduates ("IMGs") before they enter programs of graduate medical education ("GME") at teaching hospitals across the United States. Each year, ECFMG certifies approximately 10,000 IMGs for entry into U.S. GME programs. ECFMG also is the sole agency designated by the U.S. Department of State to sponsor foreign national physicians in J-1 visa status to participate in U.S. GME programs. ECFMG provides J-1 visa sponsorship for more than 11,000 residents[2] and fellows, including 55 trainees at Hahnemann.

3.  This bankruptcy proceeding will mark the largest loss of medical residents to a community in a single event, exceeding even the 550 displaced residents following the closure of

---

[2] The term "resident" or "medical resident" is intended to include fellows who are physicians who have completed training in their initial specialty and have continued training in a subspecialty.

112765088

Charity Hospital after Hurricane Katrina, putting Hahnemann patient care at grave risk. The AAMC and the ECFMG are concerned for the placement and well-being of the residents of Hahnemann and so join in the Response of the Accreditation Council for Graduate Medical Education (the "ACGME") to the Closure Motion [Docket No. 122] as if set forth at length hereon and share in those concerns. The AAMC and the ECFMG reserve their rights to address issues that may arise with respect to the Closure Motion at a later date.

4. The AAMC and the ECFMG submit this Limited Objection to the Bid Procedures Motion in order to highlight for the Court their concerns regarding the myriad of issues facing the medical residents in this bankruptcy case, which impact the bid procedures, the role of the patient care ombudsman, and any temporary manager or special master that might be appointed. Under ACGME requirements, in the event of a closure, institutions that have accredited residency programs must assist medical residents in "enrolling in (an)other ACGME-accredited program(s) in which they can continue their education."[3] ACGME requirements further provide that "If more than one institution or program is available for temporary or permanent transfer of a particular resident or fellow, the preferences of the resident or fellow must be considered by the transferring institution or program. Programs must expeditiously make the decision to reconstitute the program and/or arrange for temporary or permanent transfers of the residents and/or fellows so as to maximize the likelihood that each resident or fellow will complete the academic year with the least disruption to her or his education."[4]

5. Given the possibility that the successful bidder will not have a sufficient number of accredited residency training programs or positions to accommodate all Hahnemann residents, under ACGME requirements Hahnemann is obligated to facilitate the transfer of residents to other

---

[3] ACGME Institutional Requirements, IV.N.II, available at www.acgme.org.
[4] See Section 21.20.c. of the ACGME Policies and Procedures.

3

programs. The AAMC and the ECFMG would like to ensure, among other things, that there is a timely, orderly and consensual transition of residents whether (i) to the program of each resident's choice, (ii) to Tower Health, as stalking horse bidder, or (iii) to another successful qualified bidder; so as to ensure proper patient care at Hahnemann and that all necessary steps be taken to ensure the continued quality of each resident's medical education.

6. Among the AAMC and the ECFMG's concerns related to the transfer of residents to other accredited residency training programs is the transfer of the Medicare funding associated with the resident's funded position. Centers for Medicare & Medicaid Services ("CMS") regulations permit a hospital that closes a residency program to temporarily transfer Medicare GME funded positions to other hospitals, through the duration of each so-called "displaced" resident's training. In many instances, the transfer of funding through this CMS process is necessary to effectuate the orderly transition of residents to programs of their choice. Retaining these funded Medicare positions would present no benefit to Hahnemann, given that a hospital cannot receive any Medicare GME funding if no resident is training at the hospital to fill the funded position. Accordingly, Hahnemann should be willing to effectuate Medicare funding transfers as quickly as possible, so as not to cause any interruption or delay in the resident's medical training.

## RELIEF REQUESTED

7. In order to ensure that the serious and nuanced issues facing patient care as a result of the treatment of residents are considered in this bankruptcy case, the AAMC and the ECFMG respectfully request that the Court modify the July 2, 2019 Order Directing the Appointment of a Patient Care Ombudsman [D.I. 83] and the July 3, 2019 Notice of Appointment of Patient Care Ombudsman [D.I. 95] to specify that in fulfilling her duty under Section 333 of the Bankruptcy Code to "monitor the quality of patient care provided to patients of the debtor, to the extent necessary under the circumstances, including interviewing patients and physicians," the

112765088

Ombudsman must: (1) take into consideration the potentially irreparable consequences an interruption to resident training will have on patient care; (2) take into consideration whether a sale of residency slots to an entity without enough accredited programs to absorb the residents themselves could result in any interruption in resident training and disruption to patient care; and (3) in interviewing physicians, include physicians-in-training, *i.e.,* medical residents.

