**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*,[1] | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket No. 142** **Obj. Deadline: July 15, 2019 (4:00 p.m.)** |

**LIMITED OBJECTION OF THE UNITED STATES TO
DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING
BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS'
RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE,
(B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING
NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND
MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A
HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE
OF THE DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS; AND (III) GRANTING RELATED RELIEF**

The United States of America (the "United States"), on behalf of the Department of Health

and Human Services ("HHS"), acting through its designated component, the Centers for Medicare

& Medicaid Services ("CMS"), hereby files this limited objection to the *Debtors' Motion for Entry*

*of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident*

*Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to*

*the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed*

---

[1] The Debtors in these jointly administered cases, along with the last four digits of each Debtor's federal tax identification number, are:  Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

*Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief* (Dkt. 142) (the "Bid Procedures Motion" or "Motion").[2]

While the United States does not oppose at this time the transition of the Hahnemann University Hospital ("Hahnemann") residents and fellows to alternative hospitals, the United States objects to the terms of the proposed sale as set forth in the Motion, which improperly attempt to "discharge" monies owed to HHS and seek to avoid the Successful Bidder's successor liability under the assumed and transferred Medicare Part A agreement.  Bid Procedures Motion at 3 (sale includes "purchase of . . . Hahnemann's . . . Medicare provider number and agreement.").  Moreover, the United States objects to the Bid Procedures Order (Dkt. 142-1) to the extent the Court, in entering the order, would deem the terms of the Stalking Horse Sale Agreement – that presumably will mirror the terms of the Stalking Horse LOI by including a CMS "discharge" (Stalking Horse LOI ¶ 7(d) – to be a "Qualified Bid."  Bid Procedures Order at ¶ 7.[3]

The United States does not object generally to the establishment of procedures for bids on certain of Debtors' Hahnemann-related assets.  However, bidding on proposed terms of sale that

---

[2] Any capitalized term not defined herein shall have the meaning ascribed to the term in the Bid Procedures Motion.

[3] The United States also reserves its rights to contest the sale to the extent that it transfers the Residents Program Assets, Hahnemann's Medicare provider number and agreement, and Hahnemann's programs for training Residents to the Successful Bidder when Debtors seek to close Hahnemann.  The anticipated transfer of the residency program itself (separate from the provider agreement) would need to satisfy Medicare Program requirements and be approved by HHS.  Additionally, Hahnemann's Provider Agreement may terminate with its closure, making it ineligible to be transferred.

improperly restrict HHS's rights is potentially a waste of the court's, the Debtors' and the Bidders' time and the estate's limited resources.

## REGULATORY BACKGROUND

1.      Certain of the Debtors are "providers" of hospital and skilled nursing services under the Social Security Act, 42 U.S.C. § 1395-1395lll and 42 C.F.R. Chapter IV and CMS policies and procedures (collectively, the "Medicare Program").  To be eligible to be reimbursed for services to Medicare beneficiaries, certain Debtors are party to separate Medicare Part A provider agreements ("Provider Agreements"). 42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider").  A Provider Agreement is defined as an agreement between CMS and a hospital, skilled nursing facility, home health agency, clinic, outpatient rehabilitation facility, hospice, or community mental health center.  42 C.F.R. §§ 489.2 and 489.3.

2.      To obtain a Provider Agreement, a new provider must apply for initial certification. *See* 42 C.F.R. §§ 488.1, 488.3, 489.1, 489.2 and 489.10.  The certification process enables HHS to determine, *inter alia*, that the provider is qualified to provide health care services to patients. *See* 42 C.F.R. §§ 489.10-.12 (grounds for denying a Provider Agreement); *see also* 42 C.F.R. Part 418 (health and safety requirements to qualify as a hospice).

