## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
| | Jointly Administered |
| Debtors. | **Hearing Date: July 26, 2019 at 10:00 a.m. (EST) (Requested)** |
| | **Objection Deadline: July 19, 2019 at 4:00 p.m. (EST) (Requested)** |

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) SCHEDULING
A HEARING TO CONSIDER APPROVAL OF THE SALE OR SALES
OF SUBSTANTIALLY ALL ASSETS OF ST. CHRISTOPHER'S HEALTHCARE, LLC
AND CERTAIN RELATED DEBTORS AND THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
(II) APPROVING CERTAIN BIDDING PROCEDURES, ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE
THEREOF, (III) ESTABLISHING PROCEDURES IN CONNECTION WITH THE
SELECTION OF AND PROTECTIONS AFFORDED TO ANY STALKING HORSE
PURCHASERS, AND (IV) GRANTING RELATED RELIEF; AND (B) ONE OR MORE
ORDERS (I) APPROVING THE SALES OR OTHER ACQUISITION TRANSACTIONS
FOR THE ASSETS, (II) AUTHORIZING THE SALES FREE AND CLEAR OF ALL
ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(IV) GRANTING RELATED RELIEF**

St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children ("**SCH**")

and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"),

hereby submit this motion (the "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532  (the "**Bankruptcy Code**"), for the

entry of:

    (A)    an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of one or more sales of, or other acquisition transactions for (each a "**Sale**"), substantially all assets of SCH, SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C, StChris Care at Northeast Pediatrics, L.L.C. and TPS V of PA, L.L.C. (together, the "**STC Entities**" or the "**Sellers**"), free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Encumbrances**"), other than those Encumbrances permitted by the applicable asset purchase agreement or other agreement for the applicable Sale (each a "**Transaction Agreement**"),[2] and authorizing the assumption and assignment of certain executory contracts and unexpired leases (each, an "**Assumed Contract**," and collectively, the "**Assumed Contracts**") in connection therewith, (ii) authorizing and approving certain proposed bidding procedures for the Sales in the form attached to the Bidding Procedures Order as **Exhibit 1** (collectively, the "**Bidding Procedures**"), certain proposed assumption and assignment procedures (collectively, the "**Assumption and Assignment Procedures**"), and the form and manner of notice thereof; (iii) establishing procedures in connection with the selection of a Stalking Horse Purchaser (as defined herein) and any protections to be afforded thereto; and (iv) granting related relief; and

    (B)    an order (or orders) (each a "**Sale Order**"),[3] (i) authorizing and approving the Sellers' entry into the Transaction Agreement(s) with the Successful Bidder(s), Back-Up Bidder(s), or Stalking Horse Purchaser(s) (each as defined herein), as applicable; (ii) authorizing and approving the Sale of substantially all of the Sellers' assets (the "**Assets**"), free and clear of all Encumbrances other than those permitted by the applicable Transaction Agreement; (iii) authorizing and approving the assumption and assignment of the Assumed Contacts in connection therewith; and (iv) granting related relief.

In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    From the outset of these cases, the Debtors and their professionals believed that

SCH and its related physician practice groups were viable entities that could either be

---

[2]    A form of proposed Transaction Agreement to be used by bidders in submitting stalking horse or Qualified Bids (as defined herein) will be located in the data room maintained by SSG (as defined herein).

[3]    The form of Sale Order will be filed with the Court on or before the Sale Objection Deadline.

reorganized in connection with these Chapter 11 Cases or sold pursuant to a sale under Bankruptcy Code section 363. Indeed, even though certain of the STC Entities have faced the same or similar challenges as those that have troubled HUH (as defined below), and despite drains on the STC Entities' liquidity in an effort to support HUH's losses, the operations of the STC Entities have remained stable since the Debtors' acquisition of the business in January 2018.

2.       While the operations of the STC Entities remain stable at this time, the Debtors recognize that certain uncertainties and costs inherent in the bankruptcy process, as well as financial constrictions imposed by, *inter alia*, restrictive vendor terms and proposed debtor-in-possession financing and cash collateral budgets, could, over time, create challenges and/or disruptions in the STC Entities' operations. Such disruptions, no matter how slight, are troublesome given the Debtors' heightened focus on quality and continuity of care both at STC and at its related practice group facilities. Moreover, any such disruptions risk impairing the value of the STC Entities' businesses, to the detriment of creditors and parties in interest in these cases.

