## Exhibit B

**Engagement Letters**

# EISNERAMPER

EisnerAmper LLP
1 Landmark Square
6th Floor, Suite 618
Stamford, CT 06901
T  203.210.0500
F  203.487.0404
www.eisneramper.com

March 27, 2019

Mr. Joel Freedman
President
Philadelphia Academic Health System, LLC
1500 Market Street, Suite 2400, West Tower
Philadelphia, PA 19102

Dear Mr. Freedman,

This engagement letter, effective March 27, 2019, together with the terms and conditions attached hereto as Exhibit A and incorporated by reference (collectively, this "Agreement"), sets forth the terms and conditions on which EisnerAmper LLP ("EisnerAmper") will provide the services set forth below (the "Services").

**I.  Client**

Philadelphia Academic Health System, LLC and/or its affiliates and subsidiaries (collectively, the "Client")

**II.  Services and Fees**

A.  Healthcare Consulting Services

EisnerAmper will provide Healthcare Consulting Services as directed by Gary S. Bryant or other members of management of Client.  The Services are more further described on Addendum 1, attached hereto and incorporated by reference.

The Services will be provided by EisnerAmper for the period commencing April 1, 2019 and ending March 31, 2020.

We will perform the Services in accordance with applicable professional and industry standards.

B.  Healthcare Consulting Services Fee

In consideration of the Services provided under this Agreement, Client will pay EisnerAmper based on the hourly rates set forth in Addendum 1 for the time spent by EisnerAmper in performing the Services.  This fee is based upon the complexity of the engagement, the timeliness and completeness of the information and documentation provided to us, the time required of personnel.  EisnerAmper will submit invoices to Client on a monthly basis based on the billing rates set forth on Addendum 1 and in accordance with the terms of this Agreement.  In addition, Client shall reimburse us for direct expenses incurred in connection with the performance of the Services; provided however, that EisnerAmper's direct expenses that are reimbursed by Client shall be reasonable, pre-approved, documented out-of-pocket expenses for travel, meals, and accommodations incurred in accordance with Client's expense policy.

Client will pay all undisputed amounts due within 60 days from the date on which Client receives each EisnerAmper invoice.  Client agrees to cooperate with EisnerAmper and use best efforts to efficiently and amicably resolve all fee disputes hereunder.

In the event we do not receive timely payment of undisputed amounts due in accordance with this Agreement, we shall not be required to perform any other services hereunder until we have received such payment,



# EISNERAMPER

whereupon we will resume our work as soon as individuals working on the engagement become available, and we shall not be responsible for any late filings, penalties, interest, missed elections, or other consequences which may result from such a delay.

### III. <u>EisnerAmper's Responsibilities and Limitations</u>

EisnerAmper's Services do not include, and EisnerAmper is not responsible for, the following:

- Performing ongoing evaluations or control activities that affect the execution of transactions or ensure that transactions are properly executed or accounted for;
- Determining which, if any, recommendations made by EisnerAmper should be implemented or prioritized;
- Acting on behalf of management of the Client in any capacity;
- Directing or accepting responsibility for actions of the Client's employees;
- Authorizing, executing or consummating transactions on behalf of the Client;
- Approving or being responsible for the management of Client projects, including the determination of scope, project priorities, and Client decisions;
- Being connected with the Client as an employee or in any capacity equivalent to a member of Client management; or
- Being relied upon to identify other unusual or complex transactions.

EisnerAmper will not perform management functions or make management decisions on behalf of the Client. However, we will provide advice and recommendations in an advisory capacity to assist management of the Client in performing its functions and making management decisions.

EisnerAmper will not be auditing financial statements or performing any attest procedures in conjunction with this engagement. Our engagement cannot be relied upon to identify or disclose any wrongdoing within the Client, or noncompliance with laws and regulation. The Client understands that we have no responsibility to identify and communicate deficiencies in the Client's internal control as part of this engagement and agree that the Client is responsible for preventing and detecting fraud.

Ron Dreskin is the engagement partner for the services specified in this Agreement. His responsibilities include supervising EisnerAmper's services performed as part of this engagement.

### IV. <u>Management's Responsibilities and Representations</u>

It is the Client's responsibility to provide all the information required for our Services. Our Services for the Client will be based on the information made available to us by its representatives. We will not audit or otherwise verify the information submitted to us. However, we may ask for additional documentation and clarification of some of the information. We anticipate that the Client's representatives will furnish all of the requested information in a timely and organized manner.

The Services will be performed under the direction of the Client's management, and management accepts the responsibility for all management decisions. EisnerAmper is advising and will not perform management functions or make management decisions on behalf of the Client. However, we will provide advice and recommendations in an advisory capacity to assist management of the Company in performing its functions and making decisions.

In performing the Services, Client will provide EisnerAmper with reasonable access to Client's records, property and personnel relevant to performing the Services. Client personnel will make themselves available when EisnerAmper representatives are on site to perform the Services.



**EISNERAMPER**

## V.  Acceptance and Signature

Please indicate acceptance of the above terms and the attached Exhibit A by signing and returning this letter by mail, facsimile or pdf/email.  For purposes of this Agreement, facsimile or pdf copies of signatures shall be deemed original and shall constitute one and the same instrument.

Very truly yours,

EISNERAMPER LLP

By: _____
Ronald Dreskin, Partner

**Accepted:**
This Agreement the attached Exhibit A correctly sets forth the understanding of Philadelphia Academic Health System, LLC on behalf of itself and any applicable affiliate or subsidiary:

By: _____          _President_____
Signature                                                                Title

_Joel Freedman_____          _4/4/19_____
Print Name                                                          Date



EISNERAMPER

## EXHIBIT A
## TERMS AND CONDITIONS OF ENGAGEMENT

1. **Applicability:** This Exhibit A shall apply to the Agreement. The term "Client" in shall refer to Philadelphia Academic Health System, LLC, including its affiliates and subsidiaries for whom Services are provided under the Agreement. Capitalized terms that are not expressly defined in this Exhibit A shall have the meaning ascribed to them in the body of the Agreement.

2. **Client Information and Confidentiality:**
   a. In accordance with the AICPA Code of Professional Conduct and applicable federal, state and local rules, EisnerAmper will not disclose confidential Client information without Client consent, except that EisnerAmper shall be permitted to disclose confidential Client information (i) to any government agency or regulatory body to the extent and in the form or manner necessary or required to comply with any rule, regulation or order of such government agency or regulatory order, or (ii) pursuant to subpoena or other legal process; provided that, to the extent permitted by law, EisnerAmper will give the Client notice of such request by a governmental agency, regulatory body, subpoena or other legal process so that Client may seek an appropriate protective order or so that Client may waive EisnerAmper's compliance with this paragraph. EisnerAmper utilizes appropriate safeguards, policies and procedures to maintain the confidentiality of confidential Client information.
   b. In the event EisnerAmper uses third-party service providers to assist in providing professional services, EisnerAmper may share confidential Client information with these service providers to the extent such third-party service providers need to know the confidential Client information to provide Services to the Client under this Agreement. EisnerAmper requires that such third-party service providers utilize appropriate safeguards and procedures to protect confidential client information, and EisnerAmper shall be responsible for any breaches of the confidentiality obligations of this Agreement by any third party service providers. Client hereby consents to disclosure of confidential Client information to third-party service providers for the purpose of the third-party service provider assisting with the Services provided pursuant to this Agreement.
   c. EisnerAmper may transmit or receive information through electronic means, including through the firm's secure portal. Client shall at all times comply with the terms of use of EisnerAmper's portal and shall only permit authorized users to access information through the portal. In the event that the Client creates one or more user accounts to access documents transmitted through the portal, Client shall notify EisnerAmper to disable any user account for which an individual(s) is no longer authorized to access Client information transmitted through the EisnerAmper client portal.

3. **Work Papers:** All work papers prepared in conjunction with this engagement are confidential and, upon full satisfaction of all amounts due under this Agreement, are the property of Client. EisnerAmper will provide Client with copies of work papers upon request from Client, provided that any applicable amounts due are satisfied in full. Work papers and client documents and information will be retained in accordance with EisnerAmper's document retention policies, and shall continue to be subject to the confidentiality obligations of this Agreement to the extent EisnerAmper remains in possession of such information. It is the Client's responsibility to retain its own records to, among other things, comply with applicable statutes and regulations. EisnerAmper's records and files are not a substitute for the Client's own records. The Client agrees that EisnerAmper shall not be liable for the destruction of work papers or the Client's documents that is consistent with EisnerAmper's then-current policies, including destruction of any original documents the Client may provide to EisnerAmper.

4. **EisnerAmper Foreign Employees and Subsidiaries:** Upon Client's prior written consent, EisnerAmper may assign employees or employees of its subsidiaries and affiliates located outside the United States to work on Client's engagement and access Client information in the normal course of performing its duties.

5. **No Third-Party Beneficiary:** The engagement is being undertaken solely for the Client's benefit and the parties do not intend to provide contractual rights to any other person.



EISNER**AMPER**

6. **Out-of-Scope Services**:  Any Services outside the Services set forth in this Agreement will be a separate, new engagement.  The terms and conditions of that new engagement will be governed by a new, specific engagement letter or agreement for that service.   EisnerAmper shall not perform any Services outside the scope of this Agreement without the prior written authorization from the Client in the form of a new engagement letter or agreement, and such engagement letter or agreement shall define the scope of additional services and the compensation for such work.

