# Exhibit C

## SSG Engagement Letter



June 7, 2019

Mr. Joel Freedman
Chief Executive Officer and President
Philadelphia Academic Health Holdings, LLC
Philadelphia Academic Risk Retention Group, LLC
Philadelphia Academic Health System, LLC
1500 Market Street, 24th Floor
West Tower, Centre Square
Philadelphia, PA 19102

Dear Mr. Freedman:

This agreement ("Engagement Agreement") will serve as the contract between Philadelphia Academic Health Holdings, LLC ("PAHH"), Philadelphia Academic Risk Retention Group, LLC ("RRG"), Philadelphia Academic Health System, LLC ("PAHS"), and PAHS's wholly owned subsidiaries (such subsidiaries, together with PAHS, the "PAHS Group" and the PAHS Group collectively with RRG and PAHH, the "Company Group" and any entity in the Company Group, a "Company"), and SSG Advisors, LLC ("SSG") regarding the retention of SSG as exclusive investment banker to the Company Group for the purposes outlined in this Engagement Agreement with J. Scott Victor leading the engagement. SSG's responsibilities hereunder involve providing investment banking services to the Company Group, focusing on: (i) the private placement of debt and/or equity capital (the "Financing"); and/or (ii) the sale of all or part of the Company Group (the "Sale"), and/or (iii) the restructuring of the Company Group's balance sheet with existing stakeholders ("Restructuring" and, together with a Financing or Sale, a "Transaction") and shall be effective as of May 31, 2019.

A.  **SSG's Role:**

   1.    In regard to the Financing, the following:

   - Prepare an information memorandum describing the Company Group, or any part thereof, as applicable, its historical performance and prospects, including existing contracts, patient census information, medical services offered, medical, nursing and staff information, management, and financial projections;

   - Assist the Company Group in compiling a data room of any necessary and appropriate documents related to the Financing;

   - Assist the Company Group in developing a list of suitable potential lenders and investors who will be contacted on a discreet and confidential basis after approval by the Company Group;

Mr. Joel Freedman
June 7, 2019
Page 2

- Coordinate the execution of confidentiality agreements for potential lenders and investors wishing to review the information memorandum;

- Assist the Company Group in coordinating site visits for interested lenders and investors and work with the management team to develop appropriate presentations for such visits;

- Solicit competitive offers from potential lenders and investors;

- Advise and assist the Company Group in structuring the Financing and negotiating the Financing agreements;

- Otherwise assist the Company Group and its other professionals, as necessary, through closing on a best efforts basis.

2.    In regard to the Sale, the following:

- Prepare an information memorandum describing Company Group, or any part thereof, as applicable, its historical performance and prospects, including existing contracts, patient census information, medical services offered, medical, nursing and staff information, management and anticipated financial results of the Company Group;

- Assist the Company Group in developing a list of suitable potential buyers for specific assets of the Company Group who will be contacted on a discreet and confidential basis after approval by the Company Group;

- Assist the Company Group in compiling a data room of any necessary and appropriate documents related to the Sale;

- Coordinate the execution of confidentiality agreements for potential buyers wishing to review the information memorandum;

- Assist the Company Group in coordinating site visits for interested buyers and work with the management team to develop appropriate presentations for such visits;

- Solicit competitive offers from potential buyers;

- Advise and assist the Company Group in structuring the Sale and negotiating the Sale agreements, including, without limitation, advising and negotiating with respect to Sale structures that include, as may be necessary or desirable, licenses or assignments of intellectual property and leasing arrangement of GME/IME caps/slots;

- Otherwise assist the Company Group, its attorneys and accountants, as necessary, through closing on a best efforts basis.

Mr. Joel Freedman
June 7, 2019
Page 3

3.      In regard to the Restructuring, the following:

- SSG, on a best effort basis, shall assist the Company Group in any negotiation with various stakeholders (the "Existing Stakeholders"), including, but not limited to any of the Company Group's lenders, creditors, strategic partners and/or other stakeholders in regard to a possible Restructuring Transaction of existing claims and equity;

- Complete all necessary and appropriate valuations in connection with any Company conversion from a for-profit entity into a not-for-profit entity;

- Assist the Company Group in compiling a data room of any necessary and appropriate documents related to the Restructuring.

