**Exhibit B**


**Services Agreement**



## INTERIM SERVICES AGREEMENT

This INTERIM SERVICES AGREEMENT (this "**Agreement**"), entered into as of the 17th day of July, 2019, is by and between **RANDSTAD PROFESSIONALS US, LLC d/b/a Tatum**, a Delaware limited liability company, with offices at 150 Presidential Way, 3rd Floor, Woburn, Massachusetts 01801 ("**Tatum**"), and **Philadelphia Academic Health System, LLC**, a Delaware limited liability company, with offices at 1500 Market Street, Suite 2400, West Tower, Philadelphia, PA , 19102 (the "**Company**"). A "**Party**" shall mean either Tatum or the Company, as the case may be; the "**Parties**" shall mean Tatum and the Company, collectively.

WHEREAS, the Company desires to engage Tatum to perform certain outsourced interim services; and, Tatum is willing to provide the services of its personnel to perform such tasks subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, Tatum and the Company agree as follows:

1.      **Services**.  The services (the "**Services**") and fees will be more particularly described on one or more schedules (each, a "**Schedule**") mutually agreed upon by the Parties from time to time. As of the Effective Date, the Schedule attached hereto describes the Services that will be provided by the individual professional (the "**Tatum Professional**") identified on such Schedule. Schedules for additional Tatum Professionals may be added from time to time upon the mutual written agreement of the Parties.  In addition, upon the request of the Company and the execution of an additional Schedule to this Agreement, Tatum will provide search Services to the Company, all as more particularly described on such Schedule. Each Schedule will also set forth the term length for the Services to be provided by the Tatum Professional. Tatum will not remove or replace any Tatum Professional without the prior written consent of Company, except in the case of non-payment by Company, at which Tatum may remove them immediately.

2.      **Engagement.**  The Tatum Professional will be one of Tatum's professionals, and Tatum will be solely responsible for determining the conditions, terms and payment of compensation and benefits for the Tatum Professional.  The Company will be solely responsible for providing the Tatum Professional day-to-day guidance, supervision, direction, assistance and other information necessary for the successful and timely completion of the Services.  Tatum will have no oversight, control, or authority over the Tatum Professional with respect to the Services.  The Company acknowledges that it is solely responsible for the sufficiency of the Services for its purposes.  The Company will designate a management-level individual to be responsible for overseeing the Services, and the Tatum Professional will report directly to such individual with respect to the provision of the Services.  Unless the Tatum Professional is acting as an executive officer of the Company and is authorized by the Company to make such decision, the Company will not permit or require the Tatum Professional to be the ultimate decision making authority for any material decision relating to the Company's business, including, without limitation, any proposed merger, acquisition, recapitalization, financial strategy or restructuring.

Neither Tatum nor any Tatum Professional shall have any authority (and shall not hold itself or herself/himself out as having authority) to bind Company or its affiliates and neither Tatum nor the Tatum Professional shall make any agreements or representations on Company's or its affiliates' behalf without Company's prior written consent. Furthermore, neither Tatum nor the Tatum Professional shall have any authority to approve the incurrence of any cost or expenditure on behalf of Company or its affiliates.

Without limiting the generality of the foregoing, Tatum and a Tatum Professional will not be eligible under this Agreement to participate in any vacation, group medical or life insurance, disability, profit sharing or retirement benefits or any other fringe benefits or benefit plans offered by Company to its employees, and Company will not be responsible for withholding or paying any income, payroll, Social Security or other federal, state, or local taxes, making any insurance contributions, including unemployment or disability, or obtaining worker's compensation insurance on Tatum's or a Tatum Professional's behalf. Tatum shall be responsible for, and shall indemnify Company against, all such taxes or contributions, including penalties and interest.  Any persons employed by Tatum in connection with the performance of the Services shall be Tatum's employees and Tatum shall be fully responsible for them.

Tatum will provide, and require each Tatum Professional to provide, the Services in accordance with all applicable laws, rules, policies, and regulations, including any applicable policies and procedures of Company and/or its subsidiaries or affiliates, including, but not limited to, Company's policies and procedures regarding immunizations and background check screenings and relating to business and office conduct and use of the facilities, information technology, supplies, equipment, networks, and other resources.  Tatum shall require any Tatum Professional providing Services on-site at Client's facilities to maintain up-to-date immunizations for (1) Measles, Mumps, Rubella (MMR vaccine), (2) Varicella, (3) Tetanus, Diphtheria, Pertussis (Tdap vaccine), (4) Hepatitis B, and (5) Tuberculosis (TB). In addition, any Tatum Professional providing Services on-site at Client's facilities must have a 7-year criminal background check in current and previous counties of residence and employment that has been adjudicated by Tatum based on the nature of the Services provided and Client's industry.  Upon request, Tatum shall provide to Client satisfactory evidence that the applicable Tatum Professional has received relevant immunizations and a recent tuberculosis test, as well as a completed background check screening, in accordance with Client's policies. Consultant shall also complete Client's on-boarding and orientation process, if requested by Client.

**Issued By**
Randstad Contracts Dept.
356361862 07/18/2019

**Revision Date**
April 2018

**Page**
1



Tatum represents and warrants that the performance of Services under a Schedule do not and will not conflict with or result in any breach or default under any other agreement to which Tatum or the Tatum Professional is subject or would preclude the Tatum Professional from fully performing the Services. Any potential conflict must be disclosed to Company prior to the start date of the applicable Schedule.

At all times while this Agreement is in effect, Company shall have the right to request removal of any Tatum Professional if it is in Company's judgment that such removal is in the best interests of Company, its staff, or its patients, or if the Tatum Professional breaches any of the confidentiality provisions contained in this Agreement. Tatum agrees to immediately remove any such Tatum Professional upon receipt of Company's written request.

3.    **Fees and Expenses**. The Company will pay Tatum the fees set forth on the applicable Schedule. In addition, the Company will reimburse Tatum directly for all actual, reasonable, and pre-approved travel and out-of-pocket expenses incurred in connection with this Agreement (including any Schedules). Tatum shall invoice the Company for, and the Company shall pay to Tatum for further remittance to the appropriate taxing authorities, any sales or use taxes applicable to the Services. If the Company claims that it is exempt from any such sales or use taxes, then the Company must provide Tatum with an exemption certificate satisfactory to Tatum.

4.    **Payment Terms**. Company shall pay an initial deposit of $ 51, 000.00 as set forth in the schedule. prior to Tatum providing any Services hereunder. Tatum shall invoice against this deposit on a weekly basis. On or before the first Monday of the last full week of each calendar month during the Term of this Agreement, Company shall pay a deposit of $51,000. Tatum will continue to draw from this deposit on a weekly basis against the invoices.

Bank Name and Address: Bank of America Merrill Lynch, 1401 Elm Street, Dallas, TX 75202
Beneficiary: Tatum
Beneficiary Account Number: 8188293153
ABA Transit/Routing Number: 071000039
Please reference the Company's name in the body of the payment.

5.    **Effective Date and Termination**. This Agreement's "**Effective Date**" will be the earlier of (i) the date Tatum begins providing Services to the Company, or (ii) the date of the last signature to this Agreement as indicated on the signature page. In the event that a Party commits a breach of this Agreement (including any Schedule) and fails to cure the same within 10 days following delivery by the non-breaching Party of written notice specifying the nature of the breach, the non-breaching Party may terminate this Agreement or the applicable Schedule effective upon written notice of such termination. The termination rights set forth in this Section are in addition to and not in lieu of the termination rights set forth in each of the Schedules.

