1           UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF DELAWARE
2

3                                   .    Chapter 11
    IN RE:                          .
4                                   .    Case No. 19-11466 (KG)
    CENTER CITY HEALTHCARE, LLC,    .
5   d/b/a HAHNEMANN UNIVERSITY      .
    HOSPITAL, *et al.,*             .
6                                   .    Courtroom No. 3
                                    .    824 North Market Street
7                                   .    Wilmington, Delaware 19801
                                    .
8               Debtors.            .    July 19, 2019
    . . . . . . . . . . . . . . . .      11:30 A.M.
9

10                    TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE KEVIN GROSS
11              UNITED STATES BANKRUPTCY JUDGE

12  APPEARANCES:

13  For the Debtors:        Mark Minuti, Esquire
                            Monique B. DiSabatino
14                          SAUL EWING ARNSTEIN & LEHR LLP
                            1201 N. Market Street
15                          Wilmington, Delaware 19801

16                          - and -

17                          Jeffrey C. Hampton, Esquire
                            Adam H. Isenberg, Esquire
18                          Aaron S. Applebaum, Esquire
                            Centre Square West
19                          1500 Market Street, 38th Floor
                            Philadelphia, Pennsylvania 19102
20

21  Audio Operator:         GINGER MACE

22  Transcription Company:  Reliable
                            1007 N. Orange Street
23                          Wilmington, Delaware 19801
                            Email:  gmatthews@reliable-co.com
24

25  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

1  APPEARANCES (Continued):

2  For the Committee:        Thomas M. Horan, Esquire
                             FOX ROTHSCHILD LLP
3                            919 N. Market Street, Suite 300
                             P.O. Box 2323
4                            Wilmington, Delaware 19801

5                            - and -

6                            Andrew H. Sherman, Esquire
7                            SILLS CUMMIS & GROSS P.C.
                             1 Riverfront Plaza, Suite 10
8                            Newark, New Jersey 07102

9  For Accreditation         Curtis S. Miller, Esquire
   Council for Graduate      MORRIS NICHOLS ARSHT & TUNNELL LLP
10 Medical Education:        1201 N. Market Street, Suite 1800
                             Wilmington, Delaware 19801
11
                             - and -
12
13                           Douglas Carlson, Esquire
                             DOUGLAS CARLSON LLC
14                           225 West Wacker Drive, Suite 3000
                             Chicago, Illinois 60606
15
16 For the Association of    Lauren Macksoud, Esquire
   American Medical          DENTONS US LLP
17 Colleges:                 1221 Avenue of the Americas
                             New York, New York 10020-1089
18
                             - and -
19
20                           Justin R. Alberto, Esquire
                             BAYARD, P.A.
21                           600 North King Street, Suite 400
                             Wilmington, Delaware 19801
22 For Suzanne Koenig,       Dennis Meloro, Esquire
   as Patient Care           GREENBERG TRAURIG, LLP
23 Ombudsman:                1007 N. Orange Street, Suite 1200
                             Wilmington, Delaware 19801
24
25

1   APPEARANCES (Continued):

2   For U.S. of America:        Marcus Scott Sacks, Esquire
                                U.S. DEPARTMENT OF JUSTICE
3                               950 Pennsylvania Avenue NW
                                Washington, D.C. 20530
4

5   For Drexel University:      Vincent J. Marriott, III
                                BALLARD SPAHR LLP
6                               1735 Market Street, 51st Floor
                                Philadelphia, Pennsylvania 19103
7

    For Tower Health           Robert Lapowsky, Esquire
8   Service:                   STEVENS & LEE
                               620 Freedom Business Center, Suite 200
9                              King of Prussia, Pennsylvania 19406

10  For the Pennsylvania       David Smith, Esquire
    Department of Health:      SCHNADER HARRISON SEGAL & LEWIS LLP
11                             1600 Market Street, Suite 3600
                               Philadelphia, Pennsylvania 19103
12

13  For MidCap:                Gretchen Santamour, Esquire
                               STRADLEY RONON
14                             2005 Market Street, Suite 2600
                               Philadelphia, Pennsylvania 19103
15

    For Harrison Street        Stuart Brown, Esquire
16  Real Estate LLC:           DLA PIPER (US) LLP
                               1201 North Market Street, Suite 2100
17                             Wilmington, Delaware 19801

18
    *In Propria Persona:*       Judy Owens, *Pro Se*
19                             Hahnemann Physician

20  *In Propria Persona:*       Raluca McCallum, *Pro Se*
                               Hahnemann Physician
21

22

23

24

25

1

INDEX

2

PAGE

3 **Bidding Procedures.** Debtors' Motion for Entry of Orders (I)(A)
Establishing Bidding Procedures Relating to the Sale of the
4 Debtors' Resident Program Assets, Including Approving a Break-Up
Fee, (B) Establishing Procedures Relating to the Assumption and
5 Assignment of Certain Executory Contracts, Including Notice of
Proposed Cure Amounts, (C) Approving Form and Manner of Notice
6 Relating Thereto, and (D) Scheduling a Hearing to Consider the
Proposed Sale; (II)(A) Approving the Sale of the Debtors'
7 Resident Program Assets Free and Clear of All Liens, Claims,
Encumbrances, and Interests, and (B) Authorizing the Assumption
8 and Assignment of Certain Executory Contracts; and (III) Granting
Related Relief [D.I. 142; filed: 07/09/19]
9

10 **RULING:**                                                          **126**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (Proceedings commenced at 11:32 a.m.)

2         (Call to Order of the Court)

3             THE COURT:  Good morning, everyone.  You all may

4   be seated.  Thank you.

5             Mr. Minuti, good morning.

6             MR. MINUTI:  Good morning, Your Honor; Mark Minuti

7   from Saul Ewing Arnstein & Lehr.  I am here today for the

8   debtors.  With me today, Your Honor, is my partner, Jeffrey

9   Hampton; although, I think he stepped out in the hall for a

10  moment.

11            THE COURT:  Yes.

12            MR. MINUTI:  He will be back in.  Also with me

13  today, Your Honor, are Alan Weiland, our proposed CRO sitting

14  in the front row, and Scott Victor from SSG Capital Partners

15  is here as well.

16            THE COURT:  Mr. Victor, good morning.

17            Who's that?  I'm sorry, Mr. Minuti, the last

18  person.

19            MR. MINUTI:  Scott Victor.

20            THE COURT:  Did you mention someone after Mr.

21  Victor?

22            MR. MINUTI:  From SSG.

23            THE COURT:  Oh, okay.  I'm sorry.

24            MR. MINUTI:  Thank you, Your Honor.

25            Your Honor --

1          THE COURT:  Would this be a good time?  By the

2     way, I know that there has been a committee selected in the

3     case and I wonder if maybe we could have an introduction of

4     committee counsel.

5          MR. MINUTI:  Your Honor is reading my outline.  I

6     was just about to cede the podium to Mr. Horan.  I will let

7     him do that.

8          THE COURT:  Thank you.

9          Mr. Horan, good morning.

10         MR. HORAN:  Good morning, Your Honor; Thomas Horan

11    from Fox Rothschild, proposed counsel to the official

12    committee of unsecured creditors.  I am joined at counsel

13    table by, I think, a couple of familiar faces to you; Andrew

14    Sherman and --

15         THE COURT:  Mr. Sherman, nice to see you.

16         MR. HORAN:  -- Boris Mankovetskiy, both from the

17    firm of Sills Cummis.

18         THE COURT:  All right.  Welcome to you and it's

19    good to have you involved in the case.

20         MR. MANKOVETSKIY:  Thank you, Judge.

21         THE COURT:  Thank you.

22         MR. HORAN:  Thank you, Your Honor.

23         THE COURT:  Thank you, Mr. Horan.

24         Mr. Minuti?

25         MR. MINUTI:  Your Honor, we -- our agenda

1  reflected two matters that were originally scheduled for

2  today.  We have moved our closing motion, again, to next

3  week.  I am not going to give Your Honor a long report on

4  that other than to say we are continuing to work with the

5  Department of Health and the City on that closure plan.  Our

6  goal is to file that -- we would really like -- what we are

7  trying to avoid, Your Honor, is having any open issues.

8            THE COURT:  Yes.

9            MR. MINUTI:  We are trying to have a fully

10 consensual plan.  So, hopefully, we will get that finalized.

11 You know, we know that folks have not seen that plan and so

12 once it's finalized, Your Honor, we are going to give folks

13 an opportunity to review it and if they have any issues

14 certainly come talk to us about it.  And if we can't resolve

15 it, you know, people are going to have an opportunity to

16 object.

17            THE COURT:  I'm curious about it as well.

18            MR. MINUTI:  Well, Your Honor, look -- what I do

19 know, Your Honor, is I think we are making very good progress

20 in that regard, but there is a lot of details.  So, you know,

21 it's just making sure that we have everything covered and

22 everybody is on board with what we are trying to do.  Again,

23 our goal is to have it fully consensual.  When we come back

24 before Your Honor we can lay it out.

25            So, I know there was some folks in the room, Your

1  Honor, that have asked for the plan and are concerned about

2  the plan including the committee.  So, again, the goal would

3  be the finalize it, get it out there for people to see to the

4  extent we can do so.  And then if people have an issue let

5  them have an opportunity to bring those issues before Your

6  Honor.

7              So, I see Mr. Sherman is standing.

8              THE COURT:  Mr. Sherman, do you want to be heard?

9              MR. MINUTI:  Why don't I let him speak?

10             THE COURT:  You were poised to be heard.  Yes,

11 sir.

12             MR. SHERMAN:  Thank you, Your Honor.  Again, for

13 the record, Andrew Sherman, Sills Cummis, for the committee.

14             We have begun discussions with Mr. Minuti

15 regarding the closure plan.  Obviously, it would be nice to

16 see the writing.

17             One of the other concerns of the committee in

18 connection with the closure plan, Your Honor, is how it is to

19 be funded.  Obviously, closing a hospital is a very expensive

20 endeavor.

21             THE COURT:  Yes.

22             MR. SHERMAN:  The liquidity under the proposed

23 financing or the interim financing is somewhat thin as the

24 court is well aware.  In fact, the line item relating to

25 shut-down cost, I believe, is only 100,000 a week.  We need

1  to understand how that budgeted item correlates to what is in

2  the closure plan.  And we do look forward to working with the

3  debtors' professionals to gain an understanding of how that

4  is to happen and every expectation that we will work

5  collaboratively to do that.

6              THE COURT:  Okay.  Mr. Sherman.

7              MR. SHERMAN:  Thank you, Judge.

8              THE COURT:  Yes, sir.

9              MR. MINUTI:  And then with that, Your Honor, that

10  brings us to the only matter going forward today and that is

11  our motion to establish bid procedures for the sale of the

12  debtors' residents program assets.  Your Honor, I want to

13  stress at the outset that the only thing we're asking Your

14  Honor to do today is approve bid procedures.  All sale issues

15  are going to be fully preserved for the hearing.

16              THE COURT:  Yes.

17              MR. MINUTI:  We did draw a number of objections,

18  Your Honor, to the motion.  As we go through them, Your

19  Honor, what I think Your Honor will see is that a lot of

20  those are really sale objections.  Again, from the debtors'

21  perspective, Your Honor, to the extent someone has a sale

22  issue it is going to be fully preserved, but we will talk

23  about that more when we get to the objections.

24              THE COURT:  All right.

25              MR. MINUTI:  This motion was filed on July 9th

1  along with a motion for expedited consideration.  The court

2  approved expedited consideration by order of July 10th and

3  scheduled the matter for today at eleven a.m. with objections

4  due by four p.m. on July 15th.

5          We did receive, Your Honor, one response in favor

6  of the transaction.  That was from Drexel University Medical

7  College.  We received six other formal responses and

8  objection.  We also received some informal comments from the

9  United States Trustees Office.  There have been a number of

10  changes to the order.  We will walk Your Honor through those

11  changes.  Those were designed to meet some of the objections.

12          The committee was grateful enough to take -- we

13  sent them a Word version of the order and the procedures.

14  They marked it up.  We took, I think, substantially all or

15  most of their comments. I do think we have one issue that the

16  committee has and we will get to that, Your Honor.  But the

17  good news is we're down, I think, to one issue with the

18  committee.

19          THE COURT:  Okay.

20          MR. MINUTI:  In terms of background, Your Honor,

21  as we have discussed in prior hearings prior to the petition

22  date the debtors reached a sad, but inevitable conclusion

23  that there was no choice but to close Hahnemann University

24  Hospital.  Among other issues involved in the closure is the

25  effect that such closure would have on the 583 residents and

1  fellows who are training at the hospital as part of the

2  thirty-five residency and fellowship programs conducted at

3  the hospital.

4          The debtors, with the assistance of their in-house

5  and outside advisors, quickly considered all options

6  available to minimize disruption to the residents and the

7  greater Philadelphia medical academic community.  The

8  conclusion, Your Honor, was a prompt transfer of the debtors'

9  residency program assets that represented the best option to

10 minimize disruption to the residents and monetize the

11 residents program assets.

12         The debtors quickly identified Tower Health, Your

13 Honor.  And just so Your Honor understands, part of Tower

14 Health, sort of under Tower Health is Reading Hospital.  The

15 agreement has now been assigned to Reading Hospital.  So,

16 that is actually going to be the stalking horse buyer.  We

17 quickly identified them as a natural purchaser of the

18 debtors' residence program assets.  They own and operate six

19 hospitals in our area.  That transaction, again, is supported

20 by Drexel who Your Honor heard at the first-day hearing, who

21 is very concerned about the residents.

22         So, we entered into good faith negotiations with

23 Tower Health and on July 9th we filed -- we signed a letter

24 of intent to transfer the residency program assets to now

25 Reading Hospital.  We finalized and filed that letter of

1  intent with our motion that's before Your Honor today.  We

2  have finalized today, Your Honor, an asset purchase agreement

3  which, essentially, follows the terms of the letter of

4  intent.  My understanding is, Your Honor, that is being

5  docketed as we speak.

6           So, as we did, I think, last week, Your Honor,

7  what probably makes sense, if Your Honor is agreeable, is at

8  some point in the hearing is to take a break, give parties an

9  opportunity to take a look at that as long as the changes to

10  the order, and give Your Honor an opportunity to look at

11  those as well.  Then we can come back.  But, again, today is

12  really about bid procedures, Your Honor.

13           THE COURT:  That's right.

14           MR. MINUTI:  In terms of the sale let me just

15  describe, generally, what that sale is, Your Honor.  In

16  exchange for the purchased assets the purchase price is $7.5

17  million dollars.  That is subject to some adjustments set

18  forth in the LOI and they will be set forth in the asset

19  purchase agreement.  The purchased assets are the resident's

20  program assets, that is the national provider identifiers,

21  and Medicare provider number and agreement, the Pennsylvania

22  Department of Health license to operate an acute care

23  hospital, and Hahnemann University Hospital's programs for

24  training the residents.

25           Tower Health or Reading Hospital, Your Honor, will

1  assume responsibility for the training of the residents and

2  residents will have the right to be placed in one of Tower's

3  six hospitals except for a limited number of programs.  Tower

4  Health asset purchase agreement will provide other benefits

5  to the residents including, for example, housing and meals.

6  Reading Hospital will also seek to transfer the faculty or to

7  accept the faculty with whom the residents have been training

8  to insure that the residents training cohort remains intact.

9          And as part of the letter of intent and the asset

10 purchase agreement we have agreed, Your Honor, to ask the

11 court today to authorize us to pay a break-up fee of $225,000

12 dollars.  That is, essentially, equivalent to three percent

13 of the purchase price.  That is payable if we close the

14 transaction, Your Honor, with someone else.

15         I should point out for the record, Your Honor,

16 that there is no request for an expense reimbursement.  That

17 asset purchase agreement, the LOI, is subject to higher and

18 better bids.

19         As Your Honor knows one of the applications we

20 have on file is to retain SSG Capital Advisors as our

21 investment banker.  SSG Capital Advisors has already gone to

22 market for the sale of these assets.  They contacted

23 approximately 106 potential purchasers.  They have sent those

24 parties a non-disclosure agreement.  We are now receiving

25 back those non-disclosure agreements and once Your Honor

1   approves the bid procedures, if you are inclined to do that

2   today, SG will then be free to interact with other parties to

3   hopefully bring another party to the table and maybe we can

4   have some spirited auction here for these assets.

5           As I said at the outset, Your Honor, we are here

6   today really just to seek two things and that is approval of

7   the procedures, Your Honor, that will bring us to a sale and

8   the break-up fee that I mentioned just a few moments ago.

9   The procedures are designed are designed to provide an

10  orderly process for soliciting and selecting a higher and

11  better bid if others choose to bid on these assets.

12          I would describe the proposed procedures as plain

13  vanilla.  The timeline has changed a little bit based on the

14  fact that this hearing has already been continued once.  So,

15  right now what we are proposing, Your Honor, is a bid

16  deadline of August 5th, an auction of August 7th and a sale

17  hearing, subject to the court's calendar, in early August.

18  We had actually inquired of your Chambers of August 8th.  We

19  understand it does not work for the court.

20          THE COURT:  It's a little bit tough, yes.  August

21  9th is available.

22          MR. MINUTI:  I understand that, Your Honor.  I

23  believe the committee counsel has an issue with August 9th.

24          THE COURT:  Okay.

25          MR. MINUTI:  So, I don't know what date that is.

1  It's probably a Friday.

2             THE COURT:  It is.

3             MR. MINUTI:  So, does Your Honor have any other

4  time available maybe that week?  Does that work with Mr.

5  Sherman?

6             Mr. Sherman just said, then, we will use August

7  9th if that is acceptable to the court.

8             THE COURT:  That would be fine, yes.

9             MR. MINUTI:  All right.  And we appreciate Mr.

10  Sherman's accommodations for that, Your Honor.

11             THE COURT:  Thank you, Mr. Sherman.  Yes, sir.

12             I also have August 12th available which is the

13  following Monday, but that may be too long for this to wait.

14             MR. MINUTI:  Your Honor, why don't we do this, if

15  it's acceptable to Your Honor, what Mr. Lapowsky, who

16  represents Reading Hospital, just told me is he hasn't

17  cleared that date with his client?

18             THE COURT:  Okay.

19             MR. MINUTI:  I think the 9th has been cleared.

20  So, if we could take the 9th and then when we're done today

21  we'd like to not disrupt Mr. Sherman's, I assume, vacation.

