## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, | ) |  |
| *et al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## MOTION OF TENET BUSINESS SERVICES CORPORATION
## AND CONIFER REVENUE CYCLE SOLUTIONS, LLC FOR
## ENTRY OF AN ORDER (I) COMPELLING PAYMENT OF ALL UNPAID
## POSTPETITION AMOUNTS PURSUANT TO 11 U.S.C. § 503(B)(1) OR, IN
## THE ALTERNATIVE, (II) GRANTING RELIEF FROM THE AUTOMATIC
## STAY TO THE EXTENT NECESSARY TO TERMINATE THE TSA AND MSA

Tenet Business Services Corporation ("Tenet") and Conifer Revenue Cycle Solutions, LLC ("Conifer") respectfully request entry of an order (a) compelling the Debtors to pay all unpaid postpetition amounts owing under the TSA and MSA (as defined herein) or any extension thereof pursuant to 11 U.S.C. § 503(b)(1) or, alternatively, (b) lifting the automatic stay to allow for the termination of the TSA and MSA, solely to the extent the TSA and MSA did not terminate prior to the commencement of these cases. In further support of this motion, Tenet and Conifer respectfully state as follows:[2]

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]    Tenet and Conifer will file the declarations of Michael Maloney and David Dawson in support of this motion in connection herewith.

**Preliminary Statement**

1.      In January 2018, Tenet sold Hahnemann University Hospital ("Hahnemann") and

St. Christopher's Hospital for Children ("St. Christopher's" and, collectively, the "Hospitals") to

the Debtors and certain of their non-Debtor affiliates.  To facilitate that sale and permit the

Hospitals to continue to fulfill their public health and medical education missions, Tenet entered

into the Transition Services Agreement (the "TSA") pursuant to which Tenet agreed to administer

electronic patient medical records and related information technology systems for the Hospitals.

Additionally, Conifer[3] entered into the Master Services Agreement (the "MSA"), whereby Conifer

agreed to provide the Hospitals with on-site revenue cycle management services (including patient

check-in and registration, patient check-out and payment, patient scheduling for future

appointments, other non-medical patient-facing administrative services, and enrollment services).

Offsite, Conifer employees track and collect patient receivables using Conifer's proprietary

software and, where necessary, refer "bad debts" to a third-party vendor for collection.

2.      Unfortunately, the Debtors—under the control of their controlling shareholder,

California "venture capitalist" Joel Freedman—materially breached these agreements time and

again, ultimately running up more than *$58 million* in unpaid fees and costs under the TSA and

the MSA (exclusive of any additional liabilities assumed by Tenet at closing).

Indeed, notwithstanding the fact that Tenet and Conifer have provided uninterrupted services for

over a year, the Debtors did not pay *any* invoices during the seven months leading up to the

bankruptcy filing.  As a result of the Debtors' payment and other defaults, and following Tenet

and Conifer's repeated and ultimately rebuffed attempts to engage with Debtors regarding the non-

---

[3]   Conifer is wholly owned by Conifer Health Solutions, LLC (a joint venture between an affiliate of Tenet
Healthcare Corporation and Catholic Health Initiatives).

payment, Tenet and Conifer provided notice of termination of the MSA and TSA on May 2, 2019, with such termination to be effective as of May 17, 2019.[4]

3. Following the notice of termination, the Debtors, which had by that time engaged a chief restructuring officer, reengaged with Tenet and Conifer. To facilitate that dialogue, Tenet and Conifer agreed, on a short-term basis, to continue to provide services at the levels contemplated under the terminated TSA and MSA while only receiving a fraction of their respective contractual rates in cash, without waiving any right to receive payment in full in cash for any deficiency. It was Tenet and Conifer's hope that the Debtors were merely in a short-term liquidity crisis, and that a consensual resolution could be reached and the Debtors could ultimately avoid chapter 11, thus ensuring the ongoing viability of the Hospitals. But the Debtors refused to provide basic financial and operational information to Tenet and Conifer's prior financial advisor, or even provide information about the Debtors' chapter 11 strategy after a filing became inevitable.

