1             UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE
2

3                                   .   Chapter 11
    IN RE:                          .
                                    .   Case No. 19-11466 (KG)
4   CENTER CITY HEALTHCARE, LLC,    .
    d/b/a HAHNEMANN UNIVERSITY      .
5   HOSPITAL, *et al.,*             .
                                    .   Courtroom No. 3
6                                   .   824 North Market Street
                                    .   Wilmington, Delaware 19801
7                                   .
                                    .
8             Debtors.              .   July 26, 2019
    . . . . . . . . . . . . . . .   .   10:00 A.M.
9

                      TRANSCRIPT OF HEARING
10         BEFORE THE HONORABLE KEVIN GROSS
              UNITED STATES BANKRUPTCY JUDGE
11

12  APPEARANCES:

13  For the Debtors:        Mark Minuti, Esquire
                            Monique B. DiSabatino, Esquire
14                          SAUL EWING ARNSTEIN & LEHR LLP
                            1201 N. Market Street
15                          Wilmington, Delaware 19801

16  For Pennsylvania        Richard Barkasy, Esquire
    Dept. of Health:        SCHNADER
17                          1600 Market Street, Suite 3600
                            Philadelphia, Pennsylvania 19103
18

19

20  Audio Operator:         GINGER MACE

21
    Transcription Company:  Reliable
22                          1007 N. Orange Street
                            Wilmington, Delaware 19801
23                          Email:  gmatthews@reliable-co.com

24  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
25

1  APPEARANCES (Continued):

2  For the Committee:        Andrew H. Sherman, Esquire
                             SILLS CUMMIS & GROSS P.C.
3                            1 Riverfront Plaza, Suite 10
                             Newark, New Jersey 07102
4

5  For Drexel University:    Vincent J. Marriott, III
                             BALLARD SPAHR LLP
6                            1735 Market Street, 51st Floor
                             Philadelphia, Pennsylvania 19103
7

   For HSRE:                 Stuart Brown, Esquire
8                            DLA PIPER
                             1201 North Market Street
9                            Wilmington, Delaware 19801

10 For City of Philadelphia: Megan Harper, Esquire
                             WILSON ELSER MOSKOWITZ EDELMAN DICKER
11                           The Curtis Center
                             Independence Square West
12                           Suite 1130 East
                             Philadelphia, Pennsylvania 19106
13

14 For American Academic     Martin Weiss, Esquire
   Health:                   Lawrence McMichael, Esquire
15                           DILWORTH PAXSON
                             1500 Market Street
16                           Philadelphia, Pennsylvania 19102

17 For Hayes Locum:          Daniel Hogan, Esquire
                             HOGAN MCDANIEL
18                           1311 Delaware Avenue
                             Wilmington, Delaware 19806
19

20 For Tenet/Conifer:        Laura Davis-Jones, Esquire
                             PACHULSKI STANG ZIEHL & JONES
21                           919 North Market Street
                             Wilmington, Delaware 19801
22

   TELEPHONIC APPEARANCE:
23

24 In *propria Persona*:     Kelly Ann Cody

25

1

<u>INDEX</u>

2
3
4
#8) Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Benefits and Other Compensation, and (B) Continue Employee Compensation and Employee Benefits Programs; and (III) Granting Related Relief [D.I. 11; filed: 07/01/19].

5
**RULING: 11**

6
7
8
9
#9) Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor the Terms of Premium Financing Agreement and Pay Premiums Thereunder; and (IV) Enter Into New Premium Financing Agreements in the Ordinary Course of Business [D.I. 13; filed: 07/01/19].

10
**RULING: 13**

11
12
13
14
15
16
17
18
#11) Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing to Consider Approval of the Sale or Sales of Substantially All Assets of St. Christopher's Healthcare, LLC and Certain Related Debtors and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Establishing Procedures in Connection with the Selection of and Protections Afforded to Any Stalking Horse Purchasers, and (IV) Granting Related Relief; and (B) One or More Orders (I) Approving the Sales or Other Acquisition Transactions for the Assets, (II) Authorizing the Sales Free and Clear of all Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief [D.I. 205; filed: 07/16/19].

19
**RULING: 88**

20
| <u>EXHIBITS</u> | <u>I.D.</u> | <u>REC'D</u> |
|---|---|---|
21
| Proffer of Alan Weiland | | 34 |
22
| Proffer of Scott Victor | | 40 |

23

24

25

1        (Proceedings commenced at 10:01 a.m.)

2              THE CLERK:  Please rise.

3              THE COURT:  Good morning, everyone.  You may be

4    seated.  Thank you.  And, Mr. Minuti, good morning.

5              MR. MINUTI:  Good morning, Your Honor.  Mark

6    Minuti from Saul Ewing Arnstein & Lehr.  I'm here today on

7    behalf of the debtors.

8              THE COURT:  Yes.

9              MR. MINUTI:  With me, Your Honor, at counsel table

10   is my partner, Monique DiSabatino.  Also in the courtroom,

11   Your Honor, Alan Weiland, our proposed CRO.

12             THE COURT:  Mr. Weiland, nice to see you again.

13             MR. MINUTI:  As well as in the front row, Your

14   Honor, Scott Victor, from SSG.

15             THE COURT:  Yes.

16             MR. MINUTI:  All right, Your Honor, today is our

17   scheduled second day hearing in these cases.  This is the

18   time that's been set aside that seek final relief of a number

19   of our first-day motions.

20             We had filed certificates of no objection for all

21   of those except for the debtor-in-possession financing.  At

22   the request of the committee and with the consent of our

23   lenders, we moved that to August 9th.

24             The other thing, just by way of update, Your

25   Honor, we are continuing as well our closure motion.  I can

1  tell Your Honor we're continuing to make great progress

2  there.  As of today, Your Honor, we have zero patients in the

3  hospital at Hahnemann.  The Emergency Department is still

4  open.

5          I think we're down to a few issues with the

6  Department of Health and the State, primarily dealing with

7  things like retention of records, those sorts of things.

8          THE COURT:  Yes.

9          MR. MINUTI:  So, we are hopeful, Your Honor, that

10  in the next week or, frankly, in the next few days that we're

11  going to reach closure and have a consensual plan with the

12  Department of Health and the City.  And then when we do the

13  plan is to come back before Your Honor and explain that and,

14  hopefully, move forward.  So, we're continuing that today.

15          We did have a couple, what I'll call, more routine

16  first-day matters that are on for final hearing today.

17          THE COURT:  Yes, yes.

18          MR. MINUTI:  We did upload certificates of no

19  objection.

20          THE COURT:  Okay.

21          MR. MINUTI:  A couple of those were not done until

22  yesterday, so I think we have two that are open.  What I'll

23  do is I'll turn it over to Ms. DiSabatino.  She can describe

24  those.  And, hopefully, we can dispel with those pretty

25  quickly.

1          Your Honor, I think, I'm going to try to make this

2   a first in this case, Your Honor.  We started on time and

3   that's a good thing.

4          THE COURT:  That's a good thing.

5          MR. MINUTI:  And, number two, I'm hoping that

6   we're not going to take your calendar all day today because I

7   think we're down to a couple of narrow issues with respect to

8   the bid procedures.

9          THE COURT:  All right, let me just ask you this,

10  Mr. Minuti.  Where do we sit with the hospital residents at

11  this point?

12         MR. MINUTI:  Thank you, Your Honor.  By way of

13  update when we were here last Friday, Your Honor, we talked

14  about the fact that the debtor needed a couple more days to

15  figure out the Medicaid component that would be tied to each

16  particular resident.

17         THE COURT:  Yes.

18         MR. MINUTI:  And then we talked last week about

19  the ability of the hospital, allow those residents to move

20  one; maybe half of those residents, as of Wednesday of this

21  week, and the balance to be able to move on as of August 9.

22         THE COURT:  Right.

23         MR. MINUTI:  I can tell Your Honor that on Monday

24  a correspondence went out to each of the residents letting

25  them know what percentage or what their share of the Medicaid

1  reimbursement was.  Consistent with what we said last week,

2  as of Wednesday, approximately 50 percent of the residents

3  were able to go elsewhere.

4           THE COURT:  Good.

5           MR. MINUTI:  And then the remaining residents,

6  Your Honor, really are tied to the wind-down plan.  As we no

7  longer need their services, they will be free to go.  The

8  last which will be free to go on August 9.  Again, we're

9  hoping a bunch stick around and look at the opportunity with

10 our potential buyer there --

11          THE COURT:  Yes.

12          MR. MINUTI:  -- Tower Health.  But, again, there's

13 nothing compelling them to do that.

14          So, as we stated on the record last week, we did

15 what we said we were going to do and that's where we are.

16          THE COURT:  That's great.

17          MR. MINUTI:  Does Your Honor have any other

18 questions of me?

19          THE COURT:  No.  No, I don't.  Thank you, Mr.

20 Minuti.

21          MR. MINUTI:  Very well, Your Honor.

22          THE COURT:  Yes, Mr. Sherman, good morning.

23          MR. SHERMAN:  Good morning, Your Honor.  Just a

24 couple of quick things in response to Mr. Minuti's comments

25 on closure plan issues and the DIP financing.

1           THE COURT:  Yes.

2           MR. SHERMAN:  Just so the record is clear, Your

3  Honor.

4           With regard to closure plan issues, as we said

5  last time, we continue to have discussions, but the costs for

6  the closure plan continue to be a black box from the

7  committee's perspective.  We hope to endeavor to speak to the

8  debtor and get a better understanding.

9           But, I think, Your Honor, I raised it last time, I

10  just sort of want the court to be aware that we still have

11  concerns just because we haven't seen how it correlates to

12  the budget.  But, again, we hope to work with the debtors on

13  that.

14           The other thing, Your Honor, was the DIP

15  financing.

16           THE COURT:  Yes.

17           MR. SHERMAN:  Mr. Minuti said the hearing is

18  August 9 which we agreed to.  We've worked out a potential

19  briefing schedule.  I just want the court to be aware of it

20  and make sure Your Honor is okay with it.

21           The committee's response to the financing would be

22  due three business days before the hearing.

23           THE COURT:  Yes.

24           MR. SHERMAN:  And then the reply by MidCap and/or

25  the debtor is one business day before.

1          THE COURT:  All right, that's acceptable.  Yes,

2 thank you, Mr. Sherman.

3          MR. SHERMAN:  And that just makes a somewhat busy

4 day for August 9th because we're going to be doing the

5 resident's program asset sale and the DIP financing, but, you

6 know, we'll get through it.

7          THE COURT:  I'll make sure I have plenty of time

8 and strength.

9          MR. SHERMAN:  Very good.  Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Sherman.

11          Ms. DiSabatino, good morning.

12          MS. DISABATINO:  Good morning, Your Honor.

13          THE COURT:  Yeah, that's right.  There were two

14 first day matters that I had no seen orders up, but they've

15 been uploaded at this point.

16          MS. DISABATINO:  Yes, Your Honor.  Yes, Your

17 Honor.  The first is agenda item eight which is our wages

18 order, our motion for authority to honor wages, compensation

19 and benefits and for banks and financial institutions to

20 process payments related thereto.

21          THE COURT:  Yes.

22          MS. DISABATINO:  The interim order was granted on

23 the motion on July 2nd which is located Docket 77.  And

24 pursuant to the notice of final hearing on the motion,

25 objections were to be filed by October 19th -- I'm sorry; by

1  July 19th.

2           THE COURT:  Yes.

3           MS. DISABATINO:  That deadline was extended to

4  July 23rd for the committee and for Chubb.  Prior to that

5  deadline, we received comments from the U.S. Trustee which

6  was actually a comment that the U.S. Trustee had made to the

7  interim order which we just tracked in the final version of

8  the order.  And we also received comments from the committee

9  and Chubb.

10          There are no other objections to the relief

11 requested in the motion, either informally or formally.

12          We worked through the revisions requested by Chubb

13 and the committee and reached agreement on a form of order.

14 We also circulated this form of order to the U.S. Trustee and

15 to MidCap, our DIP lender. Those parties signed off on the

16 order as well.  And we, therefore, filed it under

17 certification of counsel; that's located at Docket Number

18 283.

19          If Your Honor would like, I could walk you through

20 a blackline of the changes made.

21          THE COURT:  Yes; yes, that would be helpful.

22          MS. DISABATINO:  May I approach, Your Honor?

23          THE COURT:  Yes.  Thank you.

24          MS. DISABATINO:  Your Honor, in paragraphs two and

25 three, there's some minor changes made to make clear that

1  wages and benefit obligations can also arise from contractual

2  obligations.

3           THE COURT:  Yes.

4           MS. DISABATINO:  In paragraph six, we added

5  language clarifying that the stay is lifted so that worker's

6  compensation claims can proceed and that the debtors will

7  honor their worker's compensation policies in the ordinary

8  course.

9           THE COURT:  That looks fine; yes.

10          MS. DISABATINO:  Paragraph seven, again, just

11 clarifying language regarding the worker's compensation

12 policies that nothing in the order impacts the terms of those

13 policies or the parties' obligations under those policies.

14          THE COURT:  Good.  And then you've, obviously,

15 changed interim to final.

16          MS. DISABATINO:  Yes.

17          THE COURT:  And paragraph 12, let's see. And, of

18 course, we --

19          MS. DISABATINO:  Right, that was the U.S.

20 Trustee's language making clear that no bonus or severance

21 payments.

22          THE COURT:  That's right.  All right.  That's

23 fine.  The order looks fine and we will have it docketed

24 today.

25          MS. DISABATINO:  Great.  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          And then we had another one, didn't we?

