# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 19-11466 (KG) <br><br> Jointly Administered <br><br> Re: Docket No. 241 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF THE DEBTORS FOR THE ENTRY OF AN ORDER APPROVING (I) AGREEMENT WITH RANDSTAD PROFESSIONALS US, LLC D/B/A TATUM TO PROVIDE AN INTERIM CHIEF FINANCIAL OFFICER, AND (II) THE DESIGNATION OF PHIL PORTER AS INTERIM CHIEF FINANCIAL OFFICER TO THE DEBTORS**

The Official Committee of Unsecured Creditors (the "Committee") of Center City Healthcare, LLC d/b/a Hahnemann University Hospital, *et al.* (the "Debtors") files this limited objection to *Motion of the Debtors for the Entry of an Order Approving (I) Agreement with Randstad Professionals US, LLC D/B/A Tatum to Provide an Interim Chief Financial Officer, and (II) the Designation of Phil Porter as Interim Chief Financial Officer to the Debtors* [D.I. 241] (the "Motion"), and respectfully states as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

6507961

**PRELIMINARY STATEMENT**

1.  Randstad Professionals US, LLC d/b/a Tatum ("Tatum") and Phil Porter should not be retained to provide interim chief financial officer ("Interim CFO") services to the Debtors because (i) they are subject to conflicts of interest that preclude their retention; (ii) it is not clear that their selection was an independent exercise of the Debtors' business judgment; and (iii) their services are unnecessary and/or duplicative of services that will be provided by other professionals in these cases. Simply put, the Court should not allow conflicted parties who were selected by other conflicted parties, and whose services are superfluous, to be placed at the Debtors' nerve center. Whatever benefits might be gained by such an arrangement, if any, would be significantly outweighed by the concomitant risks to the Debtors and their estates.

2.  Tatum and Mr. Porter are subject to preclusive conflicts of interest because, as stated in paragraph 8 of the Motion, Tatum and Mr. Porter have already been – and continue to be – retained and employed by Philadelphia Academic Health Holdings, LLC ("PAH Holdings"), the Debtors' immediate corporate parent[2]. As set forth on Exhibit A to the *Declaration of Allen Wilen in Support of First Day Relief* [D.I. 2] (the "First Day Declaration"), a copy of which is attached hereto as Exhibit 1, in addition to being the Debtors' immediate

---

[2] Paragraph 8 of the Motion states as follows:

> In light of the urgency of providing these services, prior to filing this Motion, Tatum entered into an agreement with Philadelphia Academic Health Holdings, LLC ("**PAHH**") the non-debtor parent to Debtor Philadelphia Academic Health System, LLC, to provide substantively identical services to those provided for in the Services Agreement, paid for by PAHH. Upon entry of the Proposed Order granting this Motion, the agreement between PAHH and Tatum will be deemed terminated and replaced by the Services Agreement.

corporate parent, PAH Holdings is also a direct or indirect corporate parent of non-Debtor entities that are landlords, co-obligors, and/or guarantors of some or all of the Debtors, whose interests may be at odds with the Debtors' with respect to nearly every major decision in these cases as a result, including with respect to any financing, cash collateral use, asset sale, claim resolution, or bankruptcy plan. PAH Holdings and its agents, employees, and professionals, including Tatum and Mr. Porter, are therefore subject to irreconcilable conflicts of interest, and should not have control over, or be employed by, any of the Debtors.

3. Tatum and Mr. Porter's conflicts of interest are magnified by the terms of their Interim Services Agreement with the Debtors (the "Services Agreement") [D.I. 241], which in addition to acknowledging that Tatum and Mr. Porter would have access to confidential Debtor information, provide that Tatum and Mr. Porter would continue to perform services for PAH Holdings and other conflicted parties even while Mr. Porter served as the Debtors' Interim CFO. Tatum and Mr. Porter simply cannot acquit their fiduciary duties to the Debtors while simultaneously providing services to parties whose interests are adverse to those of the Debtors and their estates.

