# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CENTER CITY HEALTHCARE, LLC d/b/a<br>HAHNEMANN UNIVERSITY HOSPITAL<br>*et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11466 (KG)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 142, 246, 249**<br>**Obj. Deadline: August 5, 2019 (4:00 p.m.)** |

## OBJECTION OF THE UNITED STATES
## TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS TO THE STALKING HORSE BIDDER ON THE TERMS OF THE STALKING HORSE BID AS SET FORTH IN THE STALKING HORSE SALE AGREEMENT

The United States of America (the "United States"), on behalf of the Department of Health and Human Services ("HHS"), acting through its designated component, the Centers for Medicare & Medicaid Services ("CMS"), hereby files this objection to the *Debtors' Motion for Entry of Order Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement*. Because the Stalking Horse Sale

---

[1] The Debtors in these jointly administered cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

1

Agreement, Dkt. 246-1, is contrary to law and contravenes CMS regulations, the Court should not approve the sale.[2]

While the United States does not oppose the transition of the Hahnemann University Hospital ("Hahnemann") residents and fellows to alternative hospitals, the United States objects to the terms of the proposed sale of "resident program assets" as set forth in the Stalking Horse Sale Agreement, which improperly attempts to "discharge" monies owed to CMS and seeks to avoid the successor liability of the Stalking Horse purchaser ("Reading Hospital" or "Tower") under the assumed and assigned Medicare Part A Provider Agreement.

The United States also objects to the sale to the extent that it transfers the resident program assets, Hahnemann's Medicare Provider Agreement, and Hahnemann's programs for training residents to Reading Hospital when Debtors seek to close Hahnemann.  Hahnemann's Provider Agreement terminates with its closure, making it ineligible to be transferred.  The anticipated transfer of the residency program itself (separate from the provider agreement) must also satisfy Medicare Program requirements and be approved by HHS.

### REGULATORY BACKGROUND

1.      Certain of the Debtors are "providers" of hospital and skilled nursing services under the Social Security Act, 42 U.S.C. § 1395-1395lll and 42 C.F.R. Chapter IV and CMS policies and procedures (collectively, the "Medicare Program").  To be eligible to be reimbursed for services to Medicare beneficiaries, certain Debtors are party to separate Medicare Part A provider agreements ("Provider Agreements"). 42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider").  A Provider Agreement is defined as an agreement between CMS and a hospital,

---

[2] Any capitalized term not defined herein shall have the meaning ascribed to the term in the Bid Procedures Motion.

skilled nursing facility, home health agency, clinic, outpatient rehabilitation facility, hospice, or community mental health center. 42 C.F.R. §§ 489.2 and 489.3.

2. To obtain a Provider Agreement, a new provider must apply for initial certification. *See* 42 C.F.R. §§ 488.1, 488.3, 489.1, 489.2 and 489.10. The certification process enables HHS to determine, *inter alia*, that the provider is qualified to provide health care services to patients. *See* 42 C.F.R. §§ 489.10-.12 (grounds for denying a Provider Agreement); *see also* 42 C.F.R. Part 418 (health and safety requirements to qualify as a hospice).

3. As a result, the transfer of a Provider Agreement is strictly limited. Provider Agreements may be assigned only if there is a "change of ownership." 42 C.F.R. § 489.18. When CMS determines that a valid "change of ownership" has occurred, the existing Provider Agreement is automatically assigned to the new owner. *See* 42 C.F.R. § 489.18(c); *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994). An assigned agreement is subject to all statutory and regulatory terms under which it originally was issued, including the adjustment of payments to account for previously made overpayments. *Vernon*, 21 F.3d at 696 (*citing* 42 C.F.R. § 489.18(a), (d)).

4. HHS contracts with Medicare Administrative Contractors ("MACs") to administer payment to providers for Medicare covered services. MACs make interim payments to providers in accordance with the Medicare Program and perform the day-to-day administration of Medicare, *e.g.*, audit and reimbursement activities. 42 U.S.C. § 1395kk-1; 42 C.F.R. §§ 421.400–.404.

5. At their request, certain of Debtors' facilities receive Medicare Periodic Interim Payments ("PIP"). 42 U.S.C. § 1395g(e)(2); 42 C.F.R. § 418.307, 42 C.F.R. § 413.64(h)(2)(v). The PIP is adjusted to make it consistent with current claim levels, and to determine overpayments for the current fiscal year. Alternatively, the MAC may adjust payments to assure that total

payments at the end of the fiscal year approximate, as closely as possible, the reimbursement determined to be due after review and audit of the provider's cost report. 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(h)(6-7).

