**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC, d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*,[1] | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | Re: Docket Nos. 53 & 172 |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee")[2] in the chapter 11 cases of Center City Healthcare, LLC d/b/a Hahnemann University Hospital and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing*

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion, Interim DIP Order, or DIP Credit Agreement, as appropriate.

*Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lender, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 53] (the "DIP Motion").  In support of the Objection, the Committee respectfully represents as follows:

## **PRELIMINARY STATEMENT**

1.      The proposed DIP Facility is a 94-day extension of the Prepetition Credit Facility which purports to unblock access to $15 million of liquidity.  However, of the "unblocked" $15 million, only $5.2 million is available to the Debtors for operational use (less than 35%), on which the DIP Lenders receive an annualized return of 37.3%.  $6.5 million (or 43%) of the "unblocked" funds is paid directly back to the admittedly oversecured DIP Lenders—money that could otherwise be used to promote patient care.  Specifically, for access to the proposed DIP Facility for only 94 days—from July 12, 2019 through October 14, 2019—the DIP Lenders will receive, among other things:

| | | | |
|---|---|---|---|
| $500,000 DIP Origination Fee | $500,000 Prepetition Term Loan Deferred Origination Fee | $500,000 Prepetition Revolver Deferred Origination Fee | Use of $5 million of DIP Revolver Proceeds to Pay Down 25% of Prepetition Term Loan |
| $13 million Reduction in DIP Lenders' Exposure Under the DIP Revolver during Budget Period | Roll-Up of $58.6 million of Prepetition Obligations | Protection from Ability to Unwind Roll-Up Even After Successful Committee Challenge of Prepetition Liens or Claims | Waiver of Marshaling |
| Waiver of Section 506(c) Surcharge | Liens on Proceeds of Chapter 5 Causes of Action and Liens on Other Estate-Based Causes of Action and Proceeds Thereof | Limitations on Committee Investigation of Prepetition Obligations | Indemnification in Connection with Challenge of Prepetition Obligations |

2.      These costly fees and protections are not appropriate in these cases where the DIP

Facility itself, and the thirteen (13) week budget associated therewith (the "Budget"), protect the

DIP Lenders' collateral and reduce the DIP Lenders' exposure.  The DIP Facility enables the

Debtors to fund a prompt disposition of the DIP Lenders' Prepetition Collateral by October 14,

2019, benefiting the DIP Lenders who would otherwise not have an adequate means of realizing

on their collateral.  Further, over the course of the Budget period, the Debtors are required to pay

down the DIP Facility, reducing the DIP Lenders' exposure during these cases from

approximately $56 million to approximately $43 million—a 23% reduction in exposure in 94

days.

3.      The additional protections included in the Interim DIP Order are therefore not

commensurate with the DIP Lenders' exposure.  For example, among other unnecessary forms of

protection, the Interim DIP Order includes a waiver of the equitable doctrine of marshaling.  This

is inappropriate in these cases where the non-Debtor Guarantors secured and guaranteed the

Debtors' obligations under the Prepetition Credit Facility and DIP Facility.  Waiving the doctrine

of marshaling at this time is premature, as the Committee has not had an opportunity to

investigate MidCap's role (i) in creating the organizational structure of the Debtors, including the

creation of certain "PropCo" and "OpCo" entities, and (ii) in determining which entities would

file for chapter 11 protection.

4.      Further problematic, the currently proposed DIP Facility and Budget do not

appear to provide adequate funding for the following costs and expenses:  (i) administrative

expenses accrued but unpaid during the Budget period, (ii) costs associated with the closure of

Hahnemann University Hospital ("HUH"), and (iii) costs associated with the continued operation

and sale of St. Christopher's Hospital for Children ("STC").  It is also unclear whether the

Debtors have sufficient access to liquidity under the DIP Facility in light of, among other things, (i) the projections in the Budget for the weeks of September 13, 2019 (availability of less than $900,000) and September 27, 2019 (availability of less than $400,000), (ii) the overreaching events of default, such as those tied to the conduct of the non-Debtor Guarantors, terminating the Debtors' access to liquidity, and (iii) the $5 million pay down of the Prepetition Term Loan from the proceeds of the DIP Revolver, repaying the already oversecured DIP Lenders while denying the Debtors' access to much needed funds.

5.     The maturity of the DIP Facility is also problematic in that it is tied to the STC sale closing on or before October 14, 2019.  However, even if a winning bidder is timely selected under the Sale Benchmarks in the DIP Credit Agreement, the sale may not close on or before October 14, 2019, due to, for example, potential regulatory hurdles.  The maturity date should be extended to accommodate such reasonable delays if the parties are otherwise on track to closing. However, extending the maturity date under the currently constructed DIP Facility does not alleviate the liquidity concerns addressed herein, as the current Budget still provides insufficient liquidity during, for example, the weeks of September 13, 2019 and September 27, 2019.

6.     The DIP Facility also includes, as a form of adequate protection, a roll-up of approximately $58 million of the DIP Lenders' Prepetition Obligations.  However, the Interim DIP Order fails to provide any mechanism to unwind the roll-up, even after a successful Committee challenge of MidCap's prepetition liens, claims and/or obligations.  The DIP Lenders are thus impermissibly using the roll-up as a means of shielding their Prepetition Obligations from any challenge.  Further, the roll-up is unnecessary as the Interim DIP Order clearly states that the aggregate value of the Prepetition Collateral exceeds the aggregate amount of the

Prepetition Obligations, before taking into account the collateral of the non-Debtor Guarantors, which also secures the Prepetition Obligations.

7.    While providing the DIP Lenders overreaching benefits and protections, the DIP Facility simultaneously strips the estates of rights afforded to them under the Bankruptcy Code, such as the right to surcharge secured lenders' collateral under section 506(c) of the Bankruptcy Code and to benefit from potential Causes of Action (defined below) and the proceeds thereof. The DIP Facility also provides a truncated challenge period for the Committee to investigate any claims and/or causes of action against the Prepetition Lender and an insufficient budget to conduct such an investigation.

