# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC, d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*,[1] | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | Re: Docket Nos. 142 & 362 |

**REPLY OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO LIMITED OBJECTION OF MIDCAP FUNDING IV TRUST IN RESPONSE TO DEBTORS' MOTION FOR SALE OF RESIDENT PROGRAM ASSETS**

The Official Committee of Unsecured Creditors (the "Committee")[2] in the chapter 11 cases of Center City Healthcare, LLC d/b/a Hahnemann University Hospital and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this reply (the "Reply") to the *Limited Objection of Midcap Funding IV Trust in Response to Debtors' Motion for Sale of Resident Program Assets* [Docket No. 362] (the "MidCap Objection"). In support of the Reply, the Committee respectfully represents as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Residents Sale Motion (defined below) or MidCap Objection, as appropriate.

6547236 v4

**PRELIMINARY STATEMENT**

1. The Committee files this Reply to rebut the unsubstantiated claims in the MidCap Objection and advise the Court (and all parties in interest) that the Committee contests any liens or encumbrances asserted by MidCap on: (a) Hahnemann's National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) Hahnemann's programs for training residents (the "Residents Program Assets"). MidCap cites to no specific language, sections or definitions in the Prepetition Credit Agreement to demonstrate the existence of any such alleged liens or encumbrances. Further, MidCap has cited no federal or Pennsylvania law allowing for the attachment of liens on or security interests in the Residents Program Assets—assets which appear to require approval from state and federal regulatory agencies prior to the granting of any such liens or security interests.

2. To the extent MidCap asserts a lien on the Residents Program Assets, the Committee should be afforded a reasonable opportunity to investigate the validity, extent, priority and perfection of such alleged lien before MidCap receives any payments on account thereof. This is especially important here, where the proposed roll-up in the DIP Facility prevents the Court from unwinding any payments to MidCap from the sale proceeds, even if the Committee successfully challenges MidCap's alleged lien on the Residents Program Assets. As such, the proceeds from the sale of the Residents Program Assets should not be paid to MidCap at closing, but rather should be placed in escrow pending a determination, after the Committee's investigation, of whether MidCap has a valid and perfected lien thereon.

## BACKGROUND

A. **Residents Program Assets Sale**

3. On June 30, 2019, (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4. On July 9, 2019, the Debtors filed a motion [Docket No. 142] (the "Residents Sale Motion") seeking to approve, among other things, bidding procedures for and authorization of the sale of the Residents Program Assets.

5. On July 15, 2019, MidCap filed a reservation of rights with respect to the Residents Sale Motion [Docket No. 199] (the "MidCap ROR").

6. On July 18, 2019, the Committee filed a limited objection and reservation of rights regarding the bidding procedures and proposed form of bidding procedures order [Docket No. 238].

7. On July 19, 2019, the Court entered an order approving the bidding procedures for the sale of the Residents Program Assets [Docket No. 249].

8. On August 5, 2019, MidCap filed the MidCap Objection, objecting to the Residents Sale Motion to the extent MidCap does not receive payment of the sale's proceeds at closing.

B. **The DIP Motion**

9. On July 1, 2019, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate*

*Protection to the Prepetition Lender, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 53] (the "DIP Motion").

10. On July 12, 2019, the Court entered an interim order approving the DIP Facility [Docket No. 172] (the "Interim DIP Order"), authorizing the Debtors to borrow up to $5,500,000 on an interim basis. A final hearing with respect to the DIP Motion is scheduled for August 19, 2019 at 1:00 p.m. (prevailing Eastern Time).

11. On August 6, 2019, the Committee filed an objection to the DIP Motion (the "Committee DIP Objection"), objecting to, among other things, the Committee's inability under the DIP Facility or Interim DIP Order to unwind the proposed roll-up of MidCap's prepetition debt, even after a successful Committee challenge of MidCap's prepetition liens, claims and/or obligations, effectively insulating MidCap's prepetition liens from any challenge.

