## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) **Related to Docket No. 303** |
| | ) |

### DEBTORS' OBJECTION TO MOTION OF TENET BUSINESS SERVICES CORPORATION AND CONIFER REVENUE CYCLE SOLUTIONS, LLC FOR ENTRY OF AN ORDER (I) COMPELLING PAYMENT OF ALL UNPAID POSTPETITION AMOUNTS PURSUANT TO 11 U.S.C. § 503(B)(1) OR, IN THE ALTERNATIVE, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY TO THE EXTENT NECESSARY TO TERMINATE THE TSA AND MSA

Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") submit this objection (the "**Objection**") to the *Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA* [D.I. 303] (the "**Motion**"), which was filed by Tenet Business Services Corporation ("**Tenet**") and Conifer Revenue Cycle Solutions, LLC ("**Conifer**"),

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

an entity affiliated with Tenet.[2]  In support of their Objection, the Debtors rely on the Declaration

of Allen Wilen, a copy of which is attached hereto as **Exhibit A** (the "**Wilen Declaration**"), the

*Declaration of Allen Wilen in Support of First Day Relief* [D.I. 2] (the "**First Day Declaration**"),

and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The filing of this Objection follows a successful auction of the Debtors'

Hahnemann University Hospital residency program assets.  If such sale is approved, it will

permit the Debtors to more easily resolve the claims asserted by Tenet and Conifer and also fund

ongoing operations and the orderly shutdown of HUH (as defined below).  In the meantime,

however, the relief sought in the Motion is unwarranted and should be denied.

2.      There is no dispute that the IT and revenue cycle management services provided

by Tenet and Conifer (together, the "**Tenet Parties**") to the Debtors are central to the Debtors'

ability to operate.  That said, Tenet and Conifer's deficient performance in providing these

services has, from the beginning, undermined the Debtors' ability to operate efficiently and

effectively.

3.      By the Motion, the Tenet Parties seek the entry of an order compelling the

Debtors to pay them the full contract rates for their post-petition services, as set forth in the TSA

and MSA (both as defined below) or, alternatively, granting the Tenet Parties relief from the

automatic stay so that they can terminate the TSA and MSA.  In seeking such relief, the Tenet

Parties contend that the Debtors have unreasonably withheld payments to the Tenet Parties in the

seven months leading up to the bankruptcy filing, while Tenet and Conifer have patiently

continued to provide services and otherwise perform in good faith.  These contentions are

---

[2]      As noted in the Motion, Conifer is wholly owned by Conifer Health Solutions, LLC, a joint venture
between an affiliate of Tenet and another unrelated entity.

selective and misleading.  What the Motion fails to address is that the Debtors' decision to refrain from making certain payments to the Tenet Parties is due to legitimate disputes that have arisen in connection with the ASA (as defined below), the sub-optimal performance and functionality of services provided under the TSA, and the sub-optimal and inefficient performance of Conifer in connection with the MSA.  Put simply, the Tenet Parties' actions and performance have cost the Debtors millions of dollars and jeopardized the viability of the Debtors' businesses right from the start.

4.      Tenet and Conifer's failure to provide the level of service required to permit the Debtors' businesses to function properly and efficiently weighs against the presumption that any post-petition amounts to which the Tenet Parties may be entitled should be valued at the contract rate.  Rather, as explained below, the rate to be applied should reflect the *actual value* of the services that have been provided to the Debtors, taking into account the losses that the Debtors have suffered as a result of the Tenet Parties' deficient performance, as well as the reduced need for the Tenet Parties' services due to the closure of HUH and the contemplated sale of STC (as defined below).

5.      Moreover, the Tenet Parties' requests for *immediate* payment of their alleged post-petition claim (the "**Post-Petition Claim**") or, in the alternative, stay relief to terminate the TSA and the MSA, should likewise be denied.  Nowhere in the Motion do the Tenet Parties demonstrate that Tenet or Conifer would suffer a level of hardship that justifies the relief sought in the Motion.  In fact, the Tenet Parties have provided services to the Debtors for over a year without receiving payment for most of that time, which diminishes the alleged severity of the Tenet Parties' hardship.

