# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| CENTER CITY HEALTHCARE, LLC, *et al*.,[1] | ) Case No. 19-11466 (KG) |
| Debtors. | ) Jointly Administered |

## DECLARATION OF ALLEN WILEN
## IN SUPPORT OF THE MOTION OF THE DEBTORS FOR ENTRY
## OF AN ORDER APPROVING KEY EMPLOYEE INCENTIVE PLAN

I, Allen Wilen, hereby declare the following, under the penalty of perjury:

1. I am the Chief Restructuring Officer ("**CRO**") of Center City Healthcare, LLC and certain of its subsidiaries and affiliates, each a debtor and debtor-in-possession (each, individually, a "**Debtor**" and, collectively, the "**Debtors**") in the above-captioned chapter 11 cases.

2. I have served as CRO for the Debtors since April 8, 2019. In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

3. I am duly authorized to make and submit this declaration on behalf of the Debtors in support of the *Motion of the Debtors for Entry of an Order Approving Key Employee Incentive Plan* (the "**KEIP Motion**"), filed contemporaneously herewith.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

A. **Background**

4. I am a Partner at EisnerAmper LLP ("**EisnerAmper**") and serve as the national director of EisnerAmper's financial advisory services group. I have more than twenty years of financial and accounting experience, as well as extensive experience advising insolvent and troubled companies in turnaround and crisis situations and navigating such companies through turnaround, sale and liquidation processes. I have frequently been involved in complex matters requiring expertise in forensic accounting and operational analysis and have been qualified as an expert in numerous state and federal courts throughout the United States.

5. I developed the Debtors' Key Employee Incentive Plan (the "**KEIP**") based on similarly sized chapter 11 debtors, and after consultation with the Debtors' counsel, principals and other advisors.

6. EisnerAmper has significant experience in chapter 11 restructurings and is well-suited to provide input on the Debtors' executive and employee incentive plans. EisnerAmper assisted the Debtors in designing the KEIP, keeping in mind the Debtors' dual goals of maximizing value and ensuring quality patient care. The KEIP was designed in a reasonable, cost-effective way to promote the appropriate incentives under the circumstances of these Chapter 11 Cases.

7. The Debtors formulated and began implementation of the KEIP prior to the commencement of these bankruptcy cases. The Debtors seek authority and approval of the Court to continue implementation of the KEIP in order to continue incentivizing their key employees.

8. In particular, the KEIP mirrors the Debtors' restructuring goals by incentivizing the closing of a sale with respect to St. Christopher's Hospital for Children ("**SCH**") and the successful closure of Hahnemann University Hospital ("**HUH**"). The structuring of the KEIP

focuses on a going concern transaction for SCH, as such transactions will bring more value to the Debtors and their estates than a liquidation, and the successful implementation of a closure of HUH, to minimize further economic loss and ensure quality patient care and safety.

9. I believe the KEIP is necessary and appropriate to preserve the value of the Debtors' assets, ensure quality patient care, continue normal operations with respect to SCH and implement an appropriate closure with respect to HUH. The Debtors have required, and will continue to require, extraordinary services from their executives, officers and certain other key employees during the critical stages of these Chapter 11 cases to achieve the Debtors' restructuring goals. Accordingly, the goals of the KEIP are: (i) to incentivize essential personnel throughout the critical stages of these Chapter 11 Cases; (ii) to consummate a successful sale of STC and to complete a successful closure of HUH; (iii) to reward essential employees for the successful completion of the Debtors' objectives in the Chapter 11 Cases; and (iv) to maximize the value of the Debtors' estates for the benefit of all stakeholders.

10. I believe that if the relief sought in the KEIP Motion is not granted, there is a significant risk that the Participants will not be incentivized to continue to perform and take on the extraordinary tasks necessary to promote the successful completion of the Debtors' restructuring goals of maximizing value for creditors and ensuring quality patient care.

**B.     KEIP Overview**

11. The proposed KEIP is designed to incentivize twenty-five employees – nine senior executives and sixteen non-insider employees (collectively the "**Participants**") each of whom possess significant institutional knowledge and skills that are essential to the Debtors' efforts in these Chapter 11 Cases.

12. Each Participant under the KEIP falls within one of three silos – Philadelphia

Academic Health System (the "**PAHS Participants**"), HUH (the "**HUH Participants**") or SCH (the "**SCH Participants**"), depending on their particular role within the Debtors' organizational structure.

13. Each Participant under the KEIP may receive a total incentive amount (for each Participant, the "**Incentive Payment**"), determined as a percentage of each Participant's base salary. The applicable percentage of base salary for each Participant was determined by the Debtors, with my consultation, based on the relative criticality of each Participant and projected impact on the Debtors' restructuring goals.

14. All Participants, regardless of silo, received twenty-five percent (25%) of the Incentive Payment designated for such Participant prior to the Petition Date as an incentive to perform all of the tasks necessary to facilitate the filing of the Chapter 11 Cases.

15. PAHS Participants will receive the remaining seventy five percent (75%) of the Incentive Payment applicable to each such Participant upon the closing of a sale of SCH or confirmation of a chapter 11 plan for St. Christopher's Healthcare, LLC.

