**EXHIBIT C**

**Amendment to DIP Credit Agreement**

**AMENDMENT NO. 1 TO FIRST PRIORITY SECURED PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT**

**THIS AMENDMENT NO. 1 TO FIRST PRIORITY SECURED PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT** (this "Amendment") is made as of August [•], 2019, by and among **ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company, **CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company, **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company, **PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company, **HPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company, **STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company, **SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **TPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company, each as debtors and debtors in possession under Chapter 11 of the Bankruptcy Code, and any additional borrower that may hereafter be added to this Amendment (each individually as a "Borrower" and collectively as "Borrowers"), and **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust (successor-by-assignment to MidCap Financial Trust), individually as a Lender, and as Agent and **MIDCAP FINANCIAL TRUST**, a Delaware statutory trust, as a Lender ("New Lender").

## RECITALS

A.      Borrowers, Agent and the Lenders are party to that certain First Priority Secured Priming Super-Priority Debtor in Possession Credit and Security Agreement dated as of July 15, 2019 (as amended hereby, and as may be further amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lenders agreed to make available to Borrowers a senior secured debtor-in-possession asset-based credit facility, consisting of a $50,000,000 revolving loan commitment.  Capitalized terms used but not defined in this Amendment shall have the meanings that are set forth in the Credit Agreement, as amended hereby.

B.      Borrowers have requested Agent and Lenders amend the Credit Agreement to add a $15,000,000 senior secured debtor-in-possession term loan facility, as contemplated by the Credit Agreement, the proceeds of which will be used to roll up and refinance the Prepetition Term Loan.

C.      Agent and Lenders are willing to provide such term loan facility on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing, the terms and conditions set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders and Borrowers hereby agree as follows:

1.    <u>Amendments to Credit Agreement</u>.  Subject to the terms and conditions of this Amendment, including, without limitation, the conditions to effectiveness set forth in <u>Section 6</u> below:

(a)    <u>Credit Agreement</u>. The Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in "redlined" Credit Agreement attached as <u>Exhibit A</u> hereto (the "<u>Credit Agreement Amendment</u>").

(b)    <u>Annex to Credit Agreement</u>.  Annex A to the Credit Agreement is amended as set forth in the Credit Agreement Amendment.

(c)    <u>Exhibits to Credit Agreement</u>.  Exhibit C to the Credit Agreement is amended, and a new Exhibit D to the Credit Agreement is inserted into the Credit Agreement in proper alphabetical order, as set forth in the Credit Agreement Amendment.

2.    <u>Joinder of New Lender</u>.

(a)    Subject to the satisfaction (or waiver) of the conditions set forth in <u>Section 6</u> hereof, New Lender shall be a Lender with a Term Loan Commitment or who has funded a Term Loan and "Lender" under the Credit Agreement and other Financing Documents as of the First Amendment Effective Date.  New Lender shall be entitled to all the benefits afforded by the Credit Agreement and the other Financing Documents to Lenders, and shall, without limiting the foregoing, benefit equally and ratably from the Guarantees and security interests created by the Security Documents.

(b)    New Lender hereby (i) confirms that (w) it is not a Restricted Person, (x) it has received a copy of this Amendment, the Credit Agreement and the other Financing Documents, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Amendment and to make the Term Loan, (y) it is sophisticated with respect to decisions to make loans similar to those contemplated to be made hereunder and (z) it is experienced in making loans of such type; (ii) agrees that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Financing Documents as are delegated to the Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto and (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

3.    <u>Reaffirmation of Security Interest</u>.  Each Borrower hereby expressly acknowledges and agrees that all Liens granted under the Financing Documents extend to and cover all of the Obligations now existing or hereafter arising including, without limitation, those arising in connection with the Credit Agreement, as amended by this Amendment, upon the terms set forth

in the Credit Agreement, all of which Liens are hereby ratified, reaffirmed, confirmed and approved.

4.     <u>Enforceability</u>.    This Amendment constitutes a valid and binding agreement or instrument of each Credit Party, enforceable against such Credit Party in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.  Each of the agreements, documents and instruments executed in connection herewith to which a Credit Party is a party constitutes a valid and binding agreement or instrument of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

5.     <u>Confirmation of Representations and Warranties</u>.  Each Credit Party represents and warrants to Agent and Lenders that, before and after giving effect to this Amendment:

(a)     The representations, warranties and covenants of each Credit Party contained in the Financing Documents are true, correct and complete on and as of the date hereof, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty is true and correct as of such earlier date.

(b)     The execution and delivery by each Credit Party of this Amendment and the performance by it of the transactions herein contemplated (i) are and will be within its powers, (ii) have been authorized by all necessary action, (iii) are not and will not conflict with or result in any breach or contravention of, or the creation of any Lien under, any Material Contract to which any Credit Party is a party, any Organizational Document of any Credit Party, any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Credit Party or the property of any Credit Party is subject, (iv) will not violate any applicable Law (including, without limitation, any corporation law, limited liability company law or partnership law of the states in which the Credit Parties are organized), and (v) will not result in a limitation on any material licenses, permits or other governmental approvals applicable to the business, operations or properties of any Credit Party.

(c)     No Event of Default or Default has occurred and is continuing as of the date of this Amendment.

6.     <u>Conditions to Effectiveness</u>.  The effectiveness of this Amendment shall be subject to the satisfaction of the following conditions precedent:

(a)      that Agent shall have received a copy of this Amendment, duly executed by Borrowers, Agent and Lenders, in form and substance satisfactory to Agent; and

(b)      that Agent shall have received each of the documents listed on the Checklist attached hereto as <u>Exhibit B</u>, including, without limitation, the Lender's Title Insurance Policies.

7.      Costs, Fees and Expenses.    In consideration of Agent's and each Lender's agreement to enter into this Amendment Borrowers shall be responsible for the payment of all reasonable costs, fees and expenses of Agent's counsel incurred in connection with the preparation of this Amendment and any related documents.

8.      Defenses and Setoffs.    Each Credit Party hereby represents and warrants that as of the date hereof, there are no defenses, setoffs, claims or counterclaims which could be asserted against Agent or the Lenders arising from or in connection with the Credit Agreement or any other Financing Document.

9.      Affirmation.    Except as specifically amended pursuant to the terms hereof, the Credit Agreement and all other Financing Documents (and all covenants, terms, conditions and agreements therein) shall remain in full force and effect, and are hereby ratified and confirmed in all respects by Borrowers. Each Borrower covenants and agrees to comply with all of the terms, covenants and conditions of the Credit Agreement (as amended hereby) and the Financing Documents notwithstanding any prior course of conduct, waivers, releases or other actions or inactions on Agent's or any Lender's part which might otherwise constitute or be construed as a waiver of or agreement to such terms, covenants and conditions.

10.     No Waiver or Novation.    The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of Agent or Lenders, nor constitute a waiver of any provision of the Credit Agreement, the other Financing Documents or any other documents, instruments and agreements executed or delivered in connection with any of the foregoing. Nothing herein is intended or shall be construed as a waiver of any existing Defaults or Events of Default under the Credit Agreement or other Financing Documents or any of Agent's or Lenders' rights and remedies in respect of such Defaults or Events of Default. This Amendment (together with any other documents executed in connection herewith) is not intended to be, nor shall it be construed as, a novation of the Credit Agreement.

11.     Incorporation of Credit Agreement Provisions.    The provisions contained in Section 12.8 (Governing Law; Submission to Jurisdiction) and Section 12.9 (Waiver of Jury Trial) of the Credit Agreement are incorporated herein by reference to the same extent as if reproduced herein in their entirety.

12.     Headings.    Section headings in this Amendment are included for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

13.     Counterparts.    This Amendment may be executed in counterparts, and such counterparts taken together shall be deemed to constitute one and the same instrument. Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto.

14.     Reference to the Effect on the Financing Documents.    Upon the effectiveness of this Amendment, each reference in any Financing Document to "this Agreement," "hereunder," "hereof," "herein" or words of similar import shall mean and be a reference to such Financing Document as modified by this Amendment.

**(SIGNATURES APPEAR ON FOLLOWING PAGES)**

CHICAGO/#3325378.2E

**IN WITNESS WHEREOF**, intending to be legally bound each of the parties have caused this Amendment to be executed under seal the day and year first above mentioned.

**BORROWERS**:  **ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company
**CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company
**PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company
**PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company
**HPS OF PA, L.L.C.**, a Pennsylvania limited liability company
**SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company
**ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company
**SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company
**STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company
**TPS OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company


By:_____
    Allen Wilen
    Chief Restructuring Officer - Finance

*As Chief Restructuring Officer - Finance of each of the above entities and in such capacity, intending by this signature to legally bind each of the above entities*

SIGNATURE PAGE TO AMENDMENT NO. 1 TO FIRST PRIORITY SECURED PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT

**AGENT:**              **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust
(successor-by-assignment to MidCap Financial Trust)


By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:      Apollo Capital Management GP, LLC
Its:      General Partner

By:_____(SEAL)
Maurice Amsellem
Authorized Signatory




**LENDER:**              **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust
(successor-by-assignment to MidCap Financial Trust)


By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By:_____(SEAL)
Maurice Amsellem
Authorized Signatory


SIGNATURE PAGE TO AMENDMENT
NO. 1 TO FIRST PRIORITY SECURED
PRIMING SUPER-PRIORITY DEBTOR IN
POSSESSION CREDIT AND SECURITY
AGREEMENT

**NEW LENDER:**        **MIDCAP FINANCIAL TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By:_____(SEAL)
        Maurice Amsellem
        Authorized Signatory

SIGNATURE PAGE TO AMENDMENT
NO. 1 TO FIRST PRIORITY SECURED
PRIMING SUPER-PRIORITY DEBTOR IN
POSSESSION CREDIT AND SECURITY
AGREEMENT

# <u>EXHIBIT A</u>

## AMENDMENTS TO CREDIT AGREEMENT

(See attached.)

**FIRST PRIORITY SECURED PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT**

**dated as of July 15, 2019**

**by and among**

**CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company, **HPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company, **PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company, **SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company, **ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company, **STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company, **TPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company, and **TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company, each as debtors and debtors in possession under Chapter 11 of the Bankruptcy Code

**each as Borrower and collectively as Borrowers**

**and**

**MIDCAP** ~~FINANCIAL TRUST~~**FUNDING IV TRUST (successor-by-assignment to MidCap Financial Trust)**,

**as Agent and as a Lender**

**and**

**THE ADDITIONAL LENDERS**

**FROM TIME TO TIME PARTY HERETO**



# TABLE OF CONTENTS

**Page**

| ARTICLE 1 | DEFINITIONS | 2 |
|---|---|---|
| Section 1.1 | Certain Defined Terms | 2 |
| Section 1.2 | Accounting Terms and Determinations | ~~36~~**37** |
| Section 1.3 | Other Definitional and Interpretive Provisions | ~~36~~**37** |
| Section 1.4 | Funding and Settlement Currency | ~~37~~**38** |
| ARTICLE 2 | LOANS AND LETTERS OF CREDIT | ~~37~~**38** |
| Section 2.1 | Loans | ~~37~~**38** |
| Section 2.2 | Interest, Interest Calculations and Certain Fees | ~~40~~**43** |
| Section 2.3 | Notes | ~~41~~**44** |
| Section 2.4 | Reserved | ~~41~~**44** |
| Section 2.5 | Reserved | ~~41~~**44** |
| Section 2.6 | General Provisions Regarding Payment; Loan Account | ~~41~~**44** |
| Section 2.7 | Maximum Interest | ~~42~~**45** |
| Section 2.8 | Taxes; Capital Adequacy | ~~43~~**46** |
| Section 2.9 | Appointment of Borrower Representative | ~~47~~**49** |
| Section 2.10 | Joint and Several Liability; Rights of Contribution; Subordination and Subrogation | ~~47~~**50** |
| Section 2.11 | Collections and Lockbox Account | ~~50~~**52** |
| Section 2.12 | Termination; Restriction on Termination | ~~52~~**55** |
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES | ~~53~~**55** |
| Section 3.1 | Existence and Power | ~~53~~**56** |
| Section 3.2 | Organization and Governmental Authorization; No Contravention | ~~53~~**56** |
| Section 3.3 | Binding Effect | ~~54~~**56** |
| Section 3.4 | Capitalization | ~~54~~**56** |
| Section 3.5 | Financial and Project Information | ~~54~~**57** |
| Section 3.6 | Litigation | ~~54~~**57** |
| Section 3.7 | Ownership of Property | ~~55~~**57** |
| Section 3.8 | No Default | ~~55~~**57** |
| Section 3.9 | Labor Matters | ~~55~~**57** |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 3.10 | Regulated Entities | ~~55~~**58** |
| Section 3.11 | Margin Regulations | ~~55~~**58** |
| Section 3.12 | Compliance with Laws; Anti-Terrorism Laws | ~~55~~**58** |
| Section 3.13 | Taxes | ~~56~~**58** |
| Section 3.14 | Compliance with ERISA | ~~56~~**59** |
| Section 3.15 | Consummation of Operative Documents; Brokers | ~~57~~**59** |
| Section 3.16 | Reserved | ~~57~~**59** |
| Section 3.17 | Reserved | ~~57~~**59** |
| Section 3.18 | Compliance with Environmental Requirements; No Hazardous Materials | ~~57~~**59** |
| Section 3.19 | Super-Priority Nature of Obligations and Agent's and Lender's Liens | ~~57~~**60** |
| Section 3.20 | Full Disclosure | ~~57~~**60** |
| Section 3.21 | Interest Rate | ~~58~~**60** |
| Section 3.22 | Subsidiaries | ~~58~~**60** |
| Section 3.23 | Appointment of a Trustee or Examiner; Liquidation | ~~58~~**60** |
| Section 3.24 | Reorganization Matters | ~~58~~**61** |
| ARTICLE 4 | AFFIRMATIVE COVENANTS | ~~58~~**61** |
| Section 4.1 | Financial Statements and Other Reports | ~~58~~**61** |
| Section 4.2 | Payment and Performance of Obligations | ~~60~~**63** |
| Section 4.3 | Maintenance of Existence | ~~61~~**63** |
| Section 4.4 | Maintenance of Property; Payment of Taxes; Insurance | ~~61~~**63** |
| Section 4.5 | Compliance with Laws | ~~64~~**66** |
| Section 4.6 | Inspection of Property, Books and Records; Deposit Accounts | ~~64~~**67** |
| Section 4.7 | Use of Proceeds | ~~64~~**67** |
| Section 4.8 | Reserved | ~~65~~**68** |
| Section 4.9 | Notices of Litigation and Defaults | ~~65~~**68** |
| Section 4.10 | Hazardous Materials; Remediation | ~~65~~**68** |
| Section 4.11 | Reserved | ~~66~~**68** |
| Section 4.12 | Borrowing Base Collateral Administration | ~~66~~**68** |

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 4.13 | Further Assurances | 66**69** |
| Section 4.14 | Reserved | 67**69** |
| Section 4.15 | ~~Power of Attorney~~ | 67**Reserved 69** |
| Section 4.16 | Reserved | 67**70** |
| Section 4.17 | Borrowers' Agreement to Seek to Restrict Any Alleged Rights for Setoff or Recoupment | 67**70** |
| Section 4.18 | Priority and Liens | 68**70** |
| Section 4.19 | Sale Benchmarks | 69**71** |
| ARTICLE 5 | NEGATIVE COVENANTS | 70**72** |
| Section 5.1 | Debt; Contingent Obligations | 70**72** |
| Section 5.2 | Liens | 70**72** |
| Section 5.3 | Distributions | 70**72** |
| Section 5.4 | Restrictive Agreements | 71**73** |
| Section 5.5 | Payments and Modifications of Subordinated Debt | 71**73** |
| Section 5.6 | Consolidations and Mergers; Sales of Assets; Change in Control | 71**74** |
| Section 5.7 | Purchase of Assets, Investments | 72**74** |
| Section 5.8 | Transactions with Affiliates | 72**75** |
| Section 5.9 | Modification of Organizational Documents | 73**75** |
| Section 5.10 | Modification of Certain Agreements | 73**75** |
| Section 5.11 | Conduct of Business | 73**75** |
| Section 5.12 | Lease Payments | 73**75** |
| Section 5.13 | Limitation on Sale and Leaseback Transactions | 73**76** |
| Section 5.14 | Deposit Accounts and Securities Accounts; Payroll and Benefits Accounts | 73**76** |
| Section 5.15 | Compliance with Anti-Terrorism Laws | 74**77** |
| Section 5.16 | Transfers to Non-Debtor Credit Parties | 75**77** |
| Section 5.17 | Insurance Captive | 75**77** |
| Section 5.18 | ~~Interim Order;~~ Final Order, Administrative Expense Priority; Payments | 75**77** |
| Section 5.19 | Bankruptcy Actions | 76**78** |

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| Section 5.20 | Superpriority Claims | | ~~76~~**79** |
| Section 5.21 | Restrictions on Use of Proceeds | | ~~76~~**79** |
| ARTICLE 6 | RESERVED | | ~~77~~**79** |
| ARTICLE 7 | CONDITIONS | | ~~77~~**79** |
| Section 7.1 | Conditions to Closing | | ~~77~~**79** |
| Section 7.2 | Conditions to Each Loan | | ~~79~~**80** |
| Section 7.3 | Searches | | ~~80~~**81** |
| Section 7.4 | Post Closing Requirements | | ~~80~~**81** |
| ARTICLE 8 | RESERVED | | 81 |
| ARTICLE 9 | SECURITY AGREEMENT | | 81 |
| Section 9.1 | Grant of Security Interest | | 81 |
| Section 9.2 | Representations and Warranties and Covenants Relating to Collateral | | 81 |
| Section 9.3 | Financing Statements | | 84 |
| ARTICLE 10 | EVENTS OF DEFAULT | | ~~84~~**85** |
| Section 10.1 | Events of Default | | ~~84~~**85** |
| Section 10.2 | Acceleration and Suspension or Termination of Revolving **Loan Commitment and Term** Loan Commitment | | 89 |
| Section 10.3 | UCC Remedies | | 90 |
| Section 10.4 | Terminated Use of Cash Collateral | | ~~91~~**92** |
| Section 10.5 | Default Rate of Interest | | 92 |
| Section 10.6 | Setoff Rights | | 92 |
| Section 10.7 | Application of Proceeds | | 92 |
| Section 10.8 | Waivers | | 93 |
| Section 10.9 | Reserved | | ~~94~~**95** |
| Section 10.10 | Marshalling; Payments Set Aside | | ~~94~~**95** |
| ARTICLE 11 | AGENT | | 95 |
| Section 11.1 | Appointment and Authorization | | 95 |
| Section 11.2 | Agent and Affiliates | | 95 |
| Section 11.3 | Action by Agent | | ~~95~~**96** |
| Section 11.4 | Consultation with Experts | | ~~95~~**96** |

**TABLE OF CONTENTS**
(continued)

|  |  |  | **Page** |
|---|---|---|---|
| Section 11.5 | Liability of Agent | | ~~95~~**96** |
| Section 11.6 | Indemnification | | 96 |
| Section 11.7 | Right to Request and Act on Instructions | | ~~96~~**97** |
| Section 11.8 | Credit Decision | | 97 |
| Section 11.9 | Collateral Matters | | 97 |
| Section 11.10 | Agency for Perfection | | 97 |
| Section 11.11 | Notice of Default | | ~~97~~**98** |
| Section 11.12 | Assignment by Agent; Resignation of Agent; Successor Agent | | 98 |
| Section 11.13 | Payment and Sharing of Payment | | 99 |
| Section 11.14 | Right to Perform, Preserve and Protect | | ~~101~~**102** |
| Section 11.15 | Additional Titled Agents | | 102 |
| Section 11.16 | Amendments and Waivers | | 102 |
| Section 11.17 | Assignments and Participations | | 103 |
| Section 11.18 | Funding and Settlement Provisions Applicable When Non-Funding Lenders Exist | | 106 |
| Section 11.19 | Buy-Out Upon Refinancing | | 107 |
| Section 11.20 | Lender's Rights to Offset, Set-Off | | 107 |
| Section 11.21 | Definitions | | ~~107~~**108** |
| ARTICLE 12 | MISCELLANEOUS | | ~~108~~**109** |
| Section 12.1 | Survival | | ~~108~~**109** |
| Section 12.2 | No Waivers | | ~~108~~**109** |
| Section 12.3 | Notices | | 109 |
| Section 12.4 | Severability | | ~~109~~**110** |
| Section 12.5 | Headings | | ~~109~~**110** |
| Section 12.6 | Confidentiality | | 110 |
| Section 12.7 | Waiver of Consequential and Other Damages | | ~~110~~**111** |
| Section 12.8 | GOVERNING LAW; SUBMISSION TO JURISDICTION | | ~~110~~**111** |
| Section 12.9 | WAIVER OF JURY TRIAL | | ~~111~~**112** |
| Section 12.10 | Publication; Advertisement | | 112 |
| Section 12.11 | Counterparts; Integration | | ~~112~~**113** |

# TABLE OF CONTENTS
(continued)

Page

Section 12.12    No Strict Construction .................................... ~~112~~**113**

Section 12.13    Time .................................... ~~112~~**113**

Section 12.14    Lender Approvals .................................... 113

Section 12.15    Expenses; Indemnity .................................... 113

Section 12.16    Reinstatement .................................... ~~114~~**115**

Section 12.17    Successors and Assigns .................................... 115

Section 12.18    USA PATRIOT Act Notification .................................... 115

Section 12.19    DIP Orders .................................... 115

CHICAGO/#~~3334319.1~~3334319.3

**FIRST PRIORITY SECURED PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT**

      **THIS FIRST PRIORITY SECURED PRIMING SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT** (as the same may be amended, supplemented, restated or otherwise modified from time to time, this "**Agreement**") is dated as of July 15, 2019 by and among **CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company ("**Hahnemann Operator**"), **HPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company ("**Parent Borrower**"), **PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company ("**Practice Parent Borrower**"), **SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company ("**St. Christopher Operator**"), **ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company, **STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company, **TPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company, and **TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company, each as debtors and debtors in possession under Chapter 11 of the Bankruptcy Code (St. Christopher Operator, Hahnemann Operator, Parent Borrower, Practice Parent Borrower and the other entities listed in this Preamble, individually as a "**Borrower**" and collectively as the "**Borrowers**"), **MIDCAP** ~~**FINANCIAL TRUST**~~**FUNDING IV TRUST (successor-by-assignment to MidCap Financial Trust)**, a Delaware statutory trust, individually as a Lender, and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender.

<u>RECITALS</u>

      WHEREAS, on June 30, 2019 and July 1, 2019 (together, the "**Petition Date**"), each of the Debtors (as defined below) filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") for relief, and commenced jointly administered cases (the "**Bankruptcy Cases**") under the Bankruptcy Code and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code; and

      WHEREAS, pursuant to that certain Credit and Security Agreement dated as of January 11, 2018 (as amended on September 20, 2018) among the Borrowers, the Prepetition Lenders, and Prepetition Agent (the "**Prepetition Credit Agreement**"), the Prepetition Lenders made available to Borrowers a $120,000,000 senior secured asset-based credit facility.

      WHEREAS, as of **the** Petition Date, the Prepetition Lenders (as defined below) are owed $37,456,342.37 in revolving loan principal obligations and $20,000,000 in term loan principal obligations, plus interest, fees, costs and expenses and all other "Obligations" under and as defined in the Prepetition Credit Agreement (as defined below) (the "**Prepetition Obligations**");

WHEREAS, as a result of the filing of the Bankruptcy Cases, the Revolving Loan Commitment under the Prepetition Credit Agreement was terminated and all Prepetition Obligations, including, without limitation: (a) the remaining installment of the Revolving Loan Commitment origination fee in the amount of $500,000 and (b) the remaining installment of the Term Loan origination fee in the amount of $500,000, became immediately and automatically due and payable (the "**Outstanding Prepetition Fees**");

WHEREAS, in connection with the Bankruptcy Cases, (a) the Debtors have requested that the Lenders provide them with a senior secured debtor-in-possession asset-based credit facility, consisting of a $50,000,000 revolving loan commitment, on the terms and conditions set forth herein and pursuant to sections 364(c)(1), (2) and (3) and section 364(d) of the Bankruptcy Code, the proceeds of which shall be used as set forth herein and in the DIP Orders; and

WHEREAS, ~~as described more fully in the Interim DIP Order, it is contemplated that~~**on the First Amendment Effective Date,** this Agreement ~~will be~~**is** amended ~~or amended and restated~~ to incorporate a $15,000,000 term loan facility, the proceeds of which will be used to roll up and refinance the Term Loan outstanding under the Prepetition Credit Agreement (the "**Prepetition Term Loan**") ~~upon satisfaction of the conditions described more fully in the Interim DIP Order.~~**. Such roll up and refinance of the Prepetition Term Loan occurred pursuant to the Final DIP Order and the First Amendment.**

**NOW, THEREFORE**, each Lender is willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein.

AGREEMENT

Accordingly, the parties hereto agree as follows:

**ARTICLE 1 DEFINITIONS**

**Section 1.1    Certain Defined Terms.**    The following terms have the following meanings:

"**Acceleration Event**" means the occurrence of an Event of Default (a) in respect of which Agent has declared all or any portion of the Obligations to be immediately due and payable pursuant to Section 10.2, (b) pursuant to Section 10.1(a), and in respect of which Agent has suspended or terminated the Revolving Loan Commitment pursuant to Section 10.2, and/or (c) pursuant to Sections 10.1(o) through Section 10.1(ll).

"**Account Debtor**" means "account debtor", as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

"**Accounts**" means, collectively, (a) any right to payment of a monetary obligation, whether or not earned by performance, (b) without duplication, any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "health-care-insurance receivables" (as defined in the UCC), any "payment intangibles" (as defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, whether or not earned by performance, (c) all

CHICAGO/#~~3334319.1~~3334319.3

accounts, "general intangibles" (as defined in the UCC), Intellectual Property, rights, remedies, Guarantees, "supporting obligations" (as defined in the UCC), "letter-of-credit rights" (as defined in the UCC) and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under the Financing Documents in respect of the foregoing, (d) all information and data compiled or derived by any Borrower or to which any Borrower is entitled in respect of or related to the foregoing, and (e) all proceeds of any of the foregoing.

"**Acquisition**" means the acquisition pursuant to the Acquisition Agreement (i) by St. Christopher Operator, Hahnemann Operator, Physicians Clinical, and Practice Parent Borrower of (a) substantially all of the personal property assets that are primarily or exclusively used or held for use in connection with the operation of the Projects listed on Schedule 1.1B, (b) all of the outstanding equity securities of certain other borrowers in an equity sale transaction and (c) certain related businesses referred to, collectively, as the "Other Businesses" in the Acquisition Agreement and (ii) by Affiliates of the Borrowers of the "Owned Real Property" (as defined in the Acquisition Agreement) and certain leases and other assets as described in the Acquisition Agreement.

"**Acquisition Agreement**" means that certain Asset Sale Agreement by and among Tenet Sellers, St. Christopher Operator, Hahnemann Operator, Parent Borrower, Physicians Clinical, and Practice Parent Borrower and the other Purchasers listed on Exhibit A-2 thereto and Holdings, as Purchasers Representative, dated August 31, 2017, and all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Adequate Protection Payments**" shall have the meaning assigned to such term in Section 4.7.

"**Adjusted Medicaid Managed Care Supplemental Payments**" means the aggregate accrued amount of supplemental Medicaid managed care payments owed to the Operator Borrowers on account of serving a disproportionate share of medically needy Pennsylvania Medicaid beneficiaries *less* the aggregate amount of unpaid provider assessments owed by the Operator Borrowers.

"**Affiliate**" means, with respect to any Person, (a) any Person that directly or indirectly controls such Person, (b) any Person which is controlled by or is under common control with such controlling Person, and (c) each of such Person's (other than, with respect to any Lender, any Lender's) officers or directors (or Persons functioning in substantially similar roles) and the spouses, parents, descendants and siblings of such officers, directors or other Persons; provided that in no event shall (i) Harrison Street Real Estate, LLC or any of its Affiliates (other than any entity in which Holdings has a direct or indirect equity interest that otherwise meets the definition of an Affiliate) be an Affiliate of any Credit Party, (ii) Avanti Healthcare Holdings, LLC, Avanti Health System, LLC, Avanti Health System Holding I, LLC or any Person controlled thereby be an Affiliate of any Credit Party, or (iii) HPP be an Affiliate of any Credit Party. As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote ten percent (10%) or more of any class of voting securities of

CHICAGO/#3334319.13334319.3

such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Affiliate Leases**" means the leases and subleases described on Schedule 1.1A, and all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Agent**" means MCF, in its capacity as administrative agent for itself and for Lenders hereunder, as such capacity is established in, and subject to the provisions of, Article 11, and the successors of MCF in such capacity.

"**Allowed Fees**" means, in each case with respect to the Bankruptcy Cases, fees and reimbursement for expenses of professionals retained by the Borrowers and/or a statutory committee of unsecured creditors**the Committee** allowed or payable pursuant to an order of the Bankruptcy Court, including, without limitation, pursuant to monthly fee statements, that has not been vacated, stayed or appealed, under sections 327, 328 or 1103 of the Bankruptcy Code.

"**Anti-Terrorism Laws**" means any Laws relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by OFAC.

"**Applicable Margin**" means, with respect to (a) Revolving Loans that, by the terms of this Agreement, bear interest based upon the Base Rate, 1.75**1.32**% and (b) all other Revolving Loans and all other Obligations), 4.25%. **(other than the Term Loan), 4.25%, (c) the Term Loan, bearing interest, by the terms of this Agreement, based upon the Base Rate, 5.50% and (d) the Term Loan bearing interest, by the terms of this Agreement, based on the LIBOR Rate, 10.00%.**

"**Applicable Settlement Date**" means the first date upon which payment would become due pursuant to the statutory authority giving rise to the obligations to make a Supplemental Payment.  For the avoidance of doubt, the first date upon which payment would be come due is the date determined by the relevant statutory authority, whether or not that date changes as a result of regulatory changes affecting the scheduling of such payments or otherwise.

"**Bankruptcy Cases**" has the meaning set forth in the recitals hereto, and includes all successor or converted cases under the Bankruptcy Code in respect thereof.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statutes thereto.

"**Bankruptcy Court**" has the meaning specified therefor in the recitals to this Agreement.

"**Base LIBOR Rate**" means, for each Interest Period, the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next

1/100%), to be the rate at which Dollar deposits (for delivery on the first day of such Interest Period or, if such day is not a Business Day on the preceding Business Day) in the amount of $1,000,000 are offered to major banks in the London interbank market on or about 11:00 a.m. (Eastern time) two (2) Business Days prior to the commencement of such Interest Period, for a term comparable to such Interest Period, which determination shall be conclusive in the absence of manifest error.

"**Base Rate**" means a per annum rate of interest equal to the greater of (a) 5.0% per annum and (b) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate; *provided, however,* that Agent may, upon prior written notice to Borrower, choose a reasonably comparable index or source to use as the basis for the Base Rate.

"**Blocked Person**" means any Person:  (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (b) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (c) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, or (e) that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list or is named as a "listed person" or "listed entity" on other lists made under any Anti-Terrorism Law.

"**Borrower**" and "**Borrowers**" mean the entity(ies) described in the first paragraph of this Agreement.

"**Borrower Representative**" means Parent Borrower, in its capacity as Borrower Representative pursuant to the provisions of Section 2.9, or any successor Borrower Representative selected by Borrowers and approved by Agent.

"**Borrowing Base**" means:

(a)    the product of (i) eighty-five percent (85%) *multiplied by* (ii) the aggregate net amount at such time of the Eligible Accounts; *plus*

(b)    the product of (i) eighty-five percent (85%) *multiplied by* (ii) aggregate amount of Eligible Supplemental Payments; *minus*

(c)    until the entry of the Final Order, $2,000,000; *minus*

**(c)**    (d) the Carve-Out Reserve Amount; *minus*

**(d)**    (e) the Medicare Reserve Amount; *minus*

5

(f) until the entry of the Final Order and the repayment of the "Revolving Loan Outstandings" under the Prepetition Credit Agreement, a reserve equal to the then-current "Revolving Loan Outstandings" under Prepetition Credit Agreement; *minus*

(e) (g) the amount of any other reserves and/or adjustments expressly provided for in this Agreement.

"**Borrowing Base Certificate**" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit B hereto.

"**Broad Street**" means, individually and collectively, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC.

"**Broad Street Casualty Proceeds**" means all proceeds of insurance resulting from any loss at any Broad Street Facility or of any a condemnation or taking pursuant to the lawful exercise of the power of eminent domain of all or any portion of a Broad Street Facility.

"**Broad Street Collateral**" means all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of Agent and Lenders, pursuant to the Broad Street Guaranty and the Broad Street Mortgages.

"**Broad Street Facility**" means, individually and collectively, those certain hospital facilities, medical office buildings, parking lots and vacant land owned by Broad Street.

"**Broad Street Financing Documents**" means the Broad Street Guaranty and the Broad Street Mortgages.

"**Broad Street Guaranty**" means that certain Guaranty and Security Agreement dated as of the Closing Date, executed and delivered by Broad Street to Agent, guaranteeing payment and performance of, and providing security for, the Obligations.

"**Broad Street Mortgages**" means those certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filings dated as of the Closing Date, and all documents related thereto or executed in connection therewith, from Broad Street in favor of Agent with respect to the Broad Street Facility.

"**Business Day**" means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Washington, D.C. and New York City are authorized by law to close.

"**Capital Lease**" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital (or finance) lease on the balance sheet of such person.

"**Captive Insureds**" means those Borrowers identified in writing to Agent from time to time as being insured by a commercial general liability and professional liability policy provided by the Insurance Captive.

"**Carve-Out**" has the meaning set forth in the DIP Orders.

"**Carve-Out Reserve Amount**" means $2,500,000.

"**Cease and Desist Letter**" means that certain letter dated June 27, 2019 from the Commonwealth of Pennsylvania, Department of Health to Parent Borrower relating to certain actions taken by or on behalf of Hahnemann Operator to close the Hahnemann Project and the certain Common Pleas Court Order entered July 8, 2019.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 *et seq.*, as the same may be amended from time to time.

"**Change in Control**" means any of the following:  (a) with respect to any Borrower, any change in the legal or beneficial ownership of the capital stock, partnership interests or membership interests, which would result in any Person acquiring thirty percent (30%) or more of any class of stock, partnership interest or membership interest of such Borrower; (b) with respect to any Borrower, any change in the legal or beneficial ownership or control of the outstanding voting equity interests of the applicable Person necessary at all times to elect a majority of the board of directors (or similar governing body) of each such Borrower and to direct the management policies and decisions of such Borrower; (c) with respect to any Subsidiary of any Borrower, unless otherwise permitted hereunder, the applicable Borrower shall cease to, directly or indirectly, own and control one hundred percent (100%) of each class of the outstanding equity interests of such Subsidiary; and (d) any "Change of Control", "Change in Control", or terms of similar import under any Subordinated Debt Document.

"**Clinically Integrated Network Entities**" means Physicians Clinical and PPN Philadelphia.

"**Closing Date**" shall mean the date on which all of the conditions set forth in Section 7.1 have been satisfied or waived.

"**CMS**" means the federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration), and any successor Governmental Authority.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of Agent and Lenders, pursuant to this Agreement and the Security Documents, including, without limitation, all of the property described in Schedule 9.1 hereto.

"**Commitment Annex**" means Annex A to this Agreement.

"**Commitment Expiry Date**" means the earlier to occur of (i) twelve (12) months following the Closing Date and (ii) a DIP Facility Termination Event.

"**Committee**" **means the** statutory committee of unsecured creditors **that was appointed in the Bankruptcy Cases on July 15, 2019.**

"**Compliance Certificate**" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit A hereto.

"**Confirmation Date**" means the date on which the Confirmation Order is entered in the docket on the Bankruptcy Court.

"**Confirmation Order**" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Agent, confirming the Plan of Liquidation.

"**Conifer Agreement**" means that certain Master Services Agreement dated as of January 11, 2018 by and between Conifer Revenue Cycle Solutions, LLC and Parent Borrower, as modified prior to the Closing Date.

"**Contingent Obligation**" means, with respect to any Person, any direct or indirect liability of such Person: (a) with respect to any Debt of another Person (a "**Third Party Obligation**") if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such Third Party Obligation that such Third Party Obligation will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such Third Party Obligation will be protected, in whole or in part, against loss with respect thereto; (b) with respect to any undrawn portion of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for the reimbursement of any drawing; (c) under any Swap Contract, to the extent not yet due and payable; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for any obligations of another Person pursuant to any Guarantee or pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so Guaranteed or otherwise supported or, if not a fixed and determinable amount, the maximum amount so Guaranteed or otherwise supported.

"**Controlled Group**" means all members of any group of companies and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with any Borrower, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Credit Exposure**" means, at any time, any portion of the Revolving Loan Commitment **or Term Loan Commitment** that remains outstanding; provided, however, that no Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a written claim with respect thereto.

"**Credit Party**" means any Guarantor under a Guarantee of the Obligations or any part thereof, any Borrower and any other Person (other than Agent, a Lender or a Participant), whether now existing or hereafter acquired or formed, that becomes obligated as a borrower, guarantor, surety, indemnitor, pledgor, assignor or other obligor under any Financing Document; and "**Credit Parties**" means all such Persons, collectively.  For purposes of clarity, the Credit Parties include Debtors and the Non-Debtor Credit Parties.

"**Debt**" of a Person means at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the Ordinary Course of Business, (d) all obligations of such Person with respect to Capital Leases of such Person, (e) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (f) all equity securities of such Person subject to repurchase or redemption otherwise than at the sole option of such Person, (g) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (h) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (i) all Debt of others Guaranteed by such Person; (j) off-balance sheet liabilities; (k) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the Ordinary Course of Business; and (l) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including, without limitation, any Swap Contract, whether entered into for hedging or speculative purposes.  Without duplication of any of the foregoing, Debt of Borrowers shall include any and all Loans.

"**Debtor**" or "**Debtors**", as the case may be, means a Borrower or the Borrowers, as the case may be.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Deficiency Amount**" has the meaning set forth in Section 2.10(e).

"**Deposit Account**" means a "deposit account" (as defined in Article 9 of the UCC), an investment account, or other account in which funds are held or invested for credit to or for the benefit of any Borrower.

"**Deposit Account Control Agreement**" means an agreement, in form and substance reasonably satisfactory to Agent, among Agent, any Borrower and each financial institution in which such Borrower maintains a Deposit Account, which agreement provides that (a) such financial institution shall comply with instructions originated by Agent directing disposition of the funds in such Deposit Account without further consent by the applicable Borrower, and (b) such financial institution shall agree that it shall have no Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of usual and customary service fees and returned items for which Agent has been given value, in each

9

such case expressly consented to by Agent, and containing such other terms and conditions as Agent may reasonably require, including as to any such agreement pertaining to any Lockbox Account, providing that such financial institution shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account all funds received or deposited into such Lockbox or Lockbox Account.

"**Deposit Account Restriction Agreement**" means an agreement, in form and substance reasonably satisfactory to Agent, among Agent, a Borrower and each bank in which such Borrower maintains a Deposit Account and into which Deposit Account proceeds of Accounts from Governmental Account Debtors are paid directly by the Governmental Account Debtor, and which agreement provides that (a) such bank shall not enter into an agreement with respect to such Deposit Account pursuant to which the bank agrees to comply with instructions originated by any Person, other than the Borrower that owns the Deposit Account, directing disposition of the funds in such Deposit Account, and (b) such bank shall agree that it shall have no Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of usual and customary service fees and returned items for which Agent has been given value, in each such case expressly consented to by Agent, and containing such other terms and conditions as Agent may require, including as to any such agreement pertaining to any Lockbox Account, providing that such bank shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account and/or a Lockbox Account subject to a Deposit Account Control Agreement (as Agent shall elect and direct at the time such agreement is signed) all funds received or deposited into such Lockbox Account and associated Lockbox unless the applicable Borrower shall otherwise instruct the bank in writing, subject to the limitations set forth in the Deposit Account Restriction Agreement and the other Financing Documents.

"**DIP Budget**" shall mean a statement of the Debtors' operating cash flow on a weekly basis for the period of thirteen weeks commencing with the calendar week during which the Closing Date occurs containing line items of sufficient detail and in substantially the form attached as Exhibit E to this Agreement.  As used herein, "**DIP Budget**" shall initially refer to the budget attached as Exhibit E to this Agreement and, thereafter, the most recent DIP Budget delivered by the Borrower in accordance with Section 4.1(b).

"**DIP Budget Variance Report**" shall mean a report certified by a Responsible Officer, delivered in accordance with Section 4.1(b)(i) showing (a) the actual disbursements on a line item basis for each period since the Closing Date as of the end of the week immediately preceding the week during which such DIP Budget Variance Report is delivered and (b) the numerical difference between total disbursements for such period to total disbursements for such period as set forth in the DIP Budget then in effect on a rolling one-week and cumulative basis (any such difference, a "**Variance**").

"**DIP Facility**" shall mean the revolving credit facility provided by the Lenders pursuant to this Agreement on or after the Closing Date.

"**DIP Facility Termination Event**" means the termination of the DIP Facility by Agent, in its sole discretion, based upon any one of the following events:

10

(i)      the occurrence of an Event of Default;

(ii)     the indefeasible payment in full of all Obligations;

(iii)    the Liquidation Effective Date;

(iv)    such other events allowing for the termination of the DIP Facility by Agent, as set forth in the DIP Orders; **and**

(v)     ~~failure of Borrowers to obtain the entry of a Final Order on or before the date that is thirty (30) days after the entry of the Interim Order; and(vi)~~     the failure to repay the DIP Facility and any other Obligations (including Prepetition Obligations) owing to Agent and Lenders, through the sale of the Borrowers' business or on a refinancing of such Obligations on or before October 14, 2019.

"**DIP Orders**" means the Interim Order or, when applicable, the Final Order.

"**Distribution**" means as to any Person, (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in such Person (except those payable solely in its equity interests of the same class), (b) any payment on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in such Person or any claim respecting the purchase or sale of any equity interest in such Person, or (ii) any option, warrant or other right to acquire any equity interests in such Person, (c) any management fees, salaries, compensation or other fees or payments to any Person holding an equity interest in a Borrower or an Affiliate of a Borrower, (d) any lease or rental payments to an Affiliate of a Borrower (other than fixed rent payments, escrow payments, reserve deposits or other impounds made pursuant to an Affiliate Lease (but not any performance-based rent, incentive rent, bonus rent or other rent that fluctuates (or the requirement to pay such rent fluctuates) based on the cash flow from the operations of the real property subject to such lease)), or (e) repayments of Debt held by any Person holding an equity interest in a Borrower or an Affiliate of a Borrower, unless permitted under and made pursuant to a Subordination Agreement applicable to such loans or other indebtedness.

"**Dollars**" or "**$**" means the lawful currency of the United States of America.

"**DNFB Accounts**" means "discharged not final bill" Accounts in respect of patients who have been discharged from a Project, but for which a final bill has not yet been issued with respect to medical and health care services provided to such patient.

"**DSH Income**" means the payments made to an Operator Borrower by the United States government through Medicare and Medicaid under its Disproportionate Share Hospital programs

"**Eligible Account**" means, subject to the criteria below, an account receivable of a Borrower, whether arising Prepetition or Postpetition, which was generated in the Ordinary Course of Business, which was generated originally in the name of a Borrower and not acquired via assignment or otherwise, and which Agent, in its good faith credit judgment and discretion, deems to be an Eligible Account.  The net amount of an Eligible Account at any time shall be (a) the face amount of such Eligible Account as originally billed *minus* all cash collections and other

11

proceeds of such Account received from or on behalf of the Account Debtor thereunder as of such date and any and all returns, rebates, discounts (which may, at Agent's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time, and (b) adjusted by applying percentages (known as "**liquidity factors**") by payor and/or payor class based upon the applicable Borrower's actual recent collection history for each such payor and/or payor class in a manner consistent with Agent's underwriting practices and procedures.    Upon two (2) Business Days advanced written notice to the Borrower Representative, such liquidity factors may be adjusted by Agent from time to time as warranted by Agent's underwriting practices and procedures and using Agent's good faith, commercially reasonable credit judgment.  Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

(a)    the Account remains unpaid more than one hundred and eighty (180) days past the claim or invoice date (but in no event more than two hundred and ten (210) days after the applicable goods or services have been rendered or delivered);

(b)    the Account is subject to any defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment of any kind (but only to the extent of such defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment), or the applicable Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)    if the Account arises from the sale of goods, any part of any goods the sale of which has given rise to the Account has been returned, rejected, lost, or damaged (but only to the extent that such goods have been so returned, rejected, lost or damaged);

(d)    if the Account arises from the sale of goods, the sale was not an absolute, bona fide sale, or the sale was made on consignment or on approval or on a sale-or-return or bill-and-hold or progress billing basis, or the sale was made subject to any other repurchase or return agreement, or the goods have not been shipped to the Account Debtor or its designee or the sale was not made in compliance with applicable Laws;

(e)    if the Account arises from the performance of services, the services have not actually been performed or the services were undertaken in violation of any law or the Account represents a progress billing for which services have not been fully and completely rendered; provided that such Account shall not be deemed to represent a progress billing to the extent the relevant Account Debtor adjudicates interim invoices for recurring treatment;

(f)    the Account is subject to a Lien other than a Permitted Lien, or Agent does not have a Lien on such Account;

(g)    the Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment, unless such Chattel Paper or Instrument has been delivered to Agent;

(h)     the Account Debtor is an Affiliate or Subsidiary of a Credit Party, or if the Account Debtor holds any Debt of a Credit Party;

(i)     more than twenty percent (20%) of the aggregate balance of all Accounts owing from the Account Debtor obligated on the Account are ineligible under subclause (a) above (in which case all Accounts from such Account Debtor shall be ineligible); provided that for purposes of this subclause (i), each contract with a Third Party Payor shall be deemed to represent an individual Account Debtor;

(j)     without limiting the provisions of clause (i) above, fifty percent (50%) or more of the aggregate unpaid Accounts from the Account Debtor obligated on the Account are not deemed Eligible Accounts under this Agreement for any reason;

(k)     the total unpaid Accounts of the Account Debtor obligated on the Account exceed twenty-five percent (25%) of the net amount of all Eligible Accounts owing from all Account Debtors (but only the amount of the Accounts of such Account Debtor exceeding such twenty-five percent (25%) limitation shall be considered ineligible); provided that for purposes of this subclause (k), each contract with a Third Party Payor shall be deemed to represent an individual Account Debtor;

(l)     any covenant, representation or warranty contained in the Financing Documents with respect to such Account has been breached in any respect;

(m)     the Account is unbilled or has not been invoiced to the Account Debtor in accordance with the procedures and requirements of the applicable Account Debtor; provided, however, that:

(i)     subject in each case to the satisfaction of the other criteria set forth in this definition of Eligible Accounts, a DNFB Account shall be permitted to be included in the Borrowing Base as an Eligible Account for a period ending on the date that is thirty (30) days after the date on which the patient that is the subject of such Account was discharged for all other DNFB Accounts;

(ii)     subject in each case to the satisfaction of the other criteria set forth in this definition of Eligible Accounts, an In-house Unbilled Account shall be permitted to be included in the Borrowing Base as an Eligible Account for a period ending on the date that is thirty (30) days after the date on which the services giving rise to such Account were rendered; and

(iii)     all Accounts that are unbilled or not invoiced shall be properly recorded on Borrowers' accounting systems at all times and billed or invoiced to the applicable Account Debtor in Borrower's Ordinary Course of Business;

(n)     except for Accounts owed by Medicare, Medicaid or TRICARE programs, the Account is an obligation of an Account Debtor that is the federal, state or local government or any political subdivision thereof, unless Agent has agreed to the contrary in writing and Agent has received from the Account Debtor the acknowledgement of Agent's notice of assignment of such obligation pursuant to this Agreement;

CHICAGO/#3334319.13334319.3

(o)      the Account is an obligation of an Account Debtor that has suspended business, made a general assignment for the benefit of creditors, is unable to pay its debts as they become due or as to which a petition has been filed (voluntary or involuntary) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or the Account is an Account as to which any facts, events or occurrences exist which could reasonably be expected to impair the validity, enforceability or collectibility of such Account or materially reduce the amount payable or materially delay payment thereunder;

(p)      the Account Debtor has its principal place of business or executive office outside the United States;

(q)      the Account is payable in a currency other than United States dollars;

(r)      the Account Debtor is an individual;

(s)      within thirty (30) days after the Account Debtor to which such Account relates becomes a new Account Debtor of a Borrower, the Borrower owning such Account has not signed and delivered to Agent notices, in the form requested by Agent, directing the Account Debtors to make payment to the applicable Lockbox and/or Lockbox Account;

(t)      the Account includes late charges or finance charges (but only such portion of the Account shall be ineligible);

(u)      the Account arises out of the sale of any Inventory upon which any other Person holds, claims or asserts a Lien;

(v)      the Account is a Supplemental Payment; or

(w)      the Account or Account Debtor fails to meet such other specifications and requirements which may from time to time be established by Agent in its good faith, commercially reasonable credit judgment and discretion.

"**Eligible Supplemental Payments**" means, Supplemental Payments owing to an Operator Borrower which Agent, in its good faith credit judgment and discretion, deems to be an Eligible Supplemental Payment.   Without limiting the generality of the foregoing, no Supplemental Payment shall be an Eligible Supplemental Payment if:

(a)      (i) such Supplemental Payment remains unpaid for more than sixty (60) days after such Supplemental Payment accrues (or, solely with respect to Adjusted Medicaid Managed Care Supplemental Payments, more than ninety (90) days after such Supplemental Payment accrues); (ii) such Supplemental Payment is unpaid as of the Applicable Settlement Date or (iii) such Supplemental Payment has been written off the books of such Borrower or otherwise designated as uncollectible by such Borrower;

(b)      such Supplemental Payment is subject to any defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment of any kind (but only to the extent of such defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment), or the applicable

14

Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)     such Supplemental Payment is subject to a Lien other than a Permitted Lien, or Agent does not have a Lien on such Supplemental Payment;

(d)     any covenant, representation or warranty contained in the Financing Documents with respect to such Supplemental Payment has been breached in any respect;

(e)     Agent has not received from the Account Debtor the acknowledgement of Agent's notice of assignment of such obligation pursuant to this Agreement, to the extent such acknowledgment is requested by Agent;

(f)     such Supplemental Payment is payable in a currency other than United States dollars;

(g)     the amount of such Supplemental Payment, when added to all other Supplemental Payments of the same type earned by such Operator Borrower during the current Pennsylvania budget year, exceeds any aggregate cap on such type of Payments that can be paid to such Operator Borrower during such budget year (but only the amount of such Supplemental Payment in excess of such cap amount shall be ineligible); and

(h)     such Supplemental Payment or Account Debtor fails to meet such other specifications and requirements which may from time to time be established by Agent in its good faith, commercially reasonable credit judgment and discretion.

"**Environmental Laws**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, pertaining to the environment, natural resources, pollution, health (including any environmental clean-up statutes and all regulations adopted by any local, state, federal or other Governmental Authority, and any statute, ordinance, code, order, decree, law rule or regulation all of which pertain to or impose liability or standards of conduct concerning medical waste or medical products, equipment or supplies), safety or clean-up that apply to any Borrower or any Project and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*), the Federal Water Pollution Control Act (33 U.S.C. § 1251 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4851 *et seq.*), any analogous state or local laws, any amendments thereto, and the regulations promulgated pursuant to said laws, together with all amendments from time to time to any of the foregoing and judicial interpretations thereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**ERISA Plan**" means any "employee benefit plan", as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which any Borrower maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Title IV of ERISA, to which any Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"**Event of Default**" has the meaning set forth in Section 10.1.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Agent, any Lender or any other recipient of any payment to be made by or on behalf of any obligation of Credit Parties hereunder or the Obligations or required to be withheld or deducted from a payment to Agent, such Lender or such recipient (including any interest and penalties thereon): (a) Taxes to the extent imposed on or measured by Agent's, any Lender's or such recipient's net income (however denominated), branch profits Taxes, and franchise Taxes and similar Taxes, in each case, (i) imposed by the jurisdiction (or any political subdivision thereof) under which Agent, such Lender or such recipient is organized, has its principal office or conducts business with respect to entering into any of the Financing Documents or taking any action thereunder or (ii) that are Other Connection Taxes; (b) in the case of a Lender, United States withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Loans pursuant to a Law in effect on the date on which (i) such Lender becomes a party to this Agreement other than as a result of an assignment requested by a Credit Party under the terms hereof or (ii) such Lender changes its lending office for funding its Loan, except in each case to the extent that, pursuant to Section 2.8, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Revolving Loan Commitment **or Term Loan Commitment** or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Lender's failure to comply with Section 2.8(c); and (d) any U.S. federal withholding taxes imposed in respect of a Lender under FATCA.

"**FATCA**" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or official interpretations thereof and any agreement entered into pursuant to the implementation of Section 1471(b)(1) of the Code, and any intergovernmental agreement between the United States Internal Revenue Service, the U.S. Government and any governmental or taxation authority under any other jurisdiction which agreement's principal purposes deals with the implement such sections of the Code.

"**Federal Funds Rate**" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal

Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, *provided, however*, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, and (b) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent.

"**Federal Matching Component**" shall equal the product of (a) the dollar amount of the Borrowing Base attributable to Accounts on which Medicaid is the Third Party Payor (including Eligible Supplemental Payments), as determined by reference to each Borrowing Base Certificate delivered by Borrowers multiplied by (b) 60% (or such greater percentage as is determined by Agent by reference to the applicable "Federal Medical Assistance Percentage" for the Commonwealth of Pennsylvania calculated in accordance with Section 1905(b) of the Social Security Act).

"**Final Order**" means an order of the Bankruptcy Court in the Bankruptcy Cases which approves the transactions contemplated by this Agreement and the other Financing Documents on a final basis and is in form and substance acceptable to Agent and the Lenders, as the same may be amended, modified or otherwise supplemented from time to time in compliance with this Agreement.

"**Financing Documents**" means this Agreement, any Notes, the Security Documents, any Guarantees of Guarantors, the DIP Orders, any subordination or intercreditor agreement pursuant to which any Debt and/or any Liens securing such Debt is subordinated to all or any portion of the Obligations and all other documents, instruments and agreements (other than any Swap Contract) related to the Obligations and heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time. **For the avoidance of doubt, "Financing Documents" shall not include the Prepetition Credit Agreement or any Prepetition Financing Documents.**

"**First Amendment**" **means that certain Amendment No. 1 to First Priority Secured Priming Super-Priority Debtor In Possession Credit and Security Agreement, dated as of the First Amendment Effective Date, by and among Borrowers, Agent and Lenders.**

"**First Amendment Effective Date**" **means August [•], 2019.**

"**First Day Orders**" shall mean all orders entered by the Bankruptcy Court on or about the Petition Date or based on motions filed by the Debtors on or about the Petition Date.

"**Foreign Lender**" has the meaning set forth in Section 2.8(c).

"**Fraudulent Conveyance**" has the meaning set forth in Section 2.10(b).

"**Fund Contribution LC**" has the meaning set forth in Section 5.3(d)(viii) of the Acquisition Agreement.

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), which are applicable to the circumstances as of the date of determination.

"**General Intangible**" means any "general intangible" as defined in Article 9 of the UCC, and any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or other minerals before extraction, but including payment intangibles and software.

"**Governmental Account Debtor**" means any Account Debtor that is a Governmental Authority, including, without limitation, Medicare and Medicaid.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Guarantee**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), *provided*, *however*, that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course of Business.  The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guarantor**" means any Credit Party that has executed or delivered, or shall in the future execute or deliver, any Guarantee of any portion of the Obligations.  On the Closing Date, the Guarantors are Holdings, the Clinically Integrated Network Entities and Broad Street.

"**Hahnemann Closure**" means the orderly closure of the Hahnemann Project and discontinuation of all inpatient and outpatient hospital and related medical services in accordance with the Hahnemann Closure Plan.

"**Hahnemann Closure Plan**" means that certain plan of closure for the Hahnemann Project submitted by the Debtors and approved by the Pennsylvania Department of Health.

"**Hahnemann Operator**" has the meaning set forth in the preamble to this Agreement.

"**Hahnemann Project**" means the Project operated by Hahnemann Operator.

18

"**Hazardous Materials**" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; any substance the presence of which on the Project is prohibited by any Environmental Laws; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law, including: (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls ("**PCB's**"), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority.

"**Hazardous Materials Contamination**" means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**HPP**" means Health Partners Plans, Inc., a Pennsylvania not-for-profit corporation.

"**Healthcare Laws**" means all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical facilities (such as, but not limited to, acute care hospitals), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(6)), the Stark Law (42 U.S.C. § 1395nn), the civil False Claims Act (31 U.S.C. § 3729 et seq.), (b) TRICARE, (c) HIPAA, (d) Medicare, (e) Medicaid, (f) the Patient Protection and Affordable Care Act (P.L. 111-1468), (g) The Health Care and Education Reconciliation Act of 2010 (P.L. 111-152), (h) Emergency Medical Treatment and Active Labor Act (42 U.S.C. § 1395 dd), (i) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies, (j) all Laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (k) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (k) as may be amended from time to time.

"**Healthcare Permit**" means a Permit (a) issued or required under Healthcare Laws applicable to the business of any Borrower or any of its Affiliates or necessary in the possession,

ownership, marketing, promoting, sale, furnishing, distribution or delivery of goods or services under Healthcare Laws, (b) issued by any Person from which any Borrower has, as of the Closing Date, received an accreditation (including, without limitation, the JC), and/or (c) issued or required under Healthcare Laws applicable to the ownership, leasing and/or operation of a Project.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**HIPAA Compliant**" means that the applicable Person is in compliance, in all material respects, with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any material civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could reasonably be expected to result in any of the foregoing or that could reasonably be expected to materially and adversely affect such Person's financial condition, results of, operations, business or properties, in connection with any actual violation by such Person of the provisions of HIPAA.

"**Holdings**" means Philadelphia Academic Health Holdings, LLC.

"**HSRE Deposit Accounts**" has the meaning set forth in Section 5.14.

"**HSRE Master Leases**" means, individually and collectively, (i) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH New College MOB, LLC, (ii) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Bellet MOB, LLC, (iii) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Feinstein MOB, LLC, (iv) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Broad Street MOB, LLC, (v) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Wood Street Garage, LLC and (vi) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Erie Street Garage, LLC, and, in each case, all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**In-House Unbilled Accounts**" means Accounts accumulating in respect of patients who have not been discharged from a hospital facility, and for which a bill has not yet been issued with respect to medical and health care services provided to such patient.

"**Incentive Payments**" has the meaning set forth in Section 5.14.

"**Indemnitees**" has the meaning set forth in Section 12.15(b).

20

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower or any other Credit Party under any Financing Documents and (b) to the extent not otherwise described in (a), Other Taxes.

"**Instrument**" means "instrument", as defined in Article 9 of the UCC.

"**Insurance Captive**" means Philadelphia Academic Risk Retention Group, LLC, which shall at all times be a licensed captive insurance company in good standing under the Laws of the State of Vermont and is in compliance with all applicable Laws, except for such Laws the noncompliance with which could not reasonably be expected to have a Material Adverse Effect.

"**Intellectual Property**" means, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

"**Intercompany Loan**" has the meaning set forth in Section 2.9.

"**Interest Period**" means any period commencing on the first day of a calendar month and ending on the last day of such calendar month.

"~~**Interim Hearing**~~" shall have the meaning set forth in Section 3.24(b) hereof.

"**Interim Order**" means the order of the Bankruptcy Court entered in the Bankruptcy Cases, in form and substance reasonably satisfactory to Agent, approving this Agreement and the other Financing Documents and the Liens and any Guarantee granted thereunder and the other transactions contemplated thereby on an interim basis, which shall be in full force and effect until the entry of the Final Order approving this Agreement and other Financing Documents and the Liens and any Guarantee granted hereunder and thereunder and the other transactions contemplated hereby and thereby, and which shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Required Lenders in their sole discretion).

"**Inventory**" means "inventory" as defined in Article 9 of the UCC.

"**IRS**" has the meaning set forth in Section 2.8(c).

"**JC**" means the Joint Commission.

"**Laws**" means any and all federal, state, provincial, territorial, local and foreign statutes, laws, judicial decisions, regulations, guidances, guidelines, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to any Credit Party in any particular circumstance. "**Laws**" includes, without limitation, Healthcare Laws and Environmental Laws.

"**Legacy Accounts**" has the meaning set forth in Section 5.14.

"**Lender**" means each of (a) MCF, in its capacity as a lender hereunder, (b) each other Person party hereto in its capacity as a lender hereunder, (c) each other Person that becomes a party hereto as Lender pursuant to Section 11.17, and (d) the respective successors of all of the foregoing, and "Lenders" means all of the foregoing.

"**LIBOR Rate**" means, for each Loan, a per annum rate of interest equal to the greater of (a) 0.50% and (b) the rate determined by Agent (rounded upwards, if necessary, to the next 1/100th%) by *dividing* (i) the Base LIBOR Rate for the Interest Period, *by* (ii) the sum of one *minus* the daily average during such Interest Period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein).

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, in respect of such asset. For the purposes of this Agreement and the other Financing Documents, any Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Liquidation Effective Date**" means the effective date of the Plan of Liquidation confirmed by a final order in the Bankruptcy Case.

"**Litigation**" means any action, suit or proceeding before any court, mediator, arbitrator or Governmental Authority.

"**Loan Account**" has the meaning set forth in Section 2.6(b).

"**Loan(s)**" means the ~~Revolving Loans~~**Term Loan, the Revolving Loans or any combination of the foregoing, as the context may require. All references herein to the "making" of a Loan or words of similar import shall mean, with respect to the Term Loan, the making of any advance in respect of a Term Loan**.

"**Lockbox**" has the meaning set forth in Section 2.11.

"**Lockbox Account**" means an account or accounts maintained at the Lockbox Bank into which collections of Accounts are paid, which account or accounts shall be, if requested by Agent, opened in the name of Agent (or a nominee of Agent).

"**Lockbox Bank**" has the meaning set forth in Section 2.11.

"**Material Adverse Effect**" means with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, (a) a material adverse change in, or a material adverse effect upon, any of (i) the financial condition, operations, business or properties of the Borrowers, taken as a whole, which is reasonably likely to result in the inability of the Borrowers, taken as a whole, to pay the Obligations when due hereunder, (ii) the rights and remedies of Agent or Lenders under any Financing Document, or the ability of any Credit Party to perform any of its obligations under any Financing Document to which it is a party, (iii) the legality, validity or enforceability of any Financing Document, (iv) the existence, perfection or priority of any security interest granted in any Financing Document with respect to a material portion of the Collateral (the parties agree that any Account constitutes a material portion of Collateral), (v) the value of any Project or any other material portion of the Collateral, (vi) any Credit Party's ability to accept, admit and/or retain patients or residents, (vii) the rate at which any Third Party Payor reimburses a Credit Party for goods or services provided by such Credit Party the effect of which is reasonably likely to result in the inability of Borrowers, taken as a whole, to pay the Obligations when due hereunder, (viii) the use or scope of any materially significant Healthcare Permits, (ix) the continued participation by any Credit Party in the Medicaid or Medicare programs or any other materially significant Third Party Payor Program; or (b) an impairment to the likelihood that Eligible Accounts in general will be collected and paid in the Ordinary Course of Business of any Borrower and upon the same schedule and with the same frequency as such Borrowers' recent collections history; provided that it is understood that the commencement of the Bankruptcy Cases, the events that customarily occur following the commencement of a proceeding under the Bankruptcy Code, any defaults under agreements that have no material effect on the Credit Parties under the terms of the Bankruptcy Code as a result of the commencement of the Bankruptcy Cases, and reduction in payment terms by suppliers, individually or collectively, shall not be deemed to be, or give rise to, a Material Adverse Effect; and provided further that it is understood that the Hahnemann Closure shall not be deemed to be, or give rise to, a Material Adverse Effect so long as it is effected substantially in compliance with the Hahnemann Closure Plan.

"**Material Third Party Payor**" means a Third Party Payor that sponsors a Material Third Party Payor Program.

"**Material Third Party Payor Program**" means, as of any date of determination, (i) each Third Party Payor Program sponsored by Medicare, Medicaid and TRICARE, and (ii) each other Third Party Payor Program representing at least 25% of the Accounts billed by or on behalf of the Borrowers and the Projects, taken as a whole, during the prior fiscal year.

"**Maximum Lawful Rate**" has the meaning set forth in Section 2.7.

"**MCF**" means MidCap ~~Financial~~**Funding IV** Trust, and its successors and assigns.

23

"**Medicaid**" means the medical assistance programs administered by state agencies and approved by CMS pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 et seq.

"**Medicare**" means the program of health benefits for the aged and disabled administered by CMS pursuant to the terms of Title XVIII of the Social Security Act, codified at 42 U.S.C. 1395 et seq.

"**Medicare Component**" means an amount equal to the dollar amount of the Borrowing Base attributable to Accounts on which Medicare is the Third Party Payor, as determined by reference to each Borrowing Base Certificate delivered by Borrowers; provided that, initially, Agent shall include only such Accounts generated from inpatient services when determining the Medicare Component but shall not be limited at any time from including all Accounts included in the Borrowing Base on which Medicare is the Third Party Payor when making such determination.

"**Medicare Reserve Amount**" means a reserve against the Borrowing Base equal to the Medicare Component; provided that the Medicare Reserve may be increased by Agent to include the Federal Matching Component upon providing written notice to Borrower Representative.

"**Multiemployer Plan**" means a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA to which any Borrower or any other member of the Controlled Group (or any Person who in the last five years was a member of the Controlled Group) is making or accruing an obligation to make contributions or has within the preceding five plan years (as determined on the applicable date of determination) made contributions.

"**Net Tax Benefit**" means (a) the total amount of reduction in the income tax liability of the partners or members of Borrowers realized as a result of any loss generated by Borrowers' business during any prior tax year, assuming in such calculation that the full amount of such loss has been used to reduce such partners' or members' adjusted gross income in the same tax year that such loss was generated by Borrowers' business, *plus* (b) the amount by which (i) the aggregate amount of Tax Distributions made, based on good faith estimates, to such partners or members in such tax year is in excess of (ii) the tax obligations owing by such partners or members for income generated by Borrowers' business during such year; provided, however, to the extent that any loss is included in clause (a) above in calculating Net Tax Benefit, then the amount to be used for such loss in clause (b)(ii) above in calculating the Net Tax Benefit shall be deemed to be zero dollars ($0.00).

"**New Market Tax Credit Transactions**" means, collectively, the transactions contemplated by the following documents, each dated as of January 11, 2018: (i) that certain Lease Agreement by and between SCHC Pediatric Associates, L.L.C. and Center for the Urban Child, Inc. relating to the sublease of the "Put Property" (as defined in the Put Option Agreement referred to in clause (ii)), (ii) that certain Put Option Agreement by and among Center for the Urban Child, Inc., Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C., and Front Street Healthcare Properties II, LLC, (iii) that certain Guaranty of Performance (Put Option Agreement) by Philadelphia Academic Health Holdings, LLC, (iv) that certain Right of First Opportunity to Purchase Agreement by and among Center for the Urban Child, Inc., Tenet

HealthSystem St. Christopher's Hospital for Children, L.L.C., and Front Street Healthcare Properties II, LLC, (v) that certain Guaranty of Performance (Right of First Opportunity to Purchase Agreement) by Philadelphia Academic Health Holdings, LLC, (vi) that certain Tax Credit Reduction Event Indemnity Agreement by and among Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C., Center for the Urban Child, Inc., Tenet HealthSystem Medical, Inc. and SCHC Pediatric Associates, L.L.C., (vii) that certain Guaranty of Performance (Tax Credit Reduction Event Indemnity Agreement) by Philadelphia Academic Health Holdings, LLC, and (viii) that certain Access License and Shared Services Agreement and Agreement Regarding Sublease by and among Center for the Urban Child, Inc., Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C., Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC, and St. Christopher's Healthcare, LLC, and, with respect to each of clauses (i) through (viii) hereof, all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Non-Debtor Credit Parties**" means the Clinically Integrated Network Entities, Holdings and Broad Street.

"**Non-Funding Lender**" has the meaning set forth in Section 11.18.

"**Notes**" has the meaning set forth in Section 2.3.

"**Notice of Borrowing**" means a notice of a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit C hereto.

"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including, without limitation, the payment of interest and other amounts arising after the commencement of any case with respect to any Credit Party under the Bankruptcy Code or any similar statute which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case) or otherwise) of each Credit Party under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including, without limitation, fees, expenses and indemnification obligations.

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Operating Lease**" means any lease of any Project to an Operator Borrower, and all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

CHICAGO/#~~3334319.1~~3334319.3

"**Operative Documents**" means the Financing Documents, any Operating Leases, any HSRE Master Leases, Subordinated Debt Documents, the Affiliate Leases, the Conifer Agreement and the Transition Services Agreement.

"**Operator Borrower**" means the singular or collective (as the context requires) reference to St. Christopher Operator and Hahnemann Operator.

"**Operator**" means the singular or collective (as the context requires) reference to the following Persons:  (a) any Operator Borrower, and/or (b) any Person with whom a Borrower or any Affiliate has contracted for management or other services for a Project.

"**Ordinary Course of Business**" means, in respect of any transaction involving any Credit Party, the ordinary course of business of such Credit Party, as conducted by such Credit Party in accordance with past practices.  For the avoidance of doubt, Ordinary Course of Business includes any sales, transfer or dispositions of obsolete or worn-out assets.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

"**Other Connection Taxes**" means taxes imposed as a result of a present or former connection between Agent or any Lender and the jurisdiction imposing such tax (other than connections arising from Agent or such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, engaged in any other transaction pursuant to or enforced any Financing Document, or sold or assigned an interest in any Loans or any Financing Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Financing Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.8(j)).

"**Parent Borrower**" has the meaning set forth in the recitals to this Agreement.

"**Payment Account**" means the account specified on the signature pages hereof into which all payments by or on behalf of each Borrower to Agent under the Financing Documents shall be made, or such other account as Agent shall from time to time specify by written notice to Borrower Representative.

"**Payment Notification**" means a written notification substantially in the form of Exhibit D attached hereto and made a part hereof.

26

"**PBGC**" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"**Pension Plan**" means any ERISA Plan that is subject to Section 412 of the Code or Title IV of ERISA.

"**Permits**" means all governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals required under all applicable Laws and required in order to carry on its business as now conducted, including, without limitation, Healthcare Permits.

"**Permitted Affiliate**" means with respect to any Person (a) any Person that directly or indirectly controls such Person, and (b) any Person which is controlled by or is under common control with such controlling Person. As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote eighty percent (80%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Permitted Contest**" means, with respect to any tax obligation or other obligation allegedly or potentially owing from any Borrower to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on the books and records and financial statements of the applicable Borrower(s); *provided*, *however*, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Borrowers' title to, and its right to use, the Collateral is not adversely affected thereby and Agent's Lien and priority on such Collateral are not adversely affected, altered or impaired thereby; (c) the Collateral or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrowers; and (d) upon a final determination of such contest, Borrowers shall promptly comply with the requirements thereof.

"**Permitted Contingent Obligations**" means:

(a)     Contingent Obligations arising in respect of the Debt under the Financing Documents;

(b)     Contingent Obligations resulting from endorsements for collection or deposit in the Ordinary Course of Business;

(c)     Contingent Obligations outstanding on the date of this Agreement and set forth on Schedule 5.1 (but not including any refinancings, extensions, increases or amendments to the indebtedness underlying such Contingent Obligations other than extensions of the maturity thereof without any other change in terms or, in the case of any pension plan liabilities, such increases in the amount thereof in the Ordinary Course of Business);

(d)    Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeal bonds, performance bonds and other similar obligations not to exceed $125,000 in the aggregate at any time outstanding;

(e)    Contingent Obligations incurred with respect to Permitted Indebtedness of another Borrower; provided that (x) any such Contingent Obligation is subordinated to the Obligations to the same extent (if at all) as the Debt to which it relates is subordinated to the Obligations and (y) no Borrower may incur Contingent Obligations under this clause (i) in respect of Debt incurred by any Person that is not a Borrower;

(f)    Contingent Obligations arising with respect to customary indemnification obligations in favor of purchasers in connection with dispositions of personal property assets permitted under Section 5.6;

(g)    Contingent Obligations of a Borrower arising under an Affiliate Lease to which such Borrower is party as tenant or subtenant;

(h)    so long as there exists no Event of Default both immediately before and immediately after giving effect to any such transaction, Contingent Obligations existing or arising under any other Swap Contract, *provided, however*, that such obligations are (or were) entered into by Borrower or an Affiliate in the Ordinary Course of Business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person and not for purposes of speculation;

(i)    Contingent Obligations arising under or with respect to any Permitted Contest or Permitted Liens;

(j)    Contingent Obligations in respect of any Fund Contribution LC;

(k)    Contingent Obligations with respect to surety and appeal bonds, performance bonds, escrows, letters of credit and other similar obligations required by the terms of the Pension Fund for Hospital and Health Care Employees of Philadelphia and Vicinity and/or Section 4204 of ERISA, as applicable;

(l)    Contingent Obligations of a Borrower guaranteeing the obligations of another Borrower to the extent such obligations are otherwise permitted under this Agreement; and

(m)    other Contingent Obligations not permitted by clauses (a) through (l) above, not to exceed $250,000 in the aggregate at any time outstanding.

"**Permitted Indebtedness**" means:

(a)    Borrower's Debt to Agent and each Lender under this Agreement and the other Financing Documents;

(b)    Debt incurred as a result of endorsing negotiable instruments received in the Ordinary Course of Business;

28

(c)      purchase money Debt used solely to acquire equipment used in the Ordinary Course of Business and secured only by such equipment to the extent incurred prior to the Closing Date or otherwise approved by Agent and Required Lenders as part of the DIP Budget;

(d)      [Reserved];

(e)      Debt existing on the date of this Agreement and described on <u>Schedule 5.1</u> (but not including any refinancings, extensions, increases or amendments to such Debt other than extensions of the maturity thereof without any other change in terms);

(f)      [Reserved];

(g)      Debt constituting financed insurance premiums;

(h)      All Prepetition trade accounts payable and Postpetition trade accounts payable arising and paid on a timely basis;

(i)      Subordinated Debt to the extent approved by Agent and the Required Lenders as part of the DIP Budget; and

(j)      accrued and unpaid professional fees and administrative expenses of the Bankruptcy Case payable in the Bankruptcy Case.

"**Permitted Investments**" means, as of any date of determination:

(a)      direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)      investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from Standard & Poor's or from Moody's Investors Service, Inc.;

(c)      investments in certificates of deposit, banker's acceptances and, time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)      investments in money market mutual funds having portfolio assets in excess of $5,000,000,000 that comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940 and are rated AAA by Standard & Poor's and AAA by Moody's Investors Service, Inc.;

(e)      fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

29

(f)       securities with maturities of one year or less from the date of acquisition issued or full guaranteed by any state, commonwealth or territory of the United States of America, or any political subdivision or taxing authority thereof, and rated at least A-1 by Standard & Poor's or P by Moody's Investors Service, Inc.;

(g)       any advance or loan by a Borrower to another Borrower to the extent made to pay expenses approved as part of the DIP Budget;

(h)       any investment by a Borrower in another Borrower in effect on the Closing Date;

(i)       the extension of commercial trade credit in connection with the sale of Inventory in the Ordinary Course of Business;

(j)       investments consisting of endorsements for collection or deposit in the Ordinary Course of Business and with respect to negotiable instruments for collection;

(k)       any investment by a Borrower constituting part of the New Market Tax Credit Transactions and in effect on the Closing Date;

(l)       any interest by any Borrower in or related to HPP; and

(m)       any investment by a Borrower in the Insurance Captive consistent with its Plan of Operation, as may be amended from time to time, as filed with, and approved by, the Vermont Department of Financial Regulation.

"**Permitted Liens**" means:

(a)       deposits or pledges of cash to secure obligations under workmen's compensation, social security or similar laws, or under unemployment insurance (but excluding Liens arising under ERISA) pertaining to a Borrower's employees, if any, arising in the Ordinary Course of Business;

(b)       deposits or pledges of cash to secure statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business;

(c)       mechanic's, workmen's, materialmen's or other like Liens arising in the Ordinary Course of Business with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest;

(d)       Liens on Collateral for taxes or other governmental charges; provided that, solely with respect to taxes or charges arising Postpetition, such taxes or charges: (i) shall not be delinquent or, if delinquent, thereafter payable without penalty or (ii) shall be the subject of a Permitted Contest;

(e)       attachments, appeal bonds, judgments and other similar Liens on Collateral for sums not exceeding $62,500 in the aggregate arising in connection with court proceedings; *provided, however*, that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are the subject of a Permitted Contest;

(f)      deposits or pledges of cash to secure bids, tenders, contracts and leases arising in the Ordinary Course of Business and not in connection with the borrowing of money;

(g)      Liens and encumbrances in favor of Agent under the Financing Documents;

(h)      Liens on Collateral, other than Collateral which is part of the Borrowing Base, existing on the Closing Date and set forth on Schedule 5.2;

(i)      any Lien on any equipment or inventory securing Debt permitted under subparts (c) and (d) of the definition of Permitted Indebtedness, *provided*, *however*, (1) that such Lien attaches only to the assets purchased or acquired and the proceeds thereof and (2) that any Prepetition Liens of the Debtors shall be Permitted Liens only to the extent valid and perfected;

(j)      Liens on cash collateral for any Fund Contribution LC; *provided, however*, that such cash collateral shall not exceed an amount equal to 105% of the face amount of such Fund Contribution LC;

(k)      Liens on cash collateral securing any Permitted Contingent Obligation described in clause (k) of the definition thereof; *provided, however*, that such cash collateral shall not exceed an amount equal to 105% of the amount of such Permitted Contingent Obligation; and

(l)      rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the Ordinary Course of Business; *provided, however*, such rights or liens are subordinated to the prior right of Agent pursuant to a Deposit Account Control Agreement or Deposit Account Restriction Agreement.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Physicians Clinical**" means Physicians Clinical Network, LLC.

"**Plan Documentation**" means the Plan of Liquidation and all documentation related thereto or referenced therein, including without limitation any amendments, modifications or supplements to any of the foregoing, including any subsequent plans of liquidation, any motions related thereto and the Confirmation Order.

"**Plan of Liquidation**" means, as the same may be amended, modified or otherwise supplemented in compliance with this Agreement, a joint plan of liquidation of the Debtors in their Bankruptcy Cases which provides for indefeasible payment in full in cash and in accordance with the terms of this Agreement of all Obligations, including any Prepetition Obligations.

"**Postpetition**" or "**postpetition**" means the time period commencing on the Petition Date and ending on the Liquidation Effective Date.

"**PPN Philadelphia**" means Physician Performance Network of Philadelphia, L.L.C.

"**Practice Parent Borrower**" has the meaning set forth in the recitals to this Agreement.

"**Prepetition**" or "**prepetition**" means the time period prior to the Petition Date.

"**Prepetition Agent**" means Agent, in its capacity as the administrative agent under the Prepetition Credit Agreement.

"**Prepetition Credit Agreement**" has the meaning specified therefor in the recitals to this Agreement.

"**Prepetition Financing Documents**" **means the** "**Financing Documents**" **(**as defined in **the Prepetition** Credit Agreement)**.**

"**Prepetition Lenders**" means the lenders party to Prepetition Credit Agreement on the Petition Date, which, for the avoidance of doubt, are MidCap Financial Trust and MidCap Funding IV Trust.

"**Prepetition Obligations**" has the meaning specified therefor in the recitals to this Agreement.

"**Prepetition Payment**" means, a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Obligations or trade payables or other Prepetition claims against the Debtors.

"**Prepetition Repayment Advance**" means a Revolving Loan in the amount of the outstanding Specified Prepetition Obligations.

"**Prepetition Secured Parties**" means, collectively, Prepetition Agent and Prepetition Lenders.

"**Prepetition Term Loan**" has the meaning specified therefor in the recitals to this Agreement.

"**Project**" means the acute care facilities listed and described on Schedule 1.1B.

"**Pro Rata Share**" means (a) [Reserved]**with respect to a Lender's obligation to make advances in respect of a Term Loan and such Lender's right to receive payments of principal and interest with respect to the Term Loan, the Term Loan Commitment Percentage of such Lender**, (b) with respect to a Lender's obligation to make Revolving Loans and such Lender's right to receive the unused line fee described in Section 2.2(b), the Revolving Loan Commitment Percentage of such Lender, (c) with respect to a Lender's right to receive payments of principal and interest with respect to Revolving Loans, such Lender's Revolving Loan Exposure with respect thereto; and (d) for all other purposes (including, without limitation,

32

the indemnification obligations arising under Section 11.6) with respect to any Lender, the percentage obtained by *dividing* (i) the **sum of the** Revolving Loan Commitment Amount **and Term Loan Commitment Amount** of such Lender (or, in the event the Revolving Loan Commitment **and/or Term Loan Commitment** shall have been terminated, such Lender's then existing Revolving Loan Outstandings **or then outstanding principal advances of such Lender under the Term Loan, as applicable**), by (ii) the Revolving Loan Commitment **or Term Loan Commitment Amount** (or, in the event the Revolving Loan Commitment shall have been terminated, the then existing Revolving Loan Outstandings **or then outstanding principal advances of such Lenders under the Term Loan, as applicable**) of all Lenders.

"**Recovery Amount**" has the meaning set forth in Section 2.10(e).

"**Release**" has the meaning set forth in 42 U.S.C. § 9601 (22).

"**Required Lenders**" means at any time Lenders holding (a) sixty-six and two thirds percent (66 2/3%) or more of the **sum of the** Revolving Loan Commitment **and the Term Loan Commitment (taken as a whole)**, or (b) if the Revolving Loan Commitment **or the Term Loan Commitment** has been terminated, sixty-six and two thirds percent (66 2/3%) or more of the then aggregate outstanding principal balance of the Loans.

"**Responsible Officer**" means any of the President, Chief Executive Officer, Chief Financial Officer, Chief Restructuring Officer, Controller or Vice President/Finance of the applicable Borrower or Borrower Representative.

"**Revolving Lender**" means each Lender having a Revolving Loan Commitment Amount in excess of zero (or, in the event the Revolving Loan Commitment shall have been terminated at any time, each Lender at such time having Revolving Loan Outstandings in excess of zero).

"**Revolving Loan Availability**" means, at any time, the Revolving Loan Limit *minus* the Revolving Loan Outstandings.

"**Revolving Loan Borrowing**" means a borrowing of a Revolving Loan.

"**Revolving Loan Commitment**" means, as of any date of determination, the aggregate Revolving Loan Commitment Amounts of all Lenders as of such date. On the Closing Date, the Revolving Loan Commitment is $50,000,000; provided that, the Revolving Loan Commitment shall be reduced from time to time as set forth in Section 2.1(c).

"**Revolving Loan Commitment Amount**" means, (i) as to any Lender that is a Lender on the Closing Date, the dollar amount set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Amount" (if such Lender's name is not set forth thereon, then the dollar amount on the Commitment Annex for the Revolving Loan Commitment Amount for such Lender shall be deemed to be zero), as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of Revolving Loans outstanding and its commitment to make Revolving Loans) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party and/or as a result of any reduction in the Revolving Loan Commitment and (ii) as to any

CHICAGO/#3334319.13334319.3

Lender that becomes a Lender after the Closing Date, the amount of the "Revolving Loan Commitment Amount(s)" of other Lender(s) assigned to such new Lender pursuant to the terms of the effective assignment agreement(s) pursuant to which such new Lender shall become a Lender, as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lenders' portion of Revolving Loans outstanding and its commitment to make advances in respect of the Revolving Loan) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party and/or as a result of any reduction in the Revolving Loan Commitment.

"**Revolving Loan Commitment Percentage**" means, as to any Lender, (a) on the Closing Date, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Percentage" (if such Lender's name is not so set forth thereon, then, on the Closing Date, such percentage for such Lender shall be deemed to be zero), and (b) on any date following the Closing Date, the percentage equal to the Revolving Loan Commitment Amount of such Lender on such date *divided by* the Revolving Loan Commitment on such date.

"**Revolving Loan Exposure**" means, with respect to any Lender on any date of determination, the percentage equal to the amount of such Lender's Revolving Loan Outstandings on such date *divided by* the aggregate Revolving Loan Outstandings of all Lenders on such date.

"**Revolving Loan Limit**" means, at any time, the lesser of (a) the Revolving Loan Commitment and (b) the Borrowing Base.

"**Revolving Loan Outstandings**" means, at any time of calculation, (a) the then existing aggregate outstanding principal amount of Revolving Loans, and (b) when used with reference to any single Lender, the then existing outstanding principal amount of Revolving Loans advanced by such Lender.

"**Revolving Loans**" has the meaning set forth in Section 2.1(b).

"**Securities Account**" means a "securities account" (as defined in Article 8 and Article 9 of the UCC), an investment account, or other account in which investment property or securities are held or invested for credit to or for the benefit of any Borrower.

"**Securities Account Control Agreement**" means an agreement, in form and substance reasonably satisfactory to Agent, among Agent, any applicable Borrower and each securities intermediary in which such Borrower maintains a Securities Account pursuant to which Agent shall obtain "control" (as defined in Article 9 of the UCC) over such Securities Account.

"**Security Document**" means this Agreement and any other agreement, document or instrument executed concurrently herewith or at any time hereafter pursuant to which one or more Credit Parties or any other Person either (a) Guarantees payment or performance of all or any portion of the Obligations, and/or (b) provides, as security for all or any portion of the Obligations, a Lien on any of its assets in favor of Agent for its own benefit and the benefit of the Lenders, as any or all of the same may be amended, supplemented, restated or otherwise

modified from time to time.  The Security Documents shall include, without limitation, the Broad Street Guaranty and the Broad Street Mortgages.

"**Settlement Date**" has the meaning set forth in Section 11.13(a).

"**Specified Prepetition Obligations**" means the Outstanding Prepetition Fees *plus* $5,000,000 of the Prepetition Term Loan.

"**St. Christopher Operating Leases**" means, individually and collectively, (a) the operating lease for the Project operated by St. Christopher Operator by and between St. Christopher Operator and Front Street Healthcare Properties, LLC, dated as of January 11, 2018, (b) the operating lease for the medical office building known as Nelson Pavilion leased by St. Christopher Operator by and between St. Christopher Operator and Front Street Healthcare Properties II, LLC, dated as of January 11, 2018 and (c) the operating lease for the warehouse leased by St. Christopher Operator by and between St. Christopher Operator and Front Street Healthcare Properties II, LLC, dated as of January 11, 2018, together with all amendments, supplements, restatements or other modifications to or of such operating leases as have been previously approved by Agent to the extent required hereunder.

"**St. Christopher Operator**" has the meaning set forth in the preamble to this Agreement.

"**St. Christopher Project**" means the Project operated by St. Christopher Operator.

"**Stated Rate**" has the meaning set forth in Section 2.7.

"**Subordinated Debt**" means any Debt of Borrowers incurred pursuant to the terms of the Subordinated Debt Documents and with the prior written consent of Agent, all of which documents must be in form and substance acceptable to Agent in its sole discretion. As of the Closing Date, there is no Subordinated Debt.

"**Subordinated Debt Documents**" means any documents evidencing and/or securing Debt governed by a Subordination Agreement, all of which documents must be in form and substance acceptable to Agent in its sole discretion, and all amendments, supplements, restatements or other modification thereto or thereof as have been previously approved by Agent to the extent required hereunder.  As of the Closing Date, there are no Subordinated Debt Documents.

"**Subordination Agreement**" means any agreement between Agent and another creditor of any Borrower(s), as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, pursuant to which the Debt owing from any Borrower(s) and/or the Liens securing such Debt granted by any Borrower(s) to such creditor are subordinated in any way to the Obligations and the Liens created under the Security Documents, the terms and provisions of such Subordination Agreements to have been agreed to by and be acceptable to Agent in the exercise of its sole discretion.

"**Subsidiary**" means, with respect to any Person, (a) any corporation of which an aggregate of more than fifty percent (50%) of the outstanding capital stock having ordinary

voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, capital stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such capital stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than fifty percent (50%) or of which any such Person is a general partner or may exercise the powers of a general partner. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of a Borrower.

"**Superpriority Claim**" shall mean a claim against a Debtor in any of the Bankruptcy Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) and/or 726 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"**Supplemental Medicaid Medical Education Payments**" means the aggregate amount of supplemental payments owed to an Operator Borrower under the Pennsylvania fee-for-service Medicaid program to offset a portion of graduate medical education and indirect medical education costs incurred by such Operator Borrower.

"**Supplemental Payment**" means, without duplication, (i) Adjusted Medicaid Managed Care Supplemental Payments; (ii) DSH Income and (iii) Supplemental Medicaid Medical Education Payments.

"**Swap Contract**" means any "swap agreement", as defined in Section 101 of the Bankruptcy Code, which is obtained by Borrower for the Loan to provide protection against fluctuations in the applicable Base Rate or Libor Rate, but only to the extent Agent provides its prior written consent to the entry into such "swap agreement".

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Tenet Real Estate Debt**" means Debt of Front Street Healthcare Properties, LLC and Front Street Healthcare Properties II, LLC in favor of Tenet Business Services Corporation or its permitted assignee in the original principal amount of $17,500,000 incurred on January 11, 2018 as part of the transactions closing contemporaneously with the closing of the financing under the Prepetition Credit Agreement.

"**Tenet Sellers**" means Tenet Business Services Corporation and the other sellers listed on Exhibit A-1 to the Acquisition Agreement.

"**Term Loan**" **has** the meaning set forth in Section **2.1(a).**

"**Term Loan Commitment**" **means the sum of each Lender's Term Loan Commitment Amount, which is equal to $15,000,000 on the First Amendment Effective Date.**

"**Term Loan Commitment Amount**" **means, (i) as to any Lender that is a Lender on the First Amendment Effective Date, the dollar amount set forth opposite such Lender's name on the Commitment Annex under the column "Term Loan Commitment Amount", as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of the Term Loan outstanding and its commitment to make advances in respect of the Term Loan) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party and/or as a result of any reduction in the Term Loan Commitment and (ii) as to any Lender that becomes a Lender after the First Amendment Effective Date, the amount of the "Term Loan Commitment Amount(s)" of other Lender(s) assigned to such new Lender pursuant to the terms of the effective assignment agreement(s) pursuant to which such new Lender shall become a Lender, as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of the Term Loan outstanding and its commitment to make advances in respect of the Term Loan) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party and/or as a result of any reduction in the Term Loan Commitment.**

"**Term Loan Commitment Percentage**" **means, as to any Lender, (a) on the First Amendment Effective Date, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Term Loan Commitment Percentage" (if such Lender's name is not so set forth thereon, then, on the First Amendment Effective Date, such percentage for such Lender shall be deemed to be zero), and (b) on any date following the First Amendment Effective Date, the percentage equal to the Term Loan Commitment Amount of such Lender on such date divided by the Term Loan Commitment on such date.**

"**Termination Date**" means the earlier to occur of (a) the Commitment Expiry Date, (b) a DIP Credit Facility Termination Event, or (c) the termination date stated in any notice of termination of this Agreement provided by Borrowers in accordance with Section 2.12.

"**Third Party Payor**" means Medicare, Medicaid, TRICARE, and other state or federal health care programs, Blue Cross and/or Blue Shield, private insurers, managed care plans, self-funded employer plans and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"**Third Party Payor Programs**" means all payment and reimbursement programs, sponsored by a Third Party Payor, in which a Borrower participates.

"**Transition Services Agreement**" means that certain Transition Services Agreement dated as of January 11, 2018 by and between Tenet Business Services Corporation and Parent Borrower.

"**TRICARE**" means the program administered pursuant to 10 U.S.C. Section 1071 et. seq.), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

"**UCC**" means the Uniform Commercial Code of the State of Maryland or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" means the United States of America.

"**Variance**" has the meaning set forth in the definition of "DIP Budget Variance Report".

**Section 1.2    Accounting Terms and Determinations**.    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Debt or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value", as defined therein.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including, without limitation, determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of each Borrower and its consolidated subsidiaries delivered to Agent and each of the Lenders on or prior to the Closing Date.  If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Financing Document, and either Borrowers or the Required Lenders shall so request, the Agent, the Lenders and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided, however*, that until so amended, (a) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.

**Section 1.3    Other Definitional and Interpretive Provisions.**    References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits" or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided.  Any term defined herein may be used in the singular or plural.  "Include", "includes" and "including" shall be deemed to be followed by "without limitation".  Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively.  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.  References to any statute or act shall include all related current regulations and all amendments and any

successor statutes, acts and regulations.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.  References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States.  References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.  As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect.  References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC.  All references herein to times of day shall be references to daylight or standard time, as applicable.

**Section 1.4    Funding and Settlement Currency.**  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.

## ARTICLE 2 LOANS AND LETTERS OF CREDIT

**Section 2.1    Loans**.

(a)    ~~Reserved.~~  **Term Loan.**

(i)    **Term Loan Amounts.  On the terms and subject to the conditions set forth herein, the Lenders severally hereby agree to make to Borrowers a term loan in an original principal amount equal to the Term Loan Commitment ("Term Loan").  Each Lender's obligation to fund the Term Loan shall be limited to such Lender's Term Loan Commitment Percentage, and no Lender shall have any obligation to fund any portion of any Term Loan required to be funded by any other Lender, but not so funded.  No Borrower shall have any right to reborrow any portion of the Term Loan that is repaid or prepaid from time to time.  The Term Loan shall be funded in one advance on the First Amendment Effective Date; provided that such advance shall be effected by a book entry made by Agent showing the repayment of the principal amount of the Prepetition Term Loan with the proceeds of the Term Loan.**

(ii)    **Scheduled Repayments; Mandatory Prepayments; Optional Prepayments.**

(A)    **The outstanding principal amount of the Term Loan shall become immediately due and payable in full on the Termination Date.**

(B)    **Except as otherwise provided in the applicable Broad Street Mortgage for the Broad Street Facility to which such proceeds apply, on the date on which a Credit Party (or Agent as loss payee or assignee) receives any Broad Street Casualty Proceeds, an amount equal to one hundred percent (100%) of such Broad Street Casualty Proceeds, or such lesser portion of such proceeds as Agent shall elect to apply to the Obligations;**

39

(C) Borrowers may from time to time, with at least two (2) Business Days prior delivery to Agent of an appropriately completed Payment Notification, prepay the Term Loan in whole or in part without penalty; *provided, however*, that each such prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000.

(iii) **All Prepayments.** Except as this Agreement may specifically provide otherwise, all prepayments of the Term Loan shall be applied by Agent to the Obligations in inverse order of maturity. The monthly payments required under Schedule 2.1 shall continue in the same amount (for so long as the Term Loan shall remain outstanding) notwithstanding any partial prepayment, whether mandatory or optional, of the Term Loan.

(iv) **LIBOR Rate.**

(A) Except as provided in subsection (C) below, the Term Loan shall accrue interest at the LIBOR Rate plus Applicable Margin.

(B) The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in Applicable Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest based upon the LIBOR Rate; provided, however, that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued. In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (I) require such Lender to furnish to Borrowers a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (II) repay the Term Loan bearing interest based upon the LIBOR Rate with respect to which such adjustment is made.

40

(C)    In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain the Term Loan bearing interest based upon the LIBOR Rate or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender and (I) in the case of any outstanding Term Loan of such Lender bearing interest based upon the LIBOR Rate, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Term Loan, and interest upon such Lender's Term Loan thereafter shall accrue interest at Base Rate plus the Applicable Margin, and (II) such Term Loan shall continue to accrue interest at Base Rate plus the Applicable Margin until such Lender determines that it would no longer be unlawful or impractical to maintain such Term Loan at the LIBOR Rate.

(D)    Anything to the contrary contained herein notwithstanding, neither Agent nor any Lender is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues based on the LIBOR Rate.

(b)    Revolving Loans.

(i)    Revolving Loans and Borrowings.  On the terms and subject to the conditions set forth herein, each Lender severally agrees to make loans to Borrowers from time to time as set forth herein (each a "**Revolving Loan**", and collectively, "**Revolving Loans**") equal to such Lender's Revolving Loan Commitment Percentage of Revolving Loans requested by Borrowers hereunder, *provided*, *however*, that after giving effect thereto, the Revolving Loan Outstandings shall not exceed the Revolving Loan Limit.  Borrowers shall deliver to Agent a Notice of Borrowing with respect to each proposed Revolving Loan Borrowing, such Notice of Borrowing to be delivered no later than 1:00 P.M. (New York Time) two (2) Business Days prior to the date of such proposed borrowing; provided that, with respect to the Revolving Loan Borrowing requested to be made on the Closing Date, such Notice of Borrowing may be delivered on the Closing Date.  Subject to the provisions of this Agreement, on the Closing Date, each Revolving Lender severally agrees to make Revolving Loans available to Borrowers in amounts sufficient to (A) establish the Carve-Out Reserve in an initial amount equal to $2,500,000 and (B) make the Prepetition Repayment Advance (which advance may be effected, in whole or in part, by a book entry only made by Agent).  Each Borrower and each Revolving Lender hereby authorizes Agent to make Revolving Loans on behalf of Revolving Lenders, at any time in its sole discretion, to pay principal owing in respect of the Loans and interest, fees, expenses and other charges then due and owing by any Credit Party from time to time arising under this Agreement or any other Financing Document.  The Borrowing Base shall be determined by Agent based on the most recent Borrowing Base Certificate delivered to Agent in accordance with this Agreement and

CHICAGO/#3334319.13334319.3

such other information as may be available to Agent.  Without limiting any other rights and remedies of Agent hereunder or under the other Financing Documents or the DIP Orders, the Revolving Loans shall be subject to Agent's continuing right to withhold from the Borrowing Base reserves, and to increase and decrease such reserves from time to time, if and to the extent that in Agent's good faith, commercially reasonable credit judgment and discretion, such reserves are necessary.  Notwithstanding anything to the contrary in this Agreement, with respect to the Carve-Out and Carve-Out Reserve, the maintenance, priority, terms of and funding of such Carve-Out and Carve-Out Reserve shall be set forth in the DIP Orders.

(ii)    <u>Mandatory Revolving Loan Repayments and Prepayments</u>.

(A)    The Revolving Loan Commitment shall terminate on the Termination Date.  On such Termination Date, there shall become due, and Borrowers shall pay, the entire outstanding principal amount of each Revolving Loan, together with accrued and unpaid Obligations pertaining thereto.

(B)    If at any time the Revolving Loan Outstandings exceed the Revolving Loan Limit, then, on the next succeeding Business Day, Borrowers shall repay the Revolving Loans in an aggregate amount equal to such excess.

(C)    Principal payable on account of Revolving Loans shall be payable by Borrowers to Agent (I) immediately upon the receipt by any Borrower or Agent of any payments on or proceeds from any of the Accounts, to the extent of such payments or proceeds, as further described in Section 2.11 below, and (II) in full on the Termination Date.

(iii)    <u>Optional Prepayments</u>.  Borrowers may from time to time prepay the Revolving Loans in whole or in part; *provided*, *however*, that any such partial prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000.

(iv)    <u>LIBOR Rate</u>.

(A)    Except as provided in subsection (C) below, Revolving Loans shall accrue interest at the LIBOR Rate *plus* the Applicable Margin.

(B)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in Applicable Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest based upon the LIBOR Rate; *provided, however,* that notwithstanding anything in this

Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued.  In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (I) require such Lender to furnish to Borrowers a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (II) repay the Revolving Loans bearing interest based upon the LIBOR Rate with respect to which such adjustment is made.

(C)      In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the Closing Date, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain Revolving Loans bearing interest based upon the LIBOR Rate or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender and (I) in the case of any outstanding Revolving Loans of such Lender bearing interest based upon the LIBOR Rate, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Loans, and interest upon such Lender's Revolving Loans thereafter shall accrue interest at Base Rate *plus* the Applicable Margin, and (II)  such Revolving Loans shall continue to accrue interest at Base Rate *plus* the Applicable Margin until such Lender determines that it would no longer be unlawful or impractical to maintain such Revolving Loans at the LIBOR Rate.

(D)      Anything to the contrary contained herein notwithstanding, neither Agent nor any Lender is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues based on the LIBOR Rate.

(v)      Availability Prior to Entry of the Final Order.  During the period commencing on the Closing Date and ending on the date on which the Final Order is entered, for purposes of determining the Revolving Loan Limit and calculating the fee payable pursuant to Section 2.2(b), the Revolving Loan Commitment shall be $46,788,797.37, as approved by the Bankruptcy Court in the Interim Order, subject to compliance with the terms, conditions and covenants of this Agreement, the Interim Order and the other Financing Documents.  All Loans made available to the Borrowers during such interim period will be due and payable, and the Revolving Loan Commitment shall terminate, on the date that is 30 days after the entry of the Interim

43

~~Order unless the Final Order shall have been entered by the Bankruptcy Court on or before such date. Upon the Bankruptcy Court's entry of the Final Order and satisfaction of any other conditions precedent, the full Revolving Loan Commitment shall be used when calculating the Revolving Loan Limit and the fee payable pursuant to Section 2.2(b), as approved by the Bankruptcy Court in the Final Order, subject to compliance with the terms, conditions and covenants of this Agreement, the Final Order and the other Financing Documents.~~ **Reserved.**

(c)    _Permanent Reduction in Revolving Loan Commitment_. On the first day of each month, beginning with August 1, 2019, the Revolving Loan Commitment shall be permanently reduced to an amount equal to 110% of the average Borrowing Base for the immediately prior month without any further action needed on the part of Agent, Lenders or Borrowers and the Revolving Loan Commitment Amount of each Lender as of such date shall be reduced by such Lender's Pro Rata Share of such total reduction in the Revolving Loan Commitment; provided that, if any such reduction would result in the Revolving Loan Outstandings exceeding the Revolving Loan Limit, the Revolving Loan Commitment shall be permanently reduced to the Revolving Loan Outstandings. Agent shall promptly notify Borrowers of any such reduction of the Revolving Loan Commitment. Any reduction of the Revolving Loan Commitment shall be applied to the Revolving Loan Commitment Amount of each Lender according to its Pro Rata Share thereof.

**Section 2.2    Interest, Interest Calculations and Certain Fees**.

(a)    _Interest_. From and following the Closing Date, except as expressly set forth in this Agreement, Loans and the other Obligations shall bear interest at the sum of the LIBOR Rate _plus_ the Applicable Margin. Interest on the Loans shall be paid in arrears on the first (1st) day of each month and on the maturity of such Loans, whether by acceleration or otherwise. Interest on all other Obligations shall be payable upon demand. For purposes of calculating interest, all funds transferred from the Payment Account for application to any Revolving Loans **or the Term Loan** shall be subject to a six (6) Business Day clearance period and all interest accruing on such funds during such clearance period shall accrue for the benefit of Agent, and not for the benefit of the Lenders.

(b)    _Unused Line Fee_. From and following the Closing Date, Borrowers shall pay Agent, for the benefit of all Lenders committed to make Revolving Loans, in accordance with their respective Pro Rata Shares, a fee in an amount equal to (i) (A) the Revolving Loan Commitment _minus_ (B) the average end-of-day principal balance of the Revolving Loan Outstandings during the immediately preceding month, _multiplied by_ (ii) 0.50% per annum. Such fee is to be paid monthly in arrears on the first day of each month.

(c)    _Collateral Fee_. From and following the Closing Date, Borrowers shall pay Agent, for its own account and not for the benefit of any other Lenders, a fee in an amount equal to the product obtained by multiplying (i) the average end-of-day principal balance of Revolving Loans outstanding during the immediately preceding month by (ii) one-tenth of one percent (0.10%) per month. For purposes of calculating the average end-of-day principal balance of Revolving Loans, all funds paid into the Payment Account (or which were required to be paid into the Payment Account hereunder) or otherwise received by Agent for the account of

44

Borrowers shall be subject to a six (6) Business Day clearance period. The collateral management fee shall be deemed fully earned when due and payable and, once paid, shall be non-refundable.

(d)  Origination Fees.  Contemporaneous with Borrowers' execution of this Agreement, Borrowers shall pay Agent, for the benefit of all Lenders committed to make Revolving Loans on the Closing Date, in accordance with their respective Pro Rata Shares, a fee in an amount equal to (i) the Revolving Loan Commitment on the Closing Date, multiplied by one percent (1.0%); provided that, such fee shall be due and payable on the date on which Lender's funding obligations in respect of the Revolving Loan Commitment under this Agreement terminate for any reason (whether by voluntary termination by Borrowers, payment in full of all Obligations (whether on the Commitment Expiry Date or prior thereto), by reason of the occurrence of an Event of Default or otherwise). All fees payable pursuant to this clause (d), notwithstanding when the same is payable, shall be fully earned and non-refundable on the Closing Date.

(e)  Audit Fees.  Borrowers shall pay to Agent, for its own account and not for the benefit of any other Lenders, all reasonable fees and expenses then due and owing in connection with audits or inspections of Borrowers' books and records, audits, valuations or appraisals of the Collateral, audits of Borrowers' compliance with applicable Laws and such other matters as Agent shall deem appropriate, which shall be due and payable on the first Business Day of the month following the date of issuance by Agent of a written request for payment thereof to Borrowers.

(f)  Wire Fees.  Borrowers shall pay to Agent, for its own account and not for the account of any other Lenders, on written demand, fees for incoming and outgoing wires made for the account of Borrowers, such fees to be based on Agent's then current wire fee schedule (available upon written request of the Borrowers).

(g)  Reserved.

(h)  Computation of Interest and Related Fees.  All interest and fees under each Financing Document shall be calculated on the basis of a 360-day year for the actual number of days elapsed. The date of funding of a Loan shall be included in the calculation of interest. The date of payment of a Loan shall be excluded from the calculation of interest. If a Loan is repaid on the same day that it is made, one (1) day's interest shall be charged.

Section 2.3  Notes.  The portion of the Loans made by each Lender shall be evidenced, if so requested by such Lender, by one or more promissory notes executed by Borrowers on a joint and several basis (each, a "**Note**") in an original principal amount equal to such Lender's Revolving Loan Commitment Amount or Term Loan Commitment Amount.

45

**Section 2.4**     **Reserved**.

**Section 2.5**     **Reserved**.

**Section 2.6**     **General Provisions Regarding Payment; Loan Account**.

(a)     All payments to be made by each Borrower under any Financing Document, including payments of principal and interest made hereunder and pursuant to any other Financing Document, and all fees, expenses, indemnities and reimbursements, shall be made without set-off, recoupment or counterclaim, in lawful money of the United States and in immediately available funds. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension (it being understood and agreed that, solely for purposes of calculating financial covenants and computations contained herein and determining compliance therewith, if payment is made, in full, on any such extended due date, such payment shall be deemed to have been paid on the original due date without giving effect to any extension thereto). Any payments received in the Payment Account before 12:00 Noon (Eastern time) on any date shall be deemed received by Agent on such date, and any payments received in the Payment Account after 12:00 Noon (Eastern time) on any date shall be deemed received by Agent on the next succeeding Business Day. **In the absence of receipt by Agent of a written designation by Borrower Representative, at least two (2) Business Days prior to any prepayment, that such prepayment is to be applied to the Term Loan, Borrowers and each Lender hereby authorize and direct Agent, subject to the provisions of Section 10.7 hereof, to apply such prepayment against then outstanding Revolving Loans, and second, if no Revolving Loans are then outstanding, pro rata against the Term Loan in accordance with the provisions of Section 2.1(a)(iii); provided, that if Agent at any time determines that payments received by Agent were in respect of a mandatory prepayment event, Agent shall apply such payments in accordance with the provisions of Section 2.1(a)(ii) and shall be fully authorized by Borrowers and each Lender to make corresponding Loan Account reversals in respect thereof.**

(b)     Agent shall maintain a loan account (the "**Loan Account**") on its books to record Loans and other extensions of credit made by the Lenders hereunder or under any other Financing Document, and all payments thereon made by each Borrower. All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded in Agent's books and records at any time shall be conclusive and binding evidence of the amounts due and owing to Agent by each Borrower absent manifest error; *provided, however*, that any failure to so record or any error in so recording shall not limit or otherwise affect any Borrower's duty to pay all amounts owing hereunder or under any other Financing Document. Agent shall use good faith efforts to provide Borrowers with a monthly statement regarding the Loan Account (but neither Agent nor any Lender shall have any liability if Agent shall fail to provide any such statement). Unless any Borrower notifies Agent of any objection to any such statement (specifically describing the basis for such objection) within one hundred fifty (150) days after the date of receipt thereof, it shall be deemed final, binding and conclusive upon Borrowers in all respects as to all matters reflected therein.

**Section 2.7**    **Maximum Interest.**  In no event shall the interest charged with respect to the Loans or any other Obligations of any Borrower under any Financing Document exceed the maximum amount permitted under the laws of the State of Maryland or of any other applicable jurisdiction.  Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable hereunder or under any Note or other Financing Document (the "**Stated Rate**") would exceed the highest rate of interest permitted under any applicable law to be charged (the "**Maximum Lawful Rate**"), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; *provided*, *however*, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, each Borrower shall, to the extent permitted by law, continue to pay interest at the Maximum Lawful Rate until such time as the total interest received is equal to the total interest which would have been received had the Stated Rate been (but for the operation of this provision) the interest rate payable.  Thereafter, the interest rate payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply.  In no event shall the total interest received by any Lender exceed the amount which it could lawfully have received had the interest been calculated for the full term hereof at the Maximum Lawful Rate.  If, notwithstanding the prior sentence, any Lender has received interest hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other amounts (other than interest) payable hereunder, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining shall be paid to Borrowers.  In computing interest payable with reference to the Maximum Lawful Rate applicable to any Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate *divided by* the number of days in the year in which such calculation is made.

**Section 2.8**    **Taxes; Capital Adequacy**.

(a)    All payments of principal and interest on the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future Taxes, except as required by applicable Law.  If any withholding or deduction from any payment to be made by any Borrower hereunder is required in respect of any Taxes pursuant to any applicable Law, then such Borrower will:  (i) pay directly to the relevant authority the full amount required to be so withheld or deducted; (ii) promptly forward to Agent an official receipt or other documentation satisfactory to Agent evidencing such payment to such authority; and (iii) if any such withholding or deduction is in respect of any Indemnified Taxes, pay to Agent for the account of Agent and Lenders such additional amount or amounts as is necessary to ensure that the net amount actually received by Agent and each Lender will equal the full amount Agent and such Lender would have received had no such withholding or deduction been required.  If any Indemnified Taxes are directly asserted against Agent or any Lender with respect to any payment received by Agent or such Lender hereunder, Agent or such Lender may pay such Indemnified Taxes and Borrowers will promptly pay such additional amounts (including any penalty, interest or expense then due and owing) as is necessary in order that the net amount received by such Person after the payment of such Indemnified Taxes (including any Indemnified Taxes on such additional amount) shall equal the amount such Person would have received had such Indemnified Taxes not been asserted so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which Agent or such Lender first made written demand therefor.

47

(b)     Without duplication of any amount paid pursuant to Section 2.8(a), the Borrowers shall indemnify Agent and Lenders, within ten (10) days after demand thereof, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.8) payable or paid by Agent or any Lender or required to be withheld or deducted from a payment to Agent or any Lender and any expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate in reasonable detail as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)     Each Lender that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes and is a party hereto on the Closing Date or purports to become an assignee of an interest pursuant to Section 12.6(a) after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) (each such Lender a "**Foreign Lender**") shall, to the extent permitted by Law, execute and deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent) whichever of the following is applicable:   (A) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Financing Document, two (2) properly completed and executed originals of United States Internal Revenue Service ("**IRS**") Forms W-8BEN or W-8BEN-E (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Financing Documents, two (2) properly completed and executed originals of IRS Forms W-8BEN or W-8BEN-E (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty; (B) two (2) executed originals of Form W-8ECI (or successor form); (C) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) two (2) executed originals of IRS Forms W-8BEN or W-8BEN-E (or successor form); (D) to the extent a Foreign Lender is not the beneficial owner, two (2) executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E (or successor form), IRS Form W-9 (or successor form), and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide such certification documents on behalf of each such direct and indirect partner; or (E) other applicable forms, certificates or documents prescribed by the IRS.  Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and Agent in writing of its legal inability to do so.  In addition, to the extent permitted by applicable Law, such forms shall be delivered by each Foreign Lender upon the obsolescence or invalidity of any

form previously delivered by such Foreign Lender. Each Foreign Lender shall promptly notify Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(d)     Each Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes and is a party hereto on the Closing Date or purports to become an assignee of an interest pursuant to Section 12.6(a) after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) shall, to the extent permitted by Law, provide to Borrower and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), a properly completed and executed IRS Form W-9 or any successor form certifying as to such Lender's entitlement to an exemption from U.S. backup withholding and other applicable forms, certificates or documents prescribed by the IRS or reasonably requested by Borrower or Agent. Each such Lender shall promptly notify Borrower at any time it determines that any certificate previously delivered to Borrower (or any other form of certification adopted by the U.S. governmental authorities for such purposes) is no longer valid.

(e)     Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrowers or Agent to determine the withholding or deduction required to be made.

(f)     If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which it has been indemnified by any Borrower pursuant to this Section 2.8 (including by the payment of additional amounts pursuant to this Section 2.8), then it shall promptly pay an amount equal to such refund to Borrower, net of all reasonable out-of-pocket expenses of such Lender or of Agent with respect thereto, including any Taxes; provided, however, that Borrower, upon the written request of such Lender or Agent, agrees to repay any amount paid over to Borrower to such Lender or to Agent (plus any related penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such Lender or Agent is required, for any reason, to disgorge or otherwise repay such refund. Notwithstanding anything to the contrary in this Section 2.8, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.8(f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.8 shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     If a payment made to a Lender under any Financing Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Agent at the time or times prescribed by Law and at such time or times reasonably requested by Borrower or Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Agent as may be necessary for Borrower and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.17(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Document or otherwise payable by Agent to such Lender from any other source against any amount due to Agent under this paragraph (h).

(i)     If any Lender shall determine in its commercially reasonable judgment that the adoption or taking effect of, or any change in, any applicable Law regarding capital adequacy, in each instance, after the Closing Date, or any change after the Closing Date in the interpretation, administration or application thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, or the compliance by any Lender or any Person controlling such Lender with any request, guideline or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency adopted or otherwise taking effect after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such controlling Person could have achieved but for such adoption, taking effect, change, interpretation, administration, application or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy) then from time to time, upon written demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Agent), Borrowers shall promptly pay to such Lender such additional amount as will compensate such Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which such Lender first made demand therefor; *provided, however, that*

notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued.

(j)    If any Lender requires compensation under Section 2.8(i), or requires any Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.8(a), then, upon the written request of Borrower Representative, such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder (subject to the terms of this Agreement) to another of its offices, branches or affiliates, if, in the reasonable business judgment of such Lender, such designation or assignment (i) would eliminate or materially reduce amounts payable pursuant to any such subsection, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender (as determined in its sole discretion). Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**Section 2.9    Appointment of Borrower Representative.**    Each Borrower hereby designates Borrower Representative as its representative and agent on its behalf for the purposes of issuing Notices of Borrowing and Borrowing Base Certificates, and giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Financing Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Financing Documents.    Borrower Representative hereby accepts such appointment.    Notwithstanding anything to the contrary contained in this Agreement, no Borrower other than Borrower Representative shall be entitled to take any of the foregoing actions.    The proceeds of each Loan made hereunder shall be advanced to Borrowers at the direction of Borrower Representative and if funds are advanced to a Borrower but not used by a Borrower in its business (for the purposes provided in this Agreement) such funds shall be deemed to be immediately allocated by Borrower Representative to the appropriate other Borrower hereunder as an intercompany loan (collectively, "**Intercompany Loans**").    All collections of each Borrower in respect of Accounts and other proceeds of Collateral of such Borrower received by Agent and applied to the Obligations shall also be deemed to be repayments of the Intercompany Loans owing by such Borrower.    Borrowers shall maintain accurate books and records with respect to all Intercompany Loans and all repayments thereof. Agent and each Lender may regard any notice or other communication pursuant to any Financing Document from Borrower Representative as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or all Borrowers hereunder to Borrower Representative on behalf of such Borrower or all Borrowers.    Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and

enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

**Section 2.10    Joint and Several Liability; Rights of Contribution; Subordination and Subrogation**.

(a)    Borrowers are defined collectively to include all Persons named as one of the Borrowers herein; *provided, however*, that any references herein to "any Borrower", "each Borrower" or similar references, shall be construed as a reference to each individual Person named as one of the Borrowers herein.  Each Person so named shall be jointly and severally liable for all of the obligations of Borrowers under this Agreement.  Each Borrower, individually, expressly understands, agrees and acknowledges, that the credit facilities would not be made available on the terms herein in the absence of the collective credit of all of the Persons named as the Borrowers herein, the joint and several liability of all such Persons, and the cross-collateralization of the collateral of all such Persons.  Accordingly, each Borrower individually acknowledges that the benefit to each of the Persons named as one of the Borrowers as a whole constitutes reasonably equivalent value, regardless of the amount of the credit facilities actually borrowed by, advanced to, or the amount of collateral provided by, any individual Borrower.  In addition, each entity named as one of the Borrowers herein hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement shall be applicable to and shall be binding upon and measured and enforceable individually against each Person named as one of the Borrowers herein as well as all such Persons when taken together.  By way of illustration, but without limiting the generality of the foregoing, the terms of Section 10.1 of this Agreement are to be applied to each individual Person named as one of the Borrowers herein (as well as to all such Persons taken as a whole), such that the occurrence of any of the events described in Section 10.1 of this Agreement as to any Person named as one of the Borrowers herein shall constitute an Event of Default even if such event has not occurred as to any other Persons named as the Borrowers or as to all such Persons taken as a whole.

(b)    Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the liability of each Borrower for the Obligations and the Liens granted by Borrowers to secure the Obligations, not constitute a Fraudulent Conveyance (as defined below).  Consequently, Agent, Lenders and each Borrower agree that if the liability of a Borrower for the Obligations, or any Liens granted by such Borrower securing the Obligations would, but for the application of this sentence, constitute a Fraudulent Conveyance, the liability of such Borrower and the Liens securing such liability shall be valid and enforceable only to the maximum extent that would not cause such liability or such Lien to constitute a Fraudulent Conveyance, and the liability of such Borrower and this Agreement shall automatically be deemed to have been amended accordingly.  For purposes hereof, the term "**Fraudulent Conveyance**" means a fraudulent conveyance under Section 548 of Chapter 11 of Title II of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

(c)    Agent is hereby authorized, without notice or demand (except as otherwise specifically required under this Agreement) and without affecting the liability of any

Borrower hereunder, at any time and from time to time, to (i) renew, extend or otherwise increase the time for payment of the Obligations; (ii) with the written agreement of any Borrower, change the terms relating to the Obligations or otherwise modify, amend or change the terms of any Note or other agreement, document or instrument now or hereafter executed by any Borrower and delivered to Agent for any Lender; (iii) accept partial payments of the Obligations; (iv) take and hold any Collateral for the payment of the Obligations or for the payment of any guaranties of the Obligations and after the occurrence and during the continuance of any Event of Default, exchange, enforce, waive and release any such Collateral; (v) apply any such Collateral and direct the order or manner of sale as provided herein; and (vi) after the occurrence and during the continuance of any Event of Default, settle, release, compromise, collect or otherwise liquidate the Obligations and any Collateral therefor in any manner, all surety defenses being hereby waived by each Borrower.  Without limitations of the foregoing, with respect to the Obligations, each Borrower hereby makes and adopts each of the agreements and waivers set forth in each Guarantee, the same being incorporated hereby by reference.  Except as specifically provided in this Agreement or any of the other Financing Documents, Agent shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from any Borrower or any other source, and such determination shall be binding on all Borrowers.  All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of the Obligations that Agent shall determine, in its sole discretion, without affecting the validity or enforceability of the Obligations of the other Borrower.

(d)     Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect the Obligations from any obligor or other action to enforce the same; (ii) the waiver or consent by Agent with respect to any provision of any instrument evidencing the Obligations, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Agent; (iii) failure by Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations; (iv) the institution of any proceeding under the Bankruptcy Code, or any similar proceeding, by or against a Borrower or Agent's election in any such proceeding of the application of Section 1111(b)(2) of the Bankruptcy Code; (v) any borrowing or grant of a security interest by a Borrower as debtor-in-possession, under Section 364 of the Bankruptcy Code; (vi) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of Agent's claim(s) for repayment of any of the Obligations; or (vii) any other circumstance other than payment in full of the Obligations which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

(e)     The Borrowers hereby agree, as between themselves, that to the extent that Agent, on behalf of Lenders, shall have received from any Borrower any Recovery Amount (as defined below), then the paying Borrower shall have a right of contribution against each other Borrower in an amount equal to such other Borrower's contributive share of such Recovery Amount; *provided, however*, that in the event any Borrower suffers a Deficiency Amount (as defined below), then the Borrower suffering the Deficiency Amount shall be entitled to seek and receive contribution from and against the other Borrowers in an amount equal to the Deficiency Amount; and *provided, further*, that in no event shall the aggregate amounts so reimbursed by reason of the contribution of any Borrower equal or exceed an amount that would, if paid,

constitute or result in Fraudulent Conveyance. Until all Obligations have been paid and satisfied in full, no payment made by or for the account of a Borrower including, without limitation, (i) a payment made by such Borrower on behalf of the liabilities of any other Borrower, or (ii) a payment made by any other Guarantor under any Guarantee, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of such other Borrower's property. The right of each Borrower to receive any contribution under this Section 2.10(e) or by subrogation or otherwise from any other Borrower shall be subordinate in right of payment to the Obligations and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder, until the Obligations have been indefeasibly paid and satisfied in full, and no Borrower shall exercise any right or remedy with respect to this Section 2.10(e) until the Obligations have been indefeasibly paid and satisfied in full. As used in this Section 2.10(e), the term "**Recovery Amount**" means the amount of proceeds received by or credited to Agent from the exercise of any remedy of the Lenders under this Agreement or the other Financing Documents, including, without limitation, the sale of any Collateral. As used in this Section 2.10(e), the term "**Deficiency Amount**" means any amount that is less than the entire amount a Borrower is entitled to receive by way of contribution or subrogation from, but that has not been paid by, the other Borrowers in respect of any Recovery Amount attributable to the Borrower entitled to contribution, until the Deficiency Amount has been reduced to zero through contributions and reimbursements made under the terms of this Section 2.10(e) or otherwise.

### Section 2.11    Collections and Lockbox Account.

(a)    Borrowers shall maintain a lockbox (the "**Lockbox**") with a United States depository institution designated from time to time by Agent (the "**Lockbox Bank**"), subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Control Agreement and such other agreements related to such Lockbox as Agent may require. Borrowers shall ensure that all collections of Accounts (other than Accounts for which the Account Debtor is a Governmental Account Debtor) are paid directly from Account Debtors (i) into the Lockbox for deposit into the Lockbox Account and/or (ii) directly into the Lockbox Account; *provided, however*, unless Agent shall otherwise direct by written notice to Borrowers, Borrowers shall be permitted to cause Account Debtors who are individuals to pay Accounts directly to Borrowers, which Borrowers shall then administer and apply in the manner required below.

(b)    If any of the Account Debtors are Governmental Account Debtors, Borrowers shall establish and maintain additional lockboxes (also herein referred to collectively in the singular as the "**Lockbox**") and related Lockbox Accounts with the Lockbox Bank, subject to the provisions of this Agreement, and shall execute with the Lockbox Bank, a Deposit Account Restriction Agreement and such other agreements related to such Lockbox as Agent may require. Borrowers shall ensure that all collections of Accounts due from Governmental Account Debtors are paid directly from such Account Debtors into the applicable Lockbox and/or Lockbox Account established pursuant to this subsection for deposit into the Lockbox Account established pursuant to this subsection; *provided, however*, unless Agent shall otherwise direct by written notice to Borrowers, Borrowers shall be permitted to receive checks from Governmental Account Debtors directly, which Borrowers shall then administer and apply in the

54

manner required below. All funds deposited into a Lockbox Account that is subject (or required to be subject) to a Deposit Account Restriction Agreement shall be transferred into either (at Agent's option) (i) the Payment Account each Business Day, or (ii) the Lockbox Account established pursuant to Section 2.11(a), and then transferred to the Payment Account each Business Day.

(c)    All funds deposited into a Lockbox Account shall be transferred into the Payment Account each Business Day.

(d)    Notwithstanding anything in any lockbox agreement or Deposit Account Control Agreement to the contrary, Borrowers agree that they shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockbox and, the Lockbox Account and that Agent shall have no liability therefor. Borrowers hereby indemnify and agree to hold Agent harmless from any and all liabilities, claims, losses and demands whatsoever, including reasonable attorneys' fees and expenses actually incurred by Agent directly, arising from or relating to actions of Agent or the Lockbox Bank pursuant to this Section or any lockbox agreement or Deposit Account Control Agreement, except to the extent of such losses arising solely from Agent's gross negligence, bad faith or willful misconduct.

(e)    Agent shall apply, on a daily basis, all funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Revolving Loans; provided that, notwithstanding the foregoing, between the time period of entry of the Interim Order and entry of the Final Order, the funds transferred into the Payment Account pursuant to this Section (including any funds transferred from and after the Petition Date but prior to the Closing Date) shall be applied to repay the "Revolving Loan Outstandings" under the Prepetition Credit Agreement plus all accrued and unpaid interest, fees, costs, expenses, indemnities and premiums thereon or with respect thereto and all other amounts due and payable thereon pursuant to a "creeping roll up" of Prepetition Obligations. If as the result of collections of Accounts pursuant to the terms and conditions of this Section, a credit balance exists with respect to the Loan Account, such credit balance shall not accrue interest in favor of Borrowers, but Agent shall transfer such funds into an account designated by Borrower Representative provided no Event of Default exists on such date.

(f)    To the extent that any collections of Accounts or proceeds of other Collateral are not sent directly to the Lockbox or Lockbox Account but are received by any Borrower, such collections shall be held in trust for the benefit of Agent pursuant to an express trust created hereby and promptly remitted, in the form received, to applicable Lockbox or Lockbox Account. No such funds received by any Borrower shall be commingled with other funds of the Borrowers. If any funds received by any Borrower are required to be deposited to a Lockbox or Lockbox Account and are not so deposited within two (2) Business Days, then Borrower shall pay to Agent, for its own account and not for the account of any other Lenders, a compliance fee equal to $500 for each Business Day that any such conditions exist.

(g)    Borrowers acknowledge and agree that compliance with the terms of this Section is essential, and that Agent and Lenders will suffer immediate and irreparable injury and have no adequate remedy at law, if any Borrower, through acts or omissions, causes or permits Account Debtors to send payments other than to the Lockbox or Lockbox Accounts or if any

Borrower fails to promptly deposit collections of Accounts or proceeds of other Collateral in the Lockbox Account as herein required.  Accordingly, in addition to all other rights and remedies of Agent and Lenders hereunder, Agent, subject to the DIP Orders with respect to the Debtors, shall have the right to seek specific performance of the Borrowers' obligations under this Section, and any other equitable relief as Agent may deem necessary or appropriate, and Borrowers waive any requirement for the posting of a bond in connection with such equitable relief.

(h)     Borrowers shall not, and Borrowers shall not suffer or permit any Credit Party to, (i) withdraw any amounts from any Lockbox Account, (ii) change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii) send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of Accounts or other Collateral.  Borrowers shall, and shall cause each Credit Party to, cooperate with Agent in the identification and reconciliation on a monthly basis of all amounts constituting net patient revenue received in or required to be deposited into the Lockbox Accounts to the reported cash posted in the most-recent Borrowing Base Certificate prepared by Borrowers and delivered to Agent.  For any given month, such identification and reconciliation shall occur during ten (10) Business Days following the end of each calendar month.  If more than fifteen percent (15%) of the collections of Accounts received by Borrowers for such month is not identified or reconciled to the reasonable satisfaction of Agent within ten (10) Business Days of receipt, Agent shall not be obligated to make further advances under this Agreement until such amount is identified or is reconciled to the reasonable satisfaction of Agent, as the case may be.  In addition, if any such amount cannot be identified or reconciled to the reasonable satisfaction of Agent, Agent may utilize its own staff or, if it deems necessary, engage an outside auditor, in either case at Borrowers' expense (which in the case of Agent's own staff shall be in accordance with Agent's then prevailing customary charges (*plus* reasonable expenses actually incurred)), to make such examination and report as may be necessary to identify and reconcile such amount.

(i)     If any Borrower breaches its obligation to direct payments of the proceeds of the Accounts to the Lockbox and/or Lockbox Account, Agent, as the irrevocably made, constituted true and lawful attorney for Borrowers, may, by the signature or other act of any of Agent's officers (without requiring any of them to do so), direct any Account Debtor to pay proceeds of the Accounts to Borrowers by directing payment to the Lockbox and/or Lockbox Account.

(j)     Borrowers shall cause any payments, settlements, dividends or distributions received by a Borrower from HPP to be paid directly from HPP to the Lockbox Account described in clause (a) above.

(k)     Borrowers shall not be required to comply with the terms of this Section 2.11 with respect to any Incentive Payments received by PPN Philadelphia.

**Section 2.12     Termination; Restriction on Termination**.

(a)     <u>Termination by Lenders</u>.  In addition to the rights set forth in Section 10.2 and in the DIP Orders, Agent may, and at the direction of Required Lenders shall, terminate this Agreement (i) with written notice to Borrower Representative upon or after the occurrence and

CHICAGO/#3334319.13334319.3

during the continuance of an Event of Default and (ii) without further application to or order of the Bankruptcy Court.

(b)    Termination by Borrowers.  Upon at least five (5) days' prior written notice to Agent and Lenders, Borrowers may, at its option, terminate this Agreement; *provided, however,* that no such termination shall be effective until Borrowers have paid or collateralized to Agent's satisfaction all of the Obligations (other than unasserted Contingent Obligations) in immediately available funds.  Any notice of termination given by Borrowers shall be irrevocable unless all Lenders otherwise agree in writing and no Lender shall have any obligation to make any Loans on or after the termination date stated in such notice.  Borrowers may elect to terminate this Agreement in its entirety only.  No section of this Agreement or type of Loan available hereunder may be terminated singly.

(c)    Effectiveness of Termination.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without further application to or order of the Bankruptcy Court, all of the Obligations (other than unasserted Contingent Obligations) shall be immediately due and payable upon the Termination Date.  All undertakings, agreements, covenants, warranties and representations of Borrowers contained in the Financing Documents shall survive any such termination and Agent shall retain its Liens in the Collateral and Agent and each Lender shall retain all of its rights and remedies under the Financing Documents notwithstanding such termination until all Obligations have been discharged, collateralized or paid, in full, in immediately available funds, including, without limitation, **all Obligations under Section 2.2(d) resulting from such termination**.  Notwithstanding the foregoing or the payment in full of the Obligations, Agent shall not be required to terminate its Liens in the Collateral unless, with respect to any loss or damage Agent may incur as a result of dishonored checks or other items of payment received by Agent from Borrower or any Account Debtor and applied to the Obligations (other than unasserted Contingent Obligations), Agent shall, at its option, (i) have received a written agreement satisfactory to Agent, executed by Borrowers and by any Person whose loans or other advances to Borrowers are used in whole or in part to satisfy the Obligations, indemnifying Agent and each Lender from any such loss or damage or (ii) have retained cash Collateral or other Collateral for such period of time as Agent, in its reasonable discretion, may deem necessary to protect Agent and each Lender from any such loss or damage.

## ARTICLE 3 REPRESENTATIONS AND WARRANTIES

To induce Agent and Lenders to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, each Borrower hereby represents and warrants to Agent and each Lender that:

### Section 3.1    Existence and Power.

(a)    Each Credit Party (i) is an entity as specified on Schedule 3.1, is duly organized, validly existing and in good standing under the laws of the jurisdiction specified on Schedule 3.1 and is not organized under any other jurisdiction, (ii) has the same legal name as it appears in such Credit Party's Organizational Documents and an organizational identification number (if any), in each case as specified on Schedule 3.1, and (iii) has all powers and all Permits necessary or desirable in the operation of its business as presently conducted or as

proposed to be conducted, except where the failure to have such Permits could not reasonably be expected to have a Material Adverse Effect.

(b)    Each Credit Party is qualified to do business as a foreign entity in each jurisdiction in which it is required to be so qualified, which jurisdictions as of the Closing Date are specified on Schedule 3.1, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(c)    Except as set forth on Schedule 3.1, no Credit Party (a) has had, over the five (5) year period preceding the Closing Date, any name other than its current name, or (b) was incorporated or organized under the laws of any jurisdiction other than its current jurisdiction of incorporation or organization.

**Section 3.2    Organization and Governmental Authorization; No Contravention.** Other than and conditioned upon entry of the DIP Orders and such other necessary orders of the Bankruptcy Court, the execution, delivery and performance by each Credit Party of the Operative Documents to which it is a party (a) are within its powers, have been duly authorized by all necessary action pursuant to its Organizational Documents, (b) require no further action by or in respect of, or filing with, any Governmental Authority or other material order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, or any other action of, any other Person (except for (x) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date and (y) those, the failure of which to receive, could not reasonably be expected to have a Material Adverse Effect), and (c) do not violate, conflict with or cause a breach or a default under (i) any Law applicable to any Credit Party or any of the Organizational Documents of any Credit Party, or (ii) except as set forth on Schedule 3.2 any agreement or instrument binding upon it, except for such violations, conflicts, breaches or defaults as could not, with respect to this clause (c), reasonably be expected to have a Material Adverse Effect.

**Section 3.3    Binding Effect.** Each of the Operative Documents to which any Credit Party is a party constitutes a valid and binding agreement or instrument of such Credit Party, enforceable against such Credit Party (subject to all claims, counterclaims and defenses as to the Conifer Agreement and the Transition Services Agreement) in accordance with its respective terms except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable powers.

**Section 3.4    Capitalization.** The authorized equity securities of each of the Credit Parties as of the Closing Date, is as set forth on Schedule 3.4.  All issued and outstanding equity securities of each of the Credit Parties are duly authorized and validly issued, fully paid, nonassessable, free and clear of all Liens other than those in favor of Agent for the benefit of Agent and the Lenders (whether arising Prepetition or Postpetition), and such equity securities were issued in compliance with all applicable Laws.  The identity of the holders of the equity securities of each of the Credit Parties and the percentage of their fully-diluted ownership of the equity securities of each of the Credit Parties as of the Closing Date is set forth on Schedule 3.4. No shares of the capital stock or other equity securities of any Credit Party, other than those described above, are issued and outstanding as of the Closing Date.  Except as set forth on

Schedule 3.4, as of the Closing Date there are no preemptive or other outstanding rights, options, warrants, conversion rights or similar agreements or understandings for the purchase or acquisition from any Credit Party of any equity securities of any such entity.

Section 3.5    **Financial and Project Information.**  All information (other than any projection or forecast) delivered to Agent and pertaining to the financial condition of any Credit Party fairly presents in all material respects the financial position of such Credit Party as of such date in conformity with GAAP (and as to unaudited financial statements, subject to normal year-end adjustments, adjustments relating to accounts receivable lag analysis, purchase accounting adjustments with respect to the period ending December 31, 2018 or any portion thereof, and the absence of footnote disclosures); provided that, with respect to any projected or forecasted financial information, the Borrowers represent that such information was prepared in good faith based on assumption believed to be reasonable at the time of preparation.  All information (other than any projection or forecast) delivered to Agent and pertaining to the financial, physical or other condition or aspect of the Project is true, accurate and correct in all material respects as of such date and as of the Closing Date.

Section 3.6    **Litigation**.  Except as set forth on Schedule 3.6, and excluding any Prepetition litigation that is stayed by the provisions of Section 362 of the Bankruptcy Code or otherwise, as of the Closing Date and except as hereafter disclosed to Agent in writing, there is no Litigation pending against, or to such Borrower's knowledge threatened in writing against, any Credit Party or Project or, to such Borrower's knowledge, any party to any Operative Document other than a Credit Party that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or which in any manner draws into question the validity of any of the Operative Documents.

Section 3.7    **Ownership of Property.**  Each Credit Party is the lawful owner of, has good and marketable title to and is in lawful possession of, or has valid leasehold interests in, all properties and other assets (real or personal, tangible, intangible or mixed) purported or reported to be owned or leased (as the case may be) by such Person.

Section 3.8    **No Default.**  No Event of Default, or to such Borrower's knowledge, Default, has occurred and is continuing.

Section 3.9    **Labor Matters.**  As of the Closing Date there are no strikes or other work stoppages pending or, to any Borrower's knowledge, threatened against any Credit Party.  Hours worked and payments made to the employees of the Borrowers and/or Operator have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters. All payments due from the Borrowers and/or Operator or for which any claim may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on their books, as the case may be. The consummation of the transactions contemplated by the Financing Documents and the other Operative Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.

CHICAGO/#3334319.13334319.3

**Section 3.10    Regulated Entities.**  No Credit Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," all within the meaning of the Investment Company Act of 1940.

**Section 3.11    Margin Regulations.**  None of the proceeds from the Loans have been or will be used, directly or indirectly, for the purpose of purchasing or carrying any "margin stock" (as defined in Regulation U of the Federal Reserve Board), for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any "margin stock" or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation T, U or X of the Federal Reserve Board.

**Section 3.12    Compliance with Laws; Anti-Terrorism Laws.**

(a)    Each Credit Party is in compliance with the requirements of all applicable Laws, except for such Laws the noncompliance with which could not reasonably be expected to have a Material Adverse Effect; provided that the making of this representation and warranty by Hahnemann Operator shall be qualified in all respects by the existence of and/or the occurrence of the Hahnemann Closure and as a result of the Bankruptcy Cases.

(b)    None of the Credit Parties and, to the knowledge of the Credit Parties, none of their Affiliates (i) is in violation of any Anti-Terrorism Law, (ii) engages in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, (iii) is a Blocked Person, or is controlled by a Blocked Person, (iv) is acting for or on behalf of a Blocked Person, (v) is associated with a Blocked Person or (vi) is providing material, financial or technical support or other services to or in support of acts of terrorism of a Blocked Person.  No Credit Party nor, to the knowledge of any Credit Party, any of its Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

**Section 3.13    Taxes.**  Except to the extent set forth in Schedule 3.13 herein and subject to a Permitted Contest and, with respect to Debtors only, for unpaid Taxes as of the Petition Date and, Postpetition, as otherwise permitted by the Bankruptcy Code: (a) all federal, state and material local tax returns and reports required to be filed by or on behalf of each Credit Party have been filed with the appropriate Governmental Authorities in all jurisdictions in which such returns and reports are required to be filed (after giving effect to any extensions thereof) and all Taxes (including real property Taxes) and other charges shown to be due and payable in respect thereof have been timely paid prior to the date on which any fine, penalty, interest, or late charge may be added thereto for nonpayment thereof; (b) all state and local sales and use Taxes required to be paid by each Debtor have been paid; and (c) all federal and state returns have been filed by each Credit Party for all periods for which returns were due with respect to employee income tax withholding, social security and unemployment taxes, and the amounts shown thereon to be due and payable have been paid in full or adequate provisions therefor have been made.

**Section 3.14    Compliance with ERISA**.

(a)    Each ERISA Plan (and the related trusts and funding agreements) of a Borrower or a Subsidiary complies in form and in operation with, has been administered in compliance with, and the terms of each ERISA Plan satisfy, the applicable requirements of ERISA and the Code in all material respects. Each ERISA Plan which is intended to be qualified under Section 401(a) of the Code is so qualified, and the United States Internal Revenue Service has issued a favorable determination letter with respect to each such ERISA Plan which may be relied on currently. No Credit Party has incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

(b)    Except as set forth on Schedule 3.14(b) herein and/or as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Borrower and each Subsidiary is in compliance with the applicable provisions of ERISA and the provision of the Code relating to ERISA Plans and the regulations and published interpretations therein. During the thirty-six (36) month period prior to the Closing Date or the making of any Loan, (i) no steps have been taken to terminate any Pension Plan, and (ii) no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA. No condition exists or event or transaction has occurred with respect to any Pension Plan which could reasonably be expected to result in the incurrence by any Credit Party of any material liability, fine or penalty. No Credit Party has incurred liability to the PBGC (other than for current premiums) with respect to any employee Pension Plan. No Credit Party nor any member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan.

**Section 3.15    Consummation of Operative Documents; Brokers**. Except for fees payable to Agent and/or Lenders, and except for SSG Advisory Services, LLC, no Credit Party has engaged any broker, finder or other intermediary to bring about the obtaining, making or closing of the transactions contemplated by the Operative Documents, and no Credit Party has or will have any obligation to any Person in respect of any finder's or brokerage fees, commissions or other expenses in connection herewith or therewith.

**Section 3.16    Reserved**.

**Section 3.17    Reserved**.

**Section 3.18    Compliance with Environmental Requirements; No Hazardous Materials**. Except in each case as set forth on Schedule 3.18 and to the actual knowledge of the Borrowers without investigation or inquiry:

(a)    no notice, notification, demand, request for information, citation, summons, complaint or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending or threatened in writing by any Governmental Authority or other Person with respect to any (i) alleged violation by any Borrower of any Environmental Law, (ii) alleged failure by any Borrower to have any Permits required in

connection with the conduct of its business or to comply with the terms and conditions thereof, (iii) any generation, treatment, storage, recycling, transportation or disposal of any Hazardous Materials by any Borrower, or (iv) Release of Hazardous Materials by any Borrower; and

(b)    no property now owned or leased by any Credit Party and no such property previously owned or leased by any Credit Party, to which any Credit Party has, directly or indirectly, transported or arranged for the transportation of any Hazardous Materials, is listed or, to such Borrower's knowledge, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of Federal, state or local enforcement actions or, to the knowledge of such Borrower, other investigations which may lead to claims against any Credit Party for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, without limitation, claims under CERCLA.

For purposes of this Section 3.18, each Credit Party shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of such Credit Party.

**Section 3.19    Super-Priority Nature of Obligations and Agent's and Lender's Liens.** The priority of Agent's and Lender's Liens on the Collateral owned by Debtors is as set forth in the Interim Order and the Final Order entered with respect to the Bankruptcy Cases.

**Section 3.20    Full Disclosure.**  None of the written information (financial or otherwise but excluding any projections or forecasts referenced below) furnished by or on behalf of any Credit Party to Agent or any Lender in connection with the consummation of the transactions contemplated by the Operative Documents, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which such statements were made.  All financial projections delivered to Agent and the Lenders by Borrowers (or their agents) have been prepared on the basis of the assumptions stated therein.   Such projections represent each Borrower's best estimate of such Borrower's future financial performance and such assumptions are believed by such Borrower to be fair and reasonable in light of current business conditions; *provided*, *however*, that Borrowers can give no assurance that such projections will be attained.

**Section 3.21    Interest Rate.**  The rate of interest paid under the Notes does not violate any of the Organizational Documents.

**Section 3.22    Subsidiaries.**   Borrowers do not own any stock, partnership interests, limited liability company interests or other equity securities except for Permitted Investments.

**Section 3.23    Appointment of a Trustee or Examiner; Liquidation**.  No order has been entered in any Bankruptcy Case (a) for the appointment of a chapter 11 trustee, (b) for the appointment of an examiner with expanded powers (beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code, (c) to convert any Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (d) to dismiss any Bankruptcy Case.

**Section 3.24    Reorganization Matters**.

(a)    The Bankruptcy Cases were commenced on the Petition Date in accordance with applicable Law and proper notice thereof.

(b)    Proper notice for (i) the motion seeking approval of this Agreement, the other Financing Documents, the Interim Order and Final Order, (ii) the hearing for the approval of the Interim Order (the "**Interim Hearing**") and (iii**and (ii**) the hearing for approval of the Final Order has been given.  The Borrowers have given, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

## ARTICLE 4 AFFIRMATIVE COVENANTS

Each Borrower agrees that, so long as any Credit Exposure exists:

**Section 4.1    Financial Statements and Other Reports**.

(a)    Each Credit Party's financial statements shall be on an accrual basis consistent with industry standards as in effect on the Closing Date and substantially in accordance with GAAP.

(b)    Each Borrower will furnish to Agent **and counsel for the Committee** (or cause to be furnished to Agent **and counsel for the Committee**) the following financial information and reports with respect to each Borrower and each Credit Party, in each case in form and format and providing information reasonably satisfactory to Agent:

(i)    Prior to the Closing Date, the DIP Budget, and on the first Business Date of each week thereafter, an updated "rolling" 13-week budget that includes a DIP Budget Variance Report, which, once approved in writing by Agent in its sole discretion, shall supplement and replace the prior DIP Budget without further notice, motion, application to, order of, or hearing before the Bankruptcy Court;

(ii)    within thirty (30) days of the end of each calendar month, internally prepared monthly financial statements (including income statements and balance sheets) prepared for Borrowers on a consolidated and hospital-by-hospital basis which fairly present, in all material respects, the financial condition for Borrowers for such period;

(iii)    within thirty (30) days of the end of each calendar month, a report of operating statistics for each Project, which includes a schedule showing case mix, length of stay and payor mix in respect of Third Party Payor Programs;

(iv)    within forty-five (45) days of the end of each fiscal quarter, internally prepared quarterly financial statements (including income statements and balance sheets) prepared for Borrowers on a consolidated and hospital-by-hospital basis which fairly present, in all material respects, the financial condition for Borrowers for such period;

(v)    within forty-five (45) days after the end of each calendar month, a fully completed Compliance Certificate, and, if requested by Agent, back-up documentation as Agent shall reasonably require evidencing such compliance;

(vi)    within fifteen (15) days before the end of each fiscal year, annual projected profit and loss statements (prepared on a monthly basis) for the succeeding fiscal year;

(vii)    within seventy-five (75) days after the end of each fiscal year, internally prepared annual financial statements prepared for the Borrowers on a consolidated basis in accordance with GAAP (except for the absence of footnotes and year-end adjustments) and based on an accrual basis of accounting consistent with industry standards;

(viii)    [Reserved];

(ix)    as requested by Agent, (A) evidence satisfactory to Agent that all Postpetition federal and state taxes, including, without limitation payroll taxes, that are due have been paid in full, (B) copies of all cost reports and rate letters filed with Medicare or Medicaid or any other Third Party Payor and (C) a written statement setting forth any asserted right of set-off, counterclaim or other defense under any leases;

(x)    within ten (10) days after the last day of each month, deliver to Agent a duly completed Borrowing Base Certificate signed by a Responsible Officer, with aged listings of accounts receivable and accounts payable (by invoice date) and such other information concerning Supplemental Payments as is necessary to calculate Eligible Supplement Payments;

(xi)    not later than May 31 of each calendar year, audited financial statements of the Insurance Captive for the immediately prior Fiscal Year of the Insurance Captive, prepared in accordance with the State of Vermont statutory reporting requirements, consistently applied, together with an unqualified opinion on the financial statements from an independent certified public accounting firm acceptable to Agent in its reasonable discretion.  Borrowers shall cause the Insurance Captive to conduct, at least annually, an actuarial review of the Insurance Captive that shall include, without limitation, a review of all professional and general liability claims and other claims covered by the Insurance Captive and shall cause the Insurance Captive to deliver to Agent, promptly upon receipt (but in no event more than five (5) Business Days after receipt by the Insurance Captive) such final actuarial report and any and all other written non-privileged material reports, opinions and studies performed by actuaries or insurance advisors related to the business of the Insurance Captive;

(xii)    within three (3) Business Days after receipt, copies of all reports and documentation provided by Conifer pursuant to the Conifer Agreement, respectively; and

(xiii)    such additional information, reports or statements regarding the Credit Parties, the Projects or Operator as Agent may from time to time reasonably request.

(c)    From time to time, if Agent determines that obtaining appraisals is necessary or advisable, Borrowers shall furnish (or use best efforts cause Broad Street to furnish) to Agent appraisal reports in form and substance and from appraisers reasonably satisfactory to Agent stating the then current fair market values of all or any portion of the Collateral; provided that, for the avoidance of doubt, the cost of any such appraisals shall be paid by Agent and added to the Obligations.

(d)    Promptly upon (but in any event within thirty (30) days after) receipt or filing thereof, each Borrower shall deliver to Agent copies of any reports or notices related to any material taxes and any other material reports or material notices received by any Borrower or Guarantor from, or filed by any Borrower or Guarantor with, any Governmental Authority.

**Section 4.2    Payment and Performance of Obligations.**    Subject to the DIP Budget and the Bankruptcy Code, each Borrower (a) will pay and discharge, at or prior to maturity, all of their respective Postpetition obligations and liabilities, including tax liabilities, except for such obligations and/or liabilities (i) that may be the subject of a Permitted Contest and (ii) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, (b) will maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities, and (c) will not breach, or permit to exist any default caused by such Borrower under, the terms of any Postpetition contractual obligations under any lease, commitment, contract, instrument or obligation to which it is party, or by which its properties or assets are bound, except for such breaches or defaults which could not reasonably be expected to have a Material Adverse Effect.  For the avoidance of doubt, notwithstanding the foregoing, it is understood and agreed that the Borrowers will not have sufficient funds under the DIP Budget to pay in full all Postpetition obligations claimed to be due, including, without limitation, obligations arising under the Conifer Agreement and the Transition Services Agreement unless the Person to which such Postpetition obligation is owed agrees to a different payment arrangement which has been approved by the Agent.

**Section 4.3    Maintenance of Existence**.    Each Borrower will preserve, renew and keep in full force and effect their respective existence and all material rights, privileges and franchises necessary in the conduct of business as currently conducted and herein contemplated; it being understood and agreed that the material rights, privileges and/or franchises of the Hahnemann Operator and related practice groups may be altered in connection with the Hahnemann Closure.

**Section 4.4    Maintenance of Property; Payment of Taxes; Insurance**.

(a)    Except as may be limited by the Bankruptcy Cases and the Bankruptcy Code, each Borrower will keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.  Subject to the provisions of Section 9.2, if all or any part of the Collateral useful or necessary in its business becomes damaged or

destroyed, each Borrower will promptly and completely repair and/or restore the affected Collateral in a good and workmanlike manner. Borrowers will not, and will not permit any other Person to, commit or allow waste or permit impairment or deterioration of a material portion of the Collateral or abandon all or any part of the Collateral other than in the Ordinary Course of Business. Borrowers will perform such acts to preserve the value of Collateral. Each Borrower will (i) preserve its or their interest in and title to the Collateral and will forever warrant and defend the same to Agent and Lenders against any and all claims made by, through or under Borrowers, and (ii) except in respect of Permitted Liens, forever warrant and defend the validity and priority of the lien and security interest created in the Security Documents against the claims of all Persons whomsoever claiming by, through or under Borrowers. The foregoing warranty of title shall survive the foreclosure of the Security Documents and shall inure to the benefit of and be enforceable by Agent in the event Agent acquires title to any Collateral pursuant to any foreclosure.

(b)     Borrowers will pay or cause to be paid all Postpetition Taxes prior to the date upon which any fine, penalty, interest or cost for nonpayment is imposed, and furnish to Agent, upon request, receipted bills of the appropriate taxing authority or other documentation reasonably satisfactory to Agent evidencing the payment thereof. If Borrowers shall fail to pay any Taxes in accordance with this Section and are not contesting or causing a contesting of such Taxes pursuant to a Permitted Contest, Agent shall have the right, but shall not be obligated, to (for the account of all Lenders) pay such Taxes, and Borrowers shall repay to Agent, on written demand, any amount paid by Agent, with interest thereon from the date of the advance thereof to the date of repayment, at the rate applicable during periods of Default hereunder, and such amount shall constitute a portion of the Obligations. Borrowers shall not pay any Taxes or other obligations in installments unless permitted by applicable Laws or by the applicable taxing authority, and shall, upon the request of Agent, deliver copies of all notices and bills relating to any Taxes or other charge covered by this Section to Agent.

(c)     Upon completion of any Permitted Contest, Borrowers shall immediately pay the amount due, if any, and deliver to Agent proof of the completion of the contest and payment of the amount due, if any.

(d)     Each Borrower will maintain (i) casualty insurance on all real and personal property on an all risks basis (including the perils of flood, windstorm and quake), covering the repair and replacement cost of all such property and coverage for business interruption and rent loss and professional liability and public liability insurance (including products/completed operations liability coverage), and (ii) general and professional liability insurance, and (iii) such other insurance coverage in such reasonable amounts and coverage and with respect to such risks as Agent may reasonably request from time to time and which are customary for hospitals in the same industry; *provided, however*, that, in no event shall such insurance be in amounts or with coverage less than, or with carriers with qualifications inferior to, any of the insurance or carriers in existence as of the Closing Date. All such insurance shall be provided by insurers having an A.M. Best policyholders rating reasonably acceptable to Agent. Borrowers will not bring or keep any article on any Project, or cause or allow any condition to exist, if the presence of such article or the occurrence of such condition could reasonably cause the invalidation of any insurance required by this Section 4.4(d), or would otherwise be prohibited by the terms thereof.

(e)     On or prior to the Closing Date, and at all times thereafter, each Borrower will cause Agent to be named as an additional insured, assignee and loss payee (which shall include, as applicable, identification as mortgagee), as applicable, on each insurance policy required to be maintained pursuant to this Section 4.4 pursuant to endorsements in form and content reasonably acceptable to Agent, to the extent such insurance policy permits such designation.  Borrowers will deliver to Agent and the Lenders (i) on the Closing Date, a certificate from Borrowers' insurance broker dated such date showing the amount of coverage as of such date, and that such policies will include effective waivers (whether under the terms of any such policy or otherwise) by the insurer of all claims for insurance premiums against all loss payees and additional insureds and all rights of subrogation against all loss payees and additional insureds, and that if all or any part of such policy is canceled, terminated or expires, the insurer will forthwith give notice thereof to each additional insured, assignee and loss payee and that no cancellation thereof shall be effective until at least thirty (30) days (ten (10) days if such cancellation is due to nonpayment) after receipt by each additional insured, assignee and loss payee of written notice thereof, (ii) upon the request of any Lender through Agent from time to time full information as to the insurance carried, (iii) within five (5) days of receipt of notice from any insurer, a copy of any notice of cancellation, nonrenewal or material change in coverage from that existing on the date of this Agreement, (iv) forthwith, notice of any cancellation or nonrenewal of coverage by any Borrower, and (v) not less than thirty (30) days prior to the expiration of any policies of insurance, furnish to Lender, premiums prepaid, additional and renewal insurance policies with companies, coverage and in amounts required hereunder.

(f)     In the event any Borrower fails to provide Agent with evidence of the insurance coverage required by this Agreement, Agent may purchase insurance at Borrowers' expense to protect Agent's interests in the Collateral.  This insurance may, but need not, protect any Borrower's interests.  The coverage purchased by Agent may not pay any claim made by any Borrower or any claim that is made against any Borrower in connection with the Collateral.  The applicable Borrower may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that such Borrower has obtained insurance as required by this Agreement.  If Agent purchases insurance for the Collateral, to the fullest extent provided by law Borrowers will be responsible for the costs of that insurance, including interest and other charges imposed by Agent in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to the Obligations.  The costs of the insurance may be more than the cost of insurance each Borrower is able to obtain on its own.

(g)     If any insurance proceeds are paid by check, draft or other instrument payable to any Borrower and Agent jointly and an Event of Default has occurred and is continuing, such Borrower authorizes Agent to endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash.  Borrowers shall not carry separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section.  Borrowers shall promptly notify Agent of any loss, damage, or destruction to any Collateral outside of the Ordinary Course of Business, whether or not covered by insurance.  Unless otherwise set forth herein, and an Event of Default has occurred and is continuing, Agent is hereby authorized to collect all insurance proceeds in respect of Collateral directly and to apply the same to the Obligations then due and payable.  After the

occurrence and during the continuance of an Event of Default, Agent is authorized and empowered, and each Borrower hereby irrevocably appoints Agent as its (or their) attorney-in-fact (such appointment is coupled with an interest), at Agent's option, to make or file proofs of loss or damage and to settle and adjust any claim under insurance policies which insure against such risks, or to direct Borrowers, in writing, to agree with the insurance carrier(s) on the amount to be paid in regard to such loss.

(h)   Anything in this Section 4.4 to the contrary notwithstanding, Agent acknowledges and agrees that, solely with respect to the Captive Insureds, the commercial general liability and professional liability coverage required under Section 4.4(d) shall be provided by an Insurance Captive.  The use of an Insurance Captive shall be permitted provided that:

(i)   the Insurance Captive shall, at all times, satisfy the definition of "Insurance Captive" set forth in Section 1.1;

(ii)   the Insurance Captive shall maintain, at all times, not less than $1,000,000 of unimpaired paid-in capital and surplus as required for a risk retention group under the Laws of the State of Vermont;

(iii)   the Insurance Captive shall not have any creditors, there shall be no Liens on the assets of the Insurance Captive, and the Insurance Captive shall have no Contingent Obligations other than policy claims, including without limitation, incurred but not reported claims;

(iv)   the commercial general liability coverage limits per occurrence and in the aggregate shall be not less than $1,000,000 and $3,000,000, respectively;

(v)   the hospital professional liability coverage limits per occurrence and in the aggregate shall be not less than $500,000 and $2,500,000, respectively;

(vi)   the physician professional liability coverage limits per occurrence and in the aggregate shall be not less than $500,000 and $1,500,000, respectively;

(vii)   annual premiums shall be in an amount necessary to maintain not less than $1,000,000 of unimpaired paid-in capital and surplus as required for a risk retention group under the Laws of the State of Vermont;

(viii)   the deposit accounts of the Insurance Captive benefiting the Captive Insureds shall continue to be maintained solely for the benefit of such Captive Insureds; and

(ix)   Borrowers shall comply at all times with the requirements set forth in Section 4.1(b)(x) relating to the delivery of financial reports and other items with respect to the Insurance Captive.

**Section 4.5   Compliance with Laws**.  Except as set forth in Schedule 4.5, each ~~Credit Party~~**Borrower** will comply with **(and will use good faith efforts to cause the other Credit**

**Parties to comply with)** the requirements of all applicable Laws, except to the extent that failure to so comply could not reasonably be expected to, individually or in the aggregate, (a) have a Material Adverse Effect, or (b) result in any Lien upon either a material portion of the assets of any such Person in favor of any Governmental Authority, or any portion of the Collateral which is part of the Borrowing Base; provided that it is understood and agreed that the implementation of the Hahnemann Closure remains subject to Bankruptcy Court and other approvals.

  **Section 4.6**   **Inspection of Property, Books and Records; Deposit Accounts**.  Each ~~Credit Party~~**Borrower** will keep proper books of record substantially in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities; and will permit (or will use commercially reasonable efforts to cause the Bankruptcy Court to provide access, pursuant to court order), at the sole cost of the applicable Credit Party as provided in Section 2.2(e), representatives of Agent and of any Lender (but at such Lender's expense unless such visit or inspection is made concurrently with Agent) to visit and inspect any of their respective properties, to monitor or examine any health care quality assurance programs, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective operations and the Collateral to verify the amount and age of the Accounts, the identity and credit of the respective Account Debtors, to review the billing practices of any Credit Party, and to discuss their respective affairs, finances and accounts with their respective officers, employees and independent public accountants.  In the absence of an Event of Default, Agent or any Lender exercising any rights pursuant to this Section 4.6 shall give the applicable Borrower commercially reasonable prior notice of such exercise.  No notice shall be required during the existence and continuance of any Event of Default.  If Agent or any Lender seeks, as part of its inspection or information rights hereunder or under any related agreements, access to or copies of any patient health information or other private information protected by HIPAA or other applicable local, state and federal Laws, such information shall be provided only in accordance with applicable confidentiality safeguards, in compliance with HIPAA and such other applicable Laws; provided that nothing herein shall be deemed to be a request by Agent or any Lender for such private or confidential information nor a deviation from Agent's or any Lender's policy of requesting that information provided as part of an audit or examination be de-identified prior to disclosure.  Borrowers shall cause each Depositary Bank at which a Deposit Account is maintained to provide Agent with on-line, view-only screen access, whether by Internet access or otherwise, to daily activity in each Deposit Account maintained by a Borrower (excluding the HSRE Accounts).

  **Section 4.7**   **Use of Proceeds**.  Borrowers shall use the proceeds of Revolving Loans **and Term Loan** solely in accordance with the DIP Budget: (i) to fund Postpetition operating expenses of the Borrowers, (ii) to pay professional fees and expenses as authorized by order of the Bankruptcy Court; (iii) to pay certain other costs and expenses of administration of the Bankruptcy Case, (iv) for working capital and other general corporate purposes of Borrowers not in contravention of any requirement of Law, the Financing Documents or the DIP Budget, (v) to pay interest, expenses fees and other amounts hereunder and under the other Financing Documents, (vi) to provide certain adequate protection payments to the Prepetition Secured Parties, which may include the payment, when due or as soon as practicable thereafter, of all reasonable and documented costs, fees and expenses, incurred either prior to or after the Closing Date, of the Prepetition Agent and its counsel or with respect to the Prepetition Credit

Agreement other professionals, and the payment of non-default interest as and when due (collectively, the "**Adequate Protection Payments**") and (vii) to make the Prepetition Repayment Advance on the Closing Date.  Upon issuance of the Final Order, in addition to the above, **(A)** the proceeds of **the next** Revolving Loans **made on or after the First Amendment Effective Date** shall be used for the repayment of all Prepetition Obligations remaining outstanding (with the exception of the outstanding principal balance of the ~~"Term Loan" as defined in~~**Prepetition Term Loan) and (B) the proceeds of Term Loan shall be used for the repayment of the principal balance of** the Prepetition ~~Credit Agreement)~~**Term Loan**. Borrowers shall use the entire amount of the proceeds of each Revolving Loan in accordance with this Section 4.7; provided, however, that nothing herein shall in any way prejudice or prevent the Agent or the Lenders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest, and provided, further, that Borrowers shall not use the proceeds from any Loan for any purpose that is prohibited under the Bankruptcy Code.  No portion of the proceeds of the Loans will be used for family, personal, agricultural or household use.

**Section 4.8**    **Reserved**.

**Section 4.9**    **Notices of Litigation and Defaults**.  Borrowers will give prompt written notice to Agent (a) of any Postpetition litigation or governmental proceedings pending or threatened (in writing) against Borrowers or other Credit Party which would reasonably be expected to have a Material Adverse Effect with respect to Borrowers or any other Credit Party or which in any manner calls into question the validity or enforceability of any Financing Document, (b) upon any Borrower becoming aware of the existence of any Default or Event of Default, (c) if any Credit Party is in breach or default under or with respect to any Operative Document (other than such defaults that exist as of the Closing Date), or if any Credit Party is in breach or default under or with respect to any other contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect, (d) of any strikes or other work stoppages pending or, to any Borrower's knowledge, threatened in writing against any Credit Party, (e) of all returns, recoveries, disputes and claims relating to the Accounts that involve more than $150,000, and (f) other than with respect to reimbursement audits in the Ordinary Course of Business, any Permitted Contest involving more than $150,000 as well as any status of any Permitted Contest as requested by Agent.

**Section 4.10**    **Hazardous Materials; Remediation**.  If any Release or disposal of Hazardous Materials in violation of applicable Environmental Laws, shall occur or shall have occurred on any real property or any other assets of any Borrower or any other Credit Party, such Borrower will cause, or direct the applicable Credit Party to cause, the prompt containment and removal of such Hazardous Materials and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and so that such real property or other assets may be used as intended by such Credit Party.  Without limiting the generality of the foregoing, each Borrower shall, and shall cause each other Credit Party to, comply with each Environmental Law requiring the performance at any real property by any Borrower or any other

70

Credit Party of activities in response to the Release or threatened Release of a Hazardous Material.

**Section 4.11    Reserved**.

**Section 4.12    Borrowing Base Collateral Administration**.

(a)    All data and other information relating to Accounts or other intangible Collateral shall at all times be kept by Borrowers, at their respective principal offices and shall not be moved from such locations without (i) providing prior written notice to Agent, and (ii) obtaining the prior written consent of Agent, which consent shall not be unreasonably withheld.

(b)    Borrowers shall provide prompt written notice to each Person who either is currently an Account Debtor or becomes an Account Debtor at any time following the date of this Agreement that directs each Account Debtor to make payments into the Lockbox, and hereby authorizes Agent, upon Borrowers' failure to send such notices within ten (10) days after the date of this Agreement (or ten (10) days after the Person becomes an Account Debtor), to send any and all similar notices to such Person.  Agent reserves the right to notify Account Debtors that Agent has been granted a Lien upon all Accounts.

**Section 4.13    Further Assurances**.

(a)    Each Borrower will, at its own cost and expense, cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as may from time to time be necessary or as Agent or the Required Lenders may from time to time reasonably request in order to carry out the intent and purposes of the Financing Documents and the transactions contemplated thereby, including all such actions to establish, create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of Agent for the benefit of the Lenders on the Collateral (including Collateral acquired after the date hereof).

(b)    Upon receipt of an affidavit of an officer of Agent or a Lender as to the loss, theft, destruction or mutilation of any Note or any other Financing Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other applicable Financing Document, Borrowers will issue, in lieu thereof, a replacement Note or other applicable Financing Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Financing Document in the same principal amount thereof and otherwise of like tenor.

(c)    Upon the request of Agent, Borrowers shall obtain a landlord's agreement or mortgagee agreement, as applicable, from the lessor of each leased property or mortgagee of owned property with respect to any business location where any material portion of the Collateral included in or proposed to be included in the Borrowing Base, or the records relating to such Collateral and/or software and equipment relating to such records or Collateral, is stored or located, which agreement or letter shall be reasonably satisfactory in form and substance to Agent.  Borrowers shall timely and fully pay and perform its obligations under all leases and

other agreements with respect to each leased location where any Collateral, or any records related thereto, is or may be located.

(d)    Each Borrower will, and will, cause all Subsidiaries of Borrowers to be jointly and severally obligated with the other Borrowers under all covenants and obligations under this Agreement, including the obligation to repay the Obligations.  Borrowers shall not form or acquire any new Subsidiary after the date hereof.

**Section 4.14    Reserved**.

**Section 4.15    Power of Attorney**.  ~~Subject to the provisions of the DIP Orders, each of the officers of Agent is hereby irrevocably made, constituted and appointed the true and lawful attorney for Borrowers (without requiring any of them to act as such) with full power of substitution to do the following:  (a) endorse the name of Borrowers upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to Borrowers and constitute collections on Borrowers' Accounts; (b) so long as Agent has provided not less than three (3) Business Days' prior written notice to Borrower to perform the same and Borrower has failed to take such action and an Event of Default has occurred and is continuing, execute in the name of Borrowers any schedules, assignments, instruments, documents, and statements that Borrowers are obligated to give Agent under this Agreement; (c) after the occurrence and during the continuance of an Event of Default, take any action Borrowers are required to take under this Agreement; (d) so long as Agent has provided not less than three (3) Business Days' prior written notice to Borrower to perform the same and Borrower has failed to take such action and an Event of Default has occurred and is continuing, do such other and further acts and deeds in the name of Borrowers that Agent may deem necessary or desirable to enforce any Account or other Collateral or perfect Agent's security interest or Lien in any Collateral; and (e) after the occurrence and during the continuance of an Event of Default, do such other and further acts and deeds in the name of Borrowers that Agent may deem necessary or desirable to enforce its rights with regard to any Account or other Collateral.  This power of attorney shall be irrevocable and coupled with an interest~~**Reserved**.

**Section 4.16    Reserved**.

**Section 4.17    Borrowers' Agreement to Seek to Restrict Any Alleged Rights for Setoff or Recoupment**.  Unless agreed in writing by the Agent or approved by the Bankruptcy Court (upon notice to the Agent), each Debtor shall exercise good faith and reasonable business judgment in respect of pursuing efforts to restrict, limit and/or narrow, to the maximum extent permitted under applicable law, the application and/or allowance of any alleged rights of setoff and/or recoupment by any of its creditors (including, with respect to any application for relief from the automatic stay); *provided*, however, that Borrowers agree not to settle any disputed recoupment or setoff rights without either obtaining the written consent of the Agent or approval of the Bankruptcy Court (in the case of a settlement involving a Debtor), provided further that nothing herein shall constrain Borrowers with respect to permitting undisputed recoupment or setoff rights (as determined in the exercise of Borrowers' reasonable business judgment) (provided that Prepetition setoff claims must also comply with the requirements of Section 553 of the Bankruptcy Code).  Upon the occurrence of the Termination Date (other than upon payment in full of the Obligations and termination of the Financing Documents), then Agent, on

72

behalf of Borrowers (including with respect to any successor or assign of Borrowers, such as a chapter 7 trustee, if any) and in any Borrower's (and/or such Borrower's successor's and/or assign's) name may pursue any and all of Borrower's rights, powers and interests to seek to restrict, limit and/or narrow, to the maximum extent permitted under applicable law, the application and allowance of any such alleged rights of setoff and/or recoupment involving any Borrower or any Borrower's assets or contract rights. In respect of the rights granted to the Agent under the prior sentence, and without limiting Section 4.15 in any way, Borrowers hereby appoint Agent as its agent and attorney in fact to take all actions as Agent deems reasonable to object to, restrict, limit or narrow the application or allowance of, to the maximum extent permitted under applicable law, any such alleged rights of setoff and/or recoupment by any of Borrowers' creditors.

### Section 4.18   Priority and Liens.

(a)     Each Debtor hereby covenants, represents and warrants that upon the entry of each DIP Order, the Obligations of such Debtor hereunder and under the Financing Documents:

(i)     pursuant to section 364(c)(1) of the Bankruptcy Code and subject and subordinate only to the Carve-Out, shall at all times constitute allowed Superpriority Claims, pursuant to the DIP Orders;

(ii)     pursuant to section 364(c)(2) of the Bankruptcy Code and subject and subordinate only to the Carve-Out, shall at all times be secured by first priority valid, binding, enforceable and perfected security interests in, and Liens upon, all unencumbered tangible and intangible property of such Debtor of the type that is Collateral, including any such property that is subject to valid and perfected Liens in existence on the Petition Date, which Liens are thereafter released or otherwise extinguished in connection with the satisfaction of the obligations secured by such Liens;

(iii)     pursuant to section 364(c)(3) of the Bankruptcy Code and subject to the Carve-Out, shall at all times be secured by junior, valid, binding, enforceable and perfected security interests in, and Liens upon, all property of each of the Debtor's estates that, on the Petition Date, was subject to a valid and perfected Lien (other than the Liens securing the Prepetition Indebtedness or Liens that were otherwise junior to the liens securing the Prepetition Credit Agreement as of the Petition Date) or becomes subject to a valid Lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of prepetition claims is expressly permitted under section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"); provided that the Liens granted under the Financing Documents and DIP Orders shall not be subject or subordinate to (1) notwithstanding anything to the contrary in the Financing Documents or the DIP Orders, any security interest that is avoided and preserved for the benefit of the Debtors and their estates, (2) except as provided in the DIP Orders and except for any Collateral subject to the Permitted Prior Liens, any Liens arising after the Petition Date including, any Liens or security interests granted in favor of any federal, state municipal or other governmental unit, commission, board or court for any liability of the Debtors; or (3) any intercompany or affiliate Liens of the Debtors; and

(iv)    pursuant to section 364(d)(1) of the Bankruptcy Code and subject only to the Carve-Out, shall at all times be secured by first priority priming, valid, binding, enforceable and perfected security interests in, and Liens upon, all the Prepetition Collateral.

(b)    The Secured Parties' Liens and Superpriority Claims shall have priority over any claims, charges or liens arising under section 105, 326, 328, 330, 331, 503(b), 507(a), 726, 1113 or 1114 of the Bankruptcy Code, and shall be subject and subordinate only to the Carve-Out.  Except as set forth herein or in the DIP Orders, no other claim having a priority superior to that granted to the Secured Parties by the ~~Interim Order and~~ Final Order~~, whichever is then in effect,~~ shall be granted or approved while any Obligations under this Agreement remain outstanding.

(c)    Except for the Carve-Out, no costs or expenses of administration shall be imposed against Agent or the Lenders, or any of the Collateral under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, and, each of the Debtors hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105 or 506(c) of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent or the Lenders.

(d)    Except for the Carve-Out, the Superpriority Claims shall at all times be senior to the rights of each Debtor, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of the Debtor's cases are converted to cases under chapter 7 of the Bankruptcy Code).

**Section 4.19  Sale Benchmarks**.  Debtors shall meet the following deadlines with respect to the sale of substantially all of the Collateral owned by St. Christopher Operator a price sufficient to indefeasibly pay in full the Obligations (including any unpaid Prepetition Obligations):

(a)    No later than August 7, 2019, Debtors shall file a motion for authority to implement sales procedures, that provide for the sale of substantially all of the Collateral owned by St. Christopher Operator, or a portion thereof, for cash at a price sufficient to indefeasibly pay in full the Obligations (including any unpaid Prepetition Obligations) (the "**Sales Procedure Motion**");

(b)    An order approving the Sales Procedure Motion (the "**Sales Procedure Order**"), which shall provide for a reserve price sufficient to pay in full the Obligations (including any unpaid Prepetition Obligations) shall be approved by the Bankruptcy Court no later the date that is fourteen (14) days after the date on which the Sales Procedure Motion is filed, which such Sales Procedure Order shall provide that an auction in respect of substantially all of the Collateral owned by St. Christopher Operator, or a portion thereof (the "**Auction**") shall be conducted on or before October 2, 2019;

(c)     One or more bids under the Sales Procedure Order shall be received on or before September 27, 2019, each of which bid or bids is sufficient to indefeasibly pay in full, in cash, full the Obligations (including any unpaid Prepetition Obligations);

(d)     The Auction shall be conducted on or before October 2, 2019;

(e)     A hearing approving the results of the Auction shall be held on or before October 4, 2019; and

(f)     An order approving the sale of substantially all of the Collateral owned by St. Christopher Operator, or a portion thereof, for a price sufficient to pay in full the Obligations (including any unpaid Prepetition Obligations) shall be entered on or before October 4, 2019.

## ARTICLE 5 NEGATIVE COVENANTS

Each Borrower agrees that, so long as any Credit Exposure exists:

**Section 5.1     Debt; Contingent Obligations**.  No Borrower will, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for Permitted Indebtedness.   No Borrower  will, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations, except for Permitted Contingent Obligations.  No Borrower will, directly or indirectly, make any loans or advance any Debt to any Person (except for Permitted Investments  to the extent that Borrowers' joint and several obligations hereunder would be deemed to be a loan or advance to the other Borrower).

**Section 5.2     Liens**.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except for Permitted Liens.

**Section 5.3     Distributions**.  No Borrower will, directly or indirectly, declare, order, pay, make or set apart any sum for any Distribution (including a Distribution by a Borrower to Holdings); *provided, however*, that the following Distributions may be paid, subject to the terms and conditions below (in each case to the extent approved by the Agent and Required Lenders as part of the DIP Budget):

(a)     Dividends by any subsidiary of any Borrower to such parent Borrower;

(b)     Payments by any Borrower of shared overhead expenses, salaries, directors' fees, or advances and reimbursements to employees or directors of a Credit Party or an affiliate thereof;

(c)     distributions to Holdings in the amounts, and at such times, as required by actuarial analysis or statutory requirements relating to the capital requirements of the Insurance Captive, as supported by the financial reporting delivered pursuant to Section 4.1(b)(x), *provided* that (i) no Event of Default shall exist at the time of, or immediately after, such distribution and (ii) such distributions shall be promptly (but in any event within one (1) Business Day after distribution to Holdings) contributed by Holdings to the Insurance Captive; and

(d)     Distributions to Holdings in the amounts, and at such times, as necessary for Borrowers to pay to Holdings the portion of any Debt constituting financed insurance premiums owed by Holdings for financed insurance premiums for insurance coverage for Borrowers or financed insurance premiums for insurance coverage required to be paid by Borrowers under any lease (including, without limitation, any Operating Lease); and

Nothing in this Section 5.3 shall prohibit or limit payments by any Credit Party of salaries to its employees in the Ordinary Course of Business, but only to the extent approved by the Agent and Required Lenders as part of the DIP Budget.

**Section 5.4     Restrictive Agreements**.  No Borrower will, or will permit any Subsidiary to, directly or indirectly enter into or assume any agreement (other than the Financing Documents, any Subordinated Debt Documents, any agreement evidencing a transaction permitted under Section 5.6(b) as to the assets subject to such transaction, and any agreements for purchase money debt permitted under clauses (c) or (d) of the definition of Permitted Indebtedness) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired.

**Section 5.5     Payments and Modifications of Subordinated Debt**.  Borrower will not, and will not permit any Subsidiary to, directly or indirectly, in each case except as expressly permitted under, and made in full compliance with the terms of, a Subordination Agreement entered into with respect to such Subordinated Debt, (a) declare, pay, make or set aside any amount for payment in respect of Subordinated Debt, (b) amend or otherwise modify the terms of any Subordinated Debt, (c) declare, pay, make or set aside any amount for payment in respect of any Debt hereinafter incurred that, by its terms, or by separate agreement, is subordinated to the Obligations, or (d) amend or otherwise modify the terms of any such Debt if the effect of such amendment or modification is to (i) increase the interest rate or fees on, or change the manner or timing of payment of, such Debt, (ii) accelerate or shorten the dates upon which payments of principal or interest are due on, or the principal amount of, such Debt, (iii) change in a manner adverse to any Credit Party or Agent any event of default or add or make more restrictive any covenant with respect to such Debt, (iv) change the prepayment provisions of such Debt or any of the defined terms related thereto, (v) change the subordination provisions thereof (or the subordination terms of any guaranty thereof), or (vi) change or amend any other term if such change or amendment would materially increase the obligations of the obligor or confer additional material rights on the holder of such Debt in a manner adverse to Borrower, any Subsidiaries, Agents or Lenders.  Borrower shall, prior to entering into any such amendment or modification, deliver to Agent reasonably in advance of the execution thereof, any final or execution form copy thereof.

**Section 5.6     Consolidations and Mergers; Sales of Assets; Change in Control**.

(a)     No Borrower will, directly or indirectly consolidate or merge or amalgamate with or into any other Person other than with or into another Borrower.

(b)     No Borrower shall suffer or permit to occur any sale, transfer, lease (other than a Lease approved by Agent), conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition of all or any portion of a Project or any portion

76

of any other Collateral for the Loan, except that any Borrower may consummate dispositions ~~(in each case to the extent approved by Agent and the Required Lenders as part of the DIP Budget)~~: (i) in the Ordinary Course of Business of furniture, fixtures and equipment for cash and fair value that the applicable Borrower determines in good faith is no longer used or useful in the Borrower's business; (ii) of inventory in the Ordinary Course of Business and not pursuant to any bulk sale; (iii) in the form of discounts or compromises on Accounts that are expressly permitted by Section 9.2(e); (iv) of cash and Cash Equivalents in the Ordinary Course of Business; (v) of assets between and among Borrowers in the Ordinary Course of Business; ~~and~~ (vi) consisting of Permitted Liens **or (vii) any other** sale, lease or other transaction out of the Ordinary Course of Business pursuant to **an order of the Bankruptcy Court** so long as Debtors provide at least three (3) Business Days advance notice to Agent that it will seek such **order from the Bankruptcy Court** (in reasonable detail) and afford Agent a reasonable opportunity to consult on the determination; provided that this clause (b) is not intended to prevent any Debtor from rejecting unexpired leases or executory contracts pursuant to Section 365 of the Bankruptcy Code in connection with the Bankruptcy Cases~~, and, further provided, that this clause (b) is not intended to prevent any Debtor from seeking approval of any sale, lease or other transaction out of the Ordinary Course of Business pursuant to Section 363 of the Bankruptcy Code so long as Debtors provide at least three (3) Business Days advance notice to Agent that it will seek such approval (in reasonable detail) and afford Agent a reasonable opportunity to consult on the determination~~.

(c)    No Borrower shall suffer or permit to occur (i) any Change in Control or (ii) any other sale, transfer, conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition of any interest in any Borrower or any other Credit Party or any interest in any entity which holds an interest in, or directly or indirectly controls, Borrower or any Credit Party.

(d)    In addition to the prohibitions set forth in subsections (a) above, no Borrower shall engage in or permit to occur any transfer as set forth in subsections (b) and (c) above that would constitute or result in the occurrence of one or more non-exempt prohibited transactions under ERISA or the Internal Revenue Code. Each Borrower agrees to unwind any such transaction upon written notice from Agent or, at Agent's option, to assist Agent in obtaining such prohibited transaction exemption(s) from the United States Pension and Welfare Benefits Administration with respect to such transaction as are necessary to remedy such prohibited transactions.

**Section 5.7    Purchase of Assets, Investments**. No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) acquire or enter into any agreement to acquire any assets other than (in each case to the extent approved by Agent and the Required Lenders as part of the DIP Budget) (i) capital expenditures made pursuant to the terms of an Affiliate Lease and reflected in the most recent financial projections delivered to Agent prior to the Closing Date, (ii) assets acquired pursuant to clauses (c) and (d) of the definition of Permitted Indebtedness and (iii) otherwise in the Ordinary Course of Business; (b) engage or enter into any agreement to engage in any joint venture or partnership with any other Person other than in the Ordinary Course of Business; or (c) acquire or own or enter into any agreement to acquire or own investment in any Person, or make any loans or advance any Debt to any Person, other than Permitted Investments.

**Section 5.8    Transactions with Affiliates**.  Except as otherwise disclosed on Schedule 5.8, and except for transactions that are disclosed to Agent in advance of being entered into and which contain terms that are no less favorable to the applicable Borrower or any Subsidiary of any Borrower, as the case may be, than those which might be obtained from a third party not an Affiliate of any Borrower (and are approved by Agent and the Required Lenders as part of the DIP Budget), no Borrower will, or will permit any Subsidiary of any Borrower to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of any Borrower, *provided* that, notwithstanding the foregoing, the restrictions set forth in this Section 5.8 shall not apply to transactions by and between any Borrower or any Subsidiary and the Insurance Captive in the Ordinary Course of Business.

**Section 5.9    Modification of Organizational Documents**.  No Borrower will, directly or indirectly, amend or otherwise modify any Organizational Documents of such Person, except for such amendments or other modifications to a Borrower's Organizational Documents as are required under this Agreement or by applicable Law and fully disclosed to Agent within thirty (30) days after such amendments or modifications have become effective.

**Section 5.10    Modification of Certain Agreements**.  No Borrower will, directly or indirectly, amend or otherwise modify any document identified in the definition of "New Market Tax Credit Transactions" to which a Borrower is party, or other Operative Document, which amendment or modification in any case:  (a) is contrary to the terms of this Agreement or any other Financing Document; (b) could reasonably be expected to be adverse to the rights, interests or privileges of the Agent or the Lenders or their ability to enforce the same; (c) results in the imposition or expansion in any material respect of any obligation of or restriction or burden on any Borrower; (d) reduces in any material respect any rights or benefits of any Borrower (it being understood and agreed that any such determination shall be in the discretion of the Agent) or (e) increases the rent payable under an Operating Lease with an Affiliate of a Borrower.  Each Borrower shall, promptly after entering into any amendment or other modification of any of the foregoing documents, deliver to Agent fully executed copies thereof.

**Section 5.11    Conduct of Business**.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, engage in any line of business other than those businesses engaged in on the Closing Date and described on Schedule 5.11 and businesses reasonably related thereto.  No Borrower will, or will permit any Subsidiary to, other than in the Ordinary Course of Business, change its normal billing payment and reimbursement policies and procedures with respect to its Accounts (including, without limitation, the amount and timing of finance charges, fees and write-offs).

**Section 5.12    Lease Payments.**  No Borrower will, or will permit any Subsidiary to, directly or indirectly, incur or assume (whether pursuant to a Guarantee or otherwise) any liability for rental payments except, to the extent approved by Agent and the Required Lenders as part of the DIP Budget, in the Ordinary Course of Business (including pursuant to the Affiliate Leases).

**Section 5.13    Limitation on Sale and Leaseback Transactions.**  No Borrower will, or will permit any Subsidiary to, directly or indirectly, enter into any arrangement with any Person

78

whereby, in a substantially contemporaneous transaction, any Borrower or any Subsidiaries sells or transfers all or substantially all of its right, title and interest in an asset and, in connection therewith, acquires or leases back the right to use such asset.

**Section 5.14    Deposit Accounts and Securities Accounts; Payroll and Benefits Accounts.**  No Borrower will, or will permit any Subsidiary to, directly or indirectly, establish any new bank account, Deposit Account or Securities Account without prior written notice to Agent, and unless Agent, such Borrower or such Subsidiary and the bank, financial institution or securities intermediary at which the account is to be opened enter into a Deposit Account Control Agreement or Securities Account Control Agreement prior to or concurrently with the establishment of such Deposit Account or Securities Account.  Borrowers represent and warrant that Schedule 5.14 lists all of the Deposit Accounts and Securities Accounts of each Borrower as of the Closing Date.  The provisions of this Section requiring Deposit Account Control Agreements shall not apply to (i) that certain lockbox and deposit account(s) maintained by St. Christopher Operator for the sole purpose of receiving Subleases Rent and Parking Revenue (as such terms are defined in Schedule 9.1), making any payments therefrom under any HSRE Master Lease and retaining any funds remaining therein thereafter (the "**HSRE Deposit Accounts**"); (ii) Deposit Accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrowers' employees and identified to Agent by Borrowers as such; *provided, however*, that at all times that any Obligations remain outstanding, Borrower shall maintain one or more separate Deposit Accounts to hold any and all amounts to be used for payroll, payroll taxes and other employee wage and benefit payments, and shall not commingle any monies allocated for such purposes with funds in any other Deposit Account; (iii) deposit accounts maintained for the sole purpose of receiving payments from, and making payments to, Borrowers' credit card processor(s), so long as the aggregate amount on deposit in such deposit accounts does not exceed $500,000 at any time; (iv) certain Borrowers' Deposit Accounts and related lockboxes (if any) maintained at Bank of America on the Closing Date (the "**Legacy Accounts**"), provided that, (A) no Borrower shall deposit checks into, nor draft any checks from, the Legacy Accounts, (B) such Borrowers shall have notified all Account Debtors that make payments into one of the Legacy Accounts to make payments to a Lockbox Account or Lockbox instead, (C) such Borrowers shall close each Legacy Account at such time as no Account Debtors are making payment thereto and (D) at all times following the Closing Date, such Borrowers shall have in place standing wire instructions with respect to the Legacy Accounts, transferring all collections therein on a daily basis to a Lockbox Account that sweeps to the Payment Account and (v) that certain deposit account maintained by PPN Philadelphia for the sole purpose of receiving periodic payments pursuant to value-based performance programs in which it participates ("**Incentive Payments**"), provided that (A) such deposit accounts receive only Incentive Payments and (B) the amount on deposit in such deposit accounts from time to time does not exceed the aggregate amount of the two Incentive Payments most recently paid to PPN Philadelphia.  In the event Borrowers fail to comply with the conditions set forth in the proviso to clause (iv) in the immediately prior sentence, or any other Event of Default exists, Agent may, in its sole discretion, enter into Deposit Account Control Agreements or Deposit Account Restriction Agreements, as applicable, over any of the Legacy Accounts.

**Section 5.15    Compliance with Anti-Terrorism Laws.**    Agent hereby notifies Borrowers that pursuant to the requirements of Anti-Terrorism Laws, and Agent's policies and

practices, Agent is required to obtain, verify and record certain information and documentation that identifies Borrowers and its principals, which information includes the name and address of each Borrower and its principals and such other information that will allow Agent to identify such party in accordance with Anti-Terrorism Laws.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, knowingly enter into any Operative Documents with any Blocked Person or any Person listed on the OFAC Lists.  Each Borrower shall immediately notify Agent if such Borrower has knowledge that any Borrower, any additional Credit Party or any of their respective Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement is or becomes a Blocked Person or (a) is convicted on, (b) pleads nolo contendere to, (c) is indicted on, or (d) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

Section 5.16   **Transfers to Non-Debtor Credit Parties**.  Except as otherwise expressly provided in this Agreement or as approved by the Bankruptcy Court, Borrowers, shall not sell, transfer, assign (by operation of law or otherwise), distribute, loan, advance, invest or otherwise dispose of, any money (including, without limitation, any proceeds of Loans), assets or property in or to any Non-Debtor Credit Parties without the prior written consent of Agent.

Section 5.17   **Insurance Captive**.  No Credit Party shall assign or otherwise transfer any Collateral or any proceeds of the Loans to any Insurance Captive, except as otherwise expressly permitted by Section 4.7.

Section 5.18   ~~Interim Order;~~ **Final Order, Administrative Expense Priority; Payments**.

(a)    No Debtor will seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of ~~the Interim Order or~~ the Final Order, as the case may be, except for modifications and amendments joined in or agreed to in writing by Agent.

(b)    No Debtor will suffer to exist at any time a priority for any administrative expense or unsecured claim against any Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Section 503(b) and 507(b) of the Bankruptcy Code) equal or superior to the priority of Agent and the Lenders in respect of the Obligations, except for the Carve-Out.

(c)    Prior to the date on which the Obligations have been indefeasibly paid in full, all in accordance with the terms of this Agreement, and this Agreement has been terminated, no Debtor will (i) pay any administrative expenses pursuant to 503(b) of the Bankruptcy Code, except (A) administrative expenses incurred in the Ordinary Course of Business of the Debtors

80

as set forth in the DIP Budget in an aggregate amount in any week not to exceed 10% of the aggregate budgeted amounts for such expenses for such week, or as otherwise approved by an order of the Bankruptcy Court and (B) Allowed Fees payable under section 330 and 331 of the Bankruptcy Code up to the weekly amounts set forth in the DIP Budget (with a carryover of any unused weekly amount to the subsequent weeks as provided in the DIP Orders), or (ii) permit or seek to permit the granting of adequate protection in favor any Person other than as provided in the DIP Orders.

(d)     Except as provided in the DIP Orders, no Debtor will waive any claims under section 506(c) of the Bankruptcy Code or take any other action adverse to Agent or the Lenders or their rights and remedies under the Financing Documents.

(e)     Except as set forth in the DIP Orders, no Debtor shall apply for, agree to, incur, create, assume, suffer to exist or permit except to the extent set forth in the DIP Budget, any administrative expense, unsecured claim, or other super-priority claim or Lien that is *pari passu* with or senior to the claims of the Agent and the Lenders against the Debtors or the Collateral hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out.

**Section 5.19    Bankruptcy Actions**.

(a)     No Debtor shall enter into any agreement to return any Collateral outside the Ordinary Course of Business to any of its creditors for application against any Prepetition Debt, Prepetition trade payables or other Prepetition claims under section 546(h) of the Bankruptcy Code.

(b)     No Debtor shall make (i) any payments on account of any creditor's claims against any Debtors, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the DIP Budget, or otherwise approved by the Agent in writing.

(c)     No Debtor shall obtain, or seek to obtain, any stay on the exercise of the remedies of the Agent or any Lender hereunder, under any Financing Document or the Financing Order.

(d)     No Debtor will file any motion or application with the Bankruptcy Court seeking to extend the exclusivity periods set forth in section 1121 of the Bankruptcy Code for any reason without providing at least three (3) Business Days advance notice to Agent that it will seek such approval (in reasonable detail) and affording Agent a reasonable opportunity to consult on the determination.

**Section 5.20    Superpriority Claims**.  No Debtor will incur, create, assume, suffer to exist or permit any other Superpriority Claim that is pari passu with or senior to the claims of the Agent and the Lenders against the Debtors except with respect to the Carve-Out.

**Section 5.21** **Restrictions on Use of Proceeds**. Notwithstanding anything to the contrary set forth herein or in any other Financing Document, no portion of the Revolving Loans, **the Term Loan,** the Collateral, the Carve-Out funds or cash collateral of the Prepetition Agent and/or Prepetition Lenders may be used to fund any activities: (i) preventing, hindering, or delaying any of the Agent's, the Lenders', the Prepetition Agent's or the Prepetition Lenders' enforcement or realization upon any of the Collateral once an Even of Default has occurred; (ii) using or seeking to use cash collateral or selling or otherwise disposing of any of the Collateral without the consent of the Agent and the Required Lenders, except as authorized by this Agreement or the DIP Orders; (iii) using or seeking to use any insurance proceeds constituting Collateral without the consent of the Agent and the Required Lenders; (iv) except as permitted under Section 5.1, incurring Debt without the prior consent of the Agent and the Required Lenders; (v) objecting or challenging in any way any claims, Liens, Collateral (including cash collateral) or, as the case may be, "Collateral" (as defined in the Prepetition Credit Agreement), held by or on behalf of any of the Agent, the Lenders, the Prepetition Agent, and the Prepetition Lenders, respectively; (vi) asserting any claims or causes of action, including, without limitation, any action under chapter 5 of the Bankruptcy Code, against any of the Agent, the Lenders, or the administrative agent or collateral agent or any Prepetition Lender under the Prepetition Credit Agreement or any of their respective affiliates, agents, attorneys, investment advisors, collateral managers, servicers, professionals, officers, directors and employees; (vii) prosecuting an objection to, or contesting in any manner, or raising defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the Liens of the Agent securing the Obligations, the Prepetition Obligations, the Liens securing the Prepetition Obligations or any other rights or interests of any of the Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders; (viii) taking any action which (A) has or could have the effect of materially and adversely modifying or compromising the rights and remedies of the Agent, the Lenders, or the administrative agent or collateral agent or any Prepetition Lender under the Prepetition Credit Agreement, (B) is contrary, in a manner that is material and adverse to the Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders, to any term or condition set forth in any of the Financing Documents or the DIP Orders, or (C) results in the occurrence of an Event of Default. Notwithstanding the foregoing, the ~~creditors' committee~~**Committee** may use up to $25,000 in the aggregate amount from the Carve-Out to investigate the extent, validity and priority of the Prepetition Agent's and Prepetition Lenders' Liens.

## ARTICLE 6 RESERVED

## ARTICLE 7 CONDITIONS

**Section 7.1** **Conditions to Closing.** ~~Subject in each case to the final paragraph of this Section 7.1, the~~**The** obligation of each Lender to make the initial Loans on the Closing Date ~~shall be~~**was** subject only to the satisfaction of the ~~following conditions precedent, each to the reasonable satisfaction of Agent and Lenders and their respective counsel:~~**conditions precedent set forth in this Section 7.1 immediately prior to the First Amendment Effective Date, all of which were satisfied on the Closing Date.**

~~(a)     Each of the Financing Documents and other documentation relating to the Loans provided hereunder shall be in form and substance reasonably satisfactory to the Agent~~

and duly executed and delivered by each of the Credit Parties and each Lender and other parties thereto;

(b) Agent shall have received, in respect of each Credit Party,

(i) copies of each organizational or constitutive document (along with any amendments thereto) certified as of a recent date prior to the Closing Date by the appropriate Governmental Authority;

(ii) certificate of the secretary or an assistant secretary or such other authorized officer of each Credit Party certifying the names and true signatures of the officers of such Loan Party authorized to sign each Financing Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder;

(iii) resolutions of the board of directors (or similar governing body) of such Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Financing Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, as well as the transactions contemplated hereunder and the commencement of the Bankruptcy Cases, certified as of the Closing Date by its secretary or an assistant secretary or such other authorized officer as being in full force and effect without modification or amendment; and

(iv) good standing certificate, where applicable, from the applicable Governmental Authority of such Credit Party's jurisdiction of incorporation, organization or formation dated as of a recent date prior to the Closing Date.

(c) [Reserved].

(d) Agent shall have received a signed copy of an order entered by the Bankruptcy Court, which shall be satisfactory in form and substance to the Agent (the "**Interim Order**") and confirmation that the Interim Order has been entered on the docket, which Interim Order (i) shall approve the Financing Documents and the Initial DIP Budget and grant the Liens described in Article 9, (ii) shall authorize extensions of credit in the aggregate amount of up to $65,000,000 under the DIP Facility, (iii) shall approve the payment by the Debtors of all of the fees and expenses that are required to be paid hereunder; (iv) shall authorize the use by the Borrowers of any collateral including cash collateral, in which any Prepetition Secured Party may have an interest; (v) shall provide for Adequate Protection Payments and grant adequate protection claims and Liens to the Prepetition Secured Parties, as adequate protection of the Prepetition Secured Parties' interests in the Collateral from diminution in value of their collateral resulting from the Credit Parties' use, sale or lease of the Collateral (including cash collateral), the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code and the priming Liens described in Section 4.18; (vi) shall authorize the repayment of the Prepetition Obligations under the Prepetition Credit Agreement; (vii) shall be in full force and effect; and (viii) shall not have been vacated, reversed, or stayed, or, without the prior written consent of Agent, modified or amended; and the Debtors are in compliance with the terms and conditions of the Interim Order.

83

(e)    All accrued fees required to be paid to Agent and the Lenders (as of the Closing Date shall have been paid and all reasonable and documented out-of-pocket fees and expenses (including reasonable and documented fees and expenses of counsel) required to be paid to Agent on or before the Closing Date shall have been paid.

(f)    [Reserved].

(g)    Other than the Bankruptcy Cases, the Cease and Desist Letter and as may be set forth in Schedule 3.6, there shall not exist any action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality that could reasonably be expected to result in a Material Adverse Effect.

(h)    All necessary governmental and third party consents and approvals necessary in connection with the transactions contemplated hereunder shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to Agent) and shall remain in effect; and no law or regulation (other than the Bankruptcy Code) shall be applicable to Agent that prevents the consummation of the transactions contemplated hereunder.

(i)    Evidence that, such other documents, instruments or actions deemed necessary or advisable by Agent to perfect and protect the Liens and security interests created or purported to be created with respect to the Debtors (Agent acknowledges the appropriate filed financing statements), pursuant to the Interim Order and the other Security Documents, as applicable, and perfected pursuant to applicable requirements of Law, in each case, shall have been duly delivered or completed, including, without limitation, the delivery of Uniform Commercial Code financing statements in proper form for filing for all applicable jurisdictions of the Credit Parties and provision having been made for the payment of any fees or taxes required in connection with the filing of such documents, instruments or financing statements.

(j)    The Agent shall have received a Borrowing Base Certificate (it being understood that the Borrowing Base Certificate last delivered under the Prepetition Credit Agreement shall have satisfied this condition) and a DIP Budget.

Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Financing Document, each additional Operative Document and each other document, agreement and/or instrument required to be approved by Agent, Required Lenders or Lenders, as applicable, on the Closing Date.

**Section 7.2    Conditions to Each Loan**.  The obligation of the Lenders to make a Loan or an advance in respect of any Loan, whether made on or after the Closing Date, is subject to the satisfaction of the following additional conditions:

(a)    **except with respect to the Term Loan,** receipt by Agent of a Notice of Borrowing (or telephonic notice if permitted by this Agreement) and updated Borrowing Base Certificate;

(b) **solely with respect to a request for a Revolving Loan,** the fact that, immediately after such borrowing and after application of the proceeds thereof or after such issuance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit;

(c) ~~(i) either (x) the Interim Order shall be in full force and effect, or (y) for any advance in respect of any Loan occurring on or after the earlier of (A) 30 days after the Closing Date and (B) the entry of the Final Order,~~ the Final Order shall be in full force and effect, and the ~~Interim Order or~~ Final Order~~, as applicable,~~ shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended without the written consent of the Agent and the Required Lenders at the time of such proposed borrowing;~~ (ii) prior to entry of the Final Order, the proposed Revolving Loan Borrowing, when added to Revolving Loan Outstandings, does not exceed the amount authorized by the Interim Order; and (iii) all First Day Orders, including the cash management order, (including as entered on a final basis) shall be in form and substance reasonably satisfactory to Agent.~~

(d) the fact that, immediately before and after such advance or issuance, no Default or Event of Default shall have occurred and be continuing;

(e) the occurrence of any fact, event or circumstance that could reasonably be expected to result in a Material Adverse Effect;

(f) the fact that the representations, warranties and covenants of each Credit Party contained in the Financing Documents shall be true, correct and complete on and as of the date of such borrowing or issuance, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date;

(g) Conifer or such other revenue cycle management provider reasonably acceptable to Agent (Conifer or such replacement revenue cycle management provider, a "**Revenue Cycle Provider**") shall be performing in all material respects under the Conifer Agreement (or such replacement agreement covering substantially the same scope services) and Debtors shall be current on all amounts owing to such Revenue Cycle Provider under the DIP Budget; and

(h) Tenet shall be performing in all material respects under the Transition Services Agreement and Debtors shall be current on all amounts owing to Tenet under the DIP Budget.

Each giving of a Notice of Borrowing under this Section 7.2 and each acceptance by any Borrower of the proceeds of any Loan made under this Section 7.2 shall be deemed to be (y) a representation and warranty by each Borrower on the date of such notice or acceptance as to the facts specified in Section 7.2, and (z) a restatement by each Borrower that each and every one of the representations made by it in any of the Financing Documents is true and correct as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date).

**Section 7.3**     **Searches.**   Before the Closing Date and thereafter, Agent shall have the right to perform, all at Borrowers' expense, the searches described in clauses (a), (b), (c) and (d) below against Borrowers and any other Credit Party, the results of which are to be consistent with Borrowers' representations and warranties under this Agreement: (a) UCC searches with the Secretary of State and local filing offices of each jurisdiction where the applicable Person maintains its executive offices, a place of business, or assets and the jurisdiction in which the applicable Person is organized; (b) judgment, pending litigation, federal tax lien, personal property tax lien, and corporate and partnership tax lien searches, in each jurisdiction searched under clause (a) above; (c) real property title and lien searches in each jurisdiction in which any real property Collateral is located; and (d) searches of applicable corporate, limited liability company, partnership and related records to confirm the continued existence, organization and good standing of the applicable Person and the exact legal name under which such Person is organized.  Provided that no Event of Default has occurred or is then occurring, such searches shall be limited to no more frequently than twice annually.

**Section 7.4**     **Post Closing Requirements.**   Borrowers shall complete each of the post-closing obligations and/or provide to Agent each of the documents, instruments, agreements and information listed on Schedule 7.4 attached hereto on or before the date set forth for each such item thereon, each of which shall be completed or provided in form and substance reasonably satisfactory to Agent.

## ARTICLE 8 RESERVED

## ARTICLE 9 SECURITY AGREEMENT

**Section 9.1**     **Grant of Security Interest**.   Without limiting any other grant of a Lien and security interest in any Security Document, each Borrower hereby grants, pledges and assigns continuing security interests in and Liens upon all of Collateral.

**Section 9.2**     **Representations and Warranties and Covenants Relating to Collateral**.

(a)     Schedule 9.2 sets forth (i) each chief executive office and principal place of business of each Borrower and each of their respective Subsidiaries, and (ii) all of the addresses (including all warehouses) at which any of the Collateral is located and/or books and records of Borrowers regarding any of the Collateral are kept, which such Schedule 9.2 indicates in each case which Borrower(s) have Collateral and/or books and records located at such address, and, in the case of any such address not owned by one or more of the Borrowers(s), indicates the nature of such location (e.g., leased business location operated by Borrower(s), third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning and/or operating such location.

(b)     Without limiting the generality of Section 3.2, except for the entry of the DIP Orders by the Bankruptcy Court, and for any existing license with respect to any rights of any Borrower as a licensee under any license of Intellectual Property owned by another Person, and except for the filing of financing statements under the UCC, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or consent of any

other Person is required for (i) the grant by each Borrower to Agent of the security interests and Liens in the Collateral provided for under this Agreement and the other Security Documents (if any), or (ii) the exercise by Agent of its rights and remedies with respect to the Collateral provided for under this Agreement and the other Security Documents or under any applicable Law, including the UCC, and neither any such grant of Liens in favor of Agent nor exercise of rights by Agent shall violate or cause a default under any agreement between any Borrower and any other Person relating to any such Collateral, including any license to which a Borrower is a party, whether as licensor or licensee, with respect to any Intellectual Property, whether owned by such Borrower or any other Person.

(c)     As of the Closing Date, no Borrower has any ownership interest in any Chattel Paper (as defined in Article 9 of the UCC), letter of credit rights, commercial tort claims, Instruments, documents or investment property (other than equity interests in any Subsidiaries of such Borrower disclosed on Schedule 3.4) and Borrowers shall give notice to Agent promptly (but in any event not later than the delivery by Borrowers of the next Compliance Certificate required pursuant to Section 4.1 above) upon the acquisition by any Borrower of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, investment property.  Except for the HSRE Deposit Accounts, no Person other than Agent or (if applicable) any Lender has "control" (as defined in Article 9 of the UCC) over any Deposit Account, investment property (including Securities Accounts and commodities account), letter of credit rights or electronic chattel paper in which any Borrower has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any Deposit Account, Securities Account or commodities account of Borrowers is maintained).

(d)     Borrowers shall not, and shall not permit any Credit Party to, take any of the following actions or make any of the following changes unless Borrowers have given at least thirty (30) days prior written notice to Agent of Borrowers' intention to take any such action (which such written notice shall include an updated version of any Schedule impacted by such change) and have executed any and all documents, instruments and agreements and taken any other actions which Agent may request after receiving such written notice in order to protect and preserve the Liens, rights and remedies of Agent with respect to the Collateral:  (i) change the legal name or organizational identification number of any Borrower as it appears in official filings in the jurisdiction of its organization, (ii) change the jurisdiction of incorporation or formation of any Borrower or Credit Party or allow any Borrower or Credit Party to designate any jurisdiction as an additional jurisdiction of incorporation for such Borrower or Credit Party, or change the type of entity that it is, or (iii) change its chief executive office, principal place of business, or the location of its records concerning its Accounts.  Additionally, each Borrower shall provide Agent written notice within five (5) Business Days after any movement of any tangible Collateral to a location that is not then listed on the Schedules and/or establish any business location at any location that is not then listed on the Schedules.

(e)     Borrowers shall not adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any Account Debtor, or allow any credit or discount thereon (other than adjustments, settlements, compromises, credits and discounts in the Ordinary Course of Business, made while no Default exists and in amounts which are not material with respect to the Account and which, after giving effect thereto, do not cause the Borrowing Base to

be less than the Revolving Loan Outstandings) without the prior written consent of Agent. Without limiting the generality of this Agreement or any other provisions of any of the Financing Documents relating to the rights of Agent after the occurrence and during the continuance of an Event of Default, Agent shall have the right at any time after the occurrence and during the continuance of an Event of Default to:  (i) exercise the rights of Borrowers with respect to the obligation of any Account Debtor to make payment or otherwise render performance to Borrowers and with respect to any property that secures the obligations of any Account Debtor or any other Person obligated on the Collateral, and (ii) adjust, settle or compromise the amount or payment of such Accounts.

(f)    Without limiting the generality of Sections 9.2(c) and 9.2(e):

(i)    Borrowers shall deliver to Agent all tangible Chattel Paper and all Instruments and documents owned by any Borrower and constituting part of the Collateral duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to Agent.  Borrowers shall provide Agent with "control" (as defined in Article 9 of the UCC) of all electronic Chattel Paper owned by any Borrower and constituting part of the Collateral by having Agent identified as the assignee on the records pertaining to the single authoritative copy thereof and otherwise complying with the applicable elements of control set forth in the UCC.  Borrowers also shall deliver to Agent all security agreements securing any such Chattel Paper and securing any such Instruments.  Borrowers will mark conspicuously all such Chattel Paper and all such Instruments and documents with a legend, in form and substance reasonably satisfactory to Agent, indicating that such Chattel Paper and such instruments and documents are subject to the security interests and Liens in favor of Agent created pursuant to this Agreement and the Security Documents.  Borrowers shall comply with all the provisions of Section 5.14 with respect to the Deposit Accounts and Securities Accounts of Borrowers.

(ii)    Borrowers shall deliver to Agent all letters of credit on which any Borrower is the beneficiary and which give rise to letter of credit rights owned by such Borrower which constitute part of the Collateral in each case duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to Agent.  Borrowers shall take any and all actions as may be necessary or desirable, or that Agent may request, from time to time, to cause Agent to obtain exclusive "control" (as defined in Article 9 of the UCC) of any such letter of credit rights in a manner acceptable to Agent.

(iii)    Borrowers shall promptly advise Agent upon any Borrower becoming aware that it has any interests in any commercial tort claim in excess of $125,000 that constitutes part of the Collateral, which such notice shall include descriptions of the events and circumstances giving rise to such commercial tort claim and the dates such events and circumstances occurred, the potential defendants with respect such commercial tort claim and any court proceedings that have been instituted with respect to such commercial tort claims, and Borrowers shall, with respect to any such commercial tort claim, execute and deliver to Agent such documents as Agent shall

request to perfect, preserve or protect the Liens, rights and remedies of Agent with respect to any such commercial tort claim.

(iv)    Except for (i) books and records relating to Accounts and Inventory in an aggregate amount of less than $250,000 and (ii) Inventory in transit in the Ordinary Course of Business, no Accounts or Inventory or other Collateral shall at any time be in the possession or control of any warehouse, consignee, bailee or any of Borrowers' agents or processors without prior written notice to Agent and the receipt by Agent, if Agent has so requested, of warehouse receipts, consignment agreements, bailee lien waivers or collateral access agreements (as applicable) satisfactory to Agent prior to the commencement of such possession or control.  Borrower has notified Agent that Inventory is currently located at the locations set forth on <u>Schedule 9.2</u>.  Borrowers shall, upon the request of Agent, notify any such warehouse, consignee, bailee, agent or processor of the security interests and Liens in favor of Agent created pursuant to this Agreement and the Security Documents, instruct such Person to hold all such Collateral for Agent's account subject to Agent's instructions and shall obtain an acknowledgement from such Person that such Person holds the Collateral for Agent's benefit.

(v)    Borrowers shall, subject to the DIP Budget, cause all equipment and other tangible personal property other than Inventory to be maintained and preserved in the same condition, repair and in working order as when new, ordinary wear and tear excepted, and shall promptly make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end. Upon request of Agent, Borrowers shall promptly deliver to Agent any and all certificates of title, applications for title or similar evidence of ownership of all such tangible personal property and shall cause Agent to be named as lienholder on any such certificate of title or other evidence of ownership; provided that in no event shall Borrowers be required to deliver any such certificates, applications or other evidence or cause Agent to be named as lienholder thereon with respect to any tangible personal property with an aggregate value (based upon the lesser of fair market value and book value) not to exceed $100,000.  Borrowers shall not permit any such tangible personal property to become fixtures to real estate unless such real estate is subject to a Lien in favor of Agent.

(vi)    As of the Closing Date, except for Accounts payable by Medicare, Medicaid and TRICARE, no Borrower holds, and after the Closing Date Borrowers shall promptly notify Agent in writing upon creation or acquisition by any Borrower of, any Collateral which constitutes a claim against any Governmental Authority, including, without limitation, the federal government of the United States or any instrumentality or agency thereof, the assignment of which claim is restricted by any applicable Law, including, without limitation, the federal Assignment of Claims Act and any other comparable Law.  Upon the request of Agent, Borrowers shall take such steps as may be necessary or desirable, or that Agent may request, to comply with any such applicable Law.

(vii)    Borrowers shall furnish to Agent from time to time any statements and schedules further identifying or describing the Collateral and any other information,

89

reports or evidence concerning the Collateral as Agent may reasonably request from time to time.

**Section 9.3    Financing Statements**.  Each Borrower hereby authorizes Agent to file without the signature of such Borrower one or more UCC financing statements relating to all or any part of the Collateral, which financing statements may list Agent as the "secured party" and such Borrower as the "debtor" and which describe and indicate the collateral covered thereby as all or any part of the Collateral under the Financing Documents (including an indication of the collateral covered by any such financing statement as "all assets" of such Borrower now owned or hereafter acquired), in such jurisdictions as Agent from time to time determine are appropriate, and to file without the signature of such Borrower any continuations of or amendments to any such financing statements, in any such case in order for Agent to perfect, preserve or protect the Liens, rights and remedies of Agent with respect to the Collateral.

## ARTICLE 10 EVENTS OF DEFAULT

**Section 10.1    Events of Default**.   For purposes of the Financing Documents, the occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of law or otherwise, shall constitute an "**Event of Default**":

(a)    any Borrower shall fail to pay when due any principal, interest, premium or fee under any Financing Document or any other amount payable under any Financing Document, or there shall occur any default in the performance of or compliance with any of the following sections of this Agreement:  Sections 4.1, 4.4(d), 4.6, 4.17 or 4.18 and Article 5, or there shall occur any Event of Default (as defined there) under any Broad Street Financing Document;

(b)    any Credit Party defaults in the performance of or compliance with any term contained in this Agreement or in any other Financing Document, including any Guarantee constituting a Financing Document (other than occurrences described in other provisions of this Section 10.1 for which a different grace or cure period is specified or for which no grace or cure period is specified and thereby constitute immediate Events of Default) and such default is not remedied by the Credit Party or waived by Agent within twenty (20) days after the earlier of (i) receipt by Borrower Representative of notice from Agent or Required Lenders of such default, or (ii) actual knowledge of any Borrower or any other Credit Party of such default;

(c)    any representation, warranty or certification made by any Credit Party in any Financing Document or in any certificate, financial statement or other document delivered pursuant to any Financing Document is incorrect in any respect (or in any material respect if such representation, warranty, certification, statement or document is not by its terms already qualified as to materiality) when made (or deemed made);

(d)    (i) except (A) as prohibited or limited as a result of the Bankruptcy Code and (B) for any existing defaults of Holdings in its capacity as a guarantor of any obligations of another Person or the action commenced by One Beacon that was disclosed to Agent prior to the Closing Date, failure of any Credit Party to pay when due or within any applicable grace period any principal, interest or other amount on Debt (other than the Loans) or in respect of any Swap

Contract, or the occurrence of any breach, default, condition or event with respect to any Debt (other than the Loans) or in respect of any Swap Contract, if the effect of such failure or occurrence is to cause or to permit the holder or holders of any such Debt, or the counterparty under any such Swap Contract, to cause, Debt or other liabilities having an individual principal amount in excess of $625,000 (or any amount, solely with respect to Swap Contracts) or having an aggregate principal amount in excess of $625,000 (or any amount, solely with respect to Swap Contracts) to become or be declared due prior to its stated maturity, or (ii) the occurrence of any breach or default under any terms or provisions of any Subordinated Debt Document or under any agreement subordinating the Subordinated Debt to all or any portion of the Obligations or the occurrence of any event requiring the prepayment of any Subordinated Debt;

(e)     excluding the Bankruptcy Cases, any Non-Debtor Credit Party shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

(f)     an involuntary case or other proceeding shall be commenced against any Non-Debtor Credit Party seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of forty-five (45) days; or an order for relief shall be entered against any Credit Party, other than the Debtors, under applicable federal bankruptcy, insolvency or other similar law in respect of (i) bankruptcy, liquidation, winding-up, dissolution or suspension of general operations, (ii) composition, rescheduling, reorganization, arrangement or readjustment of, or other relief from, or stay of proceedings to enforce, some or all of the debts or obligations, or (iii) possession, foreclosure, seizure or retention, sale or other disposition of, or other proceedings to enforce security over, all or any substantial part of the assets of such Credit Party;

(g)     [Reserved];

(h)     one or more judgments or orders for the payment of money (not paid or fully covered by insurance maintained in accordance with the requirements of this Agreement and, with respect to insurance provided by a commercial insurance company, as to which the relevant insurance company has acknowledged coverage or otherwise covered by an appeal bond) aggregating in excess of $500,000 shall be rendered against any or all Credit Parties and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgments or orders, or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of any such judgments or orders, by reason of a pending appeal, bond or otherwise, shall not be in effect;

CHICAGO/#3334319.13334319.3

(i)     any Lien created by any of the Security Documents shall at any time fail to constitute a valid and perfected Lien on all of the Collateral purported to be secured thereby, subject to no prior or equal Lien except Permitted Liens, or any Credit Party shall so assert;

(j)     any Financing Document shall cease to be effective or shall be contested by any Borrower or any of the other Credit Parties;

(k)     the institution by any Governmental Authority of criminal proceedings against any Credit Party;

(l)     any Borrower makes any payment on account of any Subordinated Debt, other than payments specifically permitted herein or by the terms of any Subordination Agreement;

(m)     the occurrence of any fact, event or circumstance that did not exist as of the Petition Date that could reasonably be expected to result in a Material Adverse Effect, if such default shall have continued unremedied for a period of ten (10) Business Days after written notice from Agent;

(n)     [Reserved];

(o)     any Borrower (or any of its successors or assigns) files a motion or application or adversary proceeding challenging the validity, enforceability, perfection or priority of any claim or Lien securing or pertaining to this Agreement, the other Financing Documents and the credit facility evidenced hereby and thereby or the Obligations;

(p)     if (i) any of the Bankruptcy Cases is converted to a case under Chapter 7 of the Bankruptcy Code, (ii) any of the Bankruptcy Cases is dismissed, or (iii) any Debtor shall file any pleading requesting any such relief;

(q)     if a Chapter 11 trustee or an examiner with enlarged powers relating to the operations of the Debtors' business (beyond those set forth under section 1106(a)(3) and (4) of the Bankruptcy Code) is appointed pursuant to section 1104 of the Bankruptcy Code in any of the Bankruptcy Cases;

(r)     if any Person other than Agent is granted relief from the automatic stay provided for in the Bankruptcy Cases, or such automatic stay is otherwise modified, to permit enforcement of rights by such Person with respect any asset of any Borrower or Guarantor that is adverse to the Agent, the Lenders or the Collateral;

(s)     Except (1) as agreed in writing by the Agent and the Lenders and (2) for motions or orders or arrangements approved by the Court or effected and disclosed to the Agent and the Lenders prior to the date hereof, (i) any Debtor shall make, or file a motion seeking, or the Bankruptcy Court shall enter, an order approving, any Prepetition Payment, (ii) any Debtor shall file a motion seeking, or the Bankruptcy Court shall enter, an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets having a book value in excess of $50,000 in the aggregate, excluding relief from stay to set off

prepetition deposits or to pursue insured claims against insurance companies to the extent such deposits or claims do not constitute Collateral, or (iii) any Debtor shall enter into or file a motion seeking approval of, or the Bankruptcy Court shall enter an order approving, any other settlement or other stipulation with any creditor of any Borrower, other than the Agent and the Lenders, or otherwise providing for payments as adequate protection or otherwise to such creditor;

(t)     if any Borrower's Board of Managers shall authorize the liquidation of such Borrower's or Guarantor's business pursuant to one or more section 363 sales or otherwise or shall file any motion under section 363 of the Bankruptcy Code, other than as consented to by Agent and the Required Lenders (it being understood and agreed, for the avoidance of doubt, that the Debtors' pending motion to implement the Hahnemann Closure Plan shall not be a default hereunder);

(u)     if any Borrower shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under the Interim Order and/or the Final Order;

(v)     the failure of the Closing Date to occur within two (2) Business Days after entry of the Interim Order without the prior written consent of the Agent;**[Reserved];**

(w)     [Reserved];

(x)     any party in interest or other Person files a motion for reconsideration of, or appeals, the Final Order or seeks to modify the Final Order or if the Final Order is modified in any way not acceptable to Agent or the Final Order is vacated or if any party in interest or other Person takes action in contravention of or that is inconsistent with the Final Order;

(y)     any assumption or rejection of any executory contract over the objection of the Agent; provided that such assumption or rejection has a material adverse effect on Agent or Lenders;

(z)     the Borrowers or any Credit Party or any of their subsidiaries, shall seek, obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the Lenders relating to the credit facilities provided hereunder or against the administrative agent or other holders of obligations under the Prepetition Credit Agreement, unless such suit or other proceeding is in connection with the enforcement of the Financing Documents against Agent or Lenders;

(aa)     the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the (i) Interim Order, the Final Order, or any other order of the Bankruptcy Court affecting this Agreement, any other Financing Document or the transactions contemplated hereby or thereby, in each case, in any manner not acceptable to Agent and the Required Lenders or (ii) the Plan of Liquidation to the extent such amendment, modification, reversal, revocation, issuance or supplement results in the Prepetition Obligations and the Obligations not being paid in full in cash on or before the Liquidation Effective Date or reflects

that the Prepetition Obligations or the Obligations will not be paid in full in cash on or before the Liquidation Effective Date;

(bb)    the filing of a motion, pleading, or proceeding by Debtor, or any of its Affiliates, that could reasonably be expected to result in a material impairment of the rights or interests of the Agent or any Lender or a determination by the Bankruptcy Court or any other Governmental Authority with respect to a motion, pleading or proceeding brought by another party that results in a material impairment of the rights, claims and Liens relating to this Agreement, the other Financing Documents and the credit facility evidenced hereby and thereby or the Obligations;

(cc)    if the Borrowers fail to pay in full in cash, on the Closing Date, the Prepetition Obligations in accordance with the terms of this Agreement or if any order of the Bankruptcy Court shall fail to provide for the payment in full, in cash of all Prepetition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations on or before the Liquidation Effective Date;

(dd)    the circulation or distribution by or on behalf of the Borrowers of any plan of liquidation and/or disclosure statement, or draft thereof (or term sheet or similar indicative statements of terms thereof) that does not provide for repayment in full in cash of all Prepetition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations before or at the Liquidation Effective Date;

(ee)    if any confirmation order is entered that does not provide for repayment in full in cash of all Prepetition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations before or at the Liquidation Effective Date;

(ff)    the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the credit facility provided hereunder or the Carve-Out, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code pari passu or senior to the Obligations, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, in the Security Documents or the DIP Orders, except as expressly consented to by Agent);

(gg)    if there is a stay or injunction of the Confirmation Order in effect precluding the consummation of the transactions contemplated thereby;

(hh)    any lien securing or superiority claim in respect of the obligations under the Credit Facilities shall cease to be valid, perfected (if applicable) and enforceable in all respects or to have the priority granted under the Security Documents, the Interim Order (prior to entry of the Final Order) and the Final Order;

(ii)    if a Variance occurs with respect to aggregate expenditures in any week under the DIP Budget in an amount exceeding ten percent (10%) without the prior written

consent of Agent; provided that, notwithstanding the foregoing, any Variance with respect to the payment of professional fees set forth in the DIP Budget shall be an Event of Default without regard to the percentage of such Variance (provided that any unused portion of the budgeted professional fees can be used in a subsequent week of the DIP Budget);

        (jj)     [Reserved];

        (kk)    failure of the Hahnemann Closure to be complete by September 6, 2019; or

        (ll)     failure to meet any deadline set forth in Section 4.19.

All cure periods provided for in this Section 10.1 shall run concurrently with any cure period provided for in any applicable Financing Documents under which the default occurred.

**Section 10.2**  **Acceleration and Suspension or Termination of Revolving Loan Commitment and Term Loan Commitment.**  Subject to the terms of the DIP Orders, upon the occurrence of a DIP Termination Event, Agent may, and shall if requested by Required Lenders, (a) by notice to Borrower Representative suspend or terminate the Revolving Loan Commitment **and Term Loan Commitment** and the obligations of Agent and the Lenders with respect thereto, in whole or in part (and, if in part, each Lender's Revolving Loan Commitment **and Term Loan Commitment** shall be reduced in accordance with its Pro Rata Share) and/or (b) by notice to Borrower Representative declare all or any portion of the Obligations to be, and the Obligations shall thereupon become, immediately due and payable, with accrued interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same; *provided*, *however*, that in the case of any of the Events of Default specified in Section 10.1(e) or 10.1(f) above with respect to the Non-Debtor Credit Parties only, the Revolving Loan Commitment **and Term Loan Commitment** and the obligations of Agent and the Lenders with respect thereto shall thereupon immediately and automatically terminate and all of the Obligations shall become immediately and automatically due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same.

**Section 10.3**  **UCC Remedies**.

        (a)    Subject to the terms of the DIP Orders, upon the occurrence of and during the continuance of a DIP Termination Event Agent, in addition to all other rights, options, and remedies granted to Agent under this Agreement or at law or in equity, may exercise, either directly or through one or more assignees or designees, all rights and remedies granted to it under all Financing Documents and under the UCC in effect in the applicable jurisdiction(s) and under any other applicable law; including, without limitation:

        (i)    the right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process;

        (ii)   the right to (by its own means or with judicial assistance) enter any of Borrowers' premises and take possession of the Collateral, or render it unusable, or to

render it usable or saleable, or dispose of the Collateral on such premises in compliance with subsection (iii) below and to take possession of Borrowers' original books and records, to obtain access to Borrowers' data processing equipment, computer hardware and software relating to the Collateral and to use all of the foregoing and the information contained therein in any manner Agent deems appropriate, without any liability for rent, storage, utilities, or other sums, and Borrowers shall not resist or interfere with such action (if Borrowers' books and records are prepared or maintained by an accounting service, contractor or other third party agent, Borrowers hereby irrevocably authorize such service, contractor or other agent, upon notice by Agent to such Person that an Event of Default has occurred and is continuing, to deliver to Agent or its designees such books and records, and to follow Agent's instructions with respect to further services to be rendered);

(iii)    the right to require Borrowers at Borrowers' expense to assemble all or any part of the Collateral and make it available to Agent at any place designated by Lender;

(iv)    the right to notify postal authorities to change the address for delivery of Borrowers' mail to an address designated by Agent and to receive, open and dispose of all mail addressed to any Borrower; and/or

(v)    the right to enforce Borrowers' rights against Account Debtors and other obligors, including, without limitation, (i) the right to collect Accounts directly in Agent's own name (as agent for Lenders) and to charge the collection costs and expenses actually incurred, including reasonable attorneys' fees, to Borrowers, and (ii) the right, in the name of Agent or any designee of Agent or Borrowers, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, telegraph or otherwise, including, without limitation, verification of Borrowers' compliance in all material respects with applicable Laws.  Borrowers shall cooperate fully with Agent in an effort to facilitate and promptly conclude such verification process.  Such verification may include contacts between Agent and applicable federal, state and local regulatory authorities having jurisdiction over the Borrowers' affairs, all of which contacts Borrowers hereby irrevocably authorize.

(b)    Subject to the terms of the DIP Orders, each Borrower agrees that a notice received by it at least ten (10) days before the time of any intended public sale, or the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Agent without prior notice to Borrowers.  At any sale or disposition of Collateral, Agent may (to the extent permitted by applicable law) purchase all or any part of the Collateral, free from any right of redemption by Borrowers, which right is hereby waived and released.  Each Borrower covenants and agrees not to interfere with or impose any obstacle to Agent's exercise of its rights and remedies with respect to the Collateral.  Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  Agent may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the

commercial reasonableness of any sale of the Collateral. Agent may sell the Collateral without giving any warranties as to the Collateral. Agent may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. If Agent sells any of the Collateral upon credit, Borrowers will be credited only with payments actually made by the purchaser, received by Agent and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Agent may resell the Collateral and Borrowers shall be credited with the proceeds of the sale. Borrowers shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Obligations.

(c)    Without restricting the generality of the foregoing and for the purposes aforesaid, each Borrower hereby appoints and constitutes Agent its lawful attorney-in-fact with full power of substitution in the Collateral, upon the occurrence and during the continuance of a DIP Termination Event, to (i) use unadvanced funds remaining under this Agreement or which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Notes, (ii) pay, settle or compromise all existing bills and claims, which may be Liens or security interests, or to avoid such bills and claims becoming Liens against the Collateral, (iii) execute all applications and certificates in the name of such Borrower and to prosecute and defend all actions or proceedings in connection with the Collateral, and (iv) do any and every act which such Borrower might do in its own behalf; it being understood and agreed that this power of attorney in this subsection (c) shall be a power coupled with an interest and cannot be revoked.

(d)    Agent and each Lender is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Borrowers' labels, mask works, rights of use of any name, any other Intellectual Property and advertising matter, and any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Agent's exercise of its rights under this Article, Borrowers' rights under all licenses (whether as licensor or licensee) and all franchise agreements inure to Agent's and each Lender's benefit.

**Section 10.4    Terminated Use of Cash Collateral**.  Without limitation of any of the remedies set forth in this Agreement and the other Financing Documents, upon the occurrence and during the continuance of any Event of Default, or upon the occurrence of the Termination Date, no Borrower or Guarantor shall have any right to use or seek to use any cash collateral (as defined in section 363(a) of the Bankruptcy Code) in which Agent or the Lenders has an interest.

**Section 10.5    Default Rate of Interest.**  Subject to the terms of the DIP Orders, at the election of Agent or Required Lenders, after the occurrence of an Event of Default and for so long as it continues, the Loans and other Obligations shall bear interest at rates that are five percent (5.0%) per annum in excess of the rates otherwise payable under this Agreement.

**Section 10.6    Setoff Rights.**  Subject to the terms of the DIP Orders, during the continuance of any Event of Default, each Lender is hereby authorized by each Borrower at any time or from time to time, with reasonably prompt subsequent notice to such Borrower (any prior or contemporaneous notice being hereby expressly waived) to set off and to appropriate and to apply any and all (a) balances held by such Lender or any of such Lender's Affiliates at any of

its offices for the account of such Borrower or any of its Subsidiaries (regardless of whether such balances are then due to such Borrower or its Subsidiaries), and (b) other property at any time held or owing by such Lender to or for the credit or for the account of such Borrower or any of its Subsidiaries, against and on account of any of the Obligations; except that no Lender shall exercise any such right without the prior written consent of Agent.  Any Lender exercising a right to set off shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set off with each other Lender in accordance with their respective Pro Rata Share of the Obligations.  Each Borrower agrees, to the fullest extent permitted by law, that any Lender and any of such Lender's Affiliates may exercise its right to set off with respect to the Obligations as provided in this Section 10.6.

**Section 10.7    Application of Proceeds**.

(a)    Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, (a) each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Agent from or on behalf of such Borrower or any other Guarantor of all or any part of the Obligations, and, as between Borrowers on the one hand and Agent and Lenders on the other, Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as Agent may deem advisable notwithstanding any previous application by Agent, and (b) but absent the occurrence and continuance of an Acceleration Event, Agent shall apply any and all payments received by Agent in respect of the Obligations, and any and all proceeds of Collateral received by Agent, in such order as Agent may from time to time elect.

(b)    Notwithstanding anything to the contrary contained in this Agreement, if an Acceleration Event shall have occurred, and so long as it continues, Agent shall apply any and all payments received by Agent in respect of the Obligations, and any and all proceeds of Collateral received by Agent, in the following order: _first_, to all indemnities then due and owing and fees, costs and expenses then due and owing to Agent with respect to this Agreement, the other Financing Documents or the Collateral; _second_, to all indemnities then due and owing and fees, costs and expenses then due and owing to any Lender with respect to this Agreement, the other Financing Documents or the Collateral; _third_, to accrued and unpaid interest on the Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts); _fourth_, to the principal amount of the Obligations outstanding; and _fifth_ to any other indebtedness or obligations of Borrowers owing to Agent or any Lender under the Financing Documents.  Any balance remaining shall be delivered to Borrowers or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct.  In carrying out the foregoing, (y) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (z) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its Pro Rata Share of amounts available to be applied pursuant thereto for such category.

**Section 10.8**   **Waivers**.

(a)    Except as otherwise provided for in this Agreement and to the fullest extent permitted by applicable law, each Credit Party waives:  (i) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Financing Documents, the Notes or any other notes, commercial paper, accounts, contracts, documents, Instruments, Chattel Paper and Guarantees at any time held by Agent or Lenders on which any Borrower may in any way be liable, and hereby ratifies and confirms whatever Agent or Lenders may do in this regard; (ii) all rights to notice and a hearing prior to Agent's or any Lender's taking possession or control of, or to Agent's or any Lender's replevy, attachment or levy upon, any Collateral or any bond or security which might be required by any court prior to allowing Agent or any Lender to exercise any of its remedies; and (iii) the benefit of all valuation, appraisal and exemption Laws.  Each Credit Party acknowledges that it has been advised by counsel of its choices and decisions with respect to this Agreement, the other Financing Documents and the transactions evidenced hereby and thereby.

(b)    Each Credit Party for itself and all its successors and assigns, (i) agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Agent or any Lender; (ii) consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Agent or any Lender with respect to the payment or other provisions of the Financing Documents, and to any substitution, exchange or release of the Collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any Credit Party, endorsers, guarantors, or sureties, or whether primarily or secondarily liable, without notice to any other Borrower and without affecting its liability hereunder; (iii) agrees that its liability shall be unconditional and without regard to the liability of any other Credit Party, Agent or any Lender for any tax on the indebtedness; and (iv) to the fullest extent permitted by law, expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(c)    To the extent that Agent or any Lender may have acquiesced in any noncompliance with any requirements or conditions precedent to the closing of the Loans or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Agent or any Lender of such requirements with respect to any future disbursements of Loan proceeds and Agent may at any time after such acquiescence require Credit Parties to comply with all such requirements.  Any forbearance by Agent or Lender in exercising any right or remedy under any of the Financing Documents, or otherwise afforded by applicable law, including any failure to accelerate the maturity date of the Loans, shall not be a waiver of or preclude the exercise of any right or remedy nor shall it serve as a novation of the Notes or as a reinstatement of the Loans or a waiver of such right of acceleration or the right to insist upon strict compliance of the terms of the Financing Documents.  Agent's or any Lender's acceptance of payment of any sum secured by any of the Financing Documents after the due date of such payment shall not be a waiver of Agent's and such Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment.  The procurement of insurance or the payment of taxes or other Liens or charges by Agent as the result of an Event of Default shall not be a waiver of Agent's right to

accelerate the maturity of the Loans, nor shall Agent's receipt of any condemnation awards, insurance proceeds, or damages under this Agreement operate to cure or waive any Credit Party's default in payment of sums secured by any of the Financing Documents.

(d)     [Reserved].

(e)     Nothing contained herein or in any other Financing Document shall be construed as requiring Agent or any Lender to resort to any part of the Collateral for the satisfaction of any of Borrowers' obligations under the Financing Documents in preference or priority to any other Collateral, and, after the occurrence and during the continuance of an Event of Default, Agent may seek satisfaction out of all of the Collateral or any part thereof, in its absolute discretion in respect of Credit Parties' obligations under the Financing Documents. In addition, after the occurrence and during the continuance of an Event of Default, Agent shall have the right from time to time to partially foreclose upon any Collateral in any manner and for any amounts secured by the Financing Documents then due and payable as determined by Agent in its sole discretion, including, without limitation, the following circumstances: (i) in the event any Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Agent may foreclose upon all or any part of the Collateral to recover such delinquent payments, or (ii) in the event Agent elects to accelerate less than the entire outstanding principal balance of the Loans, Agent may foreclose all or any part of the Collateral to recover so much of the principal balance of the Loans as Lender may accelerate and such other sums secured by one or more of the Financing Documents as Agent may elect. Notwithstanding one or more partial foreclosures, any unforeclosed Collateral shall remain subject to the Financing Documents to secure payment of sums secured by the Financing Documents and not previously recovered.

(f)     To the fullest extent permitted by law, each Borrower, for itself and its successors and assigns, waives in the event of foreclosure of any or all of the Collateral any equitable right otherwise available to any Credit Party which would require the separate sale of any of the Collateral or require Agent or Lenders to exhaust their remedies against any part of the Collateral before proceeding against any other part of the Collateral; and further in the event of such foreclosure each Borrower does hereby expressly consent to and authorize, at the option of Agent, the foreclosure and sale either separately or together of each part of the Collateral.

**Section 10.9   Reserved.**

**Section 10.10 Marshalling; Payments Set Aside.**  Neither Agent nor any Lender shall be under any obligation to marshal any assets in payment of any or all of the Obligations. To the extent that Borrower makes any payment or Agent enforces its Liens or Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such enforcement or set-off is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefore, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

## ARTICLE 11 AGENT

**Section 11.1**  **Appointment and Authorization.**  Each Lender hereby irrevocably appoints and authorizes Agent to enter into each of the Financing Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as Agent on its behalf and to exercise such powers under the Financing Documents as are delegated to Agent by the terms thereof, together with all such powers as are reasonably incidental thereto.  Subject to the terms of Section 11.16 and to the terms of the other Financing Documents, Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Financing Documents on behalf of Lenders.  Except for the rights expressly granted to the Borrowers in this Article 11, the provisions of this Article 11 are solely for the benefit of Agent and Lenders and neither any Borrower nor any other Credit Party shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower or any other Credit Party.  Agent may perform any of its duties hereunder, or under the Financing Documents, by or through its agents or employees.

**Section 11.2**  **Agent and Affiliates.**  Agent shall have the same rights and powers under the Financing Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Agent, and Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with each Credit Party or Affiliate of any Credit Party as if it were not Agent hereunder.

**Section 11.3**  **Action by Agent.**  The duties of Agent shall be mechanical and administrative in nature.  Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any of the Financing Documents is intended to or shall be construed to impose upon Agent any obligations in respect of this Agreement or any of the Financing Documents except as expressly set forth herein or therein.

**Section 11.4**  **Consultation with Experts.**  Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

**Section 11.5**  **Liability of Agent.**  Neither Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be liable to any Lender for any action taken or not taken by it in connection with the Financing Documents, except that Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence, bad faith or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.  Neither Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Financing Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any Financing Document; (c) the satisfaction of any condition specified in any

Financing Document; (d) the validity, effectiveness, sufficiency or genuineness of any Financing Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Default or Event of Default; or (f) the financial condition of any Credit Party.  Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, telex, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties.  Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

**Section 11.6    Indemnification**.  Each Lender shall, in accordance with its Pro Rata Share, indemnify Agent (to the extent not reimbursed by Borrowers) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that Agent may suffer or incur in connection with the Financing Documents or any action taken or omitted by Agent hereunder or thereunder.  If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

**Section 11.7    Right to Request and Act on Instructions.**    Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Financing Documents Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Financing Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Financing Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or exposes Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

**Section 11.8    Credit Decision.**  Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem

CHICAGO/#3334319.13334319.3

appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Financing Documents.

**Section 11.9    Collateral Matters.**  Lenders irrevocably authorize Agent, at its option and in its discretion, to (a) release any Lien granted to or held by Agent under any Security Document (i) upon termination of the Revolving Loan Commitment and payment in full in cash of all Obligations (other than unasserted Contingent Obligations), and, to the extent required by Agent in its sole discretion, the expiration, termination or cash collateralization (to the satisfaction of Agent) of all Swap Contracts secured, in whole or in part, by any Collateral; or (ii) on property sold or disposed of as part of or in connection with any disposition permitted under any Financing Document (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the Financing Documents); and (b) release or subordinate any Lien granted to or held by Agent under any Security Document constituting personal property described herein (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the identification of any personal property described herein).  Upon request by Agent at any time, Lenders will confirm Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.9.

**Section 11.10 Agency for Perfection.**  Agent and each Lender hereby appoint each other Lender as agent for the purpose of perfecting Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control.  Should any Lender (other than Agent) obtain possession or control of any such assets, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor, shall deliver such assets to Agent or in accordance with Agent's instructions or transfer control to Agent in accordance with Agent's instructions.  Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loan unless instructed to do so by Agent (or consented to by Agent, as provided in Section 11.5), it being understood and agreed that such rights and remedies may be exercised only by Agent.

**Section 11.11 Notice of Default.**  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of Lenders, unless Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  Agent will notify each Lender of its receipt of any such notice.  Agent shall take such action with respect to such Default or Event of Default as may be requested by Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.  Unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

CHICAGO/#3334319.13334319.3

**Section 11.12  Assignment by Agent; Resignation of Agent; Successor Agent.**

(a)    Agent may at any time assign its rights, powers, privileges and duties hereunder to (i) another Lender, or (ii) any Person to whom Agent, in its capacity as a Lender, has assigned (or will assign, in conjunction with such assignment of agency rights hereunder) 50% or more of its Loan, in each case without the consent of the Lenders or Borrowers. Following any such assignment, Agent shall give notice to the Lenders and Borrowers.  An assignment by Agent pursuant to this subsection (a) shall not be deemed a resignation by Agent for purposes of subsection (b) below.

(b)    Without limiting the rights of Agent to designate an assignee pursuant to subsection (a) above, Agent may at any time give notice of its resignation to the Lenders and Borrowers.  Upon receipt of any such notice of resignation, Required Lenders shall have the right to appoint a successor Agent.  If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within ten (10) Business Days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent; *provided, however,* that if Agent shall notify Borrowers and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice from Agent that no Person has accepted such appointment and, from and following delivery of such notice, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Financing Documents, and (ii) all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to each Lender directly, until such time as Required Lenders appoint a successor Agent as provided for above in this paragraph.

(c)    Upon (i) an assignment permitted by subsection (a) above, or (ii) the acceptance of a successor's appointment as Agent pursuant to subsection (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder and under the other Financing Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Financing Documents, the provisions of this Article and Section 11.12 shall continue in effect for the benefit of such retiring Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting or was continuing to act as Agent.

**Section 11.13  Payment and Sharing of Payment.**

(a)    Revolving Loan Advances, Payments and Settlements; Interest and Fee Payments**; Term Loan Payments**.

(i)    Agent shall have the right, on behalf of Revolving Lenders to disburse funds to Borrowers for all Revolving Loans requested or deemed requested by Borrowers pursuant to the terms of this Agreement.  Agent shall be conclusively entitled to assume, for purposes of the preceding sentence, that each Revolving Lender, other

than any Non-Funding Revolving Lenders, will fund its Pro Rata Share of all Revolving Loans requested by Borrowers. Each Revolving Lender shall reimburse Agent on demand, in accordance with the provisions of the immediately following paragraph, for all funds disbursed on its behalf by Agent pursuant to the first sentence of this clause (i), or if Agent so requests, each Revolving Lender will remit to Agent its Pro Rata Share of any Revolving Loan before Agent disburses the same to a Borrower. If Agent elects to require that each Revolving Lender make funds available to Agent, prior to a disbursement by Agent to a Borrower, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of such Revolving Lender's Pro Rata Share of the Revolving Loan requested by such Borrower no later than noon (Eastern time) on the date of funding of such Revolving Loan, and each such Revolving Lender shall pay Agent on such date such Revolving Lender's Pro Rata Share of such requested Revolving Loan, in same day funds, by wire transfer to the Payment Account, or such other account as may be identified by Agent to Revolving Lenders from time to time. If any Lender fails to pay the amount of its Pro Rata Share of any funds advanced by Agent pursuant to the first sentence of this clause (i) within one (1) Business Day after Agent's demand, Agent shall promptly notify Borrower Representative, and Borrowers shall immediately repay such amount to Agent. Any repayment required by Borrowers pursuant to this Section 11.13 shall be accompanied by accrued interest thereon from and including the date such amount is made available to a Borrower to but excluding the date of payment at the rate of interest then applicable to Revolving Loans. Nothing in this Section 11.13 or elsewhere in this Agreement or the other Financing Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that Agent or any Borrower may have against any Lender as a result of any default by such Lender hereunder.

(ii)    On a Business Day of each week as selected from time to time by Agent, or more frequently (including daily), if Agent so elects (each such day being a "**Settlement Date**"), Agent will advise each Revolving Lender by telephone, facsimile or e-mail of the amount of each such Revolving Lender's percentage interest of the Revolving Loan balance as of the close of business of the Business Day immediately preceding the Settlement Date. In the event that payments are necessary to adjust the amount of such Revolving Lender's actual percentage interest of the Revolving Loans to such Lender's required percentage interest of the Revolving Loan balance as of any Settlement Date, the Revolving Lender from which such payment is due shall pay Agent, without setoff or discount, to the Payment Account not later than 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date the full amount necessary to make such adjustment. Any obligation arising pursuant to the immediately preceding sentence shall be absolute and unconditional and shall not be affected by any circumstance whatsoever. In the event settlement shall not have occurred by the date and time specified in the second preceding sentence, interest shall accrue on the unsettled amount at the rate of interest then applicable to Revolving Loans.

(iii)    On each Settlement Date, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of such Revolving Lender's percentage interest of principal, interest and fees paid for the benefit of Revolving

Lenders with respect to each applicable Revolving Loan, to the extent of such Revolving Lender's Revolving Loan Exposure with respect thereto, and shall make payment to such Revolving Lender not later than 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date of such amounts in accordance with wire instructions delivered by such Revolving Lender to Agent, as the same may be modified from time to time by written notice to Agent; *provided, however,* that, in the case such Revolving Lender is a Defaulted Lender, Agent shall be entitled to set off the funding short-fall against that Defaulted Lender's respective share of all payments received from any Borrower.

(iv)    On the Closing Date, Agent, on behalf of Lenders, may elect to advance to Borrowers the full amount of the initial Loans to be made on the Closing Date prior to receiving funds from Lenders, in reliance upon each Lender's commitment to make its Pro Rata Share of such Loans to Borrowers in a timely manner on such date. If Agent elects to advance the initial Loans to Borrower in such manner, Agent shall be entitled to receive all interest that accrues on the Closing Date on each Lender's Pro Rata Share of such Loans unless Agent receives such Lender's Pro Rata Share of such Loans by 3:00 p.m. (Eastern time) on the Closing Date.

(v)    It is understood that for purposes of advances to Borrowers made pursuant to this Section 11.13, Agent will be using the funds of Agent, and pending settlement, (A) all funds transferred from the Payment Account to the outstanding Revolving Loans shall be applied first to advances made by Agent to Borrowers pursuant to this Section 11.13, and (B) all interest accruing on such advances shall be payable to Agent.

(vi)    The provisions of this Section 11.13(a) shall be deemed to be binding upon Agent and Lenders notwithstanding the occurrence of any Default or Event of Default, or any insolvency or bankruptcy proceeding pertaining to any Borrower or any other Credit Party.

**(vii)    Payments of principal, interest and fees in respect of the Term Loan will be settled on the date of receipt if received by Agent on the last Business Day of a month or on the Business Day immediately following the date of receipt if received on any day other than the last Business Day of a month.**

(b)    Return of Payments.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from a Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or

condition of this Agreement or any other Financing Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(c)    <u>Defaulted Lenders</u>.  The failure of any Defaulted Lender to make any payment required by it hereunder shall not relieve any other Lender of its obligations to make payment, but neither any other Lender nor Agent shall be responsible for the failure of any Defaulted Lender to make any payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Defaulted Lender shall not have any voting or consent rights under or with respect to any Financing Document or constitute a "**Lender**" (or be included in the calculation of "**Required Lenders**" hereunder) for any voting or consent rights under or with respect to any Financing Document.

(d)    <u>Sharing of Payments</u>.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of Section 2.8(i)) in excess of its Pro Rata Share of payments entitled pursuant to the other provisions of this Section 11.13, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; *provided, however,* that if all or any portion of the excess payment or other recovery is thereafter required to be returned or otherwise recovered from such purchasing Lender, such portion of such purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such return or recovery, without interest.  Each Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this clause (d) may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 10.6) with respect to such participation as fully as if such Lender were the direct creditor of Borrowers in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this clause (d) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this clause (d) to share in the benefits of any recovery on such secured claim.

**Section 11.14 <u>Right to Perform, Preserve and Protect</u>**.  If any Credit Party fails to perform any obligation hereunder or under any other Financing Document (after giving effect to any cure periods provided for in this Agreement or such other Financing Document), Agent itself may, but shall not be obligated to, cause such obligation to be performed at Borrowers' expense.  Agent is further authorized by Borrowers and the Lenders to make expenditures from time to time which Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by Borrowers, the Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loan and other Obligations.  Each Borrower hereby agrees to reimburse Agent on demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section 11.14.  Each Lender hereby agrees to indemnify Agent upon demand for any and all costs, liabilities and obligations

incurred by Agent pursuant to this Section 11.14, in accordance with the provisions of Section 11.6.

**Section 11.15 <u>Additional Titled Agents</u>.** Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than Agent (collectively, the "**Additional Titled Agents**"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional Titled Agent, no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Financing Documents. Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Lender. At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loan, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

**Section 11.16 <u>Amendments and Waivers</u>.**

(a)     No provision of this Agreement or any other Financing Document may be materially amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrowers, the Required Lenders and any other Lender to the extent required under Section 11.16(b); *provided, however*, that Agent shall be entitled, in its sole and absolute discretion, to provide its written consent to a proposed Swap Contract, in each case without the consent of any other Lender.

(b)     In addition to the required signatures under Section 11.16(a), no provision of this Agreement or any other Financing Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by the following Persons:

(i)     if any amendment, waiver or other modification would increase a Lender's funding obligations in respect of any Loan, by such Lender; and/or

(ii)     if the rights or duties of Agent or LC Issuer are affected thereby, by Agent and LC Issuer, as the case may be;

*provided, however*, that, in each of (i) and (ii) above, no such amendment, waiver or other modification shall, unless signed or otherwise approved in writing by all the Lenders directly affected thereby, (A) reduce the principal of, rate of interest on or any fees with respect to any Loan or forgive any principal, interest (other than default interest) or fees (other than late charges) with respect to any Loan; (B) postpone the date fixed for, or waive, any payment (other than any mandatory prepayment pursuant to Section 2.1(b)(ii)) of principal of any Loan, or of interest on any Loan (other than default interest) or any fees provided for hereunder (other than late charges) or postpone the date of termination of any commitment of any Lender hereunder; (C) change the definition of the term Required Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder; (D) release all or substantially all of the Collateral, authorize any Borrower to sell or otherwise dispose of all or substantially all of the Collateral or release any Guarantor of all or any portion of the Obligations or its Guarantee

CHICAGO/#~~3334319.1~~3334319.3

obligations with respect thereto, except, in each case with respect to this clause (D), as otherwise may be provided in this Agreement or the other Financing Documents (including in connection with any disposition permitted hereunder); (E) amend, waive or otherwise modify this Section 11.16(b) or the definitions of the terms used in this Section 11.16(b) insofar as the definitions affect the substance of this Section 11.16(b);  (F) consent to the assignment, delegation or other transfer by any Credit Party of any of its rights and obligations under any Financing Document or release any Borrower of its payment obligations under any Financing Document, except, in each case with respect to this clause (F), pursuant to a merger or consolidation permitted pursuant to this Agreement; or (G) amend any of the provisions of Section 10.7 or amend any of the definitions Pro Rata Share, Revolving Loan Commitment, ~~Revolving~~**Term** Loan Commitment ~~Amount or~~**,** Revolving Loan Commitment **Amount, Term Loan Commitment Amount, Revolving Loan Commitment** Percentage~~,~~**, Term Loan Commitment Percentage** or that provide for the Lenders to receive their Pro Rata Shares of any fees, payments, setoffs or proceeds of Collateral hereunder.  It is hereby understood and agreed that all Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (C), (D), (E), (F) and (G) of the preceding sentence.

**Section 11.17** **Assignments and Participations**.

(a) Assignments.

(i) Any Lender may at any time assign to one or more Eligible Assignees all or any portion of such Lender's Loan together with all related obligations of such Lender hereunder.  Except as Agent may otherwise agree, the amount of any such assignment (determined as of the date of the applicable Assignment Agreement or, if a "Trade Date" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the assignor's entire interests in the outstanding Loan; *provided, however,* that, in connection with simultaneous assignments to two or more related Approved Funds, such Approved Funds shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above.  Borrowers and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto and a processing fee of $3,500 to be paid by the assigning Lender; *provided, however,* that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds.

(ii) From and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder, and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to Section 12.1).  Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, each

Borrower shall execute and deliver to Agent for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes in the aggregate principal amount of the Eligible Assignee's Loan (and, as applicable, Notes in the principal amount of that portion of the principal amount of the Loan retained by the assigning Lender). Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrower Representative any prior Note held by it.

(iii)    Agent, acting solely for this purpose as an agent of Borrower, shall maintain at the offices of its servicer located in Bethesda, Maryland a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount of the Loan owing to, such Lender pursuant to the terms hereof. The entries in such register shall be conclusive, and Borrower, Agent and Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. Such register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice to Agent.

(iv)    Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided, however,* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(v)    Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, Agent has the right, but not the obligation, to effectuate assignments of Loan via an electronic settlement system acceptable to Agent as designated in writing from time to time to the Lenders by Agent (the "**Settlement Service**"). At any time when the Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 11.17(a). Each assigning Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loan pursuant to the Settlement Service. With the prior written approval of Agent, Agent's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service. Assignments and assumptions of the Loan shall be effected by the provisions otherwise set forth herein until Agent notifies Lenders of the Settlement Service as set forth herein.

(b)    Participations. Any Lender may at any time, without the consent of, or notice to, any Borrower or Agent, sell to one or more Persons participating interests in its Loan, commitments or other interests hereunder (any such Person, a "**Participant**"). In the event of a sale by a Lender of a participating interest to a Participant, (i) such Lender's obligations hereunder shall remain unchanged for all purposes, (ii) Borrowers and Agent shall continue to

deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder, and (iii) all amounts payable by each Borrower shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender. Each Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; *provided, however*, that such right of set-off shall be subject to the obligation of each Participant to share with Lenders, and Lenders agree to share with each Participant, as provided in Section 11.5. Each Lender that sells a participating interest shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts and stated interest of each Participant's interest in the Loans or other Obligations under the Financing Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Financing Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in each Participant Register shall be conclusive absent manifest error, and each such Lender shall treat each Person whose name is recorded in a Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c)    Replacement of Lenders.    Within thirty (30) days after: (i) receipt by Agent of notice and demand from any Lender for payment of additional costs as provided in Section 2.8(i), which demand shall not have been revoked, (ii) any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.8(a), (iii) any Lender is a Defaulted Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any Lender to consent to a requested amendment, waiver or modification to any Financing Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender, or each Lender affected thereby, is required with respect thereto (each relevant Lender in the foregoing clauses (i) through (iv) being an "**Affected Lender**") each of Borrower Representative and Agent may, at its option, notify such Affected Lender and, in the case of Borrowers' election, the Agent, of such Person's intention to obtain, at Borrowers' expense, a replacement Lender ("**Replacement Lender**") for such Lender, which Replacement Lender shall be an Eligible Assignee and, in the event the Replacement Lender is to replace an Affected Lender described in the preceding clause (iv), such Replacement Lender consents to the requested amendment, waiver or modification making the replaced Lender an Affected Lender. In the event Borrowers or Agent, as applicable, obtains a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender shall sell, at par, and assign all of its Loan and funding commitments hereunder to such Replacement Lender in accordance with the procedures set forth in Section 11.17(a); *provided, however,* that (A) Borrowers shall have reimbursed such Lender for its increased costs and additional payments for which it is entitled to reimbursement under Section 2.8(a) or Section 2.8(i), as applicable, of this Agreement

111

through the date of such sale and assignment, and (B) Borrowers shall pay to Agent the $3,500 processing fee in respect of such assignment. In the event that a replaced Lender does not execute an Assignment Agreement pursuant to Section 11.17(a) within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 11.17(c) and presentation to such replaced Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 11.17(c), such replaced Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by Agent, the Replacement Lender and, to the extent required pursuant to Section 11.17(a), Borrowers, shall be effective for purposes of this Section 11.17(c) and Section 11.17(a). Upon any such assignment and payment, such replaced Lender shall no longer constitute a "**Lender**" for purposes hereof, other than with respect to such rights and obligations that survive termination as set forth in Section 12.1.

(d)     Credit Party Assignments. Except in connection with any consolidation, merger or amalgamation expressly permitted by Section 5.6, no Credit Party may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Financing Document without the prior written consent of Agent and each Lender.

**Section 11.18 Funding and Settlement Provisions Applicable When Non-Funding Lenders Exist**. So long as Agent has not waived the conditions to the funding of Revolving Loans set forth in Section 7.2 any Lender may deliver a notice to Agent stating that such Lender shall cease making Revolving Loans due to the non-satisfaction of one or more conditions to funding Loans set forth in Section 7.2, and specifying any such non-satisfied conditions. Any Lender delivering any such notice shall become a non-funding Lender (a "**Non-Funding Lender**") for purposes of this Agreement commencing on the Business Day following receipt by Agent of such notice, and shall cease to be a Non-Funding Lender on the date on which such Lender has either revoked the effectiveness of such notice or acknowledged in writing to each of Agent the satisfaction of the condition(s) specified in such notice, or Required Lenders waive the conditions to the funding of such Loans giving rise to such notice by Non-Funding Lender. Each Non-Funding Lender shall remain a Lender for purposes of this Agreement to the extent that such Non-Funding Lender has Revolving Loans Outstanding in excess of $0 **or holds a portion of the Term Loan outstanding in excess of $0**; *provided, however,* that during any period of time that any Non-Funding Lender exists, and notwithstanding any provision to the contrary set forth herein, the following provisions shall apply:

(a)     For purposes of determining the Pro Rata Share of each Revolving Lender under clause (c) of the definition of such term, each Non-Funding Lender shall be deemed to have a Revolving Loan Commitment Amount **and Term Loan Commitment Amount** as in effect immediately before such Lender became a Non-Funding Lender.

(b)     Except as provided in clause (a) above, the Revolving Loan Commitment Amount **and Term Loan Commitment Amount** of each Non-Funding Lender shall be deemed to be zero.

(c)     The Revolving Loan Commitment at any date of determination during such period shall be deemed to be equal to the sum of (i) the aggregate Revolving Loan

Commitment Amounts of all Lenders, other than the Non-Funding Lenders as of such date *plus* (ii) the aggregate Revolving Loan Outstandings of all Non-Funding Lenders as of such date.

(d)    [Reserved]. **The Term Loan Commitment at any date of determination during such period shall be deemed to be equal to the sum of (i) the aggregate Term Loan Commitment Amounts of all Lenders, other than the Non-Funding Lenders as of such date plus (ii) the aggregate principal amount outstanding under the Term Loan of all Non-Funding Lenders as of such date.**

(e)    Agent shall have no right to make or disburse Revolving Loans for the account of any Non-Funding Lender pursuant to Section 11.13, or to assume that any Non-Funding Lender will fund its Pro Rata Share of any Revolving Loans requested by Borrower during such period.

(f)    To the extent that Agent applies proceeds of Collateral or other payments received by Agent to repayment of Revolving Loans pursuant to Section 10.7, such payments and proceeds shall be applied first in respect of Revolving Loans made at the time any Non-Funding Lenders exist, and second in respect of all other outstanding Revolving Loans.

**Section 11.19  Buy-Out Upon Refinancing.**  MCF shall have the right to purchase from the other Lenders all of their respective interests in the Loan at par in connection with any refinancing of the Loan upon one or more new economic terms, but which refinancing is structured as an amendment and restatement of the Loan rather than a payoff of the Loan.

**Section 11.20  Lender's Rights to Offset, Set-Off**.  Notwithstanding anything to the contrary contained in Section 11.5, each Lender hereby acknowledges that the exercise by any Lender of offset, set-off, banker's lien or similar rights against any deposit or other indebtedness of Borrowers whether or not located in any state with certain laws restricting lenders from pursuing multiple collection methods could result under such laws in significant impairment of the ability of all Lenders to recover further amounts in respect of the Loan. THEREFORE, EACH LENDER AGREES THAT NO LENDER SHALL EXERCISE ANY SUCH RIGHT OF SET-OFF, BANKER'S LIEN, OR OTHERWISE, AGAINST ANY ASSETS OF ANY BORROWER (INCLUDING ALL GENERAL OR SPECIAL, TIME OR DEMAND, PROVISIONAL OR OTHER DEPOSITS AND OTHER INDEBTEDNESS OWING BY SUCH LENDER TO OR FOR THE CREDIT OR THE ACCOUNT OF ANY BORROWER) WITHOUT THE PRIOR WRITTEN CONSENT OF AGENT AND THE REQUIRED LENDERS.

**Section 11.21  Definitions.**  As used in this Article 11, the following terms have the following meanings:

"**Additional Titled Agents**" has the meaning set forth in Section 11.15.

"**Affected Lender**" has the meaning set forth in Section 11.17(c).

"**Approved Fund**" means any (a) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in

CHICAGO/#3334319.13334319.3

commercial loans and similar extensions of credit in the Ordinary Course of Business, or (b) any Person (other than a natural person) which temporarily warehouses loans for any Lender or any entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

"**Assignment Agreement**" means an assignment agreement in form and substance acceptable to Agent.

"**Defaulted Lender**" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any Financing Document.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person approved by Agent; *provided, however*, that notwithstanding the foregoing, (x) "**Eligible Assignee**" shall not include any Borrower or any of a Borrower's Affiliates, and (y) no proposed assignee intending to assume all or any portion of the Revolving Loan Commitment shall be an Eligible Assignee unless such proposed assignee either already holds a portion of such Revolving Loan Commitment, or has been approved as an Eligible Assignee by Agent.

"**Non-Funding Lender**" has the meaning set forth in Section 11.18.

"**Participant**" has the meaning set forth in Section 11.17(b).

"**Participant Register**" has the meaning set forth in Section 11.17(b).

"**Replacement Lender**" has the meaning set forth in Section 11.17(c).

"**Settlement Service**" has the meaning set forth in Section 11.17(a)(v).

## ARTICLE 12 MISCELLANEOUS

**Section 12.1    Survival.**  All agreements, representations and warranties made herein and in every other Financing Document shall survive the execution and delivery of this Agreement and the other Financing Documents and the other Operative Documents.  The provisions of Sections 2.8, 2.10 and Articles 11 and 12 shall survive the payment of the Obligations (both with respect to any Lender and all Lenders collectively) and any termination of this Agreement and any judgment with respect to any Obligations, including any final foreclosure judgment with respect to any Security Document, and no unpaid or unperformed, current or future, Obligations will merge into any such judgment.

**Section 12.2    No Waivers.**  No failure or delay by Agent or any Lender in exercising any right, power or privilege under any Financing Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein and therein

CHICAGO/#3334319.13334319.3

provided shall be cumulative and not exclusive of any rights or remedies provided by law. Any reference in any Financing Document to the "continuing" nature of any Event of Default shall not be construed as establishing or otherwise indicating that any Borrower or any other Credit Party has the independent right to cure any such Event of Default, but is rather presented merely for convenience should such Event of Default be waived in accordance with the terms of the applicable Financing Documents.

**Section 12.3    Notices**.

(a)    All notices, requests and other communications to any party hereunder shall be in writing (including prepaid overnight courier, facsimile transmission or similar writing) and shall be given to such party at its address, facsimile number or e-mail address set forth on the signature pages hereof (or, in the case of any such Lender who becomes a Lender after the Closing Date, in an assignment agreement or in a notice delivered to Borrower Representative and Agent by the assignee Lender forthwith upon such assignment) or at such other address, facsimile number or e-mail address as such party may hereafter specify for the purpose by notice to Agent and Borrower Representative; *provided*, *however*, that notices, requests or other communications shall be permitted by electronic means only in accordance with the provisions of Section 12.3(b) and (c). Each such notice, request or other communication shall be effective (i) if given by facsimile, when such notice is transmitted to the facsimile number specified by this Section and the sender receives a confirmation of transmission from the sending facsimile machine, or (ii) if given by mail, prepaid overnight courier or any other means, when received or when receipt is refused at the applicable address specified by this Section 12.3(a).

(b)    Notices and other communications to the parties hereto may be delivered or furnished by electronic communication (including facsimile, e-mail and Internet or intranet websites) pursuant to procedures approved from time to time by Agent, *provided*, *however*, that the foregoing shall not apply to notices sent directly to any Lender if such Lender has notified the Agent that it is incapable of receiving notices by electronic communication. The Agent or Borrower Representative may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it, *provided*, *however*, that approval of such procedures may be limited to particular notices or communications.

(c)    Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor, *provided*, *however*, that if any such notice or other communication is not sent or posted during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

CHICAGO/#3334319.13334319.3

**Section 12.4    Severability.**  In case any provision of or obligation under this Agreement or any other Financing Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**Section 12.5    Headings.**  Headings and captions used in the Financing Documents (including the Exhibits, Schedules and Annexes hereto and thereto) are included for convenience of reference only and shall not be given any substantive effect.

**Section 12.6    Confidentiality.**  Agent and each Lender shall hold all non-public information regarding the Credit Parties and their respective businesses identified as such by Borrowers and obtained by Agent or any Lender pursuant to the requirements hereof in accordance with such Person's customary procedures for handling information of such nature, except that disclosure of such information may be made (a) to their respective agents, employees, Subsidiaries, Affiliates, attorneys, auditors, professional consultants, rating agencies, insurance industry associations and portfolio management services *provided*, *however*, that any such Persons are bound by obligations of confidentiality (including customary confidentiality obligations of professional practice), (b) to prospective transferees or purchasers of any interest in the Loans, the Agent or a Lender, and to prospective contractual counterparties (or the professional advisors thereto) in Swap Contracts permitted hereby, *provided*, *however*, that any such Persons are bound by obligations of confidentiality, (c) as required by Law, subpoena, judicial order or similar order and in connection with any litigation, (d) as may be required in connection with the examination, audit or similar investigation of such Person, and (e) to a Person that is a trustee, investment advisor, collateral manager, servicer, noteholder or secured party in a Securitization (as hereinafter defined) in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization.  For the purposes of this Section, "**Securitization**" shall mean (i) the pledge of the Loans as collateral security for loans to a Lender, or (ii) a public or private offering by a Lender or any of its Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized, in whole or in part, by the Loans.  Confidential information shall not include information that either:  (y) is in the public domain, or becomes part of the public domain after disclosure to such Person through no fault of such Person, or (z) is disclosed to such Person by a Person other than a Credit Party, *provided*, *however*, Agent does not have actual knowledge that such Person is prohibited from disclosing such information.  The obligations of Agent and Lenders under this Section 12.6 shall supersede and replace the obligations of Agent and Lenders under any confidentiality agreement in respect of this financing executed and delivered by Agent or any Lender prior to the Closing Date.

**Section 12.7    Waiver of Consequential and Other Damages.**  To the fullest extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against any Indemnitee (as defined below), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Financing Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials

distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Financing Documents or the transactions contemplated hereby or thereby.

**Section 12.8    GOVERNING LAW; SUBMISSION TO JURISDICTION**.

(a)    THIS AGREEMENT, EACH NOTE AND EACH OTHER FINANCING DOCUMENT, AND ALL MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

(b)    EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION (IF THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION, ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION LOCATED IN THE STATE OF MARYLAND, COUNTY OF MONTGOMERY) TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO, ON THE ONE HAND, AND ANY AGENT OR ANY LENDER, ON THE OTHER HAND, PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER FINANCING DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER FINANCING DOCUMENTS; PROVIDED THAT EACH PARTY ACKNOWLEDGES THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE ANY AGENT OR ANY LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER.  EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

(c)    Each Borrower, Agent and each Lender agree that each Loan (including those made on the Closing Date) shall be deemed to be made in, and the transactions contemplated hereunder and in any other Financing Document shall be deemed to have been performed in, the State of Maryland (notwithstanding the fact that Broad Street Mortgages are governed, in part, by Pennsylvania law).

**Section 12.9    WAIVER OF JURY TRIAL**.  **EACH CREDIT PARTY, AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE FINANCING DOCUMENTS OR THE TRANSACTIONS**

CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH CREDIT PARTY, AGENT AND EACH LENDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH CREDIT PARTY, AGENT AND EACH LENDER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

Section 12.10 **Publication; Advertisement**.

(a) Publication.  No Credit Party will directly or indirectly publish, disclose or otherwise use in any public disclosure, advertising material, promotional material, press release or interview, any reference to the name, logo or any trademark of MCF or any of its Affiliates or any reference to this Agreement or the financing evidenced hereby, in any case except (i) as required by Law, subpoena or judicial or similar order, in which case the applicable Credit Party shall give Agent prior written notice of such publication or other disclosure, or (ii) with MCF's prior written consent.

(b) Advertisement.  Each Lender and each Credit Party hereby authorizes MCF to publish the name of such Lender and Credit Party, the existence of the financing arrangements referenced under this Agreement, the primary purpose and/or structure of those arrangements, the amount of credit extended under each facility, the title and role of each party to this Agreement, and the total amount of the financing evidenced hereby in any "tombstone", comparable advertisement or press release which MCF elects to submit for publication.  In addition, each Lender and each Credit Party agrees that MCF may provide lending industry trade organizations with information necessary and customary for inclusion in league table measurements after the date hereof.  With respect to any of the foregoing, MCF shall provide Borrowers with an opportunity to review and confer with MCF regarding the contents of any such tombstone, advertisement or information, as applicable, prior to its submission for publication and, following such review period, MCF may, from time to time, publish such information in any media form desired by MCF, until such time that Borrowers shall have requested MCF cease any such further publication.

Section 12.11 **Counterparts; Integration**.  This Agreement and the other Financing Documents may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Signatures by facsimile or by electronic mail delivery of an electronic version (e.g., .pdf or .tif file) of an executed signature page shall bind the parties hereto.  This Agreement and the other Financing Documents constitute the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

Section 12.12 **No Strict Construction.**  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

Section 12.13 **Time.**  Time is of the essence in each Borrower's and each other Credit Party's performance under this Agreement and all other Financing Documents

Section 12.14 **Lender Approvals.**  Unless expressly provided herein to the contrary, any approval, consent, waiver or satisfaction of Agent or Lenders with respect to any matter that is the subject of this Agreement, the other Financing Documents may be granted or withheld by Agent and Lenders in their sole and absolute discretion and credit judgment.

Section 12.15 **Expenses; Indemnity.**

(a)    Borrowers hereby agree to promptly pay (i) all reasonable costs and expenses of Agent (including, without limitation, the reasonable and documented fees, costs and expenses of counsel to, and, to the extent specifically permitted hereunder, independent appraisers and consultants retained by Agent) in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated by the Financing Documents, in connection with the performance by Agent of its rights and remedies under the Financing Documents and in connection with the continued administration of the Financing Documents including (A) any amendments, modifications, consents and waivers to and/or under any and all Financing Documents, and (B) subject to any limitations set forth in Section 7.3, any periodic public record searches conducted by or at the request of Agent (including, without limitation, title investigations, UCC searches, fixture filing searches, judgment, pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of certain Persons); (ii) without limitation of the preceding clause (i), all reasonable and documented costs and expenses of Agent in connection with the creation, perfection and maintenance of Liens pursuant to the Financing Documents; (iii) without limitation of the preceding clause (i), all reasonable and documented costs and expenses of Agent in connection with (A) protecting, storing, insuring, handling, maintaining or selling any Collateral, (B) any litigation, dispute, suit or proceeding relating to any Financing Document, and (C) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Financing Documents; (iv) without limitation of the preceding clause (i), all reasonable costs and expenses of Agent in connection with Agent's reservation of funds in anticipation of the funding of the initial Loans to be made hereunder; and (v) all reasonable and documented costs and expenses incurred by Lenders in connection with any litigation, dispute, suit or proceeding relating to any Financing Document and in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all Financing Documents, whether or not Agent or Lenders are a party thereto**.**  If Agent or any Lender uses in-house counsel for any of these purposes, Borrowers further agree that the Obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Agent or such Lender for the work performed.

CHICAGO/#3334319.13334319.3

(b)     Except with respect to indemnification for Taxes, which is addressed in Section 2.8, each Borrower hereby agrees to indemnify, pay and hold harmless Agent and Lenders and the officers, directors, employees, trustees, agents, investment advisors, collateral managers, servicers, and counsel of Agent and Lenders (collectively called the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the fees and disbursements of counsel for such Indemnitee) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be designated a party thereto and including any such proceeding initiated by or on behalf of a Credit Party, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker (other than any broker retained by Agent or Lenders) asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated hereby or by the other Operative Documents (including (i)(A) as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from, any property now or previously owned, leased or operated by Borrower, any Subsidiary or any other Person of any Hazardous Materials, (B) arising out of or relating to the offsite disposal of any materials generated or present on any such property, or (C) arising out of or resulting from the environmental condition of any such property or the applicability of any governmental requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of Borrower or any Subsidiary, and (ii) proposed and actual extensions of credit under this Agreement) and the use or intended use of the proceeds of the Loans, except that Borrower shall have no obligation hereunder to an Indemnitee with respect to any liability, obligation, loss, damage, penalty, action, judgment, suit, claim, cost, expense or disbursement resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them.

(c)     Notwithstanding any contrary provision in this Agreement, the obligations of Borrowers under this Section 12.14 shall survive the payment in full of the Obligations and the termination of this Agreement.  NO INDEMNITEE SHALL BE RESPONSIBLE OR LIABLE TO THE BORROWERS OR TO ANY OTHER PARTY TO ANY FINANCING DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR ANY OTHER FINANCING DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

**Section 12.16** **Reinstatement.**  This Agreement shall remain in full force and effect and continue to be effective should any petition or other proceeding be filed by or against any Credit

Party for liquidation or reorganization, make an assignment for the benefit of any creditor or creditors or should an interim receiver, receiver, receiver and manager or trustee be appointed for all or any significant part of any Credit Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a fraudulent preference reviewable transaction or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

     **Section 12.17 <u>Successors and Assigns</u>.**  This Agreement shall be binding upon and inure to the benefit of Borrowers and Agent and each Lender and their respective successors and permitted assigns.

     **Section 12.18 <u>USA PATRIOT Act Notification</u>.**  Agent (for itself and not on behalf of any Lender) and each Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Borrowers, which information includes the name and address of Borrower and such other information that will allow Agent or such Lender, as applicable, to identify Borrowers in accordance with the USA PATRIOT Act.

     **Section 12.19 <u>DIP Orders</u>.**  In the event of any inconsistency between the terms and conditions of any of the Financing Documents and the DIP Orders, the provisions of the DIP Orders shall govern and control.

**[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]**

CHICAGO/#3334319.13334319.3

**IN WITNESS WHEREOF**, each of the parties have caused this Agreement to be executed under seal the day and year first above mentioned.

**BORROWERS**:  **CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company
**HPS OF PA, L.L.C.**, a Pennsylvania limited liability company
**PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company
**PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company
**SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company
**SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company
**ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company
**ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company
**STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company
**TPS OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company, each as Debtor and Debtor in Possession under Chapter 11 of the Bankruptcy Code


By:_____
    Allen Wilen
    Chief Restructuring Officer - Finance

*As Chief Restructuring Officer - Finance of each of the above entities and in such capacity, intending by this signature to legally bind each of the above entities*

**AGENT:**

**MIDCAP ~~FINANCIAL~~FUNDING IV TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

   By:  Apollo Capital Management GP, LLC
   Its:  General Partner

               By:__-_____

(SEAL)
                        Maurice

Amsellem
                        Authorized

Signatory

Address:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  Account Manager for Philadelphia transaction
Facsimile:  301-941-1450
E-mail:  notices@midcapfinancial.com

with a copy to:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  General Counsel
Facsimile:  301-941-1450
E-mail:  legalnotices@midcapfinancial.com

Payment Account Designation:

Wells Fargo Bank, N.A. (McLean, VA)
ABA #:  121-000-248
Account Name:  MidCap Funding IV Trust - Collections

SIGNATURE PAGE TO FIRST PRIORITY SECURED
PRIMING SUPER-PRIORITY DEBTOR IN
POSSESSION CREDIT AND SECURITY
AGREEMENT

Account #:  2000036282803
Attention:  Philadelphia Hospital

SIGNATURE PAGE TO FIRST PRIORITY SECURED
PRIMING SUPER-PRIORITY DEBTOR IN
POSSESSION CREDIT AND SECURITY
AGREEMENT

**LENDER:**

**MIDCAP** ~~FINANCIAL~~ **FUNDING IV** **TRUST**, a
Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By:_____

___(SEAL)

Maurice Amsellem

Authorized Signatory

<u>Address</u>:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  Account Manager for Philadelphia Hospital
transaction
Facsimile:  301-941-1450
E-mail:  notices@midcapfinancial.com

with a copy to:

c/o MidCap Financial Services, LLC,
as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  General Counsel
Facsimile:  301-941-1450
E-mail:  legalnotices@midcapfinancial.com

ANNEXES, EXHIBITS  AND SCHEDULES

**ANNEXES**

Annex A              Commitment Annex

**EXHIBITS**

Exhibit A            Compliance Certificate
Exhibit B            Borrowing Base Certificate
Exhibit C            Notice of Borrowing

Exhibit D            [Reserved]**Payment Notification**

Exhibit E            Approved DIP Budget

**SCHEDULES**

Schedule 1.1A        Affiliate Leases
Schedule 1.1B        List of Projects, Names, Addresses and Bed Capacity
Schedule 3.1         Existence, Organizational ID Numbers, Foreign Qualification, Prior Names
Schedule 3.4**3.2**       Capitalization**Conflicts Etc.**
**Schedule 3.4**         **Capitalization**
Schedule 3.6         Litigation
Schedule 3.13        Taxes **and Charges**
**Schedule**             **ERISA**
**3.14(b)**              Environmental Compliance
Schedule 3.18
**Schedule 4.5**          **Compliance with Laws**
Schedule 5.1         Permitted Contingent Obligations; Permitted Indebtedness
Schedule 5.2         Permitted Liens
Schedule 5.8**5.2**       Transactions with Affiliates**Permitted Liens**
Schedule 5.11**5.8**      Conduct of Business**Transactions with Affiliates**
**Schedule 5.11**         **Conduct of Business**
Schedule 5.14        Deposit Accounts and Securities Accounts
Schedule 7.4         Post Closing Requirements
Schedule 9.1         Collateral
Schedule 9.2         Location of Collateral

**ANNEX A TO CREDIT AGREEMENT (COMMITMENT ANNEX)**

| Lender | Revolving Loan Commitment Amount | Revolving Loan Commitment Percentage | Term Loan Commitment Amount | | Term Loan Commitment Percentage |
|---|---|---|---|---|---|
| **MidCap Funding IV Trust** <br> MidCap Financial Trust | $50,000,000 <br> **$0** | 100% <br> **0%** | **$0** <br> **$15,000,000** | | **0%** <br> **100%** |
| TOTALS | $50,000,000 | 100% | **$15,000,000** | | **100%** |

CHICAGO/#3334319.13334319.3

**EXHIBIT A TO CREDIT AGREEMENT (COMPLIANCE CERTIFICATE)**

**COMPLIANCE CERTIFICATE**

Date: _____, 201__

This Compliance Certificate is given by _____, a Responsible Officer of _____ (the "**Borrower Representative**"), pursuant to that certain First Priority Secured Priming Super-Priority Debtor in Possession Credit and Security Agreement dated as of July 15, 2019 among **CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company, **HPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company**, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company, **SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company, **ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company, **STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company, **TPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company, and **TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company, each as debtors and debtors in possession under Chapter 11 of the Bankruptcy Code (collectively, "**Borrowers**"), MidCap Funding IV Trust (as successor-by-assignment to MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**").  Capitalized terms used herein without definition shall have the meanings set forth in the respective Credit Agreement.

The undersigned Responsible Officer hereby certifies to Agent and Lenders, in his or her capacity as such officer and not individually, that:

(a)    the financial statements delivered with this certificate in accordance with Section 4.1 of the Credit Agreement fairly present in all material respects the results of operations and financial condition of all applicable Credit Parties and their consolidated subsidiaries as of the dates and the accounting period covered by such financial statements;

(b)    I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of all applicable Credit Parties and their consolidated subsidiaries during the accounting period covered by such financial statements, and such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that (i) would make any of the representations, warranties or

covenants set forth in the Credit Agreement untrue as of the date of this Compliance Certificate, or (ii) constitutes a Default or an Event of Default, except as set forth in **Schedule 1** hereto, which includes a description of the nature and period of existence of such Default or an Event of Default and what action Borrowers have taken, are undertaking and propose to take with respect thereto;

(c)     Except as noted on **Schedule 2** attached hereto, no Borrower or Guarantor is aware of any Commercial Tort Claim that has not been previously reported to Agent on any Schedule 2 to any previous Compliance Certificate delivered by Borrower Representative to Agent.

The foregoing certifications and computations are made as of _____, 201__ (end of month) and as of _____, 201__.

Sincerely,

**[BORROWER REPRESENTATIVE]**


By: _____
Name: _____
Title: _____




**<u>Schedules to Compliance Certificate</u>**

Schedule 1 – Non-Compliance with Covenants

Schedule 2 – Commercial Tort Claims

Schedule 3 - Project Disclosures

CHICAGO/#3334319.13334319.3

**EXHIBIT B TO CREDIT AGREEMENT (BORROWING BASE CERTIFICATE)**

**EXHIBIT C TO CREDIT AGREEMENT (NOTICE OF BORROWING)**

[BORROWER REPRESENTATIVE]

Date: _____, 20__

    This Notice of Borrowing is given by _____, a Responsible Officer of _____ (the "**Borrower Representative**"), pursuant to that certain First Priority Secured Priming Super-Priority Debtor in Possession Credit and Security Agreement dated as of July 15, 2019 among **CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company, **HPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company**, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company, **SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company, **ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company, **STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company, **TPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company, and **TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company, each as debtors and debtors in possession under Chapter 11 of the Bankruptcy Code (collectively, "**Borrowers**"), MidCap Funding IV Trust (as successor-by-assignment to MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**").  Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

    [The undersigned Responsible Officer hereby gives notice to Agent of Borrower Representative's request to on the date hereof borrow $[_____] of Revolving Loans. Attached is a Borrowing Base Certificate complying in all respects with the Credit Agreement and confirming that, after giving effect to the requested advance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit.][1]

    **[The undersigned Responsible Officer hereby gives notice to Agent of Borrower Representative's request to on the date hereof borrow a Term Loan in the amount of $[_____].][2]**

_____

[1] **Use this if requesting a revolving loan.**
[2] **Use this if requesting a term loan.**

The undersigned officer hereby certifies, in his or her capacity as such officer and not individually, that, both before and after giving effect to the request above, each of the conditions precedent set forth in Section 7.2 have been satisfied.

**IN WITNESS WHEREOF**, the undersigned officer has executed and delivered this certificate this _____ day of _____, 20__.

Sincerely,

**[**BORROWER REPRESENTATIVE**]**


By: _____
Name: _____
Title: _____

**EXHIBIT D TO CREDIT AGREEMENT (~~RESERVED~~PAYMENT NOTIFICATION)**

**PAYMENT NOTIFICATION**

This Payment Notification is given by _____, a Responsible Officer of _____ (the "Borrower Representative"), pursuant to that certain First Priority Secured Priming Super-Priority Debtor in Possession Credit and Security Agreement dated as of July 15, 2019 among CENTER CITY HEALTHCARE, LLC, a Delaware limited liability company, HPS OF PA, L.L.C., a Pennsylvania limited liability company, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, a Delaware limited liability company, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC, a Delaware limited liability company, SCHC PEDIATRIC ASSOCIATES, L.L.C., a Pennsylvania limited liability company, SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., a Pennsylvania limited liability company, ST. CHRISTOPHER'S HEALTHCARE, LLC, a Delaware limited liability company, ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., a Pennsylvania limited liability company, STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., a Pennsylvania limited liability company, TPS OF PA, L.L.C., a Pennsylvania limited liability company, TPS II OF PA, L.L.C., a Pennsylvania limited liability company, TPS III OF PA, L.L.C., a Pennsylvania limited liability company, TPS IV OF PA, L.L.C., a Pennsylvania limited liability company, and TPS V OF PA, L.L.C., a Pennsylvania limited liability company, each as debtors and debtors in possession under Chapter 11 of the Bankruptcy Code (collectively, "Borrowers"), MidCap Funding IV Trust (as successor by assignment from MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

Please be advised that funds in the amount of $_____ will be wire transferred to Agent on _____, 201_. Such funds shall constitute [an optional] [a mandatory] prepayment of the Term Loan, with such prepayments to be applied in the manner specified in Section 2.1(a)(iii). [Such mandatory prepayment is being made pursuant to Section _____ of the Credit Agreement.]

Fax to MCF Operations 301-941-1450 no later than noon Eastern time.

Note: Funds must be received in the Payment Account by no later than noon Eastern time for same day application

IN WITNESS WHEREOF, the undersigned officer has executed and delivered this Payment Notification this _____ day of _____, 201__.

Sincerely,

[BORROWER REPRESENTATIVE]

CHICAGO/#~~3334319.1~~3334319.3

**By:** _____
**Name:** _____
**Title:** _____

CHICAGO/#3334319.13334319.3

**EXHIBIT E TO CREDIT AGREEMENT (APPROVED DIP BUDGET)**

CHICAGO/#3334319.13334319.3

**Schedule 1.1A**

**Affiliate Leases**

A.1    Master Lease between Broad Street Healthcare Properties, LLC (L) and Center City Healthcare, LLC (T) for the properties at 222-248 N Broad Street and 221-223 15th Street known as the North Tower and South Tower of Hahnemann University Hospital and the land adjacent to the SHSH building.

A.2    Lease between St. Christopher's Healthcare, LLC (L) and TPS IV of PA (T) for a total of 3,798.99 u.s.f. on the 7th and 12th floors of 225-251 North 15th Street in the building known as New College Building.

A.3    Master Lease between PAHH Bellet MOB, LLC (L) and St. Christopher's Healthcare, LLC (T) for the building at 1501-1511 Race Street in the building known as the Bellet Building.

A.4    Lease between St. Christopher's Healthcare, LLC (L) and Center City Healthcare, LLC (T) for 21,811 u.s.f. at 1501-1511 Race Street in the building known as the Bellet Building.

A.5    Master Lease between PAHH New College MOB, LLC (L) and St. Christopher's Healthcare, LLC (T) for the building at 225-251 N. 15th Street known as the New College Building.

A.6    [Reserved]

A.7    Lease between St. Christopher's Healthcare, LLC (L) and Center City Healthcare, LLC (T) for 151,139 u.s.f. at 225-251 N. 15th Street in the building known as New College Building.

A.8    Master Lease between PAHH Feinstein MOB, LLC (L) and St. Christopher's Healthcare, LLC for 216 – 220 N. Broad Street in the buildings known as Feinstein and Bobst Buildings.

A.9    Lease between Center City Healthcare, LLC (L) and TPS IV of PA (T) for 1,237.585 u.s.f. in Radiology Oncology Suite at 222-248 N. Broad Street in the buildings known as the North and South Towers.

A.10    Lease between St. Christopher's Healthcare, LLC (L) and TPS IV of PA (T) for 1,237.585 u.s.f. in Radiology Oncology Suite at 216-220 N. Broad Street in the buildings known as Feinstein and Bobst Buildings.

A.11    Lease between St. Christopher's Healthcare, LLC (L) and Center City Healthcare, LLC (T) for 126,395 usf at 216-220 N. Broad Street in the buildings known as Feinstein and Bobst Buildings.

A.12    Master Lease between PAHH Broad Street MOB, LLC (L) and St. Christopher's Healthcare, LLC (T) for 231-233 N. Broad Street in the building known as the Medical Office Building.

A.13    Master Lease between PAHH Wood Street Garage, LLC (L) and St. Christopher's Healthcare, LLC (T) for 306-320 N Broad Street in the building known as the Wood Street Garage.

A.14    Master Lease between PAHH Erie Street Garage, LLC (L) and St. Christopher's Healthcare, LLC (T) for 120 E. Erie Avenue in the building known as the Erie Street Garage.

A.15    Sublease between St. Christopher's Healthcare, LLC (L) and SCHC Pediatric Associates, LLC (T) for 6,319 r.s.f. at 500 Old York Road, Jenkintown under the lease between Rydal Square and St. Christopher's Healthcare, LLC in the building known as the Abington satellite. Assigned with Lessor Leases by Tenet HealthSystem St. Christopher's Hospital for Children, LLC to St. Christopher's Healthcare, LLC.

A.16    Timeshare sublease between SCHC Pediatric Associates, LLC (L) and St. Christopher's Pediatric Urgent Care Center, LLC (T) for 6,319 r.s.f. at 500 Old York Road, Jenkintown under Sublease A.15 in the building known as the Abington satellite for the Urgent Care Center.

A.17    Lease between St. Christopher's Healthcare, LLC (L) and TPS of PA (T) for 3,380 r.s.f. on the 3rd floor at 231 N. Broad Street Suite 300 in the building known as the Medical Offices Building. Assigned with Lessor Leases by Tenet HealthSystem Hahnemann, LLC to PAHH Broad Street, LLC on closing binder document B11(d). Assigned with Lease Agreement by PAHH Broad Street, LLC to St. Christopher's Healthcare, LLC.

A.18    Lease between Center City Healthcare, LLC (L) and TPS of PA (T) for 3,645 u.s.f. on the 15th floor at 230 N. Broad Street in the building known as the North and South Towers of Hahnemann University Hospital. Assigned under Lessor Leases by Tenet HealthSystem Hahnemann, LLC to Broad Street Healthcare Properties, LLC on closing binder document B11.(e). Assigned by Broad Street Healthcare Properties, LLC to Center City Healthcare.

A.19    Lease, as amended, between St. Christopher's Healthcare, LLC (L) and TPS of PA (T) for 6,865.8 u.s.f on the 2nd floor at 216 N. Broad Street in the building known as the Feinstein Building. Assigned under  Lessor Leases by Tenet HealthSystem Hahnemann, LLC to PAHH Feinstein MOB, LLC on closing binder document B11(c). Assigned by PAHH Feinstein MOB, LLC to St. Christopher's Healthcare, LLC.

A.20    Lease between Front Street Healthcare Properties, LLC (L) and St. Christopher's Healthcare, LLC (T) for 160 E. Erie Avenue in the building known as St. Christopher's Hospital for Children.

A.21    Lease between Front Street Healthcare Properties II, LLC (L) and St. Christopher's Healthcare, LLC (T) for 3647-3669 N. Front Street in the building known as Nelson Pavilion.

A.22    Lease between Front Street Healthcare Properties II, LLC (L) and St. Christopher's Healthcare, LLC (T) for 3483-3863 D Street in the building known as D Street Warehouse.

A.23    Operating Agreement between St. Christopher's Healthcare, LLC  and SCHC Pediatric Associates, LLC for provision of space in the building known as St. Christopher's Hospital for Children by St. Christopher's Healthcare to SCHC Pediatric Associates, LLC to enable SCHC Pediatric Association to provide professional services to St. Christopher's Healthcare, LLC.

**Schedule 1.1B**

**List of Projects, Names, Addresses, and Bed Capacity**

| Credit Party Name | Project Name | Address | Bed Capacity |
|---|---|---|---|
| St. Christopher's Healthcare, LLC | St. Christopher's Hospital for Children | 230 N. Broad St. Philadelphia, PA 19102 | 188 Beds |
| Center City Healthcare, LLC | Hahnemann University Hospital | 160 E. Erie Ave Philadelphia, PA 19134 | 496 Beds |

**Schedule 3.1**

**Existence, Organizational ID Numbers, Foreign Qualification, Prior Names**

| Legal Name | Type of Entity | Jurisdiction Of Organization | Organizational Identification Numbers | Foreign Qualifications | Additional Names | Former Jurisdictions of Organization |
|---|---|---|---|---|---|---|
| Philadelphia Academic Health Holdings, LLC | LLC | DE | 6485753 | None | None | None |
| Philadelphia Academic Health System, LLC | LLC | DE | 6521843 | PA | None | None |
| St. Christopher's Healthcare, LLC | LLC | DE | 6525436 | PA | St. Christopher's Hospital for Children | None |
| Center City Healthcare, LLC | LLC | DE | 6450199 | PA | Hahnemann University Hospital | None |
| Philadelphia Academic Medical Associates, LLC | LLC | DE | 6526197 | PA | None | None |
| HPS of PA, L.L.C. | LLC | PA | 4202831 | None | None | None |
| SCHC Pediatric Associates, L.L.C. | LLC | PA | 2933726 | None | None | None |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | LLC | PA | 4089069 | None | None | None |
| SCHC Pediatric Anesthesia Associates, L.L.C. | LLC | PA | 3866517 | None | None | None |
| StChris Care at Northeast Pediatrics, L.L.C. | LLC | PA | 3669968 | None | None | None |
| Physician Performance Network of Philadelphia, L.L.C. | LLC | PA | 4170799 | None | None | None |
| Physicians Clinical Network, LLC | LLC | DE | 6653338 | None | None | None |
| TPS of PA, L.L.C. | LLC | PA | 2839736 | None | None | None |
| TPS II of PA, L.L.C. | LLC | PA | 2893273 | None | None | None |
| TPS III of PA, L.L.C. | LLC | PA | 2893269 | None | None | None |
| TPS IV of PA, L.L.C. | LLC | PA | 2893267 | None | None | None |
| TPS V of PA, L.L.C. | LLC | PA | 2893266 | None | None | None |
| Broad Street | LLC | DE | 6528484 | PA | None | None |

| Legal Name | Type of Entity | Jurisdiction Of Organization | Organizational Identification Numbers | Foreign Qualifications | Additional Names | Former Jurisdictions of Organization |
|---|---|---|---|---|---|---|
| Healthcare Properties, LLC | | | | | | |
| Broad Street Healthcare Properties II, LLC | LLC | DE | 6521848 | PA | (formerly known as Center City Physician Associates, LLC) | None |
| Broad Street Healthcare Properties III, LLC | LLC | DE | 6521846 | PA | (formerly known as St. Christopher's Physician Associates, LLC) | None |

CHICAGO/#3334319.2A3334319.3

**Schedule 3.2**

**Conflicts Etc.**

1.      Holdings' Guaranty of the Tenet Note described in Schedule 5.1

2.      Holdings' Guaranties of the HSRE Master Leases

3.      Existing Mortgages by Guarantors in favor of MidCap

**Schedule 3.4**

**Capitalization**

| Issuer | Holder | Percentage | Type |
|--------|--------|------------|------|
| Philadelphia Academic Health Holdings, LLC | American Academic Health System, LLC | 100% (92.5% post-exercise of the warrant as described below) | Class A Units |
| | HSREP VI Holding, LLC, | 7.5% (via warrant, the exercise of which is limited as set forth therein) | Warrant to purchase Class A Units |
| Philadelphia Academic Health System, LLC | Philadelphia Academic Health Holdings, LLC | 100% | LLC Interests |
| St. Christopher's Healthcare, LLC | Philadelphia Academic Health System, LLC | 100% | LLC Interests |
| Center City Healthcare, LLC | Philadelphia Academic Health System, LLC | 100% | LLC Interests |
| Philadelphia Academic Medical Associates, LLC | Philadelphia Academic Health System, LLC | 100% | LLC Interests |
| HPS of PA, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |
| SCHC Pediatric Associates, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | SCHC Pediatric Associates, L.L.C. | 100% | LLC Interests |
| SCHC Pediatric Anesthesia Associates, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |
| StChris Care at Northeast Pediatrics, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |

| Issuer | Holder | Percentage | Type |
|---|---|---|---|
| Physician Performance Network of Philadelphia, L.L.C. | Physicians Clinical Network, LLC | 100% | LLC Interests |
| Physicians Clinical Network, LLC | Philadelphia Academic Health System, LLC | 100% | LLC Interests |
| TPS of PA, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |
| TPS II of PA, L.L.C. | TPS of PA, L.L.C. | 100% | LLC Interests |
| TPS III of PA, L.L.C. | TPS of PA, L.L.C. | 100% | LLC Interests |
| TPS IV of PA, L.L.C. | TPS of PA, L.L.C. | 100% | LLC Interests |
| TPS V of PA, L.L.C. | TPS of PA, L.L.C. | 100% | LLC Interests |
| Broad Street Healthcare Properties, LLC | Philadelphia Academic Health Holdings, LLC | 100% | LLC Interests |
| Broad Street Healthcare Properties II, LLC | Philadelphia Academic Health Holdings, LLC | 100% | LLC Interests |
| Broad Street Healthcare Properties III, LLC | Philadelphia Academic Health Holdings, LLC | 100% | LLC Interests |

Joel Freedman and the members of his immediate family (directly or through affiliated trusts) collectively own 100% of the membership interests in American Academic Health System, LLC.

CHICAGO/#3334319.2A3334319.3

**<u>Schedule 3.6</u>**

**Litigation**

I.      Pending Litigation

      **A.      EMPLOYMENT LITIGATION**

            1.      LEONE/WINN V. AAHS, ET AL.

| Plaintiff: | Defendants: |
|---|---|
| Joelle Leone and Michael Winn c/o David Cohen, James Zouras and Ryan Stephan<br>Stephan Zouras<br>Stephan Zouras, LLP<br>604 Spruce Street<br>Philadelphia, PA 19106<br>(215) 873-4836<br>dcohen@stephanzouras.com<br>jzouras@stephanzouras.com<br>rstephan@stephanzouras.com | AAHS, LLC and Hahnemann University Hospital<br>c/o<br>Michael D. Jones<br>Eckert Seamans<br>50 South 16th Street<br>Philadelphia, PA  19102<br><br>Tenet Healthcare Corporation<br>c/o |
| Court: United States District Court for the Eastern District of Pennsylvania | |

            2.      Pam Seachow v. AAHS, et al.

| Plaintiff: | Defendants: |
|---|---|
| Pam Seachow<br>c/o Bell & Bell, LLP<br>Jennifer Bell, Esq.<br>Christopher Macey, Esq.<br>1617 JFK Blvd., Suite 1254<br>Philadelphia, PA 19103<br>(215) 569-2500 | AAHS, LLC; PAHS, LLC; Paladin Healthcare Capital, LLC; Joel Freedman<br>c/o<br>Michael D. Jones<br>Eckert Seamans<br>50 South 16th Street<br>Philadelphia, PA  19102<br>mdjones@eckertseamans.com<br>(215) 851-8461 |
| Court:  United States District Court for the Eastern District of Pennsylvania | |

            3.      Combs v. St. Christopher's Healthcare, LLC

| Plaintiff: | Defendants: |
|---|---|

| | |
|---|---|
| Candese Combs<br>c/o<br>Robert Vance, Esq.<br>Law Offices of Robert T. Vance Jr.<br>100 S. Broad St., Suite 1525<br>Philadelphia, PA 19110<br>(215) 557-9550<br>rvance@vancelf.com | AAHS, LLC; Paladin Healthcare Capital,<br>LLC; St. Christopher's Healthcare, LLC<br>c/o<br>Michael D. Jones<br>Eckert Seamans<br>50 South 16th Street<br>Philadelphia, PA 19102<br>mdjones@eckertseamans.com<br>(215) 851-8461 |
| Court:  United States District Court for the<br>Eastern District of Pennsylvania | |

4.        Benefit Fund for Hospital and Healthcare Employees v. AAHS, et al.

| Plaintiff: | Defendants: |
|---|---|
| Benefit Fund for Hospital and Health Care<br>Employees and Laverne DeValia, Executive<br>Director<br>1319 Locust Street, 3rd Fl.<br>Philadelphia, PA 19107<br><br>And<br><br>Pension Fund for Hospital and Health Care<br>Employees – Philadelphia and Vicinity<br>And Lavene DeValia, Executive Director<br>1319 Locust Street, 3rd Fl.<br>Philadelphia, PA 19107<br><br>Philadelphia Hospital & Health Care<br>Employees – District 1199C Training and<br>Upgrading Fund and Cheryl Feldman,<br>Executive Director<br>100 South Broad St., 10th Fl.<br>Philadelphia, PA 19110<br><br>Counsel for Plaintiffs:<br><br>Susan Murray, Esq.<br>Freedman & Lorry, P.C.<br>1601 Market St., Suite 1500<br>Philadelphia, PA 19103 | AAHS, LLC, d/b/a Hahnemann University<br>Hospital<br><br>230 N. Broad Street<br>Philadelphia, PA 19102<br><br>c/o Saul Ewing |

| (215) 925-8400<br>smurray@freedmanlorry.com | |
|---|---|
| Court:  United States District Court for the<br>Eastern District of Pennsylvania | |

**B.      AGENCY CHARGES**

1.      Scherise Bell (PHRC charge)

| Plaintiff:<br><br>Scherise Bell<br>5206 Roosevelt Blvd.<br>Philadelphia, PA 19124<br><br>or c/o<br><br>Edmund Celiesius, Esq.<br>The Murphy Law Group<br>Eight Penn Center, Suite 2000<br>1628 JFK Blvd.<br>Philadelphia, PA 19103<br>(267) 273-1054 | Defendants:<br><br>St. Christopher's Healthcare, LLC<br>c/o<br>Eileen Keefe, Esq.<br>1601 Cherry St., Suite 1350<br>Philadelphia, PA 19102<br>(267) 319-7802<br>Eileen.keefe@jacksonlewis.com |
|---|---|
| Agency:<br><br>Philadelphia Human Rights Commission | |

2.      Pam Saechow (EEOC charge)

| Plaintiff:<br><br>Pam Saechow<br>c/o Bell & Bell, LLP<br>Jennifer Bell, Esq.<br>Christopher Macey, Esq.<br>1617 JFK Blvd., Suite 1254<br>Philadelphia, PA 19103<br>(215) 569-2500 | Defendants:<br><br>American Academic Health System, LLC |
|---|---|
| Agency:<br><br>U.S. Equal Employment Opportunity<br>Commission | |

3.      Phyicia McFadden (wage and hour claim)

| Plaintiff: | Respondent: |
|---|---|
| Phyicia McFadden<br>3300 Henry Avenue, Apt 301<br>Philadelphia, PA 19129 | Center City Healthcare, LLC |
| Agency:<br><br>Bureau of Labor Law Compliance<br>Edward Ferguson<br>110 N. 8th St., Suite 203<br>Philadelphia, PA 19107<br>(215) 965-2411 | |

## C.     LABOR DISPUTES

1.      Claim relating to 401(k) match:

| Plaintiff: | Respondent: |
|---|---|
| Pennsylvania Association of Staff Nurses and Allied Professionals<br>1 Fayette Street, Suite 475<br>Conshohocken, PA 19428<br>(610) 567-2907<br>nalpers@pasnap.com<br>bnectow@pasnap.com | Hahnemann University Hospital |
| Court:<br><br>American Arbitration Association | |

2.      Claim relating to Employee Simrak:

| Plaintiff: | Respondent: |
|---|---|
| 1199C, NUHHCE<br>C/O<br>O'Donoghue & O'Donoghue<br>Lance Geren<br>Constitution Place, Suite 515<br>325 Chestnut Street<br>Philadelphia, PA  19106 | Hahnemann University Hospital |

| lgeren@odonoghuelaw.com | |
|---|---|
| Court:<br><br>American Arbitration Association<br>Christine Naida<br>Case Administrator | |

3.      Claim relating to 15% differential

| Plaintiff:<br><br>Pennsylvania Association of Staff Nurses and Allied Professionals<br>1 Fayette Street, Suite 475<br>Conshohocken, PA 19428<br>(610) 567-2907<br>nalpers@pasnap.com<br>bnectow@pasnap.com | Respondent:<br><br>Hahnemann University Hospital |
|---|---|
| Court:<br><br>American Arbitration Association | |

4.      Claim relating Yvette Watkins

| Plaintiff:<br><br>Pennsylvania Association of Staff Nurses and Allied Professionals<br>1 Fayette Street, Suite 475<br>Conshohocken, PA 19428<br><br>Lisa Leshinksi, Esq.<br>PASNAP Executive Director<br>(215) 341-8804 | Respondent:<br><br>Hahnemann University Hospital |
|---|---|
| Court:<br><br>American Arbitration Association<br>Arbitrator: James Darby, Esq. | |

5.      NLRB Claim re: improper transfer of RNs

| Plaintiff: | Respondent: |
|---|---|

| Pennsylvania Association of Staff Nurses and Allied Professionals<br>1 Fayette Street, Suite 475<br>Conshohocken, PA 19428<br>(610) 567-2907<br>nalpers@pasnap.com<br>bnectow@pasnap.com | Hahnemann University Hospital |
|---|---|
| Court:<br><br>American Arbitration Association | |

6.    NLRB Charge re: validity of FTP agreements

| Plaintiff:<br><br>Pennsylvania Association of Staff Nurses and Allied Professionals<br>1 Fayette Street, Suite 475<br>Conshohocken, PA 19428<br><br>Lisa Leshinksi, Esq.<br>PASNAP Executive Director<br>(215) 341-8804 | Respondent:<br><br>Hahnemann University Hospital |
|---|---|
| Court:<br><br>American Arbitration Association | |

**D.    PROFESSIONAL LIABILITY**

1.    Packer v. Hahnemann University Hospital

| Plaintiff:<br><br>Marci and Steven Packer<br>614 Sweetwater Drive<br>Langhorne, PA 19053<br><br>Counsel:<br><br>Joseph Messa, Esq.<br>Justin Groen, Esq.<br>Messa & Associates<br>123 South 22nd St.<br>Philadelphia, PA 19103<br>(215) 568-3500 | Defendant:<br><br>**Tenet HealthSystem Hahnemann, LLC, d/b/a Hahnemann University Hospital**<br>c/o CT Corp System<br>116 Pine Street, Suite 320<br>Harrisburg, PA 17101<br><br>Counsel:<br><br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br><br>Phone: 215-587-1015 (Camhi) |
|---|---|

CHICAGO/#3334319.2A3334319.3

|  | **American Academic Health System, LLC and Paladin Healthcare Capital, LLC**<br><br>Counsel:<br>Gary Samms, Esq.<br>Katherine Robinson, Esq.<br>Obermayer Rebmann Maxwell & Hippel, LLP<br>(215) 665-3000<br>Gary.samms@obermayer.com<br>Katherine.robinson@obermayer.com<br><br>**Drexel College of Medicine**<br>1601 Cherry St.<br>Suite 201627<br>Philadelphia, PA 19102<br><br>Counsel:<br>Frank A. Gerolamo, Esquire<br>Joseph Garbarino, III, Esquire<br>Gerolamo, McNulty, Divis & Lewbart<br>121 S. Broad Street, Suite 1400<br>Philadelphia, PA 19107<br>Phone: 215-790-8400<br><br>**Ricardo Morgenstern, M.D.**<br>219 N. Broad St., 5th Fl.<br>Philadelphia, PA 19107<br><br>Counsel:<br><br>Frank A. Gerolamo, Esquire<br>Joseph Garbarino, III, Esquire<br>Gerolamo, McNulty, Divis & Lewbart<br>121 S. Broad Street, Suite 1400<br>Philadelphia, PA 19107<br>Phone: 215-790-8400<br><br>**Hahnemann University Hospital**<br><br>Counsel:<br><br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Post & Schell, P.C. |
|---|---|

Schedule 3.6 – Page   7

|  | Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br><br>Phone: 215-587-1015 (Camhi) |
|---|---|
| Court:  Philadelphia County Court of Common Pleas |  |

2.      Lewis (HUH)

| Plaintiff: | Defendants: |
|---|---|
| Emma Lewis, Individually and as Administratrix of the Estate of Lynn Lewis, deceased<br>1837 N. 12th Street<br>Philadelphia, PA<br><br>Counsel:<br>Robert Ross, Esq.<br>Kevin Harden, Jr., Esq.<br>Ross Feller Casey, LLP<br>1650 Market St., 34th Fl.<br>Philadephia, PA 19103 | **American Academic Health System, LLC**<br>**Paladin Healthcare**<br><br>**Hahnemann University Hospital**<br>Broad and Vine Streets<br>Philadelphia, PA 19102<br><br>Counsel:<br>None assigned yet<br><br>**Tenet HealthSystem Hahnemann University Hospital d/b/a Hahnemann University Hospital**<br>Broad and Vine Streets<br>Philadelphia, PA 19102<br><br>Counsel:<br>None entered yet<br><br>**Drexel University College of Medicine**<br>Broad and Vine Streets<br>Philadelphia, PA 19102<br><br>Counsel:<br>None entered yet<br><br>**Drexel Surgical Associates**<br>219 N. Broad Street, Suite 8<br>Philadelphia, PA 19107 |

| | |
|---|---|
| | Counsel:<br>None entered yet<br><br>**Drexel Medicine**<br>245 N. 15th St., Ms413<br>Philadelphia, PA 19102<br>Counsel:<br>None entered yet<br><br>**Drexel University**<br>Broad and Vine Streets<br>Philadelphia, PA 19102<br>Counsel:<br>None entered yet<br><br>**George Amrom,** M.D.<br>c/o Drexel Surgical Associates<br>219 N. Broad Street, Suite 8<br>Philadelphia, PA 19107<br>Counsel:<br>None entered yet<br><br>**Amanda Teichman,** M.D.<br>c/o Drexel Surgical Associates<br>219 N. Broad Street, Suite 8<br>Philadelphia, PA 19107<br><br>Counsel:<br>None entered yet |
| Court:  Philadelphia County Court of Common Pleas | |

3.      Devereaux (HUH)

| Plaintiff: | Defendant: |
|---|---|
| Courtney Devereaux, Administratrix of the Estate of Alise Adams-Allen<br>2115 South 21st Street<br>Philadelphia, PA 19145<br><br>**Counsel** | **American Academic Health System, LLC and Paladin Healthcare Capital, LLC**<br><br>Counsel:<br>Gary Samms, Esquire<br>Katherine Robinson, Esquire |

| | |
|---|---|
| Joseph L. Messa, Esquire<br>Meghan  M. Kwak, Esquire<br>**Messa & Associates**<br>123 South 22nd Street<br>Philadelphia  PA 19103<br>(215) 568-3500 | Obermayer Rebmann Maxwell & Hippel,<br>LLP<br>Centre Square<br>1500 Market Street, Suite 3400<br>Philadelphia, PA 19102<br>(215) 665-3000<br>Gary.samms@obermayer.com<br>Katherine.robinson@obermayer.com<br><br>**Drexel University College of Medicine**<br>1601 Cherry St.<br>Philadelphia, PA 19102<br><br>Counsel:<br><br>Frank A. Gerolamo, Esquire<br>Daniel Divis, Esquire<br>Gerolamo McNulty Divis Lewbart<br>121 South Broad Street, Suite 1400<br>Philadelphia,  PA 19107<br>(215) 790-8400<br><br>**Elizabeth Renza-Singhone, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br>Counsel:<br><br>Frank A. Gerolamo, Esquire<br>Daniel Divis, Esquire<br>Gerolamo McNulty Divis Lewbart<br>121 South Broad Street, Suite 1400<br>Philadelphia,  PA 19107<br>(215) 790-8400<br><br><br>**Michael Marcucci, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br>Counsel:<br><br>Frank A. Gerolamo, Esquire<br>Daniel Divis, Esquire<br>Gerolamo McNulty Divis Lewbart<br>121 South Broad Street, Suite 1400 |

Philadelphia,  PA 19107
(215) 790-8400


**Ricardo Morgenstern, M.D.**
230 N. Broad St
Philadelphia, PA 19102

Counsel:

Frank A. Gerolamo, Esquire
Daniel Divis, Esquire
**Gerolamo McNulty Divis Lewbart**
121 South Broad Street, Suite 1400
Philadelphia,  PA 19107
(215) 790-8400


**Hahnemann University Hospital**


Counsel:
Donald N. Camhi, Esquire
Marcie A. Courtney, Esquire
Steven Medina, Esquire
Post & Schell, P.C.
Four Penn Center, 13th Floor
1600 JFK Blvd.
Philadelphia, PA 19103-2808
Phone: 215-587-1015 (Camhi)

**Alberto Nunez, M.D.**
230 N. Broad St
Philadelphia, PA 19102

Counsel:
Donald N. Camhi, Esquire
Marcie A. Courtney, Esquire
Steven Medina, Esquire
Post & Schell, P.C.
Four Penn Center, 13th Floor
1600 JFK Blvd.
Philadelphia, PA 19103-2808
Phone: 215-587-1015 (Camhi)

**Paul Bailey, M.D.**
230 N. Broad St

|  | Philadelphia, PA 19102 |
|--|--|
|  | <u>Counsel:</u><br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Marina Khalili, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br><u>Counsel:</u><br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Lynsey Daniels-Iannucci, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br><u>Counsel:</u><br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Shari Reid, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102 |

Schedule 3.6 – Page 12

|  | Counsel:<br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Thomas Schwedhelm, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br>Counsel:<br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Alvaro Galvez, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br>Counsel:<br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Sonaly Patel, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br>Counsel:<br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire |

CHICAGO/#3334319.2A3334319.3

|  | Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Mohammad Shaikh, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br>Counsel:<br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Gary Xiao, M.D.**<br>230 N. Broad St<br>Philadelphia, PA 19102<br><br>Counsel:<br>Donald N. Camhi, Esquire<br>Marcie A. Courtney, Esquire<br>Steven Medina, Esquire<br>Post & Schell, P.C.<br>Four Penn Center, 13th Floor<br>1600 JFK Blvd.<br>Philadelphia, PA 19103-2808<br>Phone: 215-587-1015 (Camhi)<br><br>**Tenet HealthSystem Hahnemann, d/b/a Hahnemann University Hospital**<br>c/o CT Corporation System<br>116 Pine Street, Suite 320<br>Harrisburg, PA 17101 |

4.      Beck (STC)

| Plaintiff: | Defendant: |
|---|---|
| Charles Beck, as Legal Guardian of Isaiah | **AAHS** |

| | |
|---|---|
| Beck (an adult)<br>139 New Brooklyn Road<br>Sicklerville, NJ 08081 | **St. Christopher's Hospital for Children** |
| Counsel: | **Roy Schwartz, MD**<br>**160 E. Erie St**<br>**Philadelphia, PA 19134** |
| Shanin Specter<br>Geary Yeisley<br>Kline & Specter, P.C.<br>1525 Locust Street, 19th Fl.<br>Philadelphia, PA 19102<br>(215) 772-1000 | **Jason Parker, DO**<br>**160 E. Erie St**<br>**Philadelphia, PA 19134** |

5.  Shields (HUH)

| Plaintiff: | Defendant: |
|---|---|
| Corinthia Shields<br>6022 Hegerman St., 1st Fl.<br>Philadelphia, PA 19135 | **American Academic Health System, LLC**<br>**Paladin Healthcare Capital, LLC**<br><br>**Tenet HealthSystem Hahnemann, LLC,**<br>**d/b/a Hahnemann University Hospital** |
| Counsel:<br>Len Fodera, Esq.<br>Alison Long, Esq.<br>Fodera & Long, P.C.<br>1500 Walnut St.<br>Philadelphia, PA 19102<br>(215) 569-1212 | (Per Complaint:)<br>230 N. Broad St.<br>Philadelphia, PA 19102<br><br>Counsel:<br>None<br><br>Global Neurosciences Institute<br>219 N. Broad Street, 7th Fl.<br>Philadelphia, PA 19107<br><br>Counsel:<br>None |

6.  Re: Cassandra Porter-Robinson Professional Liability Claim (no suit filed)

| Plaintiff: | Defendant: |
|---|---|
| Cassandra Porter-Robinson and David Sloan<br>3233 Tampa St.<br>Philadelphia, PA 19134 | **Center City Healthcare, LLC, d/b/a**<br>**Hahnemann University Hospital**<br><br>No assigned counsel |
| Counsel:<br><br>Mark Bolin, Esquire<br>Kline & Spector, P.C. | Possible Defendants:<br><br>Dipak Delvadia, D.O. |

| 1525 Locust Street, 19th Fl.<br>Philadelphia, PA 19102<br>(215) 772-1000 | 216 N. Broad St.<br>Feinstein Bldg., 4th Fl.<br>Philadelphia, PA 19102<br><br>Maureen Clark, D.O.<br>c/o HUH<br>230 N. Broad St.<br>Philadelphia, PA 19102<br><br>Shontelle Cooper, M.D.<br>c/o HUH<br>230 N. Broad St.<br>Philadelphia, PA 19102<br><br>American Academic Health System, LLC,<br>d/b/a Hahnemann University Hospital<br><br>Drexel University<br>3141 Chestnut St.<br>Philadelphia, PA 19102 |
| Court:  N/A | |

7.      Beck (STC)

| Plaintiff:<br><br>Charles Beck, as Legal Guardian of Isaiah Beck (an adult)<br>139 New Brooklyn Road<br>Sicklerville, NJ 08081<br><br><br>Counsel:<br><br>Shanin Specter<br>Geary Yeisley<br>Kline & Specter, P.C.<br>1525 Locust Street, 19th Fl.<br>Philadelphia, PA 19102<br>(215) 772-1000 | Defendant:<br><br>**American Academic Health System, LLC<br>St. Christopher's Hospital for Children**<br><br>Counsel<br><br>Kenneth D. Powell, Esquire<br>Emily B. Ryan-Fiore, Esquire<br>Caitlin Goodrich, Esquire<br>Weber Gallagher<br>2000 Market St, 13th Floor<br>Philadelphia PA  19103<br>216-972-7908<br><br>**Tenet HealthSystem St. Christopher's<br>Hospital for Children, LLC, f/d/b/a St.<br>Christopher's Hospital for Children**<br>160 E. Erie St.<br>Philadelphia, PA 19134 |

| | |
|---|---|
| | **Roy Schwartz, M.D.**<br>160 E. Erie St.<br>Philadelphia, PA 19134<br><br>**Jason Parker, D.O.**<br>160 E. Erie St.<br>Philadelphia, PA 19134<br><br>**John Murphy, M.D.**<br>160 E. Erie St.<br>Philadelphia, PA 19134<br><br>**St. Christopher's Hospital for Children**<br>160 E. Erie St.<br>Philadelphia, PA 19134<br><br>Counsel for remaining defendants:<br><br>Tim McCann, Esq.<br>Sarah Petrosky, Esq.<br>McCann Law, LLC<br>1800 John F. Kennedy Blvd.<br>Suite 1812<br>Philadelphia, PA 19103<br>(215) 609-1503 |
| Court:  Philadelphia Court of Common Pleas | |

8.      Rivera (STC)

| Plaintiff: | Defendant: |
|---|---|
| Loraine Rivera<br>3148 Arbor Street<br>Philadelphia, PA 19134<br><br>Counsel:<br><br>John Spitale, Esq.<br>Christopher Giddings, P.C.<br>1880 JFK Blvd., Suite 1710<br>Philadelphia, PA 19103<br>(215) 243-3450 | **Tenet HealthSystem St. Christopher's Hospital for Children d/b/a St. Christopher's Hospital for Children**<br>c/o CT Corp System<br>116 Pine Street, Suite 320<br>Harrisburg, PA 17101<br><br>Complaint lists address as:<br>160 East Erie Ave.<br>Philadelphia, PA 19134<br><br>Counsel: |

CHICAGO/#3334319.2A3334319.3

|  | Mark DiAntonio, Esq.<br>McCann Law, LLC<br>1800 John F. Kennedy Blvd.<br>Suite 1812<br>Philadelphia, PA 19103<br>diantonio@doclawyers.com<br>(215) 609-1563<br><br>American Academic Health System, LLC,<br>d/b/a St. Christopher's Hospital for Children<br>160 East Erie Ave.<br>Philadelphia, PA 19134<br>Counsel: Jacqueline Roe (in-house counsel)<br><br>Front Street Healthcare Properties, LLC<br>160 East Erie Ave.<br>Philadelphia, PA 19134<br>Counsel: Jacqueline Roe (in-house counsel)<br><br>Altus Group U.S., Inc.<br>640 West Southlake Blvd.<br>Southlake, TX 76092<br><br>Paladin Healthcare Capital, LLC<br>Counsel: Jacqueline Roe (in-house counsel) |
|---|---|
| Court:  Philadelphia County Court of Common Pleas |  |

9.    Rivera (STC)

| Plaintiff: | Defendant: |
|---|---|
| Loraine Rivera<br>3148 Arbor Street<br>Philadelphia, PA 19134<br><br>Counsel:<br><br>John Spitale, Esq.<br>Christopher Giddings, P.C. | **Tenet HealthSystem St. Christopher's Hospital for Children d/b/a St. Christopher's Hospital for Children**<br>c/o CT Corp System<br>116 Pine Street, Suite 320<br>Harrisburg, PA 17101<br><br>Complaint lists address as: |

| | |
|---|---|
| 1880 JFK Blvd., Suite 1710<br>Philadelphia, PA 19103<br>(215) 243-3450 | 160 East Erie Ave.<br>Philadelphia, PA 19134<br><br>Counsel:<br><br>Mark DiAntonio, Esq.<br>McCann Law, LLC<br>1800 John F. Kennedy Blvd.<br>Suite 1812<br>Philadelphia, PA 19103<br>diantonio@doclawyers.com<br>(215) 609-1563<br><br>American Academic Health System, LLC,<br>d/b/a St. Christopher's Hospital for Children<br>160 East Erie Ave.<br>Philadelphia, PA 19134<br>Counsel: Jacqueline Roe (in-house counsel)<br><br>Front Street Healthcare Properties, LLC<br>160 East Erie Ave.<br>Philadelphia, PA 19134<br>Counsel: Jacqueline Roe (in-house counsel)<br><br>Altus Group U.S., Inc.<br>640 West Southlake Blvd.<br>Southlake, TX 76092<br><br>Paladin Healthcare Capital, LLC<br>Counsel: Jacqueline Roe (in-house counsel) |
| Court: Philadelphia County Court of Common Pleas | |

10.     Voelker (STC)

| Plaintiff: | Defendant: |
|---|---|
| R.V., a minor, by Kira and David Voelker<br>161 Avondale Drive<br>Birdsboro, PA 19508 | **St. Christopher's Hospital for Children**<br>**St. Christopher's Healthcare, LLC**<br>**American Academic Health System, LLC** |

| | |
|---|---|
| Counsel:<br>Stephen Raynes, Esq.<br>Joseph Traub, Esq.<br>Raynes Lawn Hehmeyer<br>(215) 568-6190 | **Tenet HealthSystem St. Christopher's Hospital for Children, LLC**<br><br>**Tenet Healthcare Corporation**<br><br>Counsel for Tenet entities:<br><br>Anne Pedersen, Esq.<br>McCann Law, LLC<br>1800 John F. Kennedy Blvd.<br>Suite 1812<br>Philadelphia, PA 19103<br><br>**Robert E. Steckler, M.D.**<br>1 Robert Wood Johnson Place<br>Division of Urology-MEB 584D<br>New Brunswick, NJ 08901<br><br>Counsel: unknown<br><br>**Reading Hospital**<br>420 S. Fifth Avenue<br>West Reading, PA 19611<br><br>Counsel: unknown<br><br>**Tower Health**<br>420 S. Fifth Avenue<br>West Reading, PA 19611<br><br>Counsel: unknown<br><br>**Tower Health Medical Group**<br>420 S. Fifth Avenue<br>West Reading, PA 19611<br><br>Counsel: unknown<br><br>**All About Women**<br>301 S. 7th Ave.<br>West Reading, PA 19611 |

CHICAGO/#3334319.2A3334319.3

| | Counsel: unknown |
| --- | --- |
| | **Paul Weinbaum, M.D.** |
| | 1307 Federal Street, Suite B200 |
| | Pittsburgh, PA 15212 |
| | |
| | Counsel: unknown |
| | |
| | **Richard Deveaux, M.D.** |
| | c/o Reading Hospital |
| | 420 S. Fifth Avenue |
| | West Reading, PA 19611 |
| | Counsel: unknown |

| Court: Philadelphia County Court of Common Pleas |
| --- |

### E.    INJUNCTION

| Plaintiff: | Defendants: |
| --- | --- |
| Drexel University and the City of Philadelphia | American Academic Health System, LLC |
| | Philadelphia Academic Health Holdings, LLC |
| Office of the President: | Philadelphia Academic Health System, LLC |
| 3141 Chestnut Street, Suite 103 | Joel Freedman |
| Main Building | |
| Philadelphia, PA 19104 | |
| P: 215.895.2100 | |
| | |
| Counsel: | |
| Steve Cozen, Esq. | |
| Fred Jacoby, Esq. | |
| One Liberty Place | |
| 1650 Market Street | |
| Suite 2800 | |
| Philadelphia, PA 19103 | |
| Phone (215) 665-2000 | |

| Court: Philadelphia County Court of Common Pleas | |
| --- | --- |

**F.    MISCELLANEOUS AND COMMERCIAL LITIGATION**

1.    FIT

| Plaintiff: | Defendants: |
|---|---|
| Future IT Advisors, Inc.<br>3610 Red Oak Drive<br>Montgomery, TX 77382<br><br>Counsel:<br>Edward Fisher, Esq.<br>Francine Griesing, Esq.<br>Griesing Law, LLC<br>1880 JFK Blvd., Suite 1800<br>Philadelphia, PA 19103<br>(215) 618-3720 | PAHS and AAHS |
| Court: United States District Court for the Eastern District of Pennsylvania | |

2.    Tenet (KPMG networking capital claim)

| Plaintiff: | Defendants: |
|---|---|
| PAHH | Tenet Business Services Corporation, Inc.<br>1445 Ross Avenue, Suite 1400<br>Dallas, TX  75202<br>(469) 893-2000<br><br>c/o CT Corp Systems<br>1999 Bryan St, Suite 900<br>Dallas, TX 75201<br><br>Counsel:<br><br>POTTER ANDERSON & CORROON LLP<br>John A. Sensing<br>Hercules Plaza, 6th Floor<br>1313 North Market Street<br>P.O. Box 951<br>Wilmington, Delaware 19801<br>(302) 984-6000<br>jsensing@potteranderson.com |

| | |
|---|---|
| | Mark Ray<br>Alston & Bird LLP<br>1201 West Peachtree St<br>Atlanta, GA 30309<br>Mark.ray@alston.com |
| Court:  In the Court of Chancery of the State of Delaware | |

3.      Tenet (ASA – indemnification claim)

| Plaintiff: | Plaintiff: |
|---|---|
| Philadelphia Academic Health Holdings, LLC;<br><br>St. Christopher's Healthcare, LLC;<br><br>Center City Healthcare, LLC;<br><br>Front Street Healthcare Properties, LLC;<br><br>Front Street Healthcare Properties LLC;<br><br>Broad Street Healthcare Properties, LLC;<br><br>Broad Street Healthcare Properties II, LLC;<br><br>Broad Street Healthcare Properties III, LLC;<br><br>Philadelphia Academic Medical Associates, LLC;<br><br>Philadelphia Academic Health System, LLC; and,<br><br>Physicians Clinical Network, LLC | Tenet Business Services Corporation, Inc.<br>1445 Ross Avenue, Suite 1400<br>Dallas, TX  75202<br>(469) 893-2000<br><br>c/o CT Corp Systems<br>1999 Bryan St, Suite 900<br>Dallas, TX 75201<br><br>Counsel:<br><br>POTTER ANDERSON & CORROON LLP<br>John A. Sensing<br>Hercules Plaza, 6th Floor<br>1313 North Market Street<br>P.O. Box 951<br>Wilmington, Delaware 19801<br>(302) 984-6000<br>jsensing@potteranderson.com<br><br>Mark Ray<br>Alston & Bird LLP<br>1201 West Peachtree St<br>Atlanta, GA 30309<br>Mark.ray@alston.com |
| Court: Superior Court – State of Delaware | |

Tenet and Conifer have been threatening to terminate the Transition Services Agreement and Master Services Agreement, both of which are with PAHS.

Capital One, a lender with respect to the HSRE Master Leases, has threatened to take action against Holdings pursuant to Holdings' guaranty of the HSRE Master Leases.

4.    Suzanne Richards (not in litigation – claim status)

| Claimant |
| --- |
| Suzanne Richards<br>SMR Healthcare Management, Inc.<br><br>SMR Healthcare Management, Inc.<br>4525 Dean Martin Drive, #2308<br>Las Vegas, NV 89103 |

| Counsel: | No Defendants, as not a claim, but threatened suits against PAHS, AAHS, "Paladin Healthcare," and Joel Freedman |
| --- | --- |
| Bell & Bell, LLP<br>Jennifer Bell, Esq.<br>One Penn Center<br>1617 JFK Blvd., Suite 1254<br>Philadelphia, PA 19103<br>(215) 569-2500 | |

5.    Atlantic Specialty Insurance Company

| Plaintiff: | Defendants: |
| --- | --- |
| Atlantic Specialty Insurance Company | Philadelphia Academic Health Holdings, Inc.<br>Philadelphia Academic Health System, Inc.<br>St. Christopher's Healthcare, LLC<br>Center City Healthcare, LLC<br>Philadelphia Academic Medical Associates, LLC |
| Court:<br><br>New York Supreme Court<br>New York County<br>No. 653513/2019 | |

Demand for Payment Pursuant to the Corporate Guaranty Dated February 4, 2019 by Philadelphia Academic Health Holdings, LLC in Favor of Medline Industries, Inc. ($4,034,274.62)

City of Philadelphia v. Center City Healthcare, d/b/a Hahnemann University Hospital. Philadelphia County Court of Common Pleas, No. 1906-1164.  Property Addresses: 1417-35 Race St. Philadelphia, PA 19102-1118.  BRT# 772026000.  Amount of lien: $10,255,106.66; and

City of Philadelphia v. Front Street Healthcare Properties, LLC.  Philadelphia County Court of Common Pleas, No. 1906-1165.  Property Address: 160 E. Erie Avenue, Philadelphia PA 19134-1011.  BRT: 7770111735.  Amount of lien: $20,725.30.

## Schedule 3.13

**Taxes and Charges**

| Credit Party | Tax Obligation / Status |
|---|---|
| Broad Street Healthcare Properties II, LLC<br><br>Property Address:  211-13 N Broad St | 2019 Center City District Charges<br><br>Amount Due: $1,877.72 |
| Broad Street Healthcare Properties III, LLC<br><br>Property Address:  1417-35 Race Street | 2019 Center City District Charges<br><br>Amount Due:  $7,891.01 |
| Broad Street Healthcare Properties III, LLC<br><br>Property Address:  200-14 N Broad Street | 2019 Center City District Charges<br><br>Amount Due:  $16,054.30 |
| Broad Street Healthcare Properties, LLC<br><br>Property Address: 222-248 N. Broad Street | 2019 Center City District Charges<br><br>Amount Due:  $68,060.19 |
| Center City Healthcare, LLC<br>Gross Income Tax | State of New Jersey – Division of Taxation<br>Amount Due:  $2,748.14 |

UOL Tax Returns due but not yet filed as of the Closing Date by any Guarantor.

Unpaid gross sale receipt taxes in the amount of approximately $10,000,000 for the year 2019.

Actions that include a Lien set forth on Schedule 3.6.

**Schedule 3.14(b)**

**ERISA**

Borrower Center City Healthcare, LLC participates in a multi-employer pension plan in connection with its collective bargaining agreement with National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and District 1199C ("**1199C**").  1199C commenced a lawsuit, which is described on Schedule 3.6, prior to commencement of the Bankruptcy Cases against American Academic Health Holdings, LLC d/b/a Hahnemann University Hospital alleging delinquent contributions.

One or more of the Credit Parties may also incur claims for withdrawal liability to the extent they terminate any ERISA Plans or related obligations in connection with the Bankruptcy Cases.

CHICAGO/#3334319.2A3334319.3

**Schedule 3.18**

**Environmental Compliance**

(a)

Notice from the Pennsylvania Department of Environmental Protection dated as of February 13, 2018, addressed to Tenet Health System, St. Christopher's Hospital.

(b)

Solely with respect to information set forth therein that is responsive to the representation:

a.    All items listed in Section 5 of the Phase I Environmental Site Assessment, Action Manufacturing Company, 100 East Erie Avenue, Philadelphia, PA, by PARS Environmental, Incorporated, January 2013 (the "PARS Phase I");

b.    All items discussed in the Phase II Environmental Site Investigation, Action Manufacturing Company, 100 East Erie Avenue, Philadelphia, PA, by PARS Environmental, Incorporated, March 2013 (the "PARS Phase II");

c.    All items listed in Section 4.1.1 of the Phase I Environmental Site Assessment, Saint Christopher's Hospital for Children, 160 East Erie Avenue, Philadelphia, PA by Ramboll Environ US Corporation, May 2017 (the "Rambol Saint Christopher's Phase I").

d.    All items listed in Section 4.1.1 of the Phase I Environmental Site Assessment, Hahnemann University Hospital, 230 North Broad Street, Philadelphia, PA by Ramboll Environ US Corporation, May 2017 (the "Rambol Hahnemann Phase I").

e.    All items listed in Section 7 of each of the following reports (the below reports are collectively referred to as the "EMG Hahnemann Phase I Reports"):

   i.    Phase I Environmental Site Assessment, Feinstein Building, 216-220 North Broad Street, Philadelphia, Pennsylvania, 19102, July 3, 2017.

   ii.    Phase I Environmental Site Assessment, Broad Street Clinic, 231-233 North Broad Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

   iii.    Phase I Environmental Site Assessment, New College Building, 225-251 15th Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

   iv.    Phase I Environmental Site Assessment, Parking Garage, 306-320 North Broad Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

   v.    Phase I Environmental Site Assessment, Bobst Building, (Part of) 222-248 North Broad Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

vi.   Phase I Environmental Site Assessment, Bellet Building, 1501-1511 North Race Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

f.   All items listed in Section 5 of the Phase I Environmental Site Assessment, Saint Christopher's Hospital, 160 East Erie Avenue, Philadelphia PA by AEI Consultants, October 18, 2017 (the "AEI Saint Christopher's Phase I").

g.   All items listed in Section 5 of each of the following reports (the below reports are collectively referred to as the "AEI Hahnemann Phase I"):

i.   Phase I Environmental Site Assessment, Hahnemann University Hospital—New College Building, 225-251 North 15th Street, Philadelphia PA by AEI Consultants, October 11, 2017.

ii.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Bobst Building, 222-248 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017.

iii.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Feinstein Building, 216-220 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017.

iv.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Bellet Building, 1501-1511 North Race Street, Philadelphia PA by AEI Consultants, October 13, 2017.

v.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Broad Street Clinic, 231-233 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017.

vi.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Parking Garage, 306-320 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017.

vii.   Phase I Environmental Site Assessment, Hahnemann University Hospital—New College Building, 225-251 North 15th Street, Philadelphia PA by AEI Consultants, October 11, 2017.

h.   All other matters and conditions listed in the PARS Phase I which do or may constitute listings of property on the specified lists, including without limitation in Section 7 of the PARS Phase I; and all other matters and conditions listed in the Rambol Saint Christopher's Phase I and the Rambol Hahnemann Phase I (collectively, the "Rambol Reports") which do or may constitute listings of property on the specified lists, including without limitation in sections 4.4 and 6.1 of each of the Rambol Reports; and all other matters and conditions listed in the AEI Saint Christopher's Phase I and the AEI Hahnemann Phase I (collectively, the "AEI Reports") which do or may constitute listings of property on the specified lists, including without limitation in section 6.3 of each of the AEI

Reports; and all other matters and conditions listed in the EMG Hahnemann Phase I Reports, which do or may constitute listings of property on the specified lists, including without limitation in section 6.3 of each of the EMG Hahnemann Phase I Reports.

i.      All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions) of the Phase I Environmental Site Assessment Report dated September 7, 2018 prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap Financial Services, LLC for property identified as Proposed Lot 3 located at 325 North 15th Street, in the City of Philadelphia, Philadelphia County, Pennsylvania, commonly known as Stiles Alumni Hall (the "Site"). The Site consists of all portions of the sixteen-story structure located at 325 North 15th Street, including basement and sub-basement, maintenance and garage areas.

j.      All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions) of the Phase I Environmental Site Assessment Report dated September 7, 2018 prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap Financial Services, LLC for property identified as Proposed Parcels A and F located at 221-223 North 15th Street and 222-248 North Broad Street in the City of Philadelphia, Philadelphia County, Pennsylvania, commonly known as Hahnemann University Hospital (the "Site"). The Site consists of the North and South Towers of Hahnemann University Hospital, including all basement and maintenance areas.

k.      All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions) of the Phase I Environmental Site Assessment Report dated September 7, 2018 prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap Financial Services, LLC for property identified as Proposed Lot 1 located at 300-304 North Broad Street in the City of Philadelphia, Philadelphia County, Pennsylvania, (the "Site"). The Site is currently a recreational park.

l.      All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions) of the Phase I Environmental Site Assessment Report dated September 7, 2018 prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap Financial Services, LLC for property identified as Proposed Lot 9 located at 211-213 North Broad Street in the City of Philadelphia, Philadelphia County, Pennsylvania, (the "Site"). The Site is currently a paved parking lot.

m.      All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions) of the Phase I Environmental Site Assessment Report dated September 7, 2018 prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap Financial Services, LLC for property identified as Proposed Parcel D (Parking Lot) 200-214 North Broad Street and the Proposed Parcel E (Vacant Building) located at 201-219 North 15th Street, in the City of Philadelphia, Philadelphia County, Pennsylvania. Proposed Parcel D is currently a parking lot and Proposed Parcel E is an eight story building commonly known as SHSH Building.

All items listed in Sections 4 (Findings) and 5 (Summary and Conclusions) of the Phase II Subsurface Investigation Report dated October 12, 2017 prepared by AEI Consultants for the benefit of Harrison Street Real Estate LLC for property identified as 160 East Erie Avenue in the City of Philadelphia, Philadelphia County, Pennsylvania, and

All items listed in the Remedial Work Agreement, effective as of November 2, 2018, among PAHH New College MOB, LLC, PAHH Bellet MOB, LLC, PAHH Wood Street Garage, LLC, PAHH Feinstein MOB, LLC, PAHH Broad Street MOB, LLC, PAHH Erie Street Garage, LLC, St. Christopher's Healthcare, LLC and Front Street Healthcare Properties, LLC (the "Remediation Agreement").

**Schedule 4.5**

**Compliance with Laws**

1.      Matters identified in Schedules 3.13, 3.14(b) and 3.18.

## Schedule 5.1

**Permitted Contingent Obligations; Permitted Indebtedness**

Contingent obligations arising pursuant to:

1.    The New Market Tax Credit Transactions;

2.    Center City Healthcare, LLC's contributions to the Pension Fund for Hospital and Health Care Employees – Philadelphia and Vicinity and obligations described on Schedule 3.14(b);

3.    Under a Corporate Guaranty with Medline Industries, Inc. dated February 4, 2019, Holdings guarantees payment of amounts due from Philadelphia Academic Health System, LLC, Center City Healthcare, LLC, and St. Christopher's Healthcare, LLC for purchases of medical supplies under the Corporate Program Agreement dated August 1, 2018 between PAHS and Medline Industries Holdings, L.P. ("Medline Guaranty")

4.    The Holdings guaranty of the $17,500,000 promissory note issued by Front Street Healthcare, LLC and Front Street Healthcare II, LLC in favor of Tenet Business Services Corporation (the "Tenet Note").

5.    The Holdings guaranties of the HSRE Master Leases.

6.    The Holdings and other Non-Debtor Credit Parties' guaranties of the Prepetition Obligations.

Permitted Indebtedness:

1.    Debt arising pursuant to the New Market Tax Credit Transactions;

2.    $550,000 loan made by Paladin Healthcare Capital, LLC to Parent Borrower after January 11, 2018;

3.    Accrued but unpaid fees arising under that certain letter agreement dated as of January 11, 2018 by and between American Academic Health System, LLC and Parent Borrower (the "Consulting Agreement");

4.    Debt arising under the Medline Guaranty described in Schedule 3.6;

## Schedule 5.2

## Permitted Liens

| Secured Party | Debtor(s) | Additional Information |
|---|---|---|
| Capital One, N.A.<br>77 West Wacker Drive,<br>10th Floor<br>Chicago, IL 60601 | St. Christopher's Healthcare, LLC | Filed UCC-1 financing statements with regard to subleases, subleased rents, lockbox and deposit accounts (and an cash, receipts or other funds deposited therein to the extent constituting subleases rent, and any proceeds thereof) related to the HSRE Master Leases. |
| GE HFS, LLC<br>P.O. Box 414, W-490<br>Milwaukee, WI 53201 | Center City Healthcare, LLC | Filed UCC-1 financing statement, listing the debtor as Tenet Healthsystem Medical, Inc. on specific equipment. Filing number 20161288412.   Filed amendment on February 2, 2018 to change the debtor's name to Center City Healthcare, LLC, filing number 20180789822. |
| Med One Capital Funding, LLC<br>10712 South 1300 East<br>Sandy, UT 84094 | Center City Healthcare, LLC | Filed UCC-1 financing statement related to specific equipment. Filing number 20187254010. 8015BD – BD Alaris System Point of Care Units, model 8015 1) Equipment Check-In-Services. |
| De Lage Landen Financial Services<br>1111 Olde Eagle School Road<br>Wayne, PA 19087 | SCHC Pediatric Associates, L.L.C. | Filed UCC-1 financing statement related to specific equipment leased or financed by secured party. |
| Olympus America Inc.<br>3500 Corporate Parkway<br>Center Valley, PA 18034 | St. Christopher's Healthcare, LLC and Center City Healthcare, LLC | Filed UCC-1 financing statement with respect to St. Christopher's Healthcare, LLC on specific equipment specified on financing statement. Filing number 20180120952.  Also filed UCC-1 financing statements with respect to Center City Healthcare, LLC on  related to specific equipment specified on financing statement. Filing numbers 20180118568, 20180118717, and 20180120739.  Financing Statements provide given for notice purpose only and not intended to create a security interest. |
| U.S. Bank, N.A.<br>777 East Wisconsin Avenue<br>Milwaukee, WI 53202<br>(assignee of Leasing Associates of Barrington) | St. Christopher's Healthcare, LLC | Filed UCC-1 financing statement with respect to St. Christopher's Healthcare, LLC on specific equipment. Filing number 20180084000. References the following leased equipment – 1 GneXpert XVI, 8 Testing Site System with 6 Modules, 1 desktop computer, 1 Black and White printer.   Financing Statement indicates intended to be a true lease and not intended as security. |
| Key Equipment Finance<br>1000 South McCaslin Blvd<br>Superior, CO 80027 | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien search results. |
| Siemens Healthcare Diagnostics Inc.<br>Glasgow Business Community<br>BLDG 500, MS #530<br>PO Box 6101<br>Newark, DE 19714-6101 | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien search results. |
| Stryker Sales Corporation<br>1901 Romence Road | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien |

CHICAGO/#3334319.2A3334319.3

| Secured Party | Debtor(s) | Additional Information |
|---|---|---|
| Parkway<br>Portage, MI 49002 | | search results. |
| Huntington Technology Finance, Inc.<br>2285 Franklin Road, Suite 100<br>Bloomfield Hills, MI 48302 | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien search results. |
| IPA One / Med One Capital Funding, LLC<br>10712 South 1300 East<br>Sandy, UT 84094 | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien search results. |
| Ortho Clinical Diagnostics<br>1001 Route 202<br>Raritan, NJ 08869 | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien search results. |
| Zimmer US, Inc.<br>200 West Ohio Avenue<br>Dover, OH 44622 | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien search results. |
| Philips Medical Capital, LLC<br>1111 Old Eagle School Road<br>Wayne, PA 19087 | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien search results. |
| People's Capital and Leasing Corp.<br>255 Bank Street #4<br>Waterbury, CT 06702 | n/a | UCC Financing Statement filed against predecessor-in-interest and reported in acquisition lien search results. |

\* - Inclusion of any potential claim hereon shall not constitute an admission by any of the Credit Parties as to the extent, validity or priority of any claim or lien. Out of an abundance of caution, all parties who filed a UCC-1 financing statement with respect to any of the Credit Parties or their predecessors are included herein, without regard for whether such party has a valid lien against any Credit Party, and whether the interest referenced in the financing statement constitutes a true lease or a secured financing.

Liens granted to Midcap with respect of the Prepetition Obligations.

Liens described on Schedule 3.13

Liens described in the title reports for the Mortgaged Properties.

**Schedule 5.8**

**Transactions with Affiliates**

| Borrower | Transactions with Affiliates |
|---|---|
| Philadelphia Academic Health System, LLC | Consulting Agreement<br><br>One-time loan from Paladin Healthcare Capital, LLC in the original principal amount of $550,000 described in Section 5.3 of the Credit Agreement |
| St. Christopher's Healthcare, LLC | Capital One Subordination, Non-Disturbance and Attornment Agreements relating to HSRE Master Leases.<br><br>Recognition Agreement with Other Affiliates and Drexel University relating to HSRE Master Leases.<br><br>Access License and Shared Services Agreement and Agreement Regarding Sublease relating to New Market Tax Credit Transactions.<br><br>Affiliate Leases (as defined on Schedule G), including the Operating Leases and HSRE Master Leases (and Memoranda of Leases, DACAs, Assignments of Leases and Rents and UCC-1s evidencing the HSRE Master Leases and the terms thereof)<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from Front Street Healthcare Properties, LLC<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from PAHH New College MOB, LLC<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from PAHH Feinstein MOB, LLC<br><br>Assignment and Assumption of Leases relating to certain Affiliate Leases and third party leases from PAHH Bellet MOB, LLC |

| Borrower | Transactions with Affiliates |
|---|---|
| | Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from PAHH Broad Street MOB, LLC<br><br>Drexel Repairs Agreement<br><br>Letter agreement re payment of Drexel University's rent for the month of January 2018 under the leases and subleases with Drexel University.<br><br>Equipment Lease Agreement between Tenet HealthSystem St. Christopher's Hospital for Children, LLC and SCHC Pediatric Associates, L.L.C., assigned to St. Christopher's Healthcare, LLC pursuant to the Bill of Sale |
| Center City Healthcare, LLC | Affiliate Leases (as defined on <u>Schedule 1.1</u>), including the Operating Leases and HSRE Master Leases<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from Broad Street Healthcare Properties, LLC |
| SCHC Pediatric Associates, L.L.C. | Affiliate Leases (as defined on <u>Schedule 1.1A</u>)<br><br>Equipment Lease Agreement between Tenet HealthSystem St. Christopher's Hospital for Children, LLC and SCHC Pediatric Associates, L.L.C., assigned to St. Christopher's Healthcare, LLC pursuant to the Bill of Sale |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Affiliate Leases (as defined on <u>Schedule 1.1A</u>) |
| Physician Performance Network of Philadelphia, L.L.C. | Clinical Integration Program Participation Agreement by and among Physician Performance Network of Philadelphia, L.L.C., TPS II of PA, L.L.C.; TPS III of PA, L.L.C. and TPS IV of PA, L.L.C. * |
| TPS of PA, L.L.C. | Affiliate Leases (as defined on <u>Schedule 1.1A</u>) |
| TPS IV of PA, L.L.C. | Affiliate Leases (as defined on <u>Schedule 1.1A</u>) |

The following agreements by and among Borrowers and its Affiliates will also exist at closing: (i) any intercompany transaction agreement, lease or other instrument assumed by Borrowers

under the Acquisition Agreement; (ii) the Organizational Documents of any Borrower or its Affiliates; and (iii) any other Operative Documents not otherwise listed in the chart above.

\*   This and all other payor agreements are being terminated  as part of the  Hahnemann Closure Plan with respect to  the Hahnemann Project only, which may result in a Material Adverse Effect to the Credit Parties.

CHICAGO/#3334319.2A3334319.3

**Schedule 5.11**

**Conduct of Business**

| Credit Party | Business Description |
|---|---|
| Philadelphia Academic Health System, LLC | Intermediate holding company for St. Christopher's Healthcare, LLC; Center City Healthcare, LLC; and Philadelphia Academic Medical Associates, LLC. |
| St. Christopher's Healthcare, LLC | Main hospital operating company for St. Christopher's Hospital for Children ("STC"); will hold all of the licenses, permits and contracts for STC. |
| Center City Healthcare, LLC | Main hospital operating company for Hahnemann University Hospital ("HUH"); will hold all of the licenses, permits and contracts for HUH. |
| Philadelphia Academic Medical Associates, LLC | Intermediate holding company for HPS OF PA, L.L.C., SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., StChris Care at Northeast Pediatrics, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., TPS of PA, L.L.C., TPS II of PA, L.L.C., TPS III of PA, L.L.C., TPS IV of PA, L.L.C. and TPS V of PA, L.L.C.. |
| HPS of PA, L.L.C. | Physician group. |
| SCHC Pediatric Associates, L.L.C. | Physician group; will hold equity of St. Christopher's Pediatric Urgent Care Center, L.L.C. |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Physician group. |
| SCHC Pediatric Anesthesia Associates, L.L.C. | Physician group. |
| StChris Care at Northeast Pediatrics, L.L.C. | Physician group. |
| TPS of PA, L.L.C. | Physician group; will hold equity of TPS II of PA, L.L.C., TPS III of PA, L.L.C, TPS IV of PA, L.L.C. and TPS V of PA, L.L.C. |
| TPS II of PA, L.L.C. | Physician group. |
| TPS III of PA, L.L.C. | Physician group. |
| TPS IV of PA, L.L.C. | Physician group. |
| TPS V of PA, L.L.C. | Physician group. |

\* - The foregoing descriptions relate to the conduct of each Borrower's business prior to commencement of the Bankruptcy Cases.  In connection with the commencement of the Bankruptcy Cases, the Borrower's are implementing a closure of Hahnemann University Hospital ("HUH"), which will affect business operations for Center City Healthcare, LLC and the above physician groups related to HUH.   The Borrower's will also seek to sell St. Christopher's Hospital for Children ("STC"), including all assets owned by St. Christopher's Healthcare, LLC and the above physician groups related to STC.

## Schedule 5.14

**Deposit Accounts and Securities Accounts**

| Credit Party | Financial Institution(s) where Accounts Maintained | Account Numbers | Descriptions of Accounts |
|---|---|---|---|
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4127906063 | Master Deposit Account – Collections |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4127916021 | Concentration Account – Disbursements |
| St. Christopher's Healthcare, LLC | Wells Fargo Bank, N.A. | 4127906097 | Government Deposit Account – Collections |
| St. Christopher's Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916005 | Non-Government Deposit Account – Collections |
| St. Christopher's Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916054 | Operating Account – Disbursements |
| St. Christopher's Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916096 | Payroll Account – Disbursements |
| Center City Healthcare, LLC | Wells Fargo Bank, N.A. | 4127906071 | Government Deposit Account – Collections |
| Center City Healthcare, LLC | Wells Fargo Bank, N.A. | 4127915981 | Non-Government Deposit Account – Collections |
| Center City Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916039 | Operating Account –Disbursements |
| Center City Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916070 | Payroll Account – Disbursements |
| Philadelphia Academic Medical Associates, LLC | Wells Fargo Bank, N.A. | 4022928873 | Operating Account –Disbursements |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4128326030 | Benefit Claims -Self-Funding |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4045695202 | Merchant Credit Card Deposits |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4128326048 | Dental Claims – Self-Funding |

| Credit Party | Financial Institution(s) where Accounts Maintained | Account Numbers | Descriptions of Accounts |
|---|---|---|---|
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4107064834 | Voluntary Benefits |
| HPS of PA, L.L.C. | Wells Fargo Bank, N.A. | 4080339500 | Government Deposit Account – Collections |
| HPS of PA, L.L.C. | Wells Fargo Bank, N.A. | 4080339518 | Non-Government Deposit Account – Collections |
| SCHC Pediatric Associates, L.L.C. | Wells Fargo Bank, N.A. | 4080339526 | Government Deposit Account – Collections |
| SCHC Pediatric Associates, L.L.C. | Wells Fargo Bank, N.A. | 4080339534 | Non-Government Deposit Account – Collections |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Wells Fargo Bank, N.A. | 4080339542 | Government Deposit Account – Collections |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Wells Fargo Bank, N.A. | 4080339559 | Non-Government Deposit Account – Collections |
| SCHC Pediatric Anesthesia Associates, L.L.C. | Wells Fargo Bank, N.A. | 4080339567 | Government Deposit Account – Collections |
| SCHC Pediatric Anesthesia Associates, L.L.C. | Wells Fargo Bank, N.A. | 4080339575 | Non-Government Deposit Account – Collections |
| StChris Care at Northeast Pediatrics, L.L.C. | Wells Fargo Bank, N.A. | 4081329310 | Government Deposit Account – Collections |
| StChris Care at Northeast Pediatrics, L.L.C. | Wells Fargo Bank, N.A. | 4081329328 | Non-Government Deposit Account – Collections |
| TPS of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329336 | Government Deposit Account – Collections |
| TPS of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329344 | Non-Government Deposit Account – Collections |
| TPS II of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329351 | Government Deposit Account – Collections |

| Credit Party | Financial Institution(s) where Accounts Maintained | Account Numbers | Descriptions of Accounts |
|---|---|---|---|
| TPS II of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329369 | Non-Government Deposit Account – Collections |
| TPS III of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329377 | Government Deposit Account – Collections |
| TPS III of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329385 | Non-Government Deposit Account – Collections |
| TPS IV of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329393 | Government Deposit Account – Collections |
| TPS IV of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329401 | Non-Government Deposit Account – Collections |
| TPS V of PA, L.L.C. | Wells Fargo Bank, N.A. | 4081329419 | Government Deposit Account – Collections |
| TPS V of PA, L.L.C. | Wells Fargo Bank, N.A. | 4082319146 | Non-Government Deposit Account – Collections |
| HPS of PA, L.L.C. | Bank of America | 4427804759 | Local Depository |
| SCHC Pediatric Associates, L.L.C. | Bank of America | 1291559784 | Local Depository |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Bank of America | 4427596258 | Local Depository |
| StChris Care at Northeast Pediatrics, L.L.C. | Bank of America | 4427133255 | Local Depository |
| StChris Care at Northeast Pediatrics, L.L.C. | Bank of America | 1291559802 | Local Depository |
| TPS V of PA, L.L.C. | Bank of America | 1291559789 | Local Depository |
| TPS IV of PA, L.L.C. | Bank of America | 1291559760 | Local Depository |
| TPS II of PA, L.L.C. | Bank of America | 1291559765 | Local Depository |
| TPS III of PA, L.L.C. | Bank of America | 1291559746 | Local Depository |
| SCHC Pediatric Associates, L.L.C. | PNC Bank, National Association | 1011551486 | Local Depository |

| Credit Party | Financial Institution(s) where Accounts Maintained | Account Numbers | Descriptions of Accounts |
|---|---|---|---|
| StChris Care at Northeast Pediatrics, L.L.C. | PNC Bank, National Association | 1019793025 | Local Depository |
| TPS IV of PA, L.L.C. | PNC Bank, National Association | 1019268626 | Local Depository |
| TPS II of PA, L.L.C. | PNC Bank, National Association | 1019268634 | Local Depository |
| TPS V of PA, L.L.C. | PNC Bank, National Association | 1019294701 | Local Depository |
| St. Christopher's Healthcare, LLC | Capital One | 7528852231 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852255 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852279 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852606 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852612 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852618 | Lockbox |

Schedule 5.14 – Page   4

**Schedule 7.4**

**Post-Closing Requirements**

Borrowers shall satisfy and complete each of the following obligations, or provide Agent each of the items listed below, as applicable, on or before the date indicated below, all to the satisfaction of Agent in its sole and absolute discretion:

[TBD]

Borrowers' failure to complete and satisfy any of the above obligations on or before the date indicated above, or Borrowers' failure to deliver any of the above listed items on or before the date indicated above, shall constitute an immediate an automatic Event of Default.

**Schedule 9.1**

**Collateral**

The Collateral consists of all of Borrower's right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising, and all proceeds and products of the following:

All goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

All of Borrowers' books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

Notwithstanding the foregoing, the Collateral shall expressly exclude (i) that certain lockbox and deposit account(s) (and any cash, receipts or other funds deposited therein to the extent constituting "Sublease Rent" or "Parking Revenue" (as such terms are defined herein) and any proceeds thereof) maintained by St. Christopher Operator for the sole purpose of receiving Sublease Rent and Parking Revenue, making any payments therefrom under any HSRE Master Lease (as such term is defined herein) and retaining any funds remaining therein thereafter, (ii) (x) real estate assets, improvements and Real Estate Fixtures and Related Personal Property (as such term is defined herein) of any Borrower, (y) any property management agreement or parking agreement solely related to such real estate assets and (z) any proceeds from the assets described in clauses (x) and (y) and (iii) the equity interest of Philadelphia Academic Risk Retention Group, LLC, a Vermont limited liability company, owned by Parent Borrower and Practice Parent Borrower, respectively, as of January 11, 2018.

As used herein, the following terms shall have the following meanings:

"**HSRE Master Leases**" means, individually and collectively, (i) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH New College MOB, LLC, (ii) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Bellet MOB, LLC, (iii) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Feinstein MOB, LLC, (iv) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Broad Street MOB, LLC, (v) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Wood Street Garage, LLC and (vi) that certain Master Lease dated as of January 11, 2018 by and between St. Christopher Operator and PAHH Erie Street Garage, LLC, and, in each case, all amendments, supplements,

restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Parking Revenue**" means the sum of all revenue from the Parking Garages (as such term is defined in each HSRE Master Lease).

"**Sublease Rent**" means the sum of all rent and other payments actually received under the Subleases (as such term is defined in each HSRE Master Lease).

"**Real Estate Fixtures and Related Personal Property**" means all real estate fixtures (i.e. HVAC, electrical, plumbing and related fixtures) and real estate-related personal property integral or primarily related to the real property itself, and unrelated to the operation of a hospital or other healthcare facility on, and/or the provision of healthcare services from, the real property (i.e., building control systems, window washing equipment, building system warranties, insurance proceeds).

CHICAGO/#3334319.2A3334319.3

## Schedule 9.2

### Location of Collateral

(i)     chief executive office and principal place of business of each Borrower:

| Borrower | Address |
|---|---|
| Philadelphia Academic Health System, LLC | 1500 Market Street, Suite 2400 Philadelphia, PA 19102 |
| St. Christopher's Healthcare, LLC | 160 East Erie Avenue Philadelphia, PA 19134 |
| Center City Healthcare, LLC | 230 North Broad Street Philadelphia, PA 19102 |
| Philadelphia Academic Medical Associates, LLC | 1500 Market Street, Suite 2400 Philadelphia, PA 19102 |
| HPS of PA, L.L.C. | 230 North Broad Street Philadelphia, PA 19102 |
| SCHC Pediatric Associates, L.L.C. | 160 East Erie Avenue Philadelphia, PA 19134 |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | 160 East Erie Avenue Philadelphia, PA 19134 |
| SCHC Pediatric Anesthesia Associates, L.L.C. | 160 East Erie Avenue Philadelphia, PA 19134 |
| StChris Care at Northeast Pediatrics, L.L.C. | 160 East Erie Avenue Philadelphia, PA 19134 |
| TPS of PA, L.L.C. | 230 North Broad Street Philadelphia, PA 19102 |
| TPS II of PA, L.L.C. | 230 North Broad Street Philadelphia, PA 19102 |
| TPS III of PA, L.L.C. | 230 North Broad Street Philadelphia, PA 19102 |
| TPS IV of PA, L.L.C. | 230 North Broad Street Philadelphia, PA 19102 |
| TPS V of PA, L.L.C. | 160 East Erie Avenue Philadelphia, PA 19134 |

(ii)    all addresses at which Collateral is located and/or books and records are kept:

| Address | Applicable Borrower(s) | Nature of Location | Owner |
|---|---|---|---|
| 230 North Broad Street | Center City Healthcare<br><br>TPS IV of PA | Leased<br><br>Subleased | Broad Street Healthcare Properties, LLC 1500 Market Street Suite 2400 Philadelphia, PA 19102 |
| 222-248 North Broad Street Philadelphia, PA | Center City Healthcare | Leased | Broad Street Healthcare Properties, LLC 1500 Market Street Suite 2400 Philadelphia, PA 19102 |
| 1501-1511 Race Street Philadelphia, PA | St. Christopher's Healthcare<br><br>Center City Healthcare | Leased<br><br>Subleased | PAHH Bellet MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, |

| | | | Suite 2100<br>Chicago, IL 60606 |
|---|---|---|---|
| 225-251 North 15th Street<br>Philadelphia, PA | St. Christopher's Healthcare<br><br>Center City Healthcare | Leased<br><br>Subleased | PAHH New College MOB, LLC<br>c/o Harrison Street Real Estate, LLC<br>444 West Lake Street, Suite 2100<br>Chicago, IL 60606 |
| 216-220 North Broad Street<br>Philadelphia, PA | St. Christopher's Healthcare<br><br>TPS IV of PA<br><br>Center City Healthcare<br><br>TPS of PA | Leased<br><br>Subleased<br><br>Subleased<br><br>Subleased | PAHH Feinstein MOB, LLC<br>c/o Harrison Street Real Estate, LLC<br>444 West Lake Street, Suite 2100<br>Chicago, IL 60606 |
| 231-233 North Broad Street<br>Philadelphia PA | St. Christopher's Healthcare<br><br>TPS of PA | Leased<br><br>Assignment | PAHH Broad Street MOB, LLC<br>c/o Harrison Street Real Estate, LLC<br>444 West Lake Street, Suite 2100<br>Chicago, IL 60606 |
| 306-320 North Broad Street<br>Philadelphia, PA | St. Christopher's Healthcare | Leased | PAHH Wood Street Garage, LLC<br>c/o Harrison Street Real Estate, LLC<br>444 West Lake Street, Suite 2100<br>Chicago, IL 60606 |
| 120 E. Erie Avenue<br>Philadelphia, PA | St. Christopher's Healthcare | Leased | PAHH Erie Street Garage, LLC<br>c/o Harrison Street Real Estate, LLC<br>444 West Lake Street, Suite 2100<br>Chicago, IL 60606 |
| 500 Old York Road<br>Jenkintown, PA | St. Christopher's Healthcare<br><br><br><br>SCHC Pediatric Associates<br><br>St. Chris Pediatric Urgent Care Center | Leased<br><br><br><br>Subleased<br><br>Subleased | Rydal Square, L.P.<br>c/o BET Investments, Inc.<br>200 Witmer Rd., Suite 200<br>Horsham, PA 19044 |
| 160 East Erie Avenue<br>Philadelphia, PA | St. Christopher's Healthcare | Leased | Front Street Healthcare Properties, LLC<br>1500 Market Street<br>Suite 2400<br>Philadelphia, PA 19102 |

| | | | |
|---|---|---|---|
| 500 Parking Spot Flat Behind 160 East Erie Avenue Philadelphia, PA | St. Christophier's Healthcare | Leased | SD Real Estate Developers, LLC |
| 3647-3669 North Front Street Philadelphia, PA (Nelson Pavilion) | St. Christopher's Healthcare | Leased | Front Street Healthcare Properties, LLC 1500 Market Street Suite 2400 Philadelphia, PA 19102 |
| 3843-3863 D Street Philadelphia, PA (Warehouse) | St. Christopher's Healthcare | Leased | Front Street Healthcare Properties, LLC 1500 Market Street Suite 2400 Philadelphia, PA 19102 |
| Edgewood Village Executive Plaza 1st Floor Heacock Road Lower Makefield Twp., PA | SCHC Pediatric Associates | Leased | Edgewood Medical Center, Ltd. |
| 301 Oxford Valley Road, Suite 1201 Lower Makefield Twp., PA | SCHC Pediatric Associates | Leased | Erin Development Company 301 Oxford Valley Road, Suite 501 Yardley, PA 19067 |
| 153 N. Broadhead Road 1st Floor Bethlehem, PA | SCHC Pediatric Associates | Leased | St. Luke's Hospital of Bethlehem, PA 801 Ostrum Street Bethlehem, PA 18015 |
| 9501 Office Center (Roosevelt Blvd and Grant) Suite 305 Philadelphia, PA | SCHC Pediatric Associates | Leased | T.F. Development, Ltd. 3 Village Road, Suite 200 Horsham, PA 19044 |
| 100 Kings Way Unit C and other portions of building Washington, Twp., NJ | SCHC Pediatric Associates | Leased | VDM, LP |
| 300 Hunting Park Avenue Philadelphia, PA | SCHC Pediatric Associates | Leased | City of Philadelphia Human Services 1515 Arch Street Philadelphia, PA 19102 |
| 1008-1010 Arch Street Philadelphia, PA | TPS III of PA | Leased | 224 E. 13th Street Realty Group 50 Commerce Street Spring Valley, NY 10977 |
| 1930 South Broad Street Philadelphia, PA | TPS of PA | Leased | St. Agnes MOB, LLC c/o Stongehenge Advisors Inc. 1930 S. Broad Street Unit 1 Philadelphia, PA 19145 |
| 207 North Broad Street Philadelphia, PA | TPS of PA (4th Floor) Center City Healthcare (5th Floor) | Leased Leased | Philadelphia Urosurgical Associates |

| 227 North Broad Street Philadelphia, PA | TPS of PA | Leased | 227 N. Broad Street Assoc. |
| 2 Capital Way Pennington, NJ | TPS IV of PA | Leased | Capital Health Systems, Inc. 750 Brunswick Avenue Trenton, NJ 08638 |

Certain records are maintained with Iron Mountain pursuant to an agreement with Philadelphia Academic Health System, LLC dated May 20, 2019.

**<u>EXHIBIT B</u>**

**CHECKLIST**

(See attached.)



**AMENDMENT NO. 1 TO**
**$50,000,000 FIRST PRIORITY SECURED PRIMING SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN**

**to**

**ST. CHRISTOPHER'S HEALTHCARE, LLC, CENTER CITY HEALTHCARE, LLC, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, HPS OF PA, L.L.C., SCHC PEDIATRIC ASSOCIATES, L.L.C., ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., TPS OF PA, L.L.C., TPS II OF PA, L.L.C., TPS III OF PA, L.L.C., TPS IV OF PA, L.L.C., and TPS V OF PA, L.L.C.,**

**Amendment Closing Date:  August 19, 2019**

---

**CLOSING CHECKLIST**

**Key:**

**B**    **Borrower**
**BC**   **Borrower's Counsel**
**A**    **MidCap Financial Trust or its affiliate**
**AC**   **MCF's Counsel**



| Closing Item | Resp Party |
|---|---|
| **I.** **LOAN DOCUMENTS** | |
| | |
| A.    Amendment No. 1 to First Priority Secured Priming Super-Priority Debtor-in-Possession Credit and  Security Agreement | AC |
| •    Exhibit A – First Priority Secured Priming Super-Priority Debtor-in-Possession Credit and  Security Agreement, Annexes, Exhibits and Schedules | |
| •    Exhibit B - Checklist | |
| B.    Term Loan Note | AC |
| C.    Lender's Title Insurance Policies | Title Company |
| •    Hospital (Broad Street Healthcare Properties, LLC) | |
| •    Land and Parking (Broad Street Healthcare Properties II, LLC) | |
| •    MOB and Land (Broad Street Healthcare Properties III, LLC) | |
| D.    Title clearance/affidavits, to the extent required by title company | B/BC |
| | |
| **II.** **BANKRUPTCY** | |
| | |
| A.    Final DIP Financing Order | AC |
| | |