## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) |
| | ) Joint Administration Requested |
| Debtors. | ) |
| | ) Re: Docket No. 53, 368 |
| | ) Hearing Date: August 19, 2019 |

**RESPONSE OF MIDCAP FUNDING IV TRUST TO OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS FOR ENTRY OF FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION; AND (IV) <u>MODIFYING THE AUTOMATIC STAY</u>**

MidCap Funding IV Trust, acting in its capacity as administrative agent for MidCap Funding IV Trust and MidCap Financial Trust (successor-by-assignment to MidCap Funding H Trust), the Debtors' prepetition lenders (collectively, the "**<u>Prepetition Agent</u>**"), MidCap Funding IV Trust (successor-by-assignment to MidCap Financial Trust), acting in its capacity as administrative agent for MidCap Funding IV Trust (successor-by-assignment to MidCap Financial Trust), the Debtors' post-petition DIP lender (collectively, the "**<u>DIP Agent</u>**", and together with the Prepetition Agent, "**<u>MidCap</u>**"), by and through its undersigned counsel, file this response to the Objection (the "**<u>Objection</u>**") of the Official Committee of Unsecured

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341) ("CCH"), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The bankruptcy cases of each of the Debtors shall be collectively be referred to herein as the "**<u>Cases</u>**."

Creditors in the chapter 11 cases of the Debtors (the "**Committee**") to the Motion of Debtors' for Entry of Final Orders (i) Authorizing Debtors to Obtain Postpetition Financing; (ii) Authorizing Debtors to Use Cash Collateral; (iii) Granting Adequate Protection; and (iv) Modifying the Automatic Stay (D.I. No. 53, the "**Motion**").

## JURISDICTION

1.       These matters constitute core proceedings pursuant to 28 U.S.C. § 157(b) and Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.       Background of Prepetition Loans to Debtors

2.       MidCap was the prepetition agent to the Debtors and certain other affiliated entities (the "**Borrowers**").

3.       On or about January 11, 2018, MidCap entered into a Credit and Security Agreement (the "**Original Credit Agreement**"), pursuant to which it agreed to make available to Borrowers a revolving loan facility in the maximum principal amount of $100,000,000 at any time outstanding, subject to the terms and conditions set forth in the Original Credit Agreement (the "**Prepetition Revolving Loan**").

4.       Subsequently, the Borrowers requested that MidCap amend the Original Credit Agreement to extend to Borrowers a $20,000,000 term loan (the "**Prepetition Term Loan**", and together with the Prepetition Revolving Loan, the "**Prepetition Loan**.")

5.      On or about September 20, 2018, MidCap and the Borrowers entered into "Amendment No. 1 to Credit and Security Agreement," (the "**Amendment**") pursuant to which MidCap provided the Prepetition Term Loan.

6.      The obligations of the Borrowers to MidCap pursuant to the Prepetition Credit Agreement are secured by a blanket perfected lien on assets of the Borrowers, as described in more detail in the Prepetition Credit Agreement and the UCC Financing Statements filed in the relevant jurisdictions.

7.      Advances under the Prepetition Revolving Loan were available in part based upon a borrowing base formula, such that all outstanding advances could not exceed an amount equal to, among other things, (i) the product of 85% of Eligible Accounts; plus (ii) the product of 85% of Eligible Supplemental Payments; minus (iii) the Minimum Liquidity Reserve.

8.      As an accommodation to the Borrowers, the origination fees associated with the Prepetition Loan (the "**Prepetition Loan Origination Fees**") that were due and owing on the closing of the Prepetition Revolving Loan and the Prepetition Term Loan, respectively, were to be paid in installments rather than in full on the applicable closing date.  This enabled the Borrowers to have access to more loan proceeds at the applicable closings than would have been available if the Prepetition Loan Origination Fees had been paid immediately upon such applicable closing.

9.      After obtaining the Prepetition Loan, the Borrowers struggled to remain in compliance with the terms of the Prepetition Credit Agreement and, ultimately, defaulted on the Prepetition Loan.

