1

<pre>
 1                      UNITED STATES BANKRUPTCY COURT
                              DISTRICT OF DELAWARE
 2
                                          .   Chapter 11
 3    IN RE:                              .
                                          .   Case No. 19-11466 (KG)
 4    CENTER CITY HEALTHCARE, LLC,        .
      d/b/a HAHNEMANN UNIVERSITY          .
 5    HOSPITAL, et al.,                   .
                                          .   Courtroom No. 3
 6                                        .   824 North Market Street
                                          .   Wilmington, Delaware 19801
 7                                        .
                                          .
 8                          Debtors.      .   August 19, 2019
      . . . . . . . . . . . . . . . . .       1:00 P.M.
 9
                             TRANSCRIPT OF HEARING
10                   BEFORE THE HONORABLE KEVIN GROSS
                       UNITED STATES BANKRUPTCY JUDGE
11
12    APPEARANCES:

13    For the Debtors:          Mark Minuti, Esquire
                                John Demmy, Esquire
14                              Monique DiSabatino, Esquire
                                SAUL EWING ARNSTEIN & LEHR LLP
15                              1201 N. Market Street
                                Wilmington, Delaware 19801
16
                                - and -
17
                                Jeffrey Hampton, Esquire
18                              1500 Market Street
                                Philadelphia, Pennsylvania 19102
19

20    Audio Operator:          LESLIE MURIN

21
      Transcription Company:    Reliable
22                              1007 N. Orange Street
                                Wilmington, Delaware 19801
23                              Email:  gmatthews@reliable-co.com

24    Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
25
</pre>

1   APPEARANCES (Continued):

2

3   For the Committee:          Andrew H. Sherman, Esquire
                                SILLS CUMMIS & GROSS P.C.
4                               1 Riverfront Plaza, Suite 10
                                Newark, New Jersey 07102

5

6   For Tenet and Conifer:      Nicholas Wasdin, Esquire
                                Kent Hayden, Esquire
7                               KIRKLAND & ELLIS
                                300 North LaSalle
                                Chicago, Illinois 60654

8

9   For HSRE:                   Stuart Brown, Esquire
                                DLA PIPER
10                              1201 North Market Street
                                Wilmington, Delaware 19801

11

12  For MidCap:                 Gretchen Santamour, Esquire
                                STRADLEY RONON
13                              2005 Market Street
                                Philadelphia, Pennsylvania 19103

14  TELEPHONIC APPEARANCES:

15  For U.S. of America:        Margaret Newell, Esquire
                                U.S. DEPARTMENT OF JUSTICE
16                              Washington, D.C.

17  For PGW:                    Pearl Pham, Esquire
                                PHILADELPHIA GAS WORKS

18

19  For Hospital Healthcare     Andrew Kelser, Esquire
    Employee Pension Fund       O'DONOGHUE & O'DONOGHUE
20  and Health Benefit Fund:    325 Chestnut Street, Suite 515
                                Philadelphia, Pennsylvania 19106

21

22

23

24

25

1

INDEX

#1) Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant To Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lender, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief [D.I. 53; filed: 07/01/19].

#3) [FILED UNDER SEAL] Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay, to the Extent Necessary to Terminate the TSA and MSA [D.I. 302; filed: 07/26/19].

#4) First Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases [D.I. 349; filed: 08/02/19].

#5) Second Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases [D.I. 350; filed: 08/02/19].

#6) Third Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Employment Agreements in Connection with the Closure of Hahnemann University Hospital [D.I. 351; filed: 08/02/19].

#7) Debtors' Motion for Entry of an Order Pursuant to Section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1(b), Authorizing the Debtors to File Under Seal Portions of (A) the Debtors' Objection to Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA and (B) the Declaration of Allen Wilen in Support Thereof [D.I. 422; filed: 08/09/19].

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  #8) Motion in Limine of Tenet Business Services Corporation
2  and Conifer Revenue Cycle Solutions, LLC to Exclude from the
   August 19 Hearing Evidence or Argument Regarding the Debtors'
3  Prepetition Lawsuits Against Tenet for Alleged Violations of
   the Asset Sale Agreement [D.I. 439; filed: 08/13/19].

4  #9) Motion in Limine of Tenet Business Services Corporation
5  and Conifer Revenue Cycle Solutions, LLC to Exclude Evidence
   or Argument Regarding Alleged PrePetition Performance
6  Deficiencies Under the Conifer Master Services Agreement
   [D.I. 512; filed: 08/16/19].

7

8  <u>FOR THE DEBTORS</u>

9      **J. Scott Victor**

10     Cross Examination by Mr. Sherman       29

11     Cross Examination by Mr. Hayden        34

12

13     **Allen Wilen**

14     Cross Examination by Mr. Sherman       51

15     Cross Examination by Mr. Hayden        75

16     Cross Examination by Mr. Santamour     87

17     Cross Examination by Mr. Brown         93

18     Recross Examination by Mr. Sherman     100

19

20     **Mike Maloney**

21     Direct Examination by Mr. Wasdin       109

22     Cross Examination by Mr. Demmy         123

23

24     **David Dawson**

25     Direct Examination by Mr. Wasdin       137

| EXHIBITS | I.D. | REC'D |
|---|---|---|
| D1,2,3,14 | | 50 |
| Tenet 3    Termination Notice of TSA/MSA | | 79 |
| Transition Services Agreement (under seal) | | 108 |
| Master Services Agreement (under seal) | | 108 |
| TSA Invoicing Summary | | 118 |
| Tenet 13 | | 147 |

1          (Proceedings commenced at 1:07 p.m.)

2                THE CLERK:  Please rise.

3                THE COURT:  Good afternoon, everyone.  Thank you.

4    You may be seated.  Good to see you all.  And, Mr. Minuti,

5    good afternoon.

6                MR. MINUTI:  Your Honor, good afternoon.  Mark

7    Minuti from Saul Ewing Arnstein & Lehr.  I'm here today on

8    behalf of the debtors.

9                With me today, Your Honor, are, let's see, my

10   partner is John Demmy at counsel table and Monique

11   DiSabatino.

12               THE COURT:   Yes.

13               MR. MINUTI:  Also in the courtroom, Your Honor, is

14   my partner, Jeffrey Hampton.  Also, today, Your Honor, with

15   us is Allen Wilen, the CRO of the debtors.

16               THE COURT:  Yes.

17               MR. MINUTI:  And sitting in the first row, Your

18   Honor, trying to hide is Mr. Victor.

19               THE COURT:  I know him anywhere.

20               MR. MINUTI:  Your Honor, Mr. Victor and Mr. Wilen

21   will be our witnesses today.  We did sign the list, so Your

22   Honor has that.

23               THE COURT:  Yes.

24               MR. MINUTI:  At the outset, let me just say, we

25   appreciate the court's flexibility, particularly this time,

1  in continuing our hearing from last week until today.

2         We got a busy agenda, Your Honor, and both debtor-

3  in-possession or final approval of debtor-in-possession

4  financing is contested.  In addition, we have Tenet's and

5  Conifer's motion up today.

6         And we have, I think we have four witnesses, maybe

7  five, Your Honor, among all of the parties.  We're hoping

8  maybe we can eliminate one by stipulating to some facts and

9  maybe at an appropriate break at some point and we can figure

10  that out.

11         But we do want to get to the witnesses, but before

12  we do that, Your Honor, I did want to give just a brief

13  update on a couple of coming attractions that I assume Your

14  Honor may be interested in.

15         First, Your Honor, I'm pleased to report that the

16  debtors have finalized their closure plan for Hahnemann

17  University Hospital in conjunction with negotiations with the

18  Pennsylvania Department of Health, as well as the City of

19  Philadelphia.

20         As Your Honor will recall, we had a motion -- it

21  was our first day motion we had filed.  So, I think in the

22  not too distant future, Your Honor, we're going to be teeing

23  that up and coming back before you, hopefully, again, with a

24  fully consensual plan.  We think we're there.  We're just

25  waiting on some final sign-offs so I wanted Your Honor to be

1  aware that that's where we were.

2          THE COURT:  How many patients do you presently

3  have?

4          MR. MINUTI:  Zero, Your Honor.

5          THE COURT:  Okay.

6          MR. MINUTI:  Next, I wanted to provide the court

7  with a brief update on the sale of the debtors' residence

8  program assets.  That was originally scheduled for a hearing,

9  Your Honor, on last Friday.

10          The good news, Your Honor, is I tell Your Honor

11  that a case -- what we do as a potentially case altering

12  event occurred the evening of August 8th.  That was the night

13  of our auction.

14          Following fifteen rounds of bidding, the debtors,

15  in consultation with the committee, ultimately accepted the

16  winning bid of Thomas Jefferson University Hospital for the

17  purchase of the debtors' residence program assets.

18          Thomas Jefferson, Your Honor, is working in

19  conjunction with a number of healthcare providers, almost all

20  of the major healthcare providers in our area, including, for

21  example, Christiana Care, Einstein, let's see, Main Line

22  Health, Temple University, the Cooper Health System.

23          Again, Your Honor, it's fitting, quite frankly,

24  that they were the winning bidder as the majority of our

25  residents, Your Honor, have already transferred to those

1  healthcare institutions.

2         In addition, Your Honor, it is those healthcare

3  institutions that, as a practical matter, have absorbed all

4  the patients that used to be at Hahnemann University

5  Hospital.

6         But as a result of sale process approved by the

7  court, the bidding for those assets went from the stalking

8  horse of $7.5 million dollars to a winning bid, Your Honor,

9  gross bid of $55 million dollars.  That is clearly a game

10 changer for our cases.

11        I want to be crystal clear, Your Honor, on the

12 record here today.  There are clearly some hurdles with us

13 getting that approved.  There are still outstanding

14 objections with respect to that sale.  One of those

15 objections is from the United States Government, Your Honor.

16        Part of the reason why we moved the hearing from,

17 let's see, today, Your Honor, to a date in the future is

18 because the government lawyer couldn't be here today.  So as

19 an accommodation, we agreed to do that.

20        We had a meeting scheduled on Wednesday in

21 Philadelphia with the government to hopefully reach agreement

22 to resolve their concerns or maybe even narrow their

23 concerns.  So, we're working hard at that.  I just wanted,

24 though, to give Your Honor that update with regard to that

25 process because the process worked very well.

1          So turning to today's agenda, we do have several

2     matters going forward today, Your Honor, but the main

3     attraction is, as I said, our final approval of debtor-in-

4     possession financing and Tenet and Conifer's motion to compel

5     payment of post-petition claims or, in the alternative, to

6     lift the automatic stay to permit them to terminate their

7     contracts.

8          These matters remain highly contested.  I can tell

9     Your Honor that, I think we put this on the record when we

10    had a teleconference with Your Honor, part of everyone's

11    agreement to move those matters to today was that we would

12    all meet to see if we couldn't resolve those issues.

13         There was such a meeting that occurred in our

14    Philadelphia office last week on Wednesday.  Unfortunately,

15    Your Honor, we were not able to achieve a global resolution

16    and that meeting included, Your Honor, the committee, MidCap,

17    our lender, as well as representatives from Tenet and

18    Conifer.  As I said, unfortunately, we were unable to reach a

19    settlement and so that brings us here today.

20         In terms of our suggestion, Your Honor, as to how

21    to proceed and I've discussed this with counsel for Tenet and

22    Conifer, I'd like to -- we'd like to deal with, at least from

23    the evidentiary standpoint, deal with all the issues

24    together.  What we think, Your Honor, makes sense is as

25    follows.

1          I've got two witnesses to proffer in support of

2    the DIP motion.  That will be Mr. Wilen and Mr. Victor.  We

3    will put them on for proffer and cross-examination really

4    confined to the DIP.  They will not be getting into any

5    issues relative to the Tenet and Conifer motion nor, for

6    example, with the appropriate rate for Tenet and Conifer

7    post-petition.

8          The idea would be that we would then, if

9    necessary, Your Honor, deal with the motion that -- two

10   motions for *in limine* that Tenet and Conifer have filed in

11   the case.  We did file a reply, Your Honor.  And we can talk

12   about this more when we get there.

13         But, you know, we are -- the evidence I think they

14   were fearful that we were going to introduce.  We've had

15   discussions with them and it's reflected in our reply, it's

16   very narrow.  So, my hope is we can reach an accommodation

17   there and Your Honor really doesn't have to rule.

18         We do have a couple of seal motions that have been

19   filed in connection with the exhibits.  We can deal with

20   those at that time.

21         But once my two witnesses are done testifying in

22   support of the DIP, we will then switch to Tenet and

23   Conifer's motion in connection with their -- I'm sorry; Tenet

24   and Conifer's witnesses in connection with their motion.

25   There would be cross-examination of their witnesses and then

1  we would put on a rebuttal case which, at this point, is

2  going to be primarily consistent of testimony of Mr. Wilen.

3          So, that would be how we would propose to proceed

4  if that's acceptable to the court.

5          THE COURT:  Does anyone have any comments on that?

6  It certainly sounds acceptable to the court.

7          MR. SHERMAN:  Good afternoon, Your Honor, Andrew

8  Sherman, Sills Cummis for the committee.

9          THE COURT:  Yes, Mr. Sherman.

10         MR. SHERMAN:  Your Honor, the only addendum or

11 modification would be to the extent the court wants any

12 argument on the DIP to sort of ground the issue or just right

13 into the evidence and we'll do it any way Your Honor wants.

14 I just want to throw that out there as far as Your Honor

15 would like to proceed.

16         THE COURT:  Well, I've certainly read your

17 objection so I have your arguments, I think, and I'm not

18 trying to foreclose you from making those arguments here.

19 But it seems to me if we get on with the testimony that would

20 be helpful.

21         MR. SHERMAN:  Perfect.  Great, Your Honor.

22         THE COURT:  Okay.  Thank you, Mr. Sherman.

23         MR. WANDIN:  Your Honor, Nick (indiscernible).

24         MS. NEWELL (via phone):  Excuse me, Your Honor.

25         THE COURT:  Yes.

1          MS. NEWELL (via phone):  Is this an okay time for

2    someone from the phone to talk?

3          THE COURT:  Who is this?  I'm sorry.

4          MS. NEWELL (via phone):  I'm sorry.  This is

5    Margaret Newell.  I'm at the Department of Justice and I just

6    wanted to note for the court that I am on the phone

7    participating for the United States, even though my colleague

8    is not in the courtroom today.

9          THE COURT:  All right.  Will you have argument to

10   make?

11         MS. NEWELL (via phone):  I don't expect to, Your

12   Honor.  I just noticed that the debtors' counsel said we

13   weren't going to be able to participate in the hearing, but I

14   just wanted to note that if you had any questions for us as

15   things proceed, I can answer them.

16         THE COURT:  All right, thank you, Ms. Newell.

17         MR. WANDIN:  Good afternoon, Your Honor.

18         MS. PHAM (via phone):  Your Honor.

19         THE COURT:  Yes.

20         MS. PHAM (via phone):  I'm sorry.  Your Honor, I'm

21   on the phone as well and I'm representing Philadelphia Gas

22   Works. This is Pearl Pham.  I'm also participating via

23   telephone, Your Honor.

24         And I just wanted to put on the record that PGW

25   does have a response and objection to the DIP order, but we

1  are withdrawing it due to the revised proposed DIP order.

2           THE COURT:  All right, thank you.

3           Anyone else on the phone?

4           MS. PHAM (via phone):  All right, thank you, Your

5  Honor.

6           THE COURT:  Thank you.

7           Anyone else on the phone who wishes to be heard?

8           MR. KELSER (via phone):  Yes, Your Honor.  Andrew

9  Kelser on behalf of the Hospital and Healthcare Employee's

10 Pension Fund and Health Benefit Fund.

11          THE COURT:  Yes.

12          MR. KELSER (via phone): So, Your Honor, I would

13 like to be heard on the issue of the new DIP order,

14 specifically the new DIP budget which did not become

15 available until Friday.

16          We did not file a formal objection because our

17 objection is really to the proposed final DIP budget, not the

18 terms of the actual order, as they were previously provided

19 to the court.

20          THE COURT:  All right, thank you.  I'll hear you

21 then at the appropriate time.

22          MR. KELSER (via phone):  Thank you, Your Honor.

23          THE COURT:  Yes, thank you.

24          MR. WASDIN:  Good afternoon, Your Honor.  Nick

25 Wasdin on behalf of Tenet and Conifer.

1          THE COURT:  Yes.

2          MR. WASDIN:  First with respect to the proposed

3   sequencing of witnesses, so starting with some direct

4   examination regarding the DIP budget, moving to our witnesses

5   for the payment motion, and then the debtors putting on a

6   rebuttal case.

7          That's not how we would do it.  You know, we think

8   it's most efficient to just put everybody on at once, but

9   that being said, we don't have an objection to them putting

10  on their case the way they want to.

11         THE COURT:  Okay.

12         MR. WASDIN:  Second, on the *motions in limine*, I

13  think it's clear that the issue on our payment motion, at

14  least, is the reasonable value of our post-petition services.

15  In the debtors' objection to our payment motion, they raised

16  sort of two types of setoff evidence.

17         The first was Delaware lawsuits they filed against

18  Tenet regarding the asset sale agreement, a different

19  agreement.  And then the second was prepetition performance

20  deficiencies, largely they allege on Conifer's part.  We move

21  to exclude both of those.

22         And this morning, I believe, the debtors filed

23  their response to that motion.

24         THE COURT:  Yes.

25         MR. WASDIN:  And reading the first two paragraphs

1  of the objection, paragraph one and paragraph two on page 2,

2  we are largely in agreement with that proposal.  It sounds

3  like they are not intending to use the Delaware litigation in

4  that way or to put in any evidence of prepetition performance

5  under the MSA.

6          So, we would be fine reserving argument on that

7  until the moment the debtors present it, but it may just be

8  that there's not a dispute.

9          THE COURT:  Okay.  Thank you.  Thank you, sir.

10          Mr. Brown, yes.

11          MR. BROWN:  Thank you, Your Honor. Stuart Brown,

12  DLA Piper on behalf of the HSRE entities.

13          Your Honor, I think that it would be our witness

14  that was the subject of the potential stipulation.  And so,

15  before we cross-examination Mr. Wilen if we have a

16  stipulation about certain discreet facts then we would not

17  need to cross Mr. Wilen. So, we might ask for a break after

18  the proffer of Mr. Wilen before the hearing proceeds.

19          THE COURT:  All right.

20          MR. BROWN:  Thank you, Your Honor.

21          THE COURT:  All right, you're ready, Mr. Minuti.

22          MR. MINUTI:  Thank you, Your Honor.

23          So, Your Honor, let me just -- I would just like

24  to state before we get to the evidence, I think just a couple

25  of points I think that should be obvious for today's hearing

1  and may help to frame some of the issues and focus the court.

2       What's relevant, I think, in terms of the

3  objections to the DIP budget and to the DIP agreement are as

4  follows.

5       We, as the debtors, Your Honor, fully stipulate

6  that the budget that is provided for under the debtor-in-

7  possession financing only contemplates $200,000 dollars a

8  week for Tenet and Conifer, so that's not in dispute.  We've

9  made that clear from day one so that is out there.

10 Obviously, Tenet and Conifer believe they're entitled to a

11 lot more than that.

12      Your Honor, we also concede that with respect to

13 Mr. Brown's client, HSRE, that the budget is insufficient to

14 cover the full amount due to HSRE on a monthly basis under

15 their leases, and there will be some testimony about that.

16 But, again, to make it clear, we do agree that it doesn't

17 include that amount.

18      The point of the break at some point, Your Honor,

19 is to see if we can agree on the number and that would

20 alleviate the need to have anybody testify as to what that

21 is.

22      So, the only other thing I wanted to say, Your

23 Honor, in terms of introduction before we get to the

24 testimony is and the testimony will make this clear.

25      You know, the debtor sort of feels caught here,

1  Your Honor.  We certainly tried to get more money to pay the

2  folks in this courtroom.  We were unable to do that, Your

3  Honor.  So, we are moving forward with the DIP budget because

4  that, in our view, provides us the best opportunity to

5  maximize value and continue our mission which is to, frankly,

6  deliver St. Christopher's as an operating entity to a buyer.

7          And so, I think that's important to keep in mind

8  as we move forward.  And so, with that, Your Honor, I'm

9  prepared to move to the evidence.

10          Mr. Victor would be my first witness.

11          THE COURT:  All right.

12          MR. MINUTI:  I am prepared to proffer his

13  testimony.  We did have a conversation last night with Tenet

14  and Conifer.  It's not clear to me whether they object to

15  that.  If necessary, we can put him on the stand for direct

16  as well.

17          MR. WASDIN:  Your Honor, Nick Wasdin again on

18  behalf of Tenet and Conifer.

19          THE COURT:  Yes.

20          MR. WASDIN:  We had the conversation with Mr.

21  Minuti last night.  At that point, I think, for us, it was

22  unclear whether he was planning on offering the witness's

23  declarations into evidence in lieu of their direct testimony

24  or proffering them in the way that Mr. Minuti just mentioned.

25          We would not have a problem with the declarations

1  coming in, subject to our *motions in limine* and the debtors'

2  response to those.

3          However, we have not seen or heard what the

4  proffer would be at this point, so I don't feel like I'm in a

5  position to object to it, other than to say our preference

6  would be without any additional information that the

7  witnesses just testify.

8          THE COURT:  Does it help that you'll have the

9  opportunity to cross examine?

