1

```
  1                 UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
  2

  3                                 .   Chapter 11
       IN RE:                       .
  4                                 .   Case No. 19-11466 (KG)
       CENTER CITY HEALTHCARE, LLC, .
  5    d/b/a HAHNEMANN UNIVERSITY   .
       HOSPITAL, et al.,            .
  6                                 .   Courtroom No. 3
                                    .   824 North Market Street
  7                                 .   Wilmington, Delaware 19801
                                    .
  8                Debtors.         .   August 20, 2019
       . . . . . . . . . . . . . . .    9:00 A.M.
  9

 10                     TRANSCRIPT OF HEARING
                  BEFORE THE HONORABLE KEVIN GROSS
 11                 UNITED STATES BANKRUPTCY JUDGE

 12    APPEARANCES:

 13    For the Debtors:        Mark Minuti, Esquire
                               John Demmy, Esquire
 14                            Monique DiSabatino, Esquire
                               SAUL EWING ARNSTEIN & LEHR LLP
 15                            1201 N. Market Street
                               Wilmington, Delaware 19801
 16
                               - and -
 17
                               Jeffrey Hampton, Esquire
 18                            1500 Market Street
                               Philadelphia, Pennsylvania 19102
 19

 20    Audio Operator:        GINGER MACE

 21
       Transcription Company:  Reliable
 22                            1007 N. Orange Street
                               Wilmington, Delaware 19801
 23                            Email:  gmatthews@reliable-co.com

 24    Proceedings recorded by electronic sound recording, transcript
       produced by transcription service.
 25
```

```
1   APPEARANCES (Continued):

2

3   For the Committee:        Andrew H. Sherman, Esquire
                              SILLS CUMMIS & GROSS P.C.
4                             1 Riverfront Plaza, Suite 10
                              Newark, New Jersey 07102
5
    For Tenet and Conifer:    Nicholas Wasdin, Esquire
6                             Kent Hayden, Esquire
                              Gregory Pesce, Esquire
7                             KIRKLAND & ELLIS
                              300 North LaSalle
8                             Chicago, Illinois 60654

9   For HSRE:                 Stuart Brown, Esquire
                              DLA PIPER
10                            1201 North Market Street
                              Wilmington, Delaware 19801
11
    For MidCap:               Gretchen Santamour, Esquire
12                            STRADLEY RONON
                              2005 Market Street
13                            Philadelphia, Pennsylvania 19103

14  TELEPHONIC APPEARANCES:

15
    For Hospital Healthcare   Andrew Kelser, Esquire
16  Employee Pension Fund     O'DONOGHUE & O'DONOGHUE
    and Health Benefit Fund:  325 Chestnut Street, Suite 515
17                            Philadelphia, Pennsylvania 19106

18

19

20

21

22

23

24

25
```

1

INDEX

2

#1) Motion of the Debtors for Entry of Interim and Final Orders (I)
3   Authorizing the Debtors to Obtain Postpetition Secured Financing
Pursuant To Section 364 of the Bankruptcy Code, (II) Authorizing
the Debtors to Use Cash Collateral, (III) Granting Liens and
4   Superpriority Administrative Expense Status, (IV) Granting Adequate
Protection to the Prepetition Lender, (V) Modifying the Automatic
5   Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related
Relief [D.I. 53; filed: 07/01/19].

6

#3) [FILED UNDER SEAL] Motion of Tenet Business Services
7   Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of
an Order (I) Compelling Payment of All Unpaid Postpetition
8   Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative,
(II) Granting Relief from the Automatic Stay to the Extent
9   Necessary to Terminate the TSA and MSA [D.I. 302; filed:
07/26/19].

10

#4) First Omnibus Motion of the Debtors for Entry of an Order
11   Authorizing the Rejection of Certain Executory Contracts and
Unexpired Leases [D.I. 349; filed: 08/02/19].

12

#5) Second Omnibus Motion of the Debtors for Entry of an
13   Order Authorizing the Rejection of Certain Executory
Contracts and Unexpired Leases [D.I. 350; filed: 08/02/19].

14

#6) Third Omnibus Motion of the Debtors for Entry of an Order
15   Authorizing the Rejection of Certain Employment Agreements in
Connection with the Closure of Hahnemann University Hospital
16   [D.I. 351; filed: 08/02/19].

17

**Ruling (4, 5, 6) – 203**
18

#7) Debtors' Motion for Entry of an Order Pursuant to Section
19   107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local
Rule 9018-1(b), Authorizing the Debtors to File Under Seal
20   Portions of (A) the Debtors' Objection to Motion of Tenet
Business Services Corporation and Conifer Revenue Cycle
21   Solutions, LLC for Entry of an Order (I) Compelling Payment
of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. §
22   503(b)(1) or, in the Alternative, (II) Granting Relief from
the Automatic Stay to the Extent Necessary to Terminate the
23   TSA and MSA and (B) the Declaration of Allen Wilen in Support
Thereof [D.I. 422; filed: 08/09/19].

24

25

1  #8) Motion in Limine of Tenet Business Services Corporation
2  and Conifer Revenue Cycle Solutions, LLC to Exclude from the
   August 19 Hearing Evidence or Argument Regarding the Debtors'
   Prepetition Lawsuits Against Tenet for Alleged Violations of
3  the Asset Sale Agreement [D.I. 439; filed: 08/13/19].

4  #9) Motion in Limine of Tenet Business Services Corporation
5  and Conifer Revenue Cycle Solutions, LLC to Exclude Evidence
   or Argument Regarding Alleged PrePetition Performance
6  Deficiencies Under the Conifer Master Services Agreement
   [D.I. 512; filed: 08/16/19].

7

8  FOR THE DEBTORS

9       **David Dawson**

10      Cross Examination by Mr. Demmy        10

11      Redirect Examination by Mr. Wasdin     44

12

13      **ALLEN WILEN**

14      Direct Examination by Mr. Minuti        50

15      Cross Examination by Mr. Hayden         67

16      Cross Examination by Mr. Sherman        69

17

18 EXHIBITS                          I.D.    REC'D

19 Tenet 2-B 1006     Summary of TSA            9

20 Tenet 7-B          1006 Summary of MSA       9

21 D-6                                         43

22 D-10                                        43

23 D-11                                        43

24

25

1          (Proceedings commenced at 9:03 a.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Good morning everyone.  You may be

4    seated.  Thank you.  This clock is about ten minutes fast, by

5    the way, just for everyone's information.  So, when we take

6    ten minute breaks you'll know that it's a little bit fast.

7               Mr. Minuti, good morning.

8               MR. MINUTI:  Good morning, Your Honor; Mark Minuti

9    from Saul Ewing Arnstein & Lehr for the debtors.

10              Your Honor, I did enjoy giving Mr. Brown a hard

11   time.  I told him was late, but based on that clock I think

12   you've redeemed him.

13              Your Honor, we're here to continue our hearing on

14   the debtor's final approval of debtor-in-possession financing

15   as well as the Tenet & Conifer motion.

16              THE COURT:  Yes.

17              MR. MINUTI:  When we left off yesterday, I

18   believe, we were just getting ready to start cross

19   examination of Mr. Dawson.

20              THE COURT:  That's right.

21              MR. MINUTI:  I think we're ready to go in that

22   regard.  There are two things we wanted to do at the outset,

23   Your Honor, that came up during yesterday's hearing and we

24   wanted to clarify.  Your Honor will recall that the committee

25   had raised an issue about the appropriate interest rate that

1  was being charged.

2          THE COURT:  Yes.

3          MR. MINUTI:  I think we've clarified that.  Ms.

4  Santamour, who is here on behalf of MidCap, I think will put

5  some statements on the record to clarify that.  I'll turn the

6  podium over to her in a second.

7          The other issue, Your Honor, the committee had

8  raised had to do with the allocation of the carve-out among

9  professionals.  All the professionals, or certainly the

10 debtors and the committee, have agreed that we're going to

11 have discussions regarding that and we're confident we can

12 reach agreement among the parties as to how to deal with

13 that.  So, I don't believe Your Honor is going to have to

14 deal with that today.

15         THE COURT:  Okay.

16         MR. MINUTI:  At this point let me have Ms.

17 Santamour come to the podium and clarify the issue regarding

18 the interest rate.

19         THE COURT:  Thank you, Mr. Minuti.

20         Good morning.

21         MS. SANTAMOUR:  Good morning, Your Honor; Gretchen

22 Santamour on behalf of MidCap Financial.

23         I'm happy to report that after the hearing

24 yesterday we met with committee counsel and with Eisenberg

25 for the debtors, and we, I think, cleared up all the

1  confusion over the interest rate.

2          THE COURT:  Good.

3          MS. SANTAMOUR:  And the interest rate post-

4  petition is identical to the interest rate prepetition on a

5  non-default basis.  For the revolver the interest rate is

6  LIBOR plus the applicable margin which with respect to the

7  revolver is 4.25 percent.  And the interest rate with respect

8  to the term loan is also LIBOR plus the applicable margin

9  which with respect to the term loan the applicable margin is

10  ten percent.

11          THE COURT:  Okay.

12          MS. SANTAMOUR:  But it's identical both

13  prepetition and post-petition, Your Honor.

14          THE COURT:  Yes, Mr. Sherman?

15          MR. SHERMAN:  Thank you, Judge.  I'm not sure

16  that's completely accurate.  I'm not sure it's completed

17  cleared up, but I do accept MidCap's representations.  So, as

18  long as Ms. Santamour represents to the court, which I think

19  I just heard, that irrespective of what's in the loan

20  documents the interest rate is static between pre and post-

21  petition.  We accept that representation.

22          THE COURT:  Okay.  Very fine.  Thank you, Mr.

23  Sherman.

24          Good morning.

25          MR. WASDIN:  Your Honor, Nick Wasdin on behalf of

1  Tenet and Conifer.

2           THE COURT:  Yes, sir.

3           MR. WASDIN:  Also, yesterday, we entered into

4  evidence to Rule 1006 summaries of Tenet and Conifer's

5  invoices.

6           THE COURT:  Yes.

7           MR. WASDIN:  There was some confusion regarding

8  the invoice date to the services provided.

9           THE COURT:  Right.

10          MR. WASDIN:  We agreed to amend those to just

11 strike out the line as to pre and post-petition. I have done

12 so and am prepared now to offer the amended 1006 summaries.

13          THE COURT:  All right.  That would be fine.  Thank

14 you.

15          MR. WASDIN:  For the record the 1006 summary

16 related to the transition services agreement was behind Tab

17 13(a) in our binder.

18          THE COURT:  Right.

19          MR. WASDIN:  And I believe bore a sticker that

20 said Tenet Exhibit 2.

21          THE COURT:  Yes.

22          MR. WASDIN:  So, we will offer into evidence an

23 amended 1006 summary that now bears the sticker Tenet Exhibit

24 2-B.

25          THE COURT:  Okay.  2-B -- since this was A and we

1    have a B --

2              MR. WASDIN:  It is a sad confusion of our binder.

3    As we moved around prior to yesterday's hearing some of the

4    stickering no longer matches up to the tab numbers

5              THE COURT:  That's right.

6              MR. WASDIN:  Yes.  So, Your Honor is correct that

7    the TSA 1006 summary was behind Tab 13(a).

8              THE COURT:  That's right.

9              MR. WASDIN:  And our amended 1006 summary for the

10   TSA will bear a sticker that says Tenet Exhibit 2-B.

11             THE COURT:  Okay.  All right.

12             MR. WASDIN:  With respect to the 1006 summary for

13   the MSA, the master services agreement, related to Conifer

14   the orginal 1006 summary was behind Tab 13(c) and the amended

15   1006 summary, which I will offer now, bears a sticker Tenet

16   Exhibit 7-B.

17             THE COURT:  All right.  Thank you.

18             MR. WASDIN:  If I may approach I will give Your

19   Honor copies of both of the amended summaries.

20             THE COURT:  Thank you much.  Thank you, Mr.

21   Wasdin.  And those are, of course, admitted.

22        (Tenet Exhibit 2-B, admitted into evidence)

23        (Tenet Exhibit 7-B, admitted into evidence)

24             THE COURT:  I think Mr. Dawson is on the stand.

25             MR. MINUTI:  Correct, Your Honor.  We're prepared

1  to begin cross examination.

2        THE COURT:  That's right.  And Mr. Demmy, I think,

3  was going to cross-examine.

4        MR. DEMMY:  Yes, Your Honor.

5        THE COURT:  Good morning, Mr. Dawson.

6        THE WITNESS:  Good morning.

7        THE COURT:  You're still under oath, of course, or

8  I should say whatever we call that.

9        THE WITNESS:  Yes, sir, Your Honor.

10                    CROSS EXAMINATION

11 BY MR. DEMMY:

12 Q    Good morning, Mr. Dawson.

13 A    Good morning.

14 Q    I hope your stay in Wilmington last night was pleasant

15 enough.

16 A    Yes.  Thank you.

17        MR. DEMMY:  And, Your Honor, I hope that your

18 experience with your young dog went well.

19        THE COURT:  Yes.  Thank you.

20 BY MR. DEMMY:

21 Q    Mr. Dawson, I believe that there is an exhibit binder

22 on your desk in front of you.  Do you see that?

23 A    Yes.

24 Q    Can you go to Tab 9 -- I'm sorry, Tab 10?

25 A    10, yes.  Okay.

1   Q      Can you tell me what that is?

2   A      This is an invoice for services for the month of July

3   2019.

4   Q      Its Conifer's invoice, correct?

5   A      That's correct.

6   Q      Okay.  Conifer bills in advance, correct?

7   A      That's correct.

8   Q      Okay.  So, the July 16th, 2019 invoice is for,

9   generally speaking, the month of July?

10  A      That is correct.

11  Q      Okay.  And payment terms it says forty-five days.  Do

12  you see that on the right side?

13  A      Yes, I do.

14  Q      Okay.  So, this invoice is not payable until August

15  30th?

16  A      That's correct.

17  Q      Eleven days from today?

18  A      Pardon me?

19  Q      I'm sorry, ten days from today.

20  A      Yes.

21  Q      And by that time approximately $1.8 million dollars

22  will have been paid pursuant to the DIP budget, considering

23  the payments that have been made to date plus payments

24  continuing if the court approves the DIP financing in its

25  current form.  Isn't that true?

1  A    Yes.

2  Q    So, in effect, those are prepayments against the

3  Conifer July 16th, 2019 invoice?

4           MR. WASDIN:  I object, Your Honor.

5           THE COURT:  Yes.

6           MR. WASDIN:  A mischaracterization of the post-

7  petition payments as exclusively applying to Conifer when, in

8  fact, only half of those amounts may apply to Conifer.

9           THE COURT:  And the other half to Tenet?

10          MR. WASDIN:  That's how we interpret it, Your

11 Honor.

12 BY MR. DEMMY:

13 Q    Well, it doesn't change the nature of my question that

14 these are -- in whatever amount that they're pre-payments of

15 an obligation due to Conifer that's not due until ten days

16 from today.  Is that correct, Mr. Dawson?

17 A    That's correct.

18          THE COURT:  I'll overrule the objection because I

19 do understand the points your making.

20          MR. DEMMY:  I'm sorry for proceeding without

21 direction, Your Honor.

22          THE COURT:  That's all right.  I was slow.

23 BY MR. DEMMY:

24 Q    And would you look at Tab 11?

25 A    Okay.

1  Q      And can you tell me what Tab 11 is?

2  A      Tab 11 is an invoice for the -- the Conifer invoice for

3  the month of August.

4  Q      Okay.  And the payment term on that invoice, again, is

5  forty-five days?

6  A      That's correct.

7  Q      From August 8th, is that correct?

8  A      That's correct.

9  Q      Okay.  So, my quick math tells me that that invoice is

10 not due until September 22nd or thereabout?

11 A      That's correct.

12 Q      And by that time an additional -- again, assuming the

13 DIP financing is approved in its current form, by that time

14 an additional $600,000 dollars will have been paid; however

15 its spread among Tenet and Conifer, correct?

16 A      That's correct.

17 Q      And that would be approximately $2.4 million dollars as

18 of that time?

19 A      Yes, but it would be -- those monies should be applied

20 to both Conifer and Tenet invoices, correct.

21 Q      Understood that those prepayments are for both

22 entities?

23 A      Correct.

24 Q      Now yesterday you testified about cash collection

25 rates.  I think you testified the rate was a hundred and one

1    percent for 2019 prior to the bankruptcy and it was ninety-

2    eight percent for July.  Do I have that correct?

3    A     Yes.

4    Q     Okay.  On what is that percentage rate of collection

5    measured?

6    A     That's based on the cash goal calculation as documented

7    in our contract.

8    Q     Okay.  Where in the contract is that documented?

9    A     It should be documented under the service levels.  I

10   don't know which tab the contract is in on this.

11   Q     Well, we can help you out.  In that exhibit I believe

12   you'd want to look at Tab 8.

13   A     8?

14   Q     You're looking for the statement of work?

15   A     I'm looking for the statement of work.  Yes, sir.

16   Q     Tab 8.  It is documented in Schedule A to Attachment 3.

17   It is Page 36 of 49.  And specifically where on Page 36 are

18   you referring to as the what against which the percentage is

19   measured?

20   A     It's the methodology for calculating the cash goal is

21   documented under the title cash goal methodology.

22   Q     Well, tell me how that works, if you would,

23   specifically?  What's the cash goal?  That's what I'm trying

24   to understand.

25   A     The cash goal is the target that we are trying to

1  obtain each month from a cash collection perspective.

2  Q    Is that target set in this contractual provision?

3  A    Yes.  The target is set at a hundred percent.

4  Q    But a hundred percent of what?  What are we trying to

5  collect?  Is it all the amounts that are billed by Conifer?

6  A    It is the expected reimbursement for the cash related

7  to the services rendered.

8  Q    And what's the expected reimbursement?

9  A    The expected reimbursement are the gross charges minus

10  a number of other items that aren't expected.  So, for

11  example, if the total charges for a bill $1,000 dollars and

12  the insurance is only going to pay 750 then the expected

13  reimbursement for that claim is 750.  You would not include

14  the contractual adjustment of $250 dollars.

15  Q    Are there any other deductions from that number?

16  A    Yes.

17  Q    What?

18  A    Things like disproportionate share, things related to

19  monies received directly from a Medicaid or Medicare that

20  Conifer is not responsible for collecting.

21  Q    Okay.  And that goes into what you understand to be the

22  cash goal?

23  A    Yes.  That's actually part of the adjusted net patient

24  revenue that's a documented cash goal.

25  Q    Are those two numbers identical in your view?

1  A     What two numbers identical?

2  Q     ANPR and the cash goal that you have been testifying

3  about.

4  A     The ANPR is a number for a monthly basis.  How we

5  calculate the cash goal is the average of two months of

6  adjusted patient revenue.  So, for the month of June we would

7  take the adjusted net patient revenue, I believe, from the

8  months of March and April, average those and that would be

9  the cash target for June.  I believe that's how that works.

10 Q     So, for July the cash goal would be the average of the

11 two months for May and June or would it be April and May?

12 A     I think based on what's documented here in the contract

13 it would be April and June because the example used in the

14 contract, if you use the January goal, it would be based on

15 October and November adjusted net patient revenue averaged.

16 Q     Now, the cash goal wouldn't involve things like bad

17 debts and other write-offs, would it?

18 A     No, it would not.

19 Q     Now you understand that Conifer is owned about seventy-

20 five percent by Tenet and twenty-five percent by Catholic

21 Health Industries?

22 A     That would be Catholic Health Initiatives, yes.

23 Q     I apologize, Catholic Health Initiatives. Is that

24 correct?

25 A     That's correct.

1  Q      And Catholic Health Initiatives also is a Conifer

2  client?

3  A      Yes, they are.

4  Q      Okay.  And I think yesterday you testified that Conifer

5  provides revenue sight and services to approximately seven

6  hundred healthcare facilities?

7  A      That's correct.

8  Q      Are any of those seven hundred not either Tenet or

9  Catholic Health Initiative facilities?

10 A      Yes.  There are other facilities other than Tenet and

11 CHI?

12 Q      How many.

13 A      I don't know the answer to that.

14 Q      Is it less than ten?

15 A      No, it would be more than ten.

16 Q      Less than twenty-five?

17 A      I really don't know the answer to that.

18 Q      Would it be consistent with Mr. Maloney's testimony of

19 yesterday that in his tenure there's been twenty-two

20 divestures of Tenet Hospitals?

21 A      I'm not familiar with that number.

22 Q      Is it less than a hundred?

23 A      Yes.

24 Q      Okay.  So, we're between twenty-five and a hundred.  I

25 could do this all day.  Do you have any specific recollection

1  between those numbers as to what number of facilities Conifer

2  provides services to that are not Tenet or Catholic Health

3  Initiative facilities?

4  A     No, I do not.

5  Q     Okay.  And are all those commercial clients in the

6  sense that those entities didn't originate as Tenet or

7  Catholic Health Initiative facilities that were divested?

8  A     There are some of those facilities that were divested

9  from Tenet that are now commercial clients.  There are other

10 clients that we have obtained that were directly with those

11 clients and had nothing to do with Tenet or CHI.

12 Q     Okay.  At this point in time Hahnemann and St.

13 Christopher's Hospital would be among those facilities that

14 are what you classified as commercial clients, correct.

15 A     That is correct.

16 Q     And does Conifer provide revenue cycle services for

17 every Tenet Hospital?

18 A     Yes.

19 Q     And it did so for Hahnemann and St. Christopher's prior

20 to the sale to the debtors, correct?

21 A     That's correct.

22 Q     Was the execution of the MSA, the master services

23 agreement, a condition to the Tenet sale of Hahnemann and St.

24 Christopher's?

25 A     I'm not sure if there's a condition of.  It was in

1  addition too.  I'm not sure if it was a condition of the

2  sale.

3          MR. DEMMY:  Give me one moment, Your Honor.

4          THE COURT:  Of course.

5  BY MR. DEMMY:

6  Q     Mr. Dawson, do you have this binder in front of you?

7  A     Yes.

8  Q     Would you take a look at the white binder that was

9  provided by Tenet and Conifer?

10 A     Okay.

11 Q     Tab 23.

12 A     I'm there.

13 Q     Thank you.

14       Do you recognize the document?

15 A     Yes.

16 Q     Tell me what it is?

17 A     This is the asset sale agreement between Tenet and the

18 purchasers for the two Philadelphia facilities.

19 Q     Are you generally familiar with the document?

20 A     Generally, yes.

21 Q     I'd direct your attention to Page 58.  Actually, let me

22 back you up a little bit.  Page 55, let's start there.

23 A     Okay.

24 Q     And I just want to reference your attention to the

25 heading Article 6, conditions precedent to obligations of

1  purchasers.  Do you see that?

2  A     Yes.

3  Q     Now we flip ahead to Page 58, Section 6.9 under Article

4  6.  Do you see that?

5  A     Yes.

6  Q     And Section 6.9 deals with the revenue cycle management

7  agreement.  Do you see that?

8  A     Yes.

9  Q     What is that referring to?

10  A     It's referring to the purchaser's agreement to enter

11  into an agreement with Conifer Health Solutions for revenue

12  cycle management.

13  Q     And would you understand that to be, as its included

14  here in Section 6.9, a condition to the purchaser's

15  obligations under the asset purchase agreement?

16  A     Yes.

17  Q     Okay.  I would direct your attention now to Section --

18  well, late in on that one, Page 58, Article 7, conditions

19  precedent to obligations of sellers.  Do you see that

20  heading?

21  A     Yes.

22  Q     Okay.  And over on the next page we have Section 7.5,

23  items to be delivered by purchasers at closing.  Do you see

24  that?

25  A     Yes.

1    Q    And there's a list of those conditions.  And if you

2    turn over to the next Page 60, Subparagraph (j) says the

3    revenue cycle management agreement.  Do you see that?

4    A    Yes.

5    Q    So, do you understand that the execution by the debtors

6    with Conifer of the master services agreement as its defined

7    as a revenue cycle managment agreement was also a condition

8    to the seller's to Tenet's obligations under the asset

9    purchase agreement?

10   A    Yes.

11   Q    And as a practical matter I think you may have

12   testified about this yesterday that it's practically

13   impossible for a buyer or for the vast majority of buyers or

14   maybe for every buyer except perhaps one to not actually

15   enter into a contract with Conifer for revenue cycle services

16   after it acquires a hospital facility from Tenet.  Isn't that

17   true?

18   A    I believe that was Mr. Maloney's testimony.  I would

19   agree with what he said, yes.

20   Q    Thank you.

21       And your understanding, based on your knowledge of the

22   industry is that it might take, you know, nine to twelve

23   months or perhaps even more than that for anybody to

24   transition to a new revenue cycle management provider in the

25   situation where it buys a hospital for Tenet?

1  A      I would agree with that statement, yes.

2  Q      Okay.  I want to turn your attention back to Tab 8 in

3  the debtor's book which the statement of work.

4  A      Okay.

5  Q      A statement of work is simply a part of the master

6  services agreement, correct?

7  A      That's correct.

8  Q      All right.  So, let's look at Section 4.1 on Page 2

9  with the heading of fee schedule; specifically, Section 4.1.

10  Do you see that?

11  A      Yes.

12  Q      Okay.  And the fees payable to Conifer under the master

13  services agreement are as specified in Attachment 4 to the

14  SOW.  Do you agree with that?

15  A      Yes.

16  Q      Okay.  Let's look at Attachment 4 which, I think, is

17  Page 39 of 49.  Tell me when you're with me?

18  A      Okay.  I'm there.

19  Q      Okay.  Paragraph 2 provides for a base fee.  What is

20  the base fee?

21  A      The base fee are the services that we charge for the

22  services provided in the statement of work.

23  Q      This is the only fee that's provided for or are there

24  any others?

25  A      No.  There are other fees associated to additional

1  services that were not originally part of the base fee,

2  mainly related to additional personnel that were required,

3  mainly from a patient aspect perspective that were inherited

4  with this contract.

5  Q    Do those types of fees continue on in this timeframe,

6  in July and August of 2019?  Do you know?

7  A    Yes.

8  Q    Would they appear on the invoice that we looked at

9  previously?  Let's go back and look and just make sure.

10  A    Okay.

11  Q    So, first, let's look at Tab 10 which is the invoice

12  dated July 16th, 2019?

13  A    Okay.

14  Q    Are you with me?

15  A    Yes, sir.

16  Q    So, on there we have the fees and charges are broken up

17  between Hahnemann and St. Christopher.  You would agree with

18  me on that?

19  A    Yes, sir.

20  Q    And you have a base fee for each?

21  A    Yes.

22  Q    And then some other charges.  Are the CCN charges among

23  the fees that you just referred to as being not part of the

24  base fee?

25  A    Correct.

1  Q     Okay.  And what about the vendor invoices?

2  A     There are certain vendor invoices that were identified

3  as pass-through costs.  So, as we received those we just

4  passed those costs directly through to the client.

5  Q     And you would agree with me that the vast majority --

6  and I don't want to put a percentage on it, but the vast

7  majority of the charge of the total amount due in connection

8  with this invoice are the aggregate base fees charged to

9  Hahnemann and St. Christopher's?

10 A     That's correct.

11 Q     All right.  And you can look at Tab 11.  I would ask

12 you the same series of questions, but to shortcut it would

13 your answers be the same for each of them relative to the

14 August 8th, 2019 invoice?

15 A     Yes, they would.

16 Q     So, turning back to Page 39 of 49 on the statement of

17 work which is Exhibit 8 in the debtor's binder.  The base fee

18 is calculated as a percentage of something, correct?

19 A     That's correct.

20 Q     And it's a percentage of what?

21 A     It's a percentage of the ANPR which is documented as

22 the acute net patient revenue.

23 Q     Okay.  And what is the acute net patient revenue?

24 A     It is defined back on the first page of the statement

25 of work.  It's the gross patient revenue received by the

1 client minus any of the examples that I cited earlier; things

2 like contractual adjustments, disproportionate share, things

3 like that.

4 Q    Okay.  We'll explore that a little bit more, but

5 generally speaking gross patient revenue is a substitute for

6 or similar to billings, the amounts that are billed for

7 patient services, correct?

8 A    It's representative of total charges.  That's where the

9 calculation starts before you apply the deductions.

10 Q    Okay.  Now you mentioned there are several things that

11 are deducted from ANPR and they're listed in Section 1.2,

12 correct?

13 A    That's correct.

14 Q    All right.  So, some of the things that are included in

15 Section 1.2 as deductions and PR are administrative right-

16 offs, denial adjustments, allowances for bad debt and charity

17 care expenses. Do you see those items?

18 A    Yes.

19 Q    Okay.  An administrative right-off is simply a charged

20 amount that's written off at some point in the future based

21 on a decision by the hospital to do so for whatever reason

22 its administrative staff believes is appropriate, correct?

23 A    That's correct.

24 Q    And that's a deduction from ANPR?

25 A    That's correct.

1   Q      What's a denial adjustment?

2   A      In this context I'm not sure what they're referring to.

3   This is -- I'm not familiar with this language and how denial

4   adjustments apply to acute net patient revenue.

5   Q      Okay.  What about allowances for bad debt?

6   A      Allowances for bad debt are charges that are not

7   collected after a period of time and the decision is made by

8   the client to write that off as a bad debt expense.

9   Q      What's the period of time?

10  A      It varies based on client policies.  I would say, you

11  know, some clients may write things off to bad debt as soon

12  as eighteen months, other clients may take longer.  It

13  depends on their policies.

14  Q      Longer then eighteen months?

15  A      Yes.

16  Q      What's the debtor's policy?

17  A      I do not know.

18  Q      Are you confident that it's in excess of forty-five

19  days?

20  A      Yes.

21  Q      In excess of sixty days?

22  A      Yes.

23  Q      And these are write-offs for amounts that have

24  previously been charged, correct?

25  A      That's correct.

1  Q     And included in ANPR for a particular month?

2  A     That's correct.

3  Q     What about charity care expense?

4  A     Charity care expense is expense related to services

5  provided by the hospital that they cannot get reimbursement

6  for based on the income level for the patients.  We cannot

7  get them -- they were not eligible for any kind of government

8  program.  So, the hospital has designated that as charity

9  expense for services provided.

