1

```
 1                   UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                    .    Chapter 11
 3    IN RE:                        .
                                    .    Case No. 19-11466 (KG)
 4    CENTER CITY HEALTHCARE, LLC,  .
      d/b/a HAHNEMANN UNIVERSITY    .
 5    HOSPITAL, et al.,             .
                                    .    Courtroom No. 3
 6                                  .    824 North Market Street
                                    .    Wilmington, Delaware 19801
 7                                  .
                                    .    August 21, 2019
 8                    Debtors.      .    9:00 A.M.
      . . . . . . . . . . . . . . . .
 9
                           TRANSCRIPT OF HEARING
10             BEFORE THE HONORABLE KEVIN GROSS
                  UNITED STATES BANKRUPTCY JUDGE
11
12    APPEARANCES:

13    For the Debtors:        Mark Minuti, Esquire
                              John Demmy, Esquire
14                            Monique DiSabatino, Esquire
                              SAUL EWING ARNSTEIN & LEHR LLP
15                            1201 N. Market Street
                              Wilmington, Delaware 19801
16
                              - and -
17
                              Jeffrey Hampton, Esquire
18                            1500 Market Street
                              Philadelphia, Pennsylvania 19102
19

20
      Audio Operator:         GINGER MACE
21
      Transcription Company:  Reliable
22                            1007 N. Orange Street
                              Wilmington, Delaware 19801
23                            Email:  gmatthews@reliable-co.com

24
      Proceedings recorded by electronic sound recording, transcript
25    produced by transcription service.
```

1   APPEARANCES (Continued):

2

3   For the Committee:          Andrew H. Sherman, Esquire
                                SILLS CUMMIS & GROSS P.C.
                                1 Riverfront Plaza, Suite 10
4                               Newark, New Jersey 07102

5
    For American Academic       Brendan Joseph Schlauch, Esquire
6   Health Systems, LLC:        RICHARDS LAYTON & FINGER, P.AL
                                920 North King Street
7                               Wilmington, Delaware 19801

8   For Tenet and Conifer:      Timothy Cairns, Esquire
                                PACHULSKI STANG ZIEHL & JONES LLP
9                               919 North Market Street, 17th Floor
                                Wilmington, Delaware 19801
10

11  For HSRE:                   Stuart Brown, Esquire
                                DLA PIPER
12                              1201 North Market Street
                                Wilmington, Delaware 19801
13

14  For MidCap:                 Gretchen Santamour, Esquire
                                STRADLEY RONON
15                              2005 Market Street
                                Philadelphia, Pennsylvania 19103

16  For the U.S. Trustee:       Juliet Sarkessian, Esquire
                                UNITED STATES DEPARTMENT OF JUSTICE
17                              OFFICE OF THE UNITED STATES TRUSTEE
                                844 King Street, Suite 2207
18                              Lockbox 35
                                Wilmington, Delaware 19801
19

20

21

22

23

24

25

1

<u>INDEX</u>

2

#1) Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant To Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lender, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief [D.I. 53; filed: 07/01/19].

**RULING:**                                                                      **36**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commenced at 9:01 a.m.)

2          THE CLERK:  All rise.

3          THE COURT:  Good morning everyone. Thank you.  You

4 may be seated.

5          Mr. Minuti, good morning.

6          MR. MINUTI:  Your Honor, unfortunately for you, I

7 think you're seeing more of me these days than my wife.

8          THE COURT:  Well, that's all right with me, but

9 I'm sure it's not with here.

10          MR. MINUTI:  I'm not so sure about that, Your

11 Honor.

12          Your Honor, good morning.  Mark Minuti, Saul Ewing

13 Arnstein & Lehr, I'm here today for the debtors.  I know Your

14 Honor only has limited time this morning.  I don't think

15 we're going to need more than the hour I think Your Honor

16 said you have.

17          THE COURT:  All right.

18          MR. MINUTI:  At the conclusion of yesterday's

19 evidentiary hearing and argument Your Honor provided the

20 parties with guidance on certain issues as it related to the

21 debtor-in-possession financing and the objections to that

22 financing.  The court's comments were very instructive and

23 very helpful, but when we left you late yesterday, at about

24 five o'clock, we were dealing with two, sort of, issues or

25 two buckets of issues.  The first issue is we still had not

1  reached agreement on the majority of the issues related to

2  the objections to the debtor-in-possession financing,

3  primarily those raised by the committee.

4           And if Your Honor will recall, late yesterday, we

5  talked about an issue with how the mechanics of the borrowing

6  worked and this idea of cross-aging, and the fact that some

7  old receivables were preventing us from getting borrowings on

8  newer receivables simply based on the mechanics of the

9  document and how they worked.  That was severely limiting the

10 liquidity and Your Honor could probably sense it in my

11 presentation that that was causing us grave concern as of

12 late yesterday.

13          THE COURT:  Yes, I could tell.

14          MR. MINUTI:  So, after the court ended the hearing

15 yesterday, at about five o'clock, I can report to Your Honor,

16 I think, to the disappointment of the security staff here we

17 stayed in the hallways, we used Your Honor's conference room

18 and the committee, MidCap and the debtors were here,

19 approximately, till about nine o'clock last night seeing if

20 we could reach agreement on all of these issues.

21          In some respects, Your Honor, the debtor was

22 working as a mediator, sort of, going back and forth between

23 the committee and MidCap.  I will tell Your Honor, and I

24 sincerely believe this, both the committee and MidCap worked

25 hard and in good faith.

1        Now, at yesterday's hearing and the hearing the

2  day before, Your Honor, there was a lot of mud thrown at

3  MidCap at that hearing and certainly while the debtors have

4  had their differences with MidCap a lot of what was said, I

5  think, in our view was unfair of MidCap.  We are extremely

6  grateful to MidCap for their problem solving approach

7  following yesterday's hearing and, frankly, leading up to the

8  hearing.

9        And we certainly don't mean to belittle the

10 committee's contribution in any way from last night, but we

11 really needed MidCap to be flexible in order to make this

12 transaction work.  And I am pleased to report that MidCap

13 stepped up in a big way.

14        I am happy to report to the court that with the

15 committee we reached agreement with both MidCap and the

16 committee on, substantially, all the issues.  We do have two

17 issues that are unresolved; one with the committee and one

18 with the non-debtor guarantors in these cases.

