# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) **Re:  Docket Nos. 142, 246, 249 and 363** |
| Debtors. | ) |

## DEBTORS' REPLY TO OBJECTION OF THE UNITED STATES
## TO PROPOSED SALE OF RESIDENCY PROGRAM ASSETS

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), by and through their undersigned counsel, respectfully submit this reply to the objection (the "**Objection**") [D.I. 363] filed by the United States of America (the "**United States**"), on behalf of the Department of Health and Human Services ("**HHS**"), acting through its designated component, the Centers for Medicare and Medicaid Services ("**CMS**") to the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Residents Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, and (C) Approving the Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; and (II)(A) Approving the Sale of the Debtors' Residents Program Assets Free and Clear of Liens, Claims, Encumbrances and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts;*

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

*and (III) Granting Related Relief* (the "**Residency Program Sale Motion**") [Docket No. 142].

In support hereof, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Through the Residency Program Sale Motion, the Debtors seek to transfer Hahnemann University Hospital's ("**Hahnemann**") graduate medical education training programs (the "**Sale**") to Thomas Jefferson University Hospitals, Inc. ("**Jefferson**"), acting on behalf of a consortium of non-profit entities including Jefferson, Temple University Health System ("**Temple**"), Albert Einstein Health Network ("**Einstein**"), Main Line Health, Inc. ("**Main Line**"), Christiana Care Health System ("**Christiana**"), and The Cooper Health Systems, a New Jersey Non-Profit Corporation ("**Cooper**" and, collectively with Jefferson, Temple, Einstein, Main Line and Christiana, the "**Consortium**").

2.      Without question, the Sale will promote the interests of the greater Philadelphia region.  Among other things, it will facilitate the long-term placement of medical residents in the Philadelphia area, for the benefit of the entire community.  The Sale also will provide critical resources to local hospitals, especially Jefferson, Temple and Einstein, which already are caring for a significant portion of the at-risk patient population historically served by Hahnemann and employing a number of displaced physicians (including residents) and other employees from Hahnemann. The Sale also will protect Hahnemann's current and former medical residents (and, by extension, former patients) by requiring and providing needed funding for the purchase of their tail insurance coverage.

3.      The Sale also will result in a greatly needed influx of liquidity into the Debtors' estates.  As the Court is aware, these have been difficult cases.  The Sale will ensure that the Debtors have funding necessary for an orderly and effective wind-down of the operations of

Hahnemann, the continued administration of these cases, and the continued operation of St. Christopher's Hospital for Children ("**St. Christopher's**") during and through the completion of its own sale process.

4.      Despite these obvious benefits, CMS objects to the Sale.  CMS' Objection is based on a myopic interpretation of Medicare regulations, and cannot be squared with CMS' own past practices and positions, the applicable provisions of Title 11 of the United States Code (the "**Bankruptcy Code**"), the Social Security Act (the enabling statute of the Medicare program that governs CMS' operations), or even the plain language of CMS' own regulations and sub-regulatory guidance.

5.      For the reasons set forth herein, the Court should overrule CMS' Objection and approve the Sale.  Several considerations compel this result.  *First*, Hahnemann's Medicare provider number and provider agreement are statutory entitlements, not executory contracts, that may be sold free and clear under section 363 of the Bankruptcy Code.  *Second*, even if Hahnemann's Medicare provider agreement is determined to be an executory contract, it may be assumed and assigned under section 365 of the Bankruptcy Code and the Court may determine a liquidated cure amount, if any, with respect thereto.  *Finally*, and in any event, assignment of Hahnemann's Medicare provider agreement and provider number fully complies with all applicable Medicare statutes and regulations; any assertion by CMS to the contrary is unreasonable and should be overruled.

## BACKGROUND AND PROCEDURAL HISTORY

6.      The Debtors filed the above-captioned cases (the "**Chapter 11 Cases**") on June 30 and July 1, 2019 (collectively, the "**Petition Date**").  A detailed description of the Debtors' businesses and the facts and circumstances surrounding the Chapter 11 Cases are set forth in

the *Declaration of Allen Wilen in Support of First Day Relief* [D.I. 2], which is incorporated herein to the extent applicable.

7.    The Debtors filed the Residency Program Sale Motion on July 9, 2019 [D.I. 142]. Through the Residency Program Sale Motion, the Debtors sought to sell Hahnemann's graduate medical education training programs, to Tower Health ("**Tower**"), as the stalking horse bidder (the "**Stalking Horse Bidder**") or to such other successful bidder (the "**Successful Bidder**").

