# EXHIBIT C

**The Medicare Provider Agreement: Is It a Contract or Not? And Why Does Anyone Care? Article**

# The Medicare Provider Agreement: Is It a Contract or Not? And Why Does Anyone Care?

*By Samuel R. Maizel and Jody A. Bedenbaugh\**

*The article first considers the conflicting positions taken by the United States Government regarding whether the Medicare Provider Agreement is an executory contract in and outside of bankruptcy court. It examines whether the Government's positions can be reconciled, and if the Government should be barred by preclusion and estoppel principles from asserting in bankruptcy court that a Provider Agreement is an executory contract. The article then discusses whether the Provider Agreement should be treated as an executory contract in bankruptcy, and the implications of such treatment on a bankrupt provider's ability to transfer its Provider Agreement to a purchaser under the Bankruptcy Code and related issues, such as the Government's setoff and recoupment rights and successor liability.*

## INTRODUCTION

For thirty years, the United States Government[1] has successfully argued in federal district and circuit courts nationwide that the Health Insurance Benefit Agreement (commonly referred to, and referred to herein, as a "Medicare Provider Agreement") between the Government, on the one hand, and various providers of healthcare services or goods on the other hand, *is not* a contract between the United States and the provider.[2] Rather, the Government has argued that the Medicare Provider Agreement grants the provider a statutory entitlement.[3] However, during that same period of time, the United States has also successfully

---

* Sam Maizel is a partner in the Los Angeles, California, office of Dentons US LLP; he leads the firm's healthcare industry restructuring efforts. Jody Bedenbaugh is a partner in the Columbia, South Carolina, office of Nelson Mullins Riley & Scarborough LLP. The viewpoints and opinions in this article do not necessarily reflect those of Dentons US LLP, Nelson Mullins Riley & Scarborough LLP, or any of their respective clients. The authors wish to thank Melanie Cyganowski, Kay Kress, Michael Maizel, and Michael Potere for their insightful comments on drafts of this article; and to thank Professor Gregory Duhl for his patience in editing it.

1. The authors use the terms "United States" and "Government" extensively and interchangeably in this article to refer to the federal government and its component agencies, which enter into Medicare Provider Agreements with the various healthcare entities that provide goods and services to Medicare beneficiaries. The primary agency involved in this "transaction" is the Centers for Medicare and Medicaid Services ("CMS"), which is a federal agency within the United States Department of Health and Human Services. Until 2001, CMS was known as the Health Care Financing Administration or "HCFA." *See* 66 Fed. Reg. 35437 (July 5, 2001).

2. *See infra* notes 24, 26, 28–30 & 33–35 and accompanying text.

3. *See infra* note 29.

argued, in federal bankruptcy courts, that the Medicare Provider Agreement *is* a contract.[4] How the Medicare Provider Agreement could be a contract inside of bankruptcy and not a contract outside of bankruptcy is hard to fathom, because the Bankruptcy Code does not define the term "contract" and precedent holds that applicable non-bankruptcy law controls the property rights held by a debtor in bankruptcy.[5] Presumably, then, the non-bankruptcy interpretation of whether a Medicare Provider Agreement is a contract governs in a bankruptcy case.

This inconsistency in treatment is complicated even further by the impact of the Government's argument in bankruptcy, because it means that the Medicare Provider Agreement is, therefore, subject to treatment under section 365 of the Bankruptcy Code. Section 365 of the Bankruptcy Code describes how debtors and trustees in bankruptcy cases deal with executory contracts.[6] The precedent in this area of bankruptcy law is, at best, complicated; courts dealing with issues related to executory contracts have described it as a "thicket . . . where . . . lurks a hopelessly convoluted and contradictory jurisprudence"[7] and referred to this area of law as "psychedelic."[8] Unfortunately, the Medicare provisions of the Social Security Act[9] are similarly complicated; courts have referred to it as "the most completely impenetrable texts within human experience."[10] The result when the two collide is, as one would imagine, difficult for judges, confusing to lawyers, and impossible to sort out for healthcare industry participants.

This article discusses the applicable law on both sides of the issue and concludes that the Medicare Provider Agreement is not a contract for bankruptcy purposes. It discusses why the Government chooses to make these inconsistent arguments and the possible implications if bankruptcy courts hold that Medicare Provider Agreements are not contracts in bankruptcy cases.[11]

---

4. *See infra* note 68 and accompanying text.

5. *See, e.g.,* Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law."); Butner v. United States, 440 U.S. 48, 55 (1979) (noting the determination of property rights is generally governed by state law); Tyler v. DH Capital Mgmt., Inc., 736 F.3d 455, 461 (6th Cir. 2013) ("The nature and extent of property rights in bankruptcy are determined by the 'underlying substantive law.'"); Am. Bankers Ins. Co. v. Maness, 101 F.3d 358, 363 (4th Cir. 1996) (finding that while federal law creates the bankruptcy estate, the determination of property rights is generally governed by applicable state law).

6. 11 U.S.C. § 365 (2012).

7. *In re* Drexel Burnham Lambert Grp., Inc., 138 B.R. 687, 690 (Bankr. S.D.N.Y. 1992) (quoting Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook*, 62 U. Colo. L. Rev. 1, 1 (1991)).

8. *Id.* at 690 (quoting Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn. L. Rev. 227, 228 (1991)).

9. *See* 42 U.S.C. §§ 1395 *et seq.* (2012).

10. Rehab. Ass'n of Va. v. Kozlowski, 42 F.3d 1444, 1450 (4th Cir. 1994) ("There can be no doubt but that the statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning in the process and making any solid grasp of the matters addressed merely a passing phase.").

11. Prior articles dealing with this issue include: Ted A. Berkowitz & Veronique A. Urban, *Medicare Issues in Bankruptcies*, Am. Bankr. J., Aug. 2012, at 28; Frank A. Oswald & Howard P. Magaliff,

## MEDICARE PROVIDER AGREEMENTS

To be able to bill the Medicare program[12] for either providing services to Medicare beneficiaries or selling goods to Medicare beneficiaries, an entity or person must apply to the Government.[13] As one would expect, applying to participate in the Medicare program is complicated. First, the party concerned must file an application for a National Provider Identifier ("NPI"). The NPI is a ten-digit number that the entity or person will use to identify itself in future transactions with the Medicare program. The application is then usually submitted via the CMS's Internet-based Provider Enrollment, Chain and Ownership System ("PECOS"). This method can be used by physicians, non-physician practitioners, provider organizations, and supplier organizations. Each kind of applicant must complete a different kind of form.[14]

Once the applicant has an NPI, the party or person concerned must submit a form and supporting documents (usually online) to the appropriate Medicare fee-for-service contractor[15] serving the appropriate state or region, which then checks the application for completeness and accuracy. If applicable, a physical inspection of the facility is included in the review process. Once the verification and inspection is complete, the packet is forwarded to the Government for final approval.[16]

If the agreement is approved, the applicant will receive a Health Insurance Benefit Agreement (CMS Form 1561, commonly referred to as a "Medicare Provider Agreement") from the Government. The Medicare Provider Agreement's operative language for hospitals follows in its entirety:

---

*Transfer of Medicare Provider Numbers in Bankruptcy: Executory Contract or Saleable Asset*, AM. BANKR. J., May 2009, at 18; Samuel R. Maizel & Debra I. Grassgreen, *Selling Relationships with Governmental Entities*, AM. BANKR. J., Sept. 1999, at 10; Sarah Robinson Borders & Rebecca Cole Moore, *Purchasing Medicare Provider Agreements in Bankruptcy: The Case Against Successor Liability for Prepetition Overpayments*, 24 CAL. BANKR. J. 253 (1998).

12. Medicare is a federal program that funds health insurance primarily for the elderly and disabled, and it was created under Title XVIII of the Social Security Act. Approximately 55 million Americans participate in the Medicare program, which accounts for approximately $600 billion paid out in benefits annually, or 20 percent of all national health expenditures. *See, e.g.*, *The Facts on Medicare Spending and Financing*, HENRY J. KAISER FAM. FOUND., http://kff.org/medicare/fact-sheet/medicare-spending-and-financing-fact-sheet/ (last visited July 30, 2016); Sims v. HHS (*In re* TLC Hosps., Inc.), 224 F.3d 1008 (9th Cir. 2000) (describing statutory and regulatory framework of Medicare reimbursement).

13. *See* 42 U.S.C. § 1395cc.

14. The forms include but are not limited to: CMS-855A, Medicare Enrollment Application for Institutional Providers; CMS-855B, Medicare Enrollment Application for Clinics, Group Practices and Certain Other Suppliers; CMS-855I, Medicare Enrollment Application for Physicians and Non-Physician Practitioners; CMS-855S, Medicare Enrollment Application for Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) Suppliers; and CMS-855POH, Medicare Enrollment Application for Physician Owned Hospitals.

15. Also referred to as "carrier," "fiscal intermediary," "Medicare Administrative Contractor," or the "National Supplier Clearinghouse."

16. *See* 42 C.F.R. §§ 488.1, 488.3, 489.1, 489.2, 489.10 (2016) (describing how a new provider must apply for initial certification). The certification process enables CMS to determine, among other things, that the provider is qualified to provide healthcare services to patients. *See id.* §§ 489.10–489.12 (grounds for denying a Provider Agreement to a new provider).

> In order to receive payment under title XVIII of the Social Security Act, [fill in name of provider] D/B/A . . . as the provider of services, agrees to conform to the provisions of section . . . 1866 of the Social Security Act and applicable provisions in 42 CFR. This agreement, upon submission by the provider of services of acceptable assurance of compliance with title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973 as amended, and upon acceptance by the Secretary of Health and Human Services, shall be binding on the Provider of services and the Secretary. In the event of a transfer of ownership, this agreement is automatically assigned to the new owner subject to the conditions specified in this agreement and 42 CFR 489, to include existing plans of correction and the duration of this agreement, if the agreement is time limited. ATTENTION: read the following provision of federal law carefully before signing. Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent representation or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years or both (18 U.S.C. § 1001).

Thus, the Medicare Provider Agreement itself expressly states that the provider only has to "conform" to the provisions of the Medicare Act. It does not state that the provider is obligated to provide any medical services or supplies.[17] Furthermore, the Medicare Provider Agreement does not mention any obligations imposed on the Government.

The transfer of a Medicare Provider Agreement is strictly controlled by federal regulations. Medicare Provider Agreements can only be assigned if there is a "change of ownership" (commonly referred to as a "CHOW").[18] Most importantly to buyers of healthcare entities, when the Government determines that a CHOW has occurred, the Medicare Provider Agreement is automatically assigned to the new owner,[19] and the new owner becomes liable for liabilities created or incurred by the prior owner.[20] As one circuit court has observed, "[i]f the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner."[21] In other words, assuming the Medicare Provider Agreement generally means assuming successor liability.[22]

---

17. The reference in the Medicare Provider Agreement to the "Secretary" is to the Secretary of the United States Department of Health and Human Services.

18. 42 C.F.R. § 489.18 (2016).

19. *Id.* § 489.18(c); United States v. Vernon Home Health, Inc., 21 F.3d 693, 696 (5th Cir. 1991).

20. *See Vernon Home Health*, 21 F.3d at 696 (citing 42 C.F.R. § 489.18(a), (d)).

21. *In re* Charter Behavioral Health Sys., LLC, 45 F. App'x 150, 151 (3d Cir. 2002).

22. 42 C.F.R. § 489.18(d); Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100, 1103 (8th Cir. 2000) (assignment of Provider Agreement to new owner of a skilled nursing facility made new owner liable for penalties assessed on the basis of former owner's actions); *Vernon Home Health*, 21 F.3d at 696 (assignment to new owner of Medicare Provider Agreement results in liability for overpayments received by prior owner); Eagle Healthcare, Inc. v. Sebelius, 969 F. Supp. 2d 38, 40 (D.D.C. 2013) ("An assigned Provider Agreement is subject to all of the terms and conditions under which it was originally issued.").

## GOVERNMENT ARGUMENTS THAT MEDICARE PROVIDER AGREEMENTS ARE NOT CONTRACTS

Although it is beyond dispute that the United States has the inherent right to use contracts in carrying out its obligations and exercising its powers,[23] for more than thirty years, the United States has argued, with success, in federal litigation nationwide that the Medicare Provider Agreement is *not* a contract.[24] These cases often arise after a regulatory or statutory change to applicable reimbursement schemes. These changes are challenged by providers in courts on contract law grounds.[25] The Government argues against these suits on the basis that unilateral changes to the applicable law do not constitute an impermissible taking because the Medicare Provider Agreements do not create contractual rights.[26] In addition, this issue also arises in False Claims Act[27] cases where the Government is the plaintiff. In such cases, the Government takes the position that it has equitable, rather than contractual, claims.[28]

---

23. United States v. Tingey, 30 U.S. 115 (1831); United States v. Maurice, 26 F. Cas. 1211 (C.C.D. Va. 1823) ("Contract is one of the means necessary to accomplish the objects of the institution of the government, and the capacity of the United States to contract is coextensive with the powers and duties of government.").

