# **EXHIBIT D**

## **Provisions of the CMS Program Manual**

created in PECOS. (This does not apply to ambulatory surgical centers and portable x-ray suppliers. These entities can submit a TIN change as a change of information unless a change of ownership is involved. If the latter is the case, the applicable instructions in sections 15.7.8.2.1 through 15.7.8.2.1.2 of this chapter should be followed.)

- If the provider or supplier is adding or changing a practice location and the new location is in another state within the contractor's jurisdiction, the contractor shall ensure that the provider or supplier meets all the requirements necessary to practice in that State (e.g., licensure). A complete Form CMS-855 or Form CMS-20134 for the new State is not required, though the contractor shall create a new enrollment record in PECOS for the new state.

- All members of a group practice must be entered into PECOS.

## 15.7.7 – Special Processing Guidelines for Form CMS-855A Applications
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

Unless otherwise stated, all references to the "RO" in sections 15.7.7.1 through 15.7.7.7 of this chapter refer to the RO's survey & certification staff.

### 15.7.7.1 - Changes of Ownership (CHOWs)
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

Changes of ownership (CHOWs) are officially defined in and governed by 42 CFR §489.18 and Publication 100-07, chapter 3, sections 3210 through 3210.5(C). The RO – not the contractor – makes the determination as to whether a CHOW has occurred (unless this function has been delegated).

Unless specified otherwise, the term "CHOW" - as used in sections 15.7.7.1 through 15.7.7.1.6 of this chapter - includes CHOWs, acquisitions/mergers and consolidations.
Though section 2 of the Form CMS-855A separates the applicable transactions into CHOWs, acquisition/mergers and consolidations for ease of disclosing and reporting, they fall with the general CHOW category under 42 CFR §489.18 (e.g., an acquisition/merger is a type of CHOW under §489.18).

### 15.7.7.1.1 - Definitions
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

For purposes of provider enrollment only, there are three main categories of CHOWs captured on the Form CMS-855A application:

- **"Standard" CHOW** – This occurs when a provider's CMS Certification Number (CCN) and provider agreement are transferred to another entity as a result of the latter's purchase of the provider. To illustrate, suppose Entity A is enrolled in Medicare, but Entity B is not. B acquires A. Assuming all regulatory requirements are met, A's provider agreement and CCN number will transfer to B.

This is the most frequently encountered change of ownership scenario. As explained in section 15.7.7.1, even though it is technically an acquisition (i.e., B bought/acquired A) under § 489.18, this situation falls under the "CHOW" category – as opposed to the "Acquisition/Merger" category – on the Form CMS-855A.

- **Acquisition/Merger** - In general, this occurs when two or more Medicare-enrolled entities combine, leaving only one remaining CCN number and provider agreement. For instance, Entity A and Entity B are both enrolled in Medicare, each with its own CCN number and provider agreement. The two entities decide to merge. Entity B's CCN number and provider agreement will be eliminated (leaving only Entity A's CCN number and provider agreement).

If the acquisition results in an existing provider having new owners but keeping its existing provider number, the applicant should check the CHOW box in section 1A of the Form CMS-855A.

Unlike the new owner in a CHOW or consolidation, the new owner in an acquisition/merger need not complete the entire Form CMS-855A. This is because the new owner is already enrolled in Medicare. As such, the provider being acquired should be reported as a practice location in section 4 of the new owner's Form CMS-855A.

- **Consolidations** - This occurs when the merger of two or more Medicare-enrolled entities results in the creation of a brand new entity. To illustrate, if Entities A and B decide to combine and, in the process, create a new entity (Entity C), the CCN numbers and provider agreements of both A and B will be eliminated. Entity C will have its own CCN number and provider agreement.

Note the difference between acquisitions/mergers and consolidations. In an acquisition/merger, when A and B combine there is one surviving entity. In a consolidation, when A and B combine there are no surviving entities. Rather, a new entity is created – Entity C.

Under 42 CFR §489.18(a)(4), the lease of all or part of a provider facility constitutes a change of ownership of the leased portion. If only part of the provider is leased, the original provider agreement remains in effect only with respect to the un-leased portion. (See Publication 100-07, chapter 3, section 3210.1D (4) for more information.)

Note that a provider may undergo a financial or administrative change that it

considers to be a CHOW, but does not meet the regulatory definition identified in §489.18.

