**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) Case No. 19-11466 (KG) |
| | ) Jointly Administered |
| Debtors. | ) **Related to Docket No. 502** |

**DEBTORS' OBJECTION TO MOTION FOR
PAYMENT OF ADMINISTRATIVE EXPENSES**

Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") submit this objection (the "**Objection**") to the *Motion for Payment of Administrative Expenses* (the "**Motion**") filed by the Trustees of the Benefit Fund for Hospital and Health Care Employees Philadelphia and Vicinity (the "**Health Benefit Fund**") and the Trustees of the Pension Fund for Hospital and Health Care Employees Philadelphia and Vicinity (the "**Pension Fund**," and together with the Health Benefit Fund, the "**Funds**"). In support of their Objection, the Debtors rely on the Declaration of Allen Wilen, a copy of which is attached hereto as **Exhibit A** (the "**Wilen Declaration**"), and respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

## PRELIMINARY STATEMENT

1. The Funds (as defined below) have asserted a vague administrative expense claim against the Debtors for "fringe benefit contributions and other amounts owed and accrued since the filing" in an unliquidated amount. The Funds also claim that the Debtors have not submitted (i) a contribution report that was due by July 1, 2019, and (ii) a contribution report and related contribution payment due by August 1, 2019.

2. As set forth below, the Debtors have provided the outstanding reports to the Funds and have already paid the contribution amount that allegedly came due on August 1st. With respect to the reports, the Debtors learned that both the July 1, 2019 contribution report referenced by the Funds (which relates to May 2019 Contributions (as defined below)) and the August 1, 2019 report (which relates to June 2019 Contributions (as defined below)) were, inadvertently, not sent to the Funds at the time the relevant contribution payments were made. In any event, both reports have since been submitted to the Funds' counsel.

3. Furthermore, the payment that was allegedly due by August 1, 2019 (which was in fact due July 31, 2019) related to work performed in June 2019 and was thus a pre-petition obligation. Indeed, the Funds' position that the June 2019 Contributions are an administrative claim, even though such amounts are premised on pre-petition services, is contrary to clear Third Circuit case law, which provides that benefits shall be accorded administrative expense priority only when they are based on services provided post-petition.

4. To the extent the June 2019 Contributions were a pre-petition obligation, which the Debtors believe to be the case, such amounts were paid by the Debtors pursuant to the First Day Wage Order (as defined below). Moreover, even if the June 2019 Contributions are construed as an administrative expense claim, such amounts were already paid. The Debtors had

authority, *in their discretion*, to pay pre-petition amounts pursuant to the First Date Wage Order, meaning that they were not *required* to use their funds to pay pre-petition obligations. Therefore, regardless of whether the June 2019 Contributions were pre-petition obligations or an administrative expense claim (which they are not), the Debtors had the discretion to use their funds to pay such amounts.

5.  Thus, because the Debtors have already paid the amounts alleged to be owed in the Motion and provided the Funds with the May and June contribution reports, no grounds exist for the Funds' claims and the Motion should be denied.

## RELEVANT FACTUAL BACKGROUND

6.  The Debtors are party to certain collective bargaining agreements ("**CBAs**") that govern, *inter alia*, rates of pay, hours of work, and conditions of employment for their union employees. Included among these CBAs is: (a) an agreement with National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and District 1199C ("**1199C**"), covering service and maintenance employees at Hahnemann University Hospital ("**HUH**"); and (b) an agreement with 1199C, covering technical unit employees at HUH.

7.  The CBAs with 1199C provide for the Debtors' payment of "contributions" to the Funds. Such contributions are based on a percentage of gross payroll paid to employees for a given month, and the amount of gross payroll depends on the number of hours worked by 1199C employees in a given month. *See* Appendix to Motion, at 008-011, 019, 021.

8.  Contribution payments owed to the Funds are due on the last day of the one month *following* the month in question. *See* Delinquency Policies, Appendix to Motion at 031, 036. This means, for example, that contributions owed based on gross payroll for May 2019 ("**May 2019 Contributions**") would come due on June 30, 2019 and contributions owed based

-3-

on gross payroll for June 2019 ("**June 2019 Contributions**") would come due July 31, 2019.[2] The gross payroll detail supporting the monthly contribution amounts is contained in "contribution reports" that, as the Funds indicate, is supplied by the Debtors in connection with the monthly contribution payments.

9. Following the Petition Date, and even though such amounts were not due until July 31st,[3] the Debtors made two payments for amounts owed to the Funds, totaling approximately $950,000, as follows: (i) $419,976.13 was paid to the Pension Fund; and (ii) $529,658.25 was paid to the Health Benefit Fund. At the time that these payments were made, the Debtors indicated that such payments reflected contribution amounts owed for services provided in June 2019.

