## **EXHIBIT A**

**Proposed Sale Order – Successful Bid**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
| | Jointly Administered |
| Debtors. | **Re:  Docket Nos. 142, 246, 249 & 590** |

### ORDER UNDER 11 U.S.C. § 105, 363, 365, 503, 507, AND 525 (A) APPROVING ASSET PURCHASE AGREEMENT WITH THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC., (B) AUTHORIZING SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF INTERESTS, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY CONTRACTS, AND (D) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[2] of Center City Healthcare, LLC, d/b/a Hahnemann University Hospital (the "Debtor"), for, *inter alia*, entry of an order, pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"):  (i) approving the sale by the Debtor to Thomas Jefferson University Hospitals, Inc. or its permitted assignee (the "Purchaser") of the certain assets (the "Purchased Assets"), as defined in and pursuant to that certain Asset Purchase Agreement attached hereto as **Exhibit A** (the "Agreement") free and clear of all Interests (defined below) (except those expressly assumed by the Purchaser), and (ii) authorizing the assumption by the Debtor and assignment to the Purchaser of certain executory contracts free and clear of all Interests (except those expressly

---

[1]The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Agreement (defined below) as applicable.

assumed by the Purchaser), and (iii) granting certain related relief; and the Court having held a

hearing on September 4, 2019 (the "Sale Hearing") to approve the Sale Motion; and the Court

having reviewed and considered (a) the Sale Motion, (b) the objections to the Sale Motion, if

any, and (c) the arguments of counsel made, and the evidence proffered or adduced at the Sale

Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the

Debtor, its estate and creditors and other parties in interest; and upon the record of the Sale

Hearing and after due deliberation thereon; and good cause appearing therefore,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.      This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C.

§§ 157 and 1334 and the *Amended Standing Order of Reference* dated February 29, 2012, from

the United States District Court for the District of Delaware.  Venue is proper pursuant to 28

U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M), (N)

and (O), and the Court may enter a final order consistent with Article III of the United States

Constitution.  The statutory predicates for the relief granted herein are Sections 105, 363, 365,

503, 507, and 525 of the Bankruptcy Code.

B.      The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to

this proceeding pursuant to Bankruptcy Rule 9014.

C.      Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale

Hearing and the Debtor's assumption and assignment (or assignment, as applicable) of the

contracts listed on **Exhibit B** hereto (the "Assigned Contracts") to the Purchaser has been

provided in accordance with sections 102(1), 363, 365, 503, and 507 of the Bankruptcy Code and

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006, 9008 and

9014 and the order of this Court dated July 19, 2019 (the "Bidding Procedures Order"), and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this Order is required.

D.      A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Purchased Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Purchased Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Purchased Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtor's and its debtor-affiliates' unions and pension funds; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; (p) all Residents, (q) all known creditors of the Debtor, including Known Patient Creditors (as defined in the Bidding Procedures Order); (r) the Pension Benefit Guaranty Corporation (the "PBGC"); and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.

E.      The Debtor also caused notice of the Sale Motion to be published in *The Philadelphia Inquirer* and *USA Today*, which notice by publication is reasonable and sufficient to bind holders of claims against the Debtor whose identity was not known to the Debtor as of

the day before the Mailing Date, including Unknown Patients (as defined in the Bidding Procedures Order).

F.    The Debtor has full corporate power and authority to execute the Agreement and all other documents contemplated thereby and consummate the transactions contemplated therein and the sale of the Purchased Assets and assumption and assignment (or assignment, as applicable) to the Purchaser of the Assigned Contracts (defined below) (collectively, the "Sale") has been duly and validly authorized by all necessary corporate action of the Debtor and no consents or approvals, other than the approval of this Court, are required for the Debtor to consummate such transactions.

G.    The Purchaser is not a successor to or mere continuation of the Debtor or its estate.

H.    The bidding procedures established pursuant to the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets and Assigned Contracts and no higher or better offer has been made.

I.    The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts and sell the Purchased Assets to the Purchaser in connection with the consummation of the Agreement, and that approval of the Agreement and the Sale pursuant thereto is in the best interests of the Debtor, its estate, and its creditors.

J.    The Sale must be completed immediately in order to preserve the value of the Purchased Assets and to provide certainty to former Hahnemann University Hospital Residents regarding the status of their tail insurance coverage and, as a result, good and

4

sufficient business justification exists for the immediate sale of the Purchased Assets and assumption and assignment (or assignment, as applicable) of the Assigned Contracts to the Purchaser outside of a plan of reorganization.

