## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*, | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket No. 142, 249, 590, 591, 631** **Obj. Deadline: Sept. 4, 2019 (10:00 a.m.)** |

## OBJECTION OF THE UNITED STATES
## TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS TO JEFFERSON AS SET FORTH IN THE ASSET PURCHASE AGREEMENT

Dated:  September 4, 2019

JOSEPH H. HUNT
Assistant Attorney General

DAVID C. WEISS
United States Attorney

ELLEN SLIGHTS
Assistant United States Attorney

/s/ Marc S Sacks
RUTH A. HARVEY
MARGARET M. NEWELL
MARC S. SACKS
Department of Justice
Commercial Litigation Branch,
Civil Division
P.O. Box 875, Ben Franklin Station
Washington, DC 20044-0875
Tel. (202) 307-1104
Fax (202) 514-9163
marcus.s.sacks@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

## TABLE OF CONTENTS

Page

STATUTORY AND REGULATORY BACKGROUND ...............................................................4

    A.    Enrollment in Medicare .......................................................................................4

    B.    Residency Program Slots and Redistributions in the
          event of Hospital Closures ...................................................................................7

FACTUAL AND PROCEDURAL BACKGROUND......................................................................9

ARGUMENT ...............................................................................................................................12

I.      Debtors Have No Authority to Sell Medicare-Funded Residency Slots............................12

    A.    Congress Has Vested the Secretary with Exclusive Authority
          to Redistribute Residency Slots from a Closed Hospital ...................................12

    B.    The Residency Slots are Not Debtors' "Property" and Cannot be
          Sold or Transferred Between Private Parties .....................................................16

II.     Debtors' Proposed Sale Violates Medicare Law and Regulations ...................................17

    A.    The Sale violates 42 C.F.R § 489.52 ..................................................................19

    B.    The Sale violates 42 C.F.R § 489.18 ..................................................................20

          1.    A CHOW is the Exclusive Vehicle for Continuous
                Enrollment in Medicare in the Sale Context.............................................21

          2.    The Court Has no Subject Matter Jurisdiction to Declare
                the Sale of the Residency Slots a CHOW .................................................21

          3.    The Sale of the Residency Slots is Not a CHOW .....................................24

    C.    The Sale violates 42 C.F.R § 489.18(d) and is contrary to
          binding Third Circuit law....................................................................................26

    D.    The Sale violates the Anti-Assignment Act........................................................29

III.    Under Binding Third Circuit Precedent, a Medicare Provider Agreement
       Must Be Assumed and Assigned Pursuant to Section 365 .................................................31

A.      Medicare Provider Agreements are properly addressed under
        section 365 ........................................................................................................31

B.      Section 363 does not apply to the transfer of Medicare provider
        agreements or Medicare-funded residency slots.....................................................36

        1.      Medicare provider agreements are not property of the
                estate transferrable under section 363.........................................................36

        2.      Medicare provider agreements or Medicare-funded residency
                slots cannot be sold "free and clear" under section 363(f) ........................39

C.      HHS is not estopped from arguing that Medicare Provider
        Agreements are executory contracts ......................................................................45

CONCLUSION....................................................................................................................46

**OBJECTION OF THE UNITED STATES
TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING THE SALE OF THE
DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS TO JEFFERSON AS SET FORTH IN
THE ASSET PURCHASE AGREEMENT**

The United States of America (the "United States"), on behalf of the Department of
Health and Human Services ("HHS"), acting through its designated component, the Centers for
Medicare & Medicaid Services ("CMS"), hereby files this objection to the *Debtors' Motion for
Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors'
Residents Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures
Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of
Proposed Cure Amounts, and (C) Approving the Form and Manner of Notice Relating Thereto,
and (D) Scheduling a Hearing to Consider the Proposed Sale; and (II)(A) Approving the Sale of
the Debtors' Residents Program Assets Free and Clear of Liens, Claims, Encumbrances and
Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts;
and (III) Granting Related Relief* (the "Jefferson Sale Motion").  Dkt. 142.  Because the
Jefferson Sale Asset Purchase Agreement ("Jefferson APA"), Dkt. 590-1, is contrary to law and
contravenes Medicare Program law regulations, the Court should not approve the sale.

Debtors assert that the Court should approve the proposed sale of Hahnemann University
Hospital ("Hahnemann") "resident program assets" as set forth in the Jefferson APA for
equitable reasons.  Debtors, however, have identified no authority for the proposition that
residency slots can be sold by private contract, while ignoring the statutes and regulations that
clearly prohibit such a transaction.[1]  Accordingly, on that basis and the others described below,

---

[1] Debtors previously told the Court that "CMS has a veto power over this transaction. They're
going to have to agree to it which is I think a compelling reason why we should get past this bid
procedure stage and let us start engaging with CMS."  Transcript of July 19, 2019; 56:13-17; *see*

the United States objects to the terms of the proposed sale on multiple grounds and respectfully asks the Court to deny the Jefferson Sale Motion.

First, the residency slots are not property of the Debtors' estate. The Secretary of HHS (the "Secretary") is solely authorized by law to allocate residency slots, approve new residency slots, and redistribute existing residency slots. 42 U.S.C. § 1395ww(h). Private parties do not have the authority to contract for the sale of permanent Medicare-funded residency slots from a closed hospital when Congress has given the power to redistribute those slots *exclusively* to the Secretary. 42 U.S.C. § 1395ww(h)(4)(H)(vi). If the Court were to order the sale, it would raise Separation of Powers concerns.

Second, the same Medicare Program laws that apply to Debtors' efforts to transfer Hahnemann's Medicare provider agreements out of bankruptcy apply in bankruptcy. As the Supreme Court recently confirmed, "The estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) (citation omitted). Until August 29, 2019, Debtors have consistently and correctly maintained that this Court may only allow assumption and assignment of a Medicare provider agreement consistent with 11 U.S.C. § 365. But even under Debtors' eleventh-hour, and unsupported, theory that the Medicare provider agreement is an asset that can be transferred under section 363, federal laws and regulations still govern the sale. Based on those relevant laws and regulations, the proposed Jefferson Sale is contrary to law for at least four additional reasons:

      A.     Hahnemann has stopped providing medical services to the community and will be permanently closed on September 6, 2019. Thus, its Medicare Provider Agreement, which authorizes Medicare reimbursement for the provision of

---

*id.* at 67:14-17 ("[CMS counsel] stood up here and said, you know, look, you need our approval for this transaction to happen. And we agree with that, Your Honor. We agree with that.")

medical services at Hahnemann's location, terminates pursuant to 42 C.F.R §§ 489.52(b)(3) and 413.79(h), and may not be sold in (or out of) bankruptcy.

B.     Even if Hahnemann's Medicare Provider Agreement is deemed not to have been terminated, the proposed sale is not a change of ownership ("CHOW") consistent with 42 C.F.R § 489.18.

C.     Even if Debtors could assume and assign Hahnemann's Medicare Provider Agreement, the assumption and assignment must be made with full successor liability. 42 C.F.R § 489.18; *University Med. Ctr. v. Sullivan* (*In re University Med. Ctr.*), 973 F.2d 1065, 1075 (3d Cir. 1992).  Here, though, Debtors improperly attempt to "discharge" monies owed to CMS and seek to avoid Jefferson's successor liability by forcing CMS to recover potential overpayments from a fixed one-year "Escrow Amount" shared among claimants.  APA at 3.1 (page 8).

D.     The Anti-Assignment Act applies here, and the United States does not consent to any assignment of Hahnemann's Medicare Provider Agreement under section 365(c)(1).

The United States previously filed objections to the Bidding Procedures for the sale of Hahnemann assets, Dkt. 188 (July 15, 2019), and to the proposed sale of Hahnemann assets to the then-Stalking Horse Bidder, Dkt. 363 (August 5, 2019).  Those objections, like this one, explain that Debtors' efforts to sell the Hahnemann Medicare Provider Agreement when Hahnemann has stopped providing medical services to the community, and the residency slots tied to that agreement, are contrary to Medicare Program law.  Despite being fully aware of the United States' position for more than one month and one half, Debtors have made no significant alterations to the proposed sale and have entirely failed to address the United States' objections. Debtors did file a Reply to the United States' objection to the proposed sale of Hahnemann assets to the then-Stalking Horse Bidder on August 29, 2019.  Dkt. 591.  This objection addresses arguments raised in that Reply.

## STATUTORY AND REGULATORY BACKGROUND

### A. Enrollment in Medicare

1.      Certain of the Debtors are "providers" of hospital and skilled nursing services under the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* and 42 C.F.R. Chapter IV and CMS policies and procedures (collectively, the "Medicare Program").  To be eligible to be reimbursed for services to Medicare beneficiaries, certain Debtors are party to separate Medicare Part A provider agreements ("Provider Agreements").  42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider").  A Provider Agreement is defined as an agreement between CMS and a hospital, skilled nursing facility, home health agency, clinic, outpatient rehabilitation facility, hospice, or community mental health center.  42 C.F.R. §§ 489.2 and 489.3.

2.      To obtain a Provider Agreement, a new provider must apply for initial certification.  *See* 42 C.F.R. §§ 488.1, 488.3, 489.1, 489.2 and 489.10.  The certification process enables HHS to determine, *inter alia*, that the provider is qualified to provide health care services to patients.  *See* 42 C.F.R. §§ 489.10-.12 (grounds for denying a Provider Agreement); *see also* 42 C.F.R. Part 418 (health and safety requirements to qualify as a hospice).

3.      As a result, the transfer of a Provider Agreement is strictly limited and must be approved by CMS before the transfer is effective.  Provider Agreements may only be assigned upon CMS' determination that there is a valid "change of ownership."  42 C.F.R. § 489.18.  When CMS determines that a valid "change of ownership" has occurred, the existing Medicare Provider Agreement is automatically assigned to the new owner.  *See* 42 C.F.R. § 489.18(c); *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994).  An assigned agreement is subject to all statutory and regulatory terms under which it originally was issued,

4

including the adjustment of payments to account for previously made overpayments.[2] *Vernon*, 21 F.3d at 696 (citing 42 C.F.R. § 489.18(a), (d)).[3] *See also In re Charter Behavioral Health Systems, LLC*, 45 F. Appx. 150, 151 n.1 (3d Cir. 2002) ("If the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner.") (citing 42 C.F.R. § 489.18(d); *Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103-05 (8th Cir.2000); *Vernon*, 21 F.3d at 696).

4.      By contrast, if a new provider opts not to accept assignment of the Medicare Provider Agreement, the Medicare Provider Agreement is voluntarily terminated. 42 C.F.R. § 489.13(c); CMS Publ. 100-08, Chapter 15 § 15.7.7.1.5. In that case, the new provider is treated as a new applicant to the Medicare program and cannot receive payments for covered services until after CMS determines that the new provider meets Medicare enrollment and certification standards. 42 C.F.R. § 489.13(c); CMS Publ. 100-08, Chapter 15 § 15.7.7.1.5. If that occurs, there is no retroactive payment for covered services for the period before CMS determines that the new provider is qualified to participate in the Medicare Program. 42 C.F.R. § 489.13(c); CMS Publ. 100-08, Chapter 15 § 15.7.7.1.5 ("If the Buyer rejects assignment of the provider

---

[2] Debtors attached one of the documents that make up their Medicare Provider Agreement for Hahnemann to their Reply. Dkt. 591-2. That agreement, signed by Mr. Freedman, states: "In the event of a transfer of ownership, this agreement is automatically assigned to the new owner subject to the conditions specified in this agreement and 42 CFR 489." *Id.*.

[3] Debtors assert that *Vernon* is not applicable here because it addresses preemption of state law. Reply at 15 (¶ 45). But, the Ninth Circuit, citing to *Vernon* with approval, explained that "[i]t is equally true that private parties have no power to alter their legal obligations with Medicare under their provider agreements." *Mission Hosp. Regional Medical Center v. Burwell*, 819 F.3d 1112, 1117 (9th Cir. 2016).

agreement, the Buyer must file an initial application to participate in the Medicare program. In this situation, Medicare will never pay the applicant for services the prospective buyer provides before the date on which the provider qualifies for Medicare participation as an initial applicant."). *See In re University Med. Ctr.*, 973 F.2d at 1075 ("Assumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits. . . .  Through executing a provider agreement, a hospital accepts the "burden" of allowing HHS to recover the amount of prior overpayments from Medicare reimbursement currently due.  Rejection, on the other hand, both cuts off any right of the contracting creditor to require the estate to perform the remaining executory portions of the contract and limits the creditor's claim to breach of contract.").

5.     Additionally, Medicare regulations specifically prohibit the sale or transfer of billing privileges or a Medicare billing number, except pursuant to a valid change of ownership. 42 C.F.R. § 424.550; *see also* 42 C.F.R. § 424.535(a)(7) (revocation of Medicare enrollment for knowingly selling Medicare billing number unless in the event of a CHOW).  To obtain CMS approval of a change of ownership of a provider number, the applicant must submit CMS form 855A.

