# EXHIBIT A

**Proposed Asset Purchase Agreement – Backup Bid**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CENTER CITY HEALTHCARE, LLC,**

**as Seller,**

**AND**

**READING HOSPITAL**

**as Purchaser**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of September , 2019, by and between Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital (the "**Seller**" or "**Hahnemann**"), a Delaware limited liability company and Reading Hospital (the "**Purchaser**"), a Pennsylvania nonprofit corporation.  The Seller and the Purchaser are sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties.**"

WHEREAS, Seller is engaged in the business of owning and operating an acute care hospital, including a graduate medical education program (the "**Business**"); and

WHEREAS, the Seller is the owner of the Purchased Assets; and

WHEREAS, on June 30, 2019 (the "**Petition Date**"), a voluntary petition for relief was filed by the Seller under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), under Case Number 19-11466 (the "**Bankruptcy Case**"); and

WHEREAS, Seller desires to sell and Purchaser desires to purchase the Purchased Assets all in accordance with, and subject to, the terms and conditions contained in this Agreement; and

WHEREAS, the Purchased Assets being transferred herein are intended to be sold, conveyed and transferred to Purchaser free and clear of all Liens and Encumbrances pursuant to Section 363 of the Bankruptcy Code, and subject to the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings indicated below, unless the context clearly requires otherwise:

"**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; provided that such Person shall be deemed an Affiliate for only so long as such control exists.  For purposes of this definition and the definition of Related Person, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" shall mean all other agreements, documents and instruments to be executed and delivered by the Purchaser and/or the Seller pursuant to this Agreement.

2

"**Applicable Privacy and Security Law**" means any applicable Law relating to privacy, data protection, confidentiality, security, integrity and protection of personal information, including (i) health care and medical record applicable Laws, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and all implementing regulations (collectively, "**HIPAA**"); (ii) state data protection laws; (iii) state breach notification laws; and (iv) any comparable applicable state Laws and the regulations promulgated pursuant to all such applicable Laws.

"**Assigned Contracts**" shall mean, collectively, those Contracts included in the Purchased Assets, which shall consist solely of the Contracts identified on Schedule A-1 to **Exhibit A**. Purchaser may add or delete Contracts from Schedule A-1 pursuant to the applicable provisions of the Bidding Procedures Order.

"**Assignment and Assumption Agreement**" shall mean the Assignment, Delegation and Assumption Agreement to be executed at the Closing between the Seller and the Purchaser in the form attached hereto as **Exhibit B**, pursuant to which, among other things, the Seller will assign and transfer to the Purchaser all of its right, title and interest under the Assigned Contracts, on the terms and conditions set forth therein.

"**Assumed Liabilities**" shall mean, collectively, (i) all liabilities arising after the Closing with respect to the Assigned Contracts, (ii) all liabilities arising with respect to the Purchased Assets arising on or after the Closing Date, (iii) all executory performance obligations of Seller to the extent arising or after the Closing, (iv) the Cure Costs (including Cure Costs asserted by CMS (including by offset) upon and/or after the Closing on account of the Participating Provider Agreement), (v) any and the Purchaser's portion of the Transfer Taxes pursuant to Section 10.4.

"**Assumption/Cure Notice**" means the Initial Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment delivered to counterparties to Contracts with the Seller pursuant to the Bidding Procedures Order.

"**Backup Bidder**" shall have the meaning stated in the Bidding Procedures Order.

"**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

"**Base Purchase Price**" is defined in Section 3.1.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Purchased Assets shall occur, which are attached to the Bidding Procedures Order as Exhibit I.

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court approving the Bid Procedures in the form attached hereto as Exhibit F and made part hereof.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

"**Bill of Sale**" shall mean the bill of sale to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **Exhibit C**.

"**Books and Records**" means, collectively, all documents, lists and files relating or pertaining to the Purchased Assets or the Assumed Liabilities.

"**Business**" is defined in the Recitals to this Agreement.

"**Business Day(s)**" shall mean calendar days other than Saturdays, Sundays and days on which banking institutions in Wilmington, Delaware are authorized by Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Claims Close Date**" is defined in Section 10.5.

"**Closing**" is defined in Section 8.1.

"**Closing Date**" is defined in Section 8.1.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**CMS Discharge Amount**" means a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as final which amount shall be the maximum Cure Costs due on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement.

"**Continuing Residents**" means the Residents as of the Closing Date who agree to become residents training at a hospital operated by the Purchaser or an Affiliate of the Purchaser.

"**Contracts**" shall mean any agreement or contract, whether written or oral.

"**Cure Costs**" shall mean, with respect to any Assigned Contract, the amount due and owing to each non-debtor counterparty to such Assigned Contract to cure any defaults required to be cured as a condition of assumption of such Assigned Contract pursuant to Section 365(b)(1) of the Bankruptcy Code.

"**Escrow Agent**" shall mean a financial institution mutually acceptable to Seller and Purchaser.

"**Escrow Agreement**" shall mean the agreement substantially in the form attached hereto as Exhibit D.

"**Escrow Account**" is defined in Section 3.1

"**Escrow Amount**" is defined in Section 3.1

"**Excluded Assets**" shall mean all rights, benefits or property of Seller which are not Purchased Assets.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

"**Excluded Liabilities**" shall mean, collectively, any and all liabilities of the Seller of any kind or description other than the Assumed Liabilities.

"**Final Order**"  shall mean an order, judgment or other decree as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"**GAAP**" shall mean generally accepted accounting principles in the United States, consistently applied.

"**Governmental Authorization**" means any consent, license, permit, certificate of authority, registration, franchise, right, Order or notice, qualification or similar right issued, granted, given, or required by or under the authority of any Governmental Body or pursuant to any Law.

"**Governmental Body**" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including the FDA and its equivalent authority or body in any foreign jurisdiction.

"**Hahnemann Programs**" is defined in Section 6.2.

"**Interests**" shall have the meaning stated in the Sale Order.

"**Knowledge of the Seller**" **and** "**to the Seller's Knowledge**" shall mean the actual knowledge of Joel Freedman, the Seller's Chief Executive Officer, or Allen Wilen, the Seller's Chief Restructuring Officer - Finance.

"**Laws**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

"**Lien**" has the meaning given to such term in the Bankruptcy Code.

"**Liquidated Cure Costs**" means all Cure Costs relating to Assigned Contracts which are allowed in a Final Order of the Bankruptcy Court.

"**Losses**" is defined in Section 10.1.

