**<u>EXHIBIT A</u>**

**Proposed Sale Order – Successful Bid**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
| | Jointly Administered |
| Debtors. | **Re: Docket Nos. 142, 246, 249 & 590** |

### ORDER UNDER 11 U.S.C. § 105, 106, 363, 365, 503, 507, AND 525 (A) APPROVING ASSET PURCHASE AGREEMENT WITH THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC., (B) AUTHORIZING SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF INTERESTS, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY CONTRACTS, AND (D) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[2] of Center City Healthcare, LLC, d/b/a Hahnemann University Hospital (the "Debtor"), for, *inter alia*, entry of an order, pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"): (i) approving the sale by the Debtor to Thomas Jefferson University Hospitals, Inc. or its permitted assignee (the "Purchaser") of the certain assets (the "Purchased Assets"), as defined in and pursuant to that certain Asset Purchase Agreement attached hereto as **Exhibit A** (the "Agreement") free and clear of all Interests (defined below) (except those expressly assumed by the Purchaser), and (ii) authorizing the assumption by the Debtor and assignment to the Purchaser of certain executory contracts free and clear of all Interests (except those expressly

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Agreement (defined below) as applicable.

assumed by the Purchaser), and (iii) granting certain related relief; and the Court having held a

hearing on September 4, 2019 (the "Sale Hearing") to approve the Sale Motion; and the Court

having reviewed and considered (a) the Sale Motion, (b) the objections to the Sale Motion, if

any, and (c) the arguments of counsel made, and the evidence proffered or adduced at the Sale

Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the

Debtor, its estate and creditors and other parties in interest; and upon the record of the Sale

Hearing and after due deliberation thereon; and good cause appearing therefore,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C.

§§ 157 and 1334 and the *Amended Standing Order of Reference* dated February 29, 2012, from

the United States District Court for the District of Delaware.  Venue is proper pursuant to 28

U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M), (N)

and (O), and the Court may enter a final order consistent with Article III of the United States

Constitution.  The statutory predicates for the relief granted herein are Sections 105, 106, 363,

365, 503, 507, and 525 of the Bankruptcy Code.

B.    The findings and conclusions set forth herein constitute the Court's

findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to

this proceeding pursuant to Bankruptcy Rule 9014.

C.    Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale

Hearing and the Debtor's potential assumption and assignment (or assignment, as applicable) of

the contracts listed on **Exhibit B** hereto (the "Assigned Contracts") to the Purchaser has been

provided in accordance with sections 102(1), 363, 365, 503, and 507 of the Bankruptcy Code and

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 6004, 6006, 9008 and

9014 and the order of this Court dated July 19, 2019 (the "Bidding Procedures Order"), and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this Order is required.

    D. A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Purchased Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Purchased Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Purchased Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtor's and its debtor-affiliates' unions and pension funds; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Human Services; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; (p) all Residents, (q) all known creditors of the Debtor, including Known Patient Creditors (as defined in the Bidding Procedures Order); (r) the Pension Benefit Guaranty Corporation (the "PBGC"); and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.

    E. The Debtor also caused notice of the Sale Motion to be published in *The Philadelphia Inquirer* and *USA Today*, which notice by publication is reasonable and sufficient to bind holders of claims against the Debtor whose identity was not known to the Debtor as of

the day before the Mailing Date, including Unknown Patients (as defined in the Bidding Procedures Order).

F.      The Debtor has full corporate power and authority to execute the Agreement and all other documents contemplated thereby and consummate the transactions contemplated therein and the sale of the Purchased Assets and assumption and assignment (or assignment, as applicable) to the Purchaser of any Assigned Contracts as provided in the Agreement (defined below) (collectively, the "Sale") has been duly and validly authorized by all necessary corporate action of the Debtor and no consents or approvals, other than the approval of this Court, are required for the Debtor to consummate such transactions.

G.      The Purchaser is not a successor to or mere continuation of the Debtor or its estate.

H.      The bidding procedures established pursuant to the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Purchased Assets and Assigned Contracts and no higher or better offer has been made.

I.      The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts and sell the Purchased Assets to the Purchaser in connection with the consummation of the Agreement, and that approval of the Agreement and the Sale pursuant thereto is in the best interests of the Debtor, its estate, and its creditors.

J.      The Sale must be completed immediately in order to preserve the value of the Purchased Assets and to provide certainty to former Hahnemann University Hospital Residents regarding the status of their tail insurance coverage and, as a result, good and

sufficient business justification exists for the immediate sale of the Purchased Assets and assumption and assignment (or assignment, as applicable) of the Assigned Contracts to the Purchaser outside of a plan of reorganization.

   K. The Purchaser is not an insider, as that term is defined in the Bankruptcy Code, of the Debtor.  Furthermore, no insiders of the Debtor are receiving or retaining any benefit, property or payments in connection with the Sale except to the extent such insiders have allowed claims against or equity interests in the Debtor and, as a result, may participate in a distribution of Sale proceeds.

   L. The Agreement was negotiated, proposed and entered into by the Debtor and Purchaser without collusion, in good faith, and as a result of arm's-length bargaining.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby with respect to the transactions authorized by this Order (including specifically, but without limitation, any assumption and assignment of executory contracts under section 365 of the Bankruptcy Code).  Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code.

   M. In the absence of a stay pending appeal, the Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Agreement at any time after the entry of this Order, provided the Purchaser shall not be obligated to close until all applicable conditions to closing under such Agreement have been satisfied or waived as provided in such Agreement.  In closing the transactions contemplated by the Agreement absent satisfaction of the condition of CMS consent, the Purchaser shall be deemed to have materially relied on the findings and decrees in

this Order, including specifically, but without limitation, (i) the finding that there has not been, and will not be, a cessation of business of Hahnemann University Hospital at any time prior to the Closing, and the Participating Provider Agreement therefore is in full force and effect; (ii) the finding and decrees that legacy Hahnemann University Hospital residency slots temporarily following displaced Residents shall revert to the Purchaser upon conclusion of each such Resident's participation in their programs, and, subject only to the temporary displacement described in the preceding clause, the Purchaser shall be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts; and (iii) the findings and decrees capping the Purchaser's liability to CMS for claims arising prior to the Closing to the CMS Pre-Closing Amount.  The aggregation of the legacy Hahnemann University Hospital residency slots with the Thomas Jefferson University Hospital residency slots and the limitation of "successor liability" for pre-Closing amounts were integral components of the bargain struck by the Purchaser for the purchase of the Purchased Assets, without which it would not have entered into the Agreement.

N.    The consideration provided by the Purchaser for the Purchased Assets being purchased, including the Assigned Contracts, pursuant to the Agreement constitutes the best and highest offer for the Purchased Assets and the Assigned Contracts and reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, and the District of Columbia.

O.    The Debtor may sell the Purchased Assets and Assigned Contracts free and clear of all Interests (including, without limitation, those (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtor's or the Purchaser's interest in the Purchased Assets and/or Assigned Contracts and, (ii) in respect of

Taxes), because each entity with an Interest in any of the Purchased Assets and/or Assigned Contracts, including but not limited to CMS or any Governmental Body, accrediting body, or other third party, as applicable, has consented to the Sale, is deemed to have consented to the Sale, has a claim which is subject to a bona fide dispute, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such Interest.  For the avoidance of doubt, HHS and CMS (as defined below) have not, and are not deemed to have, consented to the Sale.

P.      The Debtor has good and transferable title to the Purchased Assets and Assigned Contracts (including specifically, but without limitation, the Participating Provider Agreement) and, accordingly, the transfer of the Purchased Assets and assignment of the Assigned Contracts to the Purchaser pursuant to the Agreement will be a legal, valid, and effective transfer of the Purchased Assets and assignment of the Assigned Contracts.

Q.      Neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts pursuant to the Agreement will subject the Purchaser, its Affiliates, the Consortium or an of its members to any liability (except those expressly assumed by the Purchaser pursuant to the Agreement (the "Assumed Liabilities")) for claims against the Debtor or the Debtor's predecessors or affiliates of any kind or character, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent, based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor, vicarious or transferee liability.  Without limiting the general nature of the foregoing, neither the transfer of the Purchased Assets nor the assignment of the Assigned Contracts will subject the Purchaser, its Affiliates, or the Consortium or its members, to any (1) liability on account of any employee benefit plan maintained by the Debtor, or the Debtor's predecessors or affiliates, including but not limited to any liability related to benefits, underfunding, termination

7

and/or termination premiums, regardless when such claims are deemed to have accrued and regardless whether such would be considered "claims" as such term is defined in the Bankruptcy Code, to (i) the PBGC, or (ii) to any plan participant or beneficiary (collectively, the "<u>PBGC Claims</u>"); (2) claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party relating to the operation of the Business prior to Closing, subject only to collection of an amount not exceeding, in the aggregate with collections therefrom pursuant to the immediately following clause, the CMS Pre-Closing Amount from the Escrow Account; (3) claims relating to the Participating Provider Agreement for services rendered or amounts paid to Seller prior to the Closing in any amount in excess, together with other collections therefrom pursuant to the immediately preceding clause, of the CMS Pre-Closing Amount; and/or (4) claims or actions or proceedings brought under or related to Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations.

R.     The Purchaser has provided adequate assurance of future performance under the Assigned Contracts, to the extent required by Section 365(b)(1)(C) of the Bankruptcy Code.

S.     Upon the assumption and assignment (or assignment, as applicable) of the Assigned Contracts, as provided herein, the Purchaser shall succeed to all of the right, title and interest of the Debtor under the Assigned Contracts including, without limitation, the right to exercise renewal options which, pursuant to any provision of the applicable Assigned Contract or applicable nonbankruptcy law, are not exercisable by assignees of the Debtor, the Court having found that such provisions, as they relate to the assumption and assignment (or assignment, as

applicable) to the Purchaser of the Assigned Contracts, are unenforceable pursuant to Section 363(*l*), 365(e)(1), or 365(f)(3) of the Bankruptcy Code, as applicable.

T.    As to the Participating Provider Agreement and the objection of the United States of America ("United States"), on behalf of the Department of Health and Human Services ("HHS"), acting through its designated component, the Centers for Medicare & Medicaid Services ("CMS"), specifically, and without limiting the generality of any of the foregoing paragraphs that are otherwise applicable:

(i)    the Participating Provider Agreement is not an executory contract within the meaning of section 365 of the Bankruptcy Code because the parties thereto do not have any material performance obligations under such agreement, as distinct from their obligations under the applicable Medicare statutes and regulations, *see In re B.D.K. Health Management, Inc.*, No. 98-00609-6B1, 1998 WL 34188241, *6-7 (Bankr. M.D. Fla. Nov. 16, 1988); accordingly, the Debtors need not satisfy the requirements of section 365 in order to assign the Participating Provider Agreement to the Purchaser in accordance with the Agreement;

(ii)    the transfer of the Participating Provider Agreement does not violate the federal Anti-Assignment Act;

(iii)    the transaction contemplated by the Agreement (the "Transaction") constitutes a "change of ownership" within the meaning of 42 C.F.R. § 489.18(a) (a "CHOW"), as a result of which the legacy Hahnemann University Hospital residency slots temporarily following each displaced Resident shall revert to the Purchaser upon conclusion of each such Resident's participation in their respective program, and, subject only to temporary displacements referred to in the preceding clause, the Purchaser shall

be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts;

(iv)    any so-called "successor liability" under C.F.R. § 489.18(d) as a result of the CHOW is subject to limitation by operation of applicable provisions of the Bankruptcy Code, as set forth in this Order;

(v)    the Participating Provider Agreement may be assigned to the Purchaser free and clear of any alleged claim of CMS arising prior to the Closing (A) for amounts in excess of $3,000,000 (the "CMS Pre-Closing Amount") or (B) brought or made following distribution of funds in the Escrow Account to the Debtor pursuant to the terms of the Agreement and the Escrow Agreement, because (X) a debtor's rights under a contract are property that may be sold pursuant to section 363 of the Bankruptcy Code, (Y) any alleged claims in excess of the CMS Pre-Closing Amount are the subject of a *bona fide* dispute, and (Z) CMS could be compelled in a legal or equitable proceeding to accept a money satisfaction of such claims; accordingly, sale of the Participating Provider Agreement free and clear of any alleged claim of CMS for amounts in excess of the Pre-Closing Amount is permitted by sections 363(f)(4) and (f)(5) of the Bankruptcy Code;

(vi)    as of the date of entry of this order, there has been no cessation of business of Hahnemann University Hospital; accordingly, 42 C.F.R §§ 489.52(b)(3) and 413.79(h) do not apply and have not resulted in the termination of the Participating Provider Agreement, which is in full force and effect, and not subject to pending actions of termination;

(vii)    as of the Closing, there shall be deemed not to have been any cessation of business of Hahnemann University Hospital; accordingly, 42 C.F.R

§§ 489.52(b)(3) and 413.79(h) shall be deemed not to apply and not to have resulted in the termination of the Participating Provider Agreement, which shall be deemed in full force and effect, and not subject to pending actions of termination;

NOW, THEREFORE, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED THAT:

1.      The Sale Motion, and the relief sought therein (including approval of the Sale) is GRANTED, in all respects as set forth herein.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.      The Agreement, and all of the terms and conditions thereof, is hereby approved.

4.      Pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code, the Debtor is authorized and directed to take all actions necessary to consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement.

5.      In the event Purchaser fails to consummate the Sale on the terms and conditions of the Agreement, the Debtors, in consultation with the Committee, may designate Reading Hospital (the "<u>Backup Bidder</u>") as the Successful Bidder for all purposes herein pursuant to the terms of its backup bid attached hereto as **<u>Exhibit C</u>** (the "<u>Backup Bid</u>").  Upon such designation, the Debtors shall be authorized, but not required, to submit, in consultation with the Committee and under certification of counsel, an alternative form of proposed sale order, substantially in the form previously submitted with the Court [D.I. 246], modified to conform to the terms of the Backup Bid, authorizing the Debtors to consummate all transactions

contemplated by the Backup Bid.  In such case, the Purchaser's deposit shall be forfeited to the Debtors as set forth in the Bidding Procedures.

6.      As of the date of closing under the Agreement (the "<u>Closing Date</u>"), the Assigned Contracts that are executory contracts or unexpired leases shall be deemed to have been assumed by the Debtor and assigned to the Purchaser pursuant to Section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtor and the Debtor's estate shall be relieved from any liability for any breach of such an Assigned Contract occurring after the effective date of the Closing Date.  As of the Closing Date, the Assigned Contracts that are not executory contracts or unexpired leases shall be deemed to have been assigned to the Purchaser pursuant to section 363(b) of the Bankruptcy Code.

7.      On the Closing Date, from the Purchase Price, the Purchaser shall pay to the Escrow Agent the Escrow Amount, which shall be deemed to include an amount equal to the maximum cure amounts (the "<u>Maximum Cure Amounts</u>") that would be assertable by the non-debtor party to each other Assigned Contract that is an executory contract, as such Maximum Cure Amounts are stated on **Exhibit B**.  For the avoidance of doubt, the Maximum Cure Amounts stated on **Exhibit B** shall be the maximum amount of any subsequently allowed claim to which any non-debtor party to an Assigned Contract that is an executory contract shall be entitled pursuant to Section 365(b)(1)(A) of the Bankruptcy Code.  To the extent a Maximum Cure Amount is stated on **Exhibit B** for the Participating Provider Agreement, such Maximum Cure Amount shall be deemed to be the CMS Pre-Closing Amount for purposes of the Agreement.

8.      Upon the Closing (i) all defaults under the related Assigned Contracts required to be cured pursuant to Section 365(b)(1)(A) of the Bankruptcy Code shall be deemed

cured and all amounts due to the non-debtor parties to such Assigned Contracts pursuant to Section 365(b)(1)(B) on account of any pecuniary loss resulting from such defaults shall be deemed paid in full, and (ii) each non-debtor party to such Assigned Contracts that is an executory contract shall be forever bound by such Maximum Cure Amounts and enjoined from seeking to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on account of defaults by the Debtor, including defaults as to which, pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.

9.      Upon payment by the Purchaser of the Escrow Amount to the Escrow Agent, the non-debtor parties to, and beneficiaries of, Assigned Contracts that are executory contracts, including any Governmental Body, accrediting body, or other third party, shall be (i) forever bound by the Maximum Cure Amounts, and (ii) enjoined from seeking (A) recourse against the Purchaser, its Affiliates, or the Consortium or its members, on account of any defaults by the Debtor under the related Assigned Contracts required to be cured pursuant to Section 365(b)(1)(A) of the Bankruptcy Code and/or any pecuniary loss resulting from such defaults due to such non-debtor party pursuant to Section 365(b)(1)(B) of the Bankruptcy Code in excess of the related Maximum Cure Amount, (B) recourse against the Purchaser, its Affiliates, or the Consortium or its members for successor, vicarious, or transferee, relating to claims, administrative proceedings or actions relating to the operation of the Business prior to Closing, and/or (C) to terminate such Assigned Contract or enforce any other remedies under such Assigned Contract against the Purchaser on account of defaults by the Debtor, including defaults as to which, pursuant to Section 365(b)(1)(A) of the Bankruptcy Code, cure is not required.

10.      [RESERVED]

11.     Any provision in any Assigned Contract that purports to declare a breach, default or payment right as result of an assignment or a change of control in respect of the Debtor as relates to the assumption of any Assigned Contract by the Debtor and assignment of such Assigned Contract to the Purchaser is unenforceable, and all such Assigned Contracts shall remain in full force and effect, notwithstanding any such provision.  No sections or provisions of any Assigned Contract that purports to provide for additional payments, rent accelerations, assignment fees, increases, payments, deposits, security, charges or any other fees charged to the Purchaser or the Debtor as a result of the assumption and the assignment (or assignment, as applicable) of the Assigned Contracts to the Purchaser shall have any force and effect with respect to the transactions contemplated by the Agreement and assignments authorized by this Order, and such provisions are unenforceable under Section 363(*l*), 365(e)(1), 365(f), or 541(c)(1) of the Bankruptcy Code, as applicable.

12.     Except for the Assumed Liabilities, pursuant to (and to the maximum extent permitted by) sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing under the Agreement, the Purchased Assets and the Assigned Contracts shall be free and clear of all interests of any entity other than the estate (collectively, "Interests"), including, without limitation, any (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code); (ii) successor, vicarious, or transferee liability against the Purchaser, its Affiliates, or the Consortium or its members, whether known or unknown, now existing or hereafter occurring, whether fixed or contingent, based, in whole or in part, directly or indirectly, on any theory of law, relating to claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party

relating to the operation of the Business prior to Closing; (iii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Debtor's or Purchaser's interest in the Assigned Contracts and/or Purchased Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iv) PBGC Claims, (v) claims in respect of Taxes (including taxes as to which applicable returns have not yet been filed, whether or not overdue); (vii) claims relating to the Participating Provider Agreement in excess of the CMS Pre-Closing Amount or brought or made following distribution of funds in the Escrow Account to the Debtor pursuant to the terms of the Agreement and the Escrow Agreement; (viii) claims or actions or proceedings brought under Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations; and (ix) easements, restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, with all such Interests to attach to the Net Proceeds of Sale (defined below) in the order of their respective priorities, with the same validity, force and effect (if any) which they now have against the Purchased Assets and Assigned Contracts, subject to any claims and defenses the Debtor may possess with respect thereto.  The "Net Proceeds of Sale" is the Base Purchase Price, plus the adjustment pursuant to the section 3.2(d) of the Agreement, minus the Escrow Amount, minus Tail Coverage Costs paid from the Base Purchase Price, minus the $225,000 break-up fee payable to Reading Hospital, plus any amounts distributed by the Escrow Agent to the Debtor after Closing.  For the avoidance of doubt: (i) the Debtors may use a portion of the Base Purchase Price, not to exceed the Tail Coverage Costs, to purchase the Tail Coverage

Endorsement in accordance with the Agreement; and (ii) the Escrow Amount shall not be property of the Debtor's estate and no Interests shall attach to the Escrow Amount unless and until such funds are distributed to the Debtor pursuant to the terms of the Agreement and the Escrow Agreement.  The Net Proceeds of Sale and any amounts reimbursed to the Debtors from the Purchaser with respect to its Tail Coverage Costs shall be deposited into the disbursements account maintained by the Debtors at Wells Fargo Bank, N.A., and shall not be swept by MidCap Funding IV Trust or any of its affiliates (collectively "MidCap"), and shall not otherwise be disbursed except: (a) as to operating disbursements, by agreement of the Debtors and MidCap in consultation with the Committee, and otherwise by agreement of the Debtors, MidCap and the Committee; or (b) pursuant to further Court order.  All rights of the Debtors, MidCap and the Committee are expressly reserved with regard to the extent, priority and validity of any lien asserted by MidCap with respect to the Purchased Assets and the Net Proceeds of Sale.  Upon entry of a final order ruling that MidCap has a valid, perfected lien against the Net Proceeds of Sale, the remaining Net Proceeds of Sale shall be disbursed to MidCap up to the aggregate amount of MidCap's claims against the Debtors.  Any fees payable, or costs reimbursable, to SSG Advisors, LLC on account of or related to the Sale shall be paid from the Net Proceeds of Sale, upon allowance thereof by Court order.

13.    All claims of the Purchaser or any other Purchaser Indemnified Party for indemnification under the terms of the Agreement or for distributions from the Escrow Funds on account of Cure Amounts shall be treated as administrative claims pursuant to Section 503 and 507 of the Bankruptcy Code solely to the extent necessary to permit a claim against the Escrow Amount; provided, however, except as otherwise stated in the Agreement, the sole remedy for claims by the Purchaser or any other Purchaser Indemnified Party for indemnification for

monetary damages shall be to and against the Escrow Amount and shall be determined and paid pursuant to the terms of the Agreement and the Escrow Agreement. To the extent of any conflict between the terms of the Agreement or the Escrow Agreement relating to such determination and payment of indemnity claims and the Bankruptcy Code or Bankruptcy Rules, the terms of the Agreement and the Escrow Agreement shall control.

14.     All persons (including, for the avoidance of doubt, governmental agencies and departments) are hereby enjoined from asserting, prosecuting or otherwise pursuing any claim against the Purchaser or any member of the Purchaser to recover on any claims (regardless of when accrued and regardless whether meeting the definition of "claim" under the Bankruptcy Code) such person had, has or may have (other than an Assumed Liability) against (x) the Debtor, its estate, officers, directors, shareholders, the Purchased Assets or the Assigned Contracts, or (y) the Purchaser in connection with the negotiation of, and any agreements contained in, related to or conditioned upon, the Agreement.

15.     As of the Closing Date, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in or claims against the Purchased Assets and Assigned Contracts, if any, as such Interests or claims may have been recorded or may otherwise exist.

16.     Each and every federal, state and local governmental agency or department, together with its agents, contractors, and designees, shall be, and hereby is, (i) authorized and directed to accept (A) this Sale Order as sufficient evidence of the transfers of all right, title, and interest in, to, and under the Purchased Assets and the Assigned Contracts, and (B) any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement; and (ii) authorized to rely on this Sale Order in

consummating, or facilitating the consummation of, the transactions contemplated by the Agreement.

17.    Upon the occurrence of the Closing, all Interests in, against, or upon the Purchased Assets or the Assigned Contracts shall be unconditionally released, terminated, and discharged without the need for any further action.  Notwithstanding the foregoing, at the Closing, or as soon as practicable thereafter, (x) the Debtor and the Purchaser are hereby authorized to execute and file such termination statements, instruments of satisfaction, releases, or other documents to reflect the unconditional release, termination, and discharge of such Interests on behalf of such person or entity with respect to the Purchased Assets and the Assigned Contracts, and (y) the Purchaser is hereby authorized on behalf of each holder of a purported Interest to file, register, or otherwise record a copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the unconditional release, termination, and discharge of all Interests in, against, or upon the Purchased Assets or the Assigned Contracts.  The provisions of this Order authorizing the sale of the Purchased Assets free and clear of all Interests are self-executing and, notwithstanding the failure of the Debtor, the Purchaser or any other party to execute, file or obtain termination statements, instruments of satisfaction, releases, or other documents to reflect the release, termination, and discharge of any such Interests, all such Interests shall be deemed divested immediately upon Closing.

18.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date.

19.     As of the Closing Date, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the transactions contemplated by the Agreement.

20.     Pursuant to, and to the fullest extent permitted by, Sections 105(a) and 525 of the Bankruptcy Code, all governmental units are hereby prohibited from denying, revoking, suspending, or refusing to renew any permit, license, or similar grant relating to the operation of the Purchased Assets or the Assigned Contracts on account of the filing or pendency of the Bankruptcy Cases, the consummation of the Sale, or the Debtor's or the Purchaser's failure to pay a debt that is dischargeable in the Bankruptcy Cases or was discharged under the Bankruptcy Code.

21.     To the fullest extent permitted by applicable law, the Purchaser shall be authorized, as of the Closing Date and upon the occurrence of Closing, to operate under any transferred license, permit, registration and governmental authorization or approval of the Debtor with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.

22.     Subject to paragraph 34 of this Order, nothing in this Order is intended to abrogate or limit the authority or discretion of the Pennsylvania Department of Health over regulatory matters such as closure and licensing of health care facilities; provided, that if CMS or its agents, contractors, or designees seek any administrative action or processing by the Pennsylvania Department of Health in its capacity as a state survey agency to process the CHOW and transfer of the Participating Provider Agreement hereby, the Pennsylvania

Department of Health, in such capacity, shall perform such action or processing to give effect to this Transaction.

23.    No law of any state or other jurisdiction relating to bulk sales or similar laws shall apply in any way to the Transaction, the Sale Motion, and this Order.

24.    For the avoidance of doubt, any privileges, protections or immunities of the Debtor for communications, documents, materials or matters arising at any time, whether before or after the Petition Date, including but not limited to any attorney-client privilege, work product doctrine, common interest or joint defense privilege, relating to any matter whatsoever, including without limitation any matter relating to the negotiation and implementation of the Agreement and any of the transactions contemplated thereby or entered into in connection therewith (collectively, "Privilege") shall not be Purchased Assets under the Agreement, and any such Privilege is owned and will continue to be owned by the Debtor, and notwithstanding anything to the contrary herein or in the Agreement, the Purchaser shall have no interest in or rights with respect to the Privilege, whether pursuant to this Order, the Agreement, or otherwise. The Privilege shall remain within the sole control of the Debtor and may not be waived by any other person or entity.

25.    The Agreement and the Escrow Agreement, as well as other agreements related thereto, may be modified, amended, or supplemented by the Debtor and the Purchaser without further order of the Court, provided that any such modification, amendment, or supplement either is (a) not material or (b) not less favorable to the Debtor than the existing applicable provisions.

26.    This Court shall retain jurisdiction (a) to enforce and implement the terms and provisions of the Agreement, all amendments thereto, any waivers and consents thereunder

and each of the agreements executed in connection therewith, (b) to compel delivery of the Purchased Assets and Assigned Contracts to the Purchaser, (c) to resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, and (d) to interpret, implement and enforce the provisions of this Order.

27.    Nothing contained in any plan confirmed in these Bankruptcy Cases or the order confirming any such plan shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan, converting the Debtor's bankruptcy case from chapter 11 to a case under chapter 7 of the Bankruptcy Code, or providing for dismissal of the Debtor's bankruptcy case.

28.    The terms and provisions of the Agreement, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its creditors, the Purchaser and its affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting a claim against or Interest in the Debtor's estate or any of the Assigned Contracts and the Purchased Assets and any trustee appointed for the Debtor under any chapter of the Bankruptcy Code.

29.    The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

30.    The Purchaser is a party in interest and shall have standing to appear and be heard on all issues related to or otherwise connected with this Order, the Sale or the Agreement.

