1                      UNITED STATES BANKRUPTCY COURT

2                        DISTRICT OF DELAWARE

                                     .   Chapter 11

3 IN RE:                             .

                                     .   Case No. 19-11466 (KG)

4 CENTER CITY HEALTHCARE, LLC,       .

   d/b/a HAHNEMANN UNIVERSITY         .

5 HOSPITAL, *et al.,*                 .

6                                    .   Courtroom No. 3

                                   .   824 North Market Street

7                                    .   Wilmington, Delaware 19801

                                   .

8                  Debtors.     .   September 9, 2019

   . . . . . . . . . . . . . . . . .   9:30 A.M.

9

               TRANSCRIPT OF TELEPHONIC CONFERENCE

10             BEFORE THE HONORABLE KEVIN GROSS

               UNITED STATES BANKRUPTCY JUDGE

11

12 TELEPHONIC APPEARANCES:

13 For the Debtors:          Mark Minuti, Esquire

                        SAUL EWING ARNSTEIN & LEHR LLP

14                       1201 N. Market Street

                      Wilmington, Delaware 19801

15

   For U.S. Dept. of        Margaret Newell, Esquire

16 Justice:                 U.S. DEPARTMENT OF JUSTICE

                      1100 L Street, N.W.

17                       Room 10060

                      Washington, DC 20044

18

19

   Audio Operator:           GINGER MACE

20

   Transcription Company:    Reliable

21                       1007 N. Orange Street

                      Wilmington, Delaware 19801

22                       Email:  gmatthews@reliable-co.com

23 Proceedings recorded by electronic sound recording, transcript

   produced by transcription service.

24

25

1    TELEPHONIC APPEARANCES (Continued):

2

3    For Jefferson Health:        Patrick Jackson, Esquire
                                  Marita Erbeck, Esquire
4                                 DRINKER BIDDLE & REATH LLP
                                  222 Delaware Avenue Suite 1410
5                                 Wilmington, Delaware 19801

6    For the Pennsylvania        David Smith, Esquire
     Department of Health:       Richard Barkasy, Esquire
7    Department of Health:       SCHNADER HARRISON SEGAL & LEWIS LLP
                                  1600 Market Street, Suite 3600
8                                 Philadelphia, PA 19103

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 9:33 a.m.)

2          THE COURT:  Good morning, everyone, this is Judge

3  Gross on the telephone, and we're here regarding the form of

4  order for the sale of the residence program.

5          Is Mr. Sacks on the phone?

6          MS. NEWELL:  Your Honor, this is Margaret Newell.

7  I am going to be the person participating on behalf of the

8  United States and I work in Mr. Sack's office.

9          THE COURT:  Oh, wonderful.  Okay.  Thank you, Ms.

10  Newell, I appreciate that.  I didn't see him on the list.

11          Let me just say a few words at the beginning of

12  the call because of why we're here.

13          You know, no judge is pleased when his or her

14  decision is appealed because finality, particularly in a

15  bankruptcy case, is much preferred.  And parties would,

16  hopefully, negotiate a result.

17          At the same time in a situation such as this when

18  the court is ruling on a complex matter outside of the

19  court's normal experience and knowledge and absent compromise

20  which does not exist here.  The court understands that an

21  appeal is likely and the finality of its ruling is likely not

22  to be expected.

23          The order the court enters should, therefore, not

24  exceed what is necessary to give effect to its ruling.  Now,

25  CMS and the Pennsylvania Department of Health take exception

1  to the form of order presented.

2          The court had a little opportunity to carefully

3  review the order when it was originally presented, but had

4  the weekend to review it.  And the order presently, frankly,

5  does not reflect the difficulty the court had in reaching its

6  decision.

7          The court found that the sale of the residency

8  program is in the debtors' best interest and CMS does not

9  disagree with that point.  And the order should provide for

10  the ability of debtors and the Jefferson consortium to close,

11  you know, absent a stay pending appeal and for the Jefferson

12  consortium to have the benefits of its purchase which is why

13  the court approved much of the language to which CMS objected

14  the other day.

15          However, the language in paragraph thirty-four

16  pertaining to the Department of Health is outside of any

17  ruling by the court.  And the court does not see the need for

18  it.  I'll hear argument on it, but I don't see the need for

19  it.

20          So, I think that what I'd like to have first is to

21  hear from CMS I think regarding paragraph fourteen and then

22  I'll want to hear from the Department of Health concerning

23  its objection to paragraphs thirty-four and twenty-two.

24          So, Ms. Newell, you're up.

25          MS. NEWELL:  Thank you very much, Your Honor.

1       Your Honor, the United States had very little

2   notice of the debtors' change in position about, you know,

3   going forward without CMS's consent.  And so, I have to admit

4   that we were scrambling here to try to present our

5   objections, you know, fully to the judge.

6       And I don't think that the court really got a

7   chance to fully consider all of the United States rights with

8   respect to offset and recoupment in connection with the sale

9   mainly because I think the focus on our end was mostly about

10  the residency program itself.

11      I'd like to urge the court not to enter an order

12  that purports to have the sale been free of offset rights

13  with the United States.  I know that the court and the

14  parties are well aware of the <u>Folger Adams</u> case that with

15  your patience, I'd like to just briefly explain why I believe

16  that that case should not require a stripping of offset

17  rights of the United States here.

18      We do have offset rights, by the way, presently

19  because of determined overpayments.  And as of September 4th,

20  the hospital had over $1.5 million dollars in determined

21  overpayments that we could present evidence to for the court

22  if we were given an opportunity to file a motion for relief

23  from stay to offset which we would be happy to do.

24      Also, as of that date, about $1.5 million has been

25  placed in a freeze under the Supreme Court Trump decision to

1 protect the United States offset rights that are currently

2 existing and could be exercised if we got relief from the

3 stay.

4          We have not done a motion for relief from stay

5 yet, Your Honor, because due to the nature of the Medicare

6 program those -- the free and the amount of claims being

7 submitted by the debtors for prepetition services changes a

8 lot in the beginning of the case.  And so, we wanted to be

9 sure that we knew the extent of our offset rights and the

10 extent of the claims -- the mutual claims.

11          So, we have not yet gotten a chance to move for

12 relief from stay but we could do so quickly.

13          Going back to why I don't think that Folger Adams

14 should be applied in this case, there are few questions. This

15 case is very different from Folger Adams for three main

16 reasons.

17          One is we are presenting out objection to

18 stripping of our offset rights before the sale in this case.

19 And in Folger Adams, there was no objection.  That was a

20 dispute after the fact.

21          And, secondly, and you can see, I believe it's on

22 page 262 of the Folger Adam's decision which I believe we've

23 cited in the brief, but it's at 209 F.3d 252.  And the page,

24 I believe, is 262 that I'm citing to right now.

25          The counterparty to the contract with the debtor

1  in that case conceded that its claims were subject to -- that

2  were subject to offset rights could not be setoff after that

3  free and clear sale under 553 and 363(f).

