# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CENTER CITY HEALTHCARE, LLC d/b/a<br>HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1]<br><br>*Debtors*. | Chapter 11<br><br>Case No. 19-11466 (KG)<br>(Jointly Administered)<br><br>**Opening Brief** |

**PROPOSED *AMICUS* BRIEF OF THE AMERICAN MEDICAL ASSOCIATION, THE PENNSYLVANIA MEDICAL SOCIETY, AND THE PHILADELPHIA COUNTY MEDICAL SOCIETY IN SUPPORT OF THE PHILADELPHIA ACADEMIC HEALTH SYSTEM PHYSICIAN PRACTICE PLAN'S LIMITED OBJECTION TO THE DEBTORS' MOTION SEEKING APPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF ST. CHRISTOPHER'S HEALTHCARE, LLC AND <u>CERTAIN OF ITS AFFILIATES</u>**

**GORDON & REES**
Michael Heyden, Esquire
1000 N West St., Suite 1200
Wilmington, DE 19801
Tele: 302-992-8954

Maggie Finkelstein, Esq.
PA Attorney ID 86305
111 N. Front Street, Ste. 100
Harrisburg, PA 17101
(717)775-3308

*Attorneys for the American Medical Association, the Pennsylvania Medical Society, and Philadelphia County Medical Society*

September 18, 2019

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), St. Chris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

## **TABLE OF CONTENTS**

# Contents

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................... 1
SUMMARY OF ARGUMENT ........................................................................................ 2
CONCISE STATEMENT OF FACTS ............................................................................. 3
ARGUMENT .................................................................................................................. 4
CONCLUSION ............................................................................................................. 10

## TABLE OF CITATIONS

**Cases**

Fletcher v. Pennsylvania Property & Casualty Insurance Guaranty Association, 603 Pa. 452, 455 n.4, 985 A.2d 678, 680 n.4 (2009) .................................................................................. 5

Gingerlowski v. Commonwealth, 961 A.2d 237 (Pa. Commw. 2008) ...................................... 7, 10

**Other Authorities**

40 P.S. § 991.1801 ............................................................................................................. 8

40 P.S. §1303.102 .............................................................................................................. 4

40 P.S. §1303.701 .............................................................................................................. 5

40 P.S. §1303.711(a), (d) ................................................................................................... 5

40 P.S. §1303.711(c) ..................................................................................................... 3, 8

40 P.S. §§1303.711(g)(2), 712(a) ...................................................................................... 5

40 P.S. §1303.714(c) .......................................................................................................... 5

40 P.S. §1303.714(d) .......................................................................................................... 6

40 P.S. §1303.715 .............................................................................................................. 6

40 P.S. §1303.715(b) .......................................................................................................... 6

40 P.S. §1303.742 ...................................................................................................... 4, 5, 6

40 P.S. §991.1801(1) .......................................................................................................... 8

49 P.S. §991.1506(a) .......................................................................................................... 8

49 Pa. Code §16.61(a)(2) ................................................................................................... 3

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

On June 30, 2019, the Philadelphia Academic Health System, LLC and certain of its subsidiaries, including Hahnemann University Hospital and St. Christopher's Healthcare, LLC, and related physician practice groups filed for Chapter 11 bankruptcy protection in this Court. (Docket No. 1).  Relevant assets considered for sale were the Hahnemann University Hospital's residency program and assets of St. Christopher's Healthcare, LLC and some of its affiliates. This Court has approved the sale of the residency program, and the sale included an agreement by the Debtors to provide all of the Hahnemann physician residents with medical professional liability ("MPL") "tail" coverage. (See Docket No. 699, at ¶4).  There was no similar requirement to provide Hahnemann-affiliated physicians who were not residents, i.e., the Philadelphia Academic Health System Physician Practice Plan ("PAHSPPP") Physicians, with MPL insurance tail coverage.

