# EXHIBIT A

## ASSET PURCHASE AGREEMENT

**By and Among**

**St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC and certain affiliates (defined in the Agreement as the Debtor Parties)**

**and**

**STC OpCo LLC**

**Dated September 20, 2019**

24

09/26/2019 SL1 1606709v1 006375.01166
35933560.2 09/26/2019

# TABLE OF CONTENTS

**Page**

ARTICLE 1 SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING ............... 2

1.1    Sale and Transfer of Assets; Purchase Price ........................................ 2
1.2    Deposit ............................................................................................... 2
1.3    Closing Date ....................................................................................... 3
1.4    Items to be Delivered by Sellers at Closing ........................................ 3
1.5    Items to be Delivered by OpCo Buyer at Closing ............................... 4
1.6    Prorations and Utilities ....................................................................... 4
1.7    Transfer of Assets of Sellers ............................................................... 5
1.8    Excluded Assets .................................................................................. 7
1.9    Assumed Obligations .......................................................................... 9
1.10   Excluded Liabilities ............................................................................ 10
1.11   Designation of Assumed Contracts and Assumed Leases .................... 10
1.12   Disclaimer of Warranties .................................................................... 11

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................... 12

2.1    Organization and Good Standing; No Violation ................................... 12
2.2    Authorization; Consents ...................................................................... 12
2.3    Binding Agreement ............................................................................. 13
2.4    Assumed Contracts and Assumed Leases ............................................ 13
2.5    Brokers and Finders ............................................................................ 13
2.6    [RESERVED] ...................................................................................... 14
2.7    Compliance with Legal Requirements ................................................. 14
2.8    Required Consents ............................................................................... 14
2.9    Certain Other Representations with Respect to the Hospital and the
       Practices ............................................................................................. 14
2.10   Financial Statements ........................................................................... 15
2.11   Certain Post-Balance Sheet Results .................................................... 15
2.12   Legal Proceedings .............................................................................. 16
2.13   Permits ............................................................................................... 16
2.14   Medicare Participation; Accreditation and Compliance ...................... 16
2.15   Regulatory Compliance ....................................................................... 17
2.16   [RESERVED] ...................................................................................... 18
2.17   Title .................................................................................................... 18
2.18   Employee Benefit Plans ...................................................................... 18
2.19   Taxes .................................................................................................. 19
2.20   Employee Relations ............................................................................ 19
2.21   Personnel ............................................................................................ 20
2.22   Supplies .............................................................................................. 20
2.23   Insurance ............................................................................................ 20
2.24   Payor Contracts .................................................................................. 21
2.25   Excluded Individuals ........................................................................... 21
2.26   Third Party Payor Cost Reports .......................................................... 21

i

2.27    Regulatory Compliance. ............................................................ 21
2.28    Information Privacy and Security Compliance. .......................... 22
2.29    Intellectual Property. ................................................................. 22

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF OPCO BUYER ...................... 23

3.1    Existence and Capacity ............................................................. 23
3.2    Powers; Consents; Conflicts ..................................................... 23
3.3    Binding Agreement .................................................................... 23
3.4    Availability of Funds ................................................................. 24
3.5    OpCo Buyer Knowledge ............................................................ 24

ARTICLE 4 COVENANTS OF SELLERS ............................................................. 24

4.1    Access and Information; Inspections ......................................... 24
4.2    Cooperation ............................................................................... 25
4.3    [RESERVED] .............................................................................. 25
4.4    Sellers' Efforts to Close ............................................................ 25
4.5    Termination Cost Reports .......................................................... 25
4.6    Conduct of the Business ............................................................ 26
4.7    Name Change ............................................................................. 27

ARTICLE 5 COVENANTS OF OPCO BUYER ...................................................... 27

5.1    OpCo Buyer's Efforts to Close .................................................. 27
5.2    Required Governmental Approvals ............................................ 27
5.3    Certain Employee Matters ......................................................... 28
5.4    Residents ................................................................................... 28
5.5    Excluded Assets ......................................................................... 29
5.6    HSR Filing ................................................................................. 29

ARTICLE 6 BANKRUPTCY COURT APPROVAL ................................................. 29

6.1    Bankruptcy Court Approval ....................................................... 29
6.2    Appeal of Sale Order ................................................................. 29

ARTICLE 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS ...................... 30

7.1    Signing and Delivery of Instruments ......................................... 30
7.2    No Restraints .............................................................................. 30
7.3    Performance of Covenants ......................................................... 30
7.4    Governmental Authorizations .................................................... 30
7.5    Bankruptcy Court Approval. The Bankruptcy Court shall have entered the
         Sale Order. ................................................................................ 30
7.6    HSR Act ..................................................................................... 30
7.7    Representations and Warranties; Covenants ............................. 30

ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF OPCO BUYER .............. 31

8.1    Governmental Authorizations .................................................... 31
8.2    Bankruptcy Court Approval ....................................................... 31

ii

|  | 8.3 | Signing and Delivery of Instruments | 31 |
|  | 8.4 | Performance of Covenants | 31 |
|  | 8.5 | No Restraints | 31 |
|  | 8.6 | Tail Coverage | 32 |
|  | 8.7 | Medicare and Medicaid Provider Agreements | 32 |
|  | 8.8 | HSR Act | 32 |
|  | 8.9 | Health Partners Plans, Inc. | 32 |
|  | 8.10 | Assumed Contracts; Notice | 32 |
|  | 8.11 | Collective Bargaining Agreements | 32 |
|  | 8.12 | Tenet Transition Services Agreement | 33 |
|  | 8.13 | Conifer Agreement | 33 |
|  | 8.14 | Representations and Warranties; Covenants | 33 |

**ARTICLE 9 TERMINATION** ............................................................................................. 33

|  | 9.1 | Termination | 33 |
|  | 9.2 | Termination Consequences | 34 |

**ARTICLE 10 POST-CLOSING MATTERS** ......................................................................... 35

|  | 10.1 | Preservation and Access to Records After the Closing | 35 |
|  | 10.2 | [RESERVED] | 36 |
|  | 10.3 | Medical Staff | 36 |

**ARTICLE 11 DEFAULT, TAXES AND COST REPORTS** ................................................. 36

|  | 11.1 | OpCo Buyer Default | 36 |
|  | 11.2 | Sellers Default | 37 |
|  | 11.3 | Cost Report Matters | 37 |

**ARTICLE 12 [RESERVED]** ............................................................................................... 37

**ARTICLE 13 MISCELLANEOUS PROVISIONS** ........................................................... 37

|  | 13.1 | Further Assurances and Cooperation | 37 |
|  | 13.2 | Successors and Assigns | 37 |
|  | 13.3 | Governing Law; Venue | 37 |
|  | 13.4 | Amendments | 38 |
|  | 13.5 | Disclosure Schedules | 38 |
|  | 13.6 | Notices | 38 |
|  | 13.7 | Headings | 39 |
|  | 13.8 | Fair Meaning | 39 |
|  | 13.9 | Gender and Number; Construction; Affiliates | 39 |
|  | 13.10 | Third Party Beneficiary | 39 |
|  | 13.11 | Waiver of Jury Trial | 40 |
|  | 13.12 | Expenses and Attorneys' Fees | 40 |
|  | 13.13 | Counterparts | 40 |
|  | 13.14 | Entire Agreement | 40 |
|  | 13.15 | No Waiver | 40 |

13.16   Severability ................................................................................ 40

13.17   Time is of the Essence ................................................................ 41

## EXHIBITS

| Description | Exhibits |
|---|---|
| Sale Order | A |

## SCHEDULES

| Description | Schedules |
|---|---|
| Permits | 1.7(b) |
| Leased Real Property | 1.7(r)(i) |
| Tenant Leases | 1.7(r)(ii) |
| Bankruptcy Claims | 1.7(t) |
| Assumed Obligations | 1.09 |
| Designation of Assumed Contracts and Assumed Leases | 1.11 |
| Threatened or Expiring Permits | 2.9(a) |
| Historical Financial Statements | 2.10(a) |
| Litigation Schedule | 2.12 |
| Medicare Participation; Accreditation and Compliance | 2.14 |
| HIPAA Compliance | 2.15 |
| Seller Plans | 2.18(a) |
| Unfiled Taxes | 2.19 |
| Employee Relations | 2.20 |
| Personnel | 2.21(a) |
| Terminated or Suspended Personnel | 2.21(b) |
| Insurance | 2.23 |
| Payor Contracts | 2.24 |
| Third Party Payor Cost Reports | 2.26 |
| Information Privacy and Security Non-compliance | 2.28(a) |
| Excluded Intellectual Property | 2.29(d) |
| Certain Employee Matters | 5.3 |

09/26/2019 SL1 1606709v1 006375.01166
35933560.2 09/26/2019

# GLOSSARY OF DEFINED TERMS

| *Description* | *Section* |
|---|---|
| Agreement | Introduction |
| Assets | Recitals |
| Assumed Contracts | 1.7(c) |
| Assumed Leases | 1.7(r) |
| Assumed Obligations | 1.9 |
| Assignment and Assumption Agreement | 1.4(c) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Procedures | 6.1(b) |
| Bill of Sale | 1.4(a) |
| Cash Consideration | 1.1(b) |
| Closing | 1.3 |
| Closing Date | 1.3 |
| CMS | 1.7(b) |
| Code | 2.18(a) |
| Debtor Parties | Introduction |
| Deposit | 1.2 |
| Document Retention Period | 10.1(a) |
| Effective Time | 1.3 |
| Employee Liabilities | 1.10 |
| ERISA | 2.18(c) |
| ERISA Affiliate | 2.18(a) |
| Excluded Assets | 1.8 |
| Excluded Contract | 1.11 |
| Excluded Individual | 2.25 |
| Excluded Intellectual Property | 2.29(d) |
| Excluded Liabilities | 1.10 |
| Final Order | 8.2(b) |
| Government Entity | 2.15 |
| HIPAA | 2.15 |
| Hired Employees | 5.3(a) |
| Historical Financial Statements | 2.10(a) |
| Hospital | Recitals |
| Hospital Business | Recitals |
| Hospital Seller | Introduction |
| HSR Act | 5.6 |
| IBEW | 5.3(b) |
| Independent CPA | 1.1(e) |
| Information Privacy or Security Laws | 2.28(c) |
| Intellectual Property | 2.29(c) |
| Inventory | 1.7(f) |
| IRS | 2.18(b) |

v

| Description | Section |
|---|---|
| Leased Real Property | 1.7(r)(i) |
| Legal Requirements | 2.7 |
| Material Adverse Effect | 9.1 |
| Medicaid Provider Agreements | 8.7 |
| OpCo Buyer | Introduction |
| PASNAP | 8.11 |
| Payor Contracts | 2.24 |
| PDHS | 8.7 |
| Permits | 1.7(b) |
| Person | 13.9 |
| Personal Information | 2.28(e) |
| Personal Property | 1.7(a) |
| Physician Practice Business | Recitals |
| Practice Group Seller | Introduction |
| Practices | Recitals |
| Prepaids | 1.7(g) |
| Provider Agreements | 1.7(b) |
| Purchase Price | 1.1(b) |
| PTO | 5.3 |
| Purchase Price Allocation | 1.1(e) |
| OpCo Buyer | Introduction |
| Real Estate Assignment and Assumption Agreements | 1.4(b) |
| RRG | 1.8(e) |
| Sale Motion | Recitals |
| Sale Order | 6.1(a) |
| Seller Cost Reports | 11.3(a) |
| Seller or Sellers | Introduction |
| Seller Contracts | 1.11 |
| Seller Parties | 10.1(a) |
| Seller Plans | 2.18(a) |
| Seller Employees | 2.21(a) |
| Signing Date | Introduction |
| Sellers' Tail Coverage Expense | 8.6 |
| Superseded Agreements | 13.14 |
| Tail Coverage | 8.6 |
| Tax or Taxes | 2.19 |
| Tenant Leases | 1.7(r)(ii) |
| Utility Deposits | 1.8(j) |

09/26/2019 SL1 1606709v1 006375.01166
35933560.2 09/26/2019

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made and entered into as of the 20th day of September, 2019 (the "**Signing Date**") by and among St. Christopher's Healthcare, LLC (the "**Hospital Seller**"), Philadelphia Academic Medical Associates, LLC and certain affiliated debtor physician practice groups, Philadelphia Academic Medical Associates, LLC, SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., St Chris Care at Northeast Pediatrics, L.L.C., TPS V of PA, L.L.C. (the "**Practice Group Seller**" and with the Hospital Seller, the "**Debtor Parties**"), (the Debtor Parties each referred to herein individually as "**Seller**" and collectively as "**Sellers**"), and STC OpCo LLC, a Pennsylvania limited liability company formed by Drexel University and Tower Health to acquire certain assets of the Debtor Parties ("**OpCo Buyer**").

## R E C I T A L S:

A.    The Hospital Seller engages in the business of the operation of the hospital known as St. Christopher's Hospital for Children, located at 160 E. Erie Avenue, Philadelphia, PA 19134, including the hospital inpatient, outpatient, clinics, pharmacy, laboratory, emergency department services (collectively, the "**Hospital**"; the business of the operation of the Hospital is referred to herein as the "**Hospital Business**").

