**<u>EXHIBIT B</u>**

**Exhibit D-1 from Bankruptcy Court Hearing of September 4, 2019 – Auction Transcript**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - -


IN RE:                          :   Chapter 11
                                :
CENTER CITY HEALTHCARE, LLC,    :
d/b/a HAHNEMANN UNIVERSITY      :
HOSPITAL, et al.                :
                                :   Case No.19-11466(KG)
        Debtors. :


- - -

Thursday, August 8th, 2019

- - -


- - -

AUCTION, was held at SAUL

EWING LLP, 1500 Street, 38th Floor,

Philadelphia, Pennsylvania 19102,

commencing at 3:21 p.m., on the above

date, before Jessica Routhenstein,

Certified Court Reporter and Notary

Public in the Commonwealth of

Pennsylvania.

- - -

1          APPEARANCES:

2

3   For the Debtors:

4   Jeffrey Hampton, Esquire

5   Mark Minuti, Esquire

6          Aaron Applebaum, Esquire

7          SAUL EWING ARNSTEIN & LEHR LLP

8          1500 Street, 38th Floor

9          Philadelphia, Pennsylvania 19102

10

11         For the Committee:

12         Andrew H. Sherman, Esquire

13         Boris Mankovetskiy

14         SILLS CUMMIS & GROSS P.C.

15         1 Riverfront Plaza, Suite 10

16         Newark, New Jersey 07102

17

18         For KPC Global:

19         Gary Klausner, Esquire

20         NEALE, BENDER, YOO & BRILL

21

22

23

24

1           For Reading Hospital:

2           Robert Lapowsky, Esquire

3           Kirsten Raleigh, Esquire

4           Joanne Judge, Esquire

5           STEVENS & LEE

6

7           For Thomas Jefferson University

8           Hospitals, Inc.:

9           Patrick Jackson, Esquire

10          DRINKER BIDDLE & REATH

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1            MR. MINUTI:  Good afternoon,

2       everybody, welcome, and let me say at

3       the outset, we appreciate everybody's

4       patience.

5            My name is Mark Minuti, I

6       represent the debtors in these cases.  I

7       am here today with my partner Jeffrey

8       Hampton.  To my right is Scott Victor

9       from SSG Capital Advisor, our investment

10      banker.  And to his right is our CRO

11      Allen Wilen from the EisnerAmper firm.

12           We are here today in connection

13      with the bankruptcy cases of Center City

14      Healthcare, LLC.  That's Case No.

15      19-11466, pending in the District of

16      Delaware.

17           And we are here today pursuant

18      to the order establishing bidding

19      procedures relating to the sale of

20      debtors' resident program assets

21      including approving a breakup fee,

22      establishing procedures related to the

23      assumption and assignment of certain

24      executory contracts including notice of

```
 1              our post cure amounts, approving form

 2              and manner of notice related thereto and

 3              scheduling a hearing to consider the

 4              proposed sale.

 5                   What I am going to do now is ask

 6              -- as I understand, we have three

 7              bidders.  I'm going to ask -- because I

 8              think it will go much more smoothly if

 9              each bidder designates one person to be

10              their spokesperson and I think it would

11              be helpful at this time if each bidder

12              could identify themselves and designate

13              their spokesperson.

14                   KPC GROUP:  My name is Gary

15              Klausner, I am an attorney with a law

16              firm, the name of which is Levene,

17              Neale, Bender, Yoo & Brill.  Our firm is

18              representing one of the bidders.  We use

19              the term KPC Group or KPC Global.  To my

20              right is Dr. Kali P. Chaudhuri.  He is

21              the chairman and CEO of KPC Group.  To

22              his right is a member of our team, is

23              Dr. Sanjay Gupta.  I will be the

24              designated spokesperson for our group.
```

1          READING HOSPITAL:  Robert

2     Lapowsky from Stevens & Lee.  We

3     represent Reading Hospital which is the

4     stalking-horse bidder.  To my right is

5     Clint Matthews, the chief executive

6     officer of Reading Hospital.  To his

7     right is Joanne Judge, one of my

8     partners at Stevens & Lee.  And to her

9     right is Kirsten Raleigh, another

10    partner from Stevens & Lee.

11          JEFFERSON:  At our table, we

12    have Thomas Jefferson University

13    Hospitals, Inc., which we will refer to

14    as Jefferson just for the sake of

15    simplicity.

16          We also have a number of

17    parties who are members of a consortium

18    of GME partners as we are calling them.

19    I will dispense with a big introduction

20    since we have a large table.  We did put

21    card in with the court reporter.

22          My name is Patrick Jackson, I'm

23    with Drinker Biddle & Reath Law Firm and

24    I will be the spokesperson for

1    Jefferson.

2              MR. MINUTI:  Again, we

3    appreciate everyone appearing here

4    today.  We understand it's been a long

5    morning, so we again appreciate your

6    patience.

7              At this point, I will turn it

8    over to Mr. Victor from SSG Capital to

9    run the auction.

10             MR. VICTOR:  We started the

11   process with the stalking-horse bid of

12   Reading Hospital.  There were two

13   qualified bids that were received

14   yesterday and circulated to all the

15   qualified bidders including Reading

16   Hospital as the stalking horse.

17             The first was from Jefferson

18   represented by Mr. Jackson, the second

19   was from KPC represented by

20   Mr. Klausner.

21             So we have had a chance to

22   review all of the proposed submissions.

23   We have spent the last several hours,

24   many several hours speaking to each

1    group, and I believe the KPC Group has

2    some revisions to their proposed asset

3    purchase agreement constituting their

4    bid that Mr. Klausner would like to put

5    on the record for the benefit of all the

6    other bidders.

7                    KPC GROUP:  I did send out,

8    a little while ago, not to the other

9    bidders, and I apologize, but I did

10   send, to the debtor committee and the

11   investment banker, our original asset

12   purchase agreement to which I made some

13   interlineated changes that are reflected

14   in red.  So I will read them into the

15   record.

16                    At paragraph 3.2, section 3.2 of

17   the APA, which is entitled Payment of

18   Base Purchase Price, we have modified

19   subparagraph (b), and it will now read

20   as follows:

21                    (Reading:)  Purchaser shall

22   deposit the escrow amount into the

23   escrow account pursuant to and in

24   accordance with the escrow agreement,

1          and such amount shall include 50 percent

2          of the tail coverage costs not to exceed

3          1 million dollars.

4                    We have also modified section

5          6.9, which is entitled Covenants of

6          Purchaser Regarding Continued

7          Affiliation with St. Christopher's

8          Hospital for Children.  The following

9          words at the beginning of that section

10         have been deleted:  "On condition that

11         purchaser acquires ownership of St.

12         Christopher's Children's Hospital within

13         one year following the closing".

14                   Those words have been deleted.

15         The section now begins with the words

16         "For the period".

17                   We also made a change to section

18         7.2(d).  I think the best thing for me

19         to do would be to read the entirety of

20         the section.  Let me stop for a moment.

21                   Scott, or Jeff, have one of you

22         or could one of you send out this

23         revision to the other bidders?  Again, I

24         apologize, I didn't have your contact

1    information in front of me.

2              MR. HAMPTON:  Yes, I will

3    print it actually.

4              KPC GROUP:  So I will go

5    ahead and read into the record what is

6    now section 7.2(d), and I will just

7    start from the beginning and read the

8    entirety of it.  It's entitled Transfer

9    Medicare Provider Numbers and Reopening

10   of Hahnemann University Hospital.

