# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) |
|  | ) Jointly Administered |
| Debtors. | ) |
|  | ) **Related to Docket No. 733** |
|  | ) |

## DEBTORS' MOTION FOR STAY PENDING APPEAL OF ORDER GRANTING IN PART THE MOTION OF TENET BUSINESS SERVICES CORPORATION AND CONIFER REVENUE CYCLE SOLUTIONS, LLC FOR ENTRY OF AN ORDER (I) COMPELLING PAYMENT OF ALL UNPAID POSTPETITION AMOUNTS PURSUANT TO 11 U.S.C. § 503(B)(1) OR, IN THE ALTERNATIVE, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY TO THE EXTENT NECESSARY TO TERMINATE THE TSA AND MSA

Center City Healthcare, LLC d/b/a Hahnemann University Hospital and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby move this Court (the "**Motion**") for the entry of an order, a proposed form of which is attached hereto as **Exhibit A,** granting a stay pending appeal of the *Order Granting in Part the Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA* [D.I. 733] (the "**Tenet Parties Order**").  In support of this Motion, the Debtors rely on the Declaration of

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Ingrid McGovern, Chief Nursing Officer, attached hereto as **Exhibit B** (the "**McGovern Declaration**") and the Declaration of Robert Kirschner, Director of Facilities Management and Construction, attached hereto as **Exhibit C** (the "**Kirshner Declaration**," and together with the McGovern Declaration, the "**Declarations**"), and respectfully state as follows:

<u>Jurisdiction and Venue</u>

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein is Rule 8007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

<u>Background</u>

3.      On June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

3.      A description of the Debtors' businesses and the reasons for commencing these Chapter 11 Cases are set forth in the *Declaration of Allen Wilen in Support of First Day Relief* [D.I. 2] (the "**First Day Declaration**").

A.      **The Acquisition, the TSA and the MSA**

4.      On January 11, 2018, Philadelphia Academic Health Holdings, LLC, Philadelphia Academic Health System, LLC ("**PAHS**") and certain other purchasers consummated the purchase of the businesses of Hahnemann University Hospital ("**HUH**") and St. Christopher's Hospital for Children ("**STC**," and together with HUH, the "**Hospitals**") and certain related assets, including the Hospitals' related physician practice groups (together, the "**Healthcare Businesses**"), from Tenet Business Services Corporation ("**Tenet**") and its affiliates pursuant to an Asset Sale Agreement dated August 31, 2017, as amended (the "**Acquisition**").

5.      At the time of the Acquisition, PAHS and Tenet entered into a Transition Services Agreement ("**TSA**") pursuant to which Tenet agreed to provide certain services to PAHS for a two-year period to assist in the orderly transition of the Healthcare Businesses.  These services included Information Services (as defined in the TSA) such as software and IT support, and the use of Tenet's IT platform (the "**Tenet IT Platform**"), in exchange for which Tenet was entitled to certain fees.  PAHS also entered into a Master Services Agreement (the "**MSA**") with Conifer Revenue Cycle Solutions, LLC ("**Conifer**," and together with Tenet, the "**Tenet Parties**"), pursuant to which Conifer agreed to provide revenue cycle services in exchange for payment.

6.      Immediately upon or shortly after the Acquisition, the Debtors' financial performance was adversely affected by a number of disputes with, and operational challenges stemming from failures on the part of, Tenet and Conifer, which disputes and challenges are described in the First Day Declaration.

B.      **The Tenet Parties Motion**

7.      On July 26, 2019, the Tenet Parties filed the *Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA* [Docket No. 303] (the "**Tenet Parties Motion**"), pursuant to which the Tenet Parties sought the entry of an order compelling the Debtors to pay them the full contract rates for their post-petition services, as set forth in the TSA and MSA, or, alternatively, granting the Tenet Parties relief from the automatic stay so that they can terminate the TSA and MSA.

8.      On August 9, 2019, the Debtors filed an objection to the Tenet Parties Motion [D.I. 421], which was joined by the Official Committee of Unsecured Creditors (the "**Committee**") [D.I. 423]. In addition, on August 9, 2019, MidCap IV Funding Trust filed an objection to the Tenet Parties Motion [D.I. 417].

