# **Exhibit B**

**(McGovern Declaration)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |

**DECLARATION OF INGRID MCGOVERN IN SUPPORT OF
DEBTORS' MOTION FOR STAY PENDING APPEAL OF ORDER
GRANTING IN PART THE MOTION OF TENET BUSINESS SERVICES
CORPORATION AND CONIFER REVENUE CYCLE SOLUTIONS, LLC
FOR ENTRY OF AN ORDER (I) COMPELLING PAYMENT OF ALL UNPAID
POSTPETITION AMOUNTS PURSUANT TO 11 U.S.C. § 503(B)(1) OR, IN THE
ALTERNATIVE, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY
TO THE EXTENT NECESSARY TO TERMINATE THE TSA AND MSA**

I, Ingrid McGovern, hereby declare the following, under the penalty of perjury:

1.      I am the Chief Nursing Officer ("**CNO**") of St. Christopher's Hospital for Children ("**STC**") and have served in this role since January 2019. Prior to assuming the position of CNO, I served as the Senior Director of Nursing at STC for 4 years. In total, I have worked at STC for 39 years.

2.      In my capacity as CNO of STC, I provide strategic leadership for all nursing and patient care functions and services within the hospital to ensure high quality and safe patient care through competent staff and appropriate resource management. I am therefore familiar with STC's day-to-day operations and business affairs. I am above 18 years of age, and am

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

competent to testify.

3.      I submit this declaration in support of the *Debtors' Motion for Stay Pending Appeal of the Order Granting in Part the Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA* (the "**Stay Motion**").[2]  Specifically, I am submitting this declaration to describe the irreparable harm that would result from Tenet Business Services Corporation ("**Tenet**") and Conifer Revenue Sycle Solutions, LLC ("**Conifer,**" together with Tenet, the "**Tenet Parties**") terminating services under the TSA and MSA by October 18, 2019.

4.      Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge and my review of the relevant documents and information concerning the operations of the above-captioned debtors (the "**Debtors**").  If called upon to testify, I could and would testify competently to the facts set forth herein.

**I.      The Tenet IT Platform is Integral in Providing Patient Care at STC**

5.      The services provided by Tenet and, in particular, the software applications provided by Tenet, are crucial to STC's ability to provide care to patients.

6.      By way of example, one of the software applications provided by Tenet under the TSA is Cerner electronic medical records software (the "**EMR**").  The Debtors' predecessors transitioned to the EMR from manual/paper record-keeping in 2013, and this transition took approximately one year to complete.

7.      Included in the EMR is a program called the Medication Administration Record

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Stay Motion.

(the "**MAR**").  Any pharmaceuticals and medications that enter the hospital are scanned into the MAR using a bar-code methodology that transmits information relating to the mediations onto the computer system.  Thereafter, all information related to the medications – i.e. what medications were given to what patient, the dosage, the time in which the medications were given, and the related billing information – is inputted and processed through the MAR.  Without the MAR, we cannot determine what medications a patient is receiving, or has received in the past, and what dates and times the patient has received the medication.

8.     Furthermore, many of the patients at STC come through the Emergency Department.  When a patient is admitted into the Emergency Department, he or she is first registered at the registration desk, which is operated by Conifer.  The information received by Conifer at registration and the ED clinical team includes not just a patient's name and date of birth, but also an extensive medical history, going back to the patient's birth.  Through the registration and intake process, all of this background information is added to the EMR and can thereafter be accessed and reviewed by physicians, nurses and others who attend to the patient's care.  Indeed, following registration and admission in the emergency room, every step of care provided to a patient is entered onto the EMR and thereby tied to that patient's medical records so that, at any given time, physicians, nurses, pharmacists and any others assisting in the patient's care can view the patient's medical history, care plans, medications ordered, notes from physicians or nurses or requested lab or radiology studies.

