# <u>EXHIBIT D</u>

**Pre-Petition Credit Agreement**

## AMENDMENT NO. 1 TO CREDIT AND SECURITY AGREEMENT

**THIS AMENDMENT NO. 1 TO CREDIT AND SECURITY AGREEMENT** (this "Amendment") is made as of September 20, 2018, by and among **ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company, **CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company, **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company, **PHYSICIANS CLINICAL NETWORK, LLC**, a Delaware limited liability company, **PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company, **HPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company, **STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company, **SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company, **TPS OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company, **TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company, and **PHYSICIAN PERFORMANCE NETWORK OF PHILADELPHIA, L.L.C.**, a Pennsylvania limited liability company, and any additional borrower that may hereafter be added to this Amendment (each individually as a "Borrower" and collectively as "Borrowers"), **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust (successor-by-assignment to MidCap Financial Trust), individually as a Lender, and as Agent and **MIDCAP FUNDING H TRUST**, a Delaware statutory trust, as a Lender ("New Lender").

## RECITALS

A.    Borrowers, Agent and the Lenders are party to that certain Credit and Security Agreement dated as of January 11, 2018, (as amended hereby, and as may be further amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lenders agreed to make available to Borrowers a revolving loan facility in the maximum principal amount of $100,000,000 at any time outstanding. Capitalized terms used but not defined in this Amendment shall have the meanings that are set forth in the Credit Agreement, as amended hereby.

B.    Borrowers have requested Agent and Lenders amend the Credit Agreement to add a $20,000,000 term loan facility and are willing to provide additional collateral security for the Obligations in connection therewith.

C.    Agent and Lenders are willing to provide the term loan facility on the terms and conditions set forth herein, including without limitation, (i) the joinder of MidCap Funding H Trust, as a lender with a Term Loan Commitment (as defined in this Amendment), (ii) the joinder of Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (individually and collectively, "Broad Street") as Guarantors and (iii) the pledge of a Lien on substantially all of their assets by each of the entities included as Broad Street in favor of Agent.

**NOW, THEREFORE**, in consideration of the foregoing, the terms and conditions set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders and Borrowers hereby agree as follows:

1.      <u>Amendments to Credit Agreement; Joinder of New Guarantors</u>.  Subject to the terms and conditions of this Amendment, including, without limitation, the conditions to effectiveness set forth in <u>Section 6</u> below:

      (a)      <u>Credit Agreement</u>. The Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in "redlined" Credit Agreement attached as <u>Exhibit A</u> hereto (the "<u>Credit Agreement Amendment</u>").

      (b)      <u>Annex to Credit Agreement</u>.    Annex A to the Credit Agreement is amended as set forth in the Credit Agreement Amendment.

      (c)      <u>Exhibits to Credit Agreement</u>.    Exhibit A to the Credit Agreement is amended, Exhibit C-2 to the Credit Agreement is amended, and a new Exhibit D to the Credit Agreement is inserted into the Credit Agreement in proper alphabetical order, as set forth in the Credit Agreement Amendment.

      (d)      <u>Schedules</u>.    Schedules 1.1B, 3.1, 3.18, 5.8, 5.14 and 8.1 to the Credit Agreement are amended and a new Schedule 2.1 to the Credit Agreement is inserted into the Credit Agreement in proper numerical order, all as set forth in the Credit Agreement Amendment.

      (e)      <u>Joinder of Broad Street Entities as Guarantors and Credit Parties</u>.  By executing and delivering the Broad Street Guaranty, each entity included as Broad Street shall be joined to the Financing Documents as a Guarantor and Credit Party.

2.      <u>Joinder of New Lender</u>.

      (a)      Subject to the satisfaction (or waiver) of the conditions set forth in Section 6 hereof, New Lender shall be a Lender with a Term Loan Commitment or who has funded a Term Loan and "Lender" under the Credit Agreement and other Financing Documents as of the First Amendment Effective Date.  New Lender shall be entitled to all the benefits afforded by the Credit Agreement and the other Financing Documents to Lenders, and shall, without limiting the foregoing, benefit equally and ratably from the Guarantees and security interests created by the Security Documents.

      (b)      New Lender hereby (i) confirms that (w) it is not a Restricted Person, (x) it has received a copy of this Amendment, the Credit Agreement and the other Financing Documents, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Amendment and to make the Term Loan, (y) it is sophisticated with respect to decisions to make loans similar to those contemplated to be made hereunder and (z) it is experienced in making loans of such type; (ii) agrees that it will, independently and without reliance upon the

Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Financing Documents as are delegated to the Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto and (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

3. <u>Reaffirmation of Security Interest</u>. Each Borrower hereby expressly acknowledges and agrees that all Liens granted under the Financing Documents extend to and cover all of the Obligations now existing or hereafter arising including, without limitation, those arising in connection with the Credit Agreement, as amended by this Amendment, upon the terms set forth in the Credit Agreement, all of which Liens are hereby ratified, reaffirmed, confirmed and approved.

4. <u>Enforceability</u>. This Amendment constitutes a valid and binding agreement or instrument of each Credit Party, enforceable against such Credit Party in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles. Each of the agreements, documents and instruments executed in connection herewith to which a Credit Party is a party constitutes a valid and binding agreement or instrument of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

5. <u>Confirmation of Representations and Warranties</u>. Each Credit Party represents and warrants to Agent and Lenders that, before and after giving effect to this Amendment:

(a) The representations, warranties and covenants of each Credit Party contained in the Financing Documents are true, correct and complete on and as of the date hereof, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty is true and correct as of such earlier date.

(b) The execution and delivery by each Credit Party of this Amendment and the performance by it of the transactions herein contemplated (i) are and will be within its powers, (ii) have been authorized by all necessary action, (iii) are not and will not conflict with or result in any breach or contravention of, or the creation of any Lien under, any Material Contract to which any Credit Party is a party, any Organizational Document of any Credit Party, any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Credit Party or the property of any Credit Party is subject, (iv) will not violate any applicable Law (including, without limitation, any corporation law, limited liability company law or partnership law of the states in which the Credit Parties are organized), and (v) will not result in a limitation on any

material licenses, permits or other governmental approvals applicable to the business, operations or properties of any Credit Party.

(c)     No Event of Default or Default has occurred and is continuing as of the date of this Amendment.

(d)     Both before and after giving effect to (i) the Loans to be made or extended on the date hereof, (ii) the disbursement of the proceeds of such Loans pursuant to the instructions of the Credit Parties, (iii) the consummation of the transactions contemplated in the Financing Documents, and (iv) the payment and accrual of all transaction costs in connection with the foregoing, the Borrowers, on a consolidated basis, are Solvent.

6.     Conditions to Effectiveness.   The effectiveness of this Amendment shall be subject to the satisfaction of the following conditions precedent:

(a)      that Agent shall have received a copy of this Amendment, duly executed by Borrowers, Agent and Lenders, in form and substance satisfactory to Agent;

(b)     that Agent shall have received a copy of that certain Guaranty and Security Agreement, duly executed by each entity included as Broad Street in form and substance satisfactory to Agent (the "Broad Street Guaranty");

(c)     that Agent shall have received a copy of that certain Supplemental Fee Letter, duly executed by Borrowers in form and substance satisfactory to Agent (the "Fee Letter"); and

(d)     that Agent shall have received each of the documents listed on the Checklist attached hereto as Exhibit A, including, without limitation, the Broad Street Mortgages.

7.     Post-Closing Covenant. Borrowers shall use commercially reasonable efforts to deliver (or cause to be delivered) to Agent on or before the thirtieth (30th) day after the date hereof, an original subordination, non-disturbance and/or attornment agreement and tenant estoppel certificate, each in form and substance reasonably satisfactory to Agent, executed by each tenant at the Broad Street Facilities.

8.     Costs, Fees and Expenses.   In consideration of Agent's and each Lender's agreement to enter into this Amendment and in addition to the obligations under the Fee Letter and Supplemental Fee Letter, Borrowers shall be responsible for the payment of all reasonable costs, fees and expenses of Agent's counsel incurred in connection with the preparation of this Amendment and any related documents.

9.     Defenses and Setoffs. Each Credit Party hereby represents and warrants that as of the date hereof, there are no defenses, setoffs, claims or counterclaims which could be asserted against Agent or the Lenders arising from or in connection with the Credit Agreement or any other Financing Document.

10.    <u>Affirmation</u>.  Except as specifically amended pursuant to the terms hereof, the Credit Agreement and all other Financing Documents (and all covenants, terms, conditions and agreements therein) shall remain in full force and effect, and are hereby ratified and confirmed in all respects by Borrowers.  Each Borrower covenants and agrees to comply with all of the terms, covenants and conditions of the Credit Agreement (as amended hereby) and the Financing Documents notwithstanding any prior course of conduct, waivers, releases or other actions or inactions on Agent's or any Lender's part which might otherwise constitute or be construed as a waiver of or agreement to such terms, covenants and conditions.

11.    <u>No Waiver or Novation</u>.  The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of Agent or Lenders, nor constitute a waiver of any provision of the Credit Agreement, the other Financing Documents or any other documents, instruments and agreements executed or delivered in connection with any of the foregoing.  Nothing herein is intended or shall be construed as a waiver of any existing Defaults or Events of Default under the Credit Agreement or other Financing Documents or any of Agent's or Lenders' rights and remedies in respect of such Defaults or Events of Default. This Amendment (together with any other documents executed in connection herewith) is not intended to be, nor shall it be construed as, a novation of the Credit Agreement.

12.    <u>Incorporation of Credit Agreement Provisions</u>.  The provisions contained in Section 12.8 (Governing Law; Submission to Jurisdiction) and Section 12.9 (Waiver of Jury Trial) of the Credit Agreement are incorporated herein by reference to the same extent as if reproduced herein in their entirety.

13.    <u>Headings</u>.  Section headings in this Amendment are included for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

14.    <u>Counterparts</u>.  This Amendment may be executed in counterparts, and such counterparts taken together shall be deemed to constitute one and the same instrument. Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto.

15.    <u>Reference to the Effect on the Financing Documents</u>.  Upon the effectiveness of this Amendment, each reference in any Financing Document to "this Agreement," "hereunder," "hereof," "herein" or words of similar import shall mean and be a reference to such Financing Document as modified by this Amendment.

**(SIGNATURES APPEAR ON FOLLOWING PAGES)**

CHICAGO/#3086172.5A

**IN WITNESS WHEREOF**, intending to be legally bound, and intending that this Agreement constitute an agreement executed under seal, each of the parties have caused this Agreement to be executed under seal the day and year first above mentioned.

**BORROWERS**:     **ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company
**CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company
**PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company
**HPS OF PA, L.L.C.**, a Pennsylvania limited liability company
**SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company
**ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company
**SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company
**STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company
**TPS OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company
**TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
 Joel Freedman
 President

*As President of each of the above entities and in such capacity, intending by this signature to legally bind each of the above entities*

**BORROWERS:**

**PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company
**PHYSICIANS CLINICAL NETWORK, LLC**, a Delaware limited liability company
**PHYSICIAN PERFORMANCE NETWORK OF PHILADELPHIA, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
Joel Freedman
Chief Executive Officer and President

*As Chief Executive Officer and President of each of the above entities and in such capacity, intending by this signature to legally bind each of the above entities*

AGENT:    **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust
(successor-by-assignment to MidCap Financial Trust)

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:    Apollo Capital Management GP, LLC
Its:    General Partner

By: _____(SEAL)
Maurice Amsellem
Authorized Signatory

LENDER:    **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust
(successor-by-assignment to MidCap Financial Trust)

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By: _____(SEAL)
Maurice Amsellem
Authorized Signatory

NEW LENDER:    **MIDCAP FUNDING H TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

By:  Apollo Capital Management GP, LLC
Its:  General Partner

By: _____(SEAL)
Maurice Amsellem
Authorized Signatory

SIGNATURE PAGE TO AMENDMENT
NO. 1 TO CREDIT AND SECURITY
AGREEMENT

CHICAGO/#3086172

# EXHIBIT A

## AMENDMENTS TO CREDIT AGREEMENT

(See attached.)

**CREDIT AND SECURITY AGREEMENT**

**dated as of January 11, 2018**

**by and among**

**ST. CHRISTOPHER'S HEALTHCARE, LLC, CENTER CITY HEALTHCARE, LLC, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, ~~and~~ PHYSICIANS CLINICAL NETWORK, LLC ~~each as Initial Borrower and collectively as Initial Borrowers~~**

**~~and, upon, from and after the consummation of the Acquisition and the Borrower Assumption,~~HPS OF PA, L.L.C., SCHC PEDIATRIC ASSOCIATES, L.L.C., ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., TPS OF PA, L.L.C., TPS II OF PA, L.L.C., TPS III OF PA, L.L.C., TPS IV OF PA, L.L.C., TPS V OF PA, L.L.C., and PHYSICIAN PERFORMANCE NETWORK OF PHILADELPHIA, L.L.C.,**

**~~together with Initial Borrowers,~~ each as Borrower and collectively as Borrowers**

**and**

**MIDCAP ~~FINANCIAL TRUST~~FUNDING IV TRUST (successor-by-assignment to MidCap Financial Trust),**

**as Administrative Agent and as a Lender**

**and**

**THE ADDITIONAL LENDERS**

**FROM TIME TO TIME PARTY HERETO**



# TABLE OF CONTENTS

**Page**

ARTICLE 1        DEFINITIONS .......................................................................... 1

    Section 1.1        Certain Defined Terms ........................................... 1
    Section 1.2        Accounting Terms and Determinations .............. ~~34~~**36**
    Section 1.3        Other Definitional and Interpretive Provisions .... ~~34~~**37**
    Section 1.4        Funding and Settlement Currency ..................... ~~35~~**37**

ARTICLE 2        LOANS AND LETTERS OF CREDIT ......................... ~~35~~**37**

    Section 2.1        Loans ................................................................. ~~35~~**37**
    Section 2.2        Interest, Interest Calculations and Certain Fees ... ~~37~~**43**
    Section 2.3        Notes ................................................................. ~~39~~**45**
    Section 2.4        Reserved ............................................................ ~~39~~**45**
    Section 2.5        Letters of Credit and Letter of Credit Fees ........ ~~39~~**45**
    Section 2.6        General Provisions Regarding Payment; Loan Account ... ~~42~~**48**
    Section 2.7        Maximum Interest ............................................. ~~43~~**49**
    Section 2.8        Taxes; Capital Adequacy .................................. ~~43~~**50**
    Section 2.9        Appointment of Borrower Representative .......... ~~47~~**53**
    Section 2.10        Joint and Several Liability; Rights of Contribution;
                    Subordination and Subrogation ........................ ~~48~~**54**
    Section 2.11        Collections and Lockbox Account ..................... ~~50~~**57**
    Section 2.12        Termination; Restriction on Termination .......... ~~52~~**59**

ARTICLE 3        REPRESENTATIONS AND WARRANTIES ............ ~~53~~**60**

    Section 3.1        Existence and Power ......................................... ~~53~~**60**
    Section 3.2        Organization and Governmental Authorization; No
                    Contravention ................................................... ~~54~~**60**
    Section 3.3        Binding Effect .................................................. ~~54~~**61**
    Section 3.4        Capitalization ................................................... ~~54~~**61**
    Section 3.5        Financial and Project Information ...................... ~~55~~**61**
    Section 3.6        Litigation .......................................................... ~~55~~**61**
    Section 3.7        Ownership of Property ...................................... ~~55~~**62**
    Section 3.8        No Default ........................................................ ~~55~~**62**
    Section 3.9        Labor Matters ................................................... ~~55~~**62**
    Section 3.10        Regulated Entities ............................................. ~~56~~**62**
    Section 3.11        Margin Regulations .......................................... ~~56~~**62**
    Section 3.12        Compliance with Laws; Anti-Terrorism Laws ... ~~56~~**62**
    Section 3.13        Taxes ................................................................ ~~56~~**63**
    Section 3.14        Compliance with ERISA ................................... ~~57~~**63**
    Section 3.15        Consummation of Operative Documents; Brokers ... ~~57~~**64**
    Section 3.16        Related Transactions ........................................ ~~58~~**64**
    Section 3.17        Material Contracts ............................................ ~~58~~**64**

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| Section 3.18 | Compliance with Environmental Requirements; No Hazardous Materials | ~~58~~**65** |
| Section 3.19 | Solvency | ~~59~~**65** |
| Section 3.20 | Full Disclosure | ~~59~~**66** |
| Section 3.21 | Interest Rate | ~~59~~**66** |
| Section 3.22 | Subsidiaries | ~~59~~**66** |
| Section 3.23 | Representations and Warranties Incorporated from Operative Documents | ~~59~~**66** |
| Section 3.24 | Senior Indebtedness Status | ~~60~~**66** |
| Section 3.25 | Perfection of Security Interests in the Collateral | ~~60~~**66** |
| ARTICLE 4 | AFFIRMATIVE COVENANTS | ~~60~~**67** |
| Section 4.1 | Financial Statements and Other Reports | ~~60~~**67** |
| Section 4.2 | Payment and Performance of Obligations | ~~62~~**69** |
| Section 4.3 | Maintenance of Existence | ~~62~~**69** |
| Section 4.4 | Maintenance of Property; Payment of Taxes; Insurance | ~~63~~**69** |
| Section 4.5 | Compliance with Laws and Material Contracts | ~~66~~**72** |
| Section 4.6 | Inspection of Property, Books and Records | ~~66~~**72** |
| Section 4.7 | Use of Proceeds | ~~66~~**73** |
| Section 4.8 | Reserved | ~~67~~**73** |
| Section 4.9 | Notices of Litigation and Defaults | ~~67~~**73** |
| Section 4.10 | Hazardous Materials; Remediation | ~~67~~**74** |
| Section 4.11 | Reserved | ~~68~~**74** |
| Section 4.12 | Borrowing Base Collateral Administration | ~~68~~**74** |
| Section 4.13 | Further Assurances | ~~68~~**75** |
| Section 4.14 | Reserved | ~~69~~**76** |
| Section 4.15 | Power of Attorney | ~~69~~**76** |
| ARTICLE 5 | NEGATIVE COVENANTS | ~~70~~**76** |
| Section 5.1 | Debt; Contingent Obligations | ~~70~~**76** |
| Section 5.2 | Liens | ~~70~~**77** |
| Section 5.3 | Distributions | ~~70~~**77** |
| Section 5.4 | Restrictive Agreements | ~~71~~**78** |
| Section 5.5 | Payments and Modifications of Subordinated Debt | ~~72~~**78** |
| Section 5.6 | Consolidations and Mergers; Sales of Assets; Change in Control | ~~72~~**79** |
| Section 5.7 | Purchase of Assets, Investments | ~~73~~**79** |
| Section 5.8 | Transactions with Affiliates | ~~73~~**80** |
| Section 5.9 | Modification of Organizational Documents | ~~73~~**80** |
| Section 5.10 | Modification of Certain Agreements | ~~73~~**80** |

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| Section 5.11 | Conduct of Business | | ~~74~~80 |
| Section 5.12 | Lease Payments | | ~~74~~81 |
| Section 5.13 | Limitation on Sale and Leaseback Transactions | | ~~74~~81 |
| Section 5.14 | Deposit Accounts and Securities Accounts; Payroll and Benefits Accounts | | ~~74~~81 |
| Section 5.15 | Compliance with Anti-Terrorism Laws | | ~~75~~82 |
| Section 5.16 | Transfers to Clinically Integrated Network Entities | | ~~76~~82 |
| Section 5.17 | Insurance Captive | | ~~76~~82 |

ARTICLE 6      FINANCIAL COVENANTS ............ ~~76~~82

| | | | |
|---|---|---|---|
| Section 6.1 | Additional Defined Terms | | ~~76~~82 |
| Section 6.2 | Fixed Charge Coverage Ratio | | ~~76~~83 |
| Section 6.3 | Minimum Liquidity | | ~~76~~83 |
| Section 6.4 | Evidence of Compliance | | ~~77~~83 |
| Section 6.5 | Modifications to Covenants | | ~~77~~83 |

ARTICLE 7      CONDITIONS ............ ~~77~~84

| | | | |
|---|---|---|---|
| Section 7.1 | Conditions to Closing | | ~~77~~84 |
| Section 7.2 | Conditions to Each Loan, Support Agreement and Lender Letter of Credit Made After  the Closing Date | | ~~80~~86 |
| Section 7.3 | Searches | | ~~81~~87 |
| Section 7.4 | Post Closing Requirements | | ~~81~~88 |

ARTICLE 8      REGULATORY MATTERS ............ ~~81~~88

| | | | |
|---|---|---|---|
| Section 8.1 | Representations and Warranties | | ~~81~~88 |
| Section 8.2 | Licensed Facilities | | ~~85~~92 |
| Section 8.3 | Healthcare Operations | | ~~86~~93 |
| Section 8.4 | Third Party Payor Programs | | ~~87~~94 |
| Section 8.5 | Cures | | ~~88~~94 |

ARTICLE 9      SECURITY AGREEMENT ............ ~~88~~95

| | | | |
|---|---|---|---|
| Section 9.1 | Grant of Security Interest | | ~~88~~95 |
| Section 9.2 | Representations and Warranties and Covenants Relating to Collateral | | ~~88~~95 |
| Section 9.3 | Financing Statements | | ~~92~~98 |
| **Section 9.4** | **Release of Broad Street Liens** | | **98** |

ARTICLE 10      EVENTS OF DEFAULT ............ ~~92~~99

| | | | |
|---|---|---|---|
| Section 10.1 | Events of Default | | ~~92~~99 |

-iii-

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| Section 10.2 | Acceleration and Suspension or Termination of Revolving Loan Commitment 94 **and Term Loan Commitment** | | **101** |
| Section 10.3 | UCC Remedies | 94**102** |
| Section 10.4 | Cash Collateral | 96**104** |
| Section 10.5 | Default Rate of Interest | 97**104** |
| Section 10.6 | Setoff Rights | 97**104** |
| Section 10.7 | Application of Proceeds | 97**104** |
| Section 10.8 | Waivers | 98**105** |
| Section 10.9 | Injunctive Relief | 99**107** |
| Section 10.10 | Marshalling; Payments Set Aside | 100**107** |
| ARTICLE 11 | AGENT | 100**107** |
| Section 11.1 | Appointment and Authorization | 100**107** |
| Section 11.2 | Agent and Affiliates | 100**108** |
| Section 11.3 | Action by Agent | 101**108** |
| Section 11.4 | Consultation with Experts | 101**108** |
| Section 11.5 | Liability of Agent | 101**108** |
| Section 11.6 | Indemnification | 101**109** |
| Section 11.7 | Right to Request and Act on Instructions | 102**109** |
| Section 11.8 | Credit Decision | 102**109** |
| Section 11.9 | Collateral Matters | 102**109** |
| Section 11.10 | Agency for Perfection | 102**110** |
| Section 11.11 | Notice of Default | 103**110** |
| Section 11.12 | Assignment by Agent; Resignation of Agent; Successor Agent | 103**110** |
| Section 11.13 | Payment and Sharing of Payment | 104**111** |
| Section 11.14 | Right to Perform, Preserve and Protect | 107**114** |
| Section 11.15 | Additional Titled Agents | 107**114** |
| Section 11.16 | Amendments and Waivers | 107**115** |
| Section 11.17 | Assignments and Participations | 108**116** |
| Section 11.18 | Funding and Settlement Provisions Applicable When Non-Funding Lenders Exist | | 111**119** |
| Section 11.19 | Buy-Out Upon Refinancing | 113**120** |
| Section 11.20 | Lender's Rights to Offset, Set-Off | 113**120** |
| Section 11.21 | Definitions | 113**121** |
| ARTICLE 12 | MISCELLANEOUS | 115**122** |
| Section 12.1 | Survival | 115**122** |
| Section 12.2 | No Waivers | 115**122** |
| Section 12.3 | Notices | 115**123** |
| Section 12.4 | Severability | 116**123** |

**TABLE OF CONTENTS**
(continued)

| | | | |
|---|---|---|---|
| Section 12.5 | Headings | | ~~116~~**124** |
| Section 12.6 | Confidentiality | | ~~116~~**124** |
| Section 12.7 | Waiver of Consequential and Other Damages | | ~~117~~**124** |
| Section 12.8 | GOVERNING LAW; SUBMISSION TO JURISDICTION | | ~~117~~**125** |
| Section 12.9 | WAIVER OF JURY TRIAL | | ~~117~~**125** |
| Section 12.10 | Publication; Advertisement | | ~~118~~**125** |
| Section 12.11 | Counterparts; Integration | | ~~118~~**126** |
| Section 12.12 | No Strict Construction | | ~~119~~**126** |
| Section 12.13 | Time | | ~~119~~**126** |
| Section 12.14 | Lender Approvals | | ~~119~~**126** |
| Section 12.15 | Expenses; Indemnity | | ~~119~~**127** |
| Section 12.16 | Reinstatement | | ~~120~~**128** |
| Section 12.17 | Successors and Assigns | | ~~121~~**129** |
| Section 12.18 | USA PATRIOT Act Notification | | ~~121~~**129** |
| ARTICLE 13 | ACQUISITION MATTERS | | ~~121~~**129** |
| Section 13.1 | Borrower Assumption Agreement | | ~~121~~**129** |
| Section 13.2 | Reference to Closing Date | | ~~122~~**129** |

CHICAGO/#3111951.7B

## CREDIT AND SECURITY AGREEMENT

**THIS CREDIT AND SECURITY AGREEMENT** (as the same may be amended, supplemented, restated or otherwise modified from time to time, ~~the~~**this** "**Agreement**") is dated as of January 11, 2018 by and among **ST. CHRISTOPHER'S HEALTHCARE, LLC** ("**St. Christopher Operator**"), **CENTER CITY HEALTHCARE, LLC** ("**Hahnemann Operator**"), **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC** ("**Parent Borrower**"), **PHYSICIANS CLINICAL NETWORK, LLC** ("**Physicians Clinical**"), **PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC** ("**Practice Parent Borrower**" ~~and together with St. Christopher Operator, Hahnemann Operator, Parent Borrower and Physicians Clinical, each, individually as an "~~**Initial Borrower**~~" and collectively as "~~**Initial Borrowers**~~"), and, upon, from and after the consummation of the Acquisition (as defined herein) and the Borrower Assumption (as defined herein~~), **HPS OF PA, L.L.C., SCHC PEDIATRIC ASSOCIATES, L.L.C., ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., TPS OF PA, L.L.C., TPS II OF PA, L.L.C., TPS III OF PA, L.L.C., TPS IV OF PA, L.L.C.**, **TPS V OF PA, L.L.C., and PHYSICIAN PERFORMANCE NETWORK OF PHILADELPHIA, L.L.C.** (each, individually as a "**Target Borrower**" and collectively as "**Target Borrowers**") and any additional borrower that may hereafter be added to this Agreement (Initial Borrowers, Target Borrowers and any future borrower each individually as a "**Borrower**" and collectively as "**Borrowers**"), **MIDCAP FINANCIAL TRUST**, a Delaware statutory trust, individually as a Lender, and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender.

### RECITALS

Borrowers have requested that Lenders make available to Borrowers the financing facilities as described herein.  Lenders are willing to extend such credit to Borrowers under the terms and conditions herein set forth.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrowers, Lenders and Agent agree as follows:

## ARTICLE 1 DEFINITIONS

**Section 1.1    Certain Defined Terms.**    The following terms have the following meanings:

"**Acceleration Event**" means the occurrence of an Event of Default (a) in respect of which Agent has declared all or any portion of the Obligations to be immediately due and payable pursuant to Section 10.2, (b) pursuant to Section 10.1(a), and in respect of which Agent has suspended or terminated the Revolving Loan Commitment pursuant to Section 10.2, and/or (c) pursuant to either Section 10.1(e) and/or Section 10.1(f).

"**Account Debtor**" means "account debtor", as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

"**Accounts**" means, collectively, (a) any right to payment of a monetary obligation, whether or not earned by performance, (b) without duplication, any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "health-care-insurance receivables" (as defined in the UCC), any "payment intangibles" (as defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, whether or not earned by performance, (c) all accounts, "general intangibles" (as defined in the UCC), Intellectual Property, rights, remedies, Guarantees, "supporting obligations" (as defined in the UCC), "letter-of-credit rights" (as defined in the UCC) and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under the Financing Documents in respect of the foregoing, (d) all information and data compiled or derived by any Borrower or to which any Borrower is entitled in respect of or related to the foregoing, and (e) all proceeds of any of the foregoing.

"**Acquisition**" means the acquisition pursuant to the Acquisition Agreement (i) by the Initial Borrowers (other than Parent Borrower) of (a) substantially all of the personal property assets that are primarily or exclusively used or held for use in connection with the operation of the Projects listed on Schedule 1.1B as of the Closing Date, (b) all of the outstanding equity securities of the Target Borrowers in an equity sale transaction and (c) certain related businesses referred to, collectively, as the "Other Businesses" in the Acquisition Agreement and (ii) by Affiliates of the Borrowers of the "Owned Real Property" (as defined in the Acquisition Agreement) and certain leases and other assets as described in the Acquisition Agreement.

"**Acquisition Agreement**" means that certain Asset Sale Agreement by and among Tenet Sellers, Initial Borrowers and the other Purchasers listed on Exhibit A-2 thereto and Holdings, as Purchasers Representative, dated August 31, 2017, and all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Acquisition Agreement Representations**" means the representations and warranties made on behalf of the Tenet Sellers in the Acquisition Agreement that are material to the interests of the Agent and the Lenders, but only to the extent that Initial Borrowers (or any of their Affiliates or Subsidiaries) has the right to terminate Initial Borrowers' (or any of their Affiliates' or Subsidiaries') obligations under the Acquisition Agreement or not to consummate the Acquisition (in each case in accordance with the terms of the Acquisition Agreement) as a result of a breach of such representations and warranties in the Acquisition Agreement.

"**Adjusted HPP Designated Amount**" means the product of (i) eighty-five percent (85%) *multiplied by* (ii) the HPP Designated Amount.

"**Adjusted Medicaid Managed Care Supplemental Payments**" means the aggregate accrued amount of supplemental Medicaid managed care payments owed to the Operator Borrowers on account of serving a disproportionate share of medically needy Pennsylvania

2

Medicaid beneficiaries *less* the aggregate amount of unpaid provider assessments owed by the Operator Borrowers.

"**Affiliate**" means, with respect to any Person, (a) any Person that directly or indirectly controls such Person, (b) any Person which is controlled by or is under common control with such controlling Person, and (c) each of such Person's (other than, with respect to any Lender, any Lender's) officers or directors (or Persons functioning in substantially similar roles) and the spouses, parents, descendants and siblings of such officers, directors or other Persons; provided that in no event shall (i) Harrison Street Real Estate, LLC or any of its Affiliates (other than any entity in which Holdings has a direct or indirect equity interest that otherwise meets the definition of an Affiliate) be an Affiliate of any Credit Party, (ii) Avanti Healthcare Holdings, LLC, Avanti Health System, LLC, Avanti Health System Holding I, LLC or any Person controlled thereby be an Affiliate of any Credit Party, or (iii) HPP be an Affiliate of any Credit Party.  As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote ten percent (10%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Affiliate Leases**" means the leases and subleases described on Schedule 1.1A, and all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Agent**" means MCF, in its capacity as administrative agent for itself and for Lenders hereunder, as such capacity is established in, and subject to the provisions of, Article 11, and the successors of MCF in such capacity.

"**Anti-Terrorism Laws**" means any Laws relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by OFAC.

"**Applicable Margin**" means, with respect to (a) Revolving Loans that, by the terms of this Agreement, bear interest based upon the Base Rate, 1.75%, ~~and~~ (b) all other Revolving Loans and all other Obligations~~, 4.25~~ **(other than Term Loans), 4.25%, (c) any Term Loan, that, by the terms of this Agreement, bears interest based upon the Base Rate, 5.50% and (d) any Term Loan that, by the terms of this Agreement, bears interest based on the LIBOR Rate, 10.00**%.

"**Applicable Settlement Date**" means the first date upon which payment would become due pursuant to the statutory authority giving rise to the obligations to make a Supplemental Payment.  For the avoidance of doubt, the first date upon which payment would be come due is the date determined by the relevant statutory authority, whether or not that date changes as a result of regulatory changes affecting the scheduling of such payments or otherwise.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statutes thereto.

CHICAGO/#3111951.7B

"**Base LIBOR Rate**" means, for each Interest Period, the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next 1/100%), to be the rate at which Dollar deposits (for delivery on the first day of such Interest Period or, if such day is not a Business Day on the preceding Business Day) in the amount of $1,000,000 are offered to major banks in the London interbank market on or about 11:00 a.m. (Eastern time) two (2) Business Days prior to the commencement of such Interest Period, for a term comparable to such Interest Period, which determination shall be conclusive in the absence of manifest error.

"**Base Rate**" means a per annum rate of interest equal to the greater of (a) 5.0% per annum and (b) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate; *provided, however,* that Agent may, upon prior written notice to Borrower, choose a reasonably comparable index or source to use as the basis for the Base Rate.

"**Blocked Person**" means any Person:  (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (b) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (c) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, or (e) that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list or is named as a "listed person" or "listed entity" on other lists made under any Anti-Terrorism Law.

"**Borrower**" and "**Borrowers**" mean the entity(ies) described in the first paragraph of this Agreement and each of their successors and permitted assigns, provided, however, that notwithstanding such definition or any other provision herein, Lenders shall have no obligation to make available the proceeds of Revolving Loans to the Clinically Integrated Network Entities except as provided in Section 5.16.

"**Borrower Assumption**" has the meaning set forth in Section 13.1.

"**Borrower Representative**" means Parent Borrower, in its capacity as Borrower Representative pursuant to the provisions of Section 2.9, or any successor Borrower Representative selected by Borrowers and approved by Agent.

"**Borrowing Base**" means:

(a)      the product of (i) eighty-five percent (85%) *multiplied by* (ii) the aggregate net amount at such time of the Eligible Accounts; *plus*

(b)      the product of (i) eighty-five percent (85%) *multiplied by* (ii) aggregate amount of Eligible Supplemental Payments; *plus*

(c)      until the earlier of (i) April 15, 2018 and (ii) the date on which all or part of the HPP Designated Amount is paid by HPP, the Borrowing Base will include the Adjusted HPP Designated Amount (and to the extent a portion but not all of the HPP Designated Amount is paid by HPP, the Borrowing Base will include the Adjusted HPP Designated Amount as adjusted by such paid amount); *minus*

(d)      the Minimum Liquidity Reserve; *minus*

(e)      the amount of any other reserves and/or adjustments provided for in this Agreement.

"**Borrowing Base Certificate**" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit B hereto.

"**Broad Street**" means, individually and collectively, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC.

"**Broad Street Casualty Proceeds**" means all proceeds of insurance resulting from any loss at any Broad Street Facility or of any a condemnation or taking pursuant to the lawful exercise of the power of eminent domain of all or any portion of a Broad Street Facility.

"**Broad Street Collateral**" means all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of Agent and Lenders, pursuant to the Broad Street Guaranty and the Broad Street Mortgages.

"**Broad Street Facility**" means, individually and collectively, those certain hospital facilities, medical office buildings, parking lots and vacant land owned by Broad Street.

"**Broad Street Financing Documents**" means the Broad Street Guaranty and the Broad Street Mortgages.

"**Broad Street Guaranty**" means that certain Guaranty and Security Agreement dated as of the First Amendment Effective Date executed and delivered by Broad Street to Agent, guaranteeing payment and performance of, and providing security for, the Obligations.

"**Broad Street Mortgages**" means those certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filings dated as of the First Amendment Effective Date, and all documents related thereto or executed in connection therewith, from Broad Street in favor of Agent with respect to the Broad Street Facility.

"**Business Day**" means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Washington, D.C. and New York City are authorized by law to close.

"**Capital Lease**" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital (or finance) lease on the balance sheet of such person.

"**Captive Insureds**" means those Borrowers identified in writing to Agent from time to time as being insured by a commercial general liability and professional liability policy provided by the Insurance Captive.

"**CCP**" has the meaning set forth in Section 8.3(d).

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 *et seq*., as the same may be amended from time to time.

"**Change in Control**" means any of the following:  (a) with respect to any Borrower, any change in the legal or beneficial ownership of the capital stock, partnership interests or membership interests, which would result in any Person acquiring thirty percent (30%) or more of any class of stock, partnership interest or membership interest of such Borrower; (b) with respect to any Borrower, any change in the legal or beneficial ownership or control of the outstanding voting equity interests of the applicable Person necessary at all times to elect a majority of the board of directors (or similar governing body) of each such Borrower and to direct the management policies and decisions of such Borrower; (c) with respect to any Subsidiary of any Borrower, unless otherwise permitted hereunder, the applicable Borrower shall cease to, directly or indirectly, own and control one hundred percent (100%) of each class of the outstanding equity interests of such Subsidiary; and (d) any "Change of Control", "Change in Control", or terms of similar import under any Subordinated Debt Document.

"**Clinically Integrated Network Entities**" means Physicians Clinical and ~~Physician Performance Network of~~**PPN** Philadelphia~~, L.L.C~~.

"**Closing Date**" means the date of this Agreement.

"**CMS**" means the federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration), and any successor Governmental Authority.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of Agent and Lenders, pursuant to this Agreement and the Security Documents, including, without limitation, all of the property described in Schedule 9.1 hereto.

"**Commitment Annex**" means Annex A to this Agreement.

"**Commitment Expiry Date**" means the date that is three (3) years from the Closing Date.

"**Commitment Letter**" means that certain Commitment Letter dated as of August 31, 2017 by and among Borrowers, Agent and Paladin Healthcare Capital, LLC, in a limited capacity.

"**Compliance Certificate**" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of <u>Exhibit A</u> hereto.

"**Consulting Agreement**" means that certain letter agreement dated as of the Closing Date by and between American Academic Health System, LLC and Parent Borrower and all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Contingent Obligation**" means, with respect to any Person, any direct or indirect liability of such Person:  (a) with respect to any Debt of another Person (a "**Third Party Obligation**") if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such Third Party Obligation that such Third Party Obligation will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such Third Party Obligation will be protected, in whole or in part, against loss with respect thereto; (b) with respect to any undrawn portion of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for the reimbursement of any drawing; (c) under any Swap Contract, to the extent not yet due and payable; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for any obligations of another Person pursuant to any Guarantee or pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so Guaranteed or otherwise supported or, if not a fixed and determinable amount, the maximum amount so Guaranteed or otherwise supported.

"**Controlled Group**" means all members of any group of companies and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with any Borrower, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Credit Exposure**" means any period of time during which the Revolving Loan Commitment **or Term Loan Commitment** is outstanding or any Loan, Reimbursement Obligation or other Obligation remains unpaid or any Letter of Credit or Support Agreement not supported with cash collateral required by this Agreement remains outstanding; *provided, however*, that no Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a written claim with respect thereto.

"**Credit Party**" means any Guarantor under a Guarantee of the Obligations or any part thereof, any Borrower and any other Person (other than Agent, a Lender or a Participant), whether now existing or hereafter acquired or formed, that becomes obligated as a borrower, guarantor, surety, indemnitor, pledgor, assignor or other obligor under any Financing Document; and "**Credit Parties**" means all such Persons, collectively.

"**Debt**" of a Person means at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the Ordinary Course of Business, (d) all obligations of such Person with respect to Capital Leases of such Person, (e) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (f) all equity securities of such Person subject to repurchase or redemption otherwise than at the sole option of such Person, (g) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (h) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (i) all Debt of others Guaranteed by such Person; (j) off-balance sheet liabilities; (k) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the Ordinary Course of Business; and (l) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including, without limitation, any Swap Contract, whether entered into for hedging or speculative purposes.  Without duplication of any of the foregoing, Debt of Borrowers shall include any and all Loans and Letter of Credit Liabilities.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Deficiency Amount**" has the meaning set forth in Section 2.10(e).

"**Delayed Payor**" means the following Third Party Payors: Cigna Health and Life Insurance Company, Inc., Aetna Health Inc. and UnitedHealthcare Insurance Company.

"**Deposit Account**" means a "deposit account" (as defined in Article 9 of the UCC), an investment account, or other account in which funds are held or invested for credit to or for the benefit of any Borrower.

"**Deposit Account Control Agreement**" means an agreement, in form and substance reasonably satisfactory to Agent, among Agent, any Borrower and each financial institution in which such Borrower maintains a Deposit Account, which agreement provides that (a) such financial institution shall comply with instructions originated by Agent directing disposition of the funds in such Deposit Account without further consent by the applicable Borrower, and (b) such financial institution shall agree that it shall have no Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of usual and customary service fees and returned items for which Agent has been given value, in each such case expressly consented to by Agent, and containing such other terms and conditions as Agent

may reasonably require, including as to any such agreement pertaining to any Lockbox Account, providing that such financial institution shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account all funds received or deposited into such Lockbox or Lockbox Account.

"**Deposit Account Restriction Agreement**" means an agreement, in form and substance reasonably satisfactory to Agent, among Agent, a Borrower and each bank in which such Borrower maintains a Deposit Account and into which Deposit Account proceeds of Accounts from Governmental Account Debtors are paid directly by the Governmental Account Debtor, and which agreement provides that (a) such bank shall not enter into an agreement with respect to such Deposit Account pursuant to which the bank agrees to comply with instructions originated by any Person, other than the Borrower that owns the Deposit Account, directing disposition of the funds in such Deposit Account, and (b) such bank shall agree that it shall have no Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of usual and customary service fees and returned items for which Agent has been given value, in each such case expressly consented to by Agent, and containing such other terms and conditions as Agent may require, including as to any such agreement pertaining to any Lockbox Account, providing that such bank shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account and/or a Lockbox Account subject to a Deposit Account Control Agreement (as Agent shall elect and direct at the time such agreement is signed) all funds received or deposited into such Lockbox Account and associated Lockbox unless the applicable Borrower shall otherwise instruct the bank in writing, subject to the limitations set forth in the Deposit Account Restriction Agreement and the other Financing Documents.

"**Distribution**" means as to any Person, (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in such Person (except those payable solely in its equity interests of the same class), (b) any payment on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in such Person or any claim respecting the purchase or sale of any equity interest in such Person, or (ii) any option, warrant or other right to acquire any equity interests in such Person, (c) any management fees, salaries, compensation or other fees or payments to any Person holding an equity interest in a Borrower or an Affiliate of a Borrower, (d) any lease or rental payments to an Affiliate of a Borrower (other than fixed rent payments, escrow payments, reserve deposits or other impounds made pursuant to an Affiliate Lease (but not any performance-based rent, incentive rent, bonus rent or other rent that fluctuates (or the requirement to pay such rent fluctuates) based on the cash flow from the operations of the real property subject to such lease)), or (e) repayments of Debt held by any Person holding an equity interest in a Borrower or an Affiliate of a Borrower, unless permitted under and made pursuant to a Subordination Agreement applicable to such loans or other indebtedness.

"**Dollars**" or "**$**" means the lawful currency of the United States of America.

"**DNFB Accounts**" means "discharged not final bill" Accounts in respect of patients who have been discharged from a Project, but for which a final bill has not yet been issued with respect to medical and health care services provided to such patient.

9

"**DNFB Payor-Delayed Accounts**" means DNFB Accounts of any Operator Borrower owing by a Delayed Payor that have not been billed to the applicable Delayed Payor solely because the applicable Delayed Payor has required such Operator Borrower to withhold submission of invoices for such DNFB Accounts until the payment processing systems of such Delayed Payor are able to accept and process such invoices for payment.

"**DSH Income**" means the payments made to an Operator Borrower by the United States government through Medicare and Medicaid under its Disproportionate Share Hospital programs

"**EBITDA**" has the meaning provided in the Compliance Certificate.

"**Eligible Account**" means, subject to the criteria below, an account receivable of a Borrower, which was generated in the Ordinary Course of Business, which was generated originally in the name of a Borrower and not acquired via assignment or otherwise, and which Agent, in its good faith credit judgment and discretion, deems to be an Eligible Account; *provided*, that, subject to the satisfaction of the other criteria set forth in this definition of Eligible Accounts, Agent will permit Transferred Accounts to be included in the Borrowing Base as Eligible Accounts so long as the Tenet License Agreement is in full force and effect.  The net amount of an Eligible Account at any time shall be (a) the face amount of such Eligible Account as originally billed *minus* all cash collections and other proceeds of such Account received from or on behalf of the Account Debtor thereunder as of such date and any and all returns, rebates, discounts (which may, at Agent's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time, and (b) adjusted by applying percentages (known as "**liquidity factors**") by payor and/or payor class based upon the applicable Borrower's actual recent collection history for each such payor and/or payor class in a manner consistent with Agent's underwriting practices and procedures.  Such liquidity factors may be adjusted by Agent from time to time as warranted by Agent's underwriting practices and procedures and using Agent's good faith, commercially reasonable credit judgment.  Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

(a)     the Account remains unpaid more than one hundred and eighty (180) days past the claim or invoice date (but in no event more than two hundred and ten (210) days after the applicable goods or services have been rendered or delivered);

(b)     the Account is subject to any defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment of any kind (but only to the extent of such defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment), or the applicable Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)     if the Account arises from the sale of goods, any part of any goods the sale of which has given rise to the Account has been returned, rejected, lost, or damaged (but only to the extent that such goods have been so returned, rejected, lost or damaged);

(d)     if the Account arises from the sale of goods, the sale was not an absolute, bona fide sale, or the sale was made on consignment or on approval or on a sale-or-return or

bill-and-hold or progress billing basis, or the sale was made subject to any other repurchase or return agreement, or the goods have not been shipped to the Account Debtor or its designee or the sale was not made in compliance with applicable Laws;

(e)    if the Account arises from the performance of services, the services have not actually been performed or the services were undertaken in violation of any law or the Account represents a progress billing for which services have not been fully and completely rendered; provided that such Account shall not be deemed to represent a progress billing to the extent the relevant Account Debtor adjudicates interim invoices for recurring treatment;

(f)    the Account is subject to a Lien other than a Permitted Lien, or Agent does not have a Lien on such Account;

(g)    the Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment, unless such Chattel Paper or Instrument has been delivered to Agent;

(h)    the Account Debtor is an Affiliate or Subsidiary of a Credit Party, or if the Account Debtor holds any Debt of a Credit Party;

(i)    more than twenty percent (20%) of the aggregate balance of all Accounts owing from the Account Debtor obligated on the Account are ineligible under subclause (a) above (in which case all Accounts from such Account Debtor shall be ineligible); provided that for purposes of this subclause (i), each contract with a Third Party Payor shall be deemed to represent an individual Account Debtor;

(j)    without limiting the provisions of clause (i) above, fifty percent (50%) or more of the aggregate unpaid Accounts from the Account Debtor obligated on the Account are not deemed Eligible Accounts under this Agreement for any reason;

(k)    the total unpaid Accounts of the Account Debtor obligated on the Account exceed twenty-five percent (25%) of the net amount of all Eligible Accounts owing from all Account Debtors (but only the amount of the Accounts of such Account Debtor exceeding such twenty-five percent (25%) limitation shall be considered ineligible); provided that for purposes of this subclause (k), each contract with a Third Party Payor shall be deemed to represent an individual Account Debtor;

(l)    any covenant, representation or warranty contained in the Financing Documents with respect to such Account has been breached in any respect;

(m)    the Account is unbilled or has not been invoiced to the Account Debtor in accordance with the procedures and requirements of the applicable Account Debtor; provided, however, that:

(i)    subject in each case to the satisfaction of the other criteria set forth in this definition of Eligible Accounts, a DNFB Account shall be permitted to be included in the Borrowing Base as an Eligible Account for a period ending on the date that is (A) solely with respect to any Account that is a DNFB Payor-Delayed Account, April 7, 2018,

11

if the applicable Borrower named on the Account has not received authorization from (or on behalf of) the applicable Delayed Payor that invoices may be submitted for services provided on or after the Closing Date (each, an "invoice authorization") by such date, (B) solely with respect to any Account that was a DNFB Payor-Delayed Account but for which an invoice authorization has been received by the applicable Borrower named on the Account from (or on behalf of) such Delayed Payor, the date that is the later of (1) fourteen (14) days after the date on which such Borrower received such invoice authorization and (2) thirty (30) days after the date on which the services giving rise to such Account were rendered and (C) with respect to all other DNFB Accounts thirty (30) days after the date on which the patient that is the subject of such Account was discharged for all other DNFB Accounts;

(ii)     subject in each case to the satisfaction of the other criteria set forth in this definition of Eligible Accounts, an In-house Unbilled Account shall be permitted to be included in the Borrowing Base as an Eligible Account for a period ending on the date that is thirty (30) days after the date on which the services giving rise to such Account were rendered; and

(iii)     all Accounts that are unbilled or not invoiced shall be properly recorded on Borrowers' accounting systems at all times and billed or invoiced to the applicable Account Debtor in Borrower's Ordinary Course of Business;

(n)     except for Accounts owed by Medicare, Medicaid or TRICARE programs, the Account is an obligation of an Account Debtor that is the federal, state or local government or any political subdivision thereof, unless Agent has agreed to the contrary in writing and Agent has received from the Account Debtor the acknowledgement of Agent's notice of assignment of such obligation pursuant to this Agreement;

(o)     the Account is an obligation of an Account Debtor that has suspended business, made a general assignment for the benefit of creditors, is unable to pay its debts as they become due or as to which a petition has been filed (voluntary or involuntary) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or the Account is an Account as to which any facts, events or occurrences exist which could reasonably be expected to impair the validity, enforceability or collectibility of such Account or materially reduce the amount payable or materially delay payment thereunder;

(p)     the Account Debtor has its principal place of business or executive office outside the United States;

(q)     the Account is payable in a currency other than United States dollars;

(r)     the Account Debtor is an individual;

(s)     within thirty (30) days after the Closing Date or, if later, thirty (30) days after the Account Debtor to which such Account relates becomes a new Account Debtor of a Borrower, the Borrower owning such Account has not signed and delivered to Agent notices, in the form requested by Agent, directing the Account Debtors to make payment to the applicable

Lockbox and/or Lockbox Account; *provided, however*, that this clause (v) shall not apply to exclude any Transferred Accounts during the period after the Closing Date in which Borrowers are prohibited from changing payment instructions applicable to such Account Debtor so long as the Tenet License Agreement is in full force and effect;

(t)     the Account includes late charges or finance charges (but only such portion of the Account shall be ineligible);

(u)     the Account arises out of the sale of any Inventory upon which any other Person holds, claims or asserts a Lien;

(v)     the Account is a Supplemental Payment; or

(w)     the Account or Account Debtor fails to meet such other specifications and requirements which may from time to time be established by Agent in its good faith, commercially reasonable credit judgment and discretion.

"**Eligible Supplemental Payments**" means, Supplemental Payments owing to an Operator Borrower which Agent, in its good faith credit judgment and discretion, deems to be an Eligible Supplemental Payment.  Without limiting the generality of the foregoing, no Supplemental Payment shall be an Eligible Supplemental Payment if:

(a)     (i) such Supplemental Payment remains unpaid for more than sixty (60) days after such Supplemental Payment accrues (or, solely with respect to Adjusted Medicaid Managed Care Supplemental Payments, more than ninety (90) days after such Supplemental Payment accrues); (ii) such Supplemental Payment is unpaid as of the Applicable Settlement Date or (iii) such Supplemental Payment has been written off the books of such Borrower or otherwise designated as uncollectible by such Borrower;

(b)     such Supplemental Payment is subject to any defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment of any kind (but only to the extent of such defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment), or the applicable Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)     such Supplemental Payment is subject to a Lien other than a Permitted Lien, or Agent does not have a Lien on such Supplemental Payment;

(d)     any covenant, representation or warranty contained in the Financing Documents with respect to such Supplemental Payment has been breached in any respect;

(e)     Agent has not received from the Account Debtor the acknowledgement of Agent's notice of assignment of such obligation pursuant to this Agreement, to the extent such acknowledgment is requested by Agent;

(f)     such Supplemental Payment is payable in a currency other than United States dollars;

13

(g)    the amount of such Supplemental Payment, when added to all other Supplemental Payments of the same type earned by such Operator Borrower during the current Pennsylvania budget year, exceeds any aggregate cap on such type of Payments that can be paid to such Operator Borrower during such budget year (but only the amount of such Supplemental Payment in excess of such cap amount shall be ineligible); and

(h)    such Supplemental Payment or Account Debtor fails to meet such other specifications and requirements which may from time to time be established by Agent in its good faith, commercially reasonable credit judgment and discretion.

"**Environmental Laws**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, pertaining to the environment, natural resources, pollution, health (including any environmental clean-up statutes and all regulations adopted by any local, state, federal or other Governmental Authority, and any statute, ordinance, code, order, decree, law rule or regulation all of which pertain to or impose liability or standards of conduct concerning medical waste or medical products, equipment or supplies), safety or clean-up that apply to any Borrower or any Project and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*), the Federal Water Pollution Control Act (33 U.S.C. § 1251 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4851 *et seq.*), any analogous state or local laws, any amendments thereto, and the regulations promulgated pursuant to said laws, together with all amendments from time to time to any of the foregoing and judicial interpretations thereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**ERISA Plan**" means any "employee benefit plan", as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which any Borrower maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Title IV of ERISA, to which any Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"**Event of Default**" has the meaning set forth in Section 10.1.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Agent, any Lender or any other recipient of any payment to be made by or on behalf of any obligation of Credit Parties hereunder or the Obligations or required to be withheld or deducted from a payment to Agent, such Lender or such recipient (including any interest and penalties

thereon): (a) Taxes to the extent imposed on or measured by Agent's, any Lender's or such recipient's net income (however denominated), branch profits Taxes, and franchise Taxes and similar Taxes, in each case, (i) imposed by the jurisdiction (or any political subdivision thereof) under which Agent, such Lender or such recipient is organized, has its principal office or conducts business with respect to entering into any of the Financing Documents or taking any action thereunder or (ii) that are Other Connection Taxes; (b) in the case of a Lender, United States withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Loans pursuant to a Law in effect on the date on which (i) such Lender becomes a party to this Agreement other than as a result of an assignment requested by a Credit Party under the terms hereof or (ii) such Lender changes its lending office for funding its Loan, except in each case to the extent that, pursuant to Section 2.8, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan, Letter of Credit or Revolving Loan Commitment or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Lender's failure to comply with Section 2.8(c); and (d) any U.S. federal withholding taxes imposed in respect of a Lender under FATCA.

"**FATCA**" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or official interpretations thereof and any agreement entered into pursuant to the implementation of Section 1471(b)(1) of the Code, and any intergovernmental agreement between the United States Internal Revenue Service, the U.S. Government and any governmental or taxation authority under any other jurisdiction which agreement's principal purposes deals with the implement such sections of the Code.

"**Federal Funds Rate**" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, *provided, however*, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, and (b) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent.

"**Fee Letter**" means **collectively (i)** that certain letter agreement **dated as of the Closing Date** between Agent and ~~Borrower~~**Borrowers** relating to fees payable to Agent, for its own account, in connection with the execution of this Agreement**, (ii) that certain supplemental letter agreement dated as of the First Amendment Effective Date between Agent and Borrowers relating to additional fees payable to Agent, for its own account, in connection with the execution of the First Amendment; and (iii) any other letter agreement between Agent and Borrowers relating to fees payable to Agent**.

"**Financing Documents**" means this Agreement, any Notes, the Security Documents, the Fee Letter, any subordination or intercreditor agreement pursuant to which any Debt and/or any Liens securing such Debt is subordinated to all or any portion of the Obligations and all other

15

documents, instruments and agreements (other than any Swap Contract) related to the Obligations and heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

**"First Amendment" means Amendment No. 1 to Credit and Security Agreement, dated as of the First Amendment Effective Date, by and among Borrowers, Agent and Lenders.**

**"First Amendment Effective Date" means September 20, 2018.**

"**Foreign Lender**" has the meaning set forth in Section 2.8(c).

"**Fraudulent Conveyance**" has the meaning set forth in Section 2.10(b).

"**Fund Contribution LC**" has the meaning set forth in Section 5.3(d)(viii) of the Acquisition Agreement.

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), which are applicable to the circumstances as of the date of determination.

"**General Intangible**" means any "general intangible" as defined in Article 9 of the UCC, and any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or other minerals before extraction, but including payment intangibles and software.

"**Governmental Account Debtor**" means any Account Debtor that is a Governmental Authority, including, without limitation, Medicare and Medicaid.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Guarantee**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), *provided, however,*

CHICAGO/#3111951.7B

that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course of Business.  The term "**Guarantee**" used as a verb has a corresponding meaning.

"**Guarantor**" means any Credit Party that has executed or delivered, or shall in the future ~~executes~~**execute** or ~~delivers~~**deliver**, any Guarantee of any portion of the Obligations.  On the Closing Date, the only Guarantor is Holdings **and on the First Amendment Effective Date, the Guarantors are Holdings and Broad Street**.

"**Hazardous Materials**" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; any substance the presence of which on the Project is prohibited by any Environmental Laws; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law, including:  (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls ("**PCB's**"), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority.

"**Hazardous Materials Contamination**" means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**HPP**" means Health Partners Plans, Inc., a Pennsylvania not-for-profit corporation.

"**HPP Designated Amount**" means a portion of the risk-sharing amount attributable to 2017 that is anticipated to be received by Parent Borrower (on behalf of Operator Borrowers) from HPP on or prior to March 31, 2018, in an amount equal to $3,139,246.12.

"**HPP Sale**" means (a) a sale of any Borrower's membership interests in HPP or (b) a sale by HPP of any of its assets or other change of control or ownership of HPP, in each case resulting in receipt by a Borrower of gross cash proceeds.

"**Healthcare Laws**" means all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical

facilities (such as, but not limited to, acute care hospitals), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(6)), the Stark Law (42 U.S.C. § 1395nn), the civil False Claims Act (31 U.S.C. § 3729 et seq.), (b) TRICARE, (c) HIPAA, (d) Medicare, (f) the Patient Protection and Affordable Care Act (P.L. 111-1468), (g) The Health Care and Education Reconciliation Act of 2010 (P.L. 111-152), (h) Emergency Medical Treatment and Active Labor Act (42 U.S.C. § 1395 dd), (i) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies, (j) all Laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (k) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (k) as may be amended from time to time.

"**Healthcare Permit**" means a Permit (a) issued or required under Healthcare Laws applicable to the business of any Borrower or any of its Affiliates or necessary in the possession, ownership, marketing, promoting, sale, furnishing, distribution or delivery of goods or services under Healthcare Laws, (b) issued by any Person from which any Borrower has, as of the Closing Date, received an accreditation (including, without limitation, the JC), and/or (c) issued or required under Healthcare Laws applicable to the ownership, leasing and/or operation of a Project.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**HIPAA Compliant**" means that the applicable Person is in compliance, in all material respects, with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any material civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could reasonably be expected to result in any of the foregoing or that could reasonably be expected to materially and adversely affect such Person's financial condition, results of, operations, business or properties, in connection with any actual violation by such Person of the provisions of HIPAA.

"**Holdings**" means Philadelphia Academic Health Holdings, LLC.

"**HSRE Master Leases**" means, individually and collectively, (i) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH New College MOB, LLC, (ii) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Bellet MOB, LLC, (iii) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Feinstein MOB, LLC, (iv) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Broad Street MOB, LLC, (v) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Wood Street Garage, LLC and (vi) that

certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Erie Street Garage, LLC, and, in each case, all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**In-House Unbilled Accounts**" means Accounts accumulating in respect of patients who have not been discharged from a hospital facility, and for which a bill has not yet been issued with respect to medical and health care services provided to such patient.

"**Inadvertent Overadvance**" shall mean the making of any Revolving Loan at any time when the Revolving Loan Outstandings did not exceed the Revolving Loan Limit when made based upon the most recent Borrowing Base Certificate received by the Agent prior to such Revolving Loan but which has, on the relevant date of determination, resulted in the Revolving Loan Outstandings exceeding the Revolving Loan Limit as a result of the imposition or modification of any reserve or a reduction in the rate as set forth in Section (a)(i) of the definition of Borrowing Base after the funding of any such Revolving Loan.

"**Incentive Payments**" has the meaning set forth in Section 5.14.

"**Indemnitees**" has the meaning set forth in Section 12.14.

"**In-House Unbilled Accounts**" means Accounts accumulating in respect of patients who have not been discharged from a hospital facility, and for which a bill has not yet been issued with respect to medical and health care services provided to such patient.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower or any other Credit Party under any Financing Documents and (b) to the extent not otherwise described in (a), Other Taxes.

"**Initial Borrowers**" **means** St. Christopher Operator, Hahnemann Operator, Parent Borrower, Physicians Clinical, and Practice Parent Borrower.

"**Instrument**" means "instrument", as defined in Article 9 of the UCC.

"**Insurance Captive**" means Philadelphia Academic Risk Retention Group, LLC, which shall at all times be a licensed captive insurance company in good standing under the Laws of the State of Vermont and is in compliance with all applicable Laws, except for such Laws the noncompliance with which could not reasonably be expected to have a Material Adverse Effect.

"**Intellectual Property**" means, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes,

operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

"**Intercompany Loan**" has the meaning set forth in Section 2.9.

"**Interest Period**" means any period commencing on the first day of a calendar month and ending on the last day of such calendar month.

"**Inventory**" means "inventory" as defined in Article 9 of the UCC.

"**IRS**" has the meaning set forth in Section 2.8(c).

"**JC**" means the Joint Commission.

"**Laws**" means any and all federal, state, provincial, territorial, local and foreign statutes, laws, judicial decisions, regulations, guidances, guidelines, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to any Credit Party in any particular circumstance. "**Laws**" includes, without limitation, Healthcare Laws and Environmental Laws.

"**LC Issuer**" means one or more banks, trust companies or other Persons in each case expressly identified by Agent from time to time, in its sole discretion, as an LC Issuer for purposes of issuing one or more Letters of Credit hereunder. Without limitation of Agent's discretion to identify any Person as an LC Issuer, no Person shall be designated as an LC Issuer unless such Person maintains reporting systems acceptable to Agent with respect to letter of credit exposure and agrees to provide regular reporting to Agent satisfactory to it with respect to such exposure.

"**Legacy Accounts**" has the meaning set forth in Section 5.14.

"**Lender**" means each of (a) MCF, in its capacity as a lender hereunder, (b) each other Person party hereto in its capacity as a lender hereunder, (c) each other Person that becomes a party hereto as Lender pursuant to Section 11.17, and (d) the respective successors of all of the foregoing, and "**Lenders**" means all of the foregoing.

"**Lender Letter of Credit**" means a Letter of Credit issued by an LC Issuer that is also, at the time of issuance of such Letter of Credit, a Lender.

"**Letter of Credit**" means a standby letter of credit issued for the account of any Borrower by an LC Issuer which expires by its terms within one year after the date of issuance and in any event at least thirty (30) days prior to the Commitment Expiry Date. Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiry date for one or more successive one (1) year periods, *provided, however,* that the LC Issuer that issued such Letter of Credit has the right to terminate such Letter of Credit on each such annual expiration date and no renewal term may extend the term of the Letter of Credit to a date that is later than

20

the thirtieth (30th) day prior to the Commitment Expiry Date.  Each Letter of Credit shall be either a Lender Letter of Credit or a Supported Letter of Credit.

"**Letter of Credit Liabilities**" means, at any time of calculation, the sum of (a) without duplication, the amount then available for drawing under all outstanding Lender Letters of Credit and all Supported Letters of Credit, in each case without regard to whether any conditions to drawing thereunder can then be met, *plus* (b) without duplication, the aggregate unpaid amount of all reimbursement obligations in respect of previous drawings made under all such Lender Letters of Credit and Supported Letters of Credit.

"**LIBOR Rate**" means, for each Loan, a per annum rate of interest equal to the greater of (a) 0.50% and (b) the rate determined by Agent (rounded upwards, if necessary, to the next 1/100th%) by *dividing* (i) the Base LIBOR Rate for the Interest Period, *by* (ii) the sum of one *minus* the daily average during such Interest Period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein).

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, in respect of such asset.  For the purposes of this Agreement and the other Financing Documents, any Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"**Litigation**" means any action, suit or proceeding before any court, mediator, arbitrator or Governmental Authority.

"**Loan Account**" has the meaning set forth in Section 2.6(b).

"**Loan(s)**" means the ~~Revolving Loans~~**Term Loan, the Revolving Loans or any combination of the foregoing, as the context may require.  All references herein to the "making" of a Loan or words of similar import shall mean, with respect to the Term Loan, the making of any advance in respect of a Term Loan**.

"**Lockbox**" has the meaning set forth in Section 2.11.

"**Lockbox Account**" means an account or accounts maintained at the Lockbox Bank into which collections of Accounts are paid, which account or accounts shall be, if requested by Agent, opened in the name of Agent (or a nominee of Agent).

"**Lockbox Bank**" has the meaning set forth in Section 2.11.

"**Management Agreement**" has the meaning set forth in Section 8.2(b).

"**Manager**" has the meaning set forth in Section 8.2(b).

"**Material Adverse Effect**" means with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, (a) a material adverse change in, or a material adverse effect upon, any of (i) the financial condition, operations, business or properties of the Borrowers, taken as a whole, which is reasonably likely to result in the inability of the Borrowers, taken as a whole, to pay the Obligations when due hereunder, (ii) the rights and remedies of Agent or Lenders under any Financing Document, or the ability of any Credit Party to perform any of its obligations under any Financing Document to which it is a party, (iii) the legality, validity or enforceability of any Financing Document, (iv) the existence, perfection or priority of any security interest granted in any Financing Document with respect to a material portion of the Collateral (the parties agree that any Account constitutes a material portion of Collateral), (v) the value of any Project or any other material portion of the Collateral, (vi) any Credit Party's ability to accept, admit and/or retain patients or residents, (vii) the rate at which any Third Party Payor reimburses a Credit Party for goods or services provided by such Credit Party the effect of which is reasonably likely to result in the inability of Borrowers, taken as a whole, to pay the Obligations when due hereunder, (viii) the use or scope of any materially significant Healthcare Permits, (ix) the continued participation by any Credit Party in the Medicaid or Medicare programs or any other materially significant Third Party Payor Program; or (b) an impairment to the likelihood that Eligible Accounts in general will be collected and paid in the Ordinary Course of Business of any Borrower and upon the same schedule and with the same frequency as such Borrowers' recent collections history.

"**Material Contracts**" has the meaning set forth in Section 3.17.

"**Material Third Party Payor**" means a Third Party Payor that sponsors a Material Third Party Payor Program.

"**Material Third Party Payor Program**" means, as of any date of determination, (i) each Third Party Payor Program sponsored by Medicare, Medicaid and TRICARE, and (ii) each other Third Party Payor Program representing at least 25% of the Accounts billed by or on behalf of the Borrowers and the Projects, taken as a whole, during the prior fiscal year.

"**Maximum Lawful Rate**" has the meaning set forth in Section 2.7.

"**MCF**" means MidCap Financial Trust, and its successors and assigns.

"**Medicaid**" means the medical assistance programs administered by state agencies and approved by CMS pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 et seq.

"**Medicare**" means the program of health benefits for the aged and disabled administered by CMS pursuant to the terms of Title XVIII of the Social Security Act, codified at 42 U.S.C. 1395 et seq.

22

"**Minimum Liquidity**" means the sum of (a) Revolving Loan Availability *plus* (b) cash and cash equivalents that are (i) owned by any Borrower, (ii) not subject to any Lien other than a Lien in favor of Agent, (iii) not pledged to or held by Agent to secure a specified Obligation *plus* (c) the Minimum Liquidity Reserve (but only to the extent such reserve has been applied to reduce Revolving Loan Availability).

"**Minimum Liquidity Reserve**" means a reserve against the Borrowing Base in the amount equal to the then-current Minimum Liquidity covenant set forth in Section 6.3.

"**Multiemployer Plan**" means a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA to which any Borrower or any other member of the Controlled Group (or any Person who in the last five years was a member of the Controlled Group) is making or accruing an obligation to make contributions or has within the preceding five plan years (as determined on the applicable date of determination) made contributions.

"**Net Tax Benefit**" means (a) the total amount of reduction in the income tax liability of the partners or members of Borrowers realized as a result of any loss generated by Borrowers' business during any prior tax year, assuming in such calculation that the full amount of such loss has been used to reduce such partners' or members' adjusted gross income in the same tax year that such loss was generated by Borrowers' business, *plus* (b) the amount by which (i) the aggregate amount of Tax Distributions made, based on good faith estimates, to such partners or members in such tax year is in excess of (ii) the tax obligations owing by such partners or members for income generated by Borrowers' business during such year; provided, however, to the extent that any loss is included in clause (a) above in calculating Net Tax Benefit, then the amount to be used for such loss in clause (b)(ii) above in calculating the Net Tax Benefit shall be deemed to be zero dollars ($0.00).

"**New Market Tax Credit Transactions**" means, collectively, the transactions contemplated by the following documents, each dated as of the Closing Date:  (i) that certain Lease Agreement by and between SCHC Pediatric Associates, L.L.C. and Center for the Urban Child, Inc. relating to the sublease of the "Put Property" (as defined in the Put Option Agreement referred to in clause (ii)), (ii) that certain Put Option Agreement by and among Center for the Urban Child, Inc., Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C., and Front Street Healthcare Properties II, LLC, (iii) that certain Guaranty of Performance (Put Option Agreement) by Philadelphia Academic Health Holdings, LLC, (iv) that certain Right of First Opportunity to Purchase Agreement by and among Center for the Urban Child, Inc., Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C., and Front Street Healthcare Properties II, LLC, (v) that certain Guaranty of Performance (Right of First Opportunity to Purchase Agreement) by Philadelphia Academic Health Holdings, LLC, (vi) that certain Tax Credit Reduction Event Indemnity Agreement by and among Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C., Center for the Urban Child, Inc., Tenet HealthSystem Medical, Inc. and SCHC Pediatric Associates, L.L.C., (vii) that certain Guaranty of Performance (Tax Credit Reduction Event Indemnity Agreement) by Philadelphia Academic Health Holdings, LLC, and (viii) that certain Access License and Shared Services Agreement and Agreement Regarding Sublease by and among Center for the Urban Child, Inc., Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C., Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC, and St. Christopher's Healthcare, LLC, and,

23

with respect to each of clauses (i) through (viii) hereof, all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Non-Funding Lender**" has the meaning set forth in Section 11.18.

"**Notes**" has the meaning set forth in Section 2.3.

"**Notice of Borrowing**" means a notice of a Responsible Officer of Borrower Representative, (i) in the case of the Loan requested to be made on the Closing Date, appropriately completed and substantially in the form of Exhibit C-1 hereto and (ii) in the case of each Loan requested after the Closing Date, appropriately completed and substantially in the form of Exhibit C-2 hereto.

"**Notice of LC Credit Event**" means a notice from a Responsible Officer of Borrower Representative to Agent with respect to any issuance, increase or extension of a Letter of Credit specifying:  (a) the date of issuance or increase of a Letter of Credit; (b) the identity of the LC Issuer with respect to such Letter of Credit, (c) the expiry date of such Letter of Credit; (d) the proposed terms of such Letter of Credit, including the face amount; and (e) the transactions that are to be supported or financed with such Letter of Credit or increase thereof.

"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, whether or not allowed) or otherwise) of each Credit Party under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, including, without limitation, fees, expenses and indemnification obligations.  In addition to, but without duplication of, the foregoing, the Obligations shall include, without limitation, all obligations, liabilities and indebtedness arising from or in connection with (a) all Support Agreements and (b) all Lender Letters of Credit.

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Operating Lease**" means any lease of any Project to an Operator Borrower, and all amendments, supplements, restatements or other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Operative Documents**" means the Financing Documents, any Operating Leases, any HSRE Master Leases, any Management Agreements, Subordinated Debt Documents, the Affiliate Leases, and any documents to which any Credit Party is party effecting any purchase or sale or other transaction that is closing contemporaneously with the closing of the financing under this Agreement.

"**Operator Borrower**" means the singular or collective (as the context requires) reference to St. Christopher Operator and Hahnemann Operator.

"**Operator**" means the singular or collective (as the context requires) reference to the following Persons:  (a) any Operator Borrower, and/or (b) any Person with whom a Borrower or any Affiliate has contracted for management or other services for a Project.

"**Ordinary Course of Business**" means, in respect of any transaction involving any Credit Party, the ordinary course of business of such Credit Party, as conducted by such Credit Party in accordance with past practices.  For the avoidance of doubt, Ordinary Course of Business includes any sales, transfer or dispositions of obsolete or worn-out assets.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

"**Other Connection Taxes**" means taxes imposed as a result of a present or former connection between Agent or any Lender and the jurisdiction imposing such tax (other than connections arising from Agent or such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, engaged in any other transaction pursuant to or enforced any Financing Document, or sold or assigned an interest in any Loans or any Financing Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Financing Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.8(j)).

"**Payment Account**" means the account specified on the signature pages hereof into which all payments by or on behalf of each Borrower to Agent under the Financing Documents shall be made, or such other account as Agent shall from time to time specify by written notice to Borrower Representative.

"**Payment Notification**" means a written notification substantially in the form of Exhibit D attached hereto and made a part hereof.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"**Pension Plan**" means any ERISA Plan that is subject to Section 412 of the Code or Title IV of ERISA.

"**Permits**" means all governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals required under all applicable Laws and required in order to carry on its business as now conducted, including, without limitation, Healthcare Permits.

"**Permitted Affiliate**" means with respect to any Person (a) any Person that directly or indirectly controls such Person, and (b) any Person which is controlled by or is under common control with such controlling Person.  As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote eighty percent (80%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Permitted Contest**" means, with respect to any tax obligation or other obligation allegedly or potentially owing from any Borrower to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on the books and records and financial statements of the applicable Borrower(s); *provided*, *however*, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Borrowers' title to, and its right to use, the Collateral is not adversely affected thereby and Agent's Lien and priority on such Collateral are not adversely affected, altered or impaired thereby; (c) the Collateral or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrowers; and (d) upon a final determination of such contest, Borrowers shall promptly comply with the requirements thereof.

"**Permitted Contingent Obligations**" means (a) Contingent Obligations arising in respect of the Debt under the Financing Documents; (b) Contingent Obligations resulting from endorsements for collection or deposit in the Ordinary Course of Business; (c) Contingent Obligations outstanding on the date of this Agreement and set forth on <u>Schedule 5.1</u> (but not including any refinancings, extensions, increases or amendments to the indebtedness underlying such Contingent Obligations other than extensions of the maturity thereof without any other change in terms or, in the case of any pension plan liabilities, such increases in the amount thereof in the Ordinary Course of Business); (d) Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeal bonds, performance bonds and other similar obligations not to exceed $125,000 in the aggregate at any time outstanding; (e) Contingent Obligations incurred with respect to Permitted Indebtedness of another Borrower; provided that (x) any such Contingent Obligation is subordinated to the Obligations to the same extent (if at all) as the Debt to which it relates is subordinated to the Obligations and (y) no Borrower may incur Contingent Obligations under this clause (i) in respect of Debt incurred by any Person that is not a Borrower; (f) Contingent Obligations arising with respect to customary indemnification obligations in favor of purchasers in connection with dispositions of personal property assets permitted under Section 5.6; (g) Contingent Obligations of a Borrower arising under an Affiliate Lease to which such Borrower is party as tenant or subtenant; (h) so long as there exists no Event of Default both immediately before and immediately after giving effect to any such transaction,

Contingent Obligations existing or arising under any other Swap Contract, *provided, however*, that such obligations are (or were) entered into by Borrower or an Affiliate in the Ordinary Course of Business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person and not for purposes of speculation; (i) Contingent Obligations arising under or with respect to any Permitted Contest or Permitted Liens; (j) Contingent Obligations in respect of any Fund Contribution LC to the extent such Fund Contribution LC is not a Letter of Credit issued hereunder; (k) Contingent Obligations with respect to surety and appeal bonds, performance bonds, escrows, letters of credit and other similar obligations required by the terms of the Pension Fund for Hospital and Health Care Employees of Philadelphia and Vicinity and/or Section 4204 of ERISA, as applicable; (l) Contingent Obligations of a Borrower guaranteeing the obligations of another Borrower to the extent such obligations are otherwise permitted under this Agreement; and (m) other Contingent Obligations not permitted by clauses (a) through (k) above, not to exceed $250,000 in the aggregate at any time outstanding.

"**Permitted Indebtedness**" means (a) Borrower's Debt to Agent and each Lender under this Agreement and the other Financing Documents; (b) Debt incurred as a result of endorsing negotiable instruments received in the Ordinary Course of Business; (c) purchase money Debt not to exceed $35,000,000 at any time (whether in the form of a loan or a Capital Lease and including any Debt assumed from the Tenet Sellers on the Closing Date) used solely to acquire equipment used in the Ordinary Course of Business or as otherwise reflected in the most recent financial projections delivered to Agent prior to the Closing Date and secured only by such equipment; (d) purchase money Debt not to exceed $35,000,000 at any time (whether in the form of a loan or a Capital Lease) used solely to acquire IT equipment used in the Ordinary Course of Business or as otherwise reflected in the most recent financial projections delivered to Agent prior to the Closing Date and secured only by such IT equipment; (e) Debt existing on the date of this Agreement and described on Schedule 5.1 (but not including any refinancings, extensions, increases or amendments to such Debt other than extensions of the maturity thereof without any other change in terms); (f) Debt, if any, arising under Swap Contracts; (g) Debt constituting financed insurance premiums; (h) trade accounts payable arising and paid on a timely basis and in the Ordinary Course of Business and (i) Subordinated Debt.

"**Permitted Investments**" means, as of any date of determination:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from Standard & Poor's or from Moody's Investors Service, Inc.;

(c)    investments in certificates of deposit, banker's acceptances and, time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any

commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)     investments in money market mutual funds having portfolio assets in excess of $5,000,000,000 that comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940 and are rated AAA by Standard & Poor's and AAA by Moody's Investors Service, Inc.;

(e)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(f)     securities with maturities of one year or less from the date of acquisition issued or full guaranteed by any state, commonwealth or territory of the United States of America, or any political subdivision or taxing authority thereof, and rated at least A-1 by Standard & Poor's or P by Moody's Investors Service, Inc.;

(g)     any advance or loan by a Borrower to another Borrower;

(h)     any investment by a Borrower in another Borrower;

(i)     the extension of commercial trade credit in connection with the sale of Inventory in the Ordinary Course of Business;

(j)     investments consisting of endorsements for collection or deposit in the Ordinary Course of Business and with respect to negotiable instruments for collection;

(k)     any investment by a Borrower constituting part of the New Market Tax Credit Transactions;

(l)     any investment by a Borrower in the membership interests of HPP; and

(m)     any investment by a Borrower in the Insurance Captive consistent with its Plan of Operation, as may be amended from time to time, as filed with, and approved by, the Vermont Department of Financial Regulation.

"**Permitted Liens**" means: (a)  deposits or pledges of cash to secure obligations under workmen's compensation, social security or similar laws, or under unemployment insurance (but excluding Liens arising under ERISA) pertaining to a Borrower's employees, if any, arising in the Ordinary Course of Business; (b) deposits or pledges of cash to secure statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business; (c) mechanic's, workmen's, materialmen's or other like Liens arising in the Ordinary Course of Business with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest; (d) Liens on Collateral for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest; (e) attachments, appeal bonds, judgments and other similar Liens on Collateral for sums not exceeding $62,500 in the aggregate arising in connection with court proceedings; *provided, however*, that the execution or other enforcement of such Liens is effectively stayed and the

claims secured thereby are the subject of a Permitted Contest; (f) deposits or pledges of cash to secure bids, tenders, contracts and leases arising in the Ordinary Course of Business and not in connection with the borrowing of money; (g) Liens and encumbrances in favor of Agent under the Financing Documents; (h) Liens on Collateral, other than Collateral which is part of the Borrowing Base, existing on the date hereof and set forth on Schedule 5.2; (i) any Lien on any equipment or inventory securing Debt permitted under subparts (c) and (d) of the definition of Permitted Indebtedness, *provided*, *however*, that such Lien attaches only to the assets purchased or acquired and the proceeds thereof; (j) Liens on cash collateral for any Fund Contribution LC to the extent such Fund Contribution LC is not a Letter of Credit hereunder; *provided, however*, that such cash collateral shall not exceed an amount equal to 105% of the face amount of such Fund Contribution LC; (k) Liens on cash collateral securing any Permitted Contingent Obligation described in clause (k) of the definition thereof; *provided, however*, that such cash collateral shall not exceed an amount equal to 105% of the amount of such Permitted Contingent Obligation; and (l) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the Ordinary Course of Business; *provided, however*, such rights or liens are subordinated to the prior right of Agent pursuant to a Deposit Account Control Agreement or Deposit Account Restriction Agreement.

"**Permitted Transfers**" means the collective reference to one or more transfers, via a sale and not by pledge or hypothecation, which, in the aggregate during the term of this Agreement, result in a transfer of legal or beneficial ownership or control of up to twenty percent (20%) of the direct or indirect ownership or voting interests in the Borrowers or any Guarantor to a Person, other than a Blocked Person, so long as Borrowers have given Agent at least fifteen (15) days prior written notice of the identity of the assignees, together with such information as Agent shall deem reasonably necessary to confirm that such assignee is (i) not a Blocked Person, or (ii) at the time of such transfer, already a holder of direct or indirect ownership or voting interests in the Borrowers; provided, however, that no transfer shall be a "Permitted Transfer" if such transfer would result in a Change of Control.  Notwithstanding the limitations set forth in the foregoing sentence, (a) any holder of direct or indirect ownership or voting interests in the Borrowers which is a partnership may transfer such holder's rights to such holder's constituent partners, retired partners (including spouses, ancestors, lineal descendants and siblings of such partners or spouses who acquire such interests by gift, will or intestate succession) or their respective Affiliates, (b) any holder of direct or indirect ownership or voting interests in the Borrowers which is a limited liability company may transfer such holder's right to such holder's members, (c) any holder of direct or indirect ownership or voting interests in the Borrowers which is a natural person may transfer such holder's rights to any immediate family member or to any trust created for the benefit of such holder or his or her immediate family members, and (d) any holder of direct or indirect ownership or voting interests in the Borrowers may transfer such holder's rights to a Permitted Affiliate of such holder (*provided, however*, that no transfer of any given interest pursuant to this subpart may be made more often than once per twelve (12) month period), subject in each case to such transferee's agreeing in writing to be bound by the rights and restrictions of this Agreement; and any such transfer described in the foregoing clauses (a) through (d) shall be deemed a "Permitted Transfer" and shall not count toward the twenty percent (20%) limitation described above.

CHICAGO/#3111951.7B

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**PPN Philadelphia" means** Physician Performance Network of **Philadelphia**, L.L.C**.**

"**Project**" means the acute care facilities listed and described on Schedule 1.1B.

"**Pro Rata Share**" means (a) **with respect to a Lender's obligation to make advances in respect of a Term Loan and such Lender's right to receive payments of principal and interest with respect to the Term Loans, the Term Loan Commitment Percentage of such Lender, (b)** with respect to a Lender's obligation to make Revolving Loans, such Lender's right to receive the unused line fee described in Section 2.2(b), such Lender's obligation to purchase interests and participations in Letters of Credit and related Support Agreement liabilities and obligations, and such Lender's obligation to share in Letter of Credit Liabilities and to receive the related Letter of Credit fee described in Section 2.5(b), the Revolving Loan Commitment Percentage of such Lender, (b) with respect to a Lender's right to receive payments of principal and interest with respect to Revolving Loans, such Lender's Revolving Loan Exposure with respect thereto; and (c) for all other purposes (including, without limitation, the indemnification obligations arising under Section 11.6) with respect to any Lender, the percentage obtained by *dividing* (i) the sum of the Revolving Loan Commitment Amount **and Term Loan Commitment Amount** of such Lender (or, in the event the Revolving Loan Commitment **and/or Term Loan Commitment** shall have been terminated, such Lender's then existing Revolving Loan Outstandings **or then outstanding principal advances of such Lender under the Term Loan, as applicable**), *by* (ii) the sum of the Revolving Loan Commitment **or Term Loan Commitment Amount** (or, in the event the Revolving Loan Commitment shall have been terminated, the then existing Revolving Loan Outstandings **or then outstanding principal advances of such Lenders under the Term Loan, as applicable**) of all Lenders.

"**Recovery Amount**" has the meaning set forth in Section 2.10(e).

"**Reimbursement Obligations**" means, at any date, the obligations of each Borrower then outstanding to reimburse (a) Agent for payments made by Agent under a Support Agreement, and/or (b) any LC Issuer, for payments made by such LC Issuer under a Lender Letter of Credit.

"**Release**" has the meaning set forth in 42 U.S.C. § 9601 (22).

"**Replacement Operator**" has the meaning set forth in Section 8.2(c).

"**Required Lenders**" means at any time Lenders holding (a) sixty-six and two thirds percent (66 2/3%) or more of the **sum of the** Revolving Loan Commitment **and the Term Loan Commitment (taken as a whole)**, or (b) if the Revolving **Loan Commitment or Term** Loan Commitment has been terminated, sixty-six and two thirds percent (66 2/3%) or more of the sum of (x) the then aggregate outstanding principal balance of the Loans plus (y) the then aggregate amount of Letter of Credit Liabilities.

"**Required Perfection Action**" has the meaning set forth in Section 7.1(n).

"**Responsible Officer**" means any of the President, Chief Executive Officer, Chief Financial Officer, Controller or Vice President/Finance of the applicable Borrower or Borrower Representative.

"**Revolving Lender**" means each Lender having a Revolving Loan Commitment Amount in excess of zero (or, in the event the Revolving Loan Commitment shall have been terminated at any time, each Lender at such time having Revolving Loan Outstandings in excess of zero).

"**Revolving Loan Availability**" means, at any time, the Revolving Loan Limit *minus* the Revolving Loan Outstandings.

"**Revolving Loan Borrowing**" means a borrowing of a Revolving Loan.

"**Revolving Loan Commitment**" means, as of any date of determination, the aggregate Revolving Loan Commitment Amounts of all Lenders as of such date.

"**Revolving Loan Commitment Amount**" means, **(i)** as to any Lender **that is a Lender on the Closing Date**, the dollar amount set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Amount" (if such Lender's name is not so set forth thereon, then the dollar amount on the Commitment Annex for the Revolving Loan Commitment Amount for such Lender shall be deemed to be zero), as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of Revolving Loans outstanding and its commitment to make Revolving Loans) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party **and (ii) as to any Lender that becomes a Lender after the Closing Date, the amount of the "Revolving Loan Commitment Amount(s)" of other Lender(s) assigned to such new Lender pursuant to the terms of the effective assignment agreement(s) pursuant to which such new Lender shall become a Lender, as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lenders' portion of Revolving Loans outstanding and its commitment to make advances in respect of the Revolving Loan) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party**.

"**Revolving Loan Commitment Percentage**" means, as to any Lender, (a) on the Closing Date, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Percentage" (if such Lender's name is not so set forth thereon, then, on the Closing Date, such percentage for such Lender shall be deemed to be zero), and (b) on any date following the Closing Date, the percentage equal to the Revolving Loan Commitment Amount of such Lender on such date *divided by* the Revolving Loan Commitment on such date.

"**Revolving Loan Exposure**" means, with respect to any Lender on any date of determination, the percentage equal to the amount of such Lender's Revolving Loan Outstandings on such date *divided by* the aggregate Revolving Loan Outstandings of all Lenders on such date.

CHICAGO/#3111951.7B

"**Revolving Loan Limit**" means, at any time, the lesser of (a) the Revolving Loan Commitment and (b) the Borrowing Base.

"**Revolving Loan Outstandings**" means, at any time of calculation, (a) the sum of the then existing aggregate outstanding principal amount of Revolving Loans *plus* the then existing Letter of Credit Liabilities, and (b) when used with reference to any single Lender, the sum of the then existing outstanding principal amount of Revolving Loans advanced by such Lender *plus* the then existing Letter of Credit Liabilities for the account of such Lender.

"**Revolving Loans**" has the meaning set forth in Section 2.1(b).

"**Securities Account**" means a "securities account" (as defined in Article 8 and Article 9 of the UCC), an investment account, or other account in which investment property or securities are held or invested for credit to or for the benefit of any Borrower.

"**Securities Account Control Agreement**" means an agreement, in form and substance reasonably satisfactory to Agent, among Agent, any applicable Borrower and each securities intermediary in which such Borrower maintains a Securities Account pursuant to which Agent shall obtain "control" (as defined in Article 9 of the UCC) over such Securities Account.

"**Security Document**" means this Agreement and any other agreement, document or instrument executed concurrently herewith or at any time hereafter pursuant to which one or more Credit Parties or any other Person either (a) Guarantees payment or performance of all or any portion of the Obligations, and/or (b) provides, as security for all or any portion of the Obligations, a Lien on any of its assets in favor of Agent for its own benefit and the benefit of the Lenders, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.  **The Security Documents shall include, without limitation, the Broad Street Guaranty and the Broad Street Mortgages.**

"**Settlement Date**" has the meaning set forth in Section 11.13(a).

"**Solvent**" means, with respect to the Borrowers, that at the time of determination the Borrowers, on a consolidated basis, (a) own and will own assets the fair saleable value of which are (i) greater than the total amount of their liabilities (including Contingent Obligations), and (ii) greater than the amount that will be required to pay the probable liabilities of their then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to them; (b) have capital that is not unreasonably small in relation to their business as presently conducted or after giving effect to any contemplated transaction; and (c) do not intend to incur and do not believe that they will incur debts beyond their ability to pay such debts as they become due. For purposes of this definition, the amount of Contingent Obligations (such as litigation, guaranties and pension plan liabilities) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that can be reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual pursuant to Financial Accounting Standards Board Statement No. 5).

"**Specified Representations**" means each representation and warranty contained in any of Sections 3.1(a)(i), 3.2(a) (solely with respect to the Financing Documents), 3.2(b) (solely with respect to the Financing Documents), 3.2(c) (solely with respect to the Financing Documents and, with respect to clause (ii) thereof, solely with respect to any such agreements relating to Debt of a Credit Party), 3.3 (solely with respect to the Financing Documents), 3.6 (solely with respect to the Financing Documents), 3.10, 3.11, 3.12(b), 3.19, 3.24 and 3.25.

"**St. Christopher Operating Leases**" means, individually and collectively, (a) the operating lease for the Project operated by St. Christopher Operator by and between St. Christopher Operator and Front Street Healthcare Properties, LLC, dated as of the Closing Date, (b) the operating lease for the medical office building known as Nelson Pavilion leased by St. Christopher Operator by and between St. Christopher Operator and Front Street Healthcare Properties II, LLC, dated as of the Closing Date and (c) the operating lease for the warehouse leased by St. Christopher Operator by and between St. Christopher Operator and Front Street Healthcare Properties II, LLC, dated as of the Closing Date, together with all amendments, supplements, restatements or other modifications to or of such operating leases as have been previously approved by Agent to the extent required hereunder.

"**Stated Rate**" has the meaning set forth in Section 2.7.

"**Subordinated Debt**" means any Debt of Borrowers incurred pursuant to the terms of the Subordinated Debt Documents and with the prior written consent of Agent, all of which documents must be in form and substance acceptable to Agent in its sole discretion. As of the Closing Date, there is no Subordinated Debt.

"**Subordinated Debt Documents**" means any documents evidencing and/or securing Debt governed by a Subordination Agreement, all of which documents must be in form and substance acceptable to Agent in its sole discretion, and all amendments, supplements, restatements or other modification thereto or thereof as have been previously approved by Agent to the extent required hereunder.  As of the Closing Date, there are no Subordinated Debt Documents.

"**Subordination Agreement**" means any agreement between Agent and another creditor of any Borrower(s), as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, pursuant to which the Debt owing from any Borrower(s) and/or the Liens securing such Debt granted by any Borrower(s) to such creditor are subordinated in any way to the Obligations and the Liens created under the Security Documents, the terms and provisions of such Subordination Agreements to have been agreed to by and be acceptable to Agent in the exercise of its sole discretion.

"**Subsidiary**" means, with respect to any Person, (a) any corporation of which an aggregate of more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, capital stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of

more than fifty percent (50%) of such capital stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than fifty percent (50%) or of which any such Person is a general partner or may exercise the powers of a general partner. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of a Borrower.

"**Supplemental Medicaid Medical Education Payments**" means the aggregate amount of supplemental payments owed to an Operator Borrower under the Pennsylvania fee-for-service Medicaid program to offset a portion of graduate medical education and indirect medical education costs incurred by such Operator Borrower.

"**Supplemental Payment**" means, without duplication, (i) Adjusted Medicaid Managed Care Supplemental Payments; (ii) DSH Income and (iii) Supplemental Medicaid Medical Education Payments.

"**Support Agreement**" has the meaning set forth in Section 2.5(a).

"**Supported Letter of Credit**" means a Letter of Credit issued by an LC Issuer in reliance on one or more Support Agreements.

"**Swap Contract**" means any "swap agreement", as defined in Section 101 of the Bankruptcy Code, which is obtained by Borrower for the Loan to provide protection against fluctuations in the applicable Base Rate or Libor Rate, but only to the extent Agent provides its prior written consent to the entry into such "swap agreement".

"**Target Borrowers**" means, collectively, HPS OF PA, L.L.C., SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., StChris Care at Northeast Pediatrics, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., TPS of PA, L.L.C., TPS II of PA, L.L.C., TPS III of PA, L.L.C., TPS IV of PA, L.L.C., TPS V of PA, L.L.C., and Physician Performance Network of Philadelphia, L.L.C

"**Tax Distributions**" means, for any taxable year for which Borrowers are treated under the Code as a Subchapter S corporation, partnership for income tax purposes, disregarded entity for income tax purposes or otherwise disregarded under the Code for income tax purposes, dividends and/or distributions paid by any Borrowers to its partners or members in an amount not to exceed the *product of* (a) taxable income related to such partners' or members' ownership interest in such Borrower *multiplied by* (b) the sum of the highest marginal federal and state income tax rates in any State in which any partner or member is organized or resident (or, to the extent such partner or member is itself a pass-through entity or disregarded entity under the Code, the State in which an ultimate taxpaying partner or member of such partner or member is organized or resident) which were applicable in such taxable year.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Tenet License Agreement**" means that certain License Agreement entered into on the Closing Date by and among the Borrowers, other than Parent Borrower, Physicians Clinical, Practice Parent Borrower and Physician Performance Network of Philadelphia, L.L.C., and the Tenet Operators, pursuant to which, among other things, the Tenet Operators granted a security interest in favor of the Operator Borrowers in and to the "Accounts Receivable" (as defined therein), and all amendments, supplements, restatements or other modification thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Tenet Operators**" means Tenet HealthSystem Hahnemann, L.L.C. and Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C.

"**Tenet Real Estate Debt**" means Debt of Front Street Healthcare Properties, LLC and Front Street Healthcare Properties II, LLC in favor of Tenet Business Services Corporation or its permitted assignee in the original principal amount of $17,500,000 incurred on the Closing Date as part of the transactions closing contemporaneously with the closing of the financing under this Agreement.

"**Tenet Sellers**" means Tenet Business Services Corporation and the other sellers listed on Exhibit A-1 to the Acquisition Agreement.

"**Term Loan**" has the meaning set forth in Section 2.1(a).

"**Term Loan Commitment**" means the sum of each Lender's Term Loan Commitment Amount, which is equal to $20,000,000 on the First Amendment Effective Date.

"**Term Loan Commitment Amount**" means, (i) as to any Lender that is a Lender on the First Amendment Effective Date, the dollar amount set forth opposite such Lender's name on the Commitment Annex under the column "Term Loan Commitment Amount", as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of Term Loans outstanding and its commitment to make advances in respect of the Term Loan) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party and (ii) as to any Lender that becomes a Lender after the First Amendment Effective Date, the amount of the "Term Loan Commitment Amount(s)" of other Lender(s) assigned to such new Lender pursuant to the terms of the effective assignment agreement(s) pursuant to which such new Lender shall become a Lender, as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of Term Loans outstanding and its commitment to make advances in respect of the Term Loan) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party.

"**Term Loan Commitment Percentage**" means, as to any Lender, (a) on the First Amendment Effective Date, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Term Loan Commitment Percentage" (if such Lender's name is not so set forth thereon, then, on the First Amendment Effective Date, such percentage for such Lender shall be deemed to be zero), and (b) on any date following

CHICAGO/#3111951.7B

**the First Amendment Effective Date, the percentage equal to the Term Loan Commitment Amount of such Lender on such date divided by the Term Loan Commitment on such date.**

"**Termination Date**" means the earlier to occur of (a) the Commitment Expiry Date, (b) any date on which Agent accelerates the maturity of the Loans pursuant to Section 10.2, ~~or~~ (c) the termination date stated in any notice of termination of this Agreement provided by Borrowers in accordance with Section ~~2.12~~**2.12, or (d) solely with respect to the Term Loan, eighteen (18) months from the First Amendment Effective Date.**

"**Third Party Payor**" means Medicare, Medicaid, TRICARE, and other state or federal health care programs, Blue Cross and/or Blue Shield, private insurers, managed care plans, self-funded employer plans and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"**Third Party Payor Programs**" means all payment and reimbursement programs, sponsored by a Third Party Payor, in which a Borrower participates.

"**Transferred Accounts**" means, collectively, the "Accounts Receivable" (as defined in the Tenet License Agreement), which are to be paid over to the Borrowers pursuant to the terms of the Acquisition Agreement, which are subject to no Lien other than a Lien in favor of Agent for its benefit and the benefit of the Lenders, and with respect to which the Tenet License Agreement remains in full force and effect.

"**TRICARE**" means the program administered pursuant to 10 U.S.C. Section 1071 et. seq.), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

"**UCC**" means the Uniform Commercial Code of the State of Maryland or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" means the United States of America.

**Section 1.2    Accounting Terms and Determinations**.   Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Debt or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value", as defined therein.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including, without limitation, determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of each Borrower and its consolidated subsidiaries delivered to Agent and each of the Lenders on or prior to the Closing Date.  If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Financing Document, and either

36

Borrowers or the Required Lenders shall so request, the Agent, the Lenders and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided, however*, that until so amended, (a) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.

Section 1.3     **Other Definitional and Interpretive Provisions.**  References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits" or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided.  Any term defined herein may be used in the singular or plural.  "Include", "includes" and "including" shall be deemed to be followed by "without limitation".  Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively.  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.  References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.  References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States.  References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.  As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect.  References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC.  All references herein to times of day shall be references to daylight or standard time, as applicable.

Section 1.4     **Funding and Settlement Currency.**  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.

## ARTICLE 2 LOANS AND LETTERS OF CREDIT

Section 2.1     **Loans**.

(a)     **Term Loans.**

(i)     **Term Loan Amounts.  On the terms and subject to the conditions set forth herein, the Lenders severally hereby agree to make to Borrowers a term loan in an original principal amount equal to the Term Loan Commitment ("Term Loan").  Each Lender's obligation to fund the Term Loan shall be limited to such Lender's Term Loan Commitment Percentage, and no**

Lender shall have any obligation to fund any portion of any Term Loan required to be funded by any other Lender, but not so funded. No Borrower shall have any right to reborrow any portion of the Term Loan that is repaid or prepaid from time to time. The Term Loan shall be funded in one advance on the First Amendment Effective Date. Borrowers shall deliver to Agent a Notice of Borrowing with respect to the Term Loan no later than noon (Eastern time) one (1) Business Day prior to the First Amendment Effective Date.

(ii)    Scheduled Repayments; Mandatory Prepayments; Optional Prepayments.

(A)    There shall become due and payable, and Borrowers shall repay the Term Loan through, scheduled payments as set forth on Schedule 2.1. Notwithstanding the payment schedule set forth above, the outstanding principal amount of the Term Loan shall become immediately due and payable in full on the Termination Date.

(B)    Except as otherwise provided in the applicable Broad Street Mortgage for the Broad Street Facility to which such proceeds apply, on the date on which a Credit Party (or Agent as loss payee or assignee) receives any Broad Street Casualty Proceeds, an amount equal to one hundred percent (100%) of such Broad Street Casualty Proceeds, or such lesser portion of such proceeds as Agent shall elect to apply to the Obligations;

(C)    Borrowers may from time to time, with at least two (2) Business Days prior delivery to Agent of an appropriately completed Payment Notification, prepay the Term Loan in whole or in part without penalty; *provided, however,* that each such prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000.

(iii)    All Prepayments. Except as this Agreement may specifically provide otherwise, all prepayments of the Term Loan shall be applied by Agent to the Obligations in inverse order of maturity. The monthly payments required under Schedule 2.1 shall continue in the same amount (for so long as the Term Loan shall remain outstanding) notwithstanding any partial prepayment, whether mandatory or optional, of the Term Loan.

(iv)    LIBOR Rate.

(A)    Except as provided in subsection (C) below, the Term Loan shall accrue interest at the LIBOR Rate plus Applicable Margin.

(B)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in

38

Applicable Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest based upon the LIBOR Rate; provided, however, that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued. In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (I) require such Lender to furnish to Borrowers a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (II) repay the Term Loans bearing interest based upon the LIBOR Rate with respect to which such adjustment is made.

(C)    In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain Term Loans bearing interest based upon the LIBOR Rate or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender and (I) in the case of any outstanding Term Loans of such Lender bearing interest based upon the LIBOR Rate, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Term Loans, and interest upon such Lender's Term Loans thereafter shall accrue interest at Base Rate plus the Applicable Margin, and (II) such Term Loans shall continue to accrue interest at Base Rate plus the Applicable Margin until such Lender determines that it would no longer be unlawful or impractical to maintain such Term Loans at the LIBOR Rate.

(D)    (a) Reserved.Anything to the contrary contained herein notwithstanding, neither Agent nor any Lender is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues based on the LIBOR Rate.

(b)     Revolving Loans.

(i)     Revolving Loans and Borrowings. On the terms and subject to the conditions set forth herein, each Lender severally agrees to make loans to Borrowers from time to time as set forth herein (each a "**Revolving Loan**", and collectively, "**Revolving Loans**") equal to such Lender's Revolving Loan Commitment Percentage of Revolving Loans requested by Borrowers hereunder, *provided*, *however*, that after giving effect thereto, the Revolving Loan Outstandings shall not exceed the Revolving Loan Limit. Borrowers shall deliver to Agent a Notice of Borrowing with respect to each proposed Revolving Loan Borrowing, such Notice of Borrowing to be delivered no later than 1:00 P.M. (New York Time) two (2) Business Days prior to the date of such proposed borrowing. Each Borrower and each Revolving Lender hereby authorizes Agent to make Revolving Loans on behalf of Revolving Lenders, at any time in its sole discretion, (A) as provided in Section 2.5(c), with respect to obligations then due and owing under Support Agreements and/or Lender Letters of Credit, and (B) to pay principal owing in respect of the Loans and interest, fees, expenses and other charges then due and owing by any Credit Party from time to time arising under this Agreement or any other Financing Document. The Borrowing Base shall be determined by Agent based on the most recent Borrowing Base Certificate delivered to Agent in accordance with this Agreement and such other information as may be available to Agent. Without limiting any other rights and remedies of Agent hereunder or under the other Financing Documents, the Revolving Loans shall be subject to Agent's continuing right to withhold from the Borrowing Base reserves, and to increase and decrease such reserves from time to time, if and to the extent that in Agent's good faith, commercially reasonable credit judgment and discretion, such reserves are necessary. Notwithstanding any other provision herein to the contrary, Lenders shall have no obligation to make available the proceeds of Revolving Loans to the Clinically Integrated Network Entities except as provided in Section 5.16.

(ii)     Mandatory Revolving Loan Repayments and Prepayments.

(A)     The Revolving Loan Commitment shall terminate on the Termination Date. On such Termination Date, there shall become due, and Borrowers shall pay, the entire outstanding principal amount of each Revolving Loan, together with accrued and unpaid Obligations pertaining thereto.

(B)     If at any time the Revolving Loan Outstandings exceed the Revolving Loan Limit, then, on the next succeeding Business Day, Borrowers shall repay the Revolving Loans or cash collateralize Letter of Credit Liabilities in the manner specified in Section 2.5(e) or cause the cancellation of outstanding Letters of Credit, or any combination of the foregoing, in an aggregate amount equal to such excess. Notwithstanding the foregoing, Inadvertent Overadvances shall be due and payable within two (2) Business Days of the date of the existence of any such Inadvertent Overadvance.

(C)     Principal payable on account of Revolving Loans shall be payable by Borrowers to Agent (I) immediately upon the receipt by any Borrower or Agent of any payments on or proceeds from any of the Accounts, to the extent

of such payments or proceeds, as further described in Section 2.11 below, and (II) in full on the Termination Date.

(iii)    Optional Prepayments.  Borrowers may from time to time prepay the Revolving Loans in whole or in part; *provided*, *however*, that any such partial prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000.

(iv)    LIBOR Rate.

(A)    Except as provided in subsection (C) below, Revolving Loans shall accrue interest at the LIBOR Rate *plus* the Applicable Margin.

(B)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in Applicable Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest based upon the LIBOR Rate; *provided, however,* that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued.  In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (I) require such Lender to furnish to Borrowers a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (II) repay the **Revolving** Loans bearing interest based upon the LIBOR Rate with respect to which such adjustment is made.

(C)    In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain **Revolving** Loans bearing interest based upon the LIBOR Rate or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other

41

Lender and (I) in the case of any outstanding **Revolving** Loans of such Lender bearing interest based upon the LIBOR Rate, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Loans, and interest upon such Lender's **Revolving** Loans thereafter shall accrue interest at Base Rate *plus* the Applicable Margin, and (II) such **Revolving** Loans shall continue to accrue interest at Base Rate *plus* the Applicable Margin until such Lender determines that it would no longer be unlawful or impractical to maintain such **Revolving** Loans at the LIBOR Rate.

(D)     Anything to the contrary contained herein notwithstanding, neither Agent nor any Lender is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues based on the LIBOR Rate.

**Section 2.2     Interest, Interest Calculations and Certain Fees**.

(a)     Interest.  From and following the Closing Date, except as expressly set forth in this Agreement, Loans and the other Obligations shall bear interest at the sum of the LIBOR Rate *plus* the Applicable Margin.  Interest on the Loans shall be paid in arrears on the first (1st) day of each month and on the maturity of such Loans, whether by acceleration or otherwise.  Interest on all other Obligations shall be payable upon demand.  For purposes of calculating interest, all funds transferred from the Payment Account for application to any Revolving Loans **or the Term Loan** shall be subject to a six (6) Business Day clearance period and all interest accruing on such funds during such clearance period shall accrue for the benefit of Agent, and not for the benefit of the Lenders.

(b)     Unused Line Fee.  From and following the Closing Date, Borrowers shall pay Agent, for the benefit of all Lenders committed to make Revolving Loans, in accordance with their respective Pro Rata Shares, a fee in an amount equal to (i) (A) the Revolving Loan Commitment *minus* (B) the greater of (x) the average end-of-day principal balance of the Revolving Loan Outstandings during the immediately preceding month and (y) the Minimum Balance (as defined in the Fee Letter), *multiplied by* (ii) 0.50% per annum.  Such fee is to be paid monthly in arrears on the first day of each month.

(c)     Fee Letter.  In addition to the other fees set forth herein, the Borrowers agree to pay Agent the fees set forth in the Fee Letter.

(d)     Deferred Revolving Loan Fee.  If Lenders' funding obligations in respect of the Revolving Loan Commitment under this Agreement terminate for any reason (whether by voluntary termination by Borrowers, by reason of the occurrence of an Event of Default or otherwise) prior to the Commitment Expiry Date, Borrowers shall pay to Agent, for the benefit of all Lenders committed to make Revolving Loans on the Closing Date, a fee as compensation for the costs of such Lenders being prepared to make funds available to Borrowers under this Agreement, equal to an amount determined by *multiplying* the Revolving Loan Commitment *by* the following applicable percentage amount:  3.0% for the first year following the Closing Date, 2.0% for the second year following the Closing Date, and 1.0% thereafter.  All fees payable

pursuant to this paragraph shall be deemed fully earned and non-refundable as of the Closing Date.

(e)   <u>Audit Fees</u>.  Borrowers shall pay to Agent, for its own account and not for the benefit of any other Lenders, all reasonable fees and expenses then due and owing in connection with audits or inspections of Borrowers' books and records, audits, valuations or appraisals of the Collateral, audits of Borrowers' compliance with applicable Laws and such other matters as Agent shall deem appropriate, which shall be due and payable on the first Business Day of the month following the date of issuance by Agent of a written request for payment thereof to Borrowers; provided, however, that (i) unless an Event of Default has occurred and is continuing, Agent shall only conduct three (3) collateral audits or inspections per year, and (ii) Borrowers shall not be responsible for fees and expenses in connection with such collateral audits or inspections to the extent such fees and expenses are in excess of $75,000.00 per year, unless an Event of Default has occurred and is continuing.

(f)   <u>Wire Fees</u>.  Borrowers shall pay to Agent, for its own account and not for the account of any other Lenders, on written demand, fees for incoming and outgoing wires made for the account of Borrowers, such fees to be based on Agent's then current wire fee schedule (available upon written request of the Borrowers).

(g)   <u>Late Charges</u>.  If payments of principal (other than a final installment of principal upon the Termination Date), interest due on the Obligations, or any other amounts due hereunder or under the other Financing Documents are not timely made and remain overdue for a period of five (5) days, Borrowers, without notice or demand by Agent, promptly shall pay to Agent, for its own account and not for the benefit of any other Lenders, as additional compensation to Agent in administering the Obligations, an amount equal to three percent (3.0%) of each delinquent payment.

(h)   <u>Computation of Interest and Related Fees</u>.  All interest and fees under each Financing Document shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  The date of funding of a Loan shall be included in the calculation of interest.  The date of payment of a Loan shall be excluded from the calculation of interest.  If a Loan is repaid on the same day that it is made, one (1) day's interest shall be charged.

**Section 2.3**   <u>**Notes.**</u>  The portion of the Loans made by each Lender shall be evidenced, if so requested by such Lender, by one or more promissory notes executed by Borrowers on a joint and several basis (each, a "**Note**") in an original principal amount equal to such Lender's Revolving Loan Commitment Amount **or Term Loan Commitment Amount**.

**Section 2.4**   <u>**Reserved**</u>.

**Section 2.5**   <u>**Letters of Credit and Letter of Credit Fees**</u>.

(a)   <u>Letter of Credit</u>.  On the terms and subject to the conditions set forth herein, the Revolving Loan Commitment may be used by Borrowers, in addition to the making of Revolving Loans hereunder, for the issuance, prior to that date which is one year prior to the Termination Date, by (i) Agent, of letters of credit, Guarantees or other agreements or

arrangements (each, a "**Support Agreement**") to induce an LC Issuer to issue or increase the amount of, or extend the expiry date of, one or more Letters of Credit (including any Fund Contribution LC) and (ii) a Lender, identified by Agent, as an LC Issuer, of one or more Lender Letters of Credit (including any Fund Contribution LC), so long as, in each case:

        (i)     Agent shall have received a Notice of LC Credit Event at least five (5) Business Days before the relevant date of issuance, increase or extension; and

        (ii)    after giving effect to such issuance, increase or extension, (A) the aggregate Letter of Credit Liabilities do not exceed $7,500,000 and (B) the Revolving Loan Outstandings do not exceed the Revolving Loan Limit.

        Nothing in this Agreement shall be construed to obligate any Lender to issue, increase the amount of or extend the expiry date of any Letter of Credit, which act or acts, if any, shall be subject to agreements to be entered into from time to time between Borrowers and such Lender.  Each Lender that is an LC Issuer hereby agrees to give Agent prompt written notice of each issuance of a Lender Letter of Credit by such Lender and each payment made by such Lender in respect of Lender Letters of Credit issued by such Lender.

        Notwithstanding anything to the contrary set forth herein, Borrowers agree and acknowledge that no part of the Revolving Loan Commitment will be available for the issuance of a Letter of Credit until such times as Agent notifies Borrower Representative that a Lender party to this Agreement is an LC Issuer.

        (b)    <u>Letter of Credit Fee</u>.  Borrowers shall pay to Agent, for the benefit of the Revolving Lenders in accordance with their respective Pro Rata Shares, a letter of credit fee with respect to the Letter of Credit Liabilities for each Letter of Credit, computed for each day from the date of issuance of such Letter of Credit to the date that is the last day a drawing is available under such Letter of Credit, at a rate per annum equal to the Applicable Margin then applicable to Revolving Loans bearing interest based upon the LIBOR Rate.  Such fee shall be payable in arrears on the last day of each calendar month prior to the Termination Date and on such date.  In addition, Borrowers agree to pay promptly to the LC Issuer any fronting or other fees that it may charge in connection with any Letter of Credit.

        (c)    <u>Reimbursement Obligations of Borrowers</u>.  If either (i) Agent shall make a payment to an LC Issuer pursuant to a Support Agreement, or (ii) any Lender shall notify Agent that it has made payment in respect of, a Lender Letter of Credit, (A) the applicable Borrower shall reimburse Agent or such Lender, as applicable, for the amount of such payment by the end of the day on which Agent or such Lender shall make such payment and (B) Borrowers shall be deemed to have immediately requested that Revolving Lenders make a Revolving Loan, in a principal amount equal to the amount of such payment (but solely to the extent such Borrower shall have failed to directly reimburse Agent or, with respect to Lender Letters of Credit, the applicable LC Issuer, for the amount of such payment).  Agent shall promptly notify Revolving Lenders of any such deemed request and each Revolving Lender hereby agrees to make available to Agent not later than noon (Eastern time) on the Business Day following such notification from Agent such Revolving Lender's Pro Rata Share of such Revolving Loan.  Each Revolving Lender hereby absolutely and unconditionally agrees to fund such Revolving Lender's Pro Rata Share of

the Loan described in the immediately preceding sentence, unaffected by any circumstance whatsoever, including, without limitation, (x) the occurrence and continuance of a Default or Event of Default, (y) the fact that, whether before or after giving effect to the making of any such Revolving Loan, the Revolving Loan Outstandings exceed or will exceed the Revolving Loan Limit, and/or (z) the non-satisfaction of any conditions set forth in Section 7.2.  Agent hereby agrees to apply the gross proceeds of each Revolving Loan deemed made pursuant to this Section 2.5(c) in satisfaction of Borrowers' reimbursement obligations arising pursuant to this Section 2.5(c).  Borrowers shall pay interest, on demand, on all amounts so paid by Agent pursuant to any Support Agreement or to any applicable Lender in honoring a draw request under any Lender Letter of Credit for each day from the date of such payment until Borrowers reimburse Agent or the applicable Lender therefor (whether pursuant to clause (A) or (B) of the first sentence of this subsection (c)) at a rate per annum equal to the sum of two percent (2%) *plus* the interest rate applicable to Revolving Loans for such day.

(d)    Reimbursement and Other Payments by Borrowers.  The obligations of each Borrower to reimburse Agent and/or the applicable LC Issuer pursuant to Section 2.5(c) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including the following:

(i)    any lack of validity or enforceability of, or any amendment or waiver of or any consent to departure from, any Letter of Credit or any related document;

(ii)    the existence of any claim, set-off, defense or other right which any Borrower may have at any time against the beneficiary of any Letter of Credit, the LC Issuer (including any claim for improper payment), Agent, any Lender or any other Person, whether in connection with any Financing Document or any unrelated transaction, *provided*, *however*, that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(iii)    any statement or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever;

(iv)    any affiliation between the LC Issuer and Agent; or

(v)    to the extent permitted under applicable law, any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

(e)    Deposit Obligations of Borrowers.  In the event any Letters of Credit are outstanding at the time that Borrowers prepay in full or are required to repay the Obligations or the Revolving Loan Commitment is terminated, Borrowers shall (i) deposit with Agent for the benefit of all Revolving Lenders cash in an amount equal to one hundred five percent (105%) of the aggregate outstanding Letter of Credit Liabilities to be available to Agent, for its benefit and the benefit of issuers of Letters of Credit, to reimburse payments of drafts drawn under such Letters of Credit and pay any fees and expenses related thereto, and (ii) prepay the fee payable under Section 2.5(b) with respect to such Letters of Credit for the full remaining terms of such Letters of Credit assuming that the full amount of such Letters of Credit as of the date of such

CHICAGO/#3111951.7B

repayment or termination remain outstanding until the end of such remaining terms.   Upon termination of any such Letter of Credit and so long as no Event of Default has occurred and is continuing, the unearned portion of such prepaid fee attributable to such Letter of Credit shall be refunded to Borrowers, together with the deposit described in the preceding clause (i) attributable to such Letter of Credit, but only to the extent not previously applied by Agent in the manner described herein.

(f)    Participations in Support Agreements and Lender Letters of Credit.

(i)    Concurrently with the issuance of each Supported Letter of Credit, Agent shall be deemed to have sold and transferred to each Revolving Lender, and each such Revolving Lender shall be deemed irrevocably and immediately to have purchased and received from Agent, without recourse or warranty, an undivided interest and participation in, to the extent of such Lender's Pro Rata Share, Agent's Support Agreement liabilities and obligations in respect of such Supported Letter of Credit and Borrowers' Reimbursement Obligations with respect thereto.   Concurrently with the issuance of each Lender Letter of Credit, the LC Issuer in respect thereof shall be deemed to have sold and transferred to each Revolving Lender, and each such Revolving Lender shall be deemed irrevocably and immediately to have purchased and received from such LC Issuer, without recourse or warranty, an undivided interest and participation in, to the extent of such Lender's Pro Rata Share, such Lender Letter of Credit and Borrowers' Reimbursement Obligations with respect thereto.   Any purchase obligation arising pursuant to the immediately two preceding sentences shall be absolute and unconditional and shall not be affected by any circumstances whatsoever.

(ii)    If either (A) Agent makes any payment or disbursement under any Support Agreement and/or (B) an LC Issuer makes any payment or disbursement under any Lender Letter of Credit, and (I) Borrowers have not reimbursed Agent or the applicable LC Issuer, as applicable, in full for such payment or disbursement in accordance with Section 2.5(c), or (II) any reimbursement under any Support Agreement or Lender Letter of Credit received by Agent or any LC Issuer, as applicable, from any Credit Party is or must be returned or rescinded upon or during any bankruptcy or reorganization of any Credit Party or otherwise, each Revolving Lender shall be irrevocably and unconditionally obligated to pay to Agent or the applicable LC Issuer, as applicable, its Pro Rata Share of such payment or disbursement (but no such payment shall diminish the Obligations of Borrowers under Section 2.5(c)).   To the extent any such Revolving Lender shall not have made such amount available to Agent or the applicable LC Issuer, as applicable, by 12:00 p.m. (Eastern time) on the Business Day on which such Lender receives notice from Agent or the applicable LC Issuer, as applicable, of such payment or disbursement, or return or rescission, as applicable, such Lender agrees to pay interest on such amount to Agent or the applicable LC Issuer, as applicable, forthwith on demand accruing daily at the Federal Funds Rate, for the first three (3) days following such Lender's receipt of such notice, and thereafter at the Base Rate *plus* the rate set forth in clause (a) of the definition of Applicable Margin.   Any such Revolving Lender's failure to make available to Agent or the applicable LC Issuer, as applicable, its Pro Rata Share of any such payment or disbursement, or return or rescission, as applicable, shall not relieve any other Lender of its obligation hereunder to make

46

available such other Revolving Lender's Pro Rata Share of such payment, but no Revolving Lender shall be responsible for the failure of any other Lender to make available such other Lender's Pro Rata Share of any such payment or disbursement, or return or rescission.

**Section 2.6    General Provisions Regarding Payment; Loan Account**.

(a)    All payments to be made by each Borrower under any Financing Document, including payments of principal and interest made hereunder and pursuant to any other Financing Document, and all fees, expenses, indemnities and reimbursements, shall be made without set-off, recoupment or counterclaim, in lawful money of the United States and in immediately available funds.  If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension (it being understood and agreed that, solely for purposes of calculating financial covenants and computations contained herein and determining compliance therewith, if payment is made, in full, on any such extended due date, such payment shall be deemed to have been paid on the original due date without giving effect to any extension thereto).  Any payments received in the Payment Account before 12:00 Noon (Eastern time) on any date shall be deemed received by Agent on such date, and any payments received in the Payment Account after 12:00 Noon (Eastern time) on any date shall be deemed received by Agent on the next succeeding Business Day.  **In the absence of receipt by Agent of a written designation by Borrower Representative, at least two (2) Business Days prior to any prepayment, that such prepayment is to be applied to the Term Loan, Borrowers and each Lender hereby authorize and direct Agent, subject to the provisions of Section 10.7 hereof, to apply such prepayment against then outstanding Revolving Loans, and second, if no Revolving Loans are then outstanding, pro rata against the Term Loan in accordance with the provisions of Section 2.1(a)(iii); provided, that if Agent at any time determines that payments received by Agent were in respect of a mandatory prepayment event, Agent shall apply such payments in accordance with the provisions of Section 2.1(a)(ii) and shall be fully authorized by Borrowers and each Lender to make corresponding Loan Account reversals in respect thereof.**

(b)    Agent shall maintain a loan account (the "**Loan Account**") on its books to record Loans and other extensions of credit made by the Lenders hereunder or under any other Financing Document, and all payments thereon made by each Borrower.  All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded in Agent's books and records at any time shall be conclusive and binding evidence of the amounts due and owing to Agent by each Borrower absent manifest error; *provided*, *however*, that any failure to so record or any error in so recording shall not limit or otherwise affect any Borrower's duty to pay all amounts owing hereunder or under any other Financing Document.  Agent shall use good faith efforts to provide Borrowers with a monthly statement regarding the Loan Account (but neither Agent nor any Lender shall have any liability if Agent shall fail to provide any such statement).  Unless any Borrower notifies Agent of any objection to any such statement (specifically describing the basis for such objection) within one hundred fifty (150) days after the date of receipt thereof, it shall be

deemed final, binding and conclusive upon Borrowers in all respects as to all matters reflected therein.

Section 2.7  **Maximum Interest.**  In no event shall the interest charged with respect to the Loans or any other Obligations of any Borrower under any Financing Document exceed the maximum amount permitted under the laws of the State of Maryland or of any other applicable jurisdiction.  Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable hereunder or under any Note or other Financing Document (the "**Stated Rate**") would exceed the highest rate of interest permitted under any applicable law to be charged (the "**Maximum Lawful Rate**"), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; *provided*, *however*, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, each Borrower shall, to the extent permitted by law, continue to pay interest at the Maximum Lawful Rate until such time as the total interest received is equal to the total interest which would have been received had the Stated Rate been (but for the operation of this provision) the interest rate payable.  Thereafter, the interest rate payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply.  In no event shall the total interest received by any Lender exceed the amount which it could lawfully have received had the interest been calculated for the full term hereof at the Maximum Lawful Rate.  If, notwithstanding the prior sentence, any Lender has received interest hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other amounts (other than interest) payable hereunder, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining shall be paid to Borrowers.  In computing interest payable with reference to the Maximum Lawful Rate applicable to any Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate *divided by* the number of days in the year in which such calculation is made.

Section 2.8  **Taxes; Capital Adequacy**.

(a)     All payments of principal and interest on the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future Taxes, except as required by applicable Law.  If any withholding or deduction from any payment to be made by any Borrower hereunder is required in respect of any Taxes pursuant to any applicable Law, then such Borrower will:  (i) pay directly to the relevant authority the full amount required to be so withheld or deducted; (ii) promptly forward to Agent an official receipt or other documentation satisfactory to Agent evidencing such payment to such authority; and (iii) if any such withholding or deduction is in respect of any Indemnified Taxes, pay to Agent for the account of Agent and Lenders such additional amount or amounts as is necessary to ensure that the net amount actually received by Agent and each Lender will equal the full amount Agent and such Lender would have received had no such withholding or deduction been required.  If any Indemnified Taxes are directly asserted against Agent or any Lender with respect to any payment received by Agent or such Lender hereunder, Agent or such Lender may pay such Indemnified Taxes and Borrowers will promptly pay such additional amounts (including any penalty, interest or expense then due and owing) as is necessary in order that the net amount received by such Person after the payment of such Indemnified Taxes (including any Indemnified Taxes on such additional amount) shall equal the amount such Person would have received had such

Indemnified Taxes not been asserted so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which Agent or such Lender first made written demand therefor.

(b)        Without duplication of any amount paid pursuant to Section 2.8(a), the Borrowers shall indemnify Agent and Lenders, within ten (10) days after demand thereof, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.8) payable or paid by Agent or any Lender or required to be withheld or deducted from a payment to Agent or any Lender and any expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate in reasonable detail as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)        Each Lender that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes and is a party hereto on the Closing Date or purports to become an assignee of an interest pursuant to Section 12.6(a) after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) (each such Lender a "**Foreign Lender**") shall, to the extent permitted by Law, execute and deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent) whichever of the following is applicable:  (A) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Financing Document, two (2) properly completed and executed originals of United States Internal Revenue Service ("**IRS**") Forms W-8BEN or W-8BEN-E (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Financing Documents, two (2) properly completed and executed originals of IRS Forms W-8BEN or W-8BEN-E (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty; (B) two (2) executed originals of Form W-8ECI (or successor form); (C) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) two (2) executed originals of IRS Forms W-8BEN or W-8BEN-E (or successor form); (D) to the extent a Foreign Lender is not the beneficial owner, two (2) executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E (or successor form), IRS Form W-9 (or successor form), and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide such certification documents on behalf of each such direct and indirect partner; or (E) other applicable forms, certificates or documents prescribed by the IRS.  Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in

any respect, it shall update such form or certification or promptly notify Borrower and Agent in writing of its legal inability to do so.  In addition, to the extent permitted by applicable Law, such forms shall be delivered by each Foreign Lender upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender.  Each Foreign Lender shall promptly notify Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(d)     Each Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes and is a party hereto on the Closing Date or purports to become an assignee of an interest pursuant to Section 12.6(a) after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) shall, to the extent permitted by Law, provide to Borrower and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), a properly completed and executed IRS Form W-9 or any successor form certifying as to such Lender's entitlement to an exemption from U.S. backup withholding and other applicable forms, certificates or documents prescribed by the IRS or reasonably requested by Borrower or Agent. Each such Lender shall promptly notify Borrower at any time it determines that any certificate previously delivered to Borrower (or any other form of certification adopted by the U.S. governmental authorities for such purposes) is no longer valid.

(e)     Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Agent), executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrowers or Agent to determine the withholding or deduction required to be made.

(f)     If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which it has been indemnified by any Borrower pursuant to this Section 2.8 (including by the payment of additional amounts pursuant to this Section 2.8), then it shall promptly pay an amount equal to such refund to Borrower, net of all reasonable out-of-pocket expenses of such Lender or of Agent with respect thereto, including any Taxes; provided, however, that Borrower, upon the written request of such Lender or Agent, agrees to repay any amount paid over to Borrower to such Lender or to Agent (plus any related penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such Lender or Agent is required, for any reason, to disgorge or otherwise repay such refund. Notwithstanding anything to the contrary in this Section 2.8, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.8(f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.8 shall not be construed to require any indemnified party to make available its Tax

50

returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     If a payment made to a Lender under any Financing Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Agent at the time or times prescribed by Law and at such time or times reasonably requested by Borrower or Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Agent as may be necessary for Borrower and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Each Lender shall severally indemnify Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.17(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Financing Document or otherwise payable by Agent to such Lender from any other source against any amount due to Agent under this paragraph (h).

(i)     If any Lender shall determine in its commercially reasonable judgment that the adoption or taking effect of, or any change in, any applicable Law regarding capital adequacy, in each instance, after the Closing Date, or any change after the Closing Date in the interpretation, administration or application thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, or the compliance by any Lender or any Person controlling such Lender with any request, guideline or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency adopted or otherwise taking effect after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder or under any Support Agreement or Lender Letter of Credit to a level below that which such Lender or such controlling Person could have achieved but for such adoption, taking effect, change, interpretation, administration, application or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy) then from time to time, upon written demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Agent), Borrowers shall promptly pay to such

51

Lender such additional amount as will compensate such Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is one hundred seventy (270) days prior to the date on which such Lender first made demand therefor; *provided, however,* that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued.

(j)    If any Lender requires compensation under Section 2.8(i), or requires any Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.8(a), then, upon the written request of Borrower Representative, such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder (subject to the terms of this Agreement) to another of its offices, branches or affiliates, if, in the reasonable business judgment of such Lender, such designation or assignment (i) would eliminate or materially reduce amounts payable pursuant to any such subsection, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender (as determined in its sole discretion). Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**Section 2.9    Appointment of Borrower Representative.**    Each Borrower hereby designates Borrower Representative as its representative and agent on its behalf for the purposes of issuing Notices of Borrowing, Notices of LC Credit Events and Borrowing Base Certificates, and giving instructions with respect to the disbursement of the proceeds of the Loans, requesting Letters of Credit, giving and receiving all other notices and consents hereunder or under any of the other Financing Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Financing Documents. Borrower Representative hereby accepts such appointment. Notwithstanding anything to the contrary contained in this Agreement, no Borrower other than Borrower Representative shall be entitled to take any of the foregoing actions. The proceeds of each Loan made hereunder shall be advanced to Borrowers at the direction of Borrower Representative and if funds are advanced to a Borrower but not used by a Borrower in its business (for the purposes provided in this Agreement) such funds shall be deemed to be immediately allocated by Borrower Representative to the appropriate other Borrower hereunder as an intercompany loan (collectively, "**Intercompany Loans**"). All Letters of Credit and Support Agreements issued hereunder shall be issued at Borrower Representative's request therefor and shall be allocated to the appropriate Borrower's Intercompany Loan account by Borrower Representative. All collections of each Borrower in respect of Accounts and other proceeds of Collateral of such Borrower received by Agent and applied to the Obligations shall also be deemed to be repayments of the Intercompany Loans owing by such Borrower. Borrowers shall maintain accurate books and records with respect to all Intercompany Loans and all repayments thereof. Agent and each Lender may regard any notice or other communication pursuant to any Financing Document from Borrower Representative as a notice or communication from all Borrowers, and may give any notice or

communication required or permitted to be given to any Borrower or all Borrowers hereunder to Borrower Representative on behalf of such Borrower or all Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

**Section 2.10    Joint and Several Liability; Rights of Contribution; Subordination and Subrogation**.

(a)    Borrowers are defined collectively to include all Persons named as one of the Borrowers herein; *provided, however*, that any references herein to "any Borrower", "each Borrower" or similar references, shall be construed as a reference to each individual Person named as one of the Borrowers herein. Each Person so named shall be jointly and severally liable for all of the obligations of Borrowers under this Agreement. Each Borrower, individually, expressly understands, agrees and acknowledges, that the credit facilities would not be made available on the terms herein in the absence of the collective credit of all of the Persons named as the Borrowers herein, the joint and several liability of all such Persons, and the cross-collateralization of the collateral of all such Persons. Accordingly, each Borrower individually acknowledges that the benefit to each of the Persons named as one of the Borrowers as a whole constitutes reasonably equivalent value, regardless of the amount of the credit facilities actually borrowed by, advanced to, or the amount of collateral provided by, any individual Borrower. In addition, each entity named as one of the Borrowers herein hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement shall be applicable to and shall be binding upon and measured and enforceable individually against each Person named as one of the Borrowers herein as well as all such Persons when taken together. By way of illustration, but without limiting the generality of the foregoing, the terms of Section 10.1 of this Agreement are to be applied to each individual Person named as one of the Borrowers herein (as well as to all such Persons taken as a whole), such that the occurrence of any of the events described in Section 10.1 of this Agreement as to any Person named as one of the Borrowers herein shall constitute an Event of Default even if such event has not occurred as to any other Persons named as the Borrowers or as to all such Persons taken as a whole.

(b)    Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the liability of each Borrower for the Obligations and the Liens granted by Borrowers to secure the Obligations, not constitute a Fraudulent Conveyance (as defined below). Consequently, Agent, Lenders and each Borrower agree that if the liability of a Borrower for the Obligations, or any Liens granted by such Borrower securing the Obligations would, but for the application of this sentence, constitute a Fraudulent Conveyance, the liability of such Borrower and the Liens securing such liability shall be valid and enforceable only to the maximum extent that would not cause such liability or such Lien to constitute a Fraudulent Conveyance, and the liability of such Borrower and this Agreement shall automatically be deemed to have been amended accordingly. For purposes hereof, the term "**Fraudulent Conveyance**" means a fraudulent conveyance under Section 548 of Chapter 11 of Title II of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the

applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

(c)     Agent is hereby authorized, without notice or demand (except as otherwise specifically required under this Agreement) and without affecting the liability of any Borrower hereunder, at any time and from time to time, to (i) renew, extend or otherwise increase the time for payment of the Obligations; (ii) with the written agreement of any Borrower, change the terms relating to the Obligations or otherwise modify, amend or change the terms of any Note or other agreement, document or instrument now or hereafter executed by any Borrower and delivered to Agent for any Lender; (iii) accept partial payments of the Obligations; (iv) take and hold any Collateral for the payment of the Obligations or for the payment of any guaranties of the Obligations and after the occurrence and during the continuance of any Event of Default, exchange, enforce, waive and release any such Collateral; (v) apply any such Collateral and direct the order or manner of sale as provided herein; and (vi) after the occurrence and during the continuance of any Event of Default, settle, release, compromise, collect or otherwise liquidate the Obligations and any Collateral therefor in any manner, all surety defenses being hereby waived by each Borrower.  Without limitations of the foregoing, with respect to the Obligations, each Borrower hereby makes and adopts each of the agreements and waivers set forth in each Guarantee, the same being incorporated hereby by reference.  Except as specifically provided in this Agreement or any of the other Financing Documents, Agent shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from any Borrower or any other source, and such determination shall be binding on all Borrowers.  All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of the Obligations that Agent shall determine, in its sole discretion, without affecting the validity or enforceability of the Obligations of the other Borrower.

(d)     Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect the Obligations from any obligor or other action to enforce the same; (ii) the waiver or consent by Agent with respect to any provision of any instrument evidencing the Obligations, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Agent; (iii) failure by Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations; (iv) the institution of any proceeding under the Bankruptcy Code, or any similar proceeding, by or against a Borrower or Agent's election in any such proceeding of the application of Section 1111(b)(2) of the Bankruptcy Code; (v) any borrowing or grant of a security interest by a Borrower as debtor-in-possession, under Section 364 of the Bankruptcy Code; (vi) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of Agent's claim(s) for repayment of any of the Obligations; or (vii) any other circumstance other than payment in full of the Obligations which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

(e)     The Borrowers hereby agree, as between themselves, that to the extent that Agent, on behalf of Lenders, shall have received from any Borrower any Recovery Amount (as defined below), then the paying Borrower shall have a right of contribution against each other Borrower in an amount equal to such other Borrower's contributive share of such Recovery Amount; *provided, however*, that in the event any Borrower suffers a Deficiency Amount (as

CHICAGO/#3111951.7B

defined below), then the Borrower suffering the Deficiency Amount shall be entitled to seek and receive contribution from and against the other Borrowers in an amount equal to the Deficiency Amount; and *provided, further*, that in no event shall the aggregate amounts so reimbursed by reason of the contribution of any Borrower equal or exceed an amount that would, if paid, constitute or result in Fraudulent Conveyance.  Until all Obligations have been paid and satisfied in full, no payment made by or for the account of a Borrower including, without limitation, (i) a payment made by such Borrower on behalf of the liabilities of any other Borrower, or (ii) a payment made by any other Guarantor under any Guarantee, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of such other Borrower's property.  The right of each Borrower to receive any contribution under this Section 2.10(e) or by subrogation or otherwise from any other Borrower shall be subordinate in right of payment to the Obligations and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder, until the Obligations have been indefeasibly paid and satisfied in full, and no Borrower shall exercise any right or remedy with respect to this Section 2.10(e) until the Obligations have been indefeasibly paid and satisfied in full.  As used in this Section 2.10(e), the term "**Recovery Amount**" means the amount of proceeds received by or credited to Agent from the exercise of any remedy of the Lenders under this Agreement or the other Financing Documents, including, without limitation, the sale of any Collateral.  As used in this Section 2.10(e), the term "**Deficiency Amount**" means any amount that is less than the entire amount a Borrower is entitled to receive by way of contribution or subrogation from, but that has not been paid by, the other Borrowers in respect of any Recovery Amount attributable to the Borrower entitled to contribution, until the Deficiency Amount has been reduced to zero through contributions and reimbursements made under the terms of this Section 2.10(e) or otherwise.

**Section 2.11   Collections and Lockbox Account**.

(a)     Borrowers shall maintain a lockbox (the "**Lockbox**") with a United States depository institution designated from time to time by Agent (the "**Lockbox Bank**"), subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Control Agreement and such other agreements related to such Lockbox as Agent may require. Borrowers shall ensure that all collections of Accounts (other than Accounts for which the Account Debtor is a Governmental Account Debtor) are paid directly from Account Debtors (i) into the Lockbox for deposit into the Lockbox Account and/or (ii) directly into the Lockbox Account; *provided, however*, unless Agent shall otherwise direct by written notice to Borrowers, Borrowers shall be permitted to cause Account Debtors who are individuals to pay Accounts directly to Borrowers, which Borrowers shall then administer and apply in the manner required below.

(b)     If any of the Account Debtors are Governmental Account Debtors, Borrowers shall establish and maintain additional lockboxes (also herein referred to collectively in the singular as the "**Lockbox**") and related Lockbox Accounts with the Lockbox Bank, subject to the provisions of this Agreement, and shall execute with the Lockbox Bank, a Deposit Account Restriction Agreement and such other agreements related to such Lockbox as Agent may require.  Borrowers shall ensure that all collections of Accounts due from Governmental Account Debtors are paid directly from such Account Debtors into the applicable Lockbox

and/or Lockbox Account established pursuant to this subsection for deposit into the Lockbox Account established pursuant to this subsection; *provided, however*, unless Agent shall otherwise direct by written notice to Borrowers, Borrowers shall be permitted to receive checks from Governmental Account Debtors directly, which Borrowers shall then administer and apply in the manner required below.  All funds deposited into a Lockbox Account that is subject (or required to be subject) to a Deposit Account Restriction Agreement shall be transferred into either (at Agent's option) (i) the Payment Account each Business Day, or (ii) the Lockbox Account established pursuant to Section 2.11(a), and then transferred to the Payment Account each Business Day.

(c)    All funds deposited into a Lockbox Account shall be transferred into the Payment Account each Business Day.

(d)    Notwithstanding anything in any lockbox agreement or Deposit Account Control Agreement to the contrary, Borrowers agree that they shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockbox and, the Lockbox Account and that Agent shall have no liability therefor.  Borrowers hereby indemnify and agree to hold Agent harmless from any and all liabilities, claims, losses and demands whatsoever, including reasonable attorneys' fees and expenses actually incurred by Agent directly, arising from or relating to actions of Agent or the Lockbox Bank pursuant to this Section or any lockbox agreement or Deposit Account Control Agreement, except to the extent of such losses arising solely from Agent's gross negligence, bad faith or willful misconduct.

(e)    Agent shall apply, on a daily basis, all funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Revolving Loans.  **Agent shall have no obligation to apply any funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Term Loan, but Agent shall have the option to apply such funds to any Term Loan to the extent of any payments (whether of principal, interest or otherwise) due and payable in respect thereof; provided that Agent shall give Borrowers written notice at least one (1) Business Day prior to making any such application.**  If as the result of collections of Accounts pursuant to the terms and conditions of this Section, a credit balance exists with respect to the Loan Account, such credit balance shall not accrue interest in favor of Borrowers, but Agent shall transfer such funds into an account designated by Borrower Representative provided no Event of Default exists on such date.

(f)    To the extent that any collections of Accounts or proceeds of other Collateral are not sent directly to the Lockbox or Lockbox Account but are received by any Borrower, such collections shall be held in trust for the benefit of Agent pursuant to an express trust created hereby and promptly remitted, in the form received, to applicable Lockbox or Lockbox Account.  No such funds received by any Borrower shall be commingled with other funds of the Borrowers.  If any funds received by any Borrower are required to be deposited to a Lockbox or Lockbox Account and are not so deposited within two (2) Business Days, then Borrower shall pay to Agent, for its own account and not for the account of any other Lenders, a compliance fee equal to $500 for each Business Day that any such conditions exist.

(g)    Borrowers acknowledge and agree that compliance with the terms of this Section is essential, and that Agent and Lenders will suffer immediate and irreparable injury and

CHICAGO/#3111951.7B

have no adequate remedy at law, if any Borrower, through acts or omissions, causes or permits Account Debtors to send payments other than to the Lockbox or Lockbox Accounts or if any Borrower fails to promptly deposit collections of Accounts or proceeds of other Collateral in the Lockbox Account as herein required.  Accordingly, in addition to all other rights and remedies of Agent and Lenders hereunder, Agent shall have the right to seek specific performance of the Borrowers' obligations under this Section, and any other equitable relief as Agent may deem necessary or appropriate, and Borrowers waive any requirement for the posting of a bond in connection with such equitable relief.

(h)     Borrowers shall not, and Borrowers shall not suffer or permit any Credit Party to, (i) withdraw any amounts from any Lockbox Account, (ii) change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii) send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of Accounts or other Collateral.  Borrowers shall, and shall cause each Credit Party to, cooperate with Agent in the identification and reconciliation on a monthly basis of all amounts constituting net patient revenue received in or required to be deposited into the Lockbox Accounts to the reported cash posted in the most-recent Borrowing Base Certificate prepared by Borrowers and delivered to Agent.  For any given month, such identification and reconciliation shall occur during ten (10) Business Days following the end of each calendar month.  If more than fifteen percent (15%) of the collections of Accounts received by Borrowers for such month is not identified or reconciled to the reasonable satisfaction of Agent within ten (10) Business Days of receipt, Agent shall not be obligated to make further advances under this Agreement until such amount is identified or is reconciled to the reasonable satisfaction of Agent, as the case may be.  In addition, if any such amount cannot be identified or reconciled to the reasonable satisfaction of Agent, Agent may utilize its own staff or, if it deems necessary, engage an outside auditor, in either case at Borrowers' expense (which in the case of Agent's own staff shall be in accordance with Agent's then prevailing customary charges (*plus* reasonable expenses actually incurred)), to make such examination and report as may be necessary to identify and reconcile such amount.

(i)     If any Borrower breaches its obligation to direct payments of the proceeds of the Accounts to the Lockbox and/or Lockbox Account, Agent, as the irrevocably made, constituted and appointed true and lawful attorney for Borrowers, may, by the signature or other act of any of Agent's officers (without requiring any of them to do so), direct any Account Debtor to pay proceeds of the Accounts to Borrowers by directing payment to the Lockbox and/or Lockbox Account.

(j)     Borrowers shall cause any payments, settlements, dividends or distributions received by a Borrower from HPP to be paid directly from HPP to the Lockbox Account described in clause (a) above, including the HPP Designated Amount but excluding (i) any proceeds of an HPP Sale that are permitted to be distributed to Holdings pursuant to Section 5.3(f), (ii) any proceeds of an HPP Sale which are restricted by any applicable law or the articles of organization of HPP, (iii) any proceeds of an HPP Sale solely to the extent that material adverse tax consequences would be reasonably likely to occur with respect to any Borrower or any of its Subsidiaries or Affiliates from such payment, or (iv) otherwise with the prior written consent of Agent.

**(k)    Borrowers shall not be required to comply with the terms of this Section 2.11 with respect to any Incentive Payments received by PPN Philadelphia.**

Section 2.12    **Termination; Restriction on Termination**.

(a)    Termination by Lenders.  In addition to the rights set forth in Section 10.2, Agent may, and at the direction of Required Lenders shall, terminate this Agreement with written notice to Borrower Representative upon or after the occurrence and during the continuance of an Event of Default.

(b)    Termination by Borrowers.  Upon at least thirty (30) days' prior written notice to Agent and Lenders, Borrowers may, at its option, terminate this Agreement; *provided, however,* that no such termination shall be effective until Borrowers have (i) paid or collateralized to Agent's satisfaction all of the Obligations (other than unasserted Contingent Obligations) in immediately available funds and all Letters of Credit and Support Agreements have expired, terminated or have been cash collateralized to Agent's satisfaction and (ii) complied with Section 2.2(d).  Any notice of termination given by Borrowers shall be irrevocable unless all Lenders otherwise agree in writing and no Lender shall have any obligation to make any Loans or issue or procure any Letters of Credit or Support Agreements on or after the termination date stated in such notice.  Borrowers may elect to terminate this Agreement in its entirety only.  No section of this Agreement or type of Loan available hereunder may be terminated singly.

(c)    Effectiveness of Termination.    All of the Obligations (other than unasserted Contingent Obligations) shall be immediately due and payable upon the Termination Date.  All undertakings, agreements, covenants, warranties and representations of Borrowers contained in the Financing Documents shall survive any such termination and Agent shall retain its Liens in the Collateral and Agent and each Lender shall retain all of its rights and remedies under the Financing Documents notwithstanding such termination until all Obligations have been discharged, collateralized or paid, in full, in immediately available funds, including, without limitation, all Obligations under Section 2.2(d) resulting from such termination.  Notwithstanding the foregoing or the payment in full of the Obligations, Agent shall not be required to terminate its Liens in the Collateral unless, with respect to any loss or damage Agent may incur as a result of dishonored checks or other items of payment received by Agent from Borrower or any Account Debtor and applied to the Obligations (other than unasserted Contingent Obligations), Agent shall, at its option, (i) have received a written agreement satisfactory to Agent, executed by Borrowers and by any Person whose loans or other advances to Borrowers are used in whole or in part to satisfy the Obligations, indemnifying Agent and each Lender from any such loss or damage or (ii) have retained cash Collateral or other Collateral for such period of time as Agent, in its reasonable discretion, may deem necessary to protect Agent and each Lender from any such loss or damage.

## ARTICLE 3 REPRESENTATIONS AND WARRANTIES

To induce Agent and Lenders to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, each Borrower hereby represents and warrants to Agent and each Lender that:

**Section 3.1    Existence and Power.**

(a)    Each Credit Party (i) is an entity as specified on Schedule 3.1, is duly organized, validly existing and in good standing under the laws of the jurisdiction specified on Schedule 3.1 and is not organized under any other jurisdiction, (ii) has the same legal name as it appears in such Credit Party's Organizational Documents and an organizational identification number (if any), in each case as specified on Schedule 3.1, and (iii) has all powers and all Permits necessary or desirable in the operation of its business as presently conducted or as proposed to be conducted, except where the failure to have such Permits could not reasonably be expected to have a Material Adverse Effect.

(b)    Each Credit Party is qualified to do business as a foreign entity in each jurisdiction in which it is required to be so qualified, which jurisdictions as of the Closing Date are specified on Schedule 3.1, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(c)    Except as set forth on Schedule 3.1, no Credit Party (a) has had, over the five (5) year period preceding the Closing Date, any name other than its current name, or (b) was incorporated or organized under the laws of any jurisdiction other than its current jurisdiction of incorporation or organization.

(d)    Schedule 3.1 has been prepared after giving effect to the Acquisition and the Borrower Assumption.

**Section 3.2    Organization and Governmental Authorization; No Contravention.** The execution, delivery and performance by each Credit Party of the Operative Documents to which it is a party (a) are within its powers, have been duly authorized by all necessary action pursuant to its Organizational Documents, (b) require no further action by or in respect of, or filing with, any Governmental Authority or other material order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, or any other action of, any other Person (except for (x) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date and (y) those, the failure of which to receive, could not reasonably be expected to have a Material Adverse Effect), and (c) do not violate, conflict with or cause a breach or a default under (i) any Law applicable to any Credit Party or any of the Organizational Documents of any Credit Party, or (ii) any agreement or instrument binding upon it, except for such violations, conflicts, breaches or defaults as could not, with respect to this clause (c), reasonably be expected to have a Material Adverse Effect.

**Section 3.3    Binding Effect.** Each of the Operative Documents to which any Credit Party is a party constitutes a valid and binding agreement or instrument of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

**Section 3.4    Capitalization.** The authorized equity securities of each of the Credit Parties as of the Closing Date, after giving effect to the Acquisition and the Borrower

Assumption, is as set forth on Schedule 3.4.  All issued and outstanding equity securities of each of the Credit Parties are duly authorized and validly issued, fully paid, nonassessable, free and clear of all Liens other than those in favor of Agent for the benefit of Agent and the Lenders, and such equity securities were issued in compliance with all applicable Laws.  The identity of the holders of the equity securities of each of the Credit Parties and the percentage of their fully-diluted ownership of the equity securities of each of the Credit Parties as of the Closing Date is set forth on Schedule 3.4.  No shares of the capital stock or other equity securities of any Credit Party, other than those described above, are issued and outstanding as of the Closing Date.  Except as set forth on Schedule 3.4, as of the Closing Date there are no preemptive or other outstanding rights, options, warrants, conversion rights or similar agreements or understandings for the purchase or acquisition from any Credit Party of any equity securities of any such entity.

Section 3.5    **Financial and Project Information.**  All information (other than any projection or forecast) delivered to Agent and pertaining to the financial condition of any Credit Party fairly presents in all material respects the financial position of such Credit Party as of such date in conformity with GAAP (and as to unaudited financial statements, subject to normal year-end adjustments**, purchase accounting adjustments with respect to the period ending December 31, 2018 or any portion thereof,** and the absence of footnote disclosures); provided that, with respect to any projected or forecasted financial information, the Borrowers represent that such information was prepared in good faith based on assumption believed to be reasonable at the time of preparation.  All information (other than any projection or forecast) delivered to Agent and pertaining to the financial, physical or other condition or aspect of the Project is true, accurate and correct in all material respects as of such date and as of the date hereof.  Since the date of the last annual audited consolidated financial statements, there has been no event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

Section 3.6    **Litigation**.  Except as set forth on Schedule 3.6 as of the Closing Date, and except as hereafter disclosed to Agent in writing, there is no Litigation pending against, or to such Borrower's knowledge threatened in writing against, any Credit Party or Project or, to such Borrower's knowledge, any party to any Operative Document other than a Credit Party that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or which in any manner draws into question the validity of any of the Operative Documents.

Section 3.7    **Ownership of Property.**  Each Credit Party is the lawful owner of, has good and marketable title to and is in lawful possession of, or has valid leasehold interests in, all properties and other assets (real or personal, tangible, intangible or mixed) purported or reported to be owned or leased (as the case may be) by such Person.

Section 3.8    **No Default.**  No Event of Default, or to such Borrower's knowledge, Default, has occurred and is continuing.  No Borrower nor any Guarantor is in breach or default under or with respect to any contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect.

Section 3.9    **Labor Matters.**  As of the Closing Date, there are no strikes or other labor disputes pending or, to any Borrower's knowledge, threatened against any Credit Party.  Hours worked and payments made to the employees of the Borrowers, Operator and/or Managers have

not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters. All payments due from the Borrowers, Operator and/or Managers or for which any claim may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on their books, as the case may be. The consummation of the transactions contemplated by the Financing Documents and the other Operative Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.

Section 3.10  **Regulated Entities.**  No Credit Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," all within the meaning of the Investment Company Act of 1940.

Section 3.11  **Margin Regulations.**  None of the proceeds from the Loans have been or will be used, directly or indirectly, for the purpose of purchasing or carrying any "margin stock" (as defined in Regulation U of the Federal Reserve Board), for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any "margin stock" or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation T, U or X of the Federal Reserve Board.

Section 3.12  **Compliance with Laws; Anti-Terrorism Laws**.

(a)  Each Credit Party is in compliance with the requirements of all applicable Laws, except for such Laws the noncompliance with which could not reasonably be expected to have a Material Adverse Effect.

(b)  None of the Credit Parties and, to the knowledge of the Credit Parties, none of their Affiliates (i) is in violation of any Anti-Terrorism Law, (ii) engages in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, (iii) is a Blocked Person, or is controlled by a Blocked Person, (iv) is acting for or on behalf of a Blocked Person, (v) is associated with a Blocked Person or (vi) is providing material, financial or technical support or other services to or in support of acts of terrorism of a Blocked Person. No Credit Party nor, to the knowledge of any Credit Party, any of its Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

Section 3.13  **Taxes.**  All federal, state and material local tax returns and reports required to be filed by or on behalf of each Credit Party have been filed with the appropriate Governmental Authorities in all jurisdictions in which such returns and reports are required to be filed (after giving effect to any extensions thereof) and, except to the extent subject to a Permitted Contest, all Taxes (including real property Taxes) and other charges shown to be due and payable in respect thereof have been timely paid prior to the date on which any fine, penalty, interest, or late charge may be added thereto for nonpayment thereof. Except to the extent

subject to a Permitted Contest, all state and local sales and use Taxes required to be paid by each Credit Party have been paid.  All federal and state returns have been filed by each Credit Party for all periods for which returns were due with respect to employee income tax withholding, social security and unemployment taxes, and, except to the extent subject to a Permitted Contest, the amounts shown thereon to be due and payable have been paid in full or adequate provisions therefor have been made.

### Section 3.14    Compliance with ERISA.

(a)    Each ERISA Plan (and the related trusts and funding agreements) of a Borrower or a Subsidiary complies in form and in operation with, has been administered in compliance with, and the terms of each ERISA Plan satisfy, the applicable requirements of ERISA and the Code in all material respects.  Each ERISA Plan which is intended to be qualified under Section 401(a) of the Code is so qualified, and the United States Internal Revenue Service has issued a favorable determination letter with respect to each such ERISA Plan which may be relied on currently.  No Credit Party has incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

(b)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Borrower and each Subsidiary is in compliance with the applicable provisions of ERISA and the provision of the Code relating to ERISA Plans and the regulations and published interpretations therein.  During the thirty-six (36) month period prior to the Closing Date or the making of any Loan or the issuance of any Letter of Credit, (i) no steps have been taken to terminate any Pension Plan, and (ii) no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA.  No condition exists or event or transaction has occurred with respect to any Pension Plan which could reasonably be expected to result in the incurrence by any Credit Party of any material liability, fine or penalty.  No Credit Party has incurred liability to the PBGC (other than for current premiums) with respect to any employee Pension Plan.  All contributions (if any) have been made on a timely basis to any Multiemployer Plan that are required to be made by any Credit Party or any other member of the Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable Law; no Credit Party nor any member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could reasonably be expected to result in a withdrawal or partial withdrawal from any such plan, and no Credit Party nor any member of the Controlled Group has received any notice that any Multiemployer Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

### Section 3.15    Consummation of Operative Documents; Brokers.  Except for fees payable to Agent and/or Lenders, no Credit Party has engaged any broker, finder or other intermediary to bring about the obtaining, making or closing of the transactions contemplated by the Operative Documents, and no Credit Party has or will have any obligation to any Person in

62

respect of any finder's or brokerage fees, commissions or other expenses in connection herewith or therewith. All brokerage and finder's fees, commissions and other expenses payable in connection with the transactions contemplated by the Operative Documents have been paid in full by Borrowers contemporaneously with the execution of the Financing Documents and the initial funding of the Loan. Except for fees payable to Agent and/or Lenders, no broker, finder or other intermediary has brought about the obtaining, making or closing of the transactions contemplated by the Operative Documents, and no Credit Party has any obligation to any Person in respect of any finder's or brokerage fee in connection herewith or therewith.

Section 3.16 **Related Transactions.** All transactions contemplated by the Operative Documents to be consummated on or prior to the date hereof have been so consummated (including, without limitation, the disbursement and transfer of all funds in connection therewith) in all material respects pursuant to the provisions of the applicable Operative Documents, true and complete copies of which have been delivered to Agent, and in compliance with all applicable Laws, except for such Laws the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

Section 3.17 **Material Contracts**. Except for the Operative Documents and the other agreements set forth on Schedule 3.17, as of the Closing Date there are no (a) employment agreements (other than physician services agreements) covering the management of any Borrower, (b) collective bargaining agreements or other similar labor agreements covering any employees of any Borrower, (c) agreements for managerial, consulting or similar services to which any Borrower is a party or by which it is bound, (d) agreements regarding any Borrower, its assets or operations or any investment therein to which any of its equityholders is a party or by which it is bound, (e) real estate leases, intellectual property licenses or other lease or license agreements to which any Borrower is a party, either as lessor or lessee, or as licensor or licensee (other than licenses arising from the purchasing of "off the shelf" products), (f) marketing or supply agreements to which any Borrower is a party except for those supply agreements the noncompliance of which would not reasonably be expected to cause a Material Adverse Effect, in each case with respect to the preceding clauses (a), (c), (d), (e), and (f) requiring payment of more than $500,000 in any year for each Project, (g) partnership agreements to which any Borrower is a general partner or joint venture agreements to which any Borrower is a party, (h) third party billing arrangements to which any Borrower is a party, or (i) other agreements or instruments to which any Credit Party is a party, the breach, nonperformance or cancellation of which, or the failure of which to renew, could reasonably be expected to have a Material Adverse Effect (all such agreements described in subclauses (a) through (i), collectively with the Operative Documents, the "**Material Contracts**"); provided that, notwithstanding the foregoing, solely with respect to contracts that are assumed by a Borrower from a Tenet Seller or to which a Target Borrower is party at the time the Acquisition is consummated, (i) no such contract shall be a "Material Contract" hereunder unless it also satisfies the definition of "Material Contracts" in the Acquisition Agreement and (ii) no such contract shall be a "Material Contract" hereunder as a result of its inclusion on Schedule 3.17 unless it also satisfies the criteria in any of the subclauses (a) through (i) of this Section 3.17. The consummation of the transactions contemplated by the Financing Documents and the other Operative Documents will not give rise to a right of termination in favor of any party to any Material Contract (other than any Credit Party), except for such Material Contracts the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

63

**Section 3.18    Compliance with Environmental Requirements; No Hazardous Materials**.  Except in each case as set forth on Schedule 3.18:

(a)    no notice, notification, demand, request for information, citation, summons, complaint or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending, or to each Borrower's knowledge, threatened by any Governmental Authority or other Person with respect to any (i) alleged violation by any Borrower of any Environmental Law, (ii) alleged failure by any Borrower to have any Permits required in connection with the conduct of its business or to comply with the terms and conditions thereof, (iii) any generation, treatment, storage, recycling, transportation or disposal of any Hazardous Materials by any Borrower, or (iv) Release of Hazardous Materials by any Borrower; and

(b)    to the knowledge of each Borrower, no property now owned or leased by any Credit Party and no such property previously owned or leased by any Credit Party, to which any Credit Party has, directly or indirectly, transported or arranged for the transportation of any Hazardous Materials, is listed or, to such Borrower's knowledge, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of Federal, state or local enforcement actions or, to the knowledge of such Borrower, other investigations which may lead to claims against any Credit Party for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, without limitation, claims under CERCLA.

For purposes of this Section 3.18, each Credit Party shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of such Credit Party.

**Section 3.19    Solvency.**  After giving effect to the Loan advance and the liabilities and obligations of each Borrower under the Operative Documents, the Borrowers, on a consolidated basis, are Solvent.

**Section 3.20    Full Disclosure.**  None of the written information (financial or otherwise but excluding any projections or forecasts referenced below) furnished by or on behalf of any Credit Party to Agent or any Lender in connection with the consummation of the transactions contemplated by the Operative Documents, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which such statements were made.  All financial projections delivered to Agent and the Lenders by Borrowers (or their agents) have been prepared on the basis of the assumptions stated therein.  Such projections represent each Borrower's best estimate of such Borrower's future financial performance and such assumptions are believed by such Borrower to be fair and reasonable in light of current business conditions; *provided*, *however*, that Borrowers can give no assurance that such projections will be attained.

**Section 3.21    Interest Rate.**  The rate of interest paid under the Notes does not violate any of the Organizational Documents.

**Section 3.22  Subsidiaries.**  Borrowers do not own any stock, partnership interests, limited liability company interests or other equity securities except for Permitted Investments.

**Section 3.23  Representations and Warranties Incorporated from Operative Documents.**  As of the Closing Date, each of the representations and warranties made in the Operative Documents by each Credit Party is true and correct in all material respects, and such representations and warranties are hereby incorporated herein by reference with the same effect as though set forth in their entirety herein, as qualified therein, except to the extent that such representation or warranty relates to a specific date, in which case such representation and warranty shall be true as of such earlier date.

**Section 3.24  Senior Indebtedness Status**.  As of the Closing Date, the Obligations of each Credit Party under the Financing Documents rank at least senior in priority of payment to all Debt that is contractually subordinated to the Obligations of each such Person under this Agreement and is designated as "Senior Indebtedness" (or an equivalent term) under all instruments and documents, now or in the future, relating to all Debt that is contractually subordinated to the Obligations under this Agreement of each such Person.

**Section 3.25  Perfection of Security Interests in the Collateral**.  The Security Documents create valid security interests in, and Liens on, the Collateral purported to be covered thereby, which security interests and Liens, to the extent required by the Security Documents, and to the extent all necessary action has been timely and properly taken by Agent as contemplated by such Security Documents, are or will be perfected security interests and Liens, prior to all other Liens other than Permitted Liens.  Except for filings completed on or prior to the Closing Date and as contemplated hereby and by the Security Documents, no filing or other action will be necessary to perfect such Liens with respect to the Collateral owned by the Credit Parties on the Closing Date other than the actions described in Section 7.3.

## ARTICLE 4 AFFIRMATIVE COVENANTS

Each Borrower agrees that, so long as any Credit Exposure exists:

**Section 4.1  Financial Statements and Other Reports**.

(a)  Each Credit Party's financial statements shall be on an accrual basis consistent with industry standards as in effect on the Closing Date and substantially in accordance with GAAP.

(b)  Each Borrower will furnish to Agent (or cause to be furnished to Agent) the following financial information and reports with respect to each Borrower and each Credit Party, in each case in form and format and providing information reasonably satisfactory to Agent:

(i)  within thirty (30) days of the end of each calendar month (or, solely with respect to first three calendar months after the Closing Date, within forty-five (45) days of the end of each such calendar month), internally prepared monthly financial statements (including income statements and balance sheets) prepared for Borrowers on a

consolidated and hospital-by-hospital basis which fairly present, in all material respects, the financial condition for Borrowers for such period **(except for purchase accounting adjustments with respect to the period ending December 31, 2018 or any portion thereof)**;

(ii)    within thirty (30) days of the end of each calendar month, a report of operating statistics for each Project, which includes a schedule showing case mix, length of stay and payor mix in respect of Third Party Payor Programs;

(iii)    within forty-five (45) days of the end of each fiscal quarter, internally prepared quarterly financial statements (including income statements and balance sheets) prepared for Borrowers on a consolidated and hospital-by-hospital basis which fairly present, in all material respects, the financial condition for Borrowers for such period **(except for purchase accounting adjustments with respect to the period ending December 31, 2018 or any portion thereof)**;

(iv)    within forty-five (45) days after the end of each calendar month, a fully completed Compliance Certificate, and, if requested by Agent, back-up documentation as Agent shall reasonably require evidencing such compliance;

(v)    within fifteen (15) days before the end of each fiscal year, annual projected profit and loss statements (prepared on a monthly basis) for the succeeding fiscal year;

(vi)    within seventy-five (75) days after the end of each fiscal year (or, solely with respect to the first fiscal year ending after the Closing Date, one hundred five (105) days after the end of such fiscal year), internally prepared annual financial statements prepared for the Borrowers on a consolidated basis in accordance with GAAP (except for the absence of footnotes**, purchase accounting adjustments with respect to the period ending December 31, 2018 or any portion thereof,** and year-end adjustments) and based on an accrual basis of accounting consistent with industry standards;

(vii)    within one hundred fifty (150) days after the end of each fiscal year, annual consolidated audited financial statements prepared for the Borrowers in accordance with GAAP, each together with an unqualified letter from an independent certified public accounting firm acceptable to Agent in its reasonable discretion; **provided that to the extent Holdings furnishes to the Agent the financial statements and other documents required under Section 16(c) of the Payment Guaranty, dated as of January 11, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time), from Holdings in favor of the Agent, the delivery requirements of this clause (vii) shall be deemed satisfied;**

(viii)    as requested by Agent, (A) evidence satisfactory to Agent that all federal and state taxes, including, without limitation payroll taxes, that are due have been paid in full, and (B) copies of all cost reports and rate letters filed with Medicare or Medicaid or any other Third Party Payor;

(ix)    within ten (10) days after the last day of each month, deliver to Agent a duly completed Borrowing Base Certificate signed by a Responsible Officer, with aged listings of accounts receivable and accounts payable (by invoice date) and such other information concerning Supplemental Payments as is necessary to calculate Eligible Supplement Payments;

(x)    not later than May 31 of each calendar year, audited financial statements of the Insurance Captive for the immediately prior Fiscal Year of the Insurance Captive, prepared ~~under GAAP~~**in accordance with the State of Vermont statutory reporting requirements**, consistently applied, together with an unqualified opinion on the financial statements from an independent certified public accounting firm acceptable to Agent in its reasonable discretion.  Borrowers shall cause the Insurance Captive to conduct, at least annually, an actuarial review of the Insurance Captive that shall include, without limitation, a review of all professional and general liability claims and other claims covered by the Insurance Captive and shall cause the Insurance Captive to deliver to Agent, promptly upon receipt (but in no event more than five (5) Business Days after receipt by the Insurance Captive) such final actuarial report and any and all other written non-privileged material reports, opinions and studies performed by actuaries or insurance advisors related to the business of the Insurance Captive; and

(xi)    such additional information, reports or statements regarding the Credit Parties, the Projects or Operator as Agent may from time to time reasonably request.

(c)    Promptly upon (but in any event within thirty (30) days after) receipt or filing thereof, each Borrower shall deliver to Agent copies of any reports or notices related to any material taxes and any other material reports or material notices received by any Borrower or Guarantor from, or filed by any Borrower or Guarantor with, any Governmental Authority.

(d)    Promptly upon (but in any event within thirty (30) days after) their becoming available, Borrower shall deliver to Agent copies of all Swap Contracts.

(e)    Without limiting the foregoing, in the event an Event of Default described in Sections 10.1(a) (with respect to a breach of this Section 4.1 (with respect to the deliveries described in subclauses (i), (iii), (iv), (vi), (vii) and (ix) only), Section 4.6 (with respect to the Agent's or Lenders' inspection rights only) or Article 6 only), 10.1(e) or 10.1(f) has occurred and is continuing, Borrowers shall provide to Agent, within one (1) Business Day after the occurrence of any such Event of Default, a copy of the current password(s) to Borrowers' cloud-based accounts receivable and billing systems and shall not change such password(s) without providing Agent with a copy of such new password(s) (which disclosure shall be made within one (1) Business Day after any such change); provided that, notwithstanding the foregoing, the password provided to Agent pursuant to this clause (e) may be restricted to viewing-access only unless the Event of Default giving rise to such disclosure obligation is described in Section 10.1(e) or 10.1(f) or Agent or Lenders are enforcing their remedies as a result of any other Event of Default described above in which case, for the avoidance of doubt, Agent shall be provided with a full-access password.

**Section 4.2    Payment and Performance of Obligations.**  Each Borrower (a) will pay and discharge, at or prior to maturity, all of their respective obligations and liabilities, including tax liabilities, except for such obligations and/or liabilities (i) that may be the subject of a Permitted Contest, and (ii) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, (b) will maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities, and (c) will not breach, or permit to exist any default caused by such Borrower under, the terms of any Material Contract, except for such breaches or defaults which could not reasonably be expected to have a Material Adverse Effect.

**Section 4.3    Maintenance of Existence**.  Each Borrower will preserve, renew and keep in full force and effect their respective existence and all material rights, privileges and franchises necessary in the conduct of business as currently conducted and herein contemplated.

**Section 4.4    Maintenance of Property; Payment of Taxes; Insurance**.

(a)    Each Borrower will keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.  Subject to the provisions of Section 9.2, if all or any part of the Collateral useful or necessary in its business becomes damaged or destroyed, each Borrower will promptly and completely repair and/or restore the affected Collateral in a good and workmanlike manner.  Borrowers will not, and will not permit any other Person to, commit or allow waste or permit impairment or deterioration of a material portion of the Collateral or abandon all or any part of the Collateral other than in the Ordinary Course of Business.  Borrowers will perform such acts to preserve the value of Collateral.  Each Borrower will (i) preserve its or their interest in and title to the Collateral and will forever warrant and defend the same to Agent and Lenders against any and all claims made by, through or under Borrowers, and (ii) except in respect of Permitted Liens, forever warrant and defend the validity and priority of the lien and security interest created in the Security Documents against the claims of all Persons whomsoever claiming by, through or under Borrowers.  The foregoing warranty of title shall survive the foreclosure of the Security Documents and shall inure to the benefit of and be enforceable by Agent in the event Agent acquires title to any Collateral pursuant to any foreclosure.

(b)    Borrowers will pay or cause to be paid all Taxes at least five (5) days prior to the date upon which any fine, penalty, interest or cost for nonpayment is imposed, and furnish to Agent, upon request, receipted bills of the appropriate taxing authority or other documentation reasonably satisfactory to Agent evidencing the payment thereof.  If Borrowers shall fail to pay any Taxes in accordance with this Section and are not contesting or causing a contesting of such Taxes pursuant to a Permitted Contest, Agent shall have the right, but shall not be obligated, to (for the account of all Lenders) pay such Taxes, and Borrowers shall repay to Agent, on written demand, any amount paid by Agent, with interest thereon from the date of the advance thereof to the date of repayment, at the rate applicable during periods of Default hereunder, and such amount shall constitute a portion of the Obligations.  Borrowers shall not pay any Taxes or other obligations in installments unless permitted by applicable Laws, and shall, upon the request of Agent, deliver copies of all notices and bills relating to any Taxes or other charge covered by this Section to Agent.

(c)     Upon completion of any Permitted Contest, Borrowers shall immediately pay the amount due, if any, and deliver to Agent proof of the completion of the contest and payment of the amount due, if any.

(d)     Each Borrower will maintain (i) casualty insurance on all real and personal property on an all risks basis (including the perils of flood, windstorm and quake), covering the repair and replacement cost of all such property and coverage for business interruption and rent loss and professional liability and public liability insurance (including products/completed operations liability coverage), and (ii) general and professional liability insurance, and (iii) such other insurance coverage in such reasonable amounts and coverage and with respect to such risks as Agent may reasonably request from time to time and which are customary for hospitals in the same industry; *provided, however*, that, in no event shall such insurance be in amounts or with coverage less than, or with carriers with qualifications inferior to, any of the insurance or carriers in existence as of the Closing Date.  All such insurance shall be provided by insurers having an A.M. Best policyholders rating reasonably acceptable to Agent.  Borrowers will not bring or keep any article on any Project, or cause or allow any condition to exist, if the presence of such article or the occurrence of such condition could reasonably cause the invalidation of any insurance required by this Section 4.4(d), or would otherwise be prohibited by the terms thereof.

(e)     On or prior to the Closing Date, and at all times thereafter, each Borrower will cause Agent to be named as an additional insured, assignee and loss payee (which shall include, as applicable, identification as mortgagee), as applicable, on each insurance policy required to be maintained pursuant to this Section 4.4 pursuant to endorsements in form and content reasonably acceptable to Agent, to the extent such insurance policy permits such designation.  Borrowers will deliver to Agent and the Lenders (i) on the Closing Date, a certificate from Borrowers' insurance broker dated such date showing the amount of coverage as of such date, and that such policies will include effective waivers (whether under the terms of any such policy or otherwise) by the insurer of all claims for insurance premiums against all loss payees and additional insureds and all rights of subrogation against all loss payees and additional insureds, and that if all or any part of such policy is canceled, terminated or expires, the insurer will forthwith give notice thereof to each additional insured, assignee and loss payee and that no cancellation thereof shall be effective until at least thirty (30) days (ten (10) days if such cancellation is due to nonpayment) after receipt by each additional insured, assignee and loss payee of written notice thereof, (ii) upon the request of any Lender through Agent from time to time full information as to the insurance carried, (iii) within five (5) days of receipt of notice from any insurer, a copy of any notice of cancellation, nonrenewal or material change in coverage from that existing on the date of this Agreement, (iv) forthwith, notice of any cancellation or nonrenewal of coverage by any Borrower, and (v) not less than thirty (30) days prior to the expiration of any policies of insurance, furnish to Lender, premiums prepaid, additional and renewal insurance policies with companies, coverage and in amounts required hereunder.

(f)     In the event any Borrower fails to provide Agent with evidence of the insurance coverage required by this Agreement, Agent may purchase insurance at Borrowers' expense to protect Agent's interests in the Collateral.  This insurance may, but need not, protect any Borrower's interests.  The coverage purchased by Agent may not pay any claim made by any Borrower or any claim that is made against any Borrower in connection with the Collateral.  The applicable Borrower may later cancel any insurance purchased by Agent, but only after providing

69

Agent with evidence that such Borrower has obtained insurance as required by this Agreement. If Agent purchases insurance for the Collateral, to the fullest extent provided by law Borrowers will be responsible for the costs of that insurance, including interest and other charges imposed by Agent in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance each Borrower is able to obtain on its own.

(g)     If any insurance proceeds are paid by check, draft or other instrument payable to any Borrower and Agent jointly and an Event of Default has occurred and is continuing, such Borrower authorizes Agent to endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Borrowers shall not carry separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section. Borrowers shall promptly notify Agent of any loss, damage, or destruction to any Collateral outside of the Ordinary Course of Business, whether or not covered by insurance. Unless otherwise set forth herein, and an Event of Default has occurred and is continuing, Agent is hereby authorized to collect all insurance proceeds in respect of Collateral directly and to apply the same to the Obligations then due and payable. After the occurrence and during the continuance of an Event of Default, Agent is authorized and empowered, and each Borrower hereby irrevocably appoints Agent as its (or their) attorney-in-fact (such appointment is coupled with an interest), at Agent's option, to make or file proofs of loss or damage and to settle and adjust any claim under insurance policies which insure against such risks, or to direct Borrowers, in writing, to agree with the insurance carrier(s) on the amount to be paid in regard to such loss.

(h)     Anything in this Section 4.4 to the contrary notwithstanding, Agent acknowledges and agrees that, solely with respect to the Captive Insureds, the commercial general liability and professional liability coverage required under Section 4.4(d) shall be provided by an Insurance Captive. The use of an Insurance Captive shall be permitted provided that:

(i)     the Insurance Captive shall, at all times, satisfy the definition of "Insurance Captive" set forth in Section 1.1;

(ii)     the Insurance Captive shall maintain, at all times, not less than $1,000,000 of unimpaired paid-in capital and surplus as required for a risk retention group under the Laws of the State of Vermont;

(iii)     the Insurance Captive shall not have any creditors, there shall be no Liens on the assets of the Insurance Captive, and the Insurance Captive shall have no Contingent Obligations other than policy claims, including without limitation, incurred but not reported claims;

(iv)     the commercial general liability coverage limits per occurrence and in the aggregate shall be not less than $1,000,000 and $3,000,000, respectively;

70

(v)    the hospital professional liability coverage limits per occurrence and in the aggregate shall be not less than $500,000 and $2,500,000, respectively;

(vi)    the physician professional liability coverage limits per occurrence and in the aggregate shall be not less than $500,000 and $1,500,000, respectively;

(vii)    annual premiums shall be in an amount necessary to maintain not less than $1,000,000 of unimpaired paid-in capital and surplus as required for a risk retention group under the Laws of the State of Vermont;

(viii)    the deposit accounts of the Insurance Captive benefiting the Captive Insureds shall continue to be maintained solely for the benefit of such Captive Insureds; and

(ix)    Borrowers shall comply at all times with the requirements set forth in Section 4.1(b)(x) relating to the delivery of financial reports and other items with respect to the Insurance Captive.

**Section 4.5    Compliance with Laws and Material Contracts**.  Each Credit Party will comply with the requirements of all applicable Laws and Material Contracts, except to the extent that failure to so comply could not reasonably be expected to, individually or in the aggregate, (a) have a Material Adverse Effect, or (b) result in any Lien upon either a material portion of the assets of any such Person in favor of any Governmental Authority, or any portion of the Collateral which is part of the Borrowing Base.

**Section 4.6    Inspection of Property, Books and Records**.  Each Credit Party will keep proper books of record substantially in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities; and will permit, at the sole cost of the applicable Credit Party as provided in Section 2.2(e), representatives of Agent and of any Lender (but at such Lender's expense unless such visit or inspection is made concurrently with Agent) to visit and inspect any of their respective properties, to monitor or examine any health care quality assurance programs, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective operations and the Collateral to verify the amount and age of the Accounts, the identity and credit of the respective Account Debtors, to review the billing practices of any Credit Party, and to discuss their respective affairs, finances and accounts with their respective officers, employees and independent public accountants; provided that (i) Agent shall only conduct three (3) collateral audits or inspections per year, and (ii) Borrowers shall not be responsible for fees and expenses in connection with such collateral audits or inspections to the extent such fees and expenses are in excess of $75,000.00 per year, in each case unless an Event of Default has occurred and is continuing.  In the absence of an Event of Default, Agent or any Lender exercising any rights pursuant to this Section 4.6 shall give the applicable Borrower commercially reasonable prior notice of such exercise.  No notice shall be required during the existence and continuance of any Event of Default.  If Agent or any Lender seeks, as part of its inspection or information rights hereunder or under any related agreements, access to or copies of any patient health information or other private information protected by HIPAA or other applicable local, state and federal Laws, such information shall be provided only in accordance

71

with applicable confidentiality safeguards, in compliance with HIPAA and such other applicable Laws; provided that nothing herein shall be deemed to be a request by Agent or any Lender for such private or confidential information nor a deviation from Agent's or any Lender's policy of requesting that information provided as part of an audit or examination be de-identified prior to disclosure.

Section 4.7    **Use of Proceeds**.  Borrowers shall use the proceeds of Revolving Loans solely for (a) the acquisition of substantially all the assets associated with the operation of the Projects and a 10% ownership interest to be held by certain Borrowers in the Insurance Captive, (b) transaction fees incurred in connection with the Financing Documents or otherwise payable by a Borrower pursuant to another Operative Document (including reimbursement on the Closing Date of not more than $1,000,000 of transaction expenses incurred by Paladin Healthcare Capital in connection with the Acquisition), and (c) working capital and other capital requirements of Borrowers and their Subsidiaries, including, without limitation, payment of rent under the Operating Leases (subject to any restrictions set forth in Section 5.3), and solely as to any Borrower's investment in the Insurance Captive, the proportionate capital requirements of the Insurance Captive related to such Borrower's investment.  **Borrowers shall use the proceeds of the Term Loan for working capital and other capital requirements of Borrowers and their Subsidiaries.**   No portion of the proceeds of the Loans will be used for family, personal, agricultural or household use or made available to any Clinically Integrated Network Entities except as provided in Section 5.16.

Section 4.8    **Reserved**.

Section 4.9    **Notices of Litigation and Defaults**.  Borrowers will give prompt written notice to Agent (a) of any litigation or governmental proceedings pending or threatened (in writing) against Borrowers or other Credit Party which would reasonably be expected to have a Material Adverse Effect with respect to Borrowers or any other Credit Party or which in any manner calls into question the validity or enforceability of any Financing Document, (b) upon any Borrower becoming aware of the existence of any Default or Event of Default, (c) if any Credit Party is in breach or default under or with respect to any Material Contract, or if any Credit Party is in breach or default under or with respect to any other contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect, (d) of any strikes or other labor disputes pending or, to any Borrower's knowledge, threatened in writing against any Credit Party, (e) of all returns, recoveries, disputes and claims relating to the Accounts that involve more than $150,000, and (f) other than with respect to reimbursement audits in the Ordinary Course of Business, any Permitted Contest involving more than $150,000 as well as any status of any Permitted Contest as requested by Agent.  In the case of any notice given pursuant to foregoing, Borrowers shall contemporaneously deliver a certificate of a Responsible Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Credit Parties have taken, are taking and propose to take with respect thereto.  Borrowers represent and warrant that Schedule 4.9 sets forth a complete list of all matters existing as of the Closing Date for which notice is required under this Section and all litigation or governmental proceedings pending or threatened (in writing) against Borrowers or other Credit Party as of the Closing Date.

**Section 4.10    Hazardous Materials; Remediation**.

(a)    If any Release or disposal of Hazardous Materials in violation of applicable Environmental Laws, shall occur or shall have occurred on any real property or any other assets of any Borrower or any other Credit Party, such Borrower will cause, or direct the applicable Credit Party to cause, the prompt containment and removal of such Hazardous Materials and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and so that such real property or other assets may be used as intended by such Credit Party.  Without limiting the generality of the foregoing, each Borrower shall, and shall cause each other Credit Party to, comply with each Environmental Law requiring the performance at any real property by any Borrower or any other Credit Party of activities in response to the Release or threatened Release of a Hazardous Material.

(b)    Borrowers will provide Agent within thirty (30) days after written demand therefor with a bond, letter of credit or similar financial assurance evidencing to the reasonable satisfaction of Agent that sufficient funds are available to pay the cost of removing, treating and disposing of or otherwise remediating any Hazardous Materials or Hazardous Materials Contamination and discharging any assessment which may be established on any property as a result thereof, such demand to be made, if at all, upon Agent's reasonable business determination that the failure to remove, treat, dispose of or otherwise remediate any Hazardous Materials or Hazardous Materials Contamination, or the failure to discharge any such assessment could reasonably be expected to have a Material Adverse Effect.

**Section 4.11    Reserved**.

**Section 4.12    Borrowing Base Collateral Administration**.

(a)    All data and other information relating to Accounts or other intangible Collateral shall at all times be kept by Borrowers, at their respective principal offices and shall not be moved from such locations without (i) providing prior written notice to Agent, and (ii) obtaining the prior written consent of Agent, which consent shall not be unreasonably withheld.

(b)    Borrowers shall provide prompt written notice to each Person who either is currently an Account Debtor or becomes an Account Debtor at any time following the date of this Agreement that directs each Account Debtor to make payments into the Lockbox, and hereby authorizes Agent, upon Borrowers' failure to send such notices within ten (10) days after the date of this Agreement (or ten (10) days after the Person becomes an Account Debtor), to send any and all similar notices to such Person.  Agent reserves the right to notify Account Debtors that Agent has been granted a Lien upon all Accounts.

**Section 4.13    Further Assurances**.

(a)    Each Borrower will, at its own cost and expense, cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as may from time to time be necessary or as Agent or the Required Lenders may from time to time reasonably request in order to carry out the intent and purposes of the Financing Documents and the transactions contemplated thereby, including all such actions to establish,

create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of Agent for the benefit of the Lenders on the Collateral (including Collateral acquired after the date hereof).

(b)     Upon receipt of an affidavit of an officer of Agent or a Lender as to the loss, theft, destruction or mutilation of any Note or any other Financing Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other applicable Financing Document, Borrowers will issue, in lieu thereof, a replacement Note or other applicable Financing Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Financing Document in the same principal amount thereof and otherwise of like tenor.

(c)     Upon the request of Agent, Borrowers shall obtain a landlord's agreement or mortgagee agreement, as applicable, from the lessor of each leased property or mortgagee of owned property with respect to any business location where any material portion of the Collateral included in or proposed to be included in the Borrowing Base, or the records relating to such Collateral and/or software and equipment relating to such records or Collateral, is stored or located, which agreement or letter shall be reasonably satisfactory in form and substance to Agent.  Borrowers shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location where any Collateral, or any records related thereto, is or may be located.

(d)     Each Borrower will, and will, cause all Subsidiaries of Borrowers to be jointly and severally obligated with the other Borrowers under all covenants and obligations under this Agreement, including the obligation to repay the Obligations.  Upon the formation or acquisition of a new Subsidiary, Borrowers shall (i) pledge, have pledged or cause or have caused to be pledged to the Agent pursuant to a pledge agreement in form and substance reasonably satisfactory to the Agent, all of the outstanding shares of equity interests or other equity interests of such new Subsidiary owned directly or indirectly by any Borrower, along with undated stock or equivalent powers for such certificates, executed in blank; (ii) unless Agent shall agree otherwise in writing, cause the new Subsidiary to take such other actions (including entering into or joining any Security Documents) as are necessary or advisable in the reasonable opinion of the Agent in order to grant the Agent, acting on behalf of the Lenders, a first priority Lien on all real and personal property of such Subsidiary in existence as of such date and in all after acquired property, which first priority Liens are required to be granted pursuant to this Agreement; provided that, notwithstanding the foregoing, in no event shall a leasehold mortgage in favor of the Agent be required with respect to any leased real property of such Subsidiary; (iii) unless Agent shall agree otherwise in writing, cause such new Subsidiary to either (at the election of Agent) become a Borrower hereunder with joint and several liability for all obligations of Borrowers hereunder and under the other Financing Documents pursuant to a joinder agreement or other similar agreement in form and substance reasonably satisfactory to Agent or to become a Guarantor of the obligations of Borrowers hereunder and under the other Financing Documents pursuant to a guaranty and suretyship agreement in form and substance reasonably satisfactory to Agent; and (iv) cause the new Subsidiary to deliver certified copies of such Subsidiary's certificate or articles of incorporation, together with good standing certificates, by-laws (or other operating agreement or governing documents), resolutions of the Board of Directors or other governing body, approving and authorize the execution and delivery of the Security Documents,

74

incumbency certificates and to execute and/or deliver such other documents and legal opinions or to take such other actions as may be requested by the Agent, in each case, in form and substance reasonably satisfactory to the Agent.

Section 4.14    **Reserved**.

Section 4.15    **Power of Attorney**.  Each of the officers of Agent is hereby irrevocably made, constituted and appointed the true and lawful attorney for Borrowers (without requiring any of them to act as such) with full power of substitution to do the following:  (a) endorse the name of Borrowers upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to Borrowers and constitute collections on Borrowers' Accounts; (b) so long as Agent has provided not less than three (3) Business Days' prior written notice to Borrower to perform the same and Borrower has failed to take such action and an Event of Default has occurred and is continuing, execute in the name of Borrowers any schedules, assignments, instruments, documents, and statements that Borrowers are obligated to give Agent under this Agreement; (c) after the occurrence and during the continuance of an Event of Default, take any action Borrowers are required to take under this Agreement; (d) so long as Agent has provided not less than three (3) Business Days' prior written notice to Borrower to perform the same and Borrower has failed to take such action and an Event of Default has occurred and is continuing, do such other and further acts and deeds in the name of Borrowers that Agent may deem necessary or desirable to enforce any Account or other Collateral or perfect Agent's security interest or Lien in any Collateral; and (e) after the occurrence and during the continuance of an Event of Default, do such other and further acts and deeds in the name of Borrowers that Agent may deem necessary or desirable to enforce its rights with regard to any Account or other Collateral.  This power of attorney shall be irrevocable and coupled with an interest.

## ARTICLE 5 NEGATIVE COVENANTS

Each Borrower agrees that, so long as any Credit Exposure exists:

Section 5.1    **Debt; Contingent Obligations**.  No Borrower will, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for Permitted Indebtedness.  No Borrower  will, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations, except for Permitted Contingent Obligations.  No Borrower will, directly or indirectly, make any loans or advance any Debt to any Person (except for Permitted Investments  to the extent that Borrowers' joint and several obligations hereunder would be deemed to be a loan or advance to the other Borrower).

Section 5.2    **Liens**.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except for Permitted Liens.

Section 5.3    **Distributions**.  No Borrower will, directly or indirectly, declare, order, pay, make or set apart any sum for any Distribution (including a Distribution by a Borrower to Holdings); *provided, however*, that the following Distributions may be paid, subject to the terms and conditions below:

(a)      Dividends by any subsidiary of any Borrower to such parent Borrower;

(b)      Tax Distributions (which may only be paid based upon the Credit Parties' good-faith and reasonable estimate of income to be generated by Borrowers in such year), not more than once per quarter, to allow the Credit Parties' partners or members (or their direct or indirect owners), as applicable, to meet such partners' or members' tax obligations (or those of their direct or indirect owners) on such income as required by applicable Laws, minus the amount of Net Tax Benefit realized by such partners or members for any previous tax year, commencing from the tax year immediately prior to the tax year including the Closing Date, but only to the extent such Net Tax Benefit has not already been utilized to reduce, in any tax year during which this Agreement is in effect, the amount of any Tax Distribution otherwise permitted hereunder;

(c)      Payments by any Borrower of shared overhead expenses, salaries, directors' fees, or advances and reimbursements to employees or directors of a Credit Party or an affiliate thereof, all pursuant to the terms of the Consulting Agreement ~~and~~**so long as the aggregate amount of such payments do** not ~~to~~ exceed $500,000 per month (as may be increased by not more than 3% on each one-year anniversary of the Closing Date);

(d)      distributions to Holdings in the amounts, and at such times, as required by actuarial analysis or statutory requirements relating to the capital requirements of the Insurance Captive, as supported by the financial reporting delivered pursuant to Section 4.1(b)(x), *provided* that (i) no Event of Default shall exist at the time of, or immediately after, such distribution, and (ii) such distributions shall be promptly (but in any event within one (1) Business Day after distribution to Holdings) contributed by Holdings to the Insurance Captive;

(e)      Performance-based rent payments (including prepayment of rent) made by St. Christopher Operator pursuant to the "Additional Rent" section of the "Basic Lease Information" of each of the St. Christopher Operating Leases not more than once per calendar quarter so long as (i) no Event of Default exists, (ii) the FCCR Toggle Date has occurred and the Fixed Charge Coverage Ratio covenant set forth in Section 6.2 has been tested at least once, (iii) Borrowers demonstrate to Agent, after giving pro forma effect to such proposed distribution, Minimum Liquidity of at least $5,000,000 more than the then-current Minimum Liquidity covenant set forth in Section 6.3 and (iv) Borrowers are in pro forma compliance, as of the most recent calendar quarter-end for which a Compliance Certificate was delivered pursuant to Section 4.1, with the Fixed Charge Coverage Ratio covenant set forth in Section 6.2 immediately prior to and immediately after giving pro forma effect to such distribution;

(f)      so long as no Event of Default exists at the time of such distribution, a distribution to Holdings in accordance with the articles of incorporation of HPP, any applicable regulatory approvals and applicable Law in an amount equal to any "Unrestricted Net Disposition Proceeds" (as defined in the documentation evidencing the Tenet Real Estate Debt on the Closing Date) received by any Borrower on account of its membership interests in HPP as a result of an HPP Sale;

**(g)      at any time from and after the Closing Date, Distributions to Holdings in the amounts, and at such times, as necessary for Borrowers to pay to Holdings the portion of any Debt constituting financed insurance premiums owed by Holdings for**

**financed insurance premiums for insurance coverage for Borrowers or financed insurance premiums for insurance coverage required to be paid by Borrowers under any lease (including, without limitation, any Operating Lease);**

> **(h)** **one or more payments made by Parent Borrower to Paladin Healthcare Capital, not less than once per month, to repay a $550,000 loan made by Paladin Healthcare Capital to Parent Borrower after the Closing Date so long as the following conditions are satisfied (or Agent has agreed in writing prior to any such repayment to waive one or more of the following conditions, which waiver may be granted or withheld in Agent's sole discretion): (i) no Event of Default exists; (ii) the Term Loan has been paid in full; (iii) the aggregate amount of all such payments does not exceed $550,000 plus accrued and unpaid interest thereon (at a rate not to exceed 5% per annum) and (iv) Borrowers are in pro forma compliance with the financial covenants set forth in Article 6 that are in effect as of the date of payment immediately prior to and immediately after giving effect to each such payment (including for this purpose only, the amount of such proposed payment as a fixed charge if the FCCR Toggle Date has occurred);**

> **(i)** **payments of accrued but unpaid fees arising under the Consulting Agreement prior to the First Amendment Effective Date, not more than once per quarter, so long as: (i) the Term Loan has been paid in full; (ii) no Event of Default exists, (iii) the FCCR Toggle Date has occurred and the Fixed Charge Coverage Ratio covenant set forth in Section 6.2 has been tested at least once, and (iv) Borrowers are in pro forma compliance with the financial covenants set forth in Article 6 immediately prior to and immediately after giving effect to such distribution (including for this purpose only, the amount of such proposed distribution as a fixed charge);** and

> **(j)** ~~(g)~~ Distributions paid to a Credit Party's partners or members (less any Tax Distributions made pursuant to subsection (~~a~~**b**) above) on a quarterly basis, so long as (i) no Event of Default exists, (ii) the FCCR Toggle Date has occurred and the Fixed Charge Coverage Ratio covenant set forth in Section 6.2 has been tested at least once, and (iii) Borrowers are in pro forma compliance with the financial covenants set forth in Article 6 immediately prior to and immediately after giving effect to such distribution (including for this purpose only, the amount of such proposed distribution as a fixed charge).

Nothing in this Section 5.3 shall prohibit or limit payments by any Credit Party of salaries to its employees in the Ordinary Course of Business.

**Section 5.4    Restrictive Agreements.** No Borrower will, or will permit any Subsidiary to, directly or indirectly enter into or assume any agreement (other than the Financing Documents, any Subordinated Debt Documents, any agreement evidencing a transaction permitted under Section 5.6(b) as to the assets subject to such transaction, and any agreements for purchase money debt permitted under clauses (c) or (d) of the definition of Permitted Indebtedness) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired.

**Section 5.5    Payments and Modifications of Subordinated Debt.** Borrower will not, and will not permit any Subsidiary to, directly or indirectly, in each case except as expressly

permitted under, and made in full compliance with the terms of, a Subordination Agreement entered into with respect to such Subordinated Debt, (a) declare, pay, make or set aside any amount for payment in respect of Subordinated Debt, (b) amend or otherwise modify the terms of any Subordinated Debt, (c) declare, pay, make or set aside any amount for payment in respect of any Debt hereinafter incurred that, by its terms, or by separate agreement, is subordinated to the Obligations, or (d) amend or otherwise modify the terms of any such Debt if the effect of such amendment or modification is to (i) increase the interest rate or fees on, or change the manner or timing of payment of, such Debt, (ii) accelerate or shorten the dates upon which payments of principal or interest are due on, or the principal amount of, such Debt, (iii) change in a manner adverse to any Credit Party or Agent any event of default or add or make more restrictive any covenant with respect to such Debt, (iv) change the prepayment provisions of such Debt or any of the defined terms related thereto, (v) change the subordination provisions thereof (or the subordination terms of any guaranty thereof), or (vi) change or amend any other term if such change or amendment would materially increase the obligations of the obligor or confer additional material rights on the holder of such Debt in a manner adverse to Borrower, any Subsidiaries, Agents or Lenders.  Borrower shall, prior to entering into any such amendment or modification, deliver to Agent reasonably in advance of the execution thereof, any final or execution form copy thereof.

**Section 5.6      Consolidations and Mergers; Sales of Assets; Change in Control**.

(a)      No Borrower will, directly or indirectly consolidate or merge or amalgamate with or into any other Person other than with or into another Borrower.

(b)      No Borrower shall suffer or permit to occur any sale, transfer, lease (other than a Lease approved by Agent), conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition of all or any portion of a Project or any portion of any other Collateral for the Loan, except that any Borrower may consummate dispositions:  (i) in the Ordinary Course of Business of furniture, fixtures and equipment for cash and fair value that the applicable Borrower determines in good faith is no longer used or useful in the Borrower's business; (ii) of inventory in the Ordinary Course of Business and not pursuant to any bulk sale; (iii) in the form of discounts or compromises on Accounts that are expressly permitted by Section 9.2(e); (iv) of cash and Cash Equivalents in the Ordinary Course of Business; (v) of assets between and among Borrowers in the Ordinary Course of Business; (vi) consisting of Permitted Liens and (vii) of its membership interests in HPP (whether as a result of sale, recapitalization or otherwise).

(c)      No Borrower shall suffer or permit to occur (i) any Change in Control or (ii) any other sale, transfer, conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition of any interest in any Borrower or any other Credit Party or any interest in any entity which holds an interest in, or directly or indirectly controls, Borrower or any Credit Party (other than Permitted Transfers).

(d)      In addition to the prohibitions set forth in subsections (a) above, no Borrower shall engage in or permit to occur any transfer as set forth in subsections (b) and (c) above that would constitute or result in the occurrence of one or more non-exempt prohibited transactions under ERISA or the Internal Revenue Code.  Each Borrower agrees to unwind any

such transaction upon written notice from Agent or, at Agent's option, to assist Agent in obtaining such prohibited transaction exemption(s) from the United States Pension and Welfare Benefits Administration with respect to such transaction as are necessary to remedy such prohibited transactions.

**Section 5.7     Purchase of Assets, Investments**.  No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) acquire or enter into any agreement to acquire any assets other than (i) the Acquisition, (ii) capital expenditures made pursuant to the terms of an Affiliate Lease and reflected in the most recent financial projections delivered to Agent prior to the Closing Date, (iii) assets acquired pursuant to clauses (c) and (d) of the definition of Permitted Indebtedness, (iv) otherwise in the Ordinary Course of Business, and (v) the membership interests of HPP; (b) engage or enter into any agreement to engage in any joint venture or partnership with any other Person other than in the Ordinary Course of Business; or (c) acquire or own or enter into any agreement to acquire or own investment in any Person, or make any loans or advance any Debt to any Person, other than Permitted Investments.

**Section 5.8     Transactions with Affiliates**.  Except as otherwise disclosed on Schedule 5.8, and except for transactions that are disclosed to Agent in advance of being entered into and which contain terms that are no less favorable to the applicable Borrower or any Subsidiary of any Borrower, as the case may be, than those which might be obtained from a third party not an Affiliate of any Borrower, no Borrower will, or will permit any Subsidiary of any Borrower to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of any Borrower, *provided* that, notwithstanding the foregoing, the restrictions set forth in this Section 5.8 shall not apply to transactions by and between any Borrower or any Subsidiary and the Insurance Captive in the Ordinary Course of Business.

**Section 5.9     Modification of Organizational Documents**.  No Borrower will, directly or indirectly, amend or otherwise modify any Organizational Documents of such Person, except for (a) such amendments or other modifications to a Borrower's Organizational Documents as are required under this Agreement or by applicable Law and fully disclosed to Agent within thirty (30) days after such amendments or modifications have become effective, and (b) such amendments or modifications to a Borrower's Organizational Documents (other than those involving a change in the name of a Borrower or Subsidiary or involving a reorganization of a Borrower or Subsidiary under the laws of a different jurisdiction) that would not adversely affect the rights and interests of the Agent or Lenders and fully disclosed to Agent within thirty (30) days after such amendments or modifications have become effective.

**Section 5.10    Modification of Certain Agreements**.  No Borrower will, directly or indirectly, amend or otherwise modify the Management Agreement, any document identified in the definition of "New Market Tax Credit Transactions" to which a Borrower is party, or other Material Contract, which amendment or modification in any case:  (a) is contrary to the terms of this Agreement or any other Financing Document; (b) could reasonably be expected to be adverse to the rights, interests or privileges of the Agent or the Lenders or their ability to enforce the same; (c) results in the imposition or expansion in any material respect of any obligation of or restriction or burden on any Borrower; (d) reduces in any material respect any rights or benefits of any Borrower (it being understood and agreed that any such determination shall be in the

discretion of the Agent) or (e) increases the rent payable under an Operating Lease with an Affiliate of a Borrower.  Each Borrower shall, promptly after entering into any amendment or other modification of any of the foregoing documents, deliver to Agent fully executed copies thereof.

Section 5.11 **Conduct of Business**.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, engage in any line of business other than those businesses engaged in on the Closing Date and described on <u>Schedule 5.11</u> and businesses reasonably related thereto.  No Borrower will, or will permit any Subsidiary to, other than in the Ordinary Course of Business, change its normal billing payment and reimbursement policies and procedures with respect to its Accounts (including, without limitation, the amount and timing of finance charges, fees and write-offs).

Section 5.12 **Lease Payments.**  No Borrower will, or will permit any Subsidiary to, directly or indirectly, incur or assume (whether pursuant to a Guarantee or otherwise) any liability for rental payments except in the Ordinary Course of Business (including pursuant to the Affiliate Leases).

Section 5.13 **Limitation on Sale and Leaseback Transactions.**  No Borrower will, or will permit any Subsidiary to, directly or indirectly, enter into any arrangement with any Person whereby, in a substantially contemporaneous transaction, any Borrower or any Subsidiaries sells or transfers all or substantially all of its right, title and interest in an asset and, in connection therewith, acquires or leases back the right to use such asset.

Section 5.14 **Deposit Accounts and Securities Accounts; Payroll and Benefits Accounts.**  No Borrower will, or will permit any Subsidiary to, directly or indirectly, establish any new bank account, Deposit Account or Securities Account without prior written notice to Agent, and unless Agent, such Borrower or such Subsidiary and the bank, financial institution or securities intermediary at which the account is to be opened enter into a Deposit Account Control Agreement or Securities Account Control Agreement prior to or concurrently with the establishment of such Deposit Account or Securities Account.  Borrowers represent and warrant that <u>Schedule 5.14</u> lists all of the Deposit Accounts and Securities Accounts of each Borrower as of the ~~Closing~~**First Amendment Effective** Date.  The provisions of this Section requiring Deposit Account Control Agreements shall not apply to (i) that certain lockbox and deposit account(s) maintained by St. Christopher Operator for the sole purpose of receiving Subleases Rent and Parking Revenue (as such terms are defined in <u>Schedule 9.1</u>), making any payments therefrom under any HSRE Master Lease and retaining any funds remaining therein thereafter; (ii) Deposit Accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrowers' employees and identified to Agent by Borrowers as such; *provided, however*, that at all times that any Obligations remain outstanding, Borrower shall maintain one or more separate Deposit Accounts to hold any and all amounts to be used for payroll, payroll taxes and other employee wage and benefit payments, and shall not commingle any monies allocated for such purposes with funds in any other Deposit Account; (iii) deposit accounts maintained for the sole purpose of receiving payments from, and making payments to, Borrowers' credit card processor(s), so long as the aggregate amount on deposit in such deposit accounts does not exceed $500,000 at any time; ~~or~~ (iv) Target Borrowers' Deposit Accounts and related lockboxes (if any) maintained at Bank of America or PNC on the Closing

Date (the "**Legacy Accounts**"), provided that, (A) within thirty (30) days after the Closing Date (or such later date as agreed to by the Agent in its sole discretion), no Borrower shall deposit checks into, nor draft any checks from, the Legacy Accounts, (B) within sixty (60) days after the Closing Date (or such later date as agreed to by the Agent in its sole discretion), the Target Borrowers shall have notified all Account Debtors that make payments into one of the Legacy Accounts to make payments to a Lockbox Account or Lockbox instead, (C) prior to the first anniversary of the Closing Date (or, with respect to any Legacy Account into which Account Debtors are making payment notwithstanding instruction to no longer do so, such later date as agreed to by the Agent in its reasonable discretion), the Target Borrowers shall close the Legacy Accounts and (D) at all times following the Closing Date, the Target Borrowers shall have in place standing wire instructions with respect to the Legacy Accounts, transferring all collections therein on a daily basis to a Lockbox Account that sweeps to the Payment Account **or (v) that certain deposit account maintained by PPN Philadelphia for the sole purpose of receiving periodic payments pursuant to value-based performance programs in which it participates ("Incentive Payments"), provided that (A) such deposit accounts receive only Incentive Payments and (B) the amount on deposit in such deposit accounts from time to time does not exceed the aggregate amount of the two Incentive Payments most recently paid to PPN Philadelphia.**  In the event Borrowers fail to comply with the conditions set forth in the proviso to clause (iii) in the immediately prior sentence, or any other Event of Default exists, Agent may, in its sole discretion, enter into Deposit Account Control Agreements or Deposit Account Restriction Agreements, as applicable, over any of the Legacy Accounts.

**Section 5.15   Compliance with Anti-Terrorism Laws.**   Agent hereby notifies Borrowers that pursuant to the requirements of Anti-Terrorism Laws, and Agent's policies and practices, Agent is required to obtain, verify and record certain information and documentation that identifies Borrowers and its principals, which information includes the name and address of each Borrower and its principals and such other information that will allow Agent to identify such party in accordance with Anti-Terrorism Laws.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, knowingly enter into any Operative Documents or Material Contracts with any Blocked Person or any Person listed on the OFAC Lists.  Each Borrower shall immediately notify Agent if such Borrower has knowledge that any Borrower, any additional Credit Party or any of their respective Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement is or becomes a Blocked Person or (a) is convicted on, (b) pleads nolo contendere to, (c) is indicted on, or (d) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering. No Borrower will, or will permit any Subsidiary to, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

**Section 5.16   Transfers to Clinically Integrated Network Entities.**  Notwithstanding anything in this Agreement to the contrary, Borrowers, other than the Clinically Integrated

Network Entities, shall not, and shall not permit any of the Credit Parties (other than the Clinically Integrated Network Entities) to, sell, transfer, assign (by operation of law or otherwise), distribute, loan, advance, invest or otherwise dispose of, any money (including, without limitation, any proceeds of Loans), assets or property in or to any Clinically Integrated Network Entities, other than (i) such amount necessary for consummation of the Acquisition on the Closing Date or (ii**, (ii) transfers of any incentive payments payable to a Clinically Integrated Network Entity but held in Parent Borrower's operating account prior to the date on which such Clinically Integrated Network Entity opens a deposit account for such purpose, or (iii**) as otherwise approved in writing by Agent.

**Section 5.17** **Insurance Captive**.  No Credit Party shall assign or otherwise transfer any Collateral or any proceeds of the Loans to any Insurance Captive, except as otherwise expressly permitted by Section 4.7.

## ARTICLE 6 FINANCIAL COVENANTS

**Section 6.1** **Additional Defined Terms**.   The following additional definitions are hereby appended to Section 1.1 of this Agreement:

"**Early FCCR Toggle Date**" means the last day of a fiscal quarter ending on or after March 31, 2019 on which Borrowers have elected in writing to begin testing the Fixed Charge Coverage Ratio covenant set forth in Section 6.2.

"**EBITDA**" has the meaning provided in the Compliance Certificate.

"**FCCR Toggle Date**" means the earlier of the Stated FCCR Toggle Date and an Early FCCR Toggle Date.

"**Fixed Charge Coverage Ratio**" has the meaning provided in the Compliance Certificate.

"**Stated FCCR Toggle Date**" means March 31, 2020.

**Section 6.2** **Fixed Charge Coverage Ratio**.  Borrowers will not permit the Fixed Charge Coverage Ratio for any period set forth below to be less than the ratio set forth below for such period:

Any given calendar quarter beginning with the FCCR Toggle              1.1 to 1.0
Date, measured on a trailing 12-month basis (which shall be the
Defined Period for purposes of the Compliance Certificate)

Borrowers agree that any election to start testing the Fixed Charge Coverage Ratio covenant set forth in this Section 6.2 on an Early FCCR Toggle Date shall be in writing and, once given, shall be irrevocable for the remainder of the term of this Agreement notwithstanding the fact that Stated FCCR Toggle Date has not occurred.

**Section 6.3** **Minimum Liquidity**.  Borrowers will not permit the Minimum Liquidity at any time during the term of this Agreement to be less than $15,000,000; provided that such

CHICAGO/#3111951.7B

amount shall be reduced to $10,000,000 as of the first date on which Borrowers first demonstrate compliance with the Fixed Charge Coverage Ratio covenant set forth in Section 6.2.

Section 6.4    **Evidence of Compliance**.  Borrowers shall furnish to Agent evidence of compliance with the financial covenants in this Article 6 by submitting to Agent a Compliance Certificate as required in Section 4.1 hereof (in form and content satisfactory to Agent) and evidence that no Event of Default specified in this Article 6 has occurred.  The Compliance Certificate shall include, without limitation, (a) a statement and report, on a form approved by Agent, detailing the Borrowers' calculations, and (b) if requested by Agent, back-up documentation (including, without limitation, invoices, receipts and other evidence of costs incurred during such quarter as Agent shall reasonably require) evidencing the propriety of the calculations.

Section 6.5    **Modifications to Covenants.**  Notwithstanding the foregoing covenants contained in this Article 6, Agent may in its sole discretion for any quarter (a) replace any ratio set forth in this Article 6 with a less-restrictive ratio, (b) replace any percentage amount set forth in this Article 6 with a less-restrictive percentage amount, and/or (c) modify any of the definitions set forth in this Article 6 to make the terms thereof more favorable to Borrowers, in each case as Agent may, in its sole discretion, from time to time specify in writing to Borrowers.

## ARTICLE 7 CONDITIONS

Section 7.1    **Conditions to Closing.**  Subject in each case to the final paragraph of this Section 7.1, the obligation of each Lender to make the initial Loans, of Agent to issue any Support Agreements on the Closing Date and of any LC Issuer to issue any Lender Letter of Credit on the Closing Date shall be subject only to the satisfaction of the following conditions precedent, each to the reasonable satisfaction of Agent and Lenders and their respective counsel:

(a)    <u>Information Certificate; Transaction Documents</u>.  Receipt by Agent of a completed Information Certificate, prepared to give pro forma effect to the Acquisition, in form and substance reasonably satisfactory to Agent, to the extent a "form final" version thereof was not previously reviewed and deemed reasonably satisfactory by Agent prior to August 31, 2017.

(b)    <u>Lien on Accounts</u>.  Tenet Sellers shall have granted Operator Borrowers a Lien on all Accounts Receivable (as defined in the Acquisition Agreement) and accounts receivables payable by Medicare, Medicare Advantage, Medicare HMO and Medicaid and generated at the Facilities (as defined in the Acquisition Agreement) from and after the Closing Date, all as described more fully in the Tenet License Agreement.

(c)    <u>Documentation and Other Customary Deliverables</u>.  Receipt by Agent and Lenders of executed counterparts of this Agreement and the other Financing Documents (required by Agent and Lenders to be executed on the Closing Date, consisting of the following: (i)  legal opinions of Crowell Moring LLP and Pepper Hamilton LLP as to the matters set forth on Attachment A to the Commitment Letter; (ii) evidence of limited liability company authorization of the Credit Parties to enter into the Financing Documents; (iii) customary closing date officer's certificates (with organizational documents attached) of the Credit Parties; (iv) good-standing certificates (or equivalent documentation) in the jurisdiction of organization of

each Credit Party; (v) UCC lien searches on the Tenet Sellers and the Credit Parties in their respective jurisdictions of organization, with a "through-date" not more than 30 days prior to the Closing Date; (vi) a borrowing base certificate; (vii) an IRS Form 8821 for each Credit Party; (viii) certificates of insurance, which name Agent as lender loss payee and additional insured, as applicable; (ix) material governmental and material third-party consents and approvals for the Financing Documents (which will be final, with no waiting period to expire or terminate and no governmental inquiry or investigation pending, which restrain, enjoin, impede, make illegal or otherwise challenge or seek to restrain, enjoin, impede or otherwise challenge the consummation of the Financing Documents); (x) customary documents and instruments required to create and perfect Agent's first-priority security interest (subject to Permitted Liens ) in the Collateral (which, if applicable, will be in proper form for filing); (xi) a solvency certificate of Parent Borrower's chief financial officer or other appropriate responsible officer, substantially in the form of Exhibit C to the Commitment Letter; and (xii) a detailed sources-and-uses statement and funds flow memorandum for the transactions contemplated to occur concurrently with the funding of loans under this Agreement on the Closing Dates.

(d)     Reserved.

(e)     Financial Statements.   Receipt by Agent and the Lenders of (a) the financial statements of the "Healthcare Businesses" (as defined in the Acquisition Agreement) set forth in Section 2.10 of the Acquisition Agreement and (b) a pro forma consolidated balance sheet of the Borrowers as of the last day of the most recent fiscal month ended at least forty-five (45) days prior to the Closing Date, prepared after giving effect to the Acquisition as if the Acquisition had occurred as of such date; provided, that (i) each such pro forma financial statement and related statement of income and cash flow of the Healthcare Businesses shall be prepared in good faith by Borrowers and (ii) no such pro forma financial statement shall include adjustments for purchase accounting (including adjustments of the type contemplated by Financial Accounting Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)).

(f)     Required Information.   Receipt by Agent, at least five (5) business days prior to the Closing Date, documentation and other information with respect to the Credit Parties that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act and OFAC, in each case as has been reasonably requested in writing by Agent at least ten (10) business days prior to the Closing Date.

(g)     No Material Adverse Effect.   Since December 31, 2016, there has occurred no event, change, or effect that has had, or would reasonably be expected to have, a "Sellers Material Adverse Effect" (as defined in the Acquisition Agreement, as may have been amended in accordance with clause (k) below).

(h)     Specified Representations and Acquisition Agreement Representations. The Specified Representations shall be true and correct in all material respects (or in all respect to the extent already subject to a materiality qualifier) on the Closing Date, except for those that refer to an earlier date, as of such earlier date.   Furthermore, the Acquisition Agreement Representations shall be true and correct in all respects on the Closing Date, except for those that

refer to an earlier date, as of such earlier date. Notwithstanding anything to the contrary contained herein, to the extent any of the Specified Representations relating to the Tenet Sellers are qualified by, or subject to, "material adverse effect," the definition thereof shall be "Sellers Material Adverse Effect" as is defined in the Acquisition Agreement for purposes of any representations and warranties required to be accurate on, or as of, the Closing Date.

(i)      Indebtedness/Payoff Letter and Releases.   The assets that will be acquired by the Initial Borrowers on the Closing Date and the assets of the Target Borrowers shall be free and clear of Liens (other than Permitted Liens). No Borrower shall have assumed from any Tenet Seller any Debt nor shall any Target Borrower hold any Debt, in each case other than (i) the capital leases indebtedness, (ii) the Put Agreement and related documents described in the Put Agreement Term Sheet and (iii) any other Assumed Obligations (as such capitalized terms are defined in the Acquisition Agreement) that constitute Permitted Indebtedness.

(j)      Initial Notice of Borrowing.   Receipt by Agent of an executed initial Notice of Borrowing for the Loans to be made on the Closing Date.

(k)      Acquisition.   The Acquisition shall be consummated substantially concurrently with the initial funding hereunder in accordance with the terms of the Acquisition Agreement, and no amendment, modification or waiver of any of the provisions of the Acquisition Agreement that would be materially adverse to the Lenders shall have been made or given without the consent of Agent; it being agreed that any amendment, modification or waiver of (a) the definition of "Sellers Material Adverse Effect" or (b) the conditions set forth in Sections 6.5 and 6.6 of the Acquisition Agreement shall be deemed materially adverse to the Lenders.

(l)      Litigation.   No orders, decrees, judgments or injunctions of any governmental entity of competent jurisdiction in effect, and no claim, action, suit, arbitration, proceeding, investigation, inquiry or audit by or before any governmental entity shall be pending, which restrain, enjoin, impede, make illegal or otherwise challenge or seek to restrain, enjoin, impede or otherwise challenge the consummation of the transactions contemplated to occur concurrently with the funding hereunder on the Closing Date.

(m)      Security.   All Liens of Agent on the Collateral shall be perfected to the extent such liens can be perfected by the filing of a financing statement or entry into a control agreement (the "**Required Perfection Action**").

(n)      Payment of Fees and Expenses.   Agent shall have received payment of all fees and expenses required to be paid on the Closing Date pursuant to, and in accordance with, the Commitment Letter and a summary of the same shall have been delivered at least one (1) Business Day prior to the Closing Date.

Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Financing Document, each additional Operative Document and each other document, agreement and/or instrument required to be approved by Agent, Required Lenders or Lenders, as applicable, on the Closing Date.

Notwithstanding anything in this Agreement, any other Financing Documents or any other documentation entered into with respect to the Transactions to the contrary (including, without limitation, the Commitment Letter), (a) the only representations and warranties the accuracy of which shall be a condition to availability of the Credit Facility on the Closing Date shall be the Acquisition Agreement Representations and the Specified Representations, and (b) the terms of the Financing Documents shall not impair the availability of Revolving Loans on the Closing Date if the conditions set forth in this Section 7.1 shall have been satisfied or waived (it being understood that, to the extent any security interest in any Collateral is not or cannot be provided and/or perfected (other than pursuant to the Required Perfection Action) on the Closing Date after your use of commercially reasonable efforts to do so, then the provision and/or perfection of a security interest in such Collateral shall not constitute a condition precedent to the availability and initial funding of Revolving Loans on the Closing Date, but any such Lien will be required to be perfected within sixty (60) days after the Closing Date pursuant to arrangements and timing set forth in Section 7.3 (or, in each case, such later time as may be permitted by the Agent in its sole discretion).

**Section 7.2    Conditions to Each Loan, Support Agreement and Lender Letter of Credit Made After the Closing Date**.  The obligation of the Lenders to make a Loan (other than Revolving Loans made pursuant to Section 2.5(c)) or an advance in respect of any Loan, of Agent to issue any Support Agreement or of any LC Issuer to issue any Lender Letter of Credit, in each case after the Closing Date, is subject to the satisfaction of the following additional conditions:

(a)    in the case of a Revolving Loan Borrowing, receipt by Agent of a Notice of Borrowing (or telephonic notice if permitted by this Agreement) and updated Borrowing Base Certificate, in the case of any Support Agreement or Lender Letter of Credit, receipt by Agent of a Notice of LC Credit Event in accordance with Section 2.5(a) **and in the case of a Term Loan advance, receipt by Agent of a Notice of Borrowing**;

(b)    the fact that, immediately after such borrowing and after application of the proceeds thereof or after such issuance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit;

(c)    the fact that, immediately before and after such advance or issuance, no Default or Event of Default shall have occurred and be continuing;

(d)    the occurrence of any fact, event or circumstance that could reasonably be expected to result in a Material Adverse Effect; and

(e)    the fact that the representations, warranties and covenants of each Credit Party contained in the Financing Documents shall be true, correct and complete on and as of the date of such borrowing or issuance, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date.

Each giving of a Notice of LC Credit Event under this Section 7.2, each giving of a Notice of Borrowing under this Section 7.2 and each acceptance by any Borrower of the proceeds

of any Loan made under this Section 7.2 shall be deemed to be (y) a representation and warranty by each Borrower on the date of such notice or acceptance as to the facts specified in Section 7.2, and (z) a restatement by each Borrower that each and every one of the representations made by it in any of the Financing Documents is true and correct as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date).

Section 7.3    **Searches.**    Before the Closing Date and thereafter, Agent shall have the right to perform, all at Borrowers' expense, the searches described in clauses (a), (b), (c) and (d) below against Borrowers and any other Credit Party, the results of which are to be consistent with Borrowers' representations and warranties under this Agreement: (a) UCC searches with the Secretary of State and local filing offices of each jurisdiction where the applicable Person maintains its executive offices, a place of business, or assets and the jurisdiction in which the applicable Person is organized; (b) judgment, pending litigation, federal tax lien, personal property tax lien, and corporate and partnership tax lien searches, in each jurisdiction searched under clause (a) above; (c) real property title and lien searches in each jurisdiction in which any real property Collateral is located; and (d) searches of applicable corporate, limited liability company, partnership and related records to confirm the continued existence, organization and good standing of the applicable Person and the exact legal name under which such Person is organized.   Provided that no Event of Default has occurred or is then occurring, such searches shall be limited to no more frequently than twice annually.

Section 7.4    **Post Closing Requirements.**    Borrowers shall complete each of the post-closing obligations and/or provide to Agent each of the documents, instruments, agreements and information listed on Schedule 7.4 attached hereto on or before the date set forth for each such item thereon, each of which shall be completed or provided in form and substance reasonably satisfactory to Agent.

## ARTICLE 8 REGULATORY MATTERS

Section 8.1    **Representations and Warranties.**    To induce Agent and Lenders to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, Borrowers hereby represent and warrant that, except as disclosed in Schedule 8.1, the following statements are true, complete and correct as of the date hereof and as of the date of the delivery of each Compliance Certificate, and Borrowers hereby covenant and agree to notify Agent within three (3) Business Days (but in any event prior to Borrowers submitting any requests for advances of reserves or escrows) following the occurrence of any facts, events or circumstances, whether threatened, existing or pending, that would make any of the following representations and warranties untrue, incomplete or incorrect (together with such supporting data and information as shall be necessary to fully explain to Agent the scope and nature of the fact, event or circumstance), and shall provide to Agent within two (2) Business Days of Agent's request, such additional information as Agent shall request regarding such disclosure:

(a)    Healthcare Permits.    Borrowers have (i) each material Healthcare Permit and other rights from, and have made all necessary declarations and filings with, all applicable Governmental Authorities, all self-regulatory authorities and all courts and other tribunals necessary to engage in the ownership, management and operation of the Projects or the assets of any Borrower, and (ii) no knowledge that any Governmental Authority is considering limiting,

suspending or revoking any such Healthcare Permit. All such material Healthcare Permits are valid and in full force and effect and Borrowers are in material compliance with the terms and conditions of all such material Healthcare Permits, except where failure to be in such compliance or for a Healthcare Permit to be valid and in full force and effect would not have a Material Adverse Effect.

(b)    Specific Licensing. Each Project is duly licensed as an acute care hospital under the applicable Laws of the state where the Project is located. The licensed bed or unit capacity of each Project is shown on Schedule 8.1. Borrowers have not granted to any third party the right to reduce the number of licensed beds or units in the Projects or the right to apply for approval to move any and all of the licensed beds or units in the Projects to any other location and there are no proceedings or contemplated to reduce the number of licensed beds in the Projects.

(c)    Operating Leases. If required under applicable Healthcare Laws, the Operating Lease has been approved by all necessary Governmental Authorities. Under applicable Healthcare Laws in the state in which each Project is located, the reimbursement rate of the Operator under applicable Third Party Payor Programs is not affected by the rental rates under the Operating Lease. The rentals provided for under the Operating Lease comply in all material respects with all applicable Healthcare Laws.

(d)    Accreditation. Borrowers have received and maintain accreditation in good standing and without impairment by the applicable accrediting organizations, to the extent required by applicable Law (including any equivalent regulation) or the terms of any Operating Lease pertaining to the Project. No Borrower or Manager has received any written notice or communication from JC or any other accrediting organization that a Project is (i) subject to or is required to file a plan of correction with respect to any accreditation survey, or (ii) in danger of losing its accreditation due to a failure to comply with a plan of correction.

(e)    Participation Agreements/Provider Status/Cost Reports.

(i)    There is no investigation, audit, claim review, or other action pending or, to the knowledge of any Borrower, threatened which is reasonably likely to result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Third Party Payor participation agreement or provider number or other Healthcare Permit or result in a Borrower's exclusion from any Material Third Party Payor Program, nor has any Material Third Party Payor made any decision not to renew any participation agreement or provider agreement with it or other Healthcare Permit related to any Project, nor have the Borrowers made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit, nor is there any action pending or threatened to impose material intermediate or alternative sanctions with respect to any Project.

(ii)    The Borrowers, and, to the knowledge of the Borrowers, their contractors, have properly and legally billed all intermediaries and Third Party Payors in all material respects for services rendered with respect to the Projects and have maintained their records to reflect such billing practices. No materially significant

88

amount of funds relating to Borrowers is now, or, to the knowledge of Borrowers will be, withheld by any Third Party Payor.

(iii)    Borrowers have the requisite participation agreement or provider number or other Healthcare Permit to bill the Medicare program and the respective Medicaid programs in the state or states in which such Borrowers operate (to the extent such Borrower participates in the Medicare or Medicaid program in such state or states) and all other Material Third Party Payor Programs.

(iv)    All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by the Borrowers are and will be materially accurate and complete and have not been and will not be misleading in any material respects.  There are no current, pending or outstanding Medicare, Medicaid or other Third Party Payor Program reimbursement audits or appeals pending with respect to the Projects or the Borrowers which are reasonably expected to result in a finding or result in exposing material inaccuracies or issues.

(f)    <u>No Violation of Healthcare Laws</u>.

(i)    None of the Projects, the Borrowers or any Manager are in violation of any Healthcare Laws, except where any such violation could not reasonably be expected to have a Material Adverse Effect.

(ii)    Each Borrower is HIPAA Compliant.

(iii)    No Project has received a statement of material deficiencies or survey violation within the past three years for which a plan of correction has not been filed with the applicable state authority.  No Project is currently subject to any plan of correction that has not been accepted by or is currently the subject of a review by the applicable state authority.

(g)    <u>Proceedings</u>.  No Borrower nor any Project is subject to any proceeding, suit or investigation by any Governmental Authority or any other administrative or investigative body (including the Office of the Inspector General of the United States Department of Health and Human Services):  (i) which may result in the imposition of a fine, alternative, interim or final sanction, a lower reimbursement rate for services rendered to eligible patients which has not been provided for on their respective financial statements, or which would have a Material Adverse Effect on any Borrower or the operation of any individual Project; (ii) which could reasonably be expected to result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, provider agreement or material Healthcare Permits of any Project; (iii) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims to such payor by a Borrower; or (iv) which pertains to any state or federal Medicare or Medicaid cost reports or claims filed by any Borrower (including, without limitation, any reimbursement audits), or any disallowance by any commission, board or agency in connection with any audit of such cost reports.

(h)    <u>Ancillary Laws</u>.  Borrowers have received no notice, and are not aware, of any violation of applicable antitrust laws, employment or landlord-tenant laws of any federal, state or local government or quasi-governmental body, agency, board or other authority with respect to the Projects or the Borrowers except as could not reasonably be expected to have a Material Adverse Effect.

(i)    <u>Hill-Burton</u>.  No Borrower is or will be a participant in any federal program whereby any Governmental Authority may have the right to recover funds by reason of the advance of federal funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).

(j)    <u>Fraud and Abuse</u>.

(i)    No Borrower or Manager has, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in Manager or any Borrower has been finally and conclusively determined to have engaged in any of the following:  (A) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment under any Healthcare Laws; (B) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Healthcare Laws; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment under any Healthcare Laws on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (D) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (I) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b), or (II) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b); (E) presenting or causing to be presented a claim for reimbursement for services that is for an item or services that was known or should have been known to be (I) not provided as claimed, or (II) false or fraudulent; or (F) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to (I) a facility in order that the facility may qualify for Governmental Authority certification, or (II) information required to be provided under 42 U.S.C. § 1320a-3.

(ii)    No Borrower or Manager has been and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in Manager or any Borrower has been finally and conclusively determined to have:  (A) had a civil monetary penalty assessed against him

or her pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b) or is the subject of a proceeding seeking to assess such penalty, or has been "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable laws or regulations; (C) been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; (D) been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.; (E) been made a party to any other action by any governmental authority that may prohibit it from selling products to any governmental or other purchaser pursuant to any law; or (F) become subject to any federal, state, local governmental or private payor civil or criminal investigations or inquiries, proceedings, validation review, program integrity review or statement of charges involving and/or related to its compliance with Healthcare Laws or involving or threatening its participation in Medicare, Medicaid or other Third Party Payor Programs or its billing practices with respect thereto.

**Section 8.2**    **Licensed Facilities**.

(a)    Reserved.

(b)    Manager.  As of the Closing Date, no Borrower has engaged  a third party manager (collectively in the singular, a "**Manager**") to operate or provide management services to any Project. If, after the Closing Date, any Borrower elects to engage a Manager, in addition to (but not in limitation of) the covenants set forth in Section 5.10, Borrowers shall not (i) engage or change the Manager of any Project or subject to the provisions of Section 5.10, enter into, or make any modification, amendment, termination or cancellation of, any  management/operating agreements ("**Management Agreements**") or agreements with brokers, (ii) enter into any other agreement relating to the management or operation of any Project with a Manager or any other Person, (iii) consent to the assignment by any Manager of its interest under any Management Agreements, or (iv) waive or release any of its rights and remedies under any Management Agreements, in each case, without the prior written consent of Agent given or withheld in Agent's sole and absolute discretion.  Any Manager shall be required to enter into an assignment and subordination of management or operating agreement in form and substance reasonably satisfactory to Agent and any  Management Agreements shall be approved by Agent in writing and that comply with all applicable Healthcare Laws.  Such restrictions and approval rights are solely for the purposes of assuring that the Projects are managed and operated in a first-class manner consistent with Healthcare Laws and the preservation and protection of the Projects as security for the Obligations and shall not place responsibility for the control, care, management or repair of the Projects upon Agent, or make Agent responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Projects.

(c)     Transfer of Healthcare Permits and Operations.  Upon written notice from Agent to Borrowers following the occurrence of an Event of Default that is continuing hereunder, the following provisions shall be effective:

(i)     Subject to any applicable Laws relating to the transferability of any specific Healthcare Permit, Borrowers shall execute, deliver and file all documents and statements requested by Agent to effectuate a transfer of the Healthcare Permits for any Project to a replacement operator designated by Agent ("**Replacement Operator**"), subject to required approval of any Governmental Authority.  Borrowers further shall provide to Agent all information and records requested by Agent in connection with the transfer of the Healthcare Permits; and

(ii)     In order to facilitate an efficient transfer of the operations of any Project, Borrowers shall, if and to the extent requested by Agent, (A) deliver to Agent copies of all Healthcare Permits and the most recent reports and notices pertaining to such Project required to be delivered under Section 8.1; (B) continue and maintain the operation of such Project in the Ordinary Course of Business, including, without limitation, the retention of all residents at the Project to the fullest extent possible until the transfer of the operations of such Project to the Replacement Operator is completed; (C) enter into such operation transfer agreements, management agreements, and other agreements as may be requested by Agent until the transfer of the operations of such Project to the Replacement Operator is completed; and (D) provide continued access to Agent and its agents to show such Project to potential replacement operators.  Subject to applicable Healthcare Laws including HIPAA, Borrowers hereby consent to the disclosure by Agent to potential replacement operators of Borrowers' financial statements, licensure reports and surveys, financial and property due diligence materials and other documents, materials and information relating to any Project.

### Section 8.3     **Healthcare Operations**.

(a)     Borrower will timely file or caused to be timely filed (after giving effect to any extension duly obtained), all material notifications, reports, submissions, Permit renewals, cost reports and other material reports of every kind whatsoever required by applicable Healthcare Laws (which reports will be materially accurate and complete in all respects and not misleading in any respect and shall not remain open or unsettled).

(b)     Borrower will maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Project for its current use, all Healthcare Permits necessary under applicable Healthcare Laws to carry on the business of Borrowers as it is conducted on the Closing Date, except to the extent the failure of which could not reasonably be expected to result in a Material Adverse Effect.

(c)     Borrower will not suffer or permit to occur any of the following:

(i)     any transfer of a Healthcare Permit or rights thereunder to any Person (other than Borrowers or Agent) or to any location other than a Project approved by Agent in advance in writing;

(ii)     any pledge or hypothecation of any Healthcare Permit as collateral security for any indebtedness other than indebtedness to Agent;

(iii)     any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Permit without Agent's prior written consent, which consent shall not be unreasonably withheld or delayed, including, without limitation, (A) any change to the authorized units/beds capacity of any Project and/or the number of units/beds approved by the applicable Governmental Authority, and (B) any transfer all or any part of any Project's authorized units or beds to another site or location;

(iv)     without Agent's prior written consent, the provision by any Borrower of additional regulated services at any Project, including, without limitation, medical services (other than medical services related to those provided on the Closing Date); or

(v)     any fact, event or circumstance for which notice to Agent is required under Section 8.1.

(d)     Borrower will maintain a corporate health care regulatory compliance program ("**CCP**") consistent with recommendations from Borrower's legal counsel which includes at least the following components and allows Agent and/or any outside consultants to Agent from time to time to review such CCP:  (i) standards of conduct and procedures that describe compliance policies regarding laws with an emphasis on prevention of fraud and abuse; (ii) identify a specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including, without limitation, fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including, without limitation, publicizing a report system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including, without limitation, discipline of individuals responsible for the failure to detect violations of the CCP; and (vi) mechanisms to immediately respond to detected violations of the CCP.

(e)     If any Project is currently accredited by JC, Borrower will (i) maintain such accreditation in good standing and without limitation or impairment, (ii) promptly submit to JC a plan of correction for any deficiencies listed on any JC accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment of such JC accreditation.

**Section 8.4**    **Third Party Payor Programs.**    Neither the Projects, nor any Borrower, shall, other than in the Ordinary Course of Business, change the terms of any Material Third Party Payor Programs or its normal billing payment and reimbursement policies and procedures with respect thereto (including, without limitation, the amount and timing of finance charges, fees and write-offs).    Borrowers will (a) maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Project for its current use, all Healthcare Permits necessary under Healthcare Laws to continue to receive reimbursement under all Material Third Party Payor Programs in which any Borrower or any Project participates as of the date of this Agreement, and (b) provide to Agent upon reasonable request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the business of Borrowers.    Borrowers shall at all times comply with all requirements, contracts, conditions and stipulations applicable to Borrowers in order to maintain in good standing and without default or limitation all such participation in Material Third Party Payor Programs.

**Section 8.5**    **Cures.**    If there shall occur any fact, event or circumstance for which Borrowers are required to give Agent notice under Section 8.1 above after the Closing Date, Borrowers shall take such action as is necessary to validly challenge or otherwise appropriately respond to such fact, event or circumstance within any timeframe required by applicable Healthcare Laws, and shall thereafter diligently pursue the same to a favorable conclusion, all to the effect that the fact, event or circumstance giving rise to Borrowers' notice obligation under Section 8.1 shall be dismissed, rescinded, eliminated and otherwise cease to exist on that date which is the earlier to occur of (a) sixty (60) days after the date any Borrower or any of its Affiliates became aware of such fact, event or circumstance, or (b) the expiration of any cure period given under applicable Healthcare Laws; *provided, however*, that Borrowers will not permit to exist or occur any fact, event or circumstance which could reasonably be expected to cause any representation or warranty in the following subsections of Section 8.1 to be untrue, incomplete or incorrect or which could trigger an disclosure obligation under such subsections of Section 8.1(a), (b), (d)(i) and (i).

## ARTICLE 9 SECURITY AGREEMENT

**Section 9.1**    **Grant of Security Interest**.    As security for the payment and performance of the Obligations, and without limiting any other grant of a Lien and security interest in any Security Document, Borrowers hereby assign and grant to Agent, for the benefit of itself and for the Lenders, a continuing first priority Lien on and security interest in, upon, and to all right, title and interest in and to the personal property set forth on Schedule 9.1 attached hereto and made a part hereof (the "**Personal Property**"; unless otherwise defined in this Agreement, all terms used in this Article 9 shall have the meanings given them in Article 9 of the UCC).

**Section 9.2**    **Representations and Warranties and Covenants Relating to Collateral**.

(a)    Schedule 9.2 sets forth (i) each chief executive office and principal place of business of each Borrower and each of their respective Subsidiaries, and (ii) all of the addresses (including all warehouses) at which any of the Collateral is located and/or books and records of Borrowers regarding any of the Collateral are kept, which such Schedule 9.2 indicates

94

in each case which Borrower(s) have Collateral and/or books and records located at such address, and, in the case of any such address not owned by one or more of the Borrowers(s), indicates the nature of such location (e.g., leased business location operated by Borrower(s), third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning and/or operating such location.

(b)     Without limiting the generality of Section 3.2, except as indicated on Schedule 3.17 with respect to any rights of any Borrower as a licensee under any license of Intellectual Property owned by another Person, and except for the filing of financing statements under the UCC, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or consent of any other Person is required for (i) the grant by each Borrower to Agent of the security interests and Liens in the Collateral provided for under this Agreement and the other Security Documents (if any), or (ii) the exercise by Agent of its rights and remedies with respect to the Collateral provided for under this Agreement and the other Security Documents or under any applicable Law, including the UCC, and neither any such grant of Liens in favor of Agent nor exercise of rights by Agent shall violate or cause a default under any agreement between any Borrower and any other Person relating to any such Collateral, including any license to which a Borrower is a party, whether as licensor or licensee, with respect to any Intellectual Property, whether owned by such Borrower or any other Person.

(c)     As of the Closing Date, no Borrower has any ownership interest in any Chattel Paper (as defined in Article 9 of the UCC), letter of credit rights, commercial tort claims, Instruments, documents or investment property (other than equity interests in any Subsidiaries of such Borrower disclosed on Schedule 3.4) and Borrowers shall give notice to Agent promptly (but in any event not later than the delivery by Borrowers of the next Compliance Certificate required pursuant to Section 4.1 above) upon the acquisition by any Borrower of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, investment property.  No Person other than Agent or (if applicable) any Lender has "control" (as defined in Article 9 of the UCC) over any Deposit Account, investment property (including Securities Accounts and commodities account), letter of credit rights or electronic chattel paper in which any Borrower has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any Deposit Account, Securities Account or commodities account of Borrowers is maintained).

(d)     Borrowers shall not, and shall not permit any Credit Party to, take any of the following actions or make any of the following changes unless Borrowers have given at least thirty (30) days prior written notice to Agent of Borrowers' intention to take any such action (which such written notice shall include an updated version of any Schedule impacted by such change) and have executed any and all documents, instruments and agreements and taken any other actions which Agent may request after receiving such written notice in order to protect and preserve the Liens, rights and remedies of Agent with respect to the Collateral:  (i) change the legal name or organizational identification number of any Borrower as it appears in official filings in the jurisdiction of its organization, (ii) change the jurisdiction of incorporation or formation of any Borrower or Credit Party or allow any Borrower or Credit Party to designate any jurisdiction as an additional jurisdiction of incorporation for such Borrower or Credit Party, or change the type of entity that it is, or (iii) change its chief executive office, principal place of business, or the location of its records concerning its Accounts.  Additionally, each Borrower

shall provide Agent written notice within five (5) Business Days after any movement of any tangible Collateral to a location that is not then listed on the Schedules and/or establish any business location at any location that is not then listed on the Schedules.

(e)     Borrowers shall not adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any Account Debtor, or allow any credit or discount thereon (other than adjustments, settlements, compromises, credits and discounts in the Ordinary Course of Business, made while no Default exists and in amounts which are not material with respect to the Account and which, after giving effect thereto, do not cause the Borrowing Base to be less than the Revolving Loan Outstandings) without the prior written consent of Agent. Without limiting the generality of this Agreement or any other provisions of any of the Financing Documents relating to the rights of Agent after the occurrence and during the continuance of an Event of Default, Agent shall have the right at any time after the occurrence and during the continuance of an Event of Default to:  (i) exercise the rights of Borrowers with respect to the obligation of any Account Debtor to make payment or otherwise render performance to Borrowers and with respect to any property that secures the obligations of any Account Debtor or any other Person obligated on the Collateral, and (ii) adjust, settle or compromise the amount or payment of such Accounts.

(f)     Without limiting the generality of Sections 9.2(c) and 9.2(e):

(i)     Borrowers shall deliver to Agent all tangible Chattel Paper and all Instruments and documents owned by any Borrower and constituting part of the Collateral duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to Agent.  Borrowers shall provide Agent with "control" (as defined in Article 9 of the UCC) of all electronic Chattel Paper owned by any Borrower and constituting part of the Collateral by having Agent identified as the assignee on the records pertaining to the single authoritative copy thereof and otherwise complying with the applicable elements of control set forth in the UCC.  Borrowers also shall deliver to Agent all security agreements securing any such Chattel Paper and securing any such Instruments.  Borrowers will mark conspicuously all such Chattel Paper and all such Instruments and documents with a legend, in form and substance reasonably satisfactory to Agent, indicating that such Chattel Paper and such instruments and documents are subject to the security interests and Liens in favor of Agent created pursuant to this Agreement and the Security Documents.  Borrowers shall comply with all the provisions of Section 5.14 with respect to the Deposit Accounts and Securities Accounts of Borrowers.

(ii)     Borrowers shall deliver to Agent all letters of credit on which any Borrower is the beneficiary and which give rise to letter of credit rights owned by such Borrower which constitute part of the Collateral in each case duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to Agent.  Borrowers shall take any and all actions as may be necessary or desirable, or that Agent may request, from time to time, to cause Agent to obtain exclusive "control" (as defined in Article 9 of the UCC) of any such letter of credit rights in a manner acceptable to Agent.

CHICAGO/#3111951.7B

(iii)    Borrowers shall promptly advise Agent upon any Borrower becoming aware that it has any interests in any commercial tort claim in excess of $125,000 that constitutes part of the Collateral, which such notice shall include descriptions of the events and circumstances giving rise to such commercial tort claim and the dates such events and circumstances occurred, the potential defendants with respect such commercial tort claim and any court proceedings that have been instituted with respect to such commercial tort claims, and Borrowers shall, with respect to any such commercial tort claim, execute and deliver to Agent such documents as Agent shall request to perfect, preserve or protect the Liens, rights and remedies of Agent with respect to any such commercial tort claim.

(iv)    Except for (i) books and records relating to Accounts and Inventory in an aggregate amount of less than $250,000 and (ii) Inventory in transit in the Ordinary Course of Business, no Accounts or Inventory or other Collateral shall at any time be in the possession or control of any warehouse, consignee, bailee or any of Borrowers' agents or processors without prior written notice to Agent and the receipt by Agent, if Agent has so requested, of warehouse receipts, consignment agreements,  bailee lien waivers or collateral access agreements (as applicable) satisfactory to Agent prior to the commencement of such possession or control.  Borrower has notified Agent that Inventory is currently located at the locations set forth on Schedule 9.2.  Borrowers shall, upon the request of Agent, notify any such warehouse, consignee, bailee, agent or processor of the security interests and Liens in favor of Agent created pursuant to this Agreement and the Security Documents, instruct such Person to hold all such Collateral for Agent's account subject to Agent's instructions and shall obtain an acknowledgement from such Person that such Person holds the Collateral for Agent's benefit.

(v)    Borrowers shall cause all equipment and other tangible Personal Property other than Inventory to be maintained and preserved in the same condition, repair and in working order as when new, ordinary wear and tear excepted, and shall promptly make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end.  Upon request of Agent, Borrowers shall promptly deliver to Agent any and all certificates of title, applications for title or similar evidence of ownership of all such tangible Personal Property and shall cause Agent to be named as lienholder on any such certificate of title or other evidence of ownership; provided that in no event shall Borrowers be required to deliver any such certificates, applications or other evidence or cause Agent to be named as lienholder thereon with respect to any tangible Personal Property with an aggregate value (based upon the lesser of fair market value and book value) not to exceed $100,000.  Borrowers shall not permit any such tangible Personal Property to become fixtures to real estate unless such real estate is subject to a Lien in favor of Agent.

(vi)    As of the Closing Date, except for Accounts payable by Medicare, Medicaid and TRICARE, no Borrower holds, and after the Closing Date Borrowers shall promptly notify Agent in writing upon creation or acquisition by any Borrower of, any Collateral which constitutes a claim against any Governmental Authority, including, without limitation, the federal government of the United States or any instrumentality or agency thereof, the assignment of which claim is restricted by any applicable Law,

including, without limitation, the federal Assignment of Claims Act and any other comparable Law.  Upon the request of Agent, Borrowers shall take such steps as may be necessary or desirable, or that Agent may request, to comply with any such applicable Law.

(vii)    Borrowers shall furnish to Agent from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as Agent may reasonably request from time to time.

**Section 9.3    Financing Statements**.  Each Borrower hereby authorizes Agent to file without the signature of such Borrower one or more UCC financing statements relating to all or any part of the Collateral, which financing statements may list Agent as the "secured party" and such Borrower as the "debtor" and which describe and indicate the collateral covered thereby as all or any part of the Collateral under the Financing Documents (including an indication of the collateral covered by any such financing statement as "all assets" of such Borrower now owned or hereafter acquired), in such jurisdictions as Agent from time to time determine are appropriate, and to file without the signature of such Borrower any continuations of or amendments to any such financing statements, in any such case in order for Agent to perfect, preserve or protect the Liens, rights and remedies of Agent with respect to the Collateral.

**Section 9.4    Release of Broad Street Liens.  Agent will cause (i) the Liens granted on the Broad Street Collateral to be released, (ii) the Broad Street Guaranty to be terminated and (iii) the restrictions on granting a Lien on any equity interests in the entities comprising Broad Street to be removed (collectively, the "Broad Street Release"), so long as each of the following conditions is satisfied:**

**(a)    The outstanding principal balance of the Term Loan is $0 and all fees, interest and other Obligations relating to the Term Loan have been paid in full, in each case at the time of the Broad Street Release;**

**(b)    Borrowers shall have given Agent no less than ten (10) days' prior written notice of the proposed Broad Street Release (the "Broad Street Release Request");**

**(c)    Borrowers shall have demonstrated to Agent's reasonable satisfaction that, for a period of the thirty (30) consecutive days immediately prior to the date of the Broad Street Release Request and the date of the Broad Street Release, and immediately after giving pro forma effect to such proposed release, Minimum Liquidity is at least $6,500,000 more than the then-current Minimum Liquidity covenant set forth in Section 6.3, provided, that if Borrowers have requested the Broad Street Release separate and apart from the closing of any transaction that results in full repayment of the Term Loan and in which none of Parent Borrower or any of its Subsidiaries is an obligor, this clause (c) shall not apply;**

**(d)    No Event of Default described in Section 10.1(a) (solely with respect to a failure to pay when due any principal, interest, premium or fee under any Financing Document or any other amount payable under any Financing Document), 10.1(e) or 10.1(f)**

CHICAGO/#3111951.7B

**shall have occurred and be continuing on the date of the Broad Street Release Request or the date of the Broad Street Release; and**

      **(e)    Borrowers shall have paid all costs and expenses incurred by Agent (including reasonable attorneys' fees) in connection with the Broad Street Release.**

## ARTICLE 10 EVENTS OF DEFAULT

**Section 10.1  Events of Default**.  For purposes of the Financing Documents, the occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of law or otherwise, shall constitute an "**Event of Default**":

      (a)    any Borrower shall fail to pay when due any principal, interest, premium or fee under any Financing Document or any other amount payable under any Financing Document, or there shall occur any default in the performance of or compliance with any of the following sections of this Agreement:  Sections 4.1, 4.4(d) and 4.6, Article 5, and Article ~~6~~**6, or there shall occur any Event of Default (as defined there) under any Broad Street Financing Document**;

      (b)    any Credit Party defaults in the performance of or compliance with any term contained in this Agreement or in any other Financing Document, including any Guarantee constituting a Financing Document (other than occurrences described in other provisions of this Section 10.1 for which a different grace or cure period is specified or for which no grace or cure period is specified and thereby constitute immediate Events of Default) and such default is not remedied by the Credit Party or waived by Agent within twenty (20) days after the earlier of (i) receipt by Borrower Representative of notice from Agent or Required Lenders of such default, or (ii) actual knowledge of any Borrower or any other Credit Party of such default;

      (c)    any representation, warranty or certification made by any Credit Party in any Financing Document or in any certificate, financial statement or other document delivered pursuant to any Financing Document is incorrect in any respect (or in any material respect if such representation, warranty, certification, statement or document is not by its terms already qualified as to materiality) when made (or deemed made);

      (d)    (i) failure of any Credit Party to pay when due or within any applicable grace period any principal, interest or other amount on Debt (other than the Loans) or in respect of any Swap Contract, or the occurrence of any breach, default, condition or event with respect to any Debt (other than the Loans) or in respect of any Swap Contract, if the effect of such failure or occurrence is to cause or to permit the holder or holders of any such Debt, or the counterparty under any such Swap Contract, to cause, Debt or other liabilities having an individual principal amount in excess of $625,000 (or any amount, solely with respect to Swap Contracts) or having an aggregate principal amount in excess of $625,000 (or any amount, solely with respect to Swap Contracts) to become or be declared due prior to its stated maturity, or (ii) the occurrence of any breach or default under any terms or provisions of any Subordinated Debt Document or under any agreement subordinating the Subordinated Debt to all or any portion of the Obligations or the occurrence of any event requiring the prepayment of any Subordinated Debt;

(e)     any Credit Party shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

(f)     an involuntary case or other proceeding shall be commenced against any Credit Party seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of forty-five (45) days; or an order for relief shall be entered against any Credit Party under applicable federal bankruptcy, insolvency or other similar law in respect of (i) bankruptcy, liquidation, winding-up, dissolution or suspension of general operations, (ii) composition, rescheduling, reorganization, arrangement or readjustment of, or other relief from, or stay of proceedings to enforce, some or all of the debts or obligations, or (iii) possession, foreclosure, seizure or retention, sale or other disposition of, or other proceedings to enforce security over, all or any substantial part of the assets of such Credit Party;

(g)     (i) institution of any steps by any Person to terminate a Pension Plan if as a result of such termination any Credit Party or any member of the Controlled Group could reasonably be expected to be required to make a contribution to such Pension Plan, or could reasonably be expected to incur a liability or obligation to such Pension Plan, in excess of $250,000, (ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA, or (iii) there shall occur any withdrawal or partial withdrawal from a Multiemployer Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Plans as a result of such withdrawal (including any outstanding withdrawal liability that any Credit Party or any member of the Controlled Group have incurred on the date of such withdrawal) exceeds $250,000;

(h)     one or more judgments or orders for the payment of money (not paid or fully covered by insurance maintained in accordance with the requirements of this Agreement and, with respect to insurance provided by a commercial insurance company, as to which the relevant insurance company has acknowledged coverage or otherwise covered by an appeal bond) aggregating in excess of $500,000 shall be rendered against any or all Credit Parties and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgments or orders, or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of any such judgments or orders, by reason of a pending appeal, bond or otherwise, shall not be in effect;

(i)     any Lien created by any of the Security Documents shall at any time fail to constitute a valid and perfected Lien on all of the Collateral purported to be secured thereby, subject to no prior or equal Lien except Permitted Liens, or any Credit Party shall so assert;

CHICAGO/#3111951.7B

(j)      the institution by any Governmental Authority of criminal proceedings against any Credit Party;

(k)      any Borrower makes any payment on account of any Subordinated Debt, other than payments specifically permitted herein or by the terms of any Subordination Agreement;

(l)      the occurrence of any fact, event or circumstance that could reasonably be expected to result in a Material Adverse Effect, if such default shall have continued unremedied for a period of thirty (30) days after written notice from Agent; or

(m)      there shall occur any default or event of default under any Operating Lease, any HSRE Master Lease, any Management Agreement, any Subordinated Debt Document or any Affiliate Lease (in each case, after giving effect to any cure period, if any).

All cure periods provided for in this Section 10.1 shall run concurrently with any cure period provided for in any applicable Financing Documents under which the default occurred.

**Section 10.2    Acceleration and Suspension or Termination of Revolving Loan Commitment and Term Loan Commitment.**  Upon the occurrence and during the continuance of an Event of Default, Agent may, and shall if requested by Required Lenders, (a) by notice to Borrower Representative suspend or terminate the Revolving Loan Commitment **and the Term Loan Commitment** and the obligations of Agent and the Lenders with respect thereto, in whole or in part (and, if in part, each Lender's Revolving Loan Commitment **and Term Loan Commitment** shall be reduced in accordance with its Pro Rata Share), and/or (b) by notice to Borrower Representative declare all or any portion of the Obligations to be, and the Obligations shall thereupon become, immediately due and payable, with accrued interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same; *provided*, *however*, that in the case of any of the Events of Default specified in Section 10.1(e) or 10.1(f) above, without any notice to any Borrower or any other act by Agent or the Lenders, the Revolving Loan Commitment **and Term Loan Commitment** and the obligations of Agent and the Lenders with respect thereto shall thereupon immediately and automatically terminate and all of the Obligations shall become immediately and automatically due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same.

**Section 10.3    UCC Remedies.**

(a)      Upon the occurrence of and during the continuance of an Event of Default under this Agreement or the other Financing Documents, Agent, in addition to all other rights, options, and remedies granted to Agent under this Agreement or at law or in equity, may exercise, either directly or through one or more assignees or designees, all rights and remedies granted to it under all Financing Documents and under the UCC in effect in the applicable jurisdiction(s) and under any other applicable law; including, without limitation:

(i)      the right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process;

(ii)      the right to (by its own means or with judicial assistance) enter any of Borrowers' premises and take possession of the Collateral, or render it unusable, or to render it usable or saleable, or dispose of the Collateral on such premises in compliance with subsection (iii) below and to take possession of Borrowers' original books and records, to obtain access to Borrowers' data processing equipment, computer hardware and software relating to the Collateral and to use all of the foregoing and the information contained therein in any manner Agent deems appropriate, without any liability for rent, storage, utilities, or other sums, and Borrowers shall not resist or interfere with such action (if Borrowers' books and records are prepared or maintained by an accounting service, contractor or other third party agent, Borrowers hereby irrevocably authorize such service, contractor or other agent, upon notice by Agent to such Person that an Event of Default has occurred and is continuing, to deliver to Agent or its designees such books and records, and to follow Agent's instructions with respect to further services to be rendered);

(iii)      the right to require Borrowers at Borrowers' expense to assemble all or any part of the Collateral and make it available to Agent at any place designated by Lender;

(iv)      the right to notify postal authorities to change the address for delivery of Borrowers' mail to an address designated by Agent and to receive, open and dispose of all mail addressed to any Borrower; and/or

(v)      the right to enforce Borrowers' rights against Account Debtors and other obligors, including, without limitation, (i) the right to collect Accounts directly in Agent's own name (as agent for Lenders) and to charge the collection costs and expenses actually incurred, including reasonable attorneys' fees, to Borrowers, and (ii) the right, in the name of Agent or any designee of Agent or Borrowers, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, telegraph or otherwise, including, without limitation, verification of Borrowers' compliance in all material respects with applicable Laws.  Borrowers shall cooperate fully with Agent in an effort to facilitate and promptly conclude such verification process.  Such verification may include contacts between Agent and applicable federal, state and local regulatory authorities having jurisdiction over the Borrowers' affairs, all of which contacts Borrowers hereby irrevocably authorize.

(b)      Each Borrower agrees that a notice received by it at least ten (10) days before the time of any intended public sale, or the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Agent without prior notice to Borrowers.  At any sale or disposition of Collateral, Agent may (to the extent permitted by applicable law) purchase all or any part of the Collateral, free from any right of redemption by Borrowers, which right is hereby waived and released.  Each Borrower

covenants and agrees not to interfere with or impose any obstacle to Agent's exercise of its rights and remedies with respect to the Collateral. Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale. Agent may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. Agent may sell the Collateral without giving any warranties as to the Collateral. Agent may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. If Agent sells any of the Collateral upon credit, Borrowers will be credited only with payments actually made by the purchaser, received by Agent and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Agent may resell the Collateral and Borrowers shall be credited with the proceeds of the sale. Borrowers shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Obligations.

(c)    Without restricting the generality of the foregoing and for the purposes aforesaid, each Borrower hereby appoints and constitutes Agent its lawful attorney-in-fact with full power of substitution in the Collateral, upon the occurrence and during the continuance of an Event of Default, to (i) use unadvanced funds remaining under this Agreement or which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Notes, (ii) pay, settle or compromise all existing bills and claims, which may be Liens or security interests, or to avoid such bills and claims becoming Liens against the Collateral, (iii) execute all applications and certificates in the name of such Borrower and to prosecute and defend all actions or proceedings in connection with the Collateral, and (iv) do any and every act which such Borrower might do in its own behalf; it being understood and agreed that this power of attorney in this subsection (c) shall be a power coupled with an interest and cannot be revoked.

(d)    Agent and each Lender is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Borrowers' labels, mask works, rights of use of any name, any other Intellectual Property and advertising matter, and any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Agent's exercise of its rights under this Article, Borrowers' rights under all licenses (whether as licensor or licensee) and all franchise agreements inure to Agent's and each Lender's benefit.

**Section 10.4    Cash Collateral.** If (a) any Event of Default specified in Section 10.1(e) or 10.1(f) shall occur, (b) the Obligations shall have otherwise been accelerated pursuant to Section 10.2, or (c) the Revolving Loan Commitment and the obligations of Agent and the Lenders with respect thereto shall have been terminated pursuant to Section 10.2, then without any request or the taking of any other action by Agent or the Lenders, Borrowers shall immediately comply with the provisions of Section 2.5(e) with respect to the deposit of cash collateral to secure the existing Letter of Credit Liability and future payment of related fees.

**Section 10.5    Default Rate of Interest.** At the election of Agent or Required Lenders, after the occurrence of an Event of Default and for so long as it continues, (a) the Loans and other Obligations shall bear interest at rates that are five percent (5.0%) per annum in excess of the rates otherwise payable under this Agreement, and (b) the fee described in Section 2.5(b)

shall increase by a rate that is five percent (5.0%) in excess of the rate otherwise payable under such Section.

**Section 10.6    Setoff Rights.**    During the continuance of any Event of Default, each Lender is hereby authorized by each Borrower at any time or from time to time, with reasonably prompt subsequent notice to such Borrower (any prior or contemporaneous notice being hereby expressly waived) to set off and to appropriate and to apply any and all (a) balances held by such Lender or any of such Lender's Affiliates at any of its offices for the account of such Borrower or any of its Subsidiaries (regardless of whether such balances are then due to such Borrower or its Subsidiaries), and (b) other property at any time held or owing by such Lender to or for the credit or for the account of such Borrower or any of its Subsidiaries, against and on account of any of the Obligations; except that no Lender shall exercise any such right without the prior written consent of Agent.    Any Lender exercising a right to set off shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set off with each other Lender in accordance with their respective Pro Rata Share of the Obligations.    Each Borrower agrees, to the fullest extent permitted by law, that any Lender and any of such Lender's Affiliates may exercise its right to set off with respect to the Obligations as provided in this Section 10.6.

**Section 10.7    Application of Proceeds**.

(a)    Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, (a) each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Agent from or on behalf of such Borrower or any other Guarantor of all or any part of the Obligations, and, as between Borrowers on the one hand and Agent and Lenders on the other, Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as Agent may deem advisable notwithstanding any previous application by Agent, and (b) but absent the occurrence and continuance of an Acceleration Event, Agent shall apply any and all payments received by Agent in respect of the Obligations, and any and all proceeds of Collateral received by Agent, in such order as Agent may from time to time elect.

(b)    Notwithstanding anything to the contrary contained in this Agreement, if an Acceleration Event shall have occurred, and so long as it continues, Agent shall apply any and all payments received by Agent in respect of the Obligations, and any and all proceeds of Collateral received by Agent, in the following order: _first_, to all indemnities then due and owing and fees, costs and expenses then due and owing to Agent with respect to this Agreement, the other Financing Documents or the Collateral; _second_, to all indemnities then due and owing and fees, costs and expenses then due and owing to any Lender with respect to this Agreement, the other Financing Documents or the Collateral; _third_, to accrued and unpaid interest on the Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts); _fourth_, to the principal amount of the Obligations outstanding and to provide cash collateral to secure any and all Letter of Credit Liability and future payment of related fees, as provided for in Section 2.5(e); and _fifth_ to any other indebtedness or obligations of Borrowers owing to Agent or any Lender under the Financing Documents.    Any balance remaining shall be delivered to Borrowers or to whomever may be lawfully entitled to

CHICAGO/#3111951.7B

receive such balance or as a court of competent jurisdiction may direct.  In carrying out the foregoing, (y) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (z) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its Pro Rata Share of amounts available to be applied pursuant thereto for such category.

**Section 10.8    Waivers.**

(a)    Except as otherwise provided for in this Agreement and to the fullest extent permitted by applicable law, each Credit Party waives:  (i) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Financing Documents, the Notes or any other notes, commercial paper, accounts, contracts, documents, Instruments, Chattel Paper and Guarantees at any time held by Agent or Lenders on which any Borrower may in any way be liable, and hereby ratifies and confirms whatever Agent or Lenders may do in this regard; (ii) all rights to notice and a hearing prior to Agent's or any Lender's taking possession or control of, or to Agent's or any Lender's replevy, attachment or levy upon, any Collateral or any bond or security which might be required by any court prior to allowing Agent or any Lender to exercise any of its remedies; and (iii) the benefit of all valuation, appraisal and exemption Laws.  Each Credit Party acknowledges that it has been advised by counsel of its choices and decisions with respect to this Agreement, the other Financing Documents and the transactions evidenced hereby and thereby.

(b)    Each Credit Party for itself and all its successors and assigns, (i) agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Agent or any Lender; (ii) consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Agent or any Lender with respect to the payment or other provisions of the Financing Documents, and to any substitution, exchange or release of the Collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any Credit Party, endorsers, guarantors, or sureties, or whether primarily or secondarily liable, without notice to any other Borrower and without affecting its liability hereunder; (iii) agrees that its liability shall be unconditional and without regard to the liability of any other Credit Party, Agent or any Lender for any tax on the indebtedness; and (iv) to the fullest extent permitted by law, expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(c)    To the extent that Agent or any Lender may have acquiesced in any noncompliance with any requirements or conditions precedent to the closing of the Loans or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Agent or any Lender of such requirements with respect to any future disbursements of Loan proceeds and Agent may at any time after such acquiescence require Credit Parties to comply with all such requirements.  Any forbearance by Agent or Lender in exercising any right or remedy under any of the Financing Documents, or otherwise afforded by applicable law, including any failure to accelerate the maturity date of the Loans, shall not be a waiver of or preclude the exercise of any right or remedy nor shall it serve as a novation of the Notes or as a reinstatement of the Loans or a waiver of such right of acceleration or the right to

insist upon strict compliance of the terms of the Financing Documents.  Agent's or any Lender's acceptance of payment of any sum secured by any of the Financing Documents after the due date of such payment shall not be a waiver of Agent's and such Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment.  The procurement of insurance or the payment of taxes or other Liens or charges by Agent as the result of an Event of Default shall not be a waiver of Agent's right to accelerate the maturity of the Loans, nor shall Agent's receipt of any condemnation awards, insurance proceeds, or damages under this Agreement operate to cure or waive any Credit Party's default in payment of sums secured by any of the Financing Documents.

(d)     Reserved.

(e)     Nothing contained herein or in any other Financing Document shall be construed as requiring Agent or any Lender to resort to any part of the Collateral for the satisfaction of any of Borrowers' obligations under the Financing Documents in preference or priority to any other Collateral, and, after the occurrence and during the continuance of an Event of Default, Agent may seek satisfaction out of all of the Collateral or any part thereof, in its absolute discretion in respect of Credit Parties' obligations under the Financing Documents.  In addition, after the occurrence and during the continuance of an Event of Default, Agent shall have the right from time to time to partially foreclose upon any Collateral in any manner and for any amounts secured by the Financing Documents then due and payable as determined by Agent in its sole discretion, including, without limitation, the following circumstances:  (i) in the event any Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Agent may foreclose upon all or any part of the Collateral to recover such delinquent payments, or (ii) in the event Agent elects to accelerate less than the entire outstanding principal balance of the Loans, Agent may foreclose all or any part of the Collateral to recover so much of the principal balance of the Loans as Lender may accelerate and such other sums secured by one or more of the Financing Documents as Agent may elect.  Notwithstanding one or more partial foreclosures, any unforeclosed Collateral shall remain subject to the Financing Documents to secure payment of sums secured by the Financing Documents and not previously recovered.

(f)     To the fullest extent permitted by law, each Borrower, for itself and its successors and assigns, waives in the event of foreclosure of any or all of the Collateral any equitable right otherwise available to any Credit Party which would require the separate sale of any of the Collateral or require Agent or Lenders to exhaust their remedies against any part of the Collateral before proceeding against any other part of the Collateral; and further in the event of such foreclosure each Borrower does hereby expressly consent to and authorize, at the option of Agent, the foreclosure and sale either separately or together of each part of the Collateral.

**Section 10.9   Injunctive Relief.**  The parties acknowledge and agree that, in the event of a breach or threatened breach of any Credit Party's obligations under any Financing Documents, Agent and Lenders may have no adequate remedy in money damages and, accordingly, shall be entitled to an injunction (including, without limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against such breach or threatened breach, including, without limitation, maintaining any cash management and collection procedure described herein.  However, no specification in this Agreement of a specific legal or

equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision of this Agreement. Each Credit Party waives, to the fullest extent permitted by law, the requirement of the posting of any bond in connection with such injunctive relief. By joining in the Financing Documents as a Credit Party, each Credit Party specifically joins in this Section as if this Section were a part of each Financing Document executed by such Credit Party.

Section 10.10 **Marshalling; Payments Set Aside.** Neither Agent nor any Lender shall be under any obligation to marshal any assets in payment of any or all of the Obligations. To the extent that Borrower makes any payment or Agent enforces its Liens or Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such enforcement or set-off is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefore, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

## ARTICLE 11 AGENT

Section 11.1 **Appointment and Authorization.** Each Lender hereby irrevocably appoints and authorizes Agent to enter into each of the Financing Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as Agent on its behalf and to exercise such powers under the Financing Documents as are delegated to Agent by the terms thereof, together with all such powers as are reasonably incidental thereto. Subject to the terms of Section 11.16 and to the terms of the other Financing Documents, Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Financing Documents on behalf of Lenders. Except for the rights expressly granted to the Borrowers in this Article 11, the provisions of this Article 11 are solely for the benefit of Agent and Lenders and neither any Borrower nor any other Credit Party shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower or any other Credit Party. Agent may perform any of its duties hereunder, or under the Financing Documents, by or through its agents or employees.

Section 11.2 **Agent and Affiliates.** Agent shall have the same rights and powers under the Financing Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Agent, and Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with each Credit Party or Affiliate of any Credit Party as if it were not Agent hereunder.

Section 11.3 **Action by Agent.** The duties of Agent shall be mechanical and administrative in nature. Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender. Nothing in this Agreement or any of the Financing Documents is intended to or shall be construed to impose upon Agent any obligations in respect of this Agreement or any of the Financing Documents except as expressly set forth herein or therein.

**Section 11.4    Consultation with Experts.**    Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

**Section 11.5    Liability of Agent**.    Neither Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be liable to any Lender for any action taken or not taken by it in connection with the Financing Documents, except that Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence, bad faith or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.    Neither Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Financing Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any Financing Document; (c) the satisfaction of any condition specified in any Financing Document; (d) the validity, effectiveness, sufficiency or genuineness of any Financing Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Default or Event of Default; or (f) the financial condition of any Credit Party.    Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, telex, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties.    Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

**Section 11.6    Indemnification**.    Each Lender shall, in accordance with its Pro Rata Share, indemnify Agent (to the extent not reimbursed by Borrowers) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that Agent may suffer or incur in connection with the Financing Documents or any action taken or omitted by Agent hereunder or thereunder.    If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

**Section 11.7    Right to Request and Act on Instructions.**    Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Financing Documents Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any

of the Financing Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Financing Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or exposes Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

**Section 11.8    Credit Decision.**    Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Financing Documents.

**Section 11.9    Collateral Matters.**    Lenders irrevocably authorize Agent, at its option and in its discretion, to (a) release any Lien granted to or held by Agent under any Security Document (i) upon termination of the Loan Commitment and payment in full in cash of all Obligations (other than unasserted Contingent Obligations), and, to the extent required by Agent in its sole discretion, the expiration, termination or cash collateralization (to the satisfaction of Agent) of all Swap Contracts secured, in whole or in part, by any Collateral; or (ii) on property sold or disposed of as part of or in connection with any disposition permitted under any Financing Document (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the Financing Documents); and (b) release or subordinate any Lien granted to or held by Agent under any Security Document constituting personal property described herein (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the identification of any personal property described herein). Upon request by Agent at any time, Lenders will confirm Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.9.

**Section 11.10    Agency for Perfection.**    Agent and each Lender hereby appoint each other Lender as agent for the purpose of perfecting Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control. Should any Lender (other than Agent) obtain possession or control of any such assets, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor, shall deliver such assets to Agent or in accordance with Agent's instructions or transfer control to Agent in accordance with Agent's instructions. Each Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any Collateral for the Loan unless instructed to do so by Agent (or consented to by Agent, as provided in Section 11.5), it being understood and agreed that such rights and remedies may be exercised only by Agent.

**Section 11.11 <u>Notice of Default</u>.**  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to Agent for the account of Lenders, unless Agent shall have received written notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  Agent will notify each Lender of its receipt of any such notice.  Agent shall take such action with respect to such Default or Event of Default as may be requested by Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.  Unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interests of Lenders.

**Section 11.12 <u>Assignment by Agent; Resignation of Agent; Successor Agent</u>**.

(a)    Agent may at any time assign its rights, powers, privileges and duties hereunder to (i) another Lender, or (ii) any Person to whom Agent, in its capacity as a Lender, has assigned (or will assign, in conjunction with such assignment of agency rights hereunder) 50% or more of its Loan, in each case without the consent of the Lenders or Borrowers.  Following any such assignment, Agent shall give notice to the Lenders and Borrowers.  An assignment by Agent pursuant to this subsection (a) shall not be deemed a resignation by Agent for purposes of subsection (b) below.

(b)    Without limiting the rights of Agent to designate an assignee pursuant to subsection (a) above, Agent may at any time give notice of its resignation to the Lenders and Borrowers.  Upon receipt of any such notice of resignation, Required Lenders shall have the right to appoint a successor Agent.  If no such successor shall have been so appointed by Required Lenders and shall have accepted such appointment within ten (10) Business Days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent; *provided, however,* that if Agent shall notify Borrowers and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice from Agent that no Person has accepted such appointment and, from and following delivery of such notice, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Financing Documents, and (ii) all payments, communications and determinations provided to be made by, to or through Agent shall instead be made by or to each Lender directly, until such time as Required Lenders appoint a successor Agent as provided for above in this paragraph.

(c)    Upon (i) an assignment permitted by subsection (a) above, or (ii) the acceptance of a successor's appointment as Agent pursuant to subsection (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder and under the other Financing Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the other Financing Documents, the provisions of this Article and Section 11.12 shall continue in

effect for the benefit of such retiring Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting or was continuing to act as Agent.

**Section 11.13  Payment and Sharing of Payment**.

(a)  Revolving Loan Advances, Payments and Settlements; Interest and Fee Payments**; Term Loan Payments**.

(i)  Agent shall have the right, on behalf of Revolving Lenders to disburse funds to Borrowers for all Revolving Loans requested or deemed requested by Borrowers pursuant to the terms of this Agreement.  Agent shall be conclusively entitled to assume, for purposes of the preceding sentence, that each Revolving Lender, other than any Non-Funding Revolving Lenders, will fund its Pro Rata Share of all Revolving Loans requested by Borrowers.  Each Revolving Lender shall reimburse Agent on demand, in accordance with the provisions of the immediately following paragraph, for all funds disbursed on its behalf by Agent pursuant to the first sentence of this clause (i), or if Agent so requests, each Revolving Lender will remit to Agent its Pro Rata Share of any Revolving Loan before Agent disburses the same to a Borrower.  If Agent elects to require that each Revolving Lender make funds available to Agent, prior to a disbursement by Agent to a Borrower, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of such Revolving Lender's Pro Rata Share of the Revolving Loan requested by such Borrower no later than noon (Eastern time) on the date of funding of such Revolving Loan, and each such Revolving Lender shall pay Agent on such date such Revolving Lender's Pro Rata Share of such requested Revolving Loan, in same day funds, by wire transfer to the Payment Account, or such other account as may be identified by Agent to Revolving Lenders from time to time.  If any Lender fails to pay the amount of its Pro Rata Share of any funds advanced by Agent pursuant to the first sentence of this clause (i) within one (1) Business Day after Agent's demand, Agent shall promptly notify Borrower Representative, and Borrowers shall immediately repay such amount to Agent.  Any repayment required by Borrowers pursuant to this Section 11.13 shall be accompanied by accrued interest thereon from and including the date such amount is made available to a Borrower to but excluding the date of payment at the rate of interest then applicable to Revolving Loans.  Nothing in this Section 11.13 or elsewhere in this Agreement or the other Financing Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that Agent or any Borrower may have against any Lender as a result of any default by such Lender hereunder.

(ii)  On a Business Day of each week as selected from time to time by Agent, or more frequently (including daily), if Agent so elects (each such day being a "**Settlement Date**"), Agent will advise each Revolving Lender by telephone, facsimile or e-mail of the amount of each such Revolving Lender's percentage interest of the Revolving Loan balance as of the close of business of the Business Day immediately preceding the Settlement Date.  In the event that payments are necessary to adjust the amount of such Revolving Lender's actual percentage interest of the Revolving Loans to

such Lender's required percentage interest of the Revolving Loan balance as of any Settlement Date, the Revolving Lender from which such payment is due shall pay Agent, without setoff or discount, to the Payment Account not later than 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date the full amount necessary to make such adjustment. Any obligation arising pursuant to the immediately preceding sentence shall be absolute and unconditional and shall not be affected by any circumstance whatsoever. In the event settlement shall not have occurred by the date and time specified in the second preceding sentence, interest shall accrue on the unsettled amount at the rate of interest then applicable to Revolving Loans.

(iii) On each Settlement Date, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of such Revolving Lender's percentage interest of principal, interest and fees paid for the benefit of Revolving Lenders with respect to each applicable Revolving Loan, to the extent of such Revolving Lender's Revolving Loan Exposure with respect thereto, and shall make payment to such Revolving Lender not later than 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date of such amounts in accordance with wire instructions delivered by such Revolving Lender to Agent, as the same may be modified from time to time by written notice to Agent; *provided, however,* that, in the case such Revolving Lender is a Defaulted Lender, Agent shall be entitled to set off the funding short-fall against that Defaulted Lender's respective share of all payments received from any Borrower.

(iv) On the Closing Date, Agent, on behalf of Lenders, may elect to advance to Borrowers the full amount of the initial Loans to be made on the Closing Date prior to receiving funds from Lenders, in reliance upon each Lender's commitment to make its Pro Rata Share of such Loans to Borrowers in a timely manner on such date. If Agent elects to advance the initial Loans to Borrower in such manner, Agent shall be entitled to receive all interest that accrues on the Closing Date on each Lender's Pro Rata Share of such Loans unless Agent receives such Lender's Pro Rata Share of such Loans by 3:00 p.m. (Eastern time) on the Closing Date.

(v) It is understood that for purposes of advances to Borrowers made pursuant to this Section 11.13, Agent will be using the funds of Agent, and pending settlement, (A) all funds transferred from the Payment Account to the outstanding Revolving Loans shall be applied first to advances made by Agent to Borrowers pursuant to this Section 11.13, and (B) all interest accruing on such advances shall be payable to Agent.

(vi) The provisions of this Section 11.13(a) shall be deemed to be binding upon Agent and Lenders notwithstanding the occurrence of any Default or Event of Default, or any insolvency or bankruptcy proceeding pertaining to any Borrower or any other Credit Party.

**(vii) Payments of principal, interest and fees in respect of the Term Loans will be settled on the date of receipt if received by Agent on the last Business Day of a month or on the Business Day immediately following the date of receipt if received on any day other than the last Business Day of a month.**

(b)    <u>Return of Payments</u>.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from a Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Financing Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(c)    <u>Defaulted Lenders</u>.  The failure of any Defaulted Lender to make any payment required by it hereunder shall not relieve any other Lender of its obligations to make payment, but neither any other Lender nor Agent shall be responsible for the failure of any Defaulted Lender to make any payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Defaulted Lender shall not have any voting or consent rights under or with respect to any Financing Document or constitute a "**Lender**" (or be included in the calculation of "**Required Lenders**" hereunder) for any voting or consent rights under or with respect to any Financing Document.

(d)    <u>Sharing of Payments</u>.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of Section 2.8(i)) in excess of its Pro Rata Share of payments entitled pursuant to the other provisions of this Section 11.13, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; *provided, however,* that if all or any portion of the excess payment or other recovery is thereafter required to be returned or otherwise recovered from such purchasing Lender, such portion of such purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such return or recovery, without interest.  Each Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this clause (d) may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 10.6) with respect to such participation as fully as if such Lender were the direct creditor of Borrowers in the amount of such participation).  If under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this clause (d) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this clause (d) to share in the benefits of any recovery on such secured claim.

**Section 11.14 <u>Right to Perform, Preserve and Protect</u>**.  If any Credit Party fails to perform any obligation hereunder or under any other Financing Document (after giving effect to any cure periods provided for in this Agreement or such other Financing Document), Agent itself may, but shall not be obligated to, cause such obligation to be performed at Borrowers' expense.  Agent is further authorized by Borrowers and the Lenders to make expenditures from time to time which Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by Borrowers, the Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loan and other Obligations.  Each Borrower hereby agrees to reimburse Agent on demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section 11.14.  Each Lender hereby agrees to indemnify Agent upon demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this Section 11.14, in accordance with the provisions of Section 11.6.

**Section 11.15 <u>Additional Titled Agents</u>.**  Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than Agent (collectively, the "**Additional Titled Agents**"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional Titled Agent, no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Financing Documents.  Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Lender.  At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loan, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

**Section 11.16 <u>Amendments and Waivers</u>**.

(a)    No provision of this Agreement or any other Financing Document may be materially amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrowers, the Required Lenders and any other Lender to the extent required under Section 11.16(b); *provided, however*, that (i) Agent shall be entitled, in its sole and absolute discretion, to provide its written consent to a proposed Swap Contract, in each case without the consent of any other Lender, and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

(b)    In addition to the required signatures under Section 11.16(a), no provision of this Agreement or any other Financing Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by the following Persons:

(i)    if any amendment, waiver or other modification would increase a Lender's funding obligations in respect of any Loan, by such Lender; and/or

(ii)    if the rights or duties of Agent or LC Issuer are affected thereby, by Agent and LC Issuer, as the case may be;

114

*provided, however*, that, in each of (i) and (ii) above, no such amendment, waiver or other modification shall, unless signed or otherwise approved in writing by all the Lenders directly affected thereby, (A) reduce the principal of, rate of interest on or any fees with respect to any Loan or Reimbursement Obligation or forgive any principal, interest (other than default interest) or fees (other than late charges) with respect to any Loan or Reimbursement Obligation; (B) postpone the date fixed for, or waive, any payment (other than any mandatory prepayment pursuant to Section 2.1(b)(ii)) of principal of any Loan or of any Reimbursement Obligation, or of interest on any Loan or Reimbursement Obligation (other than default interest) or any fees provided for hereunder (other than late charges) or postpone the date of termination of any commitment of any Lender hereunder; (C) change the definition of the term Required Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder; (D) release all or substantially all of the Collateral, authorize any Borrower to sell or otherwise dispose of all or substantially all of the Collateral or release any Guarantor of all or any portion of the Obligations or its Guarantee obligations with respect thereto, except, in each case with respect to this clause (D), as otherwise may be provided in this Agreement or the other Financing Documents (including in connection with any disposition permitted hereunder); (E) amend, waive or otherwise modify this Section 11.16(b) or the definitions of the terms used in this Section 11.16(b) insofar as the definitions affect the substance of this Section 11.16(b);  (F) consent to the assignment, delegation or other transfer by any Credit Party of any of its rights and obligations under any Financing Document or release any Borrower of its payment obligations under any Financing Document, except, in each case with respect to this clause (F), pursuant to a merger or consolidation permitted pursuant to this Agreement; or (G) amend any of the provisions of Section 10.7 or amend any of the definitions Pro Rata Share, Revolving Loan Commitment, **Term Loan Commitment,** Revolving Loan Commitment Amount, **Term Loan Commitment Amount,** Revolving Loan Commitment Percentage, **Term Loan Commitment Percentage** or that provide for the Lenders to receive their Pro Rata Shares of any fees, payments, setoffs or proceeds of Collateral hereunder.  It is hereby understood and agreed that all Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (C), (D), (E), (F) and (G) of the preceding sentence.

**Section 11.17  Assignments and Participations.**

(a)  Assignments.

(i)  Any Lender may at any time assign to one or more Eligible Assignees all or any portion of such Lender's Loan together with all related obligations of such Lender hereunder.  Except as Agent may otherwise agree, the amount of any such assignment (determined as of the date of the applicable Assignment Agreement or, if a "Trade Date" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the assignor's entire interests in the outstanding Loan; *provided, however,* that, in connection with simultaneous assignments to two or more related Approved Funds, such Approved Funds shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above.  Borrowers and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties

thereto and a processing fee of $3,500 to be paid by the assigning Lender; *provided, however,* that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds.

(ii)    From and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder, and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to Section 12.1).  Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, each Borrower shall execute and deliver to Agent for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes in the aggregate principal amount of the Eligible Assignee's Loan (and, as applicable, Notes in the principal amount of that portion of the principal amount of the Loan retained by the assigning Lender).  Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrower Representative any prior Note held by it.

(iii)    Agent, acting solely for this purpose as an agent of Borrower, shall maintain at the offices of its servicer located in Bethesda, Maryland a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount of the Loan owing to, such Lender pursuant to the terms hereof.  The entries in such register shall be conclusive, and Borrower, Agent and Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Such register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice to Agent.

(iv)    Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided, however,* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(v)    Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, Agent has the right, but not the obligation, to effectuate assignments of Loan via an electronic settlement system acceptable to Agent as designated in writing from time to time to the Lenders by Agent (the "**Settlement Service**").  At any time when the Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 11.17(a).

116

Each assigning Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loan pursuant to the Settlement Service.  With the prior written approval of Agent, Agent's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service. Assignments and assumptions of the Loan shall be effected by the provisions otherwise set forth herein until Agent notifies Lenders of the Settlement Service as set forth herein.

(b)    Participations.  Any Lender may at any time, without the consent of, or notice to, any Borrower or Agent, sell to one or more Persons participating interests in its Loan, commitments or other interests hereunder (any such Person, a "**Participant**").  In the event of a sale by a Lender of a participating interest to a Participant, (i) such Lender's obligations hereunder shall remain unchanged for all purposes, (ii) Borrowers and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder, and (iii) all amounts payable by each Borrower shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender.  Each Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; *provided, however*, that such right of set-off shall be subject to the obligation of each Participant to share with Lenders, and Lenders agree to share with each Participant, as provided in Section 11.5. Each Lender that sells a participating interest shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts and stated interest of each Participant's interest in the Loans or other Obligations under the Financing Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Financing Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in each Participant Register shall be conclusive absent manifest error, and each such Lender shall treat each Person whose name is recorded in a Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c)    Replacement of Lenders.  Within thirty (30) days after: (i) receipt by Agent of notice and demand from any Lender for payment of additional costs as provided in Section 2.8(i), which demand shall not have been revoked, (ii) any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.8(a), (iii) any Lender is a Defaulted Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any Lender to consent to a requested amendment, waiver or modification to any Financing Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender, or each Lender affected thereby, is required with respect thereto (each relevant Lender in the foregoing clauses (i) through (iv) being an "**Affected Lender**") each of Borrower Representative and Agent may, at its option, notify such Affected Lender and, in the

117

case of Borrowers' election, the Agent, of such Person's intention to obtain, at Borrowers' expense, a replacement Lender ("**Replacement Lender**") for such Lender, which Replacement Lender shall be an Eligible Assignee and, in the event the Replacement Lender is to replace an Affected Lender described in the preceding clause (iv), such Replacement Lender consents to the requested amendment, waiver or modification making the replaced Lender an Affected Lender. In the event Borrowers or Agent, as applicable, obtains a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender shall sell, at par, and assign all of its Loan and funding commitments hereunder to such Replacement Lender in accordance with the procedures set forth in Section 11.17(a); *provided, however,* that (A) Borrowers shall have reimbursed such Lender for its increased costs and additional payments for which it is entitled to reimbursement under Section 2.8(a) or Section 2.8(i), as applicable, of this Agreement through the date of such sale and assignment, and (B) Borrowers shall pay to Agent the $3,500 processing fee in respect of such assignment.  In the event that a replaced Lender does not execute an Assignment Agreement pursuant to Section 11.17(a) within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 11.17(c) and presentation to such replaced Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 11.17(c), such replaced Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by Agent, the Replacement Lender and, to the extent required pursuant to Section 11.17(a), Borrowers, shall be effective for purposes of this Section 11.17(c) and Section 11.17(a).  Upon any such assignment and payment, such replaced Lender shall no longer constitute a "**Lender**" for purposes hereof, other than with respect to such rights and obligations that survive termination as set forth in Section 12.1.

(d)     Credit Party Assignments.  Except in connection with any consolidation, merger or amalgamation expressly permitted by Section 5.6, no Credit Party may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Financing Document without the prior written consent of Agent and each Lender.

**Section 11.18 Funding and Settlement Provisions Applicable When Non-Funding Lenders Exist**.  So long as Agent has not waived the conditions to the funding of Revolving Loans set forth in Section ~~7.2;~~**7.2** any Lender may deliver a notice to Agent stating that such Lender shall cease making Revolving Loans due to the non-satisfaction of one or more conditions to funding Loans set forth in Section 7.2, and specifying any such non-satisfied conditions.  Any Lender delivering any such notice shall become a non-funding Lender (a "**Non-Funding Lender**") for purposes of this Agreement commencing on the Business Day following receipt by Agent of such notice, and shall cease to be a Non-Funding Lender on the date on which such Lender has either revoked the effectiveness of such notice or acknowledged in writing to each of Agent the satisfaction of the condition(s) specified in such notice, or Required Lenders waive the conditions to the funding of such Loans giving rise to such notice by Non-Funding Lender.  Each Non-Funding Lender shall remain a Lender for purposes of this Agreement to the extent that such Non-Funding Lender has Revolving Loans Outstanding in excess of ~~zero;~~ **$0 or Term Loans outstanding in excess of $0;** *provided, however,* that during any period of time that any Non-Funding Lender exists, and notwithstanding any provision to the contrary set forth herein, the following provisions shall apply:

(a)    For purposes of determining the Pro Rata Share of each Revolving Lender under clause (c) of the definition of such term, each Non-Funding Lender shall be deemed to have a Revolving Loan Commitment Amount **and Term Loan Commitment Amount** as in effect immediately before such Lender became a Non-Funding Lender.

(b)    Except as provided in clause (a) above, the Revolving Loan Commitment Amount **and Term Loan Commitment Amount** of each Non-Funding Lender shall be deemed to be zero.

(c)    The Revolving Loan Commitment at any date of determination during such period shall be deemed to be equal to the sum of (i) the aggregate Revolving Loan Commitment Amounts of all Lenders, other than the Non-Funding Lenders as of such date *plus* (ii) the aggregate Revolving Loan Outstandings of all Non-Funding Lenders as of such date.

(d)    **The Term Loan Commitment at any date of determination during such period shall be deemed to be equal to the sum of (i) the aggregate Term Loan Commitment Amounts of all Lenders, other than the Non-Funding Lenders as of such date plus (ii) the aggregate principal amount outstanding under the Term Loans of all Non-Funding Lenders as of such date.**

**(e)**    (d) Agent shall have no right to make or disburse Revolving Loans for the account of any Non-Funding Lender pursuant to Section 11.13, or to assume that any Non-Funding Lender will fund its Pro Rata Share of any Revolving Loans requested by Borrower during such period.

**(f)**    (e) Agent shall have no right to make or disburse Revolving Loans for the account of any Non-Funding Lender pursuant to Section 2.1(b)(i) to pay interest, fees, expenses and other charges of any Credit Party, other than reimbursement obligations that have arisen pursuant to Section 2.5(c) in respect of Letters of Credit issued at the time such Non-Funding Lender was not then a Non-Funding Lender.

**(g)**    (f) Agent shall have no right to (i) make or disburse Revolving Loans as provided in Section 2.1(b)(i) for the account of any Revolving Lender that was a Non-Funding Lender at the time of issuance of any Letter of Credit for which funding or reimbursement obligations have arisen pursuant to Section 2.5(c), or (ii) assume that any Revolving Lender that was a Non-Funding Lender at the time of issuance of such Letter of Credit will fund any portion of the Revolving Loans to be funded pursuant to Section 2.5(c) in respect of such Letter of Credit.  In addition, no Revolving Lender that was a Non-Funding Lender at the time of issuance of any Letter of Credit for which funding or reimbursement obligations have arisen pursuant to Section 2.5(c), shall have an obligation to fund any portion of the Revolving Loans to be funded pursuant to Section 2.5(c) in respect to such Letter of Credit, or to make any payment to Agent or the L/C Issuer, as applicable, under Section 2.5(f)(ii) in respect of such Letter of Credit, or be deemed to have purchased any interest or participation in such Letter of Credit from Agent or the L/C Issuer, as applicable, under Section 2.5(f)(i).

**(h)**    (g) To the extent that Agent applies proceeds of Collateral or other payments received by Agent to repayment of Revolving Loans pursuant to Section 10.7, such

CHICAGO/#3111951.7B

payments and proceeds shall be applied first in respect of Revolving Loans made at the time any Non-Funding Lenders exist, and second in respect of all other outstanding Revolving Loans.

**Section 11.19 Buy-Out Upon Refinancing.** MCF shall have the right to purchase from the other Lenders all of their respective interests in the Loan at par in connection with any refinancing of the Loan upon one or more new economic terms, but which refinancing is structured as an amendment and restatement of the Loan rather than a payoff of the Loan.

**Section 11.20 Lender's Rights to Offset, Set-Off.** Notwithstanding anything to the contrary contained in Section 11.5, each Lender hereby acknowledges that the exercise by any Lender of offset, set-off, banker's lien or similar rights against any deposit or other indebtedness of Borrowers whether or not located in any state with certain laws restricting lenders from pursuing multiple collection methods could result under such laws in significant impairment of the ability of all Lenders to recover further amounts in respect of the Loan. THEREFORE, EACH LENDER AGREES THAT NO LENDER SHALL EXERCISE ANY SUCH RIGHT OF SET-OFF, BANKER'S LIEN, OR OTHERWISE, AGAINST ANY ASSETS OF ANY BORROWER (INCLUDING ALL GENERAL OR SPECIAL, TIME OR DEMAND, PROVISIONAL OR OTHER DEPOSITS AND OTHER INDEBTEDNESS OWING BY SUCH LENDER TO OR FOR THE CREDIT OR THE ACCOUNT OF ANY BORROWER) WITHOUT THE PRIOR WRITTEN CONSENT OF AGENT AND THE REQUIRED LENDERS.

**Section 11.21 Definitions.** As used in this Article 11, the following terms have the following meanings:

"**Additional Titled Agents**" has the meaning set forth in Section 11.15.

"**Affected Lender**" has the meaning set forth in Section 11.17(c).

"**Approved Fund**" means any (a) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business, or (b) any Person (other than a natural person) which temporarily warehouses loans for any Lender or any entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

"**Assignment Agreement**" means an assignment agreement in form and substance acceptable to Agent.

"**Bona Fide Lending Affiliate**" shall mean any bona fide debt fund, investment vehicle, regulated banking entity or non-regulated lending entity that is (a) primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business and (b) managed, sponsored or advised by any person that is controlling, controlled by or under common control with a Competitor or affiliate thereof, as applicable, but only to the extent that no personnel involved with the investment in such

Competitor or affiliate thereof, as applicable, makes (or has the right to make or participate with others in making) investment decisions on behalf of such debt fund, investment vehicle, regulated banking entity or non-regulated lending entity.

"**Competitor**" means any person that is an operating company directly and primarily engaged in the operation of acute care hospitals, physician groups or medical office buildings or in medical education research.

"**Defaulted Lender**" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any Financing Document.

"**Disqualified Lender**" means any person that is (a) designated by Borrower Representative, by written notice delivered to Agent on or prior to the Closing Date, as a Competitor or (b) clearly identifiable, solely on the basis of such person's name, as an affiliate of any person referred to in clause (a) above; provided, however, Disqualified Lender shall (A) exclude any person that Borrower Representative has designated as no longer being a Disqualified Lender by written notice delivered to Agent from time to time and (B) include any person that is added as a Competitor, pursuant to a written supplement to the list of Competitors that are Disqualified Lenders, that is delivered by Borrower Representative after the Closing Date upon reasonable notice to Agent and provided, further, that such supplement shall become effective two (2) business days after the date that such written supplement is delivered to Agent, but shall not apply retroactively to disqualify any Lender.  Notwithstanding the foregoing, no person shall be a Disqualified Lender at any time when an Event of Default described in Section 10.1(a) (solely wither respect to nonpayment), 10.1(f) or 10.1(g) has occurred and is continuing or an Event of Default described in Section 10.1(a) (solely with respect to failure to satisfy a financial covenant set forth in Article 6) has occurred and is continuing for two consecutive fiscal quarters or more and in no event shall a Bona Fide Lending Affiliate be a Disqualified Lender.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person approved by Agent; *provided, however*, that notwithstanding the foregoing, (x) "**Eligible Assignee**" shall not include any Borrower or any of a Borrower's Affiliates or a Disqualified Lender, and (y) no proposed assignee intending to assume all or any portion of the Revolving Loan Commitment shall be an Eligible Assignee unless such proposed assignee either already holds a portion of such Revolving Loan Commitment, or has been approved as an Eligible Assignee by Agent.

"**Non-Funding Lender**" has the meaning set forth in Section 11.18.

"**Participant**" has the meaning set forth in Section 11.17(b).

"**Participant Register**" has the meaning set forth in Section 11.17(b).

"**Replacement Lender**" has the meaning set forth in Section 11.17(c).

"**Settlement Service**" has the meaning set forth in Section 11.17(a)(v).

CHICAGO/#3111951.7B

## ARTICLE 12 MISCELLANEOUS

**Section 12.1    Survival.**  All agreements, representations and warranties made herein and in every other Financing Document shall survive the execution and delivery of this Agreement and the other Financing Documents and the other Operative Documents.  The provisions of Sections 2.8, 2.10 and Articles 11 and 12 shall survive the payment of the Obligations (both with respect to any Lender and all Lenders collectively) and any termination of this Agreement and any judgment with respect to any Obligations, including any final foreclosure judgment with respect to any Security Document, and no unpaid or unperformed, current or future, Obligations will merge into any such judgment.

**Section 12.2    No Waivers.**  No failure or delay by Agent or any Lender in exercising any right, power or privilege under any Financing Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by law.  Any reference in any Financing Document to the "continuing" nature of any Event of Default shall not be construed as establishing or otherwise indicating that any Borrower or any other Credit Party has the independent right to cure any such Event of Default, but is rather presented merely for convenience should such Event of Default be waived in accordance with the terms of the applicable Financing Documents.

**Section 12.3    Notices**.

(a)    All notices, requests and other communications to any party hereunder shall be in writing (including prepaid overnight courier, facsimile transmission or similar writing) and shall be given to such party at its address, facsimile number or e-mail address set forth on the signature pages hereof (or, in the case of any such Lender who becomes a Lender after the date hereof, in an assignment agreement or in a notice delivered to Borrower Representative and Agent by the assignee Lender forthwith upon such assignment) or at such other address, facsimile number or e-mail address as such party may hereafter specify for the purpose by notice to Agent and Borrower Representative; *provided*, *however*, that notices, requests or other communications shall be permitted by electronic means only in accordance with the provisions of Section 12.3(b) and (c).  Each such notice, request or other communication shall be effective (i) if given by facsimile, when such notice is transmitted to the facsimile number specified by this Section and the sender receives a confirmation of transmission from the sending facsimile machine, or (ii) if given by mail, prepaid overnight courier or any other means, when received or when receipt is refused at the applicable address specified by this Section 12.3(a).

(b)    Notices and other communications to the parties hereto may be delivered or furnished by electronic communication (including facsimile, e-mail and Internet or intranet websites) pursuant to procedures approved from time to time by Agent, *provided*, *however*, that the foregoing shall not apply to notices sent directly to any Lender if such Lender has notified the Agent that it is incapable of receiving notices by electronic communication.  The Agent or Borrower Representative may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures

CHICAGO/#3111951.7B

approved by it, *provided*, *however*, that approval of such procedures may be limited to particular notices or communications.

(c)     Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor, *provided*, *however*, that if any such notice or other communication is not sent or posted during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

**Section 12.4    Severability.**  In case any provision of or obligation under this Agreement or any other Financing Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**Section 12.5    Headings.**   Headings and captions used in the Financing Documents (including the Exhibits, Schedules and Annexes hereto and thereto) are included for convenience of reference only and shall not be given any substantive effect.

**Section 12.6    Confidentiality.**    Agent and each Lender shall hold all non-public information regarding the Credit Parties and their respective businesses identified as such by Borrowers and obtained by Agent or any Lender pursuant to the requirements hereof in accordance with such Person's customary procedures for handling information of such nature, except that disclosure of such information may be made (a) to their respective agents, employees, Subsidiaries, Affiliates, attorneys, auditors, professional consultants, rating agencies, insurance industry associations and portfolio management services *provided*, *however*, that any such Persons are bound by obligations of confidentiality (including customary confidentiality obligations of professional practice), (b) to prospective transferees or purchasers of any interest in the Loans, the Agent or a Lender, and to prospective contractual counterparties (or the professional advisors thereto) in Swap Contracts permitted hereby, *provided*, *however*, that any such Persons are bound by obligations of confidentiality, (c) as required by Law, subpoena, judicial order or similar order and in connection with any litigation, (d) as may be required in connection with the examination, audit or similar investigation of such Person, and (e) to a Person that is a trustee, investment advisor, collateral manager, servicer, noteholder or secured party in a Securitization (as hereinafter defined) in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization.  For the purposes of this Section, "**Securitization**" shall mean (i) the pledge of the Loans as collateral security for loans to a Lender, or (ii) a public or private offering by a Lender or any of its Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized, in whole or in part, by the Loans.  Confidential information shall not include information that either:  (y) is in the public domain, or becomes part of the public domain after disclosure to such Person through no fault of such Person, or (z) is disclosed to such Person by a Person other than

a Credit Party, *provided*, *however*, Agent does not have actual knowledge that such Person is prohibited from disclosing such information. The obligations of Agent and Lenders under this Section 12.6 shall supersede and replace the obligations of Agent and Lenders under any confidentiality agreement in respect of this financing executed and delivered by Agent or any Lender prior to the date hereof.

**Section 12.7 <u>Waiver of Consequential and Other Damages</u>.** To the fullest extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against any Indemnitee (as defined below), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Financing Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Financing Documents or the transactions contemplated hereby or thereby.

**Section 12.8 <u>GOVERNING LAW; SUBMISSION TO JURISDICTION</u>.**

(a)     THIS AGREEMENT, EACH NOTE AND EACH OTHER FINANCING DOCUMENT, AND ALL MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES. EACH CREDIT PARTY HEREBY CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN MONTGOMERY COUNTY, MARYLAND AND IRREVOCABLY AGREES THAT, SUBJECT TO AGENT'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER FINANCING DOCUMENTS MAY BE LITIGATED IN SUCH COURTS. EACH CREDIT PARTY EXPRESSLY SUBMITS AND CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH CREDIT PARTY AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

(b)     Each Borrower, Agent and each Lender agree that each Loan (including those made on the Closing Date) shall be deemed to be made in, and the transactions contemplated hereunder and in any other Financing Document shall be deemed to have been performed in, the State of Maryland.

**Section 12.9 <u>WAIVER OF JURY TRIAL</u>. EACH CREDIT PARTY, AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO**

**TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE FINANCING DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH CREDIT PARTY, AGENT AND EACH LENDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH CREDIT PARTY, AGENT AND EACH LENDER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

**Section 12.10  <u>Publication; Advertisement</u>**.

(a)  <u>Publication</u>.  No Credit Party will directly or indirectly publish, disclose or otherwise use in any public disclosure, advertising material, promotional material, press release or interview, any reference to the name, logo or any trademark of MCF or any of its Affiliates or any reference to this Agreement or the financing evidenced hereby, in any case except (i) as required by Law, subpoena or judicial or similar order, in which case the applicable Credit Party shall give Agent prior written notice of such publication or other disclosure, or (ii) with MCF's prior written consent.

(b)  <u>Advertisement</u>.  Each Lender and each Credit Party hereby authorizes MCF to publish the name of such Lender and Credit Party, the existence of the financing arrangements referenced under this Agreement, the primary purpose and/or structure of those arrangements, the amount of credit extended under each facility, the title and role of each party to this Agreement, and the total amount of the financing evidenced hereby in any "tombstone", comparable advertisement or press release which MCF elects to submit for publication.  In addition, each Lender and each Credit Party agrees that MCF may provide lending industry trade organizations with information necessary and customary for inclusion in league table measurements after the Closing Date.  With respect to any of the foregoing, MCF shall provide Borrowers with an opportunity to review and confer with MCF regarding the contents of any such tombstone, advertisement or information, as applicable, prior to its submission for publication and, following such review period, MCF may, from time to time, publish such information in any media form desired by MCF, until such time that Borrowers shall have requested MCF cease any such further publication.

**Section 12.11  <u>Counterparts; Integration</u>**.  This Agreement and the other Financing Documents may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Signatures by facsimile or by electronic mail delivery of an electronic version (e.g., .pdf or .tif file) of an executed signature page shall bind the parties hereto.  This Agreement and the other Financing Documents constitute the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

**Section 12.12 No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**Section 12.13 Time.** Time is of the essence in each Borrower's and each other Credit Party's performance under this Agreement and all other Financing Documents

**Section 12.14 Lender Approvals.** Unless expressly provided herein to the contrary, any approval, consent, waiver or satisfaction of Agent or Lenders with respect to any matter that is the subject of this Agreement, the other Financing Documents may be granted or withheld by Agent and Lenders in their sole and absolute discretion and credit judgment.

**Section 12.15 Expenses; Indemnity**.

(a) Borrowers hereby agree to promptly pay (i) all reasonable costs and expenses of Agent (including, without limitation, the reasonable and documented fees, costs and expenses of counsel to, and, to the extent specifically permitted hereunder, independent appraisers and consultants retained by Agent) in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated by the Financing Documents, in connection with the performance by Agent of its rights and remedies under the Financing Documents and in connection with the continued administration of the Financing Documents including (A) any amendments, modifications, consents and waivers to and/or under any and all Financing Documents, and (B) subject to any limitations set forth in Section 7.3, any periodic public record searches conducted by or at the request of Agent (including, without limitation, title investigations, UCC searches, fixture filing searches, judgment, pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of certain Persons); (ii) without limitation of the preceding clause (i), all reasonable and documented costs and expenses of Agent in connection with the creation, perfection and maintenance of Liens pursuant to the Financing Documents; (iii) without limitation of the preceding clause (i), all reasonable and documented costs and expenses of Agent in connection with (A) protecting, storing, insuring, handling, maintaining or selling any Collateral, (B) any litigation, dispute, suit or proceeding relating to any Financing Document, and (C) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Financing Documents; (iv) without limitation of the preceding clause (i), all reasonable costs and expenses of Agent in connection with Agent's reservation of funds in anticipation of the funding of the initial Loans to be made hereunder; and (v) all reasonable and documented costs and expenses incurred by Lenders in connection with any litigation, dispute, suit or proceeding relating to any Financing Document and in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all Financing Documents, whether or not Agent or Lenders are a party thereto**.** If Agent or any Lender uses in-house counsel for any of these purposes, Borrowers further agree that the Obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Agent or such Lender for the work performed.

(b)     Except with respect to indemnification for Taxes, which is addressed in Section 2.8, each Borrower hereby agrees to indemnify, pay and hold harmless Agent and Lenders and the officers, directors, employees, trustees, agents, investment advisors, collateral managers, servicers, and counsel of Agent and Lenders (collectively called the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the fees and disbursements of counsel for such Indemnitee) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be designated a party thereto and including any such proceeding initiated by or on behalf of a Credit Party, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker (other than any broker retained by Agent or Lenders) asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated hereby or by the other Operative Documents (including (i)(A) as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from, any property now or previously owned, leased or operated by Borrower, any Subsidiary or any other Person of any Hazardous Materials, (B) arising out of or relating to the offsite disposal of any materials generated or present on any such property, or (C) arising out of or resulting from the environmental condition of any such property or the applicability of any governmental requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of Borrower or any Subsidiary, and (ii) proposed and actual extensions of credit under this Agreement) and the use or intended use of the proceeds of the Loans and Letters of Credit, except that Borrower shall have no obligation hereunder to an Indemnitee with respect to any liability, obligation, loss, damage, penalty, action, judgment, suit, claim, cost, expense or disbursement resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them.

(c)     Notwithstanding any contrary provision in this Agreement, the obligations of Borrowers under this Section 12.14 shall survive the payment in full of the Obligations and the termination of this Agreement.  NO INDEMNITEE SHALL BE RESPONSIBLE OR LIABLE TO THE BORROWERS OR TO ANY OTHER PARTY TO ANY FINANCING DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR ANY OTHER FINANCING DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

**Section 12.16 <u>Reinstatement</u>.**  This Agreement shall remain in full force and effect and continue to be effective should any petition or other proceeding be filed by or against any Credit

Party for liquidation or reorganization, should any Credit Party become insolvent or make an assignment for the benefit of any creditor or creditors or should an interim receiver, receiver, receiver and manager or trustee be appointed for all or any significant part of any Credit Party's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a fraudulent preference reviewable transaction or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

Section 12.17 **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Borrowers and Agent and each Lender and their respective successors and permitted assigns.

Section 12.18 **USA PATRIOT Act Notification.**  Agent (for itself and not on behalf of any Lender) and each Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Borrowers, which information includes the name and address of Borrower and such other information that will allow Agent or such Lender, as applicable, to identify Borrowers in accordance with the USA PATRIOT Act.

## ARTICLE 13 ACQUISITION MATTERS

Section 13.1 **Borrower Assumption Agreement**.  The parties hereto hereby agree that immediately upon Target Borrowers executing and delivering the signature pages to the attached Post-Acquisition Certification to the Agent on the Closing Date after the consummation of the Acquisition, without further act or deed, (a) each Target Borrower shall become a party to this Agreement as the "Borrower" with the same force and effect as if originally named herein as the Borrower and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities (including the Obligations) of the Borrower hereunder, (b) each Target Borrower shall be bound by all of the terms and provisions of this Agreement, which are incorporated herein by reference as fully as though set forth herein verbatim, (c) each reference to the "Borrower" in this Agreement and in any other Financing Document shall be deemed to include each Target Borrower, (d) each Target Borrower shall be jointly and severally liable under this Agreement for payment of all Obligations, and (e) each Target Borrower shall grant the Agent, for the benefit of itself and the Lenders, a security interest and Lien in all its rights, title and interest in the Collateral, whether now owned or hereafter acquired and wherever located, to secure the Obligations pursuant to this Agreement and the other Security Documents (the events in the foregoing clauses (a) through (e) being, collectively, the "**Borrower Assumption**").  Notwithstanding anything in the Financing Documents to the contrary, the Borrower Assumption is consented and agreed to in all respects by all parties hereto and shall be immediately effective upon the Target Borrowers executing and delivering the signature pages to the attached Post-Acquisition Certification to the Agent on the Closing Date after the consummation of the Acquisition.

**Section 13.2    Reference to Closing Date**.  Notwithstanding anything to the contrary in the Financing Documents, for purposes of the representations and warranties (including, without limitation, the Schedules and the other provisions set forth in Section 3 of this Agreement, the conditions precedent set forth in Section 7.1 of this Agreement and any reference to "Closing Date" in Sections 4 or 5 of this Agreement, the making of the Loans and the issuance of any Letters of Credit on the Closing Date shall be assumed to occur concurrently with the consummation of the Acquisition.

**[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]**

129

**IN WITNESS WHEREOF**, intending to be legally bound, and intending that this Agreement constitute an agreement executed under seal, each of the parties have caused this Agreement to be executed under seal the day and year first above mentioned.

**BORROWERS:**

**ST. CHRISTOPHER'S HEALTHCARE, LLC**, a Delaware limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**CENTER CITY HEALTHCARE, LLC**, a Delaware limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**BORROWERS:**

**PHYSICIANS CLINICAL NETWORK, LLC**, a Delaware limited liability company

By:_____(SEAL)
    Joel Freedman

Chief Executive Officer and President

<u>Address for Notices for Borrowers (including Target Borrowers)</u>:
222 North Sepulveda Boulevard, Suite 900
El Segundo, California 90245


**AGENT:**

**MIDCAP** ~~**FINANCIAL**~~**FUNDING IV** **TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager


    By:  Apollo Capital Management
    GP, LLC
    Its:  General Partner


                                             By:_____
<u>(SEAL)</u>

Maurice Amsellem

Authorized Signatory

<u>Address</u>:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  Account Manager for Project Liberty Hospital transaction
Facsimile:  301-941-1450
E-mail:  notices@midcapfinancial.com


with a copy to:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  General Counsel

Facsimile:  301-941-1450
E-mail:  legalnotices@midcapfinancial.com

<u>Payment Account Designation:</u>

Wells Fargo Bank, N.A. (McLean, VA)
ABA #:  121-000-248
Account Name:  MidCap Funding IV Trust -
Collections
Account #:  2000036282803
Attention:  Project Liberty

**LENDER:**

**MIDCAP** ~~**FINANCIAL**~~**FUNDING IV** **TRUST**, a Delaware statutory trust

By:  Apollo Capital Management, L.P.
Its:  Investment Manager

    By:  Apollo Capital Management GP, LLC
    Its:  General Partner

                  By:_____

(SEAL)

Maurice Amsellem

Authorized Signatory

<u>Address</u>:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  Account Manager for Project Liberty Hospital transaction
Facsimile:  301-941-1450
E-mail:  notices@midcapfinancial.com

with a copy to:

c/o MidCap Financial Services, LLC,
as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  General Counsel
Facsimile:  301-941-1450
E-mail:  legalnotices@midcapfinancial.com

## <u>POST-ACQUISITION CERTIFICATION OF</u>
## <u>TARGET BORROWERS</u>

The undersigned each hereby certifies that:

The Acquisition (this and the other terms used herein without definition have the meanings assigned to them in the Credit Agreement to which this certification is attached, the "<u>Credit Agreement</u>") has been consummated.

The undersigned agrees to the Borrower Assumption and the other transactions set forth in Article 13 of the Credit Agreement and to all other agreements of the Borrower set forth in the Credit Agreement and the other Financing Documents.

## [**SIGNATURE PAGE FOLLOWS**]

**TARGET BORROWERS:**

**HPS OF PA, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
     Joel Freedman
     Chief Executive Officer and President

**SCHC PEDIATRIC ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
     Joel Freedman
     Chief Executive Officer and President

**ST CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
     Joel Freedman
     Chief Executive Officer and President

**SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
     Joel Freedman
     Chief Executive Officer and President

**STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
     Joel Freedman
     Chief Executive Officer and President

**TARGET BORROWERS:**

**TPS OF PA, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**TPS II OF PA, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**TPS III OF PA, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**TPS IV OF PA, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**TPS V OF PA, L.L.C.**, a Pennsylvania limited liability company

By:_____(SEAL)
    Joel Freedman
    Chief Executive Officer and President

**TARGET BORROWERS:**

**PHYSICIAN PERFORMANCE NETWORK OF**

POST-ACQUISITION
CERTIFICATION OF TARGET
BORROWERS

**PHILADELPHIA, L.L.C.**, a Pennsylvania limited
liability company

By:_____(SEAL)
 Joel Freedman
 Chief Executive Officer and President

## ANNEXES, EXHIBITS  AND SCHEDULES

**ANNEXES**

Annex A            Commitment Annex

**EXHIBITS**

Exhibit A          Compliance Certificate
Exhibit B          Borrowing Base Certificate
Exhibit C-1        Closing Date Notice of Borrowing
Exhibit C-2        Notice of Borrowing for Loans Requested after the Closing Date

**Exhibit D          Payment Notification**

**SCHEDULES**

Schedule 1.1A      Affiliate Leases
Schedule 1.1B      List of Projects, Names, Addresses and Bed Capacity
Schedule 3.1       Existence, Organizational ID Numbers, Foreign Qualification, Prior Names
Schedule 3.4       Capitalization
Schedule 3.6       Litigation
Schedule 3.17      Material Contracts
Schedule 3.18      Environmental Compliance
Schedule 4.9       Notices of Litigation and Defaults
Schedule 5.1       Permitted Contingent Obligations; Permitted Indebtedness
Schedule 5.2       Permitted Liens
Schedule 5.8       Transactions with Affiliates
Schedule 5.11      Conduct of Business
Schedule 5.14      Deposit Accounts and Securities Accounts
Schedule 7.4       Post Closing Requirements
Schedule 8.1       Regulatory Disclosures
Schedule 9.1       Collateral
Schedule 9.2       Location of Collateral

**ANNEX A TO CREDIT AGREEMENT (COMMITMENT ANNEX)**

| Lender | Revolving Loan Commitment Amount | | Revolving Loan Commitment Percentage Term Loan Commitment Amount Term Loan Commitment Percentage | |
|---|---|---|---|---|
| MidCap ~~Financial~~**Funding IV** Trust | $100,000,000 | 100% | **$** | **100%** |
| **MidCap Funding H Trust** | **$0** | **100%** | **$20,000,000** | **100%** |
| TOTALS | $100,000,000 | 100% | **$20,000,000** | **100%** |

Annex A – Page   1

**EXHIBIT A TO CREDIT AGREEMENT (COMPLIANCE CERTIFICATE)**

**COMPLIANCE CERTIFICATE**

Date: _____, 201__

    This Compliance Certificate is given by _____, a Responsible Officer of _____ (the "**Borrower Representative**"), pursuant to that certain Credit and Security Agreement dated as of January 11, 2018 among **ST. CHRISTOPHER'S HEALTHCARE, LLC, CENTER CITY HEALTHCARE, LLC, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, PHYSICIANS CLINICAL NETWORK, LLC, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC, HPS OF PA, L.L.C., SCHC PEDIATRIC ASSOCIATES, L.L.C., STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., TPS OF PA, L.L.C., TPS II OF PA, L.L.C., TPS III OF PA, L.L.C., TPS IV OF PA, L.L.C., TPS V OF PA, L.L.C.,** and **PHYSICIAN PERFORMANCE NETWORK OF PHILADELPHIA, L.L.C.** (collectively, "**Borrowers**"), MidCap Funding IV Trust (successor-by-assignment to MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the respective Credit Agreement.

    The undersigned Responsible Officer hereby certifies to Agent and Lenders, in his or her capacity as such officer and not individually, that:

    (a)    the financial statements delivered with this certificate in accordance with Section 4.1 of the Credit Agreement fairly present in all material respects the results of operations and financial condition of all applicable Credit Parties and their consolidated subsidiaries as of the dates and the accounting period covered by such financial statements;

    (b)    I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of all applicable Credit Parties and their consolidated subsidiaries during the accounting period covered by such financial statements, and such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that (i) would make any of the representations, warranties or covenants set forth in the Credit Agreement untrue as of the date of this Compliance Certificate, or (ii) constitutes a Default or an Event of Default, except as set forth in **Schedule 1** hereto, which includes a description of the nature and period of existence of such Default or an Event of Default and what action Borrowers have taken, are undertaking and propose to take with respect thereto;

(c)      Borrowers and Guarantor are in compliance with the covenants contained in Article 6 of the Credit Agreement, and in any Guarantee constituting a part of the Financing Documents, as demonstrated by the calculation of such covenants below, except as set forth below; in determining such compliance, the following calculations have been made:   [See attached worksheets].  Such calculations and the certifications contained therein are true, correct and complete.

(d)      Except as noted on **Schedule 2** attached hereto, no Borrower or Guarantor is aware of any Commercial Tort Claim that has not been previously reported to Agent on any Schedule 2 to any previous Compliance Certificate delivered by Borrower Representative to Agent.

The foregoing certifications and computations are made as of _____, 201__ (end of month) and as of _____, 201__.

Sincerely,

**[BORROWER REPRESENTATIVE]**


By: _____
Name: _____
Title: _____



**Schedules to Compliance Certificate**

Schedule 1 – Non-Compliance with Covenants

Schedule 2 – Commercial Tort Claims

Schedule 3 - Project Disclosures

Worksheet(s) for Financial or Other Covenant Calculations

## **EBITDA Worksheet (Attachment to Compliance Certificate)**

EBITDA for the applicable measurement period (the "**Defined Period**") is defined as follows:

Consolidated net income (or loss) for the Defined Period of the Borrowers and their consolidated Subsidiaries, but excluding: (a) the income (or loss) of any Person (other than Subsidiaries of Borrowers) in which the Borrowers or any of their Subsidiaries has an ownership interest unless received by the Borrowers or their Subsidiary in a cash distribution; and (b) the income (or loss) of any Person accrued prior to the date it became a Subsidiary of Borrowers or is merged into or consolidated with Borrowers

$_____

Plus:  Any provision for (or *minus* any benefit from) income and franchise taxes deducted in the determination of net income for the Defined Period

_____

Interest expense, net of interest income, deducted in the determination of net income for the Defined Period

_____

Amortization and depreciation deducted in the determination of net income for the Defined Period

_____

Other non-cash expenses (or *minus* other non-cash gains or income) deducted in the determination of net income for the Defined Period and for which no cash outlay (or cash receipt) is foreseeable prior to the Commitment Expiry Date

_____

Accrued rent expense under the St. Christopher Operating Leases deducted in the determination of net income for the Defined Period to the extent such rent expense is not due and payable

_____

EBITDA for the Defined Period

$_____

**Fixed Charge Coverage Ratio Worksheet (Attachment to Compliance Certificate)**

Fixed Charge Coverage Ratio for the applicable measurement period (the "**Defined Period**") is defined as follows:

Fixed Charges:

Interest expense ($_____), net of interest income ($_____), interest paid in kind ($_____) and amortization of capitalized fees and expenses incurred to consummate the transactions contemplated by the Financing Documents and included in interest expense ($_____), included in the determination of net income of Borrowers and their consolidated subsidiaries for the Defined Period ("**Total Interest Expense**")                    $_____

Plus:   Any provision for (or *minus* any benefit from) income or franchise taxes included in the determination of net income for the Defined Period                    _____

Scheduled payments of principal for the Defined Period with respect to all Debt (including the portion of scheduled payments under Capital Leases allocable to principal and excluding **mandatory prepayments required by Section 2.1 and** scheduled repayments of Revolving Loans and other Debt subject to reborrowing to the extent not accompanied by a concurrent and permanent reduction of the Revolving Loan Commitment (or equivalent loan commitment))                    _____

Solely for purposes of calculating the Fixed Charge Coverage Ratio for purposes of ~~Sections 5.3~~**clauses** (e)**, (h), (i)** and ~~5.3(g),~~**(j) of Section 5.3,** the amount of any distribution to be made pursuant to ~~Sections~~**such clauses in Section** 5.3~~(e) and 5.3(g)~~                    _____

Operating Cash Flow:

EBITDA for the Defined Period (calculated in the manner required by Section 6.0 of the Compliance Certificate)                    $_____

Less:   Unfinanced capital expenditures for the Defined Period                    _____

To the extent not already reflected in the calculation of EBITDA, other capitalized costs, defined as the gross amount paid in cash and capitalized during the Defined Period, as long term assets, other than amounts capitalized during the Defined Period as capital expenditures for property, plant and equipment or similar fixed asset accounts                    _____

Operating Cash Flow:                    $_____

Fixed Charge Coverage Ratio (Ratio of Operating Cash Flow to Fixed Charges) for the Defined Period                    ___ to 1.0

Exhibit A – Page   4

Minimum Fixed Charge Coverage for the Defined Period                    1.1 to 1.0

In Compliance                                                          Yes/No

CHICAGO/#3111951.7B

**Exhibit B to Credit Agreement (Borrowing Base Certificate)**

**Exhibit C-1 to Credit Agreement (Notice of Borrowing)**

[BORROWER REPRESENTATIVE]

Date: _____, 201___

　　　This Notice of Borrowing is given by _____, a Responsible Officer of _____ (the "**Borrower Representative**"), pursuant to that certain Credit and Security Agreement dated as of January 11, 2018 among **ST. CHRISTOPHER'S HEALTHCARE, LLC, CENTER CITY HEALTHCARE, LLC, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, PHYSICIANS CLINICAL NETWORK, LLC, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC** and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust (successor-by-assignment to MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**").  Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

　　　The undersigned Responsible Officer hereby gives notice to Agent of Borrower Representative's request to on [**_date_**] borrow $[_____] of Revolving Loans.  Attached is a Borrowing Base Certificate complying in all respects with the Credit Agreement and confirming that, after giving effect to the requested advance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit.

　　　The undersigned officer hereby certifies, in his or her capacity as such officer and not individually, that, both before and after giving effect to the request above (a) each of the conditions precedent set forth in Section 7.2 have been satisfied, (b) all of the representations and warranties contained in the Credit Agreement and the other Financing Documents are true, correct and complete as of the date hereof, except to the extent such representation or warranty relates to a specific date, in which case such representation or warranty is true, correct and complete as of such earlier date, and (c) no Default or Event of Default has occurred and is continuing on the date hereof.

　　　**IN WITNESS WHEREOF**, the undersigned officer has executed and delivered this certificate this _____ day of _____, 201__.

Sincerely,

[BORROWER REPRESENTATIVE]

By: _____
Name: _____

Exhibit C-1 – Page   1

Title: _____

Exhibit C-1 – Page   2

CHICAGO/#3111951.7B

**Exhibit C-2 to Credit Agreement (Notice of Borrowing)**

[BORROWER REPRESENTATIVE]

Date: _____, 20__

This Notice of Borrowing is given by _____, a Responsible Officer of _____ (the "**Borrower Representative**"), pursuant to that certain Credit and Security Agreement dated as of January 11, 2018 among **ST. CHRISTOPHER'S HEALTHCARE, LLC, CENTER CITY HEALTHCARE, LLC, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, PHYSICIANS CLINICAL NETWORK, LLC** and **PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC, HPS OF PA, L.L.C., SCHC PEDIATRIC ASSOCIATES, L.L.C., STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., TPS OF PA, L.L.C., TPS II OF PA, L.L.C., TPS III OF PA, L.L.C., TPS IV OF PA, L.L.C., TPS V OF PA, L.L.C.,** and **PHYSICIAN PERFORMANCE NETWORK OF PHILADELPHIA, L.L.C.** and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap ~~Financial~~**Funding IV** Trust, individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

**[**The undersigned Responsible Officer hereby gives notice to Agent of Borrower Representative's request to on the date hereof borrow $[_____] of Revolving Loans. Attached is a Borrowing Base Certificate complying in all respects with the Credit Agreement and confirming that, after giving effect to the requested advance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit.**]**[1]

**[The undersigned Responsible Officer hereby gives notice to Agent of Borrower Representative's request to on the date hereof borrow a Term Loan in the amount of $[_____].**[2]

The undersigned officer hereby certifies, in his or her capacity as such officer and not individually, that, both before and after giving effect to the request above, each of the conditions precedent set forth in Section ~~7.1~~**7.2** have been satisfied.

**IN WITNESS WHEREOF**, the undersigned officer has executed and delivered this certificate this _____ day of _____, 20__.

Sincerely,

---

[1] Use this if requesting a revolving loan.
[2] Use this if requesting a term loan.

Exhibit C-2 – Page   1

**[BORROWER REPRESENTATIVE]**

By: _____

Name: _____

Title: _____

Exhibit C-2 – Page   2

CHICAGO/#3111951.7B

**EXHIBIT D TO CREDIT AGREEMENT (PAYMENT NOTIFICATION)**

**PAYMENT NOTIFICATION**

This Payment Notification is given by _____, a Responsible Officer of _____ (the "Borrower Representative"), pursuant to that certain Credit and Security Agreement dated as of January 11, 2018 among ST. CHRISTOPHER'S HEALTHCARE, LLC, CENTER CITY HEALTHCARE, LLC, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, PHYSICIANS CLINICAL NETWORK, LLC and PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC, HPS OF PA, L.L.C., SCHC PEDIATRIC ASSOCIATES, L.L.C., STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., TPS OF PA, L.L.C., TPS II OF PA, L.L.C., TPS III OF PA, L.L.C., TPS IV OF PA, L.L.C., TPS V OF PA, L.L.C., and PHYSICIAN PERFORMANCE NETWORK OF PHILADELPHIA, L.L.C. and any additional Borrower that may hereafter be added thereto (collectively, "Borrowers"), MidCap Funding IV Trust (as successor by assignment from MidCap Financial Trust), individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

Please be advised that funds in the amount of $_____ will be wire transferred to Agent on _____, 201_. Such funds shall constitute [an optional] [a mandatory] prepayment of the Term Loans, with such prepayments to be applied in the manner specified in Section 2.1(a)(iii). [Such mandatory prepayment is being made pursuant to Section _____ of the Credit Agreement.]

Fax to MCF Operations 301-941-1450 no later than noon Eastern time.

Note: Funds must be received in the Payment Account by no later than noon Eastern time for same day application

IN WITNESS WHEREOF, the undersigned officer has executed and delivered this Payment Notification this _____ day of _____, 201__.

Sincerely,

[BORROWER REPRESENTATIVE]

By: _____
Name: _____
Title: _____

Exhibit D – Page   1

**Schedules to the MidCap Credit Agreement**

**Schedule 1.1A**

**Affiliate Leases**

1. Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and Front Street Healthcare Properties, LLC
2. Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and Front Street Healthcare Properties II, LLC for space at Nelson Pavilion
3. Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and Front Street Healthcare Properties II, LLC for D Street warehouse
4. Lease dated as of the Closing Date between Center City Healthcare, LLC and Broad Street Healthcare Properties, LLC
5. Sublease dated as of the Closing Date between TPS IV of PA, L.L.C. and Center City Healthcare, LLC at Hahnemann Hospital
6. Master Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and PAHH Bellet MOB, LLC
7. Sublease dated as of the Closing Date between Center City Healthcare, LLC and St. Christopher's Healthcare, LLC at the Bellet Building
8. Master Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and PAHH New College MOB, LLC
9. Sublease dated as of the Closing Date between TPS IV of PA, L.L.C. and St. Christopher's Healthcare, LLC at the New College Building
10. Sublease dated as of the Closing Date between Center City Healthcare, LLC and St. Christopher's Healthcare, LLC at the New College Building
11. Master Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and PAHH Feinstein MOB, LLC
12. Sublease dated as of the Closing Date between TPS IV of PA, L.L.C. and St. Christopher's Healthcare, LLC at the Bobst/Feinstein Buildings
13. Sublease dated as of the Closing Date between Center City Healthcare, LLC and St. Christopher's Healthcare, LLC at the Bobst/Feinstein Buildings
14. Master Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and PAHH Broad Street MOB, LLC
15. Master Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and PAHH Wood Street Garage, LLC
16. Master Lease dated as of the Closing Date between St. Christopher's Healthcare, LLC and PAHH Erie Street Garage, LLC
17. Sublease dated September 9, 2011 between SCHC Pediatric Associates, L.L.C. and St. Christopher's Healthcare, LLC, as successor in interest to Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C.
18. Timeshare Sublease dated November 8, 2017 between St. Christopher's Pediatric Urgent Care Center, LLC and SCHC Pediatric Associates, L.L.C.
19. Lease Agreement dated October 15, 2015 between TPS of PA, L.L.C. and St. Christopher's Healthcare, LLC, as successor in interest to Tenet HealthSystem

Hahnemann, L.L.C.

20. Lease Agreement dated December 18, 2014 between TPS IV of PA, L.L.C. , d/b/a Hahnemann Multi-Specialty Services, and Center City Healthcare, LLC, as successor in interest to Tenet HealthSystem Hahnemann, L.L.C.

21. Lease Agreement dated June 11, 2013 (as amended) between TPS of PA, L.L.C. and St. Christopher's Healthcare, LLC, as successor in interest to Tenet HealthSystem Hahnemann, L.L.C.

CHICAGO/#3111951.7B

**Schedule 1.1B**

**List of Projects, Names, Addresses, and Bed Capacity**

List of Projects, Names, Addresses, and Bed Capacity

| Credit Party Name | Project Name | Address | Bed Capacity |
|---|---|---|---|
| St. Christopher's Healthcare, LLC | St. Christopher's Hospital for Children | 230 N. Broad St. Philadelphia, PA 19102 | ~~189~~**188** Beds |
| Center City Healthcare, LLC | Hahnemann University Hospital | 160 E. Erie Ave Philadelphia, PA 19134 | 496 Beds |

Schedule 1.1B – Page   1

**Schedule 2.1**

**Amortization**

**Commencing on the first day of the thirteenth (13th) calendar month following the First Amendment Effective Date, and continuing on the first day of each calendar month thereafter, Borrowers shall pay to Agent as a principal payment under the Term Loan an amount equal to $200,000.00 as an amortization payment in respect of the Term Loan.  The entire remaining outstanding principal balance under the Term Loan shall mature and be due and payable upon the Termination Date.**

CHICAGO/#3111951.7B

**Schedule 3.1**

**Existence, Organizational ID Numbers, Foreign Qualification, Prior Names**

| Legal Name | Type of Entity | Jurisdiction Of Organization | Organizational Identification Numbers | Foreign Qualifications | Additional Names | Former Jurisdictions Of Organization |
|---|---|---|---|---|---|---|
| Philadelphia Academic Health Holdings, LLC | LLC | DE | 6485753 | None | None | None |
| Philadelphia Academic Health System, LLC | LLC | DE | 6521843 | PA | None | None |
| St. Christopher's Healthcare, LLC | LLC | DE | 6525436 | PA | St. Christopher's Hospital for Children | None |
| Center City Healthcare, LLC | LLC | DE | 6450199 | PA | Hahnemann University Hospital | None |
| Philadelphia Academic Medical Associates, LLC | LLC | DE | 6526197 | PA | None | None |
| HPS of PA, L.L.C. | LLC | PA | 4202831 | None | None | None |
| SCHC Pediatric Associates, L.L.C. | LLC | PA | 2933726 | None | None | None |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | LLC | PA | 4089069 | None | None | None |
| SCHC Pediatric Anesthesia Associates, L.L.C. | LLC | PA | 3866517 | None | None | None |
| StChris Care at Northeast Pediatrics, | LLC | PA | 3669968 | None | None | None |

CHICAGO/#3111951.7B

| Legal Name | Type of Entity | Jurisdiction Of Organization | Organizational Identification Numbers | Foreign Qualifications | Additional Names | Former Jurisdictions ~~Of~~ of Organization |
|---|---|---|---|---|---|---|
| L.L.C. | | | | | | |
| Physician Performance Network of Philadelphia, L.L.C. | LLC | PA | 4170799 | None | None | None |
| Physicians Clinical Network, LLC | LLC | DE | 6653338 | None | None | None |
| TPS of PA, L.L.C. | LLC | PA | 2839736 | None | None | None |
| TPS II of PA, L.L.C. | LLC | PA | 2893273 | None | None | None |
| TPS III of PA, L.L.C. | LLC | PA | 2893269 | None | None | None |
| TPS IV of PA, L.L.C. | LLC | PA | 2893267 | None | None | None |
| TPS V of PA, L.L.C. | LLC | PA | 2893266 | None | None | None |
| **Broad Street Healthcare Properties, LLC** | **LLC** | **DE** | **6528484** | **PA** | **None** | **None** |
| **Broad Street Healthcare Properties II, LLC** | **LLC** | **DE** | **6521848** | **PA** | **(formerly known as Center City Physician Associates, LLC)** | **None** |
| **Broad Street Healthcare Properties III, LLC** | **LLC** | **DE** | **6521846** | **PA** | **(formerly known as St. Christopher's Physician Associates, LLC)** | **None** |

**Schedule 3.4**

**Capitalization**

| **Issuer** | **Holder** | **Percentage** | **Type** |
|---|---|---|---|
| Philadelphia Academic Health Holdings, LLC | American Academic Health System, LLC<br><br>HSREP VI Holding, LLC, | 100% (92.5% post-exercise of the warrant as described below)<br><br>7.5% (via warrant, the exercise of which is limited as set forth therein) | Class A Units<br><br><br>Warrant to purchase Class A Units |
| Philadelphia Academic Health System, LLC | Philadelphia Academic Health Holdings, LLC | 100% | LLC Interests |
| St. Christopher's Healthcare, LLC | Philadelphia Academic Health System, LLC | 100% | LLC Interests |
| Center City Healthcare, LLC | Philadelphia Academic Health System, LLC | 100% | LLC Interests |
| Philadelphia Academic Medical Associates, LLC | Philadelphia Academic Health System, LLC | 100% | LLC Interests |
| HPS of PA, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |
| SCHC Pediatric Associates, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | SCHC Pediatric Associates, L.L.C. | 100% | LLC Interests |
| SCHC Pediatric Anesthesia Associates, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |

| StChris Care at Northeast Pediatrics, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |
|---|---|---|---|
| Physician Performance Network of Philadelphia, L.L.C. | Physicians Clinical Network, LLC | 100% | LLC Interests |
| Physicians Clinical Network, LLC | Philadelphia Academic Health System, LLC | 100% | LLC Interests |
| TPS of PA, L.L.C. | Philadelphia Academic Medical Associates, LLC | 100% | LLC Interests |
| TPS II of PA, L.L.C. | TPS of PA, L.L.C. | 100% | LLC Interests |
| TPS III of PA, L.L.C. | TPS of PA, L.L.C. | 100% | LLC Interests |
| TPS IV of PA, L.L.C. | TPS of PA, L.L.C. | 100% | LLC Interests |
| TPS V of PA, L.L.C. | TPS of PA, L.L.C. | 100% | LLC Interests |

Joel Freedman and the members of his immediate family (directly or through affiliated trusts) collectively own 100% of the membership interests in American Academic Health System, LLC.

CHICAGO/#3111951.7B

**Schedule 3.6**

**Litigation**

None.

**Schedule 3.17**

**Material Contracts**

**(a)**

None.

**(b)**

1. Hahnemann University Hospital and National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and its affiliate District 1199C, Service and Maintenance Unit, Agreement, effective July 1, 2012.

2. Hahnemann University Hospital and National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and its affiliate District 1199C, Technical Unit, Agreement, effective July 1, 2012.

3. Hahnemann University Hospital and National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and its affiliate District 1199C, Service and Maintenance Unit and Technical Unit, Memorandum of Agreement, effective June 30, 2014.

4. Hahnemann University Hospital and Pennsylvania Association of Staff Nurses and Allied Professionals, Nursing Professionals, Agreement, effective December 5, 2016.

5. St. Christopher's Hospital for Children and International Brotherhood of Electrical Workers, Local 98, Collective Bargaining Agreement, effective August 12, 2014.

6. St. Christopher's Hospital for Children Pediatric Associates and St. Christopher's Hospital for Children Nurses United/Pennsylvania Association of Staff Nurses and Allied Professionals, Agreement, effective December 7, 2016.

7. St. Christopher's Hospital for Children and St. Christopher's Hospital for Children Nurses United/Pennsylvania Association of Staff Nurses and Allied Professionals, Agreement, effective December 7, 2016.

8. St. Christopher's Hospital for Children Pediatric Associates and National Union of Hospital and Health Care Employees, AFSCME District 1199C, AFL-CIO – *in negotiations*.

9. St. Christopher's Hospital for Children and National Union of Hospital and Health Care Employees, AFSCME District 1199C, AFL-CIO.

CHICAGO/#3111951.7B

10. St. Christopher's Hospital for Children and International Brotherhood of Electrical Workers, Local 98, Collective Bargaining Agreement, effective August 12, 2017.

 **(c)**

Consulting Agreement.

**(d)**

1.   Parent Borrower (i) employee health and welfare benefit plan, (ii) employee retirement savings plan, (iii) workers compensation insurance, (iv) professional/general liability insurance and (v) property/business interruption insurance.

2.   Transition Services Agreement dated as of the Closing Date by and between Tenet Business Services Corporation and Parent Borrower ("Transition Services Agreement").

3.   Master Services Agreement dated as of the Closing Date by and between Conifer Revenue Cycle Solutions, LLC and Parent Borrower ("Conifer Agreement").

4.   Transition Agreement dated January 5, 2018 between HealthTrust Purchasing Group, L.P. and Parent Borrower ("HealthTrust Agreement").

5.   Management Agreement dated January 5, 2018 by and between St. Christopher Operator and Sodexo Management, Inc. and Comprehensive Asset Management Solutions Agreement dated as of January 4, 2018 between St. Christopher Operator and Sodexo CTM LLC (collectively, the "St. Chris Sodexo Agreement").

6.   Management Agreement dated January 5, 2018 by and between Hahnemann Operator and Sodexo Management, Inc. ("Hahnemann Sodexo Agreement" and together with the St. Chris Sodexo Agreement, the "Sodexo Agreements").

7.   Health Care Provider Agreement dated January 2, 2018 by and among New York Blood Center, Inc., Center City Healthcare, LLC (Hahnemann University Hospital), and St. Christopher's Hospital for Children ("New York Center Blood Agreement").

8.   American Red Cross Blood Services Agreement between The American National Red Cross and Parent Borrower and its affiliates, effective January 2, 2018, ("Red Cross Agreement").

9.   Amended and Restated Academic Affiliation Agreement dated April 25, 2002 by and between Tenet HealthSystem Philadelphia, Inc. and Philadelphia Health & Education Corporation, as amended ("Academic Affiliation Agreement"), as assigned by Tenet HealthSystem Philadelphia, Inc. to Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C. pursuant to the Assignment and Assumption Agreement dated as of the Closing Date, and as assigned by Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C. to Parent Borrower pursuant to the Bill of Sale, Assignment and

Assumption Agreement between Borrowers, other Purchasers and Sellers (the "<u>Bill of Sale</u>").

10. Master Services and License Agreement dated December 29, 2017 by and between Optum360 Solutions, LLC and Parent Borrower ("<u>Optum Agreement</u>").

11. Security and/or Patrol Service Agreement dated December 11, 2017 by and between U.S. Security Associates, Inc. and Parent Borrower ("<u>U.S. Security Agreement</u>").

12. Letter Agreement by and between Crothall Healthcare and Parent Borrower, entered into as of December 26, 2017 with respect to:

   a. Crothall Healthcare, Inc. and Tenet HealthSystem Medical, Inc., Subordinate Agreement for Housekeeping Management No. BM05235 (MTA-008-15), effective February 18, 2015. (HealthTrust) (the "<u>Crothall Housekeeping Agreement</u>").

   b. Crothall Laundry Services, Inc. and Tenet HealthSystem Medical, Inc., Subordinate 10. Agreement for Linen and Laundry Processing Services (MTA-009), effective October 7, 2009. (HealthTrust) (the "<u>Crothall Laundry Agreement</u>" and together with the Crothall Housekeeping Agreement and the letter agreement, the "<u>Crothall Agreements</u>").

13. System Product Pricing Agreement between Parent Borrower and Howmedica Osteonics Corp. dated January 1, 2018.

**(e)**

1. Master Services Agreement between Parent Borrower and NTT DATA Services, LLC dated as of the Closing Date.

2. Drexel Master Subleases between Drexel University, as tenant, and St. Christopher's Healthcare, LLC and Center City Healthcare, LLC, as applicable, as landlord, dated as of the date hereof, which Subleases are split amendments and restatements of that certain Lease between Tenet HealthSystem Hahnemann, LLC (as landlord) and Philadelphia Health & Education Corporation (as tenant) dated 11/10/98, as restated 4/25/02, as amended by First Amendment to Lease effective as of 11/1/01, as further amended by Second Amendment to Lease effective 11/10/08 and as further amended by Third Amendment to Lease effective as of 9/16/10 (collectively, the "<u>Drexel Lease</u>").

3. Lease between Parkway Corporation, as landlord, and Tenet HealthSystem Hahnemann LLC, as tenant, dated July 1, 2009, as amended by that First Amendment dated July 1, 2011, that Second Amendment dated August 6, 2012, that Third Amendment dated July 1, 2014, that Fourth Amendment dated July 1, 2015, that Fifth Amendment dated July 7, 2016 with Addendum to Fifth Amendment dated July 7, 2016, as amended or assigned from time to time.

CHICAGO/#3111951.7B

4. Corrective Work Agreement by and among Drexel University, St. Christopher's Healthcare, LLC, and PAHH New College MOB, LLC, PAHH Bellet MOB, LLC, PAHH Feinstein MOB, LLC. ("Drexel Repairs Agreement")

**(f)**

HealthTrust Agreement

**(g)**

None.

**(h)**

1. Conifer Agreement

2. Professional Billing Services Agreement dated as of June 23, 2014 by and between TPS II of PA, L.L.C. and Anesthesia Business Consultants, LLC, as amended or assigned from time to time.

3. Agreement dated April 22, 2002 by and between Tenet HealthSystem St. Christopher's Hospital for Children, LLC and Physician and Tactical Healthcare Services LLC, as amended or assigned from time to time, assigned to St. Christopher Operator pursuant to the Bill of Sale.

4. Transition Services Agreement, pursuant to which billing services from NextGen are being provided.

**(i)**

1. Transition Services Agreement

2. Global Master Services Agreement by and between ADP, LLC and Parent Borrower, effective November 22, 2017.

3. The following commercial payor agreements with the following payors:

   a. Independence Blue Cross Member Hospital Agreement dated as of February 23, 2012 by and among Tenet HealthSystem Hahnemann, L.L.C., Tenet HealthSystem St. Christopher's Hospital for Children, LLC, and Independence Blue Cross, as amended and assigned from time to time.

   b. Managed Care Participating Hospital Agreement dated as of May 1, 2012 by and among Tenet HealthSystem Hahnemann, L.L.C., Tenet HealthSystem St. Christopher's Hospital for Children, LLC, Keystone Health Plan East, QCC Insurance Company, and AmeriHealth HMO, as amended and assigned from time

to time.

c. Blue Cross and Blue Shield System Blue Distinction Centers for Transplants Hospital Participation Agreement dated as of May 1, 2012 by and between Tenet HealthSystem Hahnemann, L.L.C. and Blue Cross and Blue Shield Association, as amended and assigned from time to time.

d. Professional Group Provider Agreement dated as of May 1, 2012 among TSP II of PA, L.L.C, TPS III of PA, L.L.C., TPS IV of PA, L.L.C., QCC Insurance Company, Keystone Health Plan  East and AmeriHealth HMO, Inc., as amended and assigned from time to time.

e. Professional Group Provider Agreement dated as of May 1, 2012 among SCHC Pediatric Associates, L.L.C., TPS V of PA, L.L.C., StChris Care at Northeast Pediatrics, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., QCC Insurance Company, Keystone Health Plan  East and AmeriHealth HMO, Inc., as amended and assigned from time to time.

f. Integrated Provider Entity Agreement dated as of May 1, 2013 among Independence Blue Cross and its Affiliates (as defined therein) and Physician Performance Network of Philadelphia, L.L.C., as amended and assigned from time to time.

g. Participating Hospital/Facility Agreement effective as of the Closing Date by and between Health Partners Plans, Inc. and Parent Borrower on behalf of Center City Healthcare, LLC and St. Christopher's Healthcare, LLC, as amended by that certain Amendment #1 dated as of January 4, 2018 and effective as of the Closing Date.

h. Network Hospital Agreement dated as of October 11, 2016 by and between Horizon Healthcare Services, Inc. and Tenet HealthSystem St. Christopher's Hospital for Children, LLC, as amended and assigned from time to time.

i. Network Hospital Agreement dated as of October 11, 2016 by and between Horizon Healthcare Services, Inc. and Tenet HealthSystem Hahnemann, L.L.C., as amended and assigned from time to time.

j. Hospital Agreement for Managed Care Programs dated as of September 1, 2010 by and between Horizon Casualty Services, Inc. and Tenet HealthSystem Hahnemann, L.L.C.,  as amended and assigned from time to time.

k. Letter Agreement Regarding Services and Billing Following Consummation of Acquisition of Hahnemann University Hospital, St. Christopher's Hospital for Children, Certain Related Physician Groups, and Certain Other Related Assets by Certain Affiliates of Parent Borrower dated as of December 21, 2017 by and between AmeriHealth Caritas Health Plan and Parent Borrower.

l.  Consent to Assignment and Assumption Agreement dated December 20, 2017 by and among Keystone Health Plan East, QCC Insurance Company, Independence Hospital Indemnity Plan, Inc., and AmeriHealth HMO, Inc.; Tenet Healthcare Corporation, on behalf of itself and the Tenet Providers, as defined below; and Parent Borrower, on behalf of itself and the PAHS Assignee Entities, as defined below.

Definitions of PAHS Assignees and Tenet Providers:

"PAHS Assignee Entities" means, collectively: Center City Healthcare, LLC and St. Christopher's Healthcare, LLC.

"Tenet Providers" means, collectively: (a) The "Tenet Facility Providers," consisting of Tenet Health System Hahnemann, LLC d/b/a Hahnemann University Hospital and Tenet HealthSystem St. Christopher Hospital for Children, LLC d/b/a St. Christopher's Hospital for Children; (b) The "Tenet IPE Provider," consisting of Physician Performance Network of Philadelphia, LLC; (c) The "Hahnemann Group Providers," consisting of TPS II of PA, LLC d/b/a Hahnemann Professional Services, TPS III of PA, LLC d/b/a Hahnemann Internal Medicine, and TPS IV of PA, LLC d/b/a Hahnemann Multi-specialty Services; and (d) The "St. Christopher Group Providers," consisting of SCHC Pediatric Associates, LLC, TPS V of PA, LLC, d/b/a St. Christopher Clinical Pediatric Associates, St. Christopher Care at Northeast Pediatrics, LLC, SCHC Pediatric Anesthesia Associates, LLC, and St. Christopher's Pediatric Urgent Care Center LLC.

m.  Assignment Agreement, Acceptance, and Consent by and among Tenet HealthSystem Hahnemann, L.L.C., DBA Hahnemann University Hospital; Parent Borrower, on behalf of Center City Healthcare, LLC; Horizon Healthcare Services, Inc. dba Horizon Blue Cross Blue Shield of New Jersey; and Horizon Casualty Services, Inc.

n.  Assignment Agreement, Acceptance, and Consent by and among Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C., dba St. Christopher's Hospital for Children; Parent Borrower, on behalf of St. Christopher's Healthcare, LLC; and Horizon Healthcare Services, Inc. dba Horizon Blue Cross Blue Shield of New Jersey.

4.  Conifer Agreement

5.  HealthTrust Agreement

6.  Sodexo Agreements

7.  New York Center Blood Agreement

8.  Red Cross Agreement

9.  Drexel Lease

10. HSRE Master Leases

11. Operating Leases

12. Academic Affiliation Agreement

13. Optum Agreement

14. U.S. Security Agreement

15. Crothall Agreement

16. Lease Agreement dated June 30, 2013 between SCHC Pediatric Associates, L.L.C., as subtenant, and Center for the Urban Child, Inc., as sublandlord.

17. Pension Fund for Hospital and Health Care Employees – Philadelphia and Vicinity.

Any other contract, instrument or agreement that is listed on Schedule 1.6(f) to the Acquisition Agreement ("Assumed Contracts") that (i) satisfies the definition of "Material Contracts" in the Acquisition Agreement and (ii) also satisfies the criteria in any of the subclauses (a) through (i) above.

**Schedule 3.18**

**Environmental Compliance**

(a)

~~None.~~**Notice from the Pennsylvania Department of Environmental Protection dated as of February 13, 2018, addressed to Tenet Health System, St. Christopher's Hospital.**

(b)

Solely with respect to information set forth therein that is responsive to the representation:

    a.  All items listed in Section 5 of the Phase I Environmental Site Assessment, Action Manufacturing Company, 100 East Erie Avenue, Philadelphia, PA, by PARS Environmental, Incorporated, January 2013 (the "<u>PARS Phase I</u>");

    b.  All items discussed in the Phase II Environmental Site Investigation, Action Manufacturing Company, 100 East Erie Avenue, Philadelphia, PA, by PARS Environmental, Incorporated, March 2013 (the "<u>PARS Phase II</u>");

    c.  All items listed in Section 4.1.1 of the Phase I Environmental Site Assessment, Saint Christopher's Hospital for Children, 160 East Erie Avenue, Philadelphia, PA by Ramboll Environ US Corporation, May 2017 (the "<u>Rambol Saint Christopher's Phase I</u>").

    d.  All items listed in Section 4.1.1 of the Phase I Environmental Site Assessment, Hahnemann University Hospital, 230 North Broad Street, Philadelphia, PA by Ramboll Environ US Corporation, May 2017 (the "<u>Rambol Hahnemann Phase I</u>").

    e.  All items listed in Section 7 of each of the following reports (the below reports are collectively referred to as the "<u>EMG Hahnemann Phase I Reports</u>"):

        i.  Phase I Environmental Site Assessment, Feinstein Building, 216-220 North Broad Street, Philadelphia, Pennsylvania, 19102, July 3, 2017.

        ii.  Phase I Environmental Site Assessment, Broad Street Clinic, 231-233 North Broad Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

        iii.  Phase I Environmental Site Assessment, New College Building, 225-251 15th Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

        iv.  Phase I Environmental Site Assessment, Parking Garage, 306-320 North Broad Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

        v.  Phase I Environmental Site Assessment, Bobst Building, (Part of) 222-248 North Broad Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

        vi.  Phase I Environmental Site Assessment, Bellet Building, 1501-1511 North Race Street, Philadelphia, Pennsylvania 19102, July 3, 2017.

    f.  All items listed in Section 5 of the Phase I Environmental Site Assessment, Saint Christopher's Hospital, 160 East Erie Avenue, Philadelphia PA by AEI Consultants, October 18, 2017 (the "<u>AEI Saint Christopher's Phase I</u>").

g.  All items listed in Section 5 of each of the following reports (the below reports are collectively referred to as the "AEI Hahnemann Phase I"):

  i.   Phase I Environmental Site Assessment, Hahnemann University Hospital—New College Building, 225-251 North 15th Street, Philadelphia PA by AEI Consultants, October 11, 2017.

  ii.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Bobst Building, 222-248 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017.

  iii.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Feinstein Building, 216-220 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017.

  iv.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Bellet  Building, 1501-1511 North Race Street, Philadelphia PA by AEI Consultants, October 13, 2017.

  v.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Broad Street Clinic, 231-233 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017.

  vi.   Phase I Environmental Site Assessment, Hahnemann University Hospital—Parking Garage, 306-320 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017.

  vii.   Phase I Environmental Site Assessment, Hahnemann University Hospital—New College Building, 225-251 North 15th Street, Philadelphia PA by AEI Consultants, October 11, 2017.

h.  All other matters and conditions listed in the PARS Phase I which do or may constitute listings of property on the specified lists, including without limitation in Section 7 of the PARS Phase I; and all other matters and conditions listed in the Rambol Saint Christopher's Phase I and the Rambol Hahnemann Phase I (collectively, the "Rambol Reports") which do or may constitute listings of property on the specified lists, including without limitation in sections 4.4 and 6.1 of each of the Rambol Reports; and all other matters and conditions listed in the AEI Saint Christopher's Phase I and the AEI Hahnemann Phase I (collectively, the "AEI Reports") which do or may constitute listings of property on the specified lists, including without limitation in section 6.3 of each of the AEI Reports; and all other matters and conditions listed in the EMG Hahnemann Phase I Reports, which do or may constitute listings of property on the specified lists, including without limitation in section 6.3 of each of the EMG Hahnemann Phase I Reports.

i.  **All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions) of the Phase I Environmental Site Assessment Report dated September 7, 2018 prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap Financial Services, LLC for property identified as Proposed Lot 3 located at 325 North 15th Street, in the City of Philadelphia, Philadelphia County, Pennsylvania,**

commonly known as Stiles Alumni Hall (the "Site"). The Site consists of all portions of the sixteen-story structure located at 325 North 15th Street, including
basement and sub-basement, maintenance and garage areas.

j.   All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions)
of the Phase I Environmental Site Assessment Report dated September 7, 2018
prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap
Financial Services, LLC for property identified as Proposed Parcels A and F located at 221-223 North 15th Street and 222-248 North Broad Street in the City
of Philadelphia, Philadelphia County, Pennsylvania, commonly known as Hahnemann University Hospital (the "Site"). The Site consists of the North and
South Towers of Hahnemann University Hospital, including all basement and
maintenance areas.

k.   All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions)
of the Phase I Environmental Site Assessment Report dated September 7, 2018
prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap
Financial Services, LLC for property identified as Proposed Lot 1 located at 300-304 North Broad Street in the City of Philadelphia, Philadelphia County, Pennsylvania, (the "Site"). The Site is currently a recreational park.

l.   All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions)
of the Phase I Environmental Site Assessment Report dated September 7, 2018
prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap
Financial Services, LLC for property identified as Proposed Lot 9 located at 211-213 North Broad Street in the City of Philadelphia, Philadelphia County, Pennsylvania, (the "Site"). The Site is currently a paved parking lot.

m.  All items listed in Sections 5 (Records Review) and 8 (Findings and Conclusions)
of the Phase I Environmental Site Assessment Report dated September 7, 2018
prepared by Penn Environmental & Remediation, Inc. for the benefit of MidCap
Financial Services, LLC for property identified as Proposed Parcel D (Parking

**Lot) 200-214 North Broad Street and the Proposed Parcel E (Vacant Building)**
**located at 201-219 North 15th Street, in the City of Philadelphia, Philadelphia**
**County, Pennsylvania. Proposed Parcel D is currently a parking lot and Proposed**
**Parcel E is an eight story building commonly known as SHSH Building.**

Schedule 3.18 – Page   4

CHICAGO/#3111951.7B

**Schedule 4.9**

**Notices of Litigation and Defaults**

(a)

None.

(b)

None.

(c)

None.

(d)

None.

(e)

Credit balances on the balance sheet of Borrowers.

(f)

None.

## Schedule 5.1

**Permitted Contingent Obligations; Permitted Indebtedness**

Contingent obligations arising pursuant to:
1. The New Market Tax Credit Transactions;
2. Center City Healthcare, LLC's contributions to the Pension Fund for Hospital and Health Care Employees – Philadelphia and Vicinity; and

3. NFM Guaranty.

Debt arising pursuant to the New Market Tax Credit Transactions.

CHICAGO/#3111951.7B

**Schedule 5.2**

**Permitted Liens**

None.

**Schedule 5.8**

**Transactions with Affiliates**

| Borrower | Transactions with Affiliates |
|---|---|
| Philadelphia Academic Health System, LLC | Consulting Agreement<br><br>Guaranty of Philadelphia Academic Risk Retention Group, LLC's obligations to National Fire & Marine Insurance Company ("NFM Guaranty")<br><br>**One-time loan from Paladin Healthcare Capital, LLC in the original principal amount of $550,000 described in Section 5.3 of the Credit Agreement** |
| St. Christopher's Healthcare, LLC | Capital One Subordination, Non-Disturbance and Attornment Agreements relating to HSRE Master Leases.<br><br>Recognition Agreement with Other Affiliates and Drexel University relating to HSRE Master Leases.<br><br>Access License and Shared Services Agreement and Agreement Regarding Sublease relating to New Market Tax Credit Transactions.<br><br>Affiliate Leases (as defined on Schedule G), including the Operating Leases and HSRE Master Leases (and Memoranda of Leases, DACAs, Assignments of Leases and Rents and UCC-1s evidencing the HSRE Master Leases and the terms thereof)<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from Front Street Healthcare Properties, LLC<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from PAHH New College MOB, LLC<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from PAHH |

| | |
|---|---|
| | Feinstein MOB, LLC<br><br>Assignment and Assumption of Leases relating to certain Affiliate Leases and third party leases from PAHH Bellet MOB, LLC<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from PAHH Broad Street MOB, LLC<br><br>Drexel Repairs Agreement<br><br>Letter agreement re payment of Drexel University's rent for the month of January 2018 under the leases and subleases with Drexel University.<br><br>Equipment Lease Agreement between Tenet HealthSystem St. Christopher's Hospital for Children, LLC and SCHC Pediatric Associates, L.L.C., assigned to St. Christopher's Healthcare, LLC pursuant to the Bill of Sale |
| Center City Healthcare, LLC | Affiliate Leases (as defined on <u>Schedule 1.1</u>), including the Operating Leases and HSRE Master Leases<br><br>Assignment and Assumption of Leases re certain Affiliate Leases and third party leases from Broad Street Healthcare Properties, LLC |
| SCHC Pediatric Associates, L.L.C. | Affiliate Leases (as defined on <u>Schedule 1.1A</u>)<br><br>Equipment Lease Agreement between Tenet HealthSystem St. Christopher's Hospital for Children, LLC and SCHC Pediatric Associates, L.L.C., assigned to St. Christopher's Healthcare, LLC pursuant to the Bill of Sale |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Affiliate Leases (as defined on <u>Schedule 1.1A</u>) |
| Physician Performance Network of Philadelphia, L.L.C. | Clinical Integration Program Participation Agreement by and among Physician Performance Network of Philadelphia, L.L.C., TPS II of PA, L.L.C.; TPS III of |

| | PA, L.L.C. and TPS IV of PA, L.L.C. |
|---|---|
| TPS of PA, L.L.C. | Affiliate Leases (as defined on <u>Schedule 1.1A</u>) |
| TPS IV of PA, L.L.C. | Affiliate Leases (as defined on <u>Schedule 1.1A</u>) |

The following agreements by and among Borrowers and its Affiliates will also exist at closing: (i) any intercompany transaction agreement, lease or other instrument assumed by Borrowers under the Acquisition Agreement; (ii) the Organizational Documents of any Borrower or its Affiliates; and (iii) any other Operative Documents not otherwise listed in the chart above.

CHICAGO/#3111951.7B

**Schedule 5.11**

**Conduct of Business**

.

| Credit Party | Business Description |
|---|---|
| | |
| Philadelphia Academic Health System, LLC | Intermediate holding company for St. Christopher's Healthcare, LLC; Center City Healthcare, LLC; and Philadelphia Academic Medical Associates, LLC. |
| St. Christopher's Healthcare, LLC | Main hospital operating company for St. Christopher's Hospital for Children ("STC"); will hold all of the licenses, permits and contracts for STC. |
| Center City Healthcare, LLC | Main hospital operating company for Hahnemann University Hospital ("HUH"); will hold all of the licenses, permits and contracts for HUH. |
| Philadelphia Academic Medical Associates, LLC | Intermediate holding company for each of the Target Borrowers. |
| HPS of PA, L.L.C. | Physician group. |
| SCHC Pediatric Associates, L.L.C. | Physician group; will hold equity of St. Christopher's Pediatric Urgent Care Center, L.L.C. |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Physician group. |
| SCHC Pediatric Anesthesia Associates, L.L.C. | Physician group. |
| StChris Care at Northeast Pediatrics, L.L.C. | Physician group. |
| Physician Performance Network of Philadelphia, L.L.C. | Clinically integrated network. |
| Physicians Clinical Network, LLC | Intermediate holding company for Physician Performance Network of Philadelphia, L.L.C. |
| TPS of PA, L.L.C. | Physician group; will hold equity of TPS II of PA, L.L.C., TPS III of PA, L.L.C, TPS IV of PA, L.L.C. and TPS V of PA, L.L.C. |
| TPS II of PA, L.L.C. | Physician group. |
| TPS III of PA, L.L.C. | Physician group. |
| TPS IV of PA, L.L.C. | Physician group. |
| TPS V of PA, L.L.C. | Physician group. |

CHICAGO/#3111951.7B

**Schedule 5.14**

**Deposit Accounts and Securities Accounts**

| Credit Party | Financial Institution(s) where Accounts Maintained | Account Numbers | Descriptions of Accounts |
|---|---|---|---|
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4127906063 | Master Deposit Account – Collections |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4127916021 | Concentration Account – Disbursements |
| St. Christopher's Healthcare, LLC | Wells Fargo Bank, N.A. | 4127906097 | Government Deposit Account – Collections |
| St. Christopher's Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916005 | Non-Government **Deposit** Account – Collections |
| St. Christopher's Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916054 | Operating Account – Disbursements |
| St. Christopher's Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916096 | Payroll Account – Disbursements |
| Center City Healthcare, LLC | Wells Fargo Bank, N.A. | 4127906071 | Government Deposit Account – Collections |
| Center City Healthcare, LLC | Wells Fargo Bank, N.A. | 4127915981 | Non-Government **Deposit** Account – Collections |
| Center City Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916039 | Operating Account –Disbursements |
| Center City Healthcare, LLC | Wells Fargo Bank, N.A. | 4127916070 | Payroll Account – Disbursements |

| | | | |
|---|---|---|---|
| Philadelphia Academic Medical Associates, LLC | Wells Fargo Bank, N.A. | 4022928873 | Operating Account –Disbursements |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4128326030 | Benefit Claims -Self-Funding |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4045695202 | Merchant Credit Card Deposits |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4128326048 | Dental Claims – Self-Funding |
| Philadelphia Academic Health System, LLC | Wells Fargo Bank, N.A. | 4107064834 | Voluntary Benefits |
| HPS of PA, L.L.C. | Wells Fargo Bank of America, N.A. | 44278047594080339500 | Local DepositoryGovernment Deposit Account – Collections |
| HPS of PA, L.L.C. | Wells Fargo Bank, N.A. | 4080339518 | Non-Government Deposit Account – Collections |
| SCHC Pediatric Associates, L.L.C. | Wells Fargo Bank, N.A. | 4080339526 | Government Deposit Account – Collections |
| SCHC Pediatric Associates, L.L.C. | Wells Fargo Bank, N.A. | 4080339534 | Non-Government Deposit Account – Collections |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Wells Fargo Bank, N.A. | 4080339542 | Government Deposit Account – Collections |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Wells Fargo Bank, N.A. | 4080339559 | Non-Government Deposit Account – Collections |
| SCHC Pediatric Anesthesia Associates, L.L.C. | Wells Fargo Bank, N.A. | 4080339567 | Government Deposit Account – Collections |
| SCHC Pediatric | Wells Fargo | | Non-Government |

| | | | |
|---|---|---|---|
| **Anesthesia Associates, L.L.C.** | **Bank, N.A.** | **4080339575** | **Deposit Account – Collections** |
| **StChris Care at Northeast Pediatrics, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329310** | **Government Deposit Account – Collections** |
| **StChris Care at Northeast Pediatrics, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329328** | **Non-Government Deposit Account – Collections** |
| **TPS of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329336** | **Government Deposit Account – Collections** |
| **TPS of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329344** | **Non-Government Deposit Account – Collections** |
| **TPS II of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329351** | **Government Deposit Account – Collections** |
| **TPS II of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329369** | **Non-Government Deposit Account – Collections** |
| **TPS III of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329377** | **Government Deposit Account – Collections** |
| **TPS III of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329385** | **Non-Government Deposit Account – Collections** |
| **TPS IV of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329393** | **Government Deposit Account – Collections** |
| **TPS IV of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329401** | **Non-Government Deposit Account – Collections** |
| **TPS V of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4081329419** | **Government Deposit Account – Collections** |
| **TPS V of PA, L.L.C.** | **Wells Fargo Bank, N.A.** | **4082319146** | **Non-Government Deposit Account – Collections** |
| **HPS of PA, L.L.C.** | **Bank of America** | **4427804759** | **Local Depository** |
| SCHC Pediatric Associates, L.L.C. | Bank of America | 1291559784 | Local Depository |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | Bank of America | 4427596258 | Local Depository |
| StChris Care at Northeast | Bank of America | 4427133255 | Local Depository |

| Pediatrics, L.L.C. | | | |
|---|---|---|---|
| StChris Care at Northeast Pediatrics, L.L.C. | Bank of America | 1291559802 | Local Depository |
| TPS V of PA, L.L.C. | Bank of America | 1291559789 | Local Depository |
| TPS IV of PA, L.L.C. | Bank of America | 1291559760 | Local Depository |
| TPS II of PA, L.L.C. | Bank of America | 1291559765 | Local Depository |
| TPS III of PA, L.L.C. | Bank of America | 1291559746 | Local Depository |
| SCHC Pediatric Associates, L.L.C. | PNC Bank, National Association | 1011551486 | Local Depository |
| StChris Care at Northeast Pediatrics, L.L.C. | PNC Bank, National Association | 1019793025 | Local Depository |
| TPS IV of PA, L.L.C. | PNC Bank, National Association | 1019268626 | Local Depository |
| TPS II of PA, L.L.C. | PNC Bank, National Association | 1019268634 | Local Depository |
| TPS V of PA, L.L.C. | PNC Bank, National Association | 1019294701 | Local Depository |
| St. Christopher's Healthcare, LLC | Capital One | 7528852231 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852255 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852279 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852606 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852612 | Lockbox |
| St. Christopher's Healthcare, LLC | Capital One | 7528852618 | Lockbox |
| **Broad Street Healthcare Properties, LLC** | **Wells Fargo Bank, N.A.** | **4127926004** | **Operating Account** |
| **Physician Performance Network of Philadelphia, L.L.C.** | **Wells Fargo Bank, N.A.** | **4127906089\*** | **Operating Account** |

Schedule 5.14 – Page   4

**\*in the process of being opened as of the First Amendment Effective Date.**

## Schedule 7.4 – Post-Closing Requirements

Borrowers shall satisfy and complete each of the following obligations, or provide Agent each of the items listed below, as applicable, on or before the date indicated below, all to the satisfaction of Agent in its sole and absolute discretion:

1.    In accordance with Section 5.14 of the Credit Agreement,

   (a)    within thirty (30) days after the Closing Date (or such later date as agreed to by the Agent in its sole discretion), no Borrower shall deposit checks into, nor draft any checks from, the Legacy Accounts,

   (b)    within sixty (60) days after the Closing Date (or such later date as agreed to by the Agent in its sole discretion), the Target Borrowers shall have notified all Account Debtors that make payments into one of the Legacy Accounts to make payments to a Lockbox Account or Lockbox instead, and

   (c)    prior to the first anniversary of the Closing Date (or, with respect to any Legacy Account into which Account Debtors are making payment notwithstanding instruction to no longer do so, such later date as agreed to by the Agent in its reasonable discretion), the Target Borrowers shall close the Legacy Accounts.

2.    Within ninety (90) days after the Closing Date, a copy of CMS Form 855 submitted by Borrowers to CMS describing the Liens granted to Agent pursuant to the Financing Documents.

3.    Within three (3) Business Days of receipt,

   (a)    a copy of all issued licenses, permits or certificates identified in Section 23 of the Information Certificate delivered by the Credit Parties to Agent on the Closing Date or otherwise necessary to the operation of any Credit Party's business,

   (b)    final provider agreements between Medicaid and the Operator Borrowers, and

   (c)    Medicare Tie-In Notices issued to Operator Borrowers.

4.    Within three (3) Business Days of receipt, with respect to each Delayed Payor, confirmation that each Operator Borrower is no longer required to withhold submission of invoices for DNFB Accounts and the payment processing systems of such Delayed Payor are able to accept and process invoices from Operating Borrowers for payment.

   Borrowers' failure to complete and satisfy any of the above obligations on or before the date indicated above, or Borrowers' failure to deliver any of the above listed items on or before the date indicated above, shall constitute an immediate an automatic Event of Default.

CHICAGO/#3111951.7B

**Schedule 8.1**

(a)

~~Borrowers will not be issued material Healthcare Permits until after the close of the transaction, but Borrowers have submitted the necessary applications and notices to Governmental Authorities that issue the material Healthcare Permits and do not have any knowledge of any circumstances that any Governmental Authority is considering limiting or revoking any such Healthcare Permit.~~

**None.**

(b)

Borrowers ~~will receive new acute care hospital licenses after the close of the transaction. On December 29, 2017, Borrowers received communications from Tanya Leshko, Senior Counsel from the Commonwealth of Pennsylvania's Department of Health, Division of Acute and Ambulatory Care, which states "[t]he new [acute care hospital] licenses will be effective January 2, 2018, assuming the Department receives (1) notice from the parties that the transaction has closed as of that date, and (2) notice from the applicant that it has obtained approval form the Commonwealth to use the fictitious names to be listed on the licenses (i.e.~~ St. Christopher's Hospital for Children, ~~and Hahnemann University Hospital) . . . . If notice indicates that the transaction closes on a date other than January 2, 2018, and is received timely, the licenses will be issued and commence to be effective as of the date of closing."~~ **have received new acute care hospital licenses as follows:**

| Project Name | **License #** | **Issue Date** | **Effective Date** | ~~Bed Capacity~~ |
|---|---|---|---|---|
| ~~St. Christopher's Hospital for Children~~ | | | | ~~189~~ Beds |
| **St. Christopher's Hospital for Children**<br><br>**[St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children]** | **195601** | **1/29/2018** | **1/11/2018** | **188** |
| Hahnemann University Hospital<br><br>**[Center City Healthcare, LLC d/b/a Hahnemann University Hospital]** | **081701** | **1/29/2018** | **1/11/2018** | 496 ~~Beds~~ |

CHICAGO/#3111951.7B

(c)

None.

(d)

Borrowers ~~will not be issued any new accreditations for the Projects until after the close of the transaction.  Borrowers intend to maintain~~**have maintained** the accreditations that ~~are currently~~**were previously** associated with the Projects prior to the ~~transaction's completion.  Consistent with this intent, Borrowers have submitted, or are in the process of submitting, the necessary applications and notices to the organizations that would issue such accreditations for the Projects.~~**Acquisition's closing.  By letters dated February 14, 2018, the Joint Commission acknowledged the change in ownership of each Project and extended the accreditation of Hahnemann University Hospital and** St. Christopher's Hospital for Children **under the new ownership of Center City Healthcare, LLC and St. Christopher's Healthcare LLC, respectively.**

(e)

None.

(f)

None.

(g)

None.

(h)

None.

(i)

~~St. Christopher's Healthcare, LLC and Center City Healthcare, LLC will be participants in federal programs whereby Governmental Authorities may have a right to record funds by reason of the payment of federal funds.~~
**None.**

(j)

None.

## SCHEDULE 9.1

## COLLATERAL

The Collateral consists of all of Borrower's right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising, and all proceeds and products of the following:

All goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

All of Borrowers' books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

Notwithstanding the foregoing, the Collateral shall expressly exclude (i) that certain lockbox and deposit account(s) (and any cash, receipts or other funds deposited therein to the extent constituting "Sublease Rent" or "Parking Revenue" (as such terms are defined herein) and any proceeds thereof) maintained by St. Christopher Operator for the sole purpose of receiving Sublease Rent and Parking Revenue, making any payments therefrom under any HSRE Master Lease (as such term is defined herein) and retaining any funds remaining therein thereafter, (ii) (x) real estate assets, improvements and Real Estate Fixtures and Related Personal Property (as such term is defined herein) of any Borrower, (y) any property management agreement or parking agreement solely related to such real estate assets and (z) any proceeds from the assets described in clauses (x) and (y) and (iii) the equity interest of Philadelphia Academic Risk Retention Group, LLC, a Vermont limited liability company, owned by Parent Borrower and Practice Parent Borrower, respectively, as of the Closing Date.

As used herein, the following terms shall have the following meanings:

"**HSRE Master Leases**" means, individually and collectively, (i) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH New College MOB, LLC, (ii) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Bellet MOB, LLC, (iii) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Feinstein MOB, LLC, (iv) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Broad Street MOB, LLC, (v) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Wood Street Garage, LLC and (vi) that certain Master Lease dated as of the Closing Date by and between St. Christopher Operator and PAHH Erie Street Garage, LLC, and, in each case, all amendments, supplements, restatements or

other modifications thereto or thereof as have been previously approved by Agent to the extent required hereunder.

"**Parking Revenue**" means the sum of all revenue from the Parking Garages (as such term is defined in each HSRE Master Lease).

"**Sublease Rent**" means the sum of all rent and other payments actually received under the Subleases (as such term is defined in each HSRE Master Lease).

"**Real Estate Fixtures and Related Personal Property**" means all real estate fixtures (i.e. HVAC, electrical, plumbing and related fixtures) and real estate-related personal property integral or primarily related to the real property itself, and unrelated to the operation of a hospital or other healthcare facility on, and/or the provision of healthcare services from, the real property (i.e., building control systems, window washing equipment, building system warranties, insurance proceeds).

CHICAGO/#3111951.7B

**Schedule 9.2**

**Location of Collateral**

The chief executive office of each Credit Party is indicated in the table below with an asterisk (*).

| Credit Party | Address | Approximate Size | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|---|
| Philadelphia Academic Health Holdings, LLC | 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245* | N/A | Leased to Paladin Healthcare Capital, LLC but not leased by applicable Credit Party. | Pacific Corporate Towers LLC 200 N. Sepulveda Blvd., Suite 650 El Segundo, CA 90245 |
| Philadelphia Academic Health System, LLC | 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245* | N/A | Leased to Paladin Healthcare Capital, LLC but not leased by applicable Credit Party. | Pacific Corporate Towers LLC 200 N. Sepulveda Blvd., Suite 650 El Segundo, CA 90245 |
| St. Christopher's Healthcare, LLC | 160 E. Erie Ave Philadelphia, PA 19134* | 562,153 sq. ft. | Leased | Front Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245 |
| | 3647-69 N. Front Street, Philadelphia, Pennsylvania 19134 | 55,153 sq. ft. | Leased | Front Street Healthcare Properties II, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245 |
| | 3843-3863 D Street, Philadelphia, PA 19134 | 58,660 sq. ft. | Leased | Front Street Healthcare Properties II, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245 |
| | 225-251 N. 15th Street, Philadelphia, Pennsylvania 19102 | 590,220 sq. ft. | Leased | PAHH New College MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
| | 1501-1511 Race Street, | 123,263 sq. ft. | Leased | PAHH Bellet MOB, LLC c/o Harrison Street Real Estate, LLC |

|  |  |  |  | 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
|---|---|---|---|---|
| Philadelphia, Pennsylvania 19102 |  |  |  | |
| 216-22 0 N. Broad Street, Philadelphia, Pennsylvania 19102 | 199,663 sq. ft. |  | Leased | PAHH Feinstein MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
|  | 231-23 3 N. Broad Street, Philadelphia, Pennsylvania 19107 | 15,133 sq. ft. | Leased | PAHH Broad Street MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
|  | 500 Old York Road, Suite 250, Jenkintown, PA 19046 | 16,832 sq. ft. | Leased | Rydal Square, L.P. c/o BET Investments, Inc. 200 Witmer Rd, Ste 200 Horsham, PA 19044 |
| Center City Healthcare, LLC | 230 N. Broad St. Philadelphia, PA 19102* | 906,187 sq. ft. | Leased | Broad Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245 |
|  | 2813 Cottman Avenue, Philadelphia, PA 19149 | 248 sq. ft. | Leased | Drexel University 245 N. 15th St. Philadelphia, PA 19102 |
|  | 207 N. Broad Street, 5th Floor, Philadelphia, PA 19102 | 3,750 sq. ft. | Leased | 207 N. Broad Street LLC 207-09 N. Broad Street, Floor 5 Philadelphia, PA 19107 [13] |
| Philadelphia Academic Medical Associates, LLC | 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245* | N/A | Leased to Paladin Healthcare Capital, LLC but not leased by applicable Credit Party. | Pacific Corporate Towers LLC 200 N. Sepulveda Blvd., Suite 650 El Segundo, CA 90245 |
| HPS of PA, L.L.C. | 230 N. Broad St. Philadelphia, PA 19102* | N/A | Owned by Broad Street Healthcare Properties, LLC but not leased by | Broad Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 |

[13] Not in possession of the owner's address, as Hahnemann Operator is the subtenant. The address listed is from the Philadelphia tax records.

| | | | applicable Credit Party | El Segundo, CA 90245 |
|---|---|---|---|---|
| SCHC Pediatric Associates, L.L.C. | 160 E. Erie Ave Philadelphia, PA 19134* | N/A | Owned by Front Street Healthcare Properties, LLC but not leased by applicable Credit Party | Front Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245 |
| | 3647-69 N. Front Street, Philadelphia, Pennsylvania 19134 | 55,153 sq. ft. | Operated | St. Christopher's Healthcare, LLC |
| | 3645 North Front Street, Philadelphia, PA 19134 | 30,000 sq. ft. | Leased | Tenet HealthSystem St. Christopher's Hospital for Children, L.L.C. c/o Tenet Healthcare 1445 Ross Avenue Dallas, TX 75202 |
| | 500 Old York Road, Suite 250, Jenkintown, PA 19046 | 6,319 sq. ft. | Leased | Rydal Square, L.P. c/o BET Investments, Inc. 200 Witmer Rd, Ste 200 Horsham, PA 19044 |
| | Edgewood Village Executive Plaza, 1st Floor Heacock Road, Lower Makefield Township, PA | 5,208.57 sq. ft. | Leased | Arthur S. Karafin, Esq. 401 City Ave, Ste. 200 Bala Cynwyd, PA 19004 |
| | 301 Oxford Valley Road, Suite 1201 (A&B) Lower Makefield, PA 19067 | 2,640 sq. ft. | Leased | Erin Development Company 301 Oxford Valley Road, Ste. 501 Yardley, PA 19067 |
| | 1205 Langhorne-Newton Road, Suite 401 Langhorne, PA 19047 | 1,523 sq. ft. | Leased | Langhorne MOB Partners, L.P. c/o BPG Management Company, L.P. 770 Township Line Rd, Ste 150 Yardley, PA 19067 |
| | 100 Kings | 7,619 sq. ft. | Leased | Medical Heights |

| | | | | |
|---|---|---|---|---|
| | Way, Unit C-1 Washington Township, NJ 08080 | | | Associates, LLC P.O. Box 342 Haddonfield, NJ 08033 |
| 153 Broadhead Road 1st Floor Bethlehem, PA 18017 | 2,470.4 sq. ft. | | Leased | St. Luke's Hospital and Health Network 801 Ostrum Street Bethlehem, PA 18015 |
| | 2451 Grant Avenue Suite 305 Philadelphia, PA 19114 | 6,235 sq. ft. | Leased | T.F. Development, Ltd. 3 Village Rd, Ste 200 Horsham, PA 19044 |
| | 300 E. Hunting Park Avenue Philadelphia, PA 19124 | 866 sq. ft. | Leased | ISP 300, LLC Cira Centre, Suite 1351 2929 Arch Street Philadelphia, PA 19104 |
| St. Christopher's Pediatric Urgent Care Center, L.L.C. | 160 E. Erie Ave Philadelphia, PA 19134* | N/A | Owned by Front Street Healthcare Properties, LLC but not leased by applicable Credit Party | Front Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245 |
| | 500 Old York Road, Suite 250, Jenkintown, PA 19046 | 6,319 sq. ft. | Leased | Rydal Square, L.P. c/o BET Investments, Inc. 200 Witmer Rd, Ste 200 Horsham, PA 19044 |
| SCHC Pediatric Anesthesia Associates, L.L.C. | 160 E. Erie Ave Philadelphia, PA 19134* | N/A | Owned by Front Street Healthcare Properties, LLC but not leased by applicable Credit Party | Front Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245 |
| StChris Care at Northeast Pediatrics, L.L.C. | 160 E. Erie Ave Philadelphia, PA 19134* | N/A | Owned by Front Street Healthcare Properties, LLC but not leased by applicable Credit Party | Front Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245 |
| Physician Performance Network of Philadelphia, L.L.C. | 230 N. Broad St. Philadelphia, PA 19102* | N/A | Owned by Broad Street Healthcare Properties, LLC but not leased by applicable Credit Party | Broad Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245 |
| Physicians Clinical Network, LLC | 222 N. Sepulveda Blvd., Suite 900 | N/A | Leased to Paladin Healthcare Capital, LLC but not leased by applicable Credit | Pacific Corporate Towers LLC 200 N. Sepulveda Blvd., Suite 650 |

| | | | | |
|---|---|---|---|---|
| | El Segundo, CA  90245* | | Party | El Segundo, CA 90245 |
| TPS of PA, L.L.C. | 230 N. Broad St. Philadelphia, PA 19102* | N/A | Owned by Broad Street Healthcare Properties, LLC but not leased by applicable Credit Party | Broad Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245 |
| | 227 North Broad Street 3rd Floor Philadelphia PA  19107 | 2,301 sq. ft. | Leased | 227 North Broad Street Associates, L.P. c/o Cardiology Consultants of Philadelphia, P.C. 1703 S. Broad St, Ste 200 Philadelphia, PA  19148 |
| | 1930 S. Broad Street Suite K Philadelphia, PA 19145 | 6,053 sq. ft. | Leased | ST. Agnes MOB, LLC c/o Stonehenge Advisors Inc. 1930 S. Broad St, Unit 1 Philadelphia, PA  19145 |
| | 205 Newtown Road Suite 103 Warminster, PA 18974 | 500 sq. ft. | Leased | Abington Health Abington Health Center - Warminster Campus 225 Newtown Rd Warminster, PA  18974 |
| | 215 Newtown Road Warminster, PA 18974 | 1,000 sq. ft. | Leased | Abington Health Abington Health Center - Warminster Campus 225 Newtown Rd Warminster, PA  18974 |
| | 207 N. Broad Street 4th Floor Philadelphia, PA  19107 | 3,750 sq. ft. | Leased | 207 N. Broad Street LLC 207-09 N. Broad Street, Floor 4 Philadelphia, PA 19107 [24] |
| | 3205 Fire Road Egg Harbor Township, NJ 08234 | 2,000 sq. ft. | Leased | Credit Party does not have this information as the Session Agreement is with a tenant at the property and such Agreement does not specify the owner of the property or its address. |
| | 2 Capital Way Suite 380 Pennington, NJ 08534 | 144 sq. ft. | Leased | Capital Health System, Inc. 750 Brunswick Ave Trenton, NJ  08638 |
| | 2101 Brighton Street, | 483 sq. ft. | Leased | Reena Banka, M.D. 2101 Brighton St |

[24] Not in possession of the owner's address, as TPS of PA, L.L.C. is the subtenant.  The address listed is from the Philadelphia tax records.

|  |  |  |  |  |
|---|---|---|---|---|
|  | Philadelphia, PA 19149 |  |  | Philadelphia, PA 19149-18002 |
| 231 N. Broad Street, Suite 300 Philadelphia, PA 19102 | 3,380 sq. ft. |  | Leased | PAHH Broad Street MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
|  | 216 N. Broad Street 2nd Floor Philadelphia, PA  19102 | 6,865.80 sq. ft. | Leased | PAHH Feinstein MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
| TPS II of PA, L.L.C. | 230 N. Broad St. Philadelphia, PA 19102* | N/A | Owned by Broad Street Healthcare Properties, LLC but not leased by applicable Credit Party | Broad Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245 |
| TPS III of PA, L.L.C. | 230 N. Broad St. Philadelphia, PA 19102* | N/A | Owned by Broad Street Healthcare Properties, LLC but not leased by applicable Credit Party | Broad Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245 |
|  | 1010 Arch Street Suite 102 Philadelphia, PA  19107 | Lease is silent. | Leased | 224 E. 13th Street Realty Corp. 50 Commerce Street Spring Valley, NY 10977 |
|  | 2424 East York Street, Units 116-119 Philadelphia, PA   19125 | 2,012 sq. ft. | Leased | JB Venture 4, LLC 2424 E. York St, Unit 204 Philadelphia, PA 19125 |
| TPS IV of PA, L.L.C. | 230 N. Broad St. Philadelphia, PA 19102* | N/A | Owned by Broad Street Healthcare Properties, LLC but not leased by applicable Credit Party other than as listed below | Broad Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA  90245 |
|  | 204 State Road Suite 204 Lehighton, PA  18235 | 890.91 sq. ft. | Leased | Center for Digestive Health Real Estate, LLC 204 State Rd Lehighton, PA  18235 |

| | 525 Penn Street Reading, PA 19301 | 865 sq. ft. | Leased | Farias Health, Inc. 525 Penn Street Reading, PA 19601 |
|---|---|---|---|---|
| | 2701 Holme Avenue Suite 202 Philadelphia, PA 19152 | 1,730 sq. ft. | Leased | Credit party does not have this information as the Time Share Lease Agreement is with a tenant at the property and such Agreement does not specify the owner of the property or its address. |
| | 230 N. Broad Street Suite 12317 Philadelphia, PA 19102 | 137.27 sq. ft. | Leased | PAHH New College MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
| | 230 N. Broad Street Suite 744 Philadelphia, PA 19102 | 1,885.66 sq. ft. | Leased | PAHH New College MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
| | 222-236 N. Broad Street Suites 12316, 12318, 12320, 12322, 12324, 12326 and 12328 Philadelphia, PA 19102 | 1,776.06 sq. ft. | Leased | PAHH New College MOB, LLC c/o Harrison Street Real Estate, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606 |
| | Broad and Vine Street 15th Floor Philadelphia, PA 19102 | 3,645 sq. ft. | Leased | Broad Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245 |
| TPS V of PA, L.L.C. | 160 E. Erie Ave., Philadelphia, PA 19134* | N/A | Owned by Front Street Healthcare Properties, LLC but not leased by applicable Credit Party | Front Street Healthcare Properties, LLC 222 N. Sepulveda Blvd., Suite 900 El Segundo, CA 90245 |

Iron Mountain stores physical copies of books and records at a variety of locations at its discretion and in accordance with its policies and procedures.  Parent Borrower will enter into an agreement with Iron Mountain with respect to such storage shortly after the Closing Date.

**<u>EXHIBIT B</u>**

**CHECKLIST**

(See attached.)



## AMENDMENT NO. 1 TO CREDIT AND SECURITY AGREEMENT

**PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC and certain of its subsidiaries**
**each as Borrower and collectively as Borrowers**

**BROAD STREET HEALTHCARE PROPERTIES, LLC, BROAD STREET**
**HEALTHCARE PROPERTIES II, LLC and BROAD STREET HEALTHCARE**
**PROPERTIES III, LLC**
**each as a Guarantor and collectively as Guarantors**

**and**

**MIDCAP FUNDING IV TRUST**

**as the Agent**

**Target Closing Date:  September 20, 2018**

---

## CLOSING CHECKLIST

**Key:**

**B**      **Borrower**
**G**      **Guarantor**
**BC**     **Borrower's and Guarantor's Counsel**
**A**      **MidCap Funding IV Trust or its affiliate**
**AC**     **MCF's Counsel**



| **Closing Item** |
|---|
| **I.     LOAN DOCUMENTS** |
| A.     Amendment No. 1 to Credit and Security Agreement |
| •     Exhibit A – Amended Credit Agreement |
| a.     Annex A |
| b.     Exhibits |
| (i)     A |
| (ii)     C-2 |
| (iii)     D |
| c.     Schedules |
| (i)     1.1B – List of Projects, Names, Addresses, and Bed Capacity |
| (ii)     3.1 – Credit Parties |
| (iii)     3.18 - Environmental |
| (iv)     5.8 – Affiliate Transactions |
| (v)     5.14 – Deposit Accounts |
| (vi)     8.1 – Regulatory Matters |
| •     Exhibit B – Closing Checklist |
| B.     Guaranty and Security Agreement |
| C.     Promissory Note – Term Loan |
| D.     Reaffirmation of Holdings Guaranty |
| E.     Deposit Account Control Agreement - Wells (Acct # 4127926004; Broad Street Healthcare Properties, LLC) |
| F.     Supplemental Fee Letter |
| G.     Legal Opinions |
| •     Reed Smith LLP |
| •     Lauletta Birnbaum, LLC |
| **II.     [RESERVED]** |

| **Closing Item** |
|---|
| **III.**   **MORTGAGE RELATED DOCUMENTS (Hahnemann Hospital)** |
| A.   Open-End Mortgage and Security Agreement (Guarantors) |
| •   Hospital (Broad Street Healthcare Properties, LLC) |
| •   Land and Parking (Broad Street Healthcare Properties II, LLC) |
| •   MOB and Land (Broad Street Healthcare Properties III, LLC) |
| B.   Subordination, Non-Disturbance and Attornment Agreements |
| C.   Tenant Estoppel Certificates |
| D.   Copies of Existing Leases |
| E.   UCC Financing Statements (Guarantors) |
| F.   Title Commitment with underlying documents |
| •   Hospital (Broad Street Healthcare Properties, LLC) |
| •   Land and Parking (Broad Street Healthcare Properties II, LLC) |
| •   MOB and Land (Broad Street Healthcare Properties III, LLC) |
| G.   Lender's Title Insurance Policies with endorsements |
| •   Hospital (Broad Street Healthcare Properties, LLC) |
| •   Land and Parking (Broad Street Healthcare Properties II, LLC) |
| •   MOB and Land (Broad Street Healthcare Properties III, LLC) |
| H.   ALTA Survey |
| I.   Property Condition Reports |
| J.   Zoning Reports |
| K.   Environmental Assessments |
| L.   Appraisals |
| M.   Flood Hazard Determinations |
| **IV.**   **ORGANIZATIONAL DOCUMENTS** |
| A.   Secretary's Certificate for Guarantors with Exhibits |
| B.   Secretary's Certificate of No Change for Borrowers with following exhibit: |
| •   Supplemental resolutions authorizing term loan |
| **V.**   **LIEN AND LITIGATION DILIGENCE / FINANCIAL DILIGENCE** |
| A.   Pre-Closing  UCC, Judgment, Guarantors |
| B.   Post-Closing UCC Searches to Reflect MidCap Filings |
| C.   Name Verification and Background Checks for Principals of Guarantors |
| **VI.**   **FUNDING DOCUMENTS AND DELIVERABLES** |
| A.   Notice of Borrowing |
| B.   Loan Disbursement Statement |

2