UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CENTER CITY HEALTHCARE, LLC, d/b/a HAHNEMANN UNIVERSITY HOSPITAL, et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11466 (KG)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 733, 804** |

**PATIENT CARE OMBUDSMAN'S STATEMENT IN SUPPORT OF DEBTORS' MOTION FOR STAY PENDING APPEAL OF ORDER GRANTING IN PART THE MOTION OF TENET BUSINESS SERVICES CORPORATION AND CONIFER REVENUE CYCLE SOLUTIONS, LLC FOR ENTRY OF AN ORDER (I) COMPELLING PAYMENT OF ALL UNPAID POSTPETITION AMOUNTS PURSUANT TO 11 U.S.C. § 503 (B)(1) OR, IN THE ALTERNATIVE, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY TO THE EXTENT NECESSARY TO TERMINATE THE TSA AND MSA**

In accordance with her duties pursuant to section 333(b) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Suzanne A. Koenig (the "**Ombudsman**"), in her capacity as the patient care ombudsman[2] in the above-captioned Chapter 11 cases, respectfully submits this statement (the "**Statement**") in support of the *Debtors' Motion for Stay Pending Appeal of Order Granting in Part the Motion of Tenet Business Services Corporation* ("**Tenet**") *and Conifer Revenue Cycle Solutions, LLC* ("**Conifer**" and together with Tenet, the "**Tenet Parties**") *for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] On July 2, 2019, this Court entered an order directing the appointment of a patient care ombudsman [Docket No. 83]. On July 3, 2019, the Office of the United States Trustee appointed Suzanne A. Koenig as the Ombudsman in these Chapter 11 cases [Docket No. 95].

*Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA* (the "**Stay Motion**")[3] [Docket No. 804] and states as follows:

1.  The Ombudsman supports the relief requested in the Stay Motion out of concern that the Tenet Parties' termination of the TSA and MSA, and the subsequent discontinuation of their services thereunder, would jeopardize patient care and safety at St. Christopher's Hospital for Children ("**STC**").

2.  In preparing this Statement, the Ombudsman relies on the (i) the *Declaration of Ingrid McGovern in Support of Debtors' Motion for Stay Pending Appeal of Order Granting in Part the Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA* (the "**McGovern Declaration**") [Docket No. 804-2], (ii) the *Declaration of Robert Kirschner in Support of Debtors' Motion for Stay Pending Appeal of Order Granting in Part the Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA* (the "**Kirschner Declaration**") [Docket No. 804-3] and (iii) discussions with additional STC staff.

3.  Based on the foregoing, the Ombudsman understands that if the TSA and the MSA are terminated, STC would lose certain tools and capabilities integral to patient intake, treatment, and safety. As a result, STC likely would face an inevitable shut down, making it the second

---

[3] Unless otherwise noted, capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stay Motion.

hospital in the Philadelphia area serving the needs of a largely underprivileged population to be shut down due to these chapter 11 cases.

4. Moreover, the Ombudsman has been informed that there are no immediate solutions available to STC to replace the services provided the TSA and MSA and ensure no disruption or risk to patient care and safety.

### A. Impact of Termination of Tenet Parties' Services on Patient Intake and Records

5. As reflected in the McGovern Declaration, the services and software applications provided by the Tenet Parties are critical to STC's ability to provide care to patients [McGovern Declaration, ¶ 5]. STC staff rely on the Cerner electronic medical records system (the "EMR") provided by Tenet under the TSA, and Conifer operates the registration and admission of patients [McGovern Declaration, ¶¶ 6, 8].

6. In addition to recording a new patient's name, date of birth and reason for the hospital visit, as part of the registration and admission process, Conifer employees staffed in STC's emergency room take an extensive medical history of each patient [*Id.*, ¶ 8]. The information gathered is used to either create a new patient record or update an existing one. Patient records are uploaded and stored on the EMR [*Id.*].

7. Beyond the information gathered at registration and admission, every step of care provided to a patient is entered onto the EMR and tied to that patient's medical records. At any given time, physicians, nurses, pharmacists and other staff members tending to a patient can view the patient's medical history, care plans, medications ordered, notes from physicians or nurses or requested lab or radiology studies [*Id.*].

