# Exhibit D

## Centurion Engagement Agreement

AUCTION ENGAGEMENT AGREEMENT

This agreement ("Agreement") is made on this 30th day of October, 2019 by and between Center City Healthcare, LLC and its affiliated practice groups (collectively, "SELLER") and Centurion Service Group LLC, an Illinois limited liability corporation ("CENTURION").

WITNESSTH:

WHEREAS, SELLER wishes to sell certain items of medical equipment, furniture and inventory (the "Auction Assets") located at the premises (the "Main Premises") commonly known as Hahnemann University Hospital, 230 North Broad St., Philadelphia, PA, as well as the premises located at the Feinstein Building, Bobst Building and New College Building and any other real estate used or occupied by SELLER in Center City, Philadelphia (the "Auxiliary Premises"), and wishes to appoint CENTURION as its exclusive agent for purposes of conducting a sale of the Auction Assets (the "Auction Sale") to be held at the Main Premises and Auxiliary Premises (collectively, the "Premises").

NOW, THEREFORE, in mutual consideration of the premises and of the covenants and agreements as heretofore and hereafter set forth, the parties agree as follows:

1. <u>Appointment of Exclusive Agency.</u> Subject to Bankruptcy Court approval as set forth herein, SELLER hereby agrees to employ CENTURION as its exclusive independent agent for the purpose of selling the Auction Assets at the Auction Sale and CENTURION hereby accepts such appointment on the terms and conditions hereinafter set forth. The Auction Assets are more fully described in Exhibit "A," which will be prepared by CENTURION *after* this Agreement is executed and then attached hereto to serve as the auction catalog. Exhibit A shall not include items presently being leased and it shall be SELLER's responsibility to ensure CENTURION is made aware of all leased items to ensure no such items are included on Exhibit A. SELLER further represents and agrees Exhibit A shall include all items of medical and hospital equipment, radiology equipment, instrumentation, disposables, office furniture, computers, non-medical equipment, maintenance, kitchen and other equipment and supplies required to run the hospital or located on the Premises that CENTURION desires to sell. If there are any items of medical or hospital equipment, radiology equipment, instrumentation, disposables, office furniture, computers, non-medical equipment, maintenance, kitchen or other equipment or supplies required to run the hospital or located on the Premises that are leased by SELLER or that SELLER otherwise cannot sell pursuant to the terms of this Agreement, they are listed on Exhibit "B" attached hereto, it being understood that Exhibit B must be completed by SELLER and appended to this Agreement *before* this Agreement is executed.

2. <u>Guarantee and Division of Proceeds of Auction Sale.</u>  Centurion will pay Two Million Forty Two Thousand Five Hundred Dollars ($2,042,500) as a guarantee ("Guarantee") to the SELLER within 48 hours after the Bankruptcy Court's approval of this Agreement.

The net proceeds from the Auction Sale shall be all proceeds from the Auction Sale excluding amounts collected by CENTURION as and for any applicable sales or use tax, and any "Buyer's Premium" (described below) charged by CENTURION (the "Net Proceeds"). Centurion shall hold the Net Proceeds in trust, and in a segregated account, until disbursed pursuant to the terms of the Agreement. Promptly upon SELLER's written request, Centurion shall provide SELLER with written evidence that Centurion is complying with the foregoing requirement. The following amounts shall be disbursed by CENTURION within twenty (20) calendar days of the Auction Sale from the Net Proceeds in the following order of priority:

A. Centurion will receive Two Million Four Hundred Fifty Thousand Dollars ($2,450,000.00) from the Net Proceeds of the sale to reimburse it for the Guarantee and for all expenses.

B. All Net Proceeds in excess of Two Million Four Hundred Fifty Thousand Dollars ($2,450,000.00) will be split Eighty Five Percent (85%) to the SELLER and Fifteen Percent (15%) to CENTURION.

It is specifically understood and agreed that CENTURION may charge a "Buyer's Premium" of up to eighteen percent (18%) of the amount of the purchase price for a given item of the Auction Assets sold at the Auction Sale, to be paid by the purchasers thereof. Such Buyer's Premium shall accrue exclusively for the benefit of CENTURION and shall not be included in Net Proceeds.

