# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CENTER CITY HEALTHCARE, LLC<br>d/b/a/ HAHNEMANN UNIVERSITY<br>HOSPITAL, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11466 (KG)<br><br>Jointly Administered<br><br>**Re: DI 864**<br>**Hearing Date: 11/19/2019 at 10:00 a m.**<br>**Objection Deadline: 11/12/2019 at 4:00 p.m.** |

## MOTION OF GLOBAL NEUROSCIENCES INSTITUTE, LLC
## FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

Global Neurosciences Institute, LLC ("GNI") submits this motion (the "Motion") pursuant to, without limitation, 11 U.S.C. § 503(b)(1)(A), for the entry of an order, substantially in the form attached, allowing and directing payment of an administrative expense claim.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334. This Motion is a core proceeding under 28 U.S.C. § 158(b). Venue is proper before this Court pursuant to 28 U.S.C. § 1409. The predicates for the relief requested herein include 11 U.S.C. § 503(b)(1)(A).

2. Pursuant to Del. Bankr. L.R. 9013-1(f), GNI does consent to entry of a final judgment or order with respect to any matters for which consent is required.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), St. Chris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

**FACTUAL BACKGROUND**

A.  **The Services Agreement**

3.  GNI and Tenet Health System Hahnemann, LLC ("THSH") entered into a certain Clinical Service Chief, Neurosurgery Coverage and Neurosurgery/Trauma On-Call Coverage Services Agreement, effective as of March 6, 2015, which was amended several times (as so amended, the "Services Agreement", Exhibit "1").  Debtor Center City Healthcare, LLC ("CCH") is the successor to THSH and is the Debtor party to the Services Agreement.

4.  Under the Services Agreement, GNI provided clinical service chief, on-call and on-site neurosurgical physician and physician assistant staffing to CCH ("Services").

5.  Under the Services Agreement, Services CCH receives are delivered by GNI based on the *availability* of neurosurgical specialists, including both physicians and physician assistants. Specifically, GNI has, as an independent contractor, exclusively provided these Services to Hahnemann University Hospital since 2015, which is a requirement for the hospital to be designated as a Level 1 Trauma Center.  See generally Services Agreement, Art. I. Of note, GNI is also contracted by CCH to be the exclusive provider of similar neurosurgical services at its St. Christopher's Hospital for Children.

6.  For these Services, the Services Agreement requires CCH to pay GNI fixed fees which are invoiced on a regular basis. See Services Agreement, §§ 4.1. Hence, under the Services Agreement, CCH is obligated to pay GNI for availability of these skilled neurosurgical resources regardless of the actual level of services required for any particular time period.  By the same token, GNI must assure that it has a sufficient number of neurosurgical specialists available to fulfill any needs that may arise at any point in time--day or night.

7. One could look at the Services Agreement as a kind of insurance or risk-sharing contract: the Debtors, rather than employing a full-time staff of neurosurgical specialists at high cost, benefit by paying a fixed monthly fee to GNI. (In fact, the Debtors contracted with GNI to assume responsibility for the neurosurgical physician assistant services earlier in 2019, thereby enabling Debtors to terminate employment of the Hahnemann physician assistants.) If and when services are required, the Debtors' needs are covered via their agreement with GNI.

8. Neurosurgical services are not always needed on a regular basis, but when they are needed, the need is critical and extremely time-sensitive. In fact, if one of GNI's neurosurgical resources is not physically at the hospital at any given point in time, GNI must have resources available to arrive at the hospital upon thirty (30) minutes' advance notice. Neurosurgical specialists, as highly trained professionals, are difficult to recruit and therefore very expensive to employ, particularly since Hahnemann University Hospital had surgical equipment and staffing in place allowing it to be considered a "tertiary level" hospital accepting transfers from other community hospitals since it was able to provide a "higher level of care" to patients. This specialized surgical equipment, called a biplane, required neurosurgeons who were comprehensively trained to perform minimally invasive (endovascular) procedures in addition to traditional neurosurgery procedures whereby the brain is accessed externally through the skull. GNI employs five (5) of these comprehensively trained neurosurgeon specialists, each of which has a one hundred and eighty (180) day termination clause in their employment agreements. This is why the Services Agreement makes sense for the Debtors--it is cheaper to pay for the *availability* of neurosurgical specialists than to hire full-time employees.

