**EXHIBIT "1"**

## CLINICAL SERVICE CHIEF, NEUROSURGERY COVERAGE AND NEUROSURGERY/TRAUMA ON-CALL COVERAGE SERVICES AGREEMENT

### (GNI – Hahnemann)

**THIS CLINICAL SERVICE CHIEF, NEUROSURGERY COVERAGE AND NEUROSURGERY/TRAUMA ON-CALL COVERAGE SERVICES AGREEMENT** (the "Agreement") is made and entered into as of the later of March 2 2015, or the execution of the Agreement by both parties (the "Effective Date") between Tenet Health System Hahnemann, LLC ("THSH"), a Delaware limited liability company with a business office located at 230 N. Broad Street, Philadelphia, PA 19102, doing business as Hahnemann University Hospital, and Global Neurosciences Institute, LLC ("GNI"), a New Jersey limited liability company with a business office located at 404 South Front Street, Philadelphia, PA 19147. (THSH and GNI are also hereinafter referred to singly as a "Party" and collectively as "Parties").

**WHEREAS**, THSH operates a comprehensive acute care hospital located at 230 N. Broad Street, Philadelphia, PA ("Hospital"), which provides inpatient and outpatient healthcare services, and has been designated as a Level 1 Regional Trauma Center ("Trauma Center"); and

**WHEREAS**, in furtherance of providing, maintaining and further improving the efficiency and quality of the healthcare services THSH provides to patients served through the Hospital and the Trauma Center, THSH desires to develop a Center of Excellence in Neurosurgery (the "Center"), and further desires to contract with GNI to provide the services of a mutually agreed physician as the lead physician for THSH Neurosurgery program (the "Clinical Service Chief") with the goal of assessing, planning, developing, implementing and evaluating a Center of Excellence in Neurosurgery at THSH as well as supporting THSH's role as an "Institutional Operationalization Partner" ("IOP") with Drexel Neurosciences Institute ("DNI") . An IOP is a healthcare facility which aligns with DNI for the purpose of implementing mutually agreed upon clinical, research and teaching activities; and

**WHEREAS**, THSH is also in need of on-call coverage services and on-site coverage services for neurosurgery and neurosurgical trauma call and desires to contract with GNI to provide such services through one or more of its physicians as mutually acceptable to the Parties (each a/the "Physician" and sometimes collectively "Physician," as the text supports); and,

**WHEREAS**, the Clinical Service Chief and each Physician are duly licensed to practice medicine in the Commonwealth of Pennsylvania and board certified in the specialty of neurosurgery and are able fulfill all of the requirements established by THSH.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE ONE
## ENGAGEMENT

**Section 1.1**    Engagement.  THSH hereby: (a) engages GNI on an exclusive basis to provide, medical administrative services for the Center Programs (as that term is defined at Section 6.1 of this Agreement), which services shall be delivered through THSH's Neurosurgery Clinical Service Chief, in accordance with Section 1.2 of this Agreement; and (b) engages GNI to provide the "Coverage Services," as that term is defined in Section 1.3 of this Agreement.

**Section 1.2**    Clinical Service Chief Services.  During the Term of this Agreement, GNI shall provide the services of a mutually agreed physician to serve as THSH's Neurosurgery Clinical Service Chief.  The initial Clinical Service Chief shall be Dr. Erol Veznedaroglu.  As approved by Hospital, which approval shall not be unreasonably withheld, a Supplemental Physician may provide Clinical Service Chief Services on behalf of Dr. Veznedaroglu. The Clinical Service Chief shall provide those administrative services to THSH as set forth more fully at Appendix A which is attached to this Agreement (the "Clinical Service Chief Services"). Clinical Service Chief Services and Coverage Services are together "Services". The Clinical Service Chief shall also serve as a liaison between THSH and the governing board/council of DNI during THSH's participation as an IOP with DNI, for the purpose of advising THSH in connection with implementation of clinical activities consistent with said participation.

**Section 1.3**    On-Call and On-Site Coverage Services.  During the Term of this Agreement, Physicians, including the Clinical Service Chief (or a Supplemental Physician as defined by Section 1.5) shall provide, in accordance with a schedule established by GNI and acceptable to THSH, unrestricted, general, spine, and trauma neurosurgery call coverage on a non-exclusive basis as set forth more fully at Appendix B which is attached to this Agreement and incorporated herein (the "On-Call Coverage Services"), as well as onsite not less than eight (8) hours per day Monday through Friday (excepting Hospital-recognized holidays) evaluative, consultative and surgical clinical services to support the development and growth of THSH's neurosurgical program, including without limitation, general, spine, neurovascular, brain tumor and trauma in-patient neurosurgery programs as set forth more fully at Appendix B (the "On-Site Coverage Services") .  Physicians not employed by GNI who hold clinical privileges in neurosurgery at Hospital and who have equivalent training in neurosurgical techniques to GNI's physicians, as determined by Clinical Service Chief, shall, upon request, be assigned by GNI to provide On-Call Coverage Services on an equal rotational basis with Physicians hereunder. The On-Call Coverage Services and the On-Site Coverage Services are referred to collectively in this Agreement as the "Coverage Services."

**Section 1.4**    [intentionally deleted]

**Section 1.5**    Physician Non-Exclusivity.  THSH acknowledges and agrees that neither the Clinical Service Chief, nor any Physician shall not be required to provide clinical or administrative services exclusively to/through THSH, and that the Clinical Service Chief and any Physician may provide clinical or administrative neurosurgery services to/through other parties, including but not limited to services that may be similar to the Services to/through other hospitals or health systems, so long as the Clinical Service Chief Services and Coverage Services are provided by GNI as set forth in this Agreement and the confidential information of THSH is not used or disclosed, except for the benefit

2

of THSH, or as an aggregate/deidentified data set that GNI has made available to, or prepared for the benefit of, THSH as part of GNI's Practice Analytics, in which event the data shall be in de-identified form. Without limiting the preceding sentence, GNI or the Clinical Service Chief shall inform Hospital's Chief Executive Officer ("CEO") or his designee of any extended periods (i.e., of one week or more) during which the Clinical Service Chief will be unavailable due to vacation, professional meetings, or other personal or professional commitments, and THSH shall accommodate said requests provided that (1) such absences do not exceed twenty days per year. GNI shall not replace the Clinical Service Chief or substitute another physician under this Agreement without the approval of THSH. Notwithstanding the foregoing, upon notice to THSH, GNI may use other Physicians to provide the Services (each a "Supplemental Physician") as long as GNI and the Supplemental Physician meet all of the applicable requirements and representations set forth in this Agreement. For purposes of this Section 1.5, Practice Analytics refers to those certain evidence-based, data-driven protocols, procedures and methodologies of relevance to Center Programs that GNI has gathered and/or developed from its experiences performing similar services in other settings, from the proprietary healthcare market, service and/or provider research.

