**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) Case No. 19-11466 (KG) |
| | ) |
| | ) Jointly Administered |
| | ) |
| Debtors. | ) **Objection Deadline: December 2, 2019 at 4:00 p.m. (EST)** |
| | ) **Hearing Date: December 9, 2019 at 10:00 a.m. (EST)** |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT TERM SHEET BETWEEN THE DEBTORS, TENET BUSINESS
SERVICES CORPORATION, TENET HEALTHCARE CORPORATION, CONIFER
HEALTH SOLUTIONS, LLC, CONIFER REVENUE CYCLE SOLUTIONS, LLC
AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Center City Healthcare, LLC d/b/a Hahnemann University Hospital and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby move this Court (the "**Motion**") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), pursuant to 11 U.S.C. § 105(a) and 363(b) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy Procedure ("the "**Bankruptcy Rules**"), approving the settlement Term Sheet, a copy of which is attached to the Proposed Order as **Exhibit 1** (the "**Settlement Term Sheet**") between the Debtors, Tenet Business Services Corporation ("**Tenet**"), Tenet Healthcare Corporation, Conifer Health Solutions, LLC, Conifer Revenue Cycle Solutions, LLC ("**Conifer**," and together with Tenet, the "**Tenet Parties**") and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

the Official Committee of Unsecured Creditors of Center City Healthcare, LLC, d/b/a Hahnemann University Hospital, *et al*. (the "**Committee**").  In support of this Motion, the Debtors rely upon the *Declaration of Allen Wilen in Support of Motion of the Debtors for Entry of an Order Approving Settlement Term Sheet between the Debtors, Tenet Business Services Corporation, Conifer Revenue Cycle Solutions, LLC and the Official Committee of Unsecured Creditors* attached hereto as **Exhibit B**, and respectfully state as follows:

## Preliminary Statement

1. Following weeks of mediation before the Honorable Judith K. Fitzgerald, the Debtors, the Committee, and the Tenet Parties have reached a comprehensive agreement that will resolve significant litigation and permit the Debtors to focus on closing the sale of St. Christopher's Hospital for Children (the "**STC Sale**").  Furthermore, MidCap IV Funding Trust ("**MidCap**") has agreed to consent to the proposed settlement and to extend the DIP termination date through the closing of the STC Sale.  MidCap's commitment in this regard will provide liquidity necessary to fund the Debtors' obligations to creditors, including their obligations to the Tenet Parties under the Settlement Term Sheet.

2. More specifically, since nearly a year prior to the Petition Date, the Debtors have been engaged in significant ongoing disputes and, in certain instances, litigation, with the Tenet Parties relating to the ASA, the MSA, and the TSA (all as defined below).  This relationship has forced the Debtors to devote significant funds and resources to the parties' ongoing disputes, to the detriment of the Debtors' businesses and, since the filing of the Chapter 11 Cases, their estates and creditors.

3. The Debtors' disputes with the Tenet Parties have also threatened to derail these Chapter 11 Cases.  Absent an agreement among the parties, the Tenet Parties Order (as defined

below) could permit the Tenet Parties to terminate the TSA and MSA following the Outside Date, which would negatively affect the Debtors' ability to continue to operate and would constitute an immediate default under the Debtors' post-petition financing facility. In addition, such termination would also likely lead STC OpCo, LLC, the Court-approved purchaser of the assets of STC (as defined below), to terminate the proposed purchase of that hospital, to the detriment of the Debtors' estates, creditors, patients, employees and the community at large, which rely heavily on the services provided at STC.

4. To resolve their differences, the parties negotiated extensively and at arms' length, and with the tireless assistance of Judge Fitzgerald. Those efforts have resulted in a resolution of complex claims and open issues that best serves the Debtors' estates and creditors, the terms of which are set forth in the Settlement Term Sheet. The Settlement Term Sheet helps ensure that the Tenet Parties will, in exchange for payment and in accordance with the terms thereof, continue to provide services to the Debtors through the closing of the STC Sale. This outcome will maximize the value of STC for the benefit of creditors and helps ensure that STC will be able to provide uninterrupted care to the community. The Settlement Term Sheet further provides for the maintenance of electronic and non-electronic records and the ability of the Debtors and third parties to access such records going forward.

