```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                          .  Chapter 11
                                     .
 4   CENTER CITY HEALTHCARE, LLC,    .  Case No. 19-11466 (KG)
     d/b/a HAHNEMANN UNIVERSITY      .  (Jointly Administered)
 5   HOSPITAL, et al.,               .
                                     .  Courtroom No. 3
 6                                   .  824 Market Street
                         Debtors.    .  Wilmington, Delaware 19801
 7                                   .
                                     .  Monday, November 25, 2019
 8   . . . . . . . . . . . . . . . . .  11:00 a.m.

 9                       TRANSCRIPT OF HEARING
                   BEFORE THE HONORABLE KEVIN GROSS
10                   UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Mark Minuti, Esquire
                               SAUL EWING ARNSTEIN & LEHR, LLP
13                             1201 North Market Street
                               Suite 2300
14                             Wilmington, Delaware 19899

15   For Harrison Street
     Real Estate, LLC and
16   its affiliates:           Stuart M. Brown, Esquire
                               DLA PIPER LLP (US)
17                             1201 North Market Street
                               Suite 2100
18                             Wilmington, Delaware 19801

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded by:              Tori Huff, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For Drexel University:      Vincent J. Marriott, III, Esquire
                                BALLARD SPAHR, LLP
3                               1735 Market Street
                                51st Floor
4                               Philadelphia, Pennsylvania 19103

5   For Conifer Revenue
    Cycle Solutions, LLC:       Laura Davis Jones, Esquire
6                               PACHULSKI STANG ZIEHL & JONES LLP
                                919 North Market Street
7                               17th Floor
                                Wilmington, Delaware 19801
8
    For Tower Health
9   Services:                   Robert Lapowsky, Esquire
                                STEVENS & LEE
10                              620 Freedom Business Center
                                Suite 200
11                              King of Prussia, Pennsylvania 19046

12  For American Academic
    Health Systems, LLC:        Mark D. Collins, Esquire
13                              RICHARDS, LAYTON & FINGER, P.A.
                                One Rodney Square
14                              920 North King Street
                                Wilmington, Delaware 19801

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 2:   Fifth Omnibus Motion of the Debtors for Entry      6
4              of an Order Authorizing the Rejection of
               Certain Unexpired Real Estate Leases
5              [D.I. 620; filed: 08/30/19]

6              Court's ruling                                     23

7    Agenda
     Item 3:   Motion of Master Landlords for Entry of an         6
8              Order (A) Allowing Administrative Claims, and
               (B) Compelling Debtors (I) to Pay Post-petition
9              Rent and Other Obligations Under Master Leases
               and (II) to Coordinate with Master Landlords
10             Regarding Rejection of Master Leases and
               Surrender of Premises
11             [D.I. 878; filed: 10/18/19]

12             Court's ruling                                     23

13   Agenda
     Item 4:   Motion of Debtors for Order (I) Authorizing       23
14             Retention and Employment of Centurion Service
               Group, LLC, as Auctioneer, (II) Waiving
15             Compliance with Certain Requirements of Local
               Rule 2016-2; and (III) Approving Sale and
16             Liquidation of Certain Medical Equipment,
               Furniture and Inventory
17             [D.I. 923; filed: 10/30/19]

18             Court's ruling                                     34

19

20

21

22

23

24

25

4

1                                 <u>INDEX</u>

2    <u>MOTIONS:</u>                                              <u>PAGE</u>

3    Agenda
     Item 1:   Debtors' Motion for Entry of (A) an Order (I)      34
4              Scheduling a Hearing to Consider Approval of
               the Sale or Sales of Substantially All Assets
5              of St. Christopher's Healthcare, LLC and
               Certain Related Debtors and the Assumption and
6              Assignment of Certain Executory Contracts and
               Unexpired Leases, (II) Approving Certain
7              Bidding Procedures, Assumption and Assignment
               Procedures, and the Form and Manner of Notice
8              Thereof, (III) Establishing Procedures in
               Connection with the Selection of and
9              Protections Afforded to Any Stalking Horse
               Purchasers, and (IV) Granting Related Relief;
10             And (B) One or More Orders (I) Approving the
               Sales or Other Acquisition Transactions for
11             the Assets, (II) Authorizing the Sales Free and
               Clear of all Encumbrances, (III) Authorizing
12             the Assumption and Assignment of Certain
               Executory Contracts and Unexpired Leases, and
13             (IV) Granting Related Relief
               [D.I. 205; filed: 07/16/19]
14
               Court's ruling                                    48
15

16   Transcriptionist's Certificate                              49

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 11:01 a.m.)

2               THE COURT OFFICER:  Please rise.

3               THE COURT:  Good morning, everyone.  You may be

4    seated.  Thank you.

5               Mr. Minuti, it's been awhile since I've seen you

6    in is this case --

7               MR. MINUTI:  That's probably a good thing, Your

8    Honor.

9               THE COURT:  -- but I know you've been busy.  I

10   know you've been working hard.

11              MR. MINUTI:  Good morning, Your Honor.  Mark

12   Minuti, Saul Ewing Arnstein & Lehr.  I'll apologize at the

13   outset for my voice, Your Honor, but hopefully we can make it

14   through the hearing.

15              So, we have the four matters on today's agenda,

16   Your Honor.  I should have pointed out, I'm here, again, with

17   my colleagues, Jeffrey Hampton --

18              THE COURT:  Yes.

19              MR. MINUTI:  -- Monique DiSabatino, and also in

20   the courtroom, Your Honor, is Alan Wilen, our CRO --

21              THE COURT:  Mr. Wilen.

22              MR. MINUTI:  -- and my partner, Adam Isenberg, as

23   well.

24              THE COURT:  Good morning.

25              MR. MINUTI:  We have four matters on the agenda,

1    Your Honor.  The first matter on the agenda was the

2    assumption and assignment of two leases with Front Street to

3    our buyer.

4              THE COURT:  Yes.

5              MR. MINUTI:  If Your Honor would indulge me, I

6    think what would make sense is we put that one last and maybe

7    take a brief recess before that because we thought we were

8    close to having an uncontested hearing today and I think we

9    decided we need to have a little more conversation to see if

10   we can get there or figure out a way to short circuit the

11   hearing on that issue.

12             THE COURT:  All right.  That would be fine.

13             MR. MINUTI:  If we could, then, Your Honor, let's

14   turn to Items 2 and 3 on the agenda, which I'd like to take

15   together if it's acceptable to the Court?

16             THE COURT:  Yes.

17             MR. MINUTI:  Your Honor, this is the fifth omnibus

18   motion of the debtors for entry of an order authorizing the

19   rejection of certain unexpired real estate leases and I'm

20   going to take this together with the fourth matter -- excuse

21   me -- the third matter on the agenda, which is the motion of

22   the master landlords for enter of an order allowing

23   administrative expense claims, compelling payment, and

24   certain other relief.

25             THE COURT:  That makes sense, yes.

1          MR. MINUTI:  By way of background, Your Honor, one

2   of the goals of the bankruptcy cases has been since day one,

3   the effective and safe shutdown of Hahnemann University

4   Hospital.  Since before the petition date, the debtors have

5   been working hard to first develop a plan and then implement

6   that plan, and by the time the rejection motion was filed,

7   Your Honor, the plan had been developed and we were well on

8   our way to implement that plan.

