**<u>EXHIBIT B</u>**

**THOMAS E. WEIERS, JR., ESQ.**     *Attorney for Claimant/Plaintiff,*
PA I.D. No. 43715                                    Otis Elevator Company
2000 Georgetowne Dr.
Suite 100
Sewickley, PA 15143
Phone:  412-874-5298
Tom.weiersesq@gmail.com

---

Otis Elevator Company,                      Philadelphia County
                                                            Court of Common Pleas
                                                            Civil Division

                          Claimant,

              v.                                       No.  1909M0021

Broad Street Healthcare Properties, LLC      **MECHANIC'S LIEN CLAIM**
And Tenet HealthSystem Hahnemann, LLC,
d/b/a Hahnemann University Hospital,

                          Owners or Reputed.
                          Owners.

---

## NOTICE OF FILING OF MECHANIC'S LIEN

To:     Broad Street Healthcare Properties, LLC
          c/o Cogency Global, Inc., Its PA Registered Agent
          600 North 2nd St.
          Harrisburg, PA 17101

Notice is hereby given that a Statement of Mechanic's Lien, a true and correct copy of which is attached hereto, was filed on behalf of Otis Elevator Company on September 20, 2019 in the Court of Common Pleas of Philadelphia County, Pennsylvania, Civil Division, at case number 1909M0021.  This Mechanic's Lien claim is asserted against the property owned by Broad Street Healthcare Properties, LLC, and leased by Tenant HealthSystem Hahnemann, LLC, 222-248 Broad St., Philadelphia, 19102.

                                          Respectfully submitted

                                          _____
                                          Thomas E. Weiers, Jr.
                                          Attorney for Claimant, Otis Elevator Co.

**THOMAS E. WEIERS, JR., ESQ.**
PA I.D. No. 43715
2000 Georgetowne Dr.
Suite 100
Sewickley, PA 15143
Phone:  412-874-5298
Tom.weiersesq@gmail.com

*Attorney for Claimant/Plaintiff,*
Otis Elevator Company

---

| | |
|---|---|
| Otis Elevator Company, | Philadelphia County<br>Court of Common Pleas<br>Civil Division |
| Claimant,<br>v. | No. 1909 M0021 |
| Broad Street Healthcare Properties, LLC<br>And Tenet HealthSystem Hahnemann, LLC,<br>d/b/a Hahnemann University Hospital, | **MECHANIC'S LIEN CLAIM** |
| Owners or Reputed.<br>Owners. | |

---

## STATEMENT OF MECHANIC'S LIEN

AND NOW, comes Otis Elevator Company ("Otis"), by and through its undersigned counsel, Thomas E. Weiers, Jr., Esquire and files this Statement of Mechanic's Lien as a contractor pursuant to the Mechanic's Lien Laws of 1963, 49 P.S. §1101, et seq., against the fee simple and leasehold interests of the premises herein described, any and all building erected thereupon and the curtilage appurtenant thereto for the payment of $81,137.00, together with applicable interest.  The following is a statement of the claim.

1.    Name of Claimant:

Otis Elevator Company
30 Twosome Dr. – Suite 4
Moorestown, NJ 08057

2.   <u>Name and Address of Owners or Reputed Owners of the Buildings and/or Property and of Lessee:</u>

   Broad Street Healthcare Properties, LLC
222 N. Sepulveda Blvd. – Suite 900
El Segundo, CA 90245
(Fee Owner)

Tenet HealthSystem Hahnemann, LLC,
d/b/a Hahnemann University Hospital
230 N. Broad St.
Philadelphia, PA 19102
(Leaseholder)

3.   <u>Completion of Work/Supply of Materials at the Project:</u>

March 31, 2019

4.   <u>Detailed Statement of the Kind and Character of the Work and Labor Done:</u>

Otis provided materials and labor to make repairs and maintain elevators and escalators as set forth in more detail in the Contract, as amended, attached hereto and incorporated herein as Exhibit "A." Otis contracted with Owner, Tenet HealthSystem Hahnemann, LLC, the former fee simple owner and current lessee of the property.

5.   <u>Amount or Sum Claimed to be Due is:</u>

Eighty One Thousand One Hundred Thirty Seven Dollars and Zero Cents ($81,137.00) for materials and services furnished within six (6) months last past for erection, construction, alteration or repair and upon the credit of the property, buildings and curtilage described herein.

6. <u>Lien is Claimed Against the Following Described Real Property and Structures Thereon:</u>

The fee simple interest of real property and structures known as the Hannemann University Hospital, with a US Postal address of 222-248 Broad St., Philadelphia, 19102 and being further described as Parcel "A" in a deed filed January 18, 2018 at Document ID No. 53316745 and having Tax Parcel ID No. 77-2-0250-02, together with the leasehold interest held therein by Tenet HealthSystem Hahnemann, LLC d/b/a Hahnemann University Hospital.  It is reasonably believed and therefore averred that the fee simple Owner, Broad Street Healthcare Properties, LLC provided written consent for the improvements, repairs, maintenance and/or services to the leasehold interest held by Tenet HealthSystem Hahnemann, LLC d/b/a Hahnemann University Hospital including those improvements made by Claimant, and that Claimant's improvements, repairs, maintenance and/or services were for the immediate use and benefit of Owner, Broad Street Healthcare Properties, LLC

Respectfully submitted,

Dated:  September 20, 2019

_____
Thomas E. Weiers, Jr., Esq.
*Attorney for Otis Elevator Company*

# Hahnemann University Hospital
## Elevator Maintenance Services Agreement

### SERVICES AGREEMENT

THIS SERVICES AGREEMENT ("Agreement") is made and entered into as of MARCH 1, 2008, 2008 ("Effective Date"), by and between Tenet HealthSystem Hahnemann, LLC d/b/a Hahnemann University Hospital a Pennsylvania business corporation on its own behalf as provided herein ("HOSPITAL") and The Otis Elevator Company ("VENDOR").

### RECITALS:

A.    Tenet HealthSystem Hahnemann, Inc. is a for-profit corporation, which owns, leases or manages hospital listed on **Exhibit "A"** attached hereto and made a part hereof and is in need of elevator maintenance services (the "Services").

B.    VENDOR employs or otherwise contracts with individuals duly qualified and experienced in furnishing the Services (collectively "VENDOR Staff").

C.    VENDOR and HOSPITAL agree that it is in the best interest of HOSPITAL'S ability to provide quality patient care in a cost-effective and efficient manner for HOSPITAL to contract with an entity to provide the Services.

NOW, THEREFORE, for and in consideration of the recitals above and the mutual covenants and conditions contained herein, HOSPITAL and VENDOR agree as follows:

## 1.  VENDOR'S OBLIGATIONS

A.  **Services.** While this Agreement is in effect, VENDOR shall provide the following Services for the Equipment locations listed in **Exhibit "B"**.

1.  **Services** shall be performed in a diligent and first class manner, with quality supplies, materials, equipment and workmanship and in such a manner so as to minimize the possibility of any annoyance, interference, or disruption. Upon completion of services, VENDOR shall restore the property to its original condition and shall leave the property clean and free of all tools, equipment, waste materials and rubbish.

The VENDOR shall perform governor and safety tests on traction elevators or annual relief pressure tests on hydraulic elevators per Local and State codes, Joint Commission, and any other regulatory organization. The VENDOR shall also perform any request by the Joint Commission or any other regulatory organization.

2.  **Maintenance Standards.** VENDOR will perform regular, systematic examinations of the equipment, in accordance with the Preventive Maintenance detailed in **Exhibit "C"**. These examinations will also include lubrication, adjustment, and other services as specified within this Agreement. Replacement of signal lamps will be made during scheduled examinations. VENDOR will keep the machine room equipment and machine room floors properly painted, and will periodically clean the machinery and machine room areas, and maintain them in a presentable condition. VENDOR will periodically clean down hoistways to remove accumulated dust, dirt, and lint from the shaft way interior (including PIT), beams, doors and door tracks, and car.



EXHIBIT

"A"

PENGAD 800-631-6989

All preventive maintenance performed must meet the standards established by all pertinent regulatory agencies and those established by HOSPITAL.

3. **Uniforms.** The VENDOR's employees will be required to wear uniforms at all times while working on the Authority's equipment subject to this Contract.

4. **Identification of Personnel.** HOSPITAL shall provide The VENDOR's on-site technician(s) a HOSPITAL distinctive picture identification badge showing the VENDOR's name, the technician's name and the technician's job title. All VENDOR'S Technicians shall display these badges prominently upon entering and while on any of the HOSPITAL properties. HOSPITAL shall have the right to require the VENDOR to conduct background checks on its employees and to remove from HOSPITAL's property any employee HOSPITAL considers incompetent, careless, or who constitutes a security risk or safety hazard. All HOSPITAL issued ID badges remain the property of HOSPITAL and must be returned upon reassignment or termination of duties at the HOSPITAL facility. Cost for replacement of lost or stolen HOSPITAL ID badges is $5 and is the responsibility of the VENDOR or the VENDOR's technician.

5. **Equipment Repairs or Replacement.** When conditions warrant, due to the wear and tear of normal usage, VENDOR will repair or replace the equipment listed below. This coverage includes the applicable systems described below as well as all sub-assemblies and all subcomponents that comprise these described systems:

- **Machine,** including worms, gears, bearings, brake, linings, coil, contact, coupling and sheaves.

- **Pump Unit,** including tank, fluid, jack packing, exposed piping, motor, pump, and valve system.

