**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CENTER CITY HEALTHCARE, LLC d/b/a<br>HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1]<br><br>*Debtors*. | Chapter 11<br><br>Case No. 19-11466 (KG)<br>(Jointly Administered)<br><br>Hearing Date: Expedited Hearing Requested<br>Objection Deadline:  TBD |

**EMERGENCY MOTION OF GROUP OF FORMER RESIDENTS, FELLOWS AND
MEDICAL STAFF OF ST. CHRISTOPHER'S HEALTHCARE, LLC AND AFFILIATED
DEBTOR ENTITIES TO ENFORCE THE SALE ORDER APPROVING THE ST.
CHRISTOPHER'S TRANSACTION AND TO ENFORCE THE ASSET PURCHASE
AGREEMENT, OR, IN THE ALTERNATIVE, TO RECONSIDER THE SALE ORDER
APPROVING THE ST. CHRISTOPHER'S TRANSACTION**

Certain former residents, fellows and medical staff of St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC, SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., St. Chris Care at Northeast Pediatrics, L.L.C., and/or TPS V of PA, L.L.C. (collectively, the "**Former Physician Group**"),[2] by and through undersigned counsel, hereby move this Court to enforce its *Order Under 11 U.S.C. § 105, 363, 365, 503 and 507 (A) Approving Asset Purchase Agreement with STC OPCO, LLC and (B) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtors' Executory Contract, and (D) Granting Related Relief* [Docket No. 795] (the "**Sale Order**") and the Asset

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), St. Chris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.
[2] The Former Physician Group is comprised of not less than 71 former residents, fellows and medical staff of St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC, SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., St. Chris Care at Northeast Pediatrics, L.L.C., and/or TPS V of PA, L.L.C.

1

Purchase Agreement it approves (the "**APA**"), or, in the alternative, to reconsider the entry of the Sale Order (the "**Motion**").  In support of the Motion, the Former Physician Group respectfully states as follows:

## Preliminary Statement

In what appears to be an effort to avoid negative press, upon information and belief, St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC and certain affiliated debtor physician practice groups, SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., St. Chris Care at Northeast Pediatrics, L.L.C., and TPS V of PA, L.L.C. (as defined in the APA as the "**Debtor Parties**" or "**Sellers**") and STC OpCo LLC ("**OpCo Buyer**") have determined <u>not</u> to provide medical malpractice tail insurance to the former residents, fellows, and medical staff of the Debtor Parties, despite the provisions in the APA requiring this, and the Debtor Parties have attempted to keep this quiet until the transaction contemplated under the APA closes on or about December 13, 2019.[3]

Recognizing the precarious position that this decision will place their former colleagues, certain concerned physicians remaining at the Sellers have recently alerted their former colleagues of their plight – being faced with the prospect of having to secure their own tail coverage in about one month during the year-end holiday season.

As the Court can imagine, this news has come as quite a shock and is of grave concern to the potentially affected parties.  The Former Physician Group expects this news is a bit of a shock

---

[3] The undersigned counsel reached out to Debtors' counsel on November 25, 2019, in an attempt to confirm whether this information is accurate.  Despite repeated requests for confirmation, as of this filing, Debtors' counsel has neither confirmed nor denied this, most likely in attempt to delay a motion like this one.

to the Court as well, as the evidence presented at the hearing to approve the St. Christopher's sale indicated tail coverage would be provided and the APA requires the same. *See* § 8.6 of APA.

To protect themselves, the Former Physician Group is compelled to seek the enforcement of the Sale Order and the APA, or, in the alternative, to seek reconsideration of the Sale Order, as it appears to have been obtained under what appear to be mistakes, misrepresentations, or misunderstandings.

While the Former Physician Group is comprised of not less than 71 physicians, there are certainly many more former physicians that stand to be affected if the relief requested herein is not granted.

## Background

1. Prior to the Debtors' bankruptcy filing, members of the Former Physician Group were employed by the Debtor Parties. Each member of the Former Physician Group has an employment contract that, as an employment benefit for the physician, specifies the insurance coverages to be provided by the Debtor Parties upon expiration or termination of such employment contract or the expiration or cancellation of the insurance policies. Such contracts generally provide that the Debtor-party shall continue to maintain coverage for the physician under its then current claims made policy for the period of time required under the statute of limitations or, should the Debtor-party cease to maintain claims-made coverage, the Debtor-party shall purchase at its cost an extended reporting period policy or "tail" policy on behalf of the Debtor-party and the physician for medical malpractice claims arising out of medical malpractice incidents occurring during the physician's employment (the "**Tail Coverage Benefit**").

2. Currently, the Debtor Parties provide their current and former residents, physicians and other healthcare professionals medical malpractice insurance coverage through several claims made insurance policies that are set to expire on January 11, 2020.

