1

```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                     .    Chapter 11
IN RE:                               .
                                     .    Case No. 19-11466 (KG)
CENTER CITY HEALTHCARE, LLC,         .
d/b/a HAHNEMANN UNIVERSITY           .
HOSPITAL, et al.,                    .
                                     .    Courtroom No. 3
                                     .    824 North Market Street
                                     .    Wilmington, Delaware 19801
                                     .
             Debtors.                .    September 23, 2019
. . . . . . . . . . . . . . . . . .       1:00 P.M.

                         TRANSCRIPT OF HEARING
                   BEFORE THE HONORABLE KEVIN GROSS
                    UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Mark Minuti, Esquire
                          SAUL EWING ARNSTEIN & LEHR LLP
                          1201 N. Market Street
                          Wilmington, Delaware 19801

For Debtor 3M:            Alison Elko-Franklin, Esquire
(Telephonic)              GREENBERG TRAURIG, LLP
                          3333 Piedmont Road NE
                          Atlanta, Georgia 30305

For Tower Health:         Robert Lapowsky, Esquire
                          STEVENS & LEE
                          620 Freedom Business Center
                          King of Prussia, Pennsylvania 19406

Audio Operator:           GINGER MACE

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

1     MR. MINUTI:  Very well.  Then, Your Honor, just by
2 way of background and setting the table.
3     On July 16th, 2019, the debtors filed a motion to
4 establish bidding procedures for the sale of St.
5 Christopher's Children's Hospital operating assets and the
6 motion also asked ultimately for approval of the ultimate
7 sale to the highest and best bidder.  That appears at Docket
8 Number 205.
9     On July 26th, 2019, the court entered the bidding
10 procedures order.  That appears at Docket Number 301.  And
11 that order did a number of things including the following.
12     It included certain notice procedures related to
13 the sale;
14     It set forth the requirements if somebody needed
15 to follow it in order to be a qualified bidder;
16     It included certain procedures regarding
17 assumption and assignment of leases and executory contracts;
18     It included a bid deadline of September 16th.  It
19 set an auction, if necessary, for September 18th.  And set
20 today as the sale hearing to approve the sale to the highest
21 and best bidder.
22     The order Your Honor will recall also included
23 procedures for the ability to the debtor along the way to
24 select a stalking horse bidder.  That never materialized so
25 those provisions are now moot.

1          That bid procedures order, again, appears at
2  Docket Number 301.  The affidavit of service of that order
3  was filed on August 1.  It appears at Docket Number 325.
4          Consistent with the bid procedures order on July
5  29th, the debtors served court approved notice of the auction
6  and sale.  That notice appears at Docket Number 309 and the
7  affidavit of service of that notice appears at Docket Number
8  336.
9          Similarly, the debtors served notice of assumption
10 and assignment of executory contracts and leases on August
11 16th.  That notice appears at Docket Number 510.  Proof of
12 service is included in the affidavit filed on August 26th at
13 Docket Number 560.
14         Notice of the sale of the bid deadline and the
15 auction were also published in the *Philadelphia Inquirer* and
16 *The Wall Street Journal* on August 2nd.  Proof of publication
17 was filed and docketed on August 2nd at Docket Numbers 343
18 and 344.
19         By notice serviced and filed on September 16th,
20 the debtors notified perspective bidders and parties in
21 interest that the bid deadline was being extended to
22 September 18 at 2:00 p.m. and that the auction was being
23 continued to September 19.  That notice appears at Docket
24 Number 722.
25         By way of preview, Your Honor, we will have

1 evidence on this.  By the extended bid deadline, the debtors
2 received two bids, both of which were deemed by the debtors,
3 in consultation with the committee, to be qualified bids
4 within the meaning of the court approved bidding procedures.
5 　　　　　While both bids were qualified, neither bid was
6 acceptable to the debtors.  As the court will hear, one of
7 the qualified bidders did not appear at the auction and,
8 therefore, for the better part of two days, Your Honor, last
9 Thursday and Friday, the debtors and their advisors met and
10 negotiated with the representatives of our buyer, Drexel and
11 Tower.
12 　　　　　And, again, negotiated over a two-day period;
13 ultimately, reaching agreement, Your Honor, on a form of
14 asset purchase agreement at approximately 8:30 on Friday,
15 September 20.  That asset purchase agreement embodied the
16 terms and conditions pursuant to which the parties would move
17 forward with a sale transaction.
18 　　　　　Let me generally describe the terms of the asset
19 purchase agreement, Your Honor.  They are as follows.
20 　　　　　The purchase price, as I said, is $50 million
21 dollars.  The assets are substantially all of the operating
22 assets of the hospital.  There are some excluded items, Your
23 Honor.  For example, our buyers are not buying cash.  They're
24 not buying accounts receivable.  And they're not buying
25 certain claims and causes of action.

