## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, | ) Jointly Administered |
| *et al.*,[1] | ) |
| Debtors. | ) |

## EMERGENCY MOTION OF AD HOC COMMITTEE OF HAHNEMANN RESIDENTS AND FELLOWS TO COMPEL DEBTORS TO PROVIDE PROFESSIONAL LIABILITY INSURANCE IN ACCORDANCE WITH RESIDENT EMPLOYMENT AGREEMENTS

The Ad Hoc Committee of Hahnemann Residents and Fellows (the "Ad Hoc Resident Committee"),[2] by its undersigned counsel, submits this emergency motion (this "Motion") to require the Debtors to comply with their obligation under their contracts (the "Resident Contracts") with their residents, fellows and interns (collectively, the "Residents") that have been displaced as a result of the closing of Hahnemann University Hospital (the "Hospital") to provide a professional liability insurance tail to the Residents. In support of this Motion, the Ad Hoc Resident Committee states as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] The Initial Members of the Ad Hoc Resident Committee are Randol Hooper, Jen Schwartz, Ashley Lentini, Erika Correa, and Lynn Mackovick. More than 100 requests to join the Ad Hoc Resident Committee have come in since the its formation. The Ad Hoc Resident Committee will file a Rule 2019 statement reflecting its current membership this afternooon.

## PRELIMINARY STATEMENT

The Ad Hoc Resident Committee brings this Motion because the Debtors have willfully created a crisis that threatens the livelihood of nearly 1,000 Residents and poses a severe threat to the Pennsylvania medical system.  The Residents need relief from this Court immediately.  The professional liability insurance that covers their time at Hahnemann expires on January 10, 2020. Unless the Debtors honor their contractual obligations to purchase tail insurance for the Residents, the Residents will have no professional liability insurance covering their work at Hahnemann from January 10, 2018 through the closure of Hahnemann.  The consequences are dire.  Without tail coverage, the Residents may no longer be licensed to practice medicine.  The cost of obtaining tail coverage on their own ranges from prohibitive at best to impossible depending on their specialties.[3] These are newly practicing doctors with modest salaries and for many, hundreds of thousands in debt.

This is an emergency solely of the Debtors' making.  The origins of this emergency started in January 2018 with the Debtors' decision to ignore their contractual obligations to purchase occurrence based insurance.  Instead, they prioritized cost savings over contract and purchased cheaper claims made insurance.  The emergency became more acute as the Debtors abjectly failed this fall to give all affected Residents adequate notice that their professional liability coverage was ending and that **tail insurance needed to be procured and that Hahnemann would not honor its obligations to do so**.  Upon information and belief, despite the extraordinary efforts of certain Residents, the Philadelphia and Pennsylvania medical communities and the various professional and accrediting associates have undertaken, many Residents remain unaware that their ability to practice medicine is in peril as of January 10, 2020.

---

[3]        One Resident was quoted a cost of over $65,000 to obtain tail insurance.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory basis for the relief sought herein is 11 U.S.C. §§ 363, 365 and 503(b).

## BACKGROUND

### A.      The Residents

3.      Between January 10, 2018 and August 9, 2019, the Hospital employed the Residents.  Given the period that the Debtors operated the Hospital, the Residents fall into one or more of the following categories:  those that were residents at the Hospital in the 2017-2018 residency year; those who were residents in the 2018-2019 residency year; and those who had Resident Contracts for the 2019-2020 residency year.  Regardless of the category or categories to which the Residents belong, they are all newly trained medical professionals at the beginning of their careers.

4.      The Debtors' employed the Residents primarily pursuant to the Resident Contracts, most of which were identified as Graduate Medical Education House Staff Employment Agreements.  A copy of the template used to create these agreements is attached as **Exhibit A** (the "Resident Contract Template").

### B.      The Debtors' Obligations to Provide Professional Liability Insurance to the Residents

5.      The Pennsylvania General Assembly has declared a public interest in ensuring the availability of health care throughout the state.  40 P.S. § 1303.102(1).  To achieve that goal, "medical professional liability insurance has to be obtainable at an affordable and reasonable cost in every geographic region of this Commonwealth." *Id.* 1303.102(3). Pennsylvania law requires a health care provider, including residents, providing health care services within the state to

purchase medical professional liability insurance from an approved insurer. *Id.* § 1303.711(a). Pennsylvania defines "medical professional liability insurance" as "[i]nsurance against liability on the part of a health care provider arising out of any tort or breach of contract causing injury or death resulting from the furnishing of medical services which were or should have been provided." *Id.* §1303.702. Medical professional liability insurance cannot be offered on a "claims made" basis unless the insurer guarantees that coverage will continue to be available "subsequent to the discontinuance of professional practice by the health care provider or the termination of the insurance policy by the insurer or the health care provider for so long as there is a reasonable probability of a claim for injury for which the health care provider may be held liable." *Id.* § 1303.742.

