**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) Case No. 19-11466 (KG) |
| | ) Jointly Administered |
| Debtors. | ) Related to Docket No. 1096 |

**DEBTORS' OBJECTION TO EMERGENCY MOTION OF FORMER RESIDENTS, FELLOWS AND MEDICAL STAFF OF ST. CHRISTOPHER'S HEALTHCARE, LLC AND AFFILIATED DEBTOR ENTITIES TO ENFORCE THE SALE ORDER APPROVING THE ST. CHRISTOPHER'S TRANSACTION AND TO ENFORCE THE ASSET PURCHASE AGREEMENT, OR, IN THE ALTERNATIVE, TO RECONSIDER THE SALE ORDER APPROVING THE ST. CHRISTOPHER'S TRANSACTION**

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") submit this objection (the "**Objection**") to the *Emergency Motion of Group of Former Residents, Fellows and Medical Staff of St. Christopher's Healthcare, LLC and Affiliated Debtor Entities to Enforce the Sale Order Approving the St. Christopher's Transaction and to Enforce the Asset Purchase Agreement, or, in the Alternative, to Reconsider the Sale Order Approving the St. Christopher's Transaction* [D.I. 1096] (the "**Motion to Enforce**"), filed by "certain former residents, fellows and medical staff of St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC, SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Pediatric Anesthesia Associates, L.L.C., St. Chris Care at Northeast Pediatrics, L.L.C., and/or TPS V of PA, L.L.C." (as defined in the Motion to Shorten, the "**Former Physician Group**").  In support of their Objection, the Debtors state as follows:

## PRELIMINARY STATEMENT

1. While the Debtors are sympathetic to the plight of the members of the Former Physician Group, the accusation that the Debtors' misrepresented the Sale (as defined below) is offensive.  The Motion to Enforce is entirely based upon a misrepresentation of the STC Sale Order (defined below) as well as the related asset purchase agreement and the statements of Debtors' counsel at the sale hearing.

2. As set forth in more detail below, a condition to the closing of the Sale of St. Christopher's Hospital for Children is (a) the purchase of tail coverage for those doctors and residents who remain employed by the STC Entities (as defined below) as of the closing of the sale and who are expected to become employees of the Purchaser; and (b) the purchase of tail coverage with respect to professional liabilities of the STC Entities themselves.[2]

3. Neither the Debtors nor the Purchaser agreed to pay for tail coverage for former residents or physicians – i.e., persons whose employment with the STC Entities was terminated prior to closing of the Sale.  Such an obligation does not appear in the STC Sale Order or in the asset purchase agreement and was not suggested by Debtors' counsel in Court.  In fact, neither

---

[2] The Debtors understand that entity coverage will include the selling Debtors' medical staff and residents and medical providers who are not eligible to participate in Pennsylvania's Medical Care Availability and Reduction of Error Fund or "MCARE," created by Act 13 of 2002, 40 P.S. §§ 1303.101-1303.910, et seq.. Accordingly, the tail coverage provided for under the asset purchase agreement should cover all parties who need such coverage, other than approximately 59 MCARE eligible residents and 60 attending physicians whose employment with the selling Debtors terminated before the closing of the Sale.

-2-

the Debtors nor the Purchaser have ever agreed to purchase such tail coverage in connection with the Sale.

## JURISDICTION AND VENUE

4. The Court has jurisdiction to consider the Motion to Enforce pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6. On June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

7. A description of the Debtors' businesses, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**")[3] [D.I. 2].

---

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

-3-

8. On September 27, 2019, the Court entered the *Order Under 11 U.S.C. §§ 105, 363, 365, 503 and 507 (A) Approving Asset Purchase Agreement with STC Opco, LLC (B) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtors' Executory Contracts, and (D) Granting Related Relief* (the "**STC Sale Order**") [D.I. 795].

9. Through the STC Sale Order, the Court approved the asset purchase agreement (the "**APA**") between St. Christopher's Healthcare, LLC and certain other Debtors (collectively, the "**STC Entities**"), on the one hand, and STC Opco, LLC (the "**Purchaser**") on the other, pursuant to which the STC Entities agreed to sell substantially all of their assets related to the operation of St. Christopher's to the Purchaser (the "**Sale**"). The Sale is expected to close on or before Monday, December 16, 2019.

10. The Former Physician Group filed the Motion to Enforce, along with a motion for expedited consideration that the Court granted, on December 5, 2019.

