```
1              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE
2

                                   .    Chapter 11
3   IN RE:                         .
                                   .    Case No. 19-11466 (KG)
4   CENTER CITY HEALTHCARE, LLC,   .
    d/b/a HAHNEMANN UNIVERSITY     .
5   HOSPITAL, et al.,              .
                                   .    Courtroom No. 3
6                                  .    824 North Market Street
                                   .    Wilmington, Delaware 19801
7                                  .
                                   .
8               Debtors.           .    December 12, 2019
    . . . . . . . . . . . . . . .  .    9:30 A.M.
9

                    TRANSCRIPT OF HEARING
10           BEFORE THE HONORABLE KEVIN GROSS
                UNITED STATES BANKRUPTCY JUDGE
11

12  APPEARANCES:

13  For the Debtors:        Mark Minuti, Esquire
                            Monique DiSabatino, Esquire
14                          SAUL EWING ARNSTEIN & LEHR LLP
                            1201 N. Market Street
15                          Wilmington, Delaware 19801

16  For Tower Health:       Robert Lapowsky, Esquire
                            STEVENS & LEE
17                          620 Freedom Business Center
                            King of Prussia, Pennsylvania 19406
18

19  Audio Operator:         AL LUGANO

20  Transcription Company:  Reliable
                            1007 N. Orange Street
21                          Wilmington, Delaware 19801
                            Email:  gmatthews@reliable-co.com
22

    Proceedings recorded by electronic sound recording, transcript
23  produced by transcription service.

24

25
```

1   APPEARANCES (Continued):

2

3   For the Committee:          Andrew H. Sherman, Esquire
                                SILLS CUMMIS & GROSS P.C.
4                               1 Riverfront Plaza, Suite 10
                                Newark, New Jersey 07102

5
    For Drexel University:      Vincent J. Marriott, III
6                               BALLARD SPAHR LLP
                                1735 Market Street, 51st Floor
7                               Philadelphia, Pennsylvania 19103

8   For PAHH/Front Street:      Amalia Sax-Bolder, Esquire
                                Suzzanne Uhland, Esquire
9                               O'MELVENEY & MYERS LLP
                                7 Times Square
10                              New York, New York 10036

11                              - and -

12                              Brendan Schlauch, Esquire
13                              RICHARDS LAYTON & FINGER
                                920 North King Street
14                              Wilmington, Delaware 19801

15  For Certain Physicians:     David Carickhoff, Esquire
                                ARCHER & GREINER, P.C.
16                              300 Delaware Avenue
                                Wilmington, Delaware 19801
17

18  For Dr. Moulick:           Nella Bloom, Esquire
                                Thomas Bielli, Esquire
19                              BIELLI & KLAUDER
                                1500 Walnut Street
20                              Philadelphia, Pennsylvania 19102

21  For Ad Hoc Residents       Jeremy Ryan, Esquire
    Committee:                  POTTER ANDERSON
22                              1313 North Market Street
                                Wilmington, Delaware 19801
23

24  For PA Dept. of Health:    Richard Barkasy, Esquire
                                SCHNADER HARRISON SEGAL & LEWIS LLP
                                220 Lake Drive E #200
25                              Cherry Hill, New Jersey 08002

1

<u>INDEX</u>

2

3    #2) Debtors' Motion to Extend Deadline to Assume or Reject Unexpired Leases [D.I. 1064].

4    #2) Emergency Motion of Group of Former Residents, Fellows and Medical Staff of St. Christopher's Healthcare, LLC and

5    Affiliated Debtor Entities to Enforce the Sale Order

6    Approving the St. Christopher's Transaction and Enforce the Asset Purchase Agreement, or, in the Alternative, to

7    Reconsider the Sale Order Approving the St. Christopher's Transaction [D.I. 1096].

8

**Ruling: 63**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 9:32 a.m.)

2              THE CLERK:  Please rise.

3              THE COURT:   Good morning, everyone. You may be

4   seated. Thank you much.

5              MR. MINUTI:  Good morning, Your Honor.

6              THE COURT:  Mr. Minuti, good morning.

7              MR. MINUTI:  Good morning.  Mark Minuti from Saul

8   Ewing Arnstein & Lehr.

9              Your Honor, I'm here today representing the

10  debtors along with my partners, Jeffrey Hampton and Monique

11  DiSabatino.

12             THE COURT:  Yes.

13             MR. MINUTI:  Also in the courtroom, Your Honor, is

14  Allen Wilen of Isar-Amper, as Your Honor knows.  He is our

15  chief restructuring officer.

16             THE COURT:  Yes.

17             MR. MINUTI:  We did file an amended agenda

18  yesterday. Did Your Honor get the amended agenda?

19             THE COURT:  I did.  I did.  Thank you, Mr. Minuti.

20             MR. MINUTI:  Very well, Your Honor.

21             THE COURT:  Yes.

22             MR. MINUTI:  So as Your Honor saw, there are three

23  matters on the agenda.  The first matter was resolved.  I

24  think Your Honor saw that and it was withdrawn, so we have

25  two matters going forward today.

1          I think the good news is, Your Honor, before we

2    got to the courtroom today, both were contested.  I think

3    we've now got a resolution of the 365(b)(4) extension.

4          THE COURT:  All right.

5          MR. MINUTI:  Ms. DiSabatino will explain that to

6    Your Honor.  But the other motion, Your Honor, the motion of

7    the former physician's group is contested.

8          THE COURT:  Yes.

9          MR. MINUTI:  Before we get there, if Your Honor

10   will indulge me, I just wanted to give Your Honor just sort

11   of a brief update in terms of other things happening in the

12   case so you're aware of them.

13         THE COURT:  Yes.

14         MR. MINUTI:  In terms of what's happening now --

15         THE COURT:  And the closing as well of St.

16   Christopher's.

17         MR. MINUTI:  Exactly, Your Honor.  I want to give

18   you an update to the closing and sort of where we're going

19   from here.

20         THE COURT:  Yes.

21         MR. MINUTI:  So, as the court obviously already

22   knows from many hearings we've already had in this case, it's

23   been an extremely challenging case.  The budget in this case

24   has been extremely thing and we've been doing our best, Your

25   Honor, to manage cash and, frankly, keep St. Christopher's

1  operating so we can get to the sale and close the sale with

2  STC Opco LLC.

3          THE COURT:  Right.

4          MR. MINUTI:  I can tell Your Honor that both sides

5  are working diligently to close that transaction this

6  weekend. We're keeping our fingers crossed.  There's a lot of

7  work that remains to be done but the parties are working hard

8  and the current goal, Your Honor, is to have that closed this

9  weekend.

10          And so, the other thing to update Your Honor on,

11  Your Honor will remember that way back when, Your Honor

12  approved the sale of our resident asset program, do you

13  remember that?

14          THE COURT:  Yes, I do.

15          MR. MINUTI:  Your Honor no doubt is aware that the

16  District Court entered an order staying the implementation of

17  that order.  I can tell the Court that that matter has now

18  been fully briefed.  We have -- the appeal has been fully

19  briefed.

20          We have asked for oral argument. The District

21  Court has not responded and so my expectation is that we're

22  either going to get a decision because oral argument is in

23  the discretion of the District Court so we're either going to

24  get a decision in due course or maybe we'll get notice that

25  there will be oral argument, but that is out there, Your

1 Honor, as one of the matters that we are focused on because

2 we certainly like to close that transaction and get that

3 money.

4        But once the sale of St. Christopher's closes in

5 terms of where we're going from here going forward, Your

6 Honor, I wanted the court to be aware that the court will

7 recall from our last hearing we hired an auctioneer to sell

8 equipment at Hahnemann University Hospital.

9        THE COURT:  Yes.

10        MR. MINUTI:  That will continue, Your Honor,

11 obviously, after today and into next month.

12        The cash receivable of both the Hahnemann Hospital

13 and St. Christopher's Hospital are not being sold so we will

14 continue to collect account receivable.  We will, obviously

15 seek to enter a bar date in this case and we're going to be

16 moving I think relatively quickly, Your Honor, towards a

17 liquidating date plan in these cases.  That is certainly our

18 intent, so that's sort of go forward where we plan to go.

19        THE COURT:  All right.

20        MR. MINUTI:  So that's it by way of my report.

21 Does Your Honor have any questions?

22        THE COURT:  I don't except just to report to you,

23 you know, I will be retiring in March so this case will

24 likely be reassigned probably the beginning of February is my

25 guess.

1      MR. MINUTI:  Very well, Your Honor.

2      THE COURT:  So, you'll have me until then.

3      MR. MINUTI:  Well, we're sorry to see you go, but

4  --

5      THE COURT:  Thank you.

6      MR. MINUTI:  -- we'll report to whoever gets the

7  case after Your Honor transfers it.

8      THE COURT:  You bet.

9      MR. MINUTI:  Your Honor, so that brings us to the

10  first matter that's on the agenda which is our motion to

11  extend our deadline to assume or reject leases.  As I

12  indicated, I think we have -- well, I think we're waiting for

13  signoff.  Let me just check with Ms. DiSabatino for one

14  second.

15      THE COURT:  You bet.  You bet.

16      (Pause)

17      MR. MINUTI:  Your Honor, I think we're working out

18  language to put on the record and perhaps some

19  representation, so maybe it makes sense then to turn to the

20  motion that was filed by the former physician's group.

21      THE COURT:  Yes.

22      MR. MINUTI:  And take that and, hopefully, in the

23  interim we'll work out the 365(d)(4) issue.

24      THE COURT:  All right.  Let me make a couple of

25  comments which I don't normally do because I like to hear

1  what the parties have to say first and listen to that and

2  then speak.  But I'm a little bit confused as to why the sale

3  is implicated in this motion.

4       I thought that the asset purchase agreement was

5  perfectly clear, that Tower Health was only covering tail

6  insurance for those residents who were actively employed at

7  St. Christopher's at the time.  And there was no contractual

8  relationship whatsoever between Tower Health and these former

9  residents and doctors.

10       I understand that there is an open issue with the

11  debtors, but I don't know that there is an open issue,

12  frankly, with the closing of the sale to the St.

13  Christopher's Hospital and I'll be interested to hear from

14  the movants what that is about and what that argument is

15  about.

16       MR. MINUTI:  Your Honor, obviously, the debtors,

17  and I know the buyer agree, with Your Honor's comments, but

18  I'll turn the podium over then to the movants.

19       THE COURT:  All right, thank you.

20       I didn't see you there.  I'm sorry.  Good morning.

21       MR. CARICKHOFF:  Good morning, Your Honor.  And

22  may I please the court, David Carickhoff of Archer & Greiner

23  on behalf of what is called the former physician group.

24       THE COURT:  Yes.

25       MR. CARICKHOFF:  Your Honor, if I could just set

1  the table for the motion.

2          THE COURT:  Yes.

3          MR. CARICKHOFF:  And try and respond if I could to

4  some of Your Honor's questions.

5          THE COURT:  Absolutely.

6          MR. CARICKHOFF:  So in some of the comments that

7  were made in the objections, I was retained by the former

8  physician group on December 4th.  I filed the emergency

9  motion on December 5th.

10          THE COURT:  Yes.

11          MR. CARICKHOFF:  There were some suggestions in

12  both oppositions that I was at the September 23rd sale

13  hearing and somehow should have raised objections on behalf

14  of the client who didn't exist.  If I didn't make any

15  objections at the September 23rd hearing on behalf of this

16  group, it's because they were not my clients and they did not

17  know they were affected at that time.

18          THE COURT:  Okay.

19          MR. CARICKHOFF:  What I think is undisputed based

20  on the responses or the objections filed to the motion is

21  that the former residents, fellows and physicians who are to

22  be impacted with respect to the tail coverage issue did not

23  receive notice of that.  And it's our understanding that this

24  was intentional to wait until after the St. Christopher's

25  sale closed to provide them notice.

1          What does that mean, Your Honor?  That means that

2   you have a very public Chapter 11 case in front of Your

3   Honor.

4          THE COURT:  Yes.

5          MR. CARICKHOFF:  And they decided it would be a

6   good idea to wait until after December 15th to tell these

7   folks that they may not have tail coverage on a go forward

8   basis after January 11th, 2020.  So that's effectively giving

9   these folks less than a month during the holiday season to

10  try to get tail insurance coverage.

11         THE COURT:  Yes.

12         MR. CARICKHOFF:  To try.  I don't know if they're

13  going to be able to do it, but they'll have effectively less

14  than a month if they had not found out about it by other

15  concerns.  Doctors at St. Christopher's who reached out on an

16  informal basis to try and get tail coverage.  If they don't

17  get tail coverage, they can lose their license to practice

18  medicine.

19         THE COURT:  Yes.

20         MR. CARICKHOFF:  Okay.

21         THE COURT:  Yes.

22         MR. CARICKHOFF:  That's very real.

23         THE COURT:  Yes.

24         MR. CARICKHOFF:  And it's very troubling that they

25  would have waited to tell them this understanding that that's

1  the predicament that these folks would be in.  These

2  physicians who have worked hard and dedicated a lot of their

3  time to help children could lose their license.

4          So that's the debtors' side who's telling you that

5  they're sympathetic to their plight and, at the same time,

6  not giving them meaningful notice of what their circumstances

7  are going to be with respect to the tail coverage, so their

8  words of sympathy I think ring hollow to my clients.

9          On the buyer's side, you have STC Opco and at the

10 sale hearing, you heard Tower Health represent that as of

11 June 30th, 2019, its consolidated assets exceeded its

12 consolidated liabilities by something in excess of $800

13 million.  And that as of June 30th, 2018, Excess operating

14 revenue and non-operating gains over expenses was about $109

15 million.

16          I can point Your Honor to the transcript.  I can

17 give you the transcript.  I don't know that that would be

18 contested.  That was in connection with their proffer in

19 support of the sale.

20          THE COURT:  Yes, I remember that.

21          MR. CARICKHOFF:  You had Drexel who represented

22 that as of June 30th, 2018, it had excess consolidated assets

23 over consolidated liabilities of approximately $1.33 billion

24 with a "b."  The excess revenues and non-operating activities

25 over operating expenses were about $82.8 million, so that's -

1   - those are the buyers.

2         THE COURT:  Yes.

3         MR. CARICKHOFF:  And then you have the former

4   physician group, Your Honor, which is, at this moment,

5   comprised of eight-seven physicians.  I have one of them in

6   the courtroom with me this morning, Dr. William Hogirtel

7   (phonetic).  Dr. Hogirtel is here.

8         THE COURT:  Yes.  Good morning.  Good morning.

9         DR. HOGIRTEL:  Good morning, Your Honor.

10         MR. CARICKHOFF:  As you can see, Your Honor, the

11   members of my group are very real.  Many of them at the early

12   stages of their career with low paying jobs and saddled with

13   significant medical debt.  So, the prospect of being

14   confronted with an obligation that contractually isn't there

15   is daunting at this point, Your Honor.

16         Again, it's a mess that the debtors created.  They

17   created it in January of 2018 when they switched their

18   insurance coverage from a current based policy to a cheaper

19   claims made policy.  So, this was a decision to cut costs and

20   that decision is now putting these honorable folks in peril.

21   These folks that are the ones that provided the support that

22   kept the services and everything running.

