UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | . | Chapter 11 |
| IN RE: | . | |
| | . | Case No. 19-11466 (KG) |
| CENTER CITY HEALTHCARE, LLC, | . | |
| d/b/a HAHNEMANN UNIVERSITY | . | |
| HOSPITAL, *et al.,* | . | |
| | . | Courtroom No. 3 |
| | . | 824 North Market Street |
| | . | Wilmington, Delaware 19801 |
| | . | |
| Debtors. | . | September 23, 2019 |
| . . . . . . . . . . . . . . . . | . | 1:00 P.M. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Mark Minuti, Esquire |
| | SAUL EWING ARNSTEIN & LEHR LLP |
| | 1201 N. Market Street |
| | Wilmington, Delaware 19801 |
| For 3M: | Alison Elko-Franklin, Esquire |
| (Telephonic) | GREENBERG TRAURIG, LLP |
| | 3333 Piedmont Road NE |
| | Atlanta, Georgia 30305 |
| For Tower Health: | Robert Lapowsky, Esquire |
| | STEVENS & LEE |
| | 620 Freedom Business Center |
| | King of Prussia, Pennsylvania 19406 |
| Audio Operator: | GINGER MACE |
| Transcription Company: | Reliable |
| | 1007 N. Orange Street |
| | Wilmington, Delaware 19801 |
| | Email:  gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1    APPEARANCES (Continued):

2

3    For the Committee:          Andrew H. Sherman, Esquire
                                 SILLS CUMMIS & GROSS P.C.
4                                1 Riverfront Plaza, Suite 10
                                 Newark, New Jersey 07102

5

6    For Drexel University:      Vincent J. Marriott, III
                                 BALLARD SPAHR LLP
                                 1735 Market Street, 51st Floor
7                                Philadelphia, Pennsylvania 19103

8    For Educational             Justin Alberto, Esquire
     Commission for Foreign      BAYARD SPAHR LLP
9    Medical Graduates:          600 North King Street
                                 Wilmington, Delaware 19801
10

11   For Tenet/Conifer:          Laura Davis-Jones, Esquire
                                 PACHULSKI STANG ZIEHL & JONES
12                               919 North Market Street
                                 Wilmington, Delaware 19801

13

14   For HSRE:                   Stuart Brown, Esquire
                                 DLA PIPER
                                 1201 North Market Street
15                               Wilmington, Delaware 19801

16   For Temple:                 Francis Lawall, Esquire
                                 PEPPER HAMILTON
17                               3000 Two Logan Square
                                 18th & Arch Streets
18                               Philadelphia, Pennsylvania 19103

19

20   For Herman Goldner          Jeffrey Waxman, Esquire
                                 MORRIS JAMES
                                 500 Delaware Avenue
21                               Wilmington, Delaware 19801

22   For PAHH/Front Street:      Suzzanne Uhland, Esquire
                                 O'MELVENEY & MYERS LLP
23                               7 Times Square
                                 New York, New York 10036
24

25

```
 1   In Propria Persona:       Jeffrey Cutler

 2   For Dr. Achintya          David Klauder, Esquire
     Moulick:                  BIELLI & KLAUDER
 3                             1500 Walnut Street
                               Philadelphia, Pennsylvania 19102
 4
     For Medical Staff:        Joseph McMahon, Esquire
 5                             CIARDI ASTIN
                               1204 North King Street
 6                             Wilmington, Delaware 19801

 7
     For ACGME:                Curtis Miller, Esquire
 8                             Albert Ciardi, III, Esquire
                               MORRIS NICHOLS ARSHT & TUNNELL
 9                             1201 North Market Street
                               Wilmington, Delaware 19801
10
     For Certain Physicians:   David Carickhoff, Esquire
11                             ARCHER & GREINER, P.C.
                               300 Delaware Avenue
12                             Wilmington, Delaware 19801

13
     For Urology for Children: Elihu Allinson, Esquire
14                             SULLIVAN HAZELTINE ALLINSON
                               901 North Market Street
15                             Wilmington, Delaware 19801

16   For Chubb:                Michael Lastowski, Esquire
                               DUANE MORRIS
17                             222 Delaware Avenue
                               Wilmington, Delaware 19801
18
     For PASNAP:               Mitchell Malzberg, Esquire
19                             LAW OFFICE OF MITCHELL MALZBERG
                               6 East Main Street
20                             Clinton, New Jersey 08809

21
     For Hayes Locums:         Daniel Hogan, Esquire
22                             HOGAN MCDANIEL
                               1311 Delaware Avenue
23                             Wilmington, Delaware 19801

24

25
```

1  APPEARANCES (Continued):

2  For Crothall Healthcare:   Gary Bressler, Esquire
                              MCELROY DEUTSCH MULVANEY & CARPENTER
3                             1300 Mount Kemble Avenue
                              Morristown, New Jersey 07962
4

5  TELEPHONIC APPEARANCES:

6
   For Dept. of Justice:      Mark Sacs, Esquire
7                             UNITED DEPARTMENT OF JUSTICE
                              Civil Division
8                             1100 L Street, NW
                              Washington, D.C. 20044
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2

#2) Debtors' Motion for Entry of (A) an Order (I) Scheduling
3  a Hearing to Consider Approval of the Sale or Sales of
   Substantially All Assets of St. Christopher's Healthcare, LLC
4  and Certain Related Debtors and the Assumption and Assignment
   of Certain Executory Contracts and Unexpired Leases, (II)
5  Approving Certain Bidding Procedures, Assumption and
   Assignment Procedures, and the Form and Manner of Notice
6  Thereof, (III) Establishing Procedures in Connection with the
   Selection of and Protections Afforded to Any Stalking Horse
7  Purchasers, and (IV) Granting Related Relief; and (B) One or
   More Orders (I) Approving the Sales or Other Acquisition
8  Transactions for the Assets, (II) Authorizing the Sales Free
   and Clear of all Encumbrances, (III) Authorizing the
9  Assumption and Assignment of Certain Executory Contracts and
   Unexpired Leases, and (IV) Granting Related Relief [D.I. 205;
10 filed: 07/16/19].

11 **Ruling: 99**

12

13 EXHIBITS                                    I.D.      REC'D

14 D-1        Asset Purchase Agreement                   38

15            Proffer of Alan Wilen                      39

16            Proffer of J. Scott Victor                 44

17 STC-1      Proffer of Clint Matthews

18 STC-2      Proffer of Helen Bowman

19

20

21

22

23

24

25

1          (Proceedings commenced at 1:10 p.m.)

2               THE CLERK:  Please rise.

3               THE COURT:   Good afternoon, everyone. Thank you.

4  You may be seated.

5               MR. MINUTI:  Good afternoon, Your Honor.

6               THE COURT:  Mr. Minuti, good afternoon.

7               MR. MINUTI:  Good afternoon.  Mark Minuti, Saul

8  Ewing Arnstein & Lehr.  I'm here today for the debtors.

9          With me today are my partners,

10 Monique DiSabatino and Jeffrey Hampton.  Also in the

11 courtroom, Your Honor, are Alan Wilen our CRO, and Mr. Victor

12 our investment banker.

13          We are very pleased to be here today.  Your Honor,

14 following two days of negotiations, the debtors reached

15 agreement with an entity called STC Opco, LLC for the

16 purchase of the operating assets of St. Christopher's

17 Children's Hospital.

18          STC Opco, LLC is an LLC whose members consist of

19 Tower Health and Drexel University.  Your Honor, they're

20 going to buy substantially all of the assets of the --

21 substantially all of the operating assets of St. Children's

22 Christopher's -- St. Christopher's Children's Hospital.

23          There are some exceptions.  We'll talk about

24 those, Your Honor.  But the gross proceeds are $50 million

25 dollars.  This is a terrific result.  And once closed, it

1  will ensure that the hospital continues as a going concern

2  which was, obviously, one of the major goals we set for

3  ourselves in these Chapter 11 cases.

4       Your Honor, if you would indulge me, what I would

5  propose to do is as follows, Your Honor.  I want to just

6  create a procedural record background so Your Honor knows how

7  we got here.  We then do have evidence.

8       We have four witnesses, Your Honor.  Two both --

9  Mr. Wilen will testify as to business judgment and good

10  faith.  Mr. Victor is here to talk about the process, Your

11  Honor, and how it led to a fair price.

12       We then have one witness each of the members of

13  the Buyer here, Your Honor, with respect to adequate

14  assurance and good faith.  And then we can move to argument.

15       I think we are down to really just a handful of

16  open issues, Your Honor, with respect to the sale itself.  I

17  do know that a number of parties have some issues with the

18  order, and we can talk about that when we get there.

19       After I make the procedural record if Your Honor

20  will permit, we would like to take one brief break before we

21  put on the evidence.  And the reason for that, Your Honor, is

22  there's one point we want to discuss with our buyer to make

23  sure we're all on the same page before we go forward with the

24  evidence.  Is that acceptable to the court?

25       THE COURT:  That would be fine, yes.

1    MR. MINUTI:  Very well.  Then, Your Honor, just by

2  way of background and setting the table.

3    On July 16th, 2019, the debtors filed a motion to

4  establish bidding procedures for the sale of St.

5  Christopher's Children's Hospital operating assets and the

6  motion also asked ultimately for approval of the ultimate

7  sale to the highest and best bidder.  That appears at Docket

8  Number 205.

9    On July 26th, 2019, the court entered the bidding

10  procedures order.  That appears at Docket Number 301.  And

11  that order did a number of things including the following.

12    It included certain notice procedures related to

13  the sale;

14    It set forth the requirements if somebody needed

15  to follow it in order to be a qualified bidder;

16    It included certain procedures regarding

17  assumption and assignment of leases and executory contracts;

18    It included a bid deadline of September 16th.  It

19  set an auction, if necessary, for September 18th.  And set

20  today as the sale hearing to approve the sale to the highest

21  and best bidder.

22    The order Your Honor will recall also included

23  procedures for the ability to the debtor along the way to

24  select a stalking horse bidder.  That never materialized so

25  those provisions are now moot.

1        That bid procedures order, again, appears at

2   Docket Number 301.  The affidavit of service of that order

3   was filed on August 1.  It appears at Docket Number 325.

4        Consistent with the bid procedures order on July

5   29th, the debtors served court approved notice of the auction

6   and sale.  That notice appears at Docket Number 309 and the

7   affidavit of service of that notice appears at Docket Number

8   336.

9        Similarly, the debtors served notice of assumption

10  and assignment of executory contracts and leases on August

11  16th.  That notice appears at Docket Number 510.  Proof of

12  service is included in the affidavit filed on August 26th at

13  Docket Number 560.

14        Notice of the sale of the bid deadline and the

15  auction were also published in the *Philadelphia Inquirer* and

16  *The Wall Street Journal* on August 2nd.  Proof of publication

17  was filed and docketed on August 2nd at Docket Numbers 343

18  and 344.

19        By notice serviced and filed on September 16th,

20  the debtors notified perspective bidders and parties in

21  interest that the bid deadline was being extended to

22  September 18 at 2:00 p.m. and that the auction was being

23  continued to September 19.  That notice appears at Docket

24  Number 722.

25        By way of preview, Your Honor, we will have

1  evidence on this.  By the extended bid deadline, the debtors

2  received two bids, both of which were deemed by the debtors,

3  in consultation with the committee, to be qualified bids

4  within the meaning of the court approved bidding procedures.

5  While both bids were qualified, neither bid was

6  acceptable to the debtors.  As the court will hear, one of

7  the qualified bidders did not appear at the auction and,

8  therefore, for the better part of two days, Your Honor, last

9  Thursday and Friday, the debtors and their advisors met and

10  negotiated with the representatives of our buyer, Drexel and

11  Tower.

12  And, again, negotiated over a two-day period;

13  ultimately, reaching agreement, Your Honor, on a form of

14  asset purchase agreement at approximately 8:30 on Friday,

15  September 20.  That asset purchase agreement embodied the

16  terms and conditions pursuant to which the parties would move

17  forward with a sale transaction.

18  Let me generally describe the terms of the asset

19  purchase agreement, Your Honor.  They are as follows.

20  The purchase price, as I said, is $50 million

21  dollars.  The assets are substantially all of the operating

22  assets of the hospital.  There are some excluded items, Your

23  Honor.  For example, our buyers are not buying cash.  They're

24  not buying accounts receivable.  And they're not buying

25  certain claims and causes of action.

1          The buyer here, Your Honor, is going to offer

2   employment to substantially all of the debtors or St.

3   Christopher's Hospital's workforce, subject to certain

4   conditions contained in the APA.

5          The buyer is going to recognize and assume the

6   collective bargaining agreement with the International

7   Brotherhood of Electrical Workers Local 98;

8          The buyer is going to assume responsibility for

9   training the current residents and fellows at the hospital;

10          The buyer is going to be responsible for post-

11   petition PTO obligations for those employees that are

12   ultimately hired.

13          In addition, Your Honor, a critical element here

14   is the buyer is going to be purchasing tail insurance

15   coverage to cover the debtor parties and continuing residents

16   subject to splitting the costs with the debtors 50/50 with

17   the debtors' obligation to pay capped at $2 million dollars.

18          The outside closing date of the transaction, Your

19   Honor, is December 13, although we certainly hope to be able

20   to close sooner.

21          Our buyers here are taking an assignment of a

22   number of executory contracts, leases.  And, Your Honor, I

23   should note the CMS provider agreements with our buyer here,

24   Your Honor, paying the cure claim pursuant to the APA.

25          The buyer here are going to maintain all of the

1  patient records that are required by law to be maintained,

2  the responsibility the hospital has now.

3          So at approximately 8:30 p.m., Your Honor, on

4  Friday, September 20, we served and filed a notice cancelling

5  the auction.  That notice included a copy of the asset

6  purchase agreement, as well as a proposed form of sale order.

7  That appears at Docket Number 753.

8          Let me just pause there and ask if Your Honor had

9  an opportunity to review any of those documents?

10          THE COURT:  I did.

11          MR. MINUTI:  Very well, Your Honor.

12          THE COURT:  I did have an opportunity to review

13  the asset purchase agreement and the order.  Yes.

14          MR. MINUTI:  Thank you, Your Honor.

15          Your Honor, and then just briefly before we left

16  to head over for the hearing today, we did file an updated or

17  amended cure schedule, Your Honor, with respect to a number

18  of the contracts and leases.

19          I apologize.  I don't have that docket number, but

20  I do know that, in fact, it was docketed.

21          THE COURT:  Okay.

22          MR. MINUTI:  So that's the evidentiary background

23  in terms of the process, Your Honor, as to how we got here.

24          As I did indicate at the outset, we do have for

25  witnesses to present in support of the sale.  But if Your

1  Honor will indulge us, now may be a good time just to take a

2  quick break to see if we have our ducks in a row with respect

3  to the evidentiary or continued evidentiary presentation.

4          THE COURT:  Did you say the closing would be

5  December 13?

6          MR. MINUTI:  Outside day --

7          THE COURT:  Outside.  Okay.

8          MR. MINUTI:  Outside date is December 13th.  There

9  very well could be some regulatory issues here, Your Honor,

10  and so, we are counting for that.

11          THE COURT:  Yes.

12          MR. MINUTI:  But, again, I think the buyer, as

13  well as the debtors are motivated to close as soon as

14  possible.

