**Exhibit A**

# FIRST AMENDMENT TO
# ASSET PURCHASE AGREEMENT

This FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "*Amendment*") is made and entered into as of December 14, 2019, by and between St. Christopher's Healthcare, LLC (the "**Hospital Seller**"), Philadelphia Academic Medical Associates, LLC and certain affiliated debtor physician practice groups, Philadelphia Academic Medical Associates, LLC, SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., St Chris Care at Northeast Pediatrics, L.L.C., TPS V of PA, L.L.C. (the "**Practice Group Seller**" and with the Hospital Seller, the "**Debtor Parties**"), (the Debtor Parties each referred to herein individually as "**Seller**" and collectively as "**Sellers**"), and STC OpCo LLC, a Pennsylvania limited liability company formed by Drexel University and Tower Health to acquire certain assets of the Debtor Parties ("**OpCo Buyer**" and, together with the Sellers, the "*Parties*").

## BACKGROUND

WHEREAS, the Parties, have entered into an Asset Purchase Agreement dated September 20, 2019 (the "*Purchase Agreement*"), providing for, among other things, the sale, transfer, conveyance, assignment and delivery by Sellers to OpCo Buyer of substantially all of the assets of Sellers in connection with a proposed sale under Section 363 of Chapter 11 of Title 11 of the United States Bankruptcy Code, on the terms and conditions set forth therein and subject to the approval of the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"); and

WHEREAS, the Bankruptcy Court entered an order (the "*Sale Order*") approving the Purchase Agreement on September 27, 2019; and

WHEREAS, the OpCo Buyer has requested that the Closing will occur on or about December 15, 2019, with an effective time as set forth herein;

WHEREAS, the Parties desire to modify and amend the Purchase Agreement, as hereinafter set forth in this Amendment.

WHEREAS, pursuant to paragraph 28 of the Sale Order, the Sellers and OpCo Buyer have authority to modify or amend the Purchase Agreement without further order of the Bankruptcy Court as long as such modification or amendment is (a) not material or (b) not less favorable to the Sellers than the existing applicable provisions.

WHEREAS, the modifications and amendments to the Purchase Agreement provided for herein are (a) not material, and (b) not less favorable to the Sellers than the existing applicable provisions.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby covenant and agree as follows:

1. <u>Background</u>. The Background provisions set forth above (including, but not limited to, the defined terms set forth therein) are hereby incorporated by reference in this Amendment and made a part hereof as if set forth in their entirety in this <u>Section 1</u>.

2. <u>Capitalized Terms</u>. Any capitalized terms used in this Amendment without definition shall have the meanings ascribed to those terms in the Purchase Agreement.

3. <u>Amendments to Purchase Agreement</u>. The Purchase Agreement is hereby amended a follows:

    a. Paragraph 1.3 of the Purchase Agreement is deleted in its entirety and replaced with the following:

**Closing Date; Effective Time; Transition.**

    (a)    The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place as promptly as possible following the receipt of all governmental approvals and the satisfaction or waiver of the conditions set forth in ARTICLE 7 and ARTICLE 8, other than those conditions that by their nature are to be satisfied at Closing but subject to fulfillment or waiver of those conditions, at the offices of Ballard Spahr LLP, 1735 Market Street, 48th Floor, Philadelphia PA 19103 (the day on which Closing actually occurs, the "Closing Date").

    (b)    For purposes of this Agreement, the term "Effective Time" means 12:01 am Eastern time on Sunday, December 15, 2019, and the term "Gap Period" means the period of time commencing at the Effective Time and ending upon the earlier of (1) the termination of this Agreement or (2) when the Closing actually occurs. If the Closing occurs, the Closing will be deemed to have occurred as of the Effective Time regardless of the actual time that all conditions to Closing are satisfied or waived, and the parties agree that the purpose and intent of references to the Gap Period in this Agreement is to put the parties in the position that they would have been in had all the conditions to Closing actually been satisfied or waived as of the Effective Time.

    (c)    During the Gap Period, notwithstanding anything to the contrary in Section 4.6 of the Purchase Agreement, OpCo Buyer will be deemed to have operational control over the Hospital Business and the Physician Practice Business, provided that OpCo Buyer shall not take any action in the exercise of such control that would (i) reasonably foreseeably result in a material adverse effect on the Assets, the Hospital Business or the Physician Practice Business; (ii) cause any Seller to incur any material liability out of the ordinary course of business, consistent with the past practice of the operation of the Hospital Business or the Physician Practice Business, to which that Seller would continue to be subject from and after the Closing; or (iii) cause any Seller to be in violation of its fiduciary duties as a debtor-in-possession. For the avoidance of

doubt, and notwithstanding anything to the contrary contained in this Agreement, (i) transfer of the Assets to the OpCo Buyer shall not be deemed to occur (and the Sellers shall retain ownership thereof), and the OpCo Buyer shall not have any interest in the Assets, unless the Closing occurs and (ii) OpCo Buyer shall have no control of, and no ability to expend, move or otherwise dispose of, any funds of any Seller during the Gap Period, or otherwise.

