## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC, d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*,[1] | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | Re: Docket Nos. 1134 & 1141 |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) OMNIBUS OBJECTION TO (A) EMERGENCY MOTION OF AD HOC COMMITTEE OF HAHNEMANN RESIDENTS AND FELLOWS TO COMPEL DEBTORS TO  PROVIDE PROFESSIONAL LIABILITY INSURANCE IN ACCORDANCE WITH RESIDENT EMPLOYMENT AGREEMENTS AND (B) THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF HEALTH'S MOTION FOR AN ORDER COMPELLING DEBTORS TO OBTAIN POST-CLOSURE TAIL INSURANCE COVERAGE, AND (II) REPLY TO THE ORDER FOR RULE TO SHOW CAUSE DIRECTED TO DEBTORS

The Official Committee of Unsecured Creditors (the "Committee")[2] in the chapter 11 cases of Center City Healthcare, LLC d/b/a Hahnemann University Hospital and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this (i) omnibus objection (the "Objection") to the (a) *Emergency Motion of Ad Hoc Committee of Hahnemann Residents and Fellows to Compel Debtors to Provide Professional Liability Insurance in Accordance With Resident Employment Agreements* [D.I.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motions, as appropriate.

1134] (the "<u>Resident Motion</u>") and (b) the *Commonwealth of Pennsylvania Department of Health's Motion for an Order Compelling Debtors to Obtain Post-Closure Tail Insurance Coverage* [Docket No. 1142] (the "<u>PA DOH Motion</u>," and together with the Resident Motion, the "<u>Motions</u>"), and (ii) reply (the "<u>Reply</u>") to the *Order for Rule to Show Cause Directed to Debtors* [Docket No. 1169] (the "<u>Order to Show Cause</u>").  In support of the Objection and Reply, the Committee respectfully represents as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      While the Committee is sympathetic to the concerns of the former residents, fellows and interns of the Debtors (collectively, the "<u>Residents</u>"), nothing in the Bankruptcy Code or Pennsylvania law permits or authorizes the Residents or Pennsylvania Department of Health (the "<u>PA DOH</u>") to compel the Debtors to obtain post-closure tail insurance and pay the costs associated therewith.[3]  The Motions allege that the Debtors breached their pre-petition contracts with the Residents (the "<u>Resident Contracts</u>") in January 2018 by failing to have purchased occurrence-based professional liability insurance for the Residents and that, to rectify this alleged breach, the Debtors must now purchase tail coverage for the benefit of the Residents.  However, such alleged breach gives rise to, at best, a general unsecured claim against the Debtors' estates for damages.  The Bankruptcy Code does not require post-petition remedial action on behalf of the Debtors to address an alleged breach of a pre-petition contract and there is no remedy of specific performance for alleged breaches of pre-petition contractual obligations under these circumstances.

---

[3] While the Committee understands that the costs associated with tail coverage are asserted to be prohibitive, such costs are within the control of the Commonwealth of Pennsylvania as the PA Code declares that "medical professional liability insurance has to be obtainable at an affordable and reasonable cost in every geographic region of the Commonwealth." 40 P.S. § 1303.102(3). The Committee notes that section 1303.102—Declaration of policy—expired on December 31, 2007, but understands this concept remains operative in the PA Code.

2.      In an attempt to elevate the status of the Residents' alleged general unsecured claims to administrative priority claims, the Resident Motion argues that the estates will benefit from purchasing tail coverage because the Jefferson APA (defined below) (i) requires the Debtors keep the Resident Contracts in place, (ii) requires that prior to January 10, 2020, the Debtors purchase sufficient tail coverage for the Residents, and (iii) provides that failure to purchase such tail coverage would result in a material breach of the APA putting the entire sale at risk.  These are gross misstatements and misinterpretations of the Jefferson APA.  First, the Jefferson APA only requires that "the Seller use its commercially reasonable efforts to preserve intact its relationships with Residents at Hahnemann University Hospital[.]"  Jefferson APA, § 6.2  Next, the Jefferson Sale Order (defined below) provides that "the Debtors may use a portion of the Base Purchase Price, not to exceed the Tail Coverage Costs, to purchase the Tail Coverage Endorsement in accordance with the [Jefferson APA[.]"  Jefferson Sale Order, ¶ 12.  As such, the Jefferson Sale Order contemplates that the Debtors would purchase tail coverage subsequent to the closing of the sale using the sale proceeds—not on or before January 10, 2020—and thus the failure to purchase tail coverage by January 10, 2020 would not jeopardize the sale or harm the estates.  The Residents are therefore not entitled to administrative priority status for any alleged claims.

