<pre>
1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2
                                  .     Chapter 11
3     IN RE:                      .
                                  .     Case No. 19-11466 (KG)
4     CENTER CITY HEALTHCARE, LLC, .
      d/b/a HAHNEMANN UNIVERSITY   .
5     HOSPITAL, et al.,            .
                                  .     Courtroom No. 3
6                                  .     824 North Market Street
                                  .     Wilmington, Delaware 19801
7                                  .
                                  .
8                  Debtors.       .     December 17, 2019
      . . . . . . . . . . . . . . . .   1:00 P.M.
9
                        TRANSCRIPT OF HEARING
10            BEFORE THE HONORABLE KEVIN GROSS
                 UNITED STATES BANKRUPTCY JUDGE
11
12    APPEARANCES:

13    For the Debtors:        Mark Minuti, Esquire
                              Monique DiSabatino, Esquire
14                            SAUL EWING ARNSTEIN & LEHR LLP
                              1201 N. Market Street
15                            Wilmington, Delaware 19801

16

17

18    Audio Operator:        AL LUGANO

19    Transcription Company:  Reliable
                              1007 N. Orange Street
20                            Wilmington, Delaware 19801
                              Email:  gmatthews@reliable-co.com
21
      Proceedings recorded by electronic sound recording, transcript
22    produced by transcription service.

23

24

25
</pre>

1   APPEARANCES (Continued):

2

3   For the Committee:          Andrew H. Sherman, Esquire
                                SILLS CUMMIS & GROSS P.C.
4                               1 Riverfront Plaza, Suite 10
                                Newark, New Jersey 07102

5

6   For Drexel University:      Vincent J. Marriott, III
                                BALLARD SPAHR LLP
7                               1735 Market Street, 51st Floor
                                Philadelphia, Pennsylvania 19103

8   For PAHH/Front Street:      Amalia Sax-Bolder, Esquire
                                Suzzanne Uhland, Esquire
9                               O'MELVENEY & MYERS LLP
                                7 Times Square
10                              New York, New York 10036

11                              - and -

12                              Brendan Schlauch, Esquire
                                RICHARDS LAYTON & FINGER
13                              920 North King Street
                                Wilmington, Delaware 19801
14

15  For Ad Hoc Residents        Jeremy Ryan, Esquire
    Committee:                  POTTER ANDERSON
16                              1313 North Market Street
                                Wilmington, Delaware 19801
17

18  For Tenent & Conifer:       Laura Davis Jones, Esquire
                                PACHULSKI STANG ZIEHL & JONES LLP
19                              919 North Market Street, 17th Floor
                                Wilmington, Delaware 19801

20

21

22

23

24

25

1

INDEX

2

3

Matters Going Forward:

4 **Sale Motion.**  Debtors' Motion for Entry of (A) an Order (I)
Scheduling a Hearing to Consider Approval of the Sale or Sales of
Substantially All Assets of St. Christopher's Healthcare, LLC and
5 Certain Related Debtors and the Assumption and Assignment of
Certain Executory Contracts and Unexpired Leases, (II) Approving
6 Certain Bidding Procedures, Assumption and Assignment Procedures,
and the Form and Manner of Notice Thereof, (III) Establishing
7 Procedures in  Connection with the Selection of and Protections
Afforded to Any Stalking Horse Purchasers, and (IV) Granting
8 Related Relief; and (B) One or More Orders (I) Approving the Sales
or Other Acquisition Transactions for the Assets, (II) Authorizing
9 the Sales Free and Clear of all Encumbrances, (III) Authorizing the
Assumption and Assignment of Certain Executory Contracts and
10 Unexpired Leases, and (IV) Granting Related Relief [D.I. 205;
filed: 07/16/19]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Proceedings commenced at 1:30 p.m.)

2                THE CLERK:  Please rise.

3                THE COURT:  Thank you everyone.  You may be

4    seated.  Good afternoon.

5                Ms. DiSabatino, good afternoon.

6                MS. DISABATINO:  Good afternoon, Your Honor.  Nice

7    to see you.

8                THE COURT:  Good to see you.

9                MS. DISABATINO:  We're going forward today on a

10   more condensed agenda, Your Honor, as Your Honor may be

11   aware.

