## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (KG) |
|  | Jointly Administered |
| Debtors. | **Related to Docket Nos. 1134, 1141 and 1169** |

### DEBTORS' OMNIBUS OBJECTION AND RESPONSE TO (A) EMERGENCY MOTION OF AD HOC COMMITTEE OF HAHNEMANN RESIDENTS AND FELLOWS TO COMPEL DEBTORS TO PROVIDE PROFESSIONAL LIABILITY INSURANCE IN ACCORDANCE WITH RESIDENT EMPLOYMENT AGREEMENTS, (B) THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF HEALTH'S MOTION FOR AN ORDER COMPELLING DEBTORS TO OBTAIN POST-CLOSURE TAIL INSURANCE COVERAGE AND (C) ORDER FOR RULE TO SHOW CAUSE DIRECTED TO DEBTORS

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") submit this omnibus objection and response (the "**Objection and Response**") to (a) the *Emergency Motion of Ad Hoc Committee of Hahnemann Residents and Fellows to Compel Debtors to Provide Professional Liability Insurance in Accordance With Resident Employment Agreements* [D.I. 1134] filed by the Ad Hoc Committee of Hahnemann Residents and Fellows (the "**Ad Hoc Committee**"), (b) *The Commonwealth of Pennsylvania Department of Health's Motion for an Order Compelling Debtors to Obtain Post-Closure Tail Insurance Coverage* [D.I. 1141], filed by the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Commonwealth of Pennsylvania Department of Health ("**DOH**") (together, the "**Motions to Compel**"), and (c) the Court's Order For Rule to Show Cause Directed to Debtors [D.I. 1169] (the "**Show Cause Order**").  In support of their Objection and Response, the Debtors respectfully state as follows:

**PRELIMINARY  STATEMENT**

1.      Because of the factual and legal overlap between and among the Motions to Compel and the Show Cause Order, the Debtors believe it is most efficient to address them in an omnibus manner, as set forth herein.

*A.      The Motions to Compel*

2.      Through the Motions to Compel, the Ad Hoc Committee and DOH ask the Court to compel the Debtors to purchase "tail coverage" that they are not required to purchase under applicable law (or otherwise) related to professional liability insurance for former employees. Neither request is warranted by applicable law or the facts of these cases.

3.      The Ad Hoc Committee's motion dramatically, but incorrectly, accuses the Debtors of willfully creating a crisis.  It also conveniently ignores black-letter bankruptcy law by asking the Court to transform obligations arising under pre-petition contracts with residents into post-petition administrative expenses, notwithstanding that such contracts were terminated – by their own terms and by the conduct of the parties – and have not been assumed under section 365 of the Bankruptcy Code.

4.      DOH's motion would have the Court compel the Debtors to purchase tail coverage based on (i) DOH's role as a state licensing body for hospitals, notwithstanding DOH's revocation of Hahnemann's license, and notwithstanding the sale of St. Christopher's Hospital

for Children, and (ii) the public interest, even though the Bankruptcy Code contains no "public interest" basis to compel the Debtors to use estate assets in the manner suggested.

5.      Underlying both of the Motions to Compel is the contention that Pennsylvania law requires hospitals or other employers to provide medical malpractice insurance coverage for their employees.  This contention is incorrect.  In fact, Pennsylvania law requires health care providers, including certain residents, to maintain *their own* professional liability coverage. Here, the pre-petition Debtors *contractually* agreed to provide a form of professional liability coverage known as "occurrence" coverage for residents.  For reasons unclear to the Debtors' Chief Restructuring Officer, the pre-petition Debtors breached this obligation by providing "claims made" coverage instead.  They also breached contractual obligations to many other creditors and parties in interest; that is the unfortunate nature of bankruptcy.  Compelling the Debtors to mitigate any damages caused by this pre-petition breach by purchasing tail coverage now, absent any assumption of the underlying employment agreements (which have terminated and are currently subject to a pending, protective, motion for rejection), would elevate pre-petition contract claims above other general unsecured claims, in violation of the Bankruptcy Code and to the detriment of all of the Debtors' other unsecured creditors.

6.      For these reasons, the Debtors contend that the Motions to Compel have no legal merit and should be denied.

7.      One additional point regarding the Motions to Compel warrants preliminary comment.  Notwithstanding the Ad Hoc Committee's spurious suggestions otherwise, the Debtors have devoted significant time and effort to assist residents in these cases.  They have done so despite extremely limited resources and in the face of almost daily operational and other crises that have made these cases far more challenging than most.  The Debtors' cases are the

