# **<u>Exhibit A</u>**

# SIEMENS

**Siemens Financial Services, Inc.**
**MASTER EQUIPMENT LEASE AGREEMENT**
Dated: 06/10/2011

(Healthcare)

| | |
|---|---|
| LESSOR: SIEMENS FINANCIAL SERVICES, INC.<br>170 Wood Avenue South<br>Iselin, NJ 08830<br>(800) 327-4443 | LESSEE: Tenet HealthSystem Medical, Inc.<br>(Herein "Lessee")<br>1445 Ross Avenue Suite 1400<br>(Address)<br>Dallas, TX 76202-2703<br>(City, State, Zip) |

## TERMS AND CONDITIONS OF AGREEMENT

**1. MASTER LEASE:** This Master Equipment Lease Agreement (herein "Agreement") sets forth the basic terms and conditions upon which Lessor shall lease to Lessee and Lessee shall lease from Lessor items of property specified in leasing schedules (herein "Leasing Schedules") to be entered into from time to time. Each Leasing Schedule shall incorporate the terms and conditions of the Agreement and shall constitute a lease as to the property specified in such Leasing Schedule (herein "Equipment"). The term "Lease" as used in the Agreement shall mean the applicable Leasing Schedule as incorporating the terms and conditions of the Agreement. The Agreement shall become effective at the time of Lessor's acceptance (by execution hereof) at its corporate offices, by an authorized representative of Lessor.

**2. TERM AND LEASE PAYMENTS:** The lease term of the Equipment shall be for the period specified in the Leasing Schedule (herein "Lease Term"). The Lease Term shall commence upon the commencement date specified in the Leasing Schedule (herein "Commencement Date"). For the Lease Term, Lessee agrees to pay to Lessor the number of lease payments specified in the Leasing Schedule, each in the amount specified in the Leasing Schedule (herein "Lease Payments") for the payment periods specified in the Leasing Schedule (herein "Payment Periods"), including any Advance Lease Payments specified in the Leasing Schedule, with the first Lease Payment being due on the date set forth on the Leasing Schedule ("First Regular Payment Date"), and the remaining Lease Payments on the same day of each consecutive Payment Period thereafter for the duration of the Lease Term (except that any Lease Payment due on a date that does not exist in a particular month, shall be due on the last day of such month). If Interim Rent is applicable, then in addition to the foregoing, for the period from the Commencement Date to (but excluding) the first day of the month immediately following the Commencement Date ("Interim Period"), Lessee shall pay to Lessor Interim Rent in the amount set forth in the Leasing Schedule and such amount shall be due and payable on the tenth day following the Commencement Date (and the Stipulated Loss Value Schedule to the Lease, if any, shall be construed so that Payment #1 under such schedule shall also include the Interim Period). Any Advance Lease Payments (unless otherwise specified in the Leasing Schedule) will be applied upon the effective date of the Lease to the first regular Lease Payment, then to the remaining Lease Payments in reverse order. Lessee agrees to pay on demand, as a late charge, 1.3% per month, limited by the maximum rate permitted by law, of each overdue amount (including accelerated balances) under the Lease, whether such amount is due prior to or after a Default (as hereinafter defined). All payments provided for in the Lease shall be payable at the office of Lessor set forth above, or at any other place designated by Lessor. The Lease is a net lease and Lessee shall not be entitled to any abatement of, reduction of, or setoff against Lease Payments for any reason whatsoever. The Lease may not be terminated or canceled for any reason whatsoever, except as expressly provided in the Lease. No amounts under the Lease may be prepaid.

*(CONTINUED ON FOLLOWING PAGES)*

IN WITNESS WHEREOF, the parties hereto have duly executed the Agreement as set forth below. Lessee acknowledges that no amendment to any Leasing Schedule or the Agreement shall be effective unless in writing signed by the parties hereto.

ACCEPTED BY:
LESSOR: SIEMENS FINANCIAL SERVICES, INC.
BY: _[signature]_
    (Authorized Signature)
NAME: Michele Morisey
      (Printed or Typed)
TITLE: Team Leader
       (Printed or Typed)
BY: _[signature]_
    (Authorized Signature)
NAME: G. Alexander Cole
      (Printed or Typed)
TITLE: Vice President - Credit
       (Printed or Typed)
DATE: 7-14-11

BY EXECUTION HEREOF, THE SIGNER CERTIFIES THAT (S)HE HAS READ THE ENTIRE AGREEMENT, THAT LESSOR OR ITS REPRESENTATIVES HAVE MADE NO AGREEMENTS OR REPRESENTATIONS EXCEPT AS SET FORTH HEREIN OR IN THE LEASING SCHEDULE AND THAT (S)HE IS DULY AUTHORIZED TO EXECUTE THE AGREEMENT ON BEHALF OF LESSEE.

