IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*, | ) ) ) ) | Case No. 19-11466 (KG) Jointly Administered |
| Debtors. | ) ) ) | Ref. No. 1141, 1268 |

Hearing Date:   January 31, 2020 @ 10:00 a.m.

## THE COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF HEALTH'S REPLY IN SUPPORT OF ITS MOTION FOR AN ORDER COMPELLING DEBTORS TO OBTAIN POST-CLOSURE TAIL INSURANCE COVERAGE

The Commonwealth of Pennsylvania Department of Health ("PA DOH"), by and through undersigned counsel, by way of *The Commonwealth of Pennsylvania Department of Health's Reply in Support of its Motion for an Order Compelling Debtors to Obtain Post-Closure Tail Insurance Coverage* (the "Motion"), hereby states:

1. Pursuant to the Pennsylvania Health Care Facilities Act, 35 P.S §§ 448.101, *et seq.*, PA DOH is charged both with overseeing the safe operation of all healthcare facilities within the Commonwealth of Pennsylvania and ensuring the health, safety, and welfare of those members of the public, including patients, employees, staff, and visitors, who come into contact with Pennsylvania's health care facilities.

2. PA DOH is responsible for the licensing and oversight of hospitals within the Commonwealth of Pennsylvania and in its capacity of *parens patriae*, can act to protect the health, safety and welfare of the public at large.

3. Under Pennsylvania law, a health care provider[1] providing health care services in the Commonwealth is required to either purchase medical professional liability insurance from an insurer licensed or approved by the Pennsylvania Insurance Department or provide self-insurance.[2] 40 P.S. § 1303.711.

4. Further, state regulations governing the operations of hospital within the Commonwealth provide that:

> There should be an insurance program which provides for the protection of the physical and financial resources of the hospital. There should be appropriate coverage of the buildings and equipment and adequate comprehensive liability insurance or an equivalent self-insurance plan covering members of the governing body and appropriate medical and administrative personnel.

28 Pa. Code § 103.43.

5. Accordingly, the Debtors were required to have medical malpractice insurance to cover the health care they and their physicians, residents and other medical personnel provided at Hahnemann Hospital and St. Christopher's Hospital.

6. Under Pennsylvania law, the Pennsylvania Insurance Commissioner "shall not approve" a medical professional liability insurance policy written on a "claims made" basis by any insurer doing business in the Commonwealth unless the insurer shall guarantee the continued availability of suitable liability protection for a health care provider subsequent to the

---

[1] A "health care provider" is defined as "[a] primary health care center or a person, including a corporation, university or other educational institution licensed or approved by the Commonwealth to provide health care or professional medical services as a physician, a certified nurse midwife, a podiatrist, hospital, nursing home, birth center and except, as to section 711(a), an officer, employee or agent of any of them acting in the course and scope of employment." 40 P.S. § 1303.103.

[2] In addition, under 28 Pa. Code § 101.31(10)(xv), hospitals within the Commonwealth are required to maintain "[m]inimum supportive capabilities" including "[c]omprehensive policies and standards for assuring the safety of patients, employees and visitors and for protection against malpractice and negligence."

discontinuance of professional practice by the health care provider or the termination of the insurance policy by the insurer or the health care provider for so long as there is a reasonable probability of a claim for injury for which the health care provider may be held liable.  40 P.S. § 1303.742.

7. The Accreditation Council for Graduate Medical Education ("ACGME") similarly requires a "Sponsoring Institution to provide residents/fellows with professional liability coverage, including legal defense and protection against awards from claims reported or filed during participation in each of its ACGME-accredited programs, or after completion of the program(s) if the alleged acts or omissions of a resident/fellow are within the scope of the program(s)."

https://www.acgme.org/Portals/0/PFAssets/InstitutionalRequirements/000InstitutionalRequirements2018.pdf?ver=2018-02-19-132236-600, at Section IV.E.2.

8. Debtors were Sponsoring Institutions.

9. On December 12, 2019, ACGME notified AAHS, Mr. Freedman, the Pennsylvania Insurance Commissioner, the Secretary of Health for the Commonwealth of Pennsylvania, the Executive Director of the Pennsylvania MCare Program and others that the Hahnemann Debtor "will be in violation of the ACGME Institutional Requirements if it does not provide ongoing medical malpractice insurance coverage for the residents and fellows…." *See* ACGME Letter, attached as Exhibit A.

10. The Debtors undertook to provide, and indeed, represented to its residents and fellows that they were in fact providing, "occurrence" based coverage, but did not do so. [Doc. No. 1268 at ¶¶ 24-25, and Exhibit A, thereto].

11. The residents and fellows justifiably relied on the Debtors to make sure they and the Debtors were in compliance with Pennsylvania law, as well as accreditation requirements.

12. But the Debtors instead, contrary to their representations, acquired "claims made" insurance through their captive insurer, Philadelphia Academic Risk Retention Group, LLC ("PA RRG"), the President of which is Joel Freedman.

