# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) **Related to Docket Nos. 1134, 1141, 1169, 1268 and** |
|  | ) **1368** |

## MOTION OF DEBTORS PURSUANT TO SECTIONS 105(A) AND 363(B) OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY TO <u>PURCHASE SPECIFIED PROFESSIONAL LIABILITY TAIL INSURANCE</u>

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-caption chapter 11 cases (the "**Chapter 11 Cases**") hereby move, pursuant to Sections 105(a) and 363(b) of tile 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for authority to purchase specified professional liability tail insurance.  In support of the relief requested, the Debtors respectfully state as follows:

### <u>Preliminary Statement</u>

1.     Through separate motions filed on December 11, 2019 (each, a "**Motion to Compel**" and, collectively, the "**Motions to Compel**"), the Ad Hoc Committee of Hahnemann Residents and Fellows (the "**Ad Hoc Committee**") and the Commonwealth of Pennsylvania

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

Department of Health ("**DOH**") have asked the Court to compel the Debtors to purchase "tail coverage" related to professional liability insurance[2]. On January 2, 2020, the Debtors filed an objection [D.I. No. 1268] to the Motions to Compel (the "**Objection**"), in which they argued among other things that any obligation they might have to purchase tail insurance for former employees arose from pre-petition contracts and would be entitled merely to pre-petition claim status under the Bankruptcy Code.

2.      After filing their Objection, the Debtors extended the expiration date of their current professional liability insurance twice – first, until on or about February 11, 2020 and, second, until on or about March 11, 2020.  Meanwhile, the Debtors engaged in discussions with key stakeholders regarding the issues raised by the Motions to Compel, including the Official Committee of Unsecured Creditors, the Ad Hoc Committee, DOH, the Debtors' pre-petition and current professional liability insurer, Pennsylvania Academic Risk Retention Group, LLC ("**PARRG**"), the Commonwealth of Pennsylvania, the Pennsylvania Professional Liability Joint Underwriting Association and certain local and regional hospitals that hired significant numbers of Hahnemann's prior residents.   In addition, the Debtors engaged insurance brokers and obtained quotes from various insurers for the requested tail insurance.

3.      These efforts resulted from a desire on the part of the Debtors to resolve the issues raised by the Motions to Compel in a cost-effective manner and to circumvent what could otherwise be difficult litigation – involving both the Motions to Compel and the various administrative, priority and other claims that are likely to be asserted if tail insurance is not obtained.  The Debtors' efforts also resulted from a genuine desire to mitigate at least some of the harm to the regional medical community caused by Hahnemann's closure.   The Debtors

---

[2]      Generally, "tail insurance" extends coverage to include claims asserted after the underlying policy terminates for occurrences taking place prior to such termination. *See* paragraphs 16-17, below.

believed they had previously addressed at least part of this harm through a provision in the Asset Purchase Agreement for Hahnemann's residency program assets that required the purchase of tail insurance for all residents.[3]  Unfortunately, closing on the Debtors' residency program asset sale has been stayed pending appeal.  By letter received on February 18, 2020, the underlying Asset Purchase Agreement was terminated by the purchaser.

4.      As a result of the Debtors' efforts, the Debtors have concluded that they will, subject to Court approval, purchase tail coverage from PARRG, which provided the most favorable quote for insurance that the Debtors received, and which offered the most attractive payment terms.  As explained in greater detail below, PARRG (which is controlled and predominantly owned, indirectly, by Joel Freedman, the Debtors' principal) has agreed that the premiums for the desired tail coverage could be payable in three equal installments, over approximately eight (8) months.  The Debtors would be responsible for paying only the first and the third premium installments; PARRG would fund the second installment, via a premium credit.

