**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC, d/b/a HAHNEMANN UNIVERSITY HOSPITAL *et al.*,[1] | Case No. 19-11466 (KG) |
| | (Jointly Administered) |
| Debtors. | Re: Docket No. 1418 |

**THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS' RESPONSE TO MOTION OF DEBTORS PURSUANT TO SECTIONS
105(A) AND 363(B) OF THE BANKRUPTCY CODE AND FEDERAL RULE OF
BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY TO PURCHASE SPECIFIED
PROFESSIONAL LIABILITY TAIL INSURANCE**

The Official Committee of Unsecured Creditors (the "Committee")[2] in the chapter 11

cases of Center City Healthcare, LLC d/b/a Hahnemann University Hospital and its affiliated

debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned

counsel, hereby files this response (the "Response") to the *Motion of Debtors Pursuant to*

*Sections 105(a) and 363(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure*

*9019 for Authority to Purchase Specified Professional Liability Tail Insurance* [Docket No.

1418] (the "Tail Motion"). In support of the Response, the Committee respectfully represents as

follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Tail Motion.

## PRELIMINARY STATEMENT

1.      The Tail Motion requests authority for the Debtors' estates to purchase tail coverage for (i) Philadelphia Academic Health System, LLC ("PAHS"), (ii) Hahnemann University Hospital ("Hahnemann"), (iii) physicians (the "Physicians"), (iv) residents and fellows (the "Residents"), and (v) physician assistants, nurse practitioners, certified registered nurse anesthesiologists and dentists ((iii)-(iv) collectively, the "Non-Debtor Parties") for a total cost to these estates of $6.2 million.  Although the Tail Motion speaks broadly regarding aggregate costs and groups of covered entities, it omits any critical details such as allocation of proportionate costs and legal authority for satisfying claims of certain Non-Debtor Parties. Specifically, the Committee highlights the following concerns with respect to each proposed covered entity:

- PAHS:  PAHS is a non-operating entity that does not appear to require tail coverage.  To the extent tail coverage is necessary, it is unclear that PAHS has any funds to pay its proportionate share of the cost of such coverage.

- Hahnemann:  While the Committee understands that Hahnemann may be required under Pennsylvania law to obtain tail coverage (and to avoid the incurrence of potential administrative expense priority claims), it is unclear whether Hahnemann has the funds necessary to cover its proportionate share of the tail coverage costs.[3]

- Physicians:  The Committee understands that the Physicians were employed by certain Debtor physician groups (the "Physician Groups"), none of which appear to have the funds necessary to pay their proportionate share of the tail coverage costs.  The Physicians proposed to be covered by the tail policy predominantly worked at Hahnemann (rather than STC),[4] which as set forth

---

[3]      The Committee understands that Hahnemann has been operating at a loss on a post-petition basis and has incurred significant expenses associated with the closure of the hospital.  The Tail Motion does not demonstrate that Hahnemann has generated post-petition funds sufficient to cover its share of the amounts required in the Tail Motion and its administrative expenses.

[4]      "STC OpCo, LLC, the purchaser of St. Christopher's Hospital [], provided tail insurance to a number of Residents and other persons [including certain Physicians] in connection with its purchase of the assets of St. Christopher's Hospital and thereafter."  Tail Motion, ¶ 5, n.4.

above, also does not appear to have the funds necessary to pay for tail coverage. Further, the Debtors provide no legal basis to elevate the claims of the Physicians employed solely on a pre-petition basis above the claims of other general unsecured creditors, in contravention of the priority scheme set forth in the Bankruptcy Code.

- <u>Residents</u>:  The Committee understands that the Residents proposed to be covered by the tail policy were predominantly employed by Hahnemann.[5]  Yet, as set forth above, it is unclear that Hahnemann has the funds necessary to cover its proportionate share of tail coverage costs with respect to the Residents. Further, the Debtors provide no legal basis to elevate the claims of the Residents employed solely on a pre-petition basis above the claims of other general unsecured creditors, in violation of the Bankruptcy Code.

