<pre>
 1                  UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2
                                      .   Chapter 11
 3    IN RE:                          .
                                      .   Case No. 19-11466 (KG)
 4    CENTER CITY HEALTHCARE, LLC,    .
      d/b/a HAHNEMANN UNIVERSITY      .
 5    HOSPITAL, et al.,               .
                                      .   Courtroom No. 3
 6                                    .   824 North Market Street
                                      .   Wilmington, Delaware 19801
 7                                    .
                                      .
 8                   Debtors.         .   March 3, 2020
      . . . . . . . . . . . . . . . .     10:00 A.M.
 9
                          TRANSCRIPT OF HEARING
10              BEFORE THE HONORABLE KEVIN GROSS
                   UNITED STATES BANKRUPTCY JUDGE
11
12    APPEARANCES:

13    For the Debtors:        Mark Minuti, Esquire
                              Monique DiSabatino, Esquire
14                            SAUL EWING ARNSTEIN & LEHR LLP
                              1201 N. Market Street, Suite 2300
15                            P.O. Box 1266
                              Wilmington, Delaware 19801
16
                              - and -
17
                              Jeffrey Hampton, Esquire
18                            Adam Isenberg, Esquire
                              Aaron Applebaum,
19                            Centre Square West
                              1500 Market Street, 38th Floor
20                            Philadelphia, Pennsylvania 19102
21
      Audio Operator:         Ginger Mace
22
      Transcription Company:  Reliable
23                            1007 N. Orange Street
                              Wilmington, Delaware 19801
24                            Email:  gmatthews@reliable-co.com
25
      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
</pre>

1  APPEARANCES (Continued):

2  For the Committee:          Andrew H. Sherman, Esquire
                               SILLS CUMMIS & GROSS P.C.
3                              1 Riverfront Plaza, Suite 10
                               Newark, New Jersey 07102
4

5  For PAHH/Front Street:      Amalia Sax-Bolder, Esquire
                               Suzzanne Uhland, Esquire
6                              O'MELVENEY & MYERS LLP
                               7 Times Square
7                              New York, New York 10036

8                              - and -

9                              Brendan Schlauch, Esquire
                               RICHARDS LAYTON & FINGER
10                             920 North King Street
                               Wilmington, Delaware 19801
11

12 For Certain Physicians:     David Carickhoff, Esquire
                               ARCHER & GREINER, P.C.
13                             300 Delaware Avenue
                               Wilmington, Delaware 19801
14

15 For Ad Hoc Residents        Jeremy Ryan, Esquire
   Committee:                  POTTER ANDERSON
16                             1313 North Market Street
                               Wilmington, Delaware 19801
17

18 For PA Dept. of Health:     Richard Barkasy, Esquire
                               SCHNADER HARRISON SEGAL & LEWIS LLP
                               220 Lake Drive E #200
19                             Cherry Hill, New Jersey 08002

20

21

22

23

24

25

MATTER GOING FORWARD:

Motion of the Debtors Pursuant to Sections 105(a) and 363(b) of the
Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 for
Authority to Purchase Specified Professional Liability Tail
Insurance [D.I. 1418; filed: 02/20/20

**Ruling:  117**


DEBTORS' WITNESS(s)

**Alan Wilen**

        Direct examination by Mr. Minuti        14

        Cross-examination by Mr. Sherman        50

        Redirect examination by Mr. Minuti      64

        Recross examination by Mr. Ryan         68

        Recross examination by Mr. Sherman      70


EXHIBITS:                                       ID    Rec'd

D-1  Liability Insurance Dec 1/18 through 1/19        50

D-2  Liability Insurance Dec 1/19 through 1/20        50

D-3  Staff Employment Agreement                       50

D-4  House Staff Manual                               50

D-5  House Staff Employment Agreement                 50

D-6  House Staff Employment Agreement/St. Chris       50

D-7  Excerpts from Graduate Medical Education Policies
     And Procedures Manual                            50

D-8  House Staff Agreement for 2019-2020              50

D-9  Physician Employment Agreement                   50

D-10  Quote from RRG                                  50

1          (Proceedings commenced at 10:02 a.m.)

2                THE CLERK:  Please rise.

3                THE COURT:  Good morning everyone.  Thank you.

4   You may be seated.

5                JUDGE SONTCHI:  Good morning, Your Honor.  May I

6   please the court?

7                THE COURT:  Chief Judge Sontchi.

8                JUDGE SONTCHI:  Christopher Sontchi, appearing *pro*

9   *se* today.

10         (Laughter)

11               THE COURT:  Yes.  I think that's right.

12               JUDGE SONTCHI:  I know you have a busy day, but I

13  also know that this is your last scheduled hearing --

14               THE COURT:  Yes.

15               JUDGE SONTCHI:  -- before your retirement.  And

16  myself and my colleagues who are here wanted to take a moment

17  to honor you and thank you again for the amazing job you have

18  done as a judge of this court.  What a wonderful friend and

19  colleague you have been.  I don't think the people -- the

20  lawyers here, of course, know your work in the courtroom and

21  through your opinions, but they don't know all the things you

22  do behind the scenes that make this court  the best court in

23  America, the best Bankruptcy Court in America.  I just wanted

24  to take a few moments to thank you again for that, and wish

25  you all the best in your retirement.  And I hope to see you

1   on this side of the podium, but we will see what happens.

2           THE COURT:  We'll see what happens.

3           JUDGE SONTCHI:  In your future life.

4           THE COURT:  Yes.

5           JUDGE SONTCHI:  And unless you want us to sit

6   through this --

7           THE COURT:  No, this is going to be painful.

8           JUDGE SONTCHI:  -- slug fest --

9       (Laughter)

10          JUDGE SONTCHI:  -- I'd ask your permission to

11  retire from the court.

12          THE COURT:  I grant you leave to leave.  And I

13  thank you very much.  It's been a real pleasure for me to

14  have served on this court.  It's a wonderful court.  The

15  judges, people here don't know how great they are and how

16  closely we all work together.  And it's been a delight for me

17  to be on the court.

18          JUDGE SONTCHI:  Thank you very much, Your Honor.

19          THE COURT:  Thank you.  Thank you, Your Honor.

20  Thank you everyone.

21          Mr. Minuti?

22          MR. MINUTI:  Well, Your Honor, you know, I usually

23  -- I pride myself on trying to be the best person at the

24  podium at a hearing, but I don't think I'm going to even try

25  today after that presentation.

1           THE COURT:  Okay.

2           MR. MINUTI:  Your Honor, Mark Minuti from Saul

3   Ewing Arnstein & Lehr.  I'm here today on behalf of the

4   debtors.

5           With me today, Your Honor, are a host of folks.

6   With me as always is my partner, Jeffrey Hampton, Monique

7   DiSabatino.  I've got a new face for you, Your Honor, the

8   gentleman standing right now is my partner, Joel Hopkins.  He

9   is in our insurance group.  So, to the extent we have any

10  insurance issues that come up today or questions that I

11  certainly can't answer Mr. Hopkins, hopefully, will be the

12  one to answer those.

13          THE COURT:  Good to have you, Mr. Hopkins.  Thank

14  you.  Thank you for attending.

15          MR. MINUTI:  Also in the courtroom, Your Honor, as

16  always, is Allan Wilen of EisnerAmper, Your Honor.  He is the

17  debtor's CRO and he will be my witness for today's hearing

18  when we get to that part of the hearing.

19          Then, finally, I got one other introduction,

20  Albert Mezzaroba, Your Honor.  Mr. Mezzaroba is our

21  independent board member.  He has not appeared yet in the

22  case.  We don't plan on calling him today, but he is here.  I

23  wanted to point him out to Your Honor.

24          THE COURT:  All right.  Thank you.  Welcome, sir.

25          MR. MINUTI:  Your Honor, we are pleased to be here

1   today in what I suspect will be, and now I think I know is,

2   our final hearing before Your Honor.  And it sounds like the

3   final hearing that Your Honor has in your career.  We

4   certainly appreciate appearing before Your Honor today.

5           We are here to ask the court to authorize the

6   debtors to solve a problem which has been troubling the

7   debtors, and particularly Mr. Mezzaroba, and Mr. Wilen since

8   the inception of these cases.

9           Again, I know this hearing was probably scheduled

10  much later than the court would have preferred in light of

11  your retirement, so we wanted to thank you at the outset for

12  accommodating us, but this obviously is important.  And as we

13  said when we scheduled the call, the court's background in

14  this case we think is important to deal with the issues we're

15  dealing with today.

16          THE COURT:  I thought so too, Mr. Minuti, yes.

17          MR. MINUTI:  Thank you.

18          By the motion the debtors are asking the court or

19  seeking authority under Sections 105, 363 and Bankruptcy Rule

20  9019 to settle the motions that were filed by the

21  Pennsylvania Department of Health and an alleged ad hoc

22  committee of former Hahnemann residents, and to authorize the

23  debtors to purchase tail insurance from their existing

24  insurer, the Philadelphia Academic Risk Retention Group, LLC.

25          The insurance we're seeking authority to purchase

 1  today, Your Honor, will cover the following parties:

 2          The Debtor, Center City Healthcare LLC, doing

 3  business as Hahnemann University Hospital. And when a

 4  hospital is covered, Your Honor, that coverage trickles down

 5  to cover other folks like nurses, practitioners and so on

 6  that ultimately receive coverage through the hospital.  So,

 7  the coverage will extend to them as well.

 8          We are also going to cover residents and fellows

 9  formally employed by Center City Healthcare LLC, that's

10  Hahnemann, as well as the practice groups that practiced at

11  Hahnemann.  I'm sorry, and with regard to the physicians,

12  Your Honor, these are former physicians that were employed at

13  both St. Christopher's Hospital and Hahnemann Hospital.  They

14  were actually employees of the different practice groups, but

15  it's the former physicians that we're seeking to cover today.

16          Not covered by today's motion are the following

17  groups:

18          St. Christopher's Healthcare, LLC, that's the St.

19  Christopher's Hospital, as well as their staff and the folks

20  that would be covered under them.  The doctors who were hired

21  by STC OpCo, LLC as part of the sale of the St. Christopher's

22  Hospital, and the residents and fellows  that were hired by

23  STC OpCo, LLC as part of the purchase of the St.

24  Christopher's Hospital.  Appropriate coverage has been

25  obtained as part of that sale to cover all of those groups.

1  So, those groups don't need to be covered.

2        (Audio interruption)

3            MR. MINUTI:  . . . residents who they did not

4  hire.  So, that, again, we don't need to cover by today's

5  motion.  They are not going to be covered.  But if Your Honor

6  approves the motion today, Your Honor, we believe that

7  everyone who needs coverage will, in fact, be covered once

8  the debtors purchase the proposed insurance.

9            Now to make clear, the debtor's current

10 professional liability insurance remains in place as we sit

11 here today.  So, everyone is covered.

12           THE COURT:  Yes.  Until March 11th I think you

13 said.

14           MR. MINUTI:  I think its, technically, March 12th

15 is when it expires, Your Honor, since we had 29 days in

16 February.  That is, again, set to expire on March 12th.  So,

17 if the motion, again, is approved today the debtors will

18 continue to be in compliance with Pennsylvania law after

19 March 12th.  We believe all parties who need coverage will

20 have coverage.

21           Now with respect to the cost, Your Honor, the cost

22 of the coverage we're seeking to pay for today or seeking

23 approval of today is approximately $9.2 million dollars.

24 That is going to be paid in three installments over eight

25 months.  And the PARRG, Your Honor, has agreed to provide the

1 | debtors with a premium credit towards the second installment

2 | of $2.76 million dollars.

3 | In addition, Your Honor, we have extended the

4 | coverage twice here to give us time to come up with a

5 | solution. When we extended the coverage the debtors each time

6 | paid $487,500 dollars to extend that coverage.  The PARRG has

7 | agreed that if we purchase the full complement of coverage

8 | we're asking the court to authorize us to purchase today the

9 | last extension, the $487,500 dollars, that will also be

10 | credited toward the purchase.  So, at the end of the day,

11 | Your Honor, if the PARRG honors its commitment the debtor

12 | here will come out and pocket an additional $6 million

13 | dollars.

14 | We've received only one objection to the motion,

15 | Your Honor, that is the objection of the official committee

16 | of unsecured creditors.  And, therefore, Your Honor, we are

17 | going to have an evidentiary hearing today. And I would

18 | propose that we proceed as follows.

19 | THE COURT:  All right.

20 | MR. MINUTI:  I would like to make just a brief

21 | procedural record in terms of how we got here today talking

22 | about some of the motions.  At that point, Your Honor, we're

23 | ready to move to evidence, but in consultation with the

24 | committee, Your Honor, we believe that a Chamber's conference

25 | with the court among the debtors and the committee only would

1  be helpful to maybe narrow the presentation.  We'd like that

2  to be, again, the committee and the debtors only so that we

3  can discuss candidly some of our concerns and seek some

4  guidance from Your Honor with respect to the presentation.

5         Obviously, if something happens in Chambers and

6  Your Honor feels it appropriate for everyone in the courtroom

7  to understand we can deal with it on the record, but at least

8  in the first instance we would like it to be just the

9  committee and the debtor.

10         THE COURT:  All right.

11         MR. MINUTI:  So, Your Honor, in terms of the brief

12  procedural background the debtor's current professional

13  liability insurance was originally set to expire on January

14  11th, 2020.  On December 11th, 2019 an alleged ad hoc

15  committee of former residents of Hahnemann filed an emergency

16  motion to compel the debtors to provide professional

17  liability insurance for the former Hahnemann residents.  That

18  appears at Docket Number 1134.

19         Similarly, the Pennsylvania Department of Health

20  filed a motion seeking similar relief, but that motion was

21  broader; not only the Hahnemann residents, they sought to

22  compel the debtor to provide coverage for anyone that needed

23  coverage, essentially, Your Honor.  That appears at Docket

24  Number 1141.

25         On December 16th the court issued an order for

1  rule to show cause directed to the debtors in light of the

2  allegations in those motions.  That order appears at Docket

3  Number 1169.

4          On December 17th the committee filed an omnibus

5  objection to the motions.  That appears at Docket Number

6  1189.

7          And, similarly, on January 2nd the debtors filed

8  an omnibus objection to the motions.  That appears at Docket

9  Number 1268.

10          The hearing on both motions was continued twice on

11  consent until today's hearing to provide all parties with an

12  opportunity to try to find a solution to this problem. In

13  connection with the continuance, as I indicated, Your Honor,

14  the debtors paid two fees of $487,500 dollars to extend the

15  coverage now to March 12th, 2020.

16          After exploring all options, Your Honor, for

17  resolving these issues on February 20th, 2020 the debtors

18  filed the motion that's before the court today seeking

19  authority to purchase tail coverage.  That motion appears at

20  Docket Number 1418.

21          On February 21s the court entered -- we actually

22  filed a motion for expedited consideration.  On February

23  21st, 2020 the court entered an order approving expedited

24  consideration.  That appears at Docket Number 1422.  It set

25  an objection deadline of February 22nd and the hearing for

1  today, March 3rd at ten o'clock.

2         By agreement, Your Honor, the debtor extended the

3  objection deadline for the committee until ten a.m. on

4  February 28th.  And as I said, the committee did file the

5  sole objection we're dealing with today.

6         THE COURT:  Okay.

7         MR. MINUTI:  So, that brings us to today's

8  hearing, Your Honor.  And as I indicated, before we get to

9  evidence we think we would benefit by a brief Chamber's

10 conference with the court.  So, that would be my request.

11        THE COURT:  All right.  Does anyone have any

12 objection to my doing so?

13     (No verbal response)

14        THE COURT:  All right.  Hearing no one why don't

15 you come back and we'll talk.

16        MR. MINUTI:  Thank you, Your Honor.

17     (Recess taken at 10:13 a.m.)

18     (Proceedings resumed at 10:35 a.m.)

19        THE CLERK:  Please rise.

20        THE COURT:  Thanks again everyone.  You may be

21 seated.

22        MR. MINUTI:  Again, for the record, Mark Minuti.

23 I appreciate the court hearing us on the status conference or

24 the Chambers conference.  I do think that was helpful.

25        Your Honor, we would start by calling Mr. Wilen to

1   the stand in support of our case.

2           THE COURT:  All right.  Mr. Wilen, if you will

3   step forward.  You've been sworn in this case.  And I think

4   that is sufficient under these circumstances.

5           MR. WILEN:  Thank you, Your Honor.

6           MR. MINUTI:  Your Honor, I put a binder of our

7   proposed exhibits on the witness stand.  I also have a copy

8   for the court and I've given one to committee counsel.  May I

9   approach?

10          THE COURT:  Yes, you may.  Thank you.

11          How have you been, Mr. Wilen?

12          MR. WILEN:  I've been well.

13          THE COURT:  Good.

14          MR. WILEN:  Thank you.

15          MR. MINUTI:  Your Honor, consistent with other

16  hearings, with the court's permission, I'll skip Mr. Wilen's

17  background.

18          THE COURT:  Yes.  I am well aware of it.

19          MR. MINUTI:  Thank you, Your Honor.

20                       DIRECT EXAMINATION

21  BY MR. MINUTI:

22  Q    So, Mr. Wilen, good morning.  When were you appointed

23  chief restructuring officer of the debtors?

24  A    In April of this year -- actually, last year.

25  Q    Okay.  Now the debtors here acquired the hospitals or

1  the businesses in January 2018, is that correct?

2  A    That is correct.

3  Q    Okay. And before your arrival or what was your

4  understanding when you arrived as to who made up the

5  management team at the debtors?

6  A    Joel Friedman, who is the president; there was a CFO in

7  place at the time, Gary Bryant; there was a handful of other

8  operating officers of the hospital.

9  Q    Once you were appointed CRO did that change at all in

10  terms of who provided the management oversight?

11  A    Yes.  I did provide most of the oversight at that point

12  in time along with my colleague, Ron Dreskin, who operated as

13  the hospital's interim CEO.

14  Q    And earlier in the hearing -- you were here when I

15  introduced Mr. Mezzaroba to the court?

16  A    Yes.

17  Q    Tell the court who is Mr. Mezzaroba and when was he

18  appointed?

