## **<u>EXHIBIT A</u>**

Proposed Order

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | Case No. 19-11466 (MFW) |
| Debtors. | Jointly Administered |
| | **Re: D.I. ___** |

## EMERGENCY ORDER MODIFYING THE AUTOMATIC STAY

Upon the motion (the "Motion")[2] of PAHH Bellet MOB, LLC (the "Master Landlord") for entry of an order (this "Order") modifying the automatic stay so that the Master Landlord may terminate the Debtors' interest in the Master Lease Between PAHH Bellet MOB and St. Christopher's Healthcare, LLC, dated January 11, 2018, which was rejected pursuant to the *Order Approving Stipulation Between Debtors and Master Landlord Regarding Rejection of Leases and Allowed Administrative Expense Claim* [D.I. 1057] (the "Rejection Stipulation"), entered by this Court on November 25, 2019, as more fully described in the Motion; and this Court having found that (i) this Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334, (ii) this Court may enter a final order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C § 157(b)(2)(A), (iv) venue of this Motion in this District is proper under 28 U.S.C. §§

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meaning ascribed to such terms in the Motion.

1408 and 1409, and (v) no further or other notice of the Motion is required under the circumstances; and this Court having reviewed the Motion and any statements in support of the relief requested in the Motion and the record of these Chapter 11 Cases; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted in this Order; and this Court having found and determined that the relief sought in the Motion will not prejudice the Debtors' estates, their creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The Master Landlord is hereby relieved from the automatic stay imposed by 11 U.S.C. § 362 and authorized to terminate the Master Lease, effective immediately as of the Order.

3.      This Order is without prejudice to any and all other rights of the Master Landlord with respect to the Lease, all of which are hereby reserved.

4.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

## **SCHEDULE 1**

The Master Lease

**MASTER LEASE**

**BETWEEN**

**PAHH BELLET MOB, LLC,**

a Delaware limited liability company,

as Landlord

And

**ST. CHRISTOPHER'S HEALTHCARE, LLC,**

a Delaware limited liability company,

as Tenant

Dated: as of January 11, 2018

ARTICLE 1       PREMISES AND TERM; PERMITTED EXCEPTIONS.................................4

    1.1       Premises .................................................................................................4

    1.2       Term.......................................................................................................4

    1.3       Title Exceptions ....................................................................................5

    1.4       No Lease Personal Property...................................................................5

ARTICLE 2       BASE RENT; SUPPLEMENTARY RENT ........................................5

    2.1       Base Rent ...............................................................................................5

    2.2       Supplementary Rent...............................................................................6

    2.3       "Rent" Defined......................................................................................7

    2.4       Absolute Net Lease ...............................................................................7

    2.5       Payment of Rent Upon Assignment of Lease ......................................7

ARTICLE 3       IMPOSITIONS ................................................................................8

    3.1       "Impositions" Defined .........................................................................8

    3.2       Tax Protest ............................................................................................9

    3.3       Installment Payments ...........................................................................9

    3.4       Excluded Taxes .....................................................................................9

    3.5       Imposition Reserve Fund ......................................................................9

    3.6       Transfer of Deposits on Sale of Property............................................11

    3.7       Survival ...............................................................................................11

ARTICLE 4       USE AND OPERATION OF PREMISES ......................................11

    4.1       Use ......................................................................................................11

ARTICLE 5       CONDITION OF PREMISES; ALTERATIONS AND REPAIRS ...............11

    5.1       Condition of Premises.........................................................................11

    5.2       Tenant Repairs ....................................................................................12

    5.3       Landlord Non-Responsibility..............................................................12

    5.4       Tenant Alterations...............................................................................13

    5.5       Tenant Work .......................................................................................14

    5.6       Landlord's Inspection Right ................................................................16

    5.7       Fixtures and Tenant Personal Property ...............................................16

    5.8       Compliance with Applicable Law .......................................................16

ARTICLE 6       INSURANCE..................................................................................17

    6.1       Policies to Maintain ...........................................................................17

    6.2       Policies to Name Landlord, Mortgagees.............................................18

    6.3       Adjustment..........................................................................................19

    6.4       Insurance Company Requirements ......................................................19

6.5       Evidence of Insurance, Renewal ....................................................................19

6.6       No Violation of Policies..................................................................................19

6.7       Prohibited Insurance .....................................................................................19

6.8       Blanket/Umbrella...........................................................................................19

6.9       Landlord's Right to Place Policy ...................................................................20

6.10     Complying with Mortgagee ...........................................................................20

6.11     Insurance Reserve Fund .................................................................................20

6.12     Waiver of Subrogation ...................................................................................21

ARTICLE 7       DAMAGE OR DESTRUCTION..................................................................22

7.1       Restoration .....................................................................................................22

7.2       Disbursing of Proceeds ..................................................................................22

7.3       Payment Conditions .......................................................................................23

7.4       Payment of From Insurance Proceeds............................................................24

7.5       No Termination of Lease ................................................................................24

7.6       Applicability of Mortgage .............................................................................24

ARTICLE 8       CONDEMNATION.......................................................................................25

8.1       Generally........................................................................................................25

8.2       Limited Condemnation Termination...............................................................25

8.3       Partial Taking.................................................................................................25

8.4       Taking Unimproved Land ...............................................................................26

8.5       Temporary Taking ..........................................................................................26

8.6       Cooperation....................................................................................................26

ARTICLE 9       ASSIGNMENT AND SUBLETTING ..........................................................26

9.1       General Restriction ........................................................................................26

9.2       Request for Consent .......................................................................................28

9.3       Nature of Consent ..........................................................................................28

9.4       Subtenant Compliance ...................................................................................28

9.5       Subtenant Breach ...........................................................................................28

9.6       Lockbox ..........................................................................................................29

9.7       Landlord Lockbox Rights ...............................................................................29

9.8       Collateral Assignment ...................................................................................29

9.9       Required Sublease Terms ...............................................................................30

9.10     Bankruptcy.....................................................................................................31

9.11     Adequate Assurance.......................................................................................31

9.12     Intentionally Omitted .....................................................................................32

9.13     Survival ..........................................................................................................32

| | | |
|---|---|---|
| 9.14 | Special Purpose Entity | 32 |
| 9.15 | Subleases | 32 |
| ARTICLE 10 | SUBORDINATION | 33 |
| 10.1 | Subordination Generally | 33 |
| 10.2 | Notice; Mortgagee Performance | 34 |
| 10.3 | Inability to Obtain Non-Disturbance Agreement | 35 |
| 10.4 | Limitation of Tenant Termination Right | 35 |
| 10.5 | Subordination of Subleases | 35 |
| ARTICLE 11 | OBLIGATIONS OF TENANT | 35 |
| 11.1 | Compliance with Requirements | 36 |
| 11.2 | Notices to Landlord | 36 |
| 11.3 | Indemnity | 37 |
| 11.4 | Mechanics' Liens | 39 |
| 11.5 | Non-Liability of Landlord: Liens | 39 |
| 11.6 | Non-Liability of Landlord Generally | 39 |
| 11.7 | No Services Furnished | 39 |
| ARTICLE 12 | DEFAULT BY TENANT; REMEDIES | 40 |
| 12.1 | Event of Default Defined | 40 |
| 12.2 | Remedies | 41 |
| 12.3 | Additional Rights | 44 |
| 12.4 | Continuing Tenant Liability | 45 |
| 12.5 | Waiver | 45 |
| 12.6 | Rent and Costs as Lien | 45 |
| 12.7 | No Delay In Recovery | 45 |
| 12.8 | Damages | 45 |
| 12.9 | Tenant Waiver of Notice and Redemption | 45 |
| 12.10 | Strict Performance Not a Condition | 45 |
| 12.11 | Specific Performance | 46 |
| 12.12 | Enforcement Costs | 46 |
| 12.13 | Interest on Late Payments | 46 |
| 12.14 | Late Fees | 46 |
| 12.15 | Landlord Lien | 46 |
| 12.16 | Waiver of Statutory Notices | 47 |
| 12.17 | Additional Remedies | 47 |
| 12.18 | Landlord's Statutory Rights | 48 |

ARTICLE 13      NO WAIVER ................................................................................48

   13.1      Generally ...........................................................................................48

   13.2      Continuing Landlord Rights ............................................................49

ARTICLE 14      ESTOPPEL CERTIFICATE; CONSENT ......................................49

   14.1      Estoppel Certificate.........................................................................49

   14.2      Landlord Certificate ........................................................................50

ARTICLE 15      QUIET ENJOYMENT......................................................................50

ARTICLE 16      SURRENDER ...................................................................................50

   16.1      Generally ...........................................................................................50

   16.2      Rent Apportionment.........................................................................51

   16.3      Holding Over ....................................................................................51

ARTICLE 17      ACCESS ...........................................................................................52

   17.1      Inspection .........................................................................................52

   17.2      Repair ...............................................................................................52

ARTICLE 18      ENVIRONMENTAL MATTERS .....................................................52

   18.1      Generally ...........................................................................................52

   18.2      Compliance With Environmental Laws ...........................................53

   18.3      Notices ..............................................................................................53

   18.4      Landlord Rights ................................................................................53

   18.5      Remedial Action ...............................................................................54

   18.6      Indemnity ..........................................................................................54

   18.7      Other Requirements ..........................................................................55

   18.8      Other Landlord Rights ......................................................................56

   18.9      Costs..................................................................................................56

   18.10     Environmental Law Defined.............................................................56

   18.11     Hazardous Substance Defined ..........................................................56

   18.12     Responsibility for Pre-Commencement Date Conditions..................57

   18.13     Medical Waste and Drug Compliance ..............................................57

   18.14     Survival .............................................................................................57

   18.15     Existing Conditions...........................................................................57

   18.16     Prevailing Provision..........................................................................58

ARTICLE 19      FINANCIAL AND REGULATORY REPORTING COVENANTS..............58

   19.1      Reporting, Requirements ..................................................................58

   19.2      Publication ........................................................................................60

ARTICLE 20      LICENSED FACILITY OPERATION; ACCESS TO BOOKS AND RECORDS; MANAGEMENT ..............................................................60

20.1      Compliance ...........................................................................60

20.2      Other Reports ......................................................................60

20.3      Property Operation..............................................................60

20.4      Inspections and Audits.......................................................61

20.5      Relationship of Parties .......................................................61

20.6      Operations ............................................................................61

20.7      Intentionally Deleted..........................................................61

20.8      Other Transactions .............................................................61

20.9      Hill-Burton..........................................................................61

20.10      Tenant Representations and Warranties.............................61

20.11      Leasing "As-Is"..................................................................62

20.12      Compliance with Anti-Terrorism Laws.............................63

20.13      Management Agreements ....................................................64

ARTICLE 21      MISCELLANEOUS PROVISIONS.....................................65

21.1      Waiver of Jury Trial...........................................................65

21.2      Signs....................................................................................65

21.3      Certain Definitions.............................................................65

21.4      Headings .............................................................................65

21.5      Integration; Amendment .....................................................66

21.6      Successors/Assigns .............................................................66

21.7      Notices.................................................................................66

21.8      Construction........................................................................66

21.9      Brokers................................................................................66

21.10      Control of Premises............................................................67

21.11      Confidentiality ...................................................................67

21.12      Construction........................................................................68

21.13      Time of Essence .................................................................68

21.14      "Force Majeure" Defined...................................................68

21.15      True Lease...........................................................................68

21.16      Rent Obligation Unconditional ..........................................68

21.17      Officer's Certificate ...........................................................69

21.18      Governing Law/Consent to Jurisdiction/Venue.................69

21.19      Non-Liability for Withholding Consent, Approval ............70

21.20      Counterparts........................................................................70

21.21    Memorandum of Lease ................................................................................70

21.22    Power of Attorney......................................................................................70

ARTICLE 22    GUARANTY ................................................................................70

22.1    Master Lease Guarantee Agreements ...........................................................70

ARTICLE 23    RESERVED..................................................................................71

ARTICLE 24    RENEWAL...................................................................................71

24.1    Option .........................................................................................................71

24.2    Notice .........................................................................................................71

24.3    Rent.............................................................................................................71

24.4    Other Terms ................................................................................................73

ARTICLE 25    OFFSET AGAINST EARN-OUT ..................................................73

25.1    Off-Set Rights ............................................................................................73

ARTICLE 26    CAPITAL EXPENDITURE AND RESERVE REQUIREMENTS................73

26.1    Tenant Improvement Reserve; Environmental Reserve ..................................73

26.2    Incremental CapEx Reserve.........................................................................74

26.3    Value-Add Capital Expenditure Allowance ...................................................74

26.4    Lease Rollover Reserve ...............................................................................75

26.5    Disbursements of CapEx Reserve Funds.......................................................73

26.6    Conditions for Disbursement .......................................................................76

26.7    End of Term; Event of Default .....................................................................76

26.8    Terms of Holding.........................................................................................76

26.9    Annual CapEx Plans ....................................................................................76

26.10    Security Interest; General .............................................................................77

**LIST OF SCHEDULES**

**SCHEDULE A**            **ADDRESS AND DESCRIPTION OF THE LAND**

**SCHEDULE B**            **DEFINITIONS**

**SCHEDULE C**            **FORM OF GUARANTY**

**SCHEDULE D**            **FORM OF MEMORANDUM OF LEASE**

**SCHEDULE 18.7**         **INITIAL REMEDIAL WORK**

**SCHEDULE 18.15**        **ENVIRONMENTAL REPORTS**

**SCHEDULE 26.1**         **INITIAL CAPEX WORK**

# MASTER LEASE

THIS MASTER LEASE (the "Lease") is made effective as of January [11] , 2018, (the "Effective Date") by and between PAHH BELLET MOB, LLC, a Delaware limited liability company ("Landlord"), and ST. CHRISTOPHER'S HEALTHCARE, LLC, a Delaware limited liability company ("**Tenant**").

# RECITALS

A.    WHEREAS, Tenet Business Services Corporation, and its subsidiaries and affiliates, as sellers ("Sellers"), and Landlord and/or its subsidiaries, as purchasers, among others, entered into an Asset Sale Agreement dated as of August _31, 2017 for the sale of the Property (the "ASA").

B.    WHEREAS, Landlord is the owner of the land described on Schedule A and the improvements located thereon ("Property" or a "Premises"); and

C.    WHEREAS, Tenant desires to lease the Premises from Landlord and Landlord agrees to so lease such Premises to Tenant upon the terms and conditions set forth in this Lease;

NOW, THEREFORE, for good and valuable consideration, the receipt, sufficiency and fairness of which are hereby acknowledged, Landlord and Tenant, for themselves, and their administrators, legal representatives, successors and permitted assigns, intending to be legally bound, hereby covenant as follows:

# ARTICLE A
# CERTAIN LEASE PROVISIONS

| | | | |
|---|---|---|---|
| **1.** | **Address for the Premises:** | | As set forth on <u>Schedule A</u>. |
| **2.** | **(a)** | **"Term":** | Fifteen (15) Lease Years (the "**Initial Term**"), beginning on the Commencement Date (as defined below) and ending on the Expiration Date (as defined below), as the same may be (i) extended by Tenant pursuant to Article 24, or (ii) earlier terminated as expressly provided in this Lease. |
| | **(b)** | **"Commencement Date"** | The Effective Date of this Lease. |
| | **(c)** | **"Expiration Date"** | The last day of the Initial Term, as such date may be extended for an Extended Term pursuant to <u>Article 24</u> hereof, unless sooner terminated as expressly provided |

1

this Lease.

| | | |
|---|---|---|
| **3.** | **"Base Rent" for the Premises** | During the first Lease Year (as defined below), Base Rent per annum shall be the amount listed below and shall be paid in advance in equal consecutive monthly installments in the amount listed below on the first day of each month: |

<u>**Initial Annual Base Rent**</u>     **$975,000.00**

<u>**Initial Monthly Base Rent**</u>    **$81,250.00**

Annual Base Rent shall escalate by 3% on the first day of the second Lease Year and on the first day of each succeeding Lease Year as provided in the Lease, and shall be readjusted when the Lease is renewed pursuant to Article 24, as provided therein.

**4.**    **Permitted Use of Premises:**    The Premises shall be used and operated solely as a medical office building, including general office, administrative offices and facilities, hospital administrative offices, hospital infrastructure services (not to include acute care services), education and research, and uses ancillary thereto which are customarily associated with a medical office building, including but not limited to retail uses (provided that any expansion beyond the current retail uses shall be subject to approval by Landlord, in its commercially reasonable judgment.

**5.**    **"Extended Term":**    As defined in <u>Article 24</u>.

**6.**    **Address for Notice:**

    **(a)**    **For Landlord:**    c/o Harrison Street Real Estate, LLC
444 West Lake Street, Suite 2100
Chicago, IL 60606
Attn: Mark Burkemper
Email: <u>mburkemper@harrisonst.com</u>

|                        |     |                                                                                                                                                                                  |
|------------------------|-----|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **With copies to:**    |     | c/o Harrison Street Real Estate, LLC<br>444 West Lake Street, Suite 2100<br>Chicago, IL 60606<br>Attn: Stephen Gordon<br>Email: sgordon@harrisonst.com                            |
|                        | **and** | DLA Piper LLP (US)<br>444 West Lake Street, Suite 900<br>Chicago, IL 60606<br>Attn: David Sickle<br>Email: david.sickle@dlapiper.com                                          |
| **(b)    For Tenant:** |     | St. Christopher's Healthcare, LLC<br>222 N. Sepulveda Blvd., Suite 900<br>El Segundo, CA 90245<br>Attention: Joel Freedman and General Counsel<br>Email: jfreedman@pldn.com and<br>sattestatova@pldn.com |

**7.    Address for Rent Payment:**      Such address as the Landlord shall notify Tenant in writing no later than January 25, 2018 or thereafter at the written direction of Landlord, by wire transfer of funds to an account designated by Landlord in writing.

## ARTICLE B
## CERTAIN DEFINITIONS

This Lease utilizes capitalized terms that have specific meaning. Many of these terms and their definition (or references to the Section containing their definition) are set forth on Schedule B attached to this Lease.

## ARTICLE C
## MASTER LEASE; LANDLORD'S AGENT

1.    This Lease constitutes one of six (6) leases each of a premises sold to Landlord or its affiliate, leasing together a single collection of properties, consisting of the Premises and the Other Properties (the "Portfolio"). The Portfolio constitutes one economic enterprise and the Base Rent and all other provisions have been negotiated and agreed to, based on several leases, including, without limitation, this Lease ("Master Leases") of all of the Portfolio as a single, composite, integrated transaction. This Lease would not have been made on these terms if it was

3

not in conjunction with the Other Master Leases. Except as expressly provided herein for specific, isolated purposes (and then only to the extent expressly otherwise stated), any Event of Default under this Lease is an Event of Default as to the Other Master Leases. The parties agree that the existence of one landlord for each Master Lease does not affect the cross-defaults set-forth in this this Lease. The parties may amend this Lease from time to time to include one or more additional properties as part of the Premises and such future addition to the Premises shall not in any way change the indivisible and non-severable nature of this Lease and all of the foregoing provisions shall continue to apply in full force.

2.      Landlord hereby appoints Michael Borchetta and Mark Burkemper (each the "**Landlord's Representative**") as the agent and lawful attorney-in-fact of such Landlord to act for such Landlord for all purposes and actions of Landlord under this Lease, and Tenant shall be entitled to conclusively rely on any action taken or notice given by Landlord's Representative as being by or from Landlord in respect of this Lease. All notices, consents, waivers and all other documents and instruments executed by Landlord's Representative pursuant to the Lease from time to time and all other actions of Landlord's Representative on behalf of Landlord under the Lease shall be binding upon every entity comprising Landlord. All notices or communications from Tenant to Landlord's Representative at the address(es) set forth in Article A, Section 6 (including simultaneous copies to the other Landlord notices addresses set forth above) shall be conclusively deemed to have been communicated or delivered to Landlord in accordance with the terms of this Lease. Landlord may designate a different party to serve as Landlord's Representative, provided that no such designation shall be effective as to Tenant unless and until Landlord delivers written notice thereof to Tenant.

3.      Tenant hereby appoints each of Joel Freedman and Svetlana Attestatova (each, a "**Tenant's Representative**") as the agents and lawful attorneys-in-fact of such Tenant to act for such Tenant for all purposes and actions of Tenant under this Lease, and Landlord shall be entitled to conclusively rely on any action taken by or notice given by any single Tenant Representative as being by or from Tenant in respect of this Lease. All notices, consents, waivers and all other documents and instruments executed by any single Tenant's Representative pursuant to the Lease from time to time and all other actions of any single Tenant's Representative on behalf of Tenant under the Lease shall be binding upon Tenant. All notices or communications from Landlord to any one of Tenant's Representative shall be conclusively deemed to have been communicated or delivered to Tenant in accordance with the terms of this Lease. Tenant may designate a different party to serve as a Tenant's Representative, provided that no such designation shall be effective as to Landlord unless and until Tenant delivers written notice thereof to Landlord.

## ARTICLE 1

## PREMISES AND TERM; PERMITTED EXCEPTIONS

1.1      <u>Premises</u>. During the Term, Landlord, in consideration of the Rents herein reserved and of the terms, provisions, covenants and agreements on the part of Tenant to be kept, observed and performed, does hereby lease and demise the Premises unto Tenant, and Tenant does hereby hire and take the Premises from Landlord.

1.2      <u>Term</u>. Tenant shall lease the Premises for the Term, unless sooner terminated as hereinafter provided or pursuant to Applicable Law.

1.3    <u>Title Exceptions</u>. Title to the Premises shall be subject to each and every matter affecting title to the Premises, including, without limitation, all of the following which are in effect as of the Commencement Date and recorded against or affecting the Premises: all easements, rights of way, covenants, conditions and restrictions, liens, encumbrances, condominium regimes (if applicable), encroachments, licenses, notices of pendency, charges, zoning laws, ordinances, regulations, building codes, Requirements and other Applicable Laws, and other exceptions to Landlord's title, whether or not the same are of public record (the "**Permitted Exceptions**"), and Tenant agrees that its management, use, operation and occupancy of the Premises, and each Sublease, shall be subject to the terms and conditions of the foregoing, and accordingly Tenant shall comply with (and not violate any of) and shall use commercially reasonable efforts to require the Subtenants to comply with and to not violate the terms, conditions, obligations and restrictions set forth in the Permitted Exceptions.

1.4    <u>No Lease Personal Property</u>. Landlord and Tenant hereby acknowledge and agree that the Premises consists only of real property, and that no personal property owned or leased by any Landlord is included within or among the Premises; provided that, notwithstanding the foregoing, the Premises owned by Landlord and hereby leased to Tenant does and shall include all Building systems, machinery, apparatus and fixtures (other than Tenant's trade fixtures) now located or hereafter placed upon the Property or the Building.

## ARTICLE 2

## BASE RENT; SUPPLEMENTARY RENT

2.1    <u>Base Rent</u>.

(a)    Tenant shall pay to Landlord as Base Rent for the Premises during the Term the amount stated in <u>Article A</u>, <u>Section 3</u>, subject to increase as provided in this Article ("**Base Rent**"). Base Rent shall be payable in equal monthly installments in advance on the first (1st) day of each and every month during the Term, without previous demand, notice or presentment therefor and without abatement, offset or deduction of any kind whatsoever. Although the Base Rent may be stated herein on a per Property basis, Tenant's obligation is with respect to the aggregate Base Rent for the entire Premises, except as otherwise expressly provided herein. Notwithstanding the foregoing, Tenant shall pay the partial month's installment of Base Rent (with respect to the remaining days of the month in which the Commencement Date occurs) upon the Commencement Date of this Lease. If Tenant fails to pay any installment of Base Rent on or before the date when due hereunder, Tenant shall owe Landlord, in addition to the installment of Base Rent, interest on such installment at the Default Rate.

(b)    <u>Lease Year</u>. As used herein, the term "**Lease Year**" means a period of twelve (12) calendar months commencing on the Commencement Date and ending on the day immediately preceding the first (1st) anniversary of the Commencement Date (if the Commencement Date occurs on the first (1st) day of a month) or on the last day of the month during which the first (1st) anniversary of the Commencement Date occurs (if the Commencement Date occurs on a day other than the first (1st) day of a month), and each successive twelve (12) month period thereafter during the Term until the Expiration Date.

(c)    <u>Rent Increase</u>. On the first day of the second Lease Year and on the first day of each Lease Year thereafter during the Initial Term, Base Rent payable under this Lease shall increase by the three percent (3.0%), calculated by multiplying the Base Rent payable in the

Lease Year just ended by 103%. Accordingly, Base Rent payable during the Initial Term shall be as follows:

| Lease Year | Annual Base Rent | Monthly Base Rent |
|:---:|:---:|:---:|
| 1 | $    975,000.00 | $   81,250.00 |
| 2 | $ 1,004,250.00 | $   83,687.50 |
| 3 | $ 1,034,377.50 | $   86,198.13 |
| 4 | $ 1,065,408.83 | $   88,784.07 |
| 5 | $ 1,097,371.09 | $   91,447.59 |
| 6 | $ 1,130,292.22 | $   94,191.02 |
| 7 | $ 1,164,200.99 | $   97,016.75 |
| 8 | $ 1,199,127.02 | $   99,927.25 |
| 9 | $ 1,235,100.83 | $ 102,925.07 |
| 10 | $ 1,272,153.85 | $ 106,012.82 |
| 11 | $ 1,310,318.47 | $ 109,193.21 |
| 12 | $ 1,349,628.02 | $ 112,469.00 |
| 13 | $ 1,390,116.86 | $ 115,843.07 |
| 14 | $ 1,431,820.37 | $ 119,318.36 |
| 15 | $ 1,474,774.98 | $ 122,897.92 |

2.2     Supplementary Rent. Tenant shall also pay and discharge as supplementary rent (the "**Supplementary Rent**") all other amounts, liabilities and obligations of whatsoever nature relating to the Premises, including, without limitation, all Impositions, those amounts, liabilities and obligations arising under this Lease, any Applicable Laws, permits or requirements of Governmental Authorities, easements, restrictions, or other similar agreements affecting the Premises or any adjoining property thereto, and all interest and penalties that may accrue thereon in the event of Tenant's failure to pay such amounts when due, and all damages, costs and expenses which Landlord may incur by reason of any Event of Default, all of which Tenant hereby agrees to pay within thirty (30) days after receipt of written demand therefor or as is otherwise provided herein. Upon any failure by Tenant to pay any of the Supplementary Rent on or before the date due, such unpaid Supplementary Rent shall accrue interest at the Default Rate and Landlord shall have all legal, equitable and contractual rights, powers and remedies provided either in this Lease or by statute, at law, in equity or otherwise in the case of nonpayment of the Base Rent. The term Supplementary Rent shall be deemed rent for all purposes hereunder other

than with respect to Tenant's internal accounting procedures. Tenant may satisfy its obligations under this Section by causing some or all of the Subtenants to pay such amounts.

2.3    <u>"Rent" Defined</u>. All Base Rent and Supplementary Rent payable hereunder (collectively, "**Rent**") shall be made payable to Landlord and sent to Landlord's address set forth in <u>Article A</u>, and shall be made in United States currency which shall be legal tender for all debts, public and private. Landlord may require Rent be made payable to such other person or persons or at such other place as may be designated by written notice from Landlord to Tenant, from time to time, at least thirty (30) days in advance of the required payment date. Landlord may opt to receive all Rent payable hereunder when due by wire transfer of immediately available funds to an account designated from time to time by Landlord; such option shall become effective five (5) Business Days after Landlord's written request. Notwithstanding the foregoing, Impositions shall be payable to the parties to whom they are due, except as otherwise provided herein. The terms and conditions of this <u>Section 2.3</u> are subject to the terms and conditions of <u>Section 2.5</u> unless and until Mortgagee otherwise notifies Tenant in writing.

2.4    <u>Absolute Net Lease</u>. Except as otherwise expressly provided herein, this Lease shall be deemed and construed to be absolutely net to Landlord, and Tenant shall pay to Landlord, absolutely net throughout the Term, the Rent, free of any charges, assessments, impositions or deductions of any kind and without abatement, deduction or set-off whatsoever. Under no circumstances or conditions, whether now existing or hereafter arising, or whether beyond the present contemplation of the parties, shall Landlord be expected or required to make any payment of any kind whatsoever or be under any other express or implied obligation or liability hereunder. Tenant shall pay (or shall cause the Subtenants to pay) all costs, expenses and charges of every kind and nature relating to the Premises which arises prior to or during the Term, including, without limitation, all Operating Costs, taxes, costs of improvements, maintenance, repairs, alterations, additions, replacements, and insurance and other Impositions, leasing commissions and tenant improvements, except debt service on any Mortgage or any other indebtedness of Landlord or any rent or other charges under any Superior Lease, which may arise or become due or payable prior to, during or after (but attributable to a period falling prior to or within) the Term. Unless otherwise expressly provided in this Lease, Tenant's obligation to pay Rent hereunder shall not terminate prior to the actual date contemplated by Landlord and Tenant and specifically set forth in <u>Article A</u>, <u>Section 2(c)</u> for the expiration of the Term, notwithstanding the exercise by Landlord of any or all of its rights under <u>Article 12</u> hereof or otherwise and the obligations of Tenant hereunder shall not be affected by reason of: any prohibition, interruption, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any person or for any reason, any matter affecting title to the Premises, any eviction by paramount title or otherwise, any default by Landlord hereunder, the impossibility, impracticability or illegality of performance by Landlord, Tenant or both, any action of any Governmental Authority, Tenant's acquisition of ownership of all or part of the Premises (unless this Lease shall be terminated by a writing signed by all Persons, including any Mortgagee, having an interest in the Premises), any breach of warranty or misrepresentation, or any other cause whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or knowledge thereof and whether or not such cause shall now be foreseeable. The parties intend that the obligations of Tenant under this Lease shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations have been modified or terminated pursuant to an express provision of this Lease.

2.5    <u>Payment of Rent Upon Assignment of Lease</u>. Tenant acknowledges that all of the interest of Landlord in and to this Lease may be assigned to a present or future Mortgagee

7

pursuant to a Mortgage and other loan documents in connection therewith, and that under the terms thereof, all Rent under this Lease may be required to be paid directly to Mortgagee or its designee in accordance with the provisions contained therein. Tenant hereby agrees, upon Tenant's receipt of written notice therefor, to so pay all such Rent directly to Mortgagee or its designee as and when same are due and payable under this Lease by wire transfer pursuant to the wire transfer instructions set forth in such notice. Landlord hereby authorizes Tenant to make said payments to Mortgagee and acknowledges that any such disbursement of the appropriate amounts to Mortgagee shall satisfy Tenant's Rent payment obligations under this Lease.

## ARTICLE 3

## IMPOSITIONS

3.1     "Impositions" Defined. Subject to the terms of Section 3.5, from and after the Commencement Date and throughout the Term, Tenant shall pay and discharge (or shall cause any Subtenant to pay and discharge) not later than ten (10) days any event before any fine, penalty, interest or cost may be added thereto for the non-payment thereof), all taxes, assessments, water rents, storm and sewer rents and charges, duties, impositions, license and permit fees, regulatory application fees, assessments payable to any owner's association or similar entity, governmental levies and charges, charges for public utilities of any kind, together with any interest or penalties imposed upon the late payment thereof, which, pursuant to past, present or future Applicable Law, any Permitted Exception or other recorded instrument affecting the Premises (including assessments arising under any condominium declaration) during, prior to or after (but attributable to a period falling prior to or within) the Term, shall have been or shall be levied, charged, assessed, imposed upon or grow or become due and payable out of or for or have become a lien on the Premises or any part thereof, any Buildings or personal property (including, without limitation, the Tenant Personal Property) in or on the Premises, the Rents and income payable by Tenant or on account of any use of the Premises and such franchises as may be appurtenant to the use and occupation of the Premises as well as any sales, use, excise, commercial rent, tangible personal property, parking, gross receipts, net profits, and similar taxes imposed by any Governmental Authority or improvement district in connection with the use or operation by Tenant of the Premises, any Property, and the Tenant Personal Property, if any, and any interest and penalties assessed in connection therewith as a result of late payment or non-payment of any of the foregoing or late filing or non-filing of any tax returns or reports due in connection therewith (each of the foregoing being an "**Imposition**" and collectively "**Impositions**"); *provided, however*, Tenant's obligation to pay directly to the applicable Governmental Authority all regularly assessed ad valorem real estate taxes and assessments ("**Real Estate Taxes**") is subject to, and Tenant shall comply with the terms and provisions of Section 3.5 hereof (in which case Landlord or Mortgagee shall make such payments). Except as provided in Section 3.5, Tenant, upon request from Landlord, shall submit to Landlord the proper and sufficient receipts or other evidence of payment and discharge of the same; *provided, however*, Tenant shall not be required to furnish such receipts or other evidence for payment with respect to Real Estate Taxes (defined in Section 3.5) or with respect to Impositions that are being contested in accordance with this Section. The certificate, advice, or bill of non-payment of any Imposition from the appropriate official designated by Applicable Law to make or issue the same or to receive payment of any Imposition shall be prima facie evidence that such Imposition is due and unpaid at the time of the making or issuance of such certificate, advice, or bill of non-payment. If any Impositions are not paid when due under this Lease, Landlord shall have the right, but shall not be obligated, to pay the same following written notice to Tenant of such payment, provided Tenant is not contesting the same pursuant to a right to do so herein. If Landlord shall make such payment, Landlord shall thereupon be entitled to

8

repayment by Tenant on demand as Supplementary Rent hereunder, except where such payment is made from the Imposition Reserve Fund. Landlord shall promptly forward to Tenant any invoices for Impositions that Landlord receives so as to allow Tenant to make payment for the Impositions in a timely manner.

3.2 <u>Tax Protest</u>. Tenant shall have the right to protest and contest any Impositions imposed against the Premises or any part thereof. If Tenant so elects to contest, Tenant shall, prior to the prosecution or defense of any such claim, notify Landlord in writing of its decision to pursue such contest and, to the extent procedurally required, or to prevent jeopardizing any license, permit or certification because of nonpayment thereof, Tenant shall pay the amount in question prior to initiating the contest. Tenant's right to contest is conditioned upon the following: (i) such contest is done at Tenant's sole cost and expense, (ii) nonpayment will not subject the Premises or any part thereof to sale or other liability by reason of such nonpayment, (iii) such contest shall not subject Landlord or any Mortgagee to the risk of any criminal or civil liability, and (iv) Tenant shall provide such security as may reasonably be required by Landlord or any Mortgagee or under the terms of any Mortgage or any loan documents in connection therewith to ensure payment of such contested Impositions. Upon request, Tenant shall keep Landlord advised as to the status of such contest. Subject to the provisions of clauses (i) through (iv) above, Landlord agrees to execute and deliver to Tenant any and all documents reasonably acceptable to Landlord and otherwise required for such purpose and to cooperate with Tenant in every reasonable respect in such contest, but without any cost or expense to Landlord. If Landlord should actually receive proceeds of any such contest to the extent Tenant had paid in advance the amount in question, and to the extent that the same relate to the period of the Term, then Landlord shall promptly remit the same to Tenant. Tenant may elect to take commercially reasonable steps to file and enforce tax certiorari proceedings to reduce tax affecting the Premises, all at Tenant's own expense.

3.3 <u>Installment Payments</u>. To the extent permitted by Applicable Law, Tenant shall have the right to apply for the conversion of any Impositions to make the same payable in annual installments over a period of years. Tenant shall pay all such deferred installments (prior to the expiration or sooner termination of the Term, notwithstanding that such installments shall not then be due and payable; *provided, however*, that any Impositions (other than one converted by Tenant so as to be payable in annual installments as aforesaid) relating to a fiscal period of the taxing authority, a part of which is included in a period of time after the Expiration Date, shall (whether or not such Impositions shall be assessed, levied, confirmed, imposed or become payable, during the Term) be prorated between Landlord and Tenant as of the Expiration Date, so that Landlord shall pay at its own expense that portion of such Impositions which relate to that part of such fiscal period included in the period of time after the Expiration Date, and Tenant shall pay the remainder thereof (which amount Landlord shall be entitled to withdraw from the Imposition Reserve Fund to the extent funds are available thereof).

3.4 <u>Excluded Taxes</u>. Except Landlord's gross receipts taxes, Tenant shall not be obligated to pay any franchise, excise, corporate, gift, estate, inheritance, succession or capital levy or tax of Landlord or any income, profits or revenue tax upon the income of Landlord.

