```
 1                  UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3  IN RE:                          .  Chapter 11
                                    .
 4  CENTER CITY HEALTHCARE, LLC,    .  Case No. 19-11466 (MFW)
    d/b/a HAHNEMANN UNIVERSITY      .  (Jointly Administered)
 5  HOSPITAL, et al.,               .
                                    .  Courtroom No. 3
 6                                  .  824 Market Street
                         Debtors.   .  Wilmington, Delaware 19801
 7                                  .
                                    .  Thursday, October 22, 2020
 8  . . . . . . . . . . . . . . . . .  11:30 a.m.

 9             TRANSCRIPT OF ZOOM/TELEPHONIC HEARING
               BEFORE THE HONORABLE MARY F. WALRATH
10                UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:         Mark Minuti, Esquire
                             SAUL EWING ARNSTEIN & LEHR, LLP
13                           1201 North Market Street
                             Suite 2300
14                           Wilmington, Delaware 19899

15  For the Master
    Landlord:                Matthew Sarna, Esquire
16                           DLA PIPER LLP (US)
                             1201 North Market Street
17                           Suite 2100
                             Wilmington, Delaware 19801
18

19  (APPEARANCES CONTINUED)

20  Electronically
    Recorded by:             Brandon J. McCarthy, ECRO
21
    Transcription Service:   Reliable
22                           1007 N. Orange Street
                             Wilmington, Delaware 19801
23                           Telephone: (302) 654-8080
                             E-Mail: gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording:
25  transcript produced by transcription service.
```

```
 1  APPEARANCES (CONTINUED):

 2  For the Official
    Committee of Unsecured
 3  Creditors:                   Andrew H. Sherman, Esquire
                                 SILLS CUMMINS & GROSS, P.C.
 4                               One Riverfront Plaza
                                 Newark, New Jersey 07102
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2  MOTIONS:                                                    PAGE

3  Agenda
   Item 1:   Emergency Motion of Master Landlord to Modify       4
4            the Automatic Stay
             [Docket No. 1825; filed: 10/19/20]
5
   Court's ruling                                                5
6

7  Transcriptionist's Certificate                               19

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 11:30 a.m.)

2      THE COURT: Good morning. This is Judge Walrath.
3 We're here in the Center City Healthcare case, but I
4 understand this is an emergency motion of the master
5 landlord.

6      So, should we turn it over to counsel for the
7 movant?

8      MR. SARNA: Thank you, Your Honor.

9      Matthew Sarna, DLA Piper, on behalf of the movant,
10 PAHH Bellet MOB, LLC, referred to as the master landlord.

11      Your Honor, thank you very much, just to start
12 with allowing us to proceed on an emergency basis on a
13 shortened notice.

14      And I want to thank, also, the debtors and the
15 committee for working with us to come to a revised,
16 consensual proposed order.

17      Your Honor, the emergency motion states that we
18 are trying to get an order modifying the automatic stay so
19 the master landlord with terminate the debtors' interest in
20 that certain master lease agreement and that's so there can
21 be a sale effective, free and clear.

22      I believe that there are -- the hearing notice
23 says the objection deadline was set for the hearing. I
24 believe we have a revised, consensual order with the debtors
25 and the committee, so I would turn it over to anybody who

1  would like to raise any objection.
2              THE COURT:  All right.  Is anybody on who would
3  like to object to the emergency motion?
4        (No verbal response)
5              THE COURT:  I hear none.  So, it looks like it's
6  unopposed Mr. Sarna.
7              MR. SARNA:  Thank you, Your Honor.
8              In that case, I would request that Your Honor
9  enter the order and we'll move from there.
10             THE COURT:  I will do so.  I saw that you filed it
11 under certification of counsel, and I will enter the order,
12 then.
13             MR. SARNA:  Thank you, Your Honor.  I believe it
14 should be uploaded, as well.
15             THE COURT:  All right.  And we'll -- I guess
16 that's it.  Anybody else wish to be heard?
17             MR. MINUTI:  Your Honor, Mark Minuti from Saul
18 Ewing Arnstein & Lehr.  We represent the debtors in these
19 cases.
