## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (MFW) |
| HAHNEMANN UNIVERSITY HOSPITAL, | ) |
| *et al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) **Hearing Date: November 30, 2020 at 10:30 a.m. (EST)** |
| | ) **Objection Deadline: November 23, 2020 at 4:00 p.m. (EST)** |

## JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO COMPEL PRODUCTION OF DOCUMENTS FROM THE MBNF NON-DEBTOR ENTITIES

The debtors and debtors in possession (collectively, the "**Debtors**") and the Official Committee of Unsecured Creditors (the "**Committee**") in the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby jointly move (the "**Motion**") the Court for an order compelling Joel Freedman, MBNF Investments, LLC, American Academic Health System, LLC, Philadelphia Academic Health Holdings, LLC, Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC, Broad Street Healthcare Properties III, LLC, and Paladin Healthcare Capital, LLC (collectively, the "**MBNF Non-Debtor Entities**") to (i) produce to the Debtors and the Committee the documents erroneously withheld on the basis of the Asserted Privileges (defined below) which documents are responsive to the Committee's 2004 subpoena for the production of documents directed at the MBNF Non-Debtor Entities, dated January 2, 2020

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 216 N. Broad Street, 4th Floor, Philadelphia, PA  19102.

(the "**MBNF 2004 Subpoena**"), and (ii) produce to the Debtors (a) all other documents responsive to the MBNF 2004 Subpoena previously produced to the Committee (the "**Committee Received Documents**") and (b) all documents withheld from the Committee on the basis of an asserted joint interest or common interest privilege between the Debtors and MBNF Non-Debtor Entities (the "**Asserted Debtor Privilege Documents**," and together with the Committee Received Documents, the "**Remaining Documents**").   In support thereof, the Committee and Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

On August 31, 2017, certain entities controlled by Joel Freedman ("**Freedman**"), and certain entities controlled by Harrison Street Real Estate, LLC ("**HSRE**"), collectively, as purchasers, and Tenet Business Services Corporation ("**Tenet**") and certain of its affiliates, collectively, as sellers, entered into an asset sale agreement (as amended, the "**ASA**") for the sale of Hahnemann University Hospital ("**HUH**"), St. Christopher's Hospital for Children ("**STC**," and together with HUH, the "**Hospitals**"), and certain real property.   In connection with the ASA, Freedman created (i) "opco" entities (the "**OpCos**"—currently the Debtors in these chapter 11 cases), which purchased the Hospitals and various related practice groups, and (ii) several "propco" entities (the "**PropCos**"), which took ownership of the real estate on which the Hospitals are located.   The OpCos and PropCos are both subsidiaries of parent companies also owned by Freedman (the "**ParentCos**"), including Philadelphia Academic Health Holdings, LLC and American Academic Health System, LLC ("**AAHS**").   The ASA closed on January 11, 2018—15 months before the Petition Date.

Tenet, in contrast, owned each Hospital and the property on which it sat as a collective entity—*i.e.*, (i) neither Hospital paid rent with respect to the real estate on which it was located, (ii) the value of the real estate was not shielded from creditors of the Hospitals, and (iii) the

Hospitals did not require separate counsel from the real estate component (as the real estate did not comprise a separate entity under Tenet's structure).

The Committee and the Debtors are jointly in the process of conducting an investigation of potential claims and causes of action that may exist against the MBNF Non-Debtor Entities (the "**Joint Investigation**"), including with respect to the acquisition structure and post-closing operations at the Hospitals.  To that end, on January 2, 2020—ten months prior to the date hereof— the Committee served the MBNF 2004 Subpoena, attached hereto as **Exhibit "A"**, on the MBNF Non-Debtor Entities and their counsel.[2]  The MBNF Non-Debtor Entities identified approximately 80,000 documents responsive to the MBNF 2004 Subpoena, yet withheld approximately half of those documents (*i.e.*, 40,000 documents) on the basis of broad assertions of attorney client privilege (including asserted common interest privilege and joint defense privilege) and attorney-work product protection (the "**Asserted Privileges**").  Included in such withheld documents are 20,000 documents that the MBNF Non-Debtor Entities admitted to presuming a privilege without having reviewed such documents (the "**Non-Reviewed Documents**").

With respect to the Asserted Privileges, the MBNF Non-Debtor Entities conflate business advice with legal advice to broadly shield approximately 50% of the responsive documents from production under the guise of privilege.  The MBNF Non-Debtor Entities have improperly withheld several categories of responsive documents, including the following:

    i.    <u>Communications including Svetlana Attestatova</u>:  Ms. Attestatova was in-house counsel for the Debtors (though the Petition Date) and MBNF Non-Debtor Entities. Significantly, however, she also served, both formally and informally, in business roles for the MBNF Non-Debtor Entities and the Debtors, providing business advice to such parties.  As such, emails that include Ms. Attestatova do not necessarily contain the provision of or request for legal advice.  While the MBNF Non-Debtor Entities have produced certain communications including Ms.

---

[2]    The Debtors did not separately serve a document request on the MBNF Non-Debtor Entities, as doing so would have been redundant of the requests in the MBNF 2004 Subpoena served by the Committee.

Attestatova, the Revised Privilege Log (defined below) does not provide enough information to meet the MBNF Non-Debtor Entities' burden that the withheld documents actually contain legal advice—especially in light of the number of documents withheld.

ii.    HSRE Communications:  The MBNF Non-Debtor Entities and HSRE entities both purchased assets under the ASA.  In light of this commercial relationship, the MBNF Non-Debtor Entities improperly withheld a significant number of communications with individuals employed by HSRE and its counsel on the basis of an asserted common interest privilege.  Yet, it is unclear from the descriptions in the Revised Privilege Log (as well as the Committee's and Debtors' understanding of the business relationship between the parties), how the emails including HSRE were for the provision of advice regarding a common legal interest, as opposed to a common business interest.  While the MBNF Non-Debtor Entities and HSRE were both purchasers under the ASA and clearly negotiated documents in connection therewith, this does not mean that the parties had a common legal interest with respect to those documents.  In fact, each party appears to have had its own legal interest with respect to the documents and the circulation of such documents and emails in connection therewith does not render them subject to a common interest privilege.

iii.    Agent Communications:  A significant number of communications on the Revised Privilege Log include financial or tax advisors or lobbying and government relations firms (collectively, the "**Agents**").  The MBNF Non-Debtor Entities assert that the inclusion of the Agents does not waive the attorney-client privilege.  However, this is only true if the disclosure to such advisor is made to facilitate an attorney's provision of legal services.  The Revised Privilege Log is silent with respect to whether such Agents were included on the emails in furtherance of the provision of legal advice.

