## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (MFW) |
| HAHNEMANN UNIVERSITY HOSPITAL, | ) |  |
| *et al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Hearing Date: November 30, 2020 at 10:30 a.m. (EST)** |
|  | ) | **Objection Deadline: November 23, 2020 at 4:00 p.m. (EST)** |

### JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR APPROVAL OF CONSENT ORDER REGARDING COMMITTEE DISCOVERY OF DEBTORS AND FOR RELATED RELIEF REGARDING THE APPLICATION AND WAIVER OF PRIVILEGES

The debtors and debtors in possession (collectively, the "**Debtors**") and the Official

Committee of Unsecured Creditors (the "**Committee**") in the above-captioned chapter 11 cases

(the "**Chapter 11 Cases**") hereby jointly move (the "**Motion**"), pursuant to Sections 105(a) and

1103 of tile 11 of the United States Code (the "**Bankruptcy Code**"), Rule 2004 of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2004-1 of the Local Rules

for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for

approval of the Consent Order Regarding Production of Documents by Debtors to Official

Committee of Unsecured Creditors attached as Exhibit "1" (the "**Consent Order**") to the

proposed order attached which is hereto as **Exhibit "A"** and for certain related relief regarding

the application and waiver of privileges in connection with the Debtors' production of

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 216 N. Broad Street, 4th Floor, Philadelphia, PA 19102.

documents to the Committee pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1.   In support of the relief requested, the Debtors and the Committee respectfully state as follows:

## PRELIMINARY STATEMENT

1.     On August 31, 2017, certain entities controlled by Joel Freedman, and certain entities controlled by Harrison Street Real Estate, LLC, collectively, as purchasers, and Tenet Business Services Corporation and certain of its affiliates, collectively, as sellers, entered into an asset sale agreement for the sale of Hahnemann University Hospital, St. Christopher's Hospital for Children, and certain real property.   In connection therewith, Mr. Freedman created (i) "opco" entities (the "**OpCos**"—currently the Debtors in these chapter 11 cases), which purchased Hahnemann University Hospital, St. Christopher's Hospital for Children and various related practice groups, and (ii) several "propco" entities (the "**PropCos**"), which took ownership of the real estate on which the hospitals are located.   The OpCos and PropCos are both subsidiaries of parent companies also owned by Mr. Freedman (the "**ParentCos**"), including Philadelphia Academic Health Holdings, LLC and American Academic Health System, LLC.   The acquisition closed on January 11, 2018.

2.     Hahnemann University Hospital and St. Christopher's Hospital for Children, along with their applicable medical practice groups and certain other affiliates, filed for bankruptcy less than eighteen months after the acquisition closed. The Debtors' bankruptcy filings resulted in the closure of Hahnemann and its practice groups, the disposition of St. Christopher's, caused thousands of jobs to be lost, left thousands of unpaid creditors with asserted claims exceeding $11 billion, and caused substantial disruption to the medical community in Philadelphia and the surrounding region.   The real estate owned by the PropCos

-2-

(owned by entities controlled by Mr. Freedman), however, remained valuable and the PropCos did not file for chapter 11 protection.

3.  The circumstances surrounding the Debtors' acquisition of the hospitals and segregation of the real estate, and the manner in which the Debtors were operated prior to their bankruptcy filings, raise obvious questions regarding potential estate causes of action. The Debtors and the Committee, working collectively and cooperatively, have devoted significant efforts in exploring potential estate claims against certain affiliated non-debtor entities defined below as the "MBNF Non-Debtor Entities."

4.  Towards these ends, in June 2020, in an effort to reach an equal footing with the Debtors regarding the background information necessary to complete an appropriate analysis, the Committee requested certain documents from the Debtors pursuant to Federal Rule 2004 and Local Rule 2004-1 (the "**Document Request**"). This request led to good faith negotiations and ultimately agreement, as between the Debtors and the Committee, on a consensual discovery process, which resulted in the proposed Consent Order.

5.  Despite agreement between the Debtors and Committee regarding the proposed Consent Order, the MBNF Non-Debtor Entities inserted themselves into the discovery process, arguing that the Debtors were in possession of documents that were subject to the MBNF Non-Debtor Entities' alleged privileges – specifically, the attorney-client privilege, the "common interest" privilege and the "joint client" privilege. There are clear disputes that exist between and among the Debtors and MBNF Non-Debtor Entities, as evidenced in these chapter 11 cases, including with respect to (i) Mr. Freedman's decision that only the OpCos file for chapter 11 protection, (ii) the MBNF Non-Debtor Entities' filing of over ninety (90) proofs of claim for myriad asserted reasons aggregating hundreds of millions of dollars against the Debtors' estates,

and (iii) the ongoing joint investigation of the MBNF Non-Debtor Entities by the Debtors and Committee.   In short, by separating the Debtor hospitals from their real estate for Mr. Freedman's personal benefit, yet ignoring such separateness for the purposes of asserting privileges, Freedman is attempting to "have his cake and eat it too."   This should not be permitted.

6.      In an attempt to reach resolution with the MBNF Non-Debtor Entities, prior to filing the proposed Consent Order with the Court, the Debtors and the Committee shared a form of the order with the MBNF Non-Debtor Entities.   The parties exchanged numerous communications and held several meet and confer calls in an attempt to resolve their disputes regarding the Consent Order and the Debtors' and the Committee's consensual discovery process, as well as related discovery disputes regarding document production from the MBNF Non-Debtor Entities to the Debtors and Committee pursuant to a separate subpoena served on the MBNF Non-Debtor Entities.[2]   Unfortunately, and despite significant efforts by the Debtors and Committee, no agreement has been reached with the MBNF Non-Debtor Entities; the MBNF Non-Debtor Entities continue to inappropriately insert themselves into the Debtors/Committee discovery process and continue to assert that documents in the custody of the Debtors that are responsive to the Committee's Document Requests are the subject to privileges belonging to the MBNF Non-Debtor Entities.   The Debtors and the Committee disagree.

7.      The Debtors and Committee request approval and entry of the Consent Order to facilitate the continued investigation of the MBNF Non-Debtor Entities for the benefit of the Debtors' estates.   The Debtors and Committee also request Court rulings on the underlying

---

[2]      The discovery disputes between the Committee and the MBNF Non-Debtor Entities are addressed in another motion, filed contemporaneously herewith. *See Joint Motion of the Debtors and Official Committee of Unsecured Creditors to Compel Production of Documents From the MBNF Non-Debtor Entities*.   [D.I. 1888].

privilege disputes, to assist the parties on a going-forward basis in complying with the terms of the Consent Order. Specifically, the Debtors and Committee request the following rulings from the Court:

a.    The Debtors shall produce to the Committee non-privileged documents responsive to the Committee's Document Request (as defined above), subject to the Consent Order, without first having to provide the MBNF Non-Debtor Entities with an opportunity to review such documents.

b.    The Debtors may, in their discretion, waive their own privilege and produce to the Committee, pursuant to the Consent Order, any document responsive to the Document Request, but the Debtors' waiver of such privilege shall be document specific, and shall not operate as a waiver of privilege as it relates to any other document relating to the same subject-matter.

c.    To the extent that individuals associated with the MBNF Non-Debtor Entities sent communications over and/or stored on email servers owned and/or controlled by any of the Debtors, and such communications are not subject to a valid common interest or joint client privilege with one or more of the Debtors, any claim of attorney-client privilege over such communications is deemed to have been waived.

d.    The Debtors may, in their discretion, waive their own privilege and produce to the Committee, pursuant to the Consent Order, any documents responsive to the Document Request that are otherwise subject to a joint client or common interest privilege, which joint client or common interest

-5-

privilege has been waived as a result of the Investigation, and that the Debtors' waiver of their own privilege as it relates to joint client or common interest privilege documents shall be document specific, and shall not operate as a waiver of privilege as it relates to any other document relating to the same subject-matter.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     The statutory bases for the relief requested herein are sections 105(a) and 1103 of the Bankruptcy Code, Bankruptcy Rule 2004 and Local Rule 2004-1.

