# Exhibit C

**Document Request**

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS' FIRST DOCUMENT REQUEST TO DEBTOR ENTITIES

### DEFINITIONS

1.      As used herein, the term "document" or "documents" means any and all documents, tangible things and/or property, of any kind, as described by Federal Rules of Civil Procedure Rule 34(a), and all writings as defined by Federal Rule of Evidence 1001(1), including originals and non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, and including without limitation communications, electronically stored media (as defined in Paragraph 3), e-mails, inquiries, discussions, conversations, negotiations, agreements, understanding, meetings, conferences, interviews, cards, correspondence, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, cables, or other forms of interpersonal disclosure, whether oral or written, however transmitted, minutes, lists, agendas, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, catalogues, questionnaires, surveys, inter office and intra office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, invoices, worksheets, graphical or aural records or representations of any kind, including, without limitation, photographs, charts, microfiche, microfilm, punch cards, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations of any kind, including, without limitation, tapes, cassettes, discs, and tape recordings, voice mail recordings, wire recordings, hard drives, thumb drives, administrative and computer records, back-up recordings and files, computer printouts, computer magnetic tape, computer discs, computer tapes, computer cards, computer programs, computer software, computer readable media, machine sensible media, any other form of stored information, computer data or other computer-stored information, fields of data, data processing records and

the written information necessary to understand and use such material. The term "document" or "documents" shall also include any written, drawn, recorded, transcribed, filed or graphic matter, however produced or reproduced, and all forms of drafts, notations, workings, alterations, modifications, changes, and amendments of any of the foregoing.

2.      As used herein, the term "communication" and "communications" shall mean any and all forms of contact, including, without limitation, inquiries, discussions, conversations, negotiations, agreements, understandings, meetings, conferences, telephone conversations, interviews, cards, letters, emails, notes, correspondence, emails, text messages and other forms of electronic messaging, or other forms of interpersonal discourse, whether oral or written, however transmitted, including reports, notes, memoranda, lists, agendas, and other reports documenting, memorializing, summarizing or relating to such communication. "Communications" also means Electronically Stored Media (as defined in Paragraph 3).

3.      As used herein, the term "Electronically Stored Media" or "ESM" means all electronically stored communications and/or documents, including e-mail messages and files (including both work and personal e-mail accounts), correspondence, drafts of working documents, contracts, agreements, memoranda, reports, personal notes, administrative and computer records, word processing files, spreadsheets, digital or other photographs, video files, instant messages, text messages, voice mail messages and files, backup voice mail files, backup e-mail files, deleted e-mails, data files, program files, temporary files, system history files, web site information stored in textual, graphical or audio format, web site log files, cache files, cookies, and data stored on hard drives, CDs, floppy disks, personal digital assistants (*e.g.* Apple, Samsung, Android, Blackberry, Palm and other "Smart" or PDA devices), thumb drives, servers, backup tapes, and any other electronic media at both your home and/or office, or any and all

other data compilations from which information can be obtained and translated if necessary. This list is not meant to be exhaustive.

4.      As used herein, the term "between" shall mean sent to, received from, or otherwise shared with.

5.      As used herein, the terms "all" and "any" both shall mean and refer to "any" and "all," in the conjunctive and/or disjunctive.

6.      As used herein, the term "person" means any individual, sole proprietorship, partnership, corporation, limited liability company, trust, governmental authority or other entity of any kind or nature.

7.      As used herein, the phrase "possession, custody or control" means in Your physical possession or as to which You have the right to secure or compel the production of the document (or a copy) from another person, affiliate, corporation, partnership or other entity having physical possession thereof, including stockbrokers, investment advisors, investment counselors, financial planners, accountants, attorneys, or other agents or advisors.

8.      As used herein, the terms "relating to" and "relate to" shall mean, without limitation: bearing a subject matter relationship to, concerning, evidencing, embodying, discussing, consisting of, comprising, containing, comparing, evidencing, constituting, setting forth, showing, disclosing, concerning, describing, explaining, evaluating, analyzing, summarizing, pertaining to, reflecting, referring to, touching upon, or having any logical or factual connection with the subject matter of the documents requested by these requests.

9.      As used herein, the term "date" shall mean the exact day, month and year, if ascertainable, or if not, the best approximation, including the temporal relationship to other events.

10.     As used herein, the term "Acquisition" means the purchase of the businesses of the Hospitals and certain related assets, including, without limitation, real estate assets, by the Purchasers from the Sellers pursuant to the ASA.

