**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) Case No. 19-11466 (MFW) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |

# DISCLOSURE STATEMENT RELATING TO
# DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION

**SAUL EWING ARNSTEIN & LEHR LLP**
Mark Minuti (DE No. 2659)
Monique B. DiSabatino (DE No. 6027)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Facsimile: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Facsimile: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com

Dated: December 30, 2020                    *Attorneys for the Debtors and Debtors-in-Possession*

---

*THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "<u>BANKRUPTCY COURT</u>") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 216 N. Broad Street, 4th Floor, Philadelphia, Pennsylvania 19102.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................. 1

II. NOTICE TO HOLDERS OF CLAIMS ............................................................................. 2

III. INSTRUCTIONS FOR VOTING .................................................................................... 2

    A.   Voting Deadline ............................................................................................................. 2
    B.   Further Information/Additional Copies ......................................................................... 3
    C.   Objections to Confirmation/Confirmation Hearing ...................................................... 3

IV. EXPLANATION OF CHAPTER 11 ................................................................................ 3

V. BRIEF OVERVIEW OF THE PLAN ............................................................................... 4

    A.   Summary of Classifications under the Plan, Asserted Claims and Estimated Recoveries and Treatment ............................................................................................. 4

VI. GENERAL INFORMATION .......................................................................................... 7

    A.   Businesses of the Debtors ............................................................................................. 7
    B.   Acquisition from Tenet ................................................................................................. 9
    C.   Segregation of Assets Among "OpCos" and "PropCos" ............................................ 10
    D.   Tenet and Conifer Agreements ................................................................................... 10
    E.   Events Leading to the Commencement of the Chapter 11 Cases ................................ 11
    F.   Summary of Prepetition Indebtedness ........................................................................ 12
    G.   Material Pre-Petition Date Litigation.......................................................................... 13
    H.   Management................................................................................................................. 15

VII. THE CHAPTER 11 CASES .......................................................................................... 15

    A.   Commencement of the Chapter 11 Cases ................................................................... 15
    B.   Continuation of Business after the Petition Date ........................................................ 15
    C.   Representation of the Debtors ..................................................................................... 17
    D.   The Chief Restructuring Officer ................................................................................. 18
    E.   Formation and Representation of the Creditors' Committee....................................... 18
    F.   Schedules and Bar Date .............................................................................................. 18
    G.   Patient Care Ombudsman ............................................................................................ 20
    H.   Temporary Manager Appointment ............................................................................. 21
    I.   Key Employee Incentive Plan ..................................................................................... 21
    J.   Closure of HUH .......................................................................................................... 21
    K.   Resolution of Tenet and Conifer Disputes.................................................................. 22
    L.   Resident Program Sale ................................................................................................ 26
    M.   STC Sale ..................................................................................................................... 28
    N.   HSRE .......................................................................................................................... 30
    O.   Exclusivity .................................................................................................................. 31
    P.   Insurance ..................................................................................................................... 31
    Q.   Matters Relating to Unexpired Leases and Executory Contracts ................................ 33
    R.   Investigations .............................................................................................................. 34

S.   Governance ......................................................................................... 36
T.   Miscellaneous .................................................................................... 38

VIII. THE CHAPTER 11 PLAN ............................................................... 40

A.   Introduction ....................................................................................... 40
B.   Classification of Claims and Interests against the Debtors .............. 40
C.   Treatment of Claims against, and Interests in, the Debtors ............. 41
D.   Means for Implementation of the Plan ............................................. 45
E.   Distribution Provisions ..................................................................... 56
F.   Treatment of Executory Contracts and Unexpired Leases ............... 60
G.   Confirmation and Consummation of the Plan ................................... 62
H.   Allowance and Payment of Certain Administrative Claims ............. 62
I.   Effect of Plan Confirmation ............................................................. 63

IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ......... 67

A.   General .............................................................................................. 68
B.   Importance of Obtaining Professional Tax Assistance .................... 68

X. REQUIREMENTS FOR CONFIRMATION OF THE PLAN .............. 68

A.   Acceptance by Impaired Classes ...................................................... 69
B.   Feasibility .......................................................................................... 71
C.   Best Interests of Creditors; Liquidation under Chapter 7 of the Bankruptcy Code .......... 71

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...... 72

XII. RECOMMENDATION AND CONCLUSION ................................... 73

## I.  INTRODUCTION

All capitalized terms used in this disclosure statement (the "Disclosure Statement") and not otherwise defined herein shall have the meanings ascribed to them in the Debtors' Chapter 11 Plan of Liquidation, dated December 30, 2020, attached hereto as **Exhibit** "A" (the "Plan") (see Article I of the Plan entitled "Defined Terms and Rules of Interpretation").

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. UNLESS STATED OTHERWISE, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF DECEMBER 30, 2020, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW(S) OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THE DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.  YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL, LEGAL AND TAX ADVISORS TO FULLY UNDERSTAND THE PLAN AND DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN.  CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THERE CAN BE

**NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS MAY VARY FROM THOSE SHOWN, POSSIBLY BY MATERIAL AMOUNTS.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, IF ANY, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.**

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF, AND PROVIDES THE HIGHEST AND BEST RECOVERIES TO, HOLDERS OF ALL CLASSES OF CLAIMS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 5:00 P.M., EASTERN TIME, ON [_____], 2021 (THE "VOTING DEADLINE").**

**THE DEBTORS RESERVE THE RIGHT TO FURTHER AMEND THIS DISCLOSURE STATEMENT AND THE ATTACHED PLAN**.

## II.  NOTICE TO HOLDERS OF CLAIMS

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") have prepared and filed the Plan, which provides for, *inter alia*, the consolidation of the Debtors for Plan purposes.  The Plan further provides for the wind down and liquidation of each of the Debtors.

The purpose of this Disclosure Statement is to enable all voting creditors to make an informed decision when exercising their right to accept or reject the Plan.  As such, each Holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Moreover, except for the Debtors and certain of the Debtors' Professionals, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses or the Plan, other than the information contained in this Disclosure Statement, and if given or made, such information may not be relied upon as having been authorized by the Bankruptcy Court.

## III.  INSTRUCTIONS FOR VOTING

### A.    Voting Deadline

The Bankruptcy Court has fixed [_____], 2021 as the "**Voting Record Date**."  Only holders of Claims on the Voting Record Date and certain other parties specified by the Bankruptcy Court are entitled to receive a copy of this Disclosure Statement and related materials.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot (if applicable) and return the same to Omni Agent Solutions (the "**Voting Agent**") in

accordance with the instructions set forth on the Ballot no later than [_____], 2021 (the "**Voting Deadline**").

**BALLOTS SENT BY FACSIMILE TRANSMISSION OR ELECTRONIC MAIL ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan or you are the holder of an Unimpaired Claim.

**B.      Further Information/Additional Copies**

If you have any questions about (1) the procedures for voting your Claim, (2) the packet of materials that you have received or (3) the amount of your Claim for Voting purposes, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, please contact:

<div align="center">

Center City Healthcare, LLC, *et al.,*
c/o Omni Agent Solutions
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367
PAHSballots@omniagnt.com
Phone: 866-662-2281

</div>

**C.      Objections to Confirmation/Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing commencing on [_____], **2021 at [_____] [_].m.,** prevailing Eastern Time, before the Honorable Mary F. Walrath, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Courtroom #4, Wilmington, Delaware 19801.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before [_____], **2021 at [_____] [_].m.,** prevailing Eastern Time.

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO VOTE TO ACCEPT THE PLAN.**

**IV.  EXPLANATION OF CHAPTER 11**

A principal goal of a chapter 11 bankruptcy case is to reorganize or liquidate a debtor's business for the benefit of creditors and parties in interest.  The plan of reorganization or liquidation is the blueprint for accomplishing this goal, as it sets forth the means for satisfying the holders of claims against, and interests in, the debtor's estate.  Upon confirmation of a plan, the plan becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization or liquidation has been filed, the holders of impaired claims against, and interests in, a debtor are permitted to vote to accept or reject the plan. Before soliciting

37812817.7 12/30/2020

acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against the Debtors in order to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

A bankruptcy court may confirm a plan of reorganization or liquidation even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the votes of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not voted to accept the plan. **The Debtors believe the Plan is structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.**

## V.  BRIEF OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against, and Interests in, each of the Debtors in *In re Center City Healthcare, LLC d/b/a Hahnemann University Hospital, et al.*, Case No. 19-11466 (MFW) (Jointly Administered). The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. In summary, the Plan provides for, among other things, the: (i) classification and treatment of unclassified and classified Claims and Interests; (ii) liquidation of the Debtors' Remaining Assets; (iii) wind down of the Debtors' Estates; and (iv) reconciliation of Claims.

**A.     Summary of Classifications under the Plan, Asserted Claims and Estimated Recoveries and Treatment**

The following is a summary, as of December 30, 2020, of Claims asserted and estimated Allowed Claims and recoveries under the Plan, as well as a brief description of the treatment afforded in the Plan on account of Allowed Claims and Interests. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit "A."** The Claim amounts and recoveries set forth in the chart below reflect: (i) the Debtors' estimate of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims; and (ii) the Debtors' mid-range estimates of General Unsecured Claims. The actual Allowed amount of Claims may differ from the amounts set forth in the summary chart below and the range of estimated Allowed General Unsecured Claims is reflected in **Exhibit "B."** The amounts utilized further differ from the outstanding filed Claim amounts. Any creditor that filed a Proof of Claim in an amount, or with a priority, different from that set forth in the applicable Debtor's Schedules is subject to potential dispute regarding the appropriate amount and/or priority of such creditor's Allowed Claim.

Over 2,600 Proofs of Claim (as defined herein) have been filed with the Debtors' Claims Agent. In addition, there are other Claims that were scheduled as non-contingent, liquidated and

4

non-disputed for which no Proof of Claim was filed.  To determine the validity of the Proofs of Claim submitted in the Chapter 11 Cases, the Debtors and their Professionals will continue to review the Proofs of Claim, including any supporting documentation, and compare the Claims asserted with the Debtors' books and records. Based upon this review, the Debtors may file procedural and substantive objections to Claims both before and after the Effective Date.

| Class | Class Name | No. of Claims/Interests Asserted | Amount ($) of Claims Asserted[2] | Estimated Amount of Allowed Claims | Proposed Treatment |
|---|---|---|---|---|---|
| Unclassified | Administrative | [__] | [$    ] | [$    ] | Cash equal to 100% of Allowed Claim to be paid as soon as reasonably practicable after the Effective Date (but in no event later than thirty (30) days after the Effective Date if the Administrative Claim is an Allowed Administrative claim on the Effective Date) or the date upon which such Claim becomes an Allowed Claim, whichever is later. |
| Unclassified | Priority Tax | [__] | [$    ] | [$    ] | Cash equal to 100% of Allowed Claim to be paid as soon as reasonably practicable after the Effective Date (but in no event later than thirty (30) days after the Effective Date if the Priority Tax Claim is an Allowed Priority Tax claim on the Effective Date) or the date upon which such Claim becomes an Allowed Claim, whichever is later. |
| 1 | Priority Non-Tax Claims | [__] | [$    ] | [$    ] | Cash equal to 100% of Allowed Claim to be paid as soon as reasonably practicable after the Effective Date (but in no event later than thirty (30) days after the Effective Date if the Priority Non-Tax Claim is an Allowed Priority Non-Tax claim on the Effective Date) or the date upon which such Claim becomes an Allowed Claim, whichever is later. |
| 2 | Secured Claims | [__] | [$    ] | [$    ] | Cash equal to 100% of Allowed Claim, release of collateral securing Allowed Claim or other agreed-upon treatment, to be paid on, or as soon as is reasonably practicable after, the Effective Date (but in no event later than thirty (30) days after the Effective Date) or the date upon which such Claim becomes an Allowed Claim, whichever is later. |
| 2/MidCap | Secured Lender Claims | [__] | [$    ] | [$    ] | Upon the occurrence of the Effective Date, the Holders of the Secured Lender Claims shall be deemed, without any action of any Person, to forever release and discharge their security interest in and liens on all assets of the Debtors.  On the Effective Date, and as provided in the DIP Credit Agreement and the DIP Orders, the Debtors shall pay, in full in Cash, all reasonable and documented fees and expenses of each DIP Secured Party and their respective professionals incurred prior to the Effective Date (subject to the Debtors' receipt of invoices in customary form in connection therewith and without the requirement to file a fee application with the Bankruptcy Court).  To the extent such invoices are submitted after the Effective Date, such |

---

[2]     In summarizing the number and amount of Claims asserted, the Debtors have attempted to exclude Claims that have been withdrawn or expunged to date, as well as duplicative and amended Claims.

37812817.7 12/30/2020

| Class | Class Name | No. of Claims/Interests Asserted | Amount ($) of Claims Asserted[2] | Estimated Amount of Allowed Claims | Proposed Treatment |
|-------|-----------|----------------------------------|----------------------------------|-------------------------------------|--------------------|
| | | | | | invoices shall be paid no later than three (3) Business Days after the Debtors' receipt of such invoice. |
| 3A | Convenience Claims | [___] | [$   ] | [$   ] | The Holder of each Allowed Class 3A Convenience Class Claim shall receive, from the Convenience Claims Reserve, on or as soon as is practicable after the later of (i) the Effective Date or (ii) the date on which the Holder's Convenience Class Claim is Allowed by Final Order, Cash in the amount of [___]% of the Allowed Amount of such Holder's Convenience Class Claim. |
| 3B | General Unsecured Claims | [___] | [$   ] | [$   ] | Subject to Article III(D)(2)(d)-(f):<br><br>(a) On the Initial Distribution Date, if a Class 3B General Unsecured Claim or Class 3C HSRE Claim is Allowed at least thirty (30) days prior to the Initial Distribution Date, the Holder of such Allowed Claim shall receive, from the Debtors' Distribution Account, Cash equal to (i) the amount of its Allowed Class 3B General Unsecured Claim or Class 3C HSRE Claim, as applicable, multiplied by (ii) the Initial Distribution Percentage.<br><br>(b) On each Subsequent Distribution Date, if a Class 3B General Unsecured Claim or Class 3C HSRE Claim is Allowed at least thirty (30) days prior to such Subsequent Distribution Date, the Holder of such Allowed Claim shall receive, from the Debtors' Distribution Account (i) a Catch-Up Distribution, if applicable, and (ii) Cash equal to (a) the amount of its Allowed Class 3B General Unsecured Claim or Allowed Class 3C HSRE Claim, as applicable, multiplied by (b) the then-current Interim Distribution Percentage.<br><br>(c) On the Final Distribution Date, each Holder of an Allowed Class 3B General Unsecured Claim and Allowed Class 3C HSRE Claim shall receive, from the Debtors' Distribution Account (i) a Catch-Up Distribution, if applicable, and (ii) Cash equal to (a) the amount of its Allowed Class 3B General Unsecured Claim or Allowed Class 3C HSRE Claim, as applicable, multiplied by (b) the Final Distribution Percentage. |
| 3C | HSRE Claims | [___] | [$   ] | [$   ] | Unless subordinated, Class 3C HSRE Claims shall receive the same treatment under the Plan as Class 3B General Unsecured Claims. |

37812817.7 12/30/2020

| Class | Class Name | No. of Claims/Interests Asserted | Amount ($) of Claims Asserted[2] | Estimated Amount of Allowed Claims | Proposed Treatment |
|-------|-----------|----------------------------------|----------------------------------|------------------------------------|--------------------|
| 3D | Insider Claims | [__] | [$    ] | [$    ] | Class 3D Insider Claims are subordinated to Class 3A Convenience Claims, Class 3B General Unsecured Claims and Class 3C HSRE Claims.  Upon the prior payment of 100% of each Allowed Class 3B General Unsecured Claim and each Allowed Class 3C HSRE Claim in accordance with the Plan, the Holders of Allowed Insider Claims shall receive a pro rata distribution of all Cash Available for Distribution that has not been distributed to Holders of Allowed Class 3B General Unsecured Claims or Holders of Allowed Class 3C HSRE Claims; provided, however, that no Holder of an Allowed Class 3D Insider Claim shall be entitled to receive, on account of such Allowed Class 3D Insider Claim, Cash under the Plan in excess of 100% of such Holder's Allowed Class 3D Insider Claim. |
| 4 | Interests | [__] | N/A | N/A | No recovery.  Interests shall be cancelled upon the Effective Date. |

# VI.  GENERAL INFORMATION

The Debtors consist of Center City Healthcare, LLC, Philadelphia Academic Health System, LLC, St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC, HPS of PA, L.L.C., SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., StChris Care at Northeast Pediatrics, L.L.C., TPS of PA, L.L.C., TPS II of PA, L.L.C., TPS III of PA, L.L.C., TPS IV of PA, L.L.C., and TPS V of PA, L.L.C.

## A.    Businesses of the Debtors

### (a)    PAHS

PAHS is a Delaware limited liability company that is the direct or indirect parent company of: (i) Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**"), a Delaware limited liability company that operated Hahnemann University Hospital ("**HUH**"), (ii) St. Christopher's Healthcare, LLC d/b/a St. Christopher's Hospital for Children ("**SCH**"), a Delaware limited liability company that operated St. Christopher's Hospital for Children ("**STC**," and together with HUH, the "**Hospitals**"), and (iii) the Hospitals' affiliated physician groups (the "**Physician Groups**").  An organizational chart describing the Debtors' ownership structure is attached hereto as **Exhibit "C".**

### (b)    CCH (Hahnemann)

As of the Petition Date, CCH operated HUH, which was a 496-bed tertiary care academic medical center in Center City Philadelphia.  As of the Petition Date, HUH had a long history of providing healthcare services, dating back to 1848.  It was fully accredited by the Joint Commission and historically provided a range of specialty services, including Level I adult trauma, kidney and liver transplantation, OB/GYN services, medical and radiation oncology, minimally

37812817.7 12/30/2020

invasive robotic surgery, neonatal intensive care unit services, bariatric surgery, bloodless medicine and surgery and renal dialysis, among other inpatient and outpatient services. CCH leased the real property on which HUH was located from Broad Street Healthcare Properties, LLC, a non-Debtor affiliate, and subleased certain other properties from SHC.

As of the Petition Date, HUH also was the primary teaching hospital for Drexel University d/b/a Drexel University College of Medicine ("**DUCOM**"). HUH's Graduate Medical Education Residency Program was one of the largest in the United States, comprising approximately 573 residents and more than 100 fellows practicing in a wide range of medical specialties. HUH also operated an RN residency program consisting of didactic, clinical skills, and team-building/delegation activities and a pharmacy residency program that prepared pharmacists for positions in clinical practice, academia and advanced practice. Each year, in addition to training the residents and fellows, HUH and the DUCOM faculty physicians trained approximately 500 rotating medical students and 800 rotating nursing students.

As of the Petition Date, CCH had approximately 65 employed physicians and 2,375 non-physician employees. Approximately 1,000 additional people worked on site but were employed by third parties. Approximately 1,131 of CCH's employees were unionized. Specifically, CCH was party to collective bargaining agreements ("**CBAs**") with the following unions: (i) District 1199C, National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO (Technical Unit); (ii) District 1199C, National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO (Service and Maintenance Unit); and (iii) the Pennsylvania Association of Staff Nurses and Allied Professionals ("**PASNAP**").

    **(c)**    <u>SCH</u>

As of the Petition Date, SCH operated STC, a 188-bed free-standing pediatric hospital in North Philadelphia. STC has been a leader in pediatric care since 1875, has provided exceptional care to children throughout the Greater Philadelphia area and around the world, and has been widely regarded as one of the best children's hospitals in the country. As of the Petition Date, SCH leased the facilities from which it operated STC from Front Street Healthcare Properties, LLC and Front Street Healthcare Properties II, LLC (together, the "**Front Street Entities**"), which are non-Debtor affiliates. SCH also was the lessee under master leases with a series of entities (the "**Master Leases**") owned by HSRE-PAHH I, LLC, a non-debtor affiliate. SCH sub-leased a majority of these properties to DUCOM or to DUCOM affiliates, or to HUH or other tenants.

As of the Petition Date, STC's medical staff included pediatric experts on staff, who supported a wide array of pediatric specialties such as cardiology, endocrinology, gastroenterology, nephrology, neurology, pulmonary, oncology, and rheumatology. STC also provided pediatric surgical services such as cardiothoracic surgery, general surgery, neurosurgery, orthopedic surgery, and plastic and reconstructive surgery. STC operated a Level I Pediatric Trauma Center, a Level III Neonatal Intensive Care Unit and a certified pediatric burn center.

As of the Petition Date, STC was an academic medical center, supporting academic programs in partnership with DUCOM, Lewis Katz School of Medicine of Temple University and Albert Einstein Healthcare Network. STC's pediatric residency program included approximately 125 residents per year and is consistently top ranked. In addition, STC maintained pediatric

8

dentistry and child neurology residency programs, a medical laboratory science program, a radiologic technology program, and various fellowship programs and clinical rotations.

As of the Petition Date, SCH had approximately 237 physician employees and 1,272 non-physician employees.  Approximately 730 of SCH's employees were unionized.  SCH was a party to CBAs with the following unions: (i) the International Brotherhood of Electrical Workers, Local 98; (ii) PASNAP; and (iii) the National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and District 1199C.

**(d)**   Other Debtors/Practice Groups**.**

The remaining Debtors are Philadelphia Academic Medical Associates, LLC ("**PAMA**"), a holding company that directly or indirectly owns the following entities, which as of the Petition Date, were practice groups (the "**Practice Groups**") associated with either STC or HUH; (i) HPS of PA, L.L.C., which provided three physicians to Philadelphia Nursing Home to provide care for residents at the nursing home; (ii) SCHC Pediatric Associates, L.L.C., which served as the employer for nearly all of the physicians working at STC (approximately 180 physician employees); (iii) St. Christopher's Pediatric Urgent Care Center, L.L.C., which operated an urgent care facility in Abington, PA; (iv) SCHC Pediatric Anesthesia Associates, L.L.C., which provided anesthesia services at STC; (v) StChris Care at Northeast Pediatrics, L.L.C., which operated a Physician Group specializing in pediatrics and orthopedics in Northeast Philadelphia and Langhorne, PA, respectively; (vi) TPS of PA, L.L.C., which is a holding company that was historically used as a contract party for certain leases; (vii) TPS II of PA, L.L.C., which employed approximately 20 anesthesiologists working at HUH; (viii) TPS III of PA, L.L.C., which operated a Physician Group specializing in family and internal medicine and primary care, but ceased operations in April 2019; (ix) TPS IV of PA, L.L.C., which is a Physician Group that employed approximately 40 physicians at HUH in a variety of specialties, including cardiology, CT surgery, orthopedic surgery, radiology and trauma surgery; and (x) TPS V of PA, L.L.C., which operated STC-affiliated facilities in various locations, including Abington, PA, Yardley, PA and Washington Township, NJ, that offered a variety of specialties.

