To:     Bankruptcy Court for the District of Delaware

        824 N. Market Street

        Wilmington, Delaware 19801                                          January 31, 2021

FILED

2021 MAR -5  AM 8: 59

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

Center City Healthcare, LLC –(Debtors)-Notice of Response to relief requested in the Objection-Case No.
19-11466(MFW)

In response to the Omnibus objection, I am attaching the coverage agreement(1) between Harvard
Cardiovascular,Inc.(HC) and Hahnemann University Hospital(HUH) dated 11-15-16 which requires for
payment from HUH to be provided between 2-5 weeks for physician specialty(Interventional Cardiology-
heart attacks, cardiac arrest, etc.) emergency services. A sample of the physician call schedule(2) titled
"January-June 2018" is provided to the court as an example for properly paid past services by HUH.

Then I have attached multiple emails(3,4,5,6) requesting payments from HUH for same monthly
physician services provided through all of 2019,prior to closure of HUH, that were entirely unpaid
leading to losses of 4859*8=$38,872. As call is planned on a future basis, in addition, HUH committed to
even a  higher frequency(due to manpower losses) coverage(7) up to end of 2019 titled "July 2019-
January 2020" causing Harvard Cardiovascular to forego other call opportunities with other institutions
amounting to further losses of 4859*8=$38,872. This led to permanent loss of opportunities at other
institutions.  Thus, total losses for HC amount to at least $77,744.  Thus, HC as a sole physician
interventional cardiology provider requests the court to kindly reimburse the full amount for its patient
services commitment particularly in this time of a pandemic when these owed funds are vital to
continue to provide the best interventional cardiology care and maintain proper support staff for our
sickest patients.

Thanking the court in advance for its understanding.

Yours sincerely,

*Manoj Khandelwal*

Manoj Khandelwal,MD

Harvard Cardiovascular,Inc.

ECATS # 152183-0

## CARDIAC CATHETERIZATION EMERGENCY
## PHYSICIAN ON CALL DEPARTMENT COVERAGE

THIS AGREEMENT FOR CARDIAC CATHETERIZATION EMERGENCY PHYSICIAN ON CALL DEPARTMENT COVERAGE ("Agreement") is made and entered into as of the later of November 15, 2016, or the execution of the Agreement by both parties (the "Effective Date") between **Tenet HealthSystem Hahnemann, LLC, d/b/a Hahnemann University Hospital** ("Hospital") and **Harvard Cardiovascular, Inc.** ("Group").

### R E C I T A L S :

A.    Hospital operates an acute care hospital and trauma center in which there is a department of Cardiology (the "Department") on Hospital's premises to provide emergency medical services to persons presenting themselves for care and/or treatment, and Hospital desires to assure physician coverage for the Department.

B.    Group employs or otherwise contracts with physicians duly licensed in the State of Pennsylvania ("State") who are qualified as doctors of medicine with experience in furnishing emergency medical services (collectively "Physicians").

C.    Hospital agrees that it is in the best interest of Hospital's ability to provide quality care in a cost-effective and efficient manner for its patients, to contract with Group to be able to provide professional services in the Hospital's Cardiac Catheterization Lab ("Lab") in accordance with the on-call schedule prepared by the Hospital and to provide inpatient consultations for Hospital patients at the request of Hospital or a physician on Hospital's medical staff (the "Services").

NOW, THEREFORE, for and in consideration of the recitals above and the mutual covenants and conditions contained herein, Hospital and Group agree as follows:

1.    **GROUP'S OBLIGATIONS.**

a.    **Services.** Group shall provide Physicians ("Panel Members") qualified as doctors of medicine with experience in Cardiology (the "Specialty") to provide Services in accordance with Group's obligations hereunder. While this Agreement is in effect, Group shall provide Physicians to be on-call to provide professional services in the Specialty ("Panel Members") to the Lab and to provide inpatient consultations for Hospital patients at the request of Hospital or a physician on Hospital's medical staff and to be available to the Department in accordance with the on-call schedule prepared by the Hospital. Physicians shall also perform such additional duties as stated in Exhibit A attached hereto and incorporated herein by this reference.    Group and each Physician shall comply with the bylaws, rules, regulations, procedures, and policies of Hospital and its medical staff, including those relating to timely completion of medical records.    Group is responsible for designating a Panel Member to substitute for the Physician on call in the on-call rotation if for any reason Physician is unable to fulfill Physician's obligations as a Panel Member.    Group must assist with all scheduling changes.   In addition, no Panel Member shall be scheduled to provide Services while such Panel Member is suspended from the medical staff for delinquent medical records or any other reason. If Panel Member was scheduled prior to suspension, Group shall arrange for another Panel

1

ECATS # 152183-0

Member to substitute for Physician in the on-call rotation. Group shall work with Hospital for quality assurance and improvement of the Service.  Group shall ensure that each Physician complies with all terms and conditions contained herein. Physicians shall also: (a) cooperate with Hospital's employee health program and the designated employee health nurse in providing, reviewing and developing health services for employees who work at Hospital; (b) attend any and all meetings within Hospital that Physicians are asked to attend by Hospital's Chief Executive Officer (the "CEO"); and (c) perform such other duties as may from time to time be requested by Hospital's Governing Board, Hospital's Medical Staff, and/or the CEO.

      b.    **Other Physicians.**  The Services to be rendered hereunder shall be performed by Physicians as may be employed by or under contract with Group.  At all times while this Agreement is in effect, the CEO shall have the right to request removal of any such Physician if, in the CEO's best judgment, such removal is in the best interests of Hospital. Group hereby agrees to immediately remove any such Physician upon receipt of the CEO's request.

