IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (MFW) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) Re: D.I. 2119 |
| | ) |

## MOTION OF HSREP VI HOLDING, LLC AND ITS AFFILIATES TO INTERVENE/PARTICIPATE IN MEDIATION

HSREP VI Holding, LLC ("HSRE VI") and its affiliates (collectively, the "JV Entities"[2]), by their counsel, DLA Piper LLP (US), submit this motion to intervene and to direct that HSRE VI, its affiliates, and their respective Lenders be included as Mediation Parties in the Court-ordered mediation among the estates and the MBNF Non-Debtor Entities (defined below). Pursuant to

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]     The other relevant affiliates of HSRE VI that form the JV Entities are: HSRE-PAHH I, LLC (the "JV"), and the "Master Landlords"—PAHH New College MOB, LLC; PAHH Bellet MOB, LLC; PAHH Wood Street Garage, LLC; PAHH Erie Street Garage, LLC; PAHH Feinstein MOB, LLC; and PAHH Broad Street MOB, LLC, each, a Delaware limited liability company. In addition, Capital One, N.A., as agent for a three lender syndicated loan (collectively, the "Lenders"), holds a first priority mortgage and security interests in substantially all of the JV and Master Landlord Entities' assets, which security interests the JV Entities may not waive, release, or modify without the Lenders' consent. Thus, for the purposes of the relief requested herein only, the Lenders are to participate in the Mediation coextensively with the JV Entities in an effort to reach an efficient resolution for all parties in interest

Local Rule 9013-1(k), the JV Entities respectfully request that this Court enter an order, substantially in the form attached as Exhibit A hereto, amending its Order Appointing Mediator in Connection with Claims By and Between the Debtors' Estates and the MBNF Non-Debtor Entities (the "Mediation Order" or "Mediation," as applicable) [Docket No. 2119] to include the JV Entities as Mediation Parties.  The redlined version of the Mediation Order is attached as Exhibit B hereto.

The JV Entities are necessary and indispensable parties to the Mediation and should be permitted to participate in the efforts to reach a global resolution in the above-captioned cases (the "Chapter 11 Cases"), which will make the process more efficient and avoid the need for costly litigation to resolve issues that could (and should) be dealt with in the Mediation. In further support of this motion (the "Motion"), the JV Entities state as follows:

## PRELIMINARY STATEMENT

HSRE VI and the other JV Entities file this Motion because they hold rights and significant claims against both the Debtors' estates and the MBNF Non-Debtor Entities, making them essential parties to the Mediation if it is to succeed at reaching a global settlement among the Debtors' estates and the MBNF Non-Debtor Entities.[3] The PAHH corporate family entered into agreements involving the bankruptcy estates assigning interests to HSRE VI directly and also transacting in a way that was intended to benefit HSRE VI and other JV Entities. The Debtors and an official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee")

---

[3] The "MBNF Non-Debtor Entities" include Philadelphia Academic Health Holdings, LLC ("PAHH"); Paladin Healthcare Capital, LLC ("PHC"); Front Street Healthcare Properties, LLC and Front Street Healthcare Properties II, LLC (the "Front Street Entities"); and the "Broad Street Entities," Broad Street Healthcare Properties, LLC; Broad Street Healthcare Properties II, LLC f/k/a Center City Physician Associates, LLC; and Broad Street Healthcare Properties III, LLC f/k/a St. Christopher's Physician Associates, LLC.

seek to consolidate the MBNF Non-Debtor Entities' real property, or the entities that own the real property, with the bankruptcy estates—presumably without the corresponding obligations and expected flow of assets to satisfy them. Mediation should not proceed without allowing the JV Entities (including the Lenders) to participate as real parties in interest to the assets and claims that are the subject of the Mediation, without which the Mediation would be doomed to fail since their consent will ultimately be needed for any final agreement. Even the Debtors and Committee—the roadblocks to the JV Entities participating in the Mediation now—tacitly acknowledged that the JV Entities are necessary for reaching a global settlement by denying their participation until more "progress" is made. But this inefficient, piecemeal approach is likely to undermine whatever progress is achieved while the JV Entities are excluded from the Mediation because the issues will almost surely need to be renegotiated. Instead of wasting the opportunity for real resolution, the JV Entities should be included as parties to the Mediation.

