**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | )))) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 18-12394 (CSS) |
| HAHNEMAN UNIVERSAL HOSPITAL, *et al.*,[1] | ) |
| | Jointly Administered |
| Debtors. | |

**DECLARATION OF KAREN NOLAN IN SUPPORT OF VICINITY'S MOTION TO**
**ENFORCE 2019 STIPULATION AS THIRD PARTY BENEFICIARY**

KAREN NOLAN, of full age, under penalty of perjury and pursuant to 28 U.S.C. § 1746, by way of declaration, states as follows:

1.      I am  the Director of Accounting for Vicinity Energy, parent of Vicinity Energy Philadelphia, Inc. ("Vicinity")  I submit this declaration (the "Declaration") in connection with, and in support of, *Vicinity's Motion to Enforce 2019 Stipulation as Third Party Beneficiary* (the "Motion").

2.      Vicinity provides steam utility services to customers in the Philadelphia area.  As such, Vicinity f/k/a Veolia Energy Philadelphia, Inc., is the successor in interest to Trigen-Philadelphia Energy Corporation ("Trigen"), and purchased that entity in a Transaction that closed on December 30, 2019.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC 98395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617). SCHC Pediatrics Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4065), TPS of PA, L.L.C. (4863), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

3.      On July 1, 2002, Trigen and Tenet Health Systems Philadelphia, Inc.

("Tenet") entered into a "Steam Agreement" for provision of steam service to Hahnemann

University Hospital ("HUH")  A copy of the Steam Agreement is attached hereto as **Exhibit A**.

4.      In early 2018, the Tenet group sold Hahnemann to the Joel Freedman-

controlled Philadelphia Academic Health Holdings, LLC ("PAHH").  An organization chart

setting forth the PAHH  and subsidiaries structure, previously filed in these chapter 11 cases by

the Debtors, is attached hereto as **Exhibit B**.  Upon information and belief, as part of Tenet's sale

of Hahnemann to PAHH, Tenet assigned the Steam Agreement to PAHH's parent American

Academic Health Systems, LLC ("AAHS"), PAHH and/or its subsidiaries or affiliates PAHH

Feinstein MOB LLC ("Feinstein MOB")  and/or Broad Street Healthcare Properties, LLC

("Broad Street").  AAHS, Tenet and Veolia Energy Philadelphia, Inc. drafted but apparently

never signed an "Assignment and Assumption of Steam Purchase Agreement" in January 2018, a

copy of which is attached hereto as **Exhibit C**.  Feinstein MOB owns and operates 230 N. Broad

Street, Philadelphia, Pennsylvania 19102 ("230 N. Broad Street"), and Broad Street owns and

operates  1501 Race Street, Philadelphia, Pennsylvania 19102 ("Race Street"), which are

contiguous properties.[2]

5.      On the Petition Date, the Debtors filed a number of first day motions,

including the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections

105(a), 363, and 1108 of the Bankruptcy Code (A) Authorizing the Debtors to Implement a Plan

of Closure for Hahnemann University Hospital and (B) Scheduling a Final Hearing* [Dkt. 15]

---

[2]   Vicinity entered into a new steam service agreement dated February 13, 2020 with Feinstein MOB, for steam service for  230 N. Broad Street.  Similarly, Vicinity entered into a new steam service agreement dated December 1, 2020 with Broad Street Healthcare for steam service for Race Street.   Those new steam service agreements are attached hereto as **Exhibits D and E**, respectively (together, the "New Steam Agreements").

2901388.1 099998-00014

(the "Closure Motion"). Pursuant to the Closure Motion, the Debtors sought to implement a plan for the closure of HUH.

6.      On July 16, 2019, the Debtors filed the *Debtors' Motion for Entry of (A) and Order (I) Scheduling a Hearing to Consider Approval of the Sale or Sales of Substantially All Assets of St. Christopher's Healthcare, LLC and Certain Related Debtors and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Establishing Procedures in Connection with the Selection of and Protections Afforded to Any Stalking Horse Purchasers, and (IV) Granting Related Relief* [Dkt. 205] seeking to establish bidding procedures and the scheduling of a hearing on the sale of substantially all of the assets of St. Christopher's HealthCare, LLC, SCHC, St. Christopher's Pediatric Urgent Care Center, LLC, SCHS Pediatric Anesthesia Associates, L.L.C., St. Chris Care at Northeast Pediatrics, L.L.C., and TPS V of PA, L.L.C., St. Chris Care at Northeast Pediatrics, L.L.C., and TPS V of PA, L.L.C. (collectively, the "St. Chris Assets"). The Debtors' sale of the St. Chris Assets was approved by order dated September 27, 2019 [Dkt. 795].

7.      On November 25, 2019, the Court entered the *Order Approving Stipulation Between Debtors and Master Landlords Regarding Rejection of Leases and Allowed Administrative Expense Claim* (the "Stipulation"), a copy of which is attached hereto as **Exhibit F**. [Dkt. 1057]. The Stipulation is an agreement between the Debtors and PAHH Bellet MOB, LLC, PAHH Broad Street MOB, LLC, PAHH Feinstein MOB, LLC, PAHH New College, MOB, LLC, PAHH Wood Street Garage, LLC, and PAHH Erie Street Garage, LLC (collectively, the "Master Landlords"). The Stipulation contains, among other things, a provision addressing the payment of utility services. [Dkt. 1057-1]. Importantly, the Stipulation provides

2901388.1 099998-00014

that "[t]he Master Landlords shall commence payment of all utility services . . . after November 15, 2019.  The allocation for such utilities shall be agreed by the Debtors and the Master Landlords and/or the Master Landlords' agent, in good faith."  [Dkt. 1057-1 at ¶ 10].

8.      In the time since the Stipulation was approved, all amounts due to Vicinity have been paid, save for the amount due for the period of November 15, 2019 to December 9, 2019. A true and correct copy of Vicinity's  invoice for services provided during that period and after entry of the Stipulation ("2019 Invoice") is attached hereto as **Exhibit G**.

9.      The 2019 Invoice is in the amount of $485,737.36 for service rendered to Feinstein MOB at 230 N. Broad Street and to Broad Street at Race Street, and, at the time, all steam service was billed to Feinstein MOB.  Feinstein MOB has represented to Vicinity that its usage of the steam service billed on the 2019 Invoice was approximately 54%, and accordingly, on or about November 20, 2020, Feinstein MOB paid to Vicinity at total of $265,164.02. Accordingly, $220,573.34 remains due on the 2019 Invoice ("Outstanding Balance").

10.      Thus, Broad Street apparently received approximately 46% of the steam service at issue.  The sharing of the steam service delivered as reflected on the 2019 Invoice is further evidenced by the fact that, shortly after the invoice was rendered, Broad Street and Feinstein MOB requested that Vicinity "sub-meter" the Race Street property (i.e. install a separate steam meter at Race Street to record Broad Street's usage) and enter into the New Steam Agreements discussed in Footnote 2, above.  Feinstein MOB, as the successor counterparty under the Steam Agreement, is likewise obligated to pay the balance due under the 2019 Invoice to Vicinity.  Moreover, as one of the Master Landlords party to the Stipulation, Feinstein MOB is likewise obligated to pay said amounts.  The Stipulation provides that "[t]he Master Landlords

2901388.1 099998-00014

shall commence payment of all utility services . . . after November 15, 2019." Vicinity is a third party beneficiary of the Stipulation.

11.     After the Petition Dates and entry of the Stipulation, Vicinity has continued to perform services to 230 N. Broad Street and Race Street. These services were necessary for the continued operation of the property by Feinstein MOB and Broad Street. Accordingly, Vicinity as third party beneficiary of the Stipulation, seeks an Order enforcing the Stipulation and compelling Feinstein MOB and/or Broad Street to pay the Outstanding Balance pursuant to paragraph 10 of the Stipulation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June _10_, 2021

DocuSigned by:

*Karen Nolan*

Karen Nolan

EXHIBIT A

# TENET HEALTH SYSTEM PHILADELPHIA, INC.
## AND
## TRIGEN-PHILADELPHIA ENERGY CORPORATION
## STEAM PURCHASE AGREEMENT

1.    **STEAM AGREEMENT**

1.1    This Steam Purchase Agreement (the "Agreement") dated as of July 1, 2002 (the "Effective Date") identifies the terms under which Trigen-Philadelphia Energy Corporation, ("Trigen") will provide steam for non-air conditioning purposes (unless otherwise specified) to Tenet Health System Philadelphia, Inc. a Pennsylvania corporation ("Tenet") on behalf of Tenet Health System Hahnemann, L.L.C. ("Hahnemann") and Tenet Health System Graduate, L.L.C. ("Graduate") (collectively "Tenet").

1.2    All calculations made pursuant to this Agreement shall be based on the aggregate Mlbs of steam sold and billed to, or for the benefit of, Tenet (at its Hahnemann University Hospital and Graduate Hospital locations) by Trigen, regardless of the number of meters or accounts through which service is taken.

2.    **AGREEMENT TERM**

2.1    This Agreement will consist of four (4) phases comprised of (i) an initial phase of nine (9) years from July 1, 2002 through June 30, 20011 (the "Initial Phase"); (ii)   a termination notice phase of one (1) years from July 1, 2011 through June 30, 2012 (the "Termination Notice Phase"); (iii) a first option phase of five (5) years from July 1, 2012 through June 30, 2017 (the "First Option Phase"); and (iv) a second option phase of five (5) years from July 1, 2017 through June 30, 2022 (the "Second Option Phase").

2.2    The Initial Phase shall commence July 1, 2002 and continue through June 30, 2011.

2.3    The Termination Notice Phase shall commence July 1, 2011 and continue through

1

June 30, 2012. In the event Tenet gives written notice to Trigen during the Termination Notice Phase of Tenet's intention to terminate the Agreement, such notice of termination shall become effective one (1) full year from the date such notice is received by Trigen, which effective date may be as early as July 1, 2012 and as late as June 30, 2013. During the one (1) full year commencing the date Trigen receives from Tenet written notice of its intent to terminate, the Agreement shall remain in full force and effect.

2.4    In the event Tenet has not given written notice to Trigen during the Termination Notice Phase of Tenet's intent to terminate the Agreement one year hence, the Agreement will extend for the five (5) full years of the First Option Phase that will commence July 1, 2012 and last through June 30, 2017, if Tenet gives written notice to Trigen no sooner than July 1, 2011 and no later than June 30, 2012 of Tenet's desire to exercise the First Option Phase.

2.5    If the First Option Phase has been implemented, the Agreement will extend for the five (5) full years of the Second Option Phase that will commence July 1, 2017 and last through June 30, 2022 if Tenet gives written notice to Trigen no sooner than July 1, 2016 and no later than June 30, 2017 of Tenet's desire to exercise the Second Option Phase.

