**Exhibit B**

**Perma-Fix Agreement**



July 21, 2021

John Dinome, CHRO and Assistant General Counsel
Philadelphia Academic Health System, LLC
245 N. 15th Street
New College Building, Suite 5312
Philadelphia, PA 19102

John.dinome@americanacademic.com
215.858.2226

Subject: Nuclear Pacemaker Licensing Proposal, Revision 1

Mr. Dinome,

Perma-Fix Environmental Services Inc. (Perma-Fix) is pleased to submit this *revised* letter proposal to perform the transfer of the current nuclear pacemaker radioactive materials license to Perma-fix and to assume management of license conditions through final disposition. Perma-Fix is a leading provider of radiological services including the management of radioactive materials related to Nuclear Regulatory Commission (NRC) and NRC Agreement State licensing requirements.

The following sections provide an overview of our company's experience and qualifications working with radioactive materials, our planned technical approach, cost assumptions, and pricing.

We appreciate the opportunity to provide this revised proposal and welcome any questions or comments you might have.

Sincerely,


Andrew Lombardo, CHP
Executive Vice President, Nuclear Services
Perma-Fix Environmental Services Inc.
alombardo@perma-fix.com



## Statement of Qualifications and Cost Estimate

### Management of Radioactive Materials

Perma-Fix Environmental Services Inc. (Perma-Fix) has extensive experience managing radioactive materials in essentially all forms from sealed sources to liquids and numerous concentrations and activities. Perma-Fix offers unique abilities in hazardous, toxic, and radioactive waste (HTRW) remedial action activities, including deactivation and decommissioning (D&D), decontamination, remediation, demolition, excavation and removal of chemically or radiologically impacted soil, environmental investigation, construction activities, remedial design, on-site measurement and monitoring, site restoration, waste management, treatment and disposal of hazardous and radiological waste, industrial hygiene (IH) services, and project management services.

Perma-Fix has earned a reputation for providing practical, technical, and cost saving approaches to its clients and prides itself on being a turnkey service provider which can support waste management, treatment, and disposal projects from their initial characterization stage all the way through final processing and disposal of waste. This approach has proven to save our clients time and money due to increased efficiencies while also minimizing our customers' liability with timely and compliant disposition of their most difficult waste challenges.

In support of our diverse offerings, we have acquired and managed thirteen (13) radioactive materials licenses (RML) as detailed in the following section, six of which are authorized for D&D activities. As such we have significant demonstrated experience with financial assurance scenarios and final disposition of radioactive sources and source materials.

### PADEP Bureau of Radiation Protection Experience

In addition to our RML management experience we have extensive history working within the Commonwealth of Pennsylvania (PA) where we have performed several D&D projects involving direct interface with the PA Department of Environmental Protection (DEP) including a 5-year contract with the PADEP Bureau of Radiation Protection where we provided radiological support services on an as-needed basis throughout the Commonwealth.

Based on these qualifications we believe we are eminently qualified to coordinate the transfer of RML PA-1616SNM to a new D&D license and manage the ongoing license conditions through final disposition.

### Listing of Radioactive Material Licenses

Perma-Fix has extensive experience with licensing of radioactive materials and holds 13 radioactive material licenses across the United States covering field remediation and decommissioning activities as well as fixed-location waste treatment facilities.

- California (CA) License # 8188-07 (Service provider, decontamination and decommissioning)
- Florida (FL) License # 2598-1 (Fixed facility, waste treatment)
- FL License # 2598-2 (Fixed facility, waste treatment)
- Kentucky (KY) License # 201-650-15 (Service provider, decontamination and decommissioning)



