## **EXHIBIT A**

**Center City Lease**

## BASIC LEASE INFORMATION

| | |
|---|---|
| **Effective Date:** | January 11, 2018 |
| **Tenant:** | Center City Healthcare, LLC |
| **Tenant's Address:** | 222 N. Sepulveda Blvd., Suite 900, El Segundo, CA 90245 |
| **Contact:** | Legal Department<br>Telephone: (310) 414-2700 |
| **Landlord:** | Broad Street Healthcare Properties, LLC |
| **Landlord's Address:** | 222 N. Sepulveda Blvd., Suite 900, El Segundo, CA 90245 |
| **Contact:** | Legal Department<br>Telephone: (310) 414-2700 |
| **Premises:** | Known as "Hahnemann University Hospital" and certain land, each as more fully described on Exhibit A, with an address at 222-48 N. Broad Street, Philadelphia, Pennsylvania and 221-223 N. 15th Street, Philadelphia, Pennsylvania (collectively, the "**Building**"). |
| **Term:** | Commencing on the Effective Date (the "**Commencement Date**") and ending at 11:59 p.m. on the fifteenth anniversary of the Commencement Date. |
| **Base Rent:** | $1 per year due from Tenant to Landlord, commencing as of the Commencement Date, payable as of the last day of each calendar year commencing on the last day of the calendar year after the Commencement Date. |
| **Additional Rent:** | All Taxes and Operating Expenses allocable to the Premises. |
| **Security Deposit:** | None. |
| **Rent:** | Base Rent and Additional Rent. |
| **Permitted Use:** | Hospital, clinical and other healthcare services, medical education, medical research, office use, including medical office, general office, administrative offices and facilities, and hospital administrative offices, hospital infrastructure services, laboratory, emergency helipad and related activities, and uses ancillary thereto customarily associated with the foregoing, including but not limited to general storage, equipment and tank storage, and retail uses (provided that any expansion beyond the current retail uses shall be subject to approval by Landlord, in its commercially reasonable judgment); and any other activities permitted by any licenses or permits issued with respect to the Premises. |

The attached Lease Terms and Conditions ("**Lease Terms and Conditions**") are incorporated into and made a part of the Basic Lease Information. If any conflict exists between any Basic Lease Information and the Lease Terms and Conditions, then the Basic Lease Information shall

1

control. Basic Lease Information and Lease Terms and Conditions are sometimes herein together called the "**Lease**".

[remainder of page intentionally left blank]

## LEASE TERMS AND CONDITIONS

1. **Taxes; Operating Expenses; Contest.**

    1.1. <u>Taxes</u>: all real property taxes applicable to the Premises during the Term, which shall include any form of assessment, license fee, commercial rental tax, levy, penalty, or tax (other than inheritance estate or income taxes), imposed by any authority having the direct or indirect power to tax ("**Taxes**").

    1.2. <u>Operating Expenses</u>: all costs associated with the maintenance, repair and alterations of the Premises; all water, gas, heat, light power, telephone and other utilities and services supplied to the Premises and used by Tenant, together with any taxes thereon and all easement agreement assessments attributable to the Premises. If any such services are not separately metered to Tenant, Tenant shall pay a reasonable proportion to be determined by Landlord of all charges jointly metered with other premises ("**Operating Expenses**").

    1.3. <u>Contest</u>. Tenant shall have the right to protest and contest any Taxes, Requirements or other Legal Events (defined below) imposed against the Premises or any part thereof. If Tenant so elects to contest, Tenant shall, prior to the prosecution or defense of any such claim, notify Landlord in writing of its decision to pursue such contest and, to the extent procedurally required, or to prevent jeopardizing any license, permit or certification because of nonpayment thereof, Tenant shall pay the amount in question prior to initiating the contest. Tenant's right to contest is conditioned upon the following: (i) such contest is done at Tenant's sole cost and expense, (ii) nonpayment will not subject the Premises or any part thereof to sale or other liability by reason of such nonpayment, (iii) such contest shall not subject Landlord or its mortgagee to the risk of any criminal or civil liability, and (iv) Tenant shall provide such security as may reasonably be required by Landlord or its mortgagee or under the terms of any such mortgage or any loan documents in connection therewith to ensure payment of such contested Impositions. Subject to the provisions of clauses (i) through (iv) above, Landlord agrees to execute and deliver to Tenant any and all documents reasonably acceptable to Landlord and otherwise required for such purpose and to cooperate with Tenant in every reasonable respect in such contest, but without any cost or expense to Landlord. If Landlord should actually receive proceeds of any such contest to the extent Tenant had paid in advance the amount in question, and to the extent that the same relate to the period of the Term, then Landlord shall promptly remit the same to Tenant. Tenant may elect to take commercially reasonable steps to file and enforce tax certiorari proceedings to reduce tax affecting the Premises, all at Tenant's own expense.

