**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 18-12394 (CSS) |
| HAHNEMAN UNIVERSAL HOSPITAL, *et* | ) |
| *al*.,[1] | Jointly Administered |
| Debtors. | |

**DECLARATION OF LINDSEY B. SANDS, ESQ. IN FURTHER SUPPORT OF
VICINITY'S MOTION TO <u>ENFORCE 2019 STIPULATION AS THIRD PARTY
BENEFICIARY</u>**

LINDSEY B. SANDS, ESQ., of full age, under penalty of perjury and pursuant to 28

U.S.C. § 1746, by way of declaration, states as follows:

1.      I am an attorney at law admitted to practice in the Commonwealth of

Massachusetts and am Associate General Counsel of Vicinity Energy, , parent of Vicinity

Energy Philadelphia, Inc. ("<u>Vicinity</u>").  I submit this declaration (the "<u>Declaration</u>") in

connection with, and in support of, *Vicinity's Motion to Enforce 2019 Stipulation as Third Party

Beneficiary* (the "<u>Motion</u>"). [2]

2.      Feinstein MOB and Vicinity entered into two "Vicinity Energy Philadelphia, Inc.

Steam Service Agreement" dated February 13, 2020 for the premises at 1501 Race Street and for

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC 98395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617). SCHC Pediatrics Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), St. Chris Care at Northeast Pediatrics, L.L.C. (4065), TPS of PA, L.L.C. (4863), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used herein shall have the meaning ascribed in the Motion unless otherwise defined.

the premises at 230 Broad Street, each of which was effective as of November 15, 2019 (together, the "New Steam Agreement".)  A copy of the New Steam Agreement is attached hereto as **Exhibit A**.

3.      In an effort to resolve the dispute that is the subject of the Motion, on September 15, 2020, I forwarded a copy of the New Steam Agreement, the 2019 Invoice and the Stipulation to Feinstein MOB's counsel, Stuart Brown, Esq. of DLA Piper by email.  A copy of that email is attached hereto as **Exhibit B**.

4.      Under the applicable tariff,  discounts are generally only available for long-term agreements.  Had Feinstein MOB assumed the 2002 Steam Agreement or have entered into an agreement under Vicinity's Long-Term Rider, then a discount would be available, but Feinstein MOB was unwilling to do either.  Instead, it entered into a year-to-year agreement for which discounts are not available under the tariff.

5.      After the Debtors relinquished the steam service to Feinstein MOB under the Stipulation, Vicinity entered into the New Steam Agreement with Feinstein MOB and reissued the 2019 Invoice to eliminate the discount that was only available to the Debtors under the original Steam Agreement from 2002.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 20, 2021                                 s/ *Lindsey B. Sands*                                
                                                                        Lindsey B. Sands

2901388.1 099998-00014

EXHIBIT A

## VICINITY ENERGY PHILADELPHIA, INC.
## STEAM SERVICE AGREEMENT

This Steam Service Agreement (the "**Agreement**") is made as of February 13, 2020 (the "**Execution Date**"), by and between Vicinity Energy Philadelphia, Inc. (f/k/a Veolia Energy Philadelphia, Inc.) ("**Company**") and PAHH Feinstein MOB, LLC c/o HSRE-PAHH I, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606, ("**Customer**", and together with Company, the "**Parties**" and each a "**Party**") for the purchase of steam at 230 N. Broad Street, Philadelphia, Pennsylvania 19111 (the "**Premises**").

### 1.      *Term of Agreement*

This Agreement shall be for a term of one year from the November 15, 2019 (the "**Initial Term**").  The term of the Agreement will renew for terms of one year (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), until terminated by three (3) days' written notice by either Party.

### 2.      *Rate*

The Customer agrees to use and pay for steam services supplied hereunder in accordance with Rate S Steam Service and the tariff of the Company (Steam-PA P.U.C. No. 4, including all rules and regulations) on file with the Pennsylvania Public Utility Commission, and any applicable supplements thereto, or any tariffs issued to supersede said tariff, which may be filed thereafter (collectively, the "**Rate S Agreement**").  The Company at its sole discretion shall determine the applicability of any current or future riders ("**Riders**", and together with the Rate S Agreement, the "**Tariff**") that may apply to this Agreement.  Except as specifically set forth herein, the Company's steam service to Customer shall be governed by the Tariff.

### 3.      *Riders and Applicable Rates*

The Company has determined that no rider applies to this Agreement.

### 4.      *Demand*

The demand (as determined pursuant to the Rate S Agreement for this Agreement shall be 6,200 pounds of steam per hour.

### 5.      *Steam Purchases*

A.      During the Term of this Agreement, Customer will purchase all of its current and future Thermal Energy requirements exclusively from the Company so long as the Company is able to deliver sufficient steam to meet the Customer's Thermal Energy

requirements. The phrase "**Thermal Energy**" shall include but not be limited to [space heating, hot water, sterilization, process and humidification].

A.  Failure by Customer to use steam provided by the Company as the exclusive source of Thermal Energy for such end use shall be sufficient grounds for Company to terminate this Agreement, at its sole discretion.

## 6.  *Regularity of Supply.*

A.  The Company will use reasonable diligence  to provide a continuous, regular and uninterrupted supply of service; but, should the supply be interrupted by the Company for the purpose of making repairs, changes, or improvements, in any part of its system for the general good of the service or the safety of the public, or should the supply of service be interrupted, or fail, by reason of accident, strike, legal process, State or municipal interference, or any cause whatsoever, beyond its control (collectively, a "**Service Interruption**"), the Company shall not be liable for damages, direct or consequential resulting from such interruption or failure.

## 7.  *Special Provisions (if applicable)*

A.  Security Deposit

The Company acknowledges that Customer is depositing with the Company a security deposit (the "**Security Deposit**") in the amount of $300,000.00 (same deposit as for this contract and the contract for 1501 Race Street Philadelphia PA 19102) as follows: (i) $100,000 shall be paid as of February 14, 2020; (ii) $100,000 shall be paid with all other  amounts due under the invoice for services rendered in February 2020 and (iii) the remaining $100,000 shall be paid with all other amounts due under the invoice for services rendered in March 2020.  The Security Deposit will be held in an account at Company's Bank in Company's name and shall earn 6% simple interest annually.  If Customer fails to provide any portion of the Security Deposit set forth herein or otherwise fails to make timely payment of amounts due under this Agreement, Company shall have the option to either (i) immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law, or (ii) require Customer to post an additional $300,000 security deposit or a letter of credit, in a form and by a bank approved by Company, in the amount of $300,000.  For the avoidance of doubt, if Company requires additional security under (ii), and Customer fails to post such additional security, Company may immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law.

If Customer fails to pay any bill for service under this Agreement and/or under the 1501 Race Street Agreement within fifteen (15) days of submission, Company may

2

apply the Security Deposit to the Customer's account in satisfaction of the delinquent bill. Customer shall then remit to Company, within thirty (30) days of such draw down of the Security Deposit, an amount sufficient to return the Security Deposit to its original sum (or such increased sum as may be required above).

Customer may request a return of its Security Deposit with interest, to Customer within one year from the Execution Date, provided Customer has established credit satisfactory to Company in its sole discretion.

B.    Late Invoices

Customer hereby acknowledges that it has received the following invoices: (i) an invoice in the amount of $665,350.58 due on February 7, 2020, for services rendered from December 9, 2019 through January 15, 2020 (the "February 7[th] Invoice") which invoice remains due and owing; and (ii) an invoice in the amount of $485,737,76 due on February 19, 2020 for services rendered from November 15, 2019 through December 9, 2019 (the "February 19[th] Invoice"). Upon the Execution Date, Customer shall pay the February 7th Invoice. Failure to pay the February 7th Invoice as of the Execution Date and/or the February 19th Invoice when due shall constitute a material breach of this Agreement entitling Company to terminate this Agreement and exercise all other rights and remedies under this Agreement or at equity or law.

**8.    *Confidentiality***

The Parties agree that neither Party will disclose to any third party the specific terms of this Agreement without the prior consent of the other Party. In the event of judicial or regulatory requirements to disclose the terms of this Agreement, the required Party will promptly notify the other Party and take appropriate measures to seek the confidential treatment of the information contained in this Agreement.

*9.    **Consequential Damages***

IT IS SPECIFICALLY AGREED AND UNDERSTOOD THAT NEITHER PARTY WILL BE RESPONSIBLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER (INCLUDING LOST PROFITS AND OPPORTUNITY COSTS) ARISING OUT OF THIS AGREEMENT OR ANYTHING DONE IN CONNECTION HEREWITH, INCLUDING BUT NOT LIMITED TO CUSTOMER'S FAILURE TO ACCEPT, OR COMPANY'S FAILURE TO DELIVER, THERMAL ENERGY AT ANY TIME.    THIS SECTION SHALL APPLY WHETHER ANY SUCH INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE IS

BASED ON A CLAIM BROUGHT OR MADE IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), UNDER ANY WARRANTY, OR OTHERWISE.

10. **Limitation of Liability**

TO THE FULLEST EXTENT PERMITTED BY LAW AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, COMPANY'S LIABILITY FOR PERFORMANCE OR NON-PERFORMANCE OF ANY OBLIGATION ARISING UNDER THE AGREEMENT (WHETHER ARISING UNDER BREACH OF CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY) SHALL NOT EXCEED THREE TIMES THE AMOUNT OF THE CUSTOMER'S AVERAGE MONTHLY PAYMENT UNDER THIS AGREEMENT, CUMULATIVELY FOR THE DURATION OF THE AGREEMENT, PROVIDED THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO ANY LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COMPANY OR COMPANY'S SUBCONTRACTORS, EMPLOYEES OR AGENTS IN BREACH OF COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT.

11. **Indemnity**

Customer hereby agrees to indemnify and hold Company harmless from any liability or damages for bodily injury, including death, property damages and pollution damages which may arise from Customer's acts or omissions in connection with the performance of its obligations under this Agreement.

12. **Warranties.**

There are no warranties which extend beyond those expressed in this Agreement. COMPANY DISCLAIMS, AND CUSTOMER WAIVES, ANY IMPLIED WARRANTIES OR WARRANTIES IMPOSED BY LAW, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CUSTOM AND USAGE.

13. **Unforeseen Circumstances or Force Majeure**

Neither Party shall be liable for its failure to perform its obligations under this Agreement if such failure is due to any Unforeseen Circumstances beyond its reasonable control or force majeure. However, this Section may not be used by either Party to avoid, delay or otherwise affect any payments due to the other Party. For purposes of this Agreement, "**Unforeseen Circumstances**" shall mean any event or condition which has an effect on the rights or

obligations of the parties under this Agreement, which is beyond the reasonable control of the Party relying thereon and constitutes a justification for a delay in or non-performance of action required by this Agreement, including but not limited to (i) an act of God, landslide, lightning, earthquake, tornado, fire, explosion, flood, failure to possess sufficient property rights, acts of the public enemy, war, blockade, terrorist acts, sabotage, insurrection, riot or civil disturbance, (ii) preliminary or final order of any local, province, administrative agency or governmental body of competent jurisdiction, (iii) any change in law, regulation, rule, requirement, interpretation or statute adopted, promulgated, issued or otherwise specifically modified or changed by any local, province or governmental body, and (iv) labor disputes, strikes, work slowdowns or work stoppages, but excluding labor disputes, strikes, work slowdowns or work stoppages by employees of Company.

### *14.      Governing Law and Dispute Resolution*

A. Governing Law.  This Agreement and the rights of the Parties shall be interpreted and determined in accordance with the laws of the Commonwealth of Pennsylvania.

