UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | . | Chapter 11 |
| IN RE: | . | |
| | . | Case No. 19-11466(MFW) |
| CENTER CITY HEALTHCARE, LLC | . | |
| d/b/a HAHNEMANN UNIVERSITY | . | Courtroom 7 |
| HOSPITAL, ET AL., | . | 824 North Market Street |
| | . | Wilmington, Deleware 19801 |
| | . | |
| Debtors. | . | Friday, November 19, 2021 |
| . . . . . . . . . . . . . . . . | . | 10:46 a.m. |

TRANSCRIPT OF HEARING RE: CONTINUED MOTIONS HEARING

BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | Mark Minuti, Esq.<br>Monique DiSabitino, Esq.<br>SAUL EWING ARNSTEIN & LEHR, LLP |
| For the Official Committee<br>of Unsecured Creditors: | Andrew H. Sherman, Esq.<br>FOX ROTHSCHILD, LLP |
| For Front Street Healthcare<br>Properties, LLC: | Robert J. Malionek, Esq.<br>LATHAM & WATKINS, LLP |
| For Harrison Street Real<br>Estate, LLC, and its<br>Affiliates: | Stuart M. Brown, Esq.<br>DLA PIPER, LLP (US) |
| Audio Operator: | Electronically Recorded<br>By Lesa Neal, ECRO |
| Transcription Company: | Reliable<br>1007 N. Orange Street<br>Wilmington, Delaware 19801<br>(302)654-8080<br>Email: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

INDEX

                                                    PAGE

Debtors' Ninth Omnibus Objection
    Argument by Ms. DiSabitino                        3

Debtors' and Committee's Motion to Compel and
Mr. Freedman's Motion to Lift Automatic Stay
    Argument by Mr. Minuti                            6
    Argument by Mr. Sherman                          25
    Argument by Mr. Malionek                         26
    Argument by Mr. Brown                            36
    Further argument by Mr. Malionek                 39
    Further argument by Mr. Minuti                   39
    Further argument by Mr. Malionek                 46

Judge's Ruling                                       47

1          (Proceedings commenced at 10:45 a.m.)

2          THE COURT:  All right.  Good morning.  This is Judge

3 Walrath.  I hope we have solved the problem.  We're here in the

4 Center City Healthcare matter, and I'll turn it over to counsel

5 for the Debtor, who I hope will not be echoing.

6          MR. MINUTI:  Good morning, Your Honor.  Mark Minuti

7 from Saul Ewing Arnstein & Lehr.  I don't hear an echo so I

8 hope we're -- I hope we're in business.

9          Your Honor, there are 17 matters listed on today's

10 agenda.  The good news is only three matters are going forward

11 today.  The first matter going forward is Item Number 13, that

12 is the Debtors' 9th Omnibus objection to claims.  We did file a

13 certificate of no objection, or certificate of counsel with

14 respect to that, but the fact that the order hasn't hit the

15 docket suggests to me that the Court may have a question or

16 two, so for that I'll turn it over to my colleague and partner,

17 Ms. DiSabitino.

18    (Skip in audio 10:46:46 to 10:47:33)

19          MS. DiSABITINO:   -- at Docket Number 3013.  The

20 objection is supported by the declaration of Allen Wilen, our

21 Chief Restructuring Officer, who is present at today's hearing.

22          With respect to the claims in the objection, Your

23 Honor, before me included then in the objection we refute the

24 claims in comparison to the Debtors' books and records and in

25 certain relevant instances we reached out to the Claimants in

1 an effort to discuss the claims and hopefully resolve them or

2 otherwise avoid the need for an objection.  Ultimately we

3 determined that they should be disallowed or modified either

4 because they were filed after our general bar date of August 5,

5 2020 and not accompanied by any motion or other correspondence

6 that would provide a reasonable basis for the late filing,

7 others are duplicates of other claims by the same Claimants

8 against the same Debtors in the same amounts.  We have a group

9 of amended claims, a group of claims that lacked sufficient

10 documentation to establish their prima facie validity, as well

11 as a group of claims that were asserted against the wrong

12 Debtor based on documentation attached to those claims.

13       With respect to the insufficient documentation claims

14 in particular, there was a longer lead up to including those

15 claims in the objection.  We try and do our diligence before

16 putting those claims in the objection, particularly because all

17 those happen to be claims by individuals.  So for each of those

18 we've tried -- you know, first we would look to the Debtors'

19 books and records to see if there was any information about the

20 claims in the Debtors' records that would let us know what they

21 were about, and then we would also reach out to the Claimants

22 in an effort to get some information.

23       We had varying success with those efforts.  Some

24 people got back to us, some people didn't, Your Honor.  But

25 ultimately, you know, where we left with no documentation we

1  finally put the in the objection as insufficient documentation

2  claims.

3         The objection deadline for the claim objection was

4  October 29 at 4:00.  No responses were received by that date.

5  We did find in preparing the claim binders for the Court a

6  small typographical error in the original exhibits with respect

7  to the claim of OrthoMed (phonetic).  Specifically instead of

8  showing it's Claim Number is 1224, it was shown as Claim 1244.

9  So we corrected this in the exhibits attached to the order that

10 was filed under cert of counsel.

11        Just to be clear, there's -- OrthoMed is -- there's -

12 - it had an amended claim but it does -- it is left with the

13 remaining claim in the estate, so we don't believe there's any

14 prejudice there with that correction.

15        But we filed the under seal version of the cert of

16 counsel and that is located at Docket Number 3023, and the

17 redacted version is located at Docket Number 3024.

18        So in an effort to ensure that our claims registry is

19 accurate, that we have an accurate sense of our liabilities,

20 and of course to ensure that parties are not receiving an

21 unwarranted recovery from the Debtors' estate and we believe

22 it's critical that we be able to modify or disallow claims

23 where the circumstances show that it's appropriate.

24        And for these reasons we respectfully request

25 approval of the objection.  I understand Your Honor may have

1  questions and I'm happy to answer any questions the Court may

2  have.

3        THE COURT:  Okay.  Good.  I really only have one

4  question, and it's the first claim under Exhibit C, the amended

5  claims, instrumentation lab.  My --

6        MS. DiSABITINO:  Yes.

7        THE COURT:   -- my issue is it looks like each claim

8  is in a different amount and they reference different invoices.

9  So --

10        MS. DiSABITINO:  Your Honor --

11        THE COURT:   -- I didn't understand it.  I see you

12  are allowing the higher amount.

13        MS. DiSABITINO:  Yes, we're keeping the higher

14  amount.  I think -- and the Claim 150 which was the later

15  claim, they had checked the box for amendment and --

16        THE COURT:  Yeah.

17        MS. DiSABITINO:   -- listed the -- they didn't put

18  the claim number but they put 8/19/2019, and so there's only

19  one other claim that they had filed which was 8/19/2019, and

20  that was their earlier claim.  So that's why we viewed it as an

21  intent to amend that prior claim.

22        THE COURT:  Yeah, but it's a lesser amount and it

23  kind of looked like they were just adding invoices that hadn't

24  been included.  So why don't you take a quick look at that, you

25  can file a certification that just drops that one off and see

26  if you can get in touch with them to see what they intended

27  with that.  I don't -- it's unclear.

28        MS. DiSABITINO:  Sure.  I'm happy to do that, Your

1 Honor.  Thank you.  We will do that.

2          THE COURT:  Okay.  Thank you.

3          MR. MINUTI:  Your Honor, again for the record, Mark

4 Minuti.  That brings us to Items 16 and 17 on the agenda.  This

5 is the Debtors' and Committee's motion to compel discovery and

6 move the objection deadline and the hearing date on Mr.

7 Freedman's motion to lift the automatic stay, and the companion

8 motion by Mr. Freedman and its related (indiscernible) to

9 quash.

10          The motions before the Court today implicate basic

11 principles of the bankruptcy rules and rules of civil procedure

12 in the context of a contested matter.  In the motion Mr.

