# **EXHIBIT 1**

## **Redacted Reply**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

In re:

CENTER CITY HEALTHCARE, LLC D/B/A.
HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1]

Debtors.

---------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 19-11466 (MFW)

(Jointly Administered)

**Re: Docket Nos. 3002, 3101, 3105, 3172, 3175**

## OMNIBUS REPLY IN SUPPORT OF THE MOTION OF THE BROAD STREET ENTITIES AND PAHH FOR ENTRY OF AN ORDER (I) DETERMINING THAT THE AUTOMATIC STAY DOES NOT APPLY TO THEIR ASSETS OR (II) IN THE ALTERNATIVE, GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY FOR THEM TO SELL, TRANSFER, OR OTHERWISE ENCUMBER SUCH ASSETS

The Movants[2] hereby submit this omnibus reply in support of the Comfort Motion[3] and in response to (a) *The City of Philadelphia's Limited Objection to the Motion of the Broad Street Entities and PAHH for Entry of an Order (I) Determining That the Automatic Stay Does Not Apply to Their Assets or (II) in the Alternative, Granting Limited Relief from the Automatic Stay for Them to Sell, Transfer, or Otherwise Encumber Such Assets* [Docket No. 3101] (the "**Limited**

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).  The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2]  The "**Movants**" are Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC, and Broad Street Healthcare Properties III, LLC (collectively, the "**Broad Street Entities**"), and Philadelphia Academic Health Holdings, LLC ("**PAHH**").

[3]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Motion of the Broad Street Entities and PAHH for Entry of an Order (I) Determining That the Automatic Stay Does Not Apply to Their Assets or (II) in the Alternative, Granting Limited Relief from the Automatic Stay for Them to Sell, Transfer, or Otherwise Encumber Such Assets* [Docket No. 3002] (the "**Comfort Motion**").

**Objection**"); (b) the *Objection of Debtors and Committee to the Motion of the Broad Street Entities and PAHH for Entry of an Order (I) Determining That the Automatic Stay Does Not Apply to Their Assets or (II) in the Alternative, Granting Limited Relief from the Automatic Stay for Them to Sell, Transfer, or Otherwise Encumber Such Assets* [Docket No. 3172] (the "**Estate Objection**") filed by the Estate Parties;[4] and (c) the HSRE Joinders[5] (together with the Limited Objection and the Estate Objection, the "**Objections**").

## PRELIMINARY STATEMENT

1.       This Court should grant the Comfort Motion based on the statements and actions of the Estate Parties alone.  The Estate Parties have repeatedly recognized that the Movants' assets are the property of the Movants and not the Debtors, that the Movants will be harmed if they cannot obtain financing, and that such financing must be secured.[6]  The Estate Parties' and the other objectors' baseless opposition—and expensive discovery ostensibly in opposition to the Comfort Motion—is designed to exhaust the Movants' resources even further and gain leverage in pursuing

---

[4]     "**Estate Parties**" means the Debtors and the Official Committee of Unsecured Creditors (the "**Creditors' Committee**").

[5]     "**HSRE Joinders**" means, collectively, (i) the *Joinder of HSRE-PAHH I, LLC and Its Affiliates* ["**HSRE**"] *to Objections to Motion of the Broad Street Entities and PAHH for Entry of an Order (I) Determining That the Automatic Stay Does Not Apply to Their Assets or (II) in the Alternative, Granting Limited Relief from the Automatic Stay for Them to Sell, Transfer, or Otherwise Encumber Such Assets* [Docket No. 3105] and (ii) the *Joinder of HSRE-PAHH I, LLC and Its Affiliates to the Objection of Debtors and Committee to the Motion of the Broad Street Entities and PAHH for Entry of an Order (I) Determining That the Automatic Stay Does Not Apply to Their Assets or (II) in the Alternative, Granting Limited Relief from the Automatic Stay for Them to Sell, Transfer, or Otherwise Encumber Such Assets* [Docket No. 3175].  Please note that this reply is not in opposition to the *Objection of Tenet Business Services Corporation and Conifer Revenue Cycle Solutions, LLC to the Motion of the Broad Street Entities and PAHH for Entry of a Comfort Order Regarding the Automatic Stay* [Docket No. 3102].

[6]     In opposing the Comfort Motion, the Estate Parties state that "the Movants sprung the [Comfort] Motion" on the Estate Parties.  Estate Objection ¶ 2.  The Comfort Motion was not "sprung" on the Estate Parties because the Comfort Motion was filed on regular 21-day notice, the objection deadline for the Estate Parties was extended by twelve days from November 12 to November 24 (which resulted in Movants' preparing this reply over the Thanksgiving holiday), and the hearing was continued from November 19 to December 1, 2021.  Moreover, the Estate Parties had been aware of the Movants' need for financing to fund accrued and ongoing operating expenses and professional fees for months.

various unsupported claims against the Movants that are part of a sealed, stayed complaint and the subject of ongoing mediation before the Hon. Kevin Carey (Ret.).

2.      As the Estate Parties have known for months, the proposed Term Loan is calculated to avoid a fire sale of the MBNF Assets while awaiting the real estate market's recovery from its COVID-19-induced trough, thereby enabling the Movants to maximize the value of the MBNF Assets for the benefit of all stakeholders with valid and liquidated claims.  Recognizing the necessity of the financing secured by the MBNF Assets, and recognizing they had no legal basis to stand in the way of the third-party financing to which the Movants agreed, the Debtors made an alternative financing offer to the Movants on November 17th—weeks after the Comfort Motion was filed.  But their proposal is illusory.  Their proposal provided funds for six months of property operating expenses, with no leeway for payments to the Pension Fund and the Professionals or for working capital, secured by a first lien and maturing in six months.  Not only are the Debtors proposing to substitute their business judgment for the Movants', the Movants' agreement to such terms would be irresponsible in light of the Movants' prior obligations, fiduciary duty to pursue claims they hold against other entities, and the ridiculously short maturity.  Indeed, the Debtors offer no foundation or other explanation for their belief that a value-maximizing sale of the MBNF Assets—assets they have little, if any, familiarity with from a business or operating standpoint— can be accomplished on such a tight timeline.  Rather, the Debtors' inferior proposal was merely their attempt to put themselves in a first lien position with respect to the MBNF Assets, knowing that they otherwise have no legal interest in those Assets.

3.      The Movants' primary assets are the buildings that housed the former Hahnemann University Hospital and certain adjacent real estate.  Over the past two years, the Movants' liquidity has been drained by the property operating expenses attendant to long-vacant,

deteriorating buildings covering nearly an entire block of Philadelphia's Center City.  The Movants also made payments to the Pension Fund for Hospital and Health Care Employees of Philadelphia and Vicinity (the "**Pension Fund**") for the *Debtors'* former employees.  To ensure sufficient cash to make these payments, the Movants asked certain professionals to defer their fees and proposed to secure the amounts owed before otherwise encumbering their assets.  In hopes of supporting an expedient resolution with the Estate Parties, certain professionals of the MBNF Non-Debtor Entities (the "**Professionals**") agreed to these terms.  Sadly, as evidenced by the Debtors' aggressive litigation tactics, the personal sacrifice made by the Professionals failed to impress upon the Estate Parties the importance of the Term Loan as a lifeline to both the MBNF Assets and the Professionals involved.[7]

4.      But the Estate Parties do not stop there.  Their relentless attacks on Mr. Freedman personally while repeatedly ignoring his status as a non-Movant should not be lost on this Court.[8] Prior to the Petition Date, in keeping with his fiduciary duty and with the advice of the Debtors' professionals, Mr. Freedman, as the equity holder and an officer of each of the Debtors, and co-

---

[7]    The Estate Parties' spurious contention that the liens or obligations are fraudulent conveyances are belied by their own assertions.  These conclusory arguments, clearly in furtherance of the Estate Parties' attempt to malign Mr. Freedman, are predicated upon, *inter alia*, the assumption that the Movants are insolvent.  *See* Estate Objection ¶ 42 ("The Proposed Loan, however, is both excessive and is in large measure either a fraudulent conveyance or a refinancing of apparent *fraudulent* conveyances."); ¶ 42 ("The Proposed Loan is also expensive, with over $2.7 million in interest, fees and commissions, exclusive of the $3.2 million of *fraudulently* secured professional fees that the Proposed Loan would refinance."); ¶ 44 ("To lift the stay to allow financing that benefits Freedman and his entities would be unnecessarily costly, as the Debtors, as creditors of the Movants, would then have to expend time and money to avoid any such *fraudulent* transfers under the Pennsylvania Voidable Transfers Act.") (emphasis added); *cf. id.* ¶ 35 ("Certain of the Debtors' causes of action in the adversary complain, such as substantive consolidation . . .") and ¶ 36 ("Substantive consolidation is an equitable remedy to 'recover assets of a *financially sound affiliated entity*' for the debtor's estate when it is equitable to do so.") (citation omitted) (emphasis added); *see also Disclosure Statement Relating to Debtors' Chapter 11 Plan of Liquidation* [Docket No. 2002] (the "**Disclosure Statement**"), Section VII.R ("*The real estate . . . remained valuable* and the PropCos did not file for chapter 11 protection").  The premise that the Movants are insolvent is in no way supported by the Objections.

[8]    During the November 19th hearing, the Debtors' counsel invoked Mr. Freedman's name on no fewer than forty-five occasions.  However, the Comfort Motion was not actually filed by Mr. Freedman; it was filed by the Movants.  *See* Nov. 19th Hr'g Tr., *passim*.

manager of PAHS (the top-level Debtor),[9] determined that placing the Debtors in Chapter 11 (which decision was made in accord with the Debtors' other management) and keeping the MBNF PropCos out of bankruptcy would maximize value for the benefit of the Debtors' and MBNF PropCos' creditors. Indeed, for the last two and a half years, Mr. Freedman caused the MBNF Non-Debtor Entities to support the Debtors' operations by providing a guaranty and pledging assets for the Debtors' $65 million debtor-in-possession financing, while receiving no consideration in exchange.[10] Such support led to an orderly shutdown of Hahnemann University Hospital and a sale of St. Christopher Hospital for Children. Additionally and among other things, the MBNF Non-Debtor Entities[11] made substantial payments to the Pension Fund on account of the liability triggered by the Debtors' withdrawal from a multiemployer pension plan. These payments are on account of obligations of the Debtors, but because they failed to make the necessary payments to the Pension Fund (and still fail to do so), Mr. Freedman and the other MBNF Non-Debtor Entities stepped in to do so, and expect to continue to make such payments with the Term Loan proceeds.

5. In accordance with the Court's ruling at the November 19th hearing, the Movants produced 2,200 pages of documents beyond those hundreds provided before the hearing. The

---

[9]   Albert Mezzaroba served as the other co-manager for PAHS.

[10]   The Estate Parties refuse to acknowledge such support. *See* Estate Objection ¶ 50 ("They fail to mention that their guaranty of the Debtors' debtor-in-possession loan was merely a continuation of the Movants' (belated and reluctant) guaranty of the Debtors' pre-petition term loan."). Contrary to the Estate Parties' assertion, the MBNF PropCos had no obligation to provide the same pre-petition guaranty, and indeed they did not—the DIP guaranty was not a continuation of the Movants' prepetition guaranty. To the contrary, both the DIP guaranty and related mortgages were brand new and unrelated to the prepetition guaranty. *See* Exhibits B (Payment Guaranty) and C (Guaranty and Security Agreement), hereto.

[11]   The "**MBNF Non-Debtor Entities**" are Joel Freedman, Stella Freedman, Svetlana Attestatova, Kyle Schmidt, MBNF Investments, LLC, American Academic Health System, LLC, Philadelphia Academic Health Holdings, LLC, Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC, Broad Street Healthcare Properties III, LLC, Philadelphia Academic Risk Retention Group, LLC, Paladin Healthcare Capital, LLC, Paladin Healthcare Management, LLC, and Globe Health Foundation, Inc.

Movants also produced both Mr. Freedman and Mr. Brinkman for depositions that lasted more than eight and a half hours in the aggregate.  Yet, in the end, none of the discovery the Estate Parties so zealously sought helped their argument; the only attachment to the Estate Objection is the unsubstantiated adversary complaint.

6.      For these reasons and the reasons set forth below, the Estate Objection together with the other Objections are without merits and should be denied.

## **REPLY**

A.      **The Comfort Motion's Request For A Determination That The Automatic Stay Does Not Apply Is Procedurally Sound**

7.      The Comfort Motion seeks (i) a determination that the automatic stay does not apply to the MBNF Assets or (ii) in the alternative, relief from the automatic stay to the extent the Court finds that the Debtors have an interest in the MBNF Assets.  The Estate Parties conveniently disregard the alternative relief sought in the Comfort Motion and incorrectly argue that an adversary proceeding should have been commenced.[12]  But the Estate Parties are wrong as a matter of law.  The 1983 Notes of the Advisory Committee on Fed. R. Bankr. P. 7001 state:

> Unlike former Bankruptcy Rule 701, requests for relief from an automatic stay do not commence an adversary proceeding.  Section 362(e) of the Code and Rule 4001 establish an expedited schedule for judicial disposition of requests for relief from the automatic stay.  The formalities of the adversary proceeding process and the time for serving pleadings are not well suited to the expedited schedule.  The motion practice prescribed in Rule 4001 is best suited to such requests because the court has the flexibility to fix hearing dates and other deadlines appropriate to the particular situation.

---

[12]    *See* Estate Objection ¶ 27 ("The Movants mischaracterize the [Comfort] Motion as one about the automatic stay; what they actually seek is a declaratory judgment that the MBNF Assets are free and clear of the Debtors' equitable interests.").  However, the Estate Parties do acknowledge that the Comfort Motion seeks alternative relief when it makes sense to do so in connection with other arguments they make in the Estate Objection, without any explanation for this inconsistency.

Fed. R. Bankr. P. 7001, advisory committee notes to 1983 amendment.  Courts often look to the Advisory Committee Notes for interpretive guidance.  *See, e.g.*, *In re Crouthamel Potato Chip Co.*, 786 F.2d 141, 145 (3d Cir. 1986) (referencing the Advisory Committee Notes for a rule's purpose); *In re Worcester*, 811 F.2d 1224, 1227 (9th Cir. 1987) (relying on the Advisory Committee Notes for clarity as to a rule's application).  Because the Comfort Motion seeks to lift the automatic stay *only to the extent it applies*, an adversary proceeding is neither well suited to the Comfort Motion nor required under Fed. R. Bankr. P. 7001.[13]

8.     In fact, this Court has granted similar relief without requiring an adversary proceeding.  *See, e.g.*, *In re Downey Fin. Corp.*, 428 B.R. 595, 608 (Bankr. D. Del. 2010) (holding that "the Policy proceeds are not property of the estate," but holding in the alternative that "[e]ven if the Policy proceeds were property of the estate[,] cause exists to lift the automatic stay"); *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 513 (Bankr. D. Del. 2004) (concluding that proceeds of debtor's D&O liability policy were not included in "property of the estate," but holding that "[e]ven if the proceeds from the D & O Policy were property of the bankruptcy estate, . . . the automatic stay should be lifted"); *In re Levitz Furniture Inc.*, 267 B.R. 516, 522 (Bankr. D. Del. 2000) (rejecting debtor's argument that state court action is property of the bankruptcy estate, but holding in the alternative that "[e]ven if the stay were applicable . . . we would annul the stay to permit the . . . [a]ction to proceed . . . .") (citing *In re Siciliano*, 13 F.Rd 748 (3d Cir. 1994)).[14]

---

[13]    To the contrary, it is the Estate Parties' position that is procedurally improper.  In essence, the Estate Parties are seeking an injunction against the proposed financing transaction.  However, a motion for injunctive relief, like other actions seeking equitable relief, generally requires an adversary proceeding. *See* Fed. R. Bankr. P. 7001(7) (an adversary proceeding is necessary "to obtain an injunction or other equitable relief"). *See, e.g.*, *In re Residential Cap., LLC*, 480 B.R. 529, 538 (Bankr. S.D.N.Y. 2012) (stating that debtor must pursue section 105 injunction staying actions against non-debtors through an adversary proceeding); *In re The Fairchild Corp.*, No. 09-10899 (CSS), 2009 WL 4546581, at *7 (Bankr. D. Del. Dec. 1, 2009) (stating that entry of injunctive relief requires initiation of an adversary proceeding).