8. The AAMC and the ECFMG also ask that the Court require that Hahnemann follow its own closure policy with respect to the residents in order to ensure that residents who request a transfer are released from their existing contracts as quickly as possible, and in any event, within no more than 30 days of delivered written notice.

9. With respect to the Bid Procedures Motion, the AAMC and the ECFMG take issue with the notion that the Purchaser will "grant" or "give" residents "the right" to accept a position in an accredited program other than the Purchaser's programs. If a program closes, a displaced resident may reach out to other accredited program to continue on the educational path to medical practice without being "granted" anything by the Purchaser. For this reason, the AAMC and the ECFMG request that the proposed bid procedures be revised to require that in the event Tower Health or any other Qualified Bidder (as such term is defined in the Bid Procedures Motion) acquires the residency slots currently held at Hahnemann, that the Bidder agree to expeditiously transfer any resident's slot should a resident wish to pursue his or her training elsewhere.

## **LIMITED OBJECTION**

10. Teaching hospitals play a critical role in American health care. Not only do they provide excellent patient care, but they train medical residents and other learners and often are centers of research. Hahnemann has been a teaching hospital for well over a century, maintaining a commitment to training residents as part of its mission to serve patients and the community.

Teaching hospitals in the United States are premier destinations for medical training, attracting gifted medical graduates from across the nation and around the world and creating rich and diverse environments for clinical learning and patient care. Patients come to teaching hospitals knowing that the presence of medical residents and other learners means that the hospital has accepted the responsibility of providing excellent patient care while at the same time educating the next generation of physicians. This critical aspect of excellent patient care through the stabilization, maintenance and orderly transition of medical residents has not yet been ensured in these cases.

11. The training of medical residents, which occurs under the supervision of faculty physicians, is completely interwoven with the care of patients. Teaching hospitals rely on the presence of medical residents to improve patient care, and to care for more patients overall. Having these learners as part of the care team has enhanced the care of Hahnemann's own patients and enabled Hahnemann to serve a broader community, absorbing more of the patient base in the Philadelphia area.

12. Having learners as part of the care team also has ensured that well trained physicians are available to the Philadelphia community and throughout the country as those medical residents finish their training and establish their own medical practices. At a time when America's healthcare needs are exceeding the number of doctors available, and with a predicted shortfall of up to 122,000 physicians by 2032, the abrupt removal of approximately 583 medical residents and fellows in 35 different programs accredited by the ACGME from their training practice is a hazardous blow to patient care not only in Hahnemann, but also the greater Philadelphia area, and nationwide. The ripple effects at Hahnemann also cascade to the City of Philadelphia and the nation. For example, in the case of the 55 Hahnemann residents training under the ECFMG J-1 visa sponsorship, the loss of this physician talent and capacity, to

Philadelphia and the nation, may be swift and permanent, as their visa status requires that they leave the United States if they do not enter other training programs promptly. The ability to provide access to health care in Hahnemann and the U.S. depends upon continued ability to attract and train IMGs, who comprise one-quarter of all physicians in training and practice in the United States.

13. Hahnemann's residents came to that institution relying upon its ability to provide them the necessary training in the specialty of their choice, in a pre-determined period of time. Among these are 55 J-1 physicians from 23 other nations who established themselves, in some cases with their families, in Philadelphia to train. For Hahnemann's patient care to be maintained, so must the residents, which means an orderly closure and ensuring their prompt and focused attention on Hahnemann patient care by removing the current distractions and difficulties impacting their training.

14. Unlike other practicing physicians, residents have very little flexibility in the timing or location of where they provide medical care. Residents cannot simply start training at any another hospital; residents can only complete training at medical residency programs accredited by the ACGME. As ACGME writes, "[g]raduate medical education develops physicians who focus on excellence of delivery of safe, equitable, affordable quality care; and the health of the populations they serve."[5] ACGME accreditation is not simple to achieve and must be maintained. ACGME has a myriad of requirements that are designed to provide residents with the experiences they need to become independent physicians while also ensuring that patients are safe and well-cared for. As ACGME's objection provides, that accreditation is in jeopardy in part due to a disorderly closure of Hahnemann.