3.      As a result, the transfer of a Provider Agreement is strictly limited.  Provider Agreements may be assigned only if there is a "change of ownership."  42 C.F.R. § 489.18.  When CMS determines that a valid "change of ownership" has occurred, the existing Provider Agreement is automatically assigned to the new owner.  *See* 42 C.F.R. § 489.18(c); *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994).  An assigned agreement is subject to all statutory and regulatory terms under which it originally was issued, including the adjustment of

payments to account for previously made overpayments.  *Vernon*, 21 F.3d at 696 (*citing* 42 C.F.R. § 489.18(a), (d)).

4.      HHS contracts with Medicare Administrative Contractors ("MACs") to administer payment to providers for Medicare covered services.  MACs make interim payments to providers in accordance with the Medicare Program and perform the day-to-day administration of Medicare, *e.g.*, audit and reimbursement activities.  42 U.S.C. § 1395kk-1; 42 C.F.R.  §§ 421.400–.404.

5.      At their request, certain of Debtors' facilities receive Medicare Periodic Interim Payments ("PIP").  42 U.S.C. § 1395g(e)(2); 42 C.F.R. § 418.307, 42 C.F.R. § 413.64(h)(2)(v). The PIP is adjusted to make it consistent with current claim levels, and to determine overpayments for the current fiscal year.  Alternatively, the MAC may adjust payments to assure that total payments at the end of the fiscal year approximate, as closely as possible, the reimbursement determined to be due after review and audit of the provider's cost report.  42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(h)(6-7).

6.      Within five months after the end of the cost year, a provider must submit a report of its costs to verify the actual reimbursements owed to it for the past cost year.  42 C.F.R. §§ 413.1, 413.20, 413.24(f); *see* 42 U.S.C. §§ 1395g and 1395hh (giving the Secretary authority to require submission of cost reports).  Once the cost report is submitted, the MAC audits the cost report and determines the provider's actual, rather than estimated, reimbursement amount for the year, which can result in overpayment or underpayment claims.    42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 42 C.F.R. § 413.24.  Following an audit, providers have various appeal rights, including judicial review, with respect to the MAC's determination.  *See, e.g.*, 42 C.F.R. § 405.1807; 42 U.S.C. § 1395oo(f)(1).

7.      In addition, by motion of the MAC or the provider, or at the direction of CMS, final cost report determinations are subject to reopening for up to three years from their issuance in order to make corrections.  42 C.F.R. § 405.1885.

## FACTUAL AND PROCEDURAL BACKGROUND

8.      On July 1, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.      Since before the Petition Date, certain of the Debtors participated in the Medicare Program as Medicare Part A providers under their Provider Agreements.  For purposes of this objection, Center City Healthcare, LLC d/b/a Hahnemann University Hospital (Part A) has a Provider Agreement with the United States.

10.      In the ordinary course of business, the MACs may determine Medicare overpayments owed by the Debtors relating to prepetition service dates and postpetition service dates under the Medicare Program.

11.      Pursuant to the Bid Procedures Motion, Debtors seek approval of bid procedures and procedures for the assumption and assignment of certain executory contracts.  Debtors have identified Tower Health as a Stalking Horse Bidder and seek to transfer Hahnemann's "Medicare provider number and agreement" to Tower Health.  Bid Procedures Motion at 3.

12.      Presumably, in order for Debtors to assign the Provider Agreement as an executory contract, they must first assume it pursuant to section 365(b) of the Bankruptcy Code.  However, the Motion does not identify the executory contracts that Debtors will assume or reject, establishing a later notice date for Debtors to announce assumption or rejection of its executory contracts.  Bid Procedures Motion at 14.

13.     The Motion also does not provide that the Successful Bidder will be required to assume all liabilities relating to the Provider Agreement.  Furthermore, the Bid Procedures Order does not specify that any assumption and assignment of the Provider Agreement must comply with section 365 of the Bankruptcy Code and the Medicare Program.