3.       To avoid any such risks of disruption to the STC Entities' operations, it is necessary for the Debtors to act as quickly as possible to establish a process by which the STC Entities are sold to a highest and best bidder. To this end, the Debtors have filed the instant motion, pursuant to which the Debtors are proposing an expeditious bidding process that provides the Debtors with sufficient time to market the assets of the STC Entities while also balancing the need to move quickly to ensure smooth continuous operations and the achievement of maximum value for the Assets. In particular, the proposed procedures contemplate a closing on any Sale by October 4, 2019.

4.      For reasons described more fully below, the Debtors believe that pursuing a sale on this timeline is critical and necessary to the ongoing success of the STC Entities and also permits parties in interest with sufficient information and notice of the bidding process.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 6004-1.

**BACKGROUND**

7.      On June 30, 2019 and July 1, 2019 (together, the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.  On July 15, 2019, the Office

of the United States Trustee appointed the Official Committee of Unsecured Creditors of Center City Healthcare, LLC d/b/a Hahnemann University Hospital.

8.      A detailed description of the Debtors' businesses, capital structure, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Allen Wilen in Support of First Day Motions for Relief* [D.I. 2] (the "**First Day Declaration**").

**A.      Assets**

9.      SCH operates St. Christopher's Hospital for Children ("**STC**"), which is a 188-bed free-standing pediatric hospital in North Philadelphia.  STC has been a leader in pediatric care since 1875.  STC's pediatric specialists provide exceptional care to children throughout the Greater Philadelphia area and around the world.  Indeed, STC is widely regarded as one of the best children's hospitals in the country, as evidenced by its A-rating by Leapfrog and designation by Women's Choice as one of the top children's hospitals in the nation.

10.      SCH does not own any real property.  Rather, SCH leases the facilities from which it operates its hospital from Front Street Healthcare Properties, LLC and Front Street Healthcare Properties II, LLC, which are non-Debtor affiliates.  SCH also is the lessee under master leases with a series of entities owned by HSRE-PAHH I, LLC, a non-debtor affiliate. SCH sub-leases a majority of the properties to Drexel University d/b/a Drexel University College of Medicine ("**Drexel**") or Drexel affiliates, as well as to Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**HUH**") and other tenants.  In one instance, the leased property is a parking garage facility adjacent to, and used by, STC.

11.      In addition to its leasehold interests, SCH's primary assets include certain intellectual property, inventory, equipment and other interests related to the operation of STC.

35584444.3 07/16/2019

12.     The businesses of the remaining STC Entities (the "**STC Practice Groups**") are as follows: (i) SCHC Pediatric Associates, L.L.C. serves as the employer for nearly all of the physicians working at STC (approximately 180 full-time physician equivalents); (ii) St. Christopher's Pediatric Urgent Care Center, L.L.C., operates an urgent care facility in Abington, PA; (iii) SCHC Pediatric Anesthesia Associates, L.L.C. provides anesthesia services at STC; (iv) StChris Care at Northeast Pediatrics, L.L.C. operates practice groups specializing in pediatrics in Northeast Philadelphia and Langhorne, PA, and a practice group specializing in pediatrics and orthopedics in Bucks County, PA; and (v) TPS V of PA, L.L.C. operates STC-affiliated facilities in various locations, including Abington, PA, Yardley, PA and Washington Township, NJ, that offer a variety of specialties.  In connection with these businesses, the Assets of the STC Practice Groups primarily consist of inventory and equipment related to the operation of the practice groups.

13.     As explained below, the Debtors believe that STC Entities are viable and valuable entities that can be preserved through a sale pursuant to section 363 of the Bankruptcy Code.

**B.      The Debtors' Restructuring and Sale Efforts to Date**

14.     As described in the First Day Declaration, the Debtors have encountered a host of challenges and disputes and have suffered unsustainable losses since the acquisition of their healthcare businesses from Tenet Business Services Corporation in January 2018.  As such, in April 2019, the Debtors engaged EisnerAmper LLP to provide assistance in, *inter alia*, exploring various transaction alternatives, including restructuring and refinancing alternatives.  The Debtors also engaged in intense, arms-length discussions with DUCOM regarding a potential transaction in which DUCOM would acquire STC, HUH and its hospital towers, for, in the case of HUH, nominal consideration, including the assumption of debt and certain other obligations.