7. **Termination of Engagement:**
   a. This Agreement sets forth the term of the engagement. However, in the event no term is specified, then this Agreement will terminate on the earlier of: (a) delivery of the final work product for which EisnerAmper was engaged; (b) the last date on which the Services were provided; or (c) the date on which the last invoice for the Services was issued, not including any subsequent account payable reminder, revised bill, or other communication concerning completed Services.
   b. Client has the right to terminate this Agreement at any time written notice to EisnerAmper. EisnerAmper may terminate this Agreement: (i) for cause at any time upon notice to Client, which notice shall identify the reason for termination; or (ii) for convenience upon 30 days' prior notice to Client; provided, however, that with respect to any Director of Finance services provided under this Agreement, Client may request that EisnerAmper continue to provide such Services beyond the date of termination (at the same hourly rates set forth in this Agreement), for up to a period no longer than 60 days, in order to effectuate an orderly transition of the Services. In the event this Agreement is terminated for any reason, EisnerAmper shall cease the applicable provision of Services as of the effective date of termination (except with respect to the transition described above), and Client shall be responsible to pay for all amounts due for Services provided prior to the effective date of termination.  In the event Client or EisnerAmper exercise the right to terminate EisnerAmper's Services, such termination shall be in writing and shall be effective on the date specified in the notice of termination.
   c. Each of the termination events in subsections 7.a. and 7.b. shall be referred to as an "Engagement Termination Event."
   d. The terms and conditions of this Agreement that, by their nature or express terms, are intended to survive termination or expiration of this Agreement, will remain in full force and effect.

8. **Limitations of Liability and Indemnification:**
   a. **Limitation of Liability**: EisnerAmper's maximum liability for damages relating to the Services provided for this Agreement shall be limited to two (2) times the fees payable for this Agreement for the twelve (12) month period prior to the act or omission that gave rise to the applicable claim, provided that such limitation shall not apply where damages are determined to have been caused by EisnerAmper's gross negligence, fraud, willful misconduct, or breach of a duly-executed Business Associate Agreement.
   b. **Special Damages:** In no event shall EisnerAmper or Client or their respective personnel be liable to the other party for any consequential, incidental, indirect, punitive or special damages in connection with claims arising out of or related to this Agreement, including any amount for loss of profit, data or goodwill, whether or not the likelihood of such loss or damage was contemplated.
   c. **Indemnification:**

      i. Client shall indemnify and hold harmless EisnerAmper for any time expended, expenses (including reasonable legal fees and costs), costs and/or losses incurred in connection with any lawsuit or other legal or regulatory action or proceeding involving or relating to the Services under this Agreement, provided that such indemnification shall not apply where such expenses or losses are determined to have been caused by EisnerAmper's gross negligence, fraud, or willful misconduct.
      ii. EisnerAmper shall indemnify and hold harmless Client for all expenses (including reasonable attorneys' fees and costs of defense), costs, and/or losses to the extent that they result from the felony criminal acts that EisnerAmper partners or employees directly participated in, or from EisnerAmper's willful misconduct, gross negligence, or fraud; in each case as finally adjudicated by a court of competent jurisdiction.



EISNER**AMPER**

9. <u>**Reimbursement of Expenses Related to Compliance with Subpoenas:**</u> In the event that EisnerAmper receives a subpoena or other legal process in an action or proceeding in which EisnerAmper is not a party, that seeks testimony, documents or information related to the Services provided pursuant to the Agreement, the Client shall reimburse EisnerAmper for the reasonable costs and expenses (including reasonable legal fees and costs) associated with providing such testimony, documents or information, including any time expended at EisnerAmper's then standard rates.

10. <u>**Statute of Limitations:**</u>  Any legal action or proceeding asserting a claim against EisnerAmper arising out of or relating to this engagement shall be asserted within three (3) years from the Engagement Termination Event.

11. <u>**Choice of Law:**</u>
    a. <u>**New York Law:**</u> The terms of this Agreement, and all related matters shall be governed by the laws of the State of New York.
    b. <u>**Jury Waiver:**</u> EisnerAmper and Client, to the extent permitted by law, each knowingly, voluntarily and intentionally waive the right to a trial by jury in any action arising out of or relating to this Agreement or the Services to be performed by EisnerAmper pursuant hereto. This waiver applies to any legal action or proceeding whether sounding in contract, tort, negligence or otherwise.

12. <u>**EisnerAmper Services and Personnel:**</u>
    a. EisnerAmper represents that the personnel assigned to this Agreement will perform the Services in a competent manner, consistent with applicable professional standards. EisnerAmper represents that the personnel assigned to this Agreement will possess the education, training, and skills in order to perform the duties and functions to be performed under this Agreement.
    b. EisnerAmper and its personnel shall comply with all applicable laws (including but not limited to the Health Insurance Portability and Accountability Act of 1996, as amended), and all applicable policies and procedures of the Client that are provided in advance to EisnerAmper. EisnerAmper shall execute a mutually-agreeable Business Associate Agreement and perform any Services in accordance with such Business Associate Agreement.
    c. Neither EisnerAmper nor its personnel assigned to this Agreement shall have any authority (and shall not hold itself out as having authority) to bind Client, and neither EisnerAmper nor its personnel shall make any agreements or representations on Client's behalf without Client's consent, as applicable. Furthermore, neither EisnerAmper nor its personnel shall have authority to approve the incurrence of any cost or expenditure on behalf of Client.
    d. EisnerAmper will perform the Services as an independent contractor of Client, and not as an employee, and all personnel providing Services shall continue to be employed by EisnerAmper.  This Agreement shall not create any association, partnership, joint venture, employee or agency relationship between EisnerAmper and Client for any purpose. Without limiting the generality of the foregoing, neither EisnerAmper nor its personnel will be eligible to participate in any vacation, group medical, or life insurance, disability, profit sharing or retirement benefits or any other fringe benefits or benefit plans offered by Client to its employees, and Client will not be responsible for withholding or paying any income, payroll, Social Security, or other federal, state, or local taxes, making any insurance contributions, including unemployment or disability, or obtaining worker's compensation insurance on EisnerAmper's behalf. EisnerAmper shall be responsible for, and shall indemnify Client against, all such taxes or contributions, including penalties and interest. Any persons employed by EisnerAmper in connection with the performance of the Services hereunder shall be EisnerAmper's employees and EisnerAmper shall be responsible for them.

13. <u>**Miscellaneous:**</u>
    a. This Agreement (including this Exhibit A) shall not be amended, unless in writing and signed by authorized representatives of all parties.
    b. A waiver by either party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure. Except as set forth therein, EisnerAmper shall not assign, delegate, subcontract, or transfer, in whole or in part, this Agreement or any of its rights, duties, or obligations under this Agreement without Client's prior written consent, and any assignment, delegation, subcontracting, or transfer by



# EISNERAMPER

EisnerAmper without such consent shall be null and void. Subject to the limits stated in the preceding sentence, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

c. This Agreement (including this Exhibit A) contains the full and complete understanding of EisnerAmper and the Client with respect to the subject matter and Services described herein and supersedes all prior representations, agreements, contracts, and understandings concerning this engagement, whether they be oral or written, including but not limited to any prior non-disclosure agreements.

d. The signatories to this Agreement represent and warrant that such person is lawfully authorized and empowered to execute this Agreement on behalf of the party on whose behalf such person is signing, and that upon execution, this Agreement will be binding upon such party, without any further approval, ratification, or other action.

e. Any notices permitted or required under this Agreement shall be sent to each party's then current address to the attention of the Legal Department.

f. Access to Books and Records. If the value or cost of Services rendered by EisnerAmper pursuant to this Agreement is $10,000 or more over a 12-month period, in accordance with section 1861(v)(1)(I) of the Social Security Act, EisnerAmper agrees that at least for four (4) years after the furnishing of such Services, EisnerAmper shall, upon written request, make available to the Secretary of the United States Department of Health and Human Services (the "Secretary"), the Comptroller General of the United States, or their respective duly-authorized representatives, such books, documents, and records as may be necessary to certify the nature and extent of the cost of such Services.

g. Ineligible Persons. Neither EisnerAmper nor any of its principals, partners or employees shall have been excluded, debarred, suspended, or otherwise ineligible to participate in Federal healthcare programs or in Federal procurement or nonprocurement programs, or have been convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but have not yet been excluded, debarred, suspended, or otherwise declared ineligible (each, an "Ineligible Person"). EisnerAmper shall conduct background checks on all principals, partners and employees who will perform any of the Services under this Agreement.

h. Insurance. During the Term of this Agreement, EisnerAmper shall maintain in force workers' compensation, commercial general liability with coverage of at least $1,000,000 per occurrence and $3,000,000 in the aggregate, errors and omissions with coverage of at least $2,000,000 per occurrence, and other forms of insurance in amounts consistent with industry standards. Upon request, EisnerAmper shall furnish to the Client, certificates evidencing such insurance to the Client.

14. **Allinial Global and EisnerAmper Global Ltd:** EisnerAmper is a member firm of EisnerAmper Global Ltd., a network of legally independent firms. EisnerAmper is also a member firm of Allinial Global, an association of legally independent accounting and consulting firms. EisnerAmper Global Ltd., Allinial Global, and their member firms and correspondent firms are not responsible for and do not accept liability for the work or advice which EisnerAmper provides to its clients and do not owe any duty in relation to the work or advice which EisnerAmper provides.