In performing the services described above, the Company Group will furnish or cause to be furnished to SSG such written information as SSG requests that SSG reasonably believes appropriate to the execution of its engagement hereunder (all such written information so furnished being the "Information").  The Company Group represents to SSG that (a) all factual Information (other than the Projections (as defined below) and information of a general economic or industry-specific nature) furnished by it or its agents (but not any persons or entities who are not Affiliates (as defined in Rule 405 under the Securities Act of 1933, as amended) of any Company) will be complete and correct in all material respects, when taken as a whole, as of the date on which it is furnished or as of the date indicated in such Information, to its actual knowledge, (b) the written projections, budgets, estimates, forward-looking statements or information of a forward-looking nature (collectively, the "Projections") will be prepared in good faith based on assumptions believed by the Company Group to be reasonable at the time made (it being understood and agreed that (i) such Projections are (A) not to be viewed as facts or a guarantee of performance or results) and (B) subject to significant uncertainties and contingencies many of which are beyond the Company Group's control and (ii) no assurance can be given that any particular Projections or the Projections taken as a whole will be realized, and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material); and (c) until the expiration of SSG's engagement hereunder, it will use commercially reasonable efforts to promptly advise SSG of the occurrence of any event or any other change known by it or its agents (but not any persons or entities who are not Affiliates) that results in the factual Information (other than the Projections and information of a general economic or industry-specific nature) ceasing to be complete and correct in all material respects, when taken as a whole, as of the date on which it is furnished or as of the date indicated in such Information. The Company Group recognizes and confirms that SSG:  (a) will use and rely primarily on the Information and on information available from public sources that are generally recognized as reliable in performing the services contemplated hereby without having independently verified any of the same; (b) does not assume responsibility for accurateness or completeness of the Information and such other information; and (c) will not make an appraisal of any of the assets or liabilities of the Company Group except as set forth above in connection with the Restructuring valuations.

Mr. Joel Freedman
June 7, 2019
Page 4

The Company Group agrees that SSG shall be its exclusive investment banker in connection with a Financing or Sale undertaken with respect to the Company Group during the Engagement Term, as defined below.  the Company Group agrees to use its commercially reasonable efforts to identify to SSG:   (a) all prospective purchasers and investors who have been in contact with the Company Group during a six-month period prior to the date hereof and (b) all prospective purchasers and investors who come in contact with the Company Group during the Engagement Term.

SSG will consult with and advise the Company Group with respect to the financial and other aspects of any proposed Transaction, including price, timing, structure, other terms and conditions of a Transaction.   SSG will not, however, have any authority to bind the Company Group or any Company with respect to any proposed Transaction.  Likewise, nothing contained herein shall require the Company Group or any Company or any members thereof to accept the terms of any proposal and the Company Group and each Company shall at all times have the right in its sole and absolute discretion to reject any proposed Transaction regardless of the terms proposed.

B.    **SSG's Compensation**

As compensation for providing the foregoing services, SSG shall receive the following:

1.    Initial Fee.   An initial fee (the "Initial Fee") equal to $50,000 due upon acceptance of this Engagement Agreement by the Company Group; SSG hereby acknowledges that it has received the Initial Fee on June 5, 2019.

2.    Monthly Fees.   A monthly fee (the "Monthly Fee") of $50,000 per month payable beginning July 1, 2019 and on the first (1st) of each month thereafter throughout the Engagement Term (as such term is hereafter defined); if the Engagement Term ends prior to the last day of any month, the Monthly Fee for the last month of the Engagement Term shall be prorated for such month.  Fifty percent (50%) of the Monthly Fees and Initial Fee paid will be credited to the Transaction Fee (defined below).  However, there will be no such Monthly Fee credit for any Sale to Drexel University.