6.    **Hiring the Tatum Professional Outside of a Tatum Agreement**. If, at any time during the time frame in which a Tatum Professional is providing Services to the Company and for a period of 12-months thereafter, other than in connection with this Agreement or another Tatum agreement, the Company or any of its subsidiaries or affiliates employs such Tatum Professional, or engages such Tatum Professional as an independent contractor, the Company will pay Tatum a placement fee in an amount equal to 30% of the Annualized Compensation (as defined below). "**Annualized Compensation**" is defined as salary, incentive, signing and other bonuses, and any other compensation that may be earned by the Tatum Professional during the first 12 months of service with the Company (or its subsidiary or affiliate) regardless of when or if such compensation is actually paid. The placement fee shall be due upon the commencement of the Tatum Professional's employment or engagement with the Company (or its subsidiary or affiliate).

7.    **Warranties and Disclaimers**.    TATUM DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO ANY WARRANTIES OF QUALITY, PERFORMANCE, MERCHANTABILITY, OR FITNESS OF USE OR PURPOSE. WITHOUT LIMITING THE FOREGOING, TATUM REPRESENTS AND WARRANTS THAT THE TATUM PROFESSIONAL HAS THE REQUISITITE SKILL AND EXPERIENCE TO PERFORM THE SERVICES DESCRIBED IN THE APPLICABLE SCHEDULE, BUT TATUM MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT TO THE SERVICES PROVIDED HEREUNDER, AND TATUM WILL NOT BE RESPONSIBLE FOR ANY ACTION TAKEN BY THE COMPANY IN FOLLOWING OR DECLINING TO FOLLOW ANY OF THE TATUM PROFESSIONAL'S ADVICE OR RECOMMENDATIONS. THE SERVICES PROVIDED BY TATUM AND THE TATUM PROFESSIONAL HEREUNDER ARE FOR THE SOLE BENEFIT OF THE COMPANY AND ITS AFFILIATES AND NOT ANY UNNAMED THIRD PARTIES. THE SERVICES WILL NOT CONSTITUTE AN AUDIT, REVIEW, OPINION, OR COMPILATION, OR ANY OTHER TYPE OF FINANCIAL STATEMENT REPORTING OR ATTESTATION ENGAGEMENT THAT IS SUBJECT TO THE RULES OF THE AICPA OR OTHER SIMILAR STATE OR NATIONAL PROFESSIONAL BODIES OR LAWS AND WILL NOT RESULT IN AN OPINION OR ANY FORM OF ASSURANCE ON INTERNAL CONTROLS.

8.    **Limitation of Liability; Indemnity**.

**Issued By**
Randstad Contracts Dept.
35636186.2 07/18/2019

Revision Date
April 2018

Page
2



(a)     **EXCEPT IN THE EVENT OF TATUM'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR VIOLATION OF LAW, TATUM'S LIABILITY IN ANY AND ALL CATEGORIES AND FOR ANY AND ALL CAUSES ARISING UNDER THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, WILL, IN THE AGGREGATE, NOT EXCEED THREE TIMES THE FEES PAYABLE BY THE COMPANY TO TATUM OVER THE THREE MONTHS OF THIS AGREEMENT PRECEDING DATE THAT THE CLAIM AROSE WITH RESPECT TO THE TATUM PROFESSIONAL FROM WHOM THE LIABILITY ARISES. EXCEPT IN THE EVENT OF A PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR VIOLATION OF LAW, IN NO EVENT WILL A PARTY BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, PUNITIVE, INDIRECT OR SPECIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, INTERRUPTION OR LOSS OF BUSINESS, PROFIT OR GOODWILL.**

(b)     **EACH PARTY AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OTHER PARTY AND ITS OFFICERS, MANAGERS, EMPLOYEES, MEMBERS, AGENTS, REPRESENTATIVES, CONSULTANTS, CONTRACTORS, AND LENDERS FROM AND AGAINST ANY AND ALL LIABILITIES, LOSSES, DAMAGES, CLAIMS, CAUSES OF ACTION, PENALTIES, COSTS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) TO THE EXTENT CAUSED BY THE INDEMNIFYING PARTY'S GROSS NEGLIGENCE, FRAUD, OR WILLFUL MISCONDUCT, WHETHER IT BE SOLE OR IN CONCERT WITH OTHERS, IN CONNECTION WITH THE PERFORMANCE OF THE SERVICES HEREUNDER.**

9.     **Insurance.** (Please select appropriate checkbox)

o (private company) To the extent the Company has directors and officers liability insurance in effect, during the term of this Agreement, the Company will provide such insurance coverage for any Tatum Professional serving as an officer or executive of the Company under this Agreement at no additional cost to Tatum or the Tatum Professional. Furthermore, the Company will maintain such insurance coverage with respect to occurrences arising during the term of this Agreement for at least five years following the termination or expiration of the applicable Schedule or will purchase a directors and officers extended reporting period or "tail" policy to cover the Tatum Professional for such five year period. The Company's directors and officers insurance must be primary and non-contributory. Upon the execution of this Agreement and at any other time requested by Tatum, the Company will provide Tatum a certificate of insurance evidencing that the Company is in compliance with the requirements of this Section with a note in the Description of Operations section of the certificate indicating that the coverage is extended to the Tatum Professional.

During the term of this Agreement, Tatum shall maintain the following insurance coverages at the following limits: (a) commercial general liability in an amount of at least $1,000,000 per occurrence, (b) workers' compensation and employer's liability in amounts as required by law, and (c) auto liability in the minimum amount required by law. Company shall be listed as additional insured under such commercial general liability policy, and Tatum shall forward a certificate of insurance verifying such insurance upon execution of this Agreement to COI@americanacademic.com and otherwise upon Company's request during the term. The above insurance coverage shall not be cancellable except upon 30 days' prior written notice to Company. The commercial general liability and auto liability policies shall be primary and non-contributory with any policies of insurance maintained by Company.

In the event Company files one or more Chapter 11 Bankruptcy proceedings during the term of a Schedule, Company shall promptly file a motion with the Bankruptcy Court requesting the Court's approval of this Agreement, and Company shall use its commercially reasonable efforts to have this Agreement and the applicable Schedule(s) approved by the Bankruptcy Court. Should such approval not be granted by the Bankruptcy Court, this Agreement shall be of no further force and effect and shall terminate upon such denial, with no further obligation of Company hereunder except for the payment of any amounts owing by Company at such time, unless such payment is prohibited by the Bankruptcy Court or applicable law.

11.     **Sanctions.** Company represents that any provision of services by Company and any payment by Company to Tatum shall not result in any breach of any trade, economic or financial sanctions laws or regulations. Tatum represents and warrants that Tatum and any Tatum Professional are not excluded, debarred, suspended, or otherwise ineligible to participate in Federal healthcare programs or in Federal procurement or non-procurement programs, or has been convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but have not yet been excluded, debarred, suspended, or otherwise declared ineligible (each, an "Ineligible Person"). If, at any time during the term of this Agreement or a Schedule Tatum or a Tatum Professional becomes an Ineligible Person or proposed to be an Ineligible Person, Tatum shall immediately notify Company of the same, and Company may terminate this Agreement or the applicable Schedule(s) immediately upon written notice to Tatum.

12.     **Governing Law, Arbitration and Witness Fees.**

(a)     This Agreement will be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to conflicts of laws provisions.