22  So, if we can then check what Reading Hospital, the client,

23  see if the 12th is available, then we can confirm and maybe

24  move it to the 12th.

25             THE COURT:  All right.

1        MR. MINUTI:   Does that work for Mr. Sherman?
2   Thank you.

3        Then, what we're contemplating, Your Honor, is a
4   closing of the sale on or before September 6th.   That is the
5   goal.

6        In terms of bid procedures, Your Honor, the bid
7   procedures detail what is necessary to become a qualified
8   bidder for these assets.   Folks have to sign a non-disclosure
9   agreement.   They have to provide financial ability to close.
10  Again, I am just giving Your Honor a summary.   This all
11  spelled out in the motion.

12       They've got a bid on the same or better terms as
13  Tower Health.   We've got an initial overbid of $7,725,000
14  dollars.   That, essentially, equals Tower Health's purchase
15  price plus the break-up fee that we discussed a few minutes
16  ago.   We're asking for a ten percent deposit and if we have
17  one or more qualified bids we're going to hold an auction in
18  my firm's Philadelphia office with minimum bid increments of
19  $100,000 dollars going forward.

20       At the conclusion, Your Honor, we are going to
21  consult with the committee and we will choose the highest and
22  best bidder.   Then we may designate back-up bidders as well
23  pursuant to the bid procedures.

24       Among other things we're asking Your Honor to do
25  today is to approve a sale notice that's attached to our

1 motion.  That has been modified, Your Honor, slightly, and

2 we're going to serve and file that notice.  We are also going

3 to publish that notice, Your Honor, to get the word out,

4 obviously, to our creditors, to parties in interest as well

5 as prospective bidders.

6           Your Honor, I have an evidentiary presentation to

7 make today in support of the bid procedures.  I have two

8 witnesses.  One is Mr. Weiland.  It's a brief presentation in

9 terms of the business judgment and how we got here today.

10          THE COURT:  Yes.

11          MR. MINUTI:  Then I have an evidentiary

12 presentation to make with respect to the process and the

13 break-up fee, Your Honor.  That would be Mr. Victor.

14          Before I get there, Your Honor, I want to comment

15 on one issue that has been raised in some of the pleadings

16 and that concerns this idea of releasing the residents.

17          THE COURT:  That is a concern of mine as well.

18          MR. MINUTI:  And Your Honor can probably see from

19 the white coats in the galley I think we have a number of

20 residents here today.  And I am sure they are concerned about

21 that.  So, I want to make the debtors' position very clear on

22 the record and explain to Your Honor what is going on because

23 a couple of folks who did file responses had indicated that

24 they believed the residents were not being released.  So, at

25 least from the debtors' perspective I want to explain to Your

1  Honor what is happening and where we're going.

2           So, as set forth in the motion and as set forth in

3  the asset purchase agreement, Your Honor, it actually

4  provides that the debtors' residents are free to go.  So, if

5  they have another opportunity, they don't like Tower Health

6  or whoever our bidder is they are free to go elsewhere, Your

7  Honor.

8           THE COURT:  Good.

9           MR. MINUTI:  But those residents, Your Honor, are

10 much more attractive if the debtor also releases with them

11 the Medicare funding that it goes along with resident slots.

12          The release of the residents, Your Honor, is

13 relatively easy.  If they want to go they can go.  The

14 release of the medical funding is much more difficult and

15 complicated.

16          First, Your Honor, the debtor has discretion in

17 terms of when to release that funding.  So, for example, if a

18 number of folks that were needed for patient care decided

19 they wanted to leave the next day and would leave the

20 hospital we have the ability, Your Honor, in our discretion

21 not to let the funding go as a way of keeping those residents

22 there because we have a patient care issue.  That is point

23 number one.

24          Point number two, Your Honor, we have 570 some

25 residents and fellows at the hospital, but we don't have 570

1   some full-time equivalents of medical funding from Medicare.

2   And the reason for that, Your Honor, is and I'll just give

3   you a simple example.  And trust me, I was on the phone call

4   yesterday with folks from the hospital who explained this to

5   me. It is very complicated, but I am going to explain it how

6   I understand it and hopefully how Your Honor can understand

7   it.

8          The way it works, Your Honor, is we don't have

9   full-time funding for each of those residents.  And the

10  reason for that is that we may have a resident who is doing

11  training that we don't offer.  And the way it works is that

12  resident may go to another hospital or another location and

13  get that training.  And the funding for that portion of that

14  resident's training may come from that other hospital.

15         So, for example, we may have a resident at

16  Hahnemann University Hospital that is only receiving .25

17  percent, let's say, or twenty-five percent of the full-time

18  equivalent Medicare dollars.  Is Your Honor following me so

19  far?

20         THE COURT:  In the hospital where the resident is

21  working has the other seventy-five percent.

22         MR. MINUTI:  Picks up the rest of it, Your Honor.

23  Okay.

24         So, for example, in my example of our allotment of

25  the cost or the reimbursement it may only be twenty-five

1  percent.  All right.  That amount of funding varies depending

2  upon the resident, who they are, where they go, what their

3  training is.  In addition, Your Honor, the amount of funding

4  that is transferable is different if, for example, that

5  resident has a year left of training or that resident has

6  three years left of training.  And we don't keep, for

7  example, up to the minute accurate records of these things.

8  Obviously, when somebody comes to us and wants to leave, and

9  there have been twelve residents, Your Honor, that have left,

10  you know, we do the calculations.  Now, when we're talking

11  about five hundred and some residents it takes time for us to

12  do those calculations and figure out exactly what funding is

13  going with a resident?

14          So, that is what has taken long, Your Honor.  The

15  residents have been free to go, but the hold-up has been the

16  funding, again, Your Honor, which makes them more attractive.

17  We are now at the point, Your Honor, where we are concluding

18  that process.  I am told that we are going to conclude that

19  process by July 22nd, that's next week.  And by July 26th,

20  Your Honor, again, next week, we're going to be in a positon

21  where approximately fifty percent of the residents, if they

22  choose to go elsewhere, are going to be able to do that with

23  the funding.

24          The balance of the residents, Your Honor, we're

25  not going to be in a position to release the funding for

1  until August 9th because we are still running a hospital, we

2  are winding down that hospital, we still have patients and we

3  need people there to care for the patients.

4          So, that is the explanation as to what is

5  happening with the residents and the release of the

6  residents.  We certainly hope, Your Honor, that Reading

7  Hospital or whoever the highest and best bidder is provides

8  an attractive enough package that the residents go because we

9  would, obviously, like them to stay in the Philadelphia are.

10  I know a lot of folks in the courtroom would like them to

11  stay in the Philadelphia area.

12          THE COURT:  It probably effects the purchase price

13  as well.

14          MR. MINUTI:  Hold just one moment, Your Honor.

15          THE COURT:  It does not.

16          MR. MINUTI:  I didn't think so, Your Honor.  It

17  does not affect the purchase price, Your Honor.

18          THE COURT:  Okay.

19          MR. MINUTI:  So, that is the way it works, Your

20  Honor.  And I just wanted Your Honor to be aware of that.  I

21  wanted to put that on the record for the folks in the

22  courtroom today.

23          THE COURT:  Here is one of my concerns.  If a

24  resident, for example, has another position where they can

25  start next week, Monday, I'd like them to be able to go and

1   you're telling me that they can go, and if the hospital that

2   is accepting them as a resident doesn't have a problem with

3   waiting to receive the Medicare funding they're free to go.

4          MR. MINUTI:  Right or will except them without the

5   funding.  They are free to go.  That is right, Your Honor.

6          Here is the issue, Your Honor, that we had; if we,

7   for example, let the first four hundred folks go and we gave

8   them all one full-time equivalent of the reimbursement that

9   would be great for the first hundred that went, but then the

10  balance of the people would not have any funding.  And as I

11  understand it other providers, other hospitals are going to

12  find the residents attractive based on two criteria; their

13  skill set and the funding.

14         THE COURT:  Right.

15         MR. MINUTI:  And as I said at the outset the

16  funding makes them a lot more attractive.  So, it would be --

17  it would not be fair of us to do it on a first come first

18  serve basis because then the people at the end wouldn't have

19  the funding, Your Honor.

20         THE COURT:  Okay.

21         MR. MINUTI:  So, again, I wanted to explain that

22  to Your Honor because I know that has been raised in a couple

23  of objections.

24         THE COURT:  So, at the outside August 9th would be

25  the outside date for this funding to be available.

1          MR. MINUTI:  That is correct, Your Honor.  Then we

2   will know exactly the number that will go with each resident,

3   correct.

4          THE COURT:  Mr. Miller would like to be heard, I

5   think, on this point.

6          MR. MINUTI:  Very well, Your Honor.

7          THE COURT:  Mr. Miller, good morning.

8          MR. MILLER:  Good afternoon, Your Honor.  For the

9   record Curtis Miller of Morris Nichols on behalf of ACGME.

10          THE COURT:  Yes.

11          MR. MILLER:  The accreditation counsel for

12   graduate medical education.

13          Because of the comments just made I thought it

14   might make sense to hear from the other parties who have,

15   sort of, raised this issue so it didn't get lost in the

16   shuffle.

17          THE COURT:  I think that's well.

18          MR. MILLER:  Okay.  In that case, Your Honor, I'd

19   just like to introduce to the court my co-counsel Doug

20   Carlson who will address the court on these points.

21          THE COURT:  Thank you, Mr. Miller.

22          Mr. Carlson, good morning.

23          MR. CARLSON:  Good morning, Your Honor.  I am

24   barred in Illinois and not here, but I am admitted *pro hac*,

25   and for that I thank the court.

1          THE COURT:  And that is wonderful.  Good, Mr.

2    Carlson.

3          MR. CARLSON:  So, Your Honor, I want to start by

4    using counsel's example to indicate to the court how hard it

5    is for a resident to go elsewhere without Medicaid or without

6    Medicare funding.

7          As counsel has stated there are about 580

8    residents and fellows.  The residents being the first part of

9    the clinical training, fellowship being advanced training.

10          THE COURT:  Yes.

11          MR. CARLSON:  Thus far, twelve have left.  And I

12    understand that they have left without Medicare funding.  The

13    remainder, many if not all have available positions.  I'm

14    sure the court has read of the available positions that have

15    been accumulated.  I'm told this morning that the number is

16    1,339 with about 375 in the Philadelphia area, but they are

17    all dependent upon Medicare funding.  I don't know if they

18    are all, but certainly, substantially, all are dependent upon

19    Medicare funding following the resident.

20          I suggest to the court that if, in fact, on a

21    resident basis, resident by resident basis, the number of FTE

22    that follows a particular resident drifts downward.  The

23    farther downward it drifts the less attractive that resident

24    becomes to a receiving institution.  That is not a healthcare

25    principal, that's a marketplace principal, Your Honor.

1          THE COURT:  Yes.

2          MR. CARLSON:  And I don't know, even across the

3    board, how low is too low.  I don't represent the white coats

4    in the back.  I represent the ACGME, but I saw them in court

5    his morning and I went back and I talked with a couple of

6    them.  And I am told that -- and my question was the

7    receiving institutions, what are they expecting and the

8    answer was a hundred percent, you know, one FTE.

9          THE COURT:  Does that mean full-time?

10         MR. CARLSON:  I'm sorry.

11         THE COURT:  FTE.

12         MR. CARLSON:  Full-time equivalent, yes.

13         THE COURT:  All right.

14         MR. CARLSON:  There are people that make a living

15   figuring out how much a resident should get from CMS.  That

16   is how complicated it is.  And I don't pretend to be such a

17   person, Your Honor.

18         I know a couple of things.  I know, for instance,

19   because we have been told by CMS that -- first of all, there

20   are two categories of this funding and I'm just going to give

21   you the acronyms.  In the business they're known as DME and

22   IME.

23         THE COURT:  Okay.

24         MR. CARLSON:  And Hahnemann has, at least on the

25   books of CME or CMS, 574.82 FTE's of IME and 556.81 FTE's of

1   DME.  Now, that can even be stretched farther amongst, let's

2   say, 580 because of one simple fact.  The Medicare pays a

3   dollar per dollar for the residents, but only fifty cents per

4   dollar for the fellows.  I'm not disputing counsel as to what

5   he says, but when he says it that's a substantial lowering

6   just across the board.

7           On this point I'd like to --

8           THE COURT:  So, are you saying there is sufficient

9   Medicare funding to cover all of the residents?

10          MR. CARLSON:  They have it.  And I'm not casting

11  aspersions, Your Honor, it is common in the industry for

12  Medicare money recipients to contract that away for one

13  reason or another. I understand that some of this perhaps was

14  contracted even away by the owner of this before the current

15  owner. I am also told that some of it may have been

16  contracted away relatively recently.

17          The proposition of contracting away is not

18  uncommon for whatever reason. I don't pretend to know the

19  arithmetic or the details of how they're getting down from

20  these high five hundred numbers to their four hundred

21  numbers, but perhaps that's their explanation.

22          So, Your Honor, there are a couple of sources, I

23  would suggest to the court, for the proposition that no

24  matter what those numbers are the debtor has an obligation to

25  put these residents out into the transferee positions in a

1 market viable position as follows.

2         The letter of agreement, Your Honor, it's

3 obviously in the record, we have two filings.  We cited

4 Docket Number 191 on Page 3.  It says, and it's just a couple

5 sentences.  It's Number 3, Tower Health will assume

6 responsibility for the continued training of all 583

7 Hahnemann residents and fellows, and will give each resident

8 who desires to continue his or her training at Tower Health

9 the right.  Parenthetically, I emphasize that.  The right to

10 be placed in one of Tower Health's six hospitals or to accept

11 a position elsewhere.

12         Last sentence, Tower Health will agree to release

13 or if the release must occur prior to the closing will agree

14 that seller may release the temporary cap on Medicare

15 reimbursement on a temporary basis for those current

16 residents who elect to complete their training elsewhere.  I

17 suggest to the court that an assignment of less than one is

18 inconsistent with a right of these residents to be placed

19 elsewhere.  That is first.

20         Number two, there are a couple of ACGME

21 requirements and policies.  We addressed other things, but

22 the Association of American Medical Colleges, in their filing

23 which is Docket Number 186, at Page 3 an ACGME requirement.

24 A requirement is an accreditation standard.  All accrediting

25 agencies, the American Bar Association has accreditation

1 | standards.

2 |        THE COURT:  Right.

3 |        MR. CARLSON:  I'm just going to read from their

4 | brief.  Under ACGME requirements, in the event of a closure,

5 | institutions that have accredited residency programs must

6 | assist medical residents in rolling in another ACGME

7 | accredited program in which they can continue their

8 | education.  I suggest to the court that letting them loose

9 | with a less than one FTE is illusory.  It's not assistance.

10 |        Number three, Your Honor, and finally, ACGME has

11 | policies, all accredited entities and Hahnemann is an

12 | accredited entity as is Tower Health.

13 |        THE COURT:  Tower Health is accredited, is that

14 | right?

15 |        MR. CARLSON:  That is true, Your Honor.

16 |        We have policies and as a condition of

17 | accreditation the credited entities agree to abide by the

18 | policies.

19 |        So, here is a policy that is, again, cited in the

20 | same spot, Your Honor; that is Docket 186 at Page 3.  If, in

21 | fact, ACGME requirements provide further that if more than

22 | one institution or program is available for temporary or

23 | permanent transfer the preference must be considered by the

24 | transferring institution or program.

25 |        Then, the next sentence, programs must

1 expeditiously make the decision to reconstitute the program

2 and/or arrange for temporary or permanent transfers of the

3 residents so as to maximize the likelihood that each resident

4 will complete the academic year with the least disruption to

5 his or her education.  I suggest to the court that anything

6 less than one is a detraction from maximizing that

7 likelihood.

8         I have a couple of other things to say on other

9 topics, but I understand this has been a carve-out and I will

10 stop there unless the court has questions.

11         THE COURT:  If I made the order, the bidding

12 procedures order, conditional upon Hahnemann releasing the

13 residents at their -- if they would like to be released.

14 They may want to go with Tower Health, I don't know, with

15 full Medicare funding is that something that would be

16 acceptable?

17         MR. CARLSON:  I'm uming for a couple of reasons.

18 I don't represent the residents so I am not authorized to

19 answer authoritatively on behalf of the residents.

20         I'm uming for a second reason because, you know,

21 and I'm using Your Honor's, what does full mean?

22         THE COURT:  It means one.

23         MR. CARLSON:  Then I have no second comment, Your

24 Honor.

25         THE COURT:  Okay.  All right.

1          MR. SACKS:  Your Honor, this is Marc Sacks of the

2   Department of Justice on the phone representing CMS.  At some

3   point if I could be heard I would appreciate it.

4          THE COURT:  On this point?

5          MR. SACKS:  Yes, Your Honor.

6          THE COURT:  All right.  Why don't you speak now?

7          MR. SACKS:  Okay.  Let me try to take a little

8   broader perspective here.  I understand this is a hearing

9   about bidding procedures, not about the sale, and I want to

10  stress here that its important, I think, to consider some

11  sale issues because debtors have proposed a process here that

12  is contrary to law and is not something that CMS can or will

13  permit.  So, let me try to explain that briefly.

14         There is no asset of a residency program.  You

15  can't sever out and transfer a residency program.  The law

16  does not work that way.  The law does allow individual

17  residents to move from one hospital to another and the

18  receiving hospital has the right then to seek temporary and

19  then permanent funding for those individual residents.  That

20  is found, I believe, in 42-CFR-417 Subpart (h).  And there is

21  also a process under the new ACA by which a closing

22  hospital's FTE resident spot can be transferred to other

23  hospitals.  And that is found in 42 U.S.C. 1395 WW Subsection

24  (h) again.

25         Again, there is no basis for just a full transfer

1    of a residency program's "assets."  The only way a residency

2    program is transferred is if the Medicare provider agreement

3    that includes reimbursement of those residents is fully

4    transferred consistent with the law, but that can't happen

5    when a hospital is being closed because under 42 U.S.C. 49.52

6    closure of a hospital, and that's what's happening to

7    Hahnemann as I understand it, terminates the Medicare

8    provider agreement.  There is no agreement for Hahnemann, the

9    debtors, to transfer to Tower.  And because there is no

10   agreement there is no residency program asset that can be

11   transferred.