4. Tenet and Conifer most recently agreed to continue to provide services to the Hospitals at the levels contemplated under the MSA and TSA on July 19, 2019, for one week, through July 26, 2019. Consistent with their corporate missions and history of charitable giving in the Philadelphia area, Tenet and Conifer provided these extensions, among other reasons, to ensure that exceptional medical care is available to the patients served by the Hospitals. While Tenet and Conifer are still willing to engage on a consensual resolution, Tenet and Conifer—both of which are accountable to their own stakeholders—can no longer continue to provide services to the Debtors unless Tenet and Conifer are fully compensated in cash on the terms set forth in the now-terminated TSA and MSA.

---

[4]   A copy of the May 2, 2019 termination notice will be filed under seal as **Exhibit A** in connection herewith.

5.    More specifically, the Debtors' prepetition payment defaults notwithstanding, these estates may already be administratively insolvent, as evidenced by the fact the DIP budget only includes $200,000 per week for payments to Tenet and Conifer. While Tenet and Conifer expect the Debtors to take the position that the TSA and MSA remain binding, the budgeted amount is roughly 25 percent of the contract rate and is insufficient to cover Tenet and Conifer's costs (including payroll and benefits for their personnel on-site at the Hospitals). In other words, even if the TSA and MSA were not validly terminated prepetition, the Debtors have admitted in writing that they cannot satisfy their postpetition obligations thereunder. Requiring Tenet and Conifer to continue to perform while they receive a fraction of the cash amount owed on a postpetition basis is not only inequitable, it will also deepen the Debtors' potential administrative insolvency and run afoul of the bedrock bankruptcy principle that a debtor must pay its postpetition debts in full in cash in the ordinary course of business when such debts become due and owing.

6.    Tenet and Conifer expect that the Debtors will argue that any payment shortfalls are of no moment because the Hahnemann closure and St. Christopher's sale will generate sufficient cash to pay administrative creditors in full in cash. Tenet and Conifer believe this is uncertain at this time. Mr. Freedman is the ultimate equity owner of the non-Debtor PropCo entities (collectively, the "PropCos") that own the real estate on which Hahnemann and St. Christopher's are located. Mr. Freedman oversaw the structure of the sale of the Hospitals that included the setup of the Debtors' "OpCo/PropCo" structure whereby the Debtors operate the Hospitals and the non-Debtor PropCos own the associated real estate. While Mr. Freedman has agreed to recuse himself from the Debtors' sale process, there is no indication Mr. Freedman intends to obtain court approval for any sale of the PropCos' real estate (which is located in the heart of Philadelphia and offers a once-in-a-generation redevelopment opportunity). It is possible

4

that Mr. Freedman will use his control over the Debtors and the PropCos to shift value from the Debtors' bankruptcy estates to the PropCos and profit at the expense of the Debtors and their creditors.[5]

7.      Finally, the Debtors' liquidity shortfall is further compounded by the fact that the Debtors—without adequate notice to state or city regulators or approval by this Court—have begun to shutter Hahnemann, and it is therefore increasingly impracticable for Tenet and Conifer to prudently provide the services to the Debtors on a go-forward basis. Among other things, the Closure Plan contemplated by the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(A), 363, and 1108 of the Bankruptcy Code (A) Authorizing the Debtors to Implement A Plan of Closure for Hahnemann University Hospital and (B) Scheduling A Final Hearing* [Docket No. 15] still remains unavailable to parties in interest in these cases a month after that motion was filed with the Court. If the Hahnemann closure continues as planned, it will cease to have any medical personnel by September 6, 2019, yet Conifer is expected to collect receivables for months (or years) to come, without any ability to verify those payments with medical oversight. The lack of information provided by the Debtors about the Hahnemann closure process, as well as about basic questions regarding how Tenet and Conifer are to provide services post-closure, render it impossible for Tenet and Conifer to conduct the long-term planning and financial management

---

[5]    *See* Mike Elk, *Private Equity's Latest Scheme: Closing Urban Hospitals and Selling Off the Real Estate*, The Am. Rep. (July 11, 2019), https://prospect.org/article/private-equitys-latest-scheme-closing-urban-hospitals-and-selling-real-estate ("In addition, while Paladin put Hahnemann into bankruptcy, it did not include the real estate as part of the bankruptcy filing. 'Paladin continues to own the real estate and stands to make a fortune without lifting a finger by selling it to developers . . . .'") (quoting Eileen Applebaum, co-director of the Center for Economic and Policy Research); Matthew Rothstein, *Philly Hospital the First to Be Stripped for Assets by Private Equity*, Bisnow (July 14, 2019), https://www.bisnow.com/philadelphia/news/healthcare/private-equity-hospitals-philadelphia-hahnemann-99848 ("Rather than sell the hospital business, Freedman is dissolving it and selling the campus' buildings for their considerable real estate value.").

necessary to provide services to the Debtors and/or to protect their personnel, property, and other interests.