3          MS. DISABATINO:  Yes.  The next is item nine on

4   the agenda which is the motion for authority to continue the

5   debtors' insurance programs in the ordinary course.

6          THE COURT:  Yes.

7          MS. DISABATINO:  The interim order was granted on

8   that motion on July 2nd, as well, and located at Docket 79.

9   The objection deadline for the motion was -- I keep saying

10  October -- July 19th at 4:00 p.m. which was extended to the

11  23rd for the committee and for Chubb.

12          The committee and Chubb also had comments to that

13  form of order.  There were no other objections, informal or

14  formal, to the motion.  We worked through the revisions

15  requested by the committee and Chubb and reached agreement on

16  a proposed form of order.

17          The U.S. Trustee and MidCap, likewise, signed off

18  on that form of order. And if Your Honor would like, I can

19  hand up the blackline reflecting those changes.

20          THE COURT:  Please.  Yes, thank you, Ms.

21  DiSabatino.  Thank you.

22          MS. DISABATINO:  Thank you, Your Honor.  The first

23  change is a clarifying footnote 3 that just makes clear that

24  the insurance policies may include policies not listed on our

25  exhibit to the motion.

1          THE COURT:  Okay.

2          MS. DISABATINO:  And then the other significant

3   change is just clarifying language in paragraph nine.

4   Nothing in the order changes the terms of the policies or any

5   of the parties' obligations thereunder.

6          THE COURT:  Very well.  Does anyone wish to be

7   heard on this motion or the final order, I should say?

8      (No verbal response)

9          THE COURT:  Well hearing no one, it will be

10  docketed as well.

11         MS. DISABATINO:  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         MR. MINUTI:  Again, for the record, Mark Minuti on

14  behalf of the debtors.  Your Honor, that brings us to the

15  final matter that's on the agenda today which is the debtors'

16  motion to establish bid procedures and ultimately the sale of

17  what we're calling our St. Christopher's Hospital assets.

18         THE COURT:  Yes.

19         MR. MINUTI:  This motion was filed on July 16

20  asking the court, again, to establish bidding procedures and

21  ultimately approve the sale of the assets of the debtors' St.

22  Christopher's Healthcare, LLC and the related debtor practice

23  groups.

24         Primarily, those assets are the assets that make

25  up the St. Christopher's Children's Hospital business.  That

1   same day, we filed a motion for expedited consideration of

2   the bid procedures.

3           On July 17th, the court entered an order

4   scheduling the bid procedures portion of the motion for today

5   and establishing objection deadline of yesterday at 2:00 p.m.

6           On July 17, 2019, the debtor filed a notice of

7   today's hearing and the objection deadline.  That appears at

8   Docket Number 221.  We did receive formal objections to the

9   motions. We also received informal comments from among

10  others, the unsecured creditors committee, the United States

11  Trustee's office and the Department of Justice.

12          At the outset, Your Honor, I want to note that we

13  do appreciate approach of the committee and a number of the

14  other objectors.  We have been able to resolve, I think,

15  substantially, or I should say, most of the objections to the

16  bid procedures today.  We are really down to two objections,

17  or one objection by two parties, each of whom Your Honor have

18  asked to be consultation parties throughout the process.

19          THE COURT:  That's right.

20          MR. MINUTI:  That, I believe, is the only issue.

21          We did upload a revised form of order this

22  morning.

23          THE COURT:  Yes.

24          MR. MINUTI:  Did Your Honor have a chance to see

25  that?

1    THE COURT:  I did.

2    MR. MINUTI:  Okay.  I think we're going to have a

3 clarification or two and a couple of changes to that order

4 which we will discuss at the appropriate time with Your

5 Honor.  Nothing controversial, but as we uploaded the order

6 this morning, we received a phone call from a few people that

7 had a couple of additional comments, so we'll clarify those.

8    And then, you know, not to be outdone, Mr. Brown,

9 Your Honor, raised a couple of issues, so we have some

10 handwritten changes to the order.  I would expect nothing

11 less of Mr. Brown.

12    THE COURT:  That's right.  I'd be disappointed if

13 we didn't have issues.

14    MR. MINUTI:  Well, you know what, Your Honor, I'm

15 not going to say that. We wouldn't be disappointed, but we've

16 come to know and love Mr. Brown.

17    So, Your Honor, again, I think we're down to a

18 couple of issues.  But before we get there, let me provide

19 the court with some background.

20    THE COURT:  Okay.

21    MR. MINUTI:  As we discussed at the first-day

22 hearing, the focus of these cases has really been on the two

23 hospitals. And while the debtors, unfortunately, reached the

24 inevitable conclusion that they had to shut down Hahnemann

25 University Hospital, the exact opposition was true of St.

1  Christopher's Children's Hospital.

2          Your Honor, that hospital enjoys a stellar

3  reputation for quality care, both in Philadelphia and

4  nationally.  We've got excellent staff and doctors. And

5  without the drag of Hahnemann University Hospital, we

6  believe, that hospital can be operated profitably.

7          For these reasons, the debtors quickly identified

8  the hospital and its related assets, as assets that can be

9  monetized for the benefit of the debtors, their estates, and

10 creditors, in these cases.

11         Given the debtors' current liquidity constraints

12 and the possible disruption of a Chapter 11, however, it

13 became clear that we had to move quickly to market and

14 monetize those assets to best preserve their value.

15         In early June of 2019, the debtors hired SSG

16 Capital Advisors as their investment banker.  SSG developed a

17 teaser.  They've created a confidential information

18 memorandum, and they've set up an electronic data room, all

19 with an eye toward marketing the debtors' assets.

20         SSG informally began marketing the assets in early

21 June when they were first engaged and they formally began

22 marketing the St. Christopher's assets on July 10 of this

23 year.

24         Based upon preliminary discussions with three

25 separate proposed strategic buyers, the debtors and SSG are

1  confident and optimistic that there will be a buyer for St.

2  Children's Hospital and practice and the practice groups as a

3  going concern.

4          To best facilitate an orderly and appropriate sale

5  process, the debtors worked with SSG to develop the proposed

6  bid procedures that are before the court today for approval.

7          I would characterize those procedures as standard

8  and customary in situations where we do not have a stalking

9  horse bidder. Those bid procedures include the requirements

10  to become a qualified bidder.  They detail what's required to

11  submit a qualifying bid.

12          We've asked that Your Honor give us the ability to

13  come back to the court if we select a stalking horse bidder.

14  And, again, we will come back to the court if we're going to

15  give -- if we are proposing to give a stalking horse bidder

16  any protections.

17          THE COURT:  Okay.

18          MR. MINUTI:  All of the foregoing, Your Honor, is

19  included in the notice of sale which is included at Exhibit 2

20  to the motion. That has been modified.  Your Honor probably

21  saw that this morning, if you looked at the order we

22  uploaded.

23          THE COURT:  Yes.

24          MR. MINUTI:  One change we did make, your Honor,

25  we are planning to serve notice of the sale in the

1  *Philadelphia Inquirer.*  And at the request of, I believe, it

2  was the union, we've also agreed to publish the notice of the

3  sale once in either the *USA Today* or the Wall Street Journal.

4  The idea there would be we're going to go with whoever is

5  cheaper, Your Honor.

6          THE COURT:  Sure.

7          MR. MINUTI:  We're also asking the court to

8  approve the assumption and assignment of procedures.  You

9  know, unlike maybe a retail case, you know, we don't have

10 hundreds and hundreds of leases that we're going to be

11 assuming and assigning.  But we do have a couple of pretty

12 significant leases, Your Honor.

13          But we have a process here pursuant to which we

14 are going to give notice to the non-debtor parties to those

15 contracts.  They're going to have a particular amount of

16 time, Your Honor, in order to respond to oppose either the

17 assumption and assignment or to deal with cure issues.  And

18 if identify contracts along the way, a new notice will go

19 out, a new objection period will happen and so on.

20          We have the overall timeline, Your Honor, let me

21 just state that on the record.  We're going to publish our

22 notice of sale within ten days of when the court approves the

23 bid procedures. We're looking to serve our assumption notice

24 on August 16th.

25          If we identify a stalking horse bid, we have a

1  stalking horse bid deadline of August 23.  We have until

2  August 27 to file a supplement, Your Honor; if we identify a

3  stalking horse.

4            THE COURT:  And that's something that needs to

5  apply for bid protections, is that correct?

6            MR. MINUTI:  Correct, Your Honor.  The way the

7  procedures work is if we identify a stalking horse who does

8  not have any bid protections, we're simply going to file a

9  notice so people know we have that.

10            If we're asking for bid protections, we will come

11  back before the court --

12            THE COURT:  Good.

13            MR. MINUTI:  -- and build into the procedures a

14  proposed hearing date for us to do that.

15            THE COURT:  All right.

16            MR. MINUTI:  The deadline to object to the --

17            MS. CODY:  Excuse me, Your Honor.

18            THE COURT:  Yes.

19            MS. CODY:  Kelly Ann Cody here listening in.

20  Hello, everybody in the courtroom.

21            I have a question. I believe -- well, I believe, I

22  am owner of more than one of these companies you are talking

23  about and I would like to have some say in this but I do not

24  have the paperwork available to me to help stop the sale of

25  like St. Christopher's.  And I believe you said the

1  *Philadelphia Inquirer.*  Both and Wills Eye is another one of

2  which I do believe I own through the estate of Mary F. Price.

3         THE COURT:  Well if you are an owner then,

4  obviously, you should submit proof of ownership to the court

5  and we'll certainly hear you.

6         MS. CODY:  I've been trying -- well, my father has

7  passed away and he was manager of the estate and I have -- no

8  attorneys have come forth and I've been trying to track them

9  down.  I'm getting railroaded left and right, so this is --

10  this letter was sent to me in the mail while I'm at the

11  women's shelter and I've felt this is an honest way to get

12  involved.

13         And right now, I'm not really hearing any

14  information on trying to do anything about that; just sales

15  and recouping money.  But if I own them, I'm sure I have some

16  kind of say in this.

17         Is there anyway anybody has information on it?

18         THE COURT:  Well, I think that you're raising a

19  distinct issue and the way to raise it before the court,

20  obviously, is to file whatever papers, whatever proof you

21  have of ownership.  All right.

22         MS. CODY:  Okay.  Thank you, Your Honor.

23         THE COURT:  Yes.  Mr. Minuti.

24         MR. MINUTI:  Thank you, Your Honor.

25         Continuing the deadline to object to the

1  assumption notice we're proposing is August 30th.  There will

2  be a supplemental cure objection deadline of fourteen days.

3  In other words, if we identify additional contracts, parties

4  will have an additional fourteen days.

5          The deadline to object to -- if we file a

6  supplemental motion to seek stalking horse protections, that

7  objection deadline will be September 30th.

8          We're asking for a tentative hearing on approval

9  of any stalking horse bid protections for September 4th if

10  Your Honor --

11          THE COURT:  Did you mean August 30 for the

12  supplemental bidding -- right, you know, protections for

13  bidders or stalking horse?  You had said September 30.

14          MR. MINUTI:  Excuse me, Your Honor.  Let me

15  doublecheck with Ms. DiSabatino.

16      (Participants conferring)

17          MR. MINUTI:  Your Honor, to be clear, so the idea

18  is if identify a stalking horse bidder --

19          THE COURT:  Right.

20          MR. MINUTI:  -- we're going to do that on, let's

21  see, we're going to do that on August 27.  And then if

22  somebody has an issue, in other words, if they take the

23  position that their contract, for example, can't be assumed

24  and assigned in that stalking horse bidder or there's an

25  issue with that stalking horse, that would be September 4.

1              THE COURT:  Okay.

2              MR. MINUTI:  That's the proposal.  Excuse me;

3  September 3rd with the idea that we would come back before

4  the court on September 4 to resolve that issue.

5              THE COURT:  Okay.

6              MR. MINUTI:  All right.  The sale objection

7  deadline, otherwise, would be September 13.  The bid deadline

8  will be September 17.  If we're lucky enough to get more than

9  one bid, we would then convene an auction in our firm's

10  Philadelphia office on September 19.

11             We have a deadline to file and serve a notice of

12  successful bidder in the amount of the successful bid.

13  That's going to be one day following the conclusion of the

14  auction.

15             THE COURT:  Right.

16             MR. MINUTI:  The deadline to object to the sale to

17  anybody other than a stalking horse bidder will then be

18  September 20th.  And we did talk to chambers and we

19  understand Your Honor does have availability on September 24

20  for a sale hearing.

21             THE COURT:  That's right.  Yes.

22             MR. MINUTI:  I would like to pause there and ask

23  Your Honor does the court have any flexibility to move that

24  to September 23rd.  A few of the folks on my side have a

25  conflict with the 24th.  And if that's the only day, we will

1   take it, but if Your Honor can accommodate us on the 23rd,

2   that would help out a few folks on our side.

3          THE COURT:  I could hear you beginning like at one

4   o'clock.

5          MR. MINUTI:  One o'clock on the 23rd.

6          THE COURT:  And I know that's not -- that may be

7   too short for the sale hearing.  I'm not sure, but let's see

8   how we do at one o'clock if that's all right.

9          MR. MINUTI:  Your Honor, we very much appreciate

10  that.

11         THE COURT:  Okay.

12         MR. MINUTI:  Can Your Honor give me just one

13  moment?

14         THE COURT:  Yes.

15         Yes, Mr. Brown, yes, sir.

16         MR. BROWN:  I'll fill up the empty space, Your

17  Honor.

18         THE COURT:  Yes, please.

19         MR. BROWN:  Than you, Your Honor.  I just have a

20  couple of questions about the schedule and I don't know

21  whether I should address that now or when Mr. Minuti has

22  completed all of his initial comments.