4. These issues call into question whether Tatum and Mr. Porter's selection was an independent exercise of the Debtors' business judgment. Among other things, the Debtors have not articulated any business justification for retaining and employing Tatum and Mr. Porter when Tatum and Mr. Porter (i) are already employed by a conflicted corporate parent; (ii) intend to continue providing services to that parent and other conflicted parties while working for the Debtors; and (iii) were retained by the Debtors more than two weeks after the Debtors' bankruptcy filing, when the Debtors' interests had definitively diverged from those of the conflicted parties. Absent (a) a demonstration that no conflicted parties were involved with

Tatum and Mr. Porter's selection and (b) the articulation of a reasonable justification for retaining Tatum and Mr. Porter notwithstanding the foregoing and the apparent redundancy of their services (discussed below), there is no basis for any determination that the retention of Tatum and Mr. Porter was an independent exercise of the Debtors' business judgment.[3]

5. In addition to all of the foregoing, many of the services Tatum and Mr. Porter propose to provide are simply unnecessary due to the constraints and oversight inherent in chapter 11 cases. For instance, Tatum and Mr. Porter propose to provide cash flow oversight for the Debtors, but cash flow oversight is already provided through the budget and reporting requirements in these cases. Of the proposed services that may be useful in these cases – such as overseeing the preparation and presentation of the Debtors' operating and capital budgets – most, if not all, will be provided to the Debtors by EisnerAmper LLP ("Eisner"), Allen Wilen as chief restructuring officer ("CRO"), and Ronald Dreskin as interim chief executive officer ("Interim CEO"). As a result, it is not clear what, if any, services are needed from Tatum and Mr. Porter or justify their $12,750-per-week fee.

6. The Committee accordingly requests that the Court deny the Motion, and to the extent that an Interim CFO is retained in these cases, require that (i) no conflicted party be involved in the selection of such Interim CFO, (ii) such Interim CFO provide services only to the Debtors, and (iii) such Interim CFO report only to the Debtors' CRO, Interim CEO, and independent director.

---

[3] The Committee has made multiple requests to the Debtors for information aimed at clarifying these issues, but as of the filing of this objection, the Committee has not received the requested information.

**OBJECTION**

7. The Committee objects to the retention of Tatum and the designation of Phil Porter as Interim CFO because (i) Tatum and Mr. Porter are subject to conflicts of interest that preclude their retention; (ii) it is not clear that Tatum and Mr. Porter's selection was an independent exercise of the Debtors' business judgment; and (iii) Tatum and Mr. Porter's services are unnecessary and/or duplicative of services that will be provided by other professionals in these cases.

**I.    Tatum and Mr. Porter Are Subject to Conflicts of Interest that Preclude Their Retention**

8. Tatum and Mr. Porter are subject to various conflicts of interest stemming from the organizational structure of the Debtors and their non-Debtor affiliates. As set forth on the corporate organizational chart attached hereto as Exhibit 1, MBNF Investments, LLC ("MBNF"), through American Academic Health System, LLC ("AAH") and PAH Holdings, is both (i) the ultimate corporate parent of the Debtors and (ii) the ultimate corporate parent or indirect corporate parent of non-Debtor entities that are landlords, co-obligors, and/or guarantors of the Debtors. As a result, MBNF, AAH, and PAH Holdings are subject to conflicts of interest with respect to any matter in which the interests of the Debtors and the non-Debtor entities that are landlords, co-obligors, and/or guarantors of the Debtors may diverge. These matters include, but are not limited to, any financing, cash collateral use, asset sale, claim resolution, or bankruptcy plan in these cases.

9. The foregoing conflicts of interest extend not only to MBNF, AAH, and PAH Holdings (the "Conflicted Parents"), but to following individuals and entities (collectively with the Conflicted Parents, the "Conflicted Parties"):

> (a)    any individual or entity – including Joel Freedman – with an ownership interest in, or control over, any of the Conflicted Parents;

(b) any other individual or entity with a direct or indirect ownership interest in, or direct or indirect control over, both (i) the Debtors and (ii) non-Debtor parties that are landlords, co-obligors, and/or guarantors of the Debtors; and

(c) any individual or entity acting on behalf of, acting at the direction of, or providing services to any of the foregoing individuals or entities (including Tatum and Mr. Porter, as discussed below).