6.  Within five months after the end of the cost year, a provider must submit a report of its costs to verify the actual reimbursements owed to it for the past cost year. 42 C.F.R. §§ 413.1, 413.20, 413.24(f); *see* 42 U.S.C. §§ 1395g and 1395hh (giving the Secretary authority to require submission of cost reports). Once the cost report is submitted, the MAC audits the cost report and determines the provider's actual, rather than estimated, reimbursement amount for the year, which can result in overpayment or underpayment claims. 42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 42 C.F.R. § 413.24. Following an audit, providers have various appeal rights, including judicial review, with respect to the MAC's determination. *See, e.g.*, 42 C.F.R. § 405.1807; 42 U.S.C. § 1395oo(f)(1).

7.  In addition, by motion of the MAC or the provider, or at the direction of CMS, final cost report determinations are subject to reopening for up to three years from their issuance in order to make corrections. 42 C.F.R. § 405.1885.

## FACTUAL AND PROCEDURAL BACKGROUND

8.  On July 1, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.  Since before the Petition Date, certain of the Debtors participated in the Medicare Program as Medicare Part A providers under their Provider Agreements. For purposes of this objection, Center City Healthcare, LLC d/b/a Hahnemann University Hospital (Part A) has a Provider Agreement with the United States.

10. In the ordinary course of business, the MACs may determine Medicare overpayments owed by the Debtors relating to prepetition service dates and postpetition service dates under the Medicare Program.

11. On July 19, 2019, Debtors filed the Stalking Horse Sale Agreement (Asset Purchase Agreement). Dkt. 246-1.

12. Later that same day, the Court issued an Order establishing bidding procedures for the potential sale of Hahnemann resident program assets. Dkt. 249.

13. The Stalking Horse Sale Agreement indicates that Hahnemann's Medicare Provider Agreement will be assumed and transferred to Reading Hospital. Stalking Horse Sale Agreement, Sched. A-1 (IV); *see id.* at Sched A (defining "Excluded Assets" as including "Assigned Contracts . . . identified on Schedule A-1").

14. The Stalking Horse Sale Agreement does not provide that Reading Hospital will be required to assume all liabilities relating to the Provider Agreement. Furthermore, the Stalking Horse Sale Agreement does not specify that any assumption and assignment of the Provider Agreement must comply with section 365 of the Bankruptcy Code and the Medicare Program.

15. Instead, as set forth in the Stalking Horse Sale Agreement, Debtors are *not* assuming and assigning all liabilities associated with the Medicare provider agreement. The Stalking Horse Sale Agreement establishes a $3,000,000 Escrow Amount to "cover [certain] following losses, damages and expenses," including a "CMS Discharge Amount." Stalking Horse Sale Agreement, Art. III (3.1).

16. The Stalking Horse Sale Agreement defines the "CMS Discharge Amount" as "a dollar amount agreed to by and between CMS and the Seller which amount shall be the

maximum Cure Costs due on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement." Stalking Horse Sale Agreement, Art. I (page 4).

17. CMS has not agreed to any discharge amount or maximum Cure Costs due. Neither Debtors nor Reading Hospital has contacted the Department of Justice to discuss any "discharge."

18. The Stalking Horse Sale Agreement also states that the Debtors and Reading Hospital will obtain "Regulatory Approvals," including from CMS. Stalking Horse Sale Agreement, Art. VII (7.1(c)). The Agreement states that CMS "shall have consented to the transactions contemplated by this Agreement." *Id.* Neither Debtors nor Reading Hospital has contacted the Department of Justice to discuss any such regulatory approvals.

19. The Stalking Horse Sale Agreement also contemplates the assumption of Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health. Stalking Horse Sale Agreement, Sched. A-1 (I).

**ARGUMENT**

20. The Court should not approve the Stalking Horse Sale Agreement. Under the Agreement, Debtors improperly seek to transfer the Hahnemann Medicare Provider Agreement in a manner inconsistent with federal law.

21. Because Debtors are closing Hahnemann, Hahnemann's Provider Agreement will terminate when its business shuts down. 42 C.F.R §§ 489.52(b)(3); 413.79(h). Thus, Debtors may not assume and assign the Provider Agreement.