8.    Put simply, as currently proposed, the DIP Facility is too expense and not properly sized, while simultaneously removing critical protections afforded to unsecured creditors under the Bankruptcy Code and potentially putting patient care at risk.  As set forth below, this Court should approve a DIP facility which balances interests of the oversecured DIP Lenders, the Debtors and the patients they serve, and the general unsecured creditors, while maintaining administrative solvency of the Debtors' estates.  The DIP Facility, as currently constituted, does not meet those requirements.

## BACKGROUND

### I.    The MidCap Prepetition Credit Facility

9.    Each of the Debtors, as well as certain non-debtor entities, is a party to a Credit and Security Agreement dated January 11, 2018, which was subsequently amended on September 20, 2018 (as amended, the "Prepetition Credit Agreement"), with MidCap Funding IV Trust and MidCap Funding H Trust (together, "MidCap" or the "Prepetition Lender").  The Prepetition Credit Agreement provides for credit facilities consisting of: (i) a revolving loan

facility of up to $100 million (the "Prepetition Revolver"); and (ii) a term loan facility of $20

million (the "Prepetition Term Loan" and, with the Prepetition Revolver, collectively, the

"Prepetition Credit Facility").

10.     The amount the Debtors were able to borrow under the Prepetition Credit Facility

was limited, however, because "[a]vailability under the Prepetition Credit Facility [was] based

on various formulas that [took] into account a host of factors and appl[ied] various reserves and

blocks." DIP Motion, ¶ 6.

11.     As of the Petition Date, the Debtors allege that the principal amounts outstanding

under the Prepetition Revolver and Prepetition Term Loan are approximately $38.6 million and

$20 million, respectively.  DIP Motion, ¶ 5.

12.     The Prepetition Credit Agreement also provides for payment by the Borrowers of

certain fees, including those fees set forth in a separately executed Fee Letter.  Prepetition Credit

Agreement, ¶ 2.2(b).  The Fee Letter, dated January 11, 2018, provides that the Borrowers will

pay the Agent the following origination fee in connection with the Prepetition Revolver:  "An

origination fee equal to the product of 1.50% multiplied by the Revolving Loan Commitment on

the Closing Date, payable in three (3) equal installments due on each of the Closing Date, the

first (1st) anniversary of the Closing Date and the second (2nd) anniversary of the Closing Date."

As such, absent acceleration, the last origination fee installment of $500,000 on the Prepetition

Revolver (the "Prepetition Revolver Deferred Origination Fee") would be due on January 11,

2020.

13.     On September 18, 2018, the parties executed the Supplemental Fee Letter, which

provides that the Borrowers will pay the Agent the following origination fee in connection with

the Prepetition Term Loan:  "A term loan origination fee equal to $1,500,000 [7.5% of the $20

million Prepetition Term Loan], payable in three (3) equal installments of $500,000 due on: (a) the First Amendment Effective Date, (b) March 1, 2019 and (c) September 1, 2019." As such, absent acceleration, the last origination fee installment of $500,000 on the Prepetition Term Loan (the "Prepetition Term Loan Deferred Origination Fee") would be due on September 1, 2019.

14.     The DIP Motion states that the Prepetition Credit Facility is secured by a security interest in substantially all of the Borrowers' assets, including accounts receivable. DIP Motion, ¶ 6. Additionally, the DIP Motion provides that "[n]on-Debtors PAHH and Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (together, the "Broad Street Entities") have guaranteed the obligations of the Borrowers under the Prepetition Credit Facility. The Broad Street Entities' guarantees are secured by liens or mortgages on all their real estate and other assets." DIP Motion, ¶ 6.

## II.     The Chapter 11 Cases

15.     On June 30, 2019, (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

16.     On July 1, 2019, the Debtors filed the DIP Motion and on July 12, 2019, the Court entered the *Interim Order Under 11 U.S.C. §§105, 361, 362, 363(C), 363(D), 364(C), 364(D), 364(E) and 507 and Bankruptcy Rules 2002, 4001 and 9014; (I) Authorizing Debtors To Obtain Postpetition Financing; (II) Authorizing The Debtors To Use Cash Collateral; (III) Granting Adequate Protection; and (IV) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(B) and 4001(C)* [Docket No. 172] (the "Interim DIP Order"), authorizing the Debtors to

borrow up to $5,500,000 on an interim basis.  A final hearing with respect to the DIP Motion is scheduled for August 9, 2019 at 9:30 a.m. (prevailing Eastern Time).

17.     Also on July 1, 2019, the Debtors filed the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a), 363, and 1108 of the Bankruptcy Code (A) Authorizing the Debtors to Implement a Plan of Closure for Hahnemann University Hospital and Scheduling a Final Hearing* [Docket No. 15] (the "Motion to Close"), which requests authorization to implement a plan to close HUH (the "Closure Plan").

18.     On July 9, 2019, the Debtors filed a motion [Docket No. 205] (the "Bidding Procedures Motion") seeking to approve, among other things, bidding procedures for and authorization of the sale of substantially all of the assets of SCH.

19.     On July 15, 2019, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  *See* Notice of Appointment of Committee of Unsecured Creditors [Docket No. 182]

## OBJECTION

20.     "Courts recognize that in connection with postpetition financing, lenders often exact favorable terms that may or may not have the effect of causing harm to the estate and creditors." *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005).  "[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *In re Ames Dep't Stores*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990); *see also In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor.").  Therefore, in determining whether to approve debtor-in-possession financing, a court must ensure that the terms of the financing are not designed for the unwarranted benefit of

the post-petition lender. *Resolution Trust Co. v. Official Unsecured Creditors Committee (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 317 (9th Cir. BAP 1992).

21.     "[C]ourts [must] look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." *In re Mid-State Raceway, Inc.*, 323 B.R. at 59 (*citing In re Defender Drug Stores*, 145 B.R. at 317). Here, among other things, the currently proposed DIP Facility (i) provides an Incremental Net Operational Liquidity Amount (defined below) of only $5.2 million for a period of 94 days, on which the DIP Lenders receive an annualized return of 37.3%, (ii) provides unnecessary and expensive benefits to the DIP Lenders, (iii) exposes the Debtors' estates to the potential for administrative insolvency, and (iv) strips unsecured creditors of statutory rights. The protections afforded to the oversecured DIP Lenders in the DIP Facility must be balanced against the ability of the Debtors to provide the highest level of patient care, and the Court must weigh where the incremental liquidity is best spent in these cases.