## OBJECTION

12. The United States Court of Appeals for the Third Circuit has made clear that a party asserting a secured claim carries the ultimate burden of proving the validity, priority, and extent of any such claim. *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 n.4 (3d Cir. 2012) ("Throughout the Code, the burden of proving the 'validity, priority, and extent' of security interests lies upon the creditors asserting such interests.") (*citing In re Buick*, 126 B.R. 840, 851 (Bankr. E.D. Pa. 1991)).

13. In *In re Heritage Highgate, Inc.*, the Third Circuit explained the burden-shifting approach with respect the question of value of an alleged secured claim under section 506(a) of the Bankruptcy Code. While a properly filed claim is granted *prima facie* validity, a party seeking to negate this presumption has the opportunity to do so. "If the movant establishes with sufficient evidence that the proof of claim overvalues a creditor's secured claim because the

collateral is of insufficient value, the burden shifts. <u>The creditor thereafter bears the ultimate burden of persuasion</u> . . . to demonstrate by a preponderance of the evidence both <u>the extent of its lien</u> and the value of the collateral securing its claim." *Id.* at 140 (emphasis added).

14. MidCap alleges, without providing any support, that it is entitled to the proceeds of the sale of the Residents Program Assets at closing, making the following unsubstantiated assertions:

> MidCap has a fully perfected first priority lien against and security interest in the Residents Program Assets.
>
> If any of the Residents Program Assets are sold, then MidCap will automatically have a first lien security interest on the proceeds of such assets.
>
> As a result, MidCap objects to any sale of the Residents Program Assets that does not provide for MidCap's lien to attach to the proceeds therefrom and for the proceeds to be paid to MidCap at closing.
>
> ….
>
> [T]he [$3 million] Escrow Amount is subject to the MidCap's first priority security interest and that any portion of the Escrow Amount remaining on the anniversary date of the Closing should be released to MidCap rather than the Seller if any of MidCap's claims against the Debtors have not been paid in full.

MidCap Objection, ¶¶ 15-18.

15. However, MidCap cites no provisions, definitions or sections of the Prepetition Credit Agreement giving rise to the purported liens on the Residents Program Assets and, as such, has failed to establish the validity of such alleged liens.

16. Further, MidCap has yet to file a proof of claim setting forth the basis for the alleged lien on the Residents Program Assets. Instead, MidCap relies only on its unsupported allegations set forth in the MidCap Objection.

17. For example, MidCap has not demonstrated any specific reference to or inclusion of the Residents Program Assets in the definition of Collateral in the Prepetition Credit

Agreement, which is necessary for any liens to attach to such assets. *See DSP Acquisition, LLC v. Free Lance-Star Publ. Co. (In re Free Lance-Star Publ. Co.)*, 2014 Bankr. LEXIS 1644, *26-27 (Bankr. E.D. Va. April 14, 2014) ("The Security Agreement in *Terrestar* expressly provided for the right to 'receive monies, proceeds, or other consideration in connection with the sale, assignment, transfer, or other disposition of any FCC Licenses.' The Debtors and BB&T failed to include the Debtors' FCC licenses, or disposition thereof, in their Security Agreement . . . The fact that any reference to the FCC licenses was omitted from the defined term 'licenses,' suggests that there was no intent by the Debtor or BB&T to grant a security interest in the FCC license proceeds."). As such, the Committee contends MidCap has not met its initial burden. However, even if MidCap has met this initial burden, the Committee must be afforded an opportunity to negate the validity of MidCap's alleged claim, which would then shift the ultimate burden back to MidCap. Paying MidCap the proceeds from the sale of the Residents Program Assets at closing denies the Committee the opportunity to challenge MidCap's alleged liens on such assets and should not be permitted.

18.     Furthermore, MidCap has cited to no federal or Pennsylvania state law allowing the Debtors to grant liens on or security interests in the Residents Program Assets. The Residents Program Assets include (i) Hahnemann's National Provider Identifiers, (ii) Hahnemann's Medicare provider number and Medicare provider agreement, and (iii) the Pennsylvania Department of Health license to operate an acute care hospital. It does not appear a lien can be granted on such assets without approval of the requisite federal and state regulatory agencies, which the Debtors have not received in these cases and these issues should not be decided in a summary manner in connection with a sale of assets. Liens, if any, can attach to the

proceeds of any sale (which proceeds should be placed in escrow), subject to the Committee's challenge rights.