6.      In contrast, any order compelling immediate payment of the Post-Petition Claim or otherwise permitting the Tenet Parties to terminate the TSA and MSA would have a dire effect on the Debtors and their estates and creditors, since any amounts that the Debtors are compelled to pay in excess of the amounts set forth in the DIP budget would have to be diverted from other uses needed to sustain operations at the Hospitals (as defined below).  Likewise, given the critical role of the Tenet Parties' services in the Debtors' operations, any termination of the TSA and MSA would cause an abrupt and immediate shut down of operations at the Hospitals, the results of which would be disastrous and risk harm to patients, employees and the community at large.  These severe implications outweigh any hardships that would be imposed on the Tenet Parties if the Court denied the Motion.  Thus, no basis exists to compel immediate payment of the Post-Petition Claim or grant stay relief so that the Tenet Parties can proceed with termination.

7.      Furthermore, as described below, there are certain actions that the Debtors can pursue (and have pursued) to generate additional value for the Debtors' estates, for the potential benefit of Tenet, Conifer and other creditors.  In certain instances, these actions require, or would greatly benefit from, the Tenet Parties' cooperation.  Unfortunately, Tenet and Conifer have declined to cooperate – despite multiple requests from the Debtor and despite minimal if any anticipated burden to the Tenet Parties.  Thus, at the very same time the Tenet Parties have demanded additional payments from the Debtors, they have failed to take the minimal actions requested to help the Debtors realize funds necessary to pay them, if such payments are determined to be warranted (and the Debtors submit they are not).  Certainly, Tenet and Conifer should not be permitted to benefit from their lack of cooperation.  For these reasons, and for the

additional reasons set forth below, the Debtors respectfully request that the Court deny the Motion.

## FACTUAL BACKGROUND

8.      As set forth in the First Day Declaration, on January 11, 2018, Philadelphia Academic Health Holdings, LLC ("**PAHH**") – the holding company that is the sole member of Philadelphia Academic Health System, LLC ("**PAHS**") – as purchaser's representative, along with PAHS and other purchasers (the "**Buyers**"), consummated the purchase of the businesses of Hahnemann University Hospital ("**HUH**") and St. Christopher's Hospital for Children ("**STC**," and together with HUH, the "**Hospitals**") and certain related assets, including the Hospitals' related physician practice groups (together, the "**Healthcare Businesses**"), from Tenet and its affiliates pursuant to an Asset Sale Agreement (the "**ASA**") dated August 31, 2017, as amended (the "**Acquisition**").

9.      At the time of the Acquisition, PAHS and Tenet entered into a Transition Services Agreement ("**TSA**") pursuant to which Tenet agreed to provide certain services to PAHS for a two-year period to assist in the orderly transition of the Healthcare Businesses.  These services included Information Services (as defined in the TSA) such as software and IT support, and the use of Tenet's IT platform (the "**Tenet IT Platform**"), in exchange for which Tenet was entitled to certain fees.  PAHS also entered into a Master Services Agreement (the "**MSA**") with Conifer, pursuant to which Conifer agreed to provide revenue cycle services in exchange for payment.

10.     Immediately upon or shortly after the Acquisition, the Debtors' financial performance was adversely affected by a number of disputes with, and operational challenges stemming from alleged failures on the part of, Tenet and Conifer, which disputes and challenges are described in the First Day Declaration.

11.     In the period leading up to the Petition Date, the Debtors, Tenet and Conifer operated under an agreement under which the Debtors made payments of approximately $125,000 per week (which was later increased to $200,000 per week) in exchange for Tenet and Conifer's agreement to defer further efforts to terminate services provided under the TSA and the MSA.  The Debtors entered into this agreement because an abrupt termination of Tenet's and Conifer's services would severely disrupt the Debtors' businesses and the Debtors' ability to properly serve their patients.  Indeed, the timing of the Debtors' bankruptcy filing was driven, in part, by concerns about the potential termination of the TSA and MSA.  Subsequent to the Petition Date, the Debtors have continued to make $200,000 weekly payments to the Tenet Parties.  The Debtors are prepared to continue these payments pending resolution of the parties' respective claims.