16. HUH Participants will receive the remaining seventy five percent (75%) of the Incentive Payment applicable to each such Participant upon completion of the closure of HUH.

17. STC Participants will receive thirty five percent (35%) of the Incentive Payment applicable to each such Participant upon the signing of an asset purchase agreement with respect to SCH and/or St. Christopher's Healthcare, LLC, and will receive the remaining forty percent (40%) of the Incentive Payment applicable to each such Participant upon consummation of a sale of SCH or confirmation of a chapter 11 plan for St. Christopher's Healthcare, LLC.

18. The sum of all potential Incentive Payments under the Plan is $824,000, equating to, on average, $32,960 per Participant.

19. The Participants will only be eligible to be paid the post-petition portions of their respective Incentive Payments if the Debtors successfully achieve their restructuring goals noted above, which were narrowly based on the particular silo into which each Participant fits and designed to ensure the completion of the Debtors' objectives.

20. Each PAHS Participant, in order to participate in the KEIP, was required to agree to the following conditions: (i) if the PAHS Participant leaves employment with PAHS for any reason prior to October 31, 2019, such PAHS Participant must repay a prorated portion of the prepetition portion of the Incentive Payment; (ii) the PAHS Participant must execute a non-disclosure agreement; (iii) the PAHS Participant must be employed on the applicable trigger date in order to receive the remaining portion of the Incentive Payment; (iv) the PAHS Participant must waive all entitlement to severance payment; and (v) the PAHS Participant will remain an at-will employee of PAHS.

21. Each HUH and STC Participant, in order to participate in the KEIP, was required to agree to the following conditions: (i) the HUH or STC Participant must execute a non-disclosure agreement; (ii) the HUH or STC Participant must be employed on the applicable trigger date in order to receive the remaining portion of the Incentive Payment; (iii) the HUH or STC Participant must waive all entitlement to severance payment; and (iv) the HUH or STC Participant will remain an at-will employee of Center City Healthcare, LLC or St. Christopher's Healthcare, LLC, respectively.

C. **The KEIP is Necessary and Appropriate**

22. In my experience and business judgment, if the KEIP is not approved, there is a significant risk that the Participants will not be incentivized to perform and take on the extraordinary tasks necessary to promote the successful completion of the Debtors' restructuring

goals of maximizing value for creditors and ensuring quality patient care. The Participants provide complex, critical services to the Debtors, and the deterioration of their performance would materially and adversely affect the successful implementation of the Debtors' restructuring goals.

23. I believe that the KEIP has provided, and will continue to provide the Participants with the appropriate incentive to achieve the Debtors' restructuring objectives, thus maximizing the value of the estates for the benefit of all creditors while ensuring the Debtors continue to provide quality patient care.

24. In my business judgment, the KEIP is calibrated to achieve the desired performance, which is to achieve the Debtors' restructuring objectives of: (i) the successful sale of SCH; (ii) the successful closure of HUH; and (iii) ensuring quality patient care at all of the Debtors' facilities. Under the KEIP, the Participants can only obtain an Incentive Payment upon achievement of the particular restructuring goal applicable to such Participant. These targets are directly aligned with the Debtors' objectives in these Chapter 11 Cases. Thus, the KEIP appropriately incentivizes the Participant to achieve the desired performance.

25. Further, the KEIP is an uncertain prospect for each Participant. At the time of each Participant's agreement to the terms of the KEIP, the Debtors did not have (and still do not have) a stalking horse buyer for SCH, and the proposed closure of HUH was and remains an arduous task. The proposed KEIP requires results materially beyond the current status quo. Without an existing stalking horse, the targets set forth in the proposed KEIP are truly challenging objectives.

26. The cost of the KEIP is reasonable in the context of the Debtors' assets, liabilities, and earning potential because the payouts under the proposed KEIP are minimal compared to the

related gains the estates will realize upon the completion of a successful sale and the value of ensuring patient care throughout the process cannot be valued in dollars.

27. Further, in my business judgment, the scope of the KEIP is fair and reasonable because it applies to only a limited subset of the Debtors' most critical employees in positions most integral to the Debtors' restructuring efforts. The Participants play vital roles in both overall operations of the hospitals, and will also play significant roles in promoting a successful sale process and/or closure process with respect to HUH.

28. Finally, the KEIP is consistent with industry standards and is the product of the Debtors' due diligence and consultation with counsel and other advisors. With the Debtors' legal counsel, I reviewed a large number of key employee incentive plans that have been approved by this Court and modelled the KEIP in this case, in large part, those previously approved plans.

29. Although the KEIP may have some retentive effects, the primary goal is to incentivize the Participants to meet certain performance objectives that will maximize recoveries for the estates and parties in interest and ensure quality patient care

30. For all of these reasons, I believe that the KEIP is a sound exercise of the Debtors' business judgment, is necessary and in the best interest of the Debtors and their estates, and the KEIP Motion should be approved.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 15, 2019                                              Respectfully submitted,

*/s/  Allen Wilen*
Allen Wilen
Chief Restructuring Officer