10.     On or about May 8, 2019, MidCap provided a notice of all defaults that had occurred since the closing of the Prepetition Loan to the Borrowers and MidCap imposed the

default rate of interest provided under Section 10.5 of the Prepetition Credit Agreement. However, MidCap agreed to continue to lend which allowed the Borrowers to continue to operate and avoided an immediate closure of CCH and St. Christopher's Hospital ("STC").

**B.     The Bankruptcy and Financing**

11.     On June 30, 2019 (the "**Petition Date**"), the Debtors filed their petitions in this Court to institute the Cases.

12.     Prior to the Petition Date, the Debtors sought a debtor-in-possession financing facility from other lenders.  Specifically, the Debtors, with the assistance of SSG Capital Advisors, LLC, made inquiry into alternatives for financing and solicited proposals for debtor-in-possession financing from other financial institutions.  The Debtors and their advisors received two term sheets prior to determining that MidCap offered the Debtors the most attractive funding.  [D.I.  2; ¶ 46].

13.     Debtors, therefore, filed the Motion, including the proposed credit agreement (the "**DIP Credit Agreement**") seeking approval of DIP financing offered by MidCap and the associated relief requested therein.  *Id.*[2]

14.     Pursuant to the DIP Credit Agreement, the Debtors would have access to a revolving loan facility of up to $50,000,000 (the "**DIP Revolver**") and a $15,000,000 term loan (the "**DIP Term Loan**," and together with the DIP Revolver, the "**DIP Loans**").

---

[2] "The Debtors evaluated the prospective lenders and their proposals on a number of factors, including economic terms, impact on the Debtors' businesses, restrictions on the use of proceeds and the collateral and security packages requested. Given their current financial condition, financing arrangements and capital structure, the Debtors were unable to obtain financing from sources other than the DIP Lender on better terms than those reflected in the DIP Facility. Additionally, as the Debtors' prepetition secured lender, the DIP Lender is familiar with the Debtors, their businesses and their capital structure. This familiarity has enabled the DIP Lender to act more quickly and limit diligence risk, both of which are crucial in light of the Debtors' critical need for liquidity." *Id.* at ¶ 47.

15.    The DIP Loans, among other things, reverted to a non-default rate of interest from the default rate of interest that the Debtors had been charged prepetition, removed a significant portion of the reserves that had been protecting MidCap's ability to be repaid and provided a $2.5 million carve-out (the "Carve-out") to facilitate the retention of professionals in the Debtors' estates.

**D.    The Interim DIP Order**

16.    This Court scheduled a hearing on the Motion for July 11, 2019.

17.    On July 12, 2019, after two days of hearings and negotiations among the interested parties, this Court entered the Interim Order Under 11 U.S.C. §§ 105, 361, 362(c), 353(d), 364(c), 364(d), 364(e) and 507 and Bankruptcy Rules 2002, 4001 and 9014; (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) and 4001(c) (the "**Interim DIP Order**").

18.    In order to obtain approval of the Interim DIP Order, MidCap agreed to, among other things, the following:

-    The $2.5 million Carve-out for professional fees;

-    To increase the initial release of the Minimum Liquidity Reserve from $3,75,000 to $5,500,000.

-    To allow $25,000 of the Carve-out to be used for the Committee to investigate potential causes of action;

-    To limit its protected roll-up to advances made prior to entry of the Final DIP Order; and

-    To accommodate changes requested by the Office of the United States Trustee, the United States Department of Justice, the City of Philadelphia and HSREP VI Holding, LLC and its affiliates ("**HSRE**").

## RESPONSE TO THE OBJECTION

A.    **The Committee and its Objection**

19.    On July 15, 2019, the US Trustee appointed the Committee.

20.    Upon its appointment, the Committee raised concerns it had with the Interim DIP Order and proposed Final DIP Order (the "**Final DIP Order**") to the Debtors and MidCap.

21.    Although MidCap, the Debtors and multiple parties-in-interest (including the United States Trustee) had heavily negotiated for the terms of the Interim DIP Order and the DIP Credit Agreement, and had addressed concerns raised by this Court, MidCap endeavored to address the issues raised by the Committee.