10          MR. WASDIN:  We certainly would appreciate and

11  will look forward to our opportunity to cross examine but not

12  having a chance to see the proffer, I think our preference

13  would be that they just go ahead and testify directly.

14          THE COURT:  All right.

15          MR. MINUTI:  Your Honor, the only response I would

16  have and I'm prepared to do it either way.

17          THE COURT:  Yes.

18          MR. MINUTI:  The content of the testimony is no

19  different then if I read it into the record or the witness

20  testifies.  We're really just talking about the form in which

21  the evidence comes in.  I think a proffer will be more

22  efficient, but I'm prepared to go either way.

23          THE COURT:  Well, I will allow the proffer in

24  these circumstances where there is an opportunity to cross-

25  examine and I'm sure that your proffer will be

1  straightforward, so you may proceed with the proffer.

2          MR. MINUTI:   Thank you, Your Honor.

3          Your Honor, before we begin the proffer, we do

4  have some exhibits.  We have an exhibit binder to the court.

5  I know that Tenet & Conifer as well have some exhibits and so

6  maybe it makes sense for us to hand them up at this time.

7          I want to make one thing clear, Your Honor, most

8  of the exhibits are, in Conifer's view, highly confidential

9  and sensitive.  And so, our plan is not to distribute those

10 to the courtroom.  If it becomes an issue for anybody, I

11 guess, we can deal with it at the time.  But we'd like to

12 hand up a copy to Your Honor, so Your Honor obviously has

13 them and can see them.

14         When it comes to examining witnesses regarding

15 those documents, what we're going to try to do is do it a way

16 where the confidential sort of business sensitive information

17 is more general.  In other words, when it comes to talking

18 about the rate in which they get paid, there's a specific

19 percentage in the document.  We won't talk about what the

20 number is, but we'll talk about the fact, for example, that

21 it's based on a percentage.

22         So that's the way we're going to try to handle it.

23 We, obviously, haven't -- we haven't rehearsed this, Your

24 Honor, so we may hit a couple bumps along the way, but that

25 would be our goal if that's acceptable to the court.

1          The other thing we'd like to do, Your Honor, is

2   obviously I guess if there are, you know, there are going to

3   be copies I want to make sure their -- you know, we,

4   obviously, have copies of their documents.  They have copies

5   of ours. We're all going to make sure that all of those are

6   removed from the courtroom at the end.

7          So if that's acceptable to Your Honor, then maybe

8   it makes sense, at this point, to then hand up our documents.

9   Is that acceptable to Your Honor?

10          THE COURT:  That's fine with me.  I don't know if

11  Tenet and Conifer wish to be heard.

12          MR. WASDIN:  Your Honor, we do agree with Mr.

13  Minuti on that and appreciate his willingness to work with us

14  on the sensitive nature of some of these documents.

15          To the extent we do hit any road bumps or speed

16  bumps, as Mr. Minuti alluded to, we would, of course, reserve

17  our right to stand up and attempt to shut that down.

18          THE COURT:  Absolutely.  Yes, you certainly may.

19          MR. MINUTI:  If we may approach?

20          THE COURT:  Yes, Mr. Minuti, you may. Thank you.

21  Thank you, both.

22          MR. MINUTI:  All right.

23          THE COURT:  Yes, Mr. Sherman.

24          MR. SHERMAN:  Thank you, Judge.  I just asked Mr.

25  Minuti for copies of what's been presented to Your Honor and

1  he respectfully declined.  Figure out a way if we can follow

2  along, Your Honor.  We haven't seen these documents, so it's

3  hard for us to get along with the hearing without the

4  underlying documents that are presented to the court.

5          THE COURT:  And these will all be recovered at the

6  end of the hearing?

7          MR. MINUTI:  Absolutely, Your Honor.

8          THE COURT:  And, Mr. Sherman, of course is for the

9  committee.

10         MR. WASDIN:  Your Honor, we're okay with that.

11         THE COURT:  All right.

12         Is that all right with you, Mr. Minuti, to share

13  the documents with the committee?

14         MR. MINUTI:  It's absolutely fine with us, Your

15  Honor.

16         THE COURT:  All right, good.  Let's do that.

17         MR. MINUTI:  Your Honor, I have one more document,

18  Your Honor, to hand up. We had not planned on introducing

19  this, but our lender would like us to do it.  It's the

20  prepetition credit agreement, if I may approach?

21         THE COURT:  All right, you may.  Thank you.

22         MR. MINUTI:  Your Honor, let me know when you're

23  ready for the proffer.

24         THE COURT:  I'm ready for you.  Yes.

25         MR. MINUTI:  Thank you, Your Honor.

1          With me today in the courtroom is J. Scott Victor.

2   If called to the stand, Mr. Victor would testify as follows.

3          Again, Your Honor, with the court's permission, I

4   will skip most of Mr. victor's background if that's

5   acceptable. I know Your Honor is familiar with Mr. Victor.

6          THE COURT:  Yes, that's fine.

7          MR. MINUTI:  Your Honor, Mr. Victor would testify

8   that since 2000, he has personally served as an investment

9   banker in over 200 transactions involving the sale of all or

10  substantially all of the company's assets resulting in sale

11  proceeds ranging from under $10 million dollars to over $200

12  million dollars.

13         Further, Mr. Victor has personally been involved

14  in efforts to obtain debtor-in-possession financing on over

15  one hundred occasions involving loans ranging from $10

16  million dollars to $200 million dollars.

17         Mr. Victor would testify that he and his firm, SSG

18  Capital Advisors, were hired by the debtors in early June of

19  2019 to serve as the debtors' investment banker to, among

20  other things, assist the debtors in pursuing debtor-in-

21  possession financing and to find a purchaser for

22  substantially all of the debtors' assets.

23         With respect to debtor-in-possession financing,

24  Mr. Victor would testify that he was personally involved in

25  attempts to obtain financing in these cases.  Given the

1   debtors' liquidity issues, he would testify that the debtors

2   had an urgent need to find financing.

3           Beginning in early June of 2019, Mr. Victor would

4   testify that he reached out to approximately eight possible

5   lenders including MidCap to solicit interest in providing

6   debtor-in-possession financing to these debtors.

7           Among others contacted, Mr. Victor would testify

8   that he also spoke with both Tenet and representatives of

9   HSRE about providing debtor-in-possession financing, but

10  those discussions did not progress far at all.

11          Ultimately, the debtors received two indicative

12  term sheets for proposed debtor-in-possession financing prior

13  to the petition date from parties other than MidCap.

14          Mr. Victor would testify that he, the debtors, and

15  the debtors' counsel negotiated with these parties to attempt

16  to obtain the best financing possible under the

17  circumstances.

18          He would further testify that he and the debtors

19  evaluated the perspective lenders and their proposals on a

20  number of factors including economic terms, timing and due

21  diligence requirements, the impact on the debtors'

22  businesses, the restrictions on the use of the proceeds, and

23  the collateral and security packages requested.

24          After carefully analyzing each proposal and

25  following negotiations, Mr. Victor would testify that the

1  debtors were unable to obtain financing from sources other

2  than MidCap on better terms than those offered by MidCap and

3  is reflected in the debtor-in-possession financing facility.

4         Mr. Victor would further testify that even after

5  the petition date, he and the debtors engaged in discussions

6  with a perspective lender regarding debtor-in-possession

7  financing that would provide the debtor with more incremental

8  liquidity, but this perspective lender required the priming

9  of MidCap's secured claim.

10        Mr. Victor would testify that he, the debtors, and

11  their other professionals spent the better part of July 4th

12  and the July 4th holiday weekend exploring whether the

13  debtors could prevail on a priming debtor-in-possession

14  financing facility and they continued to negotiate with this

15  perspective lender.

16        Mr. Victor would testify that he believed that

17  MidCap is significantly over-secured, it was not certain that

18  the debtors could win a contested priming fight given the

19  evidence then available and the limited time available to

20  prepare for such a contested process.

21        Ultimately, Mr. Victor would testify that he and

22  the debtors concluded that the risk to patient safety was too

23  great and rejecting MidCap and attempting to obtain court

24  approval of a different priming financing facility.

25        Finally and subsequent to entry of the interim

1  order approving debtor-in-possession financing, Mr. Victor

2  would testify that he and the debtors negotiated with another

3  potential lender to provide additional debtor-in-possession

4  financing that would be used to satisfy a portion of MidCap's

5  debt and provide additional liquidity to the debtors.

6          The fees and costs associated with this proposed

7  loan, however, were too high and the proposal required

8  funding to be placed in escrow only to be used as directed by

9  MidCap.  Thus, the limited incremental additional liquidity

10  would be very expensive and provide little additional benefit

11  to the debtors' estates.

12          For these reasons, this proposal was not pursued

13  by the debtor.

14          Mr. Victor would further testify that he and the

15  other members of SSG have assisted the debtors in their

16  attempts to monetize their assets including the sale of the

17  debtors' residence program assets and the current marketing

18  of St. Christopher's Children's Hospital.  I should say the

19  operating assets of St. Christopher's Children's Hospital.

20          Mr. Victor would testify the efforts to sell the

21  debtors' residency program assets were a tremendous success.

22  On August 8th, 2019, Mr. Victor ran an auction for the

23  debtors' residency program assets, among three separate

24  qualified bidders.  The auction lasted approximately six

25  hours and consisted of approximately fifteen rounds of

1  bidding.

2          Ultimately, the debtors selected the final bids

3  submitted by the Thomas Jefferson University Hospital and a

4  group of participating members of the so-called consortium as

5  the highest and best bid for the debtors' residence program

6  assets providing aggregate consideration of $55 million

7  dollars broken down as $51 million dollars in cash, a $3

8  million dollar escrow, and a commitment to fund $1 million

9  dollars tail insurance for the debtors' residents.

10          Mr. Victor would testify that the winning bid

11  represents an increase of approximately $47.5 million dollars

12  over the stalking horse bid.  And, if approved, represents a

13  game changer for the debtors and their creditors.

14          Mr. Victor would testify that the hearing on

15  approval of that sale has been continued with the proposed

16  buyer's consent to a later date to provide parties with

17  additional opportunity to resolve certain objections to the

18  proposed sale.

19          Mr. Victor would also testify that by order dated

20  July 26th, 2019, the court approved the procedures to solicit

21  bids for the purchase of substantially all of the operating

22  asset of St. Christopher's Healthcare, LLC and certain

23  affiliates.  Pursuant to those procedures, the ultimate bid

24  deadline is September 16, 2019.

25          Mr. Victor would testify that he and the other

1  members of SSG are actively marketing those assets for sale.

2  There are currently several parties or groups engaged in

3  active due diligence for a possible purchase of the debtors'

4  St. Christopher Children's Hospital assets.

5          Based upon discussions to date, Mr. Victor is

6  highly optimistic that at least one party or group will

7  submit a qualified bid for the St. Christopher's Children's

8  Hospital operating assets.

9          Again, and based in part upon discussions with

10  potential bidders, Mr. Victor is optimistic.

11          I'm sorry, Your Honor.  Read the same thing twice.

12  I apologize.

13          While Mr. Victor did not prepare the budget before

14  the court today, he would testify that he is familiar with

15  that budget.  Similarly, he is familiar with the additional

16  amounts claim due by both Tenet and Conifer and HSRE.

17          Mr. Victor would testify that giving the $55

18  million dollar winning bid for the debtors' residence asset

19  program, the expecting that sale proceeds from the sale of

20  St. Christopher's, the value of the debtors other assets, for

21  example, equipment at Hahnemann University Hospital.

22          Mr. Victor would testify that he expects there to

23  be enough value in the debtors' cases at the end of the day

24  to pay the secured claims of MidCap and all anticipated

25  secured administrative claims in full including the claims --

1  including, I'm sorry; including the claims that Tenet,

2  Conifer and HSRE whatever the court ultimately determines

3  them to be.

4         Mr. Victor believes this to be the case regardless

5  of whether or not the residence program asset sale is

6  approved.  That would conclude his testimony.

7         THE COURT:  Mr. Sherman, do you wish to cross-

8  examine Mr. Victor?

9         MR. SHERMAN:  We do, Your Honor.

10        THE COURT:  All right, if you'll come forward, Mr.

11  Victor. And if you'll just remain standing in the witness

12  stand, we'll have your testimony affirmed.

13              J. VICTOR SCOTT, WITNESS, SWORN

14        THE CLERK:  Please state and spell your name for

15  the record?

16        THE WITNESS:  J. Scott Victor; V-I-C-T-O-R.

17        THE CLERK:  Thank you.

18        MR. SHERMAN:  May I proceed, Your Honor?

19        THE COURT:  Yes, you may, Mr. Sherman.

20        MR. SHERMAN:  Thank you, Judge.

21                    CROSS-EXAMINATION

22  BY MR. SHERMAN:

23  Q    Mr. Victor, when you sought capital for these debtors,

24  how much did you seek?  What was the ask as far as financing?

25  A    The ask was at least $55 million dollars.

1  Q    And how did you derive that number?

2  A    That's approximately what MidCap was owed.

3  Q    So, did you contemplate priming MidCap in any respect?

4  A    Yes.

5  Q    And what was the basis for that contemplation?

6  A    We received a term sheet from a potential lender for a

7  $10 to $15 million dollar priming debt.

8  Q    And in connection with the $55 million dollars you

9  asked for MidCap, how much additional liquidity would that

10 have provided the debtors for these bankruptcy cases?

11 A    It depends on how it was set up.

12 Q    Okay.  And then what did you ask for or what did you

13 negotiate with MidCap?

14 A    MidCap had approximately $20 million dollar term loan

15 secured by the Hahnemann real estate and approximately $36 to

16 $38 million dollar revolver.

17 Q    Okay.  And during your discussions with MidCap, did you

18 have discussions of how much liquidity the company needed to

19 operate during the bankruptcy cases?

20 A    Primarily, the CRO had those conversations.

21 Q    Okay.  As part of your negotiations with MidCap -- and

22 were you the primary individual doing the negotiations?

23 A    No.

24 Q    Who was the primary person?

25 A    The CRO and counsel.

1   Q     And that would be Mr. Wilen?

2   A     Mr. Wilen and Mr. Hampton.

3   Q     So, as far as the negotiations as far you were

4   involved, did you address any of the rollup issues that are

5   before this court?

6   A     Yes.

7   Q     And can you describe those discussions with MidCap?

8   A     Sure. My opinions to MidCap was that a rollup of a

9   revolver is one thing, but rolling up a term piece that's

10  primarily secured on non-debtor assets was very problematic.

11  Q     Okay.  And when you refer to non-debtor assets, when

12  you were out there shopping for this financing, did you

13  consider the non-debtor assets as part of those discussions?

14  A     Potentially, yes.

15  Q     And who did you have those discussions with on the non-

16  debtor assets?

17  A     All the potential alternative lenders.

18  Q     So that basically when you look for financing, you

19  looked at the debtors as the OpCo's, can I refer to them?

20  A     Yes.

21  Q     Okay. And the PropCo's you looked at the OpCo's and

22  PropCo's together?

23  A     Yes.

24  Q     And is it your belief that on an aggregate basis

25  looking at the OpCo's and PropCo's it's got greater value

1  than just simply the OpCo's?

2  A     Absolutely.

3  Q     Okay.  And that's simply because the real estate has

4  value in and of itself?

5  A     Correct.

6  Q     Okay.  And on an aggregate basis the OpCo's and

7  PropCo's the belief is that MidCap is over-secured?

8  A     Yes.

9  Q     And over-secured just based on the OpCo assets?

10 A     Certainly over-secured on their collateral which

11 includes PropCo assets of Hahnemann.

12 Q     Okay. Are you aware of any efforts by MidCap to seek

13 foreclose on the PropCo assets?

14 A     I'm not.

15 Q     And in connection with the negotiations were there any

16 discussions of the limitation of challenge rights which are

17 before this court today?

18 A     From me, not really.  I'm sure there were many

19 conversations with counsel.

20 Q     But as far as setting up the financing, you didn't get

21 into that level of detail?

22 A     I personally did not.

23 Q     And as far as the various waivers that are in the

24 financing, is it a similar answer?

25 A     Similar answer.

1  Q      Since the successful residence auction, have you

2  considered any alternative financing?

3  A      DIP financing?

4  Q      Yes, sir.

5  A      We have not.

6  Q      Do you believe that any efforts could be made to find

7  financing other than MidCap based upon the results of the

8  residence sale auction?

9  A      I think it would be extremely difficult because we have

10  enclosed on the sale of the residency program.  That if we do

11  that should provide sufficient liquidity which would not

12  require any further DIP financing from another source.

13  Q      And can you explain that?  I just want to understand so

14  you can --

15  A      Well, the net proceeds from the sale of the residency

16  program is $51 million dollars.  And to the extent that's

17  unencumbered, that would be $51 million dollars of liquidity

18  available to the estate to fund any potential shortfall in

19  the DIP budget.

20  Q      So, you would look at it as the two would effectively

21  be in tandem.  You would have the MidCap financing and then

22  you'd have --

23  A      Additional cash, right.

24  Q      Additional cash in the residence programs.

25  A      Yes.

1           MR. SHERMAN:  No further questions, Mr. Victor.

2           THE COURT:  All right, Mr. Sherman.

3           Anyone else wish to cross-examine Mr. Victor?

4           We have a taker.  Good afternoon.

5           MR. HAYDEN:  Good afternoon, Your Honor.  Kent

6   Hayden on behalf of Tenet and Conifer.

7           THE COURT:  All right.

8                      CROSS-EXAMINATION

9   BY MR. HAYDEN:

10  Q     Hello, Mr. Victor.

11  A     Hello.

12  Q     We met before, but again Kent Hayden.  I just have a

13  few questions for you.

14  A     Sure.

15  Q     The residency sale is subject to the United State

16  Government's approval --

17  A     Correct.

18  Q     Correct?

19  A     Yes.

20  Q     And as of today, the government has not approved the

21  residency sale, is that right?

22  A     Correct.

23  Q     Now in your proffer, it was stated that there would be

24  sufficient liquidity to pay administrative expenses in full

25  even if the residency sale did not go through, is that

1  correct?

2  A      Correct.

3  Q      And that testimony is based on the assumption that

4  debtors will successfully sell St. Christopher's Hospital, is

5  that correct?

6  A      As a going concern, yes.

7  Q      As you sit here today, debtors do not have a stalking

8  horse for the sale of St. Christopher's Hospital, is that

9  correct?

10 A      Correct.

11         MR. HAYDEN:  No further questions.

12         THE COURT:  All right, thank you, Mr. Hayden.

13         Mr. Brown.

14         MR. BROWN:  Your Honor, so as not to delay things,

15 we're trying to work out the stipulation on the amount and

16 we'd like to just reserve to recall Mr. Victor if there's a

17 necessity at the end of the hearing.

18         THE COURT:  All right that's fine.

19         MR. BROWN:  Thank you, Your Honor.

20         THE COURT:  That's fine with me.

21         Anyone else?  Any redirect, Mr. Minuti?

22         MR. MINUTI:  None, Your Honor.

23         THE COURT:  All right, thank you, Mr. Victor.  You

24 may step down, subject to being cross-examined by Mr. Brown.

25         (Witness excused)

1          MR. MINUTI:  Your Honor, again, for the record,

2   Mark Minuti.  My next proffer will be of Mr. Wilen, the

3   debtors' CRO.

4          THE COURT:  Yes.

5          MR. MINUTI:  With me today in the courtroom is Mr.

6   Allen Wilen.  If called to the stand, Mr. Wilen would testify

7   as follows.

8          Again, Your Honor, I'm going to skip most of Mr.

9   Wilen's background if that's acceptable to Your Honor.

10          THE COURT:  That's fine.  It's in the first day

11   declaration and that's fine.

12          MR. MINUTI:  Thank you, Your Honor.

13          Your Honor, while we'll skip most of it, I do want

14   to proffer just a couple of points on his background.

15          THE COURT:  All right.

16          MR. MINUTI:  Mr. Wilen would testify that he has

17   more than 25 years of financial and accounting experience, as

18   well as extensive experience advising insolvent and troubled

19   companies including numerous companies in healthcare industry

20   including hospitals in turnaround and crisis situations and

21   navigating such companies through turnarounds, sales, and

22   liquidation processes.

23          Mr. Wilen would testify that he's been involved in

24   approximately twenty-five matters involving distressed

25   hospitals and dozens of other matters involving distressed

1  healthcare providers.

2           Based on his experience, Mr. Wilen would testify

3  that he is familiar with hospital information technology

4  systems and billing and collecting methodologies, practices

5  and challenges in the healthcare industry.

6           Mr. Wilen would testify that he was appointed as

7  the chief restructuring officer of the debtors on April 8,

8  2019 and is serving as the CRO in these Chapter 11 cases.

9           Mr. Wilen would testify that each of the debtors,

10 as well as certain non-debtors are parties to a credit and

11 security agreement dated January 11th, 2018 which was

12 subsequently amended on September 20, 2018 with MidCap

13 Funding IV Trust and MidCap Funding H Trust.

14          One of the documents I handed you, Your Honor,

15 this is the loose document identified as Debtors' Exhibit

16 Number 14.

17          THE COURT:  Yes.

18          MR. MINUTI:  Mr. Wilen would identify that as the

19 prepetition credit agreement and amendment with the debtors

20 in these cases or between the debtors and MidCap in these

21 cases.

22          THE COURT:  All right.

23          MR. MINUTI:  Mr. Wilen would testify that the

24 prepetition credit agreement provides for credit facilities

25 consisting of a revolving loan facility of up to $100 million

 1  dollars.   That's the revolver and a term loan facility of up

 2  to $20 million dollars.   That's the term.