10 Q     And is that something that occurs typically into the

11 future?

12 A     I'm sorry, can you restate that?

13 Q     Is that decision something that happens in the future

14 after a charge is initially made?

15 A     There's some initial designation up front to determine

16 if we think this patient will apply for charity care.  I'm

17 not sure when during the process the actual amount is written

18 off, but it would be after they were discharged.

19 Q     Okay.  So, that decision also can be made later like

20 sixty days after a charge has been made, correct?

21 A     It could be.

22 Q     Do you have any basis to know what the hospital's

23 policy is with regard to charity care deductions?

24 A     I do not.

25 Q     So, go back to Page 39 of 49 in Tab 8, the same

1  document, I think, just Page 39 of 49.

2  A      Okay.

3  Q      And, again, we're looking at -- I'm going to direct

4  your attention to Paragraph 2.1 for the base fee.

5  A      Okay.

6  Q      So, it says, and I'm reading from the second line,

7         "Client shall pay Conifer a percentage multiplied by

8  the ANPR for the month commencing two months prior."

9         And that is defined as the base fee, do you see that?

10 A      Yes.

11 Q      What does it mean that the -- that it's the percentage

12 multiplied by the ANPR for the month commencing two months

13 prior?

14 A      For example, the fee for the month of June would be our

15 percentage fee multiplied by the ANPR for the month of March,

16 April.

17 Q      Okay.

18 A      I have to get my calendar right, April.

19 Q      All right.  Then the ANPR that's included in the

20 calculation of Conifer's fee for the month of July of 2019

21 was actually the ANPR in May?

22 A      That's correct.

23 Q      And consistently the ANPR used in the calculation of

24 Conifer's fee for August was actually the ANPR for June of

25 2019?

1 A     That's correct.

2 Q     And there's no way that Conifer can know in July of

3 2019 what the actual ANPR is for May of 2019, correct?

4 A     I'm sorry, can you restate that question?

5 Q     There's no possible way that Conifer can know when it

6 sounds out its July 2019 bill what the actual ANPR is for

7 May, correct?

8 A     No.  We know what it is for May.  That's what we -- for

9 the invoice we're sending for the month of July we know

10 exactly what the ANPR was for May.

11 Q     Except you don't know what bad debt write-offs are

12 going to be, right?

13 A     That's correct.

14 Q     And that's a deduction from ANPR?

15 A     That's correct.

16 Q     And you don't know what the charity care write-offs are

17 ultimately going to be, correct?

18 A     We don't, but this is a pricing methodology for how we

19 price our services.  Any time we implement this pricing

20 methodology both sides are very well aware of the challenges

21 that you've just identified and those types of things are

22 taking consideration in future months.

23 Q     I appreciate that answer, but it didn't answer my

24 question which is you can't possibly know in July what the

25 charity care write-offs were for May or are going to be for

1  May into the future?

2  A    Right, but that has no impact on our billing.

3  Q    Okay.  It has no impact, in your view, because the

4  contract says that.

5  A    That's correct.

6  Q    And just to finish the loop on this you have no idea in

7  July of 2019 what the administrative write-offs might

8  ultimately be for the May charges?

9  A    That's correct, not in total.

10  Q    Okay.  Is there any way to go back and capture those

11  kinds of write-offs against the May ANPR that was used as the

12  basis for the charge made in July?

13  A    No.  They were just applied when the write-offs

14  happened.  They were just applied to the ANPR for that

15  specific month that we're invoicing for.

16  Q    I'm not quite sure I understood what you just said.

17  Can you explain that for me?

18  A    If there are administrative write-offs taken in a given

19  month, whatever the month may be, those administrative write-

20  offs are deducted from the ANPR that we're billing for teh

21  appropriate time period.

22  Q    Okay.  Into the future?

23  A    Correct.

24  Q    Okay.  That assumes the relationship continues on

25  indefinitely, right?

1    A      That's correct.

2    Q      And if it doesn't you'll never recapture the write-

3    offs.  Isn't that correct?

4    A      That's correct.

5    Q      And, again, if six months down the road all the write-

6    offs were in and you could go back and adjust the May ANPR

7    there's no mechanism in the contract to make that adjustment

8    and provide a credit against the July bill based on those

9    write-downs?

10   A      No.  Those administrative write-offs are taken off the

11   ANPR bill for that month.

12   Q      Billed six month later when they occurred?

13   A      Whenever they occur.

14   Q      Yeah, but assuming the relationship continued.  If it

15   didn't continue there would not be any adjustment?

16   A      That's correct.  The closure of a hospital is not

17   contemplated in this type of methodology.

18   Q      And you're aware that Hahnemann is being closed?

19   A      Yes.

20   Q      Okay.  So, if there's no September billing there will

21   never be a credit to the debtors for the July and August

22   bills based on future write-offs for bad debts, charity care,

23   administrative write-offs and so forth?

24   A      Correct.

25   Q      So, I want to go back to the seven hundred,

1  approximately, facilities that Conifer provides services to.

2  And now just looking at the Tenet facilities does Conifer use

3  this ANPR formula that we've been talking about for all the

4  Tenet facilities that it bills?

5  A      For a majority of the facilities we do, yes.

6  Q      What's the majority, if you know?

7  A      Over ninety percent I would say.

8  Q      What other methodology does it use for Tenet

9  facilities?

10 A      There are a very small number of facilities that we do

11 a cost plus arrangement for, mainly because those are

12 facilities that were purchased by Tenet at a later date and

13 were not included as part of our initial contract.  Then once

14 we get our core technology implemented they migrate to the

15 ANRP methodology.

16 Q      Is it because -- is the cost plus methodology used for

17 those facilities because that was the mechanism being used by

18 that facilities revenue cycle provider?

19 A      No.

20 Q      Was that simply a product of negotiation?

21 A      Correct.

22 Q      Would that cost plus methodology be used actually for

23 less than five Tenet facilities?

24 A      I do not know the number, but that's probably pretty

25 close.

1  Q     Conifer does not bill any Tenet facilities on a

2  percentage of actual collections basis, correct?

3  A     That's correct.

4  Q     But that is a methodology that's used in the industry,

5  correct?

6  A     Yes.

7  Q     Does Conifer use that methodology for any other

8  facilities that it provides revenue cycle services to?

9  A     Yes.

10 Q     How many, do you know?

11 A     I do not know how many that covers.

12 Q     Does Conifer use that methodology for Catholic Health

13 Initiatives?

14 A     No.

15 Q     What does it use for Catholic Health Initiatives?

16 A     We use a fixed fee.

17 Q     Okay.  What is the fixed fee based on?

18 A     It was negotiated as part of the terms of the contract

19 based on the services that we provided in that contract.

20 Q     So, it's a fixed fee as a set amount, not a formula or

21 a percentage basis?

22 A     It's a set amount that's adjusted on an annual basis

23 for cost of living, that type of thing.

24 Q     Are you aware of any standard in the industry with

25 respect to how revenue cycle services should be billed?

1   A     There is no specific standard that's used universally

2   that I'm aware of.

3   Q     So, I want you to go back to the white binder, the

4   Tenet/Conifer exhibit binder.

5         I need a bigger podium, Your Honor.

6              THE COURT:  I understand.  I think there's a shelf

7   that pulls out.

8              MR. DEMMY:  I'll make due.

9              THE COURT:  All right.

10  BY MR. DEMMY:

11  Q     Are you with me?

12  A     Yes.

13  Q     Did I direct your attention to Exhibit 28?

14  A     No.

15  Q     Okay.  That's what I wanted you to look at.

16  A     Okay.

17  Q     And you testified about this chart yesterday in a

18  general manner, correct?

19  A     Correct.

20  Q     Does Conifer provide all of these services at Hahnemann

21  and St. Christopher's?

22  A     No.

23  Q     What does it not provide?

24  A     We do not provide the services that are primarily under

25  the medical category, the medical record management.  We do,

1  from a charge interest perspective, keep the charge master

2  updated which is the description of the codes that can be

3  billed with the appropriate prices, but the medical coding,

4  case managment, charge entry, medical record management we do

5  not provide those services.

6  Q     Who provides those services to the hospital, if you

7  know?

8  A     They are provided at the hospital, by the hospital.

9  Q     All right.  You mentioned the medical record

10 management, what does that entail?

11 A     That is documenting the medical record for the patient

12 for the services that were provided for that patient.

13 Q     And there's a requirement, generally speaking, of

14 maintaining those medical records, those patient medical

15 records for some period of time, correct?

16 A     That's correct.

17 Q     Who provides that service?

18 A     That service would be -- it would be part of the

19 software services, I believe, provided by Tenet, but the

20 timeframe for keeping those medical records I'm not familiar

21 with how long that is or who's responsibility that is.

22 Q     Okay.  But the responsibility for maintaining patient

23 medical records is Tenet's in this situation?

24 A     Tenet provides the software to do that.  I would think

25 it would be the responsibility of the hospital to maintain

1  those, but I can't speak for certain for that.

2  Q      Doesn't Tenet also have an interest in the maintenance

3  of those patient medical records for its own interests?

4           MR. WASDIN:  Objection; foundation.

5           MR. DEMMY:  Yesterday Mr. Dawson testified he was

6  familiar with the Tenet TSA, the Tenet billing --

7           THE COURT:  Yes.

8           MR. DEMMY:  -- and Tenet and Conifer have really

9  proceeded as a joint unit here.  So, I think this is a fair

10  question for Mr. Dawson.

11          MR. WASDIN:  Mr. Maloney was on the stand

12  yesterday for Tenet.  I think it's unfair to ask Mr. Dawson

13  what Tenet's interest is in one thing or another at the

14  hospital when he works for Conifer.

15          THE COURT:  I'll sustain that objection then, Mr.

16  Wasdin.  I think that's appropriate.

17          MR. DEMMY:  Your Honor.

18          THE COURT:  Yes, Mr. Demmy.

19          MR. DEMMY:  I apologize.  I was going to say Mr.

20  Maloney is in the courtroom.  We can ask him that question if

21  need be.

22          THE COURT:  All right.  That's fine, I think, but

23  I don't think this witness should answer that question.

24          MR. DEMMY:  Fair enough.  Thank you, Your Honor.

25  BY MR. DEMMY:

1  Q    Okay.  I'm sorry for skipping back and forth, but, you

2  know, my organization skills arent' what they used to be.  I

3  want you to go back to the debtor's exhibit book and look at

4  Exhibit 6.

5  A    Okay.

6  Q    Can you tell me what it is?

7  A    This is a letter dated June 28th, 2019 to Philadelphia

8  Academic Health Holdings.  It's signed by Mike Maloney.

9  Q    I'm sorry, it was signed by who?

10 A    Mike Maloney.

11 Q    Okay.  Do you understand what this letter is?

12 A    Yes.

13 Q    What is it?

14 A    This is a letter to Joel Friedman following up on our

15 letter dated May the 2nd provided that we receive $200,000

16 dollars in cash via wire transfer by the close of business.

17 We're going to extend the termination date through July 5th.

18 Q    That extension of the termination date applied not only

19 to the TSA, but also to the MSA, correct?

20      MR. WASDIN:  Objection, Your Honor.  This document

21 was written by Michael Maloney.  I don't see that there's any

22 connection to Mr. Dawson.  I think it's inappropriate to ask

23 him to interpret.

24      THE CLERK:  I'm not picking him up.

25      MR. WASDIN:  I'm sorry.

1          THE COURT:  I think you can move that closer if

2 you'd like.

3          MR. WASDIN:  I'll repeat that.  I object, Your

4 Honor.  This document was written by Mr. Maloney.  It doesn't

5 appear to have any connection to Mr. Dawson.  I think it's

6 inappropriate to ask Mr. Dawson to interpret it.

7          MR. DEMMY:  Your Honor, this is a letter that

8 relates to the MSA which is Conifer's contract.  I'm asking

9 the witness for his understanding of what the letter does.  I

10 think its proper cross examination.

11         THE COURT:  I'll overrule that objection.

12 BY MR. DEMMY:

13 Q     Do you understand the question?

14 A     Can you please restate it?

15 Q     Sure.  It is -- what is your understanding of what is

16 happening by this letter, Exhibit 6?

17 A     We are extending the termination date through July 5th

18 provided that we receive a $200,000 dollar cash wire by June

19 28th.

20 Q     Okay.  And your understanding is the bankruptcy cases

21 were filed on June 30th and July 1st of 2019?

22 A     That's correct.

23 Q     Yesterday you testified that the aggregate monthly

24 contract charge under both the TSA and the MSA was about $3

25 million dollars, correct?

1  A      That's correct.

2  Q      That number is certainly going down or will go down,

3  will it not?

4  A      It will go down, yes.  As Hahnemann closes, obviously,

5  their ANPR will be impacted by that and based on the

6  calculation we use, yes, over time that will go down.

7  Q      And, in fact, the ANPR has been going down over the

8  last few months, has it not?

9  A      I can't say for the last few months.  I know definitely

10 for the month of July and August.

11 Q      The ANPR has gone down?

12 A      Yes.

13 Q      In comparison to what months?

14 A      Prepetition.

15 Q      Do you know the magnitude of the reduction?

16 A      I don't know the magnitude.  I know it's significant

17 since they've been in the process of shutting down the

18 hospital since the 1st of July.

19 Q      Would you turn to Tab 8 in the white binder, the

20 Tenet/Conifer binder?

21          THE COURT:  Did you say Exhibit 10, Mr. Demmy?

22          MR. DEMMY:  I'm sorry?

23          THE COURT:  What exhibit number did you refer to?

24          MR. DEMMY:  It's Exhibit 8 in the white binder.

25          THE COURT:  Thank you.

1           THE WITNESS:  Okay.

2   BY MR. DEMMY:

3   Q    And generally speaking these are the Conifer invoices

4   from the beginning of the relationship to present day, is

5   that generally correct?

6   A    As I quickly thumb through them, yes, that's generally

7   correct.

8   Q    Okay.  And if you need to, you know, take your time and

9   go through them to make sure I'm happy to let you do that.

10  A    Yes.  It appears to be complete.

11  Q    And I want to direct your attention specifically to the

12  last four invoices, the last few pages of the exhibit

13  starting with the invoice dated May 7th, 2019.

14  A    Okay.

15  Q    And you would agree with me that there's a base fee for

16  Hahnemann based on an ANPR amount of approximately

17  25,800,000?

18  A    Correct.

19  Q    Then on the June 5th, 2019 invoice the base fee for

20  Hahnemann, based on an ANPR amount of approximately 24.8

21  million?

22  A    Correct.

23  Q    And then if you'd turn the page to the July 16th

24  invoice there's a base fee for Hahnemann based on an ANPR of

25  26 million and a few dollars?

1  A     Correct.

2  Q     And then the August 8th invoice which is now June,

3  right, the ANPR for June that ANPR amount is 20,800,000.

4  Yes, the base fee is based on an ANPR of 20.8 million?

5  A     That's correct.

6  Q     Okay.  And that's the June ANPR.  Is it your

7  expectation that the July ANPR will be less?

8  A     It's my expectation it will be, yes.

9  Q     And is it your expectation that the August ANPR will be

10 less?

11 A     Yes.

12 Q     Would it be your expectation that the August ANPR will

13 be less than the July ANPR?

14 A     Yes.

15 Q     But you don't know by what order or magnitude those

16 amounts would be decreased from the prior months?

17 A     I don't.

18 Q     And that reduction in the ANPR is based on less

19 patients and less charges generally speaking?

20 A     Generally speaking, yes.

21 Q     And if there's less patients and less charges then the

22 cost to Conifer of providing services to Hahnemann, at least,

23 would be going down as well in July and August?

24 A     It's specifically for the on-site support we provide,

25 yes.  Not so much for the remote AR support because we're

1  still billing and following up with claims that were

2  previously billed.

3  Q    And it's your anticipation to have nobody on-site in a

4  short period of time?

5  A    Currently we have no one on site.  We do have people on

6  call because we have not received official notification that

7  the hospital is closed even though, in all practicality,

8  they're closed.

9  Q    And do you have any idea how many Conifer people were

10  on-site on June 30th of 2019?

11  A    I don't.  I know that as of recently it was down to

12  about fifteen people and we've been scaling down starting

13  probably the middle of July as the hospital started shutting

14  down departments within the hospital.  I do not know the

15  number of FTE's.

16  Q    Okay.  And Conifer is generally aware that the debtors

17  have raised issues with Conifer prepetition about its

18  delivery of service?

19  A    Yes.  I think issues have been raised by both sides.

20  Q    Okay.  And those issues go back to, at least, the fall

21  of 2018?

22  A    Yes.

23  Q    There's been discussions among parties about them for

24  the intervening period?

25  A    Correct.

1    Q    And they're not resolved, is that fair to say?

2    A    That's fair to say.

3              MR. DEMMY:  May I have one moment, Your Honor?

4              THE COURT:  You may, Mr. Demmy.  Of course.

5              MR. DEMMY:  Your Honor, I don't believe I had any

6    more questions, but I would like to move exhibits that have

7    not previously been admitted.  I think it's all from the

8    debtor's book.  Debtor's 6, 10 and 11.

9              THE COURT:  Any objection?  Take your time, Mr.

10   Wasdin.

11             MR. WASDIN:  No objection.

12             THE COURT:  All right.  They are admitted.

13         (Debtor's Exhibit 6, admitted into evidence)

14         (Debtor's Exhibit 10, admitted into evidence)

15         (Debtor's Exhibit 11, admitted into evidence)

16             MR. DEMMY:  With that I'll pass if anybody --

17             THE COURT:  All right.  Thank you.

18             Take your time, Mr. Wasdin, and get prepared.

19             MR. WASDIN:  Your Honor, to begin I have not had

20   an opportunity to place the amended Rule 1006 in the

21   witness's binder.

22             THE COURT:  Okay.

23             MR. WASDIN:  May I approach and do that?

24             THE COURT:  Yes, you may.

25                      REDIRECT EXAMINATION

1  BY MR. WASDIN:

2  Q    Mr. Dawson, I want to start by talking about the ANPR

3  questions that Mr. Demmy asked you about.

4  A    Okay.

5  Q    We talked briefly about this yesterday, but what are

6  the basic types of fee structures that Conifer is willing to

7  do in service agreements like the MSA?

8  A    There's really four main types. The first is the type

9  that's documented in this contract and consistent with how we

10  price this when Tenet owned these facilities.  It's a

11  percentage of ANPR.  The second is a percentage of cash

12  collected, usually a contingent fee on the cash we collect.

13  Thirdly, there's a fixed fee component that we offer some

14  clients.  And then fourthly there would be a cost plus

15  arrangement that we offer to a very few clients.

16  Q    When Conifer is negotiating a service agreement like

17  the MSA does it typically offer to do all four of those or

18  some subset during the negotiation?

19  A    It's usually something that is part of the negotiation

20  depending on a lot of times its jus the give and take of a

21  negotiation and the options that are usually beneficial to

22  both parties.

23  Q    Now which of those four pricing structures was agreed

24  to in the MSA?

25  A    The percentage of ANPR.

1  Q      And how does the MSA calculate ANPR?

2  A      There's a formula in the contract that talks about

3  acute net patient revenue.  It basically starts with the

4  gross charges, deducts any contractual allowances and any

5  other collections that the hospital has that we're not

6  responsible for in order to calculate that number.

7  Q      Which month ANPR number does the July 2019 invoice use?

8  A      May.  May 2019.

9  Q      Was that agreed to by the parties when they entered

10 into the MSA?

11 A      Yes.

12 Q      If you can flip to Tab 8 in the white binder and go

13 almost all the way to the end to the Conifer invoice dated

14 July 16th, 2019?

15 A      Did you say the one dated July 16th, 2019?

16 Q      Yes.

17 A      Yes.

18 Q      Can you tell from the July 19th Conifer invoice what

19 month's services are being billed there?

20 A      It's being billed for the month of July.

21 Q      So, Conifer worked in July?

22 A      Correct.

23 Q      And by worked I mean worked at St. Christopher's and

24 Hahnemann in July, right?

25 A      That's correct.

1  Q    And they sent an invoice for July, right?

2  A    Correct.

3  Q    And the amounts charged for work in July that was done

4  in July are based on the ANPR for May, is that right?

5  A    That's correct.

6  Q    Does that reflect the party's agreement with respect to

7  how to price Conifer's July services?

8  A    Yes.

9  Q    Let's turn now to talk about the questions Mr. Demmy

10 asked you regarding prepayments post-petition.  If you can

11 turn your attention to Exhibit 7-B which is the 1006 summary

12 I gave you.  Are you there?

13 A    Yes.

14 Q    How much is Conifer's July 2019 invoice for?

15 A    Approximately 1.8 million.

16 A    When's it due?

17 A    It is due on August 30th.

18 Q    Is August 30th about eight weeks after the bankruptcy

19 was filed?

20 A    Yes.

21 Q    So, at $200,000 dollars a week to Tenet and Conifer how

22 much will the debtors have paid to Tenet and Conifer by

23 August 30th?

24 A    Are you asking me for the monies paid to both Tenet and

25 Conifer?

1  Q    Yeah.  $200,000 dollars a week for eight weeks

2  approximately.

3  A    1.6 million.

4  Q    So, they owe Conifer 1.9 and that's due on August 30th.

5  Is that right?

6  A    That's correct, 1.867.  So, round it up to 1.9.  That's

7  correct.

8  Q    So, if you take half of the 1.6 million they will have

9  paid by August 30th what's that, $800,000 dollars?

10 A    That's correct.

11 Q    What's 1.86 million minus $800,000 dollars?

12 A    A little over a million dollars would be remaining to

13 be paid.

14 Q    Do you have any expectation that the debtors are going

15 to pay Conifer an additional million dollars at the end of

16 August?

17 A    I do not have an expectation of that.

18         MR. WASDIN:  That's all I have, Your Honor.

19         THE COURT:  All right.  Thank you, Mr. Wasdin.

20         Any follow-up from anyone?  Mr. Demmy?

21         MR. DEMMY:  Not from me.  Thank you.

22         THE COURT:  All right.  Mr. Sherman?

23         MR. SHERMAN:  No, Your Honor.

24         THE COURT:  All right.  Mr. Dawson, thank you.

25 You may step down now.

1          (Witness excused)

2               THE COURT:  I think we have -- do we have one more

3    witness?

4               MR. MINUTI:  Your Honor, we're on the evidentiary

5    portion, I believe, of the Tenet and Conifer motion.  So, the

6    question from Tenet and Conifer is whether they've rested in

7    terms of their evidence.

8               THE COURT:  Mr. Wasdin, I saw another name on the

9    list of witnesses, but I don't know if that's yours or

10   someone else's.

11              MR. WASDIN:  Your Honor, could you tell me the

12   name?

13              THE COURT:  The name is, I believe its Kevin

14   DeLuise.

15              MR. MINUTI:  Your Honor, I believe that was the

16   HSR witness and was not necessary.

17              THE COURT:  Okay. All right.

18              MR. WASDIN:  Your Honor, we don't have any more

19   witnesses; however, to Mr. Minuti's point about us being on

20   the evidentiary record for our motion --

21              THE COURT:  Yes.

22              MR. WASDIN:  -- I will repeat again what I said

23   yesterday, which is it's our understanding that we're making

24   a joint record for both motions.

25              MR. MINUTI:  Your Honor, I agree with that, but I

1   do have one witness in rebuttal and I don't want to rebut

2   until they're finished their evidentiary presentation in

3   support of their motion.  So, if I can get that confirmation

4   we can then move to my witness.

5          MR. WASDIN:  That's correct.

6          THE COURT:  All right.

7          MR. MINUTI:  Your Honor, what I have then is just

8   a brief proffer of Mr. Wilen.  This will be focused on the

9   Tenet and Conifer issues.  If I may proceed.

10          MR. WASDIN:  Mr. Wasdin, is it acceptable?

11          MR. WASDIN:  Your Honor, we object to rebuttal

12  testimony by proffer.  To the extent Mr. Wilen is going to

13  criticize either of my clients today it would be our

14  preference that he take the stand and do so live.

15          MR. MINUTI:  Your Honor, just like we did

16  yesterday there is no difference in terms of the content.  He

17  is in the courtroom.  He is available for cross examination.

18  They will have a full and fair opportunity to respond to

19  anything we say in the proffer.  It's just a way for us to

20  get through the evidence more quickly.  I will remind the

21  court that Mr. Sherman has another hearing later this

22  afternoon.  We're trying to get done by then.

23          So, again, I just think it would be more efficient

24  if we proceed by proffer.  No one had an issue with it

25  yesterday, Your Honor.  I think it's pretty straight forward.

1    MR. WASDIN:  Your Honor, I appreciate Mr. Minuti's

2  points regarding efficiency.  I don't know how long they plan

3  to put him on for or proffer for; however, it's our position

4  that a proffer yesterday regarding the basic elements of a

5  DIP budget or things like that are totally different then

6  somebody taking the stand, taking an oath and criticizing our

7  clients in court.  We would prefer it be done live.

8    MR. MINUTI:  Your Honor, there is not going to be

9  criticism of -- it's not going to be criticism, it's going to

10  be talking about why it is the contract rate is not the

11  appropriate rate in these circumstances. Again, it's the same

12  content, it's just --

13    THE COURT:  Does that make a difference, Mr.

14  Wasdin, or do you still want live testimony?

15    MR. WASDIN:  It's our preference that it be done

16  live.  I believe some basis that they have argued in the past

17  as to why the contract rate is not the appropriate rate is a

18  criticism of our service.

19    THE COURT:  All right.  Let's put Mr. Wilen on the

20  stand then.

21    MR. MINUTI:  Very well, Your Honor.

22    THE COURT:  Mr. Wilen, if you'll come back.

23  You're still under oath or affirmation I should say.

24                    DIRECT EXAMINATION

25  BY MR. MINUTI:

1  Q     Good morning, Mr. Wilen.

2  A     Good morning.

3  Q     Mr. Wilen, you testified earlier about your familiarity

4  with both the MSA and the TSA.  You are familiar with those

5  documents?

6  A     Yes, I am.

7  Q     Okay.  And just generally tell the court what is --

8  generally, what are the services that are provided under

9  those documents?

10 A     The TSA typically provides systems related services.

11 The MSA, basically, provides revenue cycle managment

12 services.

13 Q     And can the debtors operate without the services that

14 are being provided by Tenet and Conifer?

15 A     Without Tenet's services, no.  In theory, you can

16 operate without Conifer's services.

17 Q     Okay.  But does the debtor have the ability to do that

18 today?

19 A     Today, no.

20 Q     And why not?

21 A     Because in order to operate without Conifer's services

22 you'd have to go through a period of probably six months with

23 no cash flow.

24 Q     Okay.  And you are aware, are you not, that there are

25 have been significant disputes and differences between both

1  the debtors and Tenet and Conifer since almost the inception

2  of when the debtors acquired the hospitals.  Is that correct?

3  A    Yes.

4  Q    Okay.  And are you aware of any litigation that was

5  instituted prepetition against Tenet?

6  A    I believe there are two separate pieces of litigation

7  that were filed here in Delaware.

8  Q    Okay.  If you could, you've got the black binder in

9  front of you.  If I could, let me ask you to turn to Tab 4 in

10  the black binder.

11  A    Yes.

12  Q    Okay.  And are you familiar with this document?

13  A    I am.

14  Q    And what is this document?

15  A    This is an initial complaint that was filed in the case

16  related to a working capital adjustment dispute early on in

17  the case.

18  Q    And do you have an understanding as to how much is

19  involved in connection with that lawsuit?

20  A    I believe it's a $25 million dollar working capital.

21            THE COURT:  Yes?

22            MR. WASDIN:  I'm just going to object to the

23  relevance of this line of questioning.  And I also believe it

24  may contradict the agreement that's reflected in the debtor's

25  response to our motion in limine with regard to the

1  prepetition ASA disputes.  I think they represented they

2  weren't going to introduce any of the underlying facts about

3  those disputes, just the general existence for context.

4                THE COURT:  Yes.

5                MR. WASDIN:  It seems like we're going beyond that

6  at this point, Your Honor.

7                THE COURT:  Yes.  Mr. Minuti?

8                MR. MINUTI:  Your Honor, I'm just getting this by

9  way of context.  What Tenet and Conifer have done, Your

10 Honor, is introduced a litany of prepetition invoices arguing

11 that those invoices were not paid and are due.  I'm just

12 providing some context in terms of, you know, there are

13 obviously two sides to the story.  There is a reason why

14 those amounts were not paid.

15               Again, I've got very little to cover here, Your

16 Honor, other than to provide the court with some general

17 background.  I don't intend to go into the specifics.  I'm

18 really done asking the question about this complaint.

19               MR. WASDIN:  And with respect to the invoices we

20 did skip over the amounts of the prepetition invoices, but

21 those Rule 1006 summaries were prepared before we had

22 agreement on this.

23               THE COURT:  Okay.

24               MR. WASDIN:  So, we did not introduce the actual

25 prepetition amounts owed.  And I would just object to their

1  testimony about the amount of their claims prepetition.

2         MR. MINUTI:  Your Honor, the 1006 summaries of the

3  prepetition amounts allegedly owed are in evidence. So,

4  they've put that before Your Honor.  Again, I'm done asking

5  questions about this complaint.  I think it's important for

6  context to understand the debtor's position.

7         THE COURT:  Well, just so you will understand I'm

8  ignoring the prepetition invoice amounts.  I don't think

9  that's relevant, particularly, today.  I don't really think

10  that the litigation is particularly relevant, but I'll

11  overrule your objection.  I'll allow this one question and

12  answer.

13        MR. WASDIN:  Thank you, Your Honor.

14        MR. MINUTI:  Thank you, Your Honor.  Well, Your

15  Honor, maybe I can get some guidance then.  There is a

16  separate complaint.  I was prepared to have Mr. Wilen

17  identify, this is a complaint for fraud and breach of

18  contract.

19        THE COURT:  Yes.

20        MR. MINUTI:  Again, just same question.  I simply

21  wanted him to identify the complaint to establish the

22  existence of the claims between the parties.  May I proceed

23  with that?