19             THE COURT:  Okay.

20             MR. MINUTI:  So, what I'm going to do, Your Honor,

21 is -- and so I think Your Honor is going to need to rule on

22 those two issues; one of which relates to the 506(c) waiver

23 and the other, I think, relates to some notice provisions

24 under the agreement.  That's with the non-debtor guarantors.

25             THE COURT:  And they did want notice, yes.

1        MR. MINUTI:  They wanted notice of a few items in

2   the order.  I think what I'm going to do is let MidCap

3   address that because I'm not sure exactly what the status is

4   of that, but those are the two issues.

5        Let me read into the record, if I may, the points

6   of agreement that were reached last night among the debtors,

7   MidCap and the committee.

8        THE COURT:  Okay.

9        MR. MINUTI:  Your Honor, MidCap has agreed to

10  revise the credit agreement through an amendment or a letter

11  agreement to remove the cross-aging provision with respect to

12  the Hahnemann University Hospital accounts receivable.  This

13  will have the immediate effect of freeing up approximately $5

14  million dollars of liquidity to the debtors and it will

15  present the cross-aging issue from effecting the debtor going

16  forward which is a tremendous benefit to the debtors in these

17  estates.

18        THE COURT:  Yes.

19        MR. MINUTI:  In addition, Your Honor, there's

20  going to be additional liquidity provided for under the DIP

21  loan.  As it stood, Your Honor, the DIP loan was going to

22  provide an additional $2 million dollars of liquidity if Your

23  Honor entered the final order.  MidCap, last night, agreed to

24  provide us with another 2 million on top of the 2 million I

25  just mentioned.

1        That 2 million is going to be contemplated under

2   the final DIP.  It's going to be -- that 2 million is going

3   to be put in a reserve that's going to be established by the

4   DIP order and that 2 million of additional availability --

5   excuse me, liquidity is going to be used by the debtors in

6   its discretion to fund administrative claims in this case in

7   consultation with MidCap.

8        The idea is, Your Honor, that that additional 2

9   million dollars is going to be used by the debtor to pay some

10  of the administrative claims that you've heard about over the

11  last couple days that we, otherwise, didn't have the ability

12  to pay.  Obviously, we intend to use those additional funds,

13  Your Honor, to try to reach agreement with Tenet and Conifer

14  to resolve their issues before we come back before Your Honor

15  in September.

16       THE COURT:  Okay.

17       MR. MINUTI:  This is going to be done through an

18  increase in the amount of the DIP term loan from $15 million

19  dollars to $17 million dollars. The committee, Your Honor,

20  will also have sixty days from its formation to challenge the

21  extent, validity and priority of MidCap's prepetition term

22  loan.  The committee will have until plan confirmation to

23  assert any other challenges and the committee will be granted

24  standing to pursue claims to the extent that they do their

25  investigation and determine there are viable claims against

1  MidCap.

2  On the issue of the waiver of marshaling that

3  issue, essentially, is going to be deferred.  If the proceeds

4  of the St. Christopher's sale are sufficient to pay MidCap's

5  claim in full their claim will be paid in full and there will

6  be no right to marshaling.  If the proceeds of the St.

7  Christopher's sale are not sufficient to pay MidCap in full

8  any right to marshaling, Your Honor, shall be preserved.  So,

9  in other words, the committee will have the right to

10  challenge marshaling.  MidCap will have the right to defend

11  that marshaling should not be imposed upon them in the case.

12  THE COURT:  Okay.

13  MR. MINUTI:  The only wrinkle to that, Your Honor,

14  is that before the St. Christopher's sale if there is a

15  challenge that the committee asserts against MidCap at that

16  point the St. Christopher's sale proceeds will be escrowed

17  until that challenge is resolved.

18  The provisions in the DIP credit agreement, Your

19  Honor, regarding MidCap's right to indemnification will

20  remain.  In the event there is a credit agreement default by

21  a non-debtor party MidCap is going to be able to exercise

22  their rights solely against the non-debtor party, but will

23  continue to provide funding to the debtors under the credit

24  agreement.

25  THE COURT:  Okay.

1    MR. MINUTI:  The roll-up of the prepetition

2  revolving debt, the order, Your Honor, will provide that the

3  roll-up of the prepetition revolving debt can be rolled back,

4  for example, in the event of a successful challenge, but only

5  if it turns out that MidCap's liens are under-secured and

6  only if and to the extent that their liens are under-secured.

7    The MidCap origination fee, Your Honor, of

8  $500,000 dollars is agreed to, but, again, consistent with

9  the agreement it is payable at the back-end.

10    THE COURT:  Okay.

11    MR. MINUTI:  With respect to the points of

12  disagreement, Your Honor, again, it's over the 506(c) waiver.

13  And, again, the non-debtor parties have an issue with respect

14  to the notice to them.

15    On the 506(c) order, Your Honor, the debtor's

16  position is as follows:

17    We strongly support the 506(c) waiver in light of

18  the significant and substantial concessions that MidCap has

19  now made to try to reach a consensual resolution that will

20  give the debtors much needed liquidity to move forward in

21  these cases.

22    At yesterday's hearing the court highlighted five

23  issues that were troubling to the court before we took a

24  break --

25    THE COURT:  Yes.

1    MR. MINUTI:  -- and pushed all parties, in

2  particular MidCap, to get closer.  MidCap clearly heard the

3  court's comments loud and clear and they moved significantly,

4  Your Honor, on almost all of those points.

5        During yesterday's hearing and when Your Honor

6  highlighted those five issues Your Honor also said that you

7  would reconsider your position in the event that MidCap was

8  prepared to make additional liquidity available and they've

9  done that, Your Honor.  And in our view, Your Honor, they've

10 done that in a big way.  They backed off or compromised on a

11 number of the provisions.  They agreed to provide that

12 additional liquidity in terms of the change to the credit

13 agreement, and that additional $2 million dollars I've

14 already mentioned.

15       Your Honor, these changes will provide us with

16 much greater flexibility to deal with a lot of issues we have

17 in the case including the Tenet and Conifer issues that Your

18 Honor spent the last two days hearing about.  Nothing in the

19 bankruptcy code, Your Honor, provides that a secured lender

20 must be a guarantor of payment of all administrative claims.