8.    On July 19, 2019, the Debtors filed the asset purchase agreement with Tower reflecting the terms of its stalking horse bid (the "**Stalking Horse APA**") [D.I. 246]. In summary, the Stalking Horse APA reflected a purchase price of $7,500,000, of which $3,000,000 would be placed into escrow (the "**Escrow Amount**") to cover the following items: (a) the cost of purchasing tail insurance coverage for Hahnemann residents who chose to continue their training with Tower ("**Continuing Residents**"); (b) an amount necessary, with agreement of CMS, to discharge and satisfy any potential claims for overpayment liability with respect to Hahnemann's Medicare provider number arising prior to closing; (c) cure costs associated with assigned contracts; and (d) other indemnifiable losses incurred by Tower.

9.    On July 19, 2019, the Court entered the *Order (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale* (the "**Bidding Procedures Order**") [D.I. 249] approving, among other things,

certain bidding procedures (the "**Bidding Procedures**") in connection with the Residency Program Sale Motion.

10.     On August 2, 2019, the Debtors filed the *Notice of Extension/Continuance of Bid Deadline, Auction, and Sale Hearing Date* [D.I. 346], extending the Bid Deadline (as defined in the Bidding Procedures) until August 7, 2019 and re-scheduling the Auction (as defined in the Bidding Procedures) for August 8, 2019.

11.     The United States, on behalf of CMS, filed the Objection on August 5, 2019 [D.I. 363].

## THE AUCTION AND WINNING BID

12.     The Debtors received more than one qualified bid, and accordingly conducted the Auction on August 8, 2019.

13.     At the conclusion of the Auction, the Debtors, in consultation with the Official Committee of Unsecured Creditors, designated Jefferson as the Successful Bidder, with an aggregate purchase price of $55,000,000, and the Stalking Horse Bidder was selected as the Back-Up Bidder (as defined in the Bidding Procedures), with an aggregate purchase price of $51,000,000.

14.     While structurally similar to the Stalking Horse APA, the Jefferson APA includes a material difference with respect to tail insurance.  Specifically, the Stalking Horse APA provided that the Stalking Horse Bidder would purchase tail insurance coverage for so-called Continuing Residents completing their training at Tower (with such expense, to the extent in excess of $100,000, paid from the Escrow Amount).  The Stalking Horse APA did not address tail insurance coverage for current and former residents of Hahnemann who did not continue their training with the Stalking Horse Bidder.  In other words, the Stalking Horse

APA provided for tail insurance solely for those residents who completed their training at Tower.

15.     As a result of negotiations during the Auction, under the Jefferson APA (as well as the Stalking Horse Bidder's back-up bid), the Debtors have covenanted, contingent upon closing of the Sale, to purchase tail insurance coverage for *all residents*, as a deliverable at closing.  The Jefferson APA also includes, as a separate component of the purchase price and in addition to the Escrow Amount, up to $1,000,000 to reimburse the Debtors for the cost of obtaining such tail insurance.[2]

## THE CONSORTIUM

16.     As the Court is aware, and as further described in various pleadings in these Chapter 11 Cases, the Debtors are in the process of closing Hahnemann.

17.     Hahnemann is a safety-net hospital that has provided care to one of the most at-risk patient populations in Philadelphia.  There was significant public concern at the beginning of these cases about the potential impact of Hahnemann's closure on patients.  The actual impact, however, of the Hahnemann closure on patient care has been diminished, due in large part to the coordinated and focused efforts of other local hospitals, including in particular Jefferson, Temple and Einstein, to ensure continuity in care to patients historically cared for at Hahnemann.

18.     Hahnemann is physically located in the geographic center of Philadelphia.  It is approximately three blocks north of City Hall, with its main campus situated between Broad Street and 15th Street, and between Race Street and Vine Street.  Jefferson's primary hospital is located six blocks east and four blocks south of Hahnemann; Temple is less than 3.5 miles

---

[2]     Should the cost of the tail insurance exceed this amount, the Debtors will pay the balance from the transaction proceeds, as a closing cost.

away; Einstein is less than 6 miles away; and Main Line Health's largest hospital, Lankenau, is less than 8 miles away.  As a result of this physical proximity, the members of the Consortium are the logical and natural choices for patients who were previously seen at Hahnemann.

19.     The Consortium is also already employing a significant number of former Hahnemann employees including, without limitation, nearly 300 of Hahnemann's 583 residents plus a significant number of other former Hahnemann employees.