24. *See, e.g.*, Mem'l Hosp. v. Heckler, 706 F.2d 1130, 1136 (11th Cir. 1983) ("Upon joining the Medicare Program, however, the hospitals received a statutory entitlement, not a contractual right."); United States *ex rel.* Roberts v. Aging Care Home Health, Inc., 474 F. Supp. 2d 810, 820 (W.D. La. 2007) ("Medicare Provider Agreements create statutory, not contractual, rights."); Maximum Care Home Health Agency v. HCFA, No. 3-97-CV-1451-R, 1998 WL 901642, at \*5 (N.D. Tex. Apr. 14, 1998) ("[A] Medicare service provider agreement is not a contact in the traditional sense. It is a statutory entitlement created by the Medicare Act.").

25. The Contract Clause of the United States Constitution prohibits states from enacting laws that retroactively impair contract rights. U.S. CONST. art. 1, § 10, cl. 1. However, this applies only to state legislation, not federal legislation or court decisions. The Fifth Amendment of the U.S. Constitution is the limitation on the power of Congress to enact laws impairing the obligation of contracts. *See generally* Lynch v. United States, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state or the United States."); Cienega Gardens v. United States, 331 F.3d 1319, 1330 (Fed. Cir. 2003) ("There is . . . ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment."); Elmer W. Roller, *The Impairment of Contract Obligations and Vested Rights*, 6 MARQ. L. REV. 129 (1922).

26. *See, e.g.*, Greater Dallas Home Care Alliance v. United States, 10 F. Supp. 2d 638, 647 (N.D. Tex. 1998) (holding that the provider's "participation agreements are not contracts, for the right to receive payments under the Medicare Act is a manifestation of Government policy and, as such, is a statutory rather than a contractual right"); Home Care Ass'n of Am. Inc. v. United States, No. CIV-98-193-R, 1998 U.S. Dist. LEXIS 20515, at \*17 (W.D. Okla. 1998) (noting the plaintiff providers failed to dispute the Government's "assertion that neither the provider agreements nor the Medicare Act provide contractual rights to a particular method or amount of payment" (internal citations omitted)), *rev'd on other grounds*, No. 98-6364, 2000 U.S. App. LEXIS 23220 (10th Cir. 2000).

27. 31 U.S.C. §§ 3729–3733 (2012). In 2008, 40 percent of False Claims Act recoveries were related to healthcare industry fraud. James B. Helmer, Jr., *False Claims Act: Incentivizing Integrity for 150 Years for Rogues, Privateers, Parasites and Patriots*, 81 U. CIN. L. REV. 1261, 1281 (2013).

28. *See, e.g.*, United States v. Villaspring Health Care Ctr., Inc., No. 3:11-43, 2011 U.S. Dist. LEXIS 145534, at \*7 (E.D. Ky. Dec. 19, 2011) (declining to dismiss unjust enrichment claim because Medicare Provider Agreements create statutory, not contractual, rights); United States v. Medica-Rents Co., 285 F. Supp. 2d 742, 777 (N.D. Tex. 2003) (agreeing with Government's argument, declining to grant summary judgment for provider, and holding that "a contract did not exist between [the provider] and the government").

For example, in 2005 litigation in the United States District Court for the Central District of California, the United States made the following argument:

> The Provider Agreements referenced by defendants are one-page documents that do no more than notify providers of the statutory and regulatory provisions of the Medicare program and do not in themselves convert the [G]overnment's statutory and common law remedies into contractual ones. Under those Agreements, providers "agree[] to conform to the provisions of . . . the Social Security Act and applicable provisions in [the Code of Federal Regulations]." . . . The Agreements impose no duties upon the United States or the Department of Health and Human Services. . . . Importantly, a Provider Agreement imposes no additional duties upon a provider that are not also embodied in the Social Security Act and regulations. Any "breach" of the Agreement by a provider would necessarily be a violation of the Social Security Act and/or the regulations because to determine what duties the provider had breached, one would have to turn to the statute and the regulations. . . . Medicare providers, upon joining the Medicare program, "receive[] a statutory entitlement, not a contractual right." Although the hospitals entered into an "agreement" with the Secretary that they would abide by the rules of the Medicare program, that agreement did not obligate the Secretary to provide reimbursement for any particular expenses.[29]

In another case, in the United States District Court for the District of Columbia, the United States similarly argued that the Medicare Provider Agreement was not a contract between the Government and the provider:

> Second, [the] argument that the parties enjoyed express contractual relationships is untenable. The overwhelming weight of authority rejects any notion that providers participating in Government Health Care Programs have contractual relationships with them. Although provider enrollment applications and materials are often referred to as "agreements," these materials do not establish a contractual relationship—instead providers' rights to reimbursement are statutory in nature. . . . [The defendant's] sole argument in opposition to the Government Parties' unjust enrichment claim is an erroneous contention that the Government Parties' cause of action must be styled as a breach of contract count . . . . This form over substance argument, however, is incorrect as a matter of law. . . . Courts have rejected attempts to characterize Medicare provider "agreements" as contracts. In the context of the Medicare program, the Medicare statute requires providers to enter into an agreement, commonly referred to as a provider agreement, with the Secretary of HHS in order to receive Medicare reimbursement. While the provider "agreement" is a condition for reimbursement, it does not establish a contractual relationship between providers and the United States.[30]

Further, in *United States ex rel. Drakeford v. Tuomey Healthcare System, Inc.*,[31] the United States sued a hospital, the Tuomey Regional Medical Center, for

---

29. United States' Sur-Reply to Tenant's Reply to its Motion for Summary Adjudication (Statute of Limitations) at 2, United States v. Tenant Healthcare Corp., Nos. CV-03-206, CV-04-857, CV-04-859, 2005 WL 3784642 (C.D. Cal. Dec. 22, 2005) (internal citations omitted).

30. Government Parties' Reply in Further Support of Their Motion for Partial Summary Judgment at 2, 4, United States v. Malik, No. 12-1234, 2013 WL 3948074 (D.D.C. June 13, 2013).

31. This long and complicated case involved two jury verdicts and two appeals to the Fourth Circuit. Its history is described in 675 F.3d 394 (4th Cir. 2012) and 792 F.3d 364 (4th Cir. 2015).

violations of the Ethics in Patient Referrals Act,[32] also known as the Stark Law. Tuomey provided services to Medicare beneficiaries pursuant to its Medicare Provider Agreement. The Government asserted alternative causes of action for equitable theories (unjust enrichment and payment by mistake), not for breach of contract. In describing the Medicare Provider Agreement in its second amended complaint, the Government referred to the Medicare Provider Agreement as an "application for participation."[33] Even more directly, in its Opposition to Tuomey's Motion for Summary Judgment on Government's Equitable Claims, the Government distinguished certain cases cited by Tuomey by stating the "two Northern District of Illinois cases cited by Tuomey similarly involved contracts, in contrast to the present case, *which does not*."[34] In another filing in the same case, the Government went on to state:

> Further, Tuomey erroneously argues that the Provider Agreement it signed constituted a "contract" with the government. This argument misconstrues the nature of the Medicare program. The program is a social benefit program for individuals, and the Provider Agreement is the hospital's certification that it will comply with all applicable requirements. As explained by the Seventh Circuit in *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008), the government does not receive any benefit from the services provided to Medicare beneficiaries; no "service" or "product" is provided directly to the government.[35]

The above arguments are typical of those consistently made by the United States in lawsuits throughout the nation with regard to whether the Medicare Provider Agreement is a contract. Moreover, these arguments are generally successful.

Federal circuit courts regularly agree with the Government and lower courts that Medicare Provider Agreements create statutory, rather than contractual, rights. Perhaps the earliest case to address the nature of the Medicare relationship was *Harper-Grace Hospitals v. Schweiker*.[36] In *Harper-Grace*, the United States Court of Appeals for the Sixth Circuit dealt with a situation where a hospital chain claimed it was entitled to reimbursement under the Medicare Act for a percentage of the costs that it incurred because of certain obligations that it had assumed upon receiving federal funds under the Hill-Burton Act.[37] Because the law on this issue had changed while the appeal was pending, the hospitals argued that the change in law was unconstitutional as a violation of the Due Process Clause of the Fifth Amendment.[38] Central to the hospitals' argument was

---

32. 42 U.S.C. § 1395 (2012).

33. Second Amended Complaint at para. 14, Drakeford *ex rel*. United States v. Tuomey Healthcare System, Inc., No. 3:05-cv-2858-MBS (D.S.C. Nov. 12, 2008).

34. United States' Opposition to Defendant's Motion for Summary Judgment on Government's Equitable Claim at 10, Drakeford *ex rel*. United States v. Tuomey Healthcare System, Inc., No. 3:05-cv-2858-MBS (D.S.C. Apr. 15, 2010) (emphasis added).

35. Reply in Support of United States' Motion for Entry of Judgment on Counts IV and V of the Amended Complaint, Drakeford *ex rel*. United States v. Tuomey Healthcare System, Inc., No. 3:05-cv-2858-MBS (D.S.C. July 12, 2013).

36. 708 F.2d 199 (6th Cir. 1983).

37. *Id*. at 200.

38. *Id*.

the alleged existence of a "vested contractual right to reimbursement." The Sixth Circuit rejected this argument, holding that the hospitals had not "shown that the Medicare program established a contractual relationship between the hospital and the federal Government."[39]

Three years later, in *Hollander v. Brezenoff*,[40] the United States Court of Appeals for the Second Circuit also characterized the Medicare Provider Agreement as something other than a contract. Confronted with the issue of whether New York's six-year statute of limitations on contracts applied to a dispute between the Government and a nursing home operator, or whether its three-year statute of limitations applied, the Second Circuit ruled that the three-year statute was applicable.[41] Central to its determination was the characterization of the relationship as a "statutory business relationship."[42] As for the Medicare Provider Agreement, the Second Circuit treated it as incidental to the broader relationship.[43]

More recently, the United States Court of Appeals for the Ninth Circuit drew similar conclusions in *PAMC, Ltd. v. Sebelius*, in which it stated the following about the Medicare Provider Agreement:

> Especially is that true when we consider that the whole notion of importing contract doctrines into an area that is a complex statutory and regulatory scheme is problematic. We have, on occasion, stated that providers and others have contracts with the government in this area, but our decisions have turned on the regulatory regime rather than on contract principles. . . . As the Eleventh Circuit Court of Appeals held when hospitals complained of legislative impairment of their contract rights in this area because they had agreements with the Secretary: "Upon joining the Medicare program, however, the hospitals received a statutory entitlement, not a contractual right."[44]

This is consistent with prior holdings from the Third and Eleventh Circuits.[45]

This position has been repeatedly reaffirmed by federal district courts as well. For example, in *United States ex rel. Roberts v. Aging Care Home Health, Inc.*,[46] the United States District Court for the Western District of Louisiana determined that a breach-of-contract cause of action was not available to recoup losses for Medicare fraud because the Medicare statute did not create contractual rights. Similarly, in *United States ex rel. Academy Health Center, Inc. v. Hyperion Founda-*

---

39. *Id.* at 201.

40. 787 F.2d 834 (2d Cir. 1986).

41. *Id.* at 839.

42. *Id.*

43. *Id.*

44. 747 F.3d 1214, 1221 (9th Cir. 2014) (internal citations omitted).

45. *See* Mem'l Hosp. v. Heckler, 706 F.2d 1130, 1136 (11th Cir. 1983) ("Upon joining the Medicare Program . . . the hospitals received a statutory entitlement, not a contractual right."); Germantown Hosp. & Med. Ctr. v. Heckler, 590 F. Supp. 24, 30–31 (E.D. Pa. 1983) ("There is no contractual requirement requiring [CMS] to provide Medicare reimbursement. Rather, upon joining the Medicare program, providers gain a statutory entitlement to reimbursement."), *aff'd*, 738 F.2d 631 (3d Cir. 1984).

46. 474 F. Supp. 2d 810, 820 (W.D. La. 2007).