## 15.7.7.1.2 - Examining Whether a CHOW May Have Occurred
**(Rev. 499, Issued: 12-27-13, Effective: 01-28-14, Implementation: 01-28-14)**

As stressed in section 15.7.7.1, the RO – not the contractor – determines whether a CHOW has occurred (unless this function has been delegated).  However, in processing the application, the contractor shall perform all necessary background research regarding whether: (1) a CHOW may have occurred, and/or (2) the new owner is accepting assignment of the Medicare assets and liabilities of the old owner.  Such research may include reviewing the sales agreement or lease agreement, contacting the provider(s) to request clarification of the sales agreement, etc.  (A CHOW determination by the RO is usually not required prior to the contractor making its recommendation.)

While a CHOW is usually accompanied by a tax identification number (TIN) change, this is not always the case.  There may be isolated instances where the TIN remains the same.  Conversely, there may be cases where a provider is changing its TIN but not its ownership.  In short, while a change of TIN (or lack thereof) is evidence that a CHOW may or may not have occurred, it is not the most important factor; rather, the change in the provider's ownership arrangement is.  Hence, the contractor should review the sales/lease agreement closely, as this will help indicate whether a CHOW may or may not have occurred.

In addition:

(1) If the provider claims that the transaction in question is a stock transfer and not a CHOW, the contractor reserves the right to request any information from the provider to verify this (e.g., copy of the stock transfer agreement).

If – after performing the necessary research – the contractor remains unsure as to whether a CHOW has occurred and/or whether the new owner is accepting assignment, the contractor may refer the matter to the RO for guidance.  Such referrals to the RO should only be made if the contractor is truly uncertain as to whether a CHOW and/or acceptance of assignment may have taken place and should not be made as a matter of course. A RO CHOW determination is usually not required prior to the contractor making its recommendation.

(2) There may be instances where the contractor enters a particular transaction into the Provider Enrollment, Chain and Ownership System (PECOS) as a CHOW, but it turns out that the transaction was not a CHOW (e.g., was a stock transfer; was an initial enrollment because the new owner refused to accept the Medicare liabilities). If the contractor cannot change the transaction type in PECOS, it can leave the record in a CHOW status; however, it should note in the provider's file that the transaction was not a CHOW.

## 15.7.7.1.3 - Processing CHOW Applications
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

Unless stated otherwise in this chapter, the contractor shall ensure that all applicable sections of the Form CMS-855A for both the old and new owners are completed in accordance with the instructions on the Form CMS-855A.

**A. Old Owners**

The old owner's Form CMS-855A CHOW application does not require a recommendation for approval. Any recommendations will be based on the CHOW application received from the new owner.

If the old owner's Form CMS-855A is available at the time of review, the contractor shall examine the information thereon against the new owner's Form CMS-855A to ensure consistency (e.g., same names). If the old owner's Form CMS-855A has not been received, the contractor shall contact the old owner and request it. However, the contractor may begin processing the new owner's application without waiting for the arrival of the old owner's application. It may also make its recommendation to the State agency without having received the old owner's Form CMS-855A. The contractor, of course, shall not make a recommendation for approval unless the new owner has checked on the form that it will assume the provider agreement and the terms of the sales agreement indicate as such.

If a certification statement is not on file for the old owner, the contractor shall request that section 6 be completed for the individual who is signing the certification statement.

Note that an old owner's Form CMS-855A CHOW application is essentially the equivalent of a Form CMS-855 voluntary termination submission, as the seller is voluntarily leaving the Medicare program. As such, the contractor shall not require the seller to submit a separate Form CMS-855 voluntary termination along with its Form CMS-855A CHOW application.

**B. New Owners**

If a Form CMS-855A is not received from the new owner within 14 calendar days of receipt of the old owner's Form CMS-855A, the contractor shall contact the new owner. If the new owner fails to: (1) submit a Form CMS-855A and (2) indicate that it accepts assignment of the provider agreement, within 30 calendar days after the contractor contacted it, the contractor shall stop payments unless the sale has not yet taken place per the terms of the sales agreement. Payments to the provider can resume once this information is received and the contractor ascertains that the provider accepts assignment.

### C. Order of Processing

To the maximum extent practicable, Form CMS-855A applications from the old and new owners in a CHOW should be processed as they come in. The contractor should not wait for applications from both the old and new owner to arrive before processing them. However, unless the instructions in this chapter indicate otherwise, the contractor should attempt to send the old and new applications to the State simultaneously, rather than as soon as they are processed. For instance, suppose the old owner submits an application on March 1. The contractor should begin processing the application immediately, without waiting for the arrival of the new owner's application. Yet it should avoid sending the old owner's application to the State until the new owner's application is processed. (For acquisition/mergers and consolidations, the contractor may send the applications to the RO separately, since one number is going away.)