10. Although the June 2019 Contributions are pre-petition obligations, the Debtors were authorized to pay such amounts pursuant to the *Interim Order (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Benefits and Other Compensation, and (B) Continue Employee Compensation and Employee Benefits Programs, and (II) Granting Related Relief* [D.I. 77] (such order having become a final order [D.I. 291], the "**First Day Wage Order**").

## OBJECTION

11. As set forth below, the Debtors have provided the Funds with the contribution reports related to the May 2019 and June 2019 Contributions. The Debtors have also paid the June 2019 Contributions pursuant to the First Day Wage Order. Simply because the June 2019

---

[2] Despite referencing the same provisions of the Delinquency Policies in the Motion, the Funds indicate that the contribution reports and payment came due on July 1, 2019 and/or August 1, 2019 (i.e. the first day of each month). In fact, per the Delinquency Policies, such reports and payments come due on the last day of the month following the month in which the relevant services were performed. This discrepancy does not make a practical difference for purposes of the Motion and the Debtors' objection thereto but is nevertheless worth noting.

[3] Although not due until the last day of the month following the month in which work is performed, the Debtors typically generated contribution reports and payments in advance of the deadline.

35804476.2 08/30/2019

payments came due on June 30, 2019 (one of the Petition Dates) does not mean that the entirety of the June 2019 Contributions may be treated as an administrative expense claim since such contributions were based on *pre-petition* work. Moreover, even if the June 2019 Contributions constituted an administrative claim, the Debtors have already paid such amounts and thus no obligation remains outstanding.

**I.     The Contribution Reports**

12.    The Funds argue that the Debtors failed to submit the contribution reports due on July 1, 2019 and August 1, 2019, which are the contribution reports related to work performed in May and June 2019. Setting aside the fact that the deadlines for the reports were June 30, 2019 and July 31, 2019, respectively, the Debtors provided such reports to counsel to the Funds upon finding that such reports were, inadvertently, never sent. Accordingly, this issue has been resolved.

**II.    The June 2019 Contribution Payment**

13.    The Funds further contend that the Debtors failed to submit the contribution payment "due on August 1, 2019." The payment sought by the Funds in this request is the June 2019 Contribution payment. As noted above, the Debtors paid the June 2019 Contributions shortly after the Petition Date, pursuant to the First Day Wage Order.

**A.    The June 2019 Contributions are Not an Administrative Expense**

14.    By the Motion, the Funds argue, with no binding authority or support, that the contribution payment is an administrative expense. On the contrary, however, because the June 2019 Contributions are based on gross payroll for hours worked in June 2019, which was *prior* to the Petition Date, such obligations are pre-petition obligations that could be (and were) paid pursuant to the First Day Wage Order.

-5-

15. Section 503(b)(1)(A) of the Bankruptcy Code provides for allowance as administrative expenses of "the actual, necessary costs and expenses of preserving the estate." *See* 11 U.S.C. § 503(b)(1)(A). To establish entitlement to an administrative expense claim under this section, a claimant must show that the expense (a) "arose from a post-petition transaction" with the debtor and (b) "accorded the estate an actual benefit." *In re Insilco Tech.*, Inc., 309 B.R. 111, 114 (Bankr. D. Del. 2004). "Allowances for administrative expenses are narrowly construed for the proper protection of other creditors." *In re G-I Holdings, Inc.*, 308 B.R. 196, 202 (Bankr. D.N.J. 2004) (internal brackets omitted); s*ee also*, *In re BH S & B Holdings, LLC*, 426 B.R. 478, 486 (Bankr. S.D.N.Y. 2010) ("Priority status pursuant to section 503(b)(1)(A) should be narrowly construed to maximize the value of the estate for all creditors.") The party claiming an administrative expense bears the burden of establishing that its claim is entitled to priority status. *See In re Insilco Tech., Inc.*, 309 B.R. at 114

16. Third Circuit case law is clear that benefit claims may be apportioned between the pre- and post-petition periods in which they accrued, and that only the portions of such claims attributable to post-petition services is entitled to administrative expense priority. *See, e.g.*, *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 317 (3d Cir. 2011) (holding that portion of withdrawal liability attributable to the post-petition period was entitled to administrative priority); *In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 227 (3d Cir. 2002) (finding that to the extent claim for stay-on benefits was linked to both pre- and post-petition work, only the portion attributable to the post-petition period was entitled to priority); *In re Roth Am., Inc.*, 975 F.2d 949, 958 (3d Cir. 1992) (holding that claims for vacation and severance pay were entitled to administrative expense status only to the extent that the benefits were earned by services rendered post-petition); *see also Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 103-4

-6-

(2d Cir. 1986) (finding that withdrawal liabilitiy claim was not entitled to administrative expense status where consideration supporting the claim was work done prior to the bankruptcy filing); *In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 480, 481 (Bankr. S.D.N.Y. 2006) (finding that delinquent fund contributions based on hours of work performed were not entitled to administrative expense status where the consideration supporting the contributions was pre-petition work).