   K. The Purchaser is not an insider, as that term is defined in the Bankruptcy Code, of the Debtor.  Furthermore, no insiders of the Debtor are receiving or retaining any benefit, property or payments in connection with the Sale except to the extent such insiders have allowed claims against or equity interests in the Debtor and, as a result, may participate in a distribution of Sale proceeds.

   L. The Agreement was negotiated, proposed and entered into by the Debtor and Purchaser without collusion, in good faith, and as a result of arm's-length bargaining.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby with respect to the transactions authorized by this Order (including specifically, but without limitation, any assumption and assignment of executory contracts under section 365 of the Bankruptcy Code).  Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code.

   M. In the absence of a stay pending appeal, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Agreement at any time after the entry of this Order, provided the Purchaser shall not be obligated to close until all applicable conditions to closing under such Agreement have been satisfied or waived as provided in such Agreement.  In closing the transactions contemplated by the Agreement absent satisfaction of the condition of CMS consent, the Purchaser shall be deemed to have materially relied on the findings and decrees in

this Order, including specifically, but without limitation, (i) the finding that there has not been, and will not be, a cessation of business of Hahnemann University Hospital at any time prior to the Actual Closure Date (defined below); (ii) the finding and decree that legacy Hahnemann University Hospital residency slots temporarily following displaced Residents shall revert to the Purchaser upon conclusion of such Residents' programs, and the Purchaser shall be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts; and (iii) the findings and decrees capping the Purchaser's liability to CMS for claims arising prior to the Closing to the CMS Pre-Closing Amount.  The aggregation of the legacy Hahnemann University Hospital residency slots with the Thomas Jefferson University Hospital residency slots and the limitation of "successor liability" for pre-Closing amounts were integral components of the bargain struck by the Purchaser for the purchase of the Purchased Assets, without which it would not have entered into the Agreement.

N.     The consideration provided by the Purchaser for the Purchased Assets being purchased, including the Assigned Contracts, pursuant to the Agreement constitutes the best and highest offer for the Purchased Assets and the Assigned Contracts and reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, and the District of Columbia.

O.     The Debtor may sell the Purchased Assets and Assigned Contracts free and clear of all Interests (including, without limitation, those (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtor's or the Purchaser's interest in the Purchased Assets and/or Assigned Contracts and, (ii) in respect of Taxes), because each entity with an Interest in any of the Purchased Assets and/or Assigned

Contracts, including but not limited to CMS or any Governmental Body, accrediting body, or other third party, as applicable, has consented to the Sale, is deemed to have consented to the Sale, has a claim which is subject to a bona fide dispute, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such Interest.

        P.      The Debtor has good title to the Purchased Assets and Assigned Contracts (including specifically, but without limitation, the Participating Provider Agreement) and, accordingly, the transfer of the Purchased Assets and assignment of the Assigned Contracts to the Purchaser pursuant to the Agreement will be a legal, valid, and effective transfer of the Purchased Assets and assignment of the Assigned Contracts.

        Q.      Neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts pursuant to the Agreement will subject the Purchaser, its Affiliates, the Consortium or an of its members to any liability (except those expressly assumed by the Purchaser pursuant to the Agreement (the "Assumed Liabilities")) for claims against the Debtor or the Debtor's predecessors or affiliates of any kind or character, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent, based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor, vicarious or transferee liability.  Without limiting the general nature of the foregoing, neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts will subject the Purchaser, its Affiliates, or the Consortium or its members, to any (1) liability on account of any employee benefit plan maintained by the Debtor, or the Debtor's predecessors or affiliates, including but not limited to any liability related to benefits, underfunding, termination and/or termination premiums, regardless when such claims are deemed to have accrued and regardless whether such would be considered "claims" as such term is defined in the Bankruptcy

Code, to (i) the PBGC, or (ii) to any plan participant or beneficiary (collectively, the "PBGC Claims"); (2) claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party relating to the operation of the Business prior to Closing, subject only to collection of the CMS Pre-Closing Amount from the Escrow Account; (3) claims relating to the Participating Provider Agreement for services rendered or amounts paid to Seller prior to the Closing in any amount in excess of the CMS Pre-Closing Amount; and/or (4) claims or actions or proceedings brought under Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations.