6.     HHS contracts with Medicare Administrative Contractors ("MACs") to administer payment to providers for Medicare covered services.  MACs make interim payments to providers in accordance with the Medicare Program and perform the day-to-day administration of Medicare, *e.g.*, audit and reimbursement activities.  42 U.S.C. § 1395kk-1; 42 C.F.R.  §§ 421.400-.404.

7.     At their request, certain of Debtors' facilities receive Medicare Periodic Interim Payments ("PIP").  42 U.S.C. § 1395g(e)(2); 42 C.F.R. § 418.307, 42 C.F.R. § 413.64(h)(2)(v).

The PIP is adjusted to make it consistent with current claim levels, and to determine overpayments for the current fiscal year.  Alternatively, the MAC may adjust payments to assure that total payments at the end of the fiscal year approximate, as closely as possible, the reimbursement determined to be due after review and audit of the provider's cost report.  42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(h)(6-7).

8.      Within five months after the end of the cost year, a provider must submit a report of its costs to verify the actual reimbursements owed to it for the past cost year.  42 C.F.R. §§ 413.1, 413.20, 413.24(f); *see* 42 U.S.C. §§ 1395g and 1395hh (giving the Secretary authority to require submission of cost reports).  Once the cost report is submitted, the MAC audits the cost report and determines the provider's actual, rather than estimated, reimbursement amount for the year, which can result in overpayment or underpayment claims.  42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 42 C.F.R. § 413.24.  Following an audit, providers have various appeal rights, including judicial review, with respect to the MAC's determination.  *See, e.g.*, 42 C.F.R. § 405.1807; 42 U.S.C. § 1395oo(f)(1).

9.      In addition, by motion of the MAC or the provider, or at the direction of CMS, final cost report determinations are subject to reopening for up to three years from their issuance in order to make corrections.  42 C.F.R. § 405.1885.

**B.  Residency Program Slots and Redistributions in the event of Hospital Closures**

10.      Section 1886(h) of the Social Security Act, as added by section 9202 of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985 (Pub. L. 99-272) and implemented in regulations at existing §§ 413.75 through 413.83, establish a methodology for determining payments to hospitals for the costs of approved graduate medical education (GME) programs.

11.     Section 1886(h)(4)(F) of the Act established limits on the number of allopathic and osteopathic residents that hospitals may count for purposes of calculating direct GME payments.  For most hospitals, the limits were the number of allopathic and osteopathic FTE residents training in the hospital's most recent cost reporting period ending on or before December 31, 1996.  42 U.S.C. § 1395ww(h)(4)(F); 75 Fed Reg. 71800, 72212 (Nov. 24, 2010) ("[E]ach teaching hospital's [full-time equivalent] FTE resident cap is unique to the number of FTE residents that it trained in the hospital's most recent cost reporting period ending on or before December 31, 1996.").

12.     Prior to the passage of the Affordable Care Act (2010) ("ACA"), generally, if a teaching hospital closed, its direct GME and Indirect Medical Education ("IME") FTE resident cap slots would be "lost," because those slots are associated with a specific hospital's Medicare Provider Agreement that has terminated.  Section 5506 of the ACA addresses this situation by instructing the Secretary to establish a process by regulation that would redistribute slots from teaching hospitals that close to hospitals that meet certain criteria, with priority given to hospitals located in the same Core Based Statistical Area ("CBSA") or in a contiguous CBSA to the closed hospital.  42 U.S.C. § 1395ww(h)(4)(H)(vi).  By statute, there is no "administrative or judicial review" with respect to the Secretary's redistribution of residency slots following a hospital closure.  *See* ACA § 5506(e); 42 U.S.C. § 1395ww(h)(7)(E).[4]

---

[4] Note that this process applies to *permanent* resident slots.  This Court was previously extremely concerned with how the now-former Hahnemann residents would be able to complete their residencies.   The law allows temporary resident cap adjustments for the completion of training, and it appears that all the now-former Hahnemann residents have left for other institutions, presumably utilizing temporary funding to do so.  "The Medicare regulations at 42 CFR 413.79(h) provide for temporary resident cap adjustments to hospitals that take in residents displaced by program or hospital closure."  https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/Downloads/Fact-sheet-displaced-residents.pdf.

13.     In addition, Section 5503 of the ACA provides for reductions in the direct GME

and IME FTE resident caps for certain hospitals, and authorizes a "redistribution" to certain

hospitals of the estimated number of FTE resident slots resulting from the reductions.  Effective

for portions of cost reporting periods occurring on or after July 1, 2011 for direct GME and IME,

a hospital's FTE resident caps will be reduced by 65 percent of the "excess" resident slots if its

"reference resident level" is less than its "otherwise applicable resident limit."  The Secretary is

authorized to increase the otherwise applicable FTE resident cap for each qualifying hospital that

submits a timely application by a number that the Secretary may approve, effective for portions

of cost reporting periods occurring on or after July 1, 2011.  42 U.S.C. § 1395ww(h)(8).

## FACTUAL AND PROCEDURAL BACKGROUND

14.     Since before the Petition Date, certain of the Debtors participated in the Medicare

Program as Medicare Part A providers under their Provider Agreements.  For purposes of this

objection, Center City Healthcare, LLC d/b/a Hahnemann University Hospital (Part A) has a

Provider Agreement with the United States.

15.     On December 2017, Debtors filed an electronic CHOW application in connection

with the sale of Hahnemann Hospital from Tenet Healthsystem Hahnemann, LLC to Debtors.

Ex. 1 at 1 ("Reason for Submission:  A Medicare Part A provider is undergoing a CHOW and

this application is to inform Medicare as the buyer/new owner.").

16.     In the ordinary course of business, the MACs may determine Medicare

overpayments owed by the Debtors relating to prepetition service dates and postpetition service

dates under the Medicare Program.

17.     On July 1, 2019 (the "Petition Date"), the Debtors filed their voluntary petitions

for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

18.    On July 19, 2019, Debtors filed the Stalking Horse Sale Agreement (Asset Purchase Agreement).  Dkt. 246-1.

19.    Later that same day, the Court issued an Order establishing bidding procedures for the potential sale of Hahnemann resident program assets.  Dkt. 249.

20.    After an auction in early August 2019, Debtors selected Jefferson University Hosptial as the Successful Bidder.  Jefferson is part of a consortium of six hospitals, but Jefferson is the sole Purchaser.

21.    On August 29, 2019,  Debtors filed the Asset Purchase Agreement for the sale to Jefferson.  Dkt. 590-1.

22.    The Jefferson APA indicates that Hahnemann's Medicare Provider Agreement will be assumed and assigned to Jefferson.  Jefferson APA, Sched. A-1 (III); *see id.* at Exhibit A (defining "Excluded Assets" as including "Assigned Contracts . . . identified on Schedule A-1").

23.    The Jefferson APA does not provide that Jefferson will be required to assume all liabilities relating to the Provider Agreement.  *See* Jefferson APA, Art. 3.1.  Furthermore, the Jefferson APA does not specify that any assumption and assignment of the Provider Agreement must comply with section 365 of the Bankruptcy Code and the Medicare Program.

24.    Instead, as set forth in the Jefferson APA, Debtors are *not* assuming and assigning all liabilities associated with the Medicare provider agreement.  The Jefferson APA establishes a $3,000,000 Escrow Amount to "cover [certain] following losses, damages and expenses," including a "CMS Pre-Closing Amount."[5]  Jefferson APA, Art. 3.1.  The Escrow expires after one-year.  *Id.*

---

[5] Note that the Stalking Horse Sale Agreement (Asset Purchase Agreement), Dkt. 246-1, contained a virtually identical escrow provision, but used the term "CMS Discharge Amount." Dkt. 246-1, Art. 3.1.  Apparently, Debtors believe that by altering semantics, but not substance,

25.    The Jefferson APA defines the "CMS Pre-Closing Amount" as "a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as final, which amount shall be the maximum amount due to CMS on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement."  Jefferson APA, Art. I (page 3).

26.    CMS has not agreed to any discharge (or "Pre-Closing") amount or maximum Cure Costs due.

27.    The Jefferson APA also states that the Debtors and Jefferson will obtain "Regulatory Approvals," including from CMS.  Jefferson APA, Art. VII (7.1(c)).  The Agreement states that CMS "shall have consented to the transactions contemplated by this Agreement."  *Id.*  CMS does not consent to the transaction(s) set forth in the Jefferson APA. That same provision states that "CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated hereby will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap."

28.    As demonstrated by the United States' objections, CMS does not, cannot and will not provide such confirmation.  The "full amount of Seller's residency slot cap" will be distributed publically consistent with 42 U.S.C. § 1395ww(h)(4)(H)(vi).

---

the Court may be less likely to identify the escrow for what it is:  an outright rejection of full successor liability as required by Medicare Program law and section 365.

29.     Hahnemann has stopped providing medical services to the community.

https://www.hahnemannhospital.com/SitePages/Closure%20FAQs%20for%20the%20Community.aspx.  "The last patient left the inpatient hospital unit on July 25, 2019 and the ED doors were closed on August 16, 2019."  Dkt. 632 at 11.  Every department has closed, with the possible exception of the Drexel outpatient oncology suite located in Hahnemann, which has either ceased operations or will do so by September 6.  Hahnemann will permanently close on or about September 6.

30.     Hahnemann's residency program is closed.  All Hahnemann residents have transferred to other hospitals.  Dkt. 632 at 6.  Effective August 26, 2019, the Federation of State Medical Boards is now the custodian of Hahnemann University physician training records.

https://www.fsmb.org/closed-programs/hahnemann-training-records/

## ARGUMENT

## I.     Debtors Have No Authority to Sell Medicare-Funded Residency Slots

### A.     Congress Has Vested the Secretary with Exclusive Authority to Redistribute Residency Slots from a Closed Hospital

Private parties do not have the authority to contract for the sale of permanent Medicare-funded residency slots from a closed hospital when Congress has mandated that the Secretary redistribute those slots according to a statutory order of priority.  42 U.S.C. § 1395ww(h)(4)(H)(vi); 42 C.F.R. § 413.79(o).  The Secretary's redistribution of residency program slots is not reviewable by any administrative or judicial body.  42 U.S.C. § 1395ww(h)(7)(E).

The total number of Medicare-funded resident slots nationwide was fixed by the Balanced Budget Act of 1997.  Recognizing that the resident slots of hospitals that closed after 1997 were effectively extinguished, decreasing the nationwide total, Congress, in the ACA,

included a provision to require redistribution of residency slots from closed hospitals. Section 5506 of the ACA (1395ww(h)(4)(H)(vi)) requires the Secretary, "in the case where a hospital . . . with an approved medical residency program closes," to redistribute the closed hospital's permanent residency slots by "establish[ing] a process" to "increase the otherwise applicable resident limit . . . for other hospitals." Pursuant to Section 5506, this is a mandatory process for hospitals with a residency program that closes, like Hahnemann.

In Section 5506, Congress instructed HHS to redistribute the slots in a "priority order," beginning with:

> (1) hospitals located in the same core-based statistical area as, or a core-based statistical area contiguous to, the hospital that closed.
> (2) hospitals located in the same State as the hospital that closed.
> (3) hospitals located in the same region of the country as the hospital that closed.

§ 1395ww(h)(4)(H)(vi)(II)(aa-cc).

Debtors' Reply *entirely fails to address Section 5506*, perhaps because Debtors have no counter to the unequivocal direction of Congress in Section 5506. *See* Dkt. 591. Hahnemann has stopped providing medical services to the community (or will do so imminently) and Congress has mandated that the only means of transferring Hahnemann's permanent resident slots is through the Section 5506 process.

HHS has completed thirteen successful rounds of Section 5506 cap redistributions since the ACA was enacted.[6] Notably, when hospitals in the Philadelphia area have closed, several members of the Jefferson-led Consortium have applied through the Section 5506 process and some have received slots:

---

[6]https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/DGME.html.

13

- Round 5 – Closure of Montgomery Hospital in Norristown, PA.  Ninety-six hospitals applied for slots, including eighteen from Pennsylvania.[7]  Six hospitals received slots.  Albert Einstein and Abington Memorial Hospital (now Jefferson) received slots.

- Round 10 – Closure of St. Joseph's Hospital in Philadelphia:  Thirty-three hospitals applied for slots, including nine from Pennsylvania.  Two hospitals received slots, including Abington Memorial Hospital received slots.  Cooper Union and Temple applied but did not receive slots.

Thus, Jefferson and other members of the Consortium have abided by the Section 5506 redistribution in the past when area hospitals have closed.  While, based on the Congressionally-mandated priority order, the Jefferson-led Consortium will likely receive a significant number of residency slots when Hahnemann goes through the Section 5506 redistribution, there is likely, based on these two prior redistributions, to be significant demand and many other hospitals will seek and receive Hahnemann residency slots.  Of course, the Jefferson-led Consortium seeks to subvert this public process with a private sale.