"**Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchased Assets; provided, however, that any adverse change, event, development or effect arising from or relating to any of the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been, a Material Adverse Effect: (i) the United States economy, the global economy, in each case, as a whole, or the industry or markets in which the Seller operates; (ii) the filing of the Bankruptcy Case; (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (iv) financial, banking, or securities markets (including any disruption thereof and any decline in

5

the price of any security or any market index); (v) changes in GAAP; (vi) changes in Law or Orders; (vii) the taking of any action contemplated by this Agreement or any of the Ancillary Documents; (viii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes; (ix) changes resulting from the announcement of the execution of this Agreement or any of the transactions contemplated hereby; or (x) the termination of any Contract that is not an Assigned Contract, or the occurrence of any breach by any party of any Contract that does not relate to the Purchased Assets or the Assumed Liabilities; (xi) any adverse change to the Business prior to the date hereof;.

"**Non-Disclosure Agreement**" means any and all confidentiality agreements and/or non-disclosure agreements executed by the Purchaser as a condition to obtaining confidential and/or proprietary information from the Seller.

"**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body.

"**Ordinary Course of Business**" means the ordinary course of the Seller's Business consistent with past practice.

"**Outside Closing Date**" shall mean September 6, 2019 or such other date as Seller and Purchaser may agree.

"**Participating Provider Agreement**" means the Participating Provider Agreement with the Centers for Medicare and Medicaid Services between the Seller and CMS related to Hahnemann University Hospital.

"**Permitted Escrow Withdrawals**" is defined in Section 3.1.

"**Person**" shall mean any individual, corporation, Governmental Body, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

"**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"**Purchased Assets**" shall mean the assets of Seller identified on <u>Exhibit A</u>..

"**Purchaser Indemnified Party**" is defined in Section 10.1.

"**Purchaser Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchaser.

"**Related Person**" (i) with respect to a Person who is an individual, shall mean, (a) any other individual having a relationship with such specified individual (by blood, marriage or adoption) of grandparent, parent, child, grandchild, aunt, uncle, niece, nephew, sister, brother or

first cousin (collectively, "**Relatives**"), (b) any Person that is controlled by such individual or any one or more members of such individual's Relatives; and (c) any Person with respect to which such individual or one or more members of such individual's Relatives serves as a director, officer, partner, or trustee (or in a similar capacity); and (ii) with respect to a specified Person other than an individual, shall mean (a) any Affiliate of such specified Person; and (b) each Person that serves as a director, officer, partner, or trustee (or in a similar capacity) of such specified Person.

"**Representative**" shall mean, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Notification**" is defined in Section 6.3.

"**Residents**" means the medical residents and fellows training at Hahnemann University Hospital.

"**Sale Motion**" shall mean that certain motion filed by the Seller in the Bankruptcy Case on July 9, 2019 (D.I. 142) pursuant to which, among other things, the Seller requested an order (a) approving the Bid Procedures, (b) approving procedures relating to the assumption and assignment of executory contracts, including procedures for establishing Cure Costs, (c) establishing a date for an auction, and (d) scheduling a sale hearing.

"**Sale Order**" shall mean an Order of the Bankruptcy Court pursuant to the Bankruptcy Code approving this Agreement and the transactions contemplated hereby substantially in the form attached hereto as <u>Exhibit E</u> and made part hereof.

"**Seller Disclosure Letter**" is defined in Article IV.

"**Seller Indemnified Party**" is defined in Section 10.2.

"**SSG**" means SSG Capital Advisors, LLC.

"**Tail Coverage Costs**" shall mean shall mean the cost to Seller of purchasing and maintaining the Tail Coverage Endorsement.

"**Tail Coverage Endorsement**" shall mean a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital.  Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars $1,500,000) annual aggregate for each MCARE eligible Resident only.

"**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

"**Tower GME Affiliation Agreement**" shall mean the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Seller and Purchaser (or an affiliate of Purchaser).

"**Transfer Taxes**" is defined in Section 10.14(a).

## ARTICLE II.
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

**2.1  Agreement to Sell and Purchase Purchased Assets.**  On the Closing Date, subject to the performance by the Parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Purchased Assets, free and clear of all Interests other than Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**2.2  Assumed Liabilities/Excluded Liabilities**.  On the Closing Date, the Purchaser shall assume and become responsible for, and shall pay, perform, fulfill and discharge, all of the Assumed Liabilities.  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any of the Excluded Liabilities, all of which shall remain the sole responsibility and obligation of the Seller.

**2.3  Assigned Contracts.**  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any Contracts, all of which shall remain the sole responsibility and obligation of the Seller, except for the Assigned Contracts.  As to the Assigned Contracts:

(a)  At Closing, Seller shall assign to Purchaser, and Purchaser shall assume, all of the Assigned Contracts and Purchaser shall pay to the applicable counterparty the Cure Costs as and when such Cure Costs become Liquidated Cure Costs.

(b)  Purchaser shall provide promptly any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Purchaser's capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

**2.4  Competing Transactions; Bankruptcy Court Approval.**  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids pursuant to the Bidding Procedures Order and the Bid Procedures approved thereby (each, a "**Competing Bid**").  Until the transactions contemplated by this Agreement are consummated, Seller may perform any and all other acts related to seeking a Competing Bid as provided under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including but not limited to  supplying information relating to the Purchased Assets to prospective purchasers.

## ARTICLE III.
## PURCHASE PRICE

**3.1  Purchase Price.**  The Purchase Price shall be Fifty Million Dollars ($50,000,000), subject to upward adjustment pursuant to Section 3.2(d) hereof ( the "<u>Base Purchase Price</u>") and

8

subject to the following sentence, shall be paid in cash at Closing subject to the purchase price adjustments of (a) Five Hundred Thousand Dollars ($500,000), which was paid by Purchaser to Seller on June 28, 2019 as consideration for the Tower GME Affiliation Agreement, that shall be credited against the Base Purchase Price and (b) Two Hundred Twenty-Five Thousand Dollars ($225,000) for the break-up fee.  In addition, an amount (the "Escrow Amount") equal to Three Million Dollars ($3,000,000) minus Liquidated Cure Costs paid by Purchaser on the Closing Date will be withheld from the Base Purchase Price and placed into a non-interest bearing escrow account (the "Escrow Account") held by the Escrow Agent pursuant to the Escrow Agreement. The Escrow Amount shall be distributed to Purchaser from time to time in accordance with the Escrow Agreement to cover the following losses, damages and expenses (collectively, the "Permitted Escrow Withdrawals"): (a) the CMS Discharge Amount, as and when liquidated, (b) the Cure Costs not paid on the Closing Date and not included in the CMS Discharge Amount, and (c) the Losses payable to a Purchaser Indemnified Party.  To the extent that there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, such remaining funds minus any then pending written claims asserted by Purchaser for Permitted Escrow Withdrawals (whether or not disputed) shall be distributed to Seller in accordance with the Escrow Agreement without any further action being required on the part of Purchaser. Upon resolution of any Permitted Escrow Withdrawals pending as of the one-year anniversary of the Closing Date, (x) any amounts determined to be owing to Purchaser shall be distributed to Purchaser, and (y) any amounts determined not to be owing to Purchaser shall be distributed to Seller.