35856989.8 09/06/2019

31.     <u>Participating Provider Agreement and Residency Slots.</u>     CMS, its applicable Regional Office ("<u>RO</u>"), its Medicare Administrative Contractors ("<u>MACs</u>"), and their respective agents, contractors, and designees, shall treat, and shall be deemed to have treated, the Transaction as a CHOW for all Medicare purposes, including merging provider agreements and graduate medical education ("<u>GME</u>") caps.  Legacy Hahnemann University Hospital residency slots temporarily following displaced Residents shall revert to the Purchaser upon conclusion of each such Resident's participation in their respective programs, and, subject only to temporary displacement pursuant to the preceding clause, the Purchaser shall be entitled to be paid by CMS for GME funding at aggregated legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts.  CMS, RO, MACs, and their respective agents, contractors, and designees shall give effect to the Transaction in all regards, including specifically, but without limitation, the aggregation of the legacy Hahnemann University Hospital and Thomas Jefferson University Hospital residency slot counts under the participating provider agreement of Thomas Jefferson University Hospital, and shall take all steps necessary and convenient to so effecting the Transaction, including, without limitation, the process as follows:

(a)     RO shall issue, and prior to such issuance shall be deemed to have issued, a tie-in notice, effective as of the Closing Date of the Transaction, confirming the merger of provider numbers for Hahnemann University Hospital and Thomas Jefferson University Hospital;

(b)     As a result of the merger of provider numbers described in the immediately preceding paragraph, RO shall retire, and prior to such retirement the RO

shall be deemed to have retired, the separate provider number of Hahnemann University Hospital;

(c)     RO shall instruct the MAC promptly to, and prior to such instruction and performance, the RO shall be deemed to have instructed and the MAC shall be deemed to have performed, such tasks as are necessary to, (i) update systems to change Hahnemann University Hospital's name, location, electronic funds transfer (EFT) account, and payment address to that of the Thomas Jefferson University Hospital; (ii) make other updates necessary to effect the merger of provider numbers; (iii) notify Thomas Jefferson University Hospital it may begin submitting under its provider number claims associated with the former Hahnemann University Hospital provider number (for GME purposes);

(d)     CMS shall adjust, and prior to such adjustment, shall be deemed to have adjusted, all indirect and direct GME payments to reflect the aggregation of residency slots;

(e)     if and to the extent that CMS, the RO, MACs, or their agents, contractors, or designees may require any agreement, certification, consent, instruction, recommendation, or other action of any of CMS, the RO, MACs, or their agents, contractors, or designees in order to perform such functions as are required hereunder, such agreement, certification, consent, instruction, recommendation, or other action shall be deemed to have been made, given, or taken, as applicable; and

(f)     CMS, the RO, MACs, and their agents, contractors, and designees, are precluded from taking any action prior to the Closing to seek to terminate the

Participating Provider Agreement for any reason related to any alleged cessation of business of Hahnemann University Hospital.

32.    Notwithstanding anything to the contrary in this Order, nothing set forth herein shall be deemed to limit, impair or affect in any way (i) Seller's right, title and interest in Seller's cash and patient accounts receivable, payor/contractor accounts receivable, Medicare reimbursements or adjustments and all other accounts receivable (collectively, "Accounts Receivable") for services rendered or goods sold prior to the Closing Date, which cash and Accounts Receivable remain the property of Seller as Excluded Assets and shall be reimbursed to Seller if received by Purchaser nor (ii) Seller's ability to complete any remaining billing for services rendered or goods sold prior to the Closing Date under Seller's Medicare provider number. Purchaser agrees that it will provide Seller (or Seller's billing agent) with reasonable access to the Participating Provider Agreement, Books and Records and Governmental Authorizations as may be necessary in order for Seller to facilitate billing and collecting for services furnished to Medicare beneficiaries by Seller.

33.    Notwithstanding anything to the contrary in the Agreement or any document relating to the Sale, the Purchased Assets shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising

under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action.

34.     Notwithstanding the provisions of Fed. R. Bankr. P. 6004(h), 6006(d), and 7062, this Order shall be effective and enforceable (i) immediately upon its entry, with respect to the relief granted in this paragraph and (ii) seven calendar days following the time of its entry, as to all other relief.  Prior to the earlier of (i) the Closing or (ii) seven calendar days following the full effectiveness and enforceability of this Order, no person (including, for the avoidance of doubt, any governmental agency or department), other than the Debtor and its affiliated debtors-in-possession, may take or cause any other person to take any action with respect to or affecting the Purchased Assets, including the Participating Provider Agreement, that in any way would affect the ownership, transferability, validity, enforceability, or effectiveness of the Purchased Assets, or the performance or consummation of the Transaction or any of the decrees herein.  For the avoidance of doubt, the foregoing sentence is not intended, nor shall it be construed, to preclude (i) CMS from appealing or seeking a stay pending appeal of this Order or (ii) the Purchaser from exercising any right to terminate the Agreement pursuant to the terms thereof. With respect to the Pennsylvania Department of Health ("DOH"), the provisions of this paragraph 34 shall only apply to stay DOH (1) in its capacity as a state survey agency and/or (2) from taking any further steps in connection with the Debtor's closure process or otherwise seeking the revocation, surrender and/or termination of the Debtor's hospital license.

35.     Provided that the Closing occurs within seven calendar days following the effectiveness and enforceability of this Order, the findings of fact and conclusions of law set forth in this Order shall, for all purposes related to the Order and the Transaction, be deemed to have been made as of the Closing.

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CENTER CITY HEALTHCARE, LLC,**

**as Seller,**

**AND**

**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.**

**as Purchaser**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of August, 2019, by and between Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital (the "**Seller**" or "**Hahnemann**"), a Delaware limited liability company and Thomas Jefferson University Hospitals, Inc. (the "**Purchaser**"), a Pennsylvania nonprofit corporation.  The Seller and the Purchaser are sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Seller is engaged in the business of owning and operating an acute care hospital, including a graduate medical education program (the "**Business**"); and

WHEREAS, the Seller is the owner of the Purchased Assets; and

WHEREAS, the Purchaser and the Consortium (defined below) operate acute care hospitals and graduate medical education programs; and

WHEREAS, the Purchaser has formed or intends to form a consortium including itself, (i) Temple University Health System; (ii) Albert Einstein Health Network; (iii) Main Line Health, Inc.; (iv) Christiana Care Health System; and (v) The Cooper Health Systems, A New Jersey Non-Profit Corporation (collectively, and together with the Purchaser, the "**Consortium**"), for purposes of operating a GME network as a qualified Medicare GME affiliated group;

WHEREAS, Purchaser, directly or through the Consortium members, STC, and other third parties currently under contract with the Purchaser or Consortium Members (collectively, the "**GME Network Affiliates**"), shall assume placement of the Continuing Residents in furtherance of continuing quality medical education in the Delaware Valley region; and

WHEREAS, on June 30, 2019 (the "**Petition Date**"), a voluntary petition for relief was filed by the Seller under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), under Case Number 19-11466 (the "**Bankruptcy Case**"); and

WHEREAS, in support of the Consortium's continuation of GME programs in the Delaware Valley region, and the effective transition of the Seller's predecessor GME programs, Seller desires to sell and Purchaser desires to purchase the Purchased Assets all in accordance with, and subject to, the terms and conditions contained in this Agreement; and

WHEREAS, the Purchased Assets being transferred herein are intended to be sold, conveyed and transferred to Purchaser free and clear of all Liens and Encumbrances pursuant to Section 363 of the Bankruptcy Code, and subject to the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings indicated below, unless the context clearly requires otherwise:

"**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; provided that such Person shall be deemed an Affiliate for only so long as such control exists.  For purposes of this definition and the definition of Related Person, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" shall mean all other agreements, documents and instruments to be executed and delivered by the Purchaser and/or the Seller pursuant to this Agreement.

"**Applicable Privacy and Security Law**" means any applicable Law relating to privacy, data protection, confidentiality, security, integrity and protection of personal information, including (i) health care and medical record applicable Laws, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and all implementing regulations (collectively, **"HIPAA"**); (ii) state data protection laws; (iii) state breach notification laws; and (iv) any comparable applicable state Laws and the regulations promulgated pursuant to all such applicable Laws.

"**Assigned Contracts**" shall mean, collectively, those Contracts included in the Purchased Assets, which shall consist solely of the Contracts identified on Schedule A-1 to **Exhibit A**.  Purchaser may add or delete Contracts from Schedule A-1 pursuant to the applicable provisions of the Bidding Procedures Order.

"**Assignment and Assumption Agreement**" shall mean the Assignment, Delegation and Assumption Agreement to be executed at the Closing between the Seller and the Purchaser in the form attached hereto as **Exhibit B**, pursuant to which, among other things, the Seller will assign and transfer to the Purchaser all of its right, title and interest under the Assigned Contracts, on the terms and conditions set forth therein.

"**Assumed Liabilities**" shall mean, collectively, (i) all liabilities and performance obligations of the Seller arising upon or after the Closing under the Assigned Contracts, (ii) all liabilities arising with respect to the Purchased Assets arising on or after the Closing Date, (iii) liability for amounts due to CMS on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement, up to (but not to exceed) the CMS Pre-Closing Amount, (iv) the Cure Costs, (v) and the Purchaser's portion of the Transfer Taxes pursuant to Section 10.4.

"**Assumption/Cure Notice**" means the Initial Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment delivered to counterparties to Contracts with the Seller pursuant to the Bidding Procedures Order.

"**Backup Bidder**" shall have the meaning stated in the Bidding Procedures Order.

"**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

"**Base Purchase Price**" is defined in Section 3.1.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Purchased Assets shall occur, which are attached to the Bidding Procedures Order as Exhibit I.

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court approving the Bid Procedures in the form attached hereto as **Exhibit F** and made part hereof.

"**Bill of Sale**" shall mean the bill of sale to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **Exhibit C**.

"**Books and Records**" means, collectively, all documents, lists and files relating or pertaining to the Purchased Assets or the Assumed Liabilities.

"**Business**" is defined in the Recitals to this Agreement.

"**Business Day(s)**" shall mean calendar days other than Saturdays, Sundays and days on which banking institutions in Wilmington, Delaware are authorized by Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Claims Close Date**" is defined in Section 10.5.

"**Closing**" is defined in Section 8.1.

"**Closing Date**" is defined in Section 8.1.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**CMS Pre-Closing Amount**" means a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as final, which amount shall be the maximum amount due to CMS on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement.

"**Continuing Residents**" means the Residents as of the Closing Date who have agreed to become residents training at a hospital operated by Purchaser or a GME Network Affiliate.

"**Contracts**" shall mean any agreement or contract, whether written or oral.

"**Cure Costs**" shall mean, with respect to any Assigned Contract, the amount due and owing to each non-debtor counterparty to such Assigned Contract to cure any defaults required to be cured as a condition of assumption of such Assigned Contract pursuant to Section 365(b)(1) of the Bankruptcy Code, to the extent applicable.

"**Escrow Agent**" shall mean a financial institution mutually acceptable to Seller and Purchaser.

"**Escrow Agreement**" shall mean the agreement substantially in the form attached hereto as **Exhibit D**.

"**Escrow Account**" is defined in Section 3.1.

"**Escrow Amount**" is defined in Section 3.1.

"**Excluded Assets**" shall mean all rights, benefits or property of Seller which are not Purchased Assets.

"**Excluded Liabilities**" shall mean, collectively, any and all liabilities of the Seller of any kind or description other than the Assumed Liabilities.

"**Final Order**" shall mean an order, judgment or other decree as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"**GAAP**" shall mean generally accepted accounting principles in the United States, consistently applied.

"**GME Network Affiliate**" shall have the meaning given to it in the Recitals to this Agreement.

"**Governmental Authorization**" means any consent, license, permit, certificate of authority, registration, franchise, right, Order or notice, qualification or similar right issued, granted, given, or required by or under the authority of any Governmental Body or pursuant to any Law.

"**Governmental Body**" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including the FDA and its equivalent authority or body in any foreign jurisdiction.

"**Hahnemann Programs**" is defined in Section 6.2.

"**IME**" shall mean Indirect Medical Education.

"**Interests**" shall have the meaning stated in the Sale Order.

"**Knowledge of the Seller**" and "**to the Seller's Knowledge**" shall mean the actual knowledge of Joel Freedman, the Seller's Chief Executive Officer and Allen Wilen, the Seller's Chief Restructuring Officer – Finance.

"**Laws**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

"**Lien**" has the meaning given to such term in the Bankruptcy Code.

"**Liquidated Cure Costs**" means all Cure Costs relating to Assigned Contracts which are allowed in a Final Order of the Bankruptcy Court.

"**Losses**" is defined in <u>Section 10.1</u>.

"**Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchased Assets; provided, however, that any adverse change, event, development or effect arising from or relating to any of the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been, a Material Adverse Effect:  (i) the United States economy, the global economy, in each case, as a whole, or the industry or markets in which the Seller operates; (ii) the filing of the Bankruptcy Case; (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (iv) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (v) changes in GAAP; (vi) changes in Law or Orders; (vii) the taking of any action contemplated by this Agreement or any of the Ancillary Documents; (viii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes; (ix) changes resulting from the announcement of the execution of this Agreement or any of the transactions contemplated hereby; or (x) the termination of any Contract that is not an Assigned Contract, or the occurrence of any breach by any party of any Contract that does not relate to the Purchased Assets or the Assumed Liabilities; (xi) any adverse change to the Business prior to the date hereof.

"**Non-Disclosure Agreement**" means any and all confidentiality agreements and/or non-disclosure agreements executed by the Purchaser as a condition to obtaining confidential and/or proprietary information from the Seller.

"**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body.

"**Outside Closing Date**" shall mean September 6, 2019 or such other date as Seller and Purchaser may agree.

"**Participating Provider Agreement**" means the Participating Provider Agreement with the Centers for Medicare and Medicaid Services between the Seller and CMS related to Hahnemann University Hospital.

"**Permitted Escrow Withdrawals**" is defined in <u>Section 3.1</u>.

"**Person**" shall mean any individual, corporation, Governmental Body, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

"**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"**Purchased Assets**" shall mean the assets of Seller identified on **<u>Exhibit A</u>**.

"**Purchaser Indemnified Party**" is defined in <u>Section 10.1</u>.

"**Purchaser Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchaser.

"**Related Person**" (i) with respect to a Person who is an individual, shall mean, (a) any other individual having a relationship with such specified individual (by blood, marriage or adoption) of grandparent, parent, child, grandchild, aunt, uncle, niece, nephew, sister, brother or first cousin (collectively, "**Relatives**"), (b) any Person that is controlled by such individual or any one or more members of such individual's Relatives; and (c) any Person with respect to which such individual or one or more members of such individual's Relatives serves as a director, officer, partner, or trustee (or in a similar capacity); and (ii) with respect to a specified Person other than an individual, shall mean (a) any Affiliate of such specified Person; and (b) each Person that serves as a director, officer, partner, or trustee (or in a similar capacity) of such specified Person.

"**Representative**" shall mean, with respect to a particular Person, any director, officer, trustee, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Notification**" is defined in <u>Section 6.3</u>.

"**Residents**" means the medical residents and fellows training at, or through a residency program sponsored by or in affiliation with, Hahnemann University Hospital. Unless otherwise specified, all references to the number of Residents shall be in terms of full time equivalents ("**FTEs**").

"**Sale Motion**" shall mean that certain motion filed by the Seller in the Bankruptcy Case on July 9, 2019 (D.I. 142) pursuant to which, among other things, the Seller requested an order (a) approving the Bid Procedures, (b) approving procedures relating to the assumption and

35751625.8 09/06/2019

assignment of executory contracts, including procedures for establishing Cure Costs, (a) establishing a date for an auction, and (d) scheduling a sale hearing.

"**Sale Order**" shall mean an Order of the Bankruptcy Court pursuant to the Bankruptcy Code approving this Agreement and the transactions contemplated hereby substantially in the form attached hereto as **Exhibit E** and made part hereof.

"**Seller Disclosure Letter**" is defined in **Article IV**.

"**Seller Indemnified Party**" is defined in Section 10.2.

"**SSG**" means SSG Capital Advisors, LLC.

"**STC**" shall have the meaning set forth in Section 6.9.

"**Tail Coverage Costs**" shall mean the cost to Seller of purchasing and maintaining the Tail Coverage Endorsement.

"**Tail Coverage Endorsement**" shall mean a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital.  Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars ($1,500,000) annual aggregate for each MCARE eligible Resident only.

 "**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

"**Transfer Taxes**" is defined in Section 10.14(a).

## ARTICLE II.
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

**2.1     Agreement to Sell and Purchase Purchased Assets.**  On the Closing Date, subject to the performance by the Parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Purchased Assets, free and clear of all Interests other than Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**2.2     Assumed Liabilities/Excluded Liabilities.**  On the Closing Date, the Purchaser shall assume and become responsible for, and shall pay, perform, fulfill and discharge, all of the Assumed Liabilities.  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any of the Excluded Liabilities, all of which shall remain the sole responsibility and obligation of the Seller.

**2.3** **Assigned Contracts.** The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any Contracts, all of which shall remain the sole responsibility and obligation of the Seller, except for the Assigned Contracts. As to the Assigned Contracts:

(a) At Closing, Seller shall assign to Purchaser, and Purchaser shall assume, all of the Assigned Contracts and Purchaser shall pay to the applicable counterparty the Cure Costs as and when such Cure Costs become Liquidated Cure Costs.

(b) Purchaser shall provide promptly any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Purchaser's capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts, to the extent applicable.

**2.4** **Competing Transactions; Bankruptcy Court Approval.** This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids pursuant to the Bidding Procedures Order and the Bid Procedures approved thereby (each, a "**Competing Bid**"). Until the transactions contemplated by this Agreement are consummated, Seller may perform any and all other acts related to seeking a Competing Bid as provided under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including but not limited to supplying information relating to the Purchased Assets to prospective purchasers.

**ARTICLE III.**
**PURCHASE PRICE**

**3.1** **Purchase Price.** The Purchase Price shall be Fifty-Four Million Dollars ($54,000,000), subject to upward adjustment pursuant to Section 3.2(d) hereof (the "**Base Purchase Price**") and, subject to the following sentence, shall be paid in cash at Closing. In addition, an amount (the "**Escrow Amount**") equal to Three Million Dollars ($3,000,000) minus Liquidated Cure Costs paid by Purchaser on the Closing Date will be withheld from the Base Purchase Price and placed into a non-interest bearing escrow account (the "**Escrow Account**") held by the Escrow Agent pursuant to the Escrow Agreement. The Escrow Amount shall be distributed to Purchaser from time to time in accordance with the Escrow Agreement to cover the following losses, damages and expenses (collectively, the "**Permitted Escrow Withdrawals**"): (a) the CMS Pre-Closing Amount, as and when liquidated, (b) the Cure Costs not paid on the Closing Date and not included in the CMS Pre-Closing Amount, and (c) the Losses payable to a Purchaser Indemnified Party. To the extent that there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, such remaining funds minus any then pending written claims asserted by Purchaser for Permitted Escrow Withdrawals (whether or not disputed) shall be distributed to Seller in accordance with the Escrow Agreement without any further action being required on the part of Purchaser. Upon resolution of any Permitted Escrow Withdrawals pending as of the one-year anniversary of the Closing Date, (x) any amounts determined to be owing to Purchaser shall be distributed to Purchaser, and (y) any amounts determined not to be owing to Purchaser shall be distributed to Seller.

**3.2** **Payment of Base Purchase Price.** At Closing, the Base Purchase Price shall be payable by Purchaser as follows:

      (a)     Purchaser shall deposit the Escrow Amount into the Escrow Account pursuant to and in accordance with the Escrow Agreement.

      (b)     Purchaser shall pay Liquidated Cure Costs as of the Closing Date.

      (c)     Purchaser shall pay to the Seller the Fifty-One Million Dollars ($51,000,000) balance of the Base Purchase Price by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller prior to the Closing.

      (d)     Purchaser shall reimburse Seller for the Tail Coverage Cost actually paid by Seller to purchase the Tail Coverage Endorsement, up to a maximum of One Million Dollars ($1,000,000).

**3.3**    **Tax Allocation of Base Purchase Price.**  The Base Purchase Price shall be allocated among the Purchased Assets in accordance with the IRS Form 8594, Asset Acquisition Statement Under Section 1060 as agreed by the respective accountants of Purchaser and Seller within a reasonable period of time after Closing in good faith consistent in all respects with applicable Laws.  The Seller and the Purchaser shall file their respective Tax returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Purchaser, as the case may be, reasonably determines (and notifies the other Party) that such allocation is contrary to applicable Law.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the disclosure letter delivered by the Seller to the Purchaser on the date hereof (the "**Seller Disclosure Letter**"), the Seller represents and warrants to the Purchaser as follows:

**4.1**    **Organization.**  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation and is in good standing in each other jurisdiction where the operation of the Business by the Seller requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.2**    **Power and Authority.**  Upon entry of and subject to the Sale Order, Seller shall have all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Seller.  Upon entry of and subject to the Sale Order, this Agreement shall constitute a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**4.3**    **Non-contravention.**  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery of this Agreement or any other Ancillary Document to which the Seller is a party, and the performance by the Seller of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of the Seller, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or

both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Assigned Contract, (iii) to Seller's Knowledge, violate in any material respect any Law or Order applicable to the Business or the Purchased Assets, or (iv) result in the imposition of any Lien on the Purchased Assets.

**4.4    Consents.**  Upon entry of the Sale Order and upon each regulatory approval to which Section 7.1(c) of this Agreement relates having been obtained, no approval, consent or authorization of, or declaration, filing or registration with or any notification to any Governmental Body or any other Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

**4.5    Liabilities.**  The Seller has no Liabilities with respect to the Purchased Assets for which the Purchaser will be responsible after Closing except for any Assumed Liabilities assumed by the Purchaser.

**4.6    Title.**  The Seller has good and marketable title to all of the Purchased Assets, free and clear of all Interests other than Interests which will be divested from the Purchased Assets by the Sale Order.  Upon the completion of the transactions contemplated hereby, the Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Interests other than Assumed Liabilities.

**4.7    Litigation.**  There are no Proceedings pending, or to the Seller's Knowledge, threatened against the Purchased Assets or Business, at Law or in equity, or before any Governmental Body which will interfere with the ownership or use by the Purchaser of the Purchased Assets after the Closing.

**4.8    Proceedings.**  There is no Proceeding pending that challenges, or that is reasonably likely to have the effect of preventing, delaying or rendering illegal any of the transactions contemplated by this Agreement.

**4.9    Tax Matters.**  There are no Tax Liens or Encumbrances for Taxes upon the Purchased Assets and as of the end of the day on the Closing Date there will be no such Tax Liens or Encumbrances.  There is not and, as of the end of the day on the Closing Date there will not be, any liability for Taxes affecting the Purchased Assets for which the Purchaser will at any time have any liability for payment.

**4.10    Brokers and Finders.**  Other than SSG, no broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller.  Seller will be solely responsible for any fee, commission or other consideration of any kind due to SSG on account of the transactions contemplated by this Agreement.

**4.11    Tail Coverage**.  Seller shall be solely responsible for purchasing and maintaining the Tail Coverage Endorsement and shall incur all costs associated with the same, except as provided in Section 3.2(d).

**4.12    Funding and Disputes**.  Seller represents and warrants that no Medicare GME funding for the Residents is currently owed to Seller and outstanding except as in the normal course, and that Seller has not received notice of any disputes and, to Seller's Knowledge there are no facts or circumstances that may result in a dispute with regard the payment of Medicare GME funding for the Residents in the amount of Fifty Thousand Dollars ($50,000) or more in the aggregate.

**ARTICLE V.**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

The Purchaser represents and warrants to the Seller as follows.

**5.1    Organization.**  The Purchaser is a nonprofit corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to conduct its business and own and operate its properties.

**5.2    Power and Authority.**

(a)    The Purchaser has all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Purchaser. This Agreement is a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(b)    To the extent that this Agreement or any of the Ancillary Documents provides that any Affiliate of the Purchaser makes any covenant or undertakes the payment or performance of any obligation in connection with the transactions contemplated hereunder or thereunder, such Affiliate has all requisite power and authority to enter into the transactions contemplated hereby and thereby.

**5.3    Non-contravention.**  Neither the execution and delivery of this Agreement or any other Ancillary Document to which the Purchaser is a party, will (i) violate any provision of the organizational documents of the Purchaser, or (ii) violate any Law or Order applicable to the Purchaser.

**5.4    No Proceedings.**  There are no actions, suits or proceedings pending, or to the actual knowledge of Purchaser, threatened, before or by any Governmental Body, against Purchaser which would affect Purchaser's ability to proceed with the transactions contemplated by this Agreement.

**5.5    Consents.**  No consent, waiver, authorization or approval of any person or declaration, filing or registration with any Governmental Body or other Person is required in connection with the execution and delivery by Purchaser of this Agreement or the performance by Purchaser or its Affiliates of its respective obligations hereunder or thereunder.

**5.6    Bankruptcy Matters.**  Purchaser is capable of satisfying the adequate assurance of future performance conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to each Assigned Contract, to the extent applicable.

11

**5.7    Financing.**  Purchaser has readily-available cash on hand, availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Base Purchase Price at Closing.

**5.8    Hospital Facilities.**  Purchaser, directly or through Affiliates, owns and operates a total of seven (7) Medicare-participating hospitals located within fifteen (15) miles of Hahnemann University Hospital's facility, all of which have the capacity to operate medical residency programs.

**5.9    Certain Relationships.**  Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser is an officer or director of the Seller or a Related Person of any officer, director or key employee of the Seller.  Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser has entered into any Contract with any officer, director or key employee of the Seller.

**5.10    Brokers and Finders.**  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE VI.
## COVENANTS OF THE PARTIES

**6.1    Access to Information.**  Subject to all Applicable Privacy and Security Laws, the Seller shall permit the Purchaser's Representatives to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Business, to the personnel, books, records, Assigned Contracts, and documents of or pertaining to the Purchased Assets; provided, that the Seller may restrict the foregoing access to the extent that in the reasonable judgment of the Seller, any Law applicable to the Seller requires it to restrict access to any of its business, properties, information or personnel; and provided, further, that such access shall not unreasonably disrupt the operations of the Seller or the Business.

**6.2    Conduct of the Business.**  From the date hereof until the Closing Date, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), and subject in all respects to the Bankruptcy Code and orders of the Bankruptcy Court (including, without limitation, the Sale Order), the Seller shall use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at Hahnemann University Hospital (the "**Hahnemann Programs**").  Seller and Purchaser shall work cooperatively to determine clinical rotation assignments for Residents, with such mutually-agreed assignments to commence as soon as practicable after the Purchase Agreement is entered into.  For the avoidance of doubt, neither the existence of this Agreement nor any provisions set forth herein shall restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those Residents who elect not to become Continuing Residents.

**6.3    Notification of Certain Matters.**  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "**Required Notification**"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

**6.4    Cooperation.**  Subject in all respects to the Bankruptcy Code and the Bankruptcy Cases, the Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in **Article VII** and to consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

**6.5    Records Retention and Access.**  For a period of six (6) years following the Closing or such shorter period that records are required to be retained by applicable Law (but in no event less than three (3) years), Purchaser shall at Seller's expense furnish to the Seller, to the extent in Purchaser's possession and following receipt of a reasonable, written request therefor, information that is necessary for Seller to prepare for, prosecute or defend against any Proceeding related to the Business, to validate claims filed in the Bankruptcy Case and/or to enable Seller and its Representatives to prepare, complete and file all required federal, state and local Tax returns in accordance with applicable Law.

**6.6    Cure Costs.**  Seller shall not agree to the amount of any Liquidated Cure Costs without the written consent of Purchaser.  From and after the Closing Date, Purchaser shall have the sole right to contest and settle any claims for Cure Costs and, to the extent necessary and permitted by the Bankruptcy Court, Seller shall cooperate in substituting Purchaser for Seller (at Purchaser's expense) in connection with any pending objections to Cure Costs.

**6.7    Bid Procedures.**  Seller shall not modify the Bid Procedures without the consent of Purchaser.

**6.8    Covenants of Purchaser Regarding Transition and Accommodation of Residents**.

(a)    Purchaser, directly or through a GME Network Affiliate, will accommodate a maximum of 583 Continuing Residents to pursue continued medical residency training at Purchaser-owned hospitals or GME Network Affiliate-owned hospitals, as applicable. If requested by Purchaser, Seller shall take all reasonable actions to reflect its consent to the transfer of Continuing Residents to Purchaser or a GME Network Affiliate.  For any Resident who does not become a Continuing Resident and elects to pursue their training at hospitals that are not owned by Purchaser or a GME Network Affiliate, Purchaser agrees, in compliance with applicable regulation, to release the GME cap associated with Medicare reimbursement for such

13

Residents on a temporary basis to the hospital where the Resident transfers until the Resident has completed training.