4      So, although the court had, in fact, held on page

5  260 of that opinion, that setoff is not, in fact, the same

6  type of interest as a lien or any other interest in 363(f)

7  that could be stripped.  In fact, the party conceded that

8  because the sale had already taken place, he couldn't argue

9  that it had not been stripped.

10      The court then went on to analyze whether the

11  estate didn't actually have any property right at all because

12  of the offset that happened before the case.  And that's why

13  the Pioneer Commercial Funded Corp vs. United Airlines was

14  cited there.

15      So, the rest of the opinions that debtors like to

16  cite to, like on page 263 that talks about these setoff

17  rights being subject to 363 and extinguished really relate to

18  whether these things were not property that could have been

19  transferred under 363.  They were not property of the estate

20  in the first place, based on that, Pioneer Commercial Funding

21  case.

22      So, really I think in this case, the court should

23  look to the Third Circuit's original finding that generally

24  on page 260 setoff rights like a recoupment is a defense that

25  cannot be stripped.  It's not an interest in property like a

1 | lien that could be stripped under 363(f).

2 |    And that brings me to the third reason why Folger

3 | Adams should not be applied in this instance.  And that's

4 | because this is a federal right -- a federal offset right --

5 | federal government offset right; whereas, in Folger Adams

6 | that's out with private parties.

7 |    It does make a difference here.  It's not like the

8 | federal government is just special all the time.  There are

9 | statutes that require that offset rights and in addition to

10 | recoupment be preserved.

11 |    First of all, the debtors have asked the judge to

12 | find and rule that a change of ownership has happened under

13 | 42 C.F.R. 49.18.  Under such a CHOW, there would be both

14 | successor liability under the United States versus Vernon

15 | Home Health 21 F.3d 693, page 696.

16 |    I mean I know we've argued this already that, you

17 | know, with respect to the escrow that the debtors wanted to

18 | cap our claims, but it just -- I'm just pointing it out to

19 | the judge as a reason why this case should not be governed by

20 | Folger Adams because there is -- the court is only approving

21 | the sale based on a ruling that it satisfies the Medicare

22 | statutes requirements for a change of ownership which would

23 | entail full successor liability.

24 |    The second reason, Your Honor, is there's another

25 | statute, the assignment of claims statute and that's 31

1  U.S.C. 3727.  That's a really old statute.  It was passed to

2  prohibit assignment of claims against the federal government,

3  period; except for very limited circumstances such as certain

4  financing arrangements or claims that were -- for which the

5  United States had issued a warrant which doesn't even happen

6  anymore.

7        The courts have found that there are exceptions to

8  the applicability of that statute over the years.  The most

9  important case for the court to consider would be U.S. vs.

10  Aetna Casualty and Surety Company 338 U.S. 366.  That was

11  from 1949.

12        And so, after that, the Supreme Court decided

13  there that when there are transfers by operation of law such

14  as in bankruptcy, the claims could be transferred.  But the

15  court really seemed to be referring there to transfers by

16  operation of law.

17        The transfer by operation of law that happens for

18  claims, you know, against the United States in the context of

19  bankruptcy really is the transfer, the involuntary transfer

20  to the trustee or a debtor-in-possession.  Such as like a

21  transfer for the benefit of creditors.

22        If you look at that case, it's clear that they're

23  talking about transfers by operation of law.  The Section 363

24  sale is not a transfer by operation of law, but instead the

25  courts giving approval to a debtor to do a voluntary that it

1  sought approval for.  In fact, some courts have held that a

2  court order isn't even necessary to approve a 363 sale, even

3  outside the ordinary course of business where nobody objects

4  because it's really just the court giving the debtor

5  authorization to use the assets in this way.

6          It's not a transfer by operation of law by any

7  definition of that term. And I even searched this on Westlaw

8  yesterday looking to see if anybody called this a transfer by

9  operation of law, and it's really not.

10          So, I don't think that that exception to the

11  assignment of claims statute applies in a 363 sale.  And, in

12  fact, it's very clearly not applicable if the whole reason

13  for having the claims be subject -- well, it's not the whole

14  reason but if the transfer sought to be done free and clear

15  of the setoff rights that goes to the heart of one of the

16  reasons for the Assignment of Claims Act.

17          Under U.S. vs. Shannon 342 U.S. 288, this is an

18  old case too from 1952.  It's clear that a purpose of this

19  Assignment of Claims Act is to protect the United States

20  offset rights.  And the U.S. vs. Aetna Casualty Insurance

21  Company makes clear that even when there is a transfer by

22  operation of law, the only reason that would be accepted from

23  the ordinary prohibition of the assignment of claims against

24  the United States is because offset rights would be

25  preserved.  And so, there's less of a concern about, you

1  know, the purposes for the Assignment of Claims Act.

2           So, Your Honor, I think because of these statutes

3  and because the, you know, in essence, the debtors are trying

4  to transfer their claims under the provider agreement for

5  services provided by the debtor before the assignment of the

6  provider agreement to the purchaser.  The purchaser is merely

7  receiving those claims, the claims against the United States.

8           The court in its order contemplates ruling that

9  this is not a contractual relationship.  And so, these are

10 merely claims under the Medicare Program that are being

11 assigned, you know, bear claims being assigned to the

12 purchaser.  And the United States argues that Folger Adams

13 should be applied to allow these to be assigned free and

14 clear of the United States offset rights which would violate

15 the Medicare statute and 31 U.S.C. 3727.

16          If the court feels that this is appropriate to do,

17 the United States asks that it be given at least the

18 opportunity given the inadequate notice of this, you know,

19 request to strip offset rights.  The United States ask that

20 it be permitted to have the time to file a motion for relief

21 from stay and at least offset the $1.5 million dollars that

22 it has frozen in order to get relief from stay to preserve

23 that $1.5 million dollar amount for the Medicare trust fund

24 for the payment of healthcare services for Medicare

25 beneficiary.

1          Thank you, Your Honor.

2          THE COURT:  Ms. Newell, thank you.  Do you have

3 the order and can you point out to me language in the order

4 to which CMS objects?

5          MS. NEWELL:  Yes, Your Honor.

6          In paragraph twelve --

7          THE COURT:  Yes.

8          MS. NEWELL:  -- it says that the purchased assets

9 and the assigned contracts shall be free and clear of all

10 interest of any entity and it goes onto include rights of

11 offset in those interests.

12          THE COURT:  Yes.

13          MS. NEWELL:  So, to the extent that that relates

14 to the United States, the United States would like that to be

15 carved out of that.

16          THE COURT:  All right.  Does it make any

17 difference to CMS that there is a $3million dollar escrow?