The proposed sale of assets of St. Christopher's Healthcare, LLC and certain of its affiliates is pending before this Court.  On September 12, 2019, certain PAHSPPP Physicians filed a Limited Objection to the Debtors' Motion Seeking Approval of the Sale of Substantially all of the Assets of St. Christopher's Healthcare, LLC and Certain of its Affiliates. (Docket No. 699).  In its filing, PAHSPPP objects to the sale of the St. Christopher's Healthcare, LLC and affiliate assets without a commitment by Debtors for the provision of MPL insurance tail coverage for the PAHSPPP Physicians.

The PAHSPPP Physicians anticipate that they may not be provided with MPL insurance tail coverage upon the expiration or termination of their current insurance policies.  The PAHSPPP Physicians also anticipate that the approval of the sale of the assets of St.

Christopher's Healthcare, LLC and some of its affiliates will require that the buyer provide the St. Christopher's Healthcare, LLC and its affiliates' physicians with MPL insurance tail coverage. Without a similar provision on behalf of the PAHSPPP Physicians, the PAHSPPP Physicians will be the only physicians of the Debtors without MPL insurance tail coverage. In any event, certain of the Debtors are obligated under contract to provide the PAHSPPP Physicians with tail coverage.

A hearing regarding the sale of St. Christopher's Health, LLC assets is scheduled for September 23, 2019. For this Court's consideration at the hearing, The American Medical Association ("AMA"), the Pennsylvania Medical Society ("Medical Society"), and the Philadelphia County Medical Society ("Philadelphia Society") file this *Amicus* Brief for the purpose of providing the Court with timely and useful information concerning Pennsylvania's requirement for physician MPL insurance coverage, its unique statutory requirements regarding insurance coverage, and the impact that lack of MPL insurance coverage could have on the PAHSPPP Physicians and their patients.

## SUMMARY OF ARGUMENT

I.      If tail coverage is not provided to the PAHSPPP Physicians as part of the sale of the assets of St. Christopher's Healthcare, LLC and some of its affiliates, then the PAHSPPP Physicians will be unduly and negatively impacted:

A.      The PAHSPPP Physicians would be forced to pursue costly tail coverage in the insurance market and may not be able to obtain tail coverage in the insurance market at all.

B. If unable to obtain affordable tail coverage, the PAHSPPP Physicians will have no coverage for claims that arise subsequent to the expiration or termination of their present insurance policy, which would place the physicians' personal assets at risk.

C. Without MPL insurance coverage, the PAHSPPP Physicians' livelihoods are at risk. They would be in violation of the MCARE Act, placing them at risk of discipline before their Pennsylvania state licensing board due to lack of insurance coverage as well as other reporting implications. 40 P.S. §1303.711(c); see also 49 Pa. Code §16.61(a)(2).

II. If tail coverage is not provided to the PAHSPPP Physicians as part of the sale of the assets of St. Christopher's Healthcare, LLC and some of its affiliates, then there will be risk that no funds are available to pay the claims of plaintiffs/patients for care rendered prior to the cancellation or termination of the insurance coverage. No primary or excess coverage would be available, and no coverage from Pennsylvania Property & Casualty Insurance Guaranty Association would be available.

## CONCISE STATEMENT OF FACTS

PAHSPPP Physicians provided care to certain Debtors' patients. Each PAHSPPP Physician had an employment agreement with one of the Debtors that fell under the Hahnemann University Hospital umbrella. (See Docket No. 699, at ¶1). The employment agreements require the relevant Debtor-employer to provide MPL insurance coverage to the physicians for claims that would arise from the care that the physicians provided to the Debtor-employer's patients. In this regard, the Debtor-employer has provided the PAHSPPP Physicians with claims-made MPL insurance coverage through the Philadelphia Academic Risk Retention Group, LLC. (Id. at ¶2). These policies will expire on January 11, 2020, unless sooner

3

terminated by the Debtors. (Id.). The employment agreements also require the relevant Debtor-employer to provide the physicians with MPL insurance coverage upon the expiration of their employment agreement. (Id. at ¶ 3). This is also a requirement under Pennsylvania's Medical Care Availability and Reduction of Error Act. 40 P.S. §1303.742 (stating that a claims-made insurance policy will be approved only if the insurer guarantees the "continued availability of suitable liability for a health care provider subsequent to the discontinuance of professional practice by the health care provider or the termination of the insurance policy by the insurer or the health care provider for so long as there is a reasonable probability of a claim for injury for which the health care provider may be held liable"). This coverage, again, would be for claims that would arise from the care provided by the PAHSPPP Physicians to the Debtor-employer's patients.