B.    The Practice Group Seller operates primary and specialty care services at Yardley Pediatrics, Northeast Pediatrics, Bucks County, St. Luke's Hospital, Jenkintown, Abington, Washington Township, Reading Hospital owned or operated by affiliates of the Practice Group Seller (collectively, the "**Practices**"; the business of the operation of the Practices is referred to herein as the "**Physician Practice Business**").

C.    OpCo Buyer desires to purchase from Sellers, and Sellers desire to sell to OpCo Buyer, the assets described in <u>Section 1.7</u> (the "**Assets**") owned by Sellers and used with respect to the Hospital and Physician Practice Businesses, for the consideration and upon the terms and conditions contained in this Agreement.

D.    Debtor Parties filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), <u>lead Case No. 19-11466-KG</u>, jointly administered with certain of their affiliates (the "**Bankruptcy Cases**").

E.    The Debtor Parties filed a motion (the "**Sale Motion**") pursuant to which, among other things, it sought approval from the Bankruptcy Court for the sale of the Assets.

F.    The parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets approved by the Bankruptcy Court pursuant to Section 363 and 365 of Title 11 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

1

# ARTICLE 1
## SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING

1.1    **Sale and Transfer of Assets; Purchase Price**. Subject to the terms and conditions of this Agreement,

(a)    OpCo Buyer is (i) acquiring the Assets and (ii) only assuming the Assumed Obligations (as defined below).

(b)    The purchase price (the "**Purchase Price**") shall consist of a cash payment to Sellers in an amount equal to Fifty Million Dollars ($50,000,000) (the "**Cash Consideration**").

(c)    OpCo Buyer shall prepare and deliver to Sellers within 90 calendar days after the Closing Date a schedule for each Seller setting forth the allocation of the Purchase Price and other consideration for the Assets allocated to such Seller and any other relevant items among the Assets owned by such Seller in accordance with Section 1060 of the Internal Revenue Code (the "**Purchase Price Allocation**").  The allocation shall be considered final and binding on the parties, unless, within 30 calendar days after the delivery of the Purchase Price Allocation by OpCo Buyer, Sellers notify OpCo Buyer that they have a good faith objection to the allocation set forth in the OpCo Buyer's allocation schedule.  If Sellers timely make such an objection, OpCo Buyer and Sellers shall work in good faith to resolve such dispute within 20 calendar days from the date Sellers deliver the objection to OpCo Buyer.  In the event that OpCo Buyer and Sellers are unable to resolve such dispute within the 20 calendar day period, the issue(s) in dispute will be submitted to an independent accounting firm mutually acceptable to Sellers and OpCo Buyer (the "**Independent CPA**") for resolution.  The determination of the Independent CPA shall be final, binding, and conclusive on the parties.  OpCo Buyer, on the one hand, and Sellers, on the other hand, shall each bear fifty percent (50%) of the fees and expenses of the Independent CPA.  In the event of any adjustments to the Purchase Price and other consideration for the Assets, any such adjustments shall be allocated in a manner consistent with the Purchase Price Allocation and the parties hereto shall cooperate to adjust the Purchase Price Allocation. OpCo Buyer and Sellers each shall report all Taxes and file all Tax returns (including amended Tax returns and claims for refund) consistent with the Purchase Price Allocation, and shall take no position contrary thereto or inconsistent therewith (including, in any audits or examinations by any taxing authority or any other proceedings), unless, and then only to the extent, required by a final determination.  OpCo Buyer and Sellers shall exchange completed and executed forms with respect to the allocation (including Internal Revenue Service Form 8594 and any comparable forms required to be filed for state or local Tax purposes) at least 30 calendar days prior to the due date for filing such forms and shall cooperate in the filing of any forms (including Form 8594) with respect to such Purchase Price Allocation, including any amendments to such forms required with respect to any adjustment to the Purchase Price and other consideration for the Assets, pursuant to this Agreement.  Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

1.2    **Deposit**. OpCo Buyer, by wire transfer to an account designated by Sellers has made a good faith deposit in the amount of Ten (10%) Percent of the Purchase Price on the date

2

hereof (the "**Deposit**"). The Deposit shall be non-refundable in all events, except as provided in Section 6.2, or in the event OpCo Buyer has terminated this Agreement pursuant to Section 9.1 (other than Section 9.1(b)) or as set forth in Section 9.2 or Section 11.2, in which case Seller shall immediately return the Deposit to OpCo Buyer with all interest earned thereon. Upon Closing, the Deposit and all interest thereon will be credited against the Purchase Price. Pending the Closing, or until this Agreement is terminated, the Deposit shall be deposited in an interest bearing account, with interest credited to OpCo Buyer, at a federally-insured financial institution mutually acceptable to OpCo Buyer and Sellers.

1.3    **Closing Date**. The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place on the later of (a) October 4, 2019 or (b) as promptly as possible following the receipt of all governmental approvals and the satisfaction or waiver of the conditions set forth in ARTICLE 7 and ARTICLE 8, other than those conditions that by their nature are to be satisfied at Closing but subject to fulfillment or waiver of those conditions. at the offices of Ballard Spahr LLP, 1735 Market Street, 48th Floor, Philadelphia, PA 19103 (the day on which Closing actually occurs, the "**Closing Date**") The Closing shall be deemed to occur and to be effective as of 11:59 p.m. Eastern time on the Closing Date (the "**Effective Time**").

1.4    **Items to be Delivered by Sellers at Closing**. At or before the Closing, Sellers shall deliver, or cause to be delivered, to the entity designated by OpCo Buyer, the following:

(a)    a Bill of Sale in a form and substance acceptable to Sellers and OpCo Buyer (the "**Bill of Sale**"), duly executed by each Seller, with respect to the Assets;

(b)    Real Estate Assignment and Assumption Agreements (the "**Real Estate Assignment and Assumption Agreements**") in a form and substance acceptable to Sellers and OpCo Buyer with respect to the Assumed Leases, each duly executed by the applicable Seller;

(c)    an Assignment and Assumption Agreement (the "**Assignment and Assumption Agreement**") in a form and substance acceptable to Sellers and OpCo Buyer with respect to the Assumed Contracts and other Assumed Obligations duly executed by each Seller;

(d)    favorable original certificates of good standing, of each Seller, issued by the Commonwealth of Pennsylvania or appropriate state of jurisdiction;

(e)    a duly executed certificate of an officer of each Seller certifying to OpCo Buyer (i) the incumbency of the officers of such Seller on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who have executed this Agreement and any additional documents contemplated by this Agreement and (ii) the due adoption and text of the resolutions or consents of the Board of Directors, Managers or Members (as applicable) of such Seller authorizing (A) the transfer of the Assets and transfer of the Assumed Obligations by such Seller to OpCo Buyer and (B) the due execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

(f)    a copy of the Sale Order, and

3

(g)  any such other instruments, certificates, consents or other documents which OpCo Buyer and Sellers mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.5  **Items to be Delivered by OpCo Buyer at Closing**. At or before the Closing, OpCo Buyer shall deliver or cause to be delivered to Sellers the following:

(a)  payment of an amount equal to the Cash Consideration _less_ the Sellers' Tail Coverage Expense subject to credits or plus payment to Sellers of all amounts as provided under Section 1.6;

(b)  a duly executed certificate of the secretary of OpCo Buyer certifying to Sellers (a) the incumbency of the officers of OpCo Buyer on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who have executed this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the members of OpCo Buyer authorizing the execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

(c)  the Bill of Sale, duly executed by OpCo Buyer;

(d)  the Assignment and Assumption Agreement, duly executed by OpCo Buyer;

(e)  the Real Estate Assignment and Assumption Agreement, duly executed by OpCo Buyer, and

(f)  any such other instruments, certificates, consents or other documents which OpCo Buyer and Sellers mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.6  **Prorations and Utilities**. All items of income and expense listed below with respect to the Assets shall be prorated in accordance with the principles and the rules for the specific items set forth hereafter:

(a)  In the event that as of the Closing Date the actual tax bills for the tax year or years in question are not available and the amount of taxes to be prorated as aforesaid cannot be ascertained, then rates, millages and assessed valuation of the previous year, with known changes, shall be used for proration of any lease expenses. The parties agree that if the real estate and personal property tax prorations are made based upon the taxes for the preceding tax period, the prorations shall be re-prorated after the Closing. As to power and utility charges, "final readings" as of the Closing Date shall be ordered from the utilities; the cost of obtaining such "final readings," if any, shall be paid by Sellers.

(b)  All prorations and payments to be made under the foregoing provisions shall be agreed upon by OpCo Buyer and Sellers prior to the Closing and shall be binding upon the parties. In the event any proration, apportionment or computation shall prove to be incorrect

4

for any reason, then either the applicable Seller or OpCo Buyer shall be entitled to an adjustment to correct the same, provided that said party makes written demand on the party from whom it is entitled to such adjustment within thirty (30) calendar days after the erroneous payment or computation was made, or such later time as may be required, in the exercise of due diligence, to obtain the necessary information for proration. This <u>Section 1.6</u> shall survive Closing.

1.7     **Transfer of Assets of Sellers**. On the Closing Date, each Seller shall sell, assign, transfer, convey and deliver to the entity designated by OpCo Buyer, free and clear of all "Interests" as defined in the Sale Order, other than the Assumed Obligations, and OpCo Buyer shall acquire, all of each Seller's right, title and interest in and to only the following assets and properties, such transfers being deemed to be effective as of the Effective Time:

(a)     all of the tangible personal property owned by the Hospital and the Practices for use in the Hospital Business and Physician Practice Business, including equipment, furniture, fixtures, machinery, vehicles, office furnishings and leasehold improvements (the "**Personal Property**");

(b)     all of Sellers' rights, (i) to Sellers' Provider Agreements with the Centers for Medicare and Medicaid Services ("**CMS**") Number 39-3307 and Number 39-2360 (the "**Provider Agreements**"), and (ii) to the extent assignable or transferable, to all other licenses, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or regulatory approvals issued to such Seller for use in the operation of the Hospital and Practices (the "**Permits**"), including, without limitation, the Permits set forth on <u>Schedule 1.7(b)</u>, except to the extent OpCo Buyer elects, in its sole discretion, not to take assignment of any such Permits;

(c)     all of Sellers' rights in and to all contracts and other agreements (other than leases of real property) that have been designated by OpCo Buyer as a contract to be assumed pursuant to <u>Section 0</u> (collectively, the "**Assumed Contracts**"), it being understood and agreed that, if and only to the extent the Provider Agreements are determined to be executory contracts, that the Provider Agreements shall also be Assumed Contracts;

(d)     **[RESERVED]**;

(e)     all of Sellers' interest in Health Partners Plans, Inc., if any, currently owned and/or associated with the Hospital Seller, including the right of any Seller to receive or to designate a third party as recipient of "distributions" (other than distributions allocable to the period prior to the Closing Date) as that term is used in the Articles of Incorporation of Health Partners Plans, Inc.;

(f)     all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at the Hospital or the Practices or (ii) used in the operation of the Hospital or the Practices (the "**Inventory**") except as set forth in <u>Section 1.8(f)</u>;

(g)     other than Utility Deposits, all prepaid rentals, deposits, prepayments (excluding prepaid insurance and prepaid taxes) and similar amounts relating to the Assumed Contracts and/or Assumed Leases (the "**Prepaids**");

5

(h)     all of the following: operating manuals, files and computer software with respect to the operation of the Hospital and Practices, including, without limitation, all patient records, medical records, employee records, financial records, equipment records, construction plans and specifications, and medical and administrative libraries; provided, however, that any patient records and medical records which are not required by law to be maintained by Sellers as of the Closing Date shall be an Excluded Asset and provided further, all expenses for the transfer of Hospital and Practices medical and/or patient records that are transferred to OpCo in connection with the Closing shall be borne by OpCo Buyer;

(i)     all systems, servers, computers, hardware, firmware, middleware, telecom equipment, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation owned, leased or, to the extent transferable, licensed by Sellers and used by Sellers with respect to the operations of the Hospital or the Practices but, in the case of any such item which is leased or to the extent transferable licensed pursuant to an executory contract, only such lease or license if an Assumed Contract;

(j)     all surpluses arising out of any risk pools, shared savings program or accountable care organization arrangement to which any Seller is party on the Closing Date, in each case to the extent, if the underlying contract relating to such risk pools, shared savings program or accountable care organization arrangement is an executory contract and such contract is an Assumed Contract;

(k)     all transferable unclaimed property of any Person in Sellers' possession as of the Closing Date, including, without limitation, property which is subject to applicable escheat laws;

(l)     all warranties (including warranties of any manufacturer or vendor) on or in connection with the Assets (including the Personal Property) in favor of the Hospital; Practices or Sellers;

(m)     the right to use the names "St. Christopher's Hospital for Children", including any derivation thereof and including any trademarks, service marks, trademark and service mark registrations and registration applications, trade names, trade name registrations, logos, domain names, trade dress, copyrights, copyright registrations, website content, know-how, trade secrets and the corporate or company names of Sellers and the names of the Hospital, together with all rights to sue and recover damages for infringement, dilution, misappropriation or other violation or conflict associated with any of the foregoing;

(n)     all goodwill of the Hospital and the Practices evidenced by or associated with any of the Assets;

(o)     the Hospital's and the Practices' right or interest in the telephone and facsimile numbers, email addresses and uniform resource locaters used with respect to the operation of the Hospital and the Practices;

6

(p)      except for the Excluded Assets, any other assets owned by the Hospital or the Practices (which are not otherwise specifically described above in this Section 1.7) that are used in the operation of the Hospital or the Practices;

(q)      all rights to insurance proceeds under all insurance policies and contracts and coverages obtained by any Seller or listing any Seller as insured party, a beneficiary or loss payee, relating to any casualty claim arising from or relating to the Assets;

(r)      all of Sellers' interest in and to all of the following: (i) the real property leases for all real property leased by the Hospital and the Practices and set forth on Schedule 1.7(r)(i) (the "**Leased Real Property**"), and (ii) the real property leased or subleased by such Seller to a third party and set forth on Schedule 1.7(r)(ii) (the "**Tenant Leases**" and with the leases for the Leased Real Property, the "**Assumed Leases**"));

(s)      any of the Sellers' rights (but not their obligations) to acquire the Sellers' interest in the real property related to the Center for Urban Child building; and

(t)      all claims, counterclaims and causes of action of such Seller or such Seller's bankruptcy estate (including parties acting for or on behalf of such Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Cases), arising under or with respect to claims and causes of action that relate to the Assets (other than assets that are covered only by Section 1.7(p)) or the Assumed Obligations but excluding any claims or causes of action: (i) relating to the Excluded Assets; (ii) arising under Chapter 5 of the Bankruptcy Code; or (iii) as set forth on Schedule 1.7(t).