11             (Reading:)  Purchasers

12   shall not be obligated to close this

13   transaction unless, one, purchasers

14   received confirmation that the medicare

15   provider numbers assigned to Hahnemann

16   University Hospital and the purchaser

17   provider agreement will be assigned to

18   it at closing; two, purchaser has

19   assumed the existing lease for Hahnemann

20   Hospital at $1 per year for the term of

21   12 years on the subject to purchaser's

22   review; three, purchaser has obtained

23   all required regulatory approvals from

24   state, local and federal government for

1           purchaser to commence business

2           operations at the hospital; and four,

3           purchasers received confirmation that

4           all conditions necessary for the

5           long-term utilization of the debtors'

6           GME slots have been satisfied and will

7           be available to the purchaser as of

8           closing.  Provided, however, that

9           purchaser shall have until September 5,

10          2019 to notify sellers if the conditions

11          set forth in items two or three have

12          been satisfied or waived.  And if such

13          conditions have not been satisfied or

14          waived, purchasers shall have the right

15          to terminate this agreement without

16          liability.

17                  I believe that was the last

18          change we made.

19                      MR. MINUTI:  Okay.  Thank

20          you.

21                  So based upon the debtors'

22          review in consultation with the

23          creditors' committee, with those changes

24          to the KPC asset purchase agreement, the

1        debtors are of the opinion that that

2        constitutes the highest and best offer

3        for the residency program to start the

4        auction.

5                  And I'm sure everyone, the other

6        two bidders would like to see that in

7        writing, so that's being done now.

8                  So why don't we take a break so

9        we can deliver the package to the two

10       other bidding parties.

11                 Off the record.

12                      -  -  -

13                 (Whereupon a brief break

14       was taken at this time.)

15                      -  -  -

16

17

18

19

20

21

22

23

24

1                            -   -   -

2                C E R T I F I C A T I O N

3                            -   -   -

4          I, Jessica Routhenstein, Court Reporter

5          and Notary Public, do hereby certify

6          that the proceedings and evidence are

7          contained fully and accurately in the

8          stenographic notes taken by me on

9          Thursday, August 8th, 2019, and that the

10         foregoing testimony was taken in

11         shorthand by myself and reduced to

12         typing under my direction and control

13         and that this is a correct transcript of

14         the same.

15         _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

16         Jessica Routhenstein

17         Notary Public

18

19         (The foregoing certification of this

20         transcript does not apply to any

21         reproduction of the same by any means,

22         unless under the direct control and/or

23         supervision of the certifying reporter.)

24

1              Date: August 8, 2019 at 4:41 P.M.

2

3                      -  -  -

4              Felisa McCray relieves the morning court

5    reporter at 4:41 P.M.

6                      -   -  -

7              J. Scott Victor:  So we're going to go back

8    on the record.  We're going to go back to KPC and ask

9    counsel to clarify their bid relating to the contribution

10   to the debtors of money for the debtors tail coverage.

11             KPC GROUP:  So hopefully those of you have

12   the copy --

13             J. Scott Victor:  We have it.

14             KPC GROUP:   -- well we have submitted to

15   the debitor committee revisions as to the purchase

16   agreement in concept our client is making a commitment to

17   provide an addition to the original purchase price in our

18   APA which is $7,825,000 an upward adjustment of up to an

19   additional $1 million which the purchaser will pay at

20   closing to reimburse the sellers for the tail coverage

21   cost actually paid by the sellers up to a million dollars

22   for the tail coverage for residents, and we have

23   restricted the word current from the definition of

24   residents.

25                   If the debtor has not completed it's

1   obligations to fund tail coverage for the residents as of

2   the date of closing then in lieu of paying the amount of

3   $1 million our client will escrow up to a million dollars

4   to be used exclusively for payment for tail coverage to

5   the extent not so use that money will be returned out of

6   escrow to our client.

7                    J. Scott Victor:  Just to clarify, you're

8   going to pay $1 million if we haven't paid it in tail

9   coverage at closing up to but you'll escrow $1 million

10  dollars and whatever is being un used can be returned to

11  you.

12                   KPC GROUP:  That's correct.

13                   J. Scott Victor:  So let's now have the CRO

14  make a statement for the record regarding the debtors

15  obligation to buy tail insurance for the residents.

16                   CREDITORS:  It is debtors intention to

17  purchase tail coverage for the residents that were

18  employed by the debtor in the time period it owns the

19  hospitals.

20                   J. Scott Victor:  And that I'm going to ask

21  for one more point of clarification from KPC and that's to

22   state on the record the commitment if you are the

23  successful purchaser, it is the KPC's intent and

24  commitment to keep those slots local.

25                   KPC GROUP:  You mean residents slots?

1          Aaron Applebaum:  Yes, the resident slots.

2          KPC GROUP:  Yes.

3          J. Scott Victor:  Okay.  So with that we

4    believe to start this auction at KPC's bids has an

5    economic value to debtors  of $8,825,000 which would mean

6    that pursuant to the bid procedures the next incremental

7    bid is $100,000 higher.  So based on that, I would turn it

8    to our stalking-horse Reading Health as the next bidder

9    since you were the stalking-horse and the other two

10   bidders where qualified over this.

11          TOWERS:  Just to clarify, Scott, in the

12   8 million 825 your allocating to the arrangement to tail

13   that was put on the record.

14          J. Scott Victor:  Yes.

15          TOWERS:  And is the debtor committing to by

16   tail for all the residents that Mr. Whiler described or

17   just stating an intent.

18          ALLEN WILEN:  We are committing to buying

19   tail coverage for the residents.

20          TOWERS:  So give me just one moment.

21          (Discussion was held off the record.)

22          JEFFERSON:  While they're considering

23   Jefferson would request qualification to follow on to the

24   last question.  The debtors are evaluating the tail

25   coverage piece that was put on the record at a million

1     dollars.  Just to be clear that implies that the debtors

2     are not putting any economic value for purposes of

3     incremental bidding on the baseline bids commitment to or

4     rather conditionality of taking assignment of lease of the

5     12 year lease; is that correct?

6                    J. Scott Victor:  That is correct.

7                    JEFFERSON:  Thank you.  And the other

8     question to the commitment that to obtain tail coverage

9     for the residents.  The commitment the debtors are makingk

10    to be clear mis it obtained tail coverage for residents

11    obtained under the hospital policies of Hahnemann?

12                   J. Scott Victor:  As opposed to what other

13    policy?

14                   JEFFERSON:  We have -- may I?

15                   J. Scott Victor:  Yes.

16                   JEFFERSON:  Chris Cavalieri, Thomas

17    Jefferson University.  Their hospital residents are

18    covered under two policies.  The first year and second

19    year residents are covered under the hospital policies

20    because they are not licensed practitioners.  The

21    residents in the higher level are covered under a separate

22    policy.  So to cover all the residents, we need tail

23    coverage under the hospital policies for those residents

24    first and second year and the more senior residents with

25    respect to their segregated policy.  Is that the intent?

1               J. Scott Victor:  Let us talk about that

2      for a minute.

3               J. Scott Victor:  So to answer your

4      question -- yes.

5               ALLEN WILEN:  The answer is yes.  Yes,

6      we'll cover the resident cost subject to the closing of

7      this transaction.  So if the transaction does not close,

8      we are not committing to paying for all that.

9               JEFFERSON:  Thank you.

10               CREDITORS:  Can I for the record, Andrew

11      Sherman.  Andrew Sherman on behalf of the committee.  No

12      party other than this room can rely on this record by the

13      estate estate to be every clear of any statement to

14      purchase the coverage.

15               Jeffrey Hampton:  Mr. Sherman, this is on

16      behalf of debitors that is correct and to clarify the

17      commitment made by Mr. Whilen to purchase tail coverage

18      for the residents is only in the context of the

19      transaction that would be effectuated pursuant to the sell

20      procedures that are before us today.  That is approved by

21      the bankruptcy court and actually closes.