9.      The Court conducted a joint hearing on the Tenet Parties Motion and the Debtors' motion for a final order on their proposed debtor-in-possession financing on August 19-20, 2019 (the "**August Hearing**").

10.     On August 20, 2019, the Court issued an oral ruling on the Tenet Parties Motion in which it held that the Debtors had rebutted the presumption that the Tenet Parties were entitled to the level of payment specified in the TSA and MSA. In so ruling, the Court concluded that "there just is substantially less work for Tenet and Conifer to perform **and they are not entitled to their contract rate of compensation**." Tr. of August Hearing, at 167:15 (emphasis added).

11.     The Court's ruling also addressed the appropriate amount to be paid, as follows: "[t]he contract amount has been rebutted and so it ought to be an amount obviously less than the

contract amount, but ***perhaps a little more*** than what is being paid to Tenet and Conifer now."

*Id*. at 169:3 (emphasis added).  The Court did not establish a specific amount that the Debtors

should pay for post-petition services.  Instead, the Court directed the parties to negotiate:

> I want the parties, Tenet and Conifer and the Debtors, to present an
> agreed-upon administrative claim amount.  It will not have to be
> paid immediately, but instead, there can be partial payments of the
> claim beginning at some date in the near future.

*Id*. at 168:7.  The Court set a further hearing on the Tenet Parties Motion for September 13, 2019

(the "**September Hearing**"), on which date the Court requested that the Debtors and Tenet

Parties report to the Court concerning the status of their negotiations.  *Id*. at 180:10-19.

## C.    The Tenet Parties Order

12.    As of the date of the September Hearing, despite efforts by the parties, no

agreement was reached with respect to the appropriate treatment to be afforded to the Tenet

Parties. On September 13, 2019, the Court held a confidential chambers conference among the

Debtors, the Tenet Parties and the Committee (the "**Chambers Conference**").

13.    Following the Chambers Conference, on September 19, 2019, the Court entered

the Tenet Parties Order, pursuant to which, *inter alia*, the Court (i) directed the parties to

promptly engage in mediation of certain specified claims and causes of action, (ii) ordered that

"if there is no agreement between the Parties by 5:00 p.m. (prevailing Eastern Time) on October

18, 2019, regarding the ongoing provision of services by Tenet and Conifer, then Tenet and

Conifer may terminate the TSA and/or MSA at any time thereafter and the automatic stay shall

be deemed lifted on the date of any such termination, in which case without any further order of

the Court," (iii) required the Debtors to pay the Tenet Parties $400,000 per week for their

services, beginning September 20, 2019, and (iv) allowed the Tenet Parties an administrative

claim of at least $400,000 per week from the Petition Date through September 20, 2019 (before

5

giving credit for amounts paid to the Tenet Parties on a post-petition basis).  *See* Tenet Parties Order, at ¶¶ 4-8.

14.     Consistent with the Tenet Parties Order, the parties agreed that the Honorable Judith K. Fitzgerald (ret.) would mediate this dispute.  Although Judge Fitzgerald has started the mediation process, the Tenet Parties have refused to pay for any portion of the cost of the mediation.

15.     On October 2, 2019, the Debtors filed a notice of appeal from the Tenet Parties Order insofar as it permits the termination of the TSA and/or MSA after October 18, 2019 (the "**Outside Date**").  Contemporaneously with the notice of appeal, the Debtors are filing this motion for a stay of the Tenet Parties Order to avoid harm to the Debtors' patients and the harsh results that will occur upon the abrupt termination of the TSA and MSA following the Outside Date.

16.     The Debtors are hopeful that, with Judge Fitzgerald's help, the Debtors and the Tenet Parties will engage in productive discussions to continue the TSA and MSA services beyond the Outside Date.  In the absence of such an agreement, however, and given that the Outside Date is a mere *16 days away*, the Debtors are compelled to file the appeal and seek the relief requested in this Motion to avoid the harmful consequences that will result from termination of the Tenet Parties' services.