9.     The EMR quite simply is integral to providing patient care by connecting the departments at the hospital so that care teams can collaborate in providing such care to each child.  As an example, when a physician enters a request for a particular medication on the EMR, the pharmacy receives the request for the order and can promptly prepare and deliver the

medication.  Likewise, if a child needs an X-ray or CAT-scan, this request is entered onto the

EMR, and the radiology department promptly receives an alert that a study is needed and can

prepare accordingly.  The EMR is thus critical in ensuring not only that patient records are

accurate and up-to-date but that hospital departments can collaborate in a manner necessary to

ensure that patients receive needed care as quickly as possible.

## II.    Alternatives to the Tenet IT System

10.    The Debtors lack the resources for, and there is not enough time to transition to, a

new, comprehensive IT system similar to the Tenet IT Platform.  Even if an alternative IT system

was available and even if cost was not an issue (which it is), a transition to an alternative system

could not take place in three weeks, nor could the EMR even be dismantled in 3 three weeks.  As

noted above, the transition to the EMR took *close to one year* to complete.  In addition, planning

for the transition to an upgraded Cerner system took *close to one year* and was halted before it

was implemented due to the Debtors' bankruptcy filing.  The Outside Date of October 18, 2019

therefore does not provide sufficient time for STC to transfer its records to an alternative

electronic system.

11.    Accordingly, STC's only alternative upon the termination of Tenet's services

following the Outside Date would be to revert to paper record-keeping.  In the past, there have

been short periods of time (usually no more than 4-6 hours) when the hospital has implemented

its "down time procedures," which, as a general matter, provide for paper record-keeping when

the EMR system goes down.  Because "down time procedures" are usually in place for very

short periods of time, the Debtors are typically able to rebound from the loss of the EMR without

significant burden: once the EMR system is back up and running, any information entered on

paper records during the short lapse in electronic access is manually entered onto the EMR

system.

12.     In contrast, transitioning to a paper system for an *extended* period of time would take at least up to a year and would be expensive, burdensome and potentially unsafe for patients for several reasons, the most significant of which is that the use of paper records creates an increased likelihood of medical errors.  Indeed, the issue of legibility of handwriting alone creates significant challenges and increased opportunity for errors.  Moreover, without the EMR, we at STC lose a critical tool in ensuring proper patient care.  Physicians, nurses and, where required, respiratory therapists, dieticians, child life specialists, and rehabilitation specialists, among others, create plans of care for each patient that are set forth in detail on the EMR.  These plans would be lost if access to the EMR was abruptly terminated.  We would also lose access to the extensive medical history maintained in patient files, including records describing previous in-patient or out-patient visits by a child.  This historical information is crucial in ensuring proper care and treatment for patients.

13.     A few practical examples further demonstrate how the reversion to paper records raises safety concerns and could jeopardize patient care:

- Programmed into the EMR are the upper and lower dosage limits for each medication based on a child's weight.  If a certain dosage of medicine is ordered for a child and the dosage falls outside the limits, the EMR will automatically create an alert to ensure that the dosage requested is adjusted to the appropriate limit given the patient's weight.  In the absence of the EMR, if a physician orders a medication for a child, the nurse would review the physician's order by *manually* calculating the dosage in comparison to the weight before sending the request to the pharmacy.  While I have the upmost faith in our team, there is no doubt that the risk of human error is greater with paper record-keeping than if such calculation is performed by the EMR system.

- Currently, if an issue arises with a patient and an immediate order for medication is needed, *regardless* of where that patient's primary physician is located, that physician can access the EMR through remote access software (provided by Tenet) to order the medication as quickly as possible.  Without the Tenet IT System, if medication is needed on an emergency basis, the physician will need to physically go to the STC facility in order to place the order for medication.  In emergency situations, delays such as these

could be life threatening.

14.    Even if it were possible for STC to transition back to paper records, the expedited

transition that would need to occur if the Tenet Parties terminated their services by the Outside

Date would be extremely difficult, expensive, time-consuming and would very likely jeopardize

patient health and safety in a manner that could make ongoing operations at STC impossible.

15.    To transition to a paper record-keeping system, *at a minimum*, the following steps

would be required to ensure that the transition would not adversely impact patient care:

- STC would need to request paper versions of all medical records so that the paper versions could be used going forward, and so that all medical history information and treatment plans typically available in electronic format would be available in a paper file.