8. As noted in the McGovern Declaration, the Debtors are unable to transfer STC's patient records to an alternative electronic IT system. The Debtors not only lack sufficient time to

3

transition to an alternative IT system, but also lack the resources for a new, comprehensive IT system similar to the Tenet IT Platform [*Id.*, ¶ 10].

9.  If the TSA and MSA were to be terminated and the Tenet Parties' services thereunder discontinued in the near future, STC would be forced to resort to paper record-keeping [*Id.*, ¶ 11]. This, however, is not a practical option, as the transition would take at least up to a year and would be expensive and burdensome on the staff. Significantly, paper record-keeping poses unnecessary risk to patient welfare as there is an increased likelihood of medical errors when dealing with paper record-keeping (e.g., failure of information to be kept up-to-date, legibility of handwriting, etc.) [*Id.*, ¶ 12].

### B. Impact on Patient Treatment and Care

10. In treating and caring for patients, multiple programs included in the EMR are utilized by STC staff across departments, promoting a collaborative process and enabling STC medical professionals to quickly provide care to each child. With the services provided under the TSA and the MSA, among other things, STC staff and patient primary care physicians are able to remotely submit patient medication orders to the pharmacy, order services such as X-rays and CAT-scans or otherwise schedule appointments for procedures all within the same system, accessible by all treating professionals [McGovern Declaration, ¶ 9].

11. As discussed in the McGovern Declaration, one of the many programs included in the Tenet IT Platform is the Medication Administration Record (the "**MAR**") system. This program is used by STC medical professionals to scan and account for all pharmaceuticals and medications that enter the hospital [*Id.*, ¶ 7]. Specifically, as it relates to patient care, STC medical professionals process all information related to medications prescribed and distributed to patients

(including, but not limited to, the type of medication, dosage, time last given, prescribed duration of use) through the MAR [*Id.*].

12.     If STC were to lose access to the EMR, patient care would be jeopardized. As STC does not have any true alternatives with respect to its electronic IT system, if the TSA and MSA were terminated, not only would medical histories, notes regarding prior patient visits, and care plans established for each patient be inaccessible and essentially lost, but also, without access to the MAR, STC's staff would be unable to determine what medications a patient has taken or is to take, along with the relevant history and dosage associated with the patient's usage of any such medications [*Id.*, ¶¶ 7, 12].

13.     A potential reversion to a paper record-keeping system, is even more impractical in this context. A paper record-keeping system is inconvenient and inhibits the collaborative treatment provided across departments. If STC were forced to revert back to paper record-keeping, the clinicians, physicians, nurses, pharmacists, lab technicians and any other specialists treating a patient or involved in a patient's care would lose immediate and remote access to the patient's medical history and record. Having to pass along or share a paper record lends itself to probable delays in treatment and the potential for information to be improperly or untimely recorded, possibly hindering a patient's treatment and care.

14.     As noted above, there is also a greater risk to patient care involved with the use of paper record-keeping. For example, when medications are prescribed to the patients using the MAR, the upper and lower dosage limits for such medications are programmed into the EMR based on the patient's weight [*Id.*, ¶ 13]. Under the Tenet IT Platform, if a certain dosage is ordered and the dosage falls outside the limits, the EMR will *automatically* create an alert to ensure the

5

dosage requested is adjusted to the appropriate limit [*Id.*]. The risk of human error regarding calculations and medication dosages are greater with a paper record-keeping system [*Id.*].

### C. Impact on Patient and Staff Safety

15. The services provided under the TSA and MSA also indirectly impact the welfare of the patients. Other crucial services provided by Tenet under the TSA include door access to the various floors and wings of STC, as well as internet and phone service.

16. The hospital cannot operate without internet or phone service. Not only would such a loss impair the hospital's ability to communicate internally, but the hospital would be unable to maintain food and necessary supplies, coordinate hazardous waste disposal service, or otherwise communicate with other emergency services such as ambulatory or medivac services regarding incoming traumas, law enforcement, or child welfare services.