3. **CENTURION's Obligations**. CENTURION agrees that it shall:

   (a) hold the Auction Sale in its usual and customary manner, via live webcast and timed auction and shall determine the manner of advertising the same;

   (b) arrange and number the Auction Assets in lots, catalog same and deliver to SELLER a copy of such catalog, items to be sold in accordance with exhibit "A" as attached;

   (c) advertise the Auction Sale where, in CENTURION's opinion, customers will be found who are willing to pay the highest prices for the Auction Assets;

   (d) sell the Auction Assets to purchasers at the Auction Sale for cash;

   (e) be responsible for the removal of Auction Assets paid for but not removed by purchasers thereof;

   (f) provide adequate personnel to supervise the removal of Auction Assets sold at the Auction Sale;

2

(g) hold the Net Proceeds of the sale of the Auction Assets in trust, in a segregated account, pending distribution in accordance with this Agreement;

(h) sell the Auction Assets "as is where is" irrespective of condition, wear or damage and without guarantee or warranty of any nature, kind or description; and

(i) keep accurate records of the Auction Sale, and provide SELLER a copy of said records, CENTURION will supply SELLER weekly reporting once the sale commences, and no later than twenty (20) calendar days after completion of the Auction Sale.

Notwithstanding anything else herein contained, it is expressly agreed and understood by SELLER that CENTURION is not responsible for, nor obligated to, remove or dispose of, any toxic substances, bio-hazardous, sharp or FDA controlled substances or other pharmaceuticals, or other hazardous garbage, materials, debris, or waste from the Premises nor for the disconnecting and capping of any valves from which equipment will be removed. CENTURION shall be responsible for the removal of any walls, windows or other paths of egress for larger equipment to be removed from the building and the restoration/replacement of same, and the expenses related to such removal and restoration/replacement shall be the sole responsibility of CENTURION, which, prior to commencing any removal or restoration/replacement activities, shall furnish SELLER with proof of insurance (which shall cover both SELLER and the owner(s) of the Premises) and a performance bond of $250,000. In the event a buyer at the Auction Sale wants to deinstall the Auction Assets it purchases, CENTURION will require such buyer (i) to be an experienced, knowledgeable deinstaller, or have other such qualifications as necessary and to provide insurance to CENTURION and SELLER prior to performing such work (with such insurance to be acceptable to SELLER in SELLER's sole discretion) and (ii) to promptly repair, at buyer's sole cost, any damage to the condition of the Premises caused by such deinstallation, to SELLER's reasonable satisfaction. Notwithstanding anything to the contrary in this Agreement, neither CENTURION nor any buyer shall be responsible for patching minor cavities in walls that are left in the areas where Auction Assets (such as sterilizers) are currently located, making minor repairs to areas that have not been materially damaged by deinstallation or removal work at the Premises, or making improvements to the Premises. Further, CENTURION is not responsible for the removal or disposal of any hospital or patient files or records, except to help coordinate the timing of their removal by, and at the exclusive direction, expense and control of SELLER. CENTURION will use its best efforts to remove Auction Assets from the building. CENTURION reserves the right of abandonment for unsold or other assets that were not included in the sale. CENTURION shall cooperate as may reasonably be requested by any landlord of the Premises in connection with CENTURION's performance of its obligations and

duties under this Agreement.

4. **Use of Premises.** To facilitate the Auction Sale and subsequent orderly removal of the Auction Assets by purchasers thereof, SELLER hereby agrees to supply electric power service, heat and/or air conditioning, elevator and dock service to the Premises. Further, SELLER grants to CENTURION the non-exclusive use of the Premises rent-free from the date of Bankruptcy Court approval, until ninety (90) days thereafter to allow CENTURION to conduct the Auction Sale and supervise removal of the Auction Assets; provided, however, CENTURION shall have no more than sixty (60) days after Bankruptcy Court approval to conduct the Auction Sale and supervise removal of Auction Assets from the Auxiliary Premises located at 216 North Broad Street, Philadelphia, PA. CENTURION will use its best efforts to work with SELLER to remove certain items from areas that are more time sensitive. It shall also be SELLER's sole responsibility to provide and maintain adequate property casualty and liability insurance covering the Premises, invitees, employees, and the Auction Assets during the period covered by this Agreement. Notwithstanding anything to the contrary in this Agreement, CENTURION agrees to complete its work and vacate the Premises on or before January 31, 2020 if: (1) the Bankruptcy Court approves this Agreement on or before November 19, 2019; and (2) CENTURION is engaged and permitted to begin inventorying the Auction Assets and preparing for the Auction Sale on or before November 4, 2019 for a flat fee of $40,000.00, which fee shall be forgiven if this Agreement is approved by the Court. CENTURION acknowledges the license herein granted to it and shall use the Premises subject to the following general terms and conditions.

    (a)    CENTURION will use the Premises solely for the purposes of storing, exhibiting and selling the Auction Assets, including the completion of the Auction Sale thereof, and for any legal purpose reasonably related thereto, including without limitation, photographing the Auction Assets, compiling information pertaining thereto and inviting to the Premises prospective purchasers and their agents.