9. One can also look at the Services Agreement from GNI's viewpoint. GNI employs a large staff of neurosurgical specialists. These neurosurgical specialists are paid to be

available on a 24/7 basis. This requires around-the-clock staffing, and it does not matter whether their services are, in fact, needed at any particular point in time--GNI has to pay its employees regardless. This is why GNI charges its clients for *availability* on a fixed price basis regardless of the actual level of services used at any point in time. It should also be stressed that these highly-skilled and highly-paid professionals cannot be recruited on a moment's notice. To have enough professionals in place to provide the Debtors with the contractually obligated services, GNI had appropriately trained staff in place during the timeframe in question.

10. The initial term of the Services Agreement was three years, with a continuing option to renew for additional one-year terms. Services Agreement, § 13.1.

11. The term of the Services Agreement was extended through several amendments, the last of which was effective March 15, 2019. See Exhibit "2".

### B. Post-Bankruptcy Events

12. Debtors filed their chapter 11 petitions with this Court on June 30 and July 1, 2019 (the "Petition Dates"), just over three months after the Services Agreement was renewed.

13. On July 25, 2019, GNI's Chief Operating Officer, Donald Damico, emailed Debtors' representatives Brian Crocitto (Vice President of Finance) and Dion Oglesby (Interim Chief Financial Officer) about outstanding post-petition invoices under the Services Agreement, as well as a similar exclusive services agreement in place with Debtors' St. Christopher's Hospital for Children. See email chain from July 25, 2019 through August 29, 2019, Exhibit "3" at pp. 13-14.[2]

14. Mr. Crocitto replied the same day stating: "Hahnemann discharged their final inpatient today, so the service/coverage is not needed at Hahnemann going forward." Id. at 13.

---

[2] The email chain attached as Exhibit "3" aggregates, in reverse chronological order, the emails during this period, with page numbers added for ease of reference.

15.     Mr. Damico responded that day as follows:

Regarding the Hahnemann invoice, as you are aware, GNI is providing professional neurosurgical services fulfilling our commitments under the fully executed, long term contract with Hahnemann University Hospital.  **This contract continues to be in full force and effect as it has not been rejected in the bankruptcy proceeding which requires appropriate notification to GNI.**  We have therefore continued to schedule clinical staff (neurosurgeons and physician assistants) and continue to provide 24/7 coverage fulfilling all of our obligations under the contract post-petition. We are, therefore, entitled to be paid, without delay, as agreed to in meetings with Dion, and your predecessor, Gary Bryant, who communicated that you will handle the transactions following his departure.  GNI has committed, and will continue to commit, our clinical resources to continue appropriate coverage as specified in our valid agreement and communicated these schedules to Hahnemann's hospital team. Your failure to pay this post-petition invoice is creating a significant financial burden to GNI, particularly since we have significant pre-petition amounts due to us pending the bankruptcy filing process.

Accordingly, can you please wire the amount due per the Hahnemann invoice submitted to you earlier today totaling $93,261.18? As always, I appreciate your assistance in these difficult times. Can you please let me know when the funds are wired tomorrow so I can confirm on my end. Thanks again.

Exhibit "3" at 12-13 (emphasis supplied).

16.     Mr. Damico's email makes several things clear.  First, the Services Agreement had not been rejected under the bankruptcy process.  Second, the Services Agreement was still in effect and had not been terminated.  Third, GNI was continuing to fulfill its obligations under the Services Agreement.  Finally, GNI would have a hard time making payroll if the Debtors did not pay.

17.     The Debtors never stated that they disagreed with Mr. Damico's July 25th email, which again stresses that the Services Agreement had not been rejected.