Section 1.6    Recommendations as to Supplemental Physicians; Recruitment by GNI. GNI shall consider THSH's recommendations as to physicians and other providers to recruit in connection with development of the Center ("Recruits"). To the extent that any such Recruits are mutually approved by THSH and GNI, GNI will be responsible for such recruitment, with the collaboration of THSH, including but not limited to information relative to the Center, the Hospital, the Trauma Center and, as may be applicable DNI, as well as information in connection with the Services and other neuro-health services and needs (which may be services and/or needs not delivered by THSH), with the objective that said Recruit will become an employee of GNI and render Services in connection with this Agreement, as well as other neuro-health services, to patients in the community(ies) served by Hospital and/or the Trauma Center, as well as other institutions with neuro-health capabilities ("Recruitment Services").

Section 1.7    [intentionally deleted]

Section 1.8    [intentionally deleted]

Section 1.9    Co-Management Services. In furtherance of quality health care and the objectives of the Center, not later than the first anniversary of the Commencement Date, the Parties shall consider and, upon agreement, shall enter into good faith negotiations in connection with the development of a broader, benchmark/metrics-driven arrangement in the form of a co-management agreement, or substantially similar arrangement ("Co-Management Services").

Section 1.10    Community Presence. In furtherance of quality health care and the objectives of the Center, THSH acknowledges and agrees that GNI shall be permitted to provide professional services at other locations in GNI's sole and exclusive discretion, subject only to its performance of Coverage Services as provided herein. Additionally, if THSH becomes an IOP, it shall share in community outreach and marketing activities of DNI on a basis reasonably related to its representation in these activities, up to $40,000, and GNI shall share in such activities on a basis reasonably related to its representation therein up to $20,000, with the understanding that Drexel University College of Medicine shall contribute an amount up to $40,000, as reflects its proportional representation in the promotional materials.

3

## ARTICLE TWO
## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

**Section 2.1**   Representations and Warranties of GNI.  In order to induce THSH to enter into this Agreement, GNI represents and warrants as follows:

(a)    that it has the power to execute, deliver, and perform this Agreement, and that this Agreement, when executed by it, will be valid and enforceable in accordance with its terms; and

(b)    that the execution, delivery, and performance of this Agreement will not violate any provision of law, rule, regulation, order or decree of any court or governmental authority, or upon application or adjudication of available waivers, defenses and/or remedies, will violate or conflict with, result in a breach of or constitute a default under, any indenture or agreement by which it or Clinical Service Chief and/or any Physician may be bound, or to which it, Clinical Service Chief or any Physician is a party, including but not limited to any contracts for rendering of professional services which restrict or limit Clinical Service Chief's/Physician's right to execute and perform under this Agreement; and

(c)    that there are no proceedings by or before any governmental commission, board, bureau or other administrative agency or any judicial action, suit or proceeding pending or, to its knowledge threatened against or, affecting the Clinical Service Chief or any Physician providing Clinical Service Chief Services pursuant to this Agreement or any professional licenses, privileges or properties of Clinical Service Chief or any Physician providing Clinical Service Chief Services pursuant to this Agreement; and

(d)    that neither Clinical Service Chief nor any Physician providing Clinical Service Chief Services pursuant to this Agreement is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any material agreement, contract or instrument to which Clinical Service Chief or any Physician is a party or by which Clinical Service Chief or such Physician is bound; and

(e)    that no event has occurred or failed to occur which constitutes, or which with the giving of notice or the passage of time, or both, would constitute, an event of default under this Agreement; and

(f)    that Clinical Service Chief and each Physician is licensed in good standing to practice medicine in the Commonwealth of Pennsylvania and is board certified in neurosurgery and that neither Clinical Service Chief's nor any Physician's license to practice medicine in the Commonwealth of Pennsylvania (the "Commonwealth") or in any other jurisdiction has ever been denied, suspended, revoked, terminated, relinquished under threat of disciplinary action, or restricted in any way; and

(g)    that Clinical Service Chief and each Physician has been issued a current narcotics number by the Commonwealth and the United States Drug Enforcement Agency and neither Clinical Service Chief nor any Physician's Drug Enforcement Agency number has ever been denied, suspended, revoked, terminated, relinquished under threat of disciplinary action, or restricted in any way; and

4

(h)    that as of the Effective Date of this Agreement, Clinical Service Chief and each Physician shall hold current, unrestricted medical staff membership and clinical privileges sufficient to the full performance of the Services at Hospital and neither Clinical Service Chief's nor any Physician's medical staff privileges at any health care facility have ever been denied, suspended, revoked, terminated, relinquished under threat of disciplinary action, or made subject to terms of probation or any other restriction; and

(i)    that neither it nor Clinical Service Chief nor any Physician providing Clinical Service Chief Services or On-Call Services pursuant to this Agreement is, nor ever has been determined to be, a Sanctioned Provider, as defined by Appendix C attached hereto and incorporated by reference, by any federal, state or local government, regulatory body or agency; and

(j)    that no part of the aggregate compensation paid or to be paid by GNI to any Physician shall take into account the volume or value of referrals or other business generated by such Physician for THSH and such Physician's compensation as it relates to the subject matter(s) of this Agreement is and will be, at all times during the term of the Agreement, be fair market value for services actually provided by such Physician; and

(k)    that it will provide direction and counseling to Physicians so that productivity is maximized with regard to the services Physicians perform under this Agreement.

Each of the representations and warranties set forth herein shall be continuing and in the event any such representation or warranty fails to remain true and accurate during the Term, GNI shall immediately notify THSH.