5. The resolution of the parties' significant claims through the Settlement Term Sheet also permits the Debtors to focus their efforts on achieving their ultimate objectives in these Chapter 11 Cases – i.e., the orderly wind-down of HUH, the closure of the STC Sale and the development and implementation of a chapter 11 liquidating plan that maximizes value to creditors and parties in interest – without the scenario whereby the Tenet Parties terminate services or the distraction and cost of the ongoing litigation. For these reasons, and as more fully

described below, the Settlement Term Sheet constitutes a reasonable exercise of the Debtors' business judgment, best serves the Debtors' estates, patients, creditors and parties in interest, and meets the requirements for approval by this Court.

### Jurisdiction and Venue

6. The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

### Background

8. On June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

9.      A description of the Debtors' businesses and the reasons for commencing these Chapter 11 Cases are set forth in the *Declaration of Allen Wilen in Support of First Day Relief* [D.I. 2] (the "**First Day Declaration**").

**A.      The Acquisition, the TSA and the MSA**

10.     On January 11, 2018, Philadelphia Academic Health Holdings, LLC, Philadelphia Academic Health System, LLC ("**PAHS**") and certain other purchasers consummated the purchase of the businesses of Hahnemann University Hospital ("**HUH**") and St. Christopher's Hospital for Children ("**STC**," and together with HUH, the "**Hospitals**") and certain related assets, including the Hospitals' related physician practice groups (together, the "**Healthcare Businesses**"), from Tenet and its affiliates pursuant to an Asset Sale Agreement (**"ASA"**) dated August 31, 2017, as amended (the "**Acquisition**").

11.     At the time of the Acquisition, PAHS and Tenet entered into a Transition Services Agreement ("**TSA**") pursuant to which Tenet agreed to provide certain services to PAHS for a two-year period to assist in the orderly transition of the Healthcare Businesses.  These services included Information Services (as defined in the TSA) such as software and IT support, and the use of Tenet's IT platform (the "**Tenet IT Platform**"), in exchange for which Tenet was entitled to certain fees.  PAHS also entered into a Master Services Agreement (the "**MSA**") with Conifer pursuant to which Conifer agreed to provide revenue cycle services in exchange for payment.

12.     Shortly after the Acquisition, the Debtors, Tenet and Conifer began having various disputes relating to the ASA, issues with the services provided under the TSA and MSA, and the Debtors' nonpayment of invoices under the TSA and MSA.  These disputes, which are further detailed in the First Day Declaration, included the following:

- Disputes relating to the ASA, including disputes concerning the "Net Working Capital Adjustment" provided for under the ASA and allegedly overstated

amounts of accounts receivable;[2]

- Claims relating to alleged representations made by Tenet at the time of the Acquisition concerning the financial condition of the Healthcare Businesses;[3]

- Disputes concerning the quality of Tenet's services under the TSA;

- Disputes concerning Conifer's performance under the MSA; and

- Disputes concerning the Debtors' alleged defaults under the TSA and MSA, in connection with which the Tenet Parties have asserted claims against the Debtors in excess of $57 million as of the Petition Date.

13. To be clear, each of the Debtors, Tenet and Conifer dispute the claims asserted against them.

**B.       The Tenet Parties' Motion**

14. On July 26, 2019, the Tenet Parties filed the *Motion of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC for Entry of an Order (I) Compelling Payment of All Unpaid Postpetition Amounts Pursuant to 11 U.S.C. § 503(b)(1) or, in the Alternative, (II) Granting Relief from the Automatic Stay to the Extent Necessary to Terminate the TSA and MSA* [D.I. 303] (the "**Tenet Parties Motion**"), pursuant to which the Tenet Parties sought the entry of an order compelling the Debtors to pay them the full contract rates for their post-petition services, as set forth in the TSA and MSA, or, alternatively, granting the Tenet Parties relief from the automatic stay so that they can terminate the TSA and MSA.