9          We had stopped admitting patients to the hospital.

10  We closed the emergency department.  We discharged and

11  transferred all the patients.  We let the doctors and most of

12  the employees go.  So it made sense to reject leases, Your

13  Honor, that were no longer needed for the operation of

14  Hahnemann University Hospital.

15          Now, as part of the ownership structure of the

16  real estate and the hospital operations when they were

17  acquired in January of 2018 from Tenet, Your Honor, the

18  hospital operations required by the debtors, but the real

19  estate were acquired by nondebtor parties.  And the leases at

20  issue in connection with both motions, which are before the

21  Court today are all with who we're calling the master

22  landlords, and those properties are the Bellet (ph) building,

23  231 North Broad Street; the Feinstein (ph) and Bokes (ph)

24  buildings; the new College building; and the Wood Street

25  Garage, Your Honor.  Those are the properties we're talking

1    about.

2            Under each of those leases, the master tenant is

3    St. Christopher's Healthcare, LLC, and while St.

4    Christopher's is the master tenant, these properties relate

5    to the operation of Hahnemann rather than St. Christopher's.

6    Other than the Wood Street Garage, the parking garage, most

7    of the properties or I think all of the other properties were

8    sublet to other tenants, Your Honor, subtenants, including

9    Drexel.

10           Now, the subtenants pay sub rent directly to the

11   master landlords, but the amount paid is not sufficient to

12   cover the full amounts due pursuant to the master leases, or

13   the cost necessary to maintain those properties.  Under the

14   master leases, the debtor is required to pay the difference.

15           In addition, Your Honor, St. Chris -- the debtor

16   St. Chris is responsible for substantially all of the

17   maintenance.  And these were -- rather than triple-net

18   leases, these were the exact opposite.  The master tenant had

19   all of the responsibility here, so the subtenants did pay any

20   of those costs.

21           So, the reason the debtors moved to reject the

22   leases, Your Honor, was -- and the related subleases, was

23   because each related to the operation of Hahnemann, Hahnemann

24   was being shut down, the leases were no longer necessary for

25   going-forward operations, and they were expensive, Your

1  Honor, for the reasons that I've already articulated.

2          But, admittedly, the rejection of the leases and

3  the related subleases was not so clean for a few reasons,

4  Your Honor.  First, the debtors did maintain some historical

5  books and records and valuable equipment and supplies in the

6  leased premises, Your Honor.  Some of this equipment is

7  pretty large, such as MRI machines or other imaging

8  equipment, not to easily movable, and the debtors, frankly,

9  lacked the funds, Your Honor, or the cash flow necessary to

10  move those items to somewhere else in order to liquidate

11  those.  And we're going to get to that later in the agenda,

12  Your Honor; we have on tap, a motion to hire an auctioneer to

13  sell those items.

14          Second, Your Honor, there's a number of services

15  shared among the premises at issue in the to-be-rejected

16  leases and the Hahnemann North Tower and South Tower, which

17  are subject to separate leases, which are not before Your

18  Honor today.

19          And, you know, and, frankly, I've never been

20  inside the property myself, but what folks tell me is when

21  you walk around the hospital and you walk around these

22  related buildings, you can't tell when you leave the North

23  Tower and enter it.  I mean, it's all integrated, so it's all

24  one space.  But the systems, for example, are all tied

25  together, as well.

1          So, if we're going to reject some of the leases,

2    the master leases, and not the other leases, there is an

3    issue, Your Honor, in terms of how you deal with the

4    services, for example, electricity, steam, telephone, and so

5    on, that relates to all the spaces.  So, that's an issue that

6    has to be worked out once the leases were rejected among the

7    subtenants, the master landlords, and the debtors, Your

8    Honor.

9          So, that's why the rejections here weren't so

10   clean and the solution to us, Your Honor -- and I think to

11   everybody -- seemed pretty obvious, which is we should

12   attempt to negotiate a resolution here with the master

13   landlords where there would be cooperation in the rejection.

14   We would retain a small amount -- the use of a small amount

15   of space going forward for what we need, which is housing

16   some of our stuff, allowing us access to the space so we can

17   sell some of that equipment, for example.  It would permit us

18   to remove some of the items that were stored there and then

19   we would also have time to address the shared-services issue.

20         So, both Drexel University and the master

21   landlords had objected to the rejection motion, so we've

22   carried those motions to today, Your Honor.  We've engaged in

23   discussions with both parties; meanwhile, the landlords filed

24   their motion, Your Honor, where they were seeking to compel

25   payment of over $4.2 million in alleged past-due post-

1  petition lease obligations and they also wanted that pay

2  right away.

3         MidCap filed a response to the master landlords'

4  motion, making clear that they were not prepared to fund any

5  rent for the master landlords that was not included in the

6  budget, and oh, by the way, that 4.2-million-dollar claim was

7  not included in the budget.  And the debtors timely filed an

8  objection to the master landlords' motion.

9         While we agreed that some portions of those -- the

10  rent was owed, we disagreed with a fair amount of the rent

11  which the master landlords alleged was owed.  In addition,

12  Your Honor, as we set forth in our response, we are not -- we

13  did not have an ability to pay that immediately, and so we

14  needed some more time.

15         So, I'm happy to report, Your Honor, that the

16  parties did engage in good faith settlement negotiations on

17  the issues presented by the motions and the responses and we

18  ultimately reached agreement to resolve these issues.  The

19  terms of that agreement are set forth in a stipulation.  That

20  stipulation and order were filed on the docket at Docket

21  Number 1052 on Friday.

22         Let me just pause there and ask if Your Honor had

23  a chance to look at that?

24         THE COURT:  I did.  Yes, Mr. Minuti.

25         MR. MINUTI:  Very well, Your Honor.

1           THE COURT:  Yes.

2           MR. MINUTI:  So, Your Honor, what I'm going to do

3    is I'm just going to hit a couple of the highlights with

4    respect to the stipulation.  Under the stipulation, Your

5    Honor, the master leases -- not including the Erie Street

6    master lease -- are going to be deemed rejected effective

7    November 15 and resolution of any obligations of any of the

8    debtors to the master landlords under Section 365(d)(3) and

9    503(b) of the Bankruptcy Code, the master landlords are going

10   to have an allowed administrative expense claim in the amount

11   of $2.6 million.

12           The debtors are going to pay that allowed

13   administrative expense claim, as follows.  They're going to

14   pay $650,000 of that claim from the net proceeds of the sale

15   of the St. Christopher's Hospital.  And by "net proceeds," I

16   mean after MidCap is paid in full, after we pay the fees to

17   SSG, our investment banker, and by way of a little bit of

18   preview on the calendar for December 9 is a settlement

19   motion, pursuant to our settlement we entered into with Tenet

20   and Conifer.  In that settlement motion, we are proposing to

21   pay $2.2 million to Tenet and Conifer from that sale, Your

22   Honor, and, therefore, the payment here to the master

23   landlords is also going to be subordinated to that payment,

24   as well.