- **Selector,** including motors, cams, switches, bearings, wiring, cable, tape and, driving mechanism

- **Controller and Dispatcher,** including wiring, relays, capacitors, timers, resistors, computers, solid state components, circuit boards, rectifiers, transformers, load weighing and transducers

- **Hoist Motor and Generator,** including windings, fields, stators, rotating elements, brushes, holders, bearings, commutators, and static drive

- **Hoist and Governor Ropes,** including tension equalization, and resocketing of drum hoist and counter weight ropes

- **Car and Counterweight Safety Mechanism,** including governor

- **Hoist way Equipment,** including switches, cams and sheaves

- **Car and Counterweight Guide Shoes,** including gibs and rollers

- **Car and Counterweight Buffers,** including switches, springs and oil

- **Car and Counterweight Guide Rails**

- **Car, Shaft way, and Machine Room Wiring,** including traveling cables

- **Car and Hall Signal Devices,** including lamps and displays

- **Car and Hall Operating Devices,** including buttons, lamps and switches

- **Hoist way Door Hardware,** including hangers, interlocks, gibs and closers

- **Escalator Driving System,** including machine, worms, gears, sprockets, brake, coupling, coil, linings, chairs, bearings, motor, stator and rotor

- **Escalator Handrail System,** including sprockets, handrails, rollers, chains, bearings, brush guards, and driving mechanism

- **Escalator Step System,** including steps, treads, chains, comb plates, track and rollers

- Door Operator System, including motor, clutches, sheaves, belts, bearings, contacts, cams, gears, car door hangers, and door reversal devices

- All Accessory Equipment except such items as are hereinafter excluded

6.  **Proper Use of Equipment.** Together, VENDOR and HOSPITAL will make their best efforts to reduce the level and frequency of services performed outside the contract due to vandalism, abuse and misuse of the equipment. It will be in the interest of both parties to develop educational and training programs promoting safe and responsible equipment operation; to make all users aware of the need to report malfunctions immediately; and to discourage vandalism, abuse, and misuse by reporting incidents to the appropriate officials. VENDOR will be reimbursed for misuse and vandalism at the rates listed in **Exhibit "C."**

7.  **Customer Service Technician.** To assure continuity, VENDOR will assign customer service technicians to the HOSPITAL account. These technicians will be trained and qualified to troubleshoot and perform the scheduled routine preventive maintenance functions on the equipment based on a regular and systematic program.

8.  **Prompt Emergency Service Response.** Should trouble develop between regularly scheduled monthly examinations, VENDOR shall have emergency service dispatchers on duty 24 hours per day. VENDOR will dispatch a service technician upon HOSPITAL'S notification to VENDOR of trouble and their request for such service. An emergency call is defined as an entrapment or a situation where all the elevators in a bank are shut down at the same time. The cost of emergency callback service rendered during overtime hours is listed in **Exhibit "C"**. HOSPITAL agrees to provide VENDOR with prompt notification should trouble develop with the equipment, or should any equipment malfunction be observed or reported. Should a passenger be trapped on an elevator, such a call will be given the highest priority for on-site service upon notification to VENDOR and request for such service.

a.  Response time during hours of service on regular workdays or as regular hours are agreed upon HOSPITAL and the VENDOR, within 15 minutes or as agreed between HOSPITAL and the VENDOR.

b.  On days not recognized as regular workdays or as regular hours, response time will be not more than one (1) hour for an emergency call and not more than two (2) hours for a non-emergency call.

c. Should the VENDOR fail to respond to requests for emergency service within these times, as documented by Owner's call log or other mutually agreed upon means, Owner shall not be liable for billable hours outside of contract hours incurred for that service call.

d. Additional billing for overtime callbacks shall be limited to the differential between the straight time rate and the overtime rate for the time spent on the job, travel expense and a maximum of 1.5 hour travel time for each mechanic responding to each request for overtime service.

e. Monthly, the VENDOR shall provide a report and billing statement of all requests for emergency service (callbacks) received by it, together with such detail and information as is mutually agreed upon between VENDOR and Director of Plant Operations or designee. Approval of charges and payment shall be coordinated at this time.

9. **Hours of Service.** Regular working hours are 7:00 AM to 5:30 PM, Monday through Friday, excluding New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day and Christmas Day. All other hours are considered overtime. All work is to be performed during regular working hours unless noted otherwise. Should HOSPITAL request work to be performed during overtime hours, and that work is included in this agreement during regular hours only, HOSPITAL agrees to pay VENDOR under separate invoice, at the regular billing rates listed in **Exhibit "B"** for the bonus (overtime) hours only.

10. **Parts Inventory.** VENDOR will maintain, on the job site or in their service vehicles, a supply of commonly used replacement parts, lubricants, and wiping cloths for the performance of routine maintenance and parts replacement. These materials and any enclosures provided for their storage will remain the property of VENDOR.

11. **Manpower Availability.** VENDOR will maintain a full time local staff of service technicians to meet the day-to-day requirements of this service agreement. To assure HOSPITAL of prompt service in the event of a major equipment outage, VENDOR will also call on the manpower resources of other VENDOR service locations throughout the United States.

12. **General**

a) **Cleaning:** The VENDOR shall clean all equipment, machine rooms and pit floors at regular intervals sufficient in frequency to maintain a professional appearance and preserve the life of the equipment. Unusual conditions, such as on-going construction in the building may be reviewed by HOSPITAL to determine responsibility for cleaning.

b) **Painting:** The VENDOR shall paint the equipment, including all exposed metal in the hoistway, in intervals frequent enough to maintain a professional appearance, prevent rusting and preserve the equipment.

c) **Prompt Corrective Action:** When as a result of examination, a need for corrective action is apparent within the scope of the VENDOR's responsibility, VENDOR shall proceed immediately to make (or cause to be made) such replacement, repair, and/or corrections. If the VENDOR reasonably believes the corrective action is not within the scope of the VENDOR's responsibilities, and no safety or potential safety problem exists, VENDOR shall deliver a written report to Director of Plant Operations or his designee for further action within three (3) days of the examination. If a safety or potential safety problem exists, VENDOR shall immediately take corrective action at the least possible expense to HOSPITAL, regardless of scope of responsibility, and make a prompt written report to the Director of Plant Operations or his designee.

d) **Material Safety Data Sheets:** The VENDOR shall provide the Director of Plant Operations or his designee with Material Safety Data Sheets (MSDS) for all material used and/or

stored at the property within 90 days after award. The VENDOR shall submit this information in a three ring binder and provide updated data, as required. Additionally, the VENDOR shall maintain a copy of all appropriate MSDS in each elevator equipment room.

### 13. Removal of Elevators From Service

a)     Routine Maintenance: No elevator may be removed from operation for performance of routine scheduled maintenance during the peak hours of 6:00 a.m. to 8:00 a.m., 11:30 a. m. to 12:30 p.m., or 3:00 p.m. to 4:30 p.m. without prior approval of the Director of Plant Operations or his designee.

b)     Scheduled Periodic Maintenance: At the inception of this Contract, the VENDOR shall provide a schedule to the Director of Plant Operations or his designee indication 14 days or more in advance the dates on which individual elevators are scheduled for work requiring removal from service. Such work could include:

- Periodic yearly inspections and/or test
- Scheduled replacement of wire ropes (hoist, compensation or governor).
- Scheduled machine repair such as a sheave undercutting or replacement, commutator undercutting, or removal of field coils or armatures for outsides repair work.
- Scheduled major repairs to motor generators.
- Scheduled replacement of bearings in machines, motor generators or secondary/deflector sheaves.
- Scheduled annual disassembly of machine brakes.
- Other Services requiring elevator to be taken out of service.

The schedule shall be updated monthly, or at other intervals designated by the Director of Plant Operations or his designee in order to provide HOSPITAL with a moving 14-day notice of scheduled removal of elevators from service.

**14. Replacement Parts Warehousing.** VENDOR will maintain additional inventory within local warehouses. To assure HOSPITAL of prompt service, emergency delivery of stocked parts will be available on an expedited express delivery basis. All unserviceable parts removed will become the property of VENDOR. All replacement parts will become the property of HOSPITAL.

**15. Warranty.** The VENDOR shall warrant all repair work performed under this Contract to be free from faulty workmanship and all parts installed by the VENDOR to be free of defects for a period of one (1) year. The warranty period shall begin upon the date of acceptance by HOSPITAL.

**16. Wiring Diagrams.** HOSPITAL shall provide the proper wiring diagrams for the equipment covered. These diagrams will remain HOSPITAL'S property, and will be maintained by VENDOR for use in troubleshooting and servicing the equipment. VENDOR shall provide HOSPITAL with complete wiring diagrams for any new equipment installed or modernized by VENDOR during the course of this agreement.

**17. Engineering Services.** To assure the prompt, efficient correction of special technical problems that may arise with the equipment, VENDOR will maintain a field staff and engineering personnel. They will be specially trained and uniquely qualified to support local VENDOR service technicians.

**18. Technical Library.** To assist VENDOR service technicians in the prompt repair of trouble and efficient routine maintenance, VENDOR will maintain an exclusive in-depth library of technical information. This information includes maintenance, repair, circuitry, parts, and troubleshooting information.

19. **Training.** The VENDOR service and supervisory personnel assigned to work with HOSPITAL will be continually trained and updated on new methods and technology applicable to the maintenance and repair of the equipment.

20. **Field Supervision.** To ensure the quality control and efficient execution of service and equipment upgrade programs, VENDOR will maintain a full-time staff of supervisory personnel. They will work with HOSPITAL to conveniently schedule the various repairs and routine maintenance functions, performed on the equipment. They will also oversee the work performed by the service personnel on a day-to-day basis.

21. **Application Support.** VENDOR will provide application support for existing software for all Equipment where applicable.

22. **Service Reports.** Copies of all, service reports detailing Services performed must be sent to the Plant Operations Director of that facility within twenty-four (24) hours of the visit.

23. **Damage to Equipment.** Any damage to the Equipment caused by the VENDOR'S service engineer, either related or unrelated to the initial problem, is the responsibility of the VENDOR to correct.