3. On July 16, 2019, the Debtors filed their motion seeking to sell substantially all of the Debtor Parties' assets [Docket No. 205] (the "**Sale Motion**").

4. On September 23, 2019, the Court held a hearing on the Sale Motion (the "**Sale Hearing**"). At the Sale Hearing, the Debtor Parties made the following representations to the Court about tail coverage:

> Mr. Minuti: In addition, Your Honor, a critical element here is the buyer is going to be purchasing tail insurance coverage to cover the debtor parties and continuing residents subject to splitting the costs with the debtors 50/50 with the debtors' obligation to pay capped at $2 million dollars. *Transcript of September 23, 2019 Sale Hearing* (hereafter "**Transcript**"), 11:13 – 11:17.

> Mr. Minuti proffering the testimony of Allen Wilen, Chief Restructuring Officer: The buyer is purchasing tail insurance coverage to cover the debtor parties and continuing resident [sic], subject to splitting the costs with the debtors 50/50 with the debtors' obligation cap at $2 million dollars. *Transcript* at 33:21 – 33:24.

Excerpts of the Transcript are attached hereto as **Exhibit A** and incorporated herein.

5. The foregoing representations are based on a requirement in Section 8.6 of the APA that provides as follows:

> **Tail Coverage**. OpCo Buyer shall have obtained the Tail Coverage. For purposes of this Agreement, "**Tail Coverage**" means the reporting endorsement to <u>insure against professional liabilities of the Debtor Parties</u> and the Hospital residents and fellows <u>as of the Closing Date</u>, including any excess and umbrella coverage, in amounts and coverage satisfactory to OpCo Buyer in its sole discretion. Sellers shall be responsible to pay one half of the cost of the Tail Coverage, up to a cap on Sellers' contribution of Two Million Dollars ("**Sellers' Tail Coverage Expense**").

APA, § 8.6 (underlining added).

6. Nothing in the statements made to the Court at the Sale Hearing sought to qualify the tail insurance coverage to be provided to cover only personnel continuing in the employ of OpCo Buyer. Nothing in the APA requiring Tail Coverage limits it to personnel of the Debtor Parties that remain in the employ of OpCo Buyer. The APA clearly and unambiguously states that "Tail Coverage means the reporting endorsement to <u>insure against professional liabilities of the Debtor Parties</u> … <u>as of the Closing Date</u>." "Professional liabilities of the Debtor Parties as of the Closing Date" necessarily includes the obligations of the Debtor Parties to provide the Tail Coverage Benefit to their former residents, fellows and other medical staff. Those obligations have not gone away.

7. The Sale Order provides in pertinent part:

> 3. The Agreement, each document, instrument, and agreement contemplated thereby, and all of the terms and conditions thereof, is hereby approved.
>
> 4. Pursuant to sections 105(a), 363(b) and 365 of the Bankruptcy Code, the Debtors are authorized and directed to take all actions necessary to consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement.
>
> 28. The Agreement as well as other agreements related thereto, may be modified, amended, or supplemented by the Debtors (in consultation with the Committee) and the Purchaser without further order of the Court, provided that any such modification, amendment, or supplement either is (a) not material or (b) no less favorable to the STC Entities than the existing applicable provisions.
>
> 33. This Court shall retain jurisdiction (a) to enforce and implement the terms and provisions of the Agreement …(c) to resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, and (d) to interpret, implement and enforce the provisions of this Order….

8. As of the filing of the Motion, the Debtors have not sought an order amending or modifying the APA to limit the Tail Coverage required under the APA.

9. Despite the clear and unambiguous language of the APA and the unqualified representations to the Court at the Sale Hearing, upon information and belief, the parties to the APA do not intend to follow the Tail Coverage requirement, but rather seek to limit Tail Coverage to those personnel that remain in the employ of OpCo Buyer after the sale.

### Relief Requested

10. By and through this Motion, the Former Physician Group seeks (i) entry of an order enforcing the Sale Order by compelling the Debtor Parties and OpCo Buyer to comply with the terms of the APA regarding Tail Coverage; or, in the alternative, (ii) reconsideration of the Sale Order.

### Enforcement of the Sale Order and APA

11. Bankruptcy courts have jurisdiction to interpret and enforce their own orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Here, the Sale Order specifically provides: "This Court shall retain jurisdiction (a) to enforce and implement the terms and provisions of the Agreement …(c) to resolve any disputes arising under or related to the Agreement, except as otherwise provided therein, and (d) to interpret, implement and enforce the provisions of this Order…." Sale Order, ¶ 33.

12. The Court should enforce and implement the terms of the APA to require the Debtor Parties and OpCo Buyer to provide the Tail Coverage required under the APA. Under the APA, "Tail Coverage means the reporting endorsement to <u>insure against professional liabilities of the Debtor Parties</u> … <u>as of the Closing Date</u>." APA, § 8.6. "Professional liabilities of the Debtor Parties as of the Closing Date" necessarily includes the obligations of the Debtor Parties to provide the Tail Coverage Benefit to their former residents, fellows and other medical staff, including the Former Physician Group. Those obligations have not gone away.