1    The buyer here, Your Honor, is going to offer
2 employment to substantially all of the debtors or St.
3 Christopher's Hospital's workforce, subject to certain
4 conditions contained in the APA.
5    The buyer is going to recognize and assume the
6 collective bargaining agreement with the International
7 Brotherhood of Electrical Workers Local 98;
8    The buyer is going to assume responsibility for
9 training the current residents and fellows at the hospital;
10    The buyer is going to be responsible for post-
11 petition PTO obligations for those employees that are
12 ultimately hired.
13    In addition, Your Honor, a critical element here
14 is the buyer is going to be purchasing tail insurance
15 coverage to cover the debtor parties and continuing residents
16 subject to splitting the costs with the debtors 50/50 with
17 the debtors' obligation to pay capped at $2 million dollars.
18    The outside closing date of the transaction, Your
19 Honor, is December 13, although we certainly hope to be able
20 to close sooner.
21    Our buyers here are taking an assignment of a
22 number of executory contracts, leases.  And, Your Honor, I
23 should note the CMS provider agreements with our buyer here,
24 Your Honor, paying the cure claim pursuant to the APA.
25    The buyer here are going to maintain all of the

1  patient records that are required by law to be maintained,
2  the responsibility the hospital has now.
3              So at approximately 8:30 p.m., Your Honor, on
4  Friday, September 20, we served and filed a notice cancelling
5  the auction.  That notice included a copy of the asset
6  purchase agreement, as well as a proposed form of sale order.
7  That appears at Docket Number 753.
8              Let me just pause there and ask if Your Honor had
9  an opportunity to review any of those documents?
10             THE COURT:  I did.
11             MR. MINUTI:  Very well, Your Honor.
12             THE COURT:  I did have an opportunity to review
13 the asset purchase agreement and the order.  Yes.
14             MR. MINUTI:  Thank you, Your Honor.
15             Your Honor, and then just briefly before we left
16 to head over for the hearing today, we did file an updated or
17 amended cure schedule, Your Honor, with respect to a number
18 of the contracts and leases.
19             I apologize.  I don't have that docket number, but
20 I do know that, in fact, it was docketed.
21             THE COURT:  Okay.
22             MR. MINUTI:  So that's the evidentiary background
23 in terms of the process, Your Honor, as to how we got here.
24             As I did indicate at the outset, we do have for
25 witnesses to present in support of the sale.  But if Your

1    MR. MINUTI:  Your Honor, with me in the courtroom
2 today is Allen Wilen.  If called to the stand, Mr. Wilen
3 would testify as follows.
4    In keeping with the last couple of hearings, Your
5 Honor, I will skip his background.
6    THE COURT:  Okay.
7    MR. MINUTI:  As Mr. Wilen previously testified,
8 the debtors filed these bankruptcy cases with two primary
9 goals.  First to safely and effectively shut down Hahnemann
10 University Hospital and, second, to either reorganize or sell
11 the operating assets of St. Christopher's Children's Hospital
12 so that St. Christopher's would continue as a going concern.
13    Mr. Wilen would testify that soon after the
14 petition date, the debtors determined that they lacked the
15 liquidity and ability of reorganize St. Christopher's
16 Children's Hospital so the debtors turned their attention to
17 selling the Children's Christopher Hospital assets or
18 operating assets pursuant to, among others, Section 363 and
19 365 of the Bankruptcy Code.
20    On July 16, the debtors filed a motion seeking to
21 establish bidding procedures for the sale of the St.
22 Christopher's operating assets by order dated June 26th,
23 2019.  The court approved -- excuse me; July 26th, 2019, the
24 court approved the appropriate bidding procedures and the
25 debtors work in conjunction with SSG Advisors, marketed the

1  St. Christopher's operating assets for sale.

2              As part of this process, Mr. Wilen would testify
3  that he and other members of the debtors' management team met
4  with perspective bidders, provided tours, answered questions,
5  and responded to due diligence requests and related requests
6  for information.

7              Mr. Wilen would testify the two bids were received
8  by the bid deadline, a bid from STC Opco, LLC, a limited
9  liability company formed by Tower Heath and Drexel University
10 who I will call STC Opco.  And he bid from strategic Global
11 Management, Inc., an affiliate of the KPC group of companies,
12 also known as KPC.

13             Mr. Wilen participated in a meeting at Saul
14 Ewing's Philadelphia office in the afternoon and evening of
15 September 18 to analyze the bids submitted by the bid
16 deadline.

17             After reviewing the bids and consulting with the
18 official committee of unsecured creditors, the debtors
19 qualified both bids.

20             While both bids were qualified, Mr. Wilen would
21 testify that neither opening bid was acceptable to the
22 debtors.

23             The auction was scheduled to begin at 10:00 a.m.
24 on Thursday, September 19th, 2019.  Mr. Wilen would testify
25 that approximately twenty representatives of STC Opco

1  attended the scheduled auction. No one appeared at the
2  auction in person for KPC.