6.      In recognition of Pennsylvania's public policy and the need to provide medical professional liability insurance to all physicians, including the Residents, section 3.D. of the Resident Contract Template requires the Hospital to "provide occurrence-based professional liability insurance coverage for [Resident]'s acts and omissions, within the scope of the [graduate medical education training] Program, that occur during the Training Period." Resident Contract Template, at § 3.D. Such insurance would provide protection against any claims reported or filed during the Resident's employment with the Hospital as well as any later-filed claims that were based on incidents that occurred during the period of employment. *Id.* The Hospital's obligation to provide this insurance "shall survive expiration or termination of this Agreement regardless of the cause of such termination." *Id.* at § 15.

7.      In addition to the Resident Contracts, the Debtors' House Staff Manual, a copy of which is attached hereto as **Exhibit B** (the "Resident Manual"), also emphasizes their intent to provide Residents with professional liability insurance. In particular, section 25 of GME 12:

Specific Policies provides that Residents will be provided with professional liability insurance consistent with the requirements of Pennsylvania law during the course of their employment. Resident Manual, at 54.  Importantly, "[t]his coverage will provide legal defense and protection against claims arising while participating in the program, **including claims not reported or filed until after the completion of graduate medical education**.")  *Id.*  Occurrence-based malpractice insurance is specifically identified as a "House Staff Benefit" in the Resident Manual.  *Id.* at 55.

C.    **The End of Resident Insurance Coverage**

8.    The Debtors acquired the Hospital from the former owner on or about January 10, 2018.  At that time, the Hospital switched the Residents' insurance from occurrence based policies to claims made policies, notwithstanding the Debtors' commitment under the Resident Contracts, *See* November 11, 2019 email to Residents (the "November 11 Email"), attached as **Exhibit C** hereto.  This oversight by the Debtors is critical because without a "tail," the claims made policy will only protect the Residents for claims that are made during the insurance period.  It also violates Pennsylvania law, which bars the use of claims made insurance without an appropriate tail.  40 P.S. § 1303.742.  The Debtors are undoubtedly aware of this legal obligation because they are subject to the same regulations.

9.    Because the policy covering the Residents apparently expires on January 10, 2020,[4] the Residents will no longer be covered for claims related to their time at the Hospital after that date.  November 11 Email.  The harm to the Residents from the Debtors' failure to comply with their contractual obligations is obvious and could also have a catastrophic effect on the medical services community in Philadelphia, given the adverse results under Pennsylvania law.

---

[4]    Notably, the Debtors have not yet informed the Residents of the pending expiration of their insurance coverage.  The Ad Hoc Resident Committee understands that the Debtors intend to provide such notice after the closing of the sale of St. Christopher's Sale (as defined below), during the holiday season with less than one month's notice.  This Motion should not be used to prejudice the rights of any of the Residents to argue that the notice of termination of insurance was not effective under applicable law.

**D.    The Sale of the Resident Program**

10.    On June 30 and July 1, 2019 (collectively, the "<u>Petition Date</u>"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.    On July 15, 2019, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "<u>Official Committee</u>") consisting of (a) Confier Revenue Cycle Solutions, LLC; (b) Medline Industries, Inc.; (c) Veolia Energy Philadelphia, Inc.; (d) Medtronic USA, Inc.; (e) Crothall Healthcare, Inc.; (f) Global Neurosciences Institute, LLC; and (g) Pennsylvania Association of Staff Nurses and Allied Professionals.  No Residents are represented on the Official Committee.

12.    On July 9, 2019, the Debtors filed their bidding procedures motion proposing to sell their residency placement slots at the Hospital and related assets (the "<u>Resident Assets</u>").  *See* D.I. 142.  Overruling several objections, this Court approved the bidding procedures on July 19, 2019 in its *Order (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale* [D.I. 249] (the "<u>Bidding Procedures Order</u>").

13.    Pursuant to the Bidding Procedures Order, the Debtors conducted an auction on August 8, 2019 and declared Thomas Jefferson University Hospitals, Inc. the successful bidder

("Jefferson").[5]  The United States vehemently objected to the proposed sale of the Resident Assets,[6] but following a lengthy hearing on September 10, 2019, the Court overruled that objection, and others, and entered an order approving the sale.[7]  A critical factor in the Court's approval of the Sale Order was the fact that it provided needed tail insurance for the Residents. *See* Hearing Tr., Sept. 5, 2019. At 9:10-15 ("Number four, the benefit to the community from the sale, if approved, is that it will provide placement of resident doctors within Philadelphia and its environs thereby assisting in the delivery of healthcare in the immediate area and Philadelphia in particular.  In addition, the sale provides needed tail insurance for residents.").