**OBJECTION**

**A. The STC Sale Order Does Not Require the Debtors or the Purchaser to Purchase Tail Coverage for Former Residents or Fellows**

11. The Motion to Enforce is based on the Former Physician Group's unsupported contention that in consummating the Sale, the Debtors and/or the Purchaser were obligated to purchase tail coverage for *former* residents, fellows and medical staff employed by the STC Entities. The plain language of the APA, the statements of Debtors' counsel at the sale hearing, and the testimony at the sale hearing – certain of which is quoted in the Motion to Enforce – make clear that the payment of tail coverage in connection with the Sale is limited to the selling Debtors and those residents and physicians who are hired by the Purchase at the closing of the Sale.

12. Section 8.6 of the APA, as quoted in the Motion to Enforce, provides, as a condition of closing, that "[Purchaser] shall have obtained the Tail Coverage. For purposes of this Agreement, '**Tail Coverage**' means the reporting endorsement to insure against professional liabilities of the *Debtor Parties* and the Hospital *residents and fellows as of the Closing Date*." Under the APA, the "Debtor Parties" are defined as St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC and certain affiliated debtor physician practice groups, Philadelphia Academic Medical Associates, LLC, SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., St Chris Care at Northeast Pediatrics, L.L.C., and TPS V of PA, L.L.C.  APA, preamble.

13. This language is plain and unambiguous, and supports the denial of the Motion to Enforce. The requirement under the APA is clear – tail coverage is to be purchased for two groups: (1) the "Debtor Parties" – which is clearly defined in the opening paragraph of the APA to mean the STC Entities only; and (2) Hospital residents and fellows *as of the Closing Date* – which clearly means residents and fellows employed at the Hospital **at closing**. The APA makes no mention of former residents, fellows or medical staff whose employment terminated prior to closing. Such language does not exist in the APA and there is no basis for the Former Physician Group's assertion that the language quoted above can or should be interpreted to include former residents, fellows or medical staff.

14. The Motion to Enforce also relies upon statements made by Debtors' counsel at the sale hearing. This reliance is misplaced. The cited statements by Debtors' counsel merely describe the plain language of the APA and provide no support to the Former Physician Group's position. As quoted in the Motion to Enforce, Debtors' counsel stated that "the buyer is going to be purchasing tail insurance coverage to cover **the debtor parties and continuing residents**."

-5-

This statement is fully and unquestionably consistent with the plain language of the APA – that the tail coverage would relate to the STC Entities and *continuing* residents – i.e., residents and fellows employed at the Hospital as of closing. Debtors' counsel made no statements referencing former physicians (residents or otherwise) or any parties other than the "debtor parties and continuing residents." As with the language of the APA, the statements of Debtors' counsel at the sale hearing provide no support for the relief sought in the Motion to Enforce.

15.  Debtors' counsel's statements were consistent with the testimony given at the hearing on the sale. Specifically, in describing the transaction, Allen Wilen, the Debtors' Chief Restructuring Officer, stated as follows:

> The Buyer is purchasing tail insurance coverage to cover the Debtor Parties and continuing resident[s], subject to splitting the costs with the Debtors 50/50 with the Debtors' obligation cap[ped] at $2 million dollars.

See Sept. 23, 2019 Transcript, page 33, beginning at line 22.

16.  Mr. Clint Matthews, a representative on behalf of the Purchaser, testified by proffer as follows:

> Last, Your Honor, he would testify that it is STC Opco's intent to purchase tail insurance, both primary and excess coverage, for St. Christopher's, for the hospital itself, and also for its employed physicians including residents. and as Mr. Minuti noted, the cost of that tail insurance is agreed to be split 50/50 between STC Opco and the Sellers until the Seller's 50 percent piece hits $2 million dollars. And beyond that, the financial liability is entirely STC Opco's.

See Sept. 23, 2019 Transcript at page 49, beginning at line 23.

**B.    The Former Physician Group Fails to Establish Any Basis for Reconsideration of the STC Sale Order**

17.  To the extent the Former Physician Group seeks reconsideration of the STC Sale Order, to somehow go back and change the terms of the Sale to require the Purchaser to purchase tail coverage for former residents, fellows and medical staff who will not be employed by Purchaser, there is simply no basis for such relief. The agreement memorialized in the APA is

the agreement that was reached between the parties, fully disclosed to the Court and approved through the STC Sale Order. Counsel for the Former Physician Group attended the sale hearing and had ample opportunity to review the clear language in the APA and hear the clear statements made by Debtors' counsel, none of which made reference to any obligation to procure tail coverage for former physicians.