23         What I would also like to note for the court I

24   know Mr. Minuti has advised Your Honor of the different

25   things that are happening in connection with the sale.  There

1  was a motion filed the other day by an ad hoc committee of

2  former Hahnemann residents --

3          THE COURT:  Yes, the emergency motion?

4          MR. CARICKHOFF:  Yes, Your Honor.

5          THE COURT:  Yes.

6          MR. CARICKHOFF:  And its represented by Potter

7  Anderson and those folks are in the courtroom today.

8          THE COURT:  Yes.

9          MR. CARICKHOFF:  And I believe there's potentially

10  about -- my recollection is about 600 folks that could be

11  impacted as well.

12          And their motion noted -- that's at Docket Number

13  1134 -- that many of the residents at Hahnemann still remain

14  unaware their ability to practice is in jeopardy, but not

15  knowing about this tail insurance issue.

16          I also want to know that the Commonwealth of

17  Pennsylvania has -- the Department of Health has filed a

18  motion yesterday pursuant to its police powers and statutory

19  and regulatory authority for an order compelling the debtors

20  to purchase tail insurance coverage --

21          THE COURT:  I did see that, yes.

22          MR. CARICKHOFF:  Right. And that was for all the

23  former physicians, both on the Hahnemann side and on the St.

24  Christopher's side.

25          THE COURT:  Yes.

1          MR. CARICKHOFF:  And the basis of that, Your

2    Honor, that they note in their motion is that if the

3    insurance isn't purchased, cause exists to convert and

4    dismiss this case under 1112(b)(4)(c) in that it really poses

5    a risk to the public to not have this insurance in place.

6          My motion, Your Honor, seeks to enforce the terms

7    of the sale order and the APA or in the alternative

8    reconsideration of the sale order.

9          And if I could approach, I just want to hand up

10   what I think is the language at issue, if I can.

11         THE COURT:  Yes, of course.  Yes, Mr. Carickhoff,

12   certainly.

13         MR. CARICKHOFF:  I think it will be easier if we -

14   - give that to debtors' counsel.

15         THE COURT:  Thank you, Mr. Carickhoff.

16         And let me just say this to you.  I certainly am

17   not going to foreclose you're making your argument here today

18   and I'm particularly interested in how your motion impacts

19   the sale closing, but I do see the need for an evidentiary

20   hearing in this matter.  And I'll talk about that more in a

21   little bit.

22         MR. CARICKHOFF:  Okay.  So, Your Honor, the

23   section in the asset purchase agreement I think that's at

24   issue is 8.6 which deals with the tail coverage and the

25   section that's indented on the page I handed to Your Honor is

1  taking from the asset purchase agreement.

2          And the language that I would like to focus the

3  court on is that which I underlined which is that the tail

4  coverage means reporting endorsement to ensure against

5  professional liabilities of the debtor parties as of the

6  closing date.

7          THE COURT:  Yes.

8          MR. CARICKHOFF:  And in the debtors' opposition

9  and the buyer's opposition what their trying to focus the

10 court on, they're looking to ignore the against professional

11 liabilities of the debtor parties and trying to have the

12 court focus on the provision meaning the reporting

13 endorsement to ensure the debtor parties and hospital

14 residents and fellows as of the closing date.

15         I think the argument is simply that the phrase to

16 insure against the professional liabilities of the debtor

17 parties has to include the obligations of the debtor parties

18 to provide tail coverage benefit to their current and former

19 physicians.  Those obligations haven't gone away. Those are

20 still professional liabilities.

21         And I'll hear them saying that they're not going

22 to cover their current physicians.  I don't hear -- and that

23 language doesn't say the professional liabilities of the

24 debtor parties, their current physicians and the hospital

25 residents and fellows. So, the current physicians must be

 1  incorporated in the debtor parties as part of their umbrella

 2  of professional liabilities.

 3           And, again, I would suggest that the professional

 4  liabilities because they still exist also has to include the

 5  former employees as well, Your Honor.

 6           THE COURT:  But is Tower Health -- and here's my

 7  question and it's a question, Mr. Carickhoff.

 8           MR. CARICKHOFF:  Sure.

 9           THE COURT:  Is Tower Health responsible for the

10  tail insurance?

11           MR. CARICKHOFF:  The way the provision reads is

12  that it's a 50/50 split with the debtors' obligation capped

13  at $2 million.

14           THE COURT:  Yes.

15           MR. CARICKHOFF:  And I think if Your Honor agrees

16  with my interpretation then the buyers would be responsible

17  for anything over $2 million.  So, the debtors will never

18  have to pay more than $2 million under that provision.

19           So, yes, the -- if the delta is, you know, more

20  than $2 million that the debtor would have to pay then that

21  would fall upon the buyer on an acquisition.

22           THE COURT:  And I assume the cost is significantly

23  more, the $2 million dollars, if we're talking about all of

24  the former physicians?

25           MR. CARICKHOFF:  Your Honor, I honestly don't know

1  the cost of what that would be.

2         In terms of their interpretation, it wouldn't make

3  sense to provide tail to the debtor parties and not their

4  current and former employees that they would be vicariously

5  liable for.  If their former employees are forced to get

6  their own tail insurance, you're basically setting up a

7  potential conflict and sacrificing control of litigation that

8  would probably increase the parties' exposure to tail claims,

9  in any event.

10         And unless their interpretation would violate

11  Pennsylvania law, which bars the use of claims made insurance

12  without an appropriate tail.  Their interpretation as, I

13  think, is kind of what the Commonwealth of Pennsylvania

14  Department of Health is going for, it would also subject

15  these cases to dismissal or conversion under Section

16  1112(b)(4)(c) which provides that the failure to maintain

17  appropriate insurance poses a risk to the public, this cause

18  for dismissal at conversion.

19         Now if Your Honor disagrees with my interpretation

20  of Section 8.6 of the asset purchase agreement, we seek, Your

21  Honor's reconsideration of the sale order on the grounds of

22  mistake, surprise, newly discovered evidence or another

23  reason that would justify relief.

24         Your Honor, we think that the court can consider

25  the, what we'll call the former physician group members

1  getting notice after the sale that the tail coverage would go

2  away is what I'll call as newly discovered evidence. We think

3  that it could be considered that.  And that we also think

4  that it can also be -- it could also fall under surprise had

5  they known about this.  They could have organized and been

6  vocal at the hearing on September 23rd and raised their

7  objections in a timely manner.

8         We also think the fact that the notice was not

9  given to them and what appears to be a calculated and

10  premeditated way would fall under the last loan of Rule 60

11  which another reason to justify the cause.  It was an

12  intentional calculated note to prevent them from having ample

13  notice.

14         THE COURT:  But who was responsible for giving

15  that notice, in your judgment, Mr. Carickhoff?  Was it Tower

16  Health?

17         MR. CARICKHOFF:  I think it's the debtors'

18  obligation, Your Honor.

19         THE COURT:  Yes, all right.

20         MR. CARICKHOFF:  So, the relief that we're seeking

21  from the sale order, Your Honor, is not to be harmed by the

22  sale in its present form.  What that means is not be denied

23  the rights of their bargain for medical malpractice coverage

24  in violation of Pennsylvania law.

25         And, again, this is a mess of the debtors own

1  making. And I'd also like to walk the court through a couple

2  of the points that were raised in the Amicus brief because

3  they're still relevant. They're relevant to all the former

4  physicians that would be affected by not getting the tail

5  coverage.

6       Again, if the debtors are not required to provide

7  the former physician group with tail coverage, the physicians

8  would be forced to pursue costly tail coverage in a

9  Pennsylvania insurance market.  Again, this is unfair because

10  these are the folks that provided care to the patients and

11  would place an undue burden on them because they

12  contractually negotiated for insurance coverage as part of

13  their employment agreements.

14       It's extremely difficult for a physician to obtain

15  affordable tail coverage from a different insurer because a

16  different insurer never had the opportunity to impact the

17  risk that is being asked to cover.

18       The Amicus brief also cites that a typical

19  calculation for cost of tail coverage is somewhere between

20  200 percent and 350 percent of cost of an annual policy for

21  basic insurance coverage.

22       So if a surgeon, to give an example, has basic

23  coverage that covers $47,000, the tail coverage would be

24  approximately 2.3 times that or about $108,000.  If that goes

25  up to 350 percent that number goes to $164,500 dollars.

1         And, again, this is the cost that would be on a

2    physician who plans and expects due to the contractual

3    obligations of the debtors that the employer would be

4    covering the cost.

5         THE COURT:  And you're talking about with the

6    former physicians as well as those physicians who filed the

7    emergency motion, you're talking about almost seven hundred

8    physicians, is that right?

9         MR. CARICKHOFF:  It's probably a larger number

10   than that, but yeah, I think that's -- yes, Your Honor,

11   that's probably about the scale.

12        THE COURT:  All right.

13        MR. CARICKHOFF:  It's at least the scale, shall we

14   say.

15        So, should a physician be unable to obtain tail

16   coverage, Your Honor, for whatever reason the physician's

17   personal assets are at risk, if they don't have basic

18   insurance coverage, they don't get the benefit of -- there's

19   an MCARE Act in Pennsylvania that provides an excess layer of

20   insurance coverage.  They would not have the protections of

21   that MCARE coverage.

22        They also would risk discipline before the

23   Pennsylvania Board and would risk losing their license,

24   importantly. And, Your Honor, this comes at a time when

25   Pennsylvania is experiencing a shortage of physicians.

1              So, Your Honor, I don't want to belabor the point.

2     I think Your Honor understands it pretty clearly.

3              THE COURT:  Yes.

4              MR. CARICKHOFF:  And so, we think Your Honor has

5     the authority to enforce the terms of the sale order.  The

6     sale order requires that the asset purchase agreement and all

7     of its terms were approved.  And if they're going to change

8     those terms that are materially different, they need a

9     different order from this court to do so.  And that hasn't

10    been obtained.

11             Alternatively, we think that Your Honor should

12    reconsider the relief and the sale order and the relief that

13    we would be seeking is that there be an obligation to provide

14    tail coverage to the former physicians which is consistent

15    with Pennsylvania law.

16             THE COURT:  And who would be responsible for

17    providing that tail insurance, would that be Tower Health?

18             MR. CARICKHOFF:  If you agree with our reading of

19    the asset purchase agreement, I think, yes, it would be Tower

20    Health.  If you disagree with our reading of that, then it

21    would either be a negotiated point between Tower Health --

22    it's not really Tower -- it's a combination of Tower Health.

23    We'll call it for shorthand Tower Health.

24             THE COURT:  Yes.

25             MR. CARICKHOFF:  But if not, then I think the cost

1  should be borne by the estates.

2          THE COURT:  All right.

3          MR. CARICKHOFF:  And my understanding is that the

4  secured debt is somewhere in the neighborhood of about $35

5  million and the sale proceeds are going to be somewhere

6  around $50 million.

7          THE COURT:  All right.

8          All right, thank you, Mr. Carickhoff.  You'll, of

9  course, have an opportunity to respond.

10          MR. CARICKHOFF:  Thank you.

11          THE COURT:  You know I was looking for the

12  statute.  I printed out a provision in Pennsylvania law that

13  provides that,

14          "The commissioner shall not approve a medical

15  professional liability insurance policy written on a claims

16  made basis by any insurer doing business in this commonwealth

17  unless the insurer shall guarantee to the commissioner the

18  continued availability of suitable liability protection for a

19  healthcare provider, et cetera."

20          So, I do think the Pennsylvania law does see

21  claims made policies as potentially available provided that

22  the insurer guarantees continued insurance.

23          MR. CARICKHOFF:  Yes.  I have that in front of me

24  too.  That's 4EPS1303.742.

25          THE COURT:  Thank you.  Yes.

1    MR. CARICKHOFF:  So, yes, Your Honor.

2    THE COURT:  Thank you.

3    MR. CARICKHOFF:  That's why not -- if you

4 interpret the asset purchase agreement the way they want

5 where they don't give the tail coverage to certain folks, we

6 think it's in violation of that section.

7    THE COURT:  All right.

8    MR. CARICKHOFF:  I don't think you can interpret a

9 contract to be read in violation of law.

10    THE COURT:  All right.

11    MR. CARICKHOFF:  Thank you.

12    THE COURT:  Thank you, Mr. Carickhoff.

13    MR. CARICKHOFF:  You're welcome, Your Honor.

14    THE COURT:  Who do I hear from next?  Mr. Minuti.

15    MR. MINUTI:  Thank you, Your Honor.  Again, Mark

16 Minuti, on behalf of the debtors.

17    Your Honor, I think my argument will be brief

18 today, and, look, I don't mean this to be trite at all, Your

19 Honor, but bankruptcy is rarely a joyous occasion for any

20 creditor of a debtor.  In this case, is certainly not a

21 joyous occasion.

22    I think I've acknowledged before and I'll

23 acknowledge today, Your Honor, that the impact of these cases

24 upon the debtors' creditors, the medical community in

25 Philadelphia has been devastating, and that includes the

1   impact upon Mr. Carickhoff's clients.

2           Unfortunately, in today's bankruptcy world, Your

3   Honor, it's a rare occasion when a debtor can honor all its

4   pre-petition obligations and make its creditors whole.  This

5   case is no exception and perhaps this case is even worse than

6   some other cases that are before Your Honor.

7           So, what's the debtors' job or what are we

8   supposed to do in a case like that, Your Honor, where our job

9   is really to try to maximize the value of the assets so we

10  can take care of as many people as we possibly can.  And

11  that's exactly what we've done here, Your Honor.  We ran a

12  full and fair sale process for St. Christopher's.

13  Unfortunately, we only had one buyer, and notwithstanding the

14  fact that we only had one viable bid, Your Honor, we kept

15  those folks there all day and squeezed their arm and pounded

16  the table and squeezed every cent we could get out of our

17  buyer to make this transaction work, Your Honor.

18          Part of that deal was, Your Honor, that we wanted

19  them to pick up tail insurance and we even agreed that we

20  would take a portion of the sale proceeds -- $2 million --

21  and contribute to that tail insurance.  Unfortunately, we

22  couldn't get everything we wanted, Your Honor.  We couldn't

23  get coverage for former doctors and former physicians --

24  excuse me -- former residents.

25          But the sale, Your Honor, at the price we were

1   able to obtain, Your Honor, is going to ensure the

2   continuation of an important children's hospital in the

3   Philadelphia medical community.  It's going to provide

4   employment to substantially all of St. Christopher's existing

5   doctors, residents, staff, so on and so forth.  It's going it

6   provide needed funds to pay off MidCap.  We're going to pay a

7   number of accrued and allowed administrative expense claims.

8   Your Honor has approved a couple of stipulations.  We've got

9   a settlement with Tenet and Conifer, Your Honor is all too

10  familiar with.  We've got a lot of mouths to feed --

11           THE COURT:  Yes.

12           MR. MINUTI:  -- from those sales proceeds and

13  there are no excess funds, Your Honor, that are not already

14  spoken for on the administrative side with respect to those

15  proceeds.

16           Unfortunately, the sale did not provide a

17  mechanism to provide tail insurance to the former doctors and

18  residents that Mr. Carickhoff represents.  And while we

19  certainly sympathize, Your Honor, and understand their

20  plight, in our view, Your Honor, the motion went a little too

21  far.  The motion suggested that we somehow misrepresented to

22  the Court what the transaction was and then it even goes

23  beyond that, Your Honor, and suggests that the transaction

24  required the coverage of tail coverage or the providing of

25  tail coverage and that after the fact, we secretly decided to

1 change the asset purchase agreement and relieve our buyer of

2 the obligation to provide that coverage.