15          THE COURT:  All right.  Well, why don't we take

16  the recess you've requested.  What would you need, ten

17  minutes, fifteen?

18          MR. MINUTI:  Why don't you give us ten minutes or

19  I can knock on chamber's door and let you know when we're

20  ready.  Whatever --

21          THE COURT:  Knock on the door when you're ready.

22          MR. MINUTI:  Thank you very much, Your Honor.

23          THE COURT:  All right.

24          MR. MINUTI:  We appreciate.

25          THE COURT:  All right, Mr. Minuti.

1         (Recess at 1:18 p.m.)

2         (Proceedings resume at 2:10 p.m.)

3              THE CLERK:  Please rise.

4              THE COURT:  Thank you, everyone.  You may be

5    seated.  Thank you.

6              MR. MINUTI:  Good afternoon, Your Honor.

7              THE COURT:  Yes, Mr. Minuti.  That was a long ten-

8    minute recess.

9         (Laughter)

10              THE COURT:  And let me say this to you, I was

11   prepared to go late tonight.  But given the length of that

12   recess, I'm going to stop us at quarter to five.

13              MR. MINUTI:  Understood, Your Honor.  Understood,

14   Your Honor.

15              Let me explain to the court what the issue was so

16   maybe Your Honor can get a flavor.

17              THE COURT:  Okay.

18              MR. MINUTI:  So literally, just second before Your

19   Honor took the bench, there was a disagreement with respect

20   to a portion of the asset purchase agreement that required a

21   little bit of back and forth, some additional negotiation,

22   but the good news is we've got it wrapped up, Your Honor.

23              THE COURT:  Okay.

24              MR. MINUTI:  And before we get to the evidence,

25   let me explain what that is.

1          THE COURT:  Yes.

2          MR. MINUTI:  So, Mr. Sacks is on the phone from

3   the Government.  Your Honor will remember --

4          THE COURT:  Yes, Mr. Sacks.  I do remember him.

5          MR. MINUTI:  And CMS.  So, Your Honor, just to be

6   clear, under this proposed asset purchase agreement, we are

7   proposing to assume and assign our provider agreements to our

8   buyer.

9          THE COURT:  Yes.

10          MR. MINUTI:  On consent, however, all the parties

11   here, the debtor, the buyer, CMS, I think we're all in

12   agreement.  The way we're going to do that, Your Honor, is by

13   assuming and assigning the agreement under Section 365.  And

14   the buyer is going to take it, subject to successor

15   liability.

16          THE COURT:  Okay.

17          MR. MINUTI:  Okay.  So if you remember those were

18   some of the main issues we debated with respect to the

19   residence program asset sale.  Those ae not present here.

20          I know that Mr. Sacks earlier today or maybe

21   yesterday sent some language to the form of order.  I think

22   we're going to need some time to work that out.  We're not

23   going to ask Your Honor to stay for that.

24          But, hopefully, if we get to the point where Your

25   Honor is going to indicate that you'd be inclined to approve

1   the order, we're going to go back to our office, hopefully

2   work all that out and either submit it under COC, if we get

3   there; or if there's an issue, we'll get Your Honor on the

4   phone.  I don't anticipate that be the case.

5           THE COURT:  All right.

6           MR. MINUTI:  The issue we were talking about with

7   the buyer, however, that required the ten minute plus recess

8   was the way the asset purchase agreement works is that the

9   buyer, as I said, is taking contracts and their subject to

10  cure claims and they're subject to for example in CMS any

11  future claims related to that.

12          THE COURT:  Okay.

13          MR. MINUTI:  Right.  That was a change that was

14  made in the contract throughout the course of the day last

15  week.  And the buyer raised with us the idea of wait a

16  minute.  When it came to CMS, to the extent they have a cure

17  claim at the time of closing, they had a different

18  understanding than we did as to who would be responsible for

19  that and how that would get paid.

20          The way we've agreed to resolve that issue and

21  we're going to have to change the asset purchase agreement

22  but I will put on the record.  To the extent that CMS has an

23  allowed cure claim at the time of closing, it has to be paid

24  in order to assume and assign the contract.

25          The debtor is going to be responsible for up to

1 the first $200,000 dollars of that cure claim.  Anything over

2 and above that, that will be our buyer's responsibility.  And

3 so that's how we're going to resolve it.

4          It took a little bit of negotiating, a little bit

5 of back and forth.  So, I apologize, Your Honor.  It lasted

6 longer than ten minutes.

7          THE COURT:  Yes.

8          MR. MINUTI:  But the good news is we now put that

9 behind us.  I wanted to put it on the record so Your Honor

10 was clear and everybody else is clear.  And so, with that --

11          THE COURT:  Should we ask Mr. Sacks for

12 confirmation or -- he really isn't party to that, is that

13 correct?

14          MR. MINUTI:  I think Mr. Sacks can speak for

15 himself, but I assume as long as he gets his cure claim paid,

16 he doesn't necessarily care where it comes from. And this

17 really an agreement between the buyer and the debtor as to

18 who's going to be responsible.

19          THE COURT:  That's fine.  All right.

20          MR. MINUTI:  So with that, Your Honor, we are

21 prepared to move to testimony.

22          THE COURT:  Yes.

23          MR. MINUTI:  I think we've got quick testimony

24 here today, Your Honor.  We are prepared -- at least, I'm

25 prepared to present my two witnesses by proffer if that's

1  acceptable to the court.

2          THE COURT:  That's fine with me, unless anyone has

3  any objection to a proffer?

4      (No verbal response)

5          MR. MINUTI:  Sure.  Sure.  Your Honor, the buyer's

6  counsel would like to make a couple of comments right before

7  I start if that's acceptable to the court?

8          THE COURT:  That's fine.  And then you may proceed

9  with your proffer, Mr. Minuti.

10          MR. MINUTI:  Thank you, Your Honor.

11          THE COURT:  Yes, Mr. Lapowsky.

12          MR. LAPOWSKY:  Good afternoon, Your Honor.  Ronald

13  Lapowsky, Stevens & Lee for STC Opco.

14          THE COURT:  Yes.

15          MR. LAPOWSKY:  And also, for Tower Health.

16          Your Honor, just one really clarification about

17  what Mr. Minuti said.  And he said all the provider

18  agreements are being assumed and assigned.

19          It's the Medicare provider agreement that's being

20  assumed and assigned, not the Medicaid.  They're two

21  different agreements and I just wanted to make sure the

22  record was clear on that.

23          THE COURT:  Okay.

24          MR. LAPOWSKY:  And then, Your Honor, there are a

25  couple of other minor changes to the APA that we've agreed to

1  with other parties that have been corralling us in the

2  hallway and during the break.  And I thought it might make

3  sense to put those on the record now before we get started.

4          THE COURT:  Yes.

5          MR. LAPOWSKY:  The first is, Your Honor, Temple

6  filed an objection that raised the existence of an

7  inconsistency in the asset purchase agreement and in the

8  assumed contracts list.

9          THE COURT:  Yes.

10          MR. LAPOWSKY:  Neither the Temple academic

11  affiliation agreement nor any other academic affiliation

12  agreements are currently on the assumed contract's list.  But

13  in Section 5.4 of the APA, we had a provision that said

14  something to the effect that the buyers were going to assume

15  responsibility for the continuing residents.  That's not

16  something that can happen without an academic affiliation

17  agreement.

18          So, we have agreed with the debtors to change the

19  language of Section 5.4 and I've shared this with Mr. Lawall

20  who represents Temple.

21          THE COURT:  Yes.

22          MR. LAPOWSKY:  That section will now read,

23          "Opco buyer intends to negotiate with

24          counterparties to existing academic affiliation

25          agreements, to provide at a minimum for the

1              continued training of all current hospital

2              residents and fellows through the current academic

3              year or for such longer period as may be agreed to

4              between Opco buyer and the applicable academic

5              institution on or before the closing date."

6         So that language will replace 5.4 in the purchase

7    agreement that you've seen, Your Honor.

8         THE COURT:  Absolutely.  And I know that Temple

9    was quite concerned about the way it read previously.

10        Maybe Mr. Lawall wishes to be heard.

11        MR. LAWALL:  Unless Mr. Lastowski is not done.

12        THE COURT:  Well why don't you address this point?

13   That's fine.  Yes.

14        MR. LAWALL:  Good afternoon, Your Honor.  Fran

15   Lawall, Pepper Hamilton on behalf of Temple.

16        Your Honor, I appreciate Mr. Lastowski's comments.

17   The only issue, one issue we have is just to make sure imbued

18   within that, obviously, is that these are good faith

19   negotiations to reach a resolution.

20        And I agree with Mr. Lastowski.  We absolutely did

21   have these conversations.  And I would want to have built

22   into that understanding that these would be good faith

23   negotiations for the parties to attempt to reach both a short

24   term and a long-term resolution with respect to the academic

25   affiliation agreement issues.

1          THE COURT:  Well, I would say that any

2  negotiations in front of me or, at least, a case in front of

3  me are to be good faith.

4          MR. LAWALL:  I would agree, Your Honor.  And I

5  would absolutely expect that.  And I'm sure that Tower agrees

6  with that.

7          THE COURT:  All right.

8          MR. LAWALL:  Thank you, Your Honor.

9          MR. LAPOWSKY:  Your Honor, yes, the good faith

10 runs both directions.  As long as that's understood.

11          THE COURT:  And if you have any problems, you can

12 come to me.

13          MR. LAWALL:  Thank you, Your Honor.

14          THE COURT:  Yes.

15          MR. LAPOWSKY:  Your Honor, the next clarification

16 is there is a provision in the agreement -- I'm sorry.  I'm

17 losing it now.

18          Can I have one minute, Your Honor?

19          THE COURT:  Sure, yes.

20      (Participants conferring)

21          MR. LAPOWSKY:  5.3(b).  In 5.3(b), Your Honor,

22 there is the second sentence says, "Notwithstanding anything

23 in this agreement, Opco buyer --"

24          Let me backtrack for a minute.  The first part of

25 this section says that we're going to be taking an assignment

 1  of the IBEW collective bargaining agreement.

 2          THE COURT:  Right.

 3          MR. LAPOWSKY:  The second sentence says,

 4          "Notwithstanding anything in this agreement, Opco

 5          buyer shall not recognize, be a party to, or agree

 6          to assume any other collective bargaining

 7          agreements or bargaining obligations between

 8          seller and any seller employees."

 9          PASNAP was concerned about the recognition

10  language in there.  And what we've agreed is that we will

11  recognize PASNAP as the bargaining agent for the nurses at

12  St. Christopher's.

13          THE COURT:  All right, does that resolve the

14  matter?

15          MR. MALZBERG:  Your Honor, I believe that the

16  insertion will be in Section 8.1 --

17          THE COURT:  Come forward and speak into the mike,

18  yes.

19          MR. MALZBERG:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. MALZBERG:  Mitchell Malzberg on behalf of

22  PASNAP.

23          That section is going to be crossed out.  And it's

24  my understanding, correct, that the provision that counsel

25  just read will be inserted in 8.1 which -- 8.11, 8.11.  I

1 apologize; 8.11.  That provision will be put in there to be

2 read in conjunction with the present collective bargaining

3 agreement clauses which the parties will agree to negotiate

4 any issues concerning the collective bargaining agreement.

5          THE COURT:  All right.

6          MR. LAPOWSKY:  The 5.2(b) is not -- the second

7 sentence is not coming out in its entirety, Your Honor, only

8 the reference to recognition.

9          MR. MALZBERG:  To not withstanding the whole

10 section, right?  You're taking out --

11          MR. LAPOWSKY:  We'll work this out. The commitment

12 is that we will recognize PASNAP as the bargaining unit.

13 We'll work on the language, Your Honor.

14          THE COURT:  Does that still leave you with some

15 concern?

16          MR. MALZBERG:  Well, it was my understanding that

17 sentence was being stricken out of the asset purchase

18 agreement --

19          MR. LAPOWSKY:  No, because it applies to other

20 things.  It says we're not assuming any other collective

21 bargaining agreement.  And that's true.  We're not.

22          MR. MALZBERG:  Well in 8.11, it will be entering

23 into a mutually acceptable collective --

24          MR. LAPOWSKY:  Your Honor, I didn't intend to get

25 into a negotiation up here.  I intended to just put a

1  clarification on the record. If we can't work it out -- I'd

2  like Mr. Minuti to be able to get on with his proffer.

3          If there's a disagreement on what this is going to

4  be then PASNAP's objection can stand and we'll handle it, I

5  think, during the course of the hearing.

6          MR. MALZBERG: Your Honor, I'm not sure we're

7  having an objection. I just wanted clarification because

8  it's my understanding in 8.11 the parties are agreeing to

9  negotiate a new collective bargaining agreement.

10          MR. LAPOWSKY: Agreeing to recognize them as the

11  bargaining agent for the nurses. That's what we're agreeing

12  to do.

13          That's the language I showed you.

14      (Participants conferring)

15          MR. LAPOWSKY: Your Honor, we're going to -- when

16  Mr. -- can we pass that one, Your Honor?

17          We're going to go out in the hall and try to talk

18  while Mr. Minuti is putting on his proffer to see if we can

19  agree on the language.

20          THE COURT: That's fine. Good. I think that

21  makes sense.

22          MR. LAPOWSKY: All right, Your Honor, I think the

23  only other change in the APA, I think the debtors are going

24  to put on the record and it relates to the access provisions

25  in Section 10.1.

1          THE COURT:  All right.

2          MR. MINUTI:  Your Honor, again, for the record,

3   Mark Minuti.

4          Does Your Honor have the APA in front of you?

5          THE COURT:  I do.  I do.

6          MR. MINUTI:  So if we go to Section 10.1.

7          THE COURT:  Yes.

8          MR. MINUTI:  This is the preservation and access

9   to records after the closing.

10          THE COURT:  Right.

11          MR. MINUTI:  Okay.  If you go -- let's see one,

12  two, three, four, five, six, seven lines down where there's

13  the defined term, seller parties.

14          THE COURT:  Yes.

15          MR. MINUTI:  You see that?

16          THE COURT:  Yes.

17          MR. MINUTI:  So, the beginning of that sentence

18  says -- I'll just read you the change.

19          It will read,

20          "Opco buyer will afford to the representatives of

21          sellers, seller's estate representative, --"

22          And then it's going to say comma --

23          "-- any liquidating trustee of seller's bankruptcy

24          estate or the committee subject to the seller's

25          consent."

1          And then it goes on to provide, it's going to have

2    access.  So, in other words, if the sellers give the

3    committee consent to have access, the committee is going to

4    have access to do what it needs to do.

5          THE COURT:  All right.

6          Mr. Sherman, is that right?

7          MR. MINUTI:  And then, Your Honor, if you jump

8    ahead to Subsection (b).

9          THE COURT:  Yes.

10          MR. MINUTI:  This is on page 35.  One, two, three,

11    four, five lines down.

12          THE COURT:  Yes.

13          MR. MINUTI:  This is romanette four.  It says,

14          "Seller's obligation under the excluded

15          liabilities, Opco buyer shall, after the closing

16          date, give sellers --"

17          It should read, "the seller parties."

18          THE COURT:  Okay.

19          MR. MINUTI:  And that's just by way of

20    clarification, Your Honor.

21          THE COURT:  That's fine.  Good.

22          Mr. Sherman, did you want to be heard on the last

23    point?