(d) OpCo Buyer shall indemnify, defend and hold harmless each Seller and each member, manager, officer or other representative or agent of each Seller from and against all claims, losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees, incurred or sustained by, or imposed upon, such Seller or member, manager, officer or other representative or agent of each Seller based upon, arising out of, with respect to or by reason of the exercise by OpCo Buyer of control over the Hospital Business or the Physician Practice Business during the Gap Period. This Section 1.3(d) shall survive Closing.

b. Section 1.5(a) of the Purchase Agreement is deleted in its entirety and replaced with the following:

"(a) payments of (i) an amount equal to the Cash Consideration less the Sellers' Tail Coverage Expense subject to credits or plus payment to Sellers of all amounts as provided in Section 1.6 (the "Net Cash Consideration"); plus (ii) payment to Sellers of the Estimated Straddle Payroll Payment as provided for in subsection 1.6(b)(i)(C) below; plus (iii) the sum of $98,000.00 representing reimbursement for certain medicine purchased by a Seller as an accommodation to OpCo Buyer on December 13, 2019;, minus (iv) the Physician Bonus Deposit (defined below) "

c. Paragraph 1.6(b) of the Purchase Agreement shall be re-numbered as Paragraph 1.6(c), and a new Paragraph 1.6(b) shall be added to the Purchase Agreement as follows:

"(b) **Certain Additional Specific Prorations**:

(i) **Straddle Payroll**.

(A) **Definitions**. For purposes of this Agreement: (1) the term "**Straddle Shift**" means a work shift of a shift employee of the Hospital Business or the Physician Practice Business that begins before the Effective Time and ends after the Effective Time; (2) "**Straddle Employees**" means those employees of the Hospital Business or the Physician Practice Business who have a Straddle Shift; and (3) the term "**Straddle Employees Post-Effective Time Payroll**" means the aggregate amount of the payroll of each Straddle Employee that corresponds to the period beginning on the Effective Time and ending at the end of that Straddle Employee's shift.

3

(B) **Proration.** The parties agree that the responsibility for the payroll of the Straddle Shift of Straddle Employees shall be prorated with Buyer being responsible for the Straddle Employees Post-Effective Time Payroll and with Sellers being responsible for the balance of the payroll for the Straddle Shift.

(C) **Estimated Straddle Payroll Payment.** At or before the Closing, Buyer shall deliver to Sellers a payment in the amount of $50,000 (the "**Estimated Straddle Payroll Payment**"), which amount represents the Parties' good faith estimate of the Straddle Employees Post-Effective Time Payroll. If after Closing the Estimated Straddle Payroll Payment is determined in accordance with subsection 1.6(c) below to not be equal to the Straddle Employees Post-Effective Time Payroll, then Buyer will pay to Sellers the shortfall or Sellers will pay to Buyer the surplus, as applicable, in accordance with subsection 1.6(c) below.

(ii) **Rent for Leased Real Estate.** The parties agree that the responsibility for real estate lease payments with respect to real estate leases that are being assumed by a Seller and assigned to OpCo Buyer ("**Transferred Real Estate Leases**") shall be prorated with the relevant Sellers being responsible for payment for that portion of the relevant lease period that begins on the Petition Date and ends at the Effective Time and with Buyer being responsible for payment for that portion of the relevant lease period that begins with and follows the Effective Time.

(iii) **Physician Bonuses.** OpCo Buyer shall assume the obligation to pay, and shall be liable to pay, to each physician with an employment agreement that is an Assumed Contract (each a "**Continuing Physician**"), unpaid bonus amounts due under such Assumed Contracts for all periods which include any dates prior to the Closing Date the (**Physician Bonus Amount**) without regard to whether such Physician Bonus Amount would have been an allowed administrative expense under section 503 of the Bankruptcy Code. OpCo Buyer shall pay such bonus amounts as and when due under the applicable Assumed Contract. At Closing, OpCo Buyer shall pay to a third party, as agreed to by Sellers and OpCo Buyer prior to the Closing, $300,000 (the "**Physician Bonus Deposit**"). The Physician Bonus Deposit shall not become property of the estate of any Seller unless and until it is disbursed to a Seller pursuant hereto. The Physician Bonus Deposit shall not be disbursed other than upon written agreement of the Sellers and OpCo Buyer or an order of the Bankruptcy Court.