3.      Similarly, even if the Resident Contracts are executory (which is questionable since the Residents are all *former* employees of the Debtors and have no remaining obligations under the contracts), the Debtors are not required to remedy any alleged breaches while they decide whether to assume or reject such contracts.  To the extent the Residents argue the Debtors must continue to perform under the Resident Contracts by purchasing tail coverage while the Debtors decide whether to assume or reject the contracts (which is contrary to the Residents'

position that the Debtors already breached by not purchasing occurrence-based coverage), any failure to perform would result in a breach of contract claim, which, as set forth above, would not rise to the level of administrative priority.

4.      Next, Pennsylvania law does not require that the Debtors purchase tail insurance for the Residents—it does not even require that employers provide medical professional liability insurance for its employees.  Such obligations are created by contract rather than by statute. Section 1303.711 of title 40 of the Pennsylvania Statutes (the "PA Code"), which sets forth the requirements for medical professional liability insurance, requires that health care providers either purchase medical professional liability insurance from an insurer or provide self-insurance. Importantly, "health care provider" is defined as, in relevant part, "a person . .  approved by the Commonwealth to provide health care or professional medical services as a physician[.]" 40 Pa. Stat. Ann. § 1303.103.  As such, while Pennsylvania law requires Residents have medical professional liability insurance, it does not require that an individual's employer (*i.e.*, the Debtors) provide such insurance.  If the employer decides to provide such insurance, it may do so pursuant to a contract with the employee.  If the employer breaches the contract, the employee would have, at most, a claim for that breach.

5.      Similarly, section 1303.711 of the PA Code does not require that the health care provider purchase occurrence-based professional liability coverage or a claims made policy with a tail.  Recognizing this, the Motions incorrectly argue that section 1303.742—which governs insurers—"bar[s] the use of claims made insurance without an appropriate tail."  Resident Motion, ¶ 8.  This is simply a misrepresentation of section 1303.742, which requires that if the medical professional liability insurance policy is written on a "claims made" basis, then "the **insurer** shall guarantee to the commissioner the **continued availability** of suitable liability

protection for a health care provider[.]" 40 Pa. Stat. Ann. § 1303.742 (emphasis added).  In fact, this section contemplates that a health care provider may have a claims made policy and subsequently discontinue its practice and/or terminate the claims made policy.  Put simply, the Motions misstate Pennsylvania law in an attempt to elevate the Residents' claims in contravention the Bankruptcy Code.

6. The PA DOH Motion also mischaracterizes, among other things, the PA DOH's regulatory and statutory authority, which does not authorize the PA DOH to compel the Debtors to take action beyond the scope of the PA Code.

7. Further, conversion under section 1112(b)(4)(C) and 1112(b)(4)(A) is not appropriate in these cases and is, in fact, contrary to the interests of creditors.  As stated above, "appropriate insurance," as required by section 1112(b)(4)(C), does not include tail insurance purchased by the Debtors for the benefit of their former Residents.  This is simply not required under Pennsylvania law.  Instead, the PA Code requires Residents to purchase malpractice insurance—not their employers—and requires insurers make tail coverage available for Residents with claims-made policies.  Such provisions of the PA Code are designed to protect the public without requiring an employer provide malpractice insurance.  Similarly, conversion under section 1112(b)(4)(A) is inappropriate because there is no substantial or continuing loss to or diminution of the Debtors' estates.  At this point, all the Debtors' assets have been sold and the Debtors' estates can only be augmented through the collection of accounts receivable and the pursuit of claims and causes of action of the estates.   Conversion of these cases is contrary to the interests of all general unsecured creditors and not in the best interest of the estates.  The Committee submits that its efforts, in conjunction with those of the Debtors herein, will maximize value and will necessarily avoid the additional costs and delay associated with any

possible conversion.  As such, "the creditors' best interests are served by sustaining the Bankruptcy Cases."[4]

8.      Simply, although the plight of the Residents is unfortunate on many levels, neither the Bankruptcy Code nor PA Code provide legal support for the Motions or Order to Show Cause.  This Court should not create a remedy or result which would contravene the Bankruptcy Code's express policy of ratable distribution[5] and narrow interpretation of administrative expenses to compel the use of the limited resources in these estates to elevate the claims of one group of creditors at the expense of the creditor body as a whole.  Finally, conversion is a extraordinary remedy which is neither beneficial or justified herein.