12               THE COURT:  Yes.

13               MS. DISABATINO:  The first three matters have been

14   continued to January 2nd -- I'm sorry --

15               THE COURT:  January 6th I think it is.

16               MS. DISABATINO:  Yes.  January 6th, Your Honor.

17               THE COURT:  Yes.

18               MS. DISABATINO:  While the debtors continue to

19   work with those parties on a potential solution.  Also, Your

20   Honor, just to confirm the sale for St. Christopher's has

21   closed.  We will be filing a notice to that effect on the

22   docket if it hasn't been filed already.

23               THE COURT:  Okay.

24               MS. DISABATINO:  So, just as an update to the

25   court.

1          The only matter going forward today, Your Honor,

2    is Item Number 4 on the agenda.  This is the open issue

3    related to the Front Street assumption order.

4          THE COURT:  Yes.

5          MS. DISABATINO:  That order was entered last

6    Friday and docketed at Docket Number 1157.

7          Briefly, as to how we got here, Your Honor.  You

8    may recall that at last week's hearing the buyer and the

9    debtors sought to hand-up an assumption order with respect to

10   the Front Street leases.  The Front Street entities had some

11   issues with that order and so the court decided to schedule a

12   telephonic hearing that afternoon to give the parties a

13   chance to discuss.  And to the extent there were any open

14   issues the court could help us resolve them.  The court,

15   obviously, recognized that it was important to the buyer to

16   have that order entered prior to closing.

17         Prior to that telephonic hearing Front Street

18   sought to add certain language to the order that made clear

19   that the pro-rated portion of base rent to be paid by the

20   debtors following closing was to be made directly to Front

21   Street.  This caused some pause for the debtors, Your Honor,

22   because historically the debtors were paying those rent

23   payments to Tenent which holds a mortgage on the Front Street

24   property.

25         THE COURT:  Yes.

1          MS. DISABATINO:  Why the debtors were making those

2  payments to Tenent on account of a note that was issued by

3  the non-debtor entity controlled by Joel Friedman, Your

4  Honor, is not entirely clear, but this was what has happening

5  historically.  So, this is what gave the debtors pause when

6  it came to language directing us to pay directly to Front

7  Street.

8          We ultimately resolved the issue by adding

9  language to that order that would provide some clarification

10 as to who the debtor should pay prior to making the payment.

11 The specific language is in Paragraph 5 of the Front Street

12 order and it says that the debtors will pay the pro-rated

13 base rent to the party "as agreed by the lessors and the

14 debtor or as determined by the court" at today's hearing.

15          It turns out, Your Honor, that there is no

16 contractual obligation for the debtors to make these payments

17 directly to Tenent.  Again, it was just something that the

18 debtors were doing historically.  So, at this point we

19 believe it is more so an issue between Tenent and Front

20 Street regarding who should be paid the amounts.

21          What the debtors are seeking, though, is

22 clarification on the record as to who the appropriate party

23 is to pay.  If it is determined that the debtors are to pay

24 Tenent, for example, we don't want Front Street to look to

25 the debtors for the same amount.  So, we're looking for that

1  clarification today.

2            THE COURT:  All right.

3            MS. DISABATINO:  Thank you, Your Honor.

4            THE COURT:  By the way, did we have that

5  conference call because I thought we worked this out in

6  court.

7            MS. DISABATINO:  We did.  We had that conference

8  call.  If you recall, it was supposed to be at four, then it

9  got pushed to 4:30. It took a few minutes for the other

10 parties to join.

11           THE COURT:  Oh, yes.

12           MS. DISABATINO:  So, it did take place.  It is all

13 a little fuzzy what took place last week.

14           THE COURT:  Yes.  I was in court because we were

15 on the telephone.

16           MS. DISABATINO:  Yes.

17           THE COURT:  Okay.  All right. Then that's the way

18 it worked.

19           MS. DISABATINO:  Thank you, Your Honor.

20           THE COURT:  Thank you.  Thank you, Ms. DiSabatino.

21 I think you laid it out well.

22           Who am I going to hear from first?  Front Street,

23 yes.  Ms. Uhland, good afternoon.

24           MS. UHLAND:  Good afternoon, Your Honor; Suzzanne

25 Uhland of O'Melveny & Myers on behalf of the landlords here.

1    Your Honor, you know, I'm very sorry that we're

2  all here today to discuss this issue because this is a very

3  tough case on many levels and this should not be a dispute.