36313702.16 01/02/2020

rare cases in which lives – literally, lives – have been at stake, as the Debtors' current management struggled to juggle competing, and oftentimes overwhelming, financial, operational and other demands in order to close Hahnemann safely, relocate residents, and locate a responsible purchaser for St. Christopher's, while at the same time caring for patients, many of whom were critically ill children in an at-risk community. Against this reality, the Ad Hoc Committee's accusations that the post-petition Debtors have "willfully created a crisis," and that this is "an emergency solely of the Debtors' making," are both incorrect and grossly unfair. In fact, the impact of the closure of Hahnemann upon residents has been an issue in these cases to which the post-petition Debtors have devoted significant time and effort. The Residency Program Sale (defined below) was intended to provide displaced Hahnemann residents with a safety net – a guaranteed residency position at another local institution. This safety net ultimately proved unnecessary; all of Hahnemann's residents, with the assistance and support of the Debtors, obtained new employment without relying on the Residency Program Sale. Nevertheless, the auction of the applicable Residency Program Assets resulted – at the insistence of the Debtors' Chief Restructuring Officer – in a commitment to purchase tail coverage for former Hahnemann residents from the resulting sale proceeds, provided, of course, that the sale closed. Unfortunately, the Order approving the Residency Program Sale is stayed pending appeal. If and when the Residency Program Sale closes, the Debtors will use the sale proceeds to purchase tail coverage for former Hahnemann residents, as required by the sale agreement. Absent the sale closing, however, there is no legal basis to compel the Debtors to purchase tail coverage for residents. As such, the Motions to Compel must be denied.

B.      *The Show Cause Order*

8.      The Show Cause Order appears to be based upon the Court's preliminary conclusion that the Debtors have failed to maintain appropriate insurance.  Respectfully, this conclusion is incorrect; as will be explained below, the Debtors have at all times maintained appropriate insurance, including medical malpractice insurance.  The Debtors have no statutory obligation to purchase tail coverage for former employees when their existing policy expires and not doing so does not constitute a failure to maintain appropriate insurance.

9.      Separately, the Debtors, respectfully, do not agree that they are experiencing substantial and continuing losses to, and diminution, of their estates.  In fact, the Debtors believe that they are administratively solvent, and that they can obtain confirmation of one or more liquidating plans.

10.     The Debtors respectfully submit that conversion of these cases would not be in the best interest of these estates, and would be contrary to the interests of general unsecured creditors.  Installing a chapter 7 trustee would only add additional administrative costs and delay to these cases, and would do nothing to assist residents with the purchase of tail coverage.  For these reasons, and for the reasons set forth below, the Debtors respectfully submit that the Court should not convert these cases to chapter 7.

## FACTUAL BACKGROUND

11.     On June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

36313702.16 01/02/2020

12.     A description of the Debtors' businesses and the reasons for commencing the Chapter 11 Cases are set forth in the *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**") [D.I. 2].

13.     As detailed in the First Day Declaration, as of the Petition Date the Debtors' business primarily consisted of operating two hospitals in Philadelphia, Pennsylvania – Hahnemann University Hospital ("**Hahnemann**") and St. Christopher's Hospital for Children ("**St. Christopher's**").

14.     The Debtors commenced these cases primarily because of ongoing, unsustainable operating losses at Hahnemann, and therefore to implement and facilitate an orderly closure of Hahnemann while ensuring patient safety and quality patient care.  The Debtors also sought to implement a sale of St. Christopher's to a going concern buyer to ensure its continued operations, for the benefit of an at-risk community that relies on St. Christopher's as a safety net hospital for children, and for creditors.

**A.      Hahnemann's Residents and the Residency Program Sale**

15.     As of the Petition Date, Hahnemann employed approximately 580 residents and fellows (collectively, the "**Residents**").   On July 9, 2019, the Debtors filed a motion (the "**Residency Program Sale Motion**") [D.I. 142] to sell (the "**Residency Program Sale**") Hahnemann's residency program assets (the "**Residency Programs**") to Tower Health.  As set forth in the Residency Program Sale Motion, the Debtors sought to "ensure that Hahnemann's Residents are afforded an opportunity to continue their training without significant interruption while also maximizing the value of the Residents Program Assets for the benefit of the Debtors' estates, creditors and other stakeholders." Residency Program Sale Motion, ¶5. It should be noted that the asset purchase agreement for the initially proposed Residency Program Sale

provided a credit against the gross purchase price for the cost of tail coverage for those Residents transferring to the purchaser.

16.     On July 19, 2019, the Court entered an order establishing bidding procedures for the Residency Programs Sale [D.I. 249].   In connection with such bidding procedures, the Debtors served multiple notices on the Hahnemann Residents, including notice of the proposed sale and notice of the potential assumption and assignment of their employment contracts if the sale was successful and if each Hahnemann Resident chose to continue their education with the successful purchaser.  See, Affidavit of Service, D.I. 336.

17.     On August 8, 2019, the Debtors conducted an auction with respect to the Residency Program Sale.  During the Auction, the Debtors announced that they would use a portion of the sale proceeds to purchase tail coverage for all former Hahnemann Residents, which was ultimately included in the sale agreements for both the successful bidder and the backup bidder.  At the conclusion of the auction, Thomas Jefferson University Hospitals, Inc. (the "**Purchaser**"), acting for itself and a consortium of non-profit hospitals in the greater-Philadelphia area, was deemed the successful bidder.