LESSEE: Tenet HealthSystem Medical, Inc.
BY: _[signature]_
    (Authorized Signature)
NAME: Tyler C. Morphy
      (Printed or Typed)
TITLE: Treasurer
       (Printed or Typed)
DATE: July 12, 2011

3. **DISCLAIMER OF WARRANTIES; LIMITATION OF REMEDY; LIMITATION OF LIABILITY:** Lessee has selected both the Equipment and the supplier (identified in the Leasing Schedule, herein "Supplier") from whom Lessee has requested that Lessor purchase the Equipment. LESSEE ACKNOWLEDGES THAT LESSOR HAS NO SPECIAL FAMILIARITY OR EXPERTISE WITH RESPECT TO THE EQUIPMENT. LESSEE AGREES THAT THE EQUIPMENT LEASED UNDER THE LEASE IS LEASED "AS IS" AND IS OF A SIZE, DESIGN AND CAPACITY SELECTED BY LESSEE AND THAT LESSEE IS SATISFIED THAT THE SAME IS SUITABLE FOR LESSEE'S PURPOSES, AND THAT EXCEPT AS MAY OTHERWISE BE SPECIFICALLY PROVIDED HEREIN OR IN THE LEASING SCHEDULE, LESSOR HAS MADE NO REPRESENTATION OR WARRANTY AS TO ANY MATTER WHATSOEVER. LESSOR DISCLAIMS, AND LESSEE HEREBY EXPRESSLY WAIVES AS TO LESSOR, ALL WARRANTIES WITH RESPECT TO THE EQUIPMENT INCLUDING BUT NOT LIMITED TO ALL EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, QUALITY, CAPACITY, OR WORKMANSHIP, ALL EXPRESS OR IMPLIED WARRANTIES AGAINST PATENT INFRINGEMENTS OR DEFECTS, WHETHER HIDDEN OR APPARENT, AND ALL EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO COMPLIANCE OF THE EQUIPMENT WITH THE REQUIREMENTS OF ANY LAW, REGULATION, SPECIFICATION OR CONTRACT RELATIVE THERETO. IN NO EVENT SHALL LESSOR BE LIABLE (INCLUDING WITHOUT LIMITATION, UNDER ANY THEORY IN TORTS) FOR ANY LOSS OF USE, REVENUE, ANTICIPATED PROFITS OR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE LEASE OR THE USE, PERFORMANCE OR MAINTENANCE OF THE EQUIPMENT. Nothing contained in the foregoing disclaimer is intended to diminish the right of the Lessee, consistent with the provisions of this Section, to exercise all rights and remedies against the Supplier, manufacturer or service provider of the Equipment for all representations, warranties and commitments made by such party to the Lessee; provided, however, that the exercise of any rights against the Supplier, manufacturer and/or service company shall not alter, amend, abrogate, nullify, supersede, suspend, diminish or otherwise affect any of the obligations of Lessee hereunder. If the Equipment is not properly installed, does not operate as represented or warranted by the Supplier, manufacturer and/or service company or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against the Supplier, manufacturer and/or service company and shall, nevertheless, pay Lessor all amounts payable under the Lease and shall not set up against Lessee's obligations any such claims as a defense, counterclaim, recoupment, deduction, setoff or otherwise. For the Lease Term, for so long as no Default has occurred and is continuing, Lessor assigns to Lessee (to the extent permitted by law) any right Lessor may have under a Supply Contract (as defined in the Leasing Schedule) against the Supplier, manufacturer and/or service company to enforce, at Lessee's expense (if any), any product warranties with respect to the Equipment, provided however, that Lessee shall indemnify and defend Lessor (and its assigns) from and against all claims, expenses, damages, losses and liabilities incurred or suffered by Lessor in connection with any such action taken. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE (INCLUDING, BUT NOT LIMITED TO, LESSEE'S RIGHTS, CLAIMS AND DEFENSES UNDER ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE, SECTIONS 401, 402, 508-522) AND ANY RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE THAT MAY LIMIT OR MODIFY LESSOR'S RIGHTS AS DESCRIBED IN THE LEASE.

4. **TITLE; IDENTIFICATION; PERSONAL PROPERTY:** Lessee acknowledges that subject to the provisions of Section 12 of the Leasing Schedule, title to the Equipment shall at all times be vested in Lessor, and no right, title or interest in the Equipment shall pass to Lessee other than, conditioned upon Lessee's compliance with and fulfillment of the terms and conditions of the Lease, the right to possess and use the Equipment for the full Lease Term. Lessee agrees not to sell, assign, sublet, pledge, or otherwise encumber any interest in the Lease or the Equipment and agrees to keep the same free from any lien, encumbrance, right of distraint or any other claim which may be asserted by any third party. Lessee shall immediately notify Lessor in writing of any tax or other liens attaching to the Equipment. Lessor may require plates or markings to be affixed to or placed on the Equipment indicating Lessor's interest. Lessor and Lessee hereby confirm their intent that the Equipment always remain and be deemed personal property even though the Equipment may hereafter become attached or affixed to realty. Lessee shall obtain all such waivers as Lessor may reasonably require to acknowledge Lessor's title to and assure Lessor's right to remove the Equipment, including any landlord and mortgagee waivers.