13. The Debtors did not disclose to DOH or to the residents and fellows their failure to purchase the "occurrence" based coverage they claimed to have been providing until after Debtors commenced these Chapter 11 Proceedings.

14. Debtors' failure to provide "occurrence" based coverage, or in the alternative to provide tail coverage, poses a substantial risk to the residents, fellows, and the citizens of Pennsylvania.

15. Section 1112(b)(4)(C) of the Bankruptcy Code provides that "cause" to convert a Chapter 11 proceeding to Chapter 7 includes "failure to maintain appropriate insurance that poses a risk to the estate ***or to the public***" (emphasis added). 11 U.S.C. § 1112(b)(4)(C).

16. The Operating Guidelines published by the U.S. Department of Justice, Office of the United States Trustee, Region 3, provide that "the debtor is required to maintain…[insurance] coverage as is customary in the debtor's business."

17. A debtor in possession shall perform all of the functions and duties of a Chapter 11 trustee as those functions and duties pertain to maintenance of insurance coverage. 11 U.S.C. § 1107 (a).

18. Under these circumstances, the provision of tail insurance coverage is "customary in the debtor's business" in the absence of occurrence coverage.

19. Failure to maintain appropriate malpractice insurance poses a substantial risk to the public. *See In re Daniels*, 362 B.R. 428, 435-436 (Bankr. S.D. Iowa 2007).

20. The provision of tail insurance coverage is critical to ensure that funding is in place for the adequate and equal treatment of malpractice claims. *See In re Baltimore Emergency Services II, LLC*, 334 B.R. 164, 167 (Bankr. D. Md. 2005) (noting inequity of unequal treatment of pre- and post-petition malpractice claims asserted against debtor hospitals that could arise in absence of sufficient existing insurance policies and tail insurance coverage).

21. Without the appropriate tail insurance coverage, the medical malpractice insurance coverage purchased by the Debtors for their health care operations will have been insufficient and illusory.

22. Absent the tail insurance, Hahnemann and St. Christopher's patients with legitimate medical malpractice claims may be left without a source of recovery for their injuries.

23. In addition, physicians, residents, and fellows who are unable to obtain tail coverage on their own may not be protected with regard to the health care that they provided at Hahnemann Hospital and St. Christopher's Hospital.

24. Moreover, because Pennsylvania's MCARE Act requires Pennsylvania physicians to maintain insurance coverage, including tail coverage, those of the Debtors' former residents, fellows, or physicians who are unable to purchase their own tail coverage, would be at risk of losing their ability to provide medical care in Pennsylvania due to lack of insurance coverage. *See* 40 P.S. § 1303.711; 40 P.S. § 1303.742. A physician's medical license "shall" be suspended or revoked by the relevant Pennsylvania state licensing board if the physician fails to comply with the required insurance provisions of the Act. *See* 40 P.S. § 1303.711(c).

25. Thus, numerous of the Debtors' former residents, fellows, and physicians may be prevented from providing medical care in Pennsylvania at a time when Pennsylvania is experiencing a shortage of doctors. *See* Amici Brief previously filed by the American Medical Association, the Pennsylvania Medical Society, and the Philadelphia County Medical Society (collectively the "Amici Curiae"), which brief is at Docket 729.

26. In addition, the Debtors' former residents, fellows, and physicians may have additional state medical licenses, such as in Delaware, New Jersey, or Maryland. If a physician with multiple medical licenses is disciplined by the Pennsylvania state licensing board, then the physician may also be subject to discipline by the other state boards where he maintains a medical license; there often are reciprocal reporting and discipline requirements. Further, discipline by a Pennsylvania state medical board would also result in a report to the National Practitioners' Data Bank, which becomes a permanent part of the physician's record. This avalanche effect could impact whether a physician is able to continue to practice medicine. *See* Amici Brief previously filed by the Amici Curiae.

27. For these reasons, Debtors' failure to obtain adequate tail insurance coverage would present a significant public health care problem for the citizens of the Commonwealth of Pennsylvania.

28. Requiring the Debtors to obtain any necessary tail insurance coverage (i) is within this Court's Section 105 equitable power to ensure the Debtors' compliance with Section 1112(b)(4)(C) of the Bankruptcy Code and (ii) will further the public interest and assist PA DOH in its mission to protect the health, safety, and welfare of the public.

Dated: January 28, 2020

By: /s/ Richard A. Barkasy
Richard A. Barkasy (#4683)
SCHNADER HARRISON SEGAL & LEWIS LLP
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 888-4554
Facsimile: (302) 888-1696
rbarkasy@schnader.com

-and-

David Smith (admitted *pro hac vice*)
Nicholas J. LePore, III (admitted *pro hac vice*)
Ira Neil Richards (admitted *pro hac vice*)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286
Telephone: (215) 751-2000
Facsimile: (215) 751-2205
dsmith@schnader.com
nlepore@schnader.com
irichards@schnader.com

*Counsel for the Commonwealth of Pennsylvania Department of Health*