5.      The tail insurance that would be obtained (the "**Tail Coverage**") would cover all persons and entities, other than those covered by insurance obtained by STC Opco, LLC[4] or by Reading Hospital[5], for whom insurance is required under applicable law, and will resolve the

---

[3]     *See Order Under 11 U.S.C. § 105, 106, 363, 365, 503, 507, and 525 (A) Approving Asset Purchase Agreement with Thomas Jefferson University Hospitals, Inc., (B) Authorizing Sale of Certain of Debtor's Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtor's Executory Contracts, and (D) Granting Related Relief* [D.I. 681], at ¶ 12 (". . . the Debtors may use a portion of the Base Purchase Price . . . to purchase the Tail Coverage . . .").  *See also* Asset Purchase Agreement by and Between Center City Healthcare, LLC, as Seller, and Thomas Jefferson University Hospitals, LLC, as Purchaser, at § 6.11 (requiring Debtors to obtain tail coverage for residents).

[4]     STC OpCo, LLC, the purchaser of St. Christopher's Hospital (as defined below), provided tail insurance to a number of Residents and other persons in connection with its purchase of the assets of St. Christopher's Hospital and thereafter.

[5]     Reading Hospital hired twenty-two (22) of Hahnemann's former Residents and upon information and belief provided them with tail insurance.

issues raised in the Motions to Compel.  The Debtors also are hopeful that their purchase of the Tail Coverage will resolve the Court's concerns as expressed in its Show Cause Order, which is defined and discussed below.

6.      By this Motion, the Debtors respectfully request authority from the Court, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Federal Rule 9019, to purchase the Tail Coverage.

## Jurisdiction and Venue

7.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

## Background

9.      On June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

10.     A description of the Debtors' businesses and the reasons for commencing the Chapter 11 Cases are set forth in the *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**") [D.I. 2].

11.     As detailed in the First Day Declaration, as of the Petition Date the Debtors' business primarily consisted of operating two hospitals in Philadelphia, Pennsylvania – Hahnemann University Hospital ("**Hahnemann**") and St. Christopher's Hospital for Children ("**St. Christopher's**").

12.     The Debtors commenced these cases primarily because of ongoing, unsustainable operating losses at Hahnemann, and therefore to implement and facilitate an orderly closure of Hahnemann while ensuring patient safety and quality patient care.  The Debtors also sought to implement a sale of St. Christopher's to a going concern buyer to ensure its continued operations, for the benefit of an at-risk community that relies on St. Christopher's as a safety net hospital for children, and for creditors.

A.     **Attending Physicians, Residents and Fellows**

13.     As of the Petition Date, the Debtors employed residents and fellows (collectively, the "**Residents**") as well as attending physicians, nurses and other medical professionals.

14.     Each Resident was an employee of Hahnemann or St. Christopher's and each had executed an employment agreement with the applicable pre-petition Debtor (the "**Resident Employment Contracts**").  According to the Ad Hoc Committee, each of the Resident Employment Contracts obligated the Debtors to provide occurrence-based professional liability coverage for the applicable resident.  *Ad Hoc Committee's Motion to Compel* [D.I. 1134], at ¶ 6. Despite this alleged obligation, the pre-petition Debtors purchased *claims-made* insurance for

their Residents, rather than *occurrence-based* coverage.  The difference between these two types of insurance is explained below.

15.    Upon information and belief, all or substantially all of the Debtors' employment agreements with physicians required the Debtors to obtain for the physicians either occurrence-based coverage or claims-made coverage, provided that if the Debtors provided claims-made coverage, they were required to also provide tail coverage.

## B.    Claims-Made vs. Occurrence Coverage

16.    Under an occurrence policy, coverage is provided for liabilities that arise while the policy is in effect, regardless of when the claims are actually made against the insured.  *See*, *e.g.*, *Pennsylvania Manufacturers' Assoc. Ins. Co. v. Johnson Matthey, Inc.*, 160 A.3d 285, 290 (Pa. Cmwlth. 2017) (citations omitted).  In comparison, a claims-made policy "protects the insured with respect to claims made against it during the policy period, regardless of when the liability arose." *Id.*; *see also Fletcher v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 680 n.4 (Pa. 2009) (a "claims made policy provides coverage for claims filed while the doctor holds the policy, in contrast to an occurrence policy, which covers claims relating to any acts that occurred while the doctor held the policy, regardless of when the claims were filed").