- <u>Physician assistants, nurse practitioners, certified registered nurse anesthesiologists and dentists</u>:  The Committee understands that these persons are included in any coverage provided to Hahnemann.  As such, the same concerns apply with respect to these entities as with respect to Hahnemann— whether Hahnemann can fund its proportionate share of the tail coverage costs.

2.      The Committee understands that the funding for the majority of the $6.2 million tail coverage cost will come from the liquidation of STC assets.  This is problematic because, as set forth above, the policy will primarily cover non-STC Residents and Physicians, as well as Hahnemann and PAHS (the "<u>Non-STC Entities</u>").  The Tail Motion thus apparently asks the Court to allow the STC estate to pay millions of dollars in expenses on behalf of Hahnemann and several other Debtor entities without any guarantee of repayment on an administrative priority basis, to the clear detriment of creditors of STC and in apparent derogation of this Court's *Final Order (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Authorizing Continued Performance of Intercompany Transactions; (III) Granting Administrative Expense Priority to Postpetition Intercompany Claims; and (IV) Granting Relief* [Docket No. 278] (the "<u>Cash Management Order</u>").  Cash Management Order, ¶ 13 ("All

---

[5]        *See* footnote 3 above.

Intercompany Claims arising after the Petition Date shall be accorded administrative expense priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code.").

3.      Next, the Tail Motion relies on sections 105(a) and 363(b) of the Bankruptcy Code ("Section 105(a)" and "Section 363(b)," respectively) and Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Federal Rule 9019") for authority to purchase tail insurance for (and thus elevate the claims of) the Non-Debtor Parties employed by the Debtors prior to the Petition Date (the "Pre-Petition Non-Debtor Parties") who have, at best, only general unsecured claims against the estates.  However, the purchase of tail coverage for the Pre-Petition Non-Debtor Parties contravenes the carefully crafted priority scheme set forth in the Bankruptcy Code, which none of the above-referenced provisions permit.

4.      General unsecured creditors of STC thus appear to be doubly harmed by the Tail Motion.  First, the Debtors appear to seek authorization to fund the purchase of tail coverage for Hahnemann and Hahnemann's Residents and Physicians from the proceeds of the sale of STC's assets.  Second, included in the group of Hahnemann Residents and Physicians for whom the Debtors seek to purchase tail insurance are the Pre-Petition Non Debtor Parties whose employment terminated prior to the Petition Date.  The Pre-Petition Non-Debtor Parties have, at best, general unsecured claims against Hahnemann or the Physician Groups, yet they are being treated as priority claimants to the detriment of general unsecured creditors of STC, which appears to be predominantly funding the purchase of tail coverage.

5.      While the Committee is sympathetic to the concerns of the Non-Debtor Parties (as it is sympathetic to the concerns of many other creditors in these cases), such sympathies cannot override corporate formalities or the Bankruptcy Code's priority scheme.  To the extent any persons or entities are entitled to the relief requested in the Tail Motion, such relief should be

narrowly tailored so as to provide the minimum coverage necessary without substantively consolidating the Debtors' estates at this time through a motion to purchase tail coverage or rewriting the Bankruptcy Code's express policy of ratable distribution.  Further, to the extent the Court approves the purchase of any tail coverage, such coverage should, to the extent practicable, (i) exclude any Non-Debtor Parties who purchased independent tail coverage, and (ii) be conditioned on the release of any and all claims and causes of action against the Debtors' estates as related to any agreement to provide insurance coverage, whether pursuant to an employment agreement or otherwise, by any and all parties covered by the tail insurance policy (the "Tail Exclusions and Conditions").  These estates should not be burdened with potential additional claims in light of the Debtors' effort to benefit certain parties and the community at large.