19  A    Mr. Mezzaroba is the independent director that was

20  appointed in this case a little after the time I was brought

21  on board.

22  Q    Very well.  And as chief restructuring officer -- let

23  me back up for a minute.

24      Based upon your experience had you had prior experience

25  dealing with medical malpractice insurance or professional

1  insurance for a hospital, for example?

2  A     Yes.  Many times.

3  Q     Okay.  And are you familiar with or do you have

4  experience with the types of professional liability insurance

5  typically maintained by hospitals, and the medical staff

6  doctors and so on who work there?

7  A     Yes, I do.

8  Q     And are you familiar with the medical malpractice

9  insurance coverage that the debtors had in these cases?

10  A     Yes, I am.

11  Q     And tell the court how you are familiar with that?

12  A     From the -- when I initially came on board I asked

13  about an insurance portfolio binder that we had in the stack

14  and how our insurance was put together, along with looking at

15  the agreements.

16  Q     All right.  And if you could turn, if you would, to the

17  exhibit binder, Tab Number 1.  Tell me if you recognize that

18  document?

19  A     Yes.  This is the professional liability insurance

20  declarations page for PAHS and the affiliated group.

21  Q     And what period of time does this policy cover?

22  A     This policy covers from January 18th, the time of the

23  purchase of the hospital, through January of 2019.

24  Q     Very well.  Now if you could turn your attention to

25  Exhibit Number 2 in the binder.  Do you recognize that

1  document?

2  A     Yes.  It's the professional liability declarations page

3  for January 2019 through January 2020.

4  Q     Okay. And take a look.  This is the complete policy, is

5  it not?

6  A     It appears to be with all the endorsements.

7  Q     And who is the insurer?

8  A     The insurer was Philadelphia Academic Risk Retention

9  Group.

10 Q     And who is, I'll call it, the PARRG?  Who is the PARRG

11 or what is it?

12 A     The PARRG is a captive insurance entity that is owned

13 90 percent by PAHH which was the parent company of PAHS, as

14 well as PAMA which is one of the medical practice groups, and

15 by PAHS itself.

16 Q     Okay.  And focusing on Exhibit Number 2, the existing

17 insurance policy, can you just generally describe the type of

18 medical malpractice insurance that's provided for under that

19 policy?

20 A     Sure.  The medical malpractice policy that's here has a

21 limit of professional liability of a half a million dollars

22 per event, per physician.  It has an aggregate limit of a

23 million and a half on the physician side, and has total limit

24 liabilities of a general aggregate of three million.  It

25 complies with MCARE requires under the State of Pennsylvania.

1    Q      Okay. And what is MCARE?

2    A      MCARE is a program in the State of Pennsylvania that

3    provides an additional layer of coverage to physicians and

4    hospitals for physician malpractice.

5    Q      Now are you familiar with the terms occurrence based

6    insurance and claims made insurance?

7    A      Yes, I am.

8    Q      Okay. And can you describe for the court what is the

9    difference between the two types of policies?

10   A      So, an occurrence based policy covers acts that occur

11   during a period of time.  Claims made only covers events that

12   occur during a period where is a claim is made.

13   Q      Okay.  And are the policies that appear at Tabs 1 and 2

14   in the binder claims made policies or occurrence based

15   policies?

16   A      They are claims made policies.

17   Q      And lets focus on Number 2 which is the current

18   insurance that's in place.  Can you, sort of, describe for me

19   generally who exactly is covered by the malpractice insurance

20   provided for under that policy?

21   A      So, the malpractice policy covers the hospitals

22   themselves, and with that comes residents, and nurses, and

23   other affiliated Allied health professionals and other staff

24   at the hospital.  There is also coverage for the physicians

25   at the hospitals, and on top of that there is coverage for

1  dentists and residents and fellows that can practice on a

2  standalone basis without having to be part of the hospital

3  system.

4  Q    And when was the policy that appears at Tab Number 2,

5  when was that originally set to expire?

6  A    January 11th of 2020.

7  Q    Okay.  And did the policy expire on January 11th?

8  A    No, it did not.  I bought an extension.

9  Q    Okay.  How many extensions did you purchase?

10  A    I bought one in January.  I bought another one in

11  February to extend us through to March 11th or 12th.

12  Q    What was the cost of each extension?

13  A    $487,500 dollars.

14  Q    Okay.  And so in light of the extensions, I think you

15  just answered this, but the current policy is set to expire

16  on March 12th.  Is that correct?

17  A    That is correct.

18  Q    All right. I want to switch gears a little bit.  With

19  respect to, and let's focus first on residents, with respect

20  to residents who worked at Hahnemann Hospital and St.

21  Christopher's Hospital did the debtors have written

22  employment agreements with those folks?

23  A    Yes, they did.

24  Q    Okay.  Turn your attention, if you would, to the

25  document we've marked at Exhibit 3 in the binder.  Tell me if

1  you recognize that document?

2  A     Yes.  This is a staff employment agreement.

3  Q     Okay.  And it's a staff employment agreement for which

4  hospital?

5  A     This is for Hahnemann.

6  Q     Okay.  And you will see the date at the top June 2017.

7  Do you see that?

8  A     Correct.

9  Q     Okay.  And so this is a staff employment agreement for

10  a resident at Hahnemann Hospital for the 2017 period.  Is

11  that correct?

12  A     Yes.  From June to June.

13  Q     Okay.  And if I could draw your attention to Paragraph

14  or Number Section 4.  Do you see that at the bottom of Page

15  1?

16  A     Yes.

17  Q     It says benefits.  Are you with me?

18  A     Yes, I am.

19          MR. MINUTI:  Is Your Honor with me?

20          THE COURT:  Yes.

21  BY MR. MINUTI:

22  Q     And I will just read that allowed.  It says,

23      "During the term of this agreement hospital agrees to

24  provide to the house staff those benefits provided to the

25  house staff as set forth in the house staff manual and

1  employee handbook.  These benefits are subject to amendment

2  periodically by the hospital."

3        Did I read that correctly?

4  A    Yes.

5  Q    Okay. And did Hahnemann have a house staff manual?

6  A    Yes, it did.

7  Q    Okay.  If you could turn to Page or Exhibit 4.  Tell me

8  if you recognize that document?

9  A    This is a staff manual.

10  Q    And what period of time does that staff manual cover?

11  A    2017, 2018.

12  Q    Okay.  And if we could just briefly go back to Exhibit

13  3 which is the 2017, 2018 form contract.  Did the form of

14  contract used by the hospital for residents at Hahnemann

15  change in the 2018, 2019 period?

16  A    No.  It did not.

17  Q    Okay.  And looking at Exhibit 4, which is the house

18  staff manual, did the house staff manual change with respect

19  to professional malpractice coverage?  Did it change between

20  2017-2018 and 2018-2019?

21  A    No, it did not.

22  Q    And if you will look at the house staff manual, please,

23  which we have marked as Exhibit 4.  Let me draw your

24  attention to Page 14.  Tell me if you're there?

25  A    Yes.

1   Q      All right.  You see the second heading.  It says

2   professional liability insurance.

3   A      Yes.

4   Q      Okay.  And could you just read for me the first

5   paragraph there?

6   A      "Professional liability medical malpractice insurance

7   coverage is provided for all graduate trainees for the

8   performance of any and all activities within the scope of the

9   graduate training program.  The coverage applies to any

10  action that occurred while the resident was an employee of

11  HUH.  In addition, as required by Pennsylvania law, all

12  licensed or licensed eligible graduate trainees are afforded

13  additional coverage through the Pennsylvania MCARE Fund."

14  Q      Okay.  Now if you could turn your attention to Page 55.

15  You will see about a little more than halfway down the page

16  in bold it says malpractice insurance.

17  A      Yes.

18  Q      And could you read that aloud please?

19  A      "House staff occurrence based malpractice insurance for

20  the full-time of employment only while engaged in activities

21  necessary for the completion of the residency.  Those house

22  staff are covered for claims after completion of the program.

23  Any work outside the scope of the residency program, i.e.

24  moonlighting, requires separate malpractice insurance."

25  Q      Okay.  So, the manual, itself, refers to occurrence

1  based coverage, correct?

2  A     Yes.

3  Q     All right.  Now if you will turn your attention to the

4  document I've marked as Exhibit Number 5 in the binder.  Did

5  there comes a time when the hospitals changed the form of

6  house staff agreement for the residents at Hahnemann?

7  A     Yes.

8  Q     Okay.  And do you recognize the document that at Tab

9  Number 5?

10  A     Yes.

11  Q     And what is this document?

12  A     So, this is the house staff employment agreement that

13  was modified by Dr. Boyer.

14  Q     And what period of time or when was this used?

15  A     This was used for a period from June 23rd, 2019

16  forward.

17  Q     Okay.  And did the same form of agreement -- was the

18  same form of agreement to your knowledge used for all the

19  residents at Hahnemann?

20  A     Yes.  That's my understanding.

21  Q     And if you were a resident at Hahnemann did you sign a

22  new contract every year or did you only sign a contract when

23  you started?

24  A     You signed a new contract every year because your level

25  in the residency program changed.

1   Q     Okay.  Focusing on the contract that was used for the

2   19-20 school year or education year let me draw your

3   attention to Page 2, Subsection (3)(d).  Let me know when

4   you're there?

5   A     I am there.

6   Q     And if you could just read that aloud?

7   A     "Hospital shall provide occurrence based professional

8   liability insurance coverage for house staff's acts and

9   omissions within the scope of the program that occur during

10  the training period.  Such coverage will provide legal

11  defense and protection against the claims, reported or filed,

12  during or after the completion of the program if, and only

13  if, the alleged omissions of house staff occurred during the

14  term of the training period and are, were within the scope of

15  the program.

16        The minimum amount of coverage amount will be the

17  limits as required by Pennsylvania medical care availability

18  and reduction or error, MCARE Act of 2002.  Such professional

19  liability coverage provided for the purpose of program

20  training does not extend to moonlighting activities as

21  described in Section 2(h) of this agreement and/or activities

22  by house staff."

23  Q     Okay.  And with respect to the house staff agreements

24  that were entered into with residents at Hahnemann which

25  debtor entity was the employer?

1　A　　　Center City Healthcare.

2　Q　　That's Hahnemann Hospital?

3　A　　　Hahnemann Hospital.

4　Q　　Okay.  Now I want to switch gears and focus on St.

5　Chris.  If you could turn to Exhibit Number 6 in the binder

6　and tell me if you can identify that document?

7　A　　　This is a house staff employment agreement for St.

8　Christopher's Hospital for Children for the years from June

9　2017 to June 2018.

10　Q　　Okay.  And you've looked at a number of these

11　agreements with the residents, correct?

12　A　　　Yes, I have.

13　Q　　Okay.  And is this the form agreement that was used for

14　the residents at St. Chris Hospital?

15　A　　　Yes, it was.

16　Q　　Okay.  Let me focus your attention here, again, on

17　Subsection 4.  It's on the first page.  Do you see that?

18　A　　　Yes.

19　Q　　And it says,

20　　　　"During the term of this agreement hospital agrees to

21　provide to the house staff member those benefits set forth in

22　the graduate medical education policies and procedures manual

23　which is subject to amendment from time to time by the

24　hospital."

25　　　　Did I read that correctly?

1  A      Yes.

2  Q      Okay.  Let's turn to Subsection 7 in the binder or

3  Document 7 in the binder.  Do you see that?

4  A      Yes.

5  Q      And am I correct that what we've got at Tab 7 are

6  excerpts from the graduate medical education policies and

7  procedures manual in place for 2017?

8  A      Yes, it is.

9  Q      And if you could just look on the first page under the

10 heading professional liability insurance. This time I won't

11 ask you to read it out loud.  I assume the court can see it.

12 But is this the type of coverage that the residents were told

13 that they would have at St. Chris in the 2017-2018 timeframe?

14 A      Yes, it is.

15 Q      Okay.  Now let's turn to Document Number 8.  Actually,

16 before we get there did the form of resident agreement at St.

17 Chris change from 2017-2018 to 2018-2019?

18 A      No, it did not.

19 Q      All right. Now if I could focus your attention on the

20 document at Tab 8.  Tell me if you recognize that document

21 and if so what is it?

22 A      This is a house staff employment agreement for 2019-

23 2020.

24 Q      For St. Christopher's Hospital.

25 Q      Okay.  So, this would cover the residents at St. Chris,

1  correct?

2  A     That is correct.

3  Q     All right.  And if we look at Page 2, Subsection 3(d),

4  professional liability insurance.  It says,

5        "Hospital shall provide professional liability

6  insurance coverage for house staff acts and omissions within

7  the scope of the program that occurred during the training

8  period."

9        Then it goes on from there, correct?

10 A     Correct.

11 Q     So, this was the form of agreement that the residents

12 at St. Chris signed in the 2019-2020 period.  Is that

13 correct?

14 A     Yes.

15 Q     And with regard to the St. Christopher's residence

16 which debtor was their employer?

17 A     St. Christopher's Hospital for Children.

18 Q     Let me ask you now to turn to Tab Number 9 in the book

19 and tell me if you recognize this document?

20 A     This is a physician employment agreement for a

21 physician at St. Christopher's Hospital.

22           MR. MINUTI:  Let me go off script for a minute,

23 Your Honor.  The prior agreements were either forms or

24 redacted.  The reason why we don't have a redacted copy of

25 Dr. Moulick's contract is because it was made public. It was

1  attached to the motion that he previously filed.

2           THE COURT:  That's right.

3           MR. MINUTI:  So, just in case Your Honor was

4  wondering.

5           THE COURT:  Thank you.

6  BY MR. MINUTI:

7  Q    So, this is -- is the document that appears at Number

8  9, it's the document -- it is the employment agreement for

9  Dr. Moulick, correct?

10 A    Correct.

11 Q    Okay.  But is this the form of employment agreement

12 that was used for the doctors both at Hahnemann and St.

13 Christopher's?

14 A    Yes, it is.

15 Q    Okay.  And if you could turn to Page Number 5 of that

16 document.  Are you with me?

17 A    Yes.

18 Q    And you will see at the bottom, Subsection 6, it says

19 physicians benefits.

20 A    Yes.

21 Q    All right. And carrying over to Page 6 you will see at

22 the top Subsection (a), general benefits.  It says,

23      "Physician shall receive those general benefits

24 including paid time off described in Schedule 6(a)."

25      Did I read that correctly?

1   A      Yes.

2   Q      All right.  Now if we turn to the back of the document

3   there is Schedule 6(a).  It's actually Page 26.  Tell me when

4   you're with me?

5   A      I am with you.

6             MR. MINUTI:  Your Honor, are you with me?

7             THE COURT:  Not quite, but I'll be there.  Oh,

8   here it is.  I'm sorry.

9             MR. MINUTI:  Page 26.  Are you with me?

10            THE COURT:  Yes.

11  BY MR. MINUTI:

12  Q      You will see at the bottom Subsection 3, medical

13  malpractice insurance.  Do you see that?

14  A      Yes.

15  Q      And I will just read Section (a).  It says,

16       "Medical malpractice insurance during the term

17  physician shall be provided with claims made or occurrence

18  medical malpractice insurance coverage."

19       Then it goes on from there.  Do you see that?

20  A      Yes.

21  Q      So, the physicians were told it would be one or the

22  other, occurrence or claims made, correct?

23  A      Correct.

24  Q      Then if we go toward the end of that paragraph it says

25  that,

1        "If the coverage maintained during the term is claims

2   made coverage then upon expiration or termination of this

3   agreement employer will purchase, at its cost, an extended

4   reporting period policy or tail policy on behalf of the

5   company and the physician for medical malpractice claims

6   arising out of medical malpractice incidents occurring during

7   physician's employment."

8        Did I read that correctly?

9   A    Yes, you did.

10  Q    Okay.  So, for physicians, am I correct, that they were

11  told that the employer would have either claims made or

12  occurrence based and if it was claims made a tail would be

13  purchased, correct?

14  A    That is correct.

15  Q    And it's your testimony that this form agreement was

16  used both at Hahnemann and St. Chris for the doctors?

17  A    Yes.

18  Q    Okay.  And have you looked at a number of those

19  contracts to verify that?

20  A    Yes, I have.

21  Q    And with regard to the doctors who worked either at

22  Hahnemann or St. Chris who employed those doctors?  In other

23  words, who were parties to the employment agreements?

24  A    The doctors at both hospitals were employed by the

25  practice groups, primarily for regulatory purposes.

1 Q     Well, explain that a little bit.  Explain how the

2 hospital was structured in terms of how it utilized the

3 services of doctors that were hired or employed by the

4 practice groups?

5 A     So, the hospital hired doctors in the practice groups.

6 We maintained them that way for regulatory reasons and to

7 address issues internally.  And they provided services to the

8 hospitals.  The hospitals had no doctors on staff other than

9 residents which were required by, you know, the residency

10 programs to have the doctors, the residents hired by the

11 hospitals themselves.

12       So, the doctors perform surgery.  So, you know, for all

13 intents and purposes, you know, Mary Smith came into the

14 hospital.  She didn't go see a doctor and say, well, that

15 doctor works for, you know, SCH Pediatric Associates LLC.

16 She said a doctor at St. Chris is doing my procedure and

17 getting it done.  There was no discrepancy in that patient's

18 mind. It was all kind of a blend together at the hospital

19 levels what the physician practice groups and the hospitals,

20 themselves, were and operated as.

21 Q     Now we just walked through the employment contracts

22 with both the residents and the doctors, the forms, and

23 clearly some of these provided for occurrence based coverage,

24 correct?

25 A     Correct.

1  Q     Okay.  And tell the court when is it that you first

2  realized that the debtors, Exhibit Number 2, had claims made

3  coverage?

4  A     Claims made coverage I was almost immediately upon

5  coming into the hospital.  One of the first things I always

6  like to find out in a situation is what my insurance stack

7  looks like.  That is one of the items that was there.

8  Q     All right.  So, is it fair to say that early on in the

9  bankruptcy cases you knew at some point a tail would need to

10  be purchased or folks would be without insurance.  Is that

11  fair to say?