3.5 <u>Imposition Reserve Fund</u>. Notwithstanding any provision of this Lease to the contrary, upon request of Landlord, Tenant shall: (i) pay to Landlord or, if directed by Landlord, to Mortgagee, on the first (1st) day of each month until thirty (30) days prior to the date when the next installment of all regularly assessed ad valorem real estate taxes and assessments for the Premises ("**Real Estate Taxes**") would accrue penalty or interest for non-payment to the authority or other Person to whom the same is paid, an amount equal to said next installment of

9

Real Estate Taxes divided by the number of months over which such payments are to be made; and (ii) thereafter during the Term pay to Landlord or Mortgagee an amount each month estimated by Landlord or Mortgagee to be adequate to create a fund ("**Imposition Reserve Fund**") which, as each succeeding installment of Real Estate Taxes becomes due, will be sufficient, thirty (30) days prior to such date on which penalty or interest would accrue for non-payment, to pay such installment in full. All such payments shall be deemed to be Supplementary Rent hereunder. Landlord or Mortgagee shall use reasonable efforts to cause the monthly payments to be equal in amount, but neither of them shall be liable in the event that such required payments are unequal; *provided, however*, that for the period of time between the Effective Date and the date on which the first payment of Real Estate Taxes is due, the monthly payment required hereunder shall be the monthly payment that would have been required had Tenant began making twelve (12) equal monthly installment payments one (1) year prior to said payment date, it being the intent of the parties that, at least thirty (30) days prior to said first payment due date, Tenant shall pay to Landlord the amount that, when added to the payments made as of said date, is sufficient to pay the Real Estate Taxes due and payable on said initial payment date. If at any time the amount of Real Estate Taxes are increased, said monthly payments shall be increased within five (5) Business Days after written demand by Landlord or Mortgagee so that, thirty (30) days prior to the due date for each installment of Real Estate Taxes, there will be payments on hand with Landlord and Mortgagee sufficient to pay such installments in full. Landlord or Mortgagee will apply the part or all of the Imposition Reserve Fund (as defined herein) to payments of Real Estate Taxes required to be made by Tenant pursuant to this Article. In making any payment relating to the Imposition Reserve Fund, Landlord or Mortgagee may do so according to any bill, statement or estimate procured from the applicable Governmental Authority or provided by Tenant without inquiry into the accuracy of such bill, statement or estimate or into the validity of any Real Estate Taxes. Landlord or Mortgagee shall not be required to hold or deposit any such amounts in an interest bearing account. For the purpose of determining whether Landlord or Mortgagee has on hand sufficient moneys to pay any particular Real Estate Taxes at least thirty (30) days prior to the due date therefor, payments for each category of Real Estate Taxes shall be treated separately, it being the intention that Landlord shall not be obligated to use moneys paid for the payment of an item not yet due and payable to the payment of an item that is due and payable. Notwithstanding the foregoing, it is understood and agreed that (a) to the extent permitted by Applicable Law, amounts paid by Tenant as provided for in this <u>Section 3.5</u> may be held by Landlord or its Affiliate or Mortgagee in a single bank account and commingled with other funds of Landlord or Mortgagee, and (b) Landlord or Mortgagee, may, if Tenant fails to make any payments required hereunder, use payments made for any one item for the payment of the same or any other item of Rent. If this Lease shall be terminated by reason of any Event of Default, all payments then held by Landlord shall be applied by Landlord on account of any and all sums due under this Lease; if there is a resulting deficiency, Tenant shall pay the same, and if there is a surplus, Tenant shall be entitled to a refund of the surplus. Tenant acknowledges and agrees that no deficiency, unavailability or lack of funds in the Imposition Reserve Fund shall relieve Tenant of its obligation to pay all Real Estate Taxes as required under this Lease. If at any time the balance of funds in the Imposition Reserve Fund are insufficient to pay any Real Estate Taxes when due, or if an Event of Default is outstanding and Landlord elects not to apply the Imposition Reserve Fund to the payment of Real Estate Taxes, then upon demand from Landlord, Tenant shall pay the Real Estate Taxes directly to the taxing authority or (if directed by Landlord) to Landlord as Supplemental Rent, the full amount due less the amount (if any) of the Imposition Reserve Fund that is available for same.

        (a)    <u>Security Interest</u>. Although it is the intent of Landlord and Tenant that Tenant's payments to Landlord for the Imposition Reserve Fund are Supplemental Rent and Rent

under this Lease, if a court determines that, by operation of Applicable Law, such sums are not Supplemental Rent or Rent but instead are the property of Tenant, then to further protect Landlord's interest in said amounts, Tenant hereby grants to Landlord a first-priority security interest in the Imposition Reserve Fund and any and all monies now or hereinafter deposited therein as additional security for payment of Rent. Until expended or applied in accordance with the terms of this Lease, the Imposition Reserve Fund shall serve as additional security for Tenant's obligations hereunder. Following the occurrence of an Event of Default, Landlord may, in addition to all other remedies under this Lease, apply any or all of the Imposition Reserve Fund for the payment of Rent or other sums owing to Landlord under this Lease in its sole discretion. The Imposition Reserve Fund shall not constitute trust funds.

(b)    General. Tenant shall not pledge, assign or grant a security interest in the Imposition Reserve Fund, or permit any lien or encumbrance to attach thereto or any levy to be made thereon by a party claiming through Tenant, except those naming Landlord as the secured party. Should Landlord elect to hold the Imposition Reserve Fund in an interest bearing account, all interest earned shall be added to the Imposition Reserve Fund and Tenant shall pay all taxes due in connection therewith.

3.6    Transfer of Deposits on Sale of Property. If Landlord ceases to have any interest in the Premises, Landlord shall transfer to the Person who owns or acquires such interest in the Premises from Landlord and is the transferee of this Lease, the deposits made pursuant to Section 3.5 hereof relating to the Premises covered by this Lease, subject, however, to the provisions thereof. Upon such transfer of the Premises and the deposits, the transferor and its Affiliates shall be deemed to be released from all liability with respect thereto and Tenant agrees to look to the transferee solely with respect thereto, and the provisions hereof shall apply to each such successive transfer of the said deposits.

3.7    Survival. The provisions of this Article 3 shall survive one (1) year from the expiration or earlier termination of this Lease.

## ARTICLE 4

## USE AND OPERATION OF PREMISES

4.1    Use. The Premises may be used and occupied only for the Permitted Use set forth in Article A, Section 4.1, in compliance with all Requirements and Applicable Laws. Tenant shall not be permitted (nor shall Tenant permit the Subtenants) to modify the use of the Property to a use that is not a Permitted Use without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed. Tenant shall not create, and shall prohibit its subtenants from creating, any public or private nuisance, hazardous or illegal condition or waste on or with respect to the Premises. Waste will not include medical waste properly disposed of in accordance with the terms of this Lease. This Article 4 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 5

## CONDITION OF PREMISES; ALTERATIONS AND REPAIRS

5.1    Condition of Premises. Tenant hereby acknowledges and agrees that Tenant has had a reasonable opportunity to examine the Premises, is familiar with the physical condition, expenses, operation and maintenance, zoning, Requirements, status of title and use that may be

made of the Premises and every other matter or thing affecting or related to the Premises, and are leasing the same in its "As Is" condition. Landlord has not made and does not make any representations or warranties whatsoever with respect to the Premises or otherwise with respect to this Lease, express or implied, including any warranty regarding the merchantability or warranty regarding the suitability of the Premises for their intended commercial purposes. Tenant assumes all risks resulting from any defects (patent or latent) in the Premises or from any failure of the same to comply with any Requirement, Applicable Law or the uses or purposes for which the same may be occupied and assumes all responsibility for (x) repair of any defect (patent or latent) in the Premises and (y) causing the condition of the Premises to comply with all Requirements and with Applicable Law. **WITHOUT LIMITING THE GENERALITY OF THE FOREGOING OR ANY OTHER PROVISION OF THIS LEASE, TENANT AGREES THAT IT IS TAKING AND ACCEPTING POSSESSION OF THE PREMISES ON THE COMMENCEMENT DATE AND THEREAFTER ON AN "AS IS", "WHERE IS", AND "WITH ALL FAULTS" BASIS.**

5.2    <u>Tenant Repairs</u>. At Tenant's sole cost and expense, Tenant shall maintain and keep all of the Premises and the adjoining sidewalks, curbs and common areas and any alterations or improvements thereto, if any, clean and in at least the same level of condition and repair as on the Commencement Date (as the same may be improved periodically pursuant to the Annual CapEx Plan), free of accumulations of dirt, rubbish, snow and ice, and Tenant shall make all repairs and replacements (capital and non-capital), structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, and shall perform all maintenance, necessary to (a) maintain the Premises and any sidewalks, curbs and common areas in at least the same level of condition and repair as on the Commencement Date, and (b) cause the Premises to comply with all Requirements and to comply in all material respects with all Applicable Laws, including, without limitation, the remediation of all hazardous materials on or about the Premises in compliance with all applicable Environmental Laws and other Applicable Laws, completion of the seismic retrofit of each Property when and as required thereby. When used in this <u>Section 5.2</u>, the term "**repairs**" shall include all necessary additions, alterations, improvements, replacements, renewals and substitutions. All repairs made by or at the direction of Tenant shall be at least equal in quality and class to the original work and shall be made in compliance with all Requirements and Applicable Laws. Landlord shall not be required to furnish any services or facilities or to maintain or make any repairs or alterations to the Premises, and Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Premises and all costs and expenses incidental thereto, including adequate security for each of the Buildings, whether or not Tenant is then occupying each of the Buildings. Tenant shall have the roof of each Property inspected with reasonable frequency (as determined in Tenant's reasonable discretion) by an appropriate consultant reasonably acceptable to Landlord, at Tenant's expense. Tenant shall, at its sole cost and expense, repair, replace and maintain each roof in at least the same level of condition and repair as on the Commencement Date. Notwithstanding the foregoing standard of maintaining the Premises in at least the same level of condition and repair as on the Commencement Date, if the Requirements or any Applicable Law mandate a higher standard, then Tenant shall, at Tenant's expense, be obligated to cause the Premises to comply with such higher standard. In performing the obligations set forth in this Lease, Tenant shall be permitted to cause a Subtenant that occupies the portion of the Premises covered by the applicable Sublease to perform the obligations of Tenant on behalf of Tenant, but Tenant shall not be relieved thereby of responsibility and liability for the performance thereof.

5.3    <u>Landlord Non-Responsibility</u>. Landlord shall not be responsible for the cost of any alterations or replacements of or maintenance or repairs to, or Restoration of the Premises of

any nature whatsoever, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen, whether or not now in the contemplation of the parties. To the extent not prohibited by Applicable Law, Tenant hereby waives and releases all rights now or hereinafter conferred by any Applicable Laws, Requirements or otherwise which would have the effect of limiting or modifying any of the provisions of this Article 5.

5.4    Tenant Alterations. Tenant shall have the right at any time and from time to time during the Term to make, or to allow a Subtenant to make, at its or the Subtenant's sole cost and expense, changes, alterations, additions or improvements (collectively, "**Alterations**") in or to the Premises, subject, however, in each case to all of the following:

(a)    No Alteration shall be undertaken except after prior written notice to Landlord and Landlord's approval thereof, not to be unreasonably withheld, conditioned, or delayed; *provided that* no such approval shall be required (but prior written notice to Landlord shall nonetheless be required) with respect to (i) any Alteration not involving the foundation, structure, roof, façade or electrical, mechanical, plumbing, elevator or HVAC systems of the Building, an estimated cost which is less than or equal to the Threshold Amount (as reasonably estimated by a licensed third party architect or contractor reasonably selected by Tenant), (ii) Alterations required by the Requirements or Applicable Law, or (iii) or any Alteration set forth on Schedule 26.2. As used herein, the term "nonstructural Alteration" means an alteration that does not materially and adversely affect the roof, foundation, load-bearing walls or the building-wide systems (e.g. electric, water, HVAC, etc.) serving a Property.

(b)    Other than an Alteration to comply with Applicable Laws, and subject to Article 26, no structural Alteration, and no other Alteration involving an estimated cost of more than the Threshold Amount (as reasonably estimated by a licensed third party architect or contractor reasonably selected by Tenant), shall be made without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    Any Alteration shall, when completed, be of such a character as not to be expected to reduce the value of the Premises below its value immediately before such Alteration as determined by Landlord in its reasonable discretion.

(d)    Notwithstanding the provisions of Section 5.4(a)(i) and (ii) and Section 5.4(b), if, under the provisions of any Mortgage or any loan documents in connection therewith, any Alteration requires the consent of the Mortgagee, the written consent of such Mortgagee must be obtained before the commencement of any such Alteration.

(e)    Notwithstanding the provisions of Section 5.4(a) and Section 5.4(b), no Alteration shall be made by Tenant or any Subtenant without Landlord's prior written consent, in Landlord's sole and absolute discretion, if the same would (i) reduce the useable square footage of the Property being altered, (ii) weaken, temporarily or permanently, the structure of the Building being altered or any part thereof, or (iii) enable Tenant or any Subtenant to conduct activity inconsistent with the limitations upon the Permitted Use as stated in Article 4, provided that Tenant demonstrates to the reasonable satisfaction of Landlord that such Alterations will not affect its ability to pay Rent hereunder.

(f)    The reasonable cost and expense of Landlord's and Mortgagee's review of any plans and specifications for Alterations required to be furnished to Landlord and Mortgagee pursuant to Section 5.5 hereof, including third party costs and expenses incurred by Landlord or

Mortgagee, shall be paid by Tenant to Landlord within ten (10) days after written demand as Supplementary Rent.

(g)     The provisions and conditions of <u>Section 5.5</u> shall apply to any work performed by Tenant under this <u>Section 5.4</u>.

(h)     For purposes of <u>Section 5.2</u>, <u>Section 5.4</u> and <u>Section 5.5</u>, where Landlord's consent is required, the "**Threshold Amount**" shall mean, for each applicable project or series of related projects in a Property, an amount equal to ten percent (10%) of a Property's annual Base Rent.

(i)     For purposes of <u>Section 5.4</u> and <u>Section 5.5</u>, notice of whether Landlord's consent has been given or withheld shall be delivered to Tenant within thirty (30) days following receipt of Tenant's written request ("**Alteration Notice**") (as such time period shall be extended for a reasonable period in the event Landlord determines, in its reasonable discretion, that it is prudent to engage a third party to review the plans and specifications, if any, pertaining to such contemplated Alteration). If, within thirty (30) days of Landlord's receipt of an Alteration Notice, Landlord fails to provide Tenant with written notice confirming whether Landlord's consent to such Alteration has been given or withheld, and should such failure continue for ten (10) Business Days after Landlord's receipt of a second written notice specifically referencing this Section of the Lease and stating in bold, and all-capitalized letters "**LANDLORD'S FAILURE TO RESPOND WITHIN TEN (10) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE SHALL CONSTITUTE LANDLORD'S DEEMED APPROVAL OF THIS ALTERATION NOTICE**", or including comparable language of similar import, then Landlord shall be deemed to have conclusively approved the Alteration specified in the Alteration Notice.

5.5     <u>Tenant Work</u>. Tenant agrees that all Alterations, repairs, Restoration and other work which Tenant or a Subtenant shall be required or permitted to do under the provisions of this Lease (each hereinafter called the "**Work**") shall be at Tenant's or a Subtenant's sole cost and expense (except to the extent that funds are made available for such Work from the applicable reserves under <u>Section 26.5</u> hereof), and (i) performed in a good, workmanlike manner, and in accordance with this Lease and all Requirements and Applicable Laws, as well as any plans and specifications therefor which shall have been approved by Landlord (if such approval is required hereunder), (ii) commenced and completed promptly and (iii) done in all cases upon, in compliance with and subject to the terms of any Non-Disturbance Agreement and, to the extent not inconsistent with any term thereof, all of the following terms and conditions:

(a)     If the Work shall (i) involve the foundation, structure, roof, façade or electrical, mechanical, plumbing, elevator or HVAC systems, or (ii) cost more than the Threshold Amount (as reasonably estimated in writing by a licensed third party architect or contractor reasonably selected by Tenant and approved by Landlord, in Landlord's commercially reasonable judgment), then the Work shall not be commenced until detailed plans and specifications (including layout, architectural, mechanics and structural drawings), prepared by a licensed architect selected by Tenant, or selected by a Subtenant and approved by Tenant and Landlord, a construction budget and the proposed form of construction contract(s) for the performance of the Work, shall have been submitted to and approved by (x) Landlord, which approval in each case shall not be unreasonably withheld, conditioned or delayed except as provided in Section 5.4(e) and (y) Mortgagee and (z) all Subtenants who have the right to consent to such Alterations pursuant to the terms of the applicable Subleases.

14

(b)     No material structural Work or Work costing more than the Threshold Amount shall be undertaken except under the supervision of a licensed third party architect or other appropriate design professional reasonably satisfactory to Landlord.

(c)     All Work shall be commenced only after all required permits, authorizations and approvals shall have been obtained by Tenant (or by the applicable Subtenant) from the appropriate Governmental Authorities, at its own cost and expense, and the originals or certified copies thereof delivered to Landlord and Tenant shall have furnished to Landlord satisfactory evidence that Tenant has obtained and maintains the insurance required under Section 5.5(f). Landlord will, on Tenant's written request, execute any documents necessary to be signed by Landlord to obtain any such permits, authorizations and approvals, *provided that* no such documents shall cause Landlord to incur any liability other than monetary liability associated with fees or costs charged in connection with such permits, authorizations and approvals, and Tenant shall pay and discharge any such expense or liability of Landlord in connection therewith.

(d)     If the Work will cost more than the Threshold Amount per project (as reasonably estimated in writing by a licensed third party architect or contractor reasonably selected by Tenant and approved by Landlord, which approval in each case shall not be unreasonably withheld, conditioned or delayed), then the Work shall not be commenced until Tenant shall have obtained and delivered to Landlord, (x) a performance bond and a labor and materials payment bond (issued by a corporate surety licensed to do business in the State in which the Premises are located and satisfactory to Landlord in its reasonable discretion), each in an amount equal to the estimated cost of such Work and in form otherwise satisfactory to Landlord in its reasonable discretion, and (y) such other security or evidence of ability to pay the estimated cost of such Work as shall be satisfactory to Landlord in its reasonable discretion.

(e)     The cost of all Work, to the extent uncontested, shall be paid promptly so that the Premises and Tenant's leasehold estate therein shall at all times be free from (i) liens for labor or materials supplied or claimed to have been supplied to the Premises or Tenant, and (ii) chattel mortgages, conditional sales contracts, title retention agreements, security interests and agreements, and financing agreements and statements. Tenant shall, upon Landlord's request, provide Landlord evidence of such payment satisfactory to Landlord in Landlord's reasonable discretion, which evidence may be provided as partial and final lien releases and waivers from any and all appropriate parties.

(f)     At all times when any Work is in progress, Tenant shall maintain or cause to be maintained with such companies and for such periods as Landlord may require (i) workers' compensation insurance covering all persons employed in connection with the Work, in an amount at least equal to the minimum amount of such insurance required by Applicable Law (with a waiver of subrogation satisfactory to Landlord in its reasonable discretion); and (ii) for the mutual protection of Landlord, Tenant, the applicable Subtenant and any Mortgagee, (1) builder's risk insurance, completed value form, covering all physical loss, in an amount satisfactory to Landlord in its reasonable discretion, and (2) commercial general liability insurance against all hazards, with limits for bodily injury or death to any one person, for bodily injury or death to any number of persons in respect of any one accident or occurrence, and for property damage in respect of one accident or occurrence in such amounts as Landlord in its reasonable discretion may require. Such commercial general liability insurance may be satisfied by the insurance required under Section 6.1(a), but may be effected by an endorsement, if obtainable, upon the insurance policy referred to in said Section. The provisions and conditions of Article 6 hereof shall apply to any insurance which Tenant shall be required to maintain or

15

cause to be maintained under this subsection. All contractors, subcontractors, vendors, materialmen and others performing any Work on the Premises or providing any supplies or materials in connection with Work on the Premises must be licensed and qualified to perform such services and/or provide such supplies and shall be required to maintain insurance of each of the types set forth above in such amounts as Landlord in its reasonable discretion requires, naming Landlord, and all Mortgagees as named insureds and Tenant shall obtain and supply to Landlord evidence of such required insurance.

(g)     Upon completion of any Work, Tenant, at Tenant's expense, shall obtain certificates of final approval of such Work required by any Governmental Authority and shall furnish Landlord with copies thereof, together with (i) "as-built" plans and specifications for such Work (if the cost of such Work exceeds the Threshold Amount), and (ii) final lien waivers and releases from any and all appropriate parties.

(h)     The conditions of <u>Section 5.4</u> shall have been complied with, to the extent applicable to the Work.

5.6     <u>Landlord's Inspection Right</u>. Following the delivery of at least one Business Day's prior written notice to Tenant (except in case of an emergency, in which event no such prior notice will be required), any Work shall be subject to inspection at reasonable times during normal business hours and without disruption to the business of Tenant or a Subtenant, by Landlord, its architect and Mortgagee, or their duly authorized representatives, and if Landlord's architect or Mortgagee upon any such inspection shall be of the opinion that the Work is not being performed substantially in accordance with the provisions of this <u>Article 5</u> or the plans and specifications, or that any of the materials or workmanship are not of good quality or are unsound or improper, Tenant shall correct any such failure and shall immediately replace any unsound or improper materials or workmanship, and Tenant shall, within five (5) Business Days after demand therefor, reimburse Landlord for its reasonable expenses actually incurred in connection with such inspection.

5.7     <u>Fixtures and Tenant Personal Property</u>. All Alterations, Fixtures and Related Personal Property, structures and other improvements shall become the property of Landlord and shall remain upon and be surrendered with the Premises. All Tenant Personal Property required to be removed by Tenant at the end of the Term remaining in the Premises thereafter shall be deemed abandoned and may, at the election of Landlord, either be retained as Landlord's property or may be removed from the Premises by Landlord at Tenant's expense. Tenant shall be responsible for, and shall reimburse Landlord within ten (10) days after written demand therefor, any damage to the Premises caused in whole or in part by the removal or demolition of Tenant Personal Property, structures or other improvements which Tenant is required to remove pursuant to this <u>Section 5.7</u> or which Tenant is entitled to and elects under the provisions of this Lease to remove. The provisions of this <u>Section 5.7</u> shall survive the expiration or earlier termination of the Term.

5.8     <u>Compliance with Applicable Law</u>. Notwithstanding any other provision of this Lease, Tenant shall be exclusively responsible at its own expense for determination and assurance that, and shall cause, the condition of the Premises and all repairs, Alterations Restoration and Work are in compliance in all material respects at all times with all Requirements of Governmental Authorities and of all Applicable Laws and for obtaining any approvals or consents of Governmental Authorities in connection with any repairs, Alterations, Restoration or Work.

# ARTICLE 6

## INSURANCE

6.1    <u>Policies to Maintain</u>. Throughout the Term, Tenant shall, at its own cost and expense, provide and keep in force (and, where specifically indicated in the subparagraphs of this <u>Section 6.1</u>, cause the Subtenants to provide and keep in force) for the benefit of Landlord, Tenant, each Subtenant and any Mortgagee, for each Property:

(a)    commercial general liability insurance and professional liability insurance, (including owner's protective liability coverage on operations of Tenant, Drexel Subtenant, and/or their respective independent contractors engaged in construction, personal injury, and blanket contractual liability insurance) with a limit for each occurrence not less than (i) $3,000,000 as to Tenant and Drexel Subtenant, or (ii) $1,000,000 as to any other Subtenant, and to have general aggregate limits of not less than (i) $5,000,000 as to Tenant and Drexel Subtenant, or (ii) $2,000,000 as to any other Subtenant, for each policy year, protecting and indemnifying Landlord, Tenant, Subtenant, and any Mortgagee against all claims for damages to person or property or for loss of life or of property occurring upon, in, or about the Premises, written on a claims made or occurrence basis. Such coverage shall contain endorsements: (i) deleting any liquor liability exclusion (if alcohol is sold on the Premises); (ii) including cross-liability; and (iii) waiving the insurer's rights of subrogation against Landlord for events of which Landlord is not, but Tenant and/or Subtenant is, covered; provided however, that with regard to the requirements of waiver of subrogation against Landlord, Tenant shall utilize its best efforts to obtain such waiver in any insurance policy procured by Tenant or the Subtenant, and if it cannot do so, Landlord shall have the right to procure, at Tenant's expense, an insurance policy containing such waiver if it can do so at the same or better price and on substantially the same terms and conditions;

(b)    property insurance on the Premises and all installations, additions and improvements which may now or hereafter be erected thereon against "Special Causes" of loss or damage in an amount sufficient to prevent Landlord, Tenant, each Subtenant and any Mortgagee from becoming co-insurers and in any event, including loss or damage from earthquakes and windstorm, in an amount not less than one hundred percent (100%) of the actual replacement value thereof (i.e., including the cost of debris removal) as determined by Landlord in its reasonable discretion from time to time consistent with coverages for similarly situated properties. Such coverage shall contain an agreed amount endorsement reasonably acceptable to Landlord;

(c)    business interruption insurance covering risk of loss due to the occurrence of any of the hazards covered by the insurance to be maintained by Tenant described in <u>Section 6.1(b)</u> with coverage in a face amount of not less than the aggregate amount, for a period of twelve (12) months following the insured-against peril, of 100% of all Rent (which includes all Impositions and other amounts specified in the definition of Rent) to be paid by Tenant under this Lease; such coverage shall contain an agreed amount endorsement acceptable to Landlord;

(d)    workers' compensation insurance (including employers' liability insurance), with a waiver of subrogation satisfactory to Landlord in its reasonable discretion, covering all persons employed at the Premises to the extent required by the Applicable Laws and Requirements of the state in which the Premises are located, including, without limitation, during the course of work to the Premises; *provided, however*, that with regard to the requirements of

17

waiver of subrogation against Landlord, Tenant shall utilize its best efforts to obtain such waiver in any insurance policy procured by Tenant;

      (e)    mechanical breakdown insurance, if applicable, in an amount not less than one hundred percent (100%) of the actual replacement value thereof and of any improvements in which any such boiler is located (including the cost of debris removal but excluding foundations and excavations) as determined by Landlord in its reasonable discretion from time to time;

      (f)    if sprinkler systems are located in the Buildings, sprinkler leakage insurance in amounts approved by Landlord in its reasonable discretion;

      (g)    flood insurance (if the Premises are located in whole or in part within a special flood hazard area as designated by any department or agency of the United States Government having jurisdiction);

      (h)    equipment coverage and elevator liability coverage, if applicable, in amounts approved by Landlord in its reasonable discretion;

      (i)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000) (if applicable);

      (i)    Garage keeper's Legal Liability Coverage, as reasonably required by Landlord;

      (j)    if during the Term, Tenant or the Premises are covered by general liability, professional liability, patient healthcare professional malpractice or other liability insurance on a "claims made" basis, Tenant shall procure and maintain, at Tenant's sole cost and expense, "tail" insurance coverage, with such coverage limits and such deductible amounts as shall be reasonably acceptable to Landlord for general liability, professional liability, patient healthcare professional malpractice or other liability claims reported after the termination of this Lease or expiration of the claims made policy, but concerning services provided during the Term of this Lease. Tenant shall provide Landlord with a certificate evidencing that such insurance coverage is in effect for a period of no less than one (1) year subsequent to the termination of this Lease no later than ninety (90) days prior to the termination of this Lease;

      (i)    all insurance required to be maintained by the lessor under the Subleases; and

      (k)    such other or additional insurance as Landlord or Mortgagee may reasonably require upon not less than thirty (30) days prior written notice to Tenant.

    6.2    <u>Policies to Name Landlord, Mortgagees</u>. Whenever under the terms of this Lease Tenant is required to maintain commercial general liability insurance for the benefit of Landlord, (i) Landlord, and any Mortgagee shall be an additional insured in all such commercial general liability insurance policies, and (ii) either Landlord or Mortgagee, as specified in <u>Section 6.3</u>, shall be named as loss payee on the property insurance policy. In the event that the Premises shall be subject to a Mortgage, the commercial general liability insurance shall name the Mortgagee (together with any trustee or servicer therefor) as an additional insured and all other insurance provided hereunder shall name the Mortgagee as an additional insured or, as provided in <u>Section 6.3</u>, loss payee under a standard "non-contributory mortgagee" endorsement or its

18

equivalent. The original certificates (on Acord Form 27 or its equivalent in the case of casualty and on insurance company letterhead in the case of liability) shall be delivered to Landlord and any Mortgagee.

6.3     <u>Adjustment</u>. The loss under all insurance policies insuring against property damage to the Buildings shall be payable to Mortgagee (or, if Mortgagee or requires, a financial institution acting as insurance depository) or, if there is none, to Landlord who shall be named as an additional loss payee subject to <u>Section 7.2</u>. All property insurance policies required by this Lease shall provide that all adjustments for claims with the insurers in excess of the Threshold Amount (exclusive of any deductible) shall be made only with the approval of Landlord and any Mortgagee, which approval shall not be unreasonably withheld, conditioned, or delayed. Subject to the terms of any Mortgage, any adjustments for claims with the insurers involving sums of the Threshold Amount (exclusive of any deductible) or less shall be made with Landlord and Tenant.

6.4     <u>Insurance Company Requirements</u>. All of the above-mentioned insurance policies and/or certificates evidencing such policies shall be obtained by Tenant and delivered to Landlord on or prior to the date hereof, and thereafter as provided for herein, and shall be written by insurance companies: (i) rated "A:VIII" or better in "Best's Insurance Guide" (or any substitute guide acceptable to Landlord) and at least "A" by Standard & Poor's Ratings Group; (ii) authorized to do business in the state where the Premises are located; and (iii) of recognized responsibility and which are reasonably satisfactory to Landlord and any Mortgagee. Any deductible amounts under any insurance shall not be more than 5% of the value of the Premises.

6.5     <u>Evidence of Insurance, Renewal</u>. Within thirty (30) days prior to the expiration of any policy or policies of such insurance, Tenant shall renew such insurance and shall deliver to Landlord and any Mortgagee certificates of insurance, endorsed in accordance with <u>Section 6.2</u>, promptly following the renewal of any such policy of insurance. All coverage described in this <u>Article 6</u> shall be endorsed to provide Landlord and Mortgagee with ten (10) days' notice of cancellation for nonpayment of premium. If Tenant shall fail to procure the insurance required under this <u>Article 6</u> in a timely fashion or to deliver such certificates to Landlord, Landlord may, at its option and in addition to Landlord's other remedies for an Event of Default by Tenant, upon written notice to Tenant, procure the same for the account of Tenant, and the cost thereof shall be immediately paid to Landlord as Supplementary Rent.

6.6     <u>No Violation of Policies</u>. Tenant shall not violate, nor shall Tenant permit a Subtenant to violate, in any material respect, any of the conditions of any of the said policies of insurance, which violation would result in the termination of the insurance coverage described in this <u>Article 6</u>.

6.7     <u>Prohibited Insurance</u>. Tenant shall not carry, nor shall Tenant permit a Subtenant to carry, separate or additional insurance affecting the coverage described in this <u>Article 6</u> concurrent in form and contributing in the event of any loss or damage to the Premises with any insurance required to be obtained by Tenant under this Lease, unless such separate or additional insurance shall comply with and conform to all of the provisions and conditions of this <u>Article 6</u>. Tenant shall promptly give notice to Landlord of such separate or additional insurance.

6.8     <u>Blanket/Umbrella</u>. The insurance required by this Lease, at the option of Tenant, may be effected by blanket and/or umbrella policies issued to Tenant and (with respect to insurance required of Subtenants, blanket and/or umbrella policies issued to Subtenants) covering the Premises, provided that the policies otherwise comply with the provisions of this Lease and allocate to the different properties comprising Premises the specified coverage,

19

without possibility of reduction or coinsurance by reason of, or damage to, any other premises named therein, and if the insurance required by this Lease shall be effected by any such blanket or umbrella policies, Tenant shall furnish to Landlord or Mortgagee evidence of insurance in the form required by <u>Section 6.3</u>, with schedules thereto attached showing the amount of insurance afforded by such insurance policies applicable to each of the properties comprising the Premises.

      6.9   <u>Landlord's Right to Place Policy</u>. In the event that Tenant fails to maintain the insurance required to be maintained by Tenant under this Lease following at least five (5) Business Days written notice thereof from Landlord, Landlord may thereafter, in its reasonable discretion, designate that with respect to property, fire and related building insurance coverages as described in this Lease, Landlord or Landlord's Affiliates may obtain some or all of such insurance coverages otherwise required to be obtained by Tenant under this Lease at the expense of Tenant, and in such event, Tenant shall pay to Landlord, as Supplementary Rent, the premiums and all other costs of such insurance, on a timely basis when and as required to be paid by Landlord, including payment in advance of the date such costs become due and payable, whether by payment of a single installment or in equal monthly installments. Landlord may cause such insurance which it obtains to be provided by or through an insurance carrier or insurance agency which is an Affiliate of Landlord. In the event Landlord or Landlord's Affiliates obtain any or all of the insurance coverage as set forth herein, Landlord shall furnish a certification of such insurance coverage(s) to Tenant evidencing the limits of such coverage so obtained.

      6.10   <u>Complying with Mortgagee</u>. Tenant shall comply (and shall cause the Subtenants to comply) with the insurance requirements of any Mortgagee under the Mortgage or any other loan document in connection therewith if they (a) require any insurance coverage not otherwise required under this Lease or (b) provide for more stringent coverages, terms, conditions or provisions with respect to insurance coverage required under this Lease for coverage customarily maintained on similar facilities in Philadelphia, Pennsylvania. Additionally, Tenant shall obtain and maintain such other insurance or such greater policy amounts for the insurance specified above as Landlord may reasonably require from time to time.

      6.11   <u>Insurance Reserve Fund</u>. Notwithstanding any provision in this Lease to the contrary, if at any time Tenant fails to maintain all of the insurance coverage that Tenant is required to maintain under the terms of this Lease, then at Landlord's written request made at any time thereafter, Tenant shall: (i) pay to Landlord or, if directed by Landlord, Mortgagee on the first (1st) day of each month until thirty (30) days prior to the date when the next installment of the premiums for the policies of insurance that Tenant is required by the terms of this Lease to maintain (the "**Insurance Premiums**"), is due an amount equal to said next installment of Insurance Premiums divided by the number of months over which such payments are to be made; and (ii) thereafter during the Term pay Landlord or Mortgagee an amount each month estimated by Landlord or Mortgagee to be adequate to create a fund ("**Insurance Premium Reserve Fund**") which, as each succeeding installment of Insurance Premiums becomes due, will be sufficient, thirty (30) days prior to such due date, to pay such installment in full. Landlord or Mortgagee shall use reasonable efforts to cause the monthly payments to be equal in amount, but neither of them shall be liable in the event that such required payments are unequal. All such payments shall be deemed to be Supplementary Rent and Rent hereunder. If at any time the amount of any Insurance Premium is increased, said monthly payments shall be increased within five (5) Business Days after written demand by Landlord or Mortgagee so that, thirty (30) days prior to the due date for each installment of Insurance Premiums, there will be payments on hand with Landlord or Mortgagee sufficient to pay such installments in full. Landlord or Mortgagee may apply the full amount of the Insurance Premium Reserve Fund (as defined herein) to

payments of Insurance Premiums required to be made by Tenant pursuant to this Article 6. In making any payment relating to the Insurance Premium Reserve Fund, Landlord or Mortgagee may do so according to any bill, statement or estimate procured from the applicable insurance company or provided by Tenant without inquiry into the accuracy of such bill, statement or estimate or into the validity of any Insurance Premium. Landlord or Mortgagee shall not be required to deposit any such amounts in an interest bearing account. For the purpose of determining whether Landlord or Mortgagee has on hand sufficient moneys to pay any particular Insurance Premium at least thirty (30) days prior to the due date therefor, payments for each category of insurance shall be treated separately, it being the intention that Landlord shall not be obligated to use moneys paid for the payment of an item not yet due and payable to the payment of an item that is due and payable. Notwithstanding the foregoing, it is understood and agreed that (a) to the extent permitted by Applicable Law, payments provided for hereunder may be held by Landlord or its Affiliate or Mortgagee in a single bank account and commingled with other funds of Landlord or Mortgagee, and (b) Landlord or Mortgagee, may, if Tenant fails to make any payment required hereunder, use payments made for any one item for the payment of the same or any other item of Rent. If this Lease shall be terminated by reason of any Event of Default, all payments then held by Landlord shall be applied by Landlord on account of any and all sums due under this Lease; if there is a resulting deficiency, Tenant shall pay the same, and if there is a surplus, Tenant shall be entitled to a refund of the surplus. Tenant acknowledges and agrees that no deficiency or lack of funds in the Insurance Premium Reserve Fund shall relieve Tenant of its obligation to pay all Insurance Premiums as required under this Lease.

(a)     Security Interest. Although it is the intent of Landlord and Tenant that Tenant's payments to Landlord for the Insurance Premium Reserve Fund are Supplemental Rent and Rent under this Lease, if a court determines that, by operation of Applicable Law, such sums are not Supplemental Rent or Rent but instead are the property of Tenant, then to further protect Landlord's interest in said amounts, Tenant hereby grants to Landlord a first-priority security interest in the Insurance Premium Reserve Fund and any and all monies now or hereinafter deposited therein as additional security for payment of Rent. Until expended or applied in accordance with the terms of this Lease, the Insurance Premium Reserve Fund shall serve as additional security for Tenant's obligations hereunder. Upon the occurrence of an Event of Default, Landlord may, in addition to all other remedies under this Lease, apply any or all of the Insurance Premium Reserve Fund for the payment of Rent or other sums owing to Landlord under this Lease in its sole discretion. The Insurance Premium Reserve Fund shall not constitute trust funds.

(b)     General. Tenant shall not pledge, assign or grant a security interest in the Insurance Premium Reserve Fund, or permit any lien or encumbrance to attach thereto or any levy to be made thereon by a party claiming through Tenant, except those naming Landlord as the secured party. Should Landlord elect to hold the Insurance Premium Reserve Fund in an interest bearing account, all interest earned shall be added to the Insurance Premium Reserve Fund and Tenant shall pay all taxes due in connection therewith.