20             This is sort of belated welcome to the case.  You
21 know, when Judge Gross retired, I know it was transferred to
22 you back in March, but this is the first time that we've
23 appeared before you.
24             If it would be helpful for the Court, I can give
25 you a little bit of background on the case and sort of a

1  preview of things to come, but I didn't want to presume that
2  because I knew this was an emergency hearing.  My guess is
3  you squeezed us in, so I'm happy to do that today or some
4  other time.  I'm really at the Court's pleasure.
5              THE COURT:  Well, thank you for offering.
6              I'm happy to hear what's been going on.  I signed
7  order consensually, but I'm curious to know where we're
8  headed.
9              MR. MINUTI:  Very well, Your Honor.
10             So, again, we represent the debtor, Center City
11 Healthcare LLC and its 13 related debtors in these cases.
12 Center City Healthcare LLC operated Hahnemann University
13 Hospital and the debtor St. Christopher's Healthcare LLC
14 operated St. Christopher's Hospital for Children, both of
15 which were based in Philadelphia.
16             All of the debtors in these cases are directly or
17 indirectly owned by debtor Philadelphia Academic Health
18 Systems LLC, or PAHS, and the remaining debtors in these
19 cases were the physician practice groups affiliated with the
20 hospitals.
21             Philadelphia Academic Health Holdings LLC, a
22 nondebtor, of who I will call HoldCo is the holding company
23 that is the sole member of PAHS.
24             On January 11 of 2018, HoldCo, PAHS, and certain
25 other purchasers purchased the businesses of the hospital and

1 certain other assets incident to their operations, including
2 the physician practice groups, from Tenet Business Services
3 Corporation and its affiliates.  The purchased assets were
4 allocated to various entities, creating both operating
5 entities and real estate entities.
6        We do not represent the real estate entities and
7 none of the real estate entities are debtors before Your
8 Honor in these Chapter 11 cases.
9        Hahnemann University Hospital was a 496-bed
10 tertiary care medical center.  It offered a wide range of
11 specialty services.  I'm sure Your Honor knows it had a long
12 history, you know, dating back to 1848 and in the
13 Philadelphia community, and it was also the primary teaching
14 hospital for Drexel University College of Medicine.
15        Each year, Hahnemann and the Drexel faculty
16 trained approximately 563 rotating medical students and 800
17 rotating nurses and students; meanwhile, St. Christopher's
18 Healthcare LLC operated St. Christopher's Hospital for
19 Children and that's a 188-bed, freestanding pediatric
20 hospital.  It's a leading provider of pediatric care in
21 Philadelphia, again, dating back in that case to 1875,
22 nationally recognized, certainly well-regarded in the medical
23 community.
24        As I mentioned, these businesses were purchased in
25 2018 and really from the outset, Your Honor, the businesses

1  were besieged by a number of challenges, really dating back
2  to that time.
3              At the time the debtors bought the hospitals,
4  particularly with respect to Hahnemann, it was sort of viewed
5  as a white knight.  I think the Philadelphia community was
6  hoping that the debtor could save Hahnemann and,
7  unfortunately, Your Honor, that was just not the case; again,
8  since the acquisition, both were mired in a number of
9  operational challenges.
10             So, roughly, in June of 2019, the debtors reached
11 out and hired SSG Capital Advisors to assist in pursuing
12 financing, a sale, or any sort of restructuring transaction.
13 Mr. Scott Victor and his team did the usual good job to these
14 cases, Your Honor, but, unfortunately, you know, Hahnemann,
15 at that time, in particular, was not a pretty picture and SSG
16 quickly learned that there was really no viable option to
17 save Hahnemann University Hospital.
18             So, giving the mounting losses, there was really
19 no prospect of a viable purchaser for Hahnemann and an
20 inability to access capital, we really had no option but to
21 file these Chapter 11 cases and really to begin a process of
22 winding down Hahnemann, which actually started before the
23 bankruptcy case.
24             As for St. Christopher's, Your Honor, the hope, I
25 think, at the outset of the case, I think it was a faint

1  hope, was maybe we could do a reorganization, but it was
2  quickly clear that that was not going to happen, so we
3  engaged SSG at the outset of the case to try to find a buyer
4  for St. Christopher's Hospital for Children.