The descriptions in the Revised Privilege Log thus fall short of meeting the MBNF Non-Debtor Entities' burden of demonstrating the provision of legal advice in the Attestatova Emails, the HSRE Communications, and the Agent Communications.  Instead, the MBNF Non-Debtor Entities are essentially asking the Committee and Debtors to simply trust them that they properly withheld 50% of the responsive documents on issues that seem primarily, if not entirely, commercial and, therefore, not protected from disclosure by privilege.

The MBNF Non-Debtor Entities have also improperly withheld communications and documents that (i) include no attorneys, without any description of how such documents relate to the provision of legal advice, and (ii) allegedly contain attorney work-product, yet provide no

description of how each such document was prepared in anticipation of litigation—a requirement for the attorney work-product protection to apply.

In an attempt to reach resolution of these discovery issues, the Committee and Debtors have worked extensively with the MBNF Non-Debtor Entities over the past 10 months to obtain the documents necessary to complete the Joint Investigation. Yet the Committee and Debtors continue to receive unsatisfactory answers to their questions regarding the Asserted Privileges. As the entries in the Revised Privilege Log do not satisfy the MBNF Non-Debtor Entities' burden with respect to the Asserted Privileges (for the reasons discussed further below), the Withheld Documents should be produced in their entirety to the Committee and the Debtors. Alternatively, the Withheld Documents should be produced to the Committee and Debtors on the following terms (the "**Withheld Documents Production Process**"):

i.  The Attestatova Emails: With respect to the communications withheld on the assertion of privilege regarding the provision of legal advice by Ms. Attestatova to the MBNF Non-Debtor Entities and/or Debtor entities prior to the Petition Date (the "**Attestatova Emails**"), the MBNF Non-Debtor Entities shall submit to the Court or a discovery master, as appropriate, a sample of up to 1,000 of such withheld Attestatova Emails from which to determine whether the privilege is being properly applied in these circumstances. For the avoidance of doubt, the sample documents produced by the MBNF Non-Debtor Entities will be selected at random by the Court or discovery master, as applicable.

ii.  The Third Party Communications: The MBNF Non-Debtor Entities shall produce all Paladin emails (*i.e.*, @pldn.com) responsive to the MBNF 2004 Subpoena that include any third parties (excluding the law firms provided on Exhibit A to the MBNF Follow-Up Letter (defined below)) (the "**Third-Party Emails**"). To the extent the MBNF Entities continue to assert (a) that the HSRE communications included on the Revised Privilege Log are subject to a common interest privilege, and/or (b) the inclusion of an Advisor on communications in the Revised Privilege Log does not waive the attorney-client privilege, then the MBNF Non-Debtor Entities shall submit a sample of up to 1,000 documents from each category (a) and (b), as applicable, to the Court or a discovery master to review and determine whether the MBNF Non-Debtor Entities are properly withholding such documents. For the avoidance of doubt, the sample documents produced by the MBNF Non-Debtor Entities will be selected at random by the Court or discovery master, as applicable.

iii.    <u>The Work Product Documents</u>:  The MBNF Non-Debtor Entities shall produce all documents allegedly covered by the work-product protection (the "**Work Product Documents**") responsive to the MBNF 2004 Subpoena.  To the extent the MBNF Non-Debtor Entities continue to assert such documents were prepared in anticipation of litigation, then the MBNF Non-Debtor Entities shall submit a sample of up to 1,000 documents to the Court or a discovery master to review and determine whether the MBNF Non-Debtor Entities are properly withholding such documents.  For the avoidance of doubt, the sample documents produced by the MBNF Non-Debtor Entities will be selected at random by the Court or discovery master, as applicable.

iv.    <u>The Non-Attorney Communications</u>:  The MBNF Non-Debtor Entities shall produce all Paladin emails (*i.e.*, @pldn.com) responsive to the MBNF 2004 Subpoena that do not include an attorney (whether in the to, from, cc or bcc section).  To the extent the MBNF Non-Debtor Entities continue to assert that, despite the non-presence of an attorney on the withheld communication, that the communication is privileged, then the MBNF Non-Debtor Entities shall submit a sample of up to 1,000 documents to the Court or a discovery master to review and determine whether the MBNF Non-Debtor Entities are properly withholding such documents.  For the avoidance of doubt, the sample documents produced by the MBNF Non-Debtor Entities will be selected at random by the Court or discovery master, as applicable.

v.    <u>The Non-Reviewed Documents</u>:  The MBNF Non-Debtor Entities shall produce all Non-Reviewed Documents responsive to the MBNF 2004 Subpoena.  To the extent, upon review by the MBNF Non-Debtor Entities, that the MBNF Non-Debtor Entities assert any Asserted Privileges with respect to the Non-Reviewed Documents, the MBNF Non-Debtor Entities shall submit a sample of up to 1,000 documents to the Court or a discovery master to review and determine whether the MBNF Non-Debtor Entities are properly withholding such documents.  For the avoidance of doubt, the sample documents produced by the MBNF Non-Debtor Entities will be selected at random by the Court or discovery master, as applicable.

Given that the parties have negotiated for ten months regarding the production of documents and the MBNF Non-Debtor Entities have failed to sufficiently justify how 50% of the responsive documents have been properly withheld from disclosure, at this stage a neutral third-party is required to determine the scope of such Asserted Privileges.  The Withheld Document Production Process provides a clear path for resolution of the issues and can be accomplished in a reasonable timeframe, allowing for the timely completion of the Joint Investigation.

Further, the MBNF Consent Order (defined below), which governs production of documents by the MBNF Non-Debtor Entities pursuant to the MBNF 2004 Subpoena, clearly provides that the MBNF Non-Debtor Entities shall produce to the Debtors all responsive non-privileged documents.  The MBNF Non-Debtor Entities, however, assert joint interest and common interest privileges with respect to documents between the Debtors and MBNF Non-Debtor Entities, therefore withholding such documents from the Debtors.  Yet there are clear conflicts that exist between and among the Debtors and MBNF Non-Debtor Entities, as evidenced in these chapter 11 cases, including with respect to (i) Freedman's decision that only the OpCos file for chapter 11 protection, (ii) the MBNF Non-Debtor Entities' filing of over ninety (90) proofs of claim for myriad asserted reasons aggregating hundreds of millions of dollars against the Debtors' estates, and (iii) the ongoing Joint Investigation.  In short, by separating the Hospitals from their real estate for Freedman's personal benefit, yet ignoring such separateness for the purposes of asserting privileges, Freedman is attempting to "have his cake and eat it too."  This should not be permitted.

Instead, the MBNF Non-Debtor Entities should produce to the Debtors both the Committee Received Documents, as well as the Asserted Debtor Privilege Documents (*i.e.*, any documents withheld on the basis of an asserted joint interest or common interest privilege between the Debtors and MBNF Non-Debtor Entities).