## FACTUAL BACKGROUND

A.     **The Acquisition**

10.     The Debtors and Committee understand that the Court is new to these cases. Accordingly, rather than rely upon a reference to the factual background contained in the first day declaration of the Debtors' Chief Restructuring Officer, Allen Wilen[3], the movants have set forth certain key facts below, for the Court's convenience.

---

[3]     See *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**") [D.I. 2].

-6-

11.     As of the Petition Date, the Debtors' business primarily consisted of operating two hospitals in Philadelphia, Pennsylvania – Hahnemann University Hospital ("**Hahnemann**") and St. Christopher's Hospital for Children ("**St. Christopher's**") as well as owning numerous medical practice groups.

12.     The Debtors had acquired these hospitals, as well as their associated medical practice groups, on January 11, 2018 from Tenet Business Services Corporation ("**Tenet**") and its affiliates pursuant to an Asset Sale Agreement dated August 31, 2017, as amended (the "**Acquisition**").  Tenet had owned and operated these and certain related assets (collectively, the "**Healthcare Business**") since 1998, when it purchased them from Allegheny Health, Education, and Research Foundation.

13.     The Acquisition involved far more than the sale of Hahnemann, St. Christopher's and their practice groups. The real estate underlying the Healthcare Business was segregated from the underlying hospitals and sold to multiple entities in which Joel Freedman had a direct or indirect interests, none of which is a debtor in these proceedings.  Certain of the real estate was transferred to entities owned and/or controlled by Joel Freedman, the Debtor's principal: Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC.  Each of these entities, along with others and along with Joel Freedman, is within the meaning of "MBNF Non-Debtor Entities.[4]  This real estate included (i) the so-called "North and South Towers" (which comprised a portion of Hahnemann

---

[4]      As used herein, the term "**MBNF Non-Debtor Entities**" includes Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC, Philadelphia Academic Health Holdings, LLC, American Academic Health System, LLC, MBNF Investments, LLC, Philadelphia Academic Risk Retention Group, LLC, Paladin Healthcare Capital, LLC and Joel Freedman.

37721339.10 11/12/2020

University Hospital), (ii) St. Christopher's hospital building in North Philadelphia and a nearby warehouse and (iii) a small undeveloped "park" on Broad Street, in Center City, Philadelphia, and certain surface parking lots in Center City, Philadelphia located on Broad Street.

14.     The rest of the real estate underlying the Healthcare Business – medical office buildings on or adjacent to the Hahnemann campus (including the "New College Building", where the Drexel University School of Medicine is located), two medical office buildings connected to (and previously a part of) Hahnemann University Hospital, a parking garage near the Hahnemann campus and a parking garage on the St. Christopher's campus (collectively, the "**Parking Garages**") – was conveyed to entities controlled and primarily owned by subsidiaries of Harrison Street Real Estate, LLC ("**HSRE**").    These HSRE-owned entities (the "**Master Landlords**") then leased each of these properties to St. Christopher's Healthcare, LLC, the Debtor that operated St. Christopher's.    St. Christopher's Healthcare, LLC then subleased the properties to other entities, including in certain instances other Debtors.    Mr. Freedman indirectly holds a minority interest in each of the Master Landlords.

15.     As part of the Acquisition, the Debtors acquired the operating assets of the Healthcare Business, such as equipment, accounts receivable and the like, and assumed (with certain exceptions) substantially all the liabilities of the Healthcare Business.    As a result of the segregation of the assets at closing, Debtor Center City Healthcare, LLC and Debtor St. Christopher's Healthcare, LLC became mere tenants of their respective buildings and leased them from the MBNF Non-Debtor Entities.    In addition, and as previously noted, Debtor St. Christopher's Healthcare, LLC leased the medical office buildings on or adjacent to the Hahnemann campus, as well as the Parking Garages, from the Master Landlords.

37721339.10 11/12/2020

16.     In sum, the assets comprising the Healthcare Business were divided among Debtor "OpCos," which received the operating assets, and non-Debtor "PropCos," which received the real estate.  Some of the PropCos were owned (indirectly) by Mr. Freedman; others were owned by subsidiaries of HSRE.  This ownership structure is detailed on the "Project Liberty Post-Close Legal Entity Organizational Chart" attached hereto as **Exhibit "B"**.

17.     Notably, prior to the Acquisition, all of the assets related to the operations of the Healthcare Business were under the common control of the owner.  By separating the assets among the OpCos and the PropCos, the transaction served to shield the PropCos' valuable assets (the real estate) from the Debtor OpCos' creditors.

18.     Further, certain officers, directors and key personnel of the MBNF Non-Debtor Entities worked in various capacities for the OpCos, PropCos and ParentCos, often without distinguishing in which capacity they were functioning when sending emails or performing operations—including with respect to communicating with creditors.  In addition, certain key personnel of the Debtors were directed to perform services (at Mr. Freedman's request and/or direction) for the MBNF Non-Debtor Entities on limited occasions, without benefit or compensation to the Debtors. Mr. Freedman was the ultimate manager of both the Debtors and MBNF Non-Debtor Entities.  His close advisor, Kyle Schmidt, an employee of Paladin Healthcare Capital, LLC ("**Paladin**"), which is one of the MBNF Non-Debtor Entities, was similarly involved in the operations of all entities.  Svetlana Attestatova, Esquire, Paladin's General Counsel, served in both a business capacity, and as general counsel, to Mr. Freedman individually, the other MBNF Non-Debtor Entities and the Debtors (recusing herself from

37721339.10 11/12/2020

representing the Debtors only after the Petition Date, despite the inherent conflicts that existed immediately as a result of the PropCo/OpCo structure).[5]

19.     Beginning immediately after the closing of the Acquisition, the Debtors encountered significant operational problems, transition issues, liquidity shortfalls and the repeated loss of key personnel, among many other difficulties.

## B.     The Bankruptcy Cases

20.     Since filing for bankruptcy on June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors has operated its business and managed its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

21.     The Debtors commenced their cases primarily because of ongoing, unsustainable operating losses at Hahnemann, and therefore to implement and facilitate an orderly closure of Hahnemann while ensuring patient safety and quality patient care.  The Debtors also sought to implement a sale of St. Christopher's to a going concern buyer for the benefit of creditors and to ensure its continued operations, for the benefit of an at-risk community that relies on St. Christopher's as a safety net hospital for children.

22.     These goals were met.  After obtaining debtor in possession financing, the Debtors safely closed Hahnemann in coordination with local and state authorities, sold St. Christopher's, and obtained tail insurance for themselves and former physicians, for the benefit of patients and the regional medical community.