11.     As used herein, the term "Acquisition Financing Documents" means any and all transactions and/or credit applications relating to the financing of the Acquisition, including, but not limited to, (i) the MidCap Credit Facility; (ii) the HSRE Loan; (iii) the Tenet Note, and (iv) the approximately $110,500,000 loan from Capital One, National Association to the HSRE-Non Debtor Entities.  Each document referred to individually as an "Acquisition Finance Document."

12.     As used herein, the term "ASA" means the Asset Sale Agreement, dated as of August 31, 2017, by and among Sellers, Purchasers, and Purchasers Representative.

13.     As used herein, the term "Base Purchase Price" means the aggregate consideration paid by Purchasers to Sellers for the purchase of the assets acquired in the Acquisition in the amount of one hundred seventy million dollars ($170,000,000).

14.     As used herein, the term "Broad Street Entities" means Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC.

15.     As used herein, the term "Broad Street Leases" means any and all leases between CCH and/or HUH, on the one hand, and any of the Broad Street Entities, on the other hand.

16.     As used herein, the term "CCH" means Center City Healthcare, LLC.

17.     As used herein, the term "Chancery Court Litigation" means the litigation captioned *Philadelphia Academic Health Holdings, LLC v. Tenet Business Services Corporation* currently pending in the Chancery Court of Delaware, Case No. 2018-0684-KSJM.

18.     As used herein, the term "Committee" means the Official Committee of Unsecured Creditors in the Debtors' chapter 11 cases.

19.     As used herein, the term "Commitment Letter" means the Commitment Letter entered into between Harrison Street Real Estate, LLC and PAHH on August 31, 2017.

20.     As used herein, the term "Conifer" means Conifer Revenue Cycle Solutions, LLC.

21.     As used herein, the term "Debtors" means CCH, PAHS, SCH, Philadelphia Academic Medical Associates, LLC, HPS of PA, L.L.C., SCHC Pediatric Associates, L.L.C, St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., StChris Care at Northeast Pediatrics, L.L.C., TPS of PA, L.L.C., TPS II of PA, L.L.C., TPS III of PA, L.L.C., TPS IV of PA, L.L.C., and TPS V of PA, L.L.C.  Each referred to individually as a "Debtor."

22.     As used herein, the term "DUCOM" means Drexel University d/b/a Drexel University College of Medicine

23.     As used herein, the term "First Amendment" means the First Amendment to the ASA, dated as of January 11, 2018, by and among Sellers, Purchasers, and Purchasers Representative.

24.     As used herein, the term "Front Street Entities" means Front Street Healthcare Properties, LLC, and Front Street Healthcare Properties II, LLC.

25.     As used herein, the term "Front Street Leases" means any and all leases between STC and/or SCH, on the one hand, and the Front Street Entities, on the other hand.

26.     As used herein, the term "Hospitals" means Center City Healthcare, LLC d/b/a Hahnemann University Hospital and St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children.

27.     As used herein, the term "HSRE" means HSRE-PAHH I, LLC.

28.     As used herein, the term "HSRE Loan" means the approximately $51 million loan from HSRE-PAHH I, LLC to PAHH.

29.     As used herein, the term "HSRE Non-Debtor Entities" means HSRE, HSRE-PAHH 1A, LLC, HSREP VI Holding, LLC, PAHH New College MOB LLC, PAHH Bellet MOB, LLC, PAHH Broad Street MOB, LLC, PAHH Feinstein MOB, LLC, PAHH Wood Street Garage, LLC and PAHH Erie Street Garage, LLC.

30.     As used herein, the term "HUH" means Hahnemann University Hospital.

31.     As used herein, the term "Landlords" means the HSRE Non-Debtor Entities.

32.     As used herein, the term "Letter of Intent" means the Letter of Intent entered into between Paladin and Tenet, dated February 15, 2017.

33.     As used herein, the term "Master Leases" means the six leases, each dated as of January 11, 2018, of certain property from the Landlords to SCH.

34.     As used herein, the term "MBNF Non-Debtor Entities" means Joel Freedman, Paladin, MBNF Investments, LLC, American Academic Health System, LLC, PAHH, the Broad Street Entities, the Front Street Entities, Physicians Clinical Network, LLC, Physician Performance Network of Philadelphia, LLC, and PARRG.