**B.**   **Acquisition from Tenet**

PAHS, CCH, SCH, PAMA acquired their assets, including the Practice Groups, approximately 18 months before the Petition Date.  On January 11, 2018, Philadelphia Academic Health Holdings, LLC ("**PAHH**") – the holding company that is the sole member of PAHS – as purchaser's representative, along with PAHS and other purchasers (the "**Purchasers**"), consummated the purchase of the businesses of the Hospitals and certain related assets (including but not limited to certain real estate), including the Physician Groups (together, the "**Healthcare Businesses**"), from Tenet Business Services Corporation ("**Tenet**") and its affiliates pursuant to an Asset Sale Agreement dated August 31, 2017, as amended (the "**Acquisition**").  Tenet had owned and operated the Healthcare Businesses since 1998.  Upon information and belief, Tenet had marketed the Healthcare Businesses for sale since 2016.

The Acquisition was financed through a variety of sources, including: (i) approximately $49 million from a credit facility with MidCap (as defined below); (ii) an approximately $51 million loan from an affiliate of Harrison Street Real Estate; (iii) approximately $101 million from

9

Capital One, N.A. and (iv) a $17.5 million loan from Tenet to the Front Street Entities, which was secured by a mortgage on the real property underlying STC and guaranteed by PAHH.

## C.    Segregation of Assets Among "OpCos" and "PropCos"

In connection with their purchase of the Healthcare Businesses, the Purchasers allocated the acquired assets among themselves. Several of the Purchasers were operating entities (generally, the Debtors herein) and other entities (non-Debtors) generally owning the real estate upon which the Hospital Businesses were, as of the date of the Acquisition, non-operating entities. The Acquisition also included the purchase (by certain Debtors) of certain accounts receivables and payables.

The non-Debtors that acquired the Hospital Businesses' real estate fall into one of two categories: (i) non-Debtors owned and/or controlled by PAHH (the "**PropCos**"); and (ii) non-Debtors primarily owned and/or controlled by Harrison Street Real Estate, LLC ("**HSRE**"), a real estate investment trust.

The real estate that was conveyed to the PropCos included (i) the so-called "North and South Towers" (which comprised HUH), (ii) STC's hospital building in North Philadelphia and certain related properties, including a nearby warehouse and (iii) a small undeveloped "park" on Broad Street, in Center City, Philadelphia, and certain surface parking lots in Center City, Philadelphia, located on Broad Street.

The real estate that was conveyed to non-Debtors primarily owned and/or controlled by HSRE included the medical office buildings on or adjacent to the HUH campus (including the "New College Building", where DUCOM is located) and several medical office buildings (known as the "Feinstein" building, the "Bobst" building and the "Bellet" building) connected or adjacent to HUH, as well as a parking garage near the HUH campus and a parking garage on the STC campus.

The Master Landlords (as defined herein), non-Debtors primarily owned and/or controlled by HSRE, then leased each of their properties to SCH. SCH then subleased certain of the properties to other entities, including DUCOM and CCH. As of the Petition Date, Joel Freedman ("**Mr. Freedman**") indirectly held a minority interest in each of the Master Landlords.

## D.    Tenet and Conifer Agreements

In connection with the Acquisition, PAHS and Tenet entered into a Transition Services Agreement ("**TSA**") pursuant to which Tenet agreed to provide certain services to PAHS for a two-year period to assist in the orderly transition of the Healthcare Businesses. These services included Information Services (as defined in the TSA) such as software and IT support, and the use of Tenet's IT platform (the "**Tenet IT Platform**"), in exchange for which Tenet was entitled to certain fees. PAHS also entered into a Master Services Agreement (the "**MSA**") with Conifer Revenue Cycle Solutions, LLC ("**Conifer**"), an affiliate of Tenet, pursuant to which Conifer agreed to provide revenue cycle services in exchange for payment.

37812817.7 12/30/2020

**E.      Events Leading to the Commencement of the Chapter 11 Cases**

Immediately upon or shortly after the Acquisition, the Debtors' financial performance was adversely affected by a number of disputes and operational challenges.

**Tenet and Conifer Issues**.  Disputes arose between the Debtors and Tenet with regard to, among other things, the "Net Working Capital Adjustment" provided for under the parties' Asset Sale Agreement.  In addition, disputes arose regarding the payment of certain pre-Acquisition accounts payable, and regarding the financial condition of the Debtors' businesses.  Further disputes arose between the parties regarding services provided by Tenet under the TSA and regarding the Conifer MSA.

Beginning in August 2018, Tenet and Conifer sent multiple notices to the Debtors of their intent to terminate services to the Debtors under the TSA and MSA absent cure of the Debtors' alleged defaults thereunder.  As of the Petition Date, Tenet and Conifer asserted claims against PAHS in an amount in excess of $41 million.  The Debtors responded to each of the notices sent by Tenet and Conifer with their own asserted notices of material breach, disputed invoices and termination of services, and refrained from paying Tenet or Conifer amounts claimed to be due under the TSA, the MSA, and the related documents.

As of the Petition Date, the Debtors, Tenet and Conifer were operating under a short-term interim agreement by which the Debtors made payments of approximately $125,000 per week in exchange for Tenet and Conifer's agreement to defer further efforts to terminate services provided under the TSA, the MSA and the related statement of work.  The Debtors entered into this interim agreement because an abrupt termination of Tenet's and Conifer's services would severely disrupt the Debtors' businesses and the Debtors' ability to properly serve their patients.

**DUCOM Issues**.  Prior to the Petition Date, a number of operational and other disputes arose between the Debtors and DUCOM.  As a result of these disputes, and due to the Debtors' ongoing liquidity shortages, the Debtors initially included reservations of rights with their payments to DUCOM and later withheld payments.  Among other claims, the Debtors asserted that they were prevented by DUCOM from implementing numerous initiatives designed to improve the clinical and financial performance of HUH.

**Other Issues**.  A host of other issues contributed to the Debtors' financial distress, including: (a) delays in payment of supplemental payments from the Commonwealth of Pennsylvania, as well as a reduction of such payments of approximately $17 million per year; (b) a significant reduction in patient volumes in 2018; (c) increased losses by certain Practice Groups; (d) material declines in outpatient and surgical procedures; and (e) reductions in average daily census; and (f) significant capital improvements required to HUH's facilities.

In addition to, and in many respects underlying and exacerbating, these issues was a significant shortage of liquidity and working capital, from and after the date of the Acquisition, as well as management instability, failure to establish appropriate policies and procedures for the operations of HUH and STC, unfamiliarity with the Philadelphia healthcare market and, in the Debtors' opinion, gross negligence.

These circumstances resulted in material and unsustainable losses.  In April 2019, the Debtors engaged EisnerAmper LLP to provide restructuring, operational and revenue-cycle assistance.  The Debtors also engaged in discussions with DUCOM regarding a potential transaction in which DUCOM would HUH and its hospital towers for nominal cash consideration, but assume certain significant debt and other obligations.  These discussions were unsuccessful.

In early June 2019, the Debtors retained SSG Advisors, LLC ("**SSG**") to assist in pursuing a financing, sale or restructuring transaction.  Immediately upon its retention, SSG developed marketing materials, including a "teaser" and a confidential information memorandum.  SSG also established an electronic data room containing key information for parties to conduct in depth due diligence on HUH.  Despite sending the teaser to multiple of potentially interested strategic parties, no party expressed serious interest in acquiring HUH's assets as a going concern.

Under these circumstances, and given the severity of the Debtors' financial challenges, the Debtors, in consultation with their professionals, determined that it was necessary and appropriate to shut down HUH.  The Debtors thus filed the Chapter 11 Cases with the goal of pursuing an orderly wind down of HUH consistent with patient safety.  The Debtors also sought to sell STC to a buyer that would operate the hospital for the benefit of patients, the community and creditors.

## F.     **Summary of Prepetition Indebtedness**

### <u>MidCap Credit Facility</u>

Each of the Debtors, as well as certain non-debtor entities, was as of the Petition Date a party to a Credit and Security Agreement dated January 11, 2018 (as amended on September 20, 2018, the "**Credit Agreement**"), with MidCap Funding IV Trust and MidCap Funding H Trust (together, "**MidCap**" or the "**Lender**").  The Credit Agreement provided for credit facilities consisting of: (i) a revolving loan facility of up to $100 million (the "**Revolver**"); and (ii) a term loan facility of $20 million (the "**Term Loan**" and, with the Revolver, collectively, the "**Credit Facility**").  As of the Petition Date, the principal amounts outstanding under the Revolver and Term Loan were approximately $38.6 million and $20 million, respectively.

The Credit Facility was secured by a security interest in substantially all assets of the Borrowers (as defined in the Credit Agreement), including accounts receivable.  Availability under the Credit Facility was based on various formulas that took into account of host of factors and applied various reserves and/or blocks.  Non-Debtors Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (together, the "**Broad Street Entities**") and PAHH guaranteed the obligations of the Borrowers under the Credit Facility, which obligations were subsequently also secured by mortgages on the real estate underlying HUH.

On or about May 8, 2019, MidCap sent the Debtors a Notice of Default and Reservation of Rights under the Credit Facility, and imposed a default rate of interest thereunder.  This Notice was based on a number of alleged violations of the Credit Facility, including the Debtors' alleged defaults to Tenet and Conifer under the TSA and MSA.  Although MidCap continued to provide funding under the Credit Facility, the level of funding that was available further strained the

Debtors' ability to procure needed supplies and pay important vendors for services necessary to the ongoing operation of the Healthcare Businesses.

### Trade Debt

As of the Petition Date, the Debtors estimated that they owed approximately $87 million to vendors and other parties in trade debt, excluding Tenet/Conifer and DUCOM and any pension liability.

### Withdrawal Liability

Some or all of the Debtors may have significant liability in connection with a multi-employer pension plan. Following the Acquisition, CCH participated in a multi-employer pension plan entitled "Pension Plan for Hospital and Health Care Employees – Philadelphia and Vicinity" (the "**Multi-Employer Plan**"). According to an Annual Funding Notice issued in April 2019, the Multi-Employer Plan was in critical status in the Plan Year ending December 31, 2018. Subsequent to the Petition Date, the Debtors withdrew from the Multi-Employer Plan, and the Multi-Employer Plan has asserted a general unsecured claim for withdrawal liability against each of the Debtors in the amount of approximately $29 million. One or more non-Debtor persons and entities, including without limitation Tenet and/or some or all of the MBNF Non-Debtor Parties, may have liability for some or all of this amount.

**G.**     **Material Pre-Petition Date Litigation.**

As of the Petition Date, and in addition to litigation relating to alleged personal injury/medical malpractice claims, the Debtors were party to various pieces of litigation, including the following:

*Tenet*. On September 18, 2018, PAHH, on behalf of itself and some or all of the Purchasers sued Tenet in the Court of Chancery of the State of Delaware, in a case captioned *Philadelphia Academic Health Holdings, LLC v. Tenet Business Services Corporation*, C.A. No. 2018-0684 (Del. Ch.) (the "**Chancery Court Action**"), to compel and specifically enforce Tenet's participation in a dispute resolution process before an independent accounting auditor to resolve accounting disputes arising under the August 31, 2017 Asset Sale Agreement (as amended, the "**ASA**").

On April 8, 2019, PAHH, again on behalf of the Purchasers, sued Tenet in the Superior Court of the State of Delaware (the "**Superior Court**"), in a case captioned *Philadelphia Academic Health Holdings, LLC, et al. v. Tenet Business Services Corporation*, C.A. No. N19C-04-035-EMD (Del. Super.) (the "**Superior Court Action**"), alleging that Tenet had (i) fraudulently induced the Purchasers to purchase the Hospitals at an inflated price and (ii) breached its representations and warranties in the ASA. The Purchasers sought indemnification from Tenet under Article 10 of the ASA for Tenet's alleged breach of its representations and warranties.

Pursuant to the terms of the Tenet/Conifer Settlement, the Debtors released their claims at issue in the Superior Court Action and the Chancery Court Action.

13

On September 19, 2019, Tenet and Conifer filed suit against the non-debtor Purchasers in the Superior Court, in a case captioned *Tenet Business Services Corporation, et al. v. Front Street Healthcare Properties, LLC, et al.*, C. A. No. N19C-09-116-SKR (Del. Super.), alleging that the non-debtor Purchasers breached the ASA by failing (i) to pay Tenet and Conifer fees owed under the TSA and MSA and (ii) to indemnify Tenet for pension withdrawal liability.

**Pamela Saechow**.   On May 13, 2019, Pamela Saechow filed a complaint in the United States District Court for the Eastern District of Pennsylvania against PAHS, AAHS, Paladin and Mr. Freedman.   In this complaint, Ms. Saechow alleges among other things that she was fraudulently induced to leave other employment to accept a position as Chief Information Officer for the Debtors, and that she allegedly was the subject of discrimination and termination.   Ms. Saechow asserts breach of contract claims, violation of the Pennsylvania Wage Payment and Collection Law, wrongful termination, fraudulent inducement, retaliation for whistleblowing in violation of the Pennsylvania Whistleblower Law, defamation, promissory estoppel/detrimental reliance and unjust enrichment.   She also seeks a declaration that her non-compete agreement with the defendants is invalid and unenforceable.   Upon the filing of the Chapter 11 Cases, this litigation was stayed as against PAHS.   Ms. Saechow has filed a proof of claim against PAHS in the approximate amount of $9.2 million.

**DHS Appeal**.   On or about January 23, 2019, CCH and SCH filed Appeals and Requests for Hearing with respect to certain Pennsylvania assessment amounts for the state fiscal year beginning July 1, 2018 and ending June 30, 2019. Specifically, CCH and SCH challenged the determination by the Pennsylvania Department of Human Service (the "**Department**") not to exclude Medical Assistance Supplemental Payments from the Department's calculation of such Debtors' Net Inpatient Revenue and Net Outpatient Revenue (the "**Appeals**").   The Debtors believe (but the Department disputes) that the Department's actions incorrectly increased the amounts that the Department assessed to such Debtors for annual monetary assessments for the state fiscal year beginning July 1, 2018 and ending June 30, 2019, pursuant to 62 P.S. § 801-G and 62 P.S. §803-G(b)(4), 2018, June 22, P.L. 258, No. 40, §§ 5, 6, effective July 1, 2018.   Through the Appeals, the Debtors seek a reassessment and redetermination of the amounts due for the Debtors' Net Inpatient Revenue and Net Outpatient Revenue for the fiscal year beginning July 1, 2018 and ending June 30, 2019.   The Appeals are currently pending in the Department's Bureau of Hearings and Appeals, before Jacob Herzing, Esq., Administrative Law Judge, and have been assigned case nos. 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 (Center City Healthcare, LLC) and 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 (St. Christopher's Healthcare, LLC).   On December 10, 2020, the Debtors and the Department entered into a stipulation [D.I. 1966] that, subject to Bankruptcy Court approval, would allow the Appeals to proceed notwithstanding the automatic stay of section 362(a) of the Bankruptcy Code, to the extent the automatic stay is applicable.   This stipulation was approved by the Bankruptcy Court by Order entered December 29, 2020 [D.I. 1994].

**Future IT Advisors**.   On or about February 1, 2019, Future IT Advisors, Inc. ("**FIT**") filed a complaint in the United States District Court for the Eastern District of Pennsylvania against PAHS and AAHS, alleging, among other things, that the defendants (i) breached the Master Service Agreement entered by PAHS and FIT by failing to pay

certain allegedly outstanding invoices and (ii) intentionally interfered with existing and prospective contractual relations by allegedly hiring directly certain of FIT's contractors in contravention of the Master Service Agreement. The Debtors dispute these allegations. Upon the filing of the Chapter 11 Cases, the litigation was stayed as against PAHS. FIT has filed a proof of claim against PAHS asserting a general unsecured claim in the approximate amount of $1.4 million.

## H.      Management

From at least the date of the Acquisition, Mr. Freedman was the President and Chief Executive Officer of each of the Debtors. Mr. Freedman also was the sole manager of PAHS (which served as manager for the other Debtors) and was the sole authorized signatory for the Debtors. In addition, prior to the Petition Date, the Debtors employed a series of hospital chief executive officers and chief financial officers.

In April 2019, the Debtors retained EisnerAmper LLP to provide certain services to the Debtors; specifically, Ron Dreskin of EisnerAmper LLP was retained to serve as the Debtors' Interim Systems Chief Executive Officer and Special Advisor to Mr. Freedman, and Allen Wilen of EisnerAmper LLP was retained to serve as the Debtors' Chief Restructuring Officer – Finance (the "**CRO**").

In June 2019, Albert A. Mezzaroba was added as an independent manager of PAHS. Although Mr. Freedman, in his capacity as a manger of PAHS, approved the Debtors' bankruptcy filings, due to among other things actual and potential conflicts of interest, he has not been involved in any material decisions on behalf of the Debtors relating to the Chapter 11 Cases, or relating to the Debtors' operations, since the Petition Date, except with respect to certain corporate governance actions taken by PAHH with respect to the Debtors, as described below. All such decisions have been made by the CRO, subject to the oversight and where appropriate approval of PAHS's independent manager(s).

## VII.  THE CHAPTER 11 CASES

## A.      Commencement of the Chapter 11 Cases

On June 30, 2019 and July 1, 2019 (collectively, the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Chapter 11 Cases have been jointly administered for procedural purposes only.

## B.      Continuation of Business after the Petition Date

Subsequent to the Petition Date, the Debtors continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. During the period immediately following the Petition Date, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters that were, in the Debtors' view, essential to the Debtors' orderly transition into chapter 11 and the stabilization of the Debtors' operations.

37812817.7 12/30/2020

(a)       **First Day Relief**

On the Petition Date, the Debtors sought various types of "first day" relief intended to facilitate the transition of the Debtors' ordinary business operations into chapter 11.   The Bankruptcy Court entered several "first day" orders, which authorized, among other things:

<div style="margin-left:2em">

(i)        the joint administration of the Debtors' related bankruptcy cases [D.I. 70];

(ii)       procedures to maintain the confidentiality of patient information as required by applicable privacy rules [D.I. 72];

(iii)      the continuation of the Debtors' use of their existing cash management system and maintenance of the Debtors' existing bank accounts and business forms and the grant of administrative expense priority to post-petition intercompany claims [D.I. 74];

(iv)       the (i) payment of certain prepetition wages, salaries, bonuses and other compensation, reimbursable employee expenses, employee medical and similar benefits, (ii) continuance of prepetition employee programs, and (iii) the honoring of all related checks and electronic payment requests [D.I. 77];

(v)        the maintenance, renewal, cancellation or replacement of existing insurance programs and payment of all premiums, fees and costs in connection therewith [D.I. 80];

(vi)       (i) authorization for the Debtors' proposed form of adequate assurance of payment to utility companies, (ii) the establishment of procedures for resolving objections by utility companies, and (iii) the prohibition of utility companies from altering, refusing, or discontinuing service [D.I. 78];

(vii)      the payment of certain prepetition and postpetition taxes and fees and certain related relief [D.I. 75];

(viii)     authority to pay or honor prepetition obligations to certain critical vendors [D.I. 81]; and

(ix)       the retention of the Voting Agent as claims and noticing agent [D.I. 73].

</div>

(b)       **The DIP Facility**

In the time period leading up to the Petition Date, the Debtors undertook to solicit offers for and negotiate a debtor-in-possession financing facility.   Specifically, the Debtors, with the assistance of SSG, made inquiries into alternatives for financing and solicited proposals for debtor-in-possession financing from other financial institutions.   The Debtors and their advisors received two indicative term sheets prior to determining that the DIP Secured Parties' (as defined below) proposal was highest or otherwise best.

The Debtors evaluated the prospective lenders and their proposals on a number of factors, including economic terms, impact on the Debtors' businesses, restrictions on the use of proceeds and the collateral and security packages requested.  The Debtors also considered the possibility of seeking a "priming" loan pursuant to section 364(d) of the Bankruptcy Code (*i.e.*, a loan secured by liens higher in priority than MidCap's liens).   Given their financial condition, financing arrangements and capital structure, and given the significant risks and uncertainty of prevailing in what the Debtors believed would be an almost certain dispute with MidCap over any proposed priming debtor-in-possession loan, the Debtors concluded that obtaining financing from the DIP Secured Parties was in the best interests of their estates.  Additionally, because it was the Debtors' prepetition secured lender, the DIP Secured Parties were familiar with the Debtors, their businesses and their capital structure.  This familiarity enabled the DIP Secured Parties to act more quickly and limit diligence risk, both of which were crucial in light the Debtors' critical need for liquidity.

Following good faith, arms' length negotiations, the Debtors agreed to enter into a DIP Agreement (the "**DIP Agreement**"), by and among the Debtors, as borrowers, and MidCap Financial Trust as administrative agent (in such capacity, the "**DIP Administrative Agent**") for and on behalf of itself and the other lenders party thereto (such lenders, collectively with the DIP Administrative Agent, the "**DIP Secured Parties**").  Under the terms of the DIP Agreement, the Debtors had access to a revolving loan facility of up to $50,000,000 (the "**DIP Revolver**") and a $15,000,000 in principal term loan (the "**DIP Term Loan**," and together with the DIP Revolver, the "**DIP Loans**"), with a roll-up of the Debtors' pre-petition Credit Facility.  The DIP Loans were secured by superpriority liens on substantially all of the Debtors' assets.

Prior to the approval of the DIP Agreement on an interim basis, the Court authorized the Debtors, pursuant to, *inter alia*, section 363 of the Bankruptcy Code, to use cash collateral through July 10, 2019 in accordance with certain terms and conditions [D.I. 85].  The DIP Agreement, with certain modifications, was approved on an interim basis on July 12, 2019 [D.I. 172].  Several parties, including Tenet, Conifer and the Committee, objected to the Debtors' request for final approval of the DIP Agreement [D.I. 348, 368] on a number of grounds, including what Tenet, Conifer and/or the Committee asserted was an insufficient amount of funding contemplated by the DIP Agreement, excessive fees, "roll-up" provisions, "marshalling" provisions and the like.  As a result of these objections, certain modifications were made to the DIP Agreement, and the DIP Agreement, as amended, was approved by the Bankruptcy Court on a final basis on August 23, 2019 [D.I. 557] (the "**Final DIP Order**").