      c.    **Physician Qualifications.**  Each Physician who provides the Services in the Department shall be duly licensed and qualified as a doctor of medicine or osteopathy to practice medicine in the State, and shall be approved for membership and/or clinical privileges on the Medical Staff of Hospital in accordance with Hospital's Medical Staff Bylaws and Rules and Regulations.  Director and all Physicians shall be Board Certified prior to performing the Services hereunder or, if not already certified, shall apply for and obtain Board certification no later than three (3) years from the date he/she first provides the Services hereunder.  Group shall provide proof of such certification to Hospital upon Hospital's request.  As set forth more fully herein, any approval for Medical Staff membership and/or clinical privileges, and any reappointment thereof, shall be subject to the termination provisions of the Agreement.

      d.    **Records and Reports.**  Group shall provide or cause to be provided to Hospital all records and reports requested by Hospital, including, without limitation, a daily written memorandum of all Services performed pursuant to this Agreement and all applicable Hospital charges, in accordance with Hospital's schedule of such charges, incurred in connection with such Services.  Group's records of billings and receipts relating to services performed hereunder shall be available to Hospital upon request.  Group shall also require the prompt submittal to Hospital's medical records administrator and/or the patient's private physician of written reports of all examinations, treatments and procedures performed pursuant to this Agreement.  Group shall use the medical records and report forms provided by the Department and Hospital.  Group agrees that all records and reports required by this Subsection shall be the exclusive personal property of Hospital.

      e.    **Medical Staff Membership.**  Group expressly agrees as follows: (i) Medical Staff membership and/or clinical privileges, including any appointment and reappointment thereof, of each Physician is based upon this Agreement. Group expressly agrees that the Medical Staff membership and/or clinical privileges of each Physician at Hospital shall terminate concurrently with each such individual's termination of membership in or employment by Group, the expiration or termination of this Agreement regardless of the cause of the termination, or the rescission of Hospital's approval of any such Physician in accordance with Subsection 1.c. hereof, without the necessity of notice or any right to a hearing and/or appeal under the bylaws, rules or regulations of Hospital or its Medical Staff; (ii) each Physician agrees

ECATS # 152183-0

to voluntarily resign his or her Medical Staff membership and relinquish his or her clinical privileges to practice medicine at Hospital, and knowingly and voluntarily waives any and all rights under the bylaws, rules and regulations of Hospital and/or its Medical Staff, or under any applicable law, statute, ordinance or regulation, to any notice, review, appearance, hearing and/or appeal for loss of such membership and/or clinical privileges, effective immediately and automatically upon the occurrence of any of the foregoing events.  Each Physician further expressly waives any and all rights the Physician has as a member of the Medical Staff for review of termination of his or her Medical Staff membership and/or clinical privileges pursuant to this provision.  Medical Staff membership and/or clinical privileges are governed solely by the terms of the Agreement.  Each Physician specifically agrees that the Agreement shall control any inconsistency or disagreement between the terms and provisions of the Agreement and the Medical Staff Bylaws; and (iii) Group and each Physician agrees that, as a condition precedent to the grant of exclusivity under the Agreement, the Group shall obtain the agreement of each Physician to the foregoing and provide Hospital with evidence of same in the form of the Waivers attached hereto as Exhibit A and incorporated herein by this reference.  Notwithstanding Group's obligation to obtain the Waivers, Hospital reserves the right to terminate staff membership and clinical privileges of Physician's based upon the circumstances described hereunder without hearing and appellate review.

      f.    **Representations and Warranties.**  Group represents and warrants to Hospital as follows: (i) neither Group nor any Physician is bound by any agreement or arrangement which would preclude Group or Physician from entering into, or from fully performing the Services; (ii) Physician's license to practice medicine in the State or in any other jurisdiction and Physician's Drug Enforcement Agency number has never been denied, suspended, revoked, terminated, relinquished under threat of disciplinary action, or restricted in any way; (iii) Physician's medical staff privileges at any health care facility has never been denied, suspended, revoked, terminated, relinquished under threat of disciplinary action, or made subject to terms of probation or any other restriction; (iv) Group and each Physician shall perform the Services in accordance with: (1) all applicable federal, state, and local laws, rules and regulations; (2) all applicable standards of The Joint Commission ("Joint Commission") and any other relevant accrediting organizations, and (3) all applicable bylaws, rules, regulations, procedures, and policies of Hospital and its medical staff; (v) all Physicians are participating physicians in Medicare and the State's Medicaid program; and (vi) neither Group nor any Physician has in the past conducted, and is not presently conducting, its or his/her medical practice in such a manner as to cause Group or any Physician to be suspended, excluded, debarred or sanctioned under the Medicare or Medicaid Programs or by any government licensing agency, and has never been charged with or convicted of an offense related to health care, or listed by a federal agency as debarred, excluded or otherwise ineligible for federal program participation.  Group further represents to Hospital that the compensation paid or to be paid by Group to any physician is and will, at all times during the term of the Agreement, be fair market value for services actually provided by such physician, not taking into account the value or volume of referrals or other business generated by such physician for Hospital.  Group represents to Hospital that Group has and will at all times maintain a written agreement with each physician receiving compensation from Group that is not an employee of Group (e.g., each non-employed independent contractor), which written agreement is or will be signed by the parties, and does or will specify the services covered by the arrangement.  Group further represents that with respect to employees of Group with which Group does not have a written

3

employment agreement, the employment arrangement is or will be for identifiable services and is or will be commercially reasonable even if no referrals are made to Group by the employee.

2.     **INDEPENDENT CONTRACTORS.**  In performing the services herein specified, Group and Physician are acting as independent contractors, and shall not be considered employees or agents of Hospital.