In January 2018, the Debtors acquired the operations of Hahnemann University Hospital and St. Christopher's Hospital for Children from Tenet Healthcare Corporation and certain of its affiliates. In connection with that transaction, subsidiaries of PAHH (the Broad Street Entities and Front Street Entities) acquired real estate that was leased to certain of the Debtors; at the same time, the Master Landlord entities owned by the JV acquired medical office buildings and associated parking garages (the "MOB Properties") located near or adjacent to the Hospital campuses. HSRE VI funded the acquisition of the MOB Properties by obtaining a mortgage loan in the aggregate amount of approximately $110 million, secured by the MOB Properties. The MOB Properties were all leased to St. Christopher's Healthcare, LLC ("St. Chris"), one of the Debtors in these Chapter 11 Cases. PAHH and PHC each guaranteed St. Chris's obligations under the master leases. In addition, HSRE VI made a loan to PAHH in the principal amount of $51,075,000.

The proceeds from these two loans financed approximately 95% of the total acquisition price paid by PAHH to Tenet, with the balance funded by an additional "seller note" made in favor of Tenet in the original principal amount of $17.5 million that was paid in full during the pendency of these Chapter 11 Cases, and a loan from MidCap secured by the Debtors' working capital assets that also has been paid in full during the pendency of these Chapter 11 Cases.[4] HSRE VI and the JV Entities are the most significant remaining creditors in these Chapter 11 Cases that are also collectively PAHH's and PHC's largest creditor. The purchase from Tenet by the Debtors, the MBNF Non-Debtor Entities, and the JV closed in a single transaction. Mediation without the presence of HSRE VI and the JV Entities would be futile, as they are essential parties to the issues that are inevitably at the heart of any mediated resolution. Upon information and belief, Mediation is taking place to avoid the estates commencing an adversary proceeding to seek to avoid transfers or to seek to substantively consolidate the value of the real estate owned by the MBNF Non-Debtor Entities. No complaint or motion has been filed that would provide further clarity.

Upon information and belief, the Mediation will likely involve claims that the Debtors and the Committee believe they have against the MBNF Non-Debtor Entities. As the single largest creditor of PAHH and PHC, there is no basis upon which to settle those claims—which is the goal of the Mediation—without HSRE VI's consent. Perhaps in recognition of this fact, the MBNF Non-Debtor Entities have consented to HSRE VI's participation in the Mediation; the Debtors and the Committee have not, which resulted in the need to file this Motion.

Excluding critical parties like the JV Entities from meaningful participation in the Mediation is grounds for the Court to reject any settlement that comes out of the Mediation as not

---

[4] *See* Final Order (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors the Use Cash Collateral; (III) Granting Adequate Protection; (IV) Granting Adequate Protection and Modifying the Automatic Stay [Docket No. 557].

fair and equitable. Participation also preserves judicial economy be ensuring that the parties reach a resolution that is enforceable. And if the Mediation intends to affect, impair, or otherwise involve property that belongs to entities other than the estates, then each of the parties with an interest in that property should be included in the discussions.[5] The traditional intervention factors further support the intervention of the JV Entities to participate in the Mediation. As such, the JV Entities' participation in Mediation is proper, fair, equitable, and efficient; there are no compelling reasons to bar them from participating.

## **JURISDICTION**

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the JV Entities consent to the entry of a final order by the Court in connection with this matter if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The predicates for the relief requested herein are section 105(a) of the Bankruptcy Code and Local Rules 9013-1(k), 9019-3 and 9019-5.

---

[5] The JV Entities further assert that the Debtors, or any affiliates of any of the Debtors that may hereafter become Debtors or other parties in these Chapter 11 Cases, may not encumber property that is not property of their estates and accordingly reserve all rights.

## RELEVANT BACKGROUND

5.     In January 2018, as part of the same transaction involving the Debtors' acquisition of the operations of Hahnemann University Hospital and St. Christopher's Hospital for Children in Philadelphia, PA (the "Hospitals") from Tenet Healthcare Corporation and certain of its affiliates (collectively, "Tenet"), the Broad Street and Front Street Entities purchased the real estate in which the Hospitals operated and the JV Entities acquired from Tenet a group of medical office buildings and two parking garages (the "Master Lease Buildings") located on or adjacent to the Hospital campuses.