2.6    When exercising its option(s) to continue the Agreement through the First Option Phase and the Second Option Phase, Tenet may elect to terminate service to either its Hahnemann locations or its Graduate locations, or to both locations. In the event Tenet elects to give notice to Trigen between July 1, 2011 and June 30, 2012 as to the First Option Phase or between July 1, 2016 and June 30, 2017 as to the Second Option Phase, of Tenet's intention to terminate the Agreement to either its Hahnemann or Graduate locations, but not both, during the applicable option phase, the monthly base fixed charge shall be adjusted on a pro rata basis to reflect the reduction of the measured or estimated coincident, peak demands for all buildings

2

owned or managed by Tenet being excluded from the Agreement as of the First Option Phase or
Second Option Phase, as applicable.

3.    **PREMISES/BILLING AND METERING**

3.1    A summary of all existing service addresses and account numbers included under
this Agreement as of the Effective Date is attached as Exhibit 1. In accordance with Section 5.1
hereof, additional service addresses and account numbers shall be incorporated into Exhibit 1
and governed by this Agreement as Tenet provides written notice to Trigen of Tenet's
acquisition of new locations through merger or affiliation, or constructs new facilities located
within Trigen's service territory.

3.2    Trigen will provide a monthly consolidated bill setting forth (a) for each account
location both the Mlbs used and peak demand and (b) on an aggregated basis for all accounts
governed by this Agreement both total Mlbs used and (when available) coincident peak demand.

3.3    So long as it does not interfere with Trigen's system operations, Tenet shall have
the right to receive data from Trigen meters for the purposes of obtaining real time operational
data. Tenet will be responsible for any incremental costs, including all capital costs to install this
capability, associated with the real time transmission of data.

4.    **STEAM PRICING**

4.1    <u>Fixed and Variable Rate Structure</u>. Trigen will charge Tenet, and Tenet will pay
Trigen, for Tenet's steam usage according to a combined fixed and variable rate structure as
described herein, together with (a) applicable taxes as set forth in the State Tax Adjustment
Charge contained in Trigen's Steam Service Tariff, Steam-PA.P.U.C. No. 3, as now in effect or

3

subsequently amended, and (b) any other taxes which may be imposed by a governmental entity during the term of this Agreement that are otherwise applicable to Tenet.

4.2    Fixed Charge. In addition to the Variable Charge described in Section 4.3, Trigen will charge Tenet, and Tenet shall pay Trigen monthly, a Fixed Charge, consisting of a Base Fixed Charge and an Incremental Fixed Charge. The Base Fixed Charge will apply to measured or estimated coincident, peak steam demands up to and including an aggregate of 62,000 pounds per hour. The Incremental Steam Charge will apply to each pound per hour of measured or estimated coincident, peak steam demands in excess of 62,000 pounds per hour (the "Supplemental Demand").   If, during the Agreement Term, the measured or estimated coincident, peak steam demands exceed 62,000 pounds per hour, then for the month the Supplemental Demand was recorded and each additional month the Agreement remains in effect Tenet will be billed by Trigen, and Tenet shall pay to Trigen, the amount equal to the product of (i) the applicable Incremental Fixed Charge for that Agreement Year multiplied by (ii) the highest Supplemental Demand achieved during the Agreement Term. In the event  a new higher Supplemental Demand subsequently is measured or estimated during the term of the Agreement, such higher Supplemental Demand shall be substituted  in the foregoing calculation going forward, and this method of adjustment shall be repeated whenever a higher Supplemental Demand has been achieved. The Fixed Charge shall be calculated on the basis of the measured or estimated coincident, peak demands for all buildings owned or managed by Tenet at its Hahnemann and Graduate locations during the term of the Agreement, whether or not constructed, owned or managed by Tenet as of July 1, 2002, including the Bellett Building. The Fixed Charge for each of the first five years of the Agreement will be as follows:

4

| Agreement Year | Monthly Base Fixed Charge | Monthly Incremental Fixed Charge |
|---|---|---|
| 1 | $65,129 | $1.04 per pound per hour |
| 2 | $67,341 | $1.07 per pound per hour |
| 3 | $69,553 | $1.11 per pound per hour |
| 4 | $71,765 | $1.14 per pound per hour |
| 5 | $73,977 | $1.18 per pound per hour |

Thereafter, the Fixed Charge shall each be adjusted upward annually commencing at the end of the fifth Agreement Year, and at the end of every Agreement Year thereafter, by the percentage change in the consumer price index (CPI-U) for Philadelphia, Pennsylvania as measured from the end of the fourth Agreement Year (June 30, 2006).

4.3    Variable Charge.    In addition to the Fixed Charge described in Section 4.2, Trigen will charge Tenet, and Tenet shall pay Trigen monthly, a variable charge for steam usage by Tenet calculated as the amount equal to (i) that portion of Trigen's fuel cost recoverable by Trigen under the then-current Rate S and Steam Cost Rate included in its Trigen's Steam Service Tariff, Steam-PA.P.U.C. No. 3, as now in effect or subsequently amended, including all rules, regulations, rates and surcharges, approved by the Pennsylvania Public Utility Commission plus $1.00, multiplied by (ii) the total steam consumption, as measured in Mlbs, for all accounts served under this Agreement for the applicable month. (the "Variable Charge"). The $1.00 charge described above shall remain fixed for the term of the Agreement, including all option years.

## 5    STEAM PURCHASES

5.1    All buildings owned, leased or managed by Tenet, directly or indirectly, at its Hahnemann University Hospital and Graduate Hospital locations that use steam to meet their heating, hot water, humidification and/or process needs (collectively

5

referred to as "Thermal Needs") as of the date of this Agreement shall continue to use steam to meet the Thermal Needs in such buildings during the term of this Agreement, including all option years. All buildings constructed, leased or managed by Tenet, directly or indirectly, at its Hahnemann University Hospital and Graduate Hospital locations commencing on or after the Effective Date will be designed to use, and will in fact use, Trigen steam to meet all of their Thermal Needs during the term of this Agreement, including all option years.

5.2     If, during the term of this Agreement, including all option years, Tenet leases or transfers the management of any of the building(s) governed by this Agreement, the purchaser, lessee, transferee or successor manager shall agree to assume, and shall in fact assume, all of Tenet's obligations under this Agreement with respect to such buildings, in a form satisfactory to Trigen.

6. **ENERGY CONSERVATION PROGRAM**

6.1 During the term of the Agreement, including any option years, Trigen will provide Tenet, either directly by Trigen or indirectly by a Trigen contractor, with a value added energy conservation program that includes the following services:

6.1.1   Trigen will conduct, on an annual basis, a detailed energy audit of Tenet's steam system.

6.1.2   Trigen will provide Tenet an assessment of functionality for all steam traps within the Hahnemann University Hospital and Graduate Hospital steam systems.

6.1.3   Trigen will identify and immediately tag all steam traps within the Hahnemann University Hospital and Graduate Hospital steam systems using a coding system that will detail location, type of trap and function.

6

6.1.4    Trigen will repair or replace any malfunctioning portion of Hahnemann's steam system, including steam traps, up to an annual limit of $20,000.  The cost of a steam trap audit conducted pursuant to Section 6.1.2 and 6.1.3 will be charged against this annual limit.  To the extent the costs attributable to performing these functions exceed this annual limitation, such excess costs shall be charged to, and the sole responsibility of, Tenet.

6.1.5    Trigen will repair or replace any malfunctioning portion of Graduate's steam system, including steam traps, up to an annual limit of $4,500.  The cost of a steam trap audit conducted pursuant to Section 6.1.2 and 6.1.3 will be charged against this annual limit. To the extent the costs attributable to performing these functions exceed this annual limitation, such excess costs shall be charged to, and the sole responsibility of, Tenet.

6.2 Trigen will provide Tenet annually with one or more customized training seminars covering topics such as the maintenance of plant and HVAC equipment (heat exchangers, pressure regulating valves, chillers), water chemistry and the utilization of condensate.

6.3 Trigen will provide an additional one time grant of $30,000 to pay for the conversion of the Bellet Building to Trigen steam.  Trigen will provide a steam service line and meter for the facility located at 1501 Race Street (the Bellet Building) at no cost to Tenet. The Bellet Building will be converted to steam usage within 90 days of the execution of this Agreement by both parties.

6.4 During the term of this Agreement Trigen will perform an annual audit of Tenet's electric, gas and water/sewer bills at its Hahnemann University Hospital and Graduate

7

Hospital locations to help Tenet ensure that it is being billed properly and receiving such services at the proper applicable rate.

## 7.    STEAM COOLING AT STILES DORMITORY

7.1  The current Air Conditioning Steam Agreement between Trigen and Hahnemann for the facility located at 1416 Wood Street (the Stiles Dormitory) shall remain in effect and be extended to be coterminous with this Agreement, including any option years. Tenet will continue to purchase steam for air conditioning purposes at the Stiles Dormitory during the term of this Agreement including any option years.    The steam consumed by Tenet to provide air conditioning service to the Stiles Dormitory shall be excluded from the Fixed and Variable Rate Structure calculations contained in Section 4 of this Agreement.

## 7.    ASSIGNMENT

7.1    Neither party shall assign this Agreement, except for financing purposes, without prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, and any attempted assignment without such prior written consent shall be void and of no force or effect.

## 8.    GENERAL

8.1    Except as specifically set forth herein, Trigen's steam service to Tenet shall be governed by Trigen's Steam Service Tariff, Steam - PA P.U.C., No. 3, including all Rules and Regulations, and all rates and surcharges as now in effect, or as amended from time to time.  Trigen at its sole discretion shall determine the applicability of any current or future riders that may apply to this Agreement.

8.2    Neither the execution and delivery of this Agreement nor the compliance with its terms and conditions by Trigen will constitute a violation or breach of its bylaws

or articles of incorporation, or any tariff, contract or other instrument or judicial or administrative order, decree, rule or regulation affecting Trigen or to which Trigen is party including, without limitation, any rule or regulation of the Pennsylvania Public Utility Commission or other governmental entity having jurisdiction over Trigen.

9.    **CONFIDENTIALITY**

9.1    Trigen and Tenet shall preserve as confidential all information pertaining to each others business and all technical and proprietary information obtained from the other in the performance of this Agreement and any supporting material (proposals, term sheets, work papers and all other correspondence) that preceded it.  Tenet and Trigen each further agrees that any data and information generated or delivered in the performance of this Agreement, and information and data furnished by the other to or for the other (a) shall be kept in confidence and not be disclosed to third parties without the prior written approval of Trigen or Tenet, and (b) shall not be used in the production, manufacture or design of any article or material (including, without limitation, thermal services), except as otherwise provided herein, without Trigen's or Tenet's prior written consent.