- New Jersey (NJ) License # 707619 – RAD150001 (Service provider, decontamination and decommissioning)
- Nuclear Regulatory Commission (NRC) License # 41-35520-01 (Service provider, decontamination and decommissioning)
- New York (NY) License # C5666 (Service provider, decontamination and decommissioning)
- Tennessee (TN) License # R-47161-B22 (Fixed facility, instrumentation calibration and maintenance)
- TN License # R-73014-H24 (Fixed facility, waste treatment)
- TN License # R-73029-B30 (Fixed facility, waste treatment)
- Washington (WA) License # WN-I0393-1 (Fixed facility, waste treatment)
- WA License # WN-I0508-1 (Fixed facility, waste treatment)
- WA License # WN-L0255-1 (Service provider, decontamination and decommissioning)

### Cost Estimate

The cost estimate is a combination of initial costs and future costs summed over the 20-year period of performance. Initial costs are associated with the transfer and conversion of the existing license (PA-1616SNM), which includes licensing and financial assurance. Future costs include license implementation (interactions with PADEP and the patient), final source disposition (retrieval, packaging, and transportation), and the final license termination. The future costs include support for periodic license maintenance (limited PADEP interactions, for example), and twice-yearly communication with the patient or patient's family. Table 1. below provides a summary of costs.

Initial costs can be covered under a time and materials arrangement and would have a performance period up to the successful transfer of the current license to a Perma-Fix license. At that time, the remaining estimated costs would be paid to Perma-Fix as a lump sum and the contract with Philadelphia Academic Health System, LLC would be completed and terminated. Perma-Fix would execute the new license from that point forward.

### Initial Costs (PA License Transfer)

The transfer and conversion of license # PA-1616SNM consists of administrative activities (communications, application, review) for both Perma-Fix and the Pennsylvania Department of Environmental Protection (PADEP). Additionally, PADEP will impose a financial assurance requirement for this new license prior to issue which is part of the initial costs.

Financial assurance costs estimates are based on the estimated costs for the actual source retrieval and disposition. The PADEP will have to approve this estimate as part of the licensing process and may require additional funding. Typically, FA requires periodic review and update, which is included within license future costs. Given the 20 year period of performance, the FA estimate reflects the anticipated transportation cost in 20 years as well as the anticipated labor rate at year 20 for source disposition. The rates and unit costs applied reflect the escalation of current costs over a 20 year period. Escalation was based on current trends in costs (2.3% was applied to labor and 2.5% was applied to transportation).



**Future Costs (License Maintenance, Execution, and Termination)**

The future costs will be covered as a lump sum payment after license transfer. These costs include maintenance, execution, and termination. Source disposition is also a future cost, however this cost is addressed within the FA estimate.

Maintenance of the license would typically involve periodic inspection, updates, and renewals. Two hours per year have been allocated for license maintenance. The Request for Proposal (RFP) stated "PADEP has indicated that it does not foresee billing for any services in connection with this license", however given the 20 year period of performance, it is not unreasonable to expect some limited PADEP involvement over that time. One hour per year has been included with the proposal to account for some limited regulator involvement.

License execution includes the twice annual communication with the patient and/or family to update the status of the patient and the termination of the license. Two hours per year have been allocated for the periodic patient communications.

As noted, the retrieval and the disposition of the device are also future costs however those costs have been included within the FA required for license transfer and as such are not included here.

After final disposition of the source with OSRP, some administrative effort is required to terminate the license with the PADEP. This effort includes a final disposition report and application for license termination. A nominal 20 hours has been allocated for these activities for both Perma-Fix and the PADEP.