2. **Damage or Destruction; Condemnation**.

    2.1. <u>Risk of Loss</u>. Except where due to the willful misconduct, recklessness, or gross neglect of Landlord, all risk of loss to personal property or loss to business resulting from any cause whatsoever shall be borne exclusively by Tenant.

    2.2. <u>Restoration</u>. If the Premises or any part thereof shall be damaged or destroyed by fire or other casualty, (a) Landlord shall pay over to Tenant any monies which may be recovered by Landlord from property insurance procured by Tenant as required by this Lease, to the extent of Restoration costs incurred by Tenant, with excess (if any) being retained by Landlord, or (if required) being paid to Landlord's mortgagee, (b) this Lease shall be unaffected thereby and shall continue in full force and effect, and (c) Tenant shall, expeditiously, diligently and in a good and workmanlike manner, cause such damage or destruction to be remedied or repaired to a condition that is substantially similar to, or better than, the condition that existed immediately prior to such damage by restoring the Premises to substantially the same design and configuration ("**Restoration**").

2.3. <u>Disbursing of Proceeds</u>. Landlord shall pay, from time to time, upon the following terms, any moneys which may be received by Landlord from property insurance provided by Tenant, but in no event to any extent or in any sum exceeding the amount actually collected by Landlord upon the loss; *provided, however,* that Landlord shall be entitled to reimburse or pay itself therefrom to the extent, if any, of the reasonable expenses paid or incurred by Landlord in the collection of such moneys before paying such moneys over to Tenant, and pay to Tenant, as herein provided, the aforesaid insurance proceeds which may be received by Landlord, to be applied towards the cost of Restoration. Prior to making any Restoration, Tenant shall furnish Landlord with an estimate of the cost of such Restoration, prepared by a licensed third party architect or contractor selected by Tenant and reasonably approved by Landlord. If any vendor's, mechanic's, laborer's, or materialman's lien is filed against the Premises or any part thereof, or if any public improvement lien is created or permitted to be created by Tenant and is filed against Landlord, or any assets of, or funds appropriated to Landlord, Tenant shall otherwise discharged the same, unless such lien is contested by Tenant in good faith and Tenant has obtained and delivered a bond issued by a surety or otherwise adequate security, in an amount and in form otherwise satisfactory to Landlord in its reasonable discretion.

2.4. <u>Abatement of Rent: Tenant's Remedies</u>. If the Premises are destroyed or damaged and Landlord or Tenant repairs or restores them pursuant to the provisions of this Paragraph, the Rent payable hereunder for the period during which such damage, repair or restoration continues shall be abated in proportion to the degree to which Tenant's use of the Premises is impaired.

2.5. <u>Condemnation</u>. If the Premises or any portion thereof are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "**Condemnation**"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than twenty five percent (25%) of the floor area of the improvements on the Premises, or twenty five percent (25%) of the land area of the Premises which is not occupied by any improvements, is taken by condemnation, Tenant may, at Tenant's option, to be exercised in writing only within one hundred twenty (120) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Rent shall be reduced in the proportion that the floor area taken bears to the total floor area of the Building. Any award for the taking of all or any part of the Premises under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided, however, that Tenant shall be entitled to any award for loss of or damage to Tenant's trade fixtures or removable personal property. In the event that this Lease is not terminated by reason of such condemnation, Landlord shall, to the extent of severance damages received by Landlord in connection with such condemnation, repair any damage to the Premises caused by such condemnation except to the extent that Tenant has been reimbursed therefor by the condemning authority. Tenant shall pay any amount in excess of such severance damages required to complete such repair.

3. **Condition of Premises**.

3.1. <u>As-Is</u>. Tenant hereby accepts the Premises in their condition existing as of the Commencement Date subject to all applicable zoning, municipal, county and state laws, ordinances, and regulations governing and regulating the use of the Premises. Tenant accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto.

3.2. <u>Surrender</u>. On the last day of the Term, or on any sooner termination, except as otherwise expressly provided in this Lease, Tenant shall surrender the Premises to Landlord in the same condition as when received, broom clean, ordinary wear and tear excepted.