B. Dispute Resolution.  Unless otherwise expressly provided for in this Agreement, the dispute resolution procedures of this Section 14.B. shall be the exclusive mechanism to resolve disputes arising under this Agreement.  The Parties agree to use their respective best efforts to resolve any dispute(s) that may arise regarding this Agreement.  Any dispute that arises under or with respect to this Agreement that cannot be resolved shall in the first instance be the subject of informal negotiations between the Parties involved in the dispute.  The dispute shall be considered to have arisen when one Party sends the other Party a written notice of dispute.  The period for informal negotiations shall be fourteen (14) days from receipt of the written notice of dispute unless such time period is modified by written agreement of the Parties.  In the event that the Parties cannot resolve a dispute by informal negotiations, the Parties agree to submit the dispute to mediation.  Within fourteen (14) days following the expiration of the time period for informal negotiations, the Parties shall propose and agree upon a neutral and otherwise qualified mediator.  In the event that the Parties fail to agree upon a mediator, the parties shall request that the American Arbitration Association, Philadelphia, Pennsylvania, appoint a mediator.  The period for mediation shall commence upon the appointment of the mediator and shall not exceed sixty (60) days, unless such time period is modified by written agreement of the Parties.  The decision to continue mediation shall be in the sole discretion of each Party involved in the dispute.  The Parties will bear their own costs of the mediation.  The mediator's fees shall be shared equally by all parties involved in the dispute.  In the event that the Parties cannot resolve a dispute by informal negotiations or mediation, sole venue for judicial enforcement shall be the courts of the Commonwealth of Pennsylvania.  Notwithstanding the foregoing, injunctive relief from such court may be sought without resorting to alternative dispute resolution to prevent irreparable harm that would be caused by a breach of this Agreement.

C. <u>Waiver of Jury Trial</u>. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

## *15.* *Representations and Warranties*

As a material inducement to entering into this Agreement, each Party, with respect to itself, hereby represents and warrants to the other Party as of the Execution Date as follows:

A. It is duly organized, validly existing and in good standing under the laws of the jurisdictions necessary to perform this Agreement;

B. Customer is wholly-owned, directly or indirectly, by NexCore Group LLC. The execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not violate any of the terms or conditions in its governing documents or any contract to which it is a party or any law, rule, regulation, order, writ, judgment, decree or other legal or regulatory determination applicable to it;

C. This Agreement constitutes a legal, valid and binding obligation of such Party enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws affecting creditor's rights generally, and with regard to equitable remedies, to the discretion of the court before which proceedings to obtain same may be pending;

D. There are no bankruptcy, insolvency, reorganization, receivership or other arrangement proceedings pending or being contemplated by it, or to its knowledge threatened against it; and

E. There are no suits, proceedings, judgments, rulings or orders by or before any court or any governmental authority that materially adversely affect its ability to perform this Agreement.

## **16.** *General*

A. Any and all notices provided by the Company or Customer shall be by certified mail, return receipt requested, or hand delivery addressed as follows:

If to Company:

Vicinity Energy Philadelphia, Inc.
2600 Christian Street
Philadelphia, PA 19146
Attention:  General Manager

With a copy to:

Vicinity North America
100 Federal St., 2nd Floor
Boston, MA 02110
Attention: General Counsel

If to Customer:

For notices:

PAHH Feinstein MOB, LLC
c/o HSRE-PAHH I, LLC
444 West Lake Street, Suite 2100
Chicago, IL 60606
EIN Number:  35-2607469

For invoices/billing:

PAHH Feinstein MOB, LLC
c/o HSRE-PAHH I, LLC
c/o NexCore Group
1550 Market Street
Denver, CO 80202

B. Nothing contained in this Agreement shall be deemed to create third party rights.

C. This Agreement may only be amended, modified or supplemented by an instrument in writing executed by duly authorized representatives of Company and Customer.

D. This Agreement, together with the Exhibits and any schedules and appendices attached thereto and hereto, constitute the entire agreement and understanding between Company and Customer with respect to the subject matter thereof and supersedes all prior agreements relating to the subject matter hereof, which are of no further force or effect.  The Exhibits, schedules, and appendices attached thereto and hereto are integral parts hereof and are made a part of the Agreement by reference.

7

E.  If any term, covenant or condition in the Agreement shall, to any extent, be invalid or unenforceable in any respect under applicable law, the remainder of the Agreement shall not be affected thereby, and each term, covenant or condition of the Agreement shall be valid and enforceable to the fullest extent permitted by applicable law and, if appropriate, such invalid or unenforceable provision shall be modified or replaced to give effect to the underlying intent of the Parties and to the intended economic benefits of the Parties.

F.  The Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

G.  The Agreement may be duly executed and delivered by a Party by execution and facsimile or electronic, "pdf" delivery of the signature page of a counterpart to the other Party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Execution Date by their respective duly authorized representatives as of the date first written above.

**VICINITY ENERGY PHILADELPHIA, INC.**                **PAHH FEINSTEIN MOB, LLC**

By: _____          By: _____

    Name: John C. Gibson                                  Name:

    Title: EVP & COO                                        Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date by their respective duly authorized representatives as of the date first written above.

**VEOLIA ENERGY PHILADELPHIA, INC.**          **[OWNERSHIP ENTITY]**

By: _____          By: _____

      [Name]                [Name]   Jay Jones

      [Title]                [Title]   VP Real Estate

      [Date]                [Date]   1.13.20

## VICINITY ENERGY PHILADELPHIA, INC.
## STEAM SERVICE AGREEMENT

This Steam Service Agreement (the "**Agreement**") is made as of February 13, 2020 (the "**Execution Date**"), by and between Vicinity Energy Philadelphia, Inc. (f/k/a Veolia Energy Philadelphia, Inc.) ("**Company**") and PAHH Feinstein MOB, LLC c/o HSRE-PAHH I, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606, ("**Customer**", and together with Company, the "**Parties**" and each a "**Party**") for the purchase of steam at 1501 Race Street, Philadelphia, Pennsylvania 19111 (the "**Premises**").

1. *Term of Agreement*

   This Agreement shall be for a term of one year from the November 15, 2019 (the "**Initial Term**"). The term of the Agreement will renew for terms of one year (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), until terminated by three (3) days' written notice by either Party.

2. *Rate*

   The Customer agrees to use and pay for steam services supplied hereunder in accordance with Rate S Steam Service and the tariff of the Company (Steam-PA P.U.C. No. 4, including all rules and regulations) on file with the Pennsylvania Public Utility Commission, and any applicable supplements thereto, or any tariffs issued to supersede said tariff, which may be filed thereafter (collectively, the "**Rate S Agreement**"). The Company at its sole discretion shall determine the applicability of any current or future riders ("**Riders**", and together with the Rate S Agreement, the "**Tariff**") that may apply to this Agreement. Except as specifically set forth herein, the Company's steam service to Customer shall be governed by the Tariff.

3. *Riders and Applicable Rates*

   The Company has determined that no rider applies to this Agreement.

4. *Demand*

   The demand (as determined pursuant to the Rate S Agreement for this Agreement shall be 2,080 pounds of steam per hour.

5. *Steam Purchases*

   A.   During the Term of this Agreement, Customer will purchase all of its current and future Thermal Energy requirements exclusively from the Company so long as the Company is able to deliver sufficient steam to meet the Customer's Thermal Energy

requirements. The phrase "**Thermal Energy**" shall include but not be limited to [space heating, hot water, sterilization, process and humidification].

A.     Failure by Customer to use steam provided by the Company as the exclusive source of Thermal Energy for such end use shall be sufficient grounds for Company to terminate this Agreement, at its sole discretion.

*6.*     *Regularity of Supply.*

A.     The Company will use reasonable diligence  to provide a continuous, regular and uninterrupted supply of service; but, should the supply be interrupted by the Company for the purpose of making repairs, changes, or improvements, in any part of its system for the general good of the service or the safety of the public, or should the supply of service be interrupted, or fail, by reason of accident, strike, legal process, State or municipal interference, or any cause whatsoever, beyond its control (collectively, a "**Service Interruption**"), the Company shall not be liable for damages, direct or consequential resulting from such interruption or failure.

*7.*     *Special Provisions (if applicable)*

A.     Security Deposit

The Company acknowledges that  Customer is depositing with the Company a security deposit (the "**Security Deposit**") in the amount of $300,000.00 (same deposit as for this contract and the contract for 230 N, Broad Street Philadelphia PA 19102) as follows: . (i) $100,000 shall be paid as of February 14, 2020; (ii) $100,000 shall be paid with all other  amounts due under the invoice for services rendered in February 2020 and (iii) the remaining $100,000 shall be paid with all other amounts due under the invoice for services rendered in March 2020.  The Security Deposit will be held in an account at Company's Bank in Company's name and shall earn 6% simple interest annually.  If Customer fails to provide any portion of the Security Deposit set forth herein or otherwise fails to make timely payment of amounts due under this Agreement, Company shall have the option to either (i) immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law, or (ii) require Customer to post an additional $300,000 security deposit or a letter of credit, in a form and by a bank approved by Company, in the amount of $300,000.  For the avoidance of doubt, if Company requires additional security under (ii), and Customer fails to post such additional security, Company may immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law.

If Customer fails to pay any bill for service under this Agreement and/or under the 230 N. Broad Street Agreement within fifteen (15) days of submission, Company

2

may apply the Security Deposit to the Customer's account in satisfaction of the delinquent bill. Customer shall then remit to Company, within thirty (30) days of such draw down of the Security Deposit,  an amount sufficient to return the Security Deposit to its original sum (or such increased sum as may be required above).

Customer may request a return of its Security Deposit with interest, to Customer within one year from the Execution Date, provided Customer has established credit satisfactory to Company in its sole discretion.

B.      Late Invoices

Customer hereby acknowledges that it has received the following invoices: (i) an invoice in the amount of $665,350.58 due on February 7, 2020, for services rendered from December 9, 2019 through January 15, 2020 (the "February 7th Invoice")  which invoice remains due and owing; and (ii) an invoice in the amount of $485,737,76 due on February 19, 2020 for services rendered from November 15, 2019 through December 9, 2019 (the "February 19th Invoice").  Upon the Execution Date, Customer shall pay the February 7th Invoice.  Failure to pay the February 7th Invoice as of the Execution Date and/or the February 19th Invoice when due shall constitute a material breach of this Agreement entitling Company to terminate this Agreement and exercise all other rights and remedies under this Agreement or at equity or law.

**8.      *Confidentiality***

The Parties agree that neither Party will disclose to any third party the specific terms of this Agreement without the prior consent of the other Party.  In the event of judicial or regulatory requirements to disclose the terms of this Agreement, the required Party will promptly notify the other Party and take appropriate measures to seek the confidential treatment of the information contained in this Agreement.

**9.      *Consequential Damages***

IT IS SPECIFICALLY AGREED AND UNDERSTOOD THAT NEITHER PARTY WILL BE RESPONSIBLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER (INCLUDING LOST PROFITS AND OPPORTUNITY COSTS) ARISING OUT OF THIS AGREEMENT OR ANYTHING DONE IN CONNECTION HEREWITH, INCLUDING BUT NOT LIMITED TO CUSTOMER'S FAILURE TO ACCEPT, OR COMPANY'S FAILURE TO DELIVER, THERMAL ENERGY AT ANY TIME.   THIS SECTION SHALL APPLY WHETHER ANY SUCH INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE IS

3

BASED ON A CLAIM BROUGHT OR MADE IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), UNDER ANY WARRANTY, OR OTHERWISE.

**10.**        *Limitation of Liability*

TO THE FULLEST EXTENT PERMITTED BY LAW AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, COMPANY'S LIABILITY FOR PERFORMANCE OR NON-PERFORMANCE OF ANY OBLIGATION ARISING UNDER THE AGREEMENT (WHETHER ARISING UNDER BREACH OF CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY) SHALL NOT EXCEED THREE TIMES THE AMOUNT OF THE CUSTOMER'S AVERAGE MONTHLY PAYMENT UNDER THIS AGREEMENT, CUMULATIVELY FOR THE DURATION OF THE AGREEMENT, PROVIDED THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO ANY LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COMPANY OR COMPANY'S SUBCONTRACTORS, EMPLOYEES OR AGENTS IN BREACH OF COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT.