13 Freedman filed, Your Honor, he's asking the Court for specific

14 relief based on facts that he sets forth in his motion.  Mr.

15 Freedman's motion is opposed by every major player in the

16 cases, including the Debtors, the Committee, Harrison Street

17 and tenant.  This creates a contested matter and discovery is

18 permitted in contested matters.  Those are the rules, period,

19 end of story.

20          As we will discuss, Your Honor, the only question

21 here is whether the discovery sought by the Committee and the

22 Debtor is reasonable, and as we will discuss, we believe what

23 we're seeking is eminently reasonable.

24          To understand the motion and to understand the

25 discovery, Your Honor, it is necessary for me to give you a

26 little bit of background.

27          THE COURT:  I have plenty of background.

28          MR. MINUTI:  Very well, Your Honor.

1          THE COURT:  So let's focus on what is still in

2  dispute as far as discovery you're seeking.

3          MR. MINUTI:  Very well, Your Honor.  In terms of --

4  just as a prelude to this, Your Honor, one thing that I have to

5  point out, Your Honor, is, because Your Honor hasn't been

6  involved in this because we've been mediating for quite some

7  time, back in June, Your Honor, we did file a complaint against

8  Mr. Freedman, the particular movant in this case, as well as

9  other Defendants.

10          That complaint, Your Honor, was 81 pages, 515

11  paragraphs, again raising various claims against Mr. Freedman,

12  these specific entities as well as others, for causing, Your

13  Honor, the financial collapse of the Debtors and leading to

14  harm that ultimately caused the shut down of Hahnemann and the

15  sale of St. Chris.

16          What's important to understand with respect to this

17  discovery, and frankly the motion, is that the Debtors' well-

18  pled complaint includes claims against Mr. Freedman and the

19  movants, and it includes specific claims related to the real

20  estate at issue in the financing motion he filed.  It details

21  why that real estate should be determined to be estate assets

22  and available for distribution to the estate's creditors.  In

23  other words, Your Honor, it details why the Debtors have an

24  equitable interest in that property, and why it is, Your Honor,

1  ultimately when we get to the financing motion or the lift stay

2  motion we're going to argue that we do have an interest in that

3  property and the stay should not be lifted.

4          But that was totally left out of the motion, Your

5  Honor.  None of that background was provided to let Your Honor

6  know that not -- that the Debtors are claiming interest in that

7  property.  And Your Honor should also note that HSRE intended -

8  - also claim -- had claims, either direct claims or indirect

9  claims, against those NDs with respect to that property.

10         Now the complaint, Your Honor, was filed back in June

11  to preserve the statute of limitations.  We filed it under seal

12  to really facilitate the mediation.  And we had been mediating

13  with both the MBNF parties, Mr. Freedman, these particular

14  entities, HSRE and Tenet.  We've been mediating before Judge

15  Carey.  And Your Honor may know there are sort of separate

16  claims between Mr. Freedman and the Tenet parties, Judge

17  (indiscernible) is mediating those.  But there is some overlap,

18  the mediators are communicating.

19         The ultimate goal here, Your Honor, of the mediation

20  is to come up with a global settlement that resolves all these

21  competing claims.  And the real estate at the heart of the

22  ultimate motion that Mr. Freedman filed, Your Honor, is

23  critical to that resolution.  If it's not going to be used,

24  Your Honor, in that consensual resolution, it's critical for

25  the Debtors to obtain a recovery in the adversary proceeding.

1        Now on Friday, October 29, Mr. Freedman filed his

2   motion seeking a so-called comfort order or relief from the

3   automatic stay to borrow against that property.  Again, not

4   mentioned in that motion, Your Honor, was that the Debtors had

5   made specific claims of an interest in this property.  Also not

6   mentioned in that motion, Your Honor, is that the day before he

7   filed the motion Mr. Freedman put liens on the property.

8        In other words, he filed a motion saying he needs

9   permission from the Court for a comfort order.  The day before

10  that, Your Honor, he files significant liens and claims against

11  that property in favor of a number of professionals who

12  represent him personally, who represent other entities in this

13  case, and we're not quite sure what they did, Your Honor, for

14  the Broad Street entities that own this property.

15        That all occurred the day before the financing.

16  Those professionals include Latham & Watkins, the law firm that

17  represents Mr. Freedman; Jigsaw Advisors, that's Bill Brinkman,

18  Mr. Brinkman is the witness Your Honor's going to hear from

19  ultimately on the lift stay motion.  It includes liens in favor

20  of Paladin, Your Honor, that's essentially Mr. Freedman's

21  company, and an entity controlled by Svetlana Attestatova.  Ms.

22  Attestatova is Mr. Freedman's personal attorney, she's the

23  former in-house lawyer for the Debtors, she's another Defendant

24  in our adversary complaint.

25        All of this, Your Honor, was done under the cover of

1  the mediation with no warning to the mediation parties.  As I

2  indicated, Your Honor, if Mr. Freedman prevails on this motion,

3  Your Honor, and liens this property, the mediation is over and

4  the Debtors are left, Your Honor, potentially without a

5  recovery on their claims.  And so I give you that background,

6  Your Honor, because that's why the ultimate motion is a big

7  deal, and that's ultimately why the discovery here is relevant.

8          Now let me set the table, Your Honor, and make it

9  clear by the ultimate motion, the lift stay motion, what Mr.

10  Freedman wants to do is lien the property.  The Debtors, and I

11  don't believe anybody in the courtroom today who is opposing

12  that motion has any objection to liening that property, to use

13  funds to take care of the legitimate expenses of those

14  properties.  They had ongoing expenses, we understand that.

15          So the question though is that we don't want to see

16  funds -- or liens put on that property to be used for

17  illegitimate expenses and not to maintain that collateral.  At

18  the hearing -- well, actually, Your Honor, the -- Mr. Freeman

19  in his reply to our motion to compel put it at issue today,

20  Your Honor, which is the Debtors themselves have offered Mr.

21  Freedman financing to take care of the legitimate expenses of

22  these properties.

23          HSRE, Your Honor, another party Mr. Brown represents

24  that you'll hear from today, they are talking about making an

25  offer to Mr. Freeman, again to preserve the value of that real

1  estate, to take care of the legitimate expenses.  We will

2  submit and argue at the hearing that that is better and more

3  reasonable financing, but Mr. Freedman has rejected that

4  because in his view those options are not in his personal

5  interest.

6        The relief in the motion, Your Honor, though goes

7  well beyond just paying the reasonable costs of the real

8  estate.  As I indicated, Your Honor, they want to lien up the

9  property with $17.5 million, and we can parse through it, Your

10 Honor, $6.5 million of that is really going to go to closing

11 the loan and paying the fees to Gordon Brothers.  A

12 significant -- I'm sorry, Your Honor, I can't hear you.

13       THE COURT:  We're not talking about the merits of the

14 motion today, so let's --

15       MR. MINUTI:  Well, I understand that, Your Honor, but

16 the reason I tell you that, and I'll get to the discovery, but

17 the reason I tell you that is because he, in his motion, has a

18 basis for cause for lifting the automatic stay says he needs

19 this money to pay the legitimate expenses of the ongoing

20 business.  That's why it's relevant to understand what we've

21 asked for and why.  But let me get there, Your Honor.  Let me

22 get there and talk about the specific discovery.

23       So again, Your Honor, he filed his motion, the

24 Debtors and the Committee have objected to the motion.  That

25 creates a contested matter and we serve discovery.  What

1  discovery did we serve?  We served a request for production,

2  Your Honor.  It is 23 questions, or 23 requests for documents.

3  The request for production is attached to our motion.  When the

4  Court looks at that what you'll see is, Your Honor, this is

5  contention discovery.  Mr. Freedman, you've asserted facts in

6  your motion that you believe establish cause that entitles you

7  to succeed on the motion and have the Court enter an order.

8  We've asked for specific documents related to the facts that he

9  has asserted in his motion.