[14]    *See also In re Welded Construction, L.P.*, Case No. 18-12378 (KG) (Bankr. D. Del. December 11, 2018); *In re Ciber, Inc.*, Case No. 17-10772 (BLS) (Bankr. D. Del. May 30, 2017); *In re Taylor-Wharton International LLC*,

**B.      The Comfort Motion Should Be Granted On The Sole Basis That The MBNF Assets Are Not Estate Property**

     **a.      The Estate Parties Have No Interest In The MBNF Assets Under The Plain Meaning Of The Bankruptcy Code**

9.      The Estate Parties' convoluted argument[15] that the Adversary Complaint gave rise to an equitable interest in the MBNF Assets suggests an absurd result.  Following the Estate Parties' line of reasoning, a debtor would have an "equitable interest" in the property of *any* defendant in *any* adversary proceeding, simply by filing a complaint.  Customarily invoked procedures, such as that to obtain a pre-judgment attachment of an interest in property, would be rendered obsolete.  Subject to the automatic stay, the defendant could no longer sell, transfer, or otherwise encumber any of its assets as a result of the debtor's self-proclaimed "equitable interest."

10.      Fundamental to their flawed argument, the Estate Parties conflate a "lis pendens" with an interest in property.[16]  However, a lis pendens is merely a notice of a dispute.  The Estate

---

Case No. 15-12075 (BLS) (Bankr. D. Del. February 24, 2016); *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. October 26, 2015).

[15]  *See* Estate Objection ¶ 35 ("Certain of the Debtors' causes of action in the Adversary Complaint, such as substantive consolidation and the companion claim of piercing the corporate veil, assert equitable remedies that are grounded in an equitable interest in the MBNF Assets.  This equitable interest in property of the estate is therefore within the protection of the automatic stay.") and ¶ 37 ("Another way to understand how a substantive consolidation claim generates an interest in real property is through *lis pendens* actions.").

[16]  The decision cherry-picked by the Estate Parties to support this argument—*In re Prototype Eng. & Manu., Inc.*, 628 B.R. 132 (Bankr. C.D. Cal. 2020) ("***Prototype***")—addressed expungement of a bankruptcy trustee's existing lis pendens against certain real property titled to defendants facing a substantive consolidation claim that had been dismissed due to a procedural deficiency, albeit not on a final basis.  The most basic difference between *Prototype* and the instant situation is that the Estate Parties never filed a lis pendens.  It follows that the matter at issue is not whether a lis pendens clouding (but not encumbering) the Movants' property should be expunged. Notwithstanding this obvious dissimilarity, the Estate Parties cited *Prototype* for the proposition that "an order granting a substantive consolidation claim **would** 'affect' title to and possession of real property with the meaning of California Code of Civil Procedure § 405.4," with the implication being that the Debtors' pending substantive consolidation claim should **already now** have such effect.  *Prototype* at 140 (emphasis added).

The Movants do not disagree that an order granting the Debtors' substantive consolidation claim would affect title to and possession of their real property.  However, no such order has been granted.  Further, the Estate Parties never filed a lis pendens, either under the California law at issue in *Prototype* or under the Pennsylvania law that actually applies to the MBNF Assets.  But even if the adversary complaint had warranted a lis pendens, that would not prevent the Movants from encumbering their properties, nor provide grounds for the Court to hold that the Estate Parties have a current interest in the Movants' real property sufficient to defeat the Comfort Motion. Indeed, the Estate Parties completely mistake the effect of a lis pendens, which is merely to give the public "notice of pendency of action" (as noted by the case they selected).  *Prototype* at 135; *see also Barak v. Karolizki*, 196

Parties did not file a lis pendens here because it was unnecessary—the Debtors' adversary complaint, though stayed and sealed, is well known to the potential lenders to the Movants. Because of the seal and stay, these potential lenders cannot see for themselves the weakness of the Debtors' claims, but in any event require "comfort" from the Court in light of the ongoing litigation among the Movants and the Estate Parties.

        **b.**      **The Estate Parties Cannot Claim An Equitable Interest In The MBNF Assets By Virtue Of Judicial Estoppel And *Res Judicata***

11.     *Res judicata* precludes the Estate Parties from arguing that the MBNF Assets are property of the Debtors' estates.  "The doctrine of res judicata (or claim preclusion) precludes a party from relitigating claims that were or could have been asserted in a prior action."  *In re EXDS, Inc.*, 316 B.R. 817, 821 (Bankr. D. Del. 2004).  The elements of *res judicata*, or claim preclusion, are: "(i) a final judgment on the merits in a prior suit, involving (ii) the same parties or their privies, and (iii) a subsequent suit on the same cause of action."  *In re Radnor Holdings Corp.*, 564 B.R. 467, 483 (D. Del.), *aff'd*, 706 F. App'x 94 (3d Cir. 2017).

12.     Applying claim preclusion here would accord with the "essence of res judicata," which is "'that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not to have another chance to do so.'"  *In re AMC Invs., LLC*, 524 B.R. 62, 71 (Bankr. D. Del. 2015) (quoting 47 Am. Jur. 2d Judgments § 464).  Here, the Court has already issued a final order determining that the Debtors did not have interest in the assets owned by the MBNF Non-Debtor Entities (*i.e.*, the real property related to St. Christopher's Hospital for

---

A.3d 208, 222 (Pa. Sup. Ct. Sept. 18, 2018) ("The Supreme Court of Pennsylvania has said that **a 'lis pendens is not to establish actual liens** upon the properties affected nor has it any application between the parties to the action themselves; **all that it does is give notice** to third persons that any interest they may acquire in the properties pending the litigation will be subject to the result of the action.'") (internal citations omitted) (emphasis added).

Children).  *See* Bidding Procedures Order ¶ 31[17] (concluding that "the Assets do not include the fee interest in any real estate, all of which is owned by non-Debtors and shall not be marketed for sale by or on behalf of the Debtors and/or the Committee"); *id.* ("All marketing, deliberations, decisions and actions regarding the fee interest in the real estate shall be reserved for the non-Debtor owners of such real estate.").  Both the Debtors and the Creditors' Committee were parties to the prior proceeding, and both had the opportunity to litigate that claim before the Court made its judgment, regardless of whether they felt it was worthwhile to do so at that time.  *See* Debtors' Motion for Order Approving Bidding Procedures;[18] Limited Objection and Reservation of Rights of the Creditors' Committee.[19]  Moreover, PAHH participated in the prior proceeding.  *See Jarvis v. Matlin Patterson Glob. Advisers, LLC*, 867 F. Supp. 2d 559, 562 (D. Del. 2012) (affirming bankruptcy court's application of *res judicata* and explaining that "'[a] lesser degree of privity is required for a new defendant to benefit from claim preclusion than for a plaintiff to bind a new

---

[17]  "**Bidding Procedures Order**" means the *Order (I) Scheduling a Hearing to Consider Approval of the Sale or Sales of Substantially All Assets of St. Christopher's Healthcare, LLC and Certain Related Affiliates and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Establishing Procedures in Connection with the Selection of and Protections Afforded to Any Stalking Horse Purchasers, and (IV) Granting Related Relief* [Docket No. 301].

[18]  "**Motion for Order Approving Bidding Procedures**" means the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief* [Docket No. 142].

[19]  "**Limited Objection and Reservation of Rights of the Creditors' Committee**" means the *Limited Objection and Reservation of Rights of the Official Committee of Unsecured Creditors with Respect to Debtor's* [sic] *Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Resident Program Assets, Including Approving a Break-up Fee, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (III) Granting Related Relief* [Docket No. 238].

defendant in a later action.'") (quoting *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 966 (3d Cir. 1991)).

13.     Finally, this is a "subsequent suit on the same cause of action" because this action "stem[s] from the same factual incidents and allege[s] overlapping legal theories, and the first suit was actually brought in the [same] bankruptcy proceeding." *Jarvis*, 867 F. Supp. 2d at 564.  By entering the Bidding Procedures Order and bifurcating the marketing process, the Court acknowledged the Debtors' estates' lack of any interest in the assets of the MBNF Non-Debtor Entities.  The Estate Parties should not be allowed by re-litigate the same legal issues merely because they now feel it would be to their benefit to do so.

> **c.      The Estate Parties Cannot Assert An Interest In The MBNF Assets As A Result Of Judicial Estoppel**

14.     Judicial estoppel precludes the Debtors from arguing that the MBNF Assets are part of the Debtors' estates at this late stage in the game.  Judicial estoppel, "sometimes called the doctrine against the assertion of inconsistent positions, is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding." *In re Chambers Dev. Co., Inc.*, 148 F.3d 214, 229 (3d Cir. 1998) (citation omitted).  Though "not intended to eliminate all inconsistencies, however slight or inadvertent," this doctrine "is designed to prevent litigants from playing fast and loose with the Courts." *Id.*  Judicial estoppel applies when the moving party establishes that (i) "the party to be estopped must have taken two positions that are irreconcilably inconsistent;" (ii) "judicial estoppel is unwarranted unless the party changed his or her position in bad faith;" and (iii) the "court may not employ judicial estoppel unless it is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigants' misconduct."

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003).

15.     Here, the Debtors consistently have been on record stating that the MBNF Assets are not property of their bankruptcy estates, but rather are property of the MBNF Non-Debtor Parties. *First*, the Debtors' Schedules of Assets and Liabilities made clear that the MBNF Assets are not property of the bankruptcy estates. *See, e.g.*, *Schedule A/B: Assets – Real and Personal Property of Debtor Center City Healthcare, LLC* [Docket No. 445] at 16 (listing no property ownership); *Schedule A/B: Assets – Real and Personal Property of Debtor St. Christopher's Healthcare, LLC* [Docket No. 449] at 16-17 (same). *See also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-20 (3d Cir. 1988) (judicially estopping debtor from bringing claims against a creditor bank in non-bankruptcy proceeding because debtor failed to list its claim against the bank in its schedule of assets and liabilities or to raise these claims at any point in the bankruptcy proceeding). *Second*, the disclosure statement for the Debtors' proposed plan (which long ago fell by the wayside) discusses the "non-Debtors that acquired the Hospital Businesses' real estate" in the context of "Segregation of Assets Among 'OpCos' and 'PropCos,'" contrasting "operating entities (generally, the Debtors herein)" with "other entities (non-Debtors) generally owning the real estate upon which the Hospital Businesses [operated]." Disclosure Statement, Section VI.C. *Third*, the plan appended to the Disclosure Statement also defines "Non-Debtor Real Estate" as "the real estate owned by one or more of the following entities as of the Petition Date: Front Street Healthcare Properties, LLC, Front Street Healthcare Properties II, LLC, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC, Broad Street Healthcare Properties III, LLC, including without limitation the real estate located at 160 E. Erie Ave., Philadelphia PA; 3647-3669 N. Front Street, Philadelphia, PA; 3843-3863 D Street,

Philadelphia, PA; 222-248 N. Broad Street, Philadelphia, PA; 221-223 N. 15th Street, Philadelphia, PA; 325 N. 15th Street, Philadelphia, PA; 300-304 N. Broad Street, Philadelphia, PA; 211-213 N. Broad Street, Philadelphia, PA; 200-214 N. Broad Street, Philadelphia, PA; and 201-219 N. 15th Street, Philadelphia, PA and, in all instances, the proceeds thereof." *Id.* at p. 92 (section 1.83 of proposed plan). *Fourth*, and most recently, the Estate Parties confirmed to the Court that the MBNF Assets are not owned by the Debtors at the November 19th hearing.[20] Thus, and though it should go without saying, the Debtors disclaimed any ownership in the MBNF Assets.

16.    By way of comparison, in *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corporation*, the Third Circuit applied judicial estoppel to preclude debtor/franchisee from pursuing claims against franchisor where the debtor failed to include those claims in its disclosure statement. 337 F.3d at 321-22 (3d Cir. 2003). Emphasizing the debtor's "affirmative duty to provide creditors with a disclosure statement containing 'adequate information,'" including any "*potential* causes of action," the court concluded that the debtor failed to disclose these potential claims despite possessing "enough information . . . to know it might have a claim against" the franchisee. *Id.* at 321-22, 333.[21]

17.    Further, the Debtors again failed to raise the argument that the MBNF Assets were property of the bankruptcy estates in their Motion for Approval of Bidding Procedures, where they

---

[20]    *See* Nov. 19th Hr'g Tr. (The Court: "Well, let me ask a question, the property is not currently titled in the name of the Debtors or the estate. Correct?" [Creditors Committee's Counsel]: "That's correct, Your Honor.")

[21]    The court in *In re EXDS, Inc.* declined to estop a debtor from pursuing claims, where the debtor failed to list those potential claims on its bankruptcy schedule. 316 B.R. 817, 824 (Bankr. D. Del. 2004). But there, the court credited the debtor's "explicit[] den[ial] that it had any knowledge of" the defendants' tortious wrongdoing when the debtor filed its schedule. *Id.* at 825. By contrast, here, the Debtors were aware of which properties were included as part of the bankruptcy estate and which were not. Indeed, like the debtor in *Krystal Cadillac-Oldsmobile*, the Debtors here had an affirmative obligation to disclose all assets to the bankruptcy court. *See* 11 U.S.C. § 541(a)(1); 11 U.S.C. § 521(a)(1). Nonetheless, the Debtors chose not to list the MBNF Assets as property of the bankruptcy estate in its schedule.

sought approval to sell assets related to St. Christopher's Hospital for Children. Debtors' Motion for Approval of Bidding Procedures Order ¶¶ 2-4 (citing Debtors' interest in "avoid[ing] any such risks of disruption to the [St. Christopher's Hospital for Children] Entities' operations"). In their motion, the Debtors acknowledged that "[St. Christopher's Hospital for Children] does not own any real property," and explained that it "leases the facilities from which it operates its hospitals from" certain "non-Debtor affiliates." Motion for Approval of Bidding Procedures ¶ 10. But now, two years after obtaining approval of the bidding procedures based in part on these representations, and now that the Movants are in need of financing to cover operating costs, the Debtors do a complete about-face: now, they belatedly and conveniently argue that the MBNF Assets are in fact part of their estates after all.

18.     This new position is irreconcilably inconsistent with the Debtors' previous representations. Moreover, this change in position was undertaken in bad faith, only after the Debtors received approval to sell their own assets, in order to frustrate the Movants' ability to secure much-needed financing.[22] *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) ("The basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."). Judicial estoppel would be an appropriately tailored remedy to address the harm that would occur to the Movants

---

[22]     This Court should reject any argument that the Debtors' failure to disclose the MBNF Assets in their schedule was a good faith mistake. *See Coffaro v. Crespo*, 721 F. Supp. 2d 141, 146 (E.D.N.Y. 2010) (holding "defendant's knowledge of his interest in the Painting during his bankruptcy proceedings precludes him from asserting a good faith mistake defense to judicial estoppel" where the defendant omitted the painting from his schedule of assets and liabilities); *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1287 (11th Cir. 2002) ("[S]everal circuits, in considering the particular issue of judicial estoppel and the omission of assets in a bankruptcy case, have concluded that deliberate or intentional manipulation can be inferred from the record."); *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1157 (10th Cir. 2007) ("[O]ur sister circuits . . . have not been overly receptive to debtors' attempts to recover on claims about which they inadvertently or mistakenly forgot to inform the bankruptcy court.") (internal quotation marks omitted).

should the automatic stay extend to the MBNF Assets and frustrate their efforts to secure the necessary financing.