---

[5] ACGME Common Program Requirements (Residency) at
https://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/CPRResidency2019.pdf

7

112765088

15. With the closure of Hahnemann, approximately 583 medical residents' training will abruptly halt. The J-1 physicians training at Hahnemann also face the prospect of having to leave the U.S. immediately. These looming threats weigh heavily on Hahnemann residents, who are now scrambling to ensure their continued training after long periods of schooling at significant cost, all of which detracts from Hahnemann patient care. The patients at Hahnemann, and patients of the community served by Hahnemann, will feel the marked reduction in the availability of medical care with these current distractions, as well as the sudden removal of a significant percentage of caregivers.

16. Neither the Bid Procedures Motion, nor the Stalking Horse LOI attached thereto describes Tower Health's accreditation status. Further, the Bidding Procedures do not require that a Qualified Bidder be properly accredited. Tower Health currently operates only 8 accredited programs, which is significantly fewer than the 35 programs currently operating at Hahnemann. Residents require training in accredited programs, so without the assurance of a transfer to another accredited program, the above issues surrounding patient care will persist. The Bidding Procedures should therefore be modified in order to provide that Tower Health and any Qualified Bidder will either offer positions to residents in the Qualified Bidder's accredited program in the specialty of the resident's choice, or expeditiously facilitate the resident's transfer to another accredited program.

17. To this end, the bid requirements outlined in the Bidding Procedures should be modified to require that each Qualified Bid be obligated to explain how they plan to ensure the continued training of all of Hahnemann's 583 residents. In addition, each Qualified Bid should provide free housing and benefits to all residents in order to offset the cost of their displacement. Lastly, the Bidding Procedures should be modified to provide that an individual resident's contract

112765088

cannot be assumed without that resident's written consent and that it shall be rejected, pursuant to the bankruptcy code, and transferred expeditiously on their request per Hahnemann's policy.

18. It is not disputed that the Debtor has taken steps to address the critical need to continue the training of Hahnemann's residents. However, it is not self-evident that the proposed wholesale transfer of all or most of the residency positions under these circumstances is in the best interest of the displaced residents. Full consideration must be given to other alternatives, including facilitating the transfer of displaced residents to the accredited programs of their choice without any undue delay.

19. The medical residents at Hahnemann must be able to continue their training at programs that have ACGME accreditation in the specialty in which the resident was training while at Hahnemann, with as little interruption as possible. Patients in Philadelphia, and across the country, need doctors, and any compromise in training those doctors or delay in making those doctors available to patients, is a risk to patient wellbeing. Accordingly, there is no way to separate the concept of protecting patient care from the need to protect the integrity of the residency programs being sold by Hahnemann. In order to protect both current and future patients, this Court needs to ensure that each resident's medical training and education is properly continued, without undue delay. As such, in addition to the modifications to the Bidding Procedures proposed above, the AAMC and the ECFMG also respectfully request that the Court require the Patient Care Ombudsman to consider and advise the Court on the issues and concerns impacting patient care specific to the residents and to the orderly sale of the Debtors' residency program assets to any third party purchaser.

WHEREFORE, the AAMC and the ECFMG respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court deems just and warranted.

112765088

Dated: July 15, 2019
      Wilmington, Delaware

BAYARD, P.A.

*/s/ Justin R. Alberto*
Justin R. Alberto (No. 5126)
Sophie E. Macon (No. 6562)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: jalberto@bayardlaw.com
       smacon@bayardlaw.com

-and-

DENTONS US LLP
Oscar N. Pinkas (*pro hac vice* pending)
Lauren Macksoud (*pro hac vice* pending)
1221 Avenue of the Americas
New York, New York, 10020
Telephone: (212) 768–6700
Facsimile: (212) 768–6800
Email: oscar.pinkas@dentons.com
       lauren.macksoud@dentons.com

*Counsel for the AAMC and the ECFMG*

112765088