14.     To the contrary, Debtors seek to limit HHS's rights in the sale by limiting HHS's potential recovery for Medicare overpayments to a portion of a $3 million Escrow Account by establishing a "CMS Discharge Amount."  Bid Procedures Motion at 4.  The motion indicates that CMS has "agreed" to this "limitation . . . to the amount of claims of offset or recoupment."   Bid Procedures Motion at 4 n.7.  HHS has *not* made any such agreement.

15.     The Stalking Horse LOI further asserts that HHS "shall have consented [to] discharge Buyer from any liabilities penalties and claims in excess of the CMS Discharge Amount for any period prior to the Closing Date with respect to the Purchased Assets over which the CMS exercises authority."  Stalking Horse LOI ¶ 7(d).  HHS has *not* consented to any discharge.

16.     The Bid Procedures Order states that "The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction."  Bid Procedures Order at ¶ 11.  Thus, if the Court enters the proposed order as written, that order will likely have the effect of approving the CMS discharge included in the Stalking Horse LOI (that presumably will be included in the Stalking Horse Sale Agreement).

**ARGUMENT**

1.     The Motion should be denied and the Court should not enter the Bid Procedures Order as written.  As written, the Bid Procedures Order could be interpreted to authorize Debtors to market and transfer the Hahnemann Provider Agreement in a manner inconsistent with federal law.  The Bid Procedures Order fails to state that potential bidders must assume all liabilities,

including but not limited to the Overpayment Claims and any unliquidated pre-Closing overpayment claims, related to the transferred Provider Agreement. And, to the extent the Bid Procedure Order approves the Stalking Horse LOI, which includes a CMS "discharge," the order explicitly and improperly limits the Successful Bidder's assumption of liabilities. Moreover, the United States has not yet determined whether the Provider Agreement could be transferred or assigned from a closing facility to a separate entity operating different facilities.

2.      If the Debtors seek to transfer the Hahnemann Provider Agreement, they must do so consistent with applicable federal law, including the Medicare Program as well as the Bankruptcy Code.

3.      Specifically, the transfer of the Provider Agreement contemplated in the Stalking Horse LOI would violate the requirements of the Medicare Program for transfer of a provider agreement. The Debtors cannot sell, transfer, assume and/or assign the Hahnemann Provider Agreement to the Successful Bidder without providing that the purchaser will assume liability for any pre-Closing Medicare overpayments (including those determined after any closing) and any successor liability claims. *See United States v. Vernon Home Health, Inc*., 21 F.3d 693, 696 (5th Cir. 1994) (purchaser "accept[ed] the automatic assignment of the provider agreement," making it jointly and severally liable with seller for overpayments, pursuant to the Medicare Program, including at 42 C.F.R. § 489.18(d)). Therefore, the Successful Bidder must agree to assume liabilities for any pre-closing Medicare overpayments, including any previously determined and any determined in the future.

4.      Moreover, under binding precedent in the Third Circuit, the Provider Agreement is treated as an executory contract that may only assumed and assigned pursuant to section 365 of the Bankruptcy Code. *University Med. Ctr. v. Sullivan* (*In re University Med. Ctr.*), 973 F.2d

1065, 1075 (3d Cir. 1992). If the Debtors assume and assign the Provider Agreement to a purchaser, the Debtors must cure the defaults associated with the Provider Agreement, and the purchaser must assume all of the burdens along with the benefits arising from assignment of the Provider Agreement. *See* 11 U.S.C. § 365(a), (b); *University Med. Ctr.*, 973 F.2d at 1075 (holding that "[a]ssumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits," and specifically referring to a provider agreement); 42 C.F.R. § 489.18(d) ("An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued"); *Vernon Home Health, Inc*., 21 F.3d at 696 (new owner that accepted assignment of Medicare provider agreement was liable for overpayments of prior owner); *Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103 (8th Cir. 2000) (new owner of a skilled nursing facility was liable for penalties assessed on the basis of the former owner's actions); *Eagle Healthcare, Inc. v. Sebelius*, 969 F. Supp. 2d 38, 40 (D.D.C. 2013) ("An assigned Provider Agreement is subject to all of the terms and conditions under which it was originally issued."). *See also In re Charter Behavioral Health Sys., LLC*, 45 Fed. Appx. 150, 151, 2002 WL 2004651, *1 n.1 (3d Cir. June 3, 2002) (observing that "[i]f the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments *but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner*") (emphasis added) (*citing* 42 C.F.R. § 489.18(d); *Deerbrook Pavilion, LLC*, 235 F.3d at 1103-05; *Vernon*, 21 F.3d at 696).