35584444.3 07/16/2019

These discussions were unsuccessful; in late May 2019, DUCOM informed the Debtors that it was not interested in acquiring HUH, stating "we do not believe that HUH has any financial value."

15.    In early June, 2019, the Debtors retained SSG Advisors, LLC ("**SSG**") to assist in pursuing a financing, sale or restructuring transaction.  Immediately upon its retention, SSG focused its efforts on marketing HUH to potential strategic purchasers, developing marketing materials, including a "teaser" and a confidential information memorandum.  SSG also established an electronic data room containing key information for parties to conduct in depth due diligence on HUH.

16.    Although no parties expressed an interest in acquiring HUH as a going concern, SSG is cautiously optimistic based on preliminary discussions with 3 strategic buyers that a transaction that permits the ongoing operation of the STC Entities and maximizes the value of the STC Entities for the benefit of creditors and parties in interest can be obtained if the parties act quickly.  SSG has established an electronic data room containing information for parties to conduct due diligence on the STC Entities.  SSG has also prepared a "teaser" regarding the STC Entities and is in the process of finalizing its confidential information memorandum for the entities.  SSG formally began marketing the Assets of the STC Entities on July 10, 2019 to a list of over 70 strategic buyers.

17.    The Debtors' goal is to obtain maximum exposure of the Assets to potential buyers as quickly as possible under the circumstances, and they will consider any transaction that will result in obtaining the highest and best value for the Assets.  Indeed, the Debtors and their professionals believe that in order to maximize the value of the STC Entities, the parties must act quickly to ensure that their operations continue without interruption and are otherwise unfettered

35584444.3 07/16/2019

by the pending bankruptcy proceedings. To that end, the Debtors have developed the Bidding Procedures to provide potential purchasers with flexibility to propose an acquisition transaction. By keeping multiple transactional avenues open, the Debtors and their stakeholders can use all of the tools available under the Bankruptcy Code to preserve value.

18.     Furthermore, as part of the negotiations with MidCap Financial Trust ("**MidCap**" or the "**DIP Agent**") over the terms and conditions of a debtor-in-possession financing facility (the "**DIP Facility**"), which has been approved on an interim basis by this Court [Docket No. 172] (the **"Interim DIP Order,"** and, to the extent approved on a final basis, the "**DIP Order**"), the Debtors have agreed to several milestones related to the sale of the Assets. The timeline proposed herein ensures compliance with these milestones.

## **BIDDING PROCEDURES**

19.     The Debtors intend to solicit bids for all of the Assets in accordance with the Bidding Procedures. The Bidding Procedures, which are attached to the Bidding Procedures Order as **Exhibit 1**, describe, among other things, the Assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among the bidders and the Debtors, the receipt and negotiation of bids received, the conduct of an auction (an "**Auction**"), the selection and approval of the Successful Bidder, and the selection of the Back-Up Bidder. The Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled but fair and open manner, while ensuring that the highest and best bid is obtained for the Assets.

20.     Certain of the key terms of the Bidding Procedures are included below: [4]

---

[4]     The following is a summary of the Bidding Procedures. It is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, and parties are encouraged to read the Bidding Procedures and Bidding Procedures Order in their entirety. To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control. Capitalized terms used

35584444.3 07/16/2019

- **Qualification as Bidder**:  Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder**."   Except for any Stalking Horse Purchaser(s), parties may be qualified as a Qualifying Bidder up to the Bid Deadline (***i.e.*, September 17, 2019 at 4:00 p.m. (ET)**), but parties interested in submitting a bid for the Assets are encouraged to qualify as soon as possible because the Bidding Procedures do not permit any due diligence or financing conditions in Qualifying Bids.   *Section 2 of the Bidding Procedures* identifies the requirements to be deemed a Qualifying Bidder, which include, among other things, (1) entry into a confidentiality agreement in form and substance reasonably satisfactory to the Debtors, and (2) the provision of sufficient information, as determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties,[5] to determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction and to provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code.  Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