EISNERAMPER

## Addendum A
### Scope of Services

1.  <u>**Services**</u>

EisnerAmper will provide the following Services to Client:

<u>Task 1: Director of Finance</u>

This portion of the Services will involve placing, as a first step, a part-time Director of Finance (the "Interim Director") focused principally on improving the financial management processes in place. The aim will be to drive short term stabilization of operations, and lay the foundation for improved performance in the future. Then to reassess whether the positon requires a full-time effort. Key tasks will include but not be limited to:

   a.  On site management and participation in all financial related matters;
   b.  Development of routine reporting tools and metrics, including
       i.   Production,
       ii.  Financials and Profitability, and
       iii. Revenue Cycle;
   c.  Provide advice to Client with respect to the strategic and financial goals of the Hahnemann University Hospital Physician Group (the "Group");
   d.  Assist Client with communicating the financial results of the Group to Client's senior management;
   e.  Provide advice to Client with respect to cash flow initiatives;
   f.  Provide advice to Client with respect to the financial decisions of the Group;
   g.  Assist Client with the preparation and presentation of the Group's operating and capital budgets;
   h.  Review and advise Client with respect to the Group's management on the budget on at least a quarterly basis;
   i.  Assist Client with the Group's financial forecasting;
   j.  Assist Client and provide advice to Client with respect to the development and implementation of the Client's policies and procedures regarding the expenditure of Group's funds;
   k.  Assist Client and provide advice with respect to the review and improvement of policies and procedures in place, include revenue cycle; and
   l.  Provide other related services as requested by Client.

<u>Task 1A: Additional 1 FTE Analytical Support & Oversight</u>

This portion of the Services will focus on providing additional on-site and remote support to Client and to leverage the Director of Finance's time, and advance new initiatives expeditiously.  Key tasks will include, but not be limited to:

   a.  Analytical support as assigned by the Interim Director, System CFO and any other Client staff;
   b.  Part time on-site presence, working with teams, site visits, participation in meetings, etc.;
   c.  Design and building of reporting tools, specifically key performance indicators for each physician group/individual physician and for the Group as a whole, such as but not limited to:
       i.   Charges, Collections, Adjustments by code,
       ii.  Provider Productivity both office and surgical,
       iii. Collections per wRVU,



EISNERAMPER

    iv. Surgical Conversion,
    v. Charge Capture to Billing threshold,
    vi. Billing Clean Claim rates,
    vii. Rejection Activity,
    viii. AR Activity / status,
    ix. Performance to Budget,
    x. Etc.;
  d. Management information packets, and report deliverables;
  e. Reporting tools, which will be data gathering and sourcing efforts, likely requiring working with outsourcing vendors;
  f. Analytical support for translation of reporting results into action planning:
    i. Compensation model changes,
    ii. Organizational structure,
    iii. Throughput process,
    iv. Etc.; and
  g. Any other Ad-Hoc tasks to be assigned to advance the overall initiatives being led by the Interim Director and System CFO

**2.**  <u>Fees</u>

EisnerAmper will invoice Client for the Services at the following rates:

- Task 1 – Director of Finance: $315 per hour, with such person working 24 to 30 hours per week
- Task 1A – Additional 1 FTE Analytical Support & Oversight: $225 per hour, with such person working 40 hours per week





EisnerAmper LLP
750 Third Avenue
New York, NY 10017
T 212.949.8700
F 212.891.4100

April 22, 2019

**By Email**

Mr. Joel Freedman
President
Philadelphia Academic Health System, LLC
1500 Market Street, Suite 2400, West Tower
Philadelphia, PA 19102

Dear Mr. Freedman,

This letter agreement, together with the terms and conditions attached hereto as Exhibit A and incorporated by reference (collectively, the "Master Agreement"), sets forth the terms and conditions on which EisnerAmper LLP ("EisnerAmper") will provide certain operational and financial restructuring services (collectively the "Services") during the period commencing on April 8, 2019 and ending on the earlier of: (a) the date on which this Master Agreement is terminated in accordance with the terms herein; or (b) April 7, 2021 (the "Term"). Subject to the terms and conditions of this Master Agreement, EisnerAmper will provide the Services described in a mutually agreed upon engagement letter (each, an "Engagement Letter" and collectively, the "Engagement Letters") for each Service.

## I.   Client and Services

### A.   Client

This Master Agreement shall apply to the Services to be provided to Philadelphia Academic Health System, LLC and/or its subsidiaries (collectively, the "Client"). For the avoidance of doubt, Philadelphia Academic Health System, LLC's subsidiaries include Philadelphia Academic Medical Associates, LLC, St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children, Center City Healthcare, LLC d/b/a Hahnemann University Hospital, and Physicians Clinical Network, LLC, and each of their respective subsidiaries that provide healthcare services (all subsidiaries of Philadelphia Academic Health System, LLC that are providing healthcare services are collectively referred to herein as the "Healthcare Providers").

### B.   Services and Engagement Letters

This Master Agreement shall apply to the following services:

1.   Healthcare Consulting Services (including CEO Consulting Services and Support Services)
2.   Financial Restructuring Services

EisnerAmper and the Client shall enter into the attached Engagement Letters, each of which sets forth the specific scope of services, fees, and responsibilities of the Client and EisnerAmper for such engagement (each, an "Engagement"; provided that each of the CEO Consulting Services and the Support Services shall constitute a separate and distinct Engagement). Each Engagement shall constitute a separate and distinct professional engagement, which shall be subject to the general terms of this Master Agreement and the specific terms of the applicable Engagement Letter.

In the event of a conflict between this Master Agreement and any Engagement Letter, the terms of this Master Agreement shall apply unless expressly stated to the contrary in a fully-executed Engagement Letter; provided however, that nothing in any Engagement Letter shall supersede the terms set forth in Section 8 of the terms and conditions attached hereto as Exhibit A. Any such modification will be valid only for that particular Engagement Letter and will not amend this Master Agreement generally.



**EISNERAMPER**

## II. Fees and Expenses

During the Term, the Client shall pay EisnerAmper fees (in advance) in the amount of $69,650.00 (the "Weekly Payment") per week for the Healthcare Consulting Services and the Financial Restructuring Services as set forth in the Engagement Letters, dated April 22, 2019, and executed simultaneously herewith (the "April 2019 Engagement Letters"). The Weekly Payment shall be made every Friday, for Services to be performed during the following week. The Weekly Payment consists of $35,000 per week for the services of the CRO and Interim CEO (as such terms are defined in the April 2019 Engagement Letters), plus $34,650.00 for the Support Services (as such term is defined in the April 2019 Engagement Letter for Healthcare Consulting Services). The Support Services shall be billed at a discounted hourly rate of $315, and EisnerAmper is authorized to bill up to 110 hours for Support Services per week. Hours in excess of 110 must be approved in advance in writing by the Client. Within ten (10) days from the end of each month, EisnerAmper shall issue a statement to the Client, setting forth the Services rendered,  the fee payments made, and the number of hours charged for Support Services during that month. The report shall also set forth any required true-up amount, which shall be determined as follows: in the event that EisnerAmper billed fewer than an average of 110 hours per week during the prior month, the Client shall receive a credit toward the fees for the Support Services in the following month (or a cash value thereof if the Support Services have been terminated in their entirety by the Client), and if EisnerAmper billed more than an average of 110 hours per week during the prior month, then the Client shall pay EisnerAmper such excess amount within two (2) days of receipt of EisnerAmper's statement.  The Client may choose (i) with written consent of EisnerAmper, to increase, or (ii) in the Client's sole discretion, to reduce or entirely terminate, the Support Services to be provided by EisnerAmper by written notice to EisnerAmper prior to its provision of such services. The portion of the Weekly Payment shall be ratably adjusted in any such case.  By way of an example, if the Client elects to reduce the Support Services from 110 to 55 hours per week, the portion of the Weekly Payment with respect to the Support Services shall be reduced from $34,650.00 to $17,325.00.

Out-of-pocket expenses are in addition to fees and will be invoiced to the Client on a monthly basis; provided, however that EisnerAmper's monthly out-of-pocket expenses to be reimbursed by Client shall not exceed ten percent (10%) of the aggregate monthly fees due hereunder without Client's prior written approval. Client acknowledges and agrees that the cost of one short-term rental apartment up to $6,000 per month is pre-approved for reimbursement. EisnerAmper's invoices for expenses shall be due and payable within five (5) days from the date on which Client receives each applicable EisnerAmper invoice and applicable backup expense documentation.

Any modifications to the fees, the scope of the existing Engagements, or new Engagements (except as expressly set forth above) will be effective upon a duly-executed amendment to this Master Agreement, the applicable Engagement Letter, or a new Engagement Letter.

In the event EisnerAmper does not receive timely payment of  fees and expenses hereunder, EisnerAmper shall not be required to perform any further Services until EisnerAmper receives such payment, whereupon EisnerAmper will resume work as soon as the individuals working on each Engagement become available, and that EisnerAmper shall not be responsible for any late filings, penalties, interest, missed elections or other consequences which may result from such a delay.

Philadelphia Academic Health Holdings, LLC ("Guarantor") unconditionally guarantees all of the payment obligations of the Client under this Master Agreement and each Engagement Letter and agrees that any modifications of terms of payment or extension of time of payment shall in no way impair its guarantee, and expressly agrees its guarantee extends to any modifications or extensions of payment obligations hereunder.

## III. Conflicts of Interest

EisnerAmper, its employees, and its affiliates do not have any financial interest or business connection with the Client, other than as contemplated by this Master Agreement and the Engagement Letters (and other existing



**EISNERAMPER**

service agreements), and EisnerAmper knows of no fact or situation that would represent a conflict of interest for EisnerAmper with regard to the Client.

While EisnerAmper is not currently aware of any other relationships that connect EisnerAmper to any party in interest, because EisnerAmper and its affiliates serve clients on a broad basis in numerous cases, both in and out of court, it is possible that EisnerAmper or its affiliates may have rendered services to, or have business associations with, other entities which had, or have, relationships with the Client, its equity holders, its counsel, or third parties that may become involved in actions against the Client. Should EisnerAmper become aware of any conflicts, EisnerAmper will promptly bring such to the Client's attention.