3.    Financing Fee.   Upon the closing and funding of a Financing Transaction from any party other than Midcap Financial, Harrison Street Real Estate, Tenet Business Services Corporation, Conifer Revenue Cycle Management, or any of their respective Affiliates (each, an "Existing Financing Source"), SSG shall be entitled to a fee ("Financing Fee") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Financing Transaction equal to (a) the greater of (i) $450,000 or (ii) one and a half percent (1.5%) of the principal amount of any Senior Debt, plus 4% of the principal amount of any Tranche B or Traditional Subordinated Debt or the aggregate securities proceeds (net of any fees and expenses thereof) of Equity (each such term as hereafter defined) raised from any financing source other than an Existing Financing Source. The Financing Fee shall be reduced by 50% if a Financing Transaction is with, or is led by, Capital One or Sector Financial, or their Affiliates.

Mr. Joel Freedman
June 7, 2019
Page 5

> Notwithstanding the foregoing, SSG shall be entitled to a Financing Fee of $150,000 for a Financing Transaction from an Existing Financing Source.

4.     <u>Sale Fee</u>.   Upon the consummation of a Sale Transaction, SSG shall be entitled to a fee (the "Sale Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Sale Transaction, equal to the greater of: (a) $750,000; or (b) one and a half percent (1.5%) of Total Consideration (defined below) up to and including $100 million; plus two percent (2.0%) of Total Consideration over $100 million.

However, in the event that a Sale to Drexel University, or any of its Affiliates, closes outside of a Chapter 11 bankruptcy proceeding and within one hundred (100) days from the date hereof, then the Sale Fee for such Transaction shall be $250,000. In the event of a Sale to Drexel University in a Chapter 11 bankruptcy proceeding or outside of a Chapter 11 bankruptcy proceeding but after one (100) hundred days from the date hereof, then the Sale Fee for such Transaction shall be $750,000.

In the event of a liquidation of either or both of the operating hospital entities in a PAHC Chapter 11 bankruptcy proceeding, then SSG shall be entitled to a liquidation fee of $250,000 ("Liquidation Fee").

5.     <u>Restructuring Fee</u>.   Upon the closing of a Restructuring Transaction, SSG shall be entitled to a fee ("Restructuring Fee") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Restructuring Transaction, equal to $750,000.

6.     <u>Out-of-Pocket Expenses</u>.   In addition to the foregoing Initial Fee, Monthly Fee and Transaction Fee noted above whether or not a Transaction is consummated, SSG will be entitled to reimbursement for all of SSG's reasonable and documented out-of-pocket expenses (other than any overhead expenses of SSG) incurred in connection with the subject matter of this Engagement Agreement; provided that no expenses in excess of $25,000 in the aggregate will be reimbursed by any Company or the Company Group without the prior written approval thereof.

Notwithstanding anything to the contrary set forth in this Engagement Agreement, (i) no Sale Fee shall be calculated on any Sale Transaction involving the sale of any real estate (whether owned or leased) and any real estate sale shall be specifically excluded in the computation of any Sale Fee; (ii) if more than one fee among a Financing Fee, Sale Fee, Liquidation Fee and Restructuring Fee is applicable to a series of Transactions, SSG shall be entitled to the applicable fees; (iii) the Companies shall be aggregated for the purposes of calculation of any Transaction Fees; by way of an example and not of limitation, if multiple Companies are involved in a Restructuring Transaction, only one Restructuring Fee shall be applicable; (iv) there shall be no duplication to the extent that any amounts are used in the calculation of any Transaction Fee; by way of an example and not of limitation, if more than one Company is liable on the same Senior Debt, such Senior Debt shall be used only once in the calculation of any Financing Fee; (v) withdrawal liabilities (or a compromise or settlement thereof) with respect to any multi-employer pension plan shall not be included in the computation of any Transaction Fee; and (vi) the aggregate fees payable to SSG under this Engagement Agreement

Mr. Joel Freedman
June 7, 2019
Page 6

(including, for the avoidance of doubt, the Initial Fee, Monthly Fees, Financing Fees, Sale Fees, Liquidation Fees and Restructuring Fees) shall be limited at all times to $2,000,000 (the "Cap") and SSG will not invoice any Company for any amount in excess of the Cap except for any reimbursable expenses under Section B.6 above.

C. **Definitions**

For the purpose of this Engagement Agreement:

**"Equity"** means common stock, preferred stock, convertible stock, and the proceeds from any joint venture agreement, including contributions by a joint venture partner involving cash, stock, property, plant and equipment or any other assets.