**Issued By**
Randstad Contracts Dept.
35636186.2 07/18/2019

**Revision Date**
April 2018

**Page**
3



(b)     If the Parties are unable to resolve any dispute arising out of or in connection with this Agreement, the Parties agree and stipulate that any such disputes will be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("**AAA**"). The arbitration will be conducted in the Philadelphia, Pennsylvania office of the AAA by a single arbitrator selected by the Parties according to the rules of the AAA, and the decision of the arbitrator will be final and binding on both Parties. In the event that the Parties fail to agree on the selection of the arbitrator within 30 days after either Party's request for arbitration under this Section, the arbitrator will be chosen by the AAA. The arbitrator may in his or her discretion order documentary discovery but will not allow depositions without a showing of compelling need. The arbitrator will render his or her decision within 90 days after the call for arbitration. Judgment on the award of the arbitrator may be entered in and enforced by any court of competent jurisdiction. The arbitrator will have no authority to award damages in excess or in contravention of this Agreement and may not amend or disregard any provision of this Agreement, including this Section. Notwithstanding the foregoing, either Party may seek appropriate injunctive relief from any court of competent jurisdiction, and Tatum may pursue payment of any unpaid amounts due under this Agreement through any court of competent jurisdiction.

(c)     In the event any professional of Tatum (including, without limitation, any Tatum Professional) is requested or authorized by the Company or is required by government regulation, subpoena, or other legal process to produce documents or appear as witnesses in connection with any action, suit or other proceeding initiated by a third party against the Company or by the Company against a third party, the Company will, so long as Tatum is not a party to the proceeding in which the information is sought, reimburse Tatum for its professional's time (based on customary rates) and expenses, as well as the fees and expenses of its counsel, incurred in responding to such requests. This provision is in addition to and not in lieu of any indemnification obligations the Company may have under this Agreement.

13.     **Confidentiality; Ownership of Materials.**

(a)     Tatum acknowledges that it and any Tatum Professional will have access to information that is considered confidential and proprietary by Company, including, without limitation, information pertaining to business operations and strategies, finances, personnel, or operations of Company and its affiliates, in each case whether spoken, printed, electronic, or in any other form or medium, whether or not marked as proprietary or confidential (collectively, the "Confidential Information"). The terms and existence of this Agreement shall also be considered Confidential Information. Any Confidential Information developed by a Tatum Professional during the term of a Schedule shall be subject to the terms and conditions of this subsection. Tatum and each Tatum Professional will not use any information submitted by Company or any other Confidential Information for any reason or purpose other than the performance of the Services under this Agreement and will treat all Confidential Information as strictly confidential, not disclose Confidential Information or permit it to be disclosed, in whole or part, to any third party without the prior written consent of Company in each instance. Tatum or a Tatum Professional shall notify Company immediately in the event Tatum or a Tatum Professional becomes aware of any loss or disclosure of any Confidential Information. Confidential Information shall not include information that (1) is or becomes generally available to the public other than through Tatum's or a Tatum Professional's breach of this Agreement; (2) is communicated to Tatum or a Tatum Professional by a third party that had no confidentiality obligations with respect to such information; or (3) is required to be disclosed by law, including without limitation, pursuant to the terms of a court order, provided that Tatum has given Company prior notice of such disclosure and an opportunity to contest such disclosure.

(b)     To the extent applicable, Tatum and each Tatum Professional shall be required to comply with all federal and state laws and regulations, and all bylaws, rules, regulations, policies, and procedures of Company regarding the confidentiality of information of patients and individuals, including, without limitation, the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations, as amended (collectively "HIPAA"). To the extent Tatum or a Tatum Professional accesses, receives, maintains, or transmits any information which is, or may be, considered to be Protected Health Information ("PHI") under HIPAA, then Tatum and each Tatum Professional shall comply with the terms and conditions of the Business Associate Agreement attached hereto as <u>Exhibit A, to the extent it is applicable to the provision of Services</u>.

(c)     Company is and shall be, the sole and exclusive owner of all right, title, and interest throughout the world in and to all of the results and proceeds of the Services, including, but not limited to, the deliverables provided to Company as part of the Services (collectively, the "Deliverables"), including all patents, copyrights, trademarks, trade secrets, and other intellectual property rights therein. Tatum agrees, and shall ensure that any Tatum Professional agrees, that the Deliverables are a "work made for hire" as defined in 17 U.S.C. § 101 for Company. If, for any reason, any of the Deliverables do not constitute a "work made for hire", Tatum and any Tatum Professional hereby irrevocably assigns to Company, in each case without additional consideration, all right, title, and interest throughout the world in and to the Deliverables, including all intellectual property rights therein. In addition, Company is and shall be the owner of the data and information, including Confidential Information, provided to a Tatum Professional by Company or obtained by a Tatum Professional in the performance of the Services.

(d)     Upon termination or expiration of this Agreement or any applicable Schedule, Tatum and the applicable Tatum Professional shall deliver to Company all Deliverables (whether complete or incomplete) and all hardware, software, tools, equipment, or other materials provided by Company for the Tatum Professional's use. In addition, the applicable Tatum Professional shall immediately cease the use of and deliver to Company all tangible documents and materials (and any copies) containing, reflecting, incorporating, or


a Randstad company

based on any Confidential Information, including all data or information provided by Company to the Tatum Professional under this Agreement, used or maintained by the Tatum Professional related to the Services, or developed by the Tatum Professional in the performance of the Services hereunder for Company. Tatum and the applicable Tatum Professional shall not retain any copies of any Confidential Information or any such data or information in any format and shall permanently erase all of the Confidential Information and Company's data and information from Tatum's and the Tatum Professional's computer systems. Upon completion, Tatum shall certify in writing to Company that it has complied with the requirements of this Section.

14.    **Miscellaneous.** This Agreement together with all Schedules constitutes the entire agreement between the Parties with regard to the subject matter hereof and supersedes any and all agreements, whether oral or written, between the Parties with respect to its subject matter. No amendment or modification to this Agreement will be valid unless in writing and signed by both Parties. If any portion of this Agreement is found to be invalid or unenforceable, such provision will be deemed severable from the remainder of this Agreement and will not cause the invalidity or unenforceability of the remainder of this Agreement, except to the extent that the severed provision deprives either Party of a substantial portion of its bargain. Neither Party will be deemed to have waived any rights or remedies accruing under this Agreement unless such waiver is in writing and signed by the Party electing to waive the right or remedy. The waiver by any Party of a breach or violation of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach of such provision or any other provision of this Agreement. Neither Party will be liable for any delay or failure to perform under this Agreement (other than with respect to payment obligations) to the extent such delay or failure is a result of an act of God, war, earthquake, civil disobedience, court order, labor dispute, or other cause beyond such Party's reasonable control. Neither Party may assign its rights or obligations under this Agreement without the express written consent of the other Party; provided however Tatum may assign any receivables under this Agreement to any of its affiliates. Nothing in this Agreement will confer any rights upon any person or entity other than the parties hereto and their respective successors and permitted assigns and the Tatum Professionals. The expiration or termination of this Agreement or any Schedule will not destroy or diminish the binding force and effect of any of the provisions of this Agreement or any Schedule that expressly, or by reasonable implication, come into or continue in effect on or after such expiration or termination, including, without limitation, provisions relating to payment of fees and expenses (including witness fees and expenses), hiring the Tatum Professionals, governing law, arbitration, limitation of liability and indemnity. This Agreement and any Schedule may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. A facsimile, electronic, or .pdf signature shall be considered valid as if an original.

Tatum shall not use the Company's logo or name in any press release, general circulation advertisement, or to identify Company as a client of Tatum without the Company's prior written consent. This Agreement is applicable only to the Tatum division of Randstad Professionals US, LLC, and is not intended to apply to any other division of Randstad Professionals US, LLC. Tatum agrees to comply with all provisions of the Patient Protection and Affordable Care Act ("ACA") applicable to its Tatum Professional(s) employed by Tatum, including the employer shared responsibility provisions relating to the offer of "minimum essential coverage" to "full-time employees" and their "dependents" (as those terms are defined in Internal Revenue Code Section 4980H and related regulations) and the applicable information reporting provisions under Internal Revenue Code Section 6055 and 6056 and related regulations. This paragraph is intended by the Parties as the full and complete expression of Tatum's ACA obligations under this Agreement, and the ACA shall not be deemed within the scope of any other more general provision of this Agreement.