12          Even if there was some possibility here for the

13   entire Medicare agreement including the residents program to

14   be transferred, that can only be done, you know, under

15   Bankruptcy Code Section 365 under University Medical Center

16   with the purchaser, the transferee assuming full successor

17   liability under the provider agreements.  And, of course, the

18   sale terms here suggest that Tower, even if this could be

19   transferred and Hahnemann was not closing is unwilling to do

20   that.

21          So, there is a number of factors here that prevent

22   the terms from going forward.  It is simply a non-starter at

23   this point.

24          THE COURT:  All right.  Thank you.  That is

25   helpful.

1          MR. CARLSON:  Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Carlson.

3          MS. MACKSOUD:  Good morning, Your Honor.

4          THE COURT:  Its afternoon now.

5          MS. MACKSOUD:  Oh, good afternoon, Your Honor.  My

6   name is Lauren Macksoud.  I am with Dentons US LLP and I am

7   here on behalf of the Association of American Medical

8   Colleges and the Educational Commission for Foreign Medical

9   Graduates.

10          THE COURT:  Yes.  And you filed an objection.

11          MS. MACKSOUD:  Yes.  And I believe my predecessor

12  mentioned some of the language that we used in our objection.

13  So, I thought that this was a good time for me to rise and,

14  sort of, bolster what the ACGME has said.

15          THE COURT:  Yes.

16          MS. MACKSOUD:  Just by way of background my

17  clients are non-profit organizations that serve and support

18  medical faculty students and residents.  Specifically, the

19  CFF -- the ECFMG is the sole agency that evaluates and

20  certifies the foreign medical graduates.  So, they work with

21  the J-1 Visa Program to make sure that these graduates have

22  the appropriate visa for being in this country.

23          THE COURT:  Okay.

24          MS. MACKSOUD:  One of the significant issues

25  they're considering right now, relating to this closure and

1  the transfer of this program, is the timeline for when these

2  residents will get released and will get picked up by new

3  hospitals because the visa program only gives them thirty

4  days to be replaced.  So, the ECFMG has been working with the

5  Department of State to try and get extensions of that

6  timeline.  They don't have anything concrete at this time.

7  So, it is a significant concern of my clients and also of the

8  residents.

9        As Your Honor is aware this is one of the largest

10 residence programs in the country and the bankruptcy is the

11 largest loss of the residents program since the Charity

12 Hospital closure after Hurricane Katrina.  I had the

13 opportunity, Your Honor, to speak with several of the

14 residents this morning and they have expressed significant

15 concerns with this transition and with this sale specifically

16 many of the residents have said that they have the

17 opportunity to go to new programs now.  I've heard the term

18 ninety-five percent of them have the opportunity to go to new

19 programs now, but because the funding isn't being released

20 they have no ability to move.

21        The residents tell me that many of them are

22 sitting not seeing patients which means they are not checking

23 the box on procedures that they need to complete in the

24 context of their training which, ultimately, has the effect

25 of extending their training which may then put them in a bad

1  position to move forward with a fellowship program after

2  their residency should they choose to go down that road.  So,

3  they could be missing timelines.  And it is certainly

4  extending overall what is a very expensive and long education

5  at the outset.

6            THE COURT:  Yes.

7            MS. MACKSOUD:  Our understanding, Your Honor, is

8  that Tower Health is accredited in eight of the thirty-five

9  programs that Hahnemann will be transferring.  By doing the

10 math from the ACGME's objection I came up with 109 accredited

11 residency slots for what they're selling of 183 total slots.

12 So, that means 475'ish residents will need to transfer.  The

13 residents want their programs and their release as soon as

14 possible and they would like as much clarity and closure

15 about that process as soon as possible.

16            Several of the residents this morning told me that

17 they have the opportunity to leave now, but that they are not

18 being offered full-time positions because of the confusion

19 associated with this bankruptcy.  They showed me emails from

20 other hospitals who have said we cannot offer you a position

21 until we have more information on what is happening.  And the

22 other hospitals regret that they are unable to do that.  So,

23 our --

24            THE COURT:  Is it a funding issue?

25            MS. MACKSOUD:  It's knowing what's happening to

1   the funding.  They clearly want the doctor; they want to know

2   if the funding will come with it.

3          And as debtor's counsel has said, the residents

4   are free to go.  But as the ACGME has pointed out, the

5   resident needs to go with the funding because the programs

6   don't just want the resident, they want the resident and the

7   funding.

8          There are programs where I don't know if it's

9   private funding or some sort of non-government funding, is

10  available, but those are few and far between.  And so the

11  rest of these doctors are being held out by the release of

12  the funding.  And it's unfortunate to see that several of

13  them might be missing out on opportunities to move now

14  because the funding is -- it's unclear what's happening with

15  the funding.

16         We had sent a markup of the bid procedures over to

17  the debtor.  We had sent some bullet points over with

18  additional disclosures that we would like to see added to the

19  bid procedures order.  These disclosures go to accreditation

20  status, areas of accreditation, which programs you have

21  accreditation in, they go to the number of residents they'll

22  actually be able to take, and your plan for releasing the

23  funding associated with those that you don't have accredited

24  programs for.

25         I haven't had an opportunity to speak with

1  debtor's counsel in advance of this hearing, but our hope is

2  that some of that language might make it into the final

3  order.

4         We also had the opportunity, Your Honor, to speak

5  with the patient care ombudsman.  As you might have seen from

6  our papers --

7         THE COURT:  Yes.

8         MS. MACKSOUD:  -- we would like to have a patient

9  care ombudsman consider these resident issues.  I spoke with

10 their counsel before the hearing and they said they are

11 willing to do that.  And if Your Honor would allow, they

12 would be willing to provide some updates in their periodic

13 reports on the status of the residents.  The AAMC and the

14 CFFMG are willing to provide that information to the patient

15 care ombudsman so that it can be disclosed.

16        But overall, Your Honor, we ask that debtors be

17 required and that the Court publish more information on

18 exactly how the residents programs will be handled so that

19 the hospitals who are declining to make offers have more

20 information and can actually make the offers so that the

21 residents can transfer.  And we'd like obligations that the

22 release happen as soon as possible so these transfers can

23 happen.  Thank you, Your Honor.

24        THE COURT:  Thank you.  Thank you.

25        Good afternoon.

1        MR. MELORO:  Good afternoon, Your Honor.  Dennis

2   Meloro from Greenberg Traurig on behalf of the patient care

3   ombudsman.

4        Your Honor, that's correct.  We will --

5        THE COURT:  You are here on behalf of who?

6        MR. MELORO:  The patient care ombudsman.

7        THE COURT:  Oh, I'm sorry.  Thank you.

8        MR. MELORO:  So I would like to just confirm what

9   counsel said that we will take into account residency issues

10  in the role as an ombudsman, of course, only insofar as it

11  affects patient care.  Some of it might get beyond that

12  scope.  I would note that --

13       THE COURT:  Well, I assume if residents are up and

14  leaving immediately, that will obviously affect, greatly

15  affect patient care.

16       MR. MELORO:  Of course.  Right.  And we will

17  certainly make notes as appropriate.  And I would also like

18  to be clear to the Court that the ombudsman has visited the

19  hospitals twice already, has spoken to the residents, has

20  spoken to patients, has spoken to the physicians.  At present

21  there are no patient care concerns for the ombudsman.  And as

22  I mentioned, we are willing to take all these factors into

23  account.  We just want to be clear that it's not going to,

24  the transition might not affect patient care in and of itself

25  is what I'm saying.

1           THE COURT:  Okay.

2           MR. MELORO:  We'll make sure that the patients are

3  being taken care of, we'll speak to the appropriate people

4  and I can confirm that that's acceptable to us.

5           THE COURT:  All right.  Thank you.

6           MR. MELORO:  Thank you.

7           THE COURT:  Thank you, Mr. Meloro.

8           Mr. Alberto, yes sir.

9           MR. ALBERTO:  Good afternoon, Your Honor, Justin

10  Alberto from Bayard on behalf of the AAMC and ECFMG.  I'm

11  co=-counsel with Ms. Macksoud who was just up here.

12           THE COURT:  Yes.

13           MR. ALBERTO:  I apologize for standing up a second

14  time but we inadvertently forgot to mention to the Court that

15  some of the residents would like to be heard today.  I

16  believe that they prepared a letter that they would like to

17  read to Your Honor.  I understand that this is a carve out

18  from the usual procedures, but I think now probably makes

19  sense for them to be heard.  It does deal with this point,

20  and since we're talking about it now, unless Your Honor would

21  like to hear it afterwards, I think now makes sense.

22           THE COURT:  Well, I have -- look, this is

23  obviously sort of a gating issue to the bid procedures, what

24  happens to the residents and what the residents, what their

25  rights are and what the hospital's obligation is.  So I would

1  like to hear from the residents at this point.  Not all of

2  them necessarily because I don't have --

3          MR. ALBERTO:  It's a representative or two.

4          THE COURT:  Okay.

5          MR. ALBERTO:  I believe that they have signed a

6  letter that is going to be read by that representative.

7          THE COURT:  All right.  All right, Mr. Alberto,

8  that will be fine if I hear from the residents at this point.

9          MR. ALBERTO:  Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Alberto.

11          Good afternoon.

12          MS. MCCALIN:  Good afternoon.

13          THE COURT:  And you are for the record, your

14  names?

15          MS. MCCALIN:  Sure.  For the record, my name is

16  Monica McCalin, I'm a PGY3 at Hahnemann.

17          THE COURT:  Okay.

18          MS. OWENS:  And I am Judy Owens and I'm also a

19  PGY3.

20          THE COURT:  All right.

21          MS. MCCALIN:  Thank you for the time you've

22  allotted and the consideration you have shown in letting the

23  Hahnemann residents be present today.  The time that I intend

24  to use to speak truth to power.

25          As a cohort of engaged conscientious and dedicated

1  professionals, the Hahnemann University residents have

2  continued to add to the larger body of medical research,

3  bolstered their communities through their volunteer

4  activities and community engagements, acted as mentors to

5  aspiring physicians and scientists, and given their own time

6  to better the lives on cultures of the individuals and

7  institutions with whom they interact, including their care of

8  Philadelphia's sickest, poorest, and most downtrodden

9  population.  Of this I am immeasurably proud.

10         As a cohort of engaged conscientious and dedicated

11 professionals, the Hahnemann University residents have also

12 continued to display the utmost professionalism despite the

13 looming closure of their training facility.

14         They have remained at their stations and posts

15 within Hahnemann Hospital under the circumstances.  They have

16 continued to provide the highest level of patient care

17 possible.  And they have attempted to remain positive in the

18 face of this abject tragedy, and in my humble opinion, a

19 mockery of their profession.  From this I take strength.

20         The current track to becoming a boarded physician

21 practicing in the United States is arduous.  The Hahnemann

22 University residents prior to commencing their respective

23 residencies have invested at a minimum a combined 4500 years

24 and upwards of $50 million from across the country, I'm

25 sorry, which is subject to compound interest into their

1  higher education.  They have relocated their families from

2  across the country and in some cases across the globe.  They

3  have had children, they have bought houses, they have

4  established a sense of community within their neighborhoods

5  and a sense of camaraderie with their cohorts and mentors.

6  They have achieved a great deal by any metric.  And while

7  they are all successful in their own right, it has come at a

8  great cost due to the same pensive.

9           Foremost amongst to the issues that my colleagues

10  and myself take umbrage to, is the continued treatment of

11  Hahnemann residents by American Academic as a means to an

12  end.  The Hahnemann residents are not assets.  And the

13  attempt to sell our future and the quality of our training to

14  the highest bidder is a deplorable act, and perhaps the

15  single greatest source of consternation among the individuals

16  that I have had an opportunity to speak with.

17           The perception that residents are viewed as

18  nothing more than assets, the sale of which might help offset

19  debts is further supported by the demonstrated lack of

20  communication and cooperativity between Hahnemann

21  administration and outside Tower Health residency programs.

22           Many Hahnemann residents have been offered and

23  have accepted residency positions within these outside

24  institutions.  However, these offers have almost all been

25  contingent on the release of their CMS residency funding, and

1  then no concrete information has been provided by Hahnemann

2  administration regarding whether and/or when this funding

3  would be released.

4         The terms outlined in the stalking horse letter of

5  intent as we heard earlier states that Tower Health

6  recognizes that the residents have a choice as to where to do

7  their training and will agree to release, or if the release

8  must occur prior to closing, will agree that the seller may

9  release the related cap on Medicare reimbursement on a

10  temporary basis for those current residents who elected to

11  complete their training elsewhere.  As of yet, no Hahnemann

12  residents have been released with their funding.  This is

13  unacceptable.

14         The current hospital census indicates that less

15  than 90 of the approximately 500 hospital beds at Hahnemann

16  are occupied.

17         THE COURT:  I'm sorry, what was the, what were

18  those numbers again, Ms. McCalin?  Doctor.

19         MS. MCCALIN:  Less than 90.  And there are

20  approximately 500 beds at Hahnemann.

21         THE COURT:  Okay.

22         MS. MCCALIN:  So less than 20 percent.  And with

23  each passing day, the quality of training that the current

24  residents have continues to deteriorate.  The cost to our

25  education of remaining with Hahnemann increases.

1          From my residency program in particular we were

2     required to have completed a prescribed number of studies,

3     and based on the current hospital census this is not enough

4     to satisfy those requirements.  Continuing to keep residents

5     and fellows in limbo at a crumbling institution jeopardizes

6     the quality of our education.  And as a result jeopardizes

7     both the population we serve at present and the innumerable

8     patients we will treat in the future.  These present and

9     future patients, the American taxpayers, pay for our training

10    and will ultimately be under our care in operating rooms,

11    clinics, and emergency rooms across the nation.  They deserve

12    better.

13         In addition to the deteriorating quality of the

14    Drexel Hahnemann residency programs arguing for prompt

15    transfer to other programs, greater than 50 of the

16    approximately 570 Hahnemann residents are GY1 Visa holders

17    whose very livelihood and presence in the U.S. is contingent

18    on their active employment.  The possible risk of deportation

19    that these individuals face not only impacts their families

20    and themselves, many of these GY1 Visa holders will also go

21    on to serve healthcare outlets within the U.S.  And if they

22    are unable to promptly relocate to serve healthcare outlets

23    within the U.S. they are unable to relocate to new programs

24    and face the risk of deportation.  This creates the potential

25    for lasting repercussions on public health due to the

1  unnecessary loss of highly skilled physicians.

2          Another subset of individuals whose education and

3  future are in jeopardy are those that match the Hahnemann for

4  residency beginning in 2020, but are currently completing

5  preliminary years at outside institutions.  These individuals

6  have no security and no prospects of getting CNS funding as

7  they will not be training at Hahnemann at the time of the

8  closure, thus they must either find funded spots or go

9  through the arduous and extremely expensive match process

10  that all medical students go through to secure a residency

11  spot but now for a second time.

12          In light of these circumstances, we ask that you

13  compel American Academic and/or the prospective recipient of

14  the residency spots to set aside the money required for

15  training those individuals.

16          For these reasons and more, today we ask that you

17  compel American Academic Health Systems and Hahnemann

18  Hospital to authorize the release of our federal CMS funding

19  to the residency programs that have accepted us and await our

20  arrival irrespective of the occurrence of timing, of any sale

21  of Hahnemann assets to third party entities.  We fear that

22  the sale of our residency [indiscernible] to our health in

23  addition to being demeaning and irresponsible will only

24  prolong and exacerbate the uncertainty we have patiently

25  endured.  Please allow us to continue our quest to become the

1   best doctors that we can for ourselves and as well as the

2   communities that we serve.

3            Thank you.

4            THE COURT:  Thank you, doctor. Thank you.

5            Dr. Owens, yes.

6            MS. OWENS:  So I would just say -- we actually got

7   an update as we were reading this, the census is actually

8   less than 30.

9            THE COURT:  I'm sorry?

10           MS. OWENS:  Less than 30 patients currently.

11           THE COURT:  Okay.

12           MS. OWENS:  So I just wanted to say I went to

13  medical school at Drexel as did you know a lot of my

14  colleagues.  And when I retired from the Air Force I came

15  back to Hahnemann because it was an excellent place to learn.

16  You know, as has been stated, we're all, you know, upset by

17  the unfortunate circumstances, but we're moving forward or

18  trying to in our quest to complete our careers.

19           You know, in the Air Force we talk about our core

20  values of integrity first, service before self, and

21  excellence in all we do.  And I honestly think that that was

22  something that was reflected largely in the culture of

23  Hahnemann University Hospital.  I think ultimately all we're

24  asking is that our voices be heard as residents, that we be

25  considered as professionals trying to complete our careers,

1  not as assets, and we be given the opportunity to put

2  ourselves in the best positions to do this.

3          THE COURT:  Thank you.  Thank you, Doctors.  Thank

4  you both.

5          All right.  Well, you know, I've been struck for

6  some time in preparing for this hearing.  I was certainly

7  moved by the fact that this is really, this is a human

8  tragedy involving the residents and there has to be a

9  solution provided here for them, so --

10          Yes, sir?

11          MR. MARRIOTT:  Good afternoon, Your Honor.

12          THE COURT:  Good afternoon.

13          MR. MARRIOTT:  Vince Marriott, Ballard Spahr

14  representing Drexel University.

15          THE COURT:  Yes.

16          MR. MARRIOTT:  I thought it might be worthwhile

17  for me to get up really for three reasons.

18          First, as you know we were an objector to the

19  original closure plan principally on the basis that it did

20  not make adequate provision for the residents.  And we have

21  been concerned for the residents really from the beginning.

22          Second, we filed a statement of support on behalf

23  of the Tower transaction or Tower like transaction.

24          THE COURT:  Yes.

25          MR. MARRIOTT:  With either Tower or the highest

1  and best bidder.

2          THE COURT:  Higher bidder.  Yes.

3          MR. MARRIOTT:  This is a, and this probably is not

4  too strong of a word, a tragic situation for the residents,

5  for the medical school, Drexel University College of

6  Medicine, for the community.  And there is no perfect

7  solution.  And there is no solution that maximizes the

8  outcome for all of the affected constituencies.  There is

9  ultimately going to be a need to balance a non-perfect result

10 in such a way that the best benefit that can come from this

11 situation does.

12          It's our belief and we set forth the reasons it's

13 our belief, that a Tower or Tower like transaction makes the

14 best of a bad situation.  As we understand the transaction

15 and as we state in our statement of support, its ultimate

16 affect we believe would be to maximize the optionality that

17 residents have, not minimize the optionality that residents

18 have.