8.      Accordingly, Tenet and Conifer respectfully request that the Court compel the Debtors pursuant to section 503(b) of the Bankruptcy Code to pay any amounts attributable to services provided to the Debtors postpetition, at the rates contemplated by the TSA and MSA (and, for any amounts that are not yet due and payable under the terms of the TSA and MSA, to escrow or otherwise reserve such amounts, to be paid promptly to Tenet and Conifer once such fees become due and owing).  Furthermore, Tenet and Conifer simply cannot continue to sustain these significant losses to perform the services previously provided under the now-terminated TSA and MSA.  As such, to the extent that the Debtors cannot pay the contract rate under the TSA and/or the MSA for all go-forward services, Tenet and Conifer respectfully request that the Court modify the automatic stay pursuant to section 362(d) of the Bankruptcy Code to the extent necessary to permit Tenet and Conifer to terminate the TSA and MSA, solely to the extent that the TSA and MSA did not terminate prior to the commencement of these cases.[6]

## Jurisdiction and Venue

9.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[6]     To be clear, while Tenet and Conifer believe that the TSA and MSA were validly terminated prepetition, they do not seek a declaratory judgment that those agreements were validly terminated. Rather, Tenet and Conifer request that the Court modify the automatic stay to permit the parties to terminate those agreements assuming that the agreements remain in full force and effect.  As described below, there is cause for such relief given the Debtors' financial condition and the uncontested fact that the Debtors cannot pay their postpetition obligations in full in cash in the ordinary course of business.

10.    The predicates for the relief requested herein are sections 362(d), 503, and 507 of

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rules 4001 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1, 4001-1,

9006-1, and 9013-1 of the Local Rules for the United States Bankruptcy Court for the District of

Delaware (the "Local Rules").

## Background

## I.    Sale of Hospitals by Tenet; Overview of Services Provided

11.    From 1998 through January 2018, Tenet owned and operated both Hahnemann and

St. Christopher's.  Pursuant to the terms of an Asset Sale Agreement dated August 31, 2017 and

amended January 11, 2018, Tenet and certain of its affiliates sold certain assets comprising the

Hospitals to a group of purchasers, including Debtor Philadelphia Academic Health System

("PAHS") and certain of its affiliates.  In addition, on January 11, 2018, to assist in the orderly

transition of the Hospitals, PAHS entered into two separate services agreements:  the TSA with

Tenet[7] and the MSA with Conifer.[8]

12.    Under the TSA, Tenet agreed to provide certain "Information Services" to PAHS

for two years (until January 2020).[9]  These services, at a high level, involve the provision of

software applications that allow the Hospitals to store medical records and financial data, calculate

healthcare costs, track and detail patient expenses and accounts and provide patient billing

information, and order and keep track of supplies through vendors for the Hospitals.  In addition,

---

[7]    The TSA will be filed under seal as **Exhibit B** in connection herewith.

[8]    The MSA will be filed under seal as **Exhibit C** in connection herewith.

[9]    Certain of the services provided by Tenet under the TSA are so-called "pass-through" services, which Tenet contracts with other vendors to provide for the Hospitals.  Tenet then "passes through" the cost of those services to PAHS.

Tenet also provides information support "help desk" services, telecommunications connectivity services related to the applications, and, upon request, provides the Hospitals with quality reports based on the data entered into the applications.

13.     Under the MSA, Conifer agreed to provide services to PAHS for an initial term of three years (until January 2021).  The services include certain services provided on site to the Hospitals, and certain services provided remotely.  On site, Conifer provides patient access services, including patient check in and registration, patient check out and payment, patient scheduling for future appointments, and other non-medical patient-facing administrative services. Conifer also provides on-site patient enrollment services.  These enrollment services involve counseling related to the costs patients will face for their treatment and patient eligibility for government insurance programs.

14.     Conifer also provides certain remote services, primarily from off-site Conifer facilities.  These services principally include revenue cycle management, wherein Conifer employees track and collect patient receivables using Conifer's proprietary software and, where necessary, refer "bad debts" to a third-party vendor for further collection activity.