23         THE COURT:  Let's make sure he's finished and then

24  certainly we'll hear from you.

25         MR. BROWN:  Thank you, Your Honor.

1            THE COURT:  Yes. Because that will be the sale

2   hearing -- have you finished with your schedule, because Mr.

3   Brown had a couple of questions?

4            MR. MINUTI:  Yes.

5            THE COURT:  All right, this would be an

6   appropriate time, Mr. Brown.

7            MR. BROWN:  Thank you, Your Honor.

8            In the capacity as a potential lease or contract

9   counterparty, it seems that there may be a couple overlaps

10  and just looking for some clarification as it pertains to the

11  schedule.

12           The first is as it relates to the deadline to

13  object to assumption notice listed as August 30th.  And the

14  very next one, supplemental cure objection deadline, fourteen

15  days after service.  Your Honor, those seem to overlap maybe.

16  And I would request that the supplemental cure objection

17  deadline read, the later of August 30th or fourteen days

18  after service, so as not to get the twix and between on those

19  two dates if there's a fact that comes into play and it's not

20  clear which one, which date applies.

21           MR. MINUTI:  Your Honor, I don't -- let me get to

22  the microphone.  Your Honor, again, Mike Minuti.

23           I don't think that's necessary because the idea is

24  we're going to have an initial notice.

25           THE COURT:  Right.

1            MR. MINUTI:  That initial notice is going to have

2    the August 30th date.  And then the idea is if we identify

3    additional contracts, a new notice is going to go out with a

4    fourteen-day objection deadline.

5            So, the way the process works is they're going to

6    have the later of the fourteen days.  So --

7            THE COURT:  Additional contracts will have the

8    later --

9            MR. MINUTI:  Correct; correct.  So if I send the

10   notice, the original notice, people have until August 30th.

11           THE COURT:  Right.

12           MR. MINUTI:  If I change it, they're going to have

13   fourteen days from when they receive it which, by definition,

14   is going to be later than August 30th.

15           MR. BROWN:  Okay.  Because it's the 16th.  Sixteen

16   and 14 is thirty.  Right.  Okay.

17       (Participants conferring)

18           That's fine, Your Honor.  I see the -- I did the

19   math in my head.

20           THE COURT:  Okay.  All right.

21           MR. BROWN:  The second is the deadline to object

22   to sale to successful bidder.  Your Honor, the notice of

23   successful bidder will be filed no later than one day

24   following the conclusion of the auction, notwithstanding when

25   the auction concludes and when that notice is filed, the

1  deadline is fixed.

2          It seems to me that one day after the filing of

3  the notice of successful bidder would be the appropriate time

4  for the objection to the sale, so we know who the bidder is.

5  We know -- I believe that's also when we're supposed to

6  object on adequate assurance grounds and how do we know if

7  the bidder hasn't been selected by the 20th.

8          THE COURT:  The auction takes places on September

9  19.

10         MR. BROWN:  It starts on September 19.

11         THE COURT:  Right.  And you're thinking it might

12 run longer than that?

13         MR. BROWN:  It's a distinct possible, Your Honor.

14 It has been known to happen.

15         THE COURT:  Yes, it has.  But I think that Mr.

16 Minuti will stay up all night if he has to do to run this

17 auction.

18         MR. BROWN:  As will we all, but I think for the

19 benefit of the estate if it goes an extra day then everyone

20 is going to want the bidding to continue.

21         THE COURT:  So, the proposal, I think, Mr. Minuti,

22 is that objections to sale would be one day after the

23 conclusion of the auction.

24         MR. BROWN:  No, one day after the notice of the

25 successful bidder.

1            THE COURT:  I'm sorry.  One day after the notice.

2            MR. BROWN:  Thank you, Your Honor.

3            THE COURT:  Thank you, Mr. Brown.

4            And the notice presumably, let's assume the

5    auction is on the 19th so the notices go out on the 20th.

6            MR. BROWN:  So, objections on the 21st.

7            THE COURT:  The 21st is a Saturday.

8            MR. BROWN:  May or may not be.  I mean that

9    deadline may or may not occur on the Saturday or Sunday.

10   But, regardless, there should be a little bit of gap of time,

11   even if it's a weekend day to understand who the bidder is

12   and understand adequate assurance issues.

13           MR. MINUTI:  I'm sorry, Your Honor, just give me a

14   --

15           THE COURT:  Take your time, Mr. Minuti.

16           I understand your concern, Mr. Brown.

17           MR. BROWN:  Thank you, Your Honor.

18           I've got a couple of other issues when we get into

19   the substance of the order that if I'll reserve for an

20   appropriate time later.

21           THE COURT:  Okay.  That's fine.  Of course.

22           MR. BROWN:  Thank you, Your Honor.

23        (Participants conferring)

24           MR. MINUTI:  Your Honor, I hear Mr. Brown's

25   concern, but the way we got the schedule is that the deadline

1  that we have built in here right now, Your Honor, which is

2  September 20th, that's a Friday. And then we're going to be

3  back at the sale hearing on Monday.

4            THE COURT:  Right.

5            MR. MINUTI:  So, the idea is we're going to send a

6  notice out as soon as we can.  But if we extend the deadline

7  for people to object, it literally is -- even by one day --

8  it's going to be the same day as the hearing.

9            And so, I think we'd like to keep it where it is

10 with the goal that we're going to get the notice out.  If

11 we're lucky enough to have (indiscernible) bidding and it

12 goes longer, that means the dollars go up which means, you

13 know, we're going to have to have some flexibility here.  We

14 certainly don't want to cut off anybody's rights.

15           But, again, if we move it now what that means by

16 definition is that the objections are going to be due on the

17 same day as the sale hearing and we'll have no time to

18 prepare.  And that's going to make it harder on everybody

19 including the court.

20           THE COURT:  Can we adjust when the auction takes

21 place to address Mr. Brown's concerns because I understand

22 his concern.  He wants notice of the purchaser and wants to

23 be able to file an objection, you know, a day later which

24 isn't a lot of time.

25           MR. BROWN:  And my reaction to Mr. Minuti, Your

1   Honor, would be that we hope not to have to file an

2   objection.  But under the schedule, we're compelled a

3   prophylactic objection prior to even the auction commencing

4   in order that we have adequate time to do that.  And that

5   just seems to be a waste of our time, a waste of the court's

6   time, and the debtors' time reviewing it.

7         MR. MINUTI:  I don't think that's true, Your

8   Honor, because the auction, right now we've got it scheduled

9   at the 19th.

10         THE COURT:  Right.

11         MR. MINUTI:  The deadline is the 20th, so he would

12   be filing something after the auction; unless he's right.

13   Unless the auction goes beyond the 19th.

14         But let me just confer with Mr. Weiland and Mr.

15   Victor to see if we have flexibility moving the auction.

16         THE COURT:  That's right.

17      (Participants conferring)

18         MR. MINUTI:  Your Honor, I think what we can do is

19   move the auction to the 18th.

20         THE COURT:  All right.

21         MR. MINUTI:  The reason we had built a little

22   buffer in there is that sometimes, you know, you get bids

23   that aren't apples to apples and you need a little time to

24   speak to folks and right them.  But we'll do our best --

25         THE COURT:  Do you want to make bids due a day or

1  two earlier?

2        MR. MINUTI:  Sure, Your Honor.  Why don't we make

3  it a day earlier?  We'll make it a day earlier.

4        THE COURT:  All right.

5        MR. MINUTI:  I'm looking at Ms. DiSabatino -- Mrs.

6  DiSabatino to make sure she makes that change or notes it.

7  Is that acceptable to Your Honor?

8        THE COURT:  Yes, it is.

9        And how about that, Mr. Brown, does that work for

10 you?

11        MR. BROWN:  Your Honor, thank you for the

12 accommodation.  Thank the debtors for the accommodation.

13        THE COURT:  You bet.

14        MR. SHERMAN:  Your Honor.

15        THE COURT:  Yes, Mr. Sherman.

16        MR. SHERMAN:  I just want to understand.  So, it's

17 bid deadline is Monday the 16th?

18        MS. DISABATINO:  Yes.

19        MR. SHERMAN:  Okay.

20        THE COURT:  And then the auction on the 18th.

21        MR. SHERMAN:  Thank you, Judge.

22        THE COURT:  Thank you.

23        MR. MINUTI:  So, Your Honor, in support of the bid

24 procedures, I do have two brief proffers, one of Mr. Weiland

25 and one of Mr. Victor.

1          Mr. Weiland's proffer will go the business

2   judgment of moving forward with a sale process.  Mr. Victor

3   will obviously testify as to the propriety of the process

4   itself.

5          THE COURT:  And both are in the courtroom and

6   available for cross-examination should someone choose.

7          MR. MINUTI:  That is correct, Your Honor.

8          THE COURT:  Yes.

9          MR. MINUTI:  May I proceed?

10          THE COURT:  You may.

11          MR. MINUTI:  Thank you, Your Honor.

12          With me in the courtroom today is Mr. Alan

13   Weiland. If called to the stand, Mr. Weiland would testify as

14   follows.

15          He's a partner at EisnerAmper and serves as the

16   national director of EisnerAmper Financial Advisory Services

17   Group.

18          And let me pause there, Your Honor, again.  If

19   it's acceptable to the court, I'm going to skip Mr. Weiland

20   and Mr. Victor's background?

21          THE COURT:  That's fine.  It was certainly in his

22   first day declaration, to some extent, yes.

23          MR. MINUTI:  Thank you, Your Honor.

24          Mr. Weiland would testify that he was appointed

25   the chief restructuring officer of the debtors on April 8,

1  2019 and is proposed to serve as the CRO during the debtors'

2  Chapter 11 cases.

3  He would testify that he signed a declaration in

4  support of the various first-day motions and that the

5  information set forth in his first day declaration remains

6  true and correct.

7  Mr. Weiland would testify that from the outset of

8  these Chapter 11 cases, the debtors and their professionals

9  believed that St. Christopher's Healthcare LLC and its

10  related physician practice groups were viable entities, could

11  either be reorganized in connection with these Chapter 11

12  cases or sold pursuant to a sale under Bankruptcy Code

13  Section 363.

14  Even though certain of the St. Christopher

15  entities have faced the same or similar challenges as those

16  that have troubled Hahnemann University Hospital and despite

17  the drain on the St. Christopher's entities liquidity in an

18  effort to support Hahnemann University Hospital's losses, Mr.

19  Weiland would testify that the operations of the St.

20  Christopher's entities have remained stable since the

21  debtors' acquisition of the business in January 2018.

22  While the operation of the St. Christopher's

23  entities remain stable, Mr. Weiland would testify that

24  uncertainties and costs inherent in the bankruptcy process,

25  as well as the financial constraints imposed by, among other

1 things, restricted vendor terms and the debtors' post-

2 petition financing budget could overtime create challenges

3 and/or disruption in St. Christopher entities operations.

4        Mr. Weiland would further testify that the

5 disruption, no matter how slight, is troublesome given the

6 debtors' height and focus on quality and continuity of care,

7 both at St. Christopher's and its related practice group

8 facilities.

9        Moreover, Mr. Weiland would testify that any such

10 disruption risks impair the value of the St. Christopher's

11 entities businesses to the detriment of creditors and parties

12 in interest in these cases.

13        In order to avoid any such risk of disruption to

14 the St. Christopher's entities operations, Mr. Weiland would

15 testify that it is necessary for the debtors to act as

16 quickly as possible to establish a process by which the St.

17 Christopher's entities, assets and businesses are sold to the

18 highest and best bidder.

19        Mr. Weiland would testify that he read and

20 approved the motion before the court today and is familiar

21 with the proposed bidding procedures and proposed timeline

22 set forth therein.

23        He would testify that the debtors worked with SSG

24 Capital Advisors, the debtors' investment banker, to develop

25 the proposed bidding procedures.  He was in the courtroom

1  when I described the proposed bidding procedures and the

2  proposed timeline and he would testify that I accurately

3  described both to the court.

4       Mr. Weiland would testify that in his view, the

5  best way to maximize the value of the St. Christopher's

6  entities assets for the benefit of the debtors, their estates

7  and creditors is through a 363 sale process.

8       He would further testify that the proposed bidding

9  procedures before the court represent the best process under

10  the circumstances for soliciting bids for the debtors'

11  businesses and assets in order to maximize value.

12       Mr. Weiland would conclude by encouraging the

13  court to approve the bidding procedures.

14       THE COURT:  All right.

15       MR. MINUTI:  That would conclude Mr. Weiland's

16  testimony.

17       THE COURT:  Now does anyone wish to cross-examine

18  Mr. Weiland on his proffer?

19       (No verbal response)

20       THE COURT:  Hearing no one, I suspect you'll ask

21  me to admit the proffer into evidence and I'll do so.

22       (Proffer of Alan Weiland received into evidence)

23       MR. MINUTI:  Your Honor, I would ask you to do so.

24       THE COURT:  I'm doing so, yes.

25       MR. MINUTI:  Thank you, Your Honor.

1          Next, Your Honor, I have the proffer of Mr.

2    Victor.

3          THE COURT:  Yes.

4          MR. MINUTI:  Again, Mr. Victor is in the

5    courtroom.  If called to the stand to testify, Mr. Victor

6    would testify as follows.

7          That he and SSG were hired by the debtors in early

8    June 2019 to serve as the debtors' investment banker, to,

9    among other things, assist the debtors in pursuing a

10   financing, sale or restructuring transaction.