10. By way of example, the proposed sale of substantially all of the assets of St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children ("SCH") and its applicable affiliates (collectively with SCH, the "SCH Debtors") presents conflicts of interest because (i) SCH leases its physical plant from non-Debtor affiliates for which MBNF is the ultimate corporate parent or an indirect corporate parent[4] and (ii) the cost and duration of the applicable leases, and the landlords' willingness (or lack thereof) to modify or extend such leases, may impair the value of SCH's assets. Further, in the event that a potential purchaser of the SCH assets is also interested in purchasing the non-Debtor lessors' real estate, the purchase of the real estate may affect the value of the SCH assets and will inherently present allocation issues with respect to which MBNF is conflicted. SCH Debtor loan obligations present further conflicts because it may be in the interest of certain non-Debtor guarantors[5] and their ultimate or

---

[4] As set forth in the First Day Declaration (¶ 13 and Exhibit A), these non-Debtor affiliates include, but are not limited to, Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC (f.k.a. PAH HOLDINGS Bobst MOB, LLC), and on information and belief, PAH HOLDINGS NEW College MOB, LLC, PAH HOLDINGS Bellet MOB, LLC, PAH HOLDINGS Broad Street MOB, LLC, PAH HOLDINGS Feinstein MOB, LLC, PAH HOLDINGS Wood Street Garage, LLC, and PAH HOLDINGS Erie Street Garage, LLC (landlords for properties utilized by the SCH Debtors in the operation of their businesses and/or subleased to SCH Debtor affiliates).

[5] As set forth in the First Day Declaration (¶¶ 13 and 37 and Exhibit A), these non-Debtor guarantors include, but are not limited to, Philadelphia Academic Health Holdings, LLC (guarantor and/or co-obligor of SCH Debtor obligations to MidCap Funding IV Trust and/or MidCap Funding H Trust and Tenet Business Services); and Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC (f.k.a. Center City Physician Associates, LLC),

indirect corporate parent MBNF to have their own obligations to the SCH Debtors' lenders satisfied from proceeds of a sale of the SCH Debtors' assets, while the opposite would be true for the SCH Debtors.

11. To address these issues, the Court's *Order (I) Scheduling a Hearing to Consider Approval of the Sale or Sales of Substantially All Assets of St. Christopher's Healthcare, LLC and Certain Related Affiliates and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedure, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Establishing Procedures in Connection with the Selection Of and Protections Afforded to Any Stalking Horse Purchasers, and (IV) Granting Related Relief* [D.I. 301] (the "Bidding Procedures Order") included the following protective language:

> Joel Freedman, any person or entity acting, directly or indirectly, on behalf of or at the direction of Joel Freedman, and any person or entity which holds direct or indirect ownership interests in, or is in direct or indirect control of, any of the non-Debtor affiliates, shall be recused from participation in any Sale by or on behalf of the Debtors and any deliberations, decisions and actions relating thereto. All such deliberations, decisions and actions shall instead be reserved for the Debtors' chief restructuring officer and independent director, in consultation with the Consultation Parties where required by this Order or the Bidding Procedures. All parties shall act in good faith in connection with the separate but parallel sales processes.

Bidding Procedures Order, ¶ 39. Additional protective language was also included in section 19 of the bidding procedures (the "Bidding Procedures") approved by the Bidding Procedures Order.

---

and Broad Street Healthcare Properties III, LLC (f.k.a. St. Christopher's Physician Associates, LLC) (guarantors and/or co-obligors of SCH Debtor obligations to Tenet Business Services).

6507961                                7

12. Similar safeguard with respect to both (i) the selection and retention of any Interim CFO and (ii) the duties and obligations of any such Interim CFO are required here. However, as set forth below, no such safeguards have been – or can be – implemented with respect to Tatum and Mr. Porter.

13. Tatum and Mr. Porter are irreconcilably conflicted because they have already been – and continue to be – retained and employed by a Conflicted Party, PAH Holdings. As set forth in the Motion:

> In light of the urgency of providing these services, prior to filing this Motion, Tatum entered into an agreement with Philadelphia Academic Health Holdings, LLC ("**PAHH**") the non-debtor parent to Debtor Philadelphia Academic Health System, LLC, to provide substantively identical services to those provided for in the Services Agreement, paid for by PAHH. Upon entry of the Proposed Order granting this Motion, the agreement between PAHH and Tatum will be deemed terminated and replaced by the Services Agreement.