22. Even if Debtors could assign the Provider Agreement, under the Stalking Horse Sale Agreement, Debtors improperly seek to transfer the Hahnemann Provider Agreement in a manner inconsistent with federal law. A Medicare Provider agreement may only be assumed under 42 C.F.R. § 489.18. The Stalking Horse Sale Agreement does not, however, set forth a valid change of ownership (CHOW) under section 489.18 because Reading Hospital is not purchasing all or substantially all of the assets necessary to actually operate Hahnemann. The CMS Discharge Amount is also contrary to the provision that "the existing provider agreement will automatically be assigned to the new owner." 42 C.F.R. § 489.18(c). In particular, the CMS Discharge Amount limits Reading Hospital's successor liability and is contrary to CMS's right to recoup.

23. The Stalking Horse Sale Agreement fails to state that Reading Hospital assumes all liabilities, including but not limited to the Overpayment Claims and any unliquidated pre-Closing overpayment claims, related to the transferred Provider Agreement. Instead, and contrary to law, the Stalking Horse Sale Agreement includes a CMS Discharge Amount, explicitly and improperly limiting Reading Hospital's assumption of liabilities.

24. If the Debtors seek to transfer the Hahnemann Provider Agreement, they must do so consistent with applicable federal law, including the Medicare Program as well as the Bankruptcy Code. As indicated in the Bidding Procedures, "Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act." Dkt. 249 at ¶ 34.

25. Specifically, the transfer of the Provider Agreement contemplated in the Stalking Horse Sale Agreement would violate the requirements of the Medicare Program for transfer of a provider agreement. The Debtors cannot sell, transfer, assume and/or assign the Hahnemann Provider Agreement to the Successful Bidder without providing that the purchaser will assume

liability for any pre-Closing Medicare overpayments (including those determined after any closing) and any successor liability claims. *See United States v. Vernon Home Health, Inc*., 21 F.3d 693, 696 (5th Cir. 1994) (purchaser "accept[ed] the automatic assignment of the provider agreement," making it jointly and severally liable with seller for overpayments, pursuant to the Medicare Program, including at 42 C.F.R. § 489.18(d)). Therefore, Reading Hospital must agree to assume liabilities for any pre-closing Medicare overpayments, including any previously determined and any determined in the future. Under the terms of the Stalking Horse Sale Agreement, Reading Hospital is not fully assuming those liabilities.

26. Moreover, under binding precedent in the Third Circuit, the Provider Agreement is treated as an executory contract that may only assumed and assigned pursuant to section 365 of the Bankruptcy Code. *University Med. Ctr. v. Sullivan* (*In re University Med. Ctr.*), 973 F.2d 1065, 1075 (3d Cir. 1992). If the Debtors assume and assign the Provider Agreement to Reading Hospital, the Debtors must fully cure the defaults associated with the Provider Agreement, and Reading Hospital must assume all of the burdens along with the benefits arising from assignment of the Provider Agreement. *See* 11 U.S.C. § 365(a), (b); *University Med. Ctr.*, 973 F.2d at 1075 (holding that "[a]ssumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits," and specifically referring to a provider agreement); 42 C.F.R. § 489.18(d) ("An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued"); *Vernon Home Health, Inc*., 21 F.3d at 696 (new owner that accepted assignment of Medicare provider agreement was liable for overpayments of prior owner); *Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103 (8th Cir. 2000) (new owner of a skilled nursing facility was liable for penalties assessed on the basis of the former owner's actions); *Eagle Healthcare, Inc. v. Sebelius*, 969 F.

8

Supp. 2d 38, 40 (D.D.C. 2013) ("An assigned Provider Agreement is subject to all of the terms and conditions under which it was originally issued."). *See also In re Charter Behavioral Health Sys., LLC*, 45 Fed. Appx. 150, 151, 2002 WL 2004651, *1 n.1 (3d Cir. June 3, 2002) (observing that "[i]f the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments *but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner*") (emphasis added) (*citing* 42 C.F.R. § 489.18(d); *Deerbrook Pavilion, LLC*, 235 F.3d at 1103-05; *Vernon*, 21 F.3d at 696).