I.      **The DIP Facility Promptly Disposes of the Prepetition Collateral and Pays Down the Post-Petition Debt, While Simultaneously Extracting Costly Fees from the Debtors**

22.     The DIP Lenders are providing the DIP Facility to enable the Debtors to fund a prompt disposition of the DIP Lenders' Prepetition Collateral by October 14, 2019, which, absent funds from the DIP Lenders, the Debtors would be unable to do. The DIP Facility is therefore critical and beneficial to the DIP Lenders who otherwise would not have an adequate means of realizing on their collateral, which consist primarily of Medicare and Medicare receivables that they cannot directly collect from the government. *See e.g.*, *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 350 (7th Cir. 2004)

(The anti-assignment statute, 42 U.S.C. § 1395g(c), stands "for the proposition that Medicare funds cannot be paid directly by the government to someone other than the provider, but it does not prohibit a third party from receiving Medicare funds if they first flow through the provider."); *Lock Realty Corp. IX v. U.S. Health, LP*, 2007 U.S. Dist. LEXIS 14578, at *6 (N.D. Ind. Feb. 27, 2007) (same).  As such, to realize on the receivables, the DIP Lenders must fund the Debtors' collections efforts by providing post-petition financing, which is exactly what they are doing through the DIP Facility.

23.    In return for the disposition of their collateral, the DIP Lenders are charging the Debtors exorbitant fees and extracting other benefits, all at the expense of the Debtors' estates and unsecured creditors.  Further, over the course of Budget period, the Debtors pay down the DIP Facility, reducing the DIP Lenders' exposure from approximately $56 million to approximately $43 million—a 23% reduction in exposure in 94 days.  Although the borrowing base is also decreasing during this time period as a result of the closure of HUH and sale of STC, the DIP Lenders are still oversecured by the Debtors' collateral *and* can look to the collateral of the non-Debtor Guarantors.  As such, the expensive protections and fees afforded the DIP Lenders in these cases are inappropriate, as the DIP Facility and Budget are designed to protect the DIP Lenders' collateral and reduce their expose.

## II.    The Currently Proposed DIP Facility Advances Only $5.2 Million in Incremental Net Operational Liquidity, on Which the DIP Lenders Receive an Annualized Return of 37.3%

24.    The proposed DIP Facility consists of (a) a revolving loan facility of up to $50,000,000 (the "DIP Revolver") and (b) a $15,000,000 in principal term loan (the "DIP Term Loan," and together with the DIP Revolver, the "DIP Loans"), which are simply extensions of the Prepetition Revolver and the Prepetition Term Loan.   The DIP Facility purports to "reduc[e]

the existing Liquidity Reserve in the Borrowing Base from $15,000,000 to $5,000,000, with []
$10,000,000 of additional Availability," which is "subject to applicable minimum liquidity
reserves."  Interim DIP Order, ¶ 6(a); DIP Motion, ¶ 13.  This $10 million is further reduced by
the following additional reserves and fees:  (i) a $3.3 million Medicare reserve, (ii) the
accelerated $500,000 Prepetition Term Loan Deferred Origination Fee, (iii) the accelerated
$500,000 Prepetition Revolver Deferred Origination Fee, and (iv) the $500,000 DIP Origination
Fee.  As a result, there is only $5.2 million in incremental net operational liquidity available
under the DIP Facility.

25.     Further, as set forth in the DIP Term Sheet attached as Exhibit B to the DIP
Motion, "[t]he remaining $5,000,000 of the existing Liquidity Reserve shall be released and used
to partially prepay the Term Loan (as defined in the Prepetition Credit Agreement) (the
"Prepetition Term Loan") from $20,000,000 to $15,000,000 by way of an advance of $5,000,000
under the DIP Credit Facility upon the entry of the Interim Order, defined below."  As such, $5
million from the DIP Revolver must be used to repay the already oversecured DIP Lenders,
blocking the Debtors' from accessing $5 million in much needed funds.

26.     Accordingly, as illustrated in the chart below, under the DIP Facility, the DIP
Lenders charge the Debtors a $500,000 DIP Origination Fee to unblock access, for a period of
only 94 days, to $5.2 million in net operational liquidity—*i.e.*, amounts already committed under
the Prepetition Revolver (yet previously inaccessible), which the Debtors can now access to fund
their operational expenses (the "Incremental Net Operational Liquidity Amount"):

| Net Incremental Operational Liquidity created by DIP | |
|---|---:|
| Prepetition Liquidity Reserve | $ 15,000,000 |
| Pay Down of Prepetition Term Loan | (5,000,000) |
| Medicare Reserve | (3,300,000) |
| DIP Origination Fee | (500,000) |
| Prepetition Term Loan Deferred Origination Fee | (500,000) |
| Prepetition Revolver Deferred Origination Fee | (500,000) |
| Net Incremental Operational Liquidity | $ 5,200,000 |

| Cost of DIP Origination Fee | |
|---|---:|
| DIP Origination Fee Amount | $ (500,000) |
| Fee amount as % of Net Incremental Operational Liquidity | 9.6% |
| Annualized Return on DIP Origination Fee as % of Net Incremental Operational Liquidity | 37.3% |

27.     An Incremental Net Operational Liquidity Amount of only $5.2 million is simply not enough under the circumstances of these cases where, as set forth below, the Debtors are in danger of potential administrative insolvency.  At a minimum, (i) $5 million of the DIP Revolver proceeds should not be used to repay the Prepetition Term Loan, as the Prepetition Lender is already oversecured, and (ii) the DIP Origination Fee, if any, should be reduced and based off the Incremental Net Operational Liquidity Amount (as opposed to the $50 million Commitment Amount).

28.     Further problematic, the $500,000 DIP Origination Fee is excessive in light of the Debtors' access to the Incremental Net Operational Liquidity Amount of $5.2 million <u>for only 94 days</u> since the Debtors must repay the DIP Facility by October 14, 2019.  The following definitions are contained in the DIP Facility, which provide for the termination  of the DIP Facility by October 14, 2019 (emphasis added as underlined below):

- "DIP Facility Termination Event" means the termination of the DIP Facility by Agent, in its sole discretion, based upon any one of the following events:. . . (vi) the failure to repay the DIP Facility and any other Obligations (including Prepetition Obligations) owing to Agent and Lenders, through the sale of the Borrowers' business or on a refinancing of such Obligations <u>on or before October 14, 2019</u>.