19.     With respect to the $500,000 purchase price adjustment on account of the amount paid by Purchaser to Seller on June 28, 2019 as consideration for the Medicare GME Affiliation Agreement, MidCap states: "Because MidCap has a first priority lien against substantially all of the Debtors' assets, any proceeds of the $500,000 Payment must be transferred to MidCap." MidCap Objection, ¶ 28.  Again, MidCap fails to substantiate its alleged lien on the Medicare GME Affiliate Agreement—an agreement which appears to require government approval prior to the granting of any such lien.  In fact, in the MidCap ROR, MidCap acknowledges the uncertainty regarding any asserted lien on the $500,000 payment, stating that "MidCap hereby requests details regarding this transaction to determine whether this payment is subject to MidCap's liens and security interests, and further requests that such payment be held in escrow pending determination as to whether such amounts should be paid to MidCap pursuant to the Prepetition Credit Agreement and the DIP Credit Agreement."  MidCap ROR, ¶ 14.  MidCap also fails to explain how or from what source the Debtors can repay any such amount.

20.     By including only bare assertions in the MidCap Objection, MidCap is asking the Court, the Debtors, the Committee and other parties-in-interest to simply trust that MidCap got it right with respect to the scope of its prepetition liens.  However, to do so would result in unsecured creditors giving up millions in proceeds that are likely unencumbered.  This is especially problematic in light of the proposed roll-up in the DIP Facility, which prevents the Court from unwinding any payments made to MidCap from the proceeds of the sale of the Residents Program Assets, even if the Committee successfully challenges MidCap's alleged liens on the Residents Program Assets.  MidCap cannot make unsubstantiated claims regarding its

prepetition liens and then be its own arbiter of the validity, extent, priority, amount and perfection of those liens.

21.     As such, the Committee submits that the Residents Program Assets are not subject to MidCap's liens or security interests and the proceeds of the sale of the Residents Program Assets should not be paid to MidCap at closing.  However, to the extent it is premature to make any determination as to whether MidCap has liens on or security interests in the Residents Program Assets, the proceeds from the sale of the Residents Program Assets should be placed in escrow pending a determination of the validity of such alleged liens and security interests.  In connection therewith, the Committee should be afforded a reasonable opportunity to investigate MidCap's alleged liens on and security interests in the Residents Program Assets.  Placing such proceeds in escrow will not cause the Debtors to deviate from the amounts included in the Budget in connection with the DIP Facility, as the Budget does not include any proceeds from the sale of the Residents Program Assets.

## RESERVATION OF RIGHTS

22.     The Committee reserves the right to revise, amend or supplement this Reply at any time prior to or at the hearing for the sale of the Residents Program Assets.

WHEREFORE, the Committee respectfully requests that the Court (i) deny the MidCap Objection, (ii) require the proceeds from the sale of the Residents Program Assets be placed in an escrow account pending determination whether MidCap has any liens on or security interest in such assets; and (iii) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: August 7, 2019  
Wilmington, Delaware

Respectfully submitted,

/s/ *Thomas M. Horan*  
Thomas M. Horan (DE Bar No. 4641)  
**FOX ROTHSCHILD LLP**  
919 North Market Street, Suite 300  
Wilmington, DE 19899  
Telephone: 302-654-7444  
Facsimile: 302-6568920  
Email: thoran@foxrothschild.com

- and –

Andrew H. Sherman (*pro hac vice*)  
Boris I. Mankovetskiy (*pro hac vice*)  
**SILLS CUMMIS & GROSS P.C.**  
One Riverfront Plaza  
Newark, NJ 07102  
Telephone:  973-643-7000  
Facsimile:  973-643-6500  
Email:  asherman@sillscummis.com  
　　　　bmankovetskiy@sillscummis.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*