## OBJECTION

### I.     The Tenet Parties' Post-Petition Claim Should Not Be Calculated at the Contract Rate

12.     By the Motion, Tenet and Conifer seek payment of "all unpaid postpetition claims owing . . . under the TSA and MSA," at the contract rate of $810,000 per week.  Taking into account the $200,000 weekly payments that are provided for in the DIP Budget, the Tenet Parties estimate their unpaid Post-Petition Claim to be approximately $1.4 million under the TSA and $1.8 million under the MSA as of the date of the filing of the Motion.  See Motion, at ¶¶ 23, 24.

13.     While the Tenet Parties are correct that, in determining the amount of an administrative expense claim, the contract rate is *presumed* to be the reasonable value of services provided to the estate, this presumption is rebuttable if the debtor introduces "convincing evidence to the contrary."  In re Smurfit-Stone Container Corp., 425 B.R. 735, 741 (Bankr. D. Del. 2010); see also In re ID Liquidation One, LLC, 503 B.R. 392, 400 (Bankr. D. Del. 2013)

(finding that objectors had presented sufficient evidence to rebut the presumption that the contract rate represented the reasonable value of services provided); <u>In re Sportsman's Warehouse, Inc.</u>, 436 B.R. 308, 315 (Bankr. D. Del. 2009) (noting that "the debtor can submit evidence that the benefit to the estate is lower than the contract rate").

14.     In the present case, "convincing evidence" exists to demonstrate that use of the contract rate in determining the amount of the Post-Petition Claim is inappropriate and unwarranted.  Notably, given the evidentiary issues inherent in disputing the Tenet Parties' claims, it is unrealistic for the Debtors and the Tenet Parties to be able to litigate the true value of the Post-Petition claim at the scheduled hearing on the Motion, which is in less than two weeks. Nevertheless, for the reasons set forth below and in the Wilen Declaration, this Court can easily find that application of the contract rate in determining the amount of the Post-Petition Claim is inappropriate.

15.     First, as noted above, significant steps have been taken since the outset of these cases to wind down HUH's operations, and the Debtors expect to close HUH by early September 2019.  Following the Petition Date, the average in-patient census at HUH decreased to 36 patients, as compared to 184 in-patients in the month preceding the bankruptcy filing, and 203 patients in May 2019.  On July 17, 2019, the Debtors ceased admissions at HUH, other than through the emergency department, and, as of the date of this Objection, there are no inpatients at the hospital.  Because Conifer's fees are largely based upon patient billings, the reduced patient volumes at HUH stemming from the wind-down will cause a significant reduction in amounts due to Conifer.  More fundamentally, the closure of HUH reduces the value of the Tenet Parties' services, and warrants a reduction in the weekly amounts to which the Tenet Parties may otherwise be entitled under the TSA and MSA.

16.     Second, the Tenet Parties cannot justify payment at the contract rate where the level of performance was not commensurate with the contract rate. Any post-petition payments to Tenet and Conifer should reflect their sub-optimal performance, which, as detailed below, has caused the Debtors' estates to suffer considerable financial harm:

Conifer's Performance:   Among other examples, Conifer's poor performance under the MSA can be categorized as follows:

- o   Collection Failures: Despite Conifer's representations that it performed at a high level in collecting revenue for Tenet, following the Acquisition, Conifer's revenue collection performance has persistently fallen short of goal. By way of example, Conifer's cash collections in February 2018, just one month after the Acquisition, were $16 million short of that month's goal, at 59.3% of goal. Conifer's cash collections in March 2018 were $9 million short of that month's goal, at 80.6% of goal. As such, within 60 days after the Acquisition, Conifer's performance cost the Debtors $25 million in lost revenue. The Debtors never recovered from this deficit during the remainder of 2018 and its recoveries during 2019 have thus far been deficient as well.