22.    Despite efforts to resolve the Committee's concerns, on August 6, 2019, the Committee filed the Objection.

23.    The Objection is misleading in its characterizations of numerous terms of the DIP Financing and ignores, completely, the efforts made by MidCap to address concerns raised by the Committee.

B.    **MidCap's Efforts to Accommodate the Committee's Concerns**

24.    Looking simply at the issues raised by the Committee, and not the hyperbole, the following chart addresses the significant modifications that MidCap has agreed to make in order to accommodate the concerns of the Committee:

|  | **COMMITTEE OBJECTION** | **CHANGE TO DIP ORDER AND/OR CREDIT AGREEMENT** |
|---|---|---|
| Reporting | The Committee should receive the same reporting and at the same time as the DIP Lender under the DIP Credit Agreement, including under sections 4.1 and 7.4 of the DIP Credit Agreement. | **Added to DIP Order and the DIP Credit Agreement that Committee gets the Reporting, as requested.** |

| | | |
|---|---|---|
| Adequate Protection | The Adequate Protection Liens, Adequate Protection Payments, and superiority claim of the Prepetition Lenders and Prepetition Agent shall no longer be effective after entry of the Final Order, as the Prepetition Obligations are being repaid in full and adequate protection is therefore not necessary. Interim Order, ¶ 5(b).<br><br>Adequate Protection Liens (to the extent applicable) should not attach to any Excluded Causes of Action. Interim DIP Order, ¶ 5(b)). | **MidCap agreed to withdraw its Adequate Protection Liens if the Committee withdraws its objections to the DIP Financing and, if either no challenge to MidCap's claims and liens is filed within the challenge period or all challenges are finally resolved in MidCap's favor.**<br><br>**MidCap has agreed that its liens will not extend to Chapter 5 causes of action but that its superpriority claim may be paid out of proceeds of Chapter 5 causes of action.** |
| Non-Debtor Guarantors | Any references to non-Debtor Guarantors included in paragraph 5(c) of the Interim DIP Order should be removed. As currently drafted, paragraph 5(c) states that "the Debtors have an immediate need to . . . obtain the DIP Facility . . . in order to . . . preserve the going concern value of the Debtors <u>and the non-Debtor Guarantors[.]</u>").<br><br>The Debtors shall not be required to cause any non-Debtor Guarantor to take or not take any actions. Interim DIP Order, ¶¶ 6(b), 10(c). | **Removed from 5(c), as requested.**<br><br>**Changes made to DIP Credit Agreement and DIP Order to allow for Debtors to use commercially reasonable best efforts.** |
| Amendments to DIP Facility | Notice of any amendment, waiver, consent or other modification to and under the DIP Documents shall be provided to the Committee at least five (5) business days in advance of its effectiveness and the Committee shall be provided a reasonable opportunity to object. Interim DIP Order, ¶ 6(b)(ii). | **Changed to 5 days in DIP Order, as requested.** |

| | | |
|---|---|---|
| Carve-Out/Professional Fees | Nothing contained in the Final Order or in the DIP Documents shall affect the rights of the Case Professionals to seek (i) allowance of fees and expenses in excess of the amounts set forth in the Carve-Out and Budget and/or (ii) payment of fees and expenses in excess of the amounts set forth in the Carve-Out and Budget from assets that do not constitute the DIP Collateral. | **Added to DIP Order, as requested.** |
| Challenge | All references to Prepetition Documents should be removed from paragraph 13(a) of the Interim DIP Order; paragraph 13(b) of the Interim DIP Order should be removed; and references to the Prepetition Documents should be removed from paragraph 13(d) of the Interim DIP Order. | **DIP Order amended to accommodate Committee request for additional time past the date of the Final DIP Order to investigate all claims.** |
| Plan | Any plan of reorganization shall provide for payment and performance in full of the <u>DIP</u> Obligations (as opposed to all "Obligations" as is currently contemplated) on the earlier of the effectuate date or thirty days after confirmation of the plan.  For the avoidance of doubt, the DIP Obligations shall not constitute any Prepetition Obligations that are subject to a Roll-Up Reduction, and such obligations subject to a Roll-Up Reduction shall be treated in accordance with the terms of any confirmed plan of reorganization or liquidation.  Interim DIP Order, ¶ 18. | **DIP Order now provides for possible Roll-Up Reduction relating to $15 million Term Loan roll-up if challenge is successful.** |
| Jurisdiction | The Bankruptcy Court shall have sole jurisdiction DIP Credit Agreement, § 12.8.  As currently drafted, section 12.8 currently provides that "nothing in this agreement shall be deemed or operate to preclude any agent or any lender from bringing suit or taking other legal action in any other jurisdiction to realize on the collateral or any other security for the obligations[.]" | **Changes to the DIP Order reflect notice and time to object with respect to actions taken by MidCap with respect to its rights and remedies, as well as addressing stay relief.** |