 3        As of the petition date, the principal amounts

 4  outstanding under the revolver and the term were

 5  approximately $38.6 million dollars and $20 million dollars

 6  respectively.

 7        Mr. Wilen would testify that the prepetition

 8  credit facility is secured by a security interest in

 9  substantially all of the borrower's assets.

10        Mr. Wilen would further testify that non-debtors'

11  PAHS and Broad Street Healthcare Properties, LLC, Broad

12  Street Healthcare Properties II, LLC and Broad Street

13  Healthcare Properties III, LLC have guaranteed the

14  obligations of the borrowers under the credit facility.

15        He would further testify that it is his

16  understanding that the Broad Street entities guarantees are

17  secured by mortgages on all or substantially all of their

18  real estate and other assets.

19        Mr. Wilen would testify that on or about May 8,

20  2019, MidCap sent the debtors a notice of default and

21  reservation of rights under the credit facility and imposed a

22  default rate of interest thereunder.   The notice was based on

23  a number of alleged defaults including the debtors' alleged

24  payment defaults under the transition services agreement with

25  Tenet and the master services agreement with Conifer.

1    Mr. Wilen would testify that although MidCap

2 continued to provide funding under the prepetition credit

3 facility prior to the petition date, the level of funding

4 that was available under the credit facility was reduced in

5 light of certain reserves imposed and adjustments to

6 liquidity factors, each of which significantly constrained

7 the debtors' ability -- I'm sorry; each of which

8 significantly constrained the debtors' available working

9 capital and ability to procure needed supplies and services.

10    Mr. Wilen would testify that in the time period

11 leading up to the filing of these Chapter 11 cases, the

12 debtors with the assistance of SSG Capital Advisors attempted

13 to find alternative financing and solicited proposals for

14 financing from other parties.

15    Consistent with Mr. Victor's testimony, Mr. Wilen

16 would indicate that the debtors spoke to seven parties other

17 than MidCap about providing financing and those parties

18 included both Tenet and HSRE.

19    Mr. Wilen was in the courtroom when Mr. Victor

20 testified and he would confirm the efforts that Mr. Victor

21 outlined in connection with attempts to obtain alternative

22 financing.

23    Mr. Wilen would testify that following extensive

24 good faith and contentious, but arm's length negotiations,

25 the debtors agree to enter into the DIP facility by and among

1   the debtors and MidCap Financial Trust that is before the

2   court today.

3           Mr. Wilen would identify the document at Tab

4   number 1 of the debtors' exhibit binder as a true and correct

5   copy of the first priming superpriority debtor-in-possession

6   credit agreement and security agreement with MidCap.

7           He would also identify the document at Tab 2 of

8   the debtors' exhibit binder as a true and correct copy of the

9   debtor-in-possession budget dated as of August 15, 2019.

10          Mr. Wilen would testify that the debtor-in-

11  possession budget was prepared by Mr. Wilen and his

12  colleagues with input from certain of the debtors' employees.

13          Mr. Wilen is aware that certain parties have

14  suggested that the debtor-in-possession financing facility

15  provides the debtors with little or no "new money."  Mr.

16  Wilen would testify that this is not the case.

17          Under the DIP facility, and in Mr. Wilen's view,

18  MidCap is providing $7.8 million dollars in new funds

19  including a reserve established for the payment of fees

20  required under the debtor-in-possession facility.

21          Following the entry of the interim order, Mr.

22  Wilen would testify that MidCap provided $700,000 dollars in

23  new advances, net of fees, and became obligated for funding

24  the $2.5 million dollar professional fee carve-out reserve

25  under the DIP facility.

1       At the time MidCap imposed a $3.3 million dollar

2   Medicare reserve, but that reserve has gone down over time

3   and now stands at approximately $700,000 dollars.

4       Effective upon entry of the final order, MidCap

5   will be providing the debtors with an additional $2 million

6   dollars and, again, "new money."  These funds plus the use of

7   MidCap's cash collateral are critically necessary for the

8   debtors to operate, wind-down Hahnemann University Hospital

9   and liquidate their assets in these Chapter 11 cases.

10      Mr. Wilen would testify that obtaining access to

11  the debtor-in-possession facility including the use of cash

12  collateral is critical to the success of the debtors' efforts

13  in these cases.  He believes in the exercise of his

14  reasonable business judgment that the debtors need the

15  additional liquidity provided by the facility to address the

16  expenses of operating their businesses while in Chapter 11

17  and substantial costs of safely implementing the closure of

18  Hahnemann University Hospital and selling the debtors other

19  assets.

20      Mr. Wilen would testify that he believes that the

21  debtor-in-possession facility before the court represents the

22  debtors' best available financing option and is in the best

23  interest of the estates, their creditors, and all other

24  parties in interest and will enable the debtors to continue

25  to operate their businesses in Chapter 11.

1          For these reasons, Mr. Wilen would encourage the

2     court to approve the debtor-in-possession motion on a final

3     basis.

4          Mr.  Wilen would testify that he read the

5     objections to the debtor-in-possession motion filed by each

6     Tenet and Conifer, HSRE and the official committee of

7     unsecured creditors and is aware that each objector has

8     questioned whether or not the DIP facility provides the

9     debtors with access to sufficient funds to safely and

10    effectively wind-down Hahnemann University Hospital, operate

11    St. Christopher's Hospital and to get to market for those

12    assets.

13         In response, Mr. Wilen would testify that he

14    expects the liquidity provided by the DIP facility, along

15    with additional anticipated sources of revenue to be

16    sufficient to permit the debtors to execute on their Chapter

17    11 strategy.

18         He would testify that the budget attached to the

19    proposed final DIP order, that's Exhibit 2, Your Honor, was

20    carefully developed taking into account anticipated sources

21    of funding and anticipated costs through the budget period.

22         While the budget is extremely tight, Mr. Wilen

23    would testify that in his view, the budget is sufficient to

24    pay most anticipated expenses.  The budget is not sufficient

25    to pay the contract rate under the Tenet and Conifer

1  agreements and certain unanticipated additional amounts due

2  to HSRE.

3         Mr. Wilen would testify that debtors negotiated

4  with MidCap for additional liquidity including additional

5  funds that could be used to pay these parties but,

6  unfortunately, the debtor was unable to obtain additional

7  liquidity from either MidCap or any of the other parties that

8  the debtors spoke with.

9         Mr. Wilen would testify, Your Honor, that last

10  week the debtors finalized the closure plan for Hahnemann

11  University Hospital.  As a result, the debtors now have a

12  much clearer understanding of the funds that will be

13  necessary to implement that shut down plan.  And between the

14  funds provided under the DIP facility and additional funds

15  anticipated from other sources, he would testify that he

16  expects there to be sufficient funds available to pay the

17  anticipated costs and expenses of implementing the closure of

18  Hahnemann University Hospital.

19         Mr. Wilen would point out that the budget, that's

20  Exhibit 2, Your Honor, only runs through the week ending

21  November 8th and that there are anticipated sources of

22  funding for the debtors that are not reflected in the budget.

23  For example, the budget does not reflect any proceeds from

24  the sale of the debtors' residency program assets.

25         Further, Mr. Wilen would testify that the budget

1  does not include any proceeds from the proposed sale of the

2  operating assets of St. Christopher's Children Hospital.

3  Based upon the level of interest to date, Mr. Wilen expects

4  that the sale of the St. Christophe's operating assets will

5  result in additional significant proceeds for these debtors'

6  estates.

7          He expects that the sale of the operating assets

8  alone should be sufficient to retire the existing MidCap

9  secured debt.

10          Moreover, the budget does not include the value of

11  any equipment that sits at Hahnemann University Hospital.

12  There are significant equipment remaining at the hospital

13  including 399 hospital beds, defibrillators, monitoring

14  equipment a da Vinci Surgical System, to name a few.

15          Mr. Wilen would testify that this equipment will

16  eventually be sold to the highest and best bidder.  And in

17  Mr. Wilen's view, he expects the debtors' estate will receive

18  significant proceeds from the sale of this equipment. Again,

19  not contemplated or not included in the budget.

20          The budget also does not include recovery of any

21  causes of action held by the estates including, for example,

22  Chapter 5 causes of action.  Mr. Wilen would testify that no

23  preference analysis has been performed.  The court should

24  understand that in the ninety days prior to the petition

25  date, the debtors made approximately $36 million dollars in

1  payments to creditors.

2          Finally, the budget does not reflect proceeds from

3  the continuing collection of accounts receivable following

4  the sale of St. Christopher's Hospital -- I'm sorry;

5  following the sale of the St. Christopher Hospital assets and

6  the Hahnemann University Hospital receivables that will

7  continue to be collected beyond the budget period.

8          Assuming a closing of a sale of St. Christopher's

9  in October or November of 2019 and assuming the purchased

10  assets do not include the debtors' accounts receivable, the

11  debtors would expect to have uncollected account receivable

12  at that time of approximately $25 million dollars.

13          So, in sum, Mr. Wilen would testify that it his

14  belief and expectation that there will be sufficient funds in

15  the debtors' estates to execute upon the debtors' efforts in

16  these Chapter 11 cases and to pay all reasonable and

17  anticipated and allowed post-petition claims including any

18  unpaid allowed post-petition amounts due both Tenet and

19  Conifer and HSRE with or without the proceed of the residence

20  program asset sale.

21          Mr. Wilen is aware that the committee has taken

22  issue with a number of the terms of the DIP agreement as

23  expensive and inappropriate.  In response, Mr. Wilen would

24  testify that the DIP credit agreement was the result of

25  extensive, contentious arm's length negotiations between the

 1 | debtors and MidCap and that the debtors negotiated the best
 2 | terms possible under the circumstances.
 3 | Without any viable alternative, Mr. Wilen would
 4 | testify that the debtors concluded that the DIP facility
 5 | provided the only viable option for maximizing value for all
 6 | creditors in these cases.
 7 | Without the necessary financing, the debtors would
 8 | likely have filed these cases as Chapter 7 cases resulting in
 9 | significant risk to patient safety and a tremendous loss of
10 | value for these estates.
11 | Finally, Your Honor, and turning to the objection
12 | of HSRE.  With respect to HSRE, Mr. Wilen would agree that
13 | the debtors, St. Christopher Healthcare, LLC, is a party to
14 | several master leases with HSRE and that St. Christopher, in
15 | turn, subleases most of those properties to others including
16 | Drexel University.
17 | Mr. Wilen would testify that the sub-tenants pay
18 | sub-rent directly into one or more lockboxes controlled by
19 | HSRE for application to the rent due under the master leases.
20 | There is a differential in the amounts paid by
21 | sub-tenants and the amounts due under the master leases which
22 | amount is paid by the debtors.  In other words, amounts due
23 | from sub-tenants do not fully cover the amount due under the
24 | master leases.  St. Christopher has historically paid the
25 | difference.

1        Mr. Wilen would testify that at the time the

2   budget was created, the budget includes approximately

3   $350,000 dollars a month to pay the anticipated amounts due

4   under the master leases that is not paid by the sub-tenants.

5        Prior to July, the debtors were responsible for

6   paying taxing authorities directly for the real estate taxes

7   associated with the properties under those master leases.

8        Shortly before the petition date, HSRE issued

9   default notices to the debtors on June 20, 2019 and notified

10  the debtors that it was exercising its rights under the

11  master leases to require the debtors effective July 1 to pay

12  a pro rata share of real estate taxes on a monthly basis to

13  HSRE as additional rent under the leases.

14       Mr. Wilen would identify the document at Tab 3 of

15  the debtors' Exhibit binder, Your Honor, as an example of one

16  of the letters they received with respect to each of the

17  master leases which increased the rent under those leases

18  immediately prior to the petition date.

19       Mr. Wilen would point out, Your Honor, that as set

20  forth in that letter the amount HSRE is now including for

21  that referenced lease is overstated as the real estate taxes

22  include property that does not belong to the debtors, is not

23  leased by the debtor.

24       Mr. Wilen would testify that the debtors have paid

25  the amounts due under the master leases for July and August

1  but for the increased amounts related to the real estate

2  taxes.

3          Mr. Wilen would further testify, Your Honor, that

4  the debtors expect to file a motion to reject most of the

5  master leases before September 1, 2019; thereby, eliminating

6  that rent going forward.

7          The debtors do expect to pay any balance due HSRE

8  from the proceeds of the sales of the debtors' assets

9  including the residence program assets, equipment sales,

10 and/or the sale of the operating assets of St. Christopher's

11 Children Hospital.

12         With respect to HSRE's allegations in their

13 objection of an understanding or agreement on the part of the

14 debtors to act as a mere conduit for any rebates from

15 utilities including Philadelphia Electric Company, Mr. Wilen

16 would testify that he is not aware of any such agreement or

17 arrangement between HSRE and the debtors.

18         Mr. Wilen would further testify that the debtors

19 have not received any such rebates but if such rebates are

20 received those funds are currently not included in the budget

21 and could be used to pay HSRE additional amounts due under

22 their master leases.

23         Finally, Mr. Wilen would testify that to his

24 knowledge, there is nothing in the DIP agreement or the

25 proposed final order that would grant MidCap a lien or an

1  interest in any property that is owned by HSRE.

2          Your Honor, that would complete Mr. Wilen's

3  proffer.  And, at this time, Your Honor, I would move into

4  evidence the exhibits that I mentioned during his proffer.

5          THE COURT:  All right, is there any objection to

6  the admission into evidence of these exhibits that the

7  debtors have introduced?

8          MR. MINUTI:  Your Honor, just to be clear those

9  would be Exhibits 1, 2, 3, and 14.

10          THE COURT:  Right.  Okay.  Fine, yes.  Mr. Brown.

11          MR. BROWN:  Your Honor, no objection, although as

12  I've said and as Mr. Minuti advertised for the court, there

13  is a discussion about coming to the terms on either the

14  amount or relatively narrow range of what that deficiency

15  might be, comparing the budget to what's actually due on a

16  post-petition basis.

17          I rise at this point, Your Honor, because there

18  are six default notices and I understand Tab 3 only includes

19  one of them.  And they all have different amounts.  So with

20  the understanding that either we'll come to an agreement on

21  the number or a small range for a number of what the

22  deficiency is taking into account all six of those letters or

23  the testimony of Mr. DeLuise of FTI who is a financial

24  advisor engaged by HSRE for that purpose, I have no objection

25  to the admission of Tab 3, the document on Tab 3.

1          THE COURT:  All right.

2          MR. BROWN:  Thank you, Your Honor.

3          THE COURT:  Anyone else?  Mr. Hayden, yes.

4          MR. HAYDEN:  Thank you, Your Honor.

5          Just confirming that it was Exhibits 1, 2 and 3 --

6          THE COURT:  And 14.

7          MR. MINUTI:  And 14.

8          MR. HAYDEN:  Fourteen.

9          MR. MINUTI:  It's the prepetition credit

10   agreement.  It's not --

11          MR. HAYDEN:  Okay.  Yeah, we don't have any

12   objection to that.  Thank you.

13          THE COURT:  All right, thank you.  And those

14   documents are admitted into evidence by debtors.

15      (Debtors' Exhibits 1,2,3, 14 received into evidence)

16          MR. MINUTI:  Your Honor, I would then pass the

17   witness.

18          THE COURT:  All right.

19          Anyone wish to cross-examine Mr. Wilen?

20          MR. SHERMAN:  Yes, Your Honor.

21          THE COURT:  Mr. Sherman.

22          MR. SHERMAN:  Andrew Sherman for the committee,

23   Your Honor.

24          THE COURT:  All right.

25          Mr. Wilen, if you'll come stand in the witness

1 stand until you are -- your testimony is affirmed.

2                   ALLEN WILEN, WITNESS, SWORN

3         THE CLERK:  Please state and spell your name for

4 the record?

5         THE WITNESS:  Sure.  It's Allen Wilen; A-L-L-E-N,

6 W-I-L-E-N.

7         THE CLERK:  Thank you.

8         MR. SHERMAN:  May I proceed, Your Honor?

9         THE COURT:  You may, Mr. Sherman.

10         MR. SHERMAN:  Thank you, Judge.

11                  CROSS-EXAMINATION

12 BY MR. SHERMAN:

13 Q    Mr. Wilen, can you describe your initial involvement

14 with Hahnemann Hospital and St. Christopher's Hospital for

15 Children?

16 A    I was brought in, in March to be the chief

17 restructuring officer.

18 Q    And by whom were you brought in?

19 A    I was brought in by the management team.

20 Q    And who is that management team?

21 A    Primarily Mr. Freedman.

22 Q    Anybody else?

23 A    No.

24 Q    So basically you were hired by Mr. Freedman?

25 A    Yes.

1   Q    On behalf of whom?

2   A    On behalf of PAHS and its affiliated entities below

3 subsidiaries.

4   Q    And when you refer to those entities, are those the

5 entities that are Chapter 11 debtors in these cases?

6   A    Yes, it is.

7   Q    Were you retained on behalf of entities other than the

8 Chapter 11 debtors in these cases?

9   A    No, I am not.

10   Q    Okay.  And did you provide services for any entities

11 other than those debtors?

12   A    No, I did not.

13   Q    And what were you hired to do?

14   A    I was hired to assess the situation and see if I could

15 final a solution to work out the financial problems of the

16 hospital and come up with a restructuring for the hospital,

17 but it was pretty clear to me that that was a very difficult

18 task at the time period when I came in.

19   Q    And can you elaborate what you mean, it was very

20 difficult under the time period that you were brought in?

21   A    Well when we came in, we had financial stresses from

22 creditors.  I had creditors insisting on for every two

23 dollars I paid them, they give me one dollar of goods which

24 is what we referred to earlier and Mr. Minuti referred to the

25 large preference amount that may be out there and Chapter 5

1  cause of action number.

2       I had cash flow constraints from day one.  I had

3  operations that were, you know, at that point in time, we

4  were still trying to figure out what was going on with the

5  billing systems and why we weren't collecting cash, as well

6  as just, to some point, operational turmoil.

7  Q    Did you make a determination as to the viability of

8  Hahnemann Hospital or St. Christopher's Hospital for Children

9  on their ability to reorganize?

10 A    Well, St. Christopher's was easy.  St. Christopher's is

11 a gem and it is a very valuable asset to whoever buys it.

12 Hahnemann because of its patient mix and deterioration of the

13 patient mix, because of the actions of the Triple A partner

14 in that deal or inactions to some of their billing, other

15 things that were out, we ran into clearly difficulties in the

16 long-term success of Hahnemann staying viable.

17 Q    So at what point did you determine that Hahnemann was

18 no longer viable to operate?

19 A    Probably as we approached the time to make a decision

20 on a filing.  We were negotiating a potential transfer in

21 sale of the hospital and I say sale loosely because they

22 really were giving it away effectively at that time in

23 exchange for certain liabilities being assumed.

24       To Drexel University, we worked diligently with Drexel

25 and the City of Philadelphia and insurers and the unions to

1   try and get somewhere.  And almost within days of being told

2   by Drexel they no longer had interest in the investment

3   banker that we had no other choice but at that point in time

4   to start the process down the road of a filing and shutting

5   down Hahnemann.

6   Q    And when you were hired in March/April, what role were

7   you hired for?

8   A    I was hired to be the chief restructuring officer.

9   Q    And was your firm EisnerAmper also hired?

10  A    Yes, we were.

11  Q    And in what capacity?

12  A    We were also hired, one of my colleagues, Ron Dreskin,

13  was brought in to be the system-wide CEO and to provide

14  additional healthcare consultant services.

15  Q    And in conducting your duties for the hospital, did you

16  become familiar with its lending relationships?

17  A    Yes, I did.

18  Q    And can you describe for the court the lending

19  relationship that you became aware of?

20  A    So the lending relationship was a revolver agreement

21  with MidCap Financial that had some -- had fairly tight

22  constraints on it related to the availability of cash.  We

23  also had a term loan that was supported by and guaranteed by

24  the assets of a non-debtor.

25  Q    And can you elaborate, what do you mean, supported by

1  the assets of the non-debtor?

2  A     Well there's a mortgage and guarantee by the non-

3  debtor that owns the real estate in Center City Philadelphia.

4  Q     And effectively that's what we call the PropCo

5  entities, is that fair?

6  A     Well it's not all the PropCo entities.  It's just the

7  Center City Philadelphia PropCo entities around the Hahnemann

8  University Hospital.  It does not include the real estate St.

9  Chris.

10 Q     And at the time that you were hired, do you know if the

11 debtors were in default of their obligations to MidCap?

12 A     I would imagine they were probably in default at the

13 time I was hired, yes.

14 Q     And also at the time you were hired, did you gain an

15 understanding of the pricing of the original loan from

16 MidCap?

17 A     Yes.

18 Q     And can you describe the pricing?

19 A     The pricing was -- I'm trying to remember the exact

20 percentages, but it was fairly within range of what I thought

21 was a reasonable facility at the time before they kicked the

22 default rate.

23 Q     So was there original fee under the original facility?

24 A     Yes, there were.

25 Q     And was it about 1.5 percent multiplied by the

1  revolving loan commitment?

2  A    I believe that's correct.

3  Q    Okay.  And that would be on the $400 million?

4  A    Yes.

5  Q    And in connection with the term loan was there an

6  origination fee?

7  A    I believe there was.

8  Q    Okay.  And do you know if those origination fee

9  relating to the revolver and the term loan were paid?