24        THE COURT:  Yes, that would be fine.

25        MR. MINUTI:  Very well, Your Honor.

1  BY MR. MINUTI:

2  Q     Mr. Wilen, if you could then turn to Tab 5 in the

3  binder.  Do you recognize that document?

4  A     Yes.

5  Q     And what is that document?

6  A     It's a complaint filed against Tenet.  There's a number

7  of allegations related to things that were done or not done

8  ranging from fraud complaint to issues with services

9  provided.

10 Q     And going back, relatively early in the arrangement, I

11 think you testified earlier that almost immediately there

12 were disputes and differences between the parties once the

13 debtors acquired the hospital, correct?

14 A     Correct.

15 Q     Okay.  And what is your understanding as to what was

16 happening over, let's say, the year before the petition date

17 among the parties?  Were they having discussions?

18 A     It's my understanding there were discussions going on

19 for a long period of time near the -- soon after I came on

20 board I was immediately having discussion with Mr. Maloney

21 about settling all the claims.

22 Q     All right.  And you were in the courtroom yesterday

23 when testimony occurred about a letter that was issued and a

24 termination notice that was issued in May.  Are you familiar

25 with that termination notice?

1  A      Yes, I am.

2  Q      And am I correct in notwithstanding the notice Tenet

3  and Conifer continue to provide services?

4  A      Correct.

5  Q      Okay.  Did there come a time when the debtor started to

6  pay Tenet and Conifer something?

7  A      Yes.

8  Q      And when was that?

9  A      Soon after that letter was received Mr. Maloney asked

10 me for some sort of a payment towards expenses related to the

11 case.

12 Q      Okay.  And how much was that?

13 A      The first payments were $125,000 dollars a week.

14 Q      And did there come a time when that amount was

15 increased?

16 A      Yes, to 200,000.

17 Q      And who's decision was it to increase the number?

18 A      That was mine.

19 Q      Okay.  And why is it you increased the number to 200?

20 A      Because I was -- as I had told Mr. Maloney originally,

21 I was trying to provide to Tenet and Conifer what I could

22 afford out of the cash budget to give them.

23 Q      Okay.  And in the background, right, there are all

24 these disputes and differences between the parties, correct?

25 A      Yes.

1   Q     Okay.  And what was your expectation of what ultimately

2   happened with respect to those disputes and differences?

3   A     I think as I said in my first-day affidavit, you know,

4   I was hoping to get everything resolved and settled here in

5   the Chapter 11 once we knew where things were going.

6   Q     Okay.  It's pretty clear you were unable to do that

7   prepetition, correct?

8   A     Correct.

9   Q     All right.  And the debtors filed for bankruptcy when?

10  A     June 30th and July 1st.

11  Q     Now, at yesterday's hearing Tenet and Conifer's

12  witnesses testified that they have and will continue to be

13  shorted almost $610,000 dollars per week for post-petition

14  services based on the contract rate.  Do you recall that

15  testimony?

16  A     Yes, I do.

17  Q     Okay.  And do you believe that is true?

18  A     No.

19  Q     Why not?

20  A     Because in July I had thirty-six patients in the

21  hospital.  In August I had pretty much zero patients in the

22  hospital.  So, you know, if you calculate your real cost of

23  services being provided it's minimal.

24  Q     Okay.  So, let me ask you, if you could, to turn to Tab

25  10, again, in the debtor's binder.  This is Conifer's invoice

1  for July.  Let me know if you're with me?

2  A     Yes.

3  Q     And you see that there's a percentage there that makes

4  up the amount due under the contract based on acute net

5  patient revenue.  Do you see that?

6  A     Yes.

7  Q     And the acute net patient revenue that's used to

8  calculate the bill is based on acute net patient revenue for

9  May, correct?

10  A     Correct.

11  Q     All right.  So, I'm correct, am I not, that the July

12  invoice is not based on the actual level of billings or

13  collections in July, correct?

14  A     No, it is not.

15         MR. HAYDEN:  I'm going to object to Mr. Minuti as

16  leading this witness.

17         MR. MINUTI:  Your Honor, I'll move on.

18         THE COURT:  All right

19  BY MR. MINUTI:

20  Q     And, again, if you turn to Tab 11 this is Conifer's

21  invoice for August?  Okay.  And you will agree with me that

22  the acute net patient revenue that the August bill is based

23  upon relates to June, correct?

24  A     Correct.

25  Q     So --

1 A    I'll also point out to you, by the way, that there's a

2 statement on this invoice that says that this is an estimate

3 of our accrued but unpaid charges for August 1st to August

4 31st, 2019 and that we are not seeking payment for this

5 amount at the given time, given the recent bankrutpcy filing

6 this is being produced for informational purposes only

7 pending filing of a proof of claim.  I don't believe there's

8 been a proof of claim filed.

9 Q    I see that.

10    I want to switch gears.  I want to talk a little bit

11 about the TSA.  Now, how many hospitals did the debtor

12 operate at the time the TSA was entered into?

13 A    Two.

14 Q    All right.  And is it your understanding that the fees

15 under the TSA were predicated on the operation of two

16 hospitals?

17 A    That's my understanding.

18 Q    And notwithstanding the fact that Hahnemann University

19 Hospital has been shut down are there services that are still

20 required, IT services that are still required?

21 A    Yes, there are some.

22 Q    Okay.  But has the level of IT services needed by the

23 debtor gone up, down or stayed the same as a result of the

24 closure of Hahnemann University Hospital?

25 A    Oh, it's clearly gone down.

1  Q     Okay.  How many employees did the debtor have at

2  Hahnemann University Hospital before the petition date, let's

3  say May?

4  A     Approximately 2,700.

5  Q     2,700.  And how many employees do you have there today?

6  A     About forty-five.

7  Q     Okay.  And of the 2,700 employees you previously

8  mentioned give me an idea of how many of those folks accessed

9  IT services at the hospital being provided by Tenet?

10  A     I would gather the vast majority of them in some

11  capacity.

12  Q     Right. And today you're down to forty-five employees?

13  A     Correct.

14  Q     Now, let me ask you to turn to Tab 12 in the binder.

15  This is the transition services agreement.  Let me know when

16  you're there.

17  A     Okay.  I'm there.

18  Q     And if you could go to Schedule 1.4 which is the

19  supported software applications.

20  A     Yes.

21  Q     And what is this schedule?

22  A     It is a list of all the computer systems that are being

23  provided access to and licensed for that are the old Tenet

24  systems when they ran the hospital.

25  Q     And is the debtor today using all these systems?

1  A      No, we are not.

2  Q      And how many of the systems or the applications that

3  are referenced in Schedule 1.4 is the debtor not using?

4  A      Approximately ten of them.

5  Q      And did you have any conversations with Tenet about the

6  fact that you're not using some of the services?

7  A      So, my IT director reached out to Tenet at one point in

8  time related to some of the systems.  I had conversations

9  with her regarding that issue and addressed those issues.

10 Tenet's response, in writing, was that those were all free

11 systems.

12             MR. HAYDEN:  It's fine, we'll withdraw it.

13             THE COURT:  All right.

14 BY MR. MINUTI:

15 Q      All right.  So, no change to the contract rate,

16 correct?

17 A      That's correct.

18 Q      Now, I want to turn back, I want to talk a little bit

19 about -- I apologize, I'm jumping around, Your Honor.  I'm

20 trying to move this along.

21      I want to go back to the master services agreement with

22 Conifer.  You will find that at Tab 7.  And the statement of

23 work, I believe, is at Tab 8.  Let's look at the statement of

24 work.  And you're familiar with how Conifer's fees are

25 calculated under the statement of work, are you not?

1   A     Yes, I am.

2   Q     Okay.  And generally speaking, their fee is calculated

3   as a percentage on billings, is that fair?

4   A     Correct.

5   Q     Okay.  And you've been a financial advisor for twenty-

6   five plus years?

7   A     Yes.

8   Q     How many hospital cases have you been involved in?

9   A     Approximately twenty-five.

10  Q     All right.  How many other healthcare cases have you

11  been involved in.

12  A     In excess of twenty or so.

13  Q     Okay.  Based on your experience how many of the other

14  case that you've been involved in did the billing and

15  collection firm that was being utilized get paid on a

16  percentage of billings?

17  A     Zero.

18  Q     With regard to your experience in some of the hospital

19  cases you have or you've been involved in what was the nature

20  of the fee or how was the fee determined in those cases?

21  A     There's usually a small set base fee that is a fixed

22  fee component and then almost all of its based on collection

23  of cash.

24  Q     So, collections?

25  A     Yes.

1    Q      And do you have a view as to which system is better?

2    A      A collection of cash is a dual incentive system.  It

3    motivates you to go and drive as much cash as you can for the

4    front door which is the whole idea behind a billing and

5    revenue cycle management team is.  Gross billings is kind of

6    a useless way of doing it because from that perspective, you

7    know, it encourages larger bills to be billed and doesn't

8    necessarily benefit somebody on the cash collections.

9    Q      Okay.  And we -- you were in the courtroom when Mr.

10   Dawson testified under cross examination, and we talked a

11   little bit about this idea that the July invoice is based on

12   services, for example, in May, correct?

13   A      Correct.

14   Q      All right.  Do you believe that the acute net patient

15   revenue in May is fair value for services that are being

16   provided in July?

17   A      No.

18   Q      Why not?

19   A      Because the level of service needed is significantly

20   different.  You have less patients, you have less billing.

21   Q      And let's talk about hospital -- let's talk about

22   patients in general.  Are the summer months busier months,

23   slower months for hospitals?

24   A      Typically they're much slower months.

25   Q      And why is that?

1   A    people go on vacation, people want to -- you don't have

2   the cold and flu season, pneumonia season which are usually

3   drivers for a hospital in the winter time.  So, you tend to

4   have much lower volumes in the summer.

5   Q    Okay.  Lower volumes means lower billing?

6   A    Correct.

7   Q    In other words not as much billing, correct?

8   A    That is correct.

9   Q    Okay.  Let's talk a little bit about patient census at

10  Hahnemann University Hospital.  Do you know what the patient

11  census was at, let's say average patient census at Hahnemann

12  was in May of this year?

13  A    I think it was 203.

14  Q    Okay.  What was the patient census as of the petition

15  date?

16  A    I believe it was thirty-six.

17  Q    What's the patient census today?

18  A    Zero.

19  Q    So, is it fair to say -- so, as a result of the decline

20  in patient census what's happened to the billings?

21  A    Billings have dropped.

22  Q    And how would you describe that?

23  A    Well, they've dropped naturally because I have less

24  patients in the hospital.  So, therefore you have a reduction

25  in your billing.

1  Q     Okay.  St. Christopher's is continuing to see patients,

2  correct?

3  A     Correct.

4  Q     And St. Christopher's is still billing patients with

5  Conifer's services, correct?

6  A     Correct; although, there is lower volume in the summer.

7  Q     Okay.  But give me the idea of the magnitude between

8  the two hospitals?  Was St. Christopher's busier, about the

9  same?

10 A     Well, St. Christopher's about a third of the size on a

11 billing perspective as Hahnemann was at a full room rate.

12 Q     Okay.  Mr. Dawson testified on the stand about the

13 number of on-site employees that Conifer had a Hahnemann

14 University Hospital.  Are you familiar with the number of

15 employees that Conifer has on site?

16 A     Yes.

17 Q     And give me an idea.  How many Conifer employees were

18 on-site, let's say, in May of this year?

19 A     Between sixty and seventy.

20 Q     And do you have any idea how many Conifer employees

21 were there last week?

22 A     Ten, twelve.

23 Q     And you heard Mr. Dawson say that there are no longer

24 any Conifer employees at the hospital, correct?

25 A     That's correct.

1           MR. MINUTI:  Your Honor, bear with me for one

2     second.  Your Honor, I have no further questions at this

3     time, but I would like to move into evidence Exhibits 4 and 5

4     which are the complaints.

5           THE COURT:  That's from your book, is that right?

6           MR. MINUTI:  Correct.

7           THE COURT:  Any objection to the admission of

8     those exhibits?

9           MR. HAYDEN:  Are those in the complaints?

10          MR. MINUTI:  They are.

11          THE COURT:  Yes.

12          MR. HAYDEN:  I would object to the admission of

13    those into evidence.  I don't think they're relevant and I

14    believe, as I said before, that the response to our motion in

15    limine on admitting information beyond the existence of these

16    disputes. I have think they have in the record what they need

17    from the testimony, Your Honor.

18          THE COURT:  Mr. Wasdin, did you have a comment?

19          MR. WASDIN:  If I could add to that.  I would just

20    read from the debtor's reply to our motion in limine,

21          "Contrary to the assertions in the first motion,

22    the debtors are not seeking to introduce evidence or argument

23    concerning the debtor's prepetition lawsuits against Tenet in

24    an effort to argue that the debtor's may exercise set-off

25    rights against Tenet and Conifer's post-petition claims. . .

1  or, two, to hold a mini trial on the merits of debtor's ASA

2  related claims."

3            I believe introducing the complaints, which are

4  nothing more than allegations that we dispute into evidence,

5  is contrary to that representation.

6            THE COURT:  Well, I think probably the debtors

7  would argue, you know, that they're just introducing them for

8  informational purposes as well as anything.

9            MR. MINUTI:  Right.

10            THE COURT:  But I don't know that they're really

11  relevant, Mr. Minuti.  And I don't know that they're helpful

12  to the case.  You've gotten testimony that there are these

13  lawsuits, but I don't know that the complaints themselves

14  have really been investigated or questioned.  So, I'm going

15  to deny admission of those two exhibits.

16            MR. MINUTI:  Thank you, Your Honor.

17            MR. HAYDEN:  Thank you, Your Honor.

18            MR. MINUTI:  Your Honor, with that I'll pass the

19  witness.

20            THE COURT:  All right.  Thank you, Mr. Minuti.

21            Mr. Hayden?

22                        CROSS EXAMINATION

23  BY MR. HAYDEN:

24  Q     Good morning, Mr. Wilen.

25  A     Good morning.

1  Q     Again, for the record, Kent Hayden for Tenet and

2  Conifer.

3        Now, in your direct examination this morning you

4  testified that as a result of Hahnemann's closure certain of

5  Conifer's on-site staff are no longer working at Hahnemann.

6  Is that correct?

7  A     That's correct.

8  Q     And you understand that after Hahnemann's closure

9  Conifer continues to track and collect patient receivables

10 for services at the Hahnemann Hospital.  Is that correct?

11 A     That's correct.

12 Q     And to be clear, that accounts receivable work that

13 Conifer is doing for Hahnemann will continue for months after

14 the closure of Hahnemann.  Is that correct?

15 A     Correct, because they were reimbursed for it already.

16 Q     Have you done an analysis of the amount of the contract

17 rate due to Conifer under the MSA is attributable to on-site

18 services at Hahnemann?

19 A     No, I have not.

20 Q     You also testified about how in your experience the way

21 Conifer is compensated under the MSA is unusual, is that

22 right?

23 A     Correct.

24 Q     You understand that being compensated on billing is the

25 framework that was established in the MSA, correct?

1  A      Correct.

2  Q      It was agreed to by PAHS and Conifer, correct?

3  A      Well, it was a condition of the Tenet agreement in the

4  sale.  I believe the TSA had a requirement that they used

5  with Conifer.

6  Q      And did debtors and, specifically, PAHS agree to that?

7  A      Yes.

8  Q      With respect to the litigation that you testified about

9  you understand that those claims that debtors have asserted

10  against Tenet are outstanding, correct?

11  A      Correct.

12  Q      No judge has ruled on the merits of any of debtors

13  allegations in those complaints?

14  A      That's correct.

15          MR. HAYDEN:  Okay.  I have nothing further for you

16  at this time.  Thank you.

17          THE COURT:  Mr. Wasdin, did you have any questions

18  relating?  I think -- were you questioning on the

19  Tenet/Conifer or was it a witness?

20          MR. WASDIN:  Your Honor, it was a witness.

21          THE COURT:  All right.  Mr. Sherman, did you wish

22  to ask any questions?

23          MR. SHERMAN:  Yes, Your Honor.  I can't pass up

24  the opportunity.

25                      CROSS EXAMINATION

1  BY MR. SHERMAN:

2  Q     Just a few questions, Mr. Wilen.  The services that are

3  being provided by Tenet and Conifer are those primarily

4  related to accounts receivable?

5  A     Yes.

6  Q     And that's the collection of accounts receivable?

7  A     Its revenue cycle management.

8  Q     Okay.  So, RCM.  So, generally revenues that -- can you

9  just describe what you mean by revenue cycle management?

10 A     Revenue cycle management services are everything from,

11 in this case, patient intake, through the processing of a

12 bill, through following up on denials, to collection of an

13 ultimate receivable.  Then the write-offs of receivables that

14 are collected at the end.

15 Q     So, in connection with those, I'll call them, RCM

16 services those enable the hospital to collect receivables.

17 And it's your understanding that the secured lender in this

18 case, MidCap, is asserting a lien on those receivables,

19 right?

20 A     Correct.

21 Q     So, the services that are being provided by Tenet and

22 Conifer are they benefiting MidCap in its efforts to collect

23 receivables?

24 A     Yes.

25 Q     Are they essential?  Does the hospital have any other

1  ability of collecting receivables without paying Tenet and

2  Conifer?

3  A      Patient receivables, no.

4          MR. SHERMAN:  No further questions, Your Honor.

5          THE COURT:  All right.  Anything further?

6          MR. MINUTI:  No redirect, Your Honor.

7          THE COURT:  All right.  Mr. Wilen, you may step

8  down.  Thank you.

9      (Witness excused)

10          THE COURT:  Does that complete our evidentiary

11  record, Mr. Minuti?

12          MR. MINUTI:  Your Honor, that would complete our

13  rebuttal case.

14          THE COURT:  All right.

15          MR. WASDIN:  Your Honor, we're through as well.

16          THE COURT:  All right.  Excellent.  Okay.  So, I

17  think we're probably ready for argument at this point.  Is

18  that right, Mr. Minuti?

19          MR. MINUTI:  We are, Your Honor.

20          THE COURT:  Is this a good time for a break to

21  give an opportunity for people to organize or do you want to

22  proceed?

23          MR. MINUTI:  I could probably use a bathroom

24  break, Your Honor.  So, that would be fine by me.

25          THE COURT:  That would be fine with me too.  So,

1  we'll take ten minutes and we'll be back at quarter of on

2  this clock.

3          MR. MINUTI:  Thank you, Your Honor.

4      (Recess taken at 10:30 a.m.)

5      (Proceedings resumed at 10:48 a.m.)

6          THE CLERK:  All rise.

7          THE COURT:  Thank you everyone.  You may be

8  seated.

9          Mr. Minuti, before you begin I think there were a

10 couple of motions to file under seal?

11         MR. MINUTI:  Correct, Your Honor.  I don't believe

12 there's any opposition to either.

13         THE COURT:  I don't think so either and I'm

14 certainly prepared to sign those orders, but I have a pile of

15 papers.  I'm not sure that I can readily find them.

16         MR. MINUTI:  Why don't we do this, Your Honor;

17 let's see if we -- we've uploaded those, Your Honor.

18         THE COURT:  Oh, wonderful.

19         MR. MINUTI:  So, we can be in contact with your

20 Chambers and make sure that they happen, but I don't think we

21 need any argument on contested --

22         THE COURT:  If they're uploaded that's fine.

23 We'll take care of it.

24         MR. MINUTI:  Perfect.  Okay.  Are you ready for me

25 then, Your Honor?

1        THE COURT:  Yes, I a.

2        MR. MINUTI:  Your Honor, again, at the outset I

3  want to thank the court for its attention to the hearing.

4  These are important matters, obviously in these cases and we

5  appreciate the court taking the time to hear us yesterday and

6  today.

7        Your Honor, I want to start out -- I'll talk first

8  about the debtor-in-possession financing and then I'll talk

9  about Tenet and Conifer's motion.

10        THE COURT:  Okay.

11        MR. MINUTI:  And at the outset I want to make sure

12  that none of us lose sight of what these cases are all about.

13  We're trying to safely and appropriately close down Hahnemann

14  University Hospital and we're trying to sell St.

15  Christopher's Children's Hospital as a going concern.

16  Without the financing, Your Honor, we'd have no choice but to

17  convert these cases, immediately shut-down St. Christopher's.

18  And to be honest, Your Honor, I can't even imagine what

19  that's going to look like and how that will happen.

20        That hospital is filled with children today in

21  need of critical care, cancer patients, trauma patients, burn

22  patients.  I think Mr. Victor said it best at his deposition,

23  we have to save St. Christopher's.  The survival of St.

24  Christopher's is critical to patients, Philadelphia and it's

25  critical to the debtor's mission, Your Honor, in these

1  Chapter 11 cases.

2              So, you know, forget about the impact on

3  creditors.  We know what that's going to be if the cases are

4  converted, but shutting down St. Christopher's would be a

5  catastrophic failure and we simply cannot let that happen.

6              Now, I sincerely believe, Your Honor, that nobody

7  in the courtroom today wants to see that happen.  I don't

8  believe MidCap wants that to happen, I don't believe Tenet

9  and Conifer wants that to happen, but that's the course we're

10  on, Your Honor; something has to give if Your Honor approves

11  the Tenet/Conifer motion or sustains the objections raised by

12  folks to the debtor-in-possession financing.

13              The evidence Your Honor heard makes crystal clear

14  that there is no fat in the debtor's budget to pay anything

15  further.  If more money is to be made available for HSRE or

16  Tenet and Conifer that means the debtor has to take it away

17  from somewhere else under the budget and we simply cannot do

18  that now.

19              THE COURT:  Let me ask you this question because

20  what came in the testimony was that this money that Tenet and

21  Conifer collect goes to the lender.

22              MR. MINUTI:  Well, Your Honor, the money --

23              THE COURT:  Why shouldn't the lender be paying

24  Tenet and Conifer?

25              MR. MINUTI:  Your Honor, why shouldn't the lender

1   be paying Tenet and Conifer?  The reason why the lender

2   shouldn't be paying Tenet and Conifer is because the lender

3   has given us a loan.

4           THE COURT:  Yes.

5           MR. MINUTI:  That loan allows us to use the cash

6   collateral.  They are providing additional money and that's

7   what is allowing us to operate.  The question is should they

8   be required to give us more money so we have more

9   availability later.  And we try, Your Honor.  We tried to get

10  more money.  We tried to get more availability.  This is the

11  loan we have before Your Honor today.

12          I think the evidence was crystal clear on this

13  point which is we tried to get more money from MidCap.  We

14  tried to get more money from other sources.  I can tell Your

15  Honor its -- I can't remember in my career when I've bene

16  involved in a priming fight with a DIP, but I can tell you we

17  spent all of July 4th and July 4th weekend trying to put that

18  case together because we were trying to get more money.  The

19  conclusion was there was too much risk and we couldn't do it.

20  So, this is the facility I have, Your Honor.

21          Now, look, no DIP facility is perfect.  This one

22  is far from perfect, but here's the real question, Your

23  Honor.  Look, we've heard a lot of problems with this DIP.

24  Mr. Wilen was on the stand.  Mr. Sherman crossed examined him

25  and said, well, what about this, what about that, what about

1  this and those are all things, Your Honor, that in a perfect

2  world we wouldn't want to agree to.  Here's the thing,

3  there's no alternative.  Nobody else is here today, none of

4  the objectors have come forth today with a better DIP that

5  gives us more money.  So, I've got to work with what I have

6  here, Your Honor.

7        THE COURT:  I know as the debtors you have to do

8  that.  That's right.

9        MR. MINUTI:  You got to do that, Your Honor.  So,

10  look, is the budget tight?  There's no doubt about that, Your

11  Honor.  We did the best we could.  These are the terms

12  required of MidCap in order for us to obtain the DIP loan and

13  the use of cash collateral that is necessary for us to move

14  forward.

15        As I said, Your Honor, the budget doesn't allow us

16  now to pay more money, but I stress now we've got a lot of

17  things out there in the future that are going to bring money

18  into this estate that I think and hope are going to take care

19  of all these problems.  Right.  We've got a resident asset

20  sale, Your Honor; gross number $55 million dollars.

21        THE COURT:  Which the lender says should go

22  directly to them.

23        MR. MINUTI:  Your Honor, we disagree.  That's for

24  another day.  But, you know what, we should be so lucky to

25  have $55 million dollars to worry about in this case cause

1  that's going to take care of a lot of problems.

2         So, my point is, Your Honor, we're not counting

3  that money yet.  There's some hurdles to get through, but

4  that's certainly out there.  That is certainly out there as a

5  possibility, Your Honor.  We have the entire St.

6  Christopher's Hospital sale. Again, the testimony from Mr.

7  Wilen was we think that sale alone is going to take care of

8  MidCap, right, and we'll have extra money.  We have

9  preference cases.  We have causes of action.  We have

10  equipment at the hospital.

11         So, at the end of the day the testimony of Mr.

12  Victor, the testimony of Mr. Wilen was we're going to have

13  money.  We're going to have money to make payments we need to

14  make to HSR.  Okay.  And if Your Honor decides that Tenet and

15  Conifer is entitled to more money we're going to have the

16  money later.  We don't have it now.  That's the issue.  We

17  don't have it now.

18         There is no question the debtors have an immediate

19  need for the financing and the use of cash collateral.  When

20  Your Honor approves the financing on a final basis $2 million

21  additional dollars in availability is going to become

22  available and we need that.  We believe, and the testimony

23  was, that the DIP loan and the use of cash collateral is

24  sufficient to get us through a safe and sufficient shut-down

25  of Hahnemann and the St. Christopher sale in combination with

1  the other assets I mentioned which are not included in the

2  budget.

3          We believe that's going to be sufficient to pay

4  all reasonable, allowed anticipated administrative claims

5  including, again, any amounts Your Honor ultimately

6  determines are due to HSRE, and Tenet and Conifer.  Now, can

7  I gaurantee it, Your Honor?  I cannot and nobody in my

8  position can gaurantee it.  Are there risks?  There

9  absolutely are, but notwithstanding those risks, Your Honor,

10  the debtors believe they can successfully implement what they

11  started and, again, generate sufficient funds to pay what's

12  necessary.

13          Again, absent the financing and the use of cash

14  collateral we've got no option, Your Honor.  We've got no

15  option but to shut down these hospitals.  I need that $2

16  million dollars this week.  Again, if that were to happen,

17  Your Honor, all the parade of horribles I already mentioned

18  with regard to the children in St. Christopher's there would

19  be a tremendous loss of value for our creditors, employees

20  would be let go; everyone suffers.

21          So, again, Your Honor, the DIP terms here are far

22  from perfect, but under the circumstances we believe they are

23  fair, reasonable and necessary to preserve value of these

24  estates.  So, at the end of the day, Your Honor, you can

25  nitpick this DIP apart, but as I said a few minutes ago it's

1  fair to do that, Your Honor, if you have an alternative

2  that's better and we don't have any alternative.

3         Let me turn, briefly, Your Honor, and talk about

4  HSRE just a couple of things that they raised.  One of the

5  things that HSRE raised in their objection, Your Honor, was

6  they were concerned that MidCap was going to get a lien on

7  their assets.  We added language to the interim order to

8  address that.  It's in the final order.  So, I believe that

9  issue is resolved.

10         Finally, Your Honor, in the context of its

11  objection HSRE also asserted that there's some agreement

12  between the parties that a utility rebate that the debtor was

13  holding that for their benefit.  The testimony on that was

14  crystal clear.  Mr. Wilen is not aware of any such agreement.

15  There was no counter testimony on that point or any evidence

16  on that point, but, again, that's not even a today issue,

17  Your Honor.  That rebate hasn't come in.  So, we can deal

18  with that another time if we need to do that.

19         So, let me turn to Tenet and Conifer.  Your Honor,

20  let me remind the court their motion is really two motions in

21  one.  It is a motion to compel payment of administrative

22  claim and it's a motion for relief from the automatic stay to

23  allow them to terminate their services; although, yesterday I

24  heard both witnesses testify that they're not going to

25  terminate the services.  So, Your Honor, I guess I'll wait

1  and deal with that in rebuttal if I have to with respect to

2  the lift stay portion of their motion.

3          THE COURT:  Let me tell you my concern with Tenet

4  and Conifer besides the dollar amount that maybe we have to

5  decide.  There is no such thing in this country as

6  involuntary servitude.  If a person or an entity says we're

7  out, we're not being paid, we're done, how does the court

8  keep them in?

9          MR. MINUTI:  Well, Your Honor, I think the way the

10  court keeps them in is by determining what the true value of

11  their services are and then, hopefully, the court deciding

12  that at the end of the day there will be sufficient funds to

13  pay them if there is an amount under the DIP budget that

14  we're not able to pay them today.

15          Let's talk about that for a minute, Your Honor.

16          THE COURT:  Yes.

17          MR. MINUTI:  So, their motion is a 503(b) motion,

18  right.  It's an administrative claim.

19          THE COURT:  Right.

20          MR. MINUTI:  So, it's their burden.  The case law

21  is crystal clear on this, Your Honor.  Smurfit-Stone, one of

22  the cases they cite, it is their burden to prove post-

23  petition value to these estates.  That is their burden, not

24  our burden.  Okay.

25          Case law also makes clear when you're talking

1  about an administrative claim 503(b) is supposed to be

2  narrowly construed.  And the reason for that is it takes

3  money away from other creditors in the case, right?

4              THE COURT:  Right.

5              MR. MINUTI:  So, it's a heavy burden that they

6  have.  Now, it is also true, Your Honor, that there is case

7  law that the case law provides that the contract rate is

8  presumed to be the reasonable value of those services, but

9  that is a presumption.  Once that presumption is rebutted,

10 remember, Tenet and Conifer bear the ultimate burden of

11 proving the value of the services provided post-petition.

12             So, if Your Honor has any doubt, if any of the

13 evidence has caused Your Honor to doubt that the contract

14 rate is the appropriate rate it was their burden to tell you

15 what the true value of those services were and they offered

16 no evidence in that regard.  They've put all of their eggs,

17 Your Honor, into contract rate baskets.

18             So, let's talk about the contract rate, Your

19 Honor, and why the contract rate is not an appropriate

20 measure of fair value in this case and how the presumption

21 has been rebutted in these cases.