21       And certainly in my experience, Your Honor, a

22 506(c) waiver has become part of the give and take of

23 negotiations to get to a resolution of objections to DIP

24 financing.  And in my experience, Your Honor, when most

25 issues are resolved the 506(c) waiver is appropriate.  It's

1  appropriate, Your Honor, under circumstances when a lender is

2  sharing part of the payment in the cases and when they have

3  shown flexibility on a number of the other issues.  And that

4  is exactly what has happened here, Your Honor.  MidCap has

5  stepped up in a big way.

6        Again, in their view, Your Honor, MidCap is taking

7  significantly more risk by the changes that they have

8  asserted and some have argued in this courtroom, Your Honor,

9  that they really are taking no risk because they are

10  significantly over-secured, but that argument really cuts

11  both ways, Your Honor, because at the end of the day if it

12  turns out they're significantly over-secured, and we

13  certainly believe them to be, but if it turns out they are

14  then we're never going to get to a 506(c) issue, Your Honor,

15  because there's going to be enough money to pay everybody in

16  the case.

17        So, again, in our view, Your Honor, MidCap has

18  shown tremendous flexibility.  They have provided the

19  additional liquidity.  One remaining issue should not blow-up

20  this loan and put these cases in peril, Your Honor.  And so

21  for that reason we believe that the 506(c) waiver should be

22  approved and Your Honor should overrule the objection to the

23  506(c) waiver that remains.  And I should have pointed out at

24  the outset, Your Honor, that both the committee, and Tenet

25  and Conifer continue to assert the 506(c) waiver as an issue

1  that should result in the denial of the DIP.

2          THE COURT:  Yes.

3          MR. MINUTI:  So, that's it by way of my

4  presentation.  Does Your Honor have any questions of me?

5          THE COURT:  No.  The only question I have is on

6  the marshaling.  I think you said -- I'm trying to remember

7  what you said.  You're deferring the marshaling.

8          MR. MINUTI:  Defer the issue, Your Honor.  So,

9  here's the idea, and this is going to be baked into the

10  order.

11          THE COURT:  Yes.

12          MR. MINUTI:  So, if no challenge to the lender has

13  been made at the time we close the St. Christopher's sale --

14          THE COURT:  Yes.

15          MR. MINUTI:  -- and if there are sufficient funds

16  in the St. Christopher's sale to pay-off MidCap in full they

17  will be paid in full and marshaling never becomes an issue.

18          THE COURT:  That's right.

19          MR. MINUTI:  If we get to the St. Christopher's

20  sale and there's no challenge, and the funds are not

21  sufficient to pay-off MidCap then the committee's rights to

22  argue that marshaling should occur are fully preserved and

23  MidCap's rights to argue that marshaling should not apply are

24  fully preserved.

25          THE COURT:  Okay.

1      MR. MINUTI:  The only twist, Your Honor, is that

2  if we before we get to the St. Christopher's sale if the

3  committee has asserted a challenge and that challenge has not

4  yet been ruled upon we're going to escrow the proceeds until

5  there's a resolution of the challenge.

6      THE COURT:  Okay.  All right.  That's fine.

7      MR. MINUTI:  Is Your Honor with me on that point?

8      THE COURT:  Yes, I am.

9      MR. MINUTI:  Okay.  Then with that, Your Honor,

10  I'll cede the podium.

11      THE COURT:  All right.  Mr. Sherman, yes.

12      MR. SHERMAN:  May I have thirty seconds to confer

13  with Mr. Minuti?

14      THE COURT:  Of course.

15     (Lawyers confer)

16      MR. MINUTI:  Your Honor, I apologize to the

17  committee.  There were two points they wanted me to clarify,

18  and I forgot and I'll do now if it's acceptable to the court.

19      THE COURT:  Of course

20      MR. MINUTI:  Your Honor, for the post-petition

21  loan our lenders are receiving a super-priority

22  administrative claim.  They have agreed, as part of the give

23  and take with the committee, that even though they're getting

24  a super-priority claim when it comes to Chapter 5 causes of

25  action they will look to the Chapter 5 causes of action last

1  in order to satisfy any claim that they would have with

2  respect to diminution in value.

3          THE COURT:  Okay.

4          MR. MINUTI:  Then the second point, Your Honor,

5  and, again, everybody has agreed to this, that the lenders

6  have agreed, Your Honor, that their collateral does not

7  include commercial tort claims other than claims that arise

8  from their collateral.  So, for example, a cause of action

9  against an officer or director would not be part of MidCap's

10 collateral.

11         THE COURT:  Okay.  All right.

12         MR. MINUTI:  So, I think with those two points,

13 Your Honor, I will now cede the podium.

14         THE COURT:  All right.  Thank you, Mr. Minuti.

15         Mr. Sherman, yes.

16         MR. SHERMAN:  Thank you, Judge.  Thank you, Mr.

17 Minuti, for those clarifications.  Judge, let me thank Mr.

18 Minuti and thank MidCap for the efforts last night.  There

19 were fruitful discussions and the parties made progress, Your

20 Honor, but come late last night we weren't in the position to

21 get a committee meeting, to get authority for the committee

22 to address all these issues.

23         One of the issues we felt uncomfortable waiving

24 without a committee was, obviously, the 506(c) waiver just

25 because it's a significant issue in these cases as to the

1  extent of rights and remedies available in case of a

2  potential meltdown.  506(c) is an important tool.  So, we did

3  hear and we had argument yesterday, Your Honor, on the 506(c)

4  issues.

5           As the night progressed and then, obviously, being

6  here in the morning we're simply not in a position to tell

7  Your Honor we have consent on that because I don't have the

8  authority from the committee to agree to that.  So, that is

9  why that issue is extant as we sit here today, Your Honor.

10          Just briefly on the 506(c) issue is even though

11 there may be increased liquidity there are a number of

12 expenses as this case could progress that people are unaware

13 of.  So, we don't have complete assurances that the budget

14 will satisfy that.  I think that was the testimony from Mr.

15 Wilen which is why the issue, we believe, should be

16 preserved, but, again, I don't want to belabor the point.  I

17 think the court understands the position we're in.

18          THE COURT:  I do.

19          MR. SHERMAN:  So, other than that, Your Honor, I

20 would cede the podium to MidCap.

21          THE COURT:  Let me hear, first, from the non-

22 debtors.  Good morning.

23          MR. SCHLAUCH:  Good morning, Your Honor; for the

24 record Brendan Schlauch of Richards Layton and Finger on

25 behalf of the non-debtor guarantors.