20.     In short, a significant amount of the patient services that were historically provided by Hahnemann are now being provided by members of the Consortium.  Consortium members are treating former Hahnemann patients, in many cases using former Hahnemann doctors.  Without the formality of an acquisition, the Consortium has already assumed critical components of the legacy Hahnemann operations.

21.     Through this transaction, the Consortium will formally undertake the last significant aspect of Hahnemann's legacy operations – its graduate medical education programs. Upon approval of this Sale, the Consortium will, for all practical purposes and in all material ways, have assumed responsibility for Hahnemann patient care and graduate medical education training operations.

## CMS' OBJECTION

22.     As noted above, the United States, on behalf of CMS, filed the Objection on August 5, 2019.  Following conclusion of the Auction, the Debtors and Jefferson attempted to address CMS' concerns, through multiple telephonic discussions and an in-person meeting in Philadelphia.  To date, however, those efforts have been unsuccessful.

23.     CMS raises several points in its Objection, each of which is based on untenable interpretations of various Medicare statutes or regulations, or of what CMS incorrectly views to be applicable case law.

24.     At the heart of CMS's Objection is the incorrect assertion that a provider may only assign a Medicare Provider Agreement pursuant to the provisions of 42 C.F.R. § 489.18. This regulation, a copy of which is attached hereto as **Exhibit A**, merely provides that *certain* specifically identified forms of transactions *always* constitute a change of ownership (or "**CHOW**," in Medicare parlance) and, in the event of the occurrence of *those* transactions, a provider number and provider agreement are *automatically* assigned to the new owner.  CMS fails to point to any statute or regulation, or even other regulatory guidance, to support its assertion that a change of ownership is the *only* way to transfer a provider agreement, or that the *only* type of transaction that constitutes a change of ownership is one of the transactions described in § 489.18.  No such statute, regulation, or guidance exists – and CMS' own practice, which regularly recognizes changes of ownership transactions that are not described in § 489.18, in fact proves that to be the case.  CMS's contentions thus ignore the plain language of the regulation and, operating beyond the boundaries established for it by the Social Security Act and the Administrative Procedures Act, purport to create an entirely new regulatory requirement.  The Court should overrule CMS' unreasonable position.

25.     CMS also asserts, without any statutory or legislative support, that not only do the regulations require a change of ownership, but that a change of ownership requires the continuation of the transferor as a going concern operation.  It appears CMS has simply manufactured this requirement to justify its position with respect to this Sale.

26.     Finally, CMS objects to the extent that the Debtors propose to transfer the provider agreement and provider number on any terms that do not include the assumption by Jefferson of *underlined successor liability* with respect to overpayment liability relating to pre-closing operations by Hahnemann.  CMS' position in this respect runs afoul of applicable

provisions of the Bankruptcy Code and CMS' own past practice in negotiating capped overpayment liabilities in bankruptcy cases.[3]

## **ARGUMENT**

27.    For the reasons set forth herein, the Court should overrule CMS' Objection and approve the Sale.  First, the Debtors may include Hahnemann's Medicare provider number and provider agreement in a sale of assets of the estate under section 363 of the Bankruptcy Code, free and clear of all claims, liens, encumbrances and other interests.  Alternatively, the Debtors may assume and assign the provider agreement under section 365 of the Bankruptcy Code, provided that they provide a mechanism for the cure of any default as may be proven by CMS. Finally, and in any event, while not necessary, assignment of the provider agreement may be independently authorized because the transfer of the residency programs to the Consortium effectively constitutes a change in ownership under Medicare regulations.

28.    Any of the foregoing reasons, acting independently, provides sufficient basis for the Court to overrule CMS' Objection and approve the Sale.

**A.    The Debtors May Sell Hahnemann's Provider Agreement and Provider Number Pursuant to Section 363 of the Bankruptcy Code**

29.    Hahnemann's Medicare provider number and provider agreement are assets of the bankruptcy estate that may be included in a sale transaction pursuant to section 363(b) of the Bankruptcy Code.