*tion, Inc.*,[47] the United States District Court for the Southern District of Mississippi sustained the Government's claim for unjust enrichment because the remedy of breach of contract was not available in the context of Medicare recovery. Relying upon *Roberts*, the district court held that Medicare Provider Agreements were not contracts and, instead, were creatures of statute.[48]

Further, the United States District Court for the Eastern District of Arkansas, in *Southeast Arkansas Hospice, Inc. v. Sebelius*, explained why a Medicare Provider Agreement is not a contract as follows:

> [T]he Secretary [of the United States Department of Health and Human Services] argues first that the provider agreement is a statutory entitlement and not a contract. . . . The Supreme Court has long "maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." "This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state." The party asserting the creation of a contract must overcome this well-founded presumption. The language and circumstances of the statute must evince a clear intent by the legislature to create contractual rights so as to bind the state. . . . The Secretary cites several cases in this area as to Medicare provider agreements, all of which support the Secretary's position that the agreement with SEARK is not a contract. SEARK has cited no legal authority on this issue. Indeed, SEARK makes no argument to overcome the presumption that the law at issue was not intended to create a contract. . . . The Court cannot say that SEARK is likely to succeed on the merits of its unconscionable contract claim. The weight of authority supports a finding that the provider agreement is not a contract.[49]

Thus, outside of bankruptcy, it seems to be settled law that the Medicare Provider Agreement is not a contract between the provider of goods or services and the United States, but merely a license allowing the provider to bill the Medicare program pursuant to the statutory and regulatory scheme when it provides goods or services to Medicare beneficiaries.

## DISCUSSION OF SECTION 365 AS APPLIED TO THE MEDICARE PROVIDER AGREEMENT

The Bankruptcy Code has a specific provision, section 365, that deals with the rights and obligations of debtors and trustees in bankruptcy with regard to "executory contracts."[50] Under this provision, trustees and debtors in possession in bankruptcy generally may decide to assume an executory contract or unexpired lease, assume and assign an executory contract or unexpired lease to a third party, or reject an executory contract or unexpired lease, subject to a number

47. No. 3:10-CV-552, 2014 U.S. Dist. LEXIS 93185, at *163–64 (S.D. Miss. July 9, 2014).
48. *Id.* at *163.
49. 1 F. Supp. 3d 915, 925–26 (E.D. Ark. 2014) (quoting Nat'l R.R. Passenger Corp. v. A.T. & S.F. R. Co., 470 U.S. 451, 465–66 (1985) (quoting Dodge v. Bd. of Educ., 302 U.S. 74, 79 (1937))).
50. 11 U.S.C. § 365 (2012).

of requirements and exceptions which are outside the scope of this article. The Bankruptcy Code does not define "executory contract," but most courts have adopted this definition: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."[51] However, that definition establishes only which contracts are "executory"; it does not establish what constitutes a contract. The definition of "contract" comes from applicable non-bankruptcy law.[52] Fortunately, this is consistent with the federal law outside of bankruptcy:

> [T]he creation and modification of a contractual relationship between the Government and a contractor is, for the most part, determined by common law legal rules. As these rules have been applied to Government contract cases, a body of federal law has developed as the primary source of law in this area. This federal law is generally consistent with the legal rules summarized in the Restatement of Contracts.[53]

Non-bankruptcy federal contract law therefore determines whether the Medicare Provider Agreement is a contract under the Bankruptcy Code. The elements of a contract with the United States are "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States."[54] The federal law of contracts is "generally consistent" with the rules set out in the *Restatement (Second) of Contracts*.[55]

The *Restatement (Second) of Contracts* defines a contract as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."[56] "Promise" is defined as a

---

51. Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973); *see also In re* Murexco Petroleum, Inc., 15 F.3d 60, 62–63 (5th Cir. 1994); *In re* Texscan Corp., 976 F.2d 1269, 1271–72 (9th Cir. 1992); Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (*In re* Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1045 (4th Cir. 1985).

52. *See supra* note 5.

53. John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 151 (2d ed. 1986) (citing Priebe & Sons v. United States, 332 U.S. 407, 411 (1947) ("It is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law.")); *see also* United States v. Standard Rice Co., 323 U.S. 106, 111 (1944) ("Although there will be exceptions, in general the United States as a contractor must be treated as other contractors under analogous situations. When problems of the interpretation of its contract arise the law of contracts governs."); Lynch v. United States, 292 U.S. 571, 579 (1934) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."); Torncello v. United States, 681 F.2d 756, 762 (Ct. Cl. 1982) ("While it is true that the government has the power to abrogate common-law contract doctrines by specific legislation . . . , the general rule must be that common-law doctrines limit the government's power to contract just as they limit the power of any private person.").

54. Hoag v. United States, 99 Fed. Cl. 246, 253 (2011); *see also* Allen v. United States, 100 F.3d 133, 134 (Fed. Cir. 1996).

55. *See, e.g.*, Pac. Gas & Elec. Co. v. United States, 73 Fed. Cl. 333 (2006) (applying *Restatement (Second) of Contracts* to resolve government contract case); Nat'l By-Products, Inc. v. United States, 405 F.2d 1256, 1263 (Ct. Cl. 1969) (same).

56. Restatement (Second) of Contracts § 1 (Am. Law Inst. 1981).

"manifestation of intention to act or refrain from acting in a specified way."[57] In determining whether the Medicare Provider Agreement is a contract, one must look at whether the parties to the agreement are manifesting an intention to act in a specified way.

Earlier this article quoted the Government as arguing that the Medicare Provider Agreement "impose[s] no duties upon the United States or the Department of Health and Human Services,"[58] as well as arguing that the Medicare Provider Agreement "did not obligate the Secretary to provide reimbursement for any particular expenses."[59] What then is the "promise" made by the Government when it enters into the Medicare Provider Agreement, if that agreement imposes no duties on the Government, including no duty to pay for the goods and services obtained for Medicare beneficiaries through the relationship between the provider and the Government?

Additionally, the *Restatement (Second) of Contracts* recognizes that a party's statements may affect whether a contract is formed: "Neither real nor apparent intention that a promise be legally binding is essential to the formation of a contract, but a manifestation of intention that a promise shall not affect legal relations may prevent the formation of a contract."[60] Earlier, this article quoted Government arguments that the Medicare Provider Agreement does not affect the legal relations between the provider and the Government; it does no more than "notify providers of the statutory and regulatory provisions of the Medicare program."[61] That the Government expressly argues that the Medicare Provider Agreement is not a contract is a clear expression by the Government that the Medicare Provider Agreement does not affect legal relations.

The *Restatement (Second) of Contracts* also states that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."[62] However, as shown earlier through the Government's arguments in many cases, the Government has consistently repudiated

---

57. *Id.* § 2; *see also* Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. 264, 270 (2002) ("A promise may be express or implied, but it is to be distinguished from mere statements of intention, opinion or prediction.").

58. Government Parties' Reply in Further Support of Their Motion for Partial Summary Judgment at 2, 4, United States v. Malik, No. 12-1234, 2013 WL 3948074 (D.D.C. June 13, 2013).

59. United States' Sur-Reply to Tenant's Reply to Its Motion for Summary Adjudication (Statute of Limitations) at 2, United States v. Tenant Healthcare Corp., Nos. CV-03-206, CV-04-857, CV-04-859, 2005 WL 3784642 (C.D. Cal. Dec. 22, 2005) (internal citations omitted).

60. RESTATEMENT (SECOND) OF CONTRACTS § 21.

61. *See supra* note 59.

62. *See* RESTATEMENT (SECOND) OF CONTRACTS § 17; *see also* United States v. Travelers Indem. Co., 802 F.2d 1164, 1169 (9th Cir. 1986) (applying *Restatement (Second) of Contracts* § 17); Univ. of V.I. v. Petersen-Springer, 232 F. Supp. 2d 462, 469 (D.V.I. 2002) (same); *see, e.g.*, Lauren E. Miller, *Breaking the Language Barrier: The Failure of the Objective Theory to Promote Fairness in Language-Barrier Contracting*, 43 IND. L. REV. 175, 177–80 (2009) ("The objective theory of contracts states that a party's outward manifestations of assent will bind the party to the contract if the other party could reasonably regard those manifestations as assent. However, a party cannot reasonably regard outward manifestations as assent if he subjectively knows the party making those manifestations means otherwise. Thus, courts apply the objective theory to reach decisions regarding the enforceability of contracts based on the circumstances present between the parties at the time of contracting." (internal citations omitted)).

the notion that the Medicare Provider Agreement is a manifestation of its assent to an exchange because it argues that it promises nothing to the provider in the agreement.[63] Moreover, it has expressly argued that it gets no consideration from the performance by the provider: "the [G]overnment does not receive any benefit from the services provided to Medicare beneficiaries; no 'service' or 'product' is provided directly to the [G]overnment."[64] The Government cannot enter into contracts "under which the government receives nothing."[65]

Additionally, because a contract requires consideration,[66] an agreement such as the Medicare Provider Agreement, which merely requires both parties to adhere to existing statutes and regulations, does not impose legal obligations other than those both parties already owe. The *Restatement (Second) of Contracts* points out that the "[p]erformance of a legal duty owed to a promisor which is neither doubtful nor the subject of an honest dispute is not consideration."[67] Thus, a pre-existing duty is usually not sufficient consideration for a contract. According to the Government, as the Medicare Provider Agreement merely informs the provider to follow applicable rules and statutes, which it has a pre-existing legal duty to do, the Medicare Provider Agreement is not supported by consideration.

## GOVERNMENT POSITION THAT MEDICARE PROVIDER AGREEMENTS ARE CONTRACTS

Despite the seemingly settled proposition that the Medicare Provider Agreement is not a contract but rather creates an entitlement in the provider to provide goods or services to Medicare beneficiaries and then bill the United States, in bankruptcy cases the United States takes the position that the Medicare Provider Agreement is a contract. Notably, the majority of courts have agreed with the Government, but most of these decisions merely state the conclusion without substantive analysis, or the issue otherwise does not appear to have been con-

---

63. *Russell v. Dist. of Columbia*, 747 F. Supp. 72, 79–80 (D.D.C. 1990) ("For the parties to have manifested their mutual assent, they must have exchanged promises.").

64. Reply in Support of United States' Motion for Entry of Judgment on Counts IV and V of Amended Complaint at 5, *Drakeford ex rel. United States v. Tuomey Healthcare System, Inc.*, No. 3:05-cv-2858-MBS (D.S.C. July 12, 2013).

65. *Aviation Contractor Emps., Inc. v. United States*, 945 F.2d 1568, 1573 (Fed. Cir. 1991).

66. *See, e.g.*, Gardiner, Kamya & Assocs., P.C. v. Jackson, 369 F.3d 1318, 1322 (Fed. Cir. 2004) ("[t]o be valid and enforceable, a contract must have . . . consideration to ensure mutuality of obligation").