### D. Sales and Lease Agreements

The contractor shall abide by the following:

- **Verification of Terms** - The contractor shall determine whether: (1) the information contained in the sales/lease agreement is consistent with that reported on the new owner's Form CMS-855A (e.g., same names), and (2) the terms of the contract indicate that the new owner will assume the provider agreement. In many cases, the sales/lease agreement will not specifically refer to the Medicare provider agreement. Clearly, if the box in section 2F is checked "Yes" and the sales/lease agreement either confirms that the new owner will assume the agreement or is relatively silent on the matter, the contractor can proceed as normal. Conversely, if the agreement indicates that the assets and liabilities will not be accepted, the contractor should deny the application.

- **Form of Sales/Lease Agreement** - There may be instances where the parties in a CHOW did not sign a "sales" or "lease" agreement in the conventional sense of the term; the parties, for example, may have documented their agreement via a "bill of sale." The contractor may accept this documentation in lieu of a sales/lease agreement so long as the document furnishes clear verification of the terms of the transaction.

- **Submission of Final Sales/Lease Agreement** - The contractor shall not forward a copy of the application to the State agency until it has received and reviewed the final sales/lease agreement. It need not revalidate the information on the Form CMS-855A, even if the data therein may be somewhat outdated by the time the final agreement is received.

    If a final sales/lease agreement is not submitted within 90 days after the contractor's receipt of the new owner's application, the contractor shall

reject the application. Though the contractor must wait until the 90th day to reject the application, the contractor may do so regardless of how many times it contacted the new owner or what types of responses (short of the actual receipt of the agreement) were obtained.

Unless specified otherwise in this chapter, both the old and new owners must submit separate Form CMS-855A applications, as well as copies of the interim and final sales/lease agreements.

### E. CHOWs Involving Subunits and Subtypes

Any subunit that has a separate provider agreement (e.g., home health agency (HHA) subunits) must report its CHOW on a separate Form CMS-855A. It cannot report the CHOW via the main provider's Form CMS-855A. If the subunit has a separate CMS Certification Number (CCN) but not a separate provider agreement (e.g., hospital psychiatric unit, HHA branch), the CHOW can be disclosed on the main provider's Form CMS-855A. This is because the subunit is a practice location of the main provider and not a separately enrolled entity.

On occasion, a CHOW may occur in conjunction with a change in the facility's provider subtype. This frequently happens when a hospital undergoes a CHOW and changes from a general hospital to another type of hospital, such as a psychiatric hospital. Although a change in hospital type is considered a change of information (COI), it is not necessary for the provider to submit separate applications – one for the COI and one for the CHOW. Instead, all information (including the change in hospital type) should be reported on the CHOW application; the entire application should then be processed as a CHOW. However, if the facility is changing from one main provider type to another (e.g., hospital converting to a skilled nursing facility) and also undergoing a CHOW, the provider must submit its application as an initial enrollment.

**NOTE:** For Medicare purposes, a critical access hospital (CAH) is a separately-recognized provider type. Thus, a general hospital that undergoes a CHOW while converting to a CAH must submit its Form CMS-855A as an initial enrollment, not as a CHOW.

### F. Early Submission of CHOW Application

The contractor may accept Form CMS-855A CHOW applications submitted up to 90 calendar days prior to the anticipated date of the ownership change. Any application received more than 90 days before the projected sale date can be returned under section 15.8.1 of this chapter.

### G. Unreported CHOW

If the contractor learns via any means that an enrolled provider has: (1) been

purchased by another entity, or (2) purchased another Medicare enrolled provider, the contractor shall immediately request Form CMS-855A applications from both the old and new owners.  If the new owner fails to submit a Form CMS-855A within the latter of: (1) the date of acquisition, or (2) 30 days after the request, the contractor shall stop payments to the provider.  Payments may be resumed upon receipt of the completed Form CMS-855A.

If the contractor learns of the transaction via the receipt of a tie-in notice from the RO, it shall follow the instructions under "Receipt of Tie-In When CMS-855A Not Completed" in section 15.7.7.2 of this chapter.

**H.  Relocation of Entity**

A new owner may propose to relocate the provider concurrent with the CHOW.  If the relocation is to a site in a different geographic area serving different clients than previously served and employing different personnel to serve those clients, the contractor shall notify the RO immediately.  Unless the RO dictates otherwise, the provider shall - per CMS Publication 100-07, chapter 3, section 3210.1(B)(5) - treat the transaction as an initial enrollment (and the provider as a new applicant), rather than as an address change of the existing provider.

**I.  Transitioning to Provider-Based Status**

Consistent with existing CMS policy, a provider undergoing a CHOW pursuant to 42 CFR §489.18 may be assigned to a new contractor jurisdiction only if the provider is transitioning from freestanding to provider-based status.  In such cases, the contractor for the new jurisdiction (the "new contractor") shall process both the buyer's and seller's Form CMS-855A applications.  Should the "old" (or current) contractor receive the buyer's or seller's Form CMS-855A application, it shall: (a) forward the application to the new contractor within 5 business days of receipt, and (b) notify the new contractor within that same timeframe that the application was sent.