17. Third Circuit case law is likewise clear that just because amounts come *due* post-petition does not mean that such amounts are entitled to administrative expense status. *See, e.g., In re Hechinger Inv. Co. of Del.*, 298 F.3d at 225; *In re Continental Airlines, Inc.*, 148 B.R. 207, 212 (D. Del. 1992) ("Congress was quite specific about which wage claims were to receive administrative priority . . . [and] made it clear that only the wages which were to be given priority in § 503(b)(1)(A) were those for services rendered post-petition.")

18. In *Marcal*, for example, the Third Circuit considered whether a portion of a withdrawal liability claim attributable to the post-petition period constituted an administrative expense claim. In determining that such portion *was* an administrative expense, the Court noted that the "relevant inquiry" is whether any portion of the claim at issue is "a post-petition expense provided in exchange for a service that was actual and necessary for the continued operation" of the debtor-in-possession. *Id.* at 315. Furthermore, the Court noted that the work performed post-petition in order to keep the debtor in operation "unquestionably" conferred a benefit to the estate and that the Debtors were obligated to provide benefits to such employees in exchange for such post-petition work. *Id.* at 317.

19. In contrast to *Marcal*, in the present case, the June 2019 Contributions were <u>not</u> provided in exchange for services that were actual and necessary for the continued operation of

the Debtors since such services were provided prior to the Petition Date. Thus, the work that serves as a basis for the June 2019 Contributions, and in exchange for which the June 2019 Contributions were paid, did not confer a benefit to the Debtors' estates for purposes of section 503(b)(1)(A) of the Bankruptcy Code. Rather, the June 2019 Contributions were properly regarded as pre-petition obligations.

> **B.     Case Law Cited by the Funds Does Not Support Administrative Expense Status for the June 2019 Contributions**

20.     The Funds cite two court decisions in support of their general contention that "payment of fringe benefits is properly ordered as an administrative expense," both of which are not binding on this Court and, in any event, do not support the Funds' request for an administrative expense claim in these circumstances. In *San Rafael Baking Co.*, for example, the United States Court of Appeals for the Ninth Circuit, in the context of ruling on a jurisdictional issue, ruled in passing that the lower court properly treated a benefit payment made in connection with work performed *post-petition* as an administrative claim. *See San Rafael Baking Co. v. N. Cal. Bakery Drivers Sec. Fund (In re San Rafael Baking Co.)*, 219 B.R. 860, 867 (9th Cir. 1998). The Debtors do not dispute that contributions attributable to work performed *post-petition* would likely be entitled to administrative expense status but such issue is not in contention here.

21.     Moreover, in *World Sales*, the Ninth Circuit declined to apportion a claim for monthly benefit contributions between pre and post-petition periods because, per the relevant CBA, the debtors were required to pay a set contribution amount per month so long as their employees worked a single day during the prior month. *See Teamsters Indus. Sec. Fund v. World Sales, Inc. (In re World Sales, Inc.)*, 183 B.R. 872, 873 (B.A.P. 9th Cir. 1995). As such, because the employees performed work during the post-petition portion of the month, they were entitled to the *entire* contribution payment as an administrative claim. *Id.* at 876. This differs

from the present case, where the amount of the contribution payments varies depending upon the number of hours worked by 1199C employees for a given month.  Also, the *World Sales* court specifically noted that its ruling was not inconsistent with *Roth* (in which the Third Circuit allocated benefits between pre- and post-petition amounts). *See id.* at 877; *see also In re Certified Air Technologies, Inc.*, 300 B.R. 355, 365 (Bankr. C.D. Cal. 2003) (stating that *World Sales* "concurs with *Roth* and its progeny").

22. Because the services performed by the 1199C employees in the month of June were pre-petition services that did not benefit the Debtors' estates, the June 2019 Contributions were pre-petition obligations (which the Debtors have already paid pursuant to the First Day Wage Order).

### III. Even If the June 2019 Contributions are an Administrative Claim, the Amounts were Paid

23. As noted above, even if the June 2019 Contributions are treated as an administrative expense claim, the fact remains that such amounts were already paid.  The Debtors maintained discretion to pay (or not pay) amounts pursuant to the First Day Wage Order. Thus, regardless of whether the June 2019 Contributions are regarded as a pre-petition obligation paid pursuant to the First Day Wage Order or an administrative expense paid by the Debtors in the ordinary course, no outstanding obligations for June 2019 remain and the Motion should be denied.[4]

[remainder of page left intentionally blank]

---

[4] Although the Funds have not requested such relief, to the extent it is determined that the Funds are entitled to an administrative expense claim (which they are not), the Debtors reserve all rights to demonstrate that immediate payment of such claim is inappropriate and unwarranted.

24. For the foregoing reasons, the Debtors respectfully request that the Court enter the order, substantially in the form attached hereto as **Exhibit A,** denying the Motion, and granting such other and further relief as is just and proper.

Dated: August 30, 2019  **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Counsel for Debtors and Debtors in Possession*