R.      The Purchaser has provided adequate assurance of future performance under the Assigned Contracts, to the extent required by Section 365(b)(1)(C) of the Bankruptcy Code.

S.      Upon the assumption and assignment (or assignment, as applicable) of the Assigned Contracts, as provided herein, the Purchaser shall succeed to all of the right, title and interest of the Debtor under the Assigned Contracts including, without limitation, the right to exercise renewal options which, pursuant to any provision of the applicable Assigned Contract or applicable nonbankruptcy law, are not exercisable by assignees of the Debtor, the Court having found that such provisions, as they relate to the assumption and assignment (or assignment, as applicable) to the Purchaser of the Assigned Contracts, are unenforceable pursuant to Section 363(*l*), 365(e)(1), or 365(f)(3) of the Bankruptcy Code, as applicable.

T.      As to the Participating Provider Agreement and the objection of the United States of America ("United States"), on behalf of the Department of Health and Human

8

Services ("HHS"), acting through its designated component, the Centers for Medicare & Medicare Services ("CMS"), specifically, and without limiting the generality of any of the foregoing paragraphs that are otherwise applicable:

(i)     the Participating Provider Agreement is not an executory contract within the meaning of section 365 of the Bankruptcy Code because the parties thereto do not have any material performance obligations under such agreement, as distinct from their obligations under the applicable Medicare statutes and regulations, *see In re B.D.K. Health Management, Inc.*, No. 98-00609-6B1, 1998 WL 34188241, *6-7 (Bankr. M.D. Fla. Nov. 16, 1988); accordingly, the Debtors need not satisfy the requirements of section 365 in order to assign the Participating Provider Agreement to the Purchaser in accordance with the Agreement;

(ii)     to the extent the requirements of section 365 of the Bankruptcy Code are applicable to the assignment of the Participating Provider Agreement to the Purchaser, such requirements are satisfied; specifically, (A) the maximum amount necessary to satisfy any cure obligations under section 365(b)(1) of the Bankruptcy Code is $3,000,000 (which constitutes the maximum "CMS Pre-Closing Amount," within the meaning of the Agreement), and the Escrow Account to be established pursuant to the Agreement provides adequate assurance of payment of such amounts, if and to the extent they become payable to CMS, (B) section 365(c)(1) is inapplicable to the Participating Provider Agreement because applicable law does not excuse CMS from accepting performance from or rendering performance to an entity other than the Debtor, *compare In re ANC Rental Corp.*, 277 B.R. 226, 236 (Bankr. D. Del. 2002) ("[F]or section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is

9

excused from accepting performance from a third party . . . .") *with* 42 C.F.R. § 489.18(c) (containing no such statement, and in fact expressly contemplating CMS's acceptance of performance from or rendering performance to a third party in certain circumstances), and thus does not preclude the Debtor's assumption of the Participating Provider Agreement, (C) the evidence adduced at the Sale Hearing regarding the Purchaser establishes adequate assurance of future performance under the Participating Provider Agreement within the meaning of section 365(f)(2)(B), and (D) any provision of the Participating Provider Agreement or applicable law that would provide for the termination or modification of (or would permit CMS to terminate or modify) the Participating Provider Agreement as a result of the assignment thereof to the Purchaser is invalidated by section 365(f)(3) of the Bankruptcy Code;

(iii)    the transaction contemplated by the Agreement (the "Transaction") constitutes a "change of ownership" within the meaning of 42 C.F.R. § 489.18(a) (a "CHOW"), as a result of which the legacy Hahnemann University Hospital residency slots temporarily following displaced Residents shall revert to the Purchaser upon conclusion of such Residents' programs, and the Purchaser shall be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts;

(iv)    any so-called "successor liability" under C.F.R. § 489.18(d) as a result of the CHOW is subject to limitation by operation of applicable provisions of the Bankruptcy Code, as set forth in this Order;

(v)    whether or not the Participating Provider Agreement is executory, it may be assigned to the Purchaser free and clear of any alleged claim of CMS for

amounts in excess of the CMS Pre-Closing Amount, because (A) a debtor's rights under a contract are property that may be sold pursuant to section 363 of the Bankruptcy Code, (B) any alleged claims in excess of the CMS Pre-Closing Amount are the subject of a *bona fide* dispute, and (C) CMS could be compelled in a legal or equitable proceeding to accept a money satisfaction of such claims; accordingly, sale of the Participating Provider Agreement free and clear of any alleged claim of CMS for amounts in excess of the Pre-Closing Amount is permitted by sections 363(f)(4) and (f)(5) of the Bankruptcy Code;