If this Court permits the sale, it would be acting contrary to Congress's unequivocal direction for distribution of a closed hospital's residency slots, particularly in the case of a closure of a large academic teaching hospital:

> The closure of a teaching hospital, *particularly if it is a large academic medical center*, could mean not only the displacement of hundreds of residents, but also the permanent loss of hundreds of Medicare-funded residency training slots and a sophisticated GME infrastructure that could take many years to rebuild, threatening the availability of health care services in a community. Section 5506 of the Affordable Care Act addresses this situation by amending section 1886(h)(4)(H) of the Act to add a new clause (vi) that instructs the Secretary to establish a process by regulation under which, in the event a teaching hospital closes, the Secretary will permanently increase the FTE resident caps for hospitals that meet certain criteria by the number of FTE resident positions in the closed hospital's training programs.

75 Fed Reg. 71800, 72212 (Nov. 24, 2010) (emphasis added).

---

[7] This round also involved a hospital in Alabama.

Moreover, the Court would be condoning an exclusive, private transfer of residency slots, when Congress had mandated that those slots may only be distributed through a nationwide public process administered by HHS. "[W]hen contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity." *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, (1986). "If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions." *Id.* It is not within the power of the parties to a contract, subject to valid governmental regulation, to frustrate the will of Congress and to ignore pro tanto its legislative fiat." *5050 Tuxedo, LLC v. Neal*, 2017 WL 935877, at *6 (D. Md. 2017) (quoting *United States v. Murlaugh*, 190 F.2d 407, 409 (4th Cir. 1951)); *cf. American Airlines, Inc. v. Austin*, 75 F.3d 1535, 1538 (Fed. Cir. 1996) ("Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void.").

These blackletter principles apply squarely to Medicare Program law. "Federal law fixes the relationships and responsibilities of Medicare with beneficiaries and providers. These relationships and responsibilities are beyond the reach of private parties . . . to alter. The liabilities of a Medicare provider are as different from the liabilities in a typical assets-only purchase, as chalk is from cheese." *Mission Hosp.*, 819 F.3d at 1117.

Because the Jefferson APA purports to sell residency slots that the Secretary is required to redistribute, it is void as a matter of law and cannot be approved. It follows that should a court approve a contract (such as issuing a sale order for the proposed transaction between Debtors and Jefferson), the court would violate the Separation of Powers by intruding into an area on which Congress has spoken unequivocally. Such an intrusion would be particularly overreaching

because Congress specifically exempted the Secretary's redistribution of residency slots from review by any administrative or judicial body.

B.    The Residency Slots are Not Debtors' "Property" and Cannot be Sold or Transferred Between Private Parties

No statute or regulation authorizes private parties to sell or otherwise transfer residency slots, because residency slots are not "property" that can be bought and sold.  Indeed, residency slots bear none of the hallmarks of a private property interest and remain in the *exclusive* control of the Secretary.  First, residency slots exist only within the context of Medicare participation.  If a hospital does not enroll in Medicare, it cannot receive Medicare funding for its residency program.  If a hospital ceases its participation in Medicare or closes, its allocated residency slots are forfeited and then redistributed.  42 U.S.C. § 1395ww(h)(4)(H)(vi).

Second, a hospital cannot dictate how many residency slots it has.  Instead, the Secretary determines caps on a hospital-by-hospital basis and may award additional residency slots under certain circumstances.  *Id.* § 1395ww(h)(4)(F), (H)(i).  Indeed, if a hospital opens a new residency training program, its cap is not calculated and implemented until the teaching program's *fifth* year of existence.  42 C.F.R. § 413.19(e)(1).  Third, the Secretary is authorized to redistribute residency slots while hospitals remain enrolled, such as when they go unused.  *Id.* § 1395ww(h)(8).  Fourth, CMS has expressed its concern with hospitals attempting to circumvent their respective caps and passed a regulation aimed at preventing affiliated groups (like the Jefferson-led Consortium) from doing so:

> [W]e were concerned that hospitals with existing medical residency training programs could otherwise, with the cooperation of new teaching hospitals, circumvent the statutory FTE caps by establishing new medical residency programs in the new teaching hospitals solely for the purpose of affiliating with the new teaching hospitals to receive an upward adjustment to their FTE caps under an affiliation agreement. This would effectively allow existing teaching hospitals to achieve an increase in their FTE resident caps beyond the number

> allowed by their statutory caps (70 FR 47452). Accordingly, we adopted the
> restriction under § 413.79(e)(1)(iv).

83 Fed Reg 41144, 41492 (Aug. 17, 2018).  In sum, a residency slot simply authorizes a hospital

to receive certain forms of Medicare reimbursement (namely "Direct Graduate Medical

Education" (GME) and "Indirect Medical Education" (IME) payments), while custody and

control over the slots themselves exclusively belong to the Secretary.  *Id.* § 1395ww(h)(3).  Quite

simply, Debtors are trying to sell residency slots that they don't own, and authorizing the sale of

those slots violates the laws that vest *exclusive* control over residency slots in the hands of the

Secretary.

## II.    Debtors' Proposed Sale Violates Medicare Law and Regulations

Debtors have conceded, and the Third Circuit has recognized, that transfer of the

Medicare Provider Agreement is accomplished through assumption and assignment under

section 365.  *See In re Charter*, 45 F. Appx. 150, 151 n.1; *In re University Med Ctr.*, 972 F.3d at

275.  The Bidding Procedures approved by the Court states:  "Any assumption and assignment of

the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365,

all applicable Medicare statutes and regulations, and the Anti-Assignment Act."  Dkt. 249 at

¶ 34.  Moreover, the APA lists the Hahnemann Provider Agreement as an executory contract to

be assumed and assigned.  Exhibit 1 to the APA identifies "Assigned Contracts" for which "[a]ll

of the Seller's rights and interests as of the Closing Date under or relating to the Contracts

specifically identified on Schedule A-1 to this Exhibit A."  Schedule A-1 lists the "Participating

Provider Agreement."  Despite its assurances to the Court to obtain an order for the Bidding

Procedures and its APA with the Purchasers, Debtors, in their Reply, raise, for the first time, a

contrary argument not accepted by any court in the past 20 years, and only acknowledged in one

unreported case prior – the Medicare provider agreement is an asset that may sold free and clear under section 363(f).[8]

However, whether this Court considers the proposed transfer of the Hahnemann Provider Agreement to Jefferson under section 365 or section 363, the Medicare Program laws apply. "Section 365 reflects a general bankruptcy rule: The estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Product*, 139 S. Ct. at 1663 (citing *Board of Trade of Chicago v. Johnson*, 264 U. S. 1, 15 (1924)); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("whatever rights a debtor has in property at the commencement of the case continue in bankruptcy – no more, no less.")*; see PBGC v. Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 942 (5th Cir. 1983) (lease of airport terminal space not transferable under section 363 without compliance with applicable non-bankruptcy law requiring federal agency approval); *FAA v. Gull Air, Inc. (In re Gull Air, Inc.)*, 890 F.2d 1255, 1262 (1st Cir. 1989) (recognizing debtor's limited property interest in airline landing slots under current applicable non-bankruptcy law, but holding that Bankruptcy Code did not enhance those rights).  As we explain below, the proposed Jefferson Sale violates the statutes and regulations that govern Medicare Provider Agreements, as well as the federal Anti-Assignment Act.

---

[8] Demonstrating little shame after their 180 degree pivot from section 365 to 363, Debtors assert in their Reply that the United States should be judicially estopped from contending that bankruptcy courts should analyze the transfer of Medicare provider agreement under section 365 when, in other non-bankruptcy cases involving different issues, the United States has asserted that granting a provider agreement does not grant contract rights.  *See* Dkt. 591 at 10-11.  Here, of course, Debtors consistently maintained that the Hahnemann Medicare Provider Agreement may only be transferred under section 365 until Debtors' eleventh-hour Reply.  In any event, the doctrine of nonmutual offensive collateral estoppel does not apply against the United States.  *See Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990); *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984)

A.    The Sale violates 42 C.F.R § 489.52

Hahnemann has stopped providing medical services to the community and will be

permanently closed on September 6, 2019.  Thus, its Medicare Provider Agreement, which is

tied to the provision of services at Hahnemann's location, has terminated pursuant to 42 C.F.R

§§ 489.52(b)(3) and 413.79(h), and may not be sold in (or out of) bankruptcy.

Under 42 U.S.C. § 489.52(b)(3), " [a] cessation of business is deemed to be a termination

by the provider, effective with the date on which it stopped providing services to the

community."  As described above, Hahnemann has stopped providing medical services to the

community.  It has no patients, its emergency room has long been closed, and all of its residents

have left to finish their training elsewhere.  *See* Dkt. 632 at 6.  During a hearing in this case on

August 20, 2019, the Court suggested that Hahnemann has no employees and Debtors did not

challenge that conclusion.  While there may still be a Drexel outpatient oncology suite "located

in Hahnemann" – but apparently not part of the hospital itself – that office will cease operations

on or before September 6, 2019.  Because of these facts regarding the current state of the

provision of medical services by Hahnemann, its Medicare Provider Agreement has terminated

(or will imminently), making that agreement ineligible for transfer.

Debtors, in their Reply to the United States' objection to the sale to the Stalking Horse

Bidder, also entirely fail to address section 489.52(b)(3) (as they did for ACA Section 5506).

Again, perhaps because the Debtors recognize that the regulation unequivocally renders is

Hahnemann Medicare Provider Agreement terminated.  Hahnemann has stopped providing

medical services to the community (or will do so imminently), and HHS has mandated that when

a hospital stops providing services, its provider agreement (which was specifically granted by

CMS for the provision of medical services at Hahnemann, *see* Dkt. 591-2) terminates. A terminated provider agreement cannot be transferred. 42 C.F.R § 489.52.

Debtors assert that the fact that Hahnemann has stopped providing medical services to the community is irrelevant because, although they provide the Court with no evidence, they allege that the Jefferson-led Consortium is treating all of Hahnemann's former patients: "The fact that such operations are being conducted from the Consortium's locations, rather than buildings historically operated by Hahnemann, does not materially alter this determination." Reply at 21. However, either the purchasers will continue to operate Hahnemann or Hahnemann has stopped providing medical services to the community. If the latter, which is the case, then there is no continued operation of Hahnemann "from the Consortium's locations" – there is no operation of Hahnemann at all. Debtors cannot provide the Court with an example of a change of ownership where CMS approved the transfer of a provider agreement from a hospital that stopped providing medical services to the community to another hospital that allegedly absorbed its patients.

B.    The Sale violates 42 C.F.R § 489.18

Even if Hahnemann's Medicare Provider Agreement is deemed not to have been terminated, the proposed sale is not a change of ownership ("CHOW") consistent with 42 C.F.R § 489.18. Because that regulation provides the only means to transfer a Medicare Provider Agreement, this Court must reject the proposed sale.

While Debtors now suggest that they may privately transfer Hahnemann's permanent residency slots without submitting a CHOW application or obtaining CMS approval, that baseless assertion is belied by the CHOW application Debtors submitted when they purchased all Hahnemann-related assets to continue to operate the hospital less than two years ago. *See* Ex. 1 at 1. Outside of bankruptcy, Debtors have recognized that they must follow CMS's regulations.

Now, after filing bankruptcy, Debtors assert that section 489.18 is not exclusive and that there are ways to transfer a provider agreement outside of the bounds of the regulation. Debtors mislead here – and do so badly.

1.    A CHOW is the Exclusive Vehicle for Continuous Enrollment in Medicare in the Sale Context

Medicare Provider Agreements may not be sold apart from a change of ownership under section 489.18. 42 C.F.R. § 424.535(7) explains that CMS may revoke enrollment in the Medicare program for a "provider or supplier [that] knowingly sells to or allows another individual or entity to use its billing number." The only exception to an impermissible sale (apart from the reassignment of benefits, which is not a transfer of the provider agreement itself) is "a change of ownership as outlined in § 489.18 . . . ." Thus, the *only* regulatory means for transferring a provider agreement is by a CHOW consistent with § 489.18. Because Debtors' proposed transaction is not a CHOW, and it purports to allow Jefferson to use Hahnemann's provider agreement in order to transfer its permanent residency slots, it is patently illegal. While Debtors claim that section 489.18 is not exclusive, Debtors identify no other statute or regulation authorizing them to sell Hahnemann's provider agreement, and section 424.535(7) makes clear that any vehicle other than a CHOW is illegal.

2.    The Court Has no Subject Matter Jurisdiction to Declare the Sale of the Residency Slots a CHOW

Debtors concede that the structure of their transaction does not satisfy section 498.18, *see* Dkt. 591 at 15, which does not address the sale of permanent residency slots. Even if Debtors are correct that CMS has discretion in recognizing certain transactions not specified in the regulation as CHOWs, then the proper course would be to present their CHOW application to

CMS for its consideration.  Instead, Debtors seek to bypass CMS consideration of their CHOW application and to have their transaction declared a CHOW in bankruptcy court.  Dkt. 631-1 at ¶ 30.  Granting Debtors' request would violate HHS' sovereignty as an executive branch agency, and prevent HHS from rendering a final agency decision regarding the proposed Hahnemann Medicare Provider Agreement transfer, which is a prerequisite to review in federal court.  It is black letter law that a court should not substitute its judgment for the determination of the agency charged with applying its statutes and regulations, much less when no administrative record has even been developed.  *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984) ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").