3.2  **Payment of Base Purchase Price.** At Closing, the Base Purchase Price shall be payable by Purchaser as follows:

(a)  Purchaser shall deposit the Escrow Amount into the Escrow Account pursuant to and in accordance with the Escrow Agreement.

(b)  Purchaser shall pay Liquidated Cure Costs as of the Closing Date.

(c)  Purchaser shall pay to the Seller the Forty-Six Million, Two Hundred Seventy-Five Thousand Dollars ($46,275,000) balance of the Base Purchase Price by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller prior to the Closing.

(d)  Purchaser shall reimburse Seller for the Tail Coverage Cost actually paid by Seller to purchase the Tail Coverage Endorsement, up to a maximum of One Million Dollars ($1,000,000).

3.3  **Tax Allocation of Base Purchase Price.**  The Base Purchase Price shall be allocated among the Purchased Assets in accordance with the IRS Form 8594, Asset Acquisition Statement Under Section 1060 as agreed by the respective accountants of Purchaser and Seller within a reasonable period of time after Closing in good faith consistent in all respects with applicable Laws.  The Seller and the Purchaser shall file their respective Tax returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Purchaser, as the case may be, reasonably determines (and notifies the other Party) that such allocation is contrary to applicable Law.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the disclosure letter delivered by the Seller to the Purchaser on the date hereof (the "**Seller Disclosure Letter**"), the Seller represents and warrants to the Purchaser as follows:

**4.1  Organization.**  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation and is in good standing in each other jurisdiction where the operation of the Business by the Seller requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.2  Power and Authority.**  Upon entry of and subject to the Sale Order, Seller shall have all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Seller.  Upon entry of and subject to the Sale Order, this Agreement shall constitute a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**4.3  Non-contravention.**  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery of this Agreement or any other Ancillary Document to which the Seller is a party, and the performance by the Seller of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of the Seller, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Assigned Contract, (iii) to Seller's Knowledge, violate in any material respect any Law or Order applicable to the Business or the Purchased Assets, or (iv) result in the imposition of any Lien on the Purchased Assets.

**4.4  Consents.**  Upon entry of the Sale Order and upon each regulatory approval to which Section 7.1(c) of this Agreement relates having been obtained, no approval, consent or authorization of, or declaration, filing or registration with or any notification to any Governmental Body or any other third Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

**4.**5  **Liabilities.**  The Seller has no Liabilities with respect to the Purchased Assets for which the Purchaser will be responsible after Closing except for any Assumed Liabilities assumed by the Purchaser.

**4.6  Title.**  The Seller has good and marketable title to all of the Purchased Assets, free and clear of all Interests other than Interests which will be divested from the Purchased Assets by the Sale Order.  Upon the completion of the transactions contemplated hereby, the Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Interests other than Assumed Liabilities.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

**4.**7  **Litigation.**  There are no Proceedings pending, or to the Seller's Knowledge, threatened against the Purchased Assets or Business, at Law or in equity, or before any Governmental Body which will interfere with the ownership or use by the Purchaser of the Purchased Assets after the Closing.

**4.8  Proceedings.**  There is no Proceeding pending that challenges, or that is reasonably likely to have the effect of preventing, delaying or rendering illegal any of the transactions contemplated by this Agreement.

**4.9  Tax Matters.** There are no Tax Liens or Encumbrances for Taxes upon the Purchased Assets and as of the end of the day on the Closing Date there will be no such Tax Liens or Encumbrances.  There is not and, as of the end of the day on the Closing Date there will not be, any liability for Taxes affecting the Purchased Assets for which the Purchaser will at any time have any liability for payment

**4.10  Brokers and Finders.**  Other than SSG, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller. Seller will be solely responsible for any fee, commission or other consideration of any kind due to SSG on account of the transactions contemplated by this Agreement.

**4.11  Tail Coverage**. Seller shall be solely responsible for purchasing and maintaining the Tail Coverage Endorsement and shall incur all costs associated with the same, except as provided in Section 3.2(d).

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER.

The Purchaser represents and warrants to the Seller as follows.

**5.1  Organization.**  The Purchaser is a nonprofit corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to conduct its business and own and operate its properties.

**5.2  Power and Authority.**

(a)  The Purchaser has all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Purchaser.  This Agreement is a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(b)  To the extent that this Agreement or any of the Ancillary Documents provides that any Affiliate of the Purchaser makes any covenant or undertakes the payment or performance of any obligation in connection with the transactions contemplated hereunder or thereunder, such Affiliate has all requisite power and authority to enter into the transactions contemplated hereby and thereby.

11

**5.3  Non-contravention.**  Neither the execution and delivery of this Agreement or any other Ancillary Document to which the Purchaser is a party, will (i) violate any provision of the organizational documents of the Purchaser, or (ii) violate any Law or Order applicable to the Purchaser.

**5.4  No Proceedings.**  There are no actions, suits or proceedings pending, or to the actual knowledge of Purchaser, threatened, before or by any Governmental Body, against Purchaser which would affect Purchaser's ability to proceed with the transactions contemplated by this Agreement.

**5.5  Consents.**  No consent, waiver, authorization or approval of any person or declaration, filing or registration with any Governmental Body or other Person is required in connection with the execution and delivery by Purchaser of this Agreement or the performance by Purchaser or its Affiliates of its respective obligations hereunder or thereunder.

**5.6  Bankruptcy Matters**.  Purchaser is capable of satisfying the adequate assurance of future performance conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to each Assigned Contract.

**5.7  Financing.**  Purchaser has readily-available cash on hand, availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Base Purchase Price at Closing.

**5.8  Purchaser's Hospital Facilities**.  Purchaser owns and operates six Medicare-participating hospitals located within 60 miles of Hahnemann University Hospital's facility, all of which have the capacity to operate medical residency programs.

**5.9  Certain Relationships**.  Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser is an officer or director of the Seller or a Related Person of any officer, director or key employee of the Seller.  Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser has entered into any Contract with any officer, director or key employee of the Seller.