(b)      If the Continuing Residents are required to relocate their personal residence to continue their training with Purchaser or a GME Network Affiliate, Purchaser shall provide, or cause such GME Network Affiliate to provide, reasonable private housing for such residents for the longer of the remainder of the current academic year or for the duration of a Resident's existing vacated lease. The provision of reasonable private housing shall not extend beyond the Resident's completion of his or her residency training with Purchaser or such GME Network Affiliate.

(c)      To the extent necessary to provide for continued residency training, Purchaser shall use reasonable efforts to transfer Seller's residency program faculty to a Purchaser or GME Network Affiliate hospital so that they can continue to provide education to Residents.

(d)      Unless inconsistent with Purchaser or GME Network Affiliate's standard practice for residents, Purchaser shall provide, or cause the applicable GME Network Affiliate to provide, Continuing Residents with free meals during the time that they are training at Purchaser or such GME Network Affiliate hospitals.

(e)      To the extent necessary for Continuing Residents to fulfill residency training requirements, Purchaser shall provide, or cause a GME Network Affiliate to provide, additional transition resources to Continuing Residents as may be requested by Seller from time to time.

(f)      The parties shall cooperate in determining the initial clinical rotation assignments for Continuing Residents for the period following the transfer.

(g)      Purchaser shall use reasonable efforts to ensure that each Continuing Resident's terms of employment (e.g., compensation and benefits) with Purchaser or a GME Network Affiliate are substantially equivalent or better than the Continuing Resident's current terms of employment with the Seller.

**6.9      Covenants of Purchaser Regarding Continued Affiliation with St. Christopher's Hospital for Children.**  For the period of ten (10) years after the Closing with automatic renewals for periods of five (5) years, provided that at the time of each such renewal such resident caps are used for resident training at STC only, unless either party gives not less than one hundred eighty (180) days' notice, Purchaser agrees to, and to cause any successor or assignee of any Purchased Assets to agree to:  (i) enter into an agreement to continue participating in a "**Medicare GME affiliated group**" as that term is defined in 42 C.F.R. 413.75(b), with St. Christopher's Hospital for Children ("**STC**"), whereby Purchaser will continue sharing full-time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between STC and Seller (the "**STC GME Affiliation Agreement**") or enter into a new GME affiliation agreement substantially in the form of the STC GME

Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation agreement" each academic year.

**6.10    Covenants of Purchaser Regarding Other GME Affiliation Agreements.**

(a)    For the remainder of the academic year during which the Closing occurs, and to the extent permitted and required by CMS, Purchaser shall accept assignment from Seller of the GME Affiliation Agreements identified listed as numbered items 1, 2, 3, 4 and 5 under the heading Current GME Affiliation  Agreements on Schedule A-1 to **Exhibit A** of this Agreement (the "**Current GME Affiliation Agreements**") (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(a) being included as "Cure Costs" for purposes of this Agreement), or shall enter into new GME affiliation agreements with those counterparties substantially in the form of the Current GME Affiliation Agreements; and

(b)    Purchaser, subject to Purchaser's completion of due diligence, shall accept assignment of the agreements identified under the heading GME Obligations on Schedule A-1 to **Exhibit A** of this Agreement to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(b) being included as "Cure Costs" for purposes of this Agreement).

**6.11    Covenant of Seller Regarding Tail Coverage Endorsement for Residents.**  At or prior to Closing, Seller shall obtain the Tail Coverage Endorsement.

**6.12    Covenant of Seller Regarding Medical Records.**  Seller acknowledges that Purchaser, GME Affiliates, and clinicians affiliated with each of them collectively have undertaken to provide clinical care to patients who historically have received care from Seller. To facilitate such care on an ongoing basis, and otherwise to satisfy obligations of Seller, Seller will undertake to assure the ongoing availability of medical records of Seller's patients to Purchaser, GME Affiliates, clinicians affiliated with each of them, other providers to the extent applicable, and patient themselves.  To further facilitate such availability, with acknowledgment that Seller continues to be finalizing its own arrangements in this regard as of the date of this Agreement, Seller will consider in good faith any request by Purchaser for assignment to Purchaser of agreements with any third-party vendor or vendors with respect to ongoing medical records availability, storage, or maintenance.

**6.13    Covenant of Seller Regarding Medicare Cost Reports.**  Within 45 days of the Closing Date, or such longer period as CMS may permit, Seller shall prepare and file any final Medicare cost reports related to Hahnemann's operations for the period prior to the Closing Date and, thereafter, Seller shall provide such information and assistance as may reasonably be requested by Purchaser with respect to Seller's filing of Medicare cost reports.

**ARTICLE VII.**
**CONDITIONS TO CLOSING**

**7.1    Conditions to Obligations of Each Party.**  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)    Proceedings; Orders.  No Governmental Body of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

(b)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order with such changes as are mutually agreed to by the Seller and Purchaser, each in the exercise of its respective sole discretion.

(c)    Regulatory Approvals.  CMS, the Pennsylvania Department of Health ("**DOH**") and the Accreditation Council for Graduate Medical Education ("**ACGME**") and any other applicable regulatory authority or Governmental Body, in each case to the extent required, shall have consented to the transactions contemplated by this Agreement and, solely with respect to CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated hereby will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap, shared, pursuant to generally applicable regulations, by GME Network Affiliates who qualify as members of one or more applicable Medicare GME affiliated group.

**7.2    Additional Conditions to Obligations of the Purchaser.**  The obligations of the Purchaser to effect the transactions contemplated hereby are subject to satisfaction or waiver of the following additional conditions:

(a)    Representations and Warranties.  The representations and warranties of the Seller set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Agreements and Covenants.  The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)    Documents.  All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to Section 8.2 of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

(d)    Successor Liability.  Entry of an Order of the Bankruptcy Court, which may be the Sale Order, which precludes the assertion of any successor, vicarious, or transferee liability (by piercing the corporate veil or otherwise) against the Purchaser, its Affiliates, or the Consortium or its members, relating to claims, administrative proceedings or actions brought by or on behalf of any Governmental Body, accrediting body, or other third party relating to the

operation of the Business prior to Closing.  For the avoidance of doubt, nothing in this paragraph is intended, nor shall it be construed, to preclude the collection of the CMS Pre-Closing Amount from the Escrow Account as provided herein.

**7.3**    **Additional Conditions to Obligations of the Seller.**  The obligations of the Seller to effect the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Purchaser Material Adverse Effect.

(b)    <u>Agreements and Covenants</u>.  The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)    <u>Documents</u>.  All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to <u>Section 8.3</u> of this Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

## ARTICLE VIII.
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

**8.1**    **Closing.**  The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Drinker Biddle & Reath LLP, One Logan Square, 18th and Cherry Streets, Philadelphia, PA 19103-6996, or such other place as agreed by the parties or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the Parties, as soon as practicable following the satisfaction or waiver of the conditions set forth in **Article VII** hereof and in any event within three (3) Business Days thereafter (the "**Closing Date**").  The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Time, on the Closing Date.

**8.2**    **Deliveries by the Seller at the Closing.**  At the Closing, Seller shall furnish and deliver to the Purchaser the following:

(a)    the Bill of Sale, duly executed by the Seller;

(b)    the Assignment and Assumption Agreement, duly executed by the Seller;

(c)    a certificate, dated as of the Closing Date and signed by the Seller, certifying that each of the conditions set forth in <u>Sections 7.2(a)</u> and <u>7.2(b)</u> have been satisfied;

35751625.8 09/06/2019

(d)    a copy of the Sale Order;

(e)    evidence of satisfaction of Section 6.11; and

(f)    all other certificates, instruments and documents reasonably required to be delivered by the Seller pursuant to this Agreement or any of the Ancillary Documents.

**8.3    Deliveries by the Purchaser at the Closing.**  At the Closing, Purchaser shall furnish and deliver to Seller the following:

(a)    the Fifty-One Million Dollar ($51,000,000) portion of the Base Purchase Price in excess of the Escrow Amount and the Liquidated Cure Costs by wire transfer of immediately available funds to an account designated in writing by the Seller;

(b)    reimbursement of up to One Million Dollars ($1,000,000) of Tail Coverage Costs as provided in Section 3.2(d);

(c)    the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)    a certificate, dated as of the Closing Date and signed the Purchaser, certifying that each of the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(e)    evidence of satisfaction of Section 6.9;

(f)    evidence of satisfaction of Section 6.10; and

(g)    all other certificates, instruments and documents required to be delivered by the Purchaser pursuant to this Agreement or any of the Ancillary Documents.

**8.4    Additional Actions Taken by the Purchaser at the Closing.**  At the Closing, Purchaser shall take the following actions:

(a)    Pay the Liquidated Cure Costs from the Base Purchase Price to the respective Persons entitled to receive them.

(b)    Fulfill its covenants under Sections 6.8, 6.9 and 6.10 of this Agreement.

## ARTICLE IX.
## TERMINATION

**9.1    Termination.**  This Agreement may be terminated at any time prior to the Closing:

(a)    By mutual written consent of the Seller and the Purchaser;

(b)    By (i) the Seller if, as of the day after the Outside Closing Date, any condition to the obligation of the Seller to close has not been satisfied, provided, however, that if

the Closing has not occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Seller, then Seller may not terminate this Agreement pursuant to this <u>Section 9.1(b)</u>, and (ii) the Purchaser if, as of the day after the Outside Closing Date, any condition to the obligation of the Purchaser to close has not been satisfied; <u>provided</u>, <u>however</u>, that if the Closing has not occurred on or before the after the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then the Purchaser may not terminate this Agreement pursuant to this <u>Section 9.1(b)</u>;

(c)    By Purchaser, in its sole and absolute discretion, if the sum of the (i) CMS Pre-Closing Amount, and (ii) without duplication of the CMS Pre-Closing Amount, (A) the Liquidated Cure Costs, and (B) the good faith estimate by Purchaser of the amount of any Cure Costs related to Assigned Contracts which will become Liquidated Cure Costs after the Closing Date, exceeds Three Million Dollars ($3,000,000);

(d)    Automatically, and without further action by any Party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated hereby, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(e)    Automatically, and without further action by any Party, if the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or is dismissed, provided that neither the Seller nor the Purchaser shall take any action to support entry of an order providing for such conversion or dismissal;

(f)    By the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, and if (i) the Seller fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Seller to close (other than conditions related to deliveries to be made at Closing by the Purchaser provided the Purchaser is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Seller herein become untrue or inaccurate such that the condition set forth in <u>Section 7.2(a)</u> would not be satisfied or (iii) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 7.2(b)</u> would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Seller;

(g)    By the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (i) the Purchaser fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Purchaser to close (other than conditions related to deliveries to be made at Closing by the Seller provided the Seller is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Purchaser herein become untrue or inaccurate such that the condition set forth in <u>Section 7.3(a)</u> would not be satisfied or (iii) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 7.3(b)</u> would not be satisfied, and, in the case of clauses (ii) and

(iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Purchaser;

(h)    Automatically, and without further action by any Party, if (i) the Purchaser is not the Successful Bidder or Backup Bidder (each as defined in the Bid Procedures), or (ii) if the Purchaser is the Backup Bidder, upon the earlier of (A) Closing with the Successful Bidder, and (B) the Outside Closing Date.  The foregoing notwithstanding, the Purchaser shall serve as a Backup Bidder at the Auction only if (X) its bid pursuant to this Agreement is not determined to be the "Baseline Bid," as defined in the Bid Procedures, and (Y) it elects, at its sole discretion, to offer a higher and better bid at the Auction.  For avoidance of doubt, the Purchaser's offer described in this Agreement shall not be a Back-Up Bid absent the express consent of the Purchaser; or

(i)    By the Purchaser if (i) any applicable regulatory authority or Governmental Body has not granted any necessary consents to the transfer of the Purchased Assets to Purchaser or a GME Network Affiliate, including without limitation, the Participating Provider Agreement and Seller's IME and direct GME resident cap slots appurtenant thereto; or (ii) prior to Closing, any fact or circumstance arises relating to Medicare change of ownership, Medicare IME or direct GME funding of one or more Continuing Residents that may lead to an aggregate reduction in Medicare IME or direct GME funding for the Continuing Residents in the amount of Three Million Dollars ($3,000,000) or more.

**9.2    Effect of Termination.**  Except as provided in this Section 9.2, in the event of the termination of this Agreement pursuant to Section 9.1, this Agreement (other than this Section 9.2, which shall survive such termination) will forthwith become void, and there will be no liability on the part of any Party to the other and all rights and obligations of any Party will cease, except that nothing herein shall relieve any Party from liability for any intentional and material breach of this Agreement.

**ARTICLE X.**
**INDEMNITY**

**10.1    Indemnification by Seller.**  Subject to this **Article X** and consummation of the Closing, Seller shall, indemnify, defend and hold harmless Purchaser, Purchaser's Affiliates, the Consortium, the members of the Consortium, and the Representatives of each (each, a "**Purchaser Indemnified Party**") against and in respect of any and all out-of-pocket losses, documented and reasonable costs and expenses (including, without limitation, documented and reasonable costs of investigation and defense and reasonable attorneys' fees), claims, damages, obligations, or liabilities, whether or not involving a third party claim, but only after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Purchaser Indemnified Party in respect of any such claim (collectively, "**Losses**"), arising out of, based upon or otherwise in respect of:

(i)    any inaccuracy in or breach of any representation or warranty of Seller made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Purchaser by Seller pursuant to this Agreement (determined in each case without regard to any qualification with respect to

20

materiality, Material Adverse Effect or similar qualification); provided, that the Seller shall not have any liability under this clause (i) (other than with respect any intentional fraud on the part of Seller) unless the aggregate of all Losses asserted under this clause (i) for which Seller would, but for this proviso and but for the $25,000-per-claim deductible described below, be liable exceeds on a cumulative basis an amount equal to Two Hundred Thousand Dollars ($200,000.00);

(ii)    any nonfulfillment or breach of any covenant or agreement by Seller under this Agreement or any of the Schedules attached hereto;

(iii)    any Liability or obligation of Seller which is an Excluded Liability; and

(iv)    the ownership of any of the Excluded Assets by Seller after the Closing Date.

(b)    Each Purchaser Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(c)    NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS TO THE CONTRARY, SELLER WILL NOT BE LIABLE FOR ANY LOSS ASSERTED UNDER <u>SECTION 10.1(a)(i)</u> UNLESS THE CUMULATIVE LOSSES EXCEED $25,000 IN WHICH CASE SELLER WILL, SUBJECT TO THE OTHER LIMITATIONS IN THIS **ARTICLE X**, BE LIABLE TO INDEMNIFY THE PURCHASER INDEMNIFIED PARTY ONLY FOR THE EXCESS OVER $25,000; AND THE SOLE REMEDY OF ANY PURCHASER INDEMNIFIED PARTY AGAINST SELLER UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS FOR MONETARY DAMAGES, INCLUDING, WITHOUT LIMITATION, COSTS OF INVESTIGATION AND DEFENSE AND ATTORNEYS' FEES, SHALL BE A TIMELY CLAIM BY PURCHASER PURSUANT TO THE ESCROW AGREEMENT, AND LIMITED TO THE ESCROW AMOUNT.

**10.2    Indemnification by Purchaser.**  Subject to this **Article X** and consummation of the Closing, Purchaser shall indemnify, defend and hold harmless Seller, Seller's present, former, and future officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each a, "**Seller Indemnified Party**"), against and in respect of any and all Losses arising out of, based upon or otherwise in respect of:

(a)    any inaccuracy in or breach of any representation or warranty of Purchaser made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Seller by Purchaser pursuant to this Agreement; provided, that the Purchaser shall not have any liability under this clause (a) of <u>Section 10.2</u> unless the claims asserted under this clause (a) involves Losses in excess of Twenty-Five Thousand Dollars ($25,000.00), at which time Purchaser shall be liable for the full amount of all such Losses in excess of Twenty-Five Thousand Dollars ($25,000.00);

21

(b)      any nonfulfillment or breach of any covenant or agreement by Purchaser under this Agreement or any of the Schedules attached hereto; and

(c)      any of the Assumed Liabilities pursuant to this Agreement.

Each Seller Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

**10.3      Indemnification Procedures**.

(a)      Within forty-five (45) days after receipt by an indemnified party of written notice of the commencement of any Proceeding against it to which the indemnification in this **Article X** relates, such indemnified party shall, if a claim is to be made against an indemnifying party under this **Article X**, give notice to the indemnifying party of the commencement of such Proceeding.

(b)      If any Proceeding referred to in paragraph (a) above is brought against a Seller Indemnified Party and it gives notice to Purchaser of the commencement of such Proceeding, Purchaser will be entitled to participate in such Proceeding and, to the extent that it wishes, assume the defense of such Proceeding with counsel reasonably satisfactory to such Seller Indemnified Party and, after notice from Purchaser to such Seller Indemnified Party of its election to assume the defense of such Proceeding, Purchaser will not, as long as it diligently conducts such defense, be liable to such Seller Indemnified Party under this **Article X** for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by such Seller Indemnified Party in connection with the defense of such Proceeding subject to the limitations contained in <u>Section 10.1</u> hereof, other than reasonable costs of investigation.  If Purchaser assumes the defense of a Proceeding, (A) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (B) no compromise or settlement of such claims may be effected by Purchaser without such Seller Indemnified Party's consent unless (1) there is no finding or admission of any violation of law by such Seller Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other claims that may be made against such Seller Indemnified Party, and (2) the sole relief provided is monetary damages that are paid in full by Purchaser.  Such Seller Indemnified Party will have no liability with respect to any compromise or settlement of the claims underlying such Proceeding effected without its consent.  If notice is given to Purchaser by a Seller Indemnified Party of the commencement of any Proceeding for which such Seller Indemnified Party seeks indemnification hereunder and Purchaser does not, within ten (10) days after such notice is received, give notice to such Seller Indemnified Party of Purchaser's election to assume the defense of such Proceeding, Purchaser will be bound by any determination made in such Proceeding or any compromise or settlement effected by such Seller Indemnified Party.

(c)      If any Proceeding referred to in paragraph (a) above is brought against a Purchaser Indemnified Party, Seller shall be entitled to participate in such Proceeding at its own expense.  However, such Purchaser Indemnified Party shall, in all respects, control the defense

and settlement of such Proceeding and Seller shall be liable for all fees and expenses incurred by such Purchaser Indemnified Party and for any liability established by any order of a Governmental Body of competent jurisdiction and for any liability established by any settlement or compromise agreed to by such Purchaser Indemnified Party, in the exercise of its reasonable discretion.

**10.4    Other Claims.**  A claim for any matter not involving a third party claim may be asserted by written notice to the Party from whom indemnification is sought.

**10.5    Seller Indemnification Claim Period.**  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Seller, no claim for indemnification pursuant to <u>Section 10.1</u> shall be made unless a claim arises and written notice pursuant to <u>Section 10.3</u> or <u>Section 10.4</u> which reasonably describes the claim, the basis therefor, and if possible with the exercise of reasonable diligence, the Purchaser Indemnified Party's reasonably-supported estimate of the Losses being asserted, is delivered to Seller on or before the close of business on the day preceding the first (1st) anniversary of the Closing Date (the "**Claims Close Date**") in which case the indemnity with respect to that Loss shall survive the Claims Close Date (but continue to be limited to the funds held in the Escrow Account).  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.6    Purchaser Indemnification Claim Period.**  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Purchaser, no claim for indemnification pursuant to <u>Section 10.2</u> shall be made unless a claim arises and written notice pursuant to <u>Section 10.3</u> or <u>Section 10.4</u> is delivered to Purchaser on or before the Claims Close Date.  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Seller or any Seller Indemnified Party may be entitled.

**10.7    Payment from Indemnification Escrow.**  If a Purchaser Indemnified Party becomes entitled to indemnification from Seller hereunder, such Purchaser Indemnified Party shall be entitled to receive the amount of Losses in cash from the Escrow Account in accordance with the Escrow Agreement, and the recovery of the Purchaser Indemnified Parties shall be limited to such recoveries from the Escrow Account.  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.8    Miscellaneous Indemnification Provisions.**  Disclosures made after the date hereof and any knowledge that is acquired about the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or obligation set forth herein shall not in any manner affect rights to indemnification hereunder based on any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or obligation, will not affect any right to indemnification based on such representations, warranties, covenants and obligations unless otherwise expressly agreed in writing by the party or parties entitled to the benefit thereto.

35751625.8 09/06/2019

## ARTICLE XI.
## MISCELLANEOUS

**11.1    Expiration of Representations, Warranties and Agreements.**  The representations and warranties and covenants made by Seller and Purchaser in this Agreement and in any Ancillary Document delivered pursuant to this Agreement shall survive beyond the Closing Date.

**11.2    Assignment.**  Neither this Agreement nor any interest herein may be assigned or transferred by either Party to any other Person without the prior written consent of the other Party, which consent may be given or withheld in the sole discretion of such other Party; provided, however, Purchaser may assign at Closing its rights, but not its obligations, hereunder to any Affiliate of Purchaser.

**11.3    Notices.**  All notices, requests and other communications under this Agreement shall be in writing and shall be either (a) delivered in person, (b) sent by certified mail, return-receipt requested, (c) delivered by a recognized delivery service or (d) sent by facsimile transmission and addressed as follows:

| | |
|---|---|
| If intended for Purchaser: | Thomas Jefferson University Hospitals, Inc. 925 Chestnut Street, Suite 110 Philadelphia, Pennsylvania 19107 Attention: Stephen K. Klasko, MD, MBA, President & CEO |
| With a copies to: | Thomas Jefferson University Hospitals, Inc. 1020 Walnuts Street, 6th Floor, Scott Bldg. Philadelphia, Pennsylvania 19107 Attention: Cristina G. Cavalieri, Esq., Senior Vice President, Chief Legal and Governance Officer and Secretary |
| | Neil S. Olderman, Esquire Drinker Biddle & Reath LLP 191 N. Wacker Drive Suite 3700 Chicago, IL 60606-1698 |
| | And |
| | Andrew C. Kassner, Esquire Drinker Biddle & Reath LLP One Logan Square 18th and Cherry Streets Philadelphia, PA 19103-6996 |

If intended for Seller:                         Center City Healthcare, LLC
                                                Centre Square West
                                                1500 Market Street, Suite 2400
                                                Philadelphia, PA 19102
                                                Attention: Allen Wilen, CRO-Finance

With a copy to:                                 Jeffrey Hampton
                                                Adam Isenberg
                                                Saul Ewing Arnstein & Lehr LLP
                                                Centre Square West
                                                1500 Market Street, 38th Floor
                                                Philadelphia, PA  19102-2186

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided.  A notice, request and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 P.M. on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 A.M. on the first Business Day thereafter.

**11.4    Further Assurances.**  Each of the Parties hereto shall execute such documents (including, without limitation, the Ancillary Documents) and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby or, at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement.

**11.5    Entire Agreement; Modifications; Waivers.**  This Agreement (together with the Exhibits and Schedules hereto), the Ancillary Documents, and the Non-Disclosure Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior understandings of the Parties with respect to the subject matter hereof and thereof.  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each Party.  No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Party making the waiver.

**11.6    Applicable Law; Jurisdiction and Venue; Jury Trial Waiver.**  THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.  The Parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; provided, however, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement shall be in the courts of the

State of Delaware or U.S. District Court for the District of Delaware, and the Parties each hereby waive any objections they may have with respect thereto (including any objections based upon *forum non conveniens*).  **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY**.

**11.7    Headings and Captions.**  The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent or otherwise affect the interpretation of, this Agreement or any of the provisions hereof.

**11.8    Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**11.9    Time is of the Essence.**  With respect to all provisions of this Agreement, time is of the essence.  However, if the first date or last date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then, in such event, the time of such period shall be extended to the next day which is a Business Day.

**11.10    Remedies Cumulative.**  Except as herein expressly set forth, no remedy conferred upon a Party by this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law, in equity or by statute.

**11.11    Interpretation and Construction.**

(a)    As used herein the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".

(b)    As used herein, the words "**herein**," "**hereof**," "**hereunder**" and similar terms shall refer to this Agreement unless the context requires otherwise.

(c)    For purposes of this Agreement, whenever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural and vice versa.

**11.12    Estoppel**.  Each Party confirms and agrees that (a) it has read and understood all of the provisions of this Agreement; (b) it is familiar with major sophisticated transactions such as those contemplated by this Agreement; (c) it has negotiated with the other Party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**11.13    Joint Preparation.**  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**11.14    Expenses; Transfer Taxes.**

(a)    Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

(b)    The Purchaser and Seller shall each pay fifty (50%) percent of all sales, use, transfer, real property transfer, documentary, recording and similar Taxes and fees, and any deficiency, interest or penalty asserted with respect thereof arising out of or in connection with the transactions contemplated hereby ("**Transfer Taxes**").

**11.15    Counterparts.**  This Agreement may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

**11.16    Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

*[Signature page follows.]*

35751625.8 09/06/2019

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above.

SELLER:

**CENTER CITY HEALTHCARE, LLC**

By:_____
    Allen Wilen
    Chief Restructuring Officer - Finance

PURCHASER:

**THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.**

By:_____
    Laurence M. Merlis
    Executive Vice President

*[Signature page to Asset Purchase Agreement]*

28

## EXHIBIT A

**Purchased Assets**

The Purchased Assets to be purchased by the Purchaser and sold, conveyed, assigned, transferred and delivered on the Closing Date to the Purchaser by the Seller shall include all of the Seller's right, title and interest in and to all of the following assets, but specifically excluding, however, the Excluded Assets:

1.      Assigned Contracts.   All of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on Schedule A-1 to this **Exhibit A**.

2.      Books and Records.   All Books and Records related to the Purchased Assets, but specifically excluded any Corporate Documents.

3.      Governmental Authorizations.    All transferable Governmental Authorizations identified on Schedule A-2 to this **Exhibit A**.

4.      Rights; Warranty Claims.   All of Seller's rights, claims, counterclaims, credits, causes of action or rights of set-off against third parties that relate to warranties, indemnities, and all similar rights to the extent related to any Purchased Assets.

5.      Other Assets.   Those other assets of the Seller identified on Schedule A-3 to this **Exhibit A**.

**Schedule A-1**

I.    **Current GME Affiliation Agreements**

1.    Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between the Trustees of the University of Pennsylvania, as the owner and operator of the Hospital of the University of Pennsylvania, and Seller.

2.    Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Prime Healthcare Services Roxborough, LLC, the owner and operator of Roxborough Memorial Hospital, and Seller.

3.    Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 among Temple University Hospital, Seller and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.

4.    Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Friends Behavioral Health System and Seller.

5.    Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Abington Memorial Hospital and Seller.

II.    **GME Obligations**

**Graduate Hospital/Penn**

•    Agreement Regarding Medicare FTE Resident Caps, between the Trustees of the University of Pennsylvania and Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007

**Roxborough and Warminster/Solis**

•    Agreement Regarding Medicare FTE Resident Caps between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007

•    Agreement Concerning Family Medicine Training among Abington Memorial Hospital, Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 23, 2008

•    Second Amendment to Agreement Regarding Medicare FTE Resident Caps; between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 29, 2010

**Hahnemann/Friends**

- Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP dated June 2008

- Memorandum of Understanding for Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP

**Hahnemann/Abington**

Master Agreement for Shared Rotational Arrangements between Hahnemann University Hospital and Abington Memorial Hospital dated June 29, 2007

III.    **The Participating Provider Agreement**

IV.    **Tower Health GME Affiliation Agreement**

35751625.8 09/06/2019

**Schedule A-2**

**Governmental Authorizations**

The Participating Provider Agreement

## Schedule A-3

### Other Assets

[None]

**EXHIBIT B**

**ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT**

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT ("Agreement") dated as of [_____] by and between Center City Healthcare, LLC, a Delaware limited liability company ("Assignor"), and Thomas Jefferson University Hospitals, Inc., a Pennsylvania nonprofit corporation ("Assignee").