18          MS. NEWELL:  No, Your Honor.  That would be

19 something that would be, in fact, -- if we stopped against

20 the $3 million dollars then that should be something separate

21 from the preservation of our offset rights.  Offset rights

22 are defenses to claims for payment.  And the $3 million

23 dollars should be reserved for additional separate claims

24 that we would make in excess of the offset rights that we

25 could exercise.

1          THE COURT:  All right.  All right, so it's the

2    language -- it's the words in paragraph twelve to which CMS

3    is objecting?

4          MS. NEWELL:  Right, Your Honor.  If the order is

5    not free and clear of the United States offset rights then it

6    would seem that our rights would be protected.

7          THE COURT:  Okay.  All right, let me hear now, if

8    I may, from either Mr. Minuti or Mr. Jackson or both.

9          MR. MINUTI:  Your Honor, Mark Minuti, Saul Ewing,

10   Arnstein & Lehr on behalf of the debtors.  Thanks for hearing

11   us this morning, Your Honor.

12         Your Honor, with all due respect to my friends at

13   the government, this objection to the sale order really is

14   nothing but re-argument of Your Honor's ruling that you made

15   last week on the motion and dare, I say, designed to buy more

16   to delay the closing so they get more time for a stay.

17         CMS's only objection, Your Honor, is to paragraph

18   12(i) of the order.  Paragraph 12(i) of the order is a free

19   and clear provision dare I say is in almost every -- I would

20   be surprised if it's not in every 363(f) order that Your

21   Honor enters.

22         363(f) allows the debtor to sell assets free and

23   clear of interest and the Third Circuit in Folger Adams, Your

24   Honor, made it crystal clear that a right to setoff is an

25   interest that can be stripped from an asset that's being sold

1 pursuant to 363(f).

2          Unlike recoupment which was held to be a defense,

3 Folger Adam held that a setoff right is, in fact, an interest

4 that can be stripped. And there's nothing about the facts in

5 that case, Your Honor, or there's nothing about the facts

6 here that would distinguish that holding from the facts in

7 our case.

8          Your Honor, that's been held by a number of other

9 courts, one of which includes Judge Walrath in her 2002

10 decision in the Trans World Airline case at 275 B.R. 712

11 where Judge Walrath held

12          "Section 363, on the other hand, does eliminate

13          setoff rights, vis-à-vis, a buyer, by permitting

14          the sale free and clear of such interest.  The

15          only exception to this result is if the setoff had

16          been exercised before the bankruptcy case is

17          filed."

18          In that case, Your Honor, Judge Walrath also

19 rejected a rejection based upon Citizens Bank of Maryland vs.

20 Stumpf, because whether the administrative fees -- that case

21 dealt with whether an administrative freeze violated an

22 automatic stay.  It really has nothing to do with the facts

23 of our case.

24          But, Your Honor, I want to remind the court that

25 this asset sale was of the residence asset programs. It was

1  not of any AR.  So what Your Honor heard the government say

2  was that they have frozen a million and a half of AR to deal

3  with what they believe is a million and a half dollars of

4  setoff rights.  Your Honor, that AR is not being transferred

5  to our buyer here so it's ineffective.

6          But the big issue, Your Honor, going back is that

7  their only objection is to paragraph 12(i) to the idea that

8  we're selling these assets free and clear the right of

9  setoff.  It is black letter law that that is permissible,

10 Your Honor.  Again, there's nothing about the facts of Folger

11 Adam that would make any difference.

12          And, again, I think what you've heard today, Your

13 Honor, is simply re-argument that they don't like the fact

14 that the assets are being free and clear of successor rights

15 including the right of setoff. But, again, they're holding

16 the million and a half, Your Honor, for these alleged setoff

17 rights, that million and a half dollars of AR is not being

18 transferred.

19          So, I would respectfully request that Your Honor

20 overrule their remaining objection.

21          THE COURT:  All right.

22          Ms. Newell, anything in response?

23          MR. JACKSON:  Your Honor, if I may Patrick Jackson

24 --

25          THE COURT:  Yes.

1          MR. JACKSON:  Drinker Biddle for Jefferson.

2          To that, I agree with everything Mr. Minuti just

3   said.  I would also point out that I think the distinction

4   Ms. Newell made with respect to <u>Folger Adam</u> was that in that

5   case it was backward looking.  The court was looking post-

6   sale at what the effect of the sale had had on the setoff

7   rights.  And Ms. Newell is arguing that well, here, the

8   government is appearing before the sale.

9          And I just wanted to circle back to something that

10  I touched on at length in argument at the hearing and what

11  that means.  If we take that paradigm and say, okay, here's

12  the government prior to the sale recognizing that setoff

13  rights are an interest in property that may be stripped free

14  and clear under 363, what is the government's remedy?  If the

15  government's remedy is to demand adequate protection of the

16  interest that is being sold free and clear off.

17         They have the right to demand adequate protection

18  under 363(e).  If they do, then the burden is on them.  The

19  evidentiary burden is on them under 363(p) to establish the

20  nature and scope of the interest for which they seek

21  protection.

22         They didn't.  The only evidence that was put on at

23  the hearing established that the $3 million dollars that's in

24  the escrow is -- that the amount of any claims that the

25  government may have on account of the provider agreement is

1 | not likely to exceed the amount of the $3 million dollar

2 | escrow.

3 |         And I would note that, if anything, it seems that

4 | more true now than it was last week because there was nothing

5 | in the record previously about a $1.5 million dollars of

6 | additional AR that the government is holding.  So, in

7 | essence, the government's got $4.5 million of cushion,

8 | depending on what the outcome, of course, of their setoff

9 | against those AR is.  So, I think this just ties, you know,

10 | to the extent you can differentiate Folger Adams.  It doesn't

11 | help the government here because the proceeding was fair.

12 | They had an opportunity to establish the scope of the

13 | interest that they would need protected and they didn't.

14 |         THE COURT:  All right, Ms. Newell, any response?

15 |         MS. NEWELL:  Yes, Your Honor.  I'd like to make a

16 | few points.  I'm familiar with Judge Walrath's TWA decision

17 | which, as you know, is not binding on you, but I understand

18 | how they wanted to make the association.

19 |         That case did not, in fact, deal with the transfer

20 | of any claims against the government and it did not, in fact,

21 | deal with setoff rights.  It, instead, had to do with EEOC

22 | and certain claims that had to do with -- they were successor

23 | liability claims under the statute.  The statute provided

24 | that the successor to a particular entity would be liable for

25 | claims.  And the court did say that it was following Lucky

1  Smoke with Coals analysis and it referred to Folger Adam as

2  saying that any interest in property could be something other

3  than in rem interest.  But it does not deal with offset

4  rights.  And so, I don't think that it's helpful to the

5  debtors' case here.

6        The question about adequate protection and the

7  burden, it is possible that if we had had time we could have

8  point on a case about adequate protection.  We could also do

9  that if we had an opportunity to seek relief from the stay to

10  provide the court with the evidence that we have about what

11  our overpayment are.