## ARGUMENT

### I. Pennsylvania's Medical Care Availability and Reduction of Error Act ("MCARE" Act) Statutorily Requires the PAHSPPP Physicians to Have and Maintain MPL Insurance Coverage.

The Pennsylvania Legislature passed the MCARE Act in 2002 in efforts to try to alleviate the cyclical medical malpractice crises that occur in the state of Pennsylvania. In relevant part, provisions of the MCARE Act were designed to assure *affordable* and *accessible* MPL insurance coverage for Pennsylvania physicians and thereby positively impact the *affordability* and *accessibility* of healthcare in Pennsylvania. 40 P.S. §1303.102. In addition, the MCARE Act endeavors to assure that patients injured in Pennsylvania receive prompt and fair compensation. Id. Without tail coverage provided by the Debtors to the PAHSPPP Physicians, these goals would be contravened. An understanding of the MCARE requirements is essential to understanding the need for the Debtors to provide the PAHSPPP Physicians with tail coverage.

4

The MCARE Act requires Pennsylvania physicians to purchase and maintain basic MPL insurance coverage (a/k/a "primary" layer), statutorily currently set at $500,000. 40 P.S. §1303.711(a), (d). The insurer is required to provide indemnity and defense of claims that fall under the relevant insurance policy. See 40 P.S. §1303.714(c).

The basic insurance coverage requirement can be met by purchasing a claims made policy.[2] To be in compliance with the basic insurance coverage requirement at the time of a policy cancellation or termination of a claims made policy, a reporting endorsement ("tail") or equivalent must be purchased. See 40 P.S. §1303.742.

The MCARE Act also created a fund to provide a secondary layer (a/k/a "excess" layer), of MPL insurance coverage to Pennsylvania physicians to pay for claim liabilities that exceed the primary layer, which is also currently set at $500,000. 40 P.S. §§1303.711(g)(2), 712(a). This excess layer provides indemnity only. The result is that a physician would have $1 million available to cover any damages awarded on claims filed in a given policy year ($500,000 first from the basic insurance coverage, followed by another $500,000 from the MCARE Fund). The MCARE Fund is funded by an assessment of Pennsylvania physicians and other healthcare providers.

In addition, the MCARE Act includes a provision whereby the MCARE Fund would take over indemnity and defense at the primary layer in certain cases where the claim of breach of contract or tort occurs four or more years after the breach (and the claim was filed prior to

---

[2] A claims made policy provides coverage for claims filed while the doctor holds the policy, in contrast to an occurrence policy, which covers claims relating to any acts that occurred while the doctor held the policy, regardless of when the claims were filed. Fletcher v. Pennsylvania Property & Casualty Insurance Guaranty Association, 603 Pa. 452, 455 n.4, 985 A.2d 678, 680 n.4 (2009); see also 40 P.S. §1303.701 (definition of "Claims made").

5

January 1, 2006). See 40 P.S. §1303.715; see also §1303.714(d). Accordingly, MCARE would provide the full $1 million of required coverage. 40 P.S. §1303.715(b). The types of claims that could fall within this section 715 coverage could include obstetrical delivery injuries to a then-minor and/or delay in diagnosis of cancer claims, for example, that occurred prior to January 1, 2006. These type of claims continue to be asserted as the statute of limitations has not run for minors and a delay in diagnosis could invoke the discovery rule exception to the statute of limitations bar.

Failure of PAHSPPP Physicians to have or obtain tail coverage could have negative implications to physicians and their patients as is set forth more fully in the next section.