1.8      **Excluded Assets**. Notwithstanding anything to the contrary in Section 1.7, the following interests, rights and assets of such Seller (collectively, the "**Excluded Assets**"):

(a)      cash, cash equivalents and short-term investments;

(b)      all accounts, notes or other amounts receivable relating to services rendered on or prior to the Closing Date;

(c)      all Seller Plans and the assets of all Seller Plans and any asset that would revert to the employer upon the termination of any Seller Plan, including, without limitation, any assets representing a surplus or overfunding of any Seller Plan;

(d)      all contracts that are not Assumed Contracts, Assumed Leases or the Provider Agreements (to the extent, if any, such agreement is determined to be a contract but not an executory contract), including any collective bargaining agreement to which any of Sellers is a party, or by or under which any of Sellers is otherwise bound;

(e)      Philadelphia Academic Risk Retention Group, LLC ("**RRG**") and its assets;

(f)      the portions of Inventory, Prepaids, and other assets disposed of, expended or canceled, as the case may be, by such Seller after the Signing Date and prior to the Closing Date in the ordinary course of business;

7

(g)    all of such Seller's organizational or corporate record books, minute books, tax returns, tax records and reports, data, files and documents, including electronic data related thereto;

(h)    all claims, counterclaims and causes of action of Sellers or any Seller's bankruptcy estate (including parties acting for or on behalf of such Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Cases), not included among the Assets pursuant to Section 1.7(t))1.7(t) hereof;

(i)    all insurance policies and contracts and coverages obtained by such Seller or listing such Seller as insured party, a beneficiary or loss payee, including prepaid insurance premiums, subject to rights of the OpCo Buyer under Section 1.7(q);

(j)    all deposits made with any entity that provides utilities to the Hospital or the Practices (the "**Utility Deposits**");

(k)    all rents, deposits, prepayments, and similar amounts relating to any contract or lease that is not an Assumed Contract, Assumed Lease or any contract, including the Provider Agreements, which is assigned to the OpCo Buyer but is deemed not to be an executory contract;

(l)    all non-transferrable unclaimed property of any third party as of the Closing Date, including, without limitation, property which is subject to applicable escheat laws;

(m)    all bank accounts of such Sellers;

(n)    all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection;

(o)    all director/manager and officer insurance;

(p)    all tax refunds and tax attributes of such Seller;

(q)    all documents, records, operating manuals and film pertaining to the Hospital or the Practices that the parties agree that such Seller is required by law to retain;

(r)    all patient records and medical records which are required by law to be maintained by such Seller as of the Closing Date, other than those records that will be transferred to OpCo Buyer;

(s)    all documents, records, correspondence, work papers and other patient records that may not be transferred under applicable law, and any other documents, records, or correspondence (including with respect to any employees) that may not be transferred under applicable law;

(t)    any rights or documents relating to any Excluded Liability or other Excluded Asset;

8

(u)      any rights or remedies provided to such Seller under this Agreement and each other document executed in connection with the Closing;

(v)      any (i) personnel files for employees of such Seller who are not Hired Employees; (ii) other books and records that such Seller is required by law to retain; provided, however, that except as prohibited by law and subject to ARTICLE 5, OpCo Buyer shall have the right to make copies of any portions of such retained books and records that relate to the business of the Hospital or the Practices as conducted before the Closing or that relate to any of the Assets; (iii) documents which such Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party that is not superseded by the Sale Order; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (OpCo Buyer shall be entitled to a copy of such documents). With respect to documents necessary to prepare cost reports, OpCo Buyer shall receive the original document and such Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(w)      all deposits or other prepaid charges and expenses paid in connection with or relating to any other Excluded Assets; and

(x)      other than as set forth in Section 1.7(t), all rights, claims, counterclaims, defenses and causes of action of each Seller.

1.9      **Assumed Obligations**. On the Closing Date, each Seller shall assign, and OpCo Buyer shall assume and agrees to discharge, perform and satisfy fully, on and after the Closing Date, the following liabilities and obligations of such Seller and only the following liabilities and obligations (collectively, the "**Assumed Obligations**"):

(a)      all liabilities and obligations of such Seller under the Assumed Contracts (other than the Provider Agreements) solely to the extent related to periods after the Closing Date;

(b)      all liabilities and obligations under the Provider Agreements, provided that the foregoing notwithstanding, (i) to the extent of any amounts asserted as due as of the Closing Date, the Sellers shall, pay at Closing (subject to the proviso below) the first two hundred thousand dollars ($200,000.00) and OpCo Buyer shall pay at Closing (subject to the proviso below) any amounts in excess of two hundred thousand dollars ($200,000.00), and (ii) in the event OpCo Buyer pays, after Closing, any amounts to CMS that are first asserted by CMS after Closing on account of such Assumed Obligation (by setoff against amounts owed to OpCo Buyer or otherwise), OpCo Buyer, following payment in full of Sellers' obligations to MidCap Funding IV Trust, shall have the right to offset such amounts against any amounts owed by OpCo Buyer to any Seller; provided that, Sellers may dispute the amount asserted by CMS as due as of the Closing Date under the Provider Agreements, only so long as (1) CMS agrees that the Provider Agreements may be transferred to OpCo Buyer on the Closing Date notwithstanding the pendency of such dispute, and (2) the Sellers escrow the lesser of $200,000 and the amount asserted as due pursuant to an escrow agreement in form and substance satisfactory to the Sellers and OpCo Buyer. In the event of any such permitted dispute by the Sellers, the amounts asserted as due as of the Closing Date by CMS shall not be paid on the Closing Date but, rather, shall be

9

paid promptly following resolution of such dispute. OpCo Buyer may participate in the resolution of such dispute, and must consent to any settlement of such dispute in excess of $200,000;

(c)     all liabilities and obligations of such Seller under the Assumed Leases solely to the extent related to periods after the Closing Date;

(d)     all liabilities and obligations of such Seller under the Assumed Permits solely to the extent related to periods after the Closing Date;

(e)     all unpaid real and personal property taxes, if any, that are attributable to the Assets and relate to periods after the Closing Date;

(f)     all liabilities or obligations relating to utilities being furnished in connection with the operation of the Hospital and the Practices that relate to periods after the Closing Date;

(g)     all liabilities or obligations relating to employees provided for in Section 5.3 after the Closing Date to the extent related to periods after the Closing Date, and

(h)     the PTO Obligation (as defined in Section 5.3(a).

For the avoidance of doubt, (i) none of the Assumed Obligations shall relate to any liabilities or obligations of any party other than the Hospital Seller and the Practice Group Seller, unless expressly agreed by OpCo Buyer and listed on Schedule 1.09, and (ii) OpCo Buyer shall be responsible for the payment of any cure amounts necessary for the assumption and assignment of any Assumed Contracts or Assumed Leases.

1.10   **Excluded Liabilities**. OpCo Buyer shall not assume or become responsible for any duties, obligations or liabilities of any Seller that are not expressly assumed by OpCo Buyer pursuant to the terms of this Agreement, the Bill of Sale, the Assignment and Assumption Agreement or the Real Estate Assignment and Assumption Agreement, including but not limited to, (a) except for the PTO Obligation, any liabilities associated with or related to any employees of Sellers and their employment, compensation and/or benefits, including any liabilities associated with or arising out of any collective bargaining agreements with any labor organizations representing any employees of Sellers and any liabilities under any employee benefit plans in which any employees of Sellers participate or otherwise are entitled to receive any benefits (collectively, "**Employee Liabilities**"), (b) any pre-closing liabilities, including recoupment claims for overpayments by any governmental health plan (including Medicaid or TRICARE but excluding the Provider Agreements) or other managed care payor administering a plan for a government health plan, that are required to be paid by OpCo Buyer as successor to Sellers, and (c) all liabilities related to RRG (collectively, the "**Excluded Liabilities**"); and each Seller shall remain fully and solely responsible for all Excluded Liabilities. .

1.11   **Designation of Assumed Contracts and Assumed Leases**. All contracts, leases and other agreements of each Seller (collectively the "**Seller Contracts**") will be subject to evaluation by OpCo Buyer for designation as Assumed Contracts or Assumed Leases. Sellers shall promptly, and in any event, no later than September 27, 2019, provide to OpCo Buyer true

09/26/2019 SL1 1606709v1 006375.01166
35933560.2 09/26/2019

and correct copies of all Seller Contracts, in each case as amended or otherwise modified and in effect, together with any extension notices and other material correspondence or documentation related thereto, in the possession or control of the Sellers, provided however, the Sellers' obligation to provide to OpCo Buyer any Seller Contract which is subject to a nondisclosure agreement binding upon a Seller shall be required only if the Sale Order or other order of the Bankruptcy Court, permits such Seller Contract to be provided to OpCo Buyer. Attached hereto as Schedule 1.11, Schedule 1.7(r)(i) and Schedule 1.7(r)(ii) are OpCo Buyer's initial schedules of Seller Contracts designated as Assumed Contracts or Assumed Leases. Except for physician contracts, which shall not be subject to further revision, OpCo Buyer may modify Schedule 1.11, Schedule 1.7(r)(i) and Schedule 1.7(r)(ii) to add or delete Seller Contracts until the Closing Date. Only Seller Contracts that are on the final version of Schedule 1.11, Schedule 1.7(r)(i) and Schedule 1.7(r)(ii) as of the Closing Date shall be Assumed Contracts or Assumed Leases (as applicable). To the extent that OpCo Buyer adds to any such schedule an Assumed Contract or an Assumed Lease after the Sale Hearing, Sellers agree to promptly file a motion to assume and assign such Assumed Contract or Assumed Lease, and shall give appropriate notice to the non-debtor party to such Assumed Contract or Assumed Lease. Any contract or lease of any Seller that is not an Assumed Contract, Assumed Lease or any other agreement (including the Provider Agreements) deemed not to be an executory contract but assigned hereunder shall be deemed an "**Excluded Contract**". Notwithstanding anything to the contrary set forth in this Agreement, the Excluded Contracts shall constitute part of the Excluded Assets pursuant to, and as defined in, this Agreement. It shall be a condition to Closing that the Sale Order or a subsequent order of the Bankruptcy Court approve the assumption and assignment of the Assumed Contracts and Assumed Leases.

      1.12   **Disclaimer of Warranties**.

      (a)   THE PHYSICAL ASSETS TRANSFERRED TO OPCO BUYER WILL BE SOLD BY SELLERS AND PURCHASED BY OPCO BUYER IN THEIR PHYSICAL CONDITION AT THE CLOSING DATE, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE LEASED REAL PROPERTY WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS. ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLERS INCLUDED IN THE ASSETS AND THE ASSUMED OBLIGATIONS ARE BEING ACQUIRED OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS. ALL OF THE TANGIBLE ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE CLOSING DATE. THE FOREGOING DISCLAIMER SHALL NOT BE INTERPRETED TO MODIFY OR ELIMINATE ANY EXPRESS REPRESENTATION OR WARRANTY PROVIDED UNDER THIS AGREEMENT OR ANY RELATED DOCUMENT AND, TO THE EXTENT OF ANY

11

CONFLICT BETWEEN SUCH EXPRESS REPRESENTATIONS AND WARRANTIES AND THIS DISCLAIMER, SUCH EXPRESS REPRESENTATION AND WARRANTY SHALL CONTROL.