22               TOWERS:  So your making a distinction that

23      if this transaction never closes your not committing to

24      buying.

25               Jeffrey Hampton:  That is correct.

```
1                   TOWERS:  And our commitment to go buy tail

2     on behalf of both hospitals policy itself that covers the

3     first and second year residents as well as the separate

4     policy that covers the residents.

5     A.

6                   Jeffrey Hampton:  Mr. Whilely is that

7     correct?

8                   ALLEN WILEN:  Yes, that is correct.  One

9     more thing I want to add about process.  There is no

10    passing in between rounds.  So everybody has to make their

11    bid.  It's up to you.  Reading next.

12                   TOWERS:  Reading Hospital, this is Rob

13    Lapowsky for Reading hospital.  So our next bid is going

14    to be a combination of cash $225,000 break up fee and the

15    million dollar tail commitment that was described by KPC.

16    Before I get to that I wanted to make a couple of

17    notations on the record.  First is that, as we've

18    disclosed to the debtors already Tower and University of

19    Pennsylvania have an agreement of course University of

20    Pennsylvania is not a participant in the Tower bid, but

21    for purposes of full disclosure this is an agreement

22    between Tower and University of Pennsylvania for the

23    leasing of resident slots should Tower be a successful.

24    bidder.  The second thing I wanted to put on the record is

25    that the modified designated contracts list that was filed
```

1    this morning was served last night filed this morning has

2    an error and one correction that we want to make and it's

3    items one and two on the list.  They are both Abington

4    Hospital has a contract between Hahneman and Abington

5    Memorial Hospital.  It is described at Medicare KPE

6    affiliation agreement of July 1, 2019, June 30, 2020.

7    That one was supposed to be deleted from the schedule, and

8    in the context of our modified bid we would be depleting

9    that contracts of our modified bid we would be deleting

10   that contract from our designated contracts list.  The

11   second mod is item number two on the list which is

12   Abington Memorial Hospital and Solace Healthcare are the

13   counter parties and that's an agreement concerning family

14   medicine training with tenant healthcare system,

15   Hahnemann, LLC dated June in, 2008, that's how it's

16   labeled on the schedule and that would be deleted as well.

17              With those notations on the record.

18   Reading Hospital would increase it's stalking-horse bid to

19   $7.7 million cash, $225,000 for the break up fee, and

20   would match the terms of the tail arrangement put on the

21   record that relate to KPC which we understand is valued at

22   a million dollars.  We would also be removing from our

23   agreement provisions that related to tail which were

24   two -- well, there were really one.  The stalking-horse

25   agreement had a provision in it that made it optional for

1    Reading Hospital to purchase tail for it's continuing

2    residents, and if it chose to do so it would absorb the

3    first hundred thousand dollars of the cost and any excess

4    over that will be deducted from escrow the $3 million

5    escrow that would be disappear from our agreement.  That's

6    on the assumption that there is no similar assumption on

7    the KPC agreement and that the same or assuming same

8    change would be made to the Jefferson agreement for it to

9    be apples to apples because their agreement right now

10   mirrors to what ours does as it relates to that aspect of

11   it.

12              So with those qualifications our bid I

13   believe is now $8.925 million dollars broken down as I

14   have described.  That's is all part of our bid that the

15   debtor is committed to buying tail.

16              J. Scott Victor:  Okay.  So based on that

17   Reading Hospital's bid has the economic equivalent of $8

18   million 925 thousand dollars to the debtors estate.  So we

19   then turn to Jefferson.

20              JEFFERSON:  Give us one minute.

21              J. Scott Victor:  Sure.

22              JEFFERSON:  Patrick Jackson, Drinker Biddle

23   for Jefferson.  Our next bid we are taking the total bid

24   up to we I believe the economic value of 10 million it's

25   going to consist the matching the 1 million escrow

1    arrangement that was put on the record by KPC and Tower

2    bids.  It's going to be an increase to the escrow account

3    amount from our APA 3 million to three and a half million

4    and also it's going to be a corresponding change to

5    section 9.1 C of our APA increasing the $3 million figure

6    to 3 half million dollars in that provision.  That's the

7    determination right in the event that the semes discharge

8    amounts that exceeds the amount.  We are going to up that

9    to 3 and a half and then the remainder is going to go to

10   an increase over the base purchase price.  So the total

11   value of the bid will be $10 million.

12                   Jeffrey Hampton:  What's the cash?

13                   J. Scott Victor:  Yes, what's the cash

14   compenent.

15                   Jeffrey Hampton:  Yes, can you clarify the

16   cash component?

17                   JEFFERSON:  It is an additional 500,000

18   going into the escrow.  I'm sorry.  An additional $500,000

19   going to the escrow and a additional $575,000 going to

20   base purchase price.  The goal is to get to the to the

21   total of $120 million dollar credit.

22                   Jeffrey Hampton:  And we can send that to

23   our mark up if that's necessary.

24                   TOWERS:  What's the cash of what your

25   paying and putting into escrow?

1            Mark Minuti:  I think it's 3 and half to

2     escrow and the rest to cash

3                 KPC GROUP:  How much to the creditor.

4                 JEFFERSON:  Three and half.  3 Jefferson

5     I'm sorry I misspoke hample hample take your time

6     Jefferson 1 mill to escrow and 3 half million into escrow

7     account as defined in the agreement.

8                 J. Scott Victor:  And that's up to

9     3 million that's in there right now?  So that a $500,000

10    increase.

11                JEFFERSON:  That would be 5.5 million

12    remaining cash to debtors.

13                KPC GROUP:  Are you talking about 9.1 C?

14                JEFFERSON:  Correct.  9.1 C is not an

15    economic change but a corresponding change to the increase

16    of the escrow amount credit.

17                KPC GROUP:  So you don't get double credit.

18                JEFFERSON:  9.1C isn'ta consideration

19    component.  It's a determination rate.  It's a

20    determination that's tide to the $3 million-dollar

21    increase in escrow.  We are also increasing that

22    determination amount.

23                J. Scott Victor:  So to get the $10 million

24    dollar of economic value based upon what you just said

25    your cash would be 8.5 million.  Million escrow for the

1    tail insurance and $500,000 increase in the indemnity

2    escrow.

3                    JEFFERSON:  Yes.  That's a better way to

4    put it.  The escrow account is defined.  Which is the

5    indemnity.

6                    Jeffrey Hampton:  Again, we can send this

7    to you APA mark up to be clear.

8                    JEFFERSON:  The tail escrow stays the same.

9                    J. Scott Victor:  A million.

10                   JEFFERSON:  Matching previous two bids.  The

11   escrow that used to be.

12                   J. Scott Victor:  You have to identify

13   yourself for the record.

14                   JEFFERSON:  Oh, Sorry.  Joshua Sturm,

15   Ropes & Gray the Jefferson Group.  The tail has been

16   discussed is the same.  We are matching the tail.  That's

17   not going to be touched.  The base purchase price cash

18   amount ihe way it's defined in the agreement makes it

19   little bit complicated to explain.  So the idea that we're

20   going to be putting $575,000 that is going to be enterable

21   to the purchase price and an additional price of  $500,000

22   in the escrow account is defined as an escrow account.

23                        If you know to base purchase price is

24   going up 1.75 million, but if you think about it

25   economically you will be thinking about it as the 25,075

1    thousand to the purchase price to $500,000 that might help

2    to clarify the process.

3              Jeffrey Hampton:  To clarify purchase price

4    of 10 million, the 10 million fully utilize the net would

5    only stay to be $6.5.