D.     **The Residency Program Sale and the STC Sale**

17.     On September 10, 2019, the Court entered an order [D.I. 681] (the "**Residency Program Sale Order**") authorizing the Debtors to, *inter alia*, transfer HUH's graduate medical education training program assets to Thomas Jefferson University Hospitals, Inc., which is acting on behalf of a consortium of non-profit entities (the "**Residency Program Sale**").  The

Residency Program Sale Order is currently stayed and is the subject of a pending appeal filed by the United States of America before the United States District Court for the District of Delaware (the "**District Court**").

18.    Furthermore, on September 27, 2019, the Court entered an order [D.I. 795] (the "**STC Sale Oder**") approving the sale of substantially all assets of St. Christopher's Healthcare, LLC and certain affiliated entities (the "**STC Sale**") to STC Opco, LLC (the "**Buyer**") pursuant to the terms of an asset purchase agreement (the "**STC APA**").  Pursuant to the STC APA, the agreement may be terminated by either party if closing on the STC Sale has not occurred by December 13, 2019.  *See* STC APA, at § 9.1(g).  The Buyer's obligation to close on the purchase the assets is subject to a number of conditions, including that the Buyer enter into agreements with Tenet and Conifer for certain go-forward services.  *See* STC APA, at §§ 8.12 and 8.13.

## RELIEF REQUESTED

19.    By this Motion, pursuant to Bankruptcy Rule 8007, the Debtors request that the Court stay the Tenet Parties Order pending the Debtors' appeal therefrom.

## BASIS FOR RELIEF REQUESTED

A.    **Standard for Stay Pending Appeal**

20.    Bankruptcy Rule 8007 provides that "[o]rdinarily, a party must move first in the bankruptcy court for . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal[.]" Fed. R. Bankr. P. 8007(a)(1)(A).

21.    In determining whether to grant a stay pending appeal, courts within the Third Circuit consider: (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the

proceeding; and (4) where the public interest lies.  *E.g.*, *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991); *In re Revel AC, Inc.*, 802 F.3d 558,568 (3d Cir. 2015).  Because each of these factors weighs in favor of staying the Tenet Parties Order pending appeal, the Court should grant this Motion.

**B.      The Debtors are Likely to Succeed on the Merits of Their Appeal**

22.      As an initial matter, the Debtors are likely to succeed on the merits of their appeal because, respectfully, "cause" did not, and does not, exist to lift the automatic stay to permit the Tenet Parties to terminate their services.  As noted above, by the Tenet Parties Motion, the Tenet Parties sought the entry of an order compelling the Debtors to pay them the full contract rates for their post-petition services, as set forth in the TSA and MSA, or, *alternatively,* granting the Tenet Parties relief from the automatic stay so that they can terminate the TSA and MSA.  Once the Court set the appropriate value of the Tenet Parties' post-petition services and addressed the timing of payment for those services, the Debtors respectfully submit that granting the Tenet Parties' request for alternative relief was neither necessary nor appropriate.

23.      In determining whether "cause" exists to lift the automatic stay, courts consider whether: (i) the debtor or the debtor's estate will be greatly prejudiced; (ii) the hardship to the movant by maintenance of the automatic stay considerably outweighs the hardship to the debtor; and (iii) the movant has a reasonable chance of prevailing on the merits.  *E.g., In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).  Applying these factors to the present case, it is clear that no "cause" existed to lift the automatic stay to permit the termination of the TSA and MSA, and certainly no cause existed to establish an Outside Date for termination.

24.      First, as demonstrated at the August Hearing and as further described herein, given the critical role of the Tenet Parties' services in the Debtors' ability to provide proper care

8

to patients, termination of the TSA and MSA will likely lead to an immediate shutdown of operations at STC, the results of which would be disastrous for patients, employees and the community at large.

25.     In sharp contrast, the Tenet Parties will not suffer meaningful harm to the extent a stay is entered because, consistent with the Court's ruling at the August Hearing, the Tenet Parties Order grants the Tenet Parties an allowed administrative claim and requires the Debtors to pay to the Tenet Parties an increased amount (of $400,000 per week) going forward. As determined by the Court, this $400,000 weekly amount fairly compensates the Tenet Parties for their post-petition services while also taking into account the fact that the Tenet Parties are not entitled to their contract rate for such services.[2]  As such, the Tenet Parties are appropriately compensated for their post-petition services and no "cause" exists for the Court to permit termination of the TSA and MSA by the Outside Date.