- STC would need to train its 2,000 employees on how to maintain paper records.  This includes physicians and pharmacy staff, which would need to learn how to manually place and accept orders for medication.

- More staff would be needed at the hospital – thus requiring the Debtors to incur greater expense – to permit the manual entry and processing of the large volume of information that is typically entered onto the EMR on a daily basis.

- Work teams from each department would need to plan and develop procedures for operating and collaborating on a paper system to prevent disruptions in patient care.

16.    Clearly, a responsible transition to paper records is not something that can be

"turned on" in a matter of weeks.  To even attempt such a transition on an expedited time frame

such as this – where the Tenet Parties may terminate their services in *less than one month* – is, in

my opinion, unsafe and could very likely result in a shutdown of the hospital.

17.    The consequences of a sudden loss of the EMR would be widespread throughout

the hospital.  In addition to clinical and ancillary departments, there would be significant risks

for finance and revenue departments, state regulatory compliance, accreditation, Leapfrog status

and certifications (i.e. verified burn center and level 1 pediatric trauma center).  The need for

new workflows, sufficient personnel, processes to address the inefficiencies that accompany

paper documentation and the significant knowledge deficits and training needs would likely take upwards of a year to address in order to assure safe quality care in a non-EMR environment.

### III.    Actions Required if STC is Forced to Shut Down

18.    As noted above, because the Tenet IT services are crucial in providing proper care to patients, the absence of those services will require the shutdown of the hospital.   In anticipation of a potential shutdown, the Debtors would need to start working *now* to transfer patients to other hospitals and it is my understanding that the sale of the hospital will be put in jeopardy.   Moreover, even if STC started to prepare now for a shutdown following the Outside Date, however, it is unlikely that the hospital could coordinate transfers for all of its current inpatients by that date.

19.    At present, there are approximately 100 inpatients at STC, 38 of which are in the neonatal intensive care unit (the "**NICU**") or the pediatric intensive care unit (the "**PICU**"). STC's NICU is a Level 4 NICU, meaning that it can provide care in highly complex cases. Patients requiring such care can be transferred only to hospitals that likewise maintain a Level 4 NICU.  The Children's Hospital of Philadelphia ("**CHOP**"), Nemours Alfred I. duPont Hospital for Children and UPMC Children's Hospital of Pittsburgh maintain Level 4 NICUs, but there is no guarantee that these hospitals have sufficient space to take on STC's patients.   There is also no guarantee that these hospitals take the insurance carried by STC's NICU patients.

20.    Notably, many of STC's patients and their families live in neighborhoods surrounding STC and are of limited means.  In fact, many patients and their families *walk* to the hospital.  For these families, getting to CHOP, a Philadelphia hospital, by public transportation is costly and burdensome.   As such, placing patients in hospitals even *further* away from their families will create a significant financial burden for these families, as well as considerable

emotional distress.

21.     There are also certain patients who, at present, should not be moved at all until their clinical status improves, since the act of moving them alone can threaten their health.  By way of example, when patients are transferred to another facility, they are typically accompanied by a transport crew.  While this crew is highly skilled, the fact remains that if an issue were to arise (i.e. difficulty breathing, cardiac arrest), the crew cannot respond to an emergency at the same level that they would if they were at the hospital, with access to all equipment, other necessary clinical staff and other resources.

## IV.   Conclusion

22.     The possibility that the Tenet Parties may terminate services following the Outside Date is cause for great concern given the extent to which the systems are relied upon in providing care to patients.  Moreover, the abrupt transition to paper record keeping that would be required in the absence of the Tenet IT services would create potentially insurmountable challenges for the Debtors' operations and jeopardize patient care.

23.     As noted above, STC serves a local community that is very challenged from a socio-economic standpoint.  It is unlikely that this community would be able to obtain the types of services that they receive from STC – which include not only medical care but also various social services – elsewhere.  The compromised level of care that would result from the loss of the Tenet IT system, and the potential shutdown of the hospital, would be a great disservice to the already vulnerable population served by STC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October __1__, 2019

Ingrid McGovern
Chief Nursing Officer

35962261.5 10/01/2019