17. Furthermore, without the security mechanisms in place under the Tenet IP System implementing a key card access system requiring clearance to access parts of the hospital, all doors or other access points within STC would default to being unlocked. It should go without saying that unfettered access in a hospital, especially a children's hospital, is an extreme security hazard. Such a circumstance would require employing additional security personnel to control and monitor who enters and exits the facility. Regardless of the number of personnel, there would be an increased risk of harm or danger to those within STC, including, *inter alia*, unauthorized persons gaining access to patient rooms, patients wandering about/getting lost within the hospital, patients being kidnapped, or staff or visitors otherwise being harmed by third parties.

18. Moreover, as set forth in the Kirschner Declaration, the Tenet IT System also provides an array of facility and biomedical equipment management functions. The software under the TSA creates a centralized network to inventory the biomedical and facility infrastructure

equipment located and used at STC, including, but not limited to, equipment for HVAC, emergency generator and switching equipment, safety systems (e.g., eye wash stations), fire alarm testing, and battery-operated back-up lighting. The system maintains records of testing and tracking of the equipment and the submission of work orders for repairs, ensuring that the equipment is properly maintained [Kirschner Declaration, ¶ 4].

19. Equipment that is not maintained or regularly calibrated can provide faulty readings, resulting in potentially improper and harmful proposed courses of treatment, or can otherwise pose a direct threat to patient safety [*Id.*, ¶ 5]. An abrupt loss of access to the Tenet IT System would also jeopardize the Debtors' maintenance of the hospital's equipment in a manner compliant with applicable regulations [*Id.*, ¶ 6].

D. **Impact of a Potential Shutdown of STC**

20. The abrupt absence of the Tenet Parties' services would create potentially insurmountable challenges for the Debtors' operations and jeopardize patient care. As STC's chief nursing officer noted, the consequences of a sudden loss of the EMR would be widespread throughout the hospital, and the absence of those services would likely require the hospital to be shut down [McGovern Declaration, ¶¶ 17, 18]. While an actual closure of STC would need to satisfy certain notice and regulatory approval requirements, losing EMR access would make it impossible to safely care for the patients, resulting in a *de facto* shutdown of the facility. If the hospital were to shut down, the Debtors would need to evacuate the hospital and transport the patients to other hospitals [*Id.*, ¶ 18]. This raises a number of additional considerations and challenges.

21. As set forth in the McGovern Declaration, there are approximately 100 inpatients currently at STC, 38 of which are in the neonatal intensive care unit (the "**NICU**") or the pediatric


intensive care unit (the "**PICU**") [*Id.*, ¶ 19]. STC houses a Level 4 NICU, which is equipped to provide care in highly complex cases [*Id.*]. The patients requiring such care can be transferred only to other hospitals that maintain a Level 4 NICU [*Id.*]. Although there are a few other hospitals within Pennsylvania that also maintain Level 4 NICUs, there is no guarantee that these hospitals have the capacity to take STC's patients or that they would take the insurance carried by STC's NICU patients. It is possible that STC would have to consider relocating some patients out of state, which would create even greater financial burden and emotional stress on the patients' families [*Id.*]. Furthermore, certain of STC's patients are medically fragile children who would be at substantial risk of suffering harm if they were transported to another facility, whether in state or out of state [*Id.*, ¶ 21].

Based on the foregoing, the Ombudsman respectfully requests that the Court grant the relief requested in the Stay Motion out of concern for the potential adverse ramifications to patient care and safety resulting from a termination of the services provided under the TSA and MSA. While the Ombudsman generally understands the business issues involving the Tenet Parties and the Debtors, the Ombudsman urges the Tenet Parties and the Debtors to reach a resolution that does not adversely impact the ongoing care and safety of the children at STC.

Dated: October 16, 2019

<div style="text-align: right;">
PATIENT CARE OMBUDSMAN

By: _____
Suzanne Koenig, solely in her capacity
as Patient Care Ombudsman in the
above-captioned chapter 11 cases
</div>