    (b)    CENTURION shall not alter the Premises or in any way assign its rights to the use of the Premises; provided, however, CENTURION, its employees or agents, shall not be responsible for the repair or restoration of any portion of the Premises from which the Auction Assets are removed, unless damaged by the gross negligence of CENTURION, its officers, agents, employees or invitees.

5. **Representations and Warranties of SELLER.** SELLER hereby represents and warrants to CENTURION as follows:

    (a)    SELLER owns and, subject to Bankruptcy Court approval as set forth herein, has all the requisite power and authority to enter into this Agreement and to sell from the Premises all of the Auction Assets and all other assets, equipment,

property and items being sold, from the Premises pursuant to the terms hereof, free and clear of any liens, security interests or encumbrances of every kind and nature;

(b) To the extent material to this Agreement, SELLER has paid, will pay, or has made provision to pay all taxes (whether arising pursuant to federal, state, city or local taxation statutes, ordinances, or otherwise) which have been or could be levied against it and/or the Auction Assets or which were heretofore or are hereinafter due, or which in the future may be levied against it and/or the Auction Assets, or which will or might affect or prevent, in any manner whatsoever, the sale of the Auction Assets or the vesting of clear title in the purchasers thereof. To the extent material to this Agreement, SELLER has complied with all laws, regulations, and licenses which govern its business and activities.

(c) Except to the extent not material to this Agreement, SELLER has received no notice from any government or regulatory agency or other authority that it is in violation of any existing federal, state, or local environmental or other public protection law or regulation pertaining to the Auction Assets, the Premises, or the obligations being imposed upon CENTURION by this Agreement, and that the same will not violate any such laws or regulations, or any other agreement or contract to which SELLER is a party;

(d) SELLER will fully cooperate with the reasonable directions and requests of CENTURION pertaining to the performance of CENTURION'S obligations hereunder, including without limitation the vesting of title to the purchased Auction Assets in the purchasers thereof, and the completion of any additional services to be performed by CENTURION.

6. **Representations and Warranties of CENTURION.** CENTURION hereby represents and warrants to SELLER that it has all requisite power and authority to operate its business as it is now being conducted and has complete and unrestricted power to enter into this Agreement and to perform the acts it is to perform under this Agreement. All necessary action has been taken to authorize the execution and performance of this Agreement by CENTURION.

7. **Indemnification**. SELLER shall indemnify and hold CENTURION and its employees, agents, members and managers (the "Indemnified Parties") harmless from any and all liability or defense costs, including, without limitation, reasonable attorneys' fees, arising out of or relating to any breach of this Agreement by SELLER or any intentional, reckless or grossly negligent actions by SELLER or its employees or agents concerning the Auction Assets or Auction Sale.

8. **Entire Agreement Modification.** This Agreement shall not be changed, modified, altered or amended except by written agreement duly executed by all parties.

9. **Choice of Law.** It is the intention of the parties that the laws of the State of Illinois shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties. The parties further agree that, in the event of a dispute arising hereunder, they shall submit themselves to the jurisdiction of the United States Bankruptcy Court for the District of Delaware.

10. **Cooperation by SELLER.** SELLER shall in all respects cooperate with and further the interests of CENTURION in discharging SELLER'S duties under this Agreement as required by any applicable statute or regulation, and by this Agreement, and shall refrain from all acts that would reasonably tend to interfere with CENTURION in discharging CENTURION'S duties under this Agreement or as required by statute or regulation.

11. **Bankruptcy Court Approval.** This Agreement, and CENTURION's engagement hereunder, shall not be valid unless and until approved by Order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). CENTURION understands and agrees that its fees hereunder may be subject to Bankruptcy Court approval, after application and notice to parties in interest.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed on the day and year first above written.

CENTURION SERVICE GROUP LLC

By: _____
Its Authorized Agent

SELLER

By: _____
Allen Wilen, Chief Restructuring Officer

## EXHIBIT A

[To be completed by CENTURION]

36100766.4 10/30/2019

## EXHIBIT B

- Lab Automation Equipment leased from Beckman Coulter (lease date December 4, 2012, monthly payments $30,334)
- Pyxis leased from CareFusion (lease dated December 1, 2014, monthly payment $394)
- Pyxis leased from CareFusion (lease dated December 1, 2014, monthly payment $15,282)
- Copiers leased from DEX Imaging (lease dated July 26, 2014, monthly payments $5,681)
- Phone switch/system
- Fire suppression and other building system(s).

36100766.4 10/30/2019