18.     The next day, July 26, Mr. Damico sent a follow-up email to Mr. Oglesby and Allen Wilen, Debtors' Chief Restructuring Officer, asking about the status of the Hahnemann payment in light of the explanation in his July 25 email.  Exhibit "3" at 12.   Seven minutes later,

Mr. Crocitto responded that "Don - the wire was initiated earlier today. Should be approved shortly." Id. at 11-12. A wire of $93,261.18, as requested by GNI, was sent that day. Id. at 11. This payment included the Hahnemann invoices for the last week of July. Appropriately, GNI continued to perform under the Services Agreement since the Debtors complied with GNI's payment request.

19. Six days later, on August 2, 2019—and unbeknownst to GNI--Debtors filed the First Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases (the "Rejection Motion", DI 349). In the Rejection Motion, Debtors sought to reject the Services Agreement effective as of the filing date of the motion. However, the Debtors did not serve the Rejection Motion on GNI. *See* Affidavit of Service dated August 9, 2019 (DI 412).

20. On August 8, 2019, Mr. Damico sent invoices to Mr. Oglesby and Mr. Crocitto for the second week of August under both the Hahnemann and St. Christopher agreements and asked when they would be paid. This was the regular weekly practice agreed-to by the Debtors and GNI since the declaration of bankruptcy. Exhibit "3" at 10. He sent a follow up email the next day (Id. at 9), to which Mr. Crocitto responded: "Don – Sorry for the delay. Unfortunately due to some unexpected cash restrictions, we're not able to get a wire out today. We're hoping to get back on track next week." Id. Neither Mr. Oglesby nor Mr. Crocitto indicates that the Hahnemann invoices will not be paid. Nor do they mention the Rejection Motion. Rather, it is represented that Debtors will pay, just not at the moment. Based on these statements, GNI continued to perform under the Services Agreement.

21. On August 13 and 14, Mr. Damico sent follow-up emails to Mr. Oglesby and Mr. Crocitto about the timing of payment. Id. at 8. Mr. Crocitto stated on August 14 that "I'm

optimistic that it will go out on Friday." Id. Again, Mr. Crocitto does not say that the Hahnemann invoices will not be paid and doesn't mention the Rejection Motion.

22. That Thursday, August 15, Mr. Damico sent invoices for the third week of August and again inquired as to the status of the open invoices. Id. at 7. He followed-up with an email on August 16. Id. Mr. Crocitto's response that day was "Hi Don – we're wiring over the St. Chris payments for this week and last week shortly. Unfortunately we're stuck on the HUH side for now." Id. at 6. In further email exchanges that day, Mr. Crocitto again informed Mr. Damico that the St. Christopher "piece" was the only payment the Debtors could "swing" at the time. Id.

23. The next week, on August 20, 22 and 23, Mr. Damico sent additional invoices for August and again asked why the earlier invoices had not been paid. Id. at 4-5.

24. By Order dated August 22, 2019 (the "Rejection Order", DI 547), this Court granted the Rejection Motion, which rejected the Services Agreement effective as of August 2, 2019. The Debtors' claims agent represents that it served Rejection Order on GNI by first class mail (from California) that day (see Affidavit of Service dated August 27, 2019, DI 567). However, GNI did not receive the Rejection Order until August 27th.

25. On Friday, August 23, Mr. Crocitto finally responded to Mr. Damico's numerous emails from earlier that week: "Don – sorry for the delay, funding came in late today. We are wiring the $31,992 for the STC invoice attached today. It is pending Allen's approval now." Id. at 4. He says nothing about Hahnemann, the Rejection Motion or the Rejection Order.

26. Nine minutes later, Mr. Damico responded as follows:

> Understood regarding this one - thanks. We also need to get current on the 3 outstanding Hahnemann invoices. As communicated several weeks ago, we continue to have a valid agreement in place, and we have committed resources that have 3-6 month termination periods since we don't have the ability to transition them elsewhere. In addition to our neurosurgeons, this staffing includes the seven FTE Physician Assistants that Hahnemann transitioned to GNI just

within the past 6 months. We are unable to make payroll, and while we are out over $900,000 from pre-petition accounts due, your DIP financing is designed to stay current with payments post-petition. Please provide us with a plan approved by Allen to get us current within the next week. I appreciate your assistance with this.

Exhibit "3" at 3-4.