Section 2.2    Representation and Warranties of THSH.  In order to induce GNI to enter into this Agreement, THSH represents and warrants as follow:

(a)    that it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and it has the power to execute, deliver, and perform under this Agreement; and

(b)    that, the execution, delivery, and performance of this Agreement will not violate any provision of law, rule, regulation, order or decree of any court or governmental authority, or violate or conflict with, result in a breach of or constitute, a default under any indenture or agreement by which it may be bound or to which it is a party, including but not limited to any contracts for rendering of professional services at THSH which restrict or limit THSH's right to execute and perform under this Agreement; and

(c)    that it is licensed by the Pennsylvania Department of Health as a general hospital, and has received a Level I trauma center designation.

Each of the representations and warranties set forth herein shall be continuing and in the event any such representation or warranty fails to remain true and accurate during the Term, GNI shall immediately notify THSH

## ARTICLE THREE
## TIME RECORDS/COMPLIANCE

**Section 3.1**    Time Records.  The Parties agree that the Clinical Service Chief shall record promptly and maintain all information pertaining to the performance of the Clinical Service Chief Services as defined in Appendix A.  Such time records shall include and be limited to completion of the monthly "Time Allocation Worksheets" attached hereto as Appendix D, containing such detail as shall be required by THSH.  Completion of these records shall be the responsibility of GNI and copies of completed Time Allocation Worksheets shall be forwarded to the attention of THSH's designated representative by the tenth (10th) day of the month immediately following the month in which the Services represented in the Time Allocation Worksheet were performed.

**Section 3.2**    Preservation of Time Records.  All time records as identified in this Agreement shall be maintained by GNI.

**Section 3.3**    Failure to Comply.  Compensation shall only be paid to GNI for the Clinical Service Chief Services with respect to which the requirements of Section 3.1 are satisfied.  For the avoidance of doubt, compensation for any Clinical Service Chief Services which is not recorded on Time Allocation Worksheets and timely submitted to THSH shall be forfeited by GNI.

**Section 3.4**    Corporate Compliance.  GNI understands and acknowledges that THSH has a Corporate Compliance Plan ("Program") and that THSH promotes a culture that fosters the prevention, detection and resolution of instances of misconduct.  In furtherance thereof, GNI, Clinical Service Chief and each Physician shall comply with the Program during the Term of this Agreement.  .  GNI represents that it, Clinical Service Chief and each Physician are familiar with the THSH' Corporate Compliance policies at set forth at [http://www.THSHmed.org/about/compliance.php] and will follow same and shall promptly review and execute all necessary compliance documents required by THSH.  GNI also agrees that the Clinical Service Chief and each Physician shall participate in required compliance training. GNI, Clinical Service Chief and each Physician shall immediately notify the THSH' Compliance Officer of any violation of any applicable law, regulation, third party payer requirement or breach of the THSH' policies of which GNI, Clinical Service Chief or any Physician becomes aware during the Term (as defined below) of this Agreement.  Further, the parties to this Agreement certify that they shall not violate the Anti-Kickback Statute and Stark Law, and shall abide by the Deficit Reduction Act of 2005, as applicable.

## ARTICLE FOUR
## COMPENSATION

**Section 4.1.**    Compensation.

For each hour of medical administrative service provided by Clinical Service Chief or an approved Supplemental Physician, as the same are documented on Time Allocation Worksheets, THSH shall pay GNI Four Hundred Twenty Two Dollars ($422.00) per hour up to a maximum amount of Sixty Seven Thousand Five Hundred Dollars ($67,500.00) per month.  In no event shall the full amount of compensation paid to GNI in the aggregate for Clinical Service Chief Services during any year covered by this Agreement exceed Eight Hundred Ten Thousand Dollars ($810,000.00).

6

(a)     For the provision of the On-Call Coverage Services, THSH shall pay to GNI a daily amount of One Thousand Four Hundred Dollars ($1,400) for 24-hour per day/365-day per year trauma call and One Thousand Two Hundred Sixty Dollars ($1,260) for each 24-hour on-call assignment performed by GNI. For the provision of On-Site Coverage Services, THSH shall pay to GNI a monthly amount of Seventy Two Thousand Eight Hundred Twenty Five Dollars ($72,825).

(b)     The foregoing payment amount for On-Call Coverage Services and On-Site Coverage Services is determined to be fair market value provided that Group does not receive professional collections for its Services hereunder an amount in excess of $744,200 per year. Each month during the Term, Group shall provide THSH with a report of its professional collections for services delivered to THSH patients ("THSH Collections"), whether at THSH, in Group's separate offices or any other location. The report shall be delivered not later than the tenth (10th) day of the month for TSHS Collections in the prior month. If THSH Collections exceed Sixty Two Thousand Seventeen Dollars (S62,107) in any month ("Monthly Collections Cap"), THSH's next payment to Group shall be reduced by the amount of THSH Collections over the Monthly Collections Cap or, if at the end of the Term, Group shall repay the excess of THSH Collections over the Monthly Collections Cap to THSH.

Section 4.2     Invoicing and Payment. GNI will invoice THSH monthly, in arrears, for all of the services referenced in Section 4.1 of this Agreement. THSH agrees to pay all invoices within thirty (30) days of invoice. Overdue invoices may be subject to interest to accrue at a rate of four percent (4%) per annum.

## ARTICLE FIVE
## PARTIES' RIGHT TO AMEND TERMS

Section 5.1     Amendment of Terms. THSH and GNI agree that THSH and GNI shall jointly have the right to modify, alter or amend the terms of compensation to GNI as set forth herein as may be required to bring this Agreement into compliance with changes in or interpretation of the applicable regulations for Medicare, any other third-party reimbursement program or any other regulatory or accrediting body in relation to THSH or the Program or to permit either party to submit claims for its patient care services to any payer consistent with applicable law. If an amendment cannot be agreed upon by the Parties within thirty (30) days after notice of the desire to modify the Agreement or such shorter time period required to comply with the change in law or interpretation, the Agreement may be terminated by either Party. Any interpretation of a regulation which shall result in a loss of reimbursement to GNI for the professional medical services performed by any Physician under this Agreement or to THSH for hospital services provided to Hospital to any patient is hereby recognized and agreed to require modification, alteration or amendment of the term or terms resulting in the loss of reimbursement in such fashion that any future loss of reimbursement is eliminated.