---

[2] In September 2018, PAHS filed suit against Tenet in an attempt to compel arbitration of the working capital dispute. Tenet has asserted counterclaims to PAHS's claims. The litigation is captioned *Philadelphia Academic Health Holdings, LLC v. Tenet Business Services Corporation*, and is currently pending in the Chancery Court of Delaware, Case No. 2018-0684-KSJM.

[3] The Debtors and certain of their non-debtor affiliates have asserted claims against Tenet for fraud and breach of contract/indemnification under the ASA in a lawsuit pending in the Superior Court of Delaware, which is captioned as *Philadelphia Academic Health Holdings, LLC et al v. Tenet Business Services Corporation*, Superior Court of Delaware, Case No. N19C-04-035EMDCCLD. Tenet has filed a motion to dismiss all of the claims, which is pending before the Superior Court of Delaware.

15.   On August 9, 2019, the Debtors filed an objection to the Tenet Parties Motion [D.I. 421], which was joined by the Committee [D.I. 423].  In addition, on August 9, 2019, MidCap filed an objection to the Tenet Parties Motion [D.I. 417].

16.   On August 20, 2019, the Court issued an oral ruling on the Tenet Parties Motion in which it held that the Debtors had rebutted the presumption that the Tenet Parties were entitled to the level of payment specified in the TSA and MSA.  The Court did not establish a specific amount that the Debtors should pay for post-petition services but rather directed the parties to negotiate concerning the appropriate sum.  The Court set a further hearing on the Tenet Parties Motion for September 13, 2019 (the "**September Hearing**"), on which date the Court requested that the Debtors and Tenet Parties report to the Court concerning the status of their negotiations.

C.   **The September 19 Order**

17.   As of the date of the September Hearing, despite efforts by the parties, no agreement was reached with respect to the appropriate treatment to be afforded to the Tenet Parties. On September 13, 2019, the Court held a confidential chambers conference among the Debtors, the Tenet Parties and the Committee (the "**Chambers Conference**").

18.   Following the Chambers Conference, on September 19, 2019, the Court entered an order (the "**September 19 Order**"), pursuant to which, *inter alia*, the Court (i) directed the parties to promptly engage in mediation of certain specified claims and causes of action, (ii) ordered that "if there is no agreement between the Parties by 5:00 p.m. (prevailing Eastern Time) on October 18, 2019, regarding the ongoing provision of services by Tenet and Conifer, then Tenet and Conifer may terminate the TSA and/or MSA at any time thereafter and the automatic stay shall be deemed lifted on the date of any such termination, in which case without any further order of the Court," (iii) required the Debtors to pay the Tenet Parties $400,000 per

week for their services, beginning September 20, 2019, and (iv) allowed the Tenet Parties an administrative claim of at least $400,000 per week from the Petition Date through September 20, 2019 (before giving credit for amounts paid to the Tenet Parties on a post-petition basis). *See* September 19 Order, at ¶¶ 4-8.

19. Consistent with the September 19 Order, the parties selected the Honorable Judith K. Fitzgerald (Ret.), a former chief judge of the United States Bankruptcy Court for the Western District of Pennsylvania, as mediator. Shortly thereafter, the Debtors and the Tenet Parties engaged in discussions with Judge Fitzgerald to resolve their respective disputes and claims.

D.   **The Pending Appeal of the September 19 Order**

20. On October 2, 2019, the Debtors filed a notice of appeal from the September 19 Order insofar as it permits the termination of the TSA and/or MSA after October 18, 2019 (as subsequently extended by agreement of the parties, the "**Outside Date**"). In addition, contemporaneously with the notice of appeal, the Debtors filed a motion for a stay of the September 19 Order pending appeal [D.I. 804] (the "**Stay Motion**").