25           THE COURT:  Okay.

1           MR. MINUTI:  The balance of their claim, Your

2    Honor, $1,950,000 is going to enjoy subordinated,

3    superpriority, administrative claim treatment, and that is

4    going to be payable from the net proceeds from the debtors'

5    sale of the auction assets.  The auction assets are the

6    equipment and so forth that are located at the Hahnemann

7    property.  That's going to be sold, pursuant to the Centurion

8    engagement letter that's up, again, in a few minutes before

9    the Court.

10          To the extent the allowed administrative claim is

11   not paid in full from such net proceeds, it shall be paid

12   from certain energy rebates, which we believe are due,

13   related to the Hahnemann property, with any remaining balance

14   to be paid *pro rata* with all other unpaid administrative

15   claims.

16          To be clear, Your Honor -- and I know MidCap is

17   going to want me to put this on the record -- no amount of

18   the administrative claim is going to be paid to the master

19   landlords unless and until all obligations of the debtors to

20   MidCap have been satisfied in full.

21          The superpriority claim granted to the master

22   landlords is subordinated to the superpriority administrative

23   claims granted to Tenet and Conifer in the settlement, as I

24   already mentioned.  And the debtors have agreed, Your Honor,

25   that with the exceptions of MidCap and Tenet and Conifer, no

1  other creditor shall have or be granted a lien or a

2  superpriority, administrative claim specifically from the

3  auction assets, the rebates, and/or the proceeds thereof;

4  that's part of the agreement with the master landlord.

5          If and to the extent the proceeds of the auction

6  assets, other than the guaranty -- that's what we pay to --

7  I'm sorry -- that's what Centurion is paying to us that's

8  actually going to be paid to MidCap, I believe --

9          THE COURT:  Yes.

10          MR. MINUTI:  -- the amount payable to the master

11  landlords from the net proceeds of the St. Chris sale shall

12  be correspondingly increased and applied to the amount of the

13  administrative claim.

14          Now, in return, Your Honor, the debtors -- the

15  master landlords are going to provide the following to the

16  debtor at no charge.  On or before January 31, 2020, we're

17  going to have the right to sell and remove, subject to

18  appropriate insurance and repairs to the premises, our assets

19  that remain in those spaces, including without limitations,

20  specifically, identified and tagged radiology and other

21  equipment, furniture, and inventory.

22          So long as the debtors are not in default of the

23  stipulation, the debtors may continue accessing and using on

24  a non-exclusive basis, certain spaces in the HSRE or the

25  master landlords' property through March 31, 2020, upon the

1  conditions set forth in the stipulation.

2          On or before January 31, 2020, the debtors shall,

3  at the debtors' expense, remove all radioactive waste from

4  the master landlords' premises, and shall provide to the

5  master landlords, a satisfactory certificate of clearance by

6  a radiological contractor, reasonably satisfactory to the

7  master landlords.

8          And just as an aside, Your Honor, we believe that

9  all radioactive material has been removed from the spaces

10 already, but, again, we will confirm that and provide the

11 certificate, as required under the stipulation.

12          THE COURT:  Okay.

13          MR. MINUTI:  The master landlords are going to

14 retain, without cost to the master landlords, access to

15 certain property, equipment, and systems that remain in our

16 space until such time as the effective date that we reject

17 the North and South Towers, for example, and it's all spelled

18 out in the stipulation.

19          The debtors are going to use commercially

20 reasonable efforts to transition vendors, other service

21 providers, and utility services to the master landlords.  The

22 debtors will use commercially reasonable efforts to provide

23 copies of all available contracts, amendments, memos,

24 purchase orders, et cetera, for their properties for the

25 period from January 2018 to the present, bills in lading,

1  warranties, and so on and so forth.

2          The master landlords are going to commence payment

3  of all utility services for what we're calling the Center

4  City campus, beginning after November 15, 2019.  The

5  allocations for such utilities shall be agreed to by the

6  parties, the master landlords, and negotiations in good

7  faith, Your Honor.

8          Finally, the master landlords, Your Honor, are

9  going to be responsible for all future repairs and

10 modifications to the steam vault located in the basement of

11 the North College building.

12         And, finally -- and the committee asked this

13 question, Your Honor -- other than compromising the claims,

14 there are no releases being provided under the settlement.

15         THE COURT:  Okay.

16         MR. MINUTI:  So, we believe the stipulation, Your

17 Honor, resolves the contested motion.  It permits the

18 rejection of burdensome leases.  It favorably resolves

19 disputed post-petition claims, including claims under

20 365(d)(3).  It favorably addresses the timing of payment of

21 those compromised claims favorably in terms of the debtors'

22 ability to pay and provides all parties with a solution for

23 access and use, as necessary, going forward, Your Honor, with

24 respect to the equipment, the shared services, and so on.

25         And so, unless the Court has any questions, Your

1  Honor, we would ask that Your Honor approve the -- sign the

2  order and approve the stipulation.  Again, we did upload a

3  copy of the order and the stipulation.  I have another copy

4  here if Your Honor needs to see it.

5            THE COURT:  All right.  Thank you, Mr. Minuti.

6            And I do have a copy and, Mr. Brown, did you wish

7  to be heard?  They finally negotiated with you.

8            MR. BROWN:  Yes, Your Honor.  Thank you.  Very

9  briefly, Stuart Brown, DLA Piper, on behalf of the master

10 landlords.

11           Mr. Minuti did accurately recite the terms and

12 provisions of the stipulation, notwithstanding we'll rely on

13 the actual words of the stipulation --

14           THE COURT:  That's right.

15           MR. BROWN:  -- of words, interpretation, and

16 purpose.

17           Your Honor, as of this morning, I believe the

18 parties have begun to discuss the allocation of the

19 utilities.  As I understand it, they're discussing allocation

20 based on square footage, what square footage is in the

21 medical office buildings versus the North and South Tower

22 hospital buildings, but that's not finalized.  We will

23 endeavor, at least on our side, to try to get that resolved

24 prior to the hearing, which is on the 11th of December, Mark?

25           MR. MINUTI:  The 9th.

1          MR. BROWN:  The 9th of December, and if not, Your

2   Honor, we'll maybe be back before you on that issue.

3          THE COURT:  Okay.

4          MR. BROWN:  I appreciate the hard work that the

5   debtors' entire team put into resolving these issues with us

6   and pleased that we're here to report a settlement, Your

7   Honor.

8          THE COURT:  All right.  Thank you, Mr. Brown.

9          MR. MARRIOTT:  Good morning, Your Honor.  Vince

10  Marriott of Ballard Spahr --

11         THE COURT:  Yes.

12         MR. MARRIOTT:  -- on behalf of Drexel University.

13         THE COURT:  Yes.

14         MR. MARRIOTT:  We also filed a limited objection

15  to the rejection.  Drexel University's Medical School is

16  primarily housed on what's been referred to as the Hahnemann

17  campus --

18         THE COURT:  Right.

19         MR. MARRIOTT:  -- including the new College

20  building and the Bellet building, and we are a sublessee of

21  the debtors for those properties -- sublessees from,

22  ultimately, the master landlords.  Those -- it is

23  contemplated that those subleases will be rejected

24  simultaneously if the master lease, the result of which will

25  be we'll have a new landlord --

1          THE COURT:  Yes.

2          MR. MARRIOTT:  -- HSRE.

3          Our concern with the rejection was, as Mr. Minuti

4    indicated, access to shared services, and our objection was

5    designed to make sure that any rejection was conditioned upon

6    adequate access to these shared services so that we could

7    continue to operate these buildings.