24. **Uptime Guarantee.** VENDOR will provide an uptime guarantee of 98.5%, calculated at six (6) - month intervals by the following formula:

**Hours of Time lost / Hours of Time in Operation**

For every period that VENDOR fails to maintain an uptime less than 98.5%, HOSPITAL will withhold a percentage of that month's base billing fee based on the following schedule:

| | |
|---|---|
| 95 - 98.5% | 1% rebate |
| 92- 95% | 2% rebate |
| Less than 92% | 3% rebate |

25. **Safety Tests.** VENDOR will perform safety tests as noted below per industry and ANSI standards. These tests will be coordinated with local facilities, and shall be performed in accordance with local code requirements in effect at the time of this Agreement. With regard to full load governor and safety testing, every precaution will be taken, prior to the tests, to determine that all parts appear to be in satisfactory working condition. However, it must be recognized that it is impossible to determine the ability of the safety to function properly without an actual trial. Therefore, VENDOR will not be responsible for any damage to the equipment or property, injury, or death to persons, resulting from or arising out of the performance of these tests.

a)   Annual Traction Safety Test:
VENDOR will perform an annual no-load safety test on each traction or drum elevator.

b)   Traction Full Load Safety Test / Hydraulic Pressure Relief Test:
VENDOR will perform a full load test of the down speed governors, safeties on each traction or drum elevator and a hydraulic pressure relief test on each hydraulic elevator as required per state and /or local codes.

26. **Communications and Relationship Structure.** Representatives from HOSPITAL and VENDOR agree to meet on a monthly basis to coordinate the activities governed by this Agreement. The VENDOR shall provide a report and billing statement of all requests for emergency service (callbacks) received by it, report on the incidence of vandalism, misuse, and abuse, together with such detail and information as is mutually agreed upon between VENDOR and Director of Plant Operations or designee. Approval of charges and payment shall be coordinated at this time. They shall review recommendations as necessary with respect to equipment modernization and upgrade. They shall address and be empowered to act upon any relevant issues that arise in connection with this Agreement.

27. **Standards of Performance.** Performance shall be based on the following:

a)    The typical floor shall not exceed 12'-0"

b)    Flight time starts when the fully opened doors begin to close and continues until the car is stopped level with the next floor and the car and hall doors are open to three quarters of their fully open position.

c)    Brake to brake time starts at the time the brake lifts and the car begins to travel to the next landing; stop measuring the time when the car is level at the next floor and the brake sets.

d)    The power door operation for the hall and car doors conforms to the elevator Code requirements.

e)    Door open time is measured from start of door opening to 3/4 open position.

f)    Door close time is measured from start of door closing to fully closed position.

28. **Machine Rooms**

a)    The VENDOR shall place and keep in machine rooms metal spare parts cabinets of suitable size and quantity for the storage of fast wearing spare parts, solvents, lubricants, and writing diagrams. Flammable materials such as solvents, rags or cardboard boxes must be stored in a fire-rated metal cabinet or container. No open storage of parts or other items shall be permitted.

b)    The wiring diagrams shall be kept neatly folded and stored (except where mounted on boards) and shall be copied and replaced by the VENDOR if condition warrants. All wiring diagrams shall be accessible by the Director of Plant Operations or his designee.

c)    The VENDOR shall provide a fire rated metal can and lid in each machine room for the storage of oily rags.

d)    The machine rooms shall be kept clean and neat at all times, with floors professionally painted and maintained clean and free of dirt, debris, carbon dust, etc.

29. **Special Conditions**

a)    The VENDOR shall post a preventive maintenance schedule and a work log in each elevator machine room. The log shall include all entries for routine maintenance and repairs, including supervisory surveys. Entries shall include date when work is completed, mechanic or supervisors name, brief description of work completed (including number and identification of the elevators serviced) and the approximate time required to do the work. The log and maintenance schedule for elevators shall be maintained in each machine room. HOSPITAL may inspect and copy the logs and maintenance schedules at any time. Should there be a computer-based system to schedule maintenance operations, the VENDOR and the Director of Plant Operations or his designee shall be able to review work

and callback information on line. VENDOR shall utilize any new technology as directed by owner and at owner's expense for software or devices.

b)      Inspection fees charged by any enforcing authorities will be paid by HOSPITAL. Fees for re-inspection due to failure to eliminate deficiencies covered by this Contract shall be paid at the VENDOR's expense. After hours testing shall be considered as part of this regular maintenance contract where specifically detailed in Appendix A.

c)      Should any elevator be shut down for any extended period exceeding 72 continuous hours (except for pre-scheduled repairs), the maintenance billing for that unit shall be suspended until it is back in service. HOSPITAL shall also be entitled to a credit from VENDOR of $200 per day for each or portion thereof any elevator is out of service for a period exceeding 72 continuous hours. This credit may be deducted from payments for the following months services or may requested as a separate direct payment. Owner, at its' option, may suspend this penalty if repair work is progressing at a satisfactory pace and it is unreasonable to expect such repair to be completed within the 72 hour time frame (should this be included)

d)      An initiation meeting detailing current conditions shall be attended by VENDOR and the Director of Plant Operations or his designee. Monthly meetings shall take place after that point and shall:

    i.  The VENDOR shall prepare a written report to provide information relative to callbacks by elevator, by month and a summary of completed, past due scheduled maintenance for each elevator and any recommendations by Elevator Service Company.

    ii.  A review of the VENDOR's report and approval of requested charges for payment

    iii.  Review of any elevator testing

    iv.  A review of scheduled work-requiring removal of elevators from service.

    v.  A review of any reported complaints.

    vi.  Such other elevator related items as may be appropriate.

## 30. Extent of Coverage

### a)  Traction Elevators:

1.1. The VENDOR shall use trained employees directly employed and supervised by VENDOR. Such employees shall be qualified to keep the equipment properly adjusted, and VENDOR shall use all reasonable care to maintain the equipment in proper and safe operation condition.

1.2. The VENDOR shall regularly and systematically examine, adjust, clean and lubricate the following as required, and if conditions warrant, repair or replace the same:

* Machine worm gear, thrust bearings, drive sheave, drive sheave shaft bearings, brake pulley and brake coil, contract linings and component parts;

* Motor and motor generator, motor windings, rotating element, commutator , brushes, brush holders and bearing;

- Silicon control rectifiers, reactor, filters, heat sinks, amp traps, transducers, and all control components;

- Controller, selector and dispatching equipment, leveling devices and cams, all relays, solid state components, resistors, condensers, transformer, contracts, lead, dash pots, timing devices, computer and micro computer devices, steel selector cable or tape, and mechanical and electrical driving equipment;

- Governor, governor sheave and shaft assembly, bearings, contacts and governor jaws;

- Deflector or secondary sheave, bearings, car and counterweight guide rails, top and bottom limit switches, governor tension sheave assembly, compensating sheaves assembly, counterweight and counterweight guide shoes including rollers or gibs;

- Hoistway door interlocks and hangers, bottom door guides and auxiliary door closing devices and all fastening devices and associated reinforcement in attached components;

- Hoistway entrance doorsill area beyond the entrance frame opening;

- Automatic power operated door operator, car door hanger, car door contact, door protective device, car ventilation system platform, load weighing equipment, car safety mechanism, elevator car guide shoes, gibs or roller,

1.3. The VENDOR shall maintain the individual minimum performance standards defined below:

- The VENDOR shall maintain the Rated Speed in feet per minute, the original performance time, including acceleration and retardation as designed and installed by the manufacturer and

- Perform the necessary adjustments as required to maintain the original Door Open Time and Door Close Time, within limits of applicable codes, or to adjust and maintain revised Door Open Time and/ or door close Time upon direction of Owner.

- The VENDOR shall maintain smooth ride quality, smooth acceleration and deceleration and comfortable stop.

1.4. Door operation shall be positive and quiet with rapid and smooth checking at limits of travel. VENDOR shall annually, check the group dispatching systems and make necessary tests to insure that all circuits and time settings are properly adjusted and that the system performs as designed and installed by the manufacturer or to adjust and maintain revised settings upon direction of HOSPITAL.

1.5. The VENDOR shall:

- Examine periodically all safety devices and governors and conduct an annual no-load test, and as required by governmental regulation perform a full-load, full speed test of safety mechanism, overhead speed governors, car and counterweight buffers. The car balances shall be checked, and the governor set. If required, the governor shall be calibrated and sealed for proper tripping speed.

- Calibrate load-weighing devices to HOSPITAL's selected settings, after annual and, as applicable, five- year safety test are conducted.

- Renew all wire ropes as often as is necessary to maintain an adequate factor of safety, equalize the tension on all hoist and when necessary remove all residue and accumulated deposits from the rope surface and shorten ropes and chains as required to provide legal and reasonable bottom clearances.

- Repair or replace conductor cables and hoistway and machine room elevator wiring in such a way as to maintain the percentage of spare conductors present at signing of this Agreement. In no case shall the number of spare conductors be less than 5%.

- Furnish lubricants compounded to the manufacturer's rigid specifications.

- Perform Municipal and State inspections, complete on-site certificates and submit test reports to requesting inspector and Owner for Owner 's use in filing and obtaining operation certificate.

1.6. The VENDOR shall make other safety tests recommended or directed by all applicable governmental authorities in force at the time of the signing of this Contract or instituted during the contract term. The VENDOR shall not be required to install new attachments on the elevators recommended or directed by insurance companies, or by governmental authorities, nor to make replacements with parts of a different design recommended or directed by insurance companies, or by governmental authorities. This provision is not intended to pre-empt the elevator and/or escalator manufacturer from providing replacement parts of a different design should they be unable to comply with "spare parts inventory". The VENDOR shall maintain a supply of genuine manufacturer's and alternative replacement parts in their warehouse inventory. Should such a circumstance occur, the VENDOR shall install the same or greater quality and performance standards as the original equipment and notice of the same shall be provided to Director of Plant Operations or designee.

1.7. Coordinate all testing requiring an independent witness or inspector with the Director of Plant Operations or designee appointed representative. Any such test conducted without the Director of Plant Operations or designee witness or inspector shall be repeated at VENDOR's cost.