13. The Tail Coverage requirement is clear and unambiguous. Notably, the representations to the Court regarding the Tail Coverage were unqualified. If the Debtor Parties and OpCo Buyer intended to limit the Tail Coverage to personnel of the Debtor Parties that remain in the employ of OpCo Buyer, they knew how to draft such language and chose not to do so.

14. The Court should not allow the parties to the APA to weaken the Tail Coverage requirement, as weakening the coverage required would be both a material modification of the APA and less favorable to the Debtor Parties, either one of which requires further Court order under the provisions of the Sale Order. *See* Sale Order, ¶ 28 (written in disjunctive).

15. The Tail Coverage provision was a material term of the APA and a significant reason for the Court approving the APA and the sale generally. It should be enforced.

## Reconsideration of the Sale Order

16. In the event that the Court determines not to enforce the Sale Order and the APA (or disagrees with the Former Physician Group as what the Tail Coverage requirement in the APA means), the Former Physician Group respectfully requests that the Court reconsider the entry of the Sale Order and condition approval of the same on the provision of the Tail Coverage Benefit for former residents, fellows and other physicians of the Debtor Parties.

17. Rule 60(b) of the Federal Rules of Civil Procedure (the "**Federal Rules**"), which is made applicable to these bankruptcy cases by Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), provides, in relevant part:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

>  (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
>  (4) the judgment is void;
>
>  (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
>  (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

18. Here, the Former Physician Group seeks this Court's reconsideration of the Sale Order on the grounds of mistake, surprise, newly discovered evidence, misrepresentation and/or another reason that justifies relief.

19. As noted above, the representations to the Court regarding the Tail Coverage were unqualified. The Court relied upon these representations in approving the Sale Order. If the Debtor Parties and OpCo Buyer intended to limit the Tail Coverage to personnel of the Debtor Parties that remain in the employ of OpCo Buyer, they should have informed the Court at the Sale Hearing. The Debtors' failure to qualify the representations to the Court regarding the Tail Coverage were either a mistake or a misrepresentation (regardless of whether inadvertent), either of which is grounds for reconsideration given the importance of the Tail Coverage issue in these cases.

20. Further, the Debtor Parties' failure to notify their former physicians of any intent to limit tail coverage to personnel that remain in the employ of OpCo Buyer (including failing to notify them as of this filing), is sufficient grounds to justify relief. This conduct appears to have been intentionally designed to prevent affected parties from having any fair opportunity to voice valid objections to the proposed sale, resulting in surprise to the affected parties and an inability to have made timely objections. This lack of candor is grounds for reconsideration. Indeed, had

this been known at the Sale Hearing, counsel representing Educational Commission for Foreign Graduates (Mr. Alberto) and counsel for ACGME (Mr. Miller) would have likely raised objections.

21.     A motion for reconsideration under Federal Rule 60(b) "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). However, "Rule 60(b)(2) expressly provides that a court may relieve a party from a final judgment, order, or proceeding based on 'newly discovered evidence,' but such 'newly discovered evidence' must be evidence 'that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b).'" *Robles-Garcia v. United States*, No. C-13-4031-MWB, 2014 WL 941700, at *2 (N.D. Iowa Mar. 11, 2014) (citing Fed. R. Civ. P. 60(b); *Nelson v. American Home Assur. Co.*, 702 F.3d 1038, 1043 (8th Cir. 2012)).

22.     Here, the Court may also consider the recently discovered intent of the Debtor Parties and OpCo Buyer to limit Tail Coverage to personnel continuing in the employ of OpCo Buyer as newly discovered evidence constituting grounds for reconsideration. This "intent" was intentionally withheld and only came to light when concerned physicians at the Debtor Parties reached out to their former colleagues to give them the bad news. Had this "intent" been known prior to the Sale Hearing, the affected parties would have acted sooner and raised timely objections.

### Other Considerations

23.     In considering the relief sought herein, the Former Physician Group notes that the Court accepted an amicus brief by the American Medical Association, the Pennsylvania Medical Society, and the Philadelphia County Medical Society (collectively, the "**Amici Curiae**"), which brief is at Docket No. 729 (the "**Amicus Brief**"). While the Amicus Brief was filed in support of

the Hahnemann physicians who were being denied tail coverage, the arguments apply with equal force to the Former Physician Group. The Amicus Brief is attached hereto as **Exhibit B** and incorporated herein.