3              Mr. Wilen would confirm -- excuse me, Your Honor.
4              Mr. Wilen would testify that most of the entire
5  day of September 19 was spent negotiating with the
6  representatives of STC Opco in an attempt to get STC Opco to
7  increase and modify its bid.
8              Mr. Wilen would further testify that following
9  protracted and, at times, contentious meetings and
10 negotiations, the debtors and STC Opco ultimately reached an
11 understanding, subject to further negotiations and
12 documentation, on economic terms for the purchase of St.
13 Christopher's operating assets at approximately 11:30 p.m. on
14 September 19, 2019.
15             Mr. Wilen would testify that the parties returned
16 to Saul Ewing's Philadelphia office on the morning of Friday,
17 September 20, 2019 to continue discussions regarding the
18 asset purchase agreement and to finalize it and the proposed
19 sale order and negotiate a number of remaining open issue.
20             Mr. Wilen would testify that the parties reached
21 complete agreement on all terms in the form of the asset
22 purchase agreement at approximately 7:30 p.m. on Friday,
23 September 20.
24             As a result, the debtors in consultation with the
25 committee and Midcap cancelled the auction.

1        At approximately 8:30 p.m., the debtors served and
2   filed a notice cancelling the auction.  They filed a signed
3   asset purchase agreement and related exhibits any proposed
4   form or sale order.
5        Mr. Wilen would testify KPC had requested that the
6   debtors postpone the auction and sale hearing, but Mr. Wilen
7   would testify that in his view, the debtors did not have the
8   flexibility to further delay the sale process.  Moreover,
9   delaying the sale process could have resulted in STC Opco
10  walking away or, at minimum, backtracking for much of the
11  progress made during the course of September 19 and September
12  20.
13       Mr. Wilen would testify that throughout the days
14  on both September 19 and September 20, he and the debtors'
15  professionals consulted with the official committee of
16  unsecured creditors and Midcap.
17       Mr. Wilen would testify that during the day of the
18  scheduled auction and as required by the bidding procedures,
19  he consulted with representatives of the City of Philadelphia
20  and the Pennsylvania Department of Health.  During these
21  discussions, the Health Commission for the City expressed the
22  City's strong preference for sale local established not for
23  profit operator.
24       Mr. Wilen would identify the asset purchase
25  agreement that was attached to Your Honor to the document

1   that we filed on Friday as the final signed asset purchase
2   agreement with our buyer, STC Opco.  It is a true and correct
3   copy of that asset purchase agreement.  Mr. Wilen would
4   describe the main components of the STC Opco APA as follows.
5               The purchase price is $50 million dollars;
6               The assets are substantially all assets of the St.
7   Christopher's operating debtors.  There are some excluded
8   items, for example; cash, accounts receivable, certain estate
9   claims and causes of action.
10              Mr. Wilen would testify that the buyer is to offer
11  employment to substantially all of St. Christopher's
12  workforce subject to certain conditions.  That includes our
13  positions, Your Honor.
14              Mr. Wilen would testify that the buyer is going to
15  recognize and assume the collective bargaining agreement with
16  the International Brotherhood of Electrical Workers Local 98.
17              The buyer is going to assume responsibility for
18  training the current residents and fellows.
19              The buyer is going to be responsible for post-
20  petition PTO obligations for employees that it hires.
21              The buyer is purchasing tail insurance coverage to
22  cover the debtor parties and continuing resident, subject to
23  splitting the costs with the debtors 50/50 with the debtors'
24  obligation cap at $2 million dollars.
25              Mr. Wilen would testify again that the outside

1  closing date is the 13th of December.

2  And Mr. Wilen would testify that the buyer here is
3  taking an assignment of a number of executory contracts and
4  leases including the CMS provider agreements we've already
5  talked about with STC Opco paying all cure claim subject to
6  the one change we talked about right after the break, Your
7  Honor.

8  THE COURT:  Okay.

9  MR. MINUTI:  Mr. Wilen would testify that given
10 the increase in purchase price and the fact that the members
11 of the buyer are Tower and Drexel, both of whom are actively
12 involved in the local healthcare community, the terms and
13 conditions of the STC Opco APA is the highest and best bid
14 for the St. Christopher's operating assets.

15 Mr. Wilen would testify that he accepted the Tower
16 and Drexel bid and cancelled the auction for a host of
17 reasons including the following.

18 He believed the purchased price offered by STC
19 Opco was fair and reasonable under the circumstances.  STC
20 Opco could have sat on their initial offer, Your Honor but,
21 instead, worked with the debtors to reach the favorable terms
22 of the asset purchase agreement which are now before the
23 court.  Mr. Wilen would have further delayed the auction; he
24 would testify that STC Opco told him that it would revert to
25 its initial bid for purposes of any auction.