14.    The United States subsequently appealed and sought a stay of the Sale Order.[8]  On September 16, 2019, the District Court for the District of Delaware (the "District Court") issued an order staying the Sale Order, pending appeal.  *See* Notice of Stay.  As of the date of this Motion, the appeal is still pending, and the Debtors recently requested oral argument on November 20, 2019.  In the meantime, the Hospital began winding down its operations in late July and is no longer operating. *See* United States' Objection, at ¶29.

15.    Since the stay of the Sale Order, the Debtors have subsequently received approval to sell their assets related to St. Christopher's Healthcare, LLC and certain of its affiliates (the "St. Christopher's Sale").  *See* [D.I. 795].  In connection with that sale, the Philadelphia Academic

---

[5]     *See Certification of Counsel regarding Auction Relating to the Sale of the Debtors' Residents Program Assets* [D.I. 590].

[6]     *See Objection of the United States to Debtors' Motion for Entry of Order Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests to Jefferson as Set Forth in the Asset Purchase Agreement* [D.I. 633] (the "United States' Objection").

[7]     *See Order Under 11 U.S. C. § 105, 106, 363, 365, 503, 507, and 525 (A) Approving Asset Purchase Agreement with Thomas Jefferson University Hospitals, Inc., (B) Authorizing Sale of Certain of Debtor's Assets Free and Clean of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtor's Executory Contracts, and (D) Granting Related Relief* [D.I. 681] (the "Sale Order").

[8]     *See Status Report Regarding Stay Pending Appeal of Hahnemann Sale Order Entered by District Court* [D.I. 761] (the "Notice of Stay").

Health System Physician Practice Plan Physicians (the "<u>PAHSPPP Physicians</u>") filed a limited objection arguing that the Debtors' were required to provide them with professional liability tail insurance. *See generally* [D.I. 699] (the "<u>PAHSPPP Objection</u>"). Likewise, the American Medical Association, The Pennsylvania Medical Society, and the Philadelphia County Medical Society, collectively, submitted an *amicus* brief in support PAHSPPP Objection, which outlined the adverse effects to the doctors, and the Philadelphia medical community generally, if the Debtors did not live up to their obligations to provide the PAHSPPP Physicians with required tail insurance. *See* [D.I. 729-1] (the "<u>Amicus Brief</u>"). The St. Christopher's Sale is scheduled to close on December 13, 2019, which led the PAHSPPP Physicians to file an emergency motion seeking to require the Debtors to provide them with tail insurance as part of the St. Christopher's Sale. A hearing on that emergency motion is scheduled for December 12, 2019 at 9:30 a.m.

## **RELIEF REQUESTED**

16.    The Ad Hoc Resident Committee requests that this Court compel the Debtors to comply with their obligations under the Resident Contracts and Pennsylvania law by requiring the Debtors to purchase tail policies for Residents to the extent necessary to make sure that all Residents are covered by professional liability insurance during their respective periods of employment with the Hospital between January 11, 2018, when the Debtors purchased the Hospital, and August 9, 2019, when the Hospital closed.

## BASIS FOR RELIEF

17.    As noted above, the Resident Contracts, as well as the Debtors' own internal policies, require the Debtors to purchase occurrence-based professional liability insurance for the Residents.  The Debtors have breached the Resident Contracts by purchasing narrower, and presumably cheaper, claims made policies.  Without a tail, those insurance policies deprive the Residents of the benefit of their bargain and place their careers, and their livelihood, at risk.  To date, the Debtors have refused to purchase the necessary tail insurance, and as of January 10, 2020, the Residents will no longer be covered against claims related to their acts or omissions during their employment at the Hospital.

18.    If a debtor elects to continue to receive benefits from the other party to an executory contact pending a decision to reject or assume the contract, the debtor is obligated to pay for the reasonable value of those services. *See Philadelphia Co. v. Dipple,* 312 U.S. 168, 174 (1941).  The Debtors have not rejected the Resident Contracts, and even if they did, their obligations to provide the required insurance survives the expiration or termination of the Resident Contracts.  *See* Template Resident Contract, at § 15.  Had the Debtors purchased the required occurrence-based policies from the outset of the applicable Resident's employment, the Debtors would not now need to incur the additional expense of purchasing tail coverage.  Nevertheless, the Debtors' intentional actions have imposed upon them the post-petition obligation to purchase tail insurance to fulfill their ongoing obligations under the Resident Contracts.  This Court should not permit the Debtors to shirk these obligations and shift the risks of non-insurance to the Residents.