18. Fed. R. Civ. P. 60(b), applicable in these cases pursuant to Fed. R. Bankr. P. 9024, provides in relevant part that a court may grant relief from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

19. Through the Motion to Enforce, the Former Physician Group claims to seek reconsideration on the basis of "mistake, surprise, newly discovered evidence, misrepresentation and/or another reason that justifies relief." Motion to Enforce, ¶ 18. But, the Former Physician Group does not explain the relief it seeks under Rule 60(b).

20. In support of its request for relief under Rule 60(b), the Former Physician Group suggests that the Debtors' representations to the Court were "unqualified" and somehow misrepresentative of the fact that former residents, fellows and medical staff would not be

provided tail coverage. As set forth above, the Debtors' representations to the Court and the plain language of the APA were at all times clear that tail coverage would be provided to residents who remain employed as of the date of closing of the Sale and for the STC Entities themselves. There was no indication that any other party would be provided with tail coverage. The Former Physician Group suggests that the Debtors had an obligation to identify other parties who would not be provided with tail coverage, but no such obligation exists. The Former Physician Group's argument fails to establish a basis for relief under Fed. R. Civ. P. 60(b).

21. The Former Physician Group also suggests that the STC Sale Order should be reconsidered because former physicians were not notified "of any intent to limit tail coverage." This likewise does not provide a basis for reconsideration under Fed. R. Civ. P. 60(b). The relief approved in the STC Sale Order is the sale of the assets of the STC Entities as set forth in the APA. The STC Sale Order has no impact on the Debtors' tail coverage obligations, if any, with respect to former physicians – it merely approves the agreement between the STC Entities and the Purchaser, which includes, among other things, the Purchaser's commitment to purchase tail coverage for the STC Entities and residents employed by the STC Entities as of closing. The Former Physician Group apparently suggests that the Debtors had an obligation to provide notice to other parties whose rights were not directly affected by the relief approved through the STC Sale Order. Such an argument obviously fails and does not support reconsideration.

22. The argument that the Former Physician Group "recently discovered [the] intent of the Debtor Parties and OpCo Buyer to limit Tail Coverage to personnel continuing in the employ of OpCo Buyer as newly discovered evidence" fails to provide a basis for reconsideration and makes no sense. As noted above, the Debtors were clear in the APA and in their representations to the Court with respect to the scope and extent of tail coverage that the

Purchaser had agreed to obtain through the APA. That the Former Physician Group only later realized that this plain language would result in such tail coverage also not insuring them is not newly discovered evidence.

23. Importantly, under the APA, the selling Debtors' obligation to contribute to the Tail Coverage (as defined in the APA) is capped at $2 million and the selling Debtors will contribute the full $2 million at closing. If, as suggested, the APA obligated the parties to purchase tail coverage for former residents and physicians, the entire cost of such additional coverage would be borne by the Purchaser. The APA does not provide for the provision of this additional coverage.

24. Finally, even if the Former Physician Group could not have reasonably understood the language of the APA and the Debtors' representations as set forth herein, there are no grounds for reconsideration because such knowledge or understanding could not have provided a legitimate basis for objection to entry of the STC Sale Order in any event. The agreement set forth in the APA with respect to tail coverage is the best that the Debtors were able to negotiate, and the Purchaser reasonably did not agree to purchase tail coverage for former physicians (i.e., those whom it would not be employing) for potential causes of action that necessarily related to pre-closing occurrences as to which the Purchaser was not liable. Even if the Former Physician Group had raised these arguments at the sale hearing (and, as noted above, their counsel was present at the sale hearing), the Debtors respectfully suggest that such objections would necessarily have been overruled and the STC Sale Order entered anyway.

## CONCLUSION

25. To be clear, the Debtors are sympathetic to the hardships experienced by their former physicians and would have preferred that a solution providing for tail coverage for former

physicians would have emerged from the STC Sale process. This did not happen. The Sale, which is expected to close this week, provides tremendous benefit to the Debtors, their estates and the community, and should not be jeopardized by a misreading or misrepresentation of the Debtors' position, the Sale Order or the APA.

26. Because the Former Physician Group fails to establish that the STC Sale Order or the APA require the Purchaser to obtain tail coverage for former residents and fellows, and because the Motion to Enforce fails to establish any grounds for reconsideration of the STC Sale Order, the Motion to Enforce should be denied.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-10-

36302356.5 12/11/2019

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A,** denying the Motion to Enforce, and granting such other and further relief as is just and proper.

Dated: December 11, 2019            **SAUL EWING ARNSTEIN & LEHR LLP**

By:  */s/ Aaron S. Applebaum*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7700
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Counsel for Debtors and Debtors in Possession*