3         Now, why would the debtor do this, Your Honor?

4 There's really no answer to that question and the reason for

5 that is because none of that happened and none of it makes

6 logical sense.

7         The issue before the Court today in connection

8 with the motion is one of contract interpretation.  If the

9 contract is clear and unambiguous, we don't get to parole

10 evidence and Your Honor is to interpret the contract based

11 upon its plain meaning.

12         Your Honor indicated at the outset that the plain

13 meaning of the contract -- and we agree -- is that the

14 contract provides coverage -- and remember, it's a

15 conditioned closing -- it provides that the buyer is going to

16 go out at get coverage to go-forward residents and doctors

17 and the debtor can make the deal work, agreed to contribute

18 up to $2 million.  And Mr. Wilen is here, Your Honor, but I

19 can represent to the Court that under the deal, as it exists,

20 we are going to pay that $2 million.  So, the debtor is not

21 out-of-pocket another cent under this deal, Your Honor, in

22 the event that Mr. Carickhoff's interpretation of the

23 contract was correct.

24         But it is simply not, Your Honor.  The plain

25 meaning of the contract is that the professional liabilities

1  of the debtor parties -- all right, that would be the

2  entities themselves -- the asset purchase agreement, I have

3  it here, I can show it to Your Honor, but the asset purchase

4  agreement defines the debtor parties as the selling entities.

5          THE COURT:  Yes.

6          MR. MINUTI:  And so, what is covered is the

7  professional liabilities of the selling entities and the go-

8  forward, the doctors and residents that exist as of closing.

9  That was the deal.

10         Now, what are professional liabilities of the

11 debtor parties, Your Honor?  Professional liabilities of the

12 debtor parties are malpractice insurance that covers the

13 entities.  Now, that malpractice insurance that covers the

14 entities doesn't just cover the entities.  It covers non-

15 MCARE eligible staff and residents, okay -- so nurses, staff,

16 those sorts of things -- the entity coverage would cover

17 those folks, as well.

18         Now, what Mr. Carr coughed is saying is the

19 professional liability of the debtor is professional

20 liability of his clients and that's not the case, Your Honor,

21 because what he's arguing is the debtor has a prepetition

22 contractual obligation -- not a professional liability --

23 it's a contractual liability to buy a tail for their clients.

24 That's a prepetition claim, Your Honor.  They're no different

25 than any other prepetition creditor in these cases.

1          And, unfortunately, while we tried to get creative

2    and we tried to push our buyer here, just like Your Honor in

3    connection with the resident asset sale, we tried to figure

4    out a solution to prevent the exact hardship that his clients

5    are here complaining about, we simply couldn't get there,

6    Your Honor.  It's unfortunate, but that's the reality.

7          But, again, the APA is crystal clear as to exactly

8    what was being covered in this case, Your Honor.  The -- and

9    the APA is actually consistent with what I told Your Honor at

10   the sale hearing and what the testimony was at the sale

11   hearing.  I've got a copy of the transcript here, Your Honor,

12   but at Page 11, Line 13 of the September 23 transcript I said

13   to Your Honor:

14          "In addition, Your Honor, a critical element here

15   is the buyer is going to be purchasing tail insurance

16   coverage to cover the debtor parties and continuing

17   residents."

18          Okay.  Mr. Wilen's proffer at Page 33, Line 21:

19          "The buyer is purchasing tail insurance coverage

20   to cover the debtor parties and continuing residents."

21          Clint Matthews, Your Honor, the representative of

22   Tower, testified by proffer at Page 49, Line 23:

23          "Last, Your Honor, he would testify that if STC

24   Opco -- it is STC Opco's intent to purchase tail insurance

25   both, primary and excess coverage, for St. Christopher's, for

1  the hospital, itself, and also for its employed physicians,

2  including residents.

3        And as Mr. Minuti noted, the cost of that tail

4  insurance is agreed to be split 50/50 between STC Opco and

5  the sellers, until the seller's percentage piece hits $2

6  million, and beyond that, the financial liability is entirely

7  STC Opco's."

8        And the latter part of that testimony is

9  important, Your Honor, because, again, we are going to pay $2

10  million at closing.  So, what that means is if Mr. Carickhoff

11  is right, based on his interpretation of the language, it's

12  costing the debtor not a cent more.

13        Now, why would the debtors secretly, without

14  telling anybody, amend the contract that's going to relieve

15  it of millions of dollars of prepetition claims for no

16  consideration.  It would never do that, Your Honor.

17        And the reason why it would never do that here

18  Your Honor, is because that's not what the agreement provided

19  for.  We wish it was different, but that's not the case.

20        So, again, the APA is clear, Your Honor.  There

21  was no misrepresentation.  There's no need to get to parole

22  evidence, although, Mr. Wilen is here if Your Honor wants to

23  hear from him, he can certainly testify as to that his intent

24  was, consistent with what I'm telling Your Honor.

25        And so, with respect to that portion of the motion

1    seeking re-argument based upon mistakes, surprise, or newly

2    discovered -- I'm sorry -- to the extent they seek to enforce

3    the asset purchase agreement, Your Honor, we think the motion

4    ought to be denied.

5           Now, let me turn to the 60(b) portion of the

6    motion.  Here, Your Honor, they're seeking re-argument of the

7    sale order, but it's not entirely clear to me exactly what

8    relief they're seeking by way of re-argument.  There's really

9    no ability, Your Honor, that the debtor has to force the

10   buyer here to pay additional money to pay these claims.

11          And if you really think about it, Your Honor, why

12   did the buyer do what it did?  Why would it pay a go-forward

13   tail coverage for its employees and not prior doctors and

14   prior residents?  And it's no different than any other 363

15   buyer.  What they want to make sure is when they buy the

16   assets, the go-forward business, right, that they're going to

17   run with those assets is not going to be disrupted.  So, if a

18   doctor they currently employ, right, or a nurse they

19   currently employ, gets sued, they want those people not to be

20   distracted by that lawsuit and have coverage.  And so, that's

21   why they agreed to provide that coverage.

22          But a lawsuit against a former doctor or someone

23   who left or a lawsuit against a former resident that has no

24   impact on the business going forward, why would they pay for

25   that, Your Honor?  Again, we tried, but there really wasn't a

1  business reason why they would do it, so we did the best we

2  could.

3          So, there's no way to force them to pay additional

4  money, but if what Mr. Carickhoff is suggesting is that Your

5  Honor should undo the order --

6          THE COURT:  That's what I understand.

7          MR. MINUTI:  -- okay, and not let the sale go

8  forward, Your Honor, I can only -- I can't imagine what

9  that's going to look like, Your Honor, because what that's

10 going to result is, Your Honor, is we're not going to close

11 the sale, we're not going to have those proceeds, we're going

12 to be in default of our loan with MidCap, we're not going to

13 have any funding, we're going to lose the consideration to be

14 provided by the sale, almost all of which is accounted for,

15 Your Honor, we're going to breach our settlement with Tenet

16 and Conifer, so they're going to pull services, Your Honor.

17 The case is going to quickly spin out of control and patients

18 are going to be put at risk.  That's what's going to happen

19 here, Your Honor.

20         And maybe most importantly to Mr. Carickhoff what

21 you're going to wind up with is a lot of additional doctors

22 and residents who are not going to have go-forward coverage.

23 So, for all of those reasons, Your Honor, we think the motion

24 should be denied.  Thank you.

25         THE COURT:  All right.  Thank you, Mr. Minuti.

1         MR. SHERMAN:  Good morning, Your Honor.  Andrew

2  Sherman, Sills Cummis, the committee.

3         THE COURT:  Yes?

4         MR. SHERMAN:  Your Honor, we rise in support of

5  the statements made by Mr. Minuti and join in the comments in

6  just a couple of things that we heard from the presentation

7  by the former doctors, that somehow the estate should bear

8  those costs.  I mean, the record is clear at the auction,

9  Your Honor, that the estate capped its liability at $2

10  million, related to this deal coverage.  I'm trying to recall

11  the progression of the auction, Your Honor, of how it

12  happened, but the tail coverage became a negotiated aspect of

13  the sale that was part and parcel of the auction.

14         So, to the extent that the former doctors want to

15  come in and re-trade or remake that deal, the Court shouldn't

16  allow that.

17         THE COURT:  Well, that deal only covers physicians

18  who were presently --

19         MR. SHERMAN:  Correct, Your Honor.

20         THE COURT:  -- then presently working at St.

21  Christopher's --

22         MR. SHERMAN:  And that was the intent, Your Honor.

23         THE COURT:  It doesn't touch on all of the other

24  physicians.

25         MR. SHERMAN:  Absolutely, Your Honor.  And that

1   was what the parties intended at the time.  There was never a

2   contemplation, at least the language that we looked at, that

3   it addressed that, unfortunately, Your Honor and --

4            THE COURT:  But the agreement doesn't foreclose

5   that.

6            MR. SHERMAN:  It does not foreclose it, Your

7   Honor.

8            THE COURT:  No.

9            MR. SHERMAN:  But those constituents are members

10  of our class.  So, to the extent that these claims arise and

11  Mr. Minuti said it right -- there's lots of pain that goes

12  around in bankruptcy cases and the pain should be shared

13  accordingly -- but the pain, unfortunately -- it's

14  unfortunate, right.  Nobody is happy about this situation,

15  Your Honor --

16           THE COURT:  I know.

17           MR. SHERMAN:  -- but there are thousands of

18  affected creditors.  So, Your Honor is just hearing from a

19  subset of some today.  Your Honor will hear from a subset of

20  the Hahnemann residents.  There's trade creditors that

21  provided food.  There's trade creditors that provided drugs.

22  There's trade creditors that provided lot of different things

23  to this institution, but effectively what we have going on

24  here today is one class of unsecured creditors coming to the

25  Court and saying, Put me ahead of everybody else and somehow

1  take pieces of this limited estate and allocate dollars for -

2  - to satisfy those claims.

3          That's just not the way the Bankruptcy Code works.

4  That's not 503.  That's not how the Third Circuit has

5  addressed administrative claims.  Obviously, the Court is

6  well aware of the tests to get to a 503 standard, which are

7  not here.

8          THE COURT:  What does Pennsylvania law provide,

9  though?

10         MR. SHERMAN:  Well, Your Honor, that's an

11  interesting issue because over the last number of days we've

12  tried to sort of address these statutes.  So, I think you've

13  got to start with -- what is it -- 40 Pennsylvania statute

14  1303.711, which really talks about the requirements for

15  coverage and the requirements for coverage are in Subsection

16  D where it talks about basic coverage limits.

17         THE COURT:  Yes.

18         MR. SHERMAN:  But as I look at that section, Your

19  Honor, I don't see retroactive coverage being required of a

20  healthcare provider.

21         So, Your Honor alluded to 742 earlier, which talks

22  about what an insurer has to do --

23         THE COURT:  Yes.

24         MR. SHERMAN:  -- but 711(d), Your Honor, talks

25  about what a provider has to provide and there's nothing

1  retroactive in there.  And, again, if somebody can point me

2  to it, I'm just a silly bankruptcy lawyer trying to interpret

3  Pennsylvania law, but I'm looking at the plain language of

4  the statute, Your Honor, and it doesn't talk about

5  retroactive.

6          It talks about $500,000 per occurrence, 1.5

7  million of aggregate for a healthcare provider.  It just --

8  there's nothing in the law and maybe that's why we sort of

9  why we have these issues is people are circling around,

10  because there's nothing precise in the statute that says you

11  -- there's nothing that we see, Your Honor, that mandates

12  under Pennsylvania law there shall be tail coverage.  If

13  there was such a case or such a statute, it would be before

14  Your Honor.  People are circling saying, Well, you've got to

15  put A and B together and then all of these come together and

16  then there's this somehow this created liability or

17  obligation.

18          And with all due respect, right, Your Honor, the

19  other thing is, if there was a requirement for tail coverage

20  under Pennsylvania law, then Tower and Drexel would have,

21  obviously, honored it, but it doesn't exist.  So, again, the

22  plight of these former doctors and residents is not to be

23  minimized, Your Honor --

24          THE COURT:  No, it's not, because they may not be

25  able to practice.

1          MR. SHERMAN:  -- it's just -- but there are

2    thousands -- take a small business that could have had

3    Hahnemann as a supplier that may have been, unfortunately,

4    adversely affected, and it may not have been able to pay its

5    insurance because it didn't get paid by Hahnemann.  There's

6    thousands of people like this and, again, there's lots of

7    (indiscernible) that's been affected by this case, like other

8    bankruptcy cases.  These people, you know, with respect, Your

9    Honor, should not be elevated at the expense of others.

10          THE COURT:  Thank you, Mr. Sherman.  Thank you.

11          MR. MARRIOTT:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. MARRIOTT:  Vince Marriott, Ballard Spahr.

14          THE COURT:  Yes.  I was trying to remember the

15    hotel whose name you have.

16        (Laughter)

17          MR. MARRIOTT:  It doesn't get me free rooms --

18          THE COURT:  Oh, I'm sure.

19        (Laughter)

20          MR. MARRIOTT:  -- unfortunately.

21          THE COURT:  I'm sure.

22          Yes, Mr. Marriott?

23          MR. MARRIOTT:  I rise on behalf of STC Opco, who's

24    the buyer.

25          THE COURT:  Yes.

1    MR. MARRIOTT:  And I -- for the benefit of Tower,

2 I just want the record to be clear that although Tower has

3 referred to in a number of instances earlier in this

4 proceeding --

5    THE COURT:  They're not the purchaser.

6    MR. MARRIOTT:  -- as though it were the buyer, it

7 is not.

8    THE COURT:  That's right.  And thank you for

9 pointing that out.

10    MR. MARRIOTT:  I don't have a lot to add.  I just

11 want to sort of step back to a somewhat higher level to

12 clarify what's at issue here.

13    THE COURT:  Yes.

14    MR. MARRIOTT:  In the first instance, I want to it

15 distinguish between potential debtor liability for former

16 resident and fellow tail coverage and buyer liability for

17 former resident and fellow tail coverage, because debtor

18 liability could exist and, really, that's what the Amicus

19 (ph) brief argues, that's what the ad hoc committee argues in

20 their newly filed motion, that's what the Commonwealth argues

21 in their newly filed motion.  And the ad hoc brief could be

22 right and the ad hoc -- or the Amicus brief could be right,

23 the ad hoc committee could be right, the Commonwealth could

24 be right.  Without it meeting that, the buyer, similarly, has

25 obligations with respect to tail coverage for former

1  residents and former fellows.

2       Second, there are really only two ways in which

3  the buyer could have an obligation with respect to an

4  existing debtor obligation.  One is by contract, by making it

5  an assumed liability under the contract.

6       THE COURT:  Right.

7       MR. MARRIOTT:  And the APA has a series, in fact,

8  of assumed liabilities.  This is unambiguously not one of

9  them.  And Mr. Minuti has gone through what the APA says and

10 what the entirely consistent testimony of what the sale

11 hearing said and I don't feel the need to repeat it.  I just

12 don't think that there is any fair argument that he made that

13 the buyer undertook a tail obligation, with respect to former

14 residents and fellows, only with respect to those employed at

15 the time of closing.