24          MR. SHERMAN:  Acceptable to the committee, Your

25    Honor.

1          THE COURT:  Okay.

2          MR. SHERMAN:  We appreciate it.  Thank you.

3          THE COURT:  Good.

4          MR. MINUTI:  And, Your Honor, I just want one more

5    thing before I get to the proffer.

6          THE COURT:  Yes.

7          MR. MINUTI:  Mr. Waxman represents one of the

8    objectors here today, Your Honor, Herman Goldner Company,

9    Inc.  And if I read this into the record, I think we'll

10   resolve that objection and Mr. Waxman can move on to

11   something else I think he's got scheduled for today.

12         THE COURT:  Good.

13         MR. MINUTI:  We are going to add a section to the

14   order that provides as follows.

15              "Herman Goldner Company, Inc. HG has asserted a

16              mechanic's lien on certain A assets.

17              Notwithstanding anything in this order to the

18              contrary, to the extent HG holds a valid perfected

19              and unavoidable lien on any assets, and to the

20              extent HG's alleged cure claim in the amount of

21              $80,124.42 plus reasonable fees, costs, and

22              interests is not paid in connection with the

23              purchaser's assumption and assignment of the lease

24              between Front Street Healthcare Properties, LLC

25              and St. Christopher's Healthcare LLC for the

1                property located at 160 East Erie Avenue,

2                Philadelphia, Pennsylvania, HG's lien shall attach

3                to the proceeds of the S sale.  For the avoidance

4                of doubt, the debtors reserve all rights to

5                challenge the validity and perfection of HG's

6                asserted mechanic's lien."

7           So that will be added to the order, Your Honor.  I

8    believe that will resolve that objection.

9           THE COURT:  All right.

10          Mr. Waxman, yes.

11          MR. WAXMAN:  Good afternoon, Your Honor.  Jeff

12   Waxman of Morris James on behalf of Mr. Goldner.

13          THE COURT:  Yes.

14          MR. WAXMAN:  Your Honor, that does resolve the

15   objection.  And thank you very much to the debtors and to

16   Your Honor.  And if I may be excused?

17          THE COURT:  You may be excused, Mr. Waxman.  Thank

18   you, sir.

19          MR. WAXMAN:  Thank you.

20          MR. MINUTI:  Well, Your Honor, that's the longest

21   introduction to a proffer I think I can remember.

22          THE COURT:  Yes.

23          MR. MINUTI:  But I think we're ready to go if Your

24   Honor's ready to.

25          THE COURT:  All right, all right.

1          MR. MINUTI:  Your Honor, with me in the courtroom

2   today is Allen Wilen.  If called to the stand, Mr. Wilen

3   would testify as follows.

4          In keeping with the last couple of hearings, Your

5   Honor, I will skip his background.

6          THE COURT:  Okay.

7          MR. MINUTI:  As Mr. Wilen previously testified,

8   the debtors filed these bankruptcy cases with two primary

9   goals.  First to safely and effectively shut down Hahnemann

10  University Hospital and, second, to either reorganize or sell

11  the operating assets of St. Christopher's Children's Hospital

12  so that St. Christopher's would continue as a going concern.

13         Mr. Wilen would testify that soon after the

14  petition date, the debtors determined that they lacked the

15  liquidity and ability of reorganize St. Christopher's

16  Children's Hospital so the debtors turned their attention to

17  selling the Children's Christopher Hospital assets or

18  operating assets pursuant to, among others, Section 363 and

19  365 of the Bankruptcy Code.

20         On July 16, the debtors filed a motion seeking to

21  establish bidding procedures for the sale of the St.

22  Christopher's operating assets by order dated June 26th,

23  2019.  The court approved -- excuse me; July 26th, 2019, the

24  court approved the appropriate bidding procedures and the

25  debtors work in conjunction with SSG Advisors, marketed the

1  St. Christopher's operating assets for sale.

2        As part of this process, Mr. Wilen would testify

3  that he and other members of the debtors' management team met

4  with perspective bidders, provided tours, answered questions,

5  and responded to due diligence requests and related requests

6  for information.

7        Mr. Wilen would testify the two bids were received

8  by the bid deadline, a bid from STC Opco, LLC, a limited

9  liability company formed by Tower Heath and Drexel University

10  who I will call STC Opco.  And he bid from strategic Global

11  Management, Inc., an affiliate of the KPC group of companies,

12  also known as KPC.

13        Mr. Wilen participated in a meeting at Saul

14  Ewing's Philadelphia office in the afternoon and evening of

15  September 18 to analyze the bids submitted by the bid

16  deadline.

17        After reviewing the bids and consulting with the

18  official committee of unsecured creditors, the debtors

19  qualified both bids.

20        While both bids were qualified, Mr. Wilen would

21  testify that neither opening bid was acceptable to the

22  debtors.

23        The auction was scheduled to begin at 10:00 a.m.

24  on Thursday, September 19th, 2019.  Mr. Wilen would testify

25  that approximately twenty representatives of STC Opco

1  attended the scheduled auction.  No one appeared at the

2  auction in person for KPC.

3          Mr. Wilen would confirm -- excuse me, Your Honor.

4          Mr. Wilen would testify that most of the entire

5  day of September 19 was spent negotiating with the

6  representatives of STC Opco in an attempt to get STC Opco to

7  increase and modify its bid.

8          Mr. Wilen would further testify that following

9  protracted and, at times, contentious meetings and

10  negotiations, the debtors and STC Opco ultimately reached an

11  understanding, subject to further negotiations and

12  documentation, on economic terms for the purchase of St.

13  Christopher's operating assets at approximately 11:30 p.m. on

14  September 19, 2019.

15          Mr. Wilen would testify that the parties returned

16  to Saul Ewing's Philadelphia office on the morning of Friday,

17  September 20, 2019 to continue discussions regarding the

18  asset purchase agreement and to finalize it and the proposed

19  sale order and negotiate a number of remaining open issue.

20          Mr. Wilen would testify that the parties reached

21  complete agreement on all terms in the form of the asset

22  purchase agreement at approximately 7:30 p.m. on Friday,

23  September 20.

24          As a result, the debtors in consultation with the

25  committee and Midcap cancelled the auction.

1          At approximately 8:30 p.m., the debtors served and

2    filed a notice cancelling the auction.  They filed a signed

3    asset purchase agreement and related exhibits any proposed

4    form or sale order.

5          Mr. Wilen would testify KPC had requested that the

6    debtors postpone the auction and sale hearing, but Mr. Wilen

7    would testify that in his view, the debtors did not have the

8    flexibility to further delay the sale process.  Moreover,

9    delaying the sale process could have resulted in STC Opco

10   walking away or, at minimum, backtracking for much of the

11   progress made during the course of September 19 and September

12   20.

13         Mr. Wilen would testify that throughout the days

14   on both September 19 and September 20, he and the debtors'

15   professionals consulted with the official committee of

16   unsecured creditors and Midcap.

17         Mr. Wilen would testify that during the day of the

18   scheduled auction and as required by the bidding procedures,

19   he consulted with representatives of the City of Philadelphia

20   and the Pennsylvania Department of Health.  During these

21   discussions, the Health Commission for the City expressed the

22   City's strong preference for sale local established not for

23   profit operator.

24         Mr. Wilen would identify the asset purchase

25   agreement that was attached to Your Honor to the document

1   that we filed on Friday as the final signed asset purchase

2   agreement with our buyer, STC Opco.  It is a true and correct

3   copy of that asset purchase agreement.  Mr. Wilen would

4   describe the main components of the STC Opco APA as follows.

5         The purchase price is $50 million dollars;

6         The assets are substantially all assets of the St.

7   Christopher's operating debtors.  There are some excluded

8   items, for example; cash, accounts receivable, certain estate

9   claims and causes of action.

10         Mr. Wilen would testify that the buyer is to offer

11   employment to substantially all of St. Christopher's

12   workforce subject to certain conditions.  That includes our

13   positions, Your Honor.

14         Mr. Wilen would testify that the buyer is going to

15   recognize and assume the collective bargaining agreement with

16   the International Brotherhood of Electrical Workers Local 98.

17         The buyer is going to assume responsibility for

18   training the current residents and fellows.

19         The buyer is going to be responsible for post-

20   petition PTO obligations for employees that it hires.

21         The buyer is purchasing tail insurance coverage to

22   cover the debtor parties and continuing resident, subject to

23   splitting the costs with the debtors 50/50 with the debtors'

24   obligation cap at $2 million dollars.

25         Mr. Wilen would testify again that the outside

1  closing date is the 13th of December.

2          And Mr. Wilen would testify that the buyer here is

3  taking an assignment of a number of executory contracts and

4  leases including the CMS provider agreements we've already

5  talked about with STC Opco paying all cure claim subject to

6  the one change we talked about right after the break, Your

7  Honor.

8          THE COURT:  Okay.

9          MR. MINUTI:  Mr. Wilen would testify that given

10  the increase in purchase price and the fact that the members

11  of the buyer are Tower and Drexel, both of whom are actively

12  involved in the local healthcare community, the terms and

13  conditions of the STC Opco APA is the highest and best bid

14  for the St. Christopher's operating assets.

15          Mr. Wilen would testify that he accepted the Tower

16  and Drexel bid and cancelled the auction for a host of

17  reasons including the following.

18          He believed the purchased price offered by STC

19  Opco was fair and reasonable under the circumstances.  STC

20  Opco could have sat on their initial offer, Your Honor but,

21  instead, worked with the debtors to reach the favorable terms

22  of the asset purchase agreement which are now before the

23  court.  Mr. Wilen would have further delayed the auction; he

24  would testify that STC Opco told him that it would revert to

25  its initial bid for purposes of any auction.

1    Mr. Wilen would testify that while it was the

2   debtors' goal to close the transaction with STC -- or while

3   it is the debtors' goal to close the transaction with STC

4   Opco as soon as possible, it is unlikely that the transaction

5   will close prior to October 18, 2019.

6    Pursuant to the order entered on September 19,

7   2019, Tenet and Conifer, as the court knows, has the right to

8   terminate services to St. Christopher's as of October 18,

9   which will result in the emergency shutdown of the hospital.

10    In light of the debtors' liquidity challenges and

11   the possibility that Tenet and Conifer could terminate

12   services by October 18, Mr. Wilen strongly believes that the

13   members of STC Opco are best positioned to reach agreement

14   wit Tenet and Conifer to continue service given, in

15   particular, that the Tenet and Drexel have a longstanding

16   relationship at St. Christopher's Hospital.

17    Moreover, the STC Opco APA carries with it much

18   less execution risk even if, for example, KPC had come to the

19   auction and bid more money for the STC operating assets.

20    Mr. Wilen would testify that because Tower and

21   Drexel are highly regarded and well-known players in the

22   Philadelphia healthcare community and given the fact that

23   Tower is a licensed not-for-private hospital operator, Mr.

24   Wilen believes that the purchaser will be able to obtain the

25   necessary state and local regulatory approvals on a much-

1  faster timeline than an out-of-town and/or for profit

2  operator who is a stranger to Philadelphia.

3           Any significant delay in government approvals

4  would very likely jeopardize the closing as a result of the

5  debtors' liquidity issues.

6           Mr. Wilen would testify that before the city and

7  the debtors' positions and labor force -- I'm sorry.  Excuse

8  me.

9           Mr. Wilen would testify that both the city and the

10 debtors' positions and labor force have made clear that they

11 would much prefer that approving not-for-profit operator by

12 the hospital, Mr. Wilen feared that selection of a not-for-

13 profit or an out-of-state buyer could result in opposition of

14 the transaction by the city and the commonwealth and could

15 lead to labor unrest; thereby, jeopardizing a closing of any

16 transaction.

17          Finally, Mr. Wilen would testify the debtors were

18 not in a position to agree to KPC's request to delay the

19 auction and there was no assurance that KPC could or would

20 provide a higher or better bid by the requested extension

21 date.

22          Mr. Wilen would testify that STP Opco and its

23 members are not insiders of the debtors and neither are

24 affiliated with the debtors' insiders, to the best of his

25 knowledge.

1          He would testify that to his knowledge, STC Opco

2   acted in good faith during the due diligence and auction or

3   sale process, excuse me; and the negotiations between the

4   debtors and STC Opco were at arm's length and fair.

5          Mr. Wilen is not aware of any facts to suggest

6   that the bids of STC Opco were the product of bad faith or

7   collusion among bidders.

8          Mr. Wilen would also testify that the debtors

9   complied with the court-approved bidding procedures because

10  the STC Opco bids were the product of a full and fair sale

11  process.  He would testify that the purchase price to be paid

12  for the STC offer -- I'm sorry; the St. Christopher's

13  operating assets represents the highest and best price

14  available under the circumstance.

15         Mr. Wilen would testify that the proposed assumed

16  contracts have been selected by STC Opco and that under the

17  STC Opco APA payment of all cure amounts are the

18  responsibility of the STC Opco with the slight change that I

19  mentioned earlier.

20         Mr. Wilen would testify that the closing of the

21  sale of the STC operating assets will result in significant

22  funds to the debtors' estates.  It will allow the debtors to

23  satisfy the obligations owing to Midcap and it will help

24  resolve some of the challenges that the debtors have faced in

25  these cases.

1          Importantly, the closing of the sale would permit

2    the hospital to continue as a going concern to the great

3    benefit of the debtors' patients and the Philadelphia medical

4    community.

5          For all the foregoing reasons, Mr. Wilen would

6    testify that the debtors' decision to proceed with today's

7    motion for authority to close the transaction with STC Opco

8    represents an appropriate exercise of the debtors' business

9    judgment.

10          For those reasons, Mr. Wilen would encourage the

11    court to approve the sale.

12          That would complete his proffer, Your Honor.  What

13    I would like to do is move the asset purchase agreement into

14    evidence as Debtors' Exhibit Number 1.

15          THE COURT:  Any objection?

16       (No verbal response)

17          THE COURT:  Hearing none, it is admitted as

18    Exhibit 1.

19       (Debtors' Exhibit Number 1, admitted into evidence)

20          MR. MINUTI:  Very well, Your Honor.

21          And, again, Mr. Wilen is in the courtroom and

22    available to answer any questions the court may have or to

23    take the stand for cross-examination.

24          THE COURT:  The only question I have and I can ask

25    you, Mr. Minuti.  I just want to make sure that Tower and

1   Drexel came into the bidding jointly as opposed to separately

2   and thereby giving some sense of collusion.

3           MR. MINUTI:  No, Your Honor, came into the process

4   jointly.

5           THE COURT:  Okay.  All right.  Thank you.

6           Does anyone wish to cross-examine Mr. Wilen?

7       (No verbal response)

8           THE COURT:  Hearing no one then, the proffer is

9   accepted, Mr. Minuti, and into evidence.

10      (Proffer of Alan Wilen, admitted into evidence)

11          MR. MINUTI:  Thank you very much, Your Honor.

12          Next we'll move onto the proffer of Mr. Victor.

13          THE COURT:  Yes.

14          MR. MINUTI:  With me today in the courtroom is J.

15  Scott Victor.  If called to the stand to testify, Mr. Victor

16  would testify as follows.

17          That he and SSG were hired by the debtors in early

18  June of 2019 to serve as the debtors' investment banker to,

19  among other things, assist the debtor in pursuing a financing

20  sale or restructuring transaction.