It is the intention of the Seller and OpCo Buyer that the Sellers be responsible for all Physician Bonus Amounts attributable to services rendered by a Continuing Physician after the Petition Date and prior to the Closing Date and that OpCo Buyer be responsible for all Physician Bonus Amounts attributable to services rendered by a Continuing Physician prior to the Petition Date and on and after the Closing Date, in each case, without regard to when entitlement to any such Physician Bonus Amount contractually vests.

Subsequent to Closing, OpCo Buyer shall notify Sellers in writing promptly following payment by OpCo Buyer of any Physician Bonus Amount and the amount of such Physician Bonus Amount that OpCo Buyer asserts is the responsibility of the Sellers (the "**Sellers' Share of Physician Bonus**"). Such notification shall include reasonably detailed calculations and other information so as to permit the Sellers to verify the alleged Sellers' Share of Physician Bonus.

Unless the Sellers, in good faith, dispute OpCo Buyer's calculations with respect to the Sellers' Share of Physician Bonuses, the Sellers shall, promptly upon receipt of such calculations join with OpCo Buyer in an instruction to the holder of the Physician Bonus Deposit to pay such amount to OpCo Buyer. If the Sellers dispute in good faith the Sellers' Share of Physician Bonus, the Sellers shall so advise OpCo Buyer and either the Sellers or OpCo Buyer may present the dispute to the Bankruptcy Court for resolution. The decision of the Bankruptcy Court shall be final and non-appealable.

The Physician Bonus Deposit is not a limitation on the entitlement of OpCo Buyer to reimbursement by the Sellers of the Sellers' Share of Physician Bonus. To the extent the aggregate Sellers' Share of Physician Bonus, as agreed by the Sellers and OpCo Buyer or as determined by the Bankruptcy Court, exceeds the Physician Bonus Deposit, such excess shall be an allowed administrative claim in the bankruptcy cases of each of the Sellers and shall be paid by the Sellers to OpCo Buyer promptly following allowance.

To the extent, as of the date that is one year after the Closing Date, the original Physician Bonus Deposit amount exceeds the aggregate amount of (a) all Sellers' Share of Physician Bonuses paid to OpCo Buyer from the Physician Bonus Deposit, plus (b) all then pending disputes over Sellers' Share of Physician Bonuses, such excess shall be paid by the holder of the Physician Bonus Deposit to the Sellers. Thereafter, as disputes over Sellers' Share of Physician Deposits are resolved (whether by agreement or order of the Bankruptcy Court), the agreed or Bankruptcy Court ordered amount of such Sellers' Share of Physician Deposits shall be paid from the Physician Bonus Deposit to OpCo Buyer and any originally disputed amount in excess thereof shall be paid from the Physician Bonus Deposit to the Sellers.

The Parties shall enter into a stipulation consistent with the foregoing, and shall seek Bankruptcy Court approval thereof. However, the provisions hereof shall be binding on the Sellers and OpCo Buyer whether or not approved by the Bankruptcy Court.

d. Paragraph 1.8(b) is deleted in its entirety and replaced with the following:

"all accounts, notes or other amounts relating to services rendered prior to the Effective Time;"

e. Notwithstanding the prohibition stated in paragraph 1.11 of the Purchase Agreement, OpCo Buyer shall be permitted to modify Schedule 1.11 solely to delete the physician contract with Dr. Agustin Legido ("**Dr. Legido**") provided, however, (i) OpCo Buyer shall be responsible for payment of any rejection damage claim asserted by Dr. Legido (the "**Legido Rejection Damage Claim**"), (ii) OpCo Buyer shall have full control over any litigation relating to the Legido Rejection Damage Claim and settlement of the Legido Rejection Damage Claim and shall reimburse Sellers for all reasonable fees and expenses incurred by Sellers in connection with any such litigation or negotiated settlement, (iii) OpCo Buyer shall not be required to obtain Bankruptcy Court approval of any settlement of the Legido Rejection Damage Claim and shall not be required to disclose the substance of any such settlement to the Sellers or the Bankruptcy Court, provided, however, that OpCo Buyer shall obtain a release of all claims held by Dr. Legido against Sellers.

f. The date "December 13, 2019" as it appears in paragraphs 9.1(d),(e) and (g) of the Purchase Agreement is hereby deleted in its entirety and replaced with "December 16, 2019".

g. A new section 1.13 shall be added to the Purchase Agreement, which is as follows:

**1.13. Patient Billing/Collection.** Sellers shall be entitled to all payments for services provided to patients up to and including the date preceding the Effective Time, and OpCo Buyer shall be entitled to all payments for services provided on the Effective Time and thereafter. Any payment received by OpCo Buyer or Sellers that includes amounts properly attributable to the other shall promptly be remitted to the other.