## OBJECTION

### A.    The Residents' Have, at Best, General Unsecured Claims for an Alleged Breach of a Pre-Petition Contract

9.      A pre-petition breach of a pre-petition contract results in a general, unsecured claim against the debtor's estate.  *See e.g.*, *Exide Techs. v. Enersys Del., Inc. (In re Exide Techs.)*, 2013 Bankr. LEXIS 66, at *20 (Bankr. D. Del. Jan. 8, 2013) (explaining that the definition of "claim" under the Bankruptcy Code includes a "right to payment" including based on a breach of contract).  Similarly, a post-petition breach of a pre-petition contract is treated as general unsecured claim, unless the counterparty can establish its claim is entitled to administrative priority treatment under section 503(b) of the Bankruptcy Code.  *See e.g., MBNA Am. Bank, N.A. v. TWA (In re TWA)*, 275 B.R. 712, 723 (Bankr. D. Del. 2002) (the court agreed

---

[4] *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l'l Corp.),* 386 B.R. 548, 552 (Bankr. D. Del. 2008) (reversed on other grounds).

[5] *See, e.g., Begier v. IRS*, 496 U.S. 53, 58, 110 L. Ed. 2d 46, 110 S. Ct. 2258 (1990) (policy of ratable distribution is "a central policy of the Bankruptcy Code'); Lawrence P. King, 5 COLLIER ON BANKRUPTCY P 541.01, AT 541-6.1 (15th ed. rev. 1999); *Mullins v. Burtch (In re Paul J. Paradise & Assocs.)*, 249 B.R. 360, 365 (D. Del. 2000).

with the debtor's assertion "that even post-petition breaches of a pre-petition contract are treated merely as pre-petition claims, not administrative claims[.]"); *see also Italian Oven v. No Respondent (In re Italian Oven)*, 209 B.R. 355, 361-62 (Bankr. W.D. Pa. 1997) ("A breach of the contract, if any, would give rise, at best, to a general unsecured claim against this estate.  Even though any breach would occur postpetition, nothing about the breach fits into the category of allowed administrative expenses or priority claims[.]").

10.     A post-petition breach of a pre-petition contract is treated as a pre-petition claim because the claim exists once the contract is executed, although it may be inchoate or contingent. *In re TWA*, 275 B.R. at 723-24 (*citing In re Remington Rand Corp.*, 836 F.2d 825, 830 (3d Cir. 1988)*; In re Continental Airlines, Inc.*, 146 B.R. 520 (Bankr. D. Del. 1992)). "Once the contingency occurs, even if it occurs post-petition, the contingent claim simply becomes  a liquidated one; it, however, is not thereby elevated to the status of a post-petition claim." *In re TWA*, 275 B.R. at 723-24 (citing *In re Chateaugay Corp.*, 102 B.R. 335, 352 (Bankr. S.D.N.Y. 1989)).

11.     For a post-petition claim to be entitled to priority treatment under the Bankruptcy Code, it must comply with section 503(b), which provides, in relevant part, that "[a]fter notice and a hearing, there shall be allowed administrative expenses, . . . including -- (1) (A) the actual, necessary costs and expenses of preserving the estate[.]"  11 U.S.C. § 503(b).  "For a claim [] to be entitled to first priority under § 503(b)(1)(A), the debt must arise from a transaction with the debtor-in-possession. . . . A party seeking payment of costs and fees as an administrative expense must . . . carry the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re*

*O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999).  "The reason one general unsecured creditor is paid ahead of others is that the total value of the estate has been enhanced by that creditor's post-petition contribution, ultimately to the benefit of all general unsecured creditors. If the estate has not benefited, the administrative claim results in unnecessary depletion of assets to the detriment of all creditors."  *In re Cont'l Airlines*, 146 B.R. 520, 526 (Bankr. D. Del. 1992).

12.     The Resident Motion states that in <u>January 2018</u> the Debtors made the "decision to ignore their contractual obligations to purchase occurrence based insurance."  Resident Motion, page 2.  The Resident Motion thus alleges that the "Debtors have breached the Resident Contracts by purchasing narrow, and presumably cheaper, claims made policies."  Resident Motion, ¶ 17.  Even if this is true (which the Committee cannot verify, as the Resident Motion only contains a template resident contract and does not contain the insurance policy)[6], such breach of the pre-petition Resident Contracts amounts only to a general unsecured claim.