4  And the real issues with this assumption, Mr. Marriott, and

5  Mr. Lapowsky, and the debtors, and I spent days working out

6  and the only issue was this open issue about who should be

7  paid the rent.  The only documents there, the landlords, the

8  lease, everything says it goes to the landlord under the

9  lease contract.  There is no ambiguity there.

10    There was a prepetition direction letter under the

11  prepetition credit agreement under which there was a

12  direction to pay -- there was a payment mechanism.  That

13  prepetition credit agreement is of no effect.  That payment

14  letter is of no effect. And the landlord just wants to be

15  paid its rent.

16    Now what's most interesting about Tenent's

17  pleading and what I find really troubling about it is, one,

18  they say at page 2, the first thing they say is that they

19  have not right to the rent.  There is no -- they admit that

20  there is no documents that require the rent to be paid to

21  them.  Then, what they go onto say is that notwithstanding

22  the fact that this motion to assume and assign has been

23  pending for weeks, if not months.

24    As I said, you may remember on the telephonic

25  hearing, they never came in and say, ah-hah, we need adequate

1   assurance.  We, Tenent, need adequate assurance and the order

2   has been entered.  As counsel for the debtor said, it was

3   very important to the buyer that the order assigning and

4   assuming be entered by this court.

5          THE COURT:  Yes.

6          MS. UHLAND:  So, Tenent now makes a late condition

7   on the assignment order saying that they should be paid

8   adequate protection.  Well, they are too late and the order

9   has already been entered for it to now be conditioned.

10  Perhaps more critically, Your Honor, is this capacity that

11  Tenent is here today they are the creditor of my client.

12  They are not here as a creditor of the debtor. They are the

13  creditor of a creditor.

14         The dispute and the payments that we make to them

15  are not in front of this court.  The mortgage loan we have

16  with them is not in front of this court.  And so I assert

17  that they have no standing to be here under 1109 or under

18  prudential standing that there they don't have a zone of

19  interest in this particular 365 matter which is between a

20  debtor and its landlord.

21         THE COURT:  Let me ask you this.  Here is what

22  confusing me a little bit.  The Front Street parties agreed

23  to have the court resolve the issue. And I don't remember

24  standing ever being raised in that discussion.  Am I wrong

25  about that?

1        MS. UHLAND:  What happened, Your Honor, was the --

2    yes, I said if Tenent had an issue where have they been for

3    two months.  I said that.

4        THE COURT:  Yes.

5        MS. UHLAND:  They have filed nothing.  They have

6    said nothing.

7        THE COURT:  But that wasn't a standing argument as

8    I recall it.

9        MS. UHLAND:  No.

10       THE COURT:  Okay.

11       MS. UHLAND:  What we did was Mr. Minuti and I

12   agreed -- I said I don't know of any documents --

13       THE COURT:  Right.

14       MS. UHLAND:  -- that require this contractual

15   payment and he didn't know of any documents.

16       THE COURT:  And Tenent admits that, I think.

17       MS. UHLAND:  Right, but where we were at Thursday

18   is Mr. Minuti and I didn't know if there were any documents.

19   The way I tried to resolve it with Mr. Minuti initially to

20   just say, well, let's just say it gets paid to whoever is

21   contractually entitled.  He would not agree to that.  We came

22   to the Judge.  We developed this mechanism.

23       So, when Mr. Minuti and I both went back and

24   Tenent went back, guess what, there is no contractual

25   entitlement.  I didn't know on Thursday that there was no --

1  I just wasn't aware whether there was or wasn't.  We have now

2  determined there isn't.  They have determined there isn't.

3  That is why I say they have no standing today and didn't

4  raise it before.

5          THE COURT:  Okay.  And just so I am clear, the

6  amount that the parties are arguing over is roughly $243,000

7  dollars, is that right?

8          MS. UHLAND:  That's correct.

9          THE COURT:  Is that an interest payment?

10          MS. UHLAND:  No, no, it's a rent payment.

11          THE COURT:  Okay.  All right.  The only reason I'm

12  asking is because in its document Tenent is talking about an

13  interest payment.

14          MS. UHLAND:  Well, the interest payment is a

15  different amount from the rent payment.

16          THE COURT:  Okay.  All right.  But I am confused.

17  Is Tenent asking for the rent or for interest?

18          MS. UHLAND:  They're asking for -- I don't know

19  what they are asking for.  They're asking for us rental

20  payment to be made directly to them for them to apply.

21          THE COURT:  Okay.  All right.  Do you want to hear

22  from Tenent at this point?