18.     On September 10, 2019, after a contentious hearing, the Court entered an order (the "**Sale Order**") approving the sale of the Residency Programs to the Purchaser pursuant to the terms of the asset purchase agreement (the "**APA**") [D.I. 681].

19.     Section 6.11 of the APA provides that, on or before closing, the Debtors must obtain a "Tail Coverage Endorsement," defined as:

> a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital.   Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and

One Million Five-Hundred Thousand Dollars ($1,500,000) annual aggregate for each MCARE eligible Resident only.

20.     While the APA obligated the Debtors to purchase the Tail Coverage Endorsement, section 3.2(d) of the APA provided that Purchaser would reimburse up to $1.0 million of the costs of the tail coverage.  Paragraph 12 of the Sale Order expressly provided that the Debtors could use a portion of the sale proceeds to purchase the tail coverage for the Hahnemann Residents.

21.     On September 12, 2019, the United States of America, on behalf of the Department of Health and Human Services, acting through its designated component, the Centers for Medicare and Medicaid Services ("**CMS**"), appealed the Sale Order to the United States District Court for the District of Delaware (the "**District Court**").  On September 16, 2019, the District Court issued a stay of the Sale Order pending appeal.  Since the entry of this stay, DOH has terminated Hahnemann's hospital license and CMS has terminated Hahnemann's Medicare provider agreement and provider number.  Upon information and belief, CMS also has begun at least the initial stages of the process to redistribute Hahnemann's residency slots.  As a result,  it is unclear whether the Purchaser will be able to close on the Residency Program Sale, even if the Sale Order is upheld on appeal.

**B.     The Resident Employment Agreements**

22.     As noted above, the Debtors' obligation to provide insurance for their Residents was solely contractual.

23.     Each Resident was an employee of Hahnemann or St. Christopher's and executed an employment agreement with the applicable pre-petition Debtor (the "**Resident Employment Contracts**").  Each Resident Employment Contract provided for a one-year employment term, and the Debtors and each Resident executed new Resident Employment Contracts at the

beginning of each academic year. Accordingly, for the academic year commencing July 1, 2019

(i.e., the 2019-2020 academic year), each Resident signed a Resident Employment Contract prior

to the Petition Date.

24.    Upon information and belief, all Resident Employment Contracts for the 2019-

2020 year utilized the same substantive format, a copy of which is attached hereto as **Exhibit A**.

The Debtors note the following pertinent sections of the 2019-2020 Resident Employment

Contracts:

   a.    Section 3(A) – "Hospital shall provide and maintain a [applicable residency program] GME program accredited by ACGME,[2] ADA and/or CPME.

   b.    Section 3(D) – "***Hospital shall provide occurrence-based professional liability insurance coverage*** for House Staff's acts and omissions, within the scope of the Program, that occur during the Training Period." (emphasis added)

   c.    Section 9(D) – "If Hospital loses its accreditation during House Staff's Training Period, on the effective date of any loss of such accreditation, House Staff shall be immediately released from this Agreement, the Agreement shall terminate and Hospital and its personnel shall provide references in connection with House Staff's application to enter an appropriate program elsewhere."

25.    Despite the contractual provisions set forth above, the pre-petition Debtors

purchased *claims-made* insurance for their employees, including the Residents, rather than

*occurrence-based* coverage.  The difference between these types of coverage is described below.

26.    By the middle of August 2019, Hahnemann's accreditation with respect to all of

its residency and fellowship programs had terminated.  Accordingly, pursuant to their express

---

[2]    "**ACGME**" stands for the "Accreditation Counsel for Graduate Medical Education," the general accrediting body of hospital residency and fellowship programs.  ACGME has entered a formal appearance in these Chapter 11 Cases, has filed responses to multiple pleadings, including in connection with the Residency Program Sale, and ACGME's counsel has appeared at several hearings.

terms, all of the Resident Employment Contracts related to Hahnemann Residents terminated as well.

27.     Moreover, and in any event, all Hahnemann Residents took positions at other institutions.  The last day any Resident worked at Hahnemann was August 23, 2019, although the majority had left earlier.  Upon their departure, the Residents ceased being employed by Hahnemann and stopped providing services for Hahnemann.  As such, each Resident Employment Contract terminated no later than August 23, 2019.

**C.     Communications with Residents**

28.     Residents have been apprised of events in these Chapter 11 Cases, both directly and indirectly, in a number of ways, and in full compliance with the requirements of Federal Rule of Bankruptcy 2002 and the Local Rules for the United States Bankruptcy Court for the District of Delaware.