5. **PAYMENT OF TAXES; GENERAL INDEMNIFICATION:** Lessee shall pay promptly to Lessor when due, all taxes, fees and assessments, including but not limited to, all license and registration fees, sales, use, property, gross receipts, excise, transaction, ad valorem, privilege, intangible, stamp or other taxes or charges, together with any fines, penalties or interest thereon (unless such fines, penalties or interest arise solely from Lessor's gross negligence or willful misconduct) now or hereafter imposed by any governmental body, upon or with respect to, any of the Equipment or the use, possession, ownership, leasing, operation, delivery or return thereof (excluding, however, franchise taxes and any taxes based on the net income of Lessor). Any fees, taxes or other amounts paid by Lessor upon failure of Lessee to make such payments set forth in this Section 5 shall be payable upon demand from Lessee to Lessor. Lessee agrees to indemnify and hold Lessor (and its assigns) harmless from and against any and all claims, losses, damages, penalties, actions, suits and liabilities (including negligence, tort and strict liability), together with all reasonable legal costs and expenses in connection therewith incurred by Lessor (and its assigns) which result from, or relate to, the manufacture, purchase, ownership, maintenance, modification, delivery, installation, possession, condition, use, acceptance, rejection, revocation of acceptance, operation or return of the Equipment.

6. **INSTALLATION AND DELIVERY:** Lessee shall provide a suitable installation environment for the Equipment as specified in the applicable manufacturer's or Supplier's manuals, and except as otherwise specified by the manufacturer or Supplier, furnish all labor required for unpacking and placing each item of Equipment in the desired location. Lessee shall also be responsible for any delivery, rigging, destination and installation charges charged by the manufacturer or Supplier with respect to the Equipment.

7. **OPERATION; USE; INSPECTION:** For the full Lease Term, Lessee shall operate the Equipment in accordance with all applicable manufacturer and Supplier manuals or instructions by fully qualified and duly authorized personnel only, in accordance with all applicable laws and regulations. For said Lease Term, Lessee shall properly maintain the Equipment, or cause it to be properly maintained, by a fully qualified service company, and shall immediately notify Lessor in writing of the entity maintaining the Equipment and of any change of such entity. Such maintenance shall be performed in accordance with all requirements necessary to enforce all product warranty rights. All operating and maintenance costs with respect to the Equipment shall be borne by Lessee. Lessee shall not: (a) use, operate or locate the Equipment in any manner or area so as to cause it to be excluded from coverage by any insurance required under the Lease; (b) abandon the Equipment or, without prior written notice to Lessor, take the Equipment out of use; (c) alter the Equipment; (d) permit the Equipment to be removed from the equipment location specified in the Leasing Schedule (herein "Equipment Location"), or any subsequent location, without the prior written consent of Lessor, which consent shall not be unreasonably withheld; or (e) without the prior written consent of Lessor, affix or install any accessory, equipment or device on any item of Equipment if such (i) is not readily removable, or (ii) will impair the value or the originally intended function or use of such Equipment. All additions, repairs, parts, accessories, equipment and devices attached or affixed to any item of Equipment which are not readily removable, shall become the property of Lessor and part of the Equipment for all purposes hereof. Lessor shall have the right from time to time during normal business hours to enter upon the Equipment Location or elsewhere for the purpose of confirming the existence, condition or proper maintenance of the Equipment.

8. **RISK OF LOSS; INSURANCE:** (a) Lessee agrees that it shall bear all risk of loss, damage to or destruction of the Equipment. Lessee shall give Lessor prompt notice of any damage to or loss of any Equipment or of any occurrence arising from the possession, use or operation of the Equipment resulting in death or bodily injury, or damage to property. In the event of damage to any item(s) of Equipment, Lessee shall immediately place such item(s) in good repair (with no abatement of Lease Payments), with the proceeds of any insurance recovery applied to the cost of such repair. Should any item(s) of Equipment become lost, stolen, destroyed, worn out, damaged beyond repair, condemned, confiscated, seized or requisitioned (herein "Event of Loss"), Lessee shall, at the option of Lessor, either (i) replace the same with like equipment in good repair (with no abatement of Lease Payments) and ensure that Lessor acquires good title to such replacement equipment or execute any documents or instruments requested by Lessor in order to ensure a valid, perfected and enforceable first priority security interest in such replacement equipment, or (ii) in the event Option A of Section 12 of the applicable Leasing Schedule has been selected ("Option A"), pay to Lessor on the date of the scheduled Lease Payment immediately following such Event of Loss (herein "Loss Payment Date"), the pro rata portion relating to such item(s) of the greater of (A) the remaining Lease Payments for the balance of the Lease Term (calculated as of the Loss Payment Date), plus Lessor's estimated residual interest in the Equipment, such sum discounted at a per annum rate of five percent (5%), or (B) the stipulated loss value of the Equipment as set