17.    While a claims-made policy generally covers claims that are made and reported during the policy period, an extended reporting endorsement, also known as "tail" coverage, extends coverage to include claims made after the policy terminates for occurrences taking place prior to termination.[6]  Claims-made policies also may include a "retroactive date," which is a designated date *prior* to the policy period on or after which an occurrence must take place to be

---

[6]    Many claims-made policies will include what is known as a "mini-tail" provision that allows insureds to report claims that are made against them during the policy period for a short time period (typically 30 to 60 days) following the policy's termination.

covered when a related claim is filed during the policy period. The retroactive date creates what is generally known as "prior acts" or "nose" coverage. *See*, *Catlin Specialty Ins. Co. v. J.J. White, Inc.*, 309 F. Supp. 3d 345, 364 (E.D. Pa. 2018). If a claims-made policy does not include a retroactive date, its coverage may either be limited to events taking place during the policy period or extend to events taking place at any time prior to the policy's inception, depending on the specific policy language.

## C.   Insurance Obligations Under Pennsylvania Law

18.    Pennsylvania's Medical Care Availability and Reduction of Error Act (the "**MCARE Act**")[7], Act 13 of 2002, 40 P.S. 1303.101 *et seq*., provides, among other things, that:

> a.   A health care provider[8] providing health care services in the Commonwealth shall: (1) purchase medical professional liability insurance from an insurer which is licensed or approved by the department; or (2) provide self-insurance. 40 P.S. § 1303.711(a);
>
> b.   Health care providers must submit proof of insurance or self insurance to the department within sixty (60) days of the policy being issued. *Id.* at § 1303.711(b);
>
> c.   The MCARE Fund is used to pay claims against participating health care providers for losses or damages awarded in medical professional liability actions against them in excess of the basic insurance coverage required by section 711(d). *Id.* at § 1303.712; and
>
> d.   Malpractice insurance coverage may be obtained through an insurance policy written on either an occurrence or a claims-made basis. *Id.* at § 1303.742; 31 Pa. Code § 242.2.

---

[7]    The MCARE Act is the successor to the Medical Professional Liability Catastrophe Loss Fund, better known as the "CAT" Fund, which originally was established by section 701(e) of the Health Care Services Malpractice Act, Act 11 of 1975 (40 P.S. §§ 1301.101-1301.1006, *et seq*.). Among other things, the MCARE Act provides a fund, known as the MCARE Fund, to ensure reasonable compensation for persons injured due to medical negligence by providing coverage in excess of basic insurance coverage provided by primary professional liability insurance companies or self-insurers. *See* 40 P.S. § 1303.712.

[8]    The term "Health Care Provider" is defined in 40 P.S. § 1313.103 to include both entities and persons, including hospitals and physicians, licensed to provide health care or professional medical services. Accordingly, both the hospital entities and the individual physicians (including licensed Residents) are Health Care Providers under the MCARE Act.

36579691.4 02/20/2020

19.     Health care providers have sixty (60) days after the expiration or cancellation of a claims-made policy to purchase tail coverage to avoid any gap in coverage.  *See* 40 P.S. § 3405 (providing that "[i]nsurers must provide a 60-day period, after cancellation or nonrenewal of a claims-made policy is effective, during which time the insured may purchase an extended reporting coverage endorsement, also referred to as tail coverage.  If the insured purchases the extended reporting coverage endorsement at any time within the 60-day period . . . the extended reporting coverage shall become effective as of the date the claims-made policy terminated").

20.     Any health care provider[9] in Pennsylvania who fails to comply with the foregoing requirements regarding tail coverage is at risk of loss or suspension of his/her medical license. *See* 40 P.S. § 1303.711(c).

**D.**     **The Motions to Compel**

21.     On December 11, 2019, the Ad Hoc Committee and DOH filed the Motions to Compel [D.I. Nos. 1134 and 1141].  In its motion, the Ad Hoc Committee requests an order of the Court compelling the Debtors to obtain tail insurance for all Residents, in order to avoid what the Ad Hoc Committed describes as a "catastrophic effect on the medical services community in Philadelphia." *Ad Hoc Committee's Motion to Compel* [D.I. 1134], at ¶ 9.