## **BACKGROUND**

6.      On June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.

7.      On July 24, 2019, the Court entered the Cash Management Order which provides, among other things, as follows:

> The Debtors are authorized and empowered to continue performing under and honoring Intercompany Transactions in the ordinary course of business. The Debtors shall: (i) maintain accurate and detailed records of all Intercompany Transactions so that all transactions may be readily ascertained, traced, recorded properly and distinguished between prepetition and post- petition transactions; and (ii) provide reasonable access to such records to the Committee, if requested. **All Intercompany Claims arising after the Petition Date shall be accorded administrative expense priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code.**

Cash management Order, ¶ 13 (emphasis added).

8.      On December 11, 2019, the Ad Hoc Committee of Residents filed the *Emergency Motion of Ad Hoc Committee of Hahnemann Residents and Fellows to Compel Debtors to*

*Provide Professional Liability Insurance in Accordance With Resident Employment Agreements*
[Docket No. 1134] (the "Resident Motion").  Also on December 11, 2019, the DOH filed the
*Commonwealth of Pennsylvania Department of Health's Motion for an Order Compelling*
*Debtors to Obtain Post-Closure Tail Insurance Coverage* [Docket No. 1142] (the "DOH
Motion," and together with the Resident Motion, the "Motions to Compel").

9.       On December 16, 2019, the Court entered the *Order for Rule to Show Cause*
*Directed to Debtors* [Docket No. 1169] (the "Order to Show Cause") requesting that the Debtors
show cause why their cases should not be converted to chapter 7 of the Bankruptcy Code under
section 1112(b)(4)(C) for failure to maintain appropriate insurance.[6]

10.      On December 17, 2019, the Committee filed an omnibus objection and response
(the "Committee Tail Objection") to the Motions to Compel and the Order to Show Cause
[Docket No. 1189], arguing that neither the Bankruptcy Code nor Pennsylvania law provides
legal support for the Debtors' purchase of tail coverage for non-Debtor parties because, among
other reasons, (i) Pennsylvania law does not require employers provide medical malpractice
coverage for employees, and (ii) at best, the Residents would have general unsecured claims
against the Debtors' estates for breach of pre-petition contracts.  The Committee Tail Objection
is incorporated as if fully set forth herein.

11.      On January 2, 2020, the Debtors filed an omnibus objection and response (the
"Debtor Tail Objection") to the Motions to Compel and the Order to Show Cause [Docket No.
1268].  The Debtor Tail Objection makes similar arguments to the Committee Tail Objection,

---

[6]       The Order to Show Cause also requested the Debtors show why their cases should not be
converted to chapter 7 under 1112(b)(4)(A) for substantial and continuing loss to and diminution of the
Debtors' estates and no reasonable likelihood of rehabilitation.  The Debtor Tail Objection and
Committee Tail Objection both respond to this contention, which discussion is not relevant in the context
of the Debtors' Tail Motion.

including that neither Pennsylvania law nor the Bankruptcy Code provides a basis for the relief requested in the Motions to Compel or the purchase of tail insurance for non-Debtor third parties under section 1112(b)(4)(C) of the Bankruptcy Code.

12.     The Debtor Tail Objection also explained that "[i]f and when the Residency Program Sale closes, the Debtors will **use the sale proceeds to purchase tail coverage for former Hahnemann residents**[.]"  Debtor Tail Objection, ¶ 7; *see also id.* at ¶ 17 ("During the Auction, the Debtors announced that they would use a **portion of the sale proceeds** to purchase tail coverage for all former Hahnemann Residents, which was ultimately included in the sale agreements for both the successful bidder and the backup bidder.").

13.     On February 2, 2020, the Debtors filed the Tail Motion, which does not contain information regarding (i) which Debtor-entities are funding the purchase of the tail coverage, (ii) against which Debtor entities the Non-Debtor Parties would otherwise have claims if tail coverage is not purchased, and (iii) whether such alleged claims would be administrative priority claims or general unsecured claims based on the Non-Debtor Parties' dates of employment.