12  A     Yes.

13  Q     Okay.  When is it that you first realized that some of

14  the employment contracts, specifically obligated debtors to

15  purchase occurrence based coverage?

16  A     When the ad hoc group of residents filed some of their

17  papers in court and attached copies of the employment

18  contracts that some of the residents had.

19  Q     And let's step back for a minute and talk generally

20  about what would be the effect, what would happen if tail

21  coverage was not purchased and the existing insurance policy

22  would expire on March 12th?

23  A     None of these physicians would have malpractice

24  coverage, none of the nurses would have malpractice coverage,

25  none of the staff would have malpractice coverage, and

1  patients that are injured would have nowhere to go for a

2  remedy.  You know, we did obstetrics, we had births in this

3  hospital. You know, you're going to have a child that has no

4  ability to go somewhere to get any kind of recovery or pay

5  for costs if there was a problem with a birth, for example,

6  going forward.

7  Q    And beyond that what impact will the residents or the

8  former doctors suffer if, in fact, there is no coverage for

9  them provided by the debtors?

10 A    It's my understanding that if they don't have tail

11 coverage their licenses could be suspended or revoked in the

12 State of Pennsylvania.

13 Q    So, again, you knew early on that you had claims made

14 coverage.  You didn't realize you had this contractual issue,

15 but you knew early-on the debtors had claims made coverage

16 and you knew that a tail would need to be purchased in order

17 to solve a problem.  So, what did you do during the

18 bankruptcy case to try to address this problem?

19 A    So, when we first did the, tried to sell the residency

20 slots, you know, we originally put in language into the

21 agreement that required the purchase of insurance for tail

22 insurance for those residents as part of that process.  Then

23 as the auction process started to evolve we made commitments

24 fairly early on to cover the residents to all residents.

25 Then we, even further than that, started having discussions

1  internally when the numbers started to get significant that

2  this would be the source of funding to cover tail coverage

3  for everyone.

4  Q    Let me focus on that for a minute.  So, at the outset

5  of the case did you know that you were going to have funding

6  to buy this tail coverage?

7  A    No, I didn't.

8  Q    Okay. Why did you choose to go forward or, I guess

9  maybe a better way to say it is, how were you hoping to fix

10 the problem?

11 A    Well, I knew that if we, day one, filed, for example, a

12 Chapter 7 and said let's shut the hospitals down no one would

13 have coverage and I would have no choice -- I'd still be in

14 the same position I am today.  My view was that I could go

15 through the process and figure out a way along the way to

16 fund it and come up with the funds necessary to provide the

17 tail that was needed here.

18 Q    Now you talked a little bit about the resident sale

19 program.  What is the current status of the resident program

20 asset sale?

21 A    It has been terminated as Jefferson has terminated the

22 transaction.  They have asked for the deposit back and we

23 funded the deposit back to them.

24 Q    Okay.  So, that transaction is not going to happen?

25 A    Correct.

1  Q      Okay.  Tell the court what did you do in connection

2  with the sale of St. Christopher's to try to address, at

3  least, part of this problem?

4  A      Well, when we got to the sale of St. Christopher's I

5  jumped in fairly quickly with the buyer and insisted that

6  they take all of the physicians and residents and included in

7  that tail coverage for those folks, along with the hospital

8  itself.  I figured it was the perfect time to do it.  I asked

9  them to do that and that had, you know, significant value.

10 Q      All right. And you were in the courtroom during my

11 introduction when I explained to the judge who was covered by

12 the insurance that was purchased as part of the STC OpCo

13 sale, correct?

14 A      Correct.

15 Q      Did I state that correctly?

16 A      Yes.  Its, effectively, anyone who went to work for the

17 buyer.  The buyer has also taken on as covered residents that

18 were not taken by them as well.

19 Q      Okay.  And it is true, is it not, that subsequent to

20 the sale STC OpCo picked up coverage for former residents?

21 In other words residents who worked at St. Chris who were not

22 hired by STC OpCo?

23 A      That's correct.

24 Q      So, am I correct that the only group of people who need

25 coverage who worked at St. Christopher's who don't have

1 coverage or who won't have coverage if the motion is not

2 granted are just the former doctors who left before the sale

3 to STC OpCo?

4 A     That's correct.

5 Q     So, I don't know if you have numbers.  I hope you have

6 numbers.  The question is as we sit here today, right, and

7 taken into account the sale to STC OpCo and who is being

8 covered pursuant to that sale, who would not be covered if

9 the court denies the motion today?  You are not permitted to

10 purchase the tail insurance you seek to purchase?

11 A     It would be approximately 54 doctors, I believe.  It

12 might be 55 at St. Christopher's. It is 79, I believe,

13 physicians at Hahnemann.  And about 914 residents at

14 Hahnemann.

15 Q     Okay.  Now to your knowledge have any of the --

16 A     Plus, I think you have to add to that list as well

17 hundreds of nurses, physical therapists, occupational

18 therapists, radiation technicians.  I had thousands of

19 employees in the hospital who would not be covered.

20 Q     Now to your knowledge -- I mean the folks that you just

21 mentioned, to your knowledge, have any of them gone out on

22 their own and obtained replacement coverage or tail coverage?

23 A     I do not know.

24 Q     And why don't you know that?  Did you try to find that

25 out?

1  A     We have been told that there are a number of people out

2  there who have asked for quotes.  I have reached out to

3  parties to hopefully think about solutions here from a quote

4  basis on insurance and they told me that there were folks who

5  reached out to them in the process.

6  Q     But you don't have any specifics?

7  A     No, I don't.

8  Q     Okay.  Let's switch gears and talk about the cost of

9  the coverage that we're seeking to have the court approve

10 today.

11       What did you do to try to find tail coverage for the

12 folks that need coverage?

13 A     So, we reached out to the RRG.  We reached out to the

14 JUA in Pennsylvania which is, for all intents and purposes,

15 the insurer of last resort of professional liability who

16 actually expressed an interest in funding some of this

17 potentially.  There was some activity related to that.  We

18 reached out and we hired two different brokers, a traditional

19 broker and then also an excess lines broker, trying to find

20 different solutions here.  We reached out and out of that I

21 have gotten, effectively, three quotes.

22 Q     Okay.  And let me focus on the JUA for a minute.  I

23 think you testified a moment ago that the JUA had suggested

24 that they may help fund part of this problem.  Can you just

25 describe for the court the discussions you had with the JUA

1  and what the ultimate outcome of that was?

2  A      So, I had discussions directly with the executive

3  director of the JUA who wanted to help, but told us that they

4  were facing some -- they were in the middle of litigation

5  with the State of Pennsylvania over the use of their funds.

6  So, their ability to provide us with direct financial support

7  of the premiums was zero at that point in time.  And it would

8  be months, and months, and months before I had an answer from

9  them on that issue.  But they were able to get us a quote

10  that they were able to achieve for us, but that was not a

11  subsidized quote.

12  Q     All right.  I think you testified you got three quotes

13  from three different parties?

14  A     Correct.

15  Q     Okay.  And of the three parties who gave you a quote

16  who gave you the lowest quote?

17  A     The RRG by far.

18  Q     And so you had conversations with the RRG about

19  providing a quote in this case, correct?

20  A     Yes.

21  Q     And what did you specifically ask for?

22  A     So, we asked for three or four different gyrations of

23  quotes.  One was to cover everyone.  One was to cover

24  residents only.  One was to cover physicians and residents.

25  I think there was one other analysis we did as well, but they

1   were not exactly willing to provide us with an unlimited

2   number of quotes.

3   Q    Okay.  Why is it that you asked for different quotes as

4   you just described?

5   A    Because I was trying to figure out what the most

6   efficient way and the ways to handle this case in case we had

7   an issue here today.

8   Q    All right.  If you could turn to the document we have

9   marked as Tab 10 in the binder.  Tell me if you recognize

10  this document?

11  A    Yes.  This is the quote from the RRG.

12  Q    All right. And can you just generally describe the

13  quote?  In other words, who is covered and what's the cost.

14  A    This covers, effectively, everyone that was covered

15  under the prior agreement excluding the St. Chris docs and

16  residents who were taken by STC OpCo and the STC residents

17  that left prior to STC OpCo.  So, it covers everyone else

18  other than that.

19  Q    All right.  I'm sorry, earlier you talked about getting

20  a couple different quotes that arent' reflected in Exhibit

21  10.  Did you get a quote for physicians only?

22  A    Yes.

23  Q    And do you remember what that number was?

24  A    I believe the number is a little over $3 million

25  dollars, three and a half million dollars.

1  Q     If I said 3.7 million does that refresh your

2  recollection?

3  A     That's exactly the number.

4  Q     And was that broken down between doctors who left

5  before the petition date and doctors who left after the

6  petition date?

7  A     No, it wasn't.

8  Q     Okay.  And did the PARRG give you a quote to break it

9  down that way?

10  A     No, they did not.

11  Q     Okay.  Now in terms of the overall cost of the PARRG

12  quote its $9.2 million dollars?

13  A     Yes.

14  Q     And how is that to be paid?

15  A     So, it's to be paid in three equal installments, but

16  there are offsets to that.  The first part of that is a $2.7

17  million dollar credit from the RRG.

18  Q     $2.76 million dollars, right?

19  A     $2.76 million dollar credit from the RRG along with a

20  credit of, assuming we take the entire package, the $487,500

21  dollars that we had paid for the February premium payment as

22  an offset to it.

23  Q     Okay.  And as set forth in the motion you decided to go

24  forward with the full quote that we have here at Exhibit 10.

25  Tell the court why you decided to go forward with this quote?

1  A    Because it covers everyone that needs to be covered.

2  We had employees who actually showed up for work post-

3  petition, who expected, as part of their benefits and their

4  compensation, to have insurance in place.  Okay.  So, that is

5  part of it.  I also have an issue with the fact that we

6  wanted to make sure that the patients were covered and had a

7  place to go for if they had a problem later on.

8      Additionally, the real difference in cost here isn't

9  that great because I would not get the $2.7 million dollar

10  credit.  I would not get the $487,000 dollar credit.  So,

11  really what we're talking about here is less than a million

12  dollars to cover a small group of physicians who were at the

13  hospital prepetition especially if you take into account the

14  fact, Your Honor, that the vast majority of these docs were

15  there.

16      If you remember, the hospital was only open 18 months.

17  So, I have physicians who -- if you take the physicians out

18  of the mix here who operated during the priority period who

19  were prepetition you have a very small group of people who

20  we're really talking about that were prior to the priority

21  period who would actually in theory, you know, potentially

22  have their malpractice insurance premium as part of their

23  benefits being included in their priority claims.

24  Q    Now, obviously, the cost of the tail with these credits

25  is expense.  What steps, if any, did you take to try to find

1  an alternative solution here or to get somebody else to help

2  fund some of the costs?

3  A     Well, we reached out to the JUA.  Unfortunately, they

4  couldn't help.  We reached out to the state, they couldn't

5  help.  We reached out to a number of the hospitals that took

6  the residents that we had here.   And although everybody

7  wanted to help, everyone had a cramp in their hand when it

8  came time to write a check or provide any money.  So, this is

9  where we are today.

10  Q     Okay.

11  A     I tried to mitigate the numbers as much as I could.

12  Q     And you say you reached out.  I mean, but it was more

13  than a reach out, right? I mean you were trying to get these

14  people to bring them to the table, correct?

15  A     Correct.   In reality, they were the ones that were

16  going to have a problem too.  They were going to have upset

17  staff.  I mean we tried to explain this to them.  They are

18  going to have residents who are at their hospital who are,

19  you know, panicking as to how they're going to pay

20  malpractice premiums.  So, I thought they would be the

21  logical people to help us and it got us nowhere.

22  Q     All right.  Let me switch gears and let's talk about

23  the bankruptcy cases.  You recall the judge did enter an

24  order to show cause in the case, remember?

25  A     Yes.

1  Q      Okay.  So, let's talk first generally.  What remains to

2  be done in these bankruptcy cases?

3  A      So, we are at the point now where we are about to exit

4  the Hahnemann Hospital building.  We are, right now, going

5  through the claims process.  We are going through the process

6  of looking at potential causes of action that may exist here

7  as well as trying to cleanup cost report issues that we have

8  with the government.  There is a lot of administrative

9  functions still left to go in the case.

10  Q      Okay.  What about moving towards a plan?

11  A      And move forward, obviously, towards a plan to try and

12  get this case completed.

13  Q      Let's talk about the financial position of the debtors

14  as we sit here today. What is the current financial position

15  of the debtors?

16  A      So, I currently have a little over $30 million dollars

17  in cash.  I expect another $10 to $15 million dollars to come

18  in.  And I have --

19  Q      From what source?

20  A      From a number of different sources.  Everything from

21  collection receivables.  I have a fairly sizeable refund

22  coming from one of our insurance plans related to Hahnemann.

23  I have claims coming in from the collection of, obviously,

24  all kinds of receivables and things out there; deposits that

25  are coming back to us along the way.

1  Q    The court, in prior hearings, has heard a lot about our

2  problems of collections in this case.  What changed?

3  A    Twofold.  Number one, we have actually been able to

4  really chase claims one off at a time and negotiate with

5  insurers.  The folks at Conifer have helped us a little bit

6  going forward and stepped up their game a little bit from

7  where they were as well as we've been able to chase down a

8  number of, you know, large buckets of cash that we've had out

9  there that we've had to get from governmental entities and

10 grants.

11 Q    So, you talked about what you think is coming in.  You

12 are sitting on $30 million dollars.  You got another, you

13 know, millions coming in.  What about expenses.  Where do you

14 sit today with regard to expense that are unpaid?

15 A    I am expecting that between now and the end of the case

16 to get through admin I've got probably $20 million dollars in

17 expenses less -- and that includes the $6 million dollars

18 here for the tail insurance coverage.  So, there will be

19 funds here going forward to distribute.

20 Q    Okay.  One of the concerns the judge raised in the

21 order to show cause was the idea that the debtors may be

22 suffering substantial and continuing losses in diminution of

23 their estates during the course of these Chapter 11 cases.

24 Do you believe that to be the case?

25 A    At this point, no.

1  Q    And is that based on your review of the -- based on the

2  testimony that you just gave in terms of the cash on hand and

3  what you expect to come in?

4  A    Correct.

5  Q    And as you sit here today, based upon the economics

6  that exist today and what you projected, do you have a view

7  as to whether or not the debtors are in a position to confirm

8  one or more liquidating plans in the cases?

9  A    Yes.

10 Q    What is that view?

11 A    I believe that we can confirm a case.

12 Q    And based upon your knowledge of also the outstanding

13 costs and the funds that are in this on a collected basis do

14 you believe that these debtors are administratively

15 insolvent?

16 A    No.

17 Q    You believe they are not administratively insolvent?

18 A    Correct.

19 Q    Okay.  And have you done any analysis on a case by case

20 basis, debtor by debtor basis in terms of whether a debtor is

21 administratively insolvent or not insolvent?

22 A    No.

23 Q    Let's talk a little bit about how the funds flowed in

24 this case.  Let's first focus prepetition.  How did the

25 debtors operating account work?

1  A    The debtors have one operating account that's actually

2  at the PAHS level.  Everything flowed up through it as a

3  result of the MidCap loans that forced that structure.

4  Q    All right. And that was prepetition?

5  A    Yes.

6  Q    And what has changed, if anything, post-petition?

7  A    It's the same post-petition.

8  Q    Okay.  So, everything is going in the one bucket and

9  you're paying out of one bucket?

10  A    Correct.

11  Q    Okay.

12  A    The difference is, is that when MidCap ceased to exist

13  anymore as our lender everything was swept by MidCap in the

14  past and then funded back to PAHS directly.  Now it comes up

15  from the subsidiary bank accounts directly to PAHS's main

16  account.

17  Q    Okay.  Now are you familiar with the motions that were

18  filed by the Pennsylvania Department of Health and the

19  alleged ad hoc committee of residents in these cases?

20  A    Yes, I am.

21  Q    In its motion the ad hoc committee requests an order of

22  the court compelling the debtors to obtain tail insurance for

23  all residents in order to avoid what the ad hoc committee

24  described as a "catastrophic effect on the medical services

25  community in Philadelphia."

1        Do you agree or disagree with that statement?

2    A    I would agree with it.

3    Q    Why?

4    A    Because without coverage for physicians you have

5    physicians who might lose their licenses, you would have a

6    problem with recovery for patients who have a problem out

7    there, and it would create a real hardship on people.  You

8    know, when a nurse gets sued personally who has no coverage,

9    you know, it's a real issue.

10   Q    As I stated at the outset of the hearing the debtors

11   originally filed an omnibus objection to both the motions

12   filed by the ad hoc committee and the Department of Health,

13   correct?

14   A    Correct.

15   Q    And you authorized those objections to be filed?

16   A    Yes.

17   Q    Okay.  And you are, obviously, here today asking the

18   court to authorize the approval to pay for tail coverage?

19   A    That's correct.

20   Q    And why the change of heart?

21   A    Well, because I now have had significant success in

22   collecting funds and have the ability to do what I've wanted

23   to do all along and, quite frankly, what's right.

24   Q    Okay.  Now we talked a little bit about this earlier,

25   but the PARRG gave you a couple of different options for

1  coverage, but you have chosen to go with the option that

2  covers the most people, why is that?

3  A    Because it made the most sense from an economic

4  standpoint as well as from a business and societal

5  standpoint.  It also got rid of the issues which could be

6  coming which would have been claims that came in the

7  bankruptcy estate from physicians who operated and staff who

8  operated in the hospital post-petition.  We would still be in

9  litigation for years with claims for folks as they sued along

10  the way here for not having coverage.

11  Q    Tell me who at the debtors made the decision to move

12  forward with the motion that's before the court today?

13  A    Myself and Al Mezzaroba, the primary director.

14  Q    And we talked about Mr. Friedman earlier today.  Is Mr.

15  Friedman still an officer or director of the debtors or any

16  of the debtors?

17  A    Yes, he is.

18  Q    Okay.  What, if any, involvement did Mr. Friedman have

19  in the decision related to today's motion?

20  A    None.

21  Q    Now did you read the response that the committee filed

22  to the motion that's before the court today?