6.12    Waiver of Subrogation. Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if, and to the extent, that any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Section. The provisions of this Section shall prevail over any conflicting provision in the Lease,

21

it being the intention of Landlord and Tenant that wherever applicable the waiver of subrogation contained in this Section shall take precedence over any other provision providing for the liability of one party to the other.

## ARTICLE 7

## DAMAGE OR DESTRUCTION

7.1    Restoration. If the Premises or any Building or any part thereof shall be damaged or destroyed by fire or other casualty (including any casualty for which insurance was not obtained or obtainable) of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, (a) Landlord shall pay over to Tenant, upon the terms set forth in Section 7.2 and Section 7.3, any moneys which may be recovered by Landlord from property insurance procured by Tenant as required by this Lease, to the extent of Restoration Costs incurred by Tenant, with excess (if any) being paid to Landlord or (if required) to Mortgagee, (b) this Lease shall be unaffected thereby and shall continue in full force and effect, and (c) Tenant shall, expeditiously, diligently and in a good and workmanlike manner, cause such damage or destruction to be remedied or repaired to a condition that is substantially similar to, or better than, the condition that existed immediately prior to such damage by restoring the Premises to substantially the same design and configuration and as good (or better) condition that existed immediately prior to such damage or destruction and to a value which shall not be less than the value of the Premises prior to such fire or other casualty (the "**Restoration**"). All Restoration work shall be performed in accordance with the provisions of this Lease, including, without limitation, the provisions of Section 5.4 and Section 5.5 hereof. Tenant hereby waives the provisions of any Applicable Law to the contrary and agrees that the provisions of this Article 7 shall govern and control in lieu thereof. If Tenant shall fail or neglect to restore the Premises with reasonable diligence, or having so commenced such Restoration, shall fail to complete the same with reasonable diligence, then (i) such failure shall constitute an Event of Default hereunder, and (ii) Landlord shall have the right, but not the obligation, to complete such Restoration at Tenant's cost and expense and the cost thereof shall be payable within thirty (30) days after Tenant's receipt of Landlord's written demand therefor as Supplementary Rent, together with interest thereon from the date of demand until paid at the Default Rate. The obligations of Tenant under this Section 7.1 shall survive the expiration or earlier termination of this Lease.

7.2    Disbursing of Proceeds. If Tenant fails to comply with its obligations under Section 7.1 hereof in any material respect, Landlord, the insurance carrier, or any Mortgagee may elect in their discretion to perform the Restoration (being under no obligation to do so). Subject to Tenant's compliance with Article 7 and provided no Event of Default is outstanding, Landlord shall pay over to Tenant (said disbursements, if Landlord so elects, being administered through an institutional insurance depository or other arrangements satisfactory to Landlord and Mortgagee) from time to time, upon the following terms, any moneys which may be received by Landlord from property insurance provided by Tenant or any Subtenant, but in no event to any extent or in any sum exceeding the amount actually collected by Landlord upon the loss; *provided, however,* that Landlord, before paying such moneys over to Tenant, shall be entitled to reimburse or pay itself therefrom to the extent, if any, of (i) the expenses paid or incurred by Landlord in the collection of such moneys, and (ii) any other amounts then outstanding and owing to Landlord under this Lease. Landlord shall pay to Tenant, as herein provided (said disbursements being administered through an institutional insurance depository or other administrative arrangements as provided above), the aforesaid insurance proceeds which may be received by Landlord, to be applied towards the cost of Restoration. Prior to making any Restoration, Tenant shall furnish Landlord with an estimate of the cost of such Restoration,

22

prepared by a licensed third party architect or contractor selected by Tenant and reasonably approved by Landlord. Subject to Tenant's compliance with this Article 7, such insurance moneys shall be paid to Tenant (or, at Landlord's or Mortgagee's option, directly to the party to whom such payment is due) from time to time thereafter in installments as the Restoration progresses, within ten (10) Business Days after application to be submitted by Tenant to Landlord showing the cost of labor and material incorporated in the Restoration, or incorporated therein since the last previous application (assuming such proceeds are available from the insurer). If any vendor's, mechanic's, laborer's, or materialman's lien is filed against the Premises or any part thereof, or if any public improvement lien is created or permitted to be created by Tenant and is filed against Landlord, or any assets of, or funds appropriated to, Landlord, Tenant shall not be entitled to receive any further installment until such lien is satisfied or otherwise discharged, unless such lien is contested by Tenant in good faith and Tenant has obtained and delivered a bond issued by a surety, in an amount and in form otherwise satisfactory to Landlord in its reasonable discretion. The amount of any installment to be paid to Tenant shall be such proportion of the total insurance moneys received by Landlord as the cost of labor and materials theretofore incorporated by Tenant in the Restoration bears to the total estimated cost of the Restoration by Tenant, less (a) all payments theretofore made to Tenant out of said insurance proceeds, and (b) ten percent (10%) of the amount so determined with such percentage reduced to zero upon completion of the Restoration (the "**Retainage**"). Retainage shall not be in addition to retainage held by Tenant under the construction contract. Notwithstanding the foregoing, Landlord shall not withhold the Retainage from any portion of any installment provided (i) such portion constitutes the final payment due a subcontractor or materialman, or (ii) in the case of the general contractor, the general contractor is bonded and Tenant furnishes to Landlord payment and performance bonds and labor and material bonds of Tenant's contractor complying with the Requirements, Applicable Laws and otherwise satisfactory to Landlord in its reasonable discretion, naming Landlord as co-obligee, in which event Landlord shall withhold from such installment the same percentage withheld by Tenant pursuant to the construction contract. Upon completion of and payment for the Restoration, including reimbursement of the Retainage or other amount, as applicable, the balance of any and all insurance proceeds held by Landlord shall be paid to Landlord or (if required) to Mortgagee.

7.3    Payment Conditions. The following shall be conditions precedent to each payment made to Tenant (or to any other party) as provided in Section 7.2 above:

(a)    Tenant shall provide Landlord a certificate of the aforesaid architect or contractor stating (i) that the sum then requested to be withdrawn either has been paid by Tenant and/or is justly due to contractors, subcontractors, materialmen, engineers, architects or other persons (whose names and addresses shall be stated) who have rendered or furnished certain services or materials for the work and giving a brief description of such services and materials and the principal subdivisions or categories thereof and the several amounts so paid or due to each of such persons in respect thereof, and stating in reasonable detail the progress of the work up to the date of said certificate, (ii) that no part of such expenditures (A) has been or is being made the basis, in any previous or then pending request, for the withdrawal of insurance money or (B) has been made out of the proceeds of insurance received by Tenant or the Subtenant, (iii) that the sum then requested does not exceed the value of the services and materials described in the certificate, and (iv) that the balance of any insurance proceeds held by Landlord, together with such other sums, if any, which Tenant or the Subtenant has made or will (for which evidence of Tenant's intention and ability shall be to Landlord's satisfaction in its reasonable discretion) make available for the Restoration in accordance with Section 7.4 hereof and to Landlord's satisfaction (in its reasonable discretion) will be sufficient upon completion of the

23

Restoration to pay for the same in full, and stating in reasonable detail an estimate of the cost of such completion;

(b)      there shall be furnished to Landlord an official search, or a certificate of a title insurance company satisfactory to Landlord in its reasonable discretion, or other evidence satisfactory to Landlord in its reasonable discretion, showing that there has not been filed any vendor's, mechanic's, laborer's or materialman's statutory or other similar lien affecting the Premises or any part thereof, or any public improvement lien created or permitted to be created by Tenant or a Subtenant affecting Landlord, or the assets of, or funds appropriated to, Landlord, which has not been discharged of record, except such as will be discharged upon payment of the amount then requested to be withdrawn, or unless any such lien is contested by Tenant in good faith and Tenant has obtained and delivered a bond issued by a surety, in an amount and in form otherwise satisfactory to Landlord in its reasonable discretion;

(c)      at the time of making such payment, no Event of Default shall have occurred and be continuing;

(d)      Tenant shall have deposited the funds and other items required to be deposited under Section 7.4;

(e)      if the failure to pay for the applicable underlying work or material could result in a Lien, such payment request shall be accompanied by conditional lien waivers or other evidence of payment from such Person reasonably satisfactory to Landlord; and

(f)      satisfaction of such other conditions as Mortgagee or the institutional insurance depository referred to above, shall require.

7.4      Payment of From Insurance Proceeds. If the estimated cost of any Restoration, determined as provided in Section 7.2, exceeds the net insurance proceeds, or if at any time the remaining cost to pay for and complete the Restoration exceeds the amount of net insurance proceeds that remain available for disbursement to Tenant, Tenant shall on demand by Landlord or Mortgagee, deposit with Landlord (or with the institutional depository described above, if applicable), an amount sufficient, when added to the net insurance proceeds available for disbursement to Tenant, to pay for the Restoration, in which case Tenant's funds shall be fully disbursed prior to any further disbursement of insurance proceeds.

7.5      No Termination of Lease. As material consideration to Landlord for its agreement to enter into this Lease, the parties agree that this Lease shall not terminate or be forfeited or be affected in any manner, and there shall be no reduction or abatement of the Rent payable hereunder, by reason of damage to or total, substantial or partial destruction of the Premises or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any damage or destruction of the Premises from any cause whatsoever. Tenant expressly agrees that its obligations hereunder, including the payment of Rent payable by Tenant hereunder, shall continue as though the Premises had not been damaged or destroyed and without abatement, suspension, diminution or reduction of any kind.

7.6      Applicability of Mortgage. All provisions contained in the Mortgage or any other document in connection therewith which concern or pertain to the Restoration of the Premises, the application of insurance proceeds and any and all matters concerning a casualty shall take precedence over and be in lieu of any contrary provision provided for in this Lease, subject to the terms of any Non-Disturbance Agreement executed by the Mortgagee.

24

# ARTICLE 8

## CONDEMNATION

8.1     <u>Generally</u>. Tenant, immediately upon obtaining knowledge of the institution of any proceeding for a Taking, shall notify Landlord and Mortgagee thereof and Landlord and Mortgagee shall be entitled to participate in any Taking proceeding. Subject to the provisions of this <u>Article 8</u>. Tenant hereby irrevocably assigns to Mortgagee or to Landlord, in that order, any award or payment to which Tenant is or may be entitled by reason of any Taking, whether the same shall be paid or payable for Tenant's leasehold interest hereunder or otherwise.

8.2     <u>Limited Condemnation Termination</u>. If the whole of the Premises shall be permanently taken by condemnation or other eminent domain proceedings pursuant to any Applicable Law, general or special, or by conveyance made in response to the threat of the exercise of such a right (a "**Taking**"), or if a substantial and material portion of the Premises is taken such that neither Tenant nor DUCOM (if the DUCOM Lease covers 50% or more of the rentable floor area of the Building) is able to operate its business in the remaining portion of the Premises in substantially the same manner as it was operated prior to the Taking, then on the earlier of the date of the vesting of title to the Premises or the date of possession of the Premises (the "**Taking Ending Date**"): (i) this Lease shall terminate, (ii) all Rent required to be paid by Tenant under this Lease shall be pro-rated up to such date, (iii) Landlord shall be entitled to any and all awards in connection with such condemnation on account of Landlord's fee simple interest (unencumbered by this Lease) in the Properties, with such proceeds going first to pay any outstanding amounts owed to Mortgagee, and (iv) if and to the extent available as a separate award that does not detract from Landlord's award, Tenant shall be entitled to receive any and all awards on account of Tenant Personal Property, moving expenses and interruption of or damage to Tenant's or the affected Subtenant's business (but not in respect of any value of Tenant's leasehold interest under this Lease), upon such termination, this Lease shall be of no further force and effect, except that any obligation or liability of either party, actual or contingent, under this Lease which has accrued on or prior to the Taking Ending Date shall survive and any prepayment of Rent shall be prorated between the parties.

8.3     <u>Partial Taking</u>. In the event of a permanent partial Taking of the Premises as a result of which this Lease is not terminated pursuant to <u>Section 8.2</u>, then this Lease shall be unaffected by such Taking except as provided below in this <u>Section 8.3</u>, Tenant shall, continue to pay the Base Rent and Supplementary Rent pursuant to <u>Article 2</u>, and the following shall apply:

(i)     Landlord shall be entitled to receive the entire award in any proceeding with respect to such Taking without deduction therefrom for any estate vested in Tenant by this Lease and Tenant shall receive no part of such award;

(ii)    Notwithstanding the foregoing, in the event this <u>Section 8.3</u> is applicable, Landlord shall pay over to Tenant from time to time any moneys which may be received by Landlord on account of the exercise of the power of eminent domain with respect to the Premises, which (x) are necessary for Tenant to repair and restore such Building(s) such that the remaining portion of the Premises may continue to be operated and (y) represent an award for the loss of Tenant Personal Property, moving expenses and interruption of or damage to Tenant's or the affected Subtenant's business; *provided, however,* that Landlord, before paying such moneys over to Tenant, shall be entitled to reimburse or pay itself therefrom to the extent, if any, of (i) the reasonable expenses paid or incurred by Landlord in the collection of such moneys, and (ii) any other amounts then outstanding and owing to Landlord under this Lease. Such moneys

25

shall be disbursed to Tenant on the terms and subject to the conditions set forth in <u>Article 7</u> as if, for this purpose, such moneys were insurance proceeds resulting from casualty to the Premises. Tenant agrees to undertake such Restoration on such terms and subject to such conditions to the extent of the availability of such proceeds and such additional funds as are necessary to complete the Restoration at Tenant's own cost and expense; and

        (iii)     Base Rent shall be reduced in the same ratio that (x) the amount of net Taking proceeds from the Premises that are retained by Landlord, bears to (y) the Adjusted Base Amount (defined below). The "Adjusted Base Amount" shall mean $13,500,000, increased by three percent (3%) per annum from and after the Effective Date hereof.

8.4    <u>Taking Unimproved Land</u>. If only unimproved land shall be the subject of a Taking and <u>Section 8.2</u> and <u>Section 8.3</u> do not apply, this Lease shall be unaffected by such Taking, and Tenant shall continue to pay the Base Rent and Supplementary Rent pursuant to <u>Article 2</u> without adjustment and Landlord shall be entitled to receive the entire award in any proceeding with respect to such Taking without deduction therefrom for any estate vested in Tenant by this Lease end Tenant shall receive no part of such award.

8.5    <u>Temporary Taking</u>. If the use or occupancy of all or any part of the Premises shall be the subject of a temporary Taking during the Term of this Lease, Tenant shall be entitled, except as hereinafter set forth, to receive that portion of the award for such temporary Taking which represents compensation for the use and occupancy of the Premises and, if so awarded, for the temporary Taking of Tenant Personal Property and for moving expenses, and that portion which represents reimbursement for the cost of Restoration of the Premises. This Lease shall be and remain unaffected by such temporary Taking and Tenant shall be responsible for all obligations hereunder not affected by such temporary Taking and shall continue to pay in full when due the Base Rent and Supplementary Rent without adjustment and all other sums required to be paid by Tenant pursuant to the provisions of this Lease. If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award which represents compensation for the use or occupancy of the Premises (or a part thereof) shall be divided between Landlord and Tenant so that Tenant shall receive so much thereof as represents the period to and including the Expiration Date and Landlord shall receive so much as represents the period subsequent to the Expiration Date and Landlord shall be entitled to receive that portion which represents reimbursement for the cost of Restoration of the Premises. All moneys received by Tenant as, or as part of, an award for temporary use and occupancy for a period beyond the date to which the sums to be paid by Tenant hereunder have been paid by Tenant shall be received, held and applied by Tenant as a trust fund for payment of all sums payable by Tenant hereunder.

8.6    <u>Cooperation</u>. Each party agrees to execute and deliver to each other and to applicable Governmental Authorities all documents and instruments that may be required to effectuate the provisions of this <u>Article 8</u>.

**ARTICLE 9**

**<u>ASSIGNMENT AND SUBLETTING</u>**

9.1    <u>General Restriction</u>.

        (a)     Tenant shall not directly or indirectly (i) sell, assign, convey, alienate, sublease or otherwise transfer, directly or indirectly, by operation of law or otherwise, this Lease,

26

all or any portion of Tenant's estate or interest in this Lease or all or any portion of the Premises, (ii) permit any assignment of this Lease or any estate or interest therein or thereunder by operation of law, (iii) grant or permit, directly or indirectly, any Sublease or any material modification of any existing Sublease, (iv) grant or permit, directly or indirectly, any license, concession, or other right of occupancy of all or any portion of the Premises other than in the ordinary course of business to the operators of ancillary services offered by Subtenants of the Premises (except that Landlord's consent shall not be required with respect to licenses or other operating agreements covering less than 10% of the rentable square footage of the Premises so long as (x) such license or other operating agreement is expressly subject and subordinate to this Lease, and (y) such license or other occupancy agreement is expressly terminable without cause and without the payment of any termination fee or other consideration, upon not less than thirty (30) day prior written notice from Tenant or, upon an Event of Default, Landlord, (v) permit the use of the Premises or any part thereof by any parties other than Tenant or the Subtenants, (vi) mortgage, encumber, pledge, hypothecate, grant a security interest in, collaterally assign or conditionally transfer this Lease or any Subleases or any of the rents, issues and profits from a Sublease or any other commercial sublessee or Tenant's estate or interest in the Premises, (vii) consummate, or permit any direct or indirect constituent owner of Tenant to consummate, any transaction resulting in, or otherwise in any way implement or permit any direct or indirect constituent owner of Tenant to implement, a change of control (as defined below), (viii) permit Guarantor or any direct or indirect constituent owner of Guarantor to consummate, any transaction resulting in, or otherwise in any way implement or permit any direct or indirect constituent owner of Guarantor to implement, a change of control (as the terms "control" and "change of control" are defined below), or (ix) permit any affiliate Subtenant to directly or indirectly do any of the foregoing (each of the foregoing, a "**Transfer**"), without Landlord's prior written consent, which consent may be granted or withheld in Landlord's reasonable discretion (provided that, for avoidance of doubt, it shall be deemed reasonable for Landlord to disapprove, among other things (x) any proposed Sublease the term of which would extend beyond the then scheduled Term of this Lease or (y) any proposed assignee of Tenant's interests under this Lease or of any Controlling interest, directly or indirectly, in Tenant to a Person that is not a Qualified Assignee; and provided further that Landlord may in its sole discretion withhold its consent to any Transfer in the nature of clause (vi) above). For purposes of this Article 9, the terms: (i) "control" or "controls" shall mean (a) ownership directly or indirectly of more than fifty percent (50%) of all capital stock, membership interests, partnership interests, trust units, or any other equity interest in in an entity, or (b) possession, direct or indirect, of the power to direct or to cause the direction of, the management and policies of any person or entity, whether through the ownership of voting securities, or partnership, membership or other equity interests, by contract or otherwise; and (ii) "change of control" shall mean (a) a change of the direct or indirect power to direct or to cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, or partnership, membership or other equity interests, by contract or otherwise, (b) the pledge, hypothecation, encumbrance or transfer of any interest in an entity, or (c) the merger or consolidation of an entity by, with or into another entity. In addition, a change of control requiring Landlord's consent shall be deemed to occur if Tenant ceases to be the operator of substantially all of St. Christopher's Hospital for Children. Any attempted Transfer in violation of the terms and covenants of this Section 9.1 shall be void. Notwithstanding any provision of this Lease to the contrary, except as otherwise agreed by Landlord in its sole discretion (a) there shall be no assignment of this Lease with respect to less than the entire Premises, and (b) this Lease shall not be assigned in whole or in part unless the Other Master Leases are simultaneously assigned to the same Person. The parties hereby acknowledge that the structure created by this Lease and the Subleases is not intended to limit the rights granted to or expressly or implicitly reserved by Landlord under this Lease. Accordingly, notwithstanding any provision of this Lease to the contrary, where an Sublease

obligates a Subtenant to obtain the prior consent of approval of Tenant as the sublandlord under the Sublease, Tenant shall not give such consent or approval to the Subtenant without first obtaining the prior written consent or approval of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

9.2     Request for Consent. If Tenant requests Landlord's or any Mortgagee's consent to a Transfer, Landlord and such Mortgagee shall be given not less than thirty (30) days' advance written notice of the proposed Transfer, which notice shall be delivered to Landlord and such Mortgagee together with (i) a true and complete copy of the proposed instrument(s) of the Transfer (which, for avoidance of doubt, would include a copy of the proposed Sublease, if the proposed Transfer is a Sublease), and (ii) such other information and documents as Landlord or such Mortgagee may request in its reasonable discretion. Tenant shall pay, on demand, Landlord's and such Mortgagee's reasonable costs and expenses in connection with their consideration of whether to grant any such consent to a Transfer. No Transfer may be consummated during the continuance of an Event of Default without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord shall use commercially reasonable efforts to secure any required Mortgagee approval. Notice of whether Landlord's or Mortgagee's consent has been given or withheld shall be delivered to Tenant within fifteen (15) Business Days following receipt of Tenant's written request which includes (without limitation) the information described in clauses (i) and (ii) of the first sentence of this Section 9.2 ("**Transfer Notice**"). If, within twenty-one (21) days of Landlord's or Mortgagee's receipt of a Transfer Notice, Landlord and/or Mortgagee, as applicable, fails to provide Tenant within written notice confirming whether Landlord's or Mortgagee's consent to such Transfer has been given or withheld, and should such failure continue for ten (10) Business Days after Landlord's or Mortgagee's receipt of a second written notice specifically referencing this Section of the Lease and stating in bold, and all-capitalized letters "**LANDLORD'S AND MORTGAGEE'S FAILURE TO RESPOND WITHIN THE TEN (10) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE SHALL CONSTITUTE LANDLORD'S AND MORTGAGEE'S DEEMED APPROVAL OF THIS TRANSFER NOTICE**", or including comparable language of similar import, then Landlord and/or Mortgagee, as applicable, shall be deemed to have conclusively approved the Transfer specified in the Transfer Notice.

9.3     Nature of Consent. Any consent by Landlord under this Article 9 shall apply only to the specific transaction thereby authorized and shall not relieve Tenant from the requirement of obtaining the prior written consent of Landlord to any further Transfer of this Lease. No Transfer of all or a portion of this Lease shall release or relieve the original named Tenant (or any previously approved transferee) from any obligations of Tenant hereunder, and the original named Tenant (or any previously approved transferee) shall remain liable for the performance of all obligations of Tenant hereunder.

9.4     Subtenant Compliance. If Landlord consents in writing to a Transfer involving a Sublease, license or occupancy agreement with respect to the Premises or any part thereof, Tenant shall cause each permitted subtenant, licensee and occupant (each a "**Subtenant**" and collectively, the "**Subtenants**") to comply with its obligations under its respective Sublease, license or occupancy agreement, and Tenant shall diligently enforce all of its rights thereunder in accordance with the terms of such Sublease, license or occupancy agreement and this Lease.

9.5     Subtenant Breach. The fact that a violation or breach of any of the terms, provisions or conditions of this Lease results from or is caused by an act or omission by any of the Subtenants shall not relieve Tenant of Tenant's obligation to cure the same. Tenant shall take all necessary steps to prevent any such violation or breach.

9.6    Lockbox. All Subleases Rent shall be paid by the tenants under the Subleases directly into a lockbox established by Landlord (the "**Lockbox**"). The Subleases Rent shall be remitted into the Lockbox by Tenant upon receipt if not paid directly into the Lockbox by each Subtenant. Concurrently with the execution and delivery of this Lease, the parties hereto and Capital One, National Association, are entering into a Deposit Account Control Agreement (the "DACA"), pursuant to which amounts will be swept from the Lockbox into an account owned and maintained by Landlord (the "Landlord Account"). Each month, Landlord shall apply amounts received into the Landlord Account from the Lockbox to pay (a) Rent due hereunder; (b) reserves required under this Lease; and (c) Other Lease Deficit Amounts, as hereinafter defined. To the extent any amount remains in the Landlord Account following such payments due in any month, then, so long as there is no Event of Default, such remaining amount shall be paid to Tenant on or before the last day of the following month. The amount paid to Tenant shall be applied by Tenant to pay Operating Costs and for other purposes permitted by this Lease. To the extent there are insufficient sums in the Lockbox to pay the amounts described in clauses (a) through (c) above due under this Lease in any month (each, a "Deficit"), and to the extent amounts received from the lockboxes under Other Master Leases are insufficient to pay the amounts due under clauses (a) through (c) above due under this Lease in such month, Tenant shall pay any Deficit upon demand from Landlord.

Tenant acknowledges and agrees that the Other Master Leases contain provisions the same in substance as this Section 9.6. The term "Other Lease Deficit Amounts," as used herein, shall mean the amount, if any, comparable to the Deficit under the comparable provisions under the Other Master Leases.

Pursuant to the DACA and as set forth in Section 9.8 hereof, Landlord shall have a perfected lien and security interest in the Lockbox. The DACA shall be amended and/or replaced from time to time as reasonably requested by Landlord, or as required from time to time by Mortgagee.

9.7    Landlord Lockbox Rights. The establishment of the Lockbox and the requirement that Subleases Rents be paid directly into the Lockbox shall not constitute a release of Tenant from the performance by Tenant of the terms, covenants, and conditions on the part of Tenant to be observed or performed hereunder, including without limitation the obligation to pay Rent. Tenant hereby authorizes and directs each Subtenant to make such payments of Rent directly to the Lockbox, or into any cash management system required by any Mortgagee, upon receipt of notice from Landlord, and each Sublease will contain this provision. Following an Event of Default, in the event that amounts payable under any Subleases, licenses or occupancy agreements exceed the sums due to Landlord by Tenant hereunder, Landlord shall be entitled to receive all of such excess proceeds and Tenant hereby agrees to immediately pay over to Landlord all such excess upon Tenant's receipt of same. No direct collection by Landlord from any such Subtenant shall be construed to constitute a novation or a release of Tenant from the further performance of its obligations hereunder.

9.8    Collateral Assignment. To secure the prompt and full payment by Tenant of the Rent and the faithful performance by Tenant of all the other terms and conditions herein contained on its part to be kept and performed, Tenant hereby collaterally assigns, transfers and sets over unto Landlord, subject to the conditions hereinafter set forth, and hereby grants to Landlord a first priority continuing lien and security interest in, all of Tenant's right, title and interest in and to all Subleases, Subleases Rents, Lockbox and deposit account(s) (and any cash, receipts or other funds deposited therein to the extent constituting Subleases Rent, and any proceeds thereof) maintained by Tenant for the sole purpose of receiving Subleases Rent, making

29

any payments therefrom under this Lease and retaining any funds remaining therein thereafter; and all of Tenant's rights, title and interest in and to any Management Agreement solely related to the Premises (the foregoing together "Collateral"), and hereby confers upon Landlord, its agents and representatives, a right of entry (after prior written notice) in, and sufficient possession of, the Premises to permit and insure the collection by Landlord of the rentals and other sums payable under the Subleases, and further agrees that the exercise of said right of entry and qualified possession by Landlord shall not constitute an eviction of Tenant from the Premises or any portion thereof and that should said right of entry and possession be denied Landlord, its agent or representative, Landlord, in the exercise of said right, may use all requisite force to gain and enjoy the same without responsibility or liability to Tenant, its servants, employees, guests or invitees, or any Person whomsoever; *provided*, *however,* that such assignment shall become operative and effective only if (a) an Event of Default shall occur or (b) this Lease and the Term shall be cancelled or terminated pursuant to the terms, covenants and conditions hereof or (c) there occurs repossession under a dispossess warrant or other re-entry or repossession by Landlord under the provisions hereof or (d) a receiver for the Premises is appointed, and then only as to such of the subleases that Landlord may elect to take over and assume. At any time and from time to time within ten (10) days after Landlord's written demand, Tenant promptly shall deliver to Landlord a schedule of all Subleases, setting forth the names of all Subtenants, with a true, correct and complete copy of each of the Subleases; provided solely with respect to the first three calendar months ending after the Effective Date, such statements shall be due 45 days after the end of such month. Upon reasonable request of Landlord, Tenant shall permit Landlord and its agents and representatives to inspect all Subleases affecting the Premises. Tenant covenants that each Sublease shall provide that the Subtenant thereunder shall be required from time to time, upon request of Landlord or Tenant, to execute, acknowledge and deliver, to and for the benefit of Landlord, an estoppel certificate confirming with respect to such Sublease the information set forth in Section 14.1 hereof. Although this Section 9.8 is intended to be self-executing, Tenant shall, promptly upon request from Landlord from time to time, enter into such financing statements, instruments and agreements as Landlord may reasonably request to confirm, continue and/or perfect the security interests contemplated by this Section 9.8, in accordance with Applicable Law.

9.9    Required Sublease Terms. Tenant covenants and agrees that all Subleases entered into on or after the Effective Date affecting the Premises shall provide that (a) they are subject to this Lease and that the Subtenants acknowledge that they have read this Lease and accept the terms hereof, (b) the Subtenants will not do, authorize or execute any act, deed or thing whatsoever or fail to take any action which will or may cause Tenant to be in violation of any of its obligations under this Lease, (c) the Subtenants will not pay rent or other sums under the Subleases with Tenant for more than one (1) month in advance, (d) the Subtenants shall give to Landlord at the address and otherwise in the manner specified in Section 21.8 hereof (and, if requested by Mortgagee, shall give to Mortgagee, at such address as shall be furnished to Tenant by Mortgagee) a copy of any notice of default by Tenant as the landlord under the Subleases at the same time as, and whenever, any such notice of default shall be given by the Subtenants to Tenant, (e) the Subtenant shall pay all rent and other amounts due from time to time under the Sublease to the Lockbox, pursuant to such instructions as may be furnished to Tenant by Landlord or Mortgagee from time to time and (f) in the event of the termination or expiration of this Lease prior to the Expiration Date hereof, any such Subtenant, at Landlord's election for any Subleases entered into after the Effective Date, shall be obligated to attorn to and recognize Landlord as the lessor under such Sublease, in which event such Sublease shall continue in full force and effect as a direct lease between Landlord and the Subtenant upon all the terms and conditions of such Sublease, except as hereinafter provided. Any such attornment required by Landlord of such Subtenant shall be effective and self-operative as of the date of any such

30

termination or expiration of this Lease without the execution of any further instrument; *provided, however*, that such Subtenant shall agree, upon the request of Landlord, (x) to execute and deliver any such instruments in recordable form and otherwise in form and substance satisfactory to Landlord in its reasonable discretion to evidence said attornment and (y) shall, upon the request of any Mortgagee, execute and deliver an SNDA, Recognition Agreement or similar instrument, in recordable form. With respect to any attornment required by Landlord of any Subtenant hereunder, (i) at the option of Landlord, Landlord shall recognize all rights and obligations of Tenant as the lessor under such Sublease and the Subtenant thereunder shall be obligated to Landlord to perform all of the obligations of the Subtenant under such Sublease and (ii) Landlord shall have no liability, prior to its becoming lessor under such Sublease, to such Subtenant nor shall the performance by such Subtenant of its obligations under the Sublease, whether prior to or after any such attornment, be subject to any defense, counterclaim or set-off by reason of any default by Tenant in the performance of any obligation to be performed by Tenant as lessor under such Sublease, nor shall Landlord be bound by any prepayment of more than one (1) month's rent unless such prepayment shall have been expressly approved in writing by Landlord. The provisions of this Section shall survive the expiration or earlier termination of the Term.

9.10    Bankruptcy. If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of Title 11 of the United States Code or any statute of similar purpose or nature (the "**Bankruptcy Code**") to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment shall be given to Landlord by Tenant no later than fifteen (15) days after receipt of such offer by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall file any application or motion with a court of competent jurisdiction for authority and approval to enter into such assumption and assignment. Such notice shall set forth (a) the name and address of the assignee, (b) all of the terms and conditions of such offer, and (c) the proposal for providing adequate assurance of future performance by such person under the Lease, including, without limitation, the assurance referred to in Section 365 of the Bankruptcy Code. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease from and after the date of such assignment. Any such assignee shall execute and deliver to Landlord upon demand an instrument confirming such assumption.

9.11    Adequate Assurance. The term "**adequate assurance of future performance**" as used in this Lease shall mean (in addition to the assurances called for in Bankruptcy Code Section 365(1)) that any proposed assignee shall, among other things, (a) simultaneous assume the obligations of the tenant under each of the Other Master Leases in accordance with Section 9.11 thereof, (b) deposit with Landlord on the assumption of this Lease an amount equal to the greater of (i) six (6) times the then monthly Base Rent and Supplementary Rent or (ii) such other amount deemed by the Bankruptcy Court to be reasonably necessary for the adequate protection of Landlord under the circumstances, as security for the faithful performance and observance by such assignee of the terms and obligations of this Lease, (c) furnish Landlord with financial statements of such assignee for the prior three (3) fiscal years, as finally determined after an audit and certified as correct by a certified public accountant, which financial statements shall show a net worth at least equal to the amount of the deposit referenced in clause (a) above, (d) grant to Landlord a security interest in such property of the proposed assignee as Landlord shall deem necessary to secure such assignee future performance under this Lease, and (e) provide such other information or take such action as Landlord, in its reasonable judgment, shall

31

determine is necessary to provide adequate assurance of the performance by such assignee of its obligations under the Lease.

9.12    Intentionally Omitted.

9.13    Survival. The provisions of Section 9.10, Section 9.11, and Section 9.13 hereof shall survive one (1) year from the expiration or earlier termination of this Lease.

9.14    Special Purpose Entity. Notwithstanding any of the foregoing, any assignee of Tenant's interest in this Lease must at all times be a Special Purpose Entity.

9.15    Subleases. Tenant hereby represents, warrants and covenants that (a) it shall timely perform each and every covenant of the (sub)lessor under all of the Subleases in all material respects and that it will use commercially reasonable efforts to enforce the obligations of the Subtenants thereunder, subject to all applicable notice, grace, or cure periods thereunder and under this Lease; (b) except as otherwise expressly provided as a right of a Subtenant in the Sublease, Tenant will not consent to the termination of any Sublease without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed (provided, however that Landlord shall have the right to withhold its consent, in its sole and absolute discretion, to the termination of the Ducom Lease, and any such termination without Landlord's consent shall be void at Landlord's election; (c) Tenant shall not agree to an amendment to or modification of any Sublease without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that with respect to the Ducom Lease, Landlord agrees, on a one-time only basis, not to unreasonably withhold its consent to any amendment to or modification, restatement or extension of the Ducom Lease (a "**DUCOM Extension**"), so long as the term thereof does not extend beyond the scheduled term of this Lease, the form and substance of said proposed DUCOM Extension is satisfactory to Landlord in Landlord's commercially reasonable judgment and the rent under such Sublease is economically equivalent in value to the current rent under the Ducom Lease with annual increases of at least two and a half percent (2.5%) over the term of such Sublease (but any other modification or amendment of the Ducom Lease, including any further modification thereto after the execution of the DUCOM Extension, shall be subject to Landlord's prior written approval, in Landlord's sole and absolute discretion); and (d) Tenant shall deliver to Landlord any notice of default that that Tenant delivers to a Subtenant at the same time that the notice is delivered to the Subtenant, and shall deliver to Landlord a copy of any notice of default that Tenant receives from a Subtenant within three (3) Business Days after receipt of same. Notice of whether Landlord's consent has been given or withheld shall be delivered to Tenant within fifteen (15) Business Days following receipt of Tenant's written request ("**Sublease Notice**"). If, within twenty-one (21) days of Landlord's receipt of a Sublease Notice, Landlord fails to provide Tenant within written notice confirming whether Landlord's consent to such termination, amendment to or modification of a Sublease has been given or withheld, and should such failure continue for ten (10) Business Days after Landlord's receipt of a second written notice specifically referencing this Section of the Lease and stating in bold, and all-capitalized letters "**LANDLORD'S FAILURE TO RESPOND WITHIN THE TEN (10) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE SHALL CONSTITUTE LANDLORD'S DEEMED APPROVAL OF THIS SUBLEASE NOTICE**", or including comparable language of similar import, then Landlord shall be deemed to have conclusively approved the termination, amendment to or modification of a Sublease specified in the Sublease Notice. Notwithstanding anything to the contrary contained in this Section 9.15 or in Article 12 hereof, if Tenant fails to perform its obligations under any Sublease, including, without limitation, the Ducom Lease or the DUCOM Extension, and Tenant does not cure such failure to

perform within thirty (30) days after notice from Landlord, then the same shall, at Landlord's sole option and notice thereof to Tenant, constitute an Event of Default under this Lease. Further, whether or not such failure constitutes an Event of Default, Landlord shall have the right (but not the obligation) to enter the Leased Premises and to perform the obligations of Tenant under any Sublease at Tenant's sole cost and expense in accordance with Section 12.2(e) hereof.