5           The bankruptcy cases were filed, it straddled the
6  evening of June 30th and the day of July 1 and the focus on
7  the case at that time was, of course, shutting down Hahnemann
8  in a safe and efficient fashion and trying to find a buyer
9  for St. Christopher's Hospital.
10          We worked post-petition with the City of
11 Philadelphia and the Pennsylvania Department of Health to
12 shut down Hahnemann University Hospital.  There's a lot of
13 detail that went into that, Your Honor.  I could bore you
14 with those dames, but suffice it to say that we were
15 ultimately able to successfully shut down that hospital and
16 we actually exited those facilities, one of which, it dealt
17 with the prior motion in March of this year.  That lease was
18 obviously rejected back actually before that time.
19          Now, as for St. Christopher's Hospital for
20 Children, we did pursue a court-approved marketing and sale
21 process.  SSG did conduct a marketing process and we
22 ultimately were able to find a buyer and the sale of that
23 hospital was ultimately approved and closed back in December
24 of this year -- excuse me -- of last year and the operating
25 assets were sold to an entity called FTC OptCo LLC, which was

1  a joint venture between Tower Health and Drexel University.
2  The sale price closed for approximately $50 million, Your
3  Honor, give and take.
4         So, as we appear before you today, we accomplished
5  our main goals of shutting down Hahnemann University Hospital
6  safely and effectively and we were able to sell St.
7  Christopher's.
8         I want to highlight a couple of other things that
9  happened in the bankruptcy case, and trust me, Your Honor,
10 when I say I'm giving you the Reader's Digest version because
11 a lot of these were long and drawn-out affairs and we
12 certainly occupied a lot of Judge Gross' time and we were
13 very appreciative of that.
14         In these cases, Your Honor, our pre-petition and
15 post-petition lenders were MidCap Financial.  As of the
16 petition date, we owed MidCap approximately $38.66 million on
17 a revolving loan and $20 million on a term loan.
18         I think it's fair to say, Your Honor, that our
19 relationship with MidCap was difficult.  Because of the poor
20 operations of the hospital, we had availability issues, and
21 we had a very, very tight budget in this case.
22         I could tell you, Your Honor, there were times
23 with this case that we were not sure whether we were going to
24 make it through another week, let alone, another day.  And as
25 I'm sure the Court can appreciate, you know, that brings a

lot of stress to any case, but when you're dealing with hospitals that are open and operating and you've got patients in the beds, you know, I think I shared the view of a number of people who have been involved in this case, that this has probably been one of the most stressful cases of our careers.

But we were ultimately successful in closing on the sale of St. Christopher's Hospital.  You know, we held this thing together with tape, Band-Aids -- whatever the analogy is -- and we got through the sale.  We were ultimately able to pay off MidCap, which, obviously, is a very good thing in this case.  And that was due, in part, to a lot of strong efforts and cooperation, quite frankly, from the special committee of unsecured creditors committee, other players in these cases.

The CRO in this case, Your Honor, is Alan Wilen from EisnerAmper.  He did, I think, a fantastic job.

And we have an independent board member named Albert Mesarobi (phonetic), Your Honor, again, who I think did a very good job in these cases, holding things together to get us through the sale.

Another facet of the case that I wanted to mention, Your Honor, is some disputes we had with Tenet, who we bought the hospitals from and a company called Conifer Revenue Cycle Solutions.  Conifer is a majority-owned subsidiary of Tenet and there was a contract in place for

1  Conifer to do all of the debtors' billing and collecting.
2           So, when the hospitals were purchased back in
3  2018, there was a contract with Tenet to provide the IT
4  backbone for the hospitals and there was a contract in place
5  with Conifer to provide all of the billing and collecting
6  that the hospitals were doing.
7           There were significant disputes with Tenet and
8  Conifer pre-bankruptcy and those disputes spilled into the
9  bankruptcy case.  Tenet and Conifer asserted that the debtors
10 owed them approximately $40-plus million going into the
11 bankruptcy case and in terms of the services, Tenet and
12 Conifer believed that under the contract rate, the debtor
13 owed them approximately $2 million a week.