## JURISDICTION AND VENUE

1.    The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.

2.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and, pursuant to Rule 9013-1(f) of the Local Rules, the Committee consents to entry of a final order by the Court

in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.     Venue of these cases and related proceedings is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### A.     The Acquisition

4.     The Debtors and Committee understand that the Court is new to these cases. Accordingly, rather than rely upon a reference to the factual background contained in the first day declaration of the Debtors' Chief Restructuring Officer, Allen Wilen[3], the movants have set forth certain key facts below, for the Court's convenience.

5.     As of the Petition Date, the Debtors' business primarily consisted of operating HUH and STC, as well as owning numerous medical practice groups.

6.     The Debtors had acquired the Hospitals, as well as their associated medical practice groups, on January 11, 2018 from Tenet and its affiliates pursuant to the ASA (the "**Acquisition**"). Tenet had owned and operated these and certain related assets (collectively, the "**Healthcare Business**") since 1998, when it purchased them from Allegheny Health, Education, and Research Foundation.

7.     The Acquisition involved far more than the sale of the Hospitals and their practice groups. The real estate underlying the Healthcare Business was segregated from the underlying Hospitals and sold to multiple entities in which Freedman had a direct or indirect interests, none of which is a debtor in these proceedings. Certain of the real estate was transferred to the MBNF

---

[3]     See *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**") [D.I. 2].

Non-Debtor Entities, which entities are all owned and/or controlled by Freedman.  This real estate included (i) the so-called "North and South Towers" (which comprised a portion of HUH), (ii) STC's hospital building in North Philadelphia and a nearby warehouse and (iii) a small undeveloped "park" on Broad Street, in Center City, Philadelphia, and certain surface parking lots in Center City, Philadelphia located on Broad Street.

8.      The rest of the real estate underlying the Healthcare Business – medical office buildings on or adjacent to the HUH campus (including the "New College Building", where the Drexel University School of Medicine is located), two medical office buildings connected to (and previously a part of) HUH, a parking garage near the HUH campus and a parking garage on STC's campus (collectively, the "**Parking Garages**") – was conveyed to entities controlled and primarily owned by subsidiaries of HSRE.  These HSRE-owned entities (the "**Master Landlords**") then leased each of these properties to SCH, the Debtor that operated STC.  SCH then subleased the properties to other entities, including in certain instances other Debtors.  Freedman indirectly holds a minority interest in each of the Master Landlords.

9.      As part of the Acquisition, the Debtors acquired the operating assets of the Healthcare Business, such as equipment, accounts receivable and the like, and assumed (with certain exceptions) substantially all the liabilities of the Healthcare Business.  As a result of the segregation of the assets at closing, Debtor CCH and Debtor SCH became mere tenants of their respective buildings and leased them from the MBNF Non-Debtor Entities.  In addition, and as previously noted, Debtor SCH leased the medical office buildings on or adjacent to the HUH campus, as well as the Parking Garages, from the Master Landlords.

10.     In sum, the assets comprising the Healthcare Business were divided among Debtor "OpCos," which received the operating assets, and non-Debtor "PropCos," which received the real

estate.  Some of the PropCos were owned (indirectly) by Mr. Freedman; others were owned by subsidiaries of HSRE.  This ownership structure is detailed on the "Project Liberty Post-Close Legal Entity Organizational Chart" attached hereto as **Exhibit "B"**.

11.     Notably, prior to the Acquisition, all of the assets related to the operations of the Healthcare Business were under the common control of the owner.  By separating the assets among the OpCos and the PropCos, the transaction served to shield the PropCos' valuable assets (the real estate) from the Debtor OpCos' creditors.

12.     Further, certain officers, directors and key personnel of the MBNF Non-Debtor Entities worked in various capacities for the OpCos, PropCos and ParentCos, often without distinguishing in which capacity they were functioning when sending emails or performing operations—including with respect to communicating with creditors.  In addition, certain key personnel of the Debtors were directed to perform services (at Freedman's request and/or direction) for the MBNF Non-Debtor Entities on limited occasions, without benefit or compensation to the Debtors. Mr. Freedman was the ultimate manager of both the Debtors and MBNF Non-Debtor Entities.  His close advisor, Kyle Schmidt, an employee of Paladin Healthcare Capital, LLC ("**Paladin**"), which is one of the MBNF Non-Debtor Entities, was similarly involved in the operations of all entities.  Svetlana Attestatova, Esquire, Paladin's General Counsel, served in both a business capacity, and as general counsel, to Mr. Freedman individually, the other MBNF Non-Debtor Entities and the Debtors (recusing herself from representing the Debtors only after the Petition Date, despite the inherent conflicts that existed immediately as a result of the PropCo/OpCo structure).

13.     Beginning immediately after the closing of the Acquisition, the Debtors encountered significant operational problems, transition issues, liquidity shortfalls and the repeated loss of key personnel, among many other difficulties.

**B.      The Bankruptcy Cases**

14.     Since filing for bankruptcy on June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors has operated its business and managed its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

15.     The Debtors commenced their cases primarily because of ongoing, unsustainable operating losses at HUH, and therefore to implement and facilitate an orderly closure of HUH while ensuring patient safety and quality patient care.  The Debtors also sought to implement a sale of STC to a going concern buyer for the benefit of creditors and to ensure its continued operations, for the benefit of an at-risk community that relies on STC as a safety net hospital for children.

16.     These goals were met.  After obtaining debtor in possession financing, the Debtors safely closed HUH in coordination with local and state authorities, sold STC, and obtained tail insurance for themselves and former physicians, for the benefit of patients and the regional medical community.

17.     On June 11, 2020, the Court entered an Order establishing a bar date in these cases of August 5, 2020 [D.I. 1666][4].  To date, approximately 2,600 claims have been filed, asserting on

---

[4]     Although the Debtors could have requested an earlier bar date, they believed it was appropriate to allow creditors additional time to file claims, due to the disruption caused by the Covid-19 pandemic.

a non-consolidated basis a total of $11.2 billion of claims, exclusive of unliquidated claims but including over $7.5 billion of claims asserted by the MBNF Non-Debtor Entities.

## C.    **Investigation and Discovery Disputes**

18.    As previously noted, the circumstances surrounding the Acquisition, and the manner in which the Debtors operated from the Acquisition through the Petition Date, as well as the apparent role of the MBNF Non-Debtor Entities in such operations, raise obvious questions regarding potential estate causes of action.  The Debtors and the Committee have been working collectively and cooperatively to investigate such claims.

19.    In connection with the Joint Investigation, and consistent with the Committee's rights under rule 2004 of the Federal Rules of Bankruptcy Procedure and rule 2004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), on January 2, 2020, the Committee served the MBNF 2004 Subpoena on the MBNF Non-Debtor Entities and their counsel.

20.    In connection with the MBNF 2004 Subpoena, on February 12, 2020, the Court entered the *Consent Order Regarding Production of Documents by MBNF Non-Debtor Entities* [D.I. 1401] (the "**MBNF Consent Order**"), which governed the discovery process.