---

[5]     A significant number of responsive documents which implicate the MBNF Non-Debtor Entities' assertions of privilege are emails in either Paladin's or the Debtors' possession and control that include Ms. Attestatova in an alleged legal capacity on behalf of one or more of the MBNF Non-Debtor Entities, the Debtors or both.

23.     On June 11, 2020, the Court entered an Order establishing a bar date in these cases of August 5, 2020 [D.I. 1666][6].  To date, approximately 2,600 claims have been filed, asserting on a non-consolidated basis a total of $11.2 billion of claims, exclusive of unliquidated claims but including over $7.5 billion of claims asserted by the MBNF Non-Debtor Entities.

24.     Throughout this process, the Debtors' restructuring has been overseen by Allen Wilen of EisnerAmper LLP, as Chief Restructuring Officer.

## C.     Investigations and Discovery Disputes

25.     As previously noted, the circumstances surrounding the Acquisition, and the manner in which the Debtors operated from the Acquisition through the Petition Date, as well as the apparent role of the MBNF Non-Debtor Entities in such operations, raise obvious questions regarding potential estate causes of action. The Debtors and the Committee have been working collectively and cooperatively to investigate such claims (the "**Investigation**").

26.     Towards these ends, and as noted above, the Committee issued its Document Request upon the Debtors pursuant to Federal Rule 2004 and Local Rule 2004-1.  A copy of the Document Request is attached hereto as **Exhibit "C."**

27.     After receiving the Document Request, the Debtors and the Committee worked to narrow certain of the requests, agreed to appropriate search terms to locate responsive electronic documents and set up an electronic discovery reviewing platform for the ultimate production of responsive documents.  Further, the Debtors ran searches of the agreed upon search terms, gathered the numerous documents responsive to the searches and "tagged" responsive documents that included an in-house or outside lawyer representing the Debtors for further analysis.

---

[6]     Although the Debtors could have requested an earlier bar date, they believed it was appropriate to allow creditors additional time to file claims, due to the disruption caused by the Covid-19 pandemic.

28.     At the same time, the Debtors and the Committee negotiated a document production protocol that would preserve confidentiality, protect privileges and otherwise preserve all parties' rights. These discussions resulted in the proposed Consent Order.

29.     Although, as explained below, the Consent Order expressly preserves all privileges and rights of the MBNF Non-Debtor Entities, in light of numerous demands from counsel to the MBNF Non-Debtor Entities, the Debtors and the Committee shared it with the MBNF Non-Debtor Entities prior to filing it with the Court or commencing the Debtors' document production.

30.     Based upon the MBNF Non-Debtor Entities' comments to the Consent Order and subsequent meet and confer communications, it became clear that the parties would not reach agreement on the form of the proposed Consent Order, as the MBNF Non-Debtor Entities have requested unwarranted protections regarding the Debtors' production under the Consent Order and have taken broad views of privilege that are neither appropriate nor supported by law and are in direct contravention of the corporate separateness between the OpCos and PropCos created by Mr. Freedman.  Specifically, the MBNF Non-Debtor Entities have insisted on reviewing the majority of the Debtors' documents responsive to the Document Request prior to production, so that the MBNF Non-Debtor Entities may prevent and delay the production of documents on the basis of the MBNF Non-Debtor Entities' own self-serving non-existent, or waived, privileges, including the attorney-client, joint client and/or common interest privileges.

31.     The Debtors and Committee disagree with the MBNF Non-Debtors Entities' positions.

32.     The proposed Consent Order contemplates a privilege review by the Debtors – which are in possession of the documents at issue – and includes protections and reservations of

-12-

rights for all parties, including the MBNF Non-Debtor Entities.  Because of the pervasive nature of the underlying privilege issues, the Debtors and Committee request that the Court address these issues now, so that the parties can be guided by the Court's rulings.  As further described below, the privilege disputes include the following: (i) the Debtors' attorney-client privilege and their waiver thereof; (ii) the MBNF Non-Debtor Entities' asserted attorney-client privilege, and the waiver of this privilege for communications (primarily emails) that were sent over and stored on email servers owned and/or controlled by the Debtors; and (iii) the scope of the "common interest" and "joint client" privileges asserted by the MBNF Non-Debtor Entities.

**RELIEF REQUESTED**

33.     The Debtors and Committee accordingly request the Court to approve and enter the Consent Order pursuant to Bankruptcy Rule 2004 under Local Rule 2004-1, reject the MBNF Non-Debtor Entities' attempt to insert themselves into the Debtors' and Committee's discovery process, and overrule the MBNF Non-Debtor Entities' unfounded privilege assertions.  As stated above, in addition to approval of the Consent Order, the Debtor and Committee request the following rulings from the Court:

a.     The Debtors shall produce to the Committee non-privileged documents responsive to the Committee's Document Request (as defined above), subject to the Consent Order, without first having to provide the MBNF Non-Debtor Entities with an opportunity to review such documents.

b.     The Debtors may, in their discretion, waive their own privilege and produce to the Committee, pursuant to the Consent Order, any document responsive to the Document Request, but the Debtors' waiver of such privilege shall be document specific, and shall not operate as a waiver of

-13-

privilege as it relates to any other document relating to the same subject-matter.

c.    To the extent that individuals associated with the MBNF Non-Debtor Entities sent communications over and/or stored on email servers owned and/or controlled by any of the Debtors, and such communications are not subject to a valid common interest or joint client privilege with one or more of the Debtors, any claim of attorney-client privilege over such communications is deemed to have been waived.

d.    The Debtors may, in their discretion, waive their own privilege and produce to the Committee, pursuant to the Consent Order, any documents responsive to the Document Request that are otherwise subject to a joint client or common interest privilege, which joint client or common interest privilege has been waived as a result of the Investigation, and that the Debtors' waiver of their own privilege as it relates to joint client or common interest privilege documents shall be document specific, and shall not operate as a waiver of privilege as it relates to any other document relating to the same subject-matter.

## BASIS FOR RELIEF REQUESTED

**A.    Rule 2004 Examinations and the Proposed Consent Order**

34.    Bankruptcy Rule 2004 provides that, on the motion of any party in interest, the Court may order an examination of, and the production of documentary evidence by, any entity concerning any matter relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtors, or to any matter which may affect the administration of the debtor's

-14-

estate . . . ." Fed. R. Bankr. P. 2004(b).  Rule 2004 permits any party with an interest in the bankruptcy estate to conduct an examination of any matter affecting the administration of the estate or the formulation of a plan.  Fed. R. Bankr. P. 2004(b); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 354, n.6 (3d Cir. 2007).  The goals of Rule 2004 examinations include "discovering assets, examining transactions, and determining whether wrongdoing has occurred." *In re Wash Mutual, Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (quoting *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)); *see In re Recoton Corp.*, 307 B.R. 751, 755 (S.D.N.Y. 2004).

35.     The Bankruptcy Code provides that one of the rights and responsibilities of a creditors' committee is to investigate the financial condition of the Debtors and other matters relevant to these cases.  *See*, *e.g.*, 11 U.S.C. § 1103(c)(2).  Accordingly, a committee is properly concerned with matters concerning the administration of these cases.  *See*, *e.g.*, 11 U.S.C. § 1103(c)(1).

36.     The Committee has asserted that it cannot properly exercise its duties as a fiduciary – and that it would be unable to meaningfully review and evaluate any possible claims against the MBNF Non-Debtor Entities – without conducting an investigation of the facts and circumstances surrounding the Acquisition and the conduct of the Debtors' business prior to the Petition Date.