35.     As used herein, the term "MidCap" means MidCap Funding IV Trust and MidCap Funding H Trust.

36.     As used herein, the term "MidCap Borrowers" means the Debtors, Physicians Clinical Network, LLC and Physician Performance Network of Philadelphia, L.L.C.

37.     As used herein, the term "MidCap Credit Facility" means the Credit and Security Agreement, dated as of January 11, 2018, as amended on September 20, 2018, between MidCap and the MidCap Borrowers and all addendums, schedules, and/or exhibits thereto.

38.     As used herein, the term "MSA" means the Master Services Agreement, dated as of January 11 2018, between PAHS and Conifer and all addendums, schedules, and/or exhibits thereto.

39.     As used herein, the term "Net Working Capital Adjustment" the net working capital adjustment determined in accordance with section 1.1(a)(ii) of the ASA.

40.     As used herein, the term "Non-Debtor Entities" means the HSRE Non-Debtor Entities and the MBNF Non-Debtor Entities.  Each referred to individually as a "Non-Debtor Entity."

41.     As used herein, the term "PAHH" means Philadelphia Academic Health Holdings, LLC.

42.     As used herein, the "PAHS" means Philadelphia Academic Health System, LLC.

43.     As used herein, the term "Paladin" means Paladin Healthcare Capital, LLC.

44.     As used herein, the term "PARRG" means Philadelphia Academic Risk Retention Group, LLC.

45.     As used herein, the term "Petition Date" means June 30, 2019 or July 1, 2019, as applicable.

46.     As used herein, the term "Purchasers" means SCH, St. Christopher's Physician Associates, LLC,[1] CCH, Center City Physician Associates, LLC,[2] Front Street Healthcare Properties, LLC, Broad Street Healthcare Properties, LLC, PAHH New College MOB, LLC, PAHH Feinstein MOB, LLC, PAHH Broad Street MOB, LLC, PAHH Bellet MOB, LLC, PAHH BOBST MOB, LLC,[3] PAHH Wood Street Garage, LLC, PAHH Erie Street Garage, LLC, Philadelphia Academic Medical Associates, LLC, PAHS.

47.     As used herein, the term "Purchasers Representative" means PAHH.

48.     As used herein, the term "Receivership Action" means the receivership litigation captioned *PAHH Broad Street MOB, LLC, et. al. v. Philadelphia Academic Health Holdings, LLC, et. al.* currently pending in the Court of Common Pleas Philadelphia County, Commerce Program, Case No. 4677, Case ID: 190804677, Control No.: 19084137.

49.     As used herein, the term "SCH" means St. Christopher's Healthcare, LLC.

50.     As used herein, the term "STC" means St. Christopher's Hospital for Children.

51.     As used herein, the term "Sellers" means Tenet Healthsystem Hahnemann, LLC, TPS of PA, LLC, TPS II of PA, LLC, TPS III of PA, LLC, TPS IV of PA, LLC, Tenet Healthsystem St. Christopher's Hospital for Children LLC, TPS V of PA, LLC, SCHC Pediatric Anesthesia Associates, LLC, SCHC Pediatric Associates, LLC, StChris Care at Northeast Pediatrics, LLC, St. Christopher's Pediatric Urgent Care Center, LLC, HPS of PA, LLC.

52.     As used herein, the term "Sellers' Representative" means Tenet.

53.     As used herein, the term "Superior Court Litigation" means the litigation captioned *Philadelphia Academic Heath Holdings, LLC et al v. Tenet Business Services*

---

[1] Now known as Broad Street Healthcare Properties III, LLC
[2] Now known as Broad Street Healthcare Properties II, LLC
[3] Now known as Front Street Healthcare Properties II, LLC

*Corporation* currently pending in the Superior Court of Delaware, Case No. N19C-04-035EMDCCLD.

54.    As used herein, the term "Tenet" means Tenet Business Services Corporation.

55.    As used herein, the term "Tenet IT Platform" means Tenet's information technology platform.

56.    As used herein, the term "Tenet Note" means the 17.5 million loan from Tenet to the Front Street Entities.

57.    As used herein, the term "TSA" means the Transition Services Agreement, dated as of January 11, 2018, between PAHS and Tenet and all addendums, schedules, and/or exhibits thereto.

58.    As used herein, the term "You" or "Your," unless otherwise specified, refers to the Debtors, individually or collectively, as applicable.