## C.       Representation of the Debtors

On July 17, 2019, the Debtors filed an application to retain Saul Ewing Arnstein & Lehr LLP as bankruptcy counsel [D.I. 227], which was approved by the Bankruptcy Court on August 8, 2019 [D.I. 404], as well as an application to retain the Voting Agent as administrative advisor [D.I. 232], which was approved by the Bankruptcy Court on August 2, 2019 [D.I. 337].   On July 25, 2019, the Debtors filed an application to retain Klehr Harrison Harvey Branzburg LLP as special conflicts counsel [D.I. 285], which was approved by the Bankruptcy Court on August 13, 2019 [D.I. 438].  On July 17, 2019, the Debtors filed an application to retain SSG as their investment banker [D.I. 229], which was approved by the Bankruptcy Court on August 2, 2019 [D.I. 339].

17

On October 30, 2019, the Debtors filed an application to retain Centurion Service Group, LLC ("**Centurion**") as auctioneer to assist the Debtors with the sale of certain medical equipment and related property located in the HUH [D.I. 923]. Centurion's retention was approved by the Bankruptcy Court on November 25, 2019 [D.I. 1062]. Under the terms of Centurion's retention, it was required to make an initial guaranteed payment of $1,597,750, and then to split with the Debtors all net sale proceeds above $2,167,650 on an 85% (Debtors) – 15% (Centurion) basis. The guaranteed payment amount was paid to MidCap, which held a lien on the equipment to be sold. On October 2, 2020, the Debtors filed an application to retain Centurion as auctioneer on a supplemental basis, to assist the Debtors with the sale of certain equipment belonging to HUH that had been stored at STC. [D.I. 1810]. Centurion's supplemental retention, which provides for an 85% (Debtors) / 15% (Centurion) split of the net sale proceeds, was approved by the Bankruptcy Court on November 12, 2020. [D.I. 1885].

## D.    The Chief Restructuring Officer

By order dated July 17, 2019 [D.I. 338], the Bankruptcy Court approved the Debtors' motion [D.I. 228] to retain EisnerAmper LLP to: (i) provide the Debtors with interim management services, a chief restructuring officer, an interim system chief executive officer and additional personnel; and (ii) approve the designation of Allen Wilen as the Debtors' chief restructuring officer, *nunc pro tunc* to the Petition Date.

## E.    Formation and Representation of the Creditors' Committee

On July 15, 2019, the United States Trustee appointed the Official Committee of Unsecured Creditors of Center City Healthcare, LLC, *et al.* (the "**Creditors' Committee**") [D.I. 182]. The members of the Creditors' Committee are, as of the date hereof, as follows: Conifer Revenue Cycle Solutions, LLC, Veolia Energy Solutions Philadelphia, Inc., Medtronic USA, Inc., Crothall Healthcare, Inc., Global Neuroscience Institute, LLC, and PASNAP.

By orders dated September 4, 2019, the Bankruptcy Court approved the Creditors' Committee's applications to retain the law firms of Sills, Cummis & Gross P.C. [D.I. 636] and Fox Rothschild LLP [D.I. 637] as its counsel. In addition, on September 4, 2019 the Bankruptcy Court entered an order approving the Creditors' Committee's application to retain Berkeley Research Group, LLC as its financial advisor [D.I. 638].

## F.    Schedules and Bar Date

On August 14, 2019, the Debtors filed their schedules of assets and liabilities and statements of financial affairs [Docket Nos. 445-479] (as amended, supplemented, or otherwise modified, the "**Schedules**").

Thereafter, on June 11, 2020, the Court entered the *Order (I) Establishing Deadlines for Filing Proofs of Claim, Including Section 503(b)(9) Claims, and (II) Approving the Form and Manner of Notice Thereof* [D.I. 1666] (the "**Bar Date Order**") pursuant to which the Court established, *inter alia*, the General Bar Date (as defined in the Bar Date Order) as August 5, 2020 at 5:00 p.m. (prevailing Eastern Time). Written notice of the Bar Date Order (the "**Bar Date Notice**") was mailed to, among others, all known creditors listed on the Schedules, and the Bar

37812817.7 12/30/2020

Date Notice was served on all parties who had filed requests for notice under Bankruptcy Rule 2002 as of the date of the Bar Date Order.

As of the filing of this Disclosure Statement, over 2,600 proofs of claim (the "**Proofs of Claim**") have been filed in these Chapter 11 Cases, which claims are recorded on the official claims register maintained by the Voting Agent. The Debtors are in the process of reviewing and reconciling the claims and intend to file, or have filed, objections to any claims that are inconsistent with their books and records and/or are not supported by documentation accompanying the claims. On December 1, 2020, the Bankruptcy Court entered an order granting the Debtors' first (non-substantive) omnibus objection to claims [D.I. 1941]. Further substantive and non-substantive claim objections will be forthcoming.

A summary description of the treatment afforded in the Plan on account of Allowed Claims and Interests is set forth in Article V(A) above.

**Personal Injury Claims**: Included among the Proofs of Claim filed in these Chapter 11 Cases are approximately 70 claims that assert personal injuries allegedly sustained as a result of alleged medical malpractice (the "**Personal Injury Claims**"), with an aggregate asserted claim amount of $1.045 billion. The Debtors have provided notice of these claims to their insurer and are in the process of reviewing the claims. Certain of these claims allege injuries that allegedly arose prior to the Acquisition. The Debtors believe they have no liability with respect to such claims and have objected, or will object, to the claims on this basis. The Debtors have also entered into Bankruptcy Court-approved stay relief stipulations with several of the parties asserting Personal Injury Claims [D.I. 755, 1712, 1713, 1759, 1771, 1798]. Generally, pursuant to these stipulations, the claimants have agreed to waive any recovery against the Debtors' estates and limit their recoveries to the Debtors' available insurance, if any, in exchange for limited relief from the automatic stay to proceed with their causes of action. The Debtors are continuing to review the remaining Personal Injury Claims to determine whether similar stay relief stipulations can be entered with such claimants or whether the claims may be subject to objection.

**Pension and Benefit Fund-Related Claims**: Included among the CBAs described above is: (a) an agreement with National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO and District 1199C ("**1199C**"), covering service and maintenance employees at HUH; and (b) an agreement with 1199C, covering technical unit employees at HUH. The CBAs with 1199C provided for the Debtors' payment of certain "contributions" to the Benefit Fund for Hospital and Health Care Employees Philadelphia and Vicinity (the "**Health Benefit Fund**") and the Pension Fund for Hospital and Health Care Employees Philadelphia and Vicinity (the "**Pension Fund**," and together with the Health Benefit Fund, the "**Funds**"). Such contributions were based on a percentage of gross payroll paid to employees for a given month, and the amount of gross payroll was dependent upon the number of hours worked by 1199C employees in a given month. The Funds have asserted claims, totaling in excess of $3.8 million, for alleged outstanding pre-petition contributions, approximately $3.7 million of which are asserted as priority claims.

In addition, as noted above, the Debtors withdrew from the Multi-Employer Plan in 2019, and the Multi-Employer Plan has asserted general unsecured claims in the amount of approximately $29 million against each of the Debtors for alleged withdrawal liability.

**Insider Claims**:  Mr. Freedman and certain non-Debtor persons or entities that he owns or controls, or which whom/which he has an affiliation, have filed approximately 129 claims against the Debtors, asserting a total of $8.1 billion of claims, exclusive of claims asserted on an unliquidated basis.  These claims include the following:  (i) indemnification/contribution claims on account of potential liability to HSRE with respect to, among other things, the Master Leases, (ii) indemnification claims under the Debtors' various operating agreements, for medical malpractice or other litigation; (iii) indemnification claims under the CCH operating agreement relating to CCH's lease of the North and South Towers; (iv) indemnification claims under SCH's operating agreement relating to SCH's lease of the STC property; (v) general indemnification claims under each Debtor's operating agreement; (vi) claims for amounts due to Medline (which claims allegedly were purchased); (vii) contingent indemnification claims for amounts that may be due to MidCap; (viii) claims for allegedly unpaid parking revenue; (ix) contribution and reimbursement claims on account of allegedly unpaid business income and receipts tax and interest and penalties; (x) claims for unpaid advisory fees; (xi) claims for alleged breaches of PAHS's operating agreement, alleged failure to provide tax information, alleged failure to provide information re PAHS's operations, alleged making or publishing untrue statements; (xii) claims relating to PARRG (as defined below) and its operating agreement; (xiii) claims relating to an alleged $550,000 payroll loan to the Debtors; (xiv) indemnification claims relating to the Debtors' potential withdrawal liability as well as contingent claims relating to such withdrawal liability; and (xv) contribution and indemnification claims for amounts due to Tenet and Conifer.  Certain of these claims assert administrative or priority status.  The Debtors dispute some or all of these claims.

**HSRE Claims**:  HSRE has filed ninety-one claims in the Bankruptcy Cases.  Eighty-five of these claims (six identical claims against each of the Debtors, and seven against one Debtor) are unliquidated claims for indemnification pursuant to the Master Leases with SCH.  These claims seek indemnification for (i) any benefits received by any Debtor for which HSRE was not compensated; (ii) any liability resulting from third-party claims, substantive consolidation, or inter-Debtor contribution, indemnification, reimbursement and subrogation; and (iii) any liability incurred due to Global Maintenance Inc. d/b/a Cenova, Inc.'s unjust enrichment lawsuit against SCH filed in the Montgomery County Court of Common Pleas seeking payment of approximately $100,000.00 for snow removal services performed in 2019.  In addition to these claims, HSRE filed six (6) claims against SCH for (i) asserted pre-petition liquidated base rent and supplemental rent (totaling approximately $3,096,144); (ii) asserted lease rejection damages for base rent and supplemental rent (totaling approximately $431 million) resulting from SCH's rejection of the Master Leases; and (iii) unliquidated damage claims for maintenance and repairs, attorney's fees, and other costs of enforcement.  The Debtors dispute some or all of these claims and believe that some or all of these claims are substantially overstated.

## G.    Patient Care Ombudsman

By order entered July 2, 2019, the Bankruptcy Court directed the appointment of a patient care ombudsman in the Bankruptcy Cases pursuant to section 333 of the Bankruptcy Code. [D.I. 83].  By Notice filed July 3, 2019, the Office of the United States Trustee appointed Suzanne A. Koenig as patient care ombudsman. [D.I. 95].  In that capacity, Ms. Koenig filed reports pursuant to section 333(b) of the Bankruptcy Court on August 19, 2019 [D.I. 526], September 3, 2019 [D.I. 632], November 4, 2019 [D.I. 957] and January 3, 2020 [D.I. 1281].

### H.     Temporary Manager Appointment

On or about July 3, 2019, and with the agreement of the Debtors, the Commonwealth of Pennsylvania Department of Health ("**DOH**") appointed Kyle Kramer of Pinnacle Healthcare Consulting as the "temporary manager" of HUH (the "**Temporary Manager**") to monitor HUH's closure and to monitor the clinical and fiscal performance of STC for the duration of the Bankruptcy Cases or for such shorter time as STC remained in bankruptcy.  Among other things, the Temporary Manager was given the following responsibilities by DOH: (a) to provide oversight to assure the health, safety and welfare of patients; (b) ensure that HUH had sufficient supplies to take care of patient needs; (c) ensure that HUH had sufficient staff at all patient care areas; (d) ensure the safe and orderly discharge of HUH patients or transfer of patients to other health care facilities; (e) follow-up on DOH inquiries regarding the closure of HUH; (f) inform DOH of abrupt changes to the plan to close HUH; and (g) provide daily written reports to DOH.  The Temporary Manager was given no authority to direct or authorize disbursements or incur liabilities on behalf of CCH or SCH, and expressly was not given the power, authority, duties, responsibilities or obligations of a trustee or debtor-in-possession under the Bankruptcy Code.  In addition, the Temporary Manager was directed by DOH not to hold himself out as a representative of the CCH or SCH bankruptcy estates.  By agreement with DOH, the Temporary Manager's fees, costs and expenses were borne by DOH.

### I.     Key Employee Incentive Plan

On August 15, 2019, the Debtors filed the *Motion of the Debtors for Entry of an Order Approving Key Employee Incentive Plan* [D.I. 499] (the "**KEIP Motion**"), pursuant to which the Debtors requested Bankruptcy Court approval of a proposed Key Employee Incentive Plan ("**KEIP**") for twenty-five employees, nine of whom are executives and 16 of whom are non-insider employees.  All of the participants possess (or possessed) significant institutional knowledge and skills that are essential to the Debtors' efforts in the Chapter 11 Cases.  Also, in addition to their everyday business responsibilities, these participants assume (or assumed) considerable added responsibilities in connection with the preparation for, and the filing and prosecution of, these Chapter 11 Cases, the sale process for STC, and the closure of HUH.

Pursuant to the terms of the KEIP, payments made to KEIP participants are tied to specific bench marks – such as the sale of STC, confirmation of a chapter 11 plan for STC and completion of the closure of HUH – and are determined as a percentage of each participant's base salary.  The sum of all potential incentive payments made (or to be paid) under the KEIP is $824,200, equating to, on average, $32,960 per participant.

On September 24, 2019, the Court entered an order granting the KEIP Motion [D.I. 778].

### J.     Closure of HUH

In late June 2019, with no meaningful prospect of a sale and no viable sources for additional funding, the Debtors concluded that the closure of HUH was necessary.  Accordingly, to protect the health and safety of Hospital patients, on June 25, 2019, the Board of Managers of PAHS, the parent and manager of CCH, voted to approve HUH's closure.

On June 25, 2019 the Debtors caused WARN Act notifications to be mailed to all HUH employees, providing them with sixty (60) days' advance written notification of the closure, as required by federal law. City of Philadelphia and state government officials were copied on the WARN Act notifications. In addition, on June 26, 2019, HUH provided notice of the closure and its mailing of WARN Act notices to the appropriate labor unions (*i.e.*, PASNAP and 1199C).

On June 27, 2019, the Debtors provided notice of the Closure Plan to the Health Commissioner of the City of Philadelphia. The Debtors also provided notice of the closure to the City of Philadelphia's Fire and EMS Department, and sought approval of their closure of HUH by motion filed with the Bankruptcy Court on July 1, 2019 [D.I. 15]. The Commonwealth of Pennsylvania, the City of Philadelphia and DUCOM filed objections or responses to this motion [D.I. 49, 51, 66]. On July 3, 2019 the Bankruptcy Court issued an order directing, among other things, the Debtors to engage in discussions with all interested parties regarding the closure. The Commonwealth of Pennsylvania issued a cease and desist directive, instructing the Debtors not to close HUH or eliminate services (particularly emergency department services) pending its approval of a closure plan. The City of Philadelphia sought and obtained similar relief. The Debtors engaged in ongoing discussions with the Commonwealth of Pennsylvania and other authorities. On August 9, 2019, the City of Philadelphia approved a closure plan for HUH. On August 23, 2019, the DOH approved a closure plan for HUH. The closure plan contemplated, among other things, the cessation of new inpatient admissions; the transfer, discharge and referral of patients; the communication to employees, patients, providers, government entities, area hospitals and the community at large; the safeguarding, transfer and storage of medical records; the disposition of pharmaceuticals, including controlled substances; the coordination with Emergency Medical Services and removal of hospital signs; enhanced security measures; resident/fellow orphaning; and the disposition and handling of biomedical hazardous and radioactive waste, which is completed except with respect to a nuclear pacemaker that was installed in a patient in the 1970's, and that physically remains in that patient (although it is inoperable). The Debtors are working with the Commonwealth of Pennsylvania regarding the transfer of responsibility for this pacemaker to another entity.

The Debtors believe they have fulfilled their obligations with respect to the closure of HUH. Pursuant to order entered January 28, 2020, CCH rejected its leases of the "North and South Towers" and vacated the HUH facility. [D.I. 1364]. The Debtors abandoned any remaining equipment and supplies remaining in HUH by motion filed March 7, 2020 [D.I. 1452]. Since such time, the Debtors have maintained a small office located at 216 N. Broad Street, 4th Floor, Philadelphia, Pennsylvania 19102, which they lease from an entity owned and/or controlled by HSRE.

## K.    Resolution of Tenet and Conifer Disputes

The initial phase of the Chapter 11 Cases was marked by a number of disputes among the Debtors and Tenet and Conifer. As noted above, Tenet and Conifer objected to the Debtors' proposed debtor-in-possession financing from MidCap on several grounds, including an assertion that the proposed financing did not provide sufficient funding to pay Tenet and Conifer in full for their post-petition services to the Debtors under the TSA and the MSA. [D.I. 106, 348].

Tenet and Conifer then jointly filed, on July 26, 2019, a motion for an order compelling the Debtors to pay certain post-petition amounts at the TSA and MSA contractual rate of $810,000 per week (minus the $200,000 per week that the Debtors had been paying) or, in the alternative, granting Tenet and Conifer relief from the automatic stay so they could exercise contractual rights to terminate such agreements [D.I. 303]. The Debtors objected to this motion [D.I. 420] on several grounds, including that (i) Tenet and Conifer were not entitled to allowed administrative expense claims at the TSA and MSA contractual rates because such amounts did not reflect the actual value provided to the Debtors under such agreements, (ii) even if the Bankruptcy Court concluded that Tenet and Conifer were entitled to an allowed administrative expense under the TSA and MSA in excess of the actual amounts being paid, the payment of such administrative expense should be deferred, and (iii) the alternative relief sought by Tenet and Conifer (i.e. relief from the automatic stay to terminate the TSA and MSA) was not appropriate given the irrevocable damage that termination of services would cause to the Debtors' operations and estates.

An evidentiary hearing was held on Tenet and Conifer's motion in August 2019, after which the Bankruptcy Court issued an oral ruling holding that the Debtors had rebutted the presumption that Tenet and Conifer were entitled to the level of payment specified in the TSA and MSA. The Bankruptcy Court did not establish a specific amount that the Debtors should pay for post-petition services but rather directed the parties to negotiate concerning the appropriate sum. The Court set a further hearing on Tenet and Conifer's motion for September 13, 2019, on which date the Court requested that the Debtors, Tenet and Conifer report to the Court concerning the status of their negotiations.

As of the date of the September 13th hearing, despite efforts by the parties, no agreement was reached with respect to the appropriate treatment to be afforded to Tenet/Conifer. On September 13, 2019, the Bankruptcy Court held a confidential chambers conference among the Debtors, Tenet, Conifer and the Committee. Following this chambers conference, on September 19, 2019, the Court entered an order [D.I. 733] granting Tenet and Conifer's motion in part. Among other things, the Bankruptcy Court ruled that on September 19, 2019 were entitled to an administrative expense claim of not less than $400,000 per week from the Petition Date through August 20, 2019, directed that $1.0 million should be payable to on September 19, 2019 from amounts due from Health Plan Partners, Inc., and directed Tenet, Conifer, the Debtors and the Committee to engage in a good faith mediation of their disputes. If this mediation did not result in a consensual resolution by October 18, 2019, the Bankruptcy Court's order provided that Tenet and Conifer would be granted relief from the automatic stay to terminate the TSA and MSA, provided they engage in good faith discussions with the Debtors to mitigate the impact of such termination on patient care. The Debtors appealed the Bankruptcy Court's order on October 2, 2019 [D.I. 803] and on the same day sought a stay pending appeal [D.I. 804].

As required by the Bankruptcy Court's order, the parties selected a mediator (the Honorable Judith K. Fitzgerald, ret.). Judge Fitzgerald held in-person mediation sessions in New York on October 15, 21 and 22, 2019 with the Debtors, Tenet, Conifer, MidCap and the Committee. These in-person sessions were followed by numerous subsequent communications among the parties and Judge Fitzgerald. Through the efforts of Judge Fitzgerald, and as a result of this process and extensive arms' length negotiations, the Debtors, Tenet, Conifer and the Committee reached agreement, which was memorialized in a Term Sheet (the "**Settlement Term Sheet**") that was filed with the Bankruptcy Court on November 18, 2019 (the "**Tenet/Conifer**

**Settlement**").  The Tenet/Conifer Settlement is attached to the Plan as Exhibit "A"; its key terms include the following:

- **HUH Billing Data**. Conifer agreed to provide billing and collection services consistent with its obligations under the MSA for HUH through the earlier of the closing of the STC Sale (as defined below) and December 31, 2019, subject to transfer of the current and historical billing/collection data for HUH (the "**HUH Billing Data**"), formatted in a manner reasonably acceptable to the Debtors, Tenet, and Conifer, provided that such data must be in a format that can be accessed and utilized by HUH and/or a third party billing service thereafter.  The parties agreed that such reformatting and transfer of the HUH Billing Data must be made on the earlier of five (5) days after the closing of the STC Sale and January 5, 2020, at Conifer's sole expense.  Conifer will receive a cash fee of 2% of collections received from HUH collections from the period commencing on December 1, 2019, through the earlier of the date on which Conifer ceases to provide billing and collection services for HUH and December 31 2019 (such fee, the "**Conifer HUH Collection Fee**").

- **STC Billing Data**. Conifer agreed to provide billing and collection services to STC through March 31, 2020, subject to transfer of the current and historical billing/collection data for STC (the "**STC Billing Data**"), formatted in a manner reasonably acceptable to the Debtors, Tenet and Conifer, provided that such data must be in a format that it can be accessed and utilized by STC and/or a third party billing service thereafter.  Provided that Tenet and Conifer's postpetition administrative claims as set forth in the Settlement Term Sheet are paid in full in cash, without setoff, deduction, or reduction, on or before April 6, 2020, such reformatting and transfer of the STC Billing Data was be made on or before April 6, 2020, at Conifer's sole expense.  Subsequent to the closing of the STC Sale, Conifer was entitled to receive a cash fee of 2% of collections received from the STC Sale closing date through March 31, 2020 (the "**Conifer STC Collection Fee**").

- To the extent that the TSA and MSA have not been rejected or assumed and assigned prior to April 1, 2020, the TSA and MSA shall be deemed rejected on April 1, 2020 unless the Parties agree otherwise in writing.  Any rejection of the TSA and MSA shall not result in any additional claims against the Debtors beyond the allowed pre-petition claims provided for in the Settlement Term Sheet.

- **TSA Services**. Tenet agreed to provide TSA services as modified by the Settlement Term Sheet for HUH and, to the extent that the closing of the STC Sale (as defined below) did not occur prior to such date, STC, through December 31, 2019.  In connection with such ongoing TSA services,  HUH and STC agreed to work in good faith with Tenet to eliminate services provided under the TSA that were no longer necessary given the status of operations at both hospitals.  On or before December 31, 2019, Tenet agreed, at its expense, to transfer to HUH and STC, in a usable format, all reasonably available data regarding the Debtors' business

24

operations, with certain exceptions, created or maintained by Tenet pursuant to the TSA.