3.     **GROUP'S COMPENSATION.**

a.     Group shall be compensated in accordance with Exhibit B attached hereto and incorporated herein by reference.  Notwithstanding the foregoing, no compensation shall be payable to Group for any services for which Group has not submitted such documentation as reasonably required by Hospital, including, without limitation, the IRS Form W-9 "Request for Taxpayer Identification Number and Certification". The parties acknowledge that the compensation set forth in Exhibit B represents the parties' best estimate of fair market value of the on-call coverage for the Services to be provided by Group under the terms of this Agreement. Group shall be compensated by Hospital solely for the purpose of assuring the availability of Physicians' Services for patients of the Department. Group will bill the patients or the appropriate third party payors directly for patient services rendered by Group at the Hospital in amounts not to exceed the usual and customary fees charged by physicians in the Specialty within the community and shall not seek any reimbursement from Hospital for such Services. Group shall have the sole responsibility to compensate Physicians.  Group reserves the right, in its sole discretion, to determine the compensation payable to Physicians.

b.     **Incidental Use of Premises.**  In addition to such other compensation as is provided under this Agreement in return for the services provided by Group as set forth in Sections 1 and 2, Group may utilize workspace used in performance of the Services (including, for example, desk, chair and IT access) in connection with the occasional, non-routine performance of professional emergency medical services on behalf of other facilities. Group agrees that Hospital shall have no obligation to incur any incremental costs in providing such non-routine access.

c.     **Managed Care.**  Group shall participate in all third-party payment or managed care programs in which Hospital participates, render services to patients covered by such programs, and accept the payment amounts provided for under these programs as payment in full for services of the Group to program patients.

4.     **TERM.**  The term of this Agreement ("Term") shall be two (2) years commencing on the Effective Date.  If the parties continue to abide by the terms and conditions of this Agreement without having executed a renewal or extension of this Agreement or advised the other party of such party's intent not to renew or extend this Agreement, then this Agreement shall **automatically be extended on a month-to-month basis for up to six (6) months**.

5.     **TERMINATION.**

a.     **Termination Without Cause.**  Either party may, in its sole discretion, terminate this Agreement without cause by giving the other party at least thirty (30 days' prior written notice.

ECATS # 152183-0

b.    **Termination for Breach.**  Either party may terminate this Agreement upon breach by the other party of any material provision of this Agreement, provided such breach continues for fifteen (15) days after receipt by the breaching party of written notice of such breach from the non-breaching party.

c.    **Immediate Termination by Hospital.**  Hospital may terminate this Agreement immediately by written notice to Group upon the occurrence of any of the following: (i) conduct by Group or any Physicians which, in the sole discretion of Hospital, could affect the quality of professional care provided to Hospital patients or the performance of duties required hereunder, or be prejudicial or adverse to the best interest and welfare of Hospital or its patients; (ii) breach by Group or any Physicians of any of the confidentiality provisions hereof; (iii) failure by Group to maintain the insurance required under this Agreement; (iv) closure of Hospital, cessation of the patient care operations or sale of Hospital or of all, or substantially all, of Hospital's assets; or (v) Group's or any Physicians conviction of a criminal offense related to health care, or Group's or any Physician's listing by a federal agency as being debarred, excluded or otherwise ineligible for federal program participation.

Group may cure such breach caused by a Physician under this Subsection by immediately terminating all employment and other Group-based professional and business relationships with such Physicians and preventing said Physician from providing any services hereunder.

d.    **Termination for Changes in Law.**  In the event that any governmental or nongovernmental agency, or any court or administrative tribunal passes, issues or promulgates any new, or change to any existing, law, rule, regulation, standard, interpretation, order, decision or judgment (individually or collectively, "Legal Event"), which a party (the "Noticing Party") reasonably believes (i) materially and adversely affects either party's licensure, accreditation, certification, or ability to refer, to accept any referral, to present a bill or claim, or to receive payment or reimbursement from any governmental or non-governmental payor, or (ii) indicates a Legal Event with which the Noticing Party desires further compliance, then, in either event, the Noticing Party may give the other party thirty (30) days prior written notice of its intent to amend or terminate this Agreement.  Notwithstanding the foregoing, the Noticing Party may propose an amendment to the Agreement to take into account the Legal Event, and, if accepted by the other party prior to the end of the thirty (30) day notice period, the Agreement shall be amended as of the date of such acceptance and if not amended shall automatically terminate.

e.    **Effect of Termination.**  As of the effective date of termination of this Agreement, neither party shall have any further rights or obligations hereunder except: (1) as otherwise provided herein; (2) for rights and obligations accruing prior to such effective date of termination; and (3) arising as a result of any breach of this Agreement.

6.    INSURANCE.

a.    Group shall secure and maintain at all times during the Term, at Group's sole expense, commercial general liability insurance, covering Group, all Physicians who provide the Services pursuant to this Agreement and all of Group's employees, with an admitted carrier (licensed to do business in the State in which Group is performing work for Hospital) and with a carrier having at least an "A" BEST rating, at the following limits:

ECATS # 152183-0

Commercial General Liability Insurance covering bodily injury and property damage to third parties and including Products/Completed Operations, Blanket Contractual Liability, and Personal/Advertising Injury:

Limits:        $2,000,000 per occurrence; $4,000,000 general aggregate or
               $2,000,000 Combined Single Limit

and

               $2,000,000 per occurrence Personal/Advertising Injury
               $4,000,000 Products/Completed Operations aggregate

Such insurance shall name Hospital as an Additional Insured and shall not be cancelable except upon thirty (30) days' prior written notice to Hospital. Such coverage shall be primary and non-contributory. Group shall annually provide Hospital a certificate of insurance evidencing such coverages and coverage extensions.

b.      Group shall secure and maintain at all times during the Term, at Group's sole expense, professional liability insurance covering Group, all Physicians who provide Services pursuant to this Agreement and all of Group's employees, with an admitted carrier (licensed to do business in the State in which Group is performing work for Hospital) and at the following limits:

Limits:        $1,000,000 per claim/occurrence and $3,000,000 aggregate

Such insurance shall not be cancelable except upon thirty (30) days' prior written notice to Hospital. Such coverage shall be primary and non-contributory. Group shall annually provide Hospital a certificate of insurance evidencing such coverages and coverage extensions. This coverage shall be either (1) on an occurrence basis or (2) on a claims-made basis. If the coverage is on a claims-made basis, Group hereby agrees that prior to the effective date of termination of Group's current insurance coverage, Group shall purchase either a replacement policy annually thereafter having a retroactive date no later than the Effective Date of this Agreement or unlimited tail coverage in the above stated amounts for all claims arising out of incidents occurring prior to termination of Group's current coverage or prior to termination of this Agreement and provide Hospital a certificate of insurance evidencing such coverage. Group hereby expressly acknowledges and agrees that the total premium costs for such tail coverage shall be borne by Group.

c.      Group's obligations under this Section 7 shall survive the expiration or other termination of this Agreement, regardless of the cause of any such termination.