6.     The JV Entities, the Debtors, and the MBNF Non-Debtor Entities purchased the Hospitals and related assets for approximately $170 million. The acquisition from Tenet was funded primarily through loan proceeds provided by HSRE VI, whereby HSRE VI arranged for a senior secured mortgage loan obtained from the Lenders in the original principal amount of up to $110 million ("CONA Loan") to finance the acquisition of the Master Lease Buildings and made a loan to PAHH in the original principal amount of $51,075,000 (the "JV Note") for it to acquire the Hospitals and certain other properties from Tenet. The remainder of the purchase price was funded by a Tenet seller note and working capital provided through a loan from MidCap.

7.     The JV Note is secured by a pledge of PAHH's common and preferred interests in the JV. The CONA Loan is secured by all assets of the JV Entities, including mortgages on the Master Lease Buildings, assignments of the master leases and rents, and guaranties of the master leases granted by PAHH and PHC (two of the MBNF Non-Debtor Entities), among other things. The Lenders made the CONA Loan solely based upon the value of the real estate comprising the collateral, and not on the entire Tenet transaction as a whole.

8.      Together, the proceeds from these loans financed approximately 95% of the total acquisition price with an additional "seller note" made in favor of Tenet in the original principal amount of $17,500,000, which was secured by certain real property located on or adjacent to the St. Christopher's Hospital for Children campus.

9.      The creation of the special purpose entities comprising the Master Landlords was essential to the structure, and the purchase from Tenet by the Debtors, the MBNF Non-Debtor Entities, and the JV Entities closed in a single transaction.

10.     The JV owns and controls six entities referred to as the Master Landlords: PAHH New College MOB; LLC, PAHH Bellet MOB, LLC; PAHH Broad Street MOB, LLC; PAHH Feinstein MOB, LLC; PAHH Wood Street Garage, LLC; and PAHH Erie Street Garage, LLC. Each Master Landlord is a special purpose entity that acquired a medical office building or parking garage that is generally adjacent to the Hospitals.

11.     PAHH is the parent of and wholly-owns Debtor Philadelphia Academic Heath System, LLC ("PAHS"). Upon information and belief, PAHH is a holding company that also owns the equity of Front Street Healthcare Properties, LLC; Front Street Healthcare Properties II, LLC; Broad Street Healthcare Properties, LLC; Broad Street Healthcare Properties II, LLC f/k/a Center City Physician Associates, LLC; Broad Street Healthcare Properties III, LLC f/k/a St. Christopher's Physician Associates, LLC (all MBNF Non-Debtor Entities) and indirectly owns the other subsidiaries of PAHS that are Debtors, including the entities that owned and operated the Hospitals and related physician groups. The real estate and Hospital buildings are owned by certain special purpose entities that are included as MBNF Non-Debtor Entities and are unencumbered.

12.     The acquisition structure from Tenet was intended to isolate the value of the PAHH wholly-owned MBNF Non-Debtor Entity real estate such that upon its disposition or other capital

event, the value would flow up to PAHH, which in turn would satisfy its obligations, including its obligations under the master lease guaranties and the JV Note. In other words, HSRE VI's funding of the JV Loan was underwritten on the value of the real estate and not the operations of it.

13.    Concurrently with the Debtors' acquisition of the Hospitals and the JV Entities' acquisition of the Master Lease Buildings, certain JV Entities, as landlords, and Debtor St. Christopher's Healthcare, LLC, as tenant (the "Master Tenant"), entered into six (6) Master Leases (collectively, the "Master Leases") pursuant to which the Master Tenant leased each of the Master Lease Buildings on an "absolute triple net" basis.

14.    The Master Tenant was obligated to pay all sums due and coming due under the Master Leases, including the stated base rent and all costs of owning, operating, repairing, and maintaining the Master Lease Buildings. The monthly base rent and real estate tax obligations under the Master Leases alone approximated $1,300,000. The Master Leases were deemed rejected by the Debtors in accordance with a stipulation approved by the Court on November 25, 2019 [Docket No. 1057].