9.2    The obligations contained in all of this Section 9 shall survive the termination or expiration of this Agreement.

9.3    Tenet and Trigen shall deliver all confidential data and information obtained from the other to Trigen or Tenet upon the other party's request and, in any event, upon the completion of all work hereunder or the termination or expiration of this Agreement, whichever shall first occur.  Tenet and Trigen shall be fully responsible for the care and protection of such confidential information until such delivery.

9

9.4     Notwithstanding the other provisions of this Section 9, information will not be deemed confidential hereunder if it (a) is known to Tenet and Trigen on or prior to the date of disclosure to the other, (b) is or becomes a part of the public domain through no wrongful act of Tenet and Trigen, (c) is required to be used or disclosed by applicable law or by regulation (including, without limitation, financial disclosure requirements of securities laws), or (d) is required to enforce this Agreement.

9.5     In the event the restrictions set forth in this Section 9 are violated by Tenet or Trigen or any of its or their employees, agents or contractors, the other party shall be entitled to all of its rights and remedies at law or in equity, including, without limitation, the right to injunctive relief to prevent any such violation.

10.    **NOTICES**

10.1     All notices required or permitted by this Agreement shall be sent certified or overnight mail or hand delivered.  Notices shall be effective three (3) days after postmark in the case of certified mail, the following business day in the case of overnight mail, and upon receipt in the case of hand delivery.  Notices shall be sent as follows:

| | |
|---|---|
| If to Trigen: | President |
| | Trigen-Philadelphia Energy Corporation |
| | 2600 Christian Street |
| | Philadelphia, PA 19146 |
| If to Tenet: | Chief Operating Officer |
| | Hahnemann University Hospital |
| | Mail Stop 30 |
| | Philadelphia, PA  19102 |
| With a copy to: | Director, Engineering Services Construction & Design |
| | Tenet Health Systems |
| | Dallas Operations Center |
| | PO Box 809088 |
| | Dallas, TX 75380-9088 |

11.    **DISPUTE RESOLUTION**

11.1    All disputes regarding the interpretation or application of this Agreement shall be submitted to binding arbitration conducted by the American Arbitration Association under the Commercial Arbitration Rules then pending, in Philadelphia, Pennsylvania.  Nothing herein shall deprive a court of competent jurisdiction from (a) enforcing an arbitration award properly entered pursuant to this Section, or (b) granting injunctive relief or directing specific performance when necessary to enforce the terms of this Agreement.

**TRIGEN-PHILADELPHIA
ENERGY CORPORATION**

By: _Kevin E. Brunn_

Title: _Vice President_

Date: _12 | 4 | 02_

**TENET HEALTH SYSTEM
PHILADELPHIA, INC.**

By: _____

Title: _BSr Vice President_

Date: _1 / 22 / 03_

12

**EXHIBIT 1**

## SUMMARY OF TENET HEALTH SYSTEMS ACCOUNTS

| HAHNEMANN UNIVERSITY HOSPITAL | |
|---|---|
| **SERVICE ADDRESS** | **ACCOUNT #** |
| 1416 Wood Street (Heating) | 10-1425-6 |
| 1416 Wood Street (Air Conditioning) | 10-1425-7 |
| 230 North Broad | 10-0425-6 |
| Bellett Building | TBD |

| GRADUATE HOSPITAL | |
|---|---|
| **SERVICE ADDRESS** | **ACCOUNT #** |
| 1830 Lombard Street | 13-1505-6 |
| 1840 Lombard Street | 13-2607-3 |
| 555 South 19th Street | 13-1755-3 |
| 2401 Bainbridge Street | 13-2606-4 |

13

EXHIBIT B



Case 19-11466 Doc 2-1 Filed 07/01/19 Page 2 of 3

## Organization Chart

Notes:
1) MBNF Investments, LLC owned by Freedman family and controlled by Joel Freedman

| Property Insert | Property Name | Title Premises | New Lot | Proposed Grantee | Address | OPA Account |
|---|---|---|---|---|---|---|
| A | STC Hospital | STC A | STC Lot 1 | Front Street Healthcare Properties, LLC | 160 E. Erie Avenue | 777011735 |
| B | (Nelson Pavilion MOB) | STC A | STC Lot 3 | Front Street Healthcare Properties II, LLC (f.k.a. PAHH Bobst MOB, LLC) | 3647-3669 N. Front Street | 883001100 |
| B | (warehouse) | STC B | STC Lot 4 | Front Street Healthcare Properties II, LLC (f.k.a. PAHH Bobst MOB, LLC) | 3843-3863 D Street | 884460950 |
| C | North Tower, South Tower | HUH I and J | HUH South Lot A | Broad Street Healthcare Properties, LLC | 222-248 N. Broad Street | 772025002 |
| C | (land next to SHSH Building) | HUH L | HUH South Lot F | Broad Street Healthcare Properties, LLC | 221-223 N. 15th Street | 772028498 |
| C | Stiles Alumni Hall | HUH C | HUH North Lot 3 | Broad Street Healthcare Properties, LLC | 325 N. 15th Street | 881038202 |
| D | Martinelli Park | HUH M, N and O | HUH North Lot 1 | Broad Street Healthcare Properties II, LLC (f.k.a. Center City Physician Associates, LLC) | 300-304 N. Broad Street | 885620242 |
| D | (surface parking) | HUH P | HUH South Lot 9 | Broad Street Healthcare Properties II, LLC (f.k.a. Center City Physician Associates, LLC) | 211-213 N. Broad Street | 885467980 |
| E | (redevelopment land/surface parking) (city block) | HUH Q-Y | HUH South Lot D | Broad Street Healthcare Properties III, LLC (f.k.a. St. Christopher's Physician Associates, LLC) | 200-214 N. Broad Street | 885467862 |
| E | SHSH Building (city block) | HUH D and K | HUH South Lot E | Broad Street Healthcare Properties III, LLC (f.k.a. St. Christopher's Physician Associates, LLC) | 201-219 N. 15th Street | 772028496 |
| (i) | New College (city block) | HUH F | HUH South Lot B | PAHH New College MOB, LLC | 225-251 15th Street | 772028502 |
| (ii) | Bellet | HUH A | HUH South Lot 7 | PAHH Bellet MOB, LLC | 1501-1511 N. Race Street | 772027000 |
| (iii) | Broad Street Clinic | HUH H | HUH South Lot 8 | PAHH Broad Street MOB, LLC | 231-233 N. Broad Street | 777011550 |
| (iv) | Myer Feinstein Polyclinic (city block) | HUH E | HUH South Lot C | PAHH Feinstein MOB, LLC | 216-220 N. Broad Street | 772024002 |
| (iv) | Bobst (city block) | HUH G | HUH South Lot C | PAHH Feinstein MOB, LLC | 216-220 N. Broad Street | 772024002 |
| (v) | Wood St. Garage | HUH B | HUH North Lot 2 | PAHH Wood Street Garage, LLC | 306-320 N. Broad Street | 883400102 |
| (vi) | Erie St. Garage | STC A | STC Lot 2 | PAHH Erie Street Garage, LLC | 120 E. Erie Avenue | 883400800 |

EXHIBIT C

**ASSIGNMENT AND ASSUMPTION OF STEAM PURCHASE AGREEMENT**
**BETWEEN**
**[TENET HEALTH SYSTEM PHILADELPHIA, INC. a Pennsylvania corporation]**
**AND**
**[AMERICAN ACADEMIC HEALTH SYSTEMS]**

This Assignment and Assumption of Steam Purchase Agreement (this "Assignment"), is made this ___ day of January, 2018 by Tenet Health System Philadelphia, Inc. a Pennsylvania corporation on behalf of Tenet Health System Hahnemann, L.L.C. ("Hahnemann") ("Assignor") and American Academic Health Systems ("Assignee").

WHEREAS, Assignor is a party by assignment to that certain Steam Purchase Agreement dated July 1, 2002 ("Agreement"), with Veolia Energy Philadelphia, Inc. (f/k/a Trigen-Philadelphia Energy Corp.) ("Veolia Energy"); and

WHEREAS, Assignor desires to assign and Assignee desires to assume all of Assignor's rights and obligations under the Agreement;

NOW, THEREFORE, Assignor and Assignee agree as follows:

1.      Assignor affirms that the Agreement is in full force and effect and that Assignor is duly obligated thereby;

2.      Assignor assigns to Assignee all of Assignor's right, title, interest and privilege in, to and under the Agreement, including but not limited to the obligation to accept - and make payment for - thermal energy from Veolia Energy.

3.      Assignee assumes all of Assignor's right, title, interest and privilege in, to and under the Agreement as amended by the First Amendment, including but not limited to the obligation to accept – and make payment for – thermal energy from Veolia Energy. Upon execution of this Agreement, Assignee shall make payment in full to Veolia Energy of any outstanding balances on the account.

4.      Assignee waives any present or future defense or argument that it is not the proper party to the Agreement.

5.      Assignor and Assignee specifically agree that Veolia Energy is a third-party beneficiary to this Assignment and may enforce this Assignment as if Veolia Energy were an executing party to this Assignment.

IN WITNESS WHEREOF, Assignor has duly executed this Assignment as of the day and year first above written.

Attest:                                    TENET HEALTH SYSTEM
                                           PHILADELPHIA, INC. a Pennsylvania
                                           corporation


By:    _____         By:    _____
                                           Name:

                                           Title:


Attest:                                    AMERICAN ACADEMIC HEALTH
                                           SYSTEM


By:    _____         By:    _____
                                           Name:

                                           Title:


Attest:                                    VEOLIA ENERGY PHILADELPHIA, INC.


By:    _____         By:    _____
                                           Name:

                                           Title:

EXHIBIT D

## VICINITY ENERGY PHILADELPHIA, INC.
## STEAM SERVICE AGREEMENT

This Steam Service Agreement (the "**Agreement**") is made as of February 13, 2020 (the "**Execution Date**"), by and between Vicinity Energy Philadelphia, Inc. (f/k/a Veolia Energy Philadelphia, Inc.) ("**Company**") and PAHH Feinstein MOB, LLC c/o HSRE-PAHH I, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606, ("**Customer**", and together with Company, the "**Parties**" and each a "**Party**") for the purchase of steam at 230 N. Broad Street, Philadelphia, Pennsylvania 19111 (the "**Premises**").

**1.**      *Term of Agreement*

This Agreement shall be for a term of one year from the November 15, 2019 (the "**Initial Term**").  The term of the Agreement will renew for terms of one year (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), until terminated by three (3) days' written notice by either Party.