| Table 1. Summary of Costs ||||||
|---|---|---|---|---|
| Initial Costs Estimate (covered as time and materials) |||||
|  | Hours | Rate[1] | Unit Cost | Total Initial Cost |
| **License Transfer** | 60 | $150.00 | $9,000.00 | **$9,000** |
|  |  |  |  |  |
| **Financial Assurance (FA)[2]** | - see below Source Disposition - || | **$9,948** |
|  |  |  |  |  |
| *Source Disposition* |  |  |  |  |
|  | Hours | Rate[4] | Unit Cost |  |
| *Perma-Fix Administration* | 16 | $236.38 | $ 3,782 | *$3,782* |
| *Travel[5]* |  |  | $ 1,250 | *$1,250* |
| *Transportation[6]* |  |  | $ 4,916 | *$4,916* |
|  |  |  |  |  |
|  |  |  | Subtotal | **$18,948** |
| Future Costs (covered as lump sum) |||||
|  | Hours | Rate[3] | Unit Cost | Total 20 y Cost |
| **License Maintenance** |  |  |  | **$12,484** |
| *Perma-Fix Administration* | 2 | $199.59 | $399.18 | *$7,984* |
| *PADEP Interactions* | 1 | $225.00 | $225.00 | *$4,500* |
|  |  |  |  |  |
| **License Execution** | 2 | $199.59 | $399.18 | **$7,984** |
|  |  |  |  |  |
| **License Termination** |  |  |  | **$9,228** |
| *Perma-Fix Administration* | 20 | $236.38 | $4,727.60 | *$4,728* |
| *PADEP Administration* | 20 | $225.00 | $4,500.00 | *$4,500* |
|  |  |  |  |  |
|  |  |  | Subtotal | **$29,696** |
|  |  |  |  |  |
|  |  |  | **Total** | **$48,644** |

1. The rate of $150 per hour is the current rate. It is assumed license transition will occur in the current year.
2. FA is equal to the estimated costs for Source disposition.
3. Annual Cost rates are derived from the escalated current rate of $150 per hour by 2.3% annually divided by 20 years.
4. The source deposition and license closure rates are escalated current rate by 2.3% annually divided by 20 years.
5. Travel is a combination of individual transportation costs and lodging for 2 days.
6. Transportation is the current estimate of $3000 escalated by 2.5 % annually over 20 years.



PROPOSAL ACCEPTANCE / WORK AUTHORIZATION FORM

**Project Name: Pacemaker**

**Project Location: unknown**

**PESI Proposal Number: N/A**

### CLIENT INFORMATION

John Dinome, CHRO and Assistant General Counsel
Philadelphia Academic Health System, LLC
245 N. 15th Street
New College Building
Suite 5312
Philadelphia, PA 19102
John.dinome@americanacademic.com
215.858.2226

### SCOPE OF AUTHORIZED WORK

**SEE ABOVE**

| This proposal and terms are offered this | This proposal and terms are accepted this |
|---|---|
| **8th Day of July 2021** | **_____ day of _____ 2021** |
| **Perma-Fix Environmental Services Inc. (PESI)** | |
| | **CLIENT/CUSTOMER NAME** |
| | _____ |
| Signature of Authorized PESI Representative | Signature of Authorized CLIENT Representative |
| **Andrew Lombardo Executive VP Nuclear Services** | **_____** |
| Print Name and Title | Print Name and Title |

**Period of Performance:   July 2021 – Date of License Transfer**

   **Total Price: $48,644**



**$18, 948 (T&M) + $29,696 (Lump Sum)**

## PESI TERMS AND CONDITIONS

1. **SERVICES TO BE PROVIDED**.  PESI is an independent service provider and agrees to provide CLIENT for its sole benefit and exclusive use with the Services. There are no third party beneficiaries to this Agreement. However, PESI understands that the results may be shared with and relied upon by government agencies, including the United States Environmental Protection Agency, the Nassau County Department of Health, the New York State Department of Environmental Conservation and the New York Department of Public Health.

2. **DEFINITIONS.  These terms will have the following meanings when used in this Agreement:**
    A.  <u>Orders</u> – Any orders or other form writings issued or signed by the parties, such as purchase orders or work orders.
    B.  <u>Samples</u> – Specimens or representative pieces, segments or the like and /or the residue there from.
    C.  <u>Services</u> – The consulting services set forth in the attached Scope of Authorized Work.

3. **STANDARD OF CARE**.  Seller will perform the Services, including the provision of a report, using that degree of skill and care ordinarily exercised under similar conditions by reputable members of Seller's profession practicing in the same or similar locality at the time of performance.   Seller warrants that it will provide qualified supervision and competent personnel to perform the Work. Seller further warrants that it is fully experienced, properly qualified, registered, licensed, and equipped to perform the Work offered under this Agreement. Seller is responsible for reviewing the job site and for assuring the safety of its employees, including that the employees are provided a safe place to work.   However, except as otherwise expressly specified, Buyer shall procure and pay for all permits and licenses specific to the Work to be performed, provided that Seller will advise if any permits specific to its activities are required.