3.3. <u>Alterations and Additions</u>.

(a) Tenant shall not, without Landlord's prior written consent (not to be unreasonably withheld, delayed or conditioned) make any alterations, improvements, or additions Installations in, on or about the Premises, except for alterations which otherwise do not materially adversely affect the Building, its systems and structural components or otherwise shall not exceed ten percent (10%) of the then current year's Base Rent in cost for each such item of alteration. Tenant may, in its sole and absolute discretion, remove any or all of said alterations, improvements, or additions at the expiration of the Term and, to the extent of any such removal, restore the Premises to their prior condition. For any improvements to the Premises that require Landlord's prior written consent, Landlord may require Tenant to provide Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one hundred and ten percent (110%) of the estimated cost of such improvements, to insure Landlord against any liability for mechanic's and materialmen's liens and to insure completion of the work. Should Tenant make any alterations, improvements, or additions without the prior approval of Landlord, Landlord may require that Tenant remove any or all of the same.

(b) Subject to Tenant's right to contest such Requirements under this Lease or as otherwise permitted by law, Tenant shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Tenant at or for use in the Premises, which claims are or may be secured by any mechanics' or materialmen' lien against the Premises or any interest therein. If Tenant shall, in good faith, contest the validity of any such lien, claim or demand then Tenant shall, at its sole expense defend itself and Landlord against the same and shall pay and satisfy any such adverse judgment that may be rendered before the enforcement upon the condition that if Landlord shall require, Tenant shall furnish to Landlord a surety bond or other security reasonably satisfactory to Landlord in an amount equal to such contested lien, claim or demand indemnifying Landlord against liability for the same and holding the Premises free from the effect of such lien or claim.

(c) In the event that Tenant elects not to remove any alterations, improvements or additions, all such alterations, improvements and additions, which thereafter remain on or attached to the Premises, shall become the property of Landlord and be deemed to have been surrendered with the Premises at the expiration of the term. Notwithstanding the provisions of this Paragraph, Tenant's machinery and equipment, other than that which is affixed to the Premises so that it cannot be removed without material damage to the Premises, may be removed by Tenant subject to the provisions of Paragraph 3.3.

4. **Indemnification**.

4.1. <u>Tenant Indemnity</u>. Tenant shall indemnify and hold harmless Landlord from and against any and all claims, liabilities, damages, and expenses, including without limitation reasonable attorney's fees, incurred by Landlord in defending or compromising actions brought against it, its officers, managers, directors, employees, or agents, arising out of or related to the negligent acts or omissions of Tenant, its employees, agents, and contractors in connection with the performance of duties by Tenant pursuant to this Lease.

4.2. <u>Landlord Indemnity</u>. Landlord shall indemnify and hold harmless Tenant from and against any and all claims, liabilities, damages, and expenses, including without limitation reasonable attorney's fees, incurred by Tenant in defending or compromising actions brought against it, its officers, managers, directors, employees, or agents, arising out of or related

to the negligent acts or omissions of Landlord, its employees, agents, and contractors in connection with the performance of duties by Landlord pursuant to this Lease.

5. **Insurance**.

    5.1. <u>Liability and Property Insurance</u>. Tenant shall, at Tenant's expense, obtain and keep in force at all times during the Term, liability and property insurance in such amounts and of such quality as shall be (i) commercially reasonable and consistent with similarly situated properties and (ii) required by any mortgage, deed of trust or similar instrument encumbering the Premises (but only if Tenant is given the reasonable opportunity to participate in the negotiation of such insurance provisions).

    5.2. <u>Waiver of Subrogation</u>. Tenant and Landlord each hereby waive any and all rights of recovery against the other, or against the officers, managers, directors, employees, agents and representatives of the other for loss or damage to such waiving party or its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damages. The insuring party shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease.

6. **Assignment and Subletting**.

    6.1. Tenant shall not voluntarily or involuntarily assign its interest in this Lease, nor sublet all or part of the premises, nor grant concessions or licenses upon the premises without the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld conditioned or delayed, subject to Paragraph 6.2. Notwithstanding the foregoing, Landlord hereby consents to the subleases in effect as of the Commencement Date, as the same may be assigned or sublet in accordance with their terms.