**11.**        *Indemnity*

Customer hereby agrees to indemnify and hold Company harmless from any liability or damages for bodily injury, including death, property damages and pollution damages which may arise from Customer's acts or omissions in connection with the performance of its obligations under this Agreement.

**12.**        *Warranties.*

There are no warranties which extend beyond those expressed in this Agreement. COMPANY DISCLAIMS, AND CUSTOMER WAIVES, ANY IMPLIED WARRANTIES OR WARRANTIES IMPOSED BY LAW, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CUSTOM AND USAGE.

**13.**        *Unforeseen Circumstances or Force Majeure*

Neither Party shall be liable for its failure to perform its obligations under this Agreement if such failure is due to any Unforeseen Circumstances beyond its reasonable control or force majeure. However, this Section may not be used by either Party to avoid, delay or otherwise affect any payments due to the other Party.  For purposes of this Agreement, "**Unforeseen Circumstances**" shall mean any event or condition which has an effect on the rights or

obligations of the parties under this Agreement, which is beyond the reasonable control of the Party relying thereon and constitutes a justification for a delay in or non-performance of action required by this Agreement, including but not limited to (i) an act of God, landslide, lightning, earthquake, tornado, fire, explosion, flood, failure to possess sufficient property rights, acts of the public enemy, war, blockade, terrorist acts, sabotage, insurrection, riot or civil disturbance, (ii) preliminary or final order of any local, province, administrative agency or governmental body of competent jurisdiction, (iii) any change in law, regulation, rule, requirement, interpretation or statute adopted, promulgated, issued or otherwise specifically modified or changed by any local, province or governmental body, and (iv) labor disputes, strikes, work slowdowns or work stoppages, but excluding labor disputes, strikes, work slowdowns or work stoppages by employees of Company.

### *14.*     *Governing Law and Dispute Resolution*

A. Governing Law. This Agreement and the rights of the Parties shall be interpreted and determined in accordance with the laws of the Commonwealth of Pennsylvania.

B. Dispute Resolution. Unless otherwise expressly provided for in this Agreement, the dispute resolution procedures of this Section 14.B. shall be the exclusive mechanism to resolve disputes arising under this Agreement. The Parties agree to use their respective best efforts to resolve any dispute(s) that may arise regarding this Agreement. Any dispute that arises under or with respect to this Agreement that cannot be resolved shall in the first instance be the subject of informal negotiations between the Parties involved in the dispute. The dispute shall be considered to have arisen when one Party sends the other Party a written notice of dispute. The period for informal negotiations shall be fourteen (14) days from receipt of the written notice of dispute unless such time period is modified by written agreement of the Parties. In the event that the Parties cannot resolve a dispute by informal negotiations, the Parties agree to submit the dispute to mediation. Within fourteen (14) days following the expiration of the time period for informal negotiations, the Parties shall propose and agree upon a neutral and otherwise qualified mediator. In the event that the Parties fail to agree upon a mediator, the parties shall request that the American Arbitration Association, Philadelphia, Pennsylvania, appoint a mediator. The period for mediation shall commence upon the appointment of the mediator and shall not exceed sixty (60) days, unless such time period is modified by written agreement of the Parties. The decision to continue mediation shall be in the sole discretion of each Party involved in the dispute. The Parties will bear their own costs of the mediation. The mediator's fees shall be shared equally by all parties involved in the dispute. In the event that the Parties cannot resolve a dispute by informal negotiations or mediation, sole venue for judicial enforcement shall be the courts of the Commonwealth of Pennsylvania. Notwithstanding the foregoing, injunctive relief from such court may be sought without resorting to alternative dispute resolution to prevent irreparable harm that would be caused by a breach of this Agreement.

C. <u>Waiver of Jury Trial</u>.  EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

**15.** ***Representations and Warranties***

As a material inducement to entering into this Agreement, each Party, with respect to itself, hereby represents and warrants to the other Party as of the Execution Date as follows:

A. It is duly organized, validly existing and in good standing under the laws of the jurisdictions necessary to perform this Agreement;

B. Customer is wholly-owned, directly or indirectly, by NexCore Group LLC.  The execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not violate any of the terms or conditions in its governing documents or any contract to which it is a party or any law, rule, regulation, order, writ, judgment, decree or other legal or regulatory determination applicable to it;

C. This Agreement constitutes a legal, valid and binding obligation of such Party enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws affecting creditor's rights generally, and with regard to equitable remedies, to the discretion of the court before which proceedings to obtain same may be pending;

D. There are no bankruptcy, insolvency, reorganization, receivership or other arrangement proceedings pending or being contemplated by it, or to its knowledge threatened against it; and

E. There are no suits, proceedings, judgments, rulings or orders by or before any court or any governmental authority that materially adversely affect its ability to perform this Agreement.

**16.** ***General***

A. Any and all notices provided by the Company or Customer shall be by certified mail, return receipt requested, or hand delivery addressed as follows:

If to Company:

Vicinity Energy Philadelphia, Inc.
2600 Christian Street
Philadelphia, PA 19146
Attention:  General Manager

With a copy to:

Vicinity North America
100 Federal St., 2nd Floor
Boston, MA 02110
Attention: General Counsel

If to Customer:

For notices:

PAHH Feinstein MOB, LLC
c/o HSRE-PAHH I, LLC
444 West Lake Street, Suite 2100
Chicago, IL 60606
EIN Number:  35-2607469

For invoices/billing:

PAHH Feinstein MOB, LLC
c/o HSRE-PAHH I, LLC
c/o NexCore Group
1550 Market Street
Denver, CO 80202

B. Nothing contained in this Agreement shall be deemed to create third party rights.

C. This Agreement may only be amended, modified or supplemented by an instrument in writing executed by duly authorized representatives of Company and Customer.

D. This Agreement, together with the Exhibits and any schedules and appendices attached thereto and hereto, constitute the entire agreement and understanding between Company and Customer with respect to the subject matter thereof and supersedes all prior agreements relating to the subject matter hereof, which are of no further force or effect.  The Exhibits, schedules, and appendices attached thereto and hereto are integral parts hereof and are made a part of the Agreement by reference.

E. If any term, covenant or condition in the Agreement shall, to any extent, be invalid or unenforceable in any respect under applicable law, the remainder of the Agreement shall not be affected thereby, and each term, covenant or condition of the Agreement shall be valid and enforceable to the fullest extent permitted by applicable law and, if appropriate, such invalid or unenforceable provision shall be modified or replaced to give effect to the underlying intent of the Parties and to the intended economic benefits of the Parties.

F. The Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

G. The Agreement may be duly executed and delivered by a Party by execution and facsimile or electronic, "pdf" delivery of the signature page of a counterpart to the other Party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Execution Date by their respective duly authorized representatives as of the date first written above.

**VICINITY ENERGY PHILADELPHIA, INC.**          **PAHH FEINSTEIN MOB, LLC**


By: _____          By: _____
Name: John L. Gibson                              Name:
Title: EVP + COO                                        Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date by their respective duly authorized representatives as of the date first written above.

**VEOLIA ENERGY PHILADELPHIA, INC.**     **[OWNERSHIP ENTITY]**


By: _____      By: _____
      [Name]                                          [Name]  Jay Jones
      [Title]                                         [Title]  VP Real Estate
      [Date]                                          [Date]  1.13.20

EXHIBIT B

**From:** Sands, Lindsey B
**Sent:** Tuesday, September 15, 2020 9:10 AM
**To:** stuart.brown@dlapiper.com
**Subject:** FW: PAHH/Vicinity Steam Agreement

Hi Stuart,

I'm following-up on this payment.  For your reference, I've attached the stipulation (see para. 10), the invoice, and the Agreement (see Section 7B) that also incorporates paragraph 10 from the stipulation, i.e., the obligation to pay for service beginning November 15.  If you could please let us know what the hold up on payment of the attached invoice is, I'd really appreciate it.  We've been chasing this payment for months.

Thanks,
Lindsey

**From:** Brown, Stuart <stuart.brown@dlapiper.com>
**Sent:** Tuesday, September 1, 2020 10:22 AM
**To:** Sands, Lindsey B <lindsey.sands@vicinityenergy.us>
**Subject:** RE: PAHH/Vicinity Steam Agreement

Good morning.
I am the right person, but I need to refresh my file and recollection of the details in order for to have an efficient conversation.
I will be back to you soon.

Stuart

---

**From:** Sands, Lindsey B <lindsey.sands@vicinityenergy.us>
**Sent:** Tuesday, September 1, 2020 10:15 AM
**To:** Brown, Stuart <Stuart.Brown@us.dlapiper.com>
**Subject:** PAHH/Vicinity Steam Agreement

[EXTERNAL]

---

Hi Stuart,

Peter Wieck provided me with your email.  I understand you represent Nexcore/HSRE – PAHH/PAHH Feinstein MOB.  Vicinity Energy Philadelphia, Inc. entered into steam agreements with PAHH Feinstein MOB, LLC earlier this year for steam service to its buildings located at 230 N. Broad St. and 1501 Race St in Philadelphia.

Throughout the year we've been having some issues collecting payment.  I believe at this moment we are mostly current except for about $485,000 that is due for service rendered from November 15, 2019 through December 9, 2019.  Peter and my local team are not quite sure what the confusion is surrounding this payment, so I offered to reach out to you to see if we might be able to sort it out.

Assuming you are the right contact, please advise as to what documentation or other information you may need from us.  After you've had a moment to catch up, I'd be happy to schedule a call.  Hopefully we can resolve this quickly.

Thanks,
Lindsey

**Lindsey Sands**
Associate General Counsel

**Vicinity Energy**
Office  +1 857.557.7827
Mobile +1 617.360.1234
100 Franklin St., 2nd fl., Boston, MA 02110
lindsey.sands@vicinityenergy.us
www.vicinityenergy.us



The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) |
| | ) Jointly Administered |
| | ) |
| Debtors. | ) **Related to Docket Nos. 620, 719,  878, 987, 1051 and 1052** |

## ORDER APPROVING STIPULATION BETWEEN DEBTORS AND MASTER LANDLORDS REGARDING REJECTION OF LEASES AND ALLOWED ADMINISTRATIVE EXPENSE CLAIM

Upon consideration of the *Stipulation Between Debtors and Master Landlords Regarding Rejection of Leases and Allowed Administrative Expense Claim* (the "**Stipulation**")[2] attached hereto as **Exhibit 1;** and the Court having jurisdiction over the matters raised in the Stipulation pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Stipulation and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Stipulation having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Stipulation is in the best interest of the Debtors, their estates, creditors and all parties-in-interest, and that the legal and factual bases set forth in the Stipulation establish just cause for the relief granted

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Stipulation.

herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY

ORDERED THAT:

1.      The Stipulation is approved.

2.      The Debtors are authorized to take any and all actions necessary to effectuate the

Stipulation.

3.      The leases set forth on **Exhibit 2** hereto are hereby rejected, effective as of

November 15, 2019.

4.      All leases and subleases between and among the Debtors with respect to the

HSRE Properties, including, without limitation, those set forth on **Exhibit 3** attached hereto, are

hereby rejected, effective as of November 15, 2019.

5.      This Order shall not be a determination of whether any of the leases on **Exhibit 2**

or **Exhibit 3** are unexpired leases.

6.      To the extent that a counterparty to a lease on **Exhibit 2** chooses to file a proof of

claim relating to rejection damages, such proof of claim must be filed with the Court on or before

the later of (i) thirty (30) calendar days after service of this Order and (ii) the general deadline to

file claims in these Chapter 11 Cases, as determined by the Court by separate order.

7.      This Court shall retain jurisdiction over any and all matters arising from or related

to the implementation of this Order or the Stipulation.