10         Okay.  So first Mr. Freedman claims that the loan is

11  necessary because the Debtors did not maintain the property,

12  that he had to pay $2.1 million to fix things the Debtors

13  should have fixed, and then he has ongoing expenses in the

14  property.  That's in Paragraph 5 and 6, those are contentions

15  in his motion.  We asked for the documents related to these

16  contentions.  Show us what you have to pay for, show us what

17  you have to fix, show us the $2.1 million, show us that you

18  made these payments and what you paid it for and show us the

19  back up in terms of what you're going to use this money to pay

20  for going forward.

21         Now what did they give us, Your Honor?  They gave

22  us -- they keep saying they gave us 500 pages of documents.

23  And let's be clear, Your Honor, of the 500 pages of documents

24  over 400 of those pages are the mortgages and UCC statements

25  that they put on the property the day before they filed their

1 motion.  Of the 100 pages of additional documents they gave us,

2 Your Honor, a lot of it is junk, but when it comes to things

3 like I'm talking about right now, what they gave us was just

4 summaries.  So for example they gave us a summary saying,

5 Here's some expenses.  Right?  You have to fix the elevator,

6 you have to fix the fire pump, things like that.

7          Well, in order to create that summary, Your Honor,

8 that it really had to come from somewhere.  We're entitled to

9 see the back up.  We shouldn't have to rely on a two-page

10 summary, we don't know who prepared the summary, we don't know

11 why it was prepared, we don't know --

12          THE COURT:  Okay.  What else?

13          MR. MINUTI:   -- (indiscernible) so what else, Your

14 Honor?  Same goes true, Your Honor, for the ongoing expenses.

15 In the term sheet -- excuse me, in the terms sheet with Gordon

16 Brothers, attached to that term sheet is proposed uses of the

17 funds.  Some of those are self-explanatory and we get that, but

18 there's a couple of broad categories there, Your Honor.  One is

19 working capital and the other is operating costs.  Again, give

20 us the back up that was used to come up with those numbers so

21 we can see exactly what you're proposing to spend this

22 financing on.  Those are, again, arguments, Your Honor, that

23 they've put in their motion to support cause.  We think we're

24 entitled to see it.

25          I should point out, Your Honor, because I think what

1 you're going to hear is that the summary should be sufficient.

2 But even the summaries they provided, Your Honor, are

3 inconsistent and inaccurate.  Their motion says that they paid

4 $2.1 million to fix things the Debtors should have fixed.  The

5 summary they provided says they only paid $127,000, Your Honor.

6 So there's a big disconnect there.  We're simply asking for the

7 back up.

8        Second, Mr. Freedman says that he needs the -- he

9 needs the money from the loan to pay obligations to the pension

10 fund.  This is in Paragraph 8 of the financing motion.  We

11 asked for the documentation related to those alleged

12 obligations.  What is your arrangement with the pension fund,

13 how did you arrive at that arrangement with the pension fund.

14        Back in June of 2020 Mr. Freedman filed a number of

15 transfers of claim with the pension fund, and in those

16 transfers of claim, Your Honor, there is reference to a

17 December 24, 2020 settlement and release agreement.  So they've

18 had negotiation, they've created an agreement that creates

19 obligation.  We'd like to use that agreement, we think Your

20 Honor should see that agreement and we'd also like to see how

21 he got there.

22        Why are the (indiscernible) liable to pay all of

23 these obligations related to the pension fund when there are

24 clearly other folks in the control group, why aren't they

25 paying it?  We're entitled to see the document, we're entitled

1 to use the document, the Court should see the document, and we

2 should understand how they got there and why they got there,

3 Your Honor.

4        Third, Your Honor, Mr. Freedman claims that he needs

5 the loan to fund the uses set forth in the term sheet.  I

6 already talked about that, Your Honor.  Some of them are self-

7 explanatory, others, Your Honor, are general categories.  We'd

8 like to see the back up.

9        But let me focus on one, Your Honor, and we talked --

10 I talked about that a little bit a moment ago, the professional

11 fees.  There are two liens now on this real estate.  One for

12 $2.5 million, one for $3 million.  And what do those liens now

13 support?  Those liens now support professional fees incurred

14 and to be incurred by all of the professionals that represent

15 not the Broad entities or not just the Broad entities, but Mr.

16 Freedman personally, there's liens in favor of Ms. Attestatova,

17 there's liens in favor of Paladin.

18        There's a host of liens here that are being put on

19 this property that we, Your Honor, believe have nothing to do

20 with these properties or preserving these properties.  So we've

21 asked for the back up.  Okay.  These are professionals.  Show

22 us the engagement letter, were the Broad entities even clients

23 of these professionals.  Right?  Show us the bills.  And I'm

24 not talking about attorney-client privilege information.  They

25 can redact whatever they think is attorney-client.  But what

1   were the services provided that led to these liens?

2         What we believe those documents are going to show is

3   a host of services, probably the bulk of the services that now

4   serve as liens on the property had nothing to do with these

5   entities or preserving the value of these particular

6   properties.  That's key here, Your Honor.

7         And by the way, if I'm wrong, Your Honor, what's the

8   harm here?  What's the harm?  There should be no mystery here.

9   This is an argument for cause in support of the motion they

10  filed, they should be able to show Your Honor what they're

11  using the money for and why.  There should be no mystery here.

12        Next, Your Honor, he claims that the best terms were

13  offered by Gordon Brothers to do this loan.  Okay.  The best

14  terms.  That's in Paragraph 9 of the financing motion.  The

15  only thing they've given us, Your Honor, is the term sheet

16  that's attached to some of the pleadings.  Well, how do we know

17  those are the best terms?  Were there drafts, what are the

18  other loan documents?

19        The term sheet references other terms.  For example

20  the term sheet says that Gordon Brothers is going to have a say

21  in milestones related to the property.  What are they talking

22  about, what are those milestones?  Why is this Gordon Brothers

23  loan the best loan that's out there?  And keep in mind, Your

24  Honor, what's the best loan is in the eye of the beholder.

25  What's best for Mr. Freedman may not be what's best for the

1 Broad Street entities and the creditors of those Broad Street

2 entities.

3          And that's what we're trying to probe, Your Honor, so

4 it can be, you know, an open book here, here's what's

5 happening, here's what he's using the money for, and if at the

6 end of the day Your Honor says, Yep, he's allowed to do that,

7 well, then we're going to stand down.  But we ought to know

8 what's being done and why it's being done and that's what this

9 really goes to.

10          Finally, Your Honor, we asked about documents and

11 communications related to Mr. Freedman's sale of real estate

12 related to the Front Street entities.  The Front Street

13 entities were other entities set up by Mr. Freedman that was

14 the land or was the real estate where St. Christopher's

15 Hospital existed.  Those properties were sold, Your Honor, some

16 time ago, and the net proceeds of those properties was $30-plus

17 million.

18          So we've asked Mr. Freedman, What did you do with

19 that money?  He's claiming here that he needs this money to pay

20 expenses including for example the pension.  Well, the Front

21 Street entities were part of the control group, there was $30

22 million worth of net proceeds, why aren't those proceeds

23 available to pay this?  Why do we have to lien the Broad Street

24 properties in order to pay this?

25          Now their answer to that, Your Honor, is, Well, we've

1  given you that information.  What they gave us, Your Honor, is

2  one page, it's one page and that on page includes things like

3  the following, "Property related expenses, $5.4 million", no

4  back up, no detail, no time line.  Another line item,

5  "Repayment of Paladin Healthcare capital note, $5.4 million".

6  What was that note for, why did Front Street need to borrow

7  that money?  We want the details, we should be able to see the

8  details.

9          Because, Your Honor, the reason that's relevant is,

10  if -- what he did with the proceeds of the sale of that

11  property is directly relevant whether he's actually going to

12  use the proceeds that he's going to obtain from these

13  properties, the Broad Street properties, and use them to

14  actually support the properties.