C.     **In The Alternative, The Three-Prong Test Requires The Automatic Stay To Be Lifted**

19.     For the reasons set forth above and in the Comfort Motion, the MBNF Assets are not property of the Debtors' bankruptcy estates.  However, even if the MBNF Assets were property of the estates, the Court should find that cause exists to lift the automatic stay because each element of the three-prong test that guides such determinations favors lifting the automatic stay.

a.     **Prejudice To The Estates**

20.     As to the first factor, the Estate Parties' position—"the MBNF Assets are a significant source of recovery for the Debtors' creditors in connection with any plan"—supports the relief sought in the Comfort Motion.  Estate Objection ¶ 41.  As set forth in the *Declaration of William R. Brinkman* filed contemporaneously herewith, without immediate access to the Term Loan, the Movants will be unable to continue to preserve and maximize the value of their assets for the benefit of all the Movants' stakeholders.  *See Declaration of William R. Brinkman*, filed contemporaneously herewith (the "**Brinkman Decl.**").  In the unlikely event the Debtors become judgment creditors, the Term Loan increases the chances that value will be available to them. Thus, imposing the automatic stay and blocking the Term Loan would actually cause prejudice to the Debtors' estates.  Accordingly, the first factor weighs in favor of lifting the automatic stay.

b.     **Balance Of Hardships**

21.     As set forth in the Brinkman Declaration, without relief from the automatic stay and without the Term Loan, the Movants will be unable to (i) pay all of the real estate taxes levied and municipal fees incurred with respect to their property; (ii) properly manage the property and ensure it remains compliant with applicable building and safety codes; and (iii) correct or

otherwise remedy code violations.  Brinkman Decl., ¶ 8.  In each instance, the City of Philadelphia (the "**City**") has the right to impose fines and engage in self-help remedies and, if such amounts remain unpaid, encumber the property in the amount of all outstanding taxes, municipal fees, code violation penalties, late fees, and interest incurred.  If such liens are not satisfied, the City will be able to obtain a judgment against the Movants and cause the Movants' real property to be sold at a tax sheriff sale.  A fire sale such as this would undoubtedly destroy value, to the detriment of all the Movants' stakeholders.  Further, the real property, if not maintained for code compliance, would pose a serious threat to public safety.  In addition to public safety concerns and the risk of a forced sheriff sale, the City could revoke permits and licenses or refuse to renew or re-issue occupancy certificates needed to conduct operations at the Movants' property if any violations remain uncured.  As discussed above, lifting the stay is unlikely to cause any hardship to the Debtors.  By contrast, the Movants, their creditors, and the public-at-large will suffer a real and easily identifiable hardship if the stay is not lifted.  Accordingly, the second factor weighs in favor of lifting the stay.

### c.    Probability Of Success On The Merits

22.    Despite liberal use of catchphrases in the Estate Objection, such as "fraudulent transfers" and "obligations to benefit Freedman" (Estate Objection ¶ 46), the Estate Parties fail to establish that the third factor weighs in favor of imposing the automatic stay.  As an initial matter, the Estate Parties misstate the applicable legal standard.  *See id.* ("Rather, after acknowledging the Debtors' interest in the property, the issue then becomes one about the merits of the Proposed Loan.").  While this factor can be more readily applied where relief from the stay is sought to pursue litigation, it certainly does not concern the merits of the Term Loan—whatever those might be, in a judicial context.  In the present case, the Court should consider either the merits of the Movants' property argument or the merits of the Adversary Proceeding.  *See Downey*, 428 B.R. at

595, 608 (Bankr. D. Del. 2010) ("This factor clearly favors the Insureds because they have already

won on the merits—the Securities Class Action has been dismissed, and the case is terminated.");

*In re SCO Group, Inc.*, 395 B.R. 852, 859 (Bankr. D. Del. 2007) (where defendant/cross-claimant

sought stay relief in order to proceed with federal district court litigation commenced by plaintiff-

debtors, "the Court finds that there is sufficient evidence, including the District Court's decision

[granting summary judgment against debtors on certain issues], to support a finding of a reasonable

probability of [defendant/cross-claimant's] success on the merits").  Even if the merits of the Term

Loan were at issue, the Movants' term sheet with Gordon Brothers (which was produced to the

Estate Parties on November 6, 2021) (appended hereto as <u>Exhibit A</u>) (the "**Term Sheet**") and other

documentation provided by the Movants as well as the Brinkman Declaration demonstrate that the

Term Loan proceeds will be used to pay the Movants' accrued and future obligations, including

property operating costs and professional fees, not dividends or distributions.[23]

23.    Moreover, as this Court stated in *SCO Group, Inc.*, "[e]ven a slight probability of

success on the merits may be sufficient to support lifting an automatic stay in an appropriate case."

*Id.*                                    REDACTED

---

[23] As to the Estate Parties' continuing fixation on the Movants' selection of the Term Loan in particular as the best available option, such choice constitutes an exercise of *the Movants'* business judgment that is not subject to oversight by this Court.  Indeed, the Court has already advised the Estate Parties that "[w]ith respect to the inquiring into the negotiations with Gordon Brothers and what other options the movants had, I don't think that's relevant at all to the motion.  I don't think that questioning their business judgment is relevant to the motion. They are not entities in bankruptcy."  Nov. 19th Hearing Tr., 48:4-8.

REDACTED

REDACTED

REDACTED

**D.      Response To The Limited Objection of the City of Philadelphia**

27.      State law determines lien priority.  Under Pennsylvania state law, "[a]ll taxes which may hereafter be lawfully imposed and assessed by . . . cities . . . on real property, are . . . a first lien on such real property . . . and every such lien shall date from the day on which the millage or tax rate is fixed by the proper authority of any such political subdivision . . ."  53 Pa. Stat. § 7102. The Term Loan is not intended to prime the City's liens or otherwise interfere with the operation of applicable state law.  To the extent the City holds a valid lien against the MBNF Assets, the priority of such lien will not be affected by imposition of any additional lien in connection with the Term Loan.  Accordingly, the language in the proposed order does not cause the City any prejudice.

## <u>CONCLUSION</u>

28.      For the reasons above, the Movants respectfully request that the Court deny the Objections and grant the Comfort Motion.

Dated: November 29, 2021
Wilmington, DE

*/s/ Brendan J. Schlauch*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Brendan J. Schlauch (No. 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701
Email: collins@rlf.com
        merchant@rlf.com
        schlauch@rlf.com

- and -

Suzzanne S. Uhland (admitted *pro hac vice*)
Robert J. Malionek (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Alexandra M. Zablocki (admitted *pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
E-mail: suzzanne.uhland@lw.com
        robert.malionek@lw.com
        tj.li@lw.com
        alexandra.zablocki@lw.com

*Counsel for PAHH and the Broad Street Entities*

**Exhibit A**

**Term Sheet**

MBNF000070

# Summary of Indicative Terms and Conditions

The terms and conditions summarized in this term sheet are provided by Gordon Brothers Realty Services, LLC ("GBRS") for discussion purposes only and do not constitute an offer, agreement, or commitment to extend financing. The terms and conditions contained herein are subject to the satisfactory completion of due diligence, internal credit approvals, satisfactory review and execution of documentation, and such other conditions as may be required by GBRS and its counsel.

| | |
|---|---|
| **Borrower or Company:** | Broad Street Healthcare Properties, LLC; Broad Street Healthcare Properties II, LLC & Broad Street Healthcare Properties III, LLC |
| **Guarantor:** | Philadelphia Academic Health Holdings, LLC ("Parent"), a direct parent company of the Borrower, will guaranty the credit facility on a limited basis with the recourse limited solely to its equity interests in the Borrower, which will be pledged to the Lender in support of Parent's guaranty obligations. |
| **Broker:** | Trikuta Hills Inc. |
| **Lender:** | GBRS or one of its affiliates |
| **Facility:** | $17.5 million Term Loan (the "Term Loan") fully funded at close |
| **Interest and Other Reserves:** | The Proceeds of the Facility less the amount earmarked for repayment of the secured notes issued by Borrower to Paladin Healthcare Capital, LLC, as agent (the "Paladin Notes") will be used to fund the carrying costs of the portfolio and other operating costs in such amounts and at such times as mutually agreed between Borrower and Lender, substantially consistent with the use of proceeds attached hereto as Exhibit A, subject to a mutually acceptable variance set forth in the definitive documentation, with a portion of the proceeds to be placed into an escrow account with the Lender as contemplated in Exhibit A. The escrow amounts will be released upon the repayment in full of the Term Loan facility (other than contingent indemnification obligations for which no claim has been asserted). |
| **Anticipated Closing Date:** | The five weeks from the date of execution of this Summary of Indicative Terms and Conditions. |
| **Use of Proceeds:** | Use of proceeds attached hereto as Exhibit A. |
| **Collateral:** | First priority lien on the following sites located in Center City Philadelphia with the addresses and OPAs as follows: |

| Property | Owner | Address | OPA |
|---|---|---|---|
| North Tower, South Tower | Broad Street Healthcare Properties, LLC | 222-248 N. Broad Street | 772025002 |
| (land next to SHSH Building) | Broad Street Healthcare Properties, LLC | 221-223 N. 15th Street | 772028498 |
| Stiles Alumni Hall Underground | Broad Street Healthcare Properties, LLC | 325 N. 15th Street | 881038202 |
| Martinelli Park | Broad Street Healthcare Properties II, LLC | 300-304 N. Broad Street | 885620242 |
| (redevelopment land/surface parking) (city block) | Broad Street Healthcare Properties III, LLC | 200-214 N. Broad Street | 885467862 |

US_150559373v8_340878-00043 10/27/2021 4:14 PM

MBNF000071

| SHSH Building (city block) | Broad Street Healthcare Properties III, LLC | 201-219 N. 15th Street | 777028496 |
|---|---|---|---|
| | PHL Vine Development is the former Hahnemann University Hospital and contains 1.56 acres with two buildings; the North Tower is 20 stories built in 1978 and the South Tower is 12 stories constructed in 1928. The PHL Race Development contains a low-rise building and surface parking lot. Martinelli Park is 0.76 acres located on the Northwest corner of the intersection of Broad Street and Vine Street. | | |

**Term:** Fifteen (15) months from closing. Borrower will use commercially reasonable efforts to sell properties within the 15-month period and will work cooperatively with Lender to establish commercially reasonable milestones associated with such sale which will be set forth in the loan documents. Borrower may request to extend the maturity date up to six (6) months if any of the parcels comprising the Collateral are subject to a purchase agreement and no event of default exists at the time of such request, with a payment of an extension fee in the amount of the greater of $100,000 or 0.75% of the outstanding Term Loan Facility.

**Pricing:** 90 Day SOFR (with a floor of 0.25%) + 9.50% (950 basis points) paid monthly

**Transaction Fees:** 1.0% of the Term Loan Facility principal amount funded, fully earned and paid at closing and 1.0% of the outstanding Term Loan Facility principal amount fully earned at closing but paid at the time of each partial loan repayment with respect to the repaid principal amount.

**Ticking Fees:** None

**Termination Fee:** $200,000 shall be deposited with Lender and fully earned upon execution of Term Sheet (the "Termination Fee"). The Termination Fee shall be retained by Lender in the event the Borrower elects to terminate any discussions with the Lender to enter into definitive documentation substantially consistent with this Term Sheet within forty-five (45) days following the execution of the Term Sheet, provided, however, if Lender fails to provide definitive documents substantially consistent with this Term Sheet within thirty (30) days from the execution of this Term Sheet, an amount equal to the Termination Fee less any actual out-of-pocket expenses of Lender, which are in excess of the deposit described below, will be returned to the Borrower. In the event that the Comfort Order is not entered on the Closing Date, the Termination Fee shall be held in escrow to support Borrower's indemnification obligations, and shall be released upon the repayment in full of the Term Loan facility (other than contingent indemnification obligations for which no claim has been asserted) or when the Comfort Order is entered into, whatever occurs first.

**Call Protection:** First 12 Months: "Make-Whole" for 12 months. A make-whole is defined as the interest that would have been earned if the Term Loan was outstanding for twelve (12) months minus the interest actually paid to date.

Month 13 and beyond: None

**Payment Terms:** Interest only payments due monthly. Prepayment in connection with any sale of Collateral, subject to agreed-upon prepayment percentages in the event of partial Collateral sales.

**Amortization and Excess Cash Flow capture:** None

**Deposit:** $75,000 to be deposited with Lender at execution of Term Sheet for the Lender's actual out-of-pocket expenses. Once utilized, the Borrower will provide, within 3 business days of a request, additional deposits (in $75,000 increments) as requested to reimburse the Lender for incremental actual out-of-pocket expenses. The Lender's estimate of its expenses in connection with the preparation of definitive documentation (including attorneys' fees and costs), assuming the closing date occurs as anticipated above and there is no litigation related to the Chapter 11 Cases is $150,000. If Borrower fails to provide additional deposits when due under this Term Sheet, Lender may terminate this Term Sheet and retain any portion of the Termination Fee necessary to reimburse it for such expenses incurred prior to termination. Any portion of the deposit not utilized will be returned to the Company upon Closing or at the Company's request (net of actual out-of-pocket expenses incurred to date).