5.      Moreover, the Anti-Assignment Act, and thus section 365(c)(1) of the Bankruptcy Code, preclude the Debtors from assuming and/or assigning their Provider Agreement with the United States to the purchaser without the consent of the United States. *See, e.g.*, *In re West*

*Electronics, Inc.*, 852 F.2d 79, 83-84 (3d Cir. 1988) (Anti-Assignment act precludes debtors from obtaining a legally cognizable interest in executory contract where the other party to the contract, the United States, refused to consent to the assignment of the contract.).  The United States will not consent to transfer of any Provider Agreement unless the purchaser would be subject to all the burdens of the Provider Agreement in compliance with the Medicare Program, and the Debtors should not be permitted to pursue a marketing process for assets that ultimately cannot be transferred without the United States' consent.

6.      It is also unclear whether the purchaser of the Provider Agreement would intend to provide services or just seeks to acquire the Provider Agreement in order to collect reimbursements earned by the Debtors before the transfer.  If the latter, the purchase is not likely to satisfy the Assignment of Claims Act, 31 U.S.C. § 3727, which strictly limits assignment of the authorization to receive payment on claims against the United States.  Even if a claim is successfully assigned consistent with Assignment of Claims Act, any payments made by the United States are subject to reduction or setoff (with the exception of certain unique circumstances inapplicable here).  31 U.S.C. § 3727(d)).

7.      The United States files this limited objection to prevent the bidding process from going forward with any bidders having the operating assumption that the Provider Agreement could be assigned or transferred "free and clear" of successor liability without compliance with the Medicare Program and the consent of the United States.  The Debtors should amend the proposed Bidding Procedures to clarify that Qualified Bids need not include the conditions placed on the transaction by the terms of the Stalking Horse LOI with respect to transferability of the Provider Agreement and capping of successor liability thereunder.

8.      The United States has communicated with the Debtors regarding the Motion and has indicated our willingness to work together to promote a bidding procedure consistent with the Medicare Program and other relevant laws and regulations.  The United States has proposed that Debtors add the following language to the Bid Procedures Order:

> Notwithstanding anything in the Motion, the Bidding Procedures, and/or the July 9, 2019 Stalking Horse LOI to the contrary, nothing in this Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

> To the extent the Successful Bid or the Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" pursuant to section 363(f) of the Bankruptcy Code.

## CONCLUSION

For the foregoing reasons, the Bid Procedures Motion should be denied.

Dated:  July 15, 2019                          Respectfully submitted


                                               JOSEPH H. HUNT
                                               Assistant Attorney General

                                               DAVID C. WEISS
                                               United States Attorney

                                               ELLEN SLIGHTS
                                               Assistant United States Attorney

                                               /s/ Marc S Sacks
                                               RUTH A. HARVEY
                                               MARGARET M. NEWELL
                                               MARC S. SACKS

                                               Department of Justice
                                               Commercial Litigation Branch,
                                               Civil Division
                                               P.O. Box 875, Ben Franklin Station
                                               Washington, DC 20044-0875
                                               Tel. (202) 307-1104
                                               Fax (202) 514-9163
                                               marcus.s.sacks@usdoj.gov

                                               ATTORNEYS FOR THE UNITED STATES

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July 2019, I caused a true and correct copy of the foregoing objection to be served via electronic mail upon all parties receiving electronic notice under the Court's CM/ECF system.


s/ Marc S Sacks
MARC S. SACKS