- **Qualifying Bid**.  Other than in the case of a Stalking Horse Purchaser, to be deemed a "**Qualifying Bid**," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the requirements set forth in *Section 6 of the Bidding Procedures* (each, a "**Bid Requirement**").   These requirements include, but are not limited to, the requirements that the bids:

    a.    be in writing;

    b.    fully disclose the identity of the Qualifying Bidder and whether such party is an insider (as defined in section 101 of the Bankruptcy Code) of any Debtor, and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors wish to discuss the bid submitted by the Qualifying Bidder;

    c.    set forth the purchase price to be paid by such Qualifying Bidder, including what amount is being paid as cash and what amount constitutes a credit bid, and identify the liabilities proposed to be paid or assumed by such Qualifying Bidder;

    d.    specify the Assets that are included in the bid and, to the extent a Stalking Horse Purchaser is designated, state that such Qualifying Bidder offers to purchase those Assets included in the applicable Stalking Horse Agreement upon

---

but not defined in this summary of the Bidding Procedures shall have the meanings ascribed to such terms in the Bidding Procedures.

[5]    The term "**Consultation Parties**" shall mean: (i) counsel to the Official Committee of Unsecured Creditors, if formed, and (ii) counsel to MidCap, as DIP Agent.

substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the applicable Stalking Horse Agreement;

      e.      be accompanied by a clean and marked modified Transaction Agreement that reflects any variations from the Stalking Horse Agreement, if there is one for the subject Assets;

      f.      state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until the conclusion of the Sale Hearing unless such party is the Successful Bidder or Back-Up Bidder (both as defined below), in which case such offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the Sale of the subject Assets;

      g.      state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Transaction Agreement and provide written evidence in support thereof;

      h.      contain such financial and other information to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by its proposed Transaction Agreement, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors, within one (1) business day after receipt, to make such information available to any counterparties to any contracts or leases being assumed and assigned in connection with the Sale ("**Counterparties**") that have requested, in writing, such information, provided, however, that such information may be provided on a confidential basis;

      i.      identify with particularity each and every executory contract, unexpired lease and unexpired sublease the assumption and assignment of which is a condition to close the transactions contemplated by the proposed Transaction Agreement;

      j.      a commitment to close the transactions contemplated by the Transaction Agreement promptly upon entry of the order approving the sale;

      k.      not request or entitle such Qualifying Bidder (other than a Stalking Horse Purchaser) to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

      l.      in the event that there is a Stalking Horse Purchaser, and the Qualifying Bidder wishes to bid on the same Assets that are included in the Stalking Horse Agreement, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the

purchase price under the Stalking Horse Agreement, <u>plus</u> (B) any break-up fee, expense reimbursement, or other bid protection provided under the Stalking Horse Agreement, <u>plus</u> (C) $500,000;

m.    not contain any contingencies of any kind, including, without limitation, contingencies related to financing, due diligence, or third party regulatory or internal approval;

n.    contain written evidence satisfactory to the Debtors, in consultation with the Consultation Parties, that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Transaction Agreement;

o.    contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale, and (iv) has not entered into any agreement with any other potential bidder concerning the Auction or the Sale or discloses any agreement with any other potential bidder concerning the Auction or Sale;

p.    provides for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Successful Bid (as defined below), in accordance with the terms of the Transaction Agreement;

q.    includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Transaction Agreement;

r.    provides a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the total consideration provided under the proposed Transaction Agreement; and

s.    provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the Transaction Agreement equal to the amount of the Deposit.

- *Bid Deadline.* A Qualifying Bidder, other than a Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in <u>both</u> PDF and MS-WORD format to the Debtors so as to be received on or before **September 17, 2019 at 4:00 p.m. (ET)** (the "**Bid Deadline**"); <u>provided</u> that the Debtors may extend the Bid Deadline without further order of the Court, subject to providing notice to the

Consultation Parties.  **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

- **Auction and Auction Procedures**:  In the event that the Debtors timely receive one or more Qualifying Bids, the Debtors shall conduct an Auction.  The Auction shall be held on **September 19, 2019 at 10:00 a.m. (ET)** at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102.

- **Sale Hearing**:  The Successful Bid (which, if no Auction is held, may be the Stalking Horse Agreement, if any) and any Back-Up Bid will be subject to approval by the Court. Subject to Court approval, the Sale Hearing to approve the Successful Bid(s) and any Back-Up Bid(s) shall take place on **September 23, 2019 at 10:00 a.m. (ET)**.  The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice on the docket of the Debtors' Chapter 11 Cases.