## IV.  Acceptance and Signature

Please indicate acceptance of the above terms and the attached Exhibit A by signing and returning this letter by mail, facsimile or pdf/email.  For purposes of this Master Agreement, electronic, facsimile, or pdf copies of signatures shall be deemed original and shall constitute one and the same instrument.

The signatories to this Master Agreement represent and warrant that such person is lawfully authorized and empowered to execute this Master Agreement on behalf of the party on whose behalf such person is signing, and that upon execution, this Master Agreement will be binding upon such party, without any further approval, ratification, or other action.

Very truly yours,

EISNERAMPER LLP

By: _____
    Ronald Dreskin, Partner

By: _____
    Allen Wilen, Partner

**Accepted and Agreed:**
This Master Agreement, including the attached Exhibit A, correctly sets forth the understanding of Philadelphia Academic Health System, LLC on behalf of itself and any applicable affiliate or subsidiary:

By:_____    *President*
    Signature                     Title

*Joel Freedman*        4-22-19
    Print Name                 Date

**Guarantor:**
**Accepted and Agreed with respect to the guarantee of payment and the indemnification obligations herein:**

Philadelphia Academic Health Holdings, LLC



EISNERAMPER

By: _____
       Signature

*Joel Freedman*
       Print Name

_President_____
Title

_4-22-19_____
Date



EISNERAMPER

## EXHIBIT A
## TERMS AND CONDITIONS OF ENGAGEMENT

1. **Applicability:** This Exhibit A shall apply to each Engagement Letter entered into pursuant to the Master Agreement. The term "Client" shall refer to Philadelphia Academic Health System, LLC and its subsidiaries for whom Services are provided under the Master Agreement and any duly executed Engagement Letter. Capitalized terms that are not expressly defined in this Exhibit A shall have the meaning ascribed to them in the body of the Master Agreement.

2. **Client Information and Confidentiality:**
   a. In accordance with the AICPA Code of Professional Conduct and applicable federal, state and local rules, EisnerAmper will not disclose confidential Client or Healthcare Provider information without Client's consent, except that EisnerAmper shall be permitted to disclose confidential Client or Healthcare Provider information (i) to any government agency or regulatory body to the extent and in the form or manner necessary or required to comply with any rule, regulation or order of such government agency or regulatory order, or (ii) pursuant to subpoena or other legal process; provided that, to the extent permitted by law, EisnerAmper will give the Client notice of such request by a governmental agency, regulatory body, subpoena or other legal process so that the Client may seek an appropriate protective order or so that Client may waive EisnerAmper's compliance with this paragraph. EisnerAmper utilizes appropriate safeguards, policies and procedures to maintain the confidentiality of confidential Client and Healthcare Provider information.
   b. In the event EisnerAmper uses third-party service providers to assist in providing professional services, EisnerAmper may share confidential Client or Healthcare Provider information with these service providers to the extent such third-party service providers need to know the confidential Client or Healthcare Provider information to provide Services to the Client under this Master Agreement. EisnerAmper requires that such third-party service providers utilize appropriate safeguards and procedures to protect confidential client information, and EisnerAmper shall be responsible for any breaches of the confidentiality obligations of this Master Agreement by any third party service providers. Client hereby consents to disclosure of confidential Client or Healthcare Provider information to third-party service providers for the purpose of the third-party service provider assisting with the Services provided pursuant to each Engagement under this Master Agreement.
   c. EisnerAmper may transmit or receive information through electronic means, including through the firm's secure portal. Client shall at all times comply with the terms of use of EisnerAmper's portal and shall only permit authorized users to access information through the portal. In the event that the Client creates one or more user accounts to access documents transmitted through the portal, Client shall notify EisnerAmper to disable any user account for which an individual(s) is no longer authorized to access Client information transmitted through the EisnerAmper client portal.

3. **Work Papers:** All work papers prepared in conjunction with this engagement are confidential and, upon full satisfaction of all amounts due under the applicable Engagement Letter, are the property of Client. EisnerAmper will provide Client with copies of work papers upon request from Client, provided that any applicable amounts due are satisfied in full. Work papers and client documents and information will be retained in accordance with EisnerAmper's document retention policies, and shall continue to be subject to the confidentiality obligations of this Master Agreement to the extent EisnerAmper remains in possession of such information. It is the Client's responsibility to retain its own records to, among other things, comply with applicable statutes and regulations. EisnerAmper's records and files are not a substitute for the Client's own records. The Client agrees that EisnerAmper shall not be liable for the destruction of work papers or the Client's documents that is consistent with EisnerAmper's then-current policies, including destruction of any original documents the Client may provide to EisnerAmper.

4. **[Reserved.]**



EISNERAMPER

5.  **No Third-Party Beneficiary:** Each Engagement is being undertaken solely for the Client's benefit and the parties do not intend to provide contractual rights to any other person.

6.  **Out-of-Scope Services**: Any Services outside the Services set forth in each Engagement Letter issued under this Master Agreement will be a separate, new Engagement Letter executed by the parties for that Service. EisnerAmper shall not perform any Services outside the scope of an executed Engagement Letter without the prior written authorization from the Client in the form of a new Engagement Letter, and such Engagement Letter shall define the scope of additional Services and the compensation for such work.

7.  **Termination of Engagement:**
    a.  Each Engagement Letter will terminate on the earlier of: (a) delivery of the final work product for which EisnerAmper was engaged; (b) the last date on which the Services were provided; (c) the date on which the last invoice for the Services was issued, not including any subsequent account payable reminder, revised bill, or other communication concerning completed Services; (d) the effective date of termination, as specified in a notice of termination provided by either party; or (e) the expiration of the Master Agreement.
    b.  Client has the right to terminate this Master Agreement or any Engagement Letter at any time upon written notice to EisnerAmper. EisnerAmper may terminate this Master Agreement or any Engagement Letter: (i) for cause at any time upon notice to Client, which notice shall identify the reason for termination; or (ii) for convenience upon 30 days' prior written notice to Client. In the event this Master Agreement or any Engagement Letter is terminated for any reason, EisnerAmper shall cease the applicable provision of Services as of the effective date of termination, and Client shall be responsible to pay for all amounts due for Services provided prior to the effective date of termination. In the event Client or EisnerAmper exercise the right to terminate EisnerAmper's Services, such termination shall be in writing and shall be effective on the date specified in the notice of termination.
    c.  Termination of an Engagement Letter shall not automatically terminate this Master Agreement, but termination of this Master Agreement shall automatically terminate each Engagement Letter.
    d.  Each of the termination events in subsections 7.a. and 7.b. shall be referred to as an "Engagement Termination Event."
    e.  The terms and conditions of this Master Agreement that, by their nature or express terms, are intended to survive termination or expiration of this Master Agreement, will remain in full force and effect.

8.  **Limitations of Liability and Indemnification:**
    a.  **Limitation of Liability**: EisnerAmper's maximum liability for damages relating to the Services provided for each Engagement shall be limited to five hundred thousand dollars ($500,000), provided that such limitation shall not apply where damages are finally determined by a court of competent jurisdiction to have been caused by EisnerAmper's gross negligence, fraud, willful misconduct, or breach of a duly-executed Business Associate Agreement; provided further that in the case of EisnerAmper's gross negligence only, EisnerAmper's maximum liability under this Section 8(a) with respect to each Engagement shall be limited to the greater of (i) the amount equal to two times the aggregate fees paid by Client to EisnerAmper in any 12-month period during the Term, and (ii) five hundred thousand dollars ($500,000).
    b.  **Special Damages:** In no event shall EisnerAmper or Client or their respective personnel be liable to the other party for any consequential, incidental, indirect, punitive or special damages in connection with claims arising out of or related to any Engagement, including any amount for loss of profit, data or goodwill, whether or not the likelihood of such loss or damage was contemplated except where such damages are finally determined by a court of competent jurisdiction to have been caused by EisnerAmper's gross negligence, fraud, willful misconduct, or breach of a duly-executed Business Associate Agreement; provided that in the case of EisnerAmper's gross negligence only, EisnerAmper's maximum liability under this Section 8(b) with respect to each Engagement shall be limited to the greater of (i) the amount equal to two times the aggregate fees paid by Client to EisnerAmper in any 12-month period during the Term, and (ii) five hundred thousand dollars ($500,000).



**EISNERAMPER**

c. **Indemnification:**

    i.   Client and Guarantor, shall be jointly and severally responsible for, and shall indemnify and hold harmless EisnerAmper for any reasonable time expended, reasonable expenses (including reasonable legal fees and costs), costs and/or losses incurred in connection with any lawsuit or other legal or regulatory action or proceeding brought by third-party involving or relating to the Services under each Engagement, provided that such indemnification shall not apply where such expenses or losses are finally determined by a court of competent jurisdiction to have been caused by EisnerAmper's gross negligence, fraud or willful misconduct.

    ii.   EisnerAmper shall indemnify and hold harmless Client for any reasonable time expended, reasonable expenses (including reasonable attorneys' fees and costs of defense), costs, and/or losses to the extent that they result from the felony criminal acts that EisnerAmper partners or employees directly participated in, or from EisnerAmper's gross negligence, willful misconduct, or fraud, in each case as finally adjudicated by a court of competent jurisdiction; provided that in the case of EisnerAmper's gross negligence only, EisnerAmper's maximum liability under this Section 8(c)(ii) with respect to each Engagement shall be limited to the greater of (i) the amount equal to 1.25 times the aggregate fees paid by Client to EisnerAmper in any 12-month period during the Term, and (ii) five hundred thousand dollars ($500,000).