**"Financing Transaction"** means the private placement of any Senior Debt, Traditional Subordinated Debt, or non-control Equity of any Company from any lender or investor, who is not an Existing Financing Source.

**"Restructuring Transaction"** means a conversion of any Company from a for-profit entity to a not-for-profit entity through a Chapter 11 bankruptcy proceeding that does not also involve a Sale.

**"Sale Transaction"** means the sale or transfer, directly or indirectly, of any of the assets or equity of any Company to a person or entity that is not an Affiliate of any Company or an Existing Financing Source.

**"Senior Debt"** means revolving credit facilities, notes, term loans, lines of credit, or any other type of credit facility, for which any Company is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate, without any profit participation or yield enhancement as a return on the repayment of the funds received by such Company; and for which such Company has granted a lien on its assets, superior or prior to the claim of the holders of any Tranche B or Traditional Subordinated Debt.

**"Total Consideration"** shall mean the purchase price paid at the time of the effective date of the Sale, plus the assumption or payoff by the buyer of indebtedness (secured and unsecured), with a deduction for acquired accounts receivables, not including paid time off liabilities and any other assumed employee benefits.  For purposes of computing any fees payable to SSG hereunder that are computed based on the Total Consideration, non-cash consideration shall be valued as follows:  (a) publicly traded securities shall be valued at the average of their closing prices (as reported in The Wall Street Journal) for the five (5) trading days prior to the closing of the Sale Transaction; and (b) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by the Company Group and SSG. If such aggregate consideration is increased by contingent payments such as an "earnout" or other monetary agreement in the Transaction, the portion of SSG's fee relating thereto shall be calculated and paid when and as such contingent payments or other monetary amounts are received.

**"Traditional Subordinated Debt"** means indebtedness which any Company is obligated to repay on a fixed schedule with interest on the unpaid balance therefor at a fixed interest rate or a floating rate and for which (i) the lender does not have a

Mr. Joel Freedman
June 7, 2019
Page 7

claim to or lien on the assets of such Company; and (ii) part of the lender's overall return is anticipated to consist of a participation in the profits of such Company and/or some other type of income enhancement (whether realized through equity warrants conversions of the debt to equity, or otherwise) which has the effect of raising the overall return to the lender above the level that could be realized solely due to the receipt of stated interest income.

**"Tranche B Loan"** means indebtedness which any Company is obligated to repay on a fixed schedule with interest on the unpaid balance therefor at a fixed interest rate or a floating rate higher than that of Senior Debt, and for which such Company has granted a lien on its assets, junior to the claim of the holders of Senior Debt.

**"Transaction Fee"** shall mean a Financing Fee and/or Sale Fee and/or Restructuring Fee.

D.  **Term of Engagement**

This Engagement Agreement shall remain in force (the "Engagement Term") for a period of six (6) months from the date of acceptance of this Engagement Agreement by PAHH, RRG and PAHS, on behalf of the PAHS Group, and will continue thereafter unless terminated by SSG upon thirty (30) days prior written notice to the Company Group or by the Company Group upon fifteen (15) days prior written notice to SSG; provided, however, that either party may terminate this Engagement Agreement by written notice immediately upon the closing of a Transaction.  Upon the termination of this Engagement Agreement, neither party shall have any further obligations to the other except that:  (a) termination of the Engagement Agreement shall not affect SSG's right to indemnification under the Indemnification paragraph below; (b) the Company Group shall remain obligated to pay SSG any unpaid Monthly Fees and to reimburse SSG for any expenses pursuant to Section B incurred through the date of the termination of the Engagement Agreement; and (c) if a Transaction is consummated within twelve (12) months ("Trailer Term") of the termination of this Engagement Agreement with any party that SSG was in communication with other than any Existing Financing Source, the Company Group shall remain obligated to pay a Financing Fee and/or Sale Fee and/or Restructuring Fee, as calculated above. Sections B, D, E, F G, K and L (entitled SSG's Compensation, Term of Engagement, Indemnification, Miscellaneous, Scope of Duties, HIPAA and Confidentiality, respectively) of this Engagement Agreement shall survive the expiration or termination of this Engagement Agreement indefinitely.