To the extent this Agreement is subject to Section 1861(v)(1)(I) of the Social Security Act, Tatum agrees to make available upon written request of the Secretary of Health and Human Services or the United States Comptroller General or any of their duly authorized representatives, this Agreement, and any books, documents, and records of Tatum that are necessary to certify the nature and extent of costs incurred by Company under this Agreement until the expiration of four years after the termination of this Agreement. Tatum agrees that if Tatum carries out any of the duties or obligations contemplated by this Agreement through a contract or subcontract with a value of $10,000 or more over a 12-month period, such contract or subcontract shall require this same access to the books, documents, and records of such contractor or subcontractor.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the dates set forth below.

| RANDSTAD PROFESSIONALS US, LLC d/b/a TATUM: | Philadelphia Academic Health System, LLC: |
|---|---|
| By: *Joy E. Barbour* | By: |
| Name: Joy E. Barbour | Name: Joel Freedman |
| Title: Assistant Vice President | Title: President |
| Date: Jul 18, 2019 | Date: 7/18/19 |

Issued By
Randstad Contracts Dept.
35636186.2 07/18/2019

Revision Date
April 2018

Page
5



## Schedule to Interim Services Agreement

This Schedule is entered into in connection with that certain Interim Services Agreement, dated July 17, 2019 (the "**Agreement**"), by and between **Randstad Professionals US, LLC d/b/a Tatum** ("**Tatum**") and Philadelphia Academic Health System, LLC (the "**Company**") and will be governed by the terms and conditions of the Agreement.

1.    **Tatum Professional Name:** Phil Porter

2.    **Service Description or Position: Interim CFO**

- Tatum Professional will provide Interim CFO services for Company and its subsidiaries (the "Business"), including, without limitation, Center City Healthcare, LLC d/b/a Hahnemann University Hospital and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children and their respective affiliated physician groups
- Tatum Professional shall be an officer of Company and shall have primary responsibility for planning, implementing, and managing the financial operations of the Business (other than financial restructuring matters), including, but not limited to:
  - Participate as an active member of the Company executive team to define overall strategic and financial goals for the Business;
  - Ensure that financial results are effectively communicated to all relevant parties;
  - Provide oversight and advise the Board of Managers regarding status of cash flow management and initiatives;
  - Provide oversight and ensure timely compliance with tax reporting obligations of the Business;
  - Serve as a point of contact for the Business's lenders and other capital partners and facilitating all reporting requirements under any loan, master lease, equity and other financing documents applicable to the Business;
  - Provide recommendations regarding all major financial decisions (other than decisions regarding financial restructuring matters) and oversee the implementation of financial policy decisions made by senior Business leaders;
  - Oversee the preparation and presentations of Company's operating and capital budgets;
  - Provide support to external assurance and tax firm(s) to assure cost effective engagements;
  - Work with third party reimbursement advisors to support financial reporting and communicate with lenders as needed;
  - Identify and make recommendations regarding opportunities for improvement in operations and processes;
  - Oversee the implementation of policies, procedures, and internal control mechanisms to ensure that the expenditure of funds and recording of transactions are in compliance with Business policies and procedures, as well as generally accepted accounting principles, and ensure that all applicable staff are knowledgeable regarding these requirements;
  - Serve as a liaison between applicable Business departments, managers, and financial and administrative personnel to provide appropriate coordination and consistency with policies and procedures, and transfer of funds, as needed;
  - Supervise and evaluate performance of all staff reporting to this position, including promoting an open environment which builds trust and provides opportunities for personnel to offer suggestions, obtain clarification, and voice concerns; and
  - Other tasks and responsibilities of a Chief Financial Officer as requested by the Board of Managers.
  - Tatum Professional may be requested from time to time to perform certain accounting, tax and other financial consulting services to the Company's parent companies or its other affiliates (other than the Company's subsidiaries). Tatum Professional will provide to the Company on a weekly basis the allocation of time spent by Tatum Professional performing such services along with an invoice for the Company to submit to its parent companies or such other affiliates (other than the Company's subsidiaries) for reimbursement by them to the Company, at an hourly rate of $255 per hour, in .20 hourly increments.

3.    **Company Supervisor:** the Company's Board of Managers

4.    **Start Date:**    Upon entry of an order by the United States Bankruptcy Court for the District of Delaware approving the Agreement

35636186.2 07/18/2019



5.      **Term:** Until December 23, 2019, unless terminated as set forth herein

6.      **Termination:**

Either Party may terminate this Schedule at any time for any reason upon five (5) business days' written notice to the other Party.

(b)      Tatum may terminate this Schedule immediately upon written notice to the Company if: (i) the Company is engaged in or asks Tatum or the Tatum Professional to engage in or ignore any illegal or unethical activity; (ii) the Tatum Professional ceases to be a professional of Tatum for any reason; (iii) the Tatum Professional becomes disabled; or (iv) the Company fails to pay any amounts due to Tatum under the Agreement when due or fails to pre-pay the monthly deposit.. For purposes of the Agreement, disability will be defined by the applicable policy of disability insurance or, in the absence of such insurance, by Tatum's management acting in good faith. Notwithstanding the foregoing, in lieu of terminating this Schedule under (ii) and (iii) above, upon the mutual agreement of the Parties, the Tatum Professional may be replaced by another Tatum professional.

(c)      The termination rights set forth in this section are in addition to and not in lieu of the termination rights set forth in the Agreement.

7.      **Fees:** Except as otherwise set forth below, the Company will pay to Tatum a fee of $12,750 weekly for the Tatum Professional. If Company is paying a weekly fee, the fees will be prorated for the first and final fee period based on the number of days in such period. The weekly fee includes allowance for holidays, personal and sick days, and vacation for the Tatum Professional consistent with the Company's policy as it applies to similarly situated employees of the Company.

8.      **Billings:** Tatum will bill for Services weekly in arrears and apply the prepaid deposit against the invoice amounts on a weekly basis.

As a condition to providing the Services, Tatum requires a security deposit in the amount equal to $51,000 (the "**Deposit**"), which is due upon execution of this Schedule, after which it shall pay additional monthly deposits as prescribed for in Section 4 of the Agreement. Upon the expiration or termination of the Agreement, Tatum will return to the Company the balance of the Deposit remaining under the Agreement after application of any amounts to the Company's unfulfilled payment obligations to Tatum for performed Services.

In the event of a conflict between the terms and conditions of this Schedule and the Agreement, the terms and conditions of the Agreement will control.

**Randstad Professionals US, LLC d/b/a Tatum:**

By: *Joy E. Barbour*
    Joy E. Barbour (Jul 18, 2019)

Name:   Joy E. Barbour

Title:   Assistant Vice President

Date:   Jul 18, 2019

**Philadelphia Academic Health System, LLC:**

By: _____

Name:   Joel Freedman

Title:   President

Date:   7/18/19

7

35636186 2 07/18/2019



**EXHIBIT A**

**BUSINESS ASSOCIATE AGREEMENT**

This Business Associate Agreement (the "BA Agreement"), effective as of July 17, 2019 (the "Effective Date") is made by and among Philadelphia Academic Health System, LLC ("Business Associate") and Randstad Professionals US, LLC d/b/a Tatum ("Sub-Business Associate"). Business Associate and Sub-Business Associate shall be collectively referred to herein as the "Parties." Business Associate and Sub-Business Associate acknowledge and agree that the rights and obligations in this BA Agreement shall not apply, and this BA Agreement shall have no legal effect, unless and until Sub-Business Associate performs services for, and obtains Protected Health Information from, the Business Associate in a manner that qualifies Sub-Business Associate as a "Business Associate" to the end client covered entity within the meaning of 45 C.F.R. Section 160.103.