19          I mean they can all at some point choose to go

20 elsewhere.  What the Tower transaction provides though and

21 contemplates would be to maintain the option to remain in the

22 region with the faculty with whom they have been training or

23 anticipated training when they came to Hahnemann, and with as

24 much as their cohort intact as a willing to stay.  So it

25 provides an opportunity for a potentially intact transfer

1  without eliminating the option of going elsewhere if that's

2  what a resident should choose to do.

3           Again, none of this is perfect.  I mean it's not,

4  there's no situation that will precisely map to what they

5  came to Hahnemann to have.  But a Tower transaction at least

6  in our view offers a near map to what they came to Hahnemann

7  for, but it doesn't require them to do it.

8           I think it mischaracterizes what's happening here

9  as a sale of the residents.  That isn't the way it's

10 conceptualized as we understand it by Tower at all.  And

11 again it really is intended to offer to residents an

12 opportunity which they can take or not take but would not be

13 available absent this sort of transaction.  They would all

14 have to scatter without this sort of transaction.

15          A number of people have mentioned the

16 transparency.  Of course, there should be as much as

17 possible, and to the extent that the information flow has

18 been less than complete and timely, that should be corrected.

19 But an awful lot has happened in the last three weeks as Your

20 Honor knows.  And it can be difficult to keep up.  I have a

21 hard time keeping up.  In fact, I'm sorry I know all the

22 things I do.

23          THE COURT:  Well, I was shocked to learn there are

24 only 30 patients at the hospital.

25          MR. MARRIOTT:  It doesn't take long once, for

1  example, the one part of the closure plan as I understand it

2  that's been implemented is no further admissions from the

3  emergency department.  That will very quickly, and no more, I

4  don't know whether this has been implemented yet, but it will

5  be soon, no more elective surgery.  So it doesn't take long

6  if you're cutting off the avenues in which patients are fed

7  into a hospital I mean for the census count to drop.  It

8  happens relatively quickly.

9         One more thing.

10         THE COURT:  So are you telling the Court that the

11  residents who have an opportunity to go elsewhere should wait

12  until the sale, until the sale closes and then work with

13  Tower?

14         MR. MARRIOTT:  I'm not saying that anybody should

15  do anything.  It's our understanding of the Tower transaction

16  that it provides things they can do.  And one of them would

17  be to the extent possible, an intact movement from Hahnemann

18  to Tower as an option which would not be available absent a

19  Tower transaction or a Tower like transaction.

20         The last thing, Judge, and people have mentioned

21  this, this has to happen fast.  And it --

22         THE COURT:  Yes, it does.

23         MR. MARRIOTT:  It has to happen fast.  And the

24  only way it happens fast is if we get the process going.

25         I know there have been objections, HHS, Justice

1  Department on behalf of HHS asserted both in their objections

2  and today in Court what are really sale objections.  I don't

3  think the bid procedures process should be held up for sale

4  objections for a lot of reasons.

5          Number one, I think some of the sale objections

6  are based on a misreading of the LOI.  But regardless, the

7  parties can talk between now and the sale hearing and maybe

8  these issues are resolved.  I don't think we should assume

9  they won't be and interrupt a process that would result in an

10 outcome that at least in our view is making the best of a bad

11 situation.

12         It could be a competing bidder doesn't present the

13 same issues that the Tower transaction does.  I don't know.

14 But it's always a mistake in my view to decide now that

15 something can't happen at least while the parties are still

16 talking.  I think we should get the bid procedures approved,

17 get this taken care of, move it along, it's a very tight

18 timeline, appropriately and necessarily.  But we need to get

19 it started.  I just don't think that we should assume as we

20 stand here today that a Tower type transaction and the

21 options it provides to residents can never happen, and

22 therefore we should just throw our hands up.

23              THE COURT:  Thank you.

24              MR. MARRIOTT:  Thank you, Judge.

25              THE COURT:  Thank you.

1          Mr. Lapowsky.  Good afternoon.

2          MR. LAPOWSKY:  Good afternoon, Your Honor.  I'll

3   be brief.  Robert Lapowsky, Stevens & Lee for Tower Health.

4          Your Honor, Tower Health decided to become

5   involved in this transaction because it saw itself as part of

6   a solution to a problem.  As Mr. Marriott said, not

7   necessarily a perfect solution to the problem, but a

8   solution.

9          Tower has no desire to hamstring the residents.

10   That's why the LOI says what it says about Tower agreeing

11   that Hahnemann can release residents prior to the closing on

12   the Tower transaction if it does close.  It's why there is no

13   purchase price adjustment in the Tower LOI.  And as you'll

14   see when the purchase agreement, which I think by now may be

15   on the docket, but if it's not, it will shortly be on the

16   docket, will reinforce that there is no purchase price

17   adjustment.  Tower recognizes that the residents are free to

18   move where they want to move.  Tower would hope that some

19   substantial portion of the residents would decide on their

20   own that their best interests are served by coming to Tower.

21   But Tower has no desire or intent to coerce any resident to

22   come to Tower as part of this transaction.

23          THE COURT:  Is the receipt of the Medicare funding

24   of significance to Tower?

25          MR. LAPOWSKY:  Yes.  But it comes, and here I'm in

1  dangerous territory, Your Honor, because this is pure

2  healthcare, but I'll give you my best take on what happens

3  here.  If Tower acquires the provider agreement, it acquires,

4  these may not be exactly the right words, but the

5  entitlements long term to reimbursement for those slots,

6  whatever they are, 570 or 580 slots.  But that's long term.

7            In the short term, the CMS Medicare compensation

8  for the residents who are there today will follow as I

9  understand it those residents.  So from Tower's perspective

10  in the worse case scenario, all of the residents could go

11  elsewhere.  That would mean that Tower would not inherit the

12  ability to fill those slots until those residents' tenures

13  ran off which may be some number of years in the future.  But

14  at some point, and it would not be like in one fell swoop

15  because the residencies will expire over time, Tower would

16  start to be able to use the slots as they become available

17  because the residents have moved beyond the residencies.

18            THE COURT:  Right.

19            MR. LAPOWSKY:  And those slots now.  That's

20  valuable to Tower and that's the reasons that Tower is

21  willing to pay money even though they may get in the worst

22  case scenario no residence.

23            THE COURT:  Okay.  All right.  Thank you, Mr.

24  Lapowsky.

25            MR. LAPOWSKY:  Thank you, Your Honor.

1          THE COURT:  One more.  One more person I'll hear

2    on this issue.

3          Good afternoon.

4          MR. SMITH:  Thank you, Your Honor.

5          Good afternoon, Your Honor.  David Smith, Schnader

6    Harrison, Segal and Lewis representing the Commonwealth of

7    Pennsylvania Department of Health.

8          THE COURT:  Yes, sir.

9          MR. SMITH:  Your Honor, the Department of Health

10   is supportive of efforts to preserve and protect training

11   programs and to preserve and protect residents.  But the

12   conversation this morning has ignored one important aspect

13   that is the subject of the limited objection that we filed

14   that is docketed at number 185.  And that is the Department

15   of Health has the exclusive authority and responsibility to

16   protect the public interest and the public welfare in the

17   licensing of hospitals and hospital programs.

18          The conversation today has more or less assumed,

19   in fact, it's characterized the license as an asset to be

20   sold.

21          THE COURT:  Well, I thought that maybe we were

22   putting the cart before the horse in this instance.

23          MR. SMITH:  I think we are, Your Honor, because

24   there are statutes and regulations in Pennsylvania that both

25   empower and require the Department of Health to evaluate

1   applications and to grant or deny applications to be licensed

2   for these programs.  And we're assuming that the gavel bangs

3   on November, excuse me, September 6th and we have a licensed

4   institution prepared to take on these programs.  That's not

5   the way it works.

6          Right now there is no application pending for

7   these programs to be moved from one facility to another.

8   There has been no attention paid at least in the court

9   proceedings, although there are conversations taking place

10  outside of Court on whether and how these programs can be

11  licensed in a new, under the name of a new facility.

12         And our limited objection is not to prevent

13  consideration of the bid process motion or granting of the

14  bid process motion.  It is that the order granting if it is

15  granted, the bid process motion, should expressly say that

16  it's not the intention of the Court to usurp the function of

17  the Department of Health in accepting applications and

18  evaluating applications and granting or denying applications.

19  So being a successful bidder dose not mean without an

20  application and the granting of an application that the

21  program is actually going to be licensed in Pennsylvania.

22         THE COURT:  But here's the problem.  Nobody is

23  going to file an application until there's a successful

24  bidder.

25         MR. SMITH:  Well, that is a problem, Your Honor.

1   And I --

2          THE COURT:  And we have a real human problem here

3   that I would hope that the Commonwealth of Pennsylvania is

4   prepared to address because the license will not remain,

5   cannot remain at Hahnemann.

6          MR. SMITH:  It can't remain in Hahnemann.  That is

7   correct.  And then there's a legal question of

8   transferability if Hahnemann doesn't exist.

9          THE COURT:  Right.

10         MR. SMITH:  But those who are going to bid must

11  get involved in the application process and it may be that

12  they can become involved in the application process before

13  they are a successful bidder.  That just may be a transaction

14  cost that they've got to incur.  But again, the Department of

15  Health can't waive the application process and the licensing

16  evaluation.  It's got to happen, it's got to happen quickly.

17  And again my limited point here is the order should not

18  assume that the Court can grant a license.

19         THE COURT:  No, that's right.  Is the application

20  process expensive?

21         MR. SMITH:  Your Honor, that's way beyond my

22  knowledge.

23         THE COURT:  Okay.  All right.  Thank you.

24         MR. SMITH:  Thank you.

25         THE COURT:  Mr. Lapowsky, yes sir.

1          MR. LAPOWSKY:  Just quickly, Your Honor.

2          I just wanted to point out for the benefit of the

3   Commonwealth and also for the U.S. Attorney who spoke that

4   Tower fully understands that the Court doesn't have the power

5   to usurp the position of the Department of Health and that

6   any transfer would be subject to the Department of Health.

7   That's expressly stated in the LOI.  In section 70 of the LOI

8   has a contingency that states that applicable regulatory

9   approvals must be obtained as a condition to our offer.

10         It's another condition to our offer that CMS

11  consent to the transaction so the -- Mr. Marriott said he

12  thought that there were some objections here, that we're

13  misreading the LOI.  This is one of them.  CMS has a veto

14  power over this transaction.  They're going to have to agree

15  to it which is I think a compelling reason why we should get

16  past this bid procedure stage and let us start engaging with

17  CMS.  In fact, we've already started to engage with CMS as we

18  have with the Department of Health.  There have been numerous

19  meetings with the Department of Health.

20         I just wanted to add that, Your Honor.

21         THE COURT:  Thank you.  Thank you,.

22         Mr. Cutler, I have read your papers.

23         MR. CUTLER:  Have you read the second two?

24         THE COURT:  Yes.  And I don't think that they

25  address the issues that are before me today -- the resident

1  program and the sale and the like.  So --

2           MR. CUTLER:  They're not on the docket?  Two

3  documents I filed.

4           THE COURT:  I saw them; yes I did.

5           MR. CUTLER:  Okay.  Are not on the docket, and

6  continued funding for the residency for the hospital would

7  make the hospital, all these problems go away.

8           THE COURT:  Yes.

9           MR. CUTLER:  And if the hospital has funding then

10 there is no problem about where to send people.  And as a

11 continuing operation, I believe these are viable.

12          THE COURT:  Thank you, Mr. Cutler.

13          MR. CUTLER:  Okay.

14          THE COURT:  Thank you, sir.

15          MR. MINUTI:  Your Honor, again, Mark Minuti for

16 the record.

17          THE COURT:  Yes.

18          MR. MINUTI:  Your Honor, you know, I had a whole

19 presentation today for the motion and when I came in today

20 and saw the residents and obviously understand and appreciate

21 what concerns there are for the residents, I didn't want to

22 deal with that issue at the outset, so we got a little bit

23 sidetracked.  I shouldn't say sidetracked.  We dealt with

24 that but then what's happening is we kind of bled into some

25 of the other objections.

1        So here's what I think would make sense, Your

2   Honor.  We have now filed the asset purchase agreement.  We

3   do have a blackline of the order.  Maybe it makes sense now

4   for me to hand those up to Your Honor.  I think we have some

5   other copies for folks in the courtroom.  I could use the

6   benefit of five minutes to talk to my client.

7        And I would like the opportunity to respond to

8   some of the things that were said because, you know, and Mr.

9   Marriott stole a lot of my thunder, but I think when I'm done

10  my presentation which Your Honor is going to see is that

11  nothing we're doing today impacts the residents' ability to

12  leave.  Nothing we're doing today impacts their ability to

13  leave.

14       Number two, what we think we have, Your Honor, is

15  a creative solution that provides optionality.  Now a lot of

16  things have to fall in place between now and when we get to

17  the sale hearing, okay -- Department of Health approval, CMS

18  approval.  That's why the Tower Health deal is specifically

19  contingent on that.

20       THE COURT:  Yes, that's right.

21       MR. MINUTI:  So we think it's a creative solution.

22  We think we're going to get everybody in a room and we're

23  going to explain to them the benefits of this.  And we think

24  we're going to come back to Your Honor and say look this is

25  unusual, but this is creative and it provides additional

1  optionality and it's what's best for everyone.

2         But in terms of the residents' concerns, Your

3  Honor, nothing that we're going to ask the Court to do today

4  impacts that at all.  But I do want to address that.  But

5  again I think if I have five minutes it will be beneficial

6  and I can talk to my client and maybe more orderly collect my

7  thoughts.

8         THE COURT:  That's fine.  I understand that, Mr.

9  Minuti, I appreciate your difficulty with the way the hearing

10  has gone so far.

11         If you're going to hand me, though, the order and

12  the APA, should we take a half an hour for me to look at it

13  and read it and get to see what's there?

14         MR. MINUTI:  Your Honor, that's acceptable to the

15  debtors.  Absolutely.

16         THE COURT:  All right.  I think we should do that.

17  And that would give me an opportunity at least to become

18  familiar with the papers.

19         Why don't we come back at 1:30?

20         MR. MINUTI:  Very well, Your Honor.  Thank you

21  very much.

22         THE COURT:  All right?  And you're going to hand

23  papers to me, is that right?

24         MR. MINUTI:  Oh yes.  May I approach, Your Honor?

25         THE COURT:  Yes, you sure may.

1          MR. MINUTI:  Your Honor, what I have is a copy of

2    the asset purchase agreement.  It has now been docketed, and

3    I have a clean and a blackline of the order to hand up.

4          THE COURT:  All right.  Yes.  Thank you.  Thank

5    you.

6       (Recess taken at 12:47 p.m.)

1                        P.M. Session

2          (Proceedings resumed at 1:34 p.m.)

3                 COURT CLERK:  Please rise.

4                 THE COURT:  Thank you, everyone.  You may be

5   seated.

6                 MR. MINUTI:   Good afternoon, Your Honor.

7                 THE COURT:  I lost track of the time.  I'm sorry.

8   I apologize.  Mr. Minuti, yes.

9                 MR. MINUTI:  Certainly, no need to apologize to

10  us, Your Honor.

11                Again, Your Honor, Mark Minuti on behalf of the

12  debtors.

13                You know, Your Honor, I guess, well I'll speak for

14  myself.  You know in a lot of cases you're dealing with

15  budgets, hedge funds, big numbers --

16                THE COURT:  Yes.

17                MR. MINUTI:  -- and you sort of forget the human

18  element of the case.  But this, of course, is the kind of

19  case, Your Honor, where you cannot forget the human element

20  because you're looking at it every day.

21                We're running two hospitals here.  We have

22  residents in those hospitals.  We have patients in those

23  hospitals. And we are keenly aware what a horrible situation

24  this is and how it is impacting both the residents, as well

25  as our patients.

1          We certainly respect the statement of the

2    residents here today, Your Honor.  We feel for them.  We

3    recognize this is a terrible situation and we wish it were

4    different, Your Honor.

5          But I think what Your Honor heard from a number of

6    the folks that came to the podium was really, I think, a

7    misunderstanding of what we're trying to do today and let me

8    try to clarify that so hopefully they --

9          THE COURT:  I think I understand, but go ahead.

10          MR. MINUTI:  Thank you, Your Honor.

11          We are not in any way today selling residents.

12    That's not at all what this motion is about, Your Honor.

13          What we are selling essentially is -- are Medicare

14    provider number and our hospital license.  That's what we're

15    selling.  What goes with that, Your Honor, is optionality for

16    the residents.

17          The optionality is that if they choose to go to

18    Tower Health Reading Hospital, they have the ability to do

19    that.  And what we have, Your Honor, we have a buyer who's

20    prepared to take them all.  Okay.

21          And if we get other bids, Your Honor, when we

22    evaluate those other bids, one of the things we're going to

23    be looking at is, is that optionality maintained for all our

24    residents?  Does it make it a higher and better bid?  So

25    that's what this is all about.

1          You heard Mr. Lapowsky.  He represents the buyer.

2    The residents don't have to come.  It doesn't impact the

3    purchase price.  Nothing we're asking the court to do today

4    precludes the residents from leaving.

5          Nothing we're asking the court to do today or at

6    the sale hearing impacts the funding that will go with them

7    if they choose to go somewhere else, Your Honor.

8          THE COURT:  But see it's almost insulting to tell

9    people you can leave, but you won't be able to get a position

10   because we're not going to give you the Medicare funding.

11   That's the rub.

12         MR. MINUTI:  I completely understand Your Honor

13   and it's certainly not -- it is not our intent to be

14   insulting.  That's not what we're trying to do.

15         THE COURT:  I didn't mean to accuse you of that,

16   Mr. Minuti.

17         MR. MINUTI:  But, Your Honor, I can understand how

18   some of the people in the courtroom may feel that way.  And

19   what we're trying to do, though, Your Honor, is explain the

20   reality of the situation.

21         And the reality of the situation is, and I heard

22   Your Honor say at one point, well what if I added something

23   to the order that said the residents can leave and with them

24   will go a full-time equivalent of the funding.

25         THE COURT:  Right.

1          MR. MINUTI:  The first part of that we don't have

2 an issue with, Your Honor, because that's been the intent all

3 along.  If they want to leave, they're free to leave.

4          It's the second part that as a matter of fact

5 cannot be done, we don't have a full-time equivalent of

6 Medicare funding for all of the residents and all of the

7 fellows.  And why don't we have that, Your Honor?

8          We inherited that.  Before we bought the hospital,

9 okay, there are contractual arrangements that were in place

10 with other hospitals where they have that funding.