**II.     PAHS Has Repeatedly Breached the MSA and TSA by Failing to Make Payments Due**

15.     Both Tenet and Conifer provide PAHS with monthly invoices for services provided under the TSA and MSA.  Under both the MSA and the TSA, PAHS is obligated to pay for services provided within forty-five days of the invoice.  *See* MSA § 6.1; TSA § 4.1.  Both agreements similarly make clear that continued non-payment for services constitutes a material breach of the agreements.  *See* MSA § 15.4; TSA § 2.3.

16.    PAHS has not paid for a substantial portion of the services rendered.  Under the

TSA, PAHS is currently over $27 million in undisputed arrears.[10]  Under the MSA, PAHS is

similarly delinquent:  it has not made a single MSA payment since April 2018, and currently owes

more than $30 million in arrears under the MSA.[11]  Certain of the unpaid MSA invoices include

invoices dating as far back as January 2018, the month the MSA was signed.  Both Tenet and

Conifer have repeatedly notified PAHS that its non-payment of due and owing invoices constitutes

material breach by PAHS of the agreements.

**III.    Tenet and Conifer Have Continuously Attempted to Negotiate with the Debtors**

17.    Due to PAHS's failure to pay its due and owing invoices, and the millions of dollars

of out-of-pocket costs to Tenet and Conifer, the situation was untenable.  Nevertheless, Tenet and

Conifer remained committed to the success of the Hospitals.  While clearly and explicitly reserving

their rights to terminate the TSA and MSA, for many months neither Tenet nor Conifer terminated

when they could have; instead, they continued providing services and attempted to work out a

consensual solution with PAHS.  For months, Tenet and Conifer worked to establish a dialogue

with PAHS to find a workable solution for all parties.  PAHS would initially display interest and

a willingness to engage, secure an extension of Tenet and Conifer's provision of services, and later

abandon settlement discussions with no explanation.

---

[10]    PAHS is currently over $28 million in total arrears under the TSA.  On November 20, 2018, PAHS sent a single "Dispute Notice," which disputed $806,368.25 in fees.  The dispute notice will be filed under seal as **Exhibit D** in connection herewith.

[11]    PAHS has sent a single "dispute notice," in the form of a letter dated September 18, 2018.  A number of the purportedly disputed invoices had actually been approved by PAHS's own Chief Revenue Cycle Director Sheldon Pink, which Conifer informed PAHS via a response letter dated October 12, 2018.  Further, the dispute was not timely:  each of the newly "disputed" invoices was already past due.  All of Conifer's invoices since September 2018 are undisputed, totaling more than $19 million.

### IV.    Conifer and Tenet Sent PAHS a Termination Notice on May 2, 2019

18.    On May 2, 2019—approximately one year since PAHS last paid an invoice under the MSA and over one month since PAHS shut down the settlement and transition negotiations with no explanation—Tenet and Conifer sent PAHS a letter (a) overviewing Tenet's and Conifer's efforts to support the Hospitals to date, (b) outlining PAHS' repeated failure to pay for services under the MSA and TSA, and (c) providing notice that the TSA and MSA were terminated, effective as of May 17, 2019, absent cure of all outstanding amounts due prior to such time.

19.    Settlement negotiations briefly resumed following PAHS' receipt of the termination notice, and Tenet and Conifer agreed to extend the impending termination date several times to facilitate these discussions.  On June 30, 2019, the Debtors commenced these chapter 11 cases.  The current extension of the termination date extends through July 26, 2019.

### Relief Requested

20.    By this Motion, Tenet and Conifer seek entry of an order, substantially in the form attached hereto as **Exhibit E** (the "Proposed Order"), compelling the Debtors to pay all unpaid postpetition claims owing to Tenet and Conifer under the TSA and MSA pursuant to section 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code").

21.    Tenet and Conifer validly terminated the TSA and MSA prepetition.  Nevertheless, to the extent that such agreements were not validly terminated prepetition, Tenet and Conifer request that the Court modify the automatic stay pursuant to section 362(d)(1) to the extent necessary to terminate the TSA and MSA absent mutual agreement among the parties regarding go-forward terms.