11         Other than Mr. Victor, the SSG team assigned to

12   the engagement include Theresa Kohl, Craig Warznak, Alex

13   Lamm, and Matt DiTosto.

14         The SSG team spent the first few days of their

15   assignment meeting with the debtors' management, gathering

16   information and learning about the debtors' business.

17         Mr. Victor would testify that the SSG team then

18   developed marketing materials including a teaser to be used

19   to market the debtors' assets.

20         Working with the debtors' management and Mr.

21   Weiland, the debtors' CRO, SSG created a confidential

22   information memorandum and established an electronic data

23   room of the debtors' key books and records for purposes of

24   providing potential bidders with an opportunity to do due

25   diligence.

1           Mr. Victor would testify that SSG began informally

2    marketing the debtors' assets in early June.  And based upon

3    preliminary discussions with three separate potential

4    strategic purchasers, he would testify that he's optimistic

5    that the debtors will receive one or more bids that purchase

6    the St. Christopher's entities businesses and assets.

7           Mr. Victor would further testify that SSG began

8    formally marketing the St. Christopher's entities, businesses

9    and assets on July 10, 2019.  Since then, SSG has contacted

10   approximately seventy-eight perspective strategic and

11   financial purchasers.  They've sent each of those parties the

12   teaser.  And in light of these perspective purchasers to

13   sign, an appropriate confidentiality agreement and to receive

14   a copy of the confidential information memorandum and access

15   to the data room.

16          Mr. Victor would testify that so far, sixteen

17   potential purchasers have responded; ten have signed

18   confidentiality agreements; nine potential purchasers have

19   visited the data room and are in the process of performing

20   due diligence.

21          Mr. Victor would testify that read the motion

22   before the court and is familiar with the proposed bid

23   procedures and the proposed timeline.  The bid procedures

24   were developed by SSG working with the debtors.

25          Mr. Victor would characterize the post-bidding

1  procedures as ordinary and customary.  And are reasonably

2  designed to solicit bids for the assets, to promote a

3  competitive auction process, and to lead to the highest and

4  best bid or bids for the assets.

5          Mr. Victor would testify that the bid procedures

6  include the ability to designate a stalking horse bidder and

7  to return to the court for approval of bid protections

8  including, for example, a breakup fee and appropriate

9  circumstances -- excuse me; an appropriate circumstances Mr.

10 Victor would testify that such protections can add value to

11 the sale process.

12         Mr. Victor is familiar with the sale timeline that

13 I discussed on the record a minute ago.  He would testify

14 that the sale timeline is aggressive but warranted under

15 these circumstances.  The cost of the debtors' bankruptcy,

16 the risk of disruption to St. Christopher's entities

17 operations, the liquidity constraints on the debtors

18 necessitate that the sale process for the St. Christopher's

19 entities, business and assets be concluded by early October.

20         Under the circumstances of these Chapter 11 cases

21 and given the efforts and level of interest to date, Mr.

22 Victor would testify that the proposed timeline is the best

23 that can be done and should be sufficient to run a

24 competitive auction process to maximize value.

25         Accordingly, Mr. Victor would encourage the court

1  to approve the proposed procedures as modified.

2          Mr. Victor would testify that he's aware that both

3  the City of Philadelphia and Hayes Locum LLC have objected to

4  the proposed bid procedures and have asked the court to

5  compel the debtors to treat each as a consultation party

6  throughout the sale process.

7          During his thirty-six-year career, first as a

8  bankruptcy lawyer and then as an investment banker, Mr.

9  Victor would testify that he cannot remember another occasion

10  where parties other than an official committee or secured

11  lender were treated as consultation parties in a 363 sale

12  process.

13          In Mr. Victor's view, treating the City or Hayes

14  Locum as consultation parties will be detrimental to the sale

15  process and will impede the debtors' ability to maximize

16  value.

17          First, Mr. Victor would testify that neither the

18  City or Hayes Locum are fiduciaries to the debtors' estate.

19  While it is true that the debtors' lender is a consultation

20  party and not a fiduciary, the debtors' lender's interest are

21  aligned with the debtors in that both have the goal of

22  maximizing value.  Here, the City's stated interest are much

23  different.

24          Second, Mr. Victor would testify that maximum

25  flexibility and responsiveness are critical components of any

1  sale process.  If the debtors are forced to consult with the

2  City and Hayes Locum throughout the process, there is

3  considerable risk that the process will be slowed down.

4        Third and, perhaps, most importantly, Mr. Victor

5  would testify and emphasize that fairness, confidentiality

6  and trust on the part of perspective bidders are critical

7  components to running a fair and competitive sale process.

8        Involving non-estate fiduciaries throughout the

9  process threatens these critical components and there is

10  significant risk that interested parties will be discouraged

11  from participating in the sale process and/or that the sale

12  process will become disjointed.

13        Simply stated, in Mr. Victor's view, requiring the

14  debtors to treat either the City or Hayes Locum as a

15  consultation party will negatively impact the sale process.

16        That would conclude his testimony.

17        THE COURT:  All right, thank you, Mr. Minuti.

18        Does anyone wish to cross-examine Mr. Victor?

19     (No verbal response)

20        MS. HARPER:  Your Honor, Megan Harper for the City

21  of Philadelphia.

22        THE COURT:  Ms. Harper, yes; of course.

23        MS. HARPER:  Good to see you.

24        The City doesn't wish to cross-examine with

25  respect to the proffer, but does wish to respond and pursue

1  its objection at the appropriate time.

2         THE COURT:  Absolutely.  You'll certainly have

3  that opportunity, Ms. Harper.

4         MS. HARPER:  Thank you, Your Honor.

5         THE COURT:  Yes, yes.  All right.

6         MR. MINUTI:  Your Honor, that concludes the

7  evidentiary presentation.  I would ask that the court admit

8  the proffer into evidence.

9         THE COURT:  All right, any objection?

10     (No verbal response)

11        THE COURT:  Hearing none, it is admitted; Mr.

12 Victor's proffer.

13     (Proffer of Scott Victor received into evidence)

14        MR. MINUTI:  Thank you, Your Honor.

15        As Your Honor saw there were a number of changes

16 that we made to the proposed order.  That was designed to

17 resolve a number of objections that parties had raised.  So,

18 I do think we're down to the Hayes Locum and the City's

19 request to be consultation parties.

20        Your Honor, just briefly.  We believe that

21 approval of bid procedures is supported by unrebutted

22 evidence.  The procedures are ordinary and customary.

23 They're open.  The design to solicit the highest and best

24 offer, we believe, they're fair and reasonable under the

25 circumstances.

1           They provide a full and fair opportunity for

2   interest parties to get notice, number one. And, number two,

3   a full and fair opportunity for anybody who wants to bid on

4   these assets to get involved in the process, and we hope that

5   they do so.

6           The only question, Your Honor, we're not asking

7   for any bid protections today, so really the only question is

8   whether the procedures are open, fair, and designed to

9   maximize value.  We think the evidence shows that that is to

10  be the case.

11          I think a couple of folks want to put some

12  clarifying points on the record, Your Honor.  And then what I

13  think makes the most sense is to hear from the City and Hayes

14  Locum.  And then if I could just reserve the right to

15  respond, I would like to do that.

16          THE COURT:  Of course, Mr. Moody.  That's fine.

17          Did you say there are some people who want to make

18  some comments?

19          MR. MINUTI:  Your Honor, I believe, Drexel

20  University's counsel is here, Mr. Marriott. I think he wants

21  to put a couple clarifying points on the record.

22          And other than that, I think the committee would

23  like to make a few comments.

24          THE COURT:  Okay.

25          MR. MINUTI:  But, again, I think the only two

1 objections we have are the two to being including as

2 consultation parties.

3         THE COURT:  All right, Mr. Minuti, thank you.

4         MR. MARRIOTT:  Good morning, Your Honor, Vince

5 Marriott, Ballard Spahr on behalf of Drexel University.

6         THE COURT:  Good morning, yes.

7         MR. MARRIOTT:  My clarifications are a little

8 granular, so it would be helpful, I think, if I pointed you

9 to specific provisions --

10         THE COURT:  In the order.

11         MR. MARRIOTT:  It's actually in the bid

12 procedures.  And it's easiest, I think, to work off the

13 blackline so that which is Docket Number 288-2 and I'm --

14         THE COURT:  I don't know if I have a blackline.

15         MR. MINUTI:  May I approach, Your Honor?

16         THE COURT:  Yes, you may, Mr. Minuti.  Thank you.

17 Thank you.  All right.

18         I'm sorry.  What page was that, sir?

19         MR. MARRIOTT:  Does your version have the

20 docketing numbers on at the top?

21         THE COURT:  It does not.

22         MR. MARRIOTT:  Okay.  It's page 5 of the bid

23 procedures.

24         THE COURT:  Yes.  All right.

25         MR. MARRIOTT:  Which are Exhibit 1 to the

1  blackline order.

2            THE COURT:  Yes.

3            MR. MARRIOTT:  And roughly twenty-six pages in is

4  where I am, that's page 5.

5            THE COURT:  I have that, yes.

6            MR. MARRIOTT:  Okay.  If you look at what is

7  Section 4(a)(vii), a statement that the transaction agreement

8  is not subject to contingencies of any kind.  Do you see

9  where I am?

10            THE COURT:  I do, yes.

11            MR. MARRIOTT:  One of the contingencies, which the

12  bid procedures originally prohibited, was a contingency as to

13  regulatory approval.  With this type of asset as a going

14  concern nobody could submit a bid that wasn't contingent on

15  regulatory approval.

16            We consulted with the debtor yesterday and

17  language was added subject to Section, it says, 3, it should

18  say 4(a)(ix) of these bidding procedures.

19            THE COURT:  Yes.

20            MR. MARRIOTT:  The intention of that language is

21  to permit a regulatory contingency subject to the bidder,

22  complying with new 4(a)(ix), which is a statement that the

23  qualifying bidder has the ability to retain regulatory

24  approvals.  Do you see that?

25            THE COURT:  Yes, I do.

1              MR. MARRIOTT:  So, the intention, again, that

2    additional language is to permit regulatory contingencies in

3    qualifying bids so long as romanette (ix) is complied with.

4    And romanette (ix) -- further clarification on romanette

5    (ix).  What it presently says is a statement that the

6    qualifying bidder has the ability to obtain all required

7    regulatory approvals.  The debtor agrees that that is

8    satisfied if the qualified bidder indicates it believes in

9    good faith that it has the ability to obtain those.  I mean

10   nobody could warrant that they're going to get regulatory

11   approval.

12             THE COURT:  That's right.

13             MR. MARRIOTT:  That can only have a good faith

14   belief that they can obtain it.  So, the debtor has also

15   agreed that a qualified bidder complies with romanette (ix)

16   by indicating a good faith belief.

17             THE COURT:  So, you need the words good faith in

18   that paragraph?

19             MR. MARRIOTT:  What it would say is a statement

20   that the qualifying bidder believes in good faith that it has

21   the ability to obtain.

22             THE COURT:  All right.

23             MR. MINUTI:  Your Honor, the debtor has no

24   objection to that change.

25             THE COURT:  Okay, Mr. Minuti.  Thank you.

1          MR. MARRIOTT:  That's all I had.

2          THE COURT:  Oh, okay.  Thank you, sir.

3          MR. MARRIOTT:  Thank you, Judge.

4          THE COURT:  Mr. Sherman, yes.

5          MR. SHERMAN:  Good morning, again, Your Honor.

6          I rise both in support and in one respect to

7   disagree respectfully with Mr. Minuti.  And where we rise in

8   support, obviously, Your Honor, is the committee believes

9   that moving forward on the bid procedures is reasonable and

10  acceptable.

11         The disagreement relates to Mr. Minuti's comments

12  about usual and customary.  And usual and customary is

13  different in this case, Your Honor, simply because of the

14  Opco/Propco structure.  It's, sort of, a pink elephant and

15  something that we have identified.  Let me be a little more

16  specific, Your Honor.  It's because the same owners own both

17  the Opco's and the Propco's.

18         THE COURT:  Yes.

19         MR. SHERMAN:  The committee has been very

20  sensitive to those issues since its appointment.  And what we

21  have done with the cooperation and collaboration of the

22  debtor's professionals is we added in two places in these

23  procedures, Your Honor, both in the form of order and the

24  actual bid procedures a recusal process.  So, to, basically,

25  try to clean as best we can the conflict relating to the

1  Opco/Propco distinction.

2         In Paragraph 37, Your Honor, of the actual order -

3  -

4         THE COURT:  Yes.  Let me get there and let me see

5  what you're saying.  There we are, yes.

6         MR. SHERMAN:  So, what we did, Your Honor, you

7  know, obviously, subject to Your Honor's approval is put a

8  provision that recuses Mr. Friedman and any person acting on

9  his behalf from participating on behalf of the debtors in the

10 sale process or any deliberations, et cetera.  So,

11 effectively, what we tried to do, Your Honor, was to cleave

12 Mr. Friedman and any person acting on his behalf from being

13 part of the debtor's fiduciary review/consultation of the

14 assets and then he will sit and act as a landlord or fee

15 owner as the process evolved.

16         THE COURT:  Yes.

17         MR. SHERMAN:  What we did in the bid procedures,

18 Your Honor, obviously, subject to your approval in Paragraph

19 19 --

20         THE COURT:  Yes, I see that.

21         MR. SHERMAN:  -- which is Page 17 of the

22 blackline, we tried to be as specific as possible just

23 adding, I believe, six bullets, non-exclusive bullets, as to

24 various aspects of what should be recused.