Motion, ¶ 8. As discussed above and set forth on the corporate organizational chart attached hereto as Exhibit 1, PAH Holdings is both a corporate parent of the Debtors and a direct or indirect corporate parent of non-Debtor entities that are landlords, co-obligors, and/or guarantors of the Debtors, rendering PAH Holdings a Conflicted Party. Because PAH Holdings is a Conflicted Party, Tatum and Mr. Porter's retention by PAH Holdings renders them Conflicted Parties as well.

14. Further, as set forth below, the terms of the Services Agreement make it clear that Tatum and Mr. Porter would *continue* to provide services to Conflicted Parties even as Mr. Porter served as the Debtors' Interim CFO.

15. The Services Agreement is between Tatum and Philadelphia Academic Health System, LLC ("PAH System"). As set forth on the corporate organizational chart attached hereto as Exhibit 1, PAH System is a corporate parent of each of the other Debtors, as well as

two non-Debtor entities (the "Non-Debtor Subsidiaries")[6]. In addition to providing that Tatum and Mr. Porter will provide Interim CFO services to PAH System, the Services Agreement provides that Tatum and Mr. Porter will also provide services to the Non-Debtor Subsidiaries and, more troublingly, PAH System's parents and affiliates who are Conflicted Parties.

16. Specifically, section 2 of the Schedule to Interim Services Agreement (the "Services Agreement Schedule") provides in relevant part as follows (emphasis added):

> Tatum Professional[7] will provide Interim CFO services for Company[8] **and its subsidiaries** (the "Business") including, without limitation, Center City Healthcare, LLC d/b/a Hahnemann University Hospital and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children **and their respective affiliated physician groups**.
>
> ***
>
> Tatum Professional may be requested from time to time to perform certain accounting, tax and other financial consulting services **to the Company's parent companies or its other affiliates (other than the Company's subsidiaries)**. Tatum Professional will provide to the Company on a weekly basis the allocation of time spent by Tatum Professional performing such services along with an invoice for the Company to submit

The provision of services to PAH System's parent companies, all of which are Conflicted Parties, presents inherent conflicts of interest and should be disqualifying, particularly in light of the Services Agreement's acknowledgment that Tatum and Mr. Porter will be provided with confidential material of PAH System and its subsidiaries (*see* Services Agreement, § 13).[9]

---

[6] Physicians Clinical Network, LLC and Physician Performance Network of Philadelphia, LLC.

[7] Mr. Porter.

[8] PAH System.

[9] In addition to the foregoing, the Committee notes that the estates should not compensate any Interim CFO for services provided to any non-Debtor parties, including, but not limited to the Non-Debtor Subsidiaries.

## II. It Is Not Clear that Tatum and Mr. Porter's Selection Was an Independent Exercise of the Debtors' Business Judgment

17. The above conflicts of interest issues call into question whether Tatum and Mr. Porter's selection was an independent exercise of the Debtors' business judgment. The Debtors have not articulated any business justification for retaining Tatum and Mr. Porter in light of those issues, and Tatum and Mr. Porter were not retained by the Debtors until more than two weeks after the Debtors' bankruptcy filing. By that time, the conflict of interest issues were clear, and the Debtors' interests had definitively diverged from the interests of the Conflicted Parties (including Tatum and Mr. Porter's current employer, PAH Holdings). The Committee also notes that the Services Agreement is signed by Joel Freedman, who is a Conflicted Party as a result of his ownership interest in and control over MBNF.

18. Absent (a) a demonstration that no conflicted parties – including Mr. Freedman – were involved with Tatum and Mr. Porter's selection and (b) the articulation of a reasonable justification for retaining Tatum and Mr. Porter notwithstanding all of the foregoing issues and the apparent redundancy of their services (discussed below), there is no basis for any determination that the retention of Tatum and Mr. Porter is an independent exercise of the Debtors' business judgment.

## III. Tatum and Mr. Porter's Services Are Unnecessary and/or Duplicative of Services that Will Be Provided by Other Professionals in these Cases

19. Tatum and Mr. Porter propose to provide many services that are not necessary in the chapter 11 context, including, but not limited to (i) ensuring that financial results are effectively communicated to relevant parties; (ii) providing cash flow oversight; and (iii) overseeing the implementation of policies, procedures, and control mechanisms to ensure the expenditure of funds and recording of transactions are incompliance with the Debtors' policies and procedures and generally accepted accounting principles. *See* Services Agreement Schedule,

§ 2. These services are not needed because, among other things, (a) the Debtors' financial results will be made publicly available in the monthly operating reports filed in these cases, and applicable budget variance reports and other information will be provided to the post-petition lender as required by the governing orders and loan documents; (b) cash flow oversight will be provided by the foregoing reports, the post-petition financing budget, and the requirements of the post-petition financing and cash collateral orders in these cases; and (c) the expenditure of funds and recording and reporting of transactions is dictated by all of the foregoing.