27. Moreover, the Anti-Assignment Act, and thus section 365(c)(1) of the Bankruptcy Code, preclude the Debtors from assuming and/or assigning their Provider Agreement with the United States to the purchaser without the consent of the United States. *See, e.g.*, *In re West Electronics, Inc.*, 852 F.2d 79, 83-84 (3d Cir. 1988) (Anti-Assignment act precludes debtors from obtaining a legally cognizable interest in executory contract where the other party to the contract, the United States, refused to consent to the assignment of the contract.). The United States will not consent to transfer of any Provider Agreement unless Reading Hospital would be subject to all the burdens of the Provider Agreement in compliance with the Medicare Program.

28. Because the Stalking Horse Sale Agreement suggests that Reading Hospital is not acquiring the Provider Agreement in order to provide services, but merely in order to collect reimbursements earned by the Debtors before the transfer, the purchase is not likely to satisfy the Assignment of Claims Act, 31 U.S.C. § 3727, which strictly limits assignment of the authorization to receive payment on claims against the United States. Even if a claim is successfully assigned consistent with Assignment of Claims Act, any payments made by the United States are subject to

reduction or setoff (with the exception of certain unique circumstances inapplicable here). 31 U.S.C. § 3727(d)).

29. In addition, the CMS Discharge Amount is one of several types of costs or liabilities that the Stalking Horse Sale Agreement limits to the $3 million cap for the Escrow Amount. Stalking Horse Sale Agreement, Art. III (3.1) (identifying "Permitted Escrow Withdrawals" as "(a) the Tail Coverage Costs, (b) the CMS Discharge Amount, as and when liquidated, (c) the Cure Costs not paid on the Closing Date and not included in the CMS Discharge Amount, and (d) the Losses payable to a Purchaser Indemnified Party."). Depending on the amount of those costs or liabilities, if the sale to Reading Hospital is approved, CMS may only recover a fraction of Hahnemann's overpayments from the Escrow Amount.

30. The Stalking Horse Sale Agreement is also contrary to law in contemplating that Debtors may assume and assign Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health. *See* Stalking Horse Sale Agreement, Sched. A-1 (I). The applicable statute (42 USC § 1395ww(h)(4)(H)) and regulation (42 CFR § 413.79(h)) do not contemplate that a hospital chain can absorb one hospital's residency slots and distribute those slots amongst its affiliated hospitals. Instead, only a "preference" is given to hospitals that are members of the same affiliated group for purposes of receiving temporary funding. *Id.* The fact that Debtors and Tower apparently entered into an affiliation agreement as of July 1, 2019, Stalking Horse Sale Agreement, Sched. A-1 (V), does not alter that conclusion. Under § 413.79(f)(2), "[e]ach hospital in the Medicare GME affiliated group must have a shared rotational arrangement . . . with at least one other hospital within the Medicare GME affiliated group, and all of the hospitals within the Medicare GME affiliated group must be connected by a series of such shared rotational arrangements." *See also* § 413.79(f)(5) ("If the Medicare GME affiliation agreement

terminates for any reason, the FTE cap of each hospital in the Medicare GME affiliated group will revert to the individual hospital's pre-affiliation FTE cap that is determined under the provisions of paragraph (c) of this section."). If Hahnemann closes, it will not have a shared rotational arrangement with Tower.

31. In communications with counsel for Debtors and for Tower, and at the July 19, 2019 hearing on the bid procedures for this potential sale, the United States has expressed its concerns with and objection to the sale as contemplated. However, counsel for Debtors and/or Tower have not subsequently communicated with the undersigned regarding the potential sale.

## CONCLUSION

For the foregoing reasons, the Court should not approve the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement.

Dated:  August 5, 2019	Respectfully submitted

        JOSEPH H. HUNT
        Assistant Attorney General

        DAVID C. WEISS
        United States Attorney

        ELLEN SLIGHTS
        Assistant United States Attorney

        /s/ Marc S Sacks
        RUTH A. HARVEY
        MARGARET M. NEWELL
        MARC S. SACKS

        Department of Justice
        Commercial Litigation Branch,
        Civil Division
        P.O. Box 875, Ben Franklin Station
        Washington, DC 20044-0875
        Tel. (202) 307-1104
        Fax (202) 514-9163
        marcus.s.sacks@usdoj.gov

        ATTORNEYS FOR THE UNITED STATES

## CERTIFICATE OF SERVICE

  I hereby certify that on this 5th day of August 2019, I caused a true and correct copy of the foregoing objection to be served via electronic mail upon all parties receiving electronic notice under the Court's CM/ECF system.

        <u>s/ Marc S Sacks</u>
        MARC S. SACKS