- "Commitment Expiry Date" means the earlier to occur of (i) twelve (12) months following the Closing Date and (ii) <u>a DIP Facility Termination Event</u>.

- "Termination Date" means the earlier to occur of (a) the <u>Commitment Expiry Date</u>, (b) a <u>DIP Credit Facility Termination Event</u>, or (c) the termination date stated in any notice of termination of this Agreement provided by Borrowers in accordance with Section 2.12.

DIP Credit Agreement, § 1.1.

29.     Therefore, the Debtors only have until October 14, 2019 to repay the DIP Facility. Given this 94 day time frame, the DIP Lenders will receive an annualized return of 37.3% on the DIP Origination Fee--an exorbitant rate that is simply too costly for the Debtors' estates, especially in light of the liquidity concerns addressed below and the need for the Debtors to deliver the highest level of patient care to the community.

30.     In addition to its expense, the DIP Origination Fee is duplicative of the $1 million in origination fees already paid on the Prepetition Revolver and the $500,000 Prepetition Revolver Deferred Origination Fee to be paid under the DIP Facility.  The DIP Revolver is simply an extension of the Prepetition Revolver, which is being used to liquidate the DIP Lenders' Petition Collateral.  As such, the Debtors will have already paid origination fees of $1.5 million on the $50 million Commitment Amount under the DIP Facility.  The  DIP Origination Fee therefore requires the Debtors to pay an additional fee of $500,000 on the same money— money being used for the benefit of the DIP Lenders.  To the extent any DIP Origination Fee is appropriate in these cases, it should be tied to the Incremental Net Operational Liquidity Amount (*i.e.*, 1% of $5.2 million).

### III.     The DIP Facility Includes an Waiver of the Equitable Doctrine of Marshaling, Which is Inappropriate in these Cases Where the Non-Debtor Guarantors Secured the Debtors' Obligations

31.     The Interim DIP Order waives the equitable doctrine of marshaling or other similar doctrines.  Interim DIP Order, ¶ 15.  Under the facts of these cases, where non-Debtor

entities guaranteed and secured the Debtors' obligations under the DIP Facility, such a waiver is inappropriate, at least at these early stages.  Before determining whether a waiver of marshaling is appropriate, the Committee should be given adequate time to investigate, among other things, MidCap's role (i) in creating the organizational structure of the Debtors, including the creation of certain "PropCo" and "OpCo" entities, and (ii) in determining which entities filed for chapter 11 protection.  The DIP Order illustrates the need to preserve marshaling, stating that "the Debtors have an immediate need to . . . obtain the DIP Facility . . . in order to . . . preserve the going concern value of the Debtors and the non-Debtor Guarantors[.]"  Interim DIP Order, ¶ 5(c) (emphasis added).[3]  As such, it is simply premature to waive the equitable doctrine of marshaling at this time.

## IV.    The DIP Facility Does Not Appear to Provide Adequate Funding or Sufficient Access to Liquidity

32.    The DIP Facility needs to be properly sized to ensure the Debtors have sufficient liquidity to pay all (i) administrative expenses throughout the pendency of these cases, (ii) costs associated with the closure of HUH, and (iii) costs associated with the continued operation and sale of STC.  In conjunction with increasing access to liquidity sufficient to fund the aforementioned costs and expenses, the maturity of the DIP Facility should be extended to reflect a more realistic closing timeline with respect to the STC sale, as explained further below.  Here, the DIP Facility, which provides an Incremental Net Operational Liquidity Amount of only $5.2 million for a period of only 94 days, fails to provide the Debtors' adequate access to liquidity over a reasonable length of time.

---

[3]    Any references to non-Debtor Guarantors included in paragraph 5(c) of the Interim DIP Order should be removed.

33.    With respect to the Debtors' ability to pay all administrative expenses, the Budget must account for accrued but unpaid trailing expenses.  Without considering trailing expenses, it is unclear whether the DIP Facility is properly sized such that the Debtors will be able to pay their administrative expenses accrued during the periods covered by the Budget but not payable until after the conclusion of the relevant Budget period.  This leaves the Debtors' estates exposed to the potential for administrative insolvency.

34.    Further demonstrating that the Budget does not appear to adequately account for all administrative expenses, on July 2, 2019, HSREP VI Holding, LLC and its affiliates (collectively, "HSRE") filed a preliminary objection to the DIP Motion [Docket No. 54] (the "HSRE Preliminary Objection"), objecting to the DIP Facility "to the extent the DIP budget (the "Budget") is insufficient and does not include all amounts owing by the Master Tenant in accordance with the Master Leases, in the approximate amount of $1,300,000 per month . . . . [which amount] constitutes an administrative expense owed by the Debtors and, therefore, should be accounted for in its entirety in the DIP Budget."  HSRE Motion, ¶¶ 13, 15.  On August 2, 2019, HSRE filed an objection to entry of a final order authorizing the DIP Facility [Docket No. 352] (the "HSRE Final Objection," and together with the HSRE Preliminary Objection, the "HSRE DIP Objections"),[4] arguing that "the DIP Financing and the DIP Budget is simply insufficient for the Debtors to continue to remain administratively solvent."  HRSE Final Objection, ¶ 10.  In light this concern, HSRE argued that the protections sought by the DIP Lenders, such as a roll-up of pre-petition debt and a waiver of the Debtors' surcharge rights under section 506(c), are "simply inappropriate."  HSRE Final Objection, ¶¶ 11-13.

---

[4]    The Committee is citing the HSRE Objections for illustrative purposes only and reserves all rights, defenses and objections with respect to the HSRE Objections.