- o   Reporting Failures:   Despite repeated follow-up requests, Conifer has failed to provide many of the daily, weekly and monthly reports that it is required to provide to the Debtors under the MSA, including aging reports, reports relating to patients discharged without final bills, point of sale cash collection rates and write-off rate reports. Conifer's failures to provide clear reporting on these matters, or to provide any such reports whatsoever, creates challenges to the Debtors' operations. For example, a lack of up-to-date and accurate reporting concerning write-offs for bad debt and Conifer's failures to timely process write-offs for bad debt have impacted the Debtors' availability to borrow funds needed to operate from their secured lender. The Debtors estimate that Conifer's failure to process requested write-offs of bad debt have cost them $8 million in availability since the Petition Date.

- o   Poor Intake Performance and Technical Denials: Conifer personnel perform patient registration and intake services for the Debtors. In connection with these services, Conifer's errors in recording information have resulted in denials of payment by third-party payors, which are known as "technical denials." The losses that the Debtors have incurred as a result of these denials are substantial. As of early October 2018, for example, HUH and STC were experiencing $40 million in initial or partial pay denials, of which almost $28 million were due to technical denials arising from Conifer errors or omissions. Therefore, nearly two thirds of all claims denials related to technical reasons, for which Conifer was solely responsible.

o   <u>Failure to Follow Up on Zero-Pay Accounts</u>: Conifer has repeatedly failed to follow up on "zero-pay accounts," which are claims pending for more than 60 days with no action by the third-party payor. A review of accounts receivable in October of 2018, for example, revealed $19 million in "zero-pay accounts." Based on their review, the Debtors determined that Conifer had failed to pursue these open matters on a timely basis (which, per industry standards, would have required Conifer to follow-up on open claims within 30-40 days).

o   <u>Failure to Timely File Appeals</u> When claims are initially denied or partially denied, Conifer is obligated to pursue appeals in accordance with the time requirements established by third-party payors. On a number of occasions, Conifer has failed to timely pursue appeals, resulting in several large accounts receivables (each in excess of $1 million) being out of time for further appeal. In other instances, Conifer has (i) neglected to take any appeal of the initial determination, (ii) cryptically flagged claims as "legal" without sufficient detail to determine required next steps, and (iii) provided inadequate notice to the Debtors of actions needed to be taken in connection with pending appeals.

o   <u>Further Financial Consequences Stemming from Conifer's Failures</u>: As a consequence of Conifer's failures in revenue cycle performance as outlined above, the dollar value of disputed account receivable files as of February 2019 was $89 million, of which $62 million were either closed or beyond time limits for recovery, with the majority simply having been closed by Conifer.

Moreover, Conifer's rate of first pass/initial denials for 2018 was 16.79% for HUH and 16.44% for STC. Both of these rates exceed significantly the standard industry rates of 12% to 12.5%. These excess denials have resulted in both substantial delays in the receipt of payments and losses of payments in instances where appeals were not timely pursued. Based on the value of the initially denied claims at the Hospitals during 2018, a 12.5% initial denial rate would have generated an additional $7,584,800 for the Debtors.

<u>Tenet Disputes</u>: As described in the First Day Declaration, the Debtors' disputes with Tenet include the following:

o   <u>ASA-Related Disputes</u>. Among other issues, following the Acquisition, disputes arose between the Debtors and Tenet (and the Debtors instituted litigation) with regards to the "Net Working Capital Adjustment" provided for under the ASA, most notably, for overstated amounts of accounts receivable totaling approximately $21 million. The Debtors also learned that approximately $5 million of amounts received by Tenet at closing in order for it to pay certain accounts payable was never in fact paid. These issues resulted in a significant liquidity shortfall that adversely affected the Debtors' operations almost immediately after closing of the Acquisition.

    o  <u>TSA Disputes</u>: The Debtors believe that the Tenet IT Platform – upon which the Debtors' operations and ability to provide patient care is highly dependent – is outdated and contains functionality gaps that impair (i) the efficient management of patients and patient data production of standard key performance indicators, (ii) financial management functions, and (iii) revenue cycle, supply chain and other important customary functions.