| Power of Attorney | Section 4.15 of the DIP Credit Agreement should be removed.<br><br>All language in the DIP Credit Agreement appointing Agent as Borrowers' agent and attorney in fact, including in sections 4.17 and 10.3(c), should be removed. | **This has been removed from the DIP Credit Agreement, as requested.**<br><br>**The change in Section 4.15 covers 4.17.  Section 10.3(c) remains, as it deals only with perfection.** |
|---|---|---|
| Miscellaneous | The definition of "Financing Documents" in the DIP Credit Agreement shall not include any documents governing the Prepetition Obligations or any liens or claims of the Prepetition Lenders or Prepetition Agent.<br><br>Nothing contained in the Final DIP Order or any financing instrument, including the Financing Documents, shall be deemed to waive, limit, modify or otherwise prejudice any of the Debtors' or their estates' rights, claims, defenses, or objections against any non-Debtor affiliate. | **This change has been made to the Credit Agreement, as requested.**<br><br>**This change has been made, as requested.** |

25.    As reflected on the chart, MidCap agreed to significantly compromise its position as requested by the Committee (including additional compromises described in more detail, below).

26.    Despite MidCap's efforts to make compromises to address the Committee's concerns, the Committee continues to object, unreasonably insisting that their every demand be met.

27.    Although the Debtors offered testimony that the DIP Loan was the most attractive financing package offered to the Debtors to provide them with the needed financing to take them through their bankruptcy cases, the Committee seeks to take away the protections that MidCap

negotiated, even after MidCap made numerous concessions both prior to entry of the Interim DIP

Order and after the Committee was appointed.

28.     Rather than simply refuse the <u>22 categories</u> of demands for changes made by the

Committee, MidCap has made every effort, with the support of the Debtors, to accommodate the

Committee.

29.     The additional changes being demanded by the Committee are not practical for a

lender in MidCap's position because they significantly increase MidCap's exposure in ways that

were not bargained for, they were not part of the decision making process in extending the DIP

Loan, and they were not part of the pricing of the DIP Loan.  Moreover, they go beyond the

terms that are routinely approved in chapter 11 cases in this Court.

## C.     Clarifying Misleading Objections from the Committee

### <u>Reasonable and Standard Fee</u>

30.     The Committee's argument that the DIP Origination Fee is too high is outrageous.

MidCap charged a 1% fee, and only on the DIP Revolver.  This fee is very much in keeping with

fees allowed in other cases addressing DIP financing.[3]

31.     The Committee, in order to make a reasonable fee seem unreasonable, attempts

some sleight-of-hand mathematics to boldly state that the 1% fee on the DIP Revolving Loan is

37.3% on an annualized basis.  The Committee does this by ignoring the complete financing

---

[3] Recognizing that the DIP Origination Fee is modest, the Committee attempts to lump it in with fees relating to the Prepetition Loan which had not yet been paid by the Debtors when they filed the Cases.  The prepetition fees were earned upon closing of the Prepetition Loan and are a part of the prepetition obligations that the Debtors owe to MidCap.  The prepetition fees are irrelevant to whether the DIP Origination Fee is appropriate.  If a new lender were providing DIP financing, it would charge a fee.  Simply because MidCap allowed the Debtors to pay the origination fees on the Prepetition Loan over time does not preclude MidCap from charging a reasonable DIP Origination Fee.

package that is being provided by MidCap (which was the best financing available to the Debtors).[4]