10  A    I believe they were deferred.

11  Q    What do you mean by deferred?

12  A    They were not paid initially; I do not believe.  And I

13  believe part of this DIP facility is a portion of those being

14  paid.

15  Q    And do you know how much has been deferred?

16  A    I believe a million was deferred.

17  Q    Did you come to an understanding as to the total

18  annualized interest rate on the original MidCap facility?

19  A    Not that I recall today.

20  Q    And as far as the entities obligated to repay it's the

21  OpCo entities, which are Chapter 11 debtors, plus the PropCo

22  entities you referred to earlier?

23  A    It's the OpCo entities plus the Center City Healthcare

24  guaranteed PropCo entity, yes.

25  Q    Are there any personal guarantees or any other

1  guarantees?

2  A     I believe PAHS has a guarantee as well.

3  Q     And for the court's familiarity PAHS is the holding

4  company above?

5  A     Yes.

6  Q     Okay.  And that entity is not a debtor, right?

7  A     That's correct.

8  Q     Can you describe the collateral for the loans, both for

9  the term and the revolver?

10  A     Sure.  Well, technically, the collateral is all assets

11  of the debtors as well as the mortgage and the guarantee of

12  the PropCo entity, but primarily it's a receivables-based

13  loan on a borrowing base certificate that calculates

14  availability.

15  Q     And are you familiar with the term net realizable

16  value?

17  A     Yes, I am.

18  Q     And can you explain what that term means?

19  A     Well, it's the value that is achieved on a net basis at

20  the end of the calculation.  That's probably the easiest way

21  to describe it.

22  Q     And is the borrowing base based upon net realizable

23  value of the receivables?

24  A     Yes, it is.

25  Q     And who calculates net realizable value?

1  A     Well, its calculated via a borrowing base spread sheet

2  that's, you know, enormous, but it's based upon data from the

3  hospitals receivables base as well as calculations on things

4  like cross-aging, discharge on a final build; other types of

5  areas that we'd have in the hospital for receivables to come

6  down to a net realizable value or estimated view of the

7  receivable base.

8  Q     Have you formed a basis or a conclusion as to the value

9  of the net -- have you formed a basis for what you believe

10 the net realizable value of the debtor's receivables was as

11 of the petition date?

12 A     As of the petition date I probably can't give you an

13 exact number.  That number changes constantly.

14 Q     Do you believe the net realizable value exceeds the

15 MidCap debt or is below the MidCap debt?

16 A     It's well in excess of the MidCap debt.

17 Q     And well in excess do you mean a few million dollars of

18 a multiple of that?

19 A     Twenty to thirty million dollars in excess.

20 Q     So, it's your belief that MidCap is over-secured just

21 based upon the value of the receivables?

22 A     Yes.

23 Q     And that number -- that extent of over-secured nature

24 only increasing when you add in the non-debtor guarantors, is

25 that correct?

1  A     Correct.

2  Q     And can you give the court an order of magnitude by the

3  extent of the over-secured nature when you look at the value

4  of the debtor's collateral, plus the non-debtor's collateral?

5  A     I wouldn't know what the value of the non-debtor's

6  collateral is at this point, but it is clearly in excess of

7  the number I gave you before.

8  Q     So, would it be fair to say that the MidCap debt is

9  over-secured by at least $20 million dollars?

10  A     Yes.

11  Q     By at least $30 million dollars?

12  A     Possibly, yes.

13  Q     And in your experience with -- let me go back.  Mr.

14  Minuti, in his proffer, stated that you have been involved in

15  about twenty-five different hospital insolvency cases.  Is

16  that fair?

17  A     Yes, it is.

18  Q     And in connection with -- and your involvement meaning

19  was it CRO, financial advisor, what was your involvement in

20  those cases?

21  A     It's been a mixture of things from CRO to financial

22  advisor to a debtor representing a committee, representing a

23  secured lender.  So, I've handled all aspects of those cases.

24  Q     So, in connection with those services have you become

25  familiar with the nature of healthcare receivables?

1  A      Yes, I have.

2  Q      And have you also become familiar with how healthcare

3  receivables are collected?

4  A      Yes.

5  Q      And have you formed a basis or do you know whether

6  entities other than the providers can collect receivables --

7  collect healthcare receivables?

8  A      No.  Only the provider can collect those receivables.

9  Q      Have you ever had an experience where a lender has

10 directly collected receivables?

11 A      Usually, there is an agreement in place between the

12 lender and an acquirer of a provider agreement or license to

13 collect those receivables.

14 Q      So, without such agreement have you ever seen an

15 instance where a lender has directly collected receivables?

16 A      No.

17 Q      So, it's fair to say that when working with healthcare

18 receivables that the provider/lender relationship is somewhat

19 symbiotic in the sense that both entities need each other to

20 collect out the receivables?

21 A      Yes.

22 Q      Did there come a point in time when you became aware of

23 MidCap providing a default notice to the debtors?

24 A      Yes.

25 Q      And when, approximately, do you know that happened?

1  A     I believe it was in May.

2  Q     Do you know if that was a payment default or a covenant

3  default?

4  A     It was a covenant default.

5  Q     And what was the reason for the default?

6  A     I don't recall.

7  Q     Do you know what efforts, if any, were taken to cure

8  those defaults?

9  A     I don't think they were curable or else we would have

10 probably cured them.

11 Q     Curable meaning financial issues?

12 A     They were -- the defaults in question related

13 primarily, I believe, to certain of the financial covenants,

14 things like we didn't have financial statements that we

15 hadn't provided to them, things of that sort which we didn't

16 have the ability to get done.

17 Q     In your experience were those substantive defaults or

18 was it more of just defaults that are required on the loan

19 documents?

20 A     They were getting paid if that's what you're asking.

21 Q     They were just getting paid, but there was a hiccup

22 with financial reporting?

23 A     Correct.

24 Q     Anything other than financial reporting?

25 A     Not that I recall at this point.

1  Q     are you aware of what actions MidCap took to enforce

2  those defaults?

3  A     Well, they put in liquidity constraints.  They also

4  started to tighten our availability under that.  They put a

5  default rate in place of interest that was significant going

6  forward as well.

7  Q     And what do you mean by significant?  What was the

8  default rate of interest?

9  A     I think it was another three or four points.

10  Q     And that was three or four points that the hospital

11  could rarely afford or couldn't afford?

12  A     Clearly.

13  Q     That those dollars could have been provided to

14  healthcare rather than on a default rate of interest?

15  A     Yes.

16  Q     Do you know what actions, if any, MidCap took to

17  enforce the guarantees you referred to earlier?

18  A     Specifically, no.

19  Q     Specifically, do you know if MidCap has taken any

20  action to enforce the guarantees?

21  A     I'm assuming from based on discussions had they served

22  a default letter on those entities.

23  Q     So, are you aware of any foreclosure actions on the

24  PropCo entities?

25  A     No.

1 | Q      Any lawsuits relating to the guarantee entities?

2 | A      No.

3 | Q      Have you formed a basis of whether the non-debtor

4 | guarantor entities can satisfy the underlying obligations to

5 | MidCap?

6 | A      I have no idea what the value of that property is in

7 | total.

8 | Q      But there is a value, a significant value to the

9 | property we discussed earlier, right?

10 | A      Correct, except there are things like environmental

11 | costs and other things that may offset some of those values.

12 | Q      Can you describe what was due to MidCap on the revolver

13 | as of the petition date?

14 | A      I believe it was a little over $38 million dollars.

15 | Q      And based upon the borrowing base you referred to

16 | earlier was there any availability?

17 | A      Very limited.

18 | Q      And it was limited availability because of the

19 | constraints that were put in by MidCap?

20 | A      Correct.

21 | Q      So, effectively, the hospitals bargained for a hundred

22 | million dollar facility, but only thirty-eight million was

23 | outstanding?

24 | A      Correct.

25 | Q      Okay.  Do you know why the other sixty million wasn't

1  available?

2  A     Well, some of it was related to a lack of receivable

3  volume.  Okay.  The second part of it was related to

4  receivables that were cross-aging out and unavailable to use.

5  Part of that was because of the age of some of the

6  receivables that crossed out.  And then part of that was due

7  to what I'm going to call the black box issue which is

8  liquidity factors which are applied by MidCap that we have no

9  visibility to as to what those items are that squeeze the

10  availability for you from your borrowing base.

11  Q     So, its, effectively, the lender had discretion to

12  limit the availability?

13  A     Yes.

14  Q     But the debtors paid the fees based upon the full

15  hundred million, is that fair?

16  A     Yes, we did.

17  Q     But you never -- the hospital never got the benefit of

18  the full hundred million?

19  A     Never saw it.

20  Q     Do you know the maximum that was made available through

21  the life of the loan?  Do you have any idea?

22  A     I do not know.

23  Q     Okay.  Were you involved in the negotiation of the

24  MidCap financing as of the filing of the bankruptcy cases

25  here?

1  A      Yes, I was.

2  Q      And can you describe your involvement in those

3  negotiations?

4  A      Yeah.  I was heavily involved.  I was pushing for as

5  money as I could get.  They were contentious discussions.

6  Counsel and I were walking through these issues line by line

7  trying to figure out how to squeeze more cash, but we took,

8  basically, the best deal we could find.

9  Q      So, fair to say you were the lead negotiator?

10 A      Yes.

11 Q      And as far as the DIP financing you were negotiating is

12 it fair to say it's not really a new loan, it's just opening

13 up some blocks?

14 A      Correct.  They removed the $15 million dollar block

15 from the line.

16 Q      So, there's not a -- I mean, I guess its -- many times

17 in a Chapter 11 case you'd have a new facility that would

18 come in.  That's not what we have in these cases, right?

19 It's just the opening up of some blocks?

20 A      Effectively, yes.  I'm sure that MidCap would argue

21 differently because it is a new loan document in total, but

22 the biggest item is the release of a $15 million dollar block

23 on our availability.

24 Q      And how much of that release of the $50 million dollar

25 block is going to repay MidCap?

1   A     So, five million goes to pay down the term from twenty

2   to fifteen.  And then there's another million and a half that

3   goes to fees to MidCap.

4   Q     So, my math isn't good.  You're much better than I.

5   So, six and a half million on fifteen goes right to MidCap?

6   A     Correct.

7   Q     And then pulling down the fifteen there was a reserve

8   established at the beginning, right, on that fifteen.  There

9   was a Medicare/Medicaid reserve?

10  A     Yes, there was.

11  Q     And that was $3.3 million dollars?

12  A     Correct.

13  Q     So, really when you were doing your budget you were

14  looking at around $5 million dollars of basic liquidity to

15  run this Chapter 11 case?

16  A     Yes, approximately $5 million dollars; however, that

17  $3.3 million dollar number has shrunk to 700,000 now which

18  has freed up an extra 2.6 million which is how we got to the

19  $7.8 million dollar number that Mr. Minuti read in my

20  proffer.

21  Q     Two and a half of that is for professional fees, right?

22  A     Correct.

23  Q     And most of those professional fees are allocated

24  towards the debtor's professionals?

25  A     Yes.

1  Q      And how much is allocated toward the committee's

2  professionals?

3  A      I don't recall.

4  Q      About 325,000?

5  A      That's about right.

6  Q      How did that disparity happen?  I mean how did it come

7  to be that the committee's professionals were 300,000 and the

8  debtor's professionals were multiple times that?

9  A      Well, at the time all the work and effort that we

10  sought early on the case just to get us to this point was

11  going to be on the debtor's side.

12  Q      So, is it your experience as twenty-five cases that

13  $325,000 dollars is sufficient to pay committee

14  professionals?

15  A      In a case like this probably not.

16  Q      So, it's far in excess of that?

17  A      As is the $2 million dollars going to debtor's

18  professionals.

19  Q      So, the amount that's in the budget in addition to the

20  other liquidity constraints for professional fees is probably

21  insufficient to satisfy all those obligations.

22  A      Yes, but that was intended to be all the professional

23  fees in the case.  That was meant to just be a block for fees

24  if things went south, that was kind of carved out there for

25  professionals.

1  Q     Understood.  Are you familiar with the term minimum
2  liquidity reserves?
3  A     Yes.
4  Q     And how does that term apply to these cases or this
5  financing?  What are the minimum liquidity reserves in the
6  context of the MidCap plaintiffs?
7  A     Specifically I don't know off the top of my head.
8  Q     And as part of the negotiations how did it come to be
9  that there was a roll-up of the term loan by MidCap?
10 A     Well, it was part of the negotiation and as I said
11 before they were quite contentious.  We pushed back on the
12 issue.  We pushed back on the issue on the term side as well.
13 Q     What is the benefit to the debtors to rolling up the
14 term loan?
15 A     Well, it was requested by the lender and I really had
16 no other choice at that point in time.  As I said before, we
17 were down two in this case and I think it's important for
18 everyone to understand this.  I was down to the point -- I
19 was within hours of walking away from the table with this
20 transaction, and I had folks from my staff starting to put
21 together a plan to empty the hospitals, both of them, quickly
22 like as in days.  It would be the largest exodus of patients
23 from a hospital since Katrina.  Okay.  We were within hours
24 of that.  So, I took the deal I could take.  We negotiated
25 what we could and we took it.

1  Q    I'm just trying to understand the correlation between

2  opening up block so a revolver and a roll-up of the term

3  loan.  Why are the paths crossed or why are the streams

4  inter-related?

5  A    It was give and take in the negotiation.  We got

6  certain things we wanted.  We gave up other things in the

7  process of negotiating this deal.  This is not an auto plant

8  where you can say, well, just shut the plant for a week and

9  we'll figure out how we get this all done.  I had, you know,

10 bodies in the beds getting treated as patients.  Okay.  And

11 we had to get to a deal where we felt we could make this

12 work.  And that is where I got to on the deal I took.

13 Q    I understand, but I'm just trying to understand this

14 isn't, and correct me if my numbers are wrong, but there is

15 going to be more pay-down to MidCap, all right, 6.5 million

16 then liquidity available to the debtors.  I'm just trying to

17 understand how that's reasonable.

18        MR. MINUTI:  Your Honor, I'm going to object.  I

19 think counsel has made his point.  The witness has testified

20 he negotiated the best deal he could and he's made his point.

21 There are some things in here we didn't like either, but I

22 think we can move on or we're going to be here all day.

23        MR. SHERMAN:   Your Honor, I'm just trying to --

24 the standard that the court has to imply is reasonable.  I'm

25 just trying to figure out how we got here and what happened

1  in those negotiations because I'm learning it by the minute.

2              THE COURT:  I'll overrule the objection on that

3  basis, Mr. Sherman.

4              MR. SHERMAN:  I'm not going to go far with it,

5  Your Honor.  I'm just trying to understand how it came to be

6  that -- I'll reserve the rest for argument, Your Honor.

7              THE COURT:  Okay.  All right.

8  BY MR. SHERMAN:

9  Q    In addition to the MidCap pay-down or was it part of it

10 that there was a DIP origination fee?

11 A    Yes.

12 Q    And can you explain to me why there's an origination

13 fee when we simply have an extension of the original

14 facility?

15 A    Because, once again, it's another item that was in the

16 analysis that we had give and take on.  It was in their

17 proposed term sheet.  We looked at.  We said -- you know, I

18 wanted to push back on it further, but you know what I had to

19 give and take on things.

20 Q    So, are the debtors, basically, paying a fee upon a fee

21 in the sense that you paid for the hundred million at the

22 beginning and now we're paying another fee to open up a block

23 that was embedded in the hundred million?

24              MR. MINUTI:  Your Honor, I'm going to object to

25 the question.  That assumes that MidCap was required to

1 continue the loan.

2        MR. SHERMAN:  It's got nothing to do with

3 requirements.  I'm just trying to understand the fee.  I'm

4 trying to see how much the debtors are paying for this.

5        THE COURT:  I'll overrule that objection.

6 BY MR. SHERMAN:

7 Q    Is it, effectively, right that the hospital paid an

8 origination fee on the hundred million dollar loan and now

9 we're talking about opening up a block embedded in that loan.

10 So, you're paying a fee upon a fee.  Is that fair to say?

11 A    Well, the argument MidCap will make to you, and the

12 simple one they made to us which was it's a new loan and

13 that's what we're doing here.  So, they're paying a new loan

14 origination fee and it's not uncommon and I've seen done in

15 other cases that I've been involved with.

16 Q    Understood.  Just based upon the liquidity that's

17 opened up to this DIP is it your belief that all closure

18 costs at Hahnemann can be satisfied?

19 A    From the DIP alone?

20 Q    From the DIP alone.

21 A    No.  As we explained in my testimony earlier, we expect

22 proceeds coming from the sale of St. Christopher's OpCo.  We

23 expect, potentially, dollars coming from the sales of the

24 residency slots.  The equipment is worth probably in excess

25 of close to $5 to $10 million dollars.  So, there is

1  significant other assets along with the receivables that are

2  left at the end of the day in the case which will fund the

3  wind-down cost.

4  Q    So, as far as the liquidity being opened up by MidCap

5  is it sufficient to liquidate all of MidCap's collateral?

6  A    Yes.

7  Q    Well, so does your budget account for all trailing

8  expenses?

9  A    My budget only goes to November 8th.

10 Q    So, it doesn't have trailing expenses?

11 A    No, but as I said earlier, there are other sources of

12 revenue that are not included in that budget today that are

13 there to pay for and will pay the remaining costs.

14 Q    That's not my question, Mr. Wilen.  I'm trying to

15 understand that we're now through a process where we're

16 liquidating out the receivables and the other assets of the

17 debtor that's collateral for MidCap, right?

18 A    Correct

19 Q    And there's a cost associated with that liquidation.

20 A    Correct.

21 Q    And are the costs in connection with that liquidation

22 in excess of the budget or in excess of the amounts being

23 provided by MidCap?

24 A    During the budget period?

25 Q    Yes.

1  A      Yes.

2  Q      And how long is the MidCap facility?  When's the

3  maturity of it?

4  A      Well, effectively, the target date is, I believe,

5  October 4th, the proposed date of the closing on the sale of

6  St. Christopher's.

7  Q      So, it's fair to say that the time period for this

8  lending is ninety-four days approximately?

9  A      Yes.

10 Q      Have the debtors invested MidCap's role in creating the

11 organizational structure of the debtor?  What diligence did

12 the debtors do as far as the stipulations and waivers that

13 are in there?

14 A      Related to what issue?  There are lots of stipulations.

15 Q      There are lots of stipulations and waivers as to the

16 organizational structure and whether there are any potential

17 claims against MidCap.  Have you done any diligence on

18 potential claims against MidCap?

19 A      We have looked at some of those.

20 Q      And who is we?

21 A      Myself along with my counsel.

22 Q      So, under the facility those claims are going to be

23 waived in three and a half weeks, right, if there's no

24 challenge made.  I'm just trying to figure out what

25 diligence, if any, happens if those claims are --

1   A     So, we didn't see anything from my experience that

2   would have led me to believe there's a cause of action.

3   Based on representations of counsel they looked at liens,

4   they looked at other things along the way, whether it be in-

5   house counsel or exterior counsel.  But I assumed that the

6   committee would do that as well.

7   Q     And do you know what -- so, under the existing loan the

8   committee has, what, sixty days from formation to do that?

9   A     Yes.

10  Q     And that expires in mid-September.  So, effectively,

11  under the proposed order before the court the committee has

12  three and a half weeks to investigate and bring those claims,

13  right?

14  A     Correct.

15  Q     And get standing, right, because the order doesn't

16  provide for standing of the committee?

17  A     I'm not a lawyer.  So, I would assume so.

18  Q     I understand.  And do you know or did you negotiate any

19  issues with MidCap?  So, if their lien was bad what would

20  happen with the roll-up?  Would there be a potential roll-

21  back?

22  A     No, I did not.

23  Q     And in connection with the DIP financing there are

24  various references to actions by non-debtors.  Are you

25  familiar with that?

1  A      Yes.

2  Q      So, can you help me understand why an action by a non-

3  debtor could affect the ability of the debtors to borrow in

4  these cases?

5  A      I think the issue MidCap was concerned about was some

6  of the actions of the guarantors and/or the principal may

7  initiate.

8  Q      So, from a fiduciary standpoint as a chief

9  restructuring officer, I'm just trying to understand how you

10  believe you're going to be able to obtain a facility that

11  could be premised upon conduct that's under other's control.

12  Why is it there or is that just part of the give and take?

13  A      That's part of the give and take.

14          MR. SHERMAN:  I have nothing further, Your Honor.

15          THE COURT:  All right.  Mr. Sherman, thank you.

16          Let's let Mr. Hayden go first.

17          MR. HAYDEN:  Thank you, Your Honor.

18          Your Honor, may I approach the witness to hand-up

19  a copy of Tenet's binder?

20          THE COURT:  Of course, yes.

21                    CROSS EXAMINATION

22  BY MR. HAYDEN:

23  Q      Good afternoon, Mr. Wilen.

24  A      Good afternoon.

25  Q      We met at your deposition, but, again, for the record

1  I'm Ken Hayden.  I'm one of the attorneys for Tenet and

2  Conifer in this case.

3      Now, Mr. Sherman covered a lot of ground about the DIP

4  more generally.  I'd like to focus and ask you some questions

5  about the DIP's treatment of debtor's post-petition

6  administrative expenses.

7      So, I'd like to start with the TSA and MSA.

8  Philadelphia Academic Health Systems or PAHS is one of the

9  debtors in this case, is that correct?

10 A    Yes.

11 Q    And would you mind turning with me to Tab 24 in this

12 binder?  Are you familiar with Tab 24, Mr. Wilen?