22             First and foremost, Your Honor, why is it that we

23 have this presumption that the contract rate is appropriate.

24 The reason that you have the presumption is because it's

25 assumed that the contract rate is determined by the fair

1  market.  You have an RFP, you have a competitive bid process,

2  folks negotiate, you come-up with a number; that's why we

3  presume its fair value.

4          Look what happened in this case.  The rate under

5  the Conifer contract was the rate that Tenet and its almost

6  wholly owned subsidiary came up with and it was simply

7  carried forward to the debtor.  Okay.  Number one.

8          Number two, entering into the MSA with Conifer was

9  a condition of buying the hospitals.  So, this wasn't a

10  contract, Your Honor, that was created through market forces.

11  This was as contract, in terms of the pricing, that was

12  agreed upon between two parties.  And I would analogize it to

13  Your Honor to a contract between a debtor and an insider.

14  The case law makes it crystal clear when you're talking about

15  a contract with an insider its subject to extra scrutiny.

16          There's no difference here.  The pricing was

17  between Tenet and an entity that owned seventy-five percent

18  of, Your Honor.  So, I don't think the presumption even

19  applies here, Your Honor.

20          Tenet and Conifer has suggested, Your Honor, that

21  the debtors need to come forward with some evidence as to

22  what the fair market value is, but, again, it's their burden

23  their relying on the presumption.  The debtor can rebut the

24  presumption, Your Honor, really with any evidence to the

25  contrary and that's what we've done here today, Your Honor.

1        So, let's talk about why the contract rate is not

2   appropriate.  As I already indicated, Your Honor, we have a

3   contract that wasn't part of an RFP or a competitive process.

4   Okay.  We have a contract where the rate was decided between

5   two insiders.  Mr. Dawson talked about when they talked to

6   other parties about entering the contract there's a whole

7   host of different mechanisms they could use and through

8   negotiations they arrive at the appropriate one between two

9   parties.  That didn't happen here, Your Honor.  It was a rate

10  established between Tenet and Conifer and it carried forward.

11  It's not a market driven contract.

12        THE COURT:  Well, it was agreed to by the

13  purchasers, correct?

14        MR. MINUTI:  Agreed to by the purchasers, Your

15  Honor, but let's talk about what that means.  It may be a bad

16  contract.  Right. It may be a bad contract.  Outside of

17  bankruptcy we may say, hey, you made a bad deal you got to

18  live with it, but that's not what 503 is about.  What 503 is

19  about is it allows me to correct a problem, a bad contract

20  because if I can rebut the presumption now let's talk about

21  what they're really entitled to, what's the true value of

22  their services.

23        So, let's talk about the TSA for a minute.  Okay.

24        THE COURT:  Yes.

25        MR. MINUTI:  Very simply, Your Honor, the TSA,

1  huge amount of money for IT services.  It's entered into and

2  the prices are established at a time when the debtors are

3  operating two hospitals.  We're down to one.  We've gone from

4  2,700 employees down to forty-five accessing IT services.

5  Clearly, pricing that was established when you had 2,700

6  users for IT services doesn't make sense in the context of

7  where we are today post-petition in these cases.  It doesn't

8  make sense.  The contract rate makes no sense given our facts

9  today, yet Tenet is still charging the same fee under the

10 contract.

11         Also, with respect to the TSA the testimony of Mr.

12 Wilen was unrebutted that there are a number of the services

13 that their supposed to be providing that the debtor is not

14 even using anymore or doesn't have access to and yet that led

15 to no change in the pricing of the contract.

16         So, let's turn the MSA.  Mr. Dawson agreed just

17 this morning that certain services required under the MSA

18 they're not even providing anymore.  The debtor is doing that

19 in-house and yet there is no adjustment in the base fee, Your

20 Honor.  So, that is additional evidence why the contract rate

21 no longer makes sense in this case.

22         Now, Mr. Wilen convincingly testified that in his

23 experience a contract with a billing and certain collecting

24 provider that is predicated on gross billings, right, without

25 regard to collections, his view is that's highly unusual and

1  completely backwards.  Remember, they're doing our billing

2  and collecting.  You know what the important part of that is

3  the collecting.  That is how we bring in cash, that's how we

4  operate the hospital.

5          So, the structure again, Your Honor, I would say

6  is not even appropriate.  Again, you might say, well, that's

7  what the contract says.  Maybe we made a bad deal, but I

8  don't have to live by that deal under 503(b), Your Honor, if

9  I can rebut the contract.

10         So, next, Your Honor, let's talk about the

11 mechanics of the contract rate.  And this is pretty

12 important, Your Honor.  And I know this is a difficult

13 concept to grasp because we got to look at contracts, we have

14 to look at contract language and, you know, I don't have

15 extensive experience in healthcare.  So, you kind of have to

16 really look and see what this is all about.

17         We have this concept of acute net patient revenue.

18 Right.

19         THE COURT:  Right.

20         MR. MINUTI:  And acute net patient revenue is tied

21 to billing.  Again, billing, right, but the way the contract

22 works is they bill in advance for the services, but the

23 number is based on two months prior.  In May I've got two

24 fully functioning hospitals.  In July I don't, right, and yet

25 my July bill is based upon billing in May.  It can't make

1  sense here.  It can't make sense here.

2         Now, one of the interesting things about the MSA

3  and the statement of work, Your Honor, is there's actually a

4  section of the statement of work that talks about adjusting

5  the base fee in the event that patient census goes down, but

6  the way it works is there's a six month lookback, you look at

7  it, Conifer does an analysis and then the parties get

8  together and talk about it.

9         The contract really doesn't deal with a situation

10  where one hospital closes and you're selling another one.  It

11  doesn't deal with that, but that's the entire point, Your

12  Honor.  The entire point here is we have a contract that's

13  pricing is based upon those two hospitals continuing for the

14  length of the contract and that's not what's happening here.

15  We've closed the hospital and we're going to sell another

16  hospital by October.

17         So, the billing system, Your Honor, even if you

18  assume it made sense at one time, doesn't make sense under

19  the facts of our case because, you know, simple example; we

20  had a lot more patients in May, right.  The acute net patient

21  billing was a lot higher in May.  We have now closed the

22  larger of the two hospitals.  The level of service is going

23  to go down significantly post-petition.  It has gone down.

24  It will go down, no doubt about that.

25         So, pricing, Your Honor, that's based on two

1  months prior when you had two fully functioning hospitals it

2  makes no sense in the context of this case.  It can't be fair

3  value for the services being provided post-petition.  It just

4  can't be.  Simple examples, Your Honor.  At one point Conifer

5  had fifty people on site, fifty people on site doing work.

6  Mr. Dawson said today there's none, right.  You know, pretty

7  self-evident.

8           If the work of fifty people has evaporated to no

9  work why are we still paying the same contract rate for those

10 services?  It just doesn't make any sense and it doesn't make

11 sense because the contract didn't contemplate the situation

12 we find ourselves in today.  That is the whole point.  That

13 is why we go to 503(b).  That is why we try to find out what

14 the fair value is and that's what we're really trying to do

15 here today.

16          One of the other things that we talked about when

17 we talked about acute net patient revenue, Your Honor, was

18 acute net patient revenue, the definition is its, sort of,

19 gross billings adjusted downward based on a number of

20 factors, but Mr. Dawson was clear.  Some of those factors

21 you're not going to know for months, and months and months,

22 and yet there's no mechanism in the bill to adjust what's

23 paid to Conifer.  There is no true-up down the road.

24          If the hospitals were continuing maybe the system

25 itself works out, but not when the one hospital shuts down

1    and another is being sold.  So, as a practical matter we're

2    not getting the benefit of any of those adjustments that

3    would being the amount they're entitled to down.  That's

4    another reason why the contract rate here makes absolutely no

5    sense on a post-petition basis.

6         So, Your Honor, for all of those reasons we

7    believe we've successfully rebutted the contract rate.  We

8    don't think it's appropriate for these debtors under these

9    facts where one hospital is completely closed and the other,

10   Your Honor, is being sold.  At this point, Your Honor, the

11   burdens switch back to Tenet and Conifer to offer evidence as

12   to the fair value of their services.  They offered no

13   additional evidence on fair value and for that reason, Your

14   Honor, the motion should be denied.  There is no evidence in

15   the record from which Your Honor can determine fair value.

16        Now, in the unlikely event that the court agrees

17   that Tenet and Conifer somehow met its burden to establish

18   that they are entitled to more money post-petition we believe

19   the court should deny Tenet and Conifer's request for

20   immediate payment.  Case law makes clear, and there's no

21   dispute, Your Honor, that the timing of payment is wholly

22   within the court's discretion.

23        THE COURT:  Right.

24        MR. MINUTI:  Court's typically look to three

25   factors, the prejudice to the debtors, the hardship to the

1  claimant and potential detriment to other creditors.  All of

2  these factors strongly weigh into the denial of Conifer's

3  motion.  Prejudice to the debtor, Your Honor, we don't have

4  the ability to pay more money.  What that means is we very

5  well may be converting these cases and shutting down St.

6  Christopher's Hospital.  I think I've made my point on that,

7  but there's no doubt there will be prejudice to this estate

8  if we're required to pay them any additional amounts today.

9          Next, the hardship to the claimant, Your Honor,

10  Tenet and Conifer don't even argue there's a hardship.  It's

11  a $2.8 billion dollar market cap company.  There is no

12  prejudice to them waiting for payment, Your Honor.  Again,

13  Mr. Wilen and Mr. Victor both testified in their view at the

14  end of the day there will be sufficient funds to pay their

15  claims whatever Your Honor determines them to be.

16          Finally, Your Honor, with respect to prejudice to

17  other creditors forcing us to pay them more money now, again,

18  will result in a shut-down, Your Honor.  That is a tremendous

19  loss of value.  All those things I already talked about, Your

20  Honor, there's going to be a tremendous loss of value for our

21  estates.  Nobody wins if that happens.

22          So, again, Your Honor, it sounds to me like

23  they've withdrawn their application for relief from the

24  automatic stay.  For all the reasons --

25          THE COURT:  I don't know if that's the case.  Are

1  you sure about that?

2           MR. MINUTI:  Well, Your Honor, why don't I do

3  this; I will reserve argument on that.  I heard both of their

4  witnesses testify that they're going to continue providing

5  services, but maybe I misunderstood.

6           THE COURT:  Okay.

7           MR. MINUTI:  Why don't I reserve on that argument,

8  Your Honor.  I appreciate Your Honor taking the time to

9  listen to me today.  Is there any questions of me, Your

10 Honor?

11          THE COURT:  No.  You made good argument.  I

12 understand your points.

13          MR. MINUTI:  Thank you, Your Honor.  I'll cede the

14 podium.

15          THE COURT:  Yes.

16          MR. PESCE:  Thank you, Your Honor; again, for the

17 record Gregory Pesce, Kirkland & Ellis, on behalf of Tenet.

18          THE COURT:  Is your name pronounced Pesce?

19          MR. PESCE:  Pesce, yes.

20          THE COURT:  All right.  Thank you.  I heard it in

21 different ways and I wanted to be sure.

22          MR. PESCE:  I'll take it any which way you want as

23 long as I win today.

24          THE COURT:  I think a person deserves to be called

25 by his name correctly.

1          MR. PESCE:  Thank you.

2          Your Honor, first off, Tenet and Conifer want to

3    thank the court for all of the time that you have provided

4    for us and the committee and the debtors over the last few

5    days for this important matter.  And we also want to thank

6    all of the doctors, nurses, administrators, orderly's and

7    other people that until Friday were working at Hahnemann and

8    continue to work at St. Christopher's.

9          Tenet and Conifer know the stress that those

10   employees face.  For over twenty years, we've had personnel

11   onsite at 230 Broad Street for Hahnemann and at 160 E. Erie

12   for St. Christopher's.  And regardless of who cuts the

13   paychecks and whether or not it says Tenet or Conifer or CCH,

14   those people all feel the same mission and desire to help

15   patients and save lives at those hospitals.

16         THE COURT:  Yes.

17         MR. PESCE:  And that is why for the last twenty

18   years, Tenet and Conifer have worked to preserve the

19   hospitals.  Unfortunately, they no longer fit into their

20   larger corporate strategy and they sold the hospitals.  But

21   that commitment to patient health, safety and the important

22   public health mission of those hospitals continues through

23   today.

24         And, indeed, that's why since the commencement of

25   this case, and let this sink in, Tenet and Conifer have

1   provided more financing for the estates in the first six

2   weeks of this case then the lender, so-called lender, will

3   provide for the duration of the case.  Consider that.

4           Consider that commitment that Tenet and Conifer

5   have had, the runway we provided which Mr. Wilen described

6   prepetition and lists negotiations, ultimately fruitless, but

7   endless hours of negotiations, consider that in light of the

8   testimony yesterday from Mr. Wilen.

9           Now Mr. Wilen and my clients, even me personally,

10  have had differences and sometimes raised our voices.  We

11  sometimes probably said things we regretted with the benefit

12  of hindsight.  But there is one thing that is unquestionable

13  in light of the evidence that you've heard over the last

14  twenty-four hours, and as Mr. Wilen and his colleagues are

15  the last thing -- the last bull work between the hospitals

16  closing and keeping them open.  And they kept them open under

17  conditions that no public health professional or any citizen,

18  frankly, should countenance or condone, nor should the court.

19          I recall it was Mr. Wilen yesterday.  He testified

20  under oath that he was near hours from ordering the largest

21  mass closure of an intercity hospital since Hurricane

22  Katrina.  Yet, unlike our fellow citizens from Houston to New

23  Orleans who are in the eye of that storm, wheeling patients

24  out on stretchers and walking them out in walkers as the

25  storm clouds rolled in, this calamity was not the result of

1   an act of God.  It was precipitated by our lender, a lender

2   which is purported oversecured, yet won't consent to priming,

3   a lender who is purported oversecured, yet Mr. Victor, a very

4   accomplished practitioner in the restructuring industry, was

5   unable to find someone who could provide alternative

6   financing.

7           Those facts tell you all you need to know about

8   the position of MidCap here.  And it's MidCap, our lender,

9   who wants every constituent in this case to wait and hold on,

10  get a hope note unless and until these sales close.  But the

11  evidence is clear, there will not be a sale closing until, at

12  least, September on the patient residency program.

13          And we are hopeful, we have told the debtor in

14  writing that we are hopeful and willing to work with them on

15  anything to work on St. Chris or the patient -- or, I'm

16  sorry, the residency sale.  But as of today, those sales are

17  not closed and we have no certainty that those sales will

18  ever close.

19          And while the DIP budget doesn't include that

20  money, you heard argument from Mr. Minuti saying don't worry,

21  just a matter of timing.  With respect, it's not a matter of

22  timing.  It's not a matter of timing.

23          And just as no doctor at any of these hospitals

24  would tell a patient don't worry, tomorrow will be better,

25  I'm sure we'll get through it, the creditors in this case are

1   entitled to more certainty, more specificity as they would

2   demand from a nurse or a doctor about the condition they're

3   in, then the assurances that we are getting today from the

4   debtors and their lender.

5           Indeed, the ramifications for this case and this

6   dispute are clearly massive for the hospitals, the patients,

7   the doctors, the employees that are employed by CCH, as well

8   as my own client and the City of Philadelphia.

9           But I also don't want to lose sight of something

10  that with respect some of the people that work in the

11  hospitals may not be paying attention to, but everyone in

12  this courtroom and everyone in the Wilmington -- in the

13  Bankruptcy Bar in Wilmington and beyond is focused on.

14          And that's the fact that here we are in

15  Wilmington, the beating heart of the nation's Chapter 11

16  practice.  Companies, creditors, professionals, they come to

17  Wilmington, they come to Delaware, they come to the

18  bankruptcy process more generally looking for certainty;

19  looking for closure for financial restructuring recognizing

20  that sometimes even though something is necessary that

21  doesn't mean that's okay under the Bankruptcy Code.

22          And that's where we are today.  You know and the

23  message I've received from you, Your Honor, from Judge

24  Sontchi, from the other judges in this building is always the

25  same when dealing with a company regardless of the size,

1  regardless of the industry it's in.  When we have a lender

2  that is breathing down the company's neck, when there's give

3  and take, but there's only taking by the lender and that

4  message has always been that a secured creditor has to do its

5  share.  If it wants to use the court, it must rent the court

6  and that means paying the post-petition freight.

7            With respect lenders that aren't willing to pay

8  the freight, you know, that just want to squat in the

9  courthouse, they should go to the county courthouse.  They

10 should go foreclose through an assignment for the benefit of

11 creditors.  But where they shouldn't be is here in Bankruptcy

12 Court where it is their responsibility, not the other

13 creditors, not the debtor.  It is the lender's responsibility

14 to pay the freight to bear the cost of the restructuring.

15           And in that vein on the DIP, and I'll say a few

16 things about the payment motion as well, the evidence here is

17 crystal clear that there is objectively not enough money to

18 pay not only my clients but Mr. Brown's client and given the

19 tight conditions in the DIP, we don't know how many other

20 vendors or even the professionals in this case might need to

21 take a write-off or write their fees down to have this case

22 get to the end.

23           Now consider that record in light of what is being

24 asked for here.  It's a hundred percent rollup of a

25 prepetition facility in exchange for -- we made debate what

1   single digit million dollar number of new money is coming

2   into the estate and whether it's because of a block being

3   lifted versus something else.

4          The fact of the matter is MidCap is providing

5   negligible new liquidity to the estate.  In exchange, it's

6   getting a full roll-up, which means that it will be basically

7   impossible to confirm a Chapter 11 plan in this case.  It's

8   getting a surcharge waiver, which means that our clients

9   can't -- that the estate can't surcharge the lender to pay

10  the creditors like my clients; marshaling waiver, when it's

11  obvious that there are two sides to the house, one of which

12  is not going to be left standing, and the other will be,

13  hopefully.  And it's got artificially short -- an

14  artificially short challenge deadline that's wholly

15  inconsistent with the rules and the procedures in this Court

16  that people look to as a source of stability.  And it

17  undermines the committee's ability to acquit its fiduciary

18  duties.

19         Simply put -- and mister -- to echo Mr. Minuti's

20  call here, sacrifices must be made here.  Sacrifices are

21  necessary for this case to stay in Chapter 11.  My client has

22  been willing to make sacrifices for 18 months.  Frankly, it

23  was willing to make sacrifices for the better part of 20

24  years, when it was operating the hospitals at a loss, from

25  time to time.  Mr. Brown's client is being asked to take a

1   loss.  All the unsecured creditors are going to be lucky if

2   they get any type of recovery in this case.

3           The one party that is asking to skate by scott

4   free is MidCap.  A DIP is probably necessary in this case,

5   but the Court has discretion to condition the terms on which

6   it will approve post-petition financing.  And Mr. Sherman

7   will stand up and mention some of these things in greater

8   detail.  But the fact that there might be a surcharge waiver

9   or 506(c) marshaling, these type of trip fall -- trip wire

10  defaults, in terms of covenants, at this stage of the case,

11  at the beginning of the case, is unprecedented.

12          And for those reasons, we ask that the Court

13  condition approval of the DIP, if it is necessary, on having

14  a more reasonable package of DIP financing, without a full

15  roll-up, without a 506(c) waiver, without the marshaling, et

16  cetera.

17          THE COURT:  And if this lender says no?

18          MR. PESCE:  And if this lender -- if this lender

19  says no, then the hospital -- the hospital very may well

20  suffer.  But it fundamentally unfair for this lender to get

21  all of these protections on money that it lent months or

22  years ago, in a case that is pending today.  It's a matter of

23  fundamental fairness.

24          And frankly, as an institutional matter, this is

25  the Court's chance to stop the race to the bottom here.  I'm

1  here representing the creditors.  I'm usually on Mr. Minuti's

2  side, representing the debtor.

3            THE COURT:  Yes.

4            MR. PESCE:  And you know, the one thing in talking

5  to my partners and talking to my colleagues in the industry

6  more generally, is like the thought that this type of DIP

7  facility might be approved where there is such negligible new

8  value coming in, it will set the new market standard for

9  bankruptcy cases, and this is the Court's chance to push back

10 on that.

11           And you know what?  I don't know if the lender

12 will ultimately provide new financing in the amount that's

13 here.  But the Court we would respectfully urge to push back

14 and try to see what more can be made available here, so that

15 everyone is not running the risk, while MidCap is taking all

16 of the value.

17           THE COURT:  Yes.

18           MR. PESCE:  Now turning -- much in the same vein

19 as we respectfully submit the debtor has not met its burden

20 for the roll-up and aspects of the DIP financing, with

21 respect, we do not think that the debtor has met its burden

22 to challenge our motion.

23           To set the stage here a little bit, when a company

24 files for Chapter 11, it gets immense protections from the

25 Court.  It gets the automatic stay.  If it gets to the end of

1  Chapter 11, it gets a discharge and a clean slate and can

2  move on with life.  In between, it has the ability to sell

3  assets free and clear.  The stay can hold off creditors and

4  so the estate can maximize value for the estate.  One of the

5  fundamental pretenses of that, though, is that the debtor is

6  able to pay its post-petition debts as they come due.

7          Mr. Minuti, with respect to his client, is looking

8  to have their cake and eat it, too, here.  They take the

9  position that the contract is in effect; yet, they don't want

10 to abide by the payment terms of this contract, which was

11 negotiated -- not years ago, not decades ago -- 18 months

12 ago, by the person, Mr. Friedman who yesterday we heard, on

13 the record, hired Mr. Wilen to do his job.  This is not old

14 news.  This is fresh, this is recently negotiated.

15         And as Mr. Dawson made clear, it reflected

16 extensive negotiation, not between two insiders; it reflected

17 negotiation between Tenet and Conifer on one side and the

18 debtor on the other.  There was intense negotiation between

19 those two parties.  And it's why Mr. Maloney testified it

20 took the better part of three years for us to find a buyer --

21 ultimately, Mr. Freedman -- for the hospitals.  The thought

22 that we were sort of this is an insider deal or something

23 like that is just wholly without merit.

24         As an institutional matter, the presumption that

25 the contract rate governs is paramount in Chapter 11.  If

1  Your Honor could consider this, if the debtor's position

2  governs in Chapter 11 cases, every case is going to be about

3  the reasonable rate of what a contract -- what a contract is.

4  Every case will suddenly become a question of whether it's

5  reasonable or not.

6          And with respect, it's totally unnecessary.  Mr.

7  Minuti made the case for me, for why the debtor should reject

8  this contract.  If the terms are overbearing, can't do it,

9  that's fine, the Bankruptcy Code has a mechanism.  They

10  should reject the contract and they should put the pressure

11  on my clients or whomever else they want to reject to try to

12  strike a new deal.  That doesn't mean, though, they get to

13  cherry-pick the best terms under the existing contract.

14          And it's particularly true here, given just the

15  completely contradictory record presented, which the debtor

16  says demonstrates the basis for rebutting that presumption.

17  The two -- the contract rate, a negotiated matter of, you

18  know, 18 months ago, and it was clear that the $200,000 --

19  originally one twenty-five -- that it was not -- no kind of

20  market assessment was done, no negotiation was done.  It was

21  just decreed.  Mr. Wilen specifically said that it wasn't

22  negotiated, it was just we decided that was the amount.  That

23  amount was fed through to the DIP budget.  There's no

24  presumption-- they haven't rebutted the presumption.  And

25  even assuming they did -- in other words -- they haven't

1   shown that what is in there is reasonable.

2           So, with respect, Tenet and Confider are ready,

3   willing, and able to engage.  As Mr. Minuti noted, we spent

4   the better part with our team, which flew in from Dallas to a

5   meeting last week in Philadelphia, for the, you know, six,

6   nine months before the cases were filed.  Mr. Maloney got

7   tired of taking my calls about every other which, you know,

8   term they had in the negotiations.

9           We're here, ready to do something.  But what we're

10  not ready to do is pay the freight for this case, when the

11  big -- one of the other biggest constituents in the case is,

12  in our view, providing negligible value in exchange for an

13  unprecedented roll-up that ties the hands of the estate and

14  the committee.

15          And just to knock off a couple of other points

16  that were raised, you know, our administrative motion sought

17  relief from the automatic stay.

18          THE COURT:  Yes.

19          MR. PESCE:  We are not withdrawing that part of

20  the motion.  It is our position that, if the Court decrees a

21  reasonable amount of compensation, whatever that amount is --

22  we think it's the contract rate -- that should be paid.  And

23  if that is not paid, then the -- then Tenet and Conifer

24  should be free to terminate that agreement and have the

25  automatic stay lifted, to the extent necessary.  So we

1  disagree on that point.

2          And in terms of the immediate payment, my client

3  has to be willing to agree to have the payments paid in the

4  ordinary course, it's typically net 45 days.  However, we

5  need to have some assurance that that money is actually going

6  to be there.

7          As was set forth in the testimony over the last

8  few days, the DIP facility -- assuming these sales even

9  close, which is a big question -- assuming those sales close,

10 that money is going to be swept to MidCap, so we have no

11 assurance that money will be there.  If there's some kind of

12 mechanism, like an escrow or a trust or something set up for

13 administrative creditors, or a carveout, perhaps, that might

14 be a different story.

15         And that's particularly important when -- as is

16 the case here -- we haven't been paid for the better part of

17 a year, and in the last couple of months, we've been paid a

18 fraction of what we're owed.

19         THE COURT:  Help me out for a minute, Mr. Pesce.

20         MR. PESCE:  yeah.

21         THE COURT:  Give me the parameters -- tell me what

22 you're seeking --

23         MR. PESCE:  Sure.

24         THE COURT:  -- in payments, the amounts --

25         MR. PESCE:  Right.

1          THE COURT:  -- because I want to be clear.

2          MR. PESCE:  Our position is, post-petition, we

3  should be paid in full, in cash, at the contract rates.  We

4  are willing to have those amounts paid, not immediately, so

5  45 net terms generally under those agreements, as long

6  there's adequate assurance that we'll receive those payments.

7  And we're willing to work with the debtor and the lender on

8  those regards, perhaps having a carveout or some kind of set-

9  aside for the sales and the receivables that are collected.

10          THE COURT:  But how much?  How much is the

11  contract rate, if you will?  And I -- you may not have an

12  answer immediately, but I'll want it.

13          MR. PESCE:  We can provide it.  The contract rate

14  for the Tenet agreement is -- as of -- for the invoice that

15  was sent August 6th -- which reflected the July period --

16          THE COURT:  Yes.

17          MR. PESCE:  -- that was in bankruptcy -- was

18  roughly $4.1 million.  I would anticipate that it's, more or

19  less, that amount moving forward.  As to the Conifer

20  agreement --

21          THE COURT:  Now you've been paid -- or will be

22  paid 800,000 of that 1.4 million.  Is that correct?

23          MR. PESCE:  So, theoretically -- I guess --

24          THE COURT:  So it's really six --

25          MR. PESCE:  They've received prepayments,

1  effectively, by -- through July, they would have received

2  prepayments of what we would characterize as 400,000, which

3  is one-half of the eight hundred that Tenet and Conifer

4  received, collectively.

5          So, 45 days after August 6th -- which is the third

6  week of September, call it, we would be -- we would expect to

7  have received the incremental -- I say 400,000 had been paid

8  -- well, we --

9          THE COURT:  Is --

10          MR. PESCE:  The difference for whatever has been

11  paid.

12          THE COURT:  Isn't it 800,000, that's being paid,

13  it's 200,000 a week?

14          MR. PESCE:  It's 200,000 a week for both Tenet and

15  Conifer.

16          THE COURT:  Right.

17          MR. PESCE:  Right.

18          THE COURT:  And so that's -- okay.  I see what

19  you're saying.  And the 1.4 million is just for Conifer?

20          MR. PESCE:  No, the 1.4 is for Tenet, that was the

21  amount of the Tenet invoice.  The Conifer amount for that

22  month -- we can look at it -- it was probably roughly one

23  point --

24          THE COURT:  1.2.

25      (Participants confer)

1          MR. PESCE:  We can find that, but it's, you know,

2   1.3 and 1.6 --

3          UNIDENTIFIED:  1.56.

4          MR. PESCE:  Okay.  1.56 --

5          THE COURT:  1.56?

6          MR. PESCE:  -- from my colleague.

7          So, you know, looking at the Tenet side of the

8   house, the August 6th bill, that covers the first month post-

9   petition; that's 1.4 million, roughly.  We -- Tenet gets

10  paid, effectively, $400,000 per month.  So the question would

11  be:  As of -- call it September 15th or September 21st -- how

12  much of 1.4 million had been paid?  I'm -- by that math, it

13  sounds like it will be roughly 600,000, maybe paid to Tenet

14  through that date, since the filing of the case.  So that

15  would be a shortfall of about $800,000.  Likewise, on the

16  Conifer side, we can break it up like that.

17         And I think this is an important point that you

18  raise because it came up in the cross-examination of Mr.

19  Dawson, which is, yes, we are effectively receiving

20  prepayments.  And we're not going to turn away partial

21  payments just because we're not getting full payments.  The

22  contracts expressly let us do that.

23         But the point remains that, when the Conifer bill

24  is due, when the Tenet bill is due, there will be

25  discrepancies of a couple hundred thousand dollars to a

1  million dollars for the first month of the case.  And that's

2  only going to accelerate the longer the case is in Chapter

3  11.  And if helpful for the Court, we can provide a, you

4  know, reconciliation of -- or a demonstrative that would lay

5  out that exact timing, based on that, if that's helpful.

6          THE COURT:  That would be helpful, yes.

7          MR. PESCE:  Okay.  We can put that together.

8          THE COURT:  Yes, Mr. Pesce.

9          MR. PESCE:  So just another couple of quick

10  points.  In addition to the automatic stay and the timing of

11  our payments, you know, the other point that was raised in

12  the closing that just bears mention is the thought that the

13  services -- the value of the services is going down because

14  the -- because Hahnemann is closing.

15          As we talked to -- or as our witnesses discussed

16  on the stand, the contract does have a mechanism to bring

17  down the amount of the bill based on the billables going out.