1          I just wanted to update Your Honor.  We had

2   discussions with MidCap and the debtors through yesterday's

3   hearing and, again, after the hearing and this morning.  We

4   are not able to reach an agreement on the notice issue.  So,

5   again, I just want to renew our request that the none-debtor

6   guarantors be included in the notice provisions in three

7   paragraphs of the DIP.  It will be Paragraph 7(b)(ii), 7(f)

8   and Paragraph 15.

9          Again, we think this is reasonable that a party in

10  interest such as the non-debtor guarantors receive, you know,

11  courtesy notices.  It's not different then if the United

12  States Trustee or if the committee were to receive notices.

13  It doesn't expand our rights.  It doesn't give us rights.  It

14  doesn't modify any rights.

15         As we said yesterday, we're happy to clarify for

16  the record that we agree that the inclusion of the non-debtor

17  guarantors in those paragraphs does nothing to modify the DIP

18  documents.  I understand that's the primary hang-up with

19  MidCap.  We're happy to state that on the record.  Again,

20  Your Honor, we just think it's a reasonable request that a

21  party in interest such as us is receiving notices of

22  modifications, terminations and exercise of remedies.

23         THE COURT:  Well, let me ask you a question

24  because I understand that MidCap is unwilling to provide for

25  notice to the non-debtor guarantors.  Can't you reach

1  agreement with the debtors that they will provide you with

2  that notice?

3          MR. SCHLAUCH:  I do have an understanding from the

4  debtor.  I can -- I don't know if the debtor would like to

5  speak to that.

6          MR. MINUTI:  Your Honor, we're happy to do that.

7  The reason I'm smiling is because Mr. Eisenberg and I had

8  that exact conversation this morning that if we receive a

9  notice we'll simply commit to passing it on.  I don't know I

10 that's acceptable to MidCap.  If it is then I think the issue

11 can be resolved.

12         THE COURT:  All right.

13         MR. SCHLAUCH:  I understand the debtor's point.  I

14 will just say that my client wants to be actually receiving

15 notice.  So, I am not authorized to agree to that at this

16 time, but I understand that if the court makes that ruling

17 then it is what it is.

18         THE COURT:  I understand that.  Thank you.  I

19 appreciate that.

20         Mr. Cairns, good morning.

21         MR. CAIRNS:  Good morning, Your Honor; Tim Cairns,

22 Pachulski Stang Ziehl & Jones.

23         THE COURT:  For Tenet and Conifer.

24         MR. CAIRNS:  That's correct, Your Honor.

25         Your Honor, I'd just like to thank everyone for

1   their efforts in negotiating.  We're glad to hear the

2   additional liquidity.  We think it's certainly warranted and

3   necessary.  So, we were very happy to hear that the

4   negotiations ended on that point; however, I do rise because

5   the 506(c) waiver is an issue that I'm sure Your Honor can

6   understand.  It's very important to Tenet and Conifer as it

7   would be important to any administrative claimant in these

8   cases who wasn't certain that they were going to get paid in

9   full.  So, I adopt the comments that were made by the

10  committee, but that is the reality of where we sit today.

11          Now, yesterday Your Honor set out a very wise and

12  acceptable plan to have Tenet, Conifer and the debtors

13  negotiate over the potential value of that administrative

14  claim.

15          THE COURT:  Yes.

16          MR. CAIRNS:  Okay.  That's not happening until

17  September 13th.

18          THE COURT:  Right.

19          MR. CAIRNS:  So, that issue is still open and will

20  remain open.  I don't know and I don't know that we've had

21  representations from the debtors that there can be assurance

22  that administrative costs in this case will be paid.  We know

23  that liquidity was severely strained.

24          THE COURT:  Yes.

25          MR. CAIRNS:  This was the situation we were in

1  yesterday.  Obviously, everyone beat upon the DIP lenders

2  because of this, among other things, issue.  So, we think,

3  you know, for us to now waive our 506(c) claim rights just

4  doesn't make sense in the point of the case, but let's talk

5  about precedent because we've heard from the debtors and

6  certainly from the DIP lenders that its routinely done.

7  Well, Your Honor, it's routinely done when it isn't opposed

8  and it's routinely done when there isn't this issue of

9  administrative insolvency that we have in this case.  So, I

10 question the fact that there is, you know, legitimate solid

11 precedent that says that this 506(c) waiver should be granted

12 in this case.

13          The debtor said that if the DIP lenders are over-

14 secured this 506(c) waiver is not an issue.  I guess we

15 agree, but, you know, that kind of leaves a pretty big open

16 issue on the front-end to that conclusion.  So, we think it's

17 appropriate -- it's not appropriate at this time.  Honestly,

18 Your Honor, I heard Your Honor yesterday with his comments

19 about not playing chicken.  And Your Honor was very strong in

20 his statements about how the 506(c) waiver is not routinely

21 granted here.

22          I also heard Your Honor say, well, you know,

23 leaving open the possibility in negotiation we will see where

24 this goes.  Okay.  Understood.  Understood that this 506(c)

25 waiver is one of the only issues that's still out there;

1 however, in this case because of the administrative claims

2 that may or may not be paid -- and I don't know if it's just

3 mine or if there are other administrative claimants that are

4 similarly situated.

5          THE COURT:  Mr. Brown, HSRE, yes.

6          MR. CAIRNS:  This is not an appropriate case for a

7 506(c) waiver at this time.

8          Let me make one final comment before I sit down.

9 I find it curious that on the marshaling waiver the DIP

10 lenders say, well, let's wait and see if we get paid in full

11 and then we'll make a decision on that, but on the 506(c)

12 waiver we need to do it now which simply just doesn't make

13 any sense to me.

14          Don't get me wrong, Your Honor, in this case I

15 don't think it would really ever be appropriate.  You know, I

16 agree with the debtors that if they're paid in full it's

17 clearly not an issue, but we don't know and I can't foresee a

18 timeline here.  There is, obviously, a lot of moving parts,

19 lots of balls in the air to say that, oh, at this point it's

20 going to be okay for us to waive those 506(c) claim rights.

21 To be honest with you it's simply not appropriate in this

22 case in any event.