---

[3]    *See*, *e.g.*, *In re Air Force Village West, Inc. d/b/a Altavita Village*, Case No. 19-11920-SC, D.I. 388 (Bankr. C.D. Cal. Jul. 16, 2019) (Stipulation by CMS permitting assignment of Medicare provider agreement subject to payment of a negotiated, lump-sum cure amount); *In re Verity Health System of California, Inc.*, Case No. 18-20151-ER, D.I. 1662 (Bankr. C.D. Cal. Feb. 28, 2019) (Stipulation by CMS permitting assignment of Medicare provider agreement and limiting liability to recoupment rights against amounts owed to debtors, and not against amounts due to purchaser); *see also In re Charter Behavioral Health Systems, LLC*, 45 Fed. Appx. 150, 150-51 (3d Cir. 2002) ("Charter and HHS reached a settlement as to the cure amount, and in connection with the payment of the $7 million portion of the cure amount, HHS agreed to waive its successor liability against the purchasers of the facilities").

30.     Section 363(b) of the Bankruptcy Code provides that a debtor in possession may "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

31.     A Medicare provider number and provider agreement are statutory entitlements, not contracts.  All rights and obligations with respect to a provider agreement flow from the text of applicable statutes and regulations, rather than from the text of any actual agreement or other "contract."  *See PAMC, Ltd. v. Sebelius*, 747 F.3d 1214, 1221 (9th Cir. 2014) (quoting *Memorial Hosp. v. Heckler*, 706 F.2d 1130, 1136 (11th Cir. 1983))[4].  As a statutory entitlement, the provider number and agreement are assets that may be included in a sale under section 363(b), and need not be assumed and assigned under section 365 of the Bankruptcy Code.

32.     CMS' contention that a provider agreement is an executory contract is contrary to its own arguments in several federal court cases.  *See, e.g.*, United States' Sur-Reply to Tenet's Reply to its Motion for Summary Adjudication (Statute of Limitations), at 2, *United States v. Tenet Healthcare Corp.*, No. CV-03-206, 2005 WL 3784642 (C.D. Cal. Dec. 22, 2005) (arguing specifically that provider agreements are not contracts, and citing cases); and *Southeast Arkansas Hospice, Inc. v. Sebelius*, 1 Fed. Supp. 3d 915, 925 (E.D. Ark. 2014) (noting HHS "cites several cases in this area as to Medicare provider agreements, all of which support [its] position that the agreement [at issue] is not a contract").[5]  Basic principles of

---

[4]     The agreement itself, attached hereto as **Exhibit B**, includes only three operative paragraphs:  an introduction in which the provider agrees to comply with the Social Security Act and CMS regulations; a second paragraph that states that the agreement is binding; and a third paragraph that states that, in the event of a transfer of ownership, the agreement is assigned to the new owner, subject to any applicable conditions or plans of correction.

[5]     *See also* Samuel R. Maizel and Jody A. Bedenbaugh, *The Medicare Provider Agreement: Is It a Contract or Not?  And Why Does Anyone Care?*, The Business Lawyer, Vol. 71, Fall 2016, at 1207 ("For thirty years, the United States Government has successfully argued in federal district and circuit courts nationwide that the [Medicare Provider Agreement] is *not* a contract between the Government, on the one hand, and various providers of healthcare services or goods on the other hand. . . .  How the

judicial estoppel prevent CMS from taking a contrary position in this case.  *See In re Dex Media, Inc.*, 564 B.R. 208, 215 (Bankr. D. Del. 2017) (Gross, J.) (holding party was judicially estopped from denying the existence of a valid contract where it had previously asserted there was a valid contract and sought enforcement of it, noting the party "cannot flip-flop its position" and that its "inconsistent positions in disregard of prior statements is improper"); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 111 (Bankr. D. Del. 2001) ("the doctrine is designed to prevent litigants from playing 'fast and loose' with the courts'") *citing Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996).

33.     As CMS correctly argues in its non-bankruptcy matters, courts that have actually considered whether a Medicare provider agreement is a contract have ruled that it is not.  *See*, *e.g.*, *Hollander v. Brezenoff*, 787 F.2d 834, 838-39 (2d Cir. 1986); *Memorial Hospital v. Heckler*, 706 F.2d 1130, 1136-37 (11th Cir. 1983); *Germantown Hospital & Medical Center v. Heckler*, 590 F.Supp. 24 (E.D. Pa. 1983), aff'd, *Germantown Hospital & Medical Center v. Schweiker*, 738 F.2d 631 (3d Cir. 1984); *In re Kings Terrace Nursing Home and Health Related Facility*, 1995 WL 65531 (Bankr. S.D.N.Y. 1995), aff'd, 184 B.R. 200 (S.D.N.Y. 1995); and *In re B.D.K. Health Management, Inc.*, 1998 WL 34188241, Case No. 98-00609 (Bankr. M.D. Fla. Nov. 16, 1998).