67. RESTATEMENT (SECOND) OF CONTRACTS § 73; *see, e.g.*, United States v. Travelers Indem. Co., 802 F.2d 1164, 1167 (9th Cir. 1986) ("Although the rule has been subject to criticism . . . performance of a preexisting legal duty is not sufficient consideration."); Pressman v. United States, 33 Fed. Cl. 438, 444 (1995) ("A promise by a government employee to comply with the law does not transform statutory or regulatory obligations to contractual ones" and therefore cannot provide consideration); Floyd v. United States, 26 Cl. Ct. 889, 890–91 (1992) (federal agency's promise to do what it is required to do under federal regulations is "essentially" merely a restatement of a preexisting legal duty, and therefore is not consideration; "[t]hat which one is under a legal duty to do, cannot be the basis for a contractual promise"); Corneill A. Stephens, *Abandoning the Pre-Existing Duty Rule: Eliminating the Unnecessary*, 8 HOUS. BUS. & TAX J. 355, 361 (2008) ("The [pre-existing duty] rule has even been applied where the pre-existing duty was one imposed, not by contract, but by law.").

tested.[68] For example, in *In re Vitalsigns Homecare, Inc.*,[69] the United States Bankruptcy Court for the District of Massachusetts observed that a "majority of bankruptcy courts considering the Medicare provider relationship with the Government conclude that the Medicare provider agreement, with its attendant benefits and burdens, is an executory contract." However, the court did no analysis of the issue itself. Similarly, in *In re University Medical Center*,[70] the United States Court of Appeals for the Third Circuit rejected the contention that the "complexity of the Medicare scheme" excludes a provider agreement from the ambit of section 365. Instead, it concluded that "a Medicare provider agreement easily" fit within the judicial definition of an executory contract.[71] In this decision there is no evidence that the panel considered the Third Circuit's ruling in *Germantown Hospital & Medical Center v. Heckler*,[72] eight years earlier, that the Medicare Provider Agreement created a statutory entitlement rather than a contractual relationship. More recently, in *In re Bayou Shores, SNF, LLC*,[73] the United States Bankruptcy Court for the Northern District of Florida held that the Medicare Provider Agreement was an executory contract. Citing a series of decisions, the court observed that "the majority of courts have concluded that Medicare provider agreements are executory contracts."[74] However, there is no evidence that the bankruptcy court in *Bayou Shores* considered the Eleventh Circuit's ruling in *Memorial Hospital v. Heckler*[75] in 1983 that the Medicare Provider Agreement created a statutory entitlement, and "not a contractual right." The court in *Bayou Shores* employed two approaches in reaching the conclusion that a Medicare Provider Agreement is an executory contract. The first approach examines whether a portion of the contract was unperformed, and whether a party could thus be deemed to be in material breach.[76] The other approach is more of a "functional approach," whereby a court examines the benefits that would run to the estate if the contract were accepted or rejected.[77] Although this is

---

68. *See, e.g.*, IHS of Ga., Inc. v. Michigan (*In re* First Am. Health Care of Ga., Inc.), 219 B.R. 324, 327–28 (Bankr. S.D. Ga. 1998) (treating state Medicaid Provider Agreement as executory contract without substantive analysis); *In re* Heffernan Mem'l Hosp. Dist., 192 B.R. 228, 231 n.4 (Bankr. S.D. Cal. 1996) ("[A] Provider Agreement is a contract providing for advance payments based on estimates and expressly permitting the withholding of overpayments from future advances. . . . A Medicare [P]rovider [A]greement is an executory contract."); Tidewater Mem'l Hosp., Inc. v. Bowen (*In re* Tidewater Mem'l Hosp., Inc.), 106 B.R. 876, 880 (Bankr. E.D. Va. 1989) (stating without analysis the Medicare Provider Agreement was an executory contract); Advanced Prof'l Home Health Care Inc. v. Bowen (*In re* Advanced Prof'l Home Health Care Inc.), 94 B.R. 95, 96 (Bankr. E.D. Mich. 1988) (treatment of Medicare Provider Agreement as executory was apparently not contested by the debtor); Mem'l Hosp. of Iowa City, Inc., 82 B.R. 478 (Bankr. W.D. Wisc. 1988) (same).

69. 396 B.R. 232, 239 (Bankr. D. Mass. 2008).

70. 973 F.3d 1065, 1076 (3d Cir. 1992).

71. *Id.* at 1075 n.13.

72. 738 F.2d 631 (3d Cir. 1984).

73. 525 B.R. 160, 168 (Bankr. M.D. Fla. 2014), *rev'd*, Case No. 8:14-CV-02816-T-30, 2015 U.S. Dist. LEXIS 83390 (M.D. Fla. June 26, 2015).

74. *Id.*

75. 706 F.2d 1130, 1136 (11th Cir. 1983).

76. *See generally In re* Murexco Petroleum, Inc., 15 F.3d 60, 62–63 (5th Cir. 1994); *see generally In re* Texscan Corp., 976 F.2d 1269, 1271–72 (9th Cir. 1992).

77. *See generally In re* Magness, 972 F.2d 689, 693 (6th Cir. 1992).

an interesting analysis, it presumes the Medicare Provider Agreement is a contract and then only attempts to analyze whether it is executory.

Similarly, in *In re Barincoat*,[78] the United States Bankruptcy Court for the District of Connecticut also seemed to start with the premise that a Medicaid Provider Agreement was a contract and referred to the Second Circuit's contrary holding in *Hollander* as "not entirely on point." The court went on to hold that the Medicaid Provider Agreement was not executory.[79]

Although most bankruptcy courts and appellate courts in bankruptcy cases have merely ignored the issue of whether the Medicare Provider Agreement is a contract at all, those courts that have tried to analyze the requirements under the Medicare Provider Agreement have sometimes held that there are mutual obligations arising under the "contract," namely that the healthcare provider is obligated to provide patient services, while the Government is obligated to reimburse the provider. As the United States District Court for the Western District of Pennsylvania observed in *In re Monsour Medical Center*,[80] "Monsour is obligated to provide services to Medicare patients without charge and HHS is obligated to reimburse Monsour. These mutual obligations may be viewed as growing out of either an express contract . . . or an implied in fact contract." This is an interesting observation, given that the express language of the Medicare Provider Agreement provides no such obligations. Moreover, this observation ignores that the United States denies that the Medicare Provider Agreement creates any obligations for the provider to do anything other than conform to statutory and regulatory obligations and denies that the United States is bound to do anything other than do what is required under the applicable statutes and regulations. In other words, despite the court's observation about mutual obligations arising out of the Medicare Provider Agreement, at least one party to the alleged contract denies either party is obligated to do anything as a result of the signing of the agreement.

Despite that most bankruptcy courts have held the Medicare Provider Agreement is an executory contract, some bankruptcy courts have followed the precedent from cases outside of bankruptcy.[81] Approximately two decades ago, bankruptcy courts in *In re BDK Health Management, Inc.*[82] and *Kings Terrace Nursing Home & Health Related Facility v. N.Y. State Department of Social Services (In re Kings Terrace Nursing Home & Health Related Facility)*,[83] reached a result that is consistent with the courts considering the issue outside of bankruptcy: a Medicare Provider Agreement does not create contractual rights but rather is a statutory license establishing rights that can be sold under the Bankruptcy Code.

78. 2014 Bankr. LEXIS 2752, at *12 (Bankr. D. Conn. June 23, 2014).
79. *Id.* at *12–13.
80. 11 B.R. 1014, 1018 (W.D. Pa. 1981).
81. *See, e.g.,* Saint Joseph's Hosp. v. Dep't of Pub. Welfare, 103 B.R. 643, 656 (Bankr. E.D. Pa. 1989) (rejecting a provider's claim for breach of contract in an adversary action relating to certain reimbursement determinations, and noting the Provider Agreement "seems to be merely a form document envisioned to memorialize a hospital's participation in the Medicaid program").
82. No. 98-609-B1, 1998 Bankr. LEXIS 2031, at *16 (Bankr. M.D. Fla. Nov. 16, 1998).
83. No. 91 B 11478, 1995 Bankr. LEXIS 157, at *26 (Bankr. S.D.N.Y. Jan. 26, 1995).

In *In re BDK Health Management*,[84] the United States Bankruptcy Court for the Middle District of Florida, relying on the Second Circuit decision in *Hollander* and its progeny, held that a Medicare Provider Agreement was not an executory contract but instead was a statutory entitlement.[85] In *BDK Health Management*, the debtors moved to sell their Medicare Provider Agreements free and clear of liens, claims, and encumbrances.[86] The bankruptcy court rejected the Government's argument that the Medicare Provider Agreements are executory contracts that must be assumed under section 365 of the Bankruptcy Code. The court held that the rights and duties of the provider and the Government are not set forth in the Medicare Provider Agreement, but rather in applicable law.[87] "For example, HHS is not obligated to reimburse the Debtors for services provided under the [Medicare] '[P]rovider [A]greements.' Moreover, HHS's entitlement to recoup overpayments is similarly statutory and does not arise under these arrangements."[88] The bankruptcy court in *BDK Health Management* thus concluded that a seller did not have to comply with the terms of section 365 of the Bankruptcy Code to effectuate a transfer of a Medicare Provider Agreement.[89] In discussing the majority of cases that hold otherwise, the court noted they were distinguishable because, in "virtually all instances," the parties agreed that the Medicare Provider Agreements created contracts, without challenge from the providers on the contractual nature of the "agreements."[90] Consequently, the court approved the sale of the Medicare Provider Agreements free and clear of the Government's claims and interests, including its right of recoupment.[91]

Similarly, in construing a Medicaid Provider Agreement under analogous state Medicaid[92] law, the court in *Kings Terrace Nursing Home & Health Related Facility v. New York State Department of Social Services (In re Kings Terrace Nursing Home & Health Related Facility* held that the Medicaid Provider Agreement was not an executory contract because "the Debtor's right to reimbursement and the [Government's] right to recover payments do not arise from any contract, but rather from statutory and regulatory requirements completely independent of a contract."[93] The court relied on the Second Circuit's decision

---

84. No. 98-609-B1, 1998 Bankr. LEXIS 2031 (Bankr. M.D. Fla. Nov. 16, 1998).

85. *Id.* at *17.

86. 1998 Bankr. LEXIS 2031, at *4.

87. *Id.* at *5.

88. *Id.* (internal citations omitted).

89. *Id.*

90. *Id.* at *6.

91. *Id.*

92. Medicaid is the joint federal and state program that funds health-care benefits for, among others, poor people, which was created under Title XIX of the Medicare Act. *See generally* Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006); Ravenwood Healthcare, Inc. v. State of Md., Dep't of Health & Mental Hygiene, No. MJG-06-3059, 2007 WL 1657421 (D. Md. June 5, 2007) (both discussing details of the Medicaid program). Although there are similarities between the Medicare Provider Agreement and the Medicaid Provider Agreement sufficient to allow cases dealing with one to be generally applicable to the other, treatment of the Medicaid Provider Agreement is beyond the scope of this article.

93. No. 91B-11478, 1995 Bankr. LEXIS 157, at *26 (Bankr. S.D.N.Y. Jan. 26, 1995).

in *Hollander v. Brezenoff*,[94] where the court affirmed summary judgment against a Medicaid provider on its breach-of-contract claim because the claim did not arise from contract but rather was statutorily determined.

## Does Filing Bankruptcy Transform a Medicare Provider Agreement Into a Contract?

Does the filing of a bankruptcy petition alter the essential nature of the agreement between the parties, turning it from a statutory entitlement agreement to a contract? If the Medicare Provider Agreement is not a contract outside of bankruptcy, the United States offers no explanation as to why the filing of a bankruptcy petition would change the agreement into a contract. The Bankruptcy Code does not define the word "contract," although it is employed, among other places, in section 365. Thus, the definition of "contract" comes from applicable non-bankruptcy law,[95] and applicable non-bankruptcy law, as expressed by federal courts nationwide, universally holds that the Medicare Provider Agreement is not a contract. The Government cannot point to a provision in the Bankruptcy Code that would change an agreement that is not a contract outside of bankruptcy into a contract when a bankruptcy case is commenced, because there is none.

If a Medicare Provider Agreement is not a "contract" outside of bankruptcy—if, using the Government's words, it "imposes no duties upon the United States,"[96] "imposes no duties upon a provider that are not also embodied" in applicable law,[97] and does "not establish a contractual relationship"[98]—then there is nothing in the Bankruptcy Code that would convert its essential nature. So nothing about the filing of a bankruptcy petition should turn this statutory entitlement or license into a contract.

Moreover, a Medicare Provider Agreement does not display any of the characteristics of an enforceable contract under the standards of the *Restatement (Second) of Contracts*, which informs federal law on this issue. For one, it simply does not impose any additional obligations on the provider that do not already exist in the Medicare statutes and regulations. According to the Government, which is the drafter and proponent of the Medicare Provider Agreement, the Medicare Provider Agreement also fails to set forth a single obligation of the Government. Hence, there are no rights or duties under the Medicare Provider Agreement aside from those already imposed under existing law. The seemingly inescapable conclusion is that the Medicare Provider Agreement is an enrollment form, the functional equivalent of a statement of participation or an application for a license or permit to participate in a government program. Consequently,

---

94. 787 F.2d 834 (2d Cir. 1986).
95. *See generally supra* note 5.
96. *See supra* note 29.
97. *See supra* note 29.
98. *See supra* note 30.

they are not "executory contracts" as that term is used under section 365 of the Bankruptcy Code.