## 15.7.7.1.4 - Intervening Change of Ownership (CHOW)
**(Rev. 462, Issued: 05-16-13 Effective: 03-18-13, Implementation: 03-18-13)**

(This section does not apply to home health agencies)

In situations where (1) the provider submits a Form CMS-855A initial application or CHOW application and (2) a CMS-855A CHOW application is subsequently submitted but before the contractor has received the tie-in notice from the CMS Regional Office (RO), the contractor shall abide by the following:

- Situation 1 – The provider submitted an initial application followed by a CHOW application, and a recommendation for approval has not yet been made with respect to the initial application – The contractor shall return both

applications and require the provider to re-submit an initial application with the new owner's information.

- Situation 2 - The provider submitted a CHOW application followed by another CHOW application, and a recommendation for approval has not been made for the first application - The contractor shall process both applications – preferably in the order in which they were received – and shall, if recommendations for approval are warranted, refer both applications to the State/RO in the same package. The accompanying notice/letter to the State/RO shall explain the situation.

- Situation 3 - The provider submitted an initial application followed by a CHOW application, and a recommendation for approval of the initial application has been made – The contractor shall:

  - Return the CHOW application.

  - Notify the State/RO via letter (sent via mail or e-mail) that there has been a change of ownership (the new owner should be identified) and that the contractor will be requiring the provider to resubmit a new initial application containing the new owner's information.

  - Request via letter that the provider submit a new initial CMS-855A application containing the new owner's information within 30 days of the date of the letter. If the provider fails to do so, the contractor shall return the initial application and notify the provider and the State/RO of this via letter. If the provider submits the application, the contractor shall process it as normal and, if a recommendation for approval is made, send the revised application package to the State/RO with an explanation of the situation; the initially submitted application becomes moot. If the newly submitted application is denied, however, the initially submitted application is denied as well; the contractor shall notify the provider and the State/RO accordingly.

- Situation 4 - The provider submitted a CHOW application followed by another CHOW application, and a recommendation for approval has been made for the first application - The contractor shall:

  - Notify the State/RO via e-mailed letter that there has been a change of ownership (the new owner should be identified) and that the contractor will be requiring the provider to resubmit a new initial application containing the new owner's information.

Process the new CHOW application as normal. If a recommendation for approval is made, the contractor shall send the revised CHOW package to the State/RO with an explanation of the situation; the first CHOW application becomes moot. If the

newly submitted CHOW application is denied, the first application is denied as well; the contractor shall notify the provider and the State/RO accordingly.

### 15.7.7.1.5 – Electronic Funds Transfer (EFT) Payments and CHOWs
**(Rev.717, Issued: 05-12-17, Effective: 05-15-17, Implementation: 05-15-17)**

In a CHOW, the contractor shall continue to pay the Seller/Transferor until it receives the tie-in/approval notice from the RO.  Hence, the contractor shall reject any application from the Seller or the Buyer to change the EFT account or special payment address to that of the new owner before receiving the tie-in/approval notice.   It is ultimately the responsibility of the Buyer and the Seller to work out any payment arrangements between themselves while the contractor and RO are processing the CHOW.   It is advisable that the contractor notify the new owner of this while the application is being processed.

In a CHOW, the existing provider agreement is automatically assigned to the Buyer/Transferee.  If the Buyer/Transferee does not explicitly reject automatic assignment before the transfer date, the provider agreement is automatically assigned, along with the CCN, effective on the transfer date.  The assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued.  Among other things, this means that the contractor will continue to adjust payments to the provider to account for prior overpayments and underpayments, even if they relate to services provided before the sale/transfer.  If the Buyer rejects assignment of the provider agreement, the Buyer must file an initial application to participate in the Medicare program.  In this situation, Medicare will **never** pay the applicant for services the prospective provides before the date on which the provider qualifies for Medicare participation as an initial applicant.

Depending on the terms of the sale, the Buyer/Transferee may obtain a new NPI or maintain the existing NPI.  After CHOW processing is complete, the Seller/Transferor will no longer be allowed to bill for services (i.e., services furnished after CHOW processing is complete) and only the Buyer is permitted to submit claims using the existing CCN. It is ultimately the responsibility of the old and new owners to work out between themselves any payment arrangements for claims for services furnished during the CHOW processing period.