(vi)    as of the date of entry of this order, there has been no cessation of business of Hahnemann University Hospital; accordingly, 42 C.F.R §§ 489.52(b)(3) and 413.79(h) do not apply and have not resulted in the termination of the Participating Provider Agreement;

(vii)    provided there is no material change in the operation of Hahnemann University Hospital between the entry of this Order and the Closing, there shall have been no cessation of business of Hahnemann University Hospital as of the Closing; accordingly, 42 C.F.R §§ 489.52(b)(3) and 413.79(h) will not apply and will not have not resulted in the termination of the Participating Provider Agreement at any time prior to Closing; and

(viii)    at Closing, the Purchaser shall be entitled to rely conclusively on a certification from an officer of the Seller stating that there has been no material change in the operation of Hahnemann University Hospital between the entry of this Order and the Closing;

NOW, THEREFORE, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED THAT:

1.      The Sale Motion, and the relief sought therein (including approval of the Sale) is GRANTED, in all respects as set forth herein.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.      The Agreement, and all of the terms and conditions thereof, is hereby approved.

4.      Pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code, the Debtor is authorized and directed to take all actions necessary to consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement.

5.      In the event Purchaser fails to consummate the Sale on the terms and conditions of the Agreement, the Debtors, in consultation with the Committee, may designate Reading Hospital (the "Backup Bidder") as the Successful Bidder for all purposes herein pursuant to the terms of its backup bid attached hereto as **Exhibit C** (the "Backup Bid").  Upon such designation, the Debtors shall be authorized, but not required, to submit, in consultation with the Committee and under certification of counsel, an alternative form of proposed sale order, substantially in the form previously submitted with the Court [D.I. 246], modified to conform to the terms of the Backup Bid, authorizing the Debtors to consummate all transactions contemplated by the Backup Bid.  In such case, the Purchaser's deposit shall be forfeited to the Debtors as set forth in the Bidding Procedures.

6.      As of the date of closing under the Agreement (the "Closing Date"), the Assigned Contracts that are executory contracts or unexpired leases shall be deemed to have been assumed by the Debtor and assigned to the Purchaser pursuant to Section 365(f) of the

Bankruptcy Code.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtor and the Debtor's estate shall be relieved from any liability for any breach of such an Assigned Contract occurring after the effective date of the Closing Date.  As of the Closing Date, the Assigned Contracts that are not executory contracts or unexpired leases shall be deemed to have been assigned to the Purchaser pursuant to section 363(b) of the Bankruptcy Code.

7.      On the Closing Date, from the Purchase Price, the Purchaser shall pay to the Escrow Agent the Escrow Amount, which shall be deemed to include an amount equal to the maximum cure amounts (the "Maximum Cure Amounts") that would be assertable by the non-debtor party to each other Assigned Contract, as such Maximum Cure Amounts are stated on **Exhibit B**.  For the avoidance of doubt, the Maximum Cure Amounts stated on **Exhibit B** shall be the maximum amount of any subsequently allowed claim to which any non-debtor party to an Assigned Contract shall be entitled pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, to the extent applicable.  To the extent a Maximum Cure Amount is stated on **Exhibit B** for the Participating Provider Agreement, such Maximum Cure Amount shall be deemed to be the CMS Pre-Closing Amount for purposes of the Agreement.

8.      Upon the Closing (i) all defaults under the related Assigned Contracts required to be cured pursuant to Section 365(b)(1)(A) of the Bankruptcy Code shall be deemed cured and all amounts due to the non-debtor parties to such Assigned Contracts pursuant to Section 365(b)(1)(B) on account of any pecuniary loss resulting from such defaults shall be deemed paid in full, and (ii) each non-debtor party to such Assigned Contracts shall be forever bound by such Maximum Cure Amounts and enjoined from seeking to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on

account of defaults by the Debtor, including defaults as to which, pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.