Debtors' attempt to circumvent CMS' decision-making process is also prohibited under the jurisdictional bar of the Social Security Act.  Except for conducting judicial review of the Secretary's final decision, a court is barred from jurisdiction over any Medicare Program determination. The applicable provision on this point is found at 42 U.S.C. § 1395ii, which incorporates the Social Security Act's jurisdictional bar, 42 U.S.C. § 405(h) ("No action . . . shall be brought under section 1331 or 1346 of Title 28 . . ." "except as herein provided"). The Supreme Court has characterized section 405(h) as "sweeping and direct" in its prohibition of pre-exhaustion lawsuits. *See Weinberger v. Salfi*, 422 U.S. 749, 757 (1975); *Bayou Shores SNF, LLC v. Burwell*, 2014 WL 4059900, at *5 (M.D. Fla. 2014); *Parkview Adventist Medical Center v. United States*, 842 F.3d 757, 760 (1st Cir. 2016) ( "the majority of circuits have adopted the view—based on previous versions of the statute and its legislative history—that even though § 405(h) specifically mentions a bar to jurisdiction under only 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (jurisdiction when the United States is a defendant), its jurisdictional bar

'applies to other grants of jurisdiction under Title 28, including bankruptcy jurisdiction under §

1334.').

The Supreme Court first discussed the application of this jurisdictional bar to a Medicare

dispute in *Heckler v. Ringer*, 466 U.S. 602 (1984). There, the Court ruled that the preclusive

effect of section 405(h) barred a court's review of any challenge that is "inextricably

intertwined" with a Medicare determination.  The terms of the Medicare statute provide the sole

avenue of review for any claim "arising under" the Medicare Act.  *Id.* at 614-15.  The Court

made clear that the jurisdictional bar of section 405(h) applies, without regard to whether the

complainant's claim is "substantive" or "procedural."  *Id.*  The Court also stated that it is "of no

importance" that a complainant may be seeking "only declaratory or injunctive relief" rather than

actual Medicare funds. *Id.* at 615.  The jurisdictional bar applies.

In 2000, the Supreme Court reiterated these principles in *Illinois Council on Long*

*Term Care*, 529 U.S. 1. (2000), a case that involved challenges to many elements of the

federal nursing home inspection and enforcement scheme, *see id.* at 6-7. In *Illinois Council*,

the Court emphasized that Medicare jurisdictional law requires that "virtually all legal

challenges" be channeled through the administrative agency, in order to avoid any sort of

premature interference by the courts.  *Id.* at 13.

Likewise, in *Nichole Med. Equip. & Supply,* 694 F.3d 340 (3d Cir. 2012), the Third

Circuit held that an action that a party is "entitled to payments under the Medicare program"

arises under the Medicare Act.  *Id.* at 348.  Because the essence of this dispute is Jefferson's

purported entitlement to Medicare reimbursements for the permanent residency slots, the

proposed sale of the Hahnemann Medicare Provider Agreement clearly arises under the

Medicare Act.  Notably, the Third Circuit also held that section 405(h) "continues to bar virtually

all grants of jurisdiction under Title 28." In particular, the court held that "Congress clearly prohibited federal courts from exercising subject matter jurisdiction or diversity jurisdiction over claims arising under the Act." *Id.* at 347. Accordingly, there is no subject matter jurisdiction for the Court to enter a sale order that overrides CMS' discretionary decision-making authority. If Debtors wish to transfer the Hahnemann Medicare Provider Agreement to Jefferson, it must seek CMS approval of the transaction.

### 3. The Sale of the Residency Slots is Not a CHOW

It is a logical fallacy for Debtors to assert that because CMS has exercised its discretion to recognize a CHOW in other cases, it must also do so here, much less that the Court should approve a transaction that circumvents CMS's review of Debtors' CHOW application. Section 489.18(a) describes the form of four transactions that may constitute a change of ownership. Although the regulation does not address asset purchases in the context of corporations, CMS has considered the purchase of substantially all the assets of a provider used for patient care to constitute a CHOW. *See* Provider Reimbursement Manual, Part I, §1500.7 (noting that a CHOW may include "[d]isposition of all or some portion of a provider's facility or assets (used to render patient care) through sale . . . if the disposition affects licensure or certification of the provider entity."). This position has been upheld by the Fifth Circuit in *Vernon* and is consistent with the structure of the enumerated transactions in section 489.18(a). 42 C.F.R. §489.18(a) ("*Unincorporated sole proprietorship.* Transfer of title and property to another party constitutes change of ownership. . . . *Leasing*. The lease of all or part of a provider facility constitutes change of ownership of the leased portion."); *Vernon*, 21 F.3d at 696.

Debtors cannot meet the substance of a CHOW. A CHOW involves the sale of substantially all of the assets of a hospital used to render patient care, such as facilities, staff,

equipment, patient records, electronic medical record ("EMR") systems, or any of the other basic elements of operating a hospital. Because the purpose of a CHOW is for transfer of the Medicare provider agreement such that the new owner can provide medical services and continue to obtain reimbursement under the transferred provider agreement, it should be obvious that the hospital assets necessary to provide medical services are transferred in a CHOW.

The Ninth Circuit has addressed why continuity of operation is essential to section 489.18. "The regulation [42 U.S.C. § 489.18], which Mission tried to circumvent, provides continuity of obligations, continuity which is essential to the functioning of Medicare's Prospective Payment System. The regulation talks about an assignment, not a new beginning with a clean slate on new terms." *Mission Hosp.*, 819 F.3d at 1116. The Ninth Circuit further explained that it was not limiting or restricting "assets-only purchases of medical providers, or Medicare reimbursements to assets-only purchases, *so long as the assets-only purchase makes an exception for Medicare reimbursement of overpayments*." *Id.* at 1115 (emphasis added).

Here, though, Jefferson is not buying facilities, staff, equipment, patient records, EMR, or any of the other basic elements of operating a hospital. Rather, Jefferson wants to purchase *only* the provider agreement, and only because of the 580+ residency slots associated with it. Debtors cannot identify any case where CMS has authorized the sale of residency slots, whether or not in the bankruptcy context. A bankruptcy court has no jurisdiction to modify the terms of Debtors' enrollment agreement in Medicare or force CMS to enter into a contractual relationship with Jefferson upon different terms. *See In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004) ("the equitable powers of the bankruptcy court do not accord it 'a roving commission to do equity,' . . . nor 'authorize courts to create substantive rights that are otherwise unavailable under the Code, or to expand the contractual obligations of parties.'") (citation omitted).

In their Reply, Debtors do not identify one transaction in which a hospital closed but sold its provider agreement (much less permanent resident slots).  If a CHOW under section 489.18 is not the exclusive means to transfer a Provider Agreement, where are the examples of when CMS approved non-CHOW transfers?  Where is the citation to cases where courts approved non-CHOW transfers?  There are none, because non-CHOW transfers do not exist.

Debtors also assert that "CMS' argument is belied by its own sub-regulatory guidance and practice."  Reply at 19-20.  To be blunt, Debtors again mislead the Court.  A Medicare Manual states that a "provider may undergo a financial or administrative change" that may be a CHOW, which is irrelevant here.  Hahnemann is not undergoing a "financial or administrative change" – it is attempting to sell its residency slots in a private transaction in contravention of ACA Section 5506.  Notably, the same manual provides that a CHOW constitutes automatic assignment, and that a buyer who rejects assignment must file as a new applicant.  Medicare Provider Integrity Manual, § 15.7.7.1.5.  No statute or regulation allows the private sale of Medicare-funded residency slots, and Debtors' contention that "sub-regulatory guidance" does so is wrong.[9]

C.    The Sale violates 42 C.F.R § 489.18(d) and is contrary to binding Third Circuit law

When a buyer wishes to purchase a hospital, the buyer has a binary choice.  It can either assume the seller's provider agreement under section 489.18(d), in which case it steps into the shoes of the previous owner, is able to bill Medicare continuously, and accepts full successor

---

[9] In any event, Debtors' arguments as a whole are irrelevant, because, at heart, they allege that the Bankruptcy Code eviscerates Medicare Program law and CMS's right (and obligation) to approve a CHOW.  But, as the Court is well aware, Debtors may not use bankruptcy to avoid federal regulation.  Again, as the Supreme Court recently reiterated, "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy."  *Mission Product*, 139 S. Ct. at 1663.

liability.  Or, a buyer can reject the seller's provider agreement and apply to Medicare as a new applicant.  In that case, the buyer has no successor liability, but also cannot bill Medicare until its enrollment application is approved.  Here, Jefferson attempts to "assume" Hahnemann's Provider Agreement, but only wants the benefits (continuous billing and the permanent residency slots) without any of the burdens (full successor liability).

Even if Debtors could assume and assign Hahnemann's Medicare Provider Agreement (and we've explained why doing so is contrary law), the assumption and assignment must be made with full successor liability. 42 C.F.R §§ 489.18; *In re University Med. Ctr.*, 973 F.2d at 1075.  As a CHOW is the only means of transferring a provider agreement, the assignment of the provider agreement must be "subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued." § 489.18(d); *see* Dkt. 591-2 ("In the event of a transfer of ownership, this agreement is automatically assigned to the new owner subject to the conditions specified in this agreement and 42 CFR 489.") *Id.*  In other words, as the Third Circuit has made clear, when assuming a provider agreement, "a hospital accepts the 'burden' of allowing HHS to recover the amount of prior overpayments from Medicare reimbursement currently due." *In re University Med. Ctr.*, 973 F.2d at 1075; *see also In re Charter*, 45 F. Appx. 150, 151 n.1; *Vernon,* 21 F.3d at 696 ("The operative effect of section 498.18(d) is that all assigned provider agreements are subject to the rules and regulations of the Social Security Act."); *Mission Hosp.*, 819 F.3d at 1116 ("The regulation [section 489.18] which Mission tried to circumvent, provides continuity of obligations, continuity which is essential to the functioning of Medicare's Prospective Payment System. The regulation talks about an assignment, not a new beginning with a clean slate on new terms.").

27

Neither Congress, HHS nor the Third Circuit has limited successor liability.  But, Debtors and the Jefferson-led Consortium do exactly that here.  They seek to transfer the Hahnemann provider agreement while limiting HHS's liability to a share of a $3 million escrow account that will expire a year from closing.  Dkt. 590-1, Art. 3.1.  That effort to limit HHS's liability is another reason that the proposed sale cannot qualify as a CHOW and, thus, cannot be approved by CMS.[10]

The Medicare Program's regulations and procedures manuals explain that if an acquiring entity refuses automatic assignment of a provider agreement, that refusal results in the existing provider agreement terminating effective with the date ownership changes.  42 C.F.R. §§ 412.84(i)(3)(i) (defining a "new hospital" as "an entity that has not accepted assignment of an existing hospital's provider agreement in accordance with § 489.18 of this chapter."), 489.13(c); SOM § 3210.5A, 75 Fed. Reg. 50,042, 50,401 (Aug. 16, 2010 CMS Publ. 100-08, Chapter 15 § 15.7.7.1.5 ("If a Part A provider agreement is not assumed and assigned to a purchaser, the agreement terminates, and the purchaser is not eligible for payments for any services it provides."); *see, e.g.*, *Mission Hosp.*, 819 F.3d at 1116 ("Mission extinguished South Coast's provider agreement and voluntarily refused to assume South Coast's contractual liability to return overpayments to Medicare. Consequently, Mission did not and could not take assignment of South Coast's provider agreement."); *Eagle Healthcare, Inc. v. Sebelius*, 969 F. Supp. 2d 38, 40

---

[10] Debtors apparently assert that because CMS has, where the specific circumstances warranted it, reached agreement with transferees receiving a Medicare Provider Agreement regarding the scope of that party's liability, CMS is obligated to do so here (or the Court is obligated to force CMS to do so here). *See* Reply at ¶ 26.  That's an incorrect proposition, without any basis in law.  A party may settle in one matter for any number of reasons – but doing so does not mandate settlement in other matters.  More importantly, settlement in those cases was *consensual* and the product of CMS's *choice*.  Debtor has not identified any similar attempt to buy a provider agreement from a closing hospital solely to acquire the affiliated residency slots, much less one that CMS agreed to.

(D.D.C. 2013) ("If, however, the new owner rejects the assignment, the prior owner's Provider

Agreement terminates and the new owner must seek to enter the Medicare program as a new

applicant. 42 C.F.R. § 489.10.").