**5.10  Brokers and Finders.**  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE VI.

## COVENANTS OF THE PARTIES

**6.1  Access to Information**.  Subject to all Applicable Privacy and Security Laws, the Seller shall permit the Purchaser's Representatives to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Business, to the personnel, books, records, Assigned Contracts, and documents of or pertaining to the Purchased Assets; provided, that the Seller may restrict the foregoing access to the extent that in the reasonable judgment of the Seller, any Law applicable to the Seller requires it to restrict access to any of its business,

12

properties, information or personnel; and provided, further, that such access shall not unreasonably disrupt the operations of the Seller or the Business.

     **6.2  Conduct of the Business**.  From the date hereof until the Closing Date, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), and subject in all respects to the Bankruptcy Code and orders of the Bankruptcy Court (including, without limitation, the Sale Order), the Seller shall use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at Hahnemann University Hospital (the "**Hahnemann Programs**"). Seller and Purchaser shall work cooperatively to determine clinical rotation assignments for Residents, with such mutually-agreed assignments to commence as soon as practicable after the Purchase Agreement is entered into. For the avoidance of doubt, neither the existence of this Agreement nor any provisions set forth herein shall restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those Residents who elect not to become Continuing Residents.

     **6.3  Notification of Certain Matters.**  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "**Required Notification**"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

     **6.4  Cooperation**.  Subject in all respects to the Bankruptcy Code and the Bankruptcy Cases, the Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in **Article VII** and to consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

     **6.5  Records Retention and Access**.  For a period of six (6) years following the Closing or such shorter period that records are required to be retained by applicable Law (but in no event less than three (3) years), Purchaser shall at Seller's  expense furnish to the Seller, to the extent in Purchaser's possession and following receipt of a reasonable, written request therefor, information that is necessary for Seller to prepare for, prosecute or defend against any Proceeding related to the Business, to validate claims filed in the Bankruptcy Case and/ or to enable Seller and its Representatives to prepare, complete and file all required federal, state and local Tax returns in accordance with applicable Law.

     **6.6  Cure Costs.** Seller shall not agree to the amount of any Liquidated Cure Costs without the written consent of Purchaser.  From and after the Closing Date, Purchaser shall have the sole right to contest and settle any claims for Cure Costs and, to the extent necessary and

permitted by the Bankruptcy Court, Seller shall cooperate in substituting Purchaser for Seller (at Purchaser's expense) in connection with any pending objections to Cure Costs.

**6.7  Bid Procedures.** Seller shall not modify the Bid Procedures without the consent of Purchaser.

**6.8  Covenants of Purchaser Regarding Transition and Accommodation of Residents**.

(a)  Purchaser will accommodate a maximum of 583 Continuing Residents to pursue continued medical residency training at Purchaser-owned hospitals.  If requested by Purchaser, Seller shall take all reasonable actions to reflect its consent to the transfer of Continuing Residents to Purchaser.  For any Resident who does not become a Continuing Resident and elects to pursue their training at hospitals that are not owned by Purchaser, Purchaser agrees to release the GME cap associated with Medicare reimbursement for such Residents on a temporary basis to the hospital where the Resident transfers until the Resident has completed training.

(b)  If the Continuing Residents are required to relocate their personal residence to continue their training with Purchaser, Purchaser shall provide reasonable private housing for such residents for the longer of the remainder of the current academic year or for the duration of a Resident's existing vacated lease. The provision of reasonable private housing shall not extend beyond the Resident's completion of his or her residency training with Purchaser

(c)  Purchaser shall use reasonable efforts to transfer Seller's residency program faculty to its hospitals so that they can continue to provide education to Residents.

(d)  Purchaser shall provide Continuing Residents with free meals during the time that they are training at Purchaser hospitals.

(e)  Purchaser shall provide additional transition resources to Continuing Residents as may be requested by Seller from time to time.

(f)  The parties shall cooperate in determining the initial clinical rotation assignments for Continuing Residents for the period following the transfer.

**6.9  Covenants of Purchaser Regarding Continued Affiliation with St. Christopher's Hospital for Children**.  For the period of ten (10 years after the Closing with automatic renewals for periods of five (5) years, provided that at the time of each such renewal such resident caps are used for resident training at STC only, unless either party gives not less than one hundred eighty (180) days' notice, Purchaser agrees to, and to cause any successor or assignee of any Purchased Assets to agree to: (i) enter into an agreement to continue participating in a "Medicare GME affiliated group" as that term is defined in 42 C.F.R. 413.75(b), with St. Christopher's Hospital for Children ("**STC**"), whereby Purchaser will continue sharing full-time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between STC and Seller (the "**STC GME Affiliation Agreement**") or enter into a new GME affiliation agreement substantially in the form of the STC GME Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation agreement" each academic year..

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

**6.10  Covenants of Purchaser Regarding Other GME Affiliation Agreements**.

(a)  For the remainder of the academic year during which the Closing occurs, Purchaser shall accept assignment from Seller of the GME Affiliation Agreements identified listed as numbered items 1, 2 and 4 (but not 3) under the heading <u>Current GME Affiliation Agreements</u> on Schedule A-1 to Exhibit A of this Agreement (the "**Current GME Affiliation Agreements**") (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(a) being included as "Cure Costs" for purposes of this Agreement) or enter into new GME affiliation agreements with those counterparties substantially in the form of the Current GME Affiliation Agreements; and

(b)  Purchaser shall, subject to Purchaser's completion of due diligence, accept assignment of the agreements identified under the heading <u>GME Obligations</u> on Schedule A-1 to Exhibit A of this Agreement to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(b) being included as "Cure Costs" for purposes of this Agreement).

**6.11  Covenant of Seller Regarding Tail Coverage Endorsement for Residents**.  At or prior to Closing, Seller shall obtain the Tail Coverage Endorsement.

**ARTICLE VII.**
**CONDITIONS TO CLOSING**

**7.1    Conditions to Obligations of Each Party.**  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)  <u>Proceedings; Orders</u>.  No Governmental Body of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

(b)  <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order with such changes as are mutually agreed to by the Seller and Purchaser, each in the exercise of its respective sole discretion.

(c)  <u>Regulatory Approvals</u>.  CMS, the Pennsylvania Department of Health ("**DOH**") and the Accreditation Council for Graduate Medical Education ("**ACGME**") and any other applicable regulatory authority or Governmental Body, in each case to the extent required, shall have consented to the transactions contemplated by this Agreement and, solely with respect to CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated herein will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap.

(d)  <u>CMS Discharge Amount</u>. Any order setting the CMS Discharge Amount shall have become a Final Order.