BACKGROUND

A.    ASSIGNEE AND ASSIGNOR HAVE ENTERED INTO AN ASSET PURCHASE AGREEMENT DATED AS OF [_____] (TOGETHER WITH THE EXHIBITS AND SCHEDULES THERETO, THE "PURCHASE AGREEMENT") PROVIDING FOR, AMONG OTHER THINGS, THE SALE, TRANSFER, CONVEYANCE, ASSIGNMENT, AND DELIVERY BY ASSIGNOR TO ASSIGNEE OF CERTAIN ASSETS OF ASSIGNOR (COLLECTIVELY, THE "PURCHASED ASSETS") THAT ARE OWNED OR USED BY ASSIGNOR IN CONNECTION WITH THE BUSINESS.

B.    IN CONNECTION WITH THE SALE AND PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THE PURCHASE AGREEMENT, ASSIGNOR IS TO ASSIGN AND DELEGATE, AND ASSIGNEE IS TO ASSUME, THE ASSIGNED CONTRACTS.  CLOSING IS BEING HELD ON THE DATE HEREOF UNDER THE PURCHASE AGREEMENT.

NOW, THEREFORE, pursuant to and in consideration of the Purchase Agreement and the mutual covenants and agreements set forth therein and herein, Assignor and Assignee, each intending to be legally bound, agree as follows:

1.    Incorporation of Background; Defined Terms.  The Background provisions set forth above (including, without limitation, all of the defined terms set forth therein) are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety in this Section 1.  Capitalized terms used herein which are not otherwise defined shall have the respective meanings assigned to them in the Purchase Agreement.

2.    Assignment of Rights.  Assignor hereby sells, transfers, conveys, and assigns to Assignee all of Assignor's right, title and interest in, to and under all of the Assigned Contracts, each of which are identified on Schedule 2 attached hereto.

3.    Delegation of Duties.  Assignor hereby delegates to Assignee all of Assignor's duties and liabilities under the Assigned Contracts.

4.    Assumption of Liabilities.  In partial consideration for the sale of the Purchased Assets by Assignor pursuant to the Purchase Agreement, Assignee hereby undertakes and agrees to assume, discharge, or perform as the case may be, all duties, obligations, and liabilities of Assignor under the Assigned Contracts which are to be performed after, and relate to the period after, the date hereof or which are otherwise assigned to and assumed by the Purchaser under or pursuant to the Purchase Agreement or the Sale Order.

5.      <u>Assignment of Governmental Authorizations; Etc</u>.  Assignor hereby assigns, sells, transfers, and sets over to Assignee all of Assignor's right, title and interest in, to, and under all of the Governmental Authorizations which are listed on <u>Schedule 5</u> attached hereto, but only to the extent that any of the foregoing may be legally sold, transferred, conveyed, assigned and delivered by Assignor to Assignee without any action by any such applicable federal, state, or local government or regulatory body.

6.      <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.      <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the domestic, internal laws of the State of Delaware, without regard to its rules pertaining to the conflict of laws.

8.      <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  Any party to this Agreement may deliver an executed counterpart hereof by facsimile transmission or electronic mail (as a Portable Document Format (PDF) file) to the other party hereto and any such delivery shall have the same force and effect as the manual delivery of an original executed counterpart of this Agreement.

***Remainder of Page Intentionally Left Blank***

***Signature Page Follows***

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers the day and year first above written.

CENTER CITY HEALTHCARE, LLC

By_____

  Allen Wilen
  Chief Restructuring Officer - Finance
 "<u>Assignor</u>"

THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.

By_____

  Laurence M. Merlis
  Executive Vice President
  "<u>Assignee</u>"

3

## EXHIBIT C

## BILL OF SALE

**_____, 2019**

KNOW ALL BY THESE PRESENTS that CENTER CITY HEALTHCARE, LLC, a Delaware limited liability company (the "Seller"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, has granted, bargained, sold, conveyed, transferred, assigned and delivered, and by this Bill of Sale hereby grants, bargains, sells, conveys, transfers, assigns and delivers, to Thomas Jefferson University Hospitals, Inc., a Pennsylvania nonprofit corporation ("Purchaser"), its successors and assigns, all of the Seller's right, title and interest in and to the Purchased Assets.  As used herein, the term "Purchased Assets" has the meaning given to such term in that certain Asset Purchase Agreement, dated as of - _____, 2019, by and between the Seller and Purchaser (together with the Exhibits and Schedules thereto, the "Purchase Agreement"), which Purchase Agreement is incorporated herein by this reference.

EXCLUDING, HOWEVER, the "Excluded Assets" (as such term is defined in the Purchase Agreement).

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, forever.

This Bill of Sale is being executed and delivered by the Seller to the Purchaser under and pursuant to Section 8.2(a) of the Purchase Agreement and is subject to the terms and conditions of the Purchase Agreement in all respects.

***Remainder of Page Intentionally Left Blank***

***Signature Page Follows***

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the date and year first set forth above.

CENTER CITY HEALTHCARE, LLC

By_____
    Allen Wilen
    Chief Restructuring Officer - Finance

2

# **EXHIBIT D**

# **ESCROW AGREEMENT**

[To be provided]

# EXHIBIT E

# SALE ORDER

[To be provided]

**EXHIBIT F**

**BIDDING PROCEDURES ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) **Re: Docket No. 142** |
| | ) |

## ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND <u>(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE</u>

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and

debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures**

**Order**"):  (a) approving the proposed bidding procedures attached as <u>**Schedule 1**</u> to this Bidding

Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the

highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets;

(b) establishing procedures for the assumption and assignment of executory contracts, including

notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

(c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**") [3], the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. 246], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which is attached as Exhibit E to the Stalking Horse Sale Agreement: (x) authorizing the sale of the Residents Program Assets free and clear of Interests as defined in footnote 4, below (the "**Interests**") [4], with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter

---

[3]     The Court has been advised that Reading Hospital, a subsidiary of Tower Health, will actually serve as the Stalking Horse Bidder and, as a result, all references herein to the Stalking Horse Bidder shall be deemed to include Reading Hospital.

[4]     Interests shall include: (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or purchaser's interest in the Assigned Contracts and/or Residents Program Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the Pension Benefit Guaranty Corporation or any plan participant or beneficiary, (iv) tax claims (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, and with respect to the rights described in this sub-clause (v) only as they relate to the Resident Program Assets that are the subject of the Stalking Horse Bidder's Stalking Horse Sale Agreement.

pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.       The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.       The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "**Local Rules**").  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D.    Notice of the Motion, as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order, was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Residents Program Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Residents Program Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Residents Program Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Health; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  Accordingly, no further

notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order is necessary or required.

E.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion as relates to the entry of this Bidding Procedures Order, including, without limitation:  (a) approval of the Bidding Procedures; (b) approval of the selection of the Stalking Horse Bidder and approval of the Break-Up Fee to be paid to the Stalking Horse Bidder under the circumstances described in the Motion; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.      Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

G.      The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair,

reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.  The Break-Up Fee:  (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H.     The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale Agreement.  The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely.  Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures).  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

-6-

I.       The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required.  The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.       The Auction and Sale Notice attached hereto as **Schedule 5** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d)  identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of all Interests, with all Interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.       All current and former patients of Debtor Center City Healthcare, LLC ("Center City") who have, as of the date of this order, asserted claims against Center City, including but not limited to claims formally asserted by the filing of suit or a proof of claim in these Bankruptcy Cases and claims informally asserted by letter or by a request for medical records

from a lawyer or otherwise (the "Known Patient Creditors") shall be treated as known creditors of the Debtors for purposes of notice requirements related to the Sale.

L.        All current and former patients of Center City who, as of the date of this order, are not Known Patient Creditors (including current and former patients who are not, as of the date of this order, aware that they have or may have claims against the Debtors including such patients as to whom personal injury has not manifested as of the date of this order) (the "Unknown Patient Creditors") shall be treated as unknown creditors of the Debtors for purposes of the notice requirements related to the Sale.

M.        The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.        The Motion is granted as provided herein.[5]

2.        All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.        Timeline for the Sale**

3.        The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order.  The Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), as indicated herein and in the Bidding Procedures, are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take

---

[5]        Notwithstanding anything to the contrary herein, or in the Bidding Procedures, the acceptance of a Bid and Sale Agreement by the Debtors and the consummation of a Sale are subject to entry of the Sale Order.

35602324.10 07/19/2019

any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Milestone | Proposed Date |
|---|---|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 |
| Sale Hearing | August 9, 2019 at 11:00 a.m. (prevailing Eastern Time) |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder (Other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) | (may be raised at the Sale Hearing) |

4.     For the avoidance of doubt, the Debtors, in consultation with the Committee, reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

## II.    **The Bidding Procedures**

5.     The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on August 5, 2019. Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.      The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice).  The Auction will be conducted openly and all creditors and the Committee will be permitted to attend.

9.      Any creditor with a valid and perfected lien on all of the Residents Program Assets (each, a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in

interest to object to or challenge such creditor's lien thereunder (a "**Challenge**")), to credit bid all or any portion of such Secured Creditor's allowed secured claims to purchase the Residents Program Assets to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, unless otherwise ordered by the Bankruptcy Court for cause.  The foregoing notwithstanding, any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee. In the event that the Committee, or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected.  In the event that such a creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash at the closing of the Sale.

10.     Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up Fee in lieu of cash and have the Break-Up Fee be treated as equal to cash in the same amount for the purposes of evaluating the overbid.

**III.     Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement**

11.     The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction.  The Break-Up Fee described in the Bidding Procedures is approved.  The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' closing of the Sale with a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**").  If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; and (b) shall be payable in at closing on the Alternative Transaction without further order of this Court; and

(c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

**IV.     Notice Procedures**

12.     The Auction and Sale Notice is approved.

*A.        Notice of Sale, Auction, and Sale Hearing.*

13.     Within two (2) business days after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the Auction and Sale Notice by first-class mail, electronic mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (a) the Notice Parties, (b) all Residents, and (c) all known creditors of Center City, including any Known Patient Creditors. In addition, on or before the Mailing Date, the Debtors shall serve the *Notice to Residents and Fellows Regarding Proposed Sale of Residency Program Assets* (the "**Residents' Notice**"), in substantially the form attached hereto as  **Schedule 2**, on all Residents by first class mail or electronic mail.

14.     Service of the Auction and Sale Notice and the Residents' Notice as described in paragraph 13 above shall be sufficient and proper notice of the and satisfies all due process requirements.

15.     Within ten (10) days of the date of this Bidding Procedures Order, the Debtors shall cause the notice (the "**Publication Notice**") substantially in the form attached hereto as **Schedule 3** to be published once in the National Edition of *USA Today* and once in the *Philadelphia Inquirer*. The Publication Notice shall be sufficient and proper notice of the Sale to all creditors whose identities are unknown to the Debtors, including all of the Unknown Patient Creditors.

B.      *Notice of Successful Bidder.*

16.      As soon as reasonably practicable after the Bid Deadline, if no Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, or conclusion of the Auction, if a Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, the Debtors shall file on the docket, but not serve, a notice which shall identify the Successful Bidder.

V.      **Assumption and Assignment Procedures**

17.      The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

A.      *Notice of Assumption and Assignment.*

18.      The Debtors previously filed with the Court, [D.I. 246], a list (the "**Initial Designated Contracts List**") specifying:  (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Initial Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Initial Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Initial Designated Contract (the "**Cure Costs**").

19.      On the Mailing Date, the Debtors shall serve the Notice of Proposed Assumption and Assignment of Executory Contracts attached hereto as **Schedule 4** (the "**Initial Notice of Assumption and Assignment**") on all Initial Designated Contract Counterparties by first-class

mail, email or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF.

20.     Any Initial Designated Contract Counterparty may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Initial Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance.  All Contract Objections must:  (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com) and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania, 19102, Attn: Jeffrey C. Hampton (jeffrey.hampton@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder (the "**Contract Notice Parties**") by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Initial Designated Contract Objection Deadline**").  Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

21.     If an Initial Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such Contract Objection will be determined at the Sale Hearing.

### B.     *Modification of Initial Designated Contracts List and Supplemental Notice of Assumption and Assignment.*

22.     Prior to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Stalking Horse Bidder. Subsequent to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Successful Bidder (who may be the Stalking Horse Bidder).

23.     Until the opening of business on the date of the Auction, if another Qualified Bid is received by the Bid Deadline, or the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline, at the request of the Stalking Horse Bidder, the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs. Following the conclusion of the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs, *provided*, *however*, that such deletion of any contracts shall not result in any reduction in the Purchase Price (as defined in the Stalking Horse Sale Agreement"), and any contracts added after the Auction will not be considered in connection with the right of termination in Article 9.1(c) of the Stalking Horse Sale Agreement. For the avoidance of doubt, the Initial Designated Contracts List may be modified more than

-15-

once. The contracts listed on the Initial Designated Contracts List, as modified from time to time, are hereafter referred to as the "**Designated Contracts**").

24.     In the event that the Initial Designated Contracts List is modified, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") on the affected counterparty in the same manner as the Initial Notice of Assumption and Assignment was served.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed contracts as was included in the Notice of Assumption and Assignment.

25.     Any counterparty to an executory contract listed on a Supplemental Notice of Assumption and Assignment (each a "**Supplemental Designated Contract Counterparty**") may file an objection with respect to the applicable Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs (but only to the extent reduced  as to contracts included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment), and (b) if such Designated Contract was not included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance.  All Supplemental Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the

Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

26.     If a Supplemental Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute, (a) if the Supplemental Contract Objection Deadline is on or before the date of the Sale Hearing, such Supplemental Contract Objection will be determined at the Sale Hearing, and (b) if the Supplemental Contract Objection Deadline is after the date of the Sale Hearing the Debtors will seek an expedited hearing before the Court to determine the Supplemental Contract Objection.  If there is no such Supplemental Contract Objection (or such objection has been resolved), then the Debtors may submit an order to this Court, including by filing a certification of counsel, fixing the applicable Cure Costs and approving the assumption of the contract listed on a Supplemental Notice of Assumption and Assignment.

C.     *Additional Notice of Assumption and Assignment Procedures.*

27.     If the counterparty to any Designated Contract does not file and serve a Contract Objection or Supplemental Contract Objection, as applicable, in a manner that is consistent with the requirements set forth above, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling with respect to the applicable Designated Contract, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any claim related to such Designated Contract for any default occurring or continuing prior to the date of the assumption

and assignment of such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

28.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.   Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

## VI.     Sale Hearing.

29.     A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at **11:00 a.m. (prevailing Eastern Time) on August 9, 2019**, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder.  The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale.  In the event that the Successful Bidder cannot or refuses to consummate the Sale after the Sale has been approved by the Court, the Debtors may, in consultation with the Committee, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors, in consultation with the Committee, shall be

35602324.10 07/19/2019

authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

30.     Any and all objections, if any, to (a) the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement and (b) entry of the Sale Order approving such Sale (a "**Sale Objection**") must be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pa. 19406 Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Sale Objection Deadline**").  Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder (other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) (an "**Auction Objection**") must be raised at or prior to the Sale Hearing (the "**Auction Objection Deadline**").  Any party failing to timely file a Sale Objection or raise an Auction Objection, as applicable, will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the assets free and clear of any and all Interests. For the avoidance of doubt, if the Stalking Horse Bidder is selected as the Successful Bidder, but its successful Bid is not the Stalking Horse Bid or an increased bid based on an agreement substantially similar to the Stalking Horse Sale Agreement, objections to a Sale

35602324.10 07/19/2019

to the Stalking Horse Bidder, limited to the changed terms (excluding any increase in price) may be raised by the Auction Objection Deadline.

**VII.     Miscellaneous.**

31.     Notwithstanding anything to the contrary in any asset purchase agreement or document relating to the Sale, the purchased assets (including the Residents Program Assets) shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action. The provisions of this paragraphs shall not apply to the Stalking Horse Sale Agreement, as the same may be modified other than any modifications to the defined term "Purchased Assets."

32.     This order and the Bidding Procedures shall be interpreted so as to afford the Debtors, in consultation with the Committee, the greatest opportunity to maximize the value of the Residents Program Assets for the benefit of the Debtors' estates *provided*, *however*, the provisions of this paragraph shall not apply to any matters affecting the Stalking Horse Bidder without the consent of the Stalking Horse Bidder.

33.     The Debtors, in consultation with the Committee as applicable, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

-20-

34.     Notwithstanding anything in the Motion, the Bidding Procedures, and/or the July 9, 2019 Stalking Horse LOI to the contrary, nothing in this Bidding Procedures Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability to the United States arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

35.     To the extent the Successful Bid or the Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" of successor liability for any liability to the United States arising from such provider agreement pursuant to section 363(f) of the Bankruptcy Code.

36.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

37.     This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors. Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

38.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions

of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

This Court shall retain jurisdiction with respect to all matters arising from or related to the

implementation or interpretation of this Bidding Procedures Order, including, but not limited to,

any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking

Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

**Dated: July 19th, 2019**
**Wilmington, Delaware**

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**

35602324.10 07/19/2019

# SCHEDULE 1

# BIDDING PROCEDURES

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) | |
| *al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

### BIDDING PROCEDURES

On July 19, 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**").  These Bidding Procedures set forth the process by which the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") as set forth herein, are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July 19, 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**"), or in accordance with the terms of such higher and better offer as determined by the Debtors, in consultation with the Committee, to be the Successful Bidder (defined below).

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

A.    Submissions to the Debtors and the Committee.

All submissions to the Debtors and the Committee required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

   a.    **Debtors**.  Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

   b.    **Debtors' Counsel**.  Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

   c.    **Debtors' Investment Banker**.  SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com).

   d.    **Committee's Counsel**.  Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

B.    Potential Bidders.

The Debtors and their financial advisors have identified, and may in the future, in consultation with the Committee, identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**"), other than the Stalking Horse Bidder, must deliver or have previously delivered, if determined to be necessary by the Debtors:

   a.    an executed confidentiality agreement on terms acceptable to the Debtors, in consultation with the Committee (a "**Confidentiality Agreement**"), to the extent not already executed; and

   b.    the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

C.    Qualified Bidders.

a.    A "**Qualified Bidder**" is a Potential Bidder:  (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined by the Debtors, in consultation with the Committee; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below).  On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times.  MidCap Funding IV Trust ("**Midcap**"), solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times; *provided* that MidCap Funding IV Trust's right to credit bid shall be subject to the provisions set forth in the Bidding Procedures Order and these Bidding Procedures.

b.    If any Potential Bidder is determined by the Debtors, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

c.    Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, in consultation with the Committee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

d.    Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

D.    Due Diligence.

a.    **Diligence Provided to Potential Bidders**.

Only (a) the Stalking Horse Bidder, and (b) Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders other than the Stalking Horse Bidder, the due

diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors, in consultation with the Committee, may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors, in consultation with the Committee, determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors, in consultation with the Committee, determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors, in consultation with the Committee, as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to MidCap and the Committee.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

b.      **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Committee, to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

E.     Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors, in consultation with the Committee, in their reasonable business judgment, shall constitute a "**Qualified Bid**."  For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

     a.     **Assets**.  Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

     b.     **Purchase Price**.  Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**").  The Purchase Price must be in cash consideration and must equal or exceed $7,825,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) and (iii) a $100,000 incremental amount (a "**Minimum Bid**").

     c.     **Deposit**.  With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**").  Within three (3) business days after the conclusion of any Auction, the Successful Bidder and Backup Bidder shall submit by wire transfer of immediately available funds, a supplemental cash deposit in an amount that, when added to the amount of the Deposit, is equal to ten (10) percent of the aggregate cash Purchase Price set forth in their respective Successful Bid and Backup Bid. The foregoing notwithstanding, the Stalking Horse Bidder shall not be required to submit any Deposit.

     d.     **Residents**.  Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms. Each Bid must further provide a description of the Potential Bidder's accreditation status with the Accreditation Council on Graduate Medical Education, including a description of accredited residency and fellowship programs currently offered by the Potential Bidder and/or expected to be offered in the future.

-5-

e.     **Same or Better Terms**.  Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors, in consultation with the Committee.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors, in consultation with the Committee, that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f.     **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on (i) the Potential Bidder obtaining financing, (ii) approval of the Potential Bidder's shareholders, board of directors or other internal approval, or (iii) the outcome or completion of due diligence by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment, in consultation with the Committee, than those set forth in the Stalking Horse Sale Agreement.

g.     **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.     **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment, as determined in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.  Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i.     **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Committee,.

j.     **Binding and Irrevocable**.  A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k.     **Expenses; Disclaimer of Fees**.  Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.     **Authorization**.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Committee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m.    **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

n.   **Adherence to Bid Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o.   **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p.   **Consent to Jurisdiction**.  Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q.   **Bid Deadline**.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **<u>actually</u> <u>received</u>** on or before 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Bid Deadline**").

The Debtors reserve the right, in consultation with the Committee, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

F.   Right to Credit Bid.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on all of the Resident Program Assets (a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object or challenge such creditor's lien thereunder (a "**Challenge**")) to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause.   In the event that the Committee or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected.  If such creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash as the closing of the Sale.

In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up fee in lieu of cash.

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order.

Any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee.

G.    Auction.

If, prior to the Bid Deadline, the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. By 6:00 p.m. on the date of the Bid Deadline, the Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids were received prior to the Bid Deadline. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement) prior to the Bid Deadline, the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Committee (the "**Baseline Bid**"), and provide copies of all Qualified Bid Documents supporting the Baseline Bid and each other Qualified Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Committee, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, and may include, among other things: (a) the number, type, and nature of any changes to the Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on August 7, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

    a.    **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction, in consultation with the Committee as applicable. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of

-9-

each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and the Committee and all creditors will be permitted to attend.  The Qualified Bidders, including the Stalking Horse Bidder, may appear at the Auction in person or through duly authorized representatives.

b.      **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid.  Each Overbid must comply with the following conditions:

(a)      **Minimum Overbid Increment**.  The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth in the Bidding Procedures Order or these Bidding Procedures (including the requirement of a cash component sufficient to pay all costs of sale including the Break-Up Fee).

(b)      **Conclusion of Each Overbid Round**.  Upon the solicitation of each round of applicable Overbids, the Debtors may, in consultation with the Committee, announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors and the Committee.

(c)      **Overbid Alterations**.  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures.  Any Overbid must comply with the conditions for a Qualified Bid.

(d)      **Announcing Highest Bid**.  Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have (i) in the initial Overbid round, identified an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or (ii) in subsequent rounds, identified an Overbid as

being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors, in consultation with the Committee, as the Prevailing Highest Bid as well as the value attributable by the Debtors, in consultation with the Committee, to such Prevailing Highest Bid.

c.    **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Committee, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors, the Committee, and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with the Committee, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider, in consultation with the Committee, how to value each Overbid.

d.    **Closing the Auction**.

(a)    The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Committee, to be the highest or otherwise best Bid in accordance with the Bid Assessment Criteria. Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed. The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

(b)    The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely.

(c)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

**e.      No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that:  (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder.  All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors, the Committee, and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

H.      Backup Bidder.

a.      Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Committee (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.  The Stalking Horse Bidder shall serve as a Backup Bidder only if (X) the Bid set forth in the Stalking Horse Agreement is not determined to be the Baseline Bid (as defined herein), and (Y) the Stalking Horse Bidder elects, in its sole discretion, to offer a higher and better bid at the Auction.  The Stalking Horse Bidder's Bid described in the Stalking Horse Agreement shall not be a Backup Bid absent the express consent of the Stalking Horse Bidder.

b.      The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder.  The foregoing notwithstanding, if the Stalking Horse Bidder serves as the Backup Bidder, its Backup Bid shall expire on the earlier of closing on an Alternative Transaction (defined below) or September 6, 2019.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

c.      If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Committee, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

I.    Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights, in consultation with the Committee, to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

J.    Sale Hearing.

A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on **August 9, 2019, at 11:00 a.m. (ET)** before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Committee, by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder). The foregoing notwithstanding, if the Sale Hearing is continued without the consent of the Stalking Horse, the Stalking Horse may terminate the Stalking Horse Agreement.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

K.    Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

The Break-Up fee, to the extent owed by the Debtors, (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; (b) shall be payable at closing on of a Sale to a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**")without further order of the Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

L.      Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors, in consultation with the Committee, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction. The Stalking Horse Bidder shall not be required to provide a Deposit.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

M.      Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures prior to the commencement of the Auction if the Debtors' board of managers determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as the case may be, is required to comply with applicable law or the board's fiduciary obligations thereunder; *provided* that, in the event  the Debtors' board of managers determines to take any action, or refrain from taking any action, pursuant to this paragraph, without the consent of the Stalking Horse Bidder, the Stalking Horse Bidder may, but shall not be required to, terminate the Stalking Horse Agreement if taking such action or refraining from taking such action, as the case may be, would otherwise be grounds for termination under the Stalking Horse Agreement, it being understood that any material modification to the Bid Procedures without the consent of the Stalking Horse would be a breach of the Stalking Horse Agreement pursuant to which the Stalking Horse would have the right to terminate the Stalking Horse Agreement.

35612177.6 07/19/2019

## SCHEDULE 2

## RESIDENT'S NOTICE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
| | Jointly Administered |
| Debtors. | |

## NOTICE TO RESIDENTS AND FELLOWS
## REGARDING PROPOSED SALE OF RESIDENCY PROGRAM ASSETS

## TO: ALL RESIDENTS AND FELLOWS AT HAHNEMANN UNIVERSITY HOSPITAL:

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Tower Health ("**Tower**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to Tower: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors file a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth certain key dates and deadlines in connection with the proposed Sale.  In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids.  A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**").  A copy of the Agreement, the Bidding Procedures Order and the Bidding Procedures is enclosed herewith.

## THE PROPOSED SALE

If approved by the Court, the Agreement will enable residents and fellows (collectively herein, the "**Residents**") at Hahnemann to continue their training at one of six hospitals operated by Tower - Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania.  **Residents have a choice, and are not required to continue their training with Tower**.  For any Resident who elects to complete their training elsewhere, Tower or the Debtors, as applicable, will release the related cap on Medicare reimbursement on a temporary basis to accommodate that choice.

For Residents who elect to stay with Tower, Tower will provide housing for those residents doing rotations at Reading Hospital, which is sixty miles from Hahnemann.  Tower has also agreed to seek to hire the faculty who are currently training Residents at Hahnemann to ensure continuity of the Hahnemann training programs.  Tower will also provide free housing (subject to parameters set forth in the Agreement) for the remainder of the academic year or during the term of a resident's existing vacated lease if it is necessary for the Resident to relocate during the current academic year.  Residents will receive free meals while in any Tower hospital, and Tower will also provide additional amenities to assist Residents and their families with the transition.

If the Sale is approved by the Court to someone other than Tower, the terms of the Sale, and the impact upon Residents, may be different than those under the Agreement.

The Debtors recognize the unique difficulties and challenges facing Residents in light of the bankruptcy filing and expected closure of Hahnemann.  The Debtors believe that the proposed Sale is in the best interests of Residents because it provides Residents with the option to continue their training and, to minimize, to the greatest extent possible, the impact of Hahnemann's closure on Residents, their professional training and education, and their families.

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys,

whose contact information is in the signature block below, for more information.  In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; and (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE  19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

       -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

-4-

**SCHEDULE 3**


**PUBLICATION NOTICE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
|  | Jointly Administered |
| Debtors. |  |

## NOTICE REGARDING PROPOSED SALE OF RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL INTERESTS, INCLUDING PERSONAL INJURY CLAIMS

**TO:  ALL PERSONS WITH CLAIMS AGAINST THE DEBTORS IN THE ABOVE CAPTIONED CASES, INCLUDING CLAIMS AGAINST HAHNEMANN UNIVERSITY HOSPITAL:**

    **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

    **PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Reading Hospital (the "**Purchaser**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to the Purchaser: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

    **PLEASE TAKE FURTHER NOTICE** that the Sale, if approved, will be free and clear of all Interests, including claims of successor liability.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

**PLEASE TAKE FURTHER NOTICE THAT, IF THE SALE IS APPROVED, THE PURCHASER WILL NOT BE LIABLE ON ACCOUNT OF ANY CLAIMS AGAINST ANY OF THE DEBTORS (OTHER THAN CLAIMS AFFIRMATIVELY ASSUMED BY THE PURCHASER), INCLUDING CLAIMS OF PATIENTS TREATED AT HAHNEMANN, INCLUDING CLAIMS OF WHICH THE HOLDER MAY NOT BE PRESENTLY AWARE.**

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders.  On July 9, 2019, the Debtors filed a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale.  On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which sets forth certain key dates and deadlines in connection with the proposed Sale.  In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids.  A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**").