12        I mean they've been determined by the agency and

13  so, we could do that.  I don't understand what the adequate

14  protection could be for the United States in the

15  circumstances since the debtor is not actually operating

16  anymore.  And I don't actually what Mr. Minuti was saying

17  when he said that they are not accounts receivable being

18  transferred.  So, our frozen funds will not be affected by

19  the sale.

20        If the provider agreement is -- I guess if there's

21  a change of -- if the court is ruling that there's a change

22  of ownership of a provider agreement, is it not the case that

23  the purchaser could make claims under the provider agreement

24  after the fact.  Because if that's true, I mean that would be

25  helpful and we would just say that no claims under the

1 provider agreement would be purchased assets this transaction

2 and therefore the purchasers would no rights to make claims

3 under the Medicare program and they would remain with the

4 estates.  But that's not the way I read this order.  Thank

5 you, Your Honor.

6          THE COURT:  All right, Thank you, Ms. Newell.

7          Well, I do think the language here is appropriate.

8 I read Folger Adams and to provide that setoff rights can, in

9 fact, be extinguished in a sale such as we have here.  And I

10 appreciate the fact that the government is talking about, you

11 know, a motion to lift stay and the like which dealt with an

12 accounts receivable which are not being transferred in this

13 sale.

14          I think that's what Mr. Minuti meant.  And so, it

15 takes care of the accounts receivable.  And there is an

16 escrow available to the government for overpayment of

17 Medicare.  So, I do think that there is adequate protection

18 here and although I know that's not been established.  It's

19 not been tried before me but I think that that is the case

20 and, accordingly, I do believe the language here is

21 appropriate.

22          MS. NEWELL:  Your Honor.

23          THE COURT:  Yes.

24          MS. NEWELL:  Can I ask one clarifying question

25 then?

1        THE COURT:  Yes.

2        MS. NEWELL:  If there are no accounts receivable

3 being transferred is it correct that the United States should

4 -- it would be not barred by this order from filing a motion

5 from stay or from stay to offset the withheld amounts against

6 claims that are -- that the debtor has submitted for

7 reimbursement.

8        THE COURT:  Are you talking about the overpayments

9 or are you talking about the accounts receivable?

10        MS. NEWELL:  Well, Your Honor, if the accounts

11 receivable at not being transferred under this order I assume

12 that the United States would not be barred from filing a

13 motion for relief from stay to offset the withheld amount

14 that it withheld from the debtor's clams for reimbursement in

15 order to offset those against the United States overpayment

16 clams for prepetition services, is hat correct?

17        THE COURT:  Well, you know, look, obviously the

18 government is free to file a motion to lift the stay.  That's

19 certainly not prohibited but, Mr. Minuti, can you be helpful

20 here because the $1.5 million that's been frozen, I think

21 exceeds the amount of overpayment.

22        MS. NEWELL:  Your Honor, look, obviously, the

23 government can file a motion as Your Honor said.  We'll take

24 a look at it.  I mean, look, the facts are that the frozen

25 funds are estate property.  And so, if the government

1  believes it has the ability to offset an overpayment against

2  the estate property, they can file their motion an we'll

3  respond to it, Your Honor.

4        Again, because the AR is not being -- that AR is

5  not being transferred to a buyer under the circumstance.

6  Your Honor, I don't believe this order would be a bar for

7  them to the government filing a motion.

8        MS. NEWELL:  Thank you, Your Honor.

9        THE COURT:  But, look, I do think as in all cases

10  that it would make sense for the government to talk to the

11  debtors about any overpayments.  All right.

12        MS. NEWELL:  Your Honor, we have, in fact, asked

13  the debtors about these particular frozen payments.  In fact,

14  they don't -- the frozen funds do not exceed the amount of

15  overpayments.  We've set our system so that it would not do

16  so.

17        THE COURT:  Okay.  All right.

18        That is the CMS objection.  Now, Mr. Barkasy on

19  behalf of the Department of Health, your objection.

20        MR. SMITH:  Your Honor, this is David Smith and

21  with Mr. Barkasy's permission, I'd like to address that for

22  Your Honor.

23        THE COURT:  Sure, Mr. Smith.  Good morning.

24        MR. SMITH:  Good morning.  So, the Department of

25  Health's objection is to paragraph 134.  And I think it would

1  be helpful to start with paragraph twenty-two.  The

2  Department of Health asked for essentially the first sentence

3  of paragraph twenty-two without the subject of paragraph

4  thirty-four language.

5         So what we requested was nothing in this order is

6  intended to abrogate or limit the authority or discretion of

7  the Pennsylvania Department of Health over regulatory matters

8  such as closure and licensing of healthcare facilities.

9         And that was important to the Department of Health

10 because this is still an open hospital.  The walkthrough

11 which is the last step before closing authorizing the closure

12 of the hospital is scheduled for September 16th.

13        When the hospital closes, the license, the

14 Pennsylvania State License, automatically ends.  So there's

15 nothing left to be licensed. And that license is not being

16 sold and, therefore, we see no obstacle to performing that on

17 -- performing that walkthrough on the 16th and ordering the

18 hospital closed.

19        The debtors and Jefferson then added this subject

20 of thirty-four and then provided that if CMS seeks

21 administrative action or processing by the Pennsylvania

22 Department of Health as state survey agency to process the

23 CHOW, the Department of Health shall perform such action to

24 give effect to this transaction.

25        Now when the Department of Health acts as a staff

1  survey agency in this context what it is doing, according to

2  its own rules and regulations, is it is evaluating the

3  transfer of the license of a facility to a new owner of that

4  facility and attendant to that is to sign off for the federal

5  government on the transfer of the provider agreement.

6         In other words, it's telling the federal

7  government we approve that a is going to replace b as owner

8  of the hospital University -- Hahnemann Hospital and you're

9  okay to transfer the CHOW -- transfer the provider agreement

10 at the same time.

11        What they're purporting to do here is to mandate

12 that the Department of Health in the absence of a request to

13 transfer a license do something that it's not authorized to

14 do which is to pass on the propriety of a federal transfer.

15        So what I propose here is that on twenty-two that

16 prefatory language subject to paragraph thirty-four of the

17 order be stricken.  And the provisos provided that CMS all of

18 that be stricken as well.

19        Then when we get to paragraph thirty-four,

20 paragraph thirty-four has no application to the Department of

21 Health until you get down to that very last sentence with

22 respect to the Pennsylvania Department of Health, the

23 provisions shall apply if its appointed as the state survey

24 agency.  And then it says and from taking any further steps

25 in connection with the debtors' closure process or,

1  otherwise, seeking the revocation, surrender and/or

2  termination of the debtors' hospital licenses.