**II.     PAHSPPP Physicians Would be Unfairly and Unduly Burdened if Debtors are Not Required to Provide Tail Coverage.**

A.     <u>Unaffordable and Inaccessible Tail Coverage.</u>  If the Debtors are not required to provide PAHSPPP Physicians with tail coverage, the physicians would be forced to pursue costly tail coverage in the Pennsylvania insurance market. This would be unfair to the PAHSPPP Physicians who provided care to the Debtors' patients and an undue burden on the PAHSPPP Physicians because they had contractually negotiated for tail coverage as part of their employment agreements in order to prevent such a situation. See also 40 P.S. §1303.742. The physicians provided medical care to the Debtors' patients and it is the Debtors who should bear the cost of tail coverage as agreed to in the employment agreements. In any event, it is generally extremely difficult for a physician to obtain affordable tail coverage from a different insurer because the different insurer never had an opportunity to impact the risk that it is being asked to cover.

The typical calculation for cost of tail coverage is 200% - 350% of the cost of an annual policy for the basic insurance coverage layer. See The Courtroom: Legal Spotlight (2017, May 30). What Do You Need to Know About Malpractice Tail Coverage? [Blog post]. Retrieved from URL https://www.midlevelu.com/blog/what-do-you-need-know-about-malpractice-tail-coverage. In 2012, The Doctors Company insurer's calculation was 2.3 x the annual cost of the basic insurance coverage. See Brad O'Brien (2012, April 23). The Cost of Tail (The Doctors Company) [Blog post]. Retrieved from URL http://www.doctorsagency.com/blog/entryid/1137/-the-cost-of-tail-the-doctors-company-). For example, a Pennsylvania general surgeon may have a basic insurance coverage MPL policy that costs $47,000. The cost of the tail coverage at 2.3x is equal to $108,100. At 350%, tail coverage would cost $164,500. Again, this is what the cost could be to the surgeon who had planned, and expected, due to contractual obligations that the employer would be covering such cost.

If a physician could obtain and pay for the tail coverage, the cost could be passed on to the patients/consumers. This would be counter to the goals of the MCARE Act.

B.    <u>Personal Assets at Risk.</u>  Should a physician be unable to obtain tail coverage, for whatever reason, the physician's personal assets would be at risk. No basic insurance coverage would exist, and without a tail, there is also no excess layer of coverage available from MCARE. <u>Gingerlowski v. Commonwealth</u>, 961 A.2d 237, 243 (Pa. Commw. 2008) ("the purchase of tail coverage or its substantial equivalent" is a prerequisite to excess coverage). There also would be no section 715 coverage. <u>Id.</u>

Further, in that the PAHSPPP Physician's primary insurance coverage layer is provided through a risk retention group, the physicians would not have access to the Pennsylvania Property and Casualty Insurance Guaranty Association ("PP&CIGA"). PP&CIGA is a not-for-

7

profit, unincorporated association created by Pennsylvania statute. See 40 P.S. § 991.1801, *et seq.* PP&CIGA provides $300,000 of insurance to insureds whose "traditional" insurance carriers fail. The purpose of PP&CIGA is to provide payment of covered claims, to avoid excessive delays in payment of claims, and to avoid financial loss to claimants or policyholders due to the insolvency of an insurer. 40 P.S. §991.1801(1). Pennsylvania risk retention groups are not required or permitted to join or contribute financially to any insurance guaranty fund, nor are its insureds or claimants against the insureds afforded the opportunity to receive benefits from a guaranty fund for claims arising under policies issues by the risk retention group. 49 P.S. §991.1506(a). Accordingly, if the risk retention group that currently covers the PAHSPPP Physicians becomes insolvent, the PAHSPPP Physicians are not afforded access to the funds of PP&CIGA.

While claim values vary, for reference and context, in 2018, the average malpractice payment made in Pennsylvania was $405,978 (the second highest state average in the country). 2019 Medical Malpractice Payout Report (accessible at https://www.leveragerx.com/malpractice-insurance/2019-medical-malpractice-report/). Without insurance coverage, the physician's assets would be pursued by plaintiffs to pay any awards or settlements. There is also risk that the physicians would not have sufficient assets that are attachable to satisfy the award (see Section III below).