(b)     OpCo Buyer acknowledges that OpCo Buyer will be examining, reviewing and inspecting all matters which in OpCo Buyer's judgment bear upon the Assets, Sellers, the Hospital and the Practices, the businesses of the Hospital and the Practices and their value and suitability for OpCo Buyer's purposes and is relying solely on OpCo Buyer's own examination, review and inspection of the Assets and Assumed Obligations. OpCo Buyer releases each Seller from all responsibility and liability regarding the condition, valuation, salability or utility of the business of the Hospital, the Practices or the Assets, or their suitability for any purpose whatsoever.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to OpCo Buyer to enter into this Agreement and to consummate the transactions contemplated by this Agreement, each Seller hereby represents, warrants and covenants to OpCo Buyer that the following matters are true and complete as of the date hereof, and when read in light of any schedules which have been updated in accordance with the provisions of Section 13.5, as of the Closing Date:

2.1     **Organization and Good Standing; No Violation.**

(a)     Each Seller is duly organized and validly existing in good standing under the laws of the state of its formation. Subject to entry of the Sale Order, each Seller has the requisite power and authority to enter into this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted.

(b)     Neither the execution and delivery by such Seller of this Agreement nor the consummation of the transactions contemplated hereby by such Seller nor compliance with any of the material provisions hereof by such Seller, will violate, conflict with or result in a breach of any material provision of such Seller's certificate of formation, operating agreement or any other organizational documents of such Seller.

2.2     **Authorization; Consents**. Subject to the entry of the Sale Order, the execution, delivery, and performance of this Agreement by each Seller and all other agreements referenced herein, or ancillary hereto, to which such Seller is a party, and the consummation of the transactions contemplated herein by each Seller:

(a)     are within its limited liability company or corporate powers, are not in contravention of law or of the terms of its organizational documents, and have been duly authorized by all appropriate limited liability company or corporate action;

(b)     do not require any approval or consent of, or filing with, any governmental agency or authority bearing on the validity of this Agreement which is required by law or the regulations of any such agency or authority;

12

(c)     will neither conflict with, nor result in any breach or contravention of, or the creation of any lien, charge, or encumbrance under, nor result in acceleration of the timing of payment or performance of such Seller's obligations under, any indenture, agreement, lease, instrument or understanding to which it is a party or by which it is bound;

(d)     will not violate any statute, law, rule, or regulation of any Governmental Entity to which it or the Assets may be subject; and

(e)     will not violate any judgment, decree, writ or injunction of any court or Governmental Entity to which it or the Assets may be subject.

2.3     **Binding Agreement**. This Agreement has been duly and validly executed and delivered by such Seller and, assuming due and valid execution by OpCo Buyer and entry of the Sale Order, this Agreement constitutes a valid and binding obligation of such Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies. Except for such corporate actions which have been taken on or before the date hereof, no other corporate action on the part of Sellers is necessary to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby and thereby.

2.4     **Assumed Contracts and Assumed Leases**. Sellers represent and warrant with respect to the Assumed Contracts and Assumed Leases that:

(a)     All Assumed Contracts and Assumed Leases will be upon the consummation of the transactions contemplated hereby, in full force and effect, constitute valid and legally binding obligations of the appropriate Seller and, the other parties with respect thereto, and are enforceable against the appropriate Seller and the other parties with respect thereto, in accordance with their terms;

(b)     No Seller is in breach of or default under any Assumed Contract or Assumed Lease except to the extent of defaults that will be cured in connection with assumption pursuant to Section 365 of the Bankruptcy Code, and no act or omission by the appropriate Seller has occurred or failed to occur which, with the giving of notice, the lapse of time or both would constitute a default under the Assumed Contracts or Assumed Leases except to the extent of defaults that will be cured in connection with assumption pursuant to Section 365 of the Bankruptcy Code;

(c)     There has been no breach or anticipated breach by the other parties to any Assumed Contract or Assumed Lease; and

(d)     Subject to entry of the Sale Order, the Assumed Contracts and Assumed Leases do not require consent to their assumption by the applicable Seller and assignment to OpCo Buyer.

2.5     **Brokers and Finders**. No Seller nor any affiliate thereof, nor any officer or director or manager (as applicable) thereof, has engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder.

2.6     **[RESERVED].**

2.7     **Compliance with Legal Requirements**. Each Seller, with respect to the operation of the Hospital and the Practices, is in material compliance with all applicable laws, statutes, ordinances, orders, rules, regulations, policies, guidelines, licenses, certificates, judgments or decrees of all judicial or governmental authorities (federal, state, local, foreign or otherwise) except to the extent such compliance is excused by the filing of the Bankruptcy Cases (collectively, "**Legal Requirements**"). None of Sellers, with respect to the operation of the Hospital and the Practices, has been charged in writing with or been given written notice of or is under investigation with respect to, any material violation of, or any obligation to take material remedial action under, any applicable Legal Requirements.

2.8     **Required Consents**. Sellers are not a party to or bound by, nor are any of the Assets subject to, any mortgage, or any material lien, deed of trust, material lease, or material contract or any material order, judgment or decree which, after giving effect to the Sale Order (a) will require the consent of any third party to the execution of this Agreement or (b) will require the consent of any third party to consummate the transactions contemplated by this Agreement.

2.9     **Certain Other Representations with Respect to the Hospital and the Practices.**

(a)     All of the Permits which are material and/or necessary to the operation of the Hospital or the Practices by Sellers are valid and in good standing and Sellers are in compliance with the terms and conditions of all such Permits in all material respects, in each case except where the failure to be valid and in good standing or in compliance would not have a material adverse effect on the Assets, the Hospital or the Practices. As of the Closing Date Sellers will have any and all material Permits required under Legal Requirements to conduct the Hospital and the Practices as presently conducted by Sellers, except where the failure to have any such license would not have a material adverse effect on the Assets, the Hospital or Practices. To the knowledge of Sellers, except as set forth on <u>Schedule 2.9(a)</u>, no loss or expiration of any Permit is pending or threatened.

(b)     Sellers are certified for participation in the Medicare, Medicaid and TRICARE programs and any other federal or state health care reimbursement programs in which they participate, and have current and valid provider agreements with each such program, except where the failure to be so certified or have such provider agreements would not have a material adverse effect.

(c)     Sellers have not been excluded from Medicare, Medicaid or any federal or state health care reimbursement program, and there is no pending or threatened exclusion action by a governmental authority against Sellers.

(d)     Sellers' Graduate Medical Education Residency Programs are fully accredited and operated in accordance with the requirements of the Accreditation Council for Graduate Medical Education, the appropriate Residency Review Committee, Liaison Committee on Medical Education, Middle States Commission on Higher Education and Pennsylvania

14

Department of Education and Sellers have not entered into any agreements for Shared Rotational Arrangements and Residency Cap Affiliations except as listed in the Notice of Assumption, Assignment and Cure Amount with Respect to Executory Contracts and Unexpired Leases of the Debtor as filed in the Bankruptcy Court

     2.10   **Financial Statements.**

     (a)    <u>Schedule 2.10(a)</u> hereto contains the following financial statements (the "**Historical Financial Statements**"): (i) the unaudited balance sheets of Sellers as of June 30, 2019; (ii) unaudited income statements of Sellers for the twelve (12)-month periods ended June 30, 2019; (iii) the unaudited consolidated income statement of Sellers for the year 2018; and (iv) the unaudited consolidated balance sheet of Sellers as of June 30, 2019.

     (b)    the income statements contained in the Historical Financial Statements present, fairly in all material respects the results of the operations of Sellers as of and for the periods covered therein and, the balance sheets contained in the Historical Financial Statements (i) are true, complete and correct in all material respects; and (ii) present, fairly in all material respects the financial condition of Sellers as of the dates indicated thereon.

     2.11   **Certain Post-Balance Sheet Results**. Since June 30, 2019 there has not been any:

     (a)    material damage, destruction, or loss (whether or not covered by insurance) affecting the Hospital, the Practices or the Assets;

     (b)    threatened employee strike, work stoppage, or labor dispute pertaining to the Hospital or the Practices;

     (c)    sale, assignment, transfer, or disposition of any item of property, plant or equipment included in the Assets having a value in excess of Ten Thousand Dollars ($10,000) (other than supplies), except in the ordinary course of business and consistent with past hospital practices;

     (d)    changes in the accounting methods or practices employed by Sellers or changes in depreciation or amortization policies;

     (e)    any grant or incurrence of any obligation for any increase in the compensation of any employee who is employed at the Hospital (including any increase pursuant to any bonus, pension, profit-sharing, retirement, or other plan or commitment) except in the ordinary course of business or as approved in the Bankruptcy Cases or in accordance with existing, written personnel policies;

     (f)    making or changing of any Tax election, settling of any audit, investigation or other administrative or judicial proceeding related to Taxes, entering into any closing agreement with respect to Taxes, or filing of any amended tax return, in each case by or with respect to any Seller; or

09/26/2019 SL1 1606709v1 006375.01166
35933560.2 09/26/2019

(g)     transaction or other occurrence pertaining to the Hospital or the Practices by Sellers outside the ordinary course of business unless approved in the Bankruptcy Cases.

2.12     **Legal Proceedings**. Except for any and all cases and/or pleadings filed or to be filed in the Bankruptcy Court, or addressed in the Bankruptcy Cases by mediation or otherwise, or as set forth in the Litigation Schedule (Schedule 2.12), which shall be available through Sellers' claims and noticing agent's website for this bankruptcy proceeding, there are no claims, actions, suits, proceedings, or investigations pending, or threatened against or related to Sellers, the Hospital, the Practices or the Assets, at law or in equity, or before or by any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality wherever located. Sellers have delivered to OpCo Buyer (by inclusion in the data room made available to OpCo Buyer) an accurate list and summary description of all current litigation or proceedings with respect to the Hospital, the Practices and the Assets, as well as settlements, orders and similar agreements (the **"Litigation Schedule"**) under which Sellers or any of their affiliates have current or future obligations with respect to the Hospital, the Practices or the Assets. Sellers are not in default under any order of any court or federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality wherever located.

2.13     **Permits**. The Hospital is duly registered with the Pennsylvania Department of Health in accordance with the applicable laws of the Commonwealth of Pennsylvania. Sellers have delivered to OpCo Buyer an accurate list and summary description on Schedule 1.7(b) of all such Permits owned or held by Sellers relating to the ownership, development, or operation of the Hospital, the Practices or the Assets, all of which are now, and as of the Closing shall be, in good standing. Sellers, the Hospital and the Practices, as applicable, are, and at all times since January 10, 2018, except to the extent such good standing is affected by the Bankruptcy Cases have been, in compliance in all material respects with the terms of such Permits and there are no provisions in, or agreements relating to, any Permit that preclude or limit Sellers from operating the Hospital and carrying on their operations as currently conducted. There is no pending or, , threatened proceeding by or before any Government Entity to revoke, cancel, rescind, suspend, restrict, modify, or refuse to renew any Permit owned or held by any Seller, and all such Permits are now, and as of the Closing shall be without limitation, in good standing, in full force and effect and not subject to meritorious challenge. , no event has occurred and no facts exist with respect to any material Permit owned or held by Sellers that allows, or after notice or the lapse of time or both, would allow the suspension, revocation, or termination of any such material Permit, or would result in any other material impairment in the rights of any holder thereof. Since January 11, 2018, neither Sellers nor the Hospital nor the Practices have received any written notice or communication from any Government Entity regarding any material violation of any Permit owned or held by Sellers (other than any surveys or deficiency reports for which Sellers have submitted a plan of correction that has been accepted or approved by the applicable Government Entity). Sellers have delivered to OpCo Buyer accurate and complete copies of all survey reports, deficiency notices, plans of correction, and related correspondence received by Sellers or the Hospital since January 11, 2018 in connection with the Permits owned or held by Sellers.

2.14     **Medicare Participation; Accreditation and Compliance**. The Hospital is qualified for participation in the Medicare, Medicaid and TRICARE programs, has current and

valid provider contracts with such programs, is in compliance in all material respects with the conditions of participation in such programs, and has received all approvals or qualifications necessary for capital reimbursement for the Hospital. Sellers have, or shall at least two days prior to Closing Date, delivered accurate and complete copies of all such program agreements to Buyer OpCo, each of which is in full force and effect. All billing practices of Sellers to all third party payors, including, without limitation, the government programs and private insurance companies, have been conducted in material compliance with all applicable law and the billing guidelines of such third party payors, and Sellers have not billed or received any payment or reimbursement in excess of amounts allowed by law. There is no proceeding, survey, or other action pending or, , threatened, involving any of the government programs or any other third party payor programs, including the Hospital's participation in and the reimbursement received by Sellers and the Hospital from the government programs or any such program. No Seller (i) is a party to a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services, (ii) has any reporting obligations pursuant to any settlement agreement entered into with any governmental entity, (iii) has been, , within the past five (5) years the subject of any governmental payor program investigation conducted by any federal or state enforcement agency, (iv) is and has been, , within the past five (5) years a defendant in any qui tam/False Claims Act litigation, (v) during the past five (5) years has been served with or received any search warrant, subpoena, civil investigative demand, or contact letter or telephone or personal contact by or from any federal or state enforcement agency, and (vi) has during the past five (5) years received any written complaints from any employee, independent contractor, vendor, physician or other person or organization that would indicate that such Seller has violated any healthcare law or regulation. The Hospital is duly accredited, with no contingencies, by The Joint Commission. A copy of the most recent accreditation letter from The Joint Commission pertaining to the Hospital has been made available to OpCo Buyer. Schedule 2.14 contains a list of all national provider identifiers and all provider numbers under the government programs issued to and held by Sellers and the Hospital, all of which are in full force and effect. No Seller has been excluded from participation in the Medicare, Medicaid or TRICARE programs, nor is any such exclusion threatened. Sellers have not received any notice from any of the Medicare, Medicaid or TRICARE programs, or any other third party payor programs, of any pending or threatened investigations or surveys.