6              JEFFERSON:  Yes, I think that would be

7    right.  If the net fully utilize the net to the estate

8    will be going up.

9              Jeffrey Hampton:  But net proceeds will be

10   10 minus 3 and half.  Let's assume.

11             JEFFERSON:  Jefferson, but to further

12   clarify the $3 million that's in the indemnity escrow has

13   been counted as part of the total bid for the the prior

14   bids.

15             Jeffrey Hampton:  Understood.

16             JEFFERSON:  Thanks.

17             Jeffrey Hampton:  So as we look at the last

18   bid submitted by Tower Reading Health, we look at a total

19   consideration of 8 million 925 if their escrow will be to

20   fully utilized that's 3 million-dollar that would leave us

21   a value of the estate of 6 million 925.  I'm sorry 5

22   million 925, right?

23             ALLEN WILEN:  Correct.

24             Jeffrey Hampton:  Just to clarify, if you

25   think.

1          J. Scott Victor:  If you think half million

2     there's at least --

3          Jeffrey Hampton:  No higher 5.25 versus --

4          JEFFERSON:  We've gone up 575 thousand even

5     in the escrow.

6          Jeffrey Hampton:  All right. For what it's

7     worth additional clarification just to be clear, we are

8     not contemplating any changes in the contract scheduled

9     for our original APA.

10          J. Scott Victor:  Okay.  That means the

11     total economic value to the estate on Jefferson's bid is

12     $10 million.

13          JEFFERSON:  Yes.

14          J. Scott Victor:  Okay.  KPC, do you want

15     to take a break?

16          J. Scott Victor:  Off the record.

17          (Discussion was held off the record.)?

18          J. Scott Victor:  KPC, we understand the

19     current bid is $10 million dollars consisting of

20     $8.5 million dollars cash for closing and additional

21     $1 million dollars we will call it the KPC payoff, and

22     then the escrow is now being increased to $3.6 million.

23     3.5 million which we are willing to increase to

24     3.6 million.  So we'll basically will take the Jefferson

25     proposal and increase it by $100,000 which will be added

1    to the escrow to be funded.  KPC bid is now $10.1 million

2    consisting of $8.5 million cash for closing which will be

3    close inclusive of deposits.  The $1 million KPC's tail

4    coverage provision which we discussed previously and the

5    escrow funding of $3.6 million.  So the total bid comes to

6    $10.1 million of value to the estate.

7                    J. Scott Victor:  We'll take a two minute

8    break.

9                    (Discussion was held off the record.)

10                   J. Scott Victor:  So we're back and go to

11   KPC.  Who's going to clarify their last bid?

12                   KPC GROUP:  There's a reason why I was not

13   a math major.  Our bid, KPC's bid is being increased to

14   $10.1 of the previous bid.  They're bid right down as

15   follows: cash of $5.6 million, funding of escrow for

16   $3.5 million and what we call the KPC tail of $1 million.

17   Total is 10.1.  To back out the 3.5 in escrow which monies

18   may not reach the debtor.  The offer has a net value for

19   $6.6 million.

20                   J. Scott Victor:   Okay.  Perfect.  For

21   the record for Reading Hospital and Jefferson if you wish

22   to increase that indemnity escrow above 3.5 God bless you.

23   There will be no credit to benefit the estate.

24                   TOWERS:  Okay.

25                   TOWERS:  Robert Lapowsky for Reading

1    Hospital.  Subject to the same changes general changes to

2    the purchase agreement that I put on the record with our

3    first increase bid to the reading hospital will increase

4    itself bid to total of $10.2 million dollars consisting of

5    many million dollars in the tail total.  $225,000 in break

6    up fee, $3 million in the escrow, and 5.975 million

7    dollars in cash.

8                    J. Scott Victor:  Bob, can I have that one

9    more time.

10                    TOWERS:  5.975.

11                    J. Scott Victor:  5.975.

12                    TOWERS:  3.5 million to the escrow O. 2225

13   in brake imfee and is million in the tail.  Char Total

14   value of the education at a time to 10 point

15   2 million-dollar.

16                    TOWERS:  Correct.

17                    TOWERS:  Tower and we think some extra

18   credit for going so quickly.

19                    J. Scott Victor:  And not increasing the

20   escrow.

21                    J. Scott Victor:  Okay.  Counsel.  Thank

22   you.  Reading that's it have highest and best bid.

23                    Jeffrey Hampton:  This will be the same

24   format as the last Jefferson bid.  We believe that the

25   headline value of this bid is $12.2 million-dollar.  Based

1    upon the debtor who likely view of this that says less

2    than that.  I need more food.  This will be a cash

3    purchase price.

4                KPC GROUP:  Before you go any further has

5    the debtor indicated it's calculation of the net value to

6    the estate of the last threading possible bid.

7                J. Scott Victor:  Yes.

8                KPC GROUP:  Did you announce it? I didn't

9    hear it.

10               J. Scott Victor:  It is 10.2.

11               ALLEN WILEN:  So 5.7 million.

12               TOWERS:  5.9 million cash.  3 Million

13   escrow , a million into the tail, 225 to the break up

14   that's 10.2 assuming that we get no extra credit for

15   having reduced the escrow as to 3.35 million from that

16   one.  If you're valuing that half million escrow as a

17   hundred percent on the dollar, then it is 10.2.  If we get

18   any credit for having reduced the escrow at this point and

19   credit for whatever actual credit you get.

20               ALLEN WILEN:  The value is 7.2 million to

21   the estate.

22               TOWERS:  So that's 7.2 you're giving us a

23   deduction.

24               ALLEN WILEN:  Credit.

25               J. Scott Victor:  Already Patrick you want

1    to explain where you are.

2              JEFFERSON:  I'll just note on the record

3    that we are talking in slightly different value formats

4    which is fine.  We are speaking the same language and

5    talking about the value to the estate assuming in the

6    escrow account not a tail escrow.  It's not essentially

7    counted as the net value to the to the estate.

8              TOWERS:  May I interrupt for one second.

9    It's more than 7.225 value to the estate.  The break up

10   fee is valued to the estate.  We get the credit bid the

11   break up.  So you can't ignore that.  So what we're

12   calling out the two escrow the tail $10 million dollar

13   escrow and you take the $4 million-dollar general escrow

14   your talking 4 million off of 10.2.

15             J. Scott Victor:  Yes.  We are actually

16   including the million in there.  That's 10.2 general to

17   the estate.

18             TOWERS:  The point we've to get credit for

19   10 point 35.

20             J. Scott Victor:  We I think 12.2 million

21   I'll explain and based upon Mr. Victor's statement

22   creditors who value you to gross valuing you as this.

23   Less than 12 point 1 Jefferson 1 is point 35 million that

24   consist of cash none escrow cash of 7 point 5 million.

25   The tail escrow of million that's previously been

1    component of over bids and an escrow amount of 3 point

2    2,517,000,000 which understand our A. PA will have course

3    responding change 9.1c to increase that 3 million up to 5

4    point 7 million.

5                    J. Scott Victor:  The net value is 8 point

6    50.

7                    ALLEN WILEN:  All right.  Jeffrey what I'm

8    still counting our net value will be 8 point 45 million.

9                    KPC GROUP:  What's the net value against, 8

10   point 5?

11                   J. Scott Victor:  We are onto KPC.

12                   KPC GROUP:  What's the net value you're

13   giving to Jefferson and.

14                   J. Scott Victor:  $8.8 million.

15                   KPC GROUP:  How are you giving.

16                   KPC GROUP:  We are not giving further

17   credit to 3 point 35 than we gave before.

18                   ALLEN WILEN:  So to put 7 point 5 million

19   in cash: tower I think 8 point 235 your giving 8 point 5

20   foe escrow.