26.     Moreover, any alleged burdens suffered by the Tenet Parties as a result of having to continue to provide services to the Debtors going forward are diminished by the fact that (i) operations at HUH – and thus the need for the Tenet Parties' services in connection with operations at HUH – are significantly reduced, (ii) the Debtors have Court approval to sell substantially all assets of STC  pursuant to the STC APA, which provides for an outside closing date of December 13, 2019, and (iii) the TSA expires by its own terms in early January 2020. Under these circumstances, no "cause" existed for the Court to permit the termination of the MSA and TSA.  The Debtors therefore believe that they are likely to succeed on the merits an

---

[2]        During the Chambers Conference, the Tenet Parties suggested that $400,000 per week was less than the cost to provide services, but the Tenet Parties offered no evidence on this point at the August Hearing, the evidentiary record in the connection with the Tenet Parties Motion is closed, and the Debtors have had no opportunity to rebut any such suggestion.

appeal of the Tenet Parties Order insofar as it improperly permits the lifting of the automatic stay.

**C.      The Debtors Will Be Irreparably Harmed if a Stay is Not Granted**

27.      The second factor considered for a stay pending appeal requires the applicant to "demonstrate that irreparable injury is likely [not merely possible] in the absence of [a] [stay]." *In re Revel AC, Inc.*, 802 F.3d at 569.  In the present case, the Debtors will <u>very likely</u> suffer irreparable harm if a stay pending appeal is not granted.

28.      As reflected in the Declarations, in the unfortunate event that the Debtors and the Tenet Parties are unable to resolve their respective claims by the Outside Date, the Tenet Parties will be able to terminate their services, which are vital to the Debtors' ability to properly care for patients at STC.

29.      Although Conifer's main service relates to billing and collecting, Conifer employees are responsible for patient intake at STC using alleged Tenet proprietary systems and software. *See* McGovern Declaration, at ¶ 8.  These employees and systems cannot be easily replaced, and certainly cannot be replaced by the Outside Date.

30.      By way of further example, the electronic medical records software provided by Tenet permits physicians, nurses and other caregivers to share and track each step of care provided to a particular patient, including types and amounts of medications given, labs or studies needed, care plans, physician notes and the patient's extensive medical history.  *See id.* at ¶ 8.  The EMR is also used to connect departments at the hospital so that care teams can collaborate in providing care to each child.  *Id.* at ¶ 9.  When a physician enters a request for a particular medication on the EMR, for example, the pharmacy immediately receives the request for the order and can promptly prepare and deliver the medication.  *Id.*  Similar processes occur

for radiology and laboratory orders.  Given the critical purposes served by the EMR, it is clear that without it, patients at STC will experience delays in treatment and potentially other harmful results.  ***Termination of the TSA and MSA will thus jeopardize patient health and cause irreparable injury***.  Termination of the Tenet Parties services will also constitute an immediate default under the Debtors' post-petition financing facility and impair many of the Debtors' accounting, billing and banking functions.

31.     Even if the Debtors could eventually transition to a new IT services provider, the Debtors do not have the means or resources to do so by the Outside Date.  *See id.* at 10; Kirschner Declaration, at ¶ 7.  As such, upon termination of the Tenet Parties' services, ongoing operations at the Hospital would be unsustainable.  As reflected in the Kirschner Declaration, STC's facilities team will not be able to ensure that requisite maintenance is performed for medical equipment, thus jeopardizing patient safety.  *See* Kirschner Declaration, at ¶ 6.  Likewise, from a clinical standpoint, in the absence of the Tenet IT system or a similar alternative, the Debtors would be left with no choice but to revert to paper record-keeping instead of electronic records, which is an antiquated method at best.  As reflected in the McGovern Declaration, a proper transition to paper record-keeping would likely take up to one year to complete, and would involve, among other requirements, the following steps:

- STC would need to request paper versions of all medical records so that the paper versions could be used going forward, and so that all medical history information and treatment plans typically available in electronic format would be available in a paper file.

- STC would need to train its 2,000 employees on how to maintain paper records.  This includes physicians and pharmacy staff, which would need to learn how to manually place and accept orders for medication.