27. Again hearing nothing substantive from Debtors, Mr. Damico again followed up on Tuesday, August 27th. Id.

28. That day, Mr. Oglesby replied directly to Mr. Damico as follows:

Don,

The HUH coverage contract was rejected in bankruptcy court as of August 2, 2019 per the bankruptcy judges order (attached here for your reference).

Our records indicate you were paid for services through that date. Even while the ED had closed in July and we ceased functioning as a trauma 1 level facility with need for the coverage.

Exhibit "3" at 2.

29. This was the first time that the Debtors had ever mentioned the Rejection Motion to GNI even though it had been filed almost four weeks earlier. It was also the first time GNI received notice of the Rejection Order.

30. Because GNI had no notice that Debtors intended to reject the Services Agreement until August 27, and based on Debtors' numerous statements that they intended to pay GNI under the Services Agreement, GNI continued to provide services to the Debtors under the Services Agreement in August, 2019 and issued invoices on a regular weekly basis which were acknowledged by Debtors. See Invoices for August 2019 with supporting Time Allocation Worksheets, Exhibit "4". Indeed, GNI had committed to continue providing these services through the end of August, 2019. See call coverage schedule for August, 2019, Exhibit "5".

31. On September 5, 2019, GNI filed the Motion of Global Neurosciences Institute, LLC for Reconsideration of and/or to Vacate Order Rejecting Services Agreement (the "Motion to Vacate", DI 652) based on the fact that the Debtors had not served the Rejection Motion on GNI.

32. GNI and the Debtors resolved the Motion to Vacate by agreeing that the rejection date of the Services Agreement would be August 27, 2019 (the "Rejection Date"). That agreement was confirmed by Order of this Court dated October 16, 2019 (DI 864, the "Consent Order").

## RELIEF REQUESTED AND REASONS THEREFOR

33. Section 503(b)(1)(A) of the Bankruptcy Code provides that "the actual, necessary costs and expenses of preserving the estate" shall be allowed as an administrative expense. 11 U.S.C. § 503(b)(l)(A). In the Third Circuit, section 503(b)(1)(A) "has been broadly interpreted to include 'actual, necessary costs and expenses' that benefit the debtor's estate both directly and indirectly." Elsom v. Woodward & Lothrop, Inc., 1997 WL 476091, *3 (E.D. Pa. 1997) (citing In re B. Cohen and Sons Caterers, Inc., 143 B.R. 27, 28 (E.D. Pa. 1992)). The policy behind section 503(b) is to facilitate the rehabilitation of insolvent debtors by encouraging third parties to provide those debtors with necessary goods and services. See In re B. Cohen and Sons Caterers, Inc., 143 B.R. at 28 (citations omitted). Of note, GNI continues to provide the full range of contractually obligated neurosurgical services to Debtors' St. Christopher's Hospital for Children location.

34. Administrative expenses can arise not only where the debtors have received a direct benefit, but where the acts of the debtors have, through post-petition conduct, harmed third parties and shifted costs that should be borne by the debtors onto such third parties. See Reading

Co. v. Brown, 391 U.S. 471, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968). Such claims may be entitled to administrative priority where a third party relies on the debtors' negligent misrepresentations, even in the absence of benefit to the estate. E.g., In re Women First Healthcare, Inc., 2005 WL 2737436 (Bankr. D. Del. Oct. 21, 2005) (Walrath, J) (stalking horse bidder entitled to administrative expense claim for damages sustained based on its reasonable reliance on debtors' negligent misrepresentation that debtors had properly noticed a sale motion).

35. Moreover, it is well established that if a debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor is obligated to pay for the "reasonable value" of those services as an administrative expense claim. See, e.g., National Labor Relations Board v. Bildisco and Bildisco, 465 U.S. 513, 531 (1984); In re Smurfit-Stone Container Corp., 425 B.R. 735, 741 (Bankr. D. Del. 2010) ("Courts in this District have consistently held that an administrative expense priority is available to contract parties when the debtor enjoys the benefits of the contract pending assumption or rejection."); see also In re Sportsman's Warehouse, 436 B.R. 308, 315 (Bankr. D. Del. 2009) (involving a nonresidential lease for real property but considering section 503); In re Continental Airlines, Inc., 146 B.R. 520, 526 (Bankr. D. Del. 1992) (citing NLRB. v. Bildisco, 465 U.S. 513,531 (1984)); United States v. Dewey Freight System, Inc., 31 F.3d 620, 624 (8th Cir. 1994); In re El Paso Refinery, L.P., 220 B.R. 37, 43 (Bankr. W.D. Tex. 1998); In re Monarch Capital Corp., 163 B.R. 899, 908 (Bankr. D. Mass. 1994).