Section 5.2     Adjustment to Compensation Calculation.     As of each anniversary of the Effective Date, the compensation payable to GNI pursuant to Section 4.1 above shall be automatically adjusted by multiplying the then-current compensation amount by the Change in CPI. "Change in CPI" means a fraction, the numerator of which is the difference obtained by subtracting CPI for the third calendar month preceding the Effective Date (the "Base CPI") from CPI for the third calendar month preceding the first anniversary thereof, and the denominator of which is the Base CPI. The adjustment to

7

compensation shall not exceed three percent (3%) per annum.  Notwithstanding the foregoing: (i) if THSH determines that the adjusted compensation exceeds fair market value on the basis of an independent third party valuation report, THSH shall have the right to reduce the adjusted compensation to the highest fair market value amount determined by the third party valuation report, subject to agreement of the parties; (ii) if GNI determines that the adjusted compensation is below fair market value on the basis of an independent third party valuation report, GNI shall have the right to increase the adjusted compensation to the lowest fair market value amount determined by the third party valuation report, subject to agreement of the parties; and (iii) if the parties are unable to reach agreement on an adjusted compensation amount within thirty days, which agreement shall be documented by an amendment to this Agreement, either party may terminate this Agreement upon notice to the other party.

**ARTICLE SIX**
**EQUIPMENT, FACILITIES, SUPPLIES AND PERSONNEL**

**Section 6.1**    Provision of Equipment, Utilities and Supplies by THSH.    THSH will make available to GNI, the Clinical Service Chief and the Physicians for their use as it specifically applies to those responsibilities in this Agreement, space, equipment, fixtures, facilities and supplies necessary for the performance of the Clinical Service Chief Services and Coverage Services during the term of this Agreement, as necessary for the development of the Center and the operation of a comprehensive neurosurgical program, inclusive of Level I Trauma Center, dedicated Neuro ICU, Operating Room equipment, Endovascular Interventional Suite Equipment appropriate for neurosurgical procedures, Anesthesia and ER (the "Center Programs"), all as reasonably determined by THSH in consultation with GNI. The Clinical Service Chief shall have ultimate authority to recommend all resources that will be associated with the Center Programs. GNI will be provided with an office/offices for utilization by the Clinical Service Chief and/or the Physicians, provided that such office/offices shall only be used for the sole purpose of implementing this Agreement and shall not be used in any instance for GNI's or any Physician's private practice. THSH will provide a dedicated parking space for the Clinical Service Chief as well as access to a parking area dedicated for use by the Physicians providing On-Call Services on the same basis that parking is made available by THSH to other physicians providing on-call services to the facility, provided that said Physicians shall only use said parking space when performing On-Call Services pursuant to this Agreement.  All such space, equipment, fixtures, facilities and supplies shall remain the property of THSH.  THSH will also provide, at its expense, utilities and services such as heat, air conditioning, water, gas, electricity, telephone, etc., needed for the operation of the Center Programs, as specifically applies to those responsibilities in this Agreement.

**Section 6.2**    Maintenance of Facilities by the THSH.    THSH will maintain the aforementioned equipment and facilities for the performance of the Clinical Service Chief Services, and On-Call Services at a level appropriate for maintaining professionally acceptable levels of professional practice relative to the Center Programs, as determined by THSH in consultation with GNI.

**Section 6.3**    Provision of Personnel by the THSH.    THSH will provide appropriate non-physician, clinical, technical, and housekeeping personnel as shall be reasonably necessary for the performance of Coverage Services at a level appropriate for maintaining professionally acceptable levels of professional practice relative to the Center Programs, as from a clinical perspective, this will include sufficient Physician Assistant FTEs to provide appropriate coverage in connection with the Coverage Services on a 24/7/365 basis (currently THSH employs three (3) Physician Assistants to handle these

8

responsibilities), nursing staff for the Neuro ICU, Operating Room staffing, Endovascular Interventional Suite staffing, and Anesthesia staffing as determined by THSH in consultation with GNI.

**Section 6.4**    Additional Physician Requests.    Neither GNI nor any Physician shall have any authority whatsoever to purchase, procure or otherwise obtain any services, supplies, space or equipment or any item or goods of any kind or to engage, hire, replace or retain any physician or non-physician employees on behalf of THSH or otherwise or to seek reimbursement for same from THSH.    Any requests by GNI for services, supplies, space, equipment, physician or non-physician employees or reimbursement for same may be submitted in writing to the THSH explaining GNI's need and identifying the benefit to the Center Programs and its patients.    It is expressly agreed by the Parties that only THSH shall undertake the purchase or procurement of any such services, supplies, space, equipment, item or goods of any kind, and only THSH shall hire, engage, replace or retain any personnel which may be the subject of such request.

**Section 6.5**    Unsatisfactory Practice Environment.    Both parties acknowledge and agree that the clinical environment materially affects GNI's performance of the Services and delivery of patient services. If GNI is dissatisfied with the resources provided by THSH pursuant to Sections 6.1, 6.2 and/or 6.3, GNI shall communicate such dissatisfaction in to THSH, and the parties will work in good faith to resolve the dissatisfaction.    If the personnel, equipment or facility issues are not resolved to the reasonable satisfaction of GNI, taking into account Center and THSH resources and other factors that may reasonably influence THSH's performance of its obligations under Sections 6.1, 6.2. and 6.3, and such unresolved issues materially and adversely affect GNI, GNI  may deliver THSH a request for resources ("Request") specifying the causes of its dissatisfaction.  If THSH does not satisfy the Request within 30 days, GNI shall have fifteen (15) days to request a conflict resolution meeting with one representative of GNI, one representative of THSH and one person mutually agreeable to the GNI representative and the THSH representative (the "Neutral Representative").  If the conflict resolution meeting does not result in agreement for resolution of the issues presented in the Request and unresolved by THSH, and the Neutral Representative determines in writing that the failure to fulfill the Request materially and adversely interferes with GNI's ability to perform the Services and THSH was not reasonable in not fulfilling the Request ("Irreconcilable Conflict"), GNI may terminate this Agreement upon thirty (30) days' notice to THSH.