21. On October 15, 2019, the Tenet Parties filed a motion to enforce the September 19 Order [D.I. 851].

E.   **The STC Sale**

22. Meanwhile, on September 27, 2019, the Court entered an order [D.I. 795] approving the STC Sale to STC Opco, LLC (the "**Buyer**") pursuant to the terms of an asset purchase agreement (the "**STC APA**"). Pursuant to the STC APA, the agreement may be terminated by either party if closing on the STC Sale has not occurred by December 13, 2019. *See* STC APA, at § 9.1(g). The Buyer's obligation to close on the purchase of the assets is

8

subject to a number of conditions, including that the Buyer enter into agreements with Tenet and Conifer for certain go-forward services. *See* STC APA, at §§ 8.12 and 8.13.

### F. The Mediation and the Settlement Term Sheet

23. Judge Fitzgerald held in-person mediation sessions in New York on each of October 15, 21 and 22, 2019 with the Debtors, the Tenet Parties, MidCap[4] and the Committee. These in-person sessions were followed by numerous subsequent communications among the parties and Judge Fitzgerald.

24. Through the good work of Judge Fitzgerald, and as a result of this process and extensive arms'-length negotiations, the Debtors, the Tenet Parties and the Committee reached agreement on the terms of the Settlement Term Sheet, which will settle all of the respective claims and issues between the Debtors and the Tenet Parties, subject to Court approval.

25. The key terms of the Settlement Term Sheet are as follows:[5]

- <u>HUH Billing Data</u>. Conifer shall continue to provide billing and collection services consistent with its obligations under the MSA for HUH through the earlier of the closing of the STC Sale (as defined below) and December 31, 2019, subject to transfer of the current and historical billing/collection data for HUH (the "**HUH Billing Data**"), formatted in a manner reasonably acceptable to the Debtors, Tenet, and Conifer, *provided* that such data must be in a format that it can be accessed and utilized by HUH and/or a third party billing service thereafter. Such reformatting and transfer of the HUH Billing Data to be made on the earlier of five (5) days after the closing of the STC Sale and January 5, 2020, at Conifer's sole expense. Conifer will receive a cash fee of 2% of collections received from HUH collections from the period commencing on December 1, 2019, through the earlier of the date on which Conifer ceases to provide billing and collection services for HUH and December 31 2019 (such fee, the "**Conifer HUH Collection Fee**").

---

[4] MidCap only appeared, in person, at the October 15, 2019 mediation session.

[5] This description of the Settlement Term Sheet is meant only to be a <u>summary</u> of its key provisions. To the extent there is any inconsistency between the description set forth herein and the Settlement Term Sheet, the terms of the Settlement Term Sheet shall control.

9

- STC Billing Data. Conifer shall continue to provide billing and collection services STC through March 31, 2020, subject to transfer of the current and historical billing/collection data for STC (the "**STC Billing Data**"), formatted in a manner reasonably acceptable to the Debtors, Tenet, and Conifer, *provided* that such data must be in a format that it can be accessed and utilized by STC and/or a third party billing service thereafter. Provided that Tenet and Conifer's postpetition administrative claims as set forth in paragraph 6(a) – (c) of the Settlement Term Sheet are paid in full in cash, without setoff, deduction, or reduction, on or before April 6, 2020, such reformatting and transfer of the STC Billing Data shall be made on or before April 6, 2020, at Conifer's sole expense. Subsequent to the closing of the STC Sale, Conifer will receive a cash fee of 2% of collections received from the STC Sale closing date through March 31, 2020 (the "**Conifer STC Collection Fee**").

- To the extent that the TSA and MSA have not been rejected or assumed and assigned prior to April 1, 2020, the TSA and MSA shall be deemed rejected on April 1, 2020 unless the Parties agree otherwise in writing. Any rejection of the TSA and MSA shall not result in any additional claims against the Debtors beyond the Allowed Pre-Petition Claims provided for in the Settlement Term Sheet.