8          THE COURT:  Right.

9          MR. MARRIOTT:  The stipulation, amongst a lot of

10   other things, takes care of this issue of access --

11          THE COURT:  Yes.

12          MR. MARRIOTT:  -- either providing it to us

13   directly or to our soon-to-be new landlord.

14          There is one piece of access that is going to be

15   dealt with by a separate stipulation, which is in process and

16   largely agreed to.  And I wanted to alert that another

17   stipulation will be coming.  You'll note from the stipulation

18   that one of the pieces of hardware that access will be

19   granted to is the PBX system --

20          THE COURT:  Yes.

21          MR. MARRIOTT:  -- which is the phone system.

22          THE COURT:  Yes.

23          MR. MARRIOTT:  The phone system consists, however,

24   not really just of that hardware, but of software, including

25   phone numbers and switches.

1             THE COURT:  Okay.

2             MR. MARRIOTT:  And those phone numbers are

3   critical -- not just to the debtor, but to Drexel -- because

4   if those phone numbers were to be lost, the medical school

5   would essentially go dark.

6             While we got new numbers and disseminated those

7   new numbers, and you know how that works --

8             THE COURT:  Yes.

9             MR. MARRIOTT:  -- the phone numbers, actually,

10  are, as we understand it, presently in Tenet's name.  That

11  they were not transferred, although they should have been; it

12  was just one of those minor details that sort of fell through

13  the cracks at the time of the original transaction.

14            The subject of the new stipulation or the second

15  stipulation will be transferring at least those numbers that

16  are used by Drexel into Drexel's name.

17            THE COURT:  All right.  And those are the old

18  numbers, did you say, Mr. Marriott?

19            MR. MARRIOTT:  Well, they're old numbers, but

20  they're our current numbers.

21            THE COURT:  Okay.

22            MR. MARRIOTT:  And the numbers work -- they are

23  the numbers that we are presently using --

24            THE COURT:  I see.

25            MR. MARRIOTT:  -- and have been using for

1   20 years.

2             THE COURT:  Okay.  Okay.

3             MR. MARRIOTT:  And the second stipulation will

4   deal with transferring those numbers in such a way that

5   Drexel, in addition to having access to the hardware upon

6   which those numbers presently sit, will have those phone

7   numbers, as well.

8             THE COURT:  And that stipulation will be between

9   Drexel and Tenet?

10            MR. MARRIOTT:  It's actually anticipated between

11  Drexel, Tenet, the debtor, and dealing with both, the use of

12  those numbers and whose name they are.  I mean, my

13  understanding is Tenet -- although I've had no direct

14  conversations with Tenet's counsel about this; the business

15  people have had some discussions -- my understanding is that

16  Tenet doesn't resist transferring the numbers into Drexel's

17  name, but is reluctant to do so, understandably, without a

18  court order authorizing them to do so.

19            THE COURT:  Okay.  All right.

20            MR. MARRIOTT:  So, it would be Drexel, Tenet, and

21  the debtors, at a minimum.

22            THE COURT:  All right.  Thank you.

23            MR. MARRIOTT:  Thank you.

24            THE COURT:  Thank you.  I understand.

25            Mr. Minuti?

1          MR. MINUTI:  Your Honor, just to be clear -- Mark

2     Minuti, on behalf of the debtors -- Mr. Pacitti is actually

3     handling this issue on behalf of the debtors and he's not

4     here today.

5          THE COURT:  Okay.

6          MR. MINUTI:  I have certainly have no reason to

7     dispute anything that Mr. Marriott said, but I guess we'll

8     reserve our rights and hopefully the stipulation will be

9     finalized and brought before Your Honor --

10         THE COURT:  Yes.

11         MR. MINUTI:  -- consistent with the description.

12         THE COURT:  And will that be on shortened notice

13    for the next hearing, probably, Mr. Marriott?

14         MR. MARRIOTT:  It's actually, potentially

15    anticipated to be done under certification of counsel.

16         THE COURT:  Okay.  All right.

17         MR. MARRIOTT:  So, without the need for a hearing.

18         THE COURT:  Good.  All right.  Thank you.

19         Ms. Jones, yes, for Tenet and Conifer.

20         MS. DAVIS JONES:  Good morning, Your Honor.  Laura

21    Davis Jones of Pachulski Stang Ziehl & Jones, on behalf of

22    Tenet and Conifer.

23         Your Honor, the same as Mr. Minuti, I have not

24    been in those discussions, so I better reserve whatever

25    rights we need to, but I expect, Your Honor, we'll be working

1  productively with them to get this resolved.

2          THE COURT:  Thank you, Ms. Jones.

3          MS. DAVIS JONES:  Thank you, Your Honor.

4          THE COURT:  All right.  Well, I certainly

5  recognize how hard everyone worked in resolving these matters

6  regarding the master landlord and I think it is a very

7  comprehensive stipulation.  I couldn't find anything or think

8  of anything that wasn't in there, frankly, that would pertain

9  to the master landlord, and I will be pleased to sign the

10 order.

11         MR. MINUTI:  Okay.  Thank you very much, Your

12 Honor.

13         And I should've put on the record, we do

14 appreciate Mr. Brown and his client's cooperation.

15         THE COURT:  Absolutely.  And that's been uploaded,

16 right?  And is that the order for 2 and 3?

17         MR. MINUTI:  It is, Your Honor.

18         THE COURT:  Okay.  All right.

19         MR. MINUTI:  Your Honor, that would bring us to

20 Item Number 4 on the agenda.

21         THE COURT:  Yes.

22         MR. MINUTI:  This is the debtors' motion for order

23 authorizing retention and employment of Centurion service

24 Group, LLC, as auctioneer, waiving compliance with certain

25 requirements of Local Rule 2016-2, and approving sale and

1  liquidation of certain medical equipment, furniture, and

2  inventory.

3          This motion was served and filed on October 30,

4  2019.  By an order dated October 31, the Court approved it

5  shortened notice, set an objection deadline of November 12th,

6  and set the motion for hearing on November 19.  That hearing

7  was carried forward until today, November 25.

8          We revised and -- we sent out a revised notice and

9  served that and filed on October 31.  That is at Docket

10  Number 937.

11          In response to this motion, we received informal

12  comments from MidCap, the United States Trustee's Office, the

13  master landlords, and certain other parties with an alleged

14  interest in equipment at Hahnemann University Hospital,

15  particularly Med One.  Those informal comments, Your Honor,

16  have all been resolved.  There have been some changes to the

17  proposed form of order and I'll walk Your Honor through those

18  changes when we get there.

19          THE COURT:  All right.

20          MR. MINUTI:  We received one timely objection -- I

21  misspoke, Your Honor -- we had one timely objection that was

22  filed and that was the objection of the master landlords.

23          THE COURT:  Right.

24          MR. MINUTI:  But the same result, Your Honor, we

25  have resolved that objection based on some additional

1  language we've added to the order.