1.8. The VENDOR shall maintain, and if conditions warrant, repair or replace the following auxiliary equipment:

- Fire and emergency Power Operation and elevator operating devices;
- All handicap devices;

▪ All elevator related earthquake devices if applicable; and
▪ Light fixtures including re-lamping of car-top, car-underside, and pit.

### b) Hydraulic Elevators

2.1. The VENDOR shall maintain the hydraulic elevator equipment herein the same as described above.

2.2. The VENDOR shall periodically examine all safety devices and conduct pressure tests and other tests required by ANSI A17:1 or other applicable codes.

2.3. The VENDOR shall periodically conduct an inspection of hydraulic fluid to detect contaminants and assure proper viscosity, make necessary corrections and replace fluid as required. Furnish hydraulic fluid compounded to the manufacturer's rigid specifications.

2.4. The VENDOR shall clean excessive fluid leakage from pump pans, cylinder heads, machine room and pit floors.

B. **Service Changes.** HOSPITAL reserves the right to add or delete specific services based on its changing needs. Prices for any new service additions not included in this proposal will be negotiated.

C. **Performance.** The Services to be rendered hereunder shall be performed by VENDOR Staff as may be employed by or under contract with VENDOR. At all times while this Agreement is in effect, the HOSPITAL'S Chief Executive Officer ("CEO") shall have the right to request removal of any such VENDOR staff if, in the CEO's reasonable judgment, such removal is in the best interests of HOSPITAL. VENDOR hereby agrees to immediately remove any such individual upon receipt of the CEO's request.

D. **Excuse of Performance.** The performance of this Agreement, except for the payment of money for Services already rendered, may be suspended by any party in the event the delivery of Services to a HOSPITAL Hospital, or the provision of Services by VENDOR is prevented by a cause or causes beyond the reasonable control of such party. Such causes shall include, but not be limited to acts of God, acts of war, blockades, riots, arrests, explosions, fires, accidents, flood or sabotage, lack of adequate fuel, power, raw materials, labor or transportation facilities, governmental laws, regulations, requirements, orders or actions, breakage or failure of machinery or apparatus; national defense requirements; injunctions or restraining orders; labor trouble, strike, lockout or injunction (provided that no party shall be required to settle a labor dispute against its own best judgment) or any other cause not within the control of VENDOR. VENDOR shall not be liable for any such interruption, postponement, or delay or any Liabilities resulting there from.

In the event of any such interruption, postponement, or delay, VENDOR shall take any commercially reasonable measures within its sole discretion to obtain Services for HOSPITAL, including, but not limited to, contracting with another service provider for the Services specified herein. Should it be necessary for VENDOR to provide for such substitute Services for a period of fifteen (15) consecutive days, either VENDOR or HOSPITAL may terminate this Agreement upon written notice to the other party without being in breach of this Agreement. Such termination shall be effective immediately or at such reasonable date as may be necessary to permit HOSPITAL to obtain an alternate source of Services.

E. **Applicable Standards.** VENDOR agrees that all Services provided pursuant to this Agreement shall be performed in compliance with all applicable standards set forth by law or ordinance or established by the rules and regulations of any federal, state or local agency, department, commission, association or other pertinent governing, accrediting, or advisory body, including the Joint Commission, having authority to set standards for health care facilities.

**F.  Qualification.** VENDOR warrants that it has all the necessary qualifications, certifications, and/or licenses pursuant to local, state and federal law and regulations to provide the Service covered by this Agreement. VENDOR shall provide HOSPITAL with applicable licensing and certification documentation and related information issued by all such regulatory authorities.

**G.  Audit.**  VENDOR agrees, upon reasonable request, to substantiate that Vendor's billing is in conformity with the terms of the agreement and to furnish documents verifying each charge billed to the Hospital on a time and material basis or to the extent required by law.

**H.  Records and Reports.** VENDOR shall record promptly and maintain all information pertaining to VENDOR'S performance of duties under this Agreement.  VENDOR'S records of billings and receipts relating to Services performed hereunder shall be provided to the appropriate HOSPITAL representative on a monthly basis.  Reports must be sent by mail and postmarked by the 8th day of the following month. VENDOR agrees that all records and reports required by this Subsection shall be the exclusive personal property of HOSPITAL.

**I.  Use of Premises.** VENDOR Staff shall not use, or knowingly permit any other person who is under their direction to use, any part of HOSPITAL'S facility premises for any purpose other than the performance of Services for HOSPITAL pursuant to this Agreement.

**J.  Right to Inspect.**  HOSPITAL performing under this agreement has the right to inspect VENDOR'S owned, leased, rented or contracted facilities during normal working hours.  The right of inspection, and inspections actually performed by HOSPITAL shall not limit any of VENDOR'S responsibilities under this agreement.

**K.  Representations and Warranties.** VENDOR represents and warrants to HOSPITAL, upon execution and while this Agreement is in effect, as follows:

1)  Neither VENDOR nor any of VENDOR Staff is bound by any agreement or arrangement which would preclude VENDOR or any of VENDOR Staff from entering into, or from fully performing the Services required under, this Agreement;

2)  No VENDOR Staffs license or certification in the State or in any other jurisdiction has ever been denied, suspended, revoked, terminated, voluntarily relinquished under threat of disciplinary action, or restricted in any way; and

3)  Neither VENDOR nor any of VENDOR Staff has ever been convicted of a criminal offense related to health care or listed by a federal VENDOR as debarred, excluded or otherwise ineligible for federal program participation.

**L.  Exclusivity.**  This is an umbrella agreement to cover all elevator maintenance services. Rates for special events beyond scope of regular services are listed on **Exhibit "C"** "Compensation Schedule".

**M.  Agreement Representation.** VENDOR, its agents, or representatives, shall not represent, assert, or imply to other parties that any Service other than described herein is covered within this Agreement.

**N.  Service Availability.** All services identified in this Agreement must be available for the term of the Agreement

**O.   Individual HOSPITAL Contracting.** VENDOR, its agents or representatives shall not directly or indirectly contract with individual Hospitals for the Service without the expressed written consent of HOSPITAL.

**P.   Non-Contract Service.** VENDOR, its agents or representatives shall not directly or indirectly solicit service sales not covered in this Agreement.

**Q.   Account Manager.** VENDOR shall appoint one dedicated account representative, to be approved by HOSPITAL'S Regional Director of Materials Resource Management or his designee, who will handle all operations and service issues for HOSPITAL. This individual will be responsible for coordinating all activities for the purpose of aiding in the administration of this Agreement.

**R.   Nondiscrimination in Employment.** VENDOR, in performing the work required, agrees not to discriminate against any employee or applicant for employment because of age, race, sex, sexual orientation, religion, national origin or handicap and to insert the provisions of this paragraph into any subcontracts issued under this order.

**S.   Restrictive Covenant.** HOSPITAL and VENDOR acknowledge that the recruitment and training of professional staff is a costly and time-consuming endeavor. Accordingly, VENDOR agrees that during the term of this Agreement, VENDOR shall not directly or indirectly employ any staff member who is an employee of HOSPITAL at any time during the term of the Agreement. In addition, no affiliate of VENDOR shall solicit any such employee of HOSPITAL without HOSPITAL'S written prior consent. When HOSPITAL terminates this Agreement, none of the facilities listed in Exhibit "A" will employ or contact any of VENDOR'S personnel for a period of six (6) months post-termination.

**T.   Code of Conduct.** Individuals and organizations serving as vendors or contractors to HOSPITAL have a responsibility to act with complete integrity when representing HOSPITAL. Integrity is the basis of every individual's reputation and it is the basis of HOSPITAL'S reputation as a health care leader.

**U.   Standards of Performance.** VENDOR'S employees will be required to adhere to HOSPITAL seven Standards of Performance (See **Exhibit "D"**) at all times while providing the Services described herein.

## 2.   HOSPITAL'S OBLIGATIONS.

**A.   Equipment, Facilities, Supplies, Utilities and Services.** HOSPITAL shall, at no cost to VENDOR, provide all equipment, facilities, supplies, utilities, including telephone service, and other services, including laundry, linen and janitorial services, as HOSPITAL shall, in its sole discretion, determine from time to time to be necessary for the performance of the Services. The parties expressly agree that all items supplied by HOSPITAL pursuant to this Subparagraph shall remain the exclusive personal property of HOSPITAL.

**B.   Personnel.** HOSPITAL shall employ such non-physician personnel as HOSPITAL deems necessary for the proper performance of the Services or any other VENDOR obligation set forth in this Agreement.

## 3.   VENDOR'S COMPENSATION

**A.   Pricing.** For the term of the Agreement, HOSPITAL shall pay for the Services provided by VENDOR according to the compensation schedule set forth in **Exhibit "C"**.

1.  Until the expiration of four (4) years after the furnishing of such services, VENDOR shall, upon written request, make available to the Secretary of the Department of Health and Human Services (the "Secretary"), the Secretary's duly-authorized representative, the Comptroller General, or the Comptroller General's duly-authorized representative, such books, documents, and records as may be necessary to certify the nature and extent of the cost of such services; and

2.  If any such services are performed by way of subcontract with another organization and the value or cost of such subcontracted services is Ten Thousand Dollars ($10,000) or more over a twelve-month period, such subcontract shall contain, and VENDOR shall enforce, a clause to the same effect as Subparagraph 7.a.(1) immediately above.

B.  The availability of VENDOR'S books, documents, and records shall be subject at all times to all applicable legal requirements, including without limitation, such criteria and procedures for seeking and obtaining access that may be promulgated by the Secretary by regulation. The provisions of Subparagraphs 7.a. and 7.b. shall survive expiration or other termination of this Agreement, regardless of the cause of such termination.