24. As noted in the Amicus Brief, if tail coverage is not provided to the Former Physician Group as part of the sale of the assets of St. Christopher's Healthcare, LLC and some of its affiliates, then the Former Physician Group will be unduly and negatively impacted:

   a. If the Debtors are not required to provide the Former Physician Group with tail coverage, the physicians would be forced to pursue costly tail coverage in the Pennsylvania insurance market. This would be unfair to the Former Physician Group members who provided care to the Debtors' patients and an undue burden on the Former Physician Group members because they had contractually negotiated for tail coverage as part of their employment agreements in order to prevent such a situation. *See also* 40 P.S. §1303.742. The physicians provided medical care to the Debtors' patients and it is the Debtors who should bear the cost of tail coverage as agreed to in the employment agreements. In any event, it is generally extremely difficult for a physician to obtain affordable tail coverage from a different insurer because the different insurer never had an opportunity to impact the risk that it is being asked to cover.

   b. Typical calculation for cost of tail coverage is 200% - 350% of the cost of an annual policy for the basic insurance coverage layer. *See* The Courtroom: Legal Spotlight (2017, May 30). What Do You Need to Know About Malpractice Tail Coverage? [Blog post]. Retrieved from URL https://www.midlevelu.com/blog/what-do-you-need-know-about-malpractice-tailcoverage. In 2012, The Doctors Company insurer's calculation was 2.3 x the annual cost of the basic insurance coverage. *See* Brad O'Brien (2012, April 23). The Cost of Tail (The Doctors Company) [Blog post]. Retrieved from URL http://www.doctorsagency.com/blog/entryid/1137/-the-cost-of-tail-the-doctors-company-). For example, a Pennsylvania general surgeon may have a basic insurance coverage MPL policy that costs $47,000. The cost of the tail coverage at 2.3x is equal to $108,100. At 350%, tail coverage would cost $164,500. Again, this is what the cost could be to the surgeon who had planned, and expected due to contractual obligations, that the employer would be covering such cost.

   c. If a physician could obtain and pay for the tail coverage, the cost could be passed on to the patients/consumers. This would be counter to the goals of the MCARE Act.

   d. Should a physician be unable to obtain tail coverage, for whatever reason, the physician's personal assets would be at risk. No basic insurance coverage would exist, and without a tail, there is also no excess layer of coverage available from

> MCARE. *Gingerlowski v. Commonwealth*, 961 A.2d 237, 243 (Pa. Commw. 2008) ("the purchase of tail coverage or its substantial equivalent" is a prerequisite to excess coverage). There also would be no section 715 coverage. *Id*.
>
> e. If any of the physicians were unable to obtain tail coverage, they would be at risk of discipline before their Pennsylvania state board due to lack of insurance coverage. 40 P.S. § 1303.711(c). The physician's medical license will be suspended or revoked by the relevant Pennsylvania state licensing board if the physician fails to comply with this provision. *See id*. Thus, the physicians may be prevented from providing medical care at a time when Pennsylvania is experiencing a shortage of physicians. According to the Association of American Medical Colleges, the United States immediately needs an additional 95,900 doctors to start to address the shortage of physicians. There will be a shortage of up to 122,000 physicians nationally by 2032.
>
> f. If the Debtors are not required to provide the Former Physician Group with tail coverage, there will be risk that no funds are available to pay the claims of plaintiffs/patients for care rendered prior to the cancellation or termination of the insurance coverage.

25. Under Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq.*, the Tail Coverage Benefit owed to the Former Physician Group falls within the definition of "fringe benefits or wage supplements" and is thus considered "wages" under the statute. *See* 43 P.S. § 260.2a. Absent the provision of the Tail Coverage Benefit by the Debtors, the Former Physician Group members are being deprived of valuable bargained for benefits earned while caring for patients seen during their employment with the Debtors. The Former Physician Group members should not be exposed to personal liabilities relating to patients seen during their employment with the Debtors. Similarly, they should not be saddled with the obligation to purchase their own tail coverage, as that is depriving them of their wages and eating into their potential future earnings.

26. All of the foregoing can be avoided if the Court enforces the Sale Order by compelling the Debtor Parties and OpCo Buyer to comply with the terms of the APA regarding Tail Coverage or reconsiders approval of the Sale Order and conditions it on the provision of the Tail Coverage Benefit for former residents, fellows and other physicians of the Debtor Parties.

**Notice**

27.     Notice of this Motion will be given to (a) counsel to the Debtors; (b) the Office of the United States Trustee; (c) counsel to the creditors' committee; and (d) all creditors that have requested notice under Fed. R. Bankr. P. 2002.

WHEREFORE, the Former Physician Group respectfully requests that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated:  December 5, 2019

*/s/ David W. Carickhoff*
David W. Carickhoff (DE 3715)
ARCHER & GREINER, P.C.
300 Delaware Ave., Suite 1100
Wilmington, DE 19801
Telephone:  302-777-4350
Facsimile:  302-777-4352
Email:  dcarickhoff@archerlaw.com

Attorneys for the Former Physician Group