19.    While some of the harms to the Residents from the loss of their professional liability insurance may be obvious—exposure to malpractice claims that have not yet been filed—a number of other harms could potentially be career-ending, or at least career-altering.  For example, many

states, including Pennsylvania, and employers require physicians to have malpractice insurance

from all their prior employers in order to be eligible for continued and future employment. *See,*

*e.g.*, 40 P.S. § 1303.711(a).[9]  At a minimum, the Residents would be at risk of discipline before

the Pennsylvania state board due to lack of insurance, and their medical license could be suspended

or revoked. *Id.* § 1303.711(c).[10]  Pennsylvania also requires this insurance before a physician will

qualify for supplemental malpractice insurance under state law. *See Id.* § 1303.712 (establishing

a special fund to be used to pay claims awarded in medical malpractice actions in excess of basic

insurance coverage).  These harms are irreparable and cannot be cured by monetary damages or

claims alone.

20.      Assuming the Residents are even aware of the need to purchase this insurance for

themselves,[11] they must ensure their insurance coverage remains in place, given the irreparable

harms to the Residents identified above.  Sadly, given the salary of most residents in the Mid-

Atlantic region (usually between $55,000 and $75,000) and the significant student loan debt for

many Residents, many, and likely most, Residents will be unable to acquire the necessary

insurance on their own.  Although premiums for tail coverage vary based upon location and type

of practice, it is possible an individual Resident could be charged tens of thousands of dollars for

such coverage (which, in the case of junior Residents, could equal or exceed their annual

---

[9]      The consequences, if any, of a cessation of malpractice insurance on a Resident's ability to obtain future employment is unknown at present; this Motion should not be used to prejudice the rights of any of the Residents to argue that the cessation of insurance should have no effect on their future employment.

[10]     For a sampling of even more significant potential risks, including such discipline being reflected on the Resident's permanent record, see Amicus Brief, at 9.

[11]     The November 11 Email suggests that contact information for the Residents may be inaccurate (email addresses may no longer be valid).  As a result, there may be Residents who have no idea that their coverage may soon lapse.  While the Ad Hoc Resident Committee, as well as a number of other pro-Resident associations are trying to spread the word about this issue, there is no guarantee that all Residents will be successfully contacted in time to take action.

salaries).[12]  As noted in the Amicus Brief, "the typical calculation for cost of tail coverage is 200%-350% of the cost of an annual policy for the basic insurance coverage layer."  Amicus Brief, at 7. And that amount is based on a situation where the physician planned for and anticipated that he or she would be responsible for such coverage.  *Id.*  That is not the case here, where the Resident Contracts place the burden upon the Debtors to purchase the required insurance.  Finally, even if a Resident has the financial wherewithal to purchase the necessary insurance, insurers may be unwilling to underwrite such coverage.  *Id.* at 6 ("[I]t is generally extremely difficult for a physician to obtain affordable tail coverage from a different insurer because the different insurer never had an opportunity to impact the risk that it is being asked to cover.").

21.  The Residents are not the only group harmed by the Debtors unwillingness to satisfy their obligations to provide professional liability insurance; the Philadelphia community, as well as the national medical community will also be harmed.  As noted above, the Pennsylvania General Assembly has declared a public policy in favor of providing physicians with affordable professional liability insurance.  40 P.S. § 1303.102.  The availability of insurance not only provides physicians with protection in the event of a malpractice claim, but it also ensures that injured patients will be covered in the event of a legitimate claim.  In 2018, malpractice payments in Pennsylvania averaged $405,978.  Amicus Brief, at 8.  Given the Resident's limited assets, these claims would go unsatisfied in the absence of insurance.  If Residents lose their medical licenses due to the loss of insurance, the medical community would also lose hundreds of otherwise qualified physicians at a time where doctors are already in short supply.  *See id.* at 9 (noting that the United States faces a current doctor shortage of 95,900 with an anticipated shortage of 122,000

---

[12]    Background on malpractice insurance premiums, generally, can be found at the American Medical Association's website: https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/government/advocacy/policy-research-perspective-liability-insurance-premiums.pdf.

doctors by 2032). This effect would be especially acute in the Philadelphia medical community, where the doctor shortage is expected to reach 10,000 doctors in the next 5 years. *Id.*