16      THE COURT:  Yes.

17      MR. MARRIOTT:  And there's no real ambiguity about

18 that or conflict in the testimony about that, you know, in

19 fact, what the movants are really -- they're really trying to

20 argue for a different interpretation of a clear agreement as

21 to which the actual parties to the agreement are in entire

22 accord about what it says.

23      Now, the second way that, in theory, the buyer

24 could become liable for this obligation is if compelled --

25 and that's the Rule 60 piece of the movant's motion --

1  they're argue that this Court should reopen the sale order

2  and insert a provision compelling us to undertake that

3  liability when there's no basis for the Court to do so.

4           This was a 363 sale, which is free and clear of

5  all liens, claims, and encumbrances, other than those

6  specifically assumed --

7           THE COURT:  Yes.

8           MR. MARRIOTT:  -- and even if the Court were to

9  consider there to be grounds to reconsider it order, it

10 wouldn't have the ability to insert a compulsion to assume

11 that liability in any event.  And so --

12          THE COURT:  If I reopened the sale order, I assume

13 that STC Opco would withdraw.

14          MR. MARRIOTT:  The fact of the matter is STC Opco

15 has a very specific consideration it agreed to pay for St.

16 Christopher's and if that consideration were all of a sudden

17 to have to be millions of dollars more --

18          THE COURT:  Yes.

19          MR. MARRIOTT:  -- then I don't see how this

20 transaction could close.

21          THE COURT:  And wouldn't it be tens of millions of

22 dollars more?

23          MR. MARRIOTT:  Yeah, I don't know how much it

24 would be.  It would be a lot of money.

25          THE COURT:  Yeah.

1        MR. MARRIOTT:  So, I think it's clear that we

2   didn't agree to take on and assume this obligation if it

3   exists, but, again, whether or not it exists is independent

4   as to the debtor, is independent of whether we undertook it,

5   and we didn't do so by agreement and we don't believe the

6   Court could compel us to do so by reconsidering this order

7   and entering it again.

8        So, we think insofar as this motion seeks to

9   impose this obligation on the buyer, we think it should be

10  denied, even if this Court concludes that it needs to, on a

11  more fulsome basis, deal with what the debtors' obligation

12  would be as to what the buyer's is, we think the motion

13  should be denied.  Thank you.

14        THE COURT:  Thank you, Mr. Marriott.  Thank you,

15  sir.

16        Mr. Lapowsky, good morning.

17        MR. LAPOWSKY:  Your Honor, Robert Lapowsky, co-

18  counsel to STC and Tower.  I'm at a loss.  I can't add

19  anything to what Mr. Marriott said --

20        THE COURT:  All right.

21        MR. LAPOWSKY:  -- so I'm going to sit down.

22        THE COURT:  And your papers certainly speak for

23  themselves.  Thank you.  Thank you.

24        MS. BLOOM:  Good morning, Your Honor.  May I

25  please the Court, Nella Bloom, of Bielli and Klauder, here on

1  behalf of Dr. Moulick -- he's an affected physician -- and

2  I'd like to introduce my counsel, Thomas Bielli, also of the

3  same firm.

4          Mr. Bielli, his pro hac motion is pending, but his

5  fee has been paid.

6          THE COURT:  All right.  I know Mr. Bielli and he

7  certainly may argue.  Thank you.

8          Mr. Bielli, good morning.

9          MR. BIELLI:  Good morning, Your Honor.  May I

10 please the Court, Thomas Bielli, from Bielli & Klauder.  Your

11 Honor, I represent Dr. Moulick --

12          THE COURT:  Yes, who appeared here.

13          MR. BIELLI:  -- he was previously before Your

14 Honor at another hearing that Mr. Klauder was at.  Mr.

15 Klauder couldn't be here today.

16          Dr. Moulick, as Your Honor will recall, is the

17 chief of cardiothoracic surgery at St. Christopher's, the

18 executive director of the heart center at St. Christopher's,

19 and the chief medical officer at St. Christopher's.

20          Dr. Moulick, or on Dr. Moulick's behalf, we did

21 file a joinder to the former residents' motion and we support

22 that motion in a demand that appropriate tail insurance

23 coverage be provided to all medical staff -- all medical

24 staff -- of St. Christopher's, including Dr. Moulick.

25          THE COURT:  Well, isn't he covered because he's a

1  present employee?

2         MR. BIELLI:  Well, Your Honor, there was a -- he

3  is.  And there was a motion filed yesterday, Your Honor,

4  seeking to reject Doctor -- well, Dr. Moulick's employment

5  agreement was not one of the agreements to be assumed under

6  the APA and was subject on the motion to reject, yesterday,

7  which will be effective, I believe, December 15th; however,

8  it was Dr. Moulick's understanding that he would not be

9  permitted at St. Christopher's after tomorrow, December 13th.

10         This is important, Your Honor, because why Dr.

11  Moulick filed the joinder and asked me to come down here

12  today to speak on his behalf, Dr. Moulick has performed

13  operation on babies at the hospital, at St. Christopher's,

14  with complex cardiac problems as recently as December 5th.

15  Those patients are still in the hospital today.  Those

16  patients are going to be in the hospital tomorrow.  Those

17  patients are going to be in the hospital next week.

18         Dr. Moulick's concerns -- well, he's got a number

19  of concerns --

20         THE COURT:  Yes.

21         MR. BIELLI:  -- but one of his concerns, Your

22  Honor, is the patient could still be in the hospital after he

23  no longer has access to the hospital and no longer has access

24  to those patients.  Again, not waiving any of Dr. Moulick's

25  rights -- he has an admin claim motion, I'm sure we're going

1  to respond to the motion to reject -- but he certainly

2  doesn't want to be liable professionally for patient care at

3  St. Christopher's after he's no longer permitted to access

4  the facility for the patients that he operated on, again,

5  just five or six days ago.

6           THE COURT:  Right.

7           MR. BIELLI:  With that said, Your Honor, Dr.

8  Moulick does join in with the relief requested by the former

9  doctors' motions and ask that the tail insurance be provided

10  to all the current and former doctors of St. Christopher's.

11          THE COURT:  All right.

12          MR. BIELLI:  Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Bielli.  Thank you.

14          MR. LAPOWSKY:  Your Honor, may I?

15          THE COURT:  Yes.  Yes.

16          MR. LAPOWSKY:  Robert Lapowsky for STC Opco.  I

17  just wanted to clarify one thing in response to your comment

18  there.

19          The tail coverage that's being provided by the

20  buyer falls into two basic buckets.  One is the bucket that

21  is required under the APA, Section 8.6 of the APA --

22          THE COURT:  Right.

23          MR. LAPOWSKY:  -- that is for residents and

24  fellows that are continuing on.

25          Dr. Moulick is not a resident or a fellow; he is a

1 physician that practices at St. Christopher's.

2         THE COURT:  Okay.

3         MR. LAPOWSKY:  Independently, for the -- we are

4 assuming a lot of contracts.  Each of the physicians who

5 practice at St. Christopher's does so under a contract.

6         THE COURT:  Right.

7         MR. LAPOWSKY:  A lot of those contracts are being

8 assumed and assigned to the buyer.  Under those contracts,

9 the buyer is providing tail insurance to those physicians --

10 not residents or fellows -- those physicians.

11         The reason Dr. Moulick will not be covered by the

12 buyer is because his contract is not being assumed and

13 assigned to the buyer.  So, I just think it's important --

14 you had said he'll be there on the closing, doesn't that mean

15 that he's covered?  That led me to believe that you were

16 lumping the physicians in with the residents and fellows

17 under the Section 8.6 obligation and they're separate.

18         THE COURT:  Okay.  All right.  Thank you.

19         I understood that, but I assumed that STC Opco or

20 Tower -- whoever it is as St. Christopher's -- would provide

21 insurance for physicians who were there at the time of

22 closing.

23         MR. LAPOWSKY:  The -- that is true --

24         THE COURT:  Not contractually, but just in the

25 ordinary operation of the business.

1              MR. LAPOWSKY:  For the physicians who are there at

2    closing, who are not residents and fellows oh.

3              THE COURT:  Right.

4              MR. LAPOWSKY:  -- that is true for all of them

5    except for two.  There are only two contracts with physicians

6    that STC Opco is not taking an assignment of.

7              THE COURT:  All right.  Thank you.

8              Mr. Bielli, yes?

9              MR. BIELLI:  And one of those would be Dr.

10   Moulick.

11             THE COURT:  I assumed.

12             MR. BIELLI:  Okay.

13             THE COURT:  I didn't ask, but I was pretty

14   certain.

15             MR. BIELLI:  I just want to make sure we're

16   perfectly clear, because it wasn't said.

17             Thank you, Judge.

18             THE COURT:  Thank you, Mr. Bielli.  Thank you.

19             Mr. Ryan, good morning to you.

20             MR. RYAN:  Good morning, Your Honor.  Jeremy Ryan

21   of Potter Anderson & Corroon.  As noted by Mr. Carickhoff, we

22   represent --

23             THE COURT:  Where have you been throughout this

24   case representing all of these physicians?

25             MR. RYAN:  They -- Your Honor, like Mr.

1  Carickhoff, they've been in the dark, and these physicians --

2  my group -- and as we noted, the American Medical Association

3  reached out to us and said we are concerned that the

4  residents are in the dark and have no voice and we want you

5  to form an ad hoc committee.  They've been in contact with

6  residents, so I had a steering committee.  We had an

7  engagement letter signed last week.

8           THE COURT:  Okay.

9           MR. RYAN:  We put out the call for those who

10  wanted to join the ad hoc committee on Monday evening, Your

11  Honor, I can report to you in less than four business days,

12  we have had over 160 people sign up for the ad hoc committee.

13           You know, one of your questions was about notice.

14  One of the frequent emails we get is, I know there are a lot

15  of other residents in the dark who don't know that their

16  malpractice insurance is expiring because the debtors haven't

17  told them.  It's a problem.  There's been no real notice and

18  people are in the dark.

19           So, where have my people been?  They're been in

20  the dark, Your Honor.  It's only for the good graces of the

21  AMA and the ACGME and all the other amicus parties who have

22  appeared before you who have carried their (indiscernible)

23  and their water in both sale hearings, had their concerns

24  even been addressed, otherwise, they would have been swept

25  under the rug.

1           THE COURT:  Now, these are contracts.  Why aren't

2   these unsecured claims?

3           MR. RYAN:  Well, I mean -- and this is all in our

4   motion -- Your Honor, we're probably getting to that, but --

5           THE COURT:  And I didn't mean to do, that because

6   we're going to set this down for a hearing, but I'll hear

7   from you now.

8           MR. RYAN:  There are a -- there's a large -- I'm

9   happy to say it, Your Honor.  There's a large swath of

10  Hahnemann resident whose contracts are still in existence and

11  are required to remain in existence under the first APA.

12  Those contracts require the maintenance of professional

13  liability insurance for the duration of those contracts.

14  That insurance expires on January 10th.

15          The debtors will be in breach of that sale

16  agreement and they will be in breach of every single one of

17  those executory contracts by not providing that.

18          Could we have an admin claim?  Sure, you would put

19  a number on it, the replacement cost of tail insurance, but

20  is that an adequate remedy for people who lose their

21  licenses?  These are people who make $60,000 a year --

22          THE COURT:  Right.

23          MR. RYAN:  -- if you're an obstetrics resident,

24  the quote is $65,000.  If you're sitting underneath a quarter

25  million, 300,000 --

1              THE COURT:  Of debt?

2              MR. RYAN:  -- they can't buy these things, Your

3    Honor.  The debtors know that and they've chosen not to tell

4    these people; these people are in the dark.  So, that's the

5    problem.  That's the emergency.

6              So, when you say, Is this a contract?  Part of it

7    is a contract and there's a swath of people that they have

8    current contractual obligations to that they are in immediate

9    danger of breaching and causing irreparable harm to those

10   people's lives.

11             As Mr. Barkasy noted in his motion, that leaves a

12   permanent mark on their national record if insurance expires

13   and they lose their licenses.  These things can't be cured.

14   So, that's where they are, Your Honor.

15             But there's more than just contract.  There's, as

16   best we can tell from the documents we've seen, these people

17   were affirmatively defrauded and lied to.  The contracts say,

18   We will provide you a occurrence-based health insurance.

19             THE COURT:  I saw that.

20             MR. RYAN:  The staff manual says, We will provide

21   you occurrence-based health insurance.

22             When this hospital was bought in January 2010, to

23   save money, people made an affirmative decision to change to

24   claims made.  They made an affirmative decision to still

25   issue contracts that said, We will get you occurrence-based.

1  They were lying to these people, Your Honor.  The house

2  manual never changed.  The contract didn't change.

3         And I know that the contract for the 2019 to 2020

4  resident year is different than a 2018-2019, so they drafted

5  new contracts and still affirmatively lied to these people.

6  That's where it's more than just a contract, Your Honor.

7  These people have been misled on a fundamental obligation of

8  theirs to provide health insurance.

9         Now, Mr. Sherman also said, Where under

10  Pennsylvania law is there any requirement for a tail for a

11  healthcare provider?

12         THE COURT:  Yes.

13         MR. RYAN:  And, Your Honor, it is a component of

14  Pennsylvania law.  The MCARE requirements issued by the

15  Pennsylvania Department of Insurance, Section 6(b), starting

16  at the top of Page 24, and I'll quote:

17         "Extended reporting coverage:  Contemporaneous

18  with the end of coverage of a claims-made policy, the

19  healthcare provider must secure coverage for claims that are

20  made against them after the date of policy expiration.

21  Coverage can be attained from the primary insurer of the

22  expiring policy, often referred to as tail coverage, or from

23  a new insurer, authorized to write medical, professional,

24  liability insurance in Pennsylvania, providing policy

25  retroactive dates that cover the expiring coverage time

1  periods, often referred to as nose coverage."

2          So, there's two options there -- it's not just

3  tail -- and the tail needs to be of indefinite duration.

4  That's Section 6(a).

5          THE COURT:  Is the healthcare provider the

6  individual or is the healthcare provider the hospital?

7          MR. RYAN:  Is it a small H, small C, small P.

8          THE COURT:  Yes.

9          MR. RYAN:  So, it applies to both of them.  But

10 when Mr. Sherman says there's no requirement to get tail

11 coverage, you have Hahnemann saying, We'll get you insurance.

12 We'll get you the insurance you need to practice law under

13 the state of Pennsylvania.

14         When he says that you don't have to get a tail,

15 that's absolutely untrue, to -- I know I said "practice law"

16 -- practice medicine in the state of Pennsylvania.

17         THE COURT:  I understood.

18         MR. RYAN:  So, to practice medicine in the state

19 of Pennsylvania, when Hahnemann says, We'll get you the

20 necessary insurance, that's a commitment that we'll get you

21 the necessary insurance.  They thought they had occurrence

22 policies.  They thought, all you have to do is go policy year

23 to policy year.  They didn't know this was expiring.

24         And they're now stuck with a thing where we are 30

25 days away from these policies expiring and these people's

1  lives potentially put into ruin.  So, that's why it's beyond

2  just contract.

3           And then Mr. Barkasy can tell you and the amicus

4  can tell you, the systemic threat of losing 1,000 doctors in

5  Pennsylvania poses.

6           THE COURT:  I understand that.

7           MR. RYAN:  So, there's a lot of pain in these

8  bankruptcies, but it's the rare case where you can satisfy

9  everybody.  It's the require case where you cause a public

10  health crisis and this is that rare case which calls for

11  extraordinary measures and extraordinary relief.