21          He would testify that SSG team spent the first few

22  days of their assignment meeting with the debtors'

23  management, gathering information, and learning about the

24  debtors' business.  The SSG team then developed marketing

25  materials including a teaser to be used to market the

1 debtors' assets for sale.

2       Mr. Victor would testify that working with the

3 debtors' management and Alan Wilen, the debtors' CRO, SSG

4 created a confidential information memorandum and established

5 an electronic data room of the debtors' key books and records

6 for purposes of providing potential bidders with an

7 opportunity to do due diligence with respect to the STC

8 operating assets.

9       Mr. Victor would testify that SSG began marketing

10 the St. Christopher's operating assets in early June.  On

11 July 16, the debtors filed a motion seeking to establish bid

12 procedures for the sale of these assets.  By order dated July

13 26th, the court approved appropriate bidding procedures

14 including a bid deadline of September 16, following by an

15 auction, if necessary, on September 18 and a sale hearing on

16 September 23.

17       In connection with the marketing of the St.

18 Christopher's operating assets, Mr. Victor would testify that

19 the SSG team contacted approximately eighty-one potential

20 strategic and financial buyers who may have interest in

21 acquiring the assets. Sent those buyers or interested parties

22 the teaser and a form confidential agreement.  Then the SSG

23 team followed up with each of those parties.

24       Mr. Victor would testify that of the parties

25 contacted, twenty signed confidentiality agreements, sixteen

1  received the confidential information memorandum and sixteen

2  parties engaged in varying levels of due diligence regarding

3  the assets.

4       Mr. Victor would testify that SSG and the debtors'

5  management conducted numerous in-person meetings with

6  potential bides.

7       In an effort to further facilitate the sale

8  process by notice dated September 16, the debtors notified

9  all potential bidders and all parties in interest that the

10 bid deadline was moved to 2:00 p.m. on September 18 and that

11 the auction was moved to September 19, 2019.

12      Mr. Victor would testify that by the September 18

13 bid deadline, the debtors received two bids, a bid from STC

14 Opco, LLC, an LLC whose members are made up of Tower Health

15 and Drexel University; and a bid from Strategic Global

16 Management, Inc., an affiliate of KPC Group.

17      Mr. Victor would testify that he, Mr. Wilen and

18 the debtors' legal team met at the Philadelphia office of

19 Saul Ewing on the afternoon and evening of September 18 to

20 review the bids.  After reviewing the bids and consulting

21 with the official committee of unsecured creditors, the

22 debtors qualified both bids.  Although both bids were

23 qualified, Mr. Victor would testify that neither bid was

24 acceptable to the debtor at that time.

25      Mr. Victor would testify that the auction was

1  scheduled to begin at 10:00 a.m. on September 19.  He would

2  testify that approximately twenty representatives of STC Opco

3  attended the scheduled auction.  Contrary to the bidding

4  procedures, no one from KPC came to the scheduled auction.

5         Mr. Victor would testify that he, Mr. Wilen, and

6  debtors' counsel spent most of the day and evening of

7  September 18 negotiating with representatives of STC Opco in

8  an attempt to get STC Opco to raise and modify its bid.

9         He would testify that the debtors and STC Opco

10 ultimately reached agreement, subject to documentation and

11 further negotiations on the evening of September 19.

12        The parties returned to Saul Ewing's Philadelphia

13 office on September 20, worked throughout the day, and

14 ultimately reached agreement on all terms in the form of the

15 asset purchase agreement at approximately 8:30 p.m. on

16 Friday.

17        Mr. Victor would testify that the debtors, in

18 consultation with the committee and Midcap, cancelled the

19 auction and declared the STC Opco bid, embodied in the

20 revised asset purchase agreement that is before the court, as

21 the highest and best bid for the STC operating assets.

22        Meanwhile, Mr. Victor would testify that he

23 remained in communications with KPC's counsel and KPC's

24 principal, Dr. Chaudhuri, throughout the day on September 19

25 by text, email and phone.

1       At approximately 8:00 p.m. on Thursday, September

2  19, Mr. Victor, Mr. Wilen, and the debtors' counsel spoke

3  with KPC's counsel and principal Dr. Chaudhuri. During this

4  phone conversation, Dr. Chaudhuri confirmed his interest in

5  purchasing the St. Christopher's operating assets, subject to

6  a number of conditions, but requested that the debtors extend

7  the bid deadline until Monday, September 23 and delay the

8  sale hearing until, at least, Tuesday, September 24th.

9       While the debtors duly considered KPC's request,

10  Mr. Victor would testify that Mr. Wilen concluded that it was

11  not in the best interest of the debtors to delay the sale

12  process.  Delaying the sale process would likely have

13  resulted in STC Opco walking away or, at minimum,

14  backtracking from much of the progress that had been made

15  during the course of the day of September 19.

16       Mr. Victor would testify that to his knowledge,

17  STC Opco and its members are not insiders of the debtor and

18  are not affiliated with any of the debtors' insiders.

19       He would testify that to his knowledge, STC Opco

20  and its members acted in good faith during the due diligence

21  and auction process and that negotiations between the debtors

22  and STC Opco were at arm's length and fair.

23       Mr. Victor is not aware of any facts to suggest

24  that the bids of STC Opco were the product of bad faith or

25  collusion among bidders.

1          Mr. Victor would testify that the debtors complied

2    with the court-approved bidding procedures as did SSG and

3    that the sale process was complete, that all bidders had a

4    full and fair opportunity to bid on the St. Christopher's

5    operating assets and that the winning bid of STC Opco

6    represents the highest and best offer for the purchase of

7    those assets.

8          Because the winning bid was the product of a full

9    and fair sale process, Mr. Victor would testify that the

10   purchase price to be paid for the assets represents the

11   highest and best price available under the circumstances.

12         That would complete Mr. Victor's testimony.  And,

13   again, he is in the courtroom and available to answer any

14   questions or be cross-examined.

15         THE COURT:  All right.  Does anyone wish to cross-

16   examine Mr. Victor?

17       (No verbal response)

18         THE COURT:  Hearing no one, the proffer is

19   admitted.

20       (Proffer of J. Scott Victor, admitted into evidence)

21         MR. MINUTI:  Thank you, Your Honor.

22         Your Honor, our buyers now have proffered their

23   testimony.

24         THE COURT:  All right.

25         MR. MINUTI:  I'll cede the podium.

1              THE COURT:  Thank you.

2              Mr. Lapowsky, yes.

3              MR. LAPOWSKY:  Good afternoon, again, Your Honor.

4              THE COURT:  Yes, yes.

5              MR. LAPOWSKY:  Robert Lapowsky for STC Opco and

6    for Tower Health.  With me in the courtroom today, Your

7    Honor, is Clint Matthews who is the president and chief

8    executive officer of Tower Health and also the president and

9    chief executive officer of STC Opco, the purchaser.

10             THE COURT:  All right.

11             MR. LAPOWSKY:  And it is his testimony, Your

12   Honor, that I would propose to proffer, if no one has any

13   objections.

14             THE COURT:  No.  That's fine.

15             MR. LAPOWSKY:  I do have one exhibit, Your Honor.

16   Maybe I can hand it up before we get started.

17             THE COURT:  Yes.

18             MR. LAPOWSKY:  This is marked STC-1.

19             THE COURT:  All right.  Yes, please. Thank you,

20   Mr. Lapowsky.  Thank you, sir.  All right.

21             And this proffer will go to the good faith and

22   adequate assurance, is that correct?

23             MR. LAPOWSKY:  Yes, Your Honor.

24             THE COURT:  All right.

25             MR. LAPOWSKY:  Your Honor, if Mr. Matthews were

1  called to testify, he would testify as follows.  He would

2  testify that he is employed by Tower Health, that he is the

3  president and chief executive officer of Tower Health.

4          He would testify that Tower is a health system

5  that owns entities that operate six acute care hospitals in

6  the Southeastern Pennsylvania region.

7          He would testify that Tower's hospitals have 1,468

8  licensed beds and that Tower is the third largest healthcare

9  system in the region.

10          He would testify that Tower is a not-for-profit

11  organization.

12          He would testify that he is familiar with STC

13  Opco, the buyer.  He would testify that STC Opco is a newly

14  formed entity in which Tower owns 50 percent and Drexel

15  University owns 50 percent.  He would also testify that Tower

16  is the manager of STC Opco.

17          He would testify that in the fall of 2018, Tower

18  and Drexel entered into an agreement to build a medical

19  school in West Reading, Pennsylvania.  He would testify that

20  prior to the bankruptcy filings, Tower and Drexel made a

21  joint offer to purchase St. Christopher's.

22          He would testify that STC Opco is a not-profit-

23  organization, and he would testify that STC Opco will be

24  applying for a tax exemption with the Internal Revenue

25  Service.

1          He would testify that he is the president and

2    chief executive officer of STC Opco.

3          He would testify that he is familiar with D-1

4    which is the asset purchase agreement that was negotiated

5    between the parties.

6          THE COURT:  Yes.

7          MR. LAPOWSKY:  He would testify that he was

8    involved in the negotiation of that document.

9          He would testify that neither Tower nor STC Opco

10   had an agreement with any other potential bidder to control

11   the price realized by the St. Christopher's entities for the

12   assets they were selling and would further testify that

13   neither STC Opco nor Tower colluded in any way with any other

14   potential bidder before the auction or during the auction.

15         Mr. Matthews would testify that the negotiations

16   between STC Opco and the St. Christopher's entities relating

17   to the asset purchase agreement were, at all times, conducted

18   on an arm's length basis and in good faith.

19         He would testify that Drexel and Tower have

20   guaranteed the obligations of STC Opco under the asset

21   purchase agreement on a 50/50 basis.  In other words, a

22   several bases, not a joint and several bases.

23         THE COURT:  Okay.

24         MR. LAPOWSKY:  He would testify that the document

25   which I've had marked STC-1 is a copy of the most recent

1  consolidated audited financial statements for Tower Health.

2  It is for the years ending June 30, 2017 and June 30, 2018.

3         He would testify that as of June 30, 2018, the

4  value of the consolidated assets of Tower and its

5  subsidiaries was approximately $2.6 billion dollars.

6         He would testify that as of June 30, 2018, the

7  consolidated liabilities of Tower and its subsidiaries

8  totaled about $1.63 billion dollars.  And doing the math, he

9  would testify that the difference, the consolidated assets in

10 excess of consolidated liabilities was about $970 million

11 dollars.

12        He would further testify that the operating

13 revenues of Tower and its subsidiaries for the twelve months

14 ending June 30, 2018 were about $1.62 billion dollars.  And

15 the total expenses of Tower and its subsidiaries for that

16 same period of time were about the same.

17        He would testify that Tower did, in that period of

18 time, have non-operating gains and when the non-operating

19 gains were added to the operating revenues, the excess of

20 operating revenues and non-operating gains over expenses was

21 about $109 million dollars.

22        He would testify that while there are not audited

23 financial statements available yet for the period ending June

24 30, 2019, that fiscal year resulted in losses for Tower and

25 that was a result of the integration by Tower of four or five

1  hospitals that it acquired during that fiscal year.  But he

2  would testify that even with those losses, the consolidated

3  assets still exceed consolidated liabilities by something in

4  excess of $800 million dollars.

5          He would testify that he's familiar with the

6  contracts that are to be assumed by the St. Christopher's

7  debtor entities and assigned to STC Opco under the purchase

8  agreement.

9          He would testify that its his belief that STC Opco

10 has the ability to perform under those contracts.  He would

11 testify that that belief is based upon his review of the most

12 recent historic financial information provided by the St.

13 Christopher's entities which indicates that they are

14 currently operating on about a breakeven basis taking into

15 account the cost associated with the contracts that are being

16 assumed.

17         He would also testify that it is his belief that

18 under the management of STC Opco, the operating results of

19 St. Christopher's will improve.

20         Last, he will testify that Tower and Drexel have

21 committed to arranging for additional working capital for STC

22 Opco in an amount of at least $20 million dollars.

23         Last, Your Honor, he would testify that it is STC

24 Opco's intent to purchase tail insurance, both primary and

25 excess coverage, for St. Christopher's, for the hospital

1  itself, and also for its employed physicians including

2  residents.  And as Mr. Minuti noted, the cost of that tail

3  insurance is agreed to be split 50/50 between STC Opco and

4  the sellers until the seller's 50 percent piece hits $2

5  million dollars. And beyond that, the financial liability is

6  entirely STC Opco's.

7          Your Honor, that would be Mr. Matthews' testimony.

8  He is present and available for cross-examination, if anyone

9  desires to do that.

10         THE COURT:  Does anyone wish to cross-examine Mr.

11 Matthews?

12         Good afternoon.

13         MS. UHLAND:  Good afternoon, Your Honor.  Suzanne

14 Uhland of O'Melveny and Myers on behalf of the non-debtor

15 affiliates, the landlord, in this case.

16         I do not wish to cross-examine the witness, but I

17 do want to just be clear that we would like to reserve

18 rights.  The debtors have been very busy over the past and

19 the buyer have been busy over the past several days and have

20 not had the opportunity to work with us with respect to our

21 cure amounts and our adequate assurance or provide us with

22 the necessary information.

23         So, we've agreed to have a holding date to be

24 determined for that hearing with respect to our cured

25 adequate assurance.  And we, hopefully, won't need it, the

 1  holding date.  We'll continue to try to work with them to try

 2  to resolve any of those issues.

 3          But in the meantime, I just want to be clear that

 4  any evidence today with respect to adequate assurance with

 5  respect to our contracts that we not be bound by any of that

 6  testimony.  We certainly don't object to any of the good

 7  faith related testimony, just with respect to adequate

 8  assurance with respect to our contracts, we'd like to

 9  preserve our rights.

10          THE COURT:  Mr. Lapowsky.

11          MR. LAPOWSKY:  That's agreed, Your Honor.  We are

12  not going to have the Front Street leases on the list of

13  contracts for which the assumption and assignment was

14  approved that's attached to the sale order.  We will work

15  with Front Street and we will have that assumption and

16  assignment be the subject of a subsequent order.

17          THE COURT:  All right, fine.

18          MS. UHLAND:  Thank you, Your Honor.

19          THE COURT:  Thank you.  Thank you.

20          Anyone else?

21          MR. LASTOWSKI:  Your Honor, I just want to

22  confirm, while they were putting on the -- for the record --

23          THE COURT:  Come forward so we pick you up.

24          MR. LASTOWSKI:  Sure.  I believe that we resolved

25  the language but I wanted to check with Mr. Lapowsky.  I

1  didn't know if he had an opportunity to speak --

2              MR. LAPOWSKY:  I have not.

3              MR. LASTOWSKI:  We have not yet had an opportunity

4  to confirm that the language was resolved, so it still

5  remains an open issue.  Before D-1 gets moved into evidence,

6  I just want to make sure that that language is resolved and

7  agreed to.