(a) With respect to patients of the Hospital who are hospitalized (either inpatient, emergency, observation or otherwise) and have not been medically discharged by the applicable attending physician as of 11:59 p.m. on the day before the Effective Time ("Straddle Patients"), OpCo Buyer shall (itself or through Conifer Revenue Cycle Solutions LLC) bill the patient or the third party payor, as applicable, for all services, durable medical equipment, medication and other separately identifiable billable items (collectively, "Services") rendered upon the Straddle Patients' discharge, including for those Services rendered by the Seller prior to the Closing (such payments with respect to Straddle Patients are herein referred to as "Straddle Payments"). Upon receipt of any Straddle Payments, OpCo Buyer shall cause OpCo Buyer's and Sellers' billing agent, Conifer Revenue Cycle Solutions LLC, to prepare a reasonably detailed calculation setting forth with respect to such Straddle Patient, the total Straddle Patient days, the Sellers' percentage share thereof (the "Sellers' Straddle Ratio") and OpCo Buyer's percentage share thereof (the "OpCo Buyer's Straddle Ratio" and, together with the Sellers' Straddle Ratio, the "Straddle Ratios"). On a weekly basis, OpCo Buyer shall pay to Sellers an amount equal to the sum of any Straddle Payments received multiplied by the Sellers' Straddle Ratio. For the

sake of clarity and by way of an example, if OpCo Buyer received $1,000 in reimbursement for a Straddle Patient who was hospitalized for 30 days, 16 days of which were prior to the Effective Time, the Total Straddle Patient Days would be 30, the OpCo Buyer Straddle Ratio would be 0.46667 (14/30), the Sellers Straddle Ratio would be 0.53333 (16/30) and OpCo Buyer would be obligated to pay to Sellers the amount of $533.33. In the event Sellers receive reimbursement monies in connection with Straddle Patients, payment will be appropriately allocated to OpCo Buyer for services rendered by OpCo Buyer in the manner described above. Notwithstanding the foregoing, the Parties shall meet and confer monthly to perform a monthly true-up that reflects material inequities in the use of the Straddle Ratios to allocate Straddle Payments, which shall take into account the amount of Services rendered to Straddle Patients. In the event of a disagreement regarding any such true-up, the Parties shall jointly retain a distinterested person experienced in medical billing (a "<u>Billing Expert</u>"), who shall determine the equitable manner in which such Straddle Payments shall be allocated. The decision of such Billing Expert shall be binding on the Parties. The cost and expenses of the Billing Expert shall be shared equally by the Parties. OpCo Buyer shall pay to Sellers, or Sellers shall pay to OpCo Buyer, any amounts determined to be due as a result of the foregoing true-up within three (3) business days of its final determination.

(b) In the event of any claims denial with respect to any Straddle Patient relating to Services provided prior to the Closing for which payment was made to Sellers pursuant to Section 1.13(a) hereof, OpCo Buyer may, at its sole election and by written notice to Sellers, offset against the payment to Sellers of any other portion of a Straddle Payment or require Sellers to promptly (and in no event later than 30 days after delivery of such notice) pay OpCo Buyer the Sellers' Straddle Ratio of the amount of such claims denial, provided that such amount has been set off by the applicable payor against amounts otherwise payable to OpCo Buyer. In determining the amount of the offset or Sellers' payment obligation pursuant to this Section 1.13(b), OpCo Buyer shall multiply the amount of the claim which has been denied and offset by the payor against amounts otherwise payable to OpCo Buyer, by the Sellers' Straddle Ratio.

(c) With respect to non-Straddle Patients, to the extent either party receives reimbursement monies for services which the other party rendered, the party receiving such reimbursement monies shall pay such amounts to the rendering provider on a weekly basis.

h. A new Paragraph 1.14 shall be added to the Purchase Agreement as follows:

**1.14. Funds Belonging to Counterparty.**

(a) From and after the Effective Time, if any Seller receives or collects any funds to which OpCo Buyer is entitled, or OpCo Buyer receives or collects any funds to which a Seller is entitled, as the case may be, whether pursuant to the proration provisions of this Agreement or otherwise ("**Funds Belonging to Counterparty**"),

the party in receipt or possession of such Funds Belonging to Counterparty will promptly remit the same to the party entitled thereto. In no event shall any party holding Funds Belonging to Counterparty assert or exercise any right of setoff or other right or remedy with respect to such Funds Belonging to Counterparty.