13.     Further, even if the breach occurred post-petition, such breach would still result in a general unsecured claim, as the Residents cannot establish any basis for administrative priority treatment.  The Resident Motion argues that "[g]iven the benefits to the Debtors' estates from not breaching their ongoing obligations under the Resident Contracts and preserving the potential sale to Jefferson, there can be little doubt that the Residents would be entitled to administrative expense claims under the Resident Agreements for the purchase of tail insurance, if they can locate and afford such insurance."  Resident Motion, ¶ 24.  However, this statement is based on a

---

[6] The Resident Motion also attaches the Resident Manual and states that "[o]ccurrence-based malpractice insurance is specifically identified as a 'House Staff Benefit' in the Resident Manual."  Resident Motion, ¶ 7,  Yet, in the same section describing the House Staff Benefits, the Resident Manual provides in bold with an asterisk that "Benefits are subject to amendment at any time."  Resident Manual, page 56.

wholly inaccurate reading of the asset purchase agreement with Jefferson (the "Jefferson APA")
and the sale order authorizing the Debtors to enter into the Jefferson APA (the "Jefferson Sale
Order").

14.     Section 6.2 of the Jefferson APA provides "the Seller shall use its commercially
reasonable efforts to preserve intact its relationships with Residents at Hahnemann University
Hospital and the graduate medical educational programs at Hahnemann University Hospital (the
"Hahnemann Programs")."  The Resident Motion reads this provision as requiring that the
Debtors keep the Resident Contracts in place.  Resident Motion, ¶ 22 ("Keeping the Resident
Contracts in place was one of the Debtors' covenants in connection with the sale of the Resident
Program Assets to Jefferson. See Asset Purchase Agreement by and between Center City
Healthcare, LLC and Thomas Jefferson University Hospitals, Inc. [D.I. 681-1] (the "APA"), at
§ 6.2.").  This is simply not true, as nothing in the Jefferson APA requires the Debtors continue
to perform under the Resident Contracts.  Further, schedule A-1 of the Jefferson APA, which
lists the contracts to be assumed and assigned to Jefferson, does not include the Resident
Contracts.

15.     Next, the Jefferson APA provides that the Debtors shall purchase and maintain
the Tail Coverage Endorsement for which Jefferson shall reimburse the Debtors up to
$1,000,000.  Jefferson APA, §§ 3.2(d), 4.11.  The Tail Coverage Endorsement is defined as:

> [A] reporting endorsement to insure against resident professional liability claims
> that have not yet been reported against the Residents related to any period of
> Resident employment from January 11, 2018 until the termination of Resident's
> employment from Hahnemann University Hospital. Such endorsement shall
> provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars
> ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars
> ($1,500,000) annual aggregate for each MCARE eligible Resident only.

16.     The Jefferson Sale Order provides the mechanism for the Debtors' purchase of the
Tail Coverage Endorsement.  It states "the Debtors may use a portion of the Base Purchase Price,

not to exceed the Tail Coverage Costs, to purchase the Tail Coverage Endorsement in accordance with the Agreement." Jefferson Sale Order, § 12.

17.    The Resident Motion misinterprets these provisions as well, stating that "the Debtors' failure to provide for sufficient tail coverage for the Residents would appear to result in a material breach of the APA, perhaps placing the entire sale, and $54 million in sale proceeds at risk." Resident Motion, § 23. This too is incorrect, as the Sale Order specifically contemplates that the sale must first close prior to the Debtors' purchasing the Tail Coverage Endorsement. Failing to purchase tail coverage now, prior to the closing, thus cannot be a material breach of the Jefferson APA and does not place the sale at risk. As such, the Resident Motion cannot rely on its misreading of the Jefferson APA and Jefferson Sale Order as a basis for the Residents' alleged administrative priority claim.

**B.    Neither the Residents Nor the PA DOH Can Compel the Debtors to Remedy a Breach of a Pre-Petition Contract**

18.    Unsurprisingly, neither the Residents nor the PA DOH cite any cases or statutes for the proposition that a claim for breach of a pre-petition contract results in the ability of the court to compel a debtor to take post-petition remedial actions—*i.e.*, to purchase tail insurance to remedy the alleged pre-petition breach of not obtaining occurrence-based insurance. In fact, compelling the Debtors to obtain tail insurance for the Residents would elevate the status of the Residents' claims above those of other general unsecured creditors, in violation of the Bankruptcy Code.

19.    The Residents argue that "[t]he Debtors have not rejected the Resident Contracts, and even if they did, their obligations to provide the required insurance survives the expiration or termination of the Resident Contracts." Resident Motion, § 18. This argument, however, is incorrect. First, it relies on the questionable premise that the Resident Contracts are executory

and can be rejected.  Here, all the Resident Contracts are with *former* Residents who are no

longer in the Debtors' employ.  "The Court of Appeals for the Third Circuit has adopted the

Countryman definition of executory contracts, which defines an executory contract as a contract

under which the obligation of both the bankrupt and the other party to the contact are so far

unperformed that the failure of either to complete performance would constitute a material

breach excusing performance of the other."  *In re Fed.-Mogul Glob., Inc.*, 385 B.R. 560, 575

(Bankr. D. Del. 2008).  As none of the Residents have any remaining obligations under the

Resident Contracts, the Resident Contracts do not appear executory and thus cannot be assumed,

assigned, or rejected. [7]

20.     Next, even if the Resident Contracts are executory, to the extent the Residents

allege the Debtors breached the Resident Contracts pre-petition by failing to obtain occurrence-

based insurance, nothing in the Bankruptcy Code requires the Debtors to take remedial action

(*i.e.*, purchase tail coverage), while deciding whether to assume or reject the contracts.  Instead,

as set forth above, the Residents would have an unsecured damages claim for the alleged breach.