23          MS. UHLAND:  Yes.

24          THE COURT:  Okay.  Obviously, you will have an

25  opportunity to be heard.

1          Mr. Marriott is going to be heard first.

2          MS. UHLAND:  Thank you.

3          THE COURT:  Thank you.

4          Mr. Marriott?

5          MR. MARRIOTT:  Good afternoon, Your Honor.

6          THE COURT:  Good afternoon.

7          MR. MARRIOTT:  Vince Marriott, counsel to Drexel

8  and co-counsel to STC OpCo.

9          THE COURT:  Yes.

10          MR. MARRIOTT:  Originally I thought I didn't have

11  a dog in this dispute and then I saw the Tenent pleading

12  which assumes that the order granting assumption and

13  assignment ha not already been entered.

14          THE COURT:  Right.

15          MR. MARRIOTT:  It has been.  I don't want there to

16  be any sort of suggestion that we should now re-open that

17  since we've closed.

18          THE COURT:  That's right.

19          MR. MARRIOTT:  And we're occupying the building.

20  Our view of this issue has always been it's a, I don't want

21  to say, dispute, but it's a contest involving just the debtor

22  and Front Street about where this payment goes.  My

23  understanding of why it's before this court is not to protect

24  Tenent's interest, which is not something that I think would

25  be properly before the court in connection with assumption

1   and assumption of a document to which they are not a party.

2           THE COURT:  Right.

3           MR. MARRIOTT:  It was to protect the debtors'

4   interest in paying the right person.

5           THE COURT:  Exactly.

6           MR. MARRIOTT:  That's all.  And so I think to now

7   mix-in what Tenent's rights may or may not be vis-à-vis Front

8   Street is to take us too far afield from what this was all

9   about in the beginning.  That is all I've got, Your Honor.

10          THE COURT:  All right.  I appreciate that, Mr.

11  Marriott.  Thank you, sir.

12          May I hear from Tenent?  Ms. Jones, good

13  afternoon.

14          MS. DAVIS-JONES:  Good afternoon, Your Honor;

15  Laura Davis Jones of Pachulski Stang Ziehl & Jones on behalf

16  of Tenent and Conifer.

17          THE COURT:  Yes.

18          MS. DAVIS-JONES:  Your Honor, first of all, thanks

19  for hearing us on this.  We have, obviously, not been part of

20  all these discussions, and teleconferences and so forth that

21  have been going on.  Your Honor, we filed a short statement

22  out of concern of what we've been hearing from the debtor.

23  And, frankly, the hearing today and the level of argument of

24  on this confirms our need to be concerned.

25          Your Honor, to answer your question, it is the

1  interest that we are owed.  Front Street owes Tenent interest

2  on a note --

3           THE COURT:  Yes.

4           MS. DAVIS-JONES:  -- the debtors owes Front Street

5  rent. What we just came to find out was a concern raised by

6  the debtor that along the way they have been using the rent

7  as, I guess, a way for the interest payments to be paid by

8  Front Street.  We have no knowledge of what they have been

9  doing or how they have been maneuvering that.

10          Our concern, Your Honor, was we assumed that they

11  had been following the corporate formalities, but we have

12  been hearing, just in the last day, that they're not and that

13  historically they had been, I guess, paying rent and then

14  Front Street was using that to pay the interest or something

15  was going on.

16          Our bottom line, Your Honor, is the corporate

17  formalities should be followed.  Everybody is right about

18  that.  Tenent needs to be paid the interest as required.

19  It's due no later than December 31st --

20          THE COURT:  Right.

21          MS. DAVIS-JONES:  -- however they get to that

22  payment of that interest and, Your Honor, understandably we

23  are concerned about how they have been making these interest

24  payments.  It is tight.  They have, among themselves, tied it

25  into their payment of rent.  So, that put an alarm up for us.

1          Bottom line, Your Honor, is Tenent is entitled to

2    the interest rate -- I mean the interest, I'm sorry, payment

3    by the 31st of December.  We don't want to get caught up in

4    the middle of whatever it is they're doing.  The level of

5    argument on this today, Your Honor, makes me concerned that

6    we're not hearing just from Front Street that we're going to

7    receive the interest payment by the December 31st.  I don't

8    think it should be too hard for them to confirm on the record

9    that we will be receiving the interest payment when due and

10   that resolves this issue.