29.     All Residents received notice of the commencement of the Chapter 11 Cases and, as noted above, the Debtors directly provided notice to the Hahnemann Residents several times in connection with the Residency Program Sale.  The Debtors caused Hahnemann Residents to be served by email with the Resident Program Sale Motion, the general sale notice, a more specifically tailored notice to Hahnemann Residents, and several notices regarding potential assumption and assignment of the Resident Employment Contracts. See Affidavits of Services, D.I. 336, 479 and 587.

30.     In addition, on December 20, 2019 the Debtors notified all former Residents, by both first class mail and electronic mail, of the anticipated expiration of the Debtors' existing medical malpractice insurance coverage and provided information to facilitate the Residents' acquisition of tail coverage.

31.     In addition, certain organizations that represent the educational interests of Residents have been active throughout the Chapter 11 Cases.  Such organizations maintain websites to provide ongoing information to Residents and, on information and belief, have been in direct contact with at least some, if not all, of the Residents.  These organizations include ACGME as well as the Association of American Medical Colleges (the "**AAMC**") and the Educational Commission for Foreign Medical Graduates ("**ECFMG**" and collectively with ACGME and the AAMC, the "**Resident Advocates**").  Attorneys for the Resident Advocates have  appeared and actively participated in multiple hearings in these cases, including the bidding procedures hearing and the sale hearing with respect to the Residency Program Sale, as well as the sale hearing with respect to the sale of St. Christopher's.

32.     The issue of tail coverage for Residents has been raised and kept at the forefront by the Resident Advocates, as far back as the Court's consideration of the bidding procedures for the Residency Program Sale on July 19, 2019.  In their objection to the Debtors' proposed bidding procedures [D.I. 360], the AAMC and ECFMG specifically asked the Court to "require Hahnemann to honor and satisfy the terms of its residents' contracts, as they related to insurance coverage." Id. at ¶ 6. That objection also indicated that "[t]he AAMC and the ECFMG are focused on ensuring that all current residents and past residents who still may be subject to liability for actions that occurred during their training at Hahnemann receive sufficient tail coverage." Id. at ¶ 7. Indeed, as the Court may recall, a number of Residents attended the bidding procedures hearing and addressed the Court in connection therewith.

33.     Tail coverage for current and former Residents has also been raised and discussed by the Resident Advocates at multiple sale hearings, including the hearing of September 4, 2019 with respect to the Residency Program Sale and the hearing of September 23, 2019 with respect

to the sale of St. Christopher's.  Indeed, at the September 23, 2019 hearing, counsel for ACGME expressly stated that while the Debtors had committed, as part of the Residency Program Sale, to purchase tail coverage, "the current policy expires with respect to the residents of that hospital in January 11th of next year.  As Your Honor is aware, the District Court entered a stay of that sale order on 9/16."  Transcript of Hearing of September 23, 2019, page 79, lines 2-5.  Counsel continued as follows: "that does raise a concern for ACGME as to what will happen if that sale doesn't ultimately close because you're going to have a number [of] residents both past and current who are then not going to have tail coverage."  Id. at lines 8-12.

34.    Moreover, the Debtors have been clear in their presentations to the Court with respect to tail coverage.  At the sale hearing on September 4, 2019, Mr. Wilen's testimony to the Court by proffer was that "[a]bsent the closing of the sale of the debtor's resident program assets . . . the resident's claims against Hahnemann University Hospital for tail coverage would be simply general unsecured claims in these cases."  Transcript of Hearing of September 4, 2019, page 50, lines 24-25 and page 51, lines 1-3.

35.    Based on the foregoing, it is clear that the Resident Advocates and any number of Residents themselves were aware that the Debtors had only claims-made policies that would expire in January, 2020.  They were also aware that the Debtors would not likely purchase tail coverage for Hahnemann Residents unless and until the Residency Program Sale closed.  While the Resident Advocates do not directly represent each of the individual Residents, they certainly represent their interests, and the Debtors understand they regularly communicate with the Residents, either directly or through information posted on their various websites.

**D.      The Cost of Tail Coverage**

36.      The Debtors have been working with brokers to price tail coverage.  The Debtors

also requested a quote for tail coverage from their existing "captive" insurer, Philadelphia

Academic Risk Retention Group, LLC ("**PARRG**").    PARRG is predominantly owned by

Philadelphia Academic Health Holdings, LLC, an entity owned and controlled by Joel

Freedman.

37.      The Debtors will supplement this Objection and Response when they have

received the requested formal quotes.

## LEGAL BACKGROUND

**A.      Pennsylvania Insurance Law**

38.      The responsibility for securing medical malpractice insurance in Pennsylvania

ultimately lies with each licensed health care provider.[3]    In that regard, the Medical Care

Availability and Reduction of Error Act (the "**MCARE Act**")[4], Act 13 of 2002, 40 P.S. 1303.101

*et seq*. provides, among other things, that:

a.      A health care provider providing health care services in the Commonwealth shall: (1) purchase medical professional liability insurance from an insurer which is licensed or approved by the department; or (2) provide self-insurance.  40 P.S. § 1303.711(a);

b.      Health care providers must submit proof of insurance or self insurance to the department within sixty (60) days of the policy being issued.  Id. at § 1303.711(b);

---

[3]      The term "Health Care Provider" is defined in 40 P.S. § 1313.103 to include both entities and persons, including hospitals and physicians, licensed to provide health care or professional medical services. Accordingly, both the hospital entities and the individual physicians (including licensed Residents) are Health Care Providers under the MCARE Act.