forth in the schedule to the Lease and made a part thereof ("Stipulated Loss Value") calculated for the Payment Period immediately following the Loss Payment Date; plus in either case all past due and unpaid Lease Payments and other payments due and unpaid through the Loss Payment Date relating to such item(s), whereupon the Lease shall terminate as to such item(s) and Lessor shall adjust the remaining Lease Payments and Stipulated Loss Value Schedule accordingly; or if Option B or Option C of Section 12 of the applicable Leasing Schedule has been selected ("Option B" or "Option C", as applicable), pay to Lessor on the date of the scheduled Lease Payment immediately following such Event of Loss, the pro rata portion relating to such item(s) of the sum of (A) the remaining Lease Payments for the balance of the Lease Term and (B) the purchase option price specified in Option B or Option C, as applicable (herein "Purchase Option Price"), such sum discounted at the per annum rate implicit in the Lease assuming exercise by Lessee of such purchase option (herein "Lease Rate"), plus all past due and unpaid Lease Payments and any other payments due and unpaid through the Loss Payment Date relating to such item(s), whereupon the Lease shall terminate as to such item(s) and Lessor shall adjust the remaining Lease Payments and Purchase Option Price accordingly.

(b) For the full Lease Term, Lessee, at its expense, shall maintain comprehensive general liability insurance and "all risks" property insurance with respect to the Equipment (as primary insurance for Lessee and Lessor), both in such amounts as Lessor shall require, except that such property insurance shall be in an amount at least equal to the full replacement value of the Equipment or, if Option A was selected, the applicable Stipulated Loss Value thereof, if greater; and such insurance shall be placed with carriers acceptable to Lessor. The liability insurance policy shall name Lessor (and its successors and assigns) as additional insured and the property insurance policy shall name Lessor (and its successors and assigns) as loss payee to the extent its interest may appear, and both policies shall provide that they may not be canceled or altered without at least thirty (30) days prior written notice to Lessor. Lessee irrevocably appoints Lessor its agent and attorney-in-fact for the purpose of adjusting and settling any property insurance hereunder and endorsing in Lessee's name any instruments or payments received in respect thereof. Lessee shall furnish to Lessor within thirty (30) days (or sooner if requested by Lessor) of delivery of the Equipment, a certificate of insurance that such coverage is in effect, however, Lessor shall be under no duty either to ascertain the existence of or to examine such insurance policies or to advise Lessee in the event that such insurance coverage does not comply with the requirements hereof.

9. DEFAULT AND REMEDIES: (a) Any one or more of the following shall constitute a default by Lessee under the Lease (herein "Default"): (i) failure by Lessee to pay any amounts under the Lease when due and such remains unremedied for a period of ten (10) days from the due date thereof; or (ii) (A) failure by Lessee to maintain any insurance required under the Lease; or (B) failure by Lessee to comply with any other provisions or perform any of its other obligations arising under the Lease or under any other documents or agreements relating to the Lease, and such remains unremedied by Lessee for a period of twenty (20) days; or (iii) any representations or warranties made or given by Lessee or any guarantor of any of Lessee's obligations under the Lease (herein "Guarantor") in connection with the Lease or the Agreement, or any other document or agreement relating to the Lease or the Agreement (including any applicable guaranty), were false or misleading in a material respect when made; or (iv) subjection of the Equipment to levy or execution or other judicial process which is not or cannot be removed within thirty (30) days from the subjection thereof, or the imposition of any unauthorized lien on or transfer of the Equipment by or through Lessee; or (v) commencement of any insolvency, bankruptcy or similar proceedings by or against Lessee or Guarantor (each, an "Obligor"), including any assignment by an Obligor for the benefit of creditors, and in the case of any such involuntary proceedings, such is not dismissed within thirty (30) days of institution, or the inability of an Obligor to generally pay its debts as they become due, or the appointment of a receiver, trustee or similar official for an Obligor or any of its respective property; or (vi) any material adverse change from the date of the Leasing Schedule in an Obligor's business operations or financial condition, or any act of an Obligor which imperils the value of the Equipment or the prospect of full performance of an Obligor's obligations under the Lease or any applicable guaranty, including but not limited to the liquidation or dissolution of an Obligor or the commencement of any acts relative thereto, or without the prior written consent of Lessor, any sale or other disposition of all or substantially all of the assets of an Obligor, or any merger or consolidation of an Obligor unless such Obligor is the surviving entity and such Obligor's tangible net worth, after giving effect to such transaction, equals or exceeds that which existed prior thereto, or the cessation of business by an Obligor; or (vii) a default by an Obligor under any Lease, guaranty or other agreement or note with Lessor, or with any assignee of the Lease, or under any agreement with any other party that in Lessor's sole opinion is a material agreement; or (viii) the death of an Obligor, the withdrawal of any partner of an Obligor if such Obligor is a partnership, the withdrawal of any member of an Obligor if such Obligor is a limited liability company, or the inability of an Obligor to perform any of its respective obligations contained in the Lease or in any applicable guaranty.