22.     DOH's motion asserts that "it is in the best interests of the public, including but not limited to Hahnemann and St. Christopher's patients, employees, and other hospital staff, for the Debtors to obtain tail insurance . . ." and that the "Debtors' former residents, fellows, and physicians who are unable to obtain tail coverage on their own, would be at risk of losing their ability to provide medical care in the Commonwealth of Pennsylvania due to lack of insurance

---

[9]      *See* note 7, above.

36579691.4 02/20/2020

coverage . . . . at a time when the Commonwealth of Pennsylvania is experiencing a shortage of physicians." *DOH's Motion to Compel* [D.I. No. 1141], at ¶¶ 39-40.

23.     A hearing was initially scheduled on the Motions to Compel for December 17, 2019.  This hearing was adjourned on several occasions, by consent.  Also initially scheduled for December 17th, and also adjourned, was the hearing on an Order For Rule to Show Cause Directed to Debtors entered December 16, 2019 [D.I. 1169] (the "**Show Cause Order**"), in which the Court, among other things, stated that the "Debtors appear to have failed to maintain appropriate insurance, *i.e.*, tail insurance, for physicians they employed . . ."

**E.     Subsequent Events**

24.     In order to maintain the status quo during these adjournments, the Debtors, with the consent of PARRG, twice extended what had originally been a January 11, 2020 expiration date for their professional liability insurance; first, until February 11, 2020 and, second, until March 11, 2020.  During this time period, the Debtors engaged insurance brokers and gathered the considerable information that was required to solicit quotes on tail coverage from various potential insurers.  The Debtors also communicated with key constituents, including the Official Committee of Unsecured Creditors, the Ad Hoc Committee, representatives of the Commonwealth of Pennsylvania, the Pennsylvania Professional Liability Joint Underwriting Association (the "**JUA**")[10], at least one key local health insurance company, and certain local and regional institutions that had hired significant numbers of Hahnemann residents.  The Debtors provided the Ad Hoc Committee and DOH with periodic updates, and informed Residents of the extended insurance expiration dates.

---

[10]     JUA's website describes it as "a non-profit association established pursuant to Subsection C. of the Medical Care Availability and Reduction of Error Act ("**The Act**") to offer medical professional liability insurance covering the provision of health care services in the Commonwealth of Pennsylvania in accordance with Section 732 of The Act."  *See* http://www.pajua.com.

25.     In the meantime, the Debtors continued to collect on their accounts receivable and other assets. These collections have been more successful than anticipated such that the Debtors' current liquidity is far better than initially projected.

26.     As a result of the Debtors' efforts, and with the assistance of brokers, the Debtors obtained quotes from several insurance companies, including "surplus line" insurers, for Tail Coverage.   The most favorable quote was from PARRG, a Vermont-domiciled insurance company formed under the federal Liability Risk Retention Act that is predominantly (90%) owned by Philadelphia Academic Health Holdings, LLC, which is owned and controlled by Joel Freedman.[11]   PARRG has offered, with the approval of the Insurance Division of the Vermont Department of Financial Regulation, to provide the requested coverage for a total premium of $9.3 million.  The offered coverages are as follows:

- Philadelphia Academic Health System, LLC: $1,000,000/$3,000,000
- Hahnemann University Hospital: $500,000/$2,500,000
- Each physician and Resident: $500,000/$1,500,000
- Each physician assistant, nurse practitioner, certified registered nurse anesthesiologist and dentist:  $1,000,000/$3,000,000

27.     In connection with this quote, PARRG will, subject to further approval from the Vermont regulator[12], provide the Debtors with a dollar-for-dollar credit for the cost of the most recently purchased one-month extension of the Debtors' current coverage; it also has offered to allow the premium to be paid in three equal installments over approximately eight (8) months.  In addition, and significantly, PARRG has agreed to use its surplus to provide a

---

[11]     Although Mr. Freedman remains a manager of each of the Debtors, all decisions on behalf of the Debtors regarding the Motions to Compel, the Order to Show Cause and the decision to purchase Tail Coverage have been made by the Debtors' Chief Restructuring Officer, in consultation with the Debtors' independent manager, and with no involvement whatsoever by Mr. Freedman.