## RESPONSE

### A.    The Tail Motion Appears to Improperly Disregard Corporate Separateness

14.     "'Delaware courts take the corporate form and corporate formalities very seriously,' because it would 'upset the contractual expectations' of the parties to conflate separate entities."  *Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 256 (Bankr. D. Del. 2018).[7]

---

[7]     As noted in the First Day Declaration, (i) PAHS, (ii) Center City Healthcare, LLC d/b/a Hahnemann University Hospital, that operates Hahnemann, and (iii) St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children, that operates STC, are all Delaware limited liability companies.  First Day Declaration, ¶ 9.

(citing *Culverhouse v. Paulson & Co.*, 133 A.3d 195, 199-200 (Del. 2016)).  "[This] certainty allows businesses to determine which risks, and how much risk, they wish to take in new ventures" and is a "fundamental tenet of Delaware law." *Id.* Disregarding corporate separateness "runs counter to the well-established rule that 'parent and subsidiary corporations are separate entities, having separate assets and liabilities. . . . [H]ence, the parent's creditors have no claim to the subsidiary's assets, and vice versa." *Id.* at 256-57 (citing *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998)).

15.     To disregard corporate separateness and substantively consolidate debtors' estates in the Third Circuit, the proponent of substantive consolidation must prove (absent consent): "(i) prepetition [the debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d 195, 211-12 (3d Cir. 2005). "Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation." *Id.*

16.     Here, the Debtors have yet to seek substantive consolidation or demonstrate any of the elements of substantive consolidation.[8] Yet, through the Tail Motion, the Debtors appear to disregard the Debtors' corporate forms by apparently allowing one Debtor entity to pay for tail coverage that benefits other Debtor entities, without any reasonable prospect of repayment on an administrative priority basis, as required by the Cash Management Order. Cash Management Order, ¶ 13 ("All Intercompany Claims arising after the Petition Date shall be accorded

---

[8]     The Committee's investigation regarding substantive consolidation in these cases is ongoing and nothing contained herein is intended to waive the right to seek substantive consolidation at a later date. All rights, claims and defenses concerning the remedy of substantive consolidation are hereby preserved and reserved.

administrative expense priority[.]").  Specifically, the Committee understands that STC Opco, LLC, the purchaser of STC, has provided tail coverage for most of the Residents and Physicians previously working at STC.  Tail Motion, ¶ 5, n.4 ("STC OpCo, LLC, the purchaser of St. Christopher's Hospital [], provided tail insurance to a number of Residents and other persons in connection with its purchase of the assets of St. Christopher's Hospital and thereafter.").  As such, the Tail Motion requests authority to purchase tail coverage primarily for the Non-STC Entities.  *Id.* at ¶ 5.  Purchasing tail coverage for the Non-STC Entities provides no benefit to STC.  Rather, it benefits the non-STC Debtors against whom the Non-Debtor Parties may otherwise have claims, including Hahnemann and certain of the Physician Group Debtors (who employed certain Physicians working at Hahnemann).  Purchasing tail coverage also benefits Hahnemann and PAHS directly as they are proposed covered entities.

17.     Yet, although STC receives no benefit from purchasing tail coverage, the Committee understands that most of the $6.2 million required to purchase tail coverage will be paid for by STC assets, as the other Debtor entities, based on information and belief, do not have the funds necessary to purchase tail coverage (or repay STC on an administrative priority basis as required by the Cash Management Order).  Even if Hahnemann has funds available to purchase a portion of the insurance, it is unclear that the Physician Group Debtors would have the funds necessary to pay their share of the cost of tail coverage.  In fact, the Tail Motion is completely silent on allocation and whether each Debtor has the ability to pay its proportional share of the $6.2 million.  Absent proportionally allocating the cost of tail coverage among the Debtor entities, the Debtors are seemingly requesting the Court substantively consolidate the Debtors' estates for the purpose of purchasing tail insurance.