23  A    Yes, I did.

24  Q    All right.  Throughout that response the committee

25  suggests that the debtors are using, for example, proceeds

1  from the St. Chris Hospital sale to cover obligations that

2  would be owed by, for example, Hahnemann or the practice

3  groups.  Do you agree or disagree with those assertions?

4  A    Well, the proceeds from the St. Chris Hospital sale

5  after MidCap was paid off the funds that were leftover were

6  used to pay primarily my investment banker fees and payroll

7  at St. Chris.  So, proceeds from the sale that were left over

8  couldn't be used at all for this purpose.

9  Q    Okay.  What about the general notion, though, that

10 we're taking funds away from one debtor and using those funds

11 to pay creditors of another debtor?

12 A    Well, that's been going on throughout the case.  If I

13 didn't use the funds that I collected from Hahnemann to keep

14 St. Chris alive, St. Chris would have never gotten to a sale

15 and it would have wound up shutting down.  We took supplies

16 from Hahnemann and sent it over to St. Chris to keep it

17 alive.  We took -- you know, we used cash and paid vendors

18 who were clambering that they hadn't gotten paid at St.

19 Chris.  You know, we used Hahnemann's collections to do that

20 along the way.  So, we would never have gotten to a sale.

21 Q    Do you have any idea of the magnitude of, what we'll

22 call, Hahnemann proceeds that were used to prop-up St. Chris?

23 A    Exact number, no.  I would guess is in excess of $10

24 million dollars.

25 Q    Finally, why do you believe the court should grant the

1  relief requested today?  You have touched on it before, but

2  that is my final question?

3  A    I think the estate has the funds and I think it's the

4  right thing to do both for our employees who work at the

5  hospital and for the community at large.

6           MR. MINUTI:  Your Honor, that completes my direct

7  testimony.  At this point I'd like to move into evidence the

8  documents we have marked as Exhibits 1 through 10.

9           THE COURT:  Any objection?

10           MR. SHERMAN:  No objection.

11           THE COURT:  All right.  Thank you, Mr. Sherman.

12  They are admitted.

13      (Debtor's Exhibits 1 through 10, admitted)

14           MR. MINUTI:  I will then pass the witness.  Thank

15  you, Your Honor.

16           THE COURT:  All right.  Does anyone need a break?

17  We're all right.  Okay.

18           MR. SHERMAN:  Your Honor's day.

19           THE COURT:  No, I'm fine.

20                      CROSS EXAMINATION

21  BY MR. SHERMAN:

22  Q    Good morning, Mr. Wilen.

23       You referred a couple minutes ago about doing the right

24  thing and societal benefit.  I just wanted to -- the entities

25  at issue were for profit or not for profit?

1  A      They're for profit.

2  Q      Right.  So, a for profit entity.  What obligations, in

3  your mind, does a for profit entity have to society other

4  than creditors?

5  A      It doesn't in a normal sense, but this is a hospital.

6  When I talk about the benefit to society I'm talking about

7  the benefit to patients that are there.

8  Q      Okay.  Well, we will get into that in a little bit.

9  The coverage that the debtors are seeking to buy you referred

10  to as everything, right, during your testimony with Mr.

11  Minuti.  Everybody that wasn't, otherwise, covered the

12  debtors are seeking to now cover?

13  A      Correct.

14  Q      And then let me sort of break it down and see if we can

15  put the people or the groups in buckets.  So, as far as the

16  doctor group, you talked about doctors before and I think you

17  gave us a number of 79 former doctors.  The current doctors

18  that worked about post-petition were about 30 or 40.

19  A      No.  79 doctors at Hahnemann of which 12 relate to a

20  period prior to -- 180 days prior to the filing.  The rest

21  are after that.

22  Q      Okay.  So, let's talk about those 12.  Let's just start

23  with these are people outside the 180 days that would have

24  had a contract.  What entity would they have the contract

25  with?

1   A      With PAMA, the practice group at Hahnemann.

2   Q      So, PAMA, Philadelphia Academic Medical Associates?

3   A      Yes.

4   Q      And then below PAMA in the org chart there are other

5   entities that were operated, that were physician group

6   entities, correct?

7   A      Correct.

8   Q      So, the obligation to buy any coverage would have been

9   either at the subsidiary level, the practice group level or

10  at PAMA.  Is that correct?

11  A      Yes.

12  Q      Okay. And what assets does PAMA or the practice groups

13  have to pay for what you are now seeking to purchase?

14  A      Some receivables.

15  Q      So, help me.  What -- are those receivables sufficient

16  to cover the quote you received for the coverage?

17  A      No, they are not.

18  Q      Okay.  So, where are the monies coming from to pay for

19  the coverage for those former doctors?

20  A      From the PAHS accounts.

21  Q      Okay.  So, from entities other than the party that's

22  obligated to pay the debt?

23  A      Correct.

24  Q      And do the practice groups have an ability of

25  reimbursing the entity providing that cash back so under the

1  cash managment everything would get equalized?

2  A    No.

3  Q    Okay.  So, effectively, you're creating an obligation

4  that you can't satisfy.

5  Q    There are inter-companies that are out there that you

6  could address through that process.  Remember, the doctors

7  provide services to the hospitals.  So, there is no physical

8  way that the hospital provides service to patients without

9  those doctors.  They're really inter-related as one.

10 Q    I'm talking about people that left a long time ago, Mr.

11 Wilen.  I'm talking about you're covering --

12 A    The 12 doctors that left a long time ago.

13 Q    Right.  So, what benefit does anybody have currently to

14 covering those doctors?

15 A    The patients who saw those doctors have no malpractice

16 coverage in place after March 11th for any claim that may

17 come about.  Remember, you may have an obstetrician who was

18 treating a patient back then as one of those 12 who has a 20

19 year tail on that insurance.

20 Q    So, if the court approved a process to provide tail

21 coverage for the institution and not paying for these 12

22 doctors that left that would solve the issue you just raised,

23 right?

24 A    No, it wouldn't.

25 Q    Why?

1  A      Because if the doctor is the one that -- is the one who

2  had a malpractice issue would the actual hospital be

3  responsible to foot that bill.

4  Q      And if -- do you know if any of those doctors were

5  terminated for cause?

6  A      I do not.

7  Q      And do you know how the hospital would have treated it

8  or the contract would have treated an instance where the

9  doctor was terminated for cause?

10 A      I believe, actually, that they are still required to

11 provide the tail.

12 Q      Okay.

13 A      I think in later years they changed that, but in the

14 early years I think that contract actually forced them to

15 provide the tail.

16 Q      So, you still have Mr. Minuti's exhibit binder in front

17 of you, correct?

18 A      Yes, I do.

19 Q      Okay.  Can you open up to Tab 9, please, Page 27, 28 of

20 32.  Do you see the first block paragraph?  Tell me if you're

21 with me.

22 A      Yes.

23 Q      Okay.  So, the four lines up in the first large block

24 paragraph from the end where it says,

25         "Should this agreement be terminated for cause,

1   physician may be required to purchase tail insurance."

2        Does that refresh your recollection as to how people

3   were terminated for cause?

4   A    Yes, that's the physicians.

5   Q    So, if a physician was terminated for cause he or she

6   could have -- was on notice that the hospital wasn't going to

7   buy tail insurance or may not be buying tail insurance,

8   right?

9   A    Correct.

10  Q    But now if that person was terminated for cause the

11  debtors are using estate assets to pay for tail coverage for

12  that individual?

13  A    Yes.

14  Q    Okay.  And one step further, the contracting party that

15  obligated itself, the physician's employer is taking money

16  from another debtor to pay for that tail coverage for that

17  individual that may or may not have been terminated for

18  cause?

19  A    You're assuming the debtors operated in a manner in

20  which each entity was kept separate.  The debtors did operate

21  in a very consolidated basis on a lot of the issues that they

22  dealt with from an operational standpoint.

23  Q    But as we sit here now the cases are simply jointly

24  administered and they're not consolidated.

25  A    That's correct.

1  Q     And to the contrary, under the cash management order,

2  you're required to separately identify all the transactions,

3  right?

4  A     Correct.

5  Q     And you have been post-petition?

6  A     Yes.

7  Q     So, let's talk about other doctors.  We've identified

8  12 from pre-priority period that are being covered even

9  though there's no asset that could pay for that coverage.

10 The entities within the -- individuals within the priority

11 period.  It's a similar situation from what we just described

12 with the contract, right, that as far as who their employer

13 was that that entity still didn't have the cash to pay.

14 A     I'm sorry.  Could you repeat the question?

15 Q     So, you differentiated between priority and non-

16 priority, right, as far as doctors?  Doctors that operated

17 within the priority period.

18 A     Right.

19 Q     So, with regard to the doctors that operated within the

20 priority period would there be assets to cover any priority

21 claims that those doctors would assert if the tail coverage

22 wasn't purchased?

23 A     Yes.

24 Q     What assets would the doctor groups have to pay for

25 that claim?

1  A     The doctor groups have receivables.  They are less than

2  the premiums overall here, but there are receivables from the

3  practice groups.

4  Q     So, let me just -- your familiar with the operating

5  reports, right?

6  A     Which one?

7  Q     The operating reports filed in this case?

8  A     Yes.

9  Q     You signed them.  So, are we talking about TPS-4 of PA

10 LLC, TPS-3 of LLC, St. Chris Pediatrics Associates LLC.

11 Those are all the doctor groups?

12 A     Correct.

13 Q     Okay.  So, do you have a recollection of what the

14 collections were for the doctor groups in November?

15 A     No, I don't.

16 Q     Would it be fair to say that it was less than $2,000

17 dollars?  We can go look at the docket.

18 A     The answer would be yes, but you also have to

19 understand that we also had a problem with our vendor at that

20 point in time who was doing our collections who has since

21 been replaced.  We have now signed a contract with a

22 different group to go collect those receivables.

23 Q     This is in November, Mr. Wilen.

24 A     I understand.

25 Q     Okay.

1  A     So, we had this issue back in November with our

2  practice group vendor who was doing our billing for us.  So,

3  the practice groups have collections that are significantly

4  higher.

5  Q     So, if I looked at a balance sheet as of July 31st what

6  do you think of the assets of those doctor groups would be?

7  Do you recall?

8  A     I have no idea off the top of my head.  Probably fairly

9  small.

10  Q     Fairly small.  Fair to say probably less than $10,000

11  dollars?

12  A     Correct.

13  Q     Okay.  So, if we're talking about these small dollars

14  here, what assets these doctor groups have why are you

15  worried about a priority claim when they just don't have any

16  assets to satisfy it?

17  A     Because the issue we have is that you're dealing with

18  the groups -- you're looking at these in isolation and the

19  reality is that the isolation you're looking at isn't the way

20  these groups operated from a practice group perspective.

21  They were set-up from regulatory purposes.  There were no

22  assets in those groups.  I would tell you that the physician

23  contracts had value.  Think about St. Chris, when you sold

24  St. Chris, right, the assumption of those physician practice

25  groups, those physician contracts had significant value.

1  Those doctors providing services to Hahnemann when we shut

2  down had significant value.

3  Q    So, let me -- and I think the judge gets it.  I will

4  just is one of the rationales you said that you wanted to

5  purchase tail coverage for these doctors was to avoid

6  priority claims.  Is it fair to say that the doctor groups

7  themselves --

8        (Phone rings)

9            MR. WILEN:  I thought it was off.  I apologize,

10 Your Honor.

11           THE COURT:  It's all right.

12 BY MR. SHERMAN:

13 Q    I just lost my train of thought for a second.  Would it

14 be fair to say that even if these doctors had priority claims

15 that it would be very speculative to believe that the doctor

16 groups themselves would have the assets to cover those

17 claims.

18 A    That's correct.

19 Q    Okay.  And then as far as these doctor claims, they're

20 all, as we just discussed, right, based upon prepetition

21 contracts?

22 A    Yes.

23 Q    And so, the claims of these doctors are really no

24 different than the claims of other tradespeople relating to

25 prepetition contracts, fair to say?

1  A     Are you talking about from a -- the priority period or

2  are you talking about post-petition?

3  Q     Prepetition -- pre-bankruptcy.

4  A     It should be no different.

5  Q     All right.  So, if somebody sold food or drugs or some

6  other supply to the company -- to the hospital, the claims of

7  the doctors would be at the same --

8  A     Except for the malpractice coverage, which was listed

9  in the contracts under benefits.  And, you know, if you look

10 at Pennsylvania wage law issues, those would fly into

11 unsecured priority claims --

12 Q     Okay.

13 A     -- for the employees.

14 Q     Okay.  I understand what you're saying, but right now

15 it's -- and even if it was a priority claim, it would be

16 capped, right?

17 A     Correct.

18 Q     Okay.  So -- and the amount of the coverage for these

19 individuals exceeds that of what you're paying for tail

20 coverage, probably exceeds the cap for each of those people,

21 right?

22 A     I don't know because malpractice insurance could be as

23 little as $5,000 for somebody who does primary care to

24 $100,000 for an obstetrician; it depends on who they are.

25 Q     But you never priced it like that?

1  A      I didn't price it that way, correct.

2  Q      Because -- why didn't you?

3  A      Because you -- we didn't have the ability to do that,

4  number one.  We didn't have the access to each and every

5  doctor's right to go and shop their insurance for their,

6  their claims history.

7        We are actually -- we priced it as a pool.

8  Q      So, by pricing it as a pool --

9  A      The cost is significantly less.

10 Q      -- or you're inherently treating similarly situated

11 creditors differently, right?  You're taking the claims of

12 the doctors against the doctor groups and elevating them

13 against the tradespeople we just talked about, right?

14       I mean, at base, that's what's happening, right?

15 A      Yes.

16 Q      Okay.  And that payment of the prepetition obligation

17 is consistent with what's happening with the residents and

18 fellows, right?

19       We can break it down, right?

20 A      Correct.  But that's no different than your -- than the

21 members of your committee who were getting paid with -- who

22 have been getting paid along the way with funds from the

23 hospitals.  St. Christopher's vendors were getting paid with

24 Hahnemann dollars all along the way.

25 Q      So, wait a minute, Mr. Wilen.

1       Maybe we're --

2  A     So, we've been tracking that along the way, but they

3  are using funds.

4  Q     We're talking about two different animals here.

5        The question we just talked about and what we just

6  discussed was that the debtors are now seeking to pay

7  prepetition claims with post-petition monies and we're

8  elevating the prepetition claims to get those paid.

9        That's what we're talking about as far as the doctors,

10 the former doctors?

11 A     The former doctors, yes.

12 Q     Okay.  And that's the same with former residents?

13       So, if I resident was there through '19, through the

14 prepetition period --

15 A     Correct.

16 Q     -- so the resident's claim is being elevated and being

17 paid as a -- I mean, as a post-petition claim, even though

18 that claim is prepetition?

19 A     That's correct.

20 Q     And how many of those prepetition residents are there?

21 A     A hundred and change.

22 Q     Right.  And what effort did you do to differentiate or

23 get a quote for the prepetition doctors or prepetition

24 residents so their claims wouldn't be elevated to

25 prepetition?

1  A     As I said before, we got three or four different

2  quotes.  We went back looking for additional quotes and we

3  were told no.

4       The other problem I have is that I can't get you

5  individual doc quotes without their consent on their loss

6  histories.

7  Q     But there were other ways of doing it, Mr. Wilen,

8  right?  You could have simply said to the doctor, Here's a

9  pot of money that the debtors are going to create and the

10 debtors are trying to abate the situation.  Go get your own

11 coverage and take it out of the pot and the rest comes out of

12 your pocket.

13      You never did that?

14 A     No, we didn't.

15 Q     Okay.  So, you've gone through a process of treating

16 similarly situated creditors differently?

17 A     That's correct.

18           MR. SHERMAN:  I think that's it, Your Honor.

19           THE COURT:  All right.  Thank you, Mr. Sherman.

20           MR. SHERMAN:  Thank you, Judge.

21           MR. RYAN:  May I have just a minute to talk with

22 Mr. Minuti for second, Your Honor?

23           THE COURT:  Certainly, yes.

24      (Pause)

25           THE COURT:  Mr. Wilen, do you need a break or are

1   you doing okay?

2           THE WITNESS:  I'm fine.  Thank you, Your Honor.

3        (Pause)

4           MR. MINUTI:  Your Honor, may I redirect?

5           THE COURT:  Yes, you may, Mr. Minuti.

6                      REDIRECT EXAMINATION

7   BY MR. MINUTI:

8   Q    Okay.  Mr. Wilen, I want to start sort of where Mr.

9   Sherman ended, this idea that we could create a pot of money

10  and the residents, for example, could all make a claim

11  against the pot of money.

12       If the resident went out and got coverage on their own,

13  let's say all the residents who we're trying to cover today

14  by this motion, if all of those residents went out and got

15  coverage on their own, would that be more expensive or less

16  expensive than what the debtors are trying to purchase today?

17  A    Well, based on my discussions, it's actually a

18  hypothetical; it's physically impossible.  The first- and

19  second-year residents could not obtain coverage on their own.

20       There's no market for it that's out there for that

21  insurance on a standalone basis because they're covered by

22  the hospital, traditionally.  So, the ability for them to

23  cover it would have to be a product that somebody created.

24  It doesn't exist today.

25       And may expectation would be the number would be

1 significantly higher because they would be writing it almost

2 the same way as when you buy, you know, you buy something in

3 bulk, you wind up getting it cheaper and that's why you buy

4 group insurance, for example.

5 Q    Okay.  And I want to talk a little bit about it because

6 we were talking very -- or when you were talking to Mr.

7 Sherman, it was very general about the former doctors and the

8 idea that the practice groups don't have any money.

9      But let's talk about the practice groups at St.

10 Christopher, for example, okay.  As part of the St.

11 Christopher's sale, right, the doctor contracts that were at

12 the practice-group level were assigned, right, to the buyer?

13 A    Correct.

14 Q    Okay.  And have you done an allocation of the purchase

15 price among St. Christopher's and the practice groups in

16 terms of how much of the purchase price would flow to each of

17 those entities?

18 A    No, we did not.

19 Q    Okay.  And do you have a view as to whether the

20 practice groups would be entitled to any of those proceeds?