## ARTICLE 10

## SUBORDINATION

10.1    <u>Subordination Generally</u>. This Lease shall be subject and subordinate to all Mortgages and each Superior Lease hereinafter in effect and to all renewals, modifications, consolidations, replacements, restatements, increases and extensions of any such Mortgages and/or Superior Lease; *provided, however,* that, within thirty (30) days of the Effective Date, the Mortgagee of such Mortgage and/or the Superior Landlord of such Superior Lease shall execute and deliver to Tenant an agreement (on such Mortgagee's or Superior Landlord's standard form reasonably acceptable to Tenant) to the effect that, if (i) there shall be a foreclosure of its Mortgage, such Mortgagee will not make Tenant a party defendant to such foreclosure, unless necessary under Applicable Law for the Mortgagee to foreclose, or if there shall be a foreclosure of such Mortgage, such Mortgagee shall not evict Tenant, or disturb Tenant's leasehold estate or rights hereunder, (ii) such Superior Landlord shall exercise any of its rights and remedies under such Superior Lease or at law or in equity to terminate such Superior Lease or evict the tenant thereunder, such Superior Landlord shall not evict Tenant, or disturb Tenant's leasehold estate or rights hereunder, or (iii) such Superior Lease or Mortgage conflicts with the terms of this Lease to increase the liabilities or reduce the benefits of Tenant under this Lease, the terms of this Lease shall prevail; *provided that,* in all events, no Event of Default has occurred (any such agreement, or any agreement of similar import, from a Mortgagee or any Superior Landlord being hereinafter called a "**Non-Disturbance Agreement**"), and Tenant shall attorn to the Mortgagee or any Superior Landlord, or any successor-in-interest to Landlord, the Mortgagee or any Superior Landlord including without limitation, any such party which takes title by foreclosure, power of sale, deed in lieu of foreclosure, pursuant to a proceeding in bankruptcy or alternative procedure, or any right or remedy under a Superior Lease or at law or in equity. The transfer of the title to the Premises, any part thereof or any underlying lease to any Mortgagee or any Superior Landlord, or any successor in interest to Landlord, Mortgagee or any Superior Landlord by foreclosure, power of sale, deed in lieu of foreclosure, pursuant to a proceeding in bankruptcy or any alternative procedure, or any right or remedy under a Superior Lease or at law or in equity shall <u>not</u> be considered a default or breach by Landlord of this Lease. This <u>Section 10.1</u> shall be self-operative and no further instrument of subordination shall be required to make the interest of any Mortgagee or Superior Landlord, as the case may be, superior to the interest of Tenant hereunder. Notwithstanding the previous sentence, however, Tenant shall, together with the Mortgagee or any Superior Landlord, as the case may be, execute and deliver promptly any certificate or agreement that Landlord and any Mortgagee or Superior Landlord, as the case may be, may reasonably request in confirmation of such subordination. Any Non-Disturbance Agreement may be made on the condition that neither the Mortgagee nor any Superior Landlord or anyone claiming by, through or under such Mortgagee or Superior Landlord shall be:

(a)    liable for any act or omission of any prior Landlord (including, without limitation, the then defaulting Landlord);

(b)    subject to any defense or offsets which Tenant may have against any prior Landlord (including, without limitation, the then defaulting Landlord) which arise prior to the

33

date such Mortgagee (or someone acquiring at a foreclosure sale related to the Mortgagee's Mortgage) or Superior Landlord acquires title to the Premises or any part thereof or interest therein;

        (c)    bound by any payment of Rent which Tenant might have paid for more than the current month to any prior Landlord (including, without limitation, the then defaulting Landlord);

        (d)    bound by any obligation to make any payment to Tenant which was required to be made prior to the time such Landlord succeeded to any prior Landlord's interest;

        (e)    bound by any obligation to perform any work or to make improvements to the Premises which was required to be made prior to the time such Landlord succeeded to any prior Landlord's interest;

        (f)    bound by any modification, amendment or supplement to this Lease made without the prior written consent of the Mortgagee and/or each Superior Landlord; or

        (g)    bound by any security deposit for Tenant's obligations under this Lease unless such deposit is actually received by Mortgagee and/or a Superior Landlord.

        If required by any Mortgagee or Superior Landlord, Tenant promptly shall join in any Non-Disturbance Agreement to indicate its concurrence with the provisions thereof and its agreement, in the event of (i) a foreclosure of any Mortgage, or (ii) such Superior Landlord's exercise any of its rights and remedies under such Superior Lease or at law or in equity to terminate such Superior Lease or evict the tenant thereunder, to attorn to such Mortgagee or Superior Landlord, as the case may be, as Tenant's landlord hereunder. Tenant shall promptly so accept, execute and deliver any Non-Disturbance Agreement proposed by any Mortgagee or Superior Landlord which conforms with the provisions of this Section 10.1. Any Non-Disturbance Agreement may also contain other terms and conditions as may otherwise be required by any Mortgagee or Superior Landlord which do not increase Tenant's monetary obligations or materially and adversely affect the rights or obligations of Tenant under this Lease.

        10.2   Notice; Mortgagee Performance. Tenant hereby agrees to give to any Mortgagee and Superior Landlord copies of all notices given by Tenant of default by Landlord under this Lease at the same time and in the same manner as, and whenever, Tenant shall give any such notice of default to Landlord. Such Mortgagee and Superior Landlord shall have the right to remedy any default under this Lease, or to cause any default of Landlord under this Lease to be remedied, and for such purpose Tenant hereby grants such Mortgagee and Superior Landlord such period of time as may be reasonable to enable such Mortgagee or Superior Landlord to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default which is a default. Tenant shall accept performance by such Mortgagee or the Superior Landlord of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. No default under the Lease shall exist or shall be deemed to exist (i) as long as such Mortgagee or Superior Landlord, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, subject to Force Majeure, or (ii) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by such Mortgagee or Superior Landlord, as long as such Mortgagee or Superior Landlord, in good faith, shall have notified Tenant that such

Mortgagee or Superior Landlord intends to institute proceedings under the Mortgage or the Superior Lease, as applicable, and, thereafter, as long as such proceedings shall have been instituted and shall prosecute the same with reasonable diligence and, after having obtained possession, prosecutes the cure to completion with reasonable diligence. This Lease shall not be assigned (subject to the provisions of Article 9) by Tenant or modified, amended or terminated without such Mortgagee's and each Superior Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld, conditioned or delayed. In the event of the termination of this Lease by reason of any default thereunder or for any other reason whatsoever except the expiration thereof, upon such Mortgagee's or Superior Landlord's written request, given within thirty (30) days after any such termination, Tenant, within fifteen (15) days after receipt of such request, shall execute and deliver to such Mortgagee or Superior Landlord or its designee or nominee a new lease of the Premises for the remainder of the Term of the Lease upon all of the terms, covenants and conditions of this Lease. Neither such Mortgagee nor Superior Landlord or its designee or nominee shall become liable under this Lease unless and until such Mortgagee, Superior Landlord or its designee or nominee becomes, and then only for so long as such Mortgagee, Superior Landlord or its designee or nominee remains, the fee owner of the Premises or the owner of the leasehold interest of Landlord under this Lease. Such Mortgagee and Superior Landlord shall have the right, without Tenant's consent, to, as the case may be, foreclose the Mortgage or to accept a deed in lieu of foreclosure of such Mortgage, or exercise its rights and remedies under such Superior Lease or at law or in equity to terminate such Superior Lease or evict the tenant thereunder.

10.3    Inability to Obtain Non-Disturbance Agreement. Landlord shall use its commercially reasonable efforts to obtain the Non-Disturbance Agreement referred to in Section 10.1 above from the Mortgagee of the Mortgage and each Superior Landlord under a Superior Lease which was in existence prior to the date of execution of this Lease, but Landlord does not assure that such Non-Disturbance Agreement can be obtained. This Lease shall be subject and subordinate to all Mortgages and each Superior Lease hereinafter in effect and to all renewals, modifications, consolidations, replacements, restatements, increases and extensions of any such Mortgages and/or Superior Lease only if Tenant obtains a fully executed Non-Disturbance Agreement from the Mortgagee of the Mortgage and each Superior Landlord under a Superior Lease, as applicable.

10.4    Limitation of Tenant Termination Right. If (x) a Superior Lease or Mortgage exists, and (y) Landlord gives Tenant notice thereof to Tenant, then Tenant shall not seek to terminate this Lease by reason of Landlord's default hereunder until Tenant has given written notice of such default to the Superior Landlords and the Mortgagees in either case at the addresses that have been furnished to Tenant. If any such Superior Landlord or Mortgagee notifies Tenant, within ten (10) Business Days after the date that such Superior Landlord or Mortgagee receives such notice from Tenant, that such Superior Landlord or Mortgagee intends to remedy such act or omission of Landlord, then Tenant shall not have the right to so terminate this Lease unless such Superior Landlord or Mortgagee fails to remedy such act or omission of Landlord within thirty (30) days after the date that such Superior Landlord or Mortgagee gives such notice to Tenant, or such longer period of time as may be required for the Superior Landlord or Mortgagee to gain control of the Premises (it being understood that such Superior Landlord or Mortgagee shall not have any liability to Tenant for the failure of such Superior Landlord or Mortgagee to so remedy such act or omission of Landlord during such period) and thereafter diligently prosecute a cure with respect to the matter in question.

10.5    Subordination of Subleases. As of the Effective Date, Landlord and Tenant acknowledge that all of the Subleases with DUCOM and Tenant's Affiliates have been

subordinated to this Lease, pursuant to instruments in form and substance satisfactory to Landlord, and that Tenant has entered into a non-disturbance agreement, in form and substance satisfactory to Landlord, with DUCOM in order to effectuate the subordination of the Ducom Lease in accordance with the terms of the Ducom Lease. Tenant covenants and agrees that any Sublease in existence as of the Effective Date with tenants other than DUCOM or Affiliates of Tenant that has not been subordinated to this Lease as of the Effective Date, and any future Subleases, shall be subordinated to this Lease (x) in the case of each existing Sublease, at or as soon as practicable after the Effective Date, to the extent Tenant, using commercially reasonable efforts, effects such subordination and (y) in the case of any new Sublease, concurrently with the execution and delivery of said Sublease.

## ARTICLE 11

## OBLIGATIONS OF TENANT

11.1    Compliance with Requirements. Tenant shall promptly comply (and shall cause each Subtenant to comply) in all material respects with all Applicable Laws, all permits and licenses and all requirements of Governmental Authorities with respect to the Premises (or any part thereof) and/or the use, occupation and operation thereof, whether any of the same relate to or require (i) structural changes to or in and about the Premises, or (ii) changes or requirements incident to or as the result of any use or occupation thereof or otherwise (collectively, the "**Requirements**"), and subject to Article 7, Tenant shall so perform and comply, whether or not such Applicable Laws or Requirements shall now exist or shall hereafter be enacted or promulgated and whether or not the same may be said to be within the present contemplation of the parties hereto, in each case except to the extent that failure to so comply could not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect. The foregoing shall include, without limitation, present and future compliance with the provisions of the Americans with Disabilities Act. In addition, Tenant will comply with the applicable provisions of ERISA and of the regulations and published interpretations thereunder and shall furnish to Landlord promptly after Tenant Representative has actual knowledge that any violation or other reportable event (including the events set forth in Section 4043(b) of ERISA) has occurred.

11.2    Notices to Landlord. Tenant agrees to give Landlord notice of any written notice, assessment, claim, demand, communication, violation, summons, complaint, investigation, sanction, termination, suspension, or revocation made, issued or adopted by any of the governmental departments or agencies or authorities hereinbefore mentioned affecting (i) the Premises, (ii) the use thereof or (iii) the financial condition of Tenant or a Subtenant, a copy of which is served upon or received by Tenant, a copy of which is posted on, or fastened or attached to the Premises, or otherwise received by Tenant, by mailing within five (5) Business Days after such service, receipt, posting, fastening or attaching or after the same is otherwise received by Tenant, a copy of each and every one thereof to Landlord. At the same time, Tenant will inform Landlord as to the Work or corrective measure which Tenant proposes to do or take (or that the Subtenant proposes to do or undertake) in order to comply therewith. Notwithstanding the foregoing, however, if such Work or corrective measure would require any Alterations which would, in Landlord's reasonable opinion, reduce the value of the Premises or change the general character, design or use of any of the Buildings or other improvements thereon, and if Tenant does not desire to contest the same, Tenant shall, if Landlord so requests, defer compliance therewith in order that Landlord may, if Landlord wishes, contest or seek modification of or other relief with respect to such Requirements, so long as Tenant is not put in violation in any material respects of any Applicable Law, but nothing herein shall relieve Tenant of the duty and

obligation, at Tenant's expense, to comply in all material respects with such Requirements, or such Requirements as modified, whenever Landlord shall so direct.

11.3    Indemnity.

(a)    By Tenant of Landlord. Subject to Section 6.12, Tenant, for itself and its successors and assigns, hereby agrees to indemnify, defend and hold Landlord, Landlord's Affiliates, and any of Landlord's shareholders, partners, members or managers thereof, any shareholders, partners, members or managers of any such shareholders, partners, members or managers (collectively, "**Landlord Indemnified Parties**"), free and harmless from and against any and all any and all liabilities, obligations, losses, penalties, costs, charges, sanctions, judgments, claims, causes of actions, suits, damages and expenses (collectively, "**Claims**") arising in connection with or arising out of (i) any loss of life, personal injury and/or damage to the Premises arising from or out of any occurrence in, upon or at the Premises prior to or during the Term hereof, (ii) the occupancy or use of the Premises, or any part thereof, prior to or during the Term hereof including, without limitation, the provision of health services from or at the Premises, (iii) any failure of the Premises, or the use, occupancy or operation thereof (whether by Tenant, any Subtenant, or any other Person), to comply with all Applicable Laws and Requirements prior to or during the Term hereof (including, without limitation, the failure to timely pay any Impositions prior to or during the Term hereof), (iv) Tenant's failure to comply with any provision of this Lease beyond the expiration of any notice and cure period stated herein, (v) agents, contractors, servants, employees, Subtenants, licensees, assignees or other parties claiming through Tenant; or (vi) the performance of any labor or services or the furnishing of any materials or other property in respect of the Premises or any part thereof; excepting from the foregoing any Claims to the extent caused by the gross negligence or willful misconduct of Landlord or Landlord Indemnified Parties or by a breach of this Lease by Landlord, and further provided that if Landlord can recover from a third party, such as by way of illustration and not limitation from Sellers under the ASA, with respect to such matter, then prior to making a claim for indemnity under this Section 11.3 with respect thereto, Landlord shall elect, by notice furnished to Tenant, to either (x) take commercially reasonable steps to enforce Landlord's remedies against said third party with respect thereto, in which case Tenant's obligation to make indemnity payments to Landlord with respect thereto pursuant to this Section 11.3 shall be after Landlord has completed such steps and shall be net of any amounts (less Landlord's expense of collection and enforcement) actually recovered by Landlord from said third party with respect to the claim in question on or before the time Tenant makes such indemnity payment to Landlord or (y) assign to Tenant Landlord's rights to recovery against such third parties with respect to such claim and pursue a claim against Tenant for the full amount of Tenant's indemnification obligations under this Section 11.3, in which case (provided Tenant has satisfied its obligations to Landlord pursuant to this Section 11.3 with respect to said matter), Tenant shall be entitled to retain all amounts recovered from said third party.

(b)    By Landlord of Tenant. Subject to Section 6.12, Landlord, for itself and its successors and assigns, hereby agrees to indemnify Tenant, Tenant's Affiliates, and any of shareholders, partners, members or managers thereof, any shareholders, partners, members or managers of any such shareholders, partners, members or managers ("**Tenant Indemnified Parties**") free and harmless from and against any and all Claims in connection with or arising out of Landlord's failure to comply with any provision of this Lease beyond the expiration of any notice and cure period stated herein; excepting from the foregoing any Claims to the extent caused by the act, negligence, or gross negligence or willful misconduct of Tenant or Tenant's Indemnified Parties or by a breach of this Lease by Tenant.

(c)      Joint Liability. In the event that Landlord and Tenant may be held jointly liable for any Claim asserted for which indemnification is sought under this Lease, Landlord and Tenant hereby agree to contribute to the amount of expenses (including reasonable attorney's fees), judgments, fines and penalties paid in settlement actually and reasonably incurred in connection with such Claim in such proportion as is appropriate to reflect (i) the relative fault of Landlord (based solely upon its gross negligence) on the one hand and Tenant on the other in connection with the events which resulted in such Claim, and (ii) the relative benefits, if any, received by the Landlord on the one hand and the Tenant on the other in connection with the events which resulted in such Claim, as well as any other relevant equitable consideration.

(d)      Procedure. Whenever any claim arises for indemnification under this Lease, the party seeking indemnification (in each such case, the "**Indemnified Party**") must notify the party or parties from whom indemnification is being sought (in each such case, the "**Indemnifying Party**") of such claim in writing promptly and in no case later than ten (10) Business Days after such Indemnified Party has actual knowledge of the facts constituting the basis for such claim. Each Indemnified Party will also so notify the Indemnifying Party promptly and in no case later than fifteen (15) days after the Indemnified Party has actual knowledge of the commencement of any legal proceedings with respect to any such claim. The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. Such notice will specify all facts known to such Indemnified Party giving rise to the indemnification sought and the amount or an estimate of the amount of the obligation or liability arising from such indemnifying event. If any lawsuit or enforcement action is filed by a third party against any Indemnified Party, written notice thereof shall be given to the Indemnifying Party as promptly as practicable (and in any event within fifteen (15) days after the service of the citation or summons). The failure of any Indemnified Party to give timely notice hereunder shall not affect rights to indemnification hereunder, except to the extent that the Indemnifying Party has been damaged by such failure. After such notice, the Indemnifying Party shall at its own cost, risk and expense, (i) take control of the defense and investigation of such lawsuit or action, and (ii) employ and engage legal counsel of its own choice, but, in any event, reasonably acceptable to the Indemnified Party, to handle and defend the same. The Indemnifying Party shall not, without the written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed, settle or compromise any Claim or consent to the entry of any judgment which does not include an unconditional written release by the claimant or plaintiff of the Indemnified Party from all liability in respect of such Claim, or settle or compromise any Claim if the settlement imposes equitable remedies or material obligations on the Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder. No Claim which is being defended in good faith by the Indemnifying Party in accordance with the terms of this Agreement shall be settled or compromised by the Indemnified Party without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld. If the Indemnifying Party fails to assume the defense of such lawsuit or action within thirty (30) days after receipt of the claim notice, the Indemnified Party against which such lawsuit or action has been asserted will (upon delivering notice to such effect to the Indemnifying Party) have the right to undertake, at the Indemnifying Party's cost and expense, the defense, compromise or settlement of such lawsuit or action on behalf of and for the account and risk of the Indemnifying Party; *provided, however,* that such lawsuit or action shall not be compromised or settled without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld, conditioned or delayed. If the Indemnified Party settles or compromises such lawsuit or action without the prior written consent of the Indemnifying Party, the Indemnifying Party will bear no liability hereunder for or with respect to such lawsuit or action. In the event either party assumes the defense of a particular lawsuit or action in the

manner contemplated above, the party assuming such defense will keep the other party reasonably informed of the progress of any such defense, compromise or settlement. The indemnification obligations of Tenant and Landlord under this <u>Section 11.3</u> shall survive the expiration of the term, or the termination, of this Lease.

11.4    <u>Mechanics' Liens</u>. If at any time prior to or during the Term (or within the statutory period thereafter if attributable to Tenant), any mechanic's or other lien or order for payment of money, shall (unless caused by the actions of Landlord) be filed against the Premises or any part thereof, Tenant, at its sole cost and expense, shall cause the same to be discharged by payment, bonding or otherwise, within thirty (30) days after Tenant receives notice of the filing thereof unless such lien or order is contested by Tenant in good faith and Tenant provides sufficient security or evidence of financial ability, in each case to the satisfaction of Landlord (in its reasonable discretion, not to be unreasonably withheld, conditioned or delayed), to pay the amount of such lien or order. Tenant shall, upon notice and request in writing by Landlord, defend for Landlord, at Tenant's sole cost and expense, any action or proceeding which may be brought on or for the enforcement of any such lien or order for payment of money, and will pay any damages and satisfy and discharge any judgment entered in such action or proceeding and save harmless Landlord from any liability, claim or damage resulting therefrom. In default of Tenant's procuring the discharge of any such lien as aforesaid Landlord may, without notice, and without prejudice to its other remedies hereunder, procure the discharge thereof by bonding or payment or otherwise, and all cost and expense which Landlord shall incur shall be paid by Tenant to Landlord as Supplementary Rent forthwith.

11.5    <u>Non-Liability of Landlord: Liens</u>. Landlord shall not under any circumstances be liable to pay for any work, labor or services rendered or materials furnished to, upon or in connection with the Premises (unless said work was contracted for by Landlord), and no mechanic's or other lien for such work, labor or services or material furnished shall, under any circumstances, attach to or affect the reversionary interest of Landlord in and to the Premises or any alterations, repairs, or improvements to be erected or made thereon. Nothing contained in this Lease shall be deemed or construed in any way as constituting the request or consent of Landlord, either express or implied, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises.

11.6    <u>Non-Liability of Landlord Generally</u>. Subject to <u>Section 11.3</u> hereof, neither Landlord nor its agents shall be liable for any loss of or damage to the property of Tenant or others by reason of casualty, theft or otherwise, or due to any interruption or failure of any services or use or the operation or management of the Premises, or due to any building on the Premises being defective or improperly constructed, or being or becoming out of repair, or for any injury or damage to persons or property resulting from any cause of whatsoever nature, except to the extent such loss or damage is caused by or arises from the gross negligence or willful misconduct of Landlord or its agents.

11.7    <u>No Services Furnished</u>. Landlord shall not be required to furnish to Tenant any facilities or services of any kind whatsoever, including, but not limited to, water, steam, heat, gas, oil, hot water, and/or electricity, all of which Tenant represents and warrants that Tenant has obtained from the public utility supplying the same, at Tenant's sole cost and expense. Upon Tenant's written request, however, Landlord agrees to cooperate with Tenant (at no cost to Landlord) with respect to such services.

## ARTICLE 12

## DEFAULT BY TENANT; REMEDIES

12.1    Event of Default Defined. The occurrence and continuance of the following events beyond the expiration of the notice, grace, and cure periods expressly stated in this Section 12.1 shall be deemed an event of default (an "**Event of Default**") and a breach of this Lease by Tenant:

(a)    The failure of Tenant to pay when due, any portion of any installment of Base Rent, Supplementary Rent or any other monetary charge due from Tenant under this Lease where such failure continues for a period of ten (10) Business Days after any Tenant Representative's receipt of Landlord's written notice of such failure, except that Landlord shall not be required to deliver such notice more than twice in any twelve (12) month period.

(b)    The failure of Tenant to comply in all respects with or observe any of the other provisions, agreements, conditions, covenants or terms contained in this Lease and such failure shall continue for thirty (30) days after delivery of written notice to Tenant of such failure (or if such default is of such a nature that it cannot be completely cured within said thirty (30) day period, then if Tenant does not (x) within such thirty (30) day period, agree in writing to effectuate the cure, (y) commence the cure within such thirty (30) day period and (z) thereafter diligently prosecute the cure to completion.

(c)    The occurrence of a Transfer, without strict compliance with Article 9 of this Lease.

(d)    The (i) initiation of any proceeding whereupon the estate or interest of Tenant in the Premises, or any portion thereof, or in this Lease is levied upon or attached, or (ii) taking of Tenant's leasehold estate by execution or other process of law other than as provided in Article 8, unless the proceeding or taking, as the case may be, was involuntary and is vacated, discharged, dismissed or otherwise reversed within ninety (90) days thereafter.

(e)    The existence of an Event of Default (as defined in the Guaranty Agreement) under the Guaranty Agreement.

(f)    Tenant shall abandon the Premises (but this shall exclude a complete destruction of a Property prior to completion of the Restoration, and a total condemnation of a Property).

(g)    If (i) Tenant or Guarantor shall commence any case, proceeding or other action (A) under any existing or future Applicable Law relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to Tenant, or seeking to adjudicate Tenant a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution, composition or other relief with respect to Tenant or Tenant's debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for Tenant or for all or any substantial part of Tenant's property; or (ii) Tenant or Guarantor shall become insolvent or make a general assignment for the benefit of Tenant's creditors or shall make a transfer in fraud of creditors; or (iii) there shall be commenced against Tenant or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above (including involuntary bankruptcy) or seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of Tenant's property,

40

which case, proceeding or other action (A) results in the entry of an order for relief or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (iv) Tenant or Guarantor shall take any action consenting to or approving of any of the acts set forth in clause (i) or (ii) above; or (v) Tenant or Guarantor shall generally not, or shall be unable to, pay its debts as they become due or shall admit in writing its inability to pay its debts.

(h)    Tenant shall cease to exist in good standing in the state of its formation and such failure is not remedied within the thirty (30) day period following the date on which Tenant is first notified or otherwise first becomes aware of said failing.

(i)    Tenant shall be dissolved or otherwise liquidated and not simultaneously reconstituted with the same ownership structure as before or with an alternative ownership structure not constituting a Transfer and otherwise in compliance with the requirements of this Lease.

(j)    Tenant fails or refuses to execute any certificate or agreement that Landlord or Mortgagee may reasonably request confirming the subordination and attornment required pursuant to Article 10 (provided such subordination or attornment is subject to the terms and conditions of Section 10.1) or estoppel certificate required pursuant to Article 14 within ten (10) Business Days after Tenant's receipt thereof.

(k)    If Tenant gives its consent or approval to a Subtenant required by the Sublease without first obtaining the prior written consent or approval of Landlord if such consent of Landlord is required under the terms of this Lease.

(l)    The existence of a default by Tenant or Tenant's Affiliates, as the case may be, under either the PAHH Loan or the MidCap Credit Facility, that is not cured within any applicable cure periods thereunder.

(m)    The existence or occurrence of any event of default beyond applicable cure periods by Tenant or any Affiliate of Tenant under the Other Master Leases or (y) any Sublease of the Premises with any Affiliate of Tenant.

(n)    The existence or occurrence of any event of default beyond applicable cure periods by DUCOM under the Ducom Lease, any Other Ducom Leases or DUCOM Extension or any Other DUCOM Extension.

12.2    Remedies. Upon the occurrence of an Event of Default, Landlord may, at any time thereafter, without limiting Landlord in the exercise of any right or remedy at law or in equity that Landlord may have by reason of such Event of Default, at its option pursue any one or more of the following remedies without any further notice or demand whatsoever, but only to the extent permitted by Applicable Law:

(a)    Terminate this Lease by issuing written notice of termination to Tenant, in which event Tenant shall immediately surrender the Premises to Landlord, but if Tenant shall fail to do so, Landlord may, to the extent permitted by Applicable Law and in compliance with the requirements of Governmental Authorities, without notice and without prejudice to any other remedy Landlord may have, peaceably enter upon and take possession of the Premises and expel or remove Tenant and its effects without being liable to prosecution or any claim for damages therefor, and upon any such termination, Tenant agrees that in addition to its liability for the payment of arrearages of Base Rent, Supplementary Rent and other sums due and owing by

41

Tenant to Landlord under this Lease upon such termination, Tenant shall be liable to Landlord for all damages incurred by Landlord. Tenant shall pay to Landlord as damages on the same days as Base Rent and other payments which are expressed to be due under the provisions of this Lease, the total amount of such Base Rent, Supplementary Rent and other payments plus a reimbursement for all unamortized tenant allowances and concessions, less such part, if any, of such payments that Landlord actually collects from a new tenant upon reletting. Landlord shall have the right at any time to demand final settlement. Upon demand for a final settlement, Landlord shall have the right to receive, and Tenant hereby agrees to pay, as damages for Tenant's breach, the total Rental provided for in this Lease for the remainder of the scheduled Term.

In addition to the other remedies reserved to Landlord herein, and to the extent not prohibited by law, if Landlord elects to terminate this Lease following an Event of Default, Landlord shall be entitled to recover from Tenant the aggregate of: (i) the worth at the time of award of the unpaid Rent earned as of the date of the termination hereof; (ii) the worth at the time of award of the unpaid Rent which would have been earned after the date of termination hereof until the time of award; (iii) the worth at the time of award of the amount by which the Rent for the balance of the scheduled Term after the time of award exceeds the fair market rental value of the Premises for the balance of the scheduled Term; (iv) any other amount necessary to compensate Landlord for the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom; and (v) any other amount which Landlord may hereafter be permitted to recover from Tenant to compensate Landlord for the detriment caused by Tenant's default. For the purposes hereof, "Rent" shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, the "time of award" shall mean the date upon which the judgment in any action brought by Landlord against Tenant by reason of such Event of Default is entered or such earlier date as the court may determine; the "worth at the time of award" of the amounts referred to in subclauses (i) and (ii) of this paragraph shall be computed by allowing interest on such amounts at the Default Rate; and the "worth at the time of award" of the amount referred to in subclause (iii) of this paragraph shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of Philadelphia at the time of award plus one percent (1%) per annum.

(b)      To the extent permitted by Applicable Law and in compliance with the requirements of Governmental Authorities, enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and any Tenant Personal Property effects therefrom without being liable to prosecution or any claim for damages therefor, and Landlord may relet the Premises for the account of Tenant. Tenant shall pay to Landlord all arrearages of Base Rent, Supplementary Rent and other sums due and owing by Tenant to Landlord, and Tenant shall also pay to Landlord during each month of the unexpired Term the installments of Base Rent and other sums due hereunder, less such part**,** if any, that Landlord shall have been able to collect from a new tenant upon reletting; *provided, however,* that Landlord shall have no obligation to this Tenant to relet the Premises so as to mitigate the amount for which Tenant is liable. In the event Landlord exercises the rights and remedies afforded to it under this Section 12.2(b) and then subsequently elects to terminate this Lease, Tenant shall be liable to Landlord for damages as set forth in Section 12.2(a) above and Landlord shall have the right at any time to demand final settlement as provided therein. Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all Rent as it becomes due.

42

(c)    Cause the transfer of the operation and management of the Premises and leasing of the Premises to any replacement operator, manager or tenant of the applicable Property identified by Landlord, to the extent permitted by Applicable Law, and seek the approval of Governmental Authorities in connection therewith, in which event Tenant shall cooperate with Landlord (and shall cause Subtenant to cooperate with Landlord) to transfer all books and records relating to the Premises and transition services to the replacement tenant in accordance with the provisions of Section 16.1. All fees and other expenses shall be the obligation of Tenant.

(d)    Enforce, by all legal suits and other means, its rights hereunder, including the collection of Rent and other sums payable by Tenant hereunder, without re-entering or resuming possession of the Premises and without terminating this Lease.

(e)    Landlord may do whatever Tenant is obligated to do by the provisions of this Lease, may peaceably enter the Premises in order to accomplish this purpose and may make any expenditure or incur any obligation for the payment of money in connection therewith, including, without limitation, reasonable attorneys' fees and expenses. Tenant agrees to reimburse Landlord immediately upon demand for any expenses which Landlord may incur in its actions pursuant to this Section 12.2(e), with interest thereon at the Default Rate from the date of demand until paid and such amount shall be deemed to be Supplementary Rent hereunder. Tenant further agrees that Landlord shall not be liable for damages resulting to Tenant from such action.

(f)    To the extent permitted by Applicable Law and in compliance with the requirements of Governmental Authorities, and in coordination with a transition to a replacement facility operator or manager, Landlord may peaceably enter upon the Premises and change, alter, or modify the door locks on all entry doors of the Premises, and permanently or temporarily exclude Tenant, and its agents, employees, representatives and invitees, from the Premises. In the event that Landlord either permanently excludes Tenant from the Premises or terminates this Lease on account of Tenant's default, Landlord shall not be obligated thereafter to provide Tenant with a key to the Premises at any time, regardless of any amounts subsequently paid by Tenant. If Landlord elects to exclude Tenant from the Premises temporarily without permanently repossessing the Premises or terminating this Lease, then Landlord shall not be obligated to provide Tenant with a key to renter the Premises until such time as all delinquent rent and other amounts due under this Lease have been paid in full and all other defaults, if any, have been cured and Tenant shall have given Landlord evidence reasonably satisfactory to Landlord that Tenant has the ability to comply with its remaining obligations under this Lease; and if Landlord temporarily excludes Tenant from the Premises, Landlord shall have the right thereafter to permanently exclude Tenant from the Premises or terminate this Lease at any time before Tenant pays all delinquent rent, cures all other defaults and furnishes such evidence to Landlord. A key to the Premises will be furnished to Tenant only during Landlord's normal business hours. Landlord's exclusion of Tenant from the Premises shall not constitute a permanent exclusion of Tenant from the Premises or a termination of this Lease unless Landlord so notifies Tenant in writing. Landlord shall not be obligated to place a written notice on the Premises on the front door thereof explaining Landlord's action or stating the name, address or telephone number of any individual or company from which a new key may be obtained. In the event Landlord permanently or temporarily excludes Tenant from the Premises or terminates this Lease, and Tenant owns property that has been left in the Premises but which is not subject to any statutory or contractual lien or security interest held by Landlord as security for Tenant's obligations, Tenant shall have the right to promptly so notify Landlord in writing, specifying the items of property not covered by any such lien or security interest and which Tenant desires to retrieve

43

from the Premises. Landlord shall have the right to either (i) escort Tenant to the Premises to allow Tenant to retrieve Tenant's property not covered by any such lien or security interest, or (ii) remove such property itself and make it available to Tenant at a time and place designated by Landlord. In the event Landlord elects to remove such property itself as provided in the immediately preceding clause (ii), Landlord shall not be obligated to remove such property or deliver it to Tenant unless Tenant shall pay to Landlord, in advance, an amount of cash equal to the amount that Landlord estimates Landlord will be required to expend in order to remove such property and to repair any damage caused by such removal and to make such property available to Tenant, including all moving or storage charges theretofore or thereafter incurred by Landlord with respect to such property. If Tenant pays such estimated amount to Landlord and the actual amount incurred by Landlord differs from the estimated amount, Tenant shall pay any additional amounts to Landlord on demand or Landlord shall refund any excess amounts paid by Tenant to Tenant on demand.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or equity. Exercise of such remedies shall be in compliance with the requirements of Governmental Authorities, and in coordination with a transition to a replacement facility operator or manager. Any entry by Landlord upon the Premises may be by use of a master or duplicate key or electronic pass card or any locksmith's entry procedure or other means. Any reletting by Landlord shall be without notice to Tenant, and if Landlord has not terminated this Lease, the reletting may be in the name of Tenant or Landlord, as Landlord shall elect. Any reletting shall be for such term or terms (which may be greater or less than the period which, in the absence of a termination of this Lease, would otherwise constitute the balance of the Term) and on such terms and conditions (which may include free rent, rental concessions or tenant inducements of any nature) as Landlord in its sole and absolute discretion may determine, and Landlord may collect and receive any rents payable by reason of such reletting. In the event of any reletting, Tenant shall pay to Landlord on demand the cost of brokerage fees, reasonable attorney's fees and other costs and expenses incurred by Landlord in connection with such reletting. In the event any rentals actually collected by Landlord upon any such reletting for any calendar month are in excess of the amount of rental payable by Tenant under this Lease for the same calendar month, the amount of such excess shall belong solely to Landlord and Tenant shall have no right with respect thereto. In the event it is necessary for Landlord to institute suit against Tenant in order to collect the rental due hereunder or any deficiency between the rental provided for by this Lease for a calendar month and the rental actually collected by Landlord for such calendar month, Landlord shall have the right to allow such deficiency to accumulate and to bring an action upon several or all of such rental deficiencies at one time. No suit shall prejudice in any way the right of Landlord to bring a similar action for any subsequent rental deficiency or deficiencies.

12.3    <u>Additional Rights</u>. Subject to the terms of <u>Section 12.2</u> above, upon the exercise by Landlord of any of the remedies contained in this Lease, at law or in equity:

(a)    Tenant shall pay to Landlord all Rent payable under this Lease by Tenant to Landlord to the date upon which this Lease or Tenant's right to possess the Premises shall have been terminated or to the date of re-entry upon the Premises by Landlord, as the case may be. Additionally, Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in (i) obtaining possession of the Premises, (ii) removing and storing Tenant's or any other occupant's property, (iii) repairing any damage to the Premises, and (iv) performing any of Tenant's unperformed obligations.

44

(b)    No re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless written notice of such intention be given to Tenant by Landlord. Notwithstanding any such reletting or re-entry to take possession, Landlord may at any time thereafter elect to terminate this Lease if there exists an Event of Default. No act or thing done by Landlord or its agents during the term hereby granted shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless the same be made in writing by Landlord.

12.4    <u>Continuing Tenant Liability</u>. No taking of possession of and/or reletting the Premises, or any part thereof, shall relieve Tenant or Guarantor of their liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting.

12.5    <u>Waiver</u>. To the extent not prohibited by Applicable Law, Tenant hereby waives and releases all rights now or hereafter conferred by statute or otherwise which would have the effect of limiting or modifying any of the provisions of this <u>Article 12</u>.

12.6    <u>Rent and Costs as Lien</u>. The Rent payable by Tenant hereunder and each and every installment thereof, and all costs, actual, customary and reasonable attorneys' fees and disbursements and other expenses which may be incurred by Landlord in enforcing the provisions of this Lease on account of any delinquency of Tenant in carrying out the provisions of this Lease shall be and they hereby are declared to constitute a valid lien upon the interest of Tenant in this Lease and in the Premises.

12.7    <u>No Delay In Recovery</u>. Suit or suits for the recovery of damages, or for a sum equal to any installment or installments of Rent payable hereunder or any deficiencies or other sums payable by Tenant to Landlord pursuant to this <u>Article 12</u>, may be brought by Landlord from time to time at Landlord's election, and nothing herein contained shall be deemed to require Landlord to await the date whereon this Lease or the Term would have expired by limitation had there been no Event of Default by Tenant and termination.