14          And the problem was, Your Honor, the debtor didn't
15 have the ability to pay $2 million a week for those services
16 and without those services, Your Honor, it really would have
17 been catastrophic.  We would have had to have shut the
18 hospitals down.  And you can't just shut the hospitals down,
19 you know, by turning a switch.  You've got patients in the
20 bed.  You know, many of those patients can't be moved, Your
21 Honor, to another floor, let alone to another hospital, so it
22 really presented a very challenging situation to us.
23          We believe at the time, Your Honor, that the value
24 of the services being provided were much less than the
25 contract rate.  Tenet and Conifer didn't agree with that.

1  They ultimately filed a motion to lift the automatic stay
2  or -- excuse me -- to compel us to pay a post-petition
3  administrative claim of the contract rate and, if not, to
4  terminate the automatic stay so they could terminate the
5  contracts.  And as I've already indicated, Your Honor, that
6  would not have been a good thing for these cases or these
7  hospitals.
8             Ultimately, those disputes, Your Honor, they're
9  assigned to retired Judge Judith Fitzgerald to mediate.  I
10 can tell you that Judge Fitzgerald did a terrific job.  She
11 really rolled up her sleeves.  She kept on all the parties.
12 She certainly didn't do everything we wanted.  I know she
13 didn't do everything that Tenet and Conifer wanted.
14            But over the course of a couple of weeks, Your
15 Honor, and a number of in-person mediation sessions, which
16 included the committee, we were able to resolve those issues;
17 frankly, not in every way the debtor would have liked, but
18 certainly in a way where we were able to continue with those
19 services post-petition and that was critical, because it
20 allowed us to get to the sale of St. Christopher's Hospital
21 and allowed us to get to where we are today.
22            The other big issue that confronted us before Your
23 Honor involving the case that I want to mention is tail
24 insurance.  The debtors maintained malpractice insurance for
25 the hospitals, the disburse, the residents, and staff who

1  needed such coverage to (indiscernible) policies with an
2  outfit called Philadelphia Academic Risk Retention Group LLC.
3           Because the insurance policy was a claims-made
4  policy, the policy would not cover claims that were first
5  brought after the policy expired, which was in January of
6  this year, unless we purchased the tail.  The problem, of
7  course, Your Honor was that the tail was very, very expensive
8  and at that time we didn't have the money to purchase the
9  tail.
10          At that time, Your Honor, in early December, an
11 alleged ad hoc group of former Hahnemann residents and the
12 Pennsylvania Department of Health filed separate motions
13 really to ask Judge Gross to compel us to buy that tail
14 insurance to cover everybody.  We recognized, Your Honor, the
15 importance of having insurance coverage, but we were between
16 a rock and a hard place and so with the consent of the
17 movants in those cases, those motions or the hearings on
18 those motions were continued a couple of times while we tried
19 to get creative, Your Honor, and do whatever we could to
20 either find other alternative -- you know, somebody else to
21 pick up the coverage, for example, the buyer, or we found
22 ourselves in a position where we could get reasonably priced
23 insurance and the debtors could actually pay for that.
24          Ultimately, Your Honor, I'm pleased to say that we
25 were able to pull the money together and pull the sources

1  together for coverage.  We filed a motion that settled those
2  claims pursuant to which the debtors agreed to buy that
3  coverage.  Judge Gross, I think his last, certainly last act
4  in these cases and I think his last act as a judge was to
5  approve that motion and since then, Your Honor, we have
6  purchased that tail coverage and that tail insurance is now
7  in place.
8             And so, that really brings us to today, Your
9  Honor.  You know, again, I'll repeat, I really gave you a
10 Reader's Digest version.  There were a lot of people
11 (indiscernible) in the case.  I think Your Honor is probably
12 glad you missed that part of the case, but I hope, Your
13 Honor, and I think that we are behind the more difficult
14 parts of these cases.
15            So, going forward, we should be dealing with what
16 I will call some more routine issues that Your Honor sees in
17 Chapter 11 cases.  That is certainly my hope.
18            I can tell you, Your Honor, that we purposefully
19 delayed entering the bar date in these cases because of the
20 COVID-19 pandemic.  What the Court ultimately got, is it
21 ultimately approved the bar date and entered that order.  The
22 bar date in these cases was August 5th.