21.    The MBNF Consent Order provides as follows with respect to the MBNF Non-Debtor Entities' production of documents to the Committee and Debtors:

> The MBNF Non-Debtor Entities shall produce to the Committee and the Debtors (i) all non-privileged electronically stored information ("ESI") containing one or more of the Parties' agreed-upon search terms from the Parties' agreed upon custodians and responsive to any of the Document Requests and (ii) all non-privileged documents containing one or more of the Parties' agreed-upon search terms and responsive to any of the Document Requests identified through a reasonable search of central network drives and shared electronic drives currently within the possession, custody or control of the MBNF Non-Debtor Entities (each a "Document" and collectively, the "Documents") . . . . The production of Documents shall

> begin within three weeks of the date on which the Parties reach an agreement on search terms and production shall continue on a rolling basis thereafter

MBNF Consent Order, ¶¶ 1, 3.

22.     To date, the MBNF Non-Debtor Entities have produced no documents to the Debtors.

23.     The MBNF Consent Order also provides that "[t]he Committee reserves the right to challenge the assertion of privilege with respect  to any Documents withheld on the basis of privilege and, in the event of such challenge, the Parties shall meet and confer regarding the challenged Documents.  If the Parties are unable to resolve the challenge, the Parties shall submit the issue to the court, which may be done on an expedited basis."  MBNF Consent Order, ¶ 4.

24.     On June 16, 2020, in furtherance of the Joint Investigation and to ensure the Committee and Debtors could both review pertinent documents in connection therewith, the Committee requested certain documents from the Debtors pursuant to Federal Rule 2004 and Local Rule 2004-1 (the "**Debtor Document Request**").  The Debtors and Committee reached agreement regarding a consensual discovery process governing the Debtor Document Request, which resulted in the proposed *Consent Order Regarding Production of Documents by Debtors to Official Committee of Unsecured Creditors* (the "**Joint Consent Order**").  The Committee and Debtors are seeking approval from the Court of the Joint Consent Order in a separate joint motion, filed concurrently herewith (the "**Joint Consent Motion**").

25.     In connection with the MBNF 2004 Subpoena, the MBNF Non-Debtor Entities identified approximately 80,000 responsive documents, yet produced only half of those documents to the Committee (and none to the Debtors), withholding the remaining documents on the grounds of the Asserted Privileges.

26.     In connection with the Asserted Privileges, on August 14, 2020, counsel to the

MBNF Non-Debtor Entities sent counsel to the Committee a privilege log (the "**Original Privilege**

**Log**") and cover letter in connection therewith (the "**MBNF August Letter**").  The MBNF August

Letter provides, *inter alia,* as follows:

- "The MBNF Non-Debtor Entities prepared [the privilege] log, which contains approximately 17,400 entries[.]"

- "This privilege log includes privileged communications between (i) employees or representatives of the MBNF Non-Debtor Entities and in-house counsel, and (ii) employees or representatives of the MBNF Non-Debtor Entities and outside counsel that also include a third-party with whom the MBNF Non-Debtor Entities have a common-interest or joint-defense privilege."

- "[T]his privilege log does not include entries for the (i) approximately 20,000 communications between employees of the MBNF Non-Debtor Entities and outside counsel (which do not include any third-parties), or (ii) approximately 2,900 documents that we have produced with redactions because they are only partially privileged or protected."

(Collectively, the 17,400 documents included on the Original Privilege Log *plus* the 20,000 Non-

Reviewed Documents, the "**Withheld Documents**").

27.     After reviewing the Original Privilege Log, on September 4, 2020, the Committee

replied to the MBNF August Letter (the "**Committee September Letter**"), copying the Debtors,

highlighting the following critical issues, among others, with respect to the Withheld Documents:

- "The Withheld Documents total approximately 37,400 documents. The total produced documents (including the Redacted Documents []) is approximately 40,000. As such, almost half of the documents responsive to the Document Request have been withheld on the asserted basis of the attorney-client privilege or attorney-work product protection. While the Committee is willing to work cooperatively with the MBNF-Debtor Entities, the ratio of produced documents to Withheld Documents is problematic and suggests an erroneous application of attorney-client privilege and attorney-work product protection."

- "The Withheld Documents include communications between 'employees or representatives of the MBNF Non-Debtor Entities and outside counsel that also include a third party with whom the MBNF Non-Debtor Entities have a common- interest or joint defense privilege.' The Privilege Log, however, does

not explain the nature of the asserted common-interest privilege (and includes no reference to the joint defense privilege) nor does it identify which third-party allegedly shared the common interest."

- "The Committee has received no information regarding the asserted privilege with respect to [the] 20,000 documents [with outside counsel]— including with respect to whether such communications with outside counsel involved the provision of legal advice."

- "[T]he meaning of 'third-parties' is unclear in the Cover Letter, as the Cover Letter and Privilege Log seem to group all the MBNF Non-Debtor Entities as a single entity with respect to the assertion of privilege."

28.     The MBNF Non-Debtor Entities replied to the Committee September Letter on September 15, 2020 (the "**MBNF September Letter**").  On September 16, 2020, counsel to the MBNF Non-Debtor Entities, counsel to the Committee and counsel to the Debtors conducted a call with respect to the MBNF September Letter (the "**September Call**").

29.     As set forth in the MBNF September Letter and confirmed on the September Call, (i) the MBNF Non-Debtor Entities did not review the approximately 20,000 Non-Reviewed Documents to determine if such communications were privileged, and (ii) the Original Privilege Log did not specify which Withheld Documents were subject to an asserted common interest agreement (instead specifying only which Withheld Documents were withheld because they involved the *drafting* of a common interest agreement).

30.     On September 17, 2020, the day after the September Call, the Committee sent the MBNF Non-Debtor Entities a request for additional information regarding the Original Privilege Log (the "**Committee Follow-Up Letter**"), copying the Debtors.  The Committee Follow-Up Letter focused on, among other things, the contradictory position that Freedman established separate ParentCos, PropCos and OpCos pursuant to the Acquisition—each with adverse interests—yet ignored these structures for purposes of withholding documents pursuant to a board assertion of privilege.

31.     The MBNF Non-Debtor Entities replied to the Committees and Debtors on October 18, 2020 (the "**MBNF Follow-Up Letter**"), attaching a revised privilege log (the "**Revised Privilege Log**"), which included the email addresses of third-parties, such that the Committee and Debtors could at least determine the identity of the third parties included on the withheld emails. The MBNF Follow-Up Letter confirmed that (i) Ms. Attestatova acted as in-house counsel for all the Debtors and MBNF Non-Debtor Entities, and (ii) the MBNF Non-Debtor Entities did not consider the presence of an AAHS email address (*i.e.*, the email server set up for Debtor communications) on a Paladin email exchange to constitute a third party that would waive any asserted privilege.