37.     During the pendency of these cases, the Debtors and the Committee have worked in a cooperative manner to maximize value for all constituents herein, and accordingly the Debtors agreed to voluntarily produce responsive documents to the Committee pursuant to Local Rule 2004-1(c), pursuant to the proposed Consent Order.  The Debtors and the Committee believe Court approval of the proposed Consent Order is reasonable, appropriate, in the best

interests of the Debtors' estates, and fully consistent with Bankruptcy Rule 2004 and Local Rule 2004-1.

38.     Unfortunately, and as described above, the MBNF Non-Debtor Entities do not agree.  They seek to insert themselves into the discovery process, and impede the production of broad categories of tens of thousands of documents on the ground of unwarranted, or waived, privileges.

**B.     The Court should adopt the Debtors' and the Committees' proposed process for conducting a privilege review and producing documents to the Committee.**

39.     As an initial matter, the Court should not allow the MBNF Non-Debtor Entities to insert themselves in the Debtors' document production process.  The Debtors, and not the MBNF Non-Debtor Entities, should conduct the applicable privilege review.

40.     The documents at issue are in the possession, custody, and control of the Debtors, and they contain many documents that have nothing to do with the MBNF Non-Debtor Entities. In any litigation, each party bears the responsibility for reviewing and producing its own documents.  Third parties should not be given control over that process, particularly if they are adverse to the producing party.  The Debtors are in the best position to determine whether any of their documents are privileged, including whether they involve any materials subject to the joint-client or common interest privileges.

41.     Although the MBNF Non-Debtor Entities may raise concerns that the Debtors will produce documents that the MBNF Non-Debtor Entities believe are privileged, the proposed Consent Order alleviates those concerns by protecting against the production of privileged documents and allowing for the claw back of inadvertently produced privileged material in several respects.

37721339.10 11/12/2020

42.    *First*, the proposed Consent Order only directs the Debtors to produce to the Committee "all **non-privileged** electronically stored information ('ESI') containing one or more of the Parties' agreed-upon search terms from the Parties' agreed-upon custodians and responsive to any of the Document Requests and (ii) all **non-privileged** documents containing one or more of the Parties' agreed-upon search terms and responsive to any of the Document Requests identified through a reasonable search of central network drives and shared electronic drives currently within the possession, custody or control of the Debtors . . . ." *Consent Order* at ¶ 1 (emphasis added).  Thus, the Debtors are not required to produce any documents that are protected by a legitimate privilege unless the Debtors decide to waive the privilege.  For any document that the Debtors believe is subject to a joint-defense or common interest privilege that involves a counterparty[7], the Consent Order provides that the Debtors may notify the counterparty and the counterparty can then file an objection with the Court; if no timely objection is filed, the Debtors are free to produce the document to the Committee.  *Id.* at ¶ 14.

43.    *Second*, the Consent Order protects against any argument that the order itself somehow causes a waiver of any privilege held by the Debtors or the MBNF Non-Debtor Entities.  It states in pertinent part that "[n]othing contained herein shall be construed as a waiver (i) by the Debtors of their attorney-client privilege, joint-defense privilege, common interest privilege, work product protection and/or any other applicable privilege, protection, right or immunity" and that "[n]othing contained herein shall be construed as a waiver (i) by the MBNF Non-Debtor Entities of their attorney-client privilege, joint-defense privilege, common interest privilege, work product protection and/or any other applicable privilege, protection, right or immunity . . . ." *Id.* at ¶¶ 7-8.

---

[7]    To be clear, the Debtors and Committee are seeking a ruling on the scope of such privileges as part of this Motion.

44.     *Third*, and most significantly, the Consent Order permits the Debtors and the MBNF Non-Debtor Entities to "claw back" any inadvertently produced privileged documents. Specifically, it provides that the inadvertent production of privileged material shall not be construed to be a waiver of either the Debtors' privilege rights or the privilege rights of the MBNF Non-Debtor Entities. *Id.* at ¶¶ 9-10. It further provides that if and to the extent the Court or, if applicable, any mediator or appointed discovery master determines that specified MBNF Non-Debtor Entity Privileged Material should not have been produced ("Inadvertently Produced MBNF Non-Debtor Privileged Material"), the Committee shall: (i) promptly return the specified Inadvertently Produced MBNF Non-Debtor Entity Privileged Material and any copies thereof; (ii) to the extent practicable, retrieve the specified Inadvertently Produced MBNF Non-Debtor Entity Privileged Material and any copies thereof from any third parties to which the Committee has disclosed the specified Inadvertently Produced MBNF Non-Debtor Entity Privileged Material; (iii) destroy any notes, other documents, or ESI the Committee has created that reflect the contents of the specified Inadvertently Produced MBNF Non-Debtor Entity Privileged Material; (iv) instruct any third parties to which the Committee has disclosed the specified Inadvertently Produced MBNF Non-Debtor Entity Privileged Material to destroy any notes, other documents, or ESI that such third parties have created that reflect the contents of the specified Inadvertently Produced MBNF Non-Debtor Entity Privileged Material; and (v) refrain from disclosing the substance of such Inadvertently Produced MBNF Non-Debtor Entity Privileged Material to any third party. The Consent Order also provides that the Debtors and Committee shall retain the right to challenge any assertion that MBNF Non-Debtor Entity Privileged Material has been inadvertently produced to the Committee, and that the Parties and the MBNF Non-Debtor Entities shall meet and confer regarding any assertion by the MBNF

-18-

Non-Debtor Entities that the Committee has inadvertently provided with MBNF Non-Debtor Entity Privileged Material.[8]

45.     Thus, the Consent Order protects any legitimate privilege concerns of the MBNF Non-Debtor Entities.  It should be the Debtors, and not also the MBNF Non-Debtor Entities, that conduct the privilege review of the Debtors' documents prior to production.

**C.     The Court should reject the MBNF Non-Debtor Entities' broad assertions of privilege.**

46.     As noted above, the Debtors and Committee, on one hand, and the MBNF Non-Debtor Entities, on the other, disagree on what should be considered privileged.

47.     The materials at issue include three categories of documents: (1) documents in the possession of the Debtors protected by the Debtors' own privilege; (2) documents in the possession of the Debtors that allegedly are protected by a privilege owned by the MBNF Non-Debtor Entities; and (3) documents in the possession of the Debtors that may be protected by a joint-client privilege or common interest privilege.  As discussed in more detail below, the Debtors should be free to produce documents that fall into the first or second categories.  With respect to the third category, given the current adversity between the Debtors and Committee, on

---

[8]     This follows the provisions of Federal Rule of Civil Procedure 502, which provides that the inadvertent production of privileged materials does not operate as a waiver of the applicable privilege.  Federal courts routinely enter orders providing that privileged documents may be clawed back if inadvertently produced.  *See Rajala v. McGuire Woods, LLP*, 2013 WL 50200, at *4 (D. Kan. Jan. 3, 2013) ("In sum, the Court holds that entering an order with a clawback provision to govern the inadvertent disclosure of attorney-client privileged information and work product materials would serve the purposes behind Federal Rule of Evidence 502.  It is also consistent with the Court's duty under Federal Rule of Civil Procedure 1 to 'secure the just, speedy and inexpensive determination of every action.'  In addition, the court finds that such a provision would protect [a party] from the oppression and undue burden of an exhaustive pre-production privilege review.").  The clawback provisions proposed here would preserve any valid claims of privilege over materials that are produced.  *See United States v. Sensient Colors, Inc.*, No. CIV. 07-1275, 2009 WL 2905474, at *2, n.6 (D.N.J. Sept. 9, 2009) (noting that "a clawback arrangement involves the return of documents without waiver irrespective of the care taken by the disclosing party"); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, No. 09 CIV. 9783 RWS, 2013 WL 2322678, at *12 (S.D.N.Y. May 21, 2013) (holding that "because the Protective Order was expressly issued pursuant to Federal Rule of Evidence 502, the parties intended, as that Rule permits, to displace the waiver text of that Rule with the more liberal clawback provisions of the Protective Order") (internal citations omitted).

one hand, and the MBNF Non-Debtor Entities, on the other, any protections afforded by the joint-client/common-interest privileges no longer apply.