**<ins>INSTRUCTIONS</ins>**

1.      The requests contained herein are to be construed liberally, so as to be inclusive rather than exclusive. Particularly, "and" and "or" shall be construed conjunctively rather than disjunctively as necessary, to make the requests inclusive rather than exclusive. As used herein, the singular shall include the plural, and the plural shall include the singular (except as otherwise dictated by the context). As used herein, a masculine, feminine, or neutral pronoun shall not exclude the other genders, all to the end that the interpretation applied results in the more expansive production.

2.      You shall produce all responsive documents and/or communications, in Your possession, custody, or control, meaning in Your physical possession, or as to which You have the right to secure or compel the production of the documents and/or communications (or a copy) from another person, affiliate, corporation, partnership, or other entity having physical possession thereof, including but not limited to partners, joint ventures, proprietorships, business associations, stockbrokers, investment advisors, investment counselors, financial planners, accountants, attorneys, or other agents or advisors.

3.      These requests shall be deemed continuing. Should You subsequently prepare, discover or obtain possession, custody or control of any documents and/or communications responsive to these requests, You shall produce such document and/or communication upon receipt or preparation thereof.

4.      In responding to the requests, furnish all responsive documents and/or communications available at the time of production, including, but not limited to, documents and/or communications in Your possession or the possession of Your attorneys, agents and representatives.

5.      You are requested to produce all documents and/or communications described below in the same order within each file in which they are located prior to production. The file folders, boxes, binders or other containers in which such documents and/or communications are

found are also requested to be produced intact, including the title, labels or other descriptions of each such folder, box, binder or container.

6.      If any documents and/or communications called for by these requests is not produced on the ground that it is privileged or otherwise claimed to be protected against production, You are requested to provide the following information with respect to each such documents and/or communications:

      a.   The date of the documents and/or communications;

      b.   The author(s) and/or the signatory(ies) and the names of those who participated in the formation of the documents and/or communications;

      c.   The type of documents and/or communications it is;

      d.   A description of the document's and/or communication's subject matter and length;

      e.   A list of those persons, entities to whom said documents and/or communications was/were disseminated, together with such persons' and entities' last known addresses;

      f.   The custodian of the documents and/or communications; and

      g.   The nature of the privilege or other rule relied upon in withholding production of each such documents and/or communications.

7.      Notwithstanding the assertion of any objection to the requests, any objection to documents and/or communications containing non-objectionable matter that is relevant and material to a request must be produced.  That portion of the documents and/or communications for which an objection is asserted may be withheld, provided that the information in paragraph 6 above is furnished.

8.      The documents and/or communications requested herein for inspection and copying are to be produced in their entirety and without deletions or excisions, regardless of whether You consider the entire documents and/or communications to be relevant or responsive to the request. If You have redacted any portion of a documents and/or communications, stamp

the word "redacted" on each portion of the documents and/or communications which You have redacted. Redactions should be included on the privilege log described in paragraph 6 above.

9.      If any documents and/or communications within the scope of these requests have been destroyed, You shall describe the circumstances of such destruction, and shall produce documents and/or communications relating to such destruction.

10.     ESI Production Format. Please produce ESI and non-ESI in Relativity load file format, *i.e.*, as text searchable image files (*e.g.*, PDF or TIFF), meeting the following requirements: when a text-searchable image file is produced, please preserve the integrity of the underlying ESI, *i.e.*, the original formatting, the metadata (as noted below) and, where applicable, the revision history.  Please produce information in color, single page TIFF images and associated multi-page text files containing extracted text or OCR with Relativity load files containing all requisite information including relevant metadata.  The only files that should be produced in native format are files not easily converted to image format, such as Excel and Access files.  For all ESI produced, provide the following metadata to the extent such metadata exists:  Custodian, File Path, Email Subject, Conversation Index, From, To, CC, BCC, Date Sent, Time Sent, Date Received, Time Received, Filename, Author, Date Created, Date Modified, MD5 Hash, File Size, File Extension, Control Number Begin, Control Number End, Attachment Range, Attachment Begin, and Attachment End (or the equivalent thereof).

11.     Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition except where such words have a specific custom and usage definition in Your trade or industry, in which case they shall be interpreted in accordance with such usual custom and usage definition of which You are aware.

12.     Nothing contained herein shall in any way limit, prejudice, or waive the Committee's rights (i) to amend or modify this document request or (ii) to make any additional requests in connection therewith, including, but not limited to, requests for any depositions, and all such rights of the Committee are expressly reserved and preserved.