- **Pre-Closing Superpriority Administrative Claim**. Tenet and Conifer agreed to waive any further administrative claim (in excess of $400,000 per week) for services rendered from the Petition Date through August 20, 2019, the unpaid portion of which totals $2,200,000 after taking into account payments received in the amount of $200,000 per week, which claim of $2,200,000 has been paid from the net cash proceeds of the STC Sale closing (the "**Pre-Closing Superpriority Administrative Claim**"). This claim was entitled to super administrative priority status with respect to the net cash proceeds of the STC Sale, senior to any other administrative claim other than the super administrative expense priority claims of MidCap and the Carveouts as provided in the Final DIP Order.

- **Other Superpriority Administrative Claim**. Tenet and Conifer were entitled to an additional super-priority administrative claim, which claim was agreed to be *pari passu* with the Pre-Closing Superpriority Administrative Claim and senior to any other administrative claim other than the super priority claims of MidCap and the Carveouts, equal to: (a) $400,000 per week for the period August 21, 2019 through the closing of the STC Sale (subject to credit for payments already made); (b) $100,000 per week thereafter through December 31, 2019; and (c) the Conifer HUH Collection Fee; and (d) the Conifer STC Collection Fee. The foregoing amounts (to the extent not already paid), other than the Conifer HUH Collection Fee and the Conifer STC Collection Fee, will be paid in full in cash weekly by the Debtors.

- **HUH Electronic Medical Records**. Tenet will maintain or engage a third party to maintain, at Tenet's sole expense, and to the extent required by applicable law, all electronic medical records and related data (the "**HUH Electronic Medical Records**") maintained by, or for the benefit of, Tenet for HUH consistent with such obligations under the TSA. Tenet will further arrange a process, at its expense, to maintain the Debtors' ability to access the HUH Electronic Medical Records. Tenet will further allow physicians and HUH patients and/or their legal representatives (at their sole cost and expense, in each case, solely to the extent permitted by applicable law) reasonable ability to access, during business hours and upon reasonable prior written notice to Tenet or its counsel, to and/or copies of their medical records, within the time provided by all applicable state and federal laws, including the Health Insurance Portability and Accountability Act.

- **Iron Mountain HUH Records**. Tenet agreed to fund the costs of maintaining or engaging Iron Mountain Inc. or a different third party to maintain, at Tenet's sole expense and to the extent required by all applicable state and federal laws, all non-electronic medical records for HUH (the "**Iron Mountain HUH Records**"). Tenet further agreed to arrange a process, at its expense, for a third party to maintain and provide access to the Iron Mountain HUH Records.

- **Contribution Payment**. Provided that the Debtors pay the Pre-Closing Superpriority Administrative Claim, Tenet and/or Conifer agreed to pay the

Debtors $2,800,000 (the "**Contribution Payment**") within three (3) business days after payment in full of the claims of Midcap (other than any holdback for indemnification or otherwise as provided in any payoff letter) or thereafter. Such funds were agreed to be treated as a contribution under any later-filed liquidating plan litigation trust or order dismissing the chapter 11 cases absent confirmation of a liquidation plan.

- **Allowance of Certain Claims**. Tenet and Conifer's prepetition unsecured claims under the TSA and MSA, including those TSA and MSA claims arising under the ASA, were allowed in the amount of $57.2 million against the applicable Debtor(s) (the "**Allowed Tenet/Conifer Pre-Petition Claims**"). In addition, Tenet reserved the right to file additional unsecured claims under the ASA ("**Additional ASA Claims**") and claims related to any pension liability (the "**Tenet Pension Claim**"), and all of the Parties' rights to object to such claims are fully preserved. The Allowed Tenet/Conifer Pre-Petition Claim and any allowed Additional ASA Claims or Tenet Pension Claim will be subordinated in recovery, but not for any other purposes (including voting), until all allowed non-priority prepetition unsecured claims of creditors other than Tenet and Conifer receive aggregate distributions in an amount equal to the lesser of (such lesser amount, the "**Minimum Recovery Threshold**"): (A) 50% of the aggregate amount of such allowed non-priority amount of such other allowed prepetition unsecured claims; and (B) $25 million. Once other allowed non-priority prepetition general unsecured claims receive a distribution equal to the Minimum Recovery Threshold, then all allowed non-priority general unsecured claims (including the Allowed Tenet/Conifer Pre-Petition Claim and any allowed Additional ASA Claim or Tenet Pension Claim) will share pro rata in any subsequent distributions.

- **Releases**. Subject to the entry of an order approving the Tenet/Conifer Settlement, and, with respect to the Estate Releasing Parties (as defined in the Settlement Term Sheet), payment of the Contribution Payment, the parties exchanged mutual general releases of all claims with certain specified exceptions, including exceptions for claims arising pursuant to the Settlement Term Sheet or the order approving the settlement.

The Tenet/Conifer Settlement Agreement was approved by the Bankruptcy Court on December 9, 2019 [D.I. 118]. Subsequent to the approval of the agreement, the parties to the settlement have agreed to several extensions of the date through which Conifer would provide billing and collection services to SCH and, as of the date hereof, Conifer continues to provide these services.

## L.   Resident Program Sale

On July 9, 2019, the Debtors filed a motion [D.I. 142] (the "**Resident Sale Motion**") to transfer HUH's graduate medical education training programs to Tower Health ("**Tower**"), as the stalking horse bidder (the "**Stalking Horse Bidder**"), or to such other successful bidder (the "**Successful Bidder**").

On July 19, 2019, the Debtors filed their asset purchase agreement with Tower, reflecting the terms of its stalking horse bid [D.I. 246] (the "**Stalking Horse APA**"). The Stalking Horse APA reflected a purchase price of $7,500,000, of which $3,000,000 would be placed into escrow (the "**Escrow Amount**") to cover the following items: (a) the cost of purchasing tail insurance coverage for HUH residents who chose to continue their training with Tower ("**Continuing Residents**"); (b) an amount necessary, with agreement of CMS, to discharge and satisfy any potential claims for overpayment liability with respect to HUH's Medicare provider number arising prior to closing; (c) cure costs associated with assigned contracts; and (d) other indemnifiable losses incurred by Tower.

On July 19, 2019, the Bankruptcy Court entered its *Order (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale* [D.I. 249] (the "**Bidding Procedures Order**") approving, among other things, certain bidding procedures (the "**Bidding Procedures**") in connection with the Residency Program Sale Motion.

On August 2, 2019, the Debtors filed the *Notice of Extension/Continuance of Bid Deadline, Auction, and Sale Hearing Date* [D.I. 346], extending the Bid Deadline (as defined in the Bidding Procedures) until August 7, 2019 and re-scheduling the Auction (as defined in the Bidding Procedures) for August 8, 2019.

The Debtors received more than one qualified bid and accordingly conducted the Auction on August 8, 2019. At the conclusion of the Auction, the Debtors, in consultation with the Committee, designated Thomas Jefferson University Hospitals, Inc. ("**Jefferson**") as the Successful Bidder on behalf of consortium of non-profit entities, including Jefferson, Temple University Health System, Albert Einstein Health Network, Main Line Health, Inc., Christiana Care Health System, and The Cooper Health Systems, with an aggregate purchase price of $55,000,000. The Stalking Horse Bidder was selected as the Back-Up Bidder (as defined in the Bidding Procedures), with an aggregate purchase price of $51,000,000.

While structurally similar to the Stalking Horse APA, the Jefferson APA included a material difference with respect to tail insurance. Specifically, the Stalking Horse APA provided that the Stalking Horse Bidder would purchase tail insurance coverage for so-called Continuing Residents completing their training at Tower (with such expense, to the extent in excess of $100,000, paid from the Escrow Amount). The Stalking Horse APA did not address tail insurance coverage for current and former residents of HUH who did not continue their training with the Stalking Horse Bidder. In other words, the Stalking Horse APA provided for tail insurance solely for those residents who completed their training at Tower.

As a result of negotiations during the Auction, under the Jefferson APA (as well as the Stalking Horse Bidder's back-up bid), the Debtors covenanted, contingent upon closing of the sale, to purchase tail insurance coverage for all residents as a deliverable at closing. The Jefferson APA also included, as a separate component of the purchase price and in addition to the Escrow Amount, up to $1,000,000 to reimburse the Debtors for the cost of obtaining such tail insurance.

The United States of America, on behalf of the Department of Health and Human Services, acting through its designated component, the Centers for Medicare and Medicaid Services ("**CMS**"), objected to the transaction. Among other things, it asserted that a provider may only assign a Medicare provider agreement pursuant to the provisions of 42 C.F.R. § 489.18, which provides that certain specifically identified forms of transactions always constitute a change of ownership and, in the event of the occurrence of those transactions, a provider number and provider agreement are automatically assigned to the new owner. CMS also asserted that a change of ownership required the continuation of the transferor as a going concern operation. In addition, CMS objected to the proposed transaction because the Debtors proposed to transfer the provider agreement and provider number on terms that did not include the assumption by Jefferson of unlimited successor liability with respect to overpayment liability relating to pre-closing operations by HUH.

A hearing was held on the Resident Sale Motion and, on September 10, 2019, the Bankruptcy Court issued an order approving the residency program transaction [D.I. 681] (the "**Residency Program Sale Order**"). Immediately after its ruling at the hearing, the Bankruptcy Court considered and denied the United States' motion for a stay of the Bankruptcy Court's order pending its appeal; however, the Bankruptcy Court did issue a seven-day stay of the effectiveness of the order.

On September 12, 2019, CMS filed a Notice of Appeal with respect to the sale order in the United States District Court for the District of Delaware and sought a stay of the order pending appeal. CMS also filed, in the United States Court of Appeals for the Third Circuit, an *Emergency Motion for Temporary Administrative Stay and Petition for Mandamus.* The Debtors filed a memorandum in opposition to the stay motion on September 13, 2019, which was joined by the Committee. On September 14, 2019, Jefferson likewise filed an objection to the stay motion. On September 16, 2019, the Debtors filed an objection to the *Emergency Motion for Temporary Administrative Stay and Petition for Mandamus.*

A hearing on CMS's stay motion took place before the Honorable Maryellen Noreika on September 16, 2019. At this hearing, Judge Noreika issued a stay of the Residency Program Sale Order pending appeal. CMS then withdrew its *Emergency Motion for Temporary Administrative Stay and Petition for Mandamus*.

In February 2020, Jefferson exercised its contractual right to terminate the Jefferson APA due to delays in the Residency Program Sale Order becoming final. Tower, as back-up bidder, also declined to proceed with a purchase. CMS and the Debtors then stipulated to a voluntary dismissal of the appeal of the Residency Program Sale Order, as moot, and the vacation of such order. This stipulation was approved by District Court order entered March 17, 2020 [D.I. 1480].

## M.    STC Sale

On July 16, 2019, the Debtors filed a motion [D.I. 205] for approval of procedures relating to the sale of assets of SCH and certain of its affiliates, which assets generally constituted the operating assets of STC and its practice groups. After a hearing on July 26, 2019, the Bankruptcy Court entered an order [D.I. 301] approving procedures for such sale, including procedures relating to the qualification of bidders, bid increments, the assumption and assignment of executory

contracts and unexpired leases, the determination and payment of cure amounts, the designation of a potential buyer as a stalking horse bidder and bid protections. The Bankruptcy Court's order also established deadlines regarding the sale, including bid and objection deadlines, as well as an auction date and a hearing date for the sale.

Although no stalking horse bidder was selected and no auction was held, the Debtors, with the assistance of SSG, held discussions with several parties and ultimately reached agreement with STC OpCo, LLC ("**STC OpCo**"), an entity owned jointly by Tower and Drexel University. Pursuant to this agreement, and subject to certain terms and conditions, STC OpCo agreed to purchase substantially all of the operating assets of STC and its affiliated practice groups pursuant to an asset purchase agreement (the "**STC APA**") for a gross price of $50 million, subject to up to a $2.0 million credit for the cost of certain medical malpractice coverage to be obtained by STC OpCo in connection with the acquisition.

A hearing on the sale (the "**STC Sale**") was held on September 23, 2019, after which time the Bankruptcy Court issued an order approving the STC Sale and the STC APA [D.I. 795]. Two months later, on December 14, 2019, the Debtors and STC OpCo executed a first amendment to the STC APA [D.I. 1169] that addressed certain administrative and logistical issues regarding the sale, including certain bonuses due to STC physicians, an allocation of "straddle payroll" (*i.e.*, payroll for those employees in the middle of a shift as of the effective time of closing) and an allocation of payments received post-closing for "straddle patients" (*i.e.*, hospitalized patients who had not been medically discharged prior to closing)[3].

Closing on the STC APA took place as of December 15, 2019. Proceeds from the sale, (a) as *reduced* by $2,000,000 to account for the Debtors' obligations under the STC APA to pay certain costs of professional malpractice insurance and by $5,000,000 to reflect the deposit previously paid by STC OpCo, and (b) as *increased* by $148,000 to reimburse the Debtors for straddle payroll (as described above) and certain supplies purchased prior to closing, were used to (i) satisfy the Debtors' outstanding liabilities to MidCap (in the amount of $33,238,528.75), (ii) create an escrow account for physician bonus obligations (in the amount of $300,000), (iii) pay the Debtors the remaining purchase price (in the amount of $9,609,471.25). From these funds, the Debtors made the payments due to Tenet and Conifer under the Tenet/Conifer Settlement (in the amount of $2,200,000) and to HSRE under the HSRE Stipulation (in the amount of $650,000).

As part of the STC Sale, the parties entered into a Transition Services Agreement by which, among other things, the Debtors agreed to make certain personnel available to assist STC OpCo in operating STC post-closing (at STC OpCo's cost) and STC OpCo further agreed to provide certain services and information to the Debtors subsequent to closing pursuant to certain terms and conditions. This Transition Services Agreement has been extended on several occasions and as of the date of this Disclosure Statement remains in effect.

---

[3]     Subsequent to the closing on the STC Sale, the Debtors have received in excess of $3.4 million in payments for these "straddle patients."

37812817.7 12/30/2020

In connection with, or subsequent to, the STC Sale, STC OpCo provided medical malpractice "tail" insurance, or the equivalent, to, among other individuals, those STC physicians that STC OpCo hired from SCH, and all current and former STC residents.

## N.    HSRE

On October 18, 2019, HSRE-PAHH I, LLC, PAHH New College MOB, LLC, PAHH Bellet MOB, LLC, PAHH Wood Street Garage, LLC, PAHH Feinstein MOB, LLC, PAHH Erie Street Garage, LLC, and PAHH Broad Street MOB, LLC (collectively, the "**Master Landlords**") filed the *Motion of Master Landlords for Entry of an Order (A) Allowing Administrative Claims, and (B) Compelling Debtors (I) to Pay Postpetition Rent and Other Obligations Under Master Leases and (II) to Coordinate with Master Landlords Regarding Rejection of Master Leases and Surrender of Premises* [D.I. 878] (the "**HSRE Administrative Claim Motion**").  In this motion, the Master Landlords sought allowance and payment of significant administrative expense claims in connection with certain of the Debtors' nonresidential real estate leases.

The Debtors filed an objection to the HSRE Administrative Claim Motion [D.I. 987].  In their objection, the Debtors did not contest the Master Landlords' entitlement to allowance of certain amounts as administrative expenses pursuant to the Administrative Claim Motion, but contended that many of the amounts sought by the Master Landlords were not entitled to administrative priority status, either because such amounts were not valid obligations under the parties' leases, because such obligations arose prepetition, or because such obligations did not correspond to any benefit to the Debtors' estates.  The Debtors also contended that whatever administrative expense amount that might be allowed to the Master Landlords should not be payable immediately; on the contrary, the Debtors argued that payment of any allowed administrative claim should be deferred until after closing of the pending STC Sale and be pursuant to a plan or further order of the Bankruptcy Court.

The Debtors and HSRE ultimately resolved the HSRE Administrative Claim Motion, as well as the Debtors' motion, filed on August 30, 2019 [D.I. 620], to reject certain leases, including certain of the Master Leases, through the *Stipulation Between the Debtors and Master Landlords Regarding Rejection of Leases, Allowed Administrative Expense Claim and Related Matters* (the "**HSRE Stipulation**").  This stipulation, which was approved by the Bankruptcy Court on November 25, 2019 [D.I. 1057], provided for, among other things, and subject to certain terms and conditions, (i) the rejection of certain of the Master Leases as of November 15, 2019, (ii) the allowance to the Master Landlords of an administrative expense claim of $2.6 million, (iii) payment of such administrative expense claim from the following sources (A) $650,000 from the STC Sale, (B) certain proceeds from the sale of HUH's equipment sale (as described below), (C) rebates payable to the Debtors pursuant to an energy efficiency incentive rebate program sponsored by PECO Energy Company and (D) otherwise, as a super-priority administrative claim; and (iii) the Debtors' use of certain of the space that was subject to certain Master Leases following the rejection of those leases.

In accordance with the HSRE Stipulation, the Debtors paid HSRE $650,000 from the STC Sale, equipment sale proceeds in the amount of $871,981.00, rebates in the amount of $189,452.19, and an additional $197,951.81.  The Debtors believe, and have asserted to HSRE, that they are entitled to reduce the remaining amounts owed to HSRE under the HSRE Stipulation for amounts

that the Debtors spent after November 15, 2019 (the effective date of rejection) for the maintenance and/or security of the rejected properties, to HSRE's benefit.  HSRE has disputed this contention and contends it is still owed approximately $690,614.19 of its $2.6 million administrative claim under the HSRE Stipulation, plus certain amounts for reimbursement of asserted utility charges.

Separately, in November 2020 the Debtors and the Committee jointly made a document request to HSRE pursuant to Bankruptcy Rule 2004 for certain information related to, among other things, the Acquisition.  As of the date of this Disclosure Statement, the Debtors, the Committee and HSRE remain in discussions regarding this request.

## O.    Exclusivity

Throughout the Chapter 11 Cases, the Debtors have received extensions of the time periods in which they have the exclusive right to file a chapter 11 plan (the "**Exclusive Filing Period**") and solicit acceptances of such filed plan (the "**Exclusive Solicitation Period**").  These extensions have extended the Exclusive Filing Period and the Exclusive Solicitation Period through December 30, 2020, and March 2, 2021, respectively [D.I. 1876].

## P.    Insurance

### 1.    Insurance Coverage as of Petition Date.

As of the Petition Date, the Debtors maintained, through a number of insurers, various insurance coverages, including aviation, professional and general liability, auto, workers' compensation, property, terrorism, pollution, storage tank, volunteer/student accident, cyber, crime, fiduciary, director and office, employment practices, employed lawyers and property liability.   These coverages are described in greater detail in the *Motion of The Debtors For Entry of Interim And Final Orders Authorizing The Debtors To (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor The Terms of Premium Financing Agreement and Pay Premiums Thereunder; and (IV) Enter Into New Premium Financing Agreements in The Ordinary Course of Business*, filed on July 1, 2019 [D.I. 13].

### 2.    Tail Insurance Disputes and Resolution

Certain disputes arose during the Chapter 11 Cases regarding the Debtors' provision of professional liability insurance coverage for certain attending physicians, nurses and other medical professionals, as well as residents and fellows (collectively, the "**Residents**").   Generally, these disputes were based on the Debtors' provision of "claims made" insurance coverage to these individuals rather than "occurrence based" coverage.

All or substantially all of the Debtors' employment agreements with physicians required the Debtors to obtain for the physicians either occurrence-based coverage or claims-made coverage, provided that if the Debtors provided claims-made coverage, they were required to also provide tail coverage.   Prior to the Petition Date, each Resident executed an employment agreement with the applicable pre-petition Debtor (the "**Resident Employment Contracts**") that, in some or all instances, obligated the Debtors to provide occurrence-based professional liability

31

coverage for the applicable resident rather than the claims-made coverage obtained by the pre-petition Debtors. The Debtors believe they may have a professional negligence claim against a former in-house attorney on account of what the Debtors believe is such attorney's negligent failure to properly document the correct insurance coverage for the Debtors, some or all Residents, former physicians and the like. The Debtors believe they may have claims against other persons relating to these events.

On December 11, 2019, an ad hoc committee of Residents (the "**Ad Hoc Committee**") and the DOH filed motions to compel relating to the Debtors' provision of tail coverage [D.I. Nos. 1134 and 1141]. In its motion, the Ad Hoc Committee requested an order of the Bankruptcy Court compelling the Debtors to obtain tail insurance for all Residents in order to avoid what the Ad Hoc Committed described as a "catastrophic effect on the medical services community in Philadelphia." DOH's motion similarly asserted that "it is in the best interests of the public, including but not limited to Hahnemann and St. Christopher's patients, employees, and other hospital staff, for the Debtors to obtain tail insurance . . ." and that the "Debtors' former residents, fellows, and physicians who are unable to obtain tail coverage on their own, would be at risk of losing their ability to provide medical care in the Commonwealth of Pennsylvania due to lack of insurance coverage . . . . at a time when the Commonwealth of Pennsylvania is experiencing a shortage of physicians."

A hearing was initially scheduled on these motions to compel for December 17, 2019. This hearing was adjourned on several occasions, by consent. Also initially scheduled for December 17th, and also adjourned, was a hearing on an *Order For Rule to Show Cause Directed to Debtors* entered December 16, 2019 [D.I. 1169], in which the Bankruptcy Court, among other things, stated that the "Debtors appear to have failed to maintain appropriate insurance, i.e., tail insurance, for physicians they employed . . ."

In order to maintain the status quo during these adjournments, the Debtors twice extended what had originally been a January 11, 2020 expiration date for their professional liability insurance; first, until February 11, 2020 and, second, until March 11, 2020. During this time, the Debtors engaged insurance brokers and gathered the considerable information that was required to solicit quotes on tail coverage from various potential insurers. The Debtors also communicated with key constituents, including the Committee, the Ad Hoc Committee, representatives of the Commonwealth of Pennsylvania, the Pennsylvania Professional Liability Joint Underwriting Association (the "**JUA**"), at least one key local health insurance company, and certain local and regional institutions that had hired significant numbers of HUH residents. The Debtors provided the Ad Hoc Committee and DOH with periodic updates, and informed Residents of the extended insurance expiration dates.