7.      **ACCESS TO BOOKS AND RECORDS.**  If the value or cost of services rendered to Hospital pursuant to this Agreement is $10,000 or more over a 12-month period, in accordance with section 1861(v)(1)(I) of the Social Security Act, Group agrees that for at least four years following the furnishing of such services, Group shall, upon written request, make available to the Secretary of the United States Department of Health and Human Services (the "Secretary"), the Comptroller General of the United States, or their respective duly-authorized representatives, such books, documents and records as may be necessary to certify the nature and extent of the cost of such services. The provisions of this Section shall survive expiration or other termination

ECATS # 152183-0

of this Agreement, regardless of the cause of such termination.

8.      **CONFIDENTIALITY.**  Group and Physician agree to maintain and hold as confidential and to not disclose the terms of this Agreement or any confidential or proprietary information that Group or Physician may be provided during the term of this Agreement to any other person (with the exception of Group's or any Physician's legal counsel, accountant or financial advisors), unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to in writing by Hospital ("Confidential Information").  As between Hospital, its affiliates, and Group, any Confidential Information of Hospital or its affiliates or Data provided to or learned by Group for any purpose, in connection with any software pursuant to this Agreement, shall be deemed to be the exclusive property of Hospital. In no event shall Group claim any rights with respect to such Confidential Information or Data or take any action with respect to such Confidential Information or Data that is inconsistent with the duties of a bailee for hire or in addition to the services Group is authorized to provide under this Agreement, without prior written consent of Hospital or its affiliates. Additionally, Group shall not use, authorize to use or disclose the Data received from Hospital for the purpose of developing information or statistical compilations for use by third parties or other division or subsidiary of Group or for any commercial exploitation, unless otherwise agreed upon in writing by Hospital or its affiliates. Moreover, Group hereby waives any and all statutory and common law liens it may now or hereafter have with respect to data derived from Hospital's or any of its affiliate's Confidential Information or Data. For purposes hereof, "Data" means all tangible data elements belonging to Hospital or its affiliates under the terms of this Agreement. Data specifically includes, but is not limited to, patient identification information, patient medical records, financial information, business forecasts, personnel information, customer lists, marketing information, Medicare, Medicaid and other payor information, reimbursement information, and other information relating to the business of Hospital or any affiliate thereof or their respective patients, clients or customers. With respect to any patient or medical record information regarding Hospital patients, Group and Physician shall comply with all federal and state laws and regulations, and all bylaws, rules, regulations, and policies of Hospital and its medical staff, regarding the confidentiality of such information, including, without limitation, all applicable provisions and regulations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

9.      **ARBITRATION.**  Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by final and binding arbitration in the county in which the Hospital is located in accordance with the Commercial Rules of Arbitration ("Rules") of the Judicial Arbitration and Mediation Services ("JAMS") before one arbitrator applying the laws of the State.  The parties shall attempt to mutually select the arbitrator.  In the event they are unable to mutually agree, the arbitrator shall be selected by the procedures prescribed by the JAMS Rules. Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereof may be entered in any court having jurisdiction thereof.  The costs shall be borne equally by both parties.  The provisions set forth herein shall survive expiration or other termination of this Agreement, regardless of the cause of such termination.

10.     **INDEMNIFICATION.**  Both parties mutually agree to indemnify and hold each other harmless from and against all liability, losses, damages, claims, causes of action, cost or expenses (including reasonable attorneys' fees), which directly or indirectly arise from the

ECATS # 152183-0

performance of the Services hereunder (or from services furnished by Group in connection with Subsection 4.b. of the Agreement) by the indemnifying party, its agents, servants, representatives and/or employees.

11.    **ENTIRE AGREEMENT; MODIFICATION; GOVERNING LAW; COUNTERPARTS; NOTICES; WAIVER; ASSIGNMENT.** This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the parties relating to such subject matter. This Agreement may not be amended or modified except by mutual written agreement. This Agreement shall be construed in accordance with the laws of the State, which provision shall survive the expiration or other termination of this Agreement. This Agreement may be executed in one or more counterparts, all of which together shall constitute only one Agreement. All notices hereunder shall be in writing, delivered personally, by certified or registered mail, return receipt requested, or by overnight courier, and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, postage prepaid, or deposited with the overnight courier, addressed at the place identified on the signature page below. A waiver by either party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure. Group shall not assign or transfer, in whole or in part, this Agreement or any of Group's rights, duties or obligations under this Agreement without the prior written consent of Hospital, and any assignment or transfer by Group without such consent shall be null and void. This Agreement is assignable by Hospital without consent or notice.

12.    **REFERRALS.** The parties acknowledge that none of the benefits granted Group or any Physician hereunder are conditioned on any requirement that Group or any Physician make referrals to, be in a position to make or influence referrals to, or otherwise generate business for Hospital or its affiliates. The parties further acknowledge that no Physician is restricted from establishing staff privileges at, referring any patient to, or otherwise generating any business for, any other facility of Group-affiliated physician's choosing.

13.    **NON-DISCRIMINATION.** Group agrees to treat in a nondiscriminatory manner any and all patients receiving medical benefits or assistance under any federal health care program.

14.    **ASSISTANCE IN LITIGATION.** Group and each Physician shall provide information and testimony and otherwise assist Hospital in defending against litigation brought against Hospital, its directors, officers or employees based upon a claim of negligence, malpractice or any other cause of action, arising under this Agreement, except where Physician is a named adverse party.