15.    The obligations of the Master Tenant under the Master Leases are guaranteed by non-debtor affiliate PAHH and non-debtor affiliate PHC (together with PAHH, the "Master Lease Guarantors" or the "Guaranty Agreements," as applicable).[6]

16.    Upon information and belief, PAHH and PHC have asserted substantial indemnity claims, administrative claims, and unsecured claims against the Debtors, as have the JV Entities. In addition, the Master Landlords have asserted claims against PAHH and PHC in excess of $400 million under the Guaranty Agreements.

---

[6]    The Guaranty Agreements, Master Leases, and the subleases are voluminous and may be provided upon request if relevant.

17.     In or about January 2020, certain of the Debtors (as sellers) sold substantially all of the assets of St. Christopher's Hospital for Children to a joint venture between Tower Health and Drexel College of Medicine ("Tower/Drexel JV"). Certain of the MBNF Non-Debtor Entities sold certain land and improvements used in the operation of the St. Christopher's Hospital for Children to a third party, which is now leasing the real estate to the Tower/Drexel JV ("St. Chris Real Estate").

18.     Upon information and belief, PAHH directly holds no liquid assets and has no access to financing proceeds, but does hold indirectly the net sale proceeds derived from the St. Chris Real Estate. The extent of the remaining proceeds and use of the proceeds is unknown.

19.     PAHH and PHC each failed to satisfy multiple demands made by the JV Entities under the Guaranty Agreements, which are currently being litigated but proceedings are stayed while the MBNF Non-Debtor Entities and the JV Entities seek to settle the claims.

20.     On July 1, 2019, PAHS and certain of its subsidiaries each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned cases.

21.     The Committee, an official committee of unsecured creditors was appointed in the Chapter 11 Cases, is represented by counsel and financial advisors. Neither HSRE VI nor any of the JV Entities are members of the Committee.

22.     The PAHS Debtors' bankruptcy estates are being jointly administered, but they are not substantively consolidated; each owns its own assets and each has its own liabilities (including certain joint and several liabilities).

23.     The JV Entities' claims against PAHH (and other MBNF Non-Debtor Entities) exceed $400 million dollars. Basic principles of corporate separateness require that proceeds from the sale of the St. Chris Real Estate would be available first to flow upstream to PAHH and, in

turn, to be paid to the JV Entities to satisfy PAHH's and PHC's obligations under the Master Lease Guaranties and then, after the CONA Loan has been paid in full, PAHH's JV Note obligations.

24.     Liquidating the Debtors' assets to allocate the value among the several stakeholders, possibly causing certain creditors' collections to be marshaled in order equitably to distribute the net proceeds, is already a concern for HSRE VI and the JV Entities. And now there is the unwelcome threat of including assets of the MBNF Non-Debtor Entities, which would further impair HSRE VI's and the JV Entities' ability to recover.

25.     Any Mediation held without the involvement of the MBNF Non-Debtor Entities' creditors is doomed to fail; the MBNF Non-Debtor Entities could not be released from its own obligations without their creditors' input on and agreement with the terms of any settlement that touches the MBNF Non-Debtor Entities' assets or liabilities. Under these circumstances, there is no compelling reason to prevent the MBNF Non-Debtor Entities' largest creditor from participating in the Mediation.

26.     PAHH's rights, authority, and power over the other MBNF Non-Debtor Entities are not the subject of the Chapter 11 Cases, yet may be subject to the Bankruptcy Court's determinations of a number of critical issues, including the likely allocation of value stemming from the sale of the MBNF Non-Debtor Entities' assets.

27.     The JV Entities have been made aware that the Debtors and Committee have asserted claims against the MBNF Non-Debtor Entities seeking the equitable remedy of substantive consolidation and that a pre-suit Mediation is now progressing under the supervision of the Court-appointed Mediator, the Honorable Kevin J. Carey (ret.).

28.     Since learning of the upcoming Mediation, the JV Entities have attempted to work with the Committee, the Debtors, and the MBNF Non-Debtor Entities to coordinate production of

documents, join in the Mediation, and play an active and constructive role in reaching a mediated resolution of the claims and issues.