**2.**      *Rate*

The Customer agrees to use and pay for steam services supplied hereunder in accordance with Rate S Steam Service and the tariff of the Company (Steam-PA P.U.C. No. 4, including all rules and regulations) on file with the Pennsylvania Public Utility Commission, and any applicable supplements thereto, or any tariffs issued to supersede said tariff, which may be filed thereafter (collectively, the "**Rate S Agreement**").  The Company at its sole discretion shall determine the applicability of any current or future riders ("**Riders**", and together with the Rate S Agreement, the "**Tariff**") that may apply to this Agreement.  Except as specifically set forth herein, the Company's steam service to Customer shall be governed by the Tariff.

**3.**      *Riders and Applicable Rates*

The Company has determined that no rider applies to this Agreement.

**4.**      *Demand*

The demand (as determined pursuant to the Rate S Agreement for this Agreement shall be 6,200 pounds of steam per hour.

**5.**      *Steam Purchases*

A.      During the Term of this Agreement, Customer will purchase all of its current and future Thermal Energy requirements exclusively from the Company so long as the Company is able to deliver sufficient steam to meet the Customer's Thermal Energy

1

requirements. The phrase "**Thermal Energy**" shall include but not be limited to [space heating, hot water, sterilization, process and humidification].

A.      Failure by Customer to use steam provided by the Company as the exclusive source of Thermal Energy for such end use shall be sufficient grounds for Company to terminate this Agreement, at its sole discretion.

## 6.      *Regularity of Supply.*

A.      The Company will use reasonable diligence  to provide a continuous, regular and uninterrupted supply of service; but, should the supply be interrupted by the Company for the purpose of making repairs, changes, or improvements, in any part of its system for the general good of the service or the safety of the public, or should the supply of service be interrupted, or fail, by reason of accident, strike, legal process, State or municipal interference, or any cause whatsoever, beyond its control (collectively, a "**Service Interruption**"), the Company shall not be liable for damages, direct or consequential resulting from such interruption or failure.

## 7.      *Special Provisions (if applicable)*

A.      Security Deposit

The Company acknowledges that Customer is depositing with the Company a security deposit (the "**Security Deposit**") in the amount of $300,000.00 (same deposit as for this contract and the contract for 1501 Race Street Philadelphia PA 19102) as follows: (i) $100,000 shall be paid as of February 14, 2020; (ii) $100,000 shall be paid with all other  amounts due under the invoice for services rendered in February 2020 and (iii) the remaining $100,000 shall be paid with all other amounts due under the invoice for services rendered in March 2020.  The Security Deposit will be held in an account at Company's Bank in Company's name and shall earn 6% simple interest annually.  If Customer fails to provide any portion of the Security Deposit set forth herein or otherwise fails to make timely payment of amounts due under this Agreement, Company shall have the option to either (i) immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law, or (ii) require Customer to post an additional $300,000 security deposit or a letter of credit, in a form and by a bank approved by Company, in the amount of $300,000.  For the avoidance of doubt, if Company requires additional security under (ii), and Customer fails to post such additional security, Company may immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law.

If Customer fails to pay any bill for service under this Agreement and/or under the 1501 Race Street Agreement within fifteen (15) days of submission, Company may

2

apply the Security Deposit to the Customer's account in satisfaction of the delinquent bill. Customer shall then remit to Company, within thirty (30) days of such draw down of the Security Deposit, an amount sufficient to return the Security Deposit to its original sum (or such increased sum as may be required above).

Customer may request a return of its Security Deposit with interest, to Customer within one year from the Execution Date, provided Customer has established credit satisfactory to Company in its sole discretion.

B.      Late Invoices

Customer hereby acknowledges that it has received the following invoices: (i) an invoice in the amount of $665,350.58 due on February 7, 2020, for services rendered from December 9, 2019 through January 15, 2020 (the "February 7th Invoice") which invoice remains due and owing; and (ii) an invoice in the amount of $485,737,76 due on February 19, 2020 for services rendered from November 15, 2019 through December 9, 2019 (the "February 19th Invoice"). Upon the Execution Date, Customer shall pay the February 7th Invoice. Failure to pay the February 7th Invoice as of the Execution Date and/or the February 19th Invoice when due shall constitute a material breach of this Agreement entitling Company to terminate this Agreement and exercise all other rights and remedies under this Agreement or at equity or law.

## 8.      *Confidentiality*

The Parties agree that neither Party will disclose to any third party the specific terms of this Agreement without the prior consent of the other Party. In the event of judicial or regulatory requirements to disclose the terms of this Agreement, the required Party will promptly notify the other Party and take appropriate measures to seek the confidential treatment of the information contained in this Agreement.

## *9.      Consequential Damages*

IT IS SPECIFICALLY AGREED AND UNDERSTOOD THAT NEITHER PARTY WILL BE RESPONSIBLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER (INCLUDING LOST PROFITS AND OPPORTUNITY COSTS) ARISING OUT OF THIS AGREEMENT OR ANYTHING DONE IN CONNECTION HEREWITH, INCLUDING BUT NOT LIMITED TO CUSTOMER'S FAILURE TO ACCEPT, OR COMPANY'S FAILURE TO DELIVER, THERMAL ENERGY AT ANY TIME.   THIS SECTION SHALL APPLY WHETHER ANY SUCH INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE IS

BASED ON A CLAIM BROUGHT OR MADE IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), UNDER ANY WARRANTY, OR OTHERWISE.

**10.**     *Limitation of Liability*

TO THE FULLEST EXTENT PERMITTED BY LAW AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, COMPANY'S LIABILITY FOR PERFORMANCE OR NON-PERFORMANCE OF ANY OBLIGATION ARISING UNDER THE AGREEMENT (WHETHER ARISING UNDER BREACH OF CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY) SHALL NOT EXCEED THREE TIMES THE AMOUNT OF THE CUSTOMER'S AVERAGE MONTHLY PAYMENT UNDER THIS AGREEMENT, CUMULATIVELY FOR THE DURATION OF THE AGREEMENT, PROVIDED THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO ANY LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COMPANY OR COMPANY'S SUBCONTRACTORS, EMPLOYEES OR AGENTS IN BREACH OF COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT.

**11.**     *Indemnity*

Customer hereby agrees to indemnify and hold Company harmless from any liability or damages for bodily injury, including death, property damages and pollution damages which may arise from Customer's acts or omissions in connection with the performance of its obligations under this Agreement.

**12.**     *Warranties.*

There are no warranties which extend beyond those expressed in this Agreement. COMPANY DISCLAIMS, AND CUSTOMER WAIVES, ANY IMPLIED WARRANTIES OR WARRANTIES IMPOSED BY LAW, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CUSTOM AND USAGE.

**13.**     *Unforeseen Circumstances or Force Majeure*

Neither Party shall be liable for its failure to perform its obligations under this Agreement if such failure is due to any Unforeseen Circumstances beyond its reasonable control or force majeure. However, this Section may not be used by either Party to avoid, delay or otherwise affect any payments due to the other Party.  For purposes of this Agreement, "**Unforeseen Circumstances**" shall mean any event or condition which has an effect on the rights or

4

obligations of the parties under this Agreement, which is beyond the reasonable control of the Party relying thereon and constitutes a justification for a delay in or non-performance of action required by this Agreement, including but not limited to (i) an act of God, landslide, lightning, earthquake, tornado, fire, explosion, flood, failure to possess sufficient property rights, acts of the public enemy, war, blockade, terrorist acts, sabotage, insurrection, riot or civil disturbance, (ii) preliminary or final order of any local, province, administrative agency or governmental body of competent jurisdiction, (iii) any change in law, regulation, rule, requirement, interpretation or statute adopted, promulgated, issued or otherwise specifically modified or changed by any local, province or governmental body, and (iv) labor disputes, strikes, work slowdowns or work stoppages, but excluding labor disputes, strikes, work slowdowns or work stoppages by employees of Company.

## 14.    *Governing Law and Dispute Resolution*

A. <u>Governing Law</u>.  This Agreement and the rights of the Parties shall be interpreted and determined in accordance with the laws of the Commonwealth of Pennsylvania.

B. <u>Dispute Resolution</u>.  Unless otherwise expressly provided for in this Agreement, the dispute resolution procedures of this Section 14.B. shall be the exclusive mechanism to resolve disputes arising under this Agreement.  The Parties agree to use their respective best efforts to resolve any dispute(s) that may arise regarding this Agreement.  Any dispute that arises under or with respect to this Agreement that cannot be resolved shall in the first instance be the subject of informal negotiations between the Parties involved in the dispute.  The dispute shall be considered to have arisen when one Party sends the other Party a written notice of dispute.  The period for informal negotiations shall be fourteen (14) days from receipt of the written notice of dispute unless such time period is modified by written agreement of the Parties.  In the event that the Parties cannot resolve a dispute by informal negotiations, the Parties agree to submit the dispute to mediation.  Within fourteen (14) days following the expiration of the time period for informal negotiations, the Parties shall propose and agree upon a neutral and otherwise qualified mediator.  In the event that the Parties fail to agree upon a mediator, the parties shall request that the American Arbitration Association, Philadelphia, Pennsylvania, appoint a mediator.  The period for mediation shall commence upon the appointment of the mediator and shall not exceed sixty (60) days, unless such time period is modified by written agreement of the Parties.  The decision to continue mediation shall be in the sole discretion of each Party involved in the dispute.  The Parties will bear their own costs of the mediation.  The mediator's fees shall be shared equally by all parties involved in the dispute.  In the event that the Parties cannot resolve a dispute by informal negotiations or mediation, sole venue for judicial enforcement shall be the courts of the Commonwealth of Pennsylvania.  Notwithstanding the foregoing, injunctive relief from such court may be sought without resorting to alternative dispute resolution to prevent irreparable harm that would be caused by a breach of this Agreement.

5

C. <u>Waiver of Jury Trial</u>.  EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

*15.*     *Representations and Warranties*

As a material inducement to entering into this Agreement, each Party, with respect to itself, hereby represents and warrants to the other Party as of the Execution Date as follows:

A. It is duly organized, validly existing and in good standing under the laws of the jurisdictions necessary to perform this Agreement;

B. Customer is wholly-owned, directly or indirectly, by NexCore Group LLC.  The execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not violate any of the terms or conditions in its governing documents or any contract to which it is a party or any law, rule, regulation, order, writ, judgment, decree or other legal or regulatory determination applicable to it;

C. This Agreement constitutes a legal, valid and binding obligation of such Party enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws affecting creditor's rights generally, and with regard to equitable remedies, to the discretion of the court before which proceedings to obtain same may be pending;

D. There are no bankruptcy, insolvency, reorganization, receivership or other arrangement proceedings pending or being contemplated by it, or to its knowledge threatened against it; and

E. There are no suits, proceedings, judgments, rulings or orders by or before any court or any governmental authority that materially adversely affect its ability to perform this Agreement.