4. **INDEMNIFICATION**. Each party agrees to indemnify and save harmless the other from and against all claims for losses, damages and expenses for injury to persons, including death, or property damage, to the extent caused by the willful misconduct or negligent acts or omissions of the indemnifying party or its employees or agents in connection with the performance under this Agreement and further, with respect to any violation of applicable statute, regulation or other law. In the event of injury to person or damage to property arising out of performance under this Agreement and due to the joint or concurrent negligence of the parties hereto, liability as between the parties will be apportioned on a basis which equates to the degree of negligence attributable to each, and each party shall indemnify and hold harmless the other for that portion of any such claim, loss, damage or expense.   The obligations of this provision survive termination of this Agreement and such obligations are not limited by any insurance requirements specified in this Agreement.   Any immunity provided by any insurance or Worker's Compensation policy is hereby waived.

5. **SUBCONTRACT AMOUNT.**  Buyer shall compensate Seller in accordance with the fixed unit prices set out herein for all services performed and/or instruments and materials to be used by Seller in providing services to Buyer. *[Instruments to be rented by Seller to Buyer for Buyer's use of the instruments independent of services provided by Seller shall be based on the modified rates also set out in Exhibit B and Service Standard Lease Agreement.]*   It is understood that there are no guaranteed maximum or minimum quantities.

6. **PAYMENT TERMS**.  Buyer agrees to pay each and every one of Seller's invoices within 30 days from receipt of Seller's invoice.  If Buyer reasonably objects to all or any portion of an invoice, Buyer shall notify Seller in writing within 10 days from date of receipt of Seller's invoice, give reasons for objection, and pay that portion of the invoice not in dispute.  Seller may suspend any and all Services if Seller does not receive payment of any invoiced amount not reasonably in dispute within 60 days from the date of Seller's invoice.  Payment shall be sent to the following address:

    PO BOX 676390

    Dallas TX  75267-6390

7. **SITE RESPONSIBILITY**.  Buyer will arrange for right-of-entry to the Site and will execute any necessary site access agreements.  Buyer shall provide Seller with an accurate description of the Site, all available Site information, and all documents deemed necessary



by Seller to reasonably gain access to the site. The Services do not include supervision or direction of the means, methods, or actual work of contractors, other professionals or consultants not retained by Seller. It is agreed that Seller is not responsible for safety or security at the Site, other than for Seller's employees, and that Seller does not have the right or duty to stop the work of others.

**8.    DOCUMENTS**. All Work Products shall be Seller's sole property, as author and owner, and Seller hereby reserves and shall retain all common law, statutory and other rights thereto, including copyrights. Buyer agrees that under no circumstances shall any Work Product be distributed to any third parties, published, used in advertising, or reused at any location or for any project not expressly provided for in this Agreement without Seller's prior written permission

**9.    LIABILITY.** Except as otherwise expressly provided in this Agreement, neither party shall be liable to another party hereto for any indirect, incidental, special or consequential damages, including loss of profits, loss of use, or any other costs or expenses whether arising from a termination on this Agreement or otherwise.

**10.    CLIENT DISCLOSURE**.  Buyer agrees to advise Seller of any known hazardous substance or any condition existing on or near the Site that presents a potential danger to health, the environment or Seller's employees or equipment. Buyer agrees to notify the appropriate federal, state, and local agencies as required by law, or otherwise to disclose in a timely manner, any information that may be necessary to ensure site safety and to prevent damage to health and/or the environment. Buyer acknowledges that Seller may be required to make such disclosures if Buyer fails to do so and agrees to hold Seller harmless therefore.  Buyer shall have the sole responsibility for fully informing Seller of the nature and location of the Work and the general and local conditions, including but not limited to the following:

A.    Transportation, access, disposal, handling, and storage of materials;
B.    Availability and quality of labor, water, electric power, and road conditions;
C.    Climatic conditions, tides, and seasons;

D.    River hydrology and river stages;
E.    Physical conditions at the Work site and the Project area as a whole;
F.    Subsurface geology and underground utilities;
G.    Topography and ground surface conditions;
H.    Equipment and facilities needed preliminary to and during the performance of the Work; and
I.    Radiological, hazardous or non-hazardous conditions of surface or subsurface.