    6.2. Tenant may assign or sublet the Premises, or any portion thereof, without Landlord's consent, to any entity which controls, is controlled by or is under common control with Tenant, or to any other entity resulting from a merger or consolidation with Tenant, or to any person or entity which acquires substantially all the assets of Tenant as a going concern of the business that is being conducted on the Premises, provided that said assignee assumes in full the obligations of Tenant under this Lease. Upon Landlord's consent (not to be unreasonably withheld, delayed or conditioned), any such assignment shall be deemed a release the liability of Tenant under the terms of this Lease.

7. **Termination**.

    7.1. <u>Mutual Termination Right</u>. Either party may terminate this Lease upon the occurrence of any of the following events: (1) violation by the other party of any material provision of this Lease, during the period such violation continues uncured from and after sixty (60) days from written notice from the non-violating party, specifying such violation with particularity; and (2) adjudication of the other party as bankrupt, liquidation of the other party for any purpose, or appointment of a receiver to take charge of the other party's affairs, provided each appointment remains undischarged for sixty (60) days.

    7.2. <u>Termination for Changes in Law</u>. In the event that any governmental or nongovernmental authority or agency, or any court or administrative tribunal passes, issues or promulgates any new, or change to any existing, law, rule, regulation, standard, interpretation, order, decision or judgment (individually or collectively, "**Legal Event**"), which a Tenant reasonably believes (i) materially and adversely affects Tenant's licensure, accreditation, certification, or ability to refer, to accept any referral, to present a bill or claim, or to receive

6

payment or reimbursement from any governmental or non-governmental payor, or (ii) indicates a Legal Event with which the Tenant desires further compliance, then, in either event, the Tenant may give the other party thirty (30) days prior written notice of its intent to amend or terminate this Lease. Notwithstanding the foregoing, the Tenant may propose an amendment to the Lease to take into account the Legal Event and, if accepted by the Landlord prior to the end of the thirty (30) day notice period, the Lease shall be amended as of the date of such acceptance and if not amended shall automatically terminate.

8. **No Waiver**. Any failure of a party to enforce that party's rights under any provision of this Lease shall not be construed or act as a waiver of said party's subsequent right to enforce any of the provisions contained herein.

9. **Compliance With Laws And Regulations**.

9.1. In General. During the Term of this Lease, each party shall comply with applicable federal, state and local laws and regulations ("**Requirements**"). Tenant and Landlord are direct or indirect wholly-owned subsidiaries of Philadelphia Academic Health Holdings, LLC, which operates as a single integrated healthcare delivery system.

9.2. No Violation of Law. Each party represents and warrants to the other party that it shall not knowingly violate any Requirements by entering into this Lease performing its obligations hereunder.

10. **Notices**. All notices hereunder shall be in writing, delivered personally, by certified or registered mail, return receipt requested, or by overnight courier, and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, postage prepaid, or deposited with the overnight courier addressed at the place identified on the signature page below.

11. **Negotiated Instrument**. This is a negotiated agreement between the parties hereto, and shall not be construed against any party as a result of his or her attorney having drafted this Lease. Both parties have had the opportunity to have their respective attorneys review this Lease and fully understand the terms of this Lease.

12. **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

13. **Severability**. If any provision of this Lease is held to be invalid or unenforceable for any reason, this Lease shall remain in full force and effect in accordance with its terms disregarding such unenforceable or invalid provision.

14. **Attorney's Fees**. If either party named herein brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, on trial or appeal, shall be entitled to its reasonable attorney's fees to be paid by the losing party. Each party represents and warrants to the other that it hired no real estate broker or agent who is due a fee in connection with the negotiation and execution of this Lease.

15. **Consents**. Except as otherwise expressly provided, wherever in this Lease the consent of one party is required to permit an act of the other party such consent shall not be unreasonably delayed, conditioned or withheld.

16. **Tenant's Right to Audit Operating Expenses**. Not more than once during any Lease year, Tenant shall have the right to audit Landlord's books and records with respect to Operating Expenses. If such audit correctly reveals that for any calendar year the Rent paid by

Tenant on account of Operating Expenses exceeded the sum which Tenant should have paid, Landlord shall credit such excess payments against Tenant's next monthly payment of Rent due in accordance with the terms of this Lease, or, if this Lease has terminated or if the amount of such credit is greater than such next month's installment of Rent, Landlord shall refund the overpayment to Tenant within thirty (30) days to Tenant's notice address or such other place as Tenant may designate in writing to Landlord. In addition, if such audit correctly reveals that for such calendar year the Rent paid by Tenant on account of Operating Expenses exceeded by more than four percent (4%) of the sum which Tenant should have paid, Landlord shall promptly pay Tenant of the cost of such audit upon presentation of such accounting agency's invoice therefor; provided, however, that if Landlord knowingly submits to Tenant materially incorrect invoices for Operating Expenses which are in excess of the sums Tenant should have paid on account thereof, Landlord shall promptly pay Tenant for the cost of such audit upon presentation of such accounting agency's invoice therefor.