8.      This Order is effective immediately upon entry.

**Dated: November 25th, 2019**
**Wilmington, Delaware**

36060279.14 11/22/2019

**KEVIN GROSS**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT 1

## Stipulation

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) |

## STIPULATION BETWEEN DEBTORS AND MASTER
## LANDLORDS REGARDING REJECTION OF LEASES,
## ALLOWED ADMINISTRATIVE EXPENSE CLAIM AND RELATED MATTERS

This Stipulation Between Debtors and Master Landlords Regarding Rejection of Leases, Allowed Administrative Expense Claim and Related Matters (the "**Stipulation**") is made and entered into as of the 22nd day of November, 2019 between and among the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") and PAHH Bellet MOB, LLC, PAHH Broad Street MOB, LLC, PAHH Feinstein MOB, LLC, PAHH New College, MOB, LLC, PAHH Wood Street Garage, LLC and PAHH Erie Street Garage, LLC (collectively, the "**Master Landlords**," and together with the Debtors, the "**Parties**"), by and through their respective duly authorized undersigned counsel.

## INTRODUCTION

**WHEREAS**, on June 30 and July 1, 2019 (collectively, the "**Petition Date**"), each Debtor commenced a case (the "**Chapter 11 Cases**") by filing a voluntary petition for relief

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**");

WHEREAS, the Debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Master Landlords own various medical office buildings and parking garages (referred to herein as the "**HSRE Properties**"), which are generally adjacent to Hahnemann University Hospital ("**HUH**"), except with respect to a garage (hereinafter, the "**Erie Street Garage**") located adjacent to the hospital operated by debtor St. Christopher's Healthcare, LLC ("**STC**");

WHEREAS, on or about January 11, 2018, STC entered into master leases (the "**Master Leases**") for the HSRE Properties with the Master Landlords;

WHEREAS, on August 30, 2019, the Debtors filed the *Fifth Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Unexpired Real Estate Leases* (the "**Rejection Motion**") [D.I. 620], which sought entry of an order authorizing the Debtors to reject, among other things, the Master Leases except for the Master Lease for the Erie Street Garage (the "**Erie Street Master Lease**");

WHEREAS, on September 13, 2019, the Master Landlords filed their *Limited Objection of Master Landlords to the Fifth Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Unexpired Real Estate Leases* [D.I. 719];

WHEREAS, on September 27, 2019, the Court entered the *Order Under 11 U.S.C. § 105, 363, 365, 503 and 507 (A) Approving Asset Purchase Agreement with STC Opco, LLC (B) Authorizing the Sale of Certain of Debtors' Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtors' Executory Contracts, and*

2

*(D) Granting Related Relief* [D.I. 795] that approved, among other things, the sale of certain assets of STC and certain other debtors (the "**SCHC Sale**");

**WHEREAS**, on October 18, 2019 the Master Landlords filed the *Motion of Master Landlords for Entry of an Order (A) Allowing Administrative Claims, and (B) Compelling Debtors (I) To Pay Postpetition Rent and Other Obligations under Master Leases and (II) to Coordinate with Master Landlords Regarding Rejection of the Master Leases and Surrender of the Premises* (the "**Master Landlords' Motion**") [D.I. 878];

**WHEREAS**, on November 12, 2019, the Debtors filed the *Debtors' Objection to Motion of Master Landlords for Entry of an Order (A) Allowing Administrative Claims, and (B) Compelling Debtors (I) To Pay Postpetition Rent and Other Obligations under Master Leases and (II) to Coordinate with Master Landlords Regarding Rejection of the Master Leases and Surrender of the Premises* [D.I. 987];

WHEREAS, on November 21, 2019, the Master Landlords filed a *Reply in Support of the Motion of Master Landlords for Entry of an Order (A) Allowing Administrative Claims, and (B) Compelling Debtors (I) to Pay Postpetition Rent and Other Obligations Under Master Lease and (II) to Coordinate with Master Landlords Regarding Rejection of Master Leases and Surrender of Premises* [D.I. 1051];

**WHEREAS**, the Parties have met and conferred and now seek to resolve the matters set forth in the Rejection Motion and the Master Landlords' Motion as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements contained herein, the Parties hereby agree, subject to Bankruptcy Court approval as set forth herein, as follows:

3

## STIPULATION

1.      Each of the Recitals set forth above is incorporated herein by reference.

2.      This Stipulation shall not become effective unless and until it is approved by order of the Bankruptcy Court on or before December 13, 2019.

3.      The Master Leases for which rejection is sought pursuant to the Rejection Motion shall be deemed rejected effective as of November 15, 2019 (the "**Rejection Date**"). For avoidance of doubt, the Erie Street Master Lease shall not be deemed rejected pursuant to this Stipulation.

4.      In resolution of the obligations of any Debtor to the Master Landlords under sections 365(d)(3) and 503(b) of the Bankruptcy Code, the Master Landlords shall be allowed an administrative expense claim in the amount of $2,600,000 (the "**Allowed Administrative Expense Claim**") for (i) obligations arising under the Master Leases (other than the Erie Street Master Lease) from the Petition Date through the Rejection Date; and (ii) obligations arising under the Erie Street Master Lease from the Petition Date through December 14, 2019.

5.      The Debtors shall pay the Allowed Administrative Expense Claim as follows:

     i.     $650,000 from the net proceeds of the SCHC Sale. For avoidance of doubt, "net proceeds" as used in the foregoing sentence means the proceeds of the SCHC Sale after payment of: (a) all obligations owed by any Debtor to MidCap Funding IV Trust ("**MidCap**"), (b) all investment banking fees owed to SSG Advisors, LLC relating to the SCHC Sale, (c) all customary attendant direct costs of the SCHC Sale and (d) $2,200,000 to Tenet Business Services Corporation/Conifer Revenue Cycle Solutions, LLC (hereinafter, collectively, "**Tenet/Conifer**")

4

pursuant to the terms of the settlement (the "**Tenet/Conifer Settlement**") for which approval is sought pursuant to the *Motion of the Debtors for Entry of an Order Approving Settlement Term Sheet Between the Debtors, Tenet Business Services Corporation, Tenet Healthcare Corporation, Conifer Health Solutions, LLC, Conifer Revenue Cycle Solutions, LLC and the Official Committee of Unsecured Creditors* (the "**Tenet/Conifer Settlement Motion**") [D.I. 1030].

ii. $1,950,000 as a subordinated super-priority administrative claim payable from the net proceeds payable to the Debtors, other than the Guarantee, of the sale of Auction Assets to be sold pursuant to the Centurion Engagement Agreement for which approval is sought by means of that certain *Motion of Debtors for Order (I) Authorizing Retention and Employment of Centurion Service Group, LLC, as Auctioneer, (II) Waiving Compliance With Certain Requirements of Local Rule 2016-2; and (III) Approving Sale and Liquidation of Certain Medical Equipment, Furniture and Inventory* [D.I. 923] (the "**Equipment Sale Motion**").  To the extent the Allowed Administrative Claim is not paid in full from such net proceeds, it shall be paid from the Rebates (defined below), with any remaining balance to be paid *pro rata* with all other unpaid administrative claims.  The Rebates shall be applied upon receipt as payment toward the Allowed Administrative Expense Claim (after application of all amounts paid with respect thereto).  If the Rebates are collected after the Allowed Administrative Expense Claim is paid in full, the Debtors shall retain the

proceeds of the Rebates.   The Debtors shall use commercially reasonable efforts promptly to collect the Rebates and the Master Landlords shall, upon reasonable request by the Debtors, provide any assistance required by the Debtors in connection with their efforts to collect the Rebates.   As used herein, the term "**Rebates**" shall mean amounts payable to the Debtors pursuant to an energy efficiency incentive rebate program sponsored by PECO Energy Company and related to the HSRE Properties. *Notwithstanding the foregoing or anything to the contrary set in this Stipulation including without limitation this paragraph 5(ii)*:

1.  no amount shall be paid to the Master Landlords unless and until all obligations of the Debtors to MidCap have been satisfied in full, and all claims and rights of MidCap pursuant to the *Final Order (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection; (IV) Granting Adequate Protection and Modifying the Automatic Stay* [D.I. 557] (the "**Final DIP Order**") are expressly preserved and shall be unaffected by this Stipulation;

2.  the superpriority administrative claim granted to the Master Landlords pursuant to paragraph 5(ii) of this Stipulation shall be subordinate to any superpriority administrative claims granted to Tenet/Conifer in the Tenet/Conifer Settlement, and nothing contained herein shall affect the terms of the Tenet/Conifer Settlement; and

6

3.   no other party, with the exception of MidCap (pursuant to the Final DIP Order) and Tenet/Conifer (pursuant to the Tenet/Conifer Settlement), shall have or be granted a lien on, and/or a superpriority administrative claim payable specifically from, the Auction Assets, the Rebates, and/or proceeds thereof.

iii.   As used herein, the terms "Guarantee", "Auction Assets", and "Centurion Engagement Agreement" shall have the meanings ascribed to them in the Equipment Sale Motion.

iv.   If and to the extent proceeds of the Auction Assets, other than the Guarantee, are paid to MidCap prior to the closing on the SCHC Sale, the amount payable to the Master Landlords from the net proceeds of the SCHC Sale shall be correspondingly increased and applied to the Allowed Administrative Expense Claim.  For the avoidance of doubt, nothing in this provision shall be construed to increase the amount of the Allowed Administrative Expense Claim.

6.   [intentionally omitted]

7.   The Master Landlords shall provide the following to the Debtors at no charge:

a.   On or before January 31, 2020, the right to sell (in-place) and remove (subject to appropriate insurance and repairs to the premises) the Debtors' assets, including without limitation specifically identified and tagged radiological and other equipment, furniture and inventory, from the HSRE Properties.

b.   So long as the Debtors are not in default of the terms and conditions of this Stipulation, the Debtors may continue accessing and using on a non-exclusive basis the following spaces in the HSRE Properties through March 31, 2020 (the Debtors have and shall bear all, and the Master Landlords shall have no, responsibility for any medical records or property of the Debtors, including any security):

7

    i.   The portion of space in the basements of New College Building and the Bobst Building necessary for the Debtors' operations related to maintenance, IT, environmental services, and security.

    ii.   The loading dock at the Bobst Building and the freight elevator in the Bobst Building; and

    iii.   Mechanical closets, chases and equipment reasonably necessary for the Debtors' operations in the North and South Towers.

    iv.   On or prior to January 31, 2020, the Debtors shall have, at Debtors' expense:

        1.   removed all radioactive waste from the HSRE Properties, and shall provide to the Master Landlords a satisfactory Certificate of Clearance by a Radiological Contractor reasonably satisfactory to the Master Landlords, it being understood that the Debtors may remove radioactive waste through the HSRE Properties (e.g., through loading docks and/or other exits located in HSRE Properties);

        2.   As a condition to Debtors' continued access, Debtors shall:
           a.   Maintain adequate insurance;
           b.   not interfere with the activities of the Master Landlords or their sub-tenants or other business conducted on the premises;
           c.   not remove any property or systems of the Master Landlords; and
           d.   have access only during normal business hours.

8.     The Master Landlords shall retain the following without cost to the Master Landlords with respect to the Debtors' premises in the North and South Towers until such time of the effective date of Debtors' rejection of the leases for the North and South Towers, provided, however, such rights shall be in addition to, and nothing herein is intended to and shall not negatively impact, any party's rights under the Reciprocal Easement Agreement and similar rights of record encumbering such premises:

    i.   Access to, and continued operation by Drexel University, and/or contractor(s) employed by the Master Landlords through NexCore, of the PBX and IT Area located on the 19th floor of the South Tower, being

Rooms 1901 and 1902A, respectively, and the necessary hallways, stairs and elevators between those rooms and adjacent buildings or the outside. The Debtors shall continue to provide required cooling and electric services with respect to such Areas;

ii. Access to and continued operation of the space currently utilized by WorkNet and ARA in the South Tower (located on the 1st and 12th floors, respectively);

iii. Access to and continued use of the surface parking lot for patients and staff, as currently being provided outside the Feinstein and Bobst Buildings;

iv. Access to and continued use of mechanical closets, chases and equipment reasonably necessary for the Master Landlords', and any tenants' and subtenants', operations in the HSRE Properties.

v. Access to and continued operation of the underground parking garage underneath the School of Health Sciences and Humanities Building.