15          Now to me, Your Honor, none of this is remarkable.

16  We had a contested matter, we had the movants putting these

17  very facts at issue and we had the opponent saying, We want to

18  take discovery of those facts.  Now the movants, Your Honor,

19  for the most part their response has been, We're going to give

20  you some summaries, we're going to give you limited documents,

21  what we want you to see.  Oh, by the way, we'll tell you what

22  our witness is going to testify at the hearing, and you can

23  take his deposition, but that's all you're going to get because

24  all of this is superfluous.

25          That's not how the discovery rules are supposed to

1 | work, Your Honor.  We're entitled to broad discovery, it's

2 | narrowly tailored, it's contention discovery, and we think they

3 | should be compelled to provide it.

4 | Let me pause there, Your Honor, because I want to

5 | move forward and talk about the depositions we've asked for,

6 | but let me see if the Court has any questions.

7 | THE COURT:  I have no questions.

8 | MR. MINUTI:  Thank you.  Your Honor, with respect to

9 | the depositions, so we filed 30(b)(6) depositions of each of

10 | the movants in these cases.  And remember, these are all

11 | entities, Your Honor, that own real estate.  None of these are

12 | operating companies, none of them have employees.  It's simply

13 | an instrumentality through which Mr. Freedman owns the real

14 | estate.  So we expect, Your Honor, even though we filed a

15 | 30(b)(6) motion against each movant, to be cautious, it should

16 | be one witness, Your Honor.

17 | There should be one witness practically for them,

18 | there should be one witness for the Front Street properties, it

19 | all should be the same person.  In our eyes, Your Honor, it

20 | should be Mr. Freedman, he's the lynch pin for all of this,

21 | he's ultimately at the heart of all of this.  So even though we

22 | filed a number of 30(b)(6) deposition notices, it really should

23 | come down to one witness.  But of course that's their -- it's

24 | within their prerogative, Your Honor.

25 | We also noticed the deposition of Mr. Freedman.  And

1  again, Your Honor, while he should be the 30(b)(6) witness,

2  it's important for us to depose Mr. Freedman.  Mr. Freedman,

3  Your Honor, wants to hide behind Mr. Brinkman.  He's only sent

4  Mr. Brinkman to the hearing.  But Mr. Brinkman is not an

5  officer, a manager or an equity holder of any of these

6  entities, he's not making any decisions, he's not dictating

7  strategy, he's not the one dictating the proposed financing,

8  he's not the one that granted the liens on the property the day

9  before they filed their motion.  And frankly, Your Honor, Mr.

10 Brinkman is now a lien holder in this very property.  So that

11 puts at issue the credibility of all his testimony you're going

12 to hear.

13        Mr. Freedman is the ring master.  This entire mess is

14 of his creation.  He is the Broad Street entities.  Again, no

15 employees, no business.  We should be entitled -- he's the

16 movant, we should be entitled to depose him, it's time for us

17 to take his deposition, it's time for Your Honor to hear from

18 him whether live or by way of deposition.  We think that's

19 critically important, Your Honor.  So I think we're up to two

20 depositions.

21        Your Honor, on Wednesday the Debtors and the

22 Committee served a subpoena on Kyle Schmidt.  Mr. Schmidt, Your

23 Honor, is the right hand financial person of Mr. Freedman, he's

24 been ducking the subpoena.  Frankly if the 30(b)(6) witness

25 they put forward can answer the question, we don't need Mr.

1 Schmidt, we've told the movants that.  So I don't think that's

2 relevant for today.

3        Finally, we did send a deposition notice to Mr.

4 Brinkman, Your Honor, or a subpoena to Mr. Brinkman.  They are

5 going to produce Mr. Brinkman because he is their witness

6 that's going to testify, Your Honor.  But to be clear, I think

7 they want to limit us to only ask questions related to the

8 substance of his testimony.  That's to appropriate, Your Honor,

9 we should be able to ask him anything we want related to the

10 motion.  And so if they want restrictions on that, they should

11 say so today.  We'd like a chance to respond to that.

12        So at the end of the day, Your Honor, in terms of

13 witnesses I really think we're talking about two, Mr. Freedman,

14 and a 30(b)(6) witness, which my guess will be Mr. Brinkman.

15 If it's not two, Your Honor, maybe it's three, but as we've

16 already told the movants, Your Honor, if there are certain

17 topics that Mr. Freedman or Mr. Brinkman cannot testify about,

18 let's have a discussion, maybe we can eliminate those topics,

19 maybe we can figure out a way to get the information we need

20 without doing another deposition.  So my point is, Your Honor,

21 we think we're really talking about two depositions.

22        Now it's important, Your Honor, in our view that

23 those depositions be in person and those depositions should be

24 here in Delaware.  Obviously, Your Honor, all of the parties

25 here who have counsel, those counsel are here in Delaware, Mr.

1  Freedman's counsel is in New York, the property at issue in

2  this motion, Your Honor, is 30 minutes from the courthouse in

3  Philadelphia.  Delaware is the most logical forum.  All of the

4  lawyers are here, Your Honor.  It makes more sense to bring one

5  witness here to Delaware to testify than it is to make all

6  these lawyers travel to where those witnesses are located.

7  Again, Mr. Freedman, Your Honor, picked Delaware as the forum

8  to file the Debtors' cases.  This is where it should be.

9          Your Honor, the other thing that we've asked for in

10 our motion, and this is important, we've asked for Your Honor

11 to compel the discovery we just talked about.  But obviously we

12 now need time to get that information, we need time to digest

13 the documents, we need time to take the depositions, to prepare

14 an appropriate response, and then come before Your Honor at the

15 ultimate hearing in an efficient fashion.

16         Given the timing here, given that we've got a holiday

17 next week, given my suspicion that there may be a chance that

18 we need -- we're going to need to bother Your Honor again with

19 respect to discovery, I don't see any way all that gets done by

20 December 1.  And so we're asking the Court to also move the

21 hearing date.  We suggested December 10, Your Honor, I think

22 that would give us enough time, assuming the other parties

23 cooperate with respect to discovery.  And we should move the

24 objection deadline as well, again, because the point is let's

25 see the discovery, let's take the depositions, and let's

1  prepare the objection.

2          I should point out, Your Honor, there should be

3  absolutely no prejudice to the movants if we move those

4  deadlines.  There's no suggestion in any of the motions to

5  quash or any response that a brief continuance is going to have

6  any negative impact here, there's no suggestion that there are

7  funds needed in the interim, there's nothing in the term sheet

8  that says Gordon Brothers has the ability to walk or will walk.

9  In fact, there are a number of conditions necessary before they

10 close on the financing, and frankly, Your Honor, there's

11 nothing I can do to prevent them from working on those,

12 satisfying those conditions between now and when we get to the

13 ultimate hearing on the matter.

14         So in summary, Your Honor, we believe the discovery

15 is limited, we believe it's appropriate, it goes simply to the

16 contentions that they put at issue in their motion, therefore

17 we'd ask that you deny the motion to quash, grant the Debtors'

18 motion to compel, require the witnesses to testify here in

19 Delaware, move the objection deadline and move the hearing

20 date.  That's it for me, Your Honor, unless you have any

21 questions.

22         THE COURT:  No questions.  Thank you.

23         MR. MINUTI:  Thank you.

24         THE COURT:  Is there a response?

25         MR. SHERMAN:  Your Honor, could we be heard on behalf

1  of the Committee?

2          THE COURT:  Do you have anything to add?

3          MR. SHERMAN:  Yes, Your Honor.  Two quick points

4  here.  I'll be brief, Your Honor.  One of the -- and again, for

5  the record, Andrew Sherman, Sills Cummins, for the Committee.

6  I just want to sort of frame the procedural issue, where we

7  are, Your Honor.  Is there were two forms of relief in the

8  motion, the "comfort order" and then the lift stay aspect.  And

9  the comfort order, Your Honor, seems to address whether the

10 interest in the Broad Street properties are property of the

11 estate.