**Gordon Brothers**
1903

US_150559373v8_340878-00043 10/27/2021 4:14 PM

| | |
|---|---|
| **Loan to Value Threshold:** | Definitive documentation to include a covenant to provide that outstanding loan balance shall not exceed 35% of future Broker Opinion of Value or MAI appraisal obtained in the sole discretion and at the election of Borrower, whichever is higher. |
| **Transfers of Equity Interests in Borrower:** | None permitted without written approval by Lender |
| **Additional Debt:** | None permitted without written approval by Lender, including as approved by Lender pursuant to the definitive loan documents; it being understood that (i) the Paladin Notes and related liens granted by the Borrower prior to the execution of the Term Sheet (approximately $3.16 million as of October 28, 2021) shall be repaid from the loan proceeds, (ii) existing intercompany loans and liens the documentation for which has been provided to the Lender shall be permitted to remain outstanding on the terms and conditions satisfactory to the Lender in its sole discretion, and (iii) customary premium financing arrangements shall be permitted. |
| **Recourse** | Non-recourse except for bad boy and environmental carve-outs provided by Parent. In addition, the Lender agrees that the definitive loan documentation will not provide for the remedy of Confession of Judgement in Pennsylvania in connection with an event of default. |
| **Indemnity** | For the avoidance of doubt, Borrower shall use all commercially reasonable efforts to obtain a Comfort Order (as defined below). In the event that a Comfort Order is not obtained prior to closing, Borrower shall agree to indemnify Lender for any losses or costs associated with the *City Center Healthcare LLC* chapter 11 cases captioned 19-11466 (the "Chapter 11 Cases"). Such indemnification obligations shall be guaranteed by Parent under its limited recourse guaranty described above. |
| **Conditions Precedent:** | The Loan is subject to Lender's final satisfactory underwriting and due diligence of the Collateral and Borrower including, but not limited to, the following:<br><br>• Completion of business and legal due diligence<br>• In person visit to Philadelphia, PA and Collateral<br>• Completion and satisfactory review of a Phase I environmental study, and a Phase 2 if necessary<br>• Completion and satisfactory review of Borrower's financial condition<br>• Completion and satisfactory review of insurance<br>• Completion and satisfactory review of title<br>• Completion and satisfactory loan documentation customary for transactions of this type<br>• Completion and satisfactory review of MAI appraisal<br>• Satisfactory KYC reports<br>• Entry of an order of the Bankruptcy Court for the District of Delaware (in form and substance reasonably acceptable to Lender) that provides that the automatic stay does not prevent the sale, transfer, or other encumbrance of the Collateral (including actions in connection with imposing first priority liens and/or mortgages on the Collateral), or, in the alternative, lifting the automatic stay to permit the foregoing actions (the "Comfort Order"). If the Comfort Order is not obtained and Lender completes a satisfactory review of Parent's financials, limited guaranty of Borrower's indemnification obligations by Parent will be executed. |
| **Confidentiality:** | This letter is being transmitted to you with the express understanding that each of Lender and Borrower shall keep confidential its contents and the fact that it has been transmitted except that (i) the Lender and Borrower may share this letter with its agents, attorneys and other advisors and in all other instances only when Lender provides express written consent and (ii) the Borrower may disclose certain contents of this letter in pleading(s) filed with the Bankruptcy Court to obtain approval of the Comfort Order; provided that such pleadings shall be (a) provided by Latham & Watkins LLP (as counsel to the Borrower) to Katten Muchin Rosenman LLP (as counsel to the Lender) no later than three (3) business days before such pleadings are filed with the Bankruptcy Court and (b) in form and substance reasonably acceptable to Lender. |
| **Non-binding:** | This letter is an expression of interest and is not intended to constitute a binding obligation on the part of either party to consummate the transactions contemplated hereby. Except for the obligations set forth in the "Confidentiality," "Termination Fee," "Deposit" and "Non-binding" provisions (which obligations are binding and, except as otherwise provided, shall survive any termination of this letter), neither party shall have any liability or obligation whatsoever (including any obligation to negotiate in any particular manner) with respect to any aspect of the transactions contemplated by or any provision of this letter unless and until definitive agreements with respect thereto, containing detailed terms, conditions and covenants satisfactory to both parties in their sole |

MBNF000072

US_150559373v8_340878-00043 10/27/2021 4:14 PM

Gordon Brothers



discretion, have been executed and unconditionally delivered by both parties.  No provision of this letter shall be interpreted as bestowing any rights whatsoever on any third party.

Sincerely,

**Gordon Brothers Realty Services, LLC**

By: _____

Kyle C. Shonak

Title: Managing Director


**AGREED & ACCEPTED**

**Broad Street Healthcare Properties, LLC**

By: _____

Joel Freedman

Title: CEO & President

**Broad Street Healthcare Properties II, LLC**

By: _____

Joel Freedman

Title: CEO & President

**Broad Street Healthcare Properties III, LLC**

By: _____

Joel Freedman

Title: CEO & President

US_150559373v8_340878-00043 10/27/2021 4:14 PM

MBNF000073



**EXHIBIT A**
**Use of Proceeds**

| Sources and Uses (000s) | | | |
|---|---|---|---|
| **Sources** | **Uses** | | **Comments** |
| Senior Secured Loan | $ 17,500 | Financing Transaction Costs | $ 175 | Assumes 1% fees and costs |
| | | Operating Costs (excl. tax/ins) | 3,848 | Assumes management company run-rate & excludes insurance and taxes which are reserved for separately |
| | | Reserves (to be placed into escrow): | | |
| | | Interest Reserve | 2,133 | 15 months reserve assuming 9.75% cost of money |
| | | Tax Reserve | 1,108 | 15 months of reserve at current assessment |
| | | Tax Reserve – In dispute R/E Tax | 145 | Claim by City of Philadelphia received 9/30 and is indispute |
| | | Insurance Reserve | 1,336 | 15 months of reserve |
| | | Pension Reserve | 4,158 | 15 months of reserve with first payment ($581K in 1/22) and quarterly thereafter ($894K) through 1Q23 |
| | | Environmental Reserve | TBD | Amount to be determined |
| | | Repayment of Paladin Notes | 3,161 | Repaid concurrent with funding. Amount outstanding under the Paladin Notes as of Oct 28. |
| | | Working Capital | 1,436 | Residual amounts to be utilized for general working capital purposes. |
| **Total** | **$ 17,500** | **Total** | **$ 17,500** | |

US_150559373v8_340878-00043 10/27/2021 4:14 PM

MBNF000074

**<u>Exhibit B</u>**

**Payment Guaranty**

## PAYMENT GUARANTY

**THIS PAYMENT GUARANTY** (this "**Guaranty**") made as of July 15, 2019, by **PHILADELPHIA ACADEMIC HEALTH HOLDINGS, LLC** ("**Guarantor**"), to and for the benefit of **MIDCAP FINANCIAL TRUST**, a Delaware statutory trust, its successors and assigns (in its individual capacity as a lender, "**MCF**"), having an address at c/o MidCap Financial Services, LLC, as servicer, 7255 Woodmont Avenue, Suite 200, Bethesda, Maryland 20814, in its capacity as agent (and in such capacity, together with its successors and assigns, "**Agent**") for Lenders (as defined below).

## RECITALS

A.       Pursuant to that certain First Priority Secured Priming Super-Priority Debtor in Possession Credit and Security Agreement of even date herewith (together with all extensions, renewals, restatements modifications, substitutions and amendments thereof, the "**Credit Agreement**") among **ST. CHRISTOPHER'S HEALTHCARE, LLC, CENTER CITY HEALTHCARE, LLC, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC, HPS OF PA, L.L.C., SCHC PEDIATRIC ASSOCIATES, L.L.C., ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., TPS OF PA, L.L.C., TPS II OF PA, L.L.C., TPS III OF PA, L.L.C., TPS IV OF PA, L.L.C.**, and **TPS V OF PA, L.L.C.** each as debtors and debtors in possession under Chapter 11 of the Bankruptcy Code (such entities, and any future borrower each individually as a "**Borrower**" and collectively as "**Borrowers**"), Agent, MCF, and the other financial institutions who are or hereafter become parties to the Credit Agreement (together with MCF, individually each a "**Lender**" and collectively, "**Lenders**"), Lenders are making available to Borrowers a revolving loan facility in the aggregate maximum principal amount of Fifty Million and No/100 Dollars ($50,000,000.00), as such amount may be increased or decreased from time to time in accordance with the terms of the Credit Agreement, including, without limitation, funding of a term loan as contemplated by the DIP Order. Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Credit Agreement.

B.       In connection with the Credit Agreement, Borrowers have executed and delivered certain Notes to Lenders (individually and collectively, the "**Note**").

C.       Guarantor will derive material financial benefit from the Lenders making the Loans available to Borrowers.

D.       Agent and Lenders have relied on the statements and agreements contained herein in agreeing to make the Loans and other financial accommodations available to Borrowers. The execution and delivery of this Guaranty by Guarantor is a condition precedent to making the Loans and other financial accommodations available to Borrowers.

## AGREEMENTS

**NOW, THEREFORE**, intending to be legally bound, Guarantor, in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a

part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, hereby covenants and agrees for the benefit of Agent and Lenders and their successors, indorsees, transferees, participants and assigns as follows:

1. <u>Guaranty</u>. Guarantor absolutely, unconditionally and irrevocably guarantees:

(a) the full and prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of all of the indebtedness, liabilities and obligations of every kind and nature of Borrowers to Agent and Lenders however created, arising or evidenced by, under or in connection with, the Credit Agreement and the other Financing Documents, whether direct or indirect, absolute or contingent, joint or several, now or hereafter existing, or due or to become due, and however owned, held or acquired by Agent or any Lender, whether through discount, overdraft, purchase, direct loan or as collateral or otherwise, including without limitation all Obligations and any interest that may accrue on any judgment against Guarantor in respect of any of the guaranteed obligations hereunder at the lesser of the default rate of interest set forth in Section 10.5 of the Credit Agreement and the maximum interest rate permitted by applicable law);

(b) the prompt, full and complete performance of all of Borrowers' Obligations under each and every covenant contained in the Financing Documents; and

(c) the full and prompt payment of any Enforcement Costs (as hereinafter defined in Section 7 hereof).

All amounts due, debts, liabilities and payment obligations described in subsections (a), (b) and (c) of this Section 1 shall be hereinafter collectively referred to as the "**Guaranteed Obligations**."

All payments under this Guaranty must be made in lawful money of the United States of America and in current funds. Any amount received by Agent or Lenders from any collateral or security for the Financing Documents may be applied by it towards any sums due under or in respect of the Financing Documents, in such order of application as is provided for under the applicable Financing Documents. or if not so provided for, then in such order as Agent may from time to time elect in its sole discretion. Subject to the preceding sentence, Agent shall have the right to determine how, when and what application of payments and credits, whether derived from the Borrowers or any other source, shall be made on the amounts due to Agent and Lenders under the Financing Documents.

2. <u>Payment of Amounts Owed</u>. Upon the occurrence of an Event of Default, after the expiration of any applicable cure or grace period, Guarantor agrees, on demand by Agent or any holder of the Note (which demand may be made concurrently with receipt of written notice to Borrowers that Borrowers are in default of their obligations), to pay the Guaranteed Obligations, regardless of any defense, right of set-off or recoupment or claims which Borrowers or Guarantor may have against Agent or any Lender or the holder of the Note (other than the defense of payment in full). All of the remedies set forth herein and/or provided for in any of the other Financing Documents or at law or equity shall be equally available to Agent and Lenders, and the choice by Agent or any Lender of one such alternative over another shall not be subject to question or

2

challenge by Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff, recoupment or failure to mitigate damages in any action, proceeding, or counteraction by Agent or Lenders to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Agent or Lenders from subsequently electing to exercise a different remedy. The parties have agreed to the alternative remedies provided herein in part because they recognize that the choice of remedies in the event of a default hereunder will necessarily be and should properly be a matter of good faith business judgment, which the passage of time and events may or may not prove to have been the best choice to maximize recovery by Agent or Lenders at the lowest cost to Borrowers and/or Guarantor. It is the intention of the parties that such good faith choice by Agent and any Lender be given conclusive effect regardless of such subsequent developments.

3.    <u>Certain Waivers by Guarantor</u>.  To the fullest extent permitted by law, Guarantor does hereby (a) waive notice of acceptance of this Guaranty by Agent and Lenders and any and all notices and demands of every kind which may be required to be given by any statute, rule or law; (b) agree to refrain from asserting, until after repayment in full of the Guaranteed Obligations and termination of all commitments to lend under the Credit Agreement, any defense, right of setoff, right of recoupment or other claim which Guarantor may have against Borrowers; (c) waive any defense, right of setoff, right of recoupment or other claim which Guarantor or Borrowers may have against Agent, any Lender or the holder of the Note; (d) waive any and all rights Guarantor may have under any anti-deficiency statute or other similar protections; (e) waive all rights at law or in equity to seek subrogation, contribution, indemnification or any other form of reimbursement or repayment from Borrowers or any other person or entity now or hereafter primarily or secondarily liable for any of the Guaranteed Obligations until the Guaranteed Obligations have been paid in full; (f) waive presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge Guarantor with liability; (g) waive the benefit of all appraisement, valuation, marshalling, forbearance, stay, extension, redemption, homestead, exemption and moratorium laws now or hereafter in effect; (h) waive any defense based on the incapacity, lack of authority, death or disability of any other person or entity or the failure of Agent or any Lender to file or enforce a claim against the estate of any other person or entity in any administrative, bankruptcy or other proceeding; (i) waive any defense based on an election of remedies by Agent or Lenders, whether or not such election may affect in any way the recourse, subrogation or other rights of Guarantor against the Borrowers, any other guarantor or any other person in connection with the Guaranteed Obligations; (j) waive any defense based on the failure of the Agent or any Lender to (i) provide notice to Guarantor of a sale or other disposition (including any collateral sale pursuant to the UCC) of any of the security for any of the Guaranteed Obligations, or (ii) conduct such a sale or disposition in a commercially reasonable manner; (k) waive any defense based on the negligence of Agent or Lenders in administering the Loans (including, but not limited to, the failure to perfect any security interest in any collateral for the Loans), or taking or failing to take any action in connection therewith, or based on the federal Equal Credit Opportunity Act and applicable regulations or the Equal Credit Opportunity Acts, or any similar or successor act, or any applicable regulations or any similar act or regulation of any state, *provided*, *however*, that such waiver shall not apply to the gross negligence, bad faith or willful misconduct of the Agent or any Lender as determined by the final, non-appealable decision of a court having proper jurisdiction; (l) waive the defense of expiration of any statute of limitations affecting the liability of Guarantor hereunder or the enforcement hereof; (m) waive any right to file any Claim (as defined below) as part of, and any right to request consolidation of any

3

action or proceeding relating to a Claim with, any action or proceeding filed or maintained by Agent or any Lender to collect any Guaranteed Obligations of Guarantor to Agent or any Lender hereunder or to exercise any rights or remedies available to Agent or any Lender under the Financing Documents, at law, in equity or otherwise; (n) agree that neither Agent nor Lenders shall have any obligation to obtain, perfect or retain a security interest in any property to secure any of the Guaranteed Obligations or this Guaranty, or to protect or insure any such property; (o) waive any obligation Agent or Lenders may have to disclose to Guarantor any facts the Agent or Lenders now or hereafter may know or have reasonably available to it regarding the Borrowers or Borrowers' financial condition, whether or not the Agent or any Lender has a reasonable opportunity to communicate such facts or has reason to believe that any such facts are unknown to Guarantor or materially increase the risk to Guarantor beyond the risk Guarantor intends to assume hereunder; (p) agree that neither Agent nor Lenders shall be liable in any way for any decrease in the value or marketability of any property securing any of the Guaranteed Obligations which may result from any action or omission of the Agent or any Lender in enforcing any part of this Guaranty or any portion of the Loans other than to the extent arising from Agent's or such Lender's gross negligence, bad faith or willful misconduct; (q) waive any defense based on the consideration for this Guaranty; (r) waive any defense based on any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Financing Documents; (s) waive any defense based on any change in the composition of Borrowers, including, without limitation, the voluntary or involuntary withdrawal or removal of Guarantor from any current or future position of ownership, management or control of Borrowers; and (t) waive any defense based on any representations and warranties made by Guarantor herein or by Borrowers in any of the Financing Documents.  Credit may be granted or continued from time to time by Agent or any Lender to Borrowers without notice to or authorization from Guarantor, regardless of the financial or other condition of Borrowers at the time of any such grant or continuation.  Neither Agent nor Lenders shall have any obligation to disclose or discuss with Guarantor its assessment of the financial condition of Borrowers.  Guarantor acknowledges that no representations of any kind whatsoever have been made by Agent or Lenders to induce Guarantor to execute and deliver this Guaranty.  No modification or waiver of any of the provisions of this Guaranty shall be binding upon Agent or Lenders except as expressly set forth in a writing duly signed and delivered by Agent and Lenders.  For purposes of this section, the term "**Claim**" shall mean any claim, action or cause of action, defense, counterclaim, set-off or right of recoupment of any kind or nature against the Agent or Lenders, its officers, directors, employees, agents, members, actuaries, accountants, trustees or attorneys, or any affiliate of the Agent or Lenders in connection with the making, closing, administration, collection or enforcement by the Agent or Lenders of the Guaranteed Obligations.