### PROCEDURES FOR THE DESIGNATION OF A STALKING HORSE PURCHASER AND POTENTIAL BID PROTECTIONS

21.     Based on the experience of the Debtors' restructuring professionals, the Debtors believe it would further the goal of maximizing the value of the Assets to designate one or more parties to serve as a stalking horse purchaser (each a "**Stalking Horse Purchaser**" and the Transaction Agreement with such party a "**Stalking Horse Agreement**") for the sale of the Assets.  As is customary, the Debtors would likely grant a Stalking Horse Purchaser one or more of a limited break-up fee, expense reimbursement, or other limited bid protections.

22.     The Debtors request that parties that are interested in serving as a Stalking Horse Purchaser submit a final binding proposal to SSG and proposed counsel to the Debtors by **August 23, 2019 at 4:00 p.m. (ET)** (the "**Stalking Horse Bid Deadline**").  If the Debtors seek to enter into a Stalking Horse Agreement *and* seek to provide bid protections to the Stalking Horse Purchaser, the Debtors shall file a supplement to this Motion (a "**Supplemental Motion**") seeking approval of such protections on or before **August 27, 2019** and serve the Supplemental Motion on the Transaction Notice Parties (as defined below).  To the extent the Debtors seek to

12

enter into a Stalking Horse Agreement but do *not* seek approval of any bid protections for a Stalking Horse Purchaser, the Debtors shall file only a notice of entry into any Stalking Horse Agreement(s) (a "**Stalking Horse Notice**") with the Court on or before **August 27, 2019** and serve such Stalking Horse Notice on the Transaction Notice Parties.

23.     Such Supplemental Motion or Stalking Horse Notice shall include a summary of the material terms of any Stalking Horse Agreement(s) and, in the case of the Supplemental Motion, the proposed bid protections, and attach the Stalking Horse Agreement(s).  If no objections to a Supplemental Motion are filed and served on the Debtors by **September 3, 2019 at 4:00 p.m. (ET)**, the Debtors request that they be permitted to immediately file a certificate of no objection with the Court, after which the Court may enter an order approving the Debtors' selection of a Stalking Horse Purchaser and, if applicable, any bid protections requested, without the need for a hearing.  If necessary, the Debtors seek authority to hold an expedited hearing to consider any bid protections requested in a Supplemental Motion and any objections thereto on **September 4, 2019**, subject to the Court's availability on this date.

24.     The Debtors shall have the right to extend or waive the Stalking Horse Bid Deadline and the Stalking Horse Notice Deadline, and to conduct the Auction without any Stalking Horse Purchaser.

### NOTICE PROCEDURES FOR THE SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

25.     The Debtors also request approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**.  On or before the date that is three (3) business days following the entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by first class mail on: (1) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE

19801 (Attn: Benjamin Hackman, Esq.); (2) counsel to any statutory committee; (3) counsel to MidCap, Debtors' prepetition secured lender and DIP Agent, Stradley, Ronan, Stevens & Young, LLP, 2005 Market Street, Suite 2600, Philadelphia, PA 19103 (Attn: Gretchen M. Santamour, Esq.) and 1000 N. West Street, Suite 1279, Wilmington, DE 19801 (Attn: Joelle E. Polesky, Esq.); (4) Drexel University d/b/a Drexel University College of Medicine; (5) the Debtors' unions; (6) the United States Attorney for the District of Delaware; (7) the United States Department of Justice; (8) the Pennsylvania Attorney General's Office; (9) the Pennsylvania Department of Human Services; (10) the City of Philadelphia; (11) all parties known by the Debtors to assert a lien on any of the Assets; (12) all non-Debtor parties to any of the Assumed Contracts; (13) all persons known to have expressed an interest in acquiring all or any portion of the Assets or making an equity or other investment in the Debtors within the twelve months prior to the Petition Date; (14) the Office of the Secretary of State for the Commonwealth of Pennsylvania; (15) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (16) the Securities and Exchange Commission; (17) the United States Environmental Protection Agency; (18) the Pennsylvania Department of Environmental Protection; and (19) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the date of service (collectively, the "**Transaction Notice Parties**").  In addition, the Debtors will serve the Sale Notice on all of the Debtors' known creditors and equity holders (for whom identifying information and addresses are available to the Debtors).[6]

---

[6]    The Debtors will only serve current or former patients with the Sale Notice to the extent required by the *Order (I) Authorizing the Debtors to File a Consolidated List of Creditors, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, and (III) Establishing Patient Notice Procedures* [D.I. 71].