9. **Reimbursement of Expenses Related to Compliance with Subpoenas:** In the event that EisnerAmper receives a subpoena or other legal process in an action or proceeding in which EisnerAmper is not a party, that seeks testimony, documents or information related to the Services provided pursuant to the Master Agreement, the Client shall reimburse EisnerAmper for the reasonable costs and expenses (including reasonable legal fees and costs) associated with providing such testimony, documents or information, including any time expended at EisnerAmper's then standard rates.

10. **Employment of EisnerAmper Staff:** Client agrees that it shall not directly solicit for employment a partner, principal, or employee of EisnerAmper who provides Services under an Engagement Letter during the term of the applicable Engagement Letter and for a period of one (1) year thereafter.

11. **Statute of Limitations:** Any legal action or proceeding asserting a claim against EisnerAmper arising out of or relating to an Engagement shall be asserted within three (3) years from the Engagement Termination Event.

12. **Choice of Law:**
    a.   **New York Law:** The terms of the Master Agreement and each Engagement Letter issued under the Master Agreement, and all related matters shall be governed by the laws of the State of New York.
    b.   **Jury Waiver:** EisnerAmper and Client, to the extent permitted by law, each knowingly, voluntarily and intentionally waive the right to a trial by jury in any action arising out of or relating to the Master Agreement and/or each Engagement Letter issued under this Master Agreement or the Services to be performed by EisnerAmper pursuant thereto. This waiver applies to any legal action or proceeding whether sounding in contract, tort, negligence or otherwise.

13. **EisnerAmper Services and Personnel.**
    a.   EisnerAmper represents that the personnel assigned to an Engagement under this Master Agreement will perform the Services in a competent manner, consistent with applicable professional standards. EisnerAmper represents that the personnel assigned to an Engagement will possess the education, training, and skills in order to perform the duties and functions to be performed under the applicable Engagement Letter.
    b.   EisnerAmper and its personnel shall comply with all applicable laws (including but not limited to the Health Insurance Portability and Accountability Act of 1996, as amended), and all applicable policies and procedures of the Client and Healthcare Providers that are provided in advance to EisnerAmper. EisnerAmper has executed a mutually-agreeable Business Associate Agreement with Client and will perform any Services in accordance with such Business Associate Agreement.



EISNERAMPER

   c. Neither EisnerAmper nor its personnel assigned to an Engagement under this Master Agreement shall have any authority (and shall not hold itself out as having authority) to bind Client or the Healthcare Providers, and neither EisnerAmper nor its personnel shall make any agreements or representations on Client or the Healthcare Provider's behalf without Client's consent.

   d. EisnerAmper will perform the Services as an independent contractor of Client, and not as an employee, and all personnel providing Services shall continue to be employed by EisnerAmper. This Master Agreement and any Engagement Letter shall not create any association, partnership, joint venture, employee or agency relationship between EisnerAmper and Client or the Healthcare Providers for any purpose. Without limiting the generality of the foregoing, neither EisnerAmper nor its personnel will be eligible to participate in any vacation, group medical, or life insurance, disability, profit sharing or retirement benefits or any other fringe benefits or benefit plans offered by Client or the Healthcare Providers to its or their employees, and neither Client nor the Healthcare Providers will be responsible for withholding or paying any income, payroll, Social Security, or other federal, state, or local taxes, making any insurance contributions, including unemployment or disability, or obtaining worker's compensation insurance on EisnerAmper's behalf. EisnerAmper shall be responsible for, and shall indemnify Client and the Healthcare Providers against, all such taxes or contributions, including penalties and interest. Any persons employed by EisnerAmper in connection with the performance of the Services hereunder shall be EisnerAmper's employees and EisnerAmper shall be responsible for them.

14. **Miscellaneous:**
   a. The Master Agreement (including this Exhibit A) and each Engagement Letter issued under this Master Agreement shall not be amended, unless in writing and signed by authorized representatives of all parties.

   b. A waiver by either party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure. Except as set forth therein, EisnerAmper shall not assign, delegate, subcontract, or transfer, in whole or in part, this Master Agreement or any of its rights, duties, or obligations under this Master Agreement without Client's prior written consent, and any assignment, delegation, subcontracting, or transfer by EisnerAmper without such consent shall be null and void. Subject to the limits stated in the preceding sentence, this Master Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

   c. The Master Agreement (including this Exhibit A) and each Engagement Letter issued under this Master Agreement contain the full and complete understanding of EisnerAmper and the Client with respect to the subject matter and Services described for each Engagement and supersedes all prior representations, agreements, contracts, and understandings concerning such Engagement, whether they be oral or written, including but not limited to any prior non-disclosure agreements. In the event of a conflict between this Master Agreement and any Engagement Letter, the terms of this Master Agreement shall apply unless expressly stated to the contrary in a fully-executed Engagement Letter; provided however, that nothing in any Engagement Letter shall supersede the terms set forth in Section 8 of these terms and conditions.

   d. The signatories to the Master Agreement and each Engagement Letter issued under the Master Agreement represent and warrant that such person is lawfully authorized and empowered to execute the Master Agreement and the Engagement Letter on behalf of the party on whose behalf such person is signing, and that upon execution, the Master Agreement and the Engagement Letter will be binding upon such party, without any further approval, ratification, or other action.

   e. Any notices permitted or required under this Master Agreement shall be sent to each party's then current address to the attention of the Legal Department.

   f. Access to Books and Records. If the value or cost of Services of an Engagement rendered by EisnerAmper pursuant to this Master Agreement is $10,000 or more over a 12-month period, in accordance with section 1861(v)(1)(I) of the Social Security Act, EisnerAmper agrees that at least for four (4) years after the furnishing of such Services, EisnerAmper shall, upon written request, make available to the Secretary of the United States Department of Health and Human Services (the "Secretary"), the Comptroller General of the United States, or their respective duly-authorized representatives, such books, documents, and records as may be necessary to certify the nature and extent of the cost of such Services.

   g. Ineligible Persons. Neither EisnerAmper nor any of its principals, partners or employees shall have been excluded, debarred, suspended, or otherwise ineligible to participate in Federal healthcare programs or in



EISNERAMPER

Federal procurement or nonprocurement programs, or have been convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but have not yet been excluded, debarred, suspended, or otherwise declared ineligible (each, an "Ineligible Person"). EisnerAmper shall conduct background checks on all principals, partners and employees who will perform any of the Services under this Master Agreement.

h. Insurance. During the Term of this Master Agreement, EisnerAmper shall maintain in force workers' compensation, commercial general liability, errors and omissions, and other forms of insurance in amounts consistent with industry standards. Upon request, EisnerAmper shall furnish to the Client, certificates evidencing such insurance to the Client.

15. **Allinial Global and EisnerAmper Global Ltd:** EisnerAmper is a member firm of EisnerAmper Global Ltd., a network of legally independent firms. EisnerAmper is also a member firm of Allinial Global, an association of legally independent accounting and consulting firms. EisnerAmper Global Ltd., Allinial Global, and their member firms and correspondent firms are not responsible for and do not accept liability for the work or advice which EisnerAmper provides to its clients and do not owe any duty in relation to the work or advice which EisnerAmper provides.



# EISNERAMPER

EisnerAmper LLP
750 Third Avenue
New York, NY 10017
T 212.949.8700
F 212.891.4100

April 22, 2019

**By Email**

Mr. Joel Freedman
President
Philadelphia Academic Health System, LLC
1500 Market Street, Suite 2400, West Tower
Philadelphia, PA 19102

Dear Mr. Freedman,

This Engagement Letter, effective as of April 8, 2019 (the "Effective Date"), is subject to all of the terms and conditions set forth in the Master Agreement between Philadelphia Academic Health System, LLC, and its subsidiaries ("PAHS" or "you") and EisnerAmper LLP ("EisnerAmper" or "us" or "we") dated April 22, 2019 (the "Master Agreement"). Capitalized terms that are not expressly defined herein shall have the meanings ascribed to them in the Master Agreement.

I. <u>Client</u>

      Philadelphia Academic Health System, LLC and/or its subsidiaries (collectively, the "Client")

II. <u>Services and Fee</u>

    A. <u>Healthcare Consulting Services</u>

      EisnerAmper will provide certain consulting services to the Client to assist with the restructuring of the Philadelphia Academic Health System, LLC, its subsidiaries, and the related Healthcare Providers. In connection with such restructuring, EisnerAmper will provide the services of Ronald Dreskin to serve as a temporary consultant to the Client, with no less than 37.5 hours of services per week, with the majority of such services being on PAHS' campus (the "CEO Consulting Services"). Upon the execution of this Engagement Letter, Ronald Dreskin's title will be, "Special Advisor to the President", and he will report directly to Joel Freedman (the "President"), President and Chief Executive Officer of PAHS. It is understood that PAHS is in the process of creating a Board of Managers, consisting of Joel Freedman and another individual unaffiliated with PAHS or Joel Freedman, to be selected by Joel Freedman and who is reasonably acceptable to EisnerAmper (the "Board") to oversee the restructuring of PAHS, its subsidiaries, and the related Healthcare Providers, and that upon the implementation of such Board, Ronald Dreskin's title will change to "Interim System Chief Executive Officer" (the "Interim CEO"). The Interim CEO will report directly to the Board and its Committees. For the avoidance of doubt, the Special Advisor to the President and the Interim CEO shall have no authority to retain or supervise a Chief Restructuring Officer, who, as set forth in the applicable Engagement Letter executed contemporaneously herewith, will initially report directly to Joel Freedman, President and Chief Executive Officer of PAHS, and upon the Board's creation, directly to the Board and its Committees.