E.  **Indemnification**

Each of SSG and the Company Group hereby acknowledges and agrees to the indemnification arrangements between the parties hereto as described on Attachment A hereto, which Attachment is incorporated herein and forms an integral part hereof.

Mr. Joel Freedman
June 7, 2019
Page 8

F.    **Miscellaneous**

No fee payable to any other financial advisor or finder by the Company Group in connection with the subject matter of this Engagement Agreement shall reduce or otherwise affect any fee payable to SSG hereunder. This Engagement Agreement and the NDA (defined below) sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto. This Engagement Agreement cannot be modified or changed, nor can any of its provisions be waived, except by written agreement signed by both parties. The benefits of this Engagement Agreement shall inure to the respective successors and assigns of the parties hereto and of the SSG Indemnified Parties and their successors, assigns and representatives, and the obligations and liabilities assumed in this Engagement Agreement by the parties hereto shall be binding upon their respective successors and assigns. Notwithstanding anything to the contrary herein, SSG may not assign this Engagement Agreement or any of its rights or delegate its duties hereunder without the prior written consent of the Company Group.

This Engagement Agreement may be executed in any number of counterparts, which counterparts, taken together, shall constitute one and the same Engagement Agreement.

This Engagement Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to the application of any conflict of laws principles.

G.    **Scope of Duties**

The Company Group hereby acknowledges and agrees that:  (a) it has retained SSG for the purposes set forth in this Engagement Agreement and that the rights and obligations of the parties hereto are contractual in nature, and (b) SSG has not made any warranties or guarantees of any nature with respect to the success or satisfactory conclusion of any Transaction or as to the economic, financial or other results which may be obtained or experienced by the Company Group as a result thereof.   Both the Company Group and SSG disclaim any intention to impose fiduciary  duties  or  obligations  on  the  other  by  virtue  of  the  engagement contemplated by this Engagement Agreement and no other person or entity shall have any rights or obligations hereunder except as expressly provided herein.

H.    **Bankruptcy Court Proceedings**

If any Company files a Chapter 11 bankruptcy proceeding, either voluntary or involuntary, during the Engagement Term, then (i) the Company Group shall use its commercially  reasonable  efforts  to  have  SSG  retained  upon  the  same  or substantially similar terms and shall have this Engagement Agreement and SSG's retention as the Company Group's exclusive investment banker approved by a Court of competent jurisdiction; and (ii) if such filing is by PAHS and its subsidiaries representing  all  or  substantially  all  of  its  assets  and  liabilities,  then  SSG's engagement by PAHH will be terminated as of the date of such filing; and if such filing is by Center City Healthcare, LLC, a subsidiary of PAHS, only, then SSG's engagement by Center City Healthcare, LLC will be terminated as of the date of such filing.

Mr. Joel Freedman
June 7, 2019
Page 9

I.   **Other Matters**

SSG has the right, following the Financing, Sale or Restructuring closing, to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company Group hereunder and the Company Group's prior written approval thereof shall be required except to the extent that the information contained therein is publicly available.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), SSG is required to obtain, verify and record information that identifies its clients, which information may include the name and address of the Company Group and its senior management team as well as other information that will allow SSG to properly identify its clients.  Additionally, SSG maintains important disclosures on its web site www.ssgca.com. These disclosures may be updated periodically on an as-needed basis.  The Company Group agrees to accept and receive all of these disclosures by electronically accessing the website referenced above and acknowledges that printed hard copies of these disclosures are available upon request by contacting SSG directly at (610) 940-1094.

J.   **Securities Platform**

All transactions involving the sale or purchase of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated thereunder) are offered through SSG Capital Advisors, LLC ("SCA") which is an affiliated registered Broker-Dealer in good standing with the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC").  Principals of SSG are registered representatives of SCA.  Therefore, SCA is included collectively as "SSG" with all the rights and obligations thereto under the terms of this Engagement Agreement.

To the extent a Transaction Fee is payable to SSG in connection with a Transaction constituting the purchase or sale of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated thereunder), such Transaction Fee (that, for the avoidance of doubt, does not include the Initial Fee or Monthly Fees) shall be specifically paid to SCA.