WHEREAS, Business Associate and Sub-Business Associate have entered into the Interim Services Agreement to which this BA Agreement is attached (the "Subcontract") pursuant to which Sub-Business Associate performs certain services for Business Associate and in connection with Sub-Business Associate providing such services to Business Associate pursuant to the Subcontract, Sub-Business Associate may, on behalf of Business Associate, create, receive, maintain, or transmit certain Protected Health Information ("PHI") on behalf of one or more Covered Entities;

WHEREAS, Business Associate and Sub-Business Associate intend to protect the privacy and provide for the security of PHI disclosed pursuant to this BA Agreement and the Subcontract in compliance with the Health Insurance Portability and Accountability Act of 1996, Subtitle D of the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH"), and regulations and other guidance promulgated under both laws by the U.S. Department of Health and Human Services (collectively, "HIPAA Law"), as well as other applicable federal and state laws; and

WHEREAS, Business Associate and Sub-Business Associate enter into this BA Agreement for the purpose of ensuring compliance with the requirements of the HIPAA Law and relevant State Privacy and Security Laws.

NOW THEREFORE, the premises having been considered and with acknowledgment of the mutual promises and of other good and valuable consideration herein contained, the Parties, intending to be legally bound, hereby agree as follows:

I.      **DEFINITIONS.**  Terms not defined below shall have the meaning set forth in the HIPAA Law.

A.      Individual.  "Individual" shall have the same meaning as the term "individual" in 45 CFR §160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR §164.502(g).

B.      Breach.  "Breach" shall have the same meaning as the term "breach" in 45 CFR §164.402.

C.      Designated Record Set.  "Designated Record Set" shall have the same meaning as the term "designated record set" in 45 CFR §164.501.

D.      Electronic Protected Health Information, EPHI or Electronic PHI.  "Electronic Protected Health Information", "EPHI" or "Electronic PHI" shall have the same meaning as the term "electronic protected health information" in 45 CFR §160.103, limited to the information



created or received by Sub-Business Associate from or on behalf of Business Associate and the applicable Covered Entity(ies) pursuant to the Subcontract.

E.      Encrypted or Encryption.  "Encrypted" or "Encryption" shall mean encryption that meets the U.S. Department of Health and Human Services Guidance Specifying the Technologies and Methodologies that Render Protected Health Information Unusable, Unreadable, or Indecipherable to Unauthorized Individuals for Purposes of the Breach Notification Requirements under Section 13402 of HITECH Act.

F.      Privacy Rule.  "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A and E, as amended by the HITECH Act and as may otherwise be amended from time to time.

G.      Protected Health Information or PHI.  "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in 45 CFR §160.103, limited to the information created or received by Sub-Business Associate from or on behalf of Business Associate and the applicable Covered Entity(ies) pursuant to the Subcontract.  As used in this BA Agreement, Protected Health Information shall also include Electronic PHI.

H.      Required by Law.  "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR §164.103.

I.      Secretary.  "Secretary" shall mean the Secretary of the U.S. Department of Health and Human Services or his or her designee.

J.      Security Incident.  "Security Incident" shall have the same meaning as the term "security incident" in 45 CFR §164.304.

K.      Security Rule.  "Security Rule" shall mean the regulations found at 45 CFR Part 160 and Part 164, Subparts A and C, as amended by the HITECH Act and as may otherwise be amended from time to time.

L.      State Privacy and Security Laws.  "State Privacy and Security Laws" shall mean all applicable state Laws relating to privacy, security, data breach and confidentiality of the information provided to Sub-Business Associate under this BA Agreement.

M.      Subcontractor.  "Subcontractor" shall have the same meaning as the term "subcontractor" in 45 CFR § 160.103.

N.      Unsecured Protected Health Information.   "Unsecured Protected Health Information" or "Unsecured PHI" shall have the same meaning as the term "unsecured protected health information" in 45 CFR §164.402.

## II.    APPLICABILITY.

This BA Agreement applies to the Subcontract between Business Associate and Sub-Business Associate as described above.

## III.   USE OR DISCLOSURE OF PHI BY SUB-BUSINESS ASSOCIATE.

A.      Except as otherwise limited in this BA Agreement, Sub-Business Associate may use or disclose Protected Health Information solely to perform functions, activities, or services for, or on behalf of, Business Associate as specified in the Subcontract, provided that such use or disclosure would not violate the Privacy Rule, if done by Business Associate or the applicable Covered Entity.



B.  Except as otherwise limited in this BA Agreement, Sub-Business Associate may use PHI for the proper management and administration of Sub-Business Associate or to carry its legal responsibilities. Except as otherwise limited in this BA Agreement, Sub-Business Associate may disclose PHI for the proper management and administration of Sub-Business Associate, provided that disclosures are Required by Law, or Sub-Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies Sub-Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

C.  Sub-Business Associate shall only use and disclose PHI if such use or disclosure complies with each applicable requirement of 45 CFR §164.504(e).

D.  Sub-Business Associate shall use reasonable efforts to limit uses, disclosures, and requests for PHI to the minimum necessary to accomplish the intended purposes of such use, disclosure or request, in accordance with the minimum necessary standards at 45 CFR § 164.502(b) and in any guidance issued by the Secretary.

## IV.  DUTIES OF SUB-BUSINESS ASSOCIATE RELATIVE TO PHI.

A.  Sub-Business Associate shall not use or disclose PHI other than as permitted or required by this BA Agreement or as Required by Law.

B.  Sub-Business Associate shall be directly responsible for compliance with the relevant requirements of the Privacy Rule to the same extent as Business Associate.

C.  Sub-Business Associate shall comply with the applicable provisions of the Security Rule directing the implementation of Administrative, Physical and Technical Safeguards for Electronic Protected Health Information and the development and enforcement of related policies, procedures, and documentation standards (including but not limited to designation of a security official), and shall enter into written agreements with any Subcontractors that create, receive, maintain, or transmit Electronic Protected Health Information on behalf of Sub-Business Associate pursuant to which the Subcontractors shall agree to comply with the applicable requirements of the Security Rule. Sub-Business Associate shall implement safeguards and policies, procedures, and documentation consistent with the requirements of 45 C.F.R. §§ 164.306, 164.308, 164.310, 164.312, 164.314 and 164.316. Any hard drives on any computers or laptops that are used to access, receive, send, or maintain Covered Entities' Electronic Protected Health Information must be Encrypted and all communications must be Encrypted if sending Electronic Protected Health Information over an open network. Mobile devices or external or removable media, including, without limitation backup tapes, used for sending, receiving, or storing Electronic Protected Health Information must be Encrypted and password protected.

D.  In the event of an unauthorized use or disclosure of PHI or a Breach of Unsecured PHI, Sub-Business Associate shall mitigate, to the extent practicable, any harmful effects of said disclosure that are known to it.

E.  Sub-Business Associate agrees to enter into a written agreement with any Subcontractor that creates, receives, maintains, or transmits PHI on behalf of Sub-Business Associate, which complies with the requirements of 45 C.F.R. § 164.504(e)(2) through (e)(4), and pursuant to which the Subcontractor agrees to the same restrictions and conditions that apply to Sub-Business Associate with respect to such PHI.