11          THE COURT:  Right.

12          MR. MINUTI:  And they have their own residents.

13 And they have residents that are depending on that funding.

14 So, while I wish it were the case that everybody could be

15 released today with a full-time equivalent of funding, the

16 facts are that we don't have that.

17          And, by the way, there's nothing improper about

18 that.  That's how this works.  But that's the reality. And I

19 think that's the misunderstanding and that's the rub.

20          You know, at one point, counsel for the ACGME got

21 up here and said the ideal world would be everybody gets to

22 leave with one full-time equivalent.  But then later, he

23 acknowledged that there are these contractual arrangements

24 where we may not have the full-time equivalent of funding to

25 give, and that's where we are.  We wish it were different.

1  That's where we are.  But the point of today, Your Honor, is

2  none of that is being impacted by what we're asking the court

3  today.

4         Now, we talk about when these residents can leave

5  and I'll state it again for the record to be perfectly clear.

6  By Monday, we will know exactly what funding will travel with

7  those residents by next week.  By Wednesday of next week,

8  half of our residents are free to go.  If they choose to go

9  somewhere else, we'd like them, frankly, to look at the

10  option at Tower Health, right, but Tower Health -- the Tower

11  Health deal is not dependent upon them going, but we think

12  that's a viable option --

13         THE COURT:  But here's the problem, that's going

14  to be two months away.  What are they going to do for two

15  months?  There are thirty patients at the hospital.

16         MR. MINUTI:  But, Your Honor, if the two months is

17  an imposition and they don't see the benefit of going to

18  Tower Health, half are free to go somewhere else next week.

19  The other half, Your Honor, are going to be free to go at the

20  latest August 9th.  Now why is that?

21         Your Honor heard today some statistics about

22  thirty patients, okay.

23         THE COURT:  Yes.

24         MR. MINUTI:  Let's be crystal clear what we're

25  talking about.  That's thirty patients that are in beds in

1  the hospital.  We have an emergency room that's still

2  running. We have other departments of the hospital that are

3  still running.  We have patients in their everyday that

4  exceed the thirty -- the patients we're talking about that

5  are in the beds.

6           Now, the reason why we only have thirty patients

7  in the bed at Hahnemann is we are no longer admitting our

8  emergency room patients into the hospital.  So, if someone

9  comes in and we treat them, but if they need an overnight

10 hospital stay, they're going somewhere else.

11          And because that was the main feeder of the

12 hospital beds that's why the number is dwindling and that was

13 all by design for all the reasons we already talked about.

14 So, I didn't want Your Honor to have the impression that

15 we're talking about only thirty patients and, yet, I'm

16 keeping all these folks here.

17          By next week, Your Honor, again, half -- if the

18 two months lag is an issue, half are free to make

19 arrangements elsewhere and their funding will follow because

20 we will know exactly what that funding is.

21          THE COURT:  Okay.

22          MR. MINUTI:  Okay.

23          THE COURT:  All right.

24          MR. MINUTI:  Bear with me for one second, Your

25 Honor.

1      THE COURT:  Sure.

2      MR. MINUTI:  So, again, we have a number of things

3  we're doing in the hospital still today that requires the

4  residents, and if they all go, Your Honor, then we have

5  patients we can't service which I think everybody wants to --

6      THE COURT:  I will hear you, but later.

7      MR. MINUTI:  So, Your Honor, at the end of the day

8  what this motion is really all about is optionality.  And let

9  me turn and just talk a briefly about the statements that

10 were made by the gentleman on the phone for the Department of

11 Justice on behalf of CMS and counsel who was here today for

12 the Pennsylvania Department of Health.

13     THE COURT:  Yes.

14     MR. MINUTI:  Both stood up here and said, you

15 know, look, you need our approval for this transaction to

16 happen.  And we agree with that, Your Honor.  We agree with

17 that.

18     In fact, when Your Honor looks at the Tower Health

19 agreement, and I think it's 17.1(c) of the asset purchase

20 agreement, it is specifically conditioned on us getting the

21 Department of Health onboard, and us getting the Government

22 onboard, CMS onboard.

23     THE COURT:  Right.

24     MR. MINUTI:  Right.  And I heard Mr. Smith on

25 behalf of the Department of Health said that he would

1  expedite the accrediting process or, I'm sure, the licensing

2  process for folks that are interested, and we're going to

3  take him up on that, Your Honor, because we'd like to move

4  this process as quickly as possible, and we appreciate the

5  offer because we do want to put people -- if people are

6  interested in providing optionality and a better deal comes

7  along or the Tower deal that is the best deal that's there,

8  we want to put them in a position, hopefully, to get this

9  done.

10        So, look, we may get here at the sale hearing and

11  I may say to Your Honor, look, Your Honor, we tried. We

12  couldn't get there.  And we can't go forward.  But we're

13  really hoping that doesn't happen. We're really hoping we can

14  bring everybody together and say look at what this program

15  does. Right?

16        The residents have what they have now.  They're

17  going to have what they have now later which is the

18  optionality to leave with their specific funding, and that's

19  all going to happen next week.  Right?  So, they're going to

20  have that.

21        But what I'm hoping to come back with at the sale

22  hearing is saying, look I've got this option.  And this is an

23  option for the residents, okay, that they can take advantage

24  of.  And what does that option do?

25        Remember, we may get bidding, by the way, from

1  folks far away from Philadelphia, right.  But, candidly, from

2  the debtors' perspective, it would be good if we could keep

3  these slots in Philadelphia, right.  That benefits

4  Philadelphia, it benefits the teaching committee.

5          THE COURT:  That's right.

6          MR. MINUTI:  We think that benefits the

7  Pennsylvania Department of Health.  So, I'm asking for an

8  opportunity to use the time between now and the sale hearing

9  to get those people to the table and convince them that all

10 this should happen.

11         If I don't get there, I don't get there, Your

12 Honor.  Nobody is harmed. Those are sale objections that are

13 all preserved.  And if I'm here fighting and they've got a

14 good argument, Your Honor is going to deny it and we're going

15 to say we tried.  But I'm asking for the opportunity to get

16 there because I think that's what's best for the estate.  I

17 think it's best for the residents and I think it's, frankly,

18 best for the state of Pennsylvania, as well as the city of

19 Philadelphia.

20         So, those are not today issues, but we got into a

21 little bit of those today.  I wanted to let Your Honor know

22 where I was.

23         Look, we're not kidding ourselves.  These are

24 unusual circumstances.  This is an unusual transaction.  It

25 requires us to get some cooperation and we're hoping we get

1  it.  I mean that's really all I can say about that, Your

2  Honor.

3          THE COURT:  I agree with you that those are sale

4  objections.  Let me just be clear.

5          MR. MINUTI:  Thank you, Your Honor.

6          So, Your Honor, to get back on track what I'd like

7  to do, as I said, I do have an evidentiary presentation.

8          THE COURT:  Yes.

9          MR. MINUTI:  It really doesn't touch on the

10  resident issue at all, Your Honor.  It just goes to the

11  business judgment for the transaction as well as the process

12  itself.  So, with Your Honor's permission, what I'd like to

13  do is offer some testimony.  I'm prepared to do it by proffer

14  and that, again, is of Mr. Weiland, the CRO, and Mr. Victor,

15  our investment banker.

16          THE COURT:  And both are in the courtroom and

17  available for cross-examination if anyone wants to cross-

18  examine.

19          Does anyone object to my accepting a proffer?

20      (No verbal response)

21          THE COURT:  Hearing no one, you may proceed with

22  the proffer then, Mr. Minuti.

23          MR. MINUTI:  Thank you, Your Honor.

24          Your Honor, I know the court is familiar with both

25  Mr. Weiland and Mr. Victor.  I have their background ready to

1 proffer, but given the hour I'm prepared to skip that and get

2 to the meat if Your Honor will accept that.

3        THE COURT:  They both have such distinguished

4 backgrounds it would have been nice to hear them again but

5 let's skip that.

6        (Laughter)

7        MR. MINUTI:  Thank you, Your Honor.

8        So, Your Honor, I'm going to start with Mr.

9 Weiland.  Again, Mr. Weiland is in the courtroom and if

10 called to the stand to testify he would testify as follows.

11        He was appointed the chief restructuring officer

12 of the debtors on April 8 and is proposed to serve as the CRO

13 during the debtors' Chapter 11 cases.  He would testify that

14 he signed the declaration in support of the various first-day

15 motions and that the information set forth in his first-day

16 declaration remains true and correct today.

17        Mr. Weiland would testify that once it became

18 clear that the debtors had no choice but to close Hahnemann

19 University Hospital, the debtors began working with SSG

20 Capital Advisors, the debtors' investment banker, to explore

21 options for monetizing the debtors' residents program assets

22 and minimizing disruption to the 583 residents and fellows

23 training as part of the thirty-five accredited residency and

24 fellow programs at the hospital.

25        Because most resident programs begin in July of

1   each year, it is imperative to find an alternative location

2   for residents as soon as possible.  Mr. Weiland would testify

3   that further because Hahnemann University Hospital is

4   closing, the debtors will no longer have a need for the

5   debtors' resident program assets, but those assets have value

6   to others looking to expand or adopt such programs.

7          Mr. Tower [sic] would testify that Tower Health

8   was immediately identified as a potential purchaser of the

9   debtors' residents program assets.  Tower Health is a natural

10  fit for the purchase of the debtors' residents programs asset

11  as it owns and operates six hospitals in our area; further

12  the transfer of the debtors' residents program assets to

13  Tower Health is supported by Drexel University College of

14  Medicine who the court will recall raised a number of issues

15  and concerns related to the residents.

16         Mr. Weiland would testify that on or about July 9,

17  2019, the debtors and Tower executed a letter of intent.

18  That letter of intent was attached to the motion before the

19  court today.  And the idea was to effectuate a sale of the

20  programs subject to a court-approved sale process and subject

21  to higher and better bids.

22         The day we executed or the day the debtor executed

23  the letter of intent, the debtors filed the motion before the

24  court.

25         Earlier today, Mr. Weiland would testify that the

1  debtors filed an asset purchase agreement with Tower Health

2  which embodies the terms of that letter of intent.

3        Mr. Weiland would testify that EisnerAmper was

4  involved in the negotiation of the Tower Health letter of

5  intent and asset purchase agreement and that the negotiations

6  with Tower Health were fair, at arm's length, and conducted

7  by both sides in good faith.  Both sides negotiated

8  vigorously and the asset purchase agreement represents the

9  results of considerable give and take by both parties.

10       In general terms, Mr. Weiland would testify that

11 Tower Health has agreed to acquire the debtors' residents

12 program assets for a purchase price of $7.5 million dollars,

13 subject to the adjustments set forth in the asset purchase

14 agreement and described in the motion.

15       Pursuant to the asset purchase agreement, Tower

16 Health will assume responsibility for the training of

17 Hahnemann University Hospital residents and residents will

18 have the right to be placed in one of Tower Health's six

19 hospitals.

20       Mr. Weiland would testify that the Tower Health

21 asset purchase agreement provides other benefits to the

22 residents including housing and meals.  Tower Health will

23 also seek to transfer the faculty with whom the residents

24 have been training to ensure that the residents' training

25 cohort remains intact.

1          Mr. Weiland would testify that as part of the

2  Tower Health letter of intent and now asset purchase

3  agreement, the debtors agree to seek court approval of a

4  breakup fee for Tower Health in the amount of $225,000

5  dollars.  There is no request for an expense reimbursement.

6          Mr. Weiland would testify that the proposed

7  breakup fee is payable if the debtors close another

8  transaction with a higher or better bidder. And he would

9  further testify that the breakup fee was agreed to as part of

10 the give and take of the negotiations with Tower Health and

11 that agreeing to seek approval of the breakup fee was an

12 integral part of the overall negotiations and absolutely

13 necessary to induce Tower Health to sign, first, the letter

14 of intent and now the asset purchase agreement.

15          Mr. Weiland would testify that Tower Health made

16 it clear from the outset that a breakup fee would be required

17 in order for it to spend the time and resources necessary to

18 move forward with a transaction.

19          Mr. Weiland would testify that the debtors worked

20 -- excuse me; Mr. Weiland would testify that the debtors

21 worked with SSG to develop the proposed bidding procedures

22 before the court.  In Mr. Weiland's view, the proposed

23 bidding procedures are designed under the circumstances to

24 best facilitate additional offers for the debtors' residents

25 program assets.

1          Finally, Mr. Weiland would testify that for all

2    the foregoing reasons, the debtors' decision to execute the

3    Tower Health letter of intent and now asset purchase

4    agreement and to sell the debtors' residents residence

5    program assets pursuant to the proposed bidding procedures

6    constitutes a valid exercise of the debtors' business

7    judgement.

8          That would complete Mr. Weiland's proffer. And,

9    again, he is in the courtroom if anybody wishes to cross-

10   examine.

11         THE COURT:  Does anyone wish to cross-examine Mr.

12   Weiland?

13       (No verbal response)

14         THE COURT:  All right hearing no one, the proffer

15   is accepted and admitted.

16         MR. MINUTI:  Thank you, Your Honor.

17         Your Honor, next is the proffer of Jay Scott

18   Victor of SSG Capital Advisors.  Again, Your Honor, I'm going

19   to skip Mr. Victor's background, all eleven paragraphs and

20   I'll start at paragraph number twelve.

21         THE COURT:  That would have been ten minutes

22   wouldn't it, Mr. Minuti?

23         MR. MINUTI:  Yes, Your Honor.

24         Your Honor, Mr. Victor, would testify that he and

25   SSG were hired by the debtors in early June to serve as the

1   debtors' investment banker to among other things assist the

2   debtors in pursuing a financing, sale or restructuring

3   transaction.

4         Other than Mr. Victor, the SSG team assigned to

5   this engagement includes Teresa Kohl, Craig Warznak, Alex

6   Lamb, and Matt DiTosto.

7         The SSG team spent the first few teams of their

8   assignment meeting with the debtors' management, gathering

9   information and learning about the debtors'' business.

10        They then developed marketing materials including

11  a teaser to be used to market the debtors' assets for sale,

12  working with the debtors' management and Mr. Weiland, the

13  Debtors' CRO.

14        Mr. Victor would testify that SSG created a

15  confidential information memorandum and established an

16  electronic data room of the debtors' key books and records

17  for purposes of providing potential bidders with an

18  opportunity to do due diligence.

19        Mr. Victor would testify that he was in the

20  courtroom when Mr. Weiland's proffer was read into the record

21  and he would support Mr. Weiland's testimony concerning the

22  identification of Tower Health as a potential purchaser of

23  the debtors' residents program assets.

24        Mr. Victor would testify that on or about July 9,

25  2019, the debtors and Tower Health executed the letter of

1  intent, attached to the motion, to effectuate a sale of the

2  residents program assets subject to court approval of the

3  sale and a process that would be subject to higher and better

4  bids.

5          Since the debtors signed the Tower Health letter

6  of intent, the SSG team contacted approximately 106

7  healthcare providers and institutions who may have interest

8  in acquiring the residents program assets and sent those

9  contacts a form of confidentiality agreement.

10          Mr. Victor would testify that SSG is now starting

11  to receive signed confidentiality agreements from interested

12  parties, and assume Your Honor approves the bidding

13  procedures today, they will then be permitted to engage with

14  those parties to see if we can get another bid in these

15  cases.

16          Mr. Victor would testify that he read the motion

17  before the court and is familiar with the proposed bidding

18  procedures.  The proposed bidding procedures were developed

19  by SSG working with the debtors and their advisors.  Mr.

20  Victor would characterize the proposed bidding procedures as

21  ordinary and customary and reasonably designed to solicit

22  bids for the debtors' residents program assets to promote a

23  competitive auction process and to lead to the highest and

24  best bid or bids for the assets.

25          Mr. Victor would testify that the proposed bidding

1  procedures now contemplate a bid deadline of August 5,

2  followed by an auction on August 7th, a proposed sale hearing

3  on August 9 and a closing by September 6th.

4          Mr. Victor would testify that the sale timeline is

5  aggressive but warrant under these extraordinary unusual

6  circumstances for several reasons.

7          First, Mr. Victor would testify that it is

8  imperative to find a home for the residents as soon as

9  possible to minimize disruption.  And, second, he would

10 testify that given the nature of the assets sold, it is their

11 expectation that local healthcare institutions are the best

12 position to bid on these assets.

13         Finally, Mr. Victor would testify that the debtors

14 are receiving consideration for the purchase of the debtors'

15 residents program assets and that value could be lost if the

16 process is extended in the 2019/2020 resident year is lost.

17         Under the extraordinary circumstances of this case

18 and given the efforts to date, Mr. Victor would testify that

19 the proposed timeline is the best that can be done under the

20 circumstances to maximize value.

21         Mr. Victor would testify that as part of the Tower

22 Health letter of intent and now asset purchase agreement, the

23 debtors agree to seek court approval of a breakup fee of

24 $225,000 dollars.  Again, there is no request for an expense

25 reimbursement.

1          Based upon his experience and the information

2 gathered by SSG from other transactions, performed by SSG and

3 others in the market, Mr. Victor would testify that courts

4 typically approve breakup fees in the range of between two

5 and five percent of the purchase price.

6          Here, Mr. Victor would testify that the proposed

7 breakup fee is three percent of the purchase price and well

8 within market, particularly given the lack of a request for

9 an expense reimbursement.

10          Mr. Victor would testify that the desired goal of

11 a stalking horse offer or the desired goals of the stalking

12 horse offer are to alert the marketplace that there is now a

13 floor for the value of the debtors' assets.  That, in fact,

14 the debtors' assets will be sold and that parties must act

15 quickly if they want an opportunity to bid on those assets.

16          Mr. Victor would testify that the Tower Health

17 letter of intent and now APA has already helped and will

18 continue to help achieve these goals.

19          He would testify that the Tower Health letter of

20 intent and now APA have established the floor for the

21 purchase of the residency programs assets.  In Mr. Victor's

22 view, the existence of the LOI and now APA has and will

23 provide a level of comfort and credibility to potential

24 bidders.

25          Given the relative modest amount of the proposed

1  breakup fee and given the level of interest expressed by

2  other parties in the debtors' residents program assets, Mr.

3  Victor would testify that he does not expect the amount of

4  the proposed breakup fee to be an impediment to the auction

5  and to be an impediment upon the sale process.