10

**Basis for Relief**

I.    **The Court Should Grant Tenet and Conifer Administrative Expense Claims and Compel the Debtors' Immediate Payment Thereof**

22.    Section 503 of the Bankruptcy Code provides that, after notice and a hearing, there shall be allowed administrative expenses, including the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). This Court has consistently held that a debtor must pay the reasonable value of the necessary services received under a postpetition executory contract pending assumption or rejection of that contract when the debtor continues to receive the benefits of the contract. *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741 (Bankr. D. Del. 2010) ("Courts in this District have consistently held that an administrative expense priority is available to contract parties when the debtor enjoys the benefits of the contract pending assumption or rejection."); *see also In re Sportsman's Warehouse*, 436 B.R. 308, 315 (Bankr. D. Del. 2009) (involving a nonresidential lease for real property but considering section 503); *In re Continental Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D. Del. 1992) (citing *NLRB. v. Bildisco*, 465 U.S. 513, 531 (1984)).

23.    It is presumed that the contract rate is the reasonable value of the services provided to the estate. *Smurfit-Stone*, 425 B.R. at 741 (citing *In re Bethlehem Steel Corp.*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003)); *see also Sportsman's Warehouse*, 436 at 314 ("The amount of the benefit to the estate is presumed to be the contract rate . . . ."). The contract rates for the critical services provided under the TSA and MSA require weekly payments of approximately $810,000.

24.    Tenet and Conifer's performance under the TSA and MSA has given rise to unpaid postpetition amounts that, as of the date hereof, are approximately $1.4 million and $1.8 million, and are continuing to accrue each week in the amount of approximately $250,000 and $360,000, taking into account the $200,000 weekly payments made pursuant to the DIP budget. For these

11

reasons, the Court should allow Tenet an administrative expense claim in the amount of at least $1.4 million and Conifer an administrative expense claim in the amount of at least $1.8 million on account of unpaid postpetition services provided to the Debtors thus far under the TSA and MSA, respectively. This administrative claim increases significantly every week the Debtors underpay Tenet and Conifer.

25.     Tenet and Conifer also respectfully request that the Debtors pay these administrative claims immediately (and place amounts into escrow for fees that have been incurred but are not yet due and payable pursuant to the terms of the TSA and MSA, with such escrowed amounts to be paid promptly to Tenet and Conifer once they become due and owing). Due to the potential for the Debtors' administrative insolvency, prompt payment (and escrow of amounts that have been incurred but are not yet due and owing pursuant to the TSA and MSA) is appropriate. "Courts have discretion to determine when an administrative expense will be paid." *In re Garden Ridge Corp.*, 323 B.R. 136 (Bankr. D. Del. 2005) (citing *HQ Global Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002)); *see also Continental Airlines*, 146 B.R. at 531. "In determining the time of payment, courts consider prejudice to the debtor, hardship to the claimant, and potential detriment to other creditors." *Id.*

26.     The Debtors are currently underpaying Tenet and Conifer by approximately a combined $610,000 *weekly* so long as Hahnemann operates, as the Debtors' DIP budget only provides for weekly payments of $200,000 on account of postpetition services provided by Conifer. Tenet is not receiving any payments under the current DIP budget. Despite the Debtors' delinquency, both Tenet and Conifer have continued to provide postpetition services to the Debtors and are suffering substantial losses in connection therewith, as the Debtors' payments do not even cover Tenet and Conifer's costs under the TSA and MSA.

27.     The Debtors would not be prejudiced if required to pay the reasonable value of

Tenet and Conifer's ongoing services.[12]   The Debtors admitted at the DIP hearing that they are

currently paying in cash "all of [the Debtors'] vendors on a post-petition basis currently."   *See*

Hr'g Tr. (July 12, 2019) at 54:15-17.   However, the Debtors are not treating the expenses

associated with Tenet and Conifer's services with the same level of urgency as all other operational

costs that are apparently being paid in full in cash in the ordinary course.   The alternative to

contemporaneous payment, as discussed in the next section, is that Tenet and Conifer cease

performance under the contracts.   As their course of dealings demonstrates, Tenet and Conifer do

not weigh this option lightly, but Tenet and Conifer have now been faced with over a year of

nonpayment and are presently subsidizing the Debtors by providing these critical services on a

postpetition basis at a significant loss to Tenet and Conifer, without a guarantee of ***any*** recovery

aside from the Debtors' payment of a quarter of the contract rate.