25         THE COURT:  Okay.

1          MR. SHERMAN:  So, I just wanted to highlight to

2    the court that (A) people are aware of the issue, and I think

3    everybody should be as fiduciaries or everybody on the estate

4    side should be aware of it.  And, obviously, the debtor's

5    professionals have been very responsive to these concerns.

6          As we walk through this, you know, this is going

7    to be somewhat of a challenge to manage that simply because

8    the term of the lease is in play, you know, how the bidders

9    react to that and how value will work in this structure.  So,

10   we will do our best to manage it, but I wanted to make the

11   court aware that the parties are sensitive to the issue.

12   We've created a process, and it is hoped and expected that

13   people who are here to the directive in the proposed order.

14         THE COURT:  All right.  Mr. Sherman, while you're

15   at the podium let me just ask you your position on the

16   requests of the City of Philadelphia and consultation

17   parties.

18         MR. SHERMAN:  So, in that respect, Your Honor, we

19   join-in and endorse Mr. Minuti's statements, the evidence

20   that the court received on Mr. Victor.  I think his -- he had

21   thirty-six years in the industry.  I am not that far along,

22   but I have never seen it and this is not a time to deviate

23   from that for a number of reasons including what Mr. Victor

24   said, but we're also dealing with, you know, hospital assets

25   here which can be unique.

1          So, the fiduciary role as a consultation party,

2   put the secured creditors aside, they have their own

3   interests, but in managing the process there has to be a give

4   and take and a sensitivity to the communications between the

5   estate fiduciaries as how bids are evaluated.  And with no

6   disrespect to the parties what we perceive to be interlopers

7   who would have distinct interests.  They will have their

8   rights to come and object.  This court, my experience, Your

9   Honor, is always open to comments, objections.  I think the

10  parties will be open to comments, objections informally.

11         So, the idea is that if those individual parties

12  have concerns, we're happy to listen to them.  Obviously,

13  they're creditors and they're part of our constituency.

14              THE COURT:  Yes.

15              MR. SHERMAN:  So, we will -- you have our

16  commitment to speak to them, to understand their issues with

17  all other creditors as we walk into that process.  But in

18  certain respect being a consultation party is almost a

19  sacrosanct issue.

20              THE COURT:  Yes.

21              MR. SHERMAN:  It is an issue we take with great

22  responsibility especially in this type of case.  So, I think

23  we can be responsive to those issues, Your Honor, without

24  denominating those individuals with consultation party

25  status.

1          THE COURT:  All right.  Thank you, Mr. Sherman.

2          Yes, good morning.

3          MR. WEIS:  Good morning, Your Honor; Martin Weis

4   from Dilworth Paxson.

5          THE COURT:  Yes, sir.

6          MR. WEIS:  With me today is my partner, Larry

7   McMichael who has been admitted *pro hac vice*.

8          THE COURT:  Yes.

9          MR. WEIS:  We are here today on behalf of American

10  Academic Health Systems, LLC; Philadelphia Academic Holdings;

11  and Joel Friedman.  And with the court's permission I would

12  cede the podium to Mr. McMichael.

13         THE COURT:  That would be fine.  Thank you for the

14  introduction.

15         Good morning.

16         MR. MCMICHAEL:  Good morning, Your Honor.  Nice to

17  be here.  As Mr. Weis pointed out, I represent the parent

18  companies of the debtor and the ultimate owner, Mr. Friedman.

19         THE COURT:  Yes.

20         MR. MCMICHAEL:  I wanted to expand a little bit on

21  what committee counsel had to say about this recusal issue so

22  that everybody is fully aware of it.

23         THE COURT:  Yes.

24         MR. MCMICHAEL:  First of all, this is something

25  that we suggested a while ago, recognizing that there is an

1  inherent conflict when you're selling clusters of assets and

2  you have one party owning one cluster and another party

3  owning another cluster.  Mr. Friedman believes it's important

4  as the person who is ultimately in control of the debtors to

5  stay away from this side of the transaction because he's also

6  in control of the subsidiaries of Philadelphia Academic

7  Health Holdings which own the real estate.

8           THE COURT:  Right.

9           MR. MCMICHAEL:  So, in the order there is

10  Paragraph 37 which we endorse and are in full support of.

11  There is also Paragraph 29 --

12           THE COURT:  In the order?

13           MR. MCMICHAEL:  -- in the order, which is a

14  reciprocal acknowledgement that the debtors don't own the

15  real estate and that they'll sort of stay out of this process

16  of selling the real estate.  So, it's kind of a mutual

17  recusal.

18           Having said that, not having just started in this

19  business.  I'm actually doing it a little bit longer then Mr.

20  Victor has.  This isn't going to work unless we act, in some

21  respects, together --

22           THE COURT:  That's right.

23           MR. MCMICHAEL:  -- to get the best deal.

24           THE COURT:  Yes.

25           MR. MCMICHAEL:  It is in my client's interest that

1  the debtor gets the best deal for these assets.  So, we're

2  going to have to walk a fine line here and cooperate which is

3  why the sentence, and I know that Mr. Brown has something to

4  say about it later, I'm not going to steal his thunder, but

5  we added a sentence saying both parties will act in good

6  faith.  We couldn't figure out how to contain the concept

7  that both at the principal level and at the counsel level we

8  need to coordinate with each other to try to get the right

9  result.

10         For most buyers they're going to expect to put a

11  price on the table for everything.  And we're going to have

12  to separately negotiate, you know, what part of that price is

13  paying for the real estate, what part of that price is paying

14  for the debtor assets.  While that process is going on we

15  can't literally be on opposite sides of a line not talking to

16  each other.  We have to communicate and we have to coordinate

17  to assure that the process works right and we get to the

18  right result.

19         So, I just wanted to add that to the record.  I'm

20  happy to address any questions Your Honor has about it.

21         THE COURT:  You know, I had thoughts on the same

22  subject.  Is it your client's intention to sell the real

23  estate to the buyer, to the purchaser because I don't think

24  that that was part of the bid procedures motion?

25         MR. MCMICHAEL:  It is not part of the bid

1  procedures if the debtor doesn't own the property.

2           THE COURT:  Right.

3           MR. MCMICHAEL:  So, the answer is a qualified yes.

4  My client is very flexible on this subject.  We will sell.

5  We will finance it.  We will lease it.  Whatever gets to the

6  highest value for the debtors we're prepared to do.

7           THE COURT:  Okay.

8           MR. MCMICHAEL:  So, that, in many respects, is

9  going to be up to what the buyers want.  The buyers that I

10 have spoken with, to date, at this point prefer to own the

11 real estate.  So, we're probably talking about a sale, but

12 we're open to any form of transaction that makes sense that

13 does the best for the greater good.

14          THE COURT:  All right.  I appreciate your

15 comments.  Thank you.

16          MR. MCMICHAEL:  Thank you, Your Honor.

17          THE COURT:  Mr. Brown.  Yes, sir.

18          MR. BROWN:  Good morning, again, Your Honor.

19          So, on the heels of the committee's comments, the

20 debtor's comments and Mr. Friedman's comments I wouldn't

21 characterize it as my thunder is stolen, but I think that we

22 are in alignment so long as Your Honor's interpretation of

23 the proposed order is not inclusive of my clients interests

24 which is a string of assets that are independent of what Mr.

25 Friedman owns and controls, and independent of what the

1  debtor owns and controls.

2         St. Christopher's Healthcare LLC is the tenant and

3  then there may be a sub-tenant of certain of those

4  properties.  And so long as the court's interpretation of the

5  language, all parties shall act in good faith, does not

6  encompass my clients so long as --

7         THE COURT:  You don't want to act in good faith?

8         MR. BROWN:  Your Honor, I always like to act in

9  good faith, but I don't know that the court wants to include

10 them in the scope of this order in that context.  I don't

11 know that they were intended to be there by the parties that

12 crafted this.

13        THE COURT:  I don't think they are.

14        MR. BROWN:  But it's not their intention that

15 matters, Your Honor.  It's your intention that matters when

16 you sign the order.  And so, I want to make sure that Your

17 Honor is clear and is not intending to include my clients in

18 the context of that.

19        Similarly, the language at Paragraph 37, while I

20 applaud the effort, it is extraordinarily broad.  The

21 language that I have in front of me is a blackline that was

22 uploaded this morning.  I understand that further changes had

23 been proposed and adopted by the parties, and I believe is

24 acceptable, and clarifies the issue.

25        Basically, what the intention here is to say --

1   well, the intention is not to say that my clients cannot

2   participate in the sale.  They're not an insider.  They're

3   not a consultation party.  They're not recusing themselves

4   from anything.  They're not prohibited from participating in

5   the sale.  And given the breadth of the language, and I don't

6   know whether people perceive that my clients fit within the

7   scope of all these words at the beginning of Paragraph 37,

8   but I believe they all intend that my clients are not

9   included in what was intended by Paragraph 37.

10          THE COURT:  Well, I read those two paragraphs as

11  referring only to Mr. Friedman and his entities.

12          MR. BROWN:  Well, it's the entities part, Your

13  Honor, that people have said, well, your client is an

14  insider.  Well, my client is not an insider, but people have

15  thrown that around from time to time and the description of

16  entities at the beginning of Paragraph 37 may include what

17  people have thrown around in the colloquial your client is an

18  insider comment.

19          THE COURT:  Well, I will hear from the debtors.  I

20  don't read it that way, Mr. Brown.

21          MR. BROWN:  And I don't think it's intended that

22  way, Your Honor, but it's important to hear that from you

23  that you don't read it to include my clients.

24          THE COURT:  Let's hear from others.  Yes.

25          MR. MCMICHAEL:  Your Honor, again, Larry

1  McMichael, Dilworth Paxson LLP, for Mr. Friedman and the

2  parent companies.

3          THE COURT:  Yes.

4          MR. MCMICHAEL:  The capital structure of this

5  transaction is inordinately complicated when it was done a

6  year and a half ago.  We agree a hundred percent with what

7  Mr. Brown just said.  Certainly not my intention in

8  negotiating this language to include HSRE, but in the

9  interest of full disclosure it is important that the court

10  and the parties understand that Mr. Friedman does have an

11  interest in Mr. Brown's client.  It's a minority interest.

12  It is not controlling, but he does have an interest in Mr.

13  Brown's client.

14          So, that is why some people have thrown around

15  this insider concept.  Mr. Brown is correct; his client is

16  not an insider.  My client's interest in his client is a

17  small stake, about ten percent, I believe, is the correct

18  number.  There is some preferred stock also, but that is

19  totally non-controlling.  So, I just wanted to be completely

20  candid about that so that everybody understands what the

21  situation is.

22          But as to Paragraphs 29 and 37 from our

23  standpoint, and I will let Mr. Minuti speak for himself, they

24  were intended only to apply to the Joel Friedman group of

25  non-debtor entities and the debtors.

1          THE COURT:  All right.  Thank you, Mr. McMichael.

2   That is helpful.

3          Mr. Minuti?

4          MR. MINUTI:  Yes, Your Honor.  Before Your Honor

5   took the bench, we did agree to add some language in

6   Paragraph 37 which I thought satisfied Mr. Brown's concern.

7   The intent of that paragraph, Your Honor, was to make it

8   clear that Mr. Friedman and the entities he's part of a

9   control are not going to take part in the process on behalf

10  of the debtor.  So, we have added language to make that

11  clear.

12         So, with respect to the real estate, Your Honor,

13  we're not going to be involved in that.  Mr. Friedman is

14  going to be involved in that, but in terms of who's making

15  the decisions on the part of the debtor he's not going to be

16  involved in that process.

17         THE COURT:  Okay.

18         MR. MINUTIE:  That is the whole idea.  So, if Your

19  Honor looks at Paragraph 37 you will see the sentence says,

20         "Joel Friedman and any person or entity acting

21  directly or indirectly on behalf of or at the direction of

22  Joel Friedman, and any person or entity which holds direct or

23  indirect ownership interest in or is in direct or indirect

24  control of any of the non-debtor affiliates shall be recused

25  from participating in any sale" -- and then we've added

1 language, "by or on behalf of the debtors."

2          Then it continues.

3          THE COURT:  Okay.

4          MR. MINUTI:  So, I think that clarifies it.  If

5 not, I think I'm missing it, Your Honor.

6          THE COURT:  Yes, Sherman.

7          MR. SHERMAN:  Thank you, Your Honor.

8          Since we were the author of Paragraph 37 I just

9 wanted -- and that is where I will disagree with Mr.

10 McMichael.  I think it was raised by the committee, not by

11 Mr. Friedman, but that's an aside.

12          With regard to Mr. Brown's comments twofold, Your

13 Honor.  One is I don't want anything today to be dispositive.

14 Your Honor is not making findings as to insidership.  We

15 don't know that.  That is an issue that is not for today.  We

16 are simply dealing with Paragraph 37.  I just want to make

17 sure that that's very clear that nobody is making any

18 determinations as this case progresses as to people's status

19 just because of the complicated nature of what's happened

20 here.