20. The proposed services that may be useful to the Debtors in these cases, such as (i) helping define the Debtors' overall strategic and financial goals; (ii) serving as a point of contact for the Debtors' lenders; (iii) overseeing the preparation and presentation of the Debtors' operating and capital budgets; (iv) identifying and making recommendations regarding opportunities for improvement in operations and processes; and (v) supervising and evaluating performance of relevant staff (*see* Services Agreement Schedule, § 2), are duplicative of services that will or can be provided by the Debtors' other professionals, including Eisner, the CRO, and the Interim CEO. As set forth in detail in the motion to retain Eisner and its accompanying materials [D.I. 228] (the "Eisner Motion"), Eisner's services will include, but will not be limited to, the following:

(a) Developing restructuring transaction alternatives;

(b) Negotiating the terms of vendor contracts, licensing and sale agreements, financing arrangements, and cash preservation measures (including maintenance of a 13-week rolling cash flow statement and vendor management);

(c) Assisting the Debtors in contingency planning;

(d) Assisting the Debtors and its advisors with the formulation of a bankruptcy plan;

<pre>                Case 19-11466-MFW    Doc 345    Filed 08/02/19    Page 12 of 13</pre>

    (e)      Advising and assisting the Debtors in the assembly and preparation of financial information, statements, schedules, budgets and monthly operating reports required by the Court or the office of the U.S. Trustee;

    (f)      Assisting with communications and negotiations with lenders, creditors, and other parties-in-interest, including the preparation of financial information for distribution to those parties;

    (g)      Assisting in the preparation of weekly and monthly reporting in accordance with the debtor-in-possession credit facility and/or other financing arrangements;

    (h)      Assisting with such other accounting and financial services as requested by the Debtors.

    (i)      Providing advice and recommendations to the board with respect to day-to-day operations and strategic planning pertaining to the restructuring of the Debtors, including:

          (1)      Advising on a closure plan for Hahnemann University Hospital;

          (2)      Recommending and following operational standards;

          (3)      Advising the board with respect to and overseeing the day-to-day performance of the Debtors' senior executives and key personnel;

          (4)      Identifying and assisting with the implementation of certain business initiatives to improve operational performance; and

          (5)      Advising the board with respect to the hiring and training of staff; and

    (j)      Performing support services including providing analytical support, designing and building reporting tools, performing supply chain and revenue cycle management services, and assessing profit improvement plans.

*See* Eisner Motion, ¶ 11. These services render Tatum and Mr. Porter's superfluous, and the Debtors' estates should not bear their additional cost.

### IV.    CFO Safeguards

21. It is not clear that the retention of an Interim CFO in these cases is needed. However, in the event that the Debtors determine that an Interim CFO is desirable, that determination and the selection of the Interim CFO should be made independent of any input or involvement from any Conflicted Party. Further, in order to safeguard against the systemic

<pre>6507961                                       12</pre>

conflicts of interest in these cases, the Interim CFO should provide services only to the Debtors, and should report only to the Debtors' CRO, Interim CEO, and independent director.

WHEREFORE, the Committee respectfully requests that the Motion be denied.

Dated: August 2, 2019
Wilmington, Delaware

Respectfully submitted,

/s/ *Thomas M. Horan*
Thomas M. Horan (DE Bar No. 4641)
**FOX ROTHSCHILD LLP**
919 North Market Street, Suite 300
Wilmington, DE 19899
Telephone: 302-654-7444
Facsimile: 302-656-8920
Email: thoran@foxrothschild.com

- and –

Andrew H. Sherman (*pro hac vice*)
Boris I. Mankovetskiy (*pro hac vice*)
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ 07102
Telephone: 973-643-7000
Facsimile: 973-643-6500
Email: asherman@sillscummis.com
          bmankovetskiy@sillscummis.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*