35.     Similarly, on July 26, 2019, Tenet Business Services Corporation ("Tenet") and Conifer Revenue Cycle Solutions, LLC ("Conifer") filed a motion [Docket No. 303] (the "Payment Motion")[5]  alleging that the Budget does not include sufficient amounts to pay Tenet and Conifer's post-petition expenses.  Specifically, the Payment Motion states that "these estates may already be administratively insolvent, as evidenced by the fact that the DIP budget only includes $200,000 per week for payments to Tenant and Conifer . . . [and] the budgeted amount is roughly 25 percent of the contract rate and is insufficient to cover Tenent and Confier's costs (including payroll and benefits for their personnel on-site at the Hospitals)."  Payment Motion, ¶ 5.  On August 2, 2019, Tenet and Conifer filed an objection to the DIP Motion [Docket No. 348] (the "Tenet DIP Objection"), similarly arguing that (i) the Debtors' payment of all outstanding post-petition amounts owing to Tenet and Conifer would trigger events of default under the DIP Facility, (ii) the Budget and DIP Facility do not sufficiently compensate Tenet and Conifer on account of their post-petition services, (iii) the DIP Facility does not provide adequate funding for the Debtors' post-sale wind down process or HUH closure process (as discussed below), and (iv) the DIP Facility's waivers of section 506(c), section 552(b),[6] and marshaling are inappropriate.  *See* Tenet DIP Objection.

---

[5]     The Committee is citing the Payment Motion and Tenet DIP Objection for illustrative purposes only and reserves all rights, defenses and objections with respect to the Payment Motion and Tenet DIP Objection.

[6]     The Committee does not believe that the Debtors are seeking a waiver of section 552(b)'s equities of the case exception, as no such waiver is mentioned in the DIP Motion or Interim DIP Order.  To the extent that the Debtors intend to seek such a waiver, the Committee objects and reserves the right to supplement this Objection accordingly.  *See In re Metaldyne Corp.*, 2009 Bankr. LEXIS 1533, at *20 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make. If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lender's rights, the Court will consider it.").

36.     Next, it is unclear whether the DIP Facility and the Budget associated therewith provide sufficient funds to pay all the costs associated with the closure of HUH.  The Budget appears to allocate only $100,000 per week for hospital shutdown costs during the first thirteen (13) weeks of these chapter 11 cases.  The Motion to Close, however, lacks adequate information to enable the Committee and its advisors to determine the reasonableness of the amount allocated, in particular given the size and complexity of HUH's operations.  Moreover, because the Budget only covers the first thirteen (13) weeks of these chapter 11 cases, there appears to be a material risk of inadequate funding if the Closure Plan extends beyond this period.

37.     Similarly, the DIP Facility and Budget do not appear feasible with respect to the STC sale.  The Budget runs only through October 4, 2019 and the DIP Facility terminates on October 14, 2019, which timeline is based on the STC sale closing on October 4, 2019.  However, such an expedited closing may not be possible because of, for example, potential regulatory hurdles that may arise after a winning bidder is selected and a sale is approved.  If the sale does not close by October 14, 2019, the Debtors would lose access to liquidity and not have the necessary funds to run these cases to their conclusions.

38.     Extending the maturity of the DIP Facility, however, would not alleviate the Debtors' liquidity concerns, as the Budget reflects insufficient liquidity even during the currently contemplated Budget period.  For example, based on the proposed borrowing base formula in the DIP Credit Agreement, the projections in the Budget for the weeks of September 13, 2019 and September 27, 2019 show an unreasonably low liquidity of less than $900,000 and less than $400,000, respectively.  Any material variance from the forecasted operations would likely result in the Debtors not having liquidity under the DIP Facility sufficient to fund the chapter 11 cases to their conclusions and could result in administrative insolvency.

39.     This is especially troublesome here, where the DIP Lenders claim to have unblocked access to $15 million under the Prepetition Revolver, but, as explained above, $9.8 million of that amount is used to pay fees, reserves, and repayments of the Prepetition Term Loan.  Making these amounts available to the Debtors for use in their operations would help alleviate some of the liquidity concerns presented herein.

40.     The DIP Credit Agreement also includes several Events of Default which must be revised so they do not afford the DIP Lenders the opportunity to unnecessarily terminate the DIP Facility and cut off the Debtors' access to its bargained-for liquidity.  For example, references to non-Debtor Guarantors, or any actions taken or not taken by non-Debtor Guarantors, should not be included in any Events of Default, nor should an event of default under any Financing Document or other agreement with a non-Debtor Guarantor trigger an Event of Default under the DIP Credit Agreement.  *See e.g.*, DIP Credit Agreement, §§ 10.1(a), (b), (c), (d), (e), (f), (h), (i), (j), (k), (t), (z).

41.     Further, the DIP Lenders should be required to give the Debtors notice of, and a reasonable opportunity to cure, any Event of Default.  The DIP Lenders should not be entitled to exercise remedies in connection with an alleged Event of Default or terminate the DIP Credit Agreement absent an order of the Court.  These measures will protect the Debtors' ability to access funds under the DIP Facility and receive the requisite liquidity to fund their chapter 11 cases.

42.     Given the insufficient funding and inclusion of terms limiting the Debtors' access to liquidity, the currently proposed DIP Facility is not in the best interests of the Debtors' estates and creditors and should not be approved.  *See In re Mid-State Raceway, Inc.*, 323 B.R. at 60.

**V.    The DIP Facility Includes an Impermissible Roll-Up of MidCap's Prepetition Obligations Without Any Mechanism to Unwind the Roll-Up**

43.    The Committee also objects to the unnecessary and costly roll-up of MidCap's prepetition debt, especially since the Interim DIP Order provides no mechanism to unwind the rolled-up debt, even after a successful Committee challenge of MidCap's prepetition liens and claims.   Without the ability to unwind the roll-up of the Prepetition Obligations, MidCap is impermissibly using the roll-up as a means of insulating its Prepetition Obligations from any challenge by the Committee or any other party in interest, since such challenge, even if successful, would have no net effect (as the Prepetition Obgliations would have already been converted to post-Petition adminstrative expense oblgiaiotns). As such, to the extent any roll-up is appropriate, the Final DIP Order should provide that, to the extent the Committee or any other party in interest successfully challenges the validity, extent, amount, perfection, priority or enforceability of any or all of the Prepetition Liens and/or Prepetition Obligations, the amount of the roll-up should be reduced accordingly on a dollar for dollar basis (the "Roll-Up Reduction") and any pre-petition liens, claims or obligations subject to a Roll-Up Reduction should be treated in accordance with the terms of any confirmed plan in these chapter 11 cases. *See e.g.*, Interim DIP Order, ¶¶ 6(c), 10(a), 15, 18; DIP Credit Agreement, §§ 10.1(aa)(ii), 10(dd), or 10(ee).