17.    Third, the fact that, in the time leading up to the Petition Date, the Tenet Parties agreed to weekly payments of $200,000 per week for their services likewise suggests that application of the contract rate is not appropriate here.  It was only after the bankruptcy cases were filed that the Tenet Parties suddenly demanded that the entire contract rate for their services was required.  The Tenet Parties have not offered any explanation as to why such amounts are no longer sufficient, even though, as noted above, the need for the Tenet Parties' services is diminishing following the Petition Date.

18.    Based on the foregoing, and in light of (i) the anticipated reduction in the Debtors' need for the Tenet Parties' services following the closure of HUH (and the sale of STC), (ii) the documented failures on the part of the Tenet Parties to perform as required under the TSA and MSA, and the resulting losses suffered by the Debtors therefrom, and (iii) evidence demonstrating that the contract rate for the services far exceeds the value of such services, any presumption in favor of the contract rate is easily rebutted.  Instead, to the extent the Tenet Parties are entitled to a post-petition claim, such amounts should be reduced from the contract rates to reflect the value of the services actually provided to the Debtors, taking into account the Tenet Parties' record of poor performance and the losses suffered by the Debtors as a result of such poor performance.[3]

---

[3]    The Debtors reserve all rights to assert setoff and/or recoupment claims against the Post-Petition Claim, which may reduce the amount of the Post-Petition Claim.

**II.     The Court Should Not Compel Immediate Payment of Tenet and Conifer's Claims**

19.     Even if the Tenet Parties are entitled to a post-petition claim, case law is clear that courts have discretion as to *when* the claim gets paid.  See In re HQ Glob. Holdings, Inc., 282 B.R. 169, 173 (Bankr. D. Del. 2002) (explaining that "[t]he determination of the timing of payment of administrative expenses is a matter within the discretion of the bankruptcy court"). In Global Home Products, this Court explained that "[t]o qualify for exceptional immediate payment, a creditor must show that there is a necessity to pay and not merely that the Debtor has the ability to pay." In re Global Home Products, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006).   This Court also considered the following three factors in determining an entitlement to immediate payment: (1) the prejudice to the debtors, (2) hardship to the claimant, and (3) potential detriment to other creditors.  Id. at *4; see also In re Garden Ridge Corp., 323 B.R. 136, 143 (Bankr. D. Del. 2005) (applying three-factor test as to landlord's 503(b) claims); In re Bookbinders' Restaurant, Inc., No. 06-12302, 2006 WL 3858020, at *4 (Bankr. E.D. Pa. Dec. 28, 2006) (applying three-factor test in denying immediate payment to 503(b)(9) claimant).

20.     An application of these factors to the present case weighs against compelling immediate payment.   First, compelling the Debtors to pay immediately the Tenet Parties' asserted post-petition claims would cause immediate and substantial harm to the Debtors' businesses, as well as other creditors and parties in interest, since the Debtors would be required to divert funds budgeted for other critical purposes in order to pay the Tenet Parties' claims. Moreover, as reflected in the DIP budget attached to the Interim DIP Order [D.I. 172], if the Debtors are required to immediately pay the $3.2 million that the Tenet Parties are requesting, the Debtors would likely be forced to shut down operations at the Hospitals on an extremely

expedited time frame, which would be disastrous and compromise patient safety. Such a result would also deprive the Debtors' estates of the ability to maximize value for *all* creditors, *including* the Tenet Parties, since it would impair the Debtors' efforts to sell STC and its related practice groups as a going concern, for the benefit of their estates and creditors.