32.     The facts are different than the argumentative assertions of the Committee.  The Debtors have access to a $50 million DIP Revolving Loan.  Throughout the Cases, the Debtors have borrowed from the DIP Revolving Loan, made repayments from collections and re-borrowed.  Each week, the Debtors have been able to make all of the payments required by the Budget, including payroll.  Additionally, as part of the DIP Loan, MidCap released $10 million of a $15 million reserve in order to provide the Debtors with additional liquidity to operate in bankruptcy.  In addition, the DIP Revolving Loan provides liquidity to the Debtors when accounts are generated rather than making the Debtors wait for the collection of accounts; hence, liquidity in excess of the released reserves is provided every time the Debtors borrow under the DIP Revolving Loan.  Therefore, for the Committee to argue that the DIP Origination Fee should be analyzed based upon only the release of a portion of the $10 million from the reserve is disingenuous and ignores the fact that MidCap has been continuing to advance funds to allow the Debtors to operate.[5]

---

[4] MidCap believes that the other lenders who proposed financing had larger origination fees and were proposing to charge additional fees that MidCap is not charging making other options for borrowing much more expensive for the Debtors.

[5] The Committee's argument that availability is further reduced by a $3.3 million Medicare Reserve is similarly mis-leading.  The Medicare Reserve has been shrinking and is currently only $665,289.66.  Therefore, the Committee's analysis of the alleged annualized cost of the DIP Origination Fee is significantly off-base.

**Marshaling Assets Would Be Contrary to Established Law**

33.     The Committee is also attempting to bully the Debtors and MidCap to marshal assets (specifically assets owned by non-Debtors), though it has no standing to do so and no law to support its position.

34.     Unsecured creditors, like the creditors represented by the Committee, may not invoke the equitable doctrine of marshaling.  *In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427–28 (Bankr. D. Del. 2007).  The traditional elements of marshaling are thus (1) two ***secured creditors*** are creditors of the same debtor (i.e., there is a common debtor); (2) that there are ***two funds belonging to that debtor***; (3) that only one secured creditor has access to both funds; and (4) that the senior creditor or third parties are not prejudiced by the application of the doctrine.  *Matter of New Woodbridge Barrel & Drum Co., Inc.,* 99 B.R. 221, 223 (Bankr. D.N.J. 1988) (emphasis added).

35.     The Committee seeks to force MidCap to pursue assets of non-Debtors as part of its marshaling argument which is not permitted.  *See Matter of Maimone*, 41 B.R. 974, 984 (Bankr. D.N.J. 1984) ("This doctrine [of marshaling] obviously cannot be applied, however, when the other asset is also owned or liened by parties other than the debtor.").

36.     Marshaling is not appropriate in this case where the Committee, a party without standing, is attempting to force MidCap to seek assets of non-Debtors to satisfy the Debtors' obligations.  While the Committee may be demanding this result, the law does not allow for it.

**MidCap is Entitled to Protections Provided in the Interim DIP Order**

37.     Prior to entry of the Interim DIP Order, MidCap agreed to allow for certain limitations with respect to the roll-up of the Prepetition Loan.  However, it was made clear, both in the Interim DIP Order and in the transcript from the hearing on the Interim DIP Order, that the

advances made by MidCap prior to entry of the Final DIP Order would <u>not</u> be subject to challenge.

> MS. REPEROWITZ[6]:  … to the extent that new dollars come in, because we have the approval today, they will be applied to prepetition dollars on a – to reduce the prepetition debt on a dollar for dollar basis for new money coming in or money made available to the debtor post-petition.
>
> THE COURT:  Right.
>
> MS. REPEROWITZ:  And to the extent that there has been dollar for dollar reduction of the prepetition debt whatever challenge occurs at the final hearing, if any, would not – they would not be able to undo the new dollars that have come in and the pay-down that has occurred to that date because it would be dollar for dollar
>
> THE COURT:  Right.

Transcript from July 12, 2019 Hearing at 60:11-24.

38.    While agreeing to a less favorable roll-up than it initially negotiated left MidCap exposed on some of the Obligations, it provided MidCap with the protection that, when it advanced funds to the Debtors, those advances would be protected. (D.I. 172, ¶6(c); Transcript from July 12, 2019 Hearing at 60:11-24)

---

[6] Ms. Reperowitz is counsel for MidCap.