13 A    Yes, I am.

14 Q    And is Tab 24 an accurate org chart of the debtors and

15 some of their affiliated entities?

16 A    Yes, it is.

17 Q    And do you see on the left toward the top, Philadelphia

18 Academic Health Systems LLC?

19 A    Yes.

20 Q    And so PAHS is a parent to many of the debtors in this

21 case, is that correct?

22 A    That's correct.

23 Q    Now, PAHS entered in January 2018 into a transition

24 services agreement with Tenet, is that correct?

25 A    That's correct.

1  Q    And at the same time they entered into a master

2  services agreement with Conifer, is that right?

3  A    Yes.

4  Q    Under the TSA with Tenet, Tenet administers electronic

5  medical records and related technology systems for the

6  hospitals.  Is that correct?

7  A    Yes, it does.

8  Q    And PAHS -- excuse me, and under the MSA Conifer

9  provides on-sight revenue cycle management services and

10 patient facing administrative services?

11 A    Yes.

12 Q    Under the MSA Conifer also tracks and collects payments

13 and patient receivables using proprietary software, is that

14 correct?

15 A    Yes.

16 Q    Now you were not involved in the negotiation of either

17 the TSA or the MSA, is that correct?

18 A    That's correct.

19 Q    You'd agree with me that the services Tenet provides

20 under the TSA are central to the debtor's ability to operate

21 the hospitals, is that correct?

22 A    Yes, they are.

23 Q    And similarly the services Conifer provides under the

24 MSA are also central to the debtor's ability to operate the

25 hospitals?

1  A     Yes.

2  Q     And Tenet and Conifer have performed, under the TSA and

3  MSA, since the debtor's acquisition of the hospitals.  Is

4  that right?

5  A     Performed, yes.

6  Q     And debtors have taken the position that both the TSA

7  and the MSA are still in force?

8  A     Yes.

9  Q     Now, under the proposed DIP debtors expect Tenet to

10 continue operating under the TSA.  Is that right?

11 A     Yes.

12 Q     And similarly, under the proposed DIP debtors expect

13 Conifer to continue operating under the MSA, is that correct?

14 A     Correct.

15 Q     And you began working with debtors late March 2019?

16 A     Yes.

17 Q     When you arrived debtors were not paying Tenet or

18 Conifer for their services under the TSA or MSA, is that

19 correct?

20 A     No, because there were issues with delivery of

21 services.

22 Q     And on May 2nd, 2019 Tenet and Conifer sent a letter to

23 debtors demanding payment of their unpaid invoices, is that

24 correct?

25 A     That's correct.

1  Q      Would you turn to Tab 14 with me, Mr. Wilen?  Are you

2  familiar with the document at Tab 14?

3  A      Yes, I am.

4  Q      Would you tell us what it is?

5  A      It's a termination notice of the TSA and the MSA.

6  Q      And you received this termination notice shortly after

7  Tenet and Conifer sent it, isn't that correct?

8  A      Yes.  Mr. Friedman forwarded it to me.

9           MR. HAYDEN:  I'd like to move to admit what's been

10 pre-marked as Tenet Exhibit Number 3 into evidence.

11          THE COURT:  Tenet Number 3?

12          MR. HAYDEN:  Yes.

13          THE COURT:  Any objection?

14          MR. MINUTI:  No objection, Your Honor.

15          THE COURT:  All right. It is admitted.

16      (Tenet Exhibit 3, admitted into evidence)

17          THE COURT:  That's the transition services

18 agreement, is that right, Mr. Hayden?

19          MR. HAYDEN:  No, I'm sorry.  There's confusion.

20 So, Tab 14 has a sticker on it that says Exhibit 3.

21          THE COURT:  I'm sorry.  I see now.  Yes, it is

22 admitted.

23          MR. HAYDEN:  Thank you, Your Honor.

24          THE COURT:  Tenet Exhibit 3 which is under Tab 14.

25          MR. HAYDEN:  Yes.  I apologize for that confusion.

1   We were shuffling things around a bit.

2            THE COURT:  I got you.

3   BY MR. HAYDEN:

4   Q    Now, Mr. Wilen, following your receipt of this letter

5   debtors negotiated with Tenet and Conifer regarding the

6   parties' various disputes.  Is that correct?

7   A    Yes, we did.

8   Q    And you were a party to those negotiations, is that

9   right?

10  A    Yes, I was.

11  Q    As a result of those negotiations Tenet and Conifer

12  agreed to a series of one-week extensions of their

13  termination of the MSA and TSA, is that correct?

14  A    Correct.

15  Q    And debtors agreed to make partial payments to Tenet

16  and Conifer while the parties negotiated, is that correct?

17  A    Yes.

18  Q    Initially, debtors paid Tenet and Conifer a combined

19  $125,000 dollars per week, is that right?

20  A    Correct

21  Q    And then later that amount was changed to $200,000

22  dollars per week?

23  A    Correct.

24  Q    The DIP budget in this case provides for $200,000

25  dollar weekly payments to Tenet and Conifer, is that correct?

1  A      That is correct.

2  Q      And the $200,000 dollars per week to be paid to Tenet

3  and Conifer in the DIP budget are based on the $200,000

4  dollar per week prepetition payments that were negotiated

5  among Tenet, Conifer and the debtors, is that correct?

6  A      The $200,000 dollars and the $125,000 dollar amounts

7  were never negotiated.

8  Q      Is it correct that the $200,000 dollar payments in the

9  DIP budget are based on the prepetition $200,000 dollar

10  payments?

11  A      Yes.

12  Q      You agree that $200,000 dollars per week is less than

13  Tenet and Conifer's combined contract rates under the MSA and

14  the TSA, correct?

15  A      Correct.

16  Q      And the $200,000 dollar weekly payment negotiated or --

17  strike that.

18        The $200,000 dollar weekly payment paid to Tenet and

19  Conifer prepetition was not the result of a determination of

20  the fair market value of Tenet and Conifer's services under

21  the MSA and TSA, is that correct?

22  A      No.

23  Q      It is correct?

24  A      It is correct, yes.

25  Q      Thank you.

1    And you understand that Tenet and Conifer contend that

2  the combined contract rate for their services under the TSA

3  and MSA is around $800,000 dollars per week, is that right?

4  A    Prior to the closing of Hahnemann, yes.

5  Q    The reason you proposed paying Tenet and Conifer

6  $200,000 dollars in the DIP budget is that you didn't have

7  cash available to pay them more, is that correct?

8  A    That's correct.

9  Q    MidCap wanted debtors to pay Tenet and Conifer more

10  than $200,000 dollars a week, is that correct?

11  A    They never specifically asked me that question, but I

12  know there was negotiations regarding getting more money to

13  Tenet, but I was never specifically asked for more dollars.

14  Q    I think that we may have a miscommunication.  Is it

15  your understanding that when you were negotiating the DIP

16  budget with MidCap that they wanted debtors to pay Tenet and

17  Conifer more than $200,000 dollars per week?

18  A    Yes, they wanted me to pay them more.

19  Q    Okay.  You never told MidCap that Tenet and Conifer

20  should not be paid more on account of the fair market value

21  of their services, is that correct?

22  A    Yes.

23  Q    And, in fact, you asked MidCap for more availability in

24  order to pay Tenet and Conifer more than $200,000 dollars per

25  week, is that correct?

1  A    Yes.

2  Q    And MidCap refused to provide more availability, is

3  that correct?

4  A    MidCap said I had plenty availability.

5  Q    And during your conversations with MidCap about the DIP

6  budget the issue of the market value of Tenet and Conifer's

7  services never even came up, is that right?

8  A    We did tell them that we had issues with the delivery

9  of services, but not the market value of those services.

10  Q    And, in fact, if you wanted to know the fair market

11  value of Tenet and Conifer's services under the MSA and TSA

12  you would have to sit down and do an analysis, isn't that

13  correct?

14  A    Correct.

15  Q    And you haven't done an analysis of the fair market

16  value of Tenet and Conifer's services under the TSA and MSA,

17  is that correct?

18  A    Not on the Tenet side, but I have a rough estimate of

19  what I think the Conifer services are worth.

20  Q    When did you do that analysis?

21  A    I've done it all along from the recent period, but, you

22  know, during my deposition I talked about the issue of I have

23  not done a detailed analysis and calculation and roll-up of

24  what Conifer and Tenet's services are.  I still can't tell

25  you what the Tenet services are worth, but I probably could

1  tell you what the Conifer services are worth.

2  Q    Now you just referenced your deposition.  You recall

3  giving a deposition in this case last week?

4  A    Yes, I do.

5  Q    And you were under oath at that deposition?

6  A    Yes, I was.

7  Q    Would you turn with me, there's a spiral bound print-

8  out of your deposition in that binder.  I'd like you to turn

9  to Page 63.  I'm going to direct your attention to Page 63,

10 Lines 9 through 15.

11     Now, during your deposition did I ask you this question

12 and did you give this answer?

13     "You haven't done an analysis of the fair market value

14 of Tenet and Conifer's services.  Is that correct?

15     Answer:

16     "Correct."

17     Did I ask you that question and did you give that

18 answer?

19 A    Yes.

20 Q    Okay.

21 A    But sitting down and doing an analysis, as you asked

22 here, and doing something in the back of my head, kind of a

23 rough analysis of what I think the services would be, are two

24 completely different things.

25 Q    And you did just testify that if you wanted to know the

1  market value of Tenet and Conifer's services under the MSA

2  and TSA you would have to sit down and do an analysis, isn't

3  that correct?

4  A    Correct.

5  Q    Now, the DIP prohibits debtors from paying Tenet and

6  Conifer more than $200,000 dollars a week.  Isn't that

7  correct?

8  A    It's in the DIP budget of $200,000 dollars a week, yes.

9  Q    And Tenet and Conifer are -- excuse me, strike that.

10   Debtors are unable to pay Tenet and Conifer more than

11  $200,000 dollars a week under the DIP budget, is that

12  correct?

13  A    There's no restriction on my DIP budget to individual

14  line item disbursements.  There is just a disbursements

15  amount that I keep in place for the budget.  I don't have the

16  -- I just don't have the availability to pay Tenet more than

17  $200,000 dollars.  That is what I budgeted for them.

18  Q    Again, I'm going to ask you to turn to Page 55 of your

19  deposition with me.  And I will direct you to Lines 15

20  through 18.  Mr. Wilen, during your deposition did I ask you

21  this question and did you give me this answer?

22   "It actually prohibits the debtors from paying Tenet

23  and Conifer more than $200,000 dollars a week, is that right?

24   Answer:

25   "Yes."

1       Did I ask you that question and did you give me that

2  answer?

3  A      In the DIP budget that's what it says $200,000 dollars.

4  I guess I misunderstood your question at the time of my

5  deposition, but the budget is $200,000 dollars.  There's a

6  disbursements line item in the DIP agreement that allows me

7  to -- I can pay what I want to pay.  That is a guideline for

8  budget purposes, but I have the ability to pay up to my

9  disbursement limits in my DIP week to week from a variance

10 perspective.

11 Q      If the DIP is approved debtors will be unable to pay

12 their post-petition obligations to Tenet and Conifer at the

13 full contract rate as those obligations become due, is that

14 correct?

15 A      Could you repeat the question again?

16 Q      If the DIP is approved debtors will be unable to pay

17 their post-petition obligations to Tenet and Conifer at the

18 full contract rate as those obligations become due, is that

19 correct?

20 A      That depends on whether I have a sale of the residency

21 slots go through.  The sale of the St. Christopher OpCo

22 entities, the sale of the equipment that we have.  If those

23 come through, we will be able to pay.

24 Q      And sitting here today all of those sales you just

25 mentioned have not been finally approved or negotiated, is

1  that correct?

2  A     Correct.

3         MR. HAYDEN:  I have no further questions at this

4  time.

5         THE COURT:  All right.  Mr. Hayden, thank you.

6         Anyone else?  Oh, I'm sorry, yes.

7         MS. SANTAMOUR:  Gretchen Santamour, Your Honor, on

8  behalf of MidCap Financial Trust.

9         THE COURT:  Yes.

10        MS. SANTAMOUR:  I just have a few questions for

11 Mr. Wilen.

12                         CROSS EXAMINATION

13 BY MS. SANTAMOUR:

14 Q     Mr. Wilen, Mr. Sherman solicited testimony from you

15 that the default rate was implemented on a revolver

16 prepetition, is that true?

17 A     I believe it was.

18 Q     And isn't it true that MidCap and the debtors

19 negotiated an interest rate on the post-petition revolver

20 that is equal to the non-default interest rate on the

21 prepetition revolver?

22 A     I believe that is correct.

23 Q     So, the interest rate on the prepetition revolver is

24 even less than the default rate that was in place

25 prepetition, correct?

1  A    On an interest rate basis, yes, but you add in all the

2  fees on the short timeframe it actually accelerates it.  It

3  increases the actual --

4  Q    I'm just talking about just limited to the interest

5  rate.  Is the actual interest rate that's being charged on

6  the post-petition revolver, in fact, less than the interest

7  rate that was in place in the revolver prepetition?

8  A    I believe so.

9  Q    Now the DIP origination fee are you aware that that's

10 due upon maturity of the revolver and has not been paid out

11 of the $15 million dollars in reserves that have been freed

12 up?

13 A    That is my understanding.

14 Q    Is the interest rate on the term loan significantly

15 higher than the interest rate on the revolver?

16 A    I believe the term loan actually, if I remember

17 correctly, is actually slightly higher, but I don't recall.

18 Q    Okay.  So, when the $5 million dollar payment on the

19 term loan was made the debtor really benefited by converting

20 that portion of the debt from a term loan debt to a revolving

21 debt because the interest rate on the revolver is lower, is

22 that correct?

23 A    Well, I would have rather had the $5 million dollars in

24 cash to spend.

25 Q    But assuming you didn't have the cash to spend, which

1   wasn't what MidCap was willing to do, wouldn't you agree that

2   the $5 million dollars was a wash from a principal

3   indebtedness perspective, but it actually now accumulates

4   interest at a lower rate?

5   A    Yes.

6   Q    Okay.  The committee has been focusing on the liquidity

7   that arises from MidCap releasing the reserves.  Doesn't the

8   debtor also benefit from liquidity by being able to borrow on

9   the accounts receivable rather than having to wait for the

10  collection of the receivables?

11  A    Yes, by definition.

12  Q    Thank you.

13       Do you know what the purpose of -- what the proposed

14  fees were for the other lenders that Mr. Victor was

15  negotiating with?

16  A    They range -- they were all over the place.  Some of

17  them were more expensive; some were less expensive, but had

18  limited availability; some had requirements related to third-

19  parties, but they were all over the place.

20  Q    But would you say that all of the fees and the

21  economics of the other proposals was in excess of what MidCap

22  was offering and what's on the table with the DIP financing?

23  A    Yes.  That's why I said I thought this deal was the

24  best I had on the table.

25            MS. SANTAMOUR:  Thank you, Your Honor.  No further

1    questions.

2            THE COURT:  All right.  Mr. Brown?

3            MR. BROWN:  So, in having a brief conference with

4    Mr. Hampton, who I believe had a brief conference with Mr.

5    Minuti, now may be an appropriate time for a very short

6    break.  But I think Mr. Minuti has a request of Your Honor to

7    which we have no objection.

8            THE COURT:  All right, Mr. Brown.

9            MR. MINUTI:  Your Honor, we would like to take a

10   break to see if we can reach agreement on the number that's

11   due HSRE.  A little unusual, we will need to talk to the

12   witness during the break about that point.  I don't think Mr.

13   Brown has any objection.  It really only goes to his issue,

14   but we'd like Your Honor to know we're going to do that.  And

15   if Your Honor has an issue then I guess we won't.  I think it

16   will be helpful because if we can agree on the number then it

17   will eliminate the need for Mr. Brown's witness, I believe.

18           THE COURT:  And this will only relate to HSRE your

19   discussion with Mr. Wilen, is that correct?

20           MR. MINUTI:  Absolutely, Your Honor.

21           THE COURT:  Any objection, Mr. Sherman?

22           MR. SHERMAN:  No, Your Honor.

23           THE COURT:  Mr. Hayden?

24           MR. HAYDEN:  No, Your Honor.

25           THE COURT:  All right.  That's fine.  Why don't we

1  take -- yes, Mr. Brown?

2          MR. BROWN:  I may have a couple of short

3  questions.

4          THE COURT:  At the conclusion?

5          MR. BROWN:  A couple questions following once we

6  agree on either the number or range of the number.

7          THE COURT:  All right. Well, this is an

8  appropriate time for a break.  Let's take ten minutes.  Is

9  that enough time?

10          MR. BROWN:  Should be, Your Honor.

11          THE COURT:  All right.  Ten minutes and then we'll

12  be back at ten after.

13      (Recess taken at 2:54 p.m.)

14      (Proceedings resumed at 3:09 p.m.)

15      (Call to Order of the Court)

16          THE COURT:  Thank you everyone.  You may be

17  seated.  I appreciate everyone's patience.

18          Let me just say this; I have to stop tonight at

19  quarter to five because my wife is away taking care of a new

20  grandson and there's a little dog at home waiting for me and

21  I've got to get home to her.

22      (Laughter)

23          THE COURT:  I don't know where we'll be at quarter

24  to five, but, hopefully, we will have made significant

25  progress.

1          MR. MINUTI:  Understood, Your Honor.

2          Your Honor, I think the good news is we used our

3 time during the break wisely.  And we've agreed to put a

4 stipulation on the record that I think will significantly

5 narrow Mr. Brown's cross-examination.  I know Your Honor is

6 disappointed not to hear from more from Mr. Brown.

7          THE COURT:  I am.

8          MR. MINUTI:  Your Honor, for today's purposes the

9 debtors will stipulate that the amount outstanding that has

10 not been paid to HSRE to date is approximately $750,000

11 dollars.  The debtors do expect to make a payment to them

12 this month which will bring the outstanding balance down to

13 approximately 400.  Then throughout the course of the budget

14 period, Your Honor, if the debtor does not reject the total

15 that will accrue during the budget period is approximately

16 $1.5 million dollars for purposes, again, of today's hearing.

17          So, I think with that stipulation we will

18 eliminate a witness, but I know Mr. Brown has some additional

19 questions of Mr. Wilen.

20          THE COURT:  Thank you, Mr. Minuti.

21          MR. MINUTI:  He will now correct anything I said

22 that was wrong and let him cross-examine the witness.

23          THE COURT:  All right.

24          MR. BROWN:  Mr. Minute said it correct, Your

25 Honor.  Again, Stuart Brown for the record.  Again, we're not

1    going to try to litigate our post-petition claim today.  So,

2    that's why Mr. Minute said for today's purposes it's in these

3    approximate amounts.

4              THE COURT:  Okay.

5              MR. BROWN:  I believe that's the essence of our

6    agreement.

7              THE COURT:  All right.

8              MR. BROWN:  Your Honor, I just have a couple of

9    follow-up cross-examination questions of Mr. Wilen if I may.

10             THE COURT:  Yes.

11                       CROSS EXAMINATION

12   BY MR. BROWN:

13   Q    Good afternoon, Mr. Wilen.  You testified that there

14   are certain opportunities for the debtor's estates to receive

15   additional revenues, is that right?

16   A    Correct.

17   Q    And you testified that that might include the sale of

18   equipment, is that right?

19   A    Yes

20   Q    And you testified that your, is it back of the envelope

21   analysis or, value for that equipment is somewhere between $5

22   and $10 million dollars to the estate?

23   A    Correct.

24   Q    And you testified that -- and that number is not in the

25   budget, right?

1   A       That is correct.

2   Q       And you testified that there was an auction sale for

3   the residency slots and the gross sale proceeds or gross sale

4   price was $55 million dollars, is that correct?

5   A       Correct.

6   Q       What's the net amount of the fifty-five that the

7   estates would realize if that sale can close?

8   A       I believe fifty-two million?

9   Q       I'm sorry.

10  A       I believe fifty-two million.

11  Q       Thank you.

12          Is that $52 million dollars on the budget?

13  A       No, it is not.

14  Q       You testified that the debtors spent about $36 million

15  dollars prepetition during the ninety days and I think you

16  testified that you were getting two for one benefits of that,

17  is that right?

18  A       Not for all of those dollars, but for a significant

19  amount.

20  Q       So, there may be some defenses to the preference in

21  analyzing those preference claims, is that right?

22  A       Correct.

23  Q       Have you done a preference analysis yet?

24  A       No, we have not.

25  Q       So, the $36 million dollars is a gross number and you

1  haven't yet calculated the net, is that right?

2  A    Correct.

3  Q    You testified that there may be a sale of St. Chris,

4  correct?

5  A    Correct.

6  Q    What are the components of the St. Chris sale?  Don't

7  they include the St. Chris operating assets, the St. Chris

8  real estate owned by non-debtor property companies and the

9  St. Chris parking garage owned by a non-debtor garage

10  company?

11  A    Well, I don't believe the garage is part of the sale

12  process.

13  Q    Okay.

14  A    I think we've offered it up to folks as something they

15  can assume a lease on or negotiate a purchase of, but that's

16  not necessarily our asset.  As it relates to the OpCo and the

17  PropCo issues the intention is to have a division at some

18  point in time as to how the proceeds get divided, but at this

19  point in time we have not had that discussion finalized with

20  the PropCo owners, but we're moving forward towards a sale.

21  And I have always found in my experience that when you have a

22  sale and you have a large batch of cash people all of a

23  sudden start having negotiations and discussions about how

24  you split it up.