18  So, you know, the portion attributable to Hahnemann may, in

19  time, go down.  But the -- but in terms of the services that

20  Conifer is providing and the services that Tenet is providing

21  that are integral to the collection of receivables, those

22  services are as valuable, if not more valuable, given the

23  state that the estates are in.  The testimony was that there

24  are not -- there is no ability to have a replacement stand in

25  here on this type of notice.  So the thought that our

1  services are worth less, I just think is belied by that fact.

2              And you know, in closing, we just want to

3  reemphasize just the importance of the predictability here

4  and the basic bargain the debtor strikes by filing for

5  Chapter 11.  They get all the benefits, but they do have to

6  bear the burdens, and that goes for the lender, as well.  If

7  they're going to get all of the benefits that are proposed by

8  the DIP budget, there has to be a give and take, it can't

9  just be all taking.

10             And for those reasons, we would ask that the Court

11  condition approval of the DIP on those terms, and also

12  require payment in full, in cash, at the contract rate, and

13  provide some sort of adequate assurance of that payment.  And

14  if that is not possible because the lender is unable to fund

15  or the debtor is unable to generate cash, we would have -- we

16  would request the ability to lift the automatic stay to the

17  extent necessary to do that, so we're not bearing all of the

18  risk of sales and transactions that we fully support, but as

19  of today, standing here, have no assurance will actually

20  occur.

21             THE COURT:  Okay.

22             MR. PESCE:  Thank you, Your Honor.

23             THE COURT:  All right.  Thank you, Mr. Pesce.

24             Mr. Sherman, you had a -- you had a very detailed,

25  thorough objection to the financing.

1          MR. SHERMAN:  Thank you, Your Honor.

2          THE COURT:  Do you want to first address the Tenet

3  and Conifer issue, or do you think that's been addressed --

4          MR. SHERMAN:  I --

5          THE COURT:  -- sufficiently?

6          MR. SHERMAN:  I -- we think it's been addressed by

7  the debtor, Your Honor.  We would -- we'd be supportive of

8  the debtors' position as it relates to that, obviously.

9  Actually, Your Honor, I think the two go hand in hand, in a

10  certain respect.  And I'm going to get to some of the

11  Tenet/Conifer through my comments and --

12          THE COURT:  Okay.  All right.

13          MR. SHERMAN:  And I think Your Honor actually

14  addressed some of it when your first question to Mr. Minuti

15  is why isn't MidCap paying them directly.  I have the same

16  type of question, Your Honor.  I think your concern is well-

17  founded, and we'll get to that during our -- my argument.

18          THE COURT:  All right.

19          MR. SHERMAN:  But let me start, Your Honor, with -

20  -

21          THE COURT:  Take your time and go through your

22  argument, yes.

23          MR. SHERMAN:  Thank you, Judge.

24          I'm going to start, Your Honor, with a concern

25  that you expressed earlier in this case before we were

1  retained.  And I think Your Honor said -- and correct me if

2  I'm wrong -- you said that -- early in this case, that you

3  expressed some concerns that MidCap was taking advantage of

4  the debtor through some of the DIP financing.

5          What we've heard over the last 24 hours is that

6  Your Honor's concern was well-founded because the testimony

7  from Mr. Wilen made it extraordinarily clear that there was

8  bargaining.  And I commend the debtors' efforts.  I want to

9  make the record crystal-clear that the committee does not

10 question any of the efforts by the debtors' professionals; in

11 fact --

12         THE COURT:  No.

13         MR. SHERMAN:  -- we applaud them --

14         THE COURT:  Yes.

15         MR. SHERMAN:  -- because the -- you know, we heard

16 Mr. Wilen, and he's an experienced, extraordinary financial

17 professional that did his best under the circumstances.  Your

18 Honor, but the circumstances were way against the debtor

19 here.  It was a lender that used its position -- and Your

20 Honor, we're going to say improperly -- and over-leveraged

21 its position to the detriment of this debtor.

22         And ordinarily, Your Honor, many times, a debtor

23 will come in with a DIP that they have negotiated and said

24 they've done the best they can.  And I think that was Your

25 Honor's question earlier is, from the debtors' perspective,

1  they come to the Court.  Then it becomes the other parties-

2  in-interest and the Court itself to review what the debtor

3  did.  And that's what we're here to consider because the

4  debtor did its best.  Nobody can at all question those

5  efforts.

6        Now it becomes whether that's reasonable.  All

7  right?  So you take the debtors' efforts, and then you

8  overlay them with the protections and requirements of 364

9  because that's got to ground everything, as everything is

10  grounded in:  Can the debtor obtain financing on reasonable

11  terms and can they be approved?  And that's the ultimate

12  standard.

13        And the question, it's sort of reasonableness.

14  And almost when you sort of think of reasonableness in this

15  context, I sort of make it akin to Goldilocks, in the sense

16  that, you know, the porridge can't be too hot, can't be too

17  cold, it's got to be just right.  And just right is under the

18  circumstances of this case.

19        THE COURT:  Right.

20        MR. SHERMAN:  And the circumstances of this case

21  are that you have a lender that had extraordinary power and a

22  debtor that had limited rights to push back.  And that's the

23  testimony, Your Honor.  I don't think anybody can dispute

24  that factual record.

25        And at the end of the day, what is the debtor

1  getting here?  And what struck me, Your Honor, from Mr.

2  Wilen's testimony, was the lender is getting 6.5 million in

3  fees and a pay-down, two and a half million dollars is going

4  to a professional escrow -- two and a half million dollars is

5  going to a professional fee reserve.  The balance is going to

6  pay for all the trade.

7          But if you compare the 6.5 going to the lender --

8          THE COURT:  Right.

9          MR. SHERMAN:  -- and you look at what's going to

10  the nonprofessionals in this case, the lender is receiving

11  more than the nonprofessionals.

12          And Your Honor has seen more DIPs than I.  I'm not

13  sure if, in Your Honor's esteemed history on this bench, you

14  can find another instance where a lender is taking more for

15  itself than it's lending out.  That fact really should be

16  considered by this Court as we look and see the approval.

17  And as we try to find a financing package that is just right,

18  that's a significant fact.

19          And let me address one of your other -- Your

20  Honor's concerns that I think you raised to Mr. Minuti, which

21  is, boy, I can't force the lender to lend.  And one of the

22  questions I asked Mr. Wilen intentionally was the

23  relationship between a healthcare lender and a healthcare

24  provider is "symbiotic."  That was the term that was used;

25  Mr. Wilen agreed with that term when we did it.

1          So, as the Court considers these issues, this

2    isn't an instance like a widget factory, where a lender can

3    go to State Court or whatever and foreclose and collect its

4    collateral.

5          THE COURT:  Right.

6          MR. SHERMAN:  This is different.  It's different

7    because of the debtor being a healthcare provider and the

8    ability of the healthcare lender to realize on the healthcare

9    provider's assets without the assistance of the healthcare

10    provider.  That's what makes hospital cases, healthcare cases

11    different.  And when you need the provider to collect the

12    collateral, the lender needs to pay the freight associated

13    with the provider's services.

14          And the other aspect of the testimony that became

15    very clear from Mr. Wilen was that the costs associated with

16    the provider's services exceed what's in the budget.  And

17    that addresses 506(c) and some of the other issues.

18          THE COURT:  I agree.

19          MR. SHERMAN:  But I just want to sort of frame the

20    factual record as we have it.

21          So, in that context, Your Honor, what we've done -

22    - and we've tried to engage MidCap post-petition.  I think

23    there were meetings and discussions.  But unfortunately, we -

24    - you know, the discussions were cordial, professional, but

25    were -- we are where we are, Your Honor.

1            What we've tried to do, Your Honor, to frame the

2    differences -- and I think we sort of did it in our

3    objection, in our Jeopardy board --

4            THE COURT:  Yes.

5            MR. SHERMAN:  I sort of --

6            THE COURT:  Yes.

7            MR. SHERMAN:  -- look at it.

8            THE COURT:  Yes.

9            MR. SHERMAN:  But if I may, Your Honor, we've

10   actually done a Cliff Notes version, and I've done it two

11   ways:  I've done a Cliff Notes with citations and without

12   citations.

13           THE COURT:  Okay.

14           MR. SHERMAN:  And if -- may I approach, Your

15   Honor?

16           THE COURT:  Yes, you may.  Yes, certainly, Mr.

17   Sherman.  Thank you.  Thank you much.

18           MR. SHERMAN:  And we've handed that out, Your

19   Honor, to the other parties.

20           So, really, where we are, Your Honor, is those --

21   this handout gives the Court an idea of where we are and

22   where the open issues are.  We started on the sheet, Your

23   Honor, with the roll-up.

24           THE COURT:  Yes.

25           MR. SHERMAN:  Let's -- and the roll-up is,

1  ordinarily when new credit is being provided, a lender will

2  get that protection.

3          THE COURT:  Right.

4          MR. SHERMAN:  So the roll-up in this case is two

5  forms:  It's a roll-up of the revolver on that side, plus

6  there's a roll-up of the term.  We asked Mr. Wilen what's the

7  connection between the two; he didn't have an answer, it was

8  just part of the bargaining.

9          So, again, sort of in the context of trying to get

10 porridge being just right, we could understand the roll-up on

11 the revolver side, as long as there's an ability to roll back

12 if there's an ultimate challenge; that's one aspect.  We

13 don't understand the roll-up on the term side.  So, again, I

14 think, from the committee's perspective, Your Honor, to get

15 it to a fair order, if there's a roll-up on the revolver for

16 all the lending that's going on sort of on a daily basis, as

17 long as there's valid liens and ultimately a way to pull back

18 on it --

19         THE COURT:  Right.

20         MR. SHERMAN:  -- that's not unreasonable.  Where

21 the unreasonable aspect becomes is on the term.  That's sort

22 of on the roll-up issue.

23         The second is the challenge, Your Honor, as we

24 sort of flip pages.  The challenge is unreasonable on its

25 face, and let me sort of explain it.  And sort of, as I was

1  thinking about this, I was doing one real long run-on

2  sentence, so I'll try to sort of break it down in concepts.

3            The challenge, as it's currently in the proposed

4  form of order, requires the committee to bring a challenge

5  within 60 days after appointment.  That's only about 3 and

6  half weeks from now.

7            THE COURT:  Right.

8            MR. SHERMAN:  Obviously, we've been very busy on

9  the various sales.

10            But let me just frame the challenge as proposed by

11  MidCap.  It's not just a challenge to the validity, extent,

12  and priority of the lien that you sort of typically see; it's

13  a challenge to everything, to the entire relationship.  So,

14  in the context of being reasonable, we can see a challenge

15  period, say 75 days from appointment or 75 days from the

16  entry of the order -- the sort of typical stuff we see -- to

17  the validity, extent, and priority.  But once you start to

18  get to a challenge as to the entire relationship, Your Honor,

19  that, we need more time.  And the Bankruptcy Code gives us

20  more time.  There's nothing that requires a lender to get a

21  release pre-confirmation.

22            That's just -- and this one is different, Your

23  Honor, simply because of the structure here, right?  Because

24  the other pink elephant about this case is the OpCo/PropCo

25  structure and the fact that the PropCos are sitting outside

1  of bankruptcy and the OpCos are inside of bankruptcy.

2          THE COURT:  Yes.

3          MR. SHERMAN:  The committee needs time to

4  investigate how that happened, why it happened, was MidCap

5  involved.  We have no idea.  I'm not throwing stones at it,

6  Your Honor.  I just -- we have to do our diligence.  So the

7  investigation period, as it relates to anything other than

8  extent, validity, and priority, Your Honor, should be a

9  longer period, sort of triggered with confirmation or some

10 time period where we actually have time to take a breath and

11 do our work.

12         THE COURT:  Okay.  And you want --

13         MR. SHERMAN:  Then, Your Honor --

14         THE COURT:  And you want standing.

15         MR. SHERMAN:  Obviously, that's the second piece,

16 Your Honor, is:  If we don't do the challenge, then who will?

17 The proposed form of order from MidCap is big, bold letters,

18 nobody can challenge us.  Well, that's just facially

19 unreasonable, Your Honor.  Somebody has to be able to do it.

20 So, if the work is going to get done to do the challenge, we

21 would submit, Your Honor, that the committee is the right

22 party to do it.

23         But then, Your Honor, then the challenge, as

24 proposed by MidCap, gets even more challenging -- no pun

25 intended -- that, even if we're successful in the challenge,

1  they way it reads there's no unwind of the revolver, and

2  there's no unwind of the $5 million that's being paid down on

3  the term.

4          So the only thing -- and it's even cuter.  The

5  only thing we can un -- we would then have the right to

6  unwind the fifteen.  So, even if we're right on the

7  challenge, the fifteen doesn't become unrolled, we only have

8  the right to unroll it.  So that, in and of itself, Your

9  Honor, is -- as Judge Stern in New Jersey once taught me, was

10  a lender with sharp elbows.  Those are just facially

11  unreasonable.

12          And again, if that's the power of this Court and

13  Your Honor's pen, to say, if the -- you know, again, I --

14  nobody is forcing you to lend.  But you can simply say what

15  reasonable requirements of lending are under 364.  And those

16  reasonable requirements are giving a party-in-interest a

17  right to determine whether the actual lending was proper,

18  whether the liens are proper, whether there's -- you know,

19  the typical challenge stuff, all we need to be preserved.  We

20  can't have it restricted, and that's what's in the form of

21  the DIP order.

22          The roll-up I addressed, Your Honor, I think.  Let

23  me see.  The next issue -- and that's -- and as we flip

24  pages, Your Honor, this is significant in this case:

25  Marshaling.

1           THE COURT:  Yes.

2           MR. SHERMAN:  And let me be very clear, Your

3    Honor, is:  In reading the MidCap objection, MidCap said,

4    well, you don't have marshaling unless it's between two

5    secured creditors.  And all we're saying in our perspective,

6    Your Honor, is there shouldn't be a waiver of marshaling.

7    I'm not saying there will be marshaling or there won't be

8    marshaling.  All we're saying is that, under the

9    circumstances of this case, there shouldn't be a waiver of

10   marshaling.  I don't know if it applies or it doesn't apply.

11   It goes back to the investigation.  So, simply, that should

12   be preserved.

13          The next, Your Honor, deals with collateral issues

14   and causes of action.  So this is where there was a little

15   flex by MidCap, which we'll acknowledge on the record.  The

16   initial interim order had a lien on Chapter 5 causes of

17   action.  Their modification was a little cute, but it did, in

18   certain respects, pull out the lien on avoidance actions.

19   They simply said there's a super-pri claim [sic], as it

20   relates to those issue, so -- which is a little inconsistent,

21   Your Honor, because, if there's going to be a full roll-up,

22   as requested by MidCap, then there's no basis for a super-pri

23   claim because you're not adequately protecting a pre-petition

24   claim that's already been satisfied through the roll-up.

25          But putting that aside, Your Honor, the Chapter 5

1  causes of action should be preserved for the stakeholders.

2  MidCap is way -- that's the other piece of the evidence,

3  right?  MidCap is way oversecured, I think Mr. Wilen's

4  testimony was by twenty to $30 million of the debtors' assets

5  --

6           THE COURT:  Yes.

7           MR. SHERMAN:  -- and then, not even taking into

8  consideration the guarantor's assets --

9           THE COURT:  Right.

10          MR. SHERMAN:  -- which is another issue that also

11 is -- should be questioned of why isn't MidCap going after

12 the guarantors.  I don't know.

13          They're using this Court as a collection court.

14 And it goes back to sort of the 506(c) issue.  If they're

15 going to -- if they're going to use this Court as a

16 collection court, then I think, as Judge Gerber once said to

17 me, right?  Pay the rental for that fee.

18          Budget issues, I think Mr. Pesce well stated it.

19 The size of the facility issues is questionable.  I think

20 we've address the 506(c) waiver, unless the Court has any

21 other issues on that.  I think I --

22          THE COURT:  No.

23          MR. SHERMAN:  I tried to beat that.

24          The professional fee issue, I appreciate the

25 accommodation by debtors' counsel to work with us, and we

1    appreciate that olive branch.

2              Net operational liquidity, I think that just goes

3    back to the factors issue, as to sort of what's ultimately

4    being lent.

5              The last issue we had, Your Honor, was on the DIP

6    origination fee, which is sort of the fee on the fee, which

7    we questioned Mr. Wilen about, which was the debtors already

8    paid for this.

9              THE COURT:  Yeah.

10             MR. SHERMAN:  The debtors paid a fee negotiated

11   what?  Eighteen months ago, when this loan came about.  What

12   the testimony from Mr. Wilen was:  This is the same facility,

13   this is just an additional fee to use the same facility.

14             So I understand paying a fee for money.  And we're

15   all capitalists, and MidCap is entitled to a fee once for the

16   use of its capital; it's not entitled to be paid twice.  And

17   really, if you sort of drill down on what the DIP origination

18   fee is, it's a fee that's already -- again, I'm not going to

19   be duplicative of duplicative.  It was a fee that was already

20   paid, those dollars were already paid for by the debtor.

21             Oh, I'm sorry, Your Honor, the last -- as I flip

22   pages -- was to the reference to the nondebtor entities.

23             THE COURT:  Yes.

24             MR. SHERMAN:  So that was also kind of disturbing,

25   when you looked at the original form of DIP order because the

1  way -- and I think Mr. Pesce said, you know, trip wire type

2  issues in a DIP, is the -- this DIP could be affected by non-

3  debtor actions.  And Mr. Minuti well said the debtors'

4  mission in providing healthcare to the Community of

5  Philadelphia.  The healthcare -- the debtors' ability to

6  provide healthcare to the Community of Philadelphia should

7  not be impacted by actions of a nondebtor, period, full stop.

8         We tried to make that point to MidCap through

9  this.  I think they pulled back some of it, Your Honor.  I

10 saw some reference in the -- in their response that they were

11 going -- I think it was (indiscernible) five point C -- five

12 point -- yeah, five C, five dot C.  We're not clear, Your

13 Honor.

14        We would like an override to make abundantly clear

15 that, irrespective of any actions of the nondebtor, they will

16 not affect the DIP financing in any respect; any rights and

17 remedies that MidCap against have [sic] the nondebtor are

18 preserved.  They can do whatever -- do what they want with

19 those entities, it's not -- those entities aren't the subject

20 of the jurisdiction of the Court.  But the actions of the

21 nondebtors should not affect these cases in any capacity.

22        So I think that's what we had, Your Honor, as far

23 as the issues list.  Obviously, if you have, Your Honor, any

24 questions --

25        THE COURT:  Well, look, I'm -- you know, I'm going

1   to have MidCap up here in a minute and I'm going to ask them

2   about all of these points.  And based upon prior experience,

3   they're going to say no.

4            MR. SHERMAN:  Understood.

5            THE COURT:  And so then we have an issue about

6   lending and whether there's money available, even bad money

7   available.  Is there any way to compel MidCap to lend -- to

8   loan?

9            MR. SHERMAN:  Well --

10           THE COURT:  Is --

11           MR. SHERMAN:  -- going back --

12           THE COURT:  Is there --

13           MR. SHERMAN:  -- to the --

14           THE COURT:  Is there a bad faith possibility?

15           MR. SHERMAN:  Well, they would be -- if they

16  stopped lending, there would be a waste potential claim,

17  right?

18           THE COURT:  Yes.

19           MR. SHERMAN:  There are claims that -- we're all

20  creative lawyers.

21           THE COURT:  But by then, there's a Chapter 7.

22           MR. SHERMAN:  And which is not what anybody in

23  this case wants --

24           THE COURT:  That's right.

25           MR. SHERMAN:  -- right?  Is -- the ultimate goal

 1  is the preservation of healthcare for the community and the

 2  preservation of these debtors.

 3           But MidCap is an economic actor, Your Honor, at

 4  its heart.  And I have absolute confidence in this Court and

 5  Your Honor's ability of --

 6           THE COURT:  Persuasion?

 7           MR. SHERMAN:  -- guiding people -- your word,

 8  "persuasion;" I would use "guiding" -- contours, giving

 9  people a push or a nudge, as necessary, because I can't

10  fathom that MidCap is going to stand up in this podium --

11  maybe they will -- and say they want to shut down this

12  hospital.

13           And if MidCap is willing to come up here and stand

14  -- I -- you know, I certainly said -- I said I welcome it.  I

15  don't.  It would be disturbing if MidCap came up here and

16  said they won't lend, Your Honor, under these circumstances,

17  when they're twenty-plus million dollars oversecured.

18           THE COURT:  Yes.

19           MR. SHERMAN:  They have guarantee assets sitting

20  out there.

21           THE COURT:  There are sales out there that are

22  going to --

23           MR. SHERMAN:  Exactly.

24           THE COURT:  Yeah.

25           MR. SHERMAN:  It's that there is just so many

1  different buckets of availability of repayment that the sharp

2  elbows that we saw in this DIP order do not -- are just not

3  necessary.

4           THE COURT:  All right.

5           MR. SHERMAN:  Thank you, Judge.

6           THE COURT:  Thank you, Mr. Sherman.

7           Mr. Brown?  Oh.  I think it's afternoon, or maybe

8  it's right on the cusp.

9           MS. SCHLAUCH:  It's noon, Your Honor.  For the

10  record, Brendan Schlauch of Richards, Layton & Finger --

11           THE COURT:  Yes.

12           MR. SCHLAUCH:  -- on behalf of the nondebtor

13  guarantors.

14           THE COURT:  Yes, sir.

15           MR. SCHLAUCH:  I'll be very brief.  We filed a

16  very short a reservation of rights prior to yesterday's

17  hearing.  As we noted in the pleading, we had been in contact

18  with MidCap and the debtors over some comments that we had to

19  the form of order.  Those conversations continued up through

20  and including during this hearing.

21           THE COURT:  But you got nowhere, did you?

22           MR. SCHLAUCH:  Well, we got somewhere on certain

23  issues, and we have decided that we're only going to press

24  one issue.

25           THE COURT:  Okay.

1        MR. SCHLAUCH:  And that issue is really just a

2   request to receive notices of modifications, amendments, and

3   terminations of the DIP.  Specifically, we're just requesting

4   that the nondebtor guarantors be added as notice parties in

5   three places.  It would be Paragraph 7(b)(ii), Paragraph

6   7(f), and Paragraph 15.

7        Your Honor, we believe the request is reasonable.

8   Our client is clearly a party-in-interest as a DIP guarantor;

9   in fact, people have been mentioning us just several minutes

10  ago.

11       THE COURT:  Yes.

12       MR. SCHLAUCH:  Notice does nothing more than let

13  us know what is going on in the cases and give us an

14  opportunity to protect our rights.  What it does not do is

15  give us rights or expand our rights.

16       We're also willing to clarify for the record that

17  the inclusion of the nondebtor guarantors in the notice

18  provisions does not alter any agreements or documents

19  previously executed by parties.  I know that might have been

20  an issue, and we just wanted to be clear about that point on

21  that record.

22       THE COURT:  All right.

23       MR. SCHLAUCH:  So, with that, Your Honor, we just

24  request that we be a notice party in those three paragraphs.

25  Thank you.

1          THE COURT:  Thank you.

2          Mr. Brown, stir me up a little bit.

3          MR. BROWN:  Your Honor, I was going to try to do

4   the opposite, actually.  I was going to try to be brief.

5          First and foremost, let me adopt the arguments of

6   my able colleagues Mr. Pesce and Mr. Sherman as they relate

7   to the DIP issues.  Harrison Street doesn't need to repeat

8   the --

9          THE COURT:  No.

10          MR. BROWN:  -- cogent arguments that those counsel

11  made with respect to those issues.

12          Going to our objection on the couple of issues Mr.

13  Minuti raised, we appreciate that the order will be revised,

14  so as to exclude liens on assets that the debtors don't own

15  that are assets either own by Harrison Street or in which

16  Harrison Street has an interest.

17          We appreciate the notion that we'll punt for

18  another day entitlements, rights, with respect to the

19  rebates.

20          THE COURT:  Okay.

21          MR. BROWN:  There's no need to deal with those

22  issues today, either, Your Honor.

23          THE COURT:  Okay.

24          MR. BROWN:  So those are -- those issues are

25  closed for today's purposes.

1          In summary, if this case proceeds and the leases

2    aren't rejected until the end of October, I don't see how the

3    debtors get out before then, reasonably.  And given the

4    shortfall that's in the budget, just to put a number on the

5    page, as Your Honor has been asking all around, Harrison

6    Street's rental payments alone will be approximately $2

7    million short.

8          In addition, as you heard Mr. Wilen testify, the

9    debtors -- St. Chris, as the master landlord, is responsible

10   for providing goods and services to the subtenants.  And you

11   heard Mr. Wilen testify that he thinks, but doesn't know,

12   that those services are being provided and those services are

13   being paid for, but didn't know that oxygen was running short

14   and that there were no oxygen payments as just for example,

15   Your Honor.

16         Another example is that certain service providers

17   are walking off the job and other Tenets are providing self-

18   help, not necessarily on the record, but -- and also not

19   necessarily germane, but just finer points to the bigger

20   point of the budget is deficient.

21         THE COURT:  And the budget is deficient, I

22   suppose, because the lender is not providing enough money.

23         MR. BROWN:  Yes, Your Honor.  I'm not party to

24   those discussions.

25         THE COURT:  Okay.

1          MR. BROWN:  Harrison Street is subject to a

2   confidentiality agreement, so I can't really say much beyond

3   that --

4          THE COURT:  All right.

5          MR. BROWN:  -- as it relates to your question,

6   Your Honor.  Maybe over a beer.  Kidding, kidding, kidding.

7          THE COURT:  All right.

8          MR. BROWN:  But what this is about, Your Honor, as

9   everybody has pointed out, is risk allocation.  There are

10  speculative opportunities in these cases.  But we all, too,

11  are familiar with speculation not coming to fruition,

12  especially when relying on the Government's consent.

13          The Government has filed an objection that says we

14  have rules and regulations.  There is no precedent for the

15  sale of the residence slots.

16          THE COURT:  Yeah.

17          MR. BROWN:  The contracts and the rules and

18  regulations that pertain to those contracts prohibit this

19  sale, prohibit the Government from consenting because, in

20  fact, as the Government says, the contracts extinguish by

21  themselves; and, therefore, there's nothing for the

22  Government to consent to.  I'm not looking to make the

23  Government's argument or case for them; that's just what they

24  said in their papers.

25          THE COURT:  Yes.

1          MR. BROWN:  And so the idea that there's $55

2    million or $52 million out there that's going to solve all

3    the problems of these cases, and that speculative result

4    should then all be borne or benefitted by the creditors in

5    this case is unfair.  The opportunity to sell those assets --

6    MidCap lays a claim to them -- should be on MidCap.  MidCap

7    should pay for them.  Your Honor has repeated that refrain

8    throughout yesterday and today.

9          The Bankruptcy Code sets up the balance.  It says,

10   506(c), if the lender's collateral is being sold, the lender

11   may be surcharged if the estate doesn't otherwise have the

12   resources to do that.  And 552(b) says, if it's unfair for

13   the estate to bear all those expenses under the circumstances

14   of that case, then the estate shouldn't have to bear those

15   expenses.  And read together -- and both of which are seeking

16   to be waived, the equities of the case and the 506(c)

17   surcharge rights, under the Bankruptcy Code -- should not be

18   part of this order under these circumstances.

19         I agree that -- I agree that approving this DIP

20   would set -- I was trying to decide whether it would set a

21   high-level mark or a low-level mark, and I'm going to decide

22   on the low-level mark for future bankruptcy cases.  And DIP

23   lenders perceive leverage over debtors as they're approaching

24   the -- a bankruptcy case and within a bankruptcy case.  And I

25   guess similar to my colleagues, I spend a lot more time in

1  Mr. Minuti's chair than in a creditor's chair, as well.

2           THE COURT:  Yes.  Yes.

3           MR. BROWN:  Your Honor, I'm going to say this and

4  I'm going to say it regrettably.  But you asked if -- is

5  there an alternative.  Under the existing DIP, sure, there is

6  an alternative.  There is a 2.5-million-dollar funded

7  carveout or reserve against availability, and Mr. Minuti said

8  he needs $2 million.  Well, those numbers seem to be almost

9  the same.  So, if the funded carveout for professionals isn't

10 funded and the professionals take the same risk as all of the

11 other professionals -- or I'm sorry -- all the other

12 creditors in this case, and wait for the speculative events

13 to become reality, then the debtors' estate can be protected.

14 But I don't think that that's the right answer, Your Honor.

15 It's an answer, but not the right answer.  The right answer

16 is what Your Honor has already looked to many times, and that

17 is for the DIP to provide adequate funding in these cases.

18           My client is a creditor of certain of the

19 nondebtor entities --

20           THE COURT:  Yes.

21           MR. BROWN:  -- guarantors of the DIP, guarantors

22 of my client.  As a creditor of those nondebtors, I'm not

23 quite sure what those nondebtors did in the reservation of

24 rights that they just spoke about, but we fully agree with

25 the reservation of rights that they filed.  We also think

1  that the rights conferred upon MidCap are suspect, in that

2  each one of those entities is jointly and severally liable

3  for the entirety of -- now I guess the DIP because they

4  guaranteed it post-petition.

5           Your Honor, those are nondebtors, and probably

6  they were rendered insolvent, to the extent that they weren't

7  as a result of those guarantees.  And there's a question

8  whether MidCap could go chase those assets or not.  And it's

9  improper for this Court to look at those nondebtors and those

10 nondebtors' assets in the context of this DIP.  It's not

11 relevant for today.  It's not relevant to your consideration

12 of whether this debtor, this debtor's asset -- these debtors,

13 these debtors' assets are adequate to provide adequate

14 protection to the lender, which everyone has agreed the

15 lender is oversecured by at least twenty to $30 million.

16          And I heard the testimony a little differently.  I

17 heard twenty to $30 million just on receivables.  And you add

18 all these other opportunities and speculative opportunities

19 and whatever, it could be by $100 million that they're

20 oversecured, Your Honor.  And then the question becomes risk

21 allocation and timing.