23          THE COURT:  But let me ask you this question, Mr.

24 Cairns, what happens if I don't approve the financing and the

25 case converts?  How does that leave Tenet and Conifer any

1  biter off because the case is on the brink, it seems to me,

2  of success or failure depending upon what happens with these

3  various sales.

4        MR. CAIRNS:  Your Honor, it's a great question,

5  obviously, but here's the issue.  We don't think the 506(c)

6  waiver -- I don't really see that and, you know, maybe we

7  will hear the DIP lenders get up and say yes, make or break.

8  Really, we're talking about waiving the right to bring a

9  claim if our administrative claims are not paid in full.

10        THE COURT:  Yes.

11        MR. CAIRNS:  There were a lot of people

12  yesterdays, including my colleague, Mr. Pesce, and said not

13  just yesterday, but earlier in the case that if

14  administrative claims can't be paid, you know, is it

15  appropriate to keep these cases where they're at not at this

16  point when the parties have worked so hard to negotiate where

17  they're at right now.

18        Again, the 506(c) waiver that's a stretch in this

19  case.  To be honest it's a stretch in any case.  I think

20  we've gotten to this point with a precedent here where people

21  come in expecting it.  I don't think that's appropriate.  Our

22  local rules specifically carve that out and say, no, that's

23  not appropriate in the normal course.  You have to show

24  specific need.

25        THE COURT:  Yes.

1          MR. CAIRNS:  And the facts of the case have to

2   match-up and they simply don't here.  Thank you, Your Honor.

3          THE COURT:  Thank you, Mr. Cairns.  Thank you.

4          Good morning, Mr. Brown.

5          MR. BROWN:  Good morning, Your Honor.  Thank you

6   for hearing me.

7          THE COURT:  Of course.

8          MR. BROWN:  Stuart Brown on behalf of the HRSE

9   entities.

10          Your Honor, I was not a participant in the

11  discussions last evening.  I heard this morning that there's

12  $7 million dollars of additional liquidity, five plus two,

13  that is available to the budget.  My client's rent for

14  August, the piece that the debtors have agreed to pay, as far

15  as I know, hasn't been paid yet.  There's the shortfall from

16  both July, August and the months to come.  I haven't seen a

17  revised budget.  I don't know what that added liquidity means

18  to my client as well as the other administrative creditors in

19  these cases.

20          So, when it comes to the 506(c) issue from a

21  precedential standpoint I disagree with Mr. Minuti.  From a

22  practical standpoint I agree with Mr. Cairns that in the

23  cases that I've seen where a 506(c) waiver is not objected to

24  and its granted it's because debtor's counsel can stand in

25  front of Your Honor and say the budget is fully funded.

1      THE COURT:  Yes.

2      MR. BROWN:  Everything that we anticipate that

3 will come to bear on these estates is provided for in the

4 budget.  Now, are they always right?  No.  But standing there

5 on day one, or day thirty of the case they have the ability

6 to make that representation to the court.  And here the exact

7 opposite representation has been made to the court.

8      That being said, Your Honor, from a practical

9 standpoint I can't take a position because I don't know what

10 the budget looks like.  So, I don't know whether the debtor

11 has a revised budget that we can spend a little time looking

12 at or whether this, you know, absolutely has to be done in

13 the next ten minutes that not even the court has a chance to

14 look at the budget.

15      THE COURT:  Right.

16      MR. BROWN:  Thank you, Your Honor.

17      THE COURT:  Thank you, Mr. Brown.

18      Ms. Santamour, yes, good morning.

19      MS. SANTAMOUR:  Good morning.

20      THE COURT:  And I do appreciate your hard work

21 last evening.

22      MS. SANTAMOUR:  I just want to -- before my phone

23 dies I want to just make a statement about the non-debtor

24 guarantors.  I want it to be clear because I feel like

25 MidCap's reputation, again, is being a little tainted.  It

1    isn't that MidCap didn't want the guarantors, the non-debtor

2    guarantors to get notice.  We consented to notice.  What we

3    wanted to make sure is that by consenting to notice in the

4    order that it wasn't a gotcha moment.  That they could

5    somehow defend or raise an issue with respect to the

6    enforceability or certain rights and obligations under the

7    guarantee.

8          So, what we asked is that, and I can read it for

9    Your Honor, that this language be added to the order.  That,

10          "The non-debtor guarantors, nothing in this final

11    order requiring DIP agent to provide notice of amendment to

12    the DIP documents and/or notice of commencement of

13    enforcement of remedies to the non-debtor guarantors shall be

14    deemed to modify the terms of any DIP documents executed by a

15    non-debtor guarantor including, without limitation, any term

16    therein providing that the DIP documents may be amended or

17    modified without the consent of the non-debtor guarantor and

18    without effecting the scope of enforceability of any DIP

19    document executed by such non-debtor guarantor. "

20          To me, you know, that's a fair exchange for adding

21    them to the notice provisions in the order.  If they're not

22    added to the notice provisions in the order we, obviously,

23    don't need this language.  If the debtor just wants to agree,

24    you know, kind of, on the record to provide notice to them,

25    but we don't want there to be a gotcha moment and some kind

1    of defense just by agreeing to give them notice.

2            THE COURT:  That seems certainly neutral to me.

3            Mr. Schlauch, you rejected that language.  Is that

4    right?

5            MR. SCHLAUCH:  Yes, Your Honor.  Our client

6    rejected that language.  I would say that those were,

7    actually, settlement conversations that our client had had

8    with Ms. Santamour and her client.

9            THE COURT:  Okay

10           MR. SCHLAUCH:  So, you know, I understand it's on

11   the record now.  But we did reject that. At the end of the

12   day we've already said on the record twice, and I'll say it

13   for a third time that, you know, the inclusion of the non-

14   debtor guarantors in the notice provisions of the DIP order

15   do not modify or change the DIP documents.  We've already

16   said it three times.  I don't have authority to add that

17   language into the order.

18           To the extent Your Honor is inclined to just rely

19   simply on the debtor's promise that they will get us the

20   notices I will say that, you know, the non-debtor guarantors

21   have their own constituents, they have their own creditors.

22   While I believe Mr. Minuti and his colleagues will get us

23   those things, I also think that it's much better if we get

24   them directly from MidCap and the other parties involved. I

25   don't think that's fair for someone who is providing such

1  substantial credit report in this case to be excluded from

2  something as simple as providing us with notice whether

3  they're going to modify documents or exercise remedies under

4  the documents.