34.     The *BDK* decision is the only bankruptcy court decision to have actually analyzed the issue and ruled on whether a provider agreement is a statutory entitlement or an executory contract.  The court there held that it is a statutory entitlement that may be sold

---

Medicare Provider Agreement could be a contract inside of bankruptcy and not a contract outside of bankruptcy is hard to fathom, because the Bankruptcy Code does not define the term 'contract' and precedent holds that applicable non-bankruptcy law controls the property rights held by a debtor in bankruptcy." (footnotes omitted)).  A copy of the article is attached hereto as **Exhibit C**, for reference.

under section 363 of the Bankruptcy Code free and clear of any successor liability obligations. *BDK*, 1998 WL 34188241 at *6-7.

35.     CMS' citation to *In re University Medical Center*, 973 F.2d 1065 (3d Cir. 1992) for the proposition that a provider agreement is an executory contract is misleading.  In *University Medical Center*, the issue of whether a provider agreement is an executory contract was presumed but never determined by the Court.  The Third Circuit Court of Appeals never analyzed the issue and the statement regarding such status, which appears in a footnote, is nothing more than *dicta*.  Moreover, such *dicta* ignored contrary precedent.  *Cf. Germantown Hosp. & Med. Ctr. v. Heckler*, 590 F. Supp. 24, 30-31 (E.D. Pa. 1983) ("There is no contractual requirement requiring [CMS] to provide Medicare reimbursement.  Rather, upon joining the Medicare program, providers gain a statutory entitlement to reimbursement."), *aff'd* 738 F.2d 631 (3d Cir. 1984).

36.     This Court has previously recognized the necessity of analyzing the executory nature of an agreement, once put at issue, instead of relying on *dictum* from other cases where an agreement's executory nature was simply assumed by the courts without analysis.  *See In re SuperMedia, Inc.*, Case No. 13-10545, 2013 WL 5567838, *2-4 (Bankr. D. Del. Oct. 9, 2013) (Gross, J.) (holding perpetual, royalty-free copyright license was non-executory notwithstanding precedent generally holding IP licenses to be executory, where precedent had not analyzed the issue under the standards set forth by the Third Circuit in *In re Exide Techs.*, 607 F.3d 957 (3d Cir. 2010)).

37.     A Medicare provider agreement is not an executory contract because (i) the agreement does not impose obligations upon either the United States or the healthcare provider that are not already embodied in controlling laws and regulations, and (ii) therefore, one party's

breach of its obligations would not excuse the other party's performance of its obligations. *See Exide Techs.*, 607 F.3d 957 (defining an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other").

38.     Medicare provider agreements, accordingly, create a "statutory entitlement" to bill the Medicare program, effectively making the provider agreement akin to a license to participate in the Medicare program.   Most courts have held that a license issued by a government agency is property of the bankruptcy estate. *See*, *e.g.*, *In re Tak Communications*, 985 F.2d 916 (7th Cir. 1993); *In re Fugazy Express, Inc*., 124 B.R. 426 (S.D.N.Y. 1991); *In re Smith*, 94 B.R. 220 (Bankr. M.D. Ga. 1988).

39.     As property of the estate, a Medicare provider agreement and provider number may be transferred by the Debtors as part of the larger transfer of Hahnemann's residency programs, pursuant to section 363 of the Bankruptcy Code.

40.     Section 363(f) of the Bankruptcy Code permits this transfer to be free and clear of any interest, and Third Circuit precedent makes clear that successor liability arising in connection with the debtor-transferor's use of the property constitutes an "interest" for purposes of section 363(f). *See In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003) (affirming sale of debtors' assets to purchaser free and clear of EEOC's successor liability claims arising under federal employment discrimination statutes, which claims might otherwise have been assertable against the purchaser outside of bankruptcy).   And while the Third Circuit has recognized that section 363(f) does not permit the sale of a contract free and clear of a non-debtor's recoupment defenses under that contract (as distinct from setoff rights arising from

other transactions), *see Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 262 (3d Cir. 2000), the Third Circuit has also recognized that liability for Medicare overpayments in different fiscal years is in the nature of a "setoff" rather than "recoupment." *See University Medical Center*, 973 F.2d at 1079-80. Thus, by necessary implication, the Debtors' provider agreement may be sold free and clear of overpayment liabilities from prior fiscal years.[6]

**B.     To the Extent Required, the Debtors May Assume and Assign Hahnemann's Provider Agreement Pursuant to Section 365 of the Bankruptcy Code**

41.     To the extent the Court determines that a Medicare provider agreement is an executory contract, the Debtors may nonetheless assume and assign it to Jefferson pursuant to section 365 of the Bankruptcy Code.