In sum, while the courts cited for the "majority" position within bankruptcy reason (if they analyze the issue at all) in terms of the benefits and burdens of the Medicare Provider Agreement that create mutual obligations, the courts in *BDK Health Management* and *Kings Terrace*, along with virtually every court to consider the issue outside of bankruptcy, correctly conclude that these benefits and burdens are statutorily created. It is readily apparent from a review of the Medicare Provider Agreements that they are merely form documents used to memorialize a provider's participation in the Medicare or Medicaid program. Consequently, the Medicare Provider Agreements are not contracts but rather are statutory entitlement licenses.[99]

## WHY DOES IT MATTER?

The treatment of the Medicare Provider Agreement can be an important factor in the resolution of a bankruptcy involving a healthcare industry entity. To bring the highest price for the assets of a hospital, for example, many buyers will need to obtain the Medicare Provider Agreement from the seller-debtor as part of the assets being transferred. Getting a new Medicare Provider Agreement can take months, and during that period of time, the hospital will be treating Medicare beneficiaries without any assurance of being paid for those services.[100] If the Medicare Provider Agreement were a contract, the buyer would have to assume successor liability for monies owed to the Government, including any overpayments from CMS to the seller discovered subsequent to the sale closing and, possibly, even for any fraud allegations against the seller. And because the Govern-

---

99.  As noted earlier, at least one bankruptcy court suggested that even if the Medicare Provider Agreement is not an express contract, perhaps it is an implied-in-fact contract. Implied-in-fact contracts are recognized as enforceable against the United States. *See, e.g.*, Goldings v. United States, 98 Fed. Cl. 470, 479 (2011) ("The elements of a binding contract with the United States are identical for express and implied-in-fact contracts."); CIBINIC & NASH, *supra* note 53, at 179 (citing Balt. & Ohio R.R. v. United States, 261 U.S. 592 (1923)). The *Restatement (Second) of Contracts* defines an implied contract as being created when the conduct of the parties indicates that they have actually manifested their mutual assent but an express offer or acceptance is absent. RESTATEMENT (SECOND) OF CONTRACTS §§ 4, 19 (AM. LAW INST. 1981). There are several ways an implied contract can be created against the Government, including course of conduct and acceptance of benefits. CIBINIC & NASH, *supra* note 53, at 180–82. Whereas the former seems inappropriate to our situation here (it generally relates to a formal contract that has been informally amended by subsequent conduct), the latter seems at least to offer superficial support to the idea that the Medicare Provider Agreement creates an implied contract. It generally requires the Government to accept benefits with the knowledge that the contractor expects to be compensated. CIBINIC & NASH, *supra* note 53, at 181 (citing, *inter alia*, Pac. Mar. Assoc. v. United States, 108 F. Supp. 603 (Ct. Cl. 1952)). However, that the provider conferred a benefit on the Government is not at all clear, because the medical care is not provided to the Government; rather, it is provided to Medicare beneficiaries and the Government's obligation to pay is created by statute, not by contract. In fact, as described earlier, the Government expressly denies that it receives any benefit from the services and products provided to Medicare beneficiaries. *See supra* note 35. Finally, to the extent an implied contract requires the parties to manifest mutual assent, as described earlier, the Government expressly rejects the notion it has agreed to any obligations through the Medicare Provider Agreement. *See supra* note 29.

100.  Delta Health Grp., Inc. v. HHS, 459 F. Supp. 2d 1207, 1210 (N.D. Fla. 2006).

ment and its agents have years to review and audit cost reports filed by the seller, the buyer would have enormous unliquidated contingent liabilities. So, outside of bankruptcy, buyers will adjust for this risk by either reducing the purchase price or escrowing significant amounts of the purchase price for significant periods of time.

However, if a seller can transfer a Medicare Provider Agreement in bankruptcy, the seller may be able to increase the amounts paid or eliminate the escrow requirement. If that transfer is as a contract, however, the Government has leverage over the provider. The Government can demand that any outstanding liabilities be paid as cure of the defaults related to the Medicare Provider Agreement, and it can demand adequate assurance from the buyer. If, however, the seller can transfer the Medicare Provider Agreement as a statutory license, the seller can sell the Medicare Provider Agreement without successor liability and obtain maximum value for the assets being sold.

## ESTOPPEL

Based on the Government's position in numerous cases that Medicare Provider Agreements are not contracts, it should be judicially and equitably estopped from taking a contrary position in bankruptcy cases. Judicial estoppel is an equitable doctrine that "prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding."[101] In *Reynolds v. Commissioner of Internal Revenue*, the court stated:

> The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. The purpose of the doctrine is to protect the courts "from the perversion of judicial machinery." Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against "playing 'fast and loose with the courts,'" "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." Emerson's dictum that "a foolish consistency is the hobgoblin of little minds" cuts no ice in this context.[102]

Judicial estoppel requires three elements: (1) the party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage.[103]

The Government has repeatedly taken the position that Medicare Provider Agreements are not contracts, and the cases cited above are just several examples

---

101. King. v. Herbert J. Thomas Mem'l Hosp., 159 F.3d 192, 196 (4th Cir. 1998) (citations omitted); *see also* Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987); Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982).
102. 861 F.2d 469, 472–73 (6th Cir. 1988) (internal citations omitted).
103. *Id.*; *see also* New Hampshire v. Maine, 532 U.S. 742, 749–51 (2001).

of that position being accepted by courts, thereby defeating providers' claims or defenses based on contract principles. As one specific example, consider the Government's position in *Southeast Arkansas Hospice, Inc. v. Sebelius*.[104] Southeast Arkansas Hospice asserted a cause of action against the Government that its Medicare Provider Agreement was an unconscionable contract, and it sought a preliminary injunction to stay collection of certain repayments. The Government contested the plaintiff's request for a preliminary injunction and moved to dismiss the complaint on the ground that the Medicare Provider Agreement is not a contract.[105] The court agreed with the Government's argument and found the Medicare Provider Agreement was not a contract. As a result, the court denied the provider's request for a preliminary injunction and dismissed the complaint.[106]

The Government's conduct should satisfy the elements of judicial estoppel. First, the position that a Medicare Provider Agreement is an executory contract is factually inconsistent with the position that it is not a contract at all. As discussed above, if the Government owes no duties under the Medicare Provider Agreement, if the provider has no non-statutory duties under the Medicare Provider Agreement, and the parties do not have a contractual relationship, the Medicare Provider Agreement cannot be an executory contract. Second, the Government's prior inconsistent position has been widely accepted by tribunals, as evidenced by the *Southeast Arkansas Hospice* case and other cases discussed earlier in this article. Third, it could be argued that the Government has taken inconsistent positions intentionally for gaining unfair advantage. Certainly, the Government is aware of the positions it takes nationwide in breach-of-contract cases outside of bankruptcy and the positions it takes in bankruptcy cases. Indeed, the Government purposefully alters its position based on the forum: if it is in bankruptcy where a contract counterparty has certain benefits under section 365 of the Bankruptcy Code, the Medicare Provider Agreement is a contract; if the Government is in any other forum in which a provider may have a remedy or a defense based on contract, then the Medicare Provider Agreement is not a contract. The Government's position in *Tenet Healthcare* shows that it is aware of the contrary position taken in bankruptcy. In response to the provider's citation to a bankruptcy case in *Tenet Healthcare*, the Government attempted to limit the

---

104. No. 3:13-CV-00134-KGB (E.D. Ark.). It is immaterial for judicial estoppel purposes that the provider seeking to invoke the doctrine was not a party to many of the cases cited above. *See* Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982) (noting that judicial estoppel, unlike equitable estoppel, does not require privity, as it is "intended to protect the integrity of the judicial process" rather than protecting litigants from less scrupulous opponents); USinternetworking, Inc. v. Gen. Growth Mgmt., Inc. (*In re* USinternetworking, Inc.), 310 B.R. 274, 282 (Bankr. D. Md. 2004) (same).

105. See Defendant's Response to Plaintiff's Application for a Temporary Restraining Order/Preliminary Injunction at 9, Se. Ark. Hospice, Inc. v. Sebelius, No. 3:13-CV-00134-KG (E.D. Ark. Feb. 3, 2014); The Secretary of Health and Human Services' Brief in Support of Motion to Dismiss at 8–9, Se. Ark. Hospice, Inc. v. Sebelius, No. 3:13-CV-00134-KG (E.D. Ark. May 19, 2014).

106. *See* Se. Ark. Hospice, Inc. v. Sebelius, 1 F. Supp. 3d 915 (E.D. Ark. 2014) (denying injunction); Se. Ark. Hospice, Inc. v. Sebelius, No. 3:13-CV-00134-KG, slip op. at 18–19 (E.D. Ark. Mar. 26, 2015) (granting motion to dismiss).

application of the bankruptcy case law, but ultimately asserted "in neither context, bankruptcy nor federal court, are Medicare Provider Agreements enforceable as contracts."[107] Thus, it is clear that it is not by "inadvertence" or "mistake"[108] that the Government's position changes depending on which is more favorable in the particular context.

This situation illustrates the public policy interests served by the doctrine of judicial estoppel. The doctrine is "invoked to prevent a party from playing 'playing fast and loose with the courts,' 'from blowing hot and cold as the occasion demands'; or from attempting 'to mislead the courts to gain unfair advantage.'"[109] In breach-of-contract cases outside of bankruptcy, the Government repeatedly takes the position that Medicare Provider Agreements are not contracts and it owes no contractual obligations to providers to defeat breach-of-contract claims by providers or contract defenses asserted by providers. In bankruptcy, it takes the opposite position, asserting Medicare Provider Agreements are executory contracts, with obligations due both sides, to obtain the benefits afforded to counterparties under section 365 of the Bankruptcy Code. The Government is attempting to "have [its] cake and eat it too,"[110] which is exactly what judicial estoppel is intended to prevent. Consequently, the Government should be estopped from asserting in subsequent bankruptcy cases that Medicare Provider Agreements are contracts.[111]

In addition, if the Government successfully argues in prior litigation with a provider that the Medicare Provider Agreement is not a contract, then the Government should also be equitably estopped from arguing that the Medicare Provider Agreement is a contract in a subsequent bankruptcy proceeding between the same parties. The doctrine of equitable estoppel is "'designed to protect any adversary who may be prejudiced by [an] attempted change of position.'"[112]

---

107. United States' Sur-Reply to Tenant's Reply to Its Motion for Summary Adjudication (Statute of Limitations) at 3, United States v. Tenant Healthcare Corp., No. CV-03-206, 2005 WL 3784642 (C.D. Cal. Dec. 22, 2005).

108. *See* King v. Herbert J. Thomas Mem'l Hosp., 159 F.3d 192, 196 (4th Cir. 1998) (discussing elements and stating judicial estoppel does not apply "where the party's inconsistent positions resulted from inadvertence or mistake").

109. *King*, 159 F.3d at 196 (quoting Lowery v. Stovall, 92 F.3d 219, 223, 225 (4th Cir. 1996)); *see also* Browning Mfg. v. Mims (*In re* Coastal Plains, Inc.), 179 F.3d 197, 205 (5th Cir. 1999) ("[T]he doctrine is intended to protect the judicial system, rather than litigants . . . ."); Shadow Factory Films Ltd. v. Swilley (*In re* Swilley), 295 B.R. 839, 850 (Bankr. D.S.C. 2003) (same).

110. *Lowery*, 92 F.3d at 225 (quoting Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1177 (D.S.C. 1974)).

111. Although it is not without controversy, courts have held that judicial estoppel "applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact or a legal assertion." Helfand v. Gerson, 105 F.3d 530, 535 (9th Cir. 1997); *In re* Cassidy, 892 F.2d 637, 642 (7th Cir. 1990) ("We think that the change of position on the legal questions is every bit as harmful to the administration of justice as a change on an issue of fact."), *cert. denied*, 498 U.S. 812 (1990); Kira A. Davis, *Judicial Estoppel and Inconsistent Positions of Law Applied to Fact and Pure Law*, 89 Cornell L. Rev. 191, 215 (2003). Thus, that the Government's argument is a legal assertion should not bar application of judicial estoppel.

112. First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (*In re* Varat Enters., Inc.), 81 F.3d 1310, 1317 (4th Cir. 1996) (quoting Guinness PLC v. Ward, 955 F.2d 875, 899 (4th Cir. 1992)).

Equitable estoppel applies when four elements are met: (1) the party estopped knew the relevant facts; (2) the party estopped intended for its conduct to be relied or acted upon or the party acting has the right to believe the conduct was so intended; (3) the party acting was ignorant of the true facts; and (4) the party acting relied on the conduct to its injury.[113] In many cases the first two elements are met as the Government certainly knows the nature of the Medicare Provider Agreements and, apparently, intends for providers and courts to rely on its position that the Medicare Provider Agreement is not a contract. Providers should not be expected to foresee that the Government would later completely change its position after it succeeded on its non-contractual claims. In fact, in non-bankruptcy litigation, providers may rely on the Government's position that Medicare Provider Agreements are not contracts by not asserting contract defenses, counterclaims, or contractual damages evidence. Having relied on the Government's position in the non-bankruptcy forum, the provider should be able to go into the bankruptcy court and utilize the remedies under the Bankruptcy Code for statutory licenses and other assets, rather than being faced with the contrary position that Medicare Provider Agreements are now executory contracts that instead must be dealt with under section 365 of the Bankruptcy Code.