### 15.7.7.1.6 – Pre-Approval Changes of Information
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

**A.  Seller**

If – prior to the issuance of the tie-in notice – the contractor receives from the seller a Form CMS-855 request to change any of the provider's enrollment data, the contractor shall  reject the change request if the information in question involves

changing the provider's:

1. Electronic funds transfer or special payment address information to that of the buyer (as described in section 15.7.7.1.5 of this chapter)

2. Practice location or base of operations to that of the buyer

3. Ownership or managing control to that of the buyer

4. Legal business name, tax identification number, or "doing business as" name to that of the buyer.

All other "pre-tie-in notice" Form CMS-855 change requests from the seller can be processed normally.

**B. Buyer**

If – prior to the issuance of the tie-in notice – the contractor receives from the buyer a Form CMS-855 request to change any of the provider's existing enrollment information, the contractor shall reject the change request. Until the tie-in notice is issued, the seller remains the owner of record. Hence, the buyer has no standing to submit Form CMS-855 changes on behalf of the provider.

## 15.7.7.2 - Tie-In/Tie-Out Notices and Referrals to the State/RO
**(Rev.717, Issued: 05-12-17, Effective: 05-15-17, Implementation: 05-15-17)**

**A. Issuance of Tie-In/Tie-Out Notices**

A tie-in or tie-out notice (CMS-2007) is generally issued in the following circumstances:

1. Initial enrollments

2. CHOWs

3. Voluntary terminations

4. Involuntary terminations (e.g., provider no longer meets conditions of participation or coverage) prompted by the state/RO

With the exception of voluntary and involuntary terminations, each of the transactions described above requires a referral and recommendation to the state/RO.

(Depending on the specific RO, certain changes of information may also result in the issuance of a CMS-2007.)

**B. Form CMS-855 Changes of Information, Stock Transfers, and Other Transactions**

**1. Referrals to State/RO**

The following is a list of Form CMS-855A transactions that generally require a recommendation and referral to the state/RO:

- Addition of outpatient physician therapy/outpatient speech pathology extension site

- Addition of hospice satellite

- Addition of home health agency branch

- Change in type of Prospective Payment System (PPS)-exempt unit

- Conversion of a hospital from one type to another (e.g., acute care to psychiatric)

- Change in practice location or subunit address in cases where a survey of the new site is required

- Stock transfer

In these situations, the Provider Enrollment, Chain and Ownership System (PECOS) record should not be switched to "approved" until the contractor receives notice from the RO that the latter has authorized the transaction. However, if the contractor knows that the particular state/RO in question typically does not review, approve, or deny this type of transaction, the contractor need not send the transaction to the state/RO for approval and shall instead follow the instructions in (B)(2) below.

(If the transaction is a stock transfer, the contractor need not send the transaction to the state/RO for approval (and shall instead follow the instructions in (B)(2) below) if the following three conditions are met:

   (1) The contractor is confident that the transaction is merely a transfer of stock and not a CHOW,

   (2) The RO in question (based on the contractor's past experience with this RO) does not treat stock transfers as potential CHOWs, and

   (3) The contractor knows that the particular state/RO in question does not review, approve, or deny this type of transaction.

If any of these 3 conditions are not met, the contractor shall send the transaction to the state/RO for approval.)

RO approval for the transactions listed in (B)(1) may be furnished to the contractor via tie-in notice, letter, e-mail, fax, or even telephone; the contractor may accept any of these formats.

If the RO (after receiving the transaction from the contractor for review) notifies the contractor that it does not normally review/approve/deny such transactions, the contractor may finalize the transaction (e.g., switch the PECOS record to "approved).

### 2. Post-Approval RO Contact Required

Form CMS-855A changes that do not mandate a recommendation to the state/RO but do require post-approval correspondence with the RO include:

- Deletions/voluntary terminations of practice locations or hospital subunits

- Legal business name, tax identification number, or "doing business as name" changes that do not involve a CHOW

- Address changes that do not require a survey of the new location

- Addition of hospital practice location

- The transactions (excluding stock transfers) described in (B)(1) for which the contractor knows that the state/RO does not issue approvals/denials

- Stock transfers for which the 3 conditions mentioned in (B)(1) are met.

For these transactions, the contractor shall: (1) notify the provider via letter, fax, e-mail, or telephone that the change has been made, and (2) switch the PECOS record to "approved." The contractor shall also notify the state and RO of the changed information (via any mechanism it chooses, including copying the state/RO on the notification letter or e-mail) no later than 10 calendar days after it has completed processing the transaction. Such notice to the State/RO shall specify the type of information that is changing.

### 3. All Other Changes of Information

For all Form CMS-855A change requests not identified in (B)(1) or (B)(2) above, the contractor shall notify the provider via letter, fax, e-mail, or telephone that the change has been made and shall switch the PECOS record to "approved." The state and RO need not be notified of the change.