        9.      Upon payment by the Purchaser of the Escrow Amount to the Escrow Agent, the non-debtor parties to, and beneficiaries of, such Assigned Contracts, including any Governmental Body, accrediting body, or other third party, shall be (i) forever bound by the Maximum Cure Amounts, and (ii) enjoined from seeking (A) recourse against the Purchaser, its Affiliates, or the Consortium or its members, on account of any defaults by the Debtor under the related Assigned Contracts required to be cured pursuant to Section 365(b)(1)(A) of the Bankruptcy Code and/or any pecuniary loss resulting from such defaults due to such non-debtor party pursuant to Section 365(b)(1)(B) of the Bankruptcy Code (including on account of overpayments under the Participating Provider Agreement) in excess of the related Maximum Cure Amount, (B) recourse against the Purchaser, its Affiliates, or the Consortium or its members for successor, vicarious, or transferee, relating to claims, administrative proceedings or actions relating to the operation of the Business prior to Closing, and/or (C) to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on account of defaults by the Debtor, including defaults as to which, pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.   The foregoing notwithstanding, CMS shall be entitled to offset overpayments of amounts under the Participating Provider Agreement which occurred prior to the Closing Date against amounts due to the Purchaser under the Participating Provider Agreement for periods on and after the Closing Date in amounts up to, but not exceeding, the CMS Pre-Closing Amount.

        10.    [RESERVED]

11.     Any provision in any Assigned Contract that purports to declare a breach, default or payment right as result of an assignment or a change of control in respect of the Debtor as relates to the assumption of any Assigned Contract by the Debtor and assignment of such Assigned Contract to the Purchaser is unenforceable, and all such Assigned Contracts shall remain in full force and effect, notwithstanding any such provision.  No sections or provisions of any Assigned Contract that purports to provide for additional payments, rent accelerations, assignment fees, increases, payments, deposits, security, charges or any other fees charged to the Purchaser or the Debtor as a result of the assumption and the assignment (or assignment, as applicable) of the Assigned Contracts to the Purchaser shall have any force and effect with respect to the transactions contemplated by the Agreement and assignments authorized by this Order, and such provisions are unenforceable under Section 363(*l*), 365(e)(1), 365(f), or 541(c)(1) of the Bankruptcy Code, as applicable.

12.     Except for the Assumed Liabilities, pursuant to (and to the maximum extent permitted by) sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing under the Agreement, the Purchased Assets and the Assigned Contracts shall be free and clear of all interests of any entity other than the estate (collectively, "Interests"), including, without limitation, any (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code); (ii) successor, vicarious, or transferee liability against the Purchaser, its Affiliates, or the Consortium or its members, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent, based, in whole or in part, directly or indirectly, on any theory of law, relating to claims, administrative proceedings or actions brought or on behalf of any Governmental Body, accrediting body, or other third party

relating to the operation of the Business prior to Closing; (iii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Debtor's or Purchaser's interest in the Assigned Contracts and/or Purchased Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iv) PBGC Claims, (v) claims in respect of Taxes (including taxes as to which applicable returns have not yet been filed, whether or not overdue); (vii) claims relating to the Participating Provider Agreement in excess of the CMS Pre-Closing Amount; (viii) claims or actions or proceedings brought under Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations; and (ix) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, with all such Interests to attach to the Net Proceeds of Sale (defined below) in the order of their respective priorities, with the same validity, force and effect (if any) which they now have against the Purchased Assets and Assigned Contracts, subject to any claims and defenses the Debtor may possess with respect thereto.  The "Net Proceeds of Sale" is the Base Purchase Price, as adjusted pursuant to the Agreement, minus amounts paid to the Escrow Agent at Closing, minus Tail Coverage Costs and other costs of sale, and plus any amounts distributed by the Escrow Agent to the Debtor after Closing.  For the avoidance of doubt, the Escrow Amount shall not be property of the Debtor's estate and no Interests shall attach to the Escrow Amount unless and until such funds are distributed to the Debtor pursuant to the terms of the Agreement and the Escrow Agreement.