Accordingly, under the present structure of the transaction, Hahnemann's enrollment in

Medicare has either terminated because it has stopped providing medical services to the

community, or upon Jefferson's rejection of assumption of Hahnemann's Medicare Provider

Agreement (the outcome if Jefferson refuses to assume full successor liability).  In either case,

Hahnemann has ceased to participate in the Medicare Program *before* the transfer of its

permanent residency slots could purportedly be accomplished.  Because a hospital that is not

enrolled in Medicare forfeits its residency slots, Debtors' proposed transaction (even if legal,

which it is not) is impossible under the regulations.  *See* 42 C.F.R. §§ 413.79(o) ("in the instance

of a hospital closure . . . , as defined at paragraph (h)(1)(i) of this section, the FTE resident cap of

the closed hospital would be redistributed"), 413.79(h)(1)(i) ("Closure of a hospital means the

hospital terminates its Medicare agreement under the provisions of § 489.52 of this chapter.").

D.  The Sale violates the Anti-Assignment Act

The Federal Anti-Assignment Act, 41 U.S.C. § 6305, also prohibits Debtors' transfer

and/or assumption and assignment of the Hahnemann Medicare Provider Agreement without the

consent of the United States.  The United States does not consent to the transfer of the

Hahnemann provider agreement as set forth in the proposed sale, because, as described above,

such a transfer is contrary to law.

The Federal Anti-Assignment Act provides:

> The party to whom the Federal Government gives a contract or order may not
> transfer the contract or order, or any interest in the contract or order, to another
> party. A purported transfer in violation of this subjection annuls that contract or

29

> order so far as the Federal Government is concerned, except that all rights of
> action for breach of contract are reserved to the Federal Government.

41 U.S.C. § 6305(a).

The Anti-Assignment Act precludes Debtors from transferring and/or assuming and assigning the Medicare Provider Agreement to Jefferson without the consent of the United States. *See, e.g.*, *Matter of West Elecs.*, *Inc.*, 852 F.2d 79, 83-84 (3d Cir. 1988) (no assignment of an executory contract with a federal agency under the Bankruptcy Code without the United States' consent); *see also In re Access Beyond Techs.*, 237 B.R. 32 (Bankr. D. Del. 1999) ("Like the language of the statute, the decision in *West Electronics* is clear and unequivocal. We are bound by Third Circuit law on this point."). The United States has not provided its consent. Accordingly, the Jefferson Sale Motion should be denied for this reason alone. *See In re Catapult Entm't, Inc.*, 165 F.3d 747, 750 (9th Cir. 1999) (debtor-in-possession may not assume executory contract over non-debtor's objection if applicable non-bankruptcy law would bar assignment to hypothetical third-party); *see also In re CFLC, Inc.*, 89 F.3d 673, 680 (9th Cir. 1996) (patent licenses are non-assignable under federal common law).

In their Reply, the Debtors elide the Anti-Assignment Act's absolute requirement of federal government consent, relying only upon *In re ANC Rental Corp.*, 277 B.R. 226, 235-36 (Bankr. D. Del. 2002). But *ANC Rental*, which did not involve the federal government and did not discuss the Anti-Assignment Act, has no relevance here. In that case, the question was whether an airport authority was required to approve the assignment of an airport concession assignment. The Court explained that "[n]one of the statutes expressly prohibit assignment of concession agreements and none expressly excuse the airport authority from accepting performance from an assignee of a concessionaire." *Id.* at 235. Here, there is no dispute that CMS must approve CHOWs. Moreover, in analyzing whether assignment required approval, the

*ANC Rental* Court distinguished the facts before it from "the kind of law that regulates important public rights, such as the public air safety in *Braniff*, or the regulation of government contracts for production of military equipment, as in *West Electronics*." *Id.* at 236 (quoting *In re Federated Dep't Stores, Inc.*, 126 B.R. 516, 518-19 (Bankr. S.D. Ohio 1990). There is no question here that CMS's oversight of the provision of Medicare services nationwide is the regulation of important public rights.

### III.   Under Binding Third Circuit Precedent, a Medicare Provider Agreement Must Be Assumed and Assigned Pursuant to Section 365

A.   <u>Medicare Provider Agreements are properly addressed under section 365</u>

Under binding precedent in the Third Circuit, the Provider Agreement is treated as an executory contract that may only assumed and assigned pursuant to section 365 of the Bankruptcy Code. *In re University Med. Ctr.*, 973 F.2d at 1075; *see In re Bayou Shores SNF, LLC*, 525 B.R. 160, 168 (Bankr. M.D. Fla. 2014) (quotation omitted) ("Under the . . . 'functional approach,' courts abandon the traditional focus on the 'executoriness' of contracts in bankruptcy in favor of a more practical, functional approach. . . . [T]he majority of courts have concluded that Medicare provider agreements are executory contracts.").

If the Debtors assume and assign the Hahnemann Medicare Provider Agreement to Jefferson, Jefferson must assume all of the burdens along with the benefits arising from assignment of the Provider Agreement. *See* 11 U.S.C. § 365(a), (b); *In re University Med. Ctr.*, 973 F.2d at 1075 (holding that "[a]ssumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits," and specifically referring to a provider agreement); 42 C.F.R. § 489.18(d) ("An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued").

Those burdens include the obligation to comply with the Medicare Program regulations governing the agreement.  *See, e.g.*, *In re EES Lambert Associates*, 62 B.R. 328, 336 (Bankr. N.D. Ill. 1986) (explaining that debtor could not "assume [a] note and mortgage . . . and then simply reject [an accompanying] regulatory Agreement.").  "A debtor cannot retain those aspects of the contract to his benefit while rejecting the burdensome aspects thereof."  *Id.*  Here, those Medicare Program statutes and regulations include 42 C.F.R. § 489.52 and 42 U.S.C. § 1395ww, which terminate a closed hospital's provider agreement and redistributes its residency slots, and 42 C.F.R. § 489.18, which requires CMS approval of a CHOW.  Thus, the Court cannot permit Debtors to assume and assign the Hahnemann Medicare Provider Agreement because doing so would immediately conflict with Medicare Program law, such that Debtors cannot assume the burdens of the Medicare Provider Agreement.  That insurmountable burden makes section 365 assumption and assignment impossible here.

Assuming for the sake of argument that Hahnemann had not stopped providing medical services to the community and Jefferson would continue to operate the hospital, to satisfy both section 365 and Medicare Program law, Debtors could not "sell" the Medicare Provider Agreement, but must assume and assign it, cure all existing defaults associated with it, and provide adequate assurance that Jefferson will assume all of the burdens along with the benefits of future performance arising from the assignment, including successor liability. 11 U.S.C. § 365(a), (b); 42 C.F.R. § 489.18(d) (upon a change of ownership, the existing provider agreement is automatically assigned to the new owner, subject to all applicable statutes and regulations and terms and conditions under which it was originally issued); *see Vernon*, 21 F.3d at 696 (new owner that accepted assignment of Medicare provider agreement was liable for overpayments of prior owner); *Deerbrook Pavilion*, 235 F.3d at 1103 (new owner of a skilled nursing facility was

32

liable for penalties assessed on the basis of the former owner's actions); *Eagle Healthcare*, 969 F. Supp. 2d at 40 ("An assigned Provider Agreement is subject to all of the terms and conditions under which it was originally issued."). *See also In re Charter*, 45 Fed. Appx. 150, 151 n.1 (observing that "[i]f the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments *but assumes successor liability for overpayments and civil monetary penalties asserted by the Government against the previous owner*") (emphasis added) (citing 42 C.F.R. § 489.18(d); *Deerbrook Pavilion*, 235 F.3d at 1103-05; *Vernon*, 21 F.3d at 696).[11]

Indeed, in *In re Heffernan Mem'l Hosp. Dist.*, 192 B.R. 228, 231 n.4 (Bankr. S.D. Cal. 1996), the Bankruptcy Court for the Southern District of California held that the Medicare provider agreement is an executory contract providing for advance payments based on estimates and expressly permitting the withholding of overpayments from future advances. Further, in *In re Vitalsigns Homecare, Inc.,* 396 B.R. 232, 240-41 (Bankr. D. Mass. 2008), the court treated Medicare provider numbers as executory contracts based on a rationale that applying section 365 to the provider numbers is an appropriate harmonization of the statutory schemes of the Bankruptcy Code and the Medicare Statute. The court reasoned that "the provider number and the provider agreement are part and parcel of a complicated statutory scheme. It appears that the

---

[11] In their Reply, Debtors assert that the Third Circuit in *In re University Medical Center* did not actually conclude that Medicare Provider Agreements must be treated as executory contracts under Section 365. Reply at ¶ 35. That is, frankly, an absurd argument, because the Third Circuit specifically made that finding. *See id.* at 1075 ("Assumption of the executory contract requires the debtor to accept its burdens as well as permitting the debtor to profit from its benefits. Consequently, if UMC assumed its provider agreement, there is no question that HHS could withhold UMC's post-petition reimbursement in order to recover pre-petition overpayments."); *id.* n.13 ("A Medicare provider agreement easily fits within [the] definition" of "executory contract"). Even if the parties did not contest the issue, the Third Circuit's conclusions were not mere *dicta*, but formed an integral part of the Court's decision.

provider agreement, the statute, and the regulations form an arrangement that imposes both benefits and burdens on the provider.  It cannot accept the benefits without the attendant burdens."  *Id.* at 240; *see also In re Raintree Healthcare Corp.*, 431 F.3d 685 (9th Cir. 2005) (Debtor cannot assign to the purchaser greater rights than it had in the Medicare provider agreement); *In re Diamond Head Emporium*, 69 B.R. 487, 494 (Bankr. D. Hawaii 1987) ("A debtor may not pick and choose those portions that it wishes to enforce and reject those that it does not deem desirable.  That is black letter law engraved in stone.").

Moreover, because the Medicare Program payment mechanism involves upfront payments subject to adjustment through cost report auditing before actual reimbursements are determined, assumption and assignment of a Provider Agreement requires not just cure of overpayments determined as of the date of the assumption and assignment under section 365(b)(1)(A), but also adequate assurance of future performance under section 365(b)(1)(C), including assumption of liability for later determined overpayments, regardless of whether they relate to requested reimbursements for services provided before the assumption and assignment. *Vernon*, 21 F.3d at 6964 (purchaser "accept[ed] the automatic assignment of the provider agreement," making it jointly and severally liable with seller for overpayments, pursuant to Medicare regulations at 42 C.F.R. § 489.18(d)).

Applying Bankruptcy Code section 365 to Medicare Provider Agreements is also consistent with the Medicare statute because it does not strip off the Medicare overpayment liabilities from the provider agreement that a section 363(f) sale would allegedly do.  A section 363(f) sale would also arguably, yet improperly, extinguish HHS's rights of recoupment and setoff and impair the Medicare scheme adopted by Congress.  It would thwart a fundamental principle and purpose of the Medicare statute, namely providing healthcare to the elderly while

protecting the public fisc. *Vitalsigns*, 396 B.R. at 240-41. Requiring the provider agreement to be assumed pursuant to 11 U.S.C. § 365 prior to the assignment of that agreement to a third party assignee harmonizes both the Medicare and bankruptcy statutes.[12]

In contending that successor liability is not required by law, Debtors use slippery language, and this Court should examine it carefully. For example, Debtors claim that the United States' position that a provider agreement is assumed and assigned with full successor liability, as mandated by 42 U.S.C. § 489.18 and *University Medical Center*, "runs afoul of applicable provisions of the Bankruptcy Code and CMS' own past practice in negotiating capped overpayment liabilities in bankruptcy cases." Reply at ¶ 26. But Section 365 requires cure and adequate assurance of future performance (not limited cure and limited assurance). And Debtors well know that the fact that CMS may have resolved a limited number of cases through agreement as to the scope of its liability does not bind or obligate CMS to do so in any or every case. In any event, though, assignment of a Medicare Provider Agreement must be consistent with Medicare Program law – and Medicare law mandates full successor liability upon assumption and assignment of a provider agreement.

Moreover, because CMS cost reports identifying overpayments that may be recouped or offset take multiple years to be resolved, including the potential for appeal of initial determinations, the *only* way that an assignee of a Medicare Provider Agreement can provide adequate assurance of future performance is to assume full successor liability for any such

---

[12] "'[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. The courts are not at liberty to pick and choose among congressional enactments.'" *Id.* at 240 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

overpayments.[13]  That is exactly what 489.18 requires.  Moreover, CMS did not identify a cure

amount here, *see* Reply at 15-16, because the *only* valid means of transfer of the Hahnemann

provider agreement would be with the assumption and assignment of full successor liability.

      B.     <u>Section 363 does not apply to the transfer of Medicare provider agreements or Medicare-funded residency slots</u>

        1.     Medicare provider agreements are not property of the estate transferrable under section 363

As noted above, for the first time in their August 29, 2019 Reply to the United States'

objection, the Debtors assert that the Hahnemann Medicare Provider Agreement may be

transferred "free and clear" under section 363.  Dkt. 591 at PP 5, 27-40.  Debtors' argument is

flawed on multiple levels.  First, a Medicare Provider Agreement and/or Medicare-funded

resident slots are not "property" of the estate.  Second, even if the Medicare Provider Agreement

was deemed property of the state, Debtors cannot meet any elements of the statutory test set out

in section 363(f) in order to sell the agreement "free and clear" of successor liability.