15

**7.2     Additional Conditions to Obligations of the Purchaser.**  The obligations of the Purchaser to effect the transactions contemplated hereby are subject to satisfaction or waiver of the following additional conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of the Seller set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>.  The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     <u>Documents</u>.  All of the documents, instruments and agreements required to be executed and/or delivered  by Seller on or prior to Closing pursuant to Section 8.2 of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

(d)     <u>Successor Liability</u>.  Entry of an Order of the Bankruptcy Court, which may be the Sale Order, which precludes the assertion of any successor, vicarious, or transferee liability (by piercing the corporate veil or otherwise) against the Purchaser, relating to claims, administrative proceedings or actions brought by or on behalf of any Government Body, accrediting body, or other third party relating to the operation of the Business prior to Closing. For avoidance of doubt, nothing in this paragraph is intended, nor shall it be construed, to preclude the collection of the CMS Discharge Amount from the Escrow Account as provided herein.

**7.3     Additional Conditions to Obligations of the Seller.**  The obligations of the Seller to effect the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Purchaser Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>.  The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     <u>Documents</u>.  All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to Section 8.3 of this

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

## ARTICLE VIII.
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

**8.1  Closing**.  The closing of the transactions contemplated hereby (the "**Closing**") shall take place at the offices of Stevens & Lee, P.C., 1818 Market St., 29th Floor, Philadelphia, PA., or such other place or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the Parties, as soon as practicable following the satisfaction or waiver of the conditions set forth in **Article VII** hereof and in any event within three (3) Business Days thereafter (the "**Closing Date**").  The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Standard Time, on the Closing Date.

**8.2  Deliveries by the Seller at the Closing.**  At the Closing, Seller shall furnish and deliver to the Purchaser the following:

(a)  the Bill of Sale, duly executed by the Seller;

(b)  the Assignment and Assumption Agreement, duly executed by the Seller;

(c)  a certificate, dated as of the Closing Date and signed the Seller, certifying that each of the conditions set forth in **Sections 7.2(a)** and **7.2(b)** have been satisfied;

(d)  a copy of the Sale Order;

(e)  evidence of satisfaction of Section 6.11; and;

(f)  all other certificates, instruments and documents reasonably required to be delivered by the Seller pursuant to this Agreement or any of the Ancillary Documents.

**8.3  Deliveries by the Purchaser at the Closing.**  At the Closing, Purchaser shall furnish and deliver to Seller the following:

(a)  the Forty-Six Million, Two Hundred Seventy-Five Thousand Dollar ($46,275,000) portion of the Base Purchase Price in excess of the Escrow Amount and the Liquidated Cure Costs by wire transfer of immediately available funds to an account designated in writing by the Seller;

(b)  reimbursement of up to One Million Dollars ($1,000,000) of Tail Coverage Costs as provided in Section 3.2(d);

(c)  the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)  a certificate, dated as of the Closing Date and signed the Purchaser, certifying that each of the conditions set forth in **Sections 7.3(a)** and **7.3(b)** have been satisfied; and

(e)  evidence of satisfaction of Section 6.9;

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

(f)  evidence of satisfaction of Section 6.10; and

(g)  all other certificates, instruments and documents required to be delivered by the Purchaser pursuant to this Agreement or any of the Ancillary Documents.

**8.4  Additional Actions Taken by the Purchaser at the Closing.**  At the Closing, Purchaser shall take the following actions:

(a)  Pay the Liquidated Cure Costs from the Base Purchase Price to the respective Persons entitled to receive them.

(b)  Fulfill its covenants under Sections 6.8, 6.9 and 6.10 of this Agreement.

**ARTICLE IX.**
**TERMINATION**

**9.1      Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)  By mutual written consent of the Seller and the Purchaser;

(b)  By (i) the Seller if, as of the day after the Outside Closing Date, any condition to the obligation of the Seller to close has not been satisfied, provided, however, that if the Closing has not occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Seller, then Seller may not terminate this Agreement pursuant to this Section 9.1(b), and (ii) the Purchaser if, as of the day after the Outside Closing Date, any condition to the obligation of the Purchaser to close has not been satisfied provided, however, that if the Closing has not occurred on or before the after the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then the Purchaser may not terminate this Agreement pursuant to this Section 9.1(b);

(c)  By Purchaser, in its sole and absolute discretion, if the sum of the (i) CMS Discharge Amount, and (ii) without duplication of the CMS Discharge Amount, (A) the Liquidated Cure Costs, and (B) the good faith estimate by Purchaser of the amount of any Cure Costs related to Assigned Contracts which will become Liquidated Cure Costs after the Closing Date, exceeds Three Million Dollars ($3,000,000);

(d)  Automatically, and without further action by any Party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated hereby, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(e)  Automatically, and without further action by any Party, if the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or is dismissed, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(f)  By the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, and if (i) the Seller fails to close on the Closing Date notwithstanding the

18

satisfaction of all conditions to the obligation of the Seller to close (other than conditions related to deliveries to be made at Closing by the Purchaser provided the Purchaser is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Seller herein become untrue or inaccurate such that the condition set forth Section 7.2(a) would not be satisfied or (iii) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.2(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Seller;

(g)  By the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (i)  the Purchaser fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Purchaser to close (other than conditions related to deliveries to be made at Closing by the Seller provided the Seller is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Purchaser herein become untrue or inaccurate such that the condition set forth in Section 7.3(a) would not be satisfied or (iii) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.3(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Purchaser;

(h)  Automatically, and without further action by any Party, upon the earlier of (A) Closing with the Successful Bidder, and (B) the Outside Closing Date.

**9.2** .**Effect of Termination.**  Except as provided in this Section 9.2, in the event of the termination of this Agreement pursuant to Section 9.1, this Agreement (other than this Section 9.2, which shall survive such termination) will forthwith become void, and there will be no liability on the part of any Party to the other and all rights and obligations of any Party will cease, except that nothing herein shall relieve any Party from liability for any intentional and material breach of this Agreement.

## ARTICLE X.
## INDEMNITY

**10.1  Indemnification by Seller**.

(a)  Subject to this Article X and consummation of the Closing, Seller shall, indemnify, defend and hold harmless Purchaser and Purchaser's officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each, a "Purchaser Indemnified Party") against and in respect of any and all out-of-pocket losses, documented and reasonable costs and expenses (including, without limitation, documented and reasonable costs of investigation and defense and reasonable attorneys' fees), claims, damages, obligations, or liabilities, whether or not involving a third party claim, but only after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Purchaser Indemnified Party in respect of any such claim (collectively, "Losses"), arising out of, based upon or otherwise in respect of:

19

(i)  any inaccuracy in or breach of any representation or warranty of Seller made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Purchaser by Seller pursuant to this Agreement (determined in each case without regard to any qualification with respect to materiality, Material Adverse Effect or similar qualification); provided, that the Seller shall not have any liability under this clause (i) (other than with respect any intentional fraud on the part of Seller) unless the aggregate of all Losses asserted under this clause (i) for which Seller would, but for this proviso and but for the $25,000 per claim deductible described below, be liable exceeds on a cumulative basis an amount equal to Two Hundred Thousand Dollars ($200,000.00);

(ii)  any nonfulfillment or breach of any covenant or agreement by Seller under this Agreement or any of the Schedules attached hereto;

(iii)  any Liability or obligation of Seller which is an Excluded Liability; and

(iv)  the ownership of any of the Excluded Assets by Seller after the Closing Date.