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys, whose contact information is below, for more information.  In addition, Residents should contact their Program Director with questions specific to their situation.

## Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower, and (d) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee.

35642133.2 07/19/2019

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Mark Minuti*

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Proposed Counsel for Debtors and
Debtors in Possession*

# SCHEDULE 4

## INITIAL NOTICE OF ASSUMPTION AND ASSIGNMENT

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

### NOTICE OF PROPOSED ASSUMPTION AND
### ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 and July 1, 2019 (the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion [D.I. 142] (the "**Sale Motion**") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets (the "**Residents Program Assets**") to Tower Health (the "**Stalking Horse Bidder**"), including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"), attached as **Exhibit B** to the Sale Motion; (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July 19, 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") [D.I. [●]] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herewith.

     **PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder, or any other Successful Bidder, the Designated Contracts. A schedule listing the Designated Contracts (the "**Designated Contracts List**") is attached hereto and may also be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "**Cure Payments**") is set forth on the Designated Contracts List.

     **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO AN INITIAL DESIGNATED CONTRACT IN THE INITIAL DESIGNATED CONTRACTS LIST**. Under the terms of the proposed Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Designated Contracts until the opening of business on the date of the Auction, or until the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline. Following the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Payments. If the Initial Designated Contracts List is modified, the Debtors will serve a supplemental notice of assumption and assignment on the affected counterparty, which shall identify the deadline for filing an objection with respect to the applicable Designated Contract.

### IMPORTANT PROPOSED DATES AND DEADLINES

1.     The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "**Sale Order**") and all objections related to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m. (ET)** (the "**Sale Objection Deadline**").

2.     The Auction for the Residents Program Assets, if one is necessary, will commence on **August 7, 2019 at 10:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

3.     A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

35599108.3 07/19/2019

## FILING ASSUMPTION AND ASSIGNMENT OBJECTIONS

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("**Designated Contract Objections**"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on August 5, 2019**. Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

Failure to timely file a timely Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

### CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE A TIMELY OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE PROPOSED BIDDING PROCEDURES ORDER AND THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Proposed Counsel for Debtors and
Debtors in Possession*

**Designated Contracts List**

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Master Agreement for Shared Rotational Arrangements with Hahnemann University Hospital dated June 29, 2007 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $0.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Temple University Hospital | Academic Affiliation Agreement with Tenet HealthSystem St. Christopher's Hospital for Children, LLC, dated October 19, 2007 | $0.00 |
| 15 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 17 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |
| 18-X | [INDIVIDUAL RESIDENTS] (to be provided and/or filed under seal) | Resident Employment Contract | $0.00 |

35599108.3 07/19/2019

# SCHEDULE 5

# AUCTION AND SALE NOTICE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) |
|  | ) |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 and July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale and Bidding Procedures Motion**")[2] seeking the entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of certain of the Debtors' assets to Tower Health (the "**Stalking Horse Bidder**") for $7.5 million plus the assumption of certain contracts and responsibilities of the Debtors with respect to Residents at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) the form and manner of notices related to the Sale; and (c) procedures for the assumption and assignment of contracts in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that on July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety. To the extent that there are any inconsistencies between the Bidding Procedures and the

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bidding Procedures Motion.

summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects. The deadline by which all Bids must be *actually received* by the parties specified in the Bidding Procedures Order is August 5, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Residents Program Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

| Proposed Investment Banker to Debtors | Proposed Counsel to Debtors |
|---|---|
| SSG Advisors, LLC<br>Five Tower Bridge, Suite 420<br>300 Barr Harbor Drive<br>West Conshohocken, PA 19428<br>J. Scott Victor (jsvictor@ssgca.com)<br>Teresa Kohl (tkohl@ssgca.com)<br>Craig Warznak (cwarznak@ssgca.com)<br>(610) 940-3615 | Saul Ewing Arnstein & Lehr LLP<br>1201 N. Market Street,  Suite 2300<br>Wilmington, Delaware 19899<br>Mark Minuti (mark.minuti@saul.com),<br>Jeffrey C. Hampton (jeffrey.hampton@saul.com),<br>Aaron S. Applebaum (aaron.applebaum@saul.com)<br>(215) 972-7777 |

## Obtaining Additional Information

Copies of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Purchase Agreement and all other documents filed with the Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

## Important Dates and Deadlines

1. The deadline to submit a Qualified Bid is August 5, 2019 at 4:00 p.m. (prevailing Eastern time).

2. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "**Sale Order**") and all objections relating to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m.** (prevailing Eastern time) (the "**Sale Objection Deadline**").

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Residents Program Assets. The Auction, if one is necessary, will commence on August 7, 2019 at 10:00 a.m. (prevailing Eastern time), or such other date as determined by the Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre

Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

4. Objections to the conduct of the Auction and the terms of a sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "**Auction Objections**") may be raised at the Sale Hearing (as defined below).

5. A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Court on **August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

### Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019                    **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
      Mark Minuti (DE Bar No. 2659)
      Monique B. DiSabatino (DE Bar No. 6027)
      1201 N. Market Street, Suite 2300
      P.O. Box 1266
      Wilmington, DE  19899
      Telephone: (302) 421-6800
      Fax: (302) 421-5873
      mark.minuti@saul.com
      monique.disabatino@saul.com

         -and-

      Jeffrey C. Hampton
      Adam H. Isenberg
      Aaron S. Applebaum (DE Bar No. 5587)
      Centre Square West
      1500 Market Street, 38th Floor
      Philadelphia, PA 19102
      Telephone: (215) 972-7700
      Fax: (215) 972-7725
      jeffrey.hampton@saul.com
      adam.isenberg@saul.com
      aaron.applebaum@saul.com

      *Proposed Counsel for Debtors and*
      *Debtors in Possession*

35599172.2 07/19/2019

# **EXHIBIT B**

## **ASSIGNED CONTRACTS**

| No. | Counterparty/Counterparties | Contract Type and Description | Maximum Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Agreement for Clinical Rotations with Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, dated September 14, 2018 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $3,000,000.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 7 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 8 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 9 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 10 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 11 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 12 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |

# EXHIBIT C

## BACKUP BID ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CENTER CITY HEALTHCARE, LLC,**

**as Seller,**

**AND**

**READING HOSPITAL**

**as Purchaser**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of September , 2019, by and between Center City Healthcare, LLC, d/b/a, Hahnemann University Hospital (the "**Seller**" or "**Hahnemann**"), a Delaware limited liability company and Reading Hospital (the "**Purchaser**"), a Pennsylvania nonprofit corporation.  The Seller and the Purchaser are sometimes individually referred to herein as a "**Party**" and collectively as the "**Parties.**"

WHEREAS, Seller is engaged in the business of owning and operating an acute care hospital, including a graduate medical education program (the "**Business**"); and

WHEREAS, the Seller is the owner of the Purchased Assets; and

WHEREAS, on June 30, 2019 (the "**Petition Date**"), a voluntary petition for relief was filed by the Seller under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), under Case Number 19-11466 (the "**Bankruptcy Case**"); and

WHEREAS, Seller desires to sell and Purchaser desires to purchase the Purchased Assets all in accordance with, and subject to, the terms and conditions contained in this Agreement; and

WHEREAS, the Purchased Assets being transferred herein are intended to be sold, conveyed and transferred to Purchaser free and clear of all Liens and Encumbrances pursuant to Section 363 of the Bankruptcy Code, and subject to the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings indicated below, unless the context clearly requires otherwise:

"**Affiliate**" shall mean, with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person; provided that such Person shall be deemed an Affiliate for only so long as such control exists.  For purposes of this definition and the definition of Related Person, the term "control" includes, without limitation, the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" shall mean all other agreements, documents and instruments to be executed and delivered by the Purchaser and/or the Seller pursuant to this Agreement.

2

"**Applicable Privacy and Security Law**" means any applicable Law relating to privacy, data protection, confidentiality, security, integrity and protection of personal information, including (i) health care and medical record applicable Laws, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and all implementing regulations (collectively, "**HIPAA**"); (ii) state data protection laws; (iii) state breach notification laws; and (iv) any comparable applicable state Laws and the regulations promulgated pursuant to all such applicable Laws.

"**Assigned Contracts**" shall mean, collectively, those Contracts included in the Purchased Assets, which shall consist solely of the Contracts identified on Schedule A-1 to **Exhibit A**. Purchaser may add or delete Contracts from Schedule A-1 pursuant to the applicable provisions of the Bidding Procedures Order.

"**Assignment and Assumption Agreement**" shall mean the Assignment, Delegation and Assumption Agreement to be executed at the Closing between the Seller and the Purchaser in the form attached hereto as **Exhibit B**, pursuant to which, among other things, the Seller will assign and transfer to the Purchaser all of its right, title and interest under the Assigned Contracts, on the terms and conditions set forth therein.

"**Assumed Liabilities**" shall mean, collectively, (i) all liabilities arising after the Closing with respect to the Assigned Contracts, (ii) all liabilities arising with respect to the Purchased Assets arising on or after the Closing Date, (iii) all executory performance obligations of Seller to the extent arising or after the Closing, (iv) the Cure Costs (including Cure Costs asserted by CMS (including by offset) upon and/or after the Closing on account of the Participating Provider Agreement), (v) any and the Purchaser's portion of the Transfer Taxes pursuant to Section 10.4.

"**Assumption/Cure Notice**" means the Initial Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment delivered to counterparties to Contracts with the Seller pursuant to the Bidding Procedures Order.

"**Backup Bidder**" shall have the meaning stated in the Bidding Procedures Order.

"**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

"**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

"**Base Purchase Price**" is defined in Section 3.1.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Purchased Assets shall occur, which are attached to the Bidding Procedures Order as Exhibit I.

"**Bidding Procedures Order**" shall mean the order of the Bankruptcy Court approving the Bid Procedures in the form attached hereto as Exhibit F and made part hereof.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

"**Bill of Sale**" shall mean the bill of sale to be delivered at Closing by the Seller to the Purchaser in the form attached hereto as **Exhibit C**.

"**Books and Records**" means, collectively, all documents, lists and files relating or pertaining to the Purchased Assets or the Assumed Liabilities.

"**Business**" is defined in the Recitals to this Agreement.

"**Business Day(s)**" shall mean calendar days other than Saturdays, Sundays and days on which banking institutions in Wilmington, Delaware are authorized by Law to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Claims Close Date**" is defined in Section 10.5.

"**Closing**" is defined in Section 8.1.

"**Closing Date**" is defined in Section 8.1.

"**CMS**" means the Centers for Medicare and Medicaid Services.

"**CMS Discharge Amount**" means a dollar amount agreed to by and between CMS and the Seller or, alternatively, an amount established by the Bankruptcy Court as final which amount shall be the maximum Cure Costs due on account of the Participating Provider Agreement and the maximum amount which CMS would seek to collect, by offset or otherwise, against the Purchaser on account of services rendered or amounts previously paid to Seller under the Participating Provider Agreement.

"**Continuing Residents**" means the Residents as of the Closing Date who agree to become residents training at a hospital operated by the Purchaser or an Affiliate of the Purchaser.

"**Contracts**" shall mean any agreement or contract, whether written or oral.

"**Cure Costs**" shall mean, with respect to any Assigned Contract, the amount due and owing to each non-debtor counterparty to such Assigned Contract to cure any defaults required to be cured as a condition of assumption of such Assigned Contract pursuant to Section 365(b)(1) of the Bankruptcy Code.

"**Escrow Agent**" shall mean a financial institution mutually acceptable to Seller and Purchaser.

"**Escrow Agreement**" shall mean the agreement substantially in the form attached hereto as Exhibit D.

"**Escrow Account**" is defined in Section 3.1

"**Escrow Amount**" is defined in Section 3.1

"**Excluded Assets**" shall mean all rights, benefits or property of Seller which are not Purchased Assets.

4

"**Excluded Liabilities**" shall mean, collectively, any and all liabilities of the Seller of any kind or description other than the Assumed Liabilities.

"**Final Order**"  shall mean an order, judgment or other decree as to which (a) the operation or effect has not been reversed, stayed, modified or amended, (b) no appeals or motions for reconsideration are pending, and (c) any and all appeal periods have expired.

"**GAAP**" shall mean generally accepted accounting principles in the United States, consistently applied.

"**Governmental Authorization**" means any consent, license, permit, certificate of authority, registration, franchise, right, Order or notice, qualification or similar right issued, granted, given, or required by or under the authority of any Governmental Body or pursuant to any Law.

"**Governmental Body**" means any federal, state, local, municipal, foreign or other governmental or quasi-governmental entity or authority of any nature, including the FDA and its equivalent authority or body in any foreign jurisdiction.

"**Hahnemann Programs**" is defined in Section 6.2.

"**Interests**" shall have the meaning stated in the Sale Order.

"**Knowledge of the Seller**" **and** "**to the Seller's Knowledge**" shall mean the actual knowledge of Joel Freedman, the Seller's Chief Executive Officer, or Allen Wilen, the Seller's Chief Restructuring Officer - Finance.

"**Laws**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

"**Lien**" has the meaning given to such term in the Bankruptcy Code.

"**Liquidated Cure Costs**" means all Cure Costs relating to Assigned Contracts which are allowed in a Final Order of the Bankruptcy Court.

"**Losses**" is defined in Section 10.1.

"**Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchased Assets; provided, however, that any adverse change, event, development or effect arising from or relating to any of the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been, a Material Adverse Effect: (i) the United States economy, the global economy, in each case, as a whole, or the industry or markets in which the Seller operates; (ii) the filing of the Bankruptcy Case; (iii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (iv) financial, banking, or securities markets (including any disruption thereof and any decline in

5

the price of any security or any market index); (v) changes in GAAP; (vi) changes in Law or Orders; (vii) the taking of any action contemplated by this Agreement or any of the Ancillary Documents; (viii) any "act of God," including, but not limited to, weather, natural disasters and earthquakes; (ix) changes resulting from the announcement of the execution of this Agreement or any of the transactions contemplated hereby; or (x) the termination of any Contract that is not an Assigned Contract, or the occurrence of any breach by any party of any Contract that does not relate to the Purchased Assets or the Assumed Liabilities; (xi) any adverse change to the Business prior to the date hereof;.

"**Non-Disclosure Agreement**" means any and all confidentiality agreements and/or non-disclosure agreements executed by the Purchaser as a condition to obtaining confidential and/or proprietary information from the Seller.

"**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body.

"**Ordinary Course of Business**" means the ordinary course of the Seller's Business consistent with past practice.

"**Outside Closing Date**" shall mean September 6, 2019 or such other date as Seller and Purchaser may agree.

"**Participating Provider Agreement**" means the Participating Provider Agreement with the Centers for Medicare and Medicaid Services between the Seller and CMS related to Hahnemann University Hospital.

"**Permitted Escrow Withdrawals**" is defined in Section 3.1.

"**Person**" shall mean any individual, corporation, Governmental Body, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

"**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body.

"**Purchased Assets**" shall mean the assets of Seller identified on Exhibit A..

"**Purchaser Indemnified Party**" is defined in Section 10.1.

"**Purchaser Material Adverse Effect**" means any event, circumstance, change, occurrence or effect that, individually or in the aggregate, has a material and adverse effect upon the Purchaser.

"**Related Person**" (i) with respect to a Person who is an individual, shall mean, (a) any other individual having a relationship with such specified individual (by blood, marriage or adoption) of grandparent, parent, child, grandchild, aunt, uncle, niece, nephew, sister, brother or

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

first cousin (collectively, "**Relatives**"), (b) any Person that is controlled by such individual or any one or more members of such individual's Relatives; and (c) any Person with respect to which such individual or one or more members of such individual's Relatives serves as a director, officer, partner, or trustee (or in a similar capacity); and (ii) with respect to a specified Person other than an individual, shall mean (a) any Affiliate of such specified Person; and (b) each Person that serves as a director, officer, partner, or trustee (or in a similar capacity) of such specified Person.

"**Representative**" shall mean, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Notification**" is defined in Section 6.3.

"**Residents**" means the medical residents and fellows training at Hahnemann University Hospital.

"**Sale Motion**" shall mean that certain motion filed by the Seller in the Bankruptcy Case on July 9, 2019 (D.I. 142) pursuant to which, among other things, the Seller requested an order (a) approving the Bid Procedures, (b) approving procedures relating to the assumption and assignment of executory contracts, including procedures for establishing Cure Costs, (c) establishing a date for an auction, and (d) scheduling a sale hearing.

"**Sale Order**" shall mean an Order of the Bankruptcy Court pursuant to the Bankruptcy Code approving this Agreement and the transactions contemplated hereby substantially in the form attached hereto as <u>Exhibit E</u> and made part hereof.

"**Seller Disclosure Letter**" is defined in Article IV.

"**Seller Indemnified Party**" is defined in Section 10.2.

"**SSG**" means SSG Capital Advisors, LLC.

"**Tail Coverage Costs**" shall mean shall mean the cost to Seller of purchasing and maintaining the Tail Coverage Endorsement.

"**Tail Coverage Endorsement**" shall mean a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital.  Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars $1,500,000) annual aggregate for each MCARE eligible Resident only.

"**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

"**Tower GME Affiliation Agreement**" shall mean the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between Seller and Purchaser (or an affiliate of Purchaser).

"**Transfer Taxes**" is defined in Section 10.14(a).

## ARTICLE II.
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

**2.1  Agreement to Sell and Purchase Purchased Assets.**  On the Closing Date, subject to the performance by the Parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, the Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, the Purchased Assets, free and clear of all Interests other than Assumed Liabilities, to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**2.2  Assumed Liabilities/Excluded Liabilities**.  On the Closing Date, the Purchaser shall assume and become responsible for, and shall pay, perform, fulfill and discharge, all of the Assumed Liabilities.  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any of the Excluded Liabilities, all of which shall remain the sole responsibility and obligation of the Seller.

**2.3  Assigned Contracts.**  The Purchaser is not assuming and will have no obligation to assume, perform, or discharge any Contracts, all of which shall remain the sole responsibility and obligation of the Seller, except for the Assigned Contracts.  As to the Assigned Contracts:

(a)  At Closing, Seller shall assign to Purchaser, and Purchaser shall assume, all of the Assigned Contracts and Purchaser shall pay to the applicable counterparty the Cure Costs as and when such Cure Costs become Liquidated Cure Costs.

(b)  Purchaser shall provide promptly any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Purchaser's capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.

**2.4  Competing Transactions; Bankruptcy Court Approval.**  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids pursuant to the Bidding Procedures Order and the Bid Procedures approved thereby (each, a "**Competing Bid**").  Until the transactions contemplated by this Agreement are consummated, Seller may perform any and all other acts related to seeking a Competing Bid as provided under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including but not limited to  supplying information relating to the Purchased Assets to prospective purchasers.

## ARTICLE III.
## PURCHASE PRICE

**3.1  Purchase Price.**  The Purchase Price shall be Fifty Million Dollars ($50,000,000), subject to upward adjustment pursuant to Section 3.2(d) hereof ( the "<u>Base Purchase Price</u>") and

subject to the following sentence, shall be paid in cash at Closing subject to the purchase price adjustments of (a) Five Hundred Thousand Dollars ($500,000), which was paid by Purchaser to Seller on June 28, 2019 as consideration for the Tower GME Affiliation Agreement, that shall be credited against the Base Purchase Price and (b) Two Hundred Twenty-Five Thousand Dollars ($225,000) for the break-up fee.  In addition, an amount (the "Escrow Amount") equal to Three Million Dollars ($3,000,000) minus Liquidated Cure Costs paid by Purchaser on the Closing Date will be withheld from the Base Purchase Price and placed into a non-interest bearing escrow account (the "Escrow Account") held by the Escrow Agent pursuant to the Escrow Agreement. The Escrow Amount shall be distributed to Purchaser from time to time in accordance with the Escrow Agreement to cover the following losses, damages and expenses (collectively, the "Permitted Escrow Withdrawals"): (a) the CMS Discharge Amount, as and when liquidated, (b) the Cure Costs not paid on the Closing Date and not included in the CMS Discharge Amount, and (c) the Losses payable to a Purchaser Indemnified Party.  To the extent that there are any funds remaining in the Escrow Account on the date that is the one-year anniversary of the Closing Date, such remaining funds minus any then pending written claims asserted by Purchaser for Permitted Escrow Withdrawals (whether or not disputed) shall be distributed to Seller in accordance with the Escrow Agreement without any further action being required on the part of Purchaser. Upon resolution of any Permitted Escrow Withdrawals pending as of the one-year anniversary of the Closing Date, (x) any amounts determined to be owing to Purchaser shall be distributed to Purchaser, and (y) any amounts determined not to be owing to Purchaser shall be distributed to Seller.

**3.2  Payment of Base Purchase Price.** At Closing, the Base Purchase Price shall be payable by Purchaser as follows:

(a)  Purchaser shall deposit the Escrow Amount into the Escrow Account pursuant to and in accordance with the Escrow Agreement.

(b)  Purchaser shall pay Liquidated Cure Costs as of the Closing Date.

(c)  Purchaser shall pay to the Seller the Forty-Six Million, Two Hundred Seventy-Five Thousand Dollars ($46,275,000) balance of the Base Purchase Price by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller prior to the Closing.

(d)  Purchaser shall reimburse Seller for the Tail Coverage Cost actually paid by Seller to purchase the Tail Coverage Endorsement, up to a maximum of One Million Dollars ($1,000,000).

**3.3  Tax Allocation of Base Purchase Price.**  The Base Purchase Price shall be allocated among the Purchased Assets in accordance with the IRS Form 8594, Asset Acquisition Statement Under Section 1060 as agreed by the respective accountants of Purchaser and Seller within a reasonable period of time after Closing in good faith consistent in all respects with applicable Laws.  The Seller and the Purchaser shall file their respective Tax returns in accordance with such allocation and shall not take any position inconsistent with such allocation, unless the Seller or the Purchaser, as the case may be, reasonably determines (and notifies the other Party) that such allocation is contrary to applicable Law.

9

# ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the disclosure letter delivered by the Seller to the Purchaser on the date hereof (the "**Seller Disclosure Letter**"), the Seller represents and warrants to the Purchaser as follows:

**4.1  Organization.**  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business as a foreign corporation and is in good standing in each other jurisdiction where the operation of the Business by the Seller requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**4.2  Power and Authority.**  Upon entry of and subject to the Sale Order, Seller shall have all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Seller.  Upon entry of and subject to the Sale Order, this Agreement shall constitute a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

**4.3  Non-contravention.**  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery of this Agreement or any other Ancillary Document to which the Seller is a party, and the performance by the Seller of its obligations hereunder and thereunder, will not (i) violate any provision of the organizational documents of the Seller, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or breach (or give rise to any right of termination, amendment, cancellation or acceleration) under any Assigned Contract, (iii) to Seller's Knowledge, violate in any material respect any Law or Order applicable to the Business or the Purchased Assets, or (iv) result in the imposition of any Lien on the Purchased Assets.

**4.4  Consents.**  Upon entry of the Sale Order and upon each regulatory approval to which Section 7.1(c) of this Agreement relates having been obtained, no approval, consent or authorization of, or declaration, filing or registration with or any notification to any Governmental Body or any other third Person is required in connection with the execution, delivery or performance by the Seller of this Agreement or the consummation by the Seller of the transactions contemplated hereby.

**4.5  Liabilities.**  The Seller has no Liabilities with respect to the Purchased Assets for which the Purchaser will be responsible after Closing except for any Assumed Liabilities assumed by the Purchaser.

**4.6  Title.**  The Seller has good and marketable title to all of the Purchased Assets, free and clear of all Interests other than Interests which will be divested from the Purchased Assets by the Sale Order.  Upon the completion of the transactions contemplated hereby, the Purchaser will be vested with good and marketable title to the Purchased Assets, free and clear of all Interests other than Assumed Liabilities.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

**4.**7  **Litigation.**  There are no Proceedings pending, or to the Seller's Knowledge, threatened against the Purchased Assets or Business, at Law or in equity, or before any Governmental Body which will interfere with the ownership or use by the Purchaser of the Purchased Assets after the Closing.

**4.8  Proceedings.**  There is no Proceeding pending that challenges, or that is reasonably likely to have the effect of preventing, delaying or rendering illegal any of the transactions contemplated by this Agreement.

**4.9  Tax Matters.** There are no Tax Liens or Encumbrances for Taxes upon the Purchased Assets and as of the end of the day on the Closing Date there will be no such Tax Liens or Encumbrances.  There is not and, as of the end of the day on the Closing Date there will not be, any liability for Taxes affecting the Purchased Assets for which the Purchaser will at any time have any liability for payment

**4.10  Brokers and Finders.**  Other than SSG, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller. Seller will be solely responsible for any fee, commission or other consideration of any kind due to SSG on account of the transactions contemplated by this Agreement.

**4.11  Tail Coverage**. Seller shall be solely responsible for purchasing and maintaining the Tail Coverage Endorsement and shall incur all costs associated with the same, except as provided in Section 3.2(d).

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER.

The Purchaser represents and warrants to the Seller as follows.

**5.1  Organization.**  The Purchaser is a nonprofit corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has all requisite power and authority to conduct its business and own and operate its properties.

**5.2  Power and Authority.**

(a)  The Purchaser has all requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by the Purchaser.  This Agreement is a valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(b)  To the extent that this Agreement or any of the Ancillary Documents provides that any Affiliate of the Purchaser makes any covenant or undertakes the payment or performance of any obligation in connection with the transactions contemplated hereunder or thereunder, such Affiliate has all requisite power and authority to enter into the transactions contemplated hereby and thereby.

11

**5.3 Non-contravention.** Neither the execution and delivery of this Agreement or any other Ancillary Document to which the Purchaser is a party, will (i) violate any provision of the organizational documents of the Purchaser, or (ii) violate any Law or Order applicable to the Purchaser.

**5.4 No Proceedings.** There are no actions, suits or proceedings pending, or to the actual knowledge of Purchaser, threatened, before or by any Governmental Body, against Purchaser which would affect Purchaser's ability to proceed with the transactions contemplated by this Agreement.

**5.5 Consents.** No consent, waiver, authorization or approval of any person or declaration, filing or registration with any Governmental Body or other Person is required in connection with the execution and delivery by Purchaser of this Agreement or the performance by Purchaser or its Affiliates of its respective obligations hereunder or thereunder.

**5.6 Bankruptcy Matters**. Purchaser is capable of satisfying the adequate assurance of future performance conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to each Assigned Contract.

**5.7 Financing.** Purchaser has readily-available cash on hand, availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Base Purchase Price at Closing.

**5.8 Purchaser's Hospital Facilities**. Purchaser owns and operates six Medicare-participating hospitals located within 60 miles of Hahnemann University Hospital's facility, all of which have the capacity to operate medical residency programs.

**5.9 Certain Relationships**. Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser is an officer or director of the Seller or a Related Person of any officer, director or key employee of the Seller. Neither the Purchaser nor any officer, director, manager, member, Representative or Affiliate of the Purchaser has entered into any Contract with any officer, director or key employee of the Seller.

**5.10 Brokers and Finders.** No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof.

**ARTICLE VI.**

**COVENANTS OF THE PARTIES**

**6.1 Access to Information**. Subject to all Applicable Privacy and Security Laws, the Seller shall permit the Purchaser's Representatives to have, upon prior written notice, reasonable access during normal business hours and under reasonable circumstances, and in a manner so as not to interfere with the normal business operations of the Business, to the personnel, books, records, Assigned Contracts, and documents of or pertaining to the Purchased Assets; provided, that the Seller may restrict the foregoing access to the extent that in the reasonable judgment of the Seller, any Law applicable to the Seller requires it to restrict access to any of its business,

12

properties, information or personnel; and provided, further, that such access shall not unreasonably disrupt the operations of the Seller or the Business.