3          Well right now, we have, as a matter of law, an

4  open hospital.  It's got to be closed.  The Department of

5  Health is willing to put off a little bit, which is ironic

6  given the litigation to force the Department of Health to act

7  more quickly on closure.  But they're willing to put off

8  until the end of September to close the hospital provided

9  that there is insurance covering the facility during that

10 time.

11         And what the Pennsylvania Department of Health

12 also needs is the right to refuse to act as a state survey

13 agency for the federal government, that they can't be ordered

14 to serve as the agency of the federal government when their

15 own license is not being transferred.

16         THE COURT:  All right, so you want out significant

17 language from paragraph twenty-two.  And the language from

18 paragraph thirty-four.

19         MR. SMITH:  Right.  And they can just delete that

20 sentence relating to the Department of Health if twenty-two

21 provides that the Department of Health has no obligations.

22 It just has to do its job.

23         THE COURT:  All right.  All right, Mr. Minuti, or,

24 Mr. Jackson.

25         MR. MINUTI:  Your Honor, I guess, we'll keep in

1   the same turn.  Mark Minuti, again, on behalf of the debtors.

2           Your Honor, let me put this in context so the

3   court understands where we're going.  And, look, this is sort

4   of, you know, we're trying to thread the needle here a little

5   bit and, you know, maybe the language wasn't perfect, let me

6   tell Your Honor what we're trying to do here and what this is

7   all about.

8           As part of the court's ruling last week, the court

9   included a seven-day staff of the effectiveness of the sale

10  order to provide CMS and other agreed parties with the

11  opportunity to seek relief in the district court.

12          And the court will recall last week that I raised

13  a concern that certain actions could occur in the interim

14  which could jeopardize the sale.  And, therefore, we asked

15  that Your Honor if you're going to impose a stay on the

16  effectiveness of the order, we said look, put in place a stay

17  that would apply to all parties that would preclude anybody

18  from taking action that would jeopardize the sale during this

19  time.

20          At page twenty-two, line 23 of the transcript of

21  last week's hearing, the court specifically asked me, what

22  were the other concerns that I had regarding parties taking

23  action.

24          And while I listed several concerns, the first

25  appears at line 25 on page 22 of the transcript and I'll just

1  quote myself as I indicated to Your Honor, I hate when other

2  people do that.  But what I do on the transcript last week

3  was, Your Honor, "Well, Your Honor, look, in theory, the

4  Pennsylvania Department of Health, could take action with

5  respect to the license."

6          So, what we don't want to be -- where we don't

7  want to be, Your Honor, is in a situation where the

8  effectiveness of the order stayed.  We can't close the

9  transaction.  The government has an opportunity to go to the

10  District Court to try to get a stay.  But that if somebody

11  does something in the interim that would make this $55

12  million dollar asset disappear.

13          So, I believe at the end of the hearing, the court

14  ultimately agreed with me and said, look.  We should stay

15  everything.  In other words, we're maintaining the status quo

16  to give the government this opportunity.

17          The court will recall at that hearing, Mr. Barkasy

18  was there and got to the podium and raised the question about

19  paragraph twenty-two, but he didn't say anything about the

20  stay, Your Honor, staying the status quo.

21          And so, if you look at paragraph thirty-four, Your

22  Honor, and let's start there, what we tried to do was

23  incorporate what I thought the court agreed to last week.

24  Essentially it effectuates the court's ruling by delaying the

25  effectiveness of the order for seven days.  But then it goes

1  onto include language that was designed to maintain the

2  status quo.

3          And at the end of the paragraph, Your Honor, at

4  the end of paragraph thirty-four, we added specific language

5  to restrict the stay as it applied to the Pennsylvania

6  Department of Health believing, Your Honor, that that would

7  resolve their concern with respect to what they could or

8  could not do.

9          And so if we look at the last sentence that we

10 added to paragraph thirty-four, it says with respect to the

11 Pennsylvania Department of Health, the provision of this

12 paragraph thirty-four, in other words the maintaining of the

13 status quo shall only apply to stay the Department of Health

14 in its capacity as a state survey agency, and I'll come back

15 to that in a minute, and/or from taking any further steps in

16 connection with the debtors' closure process or otherwise

17 seeking to revoke, surrender or terminate the hospital

18 license.

19         And the reason that's important, Your Honor, is

20 because if the hospital license is terminated, all right,

21 there's, at least, the argument that the government has that

22 only licensed hospitals can have provider agreements and,

23 therefore, if the state license is terminated, the provider

24 agreement goes away and, therefore, our $55 million dollar

25 asset goes away.

1          So, again, the idea with this language was to be

2    very narrow with respect to the Department of Health and

3    preclude them from terminating the license.  And, remember,

4    at this point, Your Honor, we're no longer treating patients

5    at the hospital.  So nothing in terms of the facts should

6    change.  And so, we don't really think this is much of a

7    restriction at all.

8          All we're asking is for the Department of Health

9    to sit tight, not do anything to terminate the license, while

10   we allow the appeal process here to unfold and see where we

11   go.

12          Now, let me come back to the language, Your Honor,

13   that deals with the restricting the Department of Health in

14   its capacity as a state survey agency and that gets back to

15   the language at twenty-two.

16          The reason why the language at twenty-two is

17   important for the debtor and it's important to Jefferson is

18   the following, Your Honor.  It is pretty clear to us or was

19   pretty clear to us from the hearing last week and the

20   Department of Justice or the United States' comments that the

21   United States obviously feels that Your Honor got this wrong

22   and that you're directing them to do something they're not

23   required to do.  And so, we don't have a lot of comfort, Your

24   Honor, that the government was going to follow the court

25   order and actually effectuate the transfer of the provider

1 agreement and let this happen.

2          And so, Your Honor will recall at last week's

3 hearing, we walked through a number of the provisions of the

4 order which bound the government to do certain things but it

5 was the natural flow from a decision that the proviso

6 agreement was being transferred.

7          And Your Honor ultimately over the government's

8 objection said that's right because the government's real

9 quarrel was not with these things happening, but with the

10 ultimate decision that the provider agreement could be

11 transferred and Your Honor overruled that objection.

12          This provision in paragraph twenty-two, Your

13 Honor, is the same.  What paragraph twenty-two is saying is

14 that the government is required to do something and notify

15 the Department of Health to take action. And all paragraph

16 twenty-two is designed to say is if the government doesn't do

17 that because they don't like Your Honor's ruling that the

18 provider agreement has changed hands, that the Department of

19 Health, frankly, is protected by paragraph twenty-two and can

20 effectuate the change not withstanding the fact that the

21 government or CMS doesn't instruct them to do so.

22          So, again, Your Honor, we think the steps that

23 we've outlined in paragraph twenty-two really gives the

24 Department of Health comfort that they can take this action

25 notwithstanding the federal government's directive.  And

1  really what it is, is, Your Honor, the natural flow from Your

2  Honor's decision that, in fact, these assets can be

3  transferred ultimately to our buyer.