C. <u>Physicians at Risk of State Board Discipline.</u> If any of the physicians were unable to obtain tail coverage, they would be at risk of discipline before their Pennsylvania state board due to lack of insurance coverage. 40 P.S. §1303.711(c). The physician's medical license will be suspended or revoked by the relevant Pennsylvania state licensing board if the physician fails to comply with this provision. See <u>id.</u> Thus, the physicians may be prevented from providing

8

medical care at a time when Pennsylvania is experiencing a shortage of physicians. According to the Association of American Medical Colleges, the United States immediately needs an additional 95,900 doctors to start to address the shortage of physicians. There will be a shortage of up to 122,000 physicians nationally by 2032. 5th Annual Report The Complexities of Physician Supply and Demand: Projections from 2017-2032 (April 2019) (accessible at https://aamc-black.global.ssl.fastly.net/production/media/filer_public/31/13/3113ee5c-a038-4c16-89af-294a69826650/2019_update_-_the_complexities_of_physician_supply_and_demand_-_projections_from_2017-2032.pdf). According to the United States Department of Health and Human Services, Pennsylvania will have a shortage of primary care physicians (general practice physicians and family medicine physicians) by more than 10,000 doctors by 2025. (U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Health Workforce Analysis.  2016.  State-Level Projections of Supply and Demand for Primary Care Practitioners: 2013-2025.  Rockville, Maryland.).

In addition, the PAHSPPP Physicians may have additional state medical licenses such as Delaware, New Jersey, or Maryland. If a physician with multiple medical licenses is disciplined by the Pennsylvania state licensing board, then the physician may also be subject to discipline by the other state boards where he maintains a medical license; there is often a reciprocal reporting and discipline requirement. Further, discipline by a Pennsylvania state medical board would also result in a report to the National Practitioners' Data Bank which becomes a permanent part of the physician's record. The National Practitioners' Data Bank is queried by health insurers, hospitals, and MPL insurance carriers when it makes decisions regarding whether a physician will be approved as part of a health insurer's panel, regarding credentialing at hospitals, and

9

regarding insurance coverage and cost, respectively. This avalanche effect could impact whether a physician is able to continue to practice medicine.

### III. PAHSPPP Plaintiffs/Patients would be at Risk of not being Compensated for Claims if Debtors are Not Required to Provide PAHSPPP Physicians with Tail Coverage.

If the Debtors are not required to provide the PAHSPPP Physicians with tail coverage, there will be risk that no funds are available to pay the claims of plaintiffs/patients for care rendered prior to the cancellation or termination of the insurance coverage.

As noted in the previous section, PAHSPPP Physicians may be unable to obtain tail coverage on their own or to afford it. Without the primary layer of coverage, no MCARE coverage would be available to cover indemnity of claims, including no section 715 coverage. Gingerlowski v. Commonwealth, 961 A.2d 237 (Pa. Commw. 2008) (where physician canceled his claims made policy and did not obtain tail coverage, MCARE was not liable for claim filed thereafter). Further, as above, no coverage would be available from PP&CIGA, if applicable. Accordingly, plaintiff/patients would be faced with the difficult task of pursuing a physician's personal assets in order to satisfy an award of damages. This could result in the plaintiff/patients' awards only being partially satisfied or not satisfied at all, in contravention of the goals of the MCARE Act.

### **CONCLUSION**

For all the reasons set forth herein, it is vital to assure that the Debtors in the pending proceeding follow through with their contractual obligation to provide the PAHSPPP Physicians with tail coverage. *Amici* respectfully request that should this Court approve the sale of the assets of St. Christopher's Healthcare, LLC and its affiliates, that it require that the Debtors

10

provide the PAHSPPP Physicians with appropriate, required, and agreed to MPL insurance tail coverage.

Date:  September 18, 2019

Respectfully Submitted,

GORDON & REES

BY:_____

Michael Heyden, Esquire
1000 N West St., Suite 1200
Wilmington, DE 19801
Tele: 302-992-8954

BY:_____

Maggie M. Finkelstein, Esquire*
Attorney PA I.D. No. 86305
111 N. Front Street, Suite 100
Harrisburg, PA 17101
Tele: 717-775-3308
*Attorneys for the American Medical Association and The Pennsylvania Medical Society*

*Motion for admission *pro hac vice* filed simultaneously