2.15   **Regulatory Compliance** . Sellers are in compliance in all material respects with all material statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over the Hospital or the Practices and the operations of the Hospital, the Practices or its related ancillary services. As used herein, "**Government Entity**" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local. Sellers have timely filed all material reports, data, and other information required to be filed with the Government Entities. Sellers have not committed a material violation of federal or state laws regulating fraud, including but not limited to the federal Anti-Kickback Law, the Stark Law, and the False Claims Act. Sellers' contracts with physicians are in compliance in all material respects with all applicable state corporate practice of medicine and fee-splitting laws and regulations. Except as set forth in Schedule 2.15, Sellers are in compliance in all material respects with the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") as amended and all rules and regulations promulgated pursuant to HIPAA. Sellers' contracts with referral sources, including (a) physicians, or physicians' immediate family members (as that term is defined at 42

17

C.F.R. § 411.351), or other healthcare providers or entities in which physicians or other healthcare providers are equity owners or healthcare providers, (b) entities that refer to Sellers, or (c) entities that are the beneficiaries of referrals from providers at Sellers, are in compliance in all material respects with all applicable laws, including, without limitation, state corporate practice of medicine, fee splitting, anti-markup, anti-kickback, disclosure and self-referral related laws and regulations.

2.16    **[RESERVED]**.

2.17    **Title**. Subject to the entry of the Sale Order, on the Closing Date Sellers will transfer to OpCo good and valid title to all tangible personal property assets and valid title to all intangible assets included in the Assets, free and clear of all Interests, except the Assumed Obligations.

2.18    **Employee Benefit Plans**.

(a)    Set forth on Schedule 2.18(a) is a list of each Seller Plan. For purposes of this Agreement, "**Seller Plans**" means (i) each "employee benefit plan" (within the meaning of Section 3(3) of ERISA), and (ii) each other retirement, non-qualified deferred compensation, disability, vacation, leave of absence, fringe benefit, severance, change-in-control, option, equity or equity-based, bonus, incentive, welfare or material fringe benefit plan, program, agreement or arrangement currently maintained, contributed to, or required to be contributed to, by Seller or any ERISA Affiliate for the benefit of any current or former director, officer, consultant or employee of the Hospital or the Practices. For purposes of this Agreement, "**ERISA Affiliate**" means any person or entity under common control with the Seller within the meaning of Section 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986, as amended (the "**Code**").

(b)    As applicable with respect to each of the Seller Plans, the Seller has made available to Buyer true and complete copies of (i) the applicable plan document (including all amendments thereof) and in the case of an unwritten Seller Plan, a written description of the material terms thereof, (ii) the most recent summary plan description, (iii) the last filed Form 5500 series and all schedules thereto and (iv) the most recent determination, opinion or advisory letter issued by the Internal Revenue Service ("**IRS**").

(c)    Each Seller Plan has been maintained, operated and administered in compliance with its terms and the applicable provisions of ERISA, the Code and all other applicable laws, including, without limitation, the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and the Code.

(d)    Each Seller Plan that is intended to meet the qualification requirements of Section 401(a) of the Code has received a determination, opinion or advisory letter from the IRS to the effect that such Seller Plan is so qualified, and no determination, opinion or advisory letter with respect to any Seller Plan has been revoked nor is any such revocation threatened.

18

(e)     All contributions and premium payments that are due to any Seller Plan on or before the Closing Date have been timely made or accrued and reflected on the Seller's financial statements.

(f)     No Seller Plan provides medical, life insurance, disability or other welfare benefits beyond termination of service or retirement other than coverage mandated by law.

(g)     Except as set forth in any Court-approved key employee incentive plan, neither the execution of this Agreement nor the consummation of the transactions contemplated hereby (either alone or together with any other event) will (i) entitle any current or former employee, officer, director or consultant of the Hospital or the Practices to any payment or benefit, including any bonus, retention, separation, severance, termination, retirement or similar benefits or payments; or (ii) accelerate the time of payment or vesting or trigger any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, or increase the amount payable under, any Seller Plan.

2.19    **Taxes**. Except as set forth on <u>Schedule 2.19</u>, Sellers have filed all federal, state and local tax returns required to be filed by Sellers (all of which are true and correct in all material respects) and have duly paid or made provision for the payment of all Taxes (including any interest or penalties and amounts due state unemployment authorities) which are due and payable to the appropriate tax authorities. no deficiencies for any of such Taxes have been asserted or threatened, and no audit on any such returns is currently under way or threatened. There are no outstanding agreements by Sellers for the extension of time for the assessment of any such Taxes. There are no tax liens on any of the Assets and no basis exists for the imposition of any such liens. As used in this Agreement, "**Tax**" or "**Taxes**" means (a) any federal, state, local or foreign income, gross receipts, capital, bulk, production, license, payroll, employment, excise, severance, stamp, recording, occupation, premium, windfall profits, environmental, customs duties, franchise, single business, profits, margin, withholding, social security, unemployment, disability, real property, real estate excise, mortgage, inventory, personal property, intangible property, escheatment, unclaimed property, sales, use, ad valorem, transfer, registration, value added, alternative or add-on minimum, estimated or other tax, fee or assessment of any kind whatsoever, including any interest, penalties, fines, additions to tax or additional amounts imposed by any Government Entity with respect thereto, whether disputed or not, and (b) any liability for payment of amounts described in clause (a) whether as a result of transferee liability, of being a member of an affiliated, consolidated, combined or unitary group for any taxable period (including, without limitation, any liability pursuant to Treasury Regulations Section 1.1502-6 or any similar provision of state, local or foreign law), by contract, or otherwise.

2.20    **Employee Relations** . All employees of the Hospital are employees of one of the Sellers.  There is no threatened employee strike, work stoppage, or labor dispute pertaining to the Hospital. No union representation question exists respecting any employees of any Seller. Except as set forth on <u>Schedule 2.20</u>, no collective bargaining agreement exists or is currently being negotiated by any Seller, no demand has been made for recognition by a labor organization by or with respect to any employees of any Seller, no union organizing activities by or with

19

respect to any employees of any Seller are taking place, and none of the employees of any Seller is represented by any labor union or organization. There is no unfair practice claim against any Seller before the National Labor Relations Board, nor any strike, dispute, slowdown, or stoppage pending or threatened against or involving the Hospital or the Practices, and none has occurred within the last five (5) years. Sellers are in compliance in all material respects with all federal and state laws respecting employment and employment practices, terms and conditions of employment, and wages and hours. Sellers are not engaged in any unfair labor practices. Sellers have complied in all material respects with all requirements of the Immigration and Reform and Control Act of 1986. Except as set forth on <u>Schedule 2.20</u>, there are no pending or threatened EEOC claims, OSHA complaints, union grievances, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like.

2.21    **Personnel.**

(a)    <u>Schedule 2.21(a)</u> sets forth a complete list (as of the date set forth therein) of names, positions and current annual salaries or wage rates and scheduled bonus, and the accrued paid time off pay of all employees of the Debtor Parties who are providing services at the Hospital and Practices immediately prior to August 18, 2019, whether such employees are full time employees, part-time employees, on short-term or long-term disability or on leave of absence pursuant to Sellers's policies, the Family and Medical Leave Act of 1993 or other similar Legal Requirements (the "**Seller Employees**") and indicating whether the Sellers Employee is full-time or part-time. Sellers shall have the obligation to update to <u>Schedule 2.21(a)</u> to reflect changes in employment status or new hires and terminations occurring after August 18, 2019 by providing a revised schedule to OpCo Buyer no later than five (5) business days before the date scheduled for the Closing.

(b)    There are no adverse actions with respect to any Seller Employee or any applicant thereto for which a Seller Employee or applicant has requested a judicial review which has not been scheduled or has been scheduled but has not been completed, and there are no pending threatened disputes with applicants, Seller Employees, or health professional affiliates, and Sellers know of no basis therefore, and all appeal periods in respect of any Seller Employee or applicant against whom an adverse action has been taken have expired. <u>Schedule 2.21(b)</u> sets forth a complete list of all Seller Employees who have resigned or had their privileges revoked or suspended since July 1, 2019.

2.22    **Supplies**. All the inventory and supplies constituting any part of the Assets are substantially of a quality and quantity usable and salable in the ordinary course of business of the Hospital and the Practices. The inventory levels as of the Closing Date will be consistent with normalized inventory levels at the Hospital and the Practices since the filing of the Bankruptcy Cases.

2.23    **Insurance**. <u>Schedule 2.23</u> contains an accurate listing of the insurance policies covering the ownership and operations of the Hospital, the Practices and the Assets, which <u>Schedule 2.23</u> reflects the policies' numbers, terms, identity of insurers, amounts, and coverage. All of such policies are in full force and effect with no premium arrearage. Sellers have given in a timely manner to its insurers all notices required to be given under their insurance policies with respect to all of the claims and actions covered by insurance, and no insurer has denied coverage

of any such claims or actions. Sellers have not (a) received any notice or other communication from any such insurance company canceling or materially amending any of such insurance policies, and no such cancellation or amendment is threatened or (b) failed to give any required notice or present any claim which is still outstanding under any of such policies with respect to the Hospital, the Practices or any of the Assets.

2.24    **Payor Contracts**. Schedule 2.24 sets forth a complete list of all written contracts with private third party payors including insurance companies, managed care organizations and HMOs ("**Payor Contracts**"). Sellers have provided OpCo Buyer with a true and correct copy of all material Payor Contracts, whether or not entered into in the ordinary course of business, or otherwise required to be disclosed on Schedule 2.24, in each case together with all amendments thereto.

2.25    **Excluded Individuals**. Neither Sellers, the Hospital, Practices nor any director or manager (as applicable), officer or employee of Sellers or the Hospital or Practices (a) was, is or is proposed to be, suspended, excluded from participation in, or sanctioned under, any federal or state health care program (including, without limitation, Medicare and Medicaid) (an "**Excluded Individual**"); (b) has been convicted of any criminal offense related to the delivery of any medical or health care services or supplies, or related to the neglect or abuse of patients; (c) has failed to maintain its current license to provide the services required to be provided by it to or on behalf of Sellers, the Hospital and the Practices; or (d) is unable to obtain or maintain liability insurance consistent with commercially reasonable industry practices.

2.26    **Third Party Payor Cost Reports**. Sellers have duly filed all required cost reports for all the fiscal years set forth on Schedule 2.26, and copies of all such cost reports filed by or on behalf of Sellers since January 11, 2018 have been provided to OpCo Buyer. All of such cost reports accurately reflect in all material respects the information required to be included thereon and such cost reports do not claim, and neither the Hospital nor Sellers have received, reimbursement in any amount in excess of, the amounts provided by law or any applicable agreement.  There are no facts or circumstances that would give rise to any disallowance under such cost reports. Schedule 2.26 indicates which of such cost reports have not been audited and finally settled and a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes in respect of such cost reports. Sellers have established adequate reserves to cover any potential reimbursement obligations that Sellers may have in respect of any such third party cost reports, and such reserves are set forth in the Historical Financial Statements.

2.27    **Regulatory Compliance.**

(a)    Neither Sellers nor the Hospital, nor any of their respective officers, directors or employees, have been convicted of, charged with or, , investigated for, or have engaged in conduct that would constitute, a Medicare or other Federal Health Care Program (as defined in 42 U.S.C. § 1320a-7(b)(f)) related offense or convicted of, charged with or, , investigated for, or engaged in conduct that would constitute a violation of any law related to fraud, theft, embezzlement, breach of fiduciary duty, kickbacks, bribes, other financial misconduct, obstruction of an investigation or controlled substances. None of Sellers, the

21

Hospital nor any officer, director, employee or independent contractor of Sellers or the Hospital (whether an individual or entity), has been excluded from participating in any government program, subject to sanction pursuant to 42 U.S.C. § 1320a-7a or § 1320a-8 or been convicted of a crime described at 42 U.S.C. § 1320a-7b, nor, , are any such exclusions, sanctions or charges threatened or pending.

(b)     Neither Sellers nor the Hospital have received at any time since January 10, 2018, any communication from a Government Entity, commercial payor or patient that alleges the Hospital, the Practices or the Assets are not in compliance with any law, other than statements of deficiencies from a Government Entity received in the ordinary course of business. Sellers have timely filed all material reports, data, and other information required to be filed with such commissions, boards, bureaus, and agencies regarding the Hospital, the Practices and the Assets.