21                   Jeffrey Hampton:  We're just ignoring it.

22   Wit cash plus.

23                   DEBTORS:

24                   THE COURT:  Right carb plu:

25                   J. Scott Victor:  KPC 6789 proves or

1   classify my math whiz.  So we understand that's last

2   proposal had net value 8 point $4 million.  Yes.

3                    KPC GROUP:  We are willing to provide

4   better than that in the following way.  7 point

5   $55 million in cash closing that would include obviously

6   the deposit is already made.  1 million dollars for the

7   tail coverage that we discussed, 3 million going into

8   escrow that's to the tail of 11 point 55 million if you

9   backed up the 3 million from the escrow that you are not

10  giving us the state credit that givers ambulance over8

11  point 355 million net benefit.  We've one kicker to add to

12  that as you know it's our objective to require the

13  hospital and to reopen it and that's the big part of

14  proposal as part of purchase agreement.  If we are

15  successful in requiring the hospital and reopening it well

16  agree to assume to collect.  I have bargaining agreement

17  currently in the nurses union to a reasonable review and

18  reasonable modification task necessary, and we can't put

19  dollar value on to, but in our view any way we could help

20  the community and the varies stake how old ers in this

21  case ought to be given so many value.

22                    J. Scott Victor:  Just the nurses union

23  what about the 119089.

24                    KPC GROUP:  Somebody would have to tell me

25  more about their agreement.  We are not ruling it out.

1            J. Scott Victor:  So you review the escrow.

2    The escrow went to 35 to 3.

3            KPC GROUP:  We are been before you go to

4    the next bidder is to evaluate to component part of a

5    sewages of the nursing agreement and tell everybody what

6    nas: well confer and be back exsure.  4 minute break S.

7            JEFFERSON:  The value of nurse of the

8    nurse's contract.

9            TOWERS:  If they win.

10           (Discussion was held off the record.) you?

11           J. Scott Victor:  So in response toXC's

12   offer and the question we very much a appreciate the offer

13   and potential additional conversation.  For the the record

14   we value that at zero.  We are not selling assets and

15   Hahnemann your hospital as we set hear today other than

16   residency assets and since the offered is can balance on

17   reopening Hahnemann and can't put good conscious to it.

18   That being said the 8 point 55 million-dollar net value is

19   accepted and that would brings us back to Reading.  Tower

20   so we need to get --

21           J. Scott Victor:  Okay, Reading.

22           TOWERS:  Robert certainly me for Reading

23   Hospitals subject to terms that was announced in our

24   initial bid this afternoon Reading hospitals would

25   increase bid to 11.6 million-dollar broken down as follows

1    $3 million in escrow.  $225,000 in break up fee,

2    $1 million in tail, and $7,425,000 in cash.  I'm sorry say

3    that last numb given.

4                 TOWERS:  $7 million dollars 425,000.

5                 J. Scott Victor:  And crediting the break

6    up.

7                 TOWERS:  I had that 2.5 in there.

8    3 million in escrow 2225 with break up fee, 1 million of

9    tail, 7 million of 425 cash car char since wore going am

10   also to apples to the net value of estate the number of

11   is.  8 point 65 it should be.

12                 J. Scott Victor:  8 point 65.  Okay 856.

13                 TOWERS:  8,000,650 net to the estate.

14                 J. Scott Victor:  Okay.  We'll accept that.

15   Back to you.

16                 JEFFERSON:  Jefferson Patrick Jackson

17   Drinker Biddle for Jefferson.  Subject to the same terms

18   as our prior bid.  We would put in a total bid we believe

19   is 14 point 5 million consist of 9.75 million of cash

20   closing the 3.75 million dollars prior escrow from prior

21   id baned 1 million-dollar tail that's been previously part

22   of the bids.

23                 TOWERS:  Your escrow stayed the same at 3

24   point 75 Jefferson yes.

25                 J. Scott Victor:  So again apples to apples

1    we are coming up with a present value toe estate of 120

2    point $75 million agreed Jefferson correct.  We'll accept

3    that.  Thank you :KPC.

4                    KPC GROUP:  In light of the fact that we

5    are not getting no benefits or value do agreed assumption

6    of collect I have bagger bargaining offer we'll take that

7    out of our offered.  So our total package is 13.85 million

8    with a net value of estate of 10.85.  Our offered consists

9    of three components 9.85 million in cash, 1 million in the

10   tail and 3 million in the escrow.  We understand that we

11   are not getting value credit for the 34 million.  So the

12   total of 9.785 in cash and a million in the tail make it

13   8.35 million and with I believe Thomas Jefferson's last

14   offer.

15                    J. Scott Victor:  Okay.  Thank you.  That

16   takes us back to.

17                    TOWERS:  Can we go off the record far

18   second.

19                    Mark Minuti:  While we wait for record I

20   just want to put on the record so everybody will hear it.

21   The hearing to approve the sale has been moved to

22   August 19 at 1 p.m.

23                    (Discussion was held off the record.) eye?

24                    TOWERS:  We are going to increase the net

25   to assets of 3.1 million total bid to 18.5, l million to

1    break down is 10 million 625,000 for cash $3 million for

2    escrow, $1 million in tail, 225,000 for break up fee

3    subject to the same terms as our initial bid this evening.

4                       J. Scott Victor:  That's 11.5 net to the

5    estate.

6                       KPC GROUP:  11.5 to the estate.  Okay

7    Jefferson.

8                       JEFFERSON:  Andrew Kassnerdo you Jackson

9    drinkinger Biddle for Jefferson.  Well increase our bid to

10   had line of 19 point 6 molds Total a adopting the debility

11   ors convention next to estate which we noted agreement

12   with not giving economic value to escrow debtors to the

13   methodology with which will be 15.78 million for this

14   bid's component 14.8 million cash, $1 million tail, and

15   3.75 million escrow and other terms the same as our prior

16   bid.

17                      J. Scott Victor:  So 15.85 net to the

18   estate without including the escrow Jefferson rights not

19   include the escrow and further disagreement and understand

20   the mechanism of assets purchase agreement any amount in

21   the escrow not permitted to pay will be draw rollback to

22   the estate.  All right.  I understand.  That's accepted.

23   Thank you.  Okay. KPC.

24                      KPC GROUP:  We are going to work it out.

25   A.    We are going to come if with a gross purchase plies

1    of $22 million broke undown 3 million for the escrow,

2    1 million in the tail, 18 million in cash.  So given the

3    manner nor which we are treat thing escrow this is a total

4    net of the estate of 19 million dollars.

5              J. Scott Victor:  Yes.  All right.  Thank

6    you.

7              KPC GROUP:  And we are firing all the union

8    people.

9              TOWERS:  Robert Lapowsky for Reading

10   Hospital.  We are going to increase the gross amount of

11   our bid to if million dollars, the net to the estate

12   should be 20, our bid breaks done as follows:

13   3 million-dollar for escrow, 1 million to the tail,

14   $225,000 for break up fee, 18,000,775 from cash.  And

15   that's subject to the same terms as our original bid

16   today.

17              J. Scott Victor:  Okay.  Thank you.

18              JEFFERSON:  All right.  Patrick Jackson

19   Drinker Biddle for Jefferson Jefferson will increase gross

20   bid to 24 point and 5 million which consist of the

21   following component.  20 million in cash million dollars

22   in tail and 3 point 75 million in escrow subject to same

23   conditions as itself prior bid.

24              J. Scott Victor:  Are you using the same

25   methodology.

1              JEFFERSON:  We are at 24,000,075 gross.

2              J. Scott Victor:  An 21 million into the

3     estate.  Thank you.  Back to back to KPC.