- More staff would be needed at the hospital – thus requiring the Debtors to incur greater expense – to permit the manual entry and processing of the large volume of information that is typically entered onto the EMR on a daily basis.

- Work teams from each department would need to plan and develop procedures for operating and collaborating on a paper system to prevent disruptions in patient care.

*See* McGovern Declaration, at ¶ 15. The actions required to transition to paper record-keeping simply cannot be completed in this short period of time. *See* McGovern Declaration, at ¶ 16. Moreover, even if a transition to paper record-keeping was possible, the use of paper records is itself problematic and accomplished by an increased risk of medical error, thereby again putting patients at risk. *See id.* at ¶¶ 12-13.

32. Because the Tenet IT services are crucial in providing proper care to patients, the absence of those services could very well require the shutdown of the hospital. In anticipation of a potential shutdown, the Debtors would need to start working *now* to transfer patients to other hospitals; however, even if they did so, it is unlikely that the hospital could coordinate transfers for all of its current inpatients by the Outside Date. *Id.* at ¶ 18.

33. At present, there are approximately 100 inpatients at STC, 38 of which are in the neonatal intensive care unit (the "**NICU**") or the pediatric intensive care unit (the "**PICU**"). *Id.* at ¶ 19. STC's NICU is a Level 4 NICU, meaning that it can provide care in highly complex cases. Patients requiring such care can be transferred only to hospitals that likewise maintain a Level 4 NICU and there is no guarantee that such hospitals have sufficient space to take on STC's patients or that these hospitals take the insurance carried by STC's NICU patients. *Id.* In addition, for many of STC's patients and families, traveling to a hospital that is even further away than STC is extremely burdensome and costly, not to mention that the resulting distance between families and patients would likely cause great distress. *Id.* at ¶ 20. There are also certain patients who, at present, cannot be moved at all until their clinical status improves, since the act of moving them alone can pose serious threats to their health. *See id.* at ¶ 21.

34.    Finally, in jeopardizing the Debtors' ability to operate, termination of the automatic stay will also deprive the Debtors' estates of the ability to maximize value for *all* creditors – including the Tenet Parties – since a shutdown of the Hospitals will jeopardize both the pending Residency Program Sale, the viability of which depends on HUH continuing its business operations, and the pending STC Sale, in connection with which the Debtors are required to maintain ordinary course operations at STC until closing.

35.    For these reasons, in the absence of a stay pending appeal, and upon termination of the TSA and MSA following the Outside Date, there is no question that the Debtors, and more importantly, their patients, will suffer considerable irreparable injury. Such severe harm alone warrants the granting of this Motion.

**D.    A Stay of the Tenet Parties Order Pending Appeal will Not Injure Other Parties**

36.    Next, the severe consequences faced by the Debtors' estates if a stay of the Tenet Parties Order is not granted outweigh significantly any hardship that may be endured by Tenet if the Motion is denied.  With the wind-down in HUH's operations and the closing of a sale of STC to the Buyer required to be no later than December 13, 2019, the time in which the Tenet Parties must provide services to the Debtors is limited.[3]  During this limited time, the Tenet Parties have the protection of a Court order requiring the Debtors to pay them fair value for their services.  As such, the Tenet Parties are not harmed to the extent they must continue to provide services to the Debtors since they will be adequately compensated for such services in the interim.

---

[3]    The Debtors recognize that the STC APA provides for the Buyer enter into a transition services agreement with Tenet.  Again, however, Tenet's services to the Buyer under that agreement would be for a definitive period of time.  Moreover, the transition services agreement would reflect terms agreed upon by both parties and would therefore presumably reflect payment terms that Tenet believes are appropriate compensation for the services provided during the transition period.

37.     Furthermore, a stay of the Tenet Parties Order will *benefit* other parties in interest. As explained in the Declarations, the Debtors will be faced with critical health and safety issues and likely a shutdown of operations at STC if the Debtors are forced to abruptly transition their systems from the Tenet IT Platform to a "paper" alternative.  A stay of the Tenet Parties Order will thus benefit the Debtors' employees, patients and the surrounding community by permitting the Debtors to keep STC open.   In addition, a stay of the Tenet Parties Order benefits former HUH patients by permitting the Debtors to maintain access to their patient records – which are located on the Tenet network – so that the Debtors can continue to respond to patient requests for records and take steps to migrate the records from the Tenet system to an alternative repository for future access.  Any inability to provide records to patients, physicians or other caregivers upon request can result in delays in needed treatment, among other harmful results, to patients.