36. It is presumed that the contract rate is the reasonable value of the services provided to the estate. Smurfit-Stone, 425 B.R. at 741 (citing In re Bethlehem Steel Corp., 291

B.R. 260, 264 (Bankr. S.D.N.Y. 2003)); see also Sportsman's Warehouse, 436 at 314 ("The amount of the benefit to the estate is presumed to be the contract rate .... ").

37. GNI seeks an order of this Court allowing and compelling payment of its administrative expense claim in the amount of $216,022.40.

38. The basis for this request is that GNI provided services to the Debtors during the month of August, 2019 under the Services Agreement, which was not rejected until August 27, 2019.

39. Debtors are likely to argue that the presumption that the contract rate applies is rebutted here because Hahnemann did not actually utilize neurosurgical services during the month of August.

40. The problem with the Debtors' view is that the Services Agreement is set up as a risk sharing agreement. Debtors are paying for the availability of neurosurgical services. If none are needed, that does not mean that Debtors don't have to pay under the contract. If Debtors' position were adopted, then any insurance contract, for example, would be deemed to be without value unless the insurer actually paid a claim during the relevant time frame.

41. Debtors are also likely to argue that the presumption should be rebutted here because Hahnemann apparently had stopped operating by the end of July. However, Debtors' actions, words and inactions estop them from taking that position.

42. In Mr. Crocitto's email of July 25, 2019, Debtors initially took the position that nothing should be due under the Services Agreement because ""Hahnemann discharged their final inpatient today, so the service/coverage is not needed at Hahnemann going forward." Exhibit "3" at 13. That day, however, Mr. Damico challenged that position on the grounds that the Services Agreement had not been rejected. Id. at 12-13. Debtors then paid invoices totaling

$93,261.18, which included the amounts due under the Services Agreement for the last week of July.

43. Remarkably, even though it was *GNI* that first raised the issue of rejection in the communications between the parties, Debtors never countered Mr. Damico's assertion that the Services Agreement was still binding and in effect until August 27th. Indeed, through numerous communications, the Debtors repeatedly made representations that led GNI to believe that the Services Agreement was still in effect and that the only reason payment was not forthcoming was because Debtors could not "swing" the payment or because they did not have proper authorization. E.g. Exhibit "3" at 6. In reasonable and detrimental reliance on these misrepresentations, GNI continued to employ neurosurgical specialists and have them available to Hahnemann on a 24/7 basis at significant cost. Simply stated, Debtors could have easily avoided the entire situation if they had chosen to inform GNI that they had filed the Rejection Motion.

44. As it was, GNI reasonably and detrimentally relied on Debtors' representations that payment was forthcoming in continuing to employ neurosurgical specialists and by having such specialists available during the month of August. GNI could have begun to take steps to avoid these costs via reassignment or termination of the Hahnemann allocated neurosurgical resources if the Debtors had either served GNI with the Rejection Motion or even told GNI informally about it before August 27th. That the Debtors did not do so cannot be held against GNI.

WHEREFORE, GNI respectfully requests that this Court enter an Order, substantially in the form attached hereto, allowing GNI an administrative expense claim in the amount of

$216,022.40, plus interest, costs and, to the extent appropriate, legal fees, and directing the prompt payment of such claim.

DATED:  November 4, 2019

/s/ Christopher D. Loizides
Christopher D. Loizides (No. 3968)
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE  19801
Telephone:  (302) 654-0248
Facsimile:  (302) 654-0728
E-mail:  loizides@loizides.com

*Counsel for Global Neurosciences Institute, LLC*