## ARTICLE SEVEN
## INSURANCE

**Section 7.1**    THSH Liability Insurance.    GNI represents that the Clinical Service Chief and any Physician providing Clinical Service Chief Services or Coverage Services shall be covered under GNI's general/professional liability insurance for claims that arise out of or relate to the Clinical Service Chief Services or Coverage Services provided under this Agreement.    THSH's general and/or professional liability insurance or self-insurance shall in no way cover the provision of professional services by the Clinical Service Chief or any Physician, which coverage shall be the sole responsibility of GNI .

**Section 7.2**    Physician Professional Liability Insurance.    GNI shall secure and maintain at all times during the Term, at GNI's expense, professional liability insurance covering GNI, all Physicians

9

and all of GNI's employees, with a carrier licensed to do business in the State at the following minimum limits:

$1,000,000 per claim/occurrence and $3,000,000 annual aggregate

GNI shall provide prior notice to THSH related to any changes to its current insurance carrier. Such insurance shall not be cancelable except upon 30 days' prior written notice to THSH. Such coverage shall be primary and non-contributory. GNI shall annually provide THSH a certificate of insurance evidencing such coverage and coverage extensions. This coverage shall be either (1) on an occurrence basis or (2) on a claims-made basis. If the coverage is on a claims-made basis, GNI hereby agrees that prior to the effective date of termination of GNI's current insurance coverage, GNI shall purchase, at GNI's sole expense, either a replacement policy annually thereafter having a retroactive date no later than the Effective Date or unlimited tail coverage in the above stated amounts for all claims arising out of incidents occurring prior to termination of GNI's current coverage or prior to termination of this Agreement and GNI shall provide THSH a certificate of insurance evidencing such coverage upon request.

**ARTICLE EIGHT**
**RECORDS AND CONFIDENTIALITY**

**Section 8.1**    <u>Confidential Information of the Parties</u>. GNI acknowledges that in the course of this Agreement, GNI, Clinical Service Chief and/or Physician(s) will have access to certain proprietary information of THSH, including but not limited to financial, operational, compilations, policies, procedures, analyses, studies and other information used in connection with THSH (collectively, "<u>THSH Proprietary Information</u>"). THSH acknowledges that in the course of this Agreement, THSH may have access to certain proprietary information of GNI ("<u>GNI Proprietary Information</u>"). THSH Proprietary Information and GNI Proprietary Information shall be referred to collectively herein as the "<u>Proprietary Information</u>". During the Term of this Agreement and at all times thereafter, each Party agrees that it shall not, and that it shall not cause or permit (i) any employee, officer, director, manager, owner, other affiliate or agent of such Party , (ii) any officer, director, manager, shareholder, owner, employee or other affiliate or agent of any entity in which such Party owns an interest, or (iii) any professional advisors of such Party to (such persons in (i), (ii) and (iii) collectively, referred to as the "<u>Representatives</u>" of a Party) to:

(a)    Except for the express and limited purposes set forth in this Agreement and in no event for any purpose other than the benefit of the disclosing Party, use, disclose, publish, or otherwise disseminate, any of the Proprietary Information of the other Party; or

(b)    Use, disclose, publish, or otherwise disseminate any Proprietary Information of the other Party to any third parties other than its Representatives.

Notwithstanding the foregoing, the obligations of the Parties and their Representatives under this Section 8.1 are subject to the following exceptions: (i) if such Proprietary Information becomes a part of the public domain through publication or otherwise but through no fault of the Party or its Representatives receiving the information from the disclosing Party; (ii) a receiving Party or its Representatives are required to disclose such Proprietary Information received from a disclosing Party

10

by court order or applicable law; provided, however, that if any Party or any of its Representatives becomes legally obligated to disclose said Proprietary Information of the other Party, it shall give prompt notice to the other Party prior to disclosure in order to afford the other Party an opportunity to seek an appropriate protective order or other remedy with respect to said disclosure; and (iii) upon the written consent of the other Party.

**Section 8.2**    Restrictive Covenant.  In recognition of the THSH Proprietary Information which will be disclosed to GNI in the performance of this Agreement and to assure the availability of Physicians to perform the Services, GNI agrees that it will not, and it will not allow any Physician to, perform any administrative, management, consulting, development, or other like services to any hospital associated with Temple University, University of Pennsylvania Health System, or Jefferson University Hospitals during the Term or within the period of twelve (12) months following the expiration or other termination of this Agreement, except as the parties may agree is acceptable for collaborative purposes. This covenant shall not limit the ability of a Physician to refer patients to or provide professional medical services at any other licensed healthcare facility during the Term or at any time thereafter.

**Section 8.3**    Survival.   The provisions of this Article shall survive expiration or other termination of this Agreement, regardless of the reason for such expiration or termination.

### ARTICLE NINE
### MEDICARE ACCESS TO BOOKS AND RECORDS

**Section 9.1**    Access to Books and Records.   In the event, and only in the event, that Section 952 of P.L. 96-499 (42 U.S.C. Section 1395x(v)(1)(I)) is applicable to this Agreement, GNI agrees as follows:

(a)    Until the expiration of four (4) years after the furnishing of such Services pursuant to this Agreement, GNI shall make available, upon written request to the Secretary of the federal Department of Health and Human Services or upon request to the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement, and books, documents and records of GNI and the Physician that are necessary to certify the nature and extent of the cost of the Services provided pursuant to this Agreement;

(b)    GNI shall notify THSH immediately of any request for access to books and records described above.  In addition, GNI shall indemnify and hold THSH harmless from any liability arising out of any refusal by GNI to grant access to books and records as required above.

11

## ARTICLE TEN
## INDEPENDENT CONTRACTOR

**Section 10.1**    Independent Contractor.    In the performance of all obligations of GNI, the Clinical Service Chief and each Physician shall be deemed to be an independent contractors, and THSH shall not withhold or in any way be responsible for the payment of any federal, state or local income or occupational taxes, F.I.C.A. taxes, unemployment compensation or workers' compensation contributions, vacation pay, sick leave, retirement benefits or any other payments for or on behalf of the Clinical Service Chief or any Physician.    All such payments, withholding and benefits are the responsibility of GNI and GNI shall indemnify and hold the THSH harmless from any and all loss or liability arising with respect to such payments, withholdings and benefits.    Neither the Clinical Service Chief nor any Physician shall be considered an employee of THSH for any purpose whatsoever.    Nothing herein shall be deemed to create a property interest on the part of GNI, Clinical Service Chief or any Physician in THSH's property, facilities or equipment.