- TSA Services. Tenet will provide TSA services as modified by the Settlement Term Sheet for HUH and, to the extent that the closing of the STC sale not occurred prior to such date, STC, through December 31, 2019. In connection with such ongoing TSA services, HUH and STC will work in good faith with Tenet to eliminate services provided under the TSA that are no longer necessary given the status of operations at both hospitals. On or before December 31, 2019, Tenet will, at its expense, transfer to HUH and STC, in a usable format, all reasonably available data regarding the Debtors' business operations, with certain exceptions, created or maintained by Tenet pursuant to the TSA.

- Service Levels. With respect to any services rendered by Tenet or Conifer during the period following the Release Effective Date (as defined in the Settlement Term Sheet): (i) except as expressly provided therein, Tenet and Conifer shall only be required to provide services at service levels consistent with the TSA and MSA, as applicable, provided there will be no penalties as provided in the MSA that will result in the reduction of the payments set forth in paragraph 6 of the Settlement Term Sheet; (ii) with respect to any services provided pursuant to the Settlement Term Sheet, no Debtor shall assert, and each Debtor waives, any right to assert any claim against any Tenet and Conifer Released Party (as defined in the Settlement Term Sheet) on any theory of liability for special, indirect, consequential or punitive damages arising out of, in connection with, or as a result of, the Settlement Term Sheet or any agreement or instrument contemplated hereby; and (iii) Tenet and

Conifer's liability for performing services under the Settlement Term Sheet shall be limited to the amount paid for such services for such time period.

- Pre-Closing Superpriority Administrative Claim. Tenet and Conifer will waive any further administrative claim (in excess of $400,000 per week) for services rendered from the Petition Date through August 20, 2019, the unpaid portion of which totals $2,200,000 after taking into account payments received in the amount of $200,000 per week, which claim of $2,200,000 will be paid from the net cash proceeds of the STC Sale closing (the "**Pre-Closing Superpriority Administrative Claim**").  Such claim shall have super administrative priority status with respect to the net cash proceeds of the STC Sale, senior to any other administrative claim other than the super administrative expense priority claims of MidCap and the Carveouts as provided in the *Final Order (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection; (IV) Granting Adequate Protection and Modifying the Automatic Stay* [D.I. 557] (the "**Final DIP Order**").  In the event the STC Sale does not close on or before December 31, 2019, or the proceeds of the STC Sale are insufficient to satisfy the Pre-Closing Superpriority Administrative Claim in full in cash within three (3) business days after the closing of the STC Sale, the balance of the Pre-Closing Superpriority Administrative Claim shall be treated in the same manner as Tenet and Conifer's Other Superpriority Administrative Claim.

- Other Superpriority Administrative Claim. Tenet and Conifer will be entitled to an additional super-priority administrative claim, which claim will be *pari passu* with the Pre-Closing Superpriority Administrative Claim and senior to any other administrative claim other than the super priority claims of MidCap and the Carveouts, equal to: (a) $400,000 per week for the period August 21, 2019 through the closing of the STC Sale (subject to credit for payments already made); (b) $100,000 per week thereafter through December 31, 2019; and (c) the Conifer HUH Collection Fee; and (d) the Conifer STC Collection Fee.  The foregoing amounts (to the extent not already paid), other than the Conifer HUH Collection Fee and the Conifer STC Collection Fee, will be paid in full in cash weekly by the Debtors.

- HUH Electronic Medical Records. Tenet will maintain or engage a third party to maintain, at Tenet's sole expense, and to the extent required by applicable law, all electronic medical records and related data (the "**HUH Electronic Medical Records**") maintained by, or for the benefit of, Tenet for HUH consistent with such obligations under the TSA.  Tenet will further arrange a process, at its expense, to maintain the Debtors' ability to access the HUH Electronic Medical Records. Tenet will further allow physicians and HUH patients and/or their legal representatives (at their sole cost and expense, in each case, solely to the extent permitted by applicable law) reasonable ability to access, during business hours and upon reasonable prior written notice to

11

- Tenet or its counsel, to and/or copies of their medical records, within the time provided by all applicable state and federal laws, including the Health Insurance Portability and Accountability Act.