2          In terms of factual background, the primary goal,

3  again, of these cases, one of the primary goals was the

4  shutdown of Hahnemann University Hospital.  The debtors have

5  been in the process of winding down that hospital, as I

6  indicated earlier, and those efforts are continuing.

7          As the Court, I'm sure, can appreciate, there's a

8  tremendous amount of medical equipment, furniture, and

9  inventory remaining at the Hahnemann University Hospital

10 site -- we'll call those the "auction assets" -- and that

11 includes the main hospital premise and any ancillary

12 buildings, including the Feinstein building, the Bokes

13 building, and the new College building.  While these items

14 are no longer necessary for the debtors' operations, many of

15 these items have value and for obvious reasons, it makes

16 sense for the debtors to monetize those assets and to reap

17 the benefits of those assets for the benefit of its estate

18 and creditors.

19         In the debtors' business judgment, the best way to

20 do that is to hire Centurion Service Group, LLC, to market as

21 sell these assets.  As detailed in the motion, Your Honor,

22 Centurion is an experienced auctioneer of medical equipment;

23 in fact, they're the world's largest medical auction house.

24 They average approximately 6,000 sales or pieces of surplus

25 equipment per month.

1           The terms of Centurion's engagement, Your Honor,

2   is spelled out in the motion.  There have been some changes

3   and I'll describe those in a moment.

4           As filed, Your Honor, Centurion was going to make

5   a guaranteed payment to the debtors of two million forty-

6   five -- I'm sorry -- $2,042,500 within 48 hours of court

7   approval of the motion.  They were then going to receive,

8   Your Honor, the first net proceeds of the sales in the amount

9   of $2,450,000.  Over that point, Your Honor, the net proceeds

10  would be split 85 percent to the debtors' estates --

11          THE COURT:  Yes.

12          MR. MINUTI:  -- and 15 percent to Centurion.

13          In addition, Centurion was permitted to charge a

14  premium, a buyer's premium, obviously paid by buyers, up to

15  18 percent.  Subsequent to filing the motion, Your Honor, the

16  parties realized that there were a few misunderstandings in

17  connection with certain equipment to be sold.  Leading up to

18  today's hearing, the parties realized that Centurion's offer

19  was predicated on the sale of certain equipment which

20  belonged to other parties, but still remained in the

21  facilities.

22          When the parties realized this mistake, Your

23  Honor, they negotiated in good faith and the result of those

24  issues are as follows, Your Honor.  The terms of the

25  engagement with Centurion have changed.  We've lowered the

1  guaranty payment to $1,597,750.  They are going to be paid

2  the first net proceeds up to $2,167,650.  After that point,

3  the 18 -- I'm sorry -- the 85 -- yeah, the 85/15 percent

4  split will happen and, again, they'll still charge the same

5  buyer's premium.

6          The proposed compensation structure, as modified

7  or adjusted, Your Honor, we submit is customary, fair, and

8  reasonable.  We're asking that Your Honor approve the terms

9  of Centurion's engagement.  We're also asking that Centurion

10  not be required to maintain detailed, hourly time records, as

11  otherwise required by Local Rule 2016-2.

12          Centurion, in the ordinary course of its business,

13  Your Honor, does not keep or maintain detailed time records.

14  You know, here, we're not necessarily paying just for their

15  time --

16          THE COURT:  Right.

17          MR. MINUTI:  -- we're paying for their experience,

18  their reputation, and their methodology.  So, under the

19  circumstances, Your Honor, we believe the waiver is

20  appropriate.

21          THE COURT:  I don't think you're paying for their

22  time, their hourly rate at all, are you, in this particular

23  instance?

24          MR. MINUTI:  I think it's obviously compensated.

25  Their time is obviously compensated --

1            THE COURT:  Right.

2            MR. MINUTI:  -- but, again, it's their expertise,

3    it's their methodologies, it's their system, their contact

4    list, and so forth.

5            THE COURT:  Yes.

6            MR. MINUTI:  Centurion, Your Honor, has not

7    shared, Your Honor, or agreed to share any compensation

8    inconsistent with the Bankruptcy Code.  Based upon the

9    declaration attached to the motion, Centurion is

10   disinterested and under the agreement, Your Honor, we haven't

11   agreed to indemnify them, but when Your Honor sees the form

12   of order, you'll see that we've revised the indemnity,

13   consistent with the indemnification typically approved in

14   this jurisdiction --

15           THE COURT:  Okay.

16           MR. MINUTI:  -- and pushed by United States

17   Trustee's Office, Your Honor.

18           THE COURT:  Right.

19           MR. MINUTI:  So, again, we're asking the Court to

20   approve the retention of Centurion under 327(a) and 327 --

21   I'm sorry -- 328(a).  Centurion's compensation is going to be

22   subject to review under 328(a) and not any other standard of

23   review under 330, provided, here, Your Honor, that the order

24   does provide for the United States Trustee, they have the

25   right to object based upon the reasonableness standard

1  of 330.

2         THE COURT:  Okay.

3         MR. MINUTI:  By the motion, we're obviously also

4  asking that the Court to authorize Centurion to sell the

5  auction assets under Section 363(b), free and clear of

6  interest.  The only party with a lien is MidCap, who is

7  consenting, and when Your Honor sees the form of order,

8  you'll see that we have all kinds of language in there to

9  protect MidCap.

10         Again, the debtors do not need and cannot use this

11  equipment.  Approval of the motion will permit the debtors to

12  appropriately monetize these assets for the benefit of their

13  estates.  As I mentioned, Your Honor, all the formal and

14  informal objections had been resolved, and so the only thing

15  I have left to do is to walk Your Honor through the form of

16  order.

17         I have a blackline and a clean, may I approach?

18         THE COURT:  Yes, you may.

19         MR. MINUTI:  And the clean has also been uploaded,

20  as well, Your Honor.

21         THE COURT:  All right.  Great.  Thank you,

22  Mr. Minuti.  Thank you, sir.  Thank you.

23         MR. MINUTI:  Mr. Isenberg reminds me, Your Honor,

24  there's another party, Med One, who had a lien on certain of

25  the equipment.  And just so the record is clear, we're

1   removing that equipment from the sale, as well.

2           THE COURT:  Okay.

3           MR. MINUTI:  And that's factored into the

4   adjustment of the purchase price, as well.

5           THE COURT:  All right.

6           MR. MINUTI:  So, if Your Honor looks at the

7   blackline, pretty self-explanatory.  In the caption we've

8   added "granting adequate protection, as to the benefit of the

9   master landlords" and we'll see some changes, later, with

10  respect to that.

11          On the first page we've referenced the limited

12  objection filed by the master landlords.  That continue us

13  throughout the first paragraph, and then we get to the

14  findings that start on Page 3.  If you look at Finding F,

15  that was at the request of the master landlords -- fairly

16  self-explanatory.