## 8.  INDEMNITY.

A.  **VENDOR Indemnification** -  To the extent VENDOR is negligent, VENDOR shall indemnify, hold harmless and HOSPITAL, its present and future directors, officers, employees and agents, from such civil penalties, claims and causes for actions (including costs of defenses, settlement, reasonable attorneys fees) as may be brought on account of death or bodily injury to persons, destruction or loss of natural resources; damage to or loss of property, both public or private; or any violation of federal, state or local laws, regulations or municipal ordinances, and which results from or arises out of VENDOR'S negligence, willful misconduct, breach of warranty, or failure to perform its responsibilities pursuant to this Agreement.

B.  **HOSPITAL Indemnification** – To the extent HOSPITAL is negligent, HOSPITAL shall indemnify, hold harmless and defend VENDOR, its present and future officers or directors, officers, employees and agents, from such civil penalties, claims, and causes for actions (including costs of defense, settlement, reasonable attorney fees) as may be brought on account of death or bodily injury to any person; destruction or damage of natural resources; loss or damage to property, both public and private; or any violation of federal, state or local laws, regulations, or municipal ordinances, and which results from or arises out of the negligence, willful misconduct, breach or warranty, or failure to perform services pursuant to the Agreement on the part of HOSPITAL, one or more of its Hospitals, or an officer, director, employee or agent of any of them.

C.  Under no circumstances shall either party be liable for special, indirect or consequential damages of any kind including, but not limited to loss of profit, loss of good will, loss of business opportunity, additional financing costs or loss of use of any equipment or property, whether in contract, tort (including negligence), warranty or otherwise, notwithstanding any indemnity or other provision to the contrary.

## 9.  CONFIDENTIALITY.

A.  **HOSPITAL Information.** VENDOR recognizes and acknowledges that, by virtue of entering into this Agreement and providing Services to HOSPITAL hereunder, VENDOR and VENDOR Staff may have access to certain information of HOSPITAL that is confidential and constitutes: valuable, special and unique property of HOSPITAL. VENDOR agrees that neither VENDOR nor any VENDOR Staff will at any time, either during or subsequent to the term of this Agreement, disclose to others, use, copy or permit to be copied, without HOSPITAL'S express prior written consent, except pursuant to VENDOR'S and VENDOR Staff's duties hereunder, any confidential or proprietary information of HOSPITAL, including,

but not limited to, information which concerns HOSPITAL'S patients, costs, or treatment methods developed by HOSPITAL, and which is not otherwise available to the public.

B. **Terms of this Agreement.** Except for disclosure to VENDOR or any VENDOR Staff's legal counsel, accountant or financial advisors (none of whom shall be associated or affiliated in any way with HOSPITAL or any of its affiliates), neither VENDOR nor any VENDOR Staff shall disclose the terms of this Agreement to any person who is not a party or signatory to this Agreement, unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to by HOSPITAL. Unauthorized disclosure of the terms of this Agreement shall be a material breach of this Agreement and shall provide HOSPITAL with the option of pursuing remedies for breach or immediate termination of this Agreement in accordance with Subsection 4.b. hereof.

C. **Patient Information.** Neither VENDOR nor any VENDOR Staff shall disclose to any third party, except where permitted or required by law or where such disclosure is expressly approved by HOSPITAL in writing, any patient or medical record information regarding HOSPITAL patients, and VENDOR and VENDOR Staff shall comply with all federal and state laws and regulations, and all bylaws, rules, regulations, and policies of HOSPITAL regarding the confidentiality of such information. VENDOR acknowledges that in receiving or otherwise dealing with any records or information from HOSPITAL about HOSPITAL'S patients receiving treatment for alcohol or drug abuse, VENDOR and VENDOR Staff are fully bound by the provisions of the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records (42 C.F.R. Part 2, as amended from time to time).

D. **HIPAA Compliance.** VENDOR agrees to comply with the applicable provisions of the Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. § 1320 through d-8 ("HIPAA"), and the requirements of any regulations promulgated there under including, without limitation, the federal privacy regulations as contained in 45 C.F.R. Part 164, and the federal security standards as contained in 45 C.F.R. Part 142 (collectively, the "Regulations"). VENDOR shall not use or further disclose any protected health information, as defined in 45 C.F.R. 164.504, or individually identifiable health information, as defined in 42 U.S.C. § 1320d (collectively, the "Protected Health Information"), other than as permitted by this Agreement and the requirements of HIPAA or Regulations. VENDOR will implement appropriate safeguards to prevent the use or disclosure of Protected Health Information other than as contemplated by this Agreement. VENDOR will promptly report to HOSPITAL any use or disclosures, of which VENDOR becomes aware, of Protected Health Information in violation of HIPAA or the Regulations. In the event that VENDOR contracts with any agents to whom VENDOR provides Protected Health Information, VENDOR shall include provisions in such agreements pursuant to which VENDOR and such agents agree to the same restrictions and conditions that apply to VENDOR with respect to Protected Health Information. VENDOR will make its internal practices, books and records relating to the use and disclosure of Protected Health Information available to the Secretary to the extent required for determining compliance with HIPAA and the Regulations. No attorney-client, accountant-client or other legal privilege shall be deemed to have been waived by VENDOR, HOSPITAL by virtue of this Subsection.

E. **Publicity.** Neither party shall, without the prior written approval of the other party, engage in any publicity, advertising or marketing activities relating to this Agreement, the subject matter hereof, or the other party.

F. **Survival.** The provisions of this Paragraph 9 shall survive expiration or other termination of this Agreement, regardless of the cause of such termination.

10. **REQUIRED DISCLOSURES.** VENDOR shall notify HOSPITAL in writing within three (3) days after any of the following events occurs:

A. Any VENDOR Staffs professional license or certification in the State or any other jurisdiction lapses or is denied, suspended, revoked, terminated, relinquished, or made subject to terms of probation or other restriction;

B. An event occurs that substantially interrupts all or a portion of VENDOR'S or any VENDOR Staffs ability to perform VENDOR'S or any VENDOR Staffs obligations hereunder; or

C. VENDOR'S or any VENDOR Staffs conviction of a criminal offense related to health care or VENDOR'S or any VENDOR Staffs listing by a federal VENDOR as being debarred, excluded, or otherwise ineligible for federal program participation.

11. **ARBITRATION.** Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by arbitration in Philadelphia County, Pennsylvania, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration and applying the laws of the State. Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereon may be entered in any court having jurisdiction thereof. The costs shall be borne equally by both parties. During the pendency of any such arbitration and until final judgment thereon has been entered, this Agreement shall remain in full force and effect unless otherwise terminated as provided hereunder. The provisions of this Paragraph shall survive expiration or other termination of this Agreement regardless of the cause of such termination. "Each party agrees to submit to Non-Binding Arbitration by the American Arbitration Association but does not waive its rights to pursue other remedies available by law."

12. **ENTIRE AGREEMENT; MODIFICATION.** This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the parties relating to such subject matter. This Agreement may not be amended or modified except by mutual written agreement.

13. **SEVERABILITY.** The unenforceability or invalidity of any term or provision in this Agreement, or of any portion thereof, shall not affect the validity or enforceability of any other term or provision, or portion thereof, contained in this Agreement.

14. **GOVERNING LAW.** This Agreement shall be construed in accordance with the laws of the Commonwealth of Pennsylvania. The provisions of this Paragraph shall survive expiration or other termination of this Agreement regardless of the cause of such termination.

15. **COUNTERPARTS.** This Agreement may be executed in one or more counter-parts, all of which together shall constitute only one Agreement.

16. **NOTICES.** All notices hereunder shall be in writing, delivered personally, by certified or registered mail, return receipt requested, or by overnight courier, and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, postage prepaid, or deposited with the overnight courier, addressed as follows:

If to HOSPITAL: Tenet HealthSystem Hahnemann, LLC
d/b/a Hahnemann University Hospital
Broad & Vine Streets
Philadelphia, PA 19102
Attn: Chief Executive Officer

If to VENDOR:  The Otis Elevator Company
30 Twosome Drive, Suite 4
Moorestown, NJ 08057

or to such other persons or places as either party may from time to time designate by notice pursuant to this Paragraph.

17. **WAIVER.** A waiver by either party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure.

18. **CAPTIONS.** The captions contained herein are used solely for convenience and shall not be deemed to define or limit the provisions of this Agreement.

19. **ASSIGNMENT; BINDING EFFECT.** VENDOR shall not assign or transfer, in whole or in part, this Agreement or any of VENDOR'S rights, duties or obligations under this Agreement without the prior written consent of HOSPITAL, and any assignment or transfer by VENDOR without such consent shall be null and void. For purposes of this Agreement, the transfer of ownership of all or a portion of the shares, partnership interests, or other ownership interests of VENDOR, in a single transaction or a series of transactions, which results in the replacement of fifty percent (50%) or more of the shareholders, partners, members or owners, as the case may be, of VENDOR as they existed on the commencement date of this Agreement shall be deemed an assignment hereunder. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and permitted assigns. This Agreement is assignable by HOSPITAL without consent or notice.

20. **CHANGES IN LAW.**

    A. **Legal Event; Consequences.** Notwithstanding any other provision of this Agreement, if the governmental agencies that administer the Medicare, Medicaid, or other federal programs (or their representatives or agents), or any other federal, state or local governmental or nongovernmental VENDOR, or any court or administrative tribunal passes, issues or promulgates any law, rule, regulation, standard, interpretation, order, decision or judgment, including but not limited to those relating to any regulations pursuant to state or federal anti-kickback or self-referral statutes (collectively or individually, "Legal Event"), which, in the good faith judgment of one party (the "Noticing Party"), materially and adversely affects either party's licensure, accreditation, certification, or ability to refer, to accept any referral, to bill, to claim, to present a bill or claim, or to receive payment or reimbursement from any federal, state or local governmental or non-governmental payor, or which subjects the Noticing Party to a risk of prosecution or civil monetary penalty, or which, in the good faith judgment of the Noticing Party, indicates a rule or regulation with which the Noticing Party desires further compliance, then the Noticing Party may give the other party notice of intent to amend or terminate this Agreement in accordance with the next Subparagraph.