22. While the irreparable harm to the Residents and the Philadelphia community, standing alone, warrants the grant of this Motion, the Debtors and their estates also benefit from keeping the Residents' insurance in place. In contrast to the obvious harms faced by the Residents and the Philadelphia community, the Debtors clearly benefitted from maintaining the Resident Contracts. Keeping the Resident Contracts in place was one of the Debtors' covenants in connection with the sale of the Resident Program Assets to Jefferson. *See* Asset Purchase Agreement by and between Center City Healthcare, LLC and Thomas Jefferson University Hospitals, Inc. [D.I. 681-1] (the "APA"), at § 6.2 ("Seller shall use its commercially reasonable efforts to preserve it relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at [the Hospital]."). As part of maintaining those relationships, the Debtors were required to obtain a "Tail Coverage Endorsement" to provide the Residents with appropriate professional liability insurance. *Id.* at § 6.11. "Tail Coverage Endorsement" is defined as

> a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital. Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars ($1,500,000) annual aggregate for each MCARE eligible Resident only.

*Id.* at Article I (Definitions). Jefferson agreed to reimburse the Debtors for up to $1 million for tail coverage costs paid by the Debtors in obtaining such an endorsement. *Id.* at § 3.2(d). The availability of tail insurance for Residents under Jefferson's proposal was a critical factor in the Court's approval of the sale of the Resident Assets. *See* Hearing Tr., Sept. 5, 2019. At 9:10-15.

23.     Although the Sale Order has been appealed,[13] if the sale to Jefferson is ultimately affirmed, the Debtors stand to receive $54 million from Jefferson, in addition to the tail insurance reimbursement.  *See id.*, at § 3.1.  Per the terms of the APA, the Debtors' failure to provide for sufficient tail coverage for the Residents would appear to result in a material breach of the APA, perhaps placing the entire sale, and $54 million in sale proceeds at risk.  Thus, providing the Residents with their contractually-entitled insurance would honor the Debtors obligations under both the Resident Contracts and the APA, while also benefitting their estates and all their creditors, including the Residents.  The Debtors efforts to both avoid its obligations to provide the Residents with tail insurance while simultaneously prosecuting an appeal of a sale that contemplates the provision of such insurance can only be described as baffling.

24.     Given the benefits to the Debtors' estates from not breaching their ongoing obligations under the Resident Contracts and preserving the potential sale to Jefferson, there can be little doubt that the Residents would be entitled to administrative expense claims under the Resident Agreements for the purchase of tail insurance, if they can locate and afford such insurance.  Even assuming all Residents were aware of the pending lapse of their insurance and were able to locate and afford such insurance on an individual basis, that process is inefficient and would result in a waste of estate and judicial resources.  Rather than requiring the Debtors, and this Court, to parse through hundreds of individual requests for administrative expenses, the Debtors should simply negotiate for, and obtain one all-encompassing tail policy covering all Residents.  Not only could the Debtors obtain the necessary coverage on a more cost-efficient basis

---

[13]     It remains unclear whether the APA remains live.  The APA set an "Outside Closing Date" of September 6, 2019, but the Sale Order was not entered until September 10, 2019.  APA, at Art. I (Definitions).  Closing clearly has not occurred, but termination due to the passage of the Outside Closing Date is optional to both the Debtors and Jefferson.  *Id.* at § 9.1(b).  In the absence of any notice that the APA has been abandoned and with the appeal still pending, the Sale Order remains in effect.

by negotiating a group rate, but they also would receive reimbursement up to $1 million from Jefferson for the costs of obtaining such coverage.  Even if the new coverage required a cash outlay of more than $1 million, the upside of preserving the $54 million in sale proceeds under the APA, as well as the savings in legal fees from not reviewing (and possibly objecting to) hundreds of administrative claim requests weighs heavily in favor of requiring the Debtors to purchase the insurance required under Pennsylvania law and the Resident Contracts.

## NOTICE

25.     Notice of this Motion is being provided to (a) counsel to the Debtors, (b) counsel to the Official Committee, (c) counsel to the Office of the United States Trustee, and all parties entitled to service pursuant to Bankruptcy Rule 2002.  Under the circumstances, the Ad Hoc Resident Committee submits that no further service is required.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Resident Committee respectfully requests that this Court:  (a) require the Debtors to purchase tail insurance for all Residents, as required by the Resident Contracts and (b) grant such other and further relief as is consistent with this Motion and as may be just and appropriate in the circumstances.

Dated:  December 11, 2019
        Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ Jeremy W. Ryan*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
1313 North Market Street, Sixth Floor
Wilmington, DE  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

*Attorneys for Ad Hoc Committee of Hahnemann
Residents*