12           THE COURT:  Well, let me ask you this, these

13  residents, in particular, who have now gone to new hospitals

14  --

15           MR. RYAN:  Uh-huh.

16           THE COURT:  -- are those new hospitals where

17  they've -- are they not providing tail coverage?

18           MR. RYAN:  Some have said they might.  Some have

19  said they won't.

20           THE COURT:  Okay.

21           MR. RYAN:  Many residents, especially as far as

22  you get outside of Pennsylvania and they've been disbursed

23  through these 37 states, again, they're in the dark.  They

24  don't know this is happening, so they haven't asked their new

25  hospitals.  Some have said, if the Court won't grant it,

1 | maybe we'll do it.  Some have said, Absolutely no way, no
2 | how.
3 | THE COURT:  Yeah.
4 | MR. RYAN:  And like I said, many don't even know,
5 | Your Honor.  So, those are the problems that face these
6 | people.
7 | THE COURT:  All right.  And what is your -- and
8 | we're going to have to have a hearing on this, I understand.
9 | This is not the time for the hearing.  You've asked me to
10 | shorten time.
11 | But --
12 | MR. RYAN:  Well, that's true, Your Honor, because
13 | I mean it's --
14 | THE COURT:  What is the relief?
15 | MR. RYAN:  I know you want evidence.  There's a
16 | deeper evidentiary dive, which is --
17 | THE COURT:  Yes.
18 | MR. RYAN:  -- we need to examine the decision-
19 | making at Hahnemann starting in January of 2010 to switch the
20 | policy.  We need to examine why they continued to
21 | misrepresent to the doctors that they were getting
22 | occurrence-made policy.  We're not going to get that done
23 | before January 10th, Your Honor.
24 | So, there's a crisis on January 10th.  There's a
25 | need to evidence and explanations and to find out who is

1  truly accountable and whether people are personally liable

2  for that.  That's not going to happen before January 10th, so

3  we've got to solve for an immediate crisis.

4        THE COURT:  Why won't it happen before January

5  10th, just timewise there's not time?

6        MR. RYAN:  I don't think, Your Honor, we're going

7  to be able to review all of the documents of Hahnemann

8  regarding these decisions, and all the board minutes, and

9  meetings, and who drafted these contracts, and who approved

10  these manuals, get depositions, and be back here before

11  January 10th in a time over the holidays where Your Honor can

12  hear all this evidence, digest it and do immediate relief.

13  So, we are in a position where we need immediate relief to

14  preserve the status quo and to preserve these people's

15  livelihoods.

16        THE COURT:  And what is the immediate relief?

17        MR. RYAN:  They've got to buy the tail insurance,

18  Your Honor.  They cannot renew the insurance.  They are not

19  an operating hospital.  You know, they have put themselves in

20  this pickle.  Certainly -- and they have to renew it because

21  they've got a whole bunch of residents under contract which

22  they need to keep under contract or breach the APA that

23  they're fighting so hard for in the District Court.

24        THE COURT:  Yes.

25        MR. RYAN:  So, they need to respond to that.  I

1  mean that puts them in a material breach of that.  And they

2  still have those contracts.  They haven't rejected them.

3  They need to perform.  So, those are answers that they need

4  to find.  Given the crisis that posed to Pennsylvania, the

5  crisis that posed to these innocent people that is where

6  equity, Your Honor, we say should follow for the rest.  So,

7  there are current people under contract and there are

8  hundreds and hundreds not under contract, but given where we

9  are and the actions of these debtors at that point we would

10 say, Your Honor, equity demands that all residents and

11 fellows get the benefit of tail policies.

12          THE COURT:  All right.

13          MR. RYAN:  Thank you, Your Honor.

14          THE COURT:  Yes.  Thank you, Mr. Ryan.

15          Mr. Barkasy, yes.  Good morning.

16          MR. BARKASY:  Good morning, Your Honor; Rich

17 Barkasy from Schnader Harrison Segal & Lewis for the

18 Commonwealth of Pennsylvania Department of Health.

19          We filed a motion seeking to compel the debtors to

20 purchase the tail insurance coverage.

21          THE COURT:  Yes.

22          MR. BARKASY:  We're asking that the court set down

23 a hearing on that motion before the deadline that's been

24 discussed this morning.  I don't want to kind of belabor all

25 of the things that have been said today.  The secretary and

1    the department of health have serious concerns similar to

2    those expressed by counsel representing the former physicians

3    and residents.

4           There is an additional public health concern that

5    perhaps only the Pennsylvania Department of Health has in

6    this particular circumstance and that is for the patients.  I

7    mean there were patients that had treatment at Hahnemann and

8    at St. Christopher's over this coverage period that if,

9    unfortunately, they have a claim or they have suffered some

10   serious physical harm they may not have coverage for their

11   claim.  So, that is an additional serious concern that the

12   Department of Health has, Your Honor.

13          THE COURT:  Okay.  All right.  Thank you, Mr.

14   Barkasy.

15          You know, I don't know whether I need you to

16   answer, Mr. Ryan, to Mr. Barkasy's arguments because I think

17   we need a hearing.  They have asked me to shorten time.

18          MR. MINUTI:  I think that's right, Your Honor.

19   The -- I did want to rise, though, to respond to this idea

20   that everybody has been kept in the dark because it's a

21   little surprising to me that that argument would be made and

22   here's why I say that, Your Honor.  We have had a number of

23   hearings in this case.  Your Honor will remember we had one

24   hearing where there were 50 residents in lab coats behind me.

25   I don't know if you remember that.

1        THE COURT:  I do remember that.

2        MR. MINUTI:  So, the impact on residents and

3   particularly the tail coverage has been front and center from

4   day one.  All right.  And people are saying where is my

5   notice, what notice?  You know, when you file a bankruptcy

6   case a notice goes to everybody that says, hey, your obligor

7   is bankrupt.  And so I don't think I had a notice to -- to

8   send out a notice that said, oh, by the way, under the St.

9   Christopher sale you're not getting this or you're not

10  getting that.  That is not the way it works, Your Honor.

11       So, look, could maybe we have done a better job

12  with some of the former people; maybe we could have, Your

13  Honor, but this really should come as a surprise to no one.

14  It certainly doesn't come as a surprise to us and Your Honor

15  will remember let's go back to the resident sale.  The

16  resident sale we fought, and twisted the buyers, and we had

17  competitive bidding, it was a great thing.  You know what we

18  were able to do as part of the resident sale, we got the tail

19  coverage provided for.

20       THE COURT:  That's right.

21       MR. MINUTI:  Okay.

22       THE COURT:  Yes.

23       MR. MINUTI:  If we were able to close we would

24  have had $55 million dollars.  It would have solved a lot of

25  ills we had.  It would have paid for the tail coverage.  We

1  don't have the $55 million dollars, Your Honor, because the

2  sale was stayed.

3        Now, we're fighting in the District Court to try

4  to get the sale approved so we can try to close with our

5  buyer.  I don't know if they're going to walk or not, Your

6  Honor.  You remember there was a deadline, they've hung in

7  there so far.  A lot of it is going to depend upon whether

8  the sale order is upheld and how it's upheld because events

9  have happened in the interim that may make our buyer a little

10 bit nervous.

11       THE COURT:  Whether you're still an operating

12 entity too.

13       MR. MINUTI:  That's exactly right, Your Honor.

14 So, we are fighting as much as we can to try to get the money

15 to pay for the tail coverage that Mr. Ryan is here saying we

16 didn't pay for or we have an obligation to pay for.  We're

17 trying to do that, Your Honor.  I disagree, these are

18 prepetition claims, Your Honor.

19       Look, the results of it not being paid I'm not

20 quarreling with.  It's horrible.  These are prepetition

21 claims.  Talk about misrepresentation, talk about being lied

22 to, I don't know if any of that is true, but that is not

23 under Mr. Wieland's watch.  Mr. Wieland is doing the best he

24 can to try to get as much money as we can and he did the best

25 he can as a part of a resident sale to try to get these

1  things paid.

2         So, here is the bottom line and nobody should

3  leave the courtroom with any misconception.  If we have a

4  hearing before January 10th or January 11th and Your Honor

5  says the debtor must pay this amount, we don't have the

6  money.  We absolutely don't have the money.  There is no way

7  we can pay the amount.

8         So, this has been out there.  There is no

9  emergency.  We don't need an emergency hearing.  If Mr. -- if

10  there is a claim against somebody else and there's discovery

11  to be done with that, that can be done in due course, but

12  nothing is going to change the fact that we don't have the

13  money to pay for it, Your Honor.  That is just the reality of

14  the case we're dealing with.

15         So, I disagree with the notion that people are

16  kept in the dark, Your Honor.  Again, I will concede, could

17  we have done a better job, maybe we could have, Your Honor;

18  nothing is perfect in cases like this, but these issues have

19  been front and center for quite some time and there is no

20  solution here.  We thought we had a solution.  We couldn't

21  get the sale done.

22         So, I think we need to schedule the motion, Your

23  Honor.  We need to schedule Mr. Barkasy's motion.  We need to

24  schedule Mr. Ryan's motion.  I can tell Your Honor we're,

25  obviously, coming up on the holidays.  The only emergency

1  here is I think they want to be heard before the deadline of

2  January 11th.  I can tell Your Honor selfishly I'm on

3  vacation starting next Thursday.  Mr. Wieland is going to be

4  on vacation the week after that.  So, something early in the

5  year would make sense, I think, here.

6          I think it really is a legal issue primarily which

7  is whether this is an administrative claim or not, but even

8  if it's an administrative claim or even if there was some

9  basis for Your Honor under equity to say that we have to make

10 this payment we can't do it.

11         Now, through the Hahnemann University equipment

12 sale, and through the collection of AR down the road, and

13 causes of action that are going to be investigated might

14 there be a solution or money down the road, or we can come up

15 with a creative solution here to mitigate some of this harm

16 there might be.  It's not going to happen by January 11th.  I

17 wish it were different, but it's not going to happen.

18         THE COURT:  All right.  Mr. Ryan, yes.

19         MR. RYAN:  Your Honor, January is insufficient.

20 There are hundreds and hundreds of doctors or residents who

21 don't know they have this problem.  Mr. Minuti is like where

22 have they been; they were told they had occurrence coverage.

23 They didn't know they had this problem.  So, that is the

24 problem, Your Honor.

25         I defy the debtors to put in place a program to

1   help these people obtain tail insurance coverage in the next

2   30 days, just to help them, let alone let these people out on

3   their own and tell them on January 8th, hey, you've got 48

4   hours before your license is in jeopardy.  January is

5   insufficient.  These people livelihoods are at stake.

6              THE COURT:  So, what are you suggesting for your

7   hearing date?

8              MR. RYAN:  We need next week, Your Honor.  We need

9   next week on emergency relief.  There will have to be further

10  evidentiary hearings on some of these things that have gone

11  on and the misrepresentations, but these people need to know

12  what this court is going to or not going to do.  And the

13  debtors need to explain how they are going to honor their --

14  they don't have the money to honor their executory contract,

15  which are out there.

16             These are not all prepetition claims.  They are

17  extant contracts that they have an obligation to provide

18  insurance through June 30th of 2020.  They need to provide

19  that answer next week.  That is not fair to make them wait.

20  If they don't have the money they need to come to court next

21  week and say, Your Honor, we are administratively insolvent,

22  we cannot meet our obligations that are coming up in less

23  than a month, and then the pain of administrative insolvency

24  will be shared by all the administrative creditors.

25             THE COURT:  Understood.

1              Mr. Carickoff, yes, sir.

2              MR. CARICKOFF:  I was hoping I'd be able to get

3    the last word, Your Honor, on the motion.

4              THE COURT:  Yes.  You've got the last word.

5              MR. CARICKOFF:  Your Honor, you've heard a lot and

6    you heard counsel for the committee get up and talk about

7    that bankruptcy cases there is a lot of hurt that goes

8    around, but what makes this case different is that what

9    you've heard from Mr. Ryan, what you've heard from counsel

10   for the Commonwealth of Pennsylvania Department of Health is

11   you have a public health crisis in this situation.  That is

12   what makes this different.  That is the difference that you

13   don't have in other bankruptcy cases.  Okay.  If somebody is

14   not getting paperclips, or paper, or some other goods or

15   services it doesn't create a public health crisis.  Here, you

16   have that situation.  Okay.

17             You also heard counsel for the buyer say that they

18   did not intend to get cover tail insurance for former

19   doctors, but if you look at the hand-out that I gave Your

20   Honor that talks about the -- that has that provision in

21   their APA that is exactly what the agreement says. It says

22   that the tail coverage means the reporting endorsement to

23   ensure against the professional liabilities of the debtor

24   parties as of the closing date.  The professional liabilities

25   of the debtor parties, as of the closing date, necessarily

1  includes their current doctors and their former doctors.

2           That is all I have, Your Honor.  Thank you.  I

3  appreciate your time. I didn't say that at the beginning of

4  the hearing.  I know this was an emergency motion.  I know

5  Your Honor has a full calendar.  I know you have been

6  bombarded with emergency motions left and right.  So, I truly

7  appreciate Your Honor taking the time.  I think it says a lot

8  about, Your Honor.  So, thank you.

9           THE COURT:  Thank you, Mr. Carickoff.

10           Dealing with Mr. Carickoff's motion, which was

11  scheduled and which I have heard, it's my finding that STC

12  Opco in the asset purchase agreement, and in its

13  representations to the court, did not agree to provide tail

14  coverage for all of the physicians and all of the residents,

15  but rather for those residents and fellows who were residents

16  and fellows of St. Christopher's Hospital as of the closing

17  date.

18           The alternative here is that the court re-opens

19  the hearing, the sale order, and at that point the court is

20  satisfied that STC Opco will not proceed with the purchase.

21  And that purchase is absolutely vital to the provision of

22  healthcare in Philadelphia, it clearly is.  I am not going to

23  disrupt it.  I think that it has to proceed.  The agreement,

24  as I say, I think is very clear and I understood it at the

25  time to be so as I have just said.  I appreciate the argument

1  of the committee and the like.

2          So, I am going to deny the motion to re-open under

3  Rule 59 and Rule 60.  I do think that there are issues here

4  that the court has to consider from the emergency motion that

5  Potter Anderson & Corroon filed last night and that Mr.

6  Barkasy and his client, the Pennsylvania Department of

7  Health, are pursuing, and I am going to have to set an

8  emergency hearing on that.

9          Mr. Ryan has pressed for next week.  You know, one

10  of the problems is I have a very, very full calendar and

11  because there are now seven judges and six courtrooms, I

12  don't have a courtroom next week on certain days.

13          Yes, Mr. Marriott?

14          MR. MARRIOTT:  Your Honor, Vince Marriott rising

15  again for STC Opco.

16          I wanted to clarify one point because I tried to

17  be careful about how I stated this.

18          THE COURT:  Yes.

19          MR. MARRIOTT:  You asked me whether if the sale

20  order was re-ordered -- re-opened and we were compelled to

21  assume this liability whether that would mean inevitably we

22  would refuse to close.  I don't want to --

23          THE COURT:  You don't want -- okay.  I understand

24  that.

25          MR. MARRIOTT:  I don't want to say inevitably. I

 1  want to say it would cause us to relook at this transaction

 2  which is a fair statement.  I don't know where it would come

 3  out because I don't know, for one thing, what the dollar

 4  amount would be.