8              MR. LAPOWSKY:  Well, D-1 is the contract from

9  Friday night, Your Honor.

10              THE COURT:  That's right.

11              MR. LAPOWSKY:  That's changing anyway.

12              THE COURT:  Right.

13              MR. LAPOWSKY:  I think it can be admitted.  I mean

14  we've already put a number of other changes that are going to

15  happen to that --

16              THE COURT:  On the record; yes, you did.

17              MR. LASTOWSKI:  Well, Your Honor, I wanted to have

18  the agreement as to -- with PASNAP agreed to on the record

19  before it gets moved in.  I thought -- I know --

20              THE COURT:  So tell me what the language will be.

21              MR. LAPOWSKY:  Well we're not -- we don't have it

22  yet, Your Honor.  My only point is I think the document can

23  be moved into the record because the document is going to

24  have other changes as well.  The document is only -- that's

25  the agreement that was reached Friday night.  That's what D-1

1  is.

2         THE COURT:  Well, I'm going to be asked to

3  approve, though, am I not, the asset purchase agreement?

4         MR. LAPOWSKY:  The revised asset purchase

5  agreement will be an exhibit to the sale order when it's

6  submitted to Your Honor.  And you will see a blackline that

7  will show you the changes between the one that was signed on

8  Friday night and submitted and the final version which will

9  include the changes we've agreed to today on the record and

10  whatever changes we agree to with PASNAP.

11         MR. LASTOWSKI:  Your Honor, then I'd like to have

12  a full reservation because my agreement to withdraw my

13  objection to the sale is conditioned upon the agreed upon

14  language.

15         I believe that we're going to work this out, but I

16  want to -- I mean Mr. Lapowsky was in court listening to the

17  proffers.  I was outside with counsel, other counsel.  We

18  agreed on language, subject to, obviously, Mr. Lapowsky

19  reviewing and I believe him checking with labor counsel.

20         With the language that we agreed to, I am fine

21  with withdrawing my objection.  But, obviously, understood

22  that if that agreement is not reached then I do want to

23  reserve my objection.

24         THE COURT:  Well if I approve the sale, I will

25  approve it subject to the changes that have been discussed.

1  And if you have a concern about any of the language, you'll

2  raise it with me at that time.  All right.

3          MR. MARRIOTT:  Your Honor, Vince Marriott, Ballard

4  Spahr.

5          THE COURT:  Yes.

6          MR. MARRIOTT:  Representing Drexel.

7          THE COURT:  Okay.

8          MR. MARRIOTT:  Why don't we finish putting the

9  evidence in and then ask for another Minuti ten-minute break

10 and --

11         MR. MINUTI:  Mr. Minuti five-minute break.

12         MR. MARRIOTT:  And we can see if this language has

13 been worked out.

14         THE COURT:  All right, that's fine.  That's great.

15 Let's do that.

16         MR. MARRIOTT:  And, Your Honor, as long as I'm up

17 here.

18         THE COURT:  Yes.

19         MR. MARRIOTT:  Vince Marriott, Ballard Spahr, on

20 behalf of Drexel University.

21         I have in the courtroom with me today, Helen

22 Bowman who is the executive vice president treasurer and

23 chief operating officer of Drexel.  And she will provide good

24 faith and financial ability to perform testimony which I'd

25 like offer by proffer, if that's all right with the court.

1            THE COURT:  Any objections?

2        (No verbal response)

3            THE COURT:  Hearing none, yes, you may proceed

4   then.

5            MR. MARRIOTT:  And, Your Honor, if I might

6   approach, I have what I've marked as STC-2.

7            THE COURT:  All right.  Thank you.  Okay.  Great.

8   Thank you, sir.

9            MR. MARRIOTT:  So, Your Honor, as I indicated, if

10  called to testify Ms. Bowman would testify as follows.

11           She is employed by Drexel University in the

12  position of executive vice president, treasurer and chief

13  operating officer.

14           She would testify that Drexel is a major research

15  university with approximately 24,000 undergraduate and

16  graduate students; 200 degreed programs, and 15 colleges and

17  schools, including the College of Arts and Sciences, the

18  Lebow College of Business, the College of Engineering, the

19  Kline School of Law, and the College of Medicine.

20           She would testify that Drexel is a non-profit

21  institution.

22           She would testify that she's familiar with STC

23  Opco and, as indicated by the proffer from Mr. Matthews, that

24  it is a newly formed entity in which Tower owns 50 percent

25  and Drexel owns 50 percent.  And Tower is the managing

1  member.

2          She would testify that she is familiar with what

3  has been marked as D-1, the agreement between STC Opco and

4  the St. Christopher's entities regarding the acquisition of

5  the St. Christopher's entities by STC Opco.

6          She would testify that she is familiar with

7  Drexel's involving in the negotiation of the asset purchase

8  agreement.

9          She would testify that Drexel did not have any

10 agreement with any other potential bidder to control the

11 price realized by the St. Christopher entities for their

12 assets or collude in any way with any other potential bidder

13 either before the auction or during the auction.

14         She would testify that Drexel negotiated with St.

15 Christopher's, the St. Christopher's entities relating to the

16 asset purchase agreement on an arm's length, good faith

17 basis.

18         She would testify as indicated in the proffer of

19 Mr. Matthews that Drexel and Tower have guaranteed the

20 obligations of STC Opco under the asset purchase agreement.

21         She would testify that Exhibit STC-2 is a true and

22 correct copy of Drexel's consolidated audited financial

23 statements for the years ending June 30, 2017 and June 30,

24 2018.

25         She would testify that as of June 30, 2018, the

1  value of the consolidated assets of Drexel and its

2  subsidiaries was approximately $2.2 billion dollars.  She

3  would testify that as of June 30, 2018, the amount of the

4  consolidated liabilities of Drexel and its subsidiaries was

5  approximately $840 million dollars.

6          She would testify that as of June 30, 2018, the

7  excess of consolidated assets or consolidated liabilities of

8  Drexel and its subsidiaries was approximately $1.33 billion.

9          She would testify that the total operating

10 revenues of Drexel and its subsidiaries for the twelve months

11 ending June 30, 2018 was $1.024 billion.

12         She would testify that the net results of non-

13 operating activities for the twelve months ended June 30,

14 2018 was approximately $64.5 million.

15         She would testify that the total operating

16 expenses of Drexel and its subsidiaries for the twelve months

17 ended June 30, 2018 were approximately $1.005 billion.

18         And she would testify that the excess of operating

19 revenues and the net results of non-operating activities over

20 operating expenses of Drexel and its subsidiaries for the

21 twelve months ending June 30, 2018 was approximately $82.8

22 million.

23         And, finally, she would testify that although the

24 audited financial statements for period ending June 30, 2019

25 are not yet available, there has been no material adverse

1  change in the financial condition or results of operations

2  for Drexel and its subsidiaries since June 30, 2018.

3          And, Your Honor, that would conclude Ms. Bowman's

4  testimony and I will offer her.  She's in the courtroom and

5  available for cross-examination.

6          THE COURT:  Thank you.  Thank you, Mr. Marriott.

7          Does anyone wish to cross-examine?

8      (No verbal response)

9          THE COURT:  Yes.

10         MS. UHLAND:  Suzanne Uhland, again, from O'Melveny

11 & Myers for the non-debtor affiliates.

12         We would just simply like to make the same

13 reservation of rights with respect to this proffer, with

14 respect to the adequate assurance and evidence.  We'd like to

15 reserve all rights with respect to that pending, you know,

16 our subsequent hearing.  Again, no issue with respect to any

17 good faith evidence.

18         THE COURT:  All right.  Thank you, Ms. Uhland.

19         Thank you, Mr. Marriott.

20         Anyone wish to cross-examine -- well, no one

21 wished to cross-examine so Ms. Bowman's proffer is admitted.

22         MR. MINUTI:  Your Honor, again, Mark Minuti for

23 the record.

24         With that, Your Honor, we would rest our

25 evidentiary presentation in support of the motion.

1            THE COURT:  All right.  Does anyone have any

2   evidence that they wish to submit in opposition?

3            MR. CUTLER:  Good morning, Your Honor.

4            THE COURT:  Yes.

5            MR. CUTLER:  My name is Jeffrey Cutler.

6            THE COURT:  Yes, Mr. Cutler.

7            MR. CUTLER:  At 12:23 p.m. today I filed a

8   document.  It's an objection because bankruptcy auction filed

9   19th of August 2019 violated the United States Constitution

10  Amendment 5, equal protection and unjust enrichment.  It was

11  a forty-five page document and I filed this in defense of

12  those people who are unspoken in this court and unseen.  I

13  have also filed this because I believe I have a valid default

14  judgment available to fund the operation of the hospital and

15  had tried to talk to KPC and Pontiac Health System, and also

16  contacted PNC Bank as a possible funding to the case.

17           Prior to the auction on the 19th I went to the

18  auction location and was denied access, and was told I was

19  not allowed up.  And prior to that I had filed a motion to

20  intervene in a case called Levine v. Philadelphia, which is

21  case 219 CV 03149.  And I have a case also in court 5:19 CV

22  00834 which is called Cutler v. Pelosi.

23           In both these cases I believe individuals are

24  being discriminated within the state of Pennsylvania.  I have

25  previously gone to the Supreme Court of the United States and

1  had an actual judgment that allowed me to sue over the

2  establishment clause for religious freedom.  I believe that I

3  have a valid claim for misrepresentation against Google, Ford

4  Motor Company and Erie Insurance.  These claims, along with a

5  method to fund, which is copyrighted, called a Jeffy bond

6  which was copyrighted December 7th, 2015 as an ongoing

7  funding mechanism for hospitals in the state.  This would

8  allow the hospital to pay-off the debtors.

9        Everything done to date, I feel, allows unjust

10  enrichment and as a previous Drexel graduate I presume you've

11  seen the document I wrote and what is gone on to me.

12        THE COURT:  Thank you.  Thank you, Mr. Cutler.

13  Thank you, sir.

14        MR. CUTLER:  All right.  Essentially, that is --

15  this concludes my objection, but I'd like to just make it on

16  the record.

17        THE COURT:  All right.

18        MR. CUTLER:  I believe $6 and a half billion

19  dollars that is the default judgment against all parties

20  should be sufficient to keep the hospital running as an

21  ongoing concern, and had decided that both KPC and Pontiac

22  Health could be ordered jointly and allowed to continue the

23  operation.

24        THE COURT:  Thank you.

25        Mr. Minuti, did you want to have argument at this

1  point?

2         MR. MINUTI:  Your Honor, here's what I think makes

3  sense --

4         THE COURT:  Or did you want to have a short recess

5  and work out language, or what?

6         MR. MINUTI:  Here's my suggestion, Your Honor; you

7  know a number of objections that we had, a number of cure

8  objections, we had a number of objections to the sale.  I

9  think in terms of based on who our buyer is and what

10  contracts are taking I think a number of these have been

11  mooted.  So, maybe it makes sense now to hear from objectors,

12  let's see what's still out there.

13         THE COURT:  Okay.

14         MR. MINUTI:  Perhaps if we take a break there's an

15  opportunity to resolve some of that.  If not, I'll respond at

16  the appropriate time.  But maybe now is a good time to hear

17  from what the remaining objections are and we can deal with

18  those.

19         THE COURT:  All right.

20         MR. MINUTI:  Thank you.

21         THE COURT:  That's acceptable, yes.

22         Let me hear from objectors.  Ms. Jones, good

23  afternoon, for Tenet and Conifer.

24         MS. DAVIS-JONES:  Yes.  Good afternoon, Your

25  Honor.  For the record Laura Davis Jones of Pachulski Stang

1  Ziehl & Jones on behalf of Tenet and Conifer.

2            Your Honor, we are happy that there is a sale.  We

3  have no issue with the concept, but we do have several issues

4  in reservation that I'd like to place on the record if I may.

5            THE COURT:  All right.

6            MS. DAVIS-JONES:  Your Honor, we filed an

7  objection on September 13th and filed a further supplement

8  this morning.

9            THE COURT:  Yes.

10            MS. DAVIS-JONES:  We filed an objection to the

11  assumption and assignment of the TSA and the MSA to the

12  extent the debtors intend to do so.  Again, it's not an issue

13  for today as Mr. Minuti said earlier, but we reserve all our

14  rights on that as to cure and the other issues that we've

15  raised there.

16            Your Honor, there is a condition to the closing

17  here in the APA that Tenet and the purchaser agree to a new

18  TSA, and that Conifer and the purchaser enter into a new MSA.

19  We have reached out to the proposed purchaser who,

20  understandably, did not want to discuss the issue till after

21  they had a sale order, but, Your Honor, Tenet and Conifer

22  remains available to discuss and negotiate.  We are

23  commercial and hopeful, and expect that we may be able to

24  enter into a new TSA and MSA.  One might be able to be agreed

25  on, but we reserve all our rights on that as well.

1           THE COURT:  All right.

2           MS. DAVIS-JONES:  Lastly, Your Honor, as set forth

3  in our objection, we have property and software at St.

4  Christopher's --

5           THE COURT:  Yes.

6           MS. DAVIS-JONES:  -- which belongs to Tenet and

7  Conifer which they're either personal property or the

8  software that the debtor has no interest in.  Obviously, Your

9  Honor, the debtor cannot sell property with which it doesn't

10 have an interest.

11          THE COURT:  Right.

12          MS. DAVIS-JONES:  We will work with the debtors on

13 this.  Again, Your Honor, we're commercial.  We will reach

14 out, and they can reach out to us, and we will try to work

15 those issues out, but, Your Honor, obviously, I'll need to

16 reserve that issue on the record.

17          THE COURT:  I certainly understand that, yes.

18          MS. DAVIS-JONES:  Thank you, Your Honor.

19          THE COURT:  All right.  Thank you, Ms. Jones.

20          Is it Mr. Smith?

21          MR. SMITH:  Yes, Your Honor.  Thank you.

22          THE COURT:  Yes.  Good afternoon.

23          MR. SMITH:  The Department of Health Pennsylvania

24 has a number of objections.  We provided language to the

25 debtors.  Hopefully the language will be accepted, but to put

1    them on the record.

2            THE COURT:  All right.

3            MR. SMITH:  Paragraph 16 of the order has Your

4    Honor approving a transfer of the license without the

5    approval of the Department of Health.  I think that is

6    outside of the court's jurisdiction.  We proposed language to

7    avoid that.

8            We proposed language, also the contract itself

9    provides that the buyer shall have the right to assign the

10   contract to affiliates.  Again, that requires the approval of

11   the Pennsylvania Department of Health.  There is nothing in

12   the proposed order so indicating.

13           The proposed order also has, in Paragraph 27, Your

14   Honor retaining jurisdiction including, as I read the

15   proposed order, over licensing issues with the Pennsylvania

16   Department of Health.  Again, that would be outside the

17   jurisdiction of the court.  So, for each of these we propose

18   language that qualifies what is being vested in the court and

19   what is reserved to the Pennsylvania Department of Health

20   which has the sole authority to license and to revoke

21   licenses.

22           THE COURT:  Does the Department of Health consider

23   this sale favorably?

24           MR. SMITH:  I think so, Your Honor, but it's

25   unwilling to agree to an order that usurps its licensing

1  authority.

2          THE COURT:  All right.  I will leave that to you

3  to discuss with debtor's counsel and the purchasers, yes.

4          MR. SMITH:  Thank you, Your Honor.

5          MR. KLAUDER:  Good afternoon, Your Honor.

6          THE COURT:  Good afternoon.

7          MR. KLAUDER:  David Klauder on behalf Dr. Achintya

8  Moulick.  Dr. Moulick is here next to me.

9          Your Honor, we were retained just before the

10  hearing this morning just to introduce Dr. Moulick.  He's the

11  chief medical officer, chair of cardiac surgery and executive

12  director of the heart center at St. Christopher's.  Dr.