(b) Each Seller and OpCo Buyer acknowledges and agrees that all Funds Belonging to Counterparty will be segregated and held in express trust for the benefit of the party entitled thereto.

(c) Each Seller on the one hand and OpCo Buyer on the other hand: (i) represents and warrants to the other that there are no liens, encumbrances or Interests on any Funds Belonging to Counterparty, and (ii) covenants to the other that it shall take all actions as may be required to ensure that there are no liens, encumbrances or Interests on any Funds Belonging to Counterparty; in either case to the extent that any such liens, encumbrances or Interests would interfere with the fulfillment by such Seller or OpCo Buyer, as applicable, to fulfill its duty to promptly remit such Funds Belonging to Counterparty to the party entitled thereto.

(d) Following the Closing, the Sellers and their respective advisors on the one hand, and OpCo Buyer and its advisors on the other hand, shall have reasonable access to the relevant books and records of the other party and the personnel of, and work papers prepared by the accountants, consultants and contractors of the other party, including without limitation Conifer Revenue Cycle Solutions LLC, as they may reasonably request for the purpose of confirming whether the other party is in receipt or possession of Funds Belonging to Counterparty, provided that such access shall be in a manner that does not unreasonably interfere with the normal business operations of the other party.

h. Paragraph 2.9(d) is amended in its entirety and replaced with the following:

(d) Except as set forth on Schedule 2.9(d), Sellers' Graduate Medical Education Residency Programs are fully accredited and operated in accordance with the requirements of the Accreditation Council for Graduate Medical Education, the appropriate Residency Review Committee, Liaison Committee on Medical Education, Middle States Commission on Higher Education and Pennsylvania Department of Education and Sellers have not entered into any agreements for Shared Rotational Arrangements and Residency Cap Affiliations except as listed in the Notice of Assumption, Assignment and Cure Amount with Respect to Executory Contracts and Unexpired Leases of the Debtor as filed in the Bankruptcy Court.

4. Applicable Law. This Amendment shall be governed by and construed in accordance with the Law of the Commonwealth of Pennsylvania without regard to the Law of the conflicts of Law of such State. THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO THE INTERPRETATION AND ENFORCEMENT OF THIS AMENDMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE

JURISDICTION. THE FOREGOING NOTWITHSTANDING, IF THE BANKRUPTCY COURT FOR ANY REASON DECLINES TO EXERCISE JURISDICTION OR DETERMINES THAT IT DOES NOT HAVE JURISDICTION OVER ANY DISPUTE OR MATTER, THEN THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS SITTING IN BERKS COUNTY, PENNSYLVANIA.

5. Ratification of Purchase Agreement. Except as expressly modified and amended by this Amendment, the Purchase Agreement is hereby ratified and confirmed in all respects and remains in full force and effect.

6. Filing of Amendment. The Sellers shall cause this Amendment to be filed with the Bankruptcy Court on or before December 15, 2019.

7. Counterparts. This Amendment may be executed in two or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument. Any Party to this Amendment may deliver an executed copy hereof electronically by facsimile transmission or in Portable Document Format (PDF) to another Party hereto and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Amendment.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Amendment on behalf of the parties as of the day and year first above written.

OPCO BUYER:

STC OpCo, LLC, a Pennsylvania limited liability Company

Signature By:

_____
Print Name: Clint Matthews
Title: President

SELLERS:
St. Christopher's Healthcare, LLC,
Philadelphia Academic Medical Associates, LLC
SCHC Pediatric Associates, L.L.C.,
St. Christopher's Pediatric Urgent Care Center, L.L.C.,
SCHC Pediatric Anesthesia Associates, L.L.C.,
St Chris Care at Northeast Pediatrics, L.L.C.,
TPS V of PA, L.L.C.

Signature By:

_____
Print Name: Allen Wilen
Title: Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Amendment on behalf of the parties as of the day and year first above written.

OPCO BUYER:

STC OpCo, LLC, a Pennsylvania limited liability Company

Signature By:

_____
Print Name: Clint Matthews
Title: President

SELLERS:
St. Christopher's Healthcare, LLC,
Philadelphia Academic Medical Associates, LLC
SCHC Pediatric Associates, L.L.C.,
St. Christopher's Pediatric Urgent Care Center, L.L.C.,
SCHC Pediatric Anesthesia Associates, L.L.C.,
St Chris Care at Northeast Pediatrics, L.L.C.,
TPS V of PA, L.L.C.

Signature By:

_____
Print Name: Allen Wilen
Title: Chief Restructuring Officer

*Signature Page to Amendment to Asset Purchase Agreement*