To the extent the Residents allege the Debtors have an upcoming contractual obligation to

purchase tail coverage on January 10, 2020 (as opposed to the purchase of tail coverage being a

remedial action for the alleged breach of failing to obtain occurrence-based coverage), failure to

purchase tail coverage would then be a post-petition breach of a pre-petition contract, which as

set forth above, still results in a general unsecured claim as the Residents cannot establish the

basis for administrative priority.  Significantly, even under the priority framework, nothing

entitles the Residents to compel performance under the pre-petition contract.

---

[7] On December 16, 2019, the Debtors filed a series of motions seeking rejection of the Resident Contracts.  While the Debtors dispute that such contracts are executory, the Debtors have filed the motion to reject in an abundance of caution.

21.     Next, the Resident Motion argues that even if the Resident Contracts are rejected, the Debtors' "obligation to provide the required insurance survives the expiration or termination of the Resident Contracts." Resident Motion, ¶ 18.   This too is false.  "[T]he nondebtor party has no duty to perform in accordance with a contract that has been rejected." *In re Monroe Well Serv., Inc.*, 83 B.R. 317, 320-21 (Bankr. E.D. Pa. 1988).

**C.      The Motions Incorrectly Describe Pennsylvania Law**

22.     The Motions inaccurately describe various provisions of the PA Code in an attempt to rewrite the statute to require that (i) the Debtors must provide medical insurance for its employees and (ii) if such insurance is a claims made policy, the Debtors must purchase an appropriate tail—neither of these statements are correct.  Residents Motion, ¶ 16 ("The Ad Hoc Resident Committee requests that this Court compel the Debtors to comply with their obligations under the Resident Contracts <u>and Pennsylvania law</u> by requiring <u>the Debtors to purchase tail policies</u> for Residents[.]"); PA DOH Motion, ¶ 39 ("[T]he Commonwealth of Pennsylvania's MCARE Act requires Pennsylvania physicians to maintain insurance coverage, <u>including tail coverage</u>. *See* 40 P.S. §1303.711; 40 P.S. §1303.742.").

23.     40 P.S. § 1303.711(a) provides the requirements for medical professional liability coverage.  It states that "[a] health care provider providing health care services in this Commonwealth shall:  (1) purchase medical professional liability insurance from an insurer which is licensed or approved by the department; or (2) provide self-insurance."  "Health care provider" is defined as "[a] primary health care center <u>or a person</u>, including a corporation, university or other educational institution licensed or <u>approved by the Commonwealth to provide health care or professional medical services as a physician</u>, a certified nurse midwife, a podiatrist, hospital, nursing home, birth center[.]" 40 Pa. Stat. Ann. § 1303.103 (emphasis

added).  Under Pennsylvania law, it is thus the Residents' obligation to purchase liability

insurance—not the employer's obligation.  Here, the Debtors are alleged to have extended

liability insurance to the Residents through individual Resident Contracts (not because they were

so mandated by law), and any breach of such Resident Contract results in a general unsecured

claim for damages.

24.     Next, section 1303.711(d) sets forth the requirements for the coverage limits.

Nowhere does this section reference that the medical professional liability insurance purchased

from an insurer must be an occurrence-based policy or that if the policy is claims-made, it must

include a tail.  This is simply not a requirement for health care providers purchasing insurance.

25.     Instead, the Motions cite to section 1303.742 of the PA Code to argue that if the

Debtors purchase a claims-based insurance policy for the Residents, the Debtors must, by law,

also purchase a tail policy.  *See* Residents Motion, ¶ 8 (The Debtor' claims made policies

"violate[] Pennsylvania law, which bars the use of claims made insurance without an appropriate

tail."  40.P.S. S 1303.742"); PA DOH Motion, ¶ 39 ("Moreover, the Commonwealth of

Pennsylvania's MCARE Act requires Pennsylvania physicians to maintain insurance coverage,

including tail coverage. *See* 40 P.S. §1303.711; 40 P.S. §1303.742.").  This, however, is an

incorrect analysis of section 1303.742, which discusses the requirements for an <u>insurer</u> in

providing insurance—not the requirements of a health care provider.  Instead, section 1303.742

states that if the medical professional liability insurance policy is written on a "claims made"

basis, then "the **<u>insurer</u>** shall guarantee to the commissioner the **<u>continued availability</u>** of

suitable liability protection for a health care provider subsequent to the discontinuance of

professional practice by the health care provider or the termination of the insurance policy by the

insurer or the health care provider for so long as there is a reasonable probability of a claim for

injury for which the health care provider may be held liable." 40 P.S. § 1303.742 (emphasis added).