11         Your Honor, understandably we have been, just in

12   the last 24 hours now made very concerned that somehow that

13   payment is going to be made and Front Street is just going to

14   hold onto the money and not pay us.

15         THE COURT:  How much is the interest?

16         MS. DAVIS-JONES:  Your Honor, I don't have that

17   number in front of me.

18         THE COURT:  It's not the 240 something?

19         MS. DAVIS-JONES:  It's around the number of the

20   rent, Your Honor.

21         THE COURT:  Okay.

22         MS. DAVIS-JONES:  But I do not have that number in

23   front of me.  I apologize.

24         THE COURT:  All right.

25         MS. DAVIS-JONES:  Thank you, Your Honor.

1           THE COURT:  Thank you.

2           MS. DISABATINO:  Your Honor, just briefly.

3           THE COURT:  Yes.

4           MS. DISABATINO:  Monique DiSabatino on behalf of

5   the debtors.  We just want to make clear we don't know why.

6   The rent payments that were made, I understand, approximated

7   the amount of the interest payments and that's why they were

8   made directly to Tenent.  We don't know why exactly the

9   company had the instruction to pay directly to Tenent.  We

10  reserve all rights on that issue, Your Honor.

11          THE COURT:  And who gave you that instruction?

12  Was that the Front Street Properties?

13          MS. DISABATINO:  I'm not entirely clear, Your

14  Honor.  We're looking into it, but, obviously, the companies

15  are under the direction of Mr. Friedman, but we don't know

16  why there is no contractual obligation.

17          THE COURT:  All right.  Thank you, Ms. DiSabatino.

18          Ms. Uhland, are you prepared to pay Tenent at the

19  end of the month?

20          MS. UHLAND:  Your Honor, it's none of your

21  business where I get the money to pay Tenent or whether I pay

22  Tenent.  Front Street is not before you. I have creditors.  I

23  have creditors --

24          THE COURT:  You're before me now.

25          MS. UHLAND:  I'm before you, yes.  Front Street,

1    Your Honor, is a separate entity that is not a debtor.

2              THE COURT:  Yes.

3              MS. UHLAND:  Front Street has many creditors.

4    Front Street has many sources of cash.  So, Front Street --

5    so, now I'm here and one particular revenue stream of Front

6    Street and one creditor of Front Street are standing here or

7    kind of before you saying, ah-hah, that's my revenue stream

8    because historically we think that's where it came from and,

9    therefore, I want this court to order, effectively, an entity

10   not in Chapter 11 ordered me to do something with property

11   that's my property.

12             THE COURT:  Well, I don't understand your argument

13   at all, but let me say this; the debtor is holding the money,

14   right?

15             MS. UHLAND:  Yes.

16             THE COURT:  So, that is before me.  So, it is my

17   business because the debtor holds the money.

18             MS. UHLAND:  Right.

19             THE COURT:  And the debtor needs instructions on

20   who to pay.

21             MS. UHLAND:  Yes.

22             THE COURT:  You know, sometimes you get in trouble

23   when you agree to take on a decision in a case and that's

24   what I've done here because I think that judges are

25   responsible for resolving disputes between parties and there

1   is a dispute between the parties, and everyone agreed to have

2   me decide it.  That is what I've got to do.  And I really

3   haven't heard much to be helpful to me other than your

4   standing argument which wasn't raised previously, as I said.

5           MS. UHLAND:  Well, but Your Honor, what we agreed

6   was we should pay the money to who the money is owed under

7   the applicable contracts.

8           THE COURT:  Yes.

9           MS. UHLAND:  And I didn't know whether there were

10  or there were not contracts.  I was aware of none.  So, we

11  said we will put this off.  I found no contracts.  Tenent

12  found no contracts.  The debtor found no contracts.  The only

13  contract that is before you right now is the lease and the

14  lease says that the landlord is supposed to be paid.  This

15  Tenent note is not before you with their interest that they

16  don't even know the amount --

17          THE COURT:  Right.

18          MS. UHLAND:  -- is not before you. What is before

19  you is that there is a lease that's being assumed and

20  assigned that says who the landlord is and says that the

21  landlord is supposed to be paid.  I mean it's hard for me to

22  -- I could just -- it's like given what this proceeding is

23  about, which is assignment and assumption --

24          THE COURT:  Yes.

25          MS. UHLAND:  -- and just clarification on what

1  bank account does the cure payment go to, and there is a

2  contract that says where the cure payment goes, and there is

3  nothing before you in -- there is no evidence, there is no

4  documents, there is nothing before you that says that the

5  cure payment should go anywhere other then what the lease

6  says.  That is my concern, Your Honor.