[4]      The MCARE Act is the successor to the Medical Professional Liability Catastrophe Loss Fund, better known as the "CAT" Fund, which originally was established by section 701(e) of the Health Care Services Malpractice Act, Act 11 of 1975 (40 P.S. §§ 1301.101-1301.1006, *et seq*.).  Among other things, the MCARE Act provides a fund, known as the MCARE Fund, to ensure reasonable compensation for persons injured due to medical negligence by providing coverage in excess of basic insurance coverage provided by primary professional liability insurance companies or self-insurers.  See 40 P.S. § 1303.712.

c.      The MCARE Fund is used to pay claims against participating health care providers for losses or damages awarded in medical professional liability actions against them in excess of the basic insurance coverage required by section 711(d). <u>Id.</u> at § 1303.712; and

d.      Malpractice insurance coverage may be obtained through an insurance policy written on either an occurrence or a claims-made basis. <u>Id.</u> at § 1303.742; 31 Pa. Code § 242.2.

39.      With respect to claims-made policies, such policies are approved for use by the Pennsylvania Insurance Department so long as "*the insurer* . . . guarantee[s] the continued availability of suitable liability protection for a health care provider subsequent to the discontinuance of professional practice by the health care provider or the termination of the insurance policy by the insurer or the health care provider for so long as there is a reasonable probability of a claim for injury for which the provider may be liable." <u>Id.</u> § 1303.742 (emphasis added). In other words, **the insurer providing a claims-made coverage policy, NOT the employer**, is obligated to make tail coverage available. It is up to the health care provider to decide whether to acquire such coverage from such insurer, or otherwise. Health care providers have sixty (60) days after the expiration or cancellation of a claims-made policy to purchase tail coverage to avoid any gap in coverage. <u>See</u> 40 P.S. § 3405 (providing that "[i]nsurers must provide a 60-day period, after cancellation or nonrenewal of a claims-made policy is effective, during which time the insured may purchase an extended reporting coverage endorsement, also referred to as tail coverage. If the insured purchases the extended reporting coverage endorsement at any time within the 60-day period . . . the extended reporting coverage shall become effective as of the date the claims-made policy terminated."). Thus, notwithstanding the January 11, 2020 expiration of the current insurance policies, Residents have an additional 60 days after January 11th to obtain an extended reporting coverage endorsement from PARRG.

-14-

B.      **Occurrence versus Claims-Made Policies**

40.      Under an occurrence policy, coverage is provided for liabilities that arise while the policy is in effect, regardless of when the claims are actually made against the insured.  See, e.g., Pennsylvania Manufacturers' Assoc. Ins. Co. v. Johnson Matthey, Inc., 160 A.3d 285, 290 (Pa. Cmwlth. 2017) (citations omitted).  In comparison, a claims-made policy "protects the insured with respect to claims made against it during the policy period, regardless of when the liability arose."  Id.; see also Fletcher v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n, 985 A.2d 678, 680 n.4 (Pa. 2009) (A "claims made policy provides coverage for claims filed while the doctor holds the policy, in contrast to an occurrence policy, which covers claims relating to any acts that occurred while the doctor held the policy, regardless of when the claims were filed").

41.      While a claims-made policy generally covers claims that are made and reported during the policy period, an extended reporting endorsement, also known as "tail" coverage, extends coverage to include claims made after the policy terminates for occurrences taking place prior to that date.[5]  Conversely, a retroactive date establishes a date *prior* to the policy period on or after which an occurrence must take place to be covered, otherwise known as "prior acts" or "nose" coverage.  See, Catlin Specialty Ins. Co. v. J.J. White, Inc., 309 F. Supp. 3d 345, 364 (E.D. Pa. 2018).  If a claims-made policy does not include a retroactive date, its coverage may either be limited to events taking place during the policy period or extend to events taking place at any time prior to the policy's inception, depending on the specific policy language.

---

[5]      Many claims-made policies will include what is known as a "mini-tail" provision that allows insureds to report claims that are made against them during the policy period for a short time period (typically 30 to 60 days) following the policy's termination.

42.     Given the foregoing statutory framework, it is clear that an *insurer* is required to make tail coverage available if it is offering medical malpractice insurance on a claims-made basis.  It is up to the insured (including Residents) to purchase the tail or risk non-compliance.