(b) Upon the occurrence of any Default, Lessor may exercise any one or more of the following remedies (which remedies shall be cumulative, and may be exercised simultaneously, in each case to the extent permitted by law): (i) cancel or terminate the Lease and/or any unfunded commitments or proposals to Lessee, whether related to the Lease or otherwise; (ii) secure peaceable repossession and removal of the Equipment by Lessor or its agent without judicial process; (iii) demand and Lessee shall return the Equipment to Lessor in accordance with Section 11 hereof; (iv) sell, lease or otherwise dispose of the Equipment at public or private sale without advertisement or notice except that required by law, upon such terms and at such place as Lessor may deem advisable, and Lessor may be the purchaser at any such sale (if any such notice is required, Lessor and Lessee agree that ten (10) days notice shall be deemed to be commercially reasonable); (v) demand and Lessee shall pay all expenses in connection with the Equipment relating to its retaking, refurbishing, selling, leasing or the like; and (vi) exercise any other right or remedy which may be available to it under the Uniform Commercial Code ("UCC") or any other applicable law. To the extent permitted by applicable law, Lessee waives all rights it may have to limit or modify any of Lessor's rights and remedies hereunder, including but not limited to, any right of Lessee to require Lessor to dispose of or marshal the Equipment or otherwise mitigate its damages hereunder.

(c) If Option A has been selected, Lessor may exercise the following remedy, as provided herein, in addition to the remedies set forth in Section 9 (b) above (which remedies shall be cumulative, and may be exercised simultaneously, in each case to the extent permitted by law): By notice to Lessee, as liquidated damages for loss of a bargain and not as a penalty, declare the Stipulated Loss Value of the Equipment calculated for the Payment Period immediately following the date of such notice immediately due and payable, together with (i) all past due and unpaid Lease Payments through such Payment Period, and (ii) all other amounts due and unpaid under the Lease (including late charges), whereupon such shall become immediately due and payable. In the event, however, that no Stipulated Loss Value Schedule was included in the transaction, Lessor may, alternatively, declare all remaining Lease Payments for the balance of the Lease Term discounted at a per annum rate of five percent (5%), together with any loss or damage to Lessor's residual interest in the Equipment pursuant to Section 2A-532 of the UCC, plus all past due and unpaid Lease Payments and all other amounts due and unpaid under the Lease (including late charges), immediately due and payable in full, whereupon such shall become immediately due and payable.

(d) If Option B or Option C has been selected, Lessor may exercise the following remedy in addition to the remedies set forth in Section 9(b) above (which remedies shall be cumulative, and may be exercised simultaneously, in each case to the extent permitted by law): Lessor may declare all remaining Lease Payments for the balance of the Lease Term plus the Purchase Option Price, such sum discounted at the Lease Rate, plus all past due and unpaid Lease Payments and all other amounts due and unpaid under the Lease (including late charges), immediately due and payable in full, whereupon such shall become immediately due and payable.

10. QUIET ENJOYMENT: So long as no Default exists, Lessor (and any assignee shall be deemed to have warranted that it) shall not interfere with Lessee's quiet enjoyment of the Equipment.

11. RETURN OF EQUIPMENT; EXTENSION OF TERM: Upon the end of the Lease Term or any extension thereof (unless Lessee has purchased the Equipment pursuant to the terms of the Lease), or upon demand of Lessor pursuant to Section 9 hereof, Lessee, at its own risk and expense, shall immediately return the Equipment to Lessor, free of all liens and encumbrances created by or through Lessee, in compliance with all legal and regulatory requirements, de-installed and packed for shipment (by Supplier or a qualified service company) in accordance with manufacturer's specifications, in the same condition and appearance as when received by Lessee (ordinary wear and tear excepted) and in good working order and eligible for manufacturer's maintenance (if available), along with original user manuals and documentation, freight prepaid and insured, to such location within the continental United States as Lessor shall designate. Should Lessee fail to (i) provide timely notice of exercise as provided in Option A or Option B, or (ii) provide Lessor, at least one hundred and twenty (120) but not more than one hundred and eighty (180) days prior to the proposed return date, with written notice of its election to return the Equipment, or (iii) return the Equipment to Lessor in the time and manner provided above, then the Lease Term shall be extended for successive one hundred and twenty (120) day periods until Lessee provides such notice and returns the Equipment to Lessor in accordance herewith, or Lessor terminates the Lease by ten (10) days written notice to Lessee. In the event the Lease is extended pursuant to the preceding sentence, the periodic

Lease Payments and the Stipulated Loss Value (if any) in effect prior to the expiration of the Lease Term, and all other provisions of the Lease, shall continue to apply.