[12]     In the event such approval is not timely obtained, PARRG's obligation to pay one-third of the total premiums for the Tail Coverage will be satisfied through the provision of a letter of credit or from escrowed funds, in either case ensuring full payment of PARRG's share of the premium.

36579691.4 02/20/2020

premium credit equal to one-third of the total cost of the Tail Coverage, which credit would be applied to the second premium installment. The amount of such installment is approximately $3.1 million, leaving the Debtors' total cost for the Tail Coverage at approximately $6.2 million.

28.     In the hope of obtaining assistance in covering the cost of Tail Coverage, the Debtors have contacted various constituents in the Commonwealth of Pennsylvania, including the JUA, which upon information and belief has a surplus of approximately $200 million. Although the JUA has expressed a willingness to assist the Debtors with tail insurance funding, it has been unable to obtain the necessary Commonwealth approvals/consents. The Debtors also contacted the Pennsylvania Governor's office and the Pennsylvania Insurance Department, as well as certain local and regional hospitals that have hired significant numbers of Residents, to determine whether some or all of such entities – which seemingly would have a direct interest in making sure their residents are insured as required by Pennsylvania law – would be willing to defray a portion of the cost of the Tail Coverage.

29.     As of the filing of this Motion, none of these entities has agreed to assist.

## Relief Requested

30.     By this Motion, the Debtors respectfully request authority, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Federal Rule 9019, to resolve the Motions to Compel by purchasing the Tail Coverage from PARGG pursuant to the terms and conditions outlined above.

36579691.4 02/20/2020

## **Basis For Relief Requested**

31.     The Debtors believe that the relief requested herein is warranted by Sections 363(b) and 105(a) of the Bankruptcy Code, as well as by Bankruptcy Rule 9019.

32.     ***Sections 363(b) and 105(a)***.     Section 363(b)(1) provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts apply the business judgment standard when evaluating transactions under section 363(b).  *In re Global Home Prods., LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007).  Under the business judgment standard, so long as a debtor's decision is reasonable and in the best interests of the bankruptcy estate, courts generally defer to the business judgment of the debtor's management.  *See Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task. Delaware courts have said that it may be accomplished by showing either irrationality or inattention."); *In re Global Home Prods., LLC*, 369 B.R. at 783 (applying the business judgment standard to transactions under section 363 of the Bankruptcy Code); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'").

33.     Section 105(a) of the Bankruptcy Code further provides that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 105(a) allows the bankruptcy court to "craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the [Bankruptcy] Code was designed to obtain."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235-

36 (3d Cir. 2004) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003)).

34.     The purchase by the Debtors of the Tail Coverage pursuant to the terms described above is well within the Debtors' reasonable business judgment.  Among other things, the purchase of the Tail Coverage would satisfy the Debtors' obligations under Pennsylvania law, as described above and made applicable by 28 U.S.C. § 959(b), to obtain tail insurance for Hahnemann, which was a health care provider under Pennsylvania law.

35.     The proposed purchase also would allow the Debtors to avoid difficult claims issues that are likely to arise if the Tail Coverage is not obtained.  Many, if not most, of the attending physicians, Residents and other medical professionals who would be covered by the Tail Coverage – and, most particularly, those who provided services to the Debtors after the Petition Date and/or in the 180 day period leading up to the Petition Date – likely would assert significant administrative and/or priority claims against the Debtors if the Tail Coverage is not purchased, as well as sizeable general unsecured claims for damages on various breach of contract and other theories.  Analyzing and where appropriate contesting these claims would be difficult, time-consuming and expensive, could result in unfavorable outcomes, and might impede or delay formation of one or more plans of liquidation in these cases.

36.     In addition to these risks, conversion of these cases to chapter 7 – which has been raised by the Ad Hoc Committee, DOH and the Court in the Show Cause Order, due to the Debtors' failure thus far to obtain tail insurance, would benefit no one.

37.     For these reasons, the Debtors believe it is in the best interests of their estates and creditors for the Debtors to obtain the Tail Coverage.