**B.** **The Tail Motion Does Not Distinguish Between Non-Debtor Parties Employed Pre- and Post-Petition**

18.     Even if the Debtors can demonstrate that each Debtor entity can pay its proportional share of the cost of tail insurance, none of the provisions cited by the Debtors in the Tail Motion authorize the Debtors to purchase tail insurance with respect to the Pre-Petition Non-Debtor Parties in contravention of the priority scheme in the Bankruptcy Code.  The Debtors first cite Section 363(b), which provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1).  Courts typically defer to a debtor's judgment concerning use of property under Section 363(b) when there is a legitimate business purpose.  *In re Glob. Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007).  The business judgment rule, however, does not allow a debtor to independently rewrite the priority scheme specifically set forth in the Bankruptcy Code, which is "quite appropriately, bankruptcy's most important and famous rule.'" *See* C*zyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 979, 984 (2017) (citing Roe & Tung, Breaking Bankruptcy Priority: How Rent-Seeking Upends The Creditors' Bargain, 99 Va. L. Rev. 1235, 1243, 1236 (2013)).   The Debtors next cite Section 105(a) and explain that "Section 105(a) allows the bankruptcy court to 'craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, **effect the result the [Bankruptcy] Code was designed to obtain**.'"  Tail Motion, ¶ 33 (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235- 36 (3d Cir. 2004) (emphasis added)).  Like Section 363(b), Section 105(a) cannot be used to override or rewrite the priority scheme in the Bankruptcy Code.

19.     Here, the Debtors cannot rely on Section 363(b) or Section 105(a) as support for elevating the Pre-Petition Non-Debtor Parties' claims above the claims of all other general unsecured creditors.  As set forth in the Committee Tail Objection (and as fully incorporated

herein), the Pre-Petition Non-Debtor Parties have, at best, general unsecured claims for breaches

of pre-petition contracts based on the Debtors' alleged failure to purchase occurrence-based or

tail coverage.  *See e.g.*, *Exide Techs. v. Enersys Del., Inc. (In re Exide Techs.)*, 2013 Bankr.

LEXIS 66, at *20 (Bankr. D. Del. Jan. 8, 2013) (explaining that the definition of "claim" under

the Bankruptcy Code includes a "right to payment" including based on a breach of contract).  As

such, the Pre-Petition Non-Debtor Parties should, at best, receive general unsecured claims to be

treated in accordance with the terms of a confirmed plan, like all other general unsecured

creditors.  The Debtors do not and cannot put forth a legal reason why such creditors should be

paid on a priority basis.  The business judgment rule does not allow the Debtors to do what the

Bankruptcy Code otherwise prohibits.

20.    In fact, the Debtors admit that only the Non-Debtor Parties who "provided

services to the Debtors **after the Petition Date** and/or in the 180 day period leading up to the

Petition Date [] likely would assert significant administrative and/or priority claims against the

Debtors if Tail Coverage is not purchased."[9]  Tail Motion, ¶ 35 (emphasis added).  The other

Non-Debtor Parties—*i.e.*, the Pre-Petition Non-Debtor Parties—would have "sizeable **general**

**unsecured claims for damages on various breach of contract and other theories**."  *Id.*

(emphasis added).  To justify satisfying these general unsecured claims pursuant to the terms of

---

[9]    As the Debtors have not provided a break-down of which, if any, Non-Debtor Parties provided
services in the 180 day period leading up to the Petition Date who were not also employed post-petition,
the Committee cannot evaluate whether this subsection of individuals would have "significant
administrative and/or priority claims against the Debtors."  However, any priority status for this group
would be capped at $13,650 for each individual for services rendered within 180 days before the petition
date, after deduction for any amounts received under the *Final Order (I) Authorizing the Debtors to (A)
Pay Certain Prepetition Wages, Benefits and Other Compensation and (B) Continue Employee
Compensation and Employee Benefit Programs, and (II) Granting Related Relief* [Docket No. 291].  Such
amount is the maximum amount that individuals in this group should receive towards tail insurance
coverage.  11 U.S.C. § 507(a)(4).