21 A    I'm assuming the practice groups would be entitled to a

22 significant portion of it, because one of the things that the

23 buyer bought was those employment contract and was able to

24 get the physicians onboard as an intact unit of doctors.

25 Q    All right.  And so, if we actually went ahead and

1  allocated those proceeds, is it your testimony that in all

2  likelihood those practice groups would have enough money to

3  cover the claims of any former docs?

4  A     Yes.

5  Q     Okay.  Now, I appreciate that Hahnemann is a little bit

6  different and there was a colloquy with Mr. Sherman about

7  those 12 -- the 12 people, the hundreds we're trying to

8  cover, he's focused on these 12 pre-priority claim doctors at

9  Hahnemann.

10        Now, you talked a little bit about that, right, but I

11  think you testified earlier, right, when you really do the

12  math and talk about, really, the cost that's being allocated

13  to them, what's the answer?  How much of this 9.2 gross

14  number are we talking about?

15  A     Very little.  I mean, it's a small amount.

16        Because you would lose the credit, the 2.7 million.

17  I'd lose the $487,500 or a portion thereof.  So, we're really

18  talking about a small amount that we'd be losing.

19  Q     Okay.  And in exchange for that small amount, you're

20  eliminating the costs, the delay of fighting with those

21  people over coverage; is that fair?

22  A     Correct.

23  Q     And was that part of your analysis?

24  A     Yes, it was.

25  Q     Okay.  The other thing Mr. Sherman said was -- and I

1  think I heard him correctly -- he was sort of implying that

2  if you cover Hahnemann, right, a patient who's hurt by a

3  doctor who Mr. Sherman doesn't want you to buy coverage for,

4  that patient will be okay because he can look to the

5  hospital's insurance.

6         Do you remember that -- those questions?

7  A    Yes, I do.

8  Q    Okay.  And is that a correct statement; in other words,

9  if the hospital is covered, is the patient fully covered if a

10 doctor who is not covered caused the problem?

11 A    No.

12 Q    And why not?

13 A    Because the liability doesn't fall on the hospital at

14 that point.  It falls on the actual physician, especially if

15 they saw them in a physician office and not in the hospital.

16 Q    Okay.  So, saying what you just said a different way, a

17 patient could have a claim against the doctor and not a claim

18 against the hospital?

19 A    That's correct.

20 Q    It really depends on the nature of what went wrong that

21 caused the claim, correct?

22 A    Or vice-versa.

23 Q    Very well.

24        MR. MINUTI:  Okay.  Give me one second.

25        (Pause)

1        MR. MINUTI:  Your Honor, nothing further.

2        THE COURT:  All right.  Oh, let's let Mr. Ryan ask

3  his question, if you don't mind, Mr. Sherman, then you may

4  proceed.

5        MR. SHERMAN:  No worries, Your Honor.

6        THE COURT:  Good.

7                    RECROSS-EXAMINATION

8  BY MR. RYAN:

9  Q    Mr. Wilen, good morning or good afternoon -- morning

10  still.  I'm Jeremy Ryan, counsel for the ad hoc committee of

11  creditors.

12        And Mr. Sherman was going into the difference between

13  those doctors, residents, and fellows -- my clients -- who

14  might qualify for the priority cap and those who wouldn't,

15  correct?

16  A    Correct.

17  Q    And at the time of the filing, were there a little over

18  600 residents and fellows employed by Hahnemann; is that a

19  fair number?

20  A    It was actually more than that, but yes.

21  Q    And if you look at those who were not employed, but

22  were employed in the 180 days prior, would that add a couple

23  hundred more?

24  A    Yes.

25  Q    Would it be safe to say it's more than 750 people that

1  would qualify for the priority cap?

2  A     Yes.

3  Q     And the priority cap is 12,500, correct?

4  A     Correct.

5  Q     So, if we assumed that some of them got some wages paid

6  and that cap is partially reduced, if we use 10,000, what's

7  10,000 times 750?

8  A     7.5 million.

9  Q     And is that greater than or less than the cost of the

10 entire tail policy?

11 A     It's greater than.

12 Q     So, it's cheaper to buy this whole policy that benefits

13 everybody than to take the risk of individual claims within a

14 priority-scheme cap?

15 A     That's correct.

16        MR. RYAN:  Thank you, Your Honor.

17        THE COURT:  Thank you, Mr. Ryan.

18        Mr. Sherman, yes?

19        MR. SHERMAN:  Thanks, Judge.  It's always great

20 when lawyers do math.

21    (Laughter)

22        THE COURT:  In their heads, even.

23    (Laughter)

24        MR. SHERMAN:  We'll parse that out later during

25 arguments, Judge.

1                    RECROSS-EXAMINATION

2  BY MR. SHERMAN:

3  Q    Mr. Wilen, we talked earlier about the doctors and I

4  think you said you didn't get a separate quote for the -- to

5  cover the doctors, right?

6  A    I said I didn't get a separate quote to cover the

7  prepetition physicians.

8  Q    Right.  And but you did get a quote for the physicians

9  and I think Mr. Minuti corrected you, is $3.76 million?

10 A    That's correct.

11 Q    And who did that cover?

12 A    That covered all of the doctors.

13 Q    Pre --

14 A    Pre, post, everybody.

15 Q    Everybody.

16      And if you were to remove the prepetition doctors from

17 that quote, did you try to do that?

18 A    No, I had no way of doing that.

19      We went back and said -- came back to them asking for

20 all different kinds of different quotes and we were told,

21 This is it.

22      In essence, they're required to provide us a quote for

23 everything, only.  In theory, I think they were doing us a

24 favor at the ROG, doing more than just the one quote I asked

25 for.

1  Q      They were doing you a favor?

2        They were obligated under Pennsylvania law to provide

3  tail coverage.

4  A    To provide a tail quote that would be similar to the

5  people they claimed before.  So, they could have given me one

6  quote, including St. Chris, including everything else.  They

7  accommodated us for what we asked for on a couple of

8  different bases.

9  Q    I'm not sure what that is.

10          MR. SHERMAN:  Nothing further, Judge.  I'll

11  reserve it for argument.

12          THE COURT:  All right.  Mr. Sherman, thank you.

13          Mr. Minuti, anything else?

14          MR. MINUTI:  No further evidence, Your Honor.

15          THE COURT:  All right.  Mr. Wilen, you may step

16  down.  Thank you.

17      (Witness excused)

18          MR. MINUTI:  Move to argument, Your Honor?

19          THE COURT:  Why don't we take a 10-minute break

20  right now and then we'll have argument.  Okay?

21          MR. MINUTI:  Thank you.

22          THE COURT:  Yes.

23      (Recess taken at 11:49 a.m.)

24      (Proceedings resumed at 12:03 p.m.)

25          THE COURT OFFICER:  Please rise.

1            THE COURT:  Thank you all.  You may be seated.

2            Mr. Minuti, argument time.

3            MR. MINUTI:  Thank you, Your Honor.

4            THE COURT:  Yes.

5            MR. MINUTI:  Your Honor, the debtors asked the

6    Court to authorize them to use estate funds to purchase tail

7    insurance to cover all those folks, Your Honor, that we

8    believe need to be covered in these cases.  The debtors are

9    seeking such relief in Section 105 and 363 of the Bankruptcy

10   Code and Bankruptcy Rule 9019.

11           Pursuant to Section 105, the Court has the

12   authority to allow the debtor -- or excuse me -- to enter

13   orders that further the purposes of the Bankruptcy Code and

14   pursuant to Section 363(b), the Bankruptcy Code allows the

15   debtor to use estate assets, Your Honor, to benefit these

16   estates.  And case law makes clear that a debtor's decision

17   to use estate property under Section 363 is governed by the

18   business judgment rule.  As long as the Debtor's decision to

19   use those funds is reasonable and in the best interests of

20   the debtors' estates, courts typically defer to the business

21   judgment of debtors.

22           Rule 9019, Your Honor, is the rule that covers

23   compromises and in bankruptcy, of course, compromises are

24   favored and the case law makes clear, again, that a debtor's

25   decision to enter into a compromise is governed by the

1  business judgment rule.

2          In determining whether to approve a settlement,

3  the Court typically looks to the following four factors:  the

4  probability of success of the merits; the likely difficulties

5  in collection -- that is not an issue that worries us

6  today --

7          THE COURT:  Right.

8          MR. MINUTI:  -- the complexity of the issues --

9  the expense and inconvenience and delay attending the issues;

10 and the paramount interest of creditors.

11         Applying all these factors to the present case, we

12 believe the Court should easily approve the motion and

13 authorize the debtor to purchase tail insurance.

14         First, Your Honor, it should be clear from the

15 testimony that the debtors to proceed to purchase tail

16 coverage today comes only after, number one, the debtors have

17 reached a level of comfort that we will confirm a liquidating

18 plan in these cases and administrative claims will be paid.

19         Number two, Your Honor, the decision to move

20 forward today comes only after the debtor did everything

21 possible and exhausted all other avenues to come up with a

22 cheaper, more cost-effective solution that would solve the

23 problem that confronts the debtors and the courts by this

24 motion.  Mr. Wilen's testimony on these issues was

25 unrebutted.

1          The proposal before the Court today is the best

2   and most cost-effective plan for providing the necessary

3   coverage.  The gross cost is $9.2 million, but, again, the

4   PARRG is providing a credit of $2.76 million, as well as

5   crediting the last extension fee of $487,500.  So, when we

6   get down to it, Your Honor, the out-of-pocket expense to this

7   debtor, all in, is -- additional out-of-pocket expense is

8   approximately $6 million.

9          It is not lost on us that that is a lot of money,

10  Your Honor, but we believe in the context of these cases, the

11  cases in these estates are better served if we use those

12  funds to purchase the tail insurance.

13          First and foremost, Your Honor, the law makes

14  clear that the purchase of tail coverage for Hahnemann is

15  necessary for the debtors to be in compliance with

16  Pennsylvania law.  As detailed in our motion, a healthcare

17  provider, which the hospital is, is required to maintain

18  healthcare insurance under Section 1303.711(a) of the MCARE

19  Act.

20          28 U.S.C. 959(b) requires the debtor to manage and

21  operate its property according to the requirements of the

22  laws in which such property is situated and, therefore,

23  approval of the motion will allow us to comply with

24  Pennsylvania law as it relates to Hahnemann.

25          And as Your Honor will recall, St. Chris is

1  already covered, pursuant to the coverage purchased as part

2  of the St. Chris sale.

3          Further approval of the motion and settlement of

4  the motions to compel will also allow the debtors to avoid

5  costly litigation, the outcome of which is uncertain.  The

6  outcome of the motions to compel, Your Honor, if contested,

7  are far from clear.

8          While there are certainly arguments on both sides

9  in terms of whether the debtor should be required to purchase

10  tail coverage, the outcome, again, is uncertain and it was

11  unclear what the Court would do.  The Court could have

12  determined that the obligation to pay for tail coverage was

13  an administrative claim, particularly for those doctors and

14  residents who provided post-petition coverage, and that's

15  more than half of the doctors and residents that we're

16  talking about.

17          The residents, in particular, I think the Court

18  will agree, are a particularly sympathetic group,

19  particularly those at Hahnemann, who had contracts that told

20  them that they were going to have occurrence-based coverage

21  and we know now that the debtors had claim-based coverage.

22  The point there is, Your Honor, that these are young people,

23  many of whom may not be paying attention to these bankruptcy

24  cases, many of whom may have no idea this issue is even out

25  there.  So, they are a particularly sympathetic group.

1        But, again, Your Honor, even if we were to

2   challenge the motions, Your Honor could have said, In order

3   to comply with Pennsylvania law, you have to have this

4   coverage and, therefore, Your Honor could have ruled in favor

5   of the movants or Your Honor could have said these are

6   administrative claims.

7        Remember, most of these people provided services

8   to the debtor, services post-petition, right.  Those post-

9   petition services allowed us to safely close down Hahnemann

10  and get to a sale of St. Christopher's Hospital.  Your Honor

11  very well could have decided that because of that, that was

12  essentially a cost of the value of the service they provided

13  post-petition and, therefore, the cost of tail coverage was

14  included.

15       But even if we were to challenge that and we were

16  to succeed, as we've already talked about, some of these

17  claims fall in the priority period.  Would they have been

18  priority claims or wouldn't they have been prepetition

19  claims?  Would they have been capped?  Maybe for some, for

20  others, they would not have been, right.

21       Even if these were unsecured claims, Your Honor,

22  let's keep in mind that the value of the unsecured claim is

23  not necessarily capped by the cost of replacement coverage.

24  As Mr. Wilen testified, some of the residents, because of who

25  they were, may not be able to get replacement coverage unless

1  we get it for them, right.

2          So, what are their damages?  If they can't get

3  coverage, they can't get hired anyway, okay.  Some of the

4  doctors may have issues that go far beyond.  Suppose a doctor

5  doesn't -- license is suspended or revoked because they don't

6  have coverage.

7          The point is, even if unsecured claims -- and

8  we're not just talking about the cost of tail insurance,

9  right; we're talking about additional damages that could

10 result by not purchasing the tail coverage.  And one of the

11 things the committee says in their reply is, No, no, no, this

12 isn't going to be expensive.  This can be done very quickly

13 because it's all the same issue for everybody.

14         Well, it would only be the same issue to everybody

15 if you're just focused on the contract issue, but everybody's

16 case is different, Your Honor.  Everybody's got different

17 damages.  Everybody's circumstances are a little bit

18 different.  It's not going to be so easy.

19         It's going to be expensive.  It's going to be

20 time-consuming.  And by approving today's motion, Your Honor,

21 we do away with all of that, which is one of the tenets of

22 9019, what it talks about.  You take into account the delay,

23 the cost, the expense, the risk, all those things that we

24 were taking into account today, Your Honor, by doing what

25 we're doing.

1          Moreover, Your Honor, I want to mention the

2    Court's rule to show cause and the reason why I think that's

3    important and how it ties into the business judgment.  Keep

4    in mind that neither the residents who filed their motion or

5    the Department of Health, inputted into this case the notion

6    of converting the cases, but the rule to show cause does.

7          And I'm certainly not being critical of Your

8    Honor, but when you sit back and when you talk about what's

9    in the best interests of these estates, I mean, we certainly

10   read Your Honor's rule to show cause as expressing the

11   Court's concern for this problem and asking us to come up

12   with a way to fix it.  And when we're talking about what's in

13   the best interests of the estates, nobody, I think -- and I

14   think I can speak for the committee, as well -- nobody thinks

15   conversion of these cases makes any sense.  We have a lot of

16   institutional knowledge here, both on the committee's part

17   and the debtors' part.  We've been working cooperatively in

18   this case throughout.

19          The best interests of this case and the best

20   interests of creditors are to get this problem behind us, pay

21   for this tail coverage, let us get to a plan, let us focus on

22   some of the bigger issues in the case, let the committee do

23   their investigation.  And if it turns out that investigation

24   reveals that there are viable claims to be pursued, those

25   claims can be pursued.

1          The committee, the debtors, the professionals,

2   Mr. Wilen, they are in the best position today, based on

3   everything they've done in this case to get to that goal

4   line.  Conversion would help nobody; we'd be dealing with a

5   brand new party in the case, Your Honor, which would have to

6   get up to speed, certainly not in the best interests of these

7   estates.

8          THE COURT:  Are you at all concerned with

9   Mr. Wilen's testimony that similarly situated creditors are

10  being treated differently?

11         MR. MINUTI:  Well, the answer, is Your Honor, I

12  always have concern if that's the prospect, right.

13         THE COURT:  Yes.

14         MR. MINUTI:  But I would phrase it a little bit

15  differently, right.  We are not elevating claims here.  And

16  somebody may say I'm splitting hairs, but I don't think we're

17  elevating claims.

18         We're asking to use estate proceeds to buy tail

19  insurance to prevent claims and I think a debtor is allowed

20  to do that.  A debtor is allowed to do that if there is

21  sufficient evidence that the business judgment was exercised

22  correctly for reaching that conclusion based on the costs,

23  the delay, the expense.

24         And, again, the other thing that I wanted to

25  mention that we haven't talked about yet is not just the

1   impact on the doctors and the residents, but the impact on

2   the medical community.  We have patients here, whether the

3   doctor left pre-priority period, and, remember, Your Honor,

4   we're not talking about any doctors that worked with

5   Hahnemann -- excuse me -- when Tower owned the hospitals;

6   we're only talking about coverage for the doctors during the

7   debtors' stint, which was not that long -- 18 months.

8           So, these are not people that left five years,

9   ago, right.  The latest somebody could have left was 18

10  months before the petition date, right.

11          THE COURT:  That's right.

12          MR. MINUTI:  Somebody who was operated on 18

13  months before the petition date, if there's that insurance

14  coverage for their claim, they're no different than somebody

15  who was operated on during the priority period or somebody

16  that was operated on by the post-petition date.

17          The impact on those people and the medical

18  community will be significant and I think a Court can take

19  into consideration the impact on the medical community in a

20  case like this -- a hospital case -- which, as Mr. Wilen

21  said, is a little unique.  We're not talking about the

22  manufacturing of widgets.  We're not talking about shutting

23  down a factory.

24          We're talking about healthcare institutions, Your

25  Honor, and the impact is much broader than just whether a

1  doctor here is covered or not covered.  And as Mr. Wilen

2  said, some of these claims may not manifest themselves for

3  years.  We delivered babies post-petition.  You're going to

4  be retired tomorrow or in a week, Your Honor.  I'm going to

5  be retired in a few years.  These claims may occur way before

6  you and I have long forgotten about this case, and we have to

7  be mindful of that, and I think it's a correct exercise of

8  business judgment on the part of Mr. Wilen and

9  Mr. (Indiscernible) when they take that into account when

10 they can look at the costs of this program, okay.

11         So, we talked about -- when we turn to the Martin

12 factors, we talked about the probability of success, the fact

13 that there was no slam dunk here in terms of the outcome of

14 the motions.  We talked about the complex issues and the cost

15 and delay, and we talked, really, about what's best for these

16 estates, Your Honor.  And at the end of the day the business

17 judgment here is that we can do away with all of those costs,

18 distractions, fighting by paying for this tail coverage.