12.8    <u>Damages</u>. Nothing contained in this <u>Article 12</u> shall limit or prejudice the right of Landlord to prove and obtain as damages in any bankruptcy, insolvency, receivership, reorganization or dissolution proceeding an amount equal to the maximum allowed by Applicable Law governing such proceeding and in effect at the time when such damages are to be proved, whether or not such amount shall be greater than, equal to or less than the amount of the damages referred to in any of the preceding Sections of this <u>Article 12.</u>

12.9    <u>Tenant Waiver of Notice and Redemption</u>. Except as otherwise expressly provided herein or as prohibited by Applicable Law, Tenant hereby expressly waives the service of any notice of intention to re-enter provided for in any statute, or of the institution of legal proceedings to that end, and Tenant, for and on behalf of itself and all persons claiming through or under Tenant, also waives any and all right of redemption provided by any Applicable Law or statute now in force or hereafter enacted or otherwise, or re-entry or repossession or to restore the operation of this Lease in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or in case of any expiration or termination of this Lease.

12.10    <u>Strict Performance Not a Condition</u>. No failure by Landlord to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, or receipt or acceptance of Rent with knowledge of or during the continuance of any such breach, shall constitute a waiver or

45

relinquishment of any such breach or of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Lease to be performed or complied with by Tenant, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Landlord and Tenant. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

12.11   <u>Specific Performance</u>. In the event of any breach by Tenant of any of the covenants, agreements, terms or conditions contained in this Lease, Landlord shall be entitled to a decree compelling performance of any of the provisions hereof and the restraint by injunction of the violation or attempted or threatened violation of any of the terms, covenants and conditions of this Lease, and shall have the right to invoke any rights and remedies allowed at law or in equity or by statute or otherwise as though re-entry, summary proceedings, and other remedies were not provided for in this Lease. The rights granted to Landlord in this Lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law, in equity or otherwise, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

12.12   <u>Enforcement Costs</u>. Tenant shall pay to Landlord all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Landlord in any action or proceeding to which Landlord may be made a party by reason of any act or omission of Tenant. Tenant also shall pay to Landlord all reasonable costs and expenses, including, without limitation, actual, customary and reasonable attorneys' fees and disbursements, incurred by Landlord in enforcing any of the covenants and provisions of this Lease and incurred in any action brought by Landlord against Tenant on account of the provisions hereof, and all such reasonable costs, expenses and attorneys' fees and disbursements may be included in and form a part of any judgment entered in any proceeding brought by Landlord against Tenant on or under this Lease. All of the sums paid or obligations incurred by Landlord as aforesaid, with interest and costs, shall be paid by Tenant to Landlord on demand.

12.13   <u>Interest on Late Payments</u>. If Tenant shall fail to pay any installment of Base Rent or Supplementary Rent or any other component of Rent when such payment is due, Tenant shall pay to Landlord, in addition to such payment of Rent, interest on the amount unpaid at the Default Rate, computed from the date such payment was due to and including the date of payment.

12.14   <u>Late Fees</u>. If any Rent or other amount that is due and payable by Tenant hereunder is not paid in full within twenty (20) days of the date due, then (in addition to all other rights and remedies of Landlord hereunder) Tenant shall pay to Landlord as additional Rent a late fee equal to five percent (5%) of the delinquent amount, to compensate Landlord for the administrative burden and inconvenience thereof.

12.15   <u>Landlord Lien</u>. As security for the payment and performance of all of Tenant's obligations and Landlord's rights under this Lease, Tenant hereby assigns, grants, delivers, sets over and transfers to Landlord and grants to Landlord, its successors and assigns a continuing security interest in all of their respective right, title and interest, whether now owned or hereafter acquired, now existing or hereafter arising, wherever located, in and to the Collateral (the "**Landlord Lien Collateral**") in each case to the extent owned by Tenant, if any. The aforementioned grants of a security interest in the Landlord Lien Collateral shall, in each instance, create a first priority lien. Tenant shall sign and deliver to Landlord or the applicable Landlord, as the case may be, or if Tenant's signatures are not required, Tenant hereby

46

authorizes Landlord to file in all necessary governmental offices, one or more financing statements to perfect the security interest granted by Tenant to Landlord hereunder. Landlord shall have all remedies available to a secured party under the Uniform Commercial Code, as amended from time to time. Tenant acknowledges that Landlord may collaterally assign its security interest in the Landlord Lien Collateral to Mortgagee and/or to a Superior Landlord to secure Landlord's obligations to Mortgagee or such Superior Landlord. Upon Landlord's request, or at the request of Mortgagee, Tenant shall confirm in writing the grant of such security interests to Mortgagee and/or Superior Landlord at no cost to Tenant. These provisions of this Lease shall be deemed to be a security agreement for purposes of the Uniform Commercial Code.

12.16   Waiver of Statutory Notices. Tenant further waives the right to any notices to quit as may be specified in the Landlord and Tenant Act of Pennsylvania, Act of April 6, 1951, as amended, or any similar or successor provision of law, and agrees that five (5) days notice shall be sufficient in any case where a longer period may be statutorily specified.

12.17   Additional Remedies. In addition to, and not in lieu of any of the foregoing rights granted to Landlord:

(a)   **SO LONG AS AN EVENT OF DEFAULT IS CONTINUING, TENANT HEREBY EMPOWERS ANY PROTHONOTARY, CLERK OF COURT OR ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR TENANT IN ANY AND ALL ACTIONS WHICH MAY BE BROUGHT FOR ANY RENT, OR ANY CHARGES HEREBY RESERVED OR DESIGNATED AS RENT OR ANY OTHER SUM PAYABLE BY TENANT TO LANDLORD UNDER OR BY REASON OF THIS LEASE (INCLUDING, WITHOUT LIMITATION, ANY SUM PAYABLE UNDER THE OTHER SUBPARAGRAPHS OF THIS ARTICLE 12, AND TO SIGN FOR TENANT AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN ACTION OR ACTIONS FOR THE RECOVERY OF SAID RENT, CHARGES AND OTHER SUMS, AND IN SAID SUIT OR IN SAID ACTION OR ACTIONS TO CONFESS JUDGMENT AGAINST TENANT FOR ALL OR ANY PART OF THE RENT SPECIFIED IN THIS LEASE AND THEN UNPAID INCLUDING, AT LANDLORD'S OPTION, THE RENT FOR THE ENTIRE UNEXPIRED BALANCE OF THE TERM OF THIS LEASE, AND ALL OR ANY PART OF ANY OTHER OF SAID CHARGES OR SUMS, AND FOR INTEREST AND COSTS TOGETHER WITH REASONABLE ATTORNEY'S FEES OF 5%. SUCH AUTHORITY SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, BUT JUDGMENT MAY BE CONFESSED AS AFORESAID FROM TIME TO TIME AS OFTEN AS ANY OF SAID RENT OR SUCH OTHER SUMS, CHARGES, PAYMENTS, COSTS AND EXPENSES SHALL FALL DUE OR BE IN ARREARS, AND SUCH POWERS MAY BE EXERCISED AS WELL AFTER THE EXPIRATION OF THE TERM OR DURING ANY EXTENSION OR RENEWAL OF THIS LEASE.**

(b)   **WHEN THIS LEASE OR TENANT'S RIGHT OF POSSESSION SHALL BE TERMINATED BY COVENANT OR CONDITION BROKEN, OR FOR ANY OTHER REASON, EITHER DURING THE TERM OF THIS LEASE OR ANY RENEWAL OR EXTENSION THEREOF, AND ALSO WHEN AND AS SOON AS THE TERM HEREBY CREATED OR ANY EXTENSION THEREOF SHALL HAVE EXPIRED, IT SHALL BE LAWFUL FOR ANY ATTORNEY AS ATTORNEY FOR TENANT TO FILE AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN ACTION TO CONFESS JUDGMENT IN EJECTMENT AGAINST TENANT AND ALL PERSONS CLAIMING UNDER TENANT, WHEREUPON, IF LANDLORD SO DESIRES, A WRIT OF**

47

EXECUTION OR OF POSSESSION MAY ISSUE FORTHWITH, WITHOUT ANY PRIOR WRIT OF PROCEEDINGS, WHATSOEVER, AND PROVIDED THAT IF FOR ANY REASON AFTER SUCH ACTION SHALL HAVE BEEN COMMENCED THE SAME SHALL BE DETERMINED AND THE POSSESSION OF THE PREMISES HEREBY DEMISED REMAIN IN OR BE RESTORED TO TENANT, LANDLORD SHALL HAVE THE RIGHT UPON ANY SUBSEQUENT DEFAULT OR DEFAULTS, OR UPON THE TERMINATION OF THIS LEASE AS HEREINBEFORE SET FORTH, TO BRING ONE OR MORE ACTION OR ACTIONS AS HEREINBEFORE SET FORTH TO RECOVER POSSESSION OF THE SAID PREMISES.

(c)    In any action to confess judgment in ejectment or for rent in arrears, Landlord shall first cause to be filed in such action an affidavit made by it or someone acting for it setting forth the facts necessary to authorize the entry of judgment, of which facts such affidavit shall be conclusive evidence, and if a true copy of this Lease (and of the truth of the copy such affidavit shall be sufficient evidence) be filed in such action, it shall not be necessary to file the original as a warrant of attorney, any rule of Court, custom or practice to the contrary notwithstanding.

**_____(INITIAL). TENANT WAIVER. TENANT SPECIFICALLY ACKNOWLEDGES THAT TENANT HAS VOLUNTARILY, KNOWINGLY AND INTELLIGENTLY WAIVED CERTAIN DUE PROCESS RIGHTS TO A PREJUDGMENT HEARING BY AGREEING TO THE TERMS OF THE FOREGOING PARAGRAPHS REGARDING CONFESSION OF JUDGMENT. TENANT FURTHER SPECIFICALLY AGREES THAT IN THE EVENT OF DEFAULT, LANDLORD MAY PURSUE MULTIPLE REMEDIES INCLUDING, WITHOUT LIMITATION, OBTAINING POSSESSION PURSUANT TO A JUDGMENT BY CONFESSION AND ALSO OBTAINING A MONEY JUDGEMENT FOR PAST DUE AND ACCELERATED AMOUNTS AND EXECUTING UPON SUCH JUDGMENT. IN SUCH EVENT AND SUBJECT TO THE TERMS SET FORTH HEREIN, LANDLORD SHALL PROVIDE FULL CREDIT TO TENANT FOR ANY MONTHLY CONSIDERATION WHICH LANDLORD RECEIVES FOR THE LEASED PREMISES IN MITIGATION OF ANY OBLIGATION OF TENANT TO LANDLORD FOR THAT MONEY. FURTHERMORE, TENANT SPECIFICALLY WAIVES ANY CLAIM AGAINST LANDLORD AND LANDLORD'S COUNSEL FOR VIOLATION OF TENANT'S CONSTITUTIONAL RIGHTS IN THE EVENT THAT JUDGMENT IS CONFESSED PURSUANT TO THIS LEASE.**

12.18  Landlord's Statutory Rights. Landlord shall have all rights and remedies now or hereafter existing at law or in equity with respect to the enforcement of Tenant's obligations hereunder and the recovery of the Premises. No right or remedy herein conferred upon or reserved to Landlord shall be exclusive of any other right or remedy, but shall be cumulative and in addition to all other rights and remedies given hereunder or now or hereafter existing at law.

## ARTICLE 13

## NO WAIVER

13.1  Generally. No receipt of moneys by Landlord from Tenant after the termination or cancellation of this Lease or termination of Tenant's right to possess the Premises (or after the giving of any notice of the termination of this Lease or Tenant's right to possess the Premises) shall reinstate, continue or extend the Term, or affect any notice theretofore given to Tenant, or

affect or otherwise operate as a waiver of the right of Landlord to enforce the payment of Rent (including without limitation Base Rent or Supplementary Rent) then due, or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Premises by proper suit, action, proceeding or remedy; it being agreed that, after the service of notice to terminate or cancel this Lease or Tenant's right to possess the Premises, or the commencement of suit, action or summary proceedings, or any other remedy, or after a final order or judgment for the possession of the Premises, Landlord may demand, receive and collect any moneys due, or thereafter falling due, without, in any manner whatsoever, affecting such notice, proceeding, suit, action, order or judgment; and any and all such moneys collected shall be deemed to be payments on account of the use and occupation of the Premises or, at the election of Landlord, on account of Tenant's liability hereunder. The acceptance of any check or payment bearing or accompanied by any endorsement, legend or statements shall not, of itself, constitute any change in or termination of this Lease.

     13.2   <u>Continuing Landlord Rights</u>. The failure of Landlord to enforce any agreement, condition, covenant or term, by reason of its breach by Tenant shall not be deemed to void, waive or affect the right of Landlord to enforce the same agreement, condition, covenant or term on the occasion of a subsequent default or breach. No surrender of the Premises by Tenant or a Subtenant (prior to any termination of this Lease) shall be valid unless consented to in writing by Landlord.

**ARTICLE 14**

**<u>ESTOPPEL CERTIFICATE; CONSENT</u>**

     14.1   <u>Estoppel Certificate</u>. Tenant agrees that it shall, at any time and from time to time upon not less than ten (10) Business Days' prior notice by Landlord, execute, acknowledge and deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been any modifications, that the Lease is in full force and effect as modified and stating the modifications), the Base Rent and Supplementary Rent payable and the dates to which the Base Rent and Supplementary Rent have been paid, that the address for notices to be sent to Tenant is as set forth in this Lease, stating whether or not Landlord is in default in keeping, observing or performing any term, covenant, agreement, provision, condition or limitation contained in this Lease and, if in default, specifying each such default, the Commencement Date and Expiration Date for the current Term, that Tenant is in possession of the Premises, and any other matters requested by Landlord, any Mortgagee, or any Superior Landlord; it being intended that any such statement delivered pursuant to this <u>Article 14</u> may be relied upon by Landlord or any Superior Landlord or any prospective purchaser of the Premises or any Mortgagee thereof or any assignee of any Mortgage upon the Premises. Upon receipt of Landlord's written request, Tenant shall also direct any Subtenant identified by Landlord to deliver a statement as to the foregoing matters with respect to the applicable Sublease within the time period required under the Sublease, provided such Sublease requires that such Subtenant deliver such a statement, and thereafter shall diligently pursue the Subtenant's execution, acknowledgment and delivery of same, and Landlord or any Superior Landlord or any prospective purchaser of the Premises or any Mortgagee thereof shall be entitled to rely on such estoppel certificate. If the Sublease stipulates the form of the estoppel certificate, Tenant shall be permitted to deliver the certificate in such form, however if the Sublease does not limit the estoppel certificate to a required form, such certificate shall be in the form prepared and/or approved by Landlord.

49

14.2    <u>Landlord Certificate</u>. Landlord agrees that it shall, at any time and from time to time upon not less than ten (10) days' prior notice by Tenant, execute, acknowledge and deliver to Tenant a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been any modifications, that the Lease is in full force and effect as modified and stating the modifications), the Base Rent and Supplementary Rent payable and the dates to which the Base Rent and Supplementary Rent have been paid, that the address for notices to be sent to Landlord is as set forth in this Lease, stating whether or not Landlord has furnished any Default notices to Tenant and if so, specifying the Default and stating whether or not the Default, if curable, has been cured, the Commencement Date and Expiration Date for the current Term, that Tenant is in possession of the Premises, and any other matters requested by Tenant; it being intended that any such statement delivered pursuant to this <u>Article 14</u> may be relied upon by Tenant or any prospective purchaser or assignee of the Lease or of the Premises.

**ARTICLE 15**

**<u>QUIET ENJOYMENT</u>**

Tenant, upon payment of the Rents herein reserved and upon the due performance and observance of all the covenants, conditions and agreements herein contained on Tenant's part to be performed and observed, including without limitation, the compliance by Tenant with all Requirements of Governmental Authorities, shall and may at all times during the Term peaceably and quietly have, hold and enjoy the Premises without any manner of suit, trouble or hindrance of and from any person claiming by, through or under Landlord, subject, nevertheless, to the terms and provisions of this Lease.

**ARTICLE 16**

**<u>SURRENDER</u>**

16.1    <u>Generally</u>. Tenant shall, on the last day of the Term, or upon the sooner termination of the Term, quit and surrender to Landlord the Premises vacant, free of all Tenant Personal Property, and in the same level of condition and repair as on the Commencement Date, reasonable wear and tear, and damage from condemnation excepted (provided, however, that the reference to reasonable wear and tear shall not be construed to diminish in any way Tenant's obligations pursuant to <u>Article 26</u>), and Tenant shall remove or demolish all of the Fixtures and Related Personal Property, structures and other improvements which Landlord shall have elected to cause Tenant to remove pursuant to and in accordance with <u>Section 5.7</u> hereof; *provided, however,* that if requested by Landlord, at the termination of the Lease, Tenant shall allow the successor tenant to use Tenant Personal Property for a reasonable period of time until such successor tenant is able to acquire replacements for such Tenant Personal Property, as long as the successor tenant shall pay Tenant the reasonable rental value for such use. Upon the expiration or earlier termination of this Lease, Landlord may, to the extent permitted by Applicable Law, cause the transfer of the operation and management of the Premises and leasing of the Premises to any replacement manager or tenant of the Premises designated by Landlord. In connection with such transfer, Tenant shall cooperate with Landlord (including, if required by Landlord, the execution and delivery of a transfer agreement reasonably acceptable to the parties,) and provide for, at Landlord's expense (i) the transfer to Landlord, or to the successor tenant or property manager, of: (A) all federal, state or municipal licenses, certifications, certificates, approvals, permits, variances, waivers, and other authorizations certificates that are related to the operation of the Premises to the extent same are transferable; and (B) all names associated with the Premises as then known to the general public (but excluding any names that are Tenant Personal

50

Property or any tradename or trademark), (ii) the preparation and filing of all notices reasonably required by Applicable Law in connection with such termination and transfer of management and operations, and (iii) the delivery of copies of all of Tenant's books and records relating to the Premises and their operations that are necessary to transition the Premises to the successor tenant, to Landlord or the successor property manager or tenant, within a reasonable time. Tenant's obligation to observe and perform this covenant shall survive the expiration or earlier termination of the Term. In the event that Tenant fails to surrender the Premises as aforesaid, in addition to the rights of Landlord under <u>Section 16.3</u>, Landlord shall have the right to exercise the applicable remedies upon the occurrence of an Event of Default. Tenant shall have the right, as long as no Event of Default exists under this Lease, upon the expiration of the Term (but subject to the temporary use by the successor tenant referred to above), to remove from the Premises all of Tenant Personal Property, whether or not the same be attached to the real estate, *provided that* Tenant shall at its own cost and expense reasonably restore and repair any damage to the Premises caused by the removal of Tenant Personal Property. Such removal shall be done upon reasonable advance notice, at a mutually convenient time approved by Landlord and without disruption of the successor tenant's business operations.

16.2    <u>Rent Apportionment</u>. Upon the expiration of the Term, all Base Rent and Supplementary Rent and other items payable by Tenant under this Lease shall be apportioned to the date of termination.

16.3    <u>Holding Over</u>. Tenant acknowledges that possession of the Premises must be surrendered to Landlord at the expiration or sooner termination of the term of this Lease. The parties recognize and agree that the damage to Landlord resulting from any failure by Tenant to timely surrender possession of the Premises as aforesaid will be extremely substantial, will exceed the amount of the Base Rent and Supplementary Rent theretofore payable hereunder, and will be impossible to accurately measure. Tenant therefore agrees that if possession of the Premises is not surrendered to Landlord upon the expiration or sooner termination of the term of this Lease, then, in addition to any other rights or remedies available to Landlord at law or in equity or under this Lease, Tenant shall pay to Landlord, as rent for each month and for each portion of any month during which Tenant holds over in the Premises after the expiration or sooner termination of the term of this Lease, a sum equal to the higher of the then fair market rental value of the Premises as reasonably determined by Landlord, taking into account the effect of all material factors reasonably relevant to such determination, or one and one half (1.5) times the aggregate of the Base Rent and Supplementary Rent which was payable under this Lease with respect to the last month of the term hereof. Nothing herein contained shall be deemed to permit Tenant to retain possession of the Premises after the expiration or sooner termination of the term of this Lease; and in the event of any unauthorized holding over, Tenant shall indemnify each of the Indemnified Parties against (x) all claims for damages by any other lessee or prospective lessee to whom Landlord may have leased all or any part of the Premises effective before or after the expiration or termination of the Term of this Lease and (y) all losses, costs, claims and damages suffered by Landlord as a consequence of the termination of any lease or agreement to lease with any other lessee or prospective lessee, by reason of Tenant's holding over. If Tenant holds over in possession after the expiration or termination of the term of the Lease, such holding over shall not be deemed to extend the term or renew this Lease, but Tenant shall be a tenant at sufferance upon the terms and conditions hereof, at the Base Rent and Supplementary Rent as herein increased. Tenant hereby waives the benefit of any Applicable Law which would contravene or limit the provisions set forth in this <u>Section 16.3</u>. This provision shall survive the expiration or earlier termination of this Lease.

## ARTICLE 17

## ACCESS

17.1    Inspection. Landlord shall have the right and privilege to enter the Premises for the purpose of inspecting the same or for the purpose of showing the same to prospective purchasers or Mortgagees thereof, subject to the following conditions (collectively, "**Access Conditions**"): (i) Landlord must provide to any of Tenant's Representative at least twenty-four (24) hours' prior written notice of Landlord's intent to access the Premises, except that no such notice shall be required in the event of an emergency; (ii) Landlord may only access the Premises during normal business hours, and neither Landlord nor any prospective purchasers of Mortgagees thereof shall disturb or disrupt any of business operations at the Premises; and (iii) at Tenant's election, any one of Tenant's Representative may accompany Landlord or any prospective purchasers of Mortgagees thereof throughout the Premises. Landlord shall also have the right and privilege at all times during the Term to post notices of non-responsibility for work performed by or on behalf of Tenant or a Subtenant. During the last one (1) year of the Term, and at all times subject to the Access Conditions, Landlord shall have the right and privilege, to enter the Premises for the purpose of exhibiting the same to prospective new tenants. Notwithstanding the foregoing, Landlord will not access patient or medical information which is protected from such access by Federal or State privacy laws, including the Health Insurance Portability and Accountability Act ("**HIPAA**") and the Health Information Technology for Economic and Clinical Health Act ("**HITECH Act**") and the regulations promulgated thereunder, as amended, and Landlord will respect patient's rights to privacy of their own rooms and possessions.

17.2    Repair. Subject to the terms of the Subleases, Landlord shall at all times during the Term have the right to enter the Premises or any part thereof for the purpose of making such repairs or Alterations therein as Landlord deems reasonably necessary or advisable following the failure of Tenant to make any such repairs or Alterations required by this Lease beyond any applicable notice and cure period which required repairs or Alterations must be supported (except where there is an imminent danger of injury to persons, damage to property or loss of licenses or permits) by an engineering report from an engineer reasonably acceptable to Landlord and Tenant, and reasonably agreed to by both Landlord and Tenant, but such right of access shall not be construed as obligating Landlord to make any repairs to or replacements to the Premises or as obligating Landlord to make any inspection or examination of the Buildings. Tenant shall pay to Landlord, on demand, as Supplementary Rent hereunder, all amounts expended by Landlord pursuant to this Section 17.2 which amounts shall bear interest at the Default Rate until paid, if Tenant shall have failed to make said repairs within fifteen (15) days of the receipt of said report. In the event of an emergency, Landlord shall have the right to enter the Premises or any part thereof.

## ARTICLE 18

## ENVIRONMENTAL MATTERS

18.1    Generally. During the Term of this Lease, Tenant will not use, generate, manufacture, produce, store, release, discharge or dispose of in, on, under, from or about the Premises or transport to or from the Premises any Hazardous Substance and will not allow or suffer any other person or entity (including a Subtenant) to do so (except for Hazardous Substances that are customarily used in the ordinary operation of a medical office building and

52

for which Tenant has obtained any necessary permits or Governmental approvals, collectively, "**Permitted Hazardous Substance Use**").

18.2    <u>Compliance With Environmental Laws</u>. During the Term of this Lease, Tenant shall, at its sole cost and expense, keep and maintain the Premises in compliance with, shall not cause, permit or suffer the Premises to be in violation of any Environmental Law, and shall perform Remedial Work if and to the extent required in this <u>Article 18</u>. Tenant shall, at its sole cost and expense, cause any Repairs or Alterations to the Premises to be conducted and performed by qualified contractors and in compliance with all Environmental Laws.

18.3    <u>Notices</u>. Tenant shall give prompt written notice to Landlord upon discovery or occurrence, as applicable, of:

(i)    any use, generation, manufacture, production, storage, release, discharge or disposal of any Hazardous Substance in, on, under, from or about the Premises or the migration thereof to or from other property, in each case, during the Term (other than Permitted Hazardous Substance Use);

(ii)    the commencement, institution or threat of any proceeding, inquiry or action by or written notice from any local, state or federal governmental authority with respect to the use or presence of any Hazardous Substance in, on, under, from or about the Premises or the migration thereof from or to other property, in each case, during the Term;

(iii)    all claims or demands made or threatened by any third party against Tenant, a Subtenant or the Premises relating to any damage, contribution, cost recovery, compensation, loss or injury resulting from any Hazardous Substance, in each case, during the Term;

(iv)    any circumstances, occurrence or condition on, in, under, to or from the Premises, in each case, during the Term, that reasonably could (A) cause the Premises or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Law, (B) give rise to a proceeding, inquiry, notice of violation, penalty or fine by any local, state or federal governmental authority against Landlord, Tenant or a Subtenant, or (C) give rise to a claim or demand by any third party against Landlord, Tenant or a Subtenant for damages, contribution, cost recovery, compensation, loss or injury; and

(v)    any claims for the incurrence of expense by any governmental authority or others in connection with the assessment, containment, remediation or removal of any Hazardous Substance located on, under, from or about the Premises, in each case, during the Term.

Landlord shall give prompt written notice to Tenant of any of the facts, events or circumstances set forth in (i) and (v) above, including all claims under Environmental Laws commenced or threatened against Landlord with respect to the Premises during the Term.

18.4    <u>Landlord Rights</u>. Landlord shall have the right, but not the obligation, at its sole cost to join and participate in, as a party if it so elects, any legal or administrative proceedings or actions initiated with respect to the Premises in connection with any Environmental Law. In the event that Tenant refuses or fails to defend any such legal proceedings or actions concerning matters for which Tenant has primary responsibility under this <u>Article 18</u> Landlord shall have the

right, but not the obligation to defend proceedings or actions using counsel chosen by Landlord, and Tenant shall reimburse Landlord for its actual, customary and reasonable attorney's fees and costs incurred in connection with such defense.

18.5    <u>Remedial Action</u>. Without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, Tenant shall not take any remedial action in response to the presence of any Hazardous Substance in, on, under, from or about the Premises, nor enter into any settlement, consent or compromise which might, in Landlord's judgment, impair the value of Landlord's interest in the Premises under this Lease; *provided, however,* that Landlord's prior consent shall not be necessary if the presence of Hazardous Substance in, on, under, from or about the Premises either poses an immediate threat to the health, safety or welfare of any individual or is of such a nature that an immediate remedial response is necessary and it is not reasonably practical or possible to obtain Landlord's consent before taking such action. In such event Tenant shall notify Landlord as soon as practicable of any action so taken. Landlord agrees not to withhold its consent, where such consent is required hereunder, if a particular remedial action is ordered by a court or any agency of competent jurisdiction. Any remedial action by Tenant shall satisfy its obligations under this Lease provided such remediation is to a standard that complies with Applicable Law (including applicable Environmental Laws) and permits the continued use and operation of the Property for the Permitted Use; Landlord and Tenant will execute such documents as are reasonably necessary to implement this provision.

18.6    <u>Indemnity</u>.

(a)    Except to the extent caused by the gross negligence or willful misconduct of Landlord or any Indemnified Party, Tenant shall protect, indemnify and hold harmless each of the Indemnified Parties from and against any and all claim, loss, damage, cost, expense, liability, fines, penalties, charges, administrative and judicial proceedings and orders, judgments, remedial action requirements, enforcement actions of any kind (including, without limitation, attorneys' fees and costs) directly or indirectly arising out of or attributable to, in whole or in part, any of the following: (i) the breach of any of the covenants, representations and warranties of this <u>Article 18</u> by Tenant, or (ii) the presence, use, generation, manufacture, production, storage, release, threatened release, discharge or disposal of a Hazardous Substance in, on, under, from or about the Premises prior to or during the Term of this Lease or (iii) any violation or liability under any Environmental Law with respect to the Premises, including without limitation any such violation or liability arising from any other activity carried on or undertaken on the Premises prior to or during the Term by Tenant or any employees, agents, contractors or subcontractors of Tenant, any Subtenant, or any third persons occupying or present on the Premises prior to or during the Term. The foregoing shall include the following: (i) the costs of any required or necessary response, repair, cleanup or detoxification of the Premises and the preparation and implementation of any closure, remedial or other required plans including, without limitation: (A) the costs of response, removal or remedial action incurred by any Governmental Authority, or response costs incurred by any other Person, or damages from injury to, destruction of, or loss of natural resources, including the costs of assessing such injury, destruction or loss, incurred pursuant to any Environmental Law; (B) the clean-up costs, fines, damages or penalties incurred pursuant to the provisions of Applicable Law; and (C) the cost and expenses of abatement, correction or clean-up, fines, damages, response costs or penalties which arise from the provisions of any other Applicable Law; and (ii) liability for damage, including damages assessed for the maintenance of the public or private nuisance or response costs. The obligations arising under this <u>Section 18.6</u> shall apply regardless of when the violation, liability, loss, harm, damage or injury is discovered and regardless of whether the Hazardous Substances

54

were introduced to the Premises during, or prior to the commencement of, the Term. As used in this Lease, the term "Petroleum" shall mean any petroleum, petroleum product, petroleum by-product, and any constituent derivative or by-product thereof, including methyl tertiary butyl ether (MTBE). This indemnity shall survive expiration or earlier termination of this Lease and any transfer of all or a portion of the Premises by Tenant.

(b)     The foregoing indemnity shall in no manner be construed to limit or adversely affect Landlord's rights under this <u>Article 18</u> including, without limitation, Landlord's rights to approve any Remedial Work or the contractors and consulting engineers retained in connection therewith.

18.7    <u>Other Requirements</u>.

(a)     In the event that any reporting, assessment, investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (the "**Remedial Work**") is required by any Applicable Law, or by any Governmental Authority or reasonably by any other Person because of, or in connection with, any Hazardous Substance threatened to be released, released, discharged, or disposed of thereon or therefrom prior to or during the Term, Tenant shall within thirty (30) days after written demand for performance thereof by Landlord (or such shorter period of time as may be required under any Applicable Law or agreement), commence to perform, or cause to be commenced, and thereafter diligently prosecute to completion within such period of time as may be required under any Applicable Law or agreement (or as otherwise required by Landlord), all such Remedial Work at Tenant's sole expense in accordance with the requirements of any applicable Governmental Authority or Environmental Law. In addition, without limiting Tenant's obligations hereunder, Tenant shall undertake and perform the Remedial Work described in <u>Schedule 18.7</u> attached hereto, at Tenant's sole expense (except to the extent funded from the Environmental Reserve) in accordance with all applicable Environmental Laws and the additional standards, criteria, terms and conditions set forth on <u>Schedule 18.7</u>. All such Remedial Work shall be completed in accordance with Applicable Law and performed by qualified contractors, and approved in advance in writing by Landlord, which approval may be withheld by Landlord's reasonable discretion, and under the supervision of a consulting engineer approved in advance in writing by Landlord. The scope of work and schedule for any Remedial Work shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld. All reports, data, correspondence or any other submittals to a Governmental Authority in connection with any Remedial Work shall be provided in draft form to Landlord prior to submittal to the Governmental Authority, and shall be subject to Landlord's approval, which approval shall not be unreasonably withheld. All costs and expenses of such Remedial Work shall be paid by Tenant, including, without limitation, the charges of such contractor(s) and/or the consulting engineer, and Landlord's actual, customary and reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Work. In the event Tenant shall fail to timely commence, or cause to be commenced, or fail to complete such Remedial Work within the time required above, Landlord may, but shall not be required to, cause such Remedial Work to be performed and all reasonable costs and expenses actually incurred in connection therewith shall become part of the indebtedness secured hereby; *provided, however*, that absent legal requirement or other exigent circumstances requiring more prompt action, Landlord shall not cause such Remedial Work to be performed until it provides written notice to Tenant of its failure and Tenant fails within thirty (30) days to cure, or begin to cure if there is not sufficient time to cure, such failure. Any approvals required from Landlord in this <u>Section 18.7</u> shall not be unreasonably delayed. Notwithstanding anything to the contrary in this <u>Section 18.7</u>, any Remedial Work by Tenant shall be to a standard that permits the continued use and operation of

55

the Property for the Permitted Use in accordance with applicable Environmental Laws, and Landlord and Tenant will execute such documents as are reasonably necessary to implement this provision. The obligations under this <u>Section 18.7</u> shall survive expiration or earlier termination of this Lease, and any transfer of all or any portion of the Premises by Tenant or Landlord.

(b)    <u>O&M Plan</u>. Tenant shall maintain and comply with an Operation and Maintenance Plan reasonably satisfactory to Landlord for any Property containing asbestos containing materials, which Operation and Maintenance Plan shall be mutually acceptable to the parties in their reasonable discretion within ninety (90) days of the Effective Date.

18.8    <u>Other Landlord Rights</u>. In the event that Landlord believes that there may be a violation or threatened violation of any Environmental Law or a violation or threatened violation of any covenant under this <u>Article 18</u>, Landlord is authorized, but not obligated, by itself, its agents, employees or workmen to enter at any reasonable time following notice, so long as such entry does not unduly interfere with Tenant's or the Subtenant's normal conduct of business, upon any part of the Premises for the purposes of inspecting the same for Hazardous Substances and Tenant's compliance with this <u>Article 18</u>, and such inspections may include, without limitation, soil borings and other forms of invasive testing; *provided, however*, if Landlord reasonably believes that the violation or threatened violation either poses an immediate threat to the health, safety or welfare of any individual or is of such a nature that an immediate response may be necessary, Landlord may enter the Premises at any time and Tenant's prior consent shall not be necessary. In such event, Landlord shall notify Tenant as soon as practicable of any action so taken. If such inspection reveals any violation of Environmental Law or violation by Tenant of any covenant under this <u>Article 18</u> except as disclosed to Landlord prior to the Effective Date or the existence of any Hazardous Substance released, discharged, or disposed of during the Term (other than an immaterial technical violation or liability), Tenant agrees to pay to Landlord, within ten (10) days after Landlord's written demand, all actual, customary and reasonable expenses, costs or other amounts incurred by Landlord in performing any inspection for the purposes set forth in this <u>Section 18.8</u>.

18.9    <u>Costs</u>. All reasonable costs and expenses incurred by Landlord under this <u>Article 18</u> (including, without limitation, the reasonable fees, cost and expenses of Landlord's environmental consultant(s) engaged by Landlord to monitor or inspect the Remedial Work) shall be immediately due and payable as Supplementary Rent within ten (10) days after written demand and shall bear interest at the Default Rate from the date of notice of such payment by Landlord and the expiration of any grace period provided herein until repaid.

18.10    <u>Environmental Law Defined</u>. "**Environmental Law**" and "**Environmental Laws**" shall mean respectively any one or more Applicable Law pertaining to health, industrial hygiene, occupational health and safety, Hazardous Substances, biohazards, radioactive hazards, radiological hazards, medical waste or the environmental conditions in, on, under, from or about the Premises or any part thereof, including, without limitation, the laws listed in the definition of Hazardous Substances below, and the rules, regulations and permits promulgated or issued thereunder; <u>in each case</u> as the same may have been and hereafter may be supplemented, modified, amended, restated or replaced from time to time.

18.11    <u>Hazardous Substance Defined</u>**. "Hazardous Substance**" and "**Hazardous Substances**" shall mean, respectively, any one or more element, compound, chemical mixture, contaminant, pollutant, material, waste (including medical waste), biohazards, radioactive hazards, radiological hazards or other substance (a) which poses a threat to the public health, safety or welfare or to the environment if released, or (b) which is defined, determined or

56

identified as a "hazardous substance", "hazardous waste" or "hazardous material", or is otherwise regulated under any Applicable Law, including, without limitation, the following: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. § 9601 et. seq.); (ii) the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et. seq.); (iii) the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et. seq.); (vi) the Toxic Substances Control Act (15 U.S.C. § 2601 , et seq.); (v) the Clean Air Act (33 U.S.C. § 1251 et seq.); (vi) the Clean Air Act (42 U.S.C. § 7401, et seq.); (vii) the Safe Drinking Water Act (21 U.S.C. § 349; 42 (U.S.C. § 201 and § 300f et. seq.); (viii) the National Environmental Policy Act of 1969 (42 U.S.C. § 3421); (ix) the Superfund Amendment and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C.); and (x) Title III of the Superfund Amendment and Reauthorization Act (40 U.S.C. § 1101 et seq.).