23            The debtors had already begun the claims
24 reconciliation process and I think we are, in relatively
25 short order, going to begin filing some non-substantive

1  objections to claims and ultimately some substantive
2  objections to claims in the case.
3  　　　　　The other major thing that has been happening in
4  the case, Your Honor, is that we are working together
5  cooperatively with the committee where both the committee and
6  the debtors are in the process of investigating potential
7  claims in these cases, among other things, Your Honor, claims
8  that the debtors may have in terms of why these debtors
9  failed and possible claims related to the structure of these
10 debtors and how they've been put together.
11 　　　　　We are currently engaged in 2004 discovery, as
12 well as the committee is engaged in 2004 discovery with
13 Mr. (Indiscernible) Friedman (phonetic), who's the ultimate
14 owners of the debtors, Your Honor, and his related entities,
15 including some of the real estate entities that I mentioned
16 with you before.  You know, that discovery has involved a lot
17 of documents being produced by the debtor as well as
18 Mr. Friedman and his entities.
19 　　　　　We have hit some discovery, what I'll call
20 disagreements, Your Honor, and we are trying to work through
21 those consensually; in fact, we have a call this afternoon to
22 hopefully work through those issues.  Obviously, if we can't
23 work through those, we will be back before Your Honor on
24 those issues.
25 　　　　　I can tell you, Your Honor, that we have all

1  talked, including the targets of the investigation, about the
2  possibility that if we believe there are viable claims,
3  trying to come up with some way to consensually resolve those
4  claims, whether it be through medication or otherwise, before
5  we put forward a plan in these cases.  And as the Court may
6  have seen from the docket, we did recently move to extend
7  exclusivity in these cases, and we'll be before Your Honor in
8  a couple weeks on that motion.
9            But that, I think, is the game plan that everybody
10 shares to see if we believe there are viable claims, to see
11 if there's a way to resolve those consensually, and then
12 obviously put a resolution in the disclosure statement and
13 maybe deal with the resolution of a plan.  If we can get
14 there, Your Honor, I think that is the goal.
15           So, that's where we are.  I hope the road going
16 forward, Your Honor, is less bumpy than the road as it was as
17 we got here.  I'm optimistic that that is the case and we'll
18 be able to do that.  So, that was maybe a little more long-
19 winded than the Court wanted, but that concludes the summary
20 and I'm certainly happy to answer any questions that the
21 Court has.
22           THE COURT:  No, thank you.  I'm sure you did
23 abbreviate it, but it's nice to know where we are in the
24 case, so I appreciate your taking the time.
25           Anyone else wish to be heard today?

1        (No verbal response)
2                THE COURT:  No?  All right.
3                MR. SHERMAN:  Your Honor, it's --
4                THE COURT:  I'm sorry, go ahead.
5                MR. SHERMAN:  Just briefly, Your Honor.  Andrew
6    Sherman, Sills Cummins, for the committee.
7                I just want to sort of echo a number of the
8    statements by Mr. Minuti.  We have worked collaboratively and
9    cooperatively with the debtor.  There may be some bumps ahead
10   which we're trying to smooth out, but, you know, we may be
11   back before Your Honor, but we do look forward to Your
12   Honor's involvement in this case and, you know, hopefully,
13   the parties will do what we can to keep things away from Your
14   Honor as best we can, but there may be some unavoidable
15   issues that we may need the Court's assistance.  So, we look
16   forward to being back before Your Honor.
17               THE COURT:  All right.  Well, thank you, and I
18   guess we'll stand adjourned then.
19               COUNSEL:  Thank you, Your Honor.
20        (Proceedings concluded at 11:49 a.m.)
21
22
23
24
25

1                         CERTIFICATION
2            I certify that the foregoing is a correct
3    transcript from the electronic sound recording of the
4    proceedings in the above-entitled matter to the best of my
5    knowledge and ability.
6
7
8
9    /s/ William J. Garling                    October 26, 2020
10   William J. Garling, CET**D-543
11   Certified Court Transcriptionist
12   For Reliable
13
14
15
16
17
18
19
20
21
22
23
24
25