32.     Between October 19, 2020 and November 4, 2020, the MBNF Non-Debtor Entities, the Committee and the Debtors continued to have discussions regarding discovery disputes and shared versions of proposed settlement offers and stipulations to address such disputes. Notwithstanding these attempts, (i) the parties remain at an impasse regarding the approximately 40,000 Withheld Documents and the best means to determine whether such Withheld Documents were properly withheld and (ii) the Debtors have not received any responsive documents from the MBNF Non-Debtor Entities.

## **RELIEF REQUESTED**

33.     By this Motion, the Debtors and Committee seek entry of an order (a) compelling the MBNF Non-Debtor Entities to (i) produce the Withheld Documents in their entirety to the Debtors and Committee, or (ii) produce the Withheld Documents to the Debtors and Committee subject to the terms of the Withheld Documents Production Process, to be overseen by the Court or a discovery master, with all such costs of a discovery master to be divided evenly between the MBNF Non-Debtor Entities and the Debtors' estates, and (b) compelling the MBNF Non-Debtor

Entities to produce to the Debtors the Remaining Documents pursuant to the terms of the Consent Order.

## BASIS FOR THE RELIEF REQUESTED

I.    **The MBNF Non-Debtor Entities Failed to Establish that the Attestatova Emails, the Non-Attorney Communications, and the Non-Reviewed Documents Meet the Elements for Attorney-Client Privilege**

34.    Parties to litigation may obtain discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]"  *American Bottling Company v. Repole*, No.: N19C-03-048 AML CCLD, 2020 Del. Super. LEXIS 225, at *6 (Super. Ct. May 12, 2020).  A party who withholds relevant documents on the basis of privilege bears the burden of establishing the factual basis for the privilege.  *Moyer v. Moye*r, 602 A.2d 68, 72 (Del. 1992).  To meet that burden, the withholding party must demonstrate the following elements:  "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client."  *Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)*, 493 F.3d 345, 359 (3d Cir. 2007).

35.    Although communications for the purpose of seeking or providing legal advice are privileged, communications with counsel for other purposes—*i.e.*, obtaining business or personal advice—are not.  *See e.g., AM Gen. Holdings LLC v. Renco Grp., Inc.*, 2013 Del. Ch. LEXIS 102, at *3 (Ch. Apr. 18, 2013)*; American Bottling*, 2020 Del. Super. LEXIS 225, at *6-7.  "Simply because the persons doing the work are lawyers does not necessarily support the conclusion that lawyer-based privileges are in effect.  Fundamental business functions cannot be shielded simply by assigning the tasks to lawyers."  *AM Gen. Holdings LLC v. Renco Grp., Inc.*, 2013 Del. Ch. LEXIS 102, at *3.  A lawyer performing a business function "cannot avail himself of the protection

associated with the attorney-client privilege or the work product doctrine." *Lee v. Engle,* 1995 Del. Ch. LEXIS 149, at *9 (Ch. Dec. 15, 1995).

36.     Here, the MBNF Non-Debtor Entities have failed to meet their burden with respect to the Attestatova Emails, as the MBNF Non-Debtor Entities have not demonstrated that Ms. Attestatova was providing legal advice rather than business advice.  The provision of legal assistance to a client is a necessary element to establish the applicability of the attorney-client privilege.  The Revised Privilege Log contains only generic descriptions of the alleged legal advice provided by Ms. Attestatova and often relates to topics that seem business oriented.  This is especially problematic here where Ms. Attestatova performed non-legal functions for the MBNF Non-Debtor Entities and Debtors, as well as provided business advice in her capacity as in-house counsel.

37.     For example, the following is a sample entry from the Revised Privilege Log regarding an alleged attorney-client communication with Ms. Attestatova, which relates to business and operations issues.  While this is only one entry, this same "subject matter" description is used numerous times throughout the Revised Privilege Log (too many to copy in this Motion):

> Privilege Log Entry Number: 10
>
> From:  Kyle Schmidt <kschmidt@pldn.com>
>
> To:  Svetlana Attestatova <sattestatova@pldn.com>;  Joel Freedman <jfreedman@pldn.com>
>
> Privilege Basis:  Attorney-Client Email
>
> Subject Matter:  Document providing information to attorney regarding the operation, ownership interests, and financial condition of the hospitals

38.     The subject matter described above does not appear to relate to the provision of legal services (despite included such "key words" in the description).  Rather, the subject matter

relates to business issues regarding the operation, ownership interests and financial condition of the Hospitals.

39.    Similarly, the MBNF Non-Debtor Entities have failed to meet the elements of attorney-client privilege with respect to the Non-Attorney Communications and the Non-Reviewed Emails. The Revised Privilege Log contains no explanation of how the Non-Attorney Communications involve privileged persons—an element of the attorney-client privilege. Further, the MBNF Non-Debtor Entities provided no privilege log or other document with any attempted explanation of how the Non-Reviewed Documents meet any of the elements of attorney-client privilege. Quite the opposite—the MBNF Non-Debtor Entities admitted they have not even reviewed such emails.

## II.    The MBNF Non-Debtor Entities Failed to Establish that the Third Party Communications are Subject to the Attorney Client Privilege

40.    A communication is only privileged if it is made in confidence. *In re Teleglobe Communs. Corp.*, 493 F.3d at 361. "In other words, if **persons** other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach. . . .  Disclosing a communication to a third party unquestionably waives the privilege." *Id.*

### a.    The MBNF Non-**Debtor** Entities Have Not Established that the HSRE Communications are Subject to the Common Interest Doctrine

41.    "The common interest doctrine is an exception to the general rule that the attorney-client privilege is waived following the disclosure of privileged materials to a third party. . . . The doctrine protects communications between clients and attorneys allied in a common legal cause." *AgroFresh Inc. v. Essentiv LLC*, 2019 U.S. Dist. LEXIS 172423, at \*5-6 (D. Del. Oct. 4, 2019). A communication may be subject to the common interest doctrine only if the communication is

shared with an attorney who is representing another person in a matter of common legal interest regarding the shared communication. *In re Teleglobe Communs. Corp.*, 493 F.3d at 364; *see American Bottling*, 2020 Del. Super. LEXIS 225, at *7-8. The party claiming privilege has the burden of demonstrating a common legal interest. *In re Lululemon Athletica Inc. 220 Litig.*, 2015 Del. Ch. LEXIS 127, at *30 (Ch. Apr. 30, 2015).

42. The common interest must "involve primarily legal issues, rather than relate to a common interest in a commercial venture." *In re Lululemon Athletica Inc. 220 Litig.*, 2015 Del. Ch. LEXIS 127, at *30. "In addition, even if parties to an agreement share an interest between signing and closing, that interest must primarily be legal in order to fall within the common interest doctrine." *American Bottling*, 2020 Del. Super. LEXIS 225, at *10. Further, even if one aspect of a shared interest is avoiding litigation, if the primary focus of the interest is plainly commercial, such interest is not primarily legal and will not qualify for protection under the common interest privilege. *Id.* at *13.