I.    ***Category One:  The Debtors Can Waive Their Own Privilege and Produce Their Own Privileged Documents to the Committee***

48.    The Debtors can waive their own privilege and provide otherwise protected materials to a third party, including the Committee.  In *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986 (1985), the Supreme Court held that the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to communications that took place before the filing of the bankruptcy proceeding. Although *Weintraub* involved a Chapter 7 Trustee, the Supreme Court held that if a corporate debtor remains in possession, and a trustee is not appointed, the debtor's directors have essentially the same fiduciary obligation to creditors and shareholders, requiring them to carry out the same fiduciary duties of a trustee.  *Id*. at 355.

49.    The Debtors accordingly have authority to waive their own privilege and produce otherwise protected materials to the Committee.

II.    ***Category Two:  The MBNF Non-Debtor Entities Waived Any Asserted Privileges Held by the MBNF Non-Debtor Entities by Disclosing The Materials to the Debtors***

50.    The MBNF Non-Debtor Entities contend that some of the documents in the possession of the Debtors – such as, for example, emails exchanged between Mr. Freedman and a lawyer named Svetlana Attestatova[9] relating to non-Debtor matters – are protected by a privilege that belongs to the MBNF Non-Debtor Entities.  This is incorrect.  These emails are in the possession of the Debtors because Mr. Freedman and Ms. Attestatova *used the Debtors'*

---

[9]    Ms. Attestatova is the General Counsel for Paladin Healthcare, a Freedman-controlled non-debtor entity. According to Mr. Freedman, she also sometimes acted as his personal lawyer.  Furthermore, at Mr. Freedman's direction, Ms. Attestatova was designated to provide legal services as General Counsel to some or all of Freedman's related entities, including both the Debtors and the MBNF Non-Debtor Entities, from time to time.

*email system and servers*.  These materials are not privileged because they were not treated as confidential and were disclosed to a third party – the Debtors.  The Debtors accordingly should be permitted to produce these documents to the Committee pursuant to the Consent Order.

**A.      The attorney-client privilege requires communications to remain confidential and not be shared with third parties.**

51.      Critically, the attorney-client privilege only applies when communications between a client and an attorney are and remain confidential.  As explained by the Third Circuit,

> [t]he attorney-client privilege will not apply where the party asserting it cannot demonstrate that:
>
> . . . .
>
> (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) **without the presence of strangers** (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and
>
> (4) the privilege has been (a) claimed **and (b) not waived by the client**.

*SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 472 (E.D. Pa. 2005) (citing *In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir. 1979) (emphases added).

52.      The Third Circuit has emphasized that "[a] communication is only privileged if it is made 'in confidence.'  In other words, if persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach."  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007), as amended (Oct. 12, 2007) (quoting Restatement (Third) of the Law Governing Lawyers § 68).  "Disclosing a communication to a third party unquestionably waives the privilege." *Id*.  Thus, "[t]he general rule is that voluntary disclosure of privileged attorney/client communication constitutes waiver of the privilege as to all other such communications on the same subject."  *In re DiLoreto*, 2002 WL 34573858, at *6 (Bankr. E.D. Pa. May 3, 2002).

-21-

B.    **The MBNF Non-Debtor Entities waived their own privilege by providing their communications to the Debtors, a third party.**

53.    Emails in the possession of the Debtors between Mr. Freedman and Ms. Attestatova (or between Mr. Freedman and other lawyers) that relate to non-Debtor business are not privileged because they were disclosed to the Debtors, a third party.    This was the relationship between the parties as created by Mr. Freedman when he divided the OpCos from the PropCos, thus creating corporate separateness and adversity between the Debtors and MBNF Non-Debtor Entities.    Specifically, all of the communications now in the Debtors' possession, custody, and control and that are subject to the Committee's Document Request *were sent or received on the Debtors' email system and were stored on the Debtors' servers*.    Because the Debtors were a third party to communications that may otherwise allegedly have been protected by Mr. Freedman's privilege (or by the privilege of another MBNF Non-Debtor Entity), no privilege could attach to those communications.    If Mr. Freedman and the MBNF Non-Debtor Entities had wanted to protect those communications from disclosure, they should not have disclosed them.

54.    Furthermore, Mr. Freedman and his lawyers had no reasonable expectation of privacy in their correspondence over the Debtors' email system, because *the Debtors maintained a clear and explicit electronic communications policy that warned that any personal communications may be accessed, viewed, read, or retrieved by the company*.    This policy was established and/or reviewed and understood by Mr. Freedman.    When a company promulgates such a policy, courts regularly hold that any private emails exchanged by users of the company's email system cannot be protected by a privilege belonging to the user.    In *In re Royce Homes, LP*, 449 B.R. 709, 726 (Bankr. S.D. Texas 2011), for instance, the debtor had a clear and explicit electronic communications policy banning the dissemination of confidential communication over

its computer system and warning that "personal communications may be accessed, viewed, read or retrieved by a company Manager or employee." 449 B.R.at 732. Because of this policy, the court held that the debtor's employee had no reasonable expectation of privacy in his e-mails contained on the debtor's e-mail server. Accordingly any communications between the employee and his personal counsel were not confidential and not privileged. *Id*.

55.     Similarly, in *In re Asia Global Crossing, Ltd.*, 322 B.R. 247 (S.D.N.Y. 2005), the bankruptcy trustee of two affiliated corporate debtors subpoenaed a group of company officers requesting that they disclose documents relating to the debtors. The corporate officers sought to withhold personal emails between themselves and their personal attorneys transmitted via the debtor's e-mail server on the basis of attorney-client privilege. *Id.* at 253. The debtors maintained a corporate electronic use policy that warned e-mail users that (i) emails sent or received using the debtors' server were the debtors' property; (ii) the email system was not secure; (iii) third parties had access to the email system; and (iv) no one was authorized to use the e-mail system to transmit confidential or secret information. *Id.* After assessing the legal landscape on this issue, the court developed a four-factor balancing test to determine whether an employee waives the attorney-client privilege as to their personal communications transmitted or stored on the company's email server: (1) does the corporation maintain a policy banning personal or other objectionable use of the system; (2) does the company monitor the use of the employee's computer or email; (3) do third parties have a right of access to the computer or emails; and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies. *Id.* at 257 (citing cases).