## DOCUMENTS TO BE PRODUCED

1.      Any and all communications and documents relating to the diligence on, negotiation of and/or execution of the ASA.

2.      Any and all communications and documents relating to the diligence on, negotiation of and/or execution of the First Amendment.

3.      Any and all communications and documents relating to the diligence on, negotiation of and/or calculation of the Base Purchase Price, including, without limitation, any and all appraisals and valuation models.

4.      Any and all communications and documents relating to allocation of the Base Purchase Price as between each of the Debtors, the HSRE Non-Debtor Entities, the Front Street Entities and the Broad Street Entities, including without limitation, any and all appraisals and valuation models.

5.      Any and all documents executed and/or exchanged in connection with the "Purchase Price Allocation", referenced in Section 1.11 of the ASA, including, but not limited to, the Initial Allocation (as defined in the ASA), any comments to the Initial Allocation delivered by Sellers to Purchasers, any Final Allocation (as defined in the ASA), and any position by Seller and/or Purchaser regarding the Initial Allocation and/or Final Allocation to be used for U.S. federal income tax reporting purposes, including all attachments and exhibits thereto.

6.      Any and all communications and documents relating to the diligence on, negotiation of and/or calculation of the Net Working Capital Adjustment, including, without limitation, actual performance.

7.      Any and all appraisals of real property and/or personal property that was the subject of the Acquisition.

8.      Any and all communications and/or documents relating to the financing of the Acquisition, including communications and documents relating to the negotiation and execution of the Acquisition Financing Documents and any and all guarantees and security agreements executed in connection therewith.

9.      A list of any events of default and dates associated with such events of default under the MidCap Credit Facility.

10.      Any and all communications and/or documents relating to the determination of which Debtors and Non-Debtor Entities would be borrowers and/or guarantors and/or pledge assets under each Acquisition Financing Document.

11.      Any and all communications and/or documents relating to the determination of the amount for which each of the Debtors or Non-Debtor Entities, as applicable, would be liable under each Acquisition Financing Document.

12.      Any and all communications and/or documents relating to the amount of the MidCap Credit Facility to be used towards the Base Purchase Price.

13.      Any and all communications and/or documents relating to the determination of which assets the MidCap Credit Facility would be used to purchase in the Acquisition.

14.      Any and all communications and/or documents relating to the determination of which assets the HSRE Loan would be used to purchase in the Acquisition.

15.      Any and all communications and/or documents relating to the determination of which assets the Tenet Note would be used to purchase in the Acquisition.

16.      Any and all communications and/or documents relating to the allocation of assets and liabilities – among the Purchasers and/or any other non-Purchaser entities – that were acquired in the Acquisition.

17.     Any and all communications and documents relating to the diligence of the accounts receivable and accounts payables purchased in the Acquisition.

18.     Any and all communications and documents relating to the determination of the amount of rent to be paid by SCH under the Master Leases.

19.     Any and all communications and/or documents relating to the MSA.

20.     Any and all communications and/or documents relating to the TSA.

21.     Any and all communications and/or documents relating to the Chancery Court Litigation.

22.     Any and all communications and/or documents relating to the Superior Court Litigation.

23.     Any and all communications and/or documents relating to any claims or causes of action alleged by the Debtors against Tenet and/or Conifer not already alleged in the Chancery Court Litigation and/or the Superior Court Litigation.

24.     Any and all communications and/or documents relating to any alleged or actual defaults by any party under the MSA, TSA and/or ASA.

25.     Any and all communications and/or documents relating to the Tenet Information Technology ("IT") Platform, including any diligence conducted in connection with the Tenet IT Platform prior to the Acquisition.

26.     Any and all communications and/or documents relating to the Debtors' efforts to transition their IT system from the Tenet IT Platform to any new platform or configuration.

27.     Any and all communications and/or documents relating to the capitalization of each of the Debtors.

28.     Any and all financial statements (whether audited or unaudited), management advisory comments, and/or audit reports for each of the Debtors prepared at any time prior to the Petition Date.

29.     Any and all communications and/or documents relating to HUH's pre-Acquisition financial condition and the diligence thereof, including, without limitation, HUH's revenues, expenses, assets, liabilities, and cash flows, including quality of earnings documents.

30.     Any and all communications and/or documents relating to STC's pre-Acquisition financial condition and the diligence thereof, including, without limitation, STC's revenues, expenses, assets, liabilities, and cash flows, including quality of earnings documents.