As a result of the Debtors' efforts, and with the assistance of brokers, the Debtors obtained quotes from several insurance companies, including "surplus line" insurers, for tail coverage. The most favorable quote was from Philadelphia Academic Risk Retention Group, LLC ("**PARRG**"), a Vermont-domiciled insurance company formed under the federal Liability Risk Retention Act that is predominantly (90%) owned by PAHH (which is in turn owned and controlled by Mr. Freedman). PARRG offered, with the approval of the Insurance Division of the Vermont Department of Financial Regulation, to provide the requested coverage for a total premium of $9.3 million. The offered coverages are as follows:

32

- Philadelphia Academic Health System, LLC: $1,000,000/$3,000,000
- Hahnemann University Hospital: $500,000/$2,500,000
- Each physician and Resident: $500,000/$1,500,000
- Each physician assistant, nurse practitioner, certified registered nurse anesthesiologist and dentist: $1,000,000/$3,000,000

In connection with this quote, PARRG agreed, subject to further approval from the Vermont regulator, to provide the Debtors with a dollar-for-dollar credit for the cost of the most recently purchased one-month extension of the Debtors' current coverage. It also offered to allow the premium to be paid in three equal installments over approximately eight (8) months. In addition, and significantly, PARRG agreed to use its surplus to provide a premium credit equal to one-third of the total cost of the tail coverage, which credit would be applied to the second premium installment. The amount of such installment is approximately $3.1 million, leaving the Debtors' total cost for the tail coverage to be approximately $6.2 million.

In the hope of obtaining assistance in covering the cost of tail coverage, the Debtors contacted various constituents in the Commonwealth of Pennsylvania, including the JUA, which upon information and belief has a surplus of approximately $200 million. Although the JUA expressed a willingness to assist the Debtors with tail insurance funding, it was unable to obtain the necessary Commonwealth approvals or consents. The Debtors also contacted the Pennsylvania Governor's office and the Pennsylvania Insurance Department, as well as certain local and regional hospitals that hired significant numbers of Residents, to determine whether some or all of such entities – which seemingly would have a direct interest in making sure their residents are insured as required by Pennsylvania law – would be willing to defray a portion of the cost of the tail coverage. None of these entities agreed to assist.

By motion filed on February 20, 2020 [D.I. 1418], the Debtors sought Bankruptcy Court approval to purchase the above-described tail coverage from PARRG. In its response to this motion [D.I. 1436], the Committee contended, among other things, that the proposed purchase of tail insurance, which would satisfy what the Committee described as a pre-Petition Date obligation, would be inconsistent with the priority scheme contained in the Bankruptcy Code. The Committee also asserted that the tail insurance would be purchased with funds of certain Debtors for the benefit of others. A hearing was held on the Debtors' motion on March 3, 2020, after which the Bankruptcy Court entered an order approving the Debtors' motion [D.I. 1447]. The Debtors subsequently purchased the above-described tail insurance from the PARRG, engaged in detailed discussions with the PARRG to confirm that all relevant individuals are covered, and made all premium payments required of them with respect to such coverage.

## Q.    Matters Relating to Unexpired Leases and Executory Contracts

In connection with the closure of HUH described in article VII(J) above and the sale of STC described in article VII(M) above, the Debtors have rejected, or, in the context of the STC Sale, assumed and assigned, numerous executory contracts and unexpired leases. By Orders dated August 22, 2019 [D.I. 547, 548, 549], September 18, 2019 [D.I. 727], November 14, 2019 [D.I. 1007], January 2, 2020 [D.I. 1270], January 10, 2020 [D.I. 1311, 1312], January 13, 2020 [D.I. 1321], January 22, 2020 [D.I. 1349], February 4, 2020 [D.I. 1387], March 25, 2020

[D.I. 1501-1503], March 26, 2020 [D.I. 1506] and April 2, 2020 [D.I. 1548], the Bankruptcy Court granted the Debtors' motions to reject numerous executory contracts and unexpired leases that were no longer needed either as a result of the closure of HUH or that were not assumed and assigned to STC OpCo in connection with the STC Sale and determined to not be needed in connection with the Debtors' remaining operations.

The Debtors also obtained Bankruptcy Court authority to assume and assign and reject certain nonresidential real property leases.  Specifically, as noted above, the HSRE Stipulation provided for, inter alia, the rejection of certain of the Master Leases as of November 15, 2019.  In addition, on July 24, 2019, the Bankruptcy Court entered an order [D.I. 275] rejecting a lease for office space located at 1010 Arch Street, Philadelphia, PA, effective as of July 22, 2019, and on November 13, 2019, the Bankruptcy Court authorized the Debtors to reject their lease for office space located at Centre Square, 1500 Market Street, Philadelphia, PA [D.I. 997].  On December 13, 2019, in connection with the STC Sale, the Bankruptcy Court entered an order authorizing the assumption and assignment to STC OpCo of certain leases between SCH and the Front Street Entities for the properties housing the STC medical building referred to as the Nelson Pavilion (3647-3669 N. Front Street, Philadelphia, PA) and the hospital building for STC (160 E. Erie Avenue, Philadelphia, PA), subject to the satisfaction and resolution of certain cure amounts and cure disputes between STC OpCo and the Front Street Entities.  Moreover, in accordance with the Stipulation Regarding Broad Street Lease approved by the Bankruptcy Court on January 28, 2020 [D.I. 1364], the Debtors rejected the lease between CCH and Broad Street Healthcare Properties, LLC for the hospital buildings located at 222-48 N. Broad Street, Philadelphia, PA and 221-223 N. 15th Street, Philadelphia, PA as of February 29, 2020.

Lastly, pursuant to orders entered on March 31, 2020 [D.I. 1531-1542] (the "**Resident Rejection Orders**"), the Debtors obtained Bankruptcy Court authority to reject hundreds of agreements with former Residents.  The Debtors requested such authority in an abundance of caution and in response to arguments made by the Ad Hoc Committee in its Motion to Compel (as described above) that, notwithstanding the voluntary termination of all Residents' employment, their employment agreements somehow remained executory.  To ensure that there could be no dispute or confusion with respect to the status of such contracts, the Debtors sought and obtained entry of the Resident Rejection Orders.

## R.     Investigations

As noted previously, on August 31, 2017, certain entities controlled by Mr. Freedman, and certain entities controlled by HSRE, collectively, as purchasers, and Tenet and certain of its affiliates, collectively, as sellers, entered into the ASA.  In connection therewith, Mr. Freedman created (i) "opco" entities (the "**OpCos**" – currently the Debtors in these chapter 11 cases), which purchased HUH, STC and the equity of various related practice groups, and (ii) the PropCos, which took ownership of the real estate on which the hospitals are located.  The OpCos and PropCos are both subsidiaries of parent companies owned and controlled by Mr. Freedman (the "**ParentCos**"), including PAHH and American Academic Health System, LLC.  The Acquisition closed on January 11, 2018.

As noted above, CCH and SCH, along with their medical practice groups and certain other affiliates, filed for bankruptcy less than eighteen months after this closing.  The Debtors'

bankruptcy filings resulted in the closure of HUH and its practice groups, the disposition of STC, caused thousands of jobs to be lost, left thousands of unpaid creditors with asserted claims exceeding $11 billion, and caused substantial disruption to the medical community in Philadelphia and the surrounding region.   The real estate owned by entities controlled by Mr. Freedman, however, remained valuable and the PropCos did not file for chapter 11 protection.

The circumstances surrounding the Debtors' acquisition of the hospitals and sheltering (from creditors) of the real estate, and the manner in which the Debtors were managed and operated prior to their bankruptcy filings raise, in the Debtors' view, substantial questions regarding potential estate causes of action. The Debtors and the Committee, working collectively and cooperatively, have devoted significant efforts in exploring potential estate claims against, among other parties, Mr. Freedman and certain affiliated non-debtor persons and entities (the "**MBNF Non-Debtor Entities**")[4].

Towards these ends, in January 2020, the Committee made a Rule 2004 examination request to the MBNF Non-Debtor Entities (the "**MBNF 2004 Subpoena**").   Although the MBNF Non-Debtor Entities produced certain documents in response to this request, they withheld other documents based on various asserted privileges, including attorney-client privilege, common interest privilege and joint client privilege.   After many months of unsuccessful negotiations regarding these asserted privileges and multiple "meet and confer" discussions, on November 12, 2020, the Debtors and Committee filed a joint motion to compel [D.I. 1888] (the "**Motion to Compel**"), by which they sought, among other things, an order of the Bankruptcy Court compelling the MBNF Non-Debtor Entities to (i) produce to the Debtors and the Committee the documents that the Debtors and Committee believe were erroneously withheld on the basis of the Asserted Privileges (as defined in the Motion to Compel), which documents are responsive to the MBNF 2004 Subpoena, and (ii) produce to the Debtors (a) all other documents responsive to the MBNF 2004 Subpoena previously produced to the Committee (the "**Committee Received Documents**") and (b) all documents withheld from the Committee on the basis of an asserted joint interest or common interest privilege between the Debtors and MBNF Non-Debtor Entities.

Separately, in June 2020, in an effort to reach equal footing with the Debtors regarding the background information necessary to complete an appropriate analysis, the Committee requested certain documents from the Debtors pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 (the "**Debtor Document Request**"). This request led to good faith negotiations and ultimately agreement, as between the Debtors and the Committee, on a consensual discovery process, and resulted in a proposed consent order (the "**Consent Order**").   Despite agreement between the Debtors and Committee regarding the Consent Order, the MBNF Non-Debtor Entities inserted themselves into the discovery process, arguing that the Debtors were in possession of documents that were subject to the MBNF Non-Debtor Entities' alleged privileges.

---

[4]       The term "MBNF Non-Debtor Entities" includes Joel Freedman, Stella Freedman, Svetlana Attestatova, Kyle Schmidt, MBNF Investments, LLC, American Academic Health System, LLC, Philadelphia Academic Health Holdings, LLC, Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC, Broad Street Healthcare Properties III, LLC, Philadelphia Academic Risk Retention Group, LLC, Paladin Healthcare Capital, LLC, Paladin Healthcare Management, LLC and Globe Health Foundation, Inc.

In an attempt to reach resolution with the MBNF Non-Debtor Entities, prior to filing the Consent Order with the Court, the Debtors and the Committee shared a form of the order with the MBNF Non-Debtor Entities. The parties exchanged numerous communications and held several meet and confer calls in an attempt to resolve their disputes regarding the Consent Order and the Debtors' and the Committee's consensual discovery process.  Unfortunately, and despite significant efforts, no agreement was reached.  Accordingly, on November 12, 2020, the Debtors and the Committee filed their *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors For Approval of Consent Order Regarding Committee Discovery of Debtors and Related Relief Regarding the Application and Waiver of Privileges* [D.I. 1891] (the "**Debtor 2004 Motion**").  In the Debtor 2004 Motion, the Debtors and the Committee seek approval and entry of the Consent Order as well as rulings on the underlying privilege disputes, to assist the parties on a going-forward basis.

A hearing on the Motion to Compel and the Debtor 2004 Motion (collectively, the "**Discovery Motions**") was scheduled for November 30, 2020.  On November 18, 2020, the MBNF Non-Debtor Entities filed an emergency motion to extend their deadline to respond to the Discovery Motions [D.I. 1906].  The Debtors and the Committee filed a joint objection to such emergency motion [D.I. 1916], and a hearing was held on the emergency motion on November 20, 2020.  Following this hearing, the Bankruptcy Court issued an order [D.I. 1943]  granting the emergency motion in part by extending the deadline for the MBNF Non-Debtor Entities to respond to the Discovery Motion to December 7, 2020.  The Debtors and the Committee were given until December 18, 2020 to reply to any such response, and a hearing on the Discovery Motions was scheduled for January 4, 2021.  Since then, by agreement of the parties, the parties' response and reply deadlines have been extended with the approval of the Bankruptcy Court [D.I. 1970, 1980, 1989], with the most recent extension of the MBNF Non-Debtor Entities' response deadline being to January 8, 2021.

On December 1, 2020, the Bankruptcy Court issued an order [D.I. 1943] directing the Debtors, the Committee and the MBNF Non-Debtor Entities to engage in mediation regarding the Discovery Motions, and appointing the Honorable Kevin J. Carey (ret.) to serve as mediator.

Separately, as noted above, the Debtors and the Committee, acting jointly, also have made certain information requests to HSRE pursuant to Bankruptcy Rule 2004.  As of the date hereof, the parties remain in discussion regarding this request.

S.     **Governance**

On or about August 12, 2020, Mr. Freedman, in his capacity as the chief executive officer and president of PAHH, PAHS's non-Debtor manager, executed a Member Consent that (i) increased PAHS's number of managers from two to three, and (ii) appointed Michael E. Jacoby of Phoenix Management Services, LLC ("**Phoenix**") as an independent manager of PAHS.  Mr. Freedman also executed, on behalf of PAHS, an Independent Manager Agreement with Phoenix. Mr. Freedman did not provide Mr. Mezzaroba, the CRO or counsel to the Debtors prior notice of the appointment of Mr. Jacoby as an additional independent manager or of his intention to execute, on behalf of PAHS, the foregoing Independent Manager Agreement.

The Debtors promptly informed the Committee of these events.  As a result of this appointment and the unusual manner in which it had been effectuated, representatives of the Debtors entered into negotiations with Mr. Freedman and PAHH regarding certain governance issues.  These negotiations resulted in a form of term sheet, by which the Debtors, PAHH and the Committee agreed to, among other things, the following:

- Mr. Jacoby will become chair of the PAHS board of managers (the "**Board**").

- Mr. Freedman will remain a manager of PAHS but will resign immediately from all Debtor entity officer positions.  The Restructuring Committee (defined below) will have the right to determine whether the hiring of a replacement officer is appropriate.

- A restructuring committee (the "**Restructuring Committee**") of Mr. Jacoby and Mr. Mezzaroba will be appointed immediately for all Debtor entities and for two non-Debtor subsidiaries, Physicians Clinical Network, LLC and Physician Performance Network of Philadelphia, L.L.C.

- The Debtors will provide certain monthly financial information to all PAHS managers, and the Board will hold monthly meetings on Restructuring Committee Matters (as defined below).

- The Restructuring Committee will have the sole and exclusive authority to oversee the Chapter 11 Cases, except that the Board will retain authority to address (i) matters related to assets or the realization thereof, with the exception of, among other things, matters relating to estate claims against Non-Debtor Affiliates (defined below) and their respective members, managers and consultants, matters relating to HSRE, and matters relating to Tenet and Conifer; (ii) the reconciliation of claims unrelated to the Non-Debtor Affiliates, with the exception of claims related to HSRE, withdrawal liability, and all claims for which a Non-Debtor Affiliate is seeking indemnification, is a co-obligor, guarantor or otherwise has an interest; and (iii) other matters that do not present a conflict with Non-Debtor Affiliates as determined by the Restructuring Committee in an exercise of its reasonable business judgment  (excluding such matters, the "**Restructuring Committee Matters**").  Notwithstanding the foregoing, the Restructuring Committee, in an exercise of its reasonable business judgment, will have the ability to determine that any matters purporting to fall within categories (i) – (iii) of this paragraph presents a conflict and shall not be presented to the Board.

- A Special Manager (the "**Special Manager**") will be appointed solely for the purpose of breaking deadlocks on the Restructuring Committee (see above and below) and in the specific instances below.

- If Mr. Mezzaroba or Mr. Jacoby is unwilling or unable to serve as a manager, PAHH and the remaining independent manager will agree on a replacement within 30 days, with the Special Manager to break any deadlock.

- PAHH agrees that until April 30, 2021 (the "**Standstill Period**"), (i) it may remove managers only "for cause," notwithstanding the terms of the PAHS LLC Agreement and (ii) it shall not otherwise take actions regarding PAHS's governance

composition or structure during the Standstill Period ("cause" to be determined with the consent of the Special Manager).

- The Debtors, the Committee and Mr. Freedman and his non-Debtor affiliates will, upon the resolution of certain discovery disputes pending between and among them and the production of any remaining documents, participate in a mediation with the Honorable Kevin J. Carey (ret.) acting as mediator, to attempt to resolve their disputes.

## T.    Miscellaneous

### (a)    The CMS Setoff Motion

On December 27, 2019, CMS filed the *Motion of the United States to Lift the Automatic Stay to Permit Setoff* [D.I. 1250] (the "**Setoff Motion**"), pursuant to which CMS sought relief from the automatic stay to setoff certain prepetition amounts that CMS allegedly owed to CCH (in the alleged amount of $1,671,395.83) against prepetition Medicare overpayments allegedly owed by CCH to CMS (in the alleged amount of $2,595,663.11), leaving a remaining amount allegedly owed to CMS in the amount of $924,267.28.

The Debtors filed a limited objection to the Setoff Motion [D.I. 1313], which the Committee joined [D.I. 1314], in which the Debtors indicated that they did not dispute that, to the extent mutual prepetition debts existed between the parties, an exercise of setoff rights may be warranted and appropriate. The Debtors, however, argued that the relief requested in the Setoff Motion was premature pending the Debtors' receipt and review of detail supporting the alleged amounts. CMS filed a reply to the limited objections on January 17, 2020 [D.I. 1330].

The parties thereafter engaged in discussions and an in-depth review of relevant records relating to Medicare overpayments and amounts otherwise owed by CMS to CCH. Following these discussions and detailed analysis, the Debtors, the Committee and CMS agreed on the terms of a revised proposed order granting the Setoff Motion, which was approved by the Court on October 27, 2020 [D.I. 1863]. Per the Order, the automatic stay was modified to permit CMS to offset and/or recoup certain specified pre- and post-petition amounts owed to CCH on account of Medicare services provided at HUH against certain pre- and post-petition amounts claimed to be owed to CMS. Per the Order, these offsets resulted in a balance of $1,743,029.85 owed by CMS to CCH, which amount has since been paid.

### (b)    Equipment Sales

As previously noted, the Debtors received authority, by Bankruptcy Court order entered November 25, 2019, to retain Centurion as auctioneer to sell medical equipment and supplies located at HUH. In connection with this sale, Centurion made an initial "guaranteed" payment to MidCap (which held a lien on the medical equipment and supplies at issue) in the amount of $1,597,750, and split the remaining net sale proceeds above $2,167,650 with the Debtors on an 85% (Debtors) / 15% (Centurion) basis. The total net proceeds realized from the sale was $3,211,156. As a result of this auction sale, the Debtors received, in addition to the guaranteed payment, an additional $886,980, which was payable to HSRE pursuant to the HSRE Stipulation. In September 2020, the Debtors were informed by STC OpCo that certain equipment belonging to

HUH was being stored at STC. The Debtors retrieved this equipment and, on November 12, 2020, received Bankruptcy Court authority to retain Centurion on a supplemental basis to conduct an auction sale of this equipment using on an 85% (Debtors) / 15% (Centurion) division of the net proceeds of sale [D.I. 1885]. As of the date hereof, this supplemental equipment sale remains in process.

(c)     **Potential CNNH Data Breach**

In June 2020, the Debtor were informed that in May 2019 (prior to the Petition Date), a SCH employee inadvertently sent certain potentially protected personal information, contained in a "pivot" table in an excel spreadsheet, to the Center for Neurological and Neurodevelopmental Health ("**CNNH**"), and that CNNH experienced a data breach in late 2019 that may have allowed this potentially protected personal information, which related to approximately 7,500 patients, to be accessed. The Debtors obtained additional information from CNNH and then worked with STC OpCo to arrange for (i) informational letters to be sent to affected individuals, (ii) a press release to be issued, (iii) notification to be made to the Office of Civil Rights at the Department of Health and Human Services and (iv) an informational notice to be placed on STC's website, by July 31, 2020. The Debtors believe they may hold certain claims against CNNH as a result of these circumstances.

(d)     **HPP**

As part of the Acquisition, CCH and SCH acquired certain rights with respect to Health Plan Partners, Inc. ("**HPP**"), a Pennsylvania domiciled HMO. These rights included several surplus notes from HPP, in the aggregate principal amount of $7,745,319, due on or about January 2, 2025, subject to the terms and provisions thereof.

CCH and SCH also acquired the right to certain potential retained earnings from HPP. SCH sold its rights to these retained earnings, if any, to STC OpCo as part of the STC Sale. As of the date of this Disclosure Statement, CCH has retained its rights to HPP retained earnings. HPP did not approve the transfer of Tenet's membership interest in HPP to any of the Debtors. As a result, neither CCH nor SCH acquired any membership interest in HPP as part of the Acquisition. CCH and SCH later informed HPP that they were not interested in being admitted to HPP as a new member.

(e)     **Suzanne Richards Human Relations Commission Action**

On or about August 3, 2019, Suzanne Richards filed a complaint with the Commonwealth of Pennsylvania Human Relations Commission against, among other parties, Mr. Freedman, CCH and SCH. Ms. Richards' complaint alleged among other things that she, on behalf of her company SMR Healthcare Management, Inc. ("**SMR**"), signed a consulting agreement with PHAS by which she and/or SMR agreed to provide certain services to PAHS. Ms. Richards alleges that she served as the Chief Executive Officer of CCH and SCH, and that, while in such capacity, and while supervised by Mr. Freedman, she was subject to harassment and discrimination, and that she was discriminated against in violation of the Pennsylvania Human Relations Act. The Debtors have responded to Ms. Richards' complaint, as have the other respondents. As of the date of this Disclosure Statement, this matter remains pending. Ms. Richards and her consulting firm, SMR

Healthcare Management, Inc. have filed Claims against PAHS in aggregate amounts exceeding $12.0 million.

In December 2019, Ms. Richards and SMR Healthcare Management, Inc. filed a civil complaint in the Commonwealth of Pennsylvania Common Pleas Court against Mr. Freedman, American Academic Health System, LLC ("**AAHS**") and Paladin Healthcare Capital, LLC alleging breach of contract, Pennsylvania wage payment and collection law violations, promissory estoppel and detrimental reliance, unjust enrichment, fraudulent inducement and defamation, and seeking damages in excess of $50,000. This action remains pending as of the date hereof.

## VIII. THE CHAPTER 11 PLAN

### A.    Introduction

The following is a summary of certain terms and provisions of the Plan. This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit "A."**

### B.    Classification of Claims and Interests against the Debtors

The following is a summary of the classification of Claims and Interests under the Plan. As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims and Priority Tax Claims are not classified under the Plan, and are instead treated as Unclassified Claims on the terms set forth in Article III of the Plan.

Classes of Claims against, and Interests in, the Debtors are as follows:

**(a)**    Unclassified Claims (not entitled to vote on the Plan)

    (i)    Administrative Claims against any of the Debtors.

    (ii)    Professional Fee Claims against any of the Debtors.

    (iii)    Priority Tax Claims against any of the Debtors.

**(b)**    Unimpaired Classes of Claims (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan)

    (i)    Class 1: Priority Non-Tax Claims against any of the Debtors.

    (ii)    Class 2: Secured Claims against any of the Debtors.