15.    **DISCLOSURE OF TERMS OF AGREEMENT.** Neither Group nor any Physician shall refer to the existence of this Agreement or disclose its terms to any third party, including, without limitation, in any press release, advertising, marketing, publicity or other materials, without the prior written consent of Hospital. Neither party shall use the name, trade name, trademarks, service marks or logos of the other party or any of its affiliates in any press release, advertising, marketing, publicity or other materials, without the prior written consent of the other party. Group shall not represent, directly or indirectly, that any product or service of Group has been approved or endorsed by Hospital or any of its affiliates, without the prior written consent of Hospital.

ECATS # 152183-0

16.    **COMPLIANCE OBLIGATIONS.** Group and Physicians each represents that he/she/it read, understands, and shall abide by Tenet's Standards of Conduct.  The parties to this Agreement shall comply with Tenet's Compliance Program and Tenet's policies and procedures related to the Deficit Reduction Act of 2005, Anti-Kickback Statute and the Stark Law.  Tenet's Standards of Conduct, summary of Compliance Program, and policies and procedures, including a summary of the Federal False Claims Act and applicable state false claims laws (collectively "False Claims Laws") with descriptions of penalties and whistleblower protections pertaining to such laws, are available at:  http://www.tenethealth.com/about/ethics-compliance.  Group shall require any employees providing services to Hospital to read the Standards of Conduct and information concerning Tenet's Compliance Program and abide by same. Further, the parties to this Agreement certify that they shall not violate the Anti-Kickback Statute and Stark Law, and shall abide by the Deficit Reduction Act of 2005, as applicable, in providing services to Hospital. Hardcopies of any information shall be made available upon request. Group, Physicians, and any employees, if applicable, shall complete any training required under Tenet's Compliance Program.

17.    **EXCLUSION LISTS SCREENING.**  Group shall screen all of its current and prospective owners, legal entities, officers, directors, employees, contractors, and agents ("Screened Persons") against (a) the United States Department of Health and Human Services/Office of Inspector General List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov), (b) the General Services Administration's System for Award Management (available through the Internet at http://www.sam.gov), and (c) any applicable state healthcare exclusion list (collectively, the "Exclusion Lists") to ensure that none of the Screened Persons are currently excluded, debarred, suspended, or otherwise ineligible to participate in Federal healthcare programs or in Federal procurement or nonprocurement programs, or have been convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but have not yet been excluded, debarred, suspended, or otherwise declared ineligible (each, an "Ineligible Person").  If, at any time during the term of this Agreement any Screened Person becomes an Ineligible Person or proposed to be an Ineligible Person, Group shall immediately notify Hospital of the same.  Screened Persons shall not include any employee, contractor or agent who is not providing services under this Agreement.

18.    **SURVIVAL.**  The provisions of Sections, 3, 8, 9, 10, 11, and 15 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

| TENET HEALTHSYSTEM HAHNEMANN, LLC D/B/A HAHNEMANN UNIVERSITY HOSPITAL | HARVARD CARDIOVASCULAR, INC. |
|---|---|
| By: _[signature]_ | By: _[signature]_ |
| Michael P. Halter | Name:  Manoj Khandelwal |
| Chief Executive Officer | Title:  M.D. |
| 230 N. Broad Street, MS 300 | Address:  5735 Ridge Avenue (Suite 101), |
| Philadelphia, PA  19102 | Philadelphia, PA 19128 |
| Date: _11/28/16_ | Date: _11/30/16_ |

ECATS # 152183-0

## EXHIBIT A
### Physician's Duties

During the term of this Agreement, the Services to be provided by Physicians shall include:

1      Making recommendations to the Hospital's Chief Executive Officer ("CEO") regarding the use of Hospital personnel, necessary equipment and standards of patient care in connection with this Agreement.

2      Reporting to the CEO, who will represent Hospital in the administration of this Agreement.

3      Group shall provide on-call Services on a weekly basis from Friday at 6PM through Monday at 7AM, inclusive of holidays; and maintain communication with the Department Director to ensure proper Panel coverage at all times.  Services shall include the acceptance and medical management of patients of the Department, from admission to discharge, including obtaining additional consultations as necessary.

4      Accepting Department patients regardless of the patient's ability to pay for services.

5      Managing patients up to the time of transfer, and transferring patients only upon the acceptance by receiving hospitals and physicians.

6      Providing Hospital's designee with Physician's schedule to enable preparation of the on-call schedules. If unable to provide call coverage for any reason, Group shall arrange for another Panel Member to provide call coverage.  All changes in call coverage must be reported immediately to the Department, as well as the medical staff services department, so that an accurate call schedule is maintained at all times.

7      Responding by phone to the Emergency Department within 20 minutes of initial contact and being on site at the Emergency Department within 30 minutes of initial contact if requested to come in by the Emergency Department physician.  Failure to respond as required herein during any 12-month period during the Term shall result in the following:

> (1)    first failure - mandatory meeting with the Vice President of Medical Affairs; or the Chief of Staff;
> (2)    second failure - 30 day suspension from on-call list for the Specialty;
> (3)    third failure - 60 day suspension from on-call list for the Specialty;
> (4)    fourth failure - termination from on-call list during the Term.

**EXHIBIT B**
GROUP'S COMPENSATION

1. COMPENSATION SOLELY FOR UNRESTRICTED BEEPER ON CALL:

      a.    For each 24-hour period that Group provides Physicians for on-call coverage in accordance with the terms of this Agreement, Hospital shall pay to Group the sum of Forty-Three Dollars ($43) per hour for beeper call.

      b.    Group acknowledges and agrees that only one (1) Panel Member will be entitled to compensation for providing on-call coverage in the Specialty during each twenty-four (24) hour period, regardless of the number of physicians covering or claiming to cover such twenty-four (24) hour on-call period. **Group shall complete and submit Exhibit C (the "Reimbursement Log") to Department Director no later than fifteen (15) days' following the month in which Services were rendered ("Due Date"), to receive payment.** Payment shall be paid monthly, no later than the 15th day of the month following the month in which services were provided.