29.    Accordingly, on May 9, 2021, a representative of the JV Entities wrote to the representatives for the Debtors, the Committee, and the MBNF Non-Debtor Entities in furtherance of discussions that began months ago to express the JV Entities' understandings and expectations regarding Mediation. (*See* Email from S. Brown, May 9, 2021, attached as Exhibit C.)

30.    The JV Entities hold various claims and rights that are central to any attempt at a global settlement effort that includes the MBNF Non-Debtor Entities, the assets of which are sought to be consolidated with the estates' assets through the Mediation (the JV Entities do not know the estates' intent with respect to the obligations of the MBNF Non-Debtor Entities).

31.    Judicial efficiency is best served by ensuring that all parties in interest are represented in negotiations that affect those interests, or the Mediation will be a futile effort. The JV Entities, and the secured Lenders, are parties in interest and should be involved in any discussions involving their interests.

32.    Counsel for the MBNF Non-Debtor Entities agrees that including the JV Entities in the Mediation is necessary for a global resolution. (Email from S. Uhland, Ex. C.)

33.    Counsel for the Debtors and Committee appears to object only to the timing of the JV Entities' participation in the Mediation, (Email from J. Hampton, Ex. C), conceding that "should there be a point in time when the debtors, committee, and MBNF make meaningful progress in the mediation, perhaps at that point there may be an opportunity to invite HSRE to participate." (*Id*.) While tacitly acknowledging that the JV Entities are necessary for reaching a global settlement, counsel for the Debtors and Committee, for unknown reasons, nevertheless seeks to delay the JV Entities' inevitable participation in the settlement process. The JV Entities,

as parties in interest, if excluded from the Mediation at the start, will likely need to renegotiate many of the issues that touch on their interests, and the piecemeal approach may undermine whatever progress is achieved while the JV Entities are excluded from the Mediation. Allowing the JV Entities to participate from the start is plainly the most efficient use of time and resources.

34.     By this Motion, the JV Entities seek to participate in the Mediation as Mediation Parties because their interests are not otherwise represented and their participation in the process is more efficient, since no meaningful agreements could be made without including considerations of HSRE VI, the other JV Entities, and the Lenders.

## ARGUMENT

35.     Given the JV Entities' substantial interests in the Mediation, they are crucial to any effort to reach a global resolution in the Chapter 11 Cases.

36.     Mediation in general prevents the undue delay and excessive costs connected with litigation and adversary proceedings related to claim validity. The JV Entities seek to participate in the Mediation to work towards a satisfactory resolution in a constructive manner, particularly since no other parties (including the MBNF Non-Debtor Entities) can adequately represent the JV Entities' interests.

**I.      No mediation could be fair and equitable without the JV Entities' full participation.**

37.     The Debtors filed a Chapter 11 Plan of Liquidation on December 30, 2020 [Docket No. 2001] (the "Plan") in which the JV Entities are noted to have impaired claims and interests. Under the terms of the Plan, the JV Entities, including HSRE VI, are entitled to vote to accept or reject the Plan. Rejection of the Plan by the JV Entities would require the Debtors to seek confirmation of the Plan from the Court. *See* 11 U.S.C. §§ 1126, 1129.

38.    A settlement plan may only be confirmed when the Court holds that the plan is a fair and equitable distribution of the Debtors' assets. *See, e.g.*, *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (a bankruptcy court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable."); *Will v. Northwestern Univ.* (*In re Nutraquest, Inc.*), 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them.").

39.    Courts must determine whether a settlement falls within the lowest range of reasonableness before approving it, typically applying the four so-called *Martin* factors. *See Myers v. Martin* (*In re Martin*), 91 F.3d 389, 391 (3d Cir. 1996).[7] But the court must also find that a proposed plan is fair and equitable towards a non-settling party. *In re Nutraquest, Inc.*, 434 F.3d 639, 650 (3d Cir. 2006) (finding a district court properly applied the correct factors in deciding whether to approve a settlement when applying both the *Martin* factors and evaluating whether the settlement was fair and equitable).

40.    Excluding a critical party from meaningful participation in the settlement process is a basis for finding the plan not fair and equitable. *See, e.g.*, *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 838 (Bankr. D. Del. 2008) (holding a plan settlement not fair and equitable because certain trade creditors were not afforded "meaningful participation" in settlement negotiations).