**16.**     *General*

A.     Any and all notices provided by the Company or Customer shall be by certified mail, return receipt requested, or hand delivery addressed as follows:

If to Company:

Vicinity Energy Philadelphia, Inc.
2600 Christian Street
Philadelphia, PA 19146
Attention:  General Manager

With a copy to:

Vicinity North America
100 Federal St., 2nd Floor
Boston, MA 02110
Attention: General Counsel

If to Customer:

For notices:

PAHH Feinstein MOB, LLC
c/o HSRE-PAHH I, LLC
444 West Lake Street, Suite 2100
Chicago, IL 60606
EIN Number:  35-2607469

For invoices/billing:

PAHH Feinstein MOB, LLC
c/o HSRE-PAHH I, LLC
c/o NexCore Group
1550 Market Street
Denver, CO 80202

B.  Nothing contained in this Agreement shall be deemed to create third party rights.

C.  This Agreement may only be amended, modified or supplemented by an instrument in writing executed by duly authorized representatives of Company and Customer.

D.  This Agreement, together with the Exhibits and any schedules and appendices attached thereto and hereto, constitute the entire agreement and understanding between Company and Customer with respect to the subject matter thereof and supersedes all prior agreements relating to the subject matter hereof, which are of no further force or effect.  The Exhibits, schedules, and appendices attached thereto and hereto are integral parts hereof and are made a part of the Agreement by reference.

7

E.  If any term, covenant or condition in the Agreement shall, to any extent, be invalid or unenforceable in any respect under applicable law, the remainder of the Agreement shall not be affected thereby, and each term, covenant or condition of the Agreement shall be valid and enforceable to the fullest extent permitted by applicable law and, if appropriate, such invalid or unenforceable provision shall be modified or replaced to give effect to the underlying intent of the Parties and to the intended economic benefits of the Parties.

F.  The Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

G.  The Agreement may be duly executed and delivered by a Party by execution and facsimile or electronic, "pdf" delivery of the signature page of a counterpart to the other Party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Execution Date by their respective duly authorized representatives as of the date first written above.

**VICINITY ENERGY PHILADELPHIA, INC.**          **PAHH FEINSTEIN MOB, LLC**


By: _____          By: _____
    Name: John C. Gibson                              Name: Jay Jones
    Title: EVP + COO                                  Title: VP Real Estate

EXHIBIT E

# VICINITY ENERGY PHILADELPHIA, INC.
## STEAM SERVICE AGREEMENT

This "Steam Service Agreement" (this "**Agreement**") is made as of December 1, 2020 (the "**Effective Date**"), by and between Vicinity Energy Philadelphia, Inc. ("**Company**") and Broad Street Healthcare Properties, LLC ("**Customer**"), by and through its agent, G&E Real Estate Management Services, Inc., a Delaware corporation dba Newmark Knight Frank ("**Agent**") for the purchase of steam at the real property and improvements located at 230 North Broad Street, Philadelphia, Pennsylvania (the "**Premises**").

## 1. *Term of Agreement*

This Agreement shall be for a term of one year from the Effective Date (the "**Initial Term**") and will renew for terms of one year (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), unless terminated upon not less than three (3) days' written notice by either Company or Customer (each, a "**Party**" and, jointly, the "**Parties**").

## 2. *Tariff*

In addition to the terms set forth herein, the Parties' obligations with respect to Company's steam service to Customer shall be governed by Company's Heating and Cooling Service Tariff (PA P.U.C. No. 4, including all rules and regulations) on file with the Pennsylvania Public Utility Commission, and any applicable supplements thereto, or any tariffs issued to supersede said tariff, which may be filed thereafter (collectively, the "**Tariff**"). The Company at its sole discretion shall determine the applicability of any current or future riders ("**Riders**") that may apply to this Agreement.

## 3. *Riders and Applicable Rates*

Company has determined that no rider applies to this Agreement. The terms of Company's Rate S Steam Service shall apply.

## 4. *Demand*

Customer's estimated demand (as determined for Steam Service) is 4,200 pounds of steam per hour.

## 5. *Special Provisions*

A. <u>Security Deposit</u>

By March 1, 2021, Customer shall provide a cash deposit to Company in the amount of One Hundred Fifty Thousand Dollars ($150,000) (the "**Security Deposit**"). The Security Deposit may be drawn on by Company for obligations under this Agreement. The Security Deposit will be held in an account at Company's bank in Company's name and shall earn 6% simple interest annually.

If Customer fails to timely pay any invoice, Company may apply all or a portion of the Security Deposit to the Customer's account in satisfaction of the delinquent amount. Within ten (10) days written notice from Company, Customer shall remit to Company an amount sufficient to return the Security Deposit to its original sum.

Once Customer establishes satisfactory credit with the Company or upon the termination or expiration of this Agreement, the Company shall timely return the then current balance of the Security Deposit plus interest accrued in accordance with this Section 5.A.

B.     <u>Submetering</u>

Customer agrees and acknowledges that the Premises are submetered and that Company currently only has one isolation valve to service the Premises and the premises owned by another third-party customer (the "**Other Customer Building**"), such that if Company has to interrupt, terminate or suspend service to the Other Customer Building, service to the Premises also will be interrupted, terminated or suspended. Company agrees to give Customer as much prior notice as is practicable of any interruption, termination or suspension to the Other Customer Building (except in the case of an emergency, where prior notice may not be possible). Customer shall not hold Company liable if service to the Premises is interrupted, terminated, or suspended because Company had to interrupt, terminate or suspend service to the Other Customer Building.

**6.     Confidentiality**

Neither Party will disclose to any third party the specific terms of this Agreement without the prior consent of the other Party. In the event of judicial or regulatory requirements to disclose the terms of this Agreement, the required Party will promptly notify the other Party and take appropriate measures to seek the confidential treatment of the information contained in this Agreement.  Notwithstanding the foregoing, Customer may disclose the terms of this Agreement to (i) its and its affiliates' employees, consultants, accountants, agents, advisors, and attorneys in connection with advising Customer on this Agreement or matters arising out of this Agreement, (ii) its and its affiliates' partners, members, managers, directors, officers, lenders and shareholders (collectively referred to with Customer's and its affiliates' employees, consultants, accountants, agents, advisors and attorneys as "Representatives"); provided, however, that prior to the disclosure of any such information, the Representatives will be informed by Customer of the confidential nature of such information being disclosed and shall be directed not to disclose such information to any other person. Customer agrees to be responsible for any breach of this Agreement by its Representatives.

**7.     Consequential Damages**

IT IS SPECIFICALLY AGREED AND UNDERSTOOD THAT NEITHER PARTY WILL BE RESPONSIBLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER (INCLUDING LOST PROFITS AND OPPORTUNITY COSTS) ARISING OUT OF THIS AGREEMENT OR ANYTHING DONE IN CONNECTION HEREWITH, INCLUDING BUT NOT LIMITED TO CUSTOMER'S FAILURE TO ACCEPT, OR COMPANY'S FAILURE TO DELIVER, THERMAL ENERGY AT ANY TIME. THIS SECTION SHALL APPLY WHETHER ANY SUCH INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE IS BASED ON A CLAIM BROUGHT OR MADE IN CONTRACT, IN TORT

DocuSign Envelope ID: 137AE3BB-7AAF-49D1-B8FF-AA18F76FC57C

(INCLUDING NEGLIGENCE AND STRICT LIABILITY), UNDER ANY WARRANTY, OR OTHERWISE.

8.    *Limitation of Liability*

TO THE FULLEST EXTENT PERMITTED BY LAW AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, COMPANY'S LIABILITY FOR PERFORMANCE OR NON-PERFORMANCE OF ANY OBLIGATION ARISING UNDER THE AGREEMENT (WHETHER ARISING UNDER BREACH OF CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY) SHALL NOT EXCEED SIX TIMES THE AMOUNT OF CUSTOMER'S AVERAGE MONTHLY PAYMENT UNDER THIS AGREEMENT, CUMULATIVELY FOR THE DURATION OF THE AGREEMENT, PROVIDED THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO ANY LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COMPANY OR COMPANY'S SUBCONTRACTORS, EMPLOYEES OR AGENTS IN BREACH OF COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT, AND IN SUCH EVENT, COMPANY SHALL INDEMNIFY AND HOLD CUSTOMER HARMLESS FROM ANY LIABILITY OR DAMAGES FOR BODILY INJURY, INCLUDING DEATH, PROPERTY DAMAGES AND POLLUTION DAMAGES WHICH MAY ARISE FROM COMPANY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

9.    *Indemnity*

Customer hereby agrees to indemnify and hold Company harmless from any liability or damages for bodily injury, including death, property damages and pollution damages which may arise from Customer's gross negligence or willful misconduct under this Agreement.

10.    *Unforeseen Circumstances or Force Majeure*

Neither Party shall be liable for its failure to perform its obligations under this Agreement if such failure is due to any Unforeseen Circumstances beyond its reasonable control or force majeure. However, this Section may not be used by either Party to avoid, delay or otherwise affect any payments due to the other Party. For purposes of this Agreement, "**Unforeseen Circumstances**" shall mean any event or condition which has an effect on the rights or obligations of the parties under this Agreement, which is beyond the reasonable control of the Party relying thereon and constitutes a justification for a delay in or non-performance of action required by this Agreement, including but not limited to (i) an act of God, landslide, lightning, earthquake, tornado, fire, explosion, flood, failure to possess sufficient property rights, acts of the public enemy, war, blockade, terrorist acts, sabotage, insurrection, riot or civil disturbance, (ii) explosion, accident, breakage of equipment, structural collapse, or chemical contamination (other than resulting from an act of war, terrorism or sabotage), caused by a person not being the affected Party or one of its contractors or subcontractors or any of their respective employees or agents, (iii) preliminary or final order of any local, province, administrative agency or governmental body of competent jurisdiction, (iv) any change in law, regulation, rule, requirement, interpretation or statute adopted, promulgated, issued or otherwise specifically modified or changed by any local, province or governmental body, and (v) labor disputes, strikes, work slowdowns or work stoppages, but excluding labor disputes, strikes, work slowdowns or work stoppages by employees of the party claiming an Unforeseen Circumstance.

## 11.    *Governing Law*

This Agreement and the rights of the Parties shall be interpreted and determined in accordance with the laws of the Commonwealth of Pennsylvania.

## 12.    *Representations and Warranties*

Neither the execution and delivery of this Agreement nor the compliance with its terms and conditions by the Company will constitute a violation or breach of its bylaws or articles of incorporation, or any tariff, contract or other instrument or judicial or administrative order, decree, rule or regulation affecting the Company or to which the Company is party including, without limitation, any rule or regulation of the Pennsylvania Public Utility Commission or other governmental entity having jurisdiction over the Company. Nothing contained in this Agreement shall be construed to limit the responsibilities of the Company under the tariff governing the Company's services hereunder, nor shall it be construed to limit the rights and remedies of the Customer under such tariff and relevant rules and regulations of the Pennsylvania Public Utility Commission.