**11.    TERMINATION**. Either party may terminate this Agreement without cause upon [14] days' prior written notice. Such notice shall specify the extent to which the performance of the Work is terminated and the effective date of such termination.  In such event, Seller shall be paid for all Services performed up to the date of termination except to the extent that Seller terminates the Agreement without cause and Buyer must duplicate the work.

**12.    FORCE MAJEURE**. Seller shall not be liable for damages due to the delay or failure to perform any obligation under this Agreement if such delay or failure results from circumstances beyond the control of Seller. In the event of such a Force Majeure, the time for Seller's performance shall be extended for the duration of the Force Majeure event.  Each party will take reasonable steps to mitigate the impact of any Force Majeure.

**13.    PRIORITY OVER FORM AGREEMENT/PURCHASE ORDERS**.  The parties agree that provisions of this Agreement shall control and govern over any Orders, and that Buyer may issue Orders to Seller without altering the terms hereof, regardless of any contrary language appearing therein, unless the parties specify in writing that such contrary term(s) apply to the Services that are the subject of the Orders.

**14.    SAMPLE AND WASTE DISPOSAL**.  If Buyer wishes for Seller to retain any Samples, at Buyer's written consent, Seller will use its best efforts to retain preservable Samples, but only for a mutually acceptable time and for an additional charge, which shall be paid by Buyer.

**15.    INDEPENDENT SELLER.**  It is expressly understood that Seller is an Independent Contractor and that neither Seller nor its employees are servants, agents, or employees of Buyer.  Seller will maintain complete control of and responsibility for its employees, subcontractors, suppliers and agents.  Seller shall also be responsible for the means and methods of carrying out the Work and for the safety of its employees.

**16.    NOTICES**.  Any notices required or permitted to be sent may be delivered by hand, facsimile, electronic transmission (email), overnight courier service or certified mail return receipt requested to the addresses set forth herein or such other address as either party may designate by written notice to the other.



**17.    ASSIGNMENT.**  Neither party may assign this Agreement or any part thereof without the prior written consent of the other party. Any attempted assignment without the other party's prior written consent shall be void.

**18.    ENVIRONMENTAL, SAFETY AND HEALTH REQUIREMENTS.**  Seller will conduct operations under this Agreement in a manner to avoid the risk of endangerment to health, bodily harm to persons, damage to property, and damage to the natural environment.

**19.    SUSPENSION OF WORK.**  Buyer may suspend, delay, or interrupt all or a part of the Work upon written notice to Seller.  In such event, Seller will resume the Scope of Work only upon further written notice from Buyer and an extension of time and an equitable adjustment in compensation, if appropriate, will be mutually agreed upon.  Buyer shall be liable for all labor and other costs incurred by Seller due to any Buyer-directed Suspension of Work.

**20.    NON-WAIVER OF RIGHTS.**  Both parties agree to comply with all the terms and conditions and all specifications and other documents that this Agreement incorporates by reference or attachment.  Failure of either party to enforce any of the provisions of this Agreement shall not be construed as evidence to interpret the requirements of this Agreement, nor a waiver of any requirement, nor a waiver of the right of the party to enforce each and every other provision. All rights and obligations shall survive final performance of this Agreement.

**21.    COMPLIANCE WITH LAWS.**  .  Each party agrees to comply with all federal, state and local codes and laws, ordinances and rules, regulations and orders in force during the term of this Agreement.