[Signatures Next Page]

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

**LANDLORD:**

Broad Street Healthcare Properties, LLC, a Delaware limited liability company

By: _____
Name:  Joel Freedman
Title:   Chief Executive Officer and President

Address for Notice:
222 N. Sepulveda Boulevard, Suite 900
El Segunda, CA  90245

Signature Page –PropCo Opco Affiliate Lease – HUH - Hospital/Equipment

**TENANT:**

Center City Healthcare, LLC, a Delaware limited liability company

By: _____
Name: Joel Freedman and President
Title: Chief Executive Officer

Address for Notice:
222 N. Sepulveda Boulevard, Suite 900
El Segunda, CA  90245

Signature Page –PropCo Opco Affiliate Lease – HUH - Hospital/Equipment

# EXHIBIT A

# DESCRIPTION OF THE LAND

**North/South Towers**:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF VINE STREET (ON CITY PLAN, LEGALLY OPEN, VARIABLE WIDTH) WHERE IT INTERSECTS WITH THE WESTERLY SIDE OF BROAD STREET (ON CITY PLAN, LEGALLY OPEN, 113' WIDE) AND RUNNING:

1) THENCE: ALONG SAID WESTERLY SIDE OF BROAD STREET, S11°21'00"W, A DISTANCE OF 257.406' TO A POINT COMMON TO PARCEL C;

2) THENCE: ALONG PARCEL C, N78°59'00"W, A DISTANCE OF 121.833' TO A POINT;

3) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 94.348' TO A POINT;

4) THENCE: CONTINUING ALONG SAME, N78°39'00"W, A DISTANCE OF 32.915' TO A POINT;

5) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 42.110' TO A POINT;

6) THENCE: CONTINUING ALONG SAME, N78°39'00"W, A DISTANCE OF 46.670' TO A POINT;

7) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 1.740' TO A POINT COMMON TO THE EASTERLY LINE OF PARCEL B;

8) THENCE: ALONG THE NORTHERLY LINE OF PARCEL B, N78°39'00"W, A DISTANCE OF 20.198' TO A POINT;

9) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 122.199' TO A POINT ON THE SOUTHERLY SIDE OF VINE STREET;

10) THENCE: ALONG THE SOUTHERLY SIDE OF VINE STREET, S78°59'00"E, A DISTANCE OF 27.619' TO A POINT;

11) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 0.094' TO A POINT;

12) THENCE: CONTINUING ALONG THE SOUTHERLY SIDE OF VINE STREET, S78°59'00"E, A DISTANCE OF 194.00' TO THE POINT AND PLACE OF BEGINNING.

Containing 44,820.55 s.f. / 1.02894 acres of land, more or less.

**Services Enclosure**:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL – PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY SIDE OF NORTH 15TH STREET, (ON CITY PLAN, LEGALLY OPEN, 70' WIDE), SAID POINT BEING LOCATED N 11°21'00" E, A DISTANCE OF 167.831' FROM THE INTERSECTION OF SAID EASTERLY SIDE OF NORTH 15TH STREET AND THE NORTHERLY SIDE OF RACE STREET, (ON CITY PLAN, LEGALLY OPEN, 50' WIDE) AND RUNNING;

1) THENCE ALONG SAID EASTERLY SIDE OF NORTH 15TH STREET, LOCATED N 11°21'00" E, A DISTANCE OF 32.841' TO A POINT;
2) THENCE: LEAVING SAID EASTERLY SIDE OF 15th STREET AND ALONG THE SOUTHERLY LINE OF PARCEL B, S78°59'00"E, A DISTANCE OF 65.000' TO A POINT COMMON CORNER TO PARCEL E;
3) THENCE: ALONG THE PARCEL E, S11°21'00"W, A DISTANCE OF 14.659' TO A POINT;
4) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 25.578' TO A POINT;
5) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 13.296' TO A POINT;
6) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 8.528' TO A POINT;
7) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 4.886' TO A POINT;
8) THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 30.894' TO THE POINT AND PLACE OF BEGINNING.

Containing 1,627.92 s.f. / 0.03737 acres of land, more or less.