9. The Debtors will use their commercially reasonable best efforts to and cooperate with the Master Landlords in transitioning vendors, other service providers and utility services (where applicable) to the Master Landlords or their designee(s). The Debtors will use commercially reasonable efforts to provide copies of all available contracts, amendments, memos, purchase orders, invoices relating to the HSRE Properties for the period from January 2018 to present, bills of lading, warranties, service manuals and sub-leases, as amended, modified or restated, to the Master Landlords. The Debtors have designated Allen Wilen as their authorized and knowledgeable representative to interact with the Master Landlords with respect to all aspects of this Stipulation. The Debtors may designate another representative, upon written notice to the Master Landlords.

10. The Master Landlords shall commence payment of all utility service for the Center City campus comprising the land and improvements owned by Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC, Broad Street Healthcare Properties

9

III, LLC and the Master Landlords beginning for service after November 15, 2019.  The allocation for such utilities shall be as agreed by the Debtors and the Master Landlords and/or the Master Landlords' agent, in good faith.

11.    The Master Landlords shall be responsible for all further repairs and modifications to the steam vault located in the basement of NCB.

12.    The Master Landlords' objection to the Rejection Motion and the Master Landlords' Motion shall be deemed settled and resolved pursuant to the terms hereof.

13.    The Parties are authorized to take any and all actions necessary to effectuate this Stipulation.

14.    This Stipulation is the entire agreement between the Debtors and the Master Landlords with respect to the subject matter hereof.  This Stipulation supersedes any and all agreements, whether written or oral, that may have previously existed between the Parties with respect to the matters set forth herein.  No statements, promises, or representations have been made by any Party to any other, or relied upon, and no consideration has been offered, promised, expected or held out other than as expressly provided for herein.

15.    The Parties, by and through their undersigned counsel, each represent and warrant that the undersigned is fully authorized and empowered to execute and deliver this Stipulation on behalf of, and to bind, each Party, as applicable, to the terms and conditions of this Stipulation; provided, however, the Debtors' authorization is subject to Bankruptcy Court approval and this Stipulation shall become effective upon the order approving this Stipulation becoming a Final Order.

16.    Each of the Parties further acknowledges that it has been fully advised with respect to its rights and obligations under this Stipulation by counsel of its own choosing.  Each

36060279.14 11/22/2019

of the Parties has consulted with counsel of its own choosing and has had adequate opportunity to make whatever investigation or inquiry it deems necessary or desirable with respect to the subject matter and terms of this Stipulation.

17.     In the event of any ambiguity in this Stipulation, no inferences shall be drawn against any Party on the basis of authorship of this Stipulation.

18.     This Stipulation shall be binding and inure to the benefit of the Parties hereto, their successors and assigns, and including, as to the Debtors, any chapter 7 or chapter 11 trustee, plan administrator or estate representative.

19.     This Stipulation may be modified, amended, or supplemented by the Parties, in writing, and without further order of the Court, provided that any such modification, amendment, or supplement either is (a) not material or (b) not less favorable to the Debtors than the existing applicable provisions without further order of the Court.

20.     This Stipulation is a fully integrated agreement with each provision being fully integrated and dependent on each other provision and no provision of this Stipulation may held to be unenforceable without this entire Stipulation being held to be unenforceable and no provision may be "blue penciled" to render such provision enforceable.

21.     This Stipulation shall be governed by and construed in accordance with the Bankruptcy Code and, where not inconsistent, the laws of the State of Delaware, without regard to the conflict of laws' principles thereof.  This Stipulation shall be binding upon and inure to the benefit of the Parties and their respective successors, assignees, designees, agents, attorneys and representatives.

22.     This Stipulation may be executed in one or more counterparts, including by facsimile and/or electronic mail, each of which when so executed shall be deemed to be an original, and all of which, when taken together, shall constitute one and the same Stipulation.

23.     The Parties acknowledge and agree that the Court shall retain jurisdiction over all disputes concerning or related to the subject matter of this Stipulation.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the Parties by and through their duly authorized respective counsel hereby execute this Stipulation as of the date first written above, intending to be legally bound.

**SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Monique B. DiSabatino*
Mark Minuti (DE Bar No. 2659)
Monique Bair DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899-1266
Telephone: (302) 421-6800
Fax: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Aaron S. Applebaum (DE Bar No. 5587)
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Fax: (215) 972-7725
jeffrey.hampton@saul.com
adam.isenberg@saul.com
aaron.applebaum@saul.com

*Counsel for Debtors and Debtors in Possession*

**DLA PIPER (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE Bar No. 4050)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Stuart.Brown@dlapiper.com

-and-

Richard A. Chesley
444 West Lake Street, Suite 900
Chicago, IL 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Richard.Chesley@dlapiper.com

*Counsel to the Master Landlords*

36060279.14 11/22/2019

# EXHIBIT 2

## Rejected Leases

| No. | Non-Debtor Counterparty | Description | Debtor Party |
|---|---|---|---|
| 1 | Arthur Huppert, MD | Sublease for 231 N. Broad Street – Suite 101 | Center City Healthcare, LLC |
| 2 | Lyons-Chvala Nephrology Associates | Sublease – timeshare for suite 101 of 231 N. Broad Street | Center City Healthcare, LLC |
| 3 | New Cingular Wireless PCS | Sublease – roof space of New College Building | Center City Healthcare, LLC (d/b/a Hahnemann University Hospital) |
| 4 | The Dialysis Unit of Center City Philadelphia, LLC | Sublease – Suite 1200 of Bobst Building | Center City Healthcare, LLC |
| 5 | Drexel University | Sublease – assigned master lease from PAHH Bellet MOB, LLC | St. Christopher's Healthcare, LLC |
| 6 | Drexel University | Sublease – assigned master lease from PAHH Broad Street MOB, LLC | St. Christopher's Healthcare, LLC |
| 7 | Drexel University | Sublease – assigned master lease from PAHH Feinstein MOB, LLC | St. Christopher's Healthcare, LLC |
| 8 | Drexel University | Sublease – assigned master lease from PAHH New College MOB, LLC | St. Christopher's Healthcare, LLC |
| 9 | Drexel University | Sublease – New College Building – Suite 12317 | TPS IV of PA, L.L.C. |
| 10 | Drexel University | Sublease – New College Building – Suite 744 | TPS IV of PA, L.L.C. |
| 11 | Drexel University | Sublease – New College Building -  Suites 12316, 12318, 12320, 12322, 12324, 12326, and 12328 | TPS IV of PA, L.L.C. |
| 12 | Drexel University | Sublease – New College Building – Radiation Oncology Suite | Center City Healthcare, LLC |
| 13 | Drexel University | Sublease – New College Building – Radiation Oncology Suite | TPS IV of PA, L.L.C. |
| 14 | PAHH Bellet MOB, LLC | Master Lease for Bellet Building – 1501-1511 Race Street | St. Christopher's Healthcare, LLC |

36060279.14 11/22/2019

| No. | Non-Debtor Counterparty | Description | Debtor Party |
|-----|------------------------|-------------|--------------|
| 15 | PAHH Broad Street MOB, LLC | Master Lease for 231 N. Broad Street | St. Christopher's Healthcare, LLC |
| 16 | PAHH Feinstein MOB, LLC | Master Lease for Feinstein and Bobst Buildings – 216-220 North Broad Street | St. Christopher's Healthcare, LLC |
| 17 | PAHH New College MOB, LLC | Master Lease for New College Building – 225-251 North 15th Street | St. Christopher's Healthcare, LLC |
| 18 | PAHH Wood Street Garage MOB, LLC | Master Lease for Wood Street Garage  306-320 North Broad Street | St. Christopher's Healthcare, LLC |
| 19 | Respiratory Associates LTD | Sublease – timeshare for suite 101 of 231 N. Broad Street | Center City Healthcare, LLC |
| 20 | Urology Consultants of Southeastern PA | Sublease for 231 N. Broad Street (2nd Floor) | Center City Healthcare, LLC |
| 21 | U.S. Regional Occupational Health (Worknet) | Sublease – Bobst Building – Suites B131, B133, and B134 | Center City Healthcare, LLC |

2

# EXHIBIT 3

## Rejected Inter-Debtor Leases

| No. | Debtor Sublessor | Debtor Sublessee | Description |
|---|---|---|---|
| 1 | St. Christopher's Healthcare, LLC | Center City Healthcare, LLC | Sublease for Bellet Building |
| 2 | St. Christopher's Healthcare, LLC | Center City Healthcare, LLC | Sublease for Feinstein & Bobst buildings |
| 3 | St. Christopher's Healthcare, LLC | Center City Healthcare, LLC | Sublease for New College Building |
| 4 | St. Christopher's Healthcare, LLC | TPS of PA, L.L.C. | Sublease for Feinstein Building, 2nd Floor |
| 5 | St. Christopher's Healthcare, LLC | TPS of PA, L.L.C. | 231 North Broad Street, 3rd Floor |
| 6 | St. Christopher's Healthcare, LLC | TPS IV of PA, L.L.C. | Sublease for Feinstein Building – Radiology Oncology Suite |
| 7 | St. Christopher's Healthcare, LLC | TPS IV of PA, L.L.C. | Sublease for New College Building, 7th and 12th Floors |



Invoice #                    66962273578

| Account | Account Name | Bill Date | Due Date | Amount Due | Enclosed |
|---------|--------------|-----------|----------|------------|----------|
| 6698914753 | PAHH Feinstein MOB, LLC | 2/4/2020 | 2/19/2020 | $485,737.36 | |

PAHH Feinstein MOB, LLC
Suite 2100
44 West Lake Street
Chicago, IL 60606

**Remit to:**
VICINITY ENERGY PHILADELPHIA, INC
PO Box 5018
New York, NY 10087-5018

JP Morgan Chase - Lockbox Processing
Vicinity Energy Philadelphia Inc
PO Box 5018
4 Chase Metrotech Center
7th Floor East
Brooklyn, NY 11245

Please detach and enclose this top portion with payment. Make checks payable to: VICINITY ENERGY PHILADELPHIA, INC.