12          So when we go down the road and the Court authorizes

13 discovery, we just don't want -- if the Court can give us some

14 guidance of A) whether the concept of a comfort order -- I

15 think what you'll see in our response, Your Honor, which is

16 it's in effect asking for an advisory opinion, that there's

17 no -- really we don't see any basis in the law for a "comfort

18 order".  And then that really leads to what Mr. Minuti said as

19 far as discovery, it's really lift stay discovery.

20          So I just sort of want the Court, at least from the

21 Committee's perspective, is each of the discovery aspects

22 really go to whether the stay should be lifted.  And we'd ask

23 the Court to consider it in that context.

24          THE COURT:  Well, let me ask a question, the property

25 is not currently titled in the name of the Debtors or the

1  estate.   Correct?

2           MR. SHERMAN:  That's correct, Your Honor.

3           THE COURT:  So if that's true, why is there even a

4  motion for a comfort order or relief from the stay?

5           MR. SHERMAN:  Well, A) they brought the issue before

6  the Court, sort of point one.  But as Mr. Minuti said, the

7  interests emanate from what's in the adversary proceeding.  And

8  we'll provide law to Your Honor.  I think Your Honor had a

9  decision, I believe in 2006, the Atlantic Gulf decision, sort

10 of disputed property and talking about (indiscernible) of

11 property of the estate.

12          THE COURT:  I'm sure I'm going to get arguments on

13 both sides on that.  So I mean I am going to consider the

14 relief requested in the motion, a comfort order or relief from

15 the stay.

16          MR. SHERMAN:  Understood, Your Honor.  Thank you.

17          THE COURT:  All right.

18          MR. MALIONEK:  Good morning, Your Honor.  Robert

19 Malionek of Latham & Watkins on behalf of I'll say the movants,

20 it's the MBNF non-Debtor parties, and it's actually important I

21 think to start there because Mr. Minuti over and over and over

22 again has said that this is Mr. Joel Freedman's motion, the

23 comfort motion.

24          It's not.  It's the MBNF non-Debtor parties' motion,

25 and I think, as Your Honor recognized, this relates to the MBNF

1 non-Debtor parties' assets, not the Debtors' assets.  That's

2 why we brought the motion, that's why we brought the motion the

3 way that we did.  And I think it's important to start there.

4    Mr. Minuti started with a description of a complaint

5 that is under seal, that's not public, that's not operative,

6 that's not at issue.  That is subject to an ongoing stay.  I

7 think that is the point of what the Debtors and the Committee

8 are arguing with this discovery of the estate parties.  So the

9 estate parties here, what are they looking to do?  They're

10 looking for fish for evidence that they could use in support of

11 their claims in that non-public stayed, non-operative

12 complaint.  They're looking to prevent the MBNF non-Debtor

13 parties from raising liquidity that they need to continue the

14 ongoing -- continue with ongoing necessary expenses that is

15 really acknowledged related to the properties.

16    They're looking to scuttle the financing, you know,

17 in the first place because the timing of the deal -- actually

18 the negotiation of the deal makes it critical that we have this

19 heard as quickly as possible.  We originally were going to have

20 that heard today I believe, Your Honor.  We agreed to have that

21 moved to December 1, but if -- just a review of the term sheet

22 shows we can't afford to have that extended out any further as

23 Mr. Minuti requests.

24    You've already extended it once, we can't extend it

25 again.  There are repercussions to that, including a potential

1 termination fee, including potentially Gordon Brothers deciding

2 to walk away.  And so we can't do that.  We need a comfort

3 motion and that is actually something that Gordon Brothers

4 needs, and needs in order to go forward with this.

5          So we all agree that the MBNF non-Debtor parties need

6 the liquidity, and I think we all agree that these are their

7 assets that we're talking about.  So I think it's important to

8 start there.

9          Mr. Minuti went in some detail to describe what the

10 context is here, Your Honor, and I know you want to get right

11 into --

12          THE COURT:  Well, I'm not sure that the -- I am not

13 sure that they agree that the financing is necessary, and isn't

14 that what they're asking for discovery on?

15          MR. MALIONEK:  Well, on that issue, Your Honor, what

16 they want to -- what they're looking to get I believe, if I

17 understand Mr. Minuti, is an understanding of what the

18 liquidity needs are with respect to the MBNF non-Debtor

19 parties, in other words, the sources and uses of the proceeds

20 from the financing.  Your Honor, we provided that to them.  We

21 provided them immediately upon receiving their discovery

22 requests which are -- would amount to 23 different topics of

23 discovery served on multiple different parties, non-parties,

24 several different requests for depositions, 30(b)(6) and

25 otherwise, within a few days, which is what he gave us to –

1           THE COURT:  All right.  But you gave him the summary.

2  Aren't they entitled to the back up?

3           MR. MALIONEK:  Well, we believe that we have given

4  them the back up.  But, Your Honor, we've been engaged in

5  ongoing negotiations -- we believe it's in what we've already

6  produced to them.  But as -- it's important to recognize we

7  have been engaging in ongoing meet and confer discussions

8  including to yesterday when the Debtors and the Committee said

9  they don't want to continue with ongoing (indiscernible)

10  discussions, they'd rather just have a hearing.

11          We offered to provide them, and we're still willing

12  to do so, further detail, back up related to the sources and

13  uses.  That is I think number one of what Mr. Minuti went

14  through.  We're willing to do that.  So I think that that issue

15  from our perspective is resolved.  We'll give them the back up.

16  And we told them that.

17          Number two, they'd like to understand some more back

18  up related to why they say there's some inconsistency in what's

19  in the comfort motion and what's in the underlying documents

20  relate to the $2.1 million that Mr. Minuti referenced.  And we

21  have offered to answer questions for them and to provide

22  further back up with respect to that.  So that I think responds

23  to Mr. Minuti's Category Number 2.

24          As to Mr. Minuti's category number -- I'll just do

25  this, this is how I listed it out.  Category Number 4,

1  communications, all communications and agreements with the MBNF

2  non-parties' professionals.  That goes to the heart of what we

3  say in our papers is clearly searching for attorney-client

4  privileged information.  They want the bills, it's going to

5  entail providing them with privileged information.  We think

6  that they're not entitled to that.

7         We think they're also not entitled to it because it's

8  not relevant.  What's relevant is MBNF non-parties, the movants

9  here, not Mr. Freedman, the movants here are running out of

10 cash.  That's why we brought the comfort motion and that's why

11 we went ahead and looked to be able to obtain the financing

12 that we ultimately were able to negotiate in good faith.

13 That's why we did it.

14        And so they understand that we need that -- this

15 liquidity.  We provide them the information with respect to the

16 sources and uses regarding the liquidity that they will receive

17 from the financing.  And we're not sure what the movant needs -

18 - we're not sure why they need to probe the bills and the time

19 entries of the various professionals that the movants had

20 engaged and who have not been paid.  Those are mounting fees.

21 The point is they need to be paid.  The point is there's a

22 liquidity shortage for the movants – for the movants, and that

23 needs to be addressed.  Your Honor, that's really the issue.

24        With respect to what I say is I believe Item Number

25 3, which is that Mr. Minuti would like to have more information

1  with respect to the pension obligations.  We provided them with

2  the pension back pages.  All they need to know is that, and

3  this is part of the sources and uses, that the -- that there

4  are obligations that the movants have with respect to those --

5  with respect to the pensions.  We gave them that information.

6  There's nothing further we believe that they need on that.  We

7  don't understand, and they certainly haven't shown and it's

8  their burden to show why it's relevant to this comfort motion.

9         As to their Category Number 5, they say, Yes, we have

10  the term sheet with Gordon Brothers, yes, we have the sources

11  and uses with respect to that financing.  But we want to

12  understand all of the communications back and forth leading up

13  to the entry into that term sheet.  We want to understand what

14  other options they pursued, what other financing did they have

15  available, what other possible transactions did they have

16  available, the sales, others.