4.      Guarantor's Obligations Not Affected by Modifications of Financing Documents. Guarantor further agrees that Guarantor's liability as guarantor shall not be impaired or affected by any renewals or extensions which may be made from time to time, with or without the knowledge or consent of Guarantor of the time for payment of interest or principal under the Note or by any forbearance or delay in collecting interest or principal under the Note, or by any waiver by Agent or any Lenders under the Credit Agreement or any other Financing Documents, or by Agent's or any Lender's failure or election not to pursue any other remedies it may have against Borrowers or Guarantor, or by any change or modification in the Note, Credit Agreement or any other Financing Document, or by the acceptance by Agent or Lenders of any additional security or any increase, substitution or change therein, or by the release by Agent or Lenders of any

4

security or any withdrawal thereof or decrease therein, or by the application of payments received from any source to the payment of any obligation other than the Guaranteed Obligations even though Agent or Lenders might lawfully have elected to apply such payments to any part or all of the Guaranteed Obligations, it being the intent hereof that, subject to Agent's or Lenders' compliance with the terms of this Guaranty and the other Financing Documents, Guarantor shall remain liable for the payment of the Guaranteed Obligations, until the Guaranteed Obligations have been paid in full, notwithstanding any act or thing which might otherwise operate as a legal or equitable discharge of a surety.  Guarantor further understands and agrees that Agent or Lenders may at any time enter into agreements with Borrowers to amend, modify and/or increase the principal amount of, interest rate applicable to or other economic and non-economic terms of the Note, Credit Agreement, or other Financing Documents, and may waive or release any provision or provisions of the Note, Credit Agreement, and other Financing Documents, and, with reference to such instruments, may make and enter into any such agreement or agreements as Agent, Lenders and Borrowers may deem proper and desirable, without in any manner impairing this Guaranty or any of Agent's or any Lender's rights hereunder or Guarantor's obligations hereunder, and Guarantor's obligations hereunder shall apply to the Note, Credit Agreement and other Financing Documents as so amended, modified, extended, renewed or increased.

       5.    <u>Nature of Guaranty</u>.  This is an absolute, present and continuing guaranty of payment and not merely of collection.  Guarantor agrees that this Guaranty may be enforced by Agent or any Lender without the necessity at any time of resorting to or exhausting any other security or collateral given in connection herewith or with the Note, Credit Agreement or any of the other Financing Documents through foreclosure or sale proceedings, as the case may be, under the Financing Documents or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Agent or Lenders to join Borrowers in any action brought hereunder or to commence any action against or obtain any judgment against Borrowers or to pursue any other remedy or enforce any other right.  Guarantor further agrees that nothing contained herein or otherwise shall prevent Agent or Lenders from pursuing concurrently or successively all rights and remedies available to it at law and/or in equity or under the Note, Credit Agreement or any other Financing Documents, and the exercise of any of its rights or the completion of any of its remedies that do not result in full payment of the Guaranteed Obligations and complete satisfaction of Borrowers' obligations under the Financing Documents shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent and unconditional under any and all circumstances whatsoever.  None of Guarantor's obligations under this Guaranty or any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Borrowers under the Note, Credit Agreement or other Financing Documents or by reason of the Bankruptcy Cases.  This Guaranty shall continue to be effective or be reinstated (as the case may be) if at any time payment of all or any part of any sum payable pursuant to the Note, Credit Agreement, or any other Financing Document is rescinded or otherwise required to be returned by Agent or Lenders upon the insolvency, bankruptcy, dissolution, liquidation, or reorganization of Borrowers, or upon or as a result of the appointment of a receiver, intervenor, custodian or conservator of or trustee or similar officer for, Borrowers or any substantial part of its property, or otherwise, all as though such payment to Agent or Lenders had not been made, regardless of whether Agent or Lenders contested the order requiring the return of such payment.  In the event of the foreclosure of the Financing Documents and of a deficiency, Guarantor hereby promises

and agrees forthwith to pay the amount of such deficiency notwithstanding the fact that recovery of said deficiency against Borrowers would not be allowed by applicable law; however, the foregoing shall not be deemed to require that Agent or Lenders institute foreclosure proceedings or otherwise resort to or exhaust any other collateral or security prior to or concurrently with enforcing this Guaranty.

6.    Effect of Assignment of Note.  In the event any Lender or any holder of the Note shall assign the Note (the "**Assignment**") to any of its lenders or other entity (the "**Assignee**") to secure a loan from Assignee to such Lender or such holder, Guarantor will accord full recognition thereto and agree that all rights and remedies of Agent and each Lender or such holder hereunder shall be enforceable against Guarantor by Assignee with the same force and effect and to the same extent as would have been enforceable by Agent, Lenders or such holder but for the Assignment; *provided*, *however*, that unless Agent and Lenders shall otherwise consent in writing, Agent and Lenders shall have an unimpaired right, prior and superior to that of Assignee, to enforce this Guaranty for Agent's and Lenders' benefit to the extent of any indemnities constituting a part of the Guaranteed Obligations which are not expressly assigned or transferred.  Notwithstanding the foregoing, in no event shall any Assignment (a) obligate Guarantor to make any payment to, or to perform any obligation on behalf of, any party other than Agent and Lenders following an Assignment unless Agent or such Lender provides Guarantor written notice of the Assignment, in which case Guarantor shall be entitled to rely on such written notice, or (b) entitle Agent and Lenders and Assignee to duplicative recoveries.

7.    Enforcement Costs.  If:  (a) this Guaranty is placed in the hands of an attorney for collection or is collected through any legal proceeding; (b) an attorney is retained to represent Agent or any Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty; (c) an attorney is retained to provide advice or other representation with respect to this Guaranty; or (d) an attorney is retained to represent Agent or any Lender in any proceedings whatsoever in connection with this Guaranty and Agent or Lenders prevail in any such proceedings, then Guarantor shall pay to Agent or Lenders upon demand all reasonable attorneys' fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "**Enforcement Costs**"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding brought to enforce this Guaranty as well as the other Financing Documents.

8.    Severability.  The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty are found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Agent, Lenders or the holder of the Note under the remainder of this Guaranty shall continue in full force and effect.

9.    <u>CONSENT TO JURISDICTION</u>. **WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS GUARANTY (EACH, A "PROCEEDING"), AGENT AND LENDERS (BY THEIR ACCEPTANCE HEREOF) AND GUARANTOR IRREVOCABLY (A) SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE COUNTY OF MONTGOMERY, MARYLAND, AND (B) WAIVE ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVE ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVE THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS GUARANTY SHALL PRECLUDE AGENT OR LENDERS FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION TO THE EXTENT THE FOREGOING IS PERMITTED UNDER APPLICABLE LAW. AGENT, LENDERS AND GUARANTOR FURTHER AGREE AND CONSENT THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY MARYLAND STATE OR UNITED STATES COURT SITTING IN THE COUNTY OF MONTGOMERY, MARYLAND MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE APPLICABLE PARTY AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; <u>EXCEPT</u> THAT IF SUCH PARTY SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

10.    <u>Subordination of Borrowers' Obligations to Guarantor; Claims in Bankruptcy</u>.

(a)    Any indebtedness of Borrowers to Guarantor (including, but not limited to, any right of such Guarantor to a return of any capital contributed to Borrowers), whether now or hereafter existing, is hereby subordinated to the payment of the Guaranteed Obligations. Guarantor agrees that, until the entire Guaranteed Obligations have been paid in full, Guarantor will not seek, accept, or retain for its own account, any payment from Borrowers on account of such subordinated debt except to the extent such payment is expressly permitted by the Credit Agreement. Except to the extent such payments are expressly permitted by the Credit Agreement, any payments to Guarantor on account of such subordinated debt shall be collected and received by Guarantor in trust for Agent and Lenders and shall be paid over to Agent, on behalf of Agent and Lenders, on account of the Guaranteed Obligations without impairing or releasing the obligations of Guarantor hereunder.

(b)    Guarantor shall promptly file in any bankruptcy or other proceeding in which the filing of claims is required by law, all claims and proofs of claims that Guarantor may have against the Borrowers or any other guarantor of the Obligations under the Credit Agreement and does hereby assign to Agent or its nominee (and will, upon request of Agent, reconfirm in writing the assignment to Agent or its nominee of) all rights of Guarantor under such claims (which rights may only be realized by Agent or its nominee up to the amount necessary to satisfy the

7

Guaranteed Obligations in cash in full). If Guarantor does not file any such claim, Agent, as attorney-in-fact for Guarantor, is hereby irrevocably authorized to do so in the name of Guarantor, or in Agent's discretion, to assign the claim to a designee and cause proof of claim to be filed in the name of Agent's designee. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Agent, on behalf of Agent and Lender, the full amount thereof (up to the amount necessary to satisfy the Guaranteed Obligations in cash in full) and, to the full extent necessary for that purpose, Guarantor hereby assigns to Agent and each Lender all of the Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled (which rights may only be realized by Agent or its nominee up to the amount necessary to satisfy the Guaranteed Obligations in cash in full), such assignment being a present and irrevocable assignment of all such rights.

(c)  (i) In the event (A) any other guarantor shall (1) file voluntarily or be filed against involuntarily for protection under the U.S. Bankruptcy Code or any other present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (2) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (3) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, and (B) the automatic stay imposed by the applicable provisions of the U.S. Bankruptcy Code, as amended, or under any other applicable law, against the exercise of the rights and remedies otherwise available to creditors of such other guarantor is deemed by the court having jurisdiction to apply to Guarantor so that Guarantor is not permitted to pay Agent and Lenders the Guaranteed Obligations and/or Agent or Lenders may not immediately enforce the terms of this Guaranty or exercise such other rights and remedies against Guarantor as would otherwise be provided by law, Agent and Lenders shall immediately be entitled, and Guarantor hereby consents, to relief from such stay, and Guarantor hereby authorizes and directs Agent and Lenders to present this Guaranty to the applicable court to evidence this agreement and consent, and (ii) if the automatic stay imposed by the applicable provisions of the U.S. Bankruptcy Code, as amended, or under any other applicable law, against the exercise of the rights and remedies otherwise available to creditors of the Borrowers in the Bankruptcy Cases is deemed by the court having jurisdiction to apply to Guarantor so that Guarantor is not permitted to pay Agent and Lenders the Guaranteed Obligations and/or Agent or Lenders may not immediately enforce the terms of this Guaranty or exercise such other rights and remedies against Guarantor as would otherwise be provided by law, Agent and Lenders shall immediately be entitled, and Guarantor hereby consents, to relief from such stay, and Guarantor hereby authorizes and directs Agent and Lenders to present this Guaranty to the applicable court to evidence this agreement and consent.

11. <u>Application of Proceeds</u>. Any amounts received by Agent or Lenders from any source on account of the Loans may be utilized by Agent or Lenders for the payment of the Guaranteed Obligations and any other obligations of Borrowers to Agent and Lenders in such order as Agent and Lenders may from time to time elect, subject to the terms and conditions of the Financing Documents.

8

12.    <u>Events of Default</u>.

(a)    It is expressly agreed that time is of the essence of this Guaranty and every covenant and provision hereof, and that any of the following shall be an "**Event of Default**" under this Guaranty:

(i)    any Insolvency Event (as defined below) with respect to Guarantor;

(ii)    any material inaccuracy in any representation or warranty made by Guarantor in any Financing Document; and/or

(iii)    any Guarantor Change of Control (as defined below).

(b)    Upon the occurrence of any Event of Default under this Guaranty, there shall be deemed to have occurred an Event of Default (as that term is used in any of the other Financing Documents) under each of the other Financing Documents, regardless of whether or not any portion of the Guaranteed Obligations may then be due and payable.

(c)    The term "**Insolvency Event**" shall mean any of the following: (i) Guarantor makes an assignment for the benefit of creditors, offers a composition or extension to creditors, or makes or sends notice of an intended bulk sale of any business or assets now or hereafter conducted or owned by Guarantor; (ii) Guarantor files a petition in bankruptcy; (iii) Guarantor is adjudicated insolvent or bankrupt, or petitions or applies to any tribunal for any receiver of or any trustee for itself or any substantial part of its property; (iv) Guarantor commences any proceeding relating to itself under any reorganization, arrangement, readjustment or debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; (v) any such proceeding is commenced against Guarantor and such proceeding remains undismissed for a period ninety (90) days; or (vi) Guarantor by any act indicates its consent to, approval of, or acquiescence in, any such proceeding or the appointment of any receiver of or any trustee for Guarantor or any substantial part of its property, or suffers any such receivership or trusteeship to continue undischarged for a period of ninety (90) days.

(d)    The term "**Guarantor Change of Control**" shall mean that Joel Freedman ceases to control Guarantor other than (i) as a result of a sale of Guarantor to a Qualified Assignee (as defined below) or (ii) due to his death, disability, insanity or incompetency (together, the "**Incapacity**") so long as in the event of the Incapacity (w) the then-current management team of Guarantor continues to perform in accordance with past practices, (x) the trustee appointed as a result of the Incapacity installs a management team of Guarantor reasonably acceptable to Agent, (y) such trustee engages an investment banker reasonably acceptable to Agent for the sale of the business of Guarantor to a Qualified Assignee or to any other Person reasonably acceptable to the Agent or (z) Guarantor proposes to Agent for its approval (not be unreasonably withheld) a replacement for Joel Freedman with the qualifications to serve in an operational capacity comparable to that being served by Joel Freedman at the time of the Incapacity. As used herein "**Qualified Assignee**" means a Person that concurrently acquires all or substantially all of the business and assets of Guarantor and (i) as of the consummation of said acquisition, will be a creditworthy entity with sufficient net worth, liquidity and financial stability to satisfy the financial obligations of the Guarantor under the Financing Documents and of the operator of the Projects as

a going concern, (ii) has substantial experience in successfully operating hospitals similar to the Projects, and (iii) has a favorable business and operational reputation and character in the health care industry.

(e)     All grace periods under the Note, this Guaranty and/or the other Financing Documents shall run concurrently such that once any grace period has expired without the curing of the default in question, Agent and Lenders shall be entitled to exercise any and all of the rights and remedies granted under the Note, this Guaranty and the other Financing Documents without the necessity of issuing any further notice or the granting of any further grace periods other than as provided in the Note, this Guaranty and/or the other Financing Documents.

13.     **WAIVER OF TRIAL BY JURY. GUARANTOR, AGENT, AND EACH LENDER (BY THEIR ACCEPTANCE HEREOF) EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CLAIM, CONTROVERSY, DISPUTE, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS GUARANTY AND THE OTHER FINANCING DOCUMENTS (INCLUDING WITHOUT LIMITATION ANY ACTIONS OR PROCEEDINGS FOR ENFORCEMENT OF THE FINANCING DOCUMENTS) AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. GUARANTOR, AGENT, AND EACH LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH OF THEM HAS RELIED ON THIS WAIVER IN ENTERING INTO THIS GUARANTY AND THE OTHER FINANCING DOCUMENTS AND THAT EACH OF THEM WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. GUARANTOR, AGENT AND EACH LENDER EACH WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

14.     <u>Notices</u>.  All notices required or permitted hereunder shall be given and shall become effective as provided in the Credit Agreement.

| All notices to Guarantor shall be addressed as follows: | Philadelphia Academic Health Holdings, LLC<br>c/o Centre Square West<br>1500 Market Street<br>Philadelphia, PA 19103<br>Email: jfreedman@americanacademic.com |
| --- | --- |

15.     <u>Representations and Warranties</u>.  To induce Agent and Lenders to make the Loans and other financial accommodations available to Borrowers, Guarantor makes the following representations and warranties to Agent and Lenders set forth in this Section.  Guarantor acknowledges that but for the truth and accuracy of the matters covered by the following representations and warranties, Lenders would not have agreed to make the Loans and other financial accommodations available to Borrowers.