26.     The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent, Omni Management Group, at https://omnimgt.com/CenterCityHealthcare.

27.     <u>Publication Notice</u>.  The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004, to publish the Sale Notice, as modified in a manner appropriate for publication, in the *Philadelphia Inquirer* by the date that is ten (10) days after the entry of the Bidding Procedures Order or as soon as practicable thereafter.  The Debtors request that such publication notice be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

## **<u>ASSUMPTION AND ASSIGNMENT PROCEDURES</u>**

28.     To facilitate the Sale, the Debtors seek authority to assume and assign to any acquirer in a Sale the Assumed Contracts in accordance with the proposed "Assumption and Assignment Procedures."  The Assumption and Assignment Procedures, which are detailed in the Bidding Procedures Order, include the following:

- The identification of contracts that could potentially be assumed or assumed and assigned, and the proposed Cure Amounts.

- Service of an assumption notice, substantially in the form attached to the Bidding Procedures Order as **<u>Exhibit 3</u>**.

- The provision of fourteen (14) days' notice for Counterparties to the Assumed Contracts to object to the Debtors' ability to assume and/or assign the contract and/or the proposed Cure Amount, but excluding objections based on adequate assurance of future performance of the Sellers or the proposed assignee.

- The condition that failure to timely object to the proposed assumption, assignment (if applicable) or Cure Amount will result in the Counterparty being deemed to consent to the proposed assumption or assumption and assignment, and the Cure Amount.

**RELIEF REQUESTED**

29.     By this Motion, the Debtors seek the entry of: (a) the Bidding Procedures Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding Procedures and the Assumption and Assignment Procedures and the form and manner of notice thereof, (iii) establishing procedures in connection with the selection of Stalking Horse Purchasers and protections to be afforded thereto, and (iv) granting related relief; and (b) one or more Sale Orders, (i) authorizing and approving the Sellers' entry into the Transaction Agreement(s) with Successful Bidder(s) or Back-Up Bidder(s), as applicable, (ii) authorizing and approving the Sale(s), free and clear of all Encumbrances, (iii) authorizing and approving the assumption and assignment of the Assumed Contacts in connection with such Sale(s), and (iv) granting related relief.

30.     The Bidding Procedures Order, if approved, will establish the following timeline, which the Debtors believe is necessary to achieve a value-maximizing transaction:

| Milestones | Proposed Dates[7] |
|---|---|
| Bidding Procedures Hearing | July 26, 2019 at 10:00 a.m. (ET) |
| Deadline to Serve Assumption Notice | August 16, 2019 |
| Stalking Horse Bid Deadline | August 23, 2019 at 4:00 p.m. (ET) |
| Deadline to File Supplemental Motion or Stalking Horse Notice | August 27, 2019 |
| Deadline to Object to Assumption Notice (other than adequate assurance) | August 30, 2019 at 4:00 p.m. (ET) |
| Supplemental Cure Objection Deadline | 14 days after service of a Supplemental Assumption Notice |
| Deadline to Object to Supplemental Motion or Stalking Horse Notice | September 3, 2019 at 12:00 p.m. (ET) |

---

[7]     All hearing dates proposed herein are subject to the Court's availability and approval.

| Milestones | Proposed Dates[7] |
|---|---|
| Tentative Hearing on Approval of Stalking Horse and any Bid Protections | September 4, 2019 at __:__ a.m./p.m. |
| Sale Objection Deadline (including objections to  a sale to a Stalking Horse Purchaser) | September 13, 2019 at 4:00 p.m. (ET) |
| Bid Deadline | September 17, 2019 at 4:00 p.m. (ET) |
| Auction | September 19, 2019 at 10:00 a.m. (ET) |
| Deadline to File and Serve Notice of Successful Bidder and Amount of Successful Bid | No later than 1 day following the conclusion of the Auction. |
| Deadline to Object to Sale to Successful Bidder (other than Stalking Horse Purchaser) and Adequate Assurance of Successful Bidder (other than Stalking Horse Purchaser) | September 20, 2019 at 4:00 p.m. (ET) |
| Sale Hearing | September 23, 2019 at __:__ a.m./p.m. (ET) |
| Outside Closing Date | October 4, 2019 |

31.     The Debtors respectfully submit that this proposed timeline is reasonable and necessary under the circumstances of these cases.  Such timeline will allow parties in interest sufficient time to formulate bids while also permitting the Debtors to act quickly in pursuing a transaction that will maximize value.  Further, the proposed timeline for the sale and marketing process complies with the milestones set forth in the DIP Agreement and will thus permit the Debtors to avoid any defaults under the DIP Facility.