      As described further in this Engagement Letter, supplemental EisnerAmper personnel will perform certain consulting services additional to the CEO Consulting Services (the "Support Services") (the CEO Consulting Services and the Support Services are collectively, the "Healthcare Consulting Services").

      We will perform the Healthcare Consulting Services in accordance with applicable professional standards, including the Statements on Standards for Consulting Services issued by the American Institute of Certified Public Accountants.



**EISNERAMPER**

The Healthcare Consulting Services under this Engagement Letter shall continue until terminated in accordance with the terms of the Master Agreement.

B.  <u>Healthcare Consulting Services Fee</u>

The fees and expenses for the Healthcare Consulting Services hereunder shall be as set forth in the Master Agreement. Note that we do not provide any assurance regarding the outcome of our work and our fees will not be contingent on the results of such work.

## III. <u>EisnerAmper Responsibilities and Limitations</u>

We understand the Engagement objectives and scope to be:

*CEO Consulting Services*

As the Special Advisor to the President, Ronald Dreskin will advise the President on matters relating to the day-to-day operations of the Client, as well as advise and make recommendations to the President with respect to strategic planning pertaining to the restructuring of Philadelphia Academic Health System, LLC, its subsidiaries, and the related Healthcare Providers.

As the Interim CEO, Ronald Dreskin will report directly to the Board and provide advice and recommendations with respect to day-to-day operations and strategic planning pertaining to the restructuring of Philadelphia Academic Health System, LLC, its subsidiaries, and the related Healthcare Providers. In particular, the Interim CEO will advise the Board with respect to efficiencies and strategic development initiatives, including:

- Advising the Board with respect to the quality of patient care
- Creating a positive and productive culture
- Recommending and following operational standards
- Advising the Board with respect to and overseeing the day-to-day performance of the Company's senior executives and key personnel
- Identifying and assisting with the implementation of certain business initiatives to improve operational performance
- Advising the Board with respect to the hiring and training of staff
- Advising the Board with respect to the implementation of clinical procedure and policy
- Advising the Board with respect to compliance with State, Federal and CMS regulations as well as hospital policies

*Support Services*

EisnerAmper will provide personnel to work at the direction of the Board and the Client's management, with the majority of such work being on PAHS' campus. Such personnel's services will include the following:

1.  <u>Supply Chain Management</u>

EisnerAmper's personnel will review the supply chain management at Hahnemann University Hospital, St. Christopher's Hospital for Children, and the facility practice plans' clinical and ambulatory surgery centers. Our initial assessment will include an analysis of each of the steps in the inventory management procurement delivery and accounts payable processes associated with supply chain. We will also benchmark the costs and adequacy of supplies against industry standards. Based on these analyses, we will make recommendations for performance improvement. Performance improvement may be provided through an addendum to this Engagement Letter or a new Engagement Letter.



EISNERAMPER

2. Revenue Cycle Management

EisnerAmper's personnel will review the revenue cycles at both Hahnemann University Hospital, St. Christopher's Hospital for Children, and the St. Christopher's practice groups. We segment our review into two components: Front-End and Back-End. Front-End runs through data capture in patient access to coding and documentation performed in Health Information Management (H.I.M). Back-End picks up with billing submission through Denial Management and Accounts Receivable Management (AR). We will review the metrics of performance in both sections of the revenue cycle and benchmark those against industry standards. We will use that preliminary quantified analysis to further review each of the individual nine components of the process. Out of this analysis we will develop a remediation plan that will include specific initiatives in each of the nine specific segments as well as provide a level estimation of the value opportunity in each. Because the two hospitals function separately, we will conduct the same approach independently at each facility and thus develop two distinct remediation plans.

Revenue Cycle, Facility Practice Plans:

EisnerAmper will first conduct an analysis of the current performance using both quantitative and qualitative metrics. Based on this review, again we will define critical improvement process steps in each area of the nine components of the entire revenue cycle process. We will work directly with the staff and physicians to understand the appropriate processes. We will create a remediation plan for any errors that we discover in the process and associate a level estimate of the value of the improvement.

Performance Improvement Plan; St. Christopher's Hospital for Children:

EisnerAmper will review and modify (if applicable) the existing performance improvement plan at St. Christopher's Hospital for Children. Key elements we will review will include: Cost per case, length of stay, physician –hospital alignment, operational improvements, staffing levels and ultimately resulting financial performance. Specifically, EisnerAmper will benchmark St. Christopher's Hospital for Children vs our experience with pediatric hospitals and identify specific performance opportunities. We will compare our own assessment to the preexisting plan and propose modification where applicable. Implementation of recommendations may be provided through an addendum to this Engagement Letter or a new Engagement Letter.

3. Profit Improvement Plans Assessment

EisnerAmper will advise the Client's management on any recommended adjustments and implementation challenges with respect to any other operational profit improvement initiatives developed by the Client's management not covered above.

Our Healthcare Consulting Services will consist of the scope and objectives as set forth above, or modified as needed and agreed, depending on the progress of the Engagement. We will not be auditing any financial statements or performing attest procedures with respect to information in conjunction with this Engagement. Our Engagement cannot be relied upon to identify or disclose any financial statement misstatements, including those caused by fraud or error, or to identify or disclose any wrongdoing within the Client or noncompliance with laws and regulation. The Client understands that we have no responsibility to identify and communicate deficiencies in the Client's internal control as part of this Engagement and agree that the Client is responsible for preventing and detecting fraud. Notwithstanding the foregoing, we will identify any material deficiencies that come to our attention.

Our Engagement is to represent the Client and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of the Engagement, we may provide information to directors, officers or employees in their corporate capacities.



**EISNERAMPER**

The Client, on behalf of itself and on behalf of the Healthcare Providers, acknowledges and agrees that the Services do not include: (i) audit, legal, tax, environmental, accounting, actuarial, employee benefits, insurance advice or similar specialist and other professional services, for which the Client or Healthcare Providers may choose to retain EisnerAmper under a separate engagement at additional cost; or (ii) investment banking, including valuation or securities analysis, including advising any party or representation of the Client or Healthcare Providers on the purchase, sale or exchange of securities or representation of the Client or the Healthcare Providers in securities transactions. The Client, on behalf of itself and on behalf of the Healthcare Providers, acknowledges and agrees that EisnerAmper is not a registered broker-dealer in any jurisdiction and will not offer advice or its opinion or any testimony on valuation or exchanges of securities or on any matter for which EisnerAmper is not appropriately licensed or accredited.

Neither EisnerAmper nor Ronald Dreskin make any representations, warranties, or guarantees that: (i) an appropriate or successful structuring proposal or strategic alternative can be formulated for the Client; (ii) any structuring proposal or strategic alternative will be more successful than any other structuring proposal or strategic proposal; (iii) restructuring is the best course of action for the Client; or (iv) if formulated, that any restructuring or strategic alternative proposal will be accepted by the Client's creditors, shareholders, or other constituents. Neither EisnerAmper nor Ronald Dreskin accepts responsibility for the Client's decision to pursue or not pursue any particular restructuring proposal or strategic alternative. EisnerAmper and Ronald Dreskin, in his capacity as Special Advisor to the President and Interim CEO, shall only be responsible for implementing the restructuring proposal or strategic alternative strategy approved by Board (or the Client's management, if applicable), and only to the extent and manner authorized by the Board (or the Client's management, if applicable, prior to the Board's implementation). Neither EisnerAmper nor Ronald Dreskin shall have any liability for claims arising out of the foregoing disclaimers.

Ronald Dreskin is the Engagement Partner for the Healthcare Consulting Services and will be the Special Advisor to the President and Interim CEO described hereunder. While we will attempt to comply with your requests for specific support staffing, we retain the right to assign and reassign our support personnel, as appropriate, to perform Healthcare Consulting Services. Such support personnel will be provided at the Senior Manager level or higher. If Ronald Dreskin is unavailable to perform the Healthcare Services, then we will provide the Client with notice and mutually agree on alternative personnel.

## IV.  **Management's Responsibilities and Representations**

It is the Client's responsibility to provide all the information required for our Healthcare Consulting Services. Our Healthcare Consulting Services for the Client will be based on the information made available to us by the Client and the Healthcare Providers' representatives.  We will not audit or otherwise verify the information submitted to us. However, we may ask for additional documentation and clarification of some of the information. We anticipate that the Client's representatives will furnish all of the requested information in a timely and organized manner.

The Healthcare Consulting Services will be performed under the direction of the Client's management (including the Board) and management (including the Board) accepts the responsibility for all management decisions. EisnerAmper is advising and will not perform management functions or make management decisions on behalf of the Client.  However, we will provide advice and recommendations in an advisory capacity to assist management of the Client in performing its functions and making decisions.

The Client agrees to supply office space, and office and support services to EisnerAmper as reasonably requested by EisnerAmper in connection with the performance of its duties hereunder.

In performing the Healthcare Consulting Services, EisnerAmper will have reasonable access to all of the Client and the Healthcare Providers' records, property and personnel relevant to performing the Healthcare Consulting



**EISNERAMPER**

Services.  Client and the Healthcare Provider personnel will make themselves available when EisnerAmper representatives are on site to perform the Healthcare Consulting Services.