K.   **HIPAA**

SSG shall not receive any information which is, or may be, considered to be Protected Health Information ("PHI") under, and as defined in, the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. 1320d ("HIPAA") and current and future HIPAA Requirements.  SSG acknowledges that in connection with the regulations promulgated thereunder, including without limitation the federal privacy regulations contained in 45 C.F.R. Part 160 and 164 (the "Federal Privacy Regulations"), the federal security standards contained in 45 C.F.R. Part 164 (the "Federal Security Regulations"), and the federal standards for electronic transactions contained in 45 C.F.R. Parts 160 and 162, all collectively referred to herein as the "HIPAA Requirements," SSG shall not be considered or deemed to be a business associate of any Company under the HIPAA Requirements.  In the event that SSG inadvertently received any PHI, it shall immediately return such PHI, notify

Mr. Joel Freedman
June 7, 2019
Page 10

the applicable Company of such inadvertent disclosure and comply with all applicable federal and state laws in connection therewith.

L.    **Confidentiality**

Disclosure of all information pursuant to or in connection with this Engagement Agreement shall be governed by the terms of the Confidentiality Agreement, dated as of April 24, 2019, between PAHS and SSG Capital Advisors, LLC (the "NDA").

Please indicate your acceptance of the foregoing by executing and returning the enclosed copy of this letter.

**SSG ADVISORS, LLC**

By:    _____
J. Scott Victor
Managing Director

ACCEPTED:

**PHILADELPHIA ACADEMIC HEALTH HOLDINGS, LLC**
**PHILADELPHIA ACADEMIC RISK RETENTION GROUP, LLC**
**PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, on behalf of itself and its wholly-owned subsidiaries

By:    _____
Joel Freedman
Chief Executive Officer and President

Mr. Joel Freedman
June 7, 2019
Page 11

**ATTACHMENT A**
**INDEMNIFICATION PROVISIONS**

The Company Group agrees to indemnify, defend and hold harmless SSG or SCA, and their Affiliates, the respective partners, members, directors, officers, agents and employees of SSG, SCA, and their Affiliates (the foregoing being referred to herein individually as an "SSG Indemnified Party" and collectively as the "SSG Indemnified Parties") from and against any and all losses, claims, damages, liabilities or costs, as and when incurred, which are asserted against any SSG Indemnified Party, directly or indirectly, by any third party, and which are in any way related to SSG acting for the Company Group under the Engagement Agreement of which this Attachment A forms a part, including, without limitation, in connection with:  (a) any act or omission by SSG related to its engagement as financial advisor under the Engagement Agreement; or (b) SSG's acceptance, or its performance or non-performance, of its obligations under said Engagement Agreement; provided, however, that the Company Group shall not be liable under the foregoing indemnity agreement in respect of any losses, claims, damages, liabilities or costs to the extent that such losses, claims, damages, liabilities or costs are found in a final judgment of a court of competent jurisdiction, not subject to further appeal, to have resulted from SSG's gross negligence, bad faith or willful misconduct.  The Company Group will reimburse the SSG Indemnified Parties for any reasonable and documented out-of-pocket legal or other expenses incurred by them, as and when incurred, in connection with defending against any such losses, claims, damages or liabilities or any action in respect thereof, whether or not in connection with pending or threatened litigation; provided, however, that the Company Group shall not be liable under the foregoing reimbursement agreement in respect of any losses, claims, damages, liabilities or costs to the extent that such losses, claims, damages, liabilities or costs are found in a final judgment of a court of competent jurisdiction, not subject to further appeal, to have resulted from SSG's gross negligence, bad faith or willful misconduct, and in which event SSG will promptly return all legal fees and other expenses paid by the Company Group on SSG's behalf.

The Company Group agrees that reliance by SSG on any publicly-available information from sources that are generally recognized as reliable, the information supplied by the Company Group to SSG in connection with said Engagement Agreement or any directions furnished by the Company Group that have been followed by SSG shall not constitute negligence, bad faith or willful misconduct by SSG.

The provisions of this Attachment A shall survive any termination of said Engagement Agreement.