F.  To the extent applicable, Sub-Business Associate shall provide access to Protected Health Information in a Designated Record Set at reasonable times, at the request of



Business Associate or, as directed by Business Associate, to an Individual (or Individual's designee) in order to meet the requirements under 45 CFR §164.524. Sub-Business Associate shall notify Business Associate within five (5) days of receipt of any request for access by an Individual. Business Associate shall determine whether to grant or deny any access requested by the Individual. The information shall be provided in the form or format requested, if it is readily producible in such form or format, or in summary, if the Individual has agreed in advance to accept the information in summary form. If the Individual requests an electronic copy of his or her PHI maintained in a Designated Record Set electronically, Sub-Business Associate shall provide the Individual (or Individual's designee) with access to the information in the electronic form and format requested by the Individual, if it is readily producible in such form or format, or, if not, in a machine readable electronic form and format agreed to by the Individual. No fee for copying or providing access to the PHI may be charged.

G.      If Sub-Business Associate maintains a Designated Record Set on behalf of Business Associate, Sub-Business Associate shall amend the PHI maintained by Sub-Business Associate as directed by Business Associate within five (5) days of such request. Sub-Business Associate shall notify Business Associate within five (5) days of receipt of any request for amendment by an Individual. Business Associate shall determine whether to grant or deny any access or amendment requested by the Individual. Sub-Business Associate shall have a process in place for requests for amendments and for appending such requests to the Designated Record Set, as requested by Business Associate. No fee for copying or amending the PHI may be charged.

H.      Sub-Business Associate shall, upon request with reasonable notice and at no charge, provide Business Associate or the applicable Covered Entity reasonable access to its premises for a review and demonstration of its internal practices and procedures for safeguarding PHI. The fact that Business Associate or the applicable Covered Entity inspects, or fails to inspect, or has the right to inspect, Sub-Business Associate's premises, systems, policies and procedures does not relieve Sub-Business Associate of its responsibility to comply with this BA Agreement, nor does Business Associate's or the applicable Covered Entity's: (i) failure to detect or (ii) detection, but failure to notify Sub-Business Associate or require Sub-Business Associate's remediation of any unsatisfactory practices, constitute acceptance of such practice or a waiver of Business Associate's enforcement rights under this BA Agreement.

I.       Sub-Business Associate agrees to document and make available such disclosures of PHI and information related to such disclosures as would be required for Business Associate or the applicable Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. §164.528 and Section 13405(c) of the HITECH Act, and any implementing regulations. Should an Individual make a request to Business Associate or the applicable Covered Entity for an accounting of disclosures of his or her PHI pursuant to 45 C.F.R. §164.528, Sub-Business Associate agrees to promptly provide Business Associate with information in a format and manner sufficient to respond to the Individual's request. No fee for providing the accounting of disclosures of PHI may be charged. This Section shall survive termination of this BA Agreement.

J.       If an Individual requests Sub-Business Associate to restrict the use or disclosure of PHI, Sub-Business Associate will forward the request to Business Associate within five (5) days of Sub-Business Associate's receipt of the request. As between the Parties, Business Associate will be responsible for making all determinations regarding the grant or denial of an Individual's request for restrictions, and Sub-Business Associate will make no such determinations. Sub-Business Associate will restrict the use or disclosure of PHI consistent with Business Associate's instructions, and shall further comply with any Individual's request for



restrictions on PHI disclosures that Business Associate or Sub-Business Associate is required by law to honor, including without limitation, requested restrictions on payment or healthcare operations-related disclosures to health plans when the Individual (or other person on behalf of the Individual) has paid the Individual's healthcare provider in full, unless otherwise required by law. No fee for providing the restriction of PHI may be charged.

K.    Sub-Business Associate shall make its internal practices, books, records, and any other material requested by the Secretary relating to the use, disclosure, and safeguarding of PHI received from, or created or received by Sub-Business Associate on behalf of, Business Associate and the applicable Covered Entity available to the Secretary for the purpose of determining compliance with the Privacy Rule. The aforementioned information shall be made available to the Secretary in the manner and place as designated by the Secretary or the Secretary's duly appointed delegate. Under this BA Agreement, Sub-Business Associate shall comply and cooperate with any request for documents or other information from the Secretary directed to Business Associate or the applicable Covered Entity that seeks documents or other information held by Sub-Business Associate. Notwithstanding this provision, no attorney-client, accountant-client or other legal privilege will be deemed waived by Sub-Business Associate or Business Associate as a result of this Section. Except to the extent prohibited by law, Sub-Business Associate agrees to notify Business Associate immediately upon receipt by Sub-Business Associate of any and all requests by or on behalf of any and all government authorities served upon Sub-Business Associate relating to this Section or Protected Health Information.

L.    Sub-Business Associate may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with 42 C.F.R. §164.502(j)(1).

M.    Sub-Business Associate may not de-identify any Protected Health Information without the express prior written consent of the Business Associate, and if such consent is given, Sub-Business Associate must comply with the requirements set forth at 45 C.F.R. § 164.514 for de-identifying PHI.

N.    Without prior written consent from an authorized officer of Business Associate, neither Sub-Business Associate nor its agents or subcontractors shall transfer or export any PHI provided by Business Associate outside the United States or store any PHI provided by Business Associate in a hosted/cloud computing environment.

O.    Business Associate and the applicable Covered Entity shall have the right, at its expense, during Sub-Business Associate's normal business hours, to evaluate, test, and review Sub-Business Associate's HIPAA-HITECH policies and procedures, facilities, books, records and systems which contain Business Associate's PHI and EPHI in order to ensure compliance with the terms and conditions of this BA Agreement and the HIPAA Law. Business Associate and the applicable Covered Entity shall have the right to conduct such audit by use of its own employees or by use of outside consultants and auditors. Sub-Business Associate agrees to cooperate with Business Associate or the applicable Covered Entity, and to otherwise provide any reasonable assistance to Business Associate or the applicable Covered Entity necessary for Business Associate or the applicable Covered Entity to carry out any audit as permitted herein, at no additional cost to Business Associate or the applicable Covered Entity. Upon Business Associate's or the applicable Covered Entity's written request, Sub-Business Associate agrees to provide an annual written attestation of its compliance to the HIPAA Law in the form and format requested by Business Associate or the applicable Covered Entity in order to obtain satisfactory assurances in accordance with the HIPAA Law that Sub-Business Associate will appropriately



safeguard the information with which it is entrusted. Business Associate or the applicable Covered Entity shall protect the confidentiality of all confidential and proprietary information of Sub-Business Associate to which Business Associate or the applicable Covered Entity or their agents have access during the course of such audit. The fact that Business Associate or the applicable Covered Entity inspects, or fails to inspect, or has the right to inspect, Sub-Business Associate's facilities, systems, books, records, agreements, policies and procedures does not relieve Sub-Business Associate of its responsibility to comply with this BA Agreement, nor does Business Associate's or the applicable Covered Entity's (i) failure to detect or (ii) detection, but failure to notify Sub-Business Associate or require Sub-Business Associate's remediation of any unsatisfactory practices, constitute acceptance of such practice or a waiver of Business Associate's or the applicable Covered Entity's enforcement rights under this BA Agreement. Notwithstanding the foregoing, Business Associate assumes no obligation to perform any inspection or audit of Sub-Business Associate's practices or policies, and assumes no liability for any violation or breach caused by Sub-Business Associate, whether an audit is performed or not.

P.     To the extent Sub-Business Associate is to carry out any obligation of Business Associate or the applicable Covered Entity under the Privacy Rule, Sub-Business Associate shall agree to comply with the same Privacy Rule requirements that apply to Business Associate or the applicable Covered Entity in the performance of such obligation.