6         In sum and for the reasons previously stated, Mr.

7  Victor would testify that the existence of the Tower Health

8  letter of intent and now the asset purchase agreement have

9  already provided value to the debtors' estates and,

10  accordingly, the proposed breakup fee is reasonable under the

11  circumstance and should be approved.

12         That would complete Mr. Victor's proffer.

13         THE COURT:  All right, Mr. Minuti.  Does anyone

14  wish to cross-examine Mr. Victor?

15      (No verbal response)

16         THE COURT:  Hearing no one, the proffer is

17  admitted into evidence.

18         MR. MINUTI:   Your Honor, that would then complete

19  the evidentiary presentation today and I'm prepared to move

20  to argument.

21         THE COURT:  All right.  Please do.

22         MR. MINUTI:  Thank you.

23         THE COURT:  Yes, please.

24         MR. MINUTI:  Than you, Your Honor.

25         The evidence here today is unrebutted that the

1  sale of the debtors' residency program assets, pursuant to

2  Section 363 is in the best interest of the debtors, the

3  residents and the debtors' estate and creditors.

4        The relief today we're seeking, Your Honor, is

5  limited to approval of the procedures.  The debtors have

6  worked with SSG to develop those procedures and we propose a

7  process that is open and fair and appropriate under the

8  circumstances.

9        The proposed process, in our view, will bring

10  about the highest and best value for the sale of the debtors'

11  assets, again, under the circumstances.  Importantly, those

12  procedures allow us to move quickly to place the residents to

13  avoid uncertainty and to minimize disruption.

14        And, again, as we've already discussed, Your

15  Honor, in great length, nothing we're asking the court to do

16  today interrupts in any way a resident's ability to leave.

17  And as of next week, Your Honor, leave with the funding that

18  would travel with them.  Again, by the middle of next week,

19  the balance by August 9.

20        With respect to the breakup fee, Your Honor, there

21  has been no objection to the breakup fee.  It's a modest

22  amount of 3 percent. There is no expense reimbursement.  That

23  3 percent is well within market.

24        And, Your Honor, unless you want more argument on

25  that, I think it's certainly within the O'Brien standard and

1   Reliant Energy because it has provided a value; therefore, we

2   do believe it's an appropriate administrative claim and,

3   therefore, we think granting the 3 percent is appropriate.

4   Again, it's only paid if we close the transaction with a

5   higher and better bidder.

6           And as Mr. Victor testified, Your Honor, it's

7   already sent a message to the marketplace and provided value

8   in terms of letting people know we have a buyer.  This is a

9   valuable asset --

10          THE COURT:  No one has objected and I will accept

11  a 3 percent breakup fee under these circumstances.

12          MR. MINUTI:  Thank you very much, Your Honor.

13          So, Your Honor, with that and what I'd like to do

14  is just turn to the objections and responses, some of which

15  we've already talked about and I'll certainly give folks an

16  opportunity if they want to say anything further, but we did

17  get a handful and let me just tick those off one by one, Your

18  Honor.

19          THE COURT:  All right.

20          MR. MINUTI:  The first, Your Honor, we did receive

21  a statement in support by Drexel University.  Your Honor

22  heard from Drexel earlier today.  They are supportive of this

23  motion and procedure because as I think they agree and they

24  see it does provide some optionality to the residents and

25  hopefully it keeps as many folks in this market as possible.

1          Next, Your Honor, we had the objection -- the

2    limited objection of the Commonwealth of Pennsylvania.  You

3    already heard from counsel for the Commonwealth of

4    Pennsylvania.  Again, I'm not going to repeat everything I

5    already said.

6          We fully -- the Tower Health/Redding Hospital

7    asset purchase agreement, Your Honor, requires them to

8    consent and to be onboard and Your Honor has already heard me

9    on that.  Let me just see if there is anything else I would

10   say about that before I move on.

11          THE COURT:  I think that was basically their --

12   that was their objection.                          THE

13   COURT:  I think that was basically their -- that was their

14   objection.

15          MR. MINUTI:  I think that's basically it.  Yeah,

16   the only thing to highlight, Your Honor, again, is that's

17   really a sale objection.  All the rights are fully preserved.

18          THE COURT:  Yes.

19          MR. MINUTI:  Until we get to the sale hearing.

20          Next, Your Honor, was the limited objection of the

21   Association of American Medical Colleges and the Educational

22   Commission for Foreign Medical Graduates.  These are both

23   non-profit groups. Like the debtors, they're concerned about

24   the disruption and displacement of the residency.

25          You've already heard from them today, Your Honor.

1   They did want us to add a host of language to the order, most

2   of which, Your Honor, frankly, in our view, will chill the

3   bidding or restrict the bidding.  I think what they'd like to

4   do, Your Honor, is add requirements to the bid procedures

5   that bidders must bid this, they provide housing, they must

6   do this, they just do that.

7           What we've agreed to do, Your Honor, is ask the

8   bidders to provide language.  We've added this to the order.

9   We're going to ask the bidders to provide language in terms

10  of what accredited programs they have and what accredited

11  programs they're going to try to obtain or they think they

12  can obtain because that, I think, is important information

13  that the residents will want to know and need to know.

14          But beyond that, Your Honor, the other language

15  that they've asked for is really trying to dictate what the

16  bid should be.  And while we would love for the bids to come

17  in with those things, other benefits to the residents and so

18  on.  What we don't want to do, Your Honor, is dictate to a

19  bidder what their bid needs to look like at this point.  We

20  want the highest and best bids.  We don't want to restrict

21  anybody.

22          And, obviously if somebody bids with the things

23  that those objectors want, we're going to be all over that

24  and we'd like that as well.  Because, again, certainly our

25  goal here is to maximize value for the estate, but look we've

1   heard Your Honor.  We've heard the residents today.  We

2   understand they have concerns and we're trying to preserve

3   and maximize optionality for them as well.

4         So all of those things are going to be taken in

5   consideration.  What I don't want to do, Your Honor, is add

6   something to the bid procedures order that would discourage

7   somebody from bidding, right.  Because Your Honor I'm sure

8   knows how this works.

9         If somebody submits a bid, it's not like we accept

10  that and say hey no problem. We call them up and we say, hey

11  won't do you do this, why don't you do that.  And some of the

12  things we've already talked about today are some of the

13  things I'm sure we're going to be bringing up when we talk to

14  folks.

15         THE COURT:  Or in the course of the auction, there

16  are adjustments as well very many times.

17         MR. MINUTI:  Absolutely, Your Honor.  So, again,

18  if we get to the sale hearing and there's something about the

19  bid, we're asking Your Honor to approve that they don't like,

20  their rights are preserved.  They'll be able to bring it up

21  at the hearing.

22         So, again, for the most part, we've added a little

23  bit of language to address their issue, but we think, Your

24  Honor, that for the most part their issues are sale issues.

25         Next, Your Honor, docket number 188 was the

1  limited objection of the United States.  You've heard counsel

2  for the United States on the phone.  We already talked about

3  that, Your Honor.  We think that's a sale objection.  We

4  appreciate.  We've got to get them onboard.  We're going to

5  try to do that.  I won't repeat what I've already told Your

6  Honor.

7          Next at docket number 191 is the response and

8  reservation of rights of the Accreditation Counsel for

9  Graduate Medical Education, again, the ACGME.  Again, we've

10  already talked about that, Your Honor.

11          I think that we are -- I think Your Honor has

12  heard me on that and we're going to do our best, if possible,

13  to preserve optionality for the residents.  But, again, I

14  think their main issue was the release of the residents.

15  We've already talked about. We've already talked about what's

16  going to happen next week.

17          Next, Your Honor, was the statement and

18  reservation of rights of MidCap, our prepetition lender and

19  our post-petition lender.  I think their primary concern,

20  Your Honor, was that accounts receivable or debtor cash was

21  going to go to our buyer and how would they get it back, how

22  would they account for it, how would they track it.

23          To be clear, Your Honor, under the asset purchase

24  agreement we are not selling cash.  We are not selling our

25  accounts receivable.  As I understand the way the process

1   works, once the closing happens if we get to a sale, the

2   buyer is not going to be dealing under our number, for

3   example, so we don't think there are going to be issues.  But

4   I do think we now agree to some language -- give me one

5   moment, Your Honor.

6           So, Your Honor, what I'm being told is we are

7   working on some language to add to the order that will

8   hopefully resolve their issues so I may need a minute at the

9   end of the hearing just to see if we have an issue or we have

10  that resolved or not.

11          THE COURT:  All right.

12          MR. MINUTI:  I see counsel standing behind me so

13  why don't I let them speak at this point.

14          THE COURT:  All right, thank you, Mr. Minuti.

15  Good afternoon.

16          MS. SANTAMOUR:  Good afternoon, Your Honor.

17  Gretchen Santamour from Stradley Ronon on behalf of MidCap

18  Financial Trust and MidCap Funding IV Trust.

19          THE COURT:  Yes.

20          MS. SANTAMOUR:  I was just coming up to because I

21  thought before the court reconvened that we had our

22  discussions regarding language had fallen apart.  But I'm

23  happy to hear that we're going to go back and talk about

24  language to add to the order.

25          THE COURT:  All right.

1    MS. SANTAMOUR:  We do have some issues that we

2 think belong properly in the bidding procedures and can't be

3 postponed until the sale hearing.

4    THE COURT:  All right.

5    MS. SANTAMOUR:  Thank you, Your Honor.

6    THE COURT:  All right.  And if there's still a

7 problem I'll hear you then.

8    MR. MINUTI:  Thank you, Your Honor.

9    Your Honor, the final reservation of rights

10 limited objection that was filed, was filed just yesterday by

11 the official committee of unsecured creditors.

12    THE COURT:  Yes.

13    MR. MINUTI:  Attached to their objection was a

14 blackline, a redline of the record, where they had added some

15 language.  They asked us to take -- they had actually

16 provided to us earlier in the day, Your Honor, in dealing

17 with a number of things, it took us a while to get to the

18 committee and negotiate.  I think we got all of their issues

19 resolved, except for one.  That issue has to do with some

20 language, the order regarding the debtors' fiduciary out.

21    It is a -- I think the committee and our buyer is

22 at an impasse and maybe the best thing to do is to be -- turn

23 it over to Mr. Sherman and he can articulate the committee's

24 concerns and then I'll allow Mr. Lapowsky to respond to that.

25    THE COURT:  All right.  That's fine, Mr. Minuti.

1     Mr. Sherman, yes, sir?

2          MR. SHERMAN:  Good afternoon, Your Honor.  Again,

3    we'd like to thank the debtor and its professionals.  Over

4    the last number of days, have worked with us to address the

5    form of bid procedures and the bid procedures order.

6          Incorporated a number, most, if not -- I'm not

7    going to say all -- but most of the comments proposed by the

8    committee --

9          THE COURT:  Yes.

10         MR. SHERMAN:  -- and we've had a robust

11   discussion.

12         As far as just at an interpreter line, Your Honor,

13   as far as the motion and the effect on creditors, the

14   committee does support the motion.  Your Honor, from our

15   perspective, it establishes two floors.  Obviously, the floor

16   for the sale of assets, which we hope encourages robust

17   bidding from all bidders, so that assets can be maximized.

18   At the same time, it establishes a floor for the residents,

19   and I did hear, Your Honor, the human factor, which nobody

20   can ignore, and obviously should be front and center.

21         But at the end of the day, Your Honor, if we --

22   one thing that's self-evident is if the Court denies the

23   motion and doesn't allow this protocol, then you could have a

24   free fall of this program or of these residency slots.  And,

25   obviously, we have said this in other hospital-type cases,

1  right, the Hippocratic Oath is do no harm --

2           THE COURT:  Right.

3           MR. SHERMAN:  -- we do know the harm, Your Honor,

4  which would be inflicted if Your Honor says no, is if Your

5  Honor allows the bidding procedures to go forward today, all

6  the issues that were raised of the transferability of this

7  asset or transferability of these rights can be addressed and

8  should be addressed by Your Honor at the sale hearing.  So,

9  Your Honor, we would advocate for the establishment of two

10 floors, obviously, this is for a floor on the price and a

11 floor for the residents, ultimately, for our protocol.

12          THE COURT:  All right.  Good.

13          MR. SHERMAN:  And as far as the narrow issue, Your

14 Honor, which we had a discussion with the Saul Ewing folks

15 and Mr. Lapowsky on the bid procedures, it may be best, Your

16 Honor, to address that issue at the time of the sale hearing.

17 It's a process issue, Your Honor, relating to the unlikely

18 event that a bidder comes into the sale hearing and tries to

19 top a bid at the auction.

20          I'm not sure it makes sense to burden the Court

21 with that issue now.  Your Honor has dealt with it,

22 obviously, over the years and maybe some things are best left

23 unsaid, and if it happens, we'll address it.  If it doesn't

24 happen, we won't address it.  But I don't want to belabor the

25 record with that, Your Honor.  I think we've heard a lot

1  today, but, again, we would encourage Your Honor to allow

2  this process to go forward so that we can see if these

3  programs can be saved and the residency slots preserved.

4            THE COURT:  All right.  Thank you, Mr. Sherman.

5            Mr. Minuti?

6            MR. MINUTI:  Your Honor, that certainly completes

7  my presentation.  We do have the one issue with MidCap that

8  we would like to address maybe in a short break.

9            THE COURT:  Yes.  Does anyone else wish to be

10 heard with respect to the bidding procedures order?  I know

11 someone -- Mr. Brown, yes?

12           MR. BROWN:  Your Honor, very quickly, to pick up

13 on some of Mr. Minuti's comments about we don't know who will

14 be standing at the time of the sale and who bids will be

15 made.  We don't know whether any bidder who does not have

16 access to real estate will bid and require an assignment of

17 some of the real estate.

18           And then the definition of interests, defined

19 term, Footnote 4 of the proposed order, romanette five

20 includes easements and other rights.  That my impact my

21 client's rights and those are inappropriate to be included in

22 interests that the real estate could be sold or an assignment

23 of leases free and clear of those rights and that definition

24 should be stricken from the definition of interests, Your

25 Honor, before the bidding procedures even commence.

1          THE COURT:  Okay.  Thank you.

2          MR. BROWN:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          MR. SACKS:  (Via telephone)  Your Honor, this is

5 Mark Sacks with the Justice Department.  Would this be a good

6 time for me to speak on behalf of our objections?

7          THE COURT:  Yes.  Yes, go ahead, now.

8          MR. SACKS:  Thank you, Your Honor.  I appreciate

9 it.

10          I won't go over, again, what I described earlier.

11 We have concerns, as laid out in Docket Number 188, which

12 there are limited objections as to why the terms of the

13 stalking horse agreement and the procedures involved may lead

14 us to a sale that is not consistent with the law.  Your Honor

15 can make a determination about that now, but I would like to

16 make two points.

17          The first is that in our limited objection, we

18 suggested some language to be included in any order on

19 bidding procedures.  Having had a chance to speak with

20 debtors about that, they have not, to my knowledge, included

21 that in their revisions, so I would ask the Court to include

22 that language, and it's simply -- you'll find it in, again,

23 Document 188 and it is at Page 10, and it's simply standard

24 language about needing to maintain agreement of CMS and

25 comply with law in any transfer of a Medicare agreement.

1      I don't think it's controversial language.  It was

2  recently entered by one of your colleagues in the * In re

3  Promise Healthcare case -- that's Docket 257 -- Case Number

4  1812491.  So, I would ask the Court to include that in the

5  order on bidding procedures here.

6      My second point, I don't know if this is going to

7  be an issue, but in MidCap's objection, which I think is

8  Docket 199 at Page 5, they suggested, I believe, language for

9  the bidding procedures order that would include a non-

10  exclusive and irrevocable license to use a Medicare provider

11  agreement.  That is something the Court should not -- whether

12  debtors intend to now include that in a revised order, I

13  don't know, but that is something the Court should not enter,

14  because there is no legal authority for any party to have a

15  license, exclusive or otherwise, to a Medicare provider

16  agreement.  So, we'd ask the Court to not include that

17  language.

18      Thank you, Your Honor.

19      THE COURT:  All right.  Thank you.  Thank you very

20  much.

21      Mr. Lapowsky, yes?

22      MR. LAPOWSKY:  Yes, Your Honor.  Just responding

23  briefly to Mr. Brown's objection and then just a couple

24  cleanup items on the presentation Mr. Minuti made.

25      The definition of interests that Mr. Brown was

1  referring to is on Page 2 of the proposed form of bidding

2  procedures order, and that's lifted straight out of our asset

3  purchase agreement.  That's our definition of interests in

4  our asset purchase agreement.

5       If you look at the purchased assets in our asset

6  purchase agreement, none of them touch on anything I think

7  that Mr. Brown's client has an interest in; it's the provider

8  number, it's things like that.  The definition, itself, is a

9  fairly boilerplate definition of interests.  It's expansive

10 as can be, as you would expect a buyer to want.

11      And so, from our perspective, we would ask that

12 the definition be retained in the order, as written.

13 Clearly, if another bidder comes forward and puts in a

14 competing bid, which includes Mr. Brown's assets, then the

15 issue is presented and then whether the easement language is

16 appropriate, I think would be presented, but I would suggest

17 that that's an issue that can wait for the sale-approval

18 hearing, and when you know who the successful bidder is and

19 what they're purporting to buy.

20      In terms of just --

21      THE COURT:  Let me just interrupt for a minute,

22 Mr. Brown.

23      Is that acceptable to you?

24      MR. LAPOWSKY:  I know, Mr. Brown.  It's not going

25 to be acceptable.

1        (Laughter)

2            THE COURT:  I didn't think so either.

3            MR. BROWN:  Only because Mr. Lapowsky taught me,

4    Your Honor.

5        (Laughter)

6            MR. BROWN:  Your Honor, Mr. Lapowsky also

7    mentioned that none of the assets that are the subject of

8    their purchase agreement have any easements, and so a clause

9    (indiscernible) is completely superfluous in the context of

10   his asset purchase agreement.  And I don't know Mr. Lapowsky,

11   in order to compete for a bid, will seek to take on any of

12   the real estate in order to add value to the debtors' estates

13   or not.

14           As a consequence, it's inappropriate.  It's never

15   going to be approved in the context of a sale that it's free

16   and clear of an easement and those other things that are in

17   the scope of clause, (indiscernible) clause.  There's no so

18   much thing as boilerplate, Your Honor.  Every word in a

19   contract is important and should be given meaning and this

20   Clause 5 should come out at this point.  Thank you, Your

21   Honor.

22           THE COURT:  Mr. Lapowsky, I think Mr. Brown is

23   right on this point, and I recognize, you know, it's your

24   contract, but I would hope that you would consider removing

25   that paragraph.