**II.    Alternatively, the Court Should Grant Tenet and Conifer Relief from the Automatic Stay to Allow for the Termination of the TSA and MSA, If Necessary**

**A.     Section 362(d) of the Bankruptcy Code Permits the Court to Modify the Automatic Stay "For Cause."**

28.     Section 362(a) of the Bankruptcy Code provides for the automatic stay of certain

actions against a debtor or its property.   11 U.S.C. § 362(a).   Section 362(d)(1) provides that the

automatic stay may be lifted for "cause, including the lack of adequate protection of an interest in

property of such party in interest[.]"   11 U.S.C. § 362(d); *Rocco v. J.P. Morgan Chase Bank*, 255

F. App'x 638, 641 (3d Cir. 2007).   The Bankruptcy Code does not define "cause," but courts have

---

[12]   Tenet and Conifer expect that the Debtors will respond to this motion by arguing that the Debtors have brought formal claims and made informal allegations against Tenet and Conifer that allegedly exceed the amounts due under the TSA and MSA.  Tenet and Conifer vigorously dispute those allegations and will respond at the appropriate time, but the fact remains that these fees remain due under the TSA and MSA (and those agreements do not allow for set-off against other claims between the parties).

explained that "[c]ause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007). Bankruptcy courts have found "cause" to lift the automatic stay exists when: (a) the debtor or the debtor's estate will not be greatly prejudiced; (b) the hardship to the movant by maintenance of the automatic stay considerably outweighs the hardship to the debtor; and (c) the movant has a reasonable chance of prevailing on the merits. *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (citing *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 735 (7th Cir. 1991)); *accord In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993).

29.      Once the movant establishes a *prima facie* case that "cause" exists to lift the automatic stay, the burden of proof shifts to the debtor to show that "cause" does ***not*** exist. *See* 11 U.S.C. § 362(g) ("In any hearing . . . concerning relief from the stay of any act under subsection (a) of this section—(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) that the party opposing such relief has the burden of proof on all other issues.").

**B.      To the Extent that the TSA and MSA Were Not Validly Terminated Prepetition, Cause Exists to Modify the Automatic Stay to Terminate the TSA and MSA at this Time.**

30.      As described above, pursuant to a letter dated May 2, 2019, Tenet and Conifer provided notice of the termination of the TSA and MSA in response to the Debtors' year-long material breaches, with such termination to be effective on May 17, 2019 (the "Termination Date"). Since that time, Tenet and Conifer have provided services at the levels contemplated under the TSA and MSA on a temporary basis, with the latest agreement set to expire on July 26, 2019. Irrespective of any dispute as to whether Tenet and Conifer validly terminated the TSA and MSA

prepetition, "cause" exists under section 362(d)(1) of the Bankruptcy Code to lift the automatic stay to permit termination of those agreements at this time.

(i)    *Factor #1: The Debtors Will Not Be Greatly Prejudiced.*

31.    The first factor relevant to whether "cause" exists to lift the automatic stay is whether the debtor or the debtor's estate will not be greatly prejudiced. *See In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (internal citations omitted). As noted above, the Debtors are receiving a windfall at Tenet and Conifer's expense because the estates are receiving services for a fraction of the bargained-for contractual rate. The requested relief will require the Debtors to pay their postpetition obligations in full in cash in the ordinary course, as required by section 503(b) of the Bankruptcy Code. While the requested relief may impose additional costs on the estates, Bankruptcy Code's requirement that a debtor in possession pay its postpetition obligations in full in cash is the "price of admission" for a debtor to obtain the benefits provided by chapter 11 of the Bankruptcy Code. With respect, the Debtors cannot use their refusal to satisfy postpetition obligations in full in cash as a basis to oppose the requested relief.

(ii)    *Factor #2: Tenet and Conifer Face Significant Hardship if the Court Does Not Permit Termination of the TSA and MSA Immediately.*

32.    The second factor relevant to whether "cause" exists to lift the automatic stay is whether the hardship to the movant by maintenance of the automatic stay considerably outweighs the hardship to the debtor. *See id.*

33.    There is no question that Tenet and Conifer, absent the requested relief, will face massive costs, and that those costs outweigh any benefit to the Debtors of forcing Tenet and Conifer to continue to provide services at below-market rates. More specifically, since the Petition Date, the Debtors have only paid 25 percent of the contract rate that is provided for in the DIP budget, and have not evidenced any ability or intention to pay more than that amount on a

15

go-forward basis (and, indeed, the DIP budget would prevent any additional payments for this initial 13-week period). Put simply, Tenet and Conifer should not (and cannot) bear the burden of effectively financing the Debtors' postpetition operations on an unsecured basis.[13]

34.    Furthermore, while there is a possibility that the PropCos' real property assets will fetch a substantial sum, there is significant risk that Mr. Freedman will use his control over the Debtors and their non-Debtor affiliates to steer the allocation of any sale proceeds to the PropCos, which are outside of these chapter 11 cases.