21          Simply for the purposes of Paragraph 37, Your

22 Honor, it was not the intent to have Mr. Brown's clients be

23 subject to that recusal, but --

24          THE COURT:  That's how I read it.

25          MR. SHERMAN:  We agree with Your Honor, but I just

 1 | don't want that to be binding in any respect as this case
 2 | progresses as any determination of --
 3 |         THE COURT:  You would make a separate application,
 4 | if you will, regarding HSRE?
 5 |         MR. SHERMAN:  Correct, Your Honor.
 6 |         THE COURT:  Okay.  Thank you, Mr. Sherman.
 7 |         Does that help, Mr. Brown?  I do not read
 8 | Paragraphs 29 or 37 as being directed to your client.
 9 |         MR. BROWN:  That helps, Your Honor.  Thank you.
10 |         THE COURT:  Okay.
11 |         MR. BROWN:  I think the record should be clear
12 | that while my clients own a number of properties related to
13 | certain operations and operations of Drexel and others that
14 | are the tenants of the properties, both at Hahnemann and St.
15 | Chris, the only interests that they have in the St. Chris
16 | package location on Eerie Avenue is the Eerie Street Parking
17 | Garage.  So, that all the rest of the real estate that
18 | comprises the St. Christopher Hospital's campus is not owned
19 | by my clients.
20 |         THE COURT:  All right.  That is helpful.
21 |         MR. BROWN:  And with your clarifying -- with the
22 | statement of your intention and what the order says, and with
23 | the clarification that Mr. Minuti read we have no further
24 | comment or objection.
25 |         Thank you, Your Honor.

1           THE COURT:  Thank you, Mr. Brown.

2           Mr. Barkasy, good morning.

3           MR. BARKASY:  Good morning, Your Honor; Richard

4    Barkasy from Schnader Harrison Segal & Lewis for the

5    Pennsylvania Department of Health.

6           THE COURT:  Yes.

7           MR. BARKASY:  First, I'm happy to confirm what Mr.

8    Minuti said.  The Department of Health and the debtors are

9    working towards resolution of the remaining closure plan

10   issues.  And hopefully progress has definitely been made and

11   hopefully it will be worked out shortly.

12          Your Honor, we filed a limited response --

13          THE COURT:  Yes.

14          MR. BARKASY:  -- similar to what we filed with

15   regard to the sale of the residency assets and the bidding

16   procedures.

17          THE COURT:  Regarding the licensing if you will.

18          MR. BARKASY:  Regarding the licensing and our

19   position, generally, that any sale is subject to Pennsylvania

20   statutes and regulations relating to health and welfare

21   including the Departments -- including the prohibition on the

22   transfer of a license without the Department's approval.

23          We're mindful of Your Honor's statement at the

24   last hearing that you considered this to be a sale objection.

25   We filed the limited response to make certain that our rights

1  were reserved as they were with regard to the residency

2  assets.  I assume that's the case here as well.

3          THE COURT:  Yes.  Without committing to it, Mr.

4  Barkasy, I'm assuming that the Department of Health would

5  look favorably upon a transfer of the license.

6          MR. BARKASY:  Certainly, without committing, but

7  the Department of Health certainly supports a sale of St.

8  Christopher and a successful completion of licensing

9  approval.

10          THE COURT:  All right.  Thank you.

11          MR. BARKASY:  Thank you, Your Honor.

12          THE COURT:  I understand your position completely.

13          MR. BARKASY:  Thank you.

14          THE COURT:  Ms. Harper, now it's up to you.

15          MS. HARPER:  I believe it is, Your Honor.  Again,

16  Megan Harper for the City of Philadelphia.  With me here in

17  the courtroom today is Dr. Thomas Farley, the Health

18  Commissioner for the City of Philadelphia.

19          THE COURT:  Yes.

20          MS. HARPER:  Your Honor, I recognize nobody wants

21  the City of Philadelphia as a consultation party, but I do

22  want to speak -- and that is out of a fear of misaligned

23  interests, but I do want to speak briefly to where our

24  interests do align --

25          THE COURT:  Okay.

1          MS. HARPER:  -- which as the debtors have

2   represented and I believe the committee has stated as well,

3   there is a focus and a concern on the continuing continuity

4   of care at St. Christopher's Hospital for Children.  And you

5   have been asked by the debtors to act quickly with respect to

6   the sale of the assets, in part, out of concern for the

7   continuity of care.

8          THE COURT:  Yes.

9          MS. HARPER:  The city shares that concern and

10  probably has a greater concern than any other interested

11  party in that regard because the fact of the matter is if

12  there is any threat to the continuity of care at St.

13  Christopher's Hospital for Children that will fall upon the

14  damage and the burden of that will fall upon the citizens of

15  the City of Philadelphia.

16          THE COURT:  I recognize that, Ms. Harper, and I am

17  sensitive to that.

18          MS. HARPER:  I recognize that Your Honor has been

19  sensitive to that.  Let me just say that in addition to that

20  if there is something that occurs during the course of this

21  sale that puts any of the assets at risk, because as the City

22  has identified it's not just the operations at the hospital.

23  There are ancillary services being provided that are critical

24  to that community.

25          So, to the extent this sale process puts any of

1  those assets at risk it will then fall upon the City and the

2  City's Departments of Health & Human Services to step-in and

3  protect the health, and safety and well-being of their

4  citizens.  So, yes, I understand bid procedures, standard

5  order, what not.  This is an exceptional event for the City

6  of Philadelphia.

7         Our citizens were there in 1885 when Hahnemann

8  University Hospital was founded and they're there now

9  watching it being dismantled.  The citizens were there in

10 1875 when St. Christopher's Hospital for Children was founded

11 and they're there now getting access to some of the most

12 exceptional pediatric care as well as those ancillary

13 services we have identified.  And, of course, it goes without

14 saying they will be there after these bankruptcy cases are

15 closed.

16        The City has a duty to those citizens.  I get that

17 we don't have a fiduciary duty in the same respect as the

18 debtors have with respect to gaining the most value for the

19 assets on behalf of the estate, same -- and I recognize that

20 the committee is aligned in that regard as well.  But we do

21 have a duty and that's why we ask to be a consulting party.

22 And I recognize that nobody wants us to be a consulting

23 party.

24        THE COURT:  Tell me what you have in mind, Ms.

25 Harper, as a consultation party?

1            MS. HARPER:  Your Honor, I'm willing to switch the

2      terminology.  I will switch the terminology.  We want to be

3      fully informed, as much as possible, without violating any

4      confidences, without getting involved in the negotiations as

5      to who is going to be selected to be a qualified bidder or

6      who will be selected as a stalking horse bidder.  We would

7      like notice as soon as possible and an opportunity to see

8      those bids and review them so we can be in a positon that

9      doesn't put us on our heels.

10            I'm not speaking from a legal argument standpoint

11     at a sale hearing.  I'm talking from an operational

12     standpoint as the city of Philadelphia there to protect the

13     citizens of Philadelphia.  We would like as much access as

14     possible, Your Honor.  I do see that there was an amendment

15     to the bid procedures that is opening up the auction for

16     parties who express an interest.  We want to be invited to it

17     and we want it to be known that our representatives are to be

18     there with counsel to express their opinion with respect to

19     who is looking like the potential successful bidder and to be

20     heard in that moment before it happens.

21            THE COURT:  So, you're not looking for the right

22     to veto bids, you're looking to be informed of them and --

23            MS. HARPER:  That's correct, Your Honor.  I co-

24     opted the debtor's language and I realize that put everybody

25     on edge.  And I didn't mean to do that because I can change

1  the language.  I didn't need to use their language.  I can

2  use my own language and tell you want the City wants.

3          THE COURT:  Okay.  I understand your position and

4  I'll ask the debtors to express -- oh, I'm sorry, Mr. Hogan,

5  yes.

6          Thank you, Ms. Harper.

7          MR. HOGAN:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. HOGAN:  Daniel Hogan, Hogan McDaniel on behalf

10  of Hayes Locum.

11          THE COURT:  Oh yes.

12          MR. HOGAN:  Your Honor, I likewise co-opted the

13  language from both the City of Philadelphia and obviously

14  from the order itself.

15          THE COURT:  Yes.

16          MR. HOGAN:  Hayes Locum provides physicians

17  services to the debtor both prepetition and postpetition.

18  Those services are on an ongoing basis.  They are a daily

19  services that run weekly with confirmations from the debtor.

20  These are specialty physicians, cardiac, pediatric

21  cardiologists, intensive care.  I believe at this point there

22  are eight physicians that are placed at St. Christopher's on

23  an ongoing basis.  There are confirmations from the debtor

24  for specific dates for these doctors to perform services

25  through August of 2020.

1            THE COURT:  Oh, okay.

2            MR. HOGAN:  Okay.  And in aggregate I believe the

3    costs associated with that would be in the area of $1.2

4    million.  These physicians are obviously greatly needed by

5    St. Christopher's to have the hospital continue in its

6    ongoing services.

7            So the relationship is ongoing.  We have the

8    confirmation process.  Hayes just seeks to understand who the

9    successful bidder is going to be.  Again, I understand the

10   arguments Mr. Minuti made about fiduciaries and what have

11   you.  I would say that, you know, some of those statements

12   proffered for Mr. Victor were somewhat self-serving

13   obviously, not unexpectedly of course, so they're conclusory

14   in that the information that we're looking to have access to

15   is primarily to protect the interest of Hayes Locum.  There

16   can be no doubt about that, I mean I'm not going to sugarcoat

17   that and tell you it's for some other purpose.

18           THE COURT:  Sure.

19           MR. HOGAN:  But we've got this ongoing

20   relationship that we expect to continue.  And to the extent

21   that we don't have an understanding about who the successful

22   bidder is or what their plans are vis-à-vis Hayes Locum, then

23   we've got dramatic concerns.  And so, I understand the

24   position of the debtors as well as the committee; however,

25   again we're looking for this valuable information so that we

1 can understand what our role is going forward vis-à-vis this

2 process.  Thank you.

3             THE COURT:  Thank you, Mr. Hogan.

4             Mr. Minuti?

5             MR. MINUTI:  Thank you, Your Honor, for giving me

6 an opportunity to respond.

7             THE COURT:  Of course.

8             MR. MINUTI:  Let me, I'll go in reverse order.

9 Let me start with Hayes Locum.

10            Your Honor, Hayes Locum, Your Honor, is a contract

11 party like we have probably hundreds of other contract

12 parties.

13            THE COURT:  Yes.

14            MR. MINUTI:  They have no, as I understand it,

15 Your Honor, we pay them in advance so they don't have an

16 outstanding claim.  It's just a question of whether the

17 contract is going to be assumed and assigned.

18            THE COURT:  That's right.

19            MR. MINUTI:  We have a whole procedure built into,

20 we have a whole process built into the procedures so they can

21 get notice and know where we're going, and so I'm not sure I

22 need to say anything more about that.

23            Let me turn to the City, Your Honor.

24            THE COURT:  Yes.

25            MR. MINUTI:  And let me make a couple of things

1 perfectly clear on the record.  We respect the City's

2 position, number one.  We understand the impact on the City,

3 certainly with what we did at Hahnemann University Hospital,

4 and we understand that there will be an impact on the City

5 depending upon what that outcome of the auction is.  There's

6 no question about that.

7          And so their input is important to us and their

8 views are important to us.  But you have to take a step back

9 and listen to what the City's, listen to the City's

10 arguments, and ask yourself this question -- they have,

11 there's no reason why they can't tell us now what all their

12 concerns are.  We are willing to listen.  We want to listen.

13 We've had productive dialogue with the City with regard to

14 the closure plan of Hahnemann University Hospital, and we're

15 certainly willing to talk to the City with respect to the St.

16 Christopher's assets sale.  So, we're willing to listen, we

17 want to know what their concerns are.  We will certainly take

18 into consideration or concerns when we're evaluating the bids

19 and going forward.  They will get notice like everybody else,

20 Your Honor.  They're going to be at the auction; they will

21 see who the players are.

22          THE COURT:  That's what I was going to ask.

23          MR. MINUTI:  They're welcome to be at the auction.

24 The order makes it clear they're allowed to be at the

25 auction.  We'd like it to be a reasonable contingent of

1  representatives from the City, but they can be there.  They

2  can hear what's happening, they can understand the bids at

3  the auction.  And if they have concerns, they can express

4  those concerns at the auction.

5          But the way the bid procedures work, Your Honor,

6  there's at least nine occasions where we need to consult with

7  our consultation parties, picking a stalking horse, and

8  modifying the procedures, getting the bids.  Go back to what

9  Mr. Victor testified to.  We're trying to convince parties

10  that are strangers to this event to come forward and give us

11  money and buy these assets.  The more people I open it up to

12  who are going to see their financial information, their bids,

13  that's going to make people nervous, that's going to disrupt

14  the process.  We need to speak with one voice, that voice is

15  Mr. Victor.  We need to make sure that people understand.  We

16  have a process, it's contained, we're driving to the end

17  result.

18          So, there's plenty of opportunity in the process

19  for the City to be involved.  Again, they can call us today,

20  they can call us tomorrow, we want to know what their

21  concerns are.  We'll take those into consideration.  But

22  every step along the way for us to have to stop and consult

23  with the City makes no sense.  Remember, the process is

24  moving quickly here.  Right?

25          THE COURT:  Yes.

1          MR. MINUTI:  We don't have a lot of time.  We're

2   dealing with a governmental entity, Your Honor.  Speed,

3   flexibility, responsiveness are all hallmarks of this

4   process.  If we have to stop and talk to the City about

5   something and wait for the City to respond and then react,

6   the process is going to grind to a halt.

7          So I'm trying to walk a fine line here, I'm trying

8   to balance things here, Your Honor, which is what are the

9   City's concerns, what do they need to know, are their due

10  process rights protected, okay, so that they have an

11  opportunity to come before Your Honor.  If we reach this

12  agreement, they have an opportunity to come before Your Honor

13  and say, hey, the debtor wants to do this and I don't like

14  it, and I'll tell Your Honor why I think what we're trying to

15  do makes sense.  And Your Honor is going to ultimately decide

16  it. So just like everybody else, they have an opportunity to

17  object.