44.    However, the roll-up of the DIP Lenders' Prepetition Obligations, which the Debtors are providing as a form of adequate protection, is inappropriate in these cases as the DIP Lenders are oversecured.  As noted in the DIP Motion, "[a]s of the Petition Date, the principal amounts outstanding under the Prepetition Revolver and Prepetition Term Loan are approximately $38.6 million and $20 million, respectively."  DIP Motion, ¶ 5.  The DIP Motion explains that the Debtors are rolling up these prepetition obligations as a form of adequate protection against any diminution in value of the Prepetition Collateral.  Yet, as stipulated by the

parties in Interim DIP Order, "[t]he aggregate value of the Prepetition Collateral exceeds the aggregate amount of the Prepetition Obligations." Interim DIP Order, ¶ 4(a). As such, adequate protection is unnecessary. *See In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982).

45.     Further, in addition to the Prepetition Obligations being secured by the Debtors' collateral, the parties stipulated that such Prepetition Obligations are also secured by collateral of the non-Debtor Guarantors. As explained in the DIP Motion, "[n]on-Debtors PAHH and Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (together, the "Broad Street Entities") have guaranteed the obligations of the Borrowers under the Prepetition Credit Facility. The Broad Street Entities' guarantees are secured by liens or mortgages on all their real estate and other assets." DIP Motion, ¶ 6. Given that the Prepetition Obligations are secured by the Debtors' collateral whose value exceeds the amount of the obligations, *as well as* the collateral of the non-Debtor Guarantors, the roll-up of the Prepetition Obligations is not necessary. Further problematic, the roll-up is expensive because it entitles MidCap to receive fees based on pre-petition amounts borrowed—amounts for which the Debtors have already incurred fees under the Prepetition Credit Facility.

46.     To the extent any roll up is appropriate under the facts of these cases, such roll-up should be partial and equal to the Incremental Net Operational Liquidity Amount. In no circumstances should the roll up (or the calculation of any fees in connection therewith) include any portion of the Prepetition Term Loan.

**VI.     The Terms of the DIP Facility Provide Unnecessary Benefits to the DIP Lenders to the Detriment of the Unsecured Creditors**

47.     "[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender[.]"  *Mid-State Raceway*, 323 B.R. at 59; *see also In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (characterizing the proposed financing as one that would "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed the debt.").

48.     Here, the proposed DIP Facility provides the DIP Lenders with excess protections that are not necessary under the facts of these cases, to the detriment of the unsecured creditors. In addition to, among other things, the DIP Origination Fee, the waiver of marshaling, and the roll-up, the DIP Facility benefits the DIP Lenders by including a line item in the Budget for "Lender Professional Fees" of $25,000 per week.  The Final DIP Order therefore needs to provide that DIP Lender Professional fees and expenses must be reasonable, necessary and documented and the DIP Lender Professionals' invoices must be submitted to counsel to the Debtors, the U.S. Trustee and counsel to the Committee on a monthly basis, after receipt of which such parties shall have the opportunity to object to payment of such fees and expenses.  If the U.S. Trustee or the Committee objects to the fees and/or expenses of the DIP Lenders' professionals, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the U.S. Trustee and/or the Committee may file with the Court and serve on the DIP Lenders an objection to such fees and/or expenses.

49.     Further, for the avoidance of doubt and to the extent of any provisions to the contrary in the DIP Credit Agreement or Interim DIP Order, the Final DIP Order should allow

6465061

the Debtors to dispose of the DIP Collateral in the ordinary course without the consent of the

DIP Agent or DIP Lenders and outside of the ordinary course pursuant to orders of the

Bankruptcy Court without the consent of the DIP Lenders or DIP Agent.

50.     Next, the DIP Credit Agreement appears to require the Debtors to indemnify

MidCap in connection with any challenge of MidCap's Prepetition Obligations or any liens or

claims of the Prepetition Lenders or Prepetition Agent.  DIP Credit Agreement, § 12.15(b).  Any

such provisions should be removed, as they are designed to prevent the Committee from

investigating MidCap's liens and claims.

**VII.    The Proposed DIP Financing Strips the Estates of Rights Afforded to Them Under
the Bankruptcy Code**

51.     Debtor-in-possession financing is not meant to "tilt the conduct of the bankruptcy

case [and] prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers

for the benefit of all creditors."  *In re Ames Dep't Stores*, 115 B.R. 34, 37 (Bankr. S.D.N.Y.

1990)*; see also In re Tenney Village Co., Inc.*, 104 B.R. at 568.  Rather, debtor-in-possession

financing is meant to benefit the debtor's estate as a whole, including the unsecured creditors.

A.     *The DIP Collateral Should Exclude Causes of Action and the Proceeds Thereof*

52.     The Committee has not yet had an opportunity to investigate (i) any and all causes

of action arising under chapter 5 of the Bankruptcy Code or applicable state law equivalents, (ii)

any pre-petition and post-petition commercial tort claims (as such term is defined in the Uniform

Commercial Code as in effect in the State of New York), including, without limitation, any and

all causes of action (a) against current and former directors and officers of the Debtors and/or

any of their affiliates, and (b) of the Debtors and/or any of their affiliates against non-Debtor

Guarantors and/or any of their affiliates, and (iii) any claims or causes of action against the

Debtors' contract counterparties (collectively, the "Causes of Action").  Interim DIP Order, ¶ 8.

As such, the overall value of the Causes of Action is presently unknown.  The Causes of Action

and the proceeds thereof, however, may be one of the only sources of recovery for unsecured

creditors in these chapter 11 cases.  As such, the DIP Collateral should expressly exclude, and no

post-petition liens, including adequate protection liens, or super-priority administrative claims

should attach to, the Causes of Action or any proceeds thereof to avoid potentially diminishing

recoveries to unsecured creditors.