21.     The Tenet Parties argue that the Debtors would not be prejudiced by paying for the "reasonable value" of their ongoing services because the Debtors are paying other vendors in cash on a post-petition basis. Courts within the Third Circuit, however, have rejected this type of argument. See In re Bookbinders' Rest., Inc., No. 06-12302 (ELF), 2006 WL 3858020, at *1 ("I reject the creditor's argument that it is entitled to immediate payment as a matter of law because the Debtor in this case has been paying other administrative expenses, specifically, the Debtor's postpetition trade debt, which has been paid in the ordinary course[.]").

22.     The severe consequences faced by the Debtors' estates if the Motion is granted outweigh significantly any hardship that may be endured by Tenet if the Motion is denied. While the Tenet Parties argue that, absent the requested relief, they will face "massive costs," there is no indication in the Motion that such costs would undermine their ability to operate going forward, which is not surprising given that Tenet has a $2.28 billion market capitalization. There is also no indication that any hardship resulting from a denial of the Motion would otherwise prevent the Tenet Parties from continuing to provide services to the Debtors for a limited period. Indeed, with the anticipated closure of HUH in early September and the anticipated closure of a sale of STC and its related practice groups in October, the end is in sight for the Tenet Parties in terms of the Debtors' need for their services. Moreover, the fact that the Tenet Parties have provided services to the Debtors for over a year despite not receiving

payments for a significant portion of that year undercuts the Tenet Parties' contentions as to the severity of their hardship.

23.     Furthermore, as acknowledged in the Motion, consistent with the DIP Budget and the parties' short-term agreement, the Debtors have been paying the Tenet Parties $200,000 per week since the Petition Date.  Other sources of recovery may also become available to fund any amounts determined to be owed in excess of the $200,000 per week, namely: (i) the proceeds of the sale of STC and its related practice groups, (ii) the proceeds from the sale of the Debtors' residency program assets, the auction of which, as noted above, led to a winning bid that was well in excess of the stalking horse bid,[4] and (iii) proceeds from the Debtors' recovery of certain significant amounts due from a third party, for which the Debtors require the Tenet Parties' cooperation and participation in order to pursue.

24.     Based on the foregoing, and in light of the fact that the hardship to the Debtors and other creditors greatly outweighs any hardships faced by the Tenet Parties, the Court should exercise its discretion by denying the Tenet Parties' request for immediate payment of the Post-Petition Claim.

**III.   Cause Does not Exist to Grant the Tenet Parties Relief from the Automatic Stay**

25.     The Tenet Parties next argue that to the extent the TSA and MSA were not terminated pre-petition (which they were not),[5] cause exists to grant the Tenet Parties relief from the automatic stay in order to terminate the agreements.

---

[4]    The Debtors recognize that the DIP Lender may assert first priority rights to the proceeds of the residency program and STC sales.  However, the DIP Lender has indicated a willingness to discuss making additional funds available for payment of the reasonable value of the Tenet Parties' services.

[5]    The Motion references and attaches a notice of termination of the MSA and TSA that was sent by the Tenet Parties to the Debtors on May 2, 2019.  The Tenet Parties contend that, per the termination notice, termination of the TSA and MSA was effective as of May 17, 2019.  In fact, the termination letter does not provide for termination to be effective as of May 17, 2019.  It provides only that if payments were not received by May 17, 2019, the Tenet Parties would "be left with no choice other than to terminate the Service Agreements."  Such language does not equate to termination.

35745233.1 08/09/2019

26.     As reflected in the Motion, in determining whether "cause" exists to lift the automatic stay, courts consider whether: (i) the debtor or the debtor's estate will be greatly prejudiced; (ii) the hardship to the movant by maintenance of the automatic stay considerably outweighs the hardship to the debtor; and (iii) the movant has a reasonable chance of prevailing on the merits.  E.g., In re Rexene Prods. Co., 141 B.R. 574, 576 (Bankr. D. Del. 1992).