39.     In order to address concerns of the Committee, MidCap agreed to further concessions in modifying the Final DIP Order to provide that the DIP Term Loan would be subject to challenge by a party-in-interest, including the Committee.  Moreover, MidCap also agreed to allow the roll-up of the Prepetition Term Loan to be reduced, up to $15 million, if the challenge was successful.  These changes, made to address concerns raised by the Committee, have been ignored by the Committee in its continuation of its objections.

40.     Oddly, at the same time that the Committee is challenging the fairness of the roll-up and demanding additional time to challenge MidCap's liens, it is also arguing that MidCap is not entitled to adequate protection because it is over-secured.  To the extent that the Committee or other parties-in-interest are not going to challenge the Prepetition Obligations or the extent, priority, validity or perfection of the Liens, then adequate protection of the Prepetition Obligations would not be necessary once those obligations were fully rolled-up into the DIP Facility.  However, as long as the Committee intends to challenge, then MidCap is entitled to adequate protection.

**MidCap is Entitled to a 506(c) Waiver**

41.     Merely alleging that the Debtors might eventually be administratively insolvent should not be sufficient to prevent MidCap from receiving the 506(c) Waiver in the Final DIP Order.  MidCap is funding the Debtors through the Cases which is allowing the Debtors to orderly shutdown HUH and continue to operate STC until a sale can be completed.  In fact, MidCap has agreed to a $2,500,000 carve out from its collateral, in the event there are insufficient estate assets to pay professional fees.  This Court has consistently provided DIP lenders with the protection of the 506(c) waiver.

D.      **Additional Concessions from MidCap**

42.     Continuing its efforts to address the Committee's concerns and move the Cases

forward, MidCap also agreed to numerous other demands from the Committee, including:

- providing the Debtors with summary invoices for MidCap's professional fees, redacted as necessary to protect attorney-client privilege and work product, with copies to the US Trustee and the Committee and period of time to review and object;

- agreeing to clarify that the Debtors are able to dispose of DIP Collateral in the ordinary course of business without DIP Lender consent and outside the ordinary course if ordered by the Court;

- agreeing that MidCap would not look to Avoidance Actions as collateral and, to the extent of superpriority claims, would exhaust other assets of the Debtors before turning to proceeds of Avoidance Actions for repayment;

- agreeing, despite having negotiated for a shorter time period, that it would allow the challenge period relating to the portion of the DIP Loan roll-up to extend the full 60 days from appointment of the Committee to provide sufficient time for investigation;[7] and

- agreeing to increase the Committee's budget to investigate its potential challenges to $50,000.

## <u>CONCLUSION</u>

43.     MidCap has made numerous changes to the Final DIP Order to address concerns

raised in the Objection.  The proposed Final DIP Order, submitted to the Court by Debtors on

August 16, 2019, represents an agreement negotiated between many parties and includes many

additional protections sought by objectors, including the Committee.   Recognizing the

concessions that have been made and that the DIP Loan is the most attractive financing available

to the Debtors to allow them to move through the Cases, the Motion should be granted by this

Court.

---

[7] Sixty days should be sufficient where, as here, there is one lender who loaned prepetition and post-petition.  A data room with all of the prepetition and post-petition documents was created and the Committee was provided access on July 17, 2019.  The Committee can finalize its review within 60 days from its appointment and, if it chooses to challenge, raise any challenges at that time

STRADLEY RONON STEVENS & YOUNG, LLP

*/s/ Joelle E. Polesky*
Joelle E. Polesky (ID No. 3694)
1000 N. West Street, Suite 1279
Wilmington, DE 19801
Telephone: (302) 295-4856
Facsimile: (302) 295-4801
Email: jpolesky@stradley.com

OF COUNSEL

Gretchen M. Santamour (*pro hac vice*)
Deborah Reperowitz (*pro hac vice*)
Mark J. Dorval (*pro hac vice*)
Joseph W. Catuzzi (*pro hac vice*)
2005 Market Street, Suite 2600
Philadelphia, PA 19103
Telephone: (302) 295-4856
Facsimile: (302) 295-4801