25  Q    And you don't have any of those anticipated debtor

1  proceeds from that sale included in the budget, right?

2  A     That's correct.

3  Q     What other opportunities does the debtor have that are

4  not reflected in the current budget?

5  A     There are other potential causes of action the debtor

6  has.

7  Q     And can you identify one or two of those?

8  A     I believe one of them would be a Tenet/Conifer action.

9  Tenet actions are filed, the Conifer action has not been.

10  And there are actions, potentially, against other parties

11  that the hospital did business with.

12  Q     So, isn't it true that you haven't included any of

13  those revenue opportunities in the budget because they're

14  just speculative at this point?

15  A     Well, they're not speculative, but I believe that I

16  will get somebody to buy the equipment.  That I can tell you

17  for a fact, that's not speculative.  A sale of the hospital,

18  we've had people express interest already and put up

19  potential purchase price numbers.  So, that's not

20  speculative.

21  Q     But the debtor's share of the purchase price you don't

22  know yet?

23  A     No, I don't.

24  Q     And the sale value for the equipment you don't know

25  yet.  So, putting the numbers on the page and EisnerAmper or

1  you as CRO being unwilling to include those in the budget as

2  revenue sources in the budget apparently is suggesting, at

3  least, to me and I suggest to the court that those numbers at

4  this point are viewed as speculative by you?

5  A     I don't believe they're speculative.  I believe they

6  are items that will come in and the amount is to be

7  determined.  Just the same, the receivables we have

8  outstanding could be considered speculative because I have no

9  idea what's going to get collected especially based upon the

10 service level we've gotten.

11 Q     What are the costs that the debtor admits are not

12 included in the budget?  So, does the budget include storage

13 for patient records going forward?

14 A     No, it does not.

15 Q     Does the budget include -- well, the debtor has already

16 acknowledged the budget does not include all of the

17 obligations that may be owing to Tenet which, I guess, the

18 court will decide at some point today.

19      What do you think the total case professional's fees

20 will be in this case?  You testified that the carve-out is a

21 downside protection for the professionals, but you testified

22 -- isn't that right?

23 A     Yes, it is.

24 Q     And you testified that your expectation is that the

25 case professional fees will far exceed the carve-out, didn't

1  you?

2  A      Correct.

3  Q      What do you think that number will be?

4  A      Possibly as high as $5 to $7 million dollars.

5  Q      And is that reflected in the budget?

6  A      A portion of it is.

7  Q      So, do you have any -- have you filed a monthly

8  operating report yet?

9  A      We have not.

10  Q      What are the payables that the debtor has accumulated

11  so far on a post-petition basis?

12  A      We've been paying most of our vendors on a weekly

13  basis.  The only receivables we have at this point in time

14  are primarily related to Tenet/Conifer relationship, HSRE and

15  a handful of other vendors at this point in time.  Most of

16  which, the other vendors we've been paying in the ordinary

17  course.

18  Q      So, I think you said the only receivables.  Did you

19  mean payables?

20  A      Payables, correct.

21  Q      Okay.  When did the debtor purchase oxygen that's used

22  by the various tenants of the various buildings including of

23  the medical office buildings?

24  A      There's an issue related to oxygen tanks and who has

25  responsibility to fill those.  I know I have a meeting

1  tomorrow related to that issue.

2  Q    Right.  And who paid for it six months ago?

3  A    The debtor.

4  Q    Okay.  And has the debtor paid for it post-petition?

5  A    I do not know if we filled those tanks or not post-

6  petition.

7  Q    What other services that the debtor provides to -- the

8  debtor, St. Chris is the master sub-tenant, correct?

9  A    Correct.

10 Q    Master tenant, correct?

11 A    Correct.

12 Q    And it is the landlord for sub-tenants?

13 A    Correct.

14 Q    And it has certain obligations to provide services to

15 those tenants, correct?

16 A    Correct.

17 Q    And those tenants are complaining, are they not, that

18 the services that the debtors have been providing the debtors

19 no longer are providing or no longer are providing them

20 adequately, correct?

21 A    Certain items, yes.

22        MR. BROWN:  I have no further questions, Your

23 Honor.

24        THE COURT:  All right.  Thank you, Mr. Brown.

25        Are we finished with Mr. Wilen's testimony?  No,

1  Mr. Sherman?

2          MR. SHERMAN:  Sorry, Your Honor.  Some re-cross.

3          THE COURT:  All right.

4          MR. SHERMAN:  Again, for the record, Andrew

5  Sherman.

6                    RECROSS EXAMINATION

7  BY MR. SHERMAN:

8  Q     Mr. Wilen, Ms. Santamour asked you a couple questions

9  on pricing of the DIP a few minutes ago.  Do you recall that

10 testimony?

11 A     Yes.

12 Q     And I think the testimony was that there was no real

13 difference between the interest rates prepetition and post-

14 petition or I may have misheard it.  Do you remember that

15 line of questioning?

16 A     Yes, I do.

17 Q     So, do you recall prepetition whether there was a

18 difference between the interest rate on the term in the

19 revolver?

20 A     I believe there was.

21 Q     There was.  If I was to represent to you that under the

22 term loan, under the prepetition credit agreement that they

23 were the same.  I can read you the exact language and we can

24 get that out; however, under the DIP is there a difference

25 between the term and the revolver?

1   A      I believe so.

2   Q      And can you tell the court what the difference is?

3   A      I don't recall off the top of my heads.

4          MS. SANTAMOUR:  Your Honor, I think they're

5   misstating what's in the document.

6          MR. SHERMAN:  Let me read it, Your Honor.  I will

7   make it real easy.

8          THE COURT:  All right.

9   BY MR. SHERMAN:

10  Q      Let's read applicable margin which is in the credit

11  agreement.  I will --

12         THE COURT:  Is this the post-petition, the debtor-

13  in-possession?

14         MR. SHERMAN:  Debtor-in-possession of post-

15  petition agreements, Your Honor.

16         THE COURT:  All right.

17  BY MR. SHERMAN:

18  Q      "Applicable margin means, with respect to (A) revolving

19  loans that by their terms of this agreement bear interest

20  rate at the base rate."

21         Then, there's a change, Your Honor, it was 1.75 and

22  then got moved to 1.32.

23         "And (B) all other all other revolving loans and other

24  obligations other than the term loan 4.25; (C) in the hole,

25  the term loan bearing interest by the terms of this agreement

1  based upon the base rate 5.5 percent; and (D), the term loan

2  bearing interest by the terms of this agreement based upon

3  LIBOR rates, ten percent."

4       So, if the rates were the same pre-petition, post-

5  petition the revolver is at LIBOR plus four and now the term

6  is LIBOR plus ten.  Do you remember those negotiations how it

7  came to be that the interest rates went up in such a material

8  way?

9            MS. SANTAMOUR:  Objection, Your Honor.  Again, I

10  think that Mr. Sherman is misstating the documents.  The term

11  loan, and I have someone from MidCap who can clarify this,

12  but the term loan interest rate was the same post-petition as

13  it was prepetition.  And the interest rate on the revolver is

14  the same non-default interest rate on the revolver

15  prepetition.  That is in the documents.

16            MR. SHERMAN:  Your Honor, I'm also can reference,

17  I will tell you exactly where I'll reference, Docket 53, Page

18  10 of 30 which has the term sheet, Your Honor, which has

19  interest rate of the -- it says, in the middle of the page,

20  DIP revolver thirty day LIBOR fifty basis points floor, plus

21  425 BPS reset monthly.  DIP term loan thirty-day LIBOR, 50

22  BPS floor, plus a thousand basis points reset monthly.

23  BY MR. SHERMAN:

24  Q    Does that recall your recollection of where you are

25  post-petition?

1  A     See, we raised an issue.  I raised an issue and I read

2  the document myself and I'm trying to remember as I sit here

3  today because I had both my counsel as well as MidCap explain

4  to me that there was really no change.  So, I understand your

5  issue here of the LIBOR plus 10.  That really wasn't what the

6  structure was.  I'm trying to understand it exactly.

7       I think there might be a wordsmithing problem somewhere

8  in the document or misunderstanding, but I know I raised the

9  issue earlier on when I read it and said something didn't

10 make sense here. And they walked me through it and got me

11 comfortable with it that we were back to the numbers before.

12 So, I'm not sure if somebody else, you know, can explain this

13 along the way from MidCap if that's what it takes.  I know

14 they're here today, but I'm just saying that we walked

15 through it with everyone and got comfortable with the numbers

16 that matched up.

17           MR. SHERMAN:  Your Honor, we're happy too -- I

18 understand time is short, but there's a massive disparity now

19 between what the debtor even understands it's paying for this

20 loan which even raises more red flags of what's going on

21 here.  If the bargain was that the interest rate wasn't going

22 to change then, Your Honor, I just read from the docket. I

23 mean it was on the screen.  I'm just confused.  I don't know

24 if you want to take a break.  We can get a MidCap person up

25 and we can get the actual documents.

1          THE COURT:  Let me hear from -- may we hear from

2    Ms. Santamour at this point?

3          MS. SANTAMOUR:  Your Honor, if this is the only

4    issue at the end of the day with the DIP financing agreement,

5    I can guarantee you that we will all sit down and ensure that

6    the DIP financing hasn't changed, that its back to the

7    prepetition non-default interest rate on the revolver.  The

8    term loan interest rate will also remain the same as it was

9    prepetition.  I mean maybe it is a wordsmithing issue or we

10   can get -- my firm did not draft the documents, but we can

11   get Katie from Vetter to explain that to the committee

12   counsel, but I'm sure that's an issue that we can clarify.

13         MR. SHERMAN:  Your Honor, I'll make it really

14   clear.  I'll read it into the record.

15         Right from the prepetition, I think this is the --

16   I'll say term loan -- $20 middle lane, Bethesda, Maryland,

17   September 30th -- I'm sorry -- September 20th, 2018.

18         Paragraph 3:  Each borrower promises to pay

19   interest from the date hereof until payment in full hereof,

20   of the unpaid principal balance of the term loan evidenced by

21   -- evidenced hereby, Buddy, per annum rates were rates set

22   forth in the credit agreement, which is the same as the

23   revolver.

24         So, if you just take what this document says, they

25   match.  If you take the docket entry, which I just described

1  -- was it 53, Your Honor?

2          THE COURT:  Yes.

3          MR. SHERMAN:  Docket 53, Page 10 of 13, shows a

4  significant disparity that that the interest rate on the

5  revolver is, as I said, 30-Day LIBOR, 50 bips, plus 425 basis

6  points reset monthly.  The term is 30-day alibi, 50 basis

7  points was a thousand basis points.

8          THE COURT:  Okay.

9          MR. SHERMAN:  I just want to be clear of what's

10 before the Court and right now, I'm not and I don't think the

11 witness is, Your Honor.

12         MR. MINUTI:  Your Honor, I'm going to make a

13 suggestion.

14         THE COURT:  Yes, Mr. Minuti?

15         MR. MINUTI:  So, Mr. Sherman is reading from the

16 document.

17         THE COURT:  Yes.

18         MR. MINUTI:  What I heard was the witness testify

19 that it's something different.

20         THE COURT:  Right.

21         MR. MINUTI:  I heard the lender testify it's

22 something different.  It doesn't appear to me that we're

23 going to finish today so, it seems that this is a point that

24 we can clarify overnight.  Mr. Sherman can reserve all his

25 rights on that issue --

1            THE COURT:  Yes.

2            MR. MINUTI:  -- and we're going to come back

3   tomorrow, and have it clarified, or Mr. Sherman is going to

4   be correct and he can argue to Your Honor that it's too

5   expensive.

6            But it seems to me that with both the debtor, by

7   having about agreement that that is not correct what he read

8   into the record, and the lender agreeing, as well, maybe it's

9   just a question of the documents that we all need to fix

10  them.

11           THE COURT:  Does that suggestion, does that meet

12  your approval, Mr. Sherman?

13           MR. SHERMAN:  Yes, Your Honor.

14           THE COURT:  Okay.  All right.  Perhaps this

15  evening you can resolve that issue?

16           MR. SHERMAN:  Thank you, Judge.

17           THE COURT:  Yes.  Anyone else for Mr. Wilen?

18  Mr. Hayden?

19           MR. HAYDEN:  No, Your Honor.

20           THE COURT:  Mr. Minuti, anything further from you?

21           MR. MINUTI:  No cross-examination at this time,

22  relative to the DIP, Your Honor.  Thank you.

23           THE COURT:  All right.  Mr. Wilen, you may step

24  down, sir.  Thank you.

25       (Witness excused)

1           MR. MINUTI:  Your Honor, at this time, we talked

2    about moving to Conifer's witnesses --

3           THE COURT:  Yes.

4           MR. MINUTI:  -- so, I'll cede the podium at this

5    time.

6           THE COURT:  All right.

7           MR. WASDIN:  Good afternoon, again, Your Honor, on

8    behalf of Tenet and Conifer.

9           THE COURT:  Yes, sir.

10          MR. WASDIN:  Before I get started, I just want to

11   make clear that although we are sequencing the witnesses in

12   the way we discussed when the hearing began, It's our

13   understanding that we are creating a joint every other

14   evidentiary record for both, the DIP motion and Tenet and

15   Conifer payment motion.

16          THE COURT:  That's my understanding, as well.

17   Is that right, Mr. Minuti?

18          THE WITNESS:  This that is correct, Your Honor.

19          THE COURT:  Okay.

20          MR. WASDIN:  Your Honor, at this time, Tenet would

21   call Michael Maloney to the stand.

22          THE COURT:  All right.

23          MR. WASDIN:  He's the senior vice president of

24   corporate development at Tenet Healthcare.

25          THE COURT:  All right.  Very well.

1  Mr. Maloney.

2            MR. WASDIN:  There should be a binder up there.

3            THE WITNESS:  Okay.

4            THE COURT:  Good afternoon.  If you'll just remain

5  standing the witness stand, we'll have your testimony

6  affirmed.

7            THE CLERK:  Please raise your right hand.

8    MICHAEL MALONEY, WITNESS FOR TENET/CONIFER, SWORN/AFFIRMED.

9            THE CLERK:  Please state and spell your name for

10  the record.

11            THE WITNESS:  Mike Maloney, M-A-L-O-N-E-Y.

12            THE CLERK:  Thank you.

13            MR. WASDIN:  Your Honor, before I begin, I would

14  offer at this time, the transition services agreement, and

15  the master services agreement with the schedules of work into

16  evidence.

17            THE COURT:  Any objection?

18            MR. MINUTI:  No objection, Your Honor.

19            THE COURT:  All right, they are admitted, then,

20  Mr. Wasdin.

21       (Transition Services Agreement received in evidence

22  under seal)

23       (Master Services Agreement received in evidence under

24  seal)

25            MR. WASDIN:  Today, those documents have been

1   filed under seal and that's the reason why Mr. Minuti raised

2   this morning that we would be questioning generally regarding

3   their contents.

4               THE COURT:  Yes.

5               MR. WASDIN:  But I would also request that the

6   Court keep those documents under seal on this record.

7               THE COURT:  I'm prepared to do, that yes.

8                        DIRECT EXAMINATION

9   BY MR. WASDIN:

10  Q     Good afternoon, Mr. Maloney.  Could you please

11  introduce yourself to the Court.

12  A     Mike Maloney.

13  Q     Where do you work?

14  A     I work for Tenet Healthcare.

15  Q     What does Tenet Healthcare do?

16  A     Tenet Healthcare is a healthcare services provider.  We

17  offer services through our 65 hospitals across the country,

18  roughly 500 other sites of care, as well as services to other

19  health systems through our subsidiary, Conifer Health

20  Solutions, which collects revenue and does sort of other

21  back-office processing, patient access, and scheduling

22  services for health systems.

23  Q     What's your title at Tenet?

24  A     I'm the senior vice president of corporate development.

25  Q     And how long have you been?

1  A      That's right I've been at Tenet about five years.

2  Q      What are your responsibilities as the senior vice

3  president of corporate development?

4  A      So, I run all of our merger and acquisition divestiture

5  activities and I also have responsibility for real estate.

6  Q      How many hospitals have you sold while at Tenet?

7  A      Since I joined, we've sold approximately 22 hospitals,

8  here in the United States.

9  Q      Did you have any responsibility for the January 2018

10  sale of St. Christopher's and Hahnemann Hospital in

11  Philadelphia?

12  A      Yes, I did.

13  Q      What responsibility did you have?

14  A      So, I oversaw the process to find a buyer, the

15  negotiations with the buyer, and ultimately, you know,

16  getting the deal to close.

17  Q      When Tenet sells a hospital, does it typically agree to

18  provide interim IT services to the purchaser?

19  A      Yes, we do.

20  Q      What type of services will Tenet provide in that

21  setting?

22  A      So, the services -- the specific services provided are

23  sort of at the discretion of the buyer, but they typically

24  include all the information technological you would need to

25  operate a hospital day one.  It's very hard for a buyer to

1  step in on the date the deal closes and implement their

2  information technological solutions; it typically takes time.

3      So, we offer, as an accommodation to that buyer in

4  order to get the deal done, a transition services agreement

5  typically with a term of one to two years.

6  Q    Can you give the Court some examples of the type of

7  software or IT programs you might provide to a purchaser?

8  A    Sure.  So, things like patient medical records both, on

9  the hospital side and the physician-practice side; back

10 office accounting systems; patient, accounting, and billing

11 systems, et cetera, as well as desktop, hardware and

12 software, Microsoft Office, and we also provide support

13 functions for all of those various applications.

14 Q    Does Tenet provide those services directly or does it

15 pass-through services provided by third-party vendors?

16 A    Typically, most of those services are provided by

17 third-party vendors.  A lot of it is software licensing that

18 we've obtained licenses from those third parties and we make

19 those licenses available on an interim basis.

20     We also have contracts with other companies that

21 provide those services to us and we pass-through those

22 services.  I believe there might be some things, some of them

23 on sort of an ad hoc basis that Tenet personnel are directly

24 involved in.

25 Q    Does Tenet provide those type of interim IT services to

1  make a profit?

2  A      No, we do not.

3  Q      How does Tenet typically price those service

4  agreements.

5  A      So, when we ask -- the pricing -- the specific pricing

6  is developed by the folks on our information technology team

7  and what we ask those folks to do is put together a proposal

8  and a pricing schedule for a transition services agreement

9  that mirrors the pricing that was allocated to those

10  hospitals pre-sale.

11      And we do that because, as a buyer evaluates a hospital

12  for purchase and makes a determination of value, that expense

13  is embedded in the financial performed of that hospital, and

14  so, it's affected their view of value.  We merely continue

15  that same expense post-sale for, again, a period of one to

16  two years, allowing the buyer to transition into their own

17  solutions.

18  Q      Now, focusing on St. Christopher's and Hahnemann in

19  particular, in January 2018, did Tenet into a similar

20  transition services agreement with the purchasers of those

21  hospitals?

22  A      Yes, we did.

23  Q      Are you familiar with that agreement?

24  A      Yes, I am.

25  Q      Can you direct you to Tab 3 of the binder that's in

1  front of you.  Do you recognize the document on Tab 3?

2  A    Yes, I do.

3  Q    What is that?

4  A    It is the transition-services agreement.

5  Q    What services did Tenet agree to provide to St.

6  Christopher's and Hahnemann under the TSA    in particular?

7  A    You know, generally, it's sort of the set of

8  information technology I described before -- electronic

9  medical records for both hospital and physician practices,

10 back office accounting, patient-billing, and accounting, as

11 well as desktop software and hardware.

12 Q    Now, you said you sold over 20 hospitals; is that

13 right?

14 A    Yes.

15 Q    Is that type of IT support important to the operation

16 of a hospital?

17 A    I think it's absolutely critical.

18 Q    Could a hospital functions without it?

19 A    Not for very long, no, if at all.

20 Q    Earlier in your testimony, you mentioned Revenue Cycle

21 Management.  Can you tell the Court a little bit more about

22 what Conifer does.

23 A    So, Conifer is a company that was sort of developed out

24 of Tenet's revenue-collection efforts.  Event, it became

25 commercialized and began to offer those services to third

1  parties.  They provide patient billing, collection, as well

2  as services to, you know, schedule patients for procedures,

3  admit patients in the hospital, collect payment information,

4  et cetera.

5  Q    Okay.  Is Tenet affiliated with Conifer?

6  A    Tenet is the majority owner of Conifer.

7  Q    And do you know whether or not Conifer separately

8  provides any services to the Philadelphia hospitals?

9  A    Yes, they do.

10 Q    Which ones do they provide?

11 A    I believe they provide most of those services I just

12 described.

13 Q    Are Tenet's IT systems important to Conifer's work,

14 collecting cash for the hospitals?

15 A    Yes.

16 Q    Let's talk about the contract rates for both, Tenet and

17 Conifer.  Are you familiar with the amounts that Tenet and

18 Conifer bill under both, the MSA    and the TSA?

19 A    Yes.

20 Q    What is the approximate total monthly run rate for

21 services provided to the Philadelphia hospitals provided by

22 both, Tenet and Conifer?

23 A    It's approximately $3 million.

24 Q    And do you know how much the debtors' proposed DIP

25 budget would pay both, Tenet and Conifer per month?

1   A      Yes, approximately -- it's 200,000 a week, so a little

2   over 800,000 a month.

3   Q      And would a hospital purchaser be able to contract

4   directly with the vendors for the same services that Tenet

5   provides in connection with the hospital sale?

6   A      Yes.

7   Q      Of the 20 hospitals that you've sold, how many have

8   done that?