22          I'll pass the podium, Your Honor.  Thank you.

23          THE COURT:  All right.  Thank you.

24          MR. BROWN:  Unless Your Honor has any questions

25 for me.

1          THE COURT:  No, I don't.

2          MR. BROWN:  Thank you.

3          THE COURT:  Thank you, Mr. Brown.

4          Anyone else?

5      (No verbal response)

6          THE COURT:  Ms. Santamour, come forward.  You

7  know, let me just say this.  It's been commented upon, and I

8  do believe that the proposed final order would be a low mark

9  for this Court.  And I understand that you have a client, and

10 I know, you know, you're representing the client.  But most,

11 if not all, of the committee's comments ring a strong chord

12 with me, and so here we are.

13         MS. SANTAMOUR:  Well, Your Honor, I'd like to

14 address --

15         UNIDENTIFIED:  (Via telephone) Your Honor?

16         MS. SANTAMOUR:  -- all of the comments that were

17 made by the various parties here because I was going to say

18 that I felt like I was walking to the gallows.  But I

19 actually feel like I'm walking into the hands of an angry mob

20 that has lost all sense of reason.

21         We can't forget that -- and Mr. Sherman indicated

22 that he was disturbed.  Well, I was disturbed sitting there,

23 listening to the way in which MidCap was smeared.  We cannot

24 forget that MidCap is the only lender willing to loan any

25 money to this debtor.  Scott Victor spoke with six to seven

1  lenders.  All but two of those declined to provide any terms

2  at all for financing.  Those two that provided terms provided

3  them in such outrageous economic terms and other conditions

4  that they weren't acceptable to the debtors.

5       MidCap was the only lender left standing, and not

6  willingly.  MidCap negotiated very heavily with the debtor,

7  no doubt, which is their right.  But also, they made huge

8  concessions to allow this to work in a way that we thought,

9  MidCap thought, was going to be a bridge to allow this debtor

10 to get a sale of St. Christopher's because, if we close down

11 now, MidCap loses, no doubt.  If we get to, you know, a sale

12 of St. Christopher's, everyone wins in this case,

13 potentially, especially with the numbers that have been

14 bandied around about a twenty-to-thirty-million-dollar excess

15 collateral.

16      MidCap is not the bad guy here.  They agreed to

17 terms fro the DIP loan that are actually very favorable to

18 the debtor.  The reserve that was in place that they let --

19 you know, that they opened up as a part of the DIP, which is

20 $10 million, to provide additional liquidity, was set aside

21 in the original loan agreement because the debtor could not

22 meet financial covenants.

23      There were terms in the loan agreement -- which I

24 think is the Debtors' Exhibit 14 -- and you will see in that

25 document that, in the event the debtor was able to meet

1  certain financial covenants, the reserve would have been

2  released at that time.  It's a standard condition and

3  protection for lenders in connection with borrowing-base-type

4  facilities.  This is a borrowing-base-type facility, no

5  doubt.

6          MidCap did allow -- as part of the DIP financing,

7  it took on additional, humongous risk because, not only did

8  it eliminate those reserves and let go of those reserves, it

9  also agreed to continue to lend while a huge amount of its

10 collateral is depreciating.  The Hahnemann receivables, as

11 they get collected, they're not being renewed; there are no

12 additional Hahnemann receivables.  And the older those

13 receivables become, the harder it is to collect those

14 receivables.

15         So I have to -- I just wanted to get out there

16 that I'm disturbed by the way in which MidCap has been --

17         THE COURT:  Well, the --

18         MS. SANTAMOUR:  -- portrayed here.

19         THE COURT:  The roll-up really does minimize any

20 risk to MidCap.

21         MS. SANTAMOUR:  Potentially, Your Honor.  I think

22 we all know that the purpose of this DIP is to get to a sale.

23         One of the things that Mr. Sherman indicated is

24 that MidCap had no choice but to go along with this.  That's

25 incorrect.  Under 42 C.F.R. 424.73 --

1          THE COURT:  Yes.

2          MS. SANTAMOUR:  -- which is, you know, oft cited

3   by Mr. Sherman, prohibition of assignment of claims, has an

4   exception that allows a court to order an assignment of the

5   receivables in the event that there is, you know, grounds for

6   that.  You know, so MidCap does have alternatives.  If this

7   case is converted to a Chapter 7 or the case is terminated,

8   MidCap could go to court, seek the appointment of another

9   assignee to collect the receivables on its behalf.

10          I hope we never get to that.  MidCap doesn't want

11   that alternative, either.  Despite the way it's been

12   portrayed, it really has tried to be helpful in this case.

13   It has provided -- it rolled back the default interest rate,

14   it's providing, you know, non-default interest rate.

15          The fee, while Mr. Sherman would indicate it's

16   excessive, if you look at hundreds of cases around the court

17   -- around the country of orders for DIP financing, you'll

18   find that's a very small fee.  And I think, Your Honor, even

19   in many of your own orders approving DIP financing, all of

20   the provisions that are in these documents are in those

21   orders.  It's --

22          THE COURT:  Well, I have allowed 506(c) waivers on

23   occasion, but not all the time.

24          MS. SANTAMOUR:  Okay.

25          THE COURT:  It's not --

1          MS. SANTAMOUR:  But I just want to --

2          THE COURT:  It's not a rule of the Court, you

3   know, to allow them; it's a rule of the Court not allow

4   506(c) waivers, for example.  That's in here.

5          MS. SANTAMOUR:  But Your Honor, may I just --

6          THE COURT:  Yes.

7          MS. SANTAMOUR:  I just have to address some of

8   these issues because I'm so disturbed.  Mr. Pesce expressed a

9   standard for Chapter 11 that's never been decided by any

10  Bankruptcy Code or any appellate court that I've ever heard

11  of in this country, that a secured creditor is responsible

12  for paying all of the expenses of a bankruptcy case.  That's

13  just not the case.

14         The bankruptcy case -- and you know, we all agree

15  that Tenet and Conifer provide valuable services to this

16  estate, but they're not providing services solely to MidCap.

17  They're collecting accounts receivable, those accounts

18  receivable are paying MidCap, being used by MidCap to pay

19  down the loan, and then MidCap re-advances those receivables.

20  It would be a different situation if -- I'm sorry, but I'm so

21  dehydrated.  I --

22         THE COURT:  Oh, take your --

23         MS. SANTAMOUR:  Do you mind if I --

24         THE COURT:  Take --

25         MS. SANTAMOUR:  -- have some water.

1          THE COURT:  Take a drink.  Take a drink.

2      (Participants confer)

3          MS. SANTAMOUR:  Thank you.

4          THE COURT:  Take your time because -- and while

5  you're drinking, let me just say this.  You know, we've heard

6  arguments from Mr. Pesce and Mr. Sherman and Mr. Brown.  Put

7  those arguments aside.  Now you're discussing this with the

8  Court's concerns.

9          MS. SANTAMOUR:  And I'm happy to go through all

10 of those concerns --

11         THE COURT:  These are my --

12         MS. SANTAMOUR:  -- Your Honor, but --

13         THE COURT:  These are my concerns.  They may be

14 theirs, as well, but they're mine.

15         MS. SANTAMOUR:  But I was -- you know, I did see

16 the -- hear Your Honor describe a possible bad faith claim

17 against MidCap.

18         THE COURT:  Yes.

19         MS. SANTAMOUR:  I just want it to be clear that

20 MidCap hasn't behaved in bad faith.  There is nothing that's

21 done -- it's the only game in town.  And it didn't use that

22 only game in town to extract some kind of outrageous

23 additional fee, outrageous interest rates.  It's done

24 everything it can under the borrowing base to provide as much

25 liquidity as possible.

1          And this is a lender -- a borrower who could not

2     live on cash collateral alone.  We can't forget that there is

3     liquidity that's provided as a result of having the

4     availability under the borrowing base.  MidCap lends based

5     upon available, eligible accounts receivable.  That is a

6     benefit, rather than allowing the debtor or requiring the

7     debtor to only I've on cash collateral, to live on what it's

8     collected.

9          So there are many ways in which MidCap, I think

10    provides a huge benefit here.  And it entered into this in

11    good faith, negotiated in good faith, made a lot of

12    concessions in good faith.  We made a ton of concessions, as

13    we put into our response to the objection, based upon the

14    committee's concerns.

15         And you know, I feel like MidCap is getting no

16    credit whatsoever for the efforts it's made.  And the --

17    whether this is a successful bankruptcy or not is being put

18    all on the shoulders of MidCap.  I think that we all have an

19    obligation, all the creditors in this case, to bear a certain

20    amount of the burden and risk, and MidCap is bearing risk

21    here.  Just as other parties have been concerned about

22    whether or not the resident program sale will be approved and

23    whether or not St. Chris will be approved, that's a risk to

24    MidCap, as well, as we continue to lend into declining

25    collateral.

1          So, with that said, if you'd like to go through

2   the points in the --

3          THE COURT:  Well, you know, let me just say this

4   to you.  I would have -- I will have great difficulty

5   approving this proposed final order.  And I recognize the

6   severity of what I've just said.  And I'm just wondering.

7   You know, we can go through all these points, but I agree

8   with most of these points.  And I'm just wondering if it

9   doesn't make sense to adjourn and for you to go back and talk

10  to the committee and to talk to Tenet and Conifer and to talk

11  to your client and see what can be done about improving the

12  terms of the final order.

13         MS. SANTAMOUR:  Your Honor, I think that the --

14  you know, we're happy to break and do that.  But I would like

15  to make it clear that it's unlikely that most of these

16  provisions MidCap will concede.  These provisions are

17  contained in many, many DIP financing orders.  They're not

18  unusual here or they're -- this isn't a case where these

19  aren't justified.  I don't think we're going to get to an

20  agreement.

21         If the committee is going to insist on these

22  provisions -- you know, the roll-up, for instance.  First of

23  all, the line of credit has already been rolled up, based

24  upon the interim order.

25         THE COURT:  Right.

1          MS. SANTAMOUR:  We made a huge concession, I

2  believe, in giving the mid -- giving the committee the right

3  to challenge the fifteen-million-dollar roll-up and take a

4  position that, to the extent they find MidCap is not

5  perfected -- because we know MidCap is perfected.  But if

6  they find some issue with the perfection, they can seek to

7  roll it back on a dollar-for-dollar basis, to the extent

8  they're successful.  I think that's a huge concession that

9  was not contained in the interim order.

10         Likewise, with the challenge terms.  We are -- we

11 have consented to a sixty-day challenge period.  Originally,

12 you might recall that, under the interim order, we were only

13 willing to provide for a challenge period for the committee

14 with respect to the roll-up, up through the final order.  We

15 gave up on that and said, no, you can live with the 60 days,

16 we can live with the 60 days, which is what's contemplated

17 under local rules.

18         Marshaling.  Again, marshaling is a huge point to

19 MidCap.  We don't want to have to look to this real estate

20 that has environmental issues and use issues and go through

21 the entire period of foreclosing on that property, if we're

22 even able to do that.

23         THE COURT:  I think that the principal is very

24 confident about this property and what's going to happen to

25 it after this bankruptcy case.  So I don't agree, frankly,

1   with that position.

2        MS. SANTAMOUR:  Well, you know, it's a really big

3   position for MidCap.  We don't want to be in a position where

4   this debtor has liquidated all of its assets and we have to

5   look to the real estate two or three years or four years down

6   the road.  I don't think that's fair.  I don't think that

7   that's supported by the law -- the case law out there and the

8   opinions regarding the way that marshaling is interpreted.

9   It can't be a marshaling that requires a -- I could read from

10  an opinion that was entered by Judge Walrath in this case

11  [sic]:

12        "A secured creditor can be compelled to marshal" -

13  - "cannot be compelled to marshal where its rights will be

14  endangered or injuriously delayed or there's a reasonable

15  doubt of the availability of another fund to satisfy the

16  senior secured creditor's demand."

17        And I think there's nothing that's on the record

18  currently that shows that there would be any, you know,

19  alternative to that fund, to the real estate, that would be

20  not endangered or injurious to MidCap because it would have

21  to be delayed in the collection of its debt while this case -

22  - while it supports this case, but yet, this case liquidates

23  and all the receivables are collected and all of its other

24  collateral is liquidated and it's paid to third parties.  I

25  don't think that would be fair, and that's not meant to be

1  the case in the equitable application of the marshaling

2  doctrine.

3           Likewise, Your Honor, with respect to the DIP

4  collateral and the superpriority claims, MidCap made

5  concessions with respect to the excluded causes of action.

6  They have not taken a lien on any of the Chapter 5 causes of

7  action and have only sought to have a superpriority

8  administrative claim -- to the extent it has one -- paid

9  through the proceeds of those causes of action.

10          With respect to the pre-petition/post-petition

11  commercial tort claims, we were advised by the debtors, when

12  the DIP financing closed, that they don't have any commercial

13  tort claims.  I do think, though, to the extent that they

14  have commercial claims that generate proceeds that are -- if

15  it's a commercial tort claim that's against collateral,

16  MidCap is -- for instance, like equipment or something like

17  that -- and there are insurance proceeds, our lien would

18  attach to those insurance proceeds.  And I don't think we

19  should be obligated at this point to give that up.  But we

20  have released any claim or have not sought to have a security

21  interest against the Chapter 5 causes of action.

22          You know, with respect to the size of the

23  facility, I don't know if there's anything we can do because

24  it's a borrowing base facility.  We've already lifted

25  reserves and given as much availability as we can possible

1  give, based upon the nature of these accounts receivable and

2  what's happening with Hahnemann receivables not being

3  replaced.

4        And the 506(c) waiver, again, we've agreed to a

5  2.5-million-dollar carveout.  I looked any many orders that

6  have been entered in this Court and in other courts around

7  the country, and that's a very large carveout.  I don't -- we

8  don't care how it's divvied up.  We weren't privy to the

9  agreement between the creditors' committee and the debtor

10  regarding how they were going to share the 2.5 million.  We

11  don't care if it goes to HSRE or Tenet or anyone else.  But I

12  think that the 2.5 carveout is a pretty significant

13  consideration in exchange for the waiver of the 506(c) claim.

14        You know, Mr. Sherman's description of the way the

15  liquidity works here is just wrong.  There wasn't 6.5 million

16  that was paid down to the DIP lenders; 5 million was

17  converted from the term loan that was accruing interest at

18  the rate of LIBOR plus 10 percent to a revolving loan that

19  then accrues interest at LIBOR plus 4.25 percent.  So they

20  saved 5 percent in interest.  So it wasn't a pay-down; it was

21  just a conversion to a lower interest facility.

22        Likewise, the million-dollar -- or the -- I'm

23  sorry -- five-hundred-thousand-dollar origination fee is paid

24  at the back end; it's not paid at the front end on this loan.

25  So there's not 6.5 million that was paid to MidCap from those

1    unblocked funds.

2          Likewise, the 5.2 million is an inaccurate

3    description of the availability and the liquidity.  Upon the

4    entry of the interim order, 5.5 million in liquidity was

5    immediately made available for the debtors to borrow.  In

6    addition, 2.5 was set aside as a carveout for the secured --

7    for the professionals.  And an additional 2 million is going

8    to be made available as soon as the DIP order -- if the DIP

9    order is entered, Your Honor.

10          And I think, with respect to the last point -- and

11   I'm -- regarding the references to nondebtor entities, this

12   is a situation where we have both debtor entities and

13   nondebtor entities that are both borrowers and guarantors.

14   And it's not unusual in all loan documents for there to be

15   events of default, based upon behavior of guarantors or all

16   the parties.  So that's an ask that would not be acceptable

17   to MidCap.

18          THE COURT:  Well, it sounds like none of this

19   would be acceptable to MidCap, is what you're telling me.

20   And let me tell you what's going to be acceptable to me, and

21   this is what you should talk to people about.  And you know,

22   I don't play -- I don't like to play chicken, so I'm not

23   playing chicken.  This is really where I am.

24          The challenge deadline -- I agree with Mr. Sherman

25   -- should be 75 days and should apply only to validity,

1  extent, amount, and so on.  And there should be no challenge

2  deadline for any other claims or causes of action.  That's

3  number one.  I think that's very significant to the

4  committee.

5         And the committee should be granted standing.  And

6  I know that's somewhat unusual, but I think that, here, it is

7  appropriate.

8         There will be no waiver of marshaling.

9         There will be no 506(c) waiver.

10         I agree that the conduct of the nondebtor entities

11  should not be an event of default.

12         And with those, you know, I'm giving a lot to

13  MidCap.  How much is MidCap really loaning?  How much will

14  the debtors really receive?  It sounds like about $10

15  million.

16         MS. SANTAMOUR:  No, Your Honor.  I think that

17  there is $10 million that was additional liquidity, but they

18  also have -- you know, the whole DIP loan has already rolled

19  over more than -- I mean, I don't know if it's twice, but

20  it's more than once.  So, every day, they provide additional

21  liquidity by way of allowing them to borrow off of the line

22  of credit, based upon the borrowing base.

23         So I don't know how you quantify that, but every

24  day, there's additional borrowing.  It's much beyond the $10

25  million.  I mean, they -- it's -- as I said, the debtor

1  wasn't able to live on cash collateral alone --

2           THE COURT:  Right.

3           MS. SANTAMOUR:  -- because of the -- what my

4  client says it the "lumpiness" of the receivables.  They're

5  collected, you know, periodically, and --

6           THE COURT:  And by the "receivables," you're

7  talking about what Conifer basically is paying over.

8           MS. SANTAMOUR:  That's right, yeah.

9           And I just wanted to make it clear that Confider,

10  while they're providing services for MidCap --

11           THE COURT:  Yes.

12           MS. SANTAMOUR:  -- you know, and for everyone else

13  in this case, it's not solely MidCap that gets the benefit of

14  those services.  First of all, the Tenet services, I question

15  whether they're a benefit to MidCap at all.  But the Conifer

16  services, to the collect they -- to the extent they collect

17  receivables, is a benefit.  But it's not as though those

18  receivables are paying down MidCap permanently and being --

19  you know, that would be a different story.

20           We actually have to take in the receivables, apply

21  them to the loan, and then we re-lend those receivables out.

22  So it's not MidCap that benefits, it's every creditor,

23  including Tenet, in this case that gets benefit from the DIP

24  and from Tenet's services because, if Tenet closed down

25  today, MidCap would have to go to State Court or to Federal

1  Court and get an assignment right under that regulation that

2  I cited and collected the receivables through a third party,

3  right?  That's assigned by the Court.

4         Tenet, who has a fifty-million-dollar unsecured

5  claim, also benefits by the bridge loan that this -- the

6  bridge that this DIP financing provides to get to a sale

7  because it's only through a sale that there will be a

8  significant amount available for creditors.  And we now know

9  that there could be a huge amount available for creditors

10 between the fifty-five-million-dollar resident program sale

11 and what's probably, you know, more than a fifty-million-

12 dollar St. Chris sale.  It could be a huge payday for all

13 creditors.  But we all have to take a certain amount of pain,

14 and I don't think it's fair to put that all on the burden of

15 MidCap.

16         But I do have a question about your comments, Your

17 Honor.

18         THE COURT:  Yes.

19         MS. SANTAMOUR:  Is this a take-it-or-leave-it or

20 can I go back to MidCap and see if they'll make a concession

21 with respect to any of these, but not all of them, and --

22         THE COURT:  Well, you know, these are all -- I

23 think you should tell MidCap that these are extremely

24 important to the Court.  I'm not going to say now that

25 they're a take-it-or-leave-it, but they're extremely

1  significant.  And I may -- that may be the result.  But I

2  think that MidCap, you know, with the roll-up and the fee

3  that I would be allowing, I think it's receiving significant

4  benefit from this DIP loan, and that its risk is really not

5  extraordinary, so that's where I come out.

6          But let me -- does anyone have any disagreement?

7  Mr. Minuti, I know that this is of grave concern to the

8  debtors.  But I think you can understand --

9          MR. MINUTI:  Your Honor, I perfectly understand

10  where you're coming from.  I hear Your Honor's comments loud

11  and clear.

12          I think everybody in the courtroom would benefit,

13  I think, from a break.

14          THE COURT:  I think so.

15          MR. MINUTI:  I see it is the lunch hour.

16          THE COURT:  Yes.

17          MR. MINUTI:  I mean, look, I will just say this,

18  Your Honor.  If Tenet and Conifer are going to insist on

19  their contract rate and they're not going to wait, if HSRE is

20  not going to be reasonable and they're not going to be

21  willing to wait, if the committee is not going to back off of

22  any of its position, if MidCap is not going to back off any

23  of its position, we're really not going to get anywhere, and

24  we're moving to shut this hospital down, so --

25          THE COURT:  Well, I don't want that.

1              MR. MINUTI:  So I say that on the record.  We're

2    willing to talk, we're willing to hopefully facilitate

3    somewhere where everybody can get comfortable under the

4    circumstances, recognizing that everyone is not going to get

5    what they want.  But hopefully, they'll get enough that it

6    makes sense for us to all move forward.

7              So I think a break makes sense, and hopefully, we

8    can come back and have something that everybody may not love,

9    but may be willing to do.

10             THE COURT:  Mr. Sherman, how long is your hearing

11   before Judge Sontchi?  It starts at 1.

12             MR. SHERMAN:  I'm looking to Mr. Brown, who's

13   debtor's counsel.

14             THE COURT:  He's --

15             MR. BROWN:  In a hospital case, Your Honor.

16             THE COURT:  Oh.

17        (Laughter)

18             MR. KELSER:  (Via telephone) Your Honor?

19             MR. BROWN:  Your Honor, we have a --

20             THE COURT:  Yes?  Hello?  On the phone?

21             MR. KELSER:  Yes, Your Honor.  Yes, this is Andrew

22   Kelser.  I had indicated yesterday that I would like to make

23   a statement.  I have been waiting patiently.  I did want the

24   folks who were on the agenda to have an opportunity to speak

25   first.  But before we adjourn, if there would be an

1   opportunity to make a statement on behalf of the pension fund

2   and health benefit fund for the employees represented by

3   1199C Union at Hahnemann, I would appreciate it.

4            THE COURT:  All right.  Well, let me have Mr.

5   Brown and Mr. Sherman address me, and then I'll hear from

6   you.

7            MR. BROWN:  So, Your Honor, we --

8            MR. KELSER:  Thank you, Your Honor.

9            MR. BROWN:  I agree -- I'm sorry.

10           THE COURT:  Go ahead.  Yes, Mr. Brown.

11           MR. BROWN:  I -- thank you, Your Honor.  Our

12  hearing is scheduled to commence at one o'clock.  We put a

13  call into Judge Sontchi's chambers to see if we could push

14  that back to 1:30, to let Mr. Sherman and his colleague and

15  me re-calibrate before we step into that courtroom.  And then

16  I can't see that hearing going more than an hour and a half.

17           THE COURT:  Okay.

18           MR. BROWN:  Actually, more than an hour, but for

19  safety's sake --

20           THE COURT:  So, if I said --

21           MR. BROWN:  -- more than an hour --

22           THE COURT:  -- we'll adjourn until 3, would that -

23  - that would work?

24           MR. BROWN:  Yes, Your Honor.

25           THE COURT:  1 -- okay.

1            MR. BROWN:  Yes.

2            THE COURT:  All right.  And --

3            MR. BROWN:  Thank you.

4            THE COURT:  Well, that's what I would like to

5   happen here, and we'll resume at 3.  And at that point, I'll

6   be able to rule on the Tenet and Conifer motion, as well.

7            And Mr. Brown, just one quick question for you on

8   HSRE.  I don't recall you making an administrative claim

9   motion.  Did you?

10           MR. BROWN:  Not yet, Your Honor.

11           THE COURT:  All right.  All right.

12           MR. BROWN:  Well, I think that's our compromise

13  that Mr. Minuti was speaking about.

14           THE COURT:  Okay.

15           MR. BROWN:  We haven't pushed that hard.  We

16  wanted to see where that went.

17           We also appreciate the need for St. Chris to

18  continue to operate --

19           THE COURT:  Yes.

20           MR. BROWN:  -- and want to play our part in

21  helping the debtor continue and other constituents in the

22  case continue with the mission of providing the needed

23  healthcare in the City of Philadelphia.

24           THE COURT:  All right.  Thank you, Mr. Brown.

25           MR. BROWN:  Thank you, Your Honor.

1            THE COURT:  I appreciate that.

2            And so we'll resume at three o'clock, the parties

3  will talk, and we'll see where we are at 3.

4            Yes, Mr. Minuti?

5            MR. MINUTI:  The gentleman on the phone wanted to

6  be heard, Your Honor.

7            THE COURT:  Oh, forgive me.  I almost forgot you.

8  Yes, please.  You may speak.

9            MR. KELSER:  Thank you, Your Honor.

10           So, Your Honor, as I mentioned, I represent the

11 pension fund and the health benefit fund --

12           THE COURT:  Yes.

13           MR. KELSER:  -- for employees at Hahnemann that

14 are represented by District 1199C.  And I will try to be

15 brief, i light of the proposed adjournment.

16           So the health benefit fund does provide health

17 coverage to these employees and their families, as well as

18 coverage to employees working at every other hospital, the

19 employees represented by 1199C.  And the pension fund

20 provides a defined benefit pension to these employees.

21           And both of these funds are multi-employer benefit

22 funds, subject to ERISA.  And like many multi-employer

23 benefit funds, they rely on information reported by the

24 employers about which employees worked and the amount of

25 contributions that are due for each month, based on a

1  percentage of the employee's gross payroll.  And that is

2  provided by contributing employers on a monthly basis, called

3  a "contribution report."

4          Now, since the onset of this bankruptcy, we've

5  communicated with the debtors' counsel about how and when the

6  debtor will report and pay contributions to these benefit

7  funds.  When the debtor filed its first-day motion and

8  requested that the Court approve 1.4 million in pre-petition

9  wage and benefit payments to the debtors' employees, we

10 reached out to the debtor immediately and requested

11 confirmation that some portion of the sought amount would be

12 paid to the benefit funds, who have approximately 2.4 million

13 in unpaid contributions for the work periods immediately

14 preceding the bankruptcy.

15         We still haven't seen a dollar from that approved

16 amount.  When the interim DIP budget was submitted, we did

17 not file an objection because it did contemplate payments to

18 the benefit funds during the second week of July and August,

19 which, albeit late, was at least somewhat in a timely manner

20 under the circumstances.  And these contributions, due in

21 July and August, constitute post-petition administrative

22 expenses.  We have filed a motion, and that is scheduled to

23 be heard on September 4th, so I won't get into that.

24         But I do just want to point out that, while we

25 received a payment in July, we have not received a report

1  that identifies the individuals who worked and the amount of

2  the gross payroll.  And that's significant because that means

3  the health benefit fund can't properly credit employees who

4  worked and provide coverage to those individuals.  And as far

5  as the pension fund goes, they can't properly credit

6  employees with contributions on their behalf.  So, for

7  example, if I worked at Hahnemann through August 2019, and I

8  want to retire September 1st, 2019, the pension fund wouldn't

9  have the information it needs to calculate the full pension

10  benefit.

11        And I'm telling you all this because, with respect

12  to the final proposed DIP budget, the debtor is proposing

13  that it would eliminate the September payment -- which, under

14  the previous budget, was in the amount of $980,000 -- and the

15  September payment is technically due September 1st, 2019,

16  under the terms of the collective bargaining agreement and

17  the benefits funds trust agreement, which, as far as we know,

18  have -- the debtors have not sought to reject at this point.

19  And instead, the proposed DIP budget contemplates a payment

20  in November in an amount of $1.1 million.

21        Now, if the payment would -- that's due in

22  September would not be received until November -- and quite

23  frankly, I'm skeptical whether it would be received at all --

24  it would be 60 days late, and that would violate the terms of

25  the collective bargaining agreement, the terms of the plans'

1  governing documents, and also it would be a post-petition

2  administrative expense that wouldn't be paid timely.

3          And there is a general theme that's going on here

4  with respect to these funds.  And just to give you a few

5  other examples, in MidCap's response to the unsecured

6  creditors' committee's objection, they have claimed that the

7  debtors have been able to make all of the payments required

8  by the budget, including payroll.  Well, the August

9  contribution payment was not made, so I don't think that

10  statement is true, which is why we had to file a motion.

11          And in the debtors' schedules that were filed last

12  week with the Court, they classified the funds' claims --

13  which clearly are priority claims because they're for

14  employee benefit fund contribution payments that were

15  incurred during the six months prior to the bankruptcy -- as

16  nonpriority unsecured claims.

17          And we are very concerned that the debtor and its

18  lender is not accurately representing its obligations to the

19  funds and the intention of the debtor to pay the funds is not

20  clear.  And the result of that is that the pension and the

21  health benefit fund coverage of the nearly 800 workers

22  represented by 1199C, who either worked at or worked -- or

23  are still working at Hahnemann since the date the petition

24  was filed will be adversely affected.

25          And for this additional reason, you know, we don't

1  think it's appropriate in a Chapter 11 case, where the debtor

2  has clear obligations to the funds, to be able to shirk those

3  obligations under the proposed final DIP budget.  Thank you.

4         THE COURT:  Thank you, Mr. Kelser.  I suppose I

5  will see you on September 4th.

6         But Mr. Minuti, did you want to -- at this point,

7  or wait until September 4th?

8         MR. MINUTI:  Well, Your Honor, the only thing I

9  was going to say is that the -- you know, the fund didn't

10  file an objection today.  I'm really not prepared --

11         THE COURT:  Right.

12         MR. MINUTI:  -- to respond to that.  I mean --

13         THE COURT:  I understand.

14         MR. MINUTI:  I mean, so we will deal with that on

15  the 4th, and hopefully before then, without ever needing to

16  come before Your Honor to deal with it.  But I'm just not

17  prepared at this time to address those --

18         THE COURT:  I understand.

19         MR. MINUTI:  -- issues.

20         THE COURT:  Let me -- and let me just add one

21  other thing, Ms. Santamour.  If MidCap would be willing to

22  fund more, I might be willing to reconsider some of my

23  concerns.  So you might just throw that into your

24  discussions.