5          I understand Ms. Santamour's position.  I'm not in

6  a position, today, to agree to that language.  We've said on

7  the record three times that it doesn't modify the DIP

8  documents.

9          Thank you, Your Honor.

10         THE COURT:  Thank you.

11         So, if I order that language to be put into the

12 order you will then give notice to the non-debtor guarantors,

13 is that correct?

14         MS. SANTAMOUR:  Yes, Your Honor.  There were three

15 sections of the DIP order where they requested notice and I

16 think that language was already agreed to as long as this

17 language is added.

18         THE COURT:  All right. I think it's appropriate to

19 add the language. I know that Mr. Schlauch objects to that.

20         Yes?

21         MR. SCHLAUCH:  Your Honor, I apologize, but if I

22 could have a moment to talk to my client about that.  I don't

23 know if their position would be they'd rather just rely on

24 the debtor's language then not have that in there.  So, I

25 need a moment to confer with my client.

1          THE COURT:  All right.

2          MR. SCHLAUCH:  I apologize.  We may not be able to

3   get you an answer before the hearing ends, but we will

4   certainly speak with Ms. Santamour and whatever order is

5   submitted to the court will reflect the agreement of the

6   parties.

7          THE COURT:  Okay.  All right.  That's fair.

8          MR. SCHLAUCH:  Thank you, Your Honor.

9          THE COURT:  I think you should have consultation

10  with your client.

11         MS. SANTAMOUR:  Your Honor, just one other issue.

12  There was a, I considered it, a threat last night that the

13  non-debtor guarantors would not execute affidavits in

14  connection with the title insurance if we didn't agree to the

15  notice without this language.  I think that's an -- I mean

16  that will kill the DIP financing if they can't sign this

17  document.  They're obligated to do it under the guarantees

18  that they signed in connection with the interim order.  I

19  just want to make sure that when he's talking with his client

20  or his constituents that he resolves that issue that they

21  commit to signing the affidavits in connection with the title

22  insurance.

23         MR. SCHLAUCH:  Your Honor, again, for the record,

24  Brendan Schlauch of Richards Layton & Finger.

25         THE COURT:  Yes.

1          MR. SCHLAUCH:  I vehemently object to that

2  characterization.  Our client simply said that we reserve our

3  rights.  If we are asked to sign documents our client will

4  review them and they will make a decision at that time.  I

5  understand Ms. Santamour's comment, but I just want to push

6  back on the idea that it was a threat.  That is not the case.

7  We are simply reserving our rights.

8          Yesterday morning a DIP lender indicated that

9  there would be some requirement of the non-debtor guarantors

10  to enter into documents.  We hadn't had an opportunity to

11  talk to our client.  We are simply just saying that we're not

12  taking a position on it one way or another whether we're

13  going to sign or not sign the documents.  Our client will

14  review them in the ordinary course when they are asked to do

15  so and we will make a decision at that time.

16          Thank you, Your Honor.

17          THE COURT:  I don't know what more I can do about

18  that one, Ms. Santamour.  I certainly would expect that they

19  would be cooperative as required and if they don't, I

20  suppose, you can bring it before me and we could have a

21  hearing, and I would then determine whether or not there was

22  some way around their refusal to sign.

23          MS. SANTAMOUR:  Okay.  I understand, Your Honor.

24  That's fine

25          THE COURT:  All right.

1      MS. SANTAMOUR:  I don't want to belabor the issue

2    of the 506(c) claim, but I do want to make a few comments

3    because I think Mr. Minuti did a great job, I think, arguing

4    the position of, you know, most of what occurs in the cases

5    in this District.

6      I want it, first, to be clear to Your Honor that

7    in addition to the liquidity that already been provided under

8    the DIP financing the arrangement and the agreement that was

9    reached last night provides an additional $10 million

10   dollars, $9 to $10 million dollars.  It's not the 7 million.

11   If the DIP order is approved it will be the 2 million that we

12   consented to, the release of the reserves, the 2 million in

13   additional liquidity and then approximately 5 million as a

14   result of MidCap agreeing to change its borrowing base that's

15   been in these documents for eighteen months to release from

16   the cross-aging the Hahnemann Hospital receivables

17      THE COURT:  Yes.

18      MS. SANTAMOUR: So, it is a huge commitment that's

19   on top of the 2.5 in the carve-out that we've already agreed

20   to and all the other liquidity that's provided in this case.

21   I would say, again, that MidCap isn't responsible for every

22   expense that occurs in this case.  The 506(c) waiver in

23   connection with our agreement to, you know, basically post-

24   pone the issue with respect to marshaling and all the other

25   terms that we've had to concede throughout this last two

1  weeks with respect to the DIP order is a very important

2  condition to the additional liquidity that we're offering.

3          I'd also say that with respect to Tenet and with

4  respect to HSRE both of them turned down the opportunity to

5  finance the debtor.  Tenet got before Your Honor yesterday

6  and spoke eloquently about how concerned about the patients

7  they are.  I think everyone in this case is concerned about

8  the patients.  That is, obviously, the first issue.

9          Mr. Pesce also went onto say that while they are

10 concerned about the patients Tenet is no longer the --

11 Hahnemann Hospital is no longer in their corporation

12 structure.  So, they care about it except to the extent that

13 it's no longer in their corporate structure.  And I submit to

14 Your Honor that, you know, Tenet has a lot at stake in this

15 case as does everyone.  We all have to take a little bit of

16 risk to make this work.

17         I think that Mr. Minuti has put on testimony over

18 the last few days that show that there's a likelihood that

19 this won't be an issue with respect to administrative

20 insolvency.  We all hope that's the case and we want to get

21 to the point where we can have the sale of St. Christopher's

22 and recover enough proceeds to pay everyone and hopefully

23 have a distribution to unsecured creditors.  I think MidCap

24 is doing more than its fair share to try to get to that

25 point.

1           THE COURT:  All right.

2           MS. SANTAMOUR:  Thank you, Your Honor.

3           THE COURT:  Thank you, Ms. Santamour.

4           Mr. Brown?

5           MR. BROWN:  Just too correct one comment of Ms.

6  Santamour.  It is incorrect that HSRE denied the opportunity

7  to provide a DIP.  That is subject to confidentiality

8  agreements and I'm surprised counsel mentioned that on the

9  record.