42.     In its objection, CMS asserts that a provider agreement is an executory contract that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code.

43.     Section 365 of the Bankruptcy Code does not require an assignee to assume unlimited successor liability with respect to an assumed contract. Rather, section 365(b)(1) merely provides that, if there has been a default in an executory contract, at the time of assumption, the debtor must cure, or provide adequate assurance that the debtor will promptly cure, such default. *See* 11 U.S.C. § 365(b)(1).

44.     CMS, in its Objection, asserts that assumption and assignment of a Medicare provider agreement requires both (a) demonstration that the transfer will result in a change of ownership such that the transferring hospital will remain open as a going concern, and (b) assumption of unlimited successor liability for overpayments by the assignee.

---

[6]     The Jefferson APA contemplates a "CMS Pre-Closing Amount" to be established by agreement of CMS or, failing that, by the Court at the sale hearing, which will preserve CMS's true "recoupment" rights for the current fiscal year.

45.     CMS' support for these positions, however, is limited to (a) a citation to 42 C.F.R. § 489.18 (which merely provides that *certain* specified transactions constitute changes of ownership and therefore *automatically* result in assignment of a provider agreement); and (b) a citation to *Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994), which merely held that, in a non-bankruptcy context, a Texas state law that purported to relieve a purchaser of a Medicare provider agreement from successor liability imposed by the federal Medicare regulations, was (unsurprisingly) pre-empted by federal law and thus did not cut off successor liability.  There is, of course, no preemption issue here given that the Bankruptcy Code is federal law.

46.     First, 42 C.F.R. § 489.18 does not provide any limitation on a debtor in possession's ability to assume/assign assets, including a Medicare provider agreement, nor does it suggest that a change of ownership and continued operation of the transferor as a going concern are required to assign a Medicare provider agreement.  The regulation merely provides guidance with respect to *certain* categories of transactions.

47.     Second, nothing in either 42 C.F.R. § 489.18 or *Vernon* suggests that the proposed transaction is insufficient to either cure any existing defaults under Hahnemann's provider agreement or to provide adequate assurance of cure.  As noted above, the Jefferson APA provides for the establishment of a CMS Pre-Closing Amount, either by agreement of CMS or by order of this Court, which will be paid by the Purchaser from a $3 million escrow to be established at closing.  In its Objection, CMS has not provided any indication that this amount will be insufficient.

48.     The Bidding Procedures Order approved a process to determine cure amounts, pursuant to which the Debtors indicated the amount they believed necessary to cure any defaults,

with the counterparty having the opportunity to object and assert an alternative amount. The Debtors asserted that the cure amount for the Medicare provider agreement is $0 [*see* D.I. 249-4 at 6], and CMS did not posit an alternative amount in its objection, appearing to rest instead on the normal processes and timelines for the submission and audit of cost reports under the applicable Medicare regulations. But CMS nowhere cites any authority for the proposition that its regulations somehow exempt it from the processes and timelines established for dealing with fixing cure amounts in bankruptcy. In fact, under applicable non-bankruptcy law, claims of many contract counterparties are potentially subject to a different and much longer process, such as a multi-year statute of limitations for breach of contract. In a bankruptcy sale context, however if those parties ignore a cure notice issued pursuant to Court-approved bidding procedures, they do so at their own peril. The Debtors respectfully submit that it is CMS' burden to demonstrate what amount is necessary to cure any existing defaults, or at least to provide some evidence to contradict the Debtors' position.

49.    CMS' reliance on a non-bankruptcy decision from a different circuit in argument that the only means of cure is by assumption of unlimited successor liability is unfounded and should be overruled.

50.    Alternatively, to the extent the Court determines that CMS has sufficiently established that its unspecified overpayment liability must be paid as a cure payment, the Debtors suggest that the Court should view such liability claim as a contingent and unliquidated claim that must be estimated pursuant to section 502(c) of the Bankruptcy Code. *See* 11 U.S.C. § 502(c)(1) ("There *shall be estimated* for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . ." (emphasis added)).