In sum, if a Medicare Provider Agreement is not a contract outside of bankruptcy, the doctrines of judicial estoppel and equitable estoppel should prevent the Government from taking the inconsistent position that it is a contract in bankruptcy.[114]

Historically, courts have been reluctant to allow estoppel arguments against the United States,[115] but they have allowed estoppel arguments against the

---

113. *Id.*

114. In addition, if the Government asserts purely non-contractual claims against the provider in pre-bankruptcy litigation, like in *Drakeford*, the related doctrine of claim preclusion may also provide a basis for preventing the Government from asserting new grounds for recovery in the subsequent bankruptcy. Claim preclusion, which in this context is also referred to as the rule against claim splitting, "'prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action.'" Wellin v. Wellin, No. 2:13-CV-1831-DCN, 2014 U.S. Dist. LEXIS 72432, at *10 (D.S.C. May 28, 2014) (quoting Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp., 273 F. App'x 256, 264 (4th Cir. 2008)). Under the doctrine of claim preclusion, a first lawsuit will bar the second claim where there is (i) an identity of causes of action and (ii) an identity of the parties or their privies in the two suits. *Id.* (citing Pueschel v. United States, 369 F.3d 345, 354–55 (4th Cir. 2004)). Claim splitting combined with the federal definition of a cause of action "requires that a plaintiff allege in one proceeding all claims for relief arising out of a single core of operating facts, or be precluded from pursuing those claims in the future." Shaver v. F.W. Woolworth Co., 840 F.2d 1361, 1365 (7th Cir. 1988).

115. Heckler v. Cmty. Health Servs., 467 U.S. 51, 60 (1984) ("It is well settled that the Government may not be estopped on the same terms as any other litigant."). Although courts have been reluctant to apply equitable estoppel in certain contexts against the Government on the same terms as other litigants, more modern cases have moved away from a blanket prohibition. *See generally* 4 KENNETH C. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 20:1–20:6 (2d ed. 1983 & Supp. 1984) (general discussion of estoppel against Government). Courts have allowed equitable estoppel against the Government where "justice and fair play require it," usually based on the presence of affirmative misconduct (as opposed to simple negligence). Bd. of Cty. Comm'rs v. Isaac, 18 F.3d 1492, 1498 (10th Cir. 1994); Watkins v. U.S. Army, 875 F.2d 699, 706–07 (9th Cir. 1989), *cert. denied*, 111 S. Ct. 384 (1990); *see generally* Michael C. Pitore, *Equitable Estoppel: Its Genesis, Development and Application in Government Contracting*, 19 PUB. CONT. L.J. 606 (1990); Renata Petrylaite, *Can the Doctrine of Equitable Estoppel Be Applied Against a Government*, 2

United States when it acts in its proprietary capacity.[116] Although the burden is higher when invoking estoppel against the Government, that burden is not insurmountable.[117] And courts have been more willing to allow judicial estoppel against the Government than equitable estoppel.[118]

It is not always easy to determine whether the Government is acting in its proprietary role as opposed to its sovereign capacity. The United States Court of Appeals for the Ninth Circuit described the difference: "In its proprietary role, the Government is acting as a private concern would; in its sovereign role, the Government is carrying out its unique governmental functions for the benefit of the whole public."[119] In the Medicare context, the distinction can be hard to fathom. By providing the Medicare program the Government is arguably acting in its unique role for the benefit of the public. But it is hard to distinguish between the Government paying a hospital for providing a certain medical procedure and a private insurance company such as Aetna or Blue Cross paying the same hospital for providing the exact same medical procedure. In fact, the Government providing health insurance is indistinguishable from many private concerns that provide health insurance.

## TRANSFER OF MEDICARE PROVIDER AGREEMENT UNDER SECTION 363 OR SECTION 365

If the Medicare Provider Agreement is an executory contract, it must be transferred under section 365 of the Bankruptcy Code, which requires that the debtor assume the Medicare Provider Agreement[120] and then assign it to the party buying the agreement.[121] The Government prefers this approach because section 365 of the Bankruptcy Code requires the debtor to cure existing defaults and then effectively reinstates the contract, as if bankruptcy had not intervened.[122] Additionally,

---

INT'L J. BALTIC L. 97, 101 (2004). Given the clear inconsistencies in the Government's approach, it is hard to see how this is not affirmative misconduct. Affirmative misconduct is defined as affirmative acts of misrepresentation or concealment. *Bd. of Cty. Comm'rs*, 18 F.3d at 1499. Neither can the Government argue that this is simply a mistake, because a single federal agency represents it in most of these cases. The Government's position is almost always presented by the Civil Division of the U.S. Department of Justice, which represents most federal agencies, in most circumstances, in federal litigation, or the local U.S. Attorney's office. HHS has no independent litigation authority.

116. *See, e.g.*, Emeco Indus. Inc. v. United States, 485 F.2d 652 (Ct. Cl. 1973) (per curiam) (applying estoppel in the context of an award of a Government contract).

117. Reynolds v. Comm'r of Internal Revenue, 861 F.2d 469, 474 (6th Cir. 1988).

118. *Id.*

119. United States v. Ga.-Pac. Co., 421 F.2d 92, 101 (9th Cir. 1970).

120. 11 U.S.C. § 365(a) (2012).

121. *Id.* § 365(f)(1); *see, e.g.*, A.R.S.C. Co. v. Rickel Home Ctrs. (*In re* Rickel Home Ctrs., Inc.), 209 F.3d 291, 298–99 (3d Cir. 2000).

122. 11 U.S.C. § 365(b) (2012); *see, e.g.*, Elliott v. Four Seasons Props. (*In re* Frontier Props.)., 979 F.2d 1358, 1367 (9th Cir. 1992) (the debtor that assumes a contract under section 365 must perform "in full, just as if bankruptcy had not intervened."); *In re* Allen, 135 B.R. 856, 864 (Bankr. N.D. Iowa 1992) (assuming a contract under section 365 only allows the debtor to carry on with the contract according to its terms).

transfer of an executory contract under section 365 requires the party taking the contract to provide adequate assurance of future performance.[123]

In the context of a bankruptcy of a Medicare provider, it is not at all uncommon that the reason for the bankruptcy is that the Government or an agent of the Government has determined that the Medicare provider was overpaid during some prior period. In such circumstances, the Government notifies the provider of the alleged overpayment and gives the provider the option of appealing the determination. During the appeal process, however, the provider is expected to reimburse the Government or face offset of ongoing payments. These overpayments are frequently the cause of the bankruptcy filing, and repayment is beyond the ability of the provider. In other words, if it could "cure" the defaults as necessary to assume and assign the provider agreement, it would not be in bankruptcy in the first place.

However, if the Medicare Provider Agreement is a license to treat Medicare beneficiaries and subsequently bill Medicare, it can be sold under section 363 of the Bankruptcy Code. Section 363 of the Bankruptcy Code provides that a debtor can sell assets and the claims of creditors attach to the proceeds of the sale and provides in pertinent part:

> (b) (1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, . . . (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[124]

Although not without controversy, most bankruptcy courts have held that a license issued by a Government agency is property of the bankruptcy estate,[125] is protected by the automatic stay imposed under section 362 of the Bankruptcy Code,[126] and can be sold under section 363 of the Bankruptcy Code.[127] This is

123. 11 U.S.C. § 365(b)(1)(C); *see, e.g.*, Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. 2001); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1301, 1309–10 (5th Cir. 1985).

124. 11 U.S.C. § 363 (2012).

125. *See In re* Nat'l Cattle Cong., Inc., 179 B.R. 588 (Bankr. N.D. Iowa 1995), *remanded*, 91 F.3d 1113 (8th Cir. 1996) (a license is property of the bankruptcy estate and the state's efforts to revoke the license in order to compel the post-petition payment of a pre-petition claim was void); *see also* Bd. of Trade of Chi. v. Johnson, 264 U.S. 1 (1924) (refusing to limit the concept of property to the definition of property under non-bankruptcy law, the court held that a seat on the Chicago Board of Trade, which was not considered property of the seat holder under Illinois law, constituted property of the debtor seat holder's bankruptcy estate); *compare* California v. Farmers Mkts., Inc. (*In re* Farmers Mkts., Inc.), 792 F.2d 1400, 1403 (9th Cir. 1986) (holding debtors take licenses subject to statutory restrictions), *with In re* Hoffman, 65 B.R. 985, 993 (D.R.I. 1986) (holding restrictions on transfer of a license unenforceable where the restrictions are a "legislative device designed to foster the collection of delinquent debts").

126. *In re* Elsinore Shores Assocs., 66 B.R. 723 (Bankr. D.N.J. 1986) (attempt to revoke gaming license to enforce pecuniary interest was a violation of the automatic stay).

127. *In re* Re Tak Commc'ns, 985 F.2d 916 (7th Cir. 1993); *In re* Fugazy Express, Inc., 124 B.R. 426 (S.D.N.Y. 1991); *In re* Smith, 94 B.R. 220 (Bankr. M.D. Ga. 1988).

because the bankruptcy estate is created automatically upon the commencement of the bankruptcy case.[128] The term "estate" is broadly defined and includes all of a debtor's legal or equitable interests in property, whether tangible or intangible, at the commencement of the case.[129] Unlike with regard to what property rights a debtor has, which are determined by applicable non-bankruptcy law (usually state law), it is federal, not state, law that determines what property falls within the bankruptcy estate.[130]

This issue has also been raised in the context of a Medicaid Provider Agreement, in *In re Skyline Manor, Inc.*[131] In *Skyline Manor*, the trustee elected to reject the Medicaid Provider Agreement, which rendered, among other things, a Medicaid depreciation recapture claim an unsecured claim.[132] However, the trustee also proposed to sell the debtor's assets to a third party under section 363 of the Bankruptcy Code, free and clear of the depreciation recapture claim, and in violation of applicable state law, which required any buyer to assume that liability or face not being given a new Medicaid Provider Agreement.[133] The bankruptcy court agreed with the trustee and allowed the sale of the Medicaid Provider Agreement under section 363(f)(5) of the Bankruptcy Code, over the objection of the State of Nebraska.[134]

If bankruptcy courts were to hold that the Medicare Provider Agreement was a license and not an executory contract, the debtor would have some advantages. For example, the Government would not have the right to demand adequate assurance of future performance and would not have the right to demand the cure of any existing defaults. However, to the extent that the Government has the right to approve the CHOW under applicable non-bankruptcy law (here, the Medicare Act), section 363 does not eliminate the need for such approval, except with regard to those issues relating to the debtor's financial condition.[135] Thus, a

---

128. 11 U.S.C. § 541 (2012) (A bankruptcy "estate is comprised of all the following property, where ever located: . . . all legal or equitable interests of the debtor in property as of the commencement of the case."); Taylor v. Freeland & Kronz, 503 U.S. 638, 642 (1992) ("When a debtor files a bankruptcy petition, all of his property becomes property of a bankruptcy estate.").

129. United States v. Whiting Pools, Inc., 462 U.S. 198, 203–05 (1983) ("The reorganization effort would have small chance of success, however, if property essential to running the business were excluded from the estate. Thus, to facilitate the rehabilitation of the debtor's business, all of the debtor's property must be included in the reorganization estate." (internal citations omitted)).

130. *See* Nobelman v. Am. Sav. Bank, 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has left the determination of property rights in the assets of a bankrupt's estate to state law."); Butner v. United States, 440 U.S. 48, 55 (1979); *In re* Booth, 266 B.R. 105, 111 (Bankr. N.D. Ohio 2000).

131. No. BK14-80934, 2014 WL 7239703 (Bankr. D. Neb. Dec. 17, 2014).

132. *Id.* at *2.

133. *Id.* at *1–2.

134. *Id.* at *4.

135. 28 U.S.C. § 959(b) (2012) ("[A] trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."); 11 U.S.C. § 362(b)(4) (2012) ("The filing of a petition [in bankruptcy], . . . does not operate as a stay—under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an ac-

debtor seeking to sell a Medicare Provider Agreement or a buyer seeking to pur-
chase a Medicare Provider Agreement would still have to apply for and obtain a
change of ownership certification from the Government and satisfy any condi-
tions for such a transfer, other than those related to the debtor's failure to
repay Medicare obligations, and other than the buyer's failure to assume succes-
sor liability for such unpaid obligations.