## 4. Revalidations, Reactivations and Complete Form CMS-855 Applications

In situations where the provider submits a: (1) Form CMS-855A reactivation, (2) Form CMS-855A revalidation, or (3) full Form CMS-855A as part of a change of information (i.e., the provider has no enrollment record in PECOS), the contractor shall make a recommendation to the state/RO and switch the PECOS record to "approval recommended" only if the application contains new/changed data falling within one of the categories in (B)(1) above. For instance, if a revalidation application reveals a new hospital psychiatric unit that was never reported to CMS via the Form CMS-855A, the contractor shall make a recommendation to the state/RO and await the RO's approval before switching the record to "approved." In this situation, the contractor should forward the application to the state with a note explaining that the only matter the state/RO needs to consider is the new hospital unit.

If the application contains new/changed data falling within one of the categories in (B)(2) above, the contractor can switch the PECOS record to "approved." It shall also notify the state and RO of the changed information (via any mechanism it chooses, including copying the state/RO on the notification letter or e-mail) no later than 10 calendar days after it has completed processing the transaction.

### C. Provider-Specific, Non-CMS-855 Changes

If the contractor receives a tie-in notice or approval letter from the RO for a transaction/change regarding information that is not collected on the Form CMS-855A, the contractor need not ask the provider to submit a Form CMS-855A change of information.

### D. Involuntary Termination Prompted by State/RO

If the contractor receives a tie-out notice from the RO that involuntarily terminates the provider's Medicare participation because the provider no longer meets the conditions of participation, the contractor shall adhere to the instructions in section 15.27.2 of this chapter with respect to revoking the provider's/supplier's enrollment, as the supplier is no longer in compliance with Medicare enrollment regulations.

The revocation shall be recorded in PECOS using the status reason of "Non-Compliance: Provider/Supplier Type Requirements Not Met." Contractors shall **not** identify the involuntary termination action in PECOS as a Deactivation with a status reason of "Voluntarily Withdrawal from the Medicare Program."

In addition, contractors shall enter the appropriate enrollment bar and issue a revocation letter to the certified provider or supplier using 42 CFR §424.535(a)(1), as the legal basis for the revocation. The letter shall also contain the effective date

of the revocation, appeal rights and the length of the enrollment bar. If CMS learns that the terminated provider plans to receive further surveys during the reasonable assurance period, then CMS will rescind the enrollment bar.  The issuance of the Tie-Out for non-compliance of CMS enrollment requirements, conditions of participation, or conditions of coverage is sufficient to revoke.

**E.  Other Procedures Related to Tie-In Notices, Tie-Out Notices and Approval Letters**

**1.  Receipt of Tie-In When Form CMS-855A Not Completed** - If the contractor receives a tie-in notice or approval letter from the RO but the provider never completed the necessary Form CMS-855A, the contractor shall have the provider complete and submit said form.  This applies to initial applications, CHOWs, practice location additions, etc., but does not apply to the cases described in subsection C above.

**2.  Delegation to State Agency –** There may be instances when the RO delegates the task of issuing tie-in notices, tie-out notices or approval letters to the state agency.  The contractor may accept such notices from the state in lieu of those from the RO.  However, the contractor should first contact the applicable RO to confirm: (1) that the RO has delegated this function to the state, and (2) the specific transactions (e.g., CHOWs, HHA branch additions) for which this function has been delegated.

**3.  Review for Consistency** - When the contractor receives a tie-in notice or approval letter from the RO, it shall review its contents to ensure that the data on the notice/letter matches that on the Form CMS-855A.  If there are discrepancies (e.g., different legal business name, address), the contractor shall contact the applicable RO to determine why the data is different.

**4.  Creation of New Logging and Tracking (L & T) Record Unnecessary** - The contractor is not required to create a new L & T record in PECOS when the tie-in notice arrives, as the existing record should not be in a final status and can therefore be modified.  Simply changing the L & T status is sufficient.

**5.  Provider Inquiries –** Once the contractor has made its recommendation for approval to the state/RO, any inquiry the contractor receives from the provider regarding the status of its request for Medicare participation shall be referred to the state or RO.

**6.  Timeframes -** So as not to keep the PECOS record in "approval recommended" status interminably, if the contractor does not receive notification of approval from the RO after what it deems to be an excessive amount of time, it may contact the RO to see if such approval is forthcoming.