16

13.     All claims of the Purchaser or any other Purchaser Indemnified Party for indemnification under the terms of the Agreement or for distributions from the Escrow Funds on account of Cure Amounts shall be treated as administrative claims pursuant to Section 503 and 507 of the Bankruptcy Code solely to the extent necessary to permit a claim against the Escrow Amount; provided, however, except as otherwise stated in the Agreement, the sole remedy for claims by the Purchaser or any other Purchaser Indemnified Party for indemnification for monetary damages shall be to and against the Escrow Amount and shall be determined and paid pursuant to the terms of the Agreement and the Escrow Agreement.  To the extent of any conflict between the terms of the Agreement or the Escrow Agreement relating to such determination and payment of indemnity claims and the Bankruptcy Code or Bankruptcy Rules, the terms of the Agreement and the Escrow Agreement shall control.

14.     All persons are hereby enjoined from asserting, prosecuting or otherwise pursuing any claim against the Purchaser or any member of the Purchaser to recover on any claims (regardless of when accrued and regardless whether meeting the definition of "claim" under the Bankruptcy Code) such person had, has or may have (other than an Assumed Liability) against (x) the Debtor, its estate, officers, directors, shareholders, the Purchased Assets or the Assigned Contracts, or (y) the Purchaser in connection with the negotiation of, and any agreements contained in, related to or conditioned upon, the Agreement.

15.     As of the Closing Date, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in or claims against the Purchased Assets and Assigned Contracts, if any, as such Interests or claims may have been recorded or may otherwise exist.

16.     Each and every federal, state and local governmental agency or department shall be, and hereby is, (i) authorized and directed to accept (A) this Sale Order as sufficient evidence of the transfers of all right, title, and interest in, to, and under the Purchased Assets and the Assigned Contracts, and (B) any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement; and (ii) authorized to rely on this Sale Order in consummating, or facilitating the consummation of, the transactions contemplated by the Agreement.

17.     Upon the occurrence of the Closing, all Interests in, against, or upon the Purchased Assets or the Assigned Contracts shall be unconditionally released, terminated, and discharged without the need for any further action.  Notwithstanding the foregoing, at the Closing, or as soon as practicable thereafter, (x) the Debtor and the Purchaser are hereby authorized to execute and file such termination statements, instruments of satisfaction, releases, or other documents to reflect the unconditional release, termination, and discharge of such Interests on behalf of such person or entity with respect to the Purchased Assets and the Assigned Contracts, and (y) the Purchaser is hereby authorized on behalf of each holder of a purported Interest to file, register, or otherwise record a copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the unconditional release, termination, and discharge of all Interests in, against, or upon the Purchased Assets or the Assigned Contracts.  The provisions of this Order authorizing the sale of the Purchased Assets free and clear of all Interests are self-executing and, notwithstanding the failure of the Debtor, the Purchaser or any other party to execute, file or obtain termination statements, instruments of satisfaction, releases, or other documents to reflect the release, termination, and

discharge of any such Interests, all such Interests shall be deemed divested immediately upon Closing.

18.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date.

19.     As of the Closing Date, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the transactions contemplated by the Agreement.

20.     Pursuant to, and to the fullest extent permitted by, Sections 105(a) and 525 of the Bankruptcy Code, all governmental units are hereby prohibited from denying, revoking, suspending, or refusing to renew any permit, license, or similar grant relating to the operation of the Purchased Assets or the Assigned Contracts on account of the filing or pendency of the Bankruptcy Cases, the consummation of the Sale, or the Debtor's or the Purchaser's failure to pay a debt that is dischargeable in the Bankruptcy Cases or was discharged under the Bankruptcy Code.

21.     To the fullest extent permitted by applicable law, the Purchaser shall be authorized, as of the Closing Date and upon the occurrence of Closing, to operate under any transferred license, permit, registration and governmental authorization or approval of the Debtor with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.

36029381.10 09/03/2019

22.     No law of any state or other jurisdiction relating to bulk sales or similar laws shall apply in any way to the Transaction, the Sale Motion, and this Order.

23.     For the avoidance of doubt, any privileges, protections or immunities of the Debtor for communications, documents, materials or matters arising at any time, whether before or after the Petition Date, including but not limited to any attorney-client privilege, work product doctrine, common interest or joint defense privilege, relating to any matter whatsoever, including without limitation any matter relating to the negotiation and implementation of the Agreement and any of the transactions contemplated thereby or entered into in connection therewith (collectively, "Privilege") shall not be Purchased Assets under the Agreement, and any such Privilege is owned and will continue to be owned by the Debtor, and notwithstanding anything to the contrary herein or in the Agreement, the Purchaser shall have no interest in or rights with respect to the Privilege, whether pursuant to this Order, the Agreement, or otherwise. The Privilege shall remain within the sole control of the Debtor and may not be waived by any other person or entity.