"[H]ealth care providers . . . . do not have a property interest in continued participation or

reimbursement.'" *Shah v. Azar*, 920 F.3d 987, 997-98 (5th Cir. 2019) (explaining that they "are

not the intended beneficiaries of the federal health care programs").  Moreover, clauses that treat

the Medicare Provider Agreement as property do not bind CMS.  The CMS manual clearly states

that the provider agreement and CCN, also called the "provider number," are not the "property"

of the owner which can be sold.  SOM § 3210.1E.  Although the definition of property of the

---

[13] "This case deals only with the continuity of provider agreement contractual liability for Medicare overpayments, which are not ascertainable until Medicare accounting, calculating, and reconciliation, and which might not occur until years after initial billing." *Mission Hosp.*, 819 F.3d at 1115. "How complicated is this process [by which overpayments and underpayments are calculated], and how long does it take? . . . This daunting regulation [42 C.F.R. § 412.84] demonstrates why continuity is contemplated by the Medicare system." *Id.* at 1114.

estate under section 541 includes all legal or equitable interest of the debtor in property, the

Debtors' alleged rights (if any) in the Medicare Provider Agreement do not fit that broad

definition.

A debtor's property interests are defined under applicable non-bankruptcy law "to reduce

uncertainty, to discourage forum-shopping, and to prevent a party from receiving a 'windfall

merely by reason of the happenstance of bankruptcy.'"  *Butner v. U.S.*, 440 U.S. 48, 55 (1979)

(citing *Lewis Manufacturers National Bank*, 364 U.S. 603, 609 (1961)).  A solid majority of

courts of appeals that have considered the issue outside the bankruptcy context have ruled that

Medicare providers have *no property interest* in their participation in the Medicare program,

whether that be through provider agreements or provider numbers.  *Erickson v. U.S. ex rel. Dept.*

*of Health and Human Services*, 67 F.3d 858, 862 (9th Cir. 1995)  (Medicare provider had no

takings claim against the government for exclusion from Medicare program because he had no

property interest in participation in the Medicare program); *see Parrino v. Price*, 869 F.3d 392,

397-98 (6th Cir. 2017); *Koerpel v. Heckler*, 797 F.2d 858, 863-65 (10th Cir. 1986); *Cervoni v.*

*Sec'y of Health, Educ. And Welfare*, 581 F.2d 1010, 1019 (1st Cir. 1978).  With no property

interest at all in the Hahnemann Medicare Provider Agreements, Debtors have no right to sell it.

Moreover, to the extent that Debtors have any rights at all in connection with the Provider

Agreement, those rights are defined and strictly limited by the Medicare Program and were not

enhanced upon the Debtors' bankruptcy filing to transform into freely alienable property rights.

*Mission Product*, 139 S. Ct. 1652, 1663 (2019) (acknowledging "general bankruptcy rule" that

"[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy.");

*Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("whatever rights a debtor has in

property at the commencement of the case continue in bankruptcy – no more, no less."); *see*

*PBGC v. Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 942 (5th Cir. 1983) (lease of airport terminal space not transferable under section 363 without compliance with applicable non-bankruptcy law requiring federal agency approval); *FAA v. Gull Air, Inc. (In re Gull Air, Inc.)*, 890 F.2d 1255, 1262 (1st Cir. 1989) (recognizing debtor's limited property interest in airline landing slots under current applicable non-bankruptcy law, but holding that Bankruptcy Code did not enhance those rights).[14]

In support of their position that the Medicare Provider Agreements can be assigned to a purchaser without any obligation on the part of the purchaser to comply with the statutory and regulatory requirements for assignment, Debtors, *see* Reply at ¶¶ 31, 33, rely primarily on cases holding or stating in dicta that, outside of a bankruptcy case, a Medicare provider agreement is not a contract. *See, e.g., Hollander v. Brezenoff*, 787 F.2d 834 (2d Cir. 1986); *PAMC, Ltd. v. Sebelius*, 747 F.3d 1214, 1221 (9th Cir. 2014) (quoting *Mem'l Hosp. v. Heckler*, 706 F.2d 1130 (11th Cir. 1983)).   It is true that courts outside the bankruptcy context have ruled that Medicare provider agreements do not give rise to contract rights that exceed the rights accorded by Medicare Program statutes and their implementing regulations.   Nevertheless, the vast majority of bankruptcy courts treat Medicare provider agreements as "executory contracts" within a bankruptcy case.   Debtors misplace their reliance on the extreme minority view in *BDK Health*

---

[14] Even considering a Medicare Provider Agreement as a "statutory entitlement," *see* Reply at 10, there is nothing about that entitlement that grants Debtors a property right such that the Medicare Provider Agreement is an "asset" they can transfer under section 363.  While Debtors may identify cases (*not* in bankruptcy) where courts have concluded that the Medicare provider agreement is not a contract, there is only one case, more than 20 years old, where a court considered (without analyzing) that a Medicare provider agreement could fall under section 363. In contrast, we identify numerous cases, much more recent in time, and, with *University Medical Center*, binding on this Court, where bankruptcy courts have analyzed the transfer of a Medicare provider agreement under section 365.

*Management*, an unreported bankruptcy court decision from 1998, which involved Medicare

provider numbers and did not analyze any provider agreements.  Moreover, the court did not

hold that the provider numbers were licenses, as the Debtors propose here, *see* Reply at ¶ 38, but

merely assets that could be sold under section 363.  Accordingly, the *BDK* outlier minority view

should be given no weight.

> 2.  Medicare provider agreements or Medicare-funded residency slots cannot be sold "free and clear" under section 363(f)

Even if the Court were to deem Medicare provider agreements and associated Medicare-

funded residency slots as "property" of the estate potentially eligible for treatment under section

363, Debtors still could not "sell" the provider agreement and the slots "free and clear" under

section 363(f).  Section 363(f) authorizes certain sales of property "free and clear of any interest

in such property."  A sale may be authorized under Section 363(f) "only if" one of five stated

criteria is satisfied.  In the present case, not only are Debtors incapable of selling the Hahnemann

Medicare Provider Agreement and the Medicare-funded residency slots under section 363, they

cannot meet any of the five section 363(f) criteria.  Accordingly, the bankruptcy court cannot

lawfully approve a sale of the Provider Agreements pursuant to section 363(f).

Section 363(f) provides:

(f) The trustee may sell property under subsection (b) or (c) of this section free and
clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such
interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater
than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

As a *critical* threshold consideration, the statutory provision ("necessary adjustments," 42 U.S.C. § 1395g(a)) that authorizes recoupment under a Provider Agreement, is not an "interest in property" that could be stripped under section 363(f). The term "interest in property" generally refers to liens and security interests that have attached to the property. *See, e.g., In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio. 1993); *Jandel v. Precision Colors, Inc.* 19 B.R. 415, 419-20 (Bankr. S.D. Ohio 1982). Recoupment does not constitute a lien or a security interest. It is not a charge on property. *See, e.g., Newberry v. Fireman's Fund Insurance Co.*, 95 F.3d 1392 (9th Cir. 1996). To the contrary, the "necessary adjustments" language at 42 U.S.C. § 1395g(a) defines the proper payment due the provider. *United States v. Consumer Health Servs. of America, Inc.*, 108 F.3d 390, 394 (D.C. Cir. 1997). Put another way, it defines Debtors' claims against CMS. Thus, it cannot be an interest that attaches to the independently existing property; it is part of the fundamental process by which the payment owed is actually determined.

Recoupment, "the setting off against asserted liabilities of a counterclaim arising out of the same transaction," is also the principle which allows a creditor to adjust the amounts it owes a debtor. *See Reiter v. Cooper*, 507 U.S. 258, 264, 265 n.2 (1993). It carries with it no right to payment and hence, it is not a claim under the Bankruptcy Code. *See Sims v. U.S. Dep't of Health & Human Servs. (In re TLC Hosp., Inc.)*, 224 F.3d 1008, 1011 (9th Cir. 2000); *Heffernan Mem'l Hosp. Dist.*, 192 B.R. at 230-31; *Brown v. General Motors Corp.*, 152 B.R. 935, 938 (W.D. Wis. 1993). Recoupment is not a claim, it is a defense to payment. *See Kosadnar v. Metro. Life Ins. Co. (Matter of Kosadnar)*, 157 F.3d 1011, 1013-14 (5th Cir. 1998); *Chicago Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.)*, 156 F.3d 1005, 1008-9 (9th Cir. 1997);

40

*Conoco, Inc. v. Styler (In re Peterson Distributing, Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996); *Lee v. Schwieker*, 739 F.2d 870, 875 (3d Cir. 1984).  Because recoupment is not a claim, it "does not even fall under the broadest interpretation of an "interest in property."  *In re Lawrence United Corp.*, 221 B.R. 661, 669 (Bankr. N.D.N.Y. 1998).  Indeed, the Third Circuit addressed this precise issue in a general bankruptcy context independent of Medicare considerations and unequivocally held that recoupment does not "constitute an 'interest' for purposes of section 363(f)" and, therefore, may not be extinguished by a bankruptcy sale.  *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 254-64 (3d Cir. 2000).

Furthermore, any attempted sale by Debtors of the Hahnemann Medicare Provider Agreement under section 363 should also be denied because the United States' regulatory interests in administering the Medicare Program for the benefit of Medicare patients are not an "interest in property" of the Debtors that can be extinguished under 11 U.S.C. § 363(f).  *See, e.g., Folger Adam Sec. Inc.*, 209 F.3d at 260; *In re Wolverine Radio*, 930 F.2d 1132, 1146 (6th Cir. 1991) (state assigned credit rating used to determine chapter 11 debtor's payments to the state unemployment fund was not an interest in property that could be extinguished under 11 U.S.C. § 363(f)); *In re Eveleth Mines, LLC*, 312 B.R. 634, 655 (Bankr. D. Minn. 2004) (state taxing authority's use of debtor's pre-sale iron ore production to compute production tax for which purchaser was partially liable held not to be an "interest in property" subject to § 363(f)).  *See also In re White Crane Trading Co.*, 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994) (bankruptcy court could not authorize sale that would be inconsistent with consumer protection laws); *In re Welker*, 163 B.R. 488, 489 (Bankr. N.D. Texas 1994) (trustee could not escape regulatory agreement between HUD and the Debtor).

As for the enumerated requirements of section 363(f), Debtors have not and cannot establish the proper applicability of *any* of the five subparts of § 363(f) as required for a "free and clear" transfer.  Under 11 U.S.C. § 363(f)(1), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* applicable nonbankruptcy law permits the sale of such property free and clear of such interest.  As explained in detail above, a Medicare provider agreement may be assigned to a purchaser only as part of a valid change in ownership of an ongoing health care business as determined by CMS.  42 C.F.R. § 489.18(d).  As recognized by the Fifth Circuit in *Vernon*, applicable non-bankruptcy law does not permit sale of a Provider Agreement unless it continues to be subject to the Medicare Program, including the requirement that any payments made are subject to adjustments, or recoupment, pursuant to 42 U.S.C. § 1395g(a).  And under the Medicare Program, any purchaser/assignee of a Provider Agreement must accept that provider agreement as is, with full successor liability.  Hence, the Debtors' requested relief, which could be interpreted to eviscerate the burdens of the Debtors' Medicare Provider Agreement, cannot satisfy 11 U.S.C. § 363(f)(1).

Under 11 U.S.C. § 363(f)(2), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* the party holding such interest consents to the sale on those terms.  Here, CMS does not consent to any sale which violates section 365 of the Bankruptcy Code, the Anti-Assignment Act, Medicare Program Law and eviscerates the Provider Agreement of any of its governing terms.

Under 11 U.S.C. § 363(f)(3), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* such interest is a lien.  As already noted, the Secretary's statutory obligation to make "necessary adjustments" to payment is neither an "interest" in the Debtors' property nor a lien.

Under 11 U.S.C. § 363(f)(4), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* the interest is in bona fide dispute. A debtor has the burden of showing that a bona fide dispute exists. 2 Lawrence P. King, Collier on Bankruptcy ¶ 363.06[5] (15th ed. 1998). This requires a debtor to show that "there is an objective basis for either a factual or legal dispute as to the validity of the debt." *Id.* Thus, whether a dispute is bona fide does not turn on the amount of the debt, but on the validity of the underlying liability.

For instance, in *In re Taylor*, 198 B.R. 142 (Bankr. D. S.C. 1996), the court denied the debtor's motion to sell its nursing homes free and clear of leasehold interests. The debtor argued that the leases were subject to a bona fide dispute because the lessees were in default on their rent and taxes. *Id.* at 163. The court held that the debtor could not sell free of the leasehold unless it proved that the default retroactively terminated the lease entirely. *Id.* Short of that, the lessees' alleged default did not raise a bona fide dispute as to the existence of the "interest" in the lease. *Id.*

Similarly, in the present case, Debtors may or may not dispute the dollar amount of any specific overpayment that the Secretary may seek to recoup or offset, but overpayment amounts are *not* the so-called "interest" at stake. What Debtors are actually seeking to avoid altogether is CMS's rights and authority under the Medicare Program, including the statutory directive and authority to make "necessary adjustments" when it calculates a provider's proper payment: *that statutory term* is the relevant focus for a § 363(f)(4) analysis.