(b)  Each Purchaser Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(c)  **NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS TO THE CONTRARY, SELLER WILL NOT BE LIABLE FOR ANY LOSS ASSERTED UNDER  SECTION 10.1(a)(i) UNLESS THE CUMULATIVE LOSSES EXCEED $25,000 IN WHICH CASE SELLER WILL, SUBJECT TO THE OTHER LIMITATIONS IN THIS ARTICLE X, BE LIABLE TO INDEMNIFY THE PURCHASER INDEMNIFIED PARTY ONLY FOR THE EXCESS OVER $25,000; AND THE SOLE REMEDY OF ANY PURCHASER INDEMNIFIED PARTY AGAINST SELLER UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS FOR MONETARY DAMAGES, INCLUDING, WITHOUT LIMITATION, COSTS OF INVESTIGATION AND DEFENSE AND ATTORNEYS' FEES, SHALL BE A TIMELY CLAIM BY PURCHASER PURSUANT TO THE ESCROW AGREEMENT, AND LIMITED TO THE ESCROW AMOUNT.**

**10.2   Indemnification by Purchaser**. Subject to this Article X and consummation of the Closing, Purchaser shall indemnify, defend and hold harmless Seller, Seller's present, former, and future officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each a, "**Seller Indemnified Party**"), against and in respect of any and all Losses arising out of, based upon or otherwise in respect of:

(a)  any inaccuracy in or breach of any representation or warranty of  Purchaser made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Seller by Purchaser pursuant to this Agreement; provided, that the Purchaser shall not have any liability under this clause (a) of Section 10.2 unless the  claims asserted under this clause (a) involves Losses in excess of Twenty-Five

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

Thousand Dollars ($25,000), at which time Purchaser shall be liable for the full amount of all such Losses in excess of Twenty-Five Thousand Dollars ($25,000.00);

(b)  any nonfulfillment or breach of any covenant or agreement by Purchaser under this Agreement or any of the Schedules attached hereto; and

(c)  any of the Assumed Liabilities pursuant to this Agreement.

Each Seller Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

**10.3  Indemnification Procedures**.

(a)  Within forty five (45) days after receipt by an indemnified party of written notice of the commencement of any Proceeding against it to which the indemnification in this <u>Article X</u> relates, such indemnified party shall, if a claim is to be made against an indemnifying party under this <u>Article X</u>, give notice to the indemnifying party of the commencement of such Proceeding.

(b)  If any Proceeding referred to in paragraph (a) above is brought against a Seller Indemnified Party and it gives notice to Purchaser of the commencement of such Proceeding, Purchaser will be entitled to participate in such Proceeding and, to the extent that it wishes, assume the defense of such Proceeding with counsel reasonably satisfactory to such Seller Indemnified Party and, after notice from Purchaser to such Seller Indemnified Party of its election to assume the defense of such Proceeding, Purchaser will not, as long as it diligently conducts such defense, be liable to such Seller Indemnified Party under this Article X for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by such Seller Indemnified Party in connection with the defense of such Proceeding subject to the limitations contained in Section 10.1 hereof, other than reasonable costs of investigation.  If Purchaser assumes the defense of a Proceeding, (A) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (B) no compromise or settlement of such claims may be effected by Purchaser without such Seller Indemnified Party's consent unless (1) there is no finding or admission of any violation of law by such Seller Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other claims that may be made against such Seller Indemnified Party, and (2) the sole relief provided is monetary damages that are paid in full by Purchaser.  Such Seller Indemnified Party will have no liability with respect to any compromise or settlement of the claims underlying such Proceeding effected without its consent.  If notice is given to Purchaser by a Seller Indemnified Party of the commencement of any Proceeding for which such Seller Indemnified Party seeks indemnification hereunder and Purchaser does not, within ten (10) days after such notice is received, give notice to such Seller Indemnified Party of Purchaser's election to assume the defense of such Proceeding, Purchaser will be bound by any determination made in such Proceeding or any compromise or settlement effected by such Seller Indemnified Party.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

(c)  If any Proceeding referred to in paragraph (a) above is brought against a Purchaser Indemnified Party, Seller shall be entitled to participate in such Proceeding at its own expense.  However, such Purchaser Indemnified Party shall, in all respects, control the defense and settlement of such Proceeding and Seller shall be liable for all fees and expenses incurred by such Purchaser Indemnified Party and for any liability established by any order of a Governmental Body of competent jurisdiction and for any liability established by any settlement or compromise agreed to by such Purchaser Indemnified Party, in the exercise of its reasonable discretion.

**10.4  Other Claims**.  A claim for any matter not involving a third party claim may be asserted by written notice to the Party from whom indemnification is sought.

**10.5  Seller Indemnification Claim Period**.  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Seller, no claim for indemnification pursuant to Section 10.1 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 which reasonably describes the claim, the basis therefor, and if possible with the exercise of reasonable diligence, the Purchaser Indemnified Party's reasonably-supported estimate of the Losses being asserted, is delivered to Seller on or before the close of business on the day preceding the first (1st) anniversary of the Closing Date (the "**Claims Close Date**") in which case the indemnity with respect to that Loss shall survive the Claims Close Date (but continue to be limited to the funds held in the Escrow Account).  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.6  Purchaser Indemnification Claim Period**.  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Purchaser, no claim for indemnification pursuant to Section 10.2 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 is delivered to Purchaser on or before the Claims Close Date. For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Seller or any Seller Indemnified Party may be entitled.

**10.7  Payment from Indemnification Escrow**.  If a Purchaser Indemnified Party becomes entitled to indemnification from Seller hereunder, such Purchaser Indemnified Party shall be entitled to receive the amount of Losses in cash from the Escrow Account in accordance with the Escrow Agreement, and the recovery of the Purchaser Indemnified Parties shall be limited to such recoveries from the Escrow Account. For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.8  Miscellaneous Indemnification Provisions**.  Disclosures made after the date hereof and any knowledge that is acquired about the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or obligation set forth herein shall not in any manner affect rights to indemnification hereunder based on any such representation, warranty, covenant, or obligation.  The waiver of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or obligation, will not affect any right to

22

indemnification based on such representations, warranties, covenants and obligations unless otherwise expressly agreed in writing by the party or parties entitled to the benefit thereto.