**6.2  Conduct of the Business**.  From the date hereof until the Closing Date, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), and subject in all respects to the Bankruptcy Code and orders of the Bankruptcy Court (including, without limitation, the Sale Order), the Seller shall use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at Hahnemann University Hospital (the "**Hahnemann Programs**"). Seller and Purchaser shall work cooperatively to determine clinical rotation assignments for Residents, with such mutually-agreed assignments to commence as soon as practicable after the Purchase Agreement is entered into. For the avoidance of doubt, neither the existence of this Agreement nor any provisions set forth herein shall restrict Seller from agreeing to release the related cap on Medicare reimbursement on a temporary basis for those Residents who elect not to become Continuing Residents.

**6.3  Notification of Certain Matters.**  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "**Required Notification**"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

**6.4  Cooperation**.  Subject in all respects to the Bankruptcy Code and the Bankruptcy Cases, the Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth in **Article VII** and to consummate the transactions contemplated hereby as promptly as practicable, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.

**6.5  Records Retention and Access**.  For a period of six (6) years following the Closing or such shorter period that records are required to be retained by applicable Law (but in no event less than three (3) years), Purchaser shall at Seller's  expense furnish to the Seller, to the extent in Purchaser's possession and following receipt of a reasonable, written request therefor, information that is necessary for Seller to prepare for, prosecute or defend against any Proceeding related to the Business, to validate claims filed in the Bankruptcy Case and/ or to enable Seller and its Representatives to prepare, complete and file all required federal, state and local Tax returns in accordance with applicable Law.

**6.6  Cure Costs.** Seller shall not agree to the amount of any Liquidated Cure Costs without the written consent of Purchaser.  From and after the Closing Date, Purchaser shall have the sole right to contest and settle any claims for Cure Costs and, to the extent necessary and

permitted by the Bankruptcy Court, Seller shall cooperate in substituting Purchaser for Seller (at Purchaser's expense) in connection with any pending objections to Cure Costs.

**6.7  Bid Procedures.** Seller shall not modify the Bid Procedures without the consent of Purchaser.

**6.8  Covenants of Purchaser Regarding Transition and Accommodation of Residents**.

(a)  Purchaser will accommodate a maximum of 583 Continuing Residents to pursue continued medical residency training at Purchaser-owned hospitals.  If requested by Purchaser, Seller shall take all reasonable actions to reflect its consent to the transfer of Continuing Residents to Purchaser.  For any Resident who does not become a Continuing Resident and elects to pursue their training at hospitals that are not owned by Purchaser, Purchaser agrees to release the GME cap associated with Medicare reimbursement for such Residents on a temporary basis to the hospital where the Resident transfers until the Resident has completed training.

(b)  If the Continuing Residents are required to relocate their personal residence to continue their training with Purchaser, Purchaser shall provide reasonable private housing for such residents for the longer of the remainder of the current academic year or for the duration of a Resident's existing vacated lease. The provision of reasonable private housing shall not extend beyond the Resident's completion of his or her residency training with Purchaser

(c)  Purchaser shall use reasonable efforts to transfer Seller's residency program faculty to its hospitals so that they can continue to provide education to Residents.

(d)  Purchaser shall provide Continuing Residents with free meals during the time that they are training at Purchaser hospitals.

(e)  Purchaser shall provide additional transition resources to Continuing Residents as may be requested by Seller from time to time.

(f)  The parties shall cooperate in determining the initial clinical rotation assignments for Continuing Residents for the period following the transfer.

**6.9  Covenants of Purchaser Regarding Continued Affiliation with St. Christopher's Hospital for Children**.  For the period of ten (10 years after the Closing with automatic renewals for periods of five (5) years, provided that at the time of each such renewal such resident caps are used for resident training at STC only, unless either party gives not less than one hundred eighty (180) days' notice, Purchaser agrees to, and to cause any successor or assignee of any Purchased Assets to agree to: (i) enter into an agreement to continue participating in a "Medicare GME affiliated group" as that term is defined in 42 C.F.R. 413.75(b), with St. Christopher's Hospital for Children ("**STC**"), whereby Purchaser will continue sharing full-time equivalent resident caps for direct graduate medical education with STC; (ii) accept assignment of the Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 between STC and Seller (the "**STC GME Affiliation Agreement**") or enter into a new GME affiliation agreement substantially in the form of the STC GME Affiliation Agreement; and (iii) ensure that it and STC participate in a "shared rotation agreement" each academic year..

14

**6.10  Covenants of Purchaser Regarding Other GME Affiliation Agreements**.

(a)  For the remainder of the academic year during which the Closing occurs, Purchaser shall accept assignment from Seller of the GME Affiliation Agreements identified listed as numbered items 1, 2 and 4 (but not 3) under the heading Current GME Affiliation Agreements on Schedule A-1 to Exhibit A of this Agreement (the "**Current GME Affiliation Agreements**") (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(a) being included as "Cure Costs" for purposes of this Agreement) or enter into new GME affiliation agreements with those counterparties substantially in the form of the Current GME Affiliation Agreements; and

(b)  Purchaser shall, subject to Purchaser's completion of due diligence, accept assignment of the agreements identified under the heading GME Obligations on Schedule A-1 to Exhibit A of this Agreement to participate in "Medicare GME affiliated groups" and fulfill the obligations thereunder arising after the Closing Date for the duration of the term of such agreements (with any cure amounts with respect to any agreements assumed pursuant to this Section 6.10(b) being included as "Cure Costs" for purposes of this Agreement).

**6.11  Covenant of Seller Regarding Tail Coverage Endorsement for Residents**.  At or prior to Closing, Seller shall obtain the Tail Coverage Endorsement.

## ARTICLE VII.
## CONDITIONS TO CLOSING

**7.1  Conditions to Obligations of Each Party.**  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)  Proceedings; Orders.  No Governmental Body of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that (i) is in effect and (ii) has the effect of making the transactions contemplated hereby illegal or otherwise prohibiting consummation of such transactions.

(b)  Sale Order.  The Bankruptcy Court shall have entered the Sale Order with such changes as are mutually agreed to by the Seller and Purchaser, each in the exercise of its respective sole discretion.

(c)  Regulatory Approvals.  CMS, the Pennsylvania Department of Health ("**DOH**") and the Accreditation Council for Graduate Medical Education ("**ACGME**") and any other applicable regulatory authority or Governmental Body, in each case to the extent required, shall have consented to the transactions contemplated by this Agreement and, solely with respect to CMS, shall have provided confirmation, in form and substance satisfactory to Purchaser in its sole discretion, that the transactions contemplated herein will result in a permanent (subject to statutory or regulatory changes that may in the future affect teaching hospitals generally) increase in Purchaser's residency slot cap by the full amount of Seller's residency slot cap.

(d)  CMS Discharge Amount. Any order setting the CMS Discharge Amount shall have become a Final Order.

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

**7.2**     **Additional Conditions to Obligations of the Purchaser.** The obligations of the Purchaser to effect the transactions contemplated hereby are subject to satisfaction or waiver of the following additional conditions:

(a)     <u>Representations and Warranties</u>. The representations and warranties of the Seller set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>. The Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     <u>Documents</u>. All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to Section 8.2 of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

(d)     <u>Successor Liability</u>. Entry of an Order of the Bankruptcy Court, which may be the Sale Order, which precludes the assertion of any successor, vicarious, or transferee liability (by piercing the corporate veil or otherwise) against the Purchaser, relating to claims, administrative proceedings or actions brought by or on behalf of any Government Body, accrediting body, or other third party relating to the operation of the Business prior to Closing. For avoidance of doubt, nothing in this paragraph is intended, nor shall it be construed, to preclude the collection of the CMS Discharge Amount from the Escrow Account as provided herein.

**7.3**     **Additional Conditions to Obligations of the Seller.** The obligations of the Seller to effect the transactions contemplated hereby are subject to satisfaction or waiver by the Seller of the following additional conditions:

(a)     <u>Representations and Warranties</u>. The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifications) as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Purchaser Material Adverse Effect.

(b)     <u>Agreements and Covenants</u>. The Purchaser shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(c)     <u>Documents</u>. All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to Section 8.3 of this

16

Agreement shall have been executed by the parties thereto other than the Seller and delivered to the Seller.

## ARTICLE VIII.
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

**8.1  Closing**.  The closing of the transactions contemplated hereby (the "**Closing**") shall take place at the offices of Stevens & Lee, P.C., 1818 Market St., 29th Floor, Philadelphia, PA., or such other place or remotely by mail, e-mail and/or wire transfer, in each case to the extent acceptable to each of the Parties, as soon as practicable following the satisfaction or waiver of the conditions set forth in **Article VII** hereof and in any event within three (3) Business Days thereafter (the "**Closing Date**").  The Closing shall be deemed to have occurred at 12:01 a.m., Eastern Standard Time, on the Closing Date.

**8.2  Deliveries by the Seller at the Closing.**  At the Closing, Seller shall furnish and deliver to the Purchaser the following:

(a)  the Bill of Sale, duly executed by the Seller;

(b)  the Assignment and Assumption Agreement, duly executed by the Seller;

(c)  a certificate, dated as of the Closing Date and signed the Seller, certifying that each of the conditions set forth in **Sections 7.2(a)** and **7.2(b)** have been satisfied;

(d)  a copy of the Sale Order;

(e)  evidence of satisfaction of Section 6.11; and

(f)  all other certificates, instruments and documents reasonably required to be delivered by the Seller pursuant to this Agreement or any of the Ancillary Documents.

**8.3  Deliveries by the Purchaser at the Closing.**  At the Closing, Purchaser shall furnish and deliver to Seller the following:

(a)  the Forty-Six Million, Two Hundred Seventy-Five Thousand Dollar ($46,275,000) portion of the Base Purchase Price in excess of the Escrow Amount and the Liquidated Cure Costs by wire transfer of immediately available funds to an account designated in writing by the Seller;

(b)  reimbursement of up to One Million Dollars ($1,000,000) of Tail Coverage Costs as provided in Section 3.2(d);

(c)  the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)  a certificate, dated as of the Closing Date and signed the Purchaser, certifying that each of the conditions set forth in **Sections 7.3(a)** and **7.3(b)** have been satisfied; and

(e)  evidence of satisfaction of Section 6.9;

17

(f)  evidence of satisfaction of Section 6.10; and

(g)  all other certificates, instruments and documents required to be delivered by the Purchaser pursuant to this Agreement or any of the Ancillary Documents.

**8.4  Additional Actions Taken by the Purchaser at the Closing.**  At the Closing, Purchaser shall take the following actions:

(a)  Pay the Liquidated Cure Costs from the Base Purchase Price to the respective Persons entitled to receive them.

(b)  Fulfill its covenants under Sections 6.8, 6.9 and 6.10 of this Agreement.

**ARTICLE IX.**
**TERMINATION**

**9.1      Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)  By mutual written consent of the Seller and the Purchaser;

(b)  By (i) the Seller if, as of the day after the Outside Closing Date, any condition to the obligation of the Seller to close has not been satisfied, provided, however, that if the Closing has not occurred on or before the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Seller, then Seller may not terminate this Agreement pursuant to this Section 9.1(b), and (ii) the Purchaser if, as of the day after the Outside Closing Date, any condition to the obligation of the Purchaser to close has not been satisfied provided, however, that if the Closing has not occurred on or before the after the Outside Closing Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser, then the Purchaser may not terminate this Agreement pursuant to this Section 9.1(b);

(c)  By Purchaser, in its sole and absolute discretion, if the sum of the (i) CMS Discharge Amount, and (ii) without duplication of the CMS Discharge Amount, (A) the Liquidated Cure Costs, and (B) the good faith estimate by Purchaser of the amount of any Cure Costs related to Assigned Contracts which will become Liquidated Cure Costs after the Closing Date, exceeds Three Million Dollars ($3,000,000);

(d)  Automatically, and without further action by any Party, upon the issuance of a Final Order to restrain, enjoin or otherwise prohibit the closing of the transactions contemplated hereby, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(e)  Automatically, and without further action by any Party, if the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or is dismissed, provided that neither the Seller nor the Purchaser shall take any action to support entry of such an order;

(f)  By the Purchaser, if the Purchaser is not in material breach of its obligations under this Agreement, and if (i) the Seller fails to close on the Closing Date notwithstanding the

18

satisfaction of all conditions to the obligation of the Seller to close (other than conditions related to deliveries to be made at Closing by the Purchaser provided the Purchaser is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Seller herein become untrue or inaccurate such that the condition set forth Section 7.2(a) would not be satisfied or (iii) there has been a breach on the part of the Seller of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.2(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Seller;

(g)  By the Seller, if the Seller is not in material breach of its obligations under this Agreement, and if (i)  the Purchaser fails to close on the Closing Date notwithstanding the satisfaction of all conditions to the obligation of the Purchaser to close (other than conditions related to deliveries to be made at Closing by the Seller provided the Seller is ready, willing and able to make such deliveries as of the Closing Date), (ii) any of the representations and warranties of the Purchaser herein become untrue or inaccurate such that the condition set forth in Section 7.3(a) would not be satisfied or (iii) there has been a breach on the part of the Purchaser of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 7.3(b) would not be satisfied, and, in the case of clauses (ii) and (iii) hereof, such breach (if curable) has not been cured within ten (10) days after written notice thereof to the Purchaser;

(h)  Automatically, and without further action by any Party, upon the earlier of (A) Closing with the Successful Bidder, and (B) the Outside Closing Date.

**9.2** .**Effect of Termination.**  Except as provided in this Section 9.2, in the event of the termination of this Agreement pursuant to Section 9.1, this Agreement (other than this Section 9.2, which shall survive such termination) will forthwith become void, and there will be no liability on the part of any Party to the other and all rights and obligations of any Party will cease, except that nothing herein shall relieve any Party from liability for any intentional and material breach of this Agreement.

## ARTICLE X.
## INDEMNITY

**10.1  Indemnification by Seller**.

(a)  Subject to this Article X and consummation of the Closing, Seller shall, indemnify, defend and hold harmless Purchaser and Purchaser's officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each, a "Purchaser Indemnified Party") against and in respect of any and all out-of-pocket losses, documented and reasonable costs and expenses (including, without limitation, documented and reasonable costs of investigation and defense and reasonable attorneys' fees), claims, damages, obligations, or liabilities, whether or not involving a third party claim, but only after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Purchaser Indemnified Party in respect of any such claim (collectively, "Losses"), arising out of, based upon or otherwise in respect of:

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

(i)  any inaccuracy in or breach of any representation or warranty of Seller made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Purchaser by Seller pursuant to this Agreement (determined in each case without regard to any qualification with respect to materiality, Material Adverse Effect or similar qualification); provided, that the Seller shall not have any liability under this clause (i) (other than with respect any intentional fraud on the part of Seller) unless the aggregate of all Losses asserted under this clause (i) for which Seller would, but for this proviso and but for the $25,000 per claim deductible described below, be liable exceeds on a cumulative basis an amount equal to Two Hundred Thousand Dollars ($200,000.00);

(ii)  any nonfulfillment or breach of any covenant or agreement by Seller under this Agreement or any of the Schedules attached hereto;

(iii)  any Liability or obligation of Seller which is an Excluded Liability; and

(iv)  the ownership of any of the Excluded Assets by Seller after the Closing Date.

(b)  Each Purchaser Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(c)  **NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS TO THE CONTRARY, SELLER WILL NOT BE LIABLE FOR ANY LOSS ASSERTED UNDER  SECTION 10.1(a)(i) UNLESS THE CUMULATIVE LOSSES EXCEED $25,000 IN WHICH CASE SELLER WILL, SUBJECT TO THE OTHER LIMITATIONS IN THIS ARTICLE X, BE LIABLE TO INDEMNIFY THE PURCHASER INDEMNIFIED PARTY ONLY FOR THE EXCESS OVER $25,000; AND THE SOLE REMEDY OF ANY PURCHASER INDEMNIFIED PARTY AGAINST SELLER UNDER THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS FOR MONETARY DAMAGES, INCLUDING, WITHOUT LIMITATION, COSTS OF INVESTIGATION AND DEFENSE AND ATTORNEYS' FEES, SHALL BE A TIMELY CLAIM BY PURCHASER PURSUANT TO THE ESCROW AGREEMENT, AND LIMITED TO THE ESCROW AMOUNT.**

**10.2   Indemnification by Purchaser**. Subject to this Article X and consummation of the Closing, Purchaser shall indemnify, defend and hold harmless Seller, Seller's present, former, and future officers, directors, trustees, members, employees, agents, Representatives and Affiliates (each a, "**Seller Indemnified Party**"), against and in respect of any and all Losses arising out of, based upon or otherwise in respect of:

(a)  any inaccuracy in or breach of any representation or warranty of  Purchaser made in or under this Agreement or any of the Schedules attached hereto, or in any of the certificates or other instruments or documents furnished to Seller by Purchaser pursuant to this Agreement; provided, that the Purchaser shall not have any liability under this clause (a) of Section 10.2 unless the  claims asserted under this clause (a) involves Losses in excess of Twenty-Five

Thousand Dollars ($25,000), at which time Purchaser shall be liable for the full amount of all such Losses in excess of Twenty-Five Thousand Dollars ($25,000.00);

(b)  any nonfulfillment or breach of any covenant or agreement by Purchaser under this Agreement or any of the Schedules attached hereto; and

(c)  any of the Assumed Liabilities pursuant to this Agreement.

Each Seller Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would reasonably be expected to, or does, give rise thereto including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

**10.3  Indemnification Procedures**.

(a)  Within forty five (45) days after receipt by an indemnified party of written notice of the commencement of any Proceeding against it to which the indemnification in this <u>Article X</u> relates, such indemnified party shall, if a claim is to be made against an indemnifying party under this <u>Article X</u>, give notice to the indemnifying party of the commencement of such Proceeding.

(b)  If any Proceeding referred to in paragraph (a) above is brought against a Seller Indemnified Party and it gives notice to Purchaser of the commencement of such Proceeding, Purchaser will be entitled to participate in such Proceeding and, to the extent that it wishes, assume the defense of such Proceeding with counsel reasonably satisfactory to such Seller Indemnified Party and, after notice from Purchaser to such Seller Indemnified Party of its election to assume the defense of such Proceeding, Purchaser will not, as long as it diligently conducts such defense, be liable to such Seller Indemnified Party under this Article X for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by such Seller Indemnified Party in connection with the defense of such Proceeding subject to the limitations contained in Section 10.1 hereof, other than reasonable costs of investigation.  If Purchaser assumes the defense of a Proceeding, (A) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; and (B) no compromise or settlement of such claims may be effected by Purchaser without such Seller Indemnified Party's consent unless (1) there is no finding or admission of any violation of law by such Seller Indemnified Party (or any Affiliate thereof) or any violation of the rights of any Person and no effect on any other claims that may be made against such Seller Indemnified Party, and (2) the sole relief provided is monetary damages that are paid in full by Purchaser.  Such Seller Indemnified Party will have no liability with respect to any compromise or settlement of the claims underlying such Proceeding effected without its consent.  If notice is given to Purchaser by a Seller Indemnified Party of the commencement of any Proceeding for which such Seller Indemnified Party seeks indemnification hereunder and Purchaser does not, within ten (10) days after such notice is received, give notice to such Seller Indemnified Party of Purchaser's election to assume the defense of such Proceeding, Purchaser will be bound by any determination made in such Proceeding or any compromise or settlement effected by such Seller Indemnified Party.

(c)  If any Proceeding referred to in paragraph (a) above is brought against a Purchaser Indemnified Party, Seller shall be entitled to participate in such Proceeding at its own expense.  However, such Purchaser Indemnified Party shall, in all respects, control the defense and settlement of such Proceeding and Seller shall be liable for all fees and expenses incurred by such Purchaser Indemnified Party and for any liability established by any order of a Governmental Body of competent jurisdiction and for any liability established by any settlement or compromise agreed to by such Purchaser Indemnified Party, in the exercise of its reasonable discretion.

**10.4  Other Claims**.  A claim for any matter not involving a third party claim may be asserted by written notice to the Party from whom indemnification is sought.

**10.5  Seller Indemnification Claim Period**.  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Seller, no claim for indemnification pursuant to Section 10.1 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 which reasonably describes the claim, the basis therefor, and if possible with the exercise of reasonable diligence, the Purchaser Indemnified Party's reasonably-supported estimate of the Losses being asserted, is delivered to Seller on or before the close of business on the day preceding the first (1st) anniversary of the Closing Date (the "**Claims Close Date**") in which case the indemnity with respect to that Loss shall survive the Claims Close Date (but continue to be limited to the funds held in the Escrow Account).  For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.6  Purchaser Indemnification Claim Period**.  Except as may otherwise expressly be provided in this Agreement and in the absence of intentional fraud or willful misrepresentation by Purchaser, no claim for indemnification pursuant to Section 10.2 shall be made unless a claim arises and written notice pursuant to Section 10.3 or Section 10.4 is delivered to Purchaser on or before the Claims Close Date. For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief not involving the payment of money to which the Seller or any Seller Indemnified Party may be entitled.

**10.7  Payment from Indemnification Escrow**.  If a Purchaser Indemnified Party becomes entitled to indemnification from Seller hereunder, such Purchaser Indemnified Party shall be entitled to receive the amount of Losses in cash from the Escrow Account in accordance with the Escrow Agreement, and the recovery of the Purchaser Indemnified Parties shall be limited to such recoveries from the Escrow Account. For the avoidance of doubt, nothing herein is intended to limit any rights to equitable relief to which the Purchaser or any Purchaser Indemnified Party may be entitled.

**10.8  Miscellaneous Indemnification Provisions**.  Disclosures made after the date hereof and any knowledge that is acquired about the accuracy or inaccuracy of or compliance with any representation, warranty, covenant or obligation set forth herein shall not in any manner affect rights to indemnification hereunder based on any such representation, warranty, covenant, or obligation.  The waiver of any condition based on the accuracy of any representation or warranty, or compliance with any covenant or obligation, will not affect any right to

22

indemnification based on such representations, warranties, covenants and obligations unless otherwise expressly agreed in writing by the party or parties entitled to the benefit thereto.

## ARTICLE XI.
## MISCELLANEOUS

**11.1  Expiration of Representations, Warranties and Agreements.**  The representations and  warranties and covenants made by Seller and Purchaser in this Agreement and in any Ancillary Document delivered pursuant to this Agreement shall survive beyond the Closing Date.

**11.2  Assignment.**  Neither this Agreement nor any interest herein may be assigned or transferred by either Party to any other Person without the prior written consent of the other Party, which consent may be given or withheld in the sole discretion of such other Party provided, however, Purchaser may assign at Closing its rights, but not its obligations, hereunder to any Affiliate of Purchaser.

**11.3  Notices.**  All notices, requests and other communications under this Agreement shall be in writing and shall be either (a) delivered in person, (b) sent by certified mail, return-receipt requested, (c) delivered by a recognized delivery service or (d) sent by facsimile transmission and addressed as follows:

| | |
|---|---|
| If intended for Purchaser: | Clint Matthews, President and CEO<br>Tower Health<br>420 N. Fifth Avenue<br>West Reading, PA 19611 |
| With a copy to: | Robert Lapowsky, Esquire<br>Stevens & Lee, P.C.<br>620 Freedom Business Center, Suite 200<br>King of Prussia, PA 19406 |
| | and |
| | Joanne Judge<br>Stevens & Lee, P.C.<br>111 North Sixth Street<br>Reading, PA 19601 |
| If intended for Seller: | Center City Healthcare, LLC |
| With a copy to: | Jeffrey Hampton<br>Adam Isenberg<br>Saul Ewing Arnstein & Lehr LLP |

23

Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided.  A notice, request and other communication shall be deemed to be duly received if delivered in person or by a recognized delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 P.M. on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 A.M. on the first Business Day thereafter.

**11.4  Further Assurances.**  Each of the Parties hereto shall execute such documents (including, without limitation, the Ancillary Documents) and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated hereby or, at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement.

**11.5  Entire Agreement; Modifications; Waivers.**  This Agreement (together with the Exhibits and Schedules hereto), the Ancillary Documents, and the Non-Disclosure Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersedes all prior understandings of the Parties with respect to the subject matter hereof and thereof.  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each Party.  No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Party making the waiver.

**11.6  Applicable Law; Jurisdiction and Venue; Jury Trial Waiver.**  THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.  The Parties agree that jurisdiction and venue for any litigation arising out of this Agreement shall be in the Bankruptcy Court; provided, however, that if at the time of commencement of any such litigation, there is no longer a pending Bankruptcy Case, jurisdiction and venue for any litigation arising out of this Agreement shall be in the courts of the State of Delaware or U.S. District Court for the District of Delaware, and the Parties each hereby waive any objections they may have with respect thereto (including any objections based upon *forum non conveniens*). **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

**11.7  Headings and Captions.**  The headings and captions in this Agreement are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent or otherwise affect the interpretation of, this Agreement or any of the provisions hereof.

**11.8  Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**11.9  Time is of the Essence.**  With respect to all provisions of this Agreement, time is of the essence.  However, if the first date or last date of any period which is set out in any provision of this Agreement falls on a day which is not a Business Day, then, in such event, the time of such period shall be extended to the next day which is a Business Day.

**11.10  Remedies Cumulative.**  Except as herein expressly set forth, no remedy conferred upon a Party by this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law, in equity or by statute.

**11.11  Interpretation and Construction.**

(a)  As used herein the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**".

(b)  As used herein, the words "**herein,**" "**hereof,**" "**hereunder**" and similar terms shall refer to this Agreement unless the context requires otherwise.

(c)  For purposes of this Agreement, whenever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural and vice versa.

**11.12  Estoppel.**  Each Party confirms and agrees that (a) it has read and understood all of the provisions of this Agreement; (b) it is familiar with major sophisticated transactions such as those contemplated by this Agreement; (c) it has negotiated with the other Party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**11.13  Joint Preparation.**  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**11.14  Expenses; Transfer Taxes.**

(a)  Except as otherwise expressly provided in this Agreement, each Party will bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel, and accountants.

25

(b)  The Purchaser and Seller shall each pay fifty (50%) percent of all sales, use, transfer, real property transfer, documentary, recording and similar Taxes and fees, and any deficiency, interest or penalty asserted with respect thereof arising out of or in connection with the transactions contemplated hereby ("**Transfer Taxes**").

**11.15  Counterparts.**  This Agreement may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

**11.16  Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

*[Signature page follows.]*

26

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first written above.

SELLER:

**CENTER CITY HEALTHCARE, LLC**

By: _____
      Allen Wilen
      Chief Restructuring Officer - Finance

PURCHASER:

**READING HOSPITAL**

By: _____
      Clint Matthews
      President and CEO
      Sole Member of Tower Health

*[Signature page to Asset Purchase Agreement]*

35620482.4 07/17/2019
35723081.3 08/13/2019
35723081.5 08/28/2019
35723081.6 09/06/2019

## **EXHIBIT A**

### **Purchased Assets**

The Purchased Assets to be purchased by the Purchaser and sold, conveyed, assigned, transferred and delivered on the Closing Date to the Purchaser by the Seller shall include all of the Seller's right, title and interest in and to all of the following assets, but specifically excluding, however, the Excluded Assets:

1. Assigned Contracts.  All of the Seller's rights and interests as of the Closing Date under or relating to the Contracts specifically identified on Schedule A-1 to this **Exhibit A**.

2. Books and Records.  All Books and Records related to the Purchased Assets, but specifically excluded any Corporate Documents.

3. Governmental Authorizations.  All transferable Governmental Authorizations identified on Schedule A-2 to this **Exhibit A**.

4. Rights; Warranty Claims.  All of Seller's rights, claims, counterclaims, credits, causes of action or rights of set-off against third parties that relate to warranties, indemnities, and all similar rights to the extent related to any Purchased Assets.