4          So, in conclusion, Your Honor, again, I think what

5  we're trying to here is effectuate Your Honor's order in a

6  way where the status quo is maintained.  But if we're allowed

7  to proceed, Your Honor, either because they don't get a stay

8  or they don't appeal that what is supposed to happen will, in

9  fact, happen which is we can transfer this asset and the

10  steps that are required to be taken in order for that asset

11  to be allowed to be transferred will, in fact, be taken.

12          So that's why those provisions are there, Your

13  Honor.  Again, I think if you look at paragraph thirty-four,

14  the end was designed to narrowly tailor it and significantly

15  limit exactly what we're trying to ask the Department of

16  Health to do.  Thank you, Your Honor.

17          THE COURT:  Anything to add, Mr. Jackson?

18          MR. JACKSON:  I've actually deferred to my

19  colleague, Marita Erbeck who's been a little out front on

20  this particular issue.

21          THE COURT:  All right, Ms. Erbeck.

22          MS. ERBECK:   Good morning, Your Honor.  Marita

23  Erbeck, Drinker Biddle & Reath for Jefferson.

24          We join in the comments made by Mr. Minuti.  He

25  articulated the issue well.  I would add just a few notes

1          Essentially, you know, as Mr. Minuti has

2    described, it's important to deal with the Department of

3    Health in the standstill concept in paragraph thirty-four for

4    two reasons.  One as an agent for CMS and, two, with respect

5    to, you know, the effectiveness or termination of the state

6    hospital license.

7          I think first with respect to the state survey

8    agent, Mr. Smith noted that they want the flexibility to

9    decline to serve as state survey agent for CMS in this

10   transaction.  Nothing in the order would limit them from

11   doing that.  It's only to the extent that they do serve as

12   state survey agent.  They would then be bound.

13         I think it's important, you know, it's clear based

14   on the argument last week and the argument this morning that

15   CMS objects to this sale as strenuously as they could and

16   they would, you know, they hope to prevent it from going

17   forward.  You know, they're fighting it tooth and nail.

18         I think it's important for us to sort of close a

19   potential loophole and that's how we view DOH acting as state

20   survey agent for CMS, to the extent that they do.  If they

21   decline, then the language that would be here in this order

22   closing that loophole would be of no effect on them because

23   if they're not serving as state survey agent then that's

24   fine.  If they are, they then need to do all of those things

25   that CMS needs to do in connection with this order.  And to

1 us, again, that sort of closes an obvious, but unintended

2 loophole.

3      With respect to the second point about maintaining

4 the status quo, I think Mr. Smith's comments also highlight

5 the importance of time.  In many ways, this feels sort of

6 like a race against the clock.

7      You know, we added paragraph thirty-four in order

8 as Your Honor said at the outset to essentially allow both

9 the United States to appeal and to allow Jefferson and the

10 debtors to close the transaction if there's no stay pending

11 appeal you know obtained during that seven day stay period.

12      And with respect they think eliminating the

13 ability -- eliminating the status quo for the hospital

14 license in the sort of period of time that we're talking

15 about puts at risk the ability to close.

16      Now, Mr. Smith indicated that they might be

17 willing to put off I guess the walkthrough or sort of

18 licensure process until the end of the month and so, perhaps

19 a potential solution for that second piece is to limit sort

20 of the status quo applicable to the Department of Health for

21 say fourteen days so that, you know, as long as the

22 walkthrough is not until the end of the month then that sort

23 of licensure standstill if it's fourteen days wouldn't

24 prejudice the Department of Health in any way.

25      But I think, you know, we're worried about the

1  potential downstream effects that Mr. Minuti suggested that

2  if the license is terminated, suspended, you know, any of the

3  above by DOH then it potentially gives CMS a new argument

4  with respect to transfer of the provider agreement.  And I

5  think we're trying to avoid any gotcha moments as a result of

6  the change of facts which that certainly would be and we're

7  trying to eliminate those downstream negative effects.

8          MS. NEWELL:  Your Honor, this is Margaret Newell.

9  If there's an opportunity for me to be heard or respond to

10  that, I'd like to take advantage of it.

11          THE COURT:  Go ahead, Ms. Newell.

12          MS. NEWELL:  Thank you, Your Honor.  First of all,

13  I don't think that the Pennsylvania Department of Health rule

14  as state survey agent should be in any way characterize as

15  agency relationship for the United States.  I don't think

16  that's correct.  But it's not like I have really had the

17  opportunity to thoroughly research that.  I just don't think

18  that that's the appropriate characterization.

19          And, secondly, I don't understand why Jefferson

20  attorney needed to make such inflammatory statements about

21  the United States.  It's true that we object to this sale to

22  preserve the integrity of the Medicare system and CMS's

23  authority under it.  But there will be no gotcha moments if

24  the hospital loses its license because it fails to meet the

25  state's requirements.  That's not something that the United

1  States would make happen.  And it is what it is.

2          If it provides a separate reason for something to,

3  you know, fall through for Jefferson that's not a gotcha by

4  the United States and I don't appreciate that that

5  inflammatory language was used.

6          MS. ERBECK:  Your Honor, if I may.  I was not

7  trying to be inflammatory.  And I'm not suggesting that the

8  United States would cause the Department of Health in its

9  individual capacity to do anything with respect to the state

10 license.  But I think that the sort of effect and intent of

11 Your Honor's ruling with respect to this seven-day stay

12 period is exactly as Mr. Minuti described.

13         It's not only with respect to CMS.  It's with

14 respect to the world so that the facts on the grounds don't

15 change such that the transaction cannot go forward.  And I

16 actually think that Mr. Newell's comments highlight the

17 importance for the Department of Health to be subject to the

18 stay.  That if there is a change effects on the ground, the

19 hospital is no longer licensed, then I think the position

20 would be taken that the provider agreement can't be

21 transferred.

22         Certainly, that's not the intent of the court's

23 ruling last week.  The intent is for during this period of a

24 stay nobody is prejudiced. Right. So, the Department --

25 rather CMS and the Department of the Justice has the

1  opportunity to appeal and that they will not be statutorily

2  mooted by the transaction closing.  But at the same time,

3  Jefferson and the debtors should not be effectively mooted by

4  facts on the ground changing and that is the intent, purpose

5  and goal of paragraph thirty-four.  And it should -- all

6  parties should be subject to it not only CMS.

7        We recognize that the Department of Health and,

8  frankly, that's why the language of paragraph twenty-two was

9  added.  Paragraph twenty-two was added before Your Honor

10  ruled on the seven day stay period. And so, armed with that

11  new component of the ruling, we needed to sort of deal with

12  all things that could happen during that seven-day period,

13  not just with respect to CMS, but also with respect to the

14  Department of Health that could cause a change of facts on

15  the ground such that Jefferson no longer has the benefit of

16  its bargain.