2.28    **Information Privacy and Security Compliance.**

(a)     Except as set forth in <u>Schedule 2.28(a)</u>, Sellers and the Hospital (i) to the extent their operations are subject to the administrative simplification provisions of HIPAA, and the implementing regulations contained in 45 C.F.R. Parts 160, 162 and 164, are in compliance in all material respects with those administrative simplification provisions and implementing regulations, including, without limitation, in conducting any of the standard transactions set forth in 45 C.F.R. Part 162; and (ii) are in compliance in all material respects with all other applicable Information Privacy or Security Laws.

(b)     "**Information Privacy or Security Laws**" means HIPAA and the implementing regulations and any other law concerning the privacy or security of Personal Information, including federally-assisted substance use disorder treatment programs, as defined 42 CFR Part 2, state data breach notification laws, state health information privacy laws, the FTC Act, the FTC Red Flag Rules, and state consumer protection laws. "**Personal Information**" means any information with respect to which there is a reasonable basis to believe that the information can be used to identify an individual, including "individually identifiable health information" as defined in 45 C.F.R. 160.103, demographic information, and Social Security numbers.

2.29    **Intellectual Property.**

(a)     Sellers own, or will own, or are licensed or will be licensed or otherwise possesses or will possess all necessary rights to use, all of the Intellectual Property and the Excluded Intellectual Property.

(b)     There is no unauthorized use, disclosure, infringement or misappropriation of any Intellectual Property rights of Sellers, or any trade secret material to Sellers, by any third party, including any employee or former employee of Sellers or any of their affiliates, relating in any way to any of the Assets.

(c)     "**Intellectual Property**" means, to the extent used or held for use in or ancillary to the Hospital, the Practices and the Assets, all intellectual property or rights thereto, including patents, trademarks, trade names, service marks, symbols, copyrights and any

22

applications therefor, mask works, net lists, schematics, technology, know-how, trade secrets, ideas, algorithms, processes, internet domain names, computer software programs and applications (in both source code and object code form), and tangible or intangible proprietary information or material, except for the Excluded Intellectual Property.

(d)     "**Excluded Intellectual Property**" means the Intellectual Property listed as excluded on Schedule 2.29(d).

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF OPCO BUYER

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated by this Agreement, OpCo Buyer hereby represents, warrants and covenants to Sellers that the following matters are true and complete as of the date hereof, and when read in light of any schedules which have been updated in accordance with the provisions of Section 13.5, as of the Closing Date:

3.1     **Existence and Capacity**. OpCo Buyer is a limited liability company duly organized and validly existing in good standing under the laws of the Commonwealth of Pennsylvania.  OpCo Buyer has the requisite power and authority to enter into this Agreement, to perform their respective obligations hereunder, and to conduct its business as historically conducted.

3.2     **Powers; Consents; Conflicts**. The execution, delivery, and performance of this Agreement by OpCo Buyer and all other agreements referenced herein, or ancillary hereto, to which OpCo Buyer is a party, and the consummation of the transactions contemplated herein by OpCo Buyer:

(a)     are within its corporate powers, are not in contravention of law or of the terms of its organizational documents, and have been duly authorized by all appropriate corporate action;

(b)     except as provided in ARTICLE 8, do not require any approval or consent of, or filing with, any governmental agency or authority bearing on the validity of this Agreement which is required by law or the regulations of any such agency or authority;

(c)     will neither conflict with, nor result in any breach or contravention of, or the creation of any lien, charge or encumbrance under, any indenture, agreement, lease, instrument or understanding to which it is a party or by which it is bound;

(d)     will not violate any statute, law, rule, or regulation of any Government Entity to which it may be subject; and

(e)     will not violate any judgment, decree, writ, or injunction of any court or Government Entity to which it may be subject.

3.3     **Binding Agreement**. Subject to entry of the Sale Order, this Agreement and all agreements to which OpCo Buyer will become a party pursuant hereto are and will constitute the

09/26/2019 SL1 1606709v1 006375.01166
35933560.2 09/26/2019

valid and legally binding obligations of OpCo Buyer and are and will be enforceable against OpCo Buyer in accordance with the respective terms hereof and thereof.

3.4    **Availability of Funds**. OpCo Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

3.5    **OpCo Buyer Knowledge**. References in this Agreement to "OpCo Buyer's knowledge" or "the knowledge of OpCo Buyer" means the actual knowledge of the Clint Matthews, Daniel Ahern, John Fry, Anthony Esposito and Jill Tillman, without independent research. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 4
## COVENANTS OF SELLERS

4.1    **Access and Information; Inspections**.

(a)    From the Signing Date through the Closing Date, (a) each Seller shall afford to the officers and agents of OpCo Buyer (which shall include accountants, attorneys, bankers and other consultants and authorized agents of OpCo Buyer) reasonable access during normal business hours at such Seller's corporate headquarters in Philadelphia, Pennsylvania to, and the right to inspect, the books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital and the Practices of such Seller and the plant and property of the Hospital of such Seller at the Hospital of such Seller and (b) each Seller shall furnish OpCo Buyer with such additional financial and operating data and other information in such Seller's possession as to businesses and properties of the Hospital and Practices of such Seller as OpCo Buyer or its representatives may from time to time reasonably request; provided, however, that all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among OpCo Buyer, its representatives and such Seller. OpCo Buyer's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of any Seller, the Hospital or Practices.

(b)    Notwithstanding anything contained herein, no Seller shall be required to provide OpCo Buyer or their representatives or agents access to or disclose information where such access or disclosure would violate the rights of its patients, jeopardize the attorney-client or similar privilege with respect to such information or contravene any law, judgment or contract with respect to such information, provided however, the Sellers' obligation to provide to OpCo Buyer any Seller Contract which is subject to a nondisclosure agreement binding upon a Seller shall be required only if the Sale Order (whether by generic reference or otherwise), or other order of the Bankruptcy Court, permits such Seller Contract to be provided to OpCo Buyer.

(c)    Sellers will delivered to OpCo Buyer true, correct and complete copies of each Assumed Contract and Assumed Lease and each Assumed Contract and Assumed Lease

24

constitutes the entire agreement by and between the respective parties thereto with respect to the subject matter thereof;

(d)    Sellers will provide to OpCo Buyer any records in their possession relating to any data security breach, written complaint alleging a violation of any Information Privacy or Security Laws and any open requests for medical records delivered to Sellers, the Hospital or the Practices since January 11, 2018.

4.2    **Cooperation**.

(a)    Each Seller shall reasonably cooperate with OpCo Buyer and its authorized representatives and attorneys: (a) in OpCo Buyer's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which OpCo Buyer reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in OpCo Buyer's efforts to effectuate the assignment of Assumed Contracts and Assumed Leases to OpCo Buyer as of the Closing Date. Except as may be otherwise requested by a Seller in order to comply with applicable law or regulatory guidance, notwithstanding anything contained herein, other than Bankruptcy Court orders and authorizations, it shall be OpCo Buyer's sole responsibility (including payment of any fees, expenses, filings costs or other amounts) to obtain all governmental consents, approvals, assignments, authorizations, clearances and licenses required to (x) carry out the transactions contemplated by this Agreement, including but not limited to medical licenses and/or (y) transfer any of the Assets, including any Permits. To the extent OpCo Buyer needs certain information and data which is in the possession of a Seller in order for OpCo Buyer to complete OpCo Buyer's license and permit approval applications, OpCo Buyer shall receive, upon request, reasonable assistance from such Seller in connection with the provision of such information.

(b)    OpCo Buyer and Sellers will enter into a mutually acceptable form of transition agreement to permit OpCo Buyer to use the Sellers' Medicare institutional provider numbers and related billing information and the Pennsylvania provider numbers and related billing information, following the Closing during the pendency of the OpCo Medicare CHOW Applications and Medicaid Enrollment Application to bill for services furnished by OpCo to Medicare and Medicaid beneficiaries.

4.3    **[RESERVED]**.

4.4    **Sellers' Efforts to Close**. Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in <u>ARTICLE 7</u> and <u>ARTICLE 8</u> to its or OpCo Buyer's obligations under this Agreement to the extent that such Seller's action or inaction can control or materially influence the satisfaction of such conditions.

4.5    **Termination Cost Reports**. Each Seller shall file all Medicare, Medicaid and any other termination cost reports required to be filed as a result of the consummation of (a) the transfer of the Assets of such Seller to OpCo Buyer and (b) the transactions contemplated by this

09/26/2019 SL1 1606709v1 006375.01166
35933560.2 09/26/2019

Agreement with respect to such Seller. OpCo Buyer shall permit each Seller access to all Hospital and Practices books and records to prepare such reports and shall assist such Seller in the process of preparing, filing, and reviewing the termination cost reports. All such termination cost reports shall be filed by the applicable Seller in a manner that is consistent with current laws, rules and regulations. Each Seller shall be responsible for filing governmental cost reports for the period of January 1, 2019 through the Closing Date. OpCo Buyer shall be responsible for its own cost report filings relating to the Hospital or the Practices beginning on the day immediately following the Closing Date.

  4.6 **Conduct of the Business**. From the Signing Date until the Closing, or the earlier termination of this Agreement, without the prior written consent of OpCo Buyer (which consent shall not be unreasonably withheld), Sellers shall, with respect to the ownership of the Assets and the operation of the Hospital and the Practices, use commercially reasonable efforts to, in each case except as would not have a material adverse effect (other than as noted below):

    (a) without regard to material adverse effect, carry on Sellers' ownership of the Assets and the operation of the Hospital, the Practices and the graduate medical education residency and fellowship programs in the ordinary course of business consistent with past practice of hospital operations;

    (b) maintain in effect the insurance and equipment replacement coverage with respect to the Assets;

    (c) maintain the Assets in materially the same condition as at present, ordinary wear and tear excepted;

    (d) perform its obligations under all Assumed Contracts and Assumed Leases;

    (e) following entry of the Sale Order, permit and allow reasonable access by OpCo Buyer and its representatives (which shall include the right to send written materials, all of which shall be subject to Sellers' reasonable approval prior to delivery) to make offers of post-Closing employment to any of Sellers' personnel (including access by OpCo Buyer and its representatives for the purpose of conducting open enrollment sessions for OpCo Buyer's employee benefit plans and programs) and to establish relationships with physicians, medical staff and others having business relations with Sellers;

    (f) with respect to material deficiencies, if any, cited by any governmental authority or accreditation body in the most recent surveys conducted by each, cure or develop and timely implement a plan of correction that is acceptable to such governmental authority or such accreditation body;

    (g) timely file or cause to be filed all material reports, notices and tax returns required to be filed and pay all required taxes as they come due to the extent that nonpayment would result in a lien that would not be divested by the Sale Order;

    (h) comply in all material respects with all Legal Requirements (including environmental laws) applicable to the conduct and operation of the Hospital and Practices; and

26

(i)       without regard to material adverse effect, maintain all material approvals, Permits and environmental Permits relating to the Hospital and the Practices, and the Assets.

4.7    **Name Change**. Immediately after the Closing, the Sellers will change their name to a name not containing the words "ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN" or any similar words and Sellers shall promptly deliver to OpCo Buyer evidence of such name change. At the request of OpCo Buyer, Sellers shall take all necessary actions to permit OpCo Buyer or OpCo Buyer's Affiliates to do business under the name "ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN" and under any similar names in any jurisdiction in which the Hospital Business and the Physician Practice Business are currently conducted.

## ARTICLE 5
## COVENANTS OF OPCO BUYER

5.1    **OpCo Buyer's Efforts to Close**. OpCo Buyer shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in <u>ARTICLE 7</u> and <u>ARTICLE 8</u> to its or Sellers' obligations under this Agreement to the extent that OpCo Buyer's action or inaction can control or materially influence the satisfaction of such conditions. Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement, OpCo Buyer shall be permitted to communicate and meet with (a) counter-parties to the Assumed Contracts, and the Assumed Leases regarding the terms and conditions under which they may be assumed and assigned to OpCo Buyer, and (b) applicable governmental and regulatory authorities regarding prospective compliance with regulatory requirements and related issues; so long as, in the case of each of (a) and (b) (i) such communications and meetings do not interfere with the operation of the Hospital Business or Physician Practice Business or the conduct of the Bankruptcy Cases and (ii) any communications or meetings with any governmental authority are approved in advance by Sellers as to timing and content (and Sellers are copied on such communications and afforded the opportunity to participate in such meetings).

5.2    **Required Governmental Approvals**. OpCo Buyer believes in good faith that it has the ability to obtain all required consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement. OpCo Buyer, at its sole cost and expense (a) shall use its best efforts to secure, as promptly as practicable before the Closing Date, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled (and provide Sellers copies of all materials relating to such consents, approvals, authorizations, clearances and licenses upon submission and all materials received from third parties in connection with such consents, approvals, authorizations, clearances and licenses upon receipt), and (b) will provide such other information and communications to governmental and regulatory authorities as any Seller or such authorities may reasonably request. OpCo Buyer will provide Sellers periodic and timely updates regarding all such consents, approvals, authorizations, clearances and licenses. OpCo Buyer is responsible for all filings with and requests to governmental authorities necessary to enable OpCo Buyer to operate the Hospital and the Practices after the Effective Time. OpCo

Buyer shall, promptly, after the entry of the Sale Order or sooner if required by applicable governmental or regulatory authorities, file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, Permits, authorizations and provider numbers described in Section 8.1. OpCo Buyer shall be entitled, but not obligated, to solicit and obtain estoppel certificates from any third party to any Leased Real Property.