4              (Discussion was held off the record.)

5              J. Scott Victor:  Back to KPC.  All right.

6              KPC GROUP:  KPC, we are a gross offer for

7     24,100,000 comprised of cash $20,100.

8              J. Scott Victor:  Million.  20,100,000 cash

9

10             TOWERS:  Robert Lapowski for Reading

11    Hospitals increase 22.1 million.

12             KPC GROUP:  I'm sorry.  I would you retort

13    Towers increase to gross the 21.1 the net to 22.1 the

14    components of cash of 20 million 8.75 break up fee

15    $225,000 tail of million and escrow of 3 million all

16    subject to the same terms that we've previously bid under.

17             J. Scott Victor:  So that's 22 million net

18    net to the estate. Thank you.  Patrick Jackson Drinker

19    Biddle.  So we will increase gross bid 20 million which

20    under methodology scoring will be 2.225 to the component

21    25 point 2 million cash, 1 million tail, 3.75 million

22    escrow on the terms of Jefferson's prior bids.

23             KPC GROUP:  Could you give us that cash

24    number again, please.

25             JEFFERSON GROUP:  25.25 million cash, and

1    the same tail escrow.

2              J. Scott Victor:  To note to estate 26

3    point 25 million.  On your methods.  On the the correct

4    methods.  Okay.  Let's take a quick break.

5              (Discussion held off the record.)

6              J. Scott Victor:  All right.  Back on the

7    record with KPC.

8              KPC GROUP:  We've a total package records

9    of $29 million 350,000 consisting of cash of $25,350,000,

10   1 million in tail coverage, and 3 million in escrow.  If

11   you back up 3 million in escrow for which you are not

12   giving us value credit that give the estate the net of

13   $26,350,000 which is a hundred thousand according to our

14   math a hundred thousand  above Jefferson.

15             J. Scott Victor:  Thank you.  That means

16   Reading.

17             TOWERS:  Robert for Reading how muchment

18   Readding will increase gross bid $30,350,000 that's to

19   estate $375,000 component the same as before tail of

20   million dollars escrow $3 million break up fee of 225 and

21   cash for 26million 235.

22             J. Scott Victor:  Okay.  Thank you

23   Jefferson.

24             JEFFERSON:  Patrick Jackson Drinker Biddle

25   for Jefferson.  Jefferson will increase gross bid to 31.

Page 40

1    875 million on the debtors scoring method 21.25 million to

2    the estate.  Components are 27.235 cash and 3.75 million

3    subject to the other terms of Jefferson's prior bids.

4                   J. Scott Victor:  28,125,000 net to the

5    estate got it.  Thank you.

6                   KPC GROUP:  We are going to take a minute

7    and I would like to revisit one of your value judgments.

8                   JEFFERSON:  Please use the mike.

9                   KPC GROUP:  I want to show about one issue.

10   The money put in the escrow to the.

11                  KPC GROUP:  Tent that it is use today sat

12   fie the.

13                  DEBTORS:  Ors publication to CMS I would

14   like to explain why purchaser is not getting credit for

15   satisfying an obligation Otherwise that of the.

16                  DEBTORS:  Or especially in the context of

17   purchase is in the required in the hospital.  So itself

18   note getting a transfer of provider agreement which might

19   carry successor liability.  Why is payment of that

20   obligation not given dollar to dollar credit any other

21   paying debtor for of the tail insurance.  Tower are they

22   not providing the provider agreement.

23                  J. Scott Victor:  They are.  Tower they

24   said.

25                  J. Scott Victor:  Even in hear is propose

1    to go by the buyer agreement.

2              Jeffrey Hampton:  Yes, that's our

3    understanding.

4              JEFFERSON GROUP:  And the debtor also

5    believes that it's liability for alleged potential over

6    payments is less than a million dollars.  So the

7    $34 million was placed in escrow originally by Readding

8    the stalking-horse buyer as an guesstimate an indemnity

9    escrow but that in way reflect what the debtor believes

10   any potential liability for medicaid over payments.

11             JEFFERSON GROUP:  It needs to be medicaid

12   and medicare.

13             J. Scott Victor:  Medicate both.

14             KPC GROUP:  So if the over payments to

15   which CMS is entitled perhaps $3 million then the 2

16   million dollars not gross.

17             J. Scott Victor:  Under Jefferson's

18   proposal it comes back to the estate.  Not sure Tower's is

19   the ame thing.

20             KPC GROUP:  Why shouldn't the purchaser get

21   the credit extent that those funds are not used to.

22             JEFFERSON GROUP:  We agree for the record.

23   Jefferson agrees with that.

24             J. Scott Victor:  It's a gross challenge

25   and you obviously a benefit.

Page 42

1          KPC GROUP:  State there is a payment that
2     has to be made for over payment but in order to calculate
3     apples for apples in the been facility to the estate we
4     are simply looking at net value, but the gross value is
5     here.  It's stated.  You're going to pick a winner based
6     on net value.
7          J. Scott Victor:  We'll pick a winner when
8     we get there.
9          KPC GROUP:  But historiccally you have been
10    in this process of net value in this bid.  That's how
11    we're playing.
12         J. Scott Victor:  Right and I believe the
13    liability less than the net escrow.  We don't know.
14         KPC GROUP:  What if we freeze the asset one
15    way and willing to take that risk can the 1 million be
16    applied.
17         J. Scott Victor:  It could.  It could've
18    reduced your escrow from 3 million to 35.  Jefferson's is
19    it clear understand all thee agreement the net from the
20    escrow knows back to the estates.  Yes.
21         Jeffrey Hampton:  Yes.  Jefferson's based
22    money so many of KPC questions.
23         Jeffrey Hampton:  Same truth.
24         J. Scott Victor:  Back on the record.
25         KPC GROUP:  So I -- we on behalf of my

1    client we want to thank you for the professional manner

2    which you conducted with this auction.  We think it is

3    been very fair.  We also want to have that and thank you

4    for the hospitality.  At this time our client has not

5    decided to increase its previous offer:

6                     J. Scott Victor:  Okay.  Would you to be a

7    back up bid at your last bid?

8                     KPC GROUP:  Right now we are behind.

9                     J. Scott Victor:  I understand that's the

10   case.

11                    KPC GROUP:  I don't know if we are in

12   second place.

13                    J. Scott Victor:  You're not.  We're just

14   asking.

15                    KPC GROUP:  Bear in mind in we go back to

16   paragraph 7 point 2 department subsection 2.  That are

17   conditions attached to our proposal tide to our goal which

18   is to acquire to hospital reopen it and put it back in

19   operation no pun intended.  So assuming the terms of our

20   existing APA subject to the new numbers that we've gone up

21   to, if that's considered our back up offered then that

22   would be acceptable to us.

23                    J. Scott Victor:  Thank you.

24                    KPC GROUP:  I think we should.  We are

25   good.  Good nite.  Thank you.

Page 44

1          J. Scott Victor:  Thank you.

2          ALLEN WILEN:  Thank you.

3          Jeffrey Hampton:  Thank you.

4          Mark Minuti:  Thank you.

5          J. Scott Victor:  Okay.  Back to you

6    Readding.

7          TOWERS:  So the net we are dealing with now

8    is 28125.

9          J. Scott Victor:  Yes.  To you Robert

10   Lapowsky for Readding Hospital in the same terms condition

11   we've been using all night increasing gross 122,010,225

12   net to estate 29,125,000.  Break down is escrow of

13   3 million, tail of 1 million, break up fee of 225, and

14   cash of 28,009,000,000.

15         J. Scott Victor:  I'm sorry say that again

16   2890 tower 28 million in cash 2255 in break up fee, mill

17   in tail escrow and 3 million in the general escrow.