38.     Lastly, as noted above, creditors will also benefit from a stay pending the Debtors' appeal of the Tenet Parties Order to the extent it permits the Debtors to maximize the value of their assets in connection with the pending Residency Program Sale and STC Sale.  Any threat to continued operations of either HUH or STC would undermine the sales processes for both Hospitals and likely harm the value of the Debtors' businesses, to the detriment of the Debtors' creditors and parties in interest.

39.     Under the STC APA, for example, the Debtors are required to "carry on Sellers' ownership of the Assets and the operation of the Hospital, the Practices and the graduate medical education residency and fellowship programs in the ordinary course of business consistent with past practice of hospital operations" until closing.  *See* STC APA, at § 4.6.  Certainly, the Debtors would not be able to conduct their businesses "in the ordinary course" and "consistent with past practice" if the Tenet Parties terminated their services.  As such, the impending

termination of the TSA and/or MSA jeopardizes the Debtors' ability to close on a Court-approved sale transaction that will preserve the value of the STC entities, save jobs and, most importantly, ensure uninterrupted quality patient care and safety at STC.  For these reasons, a stay of the Tenet Parties Order benefits not only the Debtors, but the Debtors' patients, creditors, employees and other parties in interest.

**E.      Granting a Stay is in the Public Interest**

40.      Consideration of the public interest also weighs in favor of granting a stay of the Tenet Parties Order pending appeal.  In the present case, the abrupt termination of the Tenet Parties' services – particularly those of Tenet – would disrupt STC's operations in a manner that would jeopardize the health and safety of an already vulnerable patient population.

41.      For the same reasons set forth above and in the Declarations, a stay of the Tenet Parties Order pending appeal that prevents the termination of the TSA and/or MSA by the Outside Date and the resulting impact on patient care would greatly serve the public interest. The healthcare and social services provided at STC to its patients, most of whom come from underprivileged areas surrounding the hospital, are critical in meeting the needs of the community, which does not have a comparable alternative that can provide such services.  A stay of the Tenet Parties Order will also avoid disruptions in care and the financial and emotional burdens that families will experience to the extent patients must be transferred to other facilities in the wake of the Tenet Parties' termination of services.  Accordingly, the public interest favors granting a stay so that the Debtors can proceed with their appeal of the Tenet Parties Order without the impending threat of the chaotic and potentially unsafe results that would ensue to the extent Tenet and Conifer terminated their services.

## NOTICE

42.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (i) the Office of the United States Trustee; (ii) the Official Committee of Unsecured Creditors; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Health; (xi) the City of Philadelphia; (xii) counsel to the Tenet Parties; (xiii) counsel to the Court appointed Patient Care Ombudsman; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.


[remainder of page left intentionally blank]

WHEREFORE, based on the foregoing, the Debtors respectfully request that the Court enter the order, substantially in the form attached hereto as **Exhibit A,** granting the Motion, and granting such other and further relief as is just and proper.

Dated: October 2, 2019        **SAUL EWING ARNSTEIN & LEHR LLP**

By:    */s/ Monique B. DiSabatino*
        Mark Minuti (DE Bar No. 2659)
        Monique B. DiSabatino (DE Bar No. 6027)
        1201 N. Market Street, Suite 2300
        P.O. Box 1266
        Wilmington, DE  19899
        Telephone: (302) 421-6800
        Fax: (302) 421-5873
        mark.minuti@saul.com
        monique.disabatino@saul.com

          -and-

        Jeffrey C. Hampton
        Adam H. Isenberg
        Aaron S. Applebaum (DE Bar No. 5587)
        Centre Square West
        1500 Market Street, 38th Floor
        Philadelphia, PA 19102
        Telephone: (215) 972-7777
        Fax: (215) 972-7725
        jeffrey.hampton@saul.com
        adam.isenberg@saul.com
        aaron.applebaum@saul.com

        *Counsel for Debtors and Debtors in Possession*

35952755.5 10/02/2019