## ARTICLE ELEVEN
## INDEMNIFICATION

**Section 11.1**    Indemnification.    Each Party shall indemnify, defend and hold the other Party harmless from all claims, loss, damage or injury of any kind or character (including, without limitation, attorneys' fees and costs) to any person or property caused by or arising from any negligent or wrongful act or omission of the indemnifying Party.

## ARTICLE TWELVE
## COOPERATION IN THE EVENT OF A CLAIM

**Section 12.1**    Cooperation in the Event of a Claim/Lawsuit.    Subject to the terms of the respective professional liability and malpractice insurance policies, each of the Parties hereto shall cooperate with each other in the defense of claims against the other Party in relation to the Center Programs and the Services.

## ARTICLE THIRTEEN
## TERM AND TERMINATION

**Section 13.1**    Term.    Unless and until sooner terminated as hereinafter provided, the Term of this Agreement shall be for a period of three (3) years, commencing as of  the Effective Date (the "Commencement Date") (the "Term").    This Agreement may be renewed for additional one (1) year periods upon mutual written agreement of the Parties and such additional one (1) year periods shall be included in the Term.

**Section 13.2**    Termination for Cause -- THSH.    Notwithstanding the foregoing and in addition to other immediate termination rights or other termination rights set forth in this Agreement, this Agreement may be terminated immediately by THSH, irrespective of any notice to GNI, upon the occurrence of any of the following:

(a)     GNI's or Clinical Service Chief's material failure to perform the duties required under this Agreement or as required by policy of THSH, which failure is not cured within thirty (30) days next following the date of written notice from THSH specifying such failure;

(b)     In the event of GNI's or any Physician's, ineligibility to receive reimbursement from the Medicare or Medicaid programs, or exclusion or suspension from the Medicare or any Medicaid program;

(c)     In the event that GNI breaches any of the representations or warranties contained in Section 2.1 of this Agreement; and

(d)     In the event that GNI is the subject of an acquisition or merger.

**Section 13.4**    Termination for Cause -- GNI.    Notwithstanding the foregoing and in addition to other immediate termination rights or other termination rights set forth in this Agreement, this Agreement may be terminated immediately by GNI, irrespective of any notice to THSH, upon the occurrence of any of the following:

(a)     THSH' material failure to perform the duties required under this Agreement, which failure is not cured within thirty (30) days next following the date of written notice from GNI specifying such failure;

(b)     In the event THSH's license to operate the Hospital is terminated or suspended or a restriction is placed thereon by licensing authorities which adversely affects, or with the passage of time will adversely affect, the development of the Center, the operation of the Center Programs, or THSH's ability to participate in DNI;

(c)     In the event of THSH' ineligibility to receive reimbursement from the Medicare or Medicaid programs, or its exclusion or suspension from the Medicare or any Medicaid program, or its status as a Sanctioned Person; and

(d)     In the event THSH breaches any of the representations or warranties contained in Section 2.2 of this Agreement; and

(f)     Any event that would preclude, prevent or otherwise adversely affect THSH'sparticipation or ability to participate in DNI.

(g)     in the event of an Irreconcilable Conflict pursuant to Section 6.5 of this Agreement.


### ARTICLE FOURTEEN
### BILLING AND FEE COLLECTION

**Section 14.1**    GNI Professional Services Fees.    GNI shall bill and collect for all professional services performed by its Physicians.    The professional fees to be charged for the services shall be determined according to GNI's usual fee schedule.    Any fees or other compensation which are paid

directly to THSH in connection with the professional services of Physicians hereunder (including co-payments collected at the time of a patient's visit) shall be paid over to GNI.

**Section 14.2**    Hospital Fees.  THSH shall be entitled to bill and collect for its sole account for all hospital fees performed by THSH pursuant to Sections 1.3 of this Agreement.

**Section 14.3**    Provision of Billing Information to GNI.  THSH shall make available to GNI's billing office prompt access to all patient billing and demographic information in its possession.

## ARTICLE FIFTEEN
## MEDICAL STAFF PRIVILEGES

**Section 15.1**    Special Acknowledgment.  In order to induce THSH to execute this Agreement, GNI, by executing this Agreement, does hereby specifically acknowledge and covenant that the rights and privileges of the Clinical Service Chief and each Physician providing services under this Agreement are conditioned upon the Clinical Service Chief and Physician's appointment and subsequent reappointment to the Medical Staff and obtaining and maintaining of clinical privileges at THSH.

**Section 15.2**    Medical Staff Membership.  GNI and each Physician expressly acknowledges and agrees that the termination or expiration of this Agreement, for whatever reason, shall not entitle the Clinical Service Chief or any Physician to challenge or dispute the termination or expiration of the Agreement through the due process procedures established for members of the Medical Staff by THSH or the Bylaws.

**Section 15.3**    Physician Acknowledgement.  GNI will provide a copy of the provisions comprising Article Fifteen this Agreement to the Clinical Service Chief and each Physician and, upon request of THSH will provide THSH evidence of the same by providing THSH with copies of Sections 15.1, 15.2 and 15.3 of this Agreement initialized by the Physicians.

## ARTICLE SIXTEEN
## MISCELLANEOUS

**Section 16.1**    Section Headings.  The section headings in this Agreement are for ease of reference only and are not intended to govern, limit or affect the meanings of the several sections.

**Section 16.2**    Integration.  This Agreement and the attachments thereto incorporate the entire understanding between the Parties with respect to the subject matter hereof and supersedes any and all prior understandings, written or oral. Any earlier agreements, discussions or negotiations between the Parties are null and void and shall be of no further effect after the date hereof.

**Section 16.3**    Amendments.  No amendments or supplements to this Agreement shall be binding unless in writing and signed by both Parties hereto.

**Section 16.4**    Waiver.  Failure by either Party to insist upon strict compliance with any of the terms, covenants or conditions hereof in any instance shall not be deemed a waiver by such Party of any such term, covenant or condition, nor shall any waiver or relinquishment of any right or power hereunder

117978079_1

at any one or more times be deemed a waiver or relinquishment of such right or power at any time or times.