- Iron Mountain HUH Records. Subject to Court approval of the settlement, Tenet will fund the costs of maintaining or engaging Iron Mountain Inc. or a different third party to maintain, at Tenet's sole expense and to the extent required by all applicable state and federal laws, all non-electronic medical records for HUH (the "**Iron Mountain HUH Records**"). Tenet will further arrange a process, at its expense, for a third party to maintain and provide access to the Iron Mountain HUH Records.

- Contribution Payment. Provided that the Debtors pay the Pre-Closing Superpriority Administrative Claim, Tenet and/or Conifer shall pay the Debtors $2,800,000 (the "**Contribution Payment**") within three (3) business days after payment in full of the claims of Midcap (other than any holdback for indemnification or otherwise as provided in any payoff letter) or thereafter. Such funds will be treated as a contribution under a later filed liquidating plan litigation trust or order dismissing the chapter 11 cases absent confirmation of a liquidation plan.

- Allowance of Certain Claims. Tenet and Conifer's prepetition unsecured claims under the TSA and MSA, including those TSA and MSA claims arising under the ASA, shall be allowed in the amount of $57.2 million against the applicable Debtor(s) (the "**Allowed Pre-Petition Claims**"). In addition, Tenet reserves the right to file additional unsecured claims under the ASA ("**Additional ASA Claims**") and claims related to any pension liability (the "**Pension Claim**"), and all of the Parties' rights to object to such claims shall be fully preserved. The Allowed Pre-Petition Claim and any allowed Additional ASA Claims or Pension Claim shall be subordinated in recovery, but not for any other purposes (including voting), until all allowed non-priority prepetition unsecured claims of creditors other than Tenet and Conifer receive aggregate distributions in an amount equal to the lesser of (such lesser amount, the "**Minimum Recovery Threshold**"): (A) 50% of the aggregate amount of such allowed non-priority amount of such other allowed prepetition unsecured claims; and (B) $25 million. Once other allowed non-priority prepetition general unsecured claims receive a distribution equal to the Minimum Recovery Threshold, then all allowed non-priority general unsecured claims (including the Allowed Pre-Petition Claim and any allowed Additional ASA Claim or Pension Claim) shall share pro rata in any subsequent distributions.

- Releases. Subject to the entry of the Approval Order, and, with respect to the Estate Releasing Parties, payment of the Contribution Payment, the Parties will exchange mutual general releases of all claims with certain specified

12

> exceptions, including exceptions for claims arising pursuant to the Settlement Term Sheet or the Approval Order.

- **No Admissions**.  The settlement is intended to compromise disputed claims and to avoid further litigation and motions practice. Nothing in the Settlement Term Sheet, nor any actions taken by, or failure to act by, the Parties in furtherance of the Settlement Term Sheet, shall be construed as an admission of liability, wrongdoing, or violation of rule or law on the part of the Debtors, the Committee, Tenet, or Conifer, and the Debtors, the Committee, Tenet, and Conifer each expressly deny and dispute any such action taken by, or failure to act by, the Parties.

## RELIEF REQUESTED

26. By this Motion, the Debtors seek the entry of an Order, pursuant to Bankruptcy Code sections 105(a), 363(b) and Bankruptcy Rule 9019(a), substantially in the form of the Proposed Order, (i) approving the Settlement Term Sheet and (ii) granting such other and further relief as this Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

27. Bankruptcy Code section 105(a) provides, in pertinent part, that "the court may issue any order . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  *See* 11 U.S.C. § 105(a).  Bankruptcy Code section 363(b) provides, in pertinent part, that the Debtors, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate,…" *See* 11 U.S.C. § 363(b).  In addition, Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

28. Settlements and compromises are "a normal part" of the chapter 11 process. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  Indeed, "compromises are favored in bankruptcy" because they minimize litigation and expedite the administration of a bankruptcy estate.  *See In re Martin*, 91 F.3d 389, 393 (3d

Cir. 1996); *see also In re Key3Media Group, Inc.*, No. 03–10323 (MFW), 2006 WL 2842462, at *3 (D. Del. Oct. 2, 2006).