17          Is Your Honor with me?

18          THE COURT:  Yes, I am, Mr. Minuti.

19          MR. MINUTI:  Okay.  If we then jump ahead, Your

20  Honor, to Page 5 of the blackline, at the top -- this is

21  Subsection A, the carryover, that was just a cleanup of a, I

22  guess, a typo -- and if you look at the sentence added to

23  Subparagraph C, "all parties in interest shall retain the

24  right to object to any demand by Centurion for

25  indemnification, contribution, or reimbursement" --

1            THE COURT:  Yes.

2            MR. MINUTI:  -- just preserving rights.

3            THE COURT:  Yes.  And then 10 --  I'm sorry, I

4  missed the top.  Hold on.

5            MR. MINUTI:  Carryover from Page 8, Your Honor,

6  that's just making clear, Your Honor, we're not selling any

7  assets that we don't own, Your Honor.

8            THE COURT:  Right.

9            MR. MINUTI:  And then the last sentence was asked

10  by the United States Trustee's Office that we add that we're

11  going to remove personal information, if Your Honor sees

12  that?

13            THE COURT:  Yes.

14            MR. MINUTI:  We certainly have no objection to

15  that.

16            THE COURT:  Right.

17            MR. MINUTI:  Paragraph 10, Your Honor, this is a

18  new paragraph that essentially provides some protections for

19  the master landlord --

20            THE COURT:  Insurance.

21            MR. MINUTI:  -- it's fairly self-explanatory.

22            THE COURT:  Yes, I see that; that's fine.

23            MR. MINUTI:  If you jump ahead to Paragraph 14,

24  this is where we've adjusted the guaranty amount --

25            THE COURT:  Right.

1          MR. MINUTI:  -- and the break -- and the split.

2          And if we go to Paragraph 15, Your Honor, this was

3   language added at the request of MidCap to make it clear that

4   MidCap was protected with respect to their lien on the

5   assets.

6          THE COURT:  Okay.

7          MR. MINUTI:  And then finally, Your Honor, in

8   Paragraph 20 -- I mentioned Med One a few minutes ago -- this

9   is a paragraph related to Med One, making it clear, Your

10  Honor, again, that we're not selling any of Med One's assets.

11         THE COURT:  Good.  And you know which assets those

12  are?  They've been identified and it's clear?

13         MR. MINUTI:  That is true, Your Honor.

14         THE COURT:  Good.  Thank you.  All right.

15         MR. MINUTI:  So, again, Your Honor, with the

16  changes to the order, I don't believe there are any

17  outstanding objections.  Unless Your Honor has any questions,

18  we would ask that Your Honor approve the order.

19         THE COURT:  All right.  Thank you, Mr. Minuti, and

20  I'll hear from Mr. Brown for the master landlord.

21         MR. BROWN:  Thank you, Your Honor.  For the

22  record, Stuart Brown on behalf of the master landlord.

23         Your Honor, we objected on the basis of insecurity

24  in looking for assurances to protect the properties.

25         THE COURT:  That's right.

1          MR. BROWN:  There's language in the engagement

2    letter that indicates that Centurion will post a two-hundred-

3    and-fifty-thousand-dollar bond.  We've not seen that.  We'd

4    like to see a copy of that.

5          Your Honor, also, there's a very large piece of

6    equipment on, I believe, the first floor of one of the

7    medical office buildings that will require substantial --

8          THE COURT:  Alterations?

9          MR. BROWN:  Yeah, let's use that word.

10       (Laughter)

11         MR. BROWN:  Removal of walls and roofs, possibly.

12         THE COURT:  Oh, wow.

13         MR. BROWN:  And so, we don't know what the plan

14    is.  We have an estimate for what the expense might be.

15    We're not sure about the adequacy of the two-hundred-and-

16    fifty-thousand-dollar bond.

17         We've reserved the right in the context of the

18    order, Your Honor --

19         THE COURT:  Yes.

20         MR. BROWN:  -- to have discussions with Centurion

21    about that and to the extent that the bond is inadequate to

22    either have Centurion agree voluntarily to increase it or to

23    come back to Your Honor to cause an increase in the bond and

24    protection for the buildings.

25         THE COURT:  All right.

1          MR. BROWN:  Thank you, Your Honor.

2          THE COURT:  All right.  Thank you, Mr. Brown.

3    That's fine.

4          Anyone else?  The committee is onboard with this?

5          UNIDENTIFIED:  We are, Your Honor.

6          THE COURT:  All right.  Good.

7          Well, I'm going to approve, obviously, the motion.

8    Centurion is known to the Court and its expertise is known,

9    and I think the debtors have certainly addressed all of the

10   concerns that parties had, with regard to the sale of the

11   assets and I'm going to approve the motion and sign the

12   order.

13         MR. MINUTI:  Thank you, Your Honor.

14         THE COURT:  Or it's uploaded, I'm sorry.

15         MR. MINUTI:  Your Honor, that brings us back to

16   Item Number 1 on the agenda --

17         THE COURT:  Yes.

18         MR. MINUTI:  -- which is the assumption and

19   assignment of two leases with Front Street.  I do think it

20   would make some sense to take a break and give the parties a

21   little more time to talk about that to see if we can either

22   resolve it or if not resolve it, maybe streamline the hearing

23   or condense the hearing.

24         So, if Your Honor will indulge us, we'd like to

25   take -- I don't know -- 15 minutes and see where we are and

1  then I can knock on chambers door and let you know where we

2  are.

3          THE COURT:  All right.  We'll take a 15- or 30-

4  minute recess.

5          MR. MINUTI:  Thank you very much, Your Honor.

6          THE COURT:  Of course.  We'll stand in recess.

7      (Recess taken at 11:33 a.m.)

8      (Proceedings resumed at 12:06 p.m.)

9          THE COURT OFFICER:  Please rise.

10         THE COURT:  Thank you, everyone.  You may be

11  seated.  Thank you.

12         Mr. Minuti?

13         MR. MINUTI:  This time, good afternoon, Your

14  Honor.  Mark Minuti, on behalf of the debtors.

15         THE COURT:  Yes.

16         MR. MINUTI:  I have good news, Judge.  I was close

17  to my estimate of time on the break.  I want the record to

18  reflect that, number one, and number two, I think we used the

19  time productively, Your Honor.  I think we have an agreement

20  in principle, in terms of how to move forward with the

21  motion.

22         So, the matter before the Court is Item Number 1

23  on the agenda and this really is our sale of St.

24  Christopher's Hospital to STC OpCo, LLC.

25         THE COURT:  Yes.

1          MR. MINUTI:  The only thing moving forward today,

2    Your Honor -- Your Honor will recall you did previously enter

3    an order authorizing that sale.

4          Just by way of update, the anticipated closing of

5    the St. Christopher's Hospital sale, it looks like right now

6    it's going to happen mid-December, I think the 15th, Your

7    Honor.

8          THE COURT:  That's what I had understood, yes.

9          MR. MINUTI:  That's what we're shooting for.

10          THE COURT:  Okay.

11          MR. MINUTI:  And so, what we're moving forward to

12    with today, Your Honor, was really just the assumption and

13    assignment of two leases; one, the lease with one of the

14    Front Street entities, that is actually the lease for the

15    hospital and the other was a lease with another Front Street

16    entity for what we call the Nelson Pavilion.