    B. **Notice Requirements.** The Noticing Party shall give notice to the other party together with an opinion of counsel setting forth the following information:

        (1) The Legal Event(s) giving rise to the notice;

        (2) The consequences of the Legal Event(s) as to the Noticing Party;

        (3) The Noticing Party's intention to either:

            (a) Terminate this Agreement due to unacceptable risk of prosecution or civil monetary penalty; or

            (b) Amend this Agreement, together with a statement that the purpose thereof is one or more of the following:

(i)   to further comply with any anti-kickback or Stark II statutory provisions or rules or regulations created or affected by the Legal Event(s); and/or

(ii)  to satisfy any licensure, accreditation or certification requirements created or affected by the Legal Event(s); and/or

(iii) to eliminate or minimize the risk of prosecution or civil monetary penalty;

(4) The Noticing Party's proposed amendment(s); and

(5) The Noticing Party's request for commencement of the Renegotiation Period (as defined below).

C. **Renegotiation Period; Termination.** In the event of notice under either Subparagraph b.(3)(a) or b.(3)(b) above, the parties shall have ten (10) days from the giving of such notice ("Renegotiation Period") within which to attempt to amend this Agreement in accordance with the Noticing Party's proposal (if any) or otherwise as the parties may agree. If this Agreement is not so amended within the Renegotiation Period, this Agreement shall terminate as of midnight on the 10th day after said notice was given. Except as otherwise required by applicable law, any amounts owing to either party hereunder shall be paid, on a pro rata basis, up to the date of such termination, and any obligation hereunder that is to continue beyond expiration or termination shall so continue pursuant to its terms. All opinions of counsel presented by the Noticing Party hereunder, and any corresponding opinions given by the other party in response, shall be deemed confidential and given solely for purposes of renegotiation and settlement of a potential dispute, and shall not be deemed disclosed so as to waive any privileges otherwise applicable to said opinions.

**21. FINANCIAL OBLIGATION.** Neither VENDOR nor any VENDOR Staff shall incur any financial obligation on behalf of HOSPITAL without the prior written approval of HOSPITAL.

TENET HEALTHSYSTEM HAHNEMANN, LLC,
d/b/a HAHNEMANN UNIVERSITY HOSPITAL

By: _____
Michael Halter
Chief Executive Officer

Date: 1-25-08

OTIS ELEVATOR COMPANY

By: _____

Name: Richard Hagendorf

Title: General Manager

Date: 1/22/08

**Exhibit A**

## Hospital

Tenet HealthSystem Hahnemann, LLC
d/b/a Hahnemann University Hospital
Broad and Vine Streets, MS 300
Philadelphia, PA 19102
215-762-1996

## EIN Number

75-2784869
Licensed 618 Beds

## Invoice Remit To Address

Hahnemann University Hospital
Accounts Payable
PO Box 42487
Philadelphia, PA 19101

## Ship To Address

Hahnemann University Hospital
1400 Race Street
Philadelphia, PA 19102

## Exhibit B

| Building | Elevator # | Type | Stops | Type |
|---|---|---|---|---|
| New College Building 245 N 15th Street | 7 | Gearless | 18 | Passenger |
| | 8 | Gearless | 18 | Passenger |
| | 9 | Gearless | 18 | Passenger |
| | 10 | Gearless | 18 | Passenger |
| | 11 | Geared | 18 | Service |
| | 12 | Geared | 18 | Service |
| | 16 | Gearless | 18 | Dumbwaiter |
| | 45 | Escalators | N/A | Escalator |
| | 46 | Escalators | N/A | Escalator |
| | 47 | Escalators | N/A | Escalator |
| | 48 | Escalators | N/A | Escalator |
| | 49 | Escalators | N/A | Escalator |
| | 50 | Escalators | N/A | Escalator |
| | 51 | Escalators | N/A | Escalator |
| | 52 | Escalators | N/A | Escalator |
| North Hospital Tower 236-246 N. Broad Street | 31 | Gearless | 18 | Passenger |
| | 32 | Gearless | 18 | Passenger |
| | 33 | Gearless | 18 | Passenger |
| | 34 | Gearless | 18 | Passenger |
| | 35 | Gearless | 18 | Passenger |
| | 36 | Gearless | 18 | Passenger |
| | 37 | Gearless | 19 | Service |
| | 38 | Gearless | 19 | Service |
| | 39 | Gearless | 19 | Service |
| | 40 | Geared | 9 | Food Cart Lift |
| | 41 | Geared | 9 | Food Cart Lift |
| | 42 | Geared | 9 | Food Cart Lift |
| South Hospital Tower 222-236 N. Broad Street | 4 | Gearless | 18 | Passenger |
| | 5 | Gearless | 18 | Passenger |
| | 6 | Gearless | 18 | Passenger |
| Bobst Building 1417 Race Street | 1 | Gearless | 15 | Passenger |
| | 2 | Gearless | 15 | Passenger |
| | 3 | Gearless | 16 | Service |
| | CCC | Hydraulic | 2 | Passenger |
| Bellet Building 1515 Race Street | 1 | Geared | 14 | Passenger |
| | 2 | Geared | 14 | Passenger |
| | 3 | Geared | 14 | Passenger |
| | 4 | Geared | 14 | Passenger |

| | | | | |
|---|---|---|---|---|
| Franklin Building 1427-33 Vine Street | 1 | Geared | 8 | Freight |
| | 2 | Hydraulic | 8 | Passenger |
| | 3 | Geared | 8 | Passenger |
| | 4 | Geared | 8 | Passenger |
| Feinstein 216-220 N. Broad Street | 25 | Geared | 5 | Passenger |
| | 26 | Geared | 5 | Passenger |
| SHSH | | Geared | 6 | Passenger |
| | | Geared | 6 | Passenger |
| | | Hydraulic | 6 | Freight |
| Parking Garage | 1 | Geared | 12 | Passenger |
| | 2 | Geared | 12 | Passenger |

## Exhibit C

| Building | # Units | Hours/ Month | Cost/ Month | Hours/ Year | Cost / Year |
|---|---|---|---|---|---|
| New College | 16 | Standby | $9,906.00 | Standby | $118,872.00 |
| North Tower | 12 | " " | $8,490.00 | " " | $101,880.00 |
| South Tower | 3 | " " | $2,358.00 | " " | $ 28,296.00 |
| Bobst | 4 | " " | $2,568.00 | " " | $ 30,816.00 |
| Bellet | 4 | " " | $1,888.00 | " " | $ 22,656.00 |
| Franklin | 4 | " " | $1,630.00 | " " | $ 19,560.00 |
| Feinstein | 2 | " " | $  944.00 | " " | $ 11,328.00 |
| SHSH | 3 | " " | $1,154.00 | " " | $ 13,848.00 |
| Parking Garage | 2 | " " | $  944.00 | " " | $ 11,328.00 |
| **Total** | **49** | **239 Hrs Avg.** | **$29,882.00** | **2,868 Hrs Avg.** | **$358,584.00** |

### OPTION 1 – CALL BACK OPTION

**NORTH and SOUTH Towers Fifteen (15) Elevators – The cost to provide overtime callback on the North and South Towers would be an additional cost of One thousand Six Hundred Sixty Two and 00/100 Dollars ($1,662.00) per month. This Option will commence six (6) months _after_ the execution of contract should HOSPITAL deem necessary to maintain towers.**

| Billing Rates | Mechanic | Helper | Team |
|---|---|---|---|
| Straight Time | $200.00 | $140.00 | $340.00 |
| Overtime Prem Port. | $140.00 | $98.00 | $238.00 |
| Travel (If applicable) | Same | Same | Same |
| **Pricing Schedule** | | | |
| Material Markup: | | 10% Mark-up | |
| Five- Year Lead Test: | | $1,320.00 per included in the base price of contract | |
| Pressure Relief Test: | | $630.00 per included in the base price of the contract | |
| Maximum Guaranteed Responsibilities: | | _2_ Hours for Non-emergency<br>_1_ Hours for entrapment/emergency | |

## Price Adjustment

The Contract Price will be adjusted on the date of any labor rate adjustment under Otis' contract with the International Union of Elevator Constructors (IUEC Contract) to reflect increases or decreases in material and labor costs.

**Material – 10%** of the original Contract price will be increased or decreased by the percentage increase or decrease shown by the index of "Producer Commodity Prices for Metals and Metal Products" published by the U.S. Department of Labor, Bureau of Statistics for the price adjustment month compared with the index on 8/1/07 which was 195.7.

**Labor – 90%** of the original Contract Price will be increased or decreased by the percentage increase or decrease in the straight time hourly rate under the IUEC contract on 01/01/07 which was $ 63.053.  The phrase "straight time hourly labor cost" means the sum of the straight time hourly rate plus the hourly cost of fringe benefits paid to the examiners in the locality where the equipment is to be maintained.

Start-Up Costs as referenced in Section 4, B-1, page 15.

| | |
|---|---|
| 3 sets Escalator Step-chains | $27,000 |
| Repair Labor to Install | $21,600 |
| Elevator Counters | $ 6,000 |
| Installation Labor | $ 2,800 |
| Rope Lubricators | $ 3,800 |
| Installation Labor | $ 2,100 |
| 2 sets of Steel Cable (Ropes) | $ 6,250 |
| Installation Labor | $11,520 |
| Escalator Lubricators | $ 4,200 |
| Installation Labor | $ 7,200 |
| | |
| Total anticipated Costs: | $92,470 |

## Exhibit D

### Attitude
#### Standard of Performance

The Hospital is committed to providing excellent service to our customers. Every customer will be greeted with positive eye contact and an appropriate smile. We will always welcome our customers with a friendly and positive attitude, projecting our commitment to excellence. All customers will be greeted in an appropriate manner. This standard applies equally to all employees in their interactions internally and externally to all customers.