 5          THE COURT:  I don't either.  And I would like to

 6  know at some point how much we're talking about here.

 7          MR. MARRIOTT:  I just wanted to be clear on that

 8  point.

 9          THE COURT:  Okay.  All right.  I appreciate that,

10  Mr. Marriott and I did over-speak.  You did make your

11  argument the way you have expressed.  It's not inevitable.  I

12  understand that, but to re-open that sale order I think

13  creates just a lot of problems here.  And also, potentially

14  impacts the closing which is going to occur in the next

15  couple of days. I think that it has to occur for the benefit

16  of the patients and for the benefit of the City of

17  Philadelphia.

18          Again, it also will bring into play the settlement

19  with Tenet and Conifer.  I know what a difficult settlement

20  that was to achieve, but it's likely they will walk from the

21  settlement and that would create additional problems,

22  obviously, in this case.  So, I am going to deny that motion,

23  but I do want to hear the parties.

24          You know, the best day for this, but it may be

25  much too soon, is Monday.  I have a courtroom that day.  I

1  have some time that day.

2          Mr. Ryan and Mr. Barkasy, does that -- I'll tell

3  you what I am going to want, I am going to want an expert or

4  experts to come in here and tell me what Pennsylvania law

5  provides on this subject for one thing.

6          MR. RYAN:  Well, Mr. Barkasy's --

7          THE COURT:  That may be Mr. Barkasy --

8          MR. RYAN:  -- client is in a much better position

9  than doctors.

10         THE COURT:  Yes.  I understand.

11         MR. RYAN:  They are experts on Pennsylvania law.

12         THE COURT:  Yes.

13         MR. RYAN:  So, I don't know whether he can raise

14 that or not.  You know, we can certainly provide Your Honor

15 with the statutes, and MCARE manual.

16         THE COURT:  Yes.

17         MR. RYAN:  That is out there.  We have given you

18 the template contract for 2019 and 2020.  We have given you

19 the staff manual.  Those are there.  I don't know that the

20 debtors are denying that that's the contract in place with

21 the current residents under contract.  They can let us know

22 by Monday.  Other than insurance testimony I don't know what

23 else more you need to know especially for the current

24 residents.  It's a contract and either they're going to honor

25 it or they're not.

1          THE COURT:  I'm concerned about, you know, what

2   the relief will be.

3          MR. RYAN:  Well, Your Honor, if they have to buy

4   insurance to maintain these contracts they have to buy

5   insurance to maintain these contracts.  That is simple.  That

6   is either in the contract or its not and they're either going

7   to honor the contract or it's not.  If you're not going to

8   honor the contract then you don't get the contract.

9          THE COURT:  If you don't honor the contract, what

10  are the ramifications of that?

11         MR. RYAN:  Well, it puts their entire sale in

12  jeopardy.

13         THE COURT:  The sale to St. Christopher -- oh, you

14  mean the resident program sale?

15         MR. RYAN:  Yes.  The resident asset program

16  requires that these resident contracts be in effect.

17         THE COURT:  Yeah.

18         MR. RYAN:  So, if they want to keep pursuing that

19  sale and keep pursuing that appeal one would think they need

20  to keep the contracts in place.  And to keep the contracts in

21  place you need to pay the insurance.

22         THE COURT:  And we're not just talking about the

23  residents here, are we.  Aren't we also talking about former

24  physicians?

25         MR. RYAN:  I only represent former residents and

1  fellows.

2              THE COURT:  I think Mr. Carickoff does.

3              MR. RYAN:  He's got former physicians at St.

4  Chris.  My mandate is for residents and fellows because they

5  are in a significantly different position, I think, then

6  physicians.

7              MR. CARICKOFF:  Your Honor, I also represent

8  former physicians at Hahnemann that are not residents.

9              THE COURT:  All right.

10             MR. RYAN:  I have my mandate, Your Honor.  I am

11  sure they are impacted, they have to be, but that's not who I

12  have been directed to represent.

13             THE COURT:  All right.

14             MR. SHERMAN:  Your Honor, I only rise because --

15             THE COURT:  Mr. Sherman, yes.

16             MR. SHERMAN:  Yeah.  I am confused at what Mr.

17  Ryan said.  One is about the contracts.  If the residents

18  have moved to new hospitals --

19             THE COURT:  Yes.

20             MR. SHERMAN:  -- then they have new contracts with

21  new hospitals, I presume, but I'd like to hear that from Mr.

22  Ryan, right.  There was a representation which we, obviously,

23  accept from the debtors that most if not all of these

24  residents have moved.  If they moved, they move with new

25  agreements.  If we're going to get into what happened with

1   the residents, well, what is their underlying agreement with

2   their new facility.

3           THE COURT:  Well, that will be an issue of fact it

4   seems to me, but I doubt that the new hospitals would be

5   picking up --

6           MR. SHERMAN:  We don't know.

7           THE COURT:  -- coverage for prior events.

8           MR. SHERMAN:  It's a fact that -- some may.  There

9   was a representation by Mr. Ryan where he said some may, some

10  may not.  I don't know how you are going to determine that by

11  Monday in a hearing, Your Honor.

12          So, there is lots to do.  I just don't see how

13  these issues can be addressed appropriately by Your Honor in

14  a matter of days when there is factual issues of

15  representations.  It is just a lot.

16          THE COURT:  Well, if I rule -- I understand your

17  concern, Mr. Sherman, but if I rule that they have to

18  purchase the tail insurance except for those residents who

19  have new contracts that provide that coverage then it will be

20  up to the debtors, and you, and for Mr. Ryan to make that

21  determination thereafter.

22          MR. SHERMAN:  We can consider that, Your Honor,

23  but, again, I am also -- the point Your Honor made about

24  Pennsylvania law we are still looking for that statute that

25  says a hospital or healthcare provider has to provide

1   coverage for its employees.

2           THE COURT:  I agree.

3           MR. SHERMAN:  And I -- that one seems to be

4   invisible to me.

5           THE COURT:  That is why I would like someone with

6   some expertise to sit on that witness stand and tell me what

7   Pennsylvania law provides.

8           MR. SHERMAN:  You and me both, Your Honor.

9           THE COURT:  Yeah.

10          MR. SHERMAN:  Thank you, Judge.

11          MR. RYAN:  Your Honor, Mr. Sherman is mixing

12  apples and oranges.

13          THE COURT:  Yes.

14          MR. RYAN:  When the residents go to new hospitals

15  the hospital is providing malpractice insurance for their

16  stay at those hospitals.  That is a red herring.  The reality

17  is they've got a contract that says these -- they've got a

18  sale contract that says maintain these resident contracts in

19  place and whether they're going to honor that contract or

20  not, which are the contracts with my clients, depends on them

21  continuing to provide appropriate insurance.  They were

22  supposed to provide occurrence.

23          What we do know from the Pennsylvania Regulations

24  is that if a claims made policy expires you have to get a

25  tail.  So, we know Pennsylvania law says when that claims

1  made policy expires you have to get a tail.  They undertook

2  the obligation to provide appropriate professional liability

3  insurance under the contracts that are still in place today.

4  They haven't rejected them.

5           THE COURT:  It says the -- the statute as I read

6  it, Mr. Ryan, says the insurer has to provide tail coverage.

7           MR. RYAN:  No, Your Honor.  The insurer has to

8  make tail coverage available for purchase.

9           THE COURT:  Okay.

10          MR. RYAN:  Insurers don't insure things for free.

11          THE COURT:  All right.

12          MR. RYAN:  The next part of MCARE says you, the

13  healthcare provider, have to buy the tail --

14          THE COURT:  Gotcha.

15          MR. RYAN:  -- or the nose.

16          THE COURT:  Okay.

17          MR. RYAN:  That is where there is a little bit of

18  a disconnect.

19          THE COURT:  Okay.

20          MR. RYAN:  But the reality for Monday is at least

21  there are a couple hundred people with executory contracts

22  that the debtor needs to decide whether they're going to

23  honor those executory contracts and perform.  And performance

24  under that requires a provision of professional liability

25  insurance.  Because the debtors have put themselves in a

1  position where they cannot renew a claims made policy the

2  only thing they can do under Pennsylvania law is to provide

3  the tail.

4        So, the law says here it what they have to

5  provide.  If they choose not to provide it then they are in

6  breach of those executory contracts.  Those consequences will

7  flow to everybody if they cannot perform.  That is an answer

8  for Monday.

9        THE COURT:  That's right.

10        MR. RYAN:  It does not depend on what their

11  contracts are with other people.  Those are contracts with

12  other institutions.  The question is whether this institution

13  is going to honor its contracts.

14        THE COURT:  I understand that.

15        MR. RYAN:  Thank you, Your Honor.

16        THE COURT:  Mr. Minuti, yes.

17        MR. MINUTI:  Your Honor, I mean I --

18        THE COURT:  Monday is close, I know.

19        MR. MINUTI:  Let me come at it from two things.

20        THE COURT:  Yes.

21        MR. MINUTI:  First of all, Your Honor, we disagree

22  with almost everything Mr. Ryan has said.  First of all,

23  these are prepetition claims. Second of all, the law does not

24  require us to maintain this insurance.  I think he is wrong

25  in his reading of the statute.  Third of all, Your Honor, the

1  contract says we need to use our best efforts to keep the

2  contracts in place, not that we have to keep the contracts in

3  place, and think about what he is saying, Your Honor.  He is

4  trying to drive this to a requirement that we purchased tail

5  coverage that we can't pay for that's then going to crater a

6  $55 million dollar sale that's going to make sure that his

7  clients aren't going to get any tail coverage paid for.

8            So, that is sort of the consequences we're talking

9  about, but that is really for the hearing, Your Honor.  And

10 we will save our powder, and we will come back and Your Honor

11 will decide what their rights are and whether these are

12 prepetition claims or not.

13           With regard to the timing, Your Honor, I need to

14 impose upon Your Honor to see if we can do something

15 different then Monday and here is why; we're trying to close

16 the St. Christopher Hospital sale.

17           THE COURT:  Yes.

18           MR. MINUTI:  Everybody at the debtor is focused on

19 trying to get that closed.  They are not going to be focused

20 or won't have the time to focus on preparing for an emergency

21 hearing to require us to make a payment we can't pay.  So, as

22 I indicated, Your Honor, Thursday and Friday I can't be here.

23 So, we're looking to see if Your Honor has any time on

24 Tuesday or Wednesday would probably be ideal.  And the notion

25 that we're going to get an expert to come in by Wednesday,

1  Your Honor, I think we would be lucky if anybody has got the

2  ability to do that.  So, we will do our best.

3          THE COURT:  Well, just so you will understand I

4  don't have this courtroom on Wednesday because, as I said,

5  there are seven judges. And I understand that all the

6  courtrooms are being occupied.  But what I am going to do is

7  check on Wednesday morning or afternoon, or both, to find out

8  if I can have a courtroom.  I am not sure at the moment that

9  I can.  If I can't then I think we're going to have to do

10 this on Monday afternoon.  I just don't have any other time.

11 Well, I shouldn't say that.  I could probably do Tuesday

12 afternoon, but I'm going to have to check on that and let the

13 parties know.  I will let you know, Mr. Minuti and you can

14 then get out the notice.

15          MR. MINUTI:  I will.

16          THE COURT:  All right.  So, it will be either

17 Tuesday afternoon which is a possibility or Wednesday.

18 Hopefully parties will have the time to make that hearing.

19          Mr. Sherman?

20          MR. SHERMAN:  I'm going to be in the state of

21 Washington on Wednesday.  We will see if we can get somebody

22 else to cover, but --

23          THE COURT:  Okay. Thank you.  Thank you for that.

24          MR. MINUTI:  Your Honor, that brings us on the

25 agenda to our 365(b)(4) extension.

1           THE COURT:  Yes.

2           MR. MINUTI:  I am going to let Ms. DiSabatino tell

3   us where we are.  When Ms. DiSabatino is concluded, Your

4   Honor, there is a housekeeping matter I want to bring up and

5   it has to do with the last time we were before Your Honor we

6   were talking about the order for the assumption and

7   assignment of the leases for the St. Christopher's Hospital.

8           THE COURT:  We still haven't reached agreement on

9   the form of the order.  And so, we wanted to discuss that

10  with Your Honor.

11          THE COURT:  All right.

12          MR. MINUTI:  We have that, obviously, so we can

13  close this.

14          THE COURT:  Well, that's right.

15          MR. MINUTI:  Thank you.

16          Ms. DiSabatino, do you have better news for me?

17          MS. DISABATINO:  I do, Your Honor.

18          THE COURT:  Oh, good.

19          MS. DISABATINO:  Your Honor, Item Number 2 on the

20  agenda, this is the debtors' motion to further extend the

21  deadline to assume or reject unexpired leases of non-

22  residential real property.

23          THE COURT:  That's right.

24          MS. DISABATINO:  We're seeking an extension of an

25  additional 27 days to January 27th, 2020.  We previously

1  filed a motion to extend the deadline to this same date which

2  would have been a full 90-day extension from the petition

3  date.  There were some objections that were filed to that

4  motion and we resolved them by agreeing to December 31st

5  instead.

6          THE COURT:  Yes.

7          MS. DISABATINO:  For reasons that I will briefly

8  address we're now seeking a brief further extension of that

9  deadline which would ultimately bring us back to the full 90

10  days from the petition date.

11         The instant motion was filed on November 25th,

12  2019 and docketed at Docket Number 1064.  Pursuant to notice

13  of the motion objections to the motion were due to be filed

14  by December 2nd, 2019.  There was one response filed to the

15  motion, Your Honor.  It was filed by Broad Street Healthcare

16  Properties.

17         THE COURT:  Right.

18         MS. DISABATINO:  I'm happy to report that we have

19  resolved it with some language that I will put on the record

20  shortly.  But very briefly, Your Honor, I will walk through a

21  very condensed version of the presentation to demonstrate to

22  the court why we believe cause exists for the extension.

23         THE COURT:  Take your time though.

24         MS. DISABATINO:  Thank you, Your Honor.

25         Your Honor, there are several remaining real

1  property leases that are subject to potential assumption and

2  assignment in connection with the St. Chris sale as Your

3  Honor knows.  We do expect that closing to take place this

4  week; however, we filed the motion seeking an extension out

5  of an abundance of caution. We know from experience that

6  sometimes issues pop-up last minute that cause a closing to

7  be delayed by a day or two, maybe even a week.  Our concern

8  was that if something like that happened it could leave us

9  with very little or no time on the backend to make a decision

10  regarding assumption and rejection.

11        We certainly don't want any unexpected delays to

12  either jeopardize operations or impair our ability to assume

13  and assign agreements to the buyer in connection with the

14  sale.  So, once closing occurs it's our expectation that we

15  can make a very prompt decision regarding assumption and

16  rejection of any leases not taken by the buyer, but until

17  that time we can't make that decision.

18        THE COURT:  And you also have equipment that

19  you're selling in some of these properties, I take it.