13  Moulick learned yesterday that he was put on the -- that his

14  contract was put on the rejection list late Friday.  I

15  understand his contract will not be rejected.

16          He has a few concerns and comments.  And if it's

17  okay, Your Honor, I'd like Dr. Moulick just to direct you

18  directly with a couple of his concerns and comments.  He has

19  a brief statement if that's acceptable.

20          THE COURT:  All right.  Yes, that's fine, Mr.

21  Klauder.  Thank you.

22          MR. KLAUDER:  Thank you, Your Honor.

23          THE COURT:  Doctor, good afternoon.

24          DR. MOULICK:  Good afternoon, sir.  Thank you for

25  benevolence and your patience.  You need a little bit of both

1  today.

2          So, first of all, I am giving a limited objection

3  and at the same time I would congratulate John Fry and Clint

4  Matthews on getting St. Christopher's and hopefully taking it

5  to the next level.

6          I am the executive director of the heart center,

7  new born heart surgeon, and possibly not the smartest guy in

8  the room. I came here ten years back to St. Christopher's

9  Hospital from Children's National Hospital after a yearlong

10 search.  It was an international search because there are not

11 many of us who do what we do.  And it's very difficult to

12 recruit somebody who does the entire gambit of surgeries that

13 I do.  Just to give you an FYI about the last twenty surgeons

14 in many centers are all international because of the

15 complexity and challenges in this operation.

16         So, about two years back when were acquired by

17 American Academic we were all ecstatic.  The hospital was

18 happy because we went to transition from Tenet.  And along

19 the way we got to know of the troubles.  And I was pretty

20 deeply entrenched.  Subsequently, when the bankruptcy was

21 declared and Hahnemann Hospital was being closed, I was

22 involved in every step of that.  And we made sure that

23 everything went smoothly at that location; however, there was

24 deep concern amongst the community and the doctors in St.

25 Christopher's that the same fate would happen to St.

1 Christopher's.

2          So, at that time a consortium of hospitals came

3 forward and said that they would support a community

4 hospital.  That was accepted.  We didn't know what was going

5 to happen with that, but at least it kept the hospital

6 together.  I was the voice of the doctors.  Eventually that

7 did not happen.  They did not even put a bid.  That is

8 another story for whatever reasons, but I'm glad.  We

9 advocated for a local non-profit hospital.

10          THE COURT:  Yes.

11          DR. MOULICK:  In our naivety we expected everyone

12 to come together.  We thought that the consortium, the Tower

13 and Drexel, and we always maintained that if everybody came

14 together it was the best for St. Christopher's.

15          In the meanwhile, the medical exec -- it was my

16 idea with our lawyers to create a community-based physician

17 supported organization called FOSCA [phonetic].  I won't

18 speak for them, but that is Friends of St. Christopher's

19 Association.  That, we advocated the same thing again, a non-

20 profit local hospital that supported (indiscernible) care.

21 (Indiscernible) care meant starting at the pinnacle with

22 neonatal cardiac heart surgery.

23          And just to let you know I'm the only one who does

24 the entire complex heart surgeries in the hospital and I've

25 been doing it for ten years.  I've done several hundred cases

1  with great exceptional outcomes.  When I came into the small

2  program and eventually made it to a medium program in 2015.

3  And got the same level as CHOP and DuPont.  We've had our own

4  trials and tribulations because we work with very limited

5  resources, but going forward there were many first in this

6  hospital.

7           It was a really hospital, became a medium program.

8  For the first time doctors in the community in this country

9  have come together and I take a lot of credit with my

10 colleagues sitting here to get the community together;

11 however, I think I was perceived to be one team rather than

12 the other which is completely wrong, I was not.  I was on the

13 side of St. Christopher's Hospital.

14          I'm happy that I took the blast on my chest and my

15 other colleagues are all safe, but martyrs are often

16 forgotten and they're not remembered.  So, I hope that the

17 new team that takes -- I wish them all the best.  I hope they

18 take care of the hospital, but also recognize the transition

19 of my road to somebody who can do what I can do.  I want St.

20 Christopher to be an independent operating hospital with a

21 level-one trauma center.  My ambitions probably were too

22 high, and I think I am paying some price for that, but, Your

23 Honor, your benevolence comes in now.

24          Please make sure, because people do not understand

25 bankruptcy outside.  It should not be construed that I'm

1 getting let go or whatever is happening because that will

2 affect my career.  Just to let you know I've been on call for

3 ten years straight every night and in the end of that when

4 you end up in this situation it's not good.

5          Having said that I, again, wish St. Christopher's

6 the very best.  Thank you.

7          THE COURT:  Thank you, doctor.  Thank you.

8          Yes?

9          MR. MALZBERG:  Your Honor, Mitchell Malzberg on

10 behalf of PASNAP.

11          We filed a limited objection as well.  And, again,

12 the union generally supports a sale for the community and the

13 benefit of the employees.  As I stated before, it's hopeful

14 that it will be able to withdraw their objection, but I

15 wanted to preserve my objection assuming that we cannot agree

16 on the language.  I believe we worked on language.

17          I know that counsel hasn't had an opportunity to

18 discuss it amongst themselves for an acceptable language, but

19 in the event that we do not come to acceptable language then

20 PASNAP does object to the sale based on Section 1113, Your

21 Honor, because they are not -- we understand, given the

22 fluidity of this case and the timing, they haven't had time

23 to fully review our agreement and wanted to discuss some

24 issues with us concerning the collective bargaining

25 agreement.  And we appreciate that and we will negotiate in

1  good faith, but in the event that they seek to terminate the

2  contract and we can't come to acceptable language in the

3  agreement then we do want to reserve and preserve our rights

4  under 1113 that the sale cannot be approved over the

5  objection.

6            THE COURT:  All right.

7            MR. MALZBERG:  But I am hopeful that when we go

8  out in the hall for the ten minutes, we could resolve the

9  language and that we will be able to withdraw that objection.

10           THE COURT:  Okay.  Thank you.

11           MR. SACS:  Your Honor, this is Marc Sacs with the

12 DOJ on the phone.  Would this be a good time to make a

13 statement?

14           THE COURT:  Why don't you do it now, Mr. Sacs?

15           MR. SACS:  Thank you very much, Your Honor.

16           As you may know, the United States filed an

17 objection to the proposed sale --

18           THE COURT:  Yes.

19           MR. SACS:  -- in part because there was no APA or

20 proposed sale order that had been filed at the time; that was

21 Docket 715.  Debtors filed the APA and the proposed sale

22 order at 8:30 p.m. on Friday night.  Our review of those

23 documents demonstrated that there was some uncertainty and

24 even potentially conflicting terms about the treatment of the

25 Medicare provider agreements in the sale.  So, we quickly

1   worked to mark-up the proposed sale order and send that back

2   to the debtors and the purchasers this morning.

3         Debtors and purchasers reached out to us by phone

4   this afternoon, which we very much appreciate, to explain, as

5   Mr. Minuti read into the record, the debtors and purchasers

6   were assuming and assigning the Medicare provider agreement

7   under Code Section 365 that the purchaser will assume the

8   Medicare provider agreement subject to successor liability.

9         We also assume the debtors and purchaser will

10  assign the Medicare provider agreement in accordance with the

11  Medicare statute, the regulations promulgated under it and

12  CMS's Medicare policies and procedures, and with the required

13  approvals of CMS.  And we look forward to working with the

14  debtors and purchaser after the hearing to reach agreement on

15  the language of the sale order as it relates to the Medicare

16  provider agreement.

17        Thus, if it's okay with the court I'm not going

18  address our concerns and objections with the current form of

19  the order to the court today as we hope to be able to work

20  that out.  And if we can't, obviously, we can come back

21  before Your Honor.

22        You also heard Mr. Minuti discuss the negotiations

23  between the debtors and the purchaser regarding a cure amount

24  for CMS.  Let me just add a clarifying point; CMS expects to

25  be able to provide the debtors and purchaser with a cure

1  amount a few days before closing, whenever that turns out to

2  be, which can then be paid to the United States at that time.

3  Of course, though, because the purchaser does assume full

4  successor liability with assignment of Medicare provider

5  agreements if there are subsequent overpayments determined

6  for the pre-closing period the purchaser will remain

7  responsible for them, but, again, we expect to be able to

8  provide a cure number right before closing.

9           Thank you, Your Honor.

10          THE COURT:  All right.  Mr. Sacs, I certainly do

11  understand that there is some work to be done and if

12  necessary, we will hear from you in the future, but,

13  otherwise, perhaps you can reach agreement right in the asset

14  purchase agreement.

15          MR. SACS:  Thank you, Your Honor.

16          THE COURT:  Mr. Bressler, yes.

17          MR. BRESSLER:  Good afternoon, Your Honor; Gary

18  Bressler for Crothall Healthcare, Inc.

19          Your Honor, we are on the cure amended schedule,

20  but we're not currently on the assumption schedule. The

21  debtors amended cure amount with us, we've agreed to it as a

22  certain date, but because we're still providing services it's

23  a moving target.  So, I agree with the debtor; there is some

24  language in the order that, basically, says you're capped at

25  the cure amount.  I agree with the debtor that our client was

1  a moving target.  So, should it ever be added to the

2  assumption list we wouldn't be limited by the amount and the

3  cure amount in the amended schedule of cure?

4           THE COURT:  All right.  I understand the

5  objection, Mr. Bressler.

6           MR. BRESSLER:  Thank you.

7           THE COURT:  Yes?

8           MR. MCMAHON:  Your Honor, good afternoon.

9           THE COURT:  Mr. McMahon, good afternoon.

10          MR. MCMAHON:  Joseph McMahon of Ciardi, Ciardi &

11 Astin for the hospital medical staff.  With me, Your Honor,

12 is my colleague, Mr. Ciardi, who you are undoubtedly familiar

13 with.

14          THE COURT:  Yes.

15          MR. MCMAHON:  Your Honor, I would like permission

16 for Mr. Ciardi to speak subject to filing a *pro hac* motion

17 for him later after this hearing.

18          THE COURT:  That's fine, Mr. McMahon.  Thank you.

19 Thank you, sir.

20          Mr. Ciardi, nice to see you again.

21          MR. CIARDI:  Good afternoon, Your Honor.  Good to

22 see you again.

23          The medical staff, Your Honor, who I represent, we

24 did file a limited objection and reservation of rights

25 because at the time we filed it there was nothing pending to

1    which we could respond.

2              THE COURT:  Right.

3              MR. CIARDI:  We would withdraw that objection, but

4    we do want to rise simply to note for the court that we

5    shared the same concern that was raised and, I think,

6    discussed by Temple with regard to the residency program as

7    they are critical to the debtors and the hospitals continued

8    providing services to the city and the community.

9              So, as that works out, we will, obviously, hope to

10   see that they resolve their issues with the three residency

11   programs that they appear to be rejecting and also deal with

12   the issue of how to maintain the cardiac program with the

13   departure of Dr. Moulick.

14             Thank you.

15             THE COURT:  All right.  Thank you, Mr. Ciardi.

16             Good afternoon, Mr. Hogan.

17             MR. HOGAN:  Daniel Hogan of Hogan McDaniel on

18   behalf of Hayes Locums.

19             Your Honor, I rise just to complete the record as

20   it relates to Hayes Locums objections.  Initially, Your

21   Honor, we filed a limited objection and reservation of rights

22   with regard to assumption and assignment.

23             THE COURT:  Yes.

24             MR. HOGAN:  We then followed that up, Your Honor,

25   with a reservation of rights with regard to the sale, again,

1  for the primary reason that we had not seen a version of the

2  sale, the APA or the sale order.  We then finally followed

3  that up, Your Honor, with another preliminary objection and

4  reservation of rights with regard to the sale of

5  substantially all those assets.  The reason for all this,

6  Your Honor, is just to protect the interest of Hayes Locum

7  who's providing services to the debtor on an ongoing basis

8  post-petition.

9         We have had dialog with the debtor regarding the

10 cure amount.  There is some confusion, at least from our

11 perspective, with regard to whether it's going to be assumed

12 or assigned.  The language of the sale order I would make one

13 note.  There is a reference in that schedule to a list of the

14 cure, but it does not list the docket number, Your Honor.

15 This is Schedule 1.1, initial schedule of seller's contracts,

16 designated for assumed contracts and assumed leases.

17         THE COURT:  Yes.

18         MR. HOGAN:  And it reads,

19         "All contracts, leases and other agreements listed

20 on Exhibit A to the notice of assumption and assignment of

21 cure amount with respect to executory contracts and unexpired

22 leases of the debtors as filed in the bankruptcy court."

23         Just for clarity, Your Honor, there's been a

24 number of modifications to that and so it would seem to me

25 that a docket number or multiple docket numbers to the extent

1    that there are supplements to that just so there's clarity

2    about what list they're talking about just so that there

3    can't be any confusion as it relates to those issues.

4                    THE COURT:  All right.

5                    MR. HOGAN:  So, with that, Your Honor, I'll sit

6    down.  Thank you.

7                    THE COURT:  Thank you, Mr. Hogan.

8                    MR. LAWALL:  Good afternoon, again, Your Honor --

9                    THE COURT:  Mr. Lawall, yes.

10                   MR. LAWALL:  -- Fran Lawall on behalf of Temple.

11                   THE COURT:  Yes.

12                   MR. LAWALL:  Your Honor, in light of the language

13   that Mr. Lapowsky had put on the record earlier I believe

14   that that will resolve the Temple objection.  We would only

15   seek to have that language inserted either in the APA or the

16   order, whichever is most convenient.  I'm sure that won't be

17   a problem.

18                   We look forward to negotiating quickly with Tower

19   in good faith to reach a resolution both on the short and the

20   long-term academic affiliation agreement issues.

21                   THE COURT:  Yes.

22                   MR. LAWALL:  Mr. Bressler, Your Honor, had raised

23   one issue with respect to the static nature of the cure

24   schedule and I believe that we may have in one of our prior

25   objections raised that same issue that to the extent there is

1  an agreement as to a cure amount as of a date certain if

2  there were subsequent accrued amounts owed that would all be

3  rolled in as part of the final cure.  That, I'm sure, can be

4  worked out to the extent that there are any of our contracts

5  that fall within that.

6           THE COURT:  All right.  Mr. Lawall, thank you.

7  And we will hear, obviously, from the debtors on that.

8           MR. LAWALL:  Thank you, Your Honor.

9           THE COURT:  Mr. Brown, good afternoon.

10          MR. BROWN:  Good afternoon, Your Honor; Stuart

11 Brown, DLA Piper on behalf of PAHH Erie Street Garage, LLC.

12          THE COURT:  Yes.

13          MR. BROWN:  Which is the entity that owns the

14 garage over at St. Christopher's.

15          THE COURT:  Okay.

16          MR. BROWN:  Your Honor, that entity is master

17 landlord under a master lease.  St. Christopher's Hospital is

18 the tenant.

19          THE COURT:  Is it a large parking garage, is that

20 what it is?