26.    In fact, section 1303.742 contemplates that a health care provider may have a claims made policy and subsequently discontinue its practice and/or terminate the claims made policy. In such situations, the insurer (not the employer) must make available suitable liability protection. This section is intended to protect the health care provider by ensuring that the insurer will provide coverage after termination of the claims made policy; it is not intended to increase the health care provider's obligations.

27.    Next, the Resident Motion provides that pursuant to section 1303.711(a), cited in full above, "employers require physicians to have malpractice insurance from all their prior employers in order to be eligible for continued and future employment." Resident Motion, ¶ 19. This is simply not included anywhere in section 1303.711(a).

28.    The Motions also suggest that without a tail, the Residents will have <u>no</u> coverage for claims made after January 10, 2020 unless the Residents purchase their own insurance. This contradicts section 1303.715(d) of the PA Code, which provides that "all medical professional liability insurance policies issued on or after January 1, 2006, shall provide indemnity and defense for claims asserted against a health care provider for a breach of contract or tort which occurs four or more years after the breach of contract or tort occurred and after December 31, 2005." As such, the insurer must provide indemnity and defense for claims asserted against the Residents for a breach of contract or tort which occurs four or more years after the breach of contract or tort occurred.

29.    Last, the Motions also state that Residents will likely have no means to purchase their own tail insurance policies. Again, while the Committee certainly understands the

Residents' economic concerns, the Commonwealth has attempted to address this issue statutorily by declaring that "medical professional liability insurance has to be obtained at **an affordable and reasonable cost** in every geographic region of the Commonwealth." 40 P.S. § 1303.102(3);[8] *see also* Resident Motion, paragraph 5. Further, the Committee understands that "[t]he Pennsylvania Professional Liability Joint Underwriting Association (JUA) has offered to fund up to 50 percent of the cost of medical liability insurance tail coverage for Hahnemann residents and fellows affected by the bankruptcy of Philadelphia Academic Health System (PAHS)." *JUA Shares Proposal to Pay a Portion of Med Liability Tail Coverage for Hahnemann Physicians*, dated November 27, 2019 (https://www.pamedsoc.org/detail/article/jua-hahnemann-tail-coverage). The status of the offer is uncertain to the Committee at this point in time.

> **D.    The PA DOH Has No Statutory or Regulatory Power to Compel the Debtors to Take Remedial Action in Respect of Alleged Breaches of the Resident Contracts**

30.    The PA DOH argues that it is bringing the PA DOH Motion "pursuant to its statutory and regulatory authority, and in its capacity of *parens patriae*, to protect the citizens of the Commonwealth of Pennsylvania" and that it has determined "that it is in the best interests of the public . . . for the Debtors to obtain tail insurance[.]" PA DOH Motion, ¶ 10. Compelling the Debtors to purchase tail insurance—which they are not statutory required to do it (nor are they required to purchase any insurance for employees)—goes well beyond the powers of the PA DOH. As set forth above, Pennsylvania law requires only that the Residents (not their employer on behalf of the Residents) obtain malpractice insurance, which need not be occurrence based or

---

[8] The Committee notes that section 1303.102—Declaration of policy—expired on December 31, 2007, but understands this concept remains operative in the PA Code.

include a tail.  Further, it is the insurer, not the Debtors, who must  guarantee to make available

to the Residents suitable coverage after the termination of any claims-made policy.  The PA

DOH has cited no statutory or regulatory power that allows it to compel the Debtors to take

remedial actions in respect of alleged breaches of individual employment contracts.

      31.     The PA DOH states that it is "concerned that inadequate protections are in place

to ensure that funds are available for any claims that may be asserted against Hahnemann or St.