7        THE COURT:  But we do -- you're not disputing that

8  the debtors have been paying the money directly to Tenent, is

9  that correct?  They haven't been paying monthly to your

10 clients.

11       MS. UHLAND:  That is -- well, Your Honor, at one

12 point in the past there was a direction by the landlord to

13 direct certain interest, not the full rent.  It was never the

14 full rent.  There was a direction letter in connection with

15 the MidCap prepetition credit agreement that no longer exists

16 and is no longer effective.

17       THE COURT:  Has there been a document rescinding

18 that instruction?

19       MS. UHLAND:  The prepetition credit agreement

20 doesn't exist.  It was an instruction for the prepetition --

21 for it to come out of directly from the MidCap account.  So,

22 it's void.  It's not an existing -- and it was really -- it

23 was -- you know, my understanding was that it was actually

24 something in connection with the original financing that

25 Tenent and MidCap were discussing.  So, that is why it was

1    set-up that way.  It was more of an inter-creditor issue, but

2    MidCap is not in the mix anymore; MidCap has been paid off.

3    Their prepetition facility, you know, was cancelled at the

4    beginning of this case.

5              THE COURT:  Okay.

6              MS. UHLAND:  So, that historical practice is not

7    established by any evidence.  I mean, I'm telling you what I

8    understand, but like I said there is a lease that says pay

9    the landlord.  There is nothing else in this record.  The

10   Tenent note, they haven't even put tier note in the record

11   and they've known -- what is kind of still shocking to me is

12   this issue has been in the -- people have been knowing about

13   this lease assignment since September.

14             THE COURT:  Okay.

15             MS. UHLAND:  Your Honor, I really believe for you

16   to do anything other than just simply pay the rent in

17   accordance with the lease would, you know, be prejudicial to

18   my client's rights.

19             THE COURT:  Well, I'm sure it would be

20   prejudicial.  And, of course, Tenent has requested assurance

21   that it will receive its payment by December 31st and you're

22   not prepared to make that assurance, is that right?

23             MS. UHLAND:  Not in this -- no.  I am not prepared

24   to make that assurance because I have absolutely no authority

25   to represent my client with respect to that matter.

1          THE COURT:  All right.  And if I instructed the

2    debtors to pay the interest to Tenent why would that be an

3    error?

4          MS. UHLAND:  Your Honor, on what evidentiary basis

5    would you direct the debtors to pay the interest to Tenent?

6        THE COURT:  Well, I ask the questions and you answer

7    them.

8          MS. UHLAND:  All right.  Because there is

9    absolutely no factual basis. If I said to pay the interest to

10   Suzanne Uhland, if you ordered it paid to Suzanne Uhland,

11   yes, you can do that.

12         THE COURT:  But that has been the practice.  The

13   debtors practice has been to pay Tenent.

14         MS. UHLAND:  There is no evidence of that.

15         THE COURT:  Well, I guess I have to conduct an

16   evidentiary hearing then and I will schedule one.  That is

17   how we will do this then.  And in the meantime the debtor

18   will continue to hold the funds.  I will schedule an

19   evidentiary hearing.

20         MS. UHLAND:  That's fine, Your Honor.

21         THE COURT:  And we will find out, you know, who's

22   been paid, and why, and so on.  I will have to look at my

23   schedule and schedule.  I will get back to the parties to

24   schedule it.  All right.  That is how we will do it because

25   you're raising issues about evidence and you're entitled to

1  do that, then we will have an evidentiary hearing on this.

2  All right.

3           MS. UHLAND:  That's fine, Your Honor.  Thank you.

4           THE COURT:  All right.  Anything else?

5           Yes.  Mr. Ryan, I couldn't see you back there.

6  Good afternoon.

7           MR. RYAN:  Good afternoon, Your Honor.  My

8  prescription is bad.  I could barely see you from back there.

9           THE COURT:  All right.

10          MR. RYAN:  Jeremy Ryan from Potter Anderson &

11  Corroon on behalf of the ad hoc committee.

12          I rise, Your Honor, we did continue our motion to

13  the 6th. I want to just put a couple of things on the record.