## OBJECTION

### A.     The Ad Hoc Committee's Motion to Compel

43.     The Ad Hoc Committee filed its motion to compel on December 11, 2019, expressly asking the Court to compel the Debtors to provide tail coverage for Hahnemann Residents "in accordance with Resident Employment Agreements."  None of the arguments asserted in the Ad Hoc Committee's motion has any merit.

44.     *First*, the Ad Hoc Committee cites to several Pennsylvania statutes governing professional liability insurance for health care providers, incorrectly suggesting that such statutes create an obligation on behalf of the Debtors to provide tail coverage for Residents.  Indeed, at the hearing on December 12, 2019, counsel for the Ad Hoc Committee argued that tail coverage is required by Pennsylvania law.  This is incorrect.  As explained above, the plain language of the statutes referenced by the Ad Hoc Committee makes clear that the statutory obligation to obtain adequate professional liability coverage rests with the health care provider, not with their employer.  Moreover, the statutory obligation to provide a mechanism to obtain tail coverage lies with the insurer, not the insured's employer.

45.     *Second*, although the Ad Hoc Committee acknowledges that the Debtors' obligations arose contractually and prior to the Petition Date, it nonetheless contends that the Debtors should be compelled to "comply with their obligations under the Resident Contracts . . . by requiring the Debtors to purchase tail policies for Residents."  Ad Hoc Committee Motion, at ¶ 16.  This contention has no merit.  As an initial matter, the Resident Contracts did not contemplate the purchase of claims-made coverage, and therefore could not have required the

purchase of tail coverage, which has no application in connection with occurrence-based coverage.  More fundamentally, the Resident Employment Contracts were entered into by the Debtors pre-petition and by their terms terminated post-petition based on both the Residents' separation from the Debtors, in connection with the Hahnemann closure, and automatically upon the loss of Hahnemann's accreditation for its residency programs.  Given that the Resident Employment Contracts for Hahnemann Residents have terminated and all such Residents have left and taken positions elsewhere, the Resident Employment Contracts are not executory contracts.[6]

46.    Even if the Resident Employment Contracts were still executory – and they are not – section 365 of the Bankruptcy Code is "designed to 'allow . . . the trustee or debtor in possession a reasonable time within which to determine whether adoption or rejection of the executory contract would be beneficial to an effective reorganization.'"  In re University Medical Ctr., 973 F.2d 1065, 1075 (3d Cir. 1992), citing In re Whitcomb & Keller Mortg. Co., 715 F.2d 375, 379 (7th Cir. 1983).  During this period, executory contract are "enforceable by the debtor but not against the debtor."  In re Broadstripe, LLC, 2009 WL 774401 at *3, Case No. C09-10006 (D. Del. Mar. 26, 2009), citing NLRB v. Bildisco & Bildisco, 465 U.S. 513, 532 (1984). Upon rejection, any continuing duties of the Debtors become general unsecured claims pursuant to sections 365(g) and 502(g) of the Bankruptcy Code.

47.    *Third*, the Ad Hoc Committee asserts that the Debtors should be compelled to "keep . . . the Resident Contracts in place" pursuant to the Debtors' covenants under the APA with the Purchaser.  Ad Hoc Committee Motion, at ¶ 22.  In actuality, the APA merely requires

---

[6]    While the Debtors do not believe the Resident Employment Contracts remain executory, out of an abundance of caution, they have filed motions to reject such contracts for Hahnemann's former Residents. See, Docket Nos. 1175 to 1186.

36313702.16 01/02/2020

the Debtors to use *commercially reasonably efforts* to preserve relationships with the Residents.

APA at § 6.2.  To the extent the Ad Hoc Committee suggests that this obligates the Debtors to

keep all of the Hahnemann Resident Employment Contracts in place, it ignores the obvious

reality that all the Hahnemann Residents had already terminated their employment (and, as such,

their Resident Employment Contracts) prior to the Court's approval of the APA – and that they

are all working elsewhere.  The closure of Hahnemann and the relocation of all of Hahnemann's

Residents to other institutions clearly results in it no longer being "commercially reasonable" for

the Debtors to keep the Residents employed.  In light of the closed status of Hahnemann and the

fact that all Hahnemann Residents have taken positions elsewhere, the maintenance of the

Hahnemann Resident Employment Contracts will have no bearing on the ability to close on the

Residency Program Sale.

48.     ***Finally***, the Ad Hoc Committee suggests that the Debtors should be compelled to

purchase tail coverage *now* because they committed to do so under the APA.  This argument

ignores the fact that the purchase of tail coverage contemplated by the APA was, per the terms of

the APA, to be accomplished solely by using resulting *sale proceeds*, which the Debtors cannot

do unless and until the sale closes.  If the District Court upholds the Sale Order and the Purchaser

remains willing to close, the Debtors stand ready to close on the Residency Program Sale and

purchase tail coverage for the Hahnemann Residents using the sale proceeds.

49.     For these reasons, the Debtors respectfully submit that the Ad Hoc Committee's

motion has no merit, and should be denied.