12. **LESSEE REPRESENTATIONS AND COVENANTS:** Lessee represents and covenants that: (a) it is duly and solely organized, validly existing and in good standing under the laws of its state of organization; (b) the execution, delivery and performance by Lessee of the Lease and all other related instruments and documents will not violate any governmental statute or regulation, or conflict with or result in any breach, default or violation of the organizational documents of Lessee or any judgment, order or decree to which Lessee or its property is subject; (c) the execution, delivery and performance by Lessee of the Lease and all other related instruments and documents have been duly authorized by all necessary organizational action; (d) Lessee shall furnish Lessor with (and cause any Guarantor to furnish) its annual and such interim financial statements as Lessor shall request, certified and audited (if available), together with officer's certificates, opinions of counsel, resolutions and such other information and documents as Lessor may reasonably request; (e) all financial statements and other related financial information furnished by Lessee or any Guarantor shall be prepared in accordance with generally accepted accounting principles consistently applied and shall fairly present, in all material respects, Lessee's and any Guarantor's financial position and results of its operations as of the dates given on such statements; (f) the Lease and all other related instruments or documents hereunder and thereunder are enforceable in accordance with their terms, shall be effective against all creditors of Lessee under applicable law, including fraudulent conveyance and bulk transfer laws, and shall raise no presumption of fraud; all information set forth on the Leasing Schedule is true and complete; and all information (taken as a whole) furnished by or on behalf of Lessee (including, without limitation, by any Guarantor) in connection with any Lease, whether before or after the date of such Lease, is, and shall be, true and accurate in all material respects on the date such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect; (g) there are no pending or threatened actions or proceedings before any court, administrative agency or other dispute resolution forum that could have a material adverse effect on Lessee, the Lease or any other related instruments or documents or the transactions thereunder, unless such actions have been previously disclosed to Lessor and consented to in writing by Lessor; (h) the Lease does not evidence a consumer transaction and all Equipment is leased for business purposes only, and not for personal, family or household purposes, and only for its normally intended purpose; (i) all Equipment is and shall at all times be and remain tangible personal property and shall not become a fixture or real property; (j) Lessee shall immediately notify Lessor in writing upon the occurrence of any Default or event which, with the lapse of time or giving of notice, would constitute a Default; and (k) Lessee shall provide Lessor with written notice at least thirty (30) days prior to changing its legal name, address, identity, state of organization, organizational structure, organizational identification number (if applicable) or social security or taxpayer identification number (as applicable). Lessee shall promptly execute and deliver to Lessor such further documents and take such further action as Lessor may reasonably request in order to more effectively carry out the intent and purpose of the Lease.

13. **NOTICES; CHANGES; FILINGS:** Notices, requests or other communications required under the Lease to be sent to either party shall be in writing and shall be (a) by United States first class mail, postage prepaid, and addressed to the other party at the address specified above (or to such other address as such party shall have designated by proper notice), (b) by personal delivery or (c) by overnight delivery by a nationally recognized courier. Lessee authorizes Lessor to fill in descriptive material in the Lease (including serial numbers) and to correct any patent errors in the Lease. Lessee (i) authorizes Lessor to file both before and/or after a Leasing Schedule is executed by Lessee (and Lessee shall execute if requested by Lessor) and (ii) irrevocably appoints Lessor its agent and attorney-in-fact to execute in the name of Lessee and file both before and/or after a Leasing Schedule is executed by Lessee, any UCC financing statements (including any amendments thereto) or similar filings with such authorities and with any filing offices as Lessor may determine are necessary or advisable to protect Lessor's interest in the Equipment and/or the Lease, and Lessee agrees to reimburse Lessor upon demand for all costs incurred with respect thereto and with respect to any lien, tax or other related searches (that Lessor may determine are necessary or advisable) performed by Lessor (whether prior to or after the date of the Lease) in connection with any Lease transaction.

14. **ASSIGNMENT:** Lessor may assign or transfer all or any interest of Lessor in the Lease and/or the Equipment without notice to Lessee. UPON ASSIGNMENT, LESSEE AGREES TO PAY WITHOUT ABATEMENT, DEDUCTION OR SETOFF ALL AMOUNTS WHICH BECOME DUE UNDER THE LEASE AND FURTHER AGREES THAT IT WILL NOT ASSERT AGAINST ASSIGNEE ANY DEFENSE, COUNTERCLAIM, RECOUPMENT CLAIM OR SETOFF WHICH LESSEE HAS OR MAY HAVE AT ANY TIME AGAINST LESSOR FOR ANY REASON WHATSOEVER. Lessee acknowledges that any assignment or transfer by Lessor shall not materially change Lessee's duties or obligations under the Lease nor materially increase the burdens or risks imposed on Lessee. Lessee shall (if requested by Lessor) acknowledge in writing any assignments (including any material terms of the Lease) in a form supplied by Lessor. LESSEE SHALL NOT ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THE LEASE OR ENTER INTO ANY SUBLEASE OF ALL OR ANY PART OF THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR.