38.     ***Bankruptcy Rule 9019***.  The Debtors believe the relief requested herein, if granted, would resolve both of the Motions to Compel.  For that reason, the Debtors have based this Motion not only on Sections 363(b) and 105(a) of the Bankruptcy Code, but also on Bankruptcy Rule 9019, which governs court approval of settlements. Settlements and compromises are "a normal part" of the chapter 11 process.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).   Indeed, "compromises are favored in bankruptcy" because they minimize litigation and expedite the administration of a bankruptcy estate.  *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re Key3Media Group, Inc.*, No. 03–10323 (MFW), 2006 WL 2842462, at \*3 (D. Del. Oct. 2, 2006).   In considering a Bankruptcy Rule 9019(a) motion, a court must "balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."  *E.g.*, *Martin*, 91 F.3d at 393.   Assessing this balance includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id*.; *see also In re Nutraquest, Inc.*, 434 F.3d 639, 644-45 (3d Cir. 2006).

39.     Notably, in determining whether to approve a proposed settlement, courts should not determine whether the debtor is getting the best possible settlement, but rather whether the compromise is reasonable.  *See In re Integrated Health Services, Inc.*, Case No. 00-398 (MFW), 2001 WL 1820426, at \*2 (Bankr. D. Del. Jan. 3, 2001) (explaining that in approving a settlement, a court is not to determine that the settlement is the best that can be achieved by the debtor but "rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'").

40.     Moreover, when deciding whether to approve a compromise, a court will normally accept the judgment of the movant as long as a legitimate business justification exists. *E.g.*, *Martin*, 91 F.3d at 395; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 250 (D. Del. 1998); *see also In re Penn Central Transportation Co.*, 347 F. Supp. 1351, 1353 (E.D. Pa. 1972) (approving settlement agreement as reflection of business judgment).   Once a debtor has articulated a valid business justification for a settlement, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."   *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (*quoting Smith v. Van Gorkam*, 488 A.2d 858, 872 (Del. 1985)).

41.     Each of the factors set forth above is easily satisfied here.  With respect to the first factor ("probability of success in litigation"), while the Debtors believe in the merits of their Objection, they recognize the difficulties raised by the Motions to Compel, which to the Debtors' knowledge are matters of first impression.  The contentions made in the Motions to Compel, and the Court's statements in the Show Cause Order, raise substantial questions as to the Debtors' likelihood of success in litigation.  Given the significant risk involved in litigation and the impact that any adverse ruling could have on the Debtors' estates, which include the potential conversion of the Debtors' cases to chapter 7, the Debtors submit that the resolution for which approval is sought herein reflects a reasonable exercise of their business judgment under the first *Martin* factor.

42.     Next, the third *Martin* factor[13] is clearly met in the present case.  The respective contentions made by the Debtors, on one hand, and the Ad Hoc Committee and DOH, on the

---

[13]     The second *Martin* factor – i.e. the likely difficulty in collection – does not apply to the within dispute, in that the Debtors have not sought any recovery in connection with the dispute at issue.

other, involve complex issues relating to, *inter alia*, the Bankruptcy Code, Pennsylvania insurance law, public policy and the impact of 28 U.S.C. § 959(b) (requiring debtor-in-possession to manage and operate its property according to the requirements of the valid laws of the State in which such property is situated). The complexity of the parties' disputes, and the expense, inconvenience and delay necessarily attending to such disputes, weighs in favor of the proposed resolution and Court approval of this Motion.