the Tail Motion, the Debtors state that "[a]nalyzing and where appropriate contesting these claims would be difficult, time-consuming and expensive, could result in unfavorable outcomes, and might impede or delay formation of one or more plans of liquidation in these cases." *Id.* This general statement on the possible difficulty of analyzing and objecting to claims does not qualify as a legitimate business reason to circumvent the Bankruptcy Code.  This is especially true here where it appears that the Residents all used the same template employment agreement giving rise to the alleged claims for breach of contract.  The mere existence of the possibility of many general unsecured claims (all of which will likely be similar) is not a basis for elevating such claims to a different priority.

21.     Finally, with respect to any risk of conversion of these cases to chapter 7 for failure to obtain appropriate insurance under section 1112(b)(4)(C), such risk is not applicable to the Pre-Petition Non-Debtor Parties, who are all non-Debtor third parties entities to whom the Debtors are not required under Pennsylvania law to provide insurance.  The Debtors concede in the Tail Motion (as articulated more fully in the Committee Tail Objection and Debtor Tail Objection) that they only have an obligation under Pennsylvania law, if at all, to obtain tail insurance for Hahnemann.  They make no similar representation with respect to any other non-Debtor party and thus this cannot provide a business judgment justification for the purchase of tail insurance for the Pre-Petition Non-Debtor Parties.

22.     Last, the Debtors cite Federal Rule 9019, which governs court approval of settlements, to support the relief requested in the Tail Motion.  Proposed settlements, however, cannot seek to undo the Bankruptcy Code's priority system without the consent of the affected creditors.  *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. at 983 (explaining in the context of a structured dismissal that "[t]he Code's priority system constitutes a basic underpinning of

business bankruptcy law" and cannot be undone without the consent of affected parties).

Further, as the Debtors' note, in considering a Federal Rule 9019(a) motion, "a court must

'balance the value of the claim that is being compromised against the value to the estate of the

acceptance of the compromise proposal.'"  Tail Motion, ¶ 38 (citing *In re Martin*, 91 F.3d 389,

393 (3d Cir. 1996)).  The Third Circuit "recognize[s] four criteria that a bankruptcy court should

consider in striking this balance: (1) the probability of success in litigation; (2) the likely

difficulties in collection; (3) the complexity of the litigation involved, and the expense,

inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."

*In re Martin*, 91 F.3d at 393.

23.     First, the proposed settlement elevates the priority of the Pre-Petition Non-Debtor

Parties' claims above the claims of all other general unsecured creditors, without the consent of

such affected creditors.  This is simply beyond the confines of what a court can approve in a

Federal Rule 9019 compromise, just as a "bankruptcy court cannot confirm a plan that contains

priority-violating distributions over the objection of an impaired creditor class."  *Czyzewski v.*

*Jevic Holding Corp.*, 137 S. Ct. at 979.

24.     Next, the Tail Motion does not analyze the Federal Rule 9019 factors with respect

to each entity for which it requests authority to purchase tail coverage.  Thus, the Debtors'

overarching statements regarding the proposed settlement are not helpful in determining whether

the purchase of tail coverage for the Pre-Petition Non-Debtor Parties is in the best interest of the

estates.  For example, with respect to the first prong—the probability of success in litigation—

the Debtors state that the contentions in the Motions to Compel and Order to Show Cause raise

substantial questions as to the Debtors' likelihood of success in litigation.  Tail Motion, ¶ 41.

However, as set forth above, this argument is only applicable, at best, to (i) the Non-Debtor

Parties employed on a post-petition basis who may have administrative priority claims against the estates and (ii) Hahnemann, a Debtor entity who may be required to obtain tail coverage.

25.     The second prong—likely difficulties in collection—is not applicable here where the Debtors are not seeking to settle estate claims against third-parties (which would then involve collection) but rather are seeking to settle third-party claims against the estates by elevating such claims to priority status in violation of the Bankruptcy Code.