19         And, again, while we appreciate that the cost is

20 significant, the debtors firmly believe that approval of the

21 motion and the purchase of the tail is what's best for these

22 estates and these creditors.  I mean providing tail coverage

23 under these facts is simply the right thing to do.

24         The hardships suffered -- I mean, and here's where

25 maybe I disagree a little bit, right -- each vendor, each

1   creditor of this estate prepetition has suffered harm.

2   There's no question about that, okay.

3          But we can look at each individual creditor and

4   decide that the hardship somebody suffered is a little bit

5   different.  Maybe it's based on the magnitude of their claim,

6   the kind of claim.

7          But look at what we're talking about here.  We're

8   talking about primary residents.  We're talking about some

9   doctors -- I'll talk about them in a minute -- but we're

10  talking about primary residents.  Now, these are young

11  people, many of whom probably have student loans, many of

12  which moved their families to Philadelphia, rented

13  apartments, became part of the community, and literally right

14  around the time that their education started -- whoops, we're

15  closing Hahnemann down, too bad for you.

16          THE COURT:  Yeah.

17          MR. MINUTI:  Now, they've got to scramble and go

18  somewhere else, right.  What are they going to do about their

19  student loans?  Are they going to land somewhere?

20          The hardship there, compared to what I'll call the

21  average unsecured creditor, is much different, Your Honor.

22  And I don't want to belittle anybody's claim or the hardship

23  they felt, but I think you can appreciate that the residents,

24  the doctors have a greater hardship if they don't have

25  coverage here.

1           And, again, particularly with regard to the

2    residents, maybe some of these folks can't get coverage, but

3    for the debtor.  Maybe some of these folks can't pay for the

4    additional coverage in light of the burden they already have.

5           And we wanted to create a distinction, Your Honor,

6    or I think the committee would like to create a distinction,

7    and I think it's natural, a distinction between former

8    doctors and former residents, right.  We can all feel bad for

9    the residents of who they are and how much money they make

10   and so on, and you would say, Yeah, but the doctors are in a

11   different position; they're doctors, they can afford to pay

12   this.

13          Well, the answer to that is:  It's probably true

14   for some, but it's not true for all, Your Honor.  How many

15   know there's an issue?  How many are able to get replacement

16   insurance?  Who am I to say that they can afford to pay that

17   additional replacement insurance?

18          But it gets back to what I already talked about,

19   which is that doctor is going to want to file a claim here

20   and we're going to want to fight in that claim and we're

21   going to pay some money to fight that claim, okay.

22          When you really look at the committee's response

23   here and you really look at the cross-examination, Your

24   Honor, it seems to me that there's a clear, sort of

25   bifurcation of what they're really focused on.  And one of

1  the things they're really focused on, I think, is the former

2  doctors, right; those doctors who left before the petition

3  date.

4          THE COURT:  Right.

5          MR. MINUTI:  These are people that don't really

6  have a good argument that they have a priority claim.  These

7  are people that don't have an argument that have an

8  administrative claim.

9          Why do we have to cover those people, okay?  And

10  that's what I think the real issue is, I think, for the

11  committee.

12          And I think the answer to that, Your Honor, is as

13  follows.  Number one, when you really parse it out, on the

14  Hahnemann side it's about 12 doctors -- 12; that's what the

15  testimony was, all right.  Number two, we were unable to get

16  a quote from the PARRG that parsed that out, okay.

17          THE COURT:  Right.

18          MR. MINUTI:  So, we don't have the ability to buy

19  coverage for less than all doctors right now as we sit here

20  today and I don't know if we'd ever be able it get that,

21  right.

22          Number three, when you really drill down and start

23  talking about the costs and you do the math, as Mr. Wilen

24  said, you're not talking about a lot of money here, all

25  right.

1          The other thing we talked about was the -- what

2    about the residents or what about the doctors at St. Chris?

3    And it very well may be, Your Honor, if these estates aren't

4    consolidated and we allocate those St. Chris sale proceeds,

5    it very well may be that some of the practice groups at St.

6    Chris will pay claims on a hundred-cent basis.

7          So, the doctors, the former doctors at St. Chris,

8    who, but for this motion, will be uncovered, they may have

9    one-hundred-percent prepetition claims, right?

10          But we're really talking about the doctors, the 12

11   doctors we were talking about at Hahnemann, Your Honor;

12   that's what we're really talking about.  Now, let's focus on

13   all of the doctors themselves, right.  The total costs of the

14   separate quote we got for a physicians' loan was $3.7

15   million, okay.  That's everybody -- pre, priority, post --

16   $3.7 million.

17          Remember, the RRG has given us a 30-percent

18   credit, right?

19          THE COURT:  Yes.

20          MR. MINUTI:  So, if we buy something less, we get

21   less money from them.  So, when you factor in the credit that

22   the RRG has given us, right, that number comes down, right.

23          Now, let's factor in the credit we're getting for

24   the last payment for the extension, the $487,500.  If we buy

25   less than full coverage, we only get part of that credit.

1          So, here's my point, Your Honor.  When you really

2     get down to it, after you do the math, and you take into

3     account the credits that we're receiving -- there's one other

4     thing I should mention, Your Honor.  Your Honor may remember,

5     and I mentioned this before, that Dr. Moulick had filed a

6     motion --

7          THE COURT:  Yes.

8          MR. MINUTI:  -- to pay an administrative claim and

9     part of what he wanted was tail coverage.

10         We've reached a settlement that we have to file a

11    stipulation on with the Court, but we've reached a settlement

12    that the committee has not objected to, and we've agreed that

13    we're either going to cover Dr. Moulick, a tail for

14    Dr. Moulick, either as part of this motion if Your Honor

15    agrees to that or we're going to buy one separately for

16    Dr. Moulick.

17         He was a heart surgeon that operated on babies.

18    As you can imagine, his coverage is pretty expensive; it's

19    $92,000.  So, win or lose today, we're going to have to spend

20    that $92,000.  So, I think you have to take that into

21    account, as well.

22         So, after you factor in the credits and the

23    additional credits we get for buying the full coverage, when

24    we're talking about the doctors, we get down to about $2.3

25    million -- $2.3 million.  Now, the split of the doctors, pre

1  and post, prepetition, we're talking about 47 percent, all

2  right.  And I'm going through this, because this is kind of

3  the math that Mr. Raub (ph) and Mr. Wilen went through.

4        All right.  So, a little less -- a little more

5  than half, right, our post-petition; a little less than half

6  for prepetition.

7        So, really, went you get down to it at the end of

8  the day -- and this is what Mr. Wilen said -- it's about a

9  million dollars, Your Honor; a million dollars you're paying

10 for all the prepetition docs, if you could break it down that

11 way or do the math, all right.  So, a million dollars --

12 again, a lot of money; certainly a lot of money in my book --

13 but not in the context of this case and the impact upon the

14 medical community that will be if we don't cover those

15 doctors.

16       Dealing with those doctors, the claims that those

17 doctors will file in this case, the fighting with them, the

18 delay, the business judgment of this debtor is that that

19 million dollars, Your Honor, is better spent making sure the

20 Philadelphia community is protected, those doctors have

21 coverage, and we move on.

22       Next, Your Honor, the committee quarrels with this

23 idea that we are using funds from some debtors to pay

24 obligations of other debtors.

25            THE COURT:  Yes.

1           MR. MINUTI:  And, here, Your Honor, I think it's a

2  little bit of a timing issue, right.  It is too early in this

3  case for the debtor or the committee to know whether, at the

4  end of the day, we're going to consolidate these debtors or

5  ask for these debtors to be consolidated, okay.  I think we

6  all want to keep our options open because we're all going to

7  decide later what we think is in the best interests of these

8  estates and I'd be shocked if the committee and the debtors

9  are not going to be hand-in-hand in that ultimate decision in

10  terms of where we want to go.

11          But we have a timing problem.  We can't wait until

12  then, okay.  And we don't want to prejudge the issue and

13  decide it now.

14          Now, the committee wants to say, Well, Judge, but

15  doing this today, you're essentially going to substantively

16  consolidate and I don't believe that's the case, because that

17  issue can remain open until later.  The debtors have an

18  obligation to sort of keep track of the separate funds, which

19  the debtors can figure that out or if we ever need to get

20  there, we can keep track of who paid what.

21          And so, where we are today, Your Honor, is, we are

22  in a situation where prepetition and post-petition, all the

23  money went into one bucket and all the money that is going

24  out of that bucket to pay all the claims in these cases, all

25  the administrative claims in these cases.  And what we're

1  asking is, Your Honor, to use the funds that are in the same

2  bucket to pay for this expense like we paid for all other

3  expenses in this cases.  No different, Your Honor.

4        No one can say today at the end of the day that if

5  we ultimately decide not to consolidate these cases, whether

6  one debtor is administratively insolvent or one debtor is not

7  administratively insolvent, we don't know as we sit here

8  today.  But we have a practical problem, which is that we

9  can't wait for that decision.  Nobody wants to hastily make

10 that decision.  And we're confronted with the problem today

11 of we need to get these folks covered.  We don't want to keep

12 extending, extending, extending the coverage because we'll

13 spend as much to extend it than it would be to buy the tail.

14        THE COURT:  But if you're wrong, there won't be

15 funds available to make up the difference, if you will, from

16 one debtor to the other, right, because some of the debtors

17 don't have any funds.

18        MR. MINUTI:  Well, Your Honor, as I sit here

19 today, I don't know that.  And here's why I say I don't know

20 that, I don't know whether a practice group, who maybe on

21 paper today has no money, I don't know whether that practice

22 group has a claim that's going to be pursued against a

23 nondebtor, for example, down the road.  I don't know that.

24        We talked a little bit earlier about the St. Chris

25 sale proceeds, right.  I don't know how much of the St. Chris

1  sale proceeds should be allocated to those practice groups.

2  So, I don't know where those practice groups are going to end

3  up at the end of the day.

4          So, I think it's anybody's guess.  It's anybody's

5  speculation.  But I think we ought to treat this obligation,

6  this desire to pay, this business judgment no different than

7  the business judgment to pay any of the other expenses in

8  this case going forward because it's in the best interests of

9  these estates and that's what's best for these debtors.

10          So, Your Honor, we believe we've made our case to

11  exercise the business judgment, and I'll just conclude with

12  the following, Your Honor.  There were times in this case --

13  and I think Your Honor's sensed this -- when we weren't sure

14  we were going to make it to the next day in terms of cash --

15          THE COURT:  Yes.

16          MR. MINUTI:  -- let alone next week or let alone

17  to the sale of St. Chris.

18          Through the hard work, primarily, of Mr. Wilen and

19  his team, Mr. Raub.  We really scratched, crawled, and fought

20  our way to get to the St. Christopher's closing; sort of

21  robbing Peter to pay Paul along the way, but we got there,

22  Your Honor.

23          As we sit here today, we sold St. Chris.  We've

24  made sure that healthcare provider will continue.  We've

25  improved our collections.  We settled with Tenet and Conifer.

1   We're sitting on a lot more cash and there were days in this

2   case where nobody would have dreamed we would be sitting on

3   that cash.

4            We have the funds to get to a plan.  We have the

5   funds to pay all the administrative claims in this case, Your

6   Honor.  And we have the funds to put forth a process where

7   the committee can do its investigation, all claims are

8   preserved.  If there are claims to be brought here, if there

9   are revival claims at the end of the day to be brought, we

10  are going to have a mechanism in this case for those to be

11  pursued.

12           I think we should all be proud of those goals that

13  we've accomplished, how we put ourselves in a position to do

14  what we're going to do in this case going forward.

15           The difficult part of this case should be behind

16  us, right.  But we have a problem in this case -- it's a

17  problem that we've had since day one -- and that's the

18  insurance coverage case.

19           THE COURT:  Yeah.

20           MR. MINUTI:  Today is the day to put that behind

21  us, to take care of that problem, to ensure that our doctors

22  and residents and hospitals are covered, to ensures patients

23  are covered, Your Honor, and to pay the funds -- maybe we're

24  paying a little bit, you know, that otherwise might be there

25  at the end of the day for another creditor -- but, overall,

1  the good we're doing to help these estates is worth it.

2           That's why Mr. Wilen and Mr. (Indiscernible)

3  exercised their business judgment the way they did, and we'd

4  ask that Your Honor approve the motion.

5           THE COURT:  Thank you, Mr. Minuti.

6           MR. MINUTI:  Thank you, Your Honor.

7           THE COURT:  Yes -- Ms. Uhland, yes?

8           MS. UHLAND:  I wanted to speak in support of the

9  motion if now would be appropriate?

10          THE COURT:  That would be -- yes, why don't you.

11 Yes, please.

12          Good afternoon.

13          MS. UHLAND:  Good afternoon, Your Honor.

14          Suzzanne Uhland of O'Melveny & Myers on behalf of

15 the nondebtors and the nondebtor entities, I'm going to walk

16 through them in a bit, but we definitely support the debtors'

17 motion.  We believe that obtaining the coverage is in the

18 best interests of not only the estate, but as Mr. Minuti

19 said, The medical community and the community at large.

20          There's been some discussion of the RRG --

21          THE COURT:  Yes.

22          MS. UHLAND:  -- and I thought I would just --

23 without my org chart -- briefly explain that the RRG is what

24 they call a "captive insurance company."

25          So, PAHH, which is a nondebtor, is the parent

1  company of PAHS, the primary hospital debtor.

2          THE COURT:  Right.

3          MS. UHLAND:  And they formed, at the time of the

4  acquisition, the RRG, as a captive insurance.  It's 90-

5  percent owned by PAHH, the nondebtor, 10 percent by the

6  debtor.

7          The reason that hospital groups form captive

8  insurance companies is that insurance companies, private

9  insurance companies charge a substantial margin for the

10 insurance and a captive insurance company is able to provide

11 the coverage without that margin, and, therefore, is much

12 cheaper coverage, in general.

13         Now, when the Court sent out its order to show

14 cause and we all became very focused on the insurance issue,

15 my clients, PHH, Joel Friedman, who's the ultimate owner, and

16 the RRG, also wanted to figure out how we could be part of

17 the solution here in enabling this situation to be addressed

18 and how do we address this insurance situation.

19         And when we first started discussing with the

20 debtors, the question was, Well, would there just be a cash

21 contribution?  And we were discussing, would there be some

22 way to use the fact that we have this captive to make it a

23 more cost-effective way to provide this coverage, because,

24 otherwise, frankly, this captive would have just wound down.

25         So, what we did is we established, you know, we

1   reviewed the policies, worked with the debtors to come up

2   with the right policy and provided them a quote that, based

3   on our market testing, is about 25 percent less than it would

4   have obtained from a third-party private policy.  In

5   addition, as part of this process, we looked at the RRG to

6   see whether there was any capital surplus and even though

7   that capital surplus would have been 90-percent owned by

8   PAHH, we said, Well, no, PHH will contribute its capital

9   surplus to the situation to provide the credit.

10          So, roughly, Your Honor, what the debtors are

11  getting is about $12 million worth of coverage for $6

12  million, as a result of this, by virtue of the contributions

13  being made by PHH, you know, through this process.

14          Now, because, you know, the debtors understandably

15  wanted clarity that it was only going to be $6 million, and

16  we won't know for 120 days for certain whether we can give

17  the premium credit, PHH is arranging for an escrow to be

18  posted so that that escrow, the premium credit will be -- the

19  premium will be paid through that escrow if the premium

20  credit is not available.

21          THE COURT:  Okay.

22          MS. UHLAND:  So, the nine-million-dollar policy is

23  definitely a nine-million-dollar policy that they're getting

24  for six, because the money has to be funded by the escrow

25  that's going to be set up this week before the current policy

1    expires.

2            So, Your Honor, in response to some of the

3    committee's comments, you know, it is a -- you know, it is in

4    the best interests of the estate, but one way the Court can

5    look at this is, the Court -- the $6 million or so of value

6    that's being contributed by the nondebtors through this

7    process is helping, you know, interest beyond those of just

8    the estate.  And maybe the Court could even look at it that,

9    you know, just as I was sitting there thinking, maybe it's

10   the -- maybe the nondebtors are really funding the former

11   residents who have, you know, no longer have coverage.  I

12   mean, there are many different ways of allocating it, but it

13   just seems to me that it's really the debtor and the

14   nondebtors who are coming together, putting their finances

15   together to solve this issue for the benefit of both, the

16   estates and the community and I would, you know, just ask the

17   Court to keep that in perspective.

18           And in considering the debtors' business judgment,

19   given the value that they're getting from this, I think it

20   makes it even an easier call.  I think Mr. Minuti pointed out

21   some of the credits, again, that we're providing -- or that

22   the nondebtors are providing here.  So, it's just a situation

23   where I think it's certainly appropriate for the Court to

24   defer to the debtors' business judgment and, again, we

25   encourage that the Court approve this motion.

1          THE COURT:  All right.  Thank you, Ms. Uhland.

2          Mr. Ryan?

3          MR. RYAN:  Good afternoon, Your Honor.

4          Jeremy Ryan, again, on behalf of the ad hoc

5    committee of residents and fellows.

6          THE COURT:  Yes.

7          MR. RYAN:  We rise, obviously, to support this

8    motion.  Your Honor, it's been mentioned, but, you know,

9    these are people, very young people at the very beginning of

10   their careers.  You know, some of them have faced quotes that

11   were up to $75,000 that they had no way of doing.  And even

12   those who had smaller quotes, you know, they don't have a lot

13   of money.

14         We got a lot of emails that said, I don't think

15   I'm going to be doing this.  How am I going to continue my

16   medical career?

17         You know, there were a couple of orphans who

18   weren't able to get placed.  You know, we got emails from the

19   committee that said, I'm on Unemployment.  It runs out next

20   week.  We're going on food stamps.  How am I ever going to

21   get a tail if I can't even put food on my family's table?

22         So, those are the problems that these people faced

23   and, you know, that's what brought us to file the motion,

24   Your Honor, is to not end the careers of so many people.

25   Foreign medical students were going to have to cease their

1  education in America and go back to their countries not as

2  well-trained as they could have been.