18.12    <u>Responsibility for Pre-Commencement Date Conditions</u>. Neither Landlord nor Tenant makes or provides any representation, warranty or indemnity with regard to the presence or existence of Hazardous Substances located or present in, on, under, about or emanating from the Premises, or the compliance of the Premises with Environmental Laws, or other environmental condition of the Premises, on or prior to the Commencement Date. Tenant shall be responsible for the costs and expenses of all Remedial Work (and shall perform such Remedial Work in accordance with the terms of this Lease) in connection with any Hazardous Substance present at, or released, discharged, or disposed of in, on, under, from or about the Premises at any time prior to or during the Term. Landlord and Tenant shall cooperate in the initiation of claims and the enforcement of remedies against third parties which may be responsible for environmental conditions at the Premises.

18.13    <u>Medical Waste and Drug Compliance</u>. Tenant shall be responsible for safe and secure storage, transport and off-site disposal of medical waste materials, including without limitation, biological or infectious waste and radioactive materials, shall ensure the compliance with all Applicable Laws pertaining to such storage, transport and disposal, and shall cause the promulgation and compliance by the Premises and all personnel with protocols for storage and disposal of such waste and compliance with Requirements relating thereto. Tenant shall be responsible for the safe and secure storage, dispensation and disposal of pharmaceuticals, drugs and controlled substances at the Premises and shall cause the promulgation and compliance by the Premises and all personnel with protocols for storage, dispensation and disposal of such pharmaceuticals, drugs and controlled substances and compliance with Requirements relating thereto.

18.14    <u>Survival</u>. All representations, warranties, covenants and indemnities of Tenant in this <u>Article 18</u> shall continue to be binding upon Tenant, and its successors and assigns, after the expiration or earlier termination of this Lease.

18.15    <u>Existing Conditions</u>. Tenant acknowledges and agrees that (i) it has reviewed and is aware of all environmental conditions at, in, on, under, from or potentially affecting the Premises (the "**Environmental Conditions**"), referenced in the documents and reports listed on <u>Schedule 18.15</u> attached hereto (the "**Environmental Reports**"), (ii) it takes possession of the Premises with full knowledge of the Environmental Conditions, and (iii) the "As Is" condition referenced in <u>Section 5.1</u> and <u>Section 20.11</u> shall include the Environmental Conditions. Tenant acknowledges and agrees that it hereby waives any claim or remedies against Landlord arising out of or in connection with any of the Environmental Conditions, arising in law or equity, whether by statute, regulation, common law or by agreement other than as specifically provided by this Lease, including but without limitation, for contribution, cost recovery, interference with

quiet enjoyment of the Premises, reduction or abatement of Rent, or other damages. The provisions contained in this <u>Section 18.15</u> shall survive expiration or earlier termination of this Lease, and any transfer of all or a portion of the premises by Tenant or Landlord. Notwithstanding any of the information, conclusions or determinations contained in the Environmental Reports, Tenant hereby acknowledges that in the event Landlord determines in its reasonable discretion that additional assessment, investigation, sampling, monitoring, remedial or other response actions may be necessary to address Environmental Conditions at the Premises or any portion thereof, Landlord shall have the right to conduct such actions at its sole cost following prior notice to Tenant, and Tenant shall provide access to the Premises as needed to conduct and complete such work.

18.16   <u>Prevailing Provision</u>. In the event of any conflict or inconsistency between this <u>Article 18</u> and any other provision of this Lease, the terms of this <u>Article 18</u> shall be controlling.

**ARTICLE 19**

**<u>FINANCIAL AND REGULATORY REPORTING COVENANTS</u>**

19.1   <u>Reporting, Requirements</u>. Tenant will furnish to Landlord:

(a)   <u>Annual Audited Financial Statements</u>.

(i)   As soon as available, and in any event within one hundred fifty (150) days after the end of each applicable fiscal year, beginning with the fiscal year ending the calendar year in which this Lease is executed, and within one hundred twenty (120) days after the end of each applicable fiscal year thereafter, beginning with the fiscal year ending December 31 of the calendar year in which this Lease is executed, copies of the annual audited reports for Tenant containing balance sheets and statements of income, retained earnings, and cash flow as at the end of such fiscal year and for the fiscal year then ended, setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and audited and certified on an unqualified basis by a "big four" accounting firm, or any other independent accounting firm of nationally recognized standing, which in either case is reasonably acceptable to Landlord, to the effect that such report has been prepared on a consolidated basis in accordance with GAAP.

(ii)   As soon as available, and in any event within one hundred fifty (150) days after the end of each applicable fiscal year, beginning with the fiscal year ending the calendar year in which this Lease is executed, and within one hundred twenty (120) days after the end of each applicable fiscal year thereafter, copies of the annual audited reports for each Guarantor containing balance sheets and statements of income, retained earnings, and cash flow as at the end of such fiscal year and for the fiscal year then ended, setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and audited and certified on an unqualified basis by a "big four" accounting firm, or any other independent accounting firm which is reasonably acceptable to Landlord, to the effect that such report has been prepared in accordance with GAAP.

(iii)   As soon as available, and in any event within thirty (30) days after the end of each applicable fiscal year, beginning with the fiscal year ending December 31 of the calendar year in which this Lease is executed, Tenant will furnish to Landlord a copy of Projections for Tenant's fiscal year immediately following the fiscal year which is the subject of

58

the financial statements delivered pursuant to clause (i) above. The foregoing shall be complete in all respects and shall include all footnotes, if any.

(b)     Unaudited Quarterly Financial Statements. As soon as available, and in any event within forty-five (45) days after the end of each fiscal quarter during the Term, copies of unaudited financial reports for Tenant and each Guarantor, as of the end of such period and for the portion of the fiscal year then ended containing balance sheets and statements of income, retained earnings, and cash flow for each Property (together with a consolidated operating statement for all Properties), setting forth in comparative form the figures for the corresponding period of the preceding fiscal year, in reasonable detail certified by the chief executive officer, chief financial officer or chief accounting officer of Tenant to have been prepared in accordance with GAAP and to fairly present the financial condition and results of operations of Tenant and each Guarantor at the date and for the periods indicated therein, subject to year-end audit adjustments. The foregoing shall be complete in all respects, excluding footnotes and year-end adjustments.

(c)     Unaudited Monthly Financial Statement. As soon as available, and in any event within thirty (30) days after the end of each month of Tenant beginning with the calendar month in which the Effective Date occurs, individual operating statements for each Property and a consolidated operating statement for all Properties, subject to year-end adjustments. The foregoing shall be complete in all respects and shall include all footnotes, if any (provided, solely with respect to the first three calendar months ending after the Effective Date, such statements shall be due 45 days after the end of such month).

(d)     Annual Projections. As soon as reasonably possible, and in any event no later than 15 days before the end of each calendar year during the term, financial projections for the forthcoming year, signed by Tenant's chief financial officer or a Person acting in a similar capacity.

(e)     Notice of Litigation. Promptly after receipt by Tenant of written notice of the commencement thereof, notice of all actions, suits, and proceedings before any Governmental Authority or arbitrator which could reasonably be expected to have a Material Adverse Effect.

(f)     Tenant will keep and maintain or will cause to be kept and maintained in accordance with GAAP books, records and accounts reflecting all of the financial affairs of Tenant and Guarantor, and all items of income and expense in connection with the operation on an individual basis of the Premises. Landlord or Landlord's designee shall have the right from time to time (but not more than once in any calendar quarter unless Tenant shall be in default under this Lease), at all times during normal business hours upon reasonable advance notice to Tenant's Representative (but in no event less than forty-eight (48) hours' notice) to examine such books, records and accounts at the office of Tenant or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Landlord shall desire.

(g)     Any reports, statements or other information required to be delivered under this Lease shall be delivered (i) in paper form or in electronic format or (ii) if requested by Landlord and within the capabilities of Tenant's data systems without change or modification thereto, in electronic form. Tenant agrees that Mortgagee may disclose information regarding the Premises as provided to Mortgagee pursuant to this Section in connection with the securitization of the Mortgage Loan to such parties requesting such information in connection with such securitization.

59

19.2    Publication.

(a)    Landlord and Mortgagee shall be permitted to rely upon the accuracy and completeness of the items furnished pursuant to this Article and to disclose and publish the same as required by Applicable Laws. Without limiting the generality of the foregoing, Tenant acknowledges that Landlord is or may be, from time to time a subsidiary of a Real Estate Investment Trust or other entity whose shares are listed on a recognized public exchange in the U.S. and that, as such, it is subject to certain filing and reporting requirements in accordance with federal laws and regulations, including but not limited to, regulations promulgated by the Securities and Exchange Commission. Accordingly, and notwithstanding any provision of this Lease or the provisions of any other existing agreement between the parties hereto to the contrary, Landlord may publicly file, disclose, report or publish any and all information related to this Lease (including the information provided to Landlord pursuant to this Article) that may be reasonably interpreted as being required by federal or state law or regulation after Closing.

(b)    Landlord shall use commercially reasonable efforts to keep confidential the information provided to Landlord pursuant to this Article. Notwithstanding the foregoing, Landlord may disclose such information (i) to its (or to any Affiliate's) existing or potential lenders, investors, members, partners, shareholders or purchasers of the Premises, (ii) to Landlord's and to said lenders' and purchasers' affiliates, directors, officers, employees, and third party advisors (including, without limitation, financial advisors, legal counsel and accountants), and (iii) as may be required by court order.

## ARTICLE 20

## LICENSED FACILITY OPERATION; ACCESS TO BOOKS AND RECORDS; MANAGEMENT

20.1    Compliance. The parties agree that if this Lease is determined to be governed by §1861(v)(1)(i) of the Social Security Act (§952 of the Omnibus Reconciliation Act of 1980) and the regulations promulgated in implementation thereof at 42 C.F.R. Part 420, the parties each agree to make available to the Comptroller General of the United States, the Department of Health and Human Services ("**HHS**") and their duly authorized representatives, the books, documents and records of either of the parties and such other information as may be required by the Comptroller General or Secretary of HHS to verify the nature and extent of the costs of services provided by either of the parties. If either of the parties carry out the duties of this Lease through a subcontract worth $10,000 or more over a twelve (12) month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General and their representatives to the related organization's books and records to the extent required by Applicable Law.

20.2    Other Reports. During the Term of this Lease, Tenant shall provide Landlord with any other financial information as may be reasonably requested by Landlord from time to time. Without limiting the generality of the foregoing, within fifteen (15) days after request at any time and from time to time, Tenant will provide a certificate to Landlord as to the FCCR, measured as set forth in Article 22 hereof, together with appropriate supporting calculations and documentation; provided, however, if Landlord shall so request, the FCCR shall be measured on a trailing 6-month basis.

20.3    Property Operation. Landlord is merely the lessor of the real property which is the subject of this Lease and, except to the extent otherwise set forth herein, shall have no liability in

connection with the condition, legal compliance, management, use and operation of the Premises or any portion thereof.

20.4    Inspections and Audits. For purposes of satisfying the requirements of any Mortgage, or any refinancing, sale or appraisal process, Landlord shall have the right (but not the obligation) to conduct such inspections, audits, visitations and quality control reviews, of the Premises as Landlord may desire, and for such purposes Tenant shall provide to Landlord and its representatives, upon not less than twenty-four (24) hours' advance notice to Tenant's Representative, access to Tenant's books and records relating to such facilities and services during normal business hours. No such inspection, audit, visitation or quality control review conducted by Landlord or its representatives or any report resulting therefrom shall modify or reduce in any way Tenant's obligations under this Lease.

20.5    Relationship of Parties. Landlord and Tenant shall be independent contractors and nothing in this Lease shall be construed as creating a partnership, joint venture, employment, agency, license or franchise relationship. Tenant shall not have any authority to create any obligation binding upon Landlord.

20.6    Operations. Tenant shall cause the use of the Premises to be conducted in a manner consistent in all material respects with at least the minimum Governmental Authority requirements, and, in connection therewith, Tenant shall or shall cause the Subtenants to operate the Premises in a prudent manner in material compliance with Applicable Laws.

20.7    Intentionally Deleted.

20.8    Other Transactions. Tenant shall not enter into any transaction, or permit any Subtenant to enter into any transaction, other than in the ordinary course of its business and on fair and reasonable terms in compliance in all material respects with all Applicable Laws and Governmental Authority requirements and, no less favorable to Tenant (or as applicable, the Subtenant) than those it would obtain in a comparable arms-length transaction with a person or entity not an Affiliate.

20.9    Hill-Burton. Tenant shall not participate in (nor permit the Subtenant to participate in) any federal, state or local program whereby any Governmental Authority or other Person may have the right to recover funds with respect to the Premises by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).

20.10    Tenant Representations and Warranties. Tenant hereby represents, warrants and certifies to Landlord and Landlord's designee, as of the date hereof, as follows:

(a)    Tenant and the operation of each Property are in material compliance with all Applicable Laws and requirements of any Governmental Authorities having jurisdiction over the operation of such Property. Tenant will and will cause the operation of each Property to be in material compliance with the foregoing throughout the Term of this Lease.

(b)    Neither Tenant nor any Subtenant is a party to any collective bargaining agreement or other labor contract applicable to persons employed by it at any Property and there are no threatened or pending labor disputes at any Property.

61

(c)    Each Property and the use thereof complies in all material respects with all Applicable Laws including, without limitation, local, state, and federal building codes, fire codes, and other similar regulatory requirements and no waivers of such physical plant standards exist at any of the Premises which would reasonably be likely to result in a Material Adverse Effect.

(d)    As of the Effective Date, any existing agreement relating to the management or operation of each Property is in full force and effect and is not in default by any party.

(e)    Not later than August _31, 2017, Tenant or its Affiliates disclosed in writing to Harrison Street Real Estate, LLC, all written information obtained by Tenant or its Affiliates from the Sellers or from third parties that would or reasonably could be expected to be pertinent and material to a prospective institutional investor in the Property.

20.11    Leasing "As-Is". The parties acknowledge that Tenant has conducted all of its own due diligence, examination and inspection regarding the Premises and the business at the Premises and is entirely familiar with all business, financial, liability, physical premises, operational and regulatory aspects, and every other matter or thing affecting or related to the business operated at the Premises, and that Tenant is leasing the same in its "As Is" condition. Landlord has not made and does not make any representations or warranties whatsoever with respect to the business conducted at and from the Premises or otherwise with respect to this Lease, express or implied, and Tenant is not relying on Landlord or its Affiliates in connection with any decision to enter into this Lease. Tenant assumes all risks resulting from any defects (patent or latent) in the Premises or from any failure of the same to comply with any Requirement or Applicable Law with respect to the Premises or the uses or purposes for which the same may be occupied. Without limiting the generality of the foregoing, the following shall apply:

(i)    ACKNOWLEDGING THE TENANT'S OPPORTUNITY TO INSPECT THE PREMISES, TENANT AGREES TO TAKE THE PREMISES "AS IS", "WHERE IS", WITH ALL FAULTS AND CONDITIONS THEREON. TENANT ACKNOWLEDGES AND AGREES THAT LANDLORD HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITION OF THE PREMISES, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PREMISES, (C) THE SUITABILITY OF THE PREMISES FOR ANY AND ALL ACTIVITIES AND USES WHICH TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PREMISES OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PREMISES, OR (F) ANY OTHER MATTER WITH RESPECT TO THE PREMISES, AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING TERMITES OR WASTES, AS DEFINED BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS AT 40 C.F.R., OR ANY HAZARDOUS SUBSTANCE. TENANT, TOGETHER WITH ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVE, RELEASE AND AGREE NOT TO MAKE ANY CLAIM OR BRING ANY COST RECOVERY ACTION OR

CLAIM FOR CONTRIBUTION OR OTHER ACTION OR CLAIM AGAINST LANDLORD OR ITS AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS, OR ASSIGNS (COLLECTIVELY OR INDIVIDUALLY AS THE CONTEXT REQUIRES, "LANDLORD AND/OR ITS AFFILIATES") BASED ON (I) ANY ENVIRONMENTAL LAW, NOW EXISTING OR HEREAFTER ENACTED, (II) ANY DISCHARGE, DISPOSAL, RELEASE, OR ESCAPE OF ANY CHEMICAL, OR ANY MATERIAL WHATSOEVER, ON, AT, TO, OR FROM THE PREMISES; OR (III) THE EXISTENCE OF ANY ENVIRONMENTAL CONDITIONS OR HAZARDOUS SUBSTANCES WHATSOEVER ON, UNDER, OR IN THE VICINITY OF THE PREMISES.

(ii)    TENANT ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, THAT MAY NOT HAVE BEEN REVEALED BY TENANT'S INVESTIGATIONS, MAY EXIST WITH RESPECT TO THE PREMISES, AND TENANT IS DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED LANDLORD AND/OR ITS AFFILIATES FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH TENANT MIGHT HAVE ASSERTED OR ALLEGED AGAINST LANDLORD AND/OR ITS AFFILIATES AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE PREMISES.

(iii)    TENANT, WITH TENANT'S COUNSEL, HAS FULLY REVIEWED THE DISCLAIMERS AND WAIVERS SET FORTH IN THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, IN THIS SECTION, AND UNDERSTANDS THEIR SIGNIFICANCE AND EFFECT. TENANT ACKNOWLEDGES AND AGREES THAT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH IN THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, IN THIS SECTION ARE AN INTEGRAL PART OF THIS AGREEMENT, AND THAT LANDLORD WOULD NOT HAVE AGREED TO LEASE THE PREMISES TO TENANT FOR THE RENTAL STATED HEREIN WITHOUT THE DISCLAIMERS AND OTHER AGREEMENTS SET FORTH IN THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, IN THIS SECTION.

20.12    Compliance with Anti-Terrorism Laws. Tenant represents and warrants to Landlord that it is not, and, after making a commercially reasonable inquiry, that no person who directly owns a controlling interest in or otherwise directly controls Tenant is, (i) listed on the Specially Designated Nationals and Blocked persons List (the "SDN List") maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or on any other similar list ("Other Lists" and, collectively with the SDN List, the "Lists") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation (collectively, "OFAC Laws and Regulations"); or (ii) a person (a "Designated Person") designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or similarly designated under any related enabling legislation or any other similar Executive Orders (collectively, the "Executive Orders"). The OFAC Laws and Regulations and the Executive Orders are collectively referred to in this Agreement as the "Anti-Terrorism Laws". This Section shall not apply to any person to the extent that such person's interest in the Tenant is through a U.S. Publicly-Traded Entity. As used in this Lease, "U.S.

Publicly-Traded Entity" means a person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a person.

      20.13  <u>Management Agreements</u>.

          (a)    Subject to <u>Section 20.13(c)</u> and (d) below, throughout the Term, Tenant shall not enter into any Management Agreement without the prior written approval of Landlord, in each instance, which approval may not be unreasonably withheld, conditioned or delayed. Tenant shall not, without the prior written consent of Landlord, which consent Landlord may not unreasonably withhold, condition or delay, agree to: (i) any change in the Manager under any Management Agreement; (ii) any material change in any Management Agreement; (iii) the termination of any Management Agreement; or (iv) the assignment of any Management Agreement by any Manager. Notice of whether Landlord's consent has been given or withheld shall be delivered to Tenant within fifteen (15) Business Days following receipt of Tenant's written request ("**Management Notice**"). If, within twenty-one (21) days of Landlord's receipt of a Management notice, Landlord fails to provide Tenant within written notice confirming whether Landlord's to such change, termination or assignment has been given or withheld, and should such failure continue for ten (10) Business Days after Landlord's receipt of a second written notice specifically referencing this Section of the Lease and stating in bold, and all-capitalized letters "**LANDLORD'S FAILURE TO RESPOND WITHIN THE TEN (10) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE SHALL CONSTITUTE LANDLORD'S DEEMED APPROVAL OF THIS Management notice**", or including comparable language of similar import, then Landlord shall be deemed to have conclusively approved the change, termination or assignment specified in the Management notice. Each Management Agreement shall provide that Landlord shall receive notice of any defaults thereunder and, at Landlord's option, an opportunity to cure any such defaults. If Landlord shall cure any of Tenant's defaults under any Management Agreement, the cost of any such cure shall be payable upon demand to Landlord by Tenant as Supplementary Rent. Any Manager shall be reputable and have experience in managing facilities similar in size, scope, use and value as the Premises or any one of them for which they are assigned management responsibilities. Tenant agrees that the engagement of the Manager by Tenant shall not relieve Tenant of any of Tenant's duties and obligations to Landlord under this Lease with respect to the leasing, management and operation of the Property. For avoidance of doubt the Management Agreement referred to in <u>Section 20.13(c)</u> shall constitute a Management Agreement, as such term is used in this Lease, and the Non-Parking Manager shall be a Manager, as such term is used in this Lease.

          (b)    All management fees, payments in connection with any extension of credit and fees for services provided in connection with the operation of the Property, and all other payments and fees, payable by Tenant to any Affiliate of Tenant, shall be paid by Tenant as Operating Expenses and Tenant's obligation to pay management fees thereunder shall be subordinated to the obligations of Tenant to pay Rent under this Lease. Tenant shall deliver to Landlord any reasonable instrument requested by Landlord to implement the intent of the foregoing provision.

          (c)    <u>Property Manager</u>. Notwithstanding anything to the contrary set forth in this <u>Section 20.13</u>, Landlord will lead the process for selecting and engaging the Manager on reasonable terms, which shall provide for a management fee of up to four percent (4%) of the annual gross rental receipts of the applicable Property(ies). Further, at Landlord's election, the Manager will enter into the Management Agreement directly with Landlord (rather than with

Tenant or any Subtenant), in which event the management fees shall nevertheless constitute Operating Expenses payable by Tenant.

## ARTICLE 21

## MISCELLANEOUS PROVISIONS

21.1    <u>Waiver of Jury Trial</u>. **TO THE EXTENT ALLOWED BY LAW, IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE EXCLUDING ANY CLAIM FOR PERSONAL INJURY OR PROPERTY DAMAGE.**

21.2    <u>Signs</u>. With the prior written consent of Landlord, which will not be unreasonably withheld, conditioned or delayed, Tenant may place one or more signs on the Premises to indicate the nature of the business of Tenant and such parties. Any sign shall be lawful under applicable sign codes and subdivision covenants. Landlord hereby approves the signage currently placed on the Premises.

21.3    <u>Certain Definitions</u>.

(a)    The term "Landlord" as used herein shall mean only the owner or the mortgagee in possession for the time being of the Premises, so that in the event of any sale, transfer or conveyance of the Premises Landlord shall be and hereby is entirely freed and relieved of all agreements, covenants and obligations of Landlord hereunder and it shall be deemed and construed without further agreement between the parties or their successors in interest or between the parties and the purchaser, transferee or grantee at any such sale, transfer conveyance that such purchaser, transferee or grantee has assumed and agreed to carry out any and all agreements, covenants and obligations of Landlord hereunder.

(b)    The term "Tenant" as used herein shall mean the tenant named herein, and from and after any valid and approved Transfer in whole of said Tenant's interest under this Lease pursuant to the provisions of <u>Article 9</u>, shall mean only the assignee or transferee thereof; but the foregoing shall not release the assignor or transferor from liability under this Lease.

(c)    The words "enter", "re-enter", "entry" and "re-entry" as used in this Lease shall not be restricted to their technical legal meaning.

(d)    The use herein of the neuter pronoun in any reference to Landlord or Tenant shall be deemed to include any individual Landlord or Tenant, and the use herein of the words "successor and assigns" or "successors or assigns" of Landlord or Tenant shall be deemed to include the heirs, executors, administrators, representatives and assigns of any individual Landlord or Tenant.

21.4    <u>Headings</u>. The headings herein are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope or intent of this Lease nor in any way affect this Lease.

65

21.5     <u>Integration; Amendment</u>.

(a)     This Lease contains the entire agreement between the parties regarding the subject matter set forth herein and may not be extended, renewed, restated, terminated or otherwise modified in any manner except by an instrument in writing executed by the party against whom enforcement of any such modification is sought and with the consent of any Mortgagee. All prior understandings and agreements between the parties and all prior working drafts of this Lease are merged in this Lease, which alone expresses the agreement of the parties. The parties agree that no inferences shall be drawn from matters deleted from any working drafts of this Lease.

(b)     Tenant agrees that Tenant will not, without the prior written consent of Landlord, (i) terminate, cancel or surrender the term of this Lease except as expressly permitted by the provisions of this Lease, or enter into any agreement with Landlord to do so, or (ii) pay any installment of Base Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease. This Lease may not be amended, restated, supplemented or modified in any manner except by means of a written instrument executed by Landlord and Tenant.

21.6     <u>Successors/Assigns</u>. The agreements, terms, covenants and conditions herein shall bind and inure to the benefit of Landlord and Tenant and, except as is otherwise provided herein, their permitted successors and permitted assigns.

21.7     <u>Notices</u>. Notice whenever provided for herein shall be in writing. Any notice required or permitted to be delivered hereunder shall be addressed as required in <u>Article A</u> of the Lease, and shall be deemed received when (i) personally delivered (including delivery via email, provided that such email specifically states that it is intended to be notice as required pursuant to this <u>Section 21.7</u>) or (ii) one (1) Business Day after being deposited with a nationally recognized overnight courier service, charges prepaid, and properly addressed for next-day delivery. Either party may change its address for notice from time to time by delivery of at least three (3) Business Days prior written notice of such change to the other party hereto in the manner prescribed herein.

21.8     <u>Construction</u>.

(a)     If any provision of this Lease shall be invalid or unenforceable, the remainder of the provisions of this Lease shall not be affected thereby and each and every provision of this Lease shall be enforceable to the fullest extent permitted by Applicable Law.

(b)     The parties hereto intend that this Lease shall constitute a single, integrated and indivisible contract under Applicable Law, and therefore, that in any bankruptcy or insolvency proceeding commenced by or against Tenant, this Lease shall not be subject to assumption, assignment or rejection in parts, or with respect to particular Premises, Buildings or parcels of land, but rather shall be subject to assumption, assignment or rejection, if at all, only in its entirety as a single contract.

21.9     <u>Brokers</u>. Landlord and Tenant each represent and warrant to the other party that such party has not dealt with any real estate broker in connection with this Lease, and Landlord and Tenant agree to indemnify the other party and save the other party harmless from any and all claims for brokerage commissions by any other person, firm, corporation or other entity claiming

through such party to have brought about this Lease transaction. The provisions of this <u>Section 21.9</u> shall survive the expiration or earlier termination of this Lease.

21.10   <u>Control of Premises</u>. Subject to the terms hereof, Tenant is and shall be, during the Term, in exclusive control and possession of the Premises, subject to the Subleases. Landlord shall not, in any event whatsoever, be liable for any injury or damage to any property or to any person happening in, on or about the Premises, nor for any injury or damage to any property of Tenant, or of any other person or persons contained therein unless the same is caused by Landlord's gross negligence or willful misconduct. The provisions hereof, including without limitation <u>Article 17</u>, permitting Landlord to enter and inspect the Premises are made for the purpose of enabling Landlord to be informed as to whether Tenant is complying with the agreements, terms, covenants and conditions hereof, and if Landlord so desires, to do such acts as Tenant shall fail to do. Tenant agrees to look solely to Landlord's interest in the Premises for recovery of any judgment from such Landlord, and in no event shall Landlord (or its partners, shareholders, members, managers, officers, directors or Affiliates) ever be personally liable for any such judgment.

21.11   <u>Confidentiality</u>.

(a)    Tenant agrees, and agrees to cause each of their Affiliates, (i) not to transmit or disclose provisions of this Lease to any Person (other than to Tenant's advisors and officers on a need-to-know basis or as otherwise may be required by law) without Landlord's prior written consent, (ii) to inform all Persons to whom provisions of this Lease are disclosed of the confidential nature of the Lease and to direct them not to disclose the same to any other Person and to direct each of them to adhere to the provisions of this Section. Tenant shall not, and shall not permit any of their Affiliates to, use Landlord's name (or the name of any of Landlord's Affiliates) in connection with any of its business operations, including without limitation, advertising, marketing or press releases or such other similar purposes, without Landlord's prior written consent. Nothing contained in this Lease is intended to permit or authorize Tenant or any of their Affiliates to contract on behalf of Landlord. Tenant hereby agrees that Landlord or any Affiliate of Landlord may (A) disclose a general description of transactions arising under this Lease for advertising, marketing or other similar purposes, (B) use Tenant's or Guarantor's names, logos or other indicia germane to such parties in connection with such advertising, marketing or other similar purposes and (C) disclose any and all information concerning the Lease, as well as any information regarding Tenant the Guarantor and their respective its operations, received by Landlord in connection with the Lease to its lenders or funding or financing sources or otherwise required by law.

(b)    Notwithstanding anything to the contrary contained in <u>Section 21.11(a)</u>, Tenant may transmit or disclose this Lease or the provisions of this Lease to: (i) any of its Affiliates or any of its or their officers, employees, directors, shareholders, partners, members, principals, agents, lenders, potential acquirers, investment bankers, investors, consultants, attorneys, accountants and other professional advisors that agrees to comply with the provisions of this <u>Section 21.11</u> or substantially equivalent provisions; (ii) any Governmental Authority having jurisdiction over it upon the request or demand of such Governmental Authority; (iii) any Person in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Applicable Law; (iv) in connection with any litigation or similar proceeding; (v) any Person if this Lease or the provisions of this Lease has been publicly disclosed other than in breach of this <u>Section 21.11</u>.

67

21.12 <u>Construction</u>. The parties took equal part in drafting this Lease and no rule of construction that would cause any of the terms hereof to be construed against the drafter shall be applicable to the interpretation of this Lease.

21.13 <u>Time of Essence</u>. Time is strictly of the essence with respect to each and every term and provision of this Lease.

21.14 <u>"Force Majeure" Defined</u>. Except for the provisions of <u>Article 7</u>, the time within which either party hereto shall be required to perform any act under this Lease (excluding Tenant's obligation to pay Rent or other sums as and when due from time to time under this Lease and excluding the indemnification obligations of the parties hereunder, which Landlord and Tenant agree shall not be excused or subject to extension for Force Majeure), shall be extended by a period of time equal to the number of days during which performance of such act is actually and reasonably delayed by strikes, lockouts (provided that any such strikes or lockouts do not relate solely to disputes with Tenant and/or Tenant's Affiliates), acts of God, governmental restrictions, failure or inability to secure materials or labor by reason of priority or similar regulation or order of any governmental or regulatory body, enemy action, civil disturbance or any other cause beyond the reasonable control of either party hereto.

21.15 <u>True Lease</u>. Landlord and Tenant each waive any claim or defense based upon the characterization of this Lease as anything other than a true lease and irrevocably waive any claim or defense which asserts that the Lease is anything other than a true lease. Landlord and Tenant covenant and agree that they will not assert that this Lease is anything but a true lease. Landlord and Tenant each stipulate and agree not to challenge the validity, enforceability or characterization of the lease of the Premises as a true lease and further stipulate and agree that nothing contained in this Lease creates or is intended to create a joint venture, partnership (either de jure or de facto), equitable mortgage, trust, financing device or arrangement, security interest or the like. Landlord or Tenant each shall support the intent of the parties that the lease of the Premises pursuant to this Lease is a true lease and does not create a joint venture, partnership (either de jure or de facto), equitable mortgage, trust, financing device or arrangement, security interest or the like, if, and to the extent that, any challenge occurs.

21.16 <u>Rent Obligation Unconditional</u>. Tenant acknowledges and agrees that Tenant's obligations to pay rent hereunder, and the rights of Landlord in and to such Rent, shall be absolute, unconditional and irrevocable. Except as expressly provided for in <u>Section 8.2</u>, Tenant shall not have any right to terminate this Lease or to be released, relieved, or discharged from any obligations or liabilities hereunder (including, without limitation, the payment of Rent) or entitled to any abatement, suspension, determent, reduction, setoff, counterclaim or defense for any reason whatsoever, including, without limitation, any of the following reasons:

(a) Any defect in, damage to, or destruction of, the Premises or any portion thereof, except as provided in <u>Article 7</u> and otherwise expressly provided for in this Lease;

(b) Any condemnation, confiscation, requisition, or other taking or sale of the possession, use, occupancy, or title to the Premises or any portion thereof, except as provided in <u>Article 8</u> and otherwise expressly provided for in this Lease;

(c) Any limitation, restriction, deprivation, or prevention of, or any interference with, the use, occupancy, or possession of the Premises or any portion thereof;

68

(d)　　Any set-off, abatement, counterclaim, suspension, recoupment, reduction, rescission, defense or other right or claim that Tenant may have against Landlord, any vendor or manufacturer of or contractor or subcontractor for the Premises or any part of any thereof, or any other person for any reason whatsoever;

(e)　　The inadequacy, incorrectness, or failure of the description of the Premises or any portion thereof;

(f)　　Any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, or other proceeding affecting Landlord, any assignee of Landlord, or Tenant or any action with respect to this Lease which may be taken by any receiver, trustee, or liquidator (or other similar official), or by any court;

(g)　　Force Majeure;

(h)　　Any title defect, lien or matter affecting title to the Premises or eviction by paramount title or otherwise; or

(i)　　Any default by Landlord under this Lease or the impossibility or illegality of performance by Landlord, Tenant or both.

Tenant hereby waives, to the fullest extent permitted by Applicable Law, any and all rights that it may now have or that at any time hereafter may be conferred upon it, by Applicable Law or otherwise, to modify, terminate, cancel, quit or surrender this Lease or to effect or claim any diminution or reduction of Rent payable by Tenant hereunder, except in accordance with the express terms hereof. Tenant agrees that, if for any reason whatsoever this Lease shall be terminated in whole or in part by operation of law or otherwise (except as expressly permitted under Section 8.2), then Tenant shall pay, to the maximum extent permitted by Applicable Law, to Landlord or any other person entitled thereto, an amount equal to each installment of Rent at the time such payment would have become due and payable in accordance with the terms hereof had this Lease not been terminated in whole or in part. Each payment of Rent made by Tenant hereunder shall be final and Tenant shall not seek or have any right to recover all or any part of such payment from Landlord or any Person for any reason whatsoever. It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, that the Rent or other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been abated, reduced or terminated pursuant to Section 8.2.

21.17　Officer's Certificate. On the execution of this Lease, Tenant has delivered an Officer's Certificate as to the corporate/LLC execution, delivery and authorization of this Lease, good standing of Tenant and incumbency of persons signing the Lease.

21.18　Governing Law/Consent to Jurisdiction/Venue. Irrespective of the place of execution and/or delivery of this Lease or the location of the Premises, this Lease shall be governed by and shall be construed in accordance with, the Applicable Laws of the State or States in which the Premises are located applicable to agreements entered into without regarding to conflicts of law principles. Landlord and Tenant hereby consent and submit to the exclusive jurisdiction of the state and Federal courts located in the state in which the Premises are located with respect to any claim or litigation arising hereunder or any alleged breach of the covenants or

provisions contained herein, and acknowledge that proper venue in any matter so claimed or litigated shall be in the state and Federal courts located in which the Premises are located.

21.19    <u>Non-Liability for Withholding Consent, Approval</u>. Tenant hereby waives any claim against Landlord, any Superior Landlord and any Mortgagee for Landlord's, such Superior Landlord's or such Mortgagee's withholding, conditioning or delaying any consent or approval requested by Tenant. Neither Landlord, any Superior Landlord nor any Mortgagee shall have any liability to Tenant for its refusal or failure to give any consent or approval. Tenant's sole remedy for Landlord's, such Superior Landlord's or such Mortgagee's withholding, conditioning or delaying consent or approval shall be to seek injunctive relief in accordance with the terms and conditions of this Lease.

21.20    <u>Counterparts</u>. This Lease may be executed in two or more counterparts (including by means of facsimile), each of which shall constitute an original, and all of which taken together shall constitute one instrument.

21.21    <u>Memorandum of Lease</u>. The parties shall execute and record in the counties in which the Premises are located (i) a memorandum of lease in the form attached hereto as Schedule D giving notice of certain non-monetary terms, including certain of Tenant's rights and options rights.

21.22    <u>Power of Attorney</u>. Tenant grants to Landlord an irrevocable power of attorney, coupled with an interest, for the purpose of (a) following an Event of Default, exercising any and all rights and remedies available to Tenant under any Sublease, at law or in equity with respect to any such Sublease, any Subtenant or the Premises or Premises thereunder, (b) executing any agreement, document or instrument as required of Tenant under this Lease, and (c) performing any of Tenant's other obligations under this Lease. To the extent not prohibited by Applicable Law, Tenant hereby ratifies all acts Landlord has lawfully done in the past or shall lawfully do or cause to be done in the future by virtue of such power of attorney. If the above provisions, or any other provision of this Lease is deemed to be a power of attorney subject to Section 5601.3 of Chapter 56 of the Pennsylvania Probate, Estates and Fiduciaries Code (a "POA Provision"), each POA Provision is hereby modified to include an irrevocable waiver by each principal of the agent's duties set forth in Section 5601.3(b) of said chapter. Without further modifying any POA Provision, Tenant hereby acknowledges that in view of the commercial nature of the relationship between the parties hereto, there is no expectation that the agent shall have a duty under any POA Provision to act in the best interest of any principal thereunder, and it is agreed that the agent shall have no such duty.

## ARTICLE 22

## GUARANTY

22.1    <u>Master Lease Guarantee Agreements</u>. Philadelphia Academic Health Holdings LLC ("PAHH") and Paladin Healthcare Capital, LLC ("PHC") shall enter into customary guarantee agreements with Landlord under which PAHH (the "<u>PAHH Guarantee</u>") and PHC (the "<u>PHC Guarantee</u>") shall guarantee the Tenant's payment and performance under the Lease. So long as there is no outstanding Event of Default, the PHC Guarantee shall automatically terminate upon:

(a)    Tenant achieving a Fixed Charge Coverage Ratio (the "FCCR") of 1.1:1.0 on a trailing 12-month basis; and

(b)    Tenant achieving a consolidated EBITDAR of at least thirty million dollars ($30,000,000).