43. "As a general rule, application of the common interest privilege is appropriate where it is clear that the parties were collaborating and sharing information in furtherance of a joint *legal* strategy or objective, rather than simply seeking legal advice with regard to a commercial transaction . . . [C]ourts have typically denied the privilege where it appears that the interests involved are primarily commercial in nature, or where the shared legal advice primarily pertains to advancing the common commercial interest" *Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 2011 Del. Super. LEXIS 63, at *12, 14 (Super. Ct. Feb. 2, 2011) (emphasis in original). Further, an "argument that [parties] shared a common legal interest in receiving legal advice on the issues concerning [a] transaction is insufficient." *Id.* at *15. In making a determination, courts

should consider whether the shared interest was designed to further a commercial transaction rather than a common legal strategy.  *Id.* at *16.

44.     Further, that entities are part of a joint venture does not inherently mean communications between the parties are subject to a common legal interest—especially when the communications do not relate to operations of the joint venture.  The same principals regarding the provision of legal advice with respect to a common legal interest and not a common business interest still apply and the burden remains with the party claiming the privilege.

45.     The court in *American Bottling* held that the following general entries in a privilege log were insufficient to assert a basis for a the common interest privilege:

> ABC's privilege log describes the chart and email communications as "conveying legal advice from [JAB's outside counsel]" and "seeking information requested by [JAB' counsel] for purposes of providing legal advice to JAB regarding the terms of agreement with Allied Brands.  These descriptions do not themselves explain the common interest that ABC contends JAB and DPSG shared.

*American Bottling*, 2020 Del. Super. LEXIS 225, at *8.

46.     The court in *American Bottling* conducted an *in camera* review to determine whether the asserted common interest privilege was accurate, ultimately determining that it was not.  The court explained "the Court's *in camera* review of the documents shows that the focus of the communications was the parties' commercial interest, even though the in-house and outside counsel provided input on the drafts."  *Id.* at *14.  The court thus ordered that the disputed documents be produced within three business days.

47.     **Here**, the MBNF Non-Debtor Entities have failed to meet their burden with respect to any asserted common interest privilege with HSRE.  The Revised Privilege Log does not even indicate in which instances the Withheld Documents are subject to an asserted common interest

with HSRE,[5] presumably assuming the Committee should trust that the inclusion of HSRE on an email necessarily means the document is subject to a common interest. In other words, the entries on the Revised Privilege Log that include HSRE and its counsel do not mention an asserted common interest nor how such communication includes the provision of legal advice from an attorney regarding a shared legal interest.

48.    The following is an example of an entry on the Revised Privilege Log containing HSRE individuals (for which there are numerous similar entries):

> Privilege Log Entry Number:  76
>
> From:  "Besser, Alison" abesser@klehr.com
>
> To:  "Sitkoff, Erica S." <erica.sitkoff@dlapiper.com>; "Scolnic, David M. (dms@hangley.com)" <dms@hangley.com>; "Sickle, David B." <david.sickle@dlapiper.com>; "Long, Adam" adam.long@dlapiper.com
>
> CC:  "Gosfield, Gregory" <ggosfield@klehr.com>; Svetlana Attestatova <sattestatova@pldn.com>; Joel Freedman <jfreedman@pldn.com>; Kyle Schmidt <kschmidt@pldn.com>; Michael Borchetta <mborchetta@harrisonst.com>; Mark Burkemper mburkemper@harrisonst.com
>
> Privilege Basis:  Attorney-Client Email
>
> Subject Matter:  Document containing legal advice regarding due diligence of land re-parceling in connection with the Acquisition

49.    This entry (i) does not mention a common interest agreement, despite the inclusion of individuals from HSRE and its counsel, DLA Piper, and (ii) does not explain how the subject matter demonstrates a shared legal interest as between HSRE and the MBNF Non-Debtor Entities.

---

[5]    The Revised Privilege Log does include reference to the common interest agreement with respect to documents withheld in connection with the actual drafting of such common interest agreement and the provision of legal advice regarding the common interest agreement itself. However, the majority of entries on the Revised Privilege Log that include HSRE do not specifically mention a common interest privilege.

50.    The following entry in the Revised Privilege Log (for which there are numerous similar entries) further demonstrates that the MBNF Non-Debtor Entities failed to explain the nature of the common interest privilege as between HSRE and the MBNF Non-Debtor Entities.

> Privilege Log Entry Number:  91
>
> From:  "Gosfield, Gregory" ggosfield@klehr.com
>
> To:  "Sickle, David B." david.sickle@dlapiper.com
>
> CC:  Svetlana Attestatova <sattestatova@pldn.com>; Kyle Schmidt <kschmidt@pldn.com>; Joel Freedman <jfreedman@pldn.com>; "Besser, Alison" <abesser@klehr.com>; "Sitkoff, Erica S." <erica.sitkoff@dlapiper.com>; "Burkemper, Mark (HSRE)" <mburkemper@harrisonst.com>; Michael Borchetta <mborchetta@harrisonst.com>; "David Scolnic (dscolnic@hangley.com)" <dscolnic@hangley.com>; "Goldstein, Richard J." <rjg@hangley.com>; dsokol@harrisonst.com
>
> Privilege Basis:  Attorney-Client Email
>
> Subject Matter:  Document discussing legal advice regarding negotiating the agreements relating to the Acquisition (ASA, TSA, and MSA)

51.    Although the MBNF Non-Debtor Entities and HSRE were both parties to the ASA, TSA and MSA, it is unclear (and to the Committee's knowledge, not accurate), that the parties shared a common legal interest with respect to such agreements.  Rather, the parties, at best, shared a common commercial interest with respect thereto and may have had separate and distinct commercial interests in such documents.

### b. The MBNF Non-Debtor Entities Have Not Met Their Burden of Establishing that the Agents Were Included on Emails to Facilitate the Provision of Legal Services

52.    The disclosure of an otherwise privileged communication to an agent, such as an accountant or tax consultant, waives the privilege unless "that disclosure is made to facilitate the attorney's provision of legal services to the client." *Williams v. Big Picture Loans, LLC*, 303 F.

Supp. 3d 434, 446 (E.D. Va. 2018).   "[A]n agent, such as a financial advisor, may have communications with an attorney that are covered by the attorney-client privilege if the financial advisor's role is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer." *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, 2006 U.S. Dist. LEXIS 20648, at *11 (S.D.N.Y. Apr. 18, 2006).   "The central concern, however, is the nature of the work performed by the accountant.  The communications to the agent must be made for the purpose of the [agent] assisting [the client] in the rendition of legal services rather than merely for the purpose of receiving accounting [or tax] advice." *Williams v. Big Picture Loans, LLC*, 303 F. Supp. 3d 434, 446 (E.D. Va. 2018) (brackets included in original); *see also United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer. If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.").