56.     Here, as detailed in the *Declaration of John Dinome, Esquire, In Support of Joint Motion of the Debtors and the Official Committee of Unsecured Creditors For Approval of*

*Consent Order Regarding Committee Discovery of Debtors and Related Relief Regarding the Application and Waiver of Privileges*, attached hereto as **Exhibit "D"** (the "**Dinome Declaration**"), the Debtors maintained a "Use of Information and Technology Systems" policy that applied to Mr. Freedman and his lawyers' use of the Debtors' email system and servers. *Dinome Declaration*, at par. 5-8 (Use of Information and Technology Systems policy).[10]   The purpose of the policy was:

> [t]o ensure [the Debtors'] technology and information systems such as voice-mail, e-mail, computers, associated computer networks, software, the Internet and other related technologies are used for business purposes only, to notify employees that they must refrain from personal use of these systems, to advise employees that all information stored in or transmitted through such systems, as well as the equipment itself is company property and to alert all employees of the privacy and confidentiality limitations inherent in the use of such company systems.

*Id.* at 8.  This policy stated that it "governs the use of [the Debtors'] electronic mail (e-mail) and voice mail systems, Internet usage on company systems, computers, computer systems . . . and software resident on any of these systems." *Id*. at 9.  The policy also made clear that users of the Debtors' system have no expectation of privacy:

> Employees should not expect privacy with regard to [the Debtors'] information systems.  Any communication which is private, confidential or personal should not be placed on [the Debtors'] information systems. Employees should expect that any e-mail or voice mail message that is created, sent or received and that any file in the computer network, in local PCS or on disks located on [the Debtors'] property may be read or listened to at any time.  [The Debtors] expressly reserves the right to intercept, read, review, access and disclose all e-mail messages, to intercept, listen to, review, access and disclose all voice mail messages and to intercept, read, review, access and disclose all computer files, including, but not limited to Internet usage and Web sites that you have accessed.  Every time you use or log on to these devices you are consenting to such action.

---

[10]     The Use of Information and Technology Systems policy was originally created by Tenet, the prior owner of the Debtors' assets.  The Debtors continued to maintain and apply the policy after acquiring those assets from Tenet. *Dinome Declaration*, at par. 7.

*Id.* at 10.  The policy further advised users to "note that it is possible that [the Debtors] could choose to or be compelled to produce e-mail and computer files in litigation." *Id. at 11.*  Finally, the policy required that employees "[u]tilize the computer and computer networks solely for company business in accordance with this policy." *Id.*

57.     Because the Debtors banned personal use of their email system, monitored the use of the system, retained the right to access user email, and made users aware of this policy, any communications exchanged between Mr. Freedman and his lawyers relating to non-Debtor business were not confidential and not privileged.  Mr. Freedman and his lawyers (including Ms. Attestatova), aware of the email policy in place, voluntarily disclosed their communications to the Debtors.  Like the policy in *Asia Global*, the Debtors' policy makes clear that sending a message using the Debtors' email system was like placing a copy of that message in the company files.  *Asia Global*, 322 B.R. at 259.  Employees of the Debtors and users of the email system, including Mr. Freedman, had no expectation of privacy in their non-Debtor communications.  Mr. Freedman and his lawyers, including Ms. Attestatova, could have (and presumably often did) conduct non-Debtor business on Paladin servers.  Here, third parties – the Debtors – had access to Mr. Freedman's e-mails because they were on the Debtor's servers.

58.     Thus, to the extent that Mr. Freedman and Ms. Attestatova or other lawyers communicated about non-Debtor business using the Debtors' email system and servers, these emails are not privileged because they were disclosed to the Debtors, a third party.  The Debtors should be able to produce them to the Committee if they are responsive to the Committee's Document Request.

59.     Moreover, and in any event, the Debtors should be able to produce attorney-client communications that are not for the primary purpose of securing a legal opinion or legal services,

or obtaining assistance in a legal proceeding; merely copying an attorney on an email does not qualify the email as an communication protected by the attorney-client privilege, and the privilege does not apply when an attorney is asked for business advice, rather than legal advice. *See In re Pappas*, No. 08-10949, 2009 WL 1574923, at *2 (Bankr. D. Del. June 3, 2009) (emails where counsel was copied were not privileged because the emails did not direct questions to the copied attorneys or discuss legal advice previously rendered); *see also Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, No. CV 08-874-RGA, 2013 WL 4476100, at *1 (D. Del. Aug. 15, 2013) (a communication between two non-lawyers on which a lawyer is copied was not privileged because it was not sent "for the purpose of obtaining or providing legal advice."); *Magten Asset Mgmt. Corp. v. Nw. Corp.*, No. CV 04-1494-JJF, 2007 WL 9811153, at *5 (D. Del. June 14, 2007) (e-mail consisting of factual recitations and business information was not privileged just because counsel was copied).

60.    Separately, the MBNF Non-Debtor Entities have sought to prevent the Debtors from producing *all* communications with *any* counsel, financial advisor or other consultant that also provided the MBNF Non-Debtor Entities with advice.  Thus, if an in-house attorney employed by a Debtor also provided legal advice to one or more of the MBNF Non-Debtor Entities on a discrete issue – ironically, at the direction, and for the benefit, of the applicable MBNF Non-Debtor Entities, but at the Debtors' cost and expense – the MBNF Non-Debtor Entities assert that *all* communications with that in-house attorney are protected from disclosure, irrespective of subject matter.  For example, if the Debtors' in-house attorney provided legal advice regarding a wholly unrelated hospital managed by one of the MBNF Non-Debtor Entities, the MBNF Non-Debtor Entities contend that all communications with that attorney should be protected from production, *even if the communications have nothing to do with the unrelated*

-26-

*hospital*. Aside from the waiver issue addressed above (*i.e.*, the fact that these communications took place over the Debtors' email servers and thus are not confidential), this assertion is absurd. It is even more absurd when applied to financial consultants and other non-legal advisors.

61.     Accordingly, the Court should order that the Debtors are free to produce to the Committee any responsive documents in the Debtors' possession for which the MBNF Non-Debtor Entities have waived any privilege, as well as any responsive documents that are not privileged because they are not communications between an attorney and his or her client made for the purpose of securing legal advice.

III.     **Category Three:  The Joint-Client and Common Interest Privilege**

62.     The third category of documents for which there is a dispute are those that the MBNF Non-Debtor Entities contend are protected by the "joint-client" privilege or the "common interest" privilege.

63.     Respectfully, the MBNF Non-Debtor Entities' contentions do not withstand scrutiny.  To the extent joint-client or common interest privileges are asserted to protect communications between MBNF Non-Debtor Entities and third parties – that is, entities other than Debtors – the fact that the communications are contained on the Debtors' email servers, as explained above, operates as a waiver.  *See Goldstein v. Colborne Acquisition Co., LLC*, 873 F. Supp. 2d 932, 937 (N.D. Ill. 2012) (attorney-client privilege waived where company policy "unequivocally stated that '[a]ll messages  . . . are Colborne records. Colborne reserves the right to access and disclose all messages sent over its electronic mail system, for any purpose,'" "whatever employees wrote became the company's property under the policy," and the parties asserting privilege "owned the company and were its officers."); *United States v. Finazzo*, 682 F. App'x 6, 16 (2d Cir. 2017) (attorney-client privilege waived for emails sent on company system

-27-

where company policy "state[d] that employees 'should have no expectation of privacy when using Company Systems,' and "notif[ied] employees that [Company] may 'monitor[ ], access[ ], delete[ ] or disclose[ ]' all use of Company Systems without permission."); *Bingham v. Baycare Health Sys.*, No. 8:14-CV-73-T-23JSS, 2016 WL 3917513, at *4 (M.D. Fla. July 20, 2016) (finding waiver of attorney-client privilege for emails sent on company system because "the majority of courts have found that an employee has no reasonable expectation of privacy in workplace e-mails when the employer's policy limits personal use or otherwise restricts employees' use of its system and notifies employees of its policy").  Accordingly, the Court should rule that the MBNF Non-Debtor Entities have waived any joint-client or common interest privilege involving communications on the Debtors' email servers between MBNF Non-Debtor Entities and entities other than the Debtors.