31.     Any and all communications and/or documents relating to HUH's financial condition between January 11, 2018 and the Petition Date, including, without limitation, HUH's revenues, expenses, assets, liabilities, and cash flows, including quality of earnings documents.

32.     Any and all communications and/or documents relating to STC's financial condition between January 11, 2018 and the Petition Date, including, without limitation, STC's revenues, expenses, assets, liabilities, and cash flows, including quality of earnings documents.

33.     Any and all communications and/or documents relating to each Debtor's financial condition from the date of inception of each Debtor through the Petition Date, including, without limitation, each Debtor's revenues, expenses, assets, liabilities, and cash flows.

34.     Any and all communications and/or documents that consist of and/or relate to board meeting minutes for each of the Debtors, including any minutes from meetings of committees or subcommittees, from the Debtors' dates of inception through the Petition Date.

35.     Any and all communications and/or documents relating to structural or operational changes the Purchasers and/or Purchasers Representative considered and/or

implemented in connection with HUH, including the estimated and/or actual costs associated with such structural and/or operational changes.

36.　　Any and all communications and/or documents relating to the negotiation and execution of the MidCap Credit Facility, as well as any and all guarantees and security agreements and/or mortgages executed in connection therewith, including the guarantees and security agreements and/or mortgages entered into by the Broad Street Entities and PAHH.

37.　　Any and all communications and/or documents relating to the Debtors' relationship with DUCOM, including, but not limited to, (i) the Debtors' pre-petition discussions with DUCOM regarding a potential transactions in which DUCOM would acquire STC and HUH, (ii) the Master Leases under which SCH is the master tenant and DUCOM is the subtenant, and (iii) any and all agreements between the Debtors and DUCOM, including, without limitation, any amendments and schedules thereto.

38.　　Any and all communications and/or documents relating to the decision by American Academic and/or any other entity to close HUH.

39.　　Any and all communications and/or documents relating to the Acquisition, the financing of the Acquisition, or any transactions related to the Acquisition between the MBNF Non-Debtor Entities and the Debtors.

40.　　Any and all communications and/or documents relating to the determination of which Debtors and/or Non-Debtor Entities would file petitions for relief under chapter 11 of the Bankruptcy Code.

41.　　Any and all communications and/or documents relating to the Debtors' consideration of and/or filing petitions for relief under chapter 11 of the Bankruptcy Code.

42.　　Any and all organizational and/or formation documents for each Debtor.

43.     Any and all communications and/or documents relating to any and all transactions between and/or among the Debtors and Non-Debtor Entities.

44.     Any and all communications and/or documents relating to the diligence, negotiation and calculation of the payments made to the Landlords under the Master Leases, including, but not limited to, the Base Rent, Rent Increase, and Supplementary Rent, as such terms are defined in Maser Leases.

45.     Any and all communications and/or documents relating to the diligence, negotiation and calculation of the payments made to the Front Street Entities under the Front Street Leases, including, but not limited to, rent payments.

46.     Any and all communications and/or documents relating to the diligence, negotiation and calculation of the payments made to the Broad Street Entities under the Broad Street Leases, including, but not limited to, rent payments.

47.     Any and all communications and/or documents relating to any payments other than those covered by the Master Leases, the Broad Street Leases, and the Front Street Leases made by any of the Debtors to the HSRE Non-Debtor Entities, the Front Street Entities and/or the Broad Street Entities.

48.     A copy of the Broad Street Leases and any communications and/or documents related thereto.

49.     A copy of the Front Street Leases and any communications and/or documents related thereto.

50.     A list of any and all payments from any of the Debtors to the HSRE Non-Debtor Entities, including, but not limited to, payments under the Master Leases.

51.　　A list of any and all payments from any of the Debtors to the Front Street Entities, including, but not limited to, payments under the Front Street Leases.

52.　　A list of any and all payments from any of the Debtors to the Broad Street Entities, including, but not limited to, payments under the Broad Street Leases.

53.　　Any and all sublease agreements between CCH and/or HUH, on the one hand, and STC and/or SCH, on the other hand, relating to, among other things, the Master Leases.

54.　　Any and all communications and documents relating to the decision that CCH and/or HUH would sublease from SCH certain of the property that SCH leased from the HSRE Non-Debtor Entities under the Master Leases.

55.　　Any and all communications and documents relating to any sublease arrangements between SCH and any non-Debtor entity, including, but not limited to, Drexel, with respect to property that SCH leased from the HSRE Non-Debtor Entities under the Master Leases.