**(c)**    Secured Lender Claims (although the Debtors believe that the Secured Lender Claims are Unimpaired by the Plan, the DIP Secured Parties will be entitled to vote on the Plan)

    (i)    Class 2/MidCap: Secured Lender Claims against any of the Debtors.

    **(d)**    Impaired Classes of Claims (entitled to vote on the Plan)

        (i)    Class 3A:  Convenience Claims

        (ii)    Class 3B: General Unsecured Claims against any of the Debtors.

        (iii)    Class 3C:  HSRE Claims against any of the Debtors.

        (iv)    Class 3D: Insider Claims against any of the Debtors.

    **(e)**    Impaired Classes of Interests (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan)

        (i)    Class 4: Interests in any of the Debtors.

Priority Non-Tax Claims and Secured Claims are Unimpaired under the Plan and are therefore deemed to have accepted the Plan.  Such Claimants are not entitled to vote to accept or reject the Plan.  Moreover, although the Debtors believe that the Secured Lender Claims are Unimpaired, the DIP Secured Parties will be entitled to vote on the Plan.  All other classes of Claims are Impaired under the Plan.  Class 4 is deemed to reject the Plan and is not entitled to vote on the Plan.  If a dispute arises as to whether any Claim, or any Class of Claims, is Impaired under the Plan, the Plan provides that the Bankruptcy Court shall, after notice and a hearing, determine such dispute.

## C.    Treatment of Claims against, and Interests in, the Debtors

    **(a)**    **Unclassified Claims**

        o    <u>Administrative Claims and Professional Fee Claims</u>

The Plan provides that except as otherwise provided therein, and subject to the requirements set forth therein, on, or as soon as reasonably practicable after the later of (i) the Effective Date, but in no event later than forty-five (45) days after the Effective Date if the Administrative Claim is an Allowed Administrative Claim on the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim shall receive, in full satisfaction of such Allowed Administrative Claim, (a) Cash from the Debtors' SAP Claims Reserve Account equal to the amount of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Debtors shall have agreed upon in writing.

Furthermore, the Plan provides that on or as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date a Professional Fee Claim becomes an Allowed Professional Fee Claim, a Holder of an Allowed Professional Fee Claim shall receive, in full satisfaction of such Allowed Professional Fee Claim, Cash from the Professional Fee Claims Reserve equal to the unpaid portion of the Allowed Professional Fee Claim.

    o   Priority Tax Claims

The Plan provides that except to the extent that a Holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive Cash from the Debtors' SAP Claims Reserve Account in an amount equal to such Allowed Priority Tax Claim on, or as soon as reasonably practicable after the later of (i) the Effective Date, but in no event later than forty-five (45) days after the Effective Date if the Priority Tax Claim is an Allowed Priority Tax Claim on the Effective Date, or (ii) the date such Claim becomes an Allowed Priority Tax Claim.

**(b)     Unimpaired Claims**

    o   Class 1: Priority Non-Tax Claims against Any of the Debtors

The Plan provides that except to the extent that a Holder of an Allowed Priority Non-Tax Claim against any of the Debtors has been paid prior to the Effective Date or agrees to a different treatment, on or as soon as reasonably practicable after the later of (i) the Effective Date, but in no event later than forty-five (45) days after the Effective Date if the Priority Non-Tax Claim is an Allowed Priority Non-Tax claim on the Effective Date, or (ii) the date such Claim becomes an Allowed Priority Non-Tax Claim, the Debtors' Representative shall pay to each Holder of an Allowed Priority Non-Tax Claim Cash in an amount equal to the Allowed Priority Non-Tax Claim from the Debtors' SAP Claims Reserve Account.

    o   Class 2: Secured Claims against Any of the Debtors

The Plan provides that except to the extent that a Holder of an Allowed Class 2 Secured Claim against any of the Debtors has been paid prior to the Effective Date or agrees to a different treatment, on or as soon as is reasonably practicable after the later of (i) the Effective Date, but in no event later than thirty (30) days after the Effective Date if the Class 2 Secured Claim is an Allowed Class 2 Secured Claim on the Effective Date or (ii) the date such Claim becomes an Allowed Secured Claim, the Debtors' Representative shall either: (a) pay from the Debtors' SAP Claims Reserve Account, to each Holder of an Allowed Class 2 Secured Claim, Cash in an amount equal to such Allowed Class 2 Secured Claim; or (b) release to such Holder the collateral securing such Allowed Class 2 Secured Claim.  In either event, such payment or release of collateral will be in full satisfaction of the applicable Allowed Class 2 Secured Claim.  Notwithstanding the preceding or anything in the Plan to the contrary, nothing contained in the Plan is intended to preclude or prevent payment to the Holder of an Allowed Class 2 Secured Claim of the proceeds of the sale of any asset in which such Holder has a Lien as and when such proceeds become available for distribution.

**(c)     Secured Lender Claims**

    o   Class 2/MidCap – Secured Lender Claims against Any of the Debtors.

The Plan provides that upon the occurrence of the Effective Date, the Holders of the Secured Lender Claims shall be deemed, without any action of any Person, to forever release and discharge their security interest in and liens on all assets of the Debtors.  On the Effective Date,

37812817.7 12/30/2020

and as provided in the DIP Credit Agreement and the DIP Orders, the Debtors will pay, in full in Cash, all reasonable and documented fees and expenses of each DIP Secured Party and their respective professionals incurred prior to the Effective Date (subject to the Debtors' receipt of invoices in customary form in connection therewith and without the requirement to file a fee application with the Bankruptcy Court).  To the extent such invoices are submitted after the Effective Date, such invoices will be paid no later than three (3) Business Days after the Debtors' receipt of such invoice.

**(d)**     **Impaired Claims and Interests**

o   Class 3A: Convenience Claims against any of the Debtors

The Plan provides that the Holder of each Allowed Class 3A Convenience Class Claim will receive, from the Convenience Claims Reserve, on or as soon as is practicable after the later of (i) the Effective Date or (ii) the date on which the Holder's Convenience Class Claim is Allowed by Final Order, Cash in the amount of [___]% of the Allowed Amount of such Holder's Convenience Class Claim.

o   Classes 3B and 3C: General Unsecured Claims and HSRE Claims against any of the Debtors

The Plan provides that on the Initial Distribution Date, if a Class 3B General Unsecured Claim or Class 3C HSRE Claim is Allowed at least thirty (30) days prior to the Initial Distribution Date, the Holder of such Allowed Claim will receive, from the Debtors' Distribution Account, Cash equal to (i) the amount of its Allowed Class 3B General Unsecured Claim or Class 3C HSRE Claim, as applicable, multiplied by (ii) the Initial Distribution Percentage.

On each Subsequent Distribution Date, if a Class 3B General Unsecured Claim or Class 3C HSRE Claim is Allowed at least thirty (30) days prior to such Subsequent Distribution Date, the Holder of such Allowed Claim will receive, from the Debtors' Distribution Account (i) a Catch-Up Distribution, if applicable, and (ii) Cash equal to (a) the amount of its Allowed Class 3B General Unsecured Claim or Allowed Class 3C HSRE Claim, as applicable, multiplied by (b) the then-current Interim Distribution Percentage.

On the Final Distribution Date, the Plan provides that each Holder of an Allowed Class 3B General Unsecured Claim and Allowed Class 3C HSRE Claim will receive, from the Debtors' Distribution Account (i) a Catch-Up Distribution, if applicable, and (ii) Cash equal to (a) the amount of its Allowed Class 3B General Unsecured Claim or Allowed Class 3C HSRE Claim, as applicable, multiplied by (b) the Final Distribution Percentage.

Notwithstanding anything to the contrary set forth in the Plan, but subject to Article III(D)(2)(f) of the Plan, until Holders of Allowed Convenience Claims, Allowed General Unsecured Claims other than Tenet/Conifer and Allowed HSRE Claims receive, in the aggregate, the lesser of (i) $25 million or (ii) 50% of the amount of their Allowed Convenience Claims, General Unsecured Claims and HSRE Claims (the "Tenet/Conifer Recovery Threshold"), (A) the Tenet/Conifer Claim will not be considered in calculating the Initial Distribution Percentage, any Subsequent Distribution Percentage or the Final Distribution Percentage and (B) no distribution

43

will be made on account of the Tenet/Conifer Claim.  If and to the extent the Tenet/Conifer Recovery Threshold is reached, the Tenet/Conifer Claim will be included in the calculation of the Initial Distribution Percentage, any Subsequent Distribution Percentage and the Final Distribution Percentage, as applicable, and will be entitled to receive Distributions under the Plan as a Class 3B General Unsecured Claim.  For the avoidance of doubt, the Plan provides that the Tenet/Conifer Claim will not be entitled to any Catch-Up Distribution but will be entitled to receive payment in full from Cash remaining in the Debtors' Distribution Account, if any, after all other Allowed Class 3B General Unsecured Claims and all Allowed Class 3C HSRE Claims have been paid in full.

Notwithstanding anything to the contrary set forth in the Plan, no Holder of an Allowed Class 3B General Unsecured Claim or Allowed Class 3C HSRE Claim will be entitled to receive, on account of such Allowed Claim, Cash under the Plan in excess of 100% of such Holder's Allowed Class 3B General Unsecured Claim or Allowed Class 3C HSRE Claim, as applicable.

Notwithstanding anything to the contrary set forth in the Plan, in the event of an HSRE Subordination (i) all references to "Class 3C HSRE Claim(s)" and "Allowed Class 3C HSRE Claim(s)" shall be deemed removed from Article III(D)(2)(a)–(d), and (ii) upon the prior payment of 100% of each Allowed Class 3B General Unsecured Claim in accordance with the Plan, Allowed HSRE Claims will receive a pro rata distribution of all Cash Available for Distribution that has not been distributed to Holders of Allowed Class 3B General Unsecured Claims; provided, however, that no Holder of an Allowed Class 3C HSRE Claim will be entitled to receive, on account of such Allowed Class 3C HSRE Claim, Cash under the Plan in excess of 100% of such Holder's Allowed Class 3C HSRE Claim.

    o   Class 3D:  Insider Claims

The Plan provides that Class 3D Insider Claims are subordinated to Class 3A Convenience Claims, Class 3B General Unsecured Claims and Class 3C HSRE Claims.  Upon the prior payment of 100% of each Allowed Class 3B General Unsecured Claim and each Allowed Class 3C HSRE Claim in accordance with the Plan, the Plan provides that the Holders of Allowed Insider Claims will receive a pro rata distribution of all Cash Available for Distribution that has not been distributed to Holders of Allowed Class 3B General Unsecured Claims or Holders of Allowed Class 3C HSRE Claims; provided, however, that no Holder of an Allowed Class 3D Insider Claim will be entitled to receive, on account of such Allowed Class 3D Insider Claim, Cash under the Plan in excess of 100% of such Holder's Allowed Class 3D Insider Claim.

    o   Class 4: Interests in Any of the Debtors

The Plan provides that Holders of Class 4 Interests will not receive or retain any property or interest in property on account of their Interests, which will be cancelled and terminated upon the occurrence of the Effective Date.

**(e)**    **Special Provision Regarding Unimpaired Claims**

The Plan provides that except as otherwise provided therein, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement enforceable pursuant to the

terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims; provided, however, that the Secured Lender Claims will not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to Section 502(d) of the Bankruptcy Code.

**(f)      Allowed Claims**

The Plan provides that notwithstanding any provision therein to the contrary, the Debtors' Representative will only make distributions to Holders of Allowed Claims.  No Holder of a Disputed Claim will receive any distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim.  Any Holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its distribution in accordance with the terms and provisions of the Plan.

**D.      Means for Implementation of the Plan**

**(a)      Global Settlement**

The Plan provides that pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a compromise and settlement of numerous inter-Debtor issues. The Plan is designed to achieve an economic settlement of Claims against the Debtors and an efficient, just and equitable resolution of these Chapter 11 Cases.  This global settlement constitutes a settlement of a number of potential litigation issues, including issues regarding substantive consolidation between and among the Debtors, the validity and enforceability of Intercompany Claims, the allocation of borrowings (and use of such borrowings) from the DIP Agent and from the Debtors' pre-Petition Date lenders, and the allocation of expenses and sale proceeds among the Debtors' Estates.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  Each provision of the global settlement will be deemed non-severable from each other and from the remaining terms of the Plan.  As set forth in detail below and in the Plan, the global settlement will be implemented as follows:

o    Settlement of Issues Relating to Intercompany Claims

Intercompany Claims will be extinguished as of the Effective Date without any further action by the Debtors or the Debtors' Representative.

o    Settlement of Issues Relating to Substantive Consolidation

The Plan provides that entry of the Confirmation Order will constitute approval, pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Estates of the Debtors.  For the avoidance of doubt, the Plan

45

will serve as a motion by the Debtors seeking the entry of an order approving the foregoing substantive consolidation. Notwithstanding the substantive consolidation called for in the Plan, each and every Debtor will remain responsible for the payment of U.S. Trustee Fees until its particular case is closed, dismissed or converted.

The Plan provides that the assets and liabilities of each of the Debtors will be deemed to be the assets and liabilities of a single, consolidated entity. Each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Debtors will be considered a single claim filed against the consolidated Debtors on and after the Effective Date. Any joint and several liability of two or more of the Debtors, and all Claims against such entities on account of such joint and several liability, will be considered a single Claim and single liability against the consolidated Debtors. Any guarantee by a Debtor of the liabilities of any other Debtor arising prior to the Effective Date will be deemed eliminated under the Plan such that any Claim against any Debtor and any guaranty thereof executed by any other Debtor will be deemed to be one obligation of the consolidated Debtors.

**(b)    Implementing Actions**

The Plan provides that unless otherwise provided therein, on the Effective Date or as soon thereafter as practicable, the following will occur in implementation of the Plan: (i) all actions, documents and agreements necessary to implement the Plan will have been effected or executed; (ii) the Debtors will have received all authorizations, consents, regulatory approvals, rulings, opinions or other documents, if any, that are determined by the Debtors to be necessary to implement the Plan; (iii) the Debtors' Representative will make all Distributions, if any, required to be made on the Effective Date pursuant to the Plan; and (iv) the Debtors' Distribution Account, the Professional Fee Claims Reserve, the Post-Effective Date Reserve, the Debtors' SAP Claims Reserve Account, and the Convenience Claims Reserve will be established and funded in a manner consistent with Article V(M) of the Plan. All Cash in such accounts will be deposited or invested in accordance with section 345 of the Bankruptcy Code and Local Rule 4001-3.

**(c)    Liquidation of the Debtors**

o    Appointment of Debtors' Representative

The Plan provides that the Debtors' Representative will be Allen Wilen, and the Plan Supplement will include an affidavit of disinterestedness of the proposed Debtors' Representative. The appointment of the Debtors' Representative will be approved in the Confirmation Order, and the Debtors' Representative's duties will commence as of the Effective Date. The Plan provides that the Debtors' Representative will administer the Plan and serve as a representative of the Debtors' Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action. The Debtors' Representative may retain professionals who were previously employed by the Debtors and/or the Creditors' Committee, and nothing in the Plan will limit the Debtors' Representative from engaging the Debtors' Representative's financial advisory/accounting firm.

Unless the Bankruptcy Court orders otherwise, the Plan provides that the Debtors' Representative will serve in such capacity through the earlier of (i) the date all of the Debtors are

dissolved and (ii) the date such Debtors' Representative resigns or is otherwise unable to serve; provided, however, that, in the event that the Debtors' Representative resigns or is otherwise unable to serve, the Special Manager will, in consultation with the Plan Implementation Committee, within ten (10) days, appoint a successor, who will be a disinterested Person, to serve as the Debtors' Representative in accordance with the Plan.   Notice of such appointment (accompanied by an affidavit of disinterestedness) will be filed with the Bankruptcy Court ten (10) days prior to the effectiveness of such proposed appointment.   To the extent that the Special Manager does not appoint a successor within the time periods specified, then the Bankruptcy Court, upon the motion of any party-in-interest, will approve a successor to serve as the Debtors' Representative.   Upon the appointment of any successor Debtors' Representative, the prior Debtors' Representative will have no further obligations under the Plan.

o    <u>Responsibilities of the Debtors' Representative</u>

Subject to the provisions of Article V(C)(f) of the Plan regarding the Plan Implementation Committee, to the extent applicable, the responsibilities of the Debtors' Representative will include, but are not limited to the following:

(i)    implementing the Plan, including making the Distributions contemplated herein, and establishing the Initial Distribution Date, each Subsequent Distribution Date and the Final Distribution Date(s);

(ii)    establishing procedures and, if necessary, establishing and funding an escrow, trust or other arrangement to resolve any remaining obligations of any Debtor with respect to the Nuclear Pacemaker, in accordance with applicable law;

(iii)    receiving, managing, liquidating, administering, investing, supervising and protecting the Remaining Assets;

(iv)    conducting an analysis of any and all Claims, and in accordance with the Debtors' Representative's business judgment prosecuting objections thereto or settling or otherwise compromising such Claims, in accordance with Article VI(G) of the Plan;

(v)    approving any settlement of the MBNF Mediation and any Causes of Action, including without limitation the Non-Debtor Real Estate Litigation, against any of the MBNF Non-Debtor Parties;

(vi)    maintaining and administering the reserves established pursuant to this Plan;

(vii)    in accordance with the Debtors' Representative's business judgment, commencing, prosecuting, or settling claims and Causes of Action, enforcing contracts, and asserting claims, defenses, and offsets in accordance with the Plan and paying all associated costs from the Post-Effective Date Reserve;

(viii)   recovering and compelling turnover of the Debtors' property;

(ix)     paying all amounts payable from the Post-Effective Date Reserve;

(x)      abandoning any property that cannot be sold or otherwise disposed of for value and whose Distribution to holders of Allowed Claims would not be feasible or cost-effective in the Debtors' Representative's business judgment;

(xi)     preparing and filing post-Effective Date operating reports;

(xii)    filing all tax returns for the Debtors and defending all audits and proceedings in connection with the Debtors' tax returns;

(xiii)   paying or causing to be paid from the Post Effective Date Reserve, any Taxes incurred after Effective Date;

(xiv)    retaining such professionals as are necessary and appropriate in furtherance of the Debtors' Representative's obligations; and

(xv)     taking such actions as are necessary and/or desirable to carry out the purposes of the Plan, including effectuating the terms of the Plan, winding down the Debtors' business affairs, and seeking one or more final decrees for the Chapter 11 Cases.

o   Retention of Assets and Causes of Action

The Plan provides that on the Effective Date, any and all of the Debtors' assets, including without limitation the Remaining Assets, shall be deemed retained by the Debtors.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and subject to the terms of the Plan, only the Debtors' Representative will have the right to pursue or not to pursue, compromise or settle any of the Debtors' assets not otherwise sold, released or otherwise settled prior to the Effective Date. From and after the Effective Date, the Plan provides that the Debtors' Representative may commence, litigate and settle any Causes of Action, except as otherwise expressly provided in the Plan.  The Debtors' Representative will be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code, subject to any order(s) entered in the Chapter 11 Cases.

o   Vesting of Debtors' Assets

In accordance with section 1141 of the Bankruptcy Code, the Plan provides that the Debtors' assets will automatically vest in the Debtors free and clear of all Claims, Liens, and other interests, subject only to (i) the Allowed Claims of the Holders of Claims as set forth in the Plan and (ii) the costs and expenses payable from the Post-Effective Date Reserve or from the Professional Fee Claims Reserve, as set forth in the Plan.

o   <u>Non-Debtor Real Estate Litigation</u>

The Plan provides that if and to the extent the MBNF Mediation does not result in a settlement or other resolution acceptable to the Debtors and the Plan Implementation Committee, the Debtors' Representative, in consultation with the Plan Implementation Committee, may in his discretion commence or continue with the Non-Debtor Real Estate Litigation and/or may commence or continue with any other Cause of Action against any of the MBNF Non-Debtor Parties in order to make some or all of the Non-Debtor Real Estate or its value or proceeds available to Holders of Claims or to obtain such other relief and/or remedy that may be appropriate, including without limitation monetary damages.

o   <u>Plan Implementation Committee</u>

The Plan provides that the Creditors' Committee, after consultation with the Debtors, shall choose a maximum of three (3) members of the Creditors' Committee to serve as members of the Plan Implementation Committee, which will have the responsibility to consult with and advise the Debtors' Representative with respect to the liquidation and distribution of the Debtors' assets in accordance with the Plan. A member of the Plan Implementation Committee must recuse itself from considering any matter in which it is not disinterested. The Debtors will file a notice identifying the members of the Plan Implementation Committee with the Plan Supplement. Vacancies on the Plan Implementation Committee will be filled by a Person designated by the remaining member or members of the Plan Implementation Committee from among the holders of General Unsecured Claims. A majority of the Plan Implementation Committee may remove or replace members of the Plan Implementation Committee for cause, and any party-in-interest will have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Plan Implementation Committee for cause. Any successor appointed pursuant to this section of the Plan will become fully vested with all of the rights, powers, duties and obligations of his or her predecessor. For the avoidance of doubt, the Plan provides that no member of the Plan Implementation Committee will be compensated for serving as a member of the Plan Implementation Committee; provided, however, that such members may be reimbursed by the Debtors' Representative for documented reasonable out-of-pocket costs and expenses from the Post-Effective Date Reserve. All communications between the Plan Implementation Committee and the Debtors' Representative will be deemed confidential, privileged, and protected from discovery pursuant to the Bankruptcy Rules or the Federal Rules of Civil Procedure or any state equivalent.

The Plan provides that the rights, powers and duties of the Plan Implementation Committee are as follows:

(i)      To approve any release or indemnity in favor of any third party granted or agreed to by the Debtors' Representative, other than as set forth in the Plan;

(ii)     To consult with the Debtors' Representative regarding the commencement or continuation of the prosecution of any material Cause of Action;

(iii)    To approve the settlement of any Cause of Action or dispute, for which the amount in controversy exceeds $250,000;

49

(iv)      Consult with the Debtors' Representative regarding the Remaining Assets and the use, sale, assignment, transfer, abandonment or other disposition thereof;

(v)      To approve any settlement of the MBNF Mediation and any Causes of Action, including without limitation the Non-Debtor Real Estate Litigation, against any of the MBNF Non-Debtor Parties;

(vi)      To consult with the Debtors' Representative regarding the Initial Distribution Date, the Subsequent Distribution Dates and the Final Distribution Dates;

(vii)      To review and object to fees and expenses of Professionals retained by the Debtors' Representative in accordance with the terms of the Plan;

(viii)      To consider and, if appropriate, approve any action proposed by the Debtors' Representative that is not specifically authorized by the Plan that would have a material effect upon administration of the Estates, provided, however, nothing contained herein shall be deemed to authorize the Debtors' Representative to take any action that is inconsistent with the terms of the Plan;

(ix)      Retain professionals (the reasonable fees and out-of-pocket expenses of which will be paid by the Debtors' Representative from the Post-Effective Date Reserve); and

(x)      Consult with the Debtors' Representative regarding any other matter related to the Plan and/or the implementation of the terms thereof.