2. COMPENSATION SOLELY FOR UNASSIGNED INDIGENT PATIENTS:

      a.    Hospital shall compensate Group for Unassigned Indigent Care Services, as hereinafter defined, rendered to Unassigned Indigent Patients, as hereinafter defined, at the fair market value rate of One Hundred Percent (100%) of the then-effective Medicare Physician Fee Schedule for inpatient consults and initial surgical procedures for the professional Services provided to such Unassigned Indigent Patients under this Agreement ("Unassigned Indigent Care Compensation"); provided, however, that only those admissions and Services covered by this Agreement that are determined to be medically necessary as established by InterQual criteria shall be eligible for reimbursement hereunder. For purposes of this Agreement, the term "Unassigned Indigent Patient" means, a patient who: (i) presents to the Department for treatment of an emergency medical condition requiring assessment and evaluation by a physician and who is not already a patient of Physician and who does not already have an attending physician; (ii) requires treatment by physicians other than the ER physicians; (iii) is unable to pay for professional Services rendered in the Department; (iv) is ineligible for federal or State medical assistance under the Medicare or Medicaid or similar programs; (v) is determined to be indigent pursuant to the Federal Poverty Guidelines; and (vi) has no private medical insurance or other personal funds or personal income to pay for such professional Services and no other party is legally obligated to make payment for all or any part of such professional Services. For purposes of this Agreement, the term "Unassigned Indigent Care Services" means the availability of Physician to treat Unassigned Indigent Patients in Hospital's Department and the provision by Physician of any medically necessary professional Services which such Unassigned Indigent Patients may require within the practice limits of Physicians.

      b.    Group hereby expressly acknowledges and agrees that Hospital's provision of Unassigned Indigent Care Compensation for any professional Services Physician renders to an Unassigned Indigent Patient shall be Group's sole compensation for both the professional

Services rendered and Physician's stand-by availability to provide such Services, and Group shall not seek any other compensation in any other manner in connection with Physician's rendering of such Services after billing the patient and a determination is made that the patient is indigent as set forth below.  As a condition of payment under this Agreement, Group and Physician shall cooperate with Hospital and Hospital's agents in connection with obtaining and/or maintaining the eligibility of patients treated by Physician under this Agreement for federal or State medical assistance under the Medicare or Medicaid programs or any other source of payment for Physician's professional Services.  Group and Physician understands and agrees that the determination of whether a patient is an Unassigned Indigent Patient may not be made until after Hospital receives formal notification from Medicaid that a patient is not eligible for Medicaid benefits.

      c.     Following the provision of Unassigned Indigent Care Services to an Unassigned Indigent Patient, Physician shall follow the following process: (i) Group or Physician shall promptly submit to Hospital a form CMS-1500 and/or such other form as Hospital may require, itemizing in detail professional Services Physician has provided to an Unassigned Indigent Patient in the Department and/or inpatient portion of Hospital.  Group's billings shall accurately reflect the Services Physician has provided and Group shall only request payment for the Services personally performed by Physician.  Group shall accurately bill and code the care and the Services provided to an Unassigned Indigent Patient, consistent with American Medical Association CPT coding guidelines.  Group and Physician shall comply with all governmental and third party record keeping and reporting requirements;  (ii) Group shall provide documentation acceptable to Hospital of Physician's efforts to (1) determine the indigent status of the Unassigned Indigent Patient and (2) bill and collect from the Unassigned Indigent Patient, including, but not limited to, at least two (2) billing statements to the Unassigned Indigent Patient; (iii) Hospital shall promptly verify the patient information and professional Services provided by Physician; (iv) Hospital shall promptly confirm via Hospital billing records, the uninsured status of the Unassigned Indigent Patient and his/her inability to pay based on guidelines established by Hospital; (v) Hospital shall confirm with the Medicaid Eligibility Program the Medicaid status or potential Medicaid eligibility of the Unassigned Indigent Patient; and (vi) once inability to pay is documented and evidence of collection efforts is confirmed, Hospital shall calculate the amount due Group based on the amount set forth in Subsection a. above.  Notwithstanding the foregoing, in the event Hospital determines that any Unassigned Indigent Patient has an income level which is equal to or less than 200% of the Federal poverty guidelines, and otherwise meets the definition of an "Unassigned Indigent Patient" hereunder, Group will not be required to provide evidence of collection efforts as set forth in this Subsection.

      d.     With respect to all Unassigned Indigent Patients treated by Physician in Hospital, Group agrees to assign the accounts receivable (if any) to Hospital.  Hospital shall submit a check to Group within sixty (60) days of completion of the billing process set forth in Section c. above.  The full completion of the forms and Hospital's review and/or verification thereof shall be a condition precedent to payment to Physician for providing Unassigned Indigent Care Services.

e.       In the event that (1) Physician provides the Services to an Unassigned Indigent Patient, receives Unassigned Indigent Care Compensation from Hospital, and subsequently is notified that such patient is not an Unassigned Indigent Patient, or (2) Physician's billing or coding for professional Services rendered pursuant to this Agreement turns out to be incorrect, Physician shall promptly refund to Hospital all amounts paid by Hospital to Physician for the Services provided to such Unassigned Indigent Patient. Physician shall then be responsible for directly billing such patient or such patient's third party payor.

**EXHIBIT C**

**CARDIAC CATHETERIZATION EMERGENCY PHYSICIAN
ON CALL DEPARTMENT COVERAGE REIMBURSEMENT LOG**

GROUP: <u>Harvard Cardiovascular, Inc.</u>

Month Of Service: _____

CONTRACT TERM: _____ TO _____

ECATS # 152183

| STEMI CALL DATES | ATTENDING | HOLIDAYS HOURS | WEEK NIGHT HOURS 6pm-7am | WEEKEND HOURS Friday 6pm – Monday 7am | TOTAL HOURS | CONTRACT HOURLY RATE ($43/hour – As per Exhibit B, Subsection 1(b)) | PAYMENT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | TOTAL | |

By signing this document, the Group hereby affirms and attests that the Services and the number of hours recorded for such Services set forth herein were performed by Group's Physicians and that each Physician fully performed all designated duties required during this month.