41.    A mediation involving all of the key parties will also allow the parties to engage more freely in "creative thinking about the allocation of the Debtors' assets." *See In re A.T.*

---

[7] Though not necessary to the instant Motion, the *Martin* factors are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." 91 F.3d at 393.

*Reynolds & Sons, Inc.*, 424 B.R. 76, 84 (Bankr. S.D.N.Y. 2010) ("Mediation permits, indeed often requires, consideration of underlying interests, causes or values that produce conflict and thus permits the management, handling or resolution of broader concerns than just those 'disputes' which crystallize at the tip of the iceberg.").

42.    Here, the involvement of the MBNF Non-Debtor Entities in the Mediation, and the possibility that their assets become intertwined with the assets of the estates without providing for the MBNF Non-Debtor Entities' liabilities, would render the Mediation efforts futile without the JV Entities' participation since those assets are also subject to claims by HSRE VI, other JV Entities, and the Lenders.

43.    The JV Entities respectfully assert that the Court can ameliorate these risks and prevent the JV Entities being closed off from meaningful participation in the negotiations by affording the JV Entities status as Mediation Parties. *See, e.g.*, *In re Tribune Co.*, 464 B.R. 126, 157 (Bankr. D. Del.), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom In re Tribune Media Co.*, 587 B.R. 606 (D. Del. 2018) (determining that Senior Noteholders were allowed meaningful participation in settlement negotiations where the majority claimholder of the Senior Noteholders was named a mediation party in the court's mediation order).

**II.    The JV Entities will be substantially harmed if not permitted to participate in Mediation.**

44.    The JV Entities would be harmed by their inability to participate in the Mediation as full Mediation Parties.

45.    Only Mediation Parties are privy to the oral and written communications disclosed in the confidential Mediation process, including submissions by the Mediation Parties as to various crucial issues in these cases. *See* Del. Bankr. L.R. 9019-5(d)(i) ("The mediator and the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written

information disclosed by the parties or by witnesses in the course of the mediation."); *see generally In re Tribune Co.*, No. 08-13141 KJC, 2011 WL 386827, at *8 (Bankr. D. Del. Feb. 3, 2011) ("There is a strong policy in promoting full and frank discussions during a mediation. Courts have recognized that confidentiality is essential to the mediation process. . .").

46.     Further, if denied status as Mediation Parties, the JV Entities would be placed at a significant informational deficit. *See* Del. Bankr. L.R. 9019-5(j)(xii)(A) ("The parties' respective position statements shall not be filed in the underlying adversary proceeding.").

**III.     It is reasonable and necessary for this Court to amend its Mediation Order to grant the JV Entities status as Mediation Parties.**

47.     There is no procedural impediment precluding this Court's amendment of its February 23, 2021 Mediation Order. Consequently, the JV Entities respectfully request that this Court amend its Mediation Order pursuant to Local Rule 9013-1(k) and grant the JV Entities status as Mediation Parties.

48.     Indeed, within the past year, such amendments were granted to provide interest holders with a meaningful opportunity to participate in bankruptcy-related mediation even though they were "not yet parties to any litigation." *See In re: Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343 (LSS), Motion of the Coalition of Abused Scouts for Justice to Participate in the Mediation [Docket No. 1161] (Bankr. D. Del. Aug. 26, 2020), *conditionally granted*, Tr. of Hybrid Zoom/Telephonic Bench Ruling [Docket No. 1544] (Oct. 16, 2020) ("[B]ased on my review of the motion, those supporting it and the opposition, I have determined on the conditions that I placed [to modify the existing protective order], to permit the coalition to participate in mediation.").

49.     "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee,

may raise and may appear and be heard *on any issue in a case* under this chapter [11 USCS §§ 1101 et seq.]." 11 U.S.C. § 1109(b) (emphasis added).