## 13.    *General*

A.    Any and all notices provided by the Company or Customer shall be by certified mail, return receipt requested, or hand delivery addressed as follows:

| | |
|---|---|
| If to Company: | Vicinity Energy Philadelphia, Inc. |
| | 2600 Christian Street |
| | Philadelphia, PA 19146 |
| | Attention: General Manager |
| | |
| With a copy to: | Vicinity Energy Inc. |
| | 100 Franklin St., 2nd Floor |
| | Boston, MA 02110 |
| | Attention: General Counsel |
| | E-mail: GeneralCounsel@vicinityenergy.us |
| | |
| If to Customer: | Broad Street Healthcare Properties, LLC |
| | c/o Newmark Knight Frank |
| | 880 E. Swedesford Rd. |
| | Wayne, PA 19087 |
| | Attention: Greg Bond |
| | |
| With a copy to: | Newmark Knight Frank |
| | 19700 Fairchild Road, Suite 300 |
| | Irvine, California 92612 |
| | Attn: Legal Department |

B.    Nothing contained in this Agreement shall be deemed to create third party rights.

C.    This Agreement may only be amended, modified or supplemented by an instrument in writing executed by duly authorized representatives of Company and Customer.

4

D.      This Agreement, together with the Exhibits and any schedules and appendices attached thereto and hereto, constitute the entire agreement and understanding between Company and Customer with respect to the subject matter hereof and supersedes all prior agreements relating to the subject matter hereof, which are of no further force or effect. The Exhibits, schedules, and appendices attached thereto and hereto are integral parts hereof and are made a part of the Agreement by reference.

E.      If any term, covenant or condition in the Agreement shall, to any extent, be invalid or unenforceable in any respect under applicable law, the remainder of the Agreement shall not be affected thereby, and each term, covenant or condition of the Agreement shall be valid and enforceable to the fullest extent permitted by applicable law and, if appropriate, such invalid or unenforceable provision shall be modified or replaced to give effect to the underlying intent of the Parties and to the intended economic benefits of the Parties.

F.      The Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

G.      The Agreement may be duly executed and delivered by a Party by execution and facsimile or electronic, "pdf" delivery of the signature page of a counterpart to the other Party.

H.      Any assignment or attempt to assign any portion of its rights or obligations by Company to a non-affiliated third-party, including the right to receive money that may become due Company under this Agreement, shall be void and of no force and effect unless Company shall have obtained the prior written consent to such assignment from Customer, which consent may not be unreasonably withheld.

I.      Customer may assign this Agreement to any entity controlled by or under common control of Customer or Customer's nominee upon written notice to Company of its intention to do so.

J.      Company shall not subcontract any of the services to be performed under this Agreement without first obtaining the written approval of Customer, which may be granted or withheld in Customer's sole and absolute discretion. Such approval, if given, shall not release the Company from any responsibility or liability under this Agreement.

K.      Company shall not permit any employee, or other entity operating directly or indirectly under its control, to engage in solicitation or distribution of materials of any kind on the Premises.

L.      Nothing in this Agreement grants either Party any rights to use, directly or indirectly, the trade name or trademark of the other Party for any purpose without the prior written approval of such Party, or grants Company any rights to use, directly or indirectly, the trade name or trademark of Customer or Agent for any purpose without the prior written approval of Customer or Agent, as the case may be.  Customer acknowledges that Company desires to use Customer or Agent's name or trademark and/or a description of the project in Company's client roster,

5

DocuSign Envelope ID: 137AF3BB-7AAF-49D1-BBEF-4A48F76FCB7C

marketing materials and press releases and agrees to reasonably cooperate and approve such communications.

M. Agent has been retained by Customer to act on behalf of and as agent for Customer for the negotiation, execution and administration of this Agreement. Customer has authorized Agent to enter into this Agreement and to exercise, on Customer's behalf, each and all of Customer's rights under this Agreement. Customer shall be solely responsible for making payments to Company pursuant to the terms and conditions of this Agreement, and Company agrees that Agent shall have no responsibility or liability to Company in connection with any such payment and that Company shall therefore look solely to Customer, and not to Agent, for any such payment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date by their respective duly authorized representatives as of the date first written above.

**VICINITY ENERGY PHILADELPHIA, INC.**

By: _John Gibson_

Name: _John Gibson_

Title: _COO_

**BROAD STREET HEALTHCARE PROPERTIES, LLC**

By:  G&E Real Estate Management Services, Inc., a Delaware corporation

Its:  Agent

By: _Gregory L. Bond_

Name: _Gregory L Bond_

Title: _Director Of Management Services_

EXHIBIT F

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) |
| | ) Jointly Administered |
| | ) |
| Debtors. | ) **Related to Docket Nos. 620, 719, 878, 987, 1051 and 1052** |

## ORDER APPROVING STIPULATION BETWEEN DEBTORS AND MASTER LANDLORDS REGARDING REJECTION OF LEASES AND ALLOWED ADMINISTRATIVE EXPENSE CLAIM

Upon consideration of the *Stipulation Between Debtors and Master Landlords Regarding Rejection of Leases and Allowed Administrative Expense Claim* (the "**Stipulation**")[2] attached hereto as **Exhibit 1;** and the Court having jurisdiction over the matters raised in the Stipulation pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Stipulation and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Stipulation having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Stipulation is in the best interest of the Debtors, their estates, creditors and all parties-in-interest, and that the legal and factual bases set forth in the Stipulation establish just cause for the relief granted

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Stipulation.

herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY
ORDERED THAT:

1.      The Stipulation is approved.

2.      The Debtors are authorized to take any and all actions necessary to effectuate the
Stipulation.

3.      The leases set forth on **Exhibit 2** hereto are hereby rejected, effective as of
November 15, 2019.

4.      All leases and subleases between and among the Debtors with respect to the
HSRE Properties, including, without limitation, those set forth on **Exhibit 3** attached hereto, are
hereby rejected, effective as of November 15, 2019.

5.      This Order shall not be a determination of whether any of the leases on **Exhibit 2**
or **Exhibit 3** are unexpired leases.

6.      To the extent that a counterparty to a lease on **Exhibit 2** chooses to file a proof of
claim relating to rejection damages, such proof of claim must be filed with the Court on or before
the later of (i) thirty (30) calendar days after service of this Order and (ii) the general deadline to
file claims in these Chapter 11 Cases, as determined by the Court by separate order.

7.      This Court shall retain jurisdiction over any and all matters arising from or related
to the implementation of this Order or the Stipulation.

8.      This Order is effective immediately upon entry.


Dated: November 25th, 2019                          **KEVIN GROSS**
       Wilmington, Delaware                          **UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT 1

## Stipulation

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |

## STIPULATION BETWEEN DEBTORS AND MASTER
## LANDLORDS REGARDING REJECTION OF LEASES,
## ALLOWED ADMINISTRATIVE EXPENSE CLAIM AND RELATED MATTERS

This Stipulation Between Debtors and Master Landlords Regarding Rejection of Leases, Allowed Administrative Expense Claim and Related Matters (the "**Stipulation**") is made and entered into as of the 22nd day of November, 2019 between and among the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") and PAHH Bellet MOB, LLC, PAHH Broad Street MOB, LLC, PAHH Feinstein MOB, LLC, PAHH New College, MOB, LLC, PAHH Wood Street Garage, LLC and PAHH Erie Street Garage, LLC (collectively, the "**Master Landlords**," and together with the Debtors, the "**Parties**"), by and through their respective duly authorized undersigned counsel.

## INTRODUCTION

**WHEREAS**, on June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each Debtor commenced a case (the "**Chapter 11 Cases**") by filing a voluntary petition for relief

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**");

WHEREAS, the Debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Master Landlords own various medical office buildings and parking garages (referred to herein as the "**HSRE Properties**"), which are generally adjacent to Hahnemann University Hospital ("**HUH**"), except with respect to a garage (hereinafter, the "**Erie Street Garage**") located adjacent to the hospital operated by debtor St. Christopher's Healthcare, LLC ("**STC**");

WHEREAS, on or about January 11, 2018, STC entered into master leases (the "**Master Leases**") for the HSRE Properties with the Master Landlords;

WHEREAS, on August 30, 2019, the Debtors filed the *Fifth Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Unexpired Real Estate Leases* (the "**Rejection Motion**") [D.I. 620], which sought entry of an order authorizing the Debtors to reject, among other things, the Master Leases except for the Master Lease for the Erie Street Garage (the "**Erie Street Master Lease**");

WHEREAS, on September 13, 2019, the Master Landlords filed their *Limited Objection of Master Landlords to the Fifth Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Unexpired Real Estate Leases* [D.I. 719];

WHEREAS, on September 27, 2019, the Court entered the *Order Under 11 U.S.C. § 105, 363, 365, 503 and 507 (A) Approving Asset Purchase Agreement with STC Opco, LLC (B) Authorizing the Sale of Certain of Debtors' Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtors' Executory Contracts, and*

*(D) Granting Related Relief* [D.I. 795] that approved, among other things, the sale of certain assets of STC and certain other debtors (the "**SCHC Sale**");

**WHEREAS**, on October 18, 2019 the Master Landlords filed the *Motion of Master Landlords for Entry of an Order (A) Allowing Administrative Claims, and (B) Compelling Debtors (I) To Pay Postpetition Rent and Other Obligations under Master Leases and (II) to Coordinate with Master Landlords Regarding Rejection of the Master Leases and Surrender of the Premises* (the "**Master Landlords' Motion**") [D.I. 878];

**WHEREAS**, on November 12, 2019, the Debtors filed the *Debtors' Objection to Motion of Master Landlords for Entry of an Order (A) Allowing Administrative Claims, and (B) Compelling Debtors (I) To Pay Postpetition Rent and Other Obligations under Master Leases and (II) to Coordinate with Master Landlords Regarding Rejection of the Master Leases and Surrender of the Premises* [D.I. 987];

WHEREAS, on November 21, 2019, the Master Landlords filed a *Reply in Support of the Motion of Master Landlords for Entry of an Order (A) Allowing Administrative Claims, and (B) Compelling Debtors (I) to Pay Postpetition Rent and Other Obligations Under Master Lease and (II) to Coordinate with Master Landlords Regarding Rejection of Master Leases and Surrender of Premises* [D.I. 1051];

**WHEREAS**, the Parties have met and conferred and now seek to resolve the matters set forth in the Rejection Motion and the Master Landlords' Motion as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements contained herein, the Parties hereby agree, subject to Bankruptcy Court approval as set forth herein, as follows:

3

### STIPULATION

1.     Each of the Recitals set forth above is incorporated herein by reference.

2.     This Stipulation shall not become effective unless and until it is approved by order of the Bankruptcy Court on or before December 13, 2019.