**22.    RIGHTS CUMULATIVE; WAIVER OF TERMS AND CONDITIONS; SURVIVAL**.  Each parties' rights and remedies are cumulative with and non-exclusive of any and all rights and remedies available hereunder, at law, or otherwise.  The failure of either party in any one or more instances to enforce one or more of the terms or conditions of this Agreement or to exercise any right or privilege in this Agreement or the waiver of any party of any breach of the terms or conditions of this Agreement shall not be construed as thereafter waiving any such or other terms, conditions, rights, or privileges, and the same shall continue and remain in force and effect as if no such failure to enforce had occurred.

23.    **INTERPRETATION AND SEVERABILITY.**  Each provision of this Agreement is severable from the others.  Should any provision of this Agreement be found invalid or unenforceable, such provision shall be ineffective only to the extent required by law without invalidating the remainder of such provision or the remainder of this Agreement.  Further, to the extent permitted by law, any provision found invalid or unenforceable shall be deemed automatically withdrawn to the extent necessary to render it valid and unenforceable, without affecting the remaining provisions.

**24.    FURNISHED UTILITIES AND FACILITIES.**

<u>Utilities.</u>  The Utilities required by Seller necessary for its successful performance of the Work, shall be supplied by Buyer without cost to Seller. Additionally,

<u>Facilities</u>. Buyer shall supply the Facilities required by Seller necessary for its successful performance of the Work, without cost to Seller.  Seller may use such facilities without charge.

25.    **CLAIMS.**  "Claim," as used in this clause, means a written demand or written assertion by one of the contracting Parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of Agreement terms, or other relief arising under or derived from the Agreement as a result of a party's action or omission such that it would constitute a claim. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not considered a claim hereunder.

Disputes between the Parties hereto shall be determined in accordance with applicable law and the Agreement.  A claim, as described above, shall be made in writing and submitted to the other party under the terms of the Agreement.



26. **RESOLUTION OF DISPUTES.**  The Parties agree to make good faith efforts to settle any dispute or claim that arises under this Agreement through discussion and negotiation. If such efforts fail to result in a mutually agreeable resolution, the Parties shall consider the use of alternate dispute resolution (ADR). In the event non-binding mediation or arbitration is agreed upon, the site of the proceedings shall be in the venue where Work is being performed. The mediator or arbitrator shall allocate cost, except that there shall be no pre-decisional interest costs, and each Party shall bear its own discretionary costs. In the event that ADR fails or is not used, the Parties agree that the exclusive and appropriate forums for resolution shall be as follows:

   Any litigation shall be brought and prosecuted exclusively in Federal District Court (unless otherwise agreed to by the Parties), with venue in the location where Work is being performed, however, that in the event the requirements for jurisdiction in Federal District Court are not present, such litigation shall be brought in the state court having proper jurisdiction within the venue where the work or services were performed.

   The Parties agree that irrespective of the place of performance, this Agreement shall be interpreted and all substantive issues presented for mediation, arbitration, dispute, claim, litigation, or other effort at resolution shall be determined in accordance with the laws of the State of New York, which shall govern the interpretation of this Agreement and the rights and obligations of the parties hereto.

   Seller agrees to proceed diligently with performance of this Agreement pending final resolution of any request for relief, claim, appeal, or action arising under this Agreement. Notwithstanding the foregoing, Seller reserves the right to terminate this Agreement in the event of non-payment or denial of claim made by Seller pursuant to the "CLAIMS" provision.  Such reservation is in addition to any and all other available remedies at law or equity.

27. **ENTIRE AGREEMENT.**  This Agreement embodies and represents the entire Agreement between Seller and Buyer.  Seller and Buyer shall not be bound by or liable for any statement, representation, promise, inducement or understanding of any kind or nature, oral or written, not set forth herein.  Nothing contained in any proposals, correspondence, discussions or negotiation prior to the date of this Agreement has any effect on this Agreement unless specifically set forth or incorporated herein. No amendments or modifications of any of the terms and conditions hereof shall be valid unless reduced to writing and signed by an authorized representative of both parties.