**Service Information**

| | | | |
|---|---|---|---|
| Rate Schedule | Rate S Steam Service | Consumption | 15,596.5 |
| Service Date | 11/15/2019  to 12/09/2019 | Demand  Billed | 46,500 |
| | | Demand Measured | 32,888 |
| | | Ratchet | 46,500 |

**Account Summary as of 02/04/2020**

PAHH Feinstein MOB, LLC

| | |
|---|---|
| Acccount | 6698914753 |
| Invoice | 66962273578 |

| | |
|---|---|
| Previous Balance | $0.00 |
| Payment Received | $0.00 |
| Balance Forward | $0.00 |
| Current Charges | $466,657.10 |
| Corrections to Prior Bills | |
| Adjustments | $0.00 |
| **Amount Due By 02/19/2020** | **$485,737.36** |

**Meter Readings**

| Loc# | Service Address | Description | Current | Previous | Diff | Const | Corr | Usage |
|------|-----------------|-------------|---------|----------|------|-------|------|-------|
| PH230NBrod | 230 N. Broad | | 104720111 | 89123566 | 15596545 | 0.001 | 1.0000 | 15,596.5 |

**Steam Charges**    **11/15/2019 - 12/09/2019**

| | |
|---|---|
| Fuel Charges -   15,596.5   MLB   at 14.04 per MLB | $218,974.86 |
| Non Fuel Charges - First 100 MLB at $9.402per MLB | $940.20 |
| Non Fuel Charges - over 100 MLB at $7.984per MLB - 15,496.5 MLBs at $7.984 per MLB | $123,724.06 |
| Demand Charges - First 300 LBs/Hr at $2.858 per LBs/ Hr - 300 Lbs/ Hr at $ 2.858 per Lbs/Hr | $857.40 |
| Demand Charges - Next 39,700 LBs/Hr at $1.926 per LBs/Hr - 39,700 Lbs/ Hr at $ 1.926 per Lbs/Hr | $76,462.20 |
| Demand Charges - Over 40,000 LBs/Hr at $1.695 per LBs/Hr - 6,500 Lbs/ Hr at $ 1.695 per Lbs/Hr | $11,017.50 |
| State Tax Adjustment Surcharge | $113.69 |
| Discount | $0.00 |
| Sales Tax | $34,567.19 |
| **TOTAL STEAM CHARGES** | **$   466,657.10** |

**Billing History**

| Month | Usage | Avg Dly Usage | Avg Temp | HDD | CDD | Billing Days |
|-------|-------|---------------|----------|-----|-----|--------------|
| 01/14/2020 | 23094.2 | 641.5 | 40.36 | 887.20 | 0.00 | 36 |
| 12/09/2019 | 15596.5 | 649.9 | 41.42 | 566.00 | 0.00 | 24 |

**Total Current Charges**                    $485,737.36



www.vicinityenergy.us

**Customer Service (215) 732-1411 Fax (215) 875-6910**
Page 1 of 3



### Service Information

| | | | |
|---|---|---|---|
| Rate Schedule | Rate S Steam Service | Consumption | 646.4 |
| Service Date | 11/15/2019 to 12/09/2019 | Demand Billed | 1,560 |
| | | Demand Measured | 1,162 |
| | | Ratchet | 1,046 |

### Billing History

| Month | Usage | Avg Dly Usage | Avg Temp | HDD | CDD | Billing Days |
|---|---|---|---|---|---|---|
| 01/14/2020 | 969.0 | 26.9 | 40.36 | 887.00 | 0.00 | 36 |
| 12/09/2019 | 646.4 | 26.9 | 41.42 | 566.00 | 0.00 | 24 |

### Meter Readings

| Loc# | Service Address | Description | Current | Previous | Diff | Const | Corr | Usage |
|---|---|---|---|---|---|---|---|---|
| PH1501Race | 1501 Race Street | | 26286368 | 25640004 | 646364 | 0.001 | 1.0000 | 646.4 |

### Steam Charges    11/15/2019 - 01/00/1900

| | |
|---|---|
| Fuel Charges -    646.4  MLB  at 14.04 per MLB | $9,075.46 |
| Non Fuel Charges - First 100 MLB at $9.402per MLB | $940.20 |
| Non Fuel Charges - over 100 MLB at $7.984per MLB - 546.4 MLBs at $7.984 per MLB | $4,362.46 |
| Demand Charges - First 300 LBs/Hr at $2.858 per LBs/Hr - 300 Lbs/ Hr at $ 2.858 per Lbs/Hr | $857.40 |
| Demand Charges - Next 39,700 LBs/Hr at $1.926 per Lbs/Hr - 1260 Lbs/ Hr at $ 1.926 per Lbs/Hr | $2,426.76 |
| | $0.00 |
| State Tax Adjustment Surcharge | $4.63 |
| Discount | $0.00 |
| Sales Tax | $1,413.35 |
| **TOTAL STEAM CHARGES** | **$   19,080.26** |





**Glossary of Terms**

HEATING DEGREE DAY (HDD) - A measure of how cold the period was with reference to a standard daily mean temperature of 65 degrees.  The number of HDDs is calculated by subtracting the average outside temperature from the standard.  (i.e. 45 degrees = 20 HDDs)  Total HDDs is the sum of the daily heating degree days in the billing period.

CONSUMPTION - The total Mlbs of steam used in the period.  An Mlb equals 1,000 pounds of steam.  Consumption is calculated by multiplying the difference in meter readings by the meter constant and a pressure correction factor.

MEASURED AND BILLED DEMAND - Demand is a measurement of the rate of steam used, in pounds per hour.  It may be viewed as a service charge for the amount of equipment the Company must have available in order to maintain steam pressure(s) throughout the system and satisfy the total demand of all customers.  Demand is charged from October 1st through May 31st, in accordance with the Company Steam Tariff, and is the highest of the following three values: 1) Actual measured demand - Load in pounds of steam per hour, occurring during the single hour of greatest use during the billing period  2) The Ratchet - 90% of the greatest recorded demand during the preceding seven heating season months or 3) Contracted minimum demand.

STATE TAX ADJUSTMENT SURCHARGE (STAS) - The Public Utility Commission (PUC) allows public utilities to collect from, or refund to, its customers, changes in certain taxes.  The STAS covers capital stock tax, public utility realty tax and state corporate net income tax.  It is calculated by multiplying the consumption and demand charges on your steam bill, adjusted for steam cost rate revenues (SCR), times the STAS rate. The STAS rate is subject to state-legislated changes in taxes imposed on public utilities and may change from time to time.

STEAM COST RATE (SCR) - The last annual change was approved by the PAPUC at Docket No. M-2019-3011217 on August 22, 2019, effective September 1, 2019, subject to monthly adjustment to reflect the actual cost of fuel of each prior month as provided in the Company's SCR Rider.

**Notes**

If you have any questions or complaints concerning this bill, please contact your account representative Daryl Landgraf, at , Ext.5807 prior to the indicated due date.

A rate schedule, an explanation of how to verify the accuracy of your bill, an explanation of various charges, if applicable, as well as the complete tariff, is available in our office at 2600 Christian Street, Philadelphia, PA for your inspection during our normal business day (Monday through Friday, 8:00 a.m. to 5:00 p.m.).  You may also file comments or complaints about your rates with the Pennsylvania Public Utility Commission.  You can send a letter or request for a formal complaint form addressed to the Pennsylvania Public Utility Commission, PO Box 3265, Harrisburg, PA 17105-3265.

All past due balances are subject to a 2% finance charge per month.

A copy of our tariff can be found on our website www.vicinityenergy.us.

If Customer sells, leases or otherwise transfers all or any portion of the Customer Premises governed under your Agreement, during the Term of your Agreement, the Agreement shall be assigned to such purchaser, lessee or transferee on the date of such sale, lease or transfer, and assumed by the same in writing in a form satisfactory to Company in its sole discretion.  If the Agreement is not assigned and assumed, then the Customer will be invoiced for steam usage until the agreement is assigned and assumed by purchaser, lessee or transferee . If Customer wishes that the steam service be terminated the Customer shall pay the Company the Termination Payment outlined in your agreement if any, which payment shall be due on the date of such sale, lease or transfer. Contact your Account Manager prior to sale closing for details




www.vicinityenergy.us

## VICINITY ENERGY PHILADELPHIA, INC.
## STEAM SERVICE AGREEMENT

This Steam Service Agreement (the "**Agreement**") is made as of February 13, 2020 (the "**Execution Date**"), by and between Vicinity Energy Philadelphia, Inc. (f/k/a Veolia Energy Philadelphia, Inc.) ("**Company**") and PAHH Feinstein MOB, LLC c/o HSRE-PAHH I, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606, ("**Customer**", and together with Company, the "**Parties**" and each a "**Party**") for the purchase of steam at 230 N. Broad Street, Philadelphia, Pennsylvania 19111 (the "**Premises**").

**1.**     *Term of Agreement*

This Agreement shall be for a term of one year from the November 15, 2019 (the "**Initial Term**").  The term of the Agreement will renew for terms of one year (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), until terminated by three (3) days' written notice by either Party.

**2.**     *Rate*

The Customer agrees to use and pay for steam services supplied hereunder in accordance with Rate S Steam Service and the tariff of the Company (Steam-PA P.U.C. No. 4, including all rules and regulations) on file with the Pennsylvania Public Utility Commission, and any applicable supplements thereto, or any tariffs issued to supersede said tariff, which may be filed thereafter (collectively, the "**Rate S Agreement**").  The Company at its sole discretion shall determine the applicability of any current or future riders ("**Riders**", and together with the Rate S Agreement, the "**Tariff**") that may apply to this Agreement.  Except as specifically set forth herein, the Company's steam service to Customer shall be governed by the Tariff.

**3.**     *Riders and Applicable Rates*

The Company has determined that no rider applies to this Agreement.

**4.**     *Demand*

The demand (as determined pursuant to the Rate S Agreement for this Agreement shall be 6,200 pounds of steam per hour.

**5.**     *Steam Purchases*

A.     During the Term of this Agreement, Customer will purchase all of its current and future Thermal Energy requirements exclusively from the Company so long as the Company is able to deliver sufficient steam to meet the Customer's Thermal Energy

1

requirements. The phrase "**Thermal Energy**" shall include but not be limited to [space heating, hot water, sterilization, process and humidification].

A.   Failure by Customer to use steam provided by the Company as the exclusive source of Thermal Energy for such end use shall be sufficient grounds for Company to terminate this Agreement, at its sole discretion.

## 6.   *Regularity of Supply.*

A.   The Company will use reasonable diligence  to provide a continuous, regular and uninterrupted supply of service; but, should the supply be interrupted by the Company for the purpose of making repairs, changes, or improvements, in any part of its system for the general good of the service or the safety of the public, or should the supply of service be interrupted, or fail, by reason of accident, strike, legal process, State or municipal interference, or any cause whatsoever, beyond its control (collectively, a "**Service Interruption**"), the Company shall not be liable for damages, direct or consequential resulting from such interruption or failure.

## 7.   *Special Provisions (if applicable)*

A.   Security Deposit

The Company acknowledges that Customer is depositing with the Company a security deposit (the "**Security Deposit**") in the amount of $300,000.00 (same deposit as for this contract and the contract for 1501 Race Street Philadelphia PA 19102) as follows: (i) $100,000 shall be paid as of February 14, 2020; (ii) $100,000 shall be paid with all other  amounts due under the invoice for services rendered in February 2020 and (iii) the remaining $100,000 shall be paid with all other amounts due under the invoice for services rendered in March 2020.  The Security Deposit will be held in an account at Company's Bank in Company's name and shall earn 6% simple interest annually.  If Customer fails to provide any portion of the Security Deposit set forth herein or otherwise fails to make timely payment of amounts due under this Agreement, Company shall have the option to either (i) immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law, or (ii) require Customer to post an additional $300,000 security deposit or a letter of credit, in a form and by a bank approved by Company, in the amount of $300,000.  For the avoidance of doubt, if Company requires additional security under (ii), and Customer fails to post such additional security, Company may immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law.

If Customer fails to pay any bill for service under this Agreement and/or under the 1501 Race Street Agreement within fifteen (15) days of submission, Company may

apply the Security Deposit to the Customer's account in satisfaction of the delinquent bill. Customer shall then remit to Company, within thirty (30) days of such draw down of the Security Deposit,  an amount sufficient to return the Security Deposit to its original sum (or such increased sum as may be required above).

Customer may request a return of its Security Deposit with interest, to Customer within one year from the Execution Date, provided Customer has established credit satisfactory to Company in its sole discretion.

B.      Late Invoices

Customer hereby acknowledges that it has received the following invoices: (i) an invoice in the amount of $665,350.58 due on February 7, 2020, for services rendered from December 9, 2019 through January 15, 2020 (the "February 7th Invoice")  which invoice remains due and owing; and (ii) an invoice in the amount of $485,737,76 due on February 19, 2020 for services rendered from November 15, 2019 through December 9, 2019 (the "February 19th Invoice").  Upon the Execution Date, Customer shall pay the February 7th Invoice.  Failure to pay the February 7th Invoice as of the Execution Date and/or the February 19th Invoice when due shall constitute a material breach of this Agreement entitling Company to terminate this Agreement and exercise all other rights and remedies under this Agreement or at equity or law.