17         In essence what Mr. Minuti seems to be suggesting is

18  that the movants' business judgment is actually being

19  questioned here.  That's not an issue that's relevant for the

20  comfort motion.  Not at all.  What's relevant is that the

21  movants need liquidity.  That's all.  So having the

22  communications back and forth between the movants and Gordon

23  Brothers for the movants and any other potential option that

24  they considered ultimately isn't relevant whatsoever to this.

25

1            I think as to what I regard as Category Number 6, I

2   believe this is the last category, at least as I have it

3   written it down, the Mr. Minuti raised, they would like to

4   understand -- they would like to have documents for information

5   with respect to transactions related to the Front Street

6   entities.  They served document requests, they asked for --

7   that's not even with respect to that.

8            The Front Street entities are not part of this

9   motion.  The transactions that Mr. Minuti says that they want

10  to probe related to the Front Street entities, their sale of

11  assets, that already occurred.  That's not at issue whatsoever

12  with respect to the comfort motion.  They act like it's

13  relevant.  It's not.

14           As to the depositions, Your Honor, again, we've

15  engaged in substantial meet and confers, back and forth with

16  the Debtors and the Committee with respect to depositions.  As

17  Mr. Minuti says, they think that really what it boils down to

18  is this should be one person that they depose.  We agree.  We

19  told them we would produce -- in fact, we entered into a

20  stipulation on that the movants would produce the witness that

21  the movants plan to put on the stand and provide testimony for

22  the comfort motion, Your Honor.

23           We told them that we would make Mr. Brinkman, who's

24  the interim CFO for the TopCo with respect to the MBNF non-

25  Debtor parties.  Although Mr. Minuti says it doesn't involve an

1  officer at all.  This is the person who is most relevant to

2  answer the questions that they have with respect to their large

3  number of topics in Number 86.  We said we would make him

4  available.

5           Not only did we say we would make him available, we

6  offered to provide them with a declaration because, Your Honor,

7  we would propose, and sometimes this is done and we think that

8  this is generally efficient, to proceed at the comfort motion

9  hearing with direct testimony by declaration.  We said that we

10 would provide a draft of that declaration even before they take

11 Mr. Brinkman's 30(b)(6) deposition so that they can prepare,

12 essentially they can cross-examine him before we even get to

13 the hearing.  And you know what, they could designate that

14 testimony as their cross-examination at the hearing.

15          I can't think of something more efficient and can't

16 think of something that will provide them with more information

17 leading up to a deposition.  We're essentially giving them a

18 road map for how to conduct their deposition.

19          So we already said that we would make him available.

20 We have already provided them with the list of topics that Mr.

21 Brinkman will cover in his deposition.  And those topics we

22 believe largely overlap with the topics under 30(b)(6).

23          One more thing.  Mr. Minuti says, You know what, if

24 it's not one witness, maybe it's two.  And even though Mr.

25 Minuti wrongly (indiscernible) movant, he says that this is his

1  motion, and they want to depose Mr. Freedman, can you make him

2  available.  But, Your Honor, as to the issues that Mr. Minuti

3  seems to raise about whether or not all of these depositions,

4  both of these depositions should occur in person in Delaware,

5  Your Honor, even this hearing is not conducted in person in

6  Delaware.

7        Depositions are routine, Your Honor, now by Zoom.

8  And that's what we would agree to do with respect to these

9  depositions.  Holidays are coming up, there's very little time

10  left.  As Mr. Minuti said, we now had a hearing on the -- just

11  on the first, which we cannot move.  Gordon Brothers required

12  us to bring this comfort motion, and required us to go forward

13  with it as quickly as possible.  Because there's so little time

14  of course we need a procedure for those deposition by Zoom,

15  Your Honor.  So we would be happy to be able to do that.

16        I just want to add, Your Honor, that the list of

17  documents that we've provided to them, although Mr. Minuti

18  seems to suggest it's paltry, I would describe it this way,

19  we've provided them documents related to, as I said, the term

20  sheet, we gave them the term sheet, we gave them the sources

21  and uses, we've now offered to provide them -- we've already

22  offered to provide them with additional back up related to

23  those uses of funds from the proceeds.

24        We have produced to them payments made on behalf of

25  the Debtors by the MBNF non-Debtor parties for expenses

1  incurred at the premises once occupied by the Debtors, repairs,

2  maintenance, utility payments, tax payments, security payments,

3  et cetera.  We've provided them the invoices, Your Honor.  They

4  have back up.  We've provided them with the uses of the sale

5  proceeds from the real property formerly owned by the Front

6  Street entities, which as I've already discussed, Your Honor,

7  is completely irrelevant to the comfort motion, but they asked

8  for it, they insisted upon it, so we provided them with the

9  uses of the sale proceeds related to that transaction, putting

10  documents with respect to the taxes, professional fees,

11  property expenses, among others.

12       We've provided them with documents showing the

13  payments made by certain of the MBNF non-Debtor entities to th

14  pension fund.  Mr. Minuti wants more information than the

15  package that we already -- the packages that we've already

16  given them with respect to the pension funds.  We provided that

17  as well.

18       We provided them with documents showing expenditures

19  related to run rates of the Broad Street entities, in other

20  words, their expenditures, as well as support behind those,

21  again, invoices, Your Honor.  We provided them with documents

22  showing the obligations of those MBNF non-Debtor entities to

23  the pension fund allegedly, documents that were previously

24  available to the estate parties in mediation that they've had

25  for quite some time, not to mention many documents that are

1 publicly available and that they've had for years.

2        But in a show of good faith we've also produced to

3 them all existing mortgages on the MBNF assets, the promissory

4 notes secured by the mortgages, and all related UCC filings.

5 Again, all things that they could obtain publicly, but we

6 provided to them anyway.

7        Your Honor, I think at the end of the day the reason

8 that the Debtors and the Committee brought -- served this

9 discovery and then quickly move to compel responses, further

10 responses than what the MBNF non-Debtor parties already have

11 produced, and now we're agreeing, and have agreed, to produce

12 even more, and now today are agreeing to produce even more.

13        Just because they want to harass the movants, the

14 MBNF non-Debtor parties.  They want to harass Mr. Freedman.

15 Again, they want to be able to fish for support for their

16 adversary proceeding.  They want to actually choke the movants,

17 the MBNF non-Debtor parties, because the know the liquidity

18 issue that they have, and they want to make it worse.

19        Your Honor, do you have any questions?

20        THE COURT:  No, thank you.

21        Any response?

22        MR. BROWN:  Your Honor, may I -- Stuart Brown, may I

23 be heard on behalf of the HSRE parties quickly?

24        THE COURT:  Of course.

25        MR. BROWN:  Thank you, Your Honor.  I probably should

1  have jumped in after Mr. Minuti because of course we did file a

2  joinder and we are in support of the motion to compel

3  discovery.  Your Honor, a couple of things that come to my

4  mind, number one is that, as Mr. Minuti pointed out, we are in

5  discussions with the Debtors and the Committee and the other

6  parties involved in the mediation to provide immediate

7  liquidity for the purposes of supporting the bonafide valid

8  expenses and actual expenses of operating and maintaining and

9  preserving the value of the real estate owned by the Broad

10  Street entities.

11          Number two, the organizational chart that we've been

12  provided in these cases from the beginning demonstrate a

13  disconnect of relationship between the Paladin entity and any

14  of the MBNF parties and what is below them.  So there's an

15  entity, Philadelphia Academic Health Holdings, PAHH, which is

16  the parent of the Debtor entity Philadelphia Academic -- I

17  forget what the S stands for, Your Honor, but it's PAHS --

18          THE COURT:  Okay.

19          MR. BROWN:   -- and then the entities below that are

20  th Debtors.  Harrison Street entities are direct creditors of

21  PAHH, and one of the things that is astounding to us is that

22  $35 million of net proceeds from the sale of the Front Street

23  entity real estate somehow was spent on expenses of PAHH

24  possibly and entities above.