(a)     Guarantor is duly formed, validly existing, and in good standing in its state of organization and has qualified to do business and is in good standing in any state in which it is necessary in the conduct of its business;

(b)     any and all balance sheets, net worth statements, and other financial data with respect to Guarantor which have heretofore been given to Agent and Lenders by or on behalf of Guarantor fairly and accurately present the financial condition of Guarantor as of the respective dates thereof; provided that, with respect to any projected or forecasted financial information, Guarantor represents that such information was prepared in good faith based on assumptions believed to be reasonable at the time of preparation;

(c)     the execution, delivery, and performance by Guarantor of this Guaranty does not and will not contravene or conflict with (i) any Laws applicable to Guarantor, or (ii) the organizational documents of Guarantor;

(d)     this Guaranty creates legal, valid, and binding obligations of Guarantor enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, moratorium, insolvency, reorganization, fraudulent conveyance or other laws affecting the enforcement of creditors' rights generally or by general equitable principles;

(e)     except as disclosed in writing to Agent and Lenders, there is no Litigation pending or, to the knowledge of Guarantor, threatened in writing against Guarantor, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or which in any manner draws into question the validity of this Guaranty; and

(f)     all statements set forth in the Recitals are true and correct.

All of the representations and warranties made by Guarantor shall be deemed remade on the date of the first disbursement of proceeds or other extension of credit in respect of the Loans, on the date of any subsequent advance of proceeds or other extension of credit in respect of the Loans (to the extent provided for in the Financing Documents), and upon any extension of the Loans pursuant to the Credit Agreement.  Guarantor hereby agrees to indemnify, defend and hold Agent and Lenders free and harmless from and against all loss, cost, liability, damage, and expense, including attorneys' fees and costs, which Agent and any Lender may sustain by reason of the inaccuracy or breach of any of the foregoing representations, warranties and covenants as of the date the foregoing representations, warranties and covenants are made and are remade, except that Guarantor shall have no obligation hereunder to indemnify Agent or any Lender with respect to any loss, cost, liability, damage or expenses resulting from the gross negligence, bad faith or willful misconduct of Agent or such Lender, as determined by a final non-appealable judgment of a court of competent jurisdiction.

16.     Covenants.  Until such time as the Guaranteed Obligations are indefeasibly satisfied, Guarantor covenants as follows:

(a)     Reserved.

(b)     Guarantor shall not pledge or grant any security interest in, or permit any pledge or grant of a security interest in, any the legal or beneficial, direct or indirect, ownership of

membership interests in any of Philadelphia Academic Health System, LLC, Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and/or Broad Street Healthcare Properties III, LLC.

(c)    Reserved.

17.    <u>Successors and Assigns</u>.  This Guaranty shall be binding upon the successors and assigns of Guarantor.  If more than one party executes this Guaranty, the liability of all such parties shall be joint and several.

18.    **<u>CONSTRUCTION; CHOICE OF LAW</u>.  THIS GUARANTY, THE NOTE, AND ALL OTHER INSTRUMENTS EVIDENCING AND SECURING THE LOAN SECURED HEREBY WERE NEGOTIATED IN THE STATE OF MARYLAND, AND DELIVERED BY GUARANTOR OR BORROWERS, AS APPLICABLE, AND ACCEPTED BY AGENT AND LENDERS IN THE STATE OF MARYLAND, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND THE UNDERLYING TRANSACTIONS EMBODIED HEREBY.  IN ALL RESPECTS, INCLUDING, WITHOUT LIMITATION, MATTERS OF CONSTRUCTION AND PERFORMANCE OF THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER, THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF MARYLAND APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  THE TITLES OF THE PARAGRAPHS OF THIS GUARANTY ARE FOR CONVENIENCE OF REFERENCE ONLY AND ARE NOT TO BE CONSIDERED IN CONSTRUING THIS GUARANTY.**

19.    <u>Advances of Proceeds of Loans</u>.  Agent shall be entitled to honor any request made by Borrowers for advances of proceeds of Loans and shall have no obligation to see to the proper disposition of such advances.  Guarantor agrees that its obligations hereunder shall not be released or affected by reason of any improper disposition by Borrowers of such proceeds of Loans.

20.    <u>Counterparts</u>.  This Guaranty may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto.

21.    <u>DIP Orders</u>.  In the event of any inconsistency between the terms and conditions of any of this Guaranty and the DIP Orders, the provisions of the DIP Orders shall govern and control.

**[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]**

12

**IN WITNESS WHEREOF**, the undersigned has caused this Guaranty to be executed the day and year first above mentioned.

GUARANTOR:

**PHILADELPHIA ACADEMIC HEALTH HOLDINGS, LLC**, a Delaware limited liability company

By:_____
   Joel Freedman
   Chief Executive Officer and President

## Exhibit C

**Guaranty and Security Agreement**

## GUARANTY AND SECURITY AGREEMENT

**THIS GUARANTY AND SECURITY AGREEMENT** (this "**Guaranty**") made as of July 15, 2019, by **BROAD STREET HEALTHCARE PROPERTIES, LLC**, a Delaware limited liability company, **BROAD STREET HEALTHCARE PROPERTIES II, LLC**, a Delaware limited liability company, **BROAD STREET HEALTHCARE PROPERTIES III, LLC**, a Delaware limited liability company (individually and collectively, "**Guarantor**"), to and for the benefit of **MIDCAP FINANCIAL TRUST**, a Delaware statutory trust, its successors and assigns (in its individual capacity as a lender, "**MCF**"), having an address at c/o MidCap Financial Services, LLC, as servicer, 7255 Woodmont Avenue, Suite 200, Bethesda, Maryland 20814, in its capacity as agent (and in such capacity, together with its successors and assigns, "**Agent**") for Lenders (as defined below).

## RECITALS

A.      Pursuant to that certain First Priority Secured Priming Super-Priority Debtor in Possession Credit and Security Agreement of even date herewith (together with all extensions, renewals, amendments and restatements, modifications, substitutions and amendments thereof, the "**Credit Agreement**") among **ST. CHRISTOPHER'S HEALTHCARE, LLC, CENTER CITY HEALTHCARE, LLC, PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC, PHILADELPHIA ACADEMIC MEDICAL ASSOCIATES, LLC HPS OF PA, L.L.C., SCHC PEDIATRIC ASSOCIATES, L.L.C., ST. CHRISTOPHER'S PEDIATRIC URGENT CARE CENTER, L.L.C., STCHRIS CARE AT NORTHEAST PEDIATRICS, L.L.C., SCHC PEDIATRIC ANESTHESIA ASSOCIATES, L.L.C., TPS OF PA, L.L.C., TPS II OF PA, L.L.C., TPS III OF PA, L.L.C., TPS IV OF PA, L.L.C.** and **TPS V OF PA, L.L.C.,** each as debtors and debtors in possession under Chapter 11 of the Bankruptcy Code, any additional borrower that may hereafter be added to the Credit Agreement (each individually as a "**Borrower**" and collectively as "**Borrowers**"), Agent, MCF, and the other financial institutions who are or hereafter become parties to the Credit Agreement (together with MCF, individually each a "**Lender**" and collectively, "**Lenders**"), Lenders made available to Borrowers a revolving loan facility in the aggregate maximum principal amount of Fifty Million and No/100 Dollars ($50,000,000.00), as such amount may be increased or decreased from time to time in accordance with the terms of the Credit Agreement, including, without limitation, funding of a term loan as contemplated by the DIP Order.  Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Credit Agreement.

B.      In connection with the Credit Agreement, Borrowers have executed and delivered certain Notes to Lenders (individually and collectively, the "**Note**").

C.      Guarantor will derive material financial benefit from the Lenders making the Loans available to Borrowers.

D.      Agent and Lenders have relied on the statements and agreements contained herein in agreeing to make the Loans and other financial accommodations available to Borrowers.  The execution and delivery of this Guaranty by Guarantor is a condition precedent to making the Loans and other financial accommodations available to Borrowers.

US_ACTIVE-139781549

## AGREEMENTS

**NOW, THEREFORE**, intending to be legally bound, Guarantor, in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, hereby covenants and agrees for the benefit of Agent and Lenders and their successors, indorsees, transferees, participants and assigns as follows:

1.      <u>Guaranty</u>.  Each Guarantor, jointly and severally, absolutely, unconditionally and irrevocably guarantees:

(a)      the full and prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of all of the indebtedness, liabilities and obligations of every kind and nature of Borrowers to Agent and Lenders however created, arising or evidenced by, under or in connection with, the Credit Agreement and the other Financing Documents, whether direct or indirect, absolute or contingent, joint or several, now or hereafter existing, or due or to become due, and however owned, held or acquired by Agent or any Lender, whether through discount, overdraft, purchase, direct loan or as collateral or otherwise, including without limitation all Obligations and any interest that may accrue on any judgment against Guarantor in respect of any of the guaranteed obligations hereunder at the lesser of the default rate of interest set forth in Section 10.5 of the Credit Agreement and the maximum interest rate permitted by applicable law);

(b)      the prompt, full and complete performance of all of Borrowers' Obligations under each and every covenant contained in the Financing Documents relating to the operations of Guarantor, which are limited to real estate ownership and related activities; and

(c)      the full and prompt payment of any Enforcement Costs (as hereinafter defined in Section 8 hereof).

All amounts due, debts, liabilities and payment obligations described in subsections (a), (b) and (c) of this Section 1 shall be hereinafter collectively referred to as the "**Guaranteed Obligations**."

All payments under this Guaranty must be made in lawful money of the United States of America and in current funds.  Any amount received by Agent or Lenders from any collateral or security for the Financing Documents may be applied by it towards any sums due under or in respect of the Financing Documents, in such order of application as is provided for under the applicable Financing Documents. or if not so provided for, then in such order as Agent may from time to time elect in its sole discretion.  Subject to the preceding sentence, Agent shall have the right to determine how, when and what application of payments and credits, whether derived from the Borrowers or any other source, shall be made on the amounts due to Agent and Lenders under the Financing Documents.

2.      <u>Payment of Amounts Owed</u>.  Upon the occurrence of an Event of Default, after the expiration of any applicable cure or grace period, Guarantor agrees, on written demand by Agent or any holder of the Note (which demand may be made concurrently with receipt of written notice to Borrowers that Borrowers are in default of their obligations), to pay the Guaranteed Obligations,

2

regardless of any defense, right of set-off or recoupment or claims which Borrowers or Guarantor may have against Agent or any Lender or the holder of the Note (other than the defense of payment in full). All of the remedies set forth herein and/or provided for in any of the other Financing Documents or at law or equity shall be equally available to Agent and Lenders, and the choice by Agent or any Lender of one such alternative over another shall not be subject to question or challenge by Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff, recoupment or failure to mitigate damages in any action, proceeding, or counteraction by Agent or Lenders to recover or seeking any other remedy under this Guaranty, nor shall such choice preclude Agent or Lenders from subsequently electing to exercise a different remedy. The parties have agreed to the alternative remedies provided herein in part because they recognize that the choice of remedies in the event of a default hereunder will necessarily be and should properly be a matter of good faith business judgment, which the passage of time and events may or may not prove to have been the best choice to maximize recovery by Agent or Lenders at the lowest cost to Borrowers and/or Guarantor. It is the intention of the parties that such good faith choice by Agent and any Lender be given conclusive effect regardless of such subsequent developments.

      3.    <u>Security Interest</u>.

      (a)    As security for Guarantor's guaranty of the payment and performance of the Guaranteed Obligations as set forth herein, each Guarantor hereby assigns and grants to Agent, for the benefit of itself and for the Lenders, a continuing first priority Lien on and security interest in, upon, and to all right, title and interest in and to the personal property set forth on **Schedule 3(a)** attached hereto and made a part hereof (the "**Collateral**").

      (b)    **Schedule 3(b)** sets forth (i) each chief executive office and principal place of business of each Guarantor and (ii) all of the addresses (including all warehouses) at which any of the Collateral is located and/or books and records of any Guarantor regarding any of the Collateral are kept.

      (c)    Set forth on **Schedule 3(c)** is a listing of all of Guarantor's Deposit Accounts as of the date hereof, including, with respect to each bank or securities intermediary (a) the name of such Person, and (b) the account numbers of the Deposit Accounts maintained with such Person.

      (d)    Except for the filing of financing statements under the UCC and the recording of the Broad Street Mortgages (and such Bankruptcy Court approval as may be needed for the Borrowers to enter into the Credit Agreement and incur the Guaranteed Obligations thereunder), no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or consent of any other Person is required for (i) the grant by each Guarantor to Agent of the security interests and Liens in the Collateral provided for under this Guaranty and the other Security Documents (including the Broad Street Mortgages), or (ii) the exercise by Agent of its rights and remedies with respect to the Collateral provided for under this Guaranty and the other Security Documents or under any applicable Law, including the UCC and neither any such grant of Liens in favor of Agent or exercise of rights by Agent shall violate or cause a default under any agreement between Guarantor and any other Person relating to any such Collateral, including any license to which Guarantor is a party, whether as licensor or licensee, with respect to any Intellectual Property, whether owned by such Guarantor or any other Person.

3

(e)    As of the date hereof, Guarantor has no ownership interest in any Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, investment property (other than equity interests in any Subsidiaries of Guarantor), Security Accounts and Guarantor shall give notice to Agent promptly upon the acquisition by Guarantor of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, investment property, Deposit Accounts or Security Accounts.  No Person other than Agent or (if applicable) any Lender shall have "control" (as defined in Article 9 of the UCC) over any Deposit Account, investment property (including Securities Accounts and commodities account), letter of credit rights or electronic chattel paper in which Guarantor has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any Deposit Account, Securities Account or commodities account of a Guarantor is maintained).

(f)    No Guarantor shall take any of the following actions or make any of the following changes unless such Guarantor has given at least thirty (30) days prior written notice to Agent of such Guarantor's intention to take any such action (which such written notice shall include an updated version of any Schedule impacted by such change) and has executed any and all documents, instruments and agreements and taken any other actions which Agent may request after receiving such written notice in order to protect and preserve the Liens, rights and remedies of Agent with respect to the Collateral:  (i) change the legal name or organizational identification number of a Guarantor as it appears in official filings in the jurisdiction of its organization, or (ii) change the jurisdiction of incorporation or formation of a Guarantor or designate any jurisdiction as an additional jurisdiction of incorporation for a Guarantor, or change the type of entity that it is. Additionally, each Guarantor shall provide written notice at least five (5) Business Days after (x) any movement of any tangible Collateral to a location that is not then listed on **Schedule 3(b)** and/or establish any business location at any location that is not then listed on **Schedule 3(b)** and (y) any change to its chief executive office, principal place of business, or the location of its records concerning the Collateral.

(g)    Each Guarantor hereby authorizes Agent to file without the signature of such Guarantor one or more UCC financing statements relating to liens on personal property relating to all or any part of the Collateral, which financing statements may list Agent as the "secured party" and such Guarantor as the "debtor" and which describe and indicate the collateral covered thereby as all or any part of the Collateral under the Financing Documents (including an indication of the collateral covered by any such financing statement as "all assets" of such Guarantor now owned or hereafter acquired) in such jurisdictions as Agent from time to time determines are appropriate, and to file without the signature of such Guarantor any continuations of or corrective amendments to any such financing statements, in any such case in order for Agent to perfect, preserve or protect the Liens, rights and remedies of Agent with respect to the Collateral.

(h)    Each Guarantor shall obtain a Deposit Account Control Agreement from each bank maintaining a Deposit Account for such Guarantor.