32.     Finally, the Debtors will also promptly make the disclosures required under Bankruptcy Rules 6004 and Local Rule 6004-1(b) with respect to any definitive Transaction Agreement that the Debtors enter into, including any Stalking Horse Agreement.

**BASIS FOR RELIEF**

**A.      Sufficient Business Justification Exists for Consummation of the Sale under Bankruptcy Code Sections 105(a) and 363(b)**

33.      Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code further provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  *See*, *e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.)*; *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

34.      The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

18

35.     In the present case, the Debtors' decision to market and sell the Assets through a section 363 sale represents a reasonable exercise of their business judgment and, accordingly, the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.   As discussed above and in the First Day Declaration, as a result of lacking capital and decreases in the Debtors' net earnings and cash flow, among other reasons, the Debtors are unable to continue as a going concern under their existing capital structure, thereby necessitating a comprehensive restructuring of the Debtors and their assets.   While the Debtors have determined that, under these circumstances, HUH must close, the Debtors believe that the STC Entities are viable and valuable entities that can be sold through a section 363 sale for the benefit of creditors and parties in interest.   As such, in order to maximize the value of such entities, the Debtors believe that they must act quickly to ensure that the operations of the STC Entities continue without interruption and are otherwise unconstrained by the pending bankruptcy proceedings.

36.     The Debtors seek to obtain the highest and best value for the Assets so that they can unlock and distribute to their stakeholders the value inherent in the Assets.   The Debtors are committed to considering all rational and viable proposals in search of that goal.   The quick, open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest and best value available for the Assets by allowing the market to set the purchase price of the Assets (or test any purchase price that may be agreed to under a Stalking Horse Agreement), while also ensuring that the operations of the STC Entities continue without interruption.   Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by any Successful Bidder, and establish that the Debtors and the Successful Bidder have proceeded in good faith.

35584444.3 07/16/2019

37.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

38.     The Sale conducted in accordance with the Bidding Procedures will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries to the Debtors' creditors and parties in interest.  The Debtors submit that ample business justification exists for the consummation of the Sale and, therefore, request that this Court approve the Sale.

**B.      The Sale of the Assets Free and Clear of All Encumbrances is Authorized under Bankruptcy Code Section 363(f)**

39.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which, as noted above, provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

40.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens.  *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

41.     The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets free and clear of any and all Encumbrances (except as otherwise expressly set forth in the Sale Order and a Stalking Horse Agreement or Transaction Agreement with a Successful Bidder, as applicable) in accordance with section 363(f) of the Bankruptcy Code, because one or more of the tests of section 363(f) are, or will be, satisfied with respect to any Sale.  In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Debtors' prepetition secured lender and proposed postpetition lender are secured by, among other things, the Assets and, subject to the entry of the DIP Order and any requirement imposed under the DIP Order concerning the payment of proceeds of the Sale, such proceeds will be paid to the DIP Lender at closing of the Sale.  Indeed, implementation of the sale process will be required by the DIP Facility.

42.     The Debtors further anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  The Debtors will serve the Sale Notice on all parties known to assert a lien, claim, or encumbrance against the Assets, so lienholders will receive

notice and will be given sufficient opportunity to object to the relief requested.  Lienholders that

are on notice of, and do not object to, a Sale should be deemed to have consented to that Sale.

*See*, *e.g.*, *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of

objection (provided of course there is notice) counts as consent.  It could not be otherwise;

transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's

assets had to execute a formal consent before they could be sold.") (internal citations omitted);

*Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994)

(holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances

satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  In the event of an objection from

a secured creditor to the Debtors' requested section 363(f) finding, the Debtors reserve the right

to demonstrate that the other provisions of section 363(f) have been satisfied.