At all times during which EisnerAmper provides Healthcare Consulting Services to the Client pursuant to this Engagement Letter, the Client shall maintain Directors and Officers liability insurance coverage in an amount not less than $30,000,000 (the "D&O Insurance"), and to name Ronald Dreskin as an additional insured to such policy. Upon execution of this Engagement Letter, the Client shall furnish EisnerAmper with a certificate of insurance, naming Ronald Dreskin as an additional insured, and setting forth the nature of the coverage, the limits of liability, the name of the insurance carrier, the policy number, and the date of expiration of the policy. The Client shall provide thirty (30) days' notice to EisnerAmper of cancellation, nonrenewal, or material modification to the D&O Insurance. The Client shall maintain such D&O Insurance for a period of not less than six (6) years from the Engagement Termination Event. The Client understands and agrees that requirements in this paragraph are a material inducement to EisnerAmper's entering into this Engagement Letter, and that if the certificate of D&O Insurance required hereunder is not provided within five (5) days of the date on which this Engagement Letter is duly executed, then EisnerAmper shall have the option to terminate this Engagement, immediately upon notice to the Client.

*       *       *

Please indicate acceptance of the above terms by signing and returning this letter by mail, facsimile or pdf/email.  For purposes of this Engagement Letter, facsimile or pdf copies of signatures shall be deemed original and shall constitute one and the same instrument.

Very truly yours,

EISNERAMPER LLP

By: _____

Ronald Dreskin, Partner

**Accepted and Agreed:**
The terms of this Engagement Letter and the terms set forth in the Master Agreement correctly sets forth the understanding of Philadelphia Academic Health System, LLC on behalf of itself and any applicable subsidiary:

By:_____       _President_____
    Signature                                    Title

_Joel Freedman_____           _4-22-19_____
    Print Name                                   Date



**EISNERAMPER**

EisnerAmper LLP
750 Third Avenue
New York, NY 10017
T 212.949.8700
F 212.891.4100

April 22, 2019

**By Email**

Mr. Joel Freedman
President
Philadelphia Academic Health System, LLC
1500 Market Street, Suite 2400, West Tower
Philadelphia, PA 19102

Dear Mr. Freedman,

This Engagement Letter, effective as of April 8, 2019 (the "Effective Date"), is subject to all of the terms and conditions set forth in the Master Agreement between Philadelphia Academic Health System, LLC, and its subsidiaries ("PAHS" or "you") and EisnerAmper LLP ("EisnerAmper" or "us" or "we") dated April 22, 2019 (the "Master Agreement"). Capitalized terms that are not expressly defined herein shall have the meanings ascribed to them in the Master Agreement.

I.   **Client**

      Philadelphia Academic Health System, LLC and/or its subsidiaries (collectively, the "Client")

II.  **Services and Fee**

    A.  Financial Chief Restructuring Officer Services (the "CRO Services")

        EisnerAmper will provide certain consulting services to the Client to assist with the financial restructuring of Philadelphia Academic Health System, LLC, its subsidiaries, and the related Healthcare Providers. EisnerAmper will provide the services of Allen Wilen to serve as a temporary consultant with the title, "Chief Restructuring Officer - Finance" (the "CRO"), with no less than 37.5 hours of services per week, with the majority of such services being on PAHS' campus,[1] reporting directly to Joel Freedman, President of PAHS. It is understood that PAHS is in the process of creating a Board of Managers, consisting of Joel Freedman and another individual unaffiliated with PAHS or Joel Freedman, to be selected by Joel Freedman and who is reasonably acceptable to EisnerAmper (the "Board") to oversee the restructuring of PAHS, its subsidiaries, and the related Healthcare Providers, and that upon the implementation of such Board, the CRO will report directly to the Board and its Committees.

        We will perform the CRO Services in accordance with applicable professional standards, including the Statements on Standards for Consulting Services issued by the American Institute of Certified Public Accountants.

        The CRO Services under this Engagement Letter shall continue until terminated in accordance with the terms of the Master Agreement. In addition, in the event of a disagreement between the CRO and the Board, the CRO shall have the right to resign immediately upon the conclusion of a reasonable meet and confer process, consisting of at least one in-person meeting to be attended by the CRO, both Board members, and their respective legal counsel (including outside corporate counsel) and any other meetings that are agreed to be scheduled as part of such process by the CRO and both Board members.

---

[1] The CRO will be offsite from June 3, 2019 through June 7, 2019.



EISNERAMPER

B.  <u>CRO Services Fee</u>

Except in the event of a bankruptcy filing, the fees and expenses for the Services hereunder shall be as set forth in the Master Agreement. Note that we do not provide any assurance regarding the outcome of our work and our fees will not be contingent on the results of such work.

*Cash on Account in the Event of a Bankruptcy Filing*

In the event of a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court.  The Application (as defined below) shall be accompanied by a proposed order approving the Application (the "Order").  The Order shall provide that:

    a)   we shall prepare, and counsel for the Client shall file, summary fee statements on a monthly basis, covering work performed for the preceding month (the "Fee Statement");

    b)   absent any objections, 100% of our invoices shall be payable after 10 business days of the filing of the Fee Statement;

    c)   we shall not be subject to any orders of the bankruptcy court setting forth interim compensation procedures; and

    d)   in the event of an objection, the Fee Statement shall be scheduled for the next omnibus hearing before the bankruptcy court.

In the event the Client intends to make a filing under the Bankruptcy Code, the Client will forward to us the amount of $150,000, which funds will be held "on account" to be applied to our professional fees, charges and disbursements for the Engagement (the "Initial Cash on Account").  To the extent that this amount exceeds our fees, charges and disbursements upon the completion of the Engagement, we will refund any unused portion.  The Client agrees to increase or supplement the Initial Cash on Account from time to time during the course of the Engagement in such amounts that we mutually agree are reasonably necessary to increase the Initial Cash on Account to a level that will be sufficient to fund Engagement fees, charges, and disbursements to be incurred pursuant to this agreement or any amendment thereto.

Upon transmittal of the invoice, we may immediately draw upon the Initial Cash on Account (as replenished from time to time) in the amount of the invoice.  The Client agrees upon submission of each such invoice to promptly wire the invoice amount to us as replenishment of the Initial Cash on Account (together with any supplemental amount to which we and the Client mutually agree), without prejudice to the Client's right to advise us of any differences it may have with respect to such invoice.  We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account (as may be supplemented from time to time) at any time subject to (and without prejudice to) the Client's opportunity to review our statements. We may, from time to time, require an additional on account payment to supplement the Initial Cash on Account to cover other fees, charges, and disbursements in connection with the bankruptcy filing (the "Additional Cash on Account").  We will hold the Additional Cash on Account, as we have the Initial Cash on Account.  Of course, the reasonableness of the Initial Cash on Account and Additional Cash on Account remains subject to review by the court in any ensuing case.

If any of the Client's entities becomes a debtor in one or more cases under the Bankruptcy Code, some fees, charges and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing.  The unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account will be applied to any such unpaid pre-petition fees, charges and disbursements.  Any requisite court permission will be obtained in advance.  We will then hold any portion of the Initial Cash on Account and the Additional Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, charges and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.



EISNERAMPER

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Client understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Client shall nevertheless remain liable for payment of court-approved post-petition fees and expenses pursuant to the applicable provisions of the Bankruptcy Code. It is agreed and understood that the unused portion, if any, of the Initial Cash on Account (as may be supplemented from time to time) and the Additional Cash on Account shall be held by us and applied against the final fee application filed and approved by the court.

## III. EisnerAmper Responsibilities and Limitations

We understand the Engagement objectives and scope to be:

*Chief Restructuring Officer - Finance Services*
- Develop range of transaction alternatives, including divestitures, restructuring, adjustments to business model (e.g., closure of Hahnemann), and both judicial and non-judicial reorganization options;
- Outline various scenarios for addressing the Hahnemann situation, including restructure, closure, or potential liquidation in a bankruptcy or bankruptcy alternative methodology;
- Advise with respect to the Client's existing financial models;
- Negotiate on behalf of the Client, and at an arms-length basis, terms of agreements between the Client and its parent entities, including but not limited to:
  o Vendor contracts;
  o Licensing and sales agreements, as applicable;
  o Debtor-in-possession and/or other financing arrangements;
  o Lead communications with key constituents, including Drexel, HSRE, Midcap, Tenet, government agencies, and other appropriate parties;
  o With assistance of on-site personnel, cash preservation, including maintenance of a 13-week rolling cash flow statement and vendor management; and
  o Other intercompany agreements and obligations;
- Advise with respect to the financial impact of any profit improvement initiatives developed by the Client's management and advise the Client's management on any recommended adjustments and implementation challenges.

*Chapter 11 Planning and Execution Services*
- Assist the Client in contingency planning including the evaluation, planning and execution of a potential chapter 11 filing;
- Assist the Client and its other advisors with the formulation of a chapter 11 plan of reorganization, liquidation and the preparation of the corresponding disclosure statement;
- Advise and assist the Client in the compilation and preparation of financial information, statements, schedules, budgets and monthly operating reports necessary due to requirements of the Bankruptcy Court and/or Office of the U.S. Trustee;
- Assist the Client in the preparation of a liquidation valuation for a reorganization plan and/or negotiation purposes;
- Assist the Client in managing and executing the reconciliation process involving claims filed by all creditors;
- Provide testimony in the chapter 11 case as necessary or appropriate at the Client's request;
- Assist Client personnel with the communications and negotiations, at your request and under your guidance, with lenders, creditors, and other parties-in-interest including the preparation of financial information for distribution to such parties-in-interest;
- Assist in the preparation of weekly and monthly reporting in accordance with the debtor-in-possession credit facility and/or other financing arrangements;
- Assist the Client in developing strategy relating to customers and vendors;



EISNERAMPER

- Assist the Client with vendor and creditor negotiations;
- Assist with such other accounting and financial services as requested by the Client and which are not duplicative of services provided by other professionals;
- Assist in the development of communication strategies and materials for effective communication with employees, customers, suppliers, investors, landlords, tenants, subtenants, academic affiliates, and other key audiences.