## V.     REPORTING.

A.     Privacy Breach. Sub-Business Associate will report to Business Associate any use or disclosure of Business Associate's PHI that is not permitted by this BA Agreement or the Subcontract within twenty-four (24) hours of discovery of the unauthorized use or disclosure. In addition, Sub-Business Associate will report to Business Associate following discovery and without unreasonable delay, but in no event later than twenty-four (24) hours following discovery of any suspected or actual Breach of Unsecured Protected Health Information or any actual or suspected disclosure or inappropriate access of Business Associate's information which is subject to State Privacy and Security Laws. Sub-Business Associate shall cooperate with Business Associate in investigating the potential or actual breach, disclosure or inappropriate access and in meeting Business Associate's obligations under the HITECH Act and any other state or federal privacy or security breach notification laws, including, without limitation, assisting the Business Associate with performing a risk assessment as set forth in 45 C.F.R. §164.402(2) and providing any information and documentation related to such risk assessment to the Business Associate promptly upon request. Any such report shall contain at a minimum the information set forth on Attachment B-1 attached hereto and incorporated by reference.

B.     Security Incident. Sub-Business Associate agrees to report to Business Associate any Security Incident affecting Electronic Protected Health Information of Business Associate within twenty-four (24) hours of becoming aware of the Security Incident. Sub-Business Associate shall mitigate, to the extent practicable, any harmful effect known to Sub-Business Associate of a Security Incident.

## VI.     TERM AND TERMINATION.

A.     Term. The Term of this BA Agreement shall commence on the Effective Date and shall terminate when all of the Protected Health Information provided by Business Associate to Sub-Business Associate, or created or received by Sub-Business Associate on behalf of Business Associate or the applicable Covered Entity, is destroyed or returned to Business Associate, or, if it is infeasible to return or destroy the Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Section



VI. Notwithstanding anything to the contrary contained in this BA Agreement, Sub-Business Associate shall not destroy any Protected Health Information without the prior written consent of Business Associate.

B.    Termination for Cause.    Upon Business Associate's knowledge of a breach by Sub-Business Associate, Sub-Business Associate's violation of the HIPAA Laws or a Breach of Unsecured Protected Health Information by Sub-Business Associate or any Subcontractor of Sub-Business Associate, Business Associate shall, within its sole discretion, either:

1.    Provide an opportunity for Sub-Business Associate to cure the breach or end the violation and, if Sub-Business Associate does not cure the breach or end the violation within the time specified by Business Associate, terminate this BA Agreement; or

2.    Immediately terminate this BA Agreement.

C.    Effect of Termination.

1.    Except as provided in paragraph C(2) of this section, upon termination of this BA Agreement, for any reason, Sub-Business Associate shall return or destroy (at Business Associate's sole discretion) all Protected Health Information received from Business Associate, or created or received by Sub-Business Associate on behalf of Business Associate within five (5) days of the effective date of the termination. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Sub-Business Associate. Sub-Business Associate shall not retain any copies of the Protected Health Information. Sub-Business Associate will be responsible for recovering any PHI from such agents or subcontractors at no cost to Business Associate. Any information that is in electronic format shall be provided to Business Associate at no additional charge. The format to be provided should be one that is commonly used for export (i.e. comma delimited, text file, Word, Excel or Access database) that is agreeable to Business Associate.

2.    In the event that Sub-Business Associate determines that returning or destroying the Protected Health Information is infeasible, Sub-Business Associate shall provide to Business Associate written notification of the conditions that make return or destruction infeasible. If such written notification that return or destruction of Protected Health Information is infeasible and agreed to by Business Associate, Sub-Business Associate shall extend the protections of this BA Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Sub-Business Associate maintains such Protected Health Information.

3.    Should Sub-Business Associate make a disclosure of PHI in violation of this BA Agreement, Business Associate shall have the right to immediately terminate this BA Agreement and the Subcontract.

VII.    REMEDIES IN EVENT OF BREACH, DISCLAIMER AND INDEMNIFICATION.

A.    Sub-Business Associate hereby recognizes that irreparable harm may result to Business Associate, and to the business of Business Associate, in the event of breach by Sub-Business Associate of any of the covenants and assurances contained in this BA Agreement. As such, in the event of breach of any of the covenants and assurances contained in Sections III, IV



or <u>V</u> above, Business Associate shall be entitled to enjoin and restrain Sub-Business Associate from any continued violation of <u>Sections III</u>, <u>IV</u> or <u>V</u>.

B.　　PHI IS PROVIDED TO SUB-BUSINESS ASSOCIATE SOLELY ON AN "AS IS" BASIS.  BUSINESS ASSOCIATE DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.  As between Business Associate and Sub-Business Associate, any PHI disclosed, delivered or provided to Sub-Business Associate in connection with the Subcontract, shall be deemed to be the exclusive property of Business Associate. In no event shall Sub-Business Associate or its subcontractors claim any rights with respect to such PHI.  To the extent any Breach of Unsecured Protected Health Information or unauthorized acquisition or access to information subject to State Privacy and Security Laws is attributable to either:  (i) a breach of the obligations under this BA Agreement by Sub-Business Associate or (ii) a violation of the HIPAA Law or State Privacy and Security Laws by Sub-Business Associate, Sub-Business Associate shall bear (a) the costs incurred by Business Associate in complying with its legal obligations relating to such breach or violation, and (b) in addition to other damages for which Sub-Business Associate may be liable for under this BA Agreement, the following expenses incurred by Business Associate in responding to such breach: (1) the cost of preparing and distributing notifications to affected Individuals, (2) the cost of providing notice to government agencies, credit bureaus, and/or other required entities, (3) the cost of providing affected Individuals with credit monitoring services for a specific period not to exceed twenty-four (24) months, or longer if required by law, to the extent the incident could lead to a compromise of the data subject's credit or credit standing, (4) call center support for such affected Individuals for a specific period not to exceed thirty (30) days from the date the breach notification is sent to such affected Individuals and (5) the cost of any other measures required under applicable law.

C.　　Sub-Business Associate will indemnify, defend and hold Business Associate and its officers, directors, employees, agents, affiliates, successors and assigns harmless, from and against any and all losses, liabilities, damages, costs, penalties, fines and expenses (including reasonably attorneys' fees and costs) arising out of or related to either:  (i) the Sub-Business Associate's breach of its obligations under this BA Agreement and/or (ii) any third-party claim based upon any breach of this BA Agreement, violation of HIPAA Laws or State Privacy and Security Laws by Sub-Business Associate or by its employees, agents or subcontractors ("Claim").  If Sub-Business Associate assumes the defense of a Claim, Business Associate shall have the right, at its expense, to participate in the defense of such Claim, and Sub-Business Associate shall not take any final action with respect to such Claim without the prior written consent of Business Associate.  This Section shall survive termination of this BA Agreement and any Claim is without regard to any limitation or exclusion of damages or liability provisions otherwise set forth in this BA Agreement or the Subcontract.

**VIII.**　**MODIFICATION.**  This BA Agreement may only be modified through a writing signed by the Parties. The Parties agree to take such action as is necessary to amend this BA Agreement from time to time as is necessary for Business Associate to comply with the requirements of the HIPAA Law.

**IX.**　**INTERPRETATION OF THIS CONTRACT IN RELATION TO OTHER CONTRACTS BETWEEN THE PARTIES.**  Should there be any conflict between the language of this contract and any other contract entered into between the Parties (either previous or subsequent to the date of this BA Agreement), the language and provisions of this BA Agreement shall control and prevail unless the Parties specifically refer in a subsequent written agreement to this BA


a Randstad company

Agreement by its title and date and specifically state that the provisions of the later written agreement shall control over this BA Agreement. Any ambiguity in this BA Agreement shall be resolved to permit the Parties to comply with the HIPAA Rules and relevant state laws.