1          MR. LAPOWSKY:  Well, not the paragraph.  He's not

2   asking about the paragraph.

3          THE COURT:  I'm sorry, the words.

4          MR. LAPOWSKY:  The word "easement"?

5          THE COURT:  Yes.

6          MR. LAPOWSKY:  We will remove the word easement,

7   Your Honor.

8          THE COURT:  All right.  And was that the only

9   word, Mr. Brown?  I thought there was another word that you

10  had concern about.

11         MR. BROWN:  Let me thank Mr. Lapowsky for his

12  graciousness on removing one word.

13         (Laughter)

14         MR. BROWN:  Your Honor, the entirety of Clause 5

15  is inappropriate.  Romanette five is inappropriate --

16         THE COURT:  Yes.

17         MR. BROWN:  -- and we'd like the whole subclause

18  to be -- if there's something that they bid on and there's a

19  particular interest that would fit within Paragraph 5 and

20  they want to modify their bid at that time to make sure that

21  they have an understanding and the counterparty has an

22  understanding of what -- how it will work --

23         THE COURT:  Yes.

24         MR. BROWN:  -- then in that context, there can be

25  a conversation, but to put the world on notice today that

1  people can come in today and walk all over people's real

2  estate rights and run with the land and something similar to

3  what's included in subclause 5, I think is inappropriate.

4          MR. LAPOWSKY:  Well, subclause 5 can apply to much

5  more than real estate.  It covers rights of first refusal.

6  It covers restrictions on the right to use.  We're buying

7  assets.

8          I mean, I thought Mr. Brown's position was we own

9  -- his client owns real estate.

10          THE COURT:  Right.

11          MR. LAPOWSKY:  Easements is kind of a real estate

12  concept.  Tower isn't buying any real estate, and, therefore,

13  why does Tower care about the word "easement" appearing in

14  the definition?  And the answer is, we don't.

15          But the rest of it could apply to personal

16  property.  It could apply to contracts we are buying, those

17  things, plenty of them, and I think it's appropriate.  And if

18  there is going to be an issue on those, I would suggest that

19  we reserve that until the sale hearing.

20          THE COURT:  Mr. Brown?

21          MR. BROWN:  Your Honor, if we take out the word

22  "easements" and insert the rest of Clause 5, as these things

23  relate to the purchased assets, I would have no further

24  objection.

25          MR. LAPOWSKY:  All of it only relates to the

1  purchased assets.  It's a divestment of interests in the

2  purchased assets.  The whole thing is qualified.  Even

3  easements is qualified by the purchased assets.

4          THE COURT:  I think that's right, Mr. Brown, in

5  these circumstances.  But do you want those words in there?

6          MR. BROWN:  I'm trying to make an accommodation,

7  Your Honor.  I don't want any of them in here, but to take

8  out the word "easements," and then specifically -- there's a

9  convoluted process in here, Your Honor, about the initial --

10  sorry, Your Honor --

11          THE COURT:  Go ahead, yes.

12          MR. BROWN:  -- about the initial designated

13  contracts list and supplemental notice of assumption and

14  assignment.  I, frankly, don't like the process that's

15  contemplated, but I don't stand to object to it.

16          THE COURT:  Okay.

17          MR. BROWN:  I don't know -- I don't have a sense

18  that I'll have any notice if our rights are implicated as a

19  result of what happens through a bid or any auction, or

20  certainly not adequate notice of any of that.  And, again,

21  I'm not rising to object to that.

22          But because of that, it gives me great pause of

23  what's in Footnote 2 -- I'm sorry -- Footnote 4.  As I see

24  it, the compounding of those problems may come back and bite

25  my client in the ankle, Your Honor, and so, if it could be

1  made expressly clear that what's left in romanette five is

2  the purchased assets, as they exist in the asset purchase

3  agreement today without modification, then I would be

4  comfortable leaving the rest of the words there, Your Honor.

5          MR. LAPOWSKY:  Your Honor, I'd point out that the

6  footnote that we're referring to --

7          THE COURT:  Yes.

8          MR. LAPOWSKY:  -- is in -- it comes in, if you go

9  up into the body of the document, it comes into Subpart X,

10 which says:

11         Authorizing the sale of the resident program

12 assets, which is a defined term -- that's what we're buying

13 --

14         THE COURT:  Right.

15         MR. LAPOWSKY:  -- in our existing agreement --

16 anybody can look at it and see what it is.  So, it says:

17         Authorizing the sale of the resident program

18 assets free and clear of interests, as defined in Footnote 4.

19         It's limited to what we're buying.  We're

20 divesting, as any buyer would want to -- we're divesting

21 interests as broadly as we can buy it in what we're buying --

22 nothing else.  So, I think it's already there.

23         MR. BROWN:  Except that this definition of

24 interests in carried through this document and would be

25 applicable to any other bidder's bid, and it would be

1  applicable to that aspect of the sale motion, that

2  contemplates a sale of the assets free and clear of the

3  defined term interests, which would then apply to every

4  bidder's bid.

5          MR. LAPOWSKY:  But then you could file an

6  objection.

7          THE COURT:  You're trying to avoid him filing an

8  objection.

9          MR. BROWN:  I'm asserting an objection now.

10         MR. LAPOWSKY:  I'm sorry, Your Honor?

11         THE COURT:  I was going to say you could file an

12  objection, but you'd prefer not to have to file an objection.

13         MR. LAPOWSKY:  Exactly, Your Honor.

14         MR. BROWN:  And I don't know whether I'll have any

15  time to file an objection.

16         MR. LAPOWSKY:  But the point is, Your Honor, he

17  doesn't appear to have an issue with the divestiture of these

18  interests, as we've defined them in the assets that we're

19  purchasing, and that's all that I'm worried about losing, is

20  the benefit of that definition in my deal.

21         I don't care if we get outbid.  I don't care what

22  the definition of interests is in the competing bidder's bid,

23  and that is -- but if we take this definition out of here

24  now, I've lost it in my deal.

25         MR. BROWN:  So, we have no dispute, Your Honor --

1          MR. LAPOWSKY:  Exactly.

2          MR. BROWN:  -- except (indiscernible) any other

3    bidder's bid, and that's what I'm concerned about.  I don't

4    know what those will be, and I don't know whether I'm going

5    to have an opportunity to know what those will be prior to

6    the objection deadline.

7          THE COURT:  Could we say something like, this

8    definition is applicable only to Tower?

9          MR. LAPOWSKY:  That works for me.

10         MR. BROWN:  And that works for me, as well, Your

11   Honor.

12         THE COURT:  All right.

13         MR. BROWN:  And it only works for Tower's bid as

14   it's presently presented.

15         MR. LAPOWSKY:  With the current asset structure --

16         THE COURT:  That's right.

17         MR. LAPOWSKY:  -- the current purchased assets

18   structure.

19         THE COURT:  Exactly, Mr. Brown.  That's right.

20         MR. BROWN:  Thank you, Mr. Lapowsky.

21         MR. LAPOWSKY:  You're welcome.

22         THE COURT:  Thank you.  Thank you.

23         MR. LAPOWSKY:  Your Honor, the cleanup items that

24   I had is -- and I think this is minor -- but in his

25   introductory remarks, Mr. Minuti referenced an initial bid,

1  an initial overbid of $7,725,000.

2            THE COURT:  And it should be seven hundred --

3            MR. LAPOWSKY:  It should be $7,825,000.

4            THE COURT:  That's right, because of the thousand-

5  dollar [sic] overbid.

6            MR. LAPOWSKY:  There was a hundred thousand

7  dollars, and that was added after we went back.

8            THE COURT:  That's right.

9            MR. LAPOWSKY:  The second thing I wanted to bring

10  to your attention, Your Honor, is in the bid procedures

11  order, the proposed bid procedures order, there was a change

12  that I wanted to bring to your attention and you probably saw

13  it.

14            THE COURT:  Right.

15            MR. LAPOWSKY:  And that deals with unknown

16  creditors.  So, these are -- the concern of Tower is that

17  somehow, some way, we get effective notice to holders of

18  claims, and we're really focused primarily here on patients -

19  - former and current patients -- who may have claims, may not

20  know they have claims.  They're not receiving actual notice,

21  unless they've asserted a claim.  If they've asserted a claim

22  already, they're a known creditor and they're getting actual

23  notice.

24            We want to make sure we're covered for what we

25  labeled the "unknown creditors."  We're doing that through a

1    publication notice.

2         THE COURT:  Yes.

3         MR. LAPOWSKY:  And I just wanted to highlight for

4    Your Honor that we are asking you, in the bid procedures

5    order, to approve the process that's been proposed for

6    noticing through publication, those kinds of creditors.

7         THE COURT:  I appreciate you pointing that out to

8    me, Mr. Lapowsky, and that would be fine.

9         MR. LAPOWSKY:  Thank you.  And, Your Honor, last,

10   I just wanted to note for the record, because you had -- this

11   really doesn't go to the bid procedures, but you asked Mr.

12   Minuti about this during his presentation -- about the

13   potential for delay in residents going to Tower.

14        THE COURT:  Yes.

15        MR. LAPOWSKY:  And there really isn't a need from

16   Tower's perspective for there to be any delay.  Tower would

17   accept residents tomorrow.  Would not -- with a release of a

18   proportionate piece of the cap that applies to those

19   residents if Hahnemann is prepared to release them.  So, from

20   Tower's perspective, anyway, there is no need to wait for

21   residents to begin moving to Tower.

22        THE COURT:  All right.  That's helpful to know.

23        MR. LAPOWSKY:  Your Honor, I'm being asked to take

24   a quick look at the language the Government has proposed to

25   be added to the bid procedures order, and I really just

1  glanced at it.

2           In concept, as I said when I was up earlier, we --

3  this whole deal is contingent on Government-approval, both,

4  the CMS and the Pennsylvania Department of Health.  As I took

5  a quick look at the language, it looks like that's what they

6  were trying to make sure there was no end run being attempted

7  here around them.  They would also have to consent to a cap

8  on their chargeback obligations -- rights under the provider

9  agreement, which they're not obligated to do, but -- so,

10  suspect that I'm going to be okay with the language that

11  they've suggested, I just haven't read it yet.

12           THE COURT:  All right.

13           MR. LAPOWSKY:  So, I want to be able to do that

14  before --

15           THE COURT:  I think that's right, Mr. Lapowsky.  I

16  do think it's somewhat neutral, based on this transaction, so

17  why don't you take a look during a break, yes.

18           MR. SMITH:  Your Honor, David Smith for the

19  Pennsylvania Department of Health.

20           THE COURT:  Yes.

21           MR. SMITH:  Once again, three quick points.  The

22  first is Mr. Minuti thanked me for expediting the

23  consideration and approval of licensing.  Obviously, that's

24  well beyond my authority as an advocate in this courtroom,

25  and I just want to make clear that I do not have authority to

1  waive regulations, procedures, what is involved in the united

2  transferring or applying for a new license.

3          The second is, at some point, in the paperwork

4  being generated by the debtors, they began calling the

5  Department of Health, the Department of Human Services.  I

6  brought that to their attention a couple of days ago, and

7  it's repeated in these papers, so that will need to be

8  corrected.

9          THE COURT:  Okay.

10          MR. SMITH:  And then the third and the substantive

11 point is that I think the order ought to expressly say, but

12 at a minimum, the transcript ought to reflect that nothing in

13 an order entered by the Court today will be construed to

14 excuse the requirement that the successful bidder must apply

15 for and obtain any and all licenses required by Pennsylvania

16 statutes and regulations or the authority of the Pennsylvania

17 Department of Health to consider, grant, or to deny such

18 licenses.

19          THE COURT:  I think that's clear on the record.

20          Mr. Lapowsky, is that right, what Mr. Smith has

21 indicated to us about the application?

22          MR. LAPOWSKY:  I'm sorry, I'm reading the --

23          THE COURT:  Oh, I'm sorry.

24          MR. LAPOWSKY:  -- the Federal Government's -- now,

25 I've got -- so, what (indiscernible) --

1          MR. SMITH:  Here, let me show you.  I wrote down

2  the language.

3          MR. LAPOWSKY:  Okay.  The language is fine, Your

4  Honor.

5          THE COURT:  All right.  I'm not going to insist

6  that that be placed in the order, but it is in the transcript

7  and it is acceptable, of course, to Tower.

8          MR. SMITH:  Thank you, very much, Your Honor.

9          THE COURT:  Thank you, Mr. Smith.

10          MR. CARLSON:  Douglas Carlson for ACGME, Your

11  Honor.

12          THE COURT:  Mr. Carlson, yes, sir?

13          MR. CARLSON:  Thank you, Your Honor.

14          I have a couple points.  I think -- I know they're

15  all pressing now to the residents -- and I say "all," I think

16  I have three -- and they may or may not be relevant to the

17  bidding, but I thought I would just ask -- that I'll raise

18  it.

19          First of all, as a point of clarification,

20  relative to the funding for the -- the Medicare funding on

21  Monday, will each resident learn the amount allocated to him

22  or her on Monday, as opposed to some other figure like the

23  aggregate?

24          MR. MINUTI:  Your Honor, the answer to that is

25  yes.

1          THE COURT:  Okay.  Good.

2          MR. CARLSON:  And so, in kind of along the same

3  vein, I've kind of perused the draft APA here and I see that

4  there's a revision, wherein the purchaser would release

5  Medicare monies and my question is, are we talking about the

6  same amount or are we talking about a different amount that

7  the purchaser would release.  If they're the same, then that

8  would be helpful for the resident to know if the resident has

9  X on Monday and at the point of purchase, the resident either

10  has X plus something or other or X minus something or other.

11          THE COURT:  I don't know.  Mr. Lapowsky, can you

12  answer that question?

13          MR. LAPOWSKY:  I think we've reached the limit of

14  my ability to answer these questions, Your Honor.

15          THE COURT:  Yes.

16          MR. LAPOWSKY:  I don't know enough about what

17  exactly it is that Tower will be getting when it closes, so I

18  don't know what it is they'd be releasing, but I can

19  certainly work on trying to get an answer to that question.

20          THE COURT:  All right.  And maybe provide it to

21  Mr. Carlson.

22          MR. LAPOWSKY:  Thank you.

23          THE COURT:  Yes.

24          MR. CARLSON:  So, again, along the same vein

25  relative to these monies, I suggest to the Court that it

1  would probably be helpful to the residents, and perhaps

2  others, if there was some transparency on the part of the

3  debtor, insofar as a per-resident amount is less than one

4  full for a resident and point five as to a fellow, as to how

5  the resulting figure was obtained.

6          THE COURT:  Is that something that's doable?  I'll

7  ask the debtors.

8          MR. MINUTI:  Your Honor, for the record, Mark

9  Minuti.  What you would --  what I'm being told by Mr.

10  Weiland is, it's a complex calculation that's being done by

11  an expert in the area that we're relying on, so I don't know

12  -- I just don't know if we can do that.

13          I mean, if we have it and we can share it, I will

14  commit to do that.

15          THE COURT:  Okay.  All right.  I think that's the

16  best I can do at this point, Mr. Carlson.

17          MR. CARLSON:  Thank you.  I have just one kind of

18  subject-matter area, and that is, I'm looking at the APA,

19  which has a provision relating to record retention, which

20  we're not going to make a movie out of, but it's an important

21  issue to all physicians and to these residents.

22          My first point is, I'd suggest to the Court that

23  it's not only helpful, but to the point of necessary to these

24  residents that a record be, in fact, created before they

25  leave, that they have, that reflects their attendance and

1  they're leaving in good standing for X amount of time in the

2  program, and also a second set of records to be passed on to

3  the transferee, which is the norm, Your Honor -- I just don't

4  know in this setting -- I just wanted to be sure that that

5  happens.  And the reason for the second set of records is to

6  guide the transferee as to the next step in the education.

7           I have kind of a related point.  Down the road,

8  these records, altogether, this provision in the APA seems to

9  apply to the current residents, but it may also apply to

10  graduates.  Throughout a physician's practicing life, it is

11  common for a physician to request privileges at another

12  hospital, to apply for another state for licensure, to apply

13  for certification from one body or another.

14           And in order to do each of those and others of

15  like kind, the requesting body requires that the answer come

16  from a reliable, original source.  There is, actually, a

17  mechanism that is operated by -- I represent them -- it's the

18  Federation of State Medical Boards that does this.  That

19  doesn't look like that's going to happen here.

20           If these records, for both sets, just go into a

21  cold-storage unit, I don't know what these folks and other

22  graduates are going to do upon the occasion that I described

23  or the occasions, and they do happen throughout the course of

24  a physician's life.

25           THE COURT:  Well, I assume that Tower is going

1  have these records.  Am I wrong about that?

2          MR. MINUTI:  Your Honor, again, I Mark Minuti --

3          THE COURT:  That these records are going to follow

4  the residents?

5          MR. MINUTI:  Your Honor, I don't know the answer

6  to that.  Here's what I can say, Your Honor.  I don't think

7  this is a bid procedures issue.

8          THE COURT:  I agree.

9          MR. MINUTI:  We've now heard the issue.  Mr.

10  Weiland has heard the issue.  Let us give some thought to

11  that.  We can have communications with counsel between now

12  and the sale hearing.

13          Maybe the answer is as simple as Your Honor just

14  suggested, which is the records are going to flow.  I know as

15  part of the closure plan, a big piece of that is what's going

16  to happen to patients' records and so on.

17          THE COURT:  Yes.

18          MR. MINUTI:  So, I think there is an answer, I

19  just don't know it.  My suggestion is it's not a today issue

20  and let's see if we can get it resolved before the sale

21  hearing.

22          THE COURT:  I think that's right.  I think that's

23  right, Mr. Carlson.

24          MR. CARLSON:  So, if that happens, I agree that

25  that is at least a place to put that issue, but it would be

1  helpful if we had some assurance as it the resident records

2  that need to be created upon their leaving the program, that

3  they are, in fact, going to be created.  This is a sensitive

4  setting.

5           THE COURT:  Well, have the discussions with

6  counsel.  If they're not satisfactory, you'll come back at

7  the sale hearing and raise them.

8           MR. CARLSON:  Thank you, Your Honor.  That's all I

9  have.