(iii)    *Factor #3:   Tenet and Conifer Are Likely to Prevail on the Merits Because the Debtors Have Habitually Breached, and Continue to Preemptively Breach, the TSA and MSA.*

35.    The final factor relevant to whether "cause" exists to lift the automatic stay is whether the movant has a reasonable chance of prevailing on the merits. *See id.* For the reasons set forth above, if the MSA and TSA were not validly terminated prepetition, cause plainly exists under section 362 of the Bankruptcy Code at this time to terminate those agreements. There is no dispute that the Debtors have breached the terms of the TSA and MSA because the Debtors have refused to agree to pay the amounts due for the postpetition period through the date hereof in full in cash at their contractual rates. Moreover, the Debtors have preemptively breached the TSA and MSA with respect to any go-forward period because the Debtors have agreed to limit payments to Tenet and Conifer to $200,000 per week, a fraction of the amounts owed to each during those successive periods. Even more problematic is the fact that the DIP order ***prohibits*** the Debtors from paying the contractual rates; in other words, the Debtors could not agree to pay the

---

[13]   It is possible that at some point there may be a determination by the Court that the Debtors' estates are administratively insolvent, and to retroactively impair all holders of administrative claims to ensure a fair and equitable distribution to all administrative creditors. But Tenet and Conifer cannot be required to agree to continue to provide their services to the Debtors on a 75% discount, or continue to perform when the Debtors are unable to pay more than a fraction of what is owed in cash.

go-forward fees and expenses absent agreement with the DIP lender or violating a court order. Finally, the Debtors admittedly cannot assume the agreements because they lack funding to satisfy the applicable cure amounts (which the Debtors' own petitions place in the tens of millions of dollars). *See, e.g.*, *In re West Electronics*, 852 F.2d 79, 83-84 (3d Cir. 1988) (finding that the automatic stay should be lifted to allow termination of a contract when the debtor was unable to assume the contract); *In re Hernandez*, 287 B.R. 795, 807 (Bankr. D. Ariz. 2002) (same).

### Reservation of Rights

36.     Tenet and Conifer reserve all rights, remedies, claims, counterclaims, and defenses under the TSA and the MSA, at law, and in equity, including, without limitation, Tenet and Conifer's right to file an administrative expense claim and/or a rejection damages claim.

### Notice

37.     A copy of the Motion has been provided to (a) counsel to the Debtors; (b) the Office of the United States Trustee; (c) counsel to the Official Committee of Unsecured Creditors; (d) counsel to MidCap Funding IV Trust; (e) Drexel University d/b/a Drexel University College of Medicine; (f) the Debtors' unions; (g) the Internal Revenue Service; (h) the United States Attorney for the District of Delaware; (i) the United States Department of Justice; (j) the Pennsylvania Attorney General's Office; (k) the Pennsylvania Department of Human Services; (l) the City of Philadelphia; and (m) all applicable federal, state and local taxing and regulatory authorities having jurisdiction over the Assets; and (n) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. Tenet and Conifer submit that, under the circumstances, such notice constitutes good and sufficient notice of this Motion and no other or further notice need be given.

**No Prior Request**

38.     No prior request for the relief sought in this Motion has been made to this Court or to any other court.

*[Reminder of this page intentionally left blank.]*

WHEREFORE, Tenet and Conifer respectfully request that the Court enter the Proposed

Order and grant such other relief as is just and proper under the circumstances.

Dated:  July 26, 2019                    PACHULSKI STANG ZIEHL & JONES LLP

_____

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:           ljones@pszjlaw.com
                      tcairns@pszjlaw.com


- and -


KIRKLAND & ELLIS LLP
Stephen C. Hackney, P.C.
Gregory F. Pesce (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           stephen.hackney@kirkland.com
                      gregory.pesce@kirkland.com


-and-


KIRKLAND & ELLIS LLP
Nicole L. Greenblatt, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           nicole.greenblatt@kirkland.com

*Counsel to Tenet Business Services Corporation and*
*Conifer Revenue Cycle Solutions, LLC*