18         What's interesting, Your Honor, when you look at

19  their, when you look at their objection, what they try to do

20  is sort of wrap themselves in Your Honor's order that you

21  entered on July 3rd and say we have to talk to them.  And,

22  again, we're willing to talk to them, there's no doubt about

23  that.

24         THE COURT:  Right.

25         MR. MINUTI:  But if Your Honor remembers, in their

1  objection that they filed to the closure motion, they cited a

2  1969 regulation.  And the 1969 regulation is what they relied

3  on to say, look, I can insert myself in this process.  And

4  that 1969 regulation talked about closure or disruption of an

5  emergency room or emergency facilities.  Here, we're selling

6  a whole hospital, we're not asking Your Honor to close

7  anything today.  What we're trying to do is get an asset that

8  keeps everything we have going as a going concern.  We

9  recognize that that's what's best for the community.  We

10  would love for that to happen, Your Honor.  But we don't know

11  what direction the bids are going to take.  And so we're

12  going to evaluate those bids.  They can be at the, they can

13  be there at the auction, they can tell us any time between

14  now and then what their concerns are so we can take those

15  into consideration.

16          You know, it's funny, before we came here, Mr.

17  Weiland and I were talking about, you know, what are the

18  fiduciary duties that a debtor has in a case like this,

19  right, because you know you have employees, you have health

20  care issues and all those sorts of things.  And we got into a

21  little debate about, you know, what are those duties.  And is

22  it really just to maximize value?  Because that's what the

23  bankruptcy code tells, to maximize value.  The bankruptcy

24  code doesn't say anything that we have to care about our

25  employees or we have to worry about patient care.

1          And we got into a little bit of an argument

2    because Mr. Weiland's view is, and I hope he's not

3    embarrassed by me saying this, his view is quite different.

4    He thinks he owes a duty to make sure that patients are cared

5    for and that there is some continuity of care, and take into

6    consideration other people's you know what other, whether

7    it's the City, whether it's other people, other industries,

8    how they're impacted.

9          So that's not an issue Your Honor has to decide

10    today, but I want Your Honor to understand what Mr. Weiland's

11    mindset is as we move this process.  And we are going to

12    listen to the City, we are going to take their issues into

13    consideration.  But at the same time, Your Honor, we have to

14    run a process, we have run a process that's fair, and we have

15    to run a process that our bidders look at and say, my

16    information is going to be confidential, I know what the

17    process is, I know I'm going to be treated fairly, and I know

18    I'm going to have an opportunity at the end of the day.

19          So, we think the process as we've proposed

20    balances those issues, it gives the City exactly what it

21    needs, again we're willing to talk to them at any time.  But

22    again, it allows us to maximize value and to take into

23    consideration all constituents and hopefully bring before

24    Your Honor at the sale hearing a bid that everybody is going

25    to -- see, I'm optimistic.  Hopefully we get there, Your

1  Honor.  Everybody is aligned because we have a great result

2  for the debtor, for this estate, the City, and everybody

3  involved.

4          So, I would ask Your Honor to overrule the

5  objections and enter the order approving the bid procedures.

6  Thank you.

7          THE COURT:  All right.  Thank you, Mr. Minuti.

8          Ms. Harper?

9          MS. HARPER:  Your Honor, the City is optimistic as

10 well.  There's no question.  And I appreciate the offers to

11 confer with the City.  An open line of communication is

12 necessary.  But I, what I'm hearing is Mr. Minuti is offering

13 to treat the City as any other creditor in this process.  The

14 City is more than any other creditor in this process.  And I

15 would hope that the Court would recognize that fact.

16          The City isn't intending to slow, and I don't know

17 if Mr. Minuti heard this representation previously but we

18 don't stand to question judgment in terms of who qualifies as

19 a bidder, who qualifies as a stalking horse bidder.  We want

20 to know who these entities are that are being qualified, and

21 what there is in terms of the scope of what they are offering

22 to purchase in terms of assets so that we can be prepared.

23 Because the City, the City is really in a unique position

24 here.

25          We've had, we have partnerships with our

1  hospitals.  We aren't just the City where the real estate is

2  purchased and the hospitals are plunked down there.  We have

3  ongoing working relationships with the hospital.  We've had

4  the longest relationship with St. Joseph's Hospital for

5  Children than any other party here, Your Honor.  And we ask

6  to be treated as something more than any other creditor.  I

7  get it. The auction is open now.  That's open to everyone,

8  that's not specifically speaking to the City.  And it's

9  giving the same role to the City as any other creditor would

10  have at the auction.  I think this merits a circumstance

11  where, no, we'll settle for something short of being a

12  consultation party, but we won't settle for being treated

13  just like any other creditor.  We need some more information

14  as the process unfolds.

15         THE COURT:  All right.  Well, let me just say this

16  to you, Ms. Harper, because I know it's of concern, the

17  continuity of care is of concern, and it's of concern to me

18  as well.  And if there are two parties, one who has been a

19  little more but has a poor record of care, and the other is a

20  little less and has a good record of care, it's unlikely that

21  I will approve the first bidder.

22         MS. HARPER:  I'm glad to hear that and we would

23  certainly lodge an objection as would any other creditor in

24  that circumstance that had an opinion on that.

25         THE COURT:  Right.  That's right.  Now, I don't

1  know to what extent the debtor is willing to let you know in

2  advance who the bidders are, who the qualified bidders are.

3  I think that's what you want so that you can then check them

4  out, the City can check them out.

5        MS. HARPER:  Certainly.  We have, as I said, we

6  don't want to be disruptive to the process.  We do not.  We

7  just need information.  And we need an open line of ongoing

8  communication if we have questions.  I think that's fair.

9        THE COURT:  Well that's -- yes, I agree with you

10  there.  And I do recognize that the City does have a

11  particularly important role in this and needs.  So let's just

12  see what the debtors are prepared to do on a voluntary basis

13  rather than me making them do something.

14        And I recognize, Mr. Minuti, there's a

15  confidentiality issue here as well.

16        MR. MINUTI:  Your Honor, I think, three points in

17  response.

18        Point number one as Mr. Hackman pointed out, Your

19  Honor, just remind the Court, we do have a patient's care

20  ombudsman so we have somebody who's in charge of looking

21  after the continuity of patient care and they are very active

22  in the process.  I can tell Your Honor that, I just wanted to

23  remind the Court and make sure that was on the record.

24        THE COURT:  I am aware.

25        MR. MINUTI:  Point number two, Your Honor, look,

1  you know, how can I say this politically correct, Your Honor?

2  All of our constituents and creditors are important, but some

3  are more important than others.  There is no doubt about it

4  that the City has a large voice in what ultimately is going

5  to happen here.

6          THE COURT:  Yes.

7          MR. MINUTI:  And so, we are not going to treat

8  them like every other creditor.  There is no doubt about

9  that, Your Honor.  We want them to be here at the podium with

10  us at the sale hearing side by side.  So, the idea that I'm

11  suggesting that they're just like everybody else, that's not

12  what I'm suggesting.  I'm suggesting that we are going to do

13  our best to keep them informed along the way.

14          Finally, Your Honor, if I understand what they

15  want to, what they would like is they would like to know who

16  the identity of the bidders are.  I spoke to Mr. Victor.  We

17  are happy to provide that once the bidders are identified

18  that we will share with the City who the bidders are.  And,

19  again, at that point if there's specific information they

20  need, we can have a dialogue about that.  At that point, if

21  they've got concerns about any particular bidder, we'd like

22  to hear that.  But that's what we're prepared to do in light

23  of the confidentiality issues that Your Honor has already

24  mentioned.

25          THE COURT:  Ms. Harper, does that help you to know

1  who the bidders are and --

2       MS. HARPER:  It helps.

3       THE COURT:  -- to be able to attend the auction

4  and be heard about what the City's concerns are?

5       MS. HARPER:  We would like some stronger language

6  in the bid procedures order with respect to the City's

7  allowed participation at that auction, just so there's no

8  misunderstanding that the City is going to have a voice

9  there, and we'll have representation there.  I recognize that

10  at that point we get involved at a point before there's a

11  decision made, and that's something I am truly going to

12  continue to press for, to have a voice before a successful

13  bidder is selected.

14       In addition, I think it is helpful to the City to

15  know who the bidders are, but it is also important to the

16  City to understand the scope of the bids.  And perhaps that

17  can be done in a way that isn't disclosing any confidential

18  information in terms of are there any components of care or

19  service that are at risk here of not continuing.

20       THE COURT:  I understand what you're saying.  In

21  other words, if somebody makes a bid for everything except

22  the cardiac unit, for example, you would like to know that.

23       MS. HARPER:  Yes, Your Honor.  Thank you.

24       MR. MINUTI:  Again, Your Honor, our goal would be

25  to identify the bidders and to share with the City what I'll

1 call nonconfidential information that hopefully can get them

2 comfortable.  But to define in the order what that's going

3 to be I think we could be here for the next three days

4 writing this order.

5         And in terms of stronger, I don't know what

6 stronger language the City would like to be added to the

7 order.  The order is clear that they can participate in the

8 auction, Your Honor.  They can be there.  I --

9         THE COURT:  Could we say the City of Philadelphia

10 will be consulted?

11         MR. MINUTI:  Well, Your Honor --

12         THE COURT:  Without being a consultation party.

13         MR. MINUTI:  Your Honor, we offered the City, and

14 we will stand by this offer, before we select the ultimate

15 "successful bidder."  We are prepared to meet with them and

16 talk to them and hear their concerns.  We're certainly

17 prepared to do that.

18         THE COURT:  All right.

19         MS. HARPER:  Your Honor, I do have to say that I,

20 I'm getting a general sense of what Your Honor is being asked

21 to perceive the City as is this behemoth non-nimble entity.

22 And I think --

23         THE COURT:  No, I --

24         MS. HARPER:  -- in the context of the closure

25 motion, we have proven that not to be the case.  We have

1  worked very diligently, very, you know, consistently and

2  constantly worked with them to reach a consensual agreement

3  in that regard.  I don't think there's any question that the

4  City can be nimble when it needs to be.  And in this

5  instance, it recognizes it needs to be nimble.

6          And, you know, that's something that I wanted to

7  speak to here.  And I must say that we had one go around

8  before this hearing, that was it with respect to what the

9  City wanted.  That was all we had.  So that doesn't bode well

10  in my mind that we are going to be listened to, we're going

11  to be a party, we're going to be included without some real

12  teeth to those statements.  And I hate to bring that up, Your

13  Honor, but it's the truth.

14          THE COURT:  I'm just, I'm just trying to think

15  about how we would modify the order.

16          MS. HARPER:  I understand.

17          THE COURT:  And let me ask if --

18          MS. HARPER:  We didn't have much of a chance to do

19  that.

20          THE COURT:  Right.  And let me ask, Ms. Harper, if

21  this helps.  If you could call me from the auction, if, you

22  or someone you designate from the auction, if you're not

23  being listened to, if there's a problem.  You see, it's

24  really, it's in the debtor's best interest to have the City

25  of Philadelphia aligned with it on the sale.

1          MS. HARPER:  I agree.

2          THE COURT:  They don't want you coming in as an

3   objector.

4          MS. HARPER:  They don't want in there -- yes.

5   They don't want to walk in here without us on board.  I

6   understand that.  But I'd like to see something in response

7   to that sentiment which we haven't to date.

8          THE COURT:  What language would you suggest?

9          MS. HARPER:  Well, Your Honor, I appreciate that

10  there are confidentiality issues here, but if there can be

11  any way in which, again, in addition to the identity of the

12  bidders be disclosed, some way that will put the City on

13  notice if there is something that may be lost in the shuffle

14  there, some way the City can be put on notice that they may

15  have to pick up the slack and start to work towards another

16  health crisis, potential health crisis.  I mean that is a

17  true concern.

18         THE COURT:  Okay.  All right.  I understand where

19  you're coming from.

20         As far as the Hayes objection, I do appreciate

21  your arguments, Mr. Hogan, but I agree with Mr. Minuti that

22  you're another contract party and it will be dealt with in

23  that regard and they'll have to talk to you obviously, but at

24  the same time I don't want to give you any special

25  consultation rights.

1          As far as the City of Philadelphia is concerned, I

2    do think that they have a specific interest in this process.

3    I think the debtors recognize that and there ought to be a

4    way to address the City's concerns about being put on notice

5    if there's a, if there is a proposed bidder with a different

6    treatment plan in mind than they presently have to provide

7    for the continuity of care.  Or even an acknowledgement in

8    the order that the debtors recognize that the City of

9    Philadelphia has a responsibility to its citizens to maintain

10   the continuity of care that St. Christopher's Hospital has

11   always provided and that they will be consulted accordingly.

12          MR. MINUTI:  Can you give me one moment?

13          THE COURT:  Yes.

14          MR. MINUTI:  Your Honor it's Mark Minuti again for

15   the record.

16          THE COURT: Yes.  Yes, sir.

17          MR. MINUTI:  I've consulted with Mr. Weiland and I

18   also talked to the committee.  Here's what I would suggest we

19   do, Your Honor.  And, you know, I mean again we're trying to

20   be responsive to the City here.

21          THE COURT:  Yes.

22          MR. MINUTI:  Their issue seems to be that if we

23   are, if we are considering a bid that for example, you know,

24   is going to be a bid for not all the assets and that's going

25   to result in something closing down or some impact on the

1  City that we let them know that.

2          THE COURT:  Yes.

3          MR. MINUTI:  And so what we will commit to do,

4  Your Honor, is if we qualify a bid, and if that bid makes

5  clear that there is going to be something like that example

6  that I just gave Your Honor which is something is not going

7  to continue, something is going to close down, there's going

8  to be some impact, we will commit to disclose that to the

9  hospital as soon as we become aware of it which would be when

10 we get the bids and we qualify the bid.  I really think

11 that's the best we're going to do.