53.    Numerous courts have restricted a debtor-in-possession's ability to pledge

avoidance actions as security for post-petition financing, holding that avoidance actions are not

property of a debtor's estate.  *See Official Comm. of Unsecured Creditors* v, *Chinery (In re*

*Cybergenics, Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the

estate, but are essentially rights held by the estate for the benefit of creditors); *In re Sweetwater,*

55 B.R. 724, 731 (D. Utah 1985), *rev'd on other grounds,* 884 F.2d 1323 (10th Cir. 1989) ("The

avoiding powers are not 'property' but a statutorily created power to recover property");

*Bethlehem Steel Corp. v. Moran Towing Corp.*, 390 B.R. 784, 786 (Bankr. S.D. N.Y. 2008)

("Avoidance actions brought pursuant to the Bankruptcy Code never belonged to the Debtor, but

rather were creditor claims that could only be brought by a trustee or debtor in possession . . . .").

Similarly, granting liens on other unencumbered causes of action belonging to the Debtor would

be at odds with the Bankruptcy Code's goal of maximizing value for the debtor's estate and its

creditors.  *See In re Ames Dep't Stores*, 115 B.R. at 37.

B.    *The Debtors Should Not Be Permitted to Waive Their Rights to Surcharge*
      *Collateral Under Section 506(c) of the Bankruptcy Code*

54.    The waiver of the Debtors' rights to seek a surcharge against MidCap's collateral

under section 506(c) of the Bankruptcy Code is improper and could be detrimental in these cases.

Section 506(c) permits a debtor to recover the "reasonable, necessary costs and expenses of

preserving, or disposing of, [secured property] to the extent of any benefit to the holder of such claim[.]"  11 U.S.C. § 506(c).  The purpose of section 506(c) is to allow a claimant who "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral . . .  to recovery such expenses from the secured party or from the property securing an allowed secured claim held by such party," thus "prevent[ing] a windfall to the secured creditor at the expense of the claimant."  *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Industries, Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995).  Section 506(c) was carefully designed to protect against the risk of a debtor's administrative insolvency and to ensure secured creditors do not use the chapter 11 process to fund their own foreclosure proceedings.  *See e.g.*, *In re Sports Authority Holdings, Inc.*, No. 16-10527 (MFW) (Bankr. D. Del. April 26, 2016) Hr'g Tr. at 195:6-16 ("[In] a case where the . . . administrative claims are clearly not budgeted or being paid while . . . the secured lenders' collateral is being liquidated and their secured claim is being paid, I have a serious problem with that. I think the fix is no 506(c) waiver for anybody. And to the extent that administrative claims are not paid at the end of this case, there will be a claim against the lenders for those costs under 506(c) to the extent they were necessary for the preservation or realization of their collateral."); *In re NEC Holdings Corp.*, No. 10-11890 (PJW) (CSS) (Bankr. D. Del. July 13, 2010), Hr'g Tr. at 101:8-9 ("[B]asically, you don't give a 506(c) waiver over an objection by the committee."); *Comerica Bank-California v. GTI Capital Holdings, L.L.C. (In re GTI Capital Holdings, L.L.C.)*, 2007 Bankr. LEXIS 4853, at *43 (B.A.P. 9th Cir. Mar. 29, 2007) (*citing Silver State Sav. & Loan Ass'n v. Young*, 252 F.2d 236, 238-39 (9th Cir. 1958)).

55.     The concern of administrative insolvency is particularly acute in hospital bankruptcy cases, such as these, where patients' lives are at stake.  Thus, here, the Debtors

should not be left without a vehicle to surcharge MidCap's collateral, especially where, as explained above, it is not clear that the Budget will protect the Debtors' estates from administrative insolvency.  A section 506(c) waiver, if any, should be contingent on resolution of the Budget and liquidity issues raised herein.

**VIII.  The Committee Must be Afforded (I) Adequate Time to Investigate MidCap's Prepetition Liens and Claims, (ii) Standing to Initiate A Challenge with Respect to the Same, and (iii) an Adequate Budget to Conduct the Investigation**

56.      The Committee's rights with respect to the investigation of MidCap's prepetition liens and claims must be protected.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (stating that "[n]o court of which we are aware has approved financing arrangements  . . . [that] would skew the conduct of the bankruptcy case, destroy the adversary process that contemplates representation by counsel and deprive the estate of possible rights and powers before the creditors' committee counsel would have a reasonable time to examine whether the estate had viable claims").  Section 1103(c)(2) of the Bankruptcy Code provides that one of the duties of the Committee is to "investigate the acts, conducts, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the formulation of the plan."  11 U.S.C. § 1103(c)(2).  These statutory duties clearly include the investigation of the purported prepetition liens of, and potential claims against, MidCap.  The Interim DIP Order, however, includes provisions that limit the Committee's ability to conduct its investigation.

57.      First, the Committee must be granted standing to (i) object to or challenge the findings contained in the Interim DIP Order and/or any Final DIP Order and the stipulations contained therein regarding (a) MidCap's prepetition indebtedness (Interim DIP Order, ¶ 4(a)); (b) MidCap's Prepetition Liens and Prepetition Collateral (Interim DIP Order, ¶ 4(b)); and (c) the Guarantor Liens (Interim DIP Order, ¶ 4(c)); and (ii) commence, prosecute and/or settle any and all claims and causes of action that the Committee may assert individually or on behalf of

the Debtors' estates against the Prepetition Lenders, Prepetition Agent, DIP Agent and/or the

DIP Lender, including without limitation, asserting any claim in the nature of a setoff,

counterclaim or defense to the Prepetition Obligations (including but not limited to, those under

sections 506, 544, 547, 548, 549 and 550 of the Bankruptcy Code) (each, a "Challenge").

58.     Second, the Committee budget contained in section 7(b) of the Interim DIP Order

should be increased to $75,000 from $25,000 so that the Committee can adequately investigate

the liens, claims and interests Prepetition Lender.

59.     Third, the challenge period should be 90 days after filing the notice of

appointment of the Committee (instead of 60 days), and this deadline should apply only to

stipulations and admissions regarding the validity, extent, amount, perfection, priority or

enforceability of the liens and claims under the prepetition loan documents.   There should be no

challenge deadline for any other claims or causes of action that the estates may have against the

Prepetition Agent, Prepetition Lenders, DIP Agent or DIP Lenders and such other claims or

causes of action against the Prepetition Agent, Prepetition Lenders, DIP Agent or DIP Lenders

should be expressly reserved and preserved.