27.     Notably absent from the Motion is any discussion as to how the "massive costs" that the Tenet Parties will allegedly suffer if they cannot terminate the agreements are somehow more burdensome than the irrevocable damage that would result to the Debtors' operations and estates if the MSA and TSA were terminated.  There is no question that, for the same reasons at those set forth above, the Debtors would be greatly prejudiced if the Tenet Parties could terminate services under the TSA and MSA at this time (however deficient such services may be), and that such prejudice outweighs any alleged hardship to the Tenet Parties.

28.     Moreover, the Tenet Parties' alleged likelihood of prevailing on the merits is likewise baseless since, as set forth above and in the First Day Declaration, the Debtors believe that there are strong grounds to challenge Tenet and Conifer's rights to payment under the TSA and MSA.  The Debtors have repeatedly countered the Tenet Parties' allegations with their own documented instances of breach by the Tenet Parties, and have even instituted litigation against the Tenet Parties with respect to certain of these disputes.[6]  Therefore, "cause" does not exist to lift the automatic stay in these circumstances.

---

[6]     Prior to the Petition Date, PAHH instituted an action against Tenet related to the Net Working Capital Adjustment in a lawsuit styled *Philadelphia Academic Health Holdings, LLC v. Tenet Business Services Corporation*, Chancery Court of Delaware, Case No. 2018-0684-KSJM.  In addition, prior to the Petition Date, PAHS and certain other debtor and non-debtor entities instituted an action against Tenet asserting claims for fraud and breach of contract/indemnification under the ASA in a lawsuit styled *Philadelphia Academic Health Holdings, LLC et al v. Tenet Business Services Corporation*, Superior Court of Delaware, Case No. N19C-04-035EMDCCLD.  Both actions are currently pending.

**IV.     Other Equitable Considerations**

29.     Equitable considerations also weigh in favor of denying the Motion.  As discussed above, if the MSA and TSA are terminated or the Debtors are otherwise compelled to immediately pay the Tenet Parties' asserted $3.2 million claim, the Debtors will be abruptly forced to cease operations.

30.     In addition, the Tenet Parties have had opportunities to assist the Debtors in generating additional revenue that could potentially be used to fund their claims but have declined to do so, without good reason.  For example, as noted above, despite the fact that the Tenet Parties' participation is needed to recover a significant amount due from a third party, the Tenet Parties have thus far declined to cooperate even though their participation would impose minimal burden upon them.

31.     ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

32.    ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

33.    The Tenet Parties should not be rewarded for failing to participate in courses of conduct that could meaningfully alleviate the very burdens and costs that they claim to be undertaking as a result of their continued service to the Debtors.  As such, the Tenet Parties' conduct in failing to participate in opportunities to generate additional revenue should weigh against the granting of the Motion.

[remainder of page left intentionally blank]

35745233.1 08/09/2019

WHEREFORE, based on the foregoing, the Debtors respectfully request that the Court enter the order, substantially in the form attached hereto as **Exhibit B,** denying the Motion, and granting such other and further relief as is just and proper.

Dated: August 9, 2019                **SAUL EWING ARNSTEIN & LEHR LLP**

By:     */s/ Monique B. DiSabatino*
        Mark Minuti (DE Bar No. 2659)
        Monique B. DiSabatino (DE Bar No. 6027)
        1201 N. Market Street, Suite 2300
        P.O. Box 1266
        Wilmington, DE  19899
        Telephone: (302) 421-6800
        Fax: (302) 421-5873
        mark.minuti@saul.com
        monique.disabatino@saul.com

            -and-

        Jeffrey C. Hampton
        Adam H. Isenberg
        Aaron S. Applebaum (DE Bar No. 5587)
        Centre Square West
        1500 Market Street, 38th Floor
        Philadelphia, PA 19102
        Telephone: (215) 972-7700
        Fax: (215) 972-7725
        jeffrey.hampton@saul.com
        adam.isenberg@saul.com
        aaron.applebaum@saul.com

        *Counsel for Debtors and Debtors in Possession*