Vedder Price
Kathryn L. Stevens (*pro hac vice*)
David L. Kane (*pro hac vice*)
222 North LaSalle Street
Chicago, IL 60601
Telephone: (312) 609 7803

*Attorneys for creditor MidCap Funding IV Trust*

## CERTIFICATE OF SERVICE

I, Joelle E. Polesky, Esquire certify that on August 16, 2019, I caused to be filed a true and correct copy of the *Response of Midcap Funding IV Trust to Objection of Official Committee of Unsecured Creditors to Motion of Debtors For Entry of Final Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection; And (IV) Modifying the Automatic Stay* with the United States Bankruptcy Court for the District of Delaware via the CM/ECF system, and caused a copy of to be served via electronic means on all parties that have requested service of process in this case.

On August 19, 2019, I will cause a true and correct copy of *Response of Midcap Funding IV Trust to Objection of Official Committee of Unsecured Creditors to Motion of Debtors For Entry of Final Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection; And (IV) Modifying the Automatic Stay* to be served via first class, United States mail, postage pre-paid on the following:

Matthew R. Brooks
Troutman Sanders LLP
600 Peachtree Street NE
Suite 5200
Atlanta, GA 30308

Douglas Carlson
Douglas Carlson LLC
330 N. Wabash
#3300
Chicago, IL 60611

Richard A. Chesley
DLA Piper LLP (US)

444 West Lake Street
Suite 900
Chicago, IL 60606

Louis Curcio
Troutman Sanders LLP
875 Third Avenue
New York, NY 10022

Jeffrey Cutler
PO Box 2806
York, PA 17405

Nicole L. Greenblatt
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022-4611

Stephen C. Hackney
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Phillip Khezri
Arent Fox LLP
1301 Avenue of the Americas
New York, NY 10019

Suzanne Koenig
SAK Management Services, LLC
300 Saunders Road, Suite 300
Riverwoods, IL 60015

Robert Lapowsky
Stevens & Lee
620 Freedom Business Center
Suite 200
King of Prussia, PA 19046

Mitchell Malzberg
Law Offices of Mitchell J. Malzberg, LLC
6 E. Main Street, Suite 7
PO Box 5122
Clinton, NJ 08809

Rachel Jaffe Mauceri

Morgan Lewis Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

Lawrence G. McMichael
Dilworth Paxson LLP
1500 Market Street
Suite 3500E
Philadelphia, PA 19102

Jessica Mikhailevich
Troutman Sanders LLP
875 Third Avenue
New York, NY 10022

Omni Management Group, Inc.
5955 DeSoto Avenue
Suite 100
Woodland Hills, CA 91367

Gregory Francis Pesce
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Nancy A. Peterman
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601

Lisa M. Rhode
Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103

Phillip D. Berger
919 Conestoga Road
Building 3, Suite 114
Rosemont, PA 19010


Kelly Ann Cody
Self Inc. Womens Shelter

1305 W. Susquehanna Ave.
Philadelphia, PA 19122

Med One Capital Funding, LLC
c/o Ray Quinney & Nebeker, P.C.
36 South State Street
14th Floor
Salt Lake City, UT 84111
Attn.: David H. Leigh

Tracy M. Ohm
Stinson LLP
1150 18th Street N.W.
Suite 800
Washington, DC 20036

Oscar N. Pinkas
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089

Ira Neil Richards
David Smith
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103-7286

Shades of Green, Inc.
1777 South Pennsylvania Avenue
Morrisville, PA 19067

William J. Wickward Jr.
2179 East Lyon Station Road
Creedmoor, NC 27522

STRADLEY RONON STEVENS & YOUNG, LLP

/s/ Joelle E. Polesky
Joelle E. Polesky (ID No. 3694)
1000 N. West Street, Suite 1279
Wilmington, DE 19801
Telephone: (302) 295-4856
Facsimile: 302-295-4801
Email: jpolesky@stradley.com

Dated: August 16, 2019

*Attorneys for creditors MidCap Funding IV Trust*