9   A      At the outset, almost none.  We had one buyer a very

10  sophisticated operator of hospitals, it was able to implement

11  information technology solutions very quickly.

12  By and large, our experience is most buyers want the TSA

13  to go the full term and often come to us and ask for an

14  extension of that term, because they haven't been able to get

15  acceptable solutions in place over a period.

16  Q      All right.  Is Tenet able to provide the services on an

17  interim basis cheaper than the purchaser would be able to

18  contract directly for it?

19          MR. DEMMY:  Objection, Your Honor; I don't think

20  there's been a foundation laid for that testimony.  I don't

21  think Mr. Maloney has been asked anything about his knowledge

22  of the pricing of services out in the market.

23          MR. WASDIN:  Mr. Maloney has sold 20 hospitals and

24  has worked with, I suppose, 20 or more purchasers to

25  negotiate transition services agreements.  He's familiar with

1  who signs on and who doesn't and why.

2         MR. DEMMY:  That's a different question.  He asked

3  him about what it would cost to provide -- to obtain these

4  services from somebody else, which is different than what Mr.

5  Wasdin just explained.

6         THE COURT:  I think that's true, Mr. Wasdin.  I'll

7  sustain that objection.

8         MR. WASDIN:  Okay.

9  BY MR. WASDIN:

10 Q    What's your view as to why purchasers of hospitals

11 typically to sign up for the TSA?

12 A    I think there's -- why they -- excuse me, why they?

13 Q    Why they opt to contract with Tenet for the IT services

14 versus directly with third-party vendors?

15 A    So, again, I think it's a very difficult thing for them

16 to implement day one -- they almost have to have us -- and I

17 think that we have also heard from several of our buyers that

18 the price at which we offer those services --

19        MR. DEMMY:  Objection, Your Honor; he's now

20 testifying about hearsay in connection with a question I just

21 had an objection sustained for.

22        THE COURT:  All right.  I'll strike that answer.

23 And you may ask the next question.

24 BY MR. WASDIN:

25 Q    Does Tenet sent invoices to PAHS, Philadelphia Academic

1  Health Systems, under the TSA?

2  A     We do.

3  Q     And in your role at Tenet, do you have assess to those

4  invoices?

5  A     Yes, I do.

6  Q     Have you reviewed the invoices sent to PAHS, under a

7  TSA, in preparation for your testimony today?

8  A     I have.

9  Q     Is there a lot of information in those invoices?

10  A     Yes, they're pretty detailed.

11  Q     So, have you helped us create a summary to aid the

12  Court in its understanding of Tenet's invoices?

13  A     We have.

14  Q     And does the summary that you helped us prepare

15  accurately reflect the amounts of the invoices and payments

16  under the TSA?

17  A     Yes, it does.

18  Q     I'll direct you to Tab 13(a) in the binder directly in

19  front of you.

20        Can you tell us what that document is?

21  A     This is a summary of the invoices for the TSA.

22             MR. WASDIN:  Your Honor, at this time, we would

23  offer in the Federal Rule of Evidence 1006 summary of the

24  invoicing payments under the transition services agreement.

25             MR. DEMMY:  I'm sorry, no objection.

1          THE COURT:  All right.  Then it is admitted.

2       (TSA Invoicing Summary received in evidence)

3          MR. WASDIN:  Your Honor, we prepared this summary

4   prior to some of the last -- over the last 24 hours.  There's

5   been some changes on the scope of evidence that came in

6   today, so I'm going to sort of skip over some of the

7   prepetition amounts that are referenced in this summary and

8   just try to focus our examination on the post-petition

9   amounts.

10          THE COURT:  All right.

11  BY MR. WASDIN:

12  Q    Before I do, Mr. Maloney, without getting into the

13  numbers, is it fair to say that Tenet was not getting paid

14  for has its services prior to the bankruptcy filing?

15  A    Yes.

16  Q    Can you tell the Court why Tenet was willing to

17  continue to perform under the TSA after PAHS quit making

18  payments.

19  A    Sure.  You know, I think it's a tough and complicated

20  situation for us, right.  We obviously have investors that we

21  have to answer to.  We don't typically provide services

22  without compensation for those services, but in this

23  instance, we worked for over three years to find a buyer for

24  these hospitals and we did that because we wanted to make

25  sure the hospitals had a solid future.

1    And not only -- I mean, we operated these hospitals for

2  about 20 years and wanted to see those services continue

3  citizens of Philadelphia, as well as further the mission of

4  Dreschler University medical school, and we knew that the

5  continued operation of these hospitals was critical for that;

6  therefore, you know, given what I said earlier about the

7  criticality of these information-technology services to the

8  operation of these hospitals, for us to terminate its

9  services would have brought about, I believe, the demise of

10 those hospitals very quickly, therefore, we elected to

11 continue to try to work out a solution with the is operators

12 over time to allow them to stabilize the financial operations

13 at the hospitals and secure a path forward.

14 Q    And notwithstanding Tenet's continued performance, did

15 there come a point when Tenet sent a letter of termination

16 related to us?

17 A    Yes, we did.

18 Q    Did you author that notice?

19 A    Yes, I did.

20 Q    Can you direct your attention to Tab 14 in the binder.

21 What is that document?

22 A    This is the termination notice.

23          MR. WASDIN:  And, Your Honor, I believe --

24          THE COURT:  It's already been marked, I believe --

25 it's already been admitted, I'm sorry.

1  BY MR. WASDIN:

2  Q     Mr. Maloney, when did you send the notice of

3  termination to PAHS?

4  A     On May 2nd, 2019.

5  Q     And if I can direct your attention to the top of Page 3

6  of that letter --

7  A     Yes.

8  Q     -- can you tell the Court what Tenet demanded at that

9  time?

10  A     We demanded that all accrued, but unpaid amounts be

11  paid within 15 days of the letter.

12  Q     After you sent that letter, what happened next?

13  A     The operators sort of re-engaged.  One of the reasons

14  that we sent this letter was that there -- we had been

15  attempting to work out a settlement and a path forward on

16  payment of the unpaid amount.

17       Those discussions had come to a halt and as a result of

18  this letter, there was reengagement about trying to work

19  towards the settlement and there was also the agreement to

20  begin paying us an amount per week.

21  Q     What was that amount that the debtors were -- or PAHS,

22  at that point, agreed to pay per week?

23  A     So, initially, it was $125,000 for both, Tenet and

24  Conifer.

25  Q     Did that amount go up?

1   A      Event, it was increased to 200,000, yes.

2   Q      And that was for both, Tenet and Conifer?

3   A      Yes.

4   Q      Why were Tenet and Conifer willing to accept those

5   payments?

6   A      Well, again, we had the reengagement from PAHS around

7   trying to work towards a settlement and we were told that

8   this would give them time to work towards that settlement.

9   Q      Mr. Maloney, do you believe that $200,000 a week

10  represents the market value of Tenet's services to the

11  hospitals?

12  A      I do not.

13  Q      Do you believe that $200,000 per week represents the

14  market value of both, Tenet and Conifer's services to the

15  hospitals?

16  A      No, I do not.

17  Q      Did Tenet reserve its rights to seek the entire amount

18  of its contract rate?

19  A      Yes, we did.

20  Q      Has Tenet continued to provide services under the TSA

21  since the debtors filed for bankruptcy?

22  A      Yes, we have.

23  Q      Directing your attention back to Tab 13(a), can you

24  tell the Court how much has Tenet invoiced under the TSA

25  since the debtors filed for bankruptcy?

1  A      Approximately $2.9 million.

2  Q      And how much of the 2.9 million of invoiced amounts

3  have the debtors paid?

4  A      Well, they've paid 1.2 for the combination of Tenet and

5  Conifer, and if we allocate that, roughly 50/50, that would

6  be 600,000 towards Tenet.

7  Q      What post-petition amounts for just Tenet remain

8  unpaid?

9  A      Approximately $2.3 million.

10 Q      One argument that the debtors have made is that Tenet

11 and Conifer should be paid less because costs will go down

12 after the Hahnemann closure.

13       First, can you tell the Court will Tenet will continue

14 to provide services to St. Christopher's regardless of

15 whether Hahnemann closes?

16 A      We will.

17 Q      Is Tenet currently still providing services to

18 Hahnemann?

19 A      Yes, we are.

20 Q      And do you know whether or not Tenet will continue to

21 provide those services in the future?

22 A      We will continue to provide them until asked not to

23 provide them.

24 Q      Since the debtors filed for bankruptcy, has Tenet fully

25 performed under the TSA?

1  A      Yes.

2  Q      Are the debtors paying Tenet the contract rate?

3  A      No, they're not.

4           MR. WASDIN:  I will pass the witness, Your Honor.

5           THE COURT:  All right.  Thank you.

6           MR. WASDIN:  I will pass the witness, Your Honor.

7           THE COURT:  All right.  Mr. Demmy, take your time.

8  When you're ready.

9           MR. DEMMY:  Thank you, Your Honor.

10          (Pause)

11                        CROSS-EXAMINATION

12  BY MR. DEMMY:

13  Q      Mr. Maloney, good afternoon.

14  We had the pleasure -- perhaps it was only my pleasure -- of

15  meeting you on Thursday when your deposition was taken; do

16  you recall that?

17  A      I do.

18  Q      Okay.  I want to ask an initial question about Tab

19  13(b), the summary, which is Tenet Exhibit 2?

20  A      Yes.

21  Q      What period of time does the invoice dated, July 17,

22  2019, relate to?

23  A      You know, I am not certain as to whether these are in

24  arrears or on the current month, so I'm sure if it's for July

25  or for June.

1  Q      Okay.  You would agree with me if that invoice was no

2  June services.  That would be a prepetition period and,

3  therefore, would not be a post-petition amount due, correct?

4  A      If it were for June, yes.

5  Q      Okay.  What month is the August 6, 2019, invoice

6  relating to?

7  A      Again, I'm not sure, but it would be the month

8  following the July invoice.

9  Q      So, you don't know whether or not Tenet bills in

10 arrears or in advance?

11 A      I'm not sure, no; not off the top of my head.

12 Q      You don't have any responsibility for sending out

13 invoices, correct?

14 A      I don't send the invoices out, no.

15 Q      And you do not prepare them either?

16 A      I do not prepare the invoices.

17 Q      And then the third column, it has the due date.  Do you

18 see that for both of the July 17 and the August 6th, 2019

19 invoices?

20 A      I do.

21 Q      And you'd agree with me that neither of those

22 obligations have yet come due; is that correct?

23 A      That's correct.

24 Q      And there will be additional payments made under the

25 DIP if it's approved up to August 31 and also up to September

1  2019, correct?

2  A    I suppose so, yes.

3  Q    And you've heard testimony here today about potential

4  additional sources of recovery, correct?

5  A    I have.

6  Q    Now, you mentioned that Tenet is a majority owner of

7  Conifer and it's on the order of about 75 percent; is that

8  correct?

9  A    That's correct.

10  Q    Awe know who else is the other owner of Conifer?

11  A    Yes, another one of its customers, a major health

12  system.

13  Q    Is that pursuant to a joint venture between Tenet and

14  the other customer?

15  A    Yes, it is.

16  Q    And I think you testified that a provision of the

17  services pursuant to the transition services agreements in

18  connection with sales of hospital facilities are done as an

19  accommodation to the buyer; do you recall that?

20  A    Yes.

21  Q    It's also providing a benefit to Tenet, is it not?

22  A    In that it ultimately enables a sale, yes.

23  Q    Because it would be extremely hard to sell the hospital

24  facility without those services be in places on day one?

25  A    That is correct.

1  Q     So, it's part of the facilitation of the sale process

2  that a transition services agreement was entered into?

3  A     Yes.

4  Q     Now, do any Tenet personnel -- are any Tenet personnel

5  involved in a provision of services to Hahnemann's and St.

6  Christopher's Hospital under the transition services

7  agreement?

8  A     I don't know, specifically, but there are people that

9  sort of administer the relationship and respond to requests

10 for help.  There's the ability for operators to ask for oh to

11 make ad hoc requests and I think those go for a Tenet person,

12 but I'm not sure day-to-day if there are Tenet people

13 directly involved in the provision of services.

14 Q     This is access to software through licenses that Tenet

15 holds, correct?

16 A     Yes, a lot of it.

17 Q     Well, most of it.

18 A     There's also support-desk functions, you know, help

19 desks.  There are data warehousing it's not just a software

20 license.

21 Q     Isn't the help desk and support functions provided by

22 an entity called NTT?

23 A     Yes.

24 Q     And that would not involve Tenet personnel, correct?

25 A     It's not Tenet personnel, that's right.

1  Q      Right.  And the NTT charge is passed through to the

2  debtor, pursuant to the TSA, correct?

3  A      That's correct.

4  Q      And you're aware that the debtor has entered into its

5  own arrangement with NTT at this time?

6  A      For some of the services that NTT provides, yes.

7  Q      Okay.  But for all the services for which help desk

8  appeared support services would have been provided under the

9  TSA; is that correct?

10 A      I believe that's true, yeah.

11 Q      Now, you testified, though, that the amounts included

12 in the TSA    were a function -- and if I get this wrong,

13 please correct me -- but it was a function of an allocation

14 of Tenet's enterprise-wide information technology expense as

15 it applied to Hahnemann's and St. Christopher's Hospital,

16 correct?

17 A      Yes.

18 Q      Okay.  And prior to the sale, Tenet did not analyze its

19 actual costs in providing information-technology services to

20 Hahnemann and St. Christopher's Hospital?

21 A      Not specific to the sale process, no.

22 Q      Well, did he do -- I'm sorry.

23 A      We're aware of our costs to provide them services

24 across the portfolio of hospitals.

25 Q      And you don't know what basis that allocation was made

1  to Hahnemann and St. Christopher's Hospital, do you?

2  A    It's the same basis we used to allocate those costs

3  across all of our hospitals, but I don't know the specifics

4  of the allocation formulas, no.

5  Q    Right.  And that information was provided by the IT

6  team, not by you or anybody in your direct reporting

7  capacity?

8  A    That's correct.

9  Q    And when you do the pricing under a transition services

10  agreement, Tenet does not go out to the market and look at

11  what other providers are charging, do they -- does it?

12  A    No, we do not.

13            MR. DEMMY:  May I approach the witness, Your

14  Honor?

15            THE COURT:  You may.

16  BY MR. DEMMY:

17  Q    This is --

18            MR. DEMMY:  Your Honor, for the record, I've

19  handed the witness the debtors' exhibit book, which I believe

20  Your Honor has and other parties have.

21            THE COURT:  Yes.

22  BY MR. DEMMY:

23  Q    And I want you to turn -- I'm sorry -- I need the

24  exhibit book myself.  Now, I'll direct your attention to

25  Tab 9.

1      Are you with me?

2   A    Yes.

3   Q    Do you know what is behind Tab 9 in the debtors'

4   exhibit book?

5   A    It's a monthly invoice for the TSA.

6   Q    Okay.  And you'd agree with me the date of the invoice

7   is August 6th of 2019?

8   A    I would, yes.

9   Q    Okay.  And based on your prior testimony, you don't

10  know if this is a bill for July or August's services?

11  A    It would appear as for July.

12  Q    And what do you base that on?

13  A    It says, "Information services fee:  July '19."

14  Q    Okay.  Does that refresh your recollection as to

15  whether Tenet bills in advance or in arrears?

16  A    Yes, it does.  It looks like -- it appears we bill for

17  the prior month (indiscernible).

18  Q    And this bill would be due -- the payment of this bill

19  would be due 45 days after August 6th, 2019, correct?

20  A    I think that's probably right, yes.

21  Q    Well --

22  A    Yes, that's correct.

23  Q    Are you certain about that?

24  A    Yeah.  And I referred to back to the earlier dates,

25  yes.

1  Q     Okay.  But the transition services agreement, itself,

2  provides for a 45-day billing cycle, right?

3  A     Yes.

4  Q     Okay.  Now, there are three items on Exhibit 9.  One is

5  an information services fee; one is an next-gen information

6  services fee; and one is an NTT charge -- variable charges.

7        Do you see those?

8  A     Yes, I do.

9  Q     Let's start at the bottom.  What --  the NTT charges,

10 we've dealt with NTT a little bit.  Help tell me what it is.

11 A     Well, again, I think -- and to clarify it earlier, I

12 believe that the transition from our -- so, our pass-through

13 entity of services to the debtors acquiring those services

14 directly from NTT has to do with on-site help at the

15 hospital, but I think there are still other services that NTT

16 provides, such as data warehousing, other things, that are

17 still passed through.  So, there's still some element of NTT

18 services that get passed through.

19       In addition, you know, there are ad hoc requests.  As I

20 understand it, you know, a request to run a certain kind of

21 report or related to various ad hoc services that may be

22 requested on a monthly basis that come through this line in

23 the invoice.

24 Q     In the transition services agreement, the amount for

25 NTT was originally put at $802,000; do you agree with that?

1  If you have to look at the transition services agreement,

2  that's at Tab 12.

3  A    And that's in the same book, right?

4  Q    Same book, yeah.

5  A    Is there a particular place in the agreement?

6  Q    There is.  If you look at Schedule 4-1 -- I'm not sure

7  how many pages into the agreement that is; it's close to the

8  end, say, about a dozen pages away from the end -- I'll

9  direct your attention to Paragraph 1(a)(c), under

10 "compensation" on that page, if you're with me?

11 A    Yes.

12 Q    And do you see the 802,000 -- I'm sorry.

13        MR. DEMMY:  I apologize.  I just realized I

14 started to talk about a number, so my apologies for that.

15 BY MR. DEMMY:

16 Q    But, do you see there's a number there for IT T or for

17 NTT, correct?

18 A    I do, as part of the information service fee.

19 Q    Right.  And that's for the pass-through amounts that

20 were chargeable under the transition services agreement, that

21 in the July bill were significantly reduced; is that correct?

22 A    Yes.

23 Q    Okay.  Now, if you'd go back to Tab 9 -- are you with

24 me?

25 A    Yes.

1  Q      There's a fee amount for next-gen information service

2  fees.  Can you tell me what that is.

3  A      So, next-gen provides, as my understanding, to sort of

4  primary services.  It's an electronic medical records for the

5  physician practices and it's also a revenue cycle tool for

6  those physician practices.

7  Q      Next-gen is a third-party; it's not related to Tenet?

8  A      It is a third party.

9  Q      And, again, this is a pass-through amount?

10  A      Yes.

11  Q      Okay.  So, the third item is information service fees,

12  do you see that?

13  A      Yes.

14  Q      What is comprised with information service fees?

15  A      Well, that is the bulk of the services in the TSA.

16  Again, it's the charges for licensing, I believe some of the

17  data storage, some of the other software that's used --

18  patient billing, et cetera -- is all comprised in that --

19  Q      This is the access to the software in other

20  applications that you testified about a little previously?

21  A      Yes, I believe so.

22  Q      Okay.  And you'd agree with me that that number is the

23  lion's share of the invoice?

24  A      It is.

25  Q      Okay.  That access to software and other problems in

1  say, May of 2019, was being accessed by a fully functioning

2  Hahnemann Hospital, correct?

3  A    Yes.

4  Q    Now, Hahnemann reduces its operations, you would agree

5  with me, there are less people accessing that software,

6  correct?

7  A    I don't know that.  I don't -- that would, obviously,

8  sort of depend on staffing at the hospital, but over time,

9  that would make sense.

10 Q    Are you aware that the staffing at the hospital has

11 significantly decreased after the filing of the bankruptcy

12 cases?

13 A    I am, yes.

14 Q    Okay.  Do you have any idea of the order of magnitude

15 of that decrease?

16 A    No, I don't.

17 Q    Okay.  Have you looked at that in connection with your

18 testimony, with respect to the fees chargeable under the

19 transition services agreement?

20 A    To the -- with regard to the staffing and the

21 hospitals?

22 Q    Yes.

23 A    No.

24 Q    Okay.  And that's because you don't think it has any

25 effect on amounts charged under the TSA, correct?

1  A     I'm not sure that it does, no, but I don't know.

2  Q     Okay.  Doesn't it stand to reason if less people are

3  using it, the access -- that are using that access to the

4  software, that the cost to Tenet would be less?

5  A     I'm not sure, again, how that -- I'm not sure if the

6  pricing is derived on a per-user basis or not, so I can't

7  really tell you.

8  Q     Would the value to the debtors if it had a lot less

9  people accessing that software, be less?

10 A     I can't really say what the value is.  I mean, if it --

11 I don't know.

12 Q     Okay.  All right.  That's fine.  Thank you.

13         MR. DEMMY:  I'm sorry, Your Honor.  Just let me

14 have one moment?

15         THE COURT:  Yeah, sure.

16     (Pause)

17 BY MR. DEMMY:

18 Q     You testified previously that the reasons that Tenet

19 was willing to continue providing services while not being

20 paid prepetition; do you recall that?

21 A     Yes.

22 Q     And you're also aware that the debtors have made climbs

23 against Tenet?

24 A     Yes.

25 Q     And without getting into the specifics and details,

1  because that's not what we're here to do today, you would

2  agree there are significant claims?

3  A     Yes.

4           MR. DEMMY:  One moment, Your Honor?

5           THE COURT:  Yes.

6           MR. SHERMAN:  I have no more questions at this

7  time.

8           THE COURT:  All right.  Thank you, Mr. Demmy.

9           MR. DEMMY:  If I could gather my things up, I will

10 be out of somebody's way.