25         MS. SANTAMOUR:  Okay.  Thank you, Your Honor.

1          THE COURT:  All right.  All right, everyone.  With

2  that, I will see you back here at three o'clock.

3          MR. MINUTI:  Thank you, Judge.

4          THE COURT:  Thank you.

5      (Recess taken at 12:34 p.m.)

1                          (Afternoon Session)

2              (Proceedings resume at 4:15 p.m.)

3                      THE COURT:  I know you've been hard at work.

4              MR. MINUTI:  Your Honor, hard at work.  And to say

5    this case is challenging, I think, for the Court and for all

6    the players is an understatement.

7                      THE COURT:  Yes.  Yes.

8              MR. MINUTI:  Your Honor, we spent the time since -

9    - let me say for the record, Mark Minuti from Saul Ewing

10   Arnstein & Lehr.  I'm here today based on behalf of the

11   debtors.

12                     THE COURT:  Yes.

13             MR. MINUTI:  Your Honor, I've been working since

14   the break analyzing the DIP facility.  We've talked -- we had

15   discussions with MidCap.  We've had discussions with Tenet.

16   We've had just brief discussions with the committee right

17   before we got here just a few minutes ago.

18                     THE COURT:  Yes.

19             MR. MINUTI:  Your Honor, where we are is as

20   follows.  We do not -- we have a profile that MidCap made.

21   It was not acceptable to the committee.  We made the proposal

22   -- a proposal to Tenet that's related to the proposal that

23   MidCap made to the debtors.  That was not acceptable.  They

24   just made a counterproposal to us which, you know, which

25   we're not sure works, but with a little more time, we may

1  find a way to get there.

2          Separate and apart from the issues we've been

3  discussing today, Your Honor, we have another issue related

4  to the financing and I'm going to try and see if I can

5  explain it very simply to Your Honor.  The availability under

6  the current DIP, as well as if Your Honor were to approve the

7  final, is tied to available or eligible accounts receivable.

8  And there's an issue in the borrowing base dealing with

9  cross-aging, and what that basically means is if you have AR

10 from, let's say, one particular client and some of it is 180

11 days old, right, that would be ineligible.  But if the total

12 amount of the receivable, if the ineligible part goes above,

13 let's say, 50 percent, then the entire AR becomes ineligible.

14          THE COURT:  All right.

15          MR. MINUTI:  And as a result of that, Your Honor,

16 the availability that the debtor has as we sit here today has

17 been restricted considerably to where we got a little bit of

18 a crisis on our hands to figures out how we're going to pay

19 short-term obligations, Your Honor.

20          THE COURT:  With or without the financing order

21 being entered?

22          MR. MINUTI:  Well, if the financing order is

23 entered in whatever fashion, we still have that issue that

24 we've got to get resolved.

25          THE COURT:  Okay.

1          MR. MINUTI:  Part of the issue has to do with the

2    ability to write-off some of the old aging, Your Honor.  We

3    are working with parent Tenet and Conifer to get that done,

4    all right.  And I'm not pointing fingers at anybody.  It's a

5    complicated issue between the parties, but we need to get

6    information relative to that.  We need to decide what can be

7    written off.  We need to get MidCap's approval to do that,

8    and I think everybody is committed to do that fairly quickly;

9    the problem is we don't have it done by today.

10          So my request, Your Honor -- and I don't know what

11   Your Honor's availability is -- if there's any time for us to

12   come back tomorrow, hopefully we can reach some accommodation

13   and some -- and we can do some analysis to see exactly what

14   we can do.  That will give us a little more time to talk to

15   Tenet and Conifer in light of the proposal they've made.  I'm

16   not quite sure we're going to make any additional headway

17   with the committee, but we may be able to make a little bit

18   of headway with Tenet and Conifer and then come back and

19   either tell Your Honor that we've got some agreements or we

20   don't and then Your Honor will rule in the context of the

21   agreements we have or if we don't have agreements, Your Honor

22   will just rule.

23          But we're feeling uncomfortable going forward

24   today under any -- right now under any circumstances in the

25   light of this issue relative to the cross-aging and the

1   availability we have regardless of approval.

2           THE COURT:  Okay.

3           MR. MINUTI:  So, that's our request.  I don't

4   think -- I'll let other people speak.  They may have their

5   own views.

6           And by the way, no one really has heard this in

7   the courtroom, except I did just whisper it in committee

8   counsel's ear right as I came to the podium, because we

9   literally just decided it out in the hall.  So, let me cede

10  the podium and see if other folks have done this.

11          THE COURT:  Yes.

12          MS. SANTAMOUR:  Your Honor, may I be heard?

13          THE COURT:  Yes, you may.  Good afternoon.  Good

14  evening.

15          MS. SANTAMOUR:  Good afternoon.  Gretchen

16  Santamour on behalf of MidCap Financial.

17          THE COURT:  Yes, Ms. Santamour.

18          MS. SANTAMOUR:  Just so you understand, Your

19  Honor, the cross-aging issue has been in the DIP facility

20  since day one, since January of 2018.  So, the debtor has

21  always been aware of that as an issue and has always complied

22  with it in the past.

23          About a week ago when we met at Saul's offices to

24  discuss a settlement, the issue was raised between the

25  financial -- I think the CFO of Tenet and my client, who was

1   there at the time, and my client said, Please provide us the

2   information we need, and the CFO indicated that they were --

3   that Tenet and Conifer was not providing any information that

4   was needed that they were required to provide under their

5   contract and they weren't providing it pending the concession

6   by the debtor of certain things that are also outside the

7   contract; meaning, they were asking for release and they were

8   asking for some other concessions and, essentially, holding

9   up that information.

10          So, it's true that there's -- you know, we believe

11  that if that information is provided, there's likely to be

12  more liquidity, but I want Your Honor to know that we didn't

13  know until today that it had gotten to the point where it was

14  a crisis.

15          THE COURT:  Okay.

16          MS. SANTAMOUR:  So, my client committed, when we

17  were in meetings earlier today after the hearing, to review

18  whatever information is provided and do that within, you

19  know, one or two days so the availability can be provided,

20  but we need to see the information first to be able to

21  analyze it.

22          THE COURT:  Okay.  All right.  Maybe Tenet and

23  Conifer can help out with that.

24          UNIDENTIFIED:  Yeah, sure.

25          THE COURT:  All right.  Thank you, Ms. Santamour.

1        Mr. Pesce?

2        MR. PESCE:  In this case, I keep thinking I'm

3  going to walk out my front door and find a yellow brick road

4  and my world turned upside down.  So, in the interests of

5  full clarity here, we have been advised that there is $5

6  million of receivables that may have been aged out, so to

7  speak, and are bad debts.

8        THE COURT:  Okay.

9        MR. PESCE:  We have advised the debtor in writing

10  for several times in the past week that we will,

11  notwithstanding the terms of the agreements, if asked, write-

12  off that 5 million that everyone thinks is probably bad debt.

13        We've also been advised that there's $7 million

14  that probably isn't considered bad debt as a technical matter

15  under the contract, but if asked, we will -- you know,

16  subject to any consents that the debtor needs to have -- we

17  will also write that off.  And so we've told the debtor now

18  in writing multiple times that if there is bad -- debt that

19  is or maybe bad debt that they want us to expeditiously

20  write-off to free up availability, we will do so.

21        But since we've been sued for basically not doing

22  collections as we're supposed to, we've just said we want to

23  have an agreement that we'll be indemnified or released from

24  that particular write-off decision so that we won't, you

25  know, get -- we won't write-off the debt and then get sued

1   for not collecting the debt.

2          So, we've also agreed that if there's ever

3   information that we're supposed to provide, we will provide

4   that.  My understanding is there's been conversation between

5   the business people.  I didn't really think this was a

6   crisis, so to speak, as characterized by the DIP lender.  We

7   are happy to represent on the record here today that if the

8   company is willing to -- if the company and the lender would

9   like us to write-off either that five and/or that 7 million,

10  we will do so as soon as possible, provided that they

11  indemnify or release us.

12         THE COURT:  Release you or -- yes.  Yes.

13         MR. PESCE:  And, you know, I hope that will

14  provide some help to the debtor as it navigates its liquidity

15  challenges.

16         THE COURT:  Okay.

17         MR. PESCE:  And in terms of a future hearing, I,

18  unfortunately could not be here tomorrow, but if there was,

19  you know, availability by the other parties and, Your Honor,

20  I could probably be here on Thursday or, you know, the

21  following week, but I'll reserve if there's any other

22  questions or scheduling issues.

23         THE COURT:  Is it -- let me ask you this question

24  --

25         MR. PESCE:  Yes?

1      THE COURT:  -- assuming that this gets resolved --

2      MR. PESCE:  Yes.

3      THE COURT:  -- is it necessary for you to be here?

4      MR. PESCE:  I guess.  If the -- well, I think if

5  the committee and the debtor and the lender resolve their

6  issues, we're still objecting to the DIP on the basis that it

7  doesn't have sufficient liquidity.

8      THE COURT:  Yes.

9      MR. PESCE:  If the Court were to find that it's

10  not necessary -- you know, that it would overrule that

11  objection, I could have a colleague probably cover it.  But I

12  think it would be helpful if we could understand what your

13  plans are for our motion and how that might tie in.

14      THE COURT:  Absolutely.

15      MR. PESCE:  Yeah.

16      THE COURT:  All right.

17      MR. PESCE:  Thank you, Your Honor.

18      THE COURT:  All right.  And I am going to rule on

19  the -- on that motion.

20      MR. PESCE:  Okay.

21      THE COURT:  Is this a good time for me to do so?

22  In other words, I don't want to leave your issue, Mr. Minuti.

23  It sounds to me like there's a possibility of freeing up some

24  liquidity here.

25      MR. MINUTI:  Your Honor, I think -- actually, can

1  you give me just one moment?

2         THE COURT:  Yes, of course.

3         MR. MINUTI:  Your Honor, I think that maybe it

4  would be helpful and instructive to all the parties if you

5  ruled on the Tenet and Conifer motion, then we'd understand

6  where the Court is, what those issues are, and then that will

7  factor into our discussions over, you know, over this

8  evening.

9         THE COURT:  All right.  And we'll see if my ruling

10 is helpful or not.  It's kind of -- it's a little bit of a

11 mixed bag here, so let me go forward with the ruling, because

12 with regard to the Tenet and Conifer motion concerning

13 payment of its administrative claim, or in the alternative,

14 to lift the automatic stay to permit them to terminate the

15 transition-services agreement, which I'll call the TSA, and

16 the master services agreement, which I'll call the MSA, I'm

17 going to make a ruling that I think is -- it's brief.  I

18 think it's simple.  I think it's straightforward.  And I hope

19 that it's helpful to everyone.  And this is a ruling; it's

20 not a tentative ruling, and I think it accounts for my

21 genuine concern for the debtors and for wanting to find a way

22 to provide some fairness to Tenet and Conifer.

23        And first, the cases provide that the contract

24 rate is presumed to be the reasonable value of services, but

25 that is a rebuttable presumption if there is convincing

1  evidence to the contrary -- and one of the cites for that is

2  In re Smurfit-Stone Container Corp., 425 B.R. 735, and

3  particularly at Page 741, and that's a decision of this Court

4  in 2010, and I find that the debtors successfully rebutted

5  the presumption that the contract rate applies in these

6  circumstances.

7        When the TSA and the MSA were entered into, two

8  active hospitals were reflected in the agreements.  Today

9  there is one active hospital, St. Christopher's, and one

10  hospital that is closed.  At the time of the agreements,

11  Hahnemann had 2700 employees and now it has none.  Further,

12  Tenet and Conifer had numerous employees located on-site at

13  Hahnemann and St. Christopher's, and I believe the testimony

14  was that was 50 employees then and today there are none.

15        Debtors clearly established to the Court's

16  satisfaction that there has been a very large change in the

17  relationship between the parties post-petition, which is the

18  period of time for which Tenet and Conifer seek payment.

19  There just is substantially less work for Tenet and Conifer

20  to perform and they are not entitled to their contract rate

21  of compensation.

22        Now, I'm going to have a little interlude because

23  this is the second point that I want to make.  The Court

24  would like to see a resolution of the disputes between Tenet

25  and Conifer on the one hand and debtors on the other.  And

1   when I say "resolution," I mean the instant issue and the

2   pending lawsuits.  I would like you to meet and a talk with

3   some urgency.  If Mr. Friedman, who may be engaged in this

4   dispute does not want to engage, then I believe the debtors

5   must.  It is their fiduciary duty to try to resolve the

6   issues.

7           Now, number three, on September 4, at the hearing,

8   I went the parties, Tenet and Conifer and debtors, to present

9   and agreed-upon administrative claim amount.  It will not

10  have to be paid immediately, but instead, there can be

11  partial payments of the claim beginning at some date in the

12  near future, and if the parties cannot agree on that claim

13  amount, then on September 4, the Court will partially lift

14  the automatic stay to permit Tenet and Conifer to terminate

15  the agreements.

16          There's just no involuntary servitude in this

17  country and I think that is where we are.  But let me be

18  clear, this ruling takes into account that Tenet and Conifer

19  have remained involved with Hahnemann and St. Christopher's

20  and I believe that if the debtors, and they are reasonable,

21  that Tenet and Conifer will remain in place out of their

22  genuine concern for the delivery of healthcare in

23  Philadelphia.

24          So, that's the ruling.  I want agreement on an

25  amount or I'll lift the stay.  And I don't do that to

1  encourage Tenet and Conifer not to be cooperative with the

2  debtors, but I'm satisfied that the contract has been

3  rebutted.  The contract amount has been rebutted and so it

4  sought to be an amount obviously less than the contract

5  amount, but perhaps a little more than what is being paid to

6  Tenet and Conifer right now.

7        Does that help at all?  It's an initial have

8  unusual ruling, because I'm not giving an amount.  I'm not

9  saying when this has to be paid, but I am suggesting that it

10 should be paid, maybe partial payments or the like, and I'm

11 also suggesting that Tenet and Conifer showed a willingness

12 to remain on-site and that I would hope that that would

13 continue.

14        Yes, Mr. Minuti?

15        MR. MINUTI:  Your Honor, thank you very much.

16 Your Honor asked the question if that's helpful.  I do think

17 it's helpful and I'm not asking to re-argue any portion of

18 what Your Honor just ruled.

19        The one provision that you stated that gives me a

20 little pause is the idea that it's an automatic; if we don't

21 come to an agreement, the stay will be lifted, because that

22 would suggest to me that Tenet and Conifer essentially have a

23 veto right.  They could demand whatever they want.  If we

24 don't come to their demand, the stay is going to lift.

25        So, what I -- well, I'm not going to ask for Your

1  Honor --

2          THE COURT:  What do you suggest?

3          MR. MINUTI:  Well, what I was going to suggest,

4  Your Honor, is that we'll certainly try in good faith.  I

5  heard Your Honor's last comment, which is, you think you're

6  entitled to a little bit more, and we certainly think we can

7  accommodate that.  If, for whatever reason we're not able to

8  reach agreement, I would at least like an opportunity on

9  September 4 to tell Your Honor what we're prepared to do.

10  And then if Your Honor feels that that's unreasonable, the

11  stay gets lifted.

12          THE COURT:  That's just -- let me hear Mr. Pesce

13  first, before I say anything.

14          MR. PESCE:  Sure.  I would -- so, first thing's

15  first, we will stay on-site and provide services at the

16  current *status quo* through September 4th.

17          THE COURT:  Yes.

18          MR. PESCE:  Absolutely no issue.  We will meet in

19  good faith and Conifer with the debtor and we hope Mr.

20  Friedman finds it in himself to attend.  There's been a

21  representative authorized to negotiate.

22          Subject to speaking for my client, we may ask Your

23  Honor to recommend one of your fellow judges to, perhaps,

24  serve as a mediator to help reach that resolution.  But I

25  think that to take what happens on the 4th and maybe, I think

1    get to the same place, but in a slightly different direction,

2    I think that the evidence today was that the contracts are

3    not, in their current form, are not sustainable by the

4    debtors.  They cannot object and you just said they can't

5    service them.

6            So, what I might suggest as an alternative to

7    lifting the stay is if we recharacterize our motion for

8    lifting the stay as a motion to compel rejection as of the

9    4th, so that we may have clarity that what happens on the

10   4th.  We have no issue with a mutually agreed resolution, but

11   if the contracts aren't kept in their current form, you know,

12   we would negotiate a different contract for Hahnemann, St.

13   Chris, one or both.  I think we do have some pause, though,

14   as being sort of compelled to continue to stay on-site

15   indefinitely, given the current circumstances.

16           So, I think as long as there's resolution that we

17   can -- that the 4th is an end date -- and I say this having

18   been in negotiations -- good faith negotiations with all

19   parties for many months, I just -- I fear that we won't reach

20   a resolution and this kind of muddling along will continue.

21           So, I think it is important to have a brightline

22   on the 4th, whether it's lifting the stay or rejecting the

23   contract for your consideration and those of the other

24   parties.

25           THE COURT:  Mr. Minuti, any response to that

1  point?

2          MR. MINUTI:  Well, Your Honor, I would prefer --

3  actually, if you give me one moment, I just want to --

4          THE COURT:  Yes, please.  Take your time.

5          MR. MINUTI:  Your Honor, I think our preference

6  would be to keep the current posture, which is a lift-stay

7  motion.  I certainly read Your Honor's ruling as providing

8  some finality if we don't have a reasonable resolution by

9  that period of time.

10         Your Honor, we -- let me just talk for a moment.

11 I want to get Your Honor's view on the mediation, this idea

12 of mediating and remediating to come to a global resolution

13 of the issues.  You know, we are not oppose to do that at

14 all.  I think we are very much in favor of that.  I think you

15 heard Mr. Wilen say that, you know, we can try to reach a

16 settlement prepetition.  His goal is ultimately to reach a

17 settlement.

18         The issue that we -- and I think it's really an

19 issue that we all have is, these are complicated issues.

20 There's a lot of background here.  Your Honor needs to

21 remember the committee really is a new player in this case.

22 They no very little about the, like, what I'll call the

23 issues between the larger parties, so I think we can maybe

24 make some progress by the 5th, in terms of maybe a structure

25 or how we will ultimately get to, for example, in mediation,

1  or put ourselves in a posture where we can actually sit down

2  and everybody can be educated.

3           But, at least from my perspective, I think it

4  would be optimistic to suggest that we're going to -- that

5  everyone is going to be fully educated and we're going to be

6  in a position to resolve all the issues by September 5th.

7           The other thing, Your Honor, is --

8           THE COURT:  It's Labor Day weekend and the like,

9  so I recognize that.

10          MR. MINUTI:  Yeah.  And, look, I just -- I think

11 it's -- look, we've all been busy.  There's a lot going on in

12 this case, and so I think what a lot of folks have done,

13 frankly, is put those litigation claims to the side while we

14 concentrate on other issues.  So, it is going to take some

15 time to get up to speed even for the debtors, quite frankly,

16 to put themselves in a position to settle.

17          I can't speak to Mr. Friedman, Your Honor, and his

18 entities at all, but I -- at least, based on what I know, I

19 don't think he would be opposed to being part of that

20 process.  I believe his counsel may be here.  Maybe they

21 could speak to that.

22          So, no, I think what Your Honor is saying makes

23 perfect sense at the appropriate time.  I'm just trying to

24 manage the Court's expectations a little bit in terms of the

25 magnitude of what we're talking about --

1          THE COURT:  Okay.

2          MR. MINUTI:  -- and what we may be able to

3  accomplish by that.

4          THE COURT:  Well, then, let me ask, is September

5  4th, is that something that we should extend as far as my

6  ruling is concerned?

7          MR. MINUTI:  Well, Your Honor, we -- well, from

8  the debtors' perspective, we would certainly like to see that

9  because, you know, look, frankly, what I'd like to be

10  spending the next few days on, maybe the next week on, is

11  trying to figure out, you know, see if we can settle some of

12  the objections to the resident sale motion --

13          THE COURT:  Yes.

14          MR. MINUTI:  -- and then coming back before Your

15  Honor and getting that approved.  And so, I'd like to see the

16  date extended, just to give us some more time to do that.

17          In addition, Your Honor, we are moving towards a

18  sale of St. Christopher's Hospital, and, again, we are

19  spending a lot of energy on that because we believe that's

20  going to bring money into the estate.  So, if Your Honor has

21  some flexibility on the September, I think, 4 date, that

22  would be beneficial from the debtors' perspective.

23          THE COURT:  All right.

24          MR. SHERMAN:  Your Honor?

25          THE COURT:  Yes, Mr. Sherman?

1        MR. SHERMAN:  I would only echo Mr. Minuti's

2   concerns in the next two weeks.  I can rest assured, Your

3   Honor, that we're probably not going to be in a position to

4   be involved in any of the Tenet and Conifer issues.  We just

5   haven't gotten up to speed on that.

6        THE COURT:  All right.  I understand that, Mr.

7   Sherman.  Okay.

8        MR. PESCE:  I think this might make it easier,

9   too.

10       THE COURT:  Yes, Mr. Pesce?

11       MR. PESCE:  I would, respectfully, submit the

12  following.  The Mr. Friedman-Tenet and Conifer dynamic is

13  extremely complicated.  I think it would be --

14       THE COURT:  Maybe more so than I recognize.

15       MR. PESCE:  We think it's cut-and-dried, but we

16  can understand, having been in Mr. Sherman's shoes before,

17  how complicated it might be to get up to speed on these

18  matters.

19       I would suggest that we set aside -- we'd be

20  willing to set Side having him at the meeting and reaching a

21  resolution on our lawsuits, and we can just focus singularly

22  on the contracts.  And if -- hopefully, we just focus on the

23  contracts, themselves, and not these other allegations being

24  bandied about, we could focus on having it on -- a resolution

25  on the 4th or the 5th or, you know, a few days give or take

1 | then.

2 | But for the sake of context -- and we appreciate

3 | that the pronunciation has been rebutted, but under the

4 | contracts, we're effectively owed $100,000 a day for our

5 | work, collectively, Tenet and Conifer.  So, we're very

6 | troubled by the prospect that's suggested by the debtors of

7 | not having sort of a brightline end point to our work.  If we

8 | don't have a brightline end point, we may need to -- we'll

9 | discuss, but we may have to think about other ways to sort of

10 | facilitate that, because we just -- respectfully, we can't

11 | just keep being dragged along as we've been.

12 | THE COURT:  I understand that.

13 | MR. PESCE:  So, we're open to a different -- we're

14 | open to a metric to facilitate that, whether it's lifting the

15 | stay or rejection of the contract.  We'd just like to have

16 | some end point where the debtors have a lot of momentum and

17 | pressure, frankly, to reach an agreement, one way or the

18 | other, before we can end the arrangement.

19 | THE COURT:  All right.

20 | MR. PESCE:  And we're willing to forego Mr.

21 | Friedman's involvement and that whole process if that would

22 | help focus people just on the business issues here.

23 | THE COURT:  I thought that bringing in everything

24 | might be a good way for the parties to finally reach a

25 | positive result, but if you don't think so --

1          MR. PESCE:  We do, too.  We do, too.  But when

2    compared with -- if we're looking at a world where we might

3    have -- we have the chance of a resolution with everybody,

4    but a muddled sort of end point and not resolution with

5    everybody, but we have a brightline end point, we would take

6    the latter choice just so we can focus on other, you know,

7    other -- focus on getting the contracts right and then we can

8    focus on these other issues which will come into play sooner

9    rather than later.

10          THE COURT:  All right.

11          MR. PESCE:  Thank you, Your Honor.

12          THE COURT:  Yes?

13          MR. SCHLAUCH:  For the record, Brendan Schlauch of

14   Richards, Layton & Finger.

15          THE COURT:  Yes, sir?

16          MR. SCHLAUCH:  I just need to stand up to disagree

17   with the characterization that Mr. Friedman has not been

18   cooperating.  It's his point of view, our client's point of

19   view that he had been cooperative.  We've made overtures to

20   the debtors.  I will certainly take what we've heard today

21   from the Court and from others and speak with our client, but

22   we did just want to, for our sake, set the record straight

23   and dispute that characterization, as Mr. Friedman not being

24   cooperative.

25          THE COURT:  All right.

1           MR. SCHLAUCH:  Thank you.

2           THE COURT:  Yes, Mr. Brown?

3           MR. BROWN:  Thank you, Your Honor.  And I

4    apologize for being slightly delayed and getting back to

5    court.  Your colleague kept me, Your Honor.

6           But I'm not aware whether it's Your Honor's

7    intention that the interim DIP order will remain outstanding

8    and in place such that the debtor still has access to

9    liquidity and, for example, can pay the differential of the

10   rent this week or next week, as originally budgeted, and I

11   didn't know whether Your Honor had ruled on that issue or

12   not.

13          THE COURT:  I did not.  Mr. Minuti's comments sort

14   of put me off of that, but it seems to me -- Ms. Santamour.

15          MS. SANTAMOUR:  Yes, Your Honor.  I just wanted to

16   say, I would have to take to my client about that issue,

17   because technically, the DIP order did expire 30 days from

18   the entry, which would have been August 15th.  MidCap has, in

19   good faith, been lending pursuant to that --

20          THE COURT:  Okay.

21          MS. SANTAMOUR:  -- even though the documents --

22   there's an event of default under the documents under the

23   interim order because the DIP final order has not been

24   entered --

25          THE COURT:  Right.

1      MS. SANTAMOUR:  -- and I don't know whether

2  there's limitations between now and when we get to the final

3  DIP lender that we need to put in place or not, but I can

4  talk to my client about what kind of availability will be

5  available until we get to the final DIP order.

6      THE COURT:  That would be fine.  You know, I was

7  looking -- I had hoped that maybe by tomorrow we would be in

8  position to get this finally resolved, but I know that Mr.

9  Pesce is unavailable tomorrow and on Friday, I could hear you

10  at nine o'clock on Friday, again.  But I have hearings at

11  11:00, 11:30, 2:00 -- I don't have a lot of time,

12  unfortunately, on Friday.  And then next week I'm out.

13      MR. PESCHE:  And Thursday, was that not an option

14  for Your Honor?

15      THE COURT:  Oh, I'm sorry, Thursday?  Thursday

16  looks worse, unfortunately, and I say that seriously.  I have

17  nine o'clock hearings and I have them going on all day.

18      It is possible that at the end of the day, if a

19  two o'clock sale hearing goes well, that I would have time at

20  three o'clock, but I'm not sure about that.  I'd be willing

21  to schedule it at three o'clock and if people didn't mind

22  standing by, then we could proceed as soon as that two

23  o'clock hearing was finished.

24      MR. PESCHE:  That would work for me, subject to

25  the other participants.

1                MR. SHERMAN:  Thursday?

2                THE COURT:  Thursday, yes.  Does that work for

3     you, Mr. Sherman?

4                MR. SHERMAN:  Yes, Your Honor.

5                THE COURT:  Mr. Minuti, does that it work for you?

6                MR. MINUTI:  Thursday at three o'clock is fine,

7     Your Honor.  I wanted to -- I rise because I wanted to

8     respond to Mr. Pesce's issue with regard to what we're going

9     to do on September 5th.

10               THE COURT:  Well, I'm looking to change the 5th to

11    the 13th.  I have time on the 13th, considerable time, which

12    is a surprise -- I don't know how that happened -- and I

13    would be willing to hear you then, and we would -- I would

14    put off, rather than using the September 4 date that I

15    previously used in my ruling, I would use September 13.

16               MR. MINUTI:  Your Honor, we -- I think we'll take

17    that.  I mean, we would appreciate it that would give us a

18    little bit more time, I think, on a couple of the other

19    issues we talked about.

20               As I understand it, then, Your Honor, the idea is

21    that we are going to meet between now and then in good faith

22    and try and resolve what I'll call the "contract issues."

23               THE COURT:  Yes.

24               MR. MINUTI:  I do think it makes sense, even

25    though the idea of a global settlement is unlikely to happen

1  by then, I do think it makes sense for the parties a at least

2  torques talk maybe about scheduling, you know, when we could

3  do that, what the mechanics would be.  So, I'd like to see if

4  we can get some commitment on the part of Tenet and Conifer

5  to do that.

6          The other thing, Your Honor, I would request of

7  Mr. Pesce, there are some deadlines coming up in a State

8  Court litigation.  We think it makes sense to stay that

9  litigation while we continue and, again, the idea is put in

10  place, maybe, some, you know, at least an agreement on

11  timing.  Maybe we can start talking about mediation.  Maybe

12  we can talk about mediators.  At least something in place so

13  we all know that down the road, we would be working towards

14  an attempt to try to settle those global issues.  So, that

15  would be my request and see if they agree to that, Your

16  Honor.

17          THE COURT:  And that's your litigation, though, is

18  it not?

19          MR. MINUTI:  That's correct.  And so, it is not

20  stayed, because we are the movant.

21          THE COURT:  Right.

22          MR. MINUTI:  Correct.

23          THE COURT:  Okay.  But I assume you could agree

24  with --

25          MR. MINUTI:  Yes.  That's why I'm asking to see if

1  he would agree to that.

2          THE COURT:  Right.

3          MR. PESCE:  So, I just wasn't quite clear.  What

4  happened -- what would happen -- on what is the 13th?  What

5  would happen on that --

6          THE COURT:  On the 13th, you would come in.  You

7  would have hopefully have agreed upon a claim amount.  I do

8  think that Mr. Minuti's point is a good one, and that is, if

9  you're unable to reach agreement, then he could suggest a

10 claim amount and depending upon whether the Court thought

11 that was sufficient or not, then I would lift the stay.

12         MR. PESCE:  Yeah, I -- we would like to, again,

13 reiterate our desire to have -- we like -- we really like the

14 framework you had originally, because with respect, we

15 continue to get dragged along with a hope and a prayer and we

16 don't -- we're kind of out of hoping and praying and wrote

17 $16 million already --

18         THE COURT:  Yes.

19         MR. PESCE:  -- and it's $100,000 a day that we're

20 not getting paid, so we would -- we're fine with any

21 conditions the Court may impose, provided that we have a hard

22 date for them that reach agreement with us on a new contract

23 or a claim, and if not, we would ask the Court to reject or

24 lift the stay to let us go about with the understanding that

25 we do want to be part of the solution.