10           THE COURT:  All right.  Mr. Cairns, yes.  Are you

11  going to say the same thing about Tenet and Conifer?

12           MR. CAIRNS:  No, Your Honor.  I just feel bad that

13  I have to get up and say this, but this concept that somehow

14  Tenet doesn't really care for the patients I think is

15  ridiculous, but I do have to get up and say that's not true.

16           This little bit of risk, we heard this yesterday

17  that somehow Tenet is taking a little bit of risk.  Your

18  Honor, Tenet is getting paid $200,000 dollars -- you know,

19  Conifer is getting paid $200,000 dollars on an $800,000

20  dollar contract rate.  I mean we don't know whether we're

21  going to get paid.  We've got to wait till the 13th of

22  September to negotiate with the debtors.  It's probably more

23  than a little bit of risk.

24           Thank you, Your Honor.

25           THE COURT:  Thank you.  Yes.

1           MR. MINUTI:  Your Honor, can I just be heard

2   briefly in response?

3           THE COURT:  Yes.

4           MR. MINUTI:  So, let me just talk about the

5   court's ruling yesterday on Tenet/Conifer.  Your Honor said

6   that the contract rate did not apply.

7           THE COURT:  Right.

8           MR. MINUTI:  Your Honor said they were entitled to

9   a little bit more.  Okay.  Now we've got MidCap who's agreed

10  to give the debtor $2 million more dollars to pay

11  administrative claims.  The administrative claimant in this

12  case that Tenet and Conifer care the most about is Tenet and

13  -- I'm sorry, that MidCap cares the most about is Tenet and

14  Conifer.  Why, because they're primary collateral is accounts

15  receivable and they want to use their systems and they want

16  them working to collect account receivable.

17          THE COURT:  Right.

18          MR. MINUTI:  So, our hearing is in September.

19  We're not waiting till September, Your Honor, to sit down

20  with Tenet and Conifer, and offering them more to each a deal

21  so we can move forward in this case with $2 million dollars,

22  Your Honor.  We have a little bit more to give them.  Okay.

23  There is no reason with $2 million more dollars we can't

24  reach a deal.  And we think we're going to reach a deal.  And

25  the only way we're not going to reach a deal, frankly, Your

1  Honor, in our view is if parties are not reasonable in

2  connection with the discussions.

3          So, I think at the end of the day we should reach

4  a deal with Tenet/Conifer because everybody wants it to

5  happen for them to stay in the case, for them to get paid

6  fairly for what they're doing going forward and that's part

7  of the reason for this additional $2 million dollars.

8          And so I think they're going to be fine.  I think

9  we've got additional liquidity in the $2 million dollars to

10 address other creditors in this case.  So, I do think this

11 case is consistent with other cases, certainly, I've been

12 involved in where there's been a 506(c) waiver.  Again,

13 nobody can gaurantee that all the administrative claims are

14 going to be paid in this case.  I mean nobody can gaurantee

15 it.

16         Look, the testimony over the last two days wasn't

17 that the budget is the budget and that's all we have.  The

18 testimony was there's a lot of value outside of the budget

19 that we think we're going to realize, but we have to be able

20 to get there.  The way we're going to get there is with this

21 DIP loan, Your Honor.

22         So, under the facts of this case we need the

23 506(c) waiver or we need the -- yeah, we need the 506(c)

24 waiver so we can get the loan and we can move forward.  Your

25 Honor asked a great question, right.  What happens if you

1  deny this, right?  Well, now we're back to the game of

2  chicken that Your Honor said you didn't want to play and

3  nobody likes to play.  And nobody has got an answer if MidCap

4  walks.

5          So, Your Honor, I think we've pushed MidCap as far

6  as we can.  I think they've given up a lot of the points they

7  raised.  We need this money.  We'd like to move forward.

8  We'd like you to overrule the 506(c) waiver objections.

9          THE COURT:  Is the budget going to be amended at

10 this point or is the budget going to remain the same and

11 we'll see where the payments come from on administrative

12 claims?

13         MR. MINUTI:  Well, Your Honor, I think the changes

14 that are going to happen to the budget is, again, the

15 mechanics of the additional $2 million dollars are as

16 follows.  The $2 million dollars is going to be set aside in

17 a reserve to pay claims.

18         THE COURT:  Right.

19         MR. MINUTI:  The first thing we're going to do is

20 sit down with Tenet and Conifer, we're going to sit down with

21 HSRE.  I believe there was already money in the budget to pay

22 HSRE some amount and we're going to try to reach agreement.

23 If we can't reach agreement with Tenet and Conifer we know

24 we're going to be back here in September.  If we can't reach

25 agreement with HSRE, HSRE can file a motion just like Tenet

1  and Conifer did and we're either going to resolve it or Your

2  Honor is going to eventually resolve it.

3        The $2 million dollars over and above the other 2

4  million that's already coming in the budget gives us a lot of

5  flexibility.  And, again, if people are reasonable there's no

6  reason why we shouldn't be able to reach agreement that

7  allows us to move forward in the case.  So, the budget will

8  be revised, but it will be revised to reflect that reserve

9  and the ability to use that for administrative claims.

10        THE COURT:  All right.

11        MR. MINUTI:  Thank you, Your Honor.

12        THE COURT:  Well, I do appreciate MidCap's

13  agreement on many of these points.  You know, the 506(c)

14  waiver was very significant to the court, but I am not going

15  to risk losing that financing over the 506(c) waiver.  And I

16  know it's an important issue.  If there is a failure in this

17  case it may rise, you know, to cause problems, but at this

18  point we're all hopeful that this case is going to proceed

19  successfully.

20        I know that Mr. Minuti and his colleagues are

21  working very hard to see that that happens.  And I know that

22  some of the sales, there are serious objections that have to

23  be resolved and I do believe that the debtors are talking in

24  an effort to resolve those disputes, but we don't what will

25  happen and we will find out on September 4th whether they're

1  successful or not.

2          For the court to, basically, shut down the

3  financing, and I believe that would happen at this time.  I

4  think that MidCap has probably reached its limit in agreeing

5  to terms and almost all of the terms except the 506(c) waiver

6  have been addressed.  So, I will overrule the objections to

7  the 506(c) waiver and I will approve the financing subject,

8  obviously, to looking at the order and approving the order as

9  well as hearing from the committee on the order.