51.     Finally, to the extent CMS asserts that assumption and assignment of the Medicare provider agreement is prohibited by operation of section 365(c)(1) and the Anti-Assignment Act, this Court has recognized that "the majority of courts have found section 365(c)(1) applicable [to limit the assumption and assignment of an executory contract] only where the identity of the contracting party is crucial under the applicable law because it is a personal services contract or for public safety reasons." *In re ANC Rental Corp.*, 277 B.R. 226, 235-36 (Bankr. D. Del. 2002) (rejecting blanket exclusion from section 365 based on federal anti-assignment provision and clarifying *In re West Elecs. Inc.*, 852 F.2d 79, 83 (3d Cir. 1988). Indeed, to the extent CMS argues that the identity of the purchaser is crucial, all members of the Consortium are established and highly respected hospitals with provider agreements in good standing; that is, CMS has already accepted each member of the Consortium as appropriate to operate a hospital and have a Medicare provider agreement.

**C.      The Sale is Permissible Under Applicable Medicare Statutes and Regulations**

52.     As noted above, the Debtors may either sell, under section 363 of the Bankruptcy Code, or assume and assign, under section 365 of the Bankruptcy Code, Hahnemann's Medicare provider agreement and provider number as part of the transfer of its graduate medical education training programs.

53.     While, in the Debtors' view, the Court may authorize the Sale solely by reliance on the statutory authority conferred by the applicable provisions of the Bankruptcy Code, the Sale is also permissible within applicable Medicare statutes or regulations, and is prohibited by no law.

**(1)      *The Sale is not Prohibited by Medicare Statutes or Regulations***

54.      CMS incorrectly takes the position that 42 C.F.R. § 489.18 provides the only pathway for assignment of a Medicare provider agreement and that the Sale fails to comply with that regulation.

55.      42 C.F.R. § 489.18, entitled "Change of ownership or leasing:   Effect on provider agreement," provides, in pertinent part, that:

(a)  What constitutes change of ownership —

. . .

> (3) Corporation.  The merger of the provider corporation into another corporation, or the consolidation of two or more corporations, resulting in the creation of a new corporation constitutes change of ownership. Transfer of corporate stock or the merger of another corporation into the provider corporation does not constitute change of ownership.

> . . .

(c)  Assignment of agreement.  When there is a change of ownership as specified in paragraph (a) of this section, the existing provider agreement will automatically be assigned to the new owner.

42 C.F.R. § 489.18 (a) and (c).

56.      The plain language of this regulation makes clear its purpose and intent – to provide that certain transactions that a corporation may undertake constitute changes of ownership, and to make clear that a provider agreement is automatically assigned when one of those transactions occurs.  This regulation exists because, in ordinary transactions outside of bankruptcy, a change of ownership transaction triggers administrative filing requirements, and a change of ownership that involves assignment of a provider agreement imposes on the purchaser ongoing responsibility for Medicare liabilities.   In those cases, providing for *automatic* assignment of a provider agreement serves CMS' interests.  CMS asserts, instead, that the regulation means that the *only* circumstance through which a provider agreement may

be assigned is a change of ownership described in the regulation.  CMS' interpretation of the regulation presents a classic logical fallacy – if every time X happens, Y occurs.  It does not follow, however, that Y *only* occurs *if* X has happened.  Stated differently – if every time a person eats too much chocolate, he gets a stomach ache, it does not mean that he only gets a stomach ache when he eats too much chocolate.  Yet that is the exact interpretation of this regulation that CMS insists must be applied in this case.

57.     CMS' argument not only presents a logical fallacy, but it is unsupported by the Social Security Act or the regulations.  The Social Security Act contains extensive provisions regarding hospitals' qualifications to hold provider agreements, *see e.g.*, 42 U.S.C. § 13955cc, but *none* limiting the situations in which provider agreements may be transferred.  CMS regulations and the provider agreement itself echo the statutory provisions regarding hospitals' qualification to hold provider agreements, *see* 42 C.F.R. § 489.20 and Exhibit B, but they, too, are not limiting with respect to transferability.  And, of course, any limitation on the transferability of a provider agreement would "establish[] or chang[e] a substantive legal standard governing . . . payment for services, or the eligibility of . . . entities . . . to furnish or receive services or benefits under [title XVIII of the Social Security Act]" and therefore must be "promulgated by the Secretary by regulation."  Social Security Act § 1871(a)(2).  The Secretary of the U.S. Department of Health and Human Services has established no such limitation by regulation, and CMS cannot establish it by fiat here.

58.     In addition to being untethered by statute or regulation, CMS' argument is belied by its own sub-regulatory guidance and practice.