## IMPACT ON GOVERNMENT'S SETOFF AND RECOUPMENT RIGHTS

Setoff is an equitable right of a creditor to deduct a debt it owes to the debtor
from a claim it has against the debtor arising out of a separate transaction. Re-
coupment differs in that the opposing claims must arise from the same transac-
tion.[136] Outside of bankruptcy, the distinction is usually not significant; in bank-
ruptcy, however, the distinction can be important. For example, the Bankruptcy
Code codifies and governs setoff but is silent as to recoupment.[137] Most signifi-
cantly, setoff is available in bankruptcy only when the opposing claims are both
pre-petition claims or both post-petition claims, and setoff is subject to the au-
tomatic stay imposed against creditors by section 362 of the Bankruptcy
Code.[138] Recoupment is not so limited.[139]

Here it is important to understand how bankruptcy courts have dealt with the
Government's right to adjust ongoing post-petition payments to recover pre-
petition debts to the Government. Most courts have held that a sale under sec-
tion 363 of the Bankruptcy Code eliminates setoff rights vis-à-vis the buyer by
permitting a sale free and clear of such interests[140] but that recoupment, being
a defense, is not extinguished by a section 363 sale.[141]

The existence of a contractual relationship between a creditor and a debtor is an
important factor in decisions that a creditor has a right of recoupment against a
debtor (as opposed to a right of setoff). And the Government frequently seeks the
right to recoup from monies owed to a provider any amounts owed by the provider
to the Government. Where the relationship between the creditor and the debtor is
contractual, and the mutual debts arise from the same contract, withholding from
ongoing payments to offset earlier overpayments has frequently been allowed as re-

tion or proceeding by a governmental unit . . . [to] enforce such governmental unit's or organization's
police and regulatory power, including the enforcement of a judgment other than a money judgment,
obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or
organization's police or regulatory power.").

136. *In re* 105 E. Second St. Assocs., 207 B.R. 64, 68 (Bankr. S.D.N.Y. 1997).

137. 11 U.S.C. § 553(a) (2012) ("Except as otherwise provided in this section and in sections 362
and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by
such creditor to the debtor that arose before the commencement of the case under this title against a
claim of such creditor against the debtor that arose before the commencement of the case."); *see gen-
erally* Citizens Bank of Md. v. Strumpf (*In re* Strumpf), 516 U.S. 16 (1995) (discussing setoff rights in
bankruptcy proceedings); Reiter v. Cooper, 507 U.S. 258, 265 n.2 (1993) (discussing recoupment
rights in bankruptcy proceedings).

138. 11 U.S.C. § 362(a) (2012).

139. *In re* McMahon, 129 F.3d 93 (2d Cir. 1997).

140. *In re* Trans World Airlines, Inc., 275 B.R. 712, 718 (Bankr. D. Del. 2002).

141. *Id.* at 719.

coupment.[142] Because recoupment is an equitable defense, most courts recognize that application of the defense of recoupment in a contractual context is appropriate.[143] Where the parties' mutual debts arise out of the contract, recoupment is allowed because "there is but one recovery due on a contract, and that recovery must be determined by taking into account the mutual benefits and obligations of the contract."[144] Still, it is not settled that a ruling that the Medicare Provider Agreement is a contract would compel a conclusion that the Government's right is one of recoupment. Many courts have rejected the argument that because obligations arise from the same contract, they necessarily arise from the same transaction.[145] Although a comprehensive discussion of whether Medicare's right to offset future payments is a right of recoupment or setoff is outside of the scope of this article, if the court determines that the Medicare Provider Agreement is a contractual relationship, it is much more likely to find that the Government's offset rights are those of recoupment rather than setoff. Moreover, as discussed above, courts have held that section 363 sales can cut off a right of setoff, but not a right of recoupment.

Generally, if a Medicare provider can convince the court that the Medicare Provider Agreement creates a statutory entitlement relationship, rather than a contractual relationship, it is much more likely to be able to convince the court that even recoupment rights can be cut off by a sale under section 363 of the Bankruptcy Code. This follows from decisions in cases where the relationship between the Government and the debtor is statutory rather than contractual, such as Social Security beneficiaries or former service members, where courts have held the application of the doctrine of recoupment is questionable.[146]

---

142. *In re* U.S. Abatement Corp., 79 F.3d 393 (5th Cir. 1996) (holding that a right of recoupment existed where both obligations arose from the terms of the contract between the parties); *In re* Flagstaff Realty Assocs., 60 F.3d 1031 (3d Cir. 1995) (where the creditor's claim and the debtor's claim arise from the same lease, there are rights of recoupment); *In re* Coxson, 43 F.3d 189, 193–94 (5th Cir. 1995) (where creditor's and debtor's obligations arise out of the same contract recoupment is appropriate); Distrib. Servs. Ltd. v. Eddie Parker Interests Inc., 897 F.2d 811, 812 (5th Cir. 1990) ("Recoupment is a defense that goes to the foundation of plaintiffs' claim by deducting from plaintiffs' recovery all just allowances or demands accruing to the defendant with respect to the same contract or transaction.").

143. *See supra* note 140.

144. *In re* Alpco, 62 B.R. 184, 188 (Bankr. S.D. Ohio 1986) (quoting *In re* Maine, 32 B.R. 452, 455 (Bankr. W.D.N.Y. 1983)).

145. *See, e.g., In re* Malinowski, 156 F.3d 131, 135 (2d Cir. 1998) ("Where the contract itself contemplates the business to be transacted as discrete and independent units, even claims predicated on a single contract will be ineligible for recoupment."); *In re* Peterson Distrib., Inc., 82 F.3d 956, 960 (10th Cir. 1996) (rejecting "same contract equals same transaction" as "overly simplistic" and holding that recoupment is only available where the obligations "are so closely intertwined that allowing the debtor to escape its obligations would be inequitable"); Univ. Med. Ctr. v. Sullivan (*In re* Univ. Med. Ctr.), 973 F.2d 1065, 1081–82 (3d Cir. 1992) ("same transaction" requirement for recoupment must be narrowly construed); *In re* Furr's Supermarkets, Inc., 320 B.R. 1, 6–7 (Bankr. D.N.M. 2004) ("It is not enough merely that the claims at issue arise out of the same contract; something more must be shown."); *In re* St. Francis Physicians Network, Inc., 213 B.R. 710, 719–20 (Bankr. N.D. Ill. 1997) (the requirements for recoupment "cannot be satisfied merely by showing that the two claims arose under the same contract"); *In re* Thompson, 182 B.R. 140, 147–49 (Bankr. E.D. Va. 1995) ("One contract alone, however, is not sufficient to establish a single transaction, since separate transactions may occur within the confines of the contract.").

146. *Compare* Lee v. Schweiker, 739 F.2d 870 (3d Cir. 1984), *In re* Rowan, 15 B.R. 834 (Bankr. N.D. Ohio 1981), *aff'd*, 747 F.2d 1052 (6th Cir. 1984) (government has no recoupment right to with-

## IMPACT ON SUCCESSOR LIABILITY

The Bankruptcy Code allows debtors to sell assets free and clear of claims, lien, and interests.[147] As mentioned earlier, if a buyer takes an assignment of the Medicare Provider Agreement, the United States will normally impose successor liability upon the buyer. In litigation around the nation, the Government takes the position that transfer of a Medicare Provider Agreement automatically results in successor liability on the entity taking the Medicare Provider Agreement, including being subject to the Government's recoupment rights.[148] However, if a debtor sells its Medicare Provider Agreement pursuant to section 363 of the Bankruptcy Code, it will argue that section 363(f) of the Bankruptcy Code allows it to sell the agreement "free and clear of any interest in such property," including any successor liability.[149]

Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined in the Bankruptcy Code. However, courts have frequently held that the scope of section 363(f) is not limited to *in rem* interests.[150] The Second, Third, Fourth, and Sev-

---

hold Social Security benefits "earned" post-petition to collect pre-petition debt), *In re* Vance, 298 B.R. 262, 267 (Bankr. E.D. Va. 2003) ("In order for the doctrine [of recoupment] to apply, . . . the source of the defendant's claims must be a contract, as opposed to a government entitlement program."), *and In re* Howell, 4 B.R. 102 (M.D. Tenn. 1980) (no recoupment of past overpayments under statutory entitlement program from future benefits), *with* Meyer v. Kan. Dep't of Labor (*In re* Meyer), 521 B.R. 918 (Bankr. D. Mo. 2014), *In re* Adamic, 291 B.R. 175, 184–85 (Bankr. D. Colo. 2003) (allowing state recoupment of prior overpaid unemployment benefits from post-petition benefits), *In re* Snodgrass, 244 B.R. 353 (Bankr. W.D. Va. 2000) (state entitled to exercise statutory right to recoup special separation benefit previously paid by deducting it from disability benefits), *In re* Gaither, 200 B.R. 847 (Bankr. S.D. Ohio 1996) (state does not violate the stay by recouping pre-petition overpayment from ongoing post-petition unemployment compensation because it is in the nature of a societal contract), *In re* Ross, 104 B.R. 171 (E.D. Mo. 1989) (allowing recoupment of unemployment compensation benefits), *In re* Keisler, 176 B.R. 605, 607 (Bankr. M.D. Fla. 1994) (government entitled to recoup prior overpayments from ongoing disability payments), *and In re* Newman, 35 B.R. 97, 99 (Bankr. W.D.N.Y. 1983) (government entitled to withhold disability benefits "earned" post-petition to offset lump sum severance payment made pre-petition where both "resulted" from same disability incident).

147. *See* 11 U.S.C. § 1123(a)(5)(D) (2012) (providing a sale of property of the estate "either subject to or free of any lien" as an example of a means for implementing a plan); *id.* § 1129(b)(2)(A)(ii) (allowing sale free and clear of liens to satisfy fair and equitable requirement for cram down); *id.* § 1141(c) ((stating property dealt with in the plan "is free and clear of all claims and interests of creditors").

148. Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100, 1103–04 (8th Cir. 2000) (noting that when a new owner of a skilled nursing facility assumes an existing Medicare Provider Agreement, it becomes liable for obligations owed by the prior owner); United States v. Vernon Home Health, Inc., 21 F.3d 693, 696 (5th Cir. 1994) (holding that purchaser of home health agency that takes assignment of Medicare Provider Agreement is liable for seller's overpayment liabilities), *cert. denied*, 513 U.S. 1015 (1994); Delta Health Grp., Inc. v. HHS, 459 F. Supp. 2d 1207, 1221 (N.D. Fla. 2006) ("[C]ourts have *uniformly* interpreted the [Medicare] regulations to apply to and justify successor liability for [Civil Monetary Penalties] meaning that the new owner who assumes an existing [Medicare] [P]rovider [A]greement and number instead of applying for a new one will be responsible for the prior owner's liabilities.").

149. 11 U.S.C. § 363(f) (2012).

150. *See, e.g.*, Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 258 (3d Cir. 2000) (holding that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute").

enth Circuits, and many lower courts, have applied an expansive interpretation of "any interest" to include not only *in rem* interests in property but also other obligations that may "arise from the property being sold."[151]

For example, in *In re Trans World Airlines, Inc.*, the United States Court of Appeals for the Third Circuit specifically addressed the scope of the term "any interest."[152] The Third Circuit observed that although some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is toward "a more expansive reading of 'interests in property,' which 'encompasses other obligations that may flow from ownership of the property.'"[153]

The United States Court of Appeals for the Fourth Circuit considered what constitutes "interests" with regard to a bankruptcy sale under section 363 of the Bankruptcy Code in *United Mine Workers of America 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.).*[154] In *Leckie Smokeless*, the debtors were signatories to coal wage agreements and thus responsible for certain retiree health benefit obligations under the agreements and related federal statutes. In determining whether the obligations were "interests," the court first declined to limit the term to *in rem* interests.[155] Rather, the court held that the obligations were "interests" because of the relationship between the creditors' rights to payment and the use to which the debtors put their assets.[156] The Fourth Circuit reasoned that the rights to collect payments were interests because they are "are grounded, at least in part, in the fact that [the assets being sold] have been employed for coal mining purposes."[157] In reaching its conclusion, the *Leckie Smokeless* court cited *P.K.R. Convalescent Centers, Inc. v. Virginia (In re P.K.R. Convalescent Centers, Inc.)*[158] with approval. *P.K.R. Convalescent Centers* involved the Virginia Medicaid program's claim for depreciation recapture, which, under state law, it could collect from a purchaser and set off against future Medicaid reimbursements.[159] The bankruptcy court in that case held that the state's recapture rights were "interests," and thus the state law was preempted by section 363(f) of the Bankruptcy Code and cut off by the bankruptcy sale.[160]

In the bankruptcy of a Medicare provider, the Government's recoupment claims are arguably analogous to the benefit obligations in *Leckie Smokeless* and the depreciation recapture rights in *P.K.R. Convalescent Centers* and

---

151. *In re* Grumman Olson Indus. Inc., 467 B.R. 694, 702–03 (S.D.N.Y. 2012); *see also* Precision Indus., Inc. v. Qualitech Steel SBQ, LLC, 327 F.3d 537, 545 (7th Cir. 2003) (the term "any interest" in section 363(f) includes a lessee's possessory interest in a Chapter 11 debtor's real property).