## 15.7.7.2.1 – Processing Tie-In Notices/Approval Letters

**(Rev. 433, Issued: 09-07-12, Effective: 10-09, 12, Implementation 10-09-12)**

With respect to Form CMS-855A transactions for which a post-tie-in notice/approval letter site visit is not required (e.g., providers in the "limited" risk category), the contractor shall complete its processing of said notice/letter within 21 calendar days after its receipt of the tie-in/approval notice. For purposes of this requirement, the term "processing" includes all steps taken by the contractor's enrollment and non-enrollment units (e.g. financial area, reimbursement area) to establish the provider's ability to bill Medicare such as, but not limited to:

1.  Entering all relevant data into the Provider Enrollment, Chain and Ownership System (PECOS).

2.  Changing the provider's PECOS record to the appropriate status (e.g., "approved").

3.  Facilitating the provider's electronic funds transfer and electronic data interchange arrangements.

4.  Notifying the provider (via any mechanism the contractor chooses) that it may begin billing.

The 21-day period begins on the day that the contractor receives the tie-in notice and ends on the day that the contractor notifies the provider that it can commence billing.

Regarding Form CMS-855A transactions that require a post-tie-in notice/approval letter site visit, the contractor shall process the tie-in notice/letter within 45 calendar days of its receipt of the notice/letter. This is to account for the additional time needed for the site visit to be performed.

## 15.7.7.3 - Reserved for Future Use
**(Rev. 435, Issued: 10-19-12, Effective: 11-20-12, Implementation: 11-20-12)**

## 15.7.7.4 - State Surveys and the Form CMS-855A
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

In general, information on the Form CMS-855A is still considered valid notwithstanding a delay in the State survey. However, the provider must submit an updated Form CMS-855A application to the contractor if:

- The contractor becomes aware of such a delay;

- The delay is the fault of the provider; and

- At least 6 months have passed since the contractor sent its recommendation for approval to the State.

If these criteria are met, the contractor shall send a letter to the provider requesting an updated Form CMS-855A. The application must contain, at a minimum, any information that is new or has changed since the recommendation for approval was made, as well as a newly-signed certification statement. If no information has changed, the provider may instead submit: (1) a letter on its business letterhead stating as such, and (2) a newly-signed Form CMS-855A certification statement.

**NOTE:** If the applicant is a home health agency (HHA), it must resubmit capitalization data per section 12 of the Form CMS-855A regardless of whether any of the provider's other Form CMS-855A information has changed. To illustrate, if no Form CMS-855A data has changed, the HHA must submit the letter, capitalization data and the signed certification statement.

If the provider fails to furnish the requested information within 60 days of the contractor's request, the contractor shall submit a revised letter to the State that recommends denial of the provider's application.

## 15.7.7.5 - Sole Proprietorships
**(Rev. 609, Issued: 08-14-15, Effective: 11-02-15, Implementation: 11-02-15)**

If the provider indicates in section 2B1 of the Form CMS-855A that he/she is a sole proprietor, the contractor shall note the following:

- The LBN in section 2B1 should list the person's (the sole proprietor's) legal name.

- The TIN in section 2B1 should list the person's social security number.

- Section 3 of the Form CMS-855A must be completed with information about the individual's final adverse action history.

- Section 5 of the Form CMS-855A will not apply unless the person has hired an entity to exercise managerial control over the business (i.e., no owners will be listed in section 5, as the sole owner has already reported his/her personal information in sections 2 and 3).

- No owners, partners, or directors/officers need to be reported in section 6. However, all managing employees (whether W-2 or not) must be listed.

- The sole proprietor may list multiple authorized or delegated officials in sections 15 and 16.

Since most sole proprietorships that complete the Form CMS-855A will also have

an employer identification number (EIN), the contractor shall request from the provider a copy of its CP-575, any federal tax department tickets, or any other preprinted information from the IRS containing the provider's EIN.

## 15.7.7.6 - Additional Form CMS-855A Processing Instructions
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

### A. Non-Enrollment Functions

In some instances, the contractor cannot forward an application to the State until it performs certain non-enrollment functions pertaining to the application (e.g., the reimbursement unit needs to examine patient listing data). The contractor may flip the provider's status in the Provider Enrollment, Chain and Ownership System (PECOS) to "approval recommended" prior to the conclusion of the non-enrollment activity if: (1) all required enrollment actions have been completed, and (2) the non-enrollment action is the only remaining activity to be performed.

### B. Multiple Providers under a Single Tax Identification Number (TIN)

Multiple providers may have the same TIN. However, each provider must submit a separate Form CMS-855A application and the contractor must create a separate enrollment record for each.

### C. Future Effective Dates

If the contractor cannot enter an effective date into PECOS because the provider, practice location, etc., is not yet established, the contractor may use the authorized official's date of signature as the temporary effective date. Once the actual effective date is established (e.g., the tie-in notice is received), the contractor shall change the effective date in PECOS.