24.     The Agreement and the Escrow Agreement, as well as other agreements related thereto, may be modified, amended, or supplemented by the Debtor and the Purchaser without further order of the Court, provided that any such modification, amendment, or supplement either is (a) not material or (b) not less favorable to the Debtor than the existing applicable provisions.

25.     This Court shall retain jurisdiction (a) to enforce and implement the terms and provisions of the Agreement, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith, (b) to compel delivery of the Purchased Assets and Assigned Contracts to the Purchaser, (c) to resolve any disputes arising

under or related to the Agreement, except as otherwise provided therein, and (d) to interpret, implement and enforce the provisions of this Order.

26.     Nothing contained in any plan confirmed in this case or the order confirming any such plan shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan, converting the Debtor's Bankruptcy Case from chapter 11 to a case under chapter 7 of the Bankruptcy Code, or providing for dismissal of the Debtor's Bankruptcy Case.

27.     The terms and provisions of the Agreement, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its creditors, the Purchaser and its affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting a claim against or Interest in the Debtor's estate or any of the Assigned Contracts and the Purchased Assets and any trustee appointed for the Debtor under any chapter of the Bankruptcy Code.

28.     The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

29.     The Purchaser is a party in interest and shall have standing to appear and be heard on all issues related to or otherwise connected with this Order, the Sale or the Agreement.

30.     <u>Participating Provider Agreement and Residency Slots.</u>  CMS, its applicable Regional Office ("<u>RO</u>"), and its Medicare Administrative Contractors ("<u>MACs</u>") shall treat the Transaction as a CHOW for all Medicare purposes, including merging provider

agreements and graduate medical education ("GME") caps.  Legacy Hahnemann University Hospital residency slots temporarily following displaced Residents shall revert to the Purchaser upon conclusion of such Residents' programs, and the Purchaser shall be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts.  CMS, RO, and MACs shall give effect to the Transaction in all regards, including specifically, but without limitation, as follows:

(a)    RO shall issue a tie-in notice, effective as of the Closing Date of the Transaction, confirming the merger of provider numbers for Hahnemann University Hospital and Thomas Jefferson University Hospital;

(b)    RO shall retire the separate provider number of Hahnemann University Hospital;

(c)    RO shall instruct the MAC promptly to (i) update systems to change Hahnemann University Hospital's name, location, electronic funds transfer (EFT) account, and payment address to that of the Thomas Jefferson University Hospital; (ii) make other updates necessary to effect the merger of provider numbers; (iii) notify Thomas Jefferson University Hospital it may begin submitting under its provider number claims associated with the former Hahnemann University Hospital provider number (for GME purposes); and

(d)    CMS shall adjust all indirect and direct GME payments to reflect the aggregation of residency slots.

31.    Notwithstanding anything to the contrary in this Order, nothing set forth herein shall be deemed to limit in any way (i) Seller's right, title and interest in Seller's cash and patient accounts receivable, payor/contractor accounts receivable, Medicare reimbursements or

adjustments and all other accounts receivable (collectively, "Accounts Receivable") for services rendered or goods sold prior to the Closing Date, which cash and Accounts Receivable remain the property of Seller as Excluded Assets and shall be reimbursed to Seller if received by Purchaser nor (ii) Seller's ability to complete any remaining billing for services rendered or goods sold prior to the Closing Date under Seller's Medicare provider number. Purchaser agrees that it will provide Seller (or Seller's billing agent) with reasonable access to the Participating Provider Agreement, Books and Records and Governmental Authorizations as may be necessary in order for Seller to facilitate billing and collecting for services furnished to Medicare beneficiaries by Seller.

32.      Notwithstanding the provisions of Fed. R. Bankr. P. 6004(h), 6006(d), and 7062, this Order shall be effective and enforceable immediately upon entry.

# **EXHIBIT A**

# **ASSET PURCHASE AGREEMENT**

# **EXHIBIT B**

## **ASSIGNED CONTRACTS**

| No. | Counterparty/Counterparties | Contract Type and Description | Maximum Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Agreement for Clinical Rotations with Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, dated September 14, 2018 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $3,000,000.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 15 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |

## EXHIBIT C

## BACKUP BID ASSET PURCHASE AGREEMENT