Finally, under 11 U.S.C. § 363(f)(5), a sale of a debtor's property may be authorized free and clear of any interest in such property *if* the holder of that interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. No legal or equitable proceeding may compel the Secretary to accept money to disregard or abrogate the

43

statute by which Congress has directed his actions in running the Medicare program.  *See*

*Maryland Dep't of Human Resources v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1480 (4th Cir.

1992) ("An injunction may not strip a federal agency of its power to exercise lawful authority

conferred by Congress through statute.").

In summary, the Secretary's statutory directive to make "necessary adjustments" to a

provider's current payment when it is determined by the Secretary that an overpayment was

previously made and all the other requirements for a change of control of a provider agreement

do not fall within the "interest in property" consideration of 11 U.S.C. § 363(f) in the first place.

Furthermore, none of the five sub-criteria of § 363(f) can be met.  Accordingly, Debtors fail to

satisfy any portion of 11 U.S.C. § 363(f), and their demand for a "free and clear" transfer of the

Hahnemann Medicare Provider Agreement should be denied.

> C.    <u>HHS is not estopped from arguing that Medicare Provider Agreements are
> executory contracts</u>

Contrary to Debtors' argument, the United States is not estopped from taking the position

– consistent with the vast majority of bankruptcy courts – that the Hahnemann Medicare

Provider Agreement is subject to the requirements of section 365 of the Bankruptcy Code.  *See*

Reply at ¶ 32.  Debtors ask the court to apply judicial estoppel broadly to bar the United States

from taking a position allegedly inconsistent with its position taken in cases involving other

litigants.  This broad application of judicial estoppel, also known as nonmutual offensive

collateral estoppel, "simply does not apply against the government."  *United States v. Mendoza*,

464 U.S. 154, 162 (1984).  This rule could not be fairly applied to the United States because it

may discretionarily forego appeal in certain cases, despite a likelihood of prevailing, based on

government-specific factors, such as limited resources and crowded dockets of the courts, with

the expectation of relitigating the issue in an appropriate case with different parties.  *Id*. at 161.

In essence, the Supreme Court recognized that government litigation in federal courts is sufficiently different from litigation by private litigants, so that "what might otherwise be economy interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the government."[15]  *Id.* at 162-63.

Even if judicial estoppel could be stretched to apply here, Debtors conveniently neglect to acknowledge that they would have to carry a "heavy burden" to estop the United States.  *United States v. Omdahl*, 104 F.3d 1143, 1146 (9th Cir. 1997) (citing *United States v. Shampang*, 987 F.2d 1439, 1443-44 (9th Cir. 1993) (citing *Yerger v. Robertson*, 981 F.2d 460, 466 (9th Cir. 1992))).  Specifically, "[i]n addition to the traditional elements of estoppel, the party must also prove that the United States engaged in affirmative conduct beyond mere negligence, that the party would suffer a severe injustice if estoppel is not applied, and that the public would not be burdened by its application."  *Id.* at 1146.  Debtors did not even attempt to meet their heavy burden to establish grounds for estoppel against the United States.  For instance, they did not and could not establish that they would suffer a "severe injustice" if the Hahnemann Medicare Provider Agreement is governed by section 365.  Provider Agreements across the country have

---

[15] Debtors reliance on the arguments made by the United States in *United States v. Tenet Healthcare Corp.*, 2005 WL 3784642 (C.D. Cal. Dec. 22, 2005) is misplaced. *See* Reply at ¶ 32. In its brief in *Tenet*, the United States first acknowledged that "a majority of bankruptcy courts treat Provider Agreements as 'executory contracts,'" and explained that this treatment is not inconsistent with the law outside the bankruptcy context because the bankruptcy arena "is a court of special jurisdiction and practice governed by a particular code that is designed to fulfill certain purposes . . . unique to bankruptcy proceedings – i.e., to determine if the debtor, at the sole option of the debtor, has assumed or rejected the Provider Agreement."  The United States then acknowledged that HHS cannot force a debtor to assume or reject a provider agreement in bankruptcy, and Provider Agreements are thus not fully "enforceable as contracts" by HHS against the debtor absent assumption under section 365 of the Bankruptcy Code.  This argument put forward by the United States' in *Tenet Healthcare* clearly acknowledges and distinguishes the bankruptcy-specific characterization of Medicare Provider Agreements.

been treated as executory contracts in bankruptcy by courts across the nation for decades.  A determination that the Hahnemann Medicare Provider Agreement is subject to section 365 would not upset any expectations of Debtors, the Purchaser, lenders, other creditors of the estate and the Medicare beneficiaries, because they have been treated as such by the vast majority of bankruptcy courts.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the Jefferson Sale Motion and refuse to order the illegal sale of the Hahnemann permanent Medicare-funded residency slots.

Dated:  September 4, 2019                    Respectfully submitted


                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            DAVID C. WEISS
                                            United States Attorney

                                            ELLEN SLIGHTS
                                            Assistant United States Attorney

                                            /s/ Marc S Sacks
                                            RUTH A. HARVEY
                                            MARGARET M. NEWELL
                                            MARC S. SACKS
                                            Department of Justice
                                            Commercial Litigation Branch,
                                            Civil Division
                                            P.O. Box 875, Ben Franklin Station
                                            Washington, DC 20044-0875
                                            Tel. (202) 307-1104
                                            Fax (202) 514-9163
                                            marcus.s.sacks@usdoj.gov

                                            ATTORNEYS FOR THE UNITED STATES

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September 2019, I caused a true and correct copy of the foregoing objection to be served via electronic mail upon all parties receiving electronic notice under the Court's CM/ECF system.


s/ Marc S Sacks
MARC S. SACKS

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*, | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket No. 142, 249, 590, 591, 631 Obj. Deadline: Sept. 4, 2019 (10:00 a.m.)** |

**OBJECTION OF THE UNITED STATES
TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING THE SALE OF THE
DEBTORS' RESIDENT PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS TO JEFFERSON AS SET FORTH IN
THE ASSET PURCHASE AGREEMENT**

# Exhibit 1

# APPLICATION DATA REPORT

**Report Print Date: 01/19/2018**

## Section 1: Basic Information Summary

### L&T Information

**Name:** Center City Healthcare, Llc
**TIN:** 82-2813341 (EIN)
**NPI:** 1467967943
**Provider/Supplier Type:** HOSPITAL

**L&T ID:** 20171211007337
**Tracking ID:** T121120170000445
**Enrollment ID:**
**Enrollment State:** Pennsylvania

**Reason for Submission**
A Medicare Part A provider is undergoing a CHOW and this application is to inform Medicare as the buyer / new owner.

### Contractor Information

**Contractor Name:** NOVITAS SOLUTIONS, INC.
**Contractor ID:** 04911

### Payment Information

**Medicare Application Fee Required:** No

**Medicare Application Fee Paid External Systems:** No

### Submission History for the Application

**Date**
**Details**
12/11/2017
RECEIVED
01/11/2018
CORRECTIONS RECEIVED

## APPLICATION SIGNATURE(s)     Signature Status: All Signatures Complete

### AUTHORIZED SIGNER: Joel Freedman                          Status: Complete

**Document:** AUTHORIZED OFFICIAL CERTIFICATION STATEMENT FOR INSTITUTIONAL PROVIDERS
**Role:** AUTHORIZED OFFICIAL
**TIN:** ▮▮▮▮▮ SSN)
**Phone Number:** (310) 414-▮▮▮
**E-mail Address:** jf▮▮▮▮▮@pldn.com

**Date Signed:** 01/11/2018
**Signature Type:** Electronic
**IP Address:** 69.195.▮▮▮

### AUTHORIZED SIGNER: Joel Freedman                          Status: Complete

**Document:** ELECTRONIC FUNDS TRANSFER (EFT) AUTHORIZATION AGREEMENT
**Role:** AUTHORIZED OFFICIAL
**TIN:** ▮▮▮▮▮ (SSN)
**Phone Number:** (310) 414-▮▮▮

**Date Signed:** 12/11/2017
**Signature Type:** Electronic
**IP Address:** 69.195.▮▮▮

**E-mail Address:** jfreedman@pldn.com

| | |
|---|---|
| **AUTHORIZED SIGNER: Stella Freedman** | Status: Complete |

**Document:** DELEGATED OFFICIAL CERTIFICATION STATEMENT FOR INSTITUTIONAL PROVIDERS

**Role:** DELEGATED OFFICIAL                          **Date Signed:** 01/12/2018

**TIN:** ▇▇▇▇▇ (SSN)                          **Signature Type:** Electronic

**Phone Number:** (310) 414-▇▇                 **IP Address:** 10.35.▇▇▇

**E-mail Address:** s▇▇▇▇@pldn.com

## Section 2: Identifying Information

### ORGANIZATION INFORMATION: CENTER CITY HEALTHCARE, LLC

**Legal Business Name**
Center City Healthcare, Llc

**TIN:** 82-2813341 (EIN)

**Year End Cost Report Date**
12/31/2017

**Organization Structure**
Limited Liability Company

**Type of Other Name**
Doing Business As Name

**Other Name**
Hahnemann University Hospital

**IRS Proprietary/Non-Profit Status**
Proprietary
**Incorporation Date:** 08/28/2017

**State Where Incorporated:** DE

### Additional Hospital Information

**Hospital has compliance plan to check against exclusion/debarment lists:** Yes

**Provider is a physician-owned hospital:** No

**Hospital Subgroups/Units**
PSYCHIATRIC UNIT

### License Information

**License Number**
**State/Territory Where Issued**
**Effective Date**
**Expiration/Renewal Date**

081701
PENNSYLVANIA
04/30/2017
04/30/2020

| Certification Information | **No Data Provided** |
|---|---|

No Data Provided

### CORRESPONDENCE ADDRESS

**Telephone Number**
(310) 414-2700

**USPS Verified Address (Vacant Address)**

| Fax Number | 222 N SEPULVEDA BLVD, STE 900<br>EL SEGUNDO, CA 90245-5670<br>US |
|---|---|
| | **User's reason for why a non-deliverable address is being used**<br>Address is receiving mail delivery. |
| | **E-mail Address:**<br>sa███████@pldn.com |

### ACCREDITATION

#### Accreditation: THE JOINT COMMISSION

| **Accrediting Body Name**<br>THE JOINT COMMISSION | **Effective Date:** 11/16/2016<br>**Current Expiration Date:** 11/16/2019 |
|---|---|
| **Accreditation Program Type**<br>Hospital accreditation program | |

### CHANGE OF OWNERSHIP (CHOW) INFORMATION

#### Seller/Former Owner Information

| **Effective date of Transfer:** 01/11/2018 | **Old Owner's NPI:** 1194755892 |
|---|---|
| **Sellers Legal Business Name Reported to IRS**<br>Tenet HealthSystem Hahnemann, LLC | **TIN:** 75-2784869 (EIN) |
| **"Doing Business As" Name of Seller/Former Owner**<br>Hahnemann University Hospital | **Name of Fee-for-Service Contrator of Seller/Former Owner**<br>NOVITAS SOLUTIONS, INC. |
| **"Provider Agreement" Accepted by New Owner:** Yes | |

| Practice Location | **No Data Provided** |
|---|---|

**Address**

US

### Section 3: Final Adverse Legal Actions

**Has a final adverse action ever been imposed against an applicant under any current or former name or business entity?**
No

### Section 4: PRACTICE LOCATION INFORMATION

#### PRACTICE LOCATIONS

#### #1: Hahnemann University Hospital

##### Practice Location Information

| **Location Name**<br>Hahnemann University Hospital | **Practice Location Type**<br>Hospital Psychiatric Unit | **Telephone**<br>(215) 762-7000 |
|---|---|---|
| **Location Type**<br>PRACTICE LOCATION | **USPS Verified Address (Exact Match)**<br>230 N BROAD ST<br>PHILADELPHIA, PA 19102-1121<br>US | **Fax**<br>(215) 762-8109 |
| **Effective Date:** 01/11/2018 | | **E-mail Address** |
| | **FDA Certification Number** | |

**CLIA Number**
39D0198114

| Payment Address Information |
| --- |

**Effective Date:** 01/11/2018

**User Entered Address (Unconfirmed Address)**
PO BOX 781036
PHILADELPHIA, PA 19178-1036
US

**User's Reason For Why USPS Verified Address Is Not Used**
Unique ZIP code for business receiving large amount of mail.

| Claims Information |
| --- |

### • Claims Detail

**Medicare ID:**

**NPI:** 1467967943

**CP-575 indicator:** Yes

**Effective Date of Location:** 01/11/2018

**Primary billing information and practice location:** Yes

**TIN:** 82-2813341 (EIN)

| Medical Records Storage Information |
| --- |
| Physical Medical Records Storage Information |
| •     Medical Records Storage Location |

**Effective Date:** 01/11/2018

**USPS Verified Address (Exact Match)**
1000 CAMPUS DR
COLLEGEVILLE, PA 19426-4908
US

**MOBILE SERVICES INFORMATION**

| Vehicle Information |
| --- |

**Does the applicant have vehicle information?**
No

| Geographic Location (Mobile/Portable Services) | No Data Provided |
| --- | --- |

No Data Provided

## Section 5: OWNERSHIP INTEREST & MANAGING CONTROL INFO (ORGANIZATIONS)

| ORGANIZATION CONTROL INFORMATION: American Academic Health System, LLC |
| --- |
| Identifying Information |

**Legal Business Name**
American Academic Health System, LLC

**Doing Business As Name**

**TIN:** 82-2929393 (EIN)

**USPS Verified Address (Vacant Address)**
222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670
US

**User's reason for why a non-deliverable address is being used**

**Type of Organization:** Limited Liability Company, For-profit

Address is receiving mail delivery.