**ARTICLE XI.**
**MISCELLANEOUS**

**11.1  Expiration of Representations, Warranties and Agreements.**  The representations and  warranties and covenants made by Seller and Purchaser in this Agreement and in any Ancillary Document delivered pursuant to this Agreement shall survive beyond the Closing Date.

**11.2  Assignment.**  Neither this Agreement nor any interest herein may be assigned or transferred by either Party to any other Person without the prior written consent of the other Party, which consent may be given or withheld in the sole discretion of such other Party provided, however, Purchaser may assign at Closing its rights, but not its obligations, hereunder to any Affiliate of Purchaser.

**11.3  Notices.**  All notices, requests and other communications under this Agreement shall be in writing and shall be either (a) delivered in person, (b) sent by certified mail, return-receipt requested, (c) delivered by a recognized delivery service or (d) sent by facsimile transmission and addressed as follows:

| | |
|---|---|
| If intended for Purchaser: | Clint Matthews, President and CEO<br>Tower Health<br>420 N. Fifth Avenue<br>West Reading, PA 19611 |
| With a copy to: | Robert Lapowsky, Esquire<br>Stevens & Lee, P.C.<br>620 Freedom Business Center, Suite 200<br>King of Prussia, PA 19406 |
| | and |
| | Joanne Judge<br>Stevens & Lee, P.C.<br>111 North Sixth Street<br>Reading, PA 19601 |
| If intended for Seller: | Center City Healthcare, LLC |
| With a copy to: | Jeffrey Hampton<br>Adam Isenberg<br>Saul Ewing Arnstein & Lehr LLP |

23

Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided.  A notice, request and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 P.M. on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 A.M. on the first Business Day thereafter.

**11.4  Further Assurances.**  Each of the Parties hereto shall execute such documents (including, without limitation, the Ancillary Documents) and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby or, at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement.

**11.5  Entire Agreement; Modifications; Waivers.**  This Agreement (together with the Exhibits and Schedules hereto), the Ancillary Documents, and the Non-Disclosure Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior understandings of the Parties with respect to the subject matter hereof and thereof.  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each Party.  No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Party making the waiver.

**11.6  Applicable Law; Jurisdiction and Venue; Jury Trial Waiver.**  THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.  The Parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; provided, however, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement shall be in the courts of the State of Delaware or U.S. District Court for the District of Delaware, and the Parties each hereby waive any objections they may have with respect thereto (including any objections based upon *forum non conveniens*). **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

**11.7  Headings and Captions.**  The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent or otherwise affect the interpretation of, this Agreement or any of the provisions hereof.

**11.8  Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**11.9  Time is of the Essence.**  With respect to all provisions of this Agreement, time is of the essence.  However, if the first date or last date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then, in such event, the time of such period shall be extended to the next day which is a Business Day.

**11.10  Remedies Cumulative.**  Except as herein expressly set forth, no remedy conferred upon a Party by this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law, in equity or by statute.

**11.11  Interpretation and Construction.**

(a)  As used herein the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".

(b)  As used herein, the words "**herein,**" "**hereof,**" "**hereunder**" and similar terms shall refer to this Agreement unless the context requires otherwise.

(c)  For purposes of this Agreement, whenever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural and vice versa.

**11.12  Estoppel.**  Each Party confirms and agrees that (a) it has read and understood all of the provisions of this Agreement; (b) it is familiar with major sophisticated transactions such as those contemplated by this Agreement; (c) it has negotiated with the other Party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**11.13  Joint Preparation.**  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**11.14  Expenses; Transfer Taxes.**

(a)  Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

(b)  The Purchaser and Seller shall each pay fifty (50%) percent of all sales, use, transfer, real property transfer, documentary, recording and similar Taxes and fees, and any deficiency, interest or penalty asserted with respect thereof arising out of or in connection with the transactions contemplated hereby ("**Transfer Taxes**").

**11.15  Counterparts.**  This Agreement may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

**11.16  Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

*[Signature page follows.]*

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above.

SELLER:

**CENTER CITY HEALTHCARE, LLC**

By: _____
    Allen Wilen
    Chief Restructuring Officer - Finance

PURCHASER:

**READING HOSPITAL**

By: _____
    Clint Matthews
    President and CEO
    Sole Member of Tower Health

*[Signature page to Asset Purchase Agreement]*

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/04/2019

**EXHIBIT A**

**Purchased Assets**

       The Purchased Assets to be purchased by the Purchaser and sold, conveyed, assigned, transferred and delivered on the Closing Date to the Purchaser by the Seller shall include all of the Seller's right, title and interest in and to all of the following assets, but specifically excluding, however, the Excluded Assets:

       1. <u>Assigned Contracts</u>.  All of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on <u>Schedule A-1</u> to this **Exhibit A**.

       2. <u>Books and Records</u>.  All Books and Records related to the Purchased Assets, but specifically excluded any Corporate Documents.

       3. <u>Governmental Authorizations</u>.  All transferable Governmental Authorizations identified on <u>Schedule A-2</u> to this **Exhibit A**.

       4. <u>Rights; Warranty Claims</u>.  All of Seller's rights, claims, counterclaims, credits, causes of action or rights of set-off against third parties that relate to warranties, indemnities, and all similar rights to the extent related to any Purchased Assets.

       5. <u>Other Assets</u>.  Those other assets of the Seller identified on <u>Schedule A-3</u> to this **Exhibit A**.

## Schedule A-1

**I.**  **Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health**

**II.**  **Current GME Affiliation Agreements**

1. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between the Trustees of the University of Pennsylvania, as the owner and operator of the Hospital of the University of Pennsylvania, and Seller.
2. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Prime Healthcare Services Roxborough, LLC, the owner and operator of Roxborough Memorial Hospital, and Seller.
3. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 among Temple University Hospital, Seller and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.
4. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Friends Behavioral Health System and Seller.