5. Other Assets.  Those other assets of the Seller identified on Schedule A-3 to this **Exhibit A**.

## Schedule A-1

**I.     Resident and Fellow Employment Agreements for those residents and fellows who elect to join Tower Health**

**II.     Current GME Affiliation Agreements**

1. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between the Trustees of the University of Pennsylvania, as the owner and operator of the Hospital of the University of Pennsylvania, and Seller.
2. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Prime Healthcare Services Roxborough, LLC, the owner and operator of Roxborough Memorial Hospital, and Seller.
3. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 among Temple University Hospital, Seller and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.
4. Medicare GME Affiliation Agreement for July 1, 2019 Through June 30, 2020 between Friends Behavioral Health System and Seller.

**III.     GME Obligations**

**Graduate Hospital/Penn**
- Agreement Regarding Medicare FTE Resident Caps, between the Trustees of the University of Pennsylvania and Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007

**Roxborough and Warminster/Solis**
- Agreement Regarding Medicare FTE Resident Caps between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007
- Second Amendment to Agreement Regarding Medicare FTE Resident Caps; between Solis Healthcare, LP and Tenet HealthSystem Hahnemann, LLC dated June 29, 2010

**St. Christopher's Hospital for Children/Temple**
- Academic Affiliation Agreement among Temple and affiliates and Tenet HealthSystem St. Christopher's Hospital For Children, LLC and affiliates dated October 19, 2007

**Hahnemann/Friends**
- Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP dated June 2008
- Memorandum of Understanding for Residency Rotation Agreement between Tenet HealthSystem Hahnemann, LLC and Friends Behavioral Health System, LP

**IV.     The Participating Provider Agreement**

**V.     The Tower GME Affiliation Agreement**

**Schedule A-2**

**Governmental Authorizations**

- **Acute Care General Hospital License for Hahnemann University Hospital ("HUH") issued by the Pennsylvania Department of Health**
- **Medicare Participation Agreement and associated Medicare Provider Number 390290 issued by the Centers for Medicare & Medicaid Services to HUH. The residents associated with the [36] ACGME-approved Graduate Medical Education Programs at HUH**

**Schedule A-3**

**Other Assets**

**None**

**Exhibit B**

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT

ASSIGNMENT, DELEGATION AND ASSUMPTION AGREEMENT ("Agreement") dated as of [_____] by and between Center City Healthcare, LLC, a Delaware limited liability company ("Assignor"), and Reading Hospital, a Pennsylvania nonprofit corporation ("Assignee").

BACKGROUND

A.  ASSIGNEE AND ASSIGNOR HAVE ENTERED INTO AN ASSET PURCHASE AGREEMENT DATED AS OF [_____] (TOGETHER WITH THE EXHIBITS AND SCHEDULES THERETO, THE "PURCHASE AGREEMENT") PROVIDING FOR, AMONG OTHER THINGS, THE SALE, TRANSFER, CONVEYANCE, ASSIGNMENT, AND DELIVERY BY ASSIGNOR TO ASSIGNEE OF CERTAIN ASSETS OF ASSIGNOR (COLLECTIVELY, THE "PURCHASED ASSETS") THAT ARE OWNED OR USED BY ASSIGNOR IN CONNECTION WITH THE BUSINESS.

B.  IN CONNECTION WITH THE SALE AND PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THE PURCHASE AGREEMENT, ASSIGNOR IS TO ASSIGN AND DELEGATE, AND ASSIGNEE IS TO ASSUME, THE ASSIGNED CONTRACTS.  CLOSING IS BEING HELD ON THE DATE HEREOF UNDER THE PURCHASE AGREEMENT.

NOW, THEREFORE, pursuant to and in consideration of the Purchase Agreement and the mutual covenants and agreements set forth therein and herein, Assignor and Assignee, each intending to be legally bound, agree as follows:

1.  Incorporation of Background; Defined Terms.  The Background provisions set forth above (including, without limitation, all of the defined terms set forth therein) are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety in this Section 1.  Capitalized terms used herein which are not otherwise defined shall have the respective meanings assigned to them in the Purchase Agreement.

2.  Assignment of Rights.  Assignor hereby sells, transfers, conveys, and assigns to Assignee all of Assignor's right, title and interest in, to and under all of the Assigned Contracts, each of which are identified on Schedule 1 attached hereto.

3.  Delegation of Duties.  Assignor hereby delegates to Assignee all of Assignor's duties and liabilities under the Assigned Contracts.

4.  Assumption of Liabilities.  In partial consideration for the sale of the Purchased Assets by Assignor pursuant to the Purchase Agreement, Assignee hereby undertakes and agrees to assume, discharge, or perform as the case may be, all duties, obligations, and liabilities of Assignor under the Assigned Contracts which are to be performed after, and relate to the period after, the date hereof or which are otherwise assigned to and assumed by the Purchaser under or pursuant to the Purchase Agreement or the Sale Order.

5.  <u>Assignment of Governmental Authorizations; Etc</u>.  Assignor hereby assigns, sells, transfers, and sets over to Assignee all of Assignor's right, title and interest in, to, and under all of the Governmental Authorizations which are listed on <u>Schedule 2</u> attached hereto, but only to the extent that any of the foregoing may be legally sold, transferred, conveyed, assigned and delivered by Assignor to Assignee without any action by any such applicable federal, state, or local government or regulatory body.

6.  <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the domestic, internal laws of the State of Delaware, without regard to its rules pertaining to the conflict of laws.

8.  <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  Any party to this Agreement may deliver an executed counterpart hereof by facsimile transmission or electronic mail (as a Portable Document Format (PDF) file) to the other party hereto and any such delivery shall have the same force and effect as the manual delivery of an original executed counterpart of this Agreement.

***Remainder of Page Intentionally Left Blank***
***Signature Page Follows***

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers the day and year first above written.

CENTER CITY HEALTHCARE, LLC

By _____

     Allen Wilen
     Chief Restructuring Officer - Finance
"Assignor"

READING HOSPITAL

By _____

     Clint Matthews
     President and CEO of Tower Health
     Sole Member of Reading Hospital

     "Assignee"

SCHEDULE 1

ASSIGNED CONTRACTS

## SCHEDULE 2

## ASSIGNED GOVERNMENTAL AUTHORIZATIONS

## EXHIBIT C

## BILL OF SALE

**_____ __, 2019**

KNOW ALL BY THESE PRESENTS that CENTER CITY  HEALTHCARE, LLC, a Delaware limited liability company (the "Seller"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, has granted, bargained, sold, conveyed, transferred, assigned and delivered, and by this Bill of Sale hereby grants, bargains, sells, conveys, transfers, assigns and delivers, to Reading Hospital, a Pennsylvania nonprofit corporation ("Purchaser"), its successors and assigns, all of the Seller's right, title and interest in and to the Purchased Assets.  As used herein, the term "Purchased Assets" has the meaning given to such term in that certain Asset Purchase Agreement, dated as of -_____ __, 2019, by and between the Seller and Purchaser (together with the Exhibits and Schedules thereto, the "Purchase Agreement"), which Purchase Agreement is incorporated herein by this reference.

EXCLUDING, HOWEVER, the "Excluded Assets" (as such term is defined in the Purchase Agreement).

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, forever.

This Bill of Sale is being executed and delivered by the Seller to the Purchaser under and pursuant to Section 8.2(a) of the Purchase Agreement and is subject to the terms and conditions of the Purchase Agreement in all respects.

*Remainder of Page Intentionally Left Blank*

*Signature Page Follows*

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale as of the date and year first set forth above.

CENTER CITY HEALTHCARE, LLC

By _____

Allen Wilen
Chief Restructuring Officer - Finance

# EXHIBIT D

## ESCROW AGREEMENT

*[SELLER TO DRAFT USING  TEMPLATE FROM JEFFERSON BUT SUBJECT TO TOWER REVIEW]*

**EXHIBIT E**

**SALE ORDER**

**EXHIBIT F**

**BIDDING PROCEDURES ORDER**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |  |
| *al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Re: Docket No. 142** |
|  | ) |  |

## ORDER (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' RESIDENT PROGRAM ASSETS, INCLUDING APPROVING A BREAK-UP FEE, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND <u>(D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE</u>

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (the "**Debtors**") for the entry of an order (this "**Bidding Procedures Order**"): (a) approving the proposed bidding procedures attached as **<u>Schedule 1</u>** to this Bidding Procedures Order (the "**Bidding Procedures**"), by which the Debtors will solicit and select the highest or otherwise best offer for the sale (the "**Sale**") of the Residents Program Assets; (b) establishing procedures for the assumption and assignment of executory contracts, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**");

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

(c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Debtors' selection of Tower Health ("**Tower Health**") as the stalking horse bidder (the "**Stalking Horse Bidder**")[3], the Break-Up Fee (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (as may be amended from time to time, the "**Stalking Horse Sale Agreement**"), as filed with the Court [D.I. 246], among Debtor Center City Healthcare, LLC d/b/a Hahnemann University Hospital (the "**Seller**") and the Stalking Horse Bidder; (e) scheduling a final hearing (the "**Sale Hearing**") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "**Sale Order**"), a proposed form of which is attached as Exhibit E to the Stalking Horse Sale Agreement: (x) authorizing the sale of the Residents Program Assets free and clear of Interests as defined in footnote 4, below (the "**Interests**")[4], with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests existed immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter

---

[3]     The Court has been advised that Reading Hospital, a subsidiary of Tower Health, will actually serve as the Stalking Horse Bidder and, as a result, all references herein to the Stalking Horse Bidder shall be deemed to include Reading Hospital.

[4]     Interests shall include: (i) mortgages, security interests, conditional sale or other title retention agreements, pledges, liens, rights of offset, judgments, demands, encumbrances and claims (as that term is defined in the Bankruptcy Code), (ii) rights or options to effect any forfeiture, modification, repurchase, or termination of the Seller's or purchaser's interest in the Assigned Contracts and/or Residents Program Assets, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, (iii) claims of the Pension Benefit Guaranty Corporation or any plan participant or beneficiary, (iv) tax claims (including taxes as to which applicable returns have not yet been filed, whether or not overdue), and (v) restrictions, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, regardless whether such are "claims" as that term is defined in the Bankruptcy Code, and with respect to the rights described in this sub-clause (v) only as they relate to the Resident Program Assets that are the subject of the Stalking Horse Bidder's Stalking Horse Sale Agreement.

pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "**Local Rules**").  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

D.      Notice of the Motion, as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order, was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order has been given to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' Residents Program Assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' Residents Program Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts related to the Residents Program Assets that could potentially be assumed and assigned to the Successful Bidder; (e) counsel to MidCap Funding IV Trust; (f) Drexel University d/b/a Drexel University College of Medicine; (g) the Debtors' unions; (h) the Internal Revenue Service; (i) the United States Attorney for the District of Delaware; (j) the United States Department of Justice; (k) the Pennsylvania Attorney General's Office; (l) the Pennsylvania Department of Health; (m) the City of Philadelphia; (n) the CMS; (o) the ACGME; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  Accordingly, no further

notice of the Motion as relates to the Bidding Procedures Hearing and the proposed entry of this Bidding Procedures Order is necessary or required.

E.       The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion as relates to the entry of this Bidding Procedures Order, including, without limitation:   (a) approval of the Bidding Procedures; (b) approval of the selection of the Stalking Horse Bidder and approval of the Break-Up Fee to be paid to the Stalking Horse Bidder under the circumstances described in the Motion; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein.   Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.       Entry into the Stalking Horse Sale Agreement with the Stalking Horse Bidder is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.   The Stalking Horse Sale Agreement provides the Debtors with the opportunity to sell the Residents Program Assets in order to preserve and realize their optimal value, while at the same time minimizing the negative impact of the closure of Hahnemann University Hospital on Residents, as well as upon the Debtors' academic affiliation partner, Drexel University.

G.       The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair,

reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.  The Break-Up Fee:  (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Sale Agreement; (b) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (c) is reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (d) was necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Sale Agreement.

H.      The Debtors have demonstrated a reasonable business justification for the payment of the Break-Up Fee under the circumstances set forth in the Stalking Horse Sale Agreement.  The Bidding Procedures and the Break-Up Fee were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Stalking Horse Sale Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, and other bidders may rely.  Unless it is assured that the Break-Up Fee will be available, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Sale Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures).  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Residents Program Assets will be realized and that Residents will be protected.

35602324.10 07/19/2019

I.     The Assumption and Assignment Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Designated Contracts in connection with the sale of the Residents Program Assets and the related Cure Costs, and no other or further notice shall be required.  The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to any Designated Contracts with proper notice of the intended assumption and assignment of their Designated Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.     The Auction and Sale Notice attached hereto as **<u>Schedule 5</u>** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Residents Program Assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d)  identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Sale Agreement; (f) a description of the Sale as being free and clear of all Interests, with all Interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Sale Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

K.     All current and former patients of Debtor Center City Healthcare, LLC ("<u>Center City</u>") who have, as of the date of this order, asserted claims against Center City, including but not limited to claims formally asserted by the filing of suit or a proof of claim in these Bankruptcy Cases and claims informally asserted by letter or by a request for medical records

from a lawyer or otherwise (the "<u>Known Patient Creditors</u>") shall be treated as known creditors of the Debtors for purposes of notice requirements related to the Sale.

L.      All current and former patients of Center City who, as of the date of this order, are not Known Patient Creditors (including current and former patients who are not, as of the date of this order, aware that they have or may have claims against the Debtors including such patients as to whom personal injury has not manifested as of the date of this order) (the "<u>Unknown Patient Creditors</u>") shall be treated as unknown creditors of the Debtors for purposes of the notice requirements related to the Sale.

M.      The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.[5]

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.      <u>Timeline for the Sale</u>**

3.      The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Sale Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order.  The Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), as indicated herein and in the Bidding Procedures, are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take

---

[5]      Notwithstanding anything to the contrary herein, or in the Bidding Procedures, the acceptance of a Bid and Sale Agreement by the Debtors and the consummation of a Sale are subject to entry of the Sale Order.

any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Milestone | Proposed Date |
|-----------|---------------|
| Deadline to Object to Approval of the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 |
| Sale Hearing | August 9, 2019 at 11:00 a.m. (prevailing Eastern Time) |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder (Other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) | (may be raised at the Sale Hearing) |

4.      For the avoidance of doubt, the Debtors, in consultation with the Committee, reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Sale Agreement.

II.     **The Bidding Procedures**

5.      The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Sale Agreement.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest. As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on August 5, 2019. Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.      The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder.

8.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures. The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on August 7, 2019 at the offices of the proposed counsel for the Debtors, Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other time and location as the Debtors may hereafter designate on proper notice). The Auction will be conducted openly and all creditors and the Committee will be permitted to attend.

9.      Any creditor with a valid and perfected lien on all of the Residents Program Assets (each, a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in

interest to object to or challenge such creditor's lien thereunder (a "**Challenge**")), to credit bid all or any portion of such Secured Creditor's allowed secured claims to purchase the Residents Program Assets to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, unless otherwise ordered by the Bankruptcy Court for cause.  The foregoing notwithstanding, any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee. In the event that the Committee, or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected.  In the event that such a creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash at the closing of the Sale.

10.     Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up Fee in lieu of cash and have the Break-Up Fee be treated as equal to cash in the same amount for the purposes of evaluating the overbid.

**III.     Stalking Horse Bidder, Bid Protections, and Stalking Horse Sale Agreement**

11.     The Debtors are authorized to enter into the Stalking Horse Sale Agreement, subject to higher or otherwise better offers at the Auction.  The Break-Up Fee described in the Bidding Procedures is approved.  The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Break-Up Fee upon the Debtors' closing of the Sale with a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**").  If triggered, the Break-Up Fee: (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; and (b) shall be payable in at closing on the Alternative Transaction without further order of this Court; and

-11-

(c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

**IV.** **Notice Procedures**

12.    The Auction and Sale Notice is approved.

*A.*    ***Notice of Sale, Auction, and Sale Hearing.***

13.    Within two (2) business days after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "**Mailing Date**"), the Debtors shall serve the Auction and Sale Notice by first-class mail, electronic mail or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF, upon (a) the Notice Parties, (b) all Residents, and (c) all known creditors of Center City, including any Known Patient Creditors. In addition, on or before the Mailing Date, the Debtors shall serve the *Notice to Residents and Fellows Regarding Proposed Sale of Residency Program Assets* (the "**Residents' Notice**"), in substantially the form attached hereto as  **Schedule 2**, on all Residents by first class mail or electronic mail.

14.    Service of the Auction and Sale Notice and the Residents' Notice as described in paragraph 13 above shall be sufficient and proper notice of the and satisfies all due process requirements.

15.    Within ten (10) days of the date of this Bidding Procedures Order, the Debtors shall cause the notice (the "**Publication Notice**") substantially in the form attached hereto as **Schedule 3** to be published once in the National Edition of *USA Today* and once in the *Philadelphia Inquirer*. The Publication Notice shall be sufficient and proper notice of the Sale to all creditors whose identities are unknown to the Debtors, including all of the Unknown Patient Creditors.

B.    *Notice of Successful Bidder.*

16.    As soon as reasonably practicable after the Bid Deadline, if no Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, or conclusion of the Auction, if a Qualified Bid other than the Stalking Horse Sale Agreement is received by the Bid Deadline, the Debtors shall file on the docket, but not serve, a notice which shall identify the Successful Bidder.

## V.    Assumption and Assignment Procedures

17.    The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Sale Agreement are hereby approved to the extent set forth herein.

A.    *Notice of Assumption and Assignment.*

18.    The Debtors previously filed with the Court, [D.I. 246], a list (the "**Initial Designated Contracts List**") specifying:  (a) each of the Debtors' executory contracts that may be assumed and assigned in connection with the Sale (the "**Initial Designated Contracts**"), including the name of each non-Debtor counterparty to such Designated Contract (the "**Initial Designated Contract Counterparty**"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Initial Designated Contract (the "**Cure Costs**").

19.    On the Mailing Date, the Debtors shall serve the Notice of Proposed Assumption and Assignment of Executory Contracts attached hereto as **Schedule 4** (the "**Initial Notice of Assumption and Assignment**") on all Initial Designated Contract Counterparties by first-class

mail, email or, for those parties who have consented to receive notice by the Electronic Case Files ("**ECF**") system, by ECF.

20.     Any Initial Designated Contract Counterparty may file an objection (a "**Contract Objection**") to the proposed assumption and assignment of the applicable Initial Designated Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance.  All Contract Objections must:  (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com) and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania, 19102, Attn: Jeffrey C. Hampton (jeffrey.hampton@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder (the "**Contract Notice Parties**") by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Initial Designated Contract Objection Deadline**").  Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

21.     If an Initial Designated Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such Contract Objection will be determined at the Sale Hearing.

B.     ***Modification of Initial Designated Contracts List and Supplemental Notice of Assumption and Assignment.***

22.     Prior to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Stalking Horse Bidder. Subsequent to the selection of a Successful Bidder, the Debtors may not modify the Initial Designated Contracts List without the consent of the Successful Bidder (who may be the Stalking Horse Bidder).

23.     Until the opening of business on the date of the Auction, if another Qualified Bid is received by the Bid Deadline, or the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline, at the request of the Stalking Horse Bidder, the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs. Following the conclusion of the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Costs, *provided*, *however*, that such deletion of any contracts shall not result in any reduction in the Purchase Price (as defined in the Stalking Horse Sale Agreement"), and any contracts added after the Auction will not be considered in connection with the right of termination in Article 9.1(c) of the Stalking Horse Sale Agreement. For the avoidance of doubt, the Initial Designated Contracts List may be modified more than

once. The contracts listed on the Initial Designated Contracts List, as modified from time to time, are hereafter referred to as the "**Designated Contracts**").

24.      In the event that the Initial Designated Contracts List is modified, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "**Supplemental Notice of Assumption and Assignment**") on the affected counterparty in the same manner as the Initial Notice of Assumption and Assignment was served.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed contracts as was included in the Notice of Assumption and Assignment.

25.      Any counterparty to an executory contract listed on a Supplemental Notice of Assumption and Assignment (each a "**Supplemental Designated Contract Counterparty**") may file an objection with respect to the applicable Designated Contract (a "**Supplemental Contract Objection**") to (a) Cure Costs (but only to the extent reduced  as to contracts included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment), and (b) if such Designated Contract was not included on the Initial Notice of Assumption and Assignment or any prior Supplemental Notice of Assumption and Assignment, (i) the proposed assumption and assignment of the applicable Designated Contract and (ii) the ability of a Successful Bidder, including the Stalking Horse Bidder, to provide adequate assurance of future performance.  All Supplemental Contract Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Contract Notice Parties no later than seven (7) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the

Supplemental Notice of Assumption and Assignment (the "**Supplemental Contract Objection Deadline**").

26.     If a Supplemental Designated Contract Counterparty files a Supplemental Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute, (a) if the Supplemental Contract Objection Deadline is on or before the date of the Sale Hearing, such Supplemental Contract Objection will be determined at the Sale Hearing, and (b) if the Supplemental Contract Objection Deadline is after the date of the Sale Hearing the Debtors will seek an expedited hearing before the Court to determine the Supplemental Contract Objection.  If there is no such Supplemental Contract Objection (or such objection has been resolved), then the Debtors may submit an order to this Court, including by filing a certification of counsel, fixing the applicable Cure Costs and approving the assumption of the contract listed on a Supplemental Notice of Assumption and Assignment.

     C.     *Additional Notice of Assumption and Assignment Procedures.*

27.     If the counterparty to any Designated Contract does not file and serve a Contract Objection or Supplemental Contract Objection, as applicable, in a manner that is consistent with the requirements set forth above, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling with respect to the applicable Designated Contract, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any claim related to such Designated Contract for any default occurring or continuing prior to the date of the assumption

-17-

and assignment of such Designated Contract against the Debtors or the Successful Bidder, or the property of any of them.

28.     The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.   Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

## VI.    Sale Hearing.

29.     A Sale Hearing to (a) approve the sale of the Debtors' Residents Program Assets to the Successful Bidder and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at **11:00 a.m. (prevailing Eastern Time) on August 9, 2019**, and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket.   At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale to the Successful Bidder, including any Backup Bidder.   The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale.   In the event that the Successful Bidder cannot or refuses to consummate the Sale after the Sale has been approved by the Court, the Debtors may, in consultation with the Committee, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors, in consultation with the Committee, shall be

authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

30.     Any and all objections, if any, to (a) the Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement and (b) entry of the Sale Order approving such Sale (a "**Sale Objection**") must be filed and served on (i) Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com), proposed counsel to the Debtors, (ii) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee, and (iii) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pa. 19406 Attn: Robert Lapowsky (rl@stevenslee.com), counsel to the Stalking Horse Bidder by 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Sale Objection Deadline**").  Any and all objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder (other than a Sale to the Stalking Horse Bidder on the terms of the Stalking Horse Bid as set forth in the Stalking Horse Sale Agreement) (an "**Auction Objection**") must be raised at or prior to the Sale Hearing (the "**Auction Objection Deadline**").  Any party failing to timely file a Sale Objection or raise an Auction Objection, as applicable, will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the assets free and clear of any and all Interests. For the avoidance of doubt, if the Stalking Horse Bidder is selected as the Successful Bidder, but its successful Bid is not the Stalking Horse Bid or an increased bid based on an agreement substantially similar to the Stalking Horse Sale Agreement, objections to a Sale

to the Stalking Horse Bidder, limited to the changed terms (excluding any increase in price) may be raised by the Auction Objection Deadline.

**VII.**   **Miscellaneous.**

31.    Notwithstanding anything to the contrary in any asset purchase agreement or document relating to the Sale, the purchased assets (including the Residents Program Assets) shall not include (i) any cause of action or proceeds of such cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents; (ii) any commercial or other tort claims arising on or before the closing date of the Sale, or any proceeds of such claims, including, without limitation, any and all causes of action (a) against present and former directors and officers of the Debtors and/or any of their affiliates, (b) against direct and indirect equity holders of the Debtors and/or their affiliates, and (c) of the Debtors and/or any of their affiliates against any other Debtors; and (iii) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any contract that is assumed by the Debtors), or any proceeds of such claims or causes of action. The provisions of this paragraphs shall not apply to the Stalking Horse Sale Agreement, as the same may be modified other than any modifications to the defined term "Purchased Assets."

32.    This order and the Bidding Procedures shall be interpreted so as to afford the Debtors, in consultation with the Committee, the greatest opportunity to maximize the value of the Residents Program Assets for the benefit of the Debtors' estates *provided*, *however*, the provisions of this paragraph shall not apply to any matters affecting the Stalking Horse Bidder without the consent of the Stalking Horse Bidder.

33.    The Debtors, in consultation with the Committee as applicable, are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

34.     Notwithstanding anything in the Motion, the Bidding Procedures, and/or the July 9, 2019 Stalking Horse LOI to the contrary, nothing in this Bidding Procedures Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability to the United States arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

35.     To the extent the Successful Bid or the Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" of successor liability for any liability to the United States arising from such provider agreement pursuant to section 363(f) of the Bankruptcy Code.

36.     This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

37.     This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors. Certain provisions of this Bidding Procedures Order that relate to the Break-Up Fee shall inure to the benefit of the Stalking Horse Bidder and its affiliates, successors, and assigns.

38.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions

of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Sale Agreement, and the implementation of this Bidding Procedures Order.

**Dated: July 19th, 2019**
**Wilmington, Delaware**

**KEVIN GROSS**
_UNITED STATES BANKRUPTCY JUDGE_

-22-

35602324.10 07/19/2019

# SCHEDULE 1

# BIDDING PROCEDURES

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) ) ) ) | Case No. 19-11466 (KG) |
|  | ) | Jointly Administered |
| Debtors. | ) ) ) | |

## BIDDING PROCEDURES

On July 19, 2019, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "**Bidding Procedures Order**"),[2] by which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**").  These Bidding Procedures set forth the process by which the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") as set forth herein, are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of the resident program assets related to the operation of Hahnemann University Hospital, including: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement, (b) the Pennsylvania Department of Health license to operate an acute care hospital, and (c) the Hahnemann training programs for Residents (collectively, the "**Residents Program Assets**"), in accordance with and as described in that certain agreement (the "**Stalking Horse Sale Agreement**"), dated as of July 19, 2019, by and among Center City Healthcare, LLC d/b/a Hahnemann University Hospital and Tower Health (the "**Stalking Horse Bidder**"), or in accordance with the terms of such higher and better offer as determined by the Debtors, in consultation with the Committee, to be the Successful Bidder (defined below).

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]      All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

A.     Submissions to the Debtors and the Committee.

All submissions to the Debtors and the Committee required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

a.     **Debtors**.  Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer.

b.     **Debtors' Counsel**.  Saul Ewing Arnstein & Lehr LLP, 1201 N. Market Street, Suite 2300, Wilmington, Delaware 19801, Attn: Mark Minuti (mark.minuti@saul.com).

c.     **Debtors' Investment Banker**.  SSG Advisors, LLC, Five Tower Bridge, 300 Barr Harbor Drive, West Conshohocken, PA 19428 Suite 420, Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com).

d.     **Committee's Counsel**.  Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com).

B.     Potential Bidders.

The Debtors and their financial advisors have identified, and may in the future, in consultation with the Committee, identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "**Potential Bidder**"), other than the Stalking Horse Bidder, must deliver or have previously delivered, if determined to be necessary by the Debtors:

a.     an executed confidentiality agreement on terms acceptable to the Debtors, in consultation with the Committee (a "**Confidentiality Agreement**"), to the extent not already executed; and

b.     the most current audited and latest unaudited financial statements (collectively, the "**Financials**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Residents Program Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

-2-

C.     Qualified Bidders.

    a.     A "**Qualified Bidder**" is a Potential Bidder:  (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined by the Debtors, in consultation with the Committee; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below).  On or before the date that is one (1) business day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times.  MidCap Funding IV Trust ("**Midcap**"), solely to the extent it seeks to credit bid, shall be deemed a Qualified Bidder at all times; *provided* that MidCap Funding IV Trust's right to credit bid shall be subject to the provisions set forth in the Bidding Procedures Order and these Bidding Procedures.

    b.     If any Potential Bidder is determined by the Debtors, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

    c.     Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, in consultation with the Committee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

    d.     Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Bankruptcy Court.