17        And so as to eliminate the argument that CMS would

18  likely make that the provider agreement can no longer be

19  transferred, I think sort of, the comments on the record

20  today sort of only go to highlight the importance of that

21  language.

22        THE COURT:  Well, clearly -- first of all, you

23  know, the normal stay is fourteen days, not seven.  And I

24  applied seven because I wanted to give the Government a fair

25  opportunity to get before the District Court if it chooses to

1  obtain a stay pending appeal or apply for one.  That is

2  number one.

3          Number two, I do agree that during this period

4  that the effectiveness of the order is stayed that there

5  ought to be a general stay against parties taking any actions

6  which will jeopardize the sale should the District Court not

7  stay the order or if the appeal not be successful.  So, that

8  was the purpose; that was the court's purpose in saying that

9  there ought to be a stay of others taking action.

10          I think that Paragraph 22 and Paragraph 34, you

11  know, do that, but Mr. Smith, is there other language that

12  you would suggest?

13          MR. SMITH:  Yes, Your Honor.  First, I think that

14  Ms. Erbeck is mistaken when she says that Paragraph 22

15  doesn't purport to compel the Commonwealth of Pennsylvania

16  Department of Health to exercise its police powers in a

17  manner contrary to what Pennsylvania law would apply.

18          And if you look at Paragraph 22, and I'm looking

19  at the carry-over sentence at the bottom of Page 19 to the

20  top of Page 20, it says that if the Department of Health is

21  asked, as a state survey agency, to process the challenge

22  transfer it shall perform such action.  It does not give the

23  Commonwealth the right to decline to work with the Federal

24  Government, with CMS on that issue.

25          The second is Mr. Minuti's argument about why the

1 Department of Health should be ordered is an argument that

2 actually I've never heard, and I've been practicing now for

3 more than forty years, and that is he says that they're

4 afraid that the CMS will be in contempt of this court's

5 order.  So, the Department of Health, as a bystander, should

6 be ordered to perform as the Federal Government was supposed

7 to perform under the order.

8             I don't think that's appropriate and I don't think

9 that the Bankruptcy Court has the jurisdiction to dictate to

10 the Department of Health how it's going to perform its public

11 safety.  We have an open hospital here and it is a licensed

12 hospital.  The testimony is that it is advising patients on

13 successors in terms of medical treatment. We don't know

14 whether the facility is insured or not insured, but that's

15 something that is of significance to the Department of

16 Health.

17             My suggestion is that for Paragraph 22 we leave it

18 just as the language that was proposed by the Department of

19 Health which is deleting the beginning, the subjective

20 Paragraph 34 of this order, and then deleting everything

21 after the semicolon after the word facilities on the third

22 line.

23             I don't think that the Department of Health can be

24 ordered to approve either a transfer of a license, which I

25 understand is not being requested here.  The license is not

1  an asset and it can't be compelled to serve as an agency of

2  CMS as the Federal Government if the Federal Government

3  declines or, otherwise, doesn't act on the transfer of the

4  provider agreement.

5        With respect to 34, I have no objection to the

6  language at the end, the Paragraph 34 shall apply only to

7  stay DOH in its capacity as a state survey agency.  For that

8  the Department of Health will simply decline to act as an

9  agent and it will not be in violation of Paragraph 34.

10        With respect to closure I think that the only way

11  that the court should include anything on the Department of

12  Health's licensing of Hahnemann Hospital in this order is by

13  agreement.  What we've offered is to put off the September

14  16th walk-through, which is something requested by Hahnemann,

15  to the end of the month and at the end of the month the

16  license is going to expire when the hospital is closed.  They

17  can't be compelled to license Hahnemann Hospital when it's no

18  longer functioning as a hospital.

19        I am willing to have a discussion with them about

20  continuing it to September 30th.

21        THE COURT:  Well, perhaps the order can provide

22  that, for one, and make it subject to further order of a

23  court in the event, for example, there is a pending appeal or

24  the like.

25        Does that make sense to anyone?

1          MS. ERBECK:  Judge, this is Marita Erbeck from

2    Drinker Biddle.

3          I think, you know, to the extent that the -- I

4    guess I'm looking at Paragraph 34 in that last sentence, Sub-

5    Clause 2 from taking any further steps in connection with the

6    closure process.  I guess to the extent that we limit that to

7    September 30th, I think that that would work for Jefferson,

8    you know, subject to further order of the court.

9          I guess I would say with respect to Paragraph 22,

10   I would respectfully submit that we need that prefatory

11   language in Paragraph 22 because if we don't -- if Paragraph

12   22 is not subject to Paragraph 34 then I think it could be

13   read to, essentially, let the Department of Health out of

14   Paragraph 34.  So, if that language is staying in 34 I would

15   submit that that prefatory language in 22 needs to stay.

16         THE COURT:  And do you also need the provided

17   language provided that if CMS, blah, blah?

18         MS. ERBECK:  Respectfully, Judge, I think we do

19   because I think that is dealing with the Department of Health

20   as state survey agent.  I just disagree with Mr. Smith's

21   reading.  I don't think it requires them to be state survey

22   agent because it does provide that if, you know, CMS or its

23   agents, et cetera, you know, by the Department of Health in

24   its capacity as state survey agency.

25         If they are not acting as the state survey agent

1   then it wouldn't, otherwise, apply, but if they are -- again,

2   I take no position as to whether they are or whether they

3   aren't.  I think in Pennsylvania they are.  That is what I'm

4   advised, but if they aren't then that's okay.  I don't think

5   this requires them to act as state survey agent.

6          THE COURT:  Well, then maybe that language could

7   be in there if it is acting as a state survey agency.

8          MS. ERBECK:  I think that -- go ahead, Mr. Minuti.

9          MR. SMITH:  If I may, this is David Smith.

10          MS. ERBECK:  Okay.

11          MR. SMITH:  What that proviso -- what it says

12   today, in Paragraph 22, is if the Department of Health is

13   asked it shall perform such action.  So, it does not permit

14   the Department of Health to decline.  That is my objection.

15   It doesn't say if it's asked and if it accepts it shall do

16   something.

17          MS. ERBECK:  I'm not -- sorry.

18          THE COURT:  Let Mr. Smith finish.

19          MS. ERBECK:  I know.  I apologize, Judge.

20          MR. SMITH:  I don't think that proviso belongs.

21   That proviso purports to dictate to the Department of Health

22   how it will evaluate under its rules and regulations this

23   proposed transfer.  The Department of Health has no -- wishes

24   to take no position on the transfer.  It will decline to

25   serve as agency, but if it were to serve as agent the court

1  can't dictate the outcome of that.  That's an evaluation of

2  public safety, of healthcare.  That is why it's wrong.

3          My proposal to get by this sticky issue, and I

4  understand the importance of the issue to the court and it's

5  not my goal here to put in language that tanks the deal, but

6  my proposal was that the language should clearly state that

7  if the Department of Health is asked to act as agent for CMS

8  it is free to decline.