5.3    **Certain Employee Matters**.

(a)    OpCo Buyer agrees to offer, or cause any affiliate to offer, employment to substantially all of the Sellers' Employees; provided, that such Sellers' Employees satisfy OpCo Buyer's screening and required employment background checks and meet the customary and reasonable conditions and qualifications for their respective positions. Any of the Sellers' Employees who accept an offer of employment with OpCo Buyer as of the Closing Date shall be referred to in this Agreement as the "**Hired Employees**", and shall be listed on Schedule 5.3, and such schedule shall be delivered to Sellers by OpCo Buyer prior to the Closing Date. For the avoidance of doubt, the Sellers' Employees shall not include any employees of any affiliate of Sellers unless such individual is listed on Schedule 5.3. All employees who are Hired Employees shall cease to be employees of the applicable Seller or its affiliates as of the Effective Time. OpCo Buyer shall credit all Hired Employees with any paid time off ("**PTO**") accruing but unused under Sellers' PTO policy subsequent to the commencement of the Bankruptcy Cases ("**PTO Obligation**").

(b)    OpCo Buyer will recognize and assume the collective bargaining agreement (the "**IBEW CBA**") between St. Christopher's Hospital for Children and International Brotherhood of Electrical Workers Local 98 ("**IBEW**") covering August 12, 2017 through August 11, 2020. Notwithstanding anything in this Agreement, OpCo Buyer shall not be a party to or agree to assume any other collective bargaining agreement between any Seller and any Seller Employees.

(c)    The provisions of this Section 5.3 are solely for the benefit of the parties to this Agreement, and no employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be construed as an amendment to any employee benefit plan for any purpose.

(d)    In the event that any transaction under this Agreement results in an employment loss that constitutes a "plant closing," "mass layoff," "transfer of operations" or "termination of operations" or is otherwise subject to the WARN Act or any similar state or local law), Sellers shall be solely responsible, and accept all liability, for compliance with the WARN Act or any similar applicable law (including, without limitation, the issuance of any required notices) in connection with all transactions covered by this Agreement.

5.4    **Residents**OpCo Buyer intends to negotiate with counterparties to existing academic affiliation agreements to provide, at a minimum, for the continued training of all students, Hospital residents and fellows planned through the current academic year and for such

longer period as may be agreed to between OpCo Buyer and applicable academic institution on or before the Closing Date...

5.5     **Excluded Assets**. As soon as practicable after the Closing Date, OpCo Buyer shall deliver to each Seller or such Seller's designee any physical Excluded Assets of such Seller found at the Hospital on and after the Closing Date.

5.6     **HSR Filing**. If applicable, OpCo Buyer and each Seller will as promptly as practicable, and in any event no later than five (5) business days after the date of the Sale Order, file with the Federal Trade Commission and the Department of Justice the notification and report forms required for the transactions contemplated hereby and any supplemental information that may be reasonably requested in connection therewith pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), which notification and report forms and supplemental information will comply in all material respects with the requirements of the HSR Act. OpCo Buyer shall pay all filing fees required with respect to the notification, report and other requirements of the HSR Act. Each of OpCo Buyer and Sellers shall furnish to the other such information and assistance as the other shall reasonably requires in connection with the preparation and submission to, or agency proceedings by, any governmental authority under the HSR Act, and each of OpCo Buyer and Sellers shall keep the other promptly apprised of any communications with, and inquires or requests for information from, such governmental authorities. OpCo Buyer shall take such action (including divestitures or hold separate arrangements) as may be required by any governmental authority in order to resolve with the minimum practicable delay any objections such governmental authorities may have to the transactions contemplated by this Agreement under the HSR Act.  To the extent that expedited review by the Federal Trade Commission or the Department of Justice as contemplated by this Section 5.6 is available, the Sellers agree to seek such expedited review.

### ARTICLE 6
### BANKRUPTCY COURT APPROVAL

6.1     **Bankruptcy Court Approval**.

(a)     Sellers and OpCo Buyer acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases are subject to entry by the Bankruptcy Court of an Order (the "**Sale Order**") in the form attached hereto as Exhibit A.

(b)     Each Seller shall at the sale hearing contemplated by the order entered by the Bankruptcy Court establishing procedures for the sale of the Assets (the "**Bid Procedures**") exercise reasonable efforts to obtain the Sale Order.

6.2     **Appeal of Sale Order**. In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Sellers shall immediately notify OpCo Buyer of such appeal or stay request and shall provide to OpCo Buyer promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide OpCo Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders. In the event of an appeal of the Sale Order, Sellers shall be primarily responsible for drafting pleadings and

29

attending hearings as necessary to defend against the appeal; provided, however, OpCo Buyer, at its option, shall have the right to participate as a party in interest in such appeal. In the event a stay is issued by any appellate court, including the United States District Court, which prevents the sale from closing, as scheduled, in addition to all other OpCo Buyer termination rights provided under this Agreement, OpCo Buyer shall have the right to terminate this Agreement if such stay is not vacated on or before forty-five (45) days from the date the stay is issued and, upon such termination, OpCo Buyer shall be entitled to the prompt return of the Deposit and any interest earned thereon.

## ARTICLE 7
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

Sellers' obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Sellers in whole or in part at or prior to the Closing:

7.1    **Signing and Delivery of Instruments**. OpCo Buyer shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.

7.2    **No Restraints**. No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.3    **Performance of Covenants**. OpCo Buyer shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

7.4    **Governmental Authorizations**. OpCo Buyer shall have obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits and authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies).

7.5    **Bankruptcy Court Approval. The Bankruptcy Court shall have entered the Sale Order.**

7.6    **HSR Act**. The applicable waiting period under the HSR Act shall have expired or been earlier terminated.

7.7    **Representations and Warranties; Covenants**. The representations and warranties of OpCo Buyer contained in this Agreement shall be true in all material respects when

30

made and, when read in light of any schedules which have been updated in accordance with the provisions of Section 13.5 as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date. Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by OpCo Buyer on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects.

**ARTICLE 8**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF OPCO BUYER**

OpCo Buyer's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by OpCo Buyer in whole or in part at or prior to the Closing.

8.1     **Governmental Authorizations**. Except as otherwise set forth in this Agreement, OpCo Buyer and Sellers shall have obtained licenses, permits and authorizations from governmental agencies or governmental bodies that are required for the purchase, sale and operation of the Hospital and the Practices, except in such case where failure to obtain such license, permit or authorizations from a governmental agency or governmental body does not have a material adverse effect. OpCo Buyer shall promptly and in good faith undertake to obtain all required regulatory approvals. Sellers shall promptly and in good faith cooperate with OpCo Buyer's governmental authorization undertakings by providing any and all information required by any regulators in connection with any required license or provider enrollment applications and requests for regulatory approvals.

8.2     **Bankruptcy Court Approval**.

(a)     The Bankruptcy Court shall have entered the Sale Order, which shall have become a Final Order.

(b)     For purposes hereof, "**Final Order**" shall mean an order of the Bankruptcy Court, the operation or effect of which has not been stayed, and which is not subject to any pending appeal, request for leave to appeal, or request for reconsideration, and as to which the time for any such appeal, request for leave to appeal, or request for reconsideration has expired.

8.3     **Signing and Delivery of Instruments**. Sellers shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement, including Section 1.4.

8.4     **Performance of Covenants**. Sellers shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Sellers on or prior to the Closing Date.

8.5     **No Restraints**. No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction and shall remain in

31

effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

8.6     **Tail Coverage**. OpCo Buyer shall have obtained the Tail Coverage.  For purposes of this Agreement, "**Tail Coverage**" means the reporting endorsement to insure against professional liabilities of the Debtor Parties and the Hospital residents and fellows as of the Closing Date, including any excess and umbrella coverage, in amounts and coverage satisfactory to OpCo Buyer in its sole discretion.  Sellers shall be responsible to pay one half of the cost of the Tail Coverage, up to a cap on Sellers' contribution of Two Million Dollars ("**Sellers' Tail Coverage Expense**").

8.7     **Medicare and Medicaid Provider Agreements**. Sellers shall have executed and delivered all documents necessary to transfer to OpCo Buyer the Provider Agreements. With respect to Sellers' provider agreements with the Pennsylvania Department of Human Services ("**PDHS**") (the "**Medicaid Provider Agreements**"), which cannot be legally transferred, OpCo Buyer shall submit new enrollment applications to participate in the Pennsylvania Medicaid program. OpCo Buyer acknowledges that it will succeed to the quality history associated with the Medicaid Provider Agreements assigned and shall be treated, for purposed of survey and certification issues as if it is the relevant Seller and no change of ownership occurred.

8.8     **HSR Act**. Any applicable waiting period under the HSR Act shall have expired or been earlier terminated.

8.9     **Health Partners Plans, Inc.** Sellers shall have executed and delivered documents sufficient to transfer to OpCo Buyer all of Sellers' interest in Health Partners Plans, Inc. currently owned and/or associated with the Hospital Seller, including the right of any Seller to receive or to designate a third party as recipient of "distributions" (other than distributions allocable to the period prior to the Closing Date) as that term is used in the Articles of Incorporation of Health Partners Plans, Inc.

8.10     **Assumed Contracts; Notice**. Sellers shall have provided to OpCo Buyer evidence satisfactory to OpCo Buyer that the Sellers have fully complied with the Bid Procedures, including by having provided timely service on all required parties of the Sale Notice and the Notice of Assumption, Assignment and Cure Amount with Respect to Executory Contracts and Unexpired Leases of the Debtors (each as defined in the Bid Procedures) and timely publication of the form of the Sale Notice as modified for publication.

8.11     **Collective Bargaining Agreements**.  Subject to the provisions of Section 5.3, OpCo Buyer will make offers of employment to the employees represented by St. Christopher's Hospital for Children Nurses United/Pennsylvania Association of Staff Nurses and Allied Professionals ("**PASNAP**") and National Union of Hospital and Healthcare Employees, District 1199 ("**District 1199**"), OpCo Buyer agrees to recognize PASNAP and District 1199 as the bargaining agent for their affiliated employees. OpCo Buyer intends to negotiate with PASNAP and District 1199 regarding new mutually acceptable collective bargaining agreements which may include, *inter alia*, the terms and conditions of the offer letters given to the employees represented by PASNAP and the employees represented by District 1199.  In the event OpCo

32

Buyer and either PASNAP or District 1199 have not entered into a mutually acceptable collective bargaining agreement with OpCo Buyer by the Closing Date, OpCo Buyer agrees to comply with applicable labor laws in any negotiations with such unions after the Closing Date. Sellers hereby authorize OpCo Buyer to commence discussions with these unions immediately after the Signing Date.

8.12    **Tenet Transition Services Agreement**.  OpCo Buyer and Tenet Healthcare Corporation shall have entered into a transition services agreement on terms mutually acceptable to OpCo Buyer and Tenet Healthcare Corporation.

8.13    **Conifer Agreement**.  OpCo Buyer and Conifer Revenue Cycle Solution, LLC shall have entered into a Master Services Agreement on terms mutually acceptable to OpCo Buyer and Conifer Revenue Cycle Solution, LLC.

8.14    **Representations and Warranties; Covenants**. The representations and warranties of Sellers contained in this Agreement shall be true in all material respects when made and, when read in light of any schedules which have been updated in accordance with the provisions of <u>Section 13.5</u> as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date. Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by Sellers on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects.

**ARTICLE 9**
**TERMINATION**

9.1    **Termination**. This Agreement may be terminated at any time prior to Closing:

(a)    by the mutual written consent of the parties;

(b)    by Sellers if a material breach of this Agreement has been committed by OpCo Buyer and such breach has not been (i) waived in writing by Sellers or (ii) cured by OpCo Buyer to the reasonable satisfaction of Sellers within fifteen (15) business days after service by Sellers upon OpCo Buyer of a written notice which describes the nature of such breach;

(c)    by OpCo Buyer if a material breach of this Agreement has been committed by Sellers and such breach has not been (i) waived in writing by OpCo Buyer or (ii) cured by Sellers to the reasonable satisfaction of OpCo Buyer within fifteen (15) business days after service by OpCo Buyer upon Sellers of a written notice which describes the nature of such breach;

(d)    by OpCo Buyer if satisfaction of any of the conditions in <u>ARTICLE 8</u> has not occurred by December 13, 2019 or becomes impossible, and OpCo Buyer has not waived such condition in writing (provided that the failure to satisfy any of the applicable condition or conditions in <u>Sections 8.1</u>, <u>8.2</u>, <u>8.3</u>, <u>8.4</u> and <u>8.5</u> inclusive has occurred by reason other than (i) through the failure of OpCo Buyer to comply with its obligations under this Agreement or (ii) Sellers' failure to provide their Closing deliveries on the Closing Date as a result of OpCo Buyer not being ready, willing and able to close the transaction on the Closing Date).  The

33

foregoing notwithstanding, OpCo Buyer shall not be entitled to terminate this Agreement pursuant to this subsection, as a result of breach by Sellers of any representations and warranties of Sellers contained in ARTICLE 2, unless any such breach, alone or in the aggregate with other such breaches, results in the occurrence of a material adverse effect as defined herein. "**Material Adverse Effect**" means any change or effect that is or would reasonably be expected to be materially adverse to the Hospital Business and Physician Practice Business (including, without limitation, material changes in relationships with providers, suppliers and patients), assets, operations, financial condition or results of operations of the Hospital Business and Physician Practice Business, taken as a whole.