18         ALLEN WILEN:  Bob reeds those numbers break

19   down again.

20         TOWERS:  Cash 28,008,900,000, escrow

21   3 million, tail of 1 million, break up fee of $225,000.

22         Jeffrey Hampton:  I'm getting 30,001,235

23   not 20 million.

24         Jeffrey Hampton:  29,002,235.  Not counting

25   tower the net your right I took it will tail out of net:

1   so this this the cash should be 27,009,000 cash should be

2   $27,008,907,000.

3                   J. Scott Victor:  That takes us you 29.

4   All right.  Thank you:

5                   JEFFERSON GROUP:  What's the final?

6                   J. Scott Victor:  27,009,000,000 in cash

7   $225,000 in break-up fee, 1 million for the tail insurance

8   3 million indemnity escrow.

9                   TOWERS:  Just so the record is clear I said

10  the gross of the last bid 133 million.  It is actually

11  32 million.

12                  J. Scott Victor:  The net is 289125.

13                  JEFFERSON:  Patrick Jackson for Jefferson.

14  Jefferson will increase it' gross bids to 35 million a net

15  of 31 to 5 point estate of method componenet of 35 million

16  of cash 1 million dollars tail and the 3 point $5 million

17  escrow which is 200,250,000 reduction of prior which would

18  require corpsing change of section 1 point 9 of C. P.  To

19  3 point 5 million-dollar.

20                  J. Scott Victor:  Why the change of heart?

21                  JEFFERSON GROUP:  Even round numbers.

22                  J. Scott Victor:  31 point 35 million net

23  to the estate.

24                  J. Scott Victor:

25                  TOWERS:   Robert Lapowsky for Reading

1    Hospital on the same terms ands conditions that we

2    previously bid on.  We are increasing the gross to 35

3    point 5 million, the net estate of 32 point 25 million

4    components are cash 31 million 275, tail 1 million, escrow

5    3 million, break up fee 2 point 5.  Hopefully, that adds

6    up this time.

7                    J. Scott Victor:  325.

8                    Jeffrey Hampton:  325.

9                    J. Scott Victor:  Nice math.  Jefferson?

10                   JEFFERSON GROUP:  Patrick Jackson Drinker

11   Biddle for Jefferson.  Jefferson will increase its gross

12   bid to 26 million this will be net 33 million to the

13   estate by any calculations methods. The components are

14   32 million cash, $1 million tail, $3 million escrow, and

15   revert back to original language in the APA 1 c dropping

16   that number of down on the end.  Now, I think we are

17   apples to apples.

18                   J. Scott Victor:  Can you already agree to

19   that.  We are knocking 3 point 35 to 3.  Now, we are

20   apples to apples of escrow.

21                   J. Scott Victor:  Okay. 33 net value to the

22   estate.  Thank you.

23                   TOWERS:  Robert Lapowsky for reading

24   Hospital same terms and conditions as before.  Gross 36

25   point 65 million net 33 point 5 million, component cash

1   32,000,275 tail 1 million, escrow 34 million, break up fee

2   225,000.

3                       J. Scott Victor:  Just checking your math.

4                       TOWERS:  Good.

5                       JEFFERSON GROUP:  Could you say that again.

6                       TOWERS:  It is 36.6 gross bid, 33.35 net

7   bid, cash is 32,020,735, tail is a million escrow is

8   3 million and the break up fee is 225,000.

9                       J. Scott Victor:  Objection Jefferson.

10                      JEFFERSON:  Patrick Jackson for Drinker

11  Biddle for Jefferson.  Jefferson will increase it's gross

12  bid 40 million-dollar with net value estate of 37 mold

13  component being 366 million cash 1 million-dollar tail

14  3 million-dollar in terms substantial to Jefferson's prior

15  bids.

16                      J. Scott Victor:  37 million net to the

17  estate.  Thank you:

18                      TOWERS:  Rob iter Lapowsky for Readding

19  hospital on the same terms and conditions previously bid

20  but one additional disclosure which is Drexel University

21  is now a participant in this bid.

22                      J. Scott Victor:  To bids can now enter

23  (inaudible).  Our gross is 45 point 5 million.  Net 37

24  point 5 million, cash componenta are cash $36,275,000,

25  escrow $3 million, tail $1 million break up fee $225,000.

1          J. Scott Victor:  367 point 5 net to the

2     estate that can you.

3          JEFFERSON:  We'd asks for you to

4     clarification as respect to disclosure so Drexel is

5     participating in the bid for materially what the terms of

6     the bid.

7          J. Scott Victor:  Why are you looking at

8     me?

9          JEFFERSON:  You're running to the judge.

10          TOWERS:  They're contributing cash.  Do you

11     want more doe tail for that.  Jefferson's tanned reason we

12     want more detail.  You have the doe tile to our consortium

13     because we filed our document.  So you understand the

14     number of people that are in the group, and so I want to a

15     thorough understanding of what Drexel east involve.  It's

16     our understanding in terms of the consortium or that side

17     of table is that based on the letter that was full-timed

18     that each of you are in for one sixty of the exhibition of

19     the deal is that correct Jefferson's so.  That's all I got

20     from your letter.

21          JEFFERSON GROUP:  Initially that is

22     correct.  Okay.  However, as those depending upon the

23     price, Okay, and as those residence become permanent

24     variable obviously things have to be reallocated.  So you

25     will see in there that there is a baseline and there is a

1   recalibration that speaks to that.  What's not in there

2   obviously are the dollars but the process is clearly in

3   there.  So you know exactly with enough specificity how

4   this is going to work.your got Drexel hear and we have no

5   idea and I expect to get it on the record the con track

6   you recall turl relation ship.  And purpose of the

7   transcript this is Chris cavalier I.

8                   TOWERS:  We are going to need to take a

9   break.  We may need to read your letter on who's on your

10  last bid who's getting what on your side of the table.

11                  JEFFERSON GROUP:  I don't know who's

12  getting what.

13                  TOWERS:  Why do you need to know who's

14  getting what on our side?

15                  JEFFERSON GROUP:  Because you brought it to

16  the table at the eleventh hour.  We didn't.  We had our

17  relationships in there.  So I expect that the relationship

18  that has the deal that's been cut I expect to go on record

19  for it.

20                  TOWERS:  I'm asking whether its going to be

21  reciprocity.

22                  JEFFERSON GROUP:  Reciprocity for the

23  record.  This procedure specifically requires the identity

24  of the bidder be disclosed including without reading the

25  whole thing and the complete terms of any such

1    participation.  You have a full letter of intent.

2                    TOWERS:  No, we do not.

3                    JEFFERSON GROUP:  I think we can certainly

4    disagree to the terms.  It's bold but also both agree that

5    the difference between giving same of someone that they

6    are participating is an extraordinary different  magnitude

7    explaining the method.

8                    TOWERS:  Ultimately, it's up to date to the

9    debtors to whether they waive any.  We'll take a break and

10   our position stands which is that if this issue is being

11   presented by you, we ought to know on your last bid how

12   the economic break up among any consortium.  Then your

13   unwilling to that you said stated in the report.

14                   JEFFERSON GROUP:  If you don't that should

15   give you your investigation.

16                   TOWERS:  I don't know.

17                   JEFFERSON GROUP:  Then your not actually

18   negotiating.

19                   TOWERS:  Fair enough.  If we say yes, we

20   expect you to say yes as well.

21                   JEFFERSON GROUP:  We leave to debtors on

22   that basis as to conditions.

23                   J. Scott Victor:  Why don't we take a

24   break.

25                   (Recess was taken from 10:02 p.m. to 11:10

1       p.m.)?