**Section 16.5**    <u>Severability</u>.  If for any reason any provision of this Agreement shall be deemed by a court of competent jurisdiction to be legally invalid or unenforceable, then the validity and enforceability of the remainder of this Agreement shall not be affected and such provision shall be deemed modified to the minimum extent necessary to make such provision consistent with applicable law, and, in its modified form, such provision shall then be enforceable.

**Section 16.6**    <u>Assignability</u>.  This Agreement shall not be assignable to any other person or entity (via subcontract, merger, sale, succession-in-interest, corporate/organizational affiliation or otherwise) unless specifically agreed in writing and in advance by the other Party.

**Section 16.7**    <u>Notices</u>.    Unless otherwise stated in this Agreement, all notices, demands, and requests which may or are required to be given by either Party to the other shall be in writing and be deemed given when actually received by certified mail, return receipt requested, or personal delivery or by mail, postage prepaid, or by Federal Express or other nationally-recognized overnight delivery service, sent to the party at their address set forth in the Preamble of this Agreement or otherwise specified in writing delivered or mailed in the same manner.  Service upon the CEO of THSH shall be deemed proper service upon THSH.

**Section 16.8**    <u>Governing Law</u>.  This Agreement shall be executed and delivered in Pennsylvania and shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.  The Parties agree that all litigation concerning this Agreement shall be brought in the Commonwealth Court of Philadelphia County.

**Section 16.9**    <u>Rule of Construction</u>.  The Parties agree and acknowledge that this is a negotiated agreement and that the rule of construction that any ambiguities are to be construed against the drafting party shall not apply.

**Section 16.10** <u>Days</u>.  For calculation of any time period, any reference to days herein shall include business days, weekends and holidays.

**Section 16.11** <u>Further Assurance</u>.  GNI agrees that it will execute and deliver such documents or information as may be deemed reasonably advisable or necessary by THSH, its legal counsel or its accountants in order to carry out the purposes of this Agreement.

**Section 16.12** <u>Illegality</u>.  This Agreement is entered into with the intention of complying with all applicable laws and regulations. In the event that performance of any provision of this Agreement could, under any reasonable interpretation of any applicable state, federal or local law or regulation, result in the potential loss of the THSH's Hospital license from the Pennsylvania Department of Health or its ability to participate in the Medicare program or any state Medicaid program, or result in a violation of any law or regulation, this Agreement shall be amended to the extent possible to comply with and permit the transaction to meet permitted laws and regulations. If this Agreement, after negotiations in good faith cannot be amended to permit the transaction contemplated hereunder to fall within such laws or regulations as aforesaid, then at the option of either party this Agreement may be terminated.

**Section 16.13** <u>Non-Referral Relationship</u>.  Nothing in this Agreement is to be construed to require or suggest referrals by either Party to the other, or to restrict the Physician's professional judgment in the use of facilities and services the Physician deems necessary or desirable in order to provide proper and appropriate treatment or care to a patient or to comply with the wishes of the patient. No Party shall receive any compensation or remuneration based upon the volume or value of referrals or other business generated by the Parties, if any.

**Section 16.14** <u>Arm's Length Negotiation</u>.  This Agreement was executed after an arm's length negotiation between the Parties and reflects the conclusion of the Parties that this Agreement is in the best interest of all Parties hereto, and of the community served by THSH.

**IN WITNESS WHEREOF**, the parties hereby have executed this Agreement as of the day and year first above written.

TENET HEALTH SYSTEM
HAHNEMANN, LLC

By: _____ 3/6/15
    Name: Michael P. Halter
    President & CEO

GLOBAL NEUROSCIENCES
INSTITUTE, LLC

By: _____ 3/6/15
    Name:  Erol Veznedaroglu, M.D.
    Title: President

16

117978079_1

## APPENDIX A

## CLINICAL SERVICE CHIEF SERVICES

The Clinical Service Chief Services shall include but not be limited to those items listed below:

❖ Perform duties of Clinical Service Chief as set forth in Hospital's Medical Staff Bylaws, a copy of which will be provided to GNI.

❖ Efficiently managing staff and ancillary support related to the neurosurgery service line.

❖ Developing and updating policies and protocols related to neurosurgery patient care for optimal experience across care settings and, upon approval by Hospital, implementing such policies and protocols.

❖ Monitoring and ensuring neurosurgery staff behavior and adherence to policies and protocols.

❖ Recruitment, deployment, and orientation of neurosurgery provider and administrative staff.

❖ Providing ongoing education and training materials for neurosurgery staff.

❖ Assist with credentialing neurosurgery physicians and facilitating physician hospital privileges.

❖ Coordinating medical residency teaching and conferences relating to neurosurgery.

❖ Developing and maintaining relationships and quality-focused protocols between the neurosurgery service lines and integrated/ancillary service lines (such as cardiology), other physicians, physician designees, hospitals and the medical community served by the neuroscience program.

❖ Holding regular meetings (at least monthly) with neurosurgery providers/physician extenders to discuss system/patient issues.

❖ Receiving, investigating and mediating issues or questions of policy concerning and/or raised by medical providers and physician extenders.

❖ Reviewing, investigating, managing and reporting all complaints concerning physician staff/extenders arising from patients, medical staff or administration.

❖ Providing clinical leadership and overall supervision to all physicians and physician extenders providing neurosurgery.

❖ Providing overall medical leadership to all staff associated with neurosurgery service line.

❖ Managing physician behavior including customer service and code of conduct.

❖ Maintaining responsibility for quality of care, appropriate resource utilization (including length-of-stay management) and patient data analysis.

❖ Serving as liaison between THSH and the governing board/council of DNI.

❖ Upon THSH's participation as an IOP with DNI, advising THSH in connection with implementation of clinical activities consistent with said participation

❖ Participating, as requested, in the development of capital and operating budgets relating to neurosurgery services.

❖ Facilitating compliance with requirements of all accreditation and licensing authorities.

❖ Developing and, upon approval by THSH, facilitating implementation of programs to monitor and assure proper quality and utilization of resources.

❖ Developing and facilitating implementation of action plans for identified performance improvement opportunities related to neurosurgery care.

❖ Monitoring and participating in all department performance improvement activities.

❖ Meeting with Hospital CEO to review progress of the neurosurgery service line.

❖ Providing input on budgets, billing, equipment purchases, staffing and yearly goals and objectives as they relate to the Center Programs.