29.     In considering a Bankruptcy Rule 9019(a) motion, a court must "balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *E.g.*, *Martin*, 91 F.3d at 393. Assessing this balance includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id.*; *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644-45 (3d Cir. 2006).

30.     Notably, in determining whether to approve a proposed settlement, courts should not determine whether the debtor is getting the best possible settlement, but rather whether the compromise is reasonable. *See In re Integrated Health Services, Inc.*, Case No. 00-398 (MFW), 2001 WL 1820426, at *2 (Bankr. D. Del. Jan. 3, 2001) (explaining that in approving a settlement, a court is not to determine that the settlement is the best that can be achieved by the debtor but "rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'").

31.     Moreover, when deciding whether to approve a compromise, a court will normally accept the judgment of the movant as long as a legitimate business justification exists. *E.g.*, *Martin*, 91 F.3d at 395; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 250 (D. Del. 1998); *see also In re Penn Central Transportation Co.*, 347 F. Supp. 1351, 1353 (E.D. Pa. 1972) (approving settlement agreement as reflection of business judgment). Once a debtor has articulated a valid business justification for a settlement, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (*quoting Smith v. Van Gorkam*, 488 A.2d 858, 872 (Del. 1985)).

32. Applying the foregoing standards to the present case, the Debtors have concluded, in the proper exercise of their business judgment, that the agreement embodied in the Settlement Term Sheet is fair, reasonable and in the best interests of their estates and creditors. The Settlement Term Sheet also withstands scrutiny under the *Martin* factors set forth above.

33. First, the factor of "probability of success in litigation" is satisfied in the present case. The Debtors recognize that resolving disputes through litigation always involves uncertainty and expense, and this especially applies in the present cases, where the Debtors have devoted considerable time and resources in both litigating, and negotiating the resolution of, their claims against the Tenet Parties as well as the Tenet Parties' claims against the Debtors. While the Debtors believe in the strength of their causes of action, the Tenet Parties take the position that the evidence is to the contrary. If the Tenet Parties are correct and are able to prevail at trial, the Debtors would be obligated to pay significant amounts to satisfy the Tenet Parties' claims, after having already devoted significant time and resources to the litigation of such claims.

34. Furthermore, as evidenced by the September 19 Order, the Court found that sufficient cause existed to lift the stay to permit the Tenet Parties to proceed with the termination of their services. While the Debtors, respectfully, do not believe that such relief was warranted, the ruling nevertheless raises question as to the Debtors' probability of success in litigating certain of their claims against the Tenet Parties. Thus, given the significant risks involved in the litigation and the detrimental impact that any adverse ruling would have on the Debtors' estates,

the Debtors submit that the Settlement Term Sheet reflects a reasonable exercise of their business judgment under the first *Martin* factor.

35. Next, the third *Martin* factor[6] is clearly met in the present case. The respective claims asserted by the Debtors and the Tenet Parties involve complex issues relating to, *inter alia*, provisions of the ASA, TSA and MSA, and complicated factual disputes regarding the circumstances surrounding the execution of these agreements and the parties' performance under such agreements. The complexity of these issues has already required the Debtors to expend significant time and resources and full-blown litigation has not even begun. Indeed, as noted above, beginning as early as August 2018, the Debtors have engaged in discussions with the Tenet Parties concerning the parties' respective claims, and in connection therewith, have devoted significant time and resources to gathering and analyzing supporting information and preparing to litigate such claims.