17          The issues, Your Honor, have to do with adequate

18    assurance and future performance, number one, and cure.  And

19    I think the way we've agreed to proceed today is I think

20    there's agreement on adequate assurance and future

21    performance and I think we're essentially going to punt on

22    the cure claims.

23          And the reason for that, Your Honor, is there is

24    the prospect that the property, itself, is going to be

25    purchased, but that may not happen until after the leases are

1  assumed and assigned, and so I think the idea is to punt on

2  the cure claims, see if that purchase happens, see if it all

3  goes away as a result of the purchase, but if it doesn't,

4  we'll come back if there's any dispute over cure claims

5  later.

6           THE COURT:  All right.

7           MR. MINUTI:  But what I'd like to do now is cede

8  the podium, if Your Honor will let me, to Mr. Lapowsky and

9  he'll sort of put the terms on the record and then I think

10 what we're going to do is follow up with an order either

11 later today or tomorrow.

12          THE COURT:  All right.  Thank you, Mr. Minuti.

13          Mr. Lapowsky, good afternoon.

14          MR. LAPOWSKY:  Good afternoon, Your Honor.  Robert

15 Lapowsky, from Stevens & Lee, appearing for both, STC OpCo,

16 the purchaser, and also for Tower Health.

17          Your Honor, the order that we anticipate

18 presenting to you -- and I think it would be later today or

19 tomorrow --

20          THE COURT:  Okay.

21          MR. LAPOWSKY:  -- would do the following.  It

22 would approve the assumption and assignment of the two leases

23 to STC OpCo.

24          THE COURT:  Okay.

25          MR. LAPOWSKY:  It would not establish the amount

1    of any cure claims.

2            THE COURT:  Okay.

3            MR. LAPOWSKY:  It would defer the determination of

4    cure amounts to a hearing which would be set sometime no

5    earlier than February 15th and no later than March 15th of

6    next year.

7            At that hearing, to the extent it's still

8    relevant, as Mr. Minuti advised you, there is the prospect of

9    a sale of these two pieces of real estate in the interim and

10   there is the prospect that if they do sell, the cure issues

11   will become moot --

12           THE COURT:  Absolutely.

13           MR. LAPOWSKY:  -- but if they do not --

14           THE COURT:  Yes.

15           MR. LAPOWSKY:  -- then the hearing that I just

16   described that would happen between February 15th and March

17   15th would address all cure issues, except for one.  And the

18   one that it would not address is something that we've been

19   referring to as "performance-based rent."

20           So, there are performance-based rent provisions in

21   both leases and to the extent there are disputes that relate

22   to those and they relate to cure amounts, those would not be

23   addressed at the hearing I just referred to.  Those are being

24   deferred for a longer period of time, 120 days.  So, to the

25   extent there is a dispute on that issue, it would come back

1   to the Court sometime later in 2020.

2            THE COURT:  All right.

3            MR. LAPOWSKY:  Your Honor, Drexel and Tower are

4   going to provide guaranties.  The guaranties are going to be

5   joint and several for all obligations under the leases and

6   that would include any cure amounts that are ultimately

7   determined to be due.  The guaranties would be joint and

8   several, up to $10 million plus the amount of any cures that

9   are determined.  Above that threshold, they would be 50/50.

10  So, each of Tower and Drexel would be responsible for one-

11  half of any amounts due above that threshold amount.

12           THE COURT:  And that threshold amount being the

13  $10 million; is that right?

14           MR. LAPOWSKY:  Ten million, plus whatever is

15  determined to be owed on account of cures.

16           THE COURT:  Okay.  Okay.

17           MR. LAPOWSKY:  The debtors have agreed that they

18  would pay any amounts due to the two landlords that have

19  arisen post-petition.  I believe the debtors and Front Street

20  have either completely worked out what that -- those numbers

21  would be or are very close to that -- and I'll let Mr. Minuti

22  address that when I'm finished -- but in any event, that

23  liability is on the debtors.

24           THE COURT:  Okay.

25           MR. LAPOWSKY:  So, to the extent that they can't

1   work things out between the debtors and Front Street or they

2   can work them out and then the debtors don't pay, that

3   doesn't come back to STC.

4               THE COURT:  Okay.

5               MR. LAPOWSKY:  That is a debtor obligation.

6               THE COURT:  All right.

7               MR. LAPOWSKY:  The debtors have agreed that they

8   will provide access to the Front Street entities to records

9   that they need to see in order to determine what the cure

10  amounts might be and STC OpCo has agreed that post-closing,

11  once we close, that we would provide reasonable cooperation

12  in terms of that access obligations.

13              THE COURT:  All right.

14              MR. LAPOWSKY:  On or before January 15th, 2020,

15  the Front Street entities will provide to the debtors and to

16  STC OpCo, their analysis of what is due on account of cure

17  claims.  If those amounts cannot be resolved prior to the

18  hearing that I referred to that's going to happen between

19  February 15th and March 15th --

20              THE COURT:  Yes.

21              MR. LAPOWSKY:  -- then they would be addressed at

22  that hearing, other than as it relates to performance-based

23  rent.

24              THE COURT:  Right.

25              MR. LAPOWSKY:  And lastly, STC OpCo, after the

1  closing, and for a period of 120 days, will pay base rent

2  under the leases; in other words, they will not pay the

3  performance-based rent.  To the extent that the performance-

4  based rent remains an issue and is ultimately resolved in

5  favor of the landlords, that determination could be

6  retroactive; so, in other words, the current pay rate for

7  that first 120 days is the base rent, but there is no

8  guarantee from STC OpCo's perspective that that will

9  ultimately be the amount that's due.  There's only a

10  guarantee that that's all they'll pay during that period of

11  time.

12           THE COURT:  That's right.

13           MR. LAPOWSKY:  And, Your Honor, that is the

14  agreement as far as I know.

15           THE COURT:  All right.  Does anyone from Front

16  Street wish to be heard?

17           Mr. Collins?

18           MR. COLLINS:  Good morning, Your Honor.

19           THE COURT:  Good afternoon, already.

20           MR. COLLINS:  Yeah, already.

21           THE COURT:  Yeah.

22           MR. COLLINS:  Mark Collins, of Richards, Layton &

23  Finger, on behalf of the Front Street entities.

24           Your Honor, I believe Mr. Lapowsky properly

25  summarized the terms.  I would note with just a little more

1  specificity with respect to certain of the payments that the

2  debtors need to make for post-petition obligations.  They

3  have agreed to make those payments on or before the STC OpCo

4  closing date.

5           THE COURT:  All right.

6           MR. COLLINS:  We believe right now that the

7  outstanding post-petition obligations include use and

8  occupancy taxes, approximately $41,000; certain parking taxes

9  that are due post-petition; and certain past-due post-

10 petition base rent of approximately $14,000.

11          All -- as Mr. Lapowsky stated, all of the cure

12 amounts --

13          THE COURT:  Yes.

14          MR. COLLINS:  -- whatever they may be, any and all

15 types of any nature --

16          THE COURT:  Yes.

17          MR. COLLINS:  -- are reserved and would be

18 considered by Your Honor at a hearing sometime between

19 February 15th and March 15th if the parties cannot otherwise

20 reach agreement on what those cure amounts are.