### Privacy / Confidentiality
#### Standard of Performance

The Hospital is committed to promoting an awareness of the importance of our customer/patient's right to privacy, dignity and modesty by creating and maintaining a secure and trusting environment. Any and all conversations which contain patient information will be conducted with discretion.

### Phone Etiquette
#### Standard of Performance

The Hospital is committed to ensuring that all customers receive the same high level of excellence in telephone courtesy within all departments. The phones will be answered in a friendly manner, giving your name, department and a pleasantry at all times. All staff will be required to answer departmental telephones within three rings. We will not put customers on hold without asking and receiving an answer of approval first. Callers on hold will be acknowledged every thirty seconds. Whenever possible, voice mail will not be utilized during normal business hours of operation. After normal business hours an alternative phone number will be used or means of reaching a person in an emergency situation will be noted on the recording. All voice mail messages will be returned within 24 hours of the next business day.

### Appearance
#### Standard of Performance

Our appearance reflects the competent, professional and approachable attitude of all our staff. Employee's attire will always be tasteful, discreet and professional. Employees will adhere to departmental uniform codes, if applicable. Otherwise clothing befitting professionals will be the standard. All staff will have their photo identification badges at eye level, to help identify themselves and assist in providing information and support to our patients/customers. Our working environments will be well maintained, clean, and uncluttered. It is all of the staff's responsibility to ensure the cleanliness and safety of public corridors and the outside grounds.

### Providing Direction: Customer Acknowledgment
#### Standard of Performance

We will actively listen when customers ask for directions and for help accessing our services either by telephone or when they visit our campus. We will be courteous, friendly and helpful when responding to those needs. Customers will be treated with personalized attention.

### Customer Education and Information
#### Standard of Performance

We will provide our patients/customers with the comprehensive information they need to make positive, personal healthcare choices. We will educate and inform our patients to maximize healthy living, to practice proactive disease prevention, to encourage disease screening, and when necessary, to understand diagnostic and therapeutic interventions.

### Call Lights / Customer Responses
#### Standard of Performance

To ensure patient needs are met in a timely, positive and caring manner by any staff member that recognized the call light. We will visit patients hourly to assess and respond to needs and prior to exiting a patient's room we will ask if there is anything more we can do for them. Call lights will be acknowledged IMMEDIATELY.

### Customer Waiting
#### Standard of Performance

From the moment our customers enter Hahnemann University Hospital, we will provide them with prompt and courteous service. All staff will be advised that customer waiting will not exceed 15 minutes. If the wait is longer than 15 minutes patients will receive communication regarding the cause for the delay. If the delay is greater than 30 minutes we will offer some type of alternative. If a delay in service is noted prior to the customer's arrival a call will be placed to the customer to adjust the arrival time for services. We will always thank our customers for allowing Hahnemann University Hospital to serve them.

### Service Recovery
#### Standard of Performance

Every employee of Hahnemann University Hospital is empowered to take ownership of a negative situation and correct the problem.

**Action Required by Contracts Department:**

**Contract Number:** NPH 5515

☐    Signature required / Service sold (new maint).

☐    Signature required / resign.

☐    Purchase order / Service sold (new maint).

☐    Purchase order / resign.

☐    Customer paper contract signed by both parties without a Fast Track Acknowledgment letter stamp.

☐    National account (other than NSA standard paper)
        ☐   Signed
        ☐   Signature Required

☐    Any modifications and/or added contract terms to Otis paper or Fast Track Acknowledgment letter. (Note: This does not include Payment terms).

☒    Person signing Fast Track Contract for Otis has signed over their limit.
     -   Contracts $5,000 per month or less – Branch or General Managers may sign.
     -   Contracts >$5,000 per month up to $15,000 per month – only RGM's may sign.

**Items not handled by Contracts Department**

- Contract is signed & stamped but Fast Track Acknowledgement letter is missing. O processor should email Sales Rep for a copy of acknowledgement letter and hold file.

- No insurance certificate and/or OCP Policy in package. They need not be included.

- If contract is otherwise acceptable to O Processor, e.g. properly executed Otis Paper and Fast Track, forms included and/or not included in contract package need not be reviewed by Contracts. An example would be a Confidentiality Agreement.

**When in doubt speak to your Contracts Specialist.**

**Return Contract to (please circle):**

Madeline (UMM)        Grace (GHW)        Eve (EFB)
Alex (ADE)             Steve (SVR)        Brian (CZA)
Michelle (MWS)                         Lamont (XXW)

**COMMENTS**
**$29K – please review**

Contract Specialist Initials: _PMM_      Date: _2/14/08_

# OTIS

66543-1

ORIGINAL

CONTRACT ADDENDUM

**DATE:** 03/07/2011

**TO:**
Hahnemann Hospital
236-246 N. Broad Street
Philadelphia, PA  19102

**FROM:**
Otis Elevator Company
30 Twosome Drive
Suite 4
Moorestown, NJ  08057

**EQUIPMENT LOCATION:**
HAHNEMANN - NEW COLLEGE
245 N 15TH STREET
PHILADELPHIA, PA 19102

Audrey Paparo
Phone: (856) 642-4941
Fax:(856) 648-4920

**CONTRACT NUMBER:**    NPH05515       **CONTRACT DATE:**    March 1, 2008

We propose the following modification to the Contract referred to above, to take effect as of:    March 1, 2011

Term.  Section 4a  of the Agreement shall be deleted in its entirety and replaced by the following.

A.    **TERM.**  The term of this Agreement ("Term") shall be extended for an additional term of three (3) years, effective March 1, 2011, (the "Effective Date") and expiring February 28, 20**??**, unless sooner terminated in accordance with Subsection 4.b.of the Agreement.  At the end of the extended term, this Agreement, if not cancelled with at least sixty (60) days' prior notice, will be extended for an additional term of two (2) years (a "Term Extension").

Compensation -- Monthly pricing for the extended period shall be as follows:

| Period | Monthly Price | Price Adjustment |
|---|---|---|
| 3/1/2011 – 2/28/2012 | $34,018 / month | 1.625% |
| 3/1/2012 – 2/28/2013 | $34,571 / month | 1.625% |
| 3/1/2013 – 2/28/2014 | $35,133 / month | 1.625% |
| *If not cancelled per the terms of Section 4a . . .* | | |
| 3/1/2014 – 2/28/2015 | $36,023 / month | 2.533% |
| 3/1/2015 – 2/28/2016 | $36,935 / month | 2.533% |

Additional Services (Select if accepted):
Escalator Clean-Downs:  During the extension period, HOSPITAL may elect to add $1,400 / month to the monthly price. In return for this additional amount, VENDOR will include 8 escalator clean-downs in the scope of the services. The clean-downs will be scheduled over the extension period (1-2 per year).  Sign if this option is selected _Michael P. Halt_  3/17/11
MICHAEL P. Halt, CEO

Supplemental Manpower:  During the extension period, HOSPITAL may elect to add $1,400 / month to the monthly price.  In return for this additional amount, VENDOR will include 2 scheduled days/month of additional mechanic time to supplement the resident mechanic.  Sign if this option is selected _N/A_

231 North Broad Street:  Effective ___3/1/2011___ elevator #417274, located at 231 North Broad Street shall be added to the scope of this agreement at an additional price of $189/month.  This amount shall be subject to the same annual price adjustment percentage per the above schedule in section 4A.  Sign if this option is selected _Michael P. Halt_  3/17/11
MICHAEL P. Halt, CEO

Both parties recognize that the fit of the resident mechanic is critical to the success of the ongoing

© OTIS ELEVATOR COMPANY, 2010 All Rights Reserved LiNX Form MNT-ADD (3/16/09) Contract#: NPH05515

maintenance program. With this in mind, the selection of any future resident mechanic under this agreement shall be subject to the approval of HOSPITAL.

This proposal, when accepted by you below and approved by our authorized representative, will become binding as an addendum and modification to the Contract. All other terms, conditions and obligations in the Contract referred to are to remain in full force and effect. This quotation is valid for ninety (90) days from the proposal date.

Submitted by: _____Audrey Paparo_____

Title: ___Sr. Account Manager___

Accepted in Duplicate

**CUSTOMER**
Approved by Authorized Representative

Date: ___3-17-11___

Signed: _____

Print Name: ___MICHAEL P. HALTER___

Title: ___CEO___

E-mail: _____

Name of Company: ___Tenet Health System Hahnemann LLC d/b/a Hahnemann University Hospital___

☑ Principal, Owner or
   Authorized Representative of Principal or Owner

☐   Agent: _____
        (Name of Principal or Owner)

**Otis Elevator Company**
Approved by Authorized Representative

Date: ___2/21/11___

Signed: _____

Print Name: ___Richard Hagendorf___

Title: ___General Manager___

CONTRACT ADDENDUM

Please use the attached schedule for pricing for the 5 years.

It should be booked as a 3&2 contract (not a 5T).

Price adjustments fixed per below.

*Use these rates for Next 5 years*

*7/14/09*

| Year | From | To | Base | Esc Work | 231 Broad | Total |
|------|------|-----|------|----------|-----------|-------|
| 1 | 3/1/2011 | 2/29/2012 | 34,018 | 1400 | 199 | 35,607 |
| 2 | 3/1/2012 | 2/28/2013 | 34,571 | 1423 | 192 | 36,186 |
| 3 | 3/1/2013 | 2/28/2014 | 35,133 | 1446 | 195 | 36,774 |
| 4 | 3/1/2014 | 2/28/2015 | 36,023 | 1483 | 200 | 37,706 |
| 5 | 3/1/2015 | 2/29/2016 | 38,935 | 1521 | 205 | 38,661 |

2

66543

# OTIS

CONTRACT ADDENDUM

**DATE:** 02/05/2014

**TO:**
Hahnemann University Hospital
Attn A/P
Po Box 42487, Ecats # 66543
Philadelphia, PA 19101

**FROM:**
Otis Elevator Company
30 Twosome Dr Ste. 4
Moorestown, NJ 08057

**EQUIPMENT LOCATION:**
Hahnemann Hosptial
231 North Broad Street
Philadelphia, PA 19123

Audrey Paparo
Phone: (856) 642-4941
Fax:(860) 660-1366

**CONTRACT NUMBER:**   NPH05515          **CONTRACT DATE:**    03/01/2008

We propose the following modification to the Contract referred to above, to take effect as of: 03/01/2014

The contract will be resigned for a new 5 year term beginning on the effective date listed above. The contract will waive the annual price adjustment scheduled for March of 2014, and the next applicable price adjustment will be March 1, 2015. The annual price adjustment shall be fixed at 2%. The pricing shown below constitutes the monthly gross and net pricing, as well as the annual pricing.