20        MS. DISABATINO:  That is exactly right.  For

21  certain of our other leases we need some additional time to

22  address issues surrounding rejection and many of those issues

23  pertain to the equipment we're selling, particularly with

24  respect to the Hahnemann building.  There is a lot of

25  inventory and equipment that is left on site.  We are working

1  on removing it.  We just received court authority to engage

2  Centurion to sell that equipment in place.  Centurion's

3  agreement actually contemplates it having the time through

4  January to complete that process.  It's a process that will

5  benefit the estates and creditors.  We need those sale

6  proceeds, Your Honor, and we really don't want to disrupt the

7  process with the threat of, you know, assumption and

8  rejection issues.

9           So, with that, Your Honor, we believe the

10  extension is critical and that cause exists to extend.  I

11  will turn, Your Honor, to the response filed by Broad Street

12  in connection with the motion.  That limited objection, Your

13  Honor, it was a limited objection and reservation of rights.

14  And in --

15           THE COURT:  They wanted information from you.

16           MS. DISABATINO:  Right. They wanted to condition

17  the extension on certain information, Your Honor.  What we

18  have agreed with Broad Street is that as opposed to putting

19  any of those conditions in the order we have agreed to put

20  certain statements on the record.

21           THE COURT:  All right.

22           MS. DISABATINO:  And certain of these statements

23  pertain to some information requests that were sent to the

24  debtors back in October.  There is a letter that is attached

25  as Exhibit A to the limited objection.  That includes those

1  information requests.  So, the statement is this, Your Honor;

2  the debtors and Broad Street have agreed that they will work

3  to reasonably narrow and clarify those information requests.

4  The debtors will work to provide Broad Street with

5  information, certain of the information, as soon as possible

6  and on a rolling basis.  The idea that we would have any,

7  sort of, agreed information to them by January 15th.  The

8  parties reserve all rights with respect to the reasonableness

9  of those requests and Broad Street reserves all rights with

10 respect to the information set forth in the letter.

11        Broad Street had sought in its limited objection

12 some clarification about post-petition amounts due.  We

13 believe that there are some post-petition use and occupancy

14 taxes due, and certain outstanding utilities.  And it's our

15 intent to pay those amounts.  We have accounts receivable,

16 proceeds of the equipment sales, proceeds of the St.

17 Christopher sale and it's our intent to use those proceeds

18 for that purpose.

19             THE COURT:  All right.

20             MS. DISABATINO:  So, I think that covers it, Your

21 Honor.

22             THE COURT:  I think they also wanted you to

23 winterize, I think, the property.

24             MS. DISABATINO:  Yes.  They wanted some assurance

25 that we winterize.  And the debtors have, in fact, done that

1  even beginning back in September.  Steps were taken to

2  winterize the property and make sure it's well equipped for

3  the cold weather.  So, we have circulated some information to

4  them to show that, but those steps have been taken.

5         THE COURT:  All right.  That was well said. Thank

6  you, Ms. DiSabatino.

7         Good morning, still.  It feels like tomorrow,

8  frankly.

9         MR. SCHLAUCH:  For the record, Brenan Schlauch of

10 Richards, Layton & Finger on behalf of Broad Street.

11         THE COURT:  Yes, sir.

12         MR. SCHLAUCH:  I just wanted to rise just to

13 concur with Ms. DiSabatino about the resolution with regard

14 to Broad Street's limited objection and reservation of

15 rights.  I just want to clarify that we do reserve all of our

16 rights with respect to ongoing obligations at the property.

17 We reserve our rights under, you know, 365(d)(3) and that

18 would include taxes and the payment of other obligations

19 under the lease.

20         Just so Your Honor is aware it's a triple net

21 lease.  So, as a result the -- I understand that the debtor

22 is responsible for paying the insurance, paying the taxes and

23 paying the maintenance costs.  So, the information requests

24 are really a way for our client to obtain visibility on those

25 issues.  We don't pay them, we don't receive notices.  We

 1  know that there have been some mechanics liens filed on the

 2  property.  So, it suggested to us that maybe these things

 3  weren't being taken care of, but we're going to work together

 4  cooperatively with the debtor to, you know, get the

 5  information that we need on a fair timeline.

 6        THE COURT:  Well, your client has been waiting

 7  since October.  So, I do think you are entitled to the

 8  information.

 9        MR. SCHLAUCH:  That is correct.  And, you know, I

10  will cede the podium to Mr. Minuti for the housekeeping item,

11  but I will say that we do object to any discussion or, kind

12  of, resolution of this assumption lease or assumption issue.

13  So, I will turn it over Mr. Minuti, but I will stay close by.

14        THE COURT:  All right.  Yes, Mr. Minuti.

15        MR. MINUTI:  Again, Your Honor, for the record

16  Mark Minuti.

17        Your Honor, on that last issue I don't mean to

18  quarrel with counsel, but just so Your Honor understands Mr.

19  Friedman, who is the ultimate principal of the debtors --

20        THE COURT:  Yes.

21        MR. MINUTI:  -- he is the owner -- he is the

22  landlord for Broad Street.  So, the idea that he didn't have

23  notice or he didn't have information, Your Honor, we would

24  quarrel with, but --

25        THE COURT:  You are right.

1          MR. MINUTI:  -- Your Honor, in addition and with

2    respect to the issue I'm about to talk to you about, again,

3    Mr. Friedman is the landlord.  He is the principal behind

4    Front Street, Your Honor, which is the landlord for the

5    hospital lease, the St. Christopher's Hospital lease that

6    needs to be assumed and assigned as part of the sale to STC

7    Opco.

8          We were here, Your Honor, before Thanksgiving to

9    present, we thought it was going to be a contested matter, so

10   we could get an order entered authorizing the assumption and

11   assignment.

12         THE COURT:  Yes.

13         MR. MINUTI:  And Your Honor will remember at that

14   time there were a couple of issues floating out there like

15   make sure the debtor is going to pay its post-petition

16   obligations related to those leases.  The buyer's here, Tower

17   and Drexel, had agreed to provide a form of guarantee and

18   that had to be worked out.  Then there was an issue of

19   performance base rent and the idea was we were going to punt

20   on that till later because there is a prospect that the

21   property is actually going to be sold and maybe all this goes

22   away.

23         So, we have been working diligently. The buyer has

24   been working diligently with Mr. Friedman's counsel to try to

25   come up with a form of order.  And for whatever reason, Your

1  Honor, we just can't get it done.  It's going back and forth,

2  and back and forth. We have a version we think now that

3  satisfies or should satisfy all the legitimate concerns that

4  Mr. Friedman and the Front Street entities.  We have served

5  that with them.  Apparently, they have an issue with it.

6       So, what I have for Your Honor is a clean and

7  blackline showing the changes from the last version that Mr.

8  Friedman and the Front Street entities sent around.  So,

9  we're not sure what the remaining issues are or what they

10  should be, but it's pretty important for us to get Your Honor

11  to enter an order authorizing the assumption and assignment,

12  whatever it may be, so, in fact, we can close the sale.

13       So, we'd like to talk about it now.  The issues

14  shouldn't be controversial.  Counsel is here.  We've been

15  going back and forth since November.  If now is not the right

16  time, I hate to impose upon the court, but if we could get

17  Your Honor on the court later to go through these issues, but

18  we got to get it resolved so it can be assumed and assigned.

19       May I approach?  I have a clean and blackline of

20  the order.

21

22       THE COURT:  Sure, Mr. Minuti, you may.  I will

23  certainly hear from counsel.

24       MR. SCHLAUCH:  Your Honor, again, for the record

25  Brendan Schlauch of Richards, Layton & Finger, Broad Street/

1   Front Street.

2             THE COURT:  Yes.

3             MR. SCHLAUCH:  Just so Your Honor is aware, I

4   apologize I am in the position of objecting to this.  I am

5   not the counsel that is responsible for this issue.  My

6   colleague, Mr. Collins, is the attorney who has been handling

7   this matter.  He is tied up in the Fury derivative standing

8   litigation today before Judge Silverstein.  So, he is

9   unavailable.  I am not familiar with this issue and,

10  honestly, this issue is not before the court today.  It is

11  not on the agenda.  We were not advised of this until, I

12  think, nine o'clock this morning that the parties wanted to

13  bring this issue to Your Honor.

14            I understand the buyer and the debtors', you know,

15  concern about the closing, and I think we and our client

16  would make ourselves available for a hearing at an

17  appropriate time if the parties aren't able to work it out.

18  Again, I am in the dark and I don't have any ability at this

19  time to add anything for the court. And I don't want to

20  prejudice my client at this time.  So, we just object to

21  having this considered at this moment before Your Honor.

22            THE COURT:  Well, I understand the importance of

23  the order and I'm just looking -- I don't know whether Mr.

24  Collins will be available later today.

25            MR. MINUTI:  Your Honor, I can add that Ms. Sax-

1   Bolder is here from O'Melveny & Myers lead counsel.  She is

2   the one that we have been communicating with most recently

3   with respect to the form of order.  She is here.  We assume

4   she's got knowledge of what the position is with respect to

5   the landlord.  Again, it is important we get this done today.

6   I don't think we need Mr. Collins.  It can really be anybody

7   on that side and we haven't been dealing with Mr. Collins as

8   of late, we've been dealing with her.

9           THE COURT:  Okay.

10          MR. MINUTI:  So, we're hoping we can get it done.

11          THE COURT:  All right.  Thank you.

12          And your name again, I'm sorry.

13          MS. SAX-BOLDER:  Good morning, Your Honor; Amalia

14   Sax-Bolder of O'Melveny & Myers for Broad Street.

15          THE COURT:  Welcome.

16          MS. SAX-BOLDER:  We were only made aware this

17   morning at about nine o'clock of the blackline showing the

18   changes made.  I haven't had a chance to look at it yet and

19   to actually contemplate the changes.  I took a quick look.  I

20   believe there is some changes made to the guarantee

21   provisions that are material and I need the opportunity to

22   review those changes in full, address them with my client and

23   the other attorneys including Mr. Collins who is still very

24   closely involved in this matter and was the attorney at the

25   hearing before Your Honor on, I believe, November 25th.

1          I echo my colleague, Mr. Schlauch, that it would

2    be prejudice to my client to hear this matter at this time.

3    We are able to make ourselves available to Your Honor later

4    in the day.

5          THE COURT:  Later in the day, okay, that's fine.

6    Yes.

7          MR. SCHLAUCH:  My understanding is that derivative

8    standing issue before Judge Silverstein may go all day.  So,

9    you know, we could certainly talk internally in caucus.  He

10   is not available right now, but, you know, we will certainly

11   make ourselves available to resolve this as soon as we can.

12   I just cannot promise Mr. Collins will be available this

13   afternoon.

14         THE COURT:  Well, here is what we will do because

15   I do understand the need for the assumption and assignment

16   order to be entered.  So, I will set a hearing this afternoon

17   at four o'clock by teleconference if appropriate.  Do you

18   think that's appropriate Mr. Minuti?  Is that acceptable to

19   you?

20         MR. MINUTI:  I do.

21         THE COURT:  By CourtCall.  We will be on CourtCall

22   and I will hear you then on this matter.  I do agree, you

23   know, it's inappropriate probably for me to press it right

24   now because it was not on the agenda, but I think, obviously,

25   all parties knew this was an issue that was arising.  So, I

1  think four o'clock this afternoon is appropriate.

2          Mr. Lapowsky?

3          MR. LAPOWSKY:  Your Honor, Robert Lapowsky for STC

4  Opco.

5          I just want to clarify the record.  Two days ago -

6  - this has been a very frustrating process for us, the

7  negotiation of this order.  Two days ago I sent an email to

8  the O'Melveny lawyers.  I think Mr. Collins was copied as

9  well.  It was the O'Melveny lawyers that we were dealing

10 with.  They have been the ones that have been providing

11 comments, not Mr. Collins, saying that if we didn't come to

12 agreement, we were going to ask you at the hearing this

13 morning to consider the two alternative forms of the order.

14 That said, four o'clock this afternoon is fine.  We can try

15 to resolve the issues then.

16         THE COURT:  And if there are issues, obviously,

17 discuss them, but if not, we will resolve them at four

18 o'clock.

19         MR. LAPOWSKY:  Thank you, Your Honor.

20         MR. MINUTI:  That completes our agenda.  Will Your

21 Honor let us know at four in terms of the hearing date?

22         THE COURT:  I will.  Again, I know what a

23 sensitive matter this is and it causes me great pain as well.

24 We will have to get to it and we will do that next week.

25         MR. MINUTI:  Thank you.

1          THE COURT:  Thank you, Mr. Minuti.

2          Yes, Ms. DiSabatino?

3          MS. DISABATINO:  Your Honor, I don't know if you

4  officially ruled on the 365(d)(4) motion.

5          THE COURT:  I am granting it.

6          MS. DISABATINO:  Okay.  Great, Your Honor.  We

7  have uploaded that order.

8          THE COURT:  Oh, good.  We will get that on the

9  docket.

10          MS. DISABATINO:  Thank you.

11          THE COURT:  Thank you, Ms. DiSabatino.

12          If there is nothing else, we will stand in recess

13  until four o'clock this afternoon.  Thank you all.

14       (Proceedings in recess until 4:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1           (Proceedings resume at 4:28 p.m.)

2               THE COURT:  Good afternoon, everyone.  Judge Gross

3   now on the telephone and we're here, of course, too discuss

4   the assumption and assignment order and who would like to be

5   heard?  Mr. Minuti?

6               OPERATOR:  Your Honor, this is the operator.  Mr.

7   Minuti has not yet redialed back in.

8               THE COURT:  Oh.

9        (Pause)

10              THE COURT:  Is Mr. Minuti on the phone?

11              MR. LAPOWSKY:  He is.  This is Bob Lapowsky.

12              THE COURT:  Yes.  No Mr. Minuti at this point?

13              MR. MINUTI:  Your Honor, it's Mark Minuti.  I've

14   joined.

15              THE COURT:  Oh good.  Okay.  Yes.  Who would like

16   to be heard about this matter?

17              MR. MINUTI:  Your Honor, I want to make sure that

18   the Front Street's counsel is on.  We were just on another

19   line with Mr. Marriott.  I want to make sure everybody is on.

20              THE COURT:  Okay.

21              UNIDENTIFIED SPEAKER:  I thought we're almost

22   there, Judge, but not completely there.

23              THE COURT:  All right.

24              UNIDENTIFIED SPEAKER:  That's the good news.

25   We're start at the end and work backwards and see if I get

1  disappointed.

2          THE COURT:  I got you, yes.

3          MR. SHERMAN:  Judge, while we're waiting -- it's

4  Andrew Sherman -- did we set a hearing yet for the sale next

5  week or Your Honor is going to do that in due course?

6          THE COURT:  Oh yes, we did.  I'm sorry.  And Mr.

7  Minuti will be sending out a notice.  It's Tuesday afternoon

8  at 1:30.

9          MR. SHERMAN:  Thank you, Judge.

10          THE COURT:  Thank you, Mr. Sherman.

11          MR. SHERMAN:  And that's not for the sale. That's

12  for the motion to try and compel the use of sale proceeds to

13  buy tail, is that right?

14          THE COURT:  That's right.

15          MR. SHERMAN:  I'm not sure if we understood tail

16  or sale.  I thought I heard him say sale.  Got me being a

17  little nervous.

18          THE COURT:  Yeah, I did too now that you mentioned

19  it but I think he meant tail.

20          MR. MARRIOTT:  Good afternoon, Your Honor.  Vince

21  Marriott has dialed in.

22          THE COURT:  Oh, hi, Mr. Marriott.  Are we waiting

23  for anyone else?