21          MR. BROWN:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. BROWN:  Originally, it was listed on schedule

24 to be assumed.  The schedules to the asset purchase agreement

25 were less then clear in my mind.  We asked Mr. Lapowsky, on

1  behalf of the purchaser, whether they intended to assume that

2  contract.  Mr. Lapowsky told us no; therefore, the objection

3  that we raised is moot at this time.  We objected to cure.

4  We objected to some other issues as well, none of which are

5  germane for today; however, should the debtors or the

6  purchaser designate that contract as one to be assumed in the

7  future we reserve all of our rights to assert those issues

8  later.

9          THE COURT:  All right.  Mr. Brown, I certainly

10 understand.  Thank you.

11         Mr. Miller, good afternoon.

12         MR. MILLER:  Good afternoon, Your Honor; for the

13 record Curtis Miller of Morris Nichols Arsht & Tunnell on

14 behalf of ACGME, the Accreditation Counsel for Graduate

15 Medical Education.

16         THE COURT:  Yes.

17         MR. MILLER:  First, I was happy to hear and see in

18 the documents that the residents of this hospital are going

19 to be covered and have tail insurance.

20         THE COURT:  That's right.

21         MR. MILLER:  But as I'm sure you recall, this

22 issue was raised a number of times in connection with the

23 residency asset sale.  In connection with that sale it's

24 resolved the objections of my clients and the objections of

25 Mr. Alberto who you will hear from in a moment.

1          The debtors had committed to fund and to pay for a

2  tail coverage of 25 years.  The current policy expires with

3  respect to the residents of that hospital in January 11th of

4  next year.  As Your Honor is aware, the District Court

5  entered a stay of that sale order on 9/16.

6          THE COURT:  Yes.

7          MR. MILLER:  There has, obviously, been no

8  determination on the merits, but that does raise a concern

9  for ACGME as to what will happen if that sale doesn't

10  ultimately close because you're going to have a number of

11  residents both past and current who are then not going to

12  have tail coverage.

13          I have spoken to debtor's counsel.  I'm informed

14  that they don't currently have an alternative plan of how to

15  pay it.  You've heard them make statements on the record that

16  there was a commitment to pay it and to get that coverage for

17  those residents.  At this point there is $50 million dollars

18  being generated from this sale.  We haven't heard that

19  there's a commitment to pay it yet, but we did just want to

20  just put that on the court's radar as a significant issue and

21  concern that we have.

22          It's not something that you have to decide in

23  connection with the sale, but we just wanted Your Honor to be

24  aware of that and depending on what happens we'll be back

25  before you, Your Honor.

1          THE COURT:  All right.  Mr. Miller, do you recall

2     what the cost was of the tail insurance?  Was it about $2

3     million dollars, as I recall?

4          MR. MILLER:  There was a commitment by the buyer

5     to pay 1 million of the total cost, but I never received the

6     total cost from the debtors.  I asked this morning and, at

7     least, Mr. Applebaum, who I spoke to, didn't know the amount.

8     Maybe debtor's counsel could inform the court.

9          THE COURT:  All right.  Thank you, Mr. Miller.

10         MR. MILLER:  Thank you, Your Honor.

11         THE COURT:  Mr. Alberto?

12         MR. ALBERTO:  Good afternoon, Your Honor; Justin

13    Alberto from Bayard on behalf of ECFMG, the Educational

14    Commission for Foreign Medical Graduates.

15         THE COURT:  Yes.

16         MR. ALBERTO:  My recollection of the cost of the

17    tail policy was that it was in the multiples of millions, but

18    that is my best guess.  We understand that it's pricy.

19         THE COURT:  Yes.

20         MR. ALBERTO:  ECFMG supports Mr. Miller's

21    argument, Your Honor.  Personally standing here right now I

22    don't know where the funds from this sale flow too, but it

23    strikes me that the court could fashion a remedy where a

24    reserve is established in the event that this sale -- excuse

25    me, in the event that the Hahnemann sale ultimately does not

1  close prior to the expiree of the current policy which, as

2  Mr. Miller said, is January of 2020.

3           THE COURT:  That's right.  All right.  Thank you,

4  Mr. Alberto.

5           MR. ALBERTO:  Thank you, Your Honor.

6           MR. CARICKHOFF:  Good afternoon, Your Honor.

7           THE COURT:  Good afternoon.  I'm sorry.

8           MR. CARICKHOFF:  May I please the court, David

9  Carickhoff of Archer & Grinder.

10           THE COURT:  Yes, sir.

11           MR. CARICKHOFF:  Your Honor, I'm here on behalf of

12  -- we filed a limited objection of certain physicians under

13  the Philadelphia Academic Health System Physician Practice

14  Plan.  And the issue is similar to what Mr.'s Miller and

15  Alberto were speaking about which is tail coverage.

16           THE COURT:  Yes.

17           MR. CARICKHOFF:  Theirs focuses on the residents.

18  Mine is focused on the non-resident physicians that are under

19  the Hahnemann umbrella.  And we were here at the residency

20  sale raising similar issues.

21           THE COURT:  Yes.

22           MR. CARICKHOFF:  If I can address one somewhat

23  procedural issue before I start.  There was a motion for

24  leave that was filed to submit an amicus brief to the court.

25  This was Docket 729.  I believe I spoke with counsel for the

1 debtors, Ms. DiSabatino and Mr. Hampton before and I don't

2 think that they had an objection to Your Honor granting that

3 motion for leave.

4          If I could approach and hand it up because I --

5          THE COURT:  I didn't see it.  So, I would be

6 pleased to have it, Mr. Carickhoff, yes.  Thank you.  And

7 this is the order?

8          MR. CARICKHOFF:  The order is on top.

9          THE COURT:  All right.  Thank you.

10          MR. CARICKHOFF:  And as I indicated, Your Honor, I

11 think that in the court's comments approving the Hahnemann

12 residency sale Your Honor did note the importance of having

13 the tail coverage was a factor that the court considered in

14 approving the sale.  I think you heard Mr. Minuti opening

15 remarks today talking about the buyer group agreeing to

16 certain tail coverage as being a critical point.  It keeps

17 repeating and repeating.

18          I think the fact that you have an amicus brief

19 filed by the American Medical Association, the Pennsylvania

20 Medical Society and the Philadelphia County Medical Society

21 underscores the importance of the tail coverage for these

22 physicians, Your Honor.

23          What the amicus brief does is it goes into, in

24 more depth, the statutory regime in Pennsylvania.  It talks

25 about Pennsylvania's Medical Care Availability & Reduction of

1  Error Act which is, kind of, shorthand MCARE.  And what that

2  was designed to do when you had the malpractice and the

3  insurance crisis back in the early 2000's that was designed

4  to try and address that issue.  And, effectively, what it

5  does is as long as the physicians have a primary coverage the

6  MCARE Act acts as a secondary or excess layer of coverage to

7  these physicians, but it's only available if they have the

8  primary coverage.

9         THE COURT:  Yes.

10        MR. CARICKHOFF:  And if this tail coverage goes

11 away or it's not continued, they don't have access to the

12 excess anymore.  So, that makes that point.

13        One of the other points that the amicus brief

14 makes is that, and this a quote from the brief, that its

15 extremely difficult for a physician to obtain affordable tail

16 coverage from a different insurer because the different

17 insurer never had the opportunity to impact the risk that it

18 is being asked to cover.

19        And it makes the point that the cost for the tail

20 coverage is usually somewhere between 200 and 350 percent of

21 the cost of an annual policy.  So, the point is that it's a

22 very expensive endeavor for a physician to be asked to take

23 this expense on, which is why in part of their employment

24 contracts the employer undertakes this responsibility, Your

25 Honor.  If there is no tail coverage that's continued and the

1  physicians are unable to purchase it on their own several

2  things happen; they don't have the ability of the MCARE

3  excess coverage, their personal assets become at risk and

4  they are also subject to disciplinary measures within their

5  state licensing boards.  They're required to have coverage

6  and if they don't then their licenses become at risk.

7          So, again, that is why you have this amicus brief

8  by these parties and similar to Mr. Alberto's ask we would

9  likewise ask for a reserve from the sale proceeds to be put

10 aside to deal with this group of physicians who appear to be

11 the only ones that are not covered in any of the existing

12 asset purchase agreements.

13         THE COURT:  How many physicians do you represent,

14 Mr. Carickhoff?

15         MR. CARICKHOFF:  Sure.  So, under the plan that I

16 referenced there is about 107 physicians that are covered and

17 that are being excluded from tail coverage.  I represent

18 about 55 of those 107 physicians, Your Honor.

19         THE COURT:  All right.  Thank you.

20         MR. CARICKHOFF:  Thank you.

21         THE COURT:  Mr. Lastowski, good afternoon.

22         MR. LASTOWSKI:  Good afternoon, Your Honor;

23 Michael Lastowski from Duane Morris here today on behalf of

24 Chubb.

25         Your Honor, Chubb had filed a reservation of

1 rights and our concerns are addressed in Paragraph 26 of the

2 sale order.

3          THE COURT:  Yes.

4          MR. LASTOWSKI:  We have no objection.

5          THE COURT:  All right.  Thank you, Mr. Lastowski.

6          Good afternoon.

7          MR. ALLINSON:  Good afternoon, Your Honor; Elihu

8 Allinson on behalf of Urology for Children, LLC.

9          I have a cure related objection.  There are five

10 contracts which were originally listed on the assumption list

11 or the potential assumption list.  Those were all listed with

12 a zero-cure amount.  After working with the debtors, we have

13 identified two that are both with St. Christopher's Hospital

14 that do have outstanding cure.

15          The amended cure schedule lists an amount of

16 $73,200 dollars as cure in connection with an emergency room

17 24 hour on-call agreement.  That figure is exclusive of

18 September, through September 2019.  That is actually for May

19 and June.  It's a prepetition amount.

20          There is another contract called the chief's

21 agreement, the section chief's agreement.  The managing

22 member of urology for children is Dr. Gregory Dean.  He is

23 the chief of urology at the hospital.  This section chief's

24 agreement is somehow education related.  They have yet to

25 invoice for July, August and September, but through the 17th

1 there's about an $8,000 dollar amount there.

2          So, the bottom line here is to the extent these

3 contracts are currently on the assumption list or get added

4 to the assumption list before the closing the current amount

5 of $73,200 dollars is under-stated.  It should be $102,064

6 dollars.  Of course, that is only through September 17th.

7 These amounts continue to accrue.

8          THE COURT:  All right.

9          MR. ALLINSON:  Thank you.

10          THE COURT:  Thank you, Mr. Allinson.

11          Mr. Minuti, you better get up fast.

12          MR. MINUTI:  So, Your Honor, I think the best

13 thing to do is take a break now to deal with the -- excuse me

14 --

15          MR. LAPOWSKY:  Your Honor, Robert Lapowsky for SDC

16 Opco.  I have just three quick things to clarify on the

17 record.

18          THE COURT:  All right.

19          MR. LAPOWSKY:  Mr. Ciardi, in his presentation,

20 made reference to Academic Affiliation agreements being

21 rejected.

22          THE COURT:  Yes.

23          MR. LAPOWSKY:  They're not being rejected, at

24 least not as of yet.  They're not on the assumed list, but

25 the assumed list can change between now and closing.

1          THE COURT:  Okay.

2          MR. LAPOWSKY:  So, I just wanted to clarify that

3    for the record.  They're not being rejected today.

4          THE COURT:  Okay.

5          MR. LAPOWSKY:  In terms of the Hayes Locums

6    objection about the way that the notices are set-up and the

7    reference in Schedule 1.11; I think that's all going to be

8    cleared up, Your Honor, because the sale order, when that

9    comes through, rather than having that reference to contracts

10   that are being assumed by referencing another document and

11   then saying except this list of things don't get assumed it's

12   going to have a list of contracts that are being assumed.

13         THE COURT:  Okay.

14         MR. LAPOWSKY:  It will be there in the agreement

15   itself or in the order itself, the exhibit to the order.

16         Lastly, Your Honor, for the Temple objection the

17   language that I read into the record when Mr. Lawall was up

18   here will go into the asset purchase agreement as a

19   replacement for the existing Section 5.4; it won't be in the

20   order.

21         THE COURT:  Okay.  All right.

22         MS. FRANKLIN:  Excuse me, Your Honor.

23         THE COURT:  Yes?

24         MS. FRANKLIN:  This is Alison Elko Franklin on

25   behalf of 3M Company on the line.  I apologize for

1  interrupting.  Is now a good time for me to make a statement

2  regarding 3M's objection.

3          THE COURT:  Yes.

4          MS. FRANKLIN:  Okay.  Thank you, Your Honor.  I

5  will keep it very brief.

6          3M filed an objection to the assumption,

7  assignment and cure amount with respect to a license

8  agreement that is entered into with the debtors approximately

9  two months before the bankruptcy filing.  I believe my

10  client, the debtors and the purchaser, can consensually

11  resolve this objection given more time.  3M's primary concern

12  is the identity of the purchaser and its ability to cure

13  defaults and perform under the agreement.

14          The license agreement is a non-exclusive copyright

15  license and may not be assigned to a third-party without 3M's

16  consent under applicable federal copyright law pursuant to

17  Section 365(e)(1).  So, since the debtors filed their notice

18  identifying STC Opco, LLC, the purchaser on Friday night, we

19  have had a very limited opportunity to research the

20  purchaser.  We also requested adequate assurance information

21  from the debtors and the purchaser, but we have not yet

22  received a response.

23          So, while the purchaser's counsel proffered

24  information related to adequate assurance my client has not

25  yet had an opportunity to consider this information.  I also

1   just wanted to mention that the cure amount is a moving

2   target as a post-petition payment recently become due.

3           So, 3M remains willing to work with the debtors

4   and the purchaser; however, at this juncture if the debtor

5   wishes to proceed with the assumption and assignment of the

6   license agreement, we request an adjournment to work through

7   some of these issues that I mentioned.

8           THE COURT:  Mr. Lapowsky, yes.

9           MR. LAPOWSKY:  Your Honor, Robert Lapowsky, again,

10  for STC Opco.

11          Your Honor, we're going to remove 3M from the

12  assumed contracts list.  We may, depending on how

13  conversations go, add them back at some later date, but to

14  remove the issue for today they will come off the assumed

15  contracts list which I think will moot the issues being

16  raised by counsel for 3M.

17          THE COURT:  All right.  And if you add them back

18  in then, of course, you will address her concerns.

19          MR. LAPOWSKY:  If we add them back in we will need

20  a notice, and we will have a new hearing, and they will have

21  their opportunity to assess whether they think we can provide

22  adequate assurance or not.

23          THE COURT:  All right.  Ms. Elko Franklin, did you

24  hear that?

25          MS. FRANKLIN:  Yes, I did.  Thank you very much,

 1  Your Honor.

 2              THE COURT:  Thank you.

 3              I think that's it, Mr. Minuti.  Should we -- is 10

 4  minutes safe?  Do you need 15?

 5              MR. MINUTI:  Your Honor, if it's up to me we will

 6  be back in 10 minutes, I promise the court.  Let's have 10

 7  minutes.  I think it will allow the buyer to talk to the

 8  union.  Hopefully that gets worked out, and if not, we can

 9  come back on the record and I can address a couple of the

10  open issues.

11              THE COURT:  I'm going to give you 15 minutes and I

12  will be out in 15 minutes.

13              MR. MINUTI:  Thank you, Your Honor.

14              THE COURT:  Thank you.

15          (Recess taken at 3:46 p.m.)