Christopher's, including claims against their former residents, physicians, and other health care

professionals, by members of the public, which arose or may arise during the pendency of or

following closure of Hahnemann, or which arose or may arise during the Debtors' ownership of

St. Christopher's."  PA DOH Motion, ¶ 29.  While the Committee understands this concern, the

PA Code is adequately designed to protect members of the public in these situations.  First, as

repeatedly noted, the insurance companies have guaranteed that they will make tail coverage

available to Residents.  40 P.S. § 1303.742.  Second, while the Committee understands the cost

involved with individual Residents' purchasing tail coverage, the PA Code declares that

"medical professional liability insurance has to be obtainable at an affordable and reasonable

cost in every geographic region of the Commonwealth."  40 P.S. § 1303.102(3).  Third, section

1303.715(d) of the PA Code provides that the insurer shall provide indemnity and defense for

claims asserted against the Residents for a breach of contract or tort which occurs four or more

years after the breach of contract or tort occurred.  In addition to protecting Residents, this also

ensures funds are available for members of the public brining claims against such Residents.

Fourth, if the Pennsylvania legislature wished to put the burden of obtaining continuous

insurance coverage on the hospital-employer, it could have done so.  Instead, it crafted the

sections above to adequately protect the public and the residents in situations where claims-made

coverage is terminated.  As such, the PA DOH's concern that there are inadequate protections in

place for members of the public is unfounded and cannot be used as a reason to compel the

Debtors' to purchase tail insurance.

**E.      There is No Cause to Convert These Cases Pursuant to Section 1112(b)(4)(C) of the Bankruptcy Code**

32.      Section 1112(b)(1) of the Bankruptcy Code provides that "on request of a party in

interest, and after notice and a hearing, the court shall convert a case under this chapter to a case

under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors

and the estate, for **cause** unless the court determines that the appointment under section 1104(a)

of a trustee or an examiner is in the best interests of creditors and the estate."  11 U.S.C.

§ 1112(b)(1) (emphasis added).  Section 1112(b)(4)(C) provides that "cause" includes "failure to

maintain **appropriate** insurance that poses a risk to the estate or to the public" (emphasis added).

This language does not require that a debtor maintain any and all insurance which might protect

the estate and the public—only "appropriate" insurance.  *DeAngelis v. KC's Pub, LLC (In re*

*KC's Pub, LLC)*, 428 B.R. 612, 617 (Bankr. M.D. Pa. 2010) ("I assume that Congress chose its

words carefully when drafting BAPCPA. I believe use of the word 'appropriate' to modify

insurance connotes the intention that the surrounding circumstances of the Chapter 11 case be

considered.").

33.      To determine what insurance is appropriate, courts should look to the provisions

of state law to see if they shed light on the debtor's choice of insurance coverage.  *Id.* at 616 ("To

determine whether or not acquiring liquor liability/dram shop coverage would be appropriate

here, I have looked to the provisions of Pennsylvania law to see what light they shed on the

Debtor's choice of insurance coverages here.").  For example, in *In re KC's Pub, LLC*, in

determining whether cause existed to dismiss the debtor's case under section 1112(b)(4)(C), the

court considered whether the Pennsylvania Liquor Code required a licensee-debtor maintain insurance coverage to cover possible losses incurred as a result of liquor law liability.  The court held that "Pennsylvania law has been interpreted as imposing liability on a liquor licensee in certain circumstances but not as imposing any requirement that a licensee maintain insurance coverage to cover possible losses incurred as a result of liquor law liability."  *Id.* at 616.  The court further noted that "[t]he Pennsylvania legislature has chosen to mandate insurance coverage in several  areas. The following are several examples of required insurance coverage: (1) automobile insurance, 75 Pa.C.S.A. § 1786; (2) worker's compensation insurance, 77 P.S. § 501; and, (3) licensed physical therapists, 63 P.S. § 1309(b)(4).  I consider the decision of the Pennsylvania legislature not to require liquor liability/dram shop insurance coverage relevant in considering any affect on the public implicated by this decision."  *Id.* at 616-617.

34.     Next, the court explained that "the relevant factors a bankruptcy judge should consider to determine whether a debtor-in-possession is maintaining 'appropriate insurance' are: (1) applicable requirements under other federal or state laws; (2) the debtor's size and the complexity of the case; (3) the debtor's financial wherewithal to purchase insurance; (4) the existence of or lack of pre- or post-petition uninsured claims against the debtor; (5) any steps taken by the debtor to reduce the risk of claims; and, (6) the best interests of creditors."  *Id.* at 617.