14          THE COURT:  All right.

15          MR. RYAN:  The first being -- certainly at last

16  Thursday's hearing there was a lot of passionate language

17  that came out of my mouth at the podium.  The ad hoc

18  committee is very concerned about some of the actions that

19  took place at Hahnemann, but I wanted to make clear for the

20  record and also because this is a hearing where people

21  unfamiliar with our process in our courtroom are listening in

22  and reporting in.

23          I wanted to make sure that there was no mistake

24  that none of that passionate language is directed towards Mr.

25  Weiland, EisnerAmper or Saul Ewing.

1          THE COURT:  Okay.

2          MR. RYAN:  This is all conduct that we are

3   concerned about before they even got involved and I didn't

4   want anyone who's unfamiliar with the process to make any

5   association with our concerns about actions of the debtor and

6   to take them and associate them with the professionals who

7   are working hard with the situation they have.

8          THE COURT:  I agree with you on that, Mr. Ryan,

9   but I took and extremely concerned.  I have been giving it

10  great thought trying to come up with a solution which I have

11  not been able to.  I am pleased that the parties are talking

12  in an effort to arrive at a solution.

13         MR. RYAN:  Your Honor, I think that we are all

14  there.  I was warmed to hear Ms. Uhland say that Mr.

15  Friedman's companies have lots of revenue sources and, you

16  know, perhaps we look forward to exploring those revenue

17  sources and how they can help these problems as well.

18         THE COURT:  Yes.

19         MR. RYAN:  That being put aside, Your Honor, we

20  are, as I think I mentioned at last week's hearing, there are

21  information deficits and there are efforts to try and get

22  information just about who the population of residents and

23  fellows are, and information to get -- information to get

24  notices to them.  The debtors are challenged because they are

25  on a skeleton crew.  There are third-parties who have, you

1    know, been here before with postures before Your Honor.

2    There is information in other places.

3         One of the things we have encountered is a lot of

4    people are under confidentiality agreements.  And what we

5    think would help is if, you know, Your Honor on the record

6    were to encourage parties who have access to information to

7    take as liberal a view as they can on releasing information

8    that they have so that we can take Your Honor's encouragement

9    to them to say, please, give us information about who the

10   residents are, if you have a last known address, if you have

11   a current email and we're trying to get notices out to these

12   people.

13        One thing that we think would be very assistive is

14   to let these parties know, who are also not familiar players

15   in our courtroom, that Your Honor encourages them to take

16   those liberal views to get information to us so that we can

17   get information to those effected.

18        THE COURT:  Well, this is an extremely broad and

19   sensitive problem.  And you have expressed, Mr. Ryan, we

20   don't know who has what information.  And, obviously, as part

21   of your work to arrive at a solution you will be determining

22   who has what information.  And I do encourage them to release

23   the information so that you can determine who is entitled to

24   relief here.  Who are the physicians who have been wronged,

25   so to speak.  That will require, perhaps, those parties

1 putting aside their confidentiality in order to work with the

2 parties who are seeking to find some relief for the

3 physicians.

4          MR. RYAN:  Thank you, Your Honor.  That is very

5 much appreciated and that is really why we wanted to come to

6 the court today.

7          THE COURT:  And to the extent that you have a

8 problem you will bring it to me and we will look at it at

9 that point.

10          MR. RYAN:  I think everyone wants to work

11 collaboratively.  You know, contracts are what they are and

12 they say what they are.

13          THE COURT:  That's right.

14          MR. RYAN:  So, you know, you have seen enough

15 comfort orders in your life, but this is more of a comfort

16 statement that gives them a little bit of room to help us

17 out.

18          THE COURT:  Absolutely. I think it's essential

19 here.

20          MR. RYAN:  Thank you, Your Honor.

21          THE COURT:  Thank you, Mr. Ryan.

22          Anything else?

23          MS. DISABATINO:  That concludes the hearing, Your

24 Honor.

25          THE COURT:  Thank you, Ms. DiSabatino.  We will

1  stand in recess and I will alert you as to when the

2  evidentiary hearing will take place.

3          MS. DISABATINO:  Thank you.

4      (Proceeding concludes at 1:55 p.m.)

5

6

7

8                  CERTIFICATE

9

10     I certify that the foregoing is a correct transcript

11 from the electronic sound recording of the proceedings in the

12 above-entitled matter.

13
   /s/Mary Zajaczkowski            December 12, 2019
14 Mary Zajaczkowski, CET**D-531

15

16

17

18

19

20

21

22

23

24

25