**B.      DOH's Motion to Compel**

50.     DOH does not rely on the Debtors' contracts with their employees in seeking to

compel the purchase of tail coverage, but instead asserts that "PA DOH has determined that it is

-18-

in the best interests of the public . . . for the Debtors to obtain tail insurance . . ." <u>DOH Motion to Compel</u>, at ¶ 11 [D.I. 1141].

51.     DOH premises its motion on its powers under Chapter 8 of the Pennsylvania Health Care Facilities Act, which governs the licensing of hospitals and sets the standards for issuance of licenses with which health care providers must comply.  As noted above, however, DOH has already revoked Hahnemann's hospital license and the Debtors have sold St. Christopher's.  As such, the Debtors no longer fall under DOH's licensing umbrella.

52.     More fundamentally, DOH fails to point to a single statute or other source of law, other than its own determination that it would "serve the public interest," in support of its motion.  Rather, DOH points to the Debtors' first-day insurance motion, through which the Debtors obtained *authority* to maintain existing insurance policies as necessary in the ordinary course of business, but which does not compel the Debtors to purchase tail coverage.  In fact, the Debtors have maintained all appropriate insurance since the filing of their bankruptcy proceedings, including general liability coverage and claims-made professional liability coverage, which remains in full force and effect.

53.     DOH also references the applicable Operating Guidelines for Chapter 11 Cases, which require chapter 11 debtors to maintain insurance coverage "as is customary in the debtor's business."  <u>U.S. Department of Justice, Operating Guidelines for Chapter 11 Cases, Region 3, District of Delaware</u>, at ¶ 3.  The operating guidelines, however, do not identify any obligation of a debtor, after it ceases operating its business, to purchase tail coverage for former employees.

54.     DOH's reliance on section 1112(b)(4)(C) of the Bankruptcy Code is similarly misplaced. Section 1112(b)(4)(C) merely provides that the term "cause," for purposes of a motion to dismiss or convert a chapter 11 case, includes the "failure to maintain appropriate

insurance that poses a risk to the estate or to the public." 11 U.S.C. § 1112(b)(4)(C). DOH fails to provide any case law suggesting that this would extend to purchasing tail coverage for former employees, and in any event, DOH does not seek dismissal or conversion through its motion. As noted above, the Debtors continue to maintain their general liability coverage, which is all the insurance that is necessary and appropriate given the Debtors' operational status.

55.    Finally, DOH cites Pennsylvania statutes and regulations governing the operation of hospitals within Pennsylvania, none of which are applicable to the Debtors because the Debtors no longer operate a hospital. DOH similarly cites to Pennsylvania's MCARE Act, which, as noted by DOH, "requires Pennsylvania physicians to maintain insurance coverage, including tail coverage." <u>DOH Motion to Compel</u>, at ¶ 39 [D.I. 1141]. DOH fails to point to any statute that requires a hospital or other employer of physicians to purchase tail coverage on behalf of former employees.

56.    For these reasons, the Debtors submit that DOH's motion should be denied.

## **THE DEBTORS' CASES SHOULD NOT BE CONVERTED TO CHAPTER 7**

57.    Section 1112(b)(1) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *for cause* unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1) (emphasis added).[7] The two types of "cause" referenced in the Show Cause Order are those set forth in sections 1112(b)(4)(C) and 1112(b)(4)(A) of the Bankruptcy Code. For the

---

[7]    Although the Debtors acknowledge that the Court has the authority, under section 105 of the Bankruptcy Code, to raise the potential conversion of these cases on a *sua sponte* basis, they note that neither the Ad Hoc Committee nor DOH has requested the conversion of these cases to chapter 7.

reasons set forth below, the Debtors respectfully submit that no such cause exists for the conversion of these cases to chapter 7.

58.    ***Section 1112(b)(4)(C)***.  Section 1112(b)(4)(C) of the Bankruptcy Code provides that "cause" includes "failure to maintain appropriate insurance that poses a risk to the estate or to the public" (emphasis added).  11 U.S.C. § 1112(b)(4)(C).  This language does not require that a debtor maintain any and all insurance that might protect the estate and the public; instead, only "appropriate" insurance is required.  In re KC's Pub, LLC, 428 B.R. 612, 617 (Bankr. M.D. Pa. 2010).

59.    While the Bankruptcy Code does not define "appropriate insurance," courts look to applicable state law to make such a determination.  Id. at 616 ("To determine whether or not acquiring liquor liability/dram shop coverage would be appropriate here, I have looked to the provisions of Pennsylvania law to see what light they shed on the Debtor's choice of insurance coverages here.").  In KC's Pub, the court denied a motion of the United States Trustee to dismiss or convert under section 1112(b) of the Bankruptcy Code, finding that the debtor was carrying significant general liability insurance and that Pennsylvania law did not require separate dram shop coverage.