15. **MISCELLANEOUS:** The Lease shall be binding upon and inure to the benefit of the parties hereto, their legal representatives, heirs, and permitted successors and assigns. TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO WAIVE ALL RIGHTS TO A JURY TRIAL IN ANY LITIGATION ARISING FROM OR RELATED IN ANY WAY TO THE AGREEMENT, LEASE, OR THE TRANSACTION CONTEMPLATED HEREBY. No waiver of any provision of the Lease shall be effective unless in writing, signed by the party to be charged, and no amendment, supplement or other modification of the Lease shall be effective unless in writing, signed by each of the parties to the Lease. No failure to exercise, no delay in exercising, and no single or partial exercise on the part of Lessor of any right, remedy, or power under the Lease, shall operate as a waiver thereof or preclude Lessor from exercising any other right, remedy or power under the Lease. Any provision of the Lease which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability, without invalidating the remaining provisions of the Lease. This Agreement shall supersede any and all proposals or agreements previously made between the parties relating to the subject matter of this Agreement. The Lease, and all related documents, including (a) amendments, addenda, consents, waivers and modifications which may be executed contemporaneously therewith or subsequently thereto, (b) documents received by Lessor from Lessee, and (c) financial statements, certificates and other information previously or subsequently furnished to Lessor, may be reproduced by Lessor by any photographic, photostatic, microfilm, micro-card, miniature photographic, compact disk reproduction or other similar process and Lessor may destroy any original document so reproduced. Lessee waives all right to object to the admissibility of such reproduction and stipulates that any such reproduction shall, to the extent permitted by law, be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original itself is in existence and whether or not the reproduction was made by Lessor in the regular course of business) and that any enlargement, facsimile or further reproduction of the reproduction shall likewise be admissible in evidence. No action, regardless of form, arising out of the Lease may be brought by Lessee more than two (2) years after the cause of action has accrued. The representations, warranties, obligations and indemnities of Lessee under the Lease shall survive the termination or cancellation of the Lease to the extent required for their full observance and performance. The obligations of each co-maker (if any) of the Lease, shall be primary, joint and several. It is the express intent of Lessor and Lessee not to violate any applicable usury laws or to exceed the maximum amount of time price differential or interest, as applicable, permitted to be charged or collected by applicable law, and any such excess payment will be applied first to Lease Payments in inverse order of maturity and then to any other payment obligations of Lessee under the Lease, and any remaining excess will be refunded to Lessee. In the event that Lessee fails to meet any of its obligations under the Lease, Lessor may at its option satisfy any of such obligations and Lessee shall, upon demand, reimburse Lessor for all costs (including insurance premiums, if any, but nothing in the Lease shall create an insurance relationship of any type between Lessor including its insurer and agents, and Lessee) incurred by Lessor in connection therewith, together with interest thereon at the late charge rate specified above. In the event that legal or other action is required to enforce Lessor's rights under the Lease (including the exercise of remedies under Section 9 hereof), Lessee agrees to reimburse Lessor on demand for its reasonable attorneys' fees and its other related costs and expenses, (whether incurred prior to or after judgment). The captions in the Lease are for convenience only and shall not define or limit any of the terms hereof. If Option A or Option B has been selected, Lessor and Lessee agree that (i) the Lease is a "finance lease" as that term is defined in Article 2A of the UCC, and (ii) Lessor shall be entitled to all the benefits applicable to a transaction that qualifies as a finance lease under Article 2A of the UCC. THE AGREEMENT AND THE LEASE SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF.

**SIEMENS**

Siemens Financial Services, Inc.

**OFFICER'S CERTIFICATE OF INCUMBENCY AND AUTHORITY**

1. **THE UNDERSIGNED** (in Section 4 below), being a duly elected, qualified and acting officer of Tenet HealthSystem Medical, Inc. (the "Corporation"), a corporation duly organized and validly existing under the laws of the State of Delaware, hereby certifies that (a) the person(s) whose names, positions and signatures appear in Section 3 below are duly appointed and qualified representatives of the Corporation and hold the positions set forth opposite their respective names; (b) each such person is duly authorized to execute and deliver for and on behalf of the Corporation all documents, instruments, guaranties and agreements relating to any financing arrangements, including, without limitation, leases and loans (collectively, the "Financing Agreements"), between (i) Siemens Financial Services, Inc. ("SFS") as lessor or lender and (ii) the Corporation; and (c) the execution and delivery of such Financing Agreements have been duly authorized by all appropriate action and are not prohibited or restricted by the Corporation's charter documents or prohibited by any other financing agreements, indentures or contracts to which the Corporation is a party or by which the Corporation is bound.

2. **THE UNDERSIGNED** (in Section 4 below) further certifies that (s)he is an officer of the Corporation duly authorized to make certifications on its behalf and that SFS and its successors and assigns may rely on this Officer's Certificate of Incumbency and Authority until it receives written notice from the Corporation (by certified or registered mail) of the modification, rescission or revocation of this Certificate, in whole or in part. Notwithstanding the foregoing, all Financing Agreements executed and delivered by the person(s) listed in this Certificate and accepted by SFS in reliance on this Certificate, prior to SFS's receipt of any modification, rescission or revocation, shall be effective.