43.      The fourth *Martin* factor (the paramount interest of the Debtors' creditors) is satisfied here as well. The Debtors' disputes regarding the Motions to Compel and tail insurance have required significant attention and resources, and likely will continue to do so if the relief requested herein is not granted. Moreover, if the relief requested herein is not granted, the Debtors and the Court likely will face difficult claims issues; many, if not most, of the attending physicians, Residents and other medical professionals who would be covered by the Tail Coverage – and, most particularly, those who provided services to the Debtors after the Petition Date and/or in the 180 day period leading up to the Petition Date – likely would assert significant administrative and/or priority claims against the Debtors, as well as sizeable general unsecured claims for damages on various breach of contract and other theories. Analyzing and where appropriate contesting these claims would be difficult, time-consuming and expensive, could result in unfavorable outcomes, and might impede or delay formation of one or more plans of liquidation in these cases. In addition to these risks, conversion of these cases to chapter 7 – which has been raised by the Ad Hoc Committee, DOH and the Court in the Show Cause Order, due to the Debtors' failure thus far to obtain tail insurance, would benefit no one. For these reasons, and to avoid these consequences, the Debtors believe that their proposed purchase of Tail Coverage is consistent with the interests of creditors, and will allow the Debtors to work

with the Creditors' Committee and other parties-in-interest to develop one or more liquidating plans for these cases.

44.     Finally, the Debtors are aware of the disruption caused to the regional medical community by Hahnemann's closure.   Although the Debtors believe that independent legal justifications support their proposed purchase of the Tail Coverage, they would be remiss if they did not mention the obvious – that purchase of the Tail Coverage would mitigate some of the harms these cases have caused to the local and regional medical community, particularly since, upon information and belief, certain of the beneficiaries of the Tail Coverage likely will be unable to purchase their own coverage.   Put simply, purchasing Tail Coverage is the right thing to do – not only for medical professionals previously employed by the Debtors and the regional and local community, but also for former patients, who otherwise may not have a source of recovery in the event of professional negligence.

45.     Based upon the foregoing, there can be no question that the resolution of the Motions to Compel, as described above, does not "fall below the lowest point in the range of reasonableness." *Integrated Health*, 2001 WL 1820426, at *2 (*quoting Cosoff v. Rodman (In re WW.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983)).   The resolution is the result of substantial good faith, arm's length discussions and negotiations between the Debtors, the Ad Hoc Committee, DOH and PARRG, and constitutes a reasonable exercise of the Debtors' business judgment.   Accordingly, this Court should exercise its discretion and approve the resolution described herein.

## **Request for Waiver of 14-Day Stay**

46.     As explained above, the Debtors' current professional liability insurance expires on or about March 11, 2020.  Due to the importance of obtaining the Tail Coverage prior to such

expiration, the Debtors respectfully request that, if the Court is inclined to grant the relief sought herein, it allow the Debtors to purchase the Tail Coverage immediately upon entry of an order granting the relief requested, rather than after any stay imposed by the Federal Rules, including but not limited to Federal Rule 6004(h).

### Notice

47.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Official Committee of Unsecured Creditors; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Health; (xi) the City of Philadelphia; (xii) counsel to the Ad Hoc Committee of Hahnemann Residents and Fellows; (xiii) counsel to the Commonwealth of Pennsylvania Department of Health; (ix) the Philadelphia County Medical Society; (x) the Pennsylvania Medical Society; (xi) the Residents; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.


[remainder of page left intentionally blank]

**WHEREFORE**, for the foregoing reasons, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit "A",** authorizing the Debtors to obtain the Tail Coverage in the manner described herein, and granting such other and further relief as is just and proper.

Dated: February 20, 2020      **SAUL EWING ARNSTEIN & LEHR LLP**

By:    */s/ Monique B. DiSabatino*
       Mark Minuti (DE Bar No. 2659)
       Monique B. DiSabatino (DE Bar No. 6027)
       1201 N. Market Street, Suite 2300
       P.O. Box 1266
       Wilmington, DE  19899
       Telephone: (302) 421-6800
       Fax: (302) 421-5873
       mark.minuti@saul.com
       monique.disabatino@saul.com

       -and-

       Jeffrey C. Hampton
       Adam H. Isenberg
       Aaron S. Applebaum (DE Bar No. 5587)
       Centre Square West
       1500 Market Street, 38th Floor
       Philadelphia, PA 19102
       Telephone: (215) 972-7777
       Fax: (215) 972-7725
       jeffrey.hampton@saul.com
       adam.isenberg@saul.com
       aaron.applebaum@saul.com

       *Counsel for Debtors and Debtors in Possession*