26.     With respect to the third prong—the complexity of litigation—the Tail Motion describes the alleged "complexity" as follows:

> [I]f the relief requested herein is not granted, the Debtors and the Court likely will face difficult claims issues; many, if not most, of the attending physicians, Residents and other medical professionals who would be covered by the Tail Coverage – and, most particularly, those who provided services to the Debtors after the Petition Date and/or in the 180 day period leading up to the Petition Date – likely would assert significant administrative and/or priority claims against the Debtors, as well as sizeable general unsecured claims for damages on various breach of contract and other theories. Analyzing and where appropriate contesting these claims would be difficult, time-consuming and expensive, could result in unfavorable outcomes, and might impede or delay formation of one or more plans of liquidation in these cases.

Tail Motion, ¶ 43, *see also* Tail Motion, ¶ 35 (almost identical language as reproduced above).

27.     As set forth above, the asserted complexity with respect to the possibility of administrative and/or priority claims does not apply to the Pre-Petition Non-Debtor Parties, who have, at best, general unsecured claims.  The Debtors note that the Pre-Petition Non-Debtor Parties may have "sizeable general unsecured claims" and that the Debtors will likely have to "analyz[e] and where appropriate contest[] these claims" which may be "difficult, time-consuming and expensive."  *Id.*  However, as explained in the Resident Motion, the same template was used to create all the Resident employment agreements, Resident Motion, ¶ 4, and thus analyzing or contesting general unsecured claims relating to the Resident employment agreements will not necessarily be an overly difficult task.  Further, the alleged complexity

involved in analyzing potential general unsecured claims is not a reason to ignore the priority scheme in the Bankruptcy Code.  Distributions under the Bankruptcy Code are not based on the complexity of claims—the more complex, the greater the distributions; rather, they are based on the priority of claims and all general unsecured claims should be treated equally.

28.     Finally, with respect to the fourth factor—the paramount interests of creditors—the Tail Motion falls short.  For the reasons set forth above, the Debtors have not demonstrated how it will benefit the Debtors' creditors to treat the Pre-Petition Non-Debtor Parties' general unsecured claims as priority claims, costing the estates millions of dollars which may otherwise be available for distribution to unsecured creditors.  Additionally, the risk of conversion to chapter 7 (and attendant harm to creditors) is not applicable with respect to any of the Non-Debtor Parties, as the Debtors are not required to purchase insurance for third parties under the Bankruptcy Code or Pennsylvania law.  As such, the Debtors have failed to demonstrate that the settlement should be approved with respect to the Pre-Petition Non-Debtor Parties.

## RESERVATION OF RIGHTS

The Committee reserves the right to revise, amend or supplement this Response at any time prior to or at the hearing on the Tail Motion.

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the Tail

Motion (a) to the extent the purchase of tail coverage requires any substantive consolidation of

the Debtors' estates on an immediate basis, or (b) to the extent substantive consolidation is not

required to purchase tail coverage, with respect to the Pre-Petition Non-Debtor Parties; (ii)

condition any purchase of tail coverage on the terms of the Tail Exclusions and Conditions, and

(iii) grant the Committee such other and further relief as the Court deems just and appropriate.


Dated: February 28, 2020
Wilmington, Delaware

Respectfully submitted,

/s/ *Thomas M. Horan*
Thomas M. Horan (DE Bar No. 4641)
**FOX ROTHSCHILD LLP**
919 North Market Street, Suite 300
Wilmington, DE 19899
Telephone: 302-654-7444
Facsimile: 302-6568920
Email: thoran@foxrothschild.com

- and –

Andrew H. Sherman (*pro hac vice*)
Boris I. Mankovetskiy (*pro hac vice*)
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email:  asherman@sillscummis.com
             bmankovetskiy@sillscummis.com

*Counsel for the Official Committee*
*of Unsecured Creditors*