3          So, we filed the motion and then Your Honor issued

4  the rule to show cause.  And to the debtors' credit, you

5  know, they immediately appreciated the gravity of the Court's

6  concerns and the gravity of the problem that faced them.

7  They worked very hard for a very long time of.

8          The reason we're here in March and we didn't come

9  back in December and we didn't come back in January and we

10  didn't come back in February was because we all knew that it

11  was worth the time.  That we knew that if we went to a

12  hearing, this, this case was going to convert and nobody

13  would have won.

14          This is a result that is far better for all

15  constituents, not just mine, to stay in Chapter 11, and this

16  is the moment that allows these cases to stay in Chapter 11.

17  So, with that, Your Honor, we would urge Your Honor to

18  approve the settlement.

19          THE COURT:  All right.  Mr. Ryan, thank you:

20          MR. RYAN:  Thank you, Your Honor.

21          THE COURT:  Mr. Barkasy, good afternoon.

22          MR. BARKASY:  Good afternoon, Your Honor.

23          Rich Barkasy, from Schnader Harrison --

24          THE COURT:  Yes.

25          MR. BARKASY:  -- on behalf of the Pennsylvania

1  Department of Health.

2          THE COURT:  Yes.

3          MR. BARKASY:  I wanted to state that the

4  Pennsylvania Department of Health supports this motion.  The

5  Pennsylvania Department of Health filed its motion to compel

6  seeking to require the debtors to provide the tail coverage

7  and this motion achieves that purpose.

8          The Pennsylvania Department of Health is

9  chartered, required to seek out to protect the public health

10  in Pennsylvania and it has concerns about the tail coverage

11  and the necessity of tail coverage to protect the public.

12          We have patients -- Hahnemann,

13  St. Christopher's -- lots and lots and lots of patients --

14          THE COURT:  Yes.

15          MR. BARKASY:  -- who, if this is not granted, are

16  going to be left without a meaningful source of recovery to

17  the extent that there was any problem with the medical care

18  or treatment that they received at those institutions and the

19  Department of Health is extraordinarily concerned about that.

20          It's also concerned about what will happen if

21  there are physicians and residents who are not going be able

22  to practice medicine in Pennsylvania because they don't have

23  a license at a time when there's a shortage of doctors in the

24  Commonwealth of Pennsylvania.  That is a very real problem.

25          We think that, and as we set out in our papers, we

1  think that there is recognition embedded in the Code of the

2  requirement of the debtors to purchase insurance not only to

3  prevent risk to the estate, but also to prevent risk to the

4  public.  Section 1112 mentions, as cause for conversion or

5  dismissal, failure to provide adequate insurance coverage for

6  risks posed to the public.  And we think that the Code

7  mandates, in this circumstance, tail insurance coverage to be

8  purchased or that the case be converted, frankly.

9           Also, as set forth in our papers, the Department

10  of Health believes that the debtors are required to purchase

11  this coverage under Pennsylvania law.  I won't repeat, again,

12  the arguments in our motion and in our reply.

13           Thank you, Your Honor.

14           THE COURT:  Mr. Barkasy, thank you.  Thank you

15  very much for your involvement here.

16           Mr. Carickhoff, yes?

17           MR. CARICKHOFF:  Good afternoon, Your Honor.

18           May I please the Court?  David Carickhoff of

19  Archer & Greiner.

20           THE COURT:  Yes?

21           MR. CARICKHOFF:  Your Honor, I've been here on a

22  couple of different occasions and lost on both prior counts

23  and I've got to tell you that I really like having Mr. Minuti

24  making the arguments on the side that I'd like to win and I

25  thought he did an excellent job doing it.

1          THE COURT:  Yes.

2          MR. CARICKHOFF:  So, I speak on behalf of two

3  different client groups that have been here before.  One was

4  a former group of physicians under the Hahnemann umbrella and

5  the other group was here more recently in connection with the

6  St. Christopher sale and trying to deal with the tail

7  coverage in that perspective.

8          I think as Your Honor looks at these issues

9  through both, the business judgment lens and the 9019 lens, I

10 think you've heard more than enough evidence and testimony to

11 be able to approve it on those counts.  And I think that the

12 points made regarding this being somewhat of a unique case,

13 you're really preventing what could otherwise be a public

14 health crisis here --

15         THE COURT:  Yes.

16         MR. CARICKHOFF:  -- and I know that's not lost on

17 Your Honor.

18         So, I just stand in support of the motion and to

19 compliment the debtors and their professionals and Mr. Wilen

20 and his team in getting them to this point and thank you.  I

21 hope Your Honor approves the motion.

22         THE COURT:  Thank you, Mr. Carickhoff.

23         Anyone else in favor?

24      (No verbal response)

25         THE COURT:  Hearing no one, now, Mr. Sherman --

1  now you're up.

2        MR. SHERMAN:  Thank you, Your Honor.

3        It's like having the room against me in a certain

4  respect, but we'll do the best we can.

5        THE COURT:  I was alone many times in court, so I

6  know how you feel.

7     (Laughter)

8        MR. SHERMAN:  Let me start, Your Honor, because I

9  think the Court should understand the perspective of the

10  general unsecured creditors in these cases, because we've

11  heard a lot about the plight of the residents and the former

12  doctors, but at the same time, Judge, these debtors operated

13  only for a short period of 18 months.

14        THE COURT:  Yes.

15        MR. SHERMAN:  And during that short period of 18

16  months, accumulated tens of millions of dollars' worth of

17  debt and that debt, really -- and when you sort of think

18  about what happened in this case, MidCap financed the

19  operation in certain respects, but to the extent that there

20  wasn't enough liquidity there, the unsecured creditors really

21  financed the balance of the operations, simply because of the

22  accumulation of debt.

23        So, in its short window of operations,

24  Ms. Uhland's clients over there, when they operated this,

25  right, accumulated a significant amount of debt and then

1  created the problem we're here today and just using her

2  numbers, right -- we're having lawyers do math, right -- if

3  it's a twelve-million-dollar problem that was created by

4  former management, whoever was running this operation at the

5  time by not making the -- you know, not providing the

6  coverage, as required in the contracts, and then coming and

7  saying, Well, we're hoping by six and then laying six back on

8  your hands.

9        That's just really inequitable if somebody were to

10 come up and say, Well, I created a twelve-million-dollar

11 problem and now I'm only fixing half of it and the other half

12 has to be borne by your constituents, because that's the crux

13 of the committee's concerns here, Your Honor.

14       Everybody has identified the problem.  The problem

15 here is at the beginning of the -- when these hospitals

16 operated, what they said and did didn't match, right.  The

17 contracts said one, the conduct made the other.

18       Mr. Barkasy comes up here from the Department of

19 Health and says how wonderful this is, right.  The State

20 licensing board, when they came and granted the licensing

21 here, they could have fixed this problem, too.  They could

22 have simply said, If you want to operate, then have a claim.

23 Make me an assurance that there's going to be a tail or give

24 me an occurrence base -- give me the proof.

25       That didn't happen, though.  So, all these bad

1  things happened in this case -- the accumulation of debt, the

2  failure to obtain the right coverage -- and now everybody is

3  here saying sunshine and roses that they fixed it.  Well,

4  they fixed it on the backs of the general unsecured

5  creditors, Judge.

6          That's the most difficult thing to appreciate here

7  is, yes, there was a problem, but my client didn't take that

8  risk, right.  The general unsecured creditors, when they

9  extended credit to these debtors, it wasn't like, Oh, well,

10 you know, get paid and by the way, you're going to pay a

11 tail.

12          And then we enter into bankruptcy, right, where

13 the idea of bankruptcy is equality and ratable distribution,

14 right.  That's as most basic as it gets.

15          And now it's salt in the wound because that

16 ratable distribution that Congress envisioned and the Supreme

17 Court mandated has not happened here and that's the most

18 difficult.  It's a thorny issue, Judge.

19          I completely appreciate the last day Your Honor

20 has to sit up on that esteemed bench after your incredibly

21 storied career and have to deal with something which --

22          THE COURT:  Well, let me ask you this,

23 Mr. Sherman --

24          MR. SHERMAN:  Uh-huh.

25          THE COURT:  -- assume for a moment that without

1  insurance I would convert the cases --

2           MR. SHERMAN:  Uh-huh.

3           THE COURT:  -- to Chapter 7 cases.  Aren't the

4  unsecured creditors better off inside of the Chapter 11 case

5  than in a Chapter 7 case?

6           MR. SHERMAN:  In that equation, the answer is yes,

7  Your Honor.  But, again, we didn't get a chance to --

8           THE COURT:  No, I know.

9           MR. SHERMAN:  Because you sort of have to think

10  about insurance and Mr. Minuti, you know -- and I will

11  compliment him; as always, he's just, you know, incredibly

12  good at what he does --

13          THE COURT:  Yes, he is.

14          MR. SHERMAN:  -- but, you know, he made the point

15  which is it's in the interest of all creditors to be in --

16  because the insurance is, as we sit here now, the debtors are

17  insured and the way I read Pennsylvania law -- and we

18  discussed this a couple of months ago when we were here --

19  the way the statutes read is the healthcare provider must

20  have insurance.

21          THE COURT:  Right.

22          MR. SHERMAN:  There's nothing in the statute that

23  says that a healthcare provider, when it ceases to be a

24  healthcare provider must maintain tail insurance.  It's just

25  not there.

1          People are reading into it and doing gymnastics to

2   get there and that's the debtor -- the debtor's own brief

3   said it, Judge, right.  They filed a pleading on, I think,

4   January 2nd, which was consistent with the committee's

5   submission, which basically, I think, articulated

6   Pennsylvania law.

7          And I don't know how Your Honor wants to rule or

8   when Your Honor rules of whether you want to step into what

9   you believe Pennsylvania law says, but it does -- the

10  statute, we can read it again -- I remember reading it

11  multiple times -- it says a healthcare provider shall provide

12  coverage.  That's it, period, full stop.

13         And it has a claims-made provision and then the

14  gymnastics we got to was what does an insurer have to

15  provide?  Because that's the way that it got linked together.

16         THE COURT:  Well, the at the time that the

17  petitions were filed --

18         MR. SHERMAN:  Uh-huh.

19         THE COURT:  -- they were a healthcare provider.

20         MR. SHERMAN:  They were and they then they ceased

21  to be when their license was terminated, and at that point in

22  time, I'm not sure that the statute continues to apply once

23  the license was terminated, and that happened post-petition.

24         And then if you want to develop it even more, Your

25  Honor -- I can continue to unpeel that onion, which I'm happy

1   to do -- the entity that you would -- who would have had the

2   license in this instance, it would have been Center City,

3   LLC.

4           THE COURT:  Yes.

5           MR. SHERMAN:  So, if you went down a conversion

6   road, you know, you wouldn't take the bathwater with the

7   baby, you would just simply -- again, if Your Honor was even

8   thinking about that, but you'd only have to think about that

9   specific entity and not the other debtors, right.

10          St. Chris, itself, had a successful sale.  We

11  talked about having all of these proceeds that came in.

12          THE COURT:  Yes.

13          MR. SHERMAN:  So, there could be a way of

14  converting one if Your Honor thought there was a lack of

15  insurance, retaining the others under Chapter 11.  And I

16  don't know if Your Honor thought of that when Your Honor

17  issued --

18          THE COURT:  I've thought of all kinds of things,

19  frankly.

20          MR. SHERMAN:  Right.

21          THE COURT:  I was -- I wanted to get some

22  movement, frankly.

23          MR. SHERMAN:  And you got it, Judge.

24          THE COURT:  Yeah.

25          MR. SHERMAN:  So, play that out, right.  So, you

1 got movement.

2          So, then the question is:  Who bears the harm,

3 right?

4          We talked earlier, remember with the DIP and the

5 MidCap and I said the Hippocratic Oath, right -- do no

6 harm --

7          THE COURT:  Yes.

8          MR. SHERMAN:  -- right?  I'm back to that, again,

9 Judge -- is do the minimum amount of harm to general

10 unsecured creditors.

11          And that was sort of where Mr. Minuti was sort of

12 discussing is, how do you balance the doctors against the

13 trades?  And we talked about a 3.7-million-dollar number as

14 far as insuring the doctors; part of that was pre, part of

15 that was post.

16          THE COURT:  Right.

17          MR. SHERMAN:  But why would the prepetition

18 doctors -- and I'm looping them altogether, including

19 priority -- why are their claims being elevated from the

20 vendor that provided drugs or food or sheets or medicine,

21 whatever is typically provided or other doctors?

22          I mean, that's the thing, Judge.  If you sort of

23 break down doctors here, right, there are other doctor groups

24 that aren't getting paid.

25          THE COURT:  Yes.

1            MR. SHERMAN:  You know, in this tens of millions

2  of dollars of unsecured creditors, you're create -- not

3  you -- the effect of the motion, Judge, would be to create

4  priorities within classes of general -- a class of general

5  unsecured creditors.  So, doctors -- doctor groups would be

6  treated differently.

7            So, doctors that had their own doctor group,

8  instead individually employed by the hospital, wouldn't have

9  the benefit of this, wouldn't have their claims paid in full.

10 Certain of the doctors would.

11           So, inherently, we're now has addressing problems

12 that sort of the Supreme Court in Jevic * and, otherwise,

13 said you shouldn't be doing.

14           And I understand the intricacies of tail coverage,

15 Judge; again, it's not lost on the committee that the harm to

16 residents and otherwise.  And that's what we tried to sort of

17 break out when we filed the response was to articulate these

18 issues for the Court, because if a member of our class calls

19 us and says, I provided goods or services to St. Chris and it

20 sold its assets for $50 million and then Mr. Wilen and his

21 team did a great job and did collections for all those

22 St. Chris receivables and St. Chris should have all this

23 money, what's my dividend going to be on St. Chris?

24           And we're going to explain that, Well, some of

25 that proceeds went out to go fund tail coverage and there's

1  not going to be as much there on the St. Chris and say, Wait

2  a minute, I never signed up to pay for tail coverage for the

3  Hahnemann docs or the Hahnemann residents.

4          So, that's the problem when you look at all

5  unsecured creditors as a whole and the fact that all should

6  be treated similarly, it's just not happening and that's --

7  maybe that's the inherent problem with this issue is there's

8  just no way to parse it out, but that's the effect, Judge.

9          And the other point, Your Honor, and the one you

10 made, which is if the receivables from is St. Chris are being

11 paid for the doctor group, the TPG group --

12          THE COURT:  Yes.

13          MR. SHERMAN:  -- and the TPG group, which wasn't

14 sold -- I mean, Mr. Minuti was artful in when he talked about

15 the St. Chris doctor groups being sold; however, the doctor

16 groups that are benefitting or the doctor entities -- I'm

17 sorry -- the physician groups that are being benefited by

18 this are the Hahnemann entities which closed and weren't

19 sold.  So, there is no sale proceeds over there.

20          So, inherently, if the motion is granted and we're

21 down the road of doing a plan, it's going to take some heavy

22 thinking and heavy lifting, as far as how to try to equalize

23 out this pot, but, inherently, it's being skewed and that's

24 what we're trying to flag for the Court.

25          And I imagine Your Honor knew this and understood

1   it and this happens in a multi-debtor case like this with

2   physician practices.  And it's also worse in this case,

3   Judge -- and I go back to so forth the general unsecured

4   perspective, creditors' perspective -- since the OptCo/PropCo

5   structure here --

6                THE COURT:  Yes.

7                MR. SHERMAN:  -- was created and the real estate

8   entities didn't come into bankruptcy, it just created another

9   level of complexity and potential harm for general unsecured

10  creditors because I'm not sure what everybody knew when they

11  were extending credit, but we're here now, Judge, with

12  substantial real estate values on the non-debtor side --

13               THE COURT:  Yes.

14               MR. SHERMAN:  -- and, boy, would it be great to

15  have that value help solve some of these tail issues, right.

16  Because if all the entities went in, then it would be an

17  easier pill to swallow and right now we're swallowing, you

18  know, a very bitter --

19               THE COURT:  Yes.

20               MR. SHERMAN:  -- lemon if this happens.

21               So, you just sort of look at the amalgam of harm

22  that's being pushed down on the general unsecured creditors

23  here from the lack of ratable distribution to the payment of

24  prepetition claims, to the inability of paying back debtors,

25  there is a lot going on here, which is sort of unique to

1    these cases and not what you see in a typical Chapter 11

2    case.

3               THE COURT:  What would be the claim of a resident

4    who was unable to practice his trade, his profession, what

5    would his claim be?

6               MR. SHERMAN:  Well, I think it's --

7               THE COURT:  Is it loss of earnings over 30, 40

8    years?

9               MR. SHERMAN:  Well, let's break that down, Judge,

10   because --

11              THE COURT:  In other words, I think it would

12   dwarf -- I think these claims would dwarf even the trade

13   claims.

14              MR. SHERMAN:  Those claims are -- and, again, I

15   don't want to mitigate the harm to that individual, right; we

16   completely understand -- so I don't want to be callous in my

17   response.

18              THE COURT:  That's all right.  I asked the

19   question.

20              MR. SHERMAN:  And so, with that caveat, Judge, but

21   that harm could be abated by that individual buying his or

22   her own coverage.  So, the magnitude is not the career; the

23   magnitude is trying to find somebody to place a policy.

24              And under Pennsylvania law, I mean, that's sort of

25   where it's still the Department of Health here coming in and

1  saying they're pushing this on the debtor, this was a problem

2  of their making and the Department of Health and the

3  Department of Insurance, somebody could have fixed this,

4  Judge, right, is, as Mr. Wilen testified, right, lots of

5  people with alligator arms here, right.

6          THE COURT:  Yes.

7          MR. SHERMAN:  And, Oh, I'm not going to fix it,

8  and it all gets borne on the general unsecured creditors.

9  So, again, Judge, I'm -- I realize we're pushing a boulder up

10 a hill here, is just because of the equities that are --

11 appear to be in favor of granting this type of relief, but

12 those equities have a consequence and the harm to general

13 unsecured creditors, we're just not going to be able to pay

14 it back; although, collections have been good.

15          That would have been -- if we didn't have to pay

16 this tail coverage, it would have been more of a dividend and

17 less of a harm to general unsecured creditors than we talked

18 about before.