Each of the tests in clauses (a) and (b) shall be measured quarterly concurrent with, and measured with reference to the same definitions as, the covenant tests under the MidCap Credit Facility, whether or not the MidCap Credit Facility remains in effect.

## ARTICLE 23

## RESERVED

## ARTICLE 24

## RENEWAL

24.1    Option. Provided no Event of Default exists either as of the date of Tenant's notice as set forth below or as of the first day of the applicable Extended Term (as hereinafter defined), Tenant shall have the right to extend the term of this Lease for two (2) additional successive periods (each an "**Extended Term**"). The first Extended Term shall be for a period of ten (10) years commencing immediately upon the expiration of the Initial Term and the second Extended Term shall be for a period of four (4) years and eleven (11) months commencing immediately upon the expiration of the first Extension Term. Each Extended Term shall be with respect to all (but not less than all) of the then-current Premises, upon all of the terms and conditions of this Section.

24.2    Notice. Tenant must provide Landlord notice of its exercise of the option for the applicable Extended Term not less than twelve (12) full months prior, but not more than eighteen (18) months prior, to the expiration date of the Term or the first Extended Term, as the case may be. Time is of the essence with respect to the foregoing and Tenant conclusively shall be deemed to have waived its right to extended the Term pursuant to this Article 24 if Tenant fails to notify Landlord of Tenant's election to extend the Term in a timely manner in accordance with the preceding sentence. Tenant may not exercise the option for the second Extended Term unless it exercised the option for, and occupied for the Premises for, the entirety of the first Extended Term.

24.3    Rent. The Base Rent for the first Lease Year of each of the first and second Extended Terms shall be the greater of (i) the prevailing Market Rental Rate as of the first day of the applicable Extended Term, not to exceed 107% of the Base Rent for the last Lease Year of then-current Term or Extended Term (as escalated during the Term as required by Section 2.1) and (ii) 103% of the Base Rent for the last Lease Year of then-current Term or Extended Term (as escalated during the Term as required by Section 2.1). The Base Rent for the first and second Extended Terms shall increase by 3% on the first day of the second Lease Year of each Extended Term, and on the first day of each succeeding Lease Year of each Extended Term, in the same manner as Base Rent increased during the Initial Term, as provided in Section 2.1(c). If Tenant exercises its option for the first or second Extended Term as provided above, Landlord and Tenant shall meet promptly and shall negotiate, in good faith, to reach agreement on the Market Rental Rate within fifteen (15) Business Days following the date on which Landlord receives Tenant's written notice exercising the option for the Extended Term. If Landlord and Tenant are unable to reach agreement on the Market Rental Rate with respect to the first or second (as applicable) Extended Term, then within such 15 Business Day period, then either (i) Tenant may withdraw its renewal election, whereupon this Lease shall terminate at the natural expiration of

the then-current term, or (ii) the Market Rental Rate for the first or second (as applicable) Extended Term shall be determined as follows:

(a)    As used herein, the term "Market Rental Rate" shall be defined as the then fair market rental value of the Premises determined in accordance with the provisions set forth below. The fair market rental value of the Premises shall mean the base rental rate that would be agreed upon by Landlord and a comparable tenant at a comparable building, each of whom is willing, but neither of whom is compelled, to enter into a lease transaction. The fair market rental value shall be projected into the commencement date of the applicable Extended Term and shall take into account all existing improvements and special uses or rights afforded to Tenant, and also shall take into account the following factors, amongst others: (i) rental for comparable premises in comparable existing buildings (taking into consideration but not limited to annual escalations, quality, age, parking ratios, power capabilities, ceiling height, loading capabilities, and location (including proximity to, or location on, hospital campuses) of applicable buildings and assuming Tenant had performed all maintenance, repairs, replacements and improvements required from time to time pursuant to this Lease); (ii) the length of the pertinent rental term; and (iv) the creditworthiness of Tenant at the commencement of the first and second of the Extended Term in question. The fair market rental value of the Premises shall be determined in accordance with the Uniform Standards of Professional Appraisal Practice (including the Competency Provision) adopted by the Appraisal Institute using the Comparative Rental Analysis approach (and not the Cost Approach, Sales Comparison Approach or Income Capitalization Approach). All appraisal reports shall be written by the designated MAI appraiser and not by an associate.

(b)    Within thirty (30) days after the end of said 15-day period, Landlord and Tenant shall mutually agree upon a MAI appraiser involved with the ownership, leasing or management of real estate and who has at least ten (10) years' experience, immediately prior to the date in question, evaluating Market Rental Rates for similar properties in comparable markets (the "**Expert**"). The Expert and the firm with whom he or she is employed shall have no current or, during the prior five (5) years, prior business relationship with a party or any of their Affiliates. If the parties are unable to timely agree on the Expert, then Market Rental Rate shall be determined by a panel of three (3) Experts, each of whom shall meet the qualifications set forth above, and who shall be selected in accordance with the following procedure. If a party fails to name, within said time period, an Expert meeting said qualifications, then the Market Rental Rate shall be determined by the Expert named by the other party. Within ten (10) Business Days following the earlier of (i) a party's election to appoint a panel of Experts or (ii) the expiration of said 15-day period, each party shall deliver to the other written notice specifying the name and address of the person to act as the Expert on the party's behalf. Within ten (10) Business Days after the parties have appointed their respective Experts, the two Experts shall appoint a third Expert, who shall have the same qualifications as those required of the first two Experts. If the two Experts are unable to timely agree upon such appointment, then either party, on behalf of both, may require appointment of such a qualified person by the then president of the commercial real estate board of the American Arbitration Association for the county in which the Building is located. Each party shall pay the fees and expenses of its respective Expert and both shall equally share the fees and expenses of the third Expert. Attorney's fees and expenses of counsel for the respective parties shall be paid by the respective party engaging such counsel. Market Rental Rate shall be fixed in accordance with the following procedures. Within ten (10) Business Days following the appointment of the third Expert, each of the two Experts selected by the parties shall state, in writing, his or her determination of the Market Rental Rate based on the criteria set forth in <u>Section 24.3</u> above and supported by the reasons therefor. If the determination of Market Rental Rate by the two Experts are within 5% of each other, the Market Rental Rate shall be the average of the two determinations. If the

72

determination of Market Rental Rate by the two Experts are not within 5% of each other, then the third Expert shall have the right to consult exerts and competent authorities for factual information or evidence pertaining to a determination of Market Rental Rate. The third Expert shall conduct investigations as he or she deems appropriate and shall, within thirty (30) days after being appointed, select which of the two proposed determinations most closely approximates his or her determination of Market Rental Rate based on the standards described above. The third Expert shall have no right to propose a middle ground or modification of either of the two proposed determinations. The determination he or she chooses as that most closely approximating his or her determination of the Market Rental Rate shall constitute the decision of the third Expert. The third Expert shall render the decision (which shall include an explanation of the basis for said decision) in writing with counterpart copies to each party. The third Expert shall have no power to add to or modify the provisions of this Lease. Promptly following receipt of the decision, the parties shall promptly enter into an amendment to this Lease evidencing the extension of the Term for the applicable terms.

(c)     The determination of the Market Rental Rate as provided above shall be final, binding and conclusive on both Landlord and Tenant, absent manifest error, shall be considered a final award pursuant to the rules of the American Arbitration Association and any applicable state or federal law and judgment may be had on the award in any court of competent jurisdiction.

(d)     All of the terms and conditions of the Lease shall remain the same and shall remain in full force and effect throughout the first and second Extended Term(s), except that (i) Base Rent shall be at the new rate determined as provided above and (ii) Tenant shall not be entitled to receive and Landlord shall have no obligation to pay any improvement or other allowance that is provided for in this Lease for the Initial Term.

24.4    <u>Other Terms</u>. All of the terms and conditions of the Lease shall remain the same and shall remain in full force and effect throughout the Extended Term(s), except that (i) Base Rent shall be at the new rate determined as provided above, and (ii) Tenant shall not be entitled to receive and Landlord shall have no obligation to pay any improvement or other allowance that is provided for in this Lease for the Initial Term, if any.

## ARTICLE 25

## OFFSET AGAINST EARN-OUT

25.1    <u>Off-Set Rights</u>. In addition to all other rights and remedies of Landlord hereunder, if any Rent or other amount payable by Tenant hereunder is not paid when due, then Landlord and its Affiliates shall have the right (but shall not be obligated) to offset the amount due (including late fees and default interest, if applicable) against the "Earnout" otherwise due to Tenant's Affiliate, PAHH under the Commitment Letter dated August 31, 2017.

## ARTICLE 26

## CAPITAL EXPENDITURE AND RESERVE REQUIREMENTS

26.1    <u>Tenant Improvement Reserve; Environmental Reserve</u>. An amount not to exceed Twenty-two million five hundred thousand dollars ($22,500,000) in the aggregate, shall be made available under this Lease and the Other Master Leases, combined, by Landlord and the other landlords under the various Other Master Leases (collectively the "Other Master Landlords") to

Tenant from time to time in to be applied by Tenant in accordance with the terms of this Lease and the Other Master Leases, towards the cost of certain immediate capital expenditure requirements for the Work that is either identified on Schedule 26.1 attached hereto or, if not identified on Schedule 26.1, is agreed by Landlord, the Other Master Landlords and Tenant within 120 days after the Effective Date in accordance with Section 26.1 (the "**Tenant Improvement Reserve**"; the "**Initial CapEx Work**"), such Tenant Improvement Reserve to include an amount not to exceed Four Million Five Hundred Thousand Dollars ($4,500,000) for environmental-related expenditures mutually and reasonably agreed upon by Landlord, the Other Master Landlords and Tenant within 180 days after the Effective Date in accordance with Section 26.10 (the "**Environmental Reserve**"). Solely if and to the extent required by the Mortgagee, Landlord and the Other Master Landlords will deposit up to the full amount of the Tenant Improvement Reserve funds in escrow with Bank, subject to an escrow agreement reasonably acceptable to Mortgagee, Landlord, the Other Master Landlords and Tenant. The amount of the Tenant Improvement Reserve and the Environmental Reserve available to Tenant hereunder shall be reduced on a dollar-for-dollar basis for any reserve funds disbursed to Tenant under Section 26.1 or the Other Master Leases..

26.2    Incremental CapEx Reserve. Tenant combined with the tenants under the Other Master Leases will deposit with Landlord and the Other Master Landlords, from time to time, as Supplemental Rent under this Lease, at the same times as installments of Base Rent are due, an amount equal to Two Hundred and Fifty Thousand Dollars ($250,000) per month, as allocated among the Master Leases with respect to each month falling within the fourth, fifth, sixth and seventh Lease Years (the "**Incremental CapEx Reserve**"), which shall be utilized for major building systems and capital expenditure projects associated with the Portfolio. Solely if and to the extent required by the Mortgagee, Landlord shall deposit the Incremental CapEx Reserve Payments, promptly following Landlord's receipt thereof from Tenant, in escrow with Land Services USA, Inc., subject to an escrow agreement reasonably acceptable to Mortgagee, Landlord and Tenant.

(a)    Notwithstanding anything to the contrary contained in Section 26.1, if the likely cost of environmental remediation relating to the Property during the first five Lease Years, as reasonably determined by the Landlord and Tenant within 180 days after the Effective Date exceeds the amount of the Environmental Reserve, Tenant will be required to increase and/or accelerate the monthly contributions under the Incremental Capex Reserve to accommodate such overage.

(b)    The Incremental CapEx Reserve shall be reevaluated by Landlord and Tenant at least every other Lease Year, starting with the fourth Lease Year, and shall be subject to reasonable adjustments as mutually determined by the Parties, taking into account any balances remaining in the Aggregate CapEx Reserves (as defined in Section 26.9).

26.3    Value-Add Capital Expenditure Allowance. Landlord and the Other Master Landlords will make funds available to Tenant, in the amount of up to five million dollars ($5,000,000) in aggregate, for Tenant to draw upon (the "**Draw**"), at its option during the first four Lease Years, to fund capital expenditure projects that (in Tenant's reasonable judgment) will result in a quantifiable reduction in operating expenses associated with the Property and all of the Other Properties (the "**Value-Add Capital Expenditure Allowance**"), it being agreed, however, that:

(a)    Tenant will have full reasonable discretion and approval over the work to be performed pursuant to this Section 26.3; and

74

(b)    The Draw will result in an eleven and one-tenth percent (11.1%) incremental yield through corresponding increases in Base Rent from time to time (as and when each portion of the Draw is paid to Tenant) under this Lease (to illustrate, a draw of the full $5,000,000 would result in an increase in annual Base Rent of $555,000, with the resulting, increased Base Rent subject to the annual increases set forth in Section 2.1(c)).

(c)    The Value-Add Capital Expenditure Allowance is separate and distinct from the Tenant Improvement Reserve and Incremental CapEx Reserve.

(d)    The amount of the Value-Add Capital Expenditure Allowance that is available to Tenant under this Lease shall be reduced on a dollar-for-dollar basis for any allowance funds disbursed to Tenant under Section 26.3 of the Other Master Leases.

26.4    Lease Rollover Reserve. An amount up to Two million four hundred thousand dollars ($2,400,000) will be funded by Landlord and the Other Master Landlords on the Effective Date (or, if permitted by the Mortgagee under the Mortgage Loan, funded on an as-needed basis). In addition, Tenant will deposit two hundred thousand dollars ($200,000) per month, as allocated among the Master Leases into a reserve account (the "**Lease Rollover Reserve**") beginning in the seventh (7th) month of the second (2nd) Lease Year and ending on the earlier to occur of (a) the month on which the balance of the Lease Rollover Reserve, together with the Lease Rollover Reserve established under Section 26.4 of the Other Master Leases equals or first exceeds eight million three hundred thousand dollars ($8,300,000), or (b) the execution of a DUCOM Extension, which shall be utilized for tenant improvements and leasing commissions, if any (the "**DUCOM Leasing Costs**"), that may be required under a DUCOM Extension. Subject to the terms of the Mortgage Loan, Landlord will have a perfected security interest in the Lease Rollover Reserve account. The Lease Rollover Reserve will be used to cover the first eight million three hundred thousand dollars ($8,300,000) (or an amount equal to the balance of the Lease Rollover Reserve, whichever is less) of the DUCOM Leasing Costs. In the event of an execution of a DUCOM Extension, (a) if the DUCOM Leasing Costs are less than the funds in the Lease Rollover Reserve at the time the execution of a DUCOM Extension, such excess funds in the Lease Rollover Reserve will be deposited into the Incremental CapEx Reserve, and Tenant's future monthly contributions into said Incremental CapEx Reserve shall be proportionally reduced in forward chronological order, and (b) if the DUCOM Leasing Costs exceed the funds in Lease Rollover Reserve, such additional costs shall be deposited by Tenant in the Lease Rollover Reserve concurrently with the execution and delivery of the DUCOM Extension (unless otherwise agreed by Landlord in its sole reasonable discretion).

26.5    Disbursements of CapEx Reserve Funds. As employed herein, the term "**CapEx Reserve**" shall mean, as the context requires, the Tenant Improvement Reserve (including the Environmental Value-Add Capital Expenditure Allowance Reserve forming a portion thereof), the Incremental CapEx Reserve and the Reserve Landlord shall make disbursements of the CapEx Reserve Funds for their intended purposes in accordance with the terms of this Lease, as requested by Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, for Tenant to use in performing the capital repairs and capital improvements to the Premises as identified on Schedule 26.1 or as set forth in the Annual CapEx Plan, or as otherwise approved by Landlord in its reasonable discretion (collectively, the "**CapEx Work**"). During the period the Landlord is directly or indirectly controlled by Harrison Street Real Estate, LLC, disbursements shall be made in Landlord's reasonable discretion. During the period Landlord is not controlled directly or indirectly by Harrison Street RealEstate, LLC, disbursements shall be made no more frequently than once in any thirty (30) day period, and in an amount no less than $5,000 upon satisfaction of each of the following criteria:

(a) Landlord shall have approved in advance in writing each contractor to be engaged by Tenant to perform said Work and the form of construction contract for the Work, it being agreed that the contractor shall not be an Affiliate of Tenant, (b) Landlord shall have approved in advance in writing all plans and specifications and contracts for the applicable Work, (c) Tenant shall have complied with all other requirements under this Lease relating to the performance of Work (including, if applicable based on the nature of the Work, all requirement of this Lease relating to Alterations), (d) Tenant shall submit a written request for payment to Landlord at least ten (10) days prior to the date on which Tenant requests such payment be made and specifying the repair and improvement costs to be paid; (e) Landlord shall have receive a certificate from an officer of Tenant stating that previous CapEx Work has been paid for in full with respect to CapEx Work that has been completed; (f) Landlord shall have received such other evidence as Landlord shall reasonably request demonstrating that the CapEx Work to be funded by the requested disbursement from the CapEx Reserve has been completed and paid for, or will be paid for upon such disbursement to Landlord; (g) Tenant shall have furnished Landlord with lien waivers and releases from all third parties furnishing materials and/or services in connection with the requested payment, and (h) no Event of Default exists. Landlord may require an inspection of the Premises at Landlord's expense prior to making any disbursement from the CapEx Reserve in order to verify completion of replacements and repairs of items for which disbursement is sought.

26.6    Conditions for Disbursement. Landlord shall have no obligation to advance funds for payment of CapEx Work if (i) an Event of Default exists, or (ii) the undisbursed portion of the applicable portion of the CapEx Reserve is insufficient to pay the requested amount.

26.7    End of Term; Event of Default. At the expiration or earlier termination of the Term, the amount of all CapEx Reserves (including all funds deposited therein) not previously disbursed to Tenant shall be the property of Landlord. If this Lease shall be terminated by reason of any Event of Default, Landlord may, in its sole discretion, apply all funds in the CapEx Reserves on account of any and all sums due under this Lease.

26.8    Terms of Holding. It is understood and agreed that (a) to the extent permitted by Applicable Law, all funds deposited in the CapEx Reserve may be held by Landlord or its Affiliate or Mortgagee in a single bank account and commingled with other funds of Landlord or its Affiliate or Mortgagee, and (b) Landlord or Mortgagee, may, if Tenant fails to make any deposit required pursuant to this Article 26, use deposits made for any one item for the payment of the same or, if an Event of Default exists, any other item of Rent.

26.9    Annual CapEx Plans. In addition to the items set forth on Schedule 26.1, Landlord and Tenant shall collaborate reasonably in advance of the start of the second Lease Year and reasonably in advance of each subsequent Lease Year, to develop and agree upon a plan (each, an "**Annual CapEx Plan**") for capital repairs and replacements to be performed by Tenant during said Lease Year (and to the extent reasonably practicable, during the two (2) subsequent Lease Year periods thereafter), which plan shall include the estimated cost of such CapEx Work to be incurred during such Lease Year (the "**Annual CapEx Expenditure Requirement**"), and including a breakdown identifying the use of the Tenant Improvement Reserve, the Incremental CapEx Reserve, and/or the Value-Add Capital Expenditure Allowance with respect to said Work. Tenant shall diligently undertake and complete the Initial CapEx Work, and all Cap Ex Work set forth in each approved Annual CapEx Plan in accordance with the terms of this Lease and shall be solely responsible for all costs and expenses with respect thereto that are not paid from the CapEx Reserve. During each Lease Year of the Term, Tenant shall spend on CapEx

Work for the Premises an amount that is no less the amount Landlord and Tenant mutually reasonably agree upon.

      26.10   <u>Security Interest; General</u>.

      (a)    Security Interest. Although it is the intent of Landlord and Tenant that all amounts, if any, deposited by Landlord in the CapEx Reserve and all amounts deposited by Tenant in the CapEx Reserve or paid to Landlord by Tenant pursuant to <u>Section 26.2</u> or <u>Section 26.4</u> hereof (collectively, the "**CapEx Reserve Funds**"), constitute Rent under this Lease, if a court determines that, by operation of Applicable Law, all or any portion of the CapEx Reserve Funds is not Rent but instead is the property of Tenant, then to further protect Landlord's interest in said amounts, Tenant hereby grants to Landlord a first-priority security interest in the CapEx Reserve Funds and any and all monies now or hereinafter deposited therein as additional security for payment of Rent. Until expended or applied in accordance with the terms of this Lease, the CapEx Reserve Funds shall serve as additional security for Tenant's obligations hereunder. Following an Event of Default, Landlord may, in addition to all other remedies under this Lease, apply any of the CapEx Reserve Funds for the payment of Rent or other sums owing to Landlord under this Lease in its sole discretion. The CapEx Reserve Funds shall not constitute trust funds.

      (b)    <u>General</u>. Tenant shall not pledge, assign or grant a security interest in the CapEx Reserve Funds, or permit any lien or encumbrance to attach thereto or any levy to be made thereon by a party claiming through Tenant, except those naming Landlord as the secured party. Should Landlord elect to hold the CapEx Reserve Funds in an interest-bearing account, all interest earned shall be added to the CapEx Reserve Funds and Tenant shall pay all taxes due in connection therewith.

[SIGNATURES FOLLOW]

**IN WITNESS WHEREOF**, the undersigned has executed this instrument the day and year first written above.

"LANDLORD"

PAHH BELLET MOB, LLC,
a Delaware limited liability company

By: _____
Name: Mark J. Burkemper
Title:   Authorized Signatory

**IN WITNESS WHEREOF,** the undersigned has executed this instrument the day and year first written above.

"TENANT"
**ST. CHRISTOPHER'S HEALTHCARE, LLC**
a Delaware limited liability company

By: _____
Name: Joel Freedman
Title:  Chief Executive Officer and President

**SCHEDULE A**

**Address and Description of the Land**

Address: 1501-1511 Race Street, Philadelphia, Pennsylvania

Legal Description:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND
BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF
PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED
"HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN"
BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT COMMON TO THE WESTERLY SIDE OF 15th STREET (70'
WIDE) AND THE NORTHERLY SIDE OF RACE STREET (50' WIDE) AND RUNNING:

1) THENCE: ALONG SAID NORTHERLY SIDE OF RACE STREET, N78°59'00"W, A
   DISTANCE OF 100.000' TO A POINT ON THE EASTERLY SIDE OF HICKS
   STREET (20' WIDE);

2) THENCE: ALONG SAID EASTERLY SIDE OF HICKS STREET, N11°21'00"E, A
   DISTANCE OF 120.000' TO A POINT ON THE SOUTHERLY SIDE OF SPRING
   STREET (59' WIDE);

3) THENCE: ALONG SAID SOUTHERLY SIDE OF SPRING STREET, S78°59'00"E, A
   DISTANCE OF 100.000' TO A POINT ON THE WESTERLY SIDE OF 15th STREET;

4) THENCE: ALONG THE EASTERLY SIDE OF 15TH STREET, S11°21'00"W, A
   DISTANCE OF 120.000' TO THE POINT OF BEGINNING.

Containing 12,000 s.f. / 0.27548 acres of land, more or less.

## SCHEDULE B

## DEFINITIONS

"**Affiliate**" means, with respect to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person; (b) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of capital stock or other ownership interests of such Person having ordinary voting power to elect a majority of the board of directors (or similar governing body) of such Person (the "**Voting Stock**"); or (c) that directly or indirectly beneficially owns or holds ten percent (10%) or more of the Voting Stock of the Person in question. As used in this definition, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of Voting Stock, by contract, or otherwise. Notwithstanding the foregoing, each Subtenant shall be deemed an Affiliate of Tenant regardless of the ownership and control of Tenant and the Subtenants.

"**Alterations**" is defined in Section 5.4.

"**Applicable Law**" and "**Applicable Laws**" respectively mean any one or more of the applicable laws, including (without limitation) any: (a) law, statute, ordinance, rule, regulation, requirement or use or disposal classification or restriction, whether domestic or foreign, of a Governmental Authority, including, without limitation, each Environmental Law; (b) order, injunction, writ, judgment, decree, ruling, interpretation, finding or other directive, whether domestic or foreign, of a Governmental Authority; (c) common law or other legal or quasi-legal precedent; (d) arbitrator's, mediator's or referee's decision, finding, award or recommendation; or (e) charter, rule, regulation or other organizational or governance document of any self-regulatory or governing body or organization.

"**Bank**" means the Mortgagee holding the first lien Mortgage, or such other institutional lender as Landlord and Tenant mutually reasonably agree.

"**Bankruptcy Code**" means the provisions of 11 U.S.C. Section 101 et seq., as amended from time to time, or any other present or future Applicable Law respecting bankruptcy, reorganization, insolvency, readjustment of debts, relief of debtors, dissolution or liquidation, and the rules and regulations promulgated thereunder, in each case as the same may have been and hereafter may be supplemented, modified, amended, restated or replaced from time to time.

"**Base Rent**" is defined in Article A, Section 3.

"**Building**" and "**Buildings**" respectively mean any one or more of the buildings and the other improvements now or hereafter erected on the Land, including, without limitation, the HVAC, electrical, plumbing, mechanical and other systems therein, and the Fixtures and Related Personal Property used or useful in connection with the operation, maintenance or repair thereof, as applicable to such buildings and improvements, respectively. Buildings exclude Tenant Personal Property.

"**Business Day**" and "**Business Days**" shall mean, respectively, one or more day(s) on which national banks located in Philadelphia Pennsylvania are required to be open for the ordinary conduct of business.

"**Capital Lease**" shall mean, as to any Person, a lease of any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" in accordance with GAAP.

"**Claims**" is defined in Section 11.3.

"**Code**" is The Internal Revenue Code of 1986, as amended.

"**Commencement Date**" is set forth in <u>Article A, Section 2(b)</u>.

"**Convey**" or "**Conveyance**" is defined in <u>Section 22.1</u>.

"**Default**" means an Event of Default or the occurrence of an event or condition which with notice or lapse of time or both would become an Event of Default.

"**Default Rate**" means the lesser of (i) four percent (4%) over the prime rate announced from time to time by Bank, as such prime reference rate may be adjusted and announced from time to funs, or if unavailable, the parties shall use the prime reference rate of any New York regional bank selected by Landlord, or (ii) the applicable maximum lawful rate.

"**Drexel Subtenant**" means the tenant under the Ducom Lease.

"**DUCOM**" means Drexel University College of Medicine.

"**DUCOM Extension**" is defined in <u>Section 9.15</u>.

"**DUCOM Lease**" means that certain Lease for the Premises between Tenet HealthSystem Hahnemann, LLC (as landlord) and Drexel University as successor by merger to Philadelphia Health & Education Corporation (as tenant) dated 11/10/98, as restated 4/25/02, and as amended by that certain First Amendment to Lease effective as of 11/1/01, that certain Second Amendment to Lease effective as if 11/10/08 and that certain Third Amendment to Lease effective as of 9/16/10.

"**Environmental Law**" and "**Environmental Laws**" are defined in <u>Section 18.10</u>.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, or any corresponding or succeeding provisions of Applicable Law, and the rules and regulations promulgated thereunder, in each <u>case</u> as the same may have been and hereafter may be supplemented, modified, amended, restated or replaced from time to time.

"**Event of Default**" is defined in <u>Section 12.1</u>.

"**Expiration Date**" is defined in <u>Article A, Section 2(c)</u>.

"**Force Majeure**" is defined in <u>Section 21.15</u>.

"**Fixtures and Related Personal Property**" means all real estate fixtures (i.e. HVAC, electrical, plumbing and related fixtures) and real estate-related personal property integral or primarily related to the Premises, and unrelated to the operation of a hospital or other healthcare facility on, and/or the provision of healthcare services from, the Premises (i.e., building control systems, window washing equipment, building system warranties, insurance proceeds).

"**GAAP**" means generally accepted accounting principles, applied on a "consistent basis", as set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question.

"**Governmental Authority**" shall mean any governmental or quasi-governmental authority, including (without limitation) any nation, federal, state, territorial, county, municipal or other government or political) subdivision thereof, or governmental or quasi-governmental agency, board, authority, body, branch, bureau, commission, court, department or other instrumentality or political unit or subdivision, including, without limitation, any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government, whether domestic or foreign, or any self-regulatory or governing body or organization.

"**Guarantor**" shall mean, individually and collectively, (i) Paladin Healthcare Capital, LLC, a Delaware limited liability company, and (ii) Philadelphia Academic Health Holdings, LLC, a Delaware limited liability company.

"**Guaranty" or "Guaranty Agreement**" means that certain Guaranty dated as of the date hereof made by each Guarantor in form and substance attached hereto as Schedule C.

"**Hazardous Substance**" and "**Hazardous Substances**" are defined in Section 18.11.

"**Permitted Hazardous Substance Use**" is defined in Section 18.1.

"**Impositions**" and "**Impositions**" are defined in Section 3.1.

"**Imposition Reserve Fund**" is defined in Section 3.5.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all items which, in accordance with GAAP, would be included in determining total liabilities as shown on the liability side of the balance sheet of such Person as of the date as of which Indebtedness is to be determined, including any lease which, in accordance with GAAP would constitute Indebtedness, (b) all indebtedness secured by any mortgage, pledge, security, Lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Person is subject, whether or not the indebtedness secured thereby shall have been assumed, (c) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock, equity or other ownership interest purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

"**Indemnified Party**" and "**Indemnified Parties**" are defined in Section 11.3.

"**Land**" means that certain plots, parcels and pieces of real property described on Schedule A attached hereto and incorporated herein by this reference.

"**Lease Year**" is defined in Section 2.1(c).

"**Lien**" means any lien, mortgage, security interest, tax lien, pledge, charge, hypothecation, assignment, preference**,** priority, or other encumbrance of any kind or nature whatsoever (including, without limitation, any conditional sale or title retention agreement), whether arising by contract, operation of law, or otherwise.

"**Management Agreement**" is any agreement, whether written or oral, between Tenant or Landlord and any other Person (other than an individual, natural person) pursuant to which Tenant or Landlord provides any payment, fee or other consideration to any other such Person to

operate or manage the Property or to provide management, advisory or other services relating to the operation thereof.

"**Manager**" is any Person (other than an individual, natural person) who has entered into a Management Agreement with Tenant or any Subtenant (including the Subtenants) (or Landlord if Landlord so elects pursuant to Section 20.13(c)).

"**Master Leases**" – As defined in Article C, Section 1.

"**Material Adverse Effect**" means with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, a material adverse change in, or a material adverse effect upon, any of the financial condition, operations, business or properties of Tenant or Subtenant, as applicable, which is reasonably likely to result in the inability of Tenant to timely satisfy its obligations under the Lease.

"**MidCap Credit Facility**" means that certain Credit and Security Agreement dated as of the date hereof, among Philadelphia Academic Health System, LLC, Tenant, Center City Healthcare, LLC, and other borrowers from time to time party thereto, MidCap Financial Trust, as administrative agent, and lenders party thereto, as amended, supplemented or otherwise modified from time to time.

"**Mortgage**" means any mortgage, deed of trust or deed to secure debt creating a lien or encumbrance on the Premises or any part thereof or this Lease and Landlord's interest in the Premises or any part thereof, as the same may be amended, modified and/or restated from time to time.

"**Mortgage Loan**" means any loan that is secured by a Mortgage.

"**Mortgagee**" means any holder or beneficiary of a Mortgage, which may be an Affiliate of Landlord.

"**Non-Disturbance Agreement**" is defined in Section 10.1.

"**Operating Costs**" means the sum of all operating expenses (including, without limitation, real property taxes, insurance premiums (or proportionate share if carried on a blanket or portfolio basis), property management fees, and required reserves, if any) (excluding such expenses that are paid directly by the subtenants under the Subleases or the parking operators), the fees of the property and parking managers, and capital expenditures incurred pursuant to the Annual CapEx Plans.

"**Other DUCOM Extension**" means any extension of any Other DUCOM Lease.

"**Other DUCOM Lease**" means (a) any of those certain Leases for other portions of the Tracts between Tenet HealthSystem Hahnemann, LLC (as landlord) and Drexel University as successor by merger to Philadelphia Health & Education Corporation (as tenant) dated 11/10/98, as restated 4/25/02, and as amended by that certain First Amendment to Lease effective as of 11/1/01, that certain Second Amendment to Lease effective as if 11/10/08 and that certain Third Amendment to Lease effective as of 9/16/10 or (b) that certain lease for space in 245 N. 15th Street, New College Building, 5th Floor, Philadelphia, Pennsylvania, dated January 6, 2016 between Tenet HeathSystem Hahnemann, LLC doing business as Hahnemann University Hospital, as landlord, and Drexel University for its College of Medicine, as tenant or (c) that

certain lease for space in 230 North Broad Street, Medical Oncology Suite (15th Floor), Philadelphia, Pennsylvania dated January 1, 2015 between Tenet HeathSystem Hahnemann, LLC doing business as Hahnemann University Hospital, as landlord, and Drexel University, for its College of Medicine, as tenant.

"**Other Master Leases**" means the Master Leases of even date herewith between Tenant as tenant and the respective owner(s) of the Other Properties, as amended from time to time.

"**Other Properties**" means the Lots, as provided in Schedule E.

"**Property**" and "**Properties**" shall mean, respectively, any one or more of the medical office buildings now or hereafter operated on the Land.

"**Person**" means any individual, corporation, limited liability company, business trust, association, company, partnership, joint venture, Governmental Authority or other entity.

"**PLGL**" means Professional Liability and General Liability.

"**Premises**" means the Land and the Buildings now or hereafter covered by this Lease.

"**Projections**" means, as to any Person, such Person's, forecasted consolidated balance sheets, profit and loss statements, cash flow statements, capitalization statements and budgets, all materially consistent with such Person's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.\

"**Qualified Assignee**" means a Person that concurrently acquires all or substantially all of the business and assets of Tenant (including the interests as tenant under the Other Master Leases and the operation of St. Christopher's Hospital for Children) and (i) as of the consummation of said acquisition, will be a creditworthy entity with sufficient net worth, liquidity and financial stability to satisfy the financial obligations of the Tenant under the Master Lease and of the operator of St. Christopher's Hospital for Children as a going concern, (ii) has substantial experience in successfully operating hospitals similar to St. Christopher's Hospital for Children and Hahnemann University Hospital, and facilities similar to the Property and the Other Properties for the purpose of the Permitted Uses (and, in the case of each Other Property, for the purposes of the Permitted Uses as set forth in the applicable Other Master Lease), and (iii) has a favorable business and operational reputation and character in the health care industry.

"**Real Estate Taxes**" is defined in Section 3.2.

"**Remedial Work**" is defined in Section 18.7. Whether or not required by applicable Environmental Laws, the Remedial Work to be performed by Tenant hereunder shall include the Work and other actions described on Schedule 18.7 attached hereto.

"**Rent**" is defined in Section 2.3.

"**Requirements**" is defined in Section 11.1.

"**Restoration**" is defined in Section 7.1.

"**Retainage**" is defined in Section 7.2.

"**Special Purpose Entity**" is a corporation, limited liability company, or limited partnership which at all times while this Lease is in effect complies with the following:

(i)  <u>Purpose</u>. Such entity was organized solely for the purpose of owning, operating, financing and/or leasing the Premises.

(ii)  <u>No Other Business</u>. Such entity has not and will not engage in any business unrelated to owning, operating, financing or leasing such Premises and any related Tenant Personal Property in connection with the Property.

(iii)  <u>No Other Assets</u>. Such entity has not and will not have any assets other than those related to its owning, operating, financing or leasing such Premises and any related Tenant Personal Property as the Property.

(iv)  <u>No Other Indebtedness</u>. Such entity has no indebtedness other than (a) obligations under this Lease, and (b) liabilities in the ordinary course of business relating to its purpose as set forth in clause (i) above of this definition.

(v)  <u>Misunderstandings</u>, Such entity has not and will not fail to correct any known misunderstanding regarding the separate identity of such entity.

(vi)  <u>Separate Accounts</u>. Such entity has maintained and will maintain or will cause to be maintained its accounts, books and records separate from any other person or entity; *provided, however*, that Tenant's assets and operations may be included in a consolidated financial statement provided that appropriate notation shall be made on such consolidated financial statement to indicate that Tenant is its own separate entity.

(vii)  <u>Commingling</u>. Such entity has not and will not commingle its funds or assets with those of any other entity, and such entity has held and will hold its assets in its own name, provided that such entity shall be entitled to maintain its inter-company cash management arrangements.

(viii)  <u>Own Name</u>. Such entity has conducted and will conduct its business in its own name (formal or DBA).

(ix)  <u>Separate Records</u>. Such entity has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other person or entity; *provided, however*, that Tenant's assets and operations may be included in a consolidated financial statement, provided that appropriate notation shall be made on such consolidated financial statement to indicate that Tenant is its own separate entity.

(x)  <u>Own Liabilities</u>. Such entity has paid and will pay its own liabilities out of its own funds and assets to the extent possible; *provided, however*, that Tenant's entry into this Lease and payment and performance of its obligations hereunder and the performance or maintenance of its inter-company cash management arrangements, shall not be deemed a violation of this paragraph.

(xi)  <u>Formalities</u>. Such entity has observed and will observe all partnership, corporate or limited liability company formalities, as applicable.

(xii)  <u>Guarantees</u>. Such entity has not and will not assume or guarantee or become obligated for the debts of any other entity or hold out its credit as being available to satisfy the obligations of any other entity except for liabilities permitted by the Landlord to be guaranteed and its obligations under this Lease.