53.     Here, with respect to emails including Agents, the Revised Privilege Log provides no explanation regarding how such Agents were included on the email in furtherance of an attorney's provision of legal services.   Instead, the Agent Emails appear related to business purposes, as set forth in the below sample Revised Privilege Log entry, which includes Ernst & Young LLP (@ey.com):

> Privilege Log Entry Number:  45
>
> From:  "Besser, Alison" abesser@klehr.com
>
> To:  Brett M Johnson <brett.johnson@ey.com>; Christine L Tutaj <christine.tutaj@ey.com>
>
> CC:  Mark Maurer <mark.maurer@ey.com>; Svetlana Attestatova <sattestatova@pldn.com>; Kyle Schmidt <kschmidt@pldn.com>; "Peanasky, Brett" <bpeanasky@klehr.com>; "Primavera, Carl"

&lt;cprimavera@klehr.com&gt;; Joel Freedman &lt;jfreedman@pldn.com&gt;;
"Gosfield, Gregory" &lt;ggosfield@klehr.com&gt;

<u>Privilege Basis</u>:  Attorney-Client

<u>Subject Matter</u>:  Email Document containing legal advice regarding due
diligence of property value in connection with the Acquisition

54.     As such, the inclusion of Agents on the MBNF Non-Debtor Entities' emails waives
any privileges in connection therewith.

### III.     The MBNF Non-Debtor Entities Failed to Establish the Application of the Work-Product Doctrine

55.     The work-product doctrine "protect[s] the confidentiality of papers prepared by or
on behalf of attorneys in anticipation of litigation, thus enabling attorneys to prepare cases without
fear that their work product will be used against their clients." *United States ex rel. Lord v. NAPA
Mgmt. Servs. Corp.*, 2019 U.S. Dist. LEXIS 194063, at *18-19 (M.D. Pa. Nov. 7, 2019) (internal
citations omitted).  The work-product privilege is codified by Federal Rule of Civil Procedure
26(b)(3), which states that "[o]rdinarily, a party may not discover documents and tangible things
*that are prepared in anticipation of litigation or for trial* by or for another party or its
representative."  Fed. R. Civ. P. 26(b)(3) (emphasis added).  "A party claiming work-product
immunity bears the burden of showing that the materials in question were prepared in the course
of preparation for possible litigation." *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d
124, 138 (3d Cir. 2000) (internal citations omitted).

56.     "The law is clear that documents prepared in the regular course of business rather
than for purpose of the litigation are not eligible for work-product protection, even if the prospect
of litigation exists." *United States ex rel. Lord v. NAPA Mgmt. Servs. Corp.*, 2019 U.S. Dist.
LEXIS 194063, at *9; see also *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d at 138
("Work product prepared in the ordinary course of business is not immune from discovery.").

57.     Courts in the Third Circuit have adopted the following two-part test for determining

whether the documents at issue should be protected under the work-product doctrine:

> The first inquiry is the "reasonable anticipation test," which requires that
> the court determine whether "litigation could reasonably have been
> anticipated." "[T]he relevant inquiry is 'whether in light of the nature of the
> document and the factual situation in the particular case, the document can
> fairly be said to have been prepared or obtained because of the prospect of
> litigation.'" Although the litigation need not be imminent, *Rockwell*, 897
> F.2d at 1266, "there must be an identifiable specific claim of impending
> litigation." (internal citations omitted).
>
> The second inquiry is whether the documents were prepared "primarily for
> the purpose of litigation." Id. (citation omitted). "Documents prepared for
> other purposes that prove useful in subsequent litigation are not attorney
> work-product.' *Id.* (quoting *In re Gabapentin*, 214 F.R.D. at 184.
> "Accordingly, documents created in the ordinary course of business, even
> if useful in subsequent litigation, are not protected by the work-product
> doctrine." *Id.* (citation omitted). "Even where the reasonable anticipation of
> litigation is established, whether the document comes within the purview of
> the work-product [doctrine] still depends primarily on the reason or purpose
> for the documents production." *Id.* (quoting *United States ex rel. Lord v.
> NAPA Mgmt. Servs. Corp.*, No. 3:13-2940, 2019 U.S. Dist. LEXIS 194063,
> at *19-20 (M.D. Pa. Nov. 7, 2019)).

58.     Here, with respect to any asserted work-product protection, the Revised Privilege

Log fails to adequately explain how the documents withheld on the asserted basis of work-product

protection were prepared in anticipation of litigation, as demonstrated in the following entries:

> Privilege Log Entry Number:  103
> Attachment
> Privilege Basis:  Work Product
> Subject Matter:  Document containing legal advice regarding financing of
> the Acquisition
>
> Privilege Log Entry Number:  12620
> Attachment
> Privilege Basis:  Work Product
> Subject Matter:  Document containing legal advice regarding the
> operation, ownership interests, and financial condition of the hospitals
>
> Privilege Log Entry Number:  12627
> Attachment

Privilege Basis:  Work Product
Subject Matter:  Document containing legal advice regarding drafting the
agreements relating to the Acquisition (ASA, TSA, and MSA)

59.     None of the above-referenced entries state that such documents were prepared in anticipation of litigation, nor could they.  These are not topics on which, at the time thereof, the parties reasonably contemplated litigation.

60.     Certain entries in the Revised Privilege Log relating to the asserted work-production protection generically cite the "litigation regarding Tenet" as the basis for the asserted privilege. For example, the following entry is used repeatedly with respect to the word-product protection regarding the Tenet litigation:

Privilege Log Entry Number:  373
Attachment
Privilege Basis:  Work Product
Subject Matter:  Document prepared in anticipation of litigation regarding
litigation regarding Tenet [sic]

61.     While such entries reference a litigation, they provide no information regarding how the document was prepared in anticipation of such litigation—the entries simply mirror the name of the asserted privilege.  Yet again, the descriptions in the Revised Privilege Log ask the Debtors and Committee to simply trust the assertions of the MBNF Non-Debtor Entities without providing them any basis to do so.  Such bare assertions in a privilege log do not meet the burden of the MBNF Non-Debtor Entities with respect to attorney work-product.