64.     To the extent, alternatively, that these privileges are asserted to protect communications between MBNF Non-Debtor Entities and Debtors, the Court should recognize that these two privileges apply only in certain limited circumstances and have been waived because the Debtors and Committee, on one hand, and the MBNF Non-Debtor Entities, on the other hand, are adverse.

     **A.**     **The Joint-Client and Common Interest Privileges are limited, waivable privileges against disclosure of communications.**

65.     *The Joint-Client Privilege*. "[C]ommunications between co-clients and their common attorneys are privileged. The joint privilege prevents those communications from compelled disclosure to persons outside the joint representation." *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 479 (D. Del. 2012), *aff'd sub nom. Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, No. CV 07-127-LPS-MPT, 2014 WL 545440 (D. Del. Feb. 7, 2014).  The joint-client privilege does not extend to all communications between

-28-

those parties and their common attorneys, however.   Instead, "[t]he scope of the co-client relationship is limited by the extent of the legal matter of common interest. In determining whether parties intended to create a joint client relationship, courts look to how the parties interact with the joint attorneys and with one another." *Id*. (internal quotations omitted). "For example, a lawyer might also represent one co-client on other matters separate from the common one." Restatement (Third) of the Law Governing Lawyers § 75 (2000).  Furthermore, even when two clients share the same lawyer and have a common interest, the joint-client privilege may not apply: "clients of the same lawyer who share a common interest are not necessarily co-clients. Whether individuals have jointly consulted a lawyer or have merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362 (3d Cir. 2007), as amended (Oct. 12, 2007).  "Waiving the joint privilege requires the consent of all joint clients.  A client, however, may unilaterally waive the privilege as to its own communications with a joint attorney, as long as those communications concern only the waiving client." *Magnetar*, 886 F. Supp. 2d 466, 479.

66.    *The Common-Interest Privilege*.  "The common interest doctrine allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." *In re Leslie Controls, Inc.*, 2010 WL 3767805 (Bankr. D. Del. Sept. 21, 2010).   "It expands the reach of the attorney-client privilege and work product doctrine by providing that, under certain circumstance, the sharing of privileged communications with third parties does not constitute a waiver of the privilege." *Id*.  "The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to

further that effort, and (3) the privilege was not otherwise waived*." In re Tribune Co.*, 2011 WL 386827, at *4 (Bankr. D. Del. Feb. 3, 2011).

67.     Courts sometimes use the terms "common interest privilege" and "joint defense privilege" interchangeably, and sometimes even to include the joint-client privilege.  *See Blanchard v. EdgeMark Fin. Corp.*, 192 F.R.D. 233, 237 (N.D. Ill. 2000) ("Defendants urge the application of the 'joint-defense' doctrine (now more commonly identified as the 'common-interest' rule)"); *Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 435 (Bankr. S.D.N.Y. 1997) ("[T]he interchangeable use of the phrase 'joint defense privilege' . . . has engendered considerable confusion").

68.     "The party asserting that a privilege exists by virtue of the common interest doctrine bears the burden of establishing each element necessary to demonstrate its applicability.  Such a showing must be based on competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence.  The burden cannot be met by mere conclusory or ipse dixit assertions in unsworn motion papers authored by attorneys." *In re Hypnotic Taxi LLC*, 566 B.R. 305, 314 (Bankr. E.D.N.Y. 2017) (internal quotations omitted).

69.     For the common interest or joint defense privilege to attach, "[t]he interests [of the clients] must be identical, not similar, and be legal, not solely commercial." *Id*. (internal quotations omitted).  "[T]he mere existence of a common business strategy or shared commercial interest, even if combined with the anticipation of or concern about litigation, is not enough to invoke the doctrine." *In re Hypnotic Taxi LLC*, 566 B.R. at 315; *see also In re Tribune Co.*, 2011 WL 386827, at *4 ("When the interests of the parties diverge to some extent the common interest doctrine applies only insofar as their interests are in fact identical.") (internal quotations omitted).

70.    Only communications made in the course of an ongoing common enterprise and intended to further the enterprise are subject to the common interest doctrine.  *See Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) (holding that in order for documents and communications to be subject to the common-interest privilege, there must exist an agreement embodying a cooperative and common enterprise towards an identical legal strategy).

71.    "Mere cooperation among the parties, absent the intent to participate in a joint strategy, does not create the requisite ongoing common enterprise. . . . Rather, some form of joint strategy is necessary to establish the existence of a joint defense agreement, which would then operate to protect evidence under the common interest rule."  *In re Quigley Co., Inc.*, No. 04-15739 SMB, 2009 WL 9034027, at *3 (Bankr. S.D.N.Y. Apr. 24, 2009), supplemented, No. 04-15739 (SMB), 2009 WL 2913450 (Bankr. S.D.N.Y. June 19, 2009) (internal quotations omitted).

72.    In *Blanchard v. EdgeMark Fin. Corp.*, 192 F.R.D. 233, 236 (N.D. Ill. 2000), for instance, a defendant company argued that certain documents were subject to the common interest privilege after it had shared the documents with a separate company it intended to merge with.  The defendant argued that it and its potential merger partner's interests were "inextricably linked" because a threatened lawsuit "might have jeopardized the merger."  *Id*.  The court ruled that the common interest privilege did not apply because the potential merger partner's interest in the suit was "peripheral," and there was "no evidence that it was called upon to assist in the defense of this case or that there was otherwise a joint, concerted effort by [the two companies] to advance a common legal enterprise."  *Id.*

73.    In *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995), a group of executives asserted that documents they had shared among

themselves were protected by the common interest privilege because the executives "were jointly concerned about being drawn into litigation with" one of their company's investors. The court rejected that argument, stating that "the common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation. . . . While each member shared a concern about the threat of shareholder litigation, there is no evidence that they formulated a joint legal strategy to deal with the possibility." *Id*.

74.     Similarly, "an asserted common legal interest was found insufficient to invoke the common interest doctrine between two wholly owned subsidiaries of a common parent, even where one subsidiary had financed the plaintiff's purchase of an aircraft from the other, and the finance and purchase agreements contained cross-defaults." *In re Hypnotic Taxi LLC*, 566 B.R. at 315 (citing *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 472 (S.D.N.Y. 2003)). The court there stated, "[a] concern to ensure the payment of money is commercial in nature and does not qualify for protection under the common interest rule." *Id*.