56.　　Any and all communications and/or documents relating to any alleged or actual defaults by any party under the Master Leases.

57.　　Any and all communications and/or documents relating to any alleged or actual defaults by any party under the Front Street Leases.

58.　　Any and all communications and/or documents relating to any alleged or actual defaults by any party under the Broad Street Leases.

59.　　Any and all business plans prepared in connection with the Acquisition and all communications and/or documents relating thereto.

60.　　Any and all turn-around plans or initiatives prepared post-Acquisition and all communications and/or documents relating thereto.

61.     Any applications (including drafts) submitted to regulatory authorities in connection with the Acquisition, including the transfer of any hospital licenses, and all communications and documents relating thereto.

62.     Any and all communications and/or documents relating to any distributions to holders of equity interests in any of the Debtors.

63.     Any and all communications and/or documents relating to the allocation of costs and expenses for employees working at more than one Debtor and/or Non-Debtor Entity.

64.     Any and all communications and/or documents relating to the Receivership Action.

65.     Any and all communications and/or documents relating to any post-Petition transactions between or among any of the MBNF Non-Debtor Entities and any of the Debtors.

66.     Any and all communications and/or documents relating to the diligence, negotiation and/or execution of any professional liability insurance policies for any of the Debtors' current and/or former employees.

67.     Any and all communications and/or documents relating to the purchase, provision, maintenance and/or termination of professional liability insurance for any of the Debtors' current and/or former employees.

68.     Any and all communications and/or documents regarding any quotes with respect to the purchase and provision of professional liability insurance for any of the Debtors' current and/or former employees, including, but not limited to, any quotes for claims-made insurance policies and/or occurrence-based insurance policies.

69.     Any and all communications and/or documents regarding the scope of coverage in connection with the provision of any professional liability insurance for the Debtors' current

and/or former employees, including, but not limited to, the decision to purchase claims-made insurance policies and/or occurrence-based insurance policies.

70.    Any and all communications and/or documents regarding any professional liability insurance requirements contained in any employment agreements between the Debtors and any current and/or former employees of the Debtors.

71.    Any and all communications and/or documents relating to the retention of any insurance broker with respect to the provision of professional liability insurance for the Debtors' current and/or former employees.

72.    Any and all communications and/or documents between the Debtors and/or the MBNF Non-Debtor Entities (with the exception of PARRG)  on the one hand, and PARRG on the other hand, regarding the provision of professional liability insurance for any of the Debtors' current and/or former employees.

73.    Any and all communications and/or documents relating to any transactions between PARRG and the Debtors, including, but not limited to, any insurance policies provided by PARRG to the Debtors.

74.    Any and all insurance policies reviewed and/or purchased by the Debtors in connection with the provision of professional liability insurance for any of the Debtors' current and/or former employees.

75.    Any and all communications and/or documents between the Debtors on one hand, and the Sellers and/or Sellers' Representative on the other hand, regarding the acquisition, provision, maintenance and/or termination of any professional liability insurance with respect to any employees of the Sellers.

76.    Any management agreements entered into by any of the Debtors.

77.     Any and all communications and/or documents relating to the diligence, negotiation and execution of any management agreements entered into by the Debtors.

78.     Any and all communications and/or documents relating to the diligence, negotiation and calculation of any management fees or other payments under any management agreements entered into by the Debtors, including, but not limited to, with respect to the allocation of any management fees between and among the Debtors.

79.     Any and all communications and/or documents regarding the hiring and/or termination of management of the Debtors, including the CEO and CFO.

80.     Any and all communications and/or documents regarding the hiring and/or termination of consultants with respect to any of the Debtors' operations.

81.     A list of all directors and officers of each of the Debtors, including the years each individual served as director or officer.

82.     Any and all communications and/or documents regarding the "Tenant Improvement Reserve" as defined in the Master Leases.

83.     A list of transfers from the Tenant Improvement Reserve to SCH or STC.

84.     A list of all requested transfers from the Tenant Improvement Reserve to SCH or STC.

85.     A list of all intercompany transfers from STC and/or SCH on the one hand, to HUH and/or CCH, on the other hand, from the inception of the Debtors through the Petition Date.

86.     A list of all intercompany transfers from HUH and/or CCH on the one hand, to STC and/or SCH on the other hand, from the inception of the Debtors through the Petition Date.