The Plan provides that notwithstanding the foregoing or anything to the contrary therein, in the event of a disagreement between the Debtors' Representative and the Plan Implementation Committee, the Debtors' Representative may take any of the actions described in subparagraphs (i), (iii), (vii) and (viii) above without the consent of the Plan Oversight Committee if the Debtors' Representative obtains the prior approval for such action(s) from the Bankruptcy Court, on notice to the Plan Implementation Committee.  The Plan Implementation Committee may oppose any request for such approval.

     o      <u>Insurance:  Bond</u>

The Plan provides that the Debtors' Representative must maintain insurance coverage with respect to the liabilities and obligations of the Debtors' Representative, the Debtors and the Plan Implementation Committee under the Plan (in the form of an errors and omissions policy or otherwise), the cost and expense of which will be paid by the Debtors from the Post-Effective Date Reserve.  The Debtors' Representative will serve with a bond, the terms of which will be agreed to by the Plan Implementation Committee and filed with the Bankruptcy Court, and the cost and expense of which will be paid by the Debtors from the Post-Effective Date Reserve.  The proposed amount and terms of such bond will be set forth in the Plan Supplement.

37812817.7 12/30/2020

o   <u>Fiduciary Duties of the Debtors' Representative</u>

Pursuant to the Plan, the Debtors' Representative will act in a fiduciary capacity on behalf of the interests of all Holders of Claims that will receive Distributions pursuant to the terms of this Plan.

o   <u>Liability of Debtors' Representative and Plan Implementation Committee: Indemnification</u>

The Plan provides that neither the Debtors, the Debtors' Representative, the Plan Implementation Committee, their respective members, designees or professionals, or any duly designated agent or representative of the Debtors' Representative or the Plan Implementation Committee, nor their respective employees, (collectively, the "**Representative Parties**") will be liable for the act or omission of any other member, designee, agent, or representative of the Debtors' Representative or Plan Implementation Committee, nor will any of the Representative Parties be liable for any act or omission taken or omitted to be taken in its capacity as a Representative Party other than for specific acts or omissions resulting from such Representative Party's willful misconduct, gross negligence or fraud. The Debtors' Representative will be entitled to enjoy all of the rights, powers, immunities and privileges of a representative of the Estates contemplated by Section 1123(b)(3)(B) of the Bankruptcy Code, and will have those powers and duties set forth in Sections 323, 704(a) (1), 704(2), 704(4), 704(5), 704(7), 704(9), 704(a)(11), 1106(a)(6) and 1106(a)(7) of the Bankruptcy Code.

The Debtors' Representative or the Plan Implementation Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and will not be liable (other than for willful misconduct, gross negligence or fraud) for any act taken, omitted to be taken, or suffered to be done in accordance with written advice or opinions rendered by such persons. The Debtors' Representative will be entitled to all rights to indemnification provided to all officers and/or directors under the Debtors' corporate charter and/or bylaws and to the maximum extent permitted under applicable law. In addition, the Debtors will indemnify and hold harmless the Debtors' Representative, the Plan Implementation Committee and their members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Plan or the discharge of their duties under the Plan; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud as determined by a Final Order.

The Plan provides that persons dealing with the Debtors' Representative must look only to the Debtors' assets to satisfy any liability incurred by the Debtors' Representative or the Plan Implementation Committee to such person in carrying out the terms of the Plan, and neither the Debtors' Representative nor the Plan Implementation Committee shall have any personal

37812817.7 12/30/2020

obligation to satisfy any such liability, except for any such liability caused by willful misconduct, gross negligence or fraud as determined by a Final Order.

**(d)     Continued Corporate Existence**

The Plan provides that from and after the Effective Date, the Debtors will continue in existence for the purpose of (i) winding up their affairs as expeditiously as reasonably possible, (ii) liquidating, by conversion to Cash or other methods, any Remaining Assets not disposed of prior to the Effective Date as expeditiously as reasonable possible, (iii) enforcing and prosecuting those Causes of Action the Debtors' Representative believes, in the exercise of his business judgment, should be enforced or prosecuted, subject to Plan Implementation Committee approval when applicable, (iv) administering the Plan, (v) filing appropriate tax returns, and (vi) dissolution. Upon the Effective Date, the Plan provides that all transactions and other actions provided for under the Plan will be deemed to be authorized and approved by the Debtors without any requirement of further action by the Debtors, the Debtors' members, the Debtors' shareholders or the Debtors' boards of directors.  As of the Effective Date, the Debtors' Representative will be deemed to be the sole equity holder and the only duly authorized, board-appointed officer and manager of each of the Debtors, other than the Special Manager (who shall have such limited duties as may be set forth in the Plan Supplement), and all by-laws, articles or certificates of incorporation and related corporate documents of the Debtors will be deemed to have been amended by the Plan to permit and authorize such sole appointment.

The Plan provides that after the Effective Date, the Debtors' Representative will be authorized to take, in his or her sole discretion, all actions reasonably necessary to dissolve one or more of the Debtors under applicable law, and to pay all reasonable costs and expenses in connection with such dissolution, including the costs of preparing or filing any necessary paperwork or documentation.  Upon the Final Distribution Date, any Debtors that have not been previously dissolved will be deemed dissolved for all purposes without the necessity for other or further actions to be taken by or on behalf of the Debtors, and the Debtors' Representative will be authorized to file any documents as may be necessary in connection with such dissolution.  Further, upon the entry of a Final Decree or other order of the Bankruptcy Court, the Debtors' Representative will be authorized to discard or destroy any and all of the Debtors' books and records except to the extent that such books relate to open tax years, are necessary for the completion and filing of tax returns, the analysis or prosecution of Causes of Action, or are required to be retained pursuant to an agreement of sale approved by a Sale Order and any ancillary documents or agreements entered in connection therewith.

**(e)     Cancellation of Interests**

The Plan provides that upon the occurrence of the Effective Date, Class 4 Interests will be deemed of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule.

**(f)     Exemption from Certain Transfer Taxes**

The Plan provides that pursuant to section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to any other Person pursuant to the Plan will not be subject to any stamp tax or

similar tax, and the Confirmation Order will direct the appropriate state and local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### (g)    The Creditors' Committee

The Plan provides that on the Effective Date, except as provided in Article V(G) of the Plan, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to, arising from or in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate, except for purposes of filing and prosecuting applications for final allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, or any appeal of the Confirmation Order.

### (h)    Remaining Assets

o    <u>General Assets.</u>

The Plan provides that on and after the Effective Date, without further approval of the Bankruptcy Court, the Debtors' Representative will, in accordance with the Plan, liquidate the remaining property of the Debtors, including without limitation all Causes of Action and the HPP Assets (the "**Remaining Assets**") and, in connection therewith, may use, sell, assign, transfer, abandon or otherwise dispose of at a public or private sale any of the Remaining Assets for the purpose of liquidating or converting such assets to Cash; provided, however, that nothing in the Plan restricts the right of the Debtors' Representative to seek Bankruptcy Court approval for the sale, assignment, transfer or other disposal of the Remaining Assets after the Effective Date.

The Plan provides that to the extent not previously authorized under a Sale Order and/or any other order(s) of the Bankruptcy Court, on and after the Effective Date, the Debtors' Representative will be deemed authorized and empowered to fully perform under, consummate and implement any agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to consummate a sale, assignment, transfer, or other disposal of the Remaining Assets, and to take all further actions as may reasonably be requested by a purchaser or transferee for the purpose of selling, assigning, transferring, granting, conveying or conferring to a purchaser or transferee, or reducing to possession, any or all of the Remaining Assets free and clear of any and all Liens and encumbrances.

### (i)    Counterclaims

The Plan provides that Causes of Action shall not be subject to any affirmative counterclaims; provided, however, that Causes of Action may be subject to set-off and recoupment rights to the extent, if any, permitted by applicable law and to the extent consistent with any Order of the Bankruptcy Court and the terms of the Plan.

**(j)      Post-Effective Date Costs**

The Plan provides that from and after the Effective Date, the Debtors' Representative shall, without the necessity for any approval by the Bankruptcy Court, pay from the Post-Effective Date Reserve those fees and expenses incurred by the Debtors' Representative, the Plan Implementation Committee and the Debtors subsequent to the Effective Date in connection with the implementation and consummation of the Plan.   All fees and expenses of the Debtors' Representative, the Debtors, the Creditors' Committee, the Plan Implementation Committee and the Claims Agent, and any of their respective agents and employees and retained professionals that are incurred subsequent to the Effective Date will be paid by the Debtors' Representative, subject to the right of the Debtors' Representative and the Plan Implementation Committee to object to the payment of such fees and expenses in accordance with Articles V(C)(b) and V(C)(e) of the Plan. If the Debtors' Representative or the Plan Implementation Committee objects to the payment of an invoice by written notice to the Person submitting such invoice within fourteen (14) days after submission of such invoice to the Debtors' Representative, the Debtors' Representative will pay, from the Post-Effective Date Reserve, only the non-disputed portion of the related statement, with the disputed portion payable only (a) upon agreement of the parties or (b) to the extent ordered by the Bankruptcy Court.

**(k)      Preservation of Causes of Action**

The Plan provides that in accordance with section 1123(b)(3) of the Bankruptcy Code, and except as otherwise provided in an order of the Bankruptcy Court, the Plan provides that the Debtors and the Debtors' Estates will retain the Causes of Action, including but not limited to the Causes of Action identified on Exhibit "B" to the Plan.   The Debtors' Representative may settle any Cause of Action without approval from the Bankruptcy Court, subject to the approval of the Plan Implementation Committee as set forth in Articles V(C)(b) and V(C)(e) of the Plan.   For the avoidance of doubt, nothing in the Plan shall waive or otherwise affect the right of the Debtors' Representative to seek to subordinate any Claim pursuant to section 510 of the Bankruptcy Code, and all such rights are expressly preserved under the Plan.

**(l)      Effectuating Documents; Further Transactions**

The Plan provides that the Debtors and the Debtors' Representative shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**(m)      Reserves and Distribution Accounts**

o      Funding of the Reserves

Professional Fee Claims Reserve.  The Plan provides that on or as soon as practicable after the Effective Date, the Debtors' Representative will fund the Professional Fee Claims Reserve from Cash in the Consolidated Debtor Cash Account, in the amount set forth in the Plan Supplement or as otherwise provided in the Confirmation Order.   There will be deposited into the

54

Professional Fee Claims Reserve an amount sufficient to enable the Debtors to pay all Allowed Professional Fee Claims.

Any Cash remaining in the Professional Fee Claims Reserve after payment of all Allowed Professional Fee Claims shall be transferred by the Debtors' Representative to the Post-Effective Date Reserve in accordance with the terms of the Plan. The Professional Fee Claims Reserve will at all times be maintained as a segregated account.

Post-Effective Date Reserve. The Plan provides that on or as soon as practicable after the Effective Date, the Debtors' Representative will fund the Post-Effective Date Reserve from Cash in the Consolidated Debtor Cash Account, in the amount set forth in the Plan Supplement or as otherwise provided in the Confirmation Order. There will be deposited into the Post-Effective Date Reserve an amount sufficient to permit the consummation and implementation of the Plan and to pay the costs and expenses, including without limitation Taxes and amounts payable to Professionals, incurred after the Effective Date by the Debtors' Representative, the Debtors, the Claims Agent, the Creditors' Committee and the Plan Implementation Committee. The Debtors' Representative, in consultation with the Plan Implementation Committee, may at any time increase or decrease the amount of the Post-Effective Date Reserve.

Any Cash remaining in the Post-Effective Date Reserve after payment of, or other provision for, all actual or anticipated expenses and operating costs will be transferred by the Debtors' Representative to the Debtors' Distribution Account.

The Post-Effective Date Reserve will at all times be maintained by the Debtors' Representative in a segregated account. All Cash obtained by the Debtors after the Effective Date from whatever source will be deposited by the Debtors' Representative into the Post-Effective Date Reserve.

Debtors' SAP Reserve Account. The Plan provides that on or as soon as practicable after the Effective Date, the Debtors' Representative will establish the Debtors' SAP Reserve Account and fund such account from Cash, in amount equal to the Face Amount of: (i) all Administrative Claims asserted against any of the Debtors; (ii) all Priority Tax Claims asserted against any of the Debtors, and (iii) all asserted Class 1 Priority Claims. If and to the extent any such Administrative Claims, Priority Tax Claims, Class 1 Priority Claims and/or Class 2 Secured Claims become Disallowed, withdrawn, or reduced, the Debtors' Representative will reduce the amount in the Debtors' SAP Reserve Account in a corresponding amount and will transfer such amount from the Debtors' SAP Reserve Account to the Debtors' Distribution Account. The Debtors' SAP Reserve Account will at all times be maintained as a segregated account.

Convenience Claims Reserve. The Plan provides that on or as soon as practicable after the Effective Date, the Debtors' Representative will establish the Convenience Claims Reserve from Cash, in amount equal to [____]% of the amount (as such amount may have been reduced by election on a Holder's Ballot) of all asserted Class 3A Convenience Claims or in such other amount set forth in the Confirmation Order. If and to the extent any such Convenience Claims become Disallowed, withdrawn, or reduced, the Debtors' Representative will reduce the amount in the Convenience Claims Reserve in a corresponding amount and will transfer such amount from the

Convenience Claims Reserve to the Debtors' Distribution Account.  The Convenience Claims Reserve will  at all times be maintained as a segregated account.

     o   <u>Funding of the Distribution Account</u>

The Plan provides that on or as soon as practicable after the Effective Date, the Debtors' Representative will fund the Debtors' Distribution Account in accordance with the terms of the Plan.  This account will at all times be maintained as a segregated account.

**(n)    Intercompany Claims**

The Plan provides that all Claims that a Debtor may have against another Debtor will be deemed Disallowed, cancelled and expunged upon the occurrence of the Effective Date.

**(o)    Tenet/Conifer Settlement**

The Plan provides that the Tenet/Conifer Settlement, as approved by Bankruptcy Court Order entered December 9, 2019 [D.I. 1118], is fully incorporated into the Plan and shall remain in full force and effect from and after the Effective Date.  Without limitation of the foregoing, the Plan provides that all provisions in the Tenet/Conifer Settlement regarding HUH Electronic Medical Records and Iron Mountain HUH Records (as such terms are defined in the Tenet/Conifer Settlement) will remain fully binding upon the parties to the Tenet/Conifer Settlement, including without limitation Tenet (as such term is defined in the Tenet/Conifer Settlement), such that none of the Debtors will have any further obligations regarding medical records except as may be expressly set forth in the Tenet/Conifer Settlement.

**E.    Distribution Provisions**

**(a)    Distributions for Claims Allowed as of the Effective Date**

The Plan provides that except as otherwise provided therein, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the Initial Distribution Date will be made pursuant to the terms and conditions of the Plan. Notwithstanding any other provision of the Plan to the contrary, no Distribution will be made on account of any Allowed Claim or portion thereof that has been satisfied after the Petition Date pursuant to an order of the Bankruptcy Court.

**(b)    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

     o   <u>Delivery of Distributions in General</u>

The Plan provides that Distributions to Holders of Allowed Claims under the Plan will be made (a) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtors' Representative after the date of any related Proof of Claim, or (c) at the

addresses reflected in the Schedules if no Proof of Claim has been filed and the Debtors' Representative or the Debtors have not received a written notice of a change of address.

In making Distributions under the Plan, the Plan provides that the Debtors' Representative, or any disbursing agent retained by the Debtors' Representative with the consent of the Plan Implementation Committee, may rely upon the accuracy of the claims register maintained by the Claims Agent in the Chapter 11 Cases and the Schedules, as may be modified by any Final Order of the Bankruptcy Court Allowing or Disallowing Claims in whole or in part.

> o   Undeliverable and Unclaimed Distributions

The Plan provides that any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed Distribution, including checks not returned as undeliverable but which remain unnegotiated, within one hundred twenty (120) days after the date on which the Distribution is made: (a) will be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution; (b) may, in the sole discretion of the Debtors' Representative, be barred from receiving further Distributions under the Plan on account of such claim; and (c) will be forever barred and enjoined from asserting any claim for an undeliverable or unclaimed Distribution against the Debtors' Representative, the Debtors and their Estates or the Plan Implementation Committee and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property.  In such cases, any Cash otherwise reserved for undeliverable or unclaimed Distributions will be added to the funds in the Post-Effective Date Reserve, notwithstanding any federal or state escheat laws to the contrary, and will be distributed in accordance with the terms of the Plan.  Nothing contained in the Plan shall require the Debtors, the Debtors' Representative, or his or her respective agents and professionals to attempt to locate any Holder of an Allowed Claim.

**(c)   Workers Compensation Claims**

The Plan provides that notwithstanding anything to the contrary set forth therein, Workers Compensation Claims will be paid solely from any applicable Insurance Policy of any of the Debtors, from any applicable state's workers compensation fund, agency or program, or from such other third party source as provided under applicable law.  No Holder of a Workers Compensation Claim will receive any payment under the Plan from any Debtor.

**(d)   Means of Cash Payment**

The Plan provides that Cash payments made pursuant to the Plan shall be in U.S. dollars and will be made at the option and in the sole discretion of the Debtors' Representative by (i) checks drawn on, or (ii) wire transfers from, a domestic bank selected by the Debtors' Representative.  In the case of foreign creditors, Cash payments may be made, at the option of the Debtors' Representative, in such funds and by such means as are necessary or customary in a particular jurisdiction.

37812817.7 12/30/2020

**(e)**     **Interest on Claims**

The Plan provides that unless otherwise specifically provided for therein, in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims, and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

**(f)**     **Withholding and Reporting Requirements**

In accordance with section 346 of the Bankruptcy Code and in connection with the Plan and all Distributions hereunder, the Plan provides that the Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority. The Debtors' Representative will be authorized to take any and all actions necessary and appropriate to comply with such requirements.

The Plan provides that all Distributions thereunder will be subject to withholding and reporting requirements. As a condition of making any Distribution under the Plan, the Debtors' Representative may require the Holder of an Allowed Claim to provide such Holder's taxpayer identification number and such other information, certification or forms, if and as required to comply with applicable tax reporting and withholding laws. If a Holder of an Allowed Claim fails to provide such information after two written requests, the Plan provides that failure to comply may result in the Debtors' Representative seeking an order of the Bankruptcy Court disallowing such Claims. Notwithstanding any other provision of the Plan, each entity receiving a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such Distribution.

**(g)**     **Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims**

    o   <u>Claims Administration Responsibilities</u>

The Plan provides that except as otherwise specifically provided therein, after the Effective Date, the Debtors' Representative will have the sole authority, subject to the rights and duties of the Plan Implementation Committee as set forth therein, to (a) file, withdraw or litigate to judgment objections to Claims, (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court, and (c) amend the Schedules in accordance with the Bankruptcy Code and the Local Rules.

    o   <u>Objection Deadline; Prosecution of Objections; Claim Estimation</u>

The Plan provides that except as set forth therein with respect to Professional Fee Claims and Administrative Claims, all objections to Claims must be filed on or before the Claims Objection Deadline (as such deadline may be extended thereunder). If an objection has not been filed or the Schedules have not been amended with respect to a Claim by the Claims Objection Deadline (as the Claims Objection Deadline may be extended thereunder), the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier. The Debtors' Representative will be the sole Person with the right and

standing to object to Claims and shall have the right to seek an order of the Bankruptcy Court estimating any contingent or unliquidated Claim.

o   Late Filed Claims

The Plan provides that pursuant to the Bar Date Order, any Person that is required but failed to file a Claim or application with respect to a Claim before the applicable Bar Date in compliance with the procedures set forth in the Bar Date Order will not be treated as a creditor with respect to such Claim for purposes of voting on, and distribution under, the Plan.  In the event a late Claim filed after the Effective Date is deemed timely filed, the Debtors' Representative will have one hundred twenty (120) days from the date the Holder is permitted to file the Claim to file an objection to such Claim.

o   No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, the Plan provides that no payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.  To the extent that a Claim is not a Disputed Claim but is held by a Holder that is or may be liable to the Debtors on account of a Cause of Action, the Plan provides that the Debtors' Representative may withhold all Distributions to such Holder until such Claim and liability have been settled or withdrawn or have been determined by Final Order of the Bankruptcy Court or such other court having jurisdiction over the matter.

o   Distributions After Allowance

The Plan provides that Distributions to each respective Holder on account of a Disputed Claim, to the extent that it ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Plan that govern Distributions to such Holders.

o   De Minimis Distributions

The Plan provides that the Debtors' Representative will have no obligation to make a Distribution on account of an Allowed Claim or otherwise if the amount to be distributed to the specific Holder of the Allowed Claim on the Initial Distribution Date, Subsequent Distribution Date or Final Distribution Date is less than $50.00.

o   Fractional Dollars

The Plan provides that any other provision of the Plan notwithstanding, the Debtors' Representative shall not be required to make Distributions of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### (h)      Allocation of Plan Distributions Between Principal and Interest

The Plan provides that to the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution will, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### (i)      Distribution Record Date

The Plan provides that the Debtors' Representative shall have no obligation to recognize the transfer of or sale of any participation in any Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes regarding the Plan to recognize and distribute only to those Holders of Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  Instead, the Debtors' Representative shall be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official claims register as of the close of business on the Distribution Record Date.

### (j)      De Minimis Fund Distribution

The Plan provides that in the event a Final Distribution under the Plan is not, in the judgment and discretion of the Debtors' Representative, in consultation with the Plan Implementation Committee, economically warranted with respect to one or more Classes given the cost of making such Final Distribution relative to the benefits to the Holders of Claims, the Debtors' Representative may cause any amount that would have been subject to such Final Distribution to be paid to any organization qualified under section 501(c)(3) of the Internal Revenue Code agreed to by the Debtors' Representative and the Plan Implementation Committee or determined by the Bankruptcy Court.  Notwithstanding the foregoing, the Plan provides that the amount to be paid to a charitable organization pursuant to this subsection shall not be in excess of $25,000, without prior Bankruptcy Court approval.

## F.      Treatment of Executory Contracts and Unexpired Leases

### (a)      Rejected Contracts and Leases

The Plan provides that except as otherwise provided in the Confirmation Order, the Plan, or in any other Plan Document, the Confirmation Order will constitute an order under section 365 of the Bankruptcy Code rejecting any pre-petition executory contract and unexpired lease to which any of the Debtors are a party, to the extent such contract or lease is an executory contract or an unexpired lease, as of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, or (d) is assumed pursuant to Article VII(C) of the Plan.