_____
Group                          Date

By signing this document, the Department Director hereby affirms and attests he/she has reviewed the above Log for completeness, legibility, overall compliance with the terms of the Agreement, and has verified the dates of service against the monthly call schedule maintained by the Director.

_____
Department Director    Date

Hahnemann University Hospital
Cardiac Catheterization Laboratory

JANUARY-JUNE 2018

| Date: 2019 | Holidays | Attending | Beeper | Home Phone | Cell Phone | CP PATH | Interventional Fellow |
|---|---|---|---|---|---|---|---|
| 01/02-01/06 | Holidays | LEDLEY | 50798 | 610-747-0770 | 215-681-3662 | UNIV | |
| 01/07-01/13 | | KHANDELWAL | | | 609-922-8258 | HUH | |
| 01/14-01/21 | MLK | GEORGE | 43083 | | 267-269-5431 | CCP | |
| 01/22-01/27 | | BANKA | | | 215-681-3662 | HUH | |
| 01/28-02/03 | | MATHEW | 50844 | | 215-870-9034 | UNIV | |
| 02/04-02/10 | | LEDLEY | 50798 | 610-747-0770 | | UNIV | |
| 02/11-02/18 | PRESIDENT'S DAY | BANKA | | | 215-681-3662 | HUH | |
| 02/19-02/24 | | KHANDELWAL | | | 609-922-8258 | CCP | |
| 02/25-03/03 | | MATHEW | 50844 | | 215-870-9034 | UNIV | |
| 03/04-03/10 | | BANKA | | | 215-681-3662 | HUH | |
| 03/11-03/17 | | GEORGE | 43083 | | 267-269-5431 | CCP | |
| 03/18-03/24 | | LEDLEY | 50798 | 610-747-0770 | | UNIV | |
| 03/25-03/31 | | MATHEW | 50844 | | 215-870-9034 | HUH | |
| 04/01-04/07 | | MATHEW | 50844 | | 215-870-9034 | CCP | |
| 4/4 ONLY | THURSDAY | BANKA | | | 215-681-3662 | CCP | |
| 04/08-04/14 | | BANKA | | | 215-681-3662 | HUH | |
| 04/15-04/21 | EASTER | KHANDELWAL | | | 609-922-8258 | UNIV | |
| 04/22-04/28 | | LEDLEY | 50798 | 610-747-0770 | | UNIV | |
| 04/29-05/05 | | LEDLEY | 50798 | 610-747-0770 | | HUH | |
| 05/06-05/12 | | KHANDELWAL | | | 609-922-8258 | CCP | |
| 05/13-05/19 | | BANKA | | | 215-681-3662 | HUH | |
| 05/20-05/27 | MEMORIAL DAY | MATHEW | 50844 | | 215-870-9034 | UNIV | |
| 05/28-06/02 | | GEORGE | 43083 | | 267-269-5431 | CCP | |
| 06/03-06/09 | | BANKA | | | 215-681-3662 | HUH | |
| 06/10-06/16 | | LEDLEY | 50798 | 610-747-0770 | | HUH | |
| 06/17-06/23 | | KHANDELWAL | | | 609-922-8258 | CCP | |
| 06/24-06/30 | | MATHEW | 50844 | | 215-870-9034 | UNIV | |

 Gmail

Manoj Khandelwal <mankhand@gmail.com>

## Fwd: STEMI

**Manoj Khandelwal** <mankhand@gmail.com>                                    Fri, Jan 29, 2021 at 8:00 AM
To: Manoj Khandelwal <mankhand@gmail.com>

*Thanks.*
*Manoj Khandelwal*
*Phone 609-922-8258*
*Fax 609-423-0306*

*CONFIDENTIALITY WARNING- The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

---------- Forwarded message ---------
From: **Camica Staten** <Camica.Staten@americanacademic.com>
Date: Wed, May 15, 2019 at 10:10 AM
Subject: RE: STEMI
To: Manoj Khandelwal <mankhand@gmail.com>
Cc: Alexander Trebelev <Alexander.Trebelev@americanacademic.com>

Hi Dr. Khandelwal,

I will forward your message to accounts payable and get back to you.

Could you please sign your reports?

*Camica Staten, BSN, RN*

*Director, Cardiac Services*

*Hahnemann University Hospital*

*(215) 762-4176*

camica.staten@americanacademic.com

 **Hahnemann** University HOSPITAL





**From:** Manoj Khandelwal [mailto:mankhand@gmail.com]
**Sent:** Wednesday, May 15, 2019 9:46 AM
**To:** Camica Staten
**Cc:** Alexander Trebelev
**Subject:** STEMI

Hi

Have mentioned on few occasions about STEMI call non-payment for about 6 months. Can you please address as terms of agreement state payment to be  made within 2 weeks of services. Thanks for your help.

*Thanks.*
*Manoj Khandelwal*

*Phone 609-922-8258*

*Fax 609-423-0306*

 Gmail                                    Manoj Khandelwal <mankhand@gmail.com>



## Fwd: stemi reimbursemment

**Manoj Khandelwal** <mankhand@gmail.com>                    Fri, Jan 29, 2021 at 8:00 AM
To: Manoj Khandelwal <mankhand@gmail.com>

*Thanks.*
*Manoj Khandelwal*
*Phone 609-922-8258*
*Fax 609-423-0306*

*CONFIDENTIALITY WARNING- The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

---------- Forwarded message ---------
From: **Manoj Khandelwal** <mankhand@gmail.com>
Date: Mon, Jun 10, 2019 at 11:58 AM
Subject: stemi reimbursement
To: Camica Staten <Camica.Staten@americanacademic.com>

Hi

Could you please ccheck into payments since february
*Thanks.*
*Manoj Khandelwal*
*Phone 609-922-8258*
*Fax 609-423-0306*

 Gmail                                                                    Manoj Khandelwal <mankhand@gmail.com>

---

## Fwd: Please send overdue stemi payment s

**Manoj Khandelwal** <mankhand@gmail.com>                                          Fri, Jan 29, 2021 at 8:00 AM
To: Manoj Khandelwal <mankhand@gmail.com>