50.    The Second Circuit explained that the phrase "any issue" in Section 1109 does not distinguish adversary proceedings from contested matters:

> It is important to recognize, as the Third Circuit did, that the "exact language" of § 1109(b) "grants a right to appear and be heard **not in 'a case' but 'on any issue in a case.'**" *Marin*, 689 F.2d 445, 451 (3d Cir. 1982). The "issues" referred to in § 1109(b) occur in proceedings, which themselves occur in and constitute part of the "case." While the bankruptcy rules "distinguish . . . between different types of litigated matters [that arise during the pendency of a bankruptcy case] and divide them into contested matters and adversary proceedings," 10 *Collier on Bankruptcy* at 7000-1 (15th ed. rev. 2001), the plain text of § 1109(b) does not distinguish between issues that occur in these different types of proceedings within a Chapter 11 case. We hold, therefore, that the phrase "any issue in a case" plainly grants a right to raise, appear and be heard on any issue regardless whether it arises in a contested matter or an adversary proceeding.

*See In re Caldor Corp.*, 303 F.3d 161, 169, 176 (2d Cir. 2002).

51.    The Mediation (involving issues of substantive consolidation and claims allowance) is a core proceeding and, due to the involvement of the MBNF Non-Debtor Entities and their assets, the JV Entities' participation is crucial to resolving these issues.

52.    As just one example, one issue is whether and to what extent the MBNF Non-Debtor Entities are entitled to retain value. This is significant because the MBNF Non-Debtor Entities will be insecure to settle while the JV Entities still hold claims in excess of $400 million against them, so the MBNF Non-Debtor Entities cannot receive an effective release without HSRE VI and the other JV Entities participating in Mediation. Consequently, without the JV Entities' participation in Mediation, it is extraordinarily likely that no resolution can be had by the other parties.

53.     The MBNF Non-Debtor Entities agree with the JV Entities' participating in the Mediation from the outset, and the Debtor and Committee appear to object only to the timing of the JV Entities' involvement.

54.     Applying the criteria for intervening in adversary proceedings, the JV Entities would meet the four traditional factors used when considering intervention: "1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005) (citing *Kleissler v. United States Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998)); *see also In re Stone & Webster*, 380 B.R. 366, 370 (Bankr. D. Del. 2008).

### A.     The JV Entities' request to intervene and participate in the Mediation is timely.

55.     The critical inquiry of the first factor is, "what proceeding of substance on the merits has occurred?" *Mountain Top*, 72 F.3d 361, 365-66 (3d Cir. 1995).

56.     No substantive proceedings have commenced, nor has the Mediation.

57.     In the coming weeks, the JV Entities will be producing documents requested by the Debtors and Committee, once a mutually agreeable protective order is entered.

58.     To the extent that Mediation work has begun, it has been over the JV Entities' demands to participate and the JV Entities' objections made to proceeding without them.

### B.     The JV Entities have a sufficient interest in the Mediation.

59.     The JV Entities also have sufficient interests in the underlying issues. This prong can be satisfied through contractual or statutory interests, including where the subject of the dispute

was intended to benefit the intervenor. *In re Stone & Webster*, 380 B.R. at 371–72 (discussing *Mountain Top*, 72 F.3d at 370).

60.     HSRE VI, other JV Entities, and the Lenders have legal and equitable interests in the assets of the Debtors and the MBNF Non-Debtor Entities to satisfy contractual claims against them under the transaction structure, including the Master Leases, Guaranty Agreements, and other related agreements and remedies owed.

61.     There is a tangible threat to those interests that supports the JV Entities' right to intervene to participate in the Mediation. *Id.* at 366.

62.     HSRE VI was a joint venture partner with PAHH; together they participated in structuring the purchase of and the organizational structure into which the Tenet assets flowed.

63.     HSRE VI arranged for nearly 95% of the funding for the purchase, which was a single transaction under which HSRE VI relied on the Hospital real estate being unencumbered and the proceeds flowing to PAHH in order to permit PAHH to repay its JV Note obligation.

64.     Other JV Entities received guaranties from MBNF Non-Debtor Entities, which became actionable upon the Debtors' rejection of the Master Leases, among other events.

65.     Now, the Debtors and Committee seek to consolidate the MBNF Non-Debtor Entities' real property, or the entities that own the real property, with the bankruptcy estates— presumably without the corresponding obligations at PAHH and without any value flowing to PAHH or its creditors. Those MBNF Non-Debtor Entities are owned ultimately by PAHH, an entity against which the JV Entities hold lease guaranty claims exceeding $400 million, note claims exceeding $60 million, and other claims. HSRE VI and the other JV Entities are entitled to recover these amounts.