3.     The Master Leases for which rejection is sought pursuant to the Rejection Motion shall be deemed rejected effective as of November 15, 2019 (the "**Rejection Date**"). For avoidance of doubt, the Erie Street Master Lease shall not be deemed rejected pursuant to this Stipulation.

4.     In resolution of the obligations of any Debtor to the Master Landlords under sections 365(d)(3) and 503(b) of the Bankruptcy Code, the Master Landlords shall be allowed an administrative expense claim in the amount of $2,600,000 (the "**Allowed Administrative Expense Claim**") for (i) obligations arising under the Master Leases (other than the Erie Street Master Lease) from the Petition Date through the Rejection Date; and (ii) obligations arising under the Erie Street Master Lease from the Petition Date through December 14, 2019.

5.     The Debtors shall pay the Allowed Administrative Expense Claim as follows:

    i.   $650,000 from the net proceeds of the SCHC Sale. For avoidance of doubt, "net proceeds" as used in the foregoing sentence means the proceeds of the SCHC Sale after payment of: (a) all obligations owed by any Debtor to MidCap Funding IV Trust ("**MidCap**"), (b) all investment banking fees owed to SSG Advisors, LLC relating to the SCHC Sale, (c) all customary attendant direct costs of the SCHC Sale and (d) $2,200,000 to Tenet Business Services Corporation/Conifer Revenue Cycle Solutions, LLC (hereinafter, collectively, "**Tenet/Conifer**")

pursuant to the terms of the settlement (the "**Tenet/Conifer Settlement**") for which approval is sought pursuant to the *Motion of the Debtors for Entry of an Order Approving Settlement Term Sheet Between the Debtors, Tenet Business Services Corporation, Tenet Healthcare Corporation, Conifer Health Solutions, LLC, Conifer Revenue Cycle Solutions, LLC and the Official Committee of Unsecured Creditors* (the "**Tenet/Conifer Settlement Motion**") [D.I. 1030].

ii. $1,950,000 as a subordinated super-priority administrative claim payable from the net proceeds payable to the Debtors, other than the Guarantee, of the sale of Auction Assets to be sold pursuant to the Centurion Engagement Agreement for which approval is sought by means of that certain *Motion of Debtors for Order (I) Authorizing Retention and Employment of Centurion Service Group, LLC, as Auctioneer, (II) Waiving Compliance With Certain Requirements of Local Rule 2016-2; and (III) Approving Sale and Liquidation of Certain Medical Equipment, Furniture and Inventory* [D.I. 923] (the "**Equipment Sale Motion**").  To the extent the Allowed Administrative Claim is not paid in full from such net proceeds, it shall be paid from the Rebates (defined below), with any remaining balance to be paid *pro rata* with all other unpaid administrative claims.  The Rebates shall be applied upon receipt as payment toward the Allowed Administrative Expense Claim (after application of all amounts paid with respect thereto).  If the Rebates are collected after the Allowed Administrative Expense Claim is paid in full, the Debtors shall retain the

proceeds of the Rebates. The Debtors shall use commercially reasonable efforts promptly to collect the Rebates and the Master Landlords shall, upon reasonable request by the Debtors, provide any assistance required by the Debtors in connection with their efforts to collect the Rebates. As used herein, the term "**Rebates**" shall mean amounts payable to the Debtors pursuant to an energy efficiency incentive rebate program sponsored by PECO Energy Company and related to the HSRE Properties. *Notwithstanding the foregoing or anything to the contrary set in this Stipulation including without limitation this paragraph 5(ii)*:

1. no amount shall be paid to the Master Landlords unless and until all obligations of the Debtors to MidCap have been satisfied in full, and all claims and rights of MidCap pursuant to the *Final Order (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection; (IV) Granting Adequate Protection and Modifying the Automatic Stay* [D.I. 557] (the "**Final DIP Order**") are expressly preserved and shall be unaffected by this Stipulation;

2. the superpriority administrative claim granted to the Master Landlords pursuant to paragraph 5(ii) of this Stipulation shall be subordinate to any superpriority administrative claims granted to Tenet/Conifer in the Tenet/Conifer Settlement, and nothing contained herein shall affect the terms of the Tenet/Conifer Settlement; and

3.  no other party, with the exception of MidCap (pursuant to the Final DIP Order) and Tenet/Conifer (pursuant to the Tenet/Conifer Settlement), shall have or be granted a lien on, and/or a superpriority administrative claim payable specifically from, the Auction Assets, the Rebates, and/or proceeds thereof.

iii.  As used herein, the terms "Guarantee", "Auction Assets", and "Centurion Engagement Agreement" shall have the meanings ascribed to them in the Equipment Sale Motion.

iv.  If and to the extent proceeds of the Auction Assets, other than the Guarantee, are paid to MidCap prior to the closing on the SCHC Sale, the amount payable to the Master Landlords from the net proceeds of the SCHC Sale shall be correspondingly increased and applied to the Allowed Administrative Expense Claim.  For the avoidance of doubt, nothing in this provision shall be construed to increase the amount of the Allowed Administrative Expense Claim.

6.  [intentionally omitted]

7.  The Master Landlords shall provide the following to the Debtors at no charge:

a.  On or before January 31, 2020, the right to sell (in-place) and remove (subject to appropriate insurance and repairs to the premises) the Debtors' assets, including without limitation specifically identified and tagged radiological and other equipment, furniture and inventory, from the HSRE Properties.

b.  So long as the Debtors are not in default of the terms and conditions of this Stipulation, the Debtors may continue accessing and using on a non-exclusive basis the following spaces in the HSRE Properties through March 31, 2020 (the Debtors have and shall bear all, and the Master Landlords shall have no, responsibility for any medical records or property of the Debtors, including any security):

7

    i.   The portion of space in the basements of New College Building and the Bobst Building necessary for the Debtors' operations related to maintenance, IT, environmental services, and security.

    ii.   The loading dock at the Bobst Building and the freight elevator in the Bobst Building; and

    iii.   Mechanical closets, chases and equipment reasonably necessary for the Debtors' operations in the North and South Towers.

    iv.   On or prior to January 31, 2020, the Debtors shall have, at Debtors' expense:

        1.   removed all radioactive waste from the HSRE Properties, and shall provide to the Master Landlords a satisfactory Certificate of Clearance by a Radiological Contractor reasonably satisfactory to the Master Landlords, it being understood that the Debtors may remove radioactive waste through the HSRE Properties (e.g., through loading docks and/or other exits located in HSRE Properties);

        2.   As a condition to Debtors' continued access, Debtors shall:
            a.   Maintain adequate insurance;
            b.   not interfere with the activities of the Master Landlords or their sub-tenants or other business conducted on the premises;
            c.   not remove any property or systems of the Master Landlords; and
            d.   have access only during normal business hours.

8.      The Master Landlords shall retain the following without cost to the Master Landlords with respect to the Debtors' premises in the North and South Towers until such time of the effective date of Debtors' rejection of the leases for the North and South Towers, provided, however, such rights shall be in addition to, and nothing herein is intended to and shall not negatively impact, any party's rights under the Reciprocal Easement Agreement and similar rights of record encumbering such premises:

    i.   Access to, and continued operation by Drexel University, and/or contractor(s) employed by the Master Landlords through NexCore, of the PBX and IT Area located on the 19th floor of the South Tower, being

Rooms 1901 and 1902A, respectively, and the necessary hallways, stairs and elevators between those rooms and adjacent buildings or the outside. The Debtors shall continue to provide required cooling and electric services with respect to such Areas;

ii.   Access to and continued operation of the space currently utilized by WorkNet and ARA in the South Tower (located on the 1st and 12th floors, respectively);

iii.   Access to and continued use of the surface parking lot for patients and staff, as currently being provided outside the Feinstein and Bobst Buildings;

iv.   Access to and continued use of mechanical closets, chases and equipment reasonably necessary for the Master Landlords', and any tenants' and subtenants', operations in the HSRE Properties.

v.   Access to and continued operation of the underground parking garage underneath the School of Health Sciences and Humanities Building.

9.      The Debtors will use their commercially reasonable best efforts to and cooperate with the Master Landlords in transitioning vendors, other service providers and utility services (where applicable) to the Master Landlords or their designee(s).   The Debtors will use commercially reasonable efforts to provide copies of all available contracts, amendments, memos, purchase orders, invoices relating to the HSRE Properties for the period from January 2018 to present, bills of lading, warranties, service manuals and sub-leases, as amended, modified or restated, to the Master Landlords.  The Debtors have designated Allen Wilen as their authorized and knowledgeable representative to interact with the Master Landlords with respect to all aspects of this Stipulation.  The Debtors may designate another representative, upon written notice to the Master Landlords.

10.     The Master Landlords shall commence payment of all utility service for the Center City campus comprising the land and improvements owned by Broad Street  Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC, Broad Street  Healthcare Properties

9

III, LLC and the Master Landlords beginning for service after November 15, 2019. The allocation for such utilities shall be as agreed by the Debtors and the Master Landlords and/or the Master Landlords' agent, in good faith.

11.    The Master Landlords shall be responsible for all further repairs and modifications to the steam vault located in the basement of NCB.

12.    The Master Landlords' objection to the Rejection Motion and the Master Landlords' Motion shall be deemed settled and resolved pursuant to the terms hereof.

13.    The Parties are authorized to take any and all actions necessary to effectuate this Stipulation.

14.    This Stipulation is the entire agreement between the Debtors and the Master Landlords with respect to the subject matter hereof.  This Stipulation supersedes any and all agreements, whether written or oral, that may have previously existed between the Parties with respect to the matters set forth herein.  No statements, promises, or representations have been made by any Party to any other, or relied upon, and no consideration has been offered, promised, expected or held out other than as expressly provided for herein.

15.    The Parties, by and through their undersigned counsel, each represent and warrant that the undersigned is fully authorized and empowered to execute and deliver this Stipulation on behalf of, and to bind, each Party, as applicable, to the terms and conditions of this Stipulation; provided, however, the Debtors' authorization is subject to Bankruptcy Court approval and this Stipulation shall become effective upon the order approving this Stipulation becoming a Final Order.

16.    Each of the Parties further acknowledges that it has been fully advised with respect to its rights and obligations under this Stipulation by counsel of its own choosing.  Each

36060279.14 11/22/2019

of the Parties has consulted with counsel of its own choosing and has had adequate opportunity

to make whatever investigation or inquiry it deems necessary or desirable with respect to the

subject matter and terms of this Stipulation.

17.    In the event of any ambiguity in this Stipulation, no inferences shall be drawn

against any Party on the basis of authorship of this Stipulation.

18.    This Stipulation shall be binding and inure to the benefit of the Parties hereto,

their successors and assigns, and including, as to the Debtors, any chapter 7 or chapter 11 trustee,

plan administrator or estate representative.