**8.      *Confidentiality***

The Parties agree that neither Party will disclose to any third party the specific terms of this Agreement without the prior consent of the other Party.  In the event of judicial or regulatory requirements to disclose the terms of this Agreement, the required Party will promptly notify the other Party and take appropriate measures to seek the confidential treatment of the information contained in this Agreement.

*9.      **Consequential Damages***

IT IS SPECIFICALLY AGREED AND UNDERSTOOD THAT NEITHER PARTY WILL BE RESPONSIBLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER (INCLUDING LOST PROFITS AND OPPORTUNITY COSTS) ARISING OUT OF THIS AGREEMENT OR ANYTHING DONE IN CONNECTION HEREWITH, INCLUDING BUT NOT LIMITED TO CUSTOMER'S FAILURE TO ACCEPT, OR COMPANY'S FAILURE TO DELIVER, THERMAL ENERGY AT ANY TIME.   THIS SECTION SHALL APPLY WHETHER ANY SUCH INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE IS

BASED ON A CLAIM BROUGHT OR MADE IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), UNDER ANY WARRANTY, OR OTHERWISE.

10.      *Limitation of Liability*

TO THE FULLEST EXTENT PERMITTED BY LAW AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, COMPANY'S LIABILITY FOR PERFORMANCE OR NON-PERFORMANCE OF ANY OBLIGATION ARISING UNDER THE AGREEMENT (WHETHER ARISING UNDER BREACH OF CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY) SHALL NOT EXCEED THREE TIMES THE AMOUNT OF THE CUSTOMER'S AVERAGE MONTHLY PAYMENT UNDER THIS AGREEMENT, CUMULATIVELY FOR THE DURATION OF THE AGREEMENT, PROVIDED THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO ANY LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COMPANY OR COMPANY'S SUBCONTRACTORS, EMPLOYEES OR AGENTS IN BREACH OF COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT.

11.      *Indemnity*

Customer hereby agrees to indemnify and hold Company harmless from any liability or damages for bodily injury, including death, property damages and pollution damages which may arise from Customer's acts or omissions in connection with the performance of its obligations under this Agreement.

12.      *Warranties.*

There are no warranties which extend beyond those expressed in this Agreement. COMPANY DISCLAIMS, AND CUSTOMER WAIVES, ANY IMPLIED WARRANTIES OR WARRANTIES IMPOSED BY LAW, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CUSTOM AND USAGE.

13.      *Unforeseen Circumstances or Force Majeure*

Neither Party shall be liable for its failure to perform its obligations under this Agreement if such failure is due to any Unforeseen Circumstances beyond its reasonable control or force majeure. However, this Section may not be used by either Party to avoid, delay or otherwise affect any payments due to the other Party.  For purposes of this Agreement, "**Unforeseen Circumstances**" shall mean any event or condition which has an effect on the rights or

4

obligations of the parties under this Agreement, which is beyond the reasonable control of the Party relying thereon and constitutes a justification for a delay in or non-performance of action required by this Agreement, including but not limited to (i) an act of God, landslide, lightning, earthquake, tornado, fire, explosion, flood, failure to possess sufficient property rights, acts of the public enemy, war, blockade, terrorist acts, sabotage, insurrection, riot or civil disturbance, (ii) preliminary or final order of any local, province, administrative agency or governmental body of competent jurisdiction, (iii) any change in law, regulation, rule, requirement, interpretation or statute adopted, promulgated, issued or otherwise specifically modified or changed by any local, province or governmental body, and (iv) labor disputes, strikes, work slowdowns or work stoppages, but excluding labor disputes, strikes, work slowdowns or work stoppages by employees of Company.

### 14.    *Governing Law and Dispute Resolution*

A. Governing Law.  This Agreement and the rights of the Parties shall be interpreted and determined in accordance with the laws of the Commonwealth of Pennsylvania.

B. Dispute Resolution.  Unless otherwise expressly provided for in this Agreement, the dispute resolution procedures of this Section 14.B. shall be the exclusive mechanism to resolve disputes arising under this Agreement.  The Parties agree to use their respective best efforts to resolve any dispute(s) that may arise regarding this Agreement.  Any dispute that arises under or with respect to this Agreement that cannot be resolved shall in the first instance be the subject of informal negotiations between the Parties involved in the dispute.  The dispute shall be considered to have arisen when one Party sends the other Party a written notice of dispute.  The period for informal negotiations shall be fourteen (14) days from receipt of the written notice of dispute unless such time period is modified by written agreement of the Parties.  In the event that the Parties cannot resolve a dispute by informal negotiations, the Parties agree to submit the dispute to mediation.  Within fourteen (14) days following the expiration of the time period for informal negotiations, the Parties shall propose and agree upon a neutral and otherwise qualified mediator.  In the event that the Parties fail to agree upon a mediator, the parties shall request that the American Arbitration Association, Philadelphia, Pennsylvania, appoint a mediator.  The period for mediation shall commence upon the appointment of the mediator and shall not exceed sixty (60) days, unless such time period is modified by written agreement of the Parties.  The decision to continue mediation shall be in the sole discretion of each Party involved in the dispute.  The Parties will bear their own costs of the mediation.  The mediator's fees shall be shared equally by all parties involved in the dispute.  In the event that the Parties cannot resolve a dispute by informal negotiations or mediation, sole venue for judicial enforcement shall be the courts of the Commonwealth of Pennsylvania.  Notwithstanding the foregoing, injunctive relief from such court may be sought without resorting to alternative dispute resolution to prevent irreparable harm that would be caused by a breach of this Agreement.

C. <u>Waiver of Jury Trial</u>. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

### *15.* *Representations and Warranties*

As a material inducement to entering into this Agreement, each Party, with respect to itself, hereby represents and warrants to the other Party as of the Execution Date as follows:

A. It is duly organized, validly existing and in good standing under the laws of the jurisdictions necessary to perform this Agreement;

B. Customer is wholly-owned, directly or indirectly, by NexCore Group LLC. The execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not violate any of the terms or conditions in its governing documents or any contract to which it is a party or any law, rule, regulation, order, writ, judgment, decree or other legal or regulatory determination applicable to it;

C. This Agreement constitutes a legal, valid and binding obligation of such Party enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws affecting creditor's rights generally, and with regard to equitable remedies, to the discretion of the court before which proceedings to obtain same may be pending;

D. There are no bankruptcy, insolvency, reorganization, receivership or other arrangement proceedings pending or being contemplated by it, or to its knowledge threatened against it; and

E. There are no suits, proceedings, judgments, rulings or orders by or before any court or any governmental authority that materially adversely affect its ability to perform this Agreement.

### **16.** *General*

A. Any and all notices provided by the Company or Customer shall be by certified mail, return receipt requested, or hand delivery addressed as follows:

If to Company:

Vicinity Energy Philadelphia, Inc.
2600 Christian Street
Philadelphia, PA 19146
Attention:  General Manager

With a copy to:

Vicinity North America
100 Federal St., 2nd Floor
Boston, MA 02110
Attention: General Counsel

If to Customer:

For notices:

PAHH Feinstein MOB, LLC
c/o HSRE-PAHH I, LLC
444 West Lake Street, Suite 2100
Chicago, IL 60606
EIN Number:  35-2607469

For invoices/billing:

PAHH Feinstein MOB, LLC
c/o HSRE-PAHH I, LLC
c/o NexCore Group
1550 Market Street
Denver, CO 80202

B.  Nothing contained in this Agreement shall be deemed to create third party rights.

C.  This Agreement may only be amended, modified or supplemented by an instrument in writing executed by duly authorized representatives of Company and Customer.

D.  This Agreement, together with the Exhibits and any schedules and appendices attached thereto and hereto, constitute the entire agreement and understanding between Company and Customer with respect to the subject matter thereof and supersedes all prior agreements relating to the subject matter hereof, which are of no further force or effect.  The Exhibits, schedules, and appendices attached thereto and hereto are integral parts hereof and are made a part of the Agreement by reference.

7

E. If any term, covenant or condition in the Agreement shall, to any extent, be invalid or unenforceable in any respect under applicable law, the remainder of the Agreement shall not be affected thereby, and each term, covenant or condition of the Agreement shall be valid and enforceable to the fullest extent permitted by applicable law and, if appropriate, such invalid or unenforceable provision shall be modified or replaced to give effect to the underlying intent of the Parties and to the intended economic benefits of the Parties.

F. The Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

G. The Agreement may be duly executed and delivered by a Party by execution and facsimile or electronic, "pdf" delivery of the signature page of a counterpart to the other Party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Execution Date by their respective duly authorized representatives as of the date first written above.

**VICINITY ENERGY PHILADELPHIA, INC.**          **PAHH FEINSTEIN MOB, LLC**

By: _____          By: _____
    Name: John C. Gibson                               Name:
    Title: EVP + COO                                  Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date by their respective duly authorized representatives as of the date first written above.

**VEOLIA ENERGY PHILADELPHIA, INC.**          **[OWNERSHIP ENTITY]**


By: _____          By: _____
    [Name]                                          [Name]  Jay Jones
    [Title]                                          [Title]  VP Real Estate
    [Date]                                          [Date]  1.13.20

## VICINITY ENERGY PHILADELPHIA, INC.
## STEAM SERVICE AGREEMENT

This Steam Service Agreement (the "**Agreement**") is made as of February 13, 2020 (the "**Execution Date**"), by and between Vicinity Energy Philadelphia, Inc. (f/k/a Veolia Energy Philadelphia, Inc.) ("**Company**") and PAHH Feinstein MOB, LLC c/o HSRE-PAHH I, LLC 444 West Lake Street, Suite 2100 Chicago, IL 60606, ("**Customer**", and together with Company, the "**Parties**" and each a "**Party**") for the purchase of steam at 1501 Race Street, Philadelphia, Pennsylvania 19111 (the "**Premises**").

**1.**     *Term of Agreement*

This Agreement shall be for a term of one year from the November 15, 2019 (the "**Initial Term**"). The term of the Agreement will renew for terms of one year (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), until terminated by three (3) days' written notice by either Party.

**2.**     *Rate*

The Customer agrees to use and pay for steam services supplied hereunder in accordance with Rate S Steam Service and the tariff of the Company (Steam-PA P.U.C. No. 4, including all rules and regulations) on file with the Pennsylvania Public Utility Commission, and any applicable supplements thereto, or any tariffs issued to supersede said tariff, which may be filed thereafter (collectively, the "**Rate S Agreement**"). The Company at its sole discretion shall determine the applicability of any current or future riders ("**Riders**", and together with the Rate S Agreement, the "**Tariff**") that may apply to this Agreement. Except as specifically set forth herein, the Company's steam service to Customer shall be governed by the Tariff.

**3.**     *Riders and Applicable Rates*

The Company has determined that no rider applies to this Agreement.

**4.**     *Demand*

The demand (as determined pursuant to the Rate S Agreement for this Agreement shall be 2,080 pounds of steam per hour.

**5.**     *Steam Purchases*

A.     During the Term of this Agreement, Customer will purchase all of its current and future Thermal Energy requirements exclusively from the Company so long as the Company is able to deliver sufficient steam to meet the Customer's Thermal Energy

1

requirements. The phrase "**Thermal Energy**" shall include but not be limited to [space heating, hot water, sterilization, process and humidification].

A.   Failure by Customer to use steam provided by the Company as the exclusive source of Thermal Energy for such end use shall be sufficient grounds for Company to terminate this Agreement, at its sole discretion.

**6.   *Regularity of Supply.***

A.   The Company will use reasonable diligence  to provide a continuous, regular and uninterrupted supply of service; but, should the supply be interrupted by the Company for the purpose of making repairs, changes, or improvements, in any part of its system for the general good of the service or the safety of the public, or should the supply of service be interrupted, or fail, by reason of accident, strike, legal process, State or municipal interference, or any cause whatsoever, beyond its control (collectively, a "**Service Interruption**"), the Company shall not be liable for damages, direct or consequential resulting from such interruption or failure.