25          THE COURT:  Is that -- this -- any of this relevant

1  to the comfort motion that is before me?

2        MR. BROWN:  It is, Your Honor, because it's --

3        THE COURT:  Why?

4        MR. BROWN:   -- it's in support of the discovery that

5  the Debtors seek and frankly, Your Honor, to put a fine point

6  on it, in my mind anyway, some of the discovery that the

7  Debtors seek is in order to prevent potential actual or

8  constructive fraudulent transfers.  And if we had the ability

9  to get the discovery to prevent fraudulent transfers, whether

10 they be actual or constructive, in advance of them happening,

11 including the refinancing of the mortgages that were put on the

12 Broad Street real estate a day or two or three before the

13 motion was filed, then I think that the estate parties and the

14 Harrison Street parties should be entitled to that information

15 in order to be able to present it to Your Honor in opposition

16 to the motion.

17       And further, Your Honor, the Harrison Street entities

18 and the estate entities have offered financing in support of

19 the operation of those buildings to preserve the value, which

20 frankly seems -- I don't know how one would characterize the

21 differences between the Gordon Brothers' proposal and what the

22 estate parties has offered as even comparable.

23       I said I would keep my remarks brief, and with that,

24 Your Honor, I'll end my remarks at this point.  Thank you.

25       THE COURT:  Thank you.

1          MR. MALIONEK:  Your Honor, may I have a brief

2    response to Mr. Brown before Mr. Minuti takes up again?

3          THE COURT:  Yes.

4          MR. MALIONEK:  If he desires to.  The brief response

5    is I'm not sure exactly what the relevance is, as we've

6    discussed already, to this constant request for documents

7    related to the Front Street entities and the sale.  That

8    occurred in the past, that's not relevant to the comfort motion

9    whatsoever.

10          There seems to be a suggestion that they are fishing

11   for some way to try to suggest that there's been some kind of a

12   fraudulent transfer here, and let me just point out that there

13   is zero relevance whatsoever to that because, for one, the MBNF

14   non-Debtor parties, they're not the Debtors.  The MBNF non-

15   Debtor parties, there's been no suggestion that they are

16   insolvent and so owe duties to creditors, nor by the way, Your

17   Honor, are the Debtors -- or the Committee at this point

18   creditors.  And so I believe that these suggestions about

19   fraudulent transfers are completely off base.

20          THE COURT:  Thank you.

21          MR. MINUTI:  Your Honor, may I briefly respond?

22          THE COURT:  Yes.

23          MR. MINUTI:  Thank you, Your Honor.  Again for the

24   record, Mark Minuti.  I'm  going to try to respond to some of

25   the points that counsel made, and I'm going to try to be brief.

1  He ended, Your Honor, by suggesting that we're doing all of

2  this to choke off the liquidity.  We wouldn't be -- Your Honor,

3  nothing is further from the truth.  I find it interesting that

4  someone would claim the Debtors are trying to choke off

5  liquidity when the Debtors have offered alternative financing,

6  Your Honor, to pay for legitimate expenses related to these

7  properties.  So there's no attempt to choke off the liquidity.

8         They've also suggested, Your Honor, that somehow we b

9  brought all this on, we suddenly want this discovery because we

10  have ulterior motives.  We're responding to the motion that Mr.

11  Freedman filed, Your Honor.  We don't like the relief he's

12  seeking, we think it's going to be damaging to the Debtors, the

13  estate and the creditors and we're entitled to discovery to get

14  at that.

15         Now let's talk about the discovery they've produced

16  and the meet and confer and, well, this is a tough one for Your

17  Honor because you have one party, me, saying they didn't give

18  us information, you have the other party saying they gave us

19  information.  And the reality, Your Honor, is that, you know,

20  that I would challenge counsel to show Your Honor exactly what

21  was produced to us, because what you're going to see is exactly

22  what I said, it's summaries, it's limited documentation, it's

23  very little in terms of the back up.  That's what we'd like to

24  see.

25         Counsel also by the way said, Hey, Judge, we tried to

1  meet and confer, we told them we'd give them additional

2  documents, we would continue to meet and confer.  Well, let's

3  be crystal clear on what they offered, Your Honor.  They

4  offered to produce documents to us the day before Thanksgiving,

5  which by the way is the day our response is due, with certainly

6  no time, Your Honor, to get before Your Honor if we have a

7  disagreement over whether they've produced to us sufficient

8  information.  That was the offer, Your Honor.

9          Okay.  We had a meet and confer, we compromised on

10  documents that we needed.  We said to them, You know what, on

11  the depositions we can maybe live with Mr. Brinkman.  Tell us

12  what 30(b)(6) topics he can't testify to and we'll figure out

13  if we don't need that or we can get it in some other way.

14  Listen to Mr. Malionek's words very carefully, Your Honor.

15  What he said was, Well, we think Mr. Brinkman can testify

16  largely to the topics on the 30(b)(6) list.  Right?

17          Well, that's not the way it works.  We've got

18  questions, Your Honor, that may go beyond what they want him to

19  testify to.  And so what they've done,  Your Honor, is put up a

20  big smoke screen.  We would continue to talk -- by the way,

21  when we had these discussions we're not going to compromise,

22  but we're willing to talk.

23          We've given them all this information, but we look

24  behind it, Your Honor, it really isn't the information we need.

25  Allowing Mr. Freedman to appear at a deposition, Your Honor,

1  we've heard that for the first time during this hearing.  I

2  guess they've decided they couldn't stick with that and they

3  backed off of that.

4          And think about what they're saying, Your Honor.  Now

5  they're saying, We're going to give you additional documents.

6  Next week is Thanksgiving week, Your Honor.  When are we going

7  to get those documents, when do they expect us to review those,

8  when do they expect us to prepare for a deposition, take that

9  deposition, use that information in our objection and all show

10 up at a hearing on December 1?  It's ridiculous, Your Honor.

11 This is ambushing us and slow-walking relevant information that

12 they put at issue for a hearing, Your Honor, that's critically

13 important to these estates.

14          Now I've looked at this term sheet, Your Honor, you

15 know, 10 times.  I've looked at the Gordon Brothers' term

16 sheet.  I don't see anything in here, Your Honor, that says

17 this hearing has to go forward on December 1.  I don't see

18 anything in here that suggests this couldn't be continued for

19 another couple of weeks for them to produce the documents they

20 just told Your Honor they'd produce so we can see if it makes

21 any sense, to see if we need information and come back before

22 Your Honor.

23          As I read this term sheet, Your Honor, it says the

24 closing is going to be five weeks from when they sign the term

25 sheet.  There's a host of closing conditions that have to be

1  satisfied before they can close the loan.  Frankly, the way I

2  read the term sheet, Your Honor, Gordon Brothers can close the

3  loan even without the comfort order.  They're not going

4  anywhere, they don't need this heard on December 1.

5       And so if counsel is sincere in what he told Your

6  Honor, which is they're trying to work with us and they're

7  going to give us the information we need, here's the answer,

8  Your Honor.  Let's move the hearing, let's keep him at his word

9  and let him produce the information he's now telling Your Honor

10 he's going to give us, and if we like it, great, we'll show up

11 at the hearing and Your Honor can make the crucial decision in

12 this case.  But if he gives us what we think he's going to give

13 us, which is not relevant information, we should have an

14 opportunity to tell Your Honor that and tell you why we've been

15 prejudiced.

16      Let me raise a couple of other points, Your Honor.

17 We don't -- we're not looking for attorney-client privilege

18 information related to the professionals frankly, and I don't

19 dispute and I don't quarrel with the idea that professionals

20 want to get paid.  What I quarrel about, Your Honor, is coming

21 before the Court and saying, I need critical financing to pay

22 professionals for work they did for an entity that has nothing

23 to do with the properties I'm meaning.  Right?  I think that's

24 relevant.  I think that's relevant.