(i)    Each Guarantor shall furnish to Agent from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as Agent may reasonably request from time to time.

4

4.    <u>Certain Waivers by Guarantor</u>.  To the fullest extent permitted by law, Guarantor does hereby (a) waive notice of acceptance of this Guaranty by Agent and Lenders and any and all notices and demands of every kind which may be required to be given by any statute, rule or law; (b) agree to refrain from asserting, until after repayment in full of the Guaranteed Obligations and termination of all commitments to lend under the Credit Agreement, any defense, right of setoff, right of recoupment or other claim which Guarantor may have against Borrowers; (c) waive any defense, right of setoff, right of recoupment or other claim which Guarantor or Borrowers may have against Agent, any Lender or the holder of the Note; (d) waive any and all rights Guarantor may have under any anti-deficiency statute or other similar protections; (e) waive all rights at law or in equity to seek subrogation, contribution, indemnification or any other form of reimbursement or repayment from Borrowers or any other person or entity now or hereafter primarily or secondarily liable for any of the Guaranteed Obligations until the Guaranteed Obligations have been paid in full; (f) waive presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge Guarantor with liability; (g) waive the benefit of all appraisement, valuation, marshalling, forbearance, stay, extension, redemption, homestead, exemption and moratorium laws now or hereafter in effect; (h) waive any defense based on the incapacity, lack of authority, death or disability of any other person or entity or the failure of Agent or any Lender to file or enforce a claim against the estate of any other person or entity in any administrative, bankruptcy or other proceeding; (i) waive any defense based on an election of remedies by Agent or Lenders, whether or not such election may affect in any way the recourse, subrogation or other rights of Guarantor against the Borrowers, any other guarantor or any other person in connection with the Guaranteed Obligations; (j) waive any defense based on the failure of the Agent or any Lender to (i) provide notice to Guarantor of a sale or other disposition (including any collateral sale pursuant to the UCC) of any of the security for any of the Guaranteed Obligations other than as specifically provided for herein, or (ii) conduct such a sale or disposition in a commercially reasonable manner; (k) waive any defense based on the negligence of Agent or Lenders in administering the Loans (including, but not limited to, the failure to perfect any security interest in any collateral for the Loans), or taking or failing to take any action in connection therewith, or based on the federal Equal Credit Opportunity Act and applicable regulations or the Equal Credit Opportunity Acts, or any similar or successor act, or any applicable regulations or any similar act or regulation of any state, *provided, however*, that such waiver shall not apply to the gross negligence, bad faith or willful misconduct of the Agent or any Lender as determined by the final, non-appealable decision of a court having proper jurisdiction; (l) waive the defense of expiration of any statute of limitations affecting the liability of Guarantor hereunder or the enforcement hereof; (m) waive any right to file any Claim (as defined below) as part of, and any right to request consolidation of any action or proceeding relating to a Claim with, any action or proceeding filed or maintained by Agent or any Lender to collect any Guaranteed Obligations of Guarantor to Agent or any Lender hereunder or to exercise any rights or remedies available to Agent or any Lender under the Financing Documents, at law, in equity or otherwise; (n) agree that neither Agent nor Lenders shall have any obligation to obtain, perfect or retain a security interest in any property to secure any of the Guaranteed Obligations or this Guaranty, or to protect or insure any such property; (o) waive any obligation Agent or Lenders may have to disclose to Guarantor any facts the Agent or Lenders now or hereafter may know or have reasonably available to it regarding the Borrowers or Borrowers' financial condition, whether or not the Agent or any Lender has a reasonable opportunity to communicate such facts or has reason to believe that any such facts

5

are unknown to Guarantor or materially increase the risk to Guarantor beyond the risk Guarantor intends to assume hereunder; (p) agree that neither Agent nor Lenders shall be liable in any way for any decrease in the value or marketability of any property securing any of the Guaranteed Obligations which may result from any action or omission of the Agent or any Lender in enforcing any part of this Guaranty or any portion of the Loans other than to the extent arising from Agent's or such Lender's gross negligence, bad faith or willful misconduct; (q) waive any defense based on the consideration for this Guaranty; (r) waive any defense based on any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Financing Documents; (s) waive any defense based on any change in the composition of Borrowers, including, without limitation, the voluntary or involuntary withdrawal or removal of Guarantor from any current or future position of ownership, management or control of Borrowers; and (t) waive any defense based on any representations and warranties made by Guarantor herein or by Borrowers in any of the Financing Documents.  Credit may be granted or continued from time to time by Agent or any Lender to Borrowers without notice to or authorization from Guarantor, regardless of the financial or other condition of Borrowers at the time of any such grant or continuation.  Neither Agent nor Lenders shall have any obligation to disclose or discuss with Guarantor its assessment of the financial condition of Borrowers.  Guarantor acknowledges that no representations of any kind whatsoever have been made by Agent or Lenders to induce Guarantor to execute and deliver this Guaranty.  No modification or waiver of any of the provisions of this Guaranty shall be binding upon Agent or Lenders except as expressly set forth in a writing duly signed and delivered by Agent and Lenders.  For purposes of this section, the term "**Claim**" shall mean any claim, action or cause of action, defense, counterclaim, set-off or right of recoupment of any kind or nature against the Agent or Lenders, its officers, directors, employees, agents, members, actuaries, accountants, trustees or attorneys, or any affiliate of the Agent or Lenders in connection with the making, closing, administration, collection or enforcement by the Agent or Lenders of the Guaranteed Obligations.

     5.     <u>Guarantor's Obligations Not Affected by Modifications of Financing Documents</u>. Guarantor further agrees that Guarantor's liability as guarantor shall not be impaired or affected by any renewals or extensions which may be made from time to time, with or without the knowledge or consent of Guarantor of the time for payment of interest or principal under the Note or by any forbearance or delay in collecting interest or principal under the Note, or by any waiver by Agent or any Lenders under the Credit Agreement or any other Financing Documents, or by Agent's or any Lender's failure or election not to pursue any other remedies it may have against Borrowers or Guarantor, or by any change or modification in the Note, Credit Agreement or any other Financing Document, or by the acceptance by Agent or Lenders of any additional security or any increase, substitution or change therein, or by the release by Agent or Lenders of any security or any withdrawal thereof or decrease therein, or by the application of payments received from any source to the payment of any obligation other than the Guaranteed Obligations even though Agent or Lenders might lawfully have elected to apply such payments to any part or all of the Guaranteed Obligations, it being the intent hereof that, subject to Agent's or Lenders' compliance with the terms of this Guaranty and the other Financing Documents, Guarantor shall remain liable for the payment of the Guaranteed Obligations, until the Guaranteed Obligations have been paid in full, notwithstanding any act or thing which might otherwise operate as a legal or equitable discharge of a surety.  Guarantor further understands and agrees that Agent or Lenders may at any time enter into agreements with Borrowers to amend, modify and/or increase the principal amount of, interest rate applicable to or other economic and non-economic terms of the

Note, Credit Agreement, or other Financing Documents, and may waive or release any provision or provisions of the Note, Credit Agreement, and other Financing Documents, and, with reference to such instruments, may make and enter into any such agreement or agreements as Agent, Lenders and Borrowers may deem proper and desirable, without in any manner impairing this Guaranty or any of Agent's or any Lender's rights hereunder or Guarantor's obligations hereunder, and Guarantor's obligations hereunder shall apply to the Note, Credit Agreement and other Financing Documents as so amended, modified, extended, renewed or increased.

6.    <u>Nature of Guaranty</u>.  This is an absolute, present and continuing guaranty of payment and not merely of collection.  Guarantor agrees that this Guaranty may be enforced by Agent or any Lender without the necessity at any time of resorting to or exhausting any other security or collateral given in connection herewith or with the Note, Credit Agreement or any of the other Financing Documents through foreclosure or sale proceedings, as the case may be, under the Financing Documents or otherwise, or resorting to any other guaranties, and Guarantor hereby waives any right to require Agent or Lenders to join Borrowers in any action brought hereunder or to commence any action against or obtain any judgment against Borrowers or to pursue any other remedy or enforce any other right.  Guarantor further agrees that nothing contained herein or otherwise shall prevent Agent or Lenders from pursuing concurrently or successively all rights and remedies available to it at law and/or in equity or under the Note, Credit Agreement or any other Financing Documents, and the exercise of any of its rights or the completion of any of its remedies that do not result in full payment of the Guaranteed Obligations and complete satisfaction of Borrowers' obligations under the Financing Documents shall not constitute a discharge of Guarantor's obligations hereunder, it being the purpose and intent of Guarantor that the obligations of Guarantor hereunder shall be absolute, independent and unconditional under any and all circumstances whatsoever.  None of Guarantor's obligations under this Guaranty or any remedy for the enforcement thereof shall be impaired, modified, changed or released in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Borrowers under the Note, Credit Agreement or other Financing Documents or by reason of the Bankruptcy Cases.  This Guaranty shall continue to be effective or be reinstated (as the case may be) if at any time payment of all or any part of any sum payable pursuant to the Note, Credit Agreement, or any other Financing Document is rescinded or otherwise required to be returned by Agent or Lenders upon the insolvency, bankruptcy, dissolution, liquidation, or reorganization of Borrowers, or upon or as a result of the appointment of a receiver, intervenor, custodian or conservator of or trustee or similar officer for, Borrowers or any substantial part of its property, or otherwise, all as though such payment to Agent or Lenders had not been made, regardless of whether Agent or Lenders contested the order requiring the return of such payment.  In the event of the foreclosure of the Financing Documents and of a deficiency, Guarantor hereby promises and agrees forthwith to pay the amount of such deficiency notwithstanding the fact that recovery of said deficiency against Borrowers would not be allowed by applicable law; however, the foregoing shall not be deemed to require that Agent or Lenders institute foreclosure proceedings or otherwise resort to or exhaust any other collateral or security prior to or concurrently with enforcing this Guaranty.

7.    <u>Effect of Assignment of Note</u>.  In the event any Lender or any holder of the Note shall assign the Note (the "**Assignment**") to any of its lenders or other entity (the "**Assignee**") to secure a loan from Assignee to such Lender or such holder, Guarantor will accord full recognition thereto and agree that all rights and remedies of Agent and each Lender or such holder hereunder

7

shall be enforceable against Guarantor by Assignee with the same force and effect and to the same extent as would have been enforceable by Agent, Lenders or such holder but for the Assignment; *provided*, *however*, that unless Agent and Lenders shall otherwise consent in writing, Agent and Lenders shall have an unimpaired right, prior and superior to that of Assignee, to enforce this Guaranty for Agent's and Lenders' benefit to the extent of any indemnities constituting a part of the Guaranteed Obligations which are not expressly assigned or transferred. Notwithstanding the foregoing, in no event shall any Assignment (a) obligate Guarantor to make any payment to, or to perform any obligation on behalf of, any party other than Agent and Lenders following an Assignment unless Agent or such Lender provides Guarantor written notice of the Assignment, in which case Guarantor shall be entitled to rely on such written notice, or (b) entitle Agent and Lenders and Assignee to duplicative recoveries.

8.  <u>Enforcement Costs</u>. If: (a) this Guaranty is placed in the hands of an attorney for collection or is collected through any legal proceeding; (b) an attorney is retained to represent Agent or any Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty; (c) an attorney is retained to provide advice or other representation with respect to this Guaranty; or (d) an attorney is retained to represent Agent or any Lender in any proceedings whatsoever in connection with this Guaranty and Agent or Lenders prevail in any such proceedings, then Guarantor shall pay to Agent or Lenders upon demand all reasonable attorneys' fees, costs and expenses incurred in connection therewith (all of which are referred to herein as "**Enforcement Costs**"), in addition to all other amounts due hereunder, regardless of whether all or a portion of such Enforcement Costs are incurred in a single proceeding brought to enforce this Guaranty as well as the other Financing Documents.

9.  <u>Severability</u>. The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty are found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Agent, Lenders or the holder of the Note under the remainder of this Guaranty shall continue in full force and effect.

10.  <u>MARSHALLING OF ASSETS; CONSENT TO JURISDICTION</u>. **TO THE GREATEST EXTENT PERMITTED BY LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OR ASSETS BY AGENT OR LENDER. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS GUARANTY (EACH, A "PROCEEDING"), AGENT AND LENDERS (BY THEIR ACCEPTANCE HEREOF) AND GUARANTOR IRREVOCABLY (A) SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE COUNTY OF MONTGOMERY, MARYLAND, AND (B) WAIVE ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE**

8

**LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVE ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVE THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS GUARANTY SHALL PRECLUDE AGENT OR LENDERS FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION TO THE EXTENT THE FOREGOING IS PERMITTED UNDER APPLICABLE LAW.  AGENT, LENDERS AND GUARANTOR FURTHER AGREE AND CONSENT THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY MARYLAND STATE OR UNITED STATES COURT SITTING IN THE COUNTY OF MONTGOMERY, MARYLAND MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO THE APPLICABLE PARTY AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; <u>EXCEPT</u> THAT IF SUCH PARTY SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.**

11.    <u>Subordination of Borrowers' Obligations to Guarantor; Claims in Bankruptcy</u>.

(a)    Any indebtedness of Borrowers to Guarantor (including, but not limited to, any right of such Guarantor to a return of any capital contributed to Borrowers), whether now or hereafter existing, is hereby subordinated to the payment of the Guaranteed Obligations. Guarantor agrees that, until the entire Guaranteed Obligations have been paid in full, Guarantor will not seek, accept, or retain for its own account, any payment from Borrowers on account of such subordinated debt. Any such payments are expressly permitted by the Credit Agreement, any payments to Guarantor on account of such subordinated debt shall be collected and received by Guarantor in trust for Agent and Lenders and shall be paid over to Agent, on behalf of Agent and Lenders, on account of the Guaranteed Obligations without impairing or releasing the obligations of Guarantor hereunder.

(b)    Guarantor shall promptly file in any bankruptcy or other proceeding in which the filing of claims is required by law, all claims and proofs of claims that Guarantor may have against the Borrowers or any other guarantor of the Obligations under the Credit Agreement and does hereby assign to Agent or its nominee (and will, upon request of Agent, reconfirm in writing the assignment to Agent or its nominee of) all rights of Guarantor under such claims (which rights may only be realized by Agent or its nominee up to the amount necessary to satisfy the Guaranteed Obligations in cash in full).  If Guarantor does not file any such claim, Agent, as attorney-in-fact for Guarantor, is hereby irrevocably authorized to do so in the name of Guarantor, or in Agent's discretion, to assign the claim to a designee and cause proof of claim to be filed in the name of Agent's designee.  In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Agent, on behalf of Agent and Lender, the full amount thereof (up to the amount necessary to satisfy the Guaranteed Obligations in cash in full) and, to the full extent necessary for that purpose, Guarantor hereby

9

assigns to Agent and each Lender all of the Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled (which rights may only be realized by Agent or its nominee up to the amount necessary to satisfy the Guaranteed Obligations in cash in full), such assignment being a present and irrevocable assignment of all such rights.