### C.    The Sale Should be Subject to the Protections of Section 363(m)

43.    Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or

modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c)

of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to

an entity that purchased or leased such property in good faith, whether or not such entity knew of

the pendency of the appeal, unless such authorization and such sale or lease were stayed pending

appeal.  *See* 11 U.S.C. § 363(m).  In approving the Sale free and clear of Encumbrances, the

Debtors request that the Court find and hold that all purchasers of Assets purchased in

accordance with the Bidding Procedures are entitled to the protections afforded by

section 363(m) of the Bankruptcy Code.  Such relief is appropriate because selection of the

Successful Bidder will be the result of a competitive bidding process and arm's-length,

good-faith negotiations, and parties in interest will have the opportunity to review and object to a

proposed transaction.  *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616,

620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

**D.**   **The Court Should Approve the Bidding Procedures**

44.   The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See In re O'Brien Envtl. Energy, Inc.,* 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

45.   The Debtors have designed the Bidding Procedures to promote an expeditious, competitive and fair bidding process that maximizes value for the Debtors' estates and creditors. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest and best possible consideration for the Assets. Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare any bids received in order to determine which bids are in the best interests of the Debtors' estates and their creditors. The Debtors submit that this timetable is fair and reasonable in light of the Debtors' current circumstances.

46.   The Debtors further submit that the forgoing procedures are fair and transparent and will derive the highest and best bids for the Assets. Therefore, the Debtors request that the Court approve the Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing.

E.     **The Assumption and Assignment of the Assumed Contracts in Connection with the Sale Satisfies Bankruptcy Code Section 365**

47.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." *See* 11 U.S.C. § 365(a).   Courts have held that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 Collier on Bankruptcy ¶ 365.01[1] (15th ed. 1993)).

48.     As set forth above, the Sale should provide significant benefits to the Debtors' estates by maximizing the value of the Assets.   To that end, permitting the Sellers to assume and assign the Assumed Contracts should provide the Sellers with flexibility to enter into a transaction that will obtain the greatest benefits from any Sale.   In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." *See* 11 U.S.C. § 365(k).   Thus, following an assignment of any Assumed Contract, the Sellers will be relieved from any liability for any subsequent breach associated therewith.

49.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. *See* 11 U.S.C. § 365(b)(1).   The Debtors propose to file with this Court and serve on each Counterparty to an Assumed Contract an Assumption Notice that indicates the proposed Cure Amount for each such contract.   As such,

each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Amount, if applicable. Moreover, the payment or reserve of the applicable Cure Amount will be a condition to the Debtors' assumption and assignment of any Assumed Contract.

50.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." *See* 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

51.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where assignee of lease has financial resources and expresses willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, chief determinant of adequate assurance is whether rent will be paid).

52.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  In order for its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including: (a) the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such Qualifying Bidder; (b) a contact person for the proposed assignee that the applicable Counterparty may directly contact in connection with the adequate assurance of future performance; and (c) the actual assignee's identity.  Moreover, to the extent available, the Adequate Assurance Information may also include: (x) a corporate organization chart or similar disclosure identifying ownership and control of the proposed assignee and (y) financial statements, tax returns and annual reports.  Furthermore, given that the Debtors and/or Successful Bidder(s) will have the opportunity to submit evidence that they have satisfied all requirements for the assumption and assignment of the Assumed Contracts at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

53.     Therefore, the Debtors respectfully request that the Court (a) approve the proposed assumption and/or assumption and assignment of the Assumed Contracts, and (b) find all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[8]

---

[8]      Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

54.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

55.    As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale would be detrimental to the Debtors, their creditors and estates, and would not only impair the Debtors' ability to take advantage of the substantial cost-savings that can be achieved by an expeditious closing of the Sale but also threaten the continuity of the STC Entities' operations.

56.    For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

### NOTICE

57.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Human Services; (xi) the City of

---

such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

Philadelphia; and (xii) all applicable federal, state and local taxing and regulatory authorities having jurisdiction over the Assets; (xiii) all parties known by the Debtors to assert a lien on any of the Assets; and (ix) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

58.    The Debtors have not previously sought the relief requested herein from this or any other Court.

*[remainder of page intentionally left blank]*

35584444.3 07/16/2019

## CONCLUSION

WHEREFORE, the Debtors request entry of the Bidding Procedures Order granting the relief requested herein and such other and further relief as is just and proper.

Dated: July 16, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Monique B. DiSabatino*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE  19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

        -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*