Our CRO Services will consist of the scope and objectives as set forth above, or modified as needed and agreed, depending on the progress of the Engagement. We will not be auditing any financial statements or performing attest procedures with respect to information in conjunction with this Engagement. Our Engagement cannot be relied upon to identify or disclose any financial statement misstatements, including those caused by fraud or error, or to identify or disclose any wrongdoing within the Client or noncompliance with laws and regulation. The Client understands that we have no responsibility to identify and communicate deficiencies in the Client's internal control as part of this Engagement and agree that the Client is responsible for preventing and detecting fraud. Notwithstanding the foregoing, we will identify any material deficiencies that come to our attention.

If cases under the Bankruptcy Code are commenced and our retention is approved, EisnerAmper's role will include providing CRO and related services to the debtors and debtors-in-possession in those cases under a general retainer, subject to court approval. EisnerAmper's role also will encompass all out-of-court planning and negotiations attendant to these tasks.

Our Engagement is to represent the Client and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of the Engagement, we may provide information to directors, officers or employees in their corporate capacities.

The Client, on behalf of itself and on behalf of the Healthcare Providers, acknowledges and agrees that the Services do not include: (i) audit, legal, tax, environmental, accounting, actuarial, employee benefits, insurance advice or similar specialist and other professional services, for which the Client or Healthcare Providers may choose to retain EisnerAmper under a separate engagement at additional cost; or (ii) investment banking, including valuation or securities analysis, including advising any party or representation of the Client or Healthcare Providers on the purchase, sale or exchange of securities or representation of the Client or the Healthcare Providers in securities transactions. The Clients, on behalf of itself and on behalf of the Healthcare Providers, acknowledges and agrees that EisnerAmper is not a registered broker-dealer in any jurisdiction and will not offer advice or its opinion or any testimony on valuation or exchanges of securities or on any matter for which EisnerAmper is not appropriately licensed or accredited.

Neither EisnerAmper nor the CRO make any representations, warranties, or guarantees that: (i) an appropriate or successful structuring proposal or strategic alternative can be formulated for the Client; (ii) any structuring proposal or strategic alternative will be more successful than any other structuring proposal or strategic proposal; (iii) restructuring is the best course of action for the Client; or (iv) if formulated, that any restructuring or strategic alternative proposal will be accepted by the Client's creditors, shareholders, or other constituents. Neither EisnerAmper nor the CRO accepts responsibility for the Client's decision to pursue or not pursue any particular restructuring proposal or strategic alternative. EisnerAmper and the CRO shall only be responsible for implementing the restructuring proposal or strategic alternative strategy approved by Board (or the Client's management, if applicable), and only to the extent and manner authorized by the Board (or the Client's management, if applicable). Neither EisnerAmper nor the CRO shall have any liability for claims arising out of the foregoing disclaimers.

Allen Wilen is the Engagement Partner for the CRO Services and will be the CRO described hereunder. While we will attempt to comply with your requests for specific support staffing, we retain the right to assign and reassign our support personnel, as appropriate, to perform CRO Services. If Allen Wilen is unavailable to perform the CRO Services, then we will provide the Client with notice and mutually agree on alternative personnel.



**EISNERAMPER**

## IV. Management's Responsibilities and Representations

Upon the Client commencing one or more cases under the Bankruptcy Code, the engagement of EisnerAmper to perform the CRO Services shall be subject to the approval of the Bankruptcy Court and shall be substantially as provided in this Engagement Letter (together with the Master Agreement) as modified by the retention order approved by the Bankruptcy Court. The Client agrees, at the Client's expense, to file an application (the "Application") to retain EisnerAmper to provide CRO Services, *nunc pro tunc* to the Petition Date pursuant to Section 363 of the Bankruptcy Code. The Client agrees to file all required applications, including the Application, for the retention of EisnerAmper at the earliest practical time.

It is the Client's responsibility to provide all the information required for our CRO Services. Our CRO Services for the Client will be based on the information made available to us by the Client and the Healthcare Providers' representatives. We will not audit or otherwise verify the information submitted to us. However, we may ask for additional documentation and clarification of some of the information. We anticipate that the Client's representatives will furnish all of the requested information in a timely and organized manner.

The CRO Services will be performed under the direction of the Client's management (including the Board) and management (including the Board) accepts the responsibility for all management decisions. EisnerAmper is advising and will not perform management functions or make management decisions on behalf of the Client. However, we will provide advice and recommendations in an advisory capacity to assist management of the Client in performing its functions and making decisions.

The Client agrees to supply office space, and office and support services to EisnerAmper as reasonably requested by EisnerAmper in connection with the performance of its duties hereunder.

In performing the CRO Services, EisnerAmper will have reasonable access to all of the Client and the Healthcare Providers' records, property and personnel relevant to performing the CRO Services. Client and Healthcare Provider personnel will make themselves available when EisnerAmper representatives are on site to perform the CRO Services.

At all times during which EisnerAmper provides CRO Services to the Client pursuant to this Engagement Letter, the Client shall maintain Directors and Officers liability insurance coverage in an amount not less than $30,000,000 (the "D&O Insurance"), and to name Allen Wilen as an additional insured to such policy. Upon execution of this Engagement Letter, the Client shall furnish EisnerAmper with a certificate of insurance, naming Allen Wilen as an additional insured, and setting forth the nature of the coverage, the limits of liability, the name of the insurance carrier, the policy number, and the date of expiration of the policy. The Client shall provide thirty (30) days' notice to EisnerAmper of cancellation, nonrenewal, or material modification to the D&O Insurance. The Client shall maintain such D&O Insurance for a period of not less than six (6) years from the Engagement Termination Event. The Client understands and agrees that requirements in this paragraph are a material inducement to EisnerAmper's entering into this Engagement Letter, and that if the certificate of D&O Insurance required hereunder is not provided within five (5) days of the date on which this Engagement Letter is duly executed, then EisnerAmper shall have the option to terminate this Engagement, immediately upon notice to the Client.

*        *        *



**EISNERAMPER**

Please indicate acceptance of the above terms by signing and returning this letter by mail, facsimile or pdf/email.  For purposes of this Engagement Letter, facsimile or pdf copies of signatures shall be deemed original and shall constitute one and the same instrument.

Very truly yours,

EISNERAMPER LLP

By: _____

    Allen Wilen, Partner

**Accepted and Agreed:**
The terms of this Engagement Letter and the terms set forth in the Master Agreement correctly sets forth the understanding of Philadelphia Academic Health System, LLC on behalf of itself and any applicable subsidiary:

By:_____        _President_____
      Signature                          Title

_Joel Freedman_____             _4-22-19_____
    Print Name                         Date



## FIRST AMENDMENT TO THE MASTER AGREEMENT BETWEEN
## EISNERAMPER LLP AND PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC

This first amendment (the "First Amendment") is made by and between EisnerAmper LLP, a New York limited liability partnership with a business address at 750 Third Avenue, New York, New York 10017 (collectively, "EisnerAmper" or the "Firm") and Philadelphia Academic Health System, LLC, on behalf of itself and its subsidiaries (collectively, the "Client") (EisnerAmper and the Client each a "Party" and collectively the "Parties").

WHEREAS, the Parties entered into the letter agreement, dated April 22, 2019, together with the terms and conditions attached thereto as Exhibit A (collectively, the "Master Agreement");

WHEREAS, in accordance with the terms of the Master Agreement, the Parties also entered into certain Engagement Letters whereby EisnerAmper is providing Healthcare Consulting Services and Financial Restructuring Services to the Client;

WHEREAS, the Parties desire to amend the terms of the Master Agreement to the limited extent set forth in this First Amendment;

NOW THEREFORE, in accordance with the terms and conditions set forth in this First Amendment, the Parties agree as follows:

1. Unless expressly modified by the terms of this First Amendment, the terms of the Master Agreement shall continue to apply and remain in full force and effect.

2. Capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Master Agreement.

3. Amendment to the Agreement:
   Effective as of June 24, 2019, the Weekly Payment shall be increased from $69,650.00 to $92,250.00, and all fees shall be allocated and increased as follows:

| Role/Segment | Effective June 24, 2019 |
|---|---|
| CRO Services | $27,500 |
| CEO Consulting Services | $17,500 |
| Support Services | $47,250 |
| | |
| Total Weekly Payment | $92,250 |

4. For the avoidance of doubt, nothing in this First Amendment shall amend, supersede or otherwise modify the terms of an Engagement Letter.

5. This First Amendment shall be governed by and construed in accordance with the laws of the State of New York.

6. The Parties each knowingly, voluntarily and intentionally waive the right to a trial by jury in any action arising out of or relating to this First Amendment.

7. This First Amendment may be executed in one or more counterparts, electronically or in wet signature, each of which when so executed shall be deemed an original and all of which,

when taken together, shall constitute one and the same instrument. Signatures transmitted by fax or email shall be deemed original signatures.

**ACCEPTED AND AGREED:**

**EISNERAMPER LLP**

By: _____
Ronald Dreskin, Partner

Date: _____6/24/19_____

By: _____
Allen Wilen, Partner

Date: _____6/24/19_____

**PHILADELPHIA    ACADEMIC    HEALTH SYSTEM, LLC, on behalf of itself and any applicable subsidiary**

By: _____
Joel Freedman, President

Date: _____6/27/19_____