X.   **COMPLIANCE WITH STATE LAW.**  Sub-Business Associate shall comply with State Privacy and Security Laws.  If the HIPAA Law and the law of the State in which Business Associate is located conflict regarding the degree of protection provided for Protected Health Information, Sub-Business Associate shall comply with the more restrictive protection requirement.

XI.  **MISCELLANEOUS.**

A.   Ambiguity.  Any ambiguity in this BA Agreement shall be resolved to permit Business Associate to comply with the HIPAA Law.

B.   Notice to Business Associate.  Any notice required under this BA Agreement to be given Business Associate shall be made in writing to Chief Compliance and Privacy Officer, 1500 Market Street, 24th Floor, West Tower, Centre Square, Philadelphia, PA 19102; via email at privacyofficer@americanacademic.com; or facsimile at (215) 762-8109.

C.   Notice to Sub-Business Associate. Any notice required under this BA Agreement to be given Sub-Business Associate shall be made in writing to the address set forth in the Subcontract.



<u>Attachment B-1</u>

## FORM OF NOTIFICATION OF

## <u>BREACH OF UNSECURED PHI AND STATE LAW</u>

Date completed: _____

This notification is made pursuant to the Business Associate Agreement between _____ (Sub-Business Associate), and _____ (Business Associate).

Sub-Business Associate hereby notifies Business Associate that there has been an actual or potential breach of unsecured (unencrypted) protected health information (PHI) or information subject to HIPAA Law and/or State Privacy and Security Laws that Sub-Business Associate (or its agents or subcontractors) has used or has had access to under the terms of the BA Agreement.

**I.**      <u>Characteristics of the Breach</u>

Date of the breach: _____      Date the breach was discovered: _____

Description of the breach: _____

_____

_____

_____

_____

_____

_____

_____

How was the breach discovered? _____

Number of individuals affected by the breach: _____

Are over 500 individuals affected by the breach?

Yes ___ No ___

Have you been able to identify all individuals affected by the breach?

Yes ___ No ___

If yes, for how many of the affected individuals do you have current addresses? _____

35636186.2 07/18/2019



Does the information disclosed in the breach identify, or can reasonably be used to identify, specific patients?

Yes ___ No ___

If no, please explain why the information does not identify, or cannot reasonably be used to identify, specific patients: _____

_____

Does the information disclosed in the breach contain any sensitive information or other information that can be used in a manner that would be adverse or cause financial or reputational harm to the individual?

Yes ___ No ___

If no, explain why the information cannot be used in an adverse or harmful manner to the individual: ____

_____
_____
_____

Was all of the patient(s') information compromised or only portions?

Yes ___ No ___

If only portions of the information, explain which portions of the information were compromised: _____

_____
_____

Indicate                    type                    of                    breach:

___    Theft              ___    Unauthorized Access        ___    Unknown

___    Loss               ___    Hacking/IT Incident        ___    Other: _____

___    Improper Disposal  ___    Phishing

                                                       _____

                                                       _____

Location          of                    breached                    information:

___ Laptop              ___ Portable Media/Device        ___ Other: _____

___ Desktop Computer    ___ EMR                          _____

___ Email               ___ Paper                        _____



Description of types of unsecured PHI or other data involved in the breach:

| | | |
|---|---|---|
| ___ Demographic (full or partial name) | ___ Account number | ___ ICD-10-CM or CPT-codes |
| ___ Social security number | ___ Disability Code | ___ Driver's license, insurance card, or other form of identification |
| ___ Date of birth | ___ Financial (billing info, credit card # or check/bank account number) | ___ Other:_____ <br> _____ <br> _____ |
| ___ Home address | ___ Clinical (any mention of diagnosis, procedure, or treatment provided) | |

Are the patient(s) or the patient(s') family members aware of the incident?

Yes ___ No ___

If yes, describe _____

_____

_____

## Description of Safeguards

Safeguards that were in place prior to the breach:

| | | |
|---|---|---|
| ___ Firewalls | ___ Encrypted wireless | ___ Secure browser |
| ___ Packet Filtering | ___ Logic access control | ___ Biometrics |
| ___ Intrusion detection | ___ Anti-virus software (list product name):_____ | ___ Strong authentication |
| ___ Other:_____ <br> _____ <br> _____ | ___ Physical security: _____ <br> _____ <br> _____ | |

Was the data encrypted in compliance with the encryption standards set forth in the U.S. Department of Health and Human Services Guidance Specifying the Technologies and Methodologies that Render PHI Unusable, Unreadable, or Indecipherable to Unauthorized Individuals for Purposes of the Breach Notification Requirements under Section 13402 of HITECH Act?



Yes ___ No ___

If yes, please identify the method of encryption: _____

_____

_____

If no, please identify any other methods of securing the information (for example, password protected file): _____

_____

The Recipient

Can you determine whether the PHI was actually acquired or viewed by the unintended recipient?

Yes ___ No ___

If yes, please explain how and provide any information regarding the information viewed, length of time viewed, whether it was e-mailed or saved to another device and who viewed the information:

_____

_____

_____

Did the breach involve a good faith, unintentional acquisition, access or use of PHI by the entity's employee/workforce member? (For example, a billing employee receives and opens an e-mail containing PHI about a patient which a nurse mistakenly sent to the billing employee. The billing employee notices that he is not the intended recipient, alerts the nurse of the misdirected e-mail, and then deletes it.)

Yes ___ No ___

If yes, please explain: _____

_____

_____

Did the breach involve an inadvertent disclosure to another authorized person within the entity or Organized Healthcare Arrangement in which the entity participates? (For example – A physician who has authority to use or disclose PHI at a hospital by virtue of participating in an organized healthcare arrangement with the hospital is similarly situated to a nurse or billing employee at the hospital.)

Yes ___ No ___

If yes, please explain: _____



_____

_____

Did the breach involve a recipient who could not reasonably have retained or remembered the data? (For example – A business associate, due to a lack of reasonable safeguards, sends a number of explanations of benefits (EOBs) to the wrong individuals. A few of the EOBs are returned by the post office, unopened, as undeliverable.)

Yes ___ No ___

If yes, please explain: _____

_____

Was the unauthorized person who received the PHI or to whom the disclosure was made covered by HIPAA and/or a licensed healthcare provider?

Yes ___ No ___

If yes, please identify the licensed healthcare provider, the type of license and any state confidentiality regulations which require the licensed provider to maintain the confidentiality of the information: _____

_____

_____

Can any of the information be used by an unauthorized recipient to further the recipient's own interests?

Yes ___ No ___

If no, explain why none of the information cannot be used by an unauthorized recipient to further the recipient's own interests? _____

_____

_____

Addressing the Breach

Description of what Sub-Business Associate is doing to investigate the breach: _____

_____

_____

_____

_____



Has law enforcement been notified?:

Yes __ No ___

If so, describe _____

Did law enforcement ask for patient notification delay (based on hindering an investigation or causing harm to national security)

Yes __ No ___

If yes, please provide documentation of the police request and deadline for notifications: _____

_____

_____

Was satisfactory assurance obtained from the recipient of PHI indicating that PHI will not be further used or disclosed?

Yes __ No ___

If yes, please attach and explain: _____

_____

Has the information been returned or properly destroyed?  (If destroyed – need to obtain satisfactory assurance that the information was destroyed.)

Yes __ No ___

If yes, please attach the assurances and explain the circumstances: _____

_____

Description of what Sub-Business Associate is doing to mitigate harm to the individual(s): _____

_____

_____

Description of what Sub-Business Associate is doing to protect against any further breaches: _____

_____



Contact information to ask questions and obtain additional information:

Name: _____

Title: _____

Address: _____

_____

Email Address: _____
Phone Number: _____