10          THE COURT:  Thank you.  Thank you.

11  MS. MACKSOUD:  Good afternoon, again, Your Honor; Lauren

12  Macksoud from Dentons US LLP on behalf of the Association of

13  American Medical Colleges and the Educational Commission on

14  Foreign Medical Graduates.

15          We had an opportunity to look at the revised bid

16  procedures and order.  We see the beefed up language on

17  accreditation status and we do appreciate that.

18          THE COURT:  Yes.

19          MS. MACKSOUD:  We do believe, Your Honor, that

20  there needs to be a further commitment and additional

21  language in the bid procedures order regarding whether it's

22  the debtor now or the purchasers ability or right in the

23  future should that become something they acquire to release

24  the residents and the funding that goes with them in an

25  expeditious manner.

1           There is still nothing in the bid procedures that

2    require that should that fall into the purchaser's hand,

3    should that responsibility fall into the purchaser's hands,

4    and we think it's appropriate for that to be in there given,

5    you know, as we discussed earlier what is at risk for the

6    residents as each day goes by that they're not receiving

7    training, that they're not treating patients and they're not

8    continuing on in their medical training program.  That is my

9    first point.

10          My second point I don't know if it's necessarily a

11   bid procedures objection, but debtor's counsel has addressed

12   the fact that fifty percent of the residents will know by

13   Tuesday whether they're staying or going.

14          THE COURT:  Yes.

15          MS. MACKSOUD:  There hasn't really been any

16   articulation of which fifty percent.  So, if they could get

17   some more color and transparency on that that would be very

18   helpful to the residents.

19          THE COURT:  Well, I don't know that they know

20   which fifty percent want to leave at this point.

21          MS. MACKSOUD:  I've heard that they all want to

22   leave.  I've heard ninety-five percent of them have other

23   offers.

24          THE COURT:  I've heard that too, but it sounds to

25   me -- I'm not sure how that will work, but fifty percent

1 will, obviously, be funded and then the other fifty percent

2 will be funded on August 9th.

3        MS. MACKSOUD:  Right.  And to the extent the

4 debtors can be aware before August 9th of certain people who

5 can go or of additional numbers that can go sooner I think

6 that would be very helpful to the residents.  If there is

7 thirty patients left and they've got two hundred and

8 something residents that seems perhaps disproportionate.  So,

9 if it's a sliding scale in time or if it's just a larger

10 percentage that can know before the 9th we'd ask the debtor

11 to do their best to work with the residents and give them

12 that information and commit to their releases as soon as

13 possible.

14        THE COURT:  All right.

15        MS. MACKSOUD:  And to that end my last point was

16 asking the debtor to simply provide the residents with a

17 place they can go wiht these types of questions.  You know,

18 my clients are not for profits.  They are here advocating for

19 the residents rights, but they don't represent the residents

20 directly.  So, I think it would be very helpful for the

21 residents to have a place to go with their questions and so

22 that they, you know, have a little more information and can

23 get more transparency in what, otherwise, is a very stressful

24 time in their career.

25        THE COURT:  I know that it is, yes.  And is there

1  not a head of the residency program?

2          MS. MACKSOUD:  My understanding is that each

3  program has a chief resident, but I know what happens if that

4  person chooses to leave before the rest of --

5          THE COURT:  But I mean an administrative person in

6  the hospital.

7          MS. MACKSOUD:  They have directors of -- let me

8  just -- the designated institutional officer, I believe, is

9  the name that they, is the title that they gave me.  So, I

10 understand that they can liaise with that person.

11         THE COURT:  Okay.

12         MS. MACKSOUD:  I don't know to what extent that

13 person has all of the up to date information.  So, maybe that

14 is the connection we need to make is the DIO and someone at

15 the debtors or the debtors' counsel's office.

16         THE COURT:  Is that right, Mr. Minuti.  Is there a

17 designated officer for this purpose?

18         MR. MINUTI:  Your Honor, I will put on the record

19 now there are two people the residents can go to with

20 questions.

21         THE COURT:  Okay.

22         MR. MINUTI:  One is Ron Dreskin.  Mr. Dreskin

23 happens to be in the courtroom today.  He is the interim

24 system-wide CEO.

25         THE COURT:  Okay.

1    MR. MINUTI:  The other is Bill Boyer.  He is the

2  vice president of academic affairs.  Both are at the hospital

3  daily.  They can go to either of those folks for questions.

4    THE COURT:  All right.

5    MS. MACKSOUD:  And do those folks have a line into

6  you guys so that they can get up to date information?

7    MR. MINUTI:  Of course.

8    MS. MACKSOUD:  Great.

9    THE COURT:  Thank you.

10    MS. MACKSOUD:  That's all for me.  Thank you, Your

11  Honor.

12    THE COURT:  And as far as their doing their best

13  to get information before August 9th I'm sure that they will.

14  I am not going to order them to do that, but I'm sure that

15  they would try.

16    MS. MACKSOUD:  Understood, Your Honor.  Thank you

17  very much.

18    THE COURT:  Sure.

19    MR. MINUTI:  Your Honor, the only point I think

20  that was left open by counsel's argument was if I'm

21  understanding it correctly what she's asking Your Honor to do

22  is include an injunction in the bid procedures order that

23  requires the debtor to let people go and requires our buyer

24  to let people go.  I think that's a sale objection.  I don't

25  think it's appropriate. I think we've said on the record

1  twelve times their rights are whatever their rights are and

2  it's going to happen under the timeframe I suggested.

3         So, I prefer not to burden the order with that

4  language.  I don't know how long it's going to take to

5  negotiate that language.  If they want it I think their

6  rights are protected.

7         THE COURT:  At the moment, obviously, it's

8  Hahnemann Hospital who would be doing the releasing and it's

9  not until the sale that it becomes the obligations of the

10 purchaser.

11        MS. MACKSOUD:  That's right.  I think it would be

12 very helpful to see in the bid procedures that any purchaser

13 needs to commit to releasing the funding that goes with the

14 residents expeditiously.

15        THE COURT:  That will be a sale objection.  We

16 will take care of that at the sale hearing, but I agree with

17 you.

18        MS. MACKSOUD:  Thank you, Your Honor.

19        THE COURT:  Yes, Mr. Lapowsky?

20        MR. LAPOWSKY:  Your Honor, I've looked at the

21 language that was in the objection of the United States and

22 I've had a chance to think about it.  So, this is language

23 that they -- do you have that language?

24        THE COURT:  I do.  I have it here.

25        MR. LAPOWSKY:  So, this is language that they want

1  inserted in the bid procedures order.

2          THE COURT:  Yes.

3          MR. LAPOWSKY:  The first sentence -- and I think

4  it's a little -- well, first of all, I think it's not

5  necessarily relevant.  The first part of it is saying nothing

6  in the order, it's a bid procedures order, would be construed

7  as authorizing the sale or transfer of the provider

8  agreements free and clear of successor liability.  The bid

9  procedures order doesn't authorize the transfer of anything

10 at all whether it's free and clear of something or not.  But

11 putting that aside my concern about the concept is that I

12 think the United States is worried about the United States.

13 I don't think they're worried about other potential creditors

14 who might assert claims against purchased assets.

15          Our primary purchased asset is the provider

16 agreement.  We will want the sale of the provider agreement

17 to us to be free and clear of successor liability claims.  To

18 the extent the United States is concerned about this we

19 acknowledge that we would not be taking the provider

20 agreement free of the claims of the United States as the

21 counter-party to the provider agreement to assert set-off

22 rights and things that they're entitled to assert.  That

23 doesn't mean that we should just completely throw the concept

24 of the successor liability shield out of our order.

25          So, I think we can work with their language, but I

1   would want to limit the effect of it to protecting the

2   interest that I think they're concerned about, which is their

3   own, and not other parties, not third-parties.  So, that is

4   my comment on the first paragraph.  And it's the first

5   sentence of the first paragraph of what they requested.

6           The second sentence is fine.  Then in the second

7   paragraph the first sentence is fine.  The second sentence I

8   think is the same issue.  It says that no successful bid or

9   back-up bid may include or require that any Medicaid provider

10  agreement be sold, assigned or transferred free and clear

11  under Section 363.  Well, we will want the provider agreement

12  transferred free and clear, maybe not of their interest, but

13  free and clear of everybody else's.

14          THE COURT:  That's right.

15          MR. LAPOWSKY:  So, if we can modify the language

16  so that it addresses the concern that they've got and isn't

17  so broad I think we can work with it.

18          THE COURT:  All right. I think that works.  I

19  understand your point, Mr. Lapowsky.  What you're saying is

20  you are a purchaser, you are buying free and clear of

21  everyone in the world's claims except perhaps the United

22  States.

23          MR. LAPOWSKY:  Right.  If there is an exception

24  let's make it narrow.

25          THE COURT:  Yes.  Okay.

1              MR. SACKS:  Your Honor, this is Mr. Sacks again.

2    May I be heard briefly?

3              THE COURT:  Yes?

4              MR. SACKS:  Thank you.

5              The language here is only in reference to the

6    Medicare provider agreement.  No other assets are discussed

7    in these two paragraphs.  I don't know what other claims

8    anyone other than the United States would have against the

9    agreement between the United States and the hospital.  So, I

10   think the language as written is very narrow and limited, but

11   I am certainly willing to consider any alternatives that Mr.

12   Lapowsky or the debtors want to present.

13             MR. LAPOWSKY:  I mean the nightmare scenario for

14   the buyer would be that some other creditor says you took the

15   provider agreement, the hospital shut down, it was the

16   primary asset and, guess what, you're now the successor.

17             THE COURT:  Right.  And I think that the sale

18   order will make it clear that that won't happen, but there

19   will be some relief to the United States in the event of a

20   problem.

21             MR. LAPOWSKY:  As I said before, Your Honor, this

22   whole transaction is contingent on the United States saying

23   yes.

24             THE COURT:  That's right.

25             MR. LAPOWSKY:  So, this and anything else that may

1  come up we're going to have to satisfy that.

2          THE COURT:  Okay.  All right.  Well, talk and

3  perhaps you will come up with language.

4          Yes?

5          MR. MINUTI:  Your Honor, I have a different

6  suggestion because as we've had an opportunity to look at the

7  language that was suggested by MidCap I don't think we're

8  going to be able to agree to it.  Even if we were to come up

9  with a compromise it would have to be run by the gentlemen

10 for the Department of Justice.  So, I think what makes more

11 sense is to have MidCap present their position to the court

12 so that the Department of Justice can hear it, the buyer can

13 hear it and we can either agree or disagree and Your Honor

14 can ultimately rule.  I think that would be the most

15 effective and easiest way to go.

16         THE COURT:  That would be fine.  All right.  Let's

17 do it that way.

18         MS. SANTAMOUR:  Good afternoon, Your Honor;

19 Gretchen Santamour on behalf of MidCap.

20         I think the language we suggested actually

21 shouldn't be objectionable to the United States because we

22 did include language that made it to the extent that it's

23 applicable, permissible under applicable law.  But,

24 basically, MidCap's position is that if they are going to

25 transfer the Medicare agreements there could be some

1 | limitations on the ability to collect the accounts receivable
2 | or that payment and tangibles that have accrued up to the
3 | point of transfer including those that have been billed, but
4 | mostly those that have not been billed yet; the services that
5 | have been provided.

6 | So, what typically happens, in our experience, is
7 | that when an operator transfers the licenses MidCap retains
8 | the right to have access to the extent necessary to be able
9 | to collect the receivables and that is the language that
10 | we're looking for.

11 | Just to make it clear that to the extent that
12 | there are accounts receivables that are generated that are
13 | subject to MidCap's lien for services that accrue prior to
14 | the transfer that there is no disruption in those accounts
15 | receivables, number one, going through the lockbox which was
16 | approved by Your Honor, you know, during the first day order
17 | and also to the extent that there is a need to collect those
18 | receivables after the fact that we will have access to the
19 | provider agreements to continue to collect those receivables.
20 | There is no obstruction.

21 | THE COURT:  But not the Medicare funds, is that
22 | right?  Is that your point?

23 | MS. SANTAMOUR:  What happens -- it's my
24 | understanding -- and I'm a little out of my water here. I
25 | thought we were going to have a break and I was going to

1  bring-in our healthcare lawyer from Vedder Price that, you

2  know, is more familiar with this issue.

3          THE COURT:  Okay.

4          MS. SANTAMOUR:  But I think, typically, they need

5  access just to the extent that they need to continue to

6  collect the receivables.  There's billing that will occur

7  after the date of the transfer, but the provider agreements

8  will be gone.  And there is also issues on collection and if

9  there's a denial or something like that.  So, there will be

10 continued collection issues that come up after this

11 transaction closes.

12         THE COURT:  Okay.  Mr. Sherman, you look like

13 you're ready to leap up.

14         MR. SHERMAN:  Your Honor, I'm just confused

15 because the hospital collects receivables.

16         THE COURT:  Right.

17         MR. SHERMAN:  MidCap doesn't collect receivables.

18 I believe, I forgot the CFR, the anti-assignment provision.

19 I am not going to guess, but there is a prohibition against

20 somebody other than the provider, the hospital, in collecting

21 the receivables.  So, I am confused by the notion that MidCap

22 would collect it.  And the language, I think, was MidCap's

23 agent, but I'm not sure the hospital is MidCap's agent.  The

24 hospital will continue to collect the receivables unless Mr.

25 Minute -- so, I am confused.

1          MS. SANTAMOUR:  Well, what will happen, Your

2    Honor, is that in the event that there is a default and

3    MidCap does take over its ability to exercise its remedies in

4    its accounts receivable it would most likely continue to

5    engage Tenent or Conifer and they would continue to collect

6    the receivables in that regard. But they would be doing that

7    on behalf of MidCap as opposed to the hospital at that point.

8    And that is where we want to make sure that there is no

9    disruption in the ability to continue to exercise the

10   remedies in the accounts receivable after the fact.

11         MR. SHERMAN:  Your Honor, I just think that's

12   illegal.  I think the hospital, in the event of a default,

13   the agent, Conifer in this instance, or the hospital will

14   continue to collect the receivables.

15         THE COURT:  Right.

16         MR. SHERMAN:  MidCap then can assert the rights

17   against those proceeds, but the collector, again, will

18   continue to be the provider.  It will be the hospital.

19         THE COURT:  I think that's right.  MidCap will

20   never be collecting the receivables even in the event of a

21   default.

22         MS. SANTAMOUR:  Well, I think that after an event

23   of default the receivables continue to come in, but they

24   continue to come into MidCap.  So, they will be collected by

25   MidCap.  We can exercise our remedies, terminate the line of

1  credit and at that point the receivables will collect out,

2  essentially.

3          THE COURT:  I don't think so.  It's my --

4          MR. BROWN:  Your Honor, I was just going to make a

5  finer point.  To the extent MidCap is using the word access

6  to gain access to facilities that my client lets to the

7  debtor or to any of the other parties.  At the last hearing

8  in the context of the DIP hearing they have agreed not to

9  include rights of access without our consent.  So, they don't

10 have that right anyway.

11         To the extent that they're talking about cloud

12 base or some other server access to data that's a different

13 story.  Then I will sit down about that issue.  That is not

14 my issue.

15         THE COURT:  All right.

16         MS. SANTAMOUR:  Your Honor, could I ask that this

17 issue be reserved to the final hearing because I think it

18 might be, you know, important to bring in our healthcare

19 counsel to be able to argue this point because I might be

20 missing, you know, an important fact here.

21         THE COURT:  Any objection to doing that?  I think

22 that makes sense.

23         MR. MINUTI:  Absolutely, Your Honor.  Remember,

24 this is just bid procedures.  Nothing is going to happen

25 until Your Honor approves the sale.  We can have dialog

1  between now and then.

2          THE COURT:  Absolutely.

3          MR. MINUTI:  And hopefully come up wiht a

4  reasonable solution to satisfy their concerns.

5          THE COURT:  Okay.  All right.

6          MS. SANTAMOUR:  Thank you, Your Honor.

7          THE COURT:  Thank you.  All right.  You need a

8  brief recess, don't you, Mr. Minuti?  Oh, no, you've talked

9  to MidCap.

10          MR. MINUTI:  Correct.  So, I think Your Honor has

11  now heard everything.  We would repeat our request that Your

12  Honor approve the bid procedures subject to the

13  modifications. I do think we're going to need a little time

14  to mark-up the order based on some of the things that have

15  happened today.

16          THE COURT:  Yes.

17          MR. MINUTI:  And my expectation is we could file

18  it under certification later this afternoon.

19          THE COURT:  All right. Well, it's getting little

20  late.

21          MR. MINUTI:  I'm not going to do what I did to you

22  last Friday.

23          THE COURT:  Right.  So, that will be fine.  Yes, I

24  am going to approve the bid procedures.  You know, I do

25  recognize the residents' concerns and I'm very, very

1   sympathetic with them.   I worry about it often, but I do

2   think that the proposed transaction is as much as possible

3   for the greater good, for the good of as many residents as

4   possible.

5            The fact that the debtors are going to make fifty

6   percent of the Medicare funds available next week for

7   residents to then be able to take that money and obtain new

8   jobs is helpful, that the rest of the money will be available

9   August 9th is also helpful.   But in the meantime a number of

10  residents may want to go with Tower.   And they ought to have

11  that opportunity to do so.

12           So, I do think that under the circumstances the

13  objections for the most part are for the sale.   The

14  objections are overruled as to the bid procedures to the

15  extent they have not already been accepted by the debtors.   I

16  will pleased to sign an order when I receive it.

17           MR. MINUTI:   Thank you very much, Your Honor.

18           THE COURT:   And we're on -- do we know, are we on

19  for August 9th, is that right?

20           MR. MINUTI:   We're going to go with August 9th,

21  Your Honor.

22           THE COURT:   I'm sorry, Mr. Sherman.   Have your

23  wife call me.

24       (Laughter)

25           MR. SHERMAN:   We'll take a late flight.

1          MR. MINUTI:  Thank you, Your Honor.  That

2    completes our agenda for today.

3          THE COURT:  Thank you everyone for being here.

4    Safe travel.  And I will wait to get that order, hopefully,

5    this afternoon.

6          MR. MINUTI:  Thank you.

7       (Proceedings concluded at 2:52 p.m.)

8

9

10                        CERTIFICATE

11

12      I certify that the foregoing is a correct transcript

13   from the electronic sound recording of the proceedings in the

14   above-entitled matter.

15
     /s/Mary Zajaczkowski                    July 20, 2019
16   Mary Zajaczkowski, CET**D-531

17

18

19

20

21

22

23

24

25