12          Again, Your Honor, it's going to have to be clear

13 from the bid or when it becomes clear in the process, you

14 know, we will certainly let them know that.  But I'm, you

15 know that I think is the best we can do.  Remember, we're

16 likely to get some bids, Your Honor, we're not going to

17 qualify.  And if we're not going to qualify them, then it

18 doesn't impact the estate, it doesn't impact the City.

19          THE COURT:  Right.

20          MR. MINUTI:  It's only if we get a bid that's --

21 you know, I'm going to throw out a wild example.  If we get a

22 bid that said we're going to close down the emergency room.

23 Right?

24          THE COURT:  Right.

25          MR. MINUTI:  Clearly, the City needs to know that

1  and we provide that.

2          THE COURT:  Yes.

3          MR. MINUTI:  So that would be my solution to this

4  issue which is we will identify the qualified bidders, and if

5  there is an aspect of the qualified bid that we're aware of

6  that we think is going to impact the continuity of care going

7  forward, if that bidder would ultimately be the successful

8  bidder, we will disclose that aspect of the transaction to

9  the City.  And hopefully that satisfies Your Honor.

10         THE COURT:  Does that do it, Ms. Harper?  Because

11  I think that's what you're looking for.

12         MS. HARPER:  Well, Your Honor, I just want to make

13  sure we don't lose what we've already gained or what I

14  thought we had already gained which is the right to know the

15  identity of qualified bids, bidders.

16         THE COURT:  No, they're committing to that.

17         MS. HARPER:  And yes --

18         THE COURT:  And they're committing to something

19  more.  They're also committing --

20         MS. HARPER:  Yes, I understand.

21         THE COURT:  Yes.

22         MS. HARPER:  And I think it's appropriate just so

23  long as that it would be helpful to put that in the

24  appropriate part of the procedures to identify that at this

25  point this is when the City will be consulted.  So when the

1  bid is qualified that perhaps would have some level of impact

2  on the service of care the City must be notified.  And I also

3  again request that the City have some language with respect

4  to that option where it is known that they will, as Your

5  Honor said we have the right to be heard and if we aren't

6  being heard we have some relief that we can seek from Your

7  Honor.

8              THE COURT:  Okay.

9              MS. HARPER:  Thank you.

10             MS. CODY:  Excuse me.  Kelly Ann Cody again.  I

11  have a question, it's an opinion, but it's a question I think

12  that goes with it.  How come you don't put the bidders' names

13  right out there because you have dealings with mental health

14  and a lot of them can't be business owners and especially

15  this amount of people.

16             THE COURT:  Well, we don't do that because they're

17  submitting confidential bids that the debtors then will have

18  to consider, and it just is not done in bidding procedures

19  and sales in any case.

20             MS. CODY:  Thank you, Your Honor.

21             THE COURT:  Yes.

22             Mr. Sherman, yes.

23             MR. SHERMAN:  Thank you, Judge.  I'm just trying

24  to understand how this is going to work in practice because

25  it's a little bit unique.

1          THE COURT:  It's unusual, but this is an unusual

2   situation.

3          MR. SHERMAN:  Understood.  And I think that -- two

4   things.  One is, as we move through the process, the legal

5   standard, Your Honor, which we're all working under is

6   highest or best.

7          THE COURT:  Highest or best.  That's right.

8          MR. SHERMAN:  Right.  Which will be Your Honor's

9   determination at the sale hearing.  So if the, if Your Honor

10  wants to take into consideration continuity of care, it

11  becomes at that point.  So I, which is, it's not a today

12  issue.

13         THE COURT:  No, that's correct.  I agree.

14         MR. SHERMAN:  So the other thing, Your Honor, is

15  on the notification to the City, I just sort of want to, a

16  bid will come in from you know Buyer X and they're going to

17  buy all the assets of the St. Christopher's Hospital for

18  Children.  And that's the way the bid will probably read.

19  But I'm not sure, Your Honor, in the bid it's going to say

20  I'm going to operate a NICU, I'm going to close this or close

21  that.  It just, I'm not sure if that's realistic of what's

22  going to happen here.  Expectation management.

23         THE COURT:  When they make a bid though, they're

24  going to have to, aren't they going to have to identify what

25  they're purchasing?

1          MR. SHERMAN:  They're going to purchase the

2    "purchased assets" will be all assets of the St.

3    Christopher's Hospital.  That's just reality, Your Honor.

4    That's what is going to happen.  They may say they'll buy

5    only a portion of the assets, but I'm just trying to

6    understand the City's concern and how that's going to

7    actually play out in reality.

8          THE COURT:  The City's concern is that if they

9    close an emergency room, the City has to know it because

10   they're going to have to provide service.

11         MR. SHERMAN:  Understood, Your Honor.

12         THE COURT:  And that's an important consideration

13   in this case.

14         MR. SHERMAN:  Absolutely.  Absolutely, Your Honor.

15   There's nobody that's going to minimize that at all.  But I'm

16   just not sure that's going to be known in the context of

17   bidding.

18         THE COURT:  I understand what you're saying, too,

19   Mr. Sherman.  As a practical matter, when parties submit a

20   bid, they're going to submit a price.

21         MR. MINUTI:  Your Honor, again, Mark Minuti.

22         When I was at the podium the last time, what I,

23   what we committed to do, Your Honor, was in the process

24   whenever we become aware that there is an issue, that's when

25   we'll let the, that's when we'll let the City know.  So for

1  example, if the bid, if it's not clear on the bid but through

2  negotiations we learn that that's something that's going to

3  happen, that's when we're going to let the City know because

4  that's the first time we're going to know.  So the

5  commitment, I don't know how I could do it other than to say

6  the commitment is going to be that once we are aware, we

7  being the debtor, are aware that there might be an issue, we

8  will let the City know.

9          The other thing that I want to make clear, Your

10 Honor, is that the information we give the City has to remain

11 confidential.  In other words  --

12         THE COURT:  Well, yes.

13         MR. MINUTI:  In other words, the City cannot share

14 it with anybody else, any constituents, and so on and so

15 forth.  Because as I understand it, the City is using it for

16 their own evaluation so they can be ready.  And so we need

17 that commitment on the record from the City.

18         THE COURT:  That's right.  I should have said

19 that, Ms. Harper.  I think you understood that.

20         MS. HARPER:  Of course, Your Honor.  The City has,

21 debtor's counsel, the committee and other consulting parties

22 have the City's commitment to execute a confidentiality

23 agreement.  And we understand the reasons why for that.

24         You know, I think the Court has heard our

25 concerns, you know.  One of the things that St. Christopher's

1  Hospital for Children does that not many do is offer primary

2  care services there for --

3           THE COURT:  Indigent --

4           MS. HARPER:  -- pediatric care.  Okay.  And that's

5  becoming fewer and farther between, those types of practices.

6  So I think you've heard us, I think we just want to point out

7  one more time, these are the things that are at risk and

8  these are the reasons why we need to be a little bit better

9  informed than your average creditor.  Thank you, Your Honor.

10          THE COURT:  Yes.  I'm aware of that and I think, I

11  think the commitment you made, Mr. Minuti, when you become

12  aware of a situation that affects the continuity of care, you

13  will alert the City and recognize that the City of

14  Philadelphia has an obligation to its citizens to maintain

15  the continuity of care.

16          MR. MINUTI:  Understood, Your Honor.  Understood.

17          Your Honor, given the number of changes we have to

18  the order, I think we're going to have to go back and submit

19  it later.

20          THE COURT:  I understand.  Yes.

21          MR. MINUTI:  So we will add a provision, obviously

22  share it with the committee's, excuse me, the City's counsel

23  and hopefully reach agreement and then submit it under a

24  certificate of counsel if that's acceptable to the Court.

25          THE COURT:  That's fine.  That's fine, Mr. Minuti.

1  And I -- did you wish to be heard any further, Ms. Harper?

2           MS. HARPER:  No, thank you, Your Honor.  Other

3  than to thank your, for taking the time to work this through

4  in real time in the courtroom.  I do really do appreciate

5  that.

6           THE COURT:  Of course.  All right, Ms. Harper.

7  Thank you.

8           And I am going to approve the bid procedures.  I

9  think that they are designed to maximize value to get us to a

10 point of higher, highest or best bid; they're fair and

11 reasonable.  And for those reasons I will certainly approve

12 them and I will sign the order when it is presented.

13          MR. MINUTI:  Thank you, Your Honor.  I think we

14 have just two housekeeping matters.  I know Ms. Jones is here

15 and wanted to put something on the record, so I'll let her do

16 that now.

17          THE COURT:  Yes.  All right.  Thank you, Mr.

18 Minuti.

19          MR. MINUTI:  I'll let her, like it's --

20          THE COURT:  I'll let her do it.

21          MR. MINUTI:  If it's acceptable to Your Honor.

22          THE COURT:  It's fine with me.  Yes.

23          Ms. Jones, good morning.

24          MS. JONES:  Good morning, Your Honor.

25          Laura Davis Jones, Pachulski, Stang, Ziehl & Jones

1  on behalf of Tenet Business Services and Conifer Revenue

2  Cycle Solutions.

3           THE COURT:  Yes.

4           MS. JONES:  Your Honor, as Mr. Minuti said, this

5  is really a housekeeping and scheduling issue I want to bring

6  before the Court.

7           THE COURT:  Okay.

8           MS. JONES:  Your Honor, we are going to be filing

9  a motion today with respect to our dispute with the debtors.

10 I wanted to raise it with Your Honor though because I know

11 Your Honor has urged us to talk with the debtors and we have

12 and we continue to do so.  The only reason we're going ahead

13 and filing our motion is so that we can provide the full 21

14 days' notice before the next omnibus hearing, so today would

15 be the last day we could file our motion.

16           We have heeded Your Honor's encouragement for the

17 parties to talk, and Your Honor offer to help in that

18 process.  Like I said, we've talked and we'll continue to

19 talk, but I didn't want to be sitting here at a hearing

20 today, file our motion and have Your Honor wonder where this

21 is coming from.

22           THE COURT:  I understand.  And would it help if

23 the Court, would it help if we appoint a mediator to help you

24 resolve your dispute, or is it not at that point as yet?

25           MS. JONES:  Not at this point yet, Your Honor.

1          THE COURT:  Okay.  All right.  I will look for

2    your motion.  Thank you, Ms. Jones.

3          MS. JONES:  Thank you.

4          MR. MINUTI:  Your Honor, the only other

5    housekeeping matter --

6          THE COURT:  I got an order by the way about

7    sealing.

8          MR. MINUTI:  Yes.  That's what I was going to

9    bring up.

10          THE COURT:  Okay.

11          MR. MINUTI:  Your Honor, so we had filed in

12    connection with our procedures relative to the residents

13    programs, we had filed a motion to seal.  We're sending out

14    an assumption assignment notice.  All of the residents are

15    going to receive that.  What we wanted to do was, Your Honor,

16    redact from the notice that goes on file the residents'

17    personal information, their names and addresses and so on.

18          So we are serving it all on them but when we file

19    on the docket we simply didn't want to give their personal

20    addresses.  And so we did file that motion.  We haven't seen

21    that that order hit the docket.

22          THE COURT:  I meant to raise it with you today

23    because I didn't get a certificate of no objection on that.

24    And it may, I don't know if there is an objection.

25          MR. MINUTI:  I don't believe anybody has objected,

1 Your Honor.  But what we'll do is we'll file a certificate

2 then today and then Your Honor can get to it in the ordinary

3 course if that's acceptable.

4 　　　　　　THE COURT:  That's fine.  But I recognize, I do

5 recognize the confidentiality of that information and I'll be

6 pleased to sign that order.

7 　　　　　　MR. MINUTI:  Thank you, Judge.  And I think that

8 completes our calendar today.  Thank you.

9 　　　　　　THE COURT:  In fact, based on the record, I do not

10 need a certificate of no objection.  We'll just get that on

11 the docket.

12 　　　　　　MR. MINUTI:  Very well.  I have a copy of the

13 motion and the order.  Would it help, Your Honor?

14 　　　　　　THE COURT:  Yes, that will help.

15 　　　　　　MR. MINUTI:  Or I could just give you the docket

16 number, whatever you prefer.

17 　　　　　　THE COURT:  Give me that and I'll make sure that

18 it gets done.

19 　　　　　　MR. MINUTI:  May I approach?

20 　　　　　　THE COURT:  Yes, you may.  Having it in hand will

21 help.  Thank you.  Thank you, Mr. Minuti.

22 　　　　　　All right.  With that I think we can adjourn.  And

23 good luck with the bidding procedures and I hope that we have

24 a very successful sale and that Mr. Brown behaves himself.

25 　　　　　　MR. MINUTI:  Thank you, Your Honor.

1          (Proceedings conclude at 11:43 a.m.)

2

3

4

5                          CERTIFICATE

6

7          We, MARY ZAJACZKOWSKI and THERESA PULLAN, certify that

8    the foregoing is a correct transcript from the electronic

9    sound recording of the proceedings in the above-entitled

10   matter.

11   /s/Mary Zajaczkowski              July 29, 2019
12   Mary Zajaczkowski, CET**D-531

13
     s/ Theresa Pullan                July 29, 2019
14   Theresa Pullan, CET**00650

15

16

17

18

19

20

21

22

23

24

25