## IX.     Other Objectionable Provisions of the Proposed DIP Facility and Interim DIP Order

60.     In addition to those provisions discussed above, the proposed DIP Facility and

Interim DIP Order contain a number of other objectionable provisions, including without

limitation, the following provisions which should be modified as indicated below:

| Budget | For the avoidance of doubt, any unencumbered property of the Debtors, including, but not limited to, the Excluded Causes of Action (defined below), and all proceeds thereof, shall not be subject to the Financing Documents, including the Budget. |
|---|---|
|  |  |

| | |
|---|---|
| Reporting | The Committee should receive the same reporting and at the same time as the DIP Lender under the DIP Credit Agreement, including under sections 4.1 and 7.4 of the DIP Credit Agreement.[7] |
| | |
| Adequate Protection | The Adequate Protection Liens, Adequate Protection Payments, and superiority claim of the Prepetition Lenders and Prepetition Agent should no longer be effective after entry of the Final DIP Order, as the Prepetition Obligations are being repaid in full and adequate protection is therefore not necessary.  Interim Order, ¶ 5(b).

Adequate Protection Liens (to the extent applicable) should not attach to any Excluded Causes of Action. Interim DIP Order, ¶ 5(b)). |
| | |
| Non-Debtor Guarantors | Any references to non-Debtor Guarantors included in paragraph 5(c) of the Interim DIP Order should be removed. As currently drafted, paragraph 5(c) states that "the Debtors have an immediate need to . . . obtain the DIP Facility . . . in order to . . . preserve the going concern value of the Debtors and the non-Debtor Guarantors[.]").

The Debtors should not be required to cause any non-Debtor Guarantor to take or not take any actions.  Interim DIP Order, ¶¶ 6(b), 10(c). |
| | |
| Amendments to DIP Facility | Notice of any amendment, waiver, consent or other modification to and under the DIP Documents should be provided to the Committee at least five (5) business days in |

---

[7] Based on preliminary discussions with the DIP Lenders, the Committee understands that the DIP Lenders are amenable to the Committee receiving the same reporting information at the same time as the DIP Lenders.

| | |
|---|---|
| | advance of its effectiveness and the Committee should be provided a reasonable opportunity to object.   Interim DIP Order, ¶ 6(b)(ii). |
| | |
| Carve-Out/Professional Fees | Nothing contained in the Final Order or in the DIP Documents should affect the rights of the Case Professionals to seek (i) allowance of fees and expenses in excess of the amounts set forth in the Carve-Out and Budget and/or (ii) payment of fees and expenses in excess of the amounts set forth in the Carve-Out and Budget from assets that do not constitute the DIP Collateral. |
| | |
| Challenge | All references to Prepetition Documents should be removed from paragraph 13(a) of the Interim DIP Order; paragraph 13(b) of the Interim DIP Order should be removed; and references to the Prepetition Documents should be removed from paragraph 13(d) of the Interim DIP Order. |
| | |
| Plan | Any plan of reorganization may provide for payment and performance in full of the DIP Obligations (as opposed to all "Obligations" as is currently contemplated) on the earlier of the effectuate date or thirty days after confirmation of the plan.  For the avoidance of doubt, the DIP Obligations should not constitute any Prepetition Obligations that are subject to a Roll-Up Reduction, and such obligations subject to a Roll-Up Reduction should be treated in accordance with the terms of any confirmed plan of reorganization or liquidation.  Interim DIP Order, ¶ 18. |
| | |
| Indemnification | Notwithstanding anything contained in the DIP Credit Agreement, the Debtors shall not be obligated to indemnify the Indemnitees in connection with any challenge of any |

| | |
|---|---|
| | Prepetition Obligations or any liens or claims of the Prepetition Lenders or Prepetition Agent.  DIP Credit Agreement, § 12.15(b). |
| | |
| Jurisdiction | The Bankruptcy Court should have sole jurisdiction over the DIP Credit Agreement, § 12.8.  As currently drafted, section 12.8 currently provides that "nothing in this agreement shall be deemed or operate to preclude any agent or any lender from bringing suit or taking other legal action in any other jurisdiction to realize on the collateral or any other security for the obligations[.]" |
| | |
| Events of Default | To the extent the validity, extent, amount, perfection, priority or enforceability of any of the Prepetition Obligations are successfully challenged, distributions on account of such Prepetition Obligations, if any, should be made pursuant to the terms of any confirmed plan (not governed by sections 10.1(aa)(ii), 10(dd), or 10(ee) of the DIP Credit Agreement). |
| | |
| Remedies | Neither the DIP Agent nor DIP Lenders should be able to exercise remedies based on the conduct of any non-Debtor Guarantors. |
| | |
| Power of Attorney | Section 4.15 of the DIP Credit Agreement should be removed.  All language in the DIP Credit Agreement appointing Agent as Borrowers' agent and attorney in fact, including in sections 4.17 and 10.3(c), should be removed. |

| | |
|---|---|
| Miscellaneous | The definition of "Financing Documents" in the DIP Credit Agreement should not include any documents governing the Prepetition Obligations or any liens or claims of the Prepetition Lenders or Prepetition Agent. |
| | Nothing contained in the Final DIP Order or any financing instrument, including the Financing Documents, should be deemed to waive, limit, modify or otherwise prejudice any of the Debtors' or their estates' rights, claims, defenses, or objections against any non-Debtor affiliate. |

### RESERVATION OF RIGHTS

61.     The Committee reserves the right to revise, amend or supplement this Objection at any time prior to or at the final hearing.

WHEREFORE, the Committee respectfully requests that the Court (i) modify any Final DIP Order with respect to the DIP Motion and DIP Facility as necessary to incorporate the concerns and objections of the Committee set forth herein; and (ii) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: August 6, 2019
Wilmington, Delaware

Respectfully submitted,

/s/ *Thomas M. Horan*
Thomas M. Horan (DE Bar No. 4641)
**FOX ROTHSCHILD LLP**
919 North Market Street, Suite 300
Wilmington, DE 19899
Telephone: 302-654-7444
Facsimile: 302-6568920
Email: thoran@foxrothschild.com

- and –

Andrew H. Sherman (*pro hac vice*)
Boris I. Mankovetskiy (*pro hac vice*)
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email:  asherman@sillscummis.com
            bmankovetskiy@sillscummis.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*