11          THE COURT:  All right.

12     (Pause)

13          MR. DEMMY:  Your Honor, we don't have any more

14 questions for Mr. Maloney.

15          THE COURT:  All right.  You may step down, Mr.

16 Maloney.  Thank you.

17     (Witness excused)

18          MR. WASDIN:  Your Honor, Conifer would now call

19 David Dawson.

20          THE COURT:  All right.  Mr. Dawson?

21          MR. SHERMAN:  As Mr. Dawson is coming up, I will

22 just address any confusion over our Rule 1006 with respect

23 arrearage or whether it's the current month.

24          There's a line on there for the date of the

25 bankruptcy and the invoices are dated by their date, but we

1  are happy to resubmit that with any post-petition or

2  prepetition totals abdomen just put in the invoiced amounts

3  by the date of the invoice, if that's acceptable to Mr.

4  Minuti.

5          THE COURT:  I think they're fine the way they are,

6  but what do you think, Mr. Demmy?

7          MR. DEMMY:  Your Honor, if the witness' testimony

8  on that point is clear enough is his, I guess, not knowing,

9  so I don't know why the exhibit needs to be changed at this

10 point in time, but I guess if they want to change the

11 exhibit, I guess that's theirs to proffer.

12         THE COURT:  Mr. Wasdin, which is you were

13 preference.

14         MR. WASDIN:  Why don't we just submit one that

15 doesn't have the post-petition/prepetition line and avoid any

16 confusion on that issue.

17         THE COURT:  That will be fine.

18         MR. WASDIN:  The same issue will apply to Mr.

19 Dawson's, but we'll use what we have and then just clean it

20 up tonight at the same time.

21         THE COURT:  All right.  Excellent.

22         Mr. Dawson, good afternoon.

23         THE WITNESS:  Good afternoon.

24         THE COURT:  If you'll remain standing while your

25 testimony is affirmed.

1          THE CLERK:  Please raise your right hand.

2     DAVID DAWSON, WITNESS FOR TENET/CONIFER, SWORN/AFFIRMED.

3                      DIRECT EXAMINATION

4  BY MR. WASDIN:

5  Q     Good afternoon, Mr. Dawson.  Could you introduce

6  yourself to the Court.

7  A     My name is David Dawson.  I am the vice president and

8  chief client officer of Conifer Health Solutions.

9  Q     What does Conifer do?

10 A     Conifer works with healthcare providers to help

11 administer the revenue cycle.  Anything from the beginning of

12 the revenue cycle, a patient seeking services and registering

13 the patient for that services to the collection of cash after

14 services have been rendered by the hospital.

15 Q     Approximately how many facilities, medical facilities

16 does Conifer provide those services to?

17 A     Approximately 700.

18 Q     How long have you been the chief client officer at

19 Conifer?

20 A     I've been in this role -- my title changed in August

21 2017 when I also assumed our physician revenue cycle clients,

22 I've been in this role for hospital revenue cycle clients for

23 approximately five years.

24 Q     And broadly speaking, what are your respondents in that

25 role?

1  A      My responsibilities and the responsibilities of my team

2  are to be the primary contact for our clients.  We're

3  responsible for understanding our contracts and delivering

4  the services associated with those contracts.

5  Q      Let's break down the steps involved in Conifer's

6  revenue cycle management process.  Did you help us create a

7  demonstrative to help the Court in its understanding of that

8  process?

9  A      Yes.

10 Q      If you could turn to Tab 28 in your binder, all the way

11 at the end, and let me know if that's the demonstrative that

12 you helped us create.

13 A      Yes, it is.

14 Q      With reference to Tab 28, can you explain to the Court,

15 what's the very First Step in the revenue cycle process.

16 A      The very first step starts with a patient seeking

17 services at one of our clients, whether it be a hospital,

18 emergency room, an outpatient surgical center.  It starts

19 with that process, and then as you go down, the functions

20 that are associated with that patient seeking services, you

21 first have to schedule them.  There's a number of functions

22 related to the precertification of those services, validating

23 benefits, validating the services that they're going to be

24 getting from the provider will be covered by their insurance

25 company.  We have to admit them and register them when they

1  show up for those services, and finally for those patients

2  who do not have access to insurance to help pay for those

3  medical services, we have an eligibility enrollment team that

4  works with those patients, and based on certain demographic

5  information, we determine if they're eligible for a

6  government-sponsor program to hem them get registered and

7  certified for that program to cover those expenses.

8  Q    After the scheduling and registration phase, what's the

9  next step in the revenue cycle management processes?

10  A    The next step is actually the patient visit, whether it

11  be scheduled, something that's scheduled or they're coming

12  through the emergency room, and in that process, they're

13  actually receiving care from our clients, from the hospitals

14  or medical personnel, and in that process, there's a

15  diagnosis that's assessed based on the condition of the

16  patient or based on the services they're seeking.  Based on

17  that diagnosis code, there are procedure codes attached to

18  that based on the services provided to that patient during

19  that visit.

20       And at the end of that visit, those diagnosis and

21  procedures are then coded into a medical claim that can be

22  billed to either the patient and/or to an insurance company.

23  Q    And after the patient receives medical treatment and

24  the claims are coded, what's the next step in the revenue

25  cycle process?

1  A     The patient has been discharged and then the invoices

2  are billed either to the patient if they have no other

3  insurance or to the payor, and in this case, it could be a

4  private entity or it could be an government entity.

5       Through that billing process, we follow-up on those

6  claims to ensure that they're adjudicated timely.  And if

7  they were denied or disputed from the payor, we either

8  provide the additional information that the payor is looking

9  for, for that dispute, or depending on what the claim is

10 denied for, we may appeal that decision seeking

11 reconsideration.

12 Q     And after the bills have been sent and any disputes

13 have been raised, what's the next step in the revenue cycle

14 management process?

15 A     The next step is to collect the cash that's being

16 paired for those services.  We determine if the cash

17 collected is sufficient to cover the expected charges; if so,

18 we close out the account.  If not, we look for the balance to

19 be billed to the patient and then we follow-up with the

20 patient to pay the balance.

21 Q     Other than cash collection, tracking down billings and

22 the like, do revenue cycle management providers like Conifer

23 provide any analytics or reporting services as part of their

24 agreements?

25 A     We do provide reporting to our clients that measures

1  what we call key performance indicator of the revenue cycle

2  to measure our performance.

3  Q    Now, when St. Christopher's and Hahnemann were sold in

4  January of 2018, did Conifer enter into any service

5  agreements with the purchasers to provide revenue cycle

6  management services like these?

7  A    Yes, we did.

8  Q    Did you have responsibility for reviewing the service

9  agreement?

10 A    I reviewed the service agreement before it was signed,

11 yes.

12 Q    And do you presently have any responsibility for

13 Conifer's work under that agreement?

14 A    That's correct, yes.

15 Q    If you could turn to Tab 5 in your binder.

16 A    Okay.

17 Q    Tell me if you recognize that document?

18 A    Yes, I do.

19 Q    What is it?

20 A    This is the master services agreement between

21 Philadelphia Academic Health System and Conifer.

22 Q    And were there any statements of work that accompanied

23 the MSA?

24 A    Yes, there were two statement offense work.  One

25 covered the hospital revenue cycle functions that I just

1  described alternative a high level, and another one covered

2  some additional patient engagement functions that are in

3  addition to those core hospital revenue cycle services.

4  Q    Now, are those statements of work behind Tab of 6 and 7

5  in your binder?

6  A    Yes, they are.

7  Q    Let's break down Conifer's work at St. Christopher's

8  and Hahnemann into on-site and remote.  Let's start with the

9  on-site.  What services does Conifer provide to the

10  Philadelphia hospitals on silent in Philadelphia?

11  A    They mainly fall in that first column to the far left,

12  the registration column, where we actually were kind of the

13  face of the hospital.  The clients or the patients come in,

14  we're greeting them.  We're registering them.  We're

15  completing the registration process, and then going through

16  admission, and then, again, the eligibility enrollment

17  services for those patients who don't have insurance.

18  Q    What services does Conifer provide to the Philadelphia

19  hospitals remotely?

20  A    Predominantly the ones in those third and fourth

21  couples relate to billings and collections; all of those

22  services are done remotely.  We also -- all of our reporting

23  team is remote and not on-site at the hospitals.

24  Q    Is Conifer the primary cash collector for the

25  Philadelphia hospitals?

1   A       Yes judge.

2   Q       In addition to Conifer's cash collection work, does

3   Tenet also have a service agreement with those hospitals?

4   A       Yes, they do.

5   Q       And at a high level, are you familiar with the type of

6   services that Tenet provides?

7   A       Yes.

8   Q       What are those?

9   A       Tenet provides information technological services for

10  facilities.  They also provide key software, such as

11  electronic medical records and the patient accounting system.

12  Q       Does Conifer rely on any of those IT services in

13  connection with its work?

14  A       Yes.

15  Q       Which ones much?

16  A       The patient accounting system is key for us because it

17  contains all the information related to from scheduling all

18  the way through collection.  Also, the medical records are of

19  extreme importance because many times in the adjudication of

20  a claim from a payor, they may ask for a medical record

21  information that we have to submit with the claim.

22  Q       If Tenet quit providing its services to either St.

23  Christopher's or Hahnemann, would that impact Conifer's

24  ability to collect cash for those hospitals?

25  A       Yes, it would provide a significant impact as to how we

1  provide services.

2  Q    Let's talk about the contract rates for both, Conifer

3  and Tenet.  Are you familiar with the amounts that Tenet and

4  Conifer bill under both, the TSA    and the MSA?

5  A    Yes.

6  Q    What's the approximate total monthly run rate for both

7  Conifer and Tenet and the Philadelphia hospitals?

8  A    It's approximately $3 million.

9           THE COURT:  I'm sorry, I missed that, Mr. Dawson.

10          THE WITNESS:  It's approximately $3 million a

11  month.

12  BY MR. WASDIN:

13  Q    And do you know how many the debtors' proposed doesn't

14  would pay both Tenet and Conifer per month?

15  A    Their proposals are approximately $800,000 a month.

16  Q    Does Conifer have cash-collection goals under the MSA?

17  A    Yes, we do.

18  Q    What are those?

19  A    Our goal is to collect 100 percent of the cash that's

20  owed to PAHS.

21  Q    Are there any penalties under the MSA    if you miss

22  the 100 percent goal?

23  A    There are no penalties for year one.  The penalties and

24  incentives began January 1, 2019, yes.

25  Q    Between January 1, 2019, and the date of the

1  bankruptcy, which was June 30th, 2019, how had Conifer

2  performed at both, St. Christopher's and Hahnemann, relative

3  to its goal.

4  A      For that time period, we were at 101 percent of cash

5  target.

6  Q      And since Hahnemann has been partially or fully closed

7  down, how are Conifer's numbers relative to the goal?

8  A      Through the month of July, we're at 98 percent cash

9  target for both facilities.

10 Q      In general, when Conifer is negotiating a service

11 agreement with a hospital, what pricing options does it

12 consider?

13 A      There are a number of options.  We consider one is the

14 methodology that we currently use for this contract, which is

15 consistent with what we do for Tenet, is a percentage of

16 adjusted net patient revenue.

17       We also bill some of our clients based on a contingency

18 fee based on the collection that we get for them through the

19 AR process.  We also have fixed-fee arrangements with some of

20 our clients and for a very small set of our clients, we also

21 do a cost-plus pricing model where it's our costs plus a

22 certain percentage.

23 Q      I think you mentioned it in passing, but to be clear,

24 what pricing did the parties agree to under the MSA?

25 A      The pricing the parties agreed to is the same pricing

1  that was in our contract with Tenet to service these

2  facilities, which is a percentage of ANPR.

3  Q    Does Conifer send invoices to PAHS under the MSA?

4  A    Yes, we send invoices on a monthly basis.

5  Q    And in your role, do you have access to those invoices?

6  A    Yes.

7  Q    Have you reviewed them in connection with preparing to

8  give testimony today?

9  A    Yes, I have.

10 Q    Is there a lot of information in those invoices?

11 A    There's a lot information in those invoices.

12 Q    And have you helped us create a summary of those

13 invoices to aid the Court in its understand of what's in

14 there?

15 A    Yes.

16 Q    I'll direct your attention to Tab 13(c).

17 A    Okay.

18 Q    Is this a summary that you helped us prepare of

19 Conifer's invoices under the MSA?

20 A    Yes, it is.

21 Q    And does it accurately reflect the amounts of invoices

22 and payments made under the TSA -- MSA, excuse me?

23 A    Yes, it does.

24          MR. WASDIN:  Your Honor, at this point, we would

25 offer the Rule 1006 summary behind Tab 13(c) as Tenet Exhibit

1   7.

2            THE COURT:  Any objection, Mr. Demmy?

3            MR. DEMMY:  No.

4            THE COURT:  It is admitted.

5        (Tenet Exhibit 13 received in evidence)

6   BY MR. WASDIN:

7   Q    Mr. Dawson, I'm going to once again, skip over some of

8   the details of the invoice payments prior to the bankruptcy

9   filing, but is it fair to say that Conifer had not been paid

10  its contract rates in full prior to the bankruptcy filing?

11  A    That is correct.

12  Q    Did Conifer work with PAHS to try to resolve the unpaid

13  invoices?

14  A    Yes, we did.

15  Q    Were those efforts successful?

16  A    No, they were not.

17  Q    Did Conifer ever send PAHS a notice of termination of

18  the MSA?

19  A    Yes, we did.

20  Q    Are you familiar with that termination notice?

21  A    Yes, I am.

22  Q    Now, I'd direct you to Tab 14 of the binder.

23  A    Okay.

24  Q    Is that the notice that Conifer sent to PAHS of

25  termination of the MSA?

1  A      Yes, it is.

2  Q      What's the date of that notice?

3  A      The date is May 2nd, 2019.

4  Q      And if I could direct your attention to the top of Page

5  3, can you tell us what that notice demanded, with respect to

6  unpaid invoice amounts?

7  A      It demanded that a payment of all accrued, but unpaid

8  amounts within 15 days of the letter.

9  Q      Did PAHS pay all unpaid invoices within that time

10  period?

11  A      No, they did not.

12  Q      In their filings related to this hearing, the debtors

13  have argued that Conifer should continue to be fade less than

14  its contract rate, in part, because it performed for so long

15  without payment prepetition.

16          Can you tell the Court why Conifer continued to perform

17  under the MSA      after PAHS quit making payments?

18  A      Well, we understand there are the hospital revenue

19  psych the services we provide are critical to a hospital and

20  the patients they serve.  We were working with PAHS

21  throughout our contract, especially when they became late on

22  their payments to work through restitutions that would be

23  mutually acceptable for both parties.

24          So, the reason that question continued to provide the

25  services were twofold.  One was because of the critical

1  nature of the mission of these two hospitals and the patients

2  they served in their areas.  They are nationally recognized

3  hospitals with over a 100-year history in Philadelphia -- we

4  thought that was very important only to them, but the

5  Citizens of Philadelphia and we knew that cancelling services

6  would be detrimental to that mission serving those patients.

7      Then secondly, we were continued to work with them to

8  come to an agreement that would be mutually beneficial to

9  both parties moving forward regarding the invoices owed and

10  the services we performed moving forward.

11 Q    With respect to any agreement, what happened after you

12 sent the May 2nd, notice of termination?

13 A    We continued to ex-Tenet on a weekly basis in exchange

14 for a payment that started out at $125,000 and then escalated

15 to about $200,000 a week in hopes that we would continue to *

16 Hammer out an agreement that both parties could live with.

17 Q    Were the hundred and twenty-five and two-hundred-

18 thousand-dollar, per-week payments for both, Tenet and

19 Conifer?

20 A    Yes.

21 Q    Why was Conifer willing to accept those payments at

22 less than its contract rate?

23 A    Similar to the answer I gave in the last, we knew that

24 our services were critical to the mission of the hospital

25 concerning the patients of the Greater Philadelphia as Your

1   Honor is aware, and we were also working them to Hammer out

2   an agreement moving forward that would be beneficial to both

3   parties.

4   Q    Do you believe that $200,000 a week represents the

5   market rate of Conifer Services?

6   A    No.

7   Q    Do you believe it represents the market rate of both,

8   the Conifer and Tenet services?

9   A    No.

10  Q    Did Conifer reserve its rights to seek an entire amount

11  of its contract rate going forward?

12  A    Yes.

13  Q    Has Conifer continued to provide services under the MSA

14  since the debtors filed for bankruptcy?

15  A    Yes.

16  Q    If I could turn your attention back to Tab 13.C --

17  A    Okay.

18  Q    -- what's the total amount of Conifer invoices under

19  the MSA     that are dated either July or August?

20  A    $3.4 million.

21  Q    And how much have the debtors paid during that time?

22  A    In total, they paid 1.2 to both, Tenet and Conifer, and

23  assuming a 50-50 split of those payments, we would have

24  $600,000 that would be applied to that balance.

25  Q    Okay.  Subtracting the $600,000 from the amount of

1  invoices billed in July and August, how much remains unpaid?

2  A    2.8 million.

3  Q    One argument the debtors have made is that Conifer

4  should continue to be paid less than its be contract rate

5  because it costs will go down after Hahnemann closes.  First,

6  can you tell the Court will Conifer continue to provide

7  services to St. Christopher's regardless of whether Hahnemann

8  closes?

9  A    Yes.

10  Q    And will any of Conifer's costs at St. Christopher's be

11  impacted by the closure of Hahnemann?

12  A    No.

13  Q    Concerning to Hahnemann, will any of Conifer's costs go

14  down after that hospital closes?

15  A    Yes, the services that we provide on-site will go down

16  and have been going down since they started closing

17  departments of the hospital.  So, we've been shedding chose

18  expenses n concert with the closure of certain parts of the

19  hospital.

20  Q    Well, what about the offsite services, the cash

21  election?

22  A    Those services or expenses have not been impacted at

23  this point.  We're continuing to bill claims and follow up on

24  claims to gather Social Security much cash as possible PAHS.

25  Q    Since the debtors filed bankruptcy, has Conifer fully

1  performed under the MSA?

2  A      Yes.

3  Q      Are the debtors paying it less than its contract bid?

4  A      Yes.

5              MR. WASDIN:  I'll pass the witness.

6              THE COURT:  All right.  Thank you.

7              Mr. Demmy, yes?

8              MR. DEMMY:  Your Honor, I'll just looking at the

9  clock, and I'll do whatever the Court wants me to do, but I

10 doubt I'll be done in 15 minutes.  That's just my

11 guesstimate.

12             As an order of magnitude, the deposition of Mr.

13 Dawson was probably 40 percent longer than that of Mr.

14 Maloney.  I can just imagine that my cross is going to be

15 that much longer or perhaps a little bit more.  So, I will do

16 what the Court wants.

17             THE COURT:  Had you prepared to stay overnight,

18 Mr. Dawson?

19             THE WITNESS:  Yes.

20             THE COURT:  All right.  Then why don't we continue

21 in the morning.

22             Let's talk about time in the morning, Mr. Minuti,

23 9:30, is that -- does that work for people?  Nine o'clock?  I

24 don't know how much of a day we've got ahead of us.

25 Mr. Sherman?

1        MR. SHERMAN:  Sorry, Your Honor.  Not to be a

2   pain, but we have a hearing, I mean, we have a hearing in

3   front of Judge Sontchi starting at 1:00 p.m. tomorrow.

4        THE COURT:  Oh, all right.

5        MR. SHERMAN:  So, we can do what we can.  I mean,

6   because I have a meeting, I can, obviously, move, but I think

7   Judge Sontchi may be upset if we're not there.

8        THE COURT:  I bet he would be.  I bet he would

9   miss you.  He would miss you, Mr. Sherman.

10      (Laughter)

11       THE COURT:  Is that doable, Mr. Minuti, or is it

12   that too early?

13       MR. MINUTI:  Your Honor, that is doable from the

14   debtors' side.

15       THE COURT:  All right.  Then let's plan on being

16   back here tomorrow morning at 9:00.

17       Mr. Dawson, you shouldn't discuss your testimony

18   with your lawyers, obviously, overnight.  You can prepare for

19   Mr. -- perhaps for Mr. Demmy, but you shouldn't discuss your

20   testimony that you've given.

21       THE WITNESS:  Understood, Your Honor.

22       THE COURT:  All right.  Very well.

23       Mr. Minuti, anything further?

24       MR. MINUTI:  Not tonight, Your Honor.  We

25   appreciate it.  Thank you.

1          THE COURT:  All right.  Then we'll adjourn until

2   tomorrow morning at 9:00.

3          Thank you, Your Honor.

4          MR. MINUTI:  Your Honor, one question?

5          THE COURT:  Yes?

6          MR. MINUTI:  Can we leave materials in the

7   courtroom?  Would that be --

8          THE COURT:  You can leave the courtroom exactly as

9   it is.

10          MR. MINUTI:  Thank you.

11          THE COURT:  It will locked.

12          MR. MINUTI:  Thank you, Your Honor.

13       (Proceedings concluded at 4:24 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2

3          We, MARY ZAJACZKOWSKI and WILLIAM GARLING, certify that

4    the foregoing is a correct transcript from the electronic

5    sound recording of the proceedings in the above-entitled

6    matter.

7

8

9    /s/Mary Zajaczkowski                    August 20, 2019
     Mary Zajaczkowski, CET**D-531

10

11   /s/William J. Garling                   August 20, 2019
     William J. Garling, CE/T 543

12

13

14

15

16

17

18

19

20

21

22

23

24

25