1          THE COURT:  Yes, I think you do.

2          MR. PESCE:  And so, we would negotiate in good

3   faith regarding that, and to that end -- I don't want to get

4   into the specifics -- but we have already discussed possible

5   modifications to the Hahnemann side of the agreement, at

6   least.  So, we'd really like to have a mechanism to kind of

7   force a resolution-by date so we can, at least, sever the

8   existing agreements and negotiate a new one, if need be.

9          And then as to the Court schedule, the State Court

10  litigation, we'll have to think about this.  We do not have

11  any -- we don't have any desire to make Mr. Minuti and his

12  clients respond to that.

13          THE COURT:  Is there a counterclaim or something

14  of that nature?

15          MR. PESCE:  With that said, there are nondebtor

16  parties party to that litigation --

17          THE COURT:  Okay.

18          MR. PESCE:  -- and has been, I think, publicly

19  disclosed at this point, Mr. Kessler was on the phone earlier

20  --

21          THE COURT:  Yes.

22          MR. PESCE:  -- the pension fund is now taking

23  action against Tenet and Conifer, among other parties, and we

24  may need to seek recourse in the courts against nondebtors as

25  a result of that.  So, I'm happy to find a way not to proceed

1  against the debtors, but I do want to have the flexibility to

2  respond to the issue that Mr. Kessler's clients has started

3  to pursue, as is their right, and that involve litigation.

4          So, I just want to think through that with Mr.

5  Minuti, but in general, I don't want to make more expenses --

6  create more expenses for the estate.

7          THE COURT:  Right.

8          MR. PESCE:  So, anyway, I hope that you can

9  understand just our -- for 18 months now we've been sort of

10  dragged along and no good deed here goes unpunished.  It

11  seems to me we would just like to have a final date where we

12  have to reach an agreement, otherwise, we can kind of go our

13  separate ways and try to find a way to negotiate a new

14  agreement, but not be held to one which we think is just not

15  appropriate.

16          THE COURT:  All right.  Then I will go back to my

17  original ruling, and that is if the parties cannot agree on a

18  claim amount, then we I will lift the stay.

19          MR. PESCE:  Thank you.  And to be clear, we'll

20  work in good faith and try to work out where we can by then

21  and we're very hopeful.

22          THE COURT:  Okay.

23          MR. PESCE:  Thank you, Your Honor.

24          THE COURT:  All right.  So, Thursday at 3:00; is

25  that right?

1          MR. PESCE:  Thank you.  Yeah, that works for us.

2          MR. SHERMAN:  Your Honor?

3          THE COURT:  Mr. Sherman, yes?

4          And at that point, I don't know, Ms. Santamour,

5   have you talked to your client about extending the interim

6   DIP?

7          MS. SANTAMOUR:  I have spoken to MidCap, Your

8   Honor, and they've agreed to extend it on its current terms.

9   The additional two million in availability that will be

10  available once the DIP -- you know, if the DIP order is

11  entered, will not be made available in the short time, but

12  they will continue to lend, pursuant to the borrowing base in

13  the interim order and the loan documents that are in place.

14         THE COURT:  All right.  Did you want to be heard,

15  Mr. Sherman?

16         MR. SHERMAN:  I did, Your Honor, and prodded by

17  Mr.  Mankovetskiy over there, just on -- I don't want to take

18  bad to good, but we appreciate Your Honor's comments on the

19  DIP earlier.  And I'm not trying to add all -- add to that, I

20  just would like if Your Honor could give us a little bit of

21  clarification --

22         THE COURT:  Yes.

23         MR. SHERMAN:  -- because it was partly my fault,

24  one of the issues we talked about where Your Honor was

25  talking about the roll-up --

1          THE COURT:  Yes?

2          MR. SHERMAN:  -- if there's a successful

3 challenge, is there a potential for a rollback, because the

4 way the DIP order is drafted now, it's almost like a futile

5 challenge, but I didn't know in Your Honor's concern whether

6 -- if there was a successful challenge, what would be the

7 effect of the roll-up.  And maybe you can address it --

8          THE COURT:  I'll address it on Thursday, I think,

9 at this point, but, you know, I'm inclined to say -- well,

10 let me not say, because I think that there are some issues

11 out there that you are discussing and I don't want to

12 influence that.

13          MR. SHERMAN:  And one other, Your Honor, the last

14 one --

15          THE COURT:  Yes.

16          MR. SHERMAN:  -- and I promise.  I don't want to

17 (indiscernible).  The indemnification, such that if in the

18 way that the agreement or the order, proposed order reads

19 now, is even if we challenge, we indemnify.  So, even if it

20 was successfully challenged, we're still paying for our

21 challenge.

22          THE COURT:  Yes.

23          MR. SHERMAN:  And, again, we can take that up on

24 Thursday.  I just sort of wanted to --

25          THE COURT:  I think Thursday would be more

1 appropriate, but I do understand your point.

2          MR. SHERMAN:  Thank you, Judge.

3          THE COURT:  Yes, Mr. Sherman.

4          Nobody ever said it would be easy, did they, Mr.

5 Minuti?

6          (Laughter)

7          MR. MINUTI:  No one has used the word "easy" in

8 this case, I can tell you that.

9          THE COURT:  No, no, I'm sure.

10          And I know how hard all of you are working, I

11 really do, and I respect you for it.

12          MR. MINUTI:  Well, thank you, Your Honor.  We

13 appreciate that.

14          Your Honor, I think we had a couple contract

15 rejection motions on for today --

16          THE COURT:  Oh, yes.

17          MR. MINUTI:  -- so, I don't know if you're -- I

18 mean, I see it's five of.  I know we're -- if we're coming

19 back on Thursday, you know, we can certainly do it then, but

20 I think the presentation is going to be 10 minutes so, if

21 Your Honor is inclined to let us do it now --

22          THE COURT:  All right.  Let's do it now.  Let's do

23 it now, yes.

24          MR. MINUTI:  -- I'm going to turn the podium over

25 to Ms. DiSabatino.

1            THE COURT:  All right.  Thank you.

2            Ms. DiSabatino, yes, I almost forgot about those

3    in all the excitement.

4            MS. DISABATINO:  Yes, it's been a long day, Your

5    Honor, and I promise I'll be brief.

6            THE COURT:  Take your time.  Take your time.

7            MS. DISABATINO:  Thank you, Your Honor.

8            Items 4, 5, and 6 on the agenda --

9            THE COURT:  Yes.

10            MS. DISABATINO:  -- are the debtors' omnibus

11   objection motions, and because the basis for the relief

12   requested in each motion is substantially the same, I will

13   address all these three of those items at one time.

14            THE COURT:  Okay.  Okay.

15            MS. DISABATINO:  The motions were filed on August

16   2nd, 2019, and docketed at Docket Numbers 349, 350, and 351.

17            THE COURT:  Yes.

18            MS. DISABATINO:  And pursuant to the notices of

19   the motions, objections to the motions were due to be filed

20   on August 9th.  Prior to that objection deadline, the debtors

21   received only one objection, which was filed by SBJ Group,

22   Inc. --

23            THE COURT:  Right.

24            MS. DISABATINO:  -- there were no other objections

25   to the motion, and in particular, Your Honor, none of the

1  parties to the contracts impacted by the motion filed

2  responses or informally responded to the motions.

3          As the Court is aware, the debtors are seeking to

4  close Hahnemann early next month and reductions in operations

5  have already been underway.  As a result of these reduced

6  operations and the ultimate intended closure of Hahnemann,

7  there's a number of contracts that have been identified by

8  the debtors as no longer being needed because they relate to

9  operations at Hahnemann.

10          As I'm sure Your Honor is aware, the standard

11  governing assumption and rejection under 365 of the Code is

12  the business judgment standard and under that standard, the

13  question is whether rejection benefits the estates.

14          THE COURT:  Right.

15          MS. DISABATINO:  In these circumstances, Your

16  Honor, the rejection of the contracts specified in the

17  motions would certainly benefit the estates and, we submit, a

18  reasonable exercise of the business judgment; quite simply,

19  as operations wind do you understand and cease, these

20  contracts are no longer needed by the debtors.  As a result

21  to continue to require the debtors to continue to perform in

22  these contracts would be burdensome and wasteful of estate

23  resources.

24          For these same reasons, Your Honor, we believe

25  *nunc pro tunc* rejection for certain of the contracts in the

1  motion would be appropriate.  The debtors have confirmed that

2  the dates set forth in the orders are the dates after which

3  they no longer require the benefits of these contracts.

4              THE COURT:  Okay.

5              MS. DISABATINO:  As I noted, Your Honor, SBJ

6  Group, Inc. filed a limited objection to all three of the

7  rejection motions.  SBJ is a party that submitted a bid in

8  connection with the resident program asset sale and the gist

9  of their objection is just that they're asking --

10             THE COURT:  I think they made a bid, didn't they,

11 to buy --

12             MS. DISABATINO:  Yes, exactly, Your Honor.

13             THE COURT:  -- the entirety of all of the assets?

14             MS. DISABATINO:  That's exactly right, Your Honor.

15 And so, their objection -- their limited objection today is

16 asking this Court to hold off on entering an order granting

17 these rejection motions until a hearing is held on the

18 resident program sale motion, because their bid contemplated

19 not just the resident program assets, but also substantially

20 all assets of Hahnemann --

21             THE COURT:  Right.

22             MS. DISABATINO:  -- and that could potentially

23 include some of these contracts.

24             THE COURT:  Yes.

25             MS. DISABATINO:  And, Your Honor, while the idea

1  of their bid might sound good, to the extent it contemplates

2  ongoing operations at Hahnemann this, was, in fact, not a bid

3  that would have saved Hahnemann, unfortunately.

4            In actuality, there were several issues with SBJ's

5  bid that led the debtors, after consulting with the

6  investment banker and after consulting with the committee, to

7  determine that it wasn't a qualified bid.

8            And we do have a very brief proffer, Your Honor,

9  of Scott Victor, our investment banker --

10           THE COURT:  All right.

11           MS. DISABATINO:  -- that we would like to offer

12 that speaks to the issues with the bid and also shows that

13 given these issues, the bid doesn't justify delaying the

14 entry of orders granting these rejection motions.

15           Mr. Victor is here, Your Honor, and is available

16 for cross.

17           THE COURT:  Yes.

18           MS. DISABATINO:  Thank you, Your Honor.

19           THE COURT:  Mr. McNeill, do you have any objection

20 to the offer?

21           MR. MCNEILL:  Your Honor, Steve McNeill from

22 Potter Anderson & Corroon, here on behalf of SBJ Group.

23           THE COURT:  Yes.

24           MR. MCNEILL:  I think I might have -- to me -- my

25 co-counsel is on the phone -- I'll let him address it -- but

1   to me, this seems to be premature.  If it's okay with you, my

2   co-counsel Lawrence Lichtman from Honigman is on the phone,

3   and he would -- he has some brief comments on this motion

4   that I think probably makes sense.

5           Given our objection that it's basically a matter

6   of timing, I think that argument -- that should probably be

7   heard before we get into evidence in the proffer, but I leave

8   that to Your Honor.

9           THE COURT:  Ms. DiSabatino?

10          MS. DISABATINO:  Your Honor, the proffer goes to

11  the issues with the bid to show that it's not the type of bid

12  that makes it worthwhile for this Court to hold off, so we do

13  think it goes to the issue of the timing of the hearing on

14  these motions and it's part of the Court's consideration in

15  determining whether or not SBJ is prejudiced or whether the

16  debtors are prejudiced in having a delay for the entry of

17  these orders.

18          THE COURT:  Well, then, proceed with your proffer.

19          MR. LICHTMAN:  (Via telephone)  Your Honor?

20          THE COURT:  Yes?

21          MR. LICHTMAN:  I apologize.  If I may, this is

22  Lawrence Lichtman of Honigman, LLP, as Mr. McNeill indicated,

23  we are co-counsel to SBJ.

24          And I agree with my co-counsel, I think it's

25  premature and inappropriate for the Court to hear the proffer

1   at this time, appeared for clarity and with respect to SBJ's

2   limited objection to these omnibus rejection motions, I think

3   the point is, Your Honor, that it is possible, beyond --

4   ignoring the fact that SBJ has previously submitted a bid

5   that was deemed not qualified, in pertinent part because it

6   sought to acquire assets beyond the scope of the residence

7   program assets and, specifically, seeking to acquire

8   substantially all of the operating assets of Hahnemann

9   University Hospital as a going concern, I think the point is,

10  Your Honor, that it's possible that when the Court conducts

11  the sale hearing and especially given the fact that there are

12  a number of outstanding and, as far as we know, unresolved

13  objections from parties, other than SBJ, including notably,

14  the United States and the Commonwealth of Pennsylvania, it is

15  entirely possible that the Court may not approve the sale of

16  the residence program assets.

17          And if that eventuality comes to pass, then it is

18  possible that there may be an amendment of the existing

19  bidding procedures and an opportunity for parties in

20  interest, including, but not limited to SBJ, to seek to

21  acquire assets of the estates beyond the residence program

22  assets and including Hahnemann University Hospital as a going

23  concern, and, therefore, it's simply premature to grant the

24  omnibus rejection motions, pending the closing of the sale

25  hearing.

1          MS. DISABATINO:  Your Honor --

2          THE COURT:  Yes, go on, Ms. DiSabatino.

3          MS. DISABATINO:  -- I'm sorry.  The -- we

4   disagree.  If there's an issue at the sale hearing and for

5   whatever reason that sale is not approved, you know, we can

6   address that then, but in the meantime, we think it's

7   important for Your Honor to understand the issues with this

8   bid in comparison to the hardship that the debtors are going

9   to suffer, starting now if they can't reject these contracts

10  immediately and start moving the process forward to end the

11  relationships with these parties.

12         THE COURT:  All right.  I will hear your proffer.

13         MS. DISABATINO:  Thank you, Your Honor.

14         Your Honor, if you'll permit, I will skip the

15  background of Scott Victor to save time.

16         THE COURT:  Okay.  Yes.

17         MS. DISABATINO:  Your Honor, with me today in the

18  courtroom is J. Scott Victor.  If called to the stand, Mr.

19  Victor would testify as follows.

20         Mr. Victor has frequently testified both, in and

21  out of court and been qualified as an expert on many subjects

22  including being qualified as an expert on 363 sales and 363

23  sale procedures.  By an order dated July 19th, 2019, this

24  Court approved Redding Hospital as a stalking horse in

25  connection with the proposed sale of the debtors' residence

1  program assets and approved bidding procedures to establish

2  an orderly process for soliciting higher and better bids for

3  the assets.

4  　　　　By notice dated August 2nd, 2019, the debtors

5  notified all potential bidders and all parties in interest

6  that the bid deadline was moved to 4:00 p.m. eastern on

7  August 7th, 2019, and that the auction was moved to August

8  8th, 2019.

9  　　　　Mr. Victor would testify that if by the August 7th

10  bid deadline, the debtors received three bids, in addition to

11  the stalking horse bid of Redding Hospital.  One of these

12  three bids was submitted by SBJ Group, Inc.

13  　　　　During the evening of August 7th, 2019, the

14  debtors CRO, Mr. Wilen; the debtors' professionals; and the

15  committee's professionals met at Saul Ewing's Philadelphia

16  office to analyze the various bids.  Even though the debtors

17  were not seeking to sell the other assets of Hahnemann, Mr.

18  Victor would testify that serious consideration was given to

19  the bids submitted by SBJ Group, Inc., which contemplated the

20  possibility of purchasing a significant portion of

21  Hahnemann's assets and keeping Hahnemann open.

22  　　　　Ultimately, however, the debtors, in consultation

23  with the committee, determined that the SBJ bid was not a

24  qualified bid for a host of reasons, including the following.

25  First, the SBJ bid was at the minimum purchase price to get

1  into the auction, $7.825 million, and that price was subject

2  to downward adjustment, based upon further required due

3  diligence; second, the SBJ bid included other significant

4  valuable Hahnemann assets for no additional consideration,

5  including acquiring the real property necessary for the

6  hospital's operations by way of purchase or lease on

7  undisclosed terms acceptable to SBJ.; third, the SBJ bid was

8  accompanied by a contingent financial commitment letter from

9  a third party for only $10 million; fourth, the SBJ bid was

10  contingent on ordinary course operation of Hahnemann while

11  SBJ conducted further due diligence, notwithstanding the fact

12  that Hahnemann is not operating in the ordinary course, but

13  in the process of shutting down and the debtors lack the

14  funds or practical ability at this point to continue with

15  Hahnemann's operations; and, finally, the SBJ bid was

16  entirely contingent on further due diligence which was

17  described by counsel of at least -- of being at least 30 days

18  with no real commitment to purchase anything in that time.

19         On the evening of August 2nd, Mr. Victor would

20  testify that he called SBJ's counsel and informed him that

21  SBJ's bid was not qualified for the reasons already stated.

22  Nevertheless, Mr. Victor invited SBJ to come to Saul Ewing's

23  offices on the day of the auction, encouraged SBJ to amend

24  and limit its bid to optional the residence program assets

25  and express the debtors' willingness to continue discussions

1  with SBJ regarding its desire to acquire other Hahnemann

2  assets and keep Hahnemann open.

3          Mr. Victor would testify that representatives of

4  SBJ did come to Saul Ewing's office on the day of the

5  auction.  At that time, Mr. Victor met with SBJ and, again,

6  encouraged it to modify its bid to the resident program

7  assets only.  SBJ refused to amend its bid, so there was no

8  need to discuss with SBJ, the other concerns regarding its

9  bid.  At that point, SBJ left before the auction began.

10          That concludes Mr. Victor's testimony, Your Honor.

11          THE COURT:  All right.  All right.

12          Mr. McNeill?

13          MR. MCNEILL:  Your Honor, I --

14          THE COURT:  Or should I hear from Mr. Lichtman?

15          MR. MCNEILL:  You should probably hear from Mr.

16  Lichtman.  That proffer was -- seems to me, related to the

17  sale and had -- there's nothing in there about rejection so,

18  I'm not sure it's appropriate, but I will leave it to Mr.

19  Lichtman.

20          MR. LICHTMAN:  Yeah, thank you, Your Honor.

21          Again, Lawrence Lichtman of Hahnemann on behalf of

22  SBJ.  Your Honor, I would reiterate what I said earlier.  I

23  don't think that it's proper for the Court to consider the

24  proffer at this time.  The Court is not conducting the sale

25  hearing.  The subject of SBJ's prior bid is really not what

1  was most germane here.

2        And I would, just in response to Ms. DiSabatino's

3  comments, I would just point out two things to the Court.

4  First, as the Court knows, as the Court is well aware, and

5  has been brought up previously in the case by other parties,

6  beyond SBJ, there's certainly clear and compelling public

7  policy reasons why it would be beneficial, if at all,

8  possible for Hahnemann University Hospital to remain open.

9        I won't elaborate on those.  I'm sure that the

10 Court understands the importance of trying to maintain a

11 hospital for the benefit of what may otherwise be an

12 underserved community.  So, I think that to the extent that

13 that possibility is kept open, pending the conclusion of the

14 sale hearing, that that would be beneficial and that's an

15 equitable consideration that the Court should take into

16 consideration.

17       Second, with respect to the issue of the cost of

18 maintaining these contracts and leases, I would point out

19 that the debtors have controlled the timing of this process,

20 including the timing of the filing of their motions and the

21 hearing on these motions, which has already been continued

22 twice and the debtors were also seeking to reject many -- not

23 all -- but many of these contracts *nunc pro tunc* to the

24 filing date of the motions, which was August 2nd.

25       So, the debtors have already accepted and really

1   assumed the risk that the estates may incur additional

2   administrative expenses.  So, given all these facts, Your

3   Honor, and taking into account, again, the fact that it

4   remains possible that the residence program asset sale will

5   not be approved at the sale hearing and that that might

6   result in an opportunity for parties, including SBJ, but not

7   limited to SBJ, to possibly acquire the hospital as a going-

8   concern.  We would ask the Court to respectfully defer -- not

9   deny -- but defer consideration of these motions until the

10  conclusion of the sale hearing.

11          And just for clarity, Your Honor, as I understand

12  it -- but I may be wrong -- the sale hearing had been

13  continued until September 4th and as I understand it, that

14  has, or is going to be further continued to September 13th

15  with other matters, but I would appreciate it if the Court

16  could clarify that.

17          THE COURT:  I know that September 13th is not a

18  date that the Court will be considering that date, because I

19  just gave that date out for other matters.

20          MS. DISABATINO:  That's correct, Your Honor --

21  I'm sorry.

22          MR. LICHTMAN:  Okay.

23          THE COURT:  Yes, Mr. --

24          MR. LICHTMAN:  I'm sorry, Your Honor.  So, the

25  sale hearing remains continued till September 4th --

1           THE COURT:  That's right.

2           MR. LICHTMAN:  -- is that correct?

3           THE COURT:  That's right.

4           MR. LICHTMAN:  Yes, okay.

5           In any event, Your Honor, again, we would ask

6  respectfully that the Court defer its ruling on the omnibus

7  rejection motions until the conclusions of the continued sale

8  hearing.

9           THE COURT:  Ms. DiSabatino, yes?

10          MS. DISABATINO:  Your Honor, we think that the

11 proffer goes to the heart of the Court's decision.  The

12 decision is the prejudice that would occur if the debtors

13 were to have the order entered today.  We need to show that

14 the bid is speculative and not worthwhile for this Court to

15 delay the entry of an order in comparison to the hardship of

16 the debtors.

17          I should note oh.

18          THE COURT:  And that was the objection, it seemed

19 to me, was the sale.

20          MS. DISABATINO:  Exactly, Your Honor.  It's an

21 aggrieved bidder.  They purchased a claim just in order to

22 get standing.  So, just to provide Your Honor with a context,

23 and, you know, we certainly appreciate their interests in the

24 assets of Hahnemann and certainly expressed an interest in

25 continuing discussions with them.

1           But, again, Your Honor, this bid was entirely

2    contingent on due diligence, which could be another 30 days.

3    As Your Honor is well aware from the hearing today, money is

4    extremely tight and the costs to operate Hahnemann are

5    significant.  The debtors need and want to be in a position

6    to wind-down Hahnemann's operations as soon as possible.

7           We recognize that SBJ is not necessarily opposed

8    to the rejection effective dates or the *nunc pro tunc* relief

9    sought in the motion, but even just delaying a hearing on

10   these motions is prejudicial.  The result of further delay is

11   that these contracts, many of which the debtors have already

12   not been using for some time, continue to sit in limbo for an

13   indefinite period, and we know, as we just mentioned that the

14   sale hearing is intended to go forward on the 4th, but, Your

15   Honor, while it's our full intent that that happens, we just

16   don't want to tie the outcome of these hearings on the timing

17   of another hearing.

18           THE COURT:  Right.  No, I understand.

19           MS. DISABATINO:  Thank you, Your Honor.

20           We also think that while the contracts sit in

21   limbo, the debtors are burdened and that they can't take the

22   steps they otherwise would to close out matters with contract

23   parties, return keys, return equipment.

24           In the same way contract parties are burdened,

25   we've heard from many of them already that are closing

1  following the case, they know that Hahnemann is closing and

2  they want to close out matters with the debtors.

3         Also, the more time things are sitting out there,

4  the more time there is for issues to arise that aren't

5  present now -- things get damaged, things get lost -- and

6  grounds for administrative claims potentially arise and we

7  want to avoid any risk of that happening.  So, if we were

8  faced with a potential bid that we truly believed could be a

9  saving grace in these cases, this issue would be a no-

10 brainer, Your Honor, but that's unfortunately not what we

11 have and we don't want the debtors to be forced to hold off

12 on taking steps needed for an orderly organized wind-down of

13 their operations for what is respectfully, a speculative bid.

14         For these reasons, Your Honor, we ask that the

15 Court enter the rejection orders today.

16         THE COURT:  All right.  Thank you.

17         MS. DISABATINO:  Thank you.

18         THE COURT:  Thank you, Ms. DiSabatino.

19         Mr. Sherman, yes, sir?

20         MR. SHERMAN:  Your Honor, we rise in support of

21 the debtors' request.  This Court has obviously heard

22 extensive testimony about the liquidity issues in these cases

23 and the committee supports the debtors' efforts in minimizing

24 expenses, which include the rejection of these contracts.

25         THE COURT:  All right.  Well, I am going to

1  approve the rejection of the contracts.

2          I do think, first of all, that the SBJ bid is

3  highly speculative and, as Ms. DiSabatino has said, it's

4  contingent, which obviously would cause further delay.  These

5  are all contracts that warrant being rejected because they're

6  not in use.  It will save the debtors significant money and

7  it's obvious that liquidity is a very important concern in

8  these cases.  So, on that basis, I will approve the rejection

9  motions.

10          MS. DISABATINO:  Thank you, Your Honor.

11          All three orders were uploaded to the Court.

12          THE COURT:  All right.  Thank you.  We'll take

13  care of that, then.  Thank you.  It will probably be

14  tomorrow.

15          MS. DISABATINO:  No problem.

16          THE COURT:  Okay.  All right.

17          MS. DISABATINO:  That concludes our

18  (indiscernible), Your Honor.

19          THE COURT:  Thank you.

20          Yes, Mr. McNeill?

21          MR. MCNEILL:  Your Honor, one clarification, and

22  I'm not sure -- I'm a little out of the loop here -- but this

23  ruling, presumably, is not intended to have any affect on our

24  objection to the sale?

25          THE COURT:  No, I don't think that it -- no,

1   that's right.

2            MR. MCNEILL:  Okay.  I just don't want to get

3   caught in a gotcha moment here where the rejection of the

4   contract is basically -- has harmed our bid further --

5            THE COURT:  No.

6            MR. MCNEILL:  -- and I don't want that to be used

7   against us at the sale hearing.

8            THE COURT:  It will not be.

9            MR. MCNEILL:  Okay.  Thank you, Your Honor.

10           THE COURT:  Thank you, Mr. McNeill.

11           MR. LICHTMAN:  Thank you, Your Honor.

12           THE COURT:  Thank you, Mr. Lichtman.

13           MR. LICHTMAN:  Thank you.

14           MR. MCNEILL:  I'm sorry, Your Honor.  Can I just

15   have one moment?

16           THE COURT:  Yes.

17           MR. MCNEILL:  I'm sorry, Your Honor.  Just give us

18   one moment.

19           (Pause)

20           MR. MINUTI:  Sorry, Your Honor.

21           We talked to -- one of the reasons why Your Honor

22   continued us till Thursday is because Mr. Pesce's schedule.

23   I believe Mr. Pesce would be okay with a hearing tomorrow if

24   Your Honor has time tomorrow and he would simply let somebody

25   else cover the hearing.  We would like to come back tomorrow

1   if we can, Your Honor, because I think we have to have some

2   serious discussions with MidCap this afternoon.

3           If we can't reach an accommodation with MidCap

4   that's going to free up some of the cash --

5           THE COURT:  Yes.

6           MR. MINUTI:  -- based on the cross-

7   collateralization, we may be in a very dangerous position

8   tomorrow and we may need some guidance from the Court.

9           So, if possible, we'd like to move the hearing

10  till tomorrow if Your Honor has time, maybe in the morning?

11          THE COURT:  Well, here's my story.  I have a 10:00

12  hearing and then I have another -- and then I'm mediating at

13  3:00 in a tough case.  So, I mean, we could schedule you for

14  9:00, but that would only give us an hour or I could schedule

15  you for 11:00 and that would give you a couple hours.

16          MR. MINUTI:  Your Honor, why don't we take 9:00.

17          THE COURT:  9:00 for an hour?

18          MR. MINUTI:  If that's acceptable to the Court?

19          THE COURT:  That's fine with me, but that's going

20  to not give -- that's not going to give you much time.

21          MR. MINUTI:  Well, I think, look, if we can't

22  resolve our issue on our own, I think what we're going to --

23  well, I think one of two things are going to happen.  Either

24  I'm going to come before Your Honor and tell you exactly

25  where we are --

1          THE COURT:  Yes.

2          MR. MINUTI:  -- and Your Honor is going to rule

3   based on where we are, or I don't have any arrangement and

4   I'm going to come before Your Honor and say, We have a big

5   problem in this case and talk about where we go from here.

6          THE COURT:  All right.  Mr. Pesce, yes?

7          MR. PESCE:  I think just the one reservation of

8   rights-type, protective statement I just want to make is, in

9   our view, our objection is, I think, effectively --

10          THE COURT:  To liquidity.

11          MR. PESCE:  It's sort of resolved by the fact that

12  we have an end date.  Our expectation is that once we -- if

13  we reach an agreement with the debtor, they need to be in the

14  DIP budget one way or the other, and we'll get into whose

15  right it is to put it in the DIP budget.  But if that is the

16  case -- our DIP objection is effectively about liquidity, so

17  we'll figure that out by the 13th --

18          THE COURT:  Yes.

19          MR. PESCE:  -- or they'll be, you know, other

20  things to discuss.  But in light of that, I didn't want to

21  have everyone, given this exigency accommodate my schedule,

22  since my piece, I think, is effectively resolved by your

23  subsequent ruling.

24          THE COURT:  All right.  I can hear you tomorrow at

25  9:00.

1          MR. MINUTI:  Thank you, Your Honor.

2          THE COURT:  All right.

3          MR. MINUTI:  Yeah, I think that completes our

4  calendar for today.  We appreciate the Court's time.

5          THE COURT:  You bet.  All right.  I'll see you

6  folks at nine o'clock tomorrow morning, and have a good

7  evening.

8          MR. MINUTI:  Thank you, Your Honor.

9          (Proceedings concluded at 5:16 p.m.)

10

11

12                      CERTIFICATE

13

14     We, MARY ZAJACZKOWSKI and COLEEN RAND, certify that the

15  foregoing is a correct transcript from the electronic sound

16  recording of the proceedings in the above-entitled matter.

17

18
   /s/Mary Zajaczkowski                    August 21, 2019
19  Mary Zajaczkowski, CET**D-531

20

21
   /s/Coleen Rand                          August 21, 2019
22  Coleen Rand

23

24

25