10         I did say yesterday that if there were additional

11 liquidity I would reconsider some of my positions and I'm

12 doing that now on the 506(c) waiver.

13         MR. MINUTI:  Thank you very much, Your Honor.  We

14 very much appreciate that.

15         Your Honor, we just had one housekeeping matter to

16 raise with the court.

17         THE COURT:  Yes.

18         MR. MINUTI:  With respect to some of those other

19 issues our resident asset sale, our resident program asset

20 sale motion we have a meeting today in Philadelphia with the

21 Government to hopefully try to resolve their objection.  That

22 is the most significant objection to that sale.  If we are

23 able to reach agreement with the Government to resolve their

24 objection I think all parties would like to see that sale

25 transaction get approved sooner than September 4th.

1    I think Your Honor is on vacation maybe next week

2   and that's why the September 4th hearing, but I'm asking

3   whether there is a mechanism or a way where if we are able to

4   reach agreement and we believe it is necessary to have the

5   hearing earlier, is there a way for us to contact Chambers

6   and maybe impose upon another Judge to consider the sale

7   hearing?

8    We have a couple of -- we have a handful of

9   objections.  I think one is moot and I think the others, Your

10  Honor, are not going to be difficult to resolve. So, I think

11  it is the Government's objection that will be the one that

12  will take extended time if we can't resolve it, but, again,

13  if we have this meeting and its successful or we can make it

14  successful in the next couple of days I think it benefits

15  everyone to get back before the court sooner.

16   So, the question is I'm asking the court whether

17  we can contact Chambers and maybe see if another Judge would

18  be available to hear the motion before September 4th.

19   THE COURT:  Well, in this case I would hate for

20  another Judge to be considering a sale of this importance.  I

21  will be around and reachable except for next Thursday and

22  Friday.  And, frankly, Thursday and Friday are close enough

23  to September 4th that I don't think that that will really be

24  a problem.  And I certainly would reconsider having another

25  Judge review the matter, but I would prefer that another

1  Judge not.

2          So, if you are able to reach agreement with the

3  Government today or tomorrow and you're in a position to

4  present the sale to the court earlier call Chambers and we'll

5  make arrangements.

6          MR. MINUTI:  Thank you very much, Your Honor.  I

7  certainly didn't want to impose upon the court during your

8  vacation, but your offer is very much appreciated.

9          THE COURT:  Ms. Sarkessian, I saw you start to

10 rise.

11         MS. SARKESSIAN:  Yes.  Thank you, Your Honor.  For

12 the record Juliet Sarkessian on behalf of the U.S. Trustee.

13         I'm covering this for my colleague, Ben Hackman.

14 So, I don't know the history of everything, but I only rise

15 to convey my concern if the hearing on the sale has already

16 been scheduled for September, is it the, 4th or 5th I'm

17 concerned that if its earlier people may not have sufficient

18 time.  I don't know how they're going to send out a notice to

19 say now it's earlier.  You've got the Labor Day weekend

20 there, people may be on vacation.  So, I am concerned that

21 there won't be adequate notice and this is a pretty

22 significant hearing from what I understand.

23         THE COURT:  How about that, Mr. Minuti?  I know

24 that we -- the sale has been adjourned, the hearing on the

25 sale.

1    MR. MINUTI:  That's correct, Your Honor.  And, you

2  know, there was an objection deadline.  We know what the

3  universe of objections are.

4    THE COURT:  Right.

5    MR. MINUTI:  As I've indicated, I think we will be

6  able to -- look, if we're going forward we're certainly not

7  going to do it in a way that's going to prejudice anybody.

8  So, once we know that we're in a position to move forward

9  quicker then September 4th we will provide anybody with

10  notice.  If somebody has got an issue we will certainly work

11  to try to resolve it.  If we reach an impasse, in a sense,

12  that we think it's appropriate to go forward and they don't

13  we will certainly let Chambers know that and, ultimately,

14  Your Honor will decide whether someone is prejudiced or not.

15    Again, with only, I think its four -- we only have

16  four objections, Your Honor; one of which I know is moot

17  because it was an objection to the assignment of a contract

18  that's not being assumed and assigned as part of the

19  transaction.  I think that those that raised an objection we

20  should be in a position to get them on board or they will be

21  in a position to press those objections on shortened notice.

22    So, again, not our intent to prejudice anyone and

23  we will get the notice out as soon as we know.

24    MS. SARKESSIAN:  Your Honor, the only thing that I

25  would ask is that once the date has been set that notice go

1  out by email or if the email is not available then by fax to

2  the parties in interest.

3          MR. MINUTI:  That's perfectly acceptable, Your

4  Honor.

5          THE COURT:  All right.

6          MR. MINUTI:  Our goal would be to get notice out

7  as quickly as possible to give folks as much notice as

8  possible.

9          THE COURT:  Do you agree with me, though, that if

10 it's Thursday or Friday that's close enough to the 4th not to

11 ask another Judge to sit on the matter?

12         MR. MINUTI:  I think that's probably right, Your

13 Honor.  I think two days shouldn't make a lot of difference.

14 In all candor others in my group have been much closer to

15 that then I.  Let us --

16         THE COURT:  Let's see what happens.

17         MR. MINUTI:  -- work on trying to see if we can't

18 get things resolved sooner and back before Your Honor sooner.

19 If it becomes an issue we will certainly let Chambers know.

20         THE COURT:  All right.  That's fine.

21         MR. MINUTI:  Thank you very much, Your Honor.  We

22 do appreciate all your attention over the last few days.

23         THE COURT:  All right.  So, I will see the order

24 and I will review.  Obviously, if I have concerns I will get

25 hold of the parties; otherwise, I will enter the order with

1    the 506(c) waiver.

2              MR. MINUTI:  Thank you, Your Honor.  We appreciate

3    it.

4              THE COURT:  Thank you for your hard work.  It's a

5    delicate matter.  It's an important matter.  I appreciate

6    everyone's efforts.  Thank you.

7         (Proceedings concluded at 9:47 a.m.)

8

9

10                        CERTIFICATE

11

12        I, MARY ZAJACZKOWSKI, certify that the foregoing is a

13    correct transcript from the electronic sound recording of the

14    proceedings in the above-entitled matter.

15

16
     /s/Mary Zajaczkowski                      August 21, 2019
17   Mary Zajaczkowski, CET**D-531

18

19

20

21

22

23

24

25