59.     In sub-regulatory guidance, CMS has written that a "provider may undergo a financial or administrative change that it considers to be a [change of ownership], but does not

meet the regulatory definition identified in § 489.18," and that CMS' Regional Office can then make a determination of whether a change of ownership has occurred.  CMS, Program Integrity Manual, ch. 15, §§ 15.7.7.1, 15.7.7.1.1.[7]  In related guidance regarding filings that accompany changes of ownership, CMS instructs that "[m]ost of the events described [in a list similar to 42 C.F.R. §  489.18] represent common forms of changes of ownership, but are not intended to represent an exhaustive list."   CMS, Provider Reimbursement Manual,[8] pt. 1, ch. 15, § 1500. For CMS to assert in this proceeding that a change of ownership cannot occur outside of the transaction types described in 42 C.F.R. § 489.18, despite having posted detailed guidance to the contrary, is untenable.

60.     In practice, and on a regular basis, hospitals acquire each other not through transactions described in 42 C.F.R. § 489.18, but through asset sales.  On a regular basis, CMS recognizes those transactions to be changes of ownership that involve a transfer of the seller's Medicare provider agreement.  Were CMS' argument correct – if the transactions described in section 489.18 constitute the *only* route to a change of ownership and assignment of a Medicare provider agreement – CMS' routine recognition of asset sales as changes of ownership that result in provider agreements' transfer would be unlawful.  To this point, CMS appears to apply a newly devised standard that considers transactions that involve a sale of substantially all of a provider's assets to be changes of ownership.  But that standard has no basis in statute or regulation, and if developed and applied outside of the formal rulemaking

---

[7]     Available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c15.pdf (last visited Aug. 28, 2019).  A copy of the cited section of the manual is attached hereto as **Exhibit D**.

[8]     Available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021929.html (last visited Aug. 28, 2019). A copy of the cited section of the manual is attached hereto as **Exhibit E**.

process would be a violation of section 1871(a)(2) of the Social Security Act – not to mention an unreasonable interpretation of a regulation the meaning of which is plain on its face.

*(2)*     ***To the Extent that the Sale Must Constitute a Change of Ownership, It Does***

61.     To the extent the Court determines that the Debtors must demonstrate a change of ownership in order for the Medicare provider agreement to be transferred pursuant to this Sale, the facts and circumstances of this case demonstrate that the Sale constitutes one.

62.     As noted above, while 42 C.F.R. § 489.18 describes two forms of corporate change of ownership (merger and consolidation), CMS' own practices and precedent make clear that this list is not exclusive.

63.     To reference CMS' own sub-regulatory guidance, changes of ownership may include transactions in which "two or more Medicare-enrolled entities combine," in which a "provider may undergo a[nother] financial or administrative change," in which "the new owner is accepting assignment of the Medicare assets and liabilities of the old owner," and in which a "new owner may propose to relocate the provider."  CMS, Program Integrity Manual, ch. 15, §§ 15.7.7.1.1, 15.7.7.1.2, 15.7.7.1.3.

64.     Here, for the reasons outlined above, the equivalent of a change of ownership has already occurred. The Sale will involve assignment of Medicare assets and, subject to a conventional cap regularly agreed by CMS in bankruptcy proceedings, Medicare liabilities. Upon closing of the Sale, the Consortium will have taken over the last remaining vestiges of Hahnemann's operations – its remaining graduate medical education program assets.  The fact that such operations are being conducted from the Consortium's locations, rather than buildings historically operated by Hahnemann, does not materially alter this determination.

## **CONCLUSION**

For these reasons, the Debtors respectfully submit that the Court should overrule CMS' Objection and approve the Sale.

Dated: August 29, 2019                    **SAUL EWING ARNSTEIN & LEHR LLP**

By:     */s/ Mark Minuti*
        Mark Minuti (DE Bar No. 2659)
        Monique B. DiSabatino (DE Bar No. 6027)
        1201 N. Market Street, Suite 2300
        P.O. Box 1266
        Wilmington, DE  19899
        Telephone: (302) 421-6800
        Fax: (302) 421-5873
        mark.minuti@saul.com
        monique.disabatino@saul.com

                -and-

        Jeffrey C. Hampton
        Adam H. Isenberg
        Aaron S. Applebaum (DE Bar No. 5587)
        Centre Square West
        1500 Market Street, 38th Floor
        Philadelphia, PA 19102
        Telephone: (215) 972-7700
        Fax: (215) 972-7725
        jeffrey.hampton@saul.com
        adam.isenberg@saul.com
        aaron.applebaum@saul.com

        *Counsel for Debtors and Debtors in Possession*