152. 322 F.3d 283 (3d Cir. 2003).

153. *Id.* at 289–90.

154. 99 F.3d 573 (4th Cir. 1996).

155. *Id.* at 582.

156. *Id.*

157. *Id.*

158. 189 B.R. 90 (Bankr. E.D. Va. 1995).

159. *Id.* at 91–92.

160. *Id.* at 94.

*WBQ Partnership v. Virginia Department of Medicine Assistance Services (In re WBQ Partnership)*.[161] As such, using the test articulated by the Fourth Circuit in *Leckie Smokeless*, there is a relationship between the right to assert recoupment and the debtor's use of the asset (providing services to Medicare beneficiaries). In short, the Government's alleged right is grounded in the asset (the Medicare Provider Agreement) that the debtor will seek to use or sell.

Further, the Fourth Circuit specifically endorsed that sales under section 363 could be accomplished free and clear of statutory rights such as the Government's right of recoupment, stating, "Congress has given no indication that bankruptcy courts cannot order property sold free and clear of interests that Congress has itself created by statute."[162] Consequently, applying the guidelines as set forth in *Leckie Smokeless*, the Government's alleged recoupment rights are "interests" that can be avoided pursuant to a free-and-clear sale under the Bankruptcy Code.[163]

In *In re Chrysler, LLC*,[164] the United States Court of Appeals for the Second Circuit, employing a broad reading of "any interest" in section 363(f), held that the bankruptcy court was permitted to authorize the sale of substantially all of the debtor's automobile manufacturing assets pursuant to section 363(f) free and clear of claims arising from the property being sold, including liability for tort claims.[165] More recently, in *Massachusetts Department of Unemployment Assistance v. OPK Biotech, LLC (In re PBBPC, Inc.)*,[166] the Bankruptcy Appellate Panel for the First Circuit held that the right of the Commonwealth of Massachusetts to treat a purchaser of substantially all of the assets of a Chapter 11 debtor as a "successor employer," to which the Commonwealth could apply the debtor's experience rating for purposes of calculating the purchaser's unemployment insurance contribution requirements, fell within the term "any interest," of which the debtor's assets could be sold free and clear. Its holding was based in part on the finding that:

> [T]he transfer of an employer's contribution rate to a successor asset purchaser is really an attempt to recover the money that the predecessor employer would have paid if it had continued in business. The liability for the increased rate thus follows any purchase of substantially all of the assets of an employer. The transfer of those assets alone, not the continuation of the Debtor's business, is sufficient to trigger the imposition of successor liability on a purchaser.[167]

Similarly, in *In re Tougher Industries*,[168] the bankruptcy court held that the right of the New York State Department of Labor to use the debtor's experience

---

161. 189 B.R. 97, 105 (Bankr. E.D. Va. 1995) (holding that Commonwealth of Virginia's right to recapture depreciation is an "interest" as that term is used in section 363 of the Bankruptcy Code).

162. *Leckie Smokeless*, 99 F.3d at 586.

163. *See also In re* BDK Health Mgmt., Inc., No. 98-609-B1, 1998 Bankr. LEXIS 2031, at *6 (authorizing the sale of the provider agreement free and clear of the Government's right to recoup future payments from the buyer).

164. 576 F.3d 108, 126 (2d Cir.), *vacated as moot sub nom.* Ind. State Police Pension Tr. v. Chrysler, LLC, 130 S. Ct. 1015 (2009).

165. *Id.* at 126; *see also In re* Gen. Motors Corp., 407 B.R. 463 (Bankr. S.D.N.Y. 2009).

166. 484 B.R. 860 (1st Cir. B.A.P. 2013).

167. *Id.* at 869.

168. Nos. 06-12960, 07-10022, 2013 WL 1276501 (Bankr. N.D.N.Y. Mar. 27, 2013).

rating to determine the buyer's tax liability as successor to the debtor was an "interest" in property, of which the debtor's assets could be sold free and clear.

Thus, courts in bankruptcy proceedings have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes such assets free from successor liability resulting from pre-existing claims.[169] The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the debtor's pre-sale conduct. Under section 363(f) of the Bankruptcy Code, the buyer is entitled to know that the debtor's assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, debtors have powerful arguments that an order approving the sale of a Medicare Provider Agreement under section 363 of the Bankruptcy Code should state that the successful bidder is not liable as a successor, under any theory of successor liability, for claims that encumber or relate to the assets being sold.

## Section 525 Impact

Section 525(a) of the Bankruptcy Code is a governmental anti-discrimination provision that provides, in pertinent part:

[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the

---

169. *See* MacArthur Co. v. Johns-Manville Corp. (*In re* Johns-Manville Corp.), 837 F.2d 89, 93–94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); Am. Living Sys. v. Bonapfel (*In re* All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims based on successor doctrine precluded after sale of assets free and clear); *In re* Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); *In re* New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free-and-clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees). Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. *See, e.g.*, Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (*In re* White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of the Bankruptcy Code).

debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.[170]

This provision prohibits the Government from punishing a debtor for, among other things, failing to pay a dischargeable debt. As one can see from the plain language of section 525 of the Bankruptcy Code, contracts are not expressly mentioned in the list of relationships covered by section 525. For this reason, commentators agreeing with the argument that the Medicare Provider Agreement is a contract have argued that the Medicare Provider Agreement is not covered by section 525 of the Bankruptcy Code because it is not a "license, permit, charter, franchise or other similar grant" as enumerated by section 525.[171] However, a determination that the Medicare Provider Agreement is a contract is not necessarily fatal to a debtor's invocation of section 525. Some courts have held that although the word "contracts" is not included in section 525's text, the enumerated examples were not intended to be exclusive, and the section was intended to reach the grant or renewal of Government contracts.[172]

If a Medicare Provider Agreement is treated as a statutory license rather than an executory contract, it is squarely within the parameters of section 525(a).[173] Thus, debtors in bankruptcy may have a ground for thwarting the Government's efforts to recoup overpayments or suspend or terminate their Medicare Provider Agreement in bankruptcy. For example, in *Health Care Financing Administration v. Sun Healthcare Group, Inc. (In re Sun Healthcare Group, Inc.)*,[174] the Government informed the provider, which was a debtor in bankruptcy, that its participation in the Medicare and Medicaid programs would not be reinstated because of two outstanding overpayments and civil penalties owed to the Medicare program. The debtor then moved pursuant to sections 105(a)[175] and 525(a) of the Bankruptcy Code to compel the Government to recertify the debtor or, in the alternative, to allow the debtor to pay the pre-petition debts.[176] The bankruptcy

---

170. 11 U.S.C. § 525(a) (2012).

171. E.H. Sperow, *Section 525(a) of the Bankruptcy Code Plainly Does Not Apply to Medicare Provider Agreements*, 34 J. HEALTH L. 487 (2001).

172. *See, e.g.*, *In re* Exquisito Servs., Inc., 823 F.2d 151 (5th Cir. 1987) (holding that the Government's refusal to renew a contract solely on the basis of the debtor's bankruptcy was a violation of section 525(a)).

173. *See, e.g.*, FCC v. Nextwave Personal Commc'ns Inc., 537 U.S. 293 (2003) (finding cancellation of FCC license a violation of section 525).

174. Nos. 99-3657, 99-3841, 2002 U.S. Dist. LEXIS 17868 (D. Del. 2002).

175. Section 105(a) of the Bankruptcy Code provides, in pertinent part:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a) (2012). Though seemingly broad, section 105 has limits. *See, e.g.*, *In re* Southmark Corp., 49 F.3d 1111, 1116 (5th Cir. 1995) (section 105 does not authorize bankruptcy courts "to act as a roving commissions to do equity").

176. Health Care Fin. Admin. v. Sun Healthcare Grp., Inc. (*In re* Sun Healthcare Grp., Inc.), Nos. 99-3657, 99-3841, 2002 U.S. Dist. LEXIS 17868, at *2 (D. Del. 2002).

court granted the debtor's motion, and the Government appealed.[177] On appeal, the district court considered whether the Medicare Provider Agreement is a license or "other similar grant" for purposes of section 525(a).[178] The Government argued that, because the Medicare Provider Agreements are executory contracts, they could not be covered under section 525 of the Bankruptcy Code. The district court disagreed, finding that the Third Circuit precedent[179] stating that the Medicare Provider Agreement was an executory contract did not address the applicability of section 525.[180] Rather, the district court noted that the Government "has never refuted the argument that without the provider agreement, the providers will lose the governmental benefit of compensation for their services."[181] As a result, the district court held that "although the Medicare Provider Agreement may not be a license in the strictest sense of the word, it is clearly similar to a license for section 525 purposes."[182] The court then found that the Government had discriminated against the debtor in violation of section 525 and affirmed the ruling of the bankruptcy court.

The Government will likely argue that it has the right to deny the transfer of the Medicare Provider Agreement because it has the regulatory authority to do so under the Medicare Act. It will also likely argue that because failure to pay obligations by a debtor (or assume the responsibility for paying those obligations by a buyer) is a violation of applicable statute and regulations, the Medicare Provider Agreement cannot be transferred without successor liability. However, the United States Supreme Court, in *FCC v. Nextwave Personal Communications Inc.*,[183] rejected a similar argument by the Federal Communications Commission:

> The FCC has not denied that the proximate cause for its cancellation of the licenses was NextWave's failure to make the payments that were due. It contends, however, that § 525 does not apply because the FCC had a "valid regulatory motive" for the cancellation. In our view, that factor is irrelevant. When the statute refers to failure to pay a debt as the sole cause of cancellation ("solely because"), it cannot reasonably be understood to include, among the other causes whose presence can preclude application of the prohibition, the governmental unit's motive in effecting the cancellation. Such a reading would deprive § 525 of all force. It is hard to imagine a situation in which a governmental unit would not have some further motive behind the cancellation—assuring the financial solvency of the licensed entity, or punishing lawlessness, or even (quite simply) making itself financially whole. Section 525 means nothing more or less than that the failure to pay a dischargeable debt must alone be the proximate cause of the cancellation—the act or event that triggers the agency's decision to cancel, whatever the agency's ultimate motive in pulling the trigger may be.[184]

177. *Id.* at *3.
178. *Id.* at *5.
179. Univ. Med. Ctr. v. Sullivan (*In re* Univ. Med. Ctr.), 973 F.2d 1065 (3d Cir. 1992).
180. *Sun Healthcare Grp.*, 2002 U.S. Dist. LEXIS 17868, at *5.
181. *Id.* at *6.
182. *Id.*
183. 537 U.S. 293 (2003).
184. *Id.* at 300 (internal citations omitted).

Thus, as long as the proximate cause of the Government's refusal to allow the transfer of the Medicare Provider Agreement relates to the unsatisfied financial obligations of the debtor to the Government, for the Government to impose successor liability or refuse to recognize the buyer as taking an assignment of the Medicare Provider Agreement without successor liability would be a violation of section 525 of the Bankruptcy Code.

## Conclusion

For three decades bankruptcy courts have allowed the Government to argue that the Medicare Provider Agreement is an executory contract, despite the Government's strong arguments outside of bankruptcy that the Medicare Provider Agreement is not a contract, but merely the equivalent of a license creating a statutory entitlement to participate in the Medicare Program under existing statute and regulations. The Government's attempt to "have its cake and eat it too" should be rejected by courts. Instead, courts should require the United States to pick a position and adhere to it. Moreover, there are powerful arguments that a Medicare Provider Agreement has none of the characteristics of a contractual relationship and, in fact, that the Government itself rejects that the Medicare Provider Agreement is a contract outside of bankruptcy should be dispositive, as a matter of contract law, estoppel, and common sense. Instead, bankruptcy courts should recognize that the Medicare Provider Agreement is a license that can be sold under section 363 of the Bankruptcy Code, free and clear of interests, including successor liability.