## 15.7.7.7 – Contractor Jurisdictional Issues
**(Rev. 492, Issued: 12-06-13, Effective: 01-07-14, Implementation: 01-07-14)**

### A. Audit and Claims Contractors

1. Background

For purposes of enrollment via the Form CMS-855A, there are generally two categories of contractors: audit contractors and claims contractors. The audit contractor enrolls the provider, conducts audits, etc. The claims contractor pays the provider's claims. In most cases, the provider's audit contractor and claims contractor will be the same. On occasion, though, they will differ. This can happen, for instance, with provider-based entities, whereby the parent provider's contractor (audit contractor) will process the provider's enrollment application and a different contractor will pay the provider's claims (claims contractor).

Should the audit and claims contractors differ, the audit contractor shall process all changes of information, including all Form CMS-588 changes. The audit contractor shall notify the applicant during the initial enrollment process that all future changes of information must be sent to the audit contractor, not the claims contractor. If the provider inadvertently sends a change request to the claims contractor, the latter shall return the application per section 15.8.1 of this chapter.

2.   Process

If the audit contractor approves the Form CMS-855A transaction in question (e.g., initial enrollment), it shall:

>   (a)  Send an e-mail to the claims contractor identifying the specific Form CMS-855A transaction involved and confirming that the information has been updated in the Provider Enrollment, Chain and Ownership System (PECOS). Pertinent identifying information, such as the provider name, CMS Certification Number and National Provider Identifier, shall be included in the e-mail notification. Any supporting documentation that contains personal health information or personally identifiable information may still be faxed to the claims contractor.
>
>   (b)  As applicable, fax or mail a copy of the submitted Form CMS-588 to the appropriate claims contractor.

Upon receipt of the e-mail notification, the claims contractor shall access PECOS, review the enrollment record, and, as needed, update its records accordingly.

The audit contractor shall keep all original copies of Form CMS-855A paperwork and supporting documentation, including all Form CMS-588s.

3.   Tie-In/Tie-Out Notices and Approval Notices

If the provider's audit contractor and claims contractor are different, the audit contractor shall e-mail or fax a copy of all tie-in/tie-out notices and approval letters it receives to the claims contractor. This is to ensure that the claims contractor is fully aware of the RO's action, as some ROs may only send copies of tie-in/tie-out notices and approval letters to the audit contractor. If the audit contractor chooses, it can simply contact the claims contractor by phone or e-mail and ask if the latter received the tie-in notice.

Again, it is imperative that audit and claims contractors effectively communicate and coordinate with each other in all payment-related and program integrity matters involving the provider.

**B.  Provider Nomination**

With respect to provider nomination and changes of contractors, the contractor shall follow the instructions in Pub. 100-04, chapter 1, sections 20 through 20.5.1.

If the contractor receives a request from a provider to change its existing contractor, it shall refer the provider to the RO contact person responsible for contractor assignments.

## 15.7.8 – Special Processing Guidelines for Independent CLIA Labs, Ambulatory Surgical Centers and Portable X-ray Suppliers
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

Unless otherwise stated, all references to the "RO" in sections 15.7.8.2 through 15.7.8.5 of this chapter refer to the RO's survey & certification staff.

## 15.7.8.1 - CLIA Labs
**(Rev. 423, Issued: 06-01-12, Effective: 07-02-12, Implementation: 07-02-12)**

Labs that are "integrated" into an existing provider or supplier do not require a separate Form CMS-855B enrollment. "Integrated" labs typically are those that have exactly the same ownership and physical location as another enrolled supplier or provider. (Common examples include: (1) hospital labs and (2) a lab at a physician's office.) If a lab is considered "integrated," the parent provider shall identify the lab as a practice location in section 4 of its Form CMS-855.

If the lab is not "integrated," the lab must enroll as an independent CLIA lab via the Form CMS-855B application. The contractor shall advise the lab that it must contact the applicable CLIA office; the lab cannot be enrolled until it receives a CLIA number. The contractor shall also ensure that the lab is CLIA-certified and, as applicable, State-licensed.

Labs that do not plan to participate in the Medicare program must be directed to the applicable CLIA office.

For more information on the enrollment of CLIA labs, refer to section 15.4.2.2 of this chapter.

## 15.7.8.2 - Ambulatory Surgical Centers (ASCs) and Portable X-ray Suppliers (PXRS) - Initial Enrollment
**(Rev. 474, Issued: 07-05-13, Effective: 10-08-13, Implementation: 10-08-13)**

Unlike other supplier types that enroll via the Form CMS-855B, ASCs and PXRSs must receive a State survey and RO approval before they can enroll in Medicare. Accordingly, once it finishes reviewing the supplier's application, the contractor may only make a recommendation for approval to the State. The contractor shall not enroll the supplier until it receives a tie-in notice or approval letter from the RO