**NPI:**

---

### Ownership/Managing Control Information

| Role | Exact Percent | Effective Date | Created Solely to acquire/buy provider and/or provider's assets | Types of Services Furnished |
|------|---------------|----------------|------------------------------------------------------------------|------------------------------|
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 100 | 08/28/2017 | No | |

---

### Final Adverse Actions

- **Adverse Action**

**Has this organization, under any current or former name or business entity, ever had a final adverse action imposed against it?**
No

---

**ORGANIZATION CONTROL INFORMATION: MBNF Investments, LLC**

### Identifying Information

**Legal Business Name**
MBNF Investments, LLC

**Doing Business As Name**

**TIN:** 82-2894029 (EIN)

**Type of Organization:** Limited Liability Company, Holding Company, For-profit

**USPS Verified Address (Vacant Address)**
222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670
US

**User's reason for why a non-deliverable address is being used**
Address is receiving mail delivery.

**NPI:**

---

### Ownership/Managing Control Information

| Role | Exact Percent | Effective Date | Created Solely to acquire/buy provider and/or provider's assets | Types of Services Furnished |
|------|---------------|----------------|------------------------------------------------------------------|------------------------------|
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 100 | 08/28/2017 | No | |

---

### Final Adverse Actions

- **Adverse Action**

**Has this organization, under any current or former name or business entity, ever had a final adverse action imposed against it?**
No

**ORGANIZATION CONTROL INFORMATION: Philadelphia Academic Health Holdings, LLC**

### Identifying Information

**Legal Business Name**
Philadelphia Academic Health Holdings, LLC
**Doing Business As Name**

**TIN:** 82-2908894 (EIN)

**Type of Organization:** Limited Liability Company, For-profit

**USPS Verified Address (Vacant Address)**
222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670
US
**User's reason for why a non-deliverable address is being used**
Address is receiving mail delivery.
**NPI:**

### Ownership/Managing Control Information

| Role | Exact Percent | Effective Date | Created Solely to acquire/buy provider and/or provider's assets | Types of Services Furnished |
|------|--------------|----------------|----------------------------------------------------------------|------------------------------|
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 100 | 08/28/2017 | No | |

### Final Adverse Actions

- **Adverse Action**

**Has this organization, under any current or former name or business entity, ever had a final adverse action imposed against it?**
No

**ORGANIZATION CONTROL INFORMATION: Philadelphia Academic Health System, LLC**

### Identifying Information

**Legal Business Name**
Philadelphia Academic Health System, LLC
**Doing Business As Name**

**TIN:** 82-2918681 (EIN)

**Type of Organization:** Limited Liability Company, For-profit

**USPS Verified Address (Vacant Address)**
222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670
US
**User's reason for why a non-deliverable address is being used**
Address is receiving mail delivery.
**NPI:**

### Ownership/Managing Control Information

| Role | Exact Percent | Effective Date | Created Solely to acquire/buy provider and/or provider's assets | Types of Services Furnished |
|------|--------------|----------------|----------------------------------------------------------------|------------------------------|

| Role | Exact Percent | Effective Date | Created Solely to acquire/buy provider and/or provider's assets | Types of Services Furnished |
|---|---|---|---|---|
| 5% OR GREATER DIRECT OWNERSHIP INTEREST | 100 | 08/28/2017 | No | |
| OPERATIONAL /MANAGERIAL CONTROL | 100 | 08/28/2017 | | This entity is the manager of Center City Healthcare, LLC. |

**Final Adverse Actions**

- **Adverse Action**

**Has this organization, under any current or former name or business entity, ever had a final adverse action imposed against it?**
No

## Section 6: OWNERSHIP INTEREST & MANAGING CONTROL INFO (INDIVIDUALS)

**INDIVIDUAL: Freedman, Joel**

**Identifying Information**

**Name:**
Joel  Freedman

**Date of Birth:** ███████

**Country of Birth:** United States
**State of Birth:** ██

**TIN:** ████████ (SSN)

**NPI:**

**Ownership/Managing Control Information**

| Role | Exact Percent | Effective Date | Title | Types of Services Furnished |
|---|---|---|---|---|
| AUTHORIZED OFFICIAL | | 01/11/2018 | | |
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 52.8 | 08/28/2017 | CEO and President | |
| OFFICER | 100 | 08/30/2017 | CEO and President | |
| OPERATIONAL/MANAGERIAL CONTROL | 100 | 08/28/2017 | CEO and President | |

| Indicate if individual is Authorized or Delegated official | Telephone | Is the delegated official a W-2 employee? |
|---|---|---|
| AUTHORIZED OFFICIAL | (310) 414-███ | No |

**Final Adverse Actions**

- **Adverse Action**

**Has this individual, under any current or former name or business entity, ever had a final adverse action imposed against him/her?**
No

**INDIVIDUAL: Freedman, Stella**

## Identifying Information

| Name: | Date of Birth: ▇▇▇ |
|---|---|
| Stella Freedman | |
| | Country of Birth: Russian Federation |
| | State of Birth: ▇▇▇ |
| TIN: ▇▇▇ (SSN) | |
| NPI: | |

## Ownership/Managing Control Information

| Role | Exact Percent | Effective Date | Title | Types of Services Furnished |
|---|---|---|---|---|
| DELEGATED OFFICIAL | | 01/11/2018 | | |
| 5% OR GREATER INDIRECT OWNERSHIP INTEREST | 35.2 | 08/28/2017 | Secretary and Treasurer | |
| OFFICER | 0 | 08/30/2001 | Secretary and Treasurer | |

| Indicate if individual is Authorized or Delegated official | Telephone | Is the delegated official a W-2 employee? |
|---|---|---|
| DELEGATED OFFICIAL | (310) 414-▇▇▇ | No |

## Final Adverse Actions

- **Adverse Action**

**Has this individual, under any current or former name or business entity, ever had a final adverse action imposed against him/her?**
No

## Section 8: Billing Agency Information

### Billing Agency: Conifer Revenue Cycle Solutions, LLC

| | | |
|---|---|---|
| **Legal Business Name** Conifer Revenue Cycle Solutions, LLC | **Effective Date:** 01/11/2018 | **Telephone Number:** (877) 266-4337 |
| | **"Doing Business As" Name** | **Fax Number:** |
| **USPS Verified Address (Exact Match)** 3560 DALLAS PKWY FRISCO, TX 75034-8635 US | **TIN:** 75-2965456 (EIN) | **Email** No Data Provided |

## Section 7: Chain Home Office Information

**Does the applicant have a chain home office for this application?**
No

## CMS 855 POH - Physician Owned Hospital Information

## Organization Ownership

**Does the applicant have any organizations having ownership or investment interest to report?**
No

### Individual Ownership

**Does the applicant have any individuals having ownership or investment interest to report?**
No

## Physician Owned Hospital - Contact Person Information                    **No Data Provided**

No Data Provided

## Section 13: Enrollment Application Contact Person

### Contact Person: Troy Barsky

**Name**
Troy Barsky

**Relationship/Affiliation to Provider/Supplier**
Third Party Company

**Telephone Number**
(202) 624-████

**User Entered Address (Unconfirmed Address)**
1001 PENNSYLVANIA AVE NW
WASHINGTON, DC, 20004-2505

**Fax Number**

**User's Reason For Why USPS Verified Address Is Not Used**
Address is receiving mail delivery.

**Email**
tbarsky@crowell.com

## Electronic Required/Supporting Documentation

### Electronic Required/Supporting Documents

**Date Uploaded**

**Document ID**

**Document Type**

**File Name**

01/11/2018
PPECOS000CA1801111615200346E120H1888T463
Bill of Sale/Sale Agreement
Bill of Sale Assignment and Assumption Agreement (Executed).pdf

12/11/2017
PPECOS000CA1712111739540107E120H1888T35674
Document not in List
ATTACHMENT B - HUH MANDATORY SUPPORTING DOCUMENTS.pdf

12/11/2017
PPECOS000CA1712111354090742E120H1892T140
CLIA Certificate
CLIA.pdf

12/11/2017
PPECOS000CA1712111353520011E120H1888T587
FDA/Mammography certificates
FDA.pdf

**Date Uploaded**

**Document ID**

**Document Type**

**File Name**

12/11/2017

PPECOS000CA1712111043580876E120H1888T186

Medical License/Certification/Registration

4.k. PA Medicaid enrollment HUH.pdf

12/11/2017

PPECOS000CA1712111043400407E120H1892T703

Voided Check/Account Verification

4.j. Bank Confirmation.pdf

12/11/2017

PPECOS000CA1712111043300312E120H1888T186

Official IRS document confirming TIN and LBN

4.i. IRS Letter.PDF

12/11/2017

PPECOS000CA1712111043210304E120H1892T705

Organization Diagram

4.h. Center City Healthcare LLC Org Diagram.pdf

12/11/2017

PPECOS000CA1712111043080749E120H1888T587

Business License/Certification/Registration

4.g. Delaware Certificate of Formation.PDF

12/11/2017

PPECOS000CA1712111043000238E120H1892T705

Business License/Certification/Registration

4.f. Pennsylvania LLC license.PDF

12/11/2017

PPECOS000CA1712111042500486E120H1884T120

Bill of Sale/Sale Agreement

4.e. Bill of Sale.pdf

12/11/2017

PPECOS000CA1712111042400607E120H1884T13608

Medical License/Certification/Registration

4.d. Current Hospital License.pdf

12/11/2017

PPECOS000CA1712111042170084E120H1892T711

Document not in List

4.a. Attachment A.pdf

| Required/Supporting Documents List with the PI User Checklist Information |
|---|

**Document**

**Delivery**

**Comment**

Copy(s) of Bills of Sale or Sales Agreements

☐ Mail  ☑ Upload

A voided check or letter from bank confirming account information

☐ Mail  ☑ Upload

Copy of IRS Form CP 575 or other official IRS communication confirming Tax Identification Number and Legal Business Name

☐ Mail  ☑ Upload

Copy(s) of Licenses, Certifications and Registrations

☐ Mail  ☑ Upload

Organizational Diagram(s)

☐ Mail  ☑ Upload

Copy of current CLIA and FDA certification

☐ Mail  ☑ Upload

Copy of Business Licenses, Certifications and/or Registrations

☐ Mail  ☑ Upload

Notarized Certificate of Good Standing from State licensing/certification board or other medical association

☐ Mail  ☐ Upload

Other Documentation requested by your Medicare Contractor(s)

☐ Mail  ☐ Upload

Authorized Official Certification Statement for Institutional Providers [PDF]

Form CMS-588, Electronic Funds Transfer (EFT) Authorization Agreement

Delegated Official Certification Statement for Institutional Providers

## CMS-588: Electronic Funds Transfer (EFT) Agreement

**Will the EFT payment be made to the Home Office of Chain?**
No

### EFT AGREEMENT DETAILS

#### Account Holder Information

**Legal Business Name**
CENTER CITY HEALTHCARE, LLC
**TIN:** 82-2813341 (EIN)

**NPI:** 1467967943

**Medicare ID:**

**USPS Verified Address (Vacant Address)**
222 N SEPULVEDA BLVD, STE 900
EL SEGUNDO, CA 90245-5670
**User's reason for why a non-deliverable address is being used**
Address is receiving mail delivery.

#### Financial Institution Information

**Name**
Wells Fargo

**User Entered Address (Unconfirmed Address)**

**Financial Institution Contact Person**

**Routing Transit Number:**
█████████

420 MONTGOMERY ST
SAN FRANCISCO, CA 94104-1207

**User's Reason For Why USPS
Verified Address Is Not Used**

Financial institution's corporate
address.

**Telephone Number:** (800) 869-3557

**Depositor Account Number:**

█████████

**Type of Account:** Checking

| EFT Contact Person |
|---|
| **Name** |
| **Title** |
| **Telephone Number** |
| **E-mail Address** |
| Svetlana Attestatova |
| General Counsel |
| (310) 414-████ |
| sa██████@pldn.com |