**III.**  **GME Obligations**

**Graduate Hospital/Penn**
- Agreement Regarding Medicare FTE Resident Caps, between the Trustees of the University of Pennsylvania and Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007

**Roxborough and Warminster/Solis**
- Agreement Regarding Medicare FTE Resident Caps between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007
- Second Amendment to Agreement Regarding Medicare FTE Resident Caps; between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 29, 2010

**St. Christopher's Hospital for Children/Temple**
- Academic Affiliation Agreement among Temple and affiliates and Tenet HealthSystem St. Christopher's Hospital For Children, LLC and affiliates dated October 19, 2007

**Hahnemann/Friends**
- Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP dated June 2008
- Memorandum of Understanding for Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP

**IV.**  **The Participating Provider Agreement**

**V.**  **The Tower GME Affiliation Agreement**

**Schedule A-2**

**Governmental Authorizations**

- **Acute Care General Hospital License for Hahnemann University Hospital ("HUH") issued by the Pennsylvania Department of Health**
- **Medicare Participation Agreement and associated Medicare Provider Number 390290 issued by the Centers for Medicare & Medicaid Services to HUH. The residents associated with the [36] ACGME-approved Graduate Medical Education Programs at HUH**

**Schedule A-3**

**Other Assets**

**<u>None</u>**

**Exhibit B**

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT ("Agreement") dated as of [_____] by and between Center City Healthcare, LLC, a Delaware limited liability company ("Assignor"), and Reading Hospital, a Pennsylvania nonprofit corporation ("Assignee").

BACKGROUND

A.  ASSIGNEE AND ASSIGNOR HAVE ENTERED INTO AN ASSET PURCHASE AGREEMENT DATED AS OF [_____] (TOGETHER WITH THE EXHIBITS AND SCHEDULES THERETO, THE "PURCHASE AGREEMENT") PROVIDING FOR, AMONG OTHER THINGS, THE SALE, TRANSFER, CONVEYANCE, ASSIGNMENT, AND DELIVERY BY ASSIGNOR TO ASSIGNEE OF CERTAIN ASSETS OF ASSIGNOR (COLLECTIVELY, THE "PURCHASED ASSETS") THAT ARE OWNED OR USED BY ASSIGNOR IN CONNECTION WITH THE BUSINESS.

B.  IN CONNECTION WITH THE SALE AND PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THE PURCHASE AGREEMENT, ASSIGNOR IS TO ASSIGN AND DELEGATE, AND ASSIGNEE IS TO ASSUME, THE ASSIGNED CONTRACTS.  CLOSING IS BEING HELD ON THE DATE HEREOF UNDER THE PURCHASE AGREEMENT.

NOW, THEREFORE, pursuant to and in consideration of the Purchase Agreement and the mutual covenants and agreements set forth therein and herein, Assignor and Assignee, each intending to be legally bound, agree as follows:

1.  Incorporation of Background; Defined Terms.  The Background provisions set forth above (including, without limitation, all of the defined terms set forth therein) are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety in this Section 1.  Capitalized terms used herein which are not otherwise defined shall have the respective meanings assigned to them in the Purchase Agreement.

2.  Assignment of Rights.  Assignor hereby sells, transfers, conveys, and assigns to Assignee all of Assignor's right, title and interest in, to and under all of the Assigned Contracts, each of which are identified on Schedule 1 attached hereto.

3.  Delegation of Duties.  Assignor hereby delegates to Assignee all of Assignor's duties and liabilities under the Assigned Contracts.

4.  Assumption of Liabilities.  In partial consideration for the sale of the Purchased Assets by Assignor pursuant to the Purchase Agreement, Assignee hereby undertakes and agrees to assume, discharge, or perform as the case may be, all duties, obligations, and liabilities of Assignor under the Assigned Contracts which are to be performed after, and relate to the period after, the date hereof or which are otherwise assigned to and assumed by the Purchaser under or pursuant to the Purchase Agreement or the Sale Order.

5.    <u>Assignment of Governmental Authorizations; Etc</u>.  Assignor hereby assigns, sells, transfers, and sets over to Assignee all of Assignor's right, title and interest in, to, and under all of the Governmental Authorizations which are listed on <u>Schedule 2</u> attached hereto, but only to the extent that any of the foregoing may be legally sold, transferred, conveyed, assigned and delivered by Assignor to Assignee without any action by any such applicable federal, state, or local government or regulatory body.

6.    <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the domestic, internal laws of the State of Delaware, without regard to its rules pertaining to the conflict of laws.

8.    <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  Any party to this Agreement may deliver an executed counterpart hereof by facsimile transmission or electronic mail (as a Portable Document Format (PDF) file) to the other party hereto and any such delivery shall have the same force and effect as the manual delivery of an original executed counterpart of this Agreement.

***Remainder of Page Intentionally Left Blank***
***Signature Page Follows***

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers the day and year first above written.

CENTER CITY HEALTHCARE, LLC

By _____

    Allen Wilen
    Chief Restructuring Officer - Finance
"Assignor"


READING HOSPITAL

By _____

Clint Matthews
President and CEO of Tower Health
Sole Member of Reading Hospital

"Assignee"

SCHEDULE 1

ASSIGNED CONTRACTS

SCHEDULE 2

ASSIGNED GOVERNMENTAL AUTHORIZATIONS

## EXHIBIT C

## BILL OF SALE

_____ __, 2019

KNOW ALL BY THESE PRESENTS that CENTER CITY  HEALTHCARE, LLC, a Delaware limited liability company (the "Seller"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, has granted, bargained, sold, conveyed, transferred, assigned and delivered, and by this Bill of Sale hereby grants, bargains, sells, conveys, transfers, assigns and delivers, to Reading Hospital, a Pennsylvania nonprofit corporation ("Purchaser"), its successors and assigns, all of the Seller's right, title and interest in and to the Purchased Assets.  As used herein, the term "Purchased Assets" has the meaning given to such term in that certain Asset Purchase Agreement, dated as of -_____ __, 2019, by and between the Seller and Purchaser (together with the Exhibits and Schedules thereto, the "Purchase Agreement"), which Purchase Agreement is incorporated herein by this reference.

EXCLUDING, HOWEVER, the "Excluded Assets" (as such term is defined in the Purchase Agreement).

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, forever.

This Bill of Sale is being executed and delivered by the Seller to the Purchaser under and pursuant to Section 8.2(a) of the Purchase Agreement and is subject to the terms and conditions of the Purchase Agreement in all respects.

*Remainder of Page Intentionally Left Blank*

*Signature Page Follows*

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the date and year first set forth above.

CENTER CITY HEALTHCARE, LLC

By _____

    Allen Wilen
    Chief Restructuring Officer - Finance

## EXHIBIT D

## ESCROW AGREEMENT

*[SELLER TO DRAFT USING  TEMPLATE FROM JEFFERSON BUT SUBJECT TO TOWER REVIEW]*

**<u>EXHIBIT E</u>**

**<u>SALE ORDER</u>**

## **EXHIBIT F**

## **BIDDING PROCEDURES ORDER**