D.     Due Diligence.

    **a.     Diligence Provided to Potential Bidders**.

       Only (a) the Stalking Horse Bidder, and (b) Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information related to the Residents Program Assets.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders other than the Stalking Horse Bidder, the due

diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Residents Program Assets, the Debtors' liabilities, or the Sale ("**Confidential Sale Information**") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors, in consultation with the Committee, may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors, in consultation with the Committee, determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors, in consultation with the Committee, determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors, in consultation with the Committee, as a Potential Bidder; *provided*, *however*, that, subject to the limitations set forth in the immediately preceding paragraph, the Debtors may furnish information to MidCap and the Committee.

**All due diligence requests must be directed by email to SSG Advisors, LLC Attn: J. Scott Victor (jsvictor@ssgca.com); Teresa Kohl (tkohl@ssgca.com); and Craig Warznak (cwarznak@ssgca.com); or by phone to (610) 940-3615.**

**b.      Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, in consultation with the Committee, to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures.  Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids (as defined below) during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

35612177.6 07/19/2019

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

E.     Bid Requirements.

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "**Bid Requirements**"), as determined by the Debtors, in consultation with the Committee, in their reasonable business judgment, shall constitute a "**Qualified Bid**." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Sale Agreement will be deemed a Qualified Bid for all purposes.

a.     **Assets**. Each Bid must provide for the purchase of all or substantially all of the Residents Program Assets, and must clearly state which assets the Qualified Bidder is agreeing to purchase.

b.     **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "**Purchase Price**"). The Purchase Price must be in cash consideration and must equal or exceed $7,825,000 (*i.e.*, the sum of (i) the Base Purchase Price set forth in the Stalking Horse Sale Agreement and (ii) the Break-Up Fee) and (iii) a $100,000 incremental amount (a "**Minimum Bid**").

c.     **Deposit**. With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to ten (10) percent of the aggregate cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**"). Within three (3) business days after the conclusion of any Auction, the Successful Bidder and Backup Bidder shall submit by wire transfer of immediately available funds, a supplemental cash deposit in an amount that, when added to the amount of the Deposit, is equal to ten (10) percent of the aggregate cash Purchase Price set forth in their respective Successful Bid and Backup Bid. The foregoing notwithstanding, the Stalking Horse Bidder shall not be required to submit any Deposit.

d.     **Residents**. Each Bid must specify the Potential Bidder's proposed treatment with respect to Residents, including whether and to what extent Residents will be offered placement with the Potential Bidder and on what terms. Each Bid must further provide a description of the Potential Bidder's accreditation status with the Accreditation Council on Graduate Medical Education, including a description of accredited residency and fellowship programs currently offered by the Potential Bidder and/or expected to be offered in the future.

e.   **Same or Better Terms**.   Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Stalking Horse Sale Agreement, as determined by the Debtors, in consultation with the Committee.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts proposed to be assumed by the Debtors and assigned to the Qualified Bidder ("**Assumed Contracts**"), and a copy of the Stalking Horse Sale Agreement clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors, in consultation with the Committee, that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "**Qualified Bid Documents**").

f.   **Contingencies; No Financing or Diligence Outs**.   A Bid shall not be conditioned on (i) the Potential Bidder obtaining financing, (ii) approval of the Potential Bidder's shareholders, board of directors or other internal approval, or (iii) the outcome or completion of due diligence by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Debtors, as determined in the Debtors' business judgment, in consultation with the Committee, than those set forth in the Stalking Horse Sale Agreement.

g.   **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.   **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment, as determined in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.  Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Residents Program Assets and include a packet of information, including financial information, that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i.    **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors, in consultation with the Committee,.

j.    **Binding and Irrevocable**.  A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of a Sale to another Qualified Bidder, and (ii) thirty (30) days after the conclusion of the Sale Hearing (as defined below).

k.    **Expenses; Disclaimer of Fees**.  Each Bid (other than the Stalking Horse Sale Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.    **Authorization**.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Committee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m.    **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Residents Program Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Residents Program Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Residents Program Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

n.    **Adherence to Bid Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o.    **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

p.    **Consent to Jurisdiction**.  Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q.    **Bid Deadline**.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually** **received** on or before 4:00 p.m. (prevailing Eastern Time) on August 5, 2019 (the "**Bid Deadline**").

The Debtors reserve the right, in consultation with the Committee, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

F.    Right to Credit Bid.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on all of the Resident Program Assets (a "**Secured Creditor**") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law (and the rights of the Committee and other parties in interest to object or challenge such creditor's lien thereunder (a "**Challenge**")) to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court for cause.   In the event that the Committee or another party in interest Challenges a creditor's lien, the approval of a Successful Bid by such creditor that includes a credit bid shall be contingent upon a final determination that such creditor's lien is valid and perfected.  If such creditor's lien is successfully Challenged, or otherwise determined not to be valid and perfected, such creditor shall pay the credit bid portion of its Bid in cash as the closing of the Sale.

In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include all or any portion of the Break-Up fee in lieu of cash.

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidder's entitlement to the Break-Up Fee granted under the Bidding Procedures Order.

Any credit bid shall include a cash component sufficient to satisfy in full all costs of sale, including the Break-Up Fee.

G.      Auction.

If, prior to the Bid Deadline, the Debtors receive a Qualified Bid, other than the Stalking Horse Sale Agreement, the Debtors will conduct an Auction to determine the Successful Bidder. By 6:00 p.m. on the date of the Bid Deadline, the Debtors shall notify the Stalking Horse Bidder if one or more Qualified Bids were received prior to the Bid Deadline. If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Sale Agreement) prior to the Bid Deadline, the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder's Bid as the Successful Bid.

On the date that is one (1) day after the Bid Deadline, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Committee (the "**Baseline Bid**"), and provide copies of all Qualified Bid Documents supporting the Baseline Bid and each other Qualified Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Committee, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, and may include, among other things: (a) the number, type, and nature of any changes to the Stalking Horse Sale Agreement, if any, requested by the Qualified Bidder, including the type and amount of Residents Program Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the impact on Residents (collectively, the "**Bid Assessment Criteria**"). Only the Stalking Horse Bidder and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors and the Committee whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 on August 7, 2019 at 10:00 a.m. (prevailing Eastern Time), or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

a.      **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction, in consultation with the Committee as applicable. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of

each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and the Committee and all creditors will be permitted to attend. The Qualified Bidders, including the Stalking Horse Bidder, may appear at the Auction in person or through duly authorized representatives.

b.  **Terms of Overbids**.

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(a)  **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $100,000 (a "**Minimum Overbid Increment**").

Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (1) cash or (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth in the Bidding Procedures Order or these Bidding Procedures (including the requirement of a cash component sufficient to pay all costs of sale including the Break-Up Fee).

(b)  **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may, in consultation with the Committee, announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors and the Committee.

(c)  **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(d)  **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have (i) in the initial Overbid round, identified an Overbid as being higher or otherwise better than the Baseline Bid for the Residents Program Assets, or (ii) in subsequent rounds, identified an Overbid as

being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for the Residents Program Assets (the "**Prevailing Highest Bid**"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors, in consultation with the Committee, as the Prevailing Highest Bid as well as the value attributable by the Debtors, in consultation with the Committee, to such Prevailing Highest Bid.

c.    **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Committee, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors, the Committee, and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment, in consultation with the Committee, may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) provide the Debtors with an opportunity to consider, in consultation with the Committee, how to value each Overbid.

d.    **Closing the Auction**.

(a)    The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Committee, to be the highest or otherwise best Bid in accordance with the Bid Assessment Criteria. Such Bid shall be declared the "**Successful Bid**," and such Qualified Bidder the "**Successful Bidder**," at which point the Auction will be closed. The Debtors shall notify the Qualified Bidders of the Successful Bid within one business day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

(b)    The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely.

(c)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Bankruptcy Court.

**e.      No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that:  (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder.  All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors, the Committee, and the United States Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

H.      Backup Bidder.

a.      Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Committee (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.  The Stalking Horse Bidder shall serve as a Backup Bidder only if (X) the Bid set forth in the Stalking Horse Agreement is not determined to be the Baseline Bid (as defined herein), and (Y) the Stalking Horse Bidder elects, in its sole discretion, to offer a higher and better bid at the Auction.  The Stalking Horse Bidder's Bid described in the Stalking Horse Agreement shall not be a Backup Bid absent the express consent of the Stalking Horse Bidder.

b.      The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder.   The foregoing notwithstanding, if the Stalking Horse Bidder serves as the Backup Bidder, its Backup Bid shall expire on the earlier of closing on an Alternative Transaction (defined below) or September 6, 2019.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

c.      If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Committee, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

35612177.6 07/19/2019

I.    Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Sale Agreement, the Debtors reserve their rights, in consultation with the Committee, to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Residents Program Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

J.    Sale Hearing.

A hearing to consider approval of the Sale of the Residents Program Assets to the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on **August 9, 2019, at 11:00 a.m. (ET)** before the Honorable Kevin Gross, at the United States Bankruptcy Court, 824 Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Committee, by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder). The foregoing notwithstanding, if the Sale Hearing is continued without the consent of the Stalking Horse, the Stalking Horse may terminate the Stalking Horse Agreement.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

K.    Break-Up Fee.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Sale Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions set forth in the Bidding Procedures Order, a break-up fee in the amount of $225,000 (the "**Breakup Fee**").

The Break-Up fee, to the extent owed by the Debtors, (a) shall be an allowed administrative expense claim under section 503(b) and 507 of the Bankruptcy Code and a direct cost of any such Sale; (b) shall be payable at closing on of a Sale to a purchaser other than the Stalking Horse Bidder (an "**Alternative Transaction**")without further order of the Court; and (c) shall be payable solely from the proceeds of such Alternative Transaction.  No Interests shall attach to the proceeds of any such Alternative Transaction equal to the amounts owed to the Stalking Horse Bidder on account of the Break-Up Fee.

L.      Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors, in consultation with the Committee, and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction. The Stalking Horse Bidder shall not be required to provide a Deposit.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court.

M.      Fiduciary Out.

Nothing in these Bidding Procedures shall require the Debtors' board of managers to take any action, or to refrain from taking any action, with respect to these Bidding Procedures prior to the commencement of the Auction if the Debtors' board of managers determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as the case may be, is required to comply with applicable law or the board's fiduciary obligations thereunder; *provided* that, in the event  the Debtors' board of managers determines to take any action, or refrain from taking any action, pursuant to this paragraph, without the consent of the Stalking Horse Bidder, the Stalking Horse Bidder may, but shall not be required to, terminate the Stalking Horse Agreement if taking such action or refraining from taking such action, as the case may be, would otherwise be grounds for termination under the Stalking Horse Agreement, it being understood that any material modification to the Bid Procedures without the consent of the Stalking Horse would be a breach of the Stalking Horse Agreement pursuant to which the Stalking Horse would have the right to terminate the Stalking Horse Agreement.

# SCHEDULE 2

# RESIDENT'S NOTICE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) | |
| *al.*,[1] | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## NOTICE TO RESIDENTS AND FELLOWS
## REGARDING PROPOSED SALE OF RESIDENCY PROGRAM ASSETS

## TO:  ALL RESIDENTS AND FELLOWS AT HAHNEMANN UNIVERSITY HOSPITAL:

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Tower Health ("**Tower**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to Tower: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders. On July 9, 2019, the Debtors file a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale. On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth certain key dates and deadlines in connection with the proposed Sale.  In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids.  A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**").  A copy of the Agreement, the Bidding Procedures Order and the Bidding Procedures is enclosed herewith.

## THE PROPOSED SALE

If approved by the Court, the Agreement will enable residents and fellows (collectively herein, the "**Residents**") at Hahnemann to continue their training at one of six hospitals operated by Tower - Brandywine Hospital in Coatesville, Pennsylvania, Chestnut Hill Hospital, in Philadelphia, Pennsylvania, Jennersville Hospital in West Grove, Pennsylvania, Phoenixville Hospital in Phoenixville, Pennsylvania, Pottstown Hospital, in Pottstown, Pennsylvania, and Reading Hospital, in Reading, Pennsylvania.  **Residents have a choice, and are not required to continue their training with Tower**.  For any Resident who elects to complete their training elsewhere, Tower or the Debtors, as applicable, will release the related cap on Medicare reimbursement on a temporary basis to accommodate that choice.

For Residents who elect to stay with Tower, Tower will provide housing for those residents doing rotations at Reading Hospital, which is sixty miles from Hahnemann.  Tower has also agreed to seek to hire the faculty who are currently training Residents at Hahnemann to ensure continuity of the Hahnemann training programs.  Tower will also provide free housing (subject to parameters set forth in the Agreement) for the remainder of the academic year or during the term of a resident's existing vacated lease if it is necessary for the Resident to relocate during the current academic year.  Residents will receive free meals while in any Tower hospital, and Tower will also provide additional amenities to assist Residents and their families with the transition.

If the Sale is approved by the Court to someone other than Tower, the terms of the Sale, and the impact upon Residents, may be different than those under the Agreement.

The Debtors recognize the unique difficulties and challenges facing Residents in light of the bankruptcy filing and expected closure of Hahnemann.  The Debtors believe that the proposed Sale is in the best interests of Residents because it provides Residents with the option to continue their training and, to minimize, to the greatest extent possible, the impact of Hahnemann's closure on Residents, their professional training and education, and their families.

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys,

35602090.2 07/19/2019

whose contact information is in the signature block below, for more information.  In addition, Residents should contact their Program Director with questions specific to their situation.

### Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; and (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

35602090.2 07/19/2019

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE  19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

       -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

-4-

**SCHEDULE 3**

**PUBLICATION NOTICE**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## NOTICE REGARDING PROPOSED SALE OF RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL INTERESTS, INCLUDING PERSONAL INJURY CLAIMS

**TO:  ALL PERSONS WITH CLAIMS AGAINST THE DEBTORS IN THE ABOVE CAPTIONED CASES, INCLUDING CLAIMS AGAINST HAHNEMANN UNIVERSITY HOSPITAL:**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), including Center City Healthcare, LLC, the entity that operates Hahnemann University Hospital ("**Hahnemann**"), each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 or July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have entered into an agreement (the "**Agreement**") with Reading Hospital (the "**Purchaser**") to sell certain assets related to Hahnemann's residency and fellowship training programs (the "**Sale**"). Specifically, the Debtors intend to sell to the Purchaser: (a) National Provider Identifiers (general and psych) and Medicare provider number and agreement; (b) the Pennsylvania Department of Health license to operate an acute care hospital; and (c) to the extent assignable or transferrable, the Hahnemann training programs for residents and fellows.

**PLEASE TAKE FURTHER NOTICE** that the Sale, if approved, will be free and clear of all Interests, including claims of successor liability.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

**PLEASE TAKE FURTHER NOTICE THAT, IF THE SALE IS APPROVED, THE PURCHASER WILL NOT BE LIABLE ON ACCOUNT OF ANY CLAIMS AGAINST ANY OF THE DEBTORS (OTHER THAN CLAIMS AFFIRMATIVELY ASSUMED BY THE PURCHASER), INCLUDING CLAIMS OF PATIENTS TREATED AT HAHNEMANN, INCLUDING CLAIMS OF WHICH THE HOLDER MAY NOT BE PRESENTLY AWARE.**

## KEY DATES AND DEADLINES

The proposed Sale is subject to the approval of the Court and subject to better offers from other qualified bidders.  On July 9, 2019, the Debtors filed a motion (the "**Sale Motion**") seeking the Court's approval of the Sale and certain procedures ("**Bidding Procedures**") related to the Sale.  On July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**"), which sets forth certain key dates and deadlines in connection with the proposed Sale.  In particular, the Bidding Procedures establish **August 5, 2019** as the deadline for parties to file objections to the Sale (the "**Sale Objection Deadline**") and as the deadline for third parties to submit competing bids.  A final hearing to seek Court approval of the Sale (either to Tower or another party submitting the best bid) is currently scheduled for **August 9, 2019 at 11:00 a.m. (ET)** (the "**Sale Hearing**").

## Obtaining Additional Information

Copies of all documents filed with the Court with respect to the Debtors' bankruptcy cases are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. You may also contact the Debtors' attorneys, whose contact information is below, for more information.  In addition, Residents should contact their Program Director with questions specific to their situation.

## Filing Objections

Objections to the Sale (a "**Sale Objection**"), if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; and (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, (i) 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti; and (ii) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA, Attn: Jeffrey C. Hampton; (c) Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, Attn: Robert Lapowsky (rl@stevenslee.com), counsel to Tower, and (d) Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman (Asherman@sillscummis.com) and Boris Mankovetskiy (BMankoverskiy@sillscummis.com), proposed counsel to the Committee.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS. IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING. ANY CREDITOR THAT FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

Dated: July 19, 2019               **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Mark Minuti*
      Mark Minuti (DE Bar No. 2659)
      Monique B. DiSabatino (DE Bar No. 6027)
      1201 N. Market Street, Suite 2300
      P.O. Box 1266
      Wilmington, DE  19899
      Telephone: (302) 421-6800
      Fax: (302) 421-5873
      mark.minuti@saul.com
      monique.disabatino@saul.com

          -and-

      Jeffrey C. Hampton
      Adam H. Isenberg
      Aaron S. Applebaum (DE Bar No. 5587)
      1500 Market Street, 38th Floor
      Philadelphia, PA 19102
      Telephone: (215) 972-7700
      Fax: (215) 972-7725
      jeffrey.hampton@saul.com
      adam.isenberg@saul.com
      aaron.applebaum@saul.com

      *Proposed Counsel for Debtors and*
      *Debtors in Possession*

Case 19-11466-MFW   Doc 669-4   Filed 09/06/19   Page 218 of 229

**SCHEDULE 4**

INITIAL NOTICE OF ASSUMPTION AND ASSIGNMENT

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) |
|  | ) |

## NOTICE OF PROPOSED ASSUMPTION AND
## ASSIGNMENT OF EXECUTORY CONTRACTS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 and July 1, 2019 (the "**Petition Date**").

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion [D.I. 142] (the "**Sale Motion**") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of certain of the Debtors' assets (the "**Residents Program Assets**") to Tower Health (the "**Stalking Horse Bidder**"), including the assumption of certain contracts and responsibilities of the Debtors with respect to Residents Programs at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) procedures for the solicitation of bids in connection with the Auction (the "**Bidding Procedures**"), attached as **Exhibit B** to the Sale Motion; (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of executory contracts ("**Designated Contracts**") in connection with the Sale (the "**Assumption and Assignment Procedures**").

**PLEASE TAKE FURTHER NOTICE THAT** on July 19, 2019, the Bankruptcy Court entered an order (the "**Bidding Procedures Order**") [D.I. [●]] granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures. Copies of the Bidding Procedures Order (which

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herewith.

      **PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder, or any other Successful Bidder, the Designated Contracts. A schedule listing the Designated Contracts (the "**Designated Contracts List**") is attached hereto and may also be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "**Cure Payments**") is set forth on the Designated Contracts List.

      **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO AN INITIAL DESIGNATED CONTRACT IN THE INITIAL DESIGNATED CONTRACTS LIST**. Under the terms of the proposed Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Designated Contracts until the opening of business on the date of the Auction, or until the conclusion of the Sale Hearing, if another Qualified Bid is not received by the Bid Deadline. Following the Auction, if an Auction occurs, and prior to the conclusion of the Sale Hearing, at the request of the Successful Bidder (who may be the Stalking Horse Bidder), the Debtors will modify the Initial Designated Contracts List to add or delete contracts and/or to change stated Cure Payments. If the Initial Designated Contracts List is modified, the Debtors will serve a supplemental notice of assumption and assignment on the affected counterparty, which shall identify the deadline for filing an objection with respect to the applicable Designated Contract.

## IMPORTANT PROPOSED DATES AND DEADLINES

1.     The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "**Sale Order**") and all objections related to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m. (ET)** (the "**Sale Objection Deadline**").

2.     The Auction for the Residents Program Assets, if one is necessary, will commence on **August 7, 2019 at 10:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, Pennsylvania 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

3.     A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Bankruptcy Court **on August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the United States Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

35599108.3 07/19/2019

## FILING ASSUMPTION AND ASSIGNMENT OBJECTIONS

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("**Designated Contract Objections**"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on August 5, 2019**. Objections to the ability of a Successful Bidder other than the Stalking Horse Bidder to provide adequate assurance of future performance shall be raised at or prior to the Sale Hearing.

Failure to timely file a timely Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder or Successful Bidder, as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE A TIMELY OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE PROPOSED BIDDING PROCEDURES ORDER AND THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

35599108.3 07/19/2019

Dated: July 19, 2019      **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*
    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

        -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

35599108.3 07/19/2019

Case 19-11466-WG   Doc 629-1   Filed 08/05/19   Page 6 of 229

**Designated Contracts List**

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 1 | Abington Memorial Hospital | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 2 | Abington Memorial Hospital | Master Agreement for Shared Rotational Arrangements with Hahnemann University Hospital June 29, 2007 | $0.00 |
| 3 | Abington Memorial Hospital and Solis Healthcare, LP | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 4 | The Centers for Medicare and Medicaid Services | Participating Provider Agreement | $0.00 |
| 5 | Friends Behavioral Health System, L.P. | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 6 | Friends Behavioral Health System, L.P. | Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC, dated June 2008 | $0.00 |
| 7 | Friends Behavioral Health System, L.P. | Memorandum of Understanding for Residency Rotation Agreement with Tenet HealthSystem Hahnemann, LLC | $0.00 |
| 8 | Prime Healthcare Services Roxborough, LLC | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 9 | Solis Healthcare, LP | Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated July 1, 2007 | $0.00 |
| 10 | Solis Healthcare, LP | Second Amendment to Agreement Regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated June 29, 2010 | $0.00 |
| 11 | Solis Healthcare, LP and Abington Memorial Hospital (duplicate of #3 above) | Agreement Concerning Family Medicine Training with Tenet HealthSystem Hahnemann, LLC, dated June 23, 2008 | $0.00 |
| 12 | St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 13 | Temple University Hospital and St. Christopher's Hospital for Children (co-debtor) | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 14 | Temple University Hospital | Academic Affiliation Agreement with Tenet HealthSystem St. Christopher's Hospital for Children, LLC, dated October 19, 2007 | $0.00 |
| 15 | Tower Health | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |
| 16 | Trustees of the University of Pennsylvania | Medicare GME Affiliation Agreement for July 1, 2019 through June 30, 2020 | $0.00 |

| No. | Counterparty/Counterparties | Contract Type and Description | Cure Amount |
|---|---|---|---|
| 17 | Trustees of the University of Pennsylvania | Agreement regarding Medicare FTE Resident Caps with Tenet HealthSystem Hahnemann, LLC, dated March 30, 2007 | $0.00 |
| 18-X | [INDIVIDUAL RESIDENTS] (to be provided and/or filed under seal) | Resident Employment Contract | $0.00 |

35599108.3 07/19/2019

# SCHEDULE 5

# AUCTION AND SALE NOTICE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |

## NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**") on June 30, 2019 and July 1, 2019.

**PLEASE TAKE FURTHER NOTICE** that on July 9, 2019, the Debtors filed a motion (the "**Sale and Bidding Procedures Motion**")[2] seeking the entry of orders, among other things, approving (a) procedures for the solicitation of bids in connection with the proposed sale of certain of the Debtors' assets to Tower Health (the "**Stalking Horse Bidder**") for $7.5 million plus the assumption of certain contracts and responsibilities of the Debtors with respect to Residents at Hahnemann University Hospital (the "**Sale**"), subject to the submission of higher or better offers in an auction process (the "**Auction**"); (b) the form and manner of notices related to the Sale; and (c) procedures for the assumption and assignment of contracts in connection with the Sale.

**PLEASE TAKE FURTHER NOTICE** that on July 19, 2019, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety. To the extent that there are any inconsistencies between the Bidding Procedures and the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale and Bidding Procedures Motion.

summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.  The deadline by which all Bids must be *actually received* by the parties specified in the Bidding Procedures Order is August 5, 2019 at 4:00 p.m. (prevailing Eastern time) (the "**Bid Deadline**").

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Residents Program Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

| Proposed Investment Banker to Debtors | Proposed Counsel to Debtors |
|---|---|
| SSG Advisors, LLC<br>Five Tower Bridge, Suite 420<br>300 Barr Harbor Drive<br>West Conshohocken, PA 19428<br>J. Scott Victor (jsvictor@ssgca.com)<br>Teresa Kohl (tkohl@ssgca.com)<br>Craig Warznak (cwarznak@ssgca.com)<br>(610) 940-3615 | Saul Ewing Arnstein & Lehr LLP<br>1201 N. Market Street,  Suite 2300<br>Wilmington, Delaware 19899<br>Mark Minuti (mark.minuti@saul.com),<br>Jeffrey C. Hampton (jeffrey.hampton@saul.com),<br>Aaron S. Applebaum (aaron.applebaum@saul.com)<br>(215) 972-7777 |

## Obtaining Additional Information

Copies of the Sale and Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including the Stalking Horse Purchase Agreement and all other documents filed with the Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Omni Management Group, https://omnimgt.com/sblite/centercityhealthcare/.

## Important Dates and Deadlines

1. The deadline to submit a Qualified Bid is August 5, 2019 at 4:00 p.m. (prevailing Eastern time).

2. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "**Sale Order**") and all objections relating to the Stalking Horse Bidder (collectively, "**Sale Objections**") is **August 5, 2019 at 4:00 p.m.** (prevailing Eastern time) (the "**Sale Objection Deadline**").

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Residents Program Assets.  The Auction, if one is necessary, will commence on August 7, 2019 at 10:00 a.m. (prevailing Eastern time), or such other date as determined by the Court, at the offices of Saul Ewing Arnstein & Lehr LLP, Centre

Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102 (or at any other location as the Debtors may hereafter designate on proper notice).

4.  Objections to the conduct of the Auction and the terms of a sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "**Auction Objections**") may be raised at the Sale Hearing (as defined below).

5.  A hearing (the "**Sale Hearing**") to consider the proposed Sale will be held before the Court on **August 9, 2019 at 11:00 a.m. (ET)**, or such other date as determined by the Bankruptcy Court, at 824 North Market Street, Wilmington, Delaware 19801.

### Filing Objections

Sale Objections, if any, must (a) be in writing, (b) state the basis of such objection with specificity and (c) be filed with the Court and served upon, so as to be **actually received on or prior to the Sale Objection Deadline**: (a) the Debtors Center City Healthcare, LLC, 230 North Broad Street, Philadelphia, Pennsylvania, Attn: Allen Wilen, Chief Restructuring Officer; (b) proposed counsel to the Debtors, Saul Ewing Arnstein & Lehr LLP, 1201 North Market Street, Suite 2300, Wilmington, DE 19899, Attn: Mark Minuti and Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn: Jeffrey C. Hampton; (c) proposed counsel to the Official Committee of Unsecured Creditors, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey, 07102, Attn: Andrew Sherman and Boris Mankovetskiy; and (d) counsel to the Stalking Horse Bidder, Stevens & Lee, P.C., 620 Freedom Business Center, Suite 200, King of Prussia, Pennsylvania 19406, Attn: Robert Lapowsky.

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY ASSERT AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE RESIDENTS PROGRAM ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.  IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.  ANY CREDITOR THAT RECEIVES NOTICE OF THE SALE HEARING AND FAILS TO TIMELY FILE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED UNDER SECTION 363(f)(2) OF THE BANKRUPTCY CODE TO SUCH SALE FREE AND CLEAR OF SUCH CREDITOR'S LIEN OR INTERESTS, IF ANY.**

35599172.2 07/19/2019

Dated: July 19, 2019

**SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Aaron S. Applebaum*

    Mark Minuti (DE Bar No. 2659)
    Monique B. DiSabatino (DE Bar No. 6027)
    1201 N. Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE  19899
    Telephone: (302) 421-6800
    Fax: (302) 421-5873
    mark.minuti@saul.com
    monique.disabatino@saul.com

    -and-

    Jeffrey C. Hampton
    Adam H. Isenberg
    Aaron S. Applebaum (DE Bar No. 5587)
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7700
    Fax: (215) 972-7725
    jeffrey.hampton@saul.com
    adam.isenberg@saul.com
    aaron.applebaum@saul.com

    *Proposed Counsel for Debtors and*
    *Debtors in Possession*

35599172.2 07/19/2019