9          THE COURT:  Does that -- doesn't that help, Mr.

10 Minuti?  Ms. Erbeck?

11         MR. MINUTI:  Your Honor, Mark Minuti on behalf of

12 the debtor.

13         You know, I listened very carefully to Mr. Smith's

14 argument and at the end of the day, Your Honor, what Mr.

15 Smith is saying is that I don't want to be bound by any stay

16 that applies to my client.  My client shouldn't be stayed.

17 And in the context of what we're trying to do here, which is

18 come up with something equitable that provides some

19 protection to the government and yet maintains the status quo

20 so we can try and get this transaction done, requiring the

21 Department of Health to do what naturally flows from a

22 decision that authorizes the transfer of the provider

23 agreement I don't think is a huge imposition on the

24 Government.  I appreciate why they don't like it.

25         The alternative, Your Honor, and the only

1    alternative that Mr. Smith has offered is to remove any

2    restrictions on the Department of Health.  That gives them

3    too much power to take any action they want.  That's going to

4    put in place a fifty foot -- you know, that's going to put in

5    jeopardy a $55 million dollar asset.

6            So, again, when you really focus on what we're

7    doing we're simply saying that if they choose to act as a

8    survey agency they will move forward as they are required to

9    do.  I don't think that's an incredible imposition and I

10   think that is consistent with Your Honor's ruling of

11   maintaining the status quo and does it in the narrowest way

12   possible so that, look, if there's some emergency that pops

13   up next week and they feel they need to take action it

14   wouldn't be restricted, Your Honor.

15           THE COURT:  Well, that is what I was going to say.

16   It may be that the Department of Health is concerned that it

17   may need to take action.  And I would say this; that should

18   be subject to further order of the court, but that this

19   language applies subject to further order of the court so

20   that if the Department of Health sees a problem, needs to get

21   relief so that it can take action, it can come to court on an

22   emergency basis and have the court authorize it to take

23   action.

24           Doesn't that do it, Mr. Smith?

25           MR. SMITH:  No, it does not.  Is Your Honor

1  ordering the Commonwealth Department of Health to license

2  this hospital indefinitely into the future?

3          THE COURT:  No, no.  I would say at the moment

4  that ought to be subject to the September 30th date.

5          MR. SMITH:  And we would agree to a thirty day

6  stay.  And if something happened during we would agree to a

7  stay until September 30th.  And if something happens during

8  that period of time, we would be willing to come back to the

9  court on that emergency issue, but we're not agreeing that

10 the license will remain in place indefinitely.

11         THE COURT:  I understand that.

12         MR. SMITH:  And in terms of how we relate to CMS

13 we expect that CMS will obey any valid order of this court

14 and I don't think that we need to be in this order as a

15 backup to CMS.  So, we need to have the right to decline to

16 serve as agent to CMS.  Let CMS do its own.

17         The reason for that, Your Honor, is that -- I

18 don't think it's any secret that when Drexel was the expected

19 purchaser Drexel came to the Department of Health and tried

20 to address some of these same issues.  The answer that the

21 Department of Health gave to Drexel, and I was by telephone

22 on some of those meetings, was we don't see any way to do

23 that because you're not -- we can't transfer Hahnemann's

24 license for its facility at Board & Vine to Drexel's facility

25 wherever it may turn out to be, but in a different location.

1  The Department of Health license locations.  So, when it is

2  asked, if it is asked to serve as agent of CMS --

3              THE COURT:  Well, I do think then that the

4  Department of Health that the order should provide that the

5  Department of Health has the authority to decline to operate

6  on behalf of CMS.  That language ought to be in the order.

7              MR. SMITH:  Okay.  Thank you, Your Honor.

8              THE COURT:  And it ought to be subject to a stay

9  to September 30th, but subject to further order of the court

10  in the case of some emergency.

11              MR. SMITH:  Thank you, Your Honor.

12              THE COURT:  Yes.

13              MS. ERBECK:  Your Honor, this is Marita Erbeck,

14  Drinker Biddle & Reath.

15              THE COURT:  Yes.

16              MS. ERBECK:  If I may be heard?

17              THE COURT:  Yes.

18              MS. ERBECK:  With respect to the state survey

19  agent piece I am advised that there needs to be a survey

20  agent in place.  One of the obligations of the survey agent

21  is to, for example, mail the provider agreement to the

22  purchaser.  And so, I am not sure that the Department of

23  Health is able to decline.  If they are from a regulatory

24  perspective able to decline that's fine.

25              I guess I would just ask that the new language,

1  and we're certainly willing to participate in crafting that

2  new language, you know, makes clear that there needs to be a

3  survey agent in accordance with the applicable regulations.

4  If it's not the Department of Health and that is permissible

5  from a regulatory perspective, you know, we don't take an

6  issue with that.  I don't know that it is, but there needs to

7  be a state survey agent because, for example, the provider

8  agreement needs to be physically provided to the purchaser,

9  for example.

10       THE COURT:  Well, I don't -- look, I don't know

11  that that's the case or isn't the case.  I don't know how you

12  would address that in the order.

13       MS. ERBECK:  I understand, Your Honor. I guess we

14  just want our position on the record because we -- to the

15  extent we're in the order creating a special right for the

16  Department of Health to decline to act as the state survey

17  agent we don't want that in of itself to cause an issue.

18       THE COURT:  All right.  Well, that is something

19  that we can address further if appropriate if there is no

20  appeal, for example.

21       MS. ERBECK:  Understood.  Thank you, Your Honor.

22       THE COURT:  All right.  Mr. Minuti, do you

23  understand what we've discussed here and can re-draft the

24  language, Paragraphs 22 and 34?

25       MR. MINUTI:  I do, Your Honor.  Look, in that last

1  point I think we should come up with some language that gives

2  the Department of Health what it needs, but doesn't, for

3  example, include in the order that Your Honor is ordering

4  that they're allowed to do it.  In other words, whatever

5  their rights are outside the order they should have those

6  rights vis-à-vis whether they can decline or not.

7          So, maybe I am going to regret saying this, but I

8  think we can come up with some language that does that and

9  then effectuates the other rulings that Your Honor made this

10 morning.  We very much appreciate the court getting on the

11 phone with us.  It is important we try to get this done

12 today.

13         THE COURT:  I agree.

14         MR. MINUTI:  So, we will mark it up and circulate

15 and get it to the court as quickly as we can.

16         THE COURT:  All right.  I thank everyone.  With

17 that we will stand in recess.

18         ALL:  Thank you, Your Honor.

19     (Proceedings concluded at 10:43 a.m.)

20

21

22

23

24

25

1

## CERTIFICATE

2

3         I certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6

    /s/Mary Zajaczkowski              September 6, 2019
7   Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25