(e)     by Sellers if satisfaction of any of the conditions in ARTICLE 7 has not occurred by December 13, 2019 or becomes impossible, and Sellers have not waived such condition in writing (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Sellers to comply with their obligations under this Agreement or (ii) OpCo Buyer's failure to provide its Closing deliveries on the Closing Date as a result of Sellers not being ready, willing and able to close the transaction on the Closing Date);

(f)     by OpCo Buyer if the Bankruptcy Court enters an order dismissing any of the Sellers' Bankruptcy Cases or converting any of the Sellers' Bankruptcy Cases to Chapter 7;

(g)     by either OpCo Buyer or Sellers if the Closing has not occurred (other than as a result of a material breach of this Agreement by the party seeking to terminate) on or before December 13, 2019;

(h)     by OpCo Buyer if a force majeure event (such as acts of God, storms, floods, landslides, earthquakes, lightning, riots, fires, pandemics, sabotage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities, other national or international calamity, one or more acts of terrorism, or failure of energy sources) shall have occurred between the Signing Date and Closing Date, which event is reasonably likely to have a material adverse effect,

(i)     by OpCo Buyer on the day after the Auction (as defined in the Bid Procedures) if the OpCo Buyer is not designated as the Successful Bidder (as defined in the Bid Procedures), and

(j)     by OpCo Buyer if the Sale Order has not been entered on or before September 26, 2019.

9.2     **Termination Consequences**. If this Agreement is terminated pursuant to Section 6.2 or Section 9.1: all further obligations of the parties under this Agreement shall terminate, and; further, provided, in the case of any termination based on Section 9.1(b) or Section 9.1(c) the consequences of such termination shall be determined in accordance with ARTICLE 11. In addition, if this Agreement is terminated pursuant to Section 6.2 or Section 9.1 (other than Section 9.1(b)), Sellers shall immediately return the Deposit to OpCo Buyer with all interest earned thereon. Each Party acknowledges that the agreements contained in this

34

Section 9.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

## ARTICLE 10
## POST-CLOSING MATTERS

10.1    **Preservation and Access to Records After the Closing**.

(a)    From the Closing Date until seven (7) years after the Closing Date or such longer period as required by law (the "**Document Retention Period**"), OpCo Buyer shall keep and preserve all medical records (including, without limitation, electronic medical records), patient records, medical staff records and other books and records which are among the Assets as of the Closing Date, but excluding any records which are among the Excluded Assets. OpCo Buyer will afford to the representatives of Sellers, Sellers' estate representative, any liquidating trustee of Sellers' bankruptcy estate, or the Committee, subject to the Sellers' consent, (the "**Seller Parties**"), including their counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records with respect to time periods prior to the Effective Time (including, without limitation, access to records of patients treated at the Hospital or by the Practices prior to the Effective Time) during normal business hours after the Closing Date, to the extent reasonably needed by any Seller Party for any lawful purpose, including in connection with the Bankruptcy Cases or otherwise. OpCo Buyer acknowledges that, as a result of entering into this Agreement and operating the Hospital and the Practices, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality. OpCo Buyer shall abide by any such rules and regulations relating to the confidential information it acquires. OpCo Buyer shall maintain the patient and medical staff records at the Hospital or the Practices in accordance with applicable law and the requirements of relevant insurance carriers. After the expiration of the Document Retention Period, if OpCo Buyer intends to destroy or otherwise dispose of any of the documents described in this Section 10.1(a), OpCo Buyer shall provide written notice to Sellers' counsel as of the Signing Date of OpCo Buyer's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal. Any of Seller Parties shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period. If any of Seller Parties does not take possession of such documents during such forty-five (45) calendar day period, OpCo Buyer shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

(b)    In connection with (i) the transition of the Hospital or the Practices pursuant to the transaction contemplated by this Agreement, (ii) Sellers' rights to the Excluded Assets, (iii) any claim, audit, or proceeding, including, without limitation, any tax claim, audit, or proceeding and (iv) Sellers' obligations under the Excluded Liabilities, OpCo Buyer shall after the Closing Date give Seller Parties access during normal business hours to OpCo Buyer's books, personnel, accounts and records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital and the Practices as representatives of Sellers and their affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Hospital and the Practices.

(c)     OpCo Buyer and its representatives shall be given access by Sellers during normal business hours to the extent reasonably needed by OpCo Buyer for business purposes to all documents, records, correspondence, work papers and other documents retained by Sellers pertaining to any of the Assets (excluding confidential employee information, privileged materials and patient records), all in such manner as to not interfere unreasonably with Sellers. Such documents and other materials shall be, at Sellers' option, either (i) copied by Sellers for OpCo Buyer at OpCo Buyer's expense, or (ii) removed by OpCo Buyer from the premises, copied by OpCo Buyer and promptly returned to Sellers.

(d)     OpCo Buyer shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Hospital or the Practices on and after the Effective Time.

(e)     To the maximum extent permitted by law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Hospital or the Practices or any of the Hospital's or the Practices' committees prior to the Effective Time, prior to any disclosure of such documents, OpCo Buyer shall notify Sellers and shall provide Sellers with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

(f)     If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, consent or approval is required for the assumption and assignment of any Assumed Contract, Assumed Lease or contract deemed not to be an executory contract, and OpCo Buyer nevertheless elects to proceed with Closing, Sellers will cooperate with OpCo Buyer in any reasonable arrangement designed to provide OpCo Buyer with the benefits of or under any such Assumed Contract, Assumed Lease or non-executory contract.

10.2    **[RESERVED]**.

10.3    **Medical Staff**. To ensure continuity of care in the community, OpCo Buyer agrees that the Hospital's medical staff members in good standing as of the Closing Date shall maintain medical staff privileges at the Hospital as of the Closing Date. On and after the Closing Date, the medical staff will be subject to the Hospital's medical staff bylaws then currently in effect, provided that such bylaws are in compliance with all applicable laws and regulations and contain customary obligations.

**ARTICLE 11**
**DEFAULT, TAXES AND COST REPORTS**

11.1    **OpCo Buyer Default**. If OpCo Buyer commits any material default under this Agreement and, as a result, Sellers terminate this Agreement pursuant to Section 9.1(b), Sellers shall have the right to sue for damages; provided, however that the amount of such damages shall never exceed Three Million Dollars ($3,000,000). For the avoidance of doubt, Sellers shall have no right to sue for specific performance under this Agreement.

36

11.2    **Sellers Default**. If Sellers commit any material default under this Agreement and, as a result, OpCo Buyer terminates this Agreement pursuant to Section 9.1(c) hereof, OpCo Buyer shall have the right to demand and receive a refund of the Deposit as its sole remedy.

11.3    **Cost Report Matters**.

(a)    Consistent with Section 4.5, Sellers shall prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, and other third party payors which settle on a cost report basis (the "**Seller Cost Reports**").

(b)    Upon reasonable notice and during normal business office hours, OpCo Buyer will cooperate reasonably with Sellers in regard to Sellers' preparation and filing of Seller Cost Reports. Such cooperation shall include, at no cost to Sellers, obtaining access to files at the Hospital or the Practices and OpCo Buyer's provision to Sellers of data and statistics, and the coordination with Sellers pursuant to reasonable notice of Medicare and Medicaid exit conferences or meetings. Sellers shall have no obligations after the Closing Date with respect to Seller Cost Reports except for preparation and filing thereof.

**ARTICLE 12**
**[RESERVED]**

**ARTICLE 13**
**MISCELLANEOUS PROVISIONS**

13.1    **Further Assurances and Cooperation**. Sellers shall execute, acknowledge and deliver to OpCo Buyer any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by OpCo Buyer at any time and shall take any and all other actions reasonably requested by OpCo Buyer at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to OpCo Buyer, the Assets. After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

13.2    **Successors and Assigns**. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties which consent shall not be unreasonably withheld or delayed, except that OpCo Buyer may, without the prior written consent of Sellers, assign all or any portion of its rights under this Agreement to one or more of its affiliates prior to the Closing Date.

13.3    **Governing Law; Venue**. This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the Commonwealth of Pennsylvania (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. For so

37

long as Sellers are subject to the jurisdiction of the Bankruptcy Court and provided the Bankruptcy Court does not decline to exercise jurisdiction, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

13.4    **Amendments**. This Agreement may not be amended other than by written instrument signed by the parties hereto.

13.5    **Disclosure Schedules**. All disclosure schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein. From the Signing Date until the Closing, the parties agree that Sellers may, except with respect to Schedules 1.09, 1.11, 1.7(r)(i), 1.7(r)(ii) and 5.3, which may only be modified by OpCo Buyer in its sole discretion, update the disclosure schedules as necessary upon written notice to OpCo Buyer, and the applicable representation and warranty shall thereafter be deemed amended for all purposes by such updated disclosure schedule. Notwithstanding the foregoing, should any Sellers' schedule not be completed and attached hereto as of the Signing Date, such schedule shall be delivered or completed on or before September 27, 2019. It shall be deemed a condition precedent to the obligations of the parties hereto that each of the schedules and related documents attached hereto by Sellers after the Signing Date shall be acceptable to the other party. The headings, if any, of the individual sections of the disclosure schedules are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement. The disclosure schedules are arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of this Agreement merely for convenience.

13.6    **Notices**. Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

If to Sellers:    **Allen Wilen, Chief Restructuring Officer**
**c/o EisnerAmper**
1 Logan Square
130 N. 18th Street
Suite 3000
Philadelphia PA 19103

With copies to:    Saul Ewing Arnstein & Lehr LLP
(which copies shall    Centre Square West
not constitute notice)    1500 Market St., 38th Floor
Philadelphia PA 19102
         Attn: Jeffrey C. Hampton, Esq.
                  Adam H. Isenberg, Esq.

|                          |                                           |
|--------------------------|-------------------------------------------|
| If to OpCo Buyer:        | OpCo Buyer                                |
|                          | 420 S. Fifth Avenue                       |
|                          | West Reading, PA 19611                    |
|                          | Attention: President and Vice President   |
|                          |                                           |
| With copies to:          | Ballard Spahr LLP                         |
| (which copies shall      | 1735 Market Street, 51st Floor            |
| not constitute notice)   | Philadelphia, PA 19130                    |
|                          | Attention: Jean Hemphill, Esq.            |
|                          | Facsimile: 215-864-8999                   |
|                          |                                           |
|                          | and                                       |
|                          |                                           |
|                          | Stevens and Lee                           |
|                          | 620 Freedom Business Center, Suite 200    |
|                          | King of Prussia, PA 19406                 |
|                          | Attention: Joanne Judge, Esq.             |
|                          | Facsimile: 610-337-4374                   |

or at such other address as one party may designate by notice hereunder to the other parties.

13.7   **Headings**. The section and other headings contained in this Agreement and in the schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the schedules hereto.

13.8   **Fair Meaning**. This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

13.9   **Gender and Number; Construction; Affiliates**. All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable. Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation." Any reference in this Agreement to an "affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with a second Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. A "**Person**" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

13.10   **Third Party Beneficiary**. None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement, except for (a) the parties' successors and permitted assigns and (b) any liquidating trustee or plan administrator for Sellers' estate.

13.11 **Waiver of Jury Trial**. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY SCHEDULES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 13.11</u>.

13.12 **Expenses and Attorneys' Fees**. Except as otherwise provided in this Agreement, each party shall pay its own fees and expenses and those of any respective agents, advisers, attorneys, financing sources, accountants and any other representatives of such party with respect to the negotiation, execution and delivery of this Agreement and the Closing.

13.13 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto. The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

13.14 **Entire Agreement**. This Agreement, the schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect.

13.15 **No Waiver**. Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition. The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance. The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

13.16 **Severability**. If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or

40

circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.17  **Time is of the Essence**. Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

*[Signature Page Follows]*

41

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**OPCO BUYER:**

STC OpCo, LLC, a Pennsylvania limited liability company

Signature By: _____

Print Name:   Clint Matthews

Title:          President

**SELLERS:**

**St. Christopher's Healthcare, LLC,**
**Philadelphia Academic Medical Associates, LLC**
**SCHC Pediatric Associates, L.L.C.,**
**St. Christopher's Pediatric Urgent Care Center,**
**L.L.C.,**
**SCHC Pediatric Anesthesia Associates, L.L.C.,**
**St Chris Care at Northeast Pediatrics, L.L.C.,**
**TPS V of PA, L.L.C.**

Signature By: _____

Print Name:  Allen Wilen

Title:         Chief Restructuring Officer

**EXHIBIT A**

**SALE ORDER**

[ATTACHED TO ORIGINAL ASSET PURCHASE AGREEMENT IN FORM OF SALE ORDER
TO WHICH THIS ASSET PURCHASE AGREEMENT IS ATTACHED AS EXHIBIT A]