2                        J. Scott Victor:  So let's finish that up.

3       Are you willing to disclose anymore than you currently

4       have?

5                        JEFFERSON GROUP:  I'm willing to disclose

6       what's in the document.

7                        J. Scott Victor:  Are you willing to

8       disclose what you have from the document.

9                        TOWERS:  Beyond that Drexel is not

10      participating in the bid task financial.

11                       J. Scott Victor:  Since it previous

12      information in debtor or collusion, we are waiving that

13      particular provision based upon all the good fate you

14      disclosures that have been made and let's move on

15      Jefferson's healths mover on.

16                       J. Scott Victor:  So next bid is to

17      Jefferson.

18                       JEFFERSON GROUP:  Patrick Jackson, we have

19      increased to gross bid to 40 point $6 million for a 37

20      point 6 meld debit to estate component 36 point 6 cash

21      3 million escrow and $1 million tail escrow Otherwise on

22      terms of prior bids char 37 point 6 net to the estate

23      Jefferson's yes.

24                       J. Scott Victor:  Thank you.  Reading.

25                       JEFFERSON GROUP:  Given the hour at this

1    time, we actually with respect to that you break and

2    reconvene the auction.  I think Monday in light of the

3    continuance of the hearing and the late hour.

4              J. Scott Victor:  Let's take that under

5    advisement and go to Reading.

6              TOWERS:  Robert Lapowsky  for Reading

7    Hospitaller.  We are increasing the gross bid to

8    41 million the net 38 million, components are 36,765,000

9    cash, 225,000 in the break up fee, 3 million in the

10   escrow, and 1 million for the tail.

11             J. Scott Victor:  38 million net.

12             TOWERS:  Correct.

13             J. Scott Victor:  Let us take a minute to

14   caucus.

15             TOWERS:  We oppose.  We want to finish.

16             J. Scott Victor:  We won't take an hour.

17             TOWERS:  No, they did.

18             J. Scott Victor:  Consulting party.

19             (Discussion was held off the record.).?

20             J. Scott Victor:  All right.  So after

21   deliberating about the request from the Jefferson group to

22   adjourn tonight's auction and after consultation to

23   tonights committee to not add jury was duly sworn an

24   proceed with the auction.

25   A.    It is been too much momentum from the debtor or

1    committees perspective to postpone this auction.

2              TOWERS:  Thank you.  So that leaves testify

3    next bid to Jefferson.

4              JEFFERSON:  Patrick Jackson Drinkerer

5    Biddle for Jefferson.  We will increase its gross bid to

6    $50 million for net value to the estate of 47 million

7    component, 46 million cash 3 million escrow tails to the

8    terms of Jefferson's prior bids.

9              J. Scott Victor:  47 million not to the

10   estate.  Reading.

11             TOWERS:  Reading Hospital increases its bid

12   to 50 point 10 gross, 47 point 1 net, and that consist of

13   cash of 45,875,000 break up fee of $225,000 escrow of

14   3 million and tail of $1 million.  It should total

15   50,100,000 gross 47,100,000.

16             J. Scott Victor:  Okay.  Thank you.  47

17   point 1 million net to the estate.  Jefferson.

18             JEFFERSON:  Patrick Jackson Drinker Biddle

19   for Jefferson.  Jefferson will increase its gross bid to

20   50 point 2 million for 47 point 2 million-dollar to

21   estated consisting of 46,000,002,000,000 cash escrow

22   remain in tail the terms are actually the same.

23             J. Scott Victor:  47 point 2 million net to

24   the estate.  Thank you.  Reading.

25             TOWERS:  Readingwill not be increasing it

1    is offer.  Congratulations.  Best of luck with CPS.  Thank

2    you.

3                    J. Scott Victor:  Thank you all.

4                    TOWERS:  Thank you:

5                    J. Scott Victor:  Ask caucus with the

6    consulting party.  So reading will you agree to be that

7    back up bidder.  I believe the APA does bind you to agree

8    at 50 point 1.  To us we leave when he may have another

9    bid.  So you withdraw the last?

10                   TOWERS:  We are withdrawing the last

11   statement and adding another bid.

12                   J. Scott Victor:  It is a good thing that

13   they didn't past.

14                   JEFFERSON GROUP:  Did they past?

15                   J. Scott Victor:  They're withdrawing

16   they're statement different from a past.

17                   J. Scott Victor:  You think the judge is

18   going to rule on that Jefferson's tell us what rules count

19   and which ones don't.

20                   JEFFERSON:  Patrick jacks or Jefferson's

21   son.for the r par case.

22                   J. Scott Victor:  They have to disclose

23   Jefferson's I went to make that known.

24                   TOWERS:  November additional participant.

25   We are the financial backers.

1                    J. Scott Victor:  Towers Robert Lapowsky.

2       Reading Hospital increases to 50 point 3 million net 47

3       point 3 million cash is $46,075,000 the escrow is

4       $3 million the tail is $1 million and the break up fee is

5       $225,000.  All on the same terms that we've been bidding

6       on all night.

7                    J. Scott Victor:  47.3 net to the estate.

8                    TOWERS:  Correct.

9                    J. Scott Victor:  Okay Jefferson.

10                   JEFFERSON GROUP:  Patrick Jackson for

11      Jefferson.  This bid is for what it is worth under protest

12      in light of what we have in the past in violation of

13      previously established rules.  Increase the gross bid to

14      50 point 4 million, net to the estate of 47 point

15      4 million consisting of cash 46 point $4,000,003,000,000,

16      escrow 1 million-dollar terms.  Otherwise the terms over

17      Jefferson's previous bids.

18                   J. Scott Victor:  47 point 4 net to the

19      estate.  Thank you.  Reading.

20                   TOWERS:  Robert Lapowsky for Reading

21      Hospital.  Reading is increasing gross bid to 55 million

22      brings the net to 41 million-dollar the cash component of

23      that deal is $46,775,000, the escrow component is 3

24      million dollars the tail is $1 million and the break up

25      fee is $225,000 all on the same terms and conditions that

1    we've been bidding on all day.

2              J. Scott Victor:  48 million net to the

3    estate.  Thank you.

4              JEFFERSON GROUP:  Patrick Jackson for

5    Jefferson increase its gross to 55 million net of

6    52 million to the estate, component of 51 million cash

7    3 million escrow 1 million tail and Otherwise same as

8    Jefferson's bids.

9              J. Scott Victor:  52 million net to the

10   estate.  Thank you, Reading.

11             TOWERS:  This time we are finishes, and we

12   are serious.  See us on the elevator.  Congratulations

13   again.

14             J. Scott Victor:  Going once.  Back up bid.

15   Reading agrees to back up bid at 51 million gross.

16             TOWERS:  Subject to terms of our agreement

17   including the September 6 outside closing date and the

18   other terms and conditions.

19             J. Scott Victor:  Okay, counsel.

20             J. Scott Victor:  Okay.  We are done.

21             JEFFERSON GROUP:  Jefferson's Patrick

22   Jackson, the auction is closed.

23             J. Scott Victor:  Closed and.

24             Jeffrey Hampton:  And closed and concluded.

25   done

1                    (Auction ended at 11:46 P.M..)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4

5           I, Felisa D. McCray, Court Reporter, certify

6    that the foregoing is a true and accurate transcript of

7    the foregoing auction.

8           I further certify that I am neither attorney

9    nor counsel for, not related to nor employed by any of the

10   parties to the action in which this deposition was taken;

11   further, that I am not a relative or employee of any

12   attorney or counsel employed in this case, nor am I

13   financially interested in this action.

14

15   _____

16   Felisa D. McCray
     Court Reporter
17   and Notary Public

18

19

20

21

22

23

24

25