❖ Interacting closely with administration to develop goals and provide ongoing assessment to achieve objectives, in keeping with strategic plans and risk management programs.

❖ Interacting with medical staff and specialists across disciplines to ensure appropriate and timely patient care, patient transfers and patient referrals.

❖ Working cooperatively with heads of diagnostic and therapeutic departments at Hospital to ensure availability and effective use of services and results reporting.

## APPENDIX B

### ON-CALL COVERAGE SERVICES

On-Call Coverage Services shall be provided as follows:

- In conjunction with other qualified physicians, as determined by GNI, unrestricted, general, spine and trauma neurosurgery call coverage on a twenty-four (24) hour per day, seven (7) days per week, three hundred sixty five (365) days per year basis.   Call schedules will be developed identifying general, spine and trauma neurosurgical call.

### ON-SITE COVERAGE SERVICES

On-Site Coverage Services shall be provided as follows:

- ❖ Onsite GNI neurosurgeons (Monday through Friday) who will support the development and growth of general, spine, neurovascular, brain tumor and trauma inpatient neurosurgery programs through delivery of clinical and medical administrative services as requested.
- All clinical aspects of a Level 1 Trauma facility neurosurgery program including rounding on all neurosurgical patients, handling all non-emergency neurosurgery consults, etc.
- Providing oversight for professional services of the Neuro ICU and spine neurosurgery program
- Building clinical neurosurgical programs including neurosurgical oncology (brain tumor program)

# APPENDIX C

## SANCTIONED PROVIDER

A "Sanctioned Provider" means a person or entity who:

(a)      is under indictment or prosecution for, or has been convicted of: (i) any offense related to the delivery of an item or service under the Medicare or Medicaid programs or any program funded under Title V or Title XX of the Social Security Act (the Maternal and Child Health Services Program or the Block grants to States for Social Services programs, respectively), (ii) a criminal offense relating to neglect or abuse of patients in connection with the delivery of a health care item or service, (iii) fraud, theft, embezzlement, or other financial misconduct in connection with the delivery of a health care item or service, (iv) obstructing an investigation of any crime referred to in (i) through (iii) above, or (v) unlawful manufacture, distribution, prescription, or dispensing of a controlled substance;

(b)      has been required or has agreed to pay any civil monetary penalty under 42 U.S.C.A. Section 1320a-7a regarding false, fraudulent, or impermissible claims under, or payments to induce a reduction or limitation of health care services to beneficiaries of, any state or federal health care program; or

(c)      has been excluded from participation in the Medicare, Medicaid, or Maternal and Child Health Services (Title V) program, or any program funded under the Block Grants to States for Social Services (Title XX) program.

## APPENDIX D

## TIME ALLOCATION WORKSHEET


[TO BE SUPPLIED BY THSH]

## APPENDIX D

## TIME ALLOCATION WORKSHEET

Director: _____

Director of _____

**Number of Calendar Months
Remaining in Agreement Term:** _____

A.    **Directorship Duties.**

1.   Efficiently managing staff and ancillary support related to the neurosurgery service line.
2.   Developing, approving, and updating policies and protocols related to neurosurgery patient care for optimal experience across care settings.
3.   Monitoring and ensuring neurosurgery staff behavior and adherence to policies and protocols.
4.   Recruitment, deployment, and orientation of neurosurgery provider and administrative staff.
5.   Providing ongoing education and training materials for neurosurgery staff.
6.   Assist with credentialing neurosurgery physicians and facilitating physician hospital privileges.
7.   Coordinating medical residency teaching and conferences relating to neurosurgery.
8.   Developing and maintaining relationships and quality-focused protocols between the neurosurgery service lines and integrated/ancillary service lines (such as cardiology), other physicians, physician designees, hospitals and the medical community served by the neuroscience program.
9.   Supervising medical directors, if any, within the neurosurgery program as well as GNI neurosurgeons providing Departmental Support Services. Holding regular meetings (at least monthly) with neurosurgery providers physician extenders to discuss system patient issues.
10.  Coordinating providers schedules to ensure efficiency and maximum productivity.
11.  Receiving, investigating and mediating all issues or questions of policy concerning and/or raised by medical providers and physician extenders.
12.  Reviewing, investigating, managing and reporting all complaints concerning physician staff/extenders arising from patients, medical staff or administration.
13.  Providing clinical leadership and overall supervision to all physicians and physician extenders providing neurosurgery.
14.  Providing overall medical leadership to all staff associated with neurosurgery service line.
15.  Managing physician behavior including customer service and code of conduct.
16.  Maintaining responsibility for quality of care, appropriate resource utilization (including length-of-stay management) and patient data analysis.
17.  Serving as liaison between THSH and the governing board/council of DNI.
18.  Upon THSH's participation as an IOP with DNI, advising THSH in connection with implementation of clinical activities consistent with said participation.

A-1

IMPORTANT NOTICES:

1.    All information recorded on this Log must be legible.  Please print or type all
      information.
2.    Please total your hours prior to submitting this Log to your hospital representative.

B.   LOG

| Date Activity Performed | Duty From List Above | Time Expended (In Quarter Hours) | Activities Performed Under this Duty (Brief Description of Activity is REQUIRED) |
|---|---|---|---|
| | | | |

Page    of    Total Pages

Month of            , 200
(Use Additional Pages as Necessary)

| Date Activity Performed (Q.A) | Duty From List Above | Time Expended (In Quarter Hours) | Activities Performed Under this Duty (Brief Description of Activity is REQUIRED) |
|---|---|---|---|
| | | | |

By signing this document, the Director hereby affirms and attests that the Services and the number of hours recorded for such Services set forth herein were performed by Director and that Director fully performed all designated duties required during this month.

Director

By signing this document, the Hospital Compliance Officer hereby affirms and attests he/she has reviewed the above Log for completeness, legibility, and overall compliance with the terms of the Agreement.

Hospital Compliance Officer

Approved for applicability of reported duties

Department Director

By signing this document, the CEO and the CFO affirm and attest that they have confirmed that the Services rendered and the number of hours recorded for such Services by Director satisfy the contractual obligations of Director, and that the number of months remaining in the Agreement Term, as stated on Page One, are correct.

Chief Financial Officer          Date          Chief Executive Officer          Date