36. Even during these Chapter 11 Cases, the time and resources devoted to the Debtors' disputes with the Tenet Parties has been significant. Both parties have taken depositions, engaged in discovery, and expended substantial time and money preparing for the August and September hearings in these cases. For these reasons, the complexity of the parties' disputes, and the expense, inconvenience and delay necessarily attending to such disputes, weighs in favor of the Settlement Term Sheet.

37. Lastly, the fourth *Martin* factor - i.e. the paramount interest of the Debtors' creditors - is satisfied in the present case. The Debtors' disputes with the Tenet Parties have required significant attention and resources during these Chapter 11 Cases, to the detriment of the Debtors' estates, creditors and others. Indeed, the critical role of the Tenet Parties' services

---

[6] The second *Martin* factor – i.e. the likely difficulty in collection – does not appear to be an issue with the Tenet Parties.

in the Debtors' operations and the Debtors' ability to provide patient care has meant that, in the absence of resolution, the Debtors' efforts to wind down HUH's operations in an orderly fashion and sell STC as a going concern without disruptions to its operations would be derailed.

38. Moreover, the threat of harm that would be caused by termination of the Tenet Parties' services became ever more apparent following the entry of the September 19 Order, under which the Tenet Parties were permitted to terminate their services following the Outside Date in the absence of an agreement between the parties. The consequences that would arise following the termination of the Tenet Parties services, not only include the loss of Tenet's critical IT services impairing the Debtors' ability to safely provide patient care, but the termination of the Tenet Parties' services would constitute an immediate default under the Debtors' post-petition financing facility, impair many of the Debtors' accounting, billing and banking functions, and jeopardize the STC Sale, which requires STC to maintain ordinary course operations through Closing.

39. With the Settlement Term Sheet, the Tenet Parties' termination of services will no longer constitute a looming threat to the viability of these Chapter 11 Cases. Through the resolution of their disputes, the Debtors can devote their efforts and attention to finalizing the orderly wind-down of HUH, achieving closure of the STC Sale, addressing critical issues with landlords and vendors, and developing a chapter 11 liquidating plan that will maximize value to creditors and parties in interest. The Settlement Term Sheet helps ensure that the Tenet Parties will continue to provide their services for time periods necessary for the functions to be transitioned to the Debtors or to other services providers and provides for the maintenance of electronic and non-electronic records and the ability of the Debtors and third parties to access

such records going forward. The Debtors estimate that the cost for the Debtors to make alternative arrangements to maintain and provide access to the records alone, are substantial.

40. The Settlement Term Sheet also clarifies the resolution and treatment of the Tenet Parties' claims in these cases, and provides for a cash infusion of $2.8 million to the Debtors' estates. The Settlement Term Sheet thus serves the paramount interests of the Debtors' patients and creditors and satisfies the fourth *Martin* factor.

41. Based upon the foregoing, there can be no question that the settlement embodied in the Settlement Term Sheet does not "fall below the lowest point in the range of reasonableness." *Integrated Health*, 2001 WL 1820426, at *2 (*quoting Cosoff v. Rodman (In re WW.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983)). The Settlement Term Sheet is the result of substantial good faith, arm's length negotiations between the Debtors, the Committee and the Tenet Parties, and constitutes a reasonable exercise of the Debtors' business judgment. Accordingly, this Court should exercise its discretion and approve the Settlement Agreement.

## NOTICE

42. Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (i) the Office of the United States Trustee; (ii) the Official Committee of Unsecured Creditors; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Health; (xi) the City of Philadelphia; (xii) counsel to the Tenet Parties; (xiii) counsel to the Court appointed Patient Care Ombudsman; and (ix) any party that has

requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, based on the foregoing, the Debtors respectfully request that the Court enter the order, substantially in the form attached hereto as **Exhibit A,** granting the Motion, approving the Settlement Term Sheet, and granting such other and further relief as is just and proper.

Dated: November 18, 2019  **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Counsel for Debtors and Debtors in Possession*