21          THE COURT:  All right.

22          MR. COLLINS:  As they stated, the post-petition

23 performance rent issue is being handled separately by the

24 parties --

25          THE COURT:  Right.

1    MR. COLLINS:  -- but as stated, if it is

2  determined that post-petition performance rent is due and

3  came due post-petition or post-closing, those amounts would

4  be retroactive and that would need to be paid by the parties.

5    THE COURT:  That's right.

6    MR. COLLINS:  And to confirm, we look at -- we're

7  trying to take this in steps, with respect to the

8  performance-based rent -- we're agreeing that for 120 days,

9  STC OpCo would pay the base rent, subject to the

10  retroactivity of the performance-based rent, if that's either

11  what is agreed to by the parties or as ordered by a Court.

12    THE COURT:  Just one thing I'm not perfectly clear

13  on --

14    MR. COLLINS:  Yes?

15    THE COURT:  -- and that is, will the debtors, at

16  all, be responsible to pay performance-based rent or is it

17  going to be just the amounts that you sort of have identified

18  thus far.

19    MR. COLLINS:  I believe -- and Mr. Lapowsky will

20  correct me, and I asked the same question -- with respect to

21  cure amounts, generally --

22    THE COURT:  Yes.

23    MR. COLLINS:  -- the buyer is responsible for

24  (indiscernible) cure amounts.

25    THE COURT:  Okay.

1          MR. COLLINS:  What the debtor is agreeing to pay

2   out of its own pocket are those obligations that are coming

3   due pretty much in the ordinary course of business post-

4   petition.

5          THE COURT:  Okay.

6          MR. COLLINS:  That's the certain occupancy taxes,

7   parking taxes, and things like that.

8          THE COURT:  Yes.

9          MR. COLLINS:  But the disputed cure amounts of the

10  larger issues would be the obligation, as I understand it, of

11  the purchaser, STC OpCo.

12         THE COURT:  Okay.  All right.  Thank you,

13  Mr. Collins.

14         MR. COLLINS:  Thank you.

15         THE COURT:  Mr. Lapowsky, yes.

16         MR. LAPOWSKY:  Yes, Your Honor.  I just wanted to

17  confirm that Mr. Collins' understanding is correct, that is

18  that the performance-based rent will never be a debtor

19  obligation.

20         THE COURT:  Okay.

21         MR. LAPOWSKY:  It will either be nobody's

22  obligation or it will be our obligation.

23         THE COURT:  I have it.  I understand.

24         MR. LAPOWSKY:  And I guess the other clarification

25  I wanted to make just so the record is clear is, the post-

1  petition obligations that the debtors are agreeing to pay --

2            THE COURT:  Yes.

3            MR. LAPOWSKY:  -- those could also be

4  characterized as cure amounts if they weren't paid, but

5  notwithstanding that, the Front Street landlords are agreeing

6  to look solely to the debtors for those items -- the use and

7  occupancy tax and the parking tax and the --

8            THE COURT:  And the base rent, yes.

9            UNIDENTIFIED:  Post-petition.

10           MR. LAPOWSKY:  Post-petition, that's what I said,

11 post-petition.

12           THE COURT:  Post-petition until the time that the

13 property is transferred.

14           Yes, Mr. Collins?  Did something come up?

15           MR. COLLINS:  We always have to add one thing

16 more, Your Honor.

17           THE COURT:  Yes.  Yes.

18           MR. COLLINS:  Then it's true, as I understand it,

19 the debtors have agreed to pay these limited post-petition

20 past-due amounts; if, however, they do not, then we have the

21 right to look to the buyer for those amounts, as they would

22 be unpaid obligations, due under the leases.

23           THE COURT:  There's a little difference here

24 between you two.

25           UNIDENTIFIED:  Can we have a minute, Your Honor?

1          THE COURT:  Sure, absolutely.

2      (Participants confer)

3          THE COURT:  Off the record.

4      (Recess taken at 12:20 p.m.)

5      (Proceedings resumed at 12:21 p.m.)

6          THE COURT:  It's a fairly small amount of money,

7  isn't it, Mr. Minuti?

8          MR. MINUTI:  You're right, Your Honor.  So, just

9  give me one second.

10         THE COURT:  Yeah.

11     (Participants confer)

12         UNIDENTIFIED:  That doesn't stop us from fighting

13  about it.

14     (Laughter)

15         MR. MINUTI:  So, Your Honor, here's what we've

16  agreed to do on this issue.  You're right, it's a fairly

17  small amount of money.

18         The debtors intend to pay those amounts that Mr.

19  Collins put on the record.  That was the use and occupancy

20  taxes of approximately $41,000; the parking taxes of

21  approximately eleven ninety, and the balance of the past due

22  rent, approximately $14,063.

23         THE COURT:  Right.

24         MR. MINUTI:  If we don't pay those and the buyers

25  have to pay them at closing, we will reimburse the buyer

1   those amounts --

2             THE COURT:  Okay.

3             MR. MINUTI:  -- Your Honor, at the closing.  So, I

4   think, with that -- not to exceed those amounts.

5             THE COURT:  Right.

6             MR. MINUTI:  So, with that, I think we've resolved

7   that issue.

8             The only other point of clarification that I

9   wanted to make -- Mr. Collins -- he switched sides on me.

10            THE COURT:  He did already, yes, and so did

11  Mr. Sherman over there.

12       (Laughter)

13            MR. MINUTI:  The only other point of clarification

14  that I wanted to make, Your Honor, is that Mr. Lapowsky said

15  that we were going to provide the Front Street parties with

16  access to our books and records.  That is not accurate.

17            What we're going to do is the Front Street parties

18  are going to give us an information request on or before

19  January 15th -- is that what we talked about?

20            UNIDENTIFIED:  Uh-huh.

21            MR. MINUTI:  -- January 15th.  We're then going to

22  respond to that so we can hopefully reach an agreement on the

23  cure claims and either we will or we won't.

24            If we won't, we'll, obviously, be back consistent

25  with the time frame that we talked about --

1          THE COURT:  Yes.

2          MR. MINUTI:  -- but we're not giving them access

3 to the premises.  That was the clarification.

4          THE COURT:  All right.  That makes sense.

5          Well, I will look for an order that says something

6 later today or tomorrow.

7          MR. MINUTI:  Very well, Your Honor.

8          THE COURT:  All right.  I'm glad, though.  I'm

9 glad the parties resolved this and I think it's a good

10 resolution.

11          MR. MINUTI:  Very well, Your Honor.

12          I think that completes our calendar.  We

13 appreciate it, Your Honor.  Thank you very much.

14          THE COURT:  We will stand in recess.  Good day to

15 all of you.

16          MR. MINUTI:  Have a happy Thanksgiving.

17          THE COURT:  And to all of you:  Happy

18 Thanksgiving.

19          UNIDENTIFIED:  You, as well, Your Honor.

20          UNIDENTIFIED:  Thanks.

21      (Proceedings concluded at 12:23 p.m.)

22

23

24

25

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ William J. Garling                    November 25, 2019

10   William J. Garling, CET**D-543

11   Certified Court Transcriptionist

12   For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25