Otis agreement with Med Assets, 5 year term, 2% PAP

| Pricing From: | Gross Price/Month | Net Price/Month | Net Annual Pricing |
|---|---|---|---|
| 3/1/2014 - 2/28/2015 | $36,774.00 | $33,464.34 | $401,572.08 |
| 3/1/2015 - 2/28/2016 | $37,509.48 | $34,133.63 | $409,603.52 |
| 3/1/2016 - 2/28/2017 | $38,259.67 | $34,816.30 | $417,795.59 |
| 3/1/2017 - 2/28/2018 | $39,024.86 | $35,512.63 | $426,151.50 |
| 3/1/2018 - 2/28/2019 | $39,805.36 | $36,222.88 | $434,674.53 |

*Med Asset discount is a 9% discount for five years and waives the 2014 price increase.

**National Agreement**

Customer understands and agrees that this Maintenance Agreement will be subject to all the terms and conditions of the NATIONAL AGREEMENT between Otis and MEDASSETS including eligibility for the National Operating Discount of 9.00 percent and the other benefits described therein.

The national quantity discount will be determined by the total number of units under Otis Extended Full Coverage Maintenance Contracts with Customer who have executed this agreement referencing the OTIS NATIONAL AGREEMENT.

Notwithstanding the foregoing, it is understood and agreed that in the event the National Agreement expires or is terminated prior to the expiration of this Agreement, this Agreement shall continue in full force and effect in accordance with the provisions contained herein.

This proposal, when accepted by you below and approved by our authorized representative, will become binding as an addendum and modification to the Contract. All other terms, conditions and obligations in the Contract referred to are to remain in full force and effect. This quotation is valid for ninety (90) days from the proposal date.

© Otis Elevator Company 2011 All Rights Reserved LiNX Form MN T-ADD (04/01/12) Contract #: NPH05515

Submitted by:    Audrey Paparo
Title:            -

Accepted in Duplicate

| **CUSTOMER** | **Otis Elevator Company** |
|---|---|
| Approved by Authorized Representative | Approved by Authorized Representative |

| | | | |
|---|---|---|---|
| Date: | 3/21/14 | Date: | |
| Signed: | _[signature]_ | Signed: | _[signature]_ |
| Print Name: | MICHAEL P. HALTER | Print Name: | |
| Title | CEO | Title | MATTHEW J. SALVO |
| | | | GENERAL MANAGER |
| E-mail: | | | |

Name of Company  TENET HEALTH SYSTEM HAHNEMANN LLC
              d/b/a  HAHNEMANN UNIVERSITY HOSPITAL
☐ Principal, Owner or Authorized Representative of Principal or Owner

☐ Agent: _____
(Name of Principal or Owner)

CONTRACT ADDENDUM

| Cust No. | Customer Name | LOB | Invoice Ref No | Invoice Date | Total Gross Amount | Total Open Amount | Days Aged | |
|---|---|---|---|---|---|---|---|---|
| Total | Total | Total | Total | Total | 268,114 | 266,862 | Total | |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18568 001 | 01/09/2019 | 268 | 268 | 161 | not equipment related callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH19015 001 | 03/18/2019 | 868 | 868 | 93 | not equipment related callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH16717 001 | 04/13/2018 | 868 | 868 | 432 | not equipment related callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18451 001 | 12/06/2018 | 268 | 268 | 195 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18881 001 | 02/27/2019 | 358 | 358 | 112 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18970 001 | 02/28/2019 | 358 | 358 | 111 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH19039 001 | 03/27/2019 | 766 | 766 | 84 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18364 001 | 11/28/2018 | 511 | 511 | 203 | not equipment related callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18499 001 | 01/30/2019 | 1,532 | 1,532 | 140 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH17656 001 | 10/01/2018 | 766 | 766 | 261 | not equipment related callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18519 001 | 01/09/2019 | 2,670 | 2,670 | 161 | doors knocked off the track |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18572 001 | 01/09/2019 | 358 | 358 | 161 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18653 001 | 01/30/2019 | 447 | 447 | 140 | OT Callback |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18926 001 | 02/27/2019 | 715 | 715 | 112 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18974 001 | 02/28/2019 | 536 | 536 | 111 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18407 001 | 11/28/2018 | 1,022 | 1,022 | 203 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH19054 001 | 03/26/2019 | 715 | 715 | 85 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH16404 001 | 02/12/2018 | 1,303 | 1,303 | 492 | Not equipment related |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH16734 001 | 04/13/2018 | 626 | 626 | 432 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH16716 001 | 04/13/2018 | 715 | 715 | 432 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH16317 001 | 04/10/2018 | 1,520 | 626 | 435 | Not equipment related |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH13386 001 | 12/06/2018 | 179 | 179 | 195 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18456 001 | 12/06/2018 | 765 | 766 | 195 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18518 001 | 01/09/2019 | 2,605 | 2,605 | 161 | doors knocked off track |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18567 001 | 01/09/2019 | 626 | 626 | 161 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18570 001 | 01/09/2019 | 511 | 511 | 161 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18602 001 | 01/30/2019 | 3,908 | 3,908 | 140 | OT Team Machine Work |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18665 001 | 01/31/2019 | 536 | 536 | 139 | OT Callback |

| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18883 001 | 02/27/2019 | 434 | 434 | 112 | OT Callback |
|---|---|---|---|---|---|---|---|---|
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18669 001 | 02/28/2019 | 358 | 358 | 111 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18972 001 | 02/28/2019 | 358 | 358 | 111 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18936 001 | 03/25/2019 | 34,914 | 34,914 | 86 | Rope Replacement on OT |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH19090 001 | 03/26/2019 | 536 | 536 | 85 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18498 001 | 01/30/2019 | 805 | 805 | 140 | OT callback |
| 468297 | Hahnemann Univ Hosp | Maintenance | NPH05515 119 | 12/20/2018 | 36,850 | 36,850 | 181 | January Maintenance |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18367 001 | 11/28/2018 | 511 | 511 | 203 | OT Callback |
| 468297 | Hahnemann Univ Hosp | Maintenance | NPH05515 419 | 03/20/2019 | 37,587 | 37,587 | 91 | April Maintenance |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH19014 001 | 03/18/2019 | 715 | 715 | 93 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18452 001 | 12/06/2018 | 268 | 268 | 195 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18565 001 | 01/09/2019 | 447 | 447 | 161 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18569 001 | 01/09/2019 | 1,022 | 1,022 | 161 | OT Callback |
| 468297 | Hahnemann Univ Hosp | Maintenance | NPH05515 219 | 01/21/2019 | 36,850 | 36,850 | 149 | February Maintenance |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18663 001 | 01/30/2019 | 511 | 511 | 140 | OT Callback |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH188884 001 | 02/27/2019 | 434 | 434 | 112 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18954 001 | 02/28/2019 | 894 | 894 | 111 | Replace drive on OT |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18971 001 | 02/28/2019 | 536 | 536 | 111 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH190016 001 | 03/18/2019 | 1,303 | 1,303 | 93 | OT - Not equipment related |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH15703 001 | 12/20/2017 | 447 | 89 | 546 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH16732 001 | 04/13/2018 | 536 | 536 | 432 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH17065 001 | 09/27/2018 | 4,492 | 4,492 | 265 | Hoistway door work |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH17808 001 | 10/01/2018 | 536 | 536 | 261 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18365 001 | 11/28/2018 | 715 | 715 | 203 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18368 001 | 11/28/2018 | 626 | 626 | 203 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18461 001 | 12/06/2018 | 1,162 | 1,162 | 195 | OT Callback |
| 468297 | Hahnemann Univ Hosp | Maintenance | NPH05515 C18 | 11/20/2018 | 36,850 | 36,850 | 211 | December Maintenance |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18571 001 | 03/09/2019 | 358 | 358 | 161 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18500 001 | 01/30/2019 | 270 | 270 | 140 | Not Equipment Related |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18616 001 | 01/30/2019 | 766 | 766 | 140 | OT Callback |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18882 001 | 02/27/2019 | 179 | 179 | 112 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH18973 001 | 02/28/2019 | 268 | 268 | 111 | OT Callback |
| 468297 | Hahnemann Univ Hosp | Maintenance | NPH05515 319 | 02/20/2019 | 37,587 | 37,587 | 119 | March Maintenance |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH19053 001 | 03/26/2019 | 536 | 536 | 85 | OT Callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH19055 001 | 03/26/2019 | 80 | 80 | 85 | OT callback |
| 468297 | Hahnemann Univ Hosp | T (Open Order) | NPH19137 001 | 03/27/2019 | 1,022 | 1,022 | 84 | Mechanic standby |

Balance No Maintenance →
$ 81,138 00

## VERIFICATION

The undersigned is an authorized representative of Otis Elevator Company. I have read the foregoing Mechanic's Lien Claim. The statements therein are true and correct to the best of my personal knowledge, information and belief. This statement and verification is made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities, which provides that, if I make knowingly false averments, I may be subject to criminal penalties.

Date: 9 - 11 - 2019 _____    By: _____