24          UNIDENTIFIED SPEAKER:  Mr. Minuti if he's not on.

25          MR. MINUTI:  I am on.

1          MR. SCHLAUCH:  Your Honor, Brendan Schlauch from

2 Richards Layton on behalf of (indiscernible).  My co-counsel

3 from OMM are supposed to be joining.

4          THE COURT:  All right.

5          MS. (INDISCERNIBLE):  Good afternoon, Your Honor.

6 It's (indiscernible), the attorney --

7          THE COURT:  Good afternoon.

8          MS. UHLAND:  Good afternoon, it's Suzanne Uhland

9 and (indiscernible).

10          THE COURT:  Good afternoon, folks.

11          I understand you've been having some discussions.

12          MS. UHLAND:  Yes, we're almost there.

13          THE COURT:  All right, do you think you're going

14 to get there amicably?

15          MS. UHLAND:  Except for one issue.

16          THE COURT:  All right, do you need my input on

17 that one issue?

18          MS. UHLAND:  I think it would be helpful.

19          THE COURT:  Mr. Minuti, do you agree?

20          MR. MINUTI:  I agree, Your Honor.

21          THE COURT:  Okay.  All right, why don't you tell

22 me about the issue?

23          MR. MINUTI:  Suzanne, do you want me to do it or

24 do you want to do it?

25          MS. UHLAND:  I'll do it.

1          So, Your Honor, like everything in this particular

2   case, there's, you know, a web of relationships but so it

3   turns out that the lease that is being assumed here today,

4   the property which is the St. Chris property, tenant, in

5   fact, has a mortgage on that for what's called the seller

6   note.  Well, the original principal amount was about $17.5

7   million.

8          And under the lease agreement that is being

9   assumed here, the rent is payable to the landlord.  Under the

10  prepetition MidCap loan agreement, there was a specific

11  direction, arrangement that provided that MidCap would be

12  directed by the debtor to pay tenant if interest directly for

13  a portion of the rent.  And so, tenant was, in fact, getting,

14  through MidCap, a portion of the rent paid directly to them

15  in connection with their notes.

16         In connection with this particular motion and the

17  cure, we believe that it's appropriate is that contract is no

18  longer going to be in effect and may no longer be in effect

19  today because it was a prepetition direction.  We believe

20  that it's appropriate that the rent simply be paid to the

21  landlord under the lease.

22         Now I would note that this assumption of this

23  lease has been part of a public proceeding and if tenant

24  believed that a portion of the cure payment should be paid

25  directly to them, they could have come in at any time and

1  filed something with the court and made their position known,

2  and they have not done that.  So, we think it is appropriate

3  that the cure payment be paid in accordance with the lease

4  agreement and paid to the landlord.

5      THE COURT:  All right, Mr. Minuti, how about your

6  position?  Yes.

7      MR. MINUTI:  Your Honor, this issue was flagged a

8  little while ago and the way the agreement or the order that

9  we've been exchanging, the way it was worded was that we

10  would pay consistent with past practice which means we would

11  pay it to tenant.

12      I have not had a chance to go back and look to see

13  what the basis is upon which the debtor was paying tenant.

14  Obviously, this was all set up by Mr. Friedman at the time

15  this overall transaction was done.  And so, obviously, my

16  only concern is I don't want to have to pay twice the rent.

17      And so, there's no question the rent is going to

18  pay.  There's no question there will be money from the

19  closing that will be set aside to pay this rent, but we need

20  some time to figure out whether there's agreement that the

21  money can be paid to the landlord.  And if there's not

22  agreement that the money can be paid to the landlord to set

23  the money aside and let the landlord and tenant, you know,

24  come before Your Honor and tell Your Honor who's entitled to

25  receive the rent.

1          But what I did not want to have is an order

2   entered directing me to pay anybody, in particular, because

3   this issue is out there and we just haven't had a chance to

4   run to ground.  So my suggestion in terms of the order, Your

5   Honor, is that we provide that the rent will be set aside at

6   the closing. That will give us some time to track down the

7   basis of this obligation.

8          If we agree with the landlord, we'll pay it over

9   to the landlord.  If there's any disagreement, we'll talk to

10  tenant and, hopefully, we can reach agreement and we'll pay

11  the right party and this all goes away.

12         If we can't and there's some disagreement, the

13  money is going to be there and we can come before Your Honor

14  and Your Honor can decide who the money goes to.  But I'm

15  just nervous that I'm going to wind up paying twice here

16  which obviously this estate cannot afford to do.

17              THE COURT:  How much is the payment --

18              MS. UHLAND:  So, Your Honor --

19              THE COURT:  Yes.  How much is the payment we're

20  talking about here?

21              MR. MINUTI:  The --

22              MS. UHLAND:  $243,000.

23              THE COURT:  I'm sorry:

24              MS. UHLAND:  $243,000 dollars.

25              THE COURT:  All right that's a lot of money.

1          MS. UHLAND:  And, Your Honor, that's a lot of

2    money.  It's very meaningful to my client.  We need that

3    money, you know -- (indiscernible) is required to be prompt

4    and creating ability for the debtor to go ask tenant who has

5    not raised his hand, has not objected, has not said they're

6    entitled to any portion of this cure and say, you know if you

7    have an issue we're not going to pay the landlord.

8          As the debtors know, the landlord and tenant are

9    in multiple litigations right now.  You know, it's incredibly

10   disadvantageous and prejudicial to us and, as I said, tenant

11   has had plenty of time to come in and say, oh the cure

12   payments should be directed to me, and they have not done

13   that.

14          THE COURT:  And tenant --

15          MR. MINUTI:  Your Honor, if I may --

16          THE COURT:  Yes, go on, Mr. Minuti.

17          MR. MINUTI:  I'm sorry, Your Honor.

18          THE COURT:  No, go on.

19          MR. MINUTI:  Your Honor, we're talking about

20   paying the cure and 365 is clear.  It's to be paid or you

21   provide adequate assurance that it will be paid.

22          If we're setting aside the money at closing, we

23   know it's going to be paid, and all I'm asking for is an

24   opportunity to track down to make sure that I am not being

25   put in a position where I have to pay twice.

1          And so, again, I didn't realize this was an issue

2   until today because the drafts that have been floating back

3   and forth thought it resolved the issue because they had

4   previously said we're going to pay, you know, consistent with

5   past practice.

6          I'm not trying to cheat anybody.  I'm not trying

7   to not pay the landlord if they're entitled to it.  Again, I

8   just don't want to put myself in a position where I wind up

9   paying the landlord and then tenant has a claim against me.

10          MR. MINUTI:  So, we'll move quickly --

11          MS. UHLAND:  So, just to be clear that was the

12   page you added in the last draft.  I just want to be clear.

13          THE COURT:  I'm sorry.

14          MR. LAPOWSKY:  This is Robert Lapowsky for STC,

15   the buyer.  From our perspective, we really don't care how

16   this is resolved as long as it is resolved and we get this

17   order entered because we are closing tomorrow.  We are

18   funding -- while the closing is not until Sunday, we are

19   closing and funding into escrow tomorrow.  And the escrow

20   agreement is going to break automatically on Monday morning.

21          So, once we wire money to the escrow agent

22   tomorrow, $50 million dollars, you know plus or minus we

23   cannot go backwards.  So and we obviously need this order in

24   place before we can do that.

25          So, right now, the draft that I'm looking at says

1  this $243,000 will be paid to the party entitled thereto

2  consistent with past practice.  You know that is fine with

3  us.  If your ruling is change it and say pay it to the

4  lessor, we're fine with that too.

5          But whatever the resolution is, I just want to

6  make sure we hammer out the wording, you know, right now so

7  that we don't hang up from this call and then still have a

8  problem.

9          THE COURT:  I understand that, Mr. Lapowsky, and

10 I'm sensitive to it.  And, you know, and I understand that

11 the lessor and tenant are involved in litigation and the

12 lessor does not want to find payment to it is somehow held up

13 in connection with that litigation.

14         And I'm certainly sensitive to that as well.  And

15 I'm just wondering if we had an escrow arrangement with a

16 very prompt requirement of tenant if they're going to object

17 or in somehow insert themselves into this very promptly.

18 They would have to do it within a few days or the money would

19 go over to the landlord, is that helpful?  And you would get

20 a prompt ruling from me.

21         MR. LAPOWSKY:  From our perspective it's fine as

22 long as we hammer out the language.  It's really the

23 substantive question is really directed to the landlord.

24         THE COURT:  Right.

25         MS. UHLAND:  Your Honor, now are you available

1  next week?  I mean I think this needs to be like we let

2  tenant that this is an issue and if they don't make something

3  by the close of business Monday and establish, we go into

4  court Tuesday or Wednesday and you decide.

5          THE COURT:  Well that's right.  I think that's

6  fair.  I think they would have to make their position known

7  by the close of business on Monday and I would hear you on

8  Tuesday if there is a dispute at the 1:30 hearing.

9          MR. LAPOWSKY:  And there, of course, there is, I

10  guess, the chance that they would agree that the lessor and

11  the debtor would agree before Monday.  So would it work to

12  have this language -- I'm just trying to pull it up here.

13          THE COURT:  Yes.

14          MR. LAPOWSKY:  Say something like after he

15  reference the 243 which shall be paid, you know, according to

16  agreement of the debtors and the lessor or further order of

17  this court pursuant a hearing which will be scheduled on an

18  expedited basis or something like that.

19          THE COURT:  Yes, go on.

20          MS. UHLAND:  I want that hearing date.  We have to

21  have it decided. This is a lot of money.  This is very

22  important to my client and, as I said, this is cure.  It's

23  supposed to be (indiscernible).  So, let's get the date in,

24  the hearing date set for Tuesday at 1:30.

25          THE COURT:  I'm sure that's fine with Mr.

1  Lapowsky.

2         MR. LAPOWSKY:  Yeah, I've actually got it up on

3  the screen right now, Your Honor, and I'm trying to -- if we

4  said should we pay to the party as agreed by the lessor and

5  the debtor or as determined by the court on Tuesday at 1:30 -

6  - or as determined by the court at a hearing -- what is

7  Tuesday's date?

8         THE COURT:  Tuesday is -- what is it -- it's the

9  17th, yes.

10         MR. LAPOWSKY:  Set for 17th at 2:30 p.m. --

11         MR. MINUTI:  1:30.

12         MR. LAPOWSKY:  1:30?

13         THE COURT:  1:30, yes.

14         MR. MINUTI:  Correct.

15         MR. LAPOWSKY:  1:30 p.m.  Glad I took typing in

16  high school.  Okay.

17         MR. MARRIOTT:  Bob?

18         MR. LAPOWSKY:  Yes.

19         MR. MARRIOTT:  Vince Marriott.  You're going to

20  have to work that into the introductory on or before x

21  business day following closing or as otherwise provided

22  herein.  You're going to have to add some language there.

23         MR. LAPOWSKY:  Right.  On or before the second

24  business day upon closing or --

25         UNIDENTIFIED SPEAKER:  Oh, no, I think Mark agreed

1  that -- well Mr. Minuti.  I don't want to speak for Mr.

2  Minuti but I think he agreed that that could drop back to

3  first business day.

4           MR. LAPOWSKY:  First business day.

5           MR. MINUTI:  Correct.

6           MR. LAPOWSKY:  Closing or as to the rent

7  referenced below in the event the lessors and debtors would

8  not agree on the appropriate recipient on the first business

9  day after ruling by the court.  How is that?

10          UNIDENTIFIED SPEAKER:  That works for me.

11          MR. MINUTI:  It's acceptable to the debtor.

12          THE COURT:  Now tenant --

13          MR. LAPOWSKY:  With everybody?

14          THE COURT:  Yes, yes.  I understand that.

15          Tenant will have to get notice of this, of course.

16          MR. MINUTI:  Your Honor, it's Mark Minuti.  I will

17 take it upon myself to alert tenant to the issue and let them

18 know the timing.

19          THE COURT:  All right.

20          UNIDENTIFIED SPEAKER:  Now one other thing, not to

21 be a nitpicker, but we're done after this.  Mr. Lapowsky, if

22 you want to look down at the bottom where the obligation for

23 the buyer to provide written evidence of these payments, that

24 needs to -- it's dropped the first business day for

25 everything other than the rent, but I think you need to put

1  some language in there that tracks the payment obligation.

2          MR. LAPOWSKY:  Why don't we just say on the first

3  business day following the --

4          UNIDENTIFIED SPEAKER:  You want to say following

5  the obligation to make payment?

6          MR. LAPOWSKY:  Yes, following the date of the

7  obligation to make payment.

8          UNIDENTIFIED SPEAKER:  Does that work for the

9  debtors and for Front Street?

10          MS. UHLAND:  Yes.

11          MR. MINUTI:  It's acceptable to the debtor.

12          UNIDENTIFIED SPEAKER:  Did anybody have any other

13  issues with either the form of the order or the form of the

14  guarantee that I circulated earlier?  When I say earlier, I

15  mean right before the start of this call?

16          UNIDENTIFIED SPEAKER:  I think your change to the

17  guarantee exactly tracks what we got from --

18          MS. UHLAND:  Amalia?

19          UNIDENTIFIED SPEAKER:  Yeah, I think.

20          UNIDENTIFIED SPEAKER:  They did, other than I

21  eliminated the notes to the draft.

22          UNIDENTIFIED SPEAKER:  Yes, that's correct.

23          MS. UHLAND:  Okay.  We're good with that.

24          UNIDENTIFIED SPEAKER:  And I think we're there.  I

25  think we've got an order that we can submit.  I will

1 circulate it.  I've tacked the guarantee onto the back of the

2 order.  It's all going to show up as a black -- the whole

3 guarantee is going to show up as a blackline when I circulate

4 this, but that's only because it came from another document,

5 but it is what I circulated.

6         THE COURT:  All right.  And if there is -- is

7 getting it docketed first thing in the morning acceptable,

8 Mr. Lapowsky?

9         MR. LAPOWSKY:  Yes, that's fine, Your Honor.

10         THE COURT:  Okay.  All right.  And that's what

11 we'll do.

12         MR. MINUTI:  Thank you, Judge.

13         THE COURT:  And you'll upload that order for me?

14         UNIDENTIFIED SPEAKER:  Mr. Minuti I assume will do

15 that.  I'm going to send it to everybody and then I assume he

16 will do that.

17         THE COURT:  Great.  All right.

18         MR. MINUTI:  Judge, do you need a certification or

19 we just upload it?

20         THE COURT:  Just upload it.  That will be fine.

21 And I will assume that everyone has agreed.

22         MR. MINUTI:  Terrific.  Thank you, Judge.

23         THE COURT:  And if you have a problem -- if you

24 have any further problems, get hold of me.

25      (A Chorus of "Thank you, Judge")

1       THE COURT:  All right, everyone, have a good

2  night.

3       (A Chorus of "Thank you, Judge")

4       THE COURT:  Thank you, all.

5       (Proceeding concludes at 4:53 p.m.)

6

7

8

9                      CERTIFICATE

10

11     I certify that the foregoing is a correct transcript

12  from the electronic sound recording of the proceedings in the

13  above-entitled matter.

14
   /s/Mary Zajaczkowski              December 12, 2019
15  Mary Zajaczkowski, CET**D-531

16
   /s/William J. Garling             December 12, 2019
17  William J. Garling, CE/T 543

18

19

20

21

22

23

24

25