16          (Proceedings resumed at 4:06 p.m.)

17              THE CLERK:  Please rise.

18              THE COURT:  Thank you everyone.  You may be

19  seated.

20              Mr. Minuti?

21              MR. MINUTI:  I think that might have been an

22  actual 15 minutes.

23              THE COURT:  That was my fault.

24              MR. MINUTI:  If it was actually 15 minutes, I want

25  the credit for that, Your Honor.

1            THE COURT:  Okay.

2            MR. MINUTI:  Your Honor, I think in terms of the

3  union's potential issue I think that's been worked out.  So,

4  let me turn the podium over to Mr. Marriott and I think he'll

5  put the resolution on the record.

6            THE COURT:  All right.  Thank you.

7            Mr. Marriott, yes, sir.

8            MR. MARRIOTT:  Hello again, Your Honor, Vince

9  Marriott representing Drexel.

10           We have agreed with PASNAP to language adjustments

11  to the APA that will result in them withdrawing their

12  objection.

13           THE COURT:  All right.

14           MR. MARRIOTT:  And I think it would make sense to

15  put them in the record.

16           THE COURT:  Yes.  Why don't you, Mr. Marriott.

17           MR. MARRIOTT:  If you want to follow along the

18  first change is to --

19           THE COURT:  What paragraph is this, I'm sorry?

20           MR. MARRIOTT:  Its 5.3(b) on Page 28.

21           THE COURT:  All right.

22           MR. MARRIOTT:  This is the first change.

23           THE COURT:  Yes.

24           MR. MARRIOTT:  If you look at the second sentence

25  of 5.3(b) it starts notwithstanding.

1           THE COURT:  Yes.

2           MR. MARRIOTT:  If you go to the end of that

3    sentence the word recognize is there.

4           THE COURT:  Yes.

5           MR. MARRIOTT:  That will be stricken.

6           THE COURT:  Okay.

7           MR. MARRIOTT:  Then if you go to the --

8           THE COURT:  The not also stricken.

9           MR. MARRIOTT:  No, not stays.

10          THE COURT:  Okay.

11          MR. MARRIOTT:  And I'll read you how the sentence

12   is going to read after I give you the edit.

13          THE COURT:  Okay.  That's fine.

14          MR. MARRIOTT:  Then in the next line to the far

15   end where it starts or bargaining.

16          THE COURT:  Yes.

17          MR. MARRIOTT:  It will be stricken from or

18   bargaining through obligations.

19          THE COURT:  Okay.

20          MR. MARRIOTT:  So, the sentence will now read,

21          "Notwithstanding anything in this agreement, Opco

22   buyer shall not be a party to or agree to assume any other

23   collective bargaining agreement between any seller and any

24   seller employees."

25          THE COURT:  All right.

1        MR. MARRIOTT:  That is how that sentence will now

2   read.

3        THE COURT:  All right.

4        MR. MARRIOTT:  Now, the next change is a little

5   longer and it's to 8.11 on Page 32.

6        THE COURT:  Okay.  Yes, sir.

7        MR. MARRIOTT:  And it's an insertion.  It's an

8   insertion at the beginning.

9        THE COURT:  Okay.

10        MR. MARRIOTT:  The insertion at the beginning will

11   read as follows,

12        "Subject to the provisions of Section 5.3, Opco

13   buyer will make offers of employment to the employees

14   represented by PASNAP and District 1199.  Opco buyer agrees

15   to recognize PASNAP and District 1199 as the bargaining

16   agents for their affiliated employees.  Opco buyer intends to

17   negotiate with PASNAP and District 1199 regarding new

18   mutually acceptable collective bargaining agreements which

19   may include *inter alia*, the terms and conditions of the offer

20   letters given to the employees represented by PASNAP and the

21   employees represented by District 1199."

22        That's the end of the insert.  8.11 would then

23   pick-up where it previously began with the phrase in the

24   event Opco buyer, et cetera.

25        THE COURT:  All right.

1          MR. MARRIOTT:  Those are the changes.  It's my

2   understanding that those changes resolve the objections of

3   PASNAP and we should be good to go.

4          THE COURT:  All right.  I will hear from PASNAP's

5   attorney.  Can you confirm that, sir?

6          MR. LASTOWSKI:  That is correct, Your Honor.  That

7   is acceptable.

8          THE COURT:  All right.  Wonderful.  I'm glad you

9   worked that out.

10          MR. LASTOWSKI:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. MINUTI:  Your Honor, again, Mark Minuti on

13   behalf of the debtor.

14          Your Honor, I want to -- I've got argument

15   prepared and I can address some of the objections that were

16   raised and I've got a lovely six or seven page argument on

17   the four prongs the court looks at in terms of the sale, but

18   I think I'm going to cut it short, Your Honor.

19          I think we satisfied the prongs.  I think the sale

20   is supported by sound business judgment.  Adequate notice was

21   certainly provided based on the record.  The sale was the

22   product of a fair and reasonable price or will produce a fair

23   and reasonable price for the assets.  And, obviously, the

24   evidence, I think, was compelling that all parties here have

25   acted in good faith.

1          So, let me turn to some of the objections that

2 remain, Your Honor. I'm not going to touch on all of them

3 because I think some were simply reservation of rights and we

4 hear that, for example, from Tenet and Conifer, Your Honor.

5 I don't think I need to respond to that, but let me just go

6 down the list and if there's one I don't hit, Your Honor

7 wants our view or wants to know where we stand on that I'm

8 certainly happy to tell the court.

9          So, let me start with the Department of Health,

10 Your Honor.  The Department of Health was concerned, there

11 was language in the order that was usurping their rights. I

12 confirmed this with the buyer, Your Honor.  We think we can

13 resolve those issues with respect to language in the order.

14 We're going to take the time to do that after the hearing if

15 Your Honor is inclined to approve the sale.  So, all of their

16 rights are going to be reserved.  Hopefully we work out

17 language, Your Honor never needs to hear from us again and we

18 will submit the order.  If there's an issue we will get back

19 to Your Honor.

20          THE COURT:  Okay.

21          MR. MINUTI:  I'm pleased to say, Your Honor, that

22 the union issue was resolved.

23          Let me next turn to Crothall Healthcare.  This was

24 an issue that was raised by a number of people.  Your Honor,

25 obviously, at this point in time we set forth the cure claim

1 that we believed was out there.  The debtors intend to pay

2 any post-petition obligations in the ordinary course, but,

3 obviously, if we don't make a payment by the time we get to

4 closing, there's an additional amount that's due post-

5 petition that isn't reflected on the schedule, for example.

6 We

7 appreciate and understand that's got to be paid.

8           THE COURT:  Okay.

9           MR. MINUTI:  So, we understand that's a moving

10 target in the event the debtor doesn't honor its post-

11 petition obligations and pay those obligations.  And that

12 applies to everybody across the board, Your Honor.  So, we're

13 not trying to cut-off anybody with respect to a post-petition

14 claim on a cure claim.

15           THE COURT:  Good.

16           MR. MINUTI:  Okay.  I think the next, sort of,

17 trio of objections I'll talk about, Your Honor, are the

18 ACGME, the ECFMG and the physicians.

19           THE COURT:  The tail insurance.

20           MR. MINUTI:  The tail insurance, Your Honor.  And

21 let's focus what we're talking about because we're very

22 appreciative of our buyer here.  With respect to our buyer

23 here, Your Honor, the tail insurance is going to be covered

24 for the St. Chris folks when we go forward.  The tail

25 insurance of these objectors they're talking about, Your

1  Honor, is tail insurance related to Hahnemann, physicians as

2  well as residents at Hahnemann.

3       One of the great benefits of the resident program

4  asset sale, at least from the resident side, was there's a

5  committee to use proceeds from that sale and that's what the

6  commitment was; to use the proceeds of the closing of that

7  sale to buy that tail coverage.  We certainly hope that we

8  can convince the District Court to allow that sale to go

9  forward.  It is certainly our intent to honor the obligation

10 if that sale goes forward, but that relates to Hahnemann,

11 Your Honor.

12      With respect to the physicians, Your Honor, you

13 know, at this point, unfortunately, there isn't a mechanism

14 right now for them to get paid tail coverage.  You know, we

15 will certainly explore that and look into ways that we can

16 make that happen down the road, but remember, Your Honor, as

17 we sit here today these are separate debtors.  There is

18 really no ability from a creditor of Hahnemann to force St.

19 Christopher's, for example, to pay anything.  There is no

20 ability, there is no legal argument that any reserve gets to

21 be established.

22      So, I think the best we're going to be able to do

23 or say at this point, Your Honor, is that we are aware of the

24 issue.  Trust me, Mr. Wilen is very concerned about tail

25 coverage.  It was he who pushed that issue with respect to

1  both the residents' program asset sale.  If there is a way

2  for this to happen, he is going to try to look for

3  opportunities at ways to make it happen.  Unfortunately,

4  we're not in a position where we can commit to do that right

5  now.  And, again, there is no legal basis and no legal

6  argument to escrow or set aside a reserve or any of those

7  issues.

8           So, we hear them.  We are sympathetic to the

9  argument, Your Honor.  We are committed to try to figure out

10  a solution to that problem, but I can't fix it today with

11  respect to this sale, Your Honor.  And that is really all I

12  can say about that.

13           THE COURT:  Let me interrupt just to say I agree

14  with your position, Mr. Minuti.  I think that it is a subject

15  of great concern and sensitivity, and one that, hopefully,

16  debtors can find a solution to, but I certainly am not in a

17  position today to order that you do so.

18           MR. MINUTI:  Thank you, Your Honor.

19           Your Honor, if you give me just one moment, I

20  think I'm concluded because I think I hit all the ones that I

21  wanted to hit, but let me just check.

22           THE COURT:  I think so too.

23           MR. MINUTI:  Your Honor, I think that's it in

24  terms of my rebuttal for any of the objections that remain

25  outstanding.

1          THE COURT:  All right.

2          Mr. Lapowsky, yes, sir.

3          MR. LAPOWSKY:  Yes, Your Honor; Robert Lapowsky

4    fort STC Opco.

5          I just wanted to make one point which I think

6    should be obvious.  The purchaser is paying cure claims.  So,

7    to the extent that the debtor doesn't pay post-petition

8    amounts due the debtor can't just stop paying post-petition

9    and saddle the purchaser with all those obligations.

10          THE COURT:  Yes.  I understand that.

11          Well, look, I've listened to the proffered

12   testimony and the objections as well.  The proffers of Mr.

13   Wilen and Mr. Victor establish that SSG performed certainly

14   more than adequate marketing sending to 81 potential

15   purchasers, that the bidding procedures that the court

16   outlined were followed and the selection of STC Opco was made

17   at arm's length and in good faith, and further that there are

18   even substantial negotiations beyond the bidding procedures

19   which further enhance the purchase price.  And the proffers

20   of the testimony of Mr. Matthews for Temple Health and Ms.

21   Owens for Drexel, who are the joint ventures, if you will, in

22   the STC Opco, LLC established clearly and without rebuttal

23   that they acted in good faith and at arm's length, and their

24   proffer is also established by, certainly, a preponderance of

25   the evidence that both Tower and Drexel have the financial

1  wherewithal to make the purchase and to provide adequate

2  assurance of future performance to the parties whose

3  contracts are being assumed and assigned.

4          There were no objections to the bona fides of the

5  sale.  And it clear to the court that the debtors exercised

6  their sound business judgment in entering into the sale and

7  that the price is the highest and best price that the debtors

8  were able to achieve under the circumstances.  There were

9  also points made that the purchasers, the types of

10 purchasers, that the community wanted.  They're local,

11 they're non-profit and that certainly established, I think,

12 satisfaction in the community.  And for those reasons the

13 court will approve the sale subject to final documentation

14 which I recognize the parties will be -- the debtors will be

15 submitting to counsel -- to the court, excuse me.

16          MR. MINUTI:  Thank you, Your Honor.

17          Your Honor, I think it's a little optimistic to

18 think that we're going to be done tonight, but we will

19 certainly submit the order and the revised asset purchase

20 agreement under certification as soon as we can.  If we

21 can't, if for some reason we hit a bump we will let Chambers

22 know that.  I don't anticipate that.

23          THE COURT:  I have time tomorrow if that happens.

24          MR. MINUTI:  Very well.  We will speak -- well,

25 speaking of tomorrow, Your Honor --

1          THE COURT:  Oh, you're here anyway.

2          MR. MINUTI:  Well, I was going to raise a

3  housekeeping matter with respect to the hearing tomorrow,

4  Your Honor.

5          THE COURT:  Yes.

6          MR. MINUTI:  So, we have two matters on for

7  tomorrow or were scheduled were for tomorrow.

8          THE COURT:  That's right.

9          MR. MINUTI:  One was our motion employing a key

10  employee incentive plan and the other was a motion to reject

11  some executory contracts and leases.  We have decided to

12  continue the motion to reject executory contracts and leases.

13  So, we do not intend to go forward on that tomorrow.

14          With respect to the key employee incentive plan,

15  Your Honor, I'm pleased to report that we have no objections.

16  We did have some dialog with the committee who asked for some

17  changes to the proposed form of order.  We have agreement on

18  that now.  We just need to go back to our offices and mark-up

19  the order and submit it under certification.

20          So, I know Your Honor loves seeing us and has seen

21  us quite a bit, but if it's acceptable to the court I think

22  what we would like to do is cancel our hearing tomorrow.  We

23  will submit the key employee incentive plan order under

24  certification.  Obviously, if Your Honor has any questions or

25  concerns, we can either come back or Your Honor can get us on

1  the phone.  I don't think that's going to be the case and I

2  think we'll be submitting a consensual order.

3         So, my request is to cancel the hearing unless the

4  court is dying again to see us tomorrow.

5         THE COURT:  Well, I would love to see you again,

6  Mr. Minuti, but I will cancel the hearing.  Is there another

7  matter that needs scheduling, I had the impression?

8         MR. MINUTI:  Your Honor, there was -- we were

9  hopeful, Your Honor, that with respect to the rejection

10 motion if it wasn't going forward tomorrow that we would have

11 time to, sort of, get our ducks in a row and maybe bring that

12 back on in relatively quick period of time.  I don't think

13 we're in a position yet to know when we're going to be able

14 to do that.  So, rather than bother Chambers let us get our

15 ducks in a row and then we will be back to Your Honor or to

16 Chambers with respect to that.

17        THE COURT:  All right.

18        MR. MINUTI:  But for right now we know we're not

19 ready to go forward tomorrow and there is no need for us to

20 get together.

21        THE COURT:  I understand.  Okay.  Very fine.

22        Well, I congratulate STC Opco and I wish you

23 success, obviously, in operating St. Christopher's Hospital

24 which is, obviously, a very, very fine institution.  With

25 that we will stand in recess everyone.

1          MR. MINUTI:  Thank you, Judge.

2          THE COURT:  Thank you.

3      (Proceedings concluded at 4:20 p.m.)

4

5

6

7                      CERTIFICATE

8

9  We certify that the foregoing is a correct transcript from

10  the electronic sound recording of the proceedings in the

11  above-entitled matter.

12

13
   /s/Mary Zajaczkowski                     September 24, 2019
14  Mary Zajaczkowski, CET**D-531

15

16

17

18

19

20

21

22

23

24

25