35.     Here, "appropriate insurance" does not include the provision of tail insurance to third-party former Residents to whom the Debtors have no obligation under Pennsylvania law to provide insurance.  As noted above, the PA Code requires only that the Residents, as healthcare providers, obtain malpractice insurance (not their employers on their behalf).  40 P.S. § 1303.711(c).  Under Pennsylvania law, the insurer, not the Debtors, must guarantee to make

available to the Residents suitable coverage after the termination of any claims-made policy.  40

P.S. § 1303.742.  Further, under the PA Code, to the extent the Residents do not maintain

insurance, the state's remedy is not specific performance, but rather a suspension of the

Resident's license.  40 P.S. § 1303.711(c).  As such, Pennsylvania law does not contemplate that

"appropriate" insurance in these cases include the Debtors' purchase of tail coverage for former

Residents.

36.     The other factors also weigh against a determination that tail insurance for third-

parties is "appropriate" in these cases.  For example, the Debtors do not have the financial

wherewithal to purchase tail insurance for all former Residents and to do so would be to the

detriment of the other unsecured creditors in these cases.  Further, as set forth above, the public

is adequately protected under the insurance regime already established by the PA Code, which

carefully allocates the burden of purchasing insurance among the Residents and insurers—not

the Debtor-employer.  Failing to purchase tail insurance for the Residents poses no risk to the

estates, and is in fact harmful to the estates.  The Committee understands that the Debtors have

their own appropriate insurance policies to protect the estates during these chapter 11 cases.  As

such, there is no cause to convert these cases under section 1112(b)(4)(C) of the Bankruptcy

Code.

**F.     There is No Cause to Convert These Cases Pursuant to Section 1112(b)(4)(A) of the Bankruptcy Code**

37.     Bankruptcy Code section 1112(b)(4)(A) provides that a case shall be converted or

dismissed for cause, including "substantial or continuing loss to or diminution of the estate **and**

the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A) (emphasis

added).  With respect to the first prong, this Court has explained as follows:

> It is important to emphasize the context of the Bankruptcy Cases.  The continuing
> losses, diminution of the estate and unlikelihood of rehabilitation are, practically

speaking, irrelevant for reasons as obvious as they are unusual.  The Debtors are not operating and are not sustaining continuing losses.  Creditors are not being prejudiced by the continuation of the Bankruptcy Cases.  On the positive side, and the statute requires a finding of 'best' interests, the creditors' best interests are served by sustaining the Bankruptcy Cases.

S*anta Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l'l Corp.)*, 386 B.R. 548, 552 (Bankr.

D. Del. 2008) (reversed on other grounds).

38.    With respect to the second prong, this Court explained that it is relevant to consider whether there is a reasonable likelihood that a plan can be confirmed, even a liquidating plan.  *Id.* at 553 ("Section 1112(b)(2)(A) specifically provides that the reasonable likelihood that a plan will be confirmed is, in combination with other factors, a basis for the Court not to dismiss the Bankruptcy Case . . . The Court believes there is a reasonable likelihood that a revised plan [of liquidation] can be confirmed and, in any event, the Court is unable and unwilling to find that Debtors will be unable to propose a confirmable plan.").  Importantly, if one of the prongs cannot be established, there is no need to consider the other prong, as both must exist for conversation under section 1112(b)(4)(A) of the Bankruptcy Code.

39.    Here, there is no substantial or continuing loss to or diminution of the estate.  At this point in these chapter 11 cases, the St. Christopher sale has closed and the Debtors are essentially a bank account which can only be augmented by, among other things, collection of assets excluded from the sale, such as accounts receivable and claims and causes of action of the estates.  Converting or dismissing these cases would thus detrimentally affect the rights of creditors, including the Residents to the extent they hold unsecured claims.  As the first prong cannot be established, there is no need to consider the second prong.  However, even if considered, there is a reasonable likelihood that the Debtors will be able to propose a confirmable liquidating plan with a structure in place to pursue claims and causes of action for

the benefit of the Debtors' unsecured creditors.  As such, conversion is not appropriate under section 1112(b)(2)(A) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

The Committee reserves the right to revise, amend or supplement this Objection at any time prior to or at the final hearing.

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the Motions, (ii) find there is no cause for conversion of these cases under sections 1112(b)(4)(A) or 1112(b)(4)(C) of the Bankruptcy Code, and (iii) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: December 17, 2019
Wilmington, Delaware

Respectfully submitted,

/s/ *Thomas M. Horan*
Thomas M. Horan (DE Bar No. 4641)
**FOX ROTHSCHILD LLP**
919 North Market Street, Suite 300
Wilmington, DE 19899
Telephone: 302-654-7444
Facsimile: 302-6568920
Email: thoran@foxrothschild.com

- and –

Andrew H. Sherman (*pro hac vice*)
Boris I. Mankovetskiy (*pro hac vice*)
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email: asherman@sillscummis.com
          bmankovetskiy@sillscummis.com

*Counsel for the Official Committee*
*of Unsecured Creditors*