60.    Further, the court in KC's Pub noted the following factors that a court should consider in determining whether a debtor in possession is maintaining appropriate insurance:

> (1) applicable requirements under other federal or state laws; (2) the debtor's size and the complexity of the case; (3) the debtor's financial wherewithal to purchase insurance; (4) the existence of or lack of pre- or post-petition uninsured claims against the debtor; (5) any steps taken by the debtor to reduce the risk of claims; and, (6) the best interests of creditors.

Id. at 617.

61.     In this case, "appropriate insurance" for purposes of section 1112(b)(4)(C) does not require the Debtors to purchase tail coverage for former employees, when such an obligation is not imposed under Pennsylvania law.  As noted above, Pennsylvania law requires only that healthcare providers, including Residents, maintain their own medical malpractice insurance; it does not require employers to provide insurance on employees' behalf.  <u>See</u> 40 P.S. § 1303.711(c).  Further, Pennsylvania law requires the insurer, not the Debtors, to make tail coverage available after the termination of a claims-made policy.  <u>See</u> 40 P.S. § 1303.742. Pennsylvania law does not create any obligation for the Debtors to purchase tail coverage for former employees and doing so does not fall within the scope of "appropriate insurance" under section 1112(b)(4)(C).

62.     The other factors identified in <u>KC's Pub</u> also demonstrate that "maintaining appropriate insurance" does not require the Debtors to purchase tail coverage for former employees.  Requiring the Debtors to use limited estate resources to purchase tail coverage for former employees that the Debtors have no statutory requirement to provide would negatively impact administrative and other unsecured creditors.  Further, the public interest is adequately protected under the insurance regime already established by Pennsylvania law, which allocates the burden of purchasing insurance between the Residents and insurers, not the Debtors/employers.  Failing to purchase tail coverage for former employees poses no risk to the estates, and is in fact harmful to other creditors.  For these reasons, the Debtors do not lack "appropriate insurance" and "cause" does not exist under section 1112(b)(4)(C) of the Bankruptcy Code to convert these cases to chapter 7.

63.     ***Section 1112(b)(4)(A).***  Section 1112(b)(4)(A) of the Bankruptcy Code provides that a case shall be converted or dismissed for cause, including "substantial or continuing loss to

or diminution of the estate *and* the absence of a reasonable likelihood of rehabilitation."   11

U.S.C. § 1112(b)(4)(A) (emphasis added).

64.     With respect to the *first* prong of section 1112(b)(4)(A) – substantial or

continuing loss to or diminution of the estate – this Court has previously explained as follows:

> It is important to emphasize the context of the Bankruptcy Cases. The
> continuing losses, diminution of the estate and unlikelihood of
> rehabilitation are, practically speaking, irrelevant for reasons as
> obvious as they are unusual. The Debtors are not operating and are not
> sustaining continuing losses. Creditors are not being prejudiced by the
> continuation of the Bankruptcy Cases.  On the positive side, and the
> statute requires a finding of 'best' interests, the creditors' best interests
> are served by sustaining the Bankruptcy Cases.

In re 15375 Mem'l Corp., 386 B.R. 548, 552 (Bankr. D. Del. 2008), reversed on other grounds,

400 B.R. 420 (D. Del. 2009), aff'd sub nom. In re 15375 Mem'l Corp. v. Bepco, L.P., 589 F.3d

605 (3d Cir. 2009).

65.     With respect to the *second* prong of section 1112(b)(4)(A) – the absence of a

reasonable likelihood of rehabilitation – this Court explained that it is relevant to consider

whether there is a reasonable likelihood that a plan can be confirmed, even a liquidating plan.  Id.

at 553.  Importantly, if one of the prongs cannot be established, there is no need to consider the

other prong, as both must exist for conversation under section 1112(b)(4)(A) of the Bankruptcy

Code.

66.     Here, there is no substantial or continuing loss to or diminution of the estates.

The Debtors have ceased operations at Hahnemann and have closed on the sale of St.

Christopher's.  The Debtors' operations now are focused on maximizing the value of their estates

by, among other things, collecting accounts receivable, liquidating miscellaneous fixed and other

assets and investigating and pursuing other sources of recovery.  Conversion would only add

another layer of administrative expense and negatively impact creditors, including Residents to

the extent they hold unsecured claims.  The Debtors are confident that they will be in a position to propose one or more confirmable liquidating plans that include a structure to pursue claims and causes of action for the benefit of all non-insider unsecured creditors.  As such, the Debtors respectfully submit that conversion is not appropriate under section 1112(b)(2)(A) of the Bankruptcy Code.

WHEREFORE, for the foregoing reasons, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit B,** denying the Motions to Compel, and granting such other and further relief as is just and proper.

Dated: January 2, 2020

**SAUL EWING ARNSTEIN & LEHR LLP**

By:    */s/ Mark Minuti*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Melissa A. Martinez
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com
melissa.martinez@saul.com

*Counsel for Debtors and Debtors in Possession*