3. **SPECIMEN SIGNATURES OF DOCUMENT SIGNERS**

| NAME | TITLE | SIGNATURE |
|---|---|---|
| Tyler C. Murphy | Treasurer | /s/ |
| James E. Snyder III | Assistant Treasurer | /s/ |

**[IMPORTANT: NO PERSON SIGNING ABOVE MAY BE THE SIGNER IN SECTION 4 BELOW]**

4. In Witness Whereof, the UNDERSIGNED has executed this Certificate as of the date set forth below.

By: Kristina A. Mack (Signature)
Name: Kristina A. Mack
Title: Secretary
Date: July 12, 2011

**SIEMENS**

Siemens Financial Services, Inc.
**OFFICER'S CERTIFICATE
OF INCUMBENCY AND AUTHORITY**

1. THE UNDERSIGNED (in Section 4 below), being a duly elected, qualified and acting officer of Tenet Healthcare Corporation (the "Corporation"), a corporation duly organized and validly existing under the laws of the State of Nevada, hereby certifies that (a) the person(s) whose names, positions and signatures appear in Section 3 below are duly appointed and qualified representatives of the Corporation and hold the positions set forth opposite their respective names; (b) each such person is duly authorized to execute and deliver for and on behalf of the Corporation all documents, instruments, guaranties and agreements relating to any financing arrangements, including, without limitation, leases and loans (collectively, the "Financing Agreements"), between (i) Siemens Financial Services, Inc. ("SFS") as lessor or lender and (ii) the Corporation; and (c) the execution and delivery of such Financing Agreements have been duly authorized by all appropriate action and are not prohibited or restricted by the Corporation's charter documents or prohibited by any other financing agreements, indentures or contracts to which the Corporation is a party or by which the Corporation is bound.

2. THE UNDERSIGNED (in Section 4 below) further certifies that (s)he is an officer of the Corporation duly authorized to make certifications on its behalf and that SFS and its successors and assigns may rely on this Officer's Certificate of Incumbency and Authority until it receives written notice from the Corporation (by certified or registered mail) of the modification, rescission or revocation of this Certificate, in whole or in part. Notwithstanding the foregoing, all Financing Agreements executed and delivered by the person(s) listed in this Certificate and accepted by SFS in reliance on this Certificate, prior to SFS's receipt of any modification, rescission or revocation, shall be effective.

3. **SPECIMEN SIGNATURES OF DOCUMENT SIGNERS**

| NAME | TITLE | SIGNATURE |
|---|---|---|
| James E. Snyder III | Assistant Treasurer | /s/ James E. Snyder III |

[IMPORTANT: NO PERSON SIGNING ABOVE MAY BE THE SIGNER IN SECTION 4 BELOW]

4. In Witness Whereof, the UNDERSIGNED has executed this Certificate as of the date set forth below.

By: Kristina A. Mack (Signature)
Name: Kristina A. Mack
Title: Asst. Secretary
Date: 02/16/12

## SECRETARY'S CERTIFICATE

## TENET HEALTHCARE CORPORATION

I, Paul A. Castanon, do hereby certify that I am the duly qualified and acting Secretary of Tenet Healthcare Corporation, a Nevada corporation (the "Company"), and that the following is an excerpt of the minutes of a meeting of the Board of Directors of the Company held on May 8, 2011:

### Capital Leasing Program

Mr. Tyler Murphy, Vice President and Treasurer of the Company, referenced his prior presentation to the Board of Directors at its meeting on February 24, 2011 at which the Board reviewed the proposed establishment of a capital leasing program pursuant to which the Company would enter into up to $100 million of leases in 2011 with third-party financing and other institutions, as well as various manufacturers. Mr. Murphy discussed the accounting and financial aspects of the capital leasing program. He also reviewed indicative pricing terms from the various counterparties. He then noted that the documents necessary to implement the program, which include master lease agreements, lease schedules, corporate guaranties, security instruments and related documents (the "Lease Documents"), were currently under negotiation, but were expected to be completed and executed in the next several weeks. Following a discussion, the Board did not object to the Company proceeding with the implementation of the capital leasing program, it being understood that each of the Company's officers is authorized to execute and deliver the Lease Documents and that such officers are also authorized to take all actions deemed by such officers to be necessary or desirable to implement the program and perform the Company's obligations thereunder, all on terms consistent with those presented to the Board.

I further certify that Tyler C. Murphy is the duly elected, qualified and acting Vice President and Treasurer of the Company, and the signature set forth opposite his name and title below is his true and genuine signature.

| Name | Title | Signature |
|------|-------|-----------|
| Tyler C. Murphy | Treasurer | /s/ Tyler C. Murphy |

IN WITNESS WHEREOF, I hereunto affix my signature as of the 18th day of May, 2011.

/s/ Paul A. Castanon
Paul A. Castanon