19          THE COURT:  Yeah.

20          MR. SHERMAN:  Thank you, Judge.

21          THE COURT:  All right.  Thank you, Mr. Sherman.

22          Any reply, Mr. Minuti?

23          MR. MINUTI:  Your Honor, just a couple of quick

24 points, Your Honor.

25          Point number one, you know, in a lot of these

1   cases you're sort of attempted to go back and say, What would

2   cause the problem?  Let's look at what the cause of the

3   problem is.

4            And I think there will be a right time to do

5   that --

6            THE COURT:  Yes.

7            MR. MINUTI:  -- you know, what caused this

8   problem --

9            THE COURT:  Yes.

10           MR. MINUTI:  -- but I think today is about

11  solutions and we have to find a solution to this problem.

12           You know, we didn't just say, Hey, let's spend

13  whatever money it costs and buy this.  You know, we went out,

14  we tried to figure out the most cost-effective way.  We

15  talked to anybody who would listen.  We tried to get people

16  to come to the table and we couldn't do that.

17           So, I can't do a lot about the cause today, I can

18  only deal with the solution, and the PARRG whether we like

19  it, you like it, anybody likes it, it's the cheapest, most-

20  effective way to accomplish what we're trying to accomplish

21  and that's where we are.

22           Point number two, Your Honor, you know, there's

23  certainly a lot of examples in a bankruptcy context, you

24  know, where you pay claims outside of the priority because

25  it's for the greater good.  You know, think of doctor

1  necessity, first day motions -- there's plenty of first day

2  motions --

3          THE COURT:  Yes.

4          MR. MINUTI:  -- where you pay outside of the

5  normal priority scheme because you think the greater good is

6  going to be served by doing that and it's really not much

7  different than what we're doing here.

8          We think the greater good is going to be served

9  and a big part of that greater good is the point Your Honor

10 just brought up a moment ago, which is what claims are going

11 to be created if we don't buy this tail coverage on the part

12 of our former doctors, our former residents, and the patients

13 who were serviced -- who were provided service at these

14 hospitals?

15         Nobody can answer that today.  Nobody is going to

16 be sure.  But what I think we can be sure is, we know with an

17 additional $6 million of expense, we can hopefully eliminate

18 those claims and move forward in these cases.

19         My final point, Your Honor, is just to correct

20 something that Mr. Sherman said, because I just think he's

21 wrong as a matter of law, this idea that once the hospital

22 ceased operating, they no longer had an obligation to provide

23 malpractice coverage.  And I'm just going to read to Your

24 Honor from 40 Pa. Stat. 1303.742 --

25         THE COURT:  Yes.

1          MR. MINUTI:  -- and that statute is entitled,

2   Approval of Policies on "Claims Made" Basis:

3          "The commissioner shall not approve a medical

4   professional liability insurance policy written on a "claims

5   made" basis by any insurer doing business in this

6   Commonwealth unless the insurer shall guarantee to the

7   commissioner the continued availability of suitable liability

8   protection for a health care provider subsequent to the

9   discontinuance of professional practice by the health care

10  provider..."

11         In other words, just because you stop providing

12  doesn't mean you can stop paying for insurance.  You have to

13  have insurance because of the claims level.  I mean, if you

14  think about it --

15         THE COURT:  Yes.

16         MR. MINUTI:  -- if you were a doctor and you

17  retired, you can't cancel your malpractice insurance the day

18  you retire.  So, the obligation continues, even though the

19  hospital is no longer in business, Your Honor --

20         THE COURT:  Yes.

21         MR. MINUTI:  -- and so, we will not be in

22  compliance with Pennsylvania law if we don't buy that

23  coverage for the hospital that we're proposing to buy,

24  pursuant to this.

25         So, for those reasons, Your Honor, again, we would

1  ask Your Honor to approve the motion.

2            THE COURT:  All right.  Thank you, Mr. Minuti.

3            Well, you know, I would like to rule today, but

4  I'm going to need about 15 or 20 minutes to collect my

5  thoughts, go through the notes or we could have a phone call

6  later, if you'd prefer.

7            What would you prefer, Mr. Minuti, 15 or 20

8  minutes or a call later?

9            MR. MINUTI:  Here's what I think, Your Honor, I

10  think we would benefit from a break, maybe even longer than

11  15 or 20 minutes.

12            THE COURT:  That's fine, yeah.

13            MR. MINUTI:  We have an issue with some language

14  to the order that the PARRG and the debtors are trying to

15  work out.

16            THE COURT:  Okay.

17            MR. MINUTI:  We're trying to work that out and

18  then we need time to discuss it with the committee, and it

19  could be, hopefully, we're all hand-in-hand, and if Your

20  Honor is inclined to grant the motion, then we'll just hand

21  up the order.

22            And there's certainly a possibility that we can't

23  reach agreement, we may have to ask Your Honor, if you're

24  inclined to grant the motion, to deal with the order, as

25  well.  So, I think we'd probably benefit --

1            THE COURT:  Three o'clock or 2:30 or three o'clock

2   is good?

3            MR. MINUTI:  Why don't we say let's be optimistic

4   and say 2:30.

5            THE COURT:  All right.  But if you need more time,

6   you'll call?

7            MR. MINUTI:  I will, Your Honor.

8            THE COURT:  All right.  So, we'll stand in recess

9   until 2:30.

10            MR. MINUTI:  Thank you, Your Honor.

11            THE COURT:  Thank you, everyone.

12       (Recess taken at 12:57 p.m.)

13       (Proceedings resumed at 3:18 p.m.)

14            THE COURT:  I like to tell people at the outset

15   what I am going to rule so that no one sits squirming and

16   wondering what the result will be.  I am going to grant the

17   motion.

18            Let me begin my comments with high, very high

19   praise for debtors and, in particular, Mr. Wilen and Mr.

20   Mezzaroba, their lawyers.

21            When I sent Mr. Minuti and Mr. Hampton, Ms.

22   DiSabatino, Mr. Isenberg and Mr. Applebaum off to obtain tail

23   insurance for physicians and nurses, I was fearful that it

24   was mission impossible.  But here we are today and debtors

25   return with the insurance and a proposed settlement of

1  motions filed by the ad hoc committee of Hahnemann residents

2  and fellows and the Commonwealth of Pennsylvania Department

3  of Health to compel the purchase of the insurance.

4          Debtors and, in particular, debtors' lawyers, as

5  they have done throughout this difficult and contentious

6  case, moved heaven and earth to obtain the insurance for

7  physicians and nurses and although they already had the

8  court's highest respect, the court admires their efforts.

9          What debtors did was critically important for the

10  physicians and nurses impacted by the absence of tail

11  insurance and, as well, for the City of Philadelphia and the

12  Commonwealth of Pennsylvania.  This is because without tail

13  insurance, these many physicians would not have been allowed

14  to practice medicine and that would have directly and

15  adversely weakened the delivery of healthcare in Philadelphia

16  and Pennsylvania.

17          Now, I also award high marks to the committee and

18  its lawyers who have been instrumental in moving the cases in

19  the right direction.  They have earned the court's respect.

20  The unsecured creditors committee has filed a response which

21  is in reality an objection to the settlement motion.  And the

22  committee has raised a number of significant concerns and the

23  court does not take those concerns lightly.  But here is what

24  the court wants to do.

25          The settlement requests extraordinary relief, and

1  this is an extraordinary situation.  It is unfortunate that

2  these debtors should alone be responsible to resolve, to pay

3  for themselves, the tail insurance.  This is particularly

4  true when the City of Philadelphia and the Commonwealth of

5  Pennsylvania will benefit from the debtors' purchase of tail

6  insurance.

7         Now, the City and the Commonwealth can rightly say

8  that we are in this situation because of debtors' disregard

9  of their contractual commitment, and debtors' purchase of

10 claim insurance, rather than occurrence insurance, is what

11 I'm talking about.  And that may true, but we are now in a

12 bankruptcy proceeding and neither the City nor the

13 Commonwealth is contributing to the settlement.  The debtors

14 are doing it alone.

15        As the court stated earlier, the court recognizes

16 the concerns which the committee raised to the settlement in

17 the response.  Further, the committee's points were

18 eloquently addressed in Mr. Sherman's oral presentation.

19        Now after almost fourteen years presiding over

20 many bankruptcy cases, the court appreciates that each

21 bankruptcy case is different and presents different

22 challenges and problems that need a solution.  This case is,

23 however, most extraordinary.  It involves the closure of a

24 major hospital in a major city, nearby Philadelphia, and the

25 sale of another hospital.

1          Debtors' management and their lawyers, in

2   conjunction with the committee and its lawyers, have brought

3   about wonderful results in the case.  And it is the court's

4   view that obtaining tail insurance for physicians, subject to

5   the court's approval, is an excellent result.

6          So, we have the creditor committee's response

7   objecting to the settlement on several grounds.  Why should

8   one of the debtors that has money pay for tail insurance for

9   physicians who worked for another debtor or other debtors?

10  And how about the absolute priority rule?  It is being

11  violated.  And, similarly, situated creditors are being

12  treated differently.  It is not easy or comfortable for the

13  court to overrule the committee's response.  But for reasons

14  espoused by debtors that is what the court will do.

15         The evidence principally showed that, thus far,

16  debtors have been functioning in combination with one

17  another.  Now that is not to say the debtors' estates should

18  or should not be substantively consolidated.  That is a

19  question, perhaps, to be answered in the future if it is

20  raised.  But it does answer the question which the committee

21  raised about money from one debtor being used to pay for the

22  insurance of physicians of another debtor.

23         And, insofar, as similarly situated creditors

24  being treated differently, we certainly try to avoid that

25  from happening, but the court does note that in the Supreme

1   Court's <u>Jevic</u> Opinion, the Supreme Court, at least, seemed to

2   endorse critical motion and those result in disparate

3   treatment of unsecured creditors.  And so, while the court is

4   troubled in this extraordinary case, it accepts the departure

5   from the norm.

6           Turning to the settlement.  The court finds that

7   debtors have satisfied Sections 105(a) and 363(b) of the

8   Bankruptcy Code and Rule 9019 of the bankruptcy rules.  First

9   of all, in obtaining the tail insurance at an excellent price

10  and receiving reductions from the insurer, debtors have

11  clearly properly exercised their business judgment to a full

12  degree.  In doing so, they satisfy Section 363(b).

13          There are myriad of cases holding such.  They

14  satisfy Section 105(a) by crafting a remedy that satisfies

15  what the Code was intended to accomplish.  Debtors have

16  eliminated costly and time-consuming issues over physician

17  claims and are satisfying Pennsylvania law which requires a

18  healthcare provider to provide tail insurance.

19          Debtors also have met the standards of Rule 9019.

20  It must be remembered that settlements are favored and the

21  settlement does not have to be at the high end of a result,

22  but just reasonable.  But the real test is a balancing one.

23  The court must value the claim against the value achieved in

24  settlement.  And that's the <u>In re Martin</u> decision 91 F.3d

25  389, at page 393, a decision of the Third Circuit in 1996.

1  And, here, it is clear to the court that in that balancing,

2  the value achieved is greater than the value given.

3           And the Martin decision also requires

4  consideration of four factors.  One, the probability of

5  success in the litigation; two, collection difficulties;

6  three, the complexity, expense and inconvenience of the

7  litigation and; four, the paramount interest of creditors.

8  It is clear to the court that the motions debtors are

9  settling lower the odds on success in the litigation.

10          They would have been very difficult for the

11  debtors, I think, to overcome.  Collection is not an issue in

12  this case.  The motions do raise difficult issues and would

13  be expensive and inconvenient to try and the interest of all

14  creditors in settling the motions is a given.  Therefore, the

15  court will grant the motion seeking authority to purchase the

16  specified professional liability tail insurance.

17          Last, the court will waive the fourteen-day stay,

18  thus, making its ruling and the order it will enter

19  immediately effective.

20          And that is my ruling.

21          Mr. Minuti.

22          MR. MINUTI:  Your Honor, thank you very much.  We

23  appreciate that ruling.

24          I think what would may be helpful if I could

25  explain to Your Honor the issue we're having coming to an

1  agreement on the order --

2           THE COURT:  Okay.

3           MR. MINUTI:  -- and then maybe Your Honor can give

4  us some guidance or not.

5           THE COURT:  All right, let me try.

6           UNIDENTIFIED SPEAKER:  Mr. Minuti, I have actually

7  -- maybe we could break first.  Some of the Judge's comments

8  gave me some ideas on some language.

9           MR. MINUTI:  I'm all for that, Your Honor.

10          THE COURT:  Did you want to take a break, is that

11 it, Ms. Miller?

12          MS. MILLER:  Yes, Your Honor.

13          THE COURT:  Let's take a break.  Okay.

14          MR. MINUTI:  Thank you, Your Honor.

15          THE COURT:  Call me when you're ready.

16          MR. MINUTI:  I will.  Thank you.

17      (Recess at 3:24 p.m.)

18      (Proceedings resume at 4:33 p.m.)

19          THE CLERK:  Please rise.

20          THE COURT:  You may be seated, everyone.  Thank

21 you.

22          Mr. Minuti?

23          MR. MINUTI:  Good afternoon, Your Honor.

24          THE COURT:  Yes.

25          MR. MINUTI:  Mark Minuti on behalf of the debtors.

1          Your Honor, I can assure you that our goal this

2   afternoon was not to convince you, you made the right

3   decision by retiring from the bench.  That wasn't our goal,

4   but you may feel that way after, you know -- it seems like a

5   déjà vu, particularly in this case.

6          I think what I can say, Your Honor, is I think we

7   believe we are pretty close to coming to an agreement on the

8   language.  It would be improper to ask Your Honor to stick

9   around any longer for that, so I think what would make the

10  most sense is for us to break, go back --

11          THE COURT:  Is there anything I can rule on to be

12  helpful to you?

13          MR. MINUTI:  You know, at this point, I don't

14  think so.  I think we're close enough that I would be afraid

15  that something you might say may draw us further apart, not

16  intentionally, obviously.

17          THE COURT:  Right.  I've been known to do that.

18      (Laughter)

19          MR. MINUTI:  But I think what would make sense is

20  give us just a little more time, Your Honor, without imposing

21  upon the court.  And if we reach agreement, we will notify

22  chambers.  We will upload the order.  And, obviously, if Your

23  Honor has any questions you can reach out to us.  If we don't

24  reach agreement, we'll be in contact.

25          And I think if we had disagreement, Your Honor can

1  give us his thought very quickly.  Again, I don't mean to

2  impose on Your Honor further, but I think if that happens, it

3  won't be a great imposition if Your Honor will allow us.

4          So, I think we're almost done.  I know Mr. Ryan

5  wanted to put something on the record or make one other

6  comments, so let me cede the podium to him.

7          THE COURT:  And let me just say one thing with

8  respect to the order.  I'm trying to get on with my life in

9  making some plans and tomorrow was a day that I was going to

10  be talking to someone.

11          MR. MINUTI:  Okay.

12          THE COURT:  So if we can do this in the morning,

13  it would be very helpful.

14          MR. MINUTI:  Your Honor, we will do our best.

15          THE COURT:  Okay.

16          MR. MINUTI:  I will promise you that.

17          THE COURT:  All right.  Mr. Ryan, yes.

18          MR. RYAN:  Thank you, Your Honor.

19          Just one request and we made this request before,

20  back in December.

21          Some of the stakeholders have been deeply involved

22  in this have probably some more current email addresses and

23  that type of contact information than even Hahnemann has.

24  And what they've offered to do is to share that information.

25  But the one thing they've asked for and they've asked me --

1  which Your Honor also did in September is to encourage them.

2  It's helpful for them to internally to have a strong

3  encouragement of the court to share such contact information

4  so that we can try and reach as many people as quickly as

5  possible with the good news once the order is entered.

6              THE COURT:  And who is this directed to, Mr. Ryan?

7              MR. RYAN:  It's directed to all of the

8  stakeholders.  I don't want to single out anyone in

9  particular.

10             THE COURT:  But I mean who should I be telling

11  that they should do this?

12             MR. RYAN:  Your Honor, if you could just say on

13  the record that you could strongly encourage all of the

14  stakeholders that the ad hoc committee has worked with to

15  share the information that would be very much appreciated by

16  me and those stakeholders.

17             THE COURT:  I'll do that.  I'll certainly order

18  that, Mr. Ryan.  I think it's important in this case.  You

19  should be able to reach these people.  And I ask that they

20  provide their email addresses.

21             MR. RYAN:  Thank you, Your Honor.  It's very much

22  appreciated.

23             THE COURT:  Yes, sir.

24             Are we done for the day?

25             MR. MINUTI:  Your Honor, I think that's it.  You

1   know, I really was trying to come up with something profound.

2   You have to take what you can get because it's me, but I just

3   want to say thank you for everything you've done in the case.

4   I think I speak for everyone here, certainly the Delaware

5   Bar.  It's been a pleasure, so thank you very much.

6           THE COURT:  Thank you, Mr. Minuti.  And this case,

7   I obviously, it was very important for me, at least, to get

8   St. Christopher's Hospital sold.  And once that occurred, I

9   felt much relieved in the cases as a whole, so I'm glad that

10  you did that.  You did it very well.  And all of you should

11  be congratulated really.  I think it's been a difficult case,

12  but I think it's been very well managed.

13          MR. MINUTI:  Well, again, Your Honor, I appreciate

14  appearing before you and can't wait to see your next move,

15  and I know we'll see you around.

16          THE COURT:  But you know if you keep interfering

17  with it, I won't be able to make one.

18          MR. MINUTI:  That is not my plan.  Thank you so

19  much, Judge.

20          THE COURT:  Thank you, everyone.  I'll be here

21  until 5:30 if you need me.

22          MR. MINUTI:  Very good.  Thank you.

23          THE COURT:  Okay.  You bet.

24       (Proceedings concluded at 4:37 p.m.)

25

1                              CERTIFICATE

2

3          I certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6
     /s/Mary Zajaczkowski              December 12, 2019
7    Mary Zajaczkowski, CET**D-531

8
     /s/William J. Garling             December 12, 2019
9    William J. Garling, CE/T 543

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25