(xiii)  <u>Affiliate Securities</u>. Such entity has not and will not acquire obligations or securities of its partners, members or shareholders.

(xiv)  <u>Allocations</u>. The administrators of such entity have allocated and will allocate fairly and reasonably any overhead for shared office space and uses, invoices and checks.

(xv)  <u>Pledges</u>. Except as otherwise permitted in this Agreement, such entity has not and will not pledge its assets for the benefit of any other person or entity, other than in connection with ordinary course trade arrangements or any loans consented to in writing by Landlord, which consent may be granted or withheld in Landlord's reasonable discretion.

(xvi)  <u>Identification</u>. Such entity will not hold itself out as liable for the debts of any other entity.

(xvii)  <u>Loans</u>. Such entity has not made and will not make loans to any person or entity, except pursuant to any cash management, joint administration arrangement or other inter-company arrangement

(xviii)  <u>No Dissolution</u>. Such entity has not and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale, transfer of membership interest, or amendment of its certificate of formation or operating agreement.

(xix)  <u>Bankruptcy Filing</u>. Such entity, without the unanimous consent of all of the members, shall not file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, dissolve, liquidate, consolidate, merge, or sell all or substantially all of its assets or any other entity in which it has a direct or indirect legal or beneficial ownership interest, engage in any other business activity, or amend its organizational documents.

(xx)  <u>Divisions</u>. Such entity has not and will not identify its members, or any affiliates of either of them as a division or part of it.

(xxi)  <u>Arm's-length Transactions</u>. Such entity has not entered and will not enter into or be a party to, any transaction with its members or its affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are not less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party.

"**Sublease**" and "**Subleases**" shall mean the leases and subleases at the Premises in existence at the Effective Date, including without limitation, the Ducom Lease, together with any future subleases (including, if applicable, the DUCOM Extension) at the Premises that are reasonably approved by PropCo.

"**Subleases Rent**" means the sum of all rent and other payments actually received under the Subleases.

"**Subsidiary**" means a Person of which an aggregate of more than fifty percent (50%) or more of the capital stock or other ownership interests thereof is owned of record or beneficially by such other Person, or by one or more Subsidiaries of such other Person, or by such other

Person and one or more Subsidiaries of such Person, (a) if the holders of such capital stock or other ownership interests (i) are ordinarily, in the absence of contingencies, entitled to vote for the election of a majority of the directors (or other individuals performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency, or (ii) are entitled, as such holders, to vote for the election of a majority of the directors (or individuals performing similar functions) of such Person, whether or not the right so to vote exists by reason of the happening of a contingency, or (b) in the case of capital stock or other ownership interests which are not issued by a corporation, if such ownership interests constitute a majority voting interest.

"**Subtenant**" and "**Subtenants**" are defined in <u>Section 9.4</u>, and shall include Drexel Subtenant.

"**Superior Landlord**" means the landlord under a Superior Lease.

"**Superior Lease**" shall mean any lease now or hereafter in effect to which this Lease is subject and subordinate.

"**Supplementary Rent**" is defined in <u>Section 2.2</u>.

"**Taking**" means a taking of the Premises (or any part thereof) or any damage to the Premises (or any part thereof) related to the exercise of the power of eminent domain and including a voluntary conveyance to any agency, authority, public utility, person, or corporate entity empowered to condemn property in lieu of court proceedings.

"**Taking Ending Date**" is defined in <u>Section 8.2(a)</u>.

"**Tenant**" is defined in the introductory paragraph to this Lease.

"**Tenant Personal Property**" shall mean all computer systems, vehicles, furniture, removable fixtures, equipment and machinery, supplies, inventory of Tenant, including the assets purchased by Tenant from the predecessor owner of the Premises, and other tangible personal property owned or leased by Tenant and located on or used in the ownership, use, operation or maintenance of the Premises and the Premises before or after the Commencement Date, and any replacements or upgrades of any of the foregoing. Notwithstanding the foregoing, Tenant Personal Property shall not include any Fixtures and Related Personal Property. "**Term**" is defined in <u>Article A</u>, <u>Section 2(a)</u>.

"**Threshold Amount**" is defined in <u>Section 5.4(h)</u>.

"**Tracts**" means the Lots A-F and 7-9 excluding the Property, depicted on the Hahnemann University Hospital Proposed Subdivision Plan V0802, prepared by Pennoni Engineering P.A., adopted by the Board of Surveyors on December 2, 2017, and consisting of 1 sheet; Lots 1-3 depicted on the Hahnemann University Hospital Existing Conditions / Proposed Subdivision Plan V0803, prepared by Pennoni Engineering P.A., and adopted by the Board of Surveyors on December 8, 2017, and consisting of 1 sheet; and Lots 1-3 depicted on the Project Liberty – St Christophers Hospital for Children Proposed Lot Line Adjustment Plan V-0812, prepared by Pennoni Engineering P.A., adopted by the Board of Surveyors on December 8, 2017, and consisting of 1 sheet.

"**Transfer**" is defined in <u>Section 9.1</u>.

"**Work**" is defined in <u>Section 5.5</u>.

**SCHEDULE C**

**<u>FORM OF GUARANTY</u>**

**LEASE GUARANTY**

## GUARANTY OF LEASE

This Guaranty of Lease (this "Guaranty") is made and entered into as of January __, 2018 by PHILADELPHIA ACADEMIC HEALTH HOLDINGS, LLC, a Delaware limited liability company ("Guarantor"), to and in favor of PAHH Bellet MOB, LLC, a Delaware limited liability company (herein, together with its successors and assigns, "Landlord").

In order to induce Landlord to execute that certain Master Lease Agreement of even date herewith (as the same may be amended, modified, replaced, restated, renewed, assigned or extended from time to time, the "Lease"), with ST. CHRISTOPHER'S HEALTHCARE, LLC, a Delaware limited liability company ("Tenant"), Guarantor (having a direct or indirect interest in Tenant or otherwise receiving material benefits from the execution of the Lease by Landlord) does hereby absolutely and unconditionally guarantee (i) the full performance and observance of all the covenants, conditions and agreements to be performed and observed by Tenant including, without limitation, the payment of the Rent and all other amounts provided in the Lease to be paid by Tenant in accordance with the terms of the Lease (herein, the "Lease Guaranty Obligations"), and (ii) the payment of all Enforcement Costs (as hereinafter defined).

Guarantor hereby waives notice of non-payment, non-performance or non-observance, and all other notices and all proof or demands; provided, however, as a condition precedent to the commencement of any action against Guarantor under this Guaranty, Tenant shall be in default of its obligations under the Lease, taking into account any notice and cure periods, (collectively, the "Conditions Precedent"). The Guarantor agrees that it shall have no right of subrogation, reimbursement, exoneration, contribution or any other rights that would result in Guarantor being deemed a creditor of Tenant under the Federal Bankruptcy Code or any other law or for any other purpose and Guarantor hereby irrevocably waives all such rights, the right to assert any such rights and any right to enforce any remedy which Landlord now or may hereafter have against Tenant and hereby irrevocably waives any benefit of, and any right to participate in, any security now or hereafter held by Landlord whether any of the foregoing rights arise in equity, at law or by contract.

Further, subject to the Conditions Precedent, Guarantor expressly agrees that its obligations hereunder shall not be terminated, affected or impaired by reason of the granting by Landlord of any indulgences to Tenant or by reason of the assertion against Tenant (or the failure to assert against Tenant) of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by the release of Tenant (or any other guarantor) from any of Tenant's obligations under the Lease by operation of law, or the waiver by Landlord of any provisions of the Lease or duties or obligations of the Tenant, Guarantor hereby waiving all suretyship defenses. Guarantor further covenants and agrees that this Guaranty shall remain and continue in full force and effect as to any renewal, extension, amendment, restatement, modification or assignment of the Lease (whether or not Guarantor shall have received any notice thereof of consented thereto), and in such case the Lease Guaranty Obligations shall include all payment and performance obligations under the Lease as so renewed, extended, amended, restated, modified or assigned. This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection. Except for the Conditions Precedent, it shall not be a condition to the obligations of Guarantor under this Guaranty that Landlord shall have made demand (other than as expressly required under the Lease) upon Tenant or any other guarantor or initiated any suit or

action against Tenant or any other guarantor for the enforcement of the Lease Guaranty Obligations.

Subject to the Conditions Precedent, no extensions of time granted to Tenant for the payment of rent or other sums, or for the strict performance or observance of any of the obligations of the Tenant or forbearance or delay on the part of Landlord to enforce any of the provisions, covenants, agreements, conditions and stipulations of the Lease, or waiver by Landlord of any of said provisions, covenants, agreements, conditions and stipulations, shall operate to release or discharge Guarantor from its full liability hereunder or prejudice the rights of Landlord hereunder. Receipt by Landlord of rent or other payments with knowledge of the breach of any provision of the Lease shall not be deemed a waiver of such breach.

No assignment or other transfer of the Lease or any interest therein, nor any subletting of the demised premises or any portion thereof, whether or not Guarantor shall have been notified of or consented to such assignment or subletting and whether or not Landlord shall have given its consent to such assignment or subletting, shall operate to extinguish or diminish the liability of Guarantor hereunder.

This Guaranty shall continue to be effective (or shall be reinstated, as the case may be) if at any time any whole or partial payment of the Lease Guaranty Obligations is or is sought to be rescinded or must otherwise be disgorged, restored or returned by Landlord upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Tenant or Guarantor (or any other guarantor) or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Tenant or Guarantor (or any other guarantor) or of or for any substantial part of the property owned by Tenant, all as though such payments or performance, to the extent so rescinded or otherwise disgorged, restored or returned, had not been made.

If this Guaranty is placed in the hands of one or more attorneys for collection or is collected through any legal proceedings, or if one or more attorneys is retained to represent Landlord in any other proceedings whatsoever in connection with this Guaranty, and if Landlord prevails in such proceedings, then Guarantor shall pay to Landlord, promptly upon demand, all reasonable attorneys' fees, costs and expenses, including without limitation court costs and filing fees, incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder.

Guarantor hereby submits to personal jurisdiction in the State of Pennsylvania (the "State") for the enforcement of this Guaranty and waives any and all personal rights to object to such jurisdiction for the purposes of litigation to enforce this Guaranty. The Guarantor hereby waives personal service of any and all process and agrees that all such service of process may be made upon the Guarantor by certified or registered mail, return receipt requested, addressed to such credit party at the address set forth in this agreement and service so made shall be complete ten (10) days after the same has been posted. Guarantor hereby consents to the jurisdiction of (at Landlord's election) either the Circuit Court of Philadelphia County, Pennsylvania, or the United States District Court for the Eastern District of Pennsylvania, in any action, suit or proceeding which Landlord at any time may wish to file in connection with this Guaranty or any related matter. Guarantor hereby agrees that an action, suit or proceeding to enforce this Guaranty may be brought in any state or federal court in the State and hereby waives any objection which

-2-

Guarantor may have to the laying of the venue of any such action, suit or proceeding in any such Court; provided, however, that the provisions of this paragraph shall not be deemed to preclude Landlord from filing any such action, suit or proceeding in any other appropriate forum or serving legal process in any other manner permitted by law.

Capitalized terms that are not otherwise defined in this Guaranty shall have the respective meanings that are ascribed to such terms in the Lease.

**IN WITNESS WHEREOF**, this Guaranty is executed the day and year first written above.

GUARANTOR:

PHILADELPHIA ACADEMIC HEALTH
HOLDINGS, LLC


By: _____
Name: Joel Freedman
Title:   Chief Executive Officer

## GUARANTY OF LEASE

This Guaranty of Lease (this "Guaranty") is made and entered into as of January __, 2018 by PALADIN HEALTHCARE CAPITAL, LLC, a Delaware limited liability company ("Guarantor"), to and in favor of PAHH Bellet MOB, LLC, a Delaware limited liability company (herein, together with its successors and assigns, "Landlord").

In order to induce Landlord to execute that certain Master Lease Agreement of even date herewith (as the same may be amended, modified, replaced, restated, renewed, assigned or extended from time to time, the "Lease"), with ST. CHRISTOPHER'S HEALTHCARE, LLC, a Delaware limited liability company ("Tenant"), Guarantor does hereby absolutely and unconditionally guarantee (i) the full performance and observance of all the covenants, conditions and agreements to be performed and observed by Tenant including, without limitation, the payment of the Rent and all other amounts provided in the Lease to be paid by Tenant in accordance with the terms of the Lease (herein, the "Lease Guaranty Obligations"), and (ii) the payment of all Enforcement Costs (as hereinafter defined); provided, however that so long as there is no outstanding default by the Tenant under the Lease and there is no pending claim under this Guaranty, this Guaranty shall automatically terminate and Guarantor shall be automatically released from all of its obligations under this Guaranty upon satisfaction of both of the following conditions (the "Termination Time"): (a) a Fixed Charge Coverage Ratio (as such term is defined in the Credit and Security Agreement dated as of the date hereof, among Philadelphia Academic Health System, LLC, Tenant, Center City Healthcare, LLC, and other borrowers from time to time party thereto (collectively, "Borrowers"), MidCap Financial Trust, as administrative agent, and lenders party thereto (as amended, supplemented or otherwise modified from time to time, the "MidCap Credit Agreement"), regardless of whether the MidCap Credit Agreement is still in effect) of not less than 1.10:1.00 and (b) EBITDAR (as defined on Exhibit A hereto) of not less than Thirty Million Dollars ($30,000,000), and Guarantor shall provide to Landlord, within forty-five (45) days of the end of each fiscal quarter, a reasonably detailed calculation of such ratio and EBITDAR.

Guarantor hereby waives notice of non-payment, non-performance or non-observance, and all other notices and all proof or demands; provided, however, as a condition precedent to the commencement of any action against Guarantor under this Guaranty, Tenant shall be in default of its obligations under the Lease, taking into account any notice and cure periods, (collectively, the "Conditions Precedent"). The Guarantor agrees that it shall have no right of subrogation, reimbursement, exoneration, contribution or any other rights that would result in Guarantor being deemed a creditor of Tenant under the Federal Bankruptcy Code or any other law or for any other purpose and Guarantor hereby irrevocably waives all such rights, the right to assert any such rights and any right to enforce any remedy which Landlord now or may hereafter have against Tenant and hereby irrevocably waives any benefit of, and any right to participate in, any security now or hereafter held by Landlord whether any of the foregoing rights arise in equity, at law or by contract.

Further, subject to the Conditions Precedent, Guarantor expressly agrees that its obligations hereunder shall not be terminated, affected or impaired by reason of the granting by Landlord of any indulgences to Tenant or by reason of the assertion against Tenant (or the failure to assert against Tenant) of any of the rights or remedies reserved to Landlord pursuant to the provisions

of the Lease or by the release of Tenant (or any other guarantor) from any of Tenant's obligations under the Lease by operation of law, or the waiver by Landlord of any provisions of the Lease or duties or obligations of the Tenant, Guarantor hereby waiving all suretyship defenses. Guarantor further covenants and agrees that this Guaranty shall remain and continue in full force and effect as to any renewal, extension, amendment, restatement, modification or assignment of the Lease (whether or not Guarantor shall have received any notice thereof or consented thereto), and in such case the Lease Guaranty Obligations shall include all payment and performance obligations under the Lease as so renewed, extended, amended, restated, modified or assigned. This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection. Except for the Conditions Precedent, it shall not be a condition to the obligations of Guarantor under this Guaranty that Landlord shall have made demand (other than as expressly required under the Lease) upon Tenant or any other guarantor or initiated any suit or action against Tenant or any other guarantor for the enforcement of the Lease Guaranty Obligations.

Subject to the Conditions Precedent, no extensions of time granted to Tenant for the payment of rent or other sums, or for the strict performance or observance of any of the obligations of the Tenant or forbearance or delay on the part of Landlord to enforce any of the provisions, covenants, agreements, conditions and stipulations of the Lease, or waiver by Landlord of any of said provisions, covenants, agreements, conditions and stipulations, shall operate to release or discharge Guarantor from its full liability hereunder or prejudice the rights of Landlord hereunder. Receipt by Landlord of rent or other payments with knowledge of the breach of any provision of the Lease shall not be deemed a waiver of such breach.

No assignment or other transfer of the Lease or any interest therein, nor any subletting of the demised premises or any portion thereof, whether or not Guarantor shall have been notified of or consented to such assignment or subletting and whether or not Landlord shall have given its consent to such assignment or subletting, shall operate to extinguish or diminish the liability of Guarantor hereunder.

This Guaranty shall continue to be effective (or shall be reinstated, as the case may be) if at any time any whole or partial payment of the Lease Guaranty Obligations is or is sought to be rescinded or must otherwise be disgorged, restored or returned by Landlord upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Tenant or Guarantor (or any other guarantor) or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Tenant or Guarantor (or any other guarantor) or of or for any substantial part of the property owned by Tenant, all as though such payments or performance, to the extent so rescinded or otherwise disgorged, restored or returned, had not been made.

If this Guaranty is placed in the hands of one or more attorneys for collection or is collected through any legal proceedings, or if one or more attorneys is retained to represent Landlord in any other proceedings whatsoever in connection with this Guaranty, and if Landlord prevails in such proceedings, then Guarantor shall pay to Landlord, promptly upon demand, all reasonable attorneys' fees, costs and expenses, including without limitation court costs and filing fees, incurred in connection therewith (all of which are referred to herein as "Enforcement Costs"), in addition to all other amounts due hereunder.

Guarantor hereby submits to personal jurisdiction in the State of Pennsylvania (the "State") for the enforcement of this Guaranty and waives any and all personal rights to object to such jurisdiction for the purposes of litigation to enforce this Guaranty. The Guarantor hereby waives personal service of any and all process and agrees that all such service of process may be made upon the Guarantor by certified or registered mail, return receipt requested, addressed to such credit party at the address set forth in this agreement and service so made shall be complete ten (10) days after the same has been posted. Guarantor hereby consents to the jurisdiction of (at Landlord's election) either the Circuit Court of Philadelphia County, Pennsylvania, or the United States District Court for the Eastern District of Pennsylvania, in any action, suit or proceeding which Landlord at any time may wish to file in connection with this Guaranty or any related matter. Guarantor hereby agrees that an action, suit or proceeding to enforce this Guaranty may be brought in any state or federal court in the State and hereby waives any objection which Guarantor may have to the laying of the venue of any such action, suit or proceeding in any such Court; provided, however, that the provisions of this paragraph shall not be deemed to preclude Landlord from filing any such action, suit or proceeding in any other appropriate forum or serving legal process in any other manner permitted by law.

Capitalized terms that are not otherwise defined in this Guaranty shall have the respective meanings that are ascribed to such terms in the Lease.

**IN WITNESS WHEREOF**, this Guaranty is executed the day and year first written above.

GUARANTOR:

PALADIN HEALTHCARE CAPITAL, LLC

By: _____
Name: Joel Freedman
Title:   Chief Executive Officer

Exhibit A

## EBITDAR

EBITDAR for any trailing twelve consecutive month period (the "**Defined Period**") is defined as follows:

Net income (or loss) for the Defined Period, but excluding: (a) the income (or loss) of any Person (other than Subsidiaries of Borrowers) in which the Borrowers or any of their Subsidiaries has an ownership interest unless received by the Borrowers or their Subsidiary in a cash distribution; and (b) the income (or loss) of any Person accrued prior to the date it became a Subsidiary of Borrowers or is merged into or consolidated with Borrowers                                         $_____

Plus:  Any provision for (or minus any benefit from) income and franchise taxes deducted in the determination of net income for the Defined Period                                                           _____

Interest expense, net of interest income, deducted in the determination of net income for the Defined Period                _____

Amortization and depreciation deducted in the determination of net income for the Defined Period                          _____

Other non-cash expenses (or *minus* other non-cash gains or income) deducted in the determination of net income for the Defined Period and for which no cash outlay (or cash receipt) is foreseeable prior to the Termination Date                     _____

The aggregate amount of fixed and contingent rentals payable by the Borrowers and their consolidated Subsidiaries with respect to leases of real and personal property (excluding obligations under Capital Leases (as defined in the MidCap Credit Agreement, whether or not the MidCap Credit Agreement is still in effect)) for the Defined Period                  _____

all of the foregoing as determined on a consolidated basis for the Borrowers and their Subsidiaries in accordance with GAAP

$_____

EBITDAR for the Defined Period

**SCHEDULE D**

**FORM OF MEMORANDUM OF LEASE**

**MEMORANDUM OF LEASE**

**Prepared by**:
Klehr Harrison Harvey Branzburg LLP
1835 Market Street
Philadelphia, PA 19103
Attn: Gregory G. Gosfield, Esq.

**Return to**:
Klehr Harrison Harvey Branzburg LLP
1835 Market Street
Philadelphia, PA 19103
Attn: Gregory G. Gosfield, Esq.

Address:        1501-1511 Race Street, Philadelphia, Pennsylvania
Tax ID No:      77-2-0270-00

## MEMORANDUM OF MASTER LEASE

THIS IS A MEMORANDUM OF MASTER LEASE ("Memorandum of Lease") made as of the 2nd day of January, 2018, and effective as of this ___ day of January, 2018, by and between PAHH BELLET MOB, LLC, a Delaware limited liability company, having offices at c/o Harrison Street Real Estate, LLC, 444 West Lake Street, Suite 2100, Chicago, IL 60606 ("Landlord"), and ST. CHRISTOPHER'S HEALTHCARE, LLC, a Delaware limited liability company, having offices at 222 N. Sepulveda Boulevard, Suite 900, El Segundo, CA 90245 ("Tenant").

Landlord and Tenant hereby state and confirm, as a matter of public record, the following:

1.        Landlord and Tenant, among others, have entered into a Master Lease ("Lease") effective as of the effective date hereof (the "Effective Date"), relating to the lease from Landlord to Tenant of the land described on Schedule A-1 of the Lease and the improvements located thereon, the legal descriptions of which are attached hereto as Exhibit A ("Premises").

2.        The term of the Lease with respect to the Premises began on the Effective Date ("Commencement Date").

3.        The initial term of the Lease with respect to the Premises started on the Commencement Date and shall expire on the day immediately preceding the fifteenth (15th) anniversary of the Commencement Date (if the Commencement Date occurs on the first (1st) day of a month) or on the last day of the month during which the fifteenth (15th) anniversary of the Commencement Date occurs (if the Commencement Date occurs on a day other than the first (1st) day of a month) (the "Expiration Date"), with the right to subsequent option periods of up to twenty-nine (29) years and eleven (11) months in aggregate from the Commencement Date.

4.      Under the Lease and subject to specific terms and conditions therein contained, Landlord is granted the right to terminate Tenant's rights to the Premises prior to the Expiration Date, and Tenant has no right of purchase or refusal on the Premises or any part thereof.

5.      Except as provided in and in accordance with the Lease, Tenant may not mortgage, encumber, pledge, hypothecate, grant a security interest in, collaterally assign or conditionally transfer the Lease, any subleases thereunder, or any rents, interests, or profits therefrom.

6.      This memorandum is intended for recording purposes only, and does not modify, supersede, diminish, add to or change all or any of the terms of the Lease in any respect.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, Landlord and Tenant have executed and acknowledged this Memorandum of Lease, effective as of the date and year first above written.

LANDLORD:

PAHH BELLET MOB, LLC

By: _____

     Name:  Stephen M. Gordon
     Title    Authorized Signatory

STATE OF _____ :
                            : SS
COUNTY OF _____ :

BE IT REMEMBERED, on this, the ___ day of _____, 201_, before me, a Notary Public for the State of _____, residing in the aforesaid County, the undersigned Officer, personally appeared Stephen M. Gordon known to me (or satisfactorily proven), who acknowledged himself to be the Authorized Signatory of PAHH Bellet MOB, LLC, and that he as such Authorized Signatory, being authorized to do so, executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public
My Commission Expires:

[*Signature Page to the Memorandum of HSRE Master Lease – PAHH Bellet MOB*]

TENANT:

ST. CHRISTOPHER'S HEALTHCARE, LLC

By: _____

     Name:  Joel Freedman
     Title:   Chief Executive Officer

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____       )

COUNTY OF _____       )

On _____ _____, 2017, before me, _____,
        *Date*                                                *(Here Insert Name and Title Of the Officer)*

personally appeared _____
                                                  *Name(s) of Signers)*

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                       *Signature of Notary Public*

**Place Notary Seal Above**

_____

## Exhibit A

### Memorandum of HSRE Master Lease

### Legal Description

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT COMMON TO THE WESTERLY SIDE OF 15th STREET (70' WIDE) AND THE NORTHERLY SIDE OF RACE STREET (50' WIDE) AND RUNNING:

1)   THENCE: ALONG SAID NORTHERLY SIDE OF RACE STREET, N78°59'00"W, A DISTANCE OF 100.000' TO A POINT ON THE EASTERLY SIDE OF HICKS STREET (20' WIDE);

2)   THENCE: ALONG SAID EASTERLY SIDE OF HICKS STREET, N11°21'00"E, A DISTANCE OF 120.000' TO A POINT ON THE SOUTHERLY SIDE OF SPRING STREET (59' WIDE);

3)   THENCE: ALONG SAID SOUTHERLY SIDE OF SPRING STREET, S78°59'00"E, A DISTANCE OF 100.000' TO A POINT ON THE WESTERLY SIDE OF 15th STREET;

4)   THENCE: ALONG THE EASTERLY SIDE OF 15TH STREET, S11°21'00"W, A DISTANCE OF 120.000' TO THE POINT OF BEGINNING.

Containing 12,000 s.f. / 0.27548 acres of land, more or less.

## SCHEDULE E

## OTHER PROPERTIES

**Wood Street Garage (Proposed HUH North Lot 2)**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – EXISTING CONDITIONS / PROPOSED PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF WOOD STREET (40' WIDE) WHERE IT INTERSECTS WITH THE WESTERLY SIDE OF BROAD STREET (113' WIDE) AND RUNNING:

1)    THENCE: ALONG SAID WESTERLY SIDE OF BROAD STREET, S11°21'00"W, A DISTANCE OF 106.575' TO A POINT COMMON TO LOT 1;

2)    THENCE: ALONG THE NORTHERLY LINE OF LOT 1, N78°59'00"W, A DISTANCE OF 237.947' TO A POINT COMMON TO LOT 3;

3)    THENCE: ALONG THE EASTERLY LINE OF LOT 3, N11°21'00"E, A DISTANCE OF 22.779' TO A POINT;

4)    THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 6.460' TO A POINT;

5)    THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 29.468' TO A POINT;

6)    THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 33.740' TO A POINT;

7)    THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 54.327' TO A POINT ON THE SOUTHERLY LINE OF SAID WOOD STREET;

8)    THENCE: ALONG THE SAID SOUTHERLY LINE OF WOOD STREET, S78°59'00"E, A DISTANCE OF 197.747' TO THE FIRST MENTIONED POINT OF BEGINNING.

Containing 22,984 s.f. / 0.52764 acres of land.

**Erie Street Garage (Proposed STC Lot 2)**

All that Certain Parcel or Tract of Land Situate in the 7th Ward of the City and County of Philadelphia, Commonwealth of Pennsylvania, as shown on a Plan prepared by Pennoni Associates Inc. entitled "Proposed Lot Line Adjustment Plan", Drawing Number V-0812, project number PALHC 17002, dated 10/20/2017. Being more particularly described as follows.

Beginning at a point of the Southerly line of Erie Avenue (S.R. 1004) (100' wide), said point being a distant 579.719' from the intersection of the said Southerly line of Erie Avenue and the Westerly line of B Street (S.R. 1003) (80' wide as shown on the aforementioned Plan in the 7th Ward of the City of Philadelphia as follows:

Thence from said Point of Beginning, S 11°09'34" W, along the westerly face of curb of a drive aisle, being the line of Proposed Lots 1 and 2, the distance of 464.986' to a point on the northerly face of curb of drive aisle, thence continuing;

N 78° 50'26" W, along a face of curb of a drive aisle, a distance of 50.550' to a point; thence continuing,

N 11°09'34" E, along the face of curb of a drive aisle, a distance of 157.396' to a point of curvature; thence continuing,

Northwesterly along a curve to the left having a radius of 24.193', an arc length of 32.463', a central angle of 76°52'56", along a chord bearing N 58°48'39" W and a distance of 30.082', to a point of tangency; thence continuing,

N 78°46'23" W, along the face of curb of a drive aisle, a distance of 205.398' to a point; thence continuing,

N 11°03'30 E, a distance of 46.989' to a point; thence continuing,

N 78°51'07 W, a distance of 27.138' to a point; thence continuing,

N 11°08'30 E, partially along the common line of Proposed Lot 2 and Proposed Lot 3 and partially along the common line of said lands of Tenet Healthcare and lands now and formerly of Philadelphia Ronald McDonald House, Inc, the distance of 169.431' to a point; thence continuing,

S 78°51'30" E, a distance of 227.063' to a point; thence continuing,

N 11°03'30" E, a distance of 70.935' to a point in the said line of Erie Avenue; thence continuing,

S 78°39'00" E, along the said line of Erie Avenue, a distance of 78.364 to the point and place of beginning, containing within these metes and bounds 79,485 square feet, (DS) or 1.825 acres of land, more or less.

**PAHH New College MOB, LLC (Proposed HUH South Lot B)**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF VINE STREET (ON CITY PLAN, LEGALLY OPEN, VARIABLE WIDTH) WHERE IT INTERSECTS WITH THE EASTERLY SIDE OF 15TH STREET (ON CITY PLAN, LEGALLY OPEN, 70' WIDE) AND RUNNING:

1) THENCE: ALONG SAID SOUTHERLY SIDE OF VINE STREET, S78°59'00"E, A DISTANCE OF 174.381' TO A POINT COMMON TO PARCEL A;

2) THENCE: ALONG THE WESTERLY LINE OF PARCEL A, S11°21'00"W, A DISTANCE OF 122.199' TO A POINT;

3) THENCE: CONTINUING ALONG SAME, S78°39'00"E, A DISTANCE OF 20.198' TO A POINT COMMON TO PARCEL C;

4) THENCE: ALONG THE WESTERLY LINE OF PARCEL C, S11°21'00"W, A DISTANCE OF 56.015' TO A POINT;

5) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 7.667' TO A POINT;

6) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 25.416' TO A POINT;

7) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 1.125' TO A POINT;

8) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 85.291' TO A POINT, COMMON TO PARCEL E;

9) THENCE: ALONG THE NORTHERLY LINE OF PARCEL E, N78°59'00"W, A DISTANCE OF 62.210' TO A POINT;

10) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 21.842 TO A POINT;

11) THENCE: CONTINUING ALONG PARCELS E & F, N78°59'00"W, A DISTANCE OF 123.582' TO A POINT ON THE EASTERLY SIDE OF 15th STREET;

12) THENCE: ALONG THE EASTERLY SIDE OF 15TH STREET, N11°21'00"E, A DISTANCE OF 267.197' TO THE POINT AND PLACE OF BEGINNING.

Containing 50,127.17 s.f. / 1.15076 acres of land, more or less.

**PAHH Feinstein MOB, LLC (Proposed HUH South Lot C)**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY SIDE OF BROAD STREET (ON CITY PLAN, LEGALLY OPEN, 113' WIDE), SAID POINT BEING LOCATED 155.932' NORTHERLY FROM THE INTERSECTION OF SAID WESTERLY SIDE OF BROAD STREET AND THE NORTHERLY SIDE OF RACE STREET (ON CITY PLAN, LEGALLY OPEN, 50' WIDE) AND RUNNING:

1) THENCE: ALONG PARCEL D, N78°59'00"W, A DISTANCE OF 91.495' TO A POINT;

2) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 7.952' TO A POINT;

3) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 7.382' TO A POINT;

4) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 8.646' TO A POINT;

5) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 61.122' TO A POINT;

6) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 2.000' TO A POINT;

7) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 10.667' TO A POINT, COMMON TO THE EASTERLY LINE OF PARCEL E;

8) THENCE: ALONG THE EASTERLY LINE OF PARCEL E, N11°21'00"E, A DISTANCE OF 16.035' TO A POINT;

9) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 29.832' TO A POINT;

10) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 42.833' TO A POINT;

11) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 9.708' TO A POINT, COMMON TO PARCEL B;

12) THENCE: ALONG THE EASTERLY LINE OF PARCEL B, N11°21'00"E, A DISTANCE OF 64.291' TO A POINT;

13) THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 1.125' TO A POINT;

14) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 25.416' TO A POINT;

15) THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 7.667' TO A POINT;

16) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 57.755' TO A POINT, COMMON CORNER TO PARCEL A;

17) THENCE: ALONG PARCEL A, S78°39'00"E, A DISTANCE OF 46.670' TO A POINT;

18) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 42.110' TO A POINT;

19) THENCE: CONTINUING ALONG SAME, S78°39'00"E, A DISTANCE OF 32.915'
TO A POINT;

20) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 94.348'
TO A POINT;

21) THENCE: CONTINUING ALONG SAME, S78°59'00"E, A DISTANCE OF 121.833'
TO A POINT ON SAID WESTERLY SIDE OF BROAD STREET;

22) THENCE: CONTINUING ALONG THE WESTERLY SIDE OF BROAD STREET,
S11°21'00"W, A DISTANCE OF 54.443' TO THE POINT AND PLACE OF
BEGINNING.

Containing 22,363.41 s.f. / 0.51339 acres of land, more or less.

**PAHH Broad Street MOB, LLC (HUH South Lot 8)**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND
BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA , COMMONWEALTH OF
PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED
"HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN"
BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY SIDE OF BROAD STREET (113' WIDE)
SAID POINT BEING THE FOLLOWING COURSE FROM THE INTERSECTION OF THE
EASTERLY SIDE OF BROAD STREET AND THE NORTHERLY SIDE OF RACE STREET
(50' WIDE) RUNNING:

a) N11°21'00"E, A DISTANCE OF 303.050' TO THE POINT OF BEGINNING

1) THENCE: ALONG SAID EASTERLY SIDE OF BROAD STREET, N11°21'00"E, A
DISTANCE OF 40.250' TO A POINT;

2) THENCE: LEAVING SAID EASTERLY SIDE OF BROAD STREET, S78°59'00"E, A
DISTANCE OF 120.000' TO A POINT ON THE WESTERLY SIDE OF WATTS
STREET (30' WIDE);

3) THENCE: ALONG SAID WESTERLY SIDE OF WATTS STREET, S11°21'00"W, A
DISTANCE OF 12.750' TO A POINT;

4) THENCE: CONTINUING ALONG SAME, S27°43'20"W, A DISTANCE OF 28.708'
TO A POINT;

5) THENCE: LEAVING SAID WESTERLY SIDE OF WATTS STREET, N78°59'00"W,
A DISTANCE OF 111.917' TO THE POINT OF BEGINNING.

Containing 4,718 s.f. / 0.10832 acres of land, more or less.

**SCHEDULE 18.7**

**<u>INITIAL REMEDIAL WORK</u>**

**SCHEDULE 18.15**

**ENVIRONMENTAL REPORTS**

1.    Phase I Environmental Site Assessment, Hahnemann University Hospital, 230 N. Broad Street, Philadelphia, PA, dated May 18, 2017, prepared by Ramboll Environ for Sellers and delivered to Purchasers.

2.    Draft AUH-Hahnemann Preliminary Status Summary dated August 8, 1998 delivered by Sellers to Purchasers real estate counsel on or about May 22, 2017.

3.    Phase I Environmental Site Assessment, Hahnemann University Hospital—Bobst Building, 222-248 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

4.    Phase I Environmental Site Assessment, Hahnemann University Hospital—Feinstein Building, 216-220 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

5.    Phase I Environmental Site Assessment, Hahnemann University Hospital—Bellet Building, 1501-1511 North Race Street, Philadelphia PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

6.    Phase I Environmental Site Assessment, Hahnemann University Hospital—Broad Street Clinic, 231-233 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

7.    Phase I Environmental Site Assessment, Hahnemann University Hospital—Parking Garage, 306-320 North Broad Street, Philadelphia PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

8.    Phase I Environmental Site Assessment, Hahnemann University Hospital—New College Building, 225-251 North 15th Street, Philadelphia PA by AEI Consultants, October 11, 2017, prepared for Harrison Street RE Capital, LLC.

9.    Draft Phase II Subsurface Investigation, 230 N. Broad Street, Philadelphia, PA by AEI Consultants, October 12, 2017, prepared for Harrison Street RE Capital, LLC.

10.    Draft Phase II Subsurface Investigation, 231-33 N. Broad Street, Philadelphia, PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

11.    Draft Phase II Subsurface Investigation, 306-20 N. Broad Street, Philadelphia, PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

12.    Draft Phase II Subsurface Investigation, 1501-11 N. Race Street, Philadelphia, PA by

AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

13.     Draft Phase II Subsurface Investigation, 216-20 N. Broad Street, Philadelphia, PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

14.     Draft Phase II Subsurface Investigation, 222-48 N. Broad Street, Philadelphia, PA by AEI Consultants, October 13, 2017, prepared for Harrison Street RE Capital, LLC.

15.     Draft Phase II Subsurface Investigation, 225-51 N. Broad Street, Philadelphia, PA by AEI Consultants, October 11, 2017, prepared for Harrison Street RE Capital, LLC.

**SCHEDULE 26.1**

**INITIAL CAPEX WORK; INITIAL REMEDIATION WORK**