**IV.    The Withheld Documents Should be Produced in their Entirety or Produced Subject to the Withheld Document Production Process**

62.     The MBNF Non-Debtor Entities fail to satisfy any of their burdens with respect to the Asserted Privileges.  As such, the entirety of the Withheld Documents should be produced to the Committee and Debtors for review.  Alternatively, rather than provide the MBNF Non-Debtor Entities another opportunity to re-review the Withheld Documents and create yet another privilege

log, the MBNF Non-Debtor Entities should be compelled to produce the Withheld Documents to the Committee and Debtors subject to the Withheld Document Production Process set forth herein. The review of documents under the Withheld Document Production Process may be undertaken by the Court or, alternatively, a discovery master selected by the Court. *See e.g.*, *In re Teleglobe Communs. Corp.,* 493 F.3d at 355-56 ("Recognizing, however, that the Debtors did not trust BCE's representation that the documents marked as privileged reflected advice provided solely to BCE, the Special Master ordered a 50-document audit by his *in camera* review to ensure the accuracy of BCE's representations."). Such process provides a fair and efficient path to determine whether the Asserted Privileges are being properly asserted by the MBNF Non-Debtor Entities under these facts.

## V.    The Remaining Documents Should be Produced in their Entirety to the Debtors

63.    The MBNF Consent Order, as negotiated and agreed to by the MBNF Non-Debtor Entities, specifically provides that "[t]he MBNF Non-Debtor Entities shall produce to the Committee and the Debtors" all non-privileged documents subject to the terms therein. MBNF Consent Order, ¶ 1 (emphasis added). While the MBNF Non-Debtor Entities have produced approximately 40,000 documents to the Committee, they have produced no documents to the Debtors, despite the clear language in the MBNF Consent Order requiring them to do so.

64.    With respect to the Committee Received Documents, such documents should be produced to the Debtors, as the MBNF Consent Order clearly mandates that the Debtors receive the documents provided to the Committee. With respect to the Asserted Debtor Privilege Documents, any asserted joint interest or common interest privilege as between the Debtors and MBNF Non-Debtor Entity has been waived as a result of the Joint Investigation and the issuance of the MBNF 2004 Subpoena on the MBNF Non-Debtor Entities.

65.     For example (and as set forth in the Joint Consent Motion), in *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 434 (Bankr. S.D.N.Y. 1997), the court held that "a joint defense privilege is waived where two parties, previously members to a valid joint defense agreement, subsequently find themselves facing each other as adversaries in litigation." *Id.* at 439. The court further explained that "the Trustee ha[d] not yet officially filed a lawsuit—although he ha[d] obtained court orders pursuant to [Bankruptcy Rule] 2004 allowing him to examine persons with knowledge of" potential claims by the estate. *Id.* at 439. Consequently, the court concluded that the privilege did not apply, reasoning as follows:

> [W]here, as here, **a trustee is conducting an investigation as to the factual underpinning and scope of identifiable claims**, he or she is adverse to the putative defendants. The trustee should not be stymied in uncovering the facts by the existence of a joint defense privilege which would evaporate were he or she only to file a complaint.

*Id.* at 439 (emphasis added); *see also In re Bonham*, 1998 WL 460279, at *4 (Bankr. D. Alaska July 28, 1998) ("when the joint clients are in a dispute about the matters involved in the joint defense, one client cannot prevent the other from waiving the privilege").

66.     This logic applies here. The Debtors and Committee are conducting the joint Investigation as to the factual underpinning and scope of identifiable estate claims against the MBNF Non-Debtor Entities. In furtherance of the Investigation, the Committee served the MBNF 2004 Subpoena on the MBNF Non-Debtor Entities. As such, just as in *Stratton Oakmont*, the Debtors (and the Committee) are adverse to the MBNF Non-Debtor Entities. Because of this adversity, *Stratton Oakmont* authorizes a fiduciary in a Rule 2004 proceeding investigating estate claims to unilaterally waive any common interest or joint defense privileges that may attach to relevant communications. Here, the Debtors have the right to unilaterally waive any common interest or joint representation privileges that the MBNF Non-Debtor Entities could assert. The

Debtors "should not be stymied in uncovering the facts" by the existence of a common interest or joint representation privilege. *Stratton Oakmont*, 213 B.R. at 439.

67.    Moreover, the Debtors would be perfectly within their rights to use these communications in a complaint against the MBNF Non-Debtor Entities. *Id.*  Importantly, as the *Stratton Oakmont* Court observed, the filing of a complaint "would evaporate" any claim of privilege. *Id.*

68.    The Asserted Debtor Privilege Documents are therefore no longer privileged (to the extent any such asserted privileges were ever appropriate, which the Committee and Debtors dispute) and, as non-privileged documents, fall plainly within the scope of the documents to be produced to the Debtors pursuant to the MBNF Consent Order.  As such, the MBNF Non-Debtor Entities should be compelled to produce to the Debtors all the Remaining Documents.

### NO PRIOR REQUEST

69.    Neither the Committee nor the Debtors have made a previous application for the relief requested in this Motion to this or any other court.

### NOTICE

70.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the MBNF Non-Debtor Entities; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Health; (xi) the City of Philadelphia; (xii) counsel to the Ad Hoc Committee of Hahnemann Residents and Fellows; (xiii) counsel to the Commonwealth of Pennsylvania Department of Health; (xiv) the Philadelphia County Medical Society; (xv) the Pennsylvania Medical Society; (xvi) the Residents; and (xvii) any party that has requested notice

pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CERTIFICATION OF COUNSEL**

71.    In accordance with Local Rule 7026-1(d), the undersigned aver that counsel for the Committee and Debtors have made a reasonable attempt to reach an agreement with counsel for the MBNF Non-Debtor Entities regarding the production of documents requested in this Motion without success, as described herein.

## **CONCLUSION**

72.    WHEREFORE the Debtors and Committee respectfully requests that the Court enter an order (a) compelling the MBNF Non-Debtor Entities to (i) produce the Withheld Documents in their entirety to the Debtors and Committee, or (ii) produce the Withheld Documents to the Debtors and Committee subject to the terms of the Withheld Documents Production Process, to be overseen by the Court or a discovery master, with all such costs of a discovery master to be divided evenly between the MBNF Non-Debtor Entities and the Debtors' estates, and (b) compelling the MBNF Non-Debtor Entities to produce to the Debtors the Remaining Documents pursuant to the terms of the Consent Order.

Dated: November 12, 2020
Wilmington, Delaware

**FOX ROTHSCHILD LLP**

/s/ *Seth A. Niederman*
Seth A. Niederman (No. 4588)
919 North Market Street, Suite 300
Wilmington, DE 19899
Telephone: 302-654-7444
Facsimile: 302-6568920
Email: sniederman@foxrothschild.com

- and –

Andrew H. Sherman (*pro hac vice*)
Boris I. Mankovetskiy (*pro hac vice*)
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email: asherman@sillscummis.com
            bmankovetskiy@sillscummis.com

*Counsel for the Official Committee
of Unsecured Creditors*

**SAUL EWING ARNSTEIN & LEHR LLP**

/s/ *Mark Minuti*
Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

- and –

Jeffrey C. Hampton
Adam H. Isenberg
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com

*Counsel for the Debtors and Debtors in
Possession*