75.     Although the "privileged status of communications falling within the common interest doctrine cannot be waived without the consent of all of the parties," *United States v. BDO Seidman, LLP*, 492 F.3d 806, 817 (7th Cir. 2007), clients with common interests or joint representation may not assert the attorney-client privilege against each other in subsequent adverse litigation between them, *see In re Ginn-LA St. Lucie Ltd., LLLP,* 439 B.R. 801, 804 (Bankr. S.D. Fla 2010); *see also In re Mirant Corp.*, 326 B.R. 646, 650 (Bankr. N.D. Tex. 2005), *quoting Brennan's Inc. v. Brennan's Rests.*, Inc. 590 F.2d 168, 172 (5th Cir. 1979) ("Assuming the prior representation was joint, defendants are quite correct that neither of the parties to this suit can assert the attorney-client privilege against the other as to matter comprehended by that joint representation."); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103 (5th Cir. 1970), *cert.*

-32-

*denied* 401 U.S. 974 (1971) ("In many situations in which the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy with the other:").

### B.    Privilege Waiver in Bankruptcy

76.    As stated above, the MBNF Non-Debtor Entities may argue that the Debtors are precluded from producing communications between the MBNF Non-Debtor Entities and the Debtors under the joint-client or common interest privileges, but those privileges have been waived here because the two sides are adverse.

77.    In *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 434 (Bankr. S.D.N.Y. 1997), the court considered whether a trustee for a bankrupt brokerage company could waive privilege over documents purportedly subject to the joint defense privilege.  A former principal of the company contended that the trustee could not waive the privilege and that all parties to the joint defense representation had to agree for the waiver to be valid.  *Id*. at 435.  The court acknowledged that "a joint defense privilege is waived where two parties, previously members to a valid joint defense agreement, subsequently find themselves facing each other as adversaries in litigation."  *Id.* at 439.  But the court also noted that in the case before it, "the Trustee ha[d] not yet officially filed a lawsuit—although he ha[d] obtained court orders pursuant to [Bankruptcy Rule] 2004 allowing him to examine persons with knowledge of" potential claims by the estate.  *Id*. at 439.  The court noted, though, that "as a policy matter, bankruptcy trustees ask first and sue later because they have no first-hand knowledge sometimes of the existence and often of the strength of claims they may possess."  *Id*.  The court concluded that the privilege did not apply, reasoning that

> where, as here, **a trustee is conducting an investigation as to the factual underpinning and scope of identifiable claims**, he or she is adverse to

-33-

> the putative defendants. The trustee should not be stymied in uncovering
> the facts by the existence of a joint defense privilege which would
> evaporate were he or she only to file a complaint.

*Id*. at 439 (emphasis added); *see also In re Bonham*, 1998 WL 460279, at *4 (Bankr. D. Alaska July 28, 1998) ("when the joint clients are in a dispute about the matters involved in the joint defense, one client cannot prevent the other from waiving the privilege").

78.     This logic applies here.   The Debtors and Committee are conducting the joint Investigation as to the factual underpinning and scope of identifiable estate claims against the MBNF Non-Debtor Entities.   In furtherance of the Investigation, the Committee has served a subpoena on the MBNF Non-Debtor Entities and the Debtors.   As such, just as in *Stratton Oakmont*, the Debtors (and the Committee) are adverse to the MBNF Non-Debtor Entities. Because of this adversity, *Stratton Oakmont* authorizes a fiduciary in a Rule 2004 proceeding investigating estate claims to unilaterally waive any common interest or joint defense privileges that may attaches to relevant communications.   Here, the Debtors have the right to unilaterally waive any common interest or joint representation privileges that the MBNF Non-Debtor Entities could assert.   The Debtors "should not be stymied in uncovering the facts" by the existence of a common interest or joint representation privilege.  *Stratton Oakmont,* 213 B.R. at 439.

79.     Moreover, Debtors would be perfectly within their rights to use these communications in a complaint against the MBNF Non-Debtor Entities.  *Id.*  Importantly, as the *Stratton Oakmont* Court observed, the filing of a complaint "would evaporate" any claim of privilege. *Id.*

80.     The Debtors' and the Committee's interests are perfectly aligned in pursuing estate claims.   For the same reasons why Debtors should not be stymied in their pursuit of uncovering facts related to possible claims, so too should the Committee be entitled to obtain the same information in support of the Investigation.   There is no logical or principled argument why

-34-

the Debtors should have access to this information to which it is entitled, while at the same time a Committee jointly investigating identical issues should be deprived of the same information until a complaint is filed.

## CONCLUSION

81.     For the reasons set forth above, the Debtors and the Committee respectfully request that the Court approve the Consent Order.  The MBNF Non-Debtor Entities should not be permitted to interpose themselves in the Debtors' document production to the Committee; it should be the Debtors, and not the MBNF Non-Debtor Entities, that conduct any required privilege review.  In addition, the Court should reject the MBNF Non-Debtor Entities' sweeping and unwarranted assertions regarding the attorney-client privilege, the common interest privilege and the joint-client privilege, and hold that the Debtors may produce any documents for which the privilege has been waived as set forth in this Motion.

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1

82.     Consistent with Local Rule 2004-1(b), counsel from Saul Ewing Arnstein & Lehr LLP (counsel to the Debtors) and Sills Cummis & Gross PC (counsel to the Committee) have undertaken good faith efforts to meet and confer with counsel to the MBNF Non-Debtor Entities. Numerous communications have been exchanged, and several conference calls have taken place, with counsel to the MBNF Non-Debtor Entities regarding these disputes, without success.

## NO PRIOR REQUEST

83.     No previous motion for the relief requested herein has been made to this or any other Court.

37721339.10 11/12/2020

## NOTICE

84.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the MBNF Non-Debtor Entities; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Health; (xi) the City of Philadelphia; (xii) counsel to the Ad Hoc Committee of Hahnemann Residents and Fellows; (xiii) counsel to the Commonwealth of Pennsylvania Department of Health; (xiv) the Philadelphia County Medical Society; (xv) the Pennsylvania Medical Society; (xvi) the Residents; and (xvii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

37721339.10 11/12/2020

**WHEREFORE**, for the foregoing reasons, the Debtors respectfully request that the

Court authorize and approve the Consent Order, and/or grant such other and further relief as is

just and proper.

Dated: November 12, 2020
Wilmington, Delaware

**SAUL EWING ARNSTEIN & LEHR LLP**     **FOX ROTHSCHILD LLP**

/s/ *Mark Minuti*                                                  /s/ *Seth A. Niederman*
Mark Minuti (DE Bar No. 2659)                     Seth A. Niederman (No. 4588)
Monique B. DiSabatino (DE Bar No. 6027)     919 North Market Street, Suite 300
1201 N. Market Street, Suite 2300                  Wilmington, DE 19899
P.O. Box 1266                                                  Telephone: 302-654-7444
Wilmington, DE 19899                                     Facsimile: 302-6568920
Telephone: (302) 421-6800                              Email: sniederman@foxrothschild.com
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com                         - and –


- and –                                                               Andrew H. Sherman (*pro hac vice*)
                                                                          Boris I. Mankovetskiy (*pro hac vice*)
Jeffrey C. Hampton                                         **SILLS CUMMIS & GROSS P.C.**
Adam H. Isenberg                                           One Riverfront Plaza
Centre Square West                                          Newark, NJ 07102
1500 Market Street, 38th Floor                        Telephone:  973-643-7000
Philadelphia, PA 19102                                   Facsimile:  973-643-6500
Telephone: (215) 972-7777                              Email: asherman@sillscummis.com
Fax: (215) 972-7725                                                   bmankovetskiy@sillscummis.com
jeffrey.hampton@saul.com
adam.isenberg@saul.com                                 *Counsel for the Official Committee*
                                                                          *of Unsecured Creditors*
*Counsel for the Debtors and Debtors in*
*Possession*