**(b)** **Bar to Rejection Damages**

The Plan provides that if the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim will be forever barred and shall not be enforceable against the Debtors or their respective successors, properties or Estates unless a Proof of Claim is filed and served on the Debtors' Representative and counsel for the Debtors' Representative within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

**(c)** **Assumed and Assigned Contracts and Leases**

The Plan provides that except as otherwise provided in the Confirmation Order, the Confirmation Order will constitute an order under section 365 of the Bankruptcy Code assuming, as of the Effective Date, those executory contracts and unexpired leases, if any, listed on the Schedule of Assumed Contracts and Leases. The Debtors reserve the right, prior to the Confirmation Hearing, to amend the Schedule of Assumed Contracts and Leases to add or remove any executory contract or unexpired lease.

The Plan provides that the Cure Amounts payable with respect to any executory contracts or unexpired leases listed in the Schedule of Assumed Contracts and Leases are listed in the schedule. Any Cure Amounts will be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the Cure Amounts, as reflected in the Schedule of Assumed Contracts and Leases, in Cash on the Effective Date, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

Any counterparty to an executory contract or unexpired leases reflected in the Schedule of Assumed Contracts and Leases will have the time prescribed by the Disclosure Statement Order to object to the proposed Cure Amount listed in the notice. The Plan provides that any counterparty to an executory contract or unexpired lease that fails to timely object to the proposed assumption or the Cure Amount (i) will be deemed to have assented to such assumption or Cure Amount, notwithstanding any provision thereof that purports to (a) prohibit, restrict or condition the transfer or assignment of such contract or lease or (b) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and will forever be barred and enjoined from asserting such objection against the Debtors or Post-Effective Date Debtors, or terminating or modifying such contract or lease on account of transactions contemplated by the Plan, and (ii) will be forever barred, estopped and enjoined from challenging the validity of such assumption thereafter.

The Plan provides that each executory contract and unexpired lease assumed pursuant to the Plan will vest in and be fully enforceable by the Post-Effective Date Debtors in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(d)    **Insurance Policies**

The Plan provides that notwithstanding anything to the contrary contained therein, all Insurance Policies will remain in full force and effect unless otherwise validly terminated, and issuers of such Insurance Policies will remain responsible for Claims, in accordance with the terms and provisions of such Insurance Policies.  The Debtors do not consider Insurance Policies that have expired as of the Effective Date (whether or not entered into prior or subsequent to the Petition Date) to be executory contracts subject to assumption or rejection.  However, the issuers of Insurance Policies will be responsible for continuing coverage obligations thereunder, regardless of the payment status of any retrospective or other insurance premiums.  Nothing in the Plan will constitute or be deemed to be a waiver of any Cause of Action that any Debtor may hold against Persons, including, without limitation, any issuer under any Insurance Policy of any of the Debtors.

## G.    Confirmation and Consummation of the Plan

Conditions to the Effective Date: The Plan provides that the following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing by the Debtors and the Creditors' Committee:

> (i)    The Confirmation Order shall have been entered by the Bankruptcy Court and shall provide that the Debtors and the Debtors' Representative are authorized to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan or effectuate, advance or further the purposes thereof.

> (ii)   The Debtors have sufficient Cash available to fully fund the Professional Fee Claims Reserve, the Post-Effective Date Reserve, the Debtors SAP Reserve Account and the Convenience Claims Reserve, in accordance with the Plan.

> (iii)  Any Causes of Action, including without limitation the Non-Debtor Real Estate Litigation, against any of the MBNF Non-Debtor Parties that is pending on the Confirmation Date has been resolved by Final Order.

Consequences of Non-Occurrence of Effective Date.  The Plan provides that at any time prior to the occurrence of the Effective Date and the substantive consummation of the Plan, the Debtors, in consultation with the Creditors Committee, may modify the Plan in accordance with, and subject to, section 1127 of the Bankruptcy Code.

## H.    Allowance and Payment of Certain Administrative Claims

(a)    **Final Fee Applications**

The Plan provides that all Final Fee Applications must be filed no later than forty-five (45) days after the Effective Date.  Objections, if any, to Final Fee Applications of such Professionals must be filed and served on the Debtors, their counsel, the requesting Professional and the United

States Trustee no later than twenty-one (21) days from the date on which each such Final Fee Application is served and filed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Fee Claims will be determined by the Bankruptcy Court. Allowed Professional Fee Claims will be paid as set forth in Article III(A)(1) of the Plan.

### (b)      Employment of Professionals after the Effective Date

The Plan provides that from and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or any order previously entered by the Bankruptcy Court in seeking retention or compensation for services rendered or expenses incurred after such date will terminate.

### (c)      Administrative Claim Bar Date

The Plan provides that unless expressly provided otherwise therein, all requests for payment of an Administrative Claim, other than (i) Claims arising under 28 U.S.C. § 1930, (ii) Administrative Claims described in section 503(b)(1)(B) or (C) of the Bankruptcy Code and (iii) Claims asserting Administrative Claim priority status under section 503(b)(9) of the Bankruptcy Code, must be filed with the Court and served on counsel for the Debtors' Representative no later than thirty (30) days from and after service of the notice of the Effective Date of the Plan (the "**Administrative Claim Bar Date**"). Unless the Debtors or any other party in interest objects to an Administrative Claim by the Claims Objection Deadline (as such deadline may be extended in accordance with the terms set forth therein), such Administrative Claim will be deemed allowed in the amount requested. In the event that the Debtors or any other party in interest objects to an Administrative Claim, the Plan provides that the Bankruptcy Court will determine the Allowed amount of such Administrative Claim, if any.

Notwithstanding the foregoing, the Plan provides that Holders of Secured Lender Claims will not be required to file or serve any request for payment of such Administrative Claims. Such Administrative Claims are allowed in the amount agreed upon between the Debtors and the DIP Secured Parties, as specified in the DIP Credit Agreement and the DIP Orders, and will be satisfied pursuant to Article III(C) of the Plan.

## I.      Effect of Plan Confirmation

### (a)      Binding Effect

The Plan provides that it shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns.

### (b)      No Discharge of the Debtors

The Plan provides that pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; provided, however, that, other than as provided in any agreement, no Holder of a Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other distribution from, or seek recourse against, any of

the Debtors and/or its respective successors, assigns and/or property, including but not limited to the Debtors' Representative, except as expressly provided in the Plan.

(c)    **Releases by the Debtors**

**The Plan provides that on the Effective Date, the Debtors, on behalf of themselves and their respective Estates, will release unconditionally, and will be deemed to forever release unconditionally the Creditors' Committee, the members of the Creditors' Committee (but solely in their capacity as such), the Independent Managers and the Creditors' Committee's and the Debtors' respective agents, advisors, accountants, investment bankers, consultants, attorneys and other representatives (including without limitation the Debtors' chief restructuring officer and EisnerAmper LLP), solely in their respective capacities as such, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce the performance of their respective obligations, if any, to the Debtors under the Plan, and the contracts, instruments, releases and other agreements delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, directly or derivatively, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement; provided, however, that notwithstanding the foregoing, nothing contained in the Plan is intended to or shall operate as a release of (i) any claims for willful misconduct, fraud or gross negligence, as determined by Final Order of a court of competent jurisdiction or (ii) any claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever against any of the MBNF Non-Debtor Parties or HSRE.**

(d)    **Injunction**

**The Plan provides that except as otherwise provided therein, from and after the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in any of the Debtors are permanently enjoined from taking any of the following actions against any Debtor or its Estate, or any of its property, or the Debtors' Representative or EisnerAmper LLP on account of any such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to any of the Debtors; (E) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provision of the Plan; and (F) taking any actions which interfere with the implementation or consummation of the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising and/or enforcing their rights pursuant to and consistent with the terms of the Plan, the Confirmation Order or a Sale Order.**

(e)     **Term of Bankruptcy Injunction or Stays**

**The Plan provides that all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect.**

(f)     **Debtors, Debtors' Representative, Creditors' Committee and Plan Implementation Committee Release of DIP Secured Parties**

The Plan provides that as of the Effective Date, the Creditors' Committee, the Debtors and their Estates, the Debtors' Representative, the Plan Implementation Committee and any respective successors and assigns of the Creditors' Committee, the Debtors, and/or their Estates, the Debtors' Representative, and the Plan Implementation Committee (each a "**Releasing Party**" and collectively, the "**Releasing Parties**"), and their respective agents, affiliates, subsidiaries, parent entities, predecessors-in-interest, beneficiaries, designees, attorneys, representatives, trustees, EisnerAmper LLP and all other persons that may be acting for or on behalf of a Releasing Party, and any and all persons who may purport to claim by, through or for a Releasing Party, including, without limitation, all present and former officers, directors, restructuring officers, professionals and employees, will forever waive, release and discharge each DIP Secured Party and any of their affiliates, together with their respective present and former agents, representatives, officers, members, directors, shareholders, professionals and employees (collectively with each DIP Secured Party and any of their affiliates, the "Released DIP Secured Parties") of and from any and all obligations, rights, claims, liabilities, actions, causes of action, suits, demands, costs, expenses, losses, cross-claims, counterclaims, controversies, damages, bankruptcy claims, and claims of any kind, nature and character whatsoever whether at law or equity or otherwise, whether based on contract (including without limitation, quasi-contract, estoppel, statute, regulation, tort (including, without limitation, intentional torts, fraud, recklessness, gross negligence and willful misconduct) or otherwise, accrued or unaccrued, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, known or unknown, foreseen or unforeseen, whether held directly or derivatively, that any of the Releasing Parties has, had or may have, as of the Effective Date, against any Released DIP Secured Party with respect to, or relating or arising in connection with, any of the Debtors or the Estates, the Chapter 11 Cases, the Plan, any Plan Document, the Disclosure Statement, the DIP Credit Agreement, the DIP Orders, the Pre-Petition Credit Documents (as used and defined in the DIP Credit Agreement), and/or any transaction proposed in connection with any of the foregoing (in each case, including, without limitation, the negotiation, consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of any of the foregoing or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any obligations arising under any of the foregoing); provided, however, that nothing contained in the Plan shall affect the obligations of the DIP Agent or the rights of the Debtors and the Debtors' Representative under Article III(C) of the Plan and all enforcement rights related thereto.

(g)     **Levy, Garnishment and Attachment**

The Plan provides that Distributions to the various Classes of Claims thereunder will not be subject to levy, garnishment, attachment or like legal process by any Holder of Claim by reason

65

of any subordination rights or otherwise, so that each Holder of Claim will have and receive the benefit of the Distributions in the manner set forth in the Plan.

**(h)      Exculpation and Limitation of Liability**

The Plan provides that except as otherwise specifically provided therein, including without limitation in Article V(K) and Exhibit "B" attached thereto, each of the Debtors, the Debtors' Chief Restructuring Officer, EisnerAmper LLP, the Independent Managers and the Debtors' Professionals, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents, and any of such parties' successors and assigns, the Creditors' Committee, the members of the Creditors' Committee (but solely in their capacity as such) and the Professionals of the Creditors' Committee, will not be liable for any claim, action, proceeding, Cause of Action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, right to payment or Claim (as defined in section 101(5) of the Bankruptcy Code), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise to one another or to any Holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or any of their successors or assigns, for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and filing of the Plan or any prior plans, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan or any prior plans, any Sale Order, the consummation of the Plan and the administration of the Plan or the property to be liquidated and/or distributed under the Plan, except for willful misconduct, gross negligence or fraud as determined by a Final Order of a court of competent jurisdiction.

Notwithstanding the foregoing or any other provision of the Plan, and for the avoidance of doubt, nothing contained in the Plan in any way operates to exculpate or limit the liability of Joel Freedman or any of the other MBNF Non-Debtor Parties.

**(i)      Indemnification Obligations**

The Plan provides that except as otherwise provided therein, any Sale Order, other order of the Bankruptcy Court, or any contract, instrument, release or other agreement or document entered into in connection with the Plan, any and all indemnification obligations that any of the Debtors has pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document or applicable law shall be deemed rejected (if and to the extent executory) as of the Effective Date.

**(j)      Confirmation Order**

The Plan provides that confirmation of the Plan shall be deemed to ratify all transactions undertaken by the Debtors during the period commencing on the Petition Date and ending on the Effective Date, except for any acts constituting willful misconduct, intentional misconduct, gross negligence or fraud as determined by a Final Order of a court of competent jurisdiction.

**(k)**      **Closing of the Chapter 11 Cases**

The Plan provides that on or after the occurrence of the Effective Date, the Post-Effective Date Debtors may submit a proposed final decree order to the Bankruptcy Court under certification of counsel, closing any or all of the Chapter 11 Cases and amending the case caption accordingly as of the Effective Date.  For the avoidance of doubt, the closing of any particular Debtor's Chapter 11 Case will not have any effect, in any manner, on any Causes of Action that may be asserted in accordance with the Plan.  As to any Debtor for which the Chapter 11 Case is closed, any and all recourse for any Claims, Interests or equitable relief with respect to such Debtor will proceed exclusively in the remaining Chapter 11 Case(s) in accordance with the Plan and any Final Orders entered in the Chapter 11 Cases.  The Plan provides that no statutory fees shall be due or payable on account of any Debtor for which a final decree has been entered.

**(l)**      **Special Environmental Provisions**

The Plan provides that nothing contained therein discharges, releases, precludes, or enjoins: (i) any environmental liability to any Governmental Unit that is not a Claim as defined in 11 U.S.C. § 101(5); (ii) any environmental Claim of any Governmental Unit arising on or after the Effective Date; (iii) any environmental liability to any Governmental Unit on the part of any entity as the owner or operator of property after the Effective Date; or (iv) any liability to the United States on the part of any entity other than a Debtor.  Nothing in the Plan divests any tribunal of any jurisdiction it may have under environmental law to interpret the Plan.

## IX.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain United States federal income tax aspects of the Plan, for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. This discussion is based on existing provisions of the Internal Revenue Code (the "**IRC**"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan.

No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Interests with respect to the United States federal income tax consequences described herein.

Each Holder of a Claim or Interest affected by the Plan is strongly urged to consult its tax advisor regarding the specific tax consequences of the transactions described herein and in the Plan.

A.      **General**

        The United States federal income tax consequences to Holders of Claims and Interests and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim or Interest; (2) the length of time the Claim or Interest has been held; (3) whether the Claim or Interest was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; (7) whether the Claim is an installment obligation for United States federal income tax purposes; and (8) whether the Claim constitutes a "security" for United States federal income tax purposes.  Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) and Interests may be subject to special rules not addressed herein.  There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to Holders of Claims and Interests, which are not addressed herein.  Each Holder of a Claim and Interest should consult its tax advisor for information that may be relevant to its particular situation and circumstances and for advice concerning the particular tax consequences to it of the transactions contemplated by the Plan.

B.      **Importance of Obtaining Professional Tax Assistance**

        **THE FOREGOING DISCUSSION IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### X.  REQUIREMENTS FOR CONFIRMATION OF THE PLAN

        The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or to be made in connection with the Plan and the Chapter 11 Cases.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

        In particular, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of the Classes of Impaired Claims, unless approval will be sought under section 1129(b) of the Bankruptcy Code, despite the dissent of one or more such Classes, (b) the Plan is "feasible," which means that there is a reasonable probability that confirmation of the Plan will not be followed by liquidation or the need for further

financial reorganization, and (c) the Plan is in the "best interests" of all holders of Claims and Interests, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all Classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must make an independent finding that the Plan conforms to the requirements of the Bankruptcy Code, that the Plan is feasible and that the Plan is in the best interests of the holders of Claims against, and Interests in, the Debtors.

## A.      Acceptance by Impaired Classes

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be impaired under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is allowed, which means generally that no party in interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan. If the holder of an impaired claim or interest will not receive or retain any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems the holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan, and the plan proponent need not solicit such holder's vote.

For present purposes, the Holder of a Claim against a Debtor that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (i) the Plan provides a Distribution in respect to such Claim and (ii) (a) the Claim has been Scheduled by the Debtors (and such claim is not Scheduled at zero or as disputed, contingent, or unliquidated) or (b) the creditor has filed a Proof of Claim on or before the bar date applicable to such Holder, pursuant to sections 502(a) and 1126(a) of the Bankruptcy Code and Bankruptcy Rules 3003 and 3018. Any Claim as to which an objection has been timely filed and not been withdrawn or dismissed or denied by Final Order is not entitled to vote unless the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a), upon application of the Holder of the Claim with respect to which there has been objection, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Impaired Classes of Claims and Interests Entitled to Vote. Subject to Articles II and III of the Plan, the Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan. In addition, although the Debtors believe that the holders of Claims in Class 2/MidCap are Unimpaired, the DIP Secured Parties shall be entitled to vote on the Plan.

Acceptance by an Impaired Class.  In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.  In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds in amount of the Allowed Interests of such Class that have timely and properly voted to accept or reject the Plan.

Presumed Acceptances by Unimpaired Classes.  Class 1 and 2 Claims are Unimpaired by the Plan.  Under section 1126 of the Bankruptcy Code, such Holders are conclusively presumed to accept the Plan, and the votes of such Holders will not be solicited.  As noted above,  although the Debtors believe that the Holders of Claims in Classes 2/MidCap Bank are Unimpaired, the DIP Secured Parties shall be entitled to vote on the Plan

Impaired Equity Interests.  With respect to Interests, in accordance with section 1126(g) of the Bankruptcy Code, Class 4 is deemed to have rejected the Plan.

Summary of Classes Voting on the Plan.  As a result of the provisions of Articles II and III of the Plan, the votes of Holders of Claims in Classes 2/MidCap and 3A, 3B, 3C and 3D will be solicited with respect to the Plan.

Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.  If any Impaired Class of Claims or Interests that is entitled to vote on the Plan rejects the Plan, the Debtors will (i) seek confirmation of the Plan from the Court by employing the "cram down" procedures set forth in section 1129(b) of the Bankruptcy Code and/or (ii) modify the Plan.  The Debtors reserve the right to alter, amend or modify the Plan, including to amend or modify the exhibits thereto, to satisfy the requirements of section 1129(b) of the Bankruptcy Code.  Each Debtor reserves the right to revoke or withdraw the Plan, as it applies to such Debtor, in whole or in part.  The withdrawal of the Plan by a Debtor will not affect the right or ability of another Debtor to seek confirmation of the Plan, as it applies to such Debtor.

"**Cram Down**." Under the "cram down" provisions of the Bankruptcy Code, the Debtors must demonstrate to the Bankruptcy Court that (i) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class, (ii) the Plan is fair and equitable with respect to each non-accepting Impaired Class, and (iii) at least one Impaired Class has accepted the Plan.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  By establishing separate Classes for the Holders of each type of Claim and by treating each Holder of a Claim in each Class identically, the Plan has been structured so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of

secured or unsecured claims or interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before any junior class may receive anything under the plan.

**B.     Feasibility**

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  In the present case, because the Plan is a liquidating plan in which sufficient funds will be set aside to satisfy all Allowed Administrative Claims and other Claims that are required to be paid under the Plan, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**C.     Best Interests of Creditors; Liquidation under Chapter 7 of the Bankruptcy Code**

Section 1129(a)(7) of the Bankruptcy Code provides that, with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code on such date.

Here, the Plan satisfies the "best interests of creditors" test because the value of any Distributions to Holders of Claims if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be less than the value of Distributions under this Plan.  To estimate what holders of Claims would receive if the Debtors were hypothetically liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Debtors' Chapter 11 Cases were converted to a chapter 7 case and each of the respective Debtor's assets were liquidated by a chapter 7 trustee.

In these cases, where substantially all of the Debtors' assets have already been liquidated, the Debtors' only significant remaining assets are Cash, accounts receivable and certain remaining claims and Causes of Action.  The Debtors otherwise have few, if any, other assets that could be liquidated for value by a chapter 7 trustee, and the proceeds available for satisfaction of allowed claims would, in any event, be reduced by the amount of any allowed secured claims, the costs and expenses of the chapter 7 case and additional allowed administrative claims, and other priority claims that may result from the use of chapter 7 for purposes of liquidation.

Furthermore, the pursuit by any chapter 7 trustee of the foregoing claims and Causes of Action for the benefit of creditors would likely lead to significantly reduced recoveries given the time and expenses that the chapter 7 trustee's new professionals would incur to familiarize themselves with the Debtors and the applicable claims and actions.  Indeed, the costs of liquidation under chapter 7 would include fees payable to a trustee in bankruptcy, as well as those that might be payable to his or her attorneys and to other professionals that such trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed in the chapter 7 case, such as compensation for the Debtors' and Committee's Professionals.  These Claims would be paid in full out of the Debtors' Cash before the balance of the Cash would be

made available to Holders of General Unsecured Claims.  The Debtors believe that the professional fees that would be incurred in a hypothetical chapter 7 would significantly exceed those anticipated under the Plan.  In addition, other claims might arise upon conversion to a chapter 7 case that might dilute the Cash available to holders of allowed general unsecured claims.  Additional claims against the Debtors' Estates might also arise as the result of the establishment of a new bar date for the filing of claims in the chapter 7 cases of the Debtors.   Based on the foregoing, the Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan.

## XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of Holders of Claims and Interests.  If the Plan is not confirmed, some or all of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In that event, the Debtors would cease their liquidation and distribution efforts and a trustee would be appointed to liquidate and distribute the remaining assets of the Estates.  As explained above, the Debtors believe that a liquidation under chapter 7 would likely result in a lower return to Holders of Allowed Claims and Interests, and would significantly delay distributions.

[remainder of page left intentionally blank]

37812817.7 12/30/2020

## XII.  RECOMMENDATION AND CONCLUSION

The Debtors believe that the Plan is in the best interest of all Holders of Claims and Interests and urge all Holders of Impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying this Disclosure Statement. IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AND RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

Dated:  December 30, 2020

> Center City Healthcare, LLC, Philadelphia Academic Health System, LLC, St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC, HPS of PA, L.L.C., SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., StChris Care at Northeast Pediatrics, L.L.C., TPS of PA, L.L.C., TPS II of PA, L.L.C., TPS III of PA, L.L.C., TPS IV of PA, L.L.C., and TPS V of PA, L.L.C.

> By:     */s/ Allen Wilen*_____
> Name: Allen Wilen
> Title: Chief Restructuring Officer

**List of Exhibits**

Exhibit "A" – Debtors' Chapter 11 Plan of Liquidation

Exhibit "B" – Estimated Range of General Unsecured Claims

Exhibit "C" – Ownership Structure