*Thanks.*
*Manoj Khandelwal*
*Phone 609-922-8258*
*Fax 609-423-0306*

*CONFIDENTIALITY WARNING- The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

---------- Forwarded message ---------
From: **Manoj Khandelwal** <mankhand@gmail.com>
Date: Thu, Jun 20, 2019 at 1:17 PM
Subject: Please send overdue stemi payment s
To: Camica Staten <Camica.Staten@americanacademic.com>

Manoj Khandelwal (p)6099228258(f)6094230306

 Gmail                                      **Manoj Khandelwal <mankhand@gmail.com>**



---

## Fwd: FW: Cardiac Catheterizations

---

**Manoj Khandelwal <mankhand@gmail.com>**                          Fri, Jan 29, 2021 at 8:00 AM
To: Manoj Khandelwal <mankhand@gmail.com>

*Thanks.*
*Manoj Khandelwal*
*Phone 609-922-8258*
*Fax 609-423-0306*

*CONFIDENTIALITY WARNING- The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

---------- Forwarded message ---------
From: **Manoj Khandelwal** <mankhand@gmail.com>
Date: Thu, Aug 8, 2019 at 10:40 AM
Subject: Re: FW: Cardiac Catheterizations
To: Camica Staten <Camica.Staten@americanacademic.com>

Good morning

Will do. can you let me know status of STEMI payments
*Thanks.*
*Manoj Khandelwal*
*Phone 609-922-8258*
*Fax 609-423-0306*

On Thu, Aug 8, 2019 at 10:39 AM Camica Staten <Camica.Staten@americanacademic.com> wrote:

Good Morning, Dr. Khandelwal,

Please see below regarding 3 outstanding reports from June.  Please log into HPF and sign off on the reports.

Thanks,

Camica

*Camica Staten, BSN, RN*

*Director, Cardiac Services*

*Hahnemann University Hospital*

*(215) 762-4176*

camica.staten@americanacademic.com





---

**From:** Norman Bach
**Sent:** Wednesday, August 07, 2019 1:15 PM
**To:** Camica Staten
**Cc:** Mary Tunney; Linda Thurber
**Subject:** Cardiac Catheterizations


Hi Camica,


Dr. Khandelwal has three outstanding cardiac cath reports from June. Monday, August 12 will be the last day for our processing staff. There will be no further scanning of documents into HPF. We can scan unsigned reports if you have them. Dr. Khandelwal can always sign in HPF, but he cannot edit in HPF. Here are the patients:


| 81751729 | 6-3 | Raymond Shuler | drug eluting stent |
| 81793069 | 6-7 | James Suber | drug eluting stent |
| 81820201 | 6-11 | Frank Mastrandrea | left heart cath |


Thanks

Norman


NORMAN BACH, RHIA

Manager, Operations

Hahnemann University Hospital

Health Information Management Services

New College Building, Suite B110

230 North Broad Street

Philadelphia, PA 19102

Tel:  215-762-4944

Fax:  215-762-7127

norman.bach@americanacademic.com

Attending On Call Schedule

Hahnemann University Hospital
Cardiac Catheterization Laboratory

July 2019 - January 2020

| Date | Holidays | Attending | Beeper | Home Phone | Cell Phone | CP PATHWAY | Interventional Fellow |
|---|---|---|---|---|---|---|---|
| 07/01 - 07/07 | INDEPENDENCE DAY | LEDLEY | 50798 | 610-747-0770 | | | |
| 07/08 - 07/14 | | KHANDELWAL | | | 609-922-8258 | | |
| 07/15 - 07/21 | | KHANDELWAL | | | 609-922-8258 | | |
| 07/22 - 07/28 | | MATHEW | 50844 | | 215-870-9034 | | |
| 07/29 - 08/04 | | LEDLEY | 50798 | 610-747-0770 | | | |
| 08/05 - 08/111 | | MATHEW | 50844 | | 215-870-9034 | | |
| 08/12 - 08/18 | | KHANDELWAL | | | 609-922-8258 | | |
| 08/19 - 08/25 | | MATHEW | 50844 | | 215-870-9034 | | |
| 08/26 - 09/02 | LABOR DAY | LEDLEY | 50798 | 610-747-0770 | | | |
| 09/03 - 09/08 | | LEDLEY | 50798 | 610-747-0770 | | | |
| 09/09 - 09/15 | | MATHEW | 50844 | | 215-870-9034 | | |
| 09/16 - 09/22 | | KANDELWAL | | | 609-922-8258 | | |
| 09/23 - 09/29 | | MATHEW | 50844 | | 215-870-9034 | | |
| 09/30-10/06 | (MATHEW 9/30&10/1) | LEDLEY | 50798 | 610-747-0770 | | | |
| 10/07 - 10/13 | | MATHEW | 50844 | | 215-870-9034 | | |
| 10/14 - 10/20 | | KHANDELWAL | | | 609-922-8258 | | |
| 10/21 - 10/27 | | LEDLEY | 50798 | 610-747-0770 | | | |
| 10/28 - 11/03 | | LEDLEY | 50798 | 610-747-0770 | | | |
| 11/04 - 11/10 | | MATHEW | 50844 | | 215-870-9034 | | |
| 11/11 - 11/17 | | MATHEW | 50844 | | 215-870-9034 | | |
| 11/18 - 11/24 | | KHANDELWAL | | | 609-922-8258 | | |
| 11/25 - 12/01 | THANKSGIVING | MATHEW | 50844 | | 215-870-9034 | | |
| 12/02 - 12/08 | | LEDLEY | 50798 | 610-747-0770 | | | |
| 12/09 - 12/15 | | LEDLEY | 50798 | 610-747-0770 | | | |
| 12/16 - 12/22 | | KHANDELWAL | | | 609-922-8258 | | |
| 12/23 - 12/29 | CHRISTMAS | KHANDELWAL | | | 609-922-8258 | | |