66.     The PAHH corporate family entered into agreements involving the bankruptcy estates. The agreements assigned interests to HSRE VI directly and also engaged in the transaction in a way that was intended to benefit HSRE VI and other JV Entities. HSRE VI and the other JV Entities thus have significantly protectable economic <u>and</u> contractual interests in the issues being mediated.

67.     The JV Entities' interests under the current Plan are already impaired, and the potential involvement of the only other assets or sources of recovery as part of the Mediation process means that the issues involved in the Mediation are squarely within the scope of issues of this bankruptcy case.

### C.     The JV Entities' interests are likely to be impaired or affected by a mediated resolution without the JV Entities' involvement.

68.     "The third factor looks to whether there is any threat that the Intervenors' interest would be affected[.]" *In re Stone & Webster*, 380 B.R. at 372.

69.     The JV Entities' absence from the Mediation, while others with competing interests in the issues and value of the MBNF Non-Debtor Entities are represented, threatens to impair the JV Entities' economic and contractual interests if a mediated resolution is reached without them.

70.     Were an adversary proceeding commenced, HSRE VI would be asserting the same arguments to intervene and participate (and HSRE VI believes it would be permitted to intervene and participate) in any mediation held after the commencement of adversary proceedings; no different result should occur here.

71.     In essence, the mediated goal now would be to remove entities or assets with value from the larger PAHH organizational structure to consolidate them with the Debtors' estates.

72.     Thus, it is clear that the ***goal*** of mediation is to threaten the JV Entities' ability to enforce its contractual and equitable interests or recover on its economic interests. As such, the JV

Entities' interests will be impaired by a mediated resolution that would unilaterally change the JV

Entities' rights and interests by consolidating estates.

73.    The JV Entities will not delay the mediation. To the contrary, their presence from

the outset of the proceedings will make the efforts more efficient and far more likely to reach a

satisfactory resolution.

**D.    The existing parties to the action do not adequately represent the JV Entities' interests.**

74.    "The last factor is whether the Intervenors' interest is adequately represented by

another party. The burden of proof for this factor is minimal," and is satisfied if the representation

*may be* inadequate. *Id.* at 373 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10

(1972)).

75.    Here, the MBNF Non-Debtor Entities are adverse to the JV Entities due to the sums

contractually owed to various JV Entities and the various transactions that may have occurred to

date. While the MBNF Non-Debtor Entities' and the JV Entities' interests may be materially

aligned in defending against consolidation, there are still be other issues over which their interests

are not aligned.

76.    The Debtors and Committee have interests that conflict with those of the JV

Entities' ability to recover under the JV Note and Guaranty Agreements, which manifests in their

attempt to build a larger asset pool for the Debtors' estates, of which MBNF Non-Debtor Entities

and JV Entities are substantial creditors.

77.    Additionally, any mediated result that the property holding companies should be

consolidated with the Debtors' estates likely will have collateral estoppel implications as to any

property holding companies that were part of the same transaction. HSRE VI and the other JV

Entities have no representation as the Mediation stands now and all of the participating parties have at least some interest that conflicts with those of the JV Entities.

78.     Therefore, HSRE VI and its affiliates should be given the opportunity to participate in the Mediation in order to adequately protect their interests, as contemplated under the Bankruptcy Code, in addition to ensuring that any mediated outcome will be a fair and enforceable settlement.

<u>**CONCLUSION**</u>

WHEREFORE, HSREP VI Holding, LLC and its affiliates respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto, granting the relief requested and such other and further relief as the Court deems just and proper.

Dated:  June 9, 2021
        Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com

-and-

Richard A. Chesley (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: Richard.Chesley@dlapiper.com

*Counsel to HSREP VI Holding, LLC; HSRE-PAHH I, LLC;
PAHH New College MOB, LLC; PAHH Bellet MOB, LLC;
PAHH Wood Street Garage, LLC; PAHH Erie Street
Garage, LLC; PAHH Feinstein MOB, LLC; and PAHH
Broad Street MOB, LLC*