19.    This Stipulation may be modified, amended, or supplemented by the Parties, in

writing, and without further order of the Court, provided that any such modification, amendment,

or supplement either is (a) not material or (b) not less favorable to the Debtors than the existing

applicable provisions without further order of the Court.

20.    This Stipulation is a fully integrated agreement with each provision being fully

integrated and dependent on each other provision and no provision of this Stipulation may held

to be unenforceable without this entire Stipulation being held to be unenforceable and no

provision may be "blue penciled" to render such provision enforceable.

21.    This Stipulation shall be governed by and construed in accordance with the

Bankruptcy Code and, where not inconsistent, the laws of the State of Delaware, without regard

to the conflict of laws' principles thereof.  This Stipulation shall be binding upon and inure to the

benefit of the Parties and their respective successors, assignees, designees, agents, attorneys and

representatives.

22.     This Stipulation may be executed in one or more counterparts, including by facsimile and/or electronic mail, each of which when so executed shall be deemed to be an original, and all of which, when taken together, shall constitute one and the same Stipulation.

23.     The Parties acknowledge and agree that the Court shall retain jurisdiction over all disputes concerning or related to the subject matter of this Stipulation.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

12

**IN WITNESS WHEREOF**, the Parties by and through their duly authorized respective counsel hereby execute this Stipulation as of the date first written above, intending to be legally bound.

**SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique Bair DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899-1266
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Counsel for Debtors and Debtors in Possession*

**DLA PIPER (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE Bar No. 4050)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Stuart.Brown@dlapiper.com

-and-

Richard A. Chesley
444 West Lake Street, Suite 900
Chicago, IL 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Richard.Chesley@dlapiper.com

*Counsel to the Master Landlords*

13

EXHIBIT G



**Invoice #**                    66962273578

| Account | Account Name | Bill Date | Due Date | Amount Due | Enclosed |
|---|---|---|---|---|---|
| 6698914753 | PAHH Feinstein MOB, LLC | 2/4/2020 | 2/19/2020 | $485,737.36 | |

PAHH Feinstein MOB, LLC
Suite 2100
44 West Lake Street
Chicago, IL 60606

**Remit to:**
VICINITY ENERGY PHILADELPHIA, INC
PO Box 5018
New York, NY 10087-5018

JP Morgan Chase - Lockbox Processing
Vicinity Energy Philadelphia Inc
PO Box 5018
4 Chase Metrotech Center
7th Floor East
Brooklyn, NY 11245

Please detach and enclose this top portion with payment. Make checks payable to: VICINITY ENERGY PHILADELPHIA, INC.

**Service Information**

| | | | |
|---|---|---|---|
| Rate Schedule | Rate S Steam Service | Consumption | 15,596.5 |
| Service Date | 11/15/2019 to 12/09/2019 | Demand Billed | 46,500 |
| | | Demand Measured | 32,888 |
| | | Ratchet | 46,500 |

**Account Summary as of 02/04/2020**

PAHH Feinstein MOB, LLC

| | |
|---|---|
| Acccount | 6698914753 |
| Invoice | 66962273578 |

| | |
|---|---|
| Previous Balance | $0.00 |
| Payment Received | $0.00 |
| Balance Forward | $0.00 |
| Current Charges | $466,657.10 |
| Corrections to Prior Bills | |
| Adjustments | $0.00 |
| **Amount Due By 02/19/2020** | **$485,737.36** |

**Meter Readings**

| Loc# | Service Address | Description | Current | Previous | Diff | Const | Corr | Usage |
|---|---|---|---|---|---|---|---|---|
| PH230NBrod | 230 N. Broad | | 104720111 | 89123566 | 15596545 | 0.001 | 1.0000 | 15,596.5 |

**Billing History**

| Month | Usage | Avg Dly Usage | Avg Temp | HDD | CDD | Billing Days |
|---|---|---|---|---|---|---|
| 01/14/2020 | 23094.2 | 641.5 | 40.36 | 887.20 | 0.00 | 36 |
| 12/09/2019 | 15596.5 | 649.9 | 41.42 | 566.00 | 0.00 | 24 |

**Steam Charges**        **11/15/2019 - 12/09/2019**

| | |
|---|---|
| Fuel Charges -   15,596.5  MLB  at 14.04 per MLB | $218,974.86 |
| Non Fuel Charges - First 100 MLB at $9.402per MLB | $940.20 |
| Non Fuel Charges - over 100 MLB at $7.984per MLB - 15,496.5 MLBs at $7.984 per MLB | $123,724.06 |
| Demand Charges - First 300 LBs/Hr at $2.858 per LBs/ Hr - 300 Lbs/ Hr at $ 2.858 per Lbs/Hr | $857.40 |
| Demand Charges - Next 39,700 LBs/Hr at $1.926 per LBs/Hr - 39,700 Lbs/ Hr at $ 1.926 per Lbs/Hr | $76,462.20 |
| Demand Charges - Over 40,000 LBs/Hr at $1.695 per LBs/Hr - 6,500 Lbs/ Hr at $ 1.695 per Lbs/Hr | $11,017.50 |
| State Tax Adjustment Surcharge | $113.69 |
| Discount | $0.00 |
| Sales Tax | $34,567.19 |
| **TOTAL STEAM CHARGES** | **$   466,657.10** |

**Total Current Charges**                                          $485,737.36



www.vicinityenergy.us

**Customer Service (215) 732-1411 Fax (215) 875-6910**
Page 1 of 3



**Service Information**

| | | | |
|---|---|---|---|
| Rate Schedule | Rate S Steam Service | Consumption | 646.4 |
| Service Date | 11/15/2019   to 12/09/2019 | Demand  Billed | 1,560 |
| | | Demand Measured | 1,162 |
| | | Ratchet | 1,046 |

**Billing History**

| Month | Usage | Avg Dly Usage | Avg Temp | HDD | CDD | Billing Days |
|---|---|---|---|---|---|---|
| 01/14/2020 | 969.0 | 26.9 | 40.36 | 887.00 | 0.00 | 36 |
| 12/09/2019 | 646.4 | 26.9 | 41.42 | 566.00 | 0.00 | 24 |

**Meter Readings**

| Loc# | Service Address | Description | Current | Previous | Diff | Const | Corr | Usage |
|---|---|---|---|---|---|---|---|---|
| PH1501Race | 1501 Race Street | | 26286368 | 25640004 | 646364 | 0.001 | 1.0000 | 646.4 |

| **Steam Charges** | **11/15/2019  - 01/00/1900** | |
|---|---|---|
| Fuel Charges -      646.4  MLB  at 14.04 per MLB | | $9,075.46 |
| Non Fuel Charges - First 100 MLB at $9.402per MLB | | $940.20 |
| Non Fuel Charges - over 100 MLB at $7.984per MLB - 546.4 MLBs at $7.984 per MLB | | $4,362.46 |
| Demand Charges - First 300 LBs/Hr at $2.858 per LBs/Hr - 300 Lbs/ Hr at $ 2.858 per Lbs/Hr | | $857.40 |
| Demand Charges - Next 39,700 LBs/Hr at $1.926 per LBs/Hr - 1260 Lbs/ Hr at $ 1.926 per Lbs/Hr | | $2,426.76 |
| | | $0.00 |
| State Tax Adjustment Surcharge | | $4.63 |
| Discount | | $0.00 |
| Sales Tax | | $1,413.35 |
| **TOTAL STEAM CHARGES** | $ | **19,080.26** |



**Customer Service (215) 732-1411 Fax (215) 875-6910**



**Glossary of Terms**

HEATING DEGREE DAY (HDD) - A measure of how cold the period was with reference to a standard daily mean temperature of 65 degrees. The number of HDDs is calculated by subtracting the average outside temperature from the standard. (i.e. 45 degrees = 20 HDDs) Total HDDs is the sum of the daily heating degree days in the billing period.

CONSUMPTION - The total Mlbs of steam used in the period. An Mlb equals 1,000 pounds of steam. Consumption is calculated by multiplying the difference in meter readings by the meter constant and a pressure correction factor.

MEASURED AND BILLED DEMAND - Demand is a measurement of the rate of steam used, in pounds per hour. It may be viewed as a service charge for the amount of equipment the Company must have available in order to maintain steam pressure(s) throughout the system and satisfy the total demand of all customers. Demand is charged from October 1st through May 31st, in accordance with the Company Steam Tariff, and is the highest of the following three values: 1) Actual measured demand - Load in pounds of steam per hour, occurring during the single hour of greatest use during the billing period 2) The Ratchet - 90% of the greatest recorded demand during the preceding seven heating season months or 3) Contracted minimum demand.

STATE TAX ADJUSTMENT SURCHARGE (STAS) - The Public Utility Commission (PUC) allows public utilities to collect from, or refund to, its customers, changes in certain taxes. The STAS covers capital stock tax, public utility realty tax and state corporate net income tax. It is calculated by multiplying the consumption and demand charges on your steam bill, adjusted for steam cost rate revenues (SCR), times the STAS rate. The STAS rate is subject to state-legislated changes in taxes imposed on public utilities and may change from time to time.

STEAM COST RATE (SCR) - The last annual change was approved by the PAPUC at Docket No. M-2019-3011217 on August 22, 2019, effective September 1, 2019, subject to monthly adjustment to reflect the actual cost of fuel of each prior month as provided in the Company's SCR Rider.

**Notes**

If you have any questions or complaints concerning this bill, please contact your account representative Daryl Landgraf, at , Ext.5807 prior to the indicated due date.

A rate schedule, an explanation of how to verify the accuracy of your bill, an explanation of various charges, if applicable, as well as the complete tariff, is available in our office at 2600 Christian Street, Philadelphia, PA for your inspection during our normal business day (Monday through Friday, 8:00 a.m. to 5:00 p.m.). You may also file comments or complaints about your rates with the Pennsylvania Public Utility Commission. You can send a letter or request for a formal complaint form addressed to the Pennsylvania Public Utility Commission, PO Box 3265, Harrisburg, PA 17105-3265.

All past due balances are subject to a 2% finance charge per month.

A copy of our tariff can be found on our website www.vicinityenergy.us.

If Customer sells, leases or otherwise transfers all or any portion of the Customer Premises governed under your Agreement, during the Term of your Agreement, the Agreement shall be assigned to such purchaser, lessee or transferee on the date of such sale, lease or transfer, and assumed by the same in writing in a form satisfactory to Company in its sole discretion. If the Agreement is not assigned and assumed, then the Customer will be invoiced for steam usage until the agreement is assigned and assumed by purchaser, lessee or transferee . If Customer wishes that the steam service be terminated the Customer shall pay the Company the Termination Payment outlined in your agreement if any, which payment shall be due on the date of such sale, lease or transfer. Contact your Account Manager prior to sale closing for details





www.vicinityenergy.us