**7.   *Special Provisions (if applicable)***

A.   Security Deposit

The Company acknowledges that  Customer is depositing with the Company a security deposit (the "**Security Deposit**") in the amount of $300,000.00 (same deposit as for this contract and the contract for 230 N, Broad Street Philadelphia PA 19102) as follows: . (i) $100,000 shall be paid as of February 14, 2020; (ii) $100,000 shall be paid with all other  amounts due under the invoice for services rendered in February 2020 and (iii) the remaining $100,000 shall be paid with all other amounts due under the invoice for services rendered in March 2020.  The Security Deposit will be held in an account at Company's Bank in Company's name and shall earn 6% simple interest annually.  If Customer fails to provide any portion of the Security Deposit set forth herein or otherwise fails to make timely payment of amounts due under this Agreement, Company shall have the option to either (i) immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law, or (ii) require Customer to post an additional $300,000 security deposit or a letter of credit, in a form and by a bank approved by Company, in the amount of $300,000.  For the avoidance of doubt, if Company requires additional security under (ii), and Customer fails to post such additional security, Company may immediately terminate this Agreement and exercise all other rights and remedies available under this Agreement or at equity or law.

If Customer fails to pay any bill for service under this Agreement and/or under the 230 N. Broad Street Agreement within fifteen (15) days of submission, Company

2

may apply the Security Deposit to the Customer's account in satisfaction of the delinquent bill. Customer shall then remit to Company, within thirty (30) days of such draw down of the Security Deposit,  an amount sufficient to return the Security Deposit to its original sum (or such increased sum as may be required above).

Customer may request a return of its Security Deposit with interest, to Customer within one year from the Execution  Date, provided Customer has established credit satisfactory to Company in its sole discretion.

B.    Late Invoices

Customer hereby acknowledges that it has received the following invoices: (i) an invoice in the amount of $665,350.58 due on February 7, 2020, for services rendered from December 9, 2019 through January 15, 2020 (the "February 7th Invoice")  which invoice remains due and owing; and (ii) an invoice in the amount of $485,737,76 due on February 19, 2020 for services rendered from November 15, 2019 through December 9, 2019 (the "February 19th Invoice").  Upon the Execution Date, Customer shall pay the February 7th Invoice.  Failure to pay the February 7th Invoice as of the Execution Date and/or the February 19th Invoice when due shall constitute a material breach of this Agreement entitling Company to terminate this Agreement and exercise all other rights and remedies under this Agreement or at equity or law.

**8.**      *Confidentiality*

The Parties agree that neither Party will disclose to any third party the specific terms of this Agreement without the prior consent of the other Party.  In the event of judicial or regulatory requirements to disclose the terms of this Agreement, the required Party will promptly notify the other Party and take appropriate measures to seek the confidential treatment of the information contained in this Agreement.

*9.*      *Consequential Damages*

IT IS SPECIFICALLY AGREED AND UNDERSTOOD THAT NEITHER PARTY WILL BE RESPONSIBLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER (INCLUDING LOST PROFITS AND OPPORTUNITY COSTS) ARISING OUT OF THIS AGREEMENT OR ANYTHING DONE IN CONNECTION HEREWITH, INCLUDING BUT NOT LIMITED TO CUSTOMER'S FAILURE TO ACCEPT, OR COMPANY'S FAILURE TO DELIVER, THERMAL ENERGY AT ANY TIME.   THIS SECTION SHALL APPLY WHETHER ANY SUCH INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE IS

BASED ON A CLAIM BROUGHT OR MADE IN CONTRACT, IN TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY), UNDER ANY WARRANTY, OR OTHERWISE.

10.     *Limitation of Liability*

TO THE FULLEST EXTENT PERMITTED BY LAW AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, COMPANY'S LIABILITY FOR PERFORMANCE OR NON-PERFORMANCE OF ANY OBLIGATION ARISING UNDER THE AGREEMENT (WHETHER ARISING UNDER BREACH OF CONTRACT, TORT, STRICT LIABILITY, OR ANY OTHER THEORY OF LAW OR EQUITY) SHALL NOT EXCEED THREE TIMES THE AMOUNT OF THE CUSTOMER'S AVERAGE MONTHLY PAYMENT UNDER THIS AGREEMENT, CUMULATIVELY FOR THE DURATION OF THE AGREEMENT, PROVIDED THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO ANY LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COMPANY OR COMPANY'S SUBCONTRACTORS, EMPLOYEES OR AGENTS IN BREACH OF COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT.

11.     *Indemnity*

Customer hereby agrees to indemnify and hold Company harmless from any liability or damages for bodily injury, including death, property damages and pollution damages which may arise from Customer's acts or omissions in connection with the performance of its obligations under this Agreement.

12.     *Warranties.*

There are no warranties which extend beyond those expressed in this Agreement. COMPANY DISCLAIMS, AND CUSTOMER WAIVES, ANY IMPLIED WARRANTIES OR WARRANTIES IMPOSED BY LAW, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CUSTOM AND USAGE.

13.     *Unforeseen Circumstances or Force Majeure*

Neither Party shall be liable for its failure to perform its obligations under this Agreement if such failure is due to any Unforeseen Circumstances beyond its reasonable control or force majeure. However, this Section may not be used by either Party to avoid, delay or otherwise affect any payments due to the other Party.  For purposes of this Agreement, "**Unforeseen Circumstances**" shall mean any event or condition which has an effect on the rights or

4

obligations of the parties under this Agreement, which is beyond the reasonable control of the Party relying thereon and constitutes a justification for a delay in or non-performance of action required by this Agreement, including but not limited to (i) an act of God, landslide, lightning, earthquake, tornado, fire, explosion, flood, failure to possess sufficient property rights, acts of the public enemy, war, blockade, terrorist acts, sabotage, insurrection, riot or civil disturbance, (ii) preliminary or final order of any local, province, administrative agency or governmental body of competent jurisdiction, (iii) any change in law, regulation, rule, requirement, interpretation or statute adopted, promulgated, issued or otherwise specifically modified or changed by any local, province or governmental body, and (iv) labor disputes, strikes, work slowdowns or work stoppages, but excluding labor disputes, strikes, work slowdowns or work stoppages by employees of Company.

## *14.*      *Governing Law and Dispute Resolution*

A. Governing Law. This Agreement and the rights of the Parties shall be interpreted and determined in accordance with the laws of the Commonwealth of Pennsylvania.

B. Dispute Resolution. Unless otherwise expressly provided for in this Agreement, the dispute resolution procedures of this Section 14.B. shall be the exclusive mechanism to resolve disputes arising under this Agreement. The Parties agree to use their respective best efforts to resolve any dispute(s) that may arise regarding this Agreement. Any dispute that arises under or with respect to this Agreement that cannot be resolved shall in the first instance be the subject of informal negotiations between the Parties involved in the dispute. The dispute shall be considered to have arisen when one Party sends the other Party a written notice of dispute. The period for informal negotiations shall be fourteen (14) days from receipt of the written notice of dispute unless such time period is modified by written agreement of the Parties. In the event that the Parties cannot resolve a dispute by informal negotiations, the Parties agree to submit the dispute to mediation. Within fourteen (14) days following the expiration of the time period for informal negotiations, the Parties shall propose and agree upon a neutral and otherwise qualified mediator. In the event that the Parties fail to agree upon a mediator, the parties shall request that the American Arbitration Association, Philadelphia, Pennsylvania, appoint a mediator. The period for mediation shall commence upon the appointment of the mediator and shall not exceed sixty (60) days, unless such time period is modified by written agreement of the Parties. The decision to continue mediation shall be in the sole discretion of each Party involved in the dispute. The Parties will bear their own costs of the mediation. The mediator's fees shall be shared equally by all parties involved in the dispute. In the event that the Parties cannot resolve a dispute by informal negotiations or mediation, sole venue for judicial enforcement shall be the courts of the Commonwealth of Pennsylvania. Notwithstanding the foregoing, injunctive relief from such court may be sought without resorting to alternative dispute resolution to prevent irreparable harm that would be caused by a breach of this Agreement.

C. <u>Waiver of Jury Trial</u>.  EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

**15.    *Representations and Warranties***

As a material inducement to entering into this Agreement, each Party, with respect to itself, hereby represents and warrants to the other Party as of the Execution Date as follows:

A. It is duly organized, validly existing and in good standing under the laws of the jurisdictions necessary to perform this Agreement;

B. Customer is wholly-owned, directly or indirectly, by NexCore Group LLC.  The execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not violate any of the terms or conditions in its governing documents or any contract to which it is a party or any law, rule, regulation, order, writ, judgment, decree or other legal or regulatory determination applicable to it;

C. This Agreement constitutes a legal, valid and binding obligation of such Party enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws affecting creditor's rights generally, and with regard to equitable remedies, to the discretion of the court before which proceedings to obtain same may be pending;

D. There are no bankruptcy, insolvency, reorganization, receivership or other arrangement proceedings pending or being contemplated by it, or to its knowledge threatened against it; and

E. There are no suits, proceedings, judgments, rulings or orders by or before any court or any governmental authority that materially adversely affect its ability to perform this Agreement.

**16.    *General***

A.    Any and all notices provided by the Company or Customer shall be by certified mail, return receipt requested, or hand delivery addressed as follows:

If to Company:

>           Vicinity Energy Philadelphia, Inc.
>           2600 Christian Street
>           Philadelphia, PA 19146
>           Attention:  General Manager

With a copy to:

>           Vicinity North America
>           100 Federal St., 2nd Floor
>           Boston, MA 02110
>           Attention: General Counsel

If to Customer:

>           For notices:

>           PAHH Feinstein MOB, LLC
>           c/o HSRE-PAHH I, LLC
>           444 West Lake Street, Suite 2100
>           Chicago, IL 60606
>           EIN Number:  35-2607469

>           For invoices/billing:

>           PAHH Feinstein MOB, LLC
>           c/o HSRE-PAHH I, LLC
>           c/o NexCore Group
>           1550 Market Street
>           Denver, CO 80202

B. Nothing contained in this Agreement shall be deemed to create third party rights.

C. This Agreement may only be amended, modified or supplemented by an instrument in writing executed by duly authorized representatives of Company and Customer.

D. This Agreement, together with the Exhibits and any schedules and appendices attached thereto and hereto, constitute the entire agreement and understanding between Company and Customer with respect to the subject matter thereof and supersedes all prior agreements relating to the subject matter hereof, which are of no further force or effect.  The Exhibits, schedules, and appendices attached thereto and hereto are integral parts hereof and are made a part of the Agreement by reference.

7

E.  If any term, covenant or condition in the Agreement shall, to any extent, be invalid or unenforceable in any respect under applicable law, the remainder of the Agreement shall not be affected thereby, and each term, covenant or condition of the Agreement shall be valid and enforceable to the fullest extent permitted by applicable law and, if appropriate, such invalid or unenforceable provision shall be modified or replaced to give effect to the underlying intent of the Parties and to the intended economic benefits of the Parties.

F.  The Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

G.  The Agreement may be duly executed and delivered by a Party by execution and facsimile or electronic, "pdf" delivery of the signature page of a counterpart to the other Party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Execution Date by their respective duly authorized representatives as of the date first written above.

**VICINITY ENERGY PHILADELPHIA, INC.**          **PAHH FEINSTEIN MOB, LLC**

By: _____          By: _____
Name: John C. Gibson                              Name:
Title: EVP & COO                                  Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date by their respective duly authorized representatives as of the date first written above.

**VEOLIA ENERGY PHILADELPHIA, INC.**          **[OWNERSHIP ENTITY]**

By: _____          By: _____
       [Name]                                                      [Name]  Jay Jones
       [Title]                                                       [Title]  VP Real Estate
       [Date]                                                      [Date]  1.13.20