25      There's $17.5 million being loaned here, over $6.8

1  million of it is the cost of the financing, and then on top of

2  that, Your Honor,  it could be three-plus more million dollars

3  going to attorneys fees.  How does that preserve the property?

4  How does that preserve the property?  It doesn't, Your Honor.

5  It doesn't.  So all of that is relevant, all that's important.

6  We're not looking for attorney-client privileged documents.

7          Your Honor, with respect to this idea that, hey, Mr.

8  Freedman is allowed to exercise his business judgment and

9  decide.  Well, why is he before the Court asking Your Honor to

10  bless what he wants to do?  That's what he's asking for.  He

11  wants a court order that he's going to use later to say, The

12  bankruptcy judge told me I could do this.

13          Well, if he's asking for that relief, then we're

14  going to tell him to probe what is the decision, why are you

15  making it, and we're allowed to tell Your Honor why we think

16  it's unreasonable.  Your Honor's going to rule how Your Honor's

17  going to rule, and there's nothing we can do about that.  But

18  if he's going to put it at issue, we should get the

19  information.

20          So again, Your Honor, I don't see any reason why this

21  can't be postponed.  It ought to be postponed no matter what

22  because they haven't given us the crucial information they put

23  at issue in these cases.

24          Let me just look, Your Honor.  Oh, Your Honor, with

25  regard to in-person depositions, Your Honor, obviously, Your

1 Honor, in-person depositions are much more efficient and much

2 better frankly for all the parties involved.  We know that the

3 witnesses here, Your Honor, have no problem with traveling

4 across the country and meeting -- who had been meeting with

5 them seven days in New York in depositions.

6         So it's not a health issue, it's not a safety issues.

7 They want to make it more difficult on us.  They should have to

8 come here.  It's just more efficient that way, Your Honor.  I

9 don't need to say anything further about that.

10        Let me just look, Your Honor.  I think I might be

11 done.  Again, Your Honor, this idea that they've already given

12 us a host of documents, we have all the sources and uses, we

13 know what they're going to use it for.  Go back to some of the

14 examples I said, Your Honor.  You know, they have a line item

15 in a document that says, Payment of expenses, $5.4 million.

16 What's that for?  We have no idea.

17        So, Your Honor, look, I appreciate the Court's time

18 today.  This is a tough one.  I think discovery issues always

19 are, particularly in a situation like this.  But this is a

20 motion, Your Honor, that's critical to these Debtors, it's

21 critical to the other parties.  We need to get it right.  Your

22 Honor has to have a complete record before -- and we ask that

23 you grant the relief requested in the Debtors' motion and deny

24 the motion to quash.  Thank you.

25        MR. MALIONEK:  Your Honor, I -- do you have patience

1  to hear just a few more minutes just to respond to the new

2  point that Mr. Minuti has made?

3          THE COURT:  Very quickly.

4          MR. MALIONEK:  Thank you.  The Debtors have known

5  about this liquidity issue for months, since August.  We've

6  been engaged in ongoing mediation discussions with them.  They

7  have known that we were going to get to this place where we

8  were going to have to file a comfort motion.  They have known

9  that we were -- that we have been moving as quickly as possible

10  in good faith to find the best deal possible with respect to

11  that financing.  And the found it.  They found it with the

12  Gordon Brothers deal that they're -- they need to be able to go

13  forward with.  That's where $17.5 million in financing.

14          Now Mr. Minuti said, Well, they had other options,

15  they could have taken ours, we gave them an option.  Yes, for

16  $3.5 million in financing.  That doesn't cut it.  Let's be

17  real.  They want to become the first lien lenders on the

18  property because they want to grab it.  That's what -- that's

19  what they want to be able to do.

20          So, Your Honor, let's come back to actually what

21  the standards are for relevance related to the comfort motion,

22  and that is it comes down to -- it just comes down to two

23  things.  Number one is, as we say in the comfort motion --

24  thank you -- as we say in the comfort motion, Your Honor, there

25  are two alternative bases for relief.

1       Number one, that the estate doesn't apply at all if

2  the MBNF assets are not the property of the Debtors of the

3  Debtors' estates.  I think that we all just discussed that.

4  They are not property of the Debtors' estates.  In fact, the

5  Debtors have conceded that since the filing of their first day

6  declaration.  So we believe that that is easy.  We believe that

7  we will have the basis to get the comfort that we need.  Even

8  if, even if the automatic stay somehow applied to the MBNF

9  assets, the Court, we ask, should grant the alternative relief

10 to us by applying a three-prong test for the lift stay.

11      The Debtors cannot show that they have great

12 prejudice from the MBNF non-parties, you know, going forward --

13 I'm sorry --

14      THE COURT:  You don't have to go into the merits of

15 your motion, but --

16      MR. MALIONEK:  Okay.

17      THE COURT:   -- are you making a point that what

18 they're asking for is not relevant to that?

19      MR. MALIONEK:  My point is that the discovery -- all

20 discovery needs to be tethered to the those standards and

21 that's it.

22      THE COURT:  All right.  Well, let me make my ruling

23 in this case that if MBNF is asserting that it needs financing

24 to pay those bills, it is going to have to show that MBNF, or

25 the Broad Street property companies are obligated, or were

1  obligated to pay those.  So I will leave it to the movants to

2  figure out how they produce that, but I think that the Debtors

3  and Committee are entitled to inquire into exactly that.

4          With respect to the inquiring into the negotiations

5  with Gordon Brothers and what other options the movants had, i

6  don't think that's relevant at all to the motion.  I don't

7  think that questioning their business judgment is relevant to

8  the motion.  They are not entities in bankruptcy.

9          With respect to Category 6 with respect to the use of

10 the proceeds of the sale of the Front Street properties, I

11 similarly think that is irrelevant.  That may be relevant to

12 the Debtors' adversary, but it is not relevant to the

13 comfort/financing/relief from the stay motion.

14         With respect to the depositions, it is up to MBNF to

15 determine who their 30(b)(6) -- or to the entities served with

16 a 30(b)(6) notice of deposition, it is up to those entities to

17 select who they will produce.  However, a word of caution, to

18 the extent that person's not able to answer all the questions

19 that were noticed, that may require a continuance of the

20 December 1 hearing.

21         I am not today going to continue the December 1

22 hearing.  But I will leave open the possibility that that may

23 have to be continued if discovery is not complete by then, or

24 if the answers to the depositions are not complete and

25 additional 30(b)(6) depositions are required.

1          With respect to whether depositions are in person or

2     not, I am not going to require that they be in person.  I think

3     a Zoom deposition at this point and given the timing of where

4     we are, I'm going to allow the depositions to be conducted by

5     Zoom.

6          Excuse me.  All right.  I think I've answered all the

7     questions that are at issue, have I?

8          MR. MINUTI:  Your Honor, Mark Minuti again for the

9     Debtors.  One point of clarification, Your Honor, you talked

10    about the 30(b)(6) witnesses.  I assume in light of the offer

11    to have Mr. Freedman sit, we do get to depose Mr. Freedman?

12         THE COURT:  Of course, that's the parties' agreement.

13         MR. MINUTI:  I have no further then, Your Honor.

14    Thank you.

15         THE COURT:  All right.  And I assume I'll see the

16    parties December 1, if not before.

17         UNIDENTIFIED SPEAKER:  Thank you very much, Your

18    Honor.

19         THE COURT:  Thank you.

20         UNIDENTIFIED SPEAKER:  Feel better, Your Honor.  It

21    was nice to see you.

22         THE COURT:  Thank you.  Have a good Thanksgiving.

23         UNIDENTIFIED SPEAKER:  You as well, Your Honor.

24    Thank you.

25         THE COURT:  Thank you.  We'll stand adjourned.

1                             *  *  *  *  *


# **C E R T I F I C A T I O N**

I, TERRI STARKEY, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/  Terri Starkey

TERRI STARKEY

RELIABLE                              DATE:  November 20, 2021