(c)      (i) In the event (A) any other guarantor shall (1) file voluntarily or be filed against involuntarily for protection under the U.S. Bankruptcy Code or any other present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (2) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (3) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, and (B) the automatic stay imposed by the applicable provisions of the U.S. Bankruptcy Code, as amended, or under any other applicable law, against the exercise of the rights and remedies otherwise available to creditors of such other guarantor is deemed by the court having jurisdiction to apply to Guarantor so that Guarantor is not permitted to pay Agent and Lenders the Guaranteed Obligations and/or Agent or Lenders may not immediately enforce the terms of this Guaranty or exercise such other rights and remedies against Guarantor as would otherwise be provided by law, Agent and Lenders shall immediately be entitled, and Guarantor hereby consents, to relief from such stay, and Guarantor hereby authorizes and directs Agent and Lenders to present this Guaranty to the applicable court to evidence this agreement and consent, and (ii) if the automatic stay imposed by the applicable provisions of the U.S. Bankruptcy Code, as amended, or under any other applicable law, against the exercise of the rights and remedies otherwise available to creditors of the Borrowers in the Bankruptcy Cases is deemed by the court having jurisdiction to apply to Guarantor so that Guarantor is not permitted to pay Agent and Lenders the Guaranteed Obligations and/or Agent or Lenders may not immediately enforce the terms of this Guaranty or exercise such other rights and remedies against Guarantor as would otherwise be provided by law, Agent and Lenders shall immediately be entitled, and Guarantor hereby consents, to relief from such stay, and Guarantor hereby authorizes and directs Agent and Lenders to present this Guaranty to the applicable court to evidence this agreement and consent.

12.    Application of Proceeds.  Any amounts received by Agent or Lenders from any source on account of the Loans may be utilized by Agent or Lenders for the payment of the Guaranteed Obligations and any other obligations of Borrowers to Agent and Lenders in such order as Agent and Lenders may from time to time elect, subject to the terms and conditions of the Financing Documents.

13.    Events of Default.

(a)      It is expressly agreed that time is of the essence of this Guaranty and every covenant and provision hereof, and that any of the following shall be an "**Event of Default**" under this Guaranty:

(i)      any Insolvency Event (as defined below) with respect to Guarantor and/or

10

(ii)    any material inaccuracy in any representation or warranty made by Guarantor in any Financing Document.

(b)    Upon the occurrence of any Event of Default under this Guaranty, there shall be deemed to have occurred an Event of Default (as that term is used in any of the other Financing Documents) under each of the other Financing Documents, regardless of whether or not any portion of the Guaranteed Obligations may then be due and payable.

(c)    The term "**Insolvency Event**" shall mean any of the following: (i) Guarantor makes an assignment for the benefit of creditors, offers a composition or extension to creditors, or makes or sends notice of an intended bulk sale of any business or assets now or hereafter conducted or owned by Guarantor; (ii) Guarantor files a petition in bankruptcy; (iii) Guarantor is adjudicated insolvent or bankrupt, or petitions or applies to any tribunal for any receiver of or any trustee for itself or any substantial part of its property; (iv) Guarantor commences any proceeding relating to itself under any reorganization, arrangement, readjustment or debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; (v) any such proceeding is commenced against Guarantor and such proceeding remains undismissed for a period ninety (90) days; or (vi) Guarantor by any act indicates its consent to, approval of, or acquiescence in, any such proceeding or the appointment of any receiver of or any trustee for Guarantor or any substantial part of its property, or suffers any such receivership or trusteeship to continue undischarged for a period of ninety (90) days.

(d)    All grace periods under the Note, this Guaranty and/or the other Financing Documents shall run concurrently such that once any grace period has expired without the curing of the default in question, Agent and Lenders shall be entitled to exercise any and all of the rights and remedies granted under the Note, this Guaranty and the other Financing Documents without the necessity of issuing any further notice or the granting of any further grace periods other than as provided in the Note, this Guaranty and/or the other Financing Documents.

(e)    Upon the occurrence of and during the continuance of an Event of Default under this Guaranty, the Credit Agreement or the other Financing Documents, Agent, in addition to all other rights, options, and remedies granted to Agent under this Guaranty or at law or in equity, may exercise, either directly or through one or more assignees or designees, all rights and remedies granted to it under this Guaranty and all Financing Documents and under the UCC in effect in the applicable jurisdiction(s) and under any other applicable law; including, without limitation:

(i)    The right to without the requirement of notice to or upon any Guarantor or any other Person (which notice is hereby expressly waived to the maximum extent permitted by the Code or any other applicable Law), with respect to any Guarantor's Deposit Accounts in which the Agent's Liens are perfected by control under Section 9-104 of the Code, instruct the bank maintaining such Deposit Account for the applicable Guarantor to pay the balance of such Deposit Account to or for the benefit of the Agent;

(ii)    The right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process;

11

(iii)    The right to (by its own means or with judicial assistance) enter any of Guarantor's premises and take possession of the Collateral, or render it unusable, or to render it usable or saleable, or dispose of the Collateral on such premises in compliance with subsection (iii) below and to take possession of Guarantor's original books and records, to obtain access to Guarantor's data processing equipment, computer hardware and software relating to the Collateral and to use all of the foregoing and the information contained therein in any manner Agent deems appropriate, without any liability for rent, storage, utilities, or other sums, and Guarantor shall not resist or interfere with such action (if Guarantor's books and records are prepared or maintained by an accounting service, contractor or other third party agent, Guarantor hereby irrevocably authorize such service, contractor or other agent, upon notice by Agent to such Person that an Event of Default has occurred and is continuing, to deliver to Agent or its designees such books and records, and to follow Agent's instructions with respect to further services to be rendered);

(iv)    The right to require Guarantor at Guarantor's expense to assemble all or any part of the Collateral and make it available to Agent at any place designated by Agent;

(v)    The right to notify postal authorities to change the address for delivery of Guarantor's mail to an address designated by Agent and to receive, open and dispose of all mail addressed to Guarantor.

(vi)    The right to enforce Guarantor's rights against Account Debtors and other obligors, including, without limitation, (i) the right to collect Accounts directly in Agent's own name (as agent for Lenders) and to charge the collection costs and expenses, including attorneys' fees, to Guarantor, and (ii) the right, in the name of Agent or any designee of Agent or Guarantor, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, telegraph or otherwise, including, without limitation, verification of Guarantor's material compliance with applicable Laws.  Guarantor shall cooperate fully with Agent in an effort to facilitate and promptly conclude such verification process.  Such verification may include contacts between Agent and applicable federal, state and local regulatory authorities having jurisdiction over Guarantor's affairs, all of which contacts Guarantor hereby irrevocably authorizes.

(f)    Guarantor agrees that a written notice received by it at least twenty (20) days before the time of any intended public sale, or the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Agent without prior notice to Guarantor.  At any sale or disposition of Collateral, Agent may (to the extent permitted by applicable law) purchase all or any part of the Collateral, free from any right of redemption by Guarantor, which right is hereby waived and released.  Each Guarantor covenants and agrees not to interfere with or impose any obstacle to Agent's exercise of its rights and remedies with respect to the Collateral.  Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  Agent may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.  Agent

12

may sell the Collateral without giving any warranties as to the Collateral. Agent may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. If Agent sells any of the Collateral upon credit, Guarantor will be credited only with payments actually made by the purchaser, received by Agent and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Agent may resell the Collateral and Guarantor shall be credited with the proceeds of the sale. Guarantor shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Obligations.

(g)     Without restricting the generality of the foregoing and for the purposes aforesaid, Guarantor hereby appoints and constitutes Agent its lawful attorney-in-fact with full power of substitution in the Collateral, upon the occurrence and during the continuance of an Event of Default, to use unadvanced funds remaining under this Guaranty or which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Notes; to pay, settle or compromise all existing bills and claims, which may be Liens or security interests, or to avoid such bills and claims becoming Liens against the Collateral; to execute all applications and certificates in the name of Guarantor and to prosecute and defend all actions or proceedings in connection with the Collateral; and to do any and every act which Guarantor might do in its own behalf; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.

(h)     Agent and each Lender is hereby granted an irrevocable, non-exclusive, royalty-free license or other right to use, without charge, Guarantor labels, mask works, rights of use of any name, any other Intellectual Property and advertising matter, and any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Agent's exercise of its rights under this Section, Guarantor's rights under all licenses and all franchise agreements inure to Agent's and each Lender's benefit.

14.     **WAIVER OF TRIAL BY JURY. GUARANTOR, AGENT, AND EACH LENDER (BY THEIR ACCEPTANCE HEREOF) EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CLAIM, CONTROVERSY, DISPUTE, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS GUARANTY AND THE OTHER FINANCING DOCUMENTS (INCLUDING WITHOUT LIMITATION ANY ACTIONS OR PROCEEDINGS FOR ENFORCEMENT OF THE FINANCING DOCUMENTS) AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. GUARANTOR, AGENT, AND EACH LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH OF THEM HAS RELIED ON THIS WAIVER IN ENTERING INTO THIS GUARANTY AND THE OTHER FINANCING DOCUMENTS AND THAT EACH OF THEM WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. GUARANTOR, AGENT AND EACH LENDER WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

13

15.    <u>Notices</u>.  All notices required or permitted hereunder shall be given and shall become effective as provided in the Credit Agreement.

All notices to Guarantor shall be addressed as follows:

> 1500 Market Street
> Centre Square
> 24th Floor West Tower
> Philadelphia, PA  19102
> Email: jfreedman@americanacademic.com

16.    <u>Affirmative Covenants; Negative Covenants</u>.

(a)    <u>Affirmative Covenants</u>.  On and after the date hereof, until the repayment in full of all the Obligations (other than any contingent indemnification obligation for which no claim has been asserted that are expressly stated in the Credit Agreement or any of the other Financing Documents to survive payment in full of the Obligations), each Guarantor hereby agrees to:

(i)    preserve, renew and keep in full force and effect its existence and all material rights, privileges and franchises necessary in the conduct of business as currently conducted and herein contemplated;

(ii)    [reserved]; and

(iii)    [reserved].

(b)    <u>Negative Covenants</u>.  On and after the date hereof, until the repayment in full of all the Obligations (other than any contingent indemnification obligation for which no claim has been asserted that are expressly stated in the Credit Agreement or any of the other Financing Documents to survive payment in full of the Obligations), each Guarantor agrees not to:

(i)    declare, order, pay, make, or set apart any sum for any Distributions, except, solely if such Guarantor is a pass-through entity for income tax purposes, Tax Distributions that would be permitted to be made under Section 5.3(b) of the Credit Agreement if such Guarantor was a Borrower;

(ii)    create, incur, assume or suffer to exist any Debt, except for the Guaranteed Obligations and Debt that would be Permitted Indebtedness allowed under Section 5.1 of the Credit Agreement if such Guarantor was a Borrower;

(iii)    create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for Liens granted under the Financing Documents securing the Obligations and Permitted Liens;

(iv)    guaranty or otherwise become liable for any Indebtedness or other obligations of any Person (including any Affiliate), except for the Guaranteed Obligations and Contingent Obligations allowed under Section 5.1 of the Credit Agreement if such Guarantor was a Borrower;

14

(v)     engage in any line of business other than ownership of the Broad Street Facilities and all activities related or incidental to the ownership of the Broad Street Facilities;

(vi)     sell, lease, assign, transfer or otherwise dispose of any of its property or assets other than the leasing of the Broad Street Facilities pursuant to the Operating Leases;

(vii)     merge, dissolve, liquidate or consolidate with or into another Person, or acquire or agree to acquire by merger, consolidation, recapitalization or other business combination or otherwise, the stock, assets or business of any Person;

(viii)     make loans to any Person or make any other Investment; and

(ix)     enter into any transaction or series of related transactions (other than the Operating Leases) with any Affiliate of any Guarantor, except for transactions the terms of which are no less favorable to such Guarantor than would reasonably be obtained by such Guarantor at that time in a comparable arm's-length transaction with a Person other than any such Affiliate.

17.     <u>Successors and Assigns</u>.  This Guaranty shall be binding upon the successors and assigns of Guarantor.  If more than one party executes this Guaranty, the liability of all such parties shall be joint and several.

18.     **CONSTRUCTION; CHOICE OF LAW.  THIS GUARANTY, THE NOTE, AND ALL OTHER INSTRUMENTS EVIDENCING AND SECURING THE LOAN SECURED HEREBY WERE NEGOTIATED IN THE STATE OF MARYLAND, AND DELIVERED BY GUARANTOR OR BORROWERS, AS APPLICABLE, AND ACCEPTED BY AGENT AND LENDERS IN THE STATE OF MARYLAND, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND THE UNDERLYING TRANSACTIONS EMBODIED HEREBY.  IN ALL RESPECTS, INCLUDING, WITHOUT LIMITATION, MATTERS OF CONSTRUCTION AND PERFORMANCE OF THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER, THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF MARYLAND APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  THE TITLES OF THE PARAGRAPHS OF THIS GUARANTY ARE FOR CONVENIENCE OF REFERENCE ONLY AND ARE NOT TO BE CONSIDERED IN CONSTRUING THIS GUARANTY.**

19.     <u>Advances of Proceeds of Loans</u>.  Agent shall be entitled to honor any request made by Borrowers for advances of proceeds of Loans and shall have no obligation to see to the proper disposition of such advances.  Guarantor agrees that its obligations hereunder shall not be released or affected by reason of any improper disposition by Borrowers of such proceeds of Loans.

CHICAGO/#3328290.5

20.    <u>Counterparts</u>.  This Guaranty may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto.

21.    <u>No Fraudulent Transfer or Conveyanc</u>e.  Notwithstanding anything to the contrary set forth herein, the Obligations of an individual Guarantor shall be limited to a maximum aggregate amount equal to the greatest amount that would not render such Guarantor's obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any provisions of applicable state law (collectively, the "**Fraudulent Transfer Laws**"), in each case after giving effect to all other liabilities of such Guarantor, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such Guarantor (a) in respect of intercompany indebtedness to the Borrower to the extent that such indebtedness would be discharged in an amount equal to the amount paid by such Guarantor hereunder and (b) under any guarantee of the Obligations or indebtedness subordinated in right of payment to the Obligations which guarantee contains a limitation as to maximum amount similar to that set forth in this paragraph, pursuant to which the liability of such Guarantor hereunder is included in the liabilities taken into account in determining such maximum amount) and after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation, contribution, reimbursement, indemnity or similar rights of such Guarantor pursuant to (a) applicable law or (b) any agreement providing for an equitable allocation among all Guarantors and other Subsidiaries of Borrower of obligations arising under guaranties by such parties.

22.    <u>DIP Orders</u>.  In the event of any inconsistency between the terms and conditions of any of this Guaranty and the DIP Orders, the provisions of the DIP Orders shall govern and control.

**[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]**

16

**IN WITNESS WHEREOF**, each of the undersigned has caused this Guaranty to be executed the day and year first above mentioned.

**GUARANTOR:**

**BROAD STREET HEALTHCARE
PROPERTIES, LLC**, a Delaware limited
liability company,

By: _____
Name: Joel Freedman
Title:  Chief Executive Officer and President

**BROAD STREET HEALTHCARE
PROPERTIES II, LLC**, a Delaware
limited liability company

By: _____
Name: Joel Freedman
Title:  Chief Executive Officer and President

**BROAD STREET HEALTHCARE
PROPERTIES III, LLC**, a Delaware
limited liability company

By: _____
Name: Joel Freedman
Title:  Chief Executive Officer and President

## Schedule 3(a) – Collateral

The Collateral consists of all of each Guarantor's rights, title and interests in and to the following, whether now owned or hereafter created, acquired or arising, and all proceeds and products of the following:

All goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

All books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

**Schedule 3(b) – Chief Executive Offices and Collateral Locations**

1500 Market Street, Centre Square, 24th Floor West Tower, Philadelphia, PA 19102

**Schedule 3(c) – Deposit Account**

| Credit Party | Financial Institution where Account Maintained | Account Number | Description of Account |
|---|---|---|---|
| Broad Street Healthcare Properties, LLC | Wells Fargo Bank, N.A. | 4127926004 | Deposit Account |