```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                         .  Chapter 11
                                    .  Case No. 19-11466 (MFW)
 4   CENTER CITY HEALTHCARE, LLC,   .
     d/b/a HAHNEMANN UNIVERSITY     .  (Jointly Administered)
 5   HOSPITAL, et al.,              .
                                    .  Courtroom No. 4
 6                                  .  824 Market Street
                         Debtors.   .  Wilmington, Delaware 19801
 7                                  .
                                    .  Wednesday, December 1, 2021
 8   . . . . . . . . . . . . . . .  .  9:00 a.m.

 9                     TRANSCRIPT OF ZOOM HEARING
                  BEFORE THE HONORABLE MARY F. WALRATH
10                   UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:           Mark Minuti, Esquire
                                SAUL EWING ARNSTEIN & LEHR, LLP
13                              1201 North Market Street
                                Suite 2300
14                              Wilmington, Delaware 19899

15
     For PAHH and the Broad
16   Street Properties II:      Robert J. Malionek, Esquire
                                Suzanne Uhland, Esquire
17                              LATHAM & WATKINS, LLP
                                1271 Avenue of the Americas
18                              New York, New York 10020

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded by:               Lesa Neal, ECRO
21
     Transcription Service:     Reliable
22                              1007 N. Orange Street
                                Wilmington, Delaware 19801
23                              Telephone: (302) 654-8080
                                E-Mail:  gmatthews@reliable-co.com
24

25   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For PAHH and the Broad
    Street Properties II:       Amy C. Quartarolo, Esquire
3                               LATHAM & WATKINS, LLP
                                355 South Grand Avenue
4                               Suite 100
                                Los Angeles, California 90071
5
                                Gail Reiser, Esquire
6                               1271 Avenue of the Americas
                                New York, New York 10020
7
                                -and-
8
                                Julien A. Adams, Esquire
9                               DOVEL & LUNER, LLP
                                201 Santa Monica Boulevard
10                              Suite 600
                                Santa Monica, California 90401
11

12  For HSREP VI
    Holding, LLC, *et al*:      Stuart M. Brown, Esquire
13                              DLA PIPER LLP (US)
                                1201 North Market Street
14                              Suite 2100
                                Wilmington, Delaware 19801
15
                                Joseph Kernen, Esquire
16                              One Liberty Place
                                1650 Market Street
17                              Suite 5000
                                Philadelphia, Pennsylvania 19103
18

19  For Gordon Brothers:        Cindi M. Giglio, Esquire
                                KATTEN MUCHIN ROSENMAN, LLP
20                              575 Madison Avenue
                                New York, New York 10022
21

22  For the US Trustee:         Benjamin A. Hackman, Esquire
                                OFFICE OF THE UNITED STATES TRUSTEE
23                              J. Caleb Boggs Federal Building
                                844 King Street
24                              Suite 2207, Lockbox 35
                                Wilmington, Delaware 19801
25

1  APPEARANCES (CONTINUED):

2  For the City of
   Philadelphia:            Megan N. Harper, Esquire
3                           CITY OF PHILADELPHIA
                              LAW/REVENUE DEPARTMENT
4                           Municipal Services Building
                            1401 John F. Kennedy Boulevard
5                           Room 580
                            Philadelphia, Pennsylvania 19102
6

7  For Conifer Revenue
   Cycle Solutions, LLC:    Christopher S. Koenig, Esquire
8                           KIRKLAND & ELLIS, LLP
                            300 North LaSalle Street
9                           Chicago, Illinois 60654

10

11 For Capital One:         Alissa K. Piccione, Esquire
                            TROUTMAN PEPPER HAMILTON
12                            SANDERS, LLP
                            875 Third Avenue
13                          New York, New York 10022

14

15 ALSO PRESENT:

16                          Harold Brubaker, Reporter
                            Philadelphia Inquirer
17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                                        PAGE

3    Agenda
     Item 1:    The Motion of the Broad Street Entities and           7
4               PAHH for Entry of an Order (I) Determining
                that the Automatic Stay Does Not Apply to
5               Their Assets or (II) in the Alternative,
                Granting Limited Relief from the Automatic
6               Stay for Them to Sell, Transfer, or Otherwise
                Encumber Such Assets
7               [Docket No. 3002; filed: 10/29/21]

8               Court's Ruling:                                       7

9
     Agenda
10   Item 2:    Debtors' and Committee's Motion for Entry of          7
                an Order Authorizing the Debtors and Committee
11              to File the Objection of Debtors and Committee
                to the Motion of the Broad Street Entities and
12              PAHH for Entry of an Order (I) Determining that
                the Automatic Stay Does Not Apply to Their
13              Assets or (II) in the Alternative, Granting
                Limited Relief From the Automatic Stay for Them
14              to Sell, Transfer, or Otherwise Encumber Such
                Assets Under Seal
15              [Docket No. 3176; filed: 11/28/21]

16              Court's Ruling:                                       7

17
     Agenda
18   Item 3:    Debtors' and Committee's Motion for Entry of          8
                an Order Authorizing the Debtors and Committee
19              to File the Debtors' and Committee's (I)
                Renewed Motion to Compel Discovery and Continue
20              Hearing on Comfort / Lift Stay Motion and (II)
                Motion in Limine Under Seal
21              [Docket No. 3179; filed: 11/28/21]

22              Court's Ruling:                                     194

23

24

25

1                              INDEX

2     MOTIONS:                                        PAGE

3     Agenda
      Item 4:   (FILED UNDER SEAL) Debtors' and Committee's    7
4               (I) Renewed Motion to Compel Discovery and
                Continue Hearing on Comfort / Lift Stay Motion
5               and (II) Motion in Limine
                [Docket No. 3177; filed: 11/28/21]
6
                Court's Ruling:                             8
7


8
      WITNESSES CALLED
9     BY THE MOVANTS:                                  PAGE

10         WILLIAM R. BRINKMAN
           Direct examination by declaration          --
11         Cross-examination by Mr. Minuti             27
           Cross-examination by Mr. Kernen            27
12         Cross-examination by Mr. Malionek           84
           Redirect examination by Mr. Minuti         96
13         Recross-examination Mr. Kernen             103

14
           JOEL L. FREEDMAN
15         Direct examination by declaration          --
           Cross-examination by Mr. Minuti           106
16         Cross-examination by Mr. Kernen           126

17


18
      WITNESSES CALLED
19    BY THE DEBTORS:                                  PAGE

20         ALLEN WILEN
           Direct examination by declaration          --
21         Cross-examination by Ms. Quartarolo        131
           Redirect examination by Mr. Minuti         147

22

23

24

25

1                          EXHIBITS

2    DEBTORS' EXHIBITS:                                    PAGE

3    Exhibit 1 - Motion papers                              77

4    Exhibit 2 - Note                                       77

5    Exhibit 3 - Note                                       77

6    Exhibit 4 - Gordon Brothers termsheet                  77

7    Exhibit 5 - No description given                       77

8    Exhibit 6 - Pension settlement agreement               77

9    Exhibit 7 - Email                                     125

10   Exhibit 8 - No description given                       77

11   Exhibit 9 - MBNF Investments org. chart                77

12   Declaration of Allen Wilen                            130

13

14   MOVANTS' EXHIBITS:                                    PAGE

15   Exhibit 1 - Declaration of Joel Freedman               26

16   Exhibit 2 - Declaration of William Brinkman             26

17   Transcriptionists' Certificate                        199

18

19

20

21

22

23

24

25

1          (Proceedings commence at 9:00 a.m.)

2          THE COURT:  Good morning.  This is Judge Walrath.

3    We're here in the Center City case.  We have a couple of

4    matters.

5          I thought, just for the record, for Motions 2 and

6    3 on the agenda, they're motions to seal, and I'll grant

7    those.

8          MR. MINUTI:  Thank you, Your Honor.

9          THE COURT:  With respect to Item Number 4, the

10   motion to continue the hearing and compel discovery, I'm

11   prepared to rule on the motion on the papers filed, unless

12   anybody has anything to add.  Does the Movant, Mr. Minuti?

13         MR. MINUTI:  Your Honor, Mark Minuti.  Nothing to

14   add, unless Your Honor has any specific questions of me.

15         THE COURT:  No.

16         Respondent?

17         MR. MALIONEK:  And Your Honor, Robert Malionek

18   from Latham on behalf of the Movants.  When I say the

19   "Movants," I mean the Movants with respect to the comfort

20   motion.  There are so many different Movants of different

21   motions here.

22         THE COURT:  Yes.

23         MR. MALIONEK:  No, we had nothing additional.  I

24   think we put everything that we needed to say into our

25   objection.  Thank you, Your Honor.

1           THE COURT:  All right.  Then, for the record, I'm

2    going to deny the motion on the papers.  And we'll proceed

3    with the hearing, reserving on any motion to exclude evidence

4    that the debtors or committee may have.  But I can't decide

5    that until I hear what evidence is presented in support of

6    the motion, so ...

7           MR. MINUTI:  Very well, Your Honor.

8           THE COURT:  Mr. Malionek, you may proceed, I

9    guess.

10          MR. MINUTI:  Your Honor, if I may.  Mark Minuti on

11   behalf of the debtors.

12          There's one preliminary matter that I want to

13   introduce to your court, and then I'm going to turn it over

14   to Mr. Malionek.  I appreciate that Your Honor entered the

15   motions -- entered orders on motions to seal today.  We thank

16   the Court very much for doing that.

17          But the assertions by the MBNF parties that a

18   number of the documents and the deposition transcripts and

19   the testimony you're going to hear today is confidential

20   requires some guidance from the Court, in terms of how we're

21   going to go forward today.  I mean, for example, we're going

22   to use exhibits today that the MBNF parties believe are

23   confidential.  We're going to ask questions based on

24   confidential information.

25          And so it is the assertion of the MBNF parties,

1  Your Honor, that these matters are confidential.  I'll let

2  Mr. Malionek explain to Your Honor what he believes is

3  confidential.  And to the extent he has a suggestion as to

4  how we should proceed, I'll be all ears.  But it would be

5  helpful for everybody, Your Honor, to have some guidance from

6  the Court at the outset, in terms of how we're going to

7  handle that.  Thank you.

8           THE COURT:  Good suggestion.

9           MR. BROWN:  And Your Honor, Stuart Brown, DLA

10 Piper, on behalf of the Harrison Street PAHH joint venture

11 and other Harrison Street affiliated entities that are

12 interested parties and creditors in these bankruptcy cases,

13 as well as creditors of the MBNF Movants.  We also, as Your

14 Honor may recall, are a party to the mediation and subject to

15 the mediation privilege.  And so, if there's an exclusion

16 order that Your Honor is considering, we ought to be on the

17 inside of that exclusion order.  And I just wanted to bring

18 that to Your Honor's attention early in the proceeding.

19           THE COURT:  All right.  Thank you.

20           MR. BROWN:  Thank you, Your Honor.

21           MR. MALIONEK:  Thank you, Your Honor.  I have -- I

22 may turn it over, also, to my partner Suzanne Uhland, as

23 well, with respect to the confidentiality issues.

24           As a matter of procedure, there are several issues

25 that are raised with respect to confidentiality.  I agree

1  with Mr. Minuti, I believe, if his suggestion was that these

2  -- this proceeding we regard to be as confidential for a

3  number of reasons:

4          Number one --

5          THE COURT:  Well --

6          MR. MALIONEK:  -- there are -- oh, I'm sorry.

7          THE COURT:  Are you suggesting the entire

8  proceeding is going to be confidential?  Do you want to seal

9  the whole hearing?

10         MR. MALIONEK:  Well, I think what we would suggest

11  is, Your Honor -- and this is what I was going to get to --

12  is, as we get to certain portions of the evidentiary hearing

13  and perhaps of the argument, we may ask or, if possible,

14  reserve the right to be able to ask afterwards that the

15  transcript be labeled as -- that portion of the transcript be

16  labeled as sealed.  We, obviously, do not want to do anything

17  to jeopardize the hearing going forward by excluding any

18  particular parties or those in attendance.  But that's, I

19  think, how we would at least propose to proceed.

20         THE COURT:  Is that going to work, Mr. Minuti?

21         MR. MINUTI:  Your Honor, I think it's going to be

22  challenge.  And the reason I say that is, you know, just, for

23  example, on cross-examination, you know, it's not entirely

24  clear to me what questions I'm going to ask that they're

25  going to view as confidential or not confidential.  And so,

1   in order for the cross-examination to be effective, Your

2   Honor, I'd like to have a flow going and I'd like to ask the

3   questions of the witnesses without a lot of objections and

4   interruptions.

5           And so, you know, look, I don't want to make this

6   any harder than it has to be.  But as a practical matter,

7   Your Honor, doing it on a question-by-question basis or

8   document-by-document may be impractical here.

9           MS. UHLAND:  Your Honor, this is Suzzanne Uhland.

10          With respect to the confidentiality, there are

11  really just two areas that we are concerned with:

12          One is obviously the sealed complaint, that is

13  under seal and I think all parties understand that.  So, to

14  the extent there's questioning or argument about the sealed

15  complaint, we believe that that should, you know, continue to

16  be placed under seal by this Court.

17          The second area is truly a commercially sensitive

18  area with respect to the property condition.  These -- there

19  is some detailed information about the property condition and

20  potential remediation that is commercially sensitive, both

21  because this property is being marketed right now and because

22  it's -- you know, there are details dealing with the

23  property.  And we believe that that particular information

24  about the property condition is commercially sensitive.  So

25  we would ask that, on those issues, that we be in a -- be

1  able to designate those later as sealed.

2          But those are really -- those are our limited two

3  areas.  And I think that we -- that that should not disrupt

4  any flow, if we try to protect those two items.

5      (Pause)

6          THE COURT:  Well, I'm also going through the

7  registration list.  Is there anybody on the line that is not

8  -- other than law clerks, is there anybody on the line who is

9  not a representative of or representing one of the parties in

10  this case?

11          MR. BRUBAKER:  I'm Harold Brubaker --

12          MS. GIGLIO:  Yes, Your Honor.

13          MR. BRUBAKER:  -- a reporter --

14          MS. GIGLIO:  This is --

15          MR. BRUBAKER:  -- from the Inquirer.

16          THE COURT:  All right.  A reporter from the

17  Philadelphia Inquirer.

18          Somebody else?

19          MS. GIGLIO:  Yes, Your Honor.  It's Cindi Giglio.

20  I represent Gordon Brothers.  I'm not a party to the

21  underlying proceeding.

22          THE COURT:  Any objection to Gordon Brothers,

23  though, participating?

24          MS. UHLAND:  No, there's no objection, Your Honor.

25          THE COURT:  All right.

1          MR. HACKMAN:  Your Honor, this is Ben Hackman for

2   the U.S. Trustee.  May I please be heard?

3          THE COURT:  You may, Mr. Hackman.

4          MR. HACKMAN:  Thank you, Your Honor, and may it

5   please the Court.

6          To the extent the parties are asking that the

7   courtroom be sealed during the presentation today, we would

8   oppose that relief.  We submit that the public and press have

9   a First Amendment right of access to civil trials and

10  attempts to restrict access to civil trials are evaluated

11  under strict scrutiny.  We would submit that the lease

12  restrictive method of adducing the evidence, while

13  maintaining that right of access, be implemented by Your

14  Honor.  Thank you, Your Honor.

15      (Pause)

16          MS. UHLAND:  Just to be clear, Your Honor, we are

17  not seeking to seal this hearing, as Mr. Malionek explained.

18  We're seeking to seal the transcript after the conclusion of

19  the hearing.

20          With respect to the presence of the press,

21  Mr. Malionek, I don't know if you have a suggestion with

22  respect to addressing that.

23          MR. MALIONEK:  Well, Your Honor, I know the

24  Court's reluctance always to seal the courtroom.  And as

25  Ms. Uhland said, that certainly is not what I was

1    recommending beforehand.  The two issues that Ms. Uhland had

2    laid out are really the only two issues that we think are

3    particularly sensitive here:

4            One is a -- relates to a, by agreement of the

5    parties, sealed adversary proceeding.  And so, if that were

6    to get out into the press, we believe that that would

7    undermine the sealing of the adversary itself.

8            Number two is, as Ms. Uhland said, the commercial

9    sensitivities regarding these properties and the financing at

10   issue underlying the motion.  And again, the terms and

11   conditions of the financing, as well as the condition of the

12   properties, if that were to get out into the press, that

13   would be a -- would cause significant harm and prejudice to

14   the Movants here.

15           So we would ask, Your Honor, if the courtroom

16   could exclude the presence of any court reporters -- excuse

17   me -- press, reporters for the press.  I believe there was

18   only one that spoke up, who's part of this proceeding.  And I

19   think that's the only suggestion that I can think of, Your

20   Honor, in order to protect what we think is highly

21   prejudicial to us.

22           THE COURT:  Well, how are we going to delineate

23   those two issues --

24           MR. MALIONEK:  Your Honor --

25           THE COURT:  -- in a meet -- in a manner that is

1  convenient for the flow of the trial, hearing.

2          MR. MALIONEK:  Well, there -- I'm sorry, Your

3  Honor.  I didn't mean to cut you off.

4          THE COURT:  No, go ahead.

5          MR. MALIONEK:  There -- so I think that there are

6  -- these are issues that are well known by the parties.  And

7  frankly, some of the issues related to those are ones in

8  which we would object to coming in at all as irrelevant to

9  the proceedings in the first place.

10          I think that one thing that we have proposed, the

11  Movants have proposed -- and none of the parties from our

12  reach-outs prior to the hearing have objected to this -- is

13  that the two witnesses that the Movants would call have

14  submitted declarations, and we would ask, as -- you know, as

15  is sometimes typical in these proceedings, Your Honor, to

16  streamline the proceeding, that these declarations be

17  proffered as their direct testimony.  And that -- and the

18  witnesses are available, obviously, by Zoom to be cross-

19  examined.

20          If that would streamline things and would not

21  address, obviously, any issues with respect to those two

22  confidential areas, as Mr. Minuti or Mr. Sherman or others

23  are conducting their cross-examinations, if they are going to

24  be going into those two areas, they certainly know what they

25  are.  And we would ask them to flag those issues, so that, at

1  that point, for those questions -- and hopefully, they can

2  cabin those questions into a grouping that's most efficient

3  together -- then, at that point, the member of the press who

4  is part of this hearing could be removed from the proceeding

5  on a temporary basis, and then allowed to come back in.  And

6  perhaps we can figure out a way how to be able to reach out

7  to that person, to be able to say that that person can come

8  back in.  But that would be my suggestion, Your Honor.

9         THE COURT:  Mr. Minuti, will that work?

10        MR. MINUTI:  Your Honor, I will certainly do my

11  best with respect to the proposal.  And look, why don't we

12  move forward as suggested and play it by ear?  If it becomes

13  impractical, we can address it at the time.  But I'll

14  certainly do my best.

15        MR. BROWN:  Your Honor, if I may be heard briefly?

16  Stuart Brown, DLA, on behalf of the HSREP parties again, for

17  the record.

18        Your Honor, I heard Ms. Uhland speak to two

19  issues, one being the sealed complaint and one being the

20  condition of the real estate.  I heard Mr. Malionek then take

21  the second and expand the scope of what is intended to be

22  confidential.  And I think it would be beneficial for all of

23  us if we were clear on exactly what the scope of the second

24  area of confidentiality is, whether it's as limited as Ms.

25  Uhland stated, or whether it's as broad or broader than Mr.

1  Malionek's --

2           THE COURT:  I'm not sure I heard the anything

3  broader.  The condition of the properties, is that what we're

4  talking about?

5           MR. BROWN:  I heard --

6           MS. UHLAND:  Yes --

7           MR. MALIONEK:  -- mister -- yes, Your Honor.  I

8  heard Mr. Malionek, not only state the -- restate the

9  condition of the properties, but also the terms and

10  conditions of the proposed financing, as well as other

11  economic issues pertaining to the maintenance of the

12  buildings.

13           MS. UHLAND:  Your Honor, to clarify, it is -- we

14  are prepared to allow the terms and conditions; i.e., the

15  termsheet and the sources of uses that is attached to the

16  termsheet.  That is not required to be sealed.  The -- it is

17  the issues with respect to the property conditions.  You

18  know, so maybe the term "condition" is subject to two

19  meanings, but I do want to clarify it is the narrow property

20  condition we're concerned about, not the termsheet or the

21  sources and uses.

22           Does that make it clearer for you, Mr. Brown?

23           MR. BROWN:  Yes.  And we have no objection to

24  those limitations and also -- and a benefit from the max --

25  from maximizing the value of those properties.  So thank you

1   for that clarification, Ms. Uhland.

2          And Your Honor, for the record, my partner Joe

3   Kernen, who's been admitted in these proceedings *pro hac vice*

4   participate in the questioning at the appropriate time.  And

5   I'll put my screen on -- I don't -- what do you call that,

6   mute?  My microphone will be on mute, not -- and my screen

7   will be off.  How's that?

8          THE COURT:  All right.  That's fine.

9          MR. MALIONEK:  And Mr. Brown, so you know, that --

10  exactly as you say, which is the ultimate issue here is to go

11  forward with this motion, so that the assets -- the maximum

12  value of the assets can be realized, that's why we're going

13  forward with this.  And so that's all I meant to say, not

14  anything inconsistent with what Ms. Uhland was laying out.

15         THE COURT:  Okay.  Then I think we have a process.

16  And you may proceed, Mr. Malionek.

17         MR. MALIONEK:  Thank you, Your Honor.

18         And then, so, to make it -- to make it easy, if

19  Your Honor agrees and since, you know, there have been no

20  objections, we would proffer Exhibits 1 and 2, which are the

21  dec -- the Movants' Exhibits 1 and 2, which are the

22  declarations of Joel Freedman and William Brinkman, including

23  the attachment that is part of the declaration of Mr.

24  Brinkman's -- of Exhibit 2, which is Mr. Brinkman's

25  declaration.  We would proffer those as their direct

1  testimony, Your Honor, and then make them immediately

2  available for cross-examination.  Is that acceptable, Your

3  Honor?

4          THE COURT:  Yes.

5          MR. MINUTI:  Your Honor, may I be heard on that?

6          THE COURT:  You may.

7          MR. MINUTI:  Your Honor, for the record, Mark

8  Minuti on behalf of the debtors.

9          We certainly don't have any objection to the

10  declarations coming in as a proffer, Your Honor.  But

11  consistent with the -- with Your Honor's direction at the

12  outset of the hearing, we do object to specific statements

13  that are contained in particularly Mr. Brinkman's

14  declaration, so I would like to be heard on those issues.

15          THE COURT:  You may.

16          MR. MINUTI:  Thank you, Your Honor.

17          Does Your Honor have a copy of Mr. Brinkman's

18  declaration?

19          THE COURT:  I'm just pulling it up now.

20          MR. MINUTI:  Let me know when Your Honor is ready.

21          MR. MALIONEK:  That's Movants' Exhibit 2, Your

22  Honor.

23          THE COURT:  It's Docket Number 3117?

24          MR. MALIONEK:  3187.

25          THE COURT:  3187, yes.

1           MR. MALIONEK:  Yes, Your Honor.

2           THE COURT:  All right.  I have it.

3           MR. MALIONEK:  Mr. Minuti, if helpful, too, we

4  also have our hot seat person, who would be able to put up

5  portions of this on the screen.  If that's helpful to you,

6  just let me know, and we're happy to be able to coordinate

7  with you on that.

8           MR. MINUTI:  Certainly.  Why don't we go ahead and

9  do that?

10          MR. MALIONEK:  Your Honor, can you give Gail

11 Reiser, please -- or could you have your chambers give Gail

12 Reiser the right to be able to share screen?

13          THE COURT:  All right.  Ms. Neal.

14      (Pause)

15          THE COURT:  All right.  Ms. Reiser, you need to

16 unmute.

17          MS. REISER:  I'm good and ready if you need me,

18 Your Honor.

19          MR. MALIONEK:  All right.  And then, Mr. Minuti --

20          THE COURT:  Mister --

21          MR. MALIONEK:  -- maybe just to be helpful -- oh,

22 I'm sorry, Your Honor.

23          THE COURT:  Let me --

24          MR. MALIONEK:  I keep cutting you off.  I'm sorry.

25          THE COURT:  I'm trying to be sure Ms. Neal is ...

1          (Pause)

2          MR. MALIONEK:  Once ready, Your Honor, just give

3   the okay.  And I think what we could do is I could ask Gail

4   to put up the first page of Movants' Exhibit 2, just so that

5   we're all looking at the same thing.

6          THE COURT:  All right.  She should be able to do

7   that now.  There you go.

8          MR. MALIONEK:  Mark, hopefully that's helpful.

9   I'll put it on mute as you go.

10          THE COURT:  All right.

11          MR. MINUTI:  Thank you, Your Honor.  Excuse me,

12   Your Honor.

13          Your Honor, a little bit of context, Your Honor, a

14   very little bit of context before I get to the specific

15   provisions.

16          By the comfort and finance motion, the Movants are

17   seeking comfort order or a motion to lift the automatic stay

18   to grant a first priority lien against the Broad Street

19   properties' assets.  They're going to use that loan, Your

20   Honor, in part, to pay Mr. Freedman's company Paladin

21   Healthcare Capital approximately $436,000 for alleged

22   services provided to the Broad Street PropCos and the MBNF

23   nondebtor parties.

24          They're going to use those funds to pay several

25   professionals over $2.7 million for alleged services provided

1  to the MBNF nondebtor parties, not just the Broad Street

2  entities.

3        And they want to pay up to an additional $2.3

4  million plus for services that may be rendered by Paladin and

5  these professionals going forward, Your Honor, again, not

6  just to the Broad Street entities, but to all of the MBNF

7  entities in this case.

8        Now we've learned from Mr. Brinkman's declaration,

9  Your Honor, that was filed on the 29th, that the foregoing

10 amounts have increased by approximately $383,000 since

11 October 28th.

12        Now, in the context of establishing cause to lift

13 the automatic stay, Your Honor, the reasonableness of these

14 proposed uses of the loan are directly at issue.  And for the

15 debtors and the committee, Your Honor, to have a fair hearing

16 today, it was important for us to investigate what were the -

17 - what were those expenses incurred for, right?  And it's

18 important for both the debtors, the committee, and the Court

19 to know how much of these alleged services actually relate

20 directly and specifically to the services provided to the

21 Broad Street entities, the borrowers here.

22        And if those services, Your Honor, apply to other

23 entities other than the Broad Street entities, why is it

24 reasonable and appropriate for the Broad Street entities to

25 pay the full amount of those services.  And I think this was

1   recognized by the Court at the 1119 hearing.  But -- and this

2   is a -- but Your Honor, they failed to provide discovery on

3   these points, and that's exactly what they're trying to do.

4          We know from Mr. Brinkman's declaration, filed on

5   the 29th, that the Movants are seeking to introduce evidence

6   to their view as to a proposed allocation of services among

7   the MBNF nondebtor parties.  They want to argue, Your Honor,

8   and present evidence that it is appropriate to have the Broad

9   Street entities pay for all of these services because the

10  Broad Street entities owe money to other MBNF nondebtor

11  parties.

12         THE COURT:  Mr. Minuti --

13         MR. MINUTI:  Yes.

14         THE COURT:  -- I'm going to cut you off.  You can

15  cross-examine on these.  I'm not going to exclude any of the

16  statements in the declaration regarding the basis for the

17  amounts that the Broad Street companies are going to pay.

18  You can inquire into that amount, but -- or the basis for it,

19  but ...

20         MR. MINUTI:  Thank you, Your Honor.

21         Your Honor, in addition to the amounts being paid,

22  there is testimony being proffered, Your Honor, regarding the

23  allocation of those services among the parties.

24         THE COURT:  Uh-huh.

25         MR. MINUTI:  Again, we were not provided

1  discovery.  Will Your Honor allow me to cite the provisions

2  of the declaration and ask to strike those related to

3  allocation?

4              THE COURT:  No.  I'm going to allow you to inquire

5  as to the basis for the allocation, but --

6              MR. MINUTI:  Thank you, Your Honor.

7              THE COURT:  -- not strike.

8              MR. MINUTI:  Thank you, Your Honor.

9              Then I have one -- then I have one final

10 objection, Your Honor.  That appears in Paragraph 6 of the

11 proposed declaration -- or the declaration -- excuse me.  It

12 is the second sentence, Your Honor.  The sentence reads:

13             "Initially, the pension fund demanded payment in

14 the amount of $59,400."

15             That statement is hearsay, Your Honor; and,

16 therefore, I would ask that it be stricken.

17             THE COURT:  Your response?

18             MR. MALIONEK:  Thank you, Your Honor.  It's Robert

19 Malionek.

20             I'm looking at the -- maybe we can put up that

21 Paragraph 6, just so we're all looking at the same thing.

22 Okay.

23             Your Honor, I mean, first, certainly, I do not

24 think it falls within the definition of "hearsay."  It's not

25 that the amount of $59,400,000 [sic] is something that,

1   obviously, the MBNF nondebtor parties even agree is true;

2   and, therefore, we're not putting this in for the truth of

3   the matter asserted at all.  We're putting it in simply to be

4   able to explain, as we do in context in this paragraph, that,

5   given the demands related to these particular nondebtor

6   entities that we believe were actually responsibilities of

7   the parties, that the MBNF nondebtor parties actually then

8   ended up reaching an agreement to make certain payments with

9   respect to those pension obligations of the debtors.

10           And again, I think, Your Honor, this is something

11  on which Mr. Brinkman can be cross-examined, and certainly

12  was cross-examined within his -- during his deposition on

13  this.  And so -- and the pension agreement, I would add, has

14  been provided to the debtors, as has evidence with respect to

15  all of the different categories that Mr. Minuti said they

16  were denied evidence into.

17           So I think this is not hearsay to begin with.

18  Even if it were hearsay, I think that this goes to a -- the

19  state of mind of the MBNF nondebtor parties with respect to

20  why it is that they were entering into --

21           THE COURT:  Okay.

22           MR. MALIONEK:  -- the agreement that they entered

23  into.

24           MR. MINUTI:  Your Honor, again, Mark Minuti for

25  the record.  May I respond?

1          THE COURT:  You may.

2          MR. MINUTI:  Your Honor, it's a hearsay statement,

3 it's a statement of the pension fund.  Yes, I agree they

4 don't agree with the number.  But it's being offered, Your

5 Honor, for the truth that that is what was asserted by the

6 pension find.

7          In addition, Your Honor, I don't even think it's

8 relevant to today's hearing, so I would simply ask that you

9 strike the sentence.

10          THE COURT:  I will strike it.  I think that the

11 assertion that somebody said something is hearsay.

12          MR. MINUTI:  Thank you, Your Honor.

13      (Movants' Exhibit 1 received in evidence)

14      (Movants' Exhibit 2 received in evidence)

15          MR. MINUTI:  Your Honor, I would like to cross-

16 examine Mr. Brinkman.

17          THE COURT:  You may.  Mr. Brinkman.  Where is he?

18          THE WITNESS:  Good morning, Your Honor.

19          THE COURT:  Good morning, Mr. Brinkman.  All

20 right.  I'll ask you to take the oath.  Raise your hand.

21          Ms. Neal.

22      WILLIAM BRINKMAN, WITNESS FOR THE MOVANTS, AFFIRMED

23          THE ECRO:  Please state your full name and spell

24 your last name for the record.

25          THE WITNESS:  My name is William R. Brinkman, B-r-

1  I--k-m-a-n.

2          THE COURT:  All right.  Mr. Minuti -- first,

3  Mr. Brinkman, are the statements that are contained in your

4  declaration that has been submitted as an exhibit in this

5  proceeding what you would have testified to had you been

6  called on direct?

7          THE WITNESS:  Yes, they are, Your Honor.

8          THE COURT:  And they are true, and you don't want

9  to make any changes?

10          THE WITNESS:  They are accurate, correct.

11          THE COURT:  All right.  Mr. Minuti, you may cross.

12          MR. MINUTI:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. MINUTI:

15  Q    Good morning, Mr. Brinkman.  I know it's early where

16  you are.

17  A    Good morning, Mr. Minuti.

18  Q    Mr. Brinkman, exactly where are you?

19  A    I am in my office in Lafayette, California.

20  Q    Is anyone in the room with you?

21  A    I am alone.

22  Q    Do you have any documents in front of you, sir?

23  A    I do not.

24  Q    Mr. Brinkman, Jigsaw Advisors, LLC is your company,

25  correct?

1  A      Yes.

2  Q      And Jigsaw Advisors, LLC is one of the lenders under

3  the first lien note and second lien note identified in

4  Paragraph 14 of your declaration, correct?

5  A      Correct.

6  Q      As --

7          MR. MALIONEK:  Mr. Minuti, may I -- I am loathe to

8  interrupt you, and I apologize.

9          And Your Honor, I do want to make one request,

10  which is Mr. Brinkman was asked if he has any documents in

11  front of him.  There has been a document that's been admitted

12  now into evidence, which is his declaration.  As Mr. Minuti

13  is asking him specific questions regarding specific

14  paragraphs from that specific exhibit, if Mr. Brinkman has

15  that available to him, I'd ask that he be allowed to have

16  that in front of him during his testimony.

17          THE COURT:  All right.  That's fine.

18          THE WITNESS:  I do have --

19          MR. MALIONEK:  Mr. Brinkman, do you have that

20  available?

21          THE WITNESS:  I do.  I have the binder.

22          THE COURT:  All right.

23          MR. MALIONEK:  Thank you.

24          THE COURT:  Well, then --

25          MR. MALIONEK:  It's Exhibit 2 -- I'm sorry, Your

1    Honor.  It's Exhibit 2.  I think that would be fair for you

2    to have that in front of you.

3              Thank you, Your Honor.

4              MR. MINUTI:  And Mr. Malionek, why don't we have

5    your technical person put that on the screen, so others can

6    follow along, if that's acceptable.

7              MR. MALIONEK:  That's no problem.  Gail, can you

8    do that?

9              THE COURT:  All right.

10             MR. MINUTI:  May I continue, Your Honor?

11             THE COURT:  You may.

12   BY MR. MINUTI:

13   Q    All right.  Mr. Brinkman, as of October 28, 2021,

14   Jigsaw Advisors was owed approximately $675,000.  Is that

15   correct?

16   A    That is correct.

17   Q    And how much is Jigsaw Advisors owed today?

18   A    Slightly more than that, approximately $50,000 in -- or

19   more than that.

20   Q    And if the Court approves the motion today, the Broad

21   Street entities are going to close on the proposed term loan

22   with Gordon Brothers and Jigsaw Advisors will be paid the

23   amounts that are owed to it, correct?

24   A    That is correct.

25   Q    So you'll agree with me, sir, that you personally have

1   a direct interest in the outcome of today's hearing, correct?

2   A    My -- my firm will -- will receive payment, correct.

3          MR. MINUTI:  Okay.  Your Honor, on the line with

4   us, Your Honor, is our technical person, Brian Collins.  I'm

5   going to ask him, if he would, to pull up on the screen the

6   document that we've identified on our exhibit list as Item

7   Number 2.

8          THE COURT:  All right.

9          MR. MINUTI:  If we could share the screen with

10  Mr. Collins.

11         THE COURT:  Okay.  It's being done.  There we go.

12  BY MR. MINUTI:

13  Q    Okay.  Can you see that, Mr. Brinkman?

14  A    I do.

15  Q    Okay.  And do you recognize this document?

16         THE COURT:  Just again, for the record,

17  Mr. Minuti, what is this, debtors' exhibit what?

18         MR. MINUTI:  Your Honor, this is going to be

19  Debtors' Exhibit Number 1 for today's hearing.

20         THE COURT:  It's Number 1 on your exhibit list?

21         MR. MINUTI:  It is Number 2 on my exhibit list,

22  Your Honor.

23         THE COURT:  Well, let's keep it in the order that

24  is on your exhibit list.

25         MR. MINUTI:  Fair enough, Your Honor.

1          THE COURT:  Thank you.

2          MR. MINUTI:  Debtors' Exhibit Number 2.

3          THE COURT:  Good.

4    BY MR. MINUTI:

5    Q     I'm sorry.  Mr. Brinkman, do you recognize this

6    document?

7    A     I do.

8    Q     And what is this document?

9    A     It is a note between several lenders, including my firm

10   and the Broad Street entities.

11   Q     And is this one of the notes that you're referring to

12   in Paragraph 14 of your declaration?

13   A     I'm -- may I look at Paragraph 14?

14   Q     Certainly.

15   A     It is.

16         MR. MINUTI:  Your Honor, I would move Exhibit

17   Number 2 into evidence.

18         THE COURT:  Well, let's wait until the end of all

19   the examination.

20         MR. MINUTI:  Thank you, Your Honor.

21         I would then ask Mr. Collins to put on the screen

22   Exhibit Number 3 on the debtors' exhibit list.

23       (Pause)

24   BY MR. MINUTI:

25   Q     Mr. Brinkman, I'll ask you if you recognize that

1  document?

2  A    I do, Mr. Minuti.

3  Q    And what is that document?

4  A    It is also a note that was entered into between the

5  lenders, including my firm, and the Broad Street entities.

6  Q    And is that note also referred to in Paragraph 14 of

7  your declaration?

8  A    I believe it is.

9  Q    Now, at Paragraph 2 of your declaration -- do you still

10  have that in front of you?

11  A    I do.

12  Q    You state that you were serving as interim Chief

13  Financial Officer of MBNF Investments, LLC, correct?

14  A    Correct.

15        MR. MINUTI:  All right.  I'm now going to ask Mr.

16  Collins to pull up Exhibit Number 9 of the debtors' exhibits.

17      (Pause)

18  BY MR. MINUTI:

19  Q    Do you recognize -- do you recognize this document, Mr.

20  Brickman?

21  A    I do recognize that document.

22  Q    And what is this document?

23  A    It is an organizational chart of MBNF Investment

24  entities.

25  Q    And using this chart -- or if you can do it without the

1  chart, that's fine -- can you tell me who, in addition to

2  MBNF Investments, LLC are you providing services to on this

3  chart?

4  A    So I'm providing services to MBNF Investments; American

5  Academic Health System, its direct subsidiary; Philadelphia

6  Academic Health Holdings, its direct subsidiary; and then,

7  below that, the Philadelphia Academic Risk Retention Group.

8  If you follow down to the middle part of the chart, there are

9  the Front Street entities, there are two of them, and there

10  are three Broad Street entities.  Those are the entities that

11  I'm providing advisory services and interim chief financial

12  services -- officer services to.

13  Q    Thank you.

14       MR. MINUTI:  Please bear with me for one moment.

15       (Pause)

16  BY MR. MINUTI:

17  Q    Now the services you provided that relate to the unpaid

18  fees that we talked about earlier are for services -- are for

19  services provided to all of the entities for whom you were

20  serving as interim Chief Financial Officer, correct?

21  A    That is correct.

22  Q    And you would agree that a substantial amount of your

23  time has been spent on tax issues, correct?

24  A    Yes.

25  Q    And among other issues, you're trying to figure out,

1  for example, you know, how to maximize net operating losses,

2  correct?

3  A    That's --

4         MR. MALIONEK:  Objection, Your Honor.  It lacks

5  foundation.

6         MR. MINUTI:  I'll --

7         THE COURT:  Sustained.

8  BY MR. MINUTI:

9  Q    Tell me what tax services you're providing?

10 A    I am -- I am managing the process to consolidate the

11 taxes of all the entities in order to get the taxes filed,

12 the returns completed and the taxes filed.

13 Q    All right.  What, if any, services are you providing

14 relating to net operating losses?

15 A    Very -- very little.  I mean, I'm not an NOL expert,

16 but that -- that issue does -- does come up in our

17 conversations with the -- with the tax professionals.

18 Q    All right.  And you've had conversations with the

19 debtors' folks about those issues, as well, correct?

20 A    There have been --

21        MR. MALIONEK:  Objection.

22 A    -- conversations --

23        MR. MALIONEK:  Objection, Your Honor.  Vagueness

24 as to "debtors' folks."

25        THE COURT:  Overruled.

1          MR. MINUTI:  Thank you, Your Honor.

2          THE COURT:  You can answer.

3          THE WITNESS:  I have.

4  BY MR. MINUTI:

5  Q    And would you agree that the tax attributes; for

6  example, income and net operating losses, if any, flow

7  through to Mr. Freedman and the other owners of MBNF

8  Investments?

9  A    Ultimately, Mr. Freedman and the members of MBNF

10 Investments, because of the passthrough nature, they will

11 receive either the benefit or the tax obligation.

12 Q    And would you agree with me that the clients you

13 represent in this case, they're not operating entities; would

14 you agree with that statement?

15 A    Well, I represent the Fronts and the Broads and their

16 operating and -- and managing buildings, real estate, the

17 real estate companies.

18 Q    Okay.  So, beyond managing the real estate companies,

19 do they have any other business?

20 A    There is not.

21 Q    Okay.  Do those entities have any current income?

22 A    They do not.

23 Q    And as chief -- and you'll agree with me, sir, that the

24 Front Street entities sold their real estate some time ago,

25 correct?

1  A    Correct.

2  Q    And as interim Chief Financial Officer, you report to

3  Ms. Svetlana Attestatova, correct?

4  A    I do.

5  Q    And you're familiar with Sonsara Management Services,

6  LLC.

7  A    I am.

8  Q    That is a company owned by Ms. Attestatova, correct?

9  A    Correct.

10  Q    And Ms. Attestatova is a lawyer, correct?

11  A    She is a lawyer by training; she's also a

12  businessperson.

13  Q    And she formerly provided legal services to the debtor,

14  correct?

15  A    She did.

16  Q    And she formerly provided legal services to the MBNF

17  nondebtor entities, correct?

18  A    Yes.

19  Q    But Ms. Attestatova is not providing legal services

20  through Sonsara Management, correct?

21  A    That is correct.

22  Q    And to your knowledge, Ms. Attestatova is serving as

23  interim Chief Executive Officer of MBNF Investors, LLC, and

24  all of your other clients, correct?

25  A    She is the CEO of MBNF Investments, correct.

1    Q      Okay.  And is she providing services to the other MBNF

2    nondebtor parties?

3    A      She is.

4    Q      Okay.  And to your knowledge, is Ms. Attestatova the

5    only employee of Sonsara?

6    A      To my knowledge, yes.

7    Q      And for the services being provided, Sonsara charges a

8    flat fee of $80,000 per month, correct?

9    A      Correct.

10   Q      And Sonsara is also lender under the notes admitted to

11   the evidence, correct?

12   A      Yes.

13   Q      And as of October 28th, 2021, Sonsara was owed

14   $240,000.  Is that correct?

15   A      I believe that is accurate.

16   Q      How much is Sonsara owed today under those notes?

17   A      I believe an additional $80,000 is now owed to Sonsara

18   Management.

19   Q      And tell me, what specifically services are being

20   provided by Sonsara?

21   A      Ms. Attestatova, via Sonsara, provides day-to-day

22   management of the overall entity, managing the people,

23   including myself.

24   Q      Okay.  When you say the "overall entity," what are you

25   referring to?

1  A     I'm sorry.  The MBNF Investments and -- and the other

2  subsidiaries, other entities that are part of that -- that

3  group.

4  Q     Okay.  And when you say she manages the "people," what

5  people are you referring to?

6  A     To myself, Mr. Kyle Schmidt, and -- and you know, our

7  professionals, the lawyers, that sort of thing.

8  Q     All right.  And you'll agree with me that the amount of

9  -- the amount owed to Sonsara are for services provided to

10  MBNF Investments and the other nondebtor affiliates, correct?

11  A     Correct.

12  Q     Not just the Broad Street entities, correct?

13  A     That is correct.

14  Q     Now the notes that have been admitted into the evidence

15  have been secured by mortgages on the properties of the Broad

16  Street entities, correct?

17  A     Yes.

18  Q     And those notes and mortgages were entered into on

19  October 28, 2021, correct?

20  A     That is correct.

21  Q     You're familiar with a company called "Paladin

22  Healthcare Management, LLC"?

23  A     I am.

24  Q     And can we agree that that's Mr. Freedman's company?

25  A     It is.

1  Q     Now, in addition to Jigsaw Advisors and Sonsara

2  Management, Paladin Healthcare Capital also provides services

3  to MBNF Investments, LLC and its nondebtor affiliates,

4  correct?

5  A     Paladin does.

6  Q     And Paladin is also a lender under the notes admitted

7  into the evidence, correct?

8  A     Paladin -- Paladin Healthcare Capital is a lender.

9  Q     As of October 28, 2021, Paladin was owed $436,472.47.

10 Is that correct?

11 A     I don't have it in front of me, but that sounds

12 approximately correct.

13 Q     And how much is Paladin owed today for services

14 provided?

15 A     I don't know the exact number, Mr. Minuti, but it would

16 be an additional amount for the month of October, you know,

17 approximately $50,000.

18 Q     Now what specific services does Paladin Healthcare

19 Capital provide?

20 A     Well, Paladin has a -- an agreement -- which we refer

21 to as a "cost of work agreement" -- with PAHH, whereby the

22 professionals of Paladin; primarily Mr. Freedman, Mr.

23 Schmidt, Ms. Grace Muranaga, their time, some of their time

24 is allocated and reimbursed under that agreement.  Other

25 things, such as formerly, when there was an office in

1  California, those office expenses, things such as rent, part

2  of that was allocated, as well, as -- as that's where those

3  folks worked and -- and provided the services.

4  Q    Now Ms. Muranaga, who you mentioned, she's Mr.

5  Freedman's administrative assistant, correct?

6  A    She is.  She wears many hats.  She -- she works with

7  me, for example, on -- on finance and accounting things.

8  Q    And you mentioned Mr. Schmidt.  Who is Mr. Schmidt?

9  A    Kyle Schmidt is a finance executive, deep experience in

10 -- in transactions in -- in M&A, in financial planning,

11 analysis, those sorts of things.

12 Q    All right.  Now the amounts owed to Paladin that you

13 testified about, there's for -- they are -- those are for

14 services provided to MBNF Investments, LLC and the other

15 nondebtor affiliates, correct?

16 A    Correct.

17 Q    Not just the Broad Street entities, correct?

18 A    That is correct.

19 Q    Now, with regard to the properties owned by the Broad

20 Street entities, you personally have not visited those

21 properties in approximately two years, correct?

22 A    It would have been the -- the fourth quarter of 2019,

23 so thereabouts.  That's correct.

24 Q    And in addition to Jigsaw Advisors, Sonsara Management,

25 and Paladin, there's a property management company that's

1  managing the Broad Street properties in Philadelphia on a

2  day-to-day basis, correct?

3  A     There is.

4  Q     And what's the name of that company?

5  A     It's the Newmark firm, or we refer to it as "NKF."

6  Q     And what specific services does NKF provide?

7  A     So the NKF management team manages the -- you know, the

8  day-to-day operations, overseeing such things as security,

9  making sure that the building is secure and safe, making sure

10 that there our utilities are properly working, all those

11 standard things you would expect from a property manager of

12 real estate properties.

13 Q     Thank you.

14        MR. MINUTI:  Bear with me one second.

15      (Pause)

16 BY MR. MINUTI:

17 Q     Now the law firm of Latham & Watkins is also a lender

18 under the notes that have been admitted into evidence,

19 correct?

20 A     Yes.

21 Q     And as of October 28th, 2021, Latham & Watkins was owed

22 $1,809,985.65, correct?

23 A     That sounds approximately correct.

24 Q     And how much is Latham & Watkins owed to date?

25 A     I don't have the specific number in front of me, Mr.

1   Minuti, but approximately another $180,000 for the month of

2   October would be added to the -- the number that you just

3   quoted.

4   Q    And Latham & Watkins represents MBNF Investments, LLC

5   and its nondebtor affiliates, correct?

6   A    Yes.

7   Q    Not just the Broad Street entities, correct?

8   A    Correct.

9   Q    They also represent Mr. Freedman personally, correct?

10  A    They do.

11  Q    They also represent Mrs. Stella Freedman, correct?

12  A    That's my understanding.

13  Q    They also represent Svetlana Attestatova, correct?

14  A    I believe they do, for a specific purpose.

15  Q    Okay.  They also represent Mr. Kyle Schmidt, correct?

16  A    Same answer, I believe they do for a specific purpose.

17  Q    Okay.  And what are those specific purposes?

18  A    I believe, in terms of -- or as it relates to the

19  mediation that we're engaged in -- engaged in.

20  Q    Fair enough.

21       And Latham & Watkins also represents Paladin Healthcare

22  Capital, LLC, correct?

23  A    I believe that's correct.

24  Q    Now the amounts owed to Latham & Watkins under the

25  notes identified in Paragraph 14 -- well, give me one second.

1  I'm sorry.

2         (Pause)

3  Q      Now the amounts owed to Latham & Watkins under the

4  notes that we -- that you just testified about, those are for

5  services provided to all of Latham & Watkins' clients,

6  correct?

7  A      I believe that's correct.

8  Q      Again --

9  A      Yes.

10 Q      Again, not just the Broad Street entities.

11 A      Correct.

12 Q      Now, with regard to the notes that have been admitted

13 into evidence, who represented the Broad Street entities in

14 connection with the negotiation and document -- documentation

15 of those notes?

16 A      I don't -- I don't recall.  I -- I -- I do believe that

17 the real estate firm McCausland -- MKB -- Keen & Buckman

18 represented -- represented the Broad Street entities.

19 Q      And what is the basis of your knowledge of that point?

20 A      I wasn't --

21 Q      (Indiscernible.)

22 A      Just -- just my -- my interaction and conversations,

23 you know during -- during that process.

24 Q      Okay.  And what did -- what specifically did that firm

25 do?  Did they negotiate the note?

1  A     Not -- not to my knowledge.  I believe they -- they --

2  they reviewed the notes and the mortgages and -- and that

3  sort of thing, and then provided general advice.

4  Q    Okay.  Regarding the filing of the mortgages?

5  A    Yes.  And -- and generally, as it -- as it relates to,

6  you know, the mortgages and the -- and the notes themselves.

7          MR. MINUTI:  All right.  I'm now going to ask Mr.

8  Collins to put up on the screen Debtors' Exhibit Number 1.

9      (Pause)

10 BY MR. MINUTI:

11 Q    Can you take a look at that, Mr. Brinkman, and tell me

12 if you recognize that document?

13 A    I do recognize it.

14 Q    Okay.  And that's the motion that's the subject of

15 today's hearing, correct?

16 A    Yes.

17 Q    And you personally had a nominal role in preparing this

18 document, correct?

19 A    Correct.

20          MR. MINUTI:  If I could ask the -- Mr. Collins to

21 put up on the screen Paragraph 5.

22 BY MR. MINUTI:

23 Q    Can you see that, Mr. Brinkman?

24 A    That's better.  Yes.

25 Q    Okay.  And I'm going to draw your attention to the

1   second-to-the-last sentence in this paragraph.  The sentence

2   reads:

3           "The debtors failed to comply with their post-

4   petition lease obligations in many respects with the result

5   that the MBNF PropCos were required to pay no less than 2.1

6   million in post-petition, pre-rejection expenses on behalf of

7   the debtors."

8       Did I read that correctly?

9   A    I believe you did.

10  Q    And you'll agree with me, sir, that that's not a

11  correct statement.

12  A    Well, that -- that statement, what it's supposed to say

13  -- and I address this in my declaration -- is -- is that,

14  because the obligations of the debtors that were not -- were

15  not met while they maintained the building, there's

16  approximately $2.1 million of claims that were created in --

17  you know, against the debtors.

18  Q    But the statement was offered to imply that MBNF paid

19  that money.  And that's not true, correct?

20  A    Well, the statement was offered to -- to mean something

21  different.  There appears to be some -- some confusion.

22  Q    Okay.  So -- well, it's not a difficult question.  MBNF

23  didn't pay $2.1 million.  Can we agree on that?

24  A    MBNF has not paid $2.1 million as of this point, no.

25  Q    Okay.  And at least at your deposition, you didn't know

1  how much of the alleged $2.1 million had been paid by the

2  MBNF parties, correct?

3  A     I believe that was correct.

4          MR. MINUTI:  All right.  I'm going to ask Mr.

5  Collins now to put up on the screen what we've marked as

6  Debtors' Exhibit Number 4.

7      (Pause)

8  BY MR. MINUTI:

9  Q     Mr. Brinkman, let me know if you can see that document

10  and you recognize it.

11  A     I do recognize it, Mr. Minuti.

12  Q     And tell me what this document is.

13  A     It is a termsheet that was prepared and presented by

14  Gordon Brothers' real estate arm to the Broad Street entities

15  for financing.

16  Q     Now you're going to see on Page 1, under the line

17  "Broker," there's a reference to a company called Trikuta

18  Hills, Incorporated.  Do you see that?

19  A     I do.

20  Q     Who hired Trikuta?

21  A     The -- the borrower did.

22  Q     You're talking about -- you're talking about the Broad

23  Street entities?

24  A     I am.

25  Q     Okay.  And what specific services was Trikuta hired to

1  provide?

2  A    General investment banker services to find and secure

3  debt financing.

4  Q    And whose idea was it to hire Trikuta?

5  A    I believe the -- the management team.  That would be

6  Mr. Freedman, Ms. Attestatova, myself, Mr. Schmidt.

7  Q    And is there a written engagement letter with Trikuta?

8  A    My under -- my understanding is there is, yes.

9  Q    And who are the parties to that engagement agreement?

10  A    I don't -- I don't recall.  I -- off the top of my

11  head.

12  Q    Is there any prior relationship between Trikuta and the

13  MBNF Investments, LLC and its affiliates or their principals?

14  A    None that I'm aware of.

15  Q    Who is the principal at Trikuta who worked on the

16  engagement?

17  A    A gentleman by the name of Kris Giroh.

18  Q    And what specific services did he provide -- or do they

19  provide?  Excuse me.

20  A    Advised -- advised the borrower as to -- as to debt

21  amounts, debt structuring, and then went out into the

22  marketplace to -- to find a borrower -- or sorry -- to find a

23  lender.

24  Q    And what are the terms under -- what are the terms

25  under which Trikuta is compensated; what's the arrangement?

1  A    Trikuta is paid a success fee, ultimately, when -- when

2  financing is secured.

3  Q    Is that a percentage?

4  A    It is.

5  Q    And what is that percentage?

6  A    I believe it was two and a half percent of the -- of

7  the total proceeds.

8  Q    Are there any other components of the success fee?

9  A    Not to my knowledge.

10 Q    Now, if Gordon Brothers -- if the Gordon -- strike

11 that.

12       If the proposed Gordon Brothers term loan closes, will

13 proceeds of that loan be used to pay Trikuta?

14 A    Yes.

15 Q    And how much is due Trikuta under the loan that's

16 detailed in the termsheet?

17 A    Approximately 437,000.

18 Q    And do you still have your declaration in front of you?

19 A    I do.

20 Q    Okay.  If you could turn to Exhibit A of your

21 declaration.  Let me know when you're there.

22 A    I have it in front of me, Mr. Minuti.

23 Q    Okay.  Am I correct that Exhibit A details the proposed

24 uses of the proposed term loan with Gordon Brothers?

25 A    Exhibit A does detail the sources and the uses of the

1  funds.

2  Q    Thank you.  Okay.

3       And the Trikuta commission that you just testified

4  about, that's in the row labeled "Working Capital," correct?

5  A    Well, working capital is -- is a catchall, per se.

6  It's the residual amount.  So the -- the amount due to

7  Trikuta, for example, would be paid out of -- out of those

8  funds.

9  Q    And of the total proceeds under the proposed term loan,

10 how much of -- strike that.

11      And am I correct that you expect to use most of that

12 working capital number in connection with closing the

13 proposed loan, correct?

14 A    No.  You know, approximately, you know, 437,000 of --

15 of that I would -- I would expect to use to -- to pay

16 transaction fees to close the loan.

17 Q    I'm sorry.  I didn't hear that last part.  Can you

18 repeat that?

19 A    I would expect that -- that, as we just discussed,

20 approximately 437,000 of the success -- related to the

21 success fee would be paid from what's called "working

22 capital," leaving approximately a million dollars of -- of

23 residual or working capital.

24 Q    Mr. Brinkman, are you aware that, on November 18th, the

25 Movants filed an objection to the debtors and the committee's

1  motion to compel discovery; are you aware of that?

2  A    I am aware.

3  Q    Okay.  And were you aware that attached to that

4  objection, which appears at Docket Number 3140, were some

5  interrogatories and answers prepared by the Movants?

6  A    I -- I'm not aware without -- without seeing them.

7  Q    I'm going to read from the interrogatories.  Question

8  Number 1 says:

9        "What specific uses are intended for the proposed

10  loan's proceeds?"

11      And as part of the response, it says the following,

12  quote:

13        "The 1.4 million working cap" -- "1.4-million-

14  dollar working capital will be largely consumed by closing-

15  related costs in connection with the term loan, including,

16  but not limited to brokerage fees and environmental, zoning,

17  title, and other closing-related expenses."

18      Does that help refresh your recollection as to whether

19  you expect most of the $1.4 million for working capital to be

20  used in connection with closing the loan?

21        MR. MALIONEK:  Objection, Your Honor.  This is an

22  exhibit, I believe, that's on the debtors' exhibit list.  The

23  witness has testified that he doesn't recall seeing the

24  document or the interrogatories that Mr. Minuti is asking him

25  about.

1              THE COURT:  Well, I'm --

2              MR. MALIONEK:  I simply would ask that it be shown

3    to him.  Oh, I'm sorry, Your Honor.

4              THE COURT:  Okay.  Do you want to pull it up?

5    Because I'm going to ask him to see if it refreshes his

6    recollection.

7              MR. MINUTI:  Sure, Your Honor.

8              MR. MALIONEK:  Thank you --

9              THE COURT:  Mr. Minuti --

10             MR. MALIONEK:  -- Your Honor.

11             THE COURT:  -- can you pull it up?

12             MR. MINUTI:  Certainly, Your Honor.  I'm just

13   trying to -- I'm trying to move things along here.

14        (Pause)

15             MR. MINUTI:  Your Honor, this document is not on

16   my list of exhibits, or maybe I'm missing it.

17             THE COURT:  Is it the response to the original

18   motion to compel; is that what you're saying?

19             MR. MINUTI:  Your Honor, it is -- yes.  It is --

20   it is Docket Number 3140, filed on November 18, 2021.

21             THE COURT:  3140.  How can we get it to the

22   witness?

23             MR. MINUTI:  Your Honor --

24             THE COURT:  Is it Exhibit A or Exhibit B?  I'm

25   sorry.  That's my clock.

1          MR. MINUTI:  It is Exhibit A, Your Honor.

2      (Pause)

3          MR. MALIONEK:  Mr. Minuti, if helpful, and Your

4   Honor, if helpful to you, as well, Gail Reiser can -- has

5   that document and can put it up.  It's Page 16 of that PDF of

6   that docket number.

7          MR. MINUTI:  Sure.  That's helpful.

8          THE COURT:  Please, Ms. Reiser.

9      (Pause)

10          MR. MINUTI:  I don't believe that's the correct

11   page.  It should be -- yeah.

12          THE COURT:  And answer to which interrogatory?

13          MR. MINUTI:  The document should be Docket Number

14   3140.  It is not the letter, it should be the responses and

15   objections to the questions set forth in the objection of the

16   debtors and committee.

17          MR. MALIONEK:  I think, Mr. Minuti, it's on a

18   later page.  Do you want to flip through it until we get to

19   that?

20          MR. MINUTI:  Sure.  All right.  We'll keep going

21   to Page 6 of that.  There we go.

22   BY MR. MINUTI:

23   Q    Now, Mr. Brinkman, can you see the document that's on

24   the screen?

25   A    I can.

1  Q     Okay.  And do you see Question Number 1.  It says:

2            "What specific uses are intended for the proposed

3  loan's proceeds?"

4        Do you see that?

5  A     I do.

6  Q     Okay.  Can you read the response to yourself and tell

7  me when you're finished?

8        (Pause)

9  A     Okay.

10 Q     And do you agree, sir, that the 1.4-million-dollar

11 working capital will be largely consumed by closing-related

12 costs in connection with the term loan?

13 A     I -- I do, Mr. Minuti.  And I would -- if I may clarify

14 my earlier comment, I did not -- I did not consider the

15 environmental cost or potential cost in that potential escrow

16 to be a -- a closing cost, per se.

17 Q     Thank you.

18        Now let me turn back to Exhibit A that's attached to

19 your declaration.  And let me know when you have that in

20 front of you.

21 A     Are you referring to the sources and uses?

22 Q     Correct.

23 A     I have it in front of me.

24 Q     Okay.  Now, of the total proceeds of the proposed term

25 loan, how much of those proceeds are being used to pay for

1 and service the loan itself?

2 A    We anticipate approximately $2.1 million of -- of

3 interest costs over the fifteen-month term of the loan.

4 Q    All right.  And you'll agree, sir -- and if you have to

5 look at the -- if you have to go back and look at the Gordon

6 Brothers termsheet itself -- the loan also includes call

7 protections, correct?

8 A    You mean such as make-whole --

9 Q    Correct.

10 A    -- provisions?  Correct.

11 Q    And what is your understanding of the make-whole

12 provisions?

13 A    My understanding is that there is a twelve-month make-

14 whole provision, so that, if -- if we repay the loan prior to

15 12 months, then a full 12 months of interest would be --

16 would be due.

17 Q    And not including any payments related to pension

18 liabilities, financing costs, and the secured professional

19 fees, how much of the loan proceeds will actually be

20 available to maintain the value of the real estate owed --

21 owned -- excuse me -- by the Broad Street entities?

22 A    I think, Mr. Minuti, from -- from this schedule,

23 approximately six and a half materials between, you know, the

24 direct operating costs and then the direct costs related to

25 taxes and insurance.

1  Q      Thank you.

2         And not including any pension payments and not

3  including the payments to the professionals or the amounts

4  necessary to service the loan, how much, on average per

5  month, does it cost to maintain the value of the Broad Street

6  properties?

7  A      The current run rate is somewhere between, you know,

8  four hundred and $450,000 a month.

9  Q      Now you contemplate that the proposed loan from Gordon

10  Brothers is going to be paid from the sale proceeds of the

11  Broad Street entities, correct?  Or the --

12  A      Correct.

13  Q      -- entities -- let me rephrase that, so the record is

14  clear.

15        You contemplate that the loan -- the proceeds from the

16  loan -- excuse me.

17        You contemplate that the proposed loan will be paid

18  from the sale of the Broad Street entities properties,

19  correct?

20  A      I'm sorry.  Will you -- will you repeat that one more

21  time?

22  Q      Sure.

23        You contemplate that the proposed loan from Gordon

24  Brothers is going to be paid back from the sale of the

25  properties that are owned by the Broad Street entities,

1  correct?

2  A       That is correct.

3  Q       All right.  And the loan itself contemplates a fifteen-

4  month sale process.  Isn't that correct?

5  A       Well, it contemplates up to 15 months in order to repay

6  the loan.  We certainly will do our best to -- to make the

7  sale process itself much shorter than that to preserve costs.

8  Q       And how long do you think it's going to take to sell

9  these properties?

10 A       I wish I -- I wish I had a crystal ball and -- and

11 knew.  I do think it's going to take an extensive period of

12 time, based upon the market feedback that we've gotten to

13 date and the advice and counsel from our real estate brokers

14 in the market.

15 Q       And who is that?

16 A       So we hired Newmark as -- as our real estate -- as our

17 real estate broker last year.

18 Q       And am I correct that engagement terminated?

19 A       It did.

20 Q       Do you currently have a broker engaged to market these

21 properties?

22 A       We -- we do not have a -- a live engagement letter, but

23 we are -- we are still working with Newmark.

24 Q       Okay.  And these particular properties were already

25 marketed for sale for approximately one year.  Isn't that

1  correct?

2  A     Thereabouts, that's correct.

3  Q     Okay.  And you -- and for -- during that sale process,

4  you used Newmark or NKR [sic], correct?

5  A     NKF, correct.

6  Q     NKF.  Excuse me.

7        Now, turning back to the dec -- your declaration, and

8  specifically Exhibit A.  Let me know if you've got that in

9  front of you.

10 A     I do.

11 Q     All right.  We already talked about the brokers'

12 fees -- well, strike that.

13       With respect to the line item on the document labeled

14 "Environmental Reserve," do you see that?

15 A     I do.

16 Q     And tell me, what is the "environmental reserve"?

17 A     It's a -- it's a line item that we included, it's part

18 of the negotiation with Gordon Brothers for potential

19 environmental costs that -- that may be identified; and,

20 therefore, the lender may require us to withhold certain --

21 certain amounts of money for the loan to address those

22 potential issues.

23 Q     Do you have any idea of the magnitude of what that

24 amount could be?

25 A     We don't.

1  Q      And where will it come from?

2  A      Where will what come from?

3  Q      In other words, if you have to create the environmental

4  reserve, where will the money come from to fill up that

5  reserve?

6  A      From the 17 and a half million dollars of the facility.

7  Q      Okay.  Now there's a line item on Exhibit A to your

8  declaration that says, "Repayment of Paladin Notes."  That

9  refers to the notes previously admitted into evidence,

10  correct?

11  A      Correct.

12  Q      Okay.  And if we could go back to the Gordon Brothers

13  termsheet, I just want to ask you a couple of questions about

14  this.

15          MR. MINUTI:  If we could have that put up again.

16  Thank you.  If we could jump to Page 2, please.  Thank you.

17  BY MR. MINUTI:

18  Q      Do you see that, Mr. Brinkman?

19  A      I do.

20  Q      Okay.  Under the column or the row labeled "Term," do

21  you see that?  There's a ref --

22  A      I do.

23  Q      There's a reference to:

24          "Commercially reasonable milestones to be agreed

25  upon between Gordon Brothers and the borrowers."

1      Do you see that?

2  A    I do.

3  Q    Have the parties reached agreement on those milestones?

4  A    Not to my knowledge.

5  Q    And what do you contemplate those milestones will be?

6  A    I don't -- I don't know know.  We haven't had any -- I

7  have not been involved, at least, in any definitive

8  discussions with the borrower -- or sorry -- with the lender,

9  as it relates to those milestones.

10  Q    And who specifically is doing the negotiations with

11  Gordon Brothers?

12  A    It's a combination of -- of Ms. Attestatova, Mr.

13  Freedman, Mr. Schmidt, and myself, along with counsel.

14  Q    Now the notes that have been admitted into evidence are

15  to be secured by -- I'm sorry, strike that.

16      Now the proposed term loan to Gordon Brothers is to be

17  secured by first priority liens on the Broad Street entities'

18  properties, correct?

19  A    Yes.

20  Q    And that loan is going to be guaranteed by Philadelphia

21  Academic Holding, LLC, correct?

22  A    Correct.

23  Q    And that guarantor is pledging its equity interest in

24  each of the borrowers, the Broad Street entities, correct?

25  A    Correct.

1  Q      I want to switch gears now and go back to your

2  declaration.  Let me know when you have that in front of you.

3  A      I have it in front of me.

4  Q      Okay.  And if you could turn to Paragraph 6 of your

5  declaration.

6  A      I'm there, Mr. Minuti.  Excuse me.

7  Q      Uh-huh.  All right.  And at Paragraph 6 of your

8  declaration, you make reference to a pension agreement.  Do

9  you see that?

10 A      I do.

11         MR. MINUTI:  All right.  I'm going to ask

12 Mr. Collins to pull up on the screen the document that we've

13 identified or marked as Debtors' Number 6.

14     (Pause)

15 BY MR. MINUTI:

16 Q      Mr. Brinkman, do you recognize this document?

17 A      I believe I do.

18 Q      And is that the -- is this the pension agreement that

19 you're referring to in Paragraph Number 6 of your

20 declaration?

21 A      I believe it is the -- the pension settlement

22 agreement, yes.

23 Q      Okay.  And tell me, how did this pension settlement

24 agreement come about?

25 A      I was not directly or -- or materially involved.  It

1  was -- it was highly negotiated between our counsel at

2  O'Melveny & Myers, and with -- and with the pension fund.

3  Q    Now, in addition to the pension fund, the parties to

4  this agreement include American Academic Health Systems, the

5  Front Street entities, the Broad Street entities,

6  Philadelphia Academic Health Holdings, and Philadelphia

7  Academic Risk Retention Group.  Do you see that in the first

8  paragraph?  Is that correct?

9  A    I don't see the -- oh, there we go.  I believe that's

10  correct.

11  Q    All right.  And who at those entities were involved in

12  negotiating and documenting this settlement agreement?

13  A    I don't know.

14  Q    What professionals represented these entities in

15  negotiating a document and settlement agreement?

16  A    I believe O'Melveny & Myers.

17  Q    And if you turn to exhibit -- or excuse me --

18  Schedule 3(b), it appears on Page 21.  Just wait to get

19  there.

20          MR. MINUTI:  Keep going.  There we go.

21  Q    Do you see Schedule 3(b) to the document, sir?

22  A    I do.

23  Q    Am I correct that this document lists the payments due

24  to the pension into the future, correct?

25  A    That -- that is what it shows.

1 Q     Okay.  And if you need to turn back to your

2 declaration, that's fine.  But as you correctly point out in

3 Paragraph 6 of your declaration, only some of the parties to

4 the settlement agreement are liable for the payments

5 reference on Schedule 3(b) -- or B(3).  Isn't that correct?

6 A     That's my understanding.

7           MR. MINUTI:  All right.  And if I could get

8 Mr. Collins to turn to Page 5 of the settlement agreement.

9      (Pause)

10           MR. MINUTI:  Better make that a little bit bigger,

11 so I can see it.  All right.  Page down, please,

12 Subsection (3).  There you go.

13 BY MR. MINUTI:

14 Q     Do you see in 3(b) it says:

15           "The payor nondebtor entities, jointly and

16 severally" -- "jointly and severally agree to make payments."

17      Do you see that?

18 A     I do.

19 Q     And then it references Schedule 3(b).

20           MR. MINUTI:  And then, if we could go back to the

21 first page of the document.

22 BY MR. MINUTI:

23 Q     And you'll see, about midway in the first paragraph,

24 there is a defined term "payor nondebtor entities."  Do you

25 see that?

1  A      I do.

2  Q      And so the parties that are responsible for making

3  these payments under the settlement agreement are American

4  Academic Health Systems, Front I, Front II, Broad I,

5  Broad II, Broad III, and Philadelphia Academic Health

6  Holdings.  Is that correct?

7  A      That's correct.

8  Q      Now other parties, however, were released under this

9  settlement agreement.  Isn't that correct?

10  A      I believe that's correct.

11          MR. MINUTI:  Let me ask Mr. Collins to page

12  forward to the bottom of Page 9.  Right there.

13  BY MR. MINUTI:

14  Q      And this is Page 9, carrying over to Page 10.  It says:

15          "On the effective date, the fund, on behalf of

16  itself and each of its affiliates, and Front 1, in its

17  capacity as purchaser, hereby releases forever and discharges

18  the nondebtor entities, Mr. Freedman, Stella Freedman,

19  Barbara Kramer, Trustee, Michael Ozamonian" (phonetic)

20  "Irrevocable Trustee, Barbara Kramer, Trustee ..."

21      It goes on to say that Paladin is getting released.

22  You see that these folks are getting released under this

23  document, correct?

24  A      Correct.

25  Q      Okay.  Now, at paragraph -- bear with me for one

1  moment, please.

2       (Pause)

3       Can we go back to your declaration, sir?  And I ask you

4  to focus on Paragraph 6.

5  A    Okay.  I'm there.

6  Q    Okay.  Toward the end of that paragraph, you purport to

7  allegate [sic] -- allocate responsibility for the payment

8  obligations under the settlement agreement 50/50 between the

9  Broad Street entities and the Front Street entities.  Is that

10  correct?

11  A    That is correct.

12  Q    What documents, if any, did you rely upon to come up

13  with this allocation?

14  A    Well, I guess, number one, the settlement agreement,

15  which is up on my screen and you've presented, Mr. Minuti.  I

16  don't recall the -- the exact details.  But my understanding

17  -- or my recollection is that the payor group that you just

18  identified, PAHH, AAHS, the Fronts, and the Broads, those --

19  those are the entities that are joint and several.  The

20  entities PAHH and AAHS are -- are indemnified by the Broads

21  and the Front per the limited liability operating agreements

22  and -- and so forth.

23       So, as we evaluate all of our claims --and that's what

24  we do when the invoice comes in, we look at the -- the

25  invoice and we make a business judgment, in terms of how

1 those amounts should be allocated on an invoice-by-invoice

2 basis, and this one, you know, was -- was the same -- the

3 same process.

4 Q    All right.  We're talking about the pension liability,

5 correct?

6 A    We are.

7 Q    Okay.  Who was involved in the decision to come up with

8 this allocation?

9 A    I don't -- I don't recall specifically, but I -- I

10 believe Ms. Attestatova and Mr. Schmidt and myself.

11 Q    And focusing specifically on allocation of the pension

12 liability, what factors were considered in coming up with

13 this 50/50 split.

14 A    The same factors that we look at -- at in -- in all the

15 invoices or all the obligations, you know, what -- from a

16 business standpoint, what -- what's fair and equitable, you

17 know, what's the spirit and -- and intent of the invoice,

18 those sort of things.

19 Q    But these aren't invoices, right?  These are payments

20 under the pension plan, correct?

21 A    Well, correct.  But you know, con -- you know, the

22 concept is the same.

23 Q    And how long did it take to come up with this

24 allocation?

25 A    I -- I don't know.

1   Q     Now, turning to Paragraph 9 of your declaration, you

2   state that the Movants have incurred significant fees to

3   defend the adversary proceeding filed by the debtors,

4   correct?

5   A     Correct.  And -- and -- and involved in the mediation.

6   Q     Okay.  We're talking about the adversary proceeding,

7   though, right?  You're aware that the complaint in that

8   action has been stayed and sealed since its inception,

9   correct?

10  A     That's my understanding.

11  Q     Okay.  And you're also aware that no professionals have

12  entered an appearance on behalf of any of the defendants in

13  that case, correct?

14  A     I'm -- I'm not aware.

15  Q     Okay.  Do you know of --

16          MR. MALIONEK:  Your Honor --

17  Q     -- anybody that's --

18          MR. MALIONEK:  -- and Mr. Minuti -- I apologize,

19  Mr. Minuti.  Again, I don't mean to interrupt.  Since this is

20  an area, as we had talked about at the beginning of the

21  hearing, that we all agree is a confidential matter because

22  we're referring to a sealed complaint, I just want to be able

23  to determine from you if you're going to be asking any

24  questions related to the substance of that?  If so, then we

25  would have confidentiality issues.  If not, then it -- then

1  that's fine.

2          And Your Honor, I apologize for the interruption,

3  but wanted --

4          THE COURT:  All right.

5          MR. MALIONEK:  -- to make that clarification.

6          MR. MINUTI:  I'm not going into the substance,

7  Your Honor.

8          THE COURT:  All right.

9          MR. MALIONEK:  Thank you.

10          THE COURT:  So no need to seal then.  Go ahead.

11  BY MR. MINUTI:

12  Q    The question, Mr. Brinkman, is:  Are you aware of

13  anybody who's representing the defendants in that adversary

14  proceeding?

15  A    I am.

16  Q    And who is representing the defendants in the adversary

17  proceeding?

18  A    I believe Latham & Watkins.

19  Q    Anyone else?

20  A    I'm -- I'm sure there are.  I just -- I just don't

21  know.

22  Q    Now, in Paragraph 15 of your declaration, you testified

23  to an earl -- internal allocation of professional and

24  personnel costs.  If you need to look at the declaration, go

25  ahead and do so.

1  A      Correct.

2  Q      Do you see that?

3  A      I do.

4  Q      What documents did you rely upon to come up with this

5  allocation?

6  A      We -- we relied upon business judgment and, again, in

7  the process that I described earlier, in terms of we evaluate

8  each -- each invoice, each obligation, each claim, and then

9  make a -- make a determination.

10  Q      All right.  And the allocation you've come up with is

11  40 percent to the Broad Street entities, 40 percent to the

12  Front Street entities, and 20 percent to Philadelphia

13  Academic Health Holdings, correct?

14  A      In -- in some instance.  It's -- it's a rule of thumb

15  and that -- that generally -- that generally holds -- holds

16  true.  But there are -- there are many invoices that are

17  specifically identified to a specific entity, and sometimes

18  only one entity.

19  Q      Now, with respect to any -- well, tell me, how do you

20  make those determinations?

21  A      By -- by closely examining and evaluating the -- the

22  invoice, what -- what was the service or the goods, what did

23  they relate to, and then making that -- that judgment.

24  Q      Okay.  And what invoices are you talking about?

25  A      It could be legal invoices, it could be appraisal

1  invoices, it could be invoices from our insurance broker, all

2  of those things.

3  Q    Okay.  And none of those invoices were provided to the

4  debtor or the committee, correct?

5  A    I'm not aware.

6  Q    Okay.  Now, with respect to any allocation of

7  professional costs, did you allocate any of those costs or

8  serve -- for services provided to Mr. Freedman personally?

9  A    No.

10 Q    Did you allocate any of those costs to services

11 provided to Mrs. Freedman?

12 A    No.

13 Q    Did you allocate any of those costs to services

14 provided to Ms. Attestatova?

15 A    No.

16 Q    Did you allocate any of those costs to services

17 provided to Mr. Schmidt?

18 A    No.

19 Q    Did you allocate any of those costs to services

20 provided to Paladin Healthcare Capital?

21 A    No.

22 Q    Now, as set forth in Paragraph 15, you've allocated 40

23 percent to the Broad Street entities and 40 percent to the

24 Broad Street entities [sic], correct?

25 A    Forty to Front and Forty to Broad, correct?

1  Q      Okay.  And yet, the Front Street entities properties

2  were sold in December of 2020, correct?

3  A      They were.

4  Q      And can we agree that a significant majority of the

5  professional fees owed relate to the period of time following

6  the sale of the Front Street properties?

7  A      I -- I believe that's correct.

8         And one correct, Mr. Minuti.  There was a Front Street

9  property that -- that was sold, you know, late last year.

10 Q      Thank you very much for the clarification.

11 A      Sure.

12 Q      Now, at Paragraph 16 of your declaration, for the first

13 time, you mention a fourteen-million-dollar loan from the

14 Front Street entities to the Broad Street entities.  Again,

15 if you need to look at your declaration, you go right ahead.

16 Are you familiar with that fourteen-million-dollar loan?

17 A      And I'm sorry.  Which -- which paragraph am I looking

18 at?

19 Q      I believe it's Paragraph 16.  Excuse me.

20 A      I am.

21 Q      Okay.  I'm sorry.  Let me make sure the record is

22 clear.

23        You're familiar with that fourteen-million-dollar loan?

24 A      I am familiar with the fourteen-million-dollar loan.

25 Q      All right.  And that was an unsecured loan?

1   A      It is.

2   Q      Is it supported by a note?

3   A      It is.

4   Q      Okay.  A written note?

5   A      Yes.

6   Q      Okay.  To your knowledge, was that note provided to the

7   debtors or the committee?

8   A      I don't know.

9   Q      When was that note entered into?

10  A      I believe it was entered into in -- in early 2000.

11  Q      And who negotiated that note on behalf of the borrowers

12  and the lenders?

13  A      It was a combination of -- of the management team

14  and -- and working with counsel.

15  Q      Okay.  Same parties on both sides?

16  A      Same parties involved.

17  Q      Okay.  And who represented -- what professionals, if

18  any, represented the borrowers and the lenders in connection

19  with that note?

20  A      I believe it would have been Latham & Watkins.

21  Q      Okay.  On both sides?

22  A      I -- I don't know.  I assume.

23  Q      Who signed the note on behalf of the Front Street

24  entities, if you know?

25  A      I don't know.

1  Q     Do you know who signed it on behalf of the Broad Street

2  entities?

3  A     Not without seeing the note, no.

4  Q     Okay.  Well, that makes two of us.

5        What's the face amount of the note?

6  A     Fifteen million dollars, I believe, is -- is the face.

7  Q     All right.  And what are the terms?

8  A     There is an eight and a half percent interest rate, I

9  believe.  And I -- I don't know when -- when the termination

10 or the expiration date is; I don't recall.

11 Q     And I think you testified to this already, but that

12 note is unsecured.

13 A     It is unsecured.

14 Q     Of the fifteen-million-dollar face amount, how much

15 money was actually loaned to the Broad Street entities?

16 A     Fourteen million and -- and change.

17 Q     All right.  And are there documents that exist that

18 would detail -- well, let me ask this question.

19       When were those amounts loaned to the Broad Street

20 entities?

21 A     Periodically, over time.

22 Q     All right.  And those are -- are there documents that

23 represent or track those loans?

24 A     There are.

25 Q     Okay.  And do you know specifically -- when you say

1  "periodically, over time," do you have any idea of when

2  exactly amounts were loaned?

3  A    So I -- I believe beginning in -- in January of -- of

4  2020, you know, the -- you know, the first amounts.  And then

5  here, you know, subsequently, you know, throughout 2020 --

6  2021.  Excuse me.

7  Q    And was there a set amount loaned per month, for

8  example, or was it based on need?

9  A    It was based on need.

10 Q    Okay.  And you say there are documents that exist that

11 would show when the amounts were loaned and what those loans

12 were used for?

13 A    There -- there are documents that -- that track the --

14 that track the loans, the -- the due tos, the due froms, in

15 between the -- the entities, yes.

16 Q    And what are those documents?

17 A    There's -- there's a -- a master, I guess, "Excel

18 spreadsheet" is -- is the best way to put it, number one.

19 And then they're recorded within the books and records of

20 each -- each of the entities.

21 Q    Okay.  And can you tell me what the funds were used

22 for?

23 A    You know, may things.  General operating costs to

24 protect and preserve the -- the real property, for example;

25 to make pension payments, for -- for example; professional

1  fees, all of those -- those daily sort of expenses.

2  Q    Okay.  And when you say, "professional fees," what

3  professionals are you referring to?

4  A    It could be lawyers, it could be the tax preparers, it

5  could be people, you know, who provided other advisory

6  services.

7  Q    Okay.  When you say "lawyers," would that include Ms.

8  Attestatova?

9  A    Well, Ms. Attestatova is not a lawyer for -- in her

10  capacity, you know, currently.  In the past, when she did

11  represent the entities, the nondebtor entities as in-house

12  general counsel, then -- then that would probably be

13  accurate.

14  Q    Okay.  Were any amounts loaned to the Broad Street

15  entities paid back?

16  A    There -- there were a couple of -- of offsets over --

17  over that period of time, yes.

18  Q    And what was the source of the funds used to pay back

19  the amounts advanced?

20  A    It -- it would be the cash on hand at -- you know,

21  within -- within the broad entities.

22          MR. MINUTI:  Your Honor, at this point, if it's

23  acceptable to the Court, I'd like to take a couple-minute

24  recess.  I think I'm done with my questions, but I would like

25  to consult my colleagues, and it's a little more difficult to

 1  do so over Zoom.  So if we could take a ten-minute break?

 2          THE COURT:  Yes.  Let's make it 15.  So we'll

 3  return at 10:45.

 4          MS. PICCIONE:  Excuse me, Your Honor.

 5          MR. MINUTI:  Very well.

 6          MS. PICCIONE:  Excuse me, Your Honor.  This is

 7  Alissa Piccione of Troutman Pepper on behalf of Capital One,

 8  a co-defendant in the HSREP adversary proceeding.

 9          I just wanted to take a minute to announce myself.

10  I apologize.  I had a technical issue earlier, so I just

11  wanted to get that on the record before we take a break.

12          THE COURT:  All right.  Thank you.

13          We'll leave the Zoom open, if you will, so people

14  can just exit.  Make sure you mute yourself if you're going

15  to be talking to others.

16          MR. MINUTI:  Your Honor, so 10:45?

17          THE COURT:  10:45.

18          MR. MINUTI:  Thank you, Your Honor.

19          THE COURT:  All right.  We'll take a recess.

20          MR. MINUTI:  Thank you.

21      (Recess taken at 10:31 a.m.)

22      (Proceedings resumed at 10:46 a.m.)

23          THE COURT:  All right, good morning.  We're back

24  on the record.  Are the parties back?

25          I see Mr. Brinkman and Mr. Minuti.

 1          MR. MALIONEK:  Yes, Your Honor.

 2          THE COURT:  Okay.

 3          MR. MALIONEK:  Mr. Malionek is here.

 4          THE COURT:  Yes.

 5          MR. MINUTI:  Your Honor, Mark Minuti, I'm ready if

 6 you are.

 7          THE COURT:  All right, you may proceed.

 8          Again, Mr. Brinkman, you're still under oath.

 9          MR. MINUTI:  Thank you, Your Honor.

10          THE WITNESS:  Thank you, Your Honor.

11          MR. MINUTI:  Your Honor, I only have one

12 additional question for Mr. Brinkman and then I'm going to

13 pass the witness.

14 BY MR. MINUTI:

15 Q    Mr. Brinkman, with respect to the $14 million unsecured

16 note that you were testifying to before the break, was that

17 note documented -- or was that loan documented

18 contemporaneously with the amounts loaned or was it

19 documented at a later period of time?

20 A    It was documented contemporaneously, I believe.

21 Q    Thank you.

22          MR. MINUTI:  Your Honor, I'm going to pass the

23 witness.  The only thing I would like to do, Your Honor, is

24 move my exhibits into evidence.  I can do that now or when

25 others are done with the witness.

1          THE COURT:  Does anybody object to the Debtors'

2  Exhibits that were identified in this being admitted?

3          MR. MALIONEK:  The Movants don't have any

4  objection, Your Honor.

5          THE COURT:  All right, and I hear none from anyone

6  else.  They will be admitted then.

7       (Debtors' Exhibits 1 through 9 received in evidence)

8          THE COURT:  Does anybody else desire to cross-

9  examine Mr. Brinkman?

10         MR. KERNEN:  Yeah, Joe Kernen here, Your Honor,

11  from DLA Piper for the Harrison Street entities.  I have some

12  short follow-up, unless Mr. Sherman has some questions, I'm

13  happy to go.

14         THE COURT:  You can go ahead.

15         MR. KERNEN:  Okay.

16                    CROSS-EXAMINATION

17  BY MR. KERNEN:

18  Q    Mr. Brinkman, you testified under -- you testified

19  regarding Exhibits 2 and 3, we were looking at an org chart,

20  and you testified that you're the interim CFO of a handful of

21  MBNF entities, do you recall that?

22  A    I do.

23  Q    I don't know if we need to put the chart up, but can

24  you tell us when with regard to each of those entities you

25  became the interim CFO?

1  A     So I was retained in August of 2019 and I assumed my

2  roles at that time.

3  Q     With respect to each of those entities that you

4  identified?

5  A     Yes.

6  Q     Okay.  And Ms. Attestatova --

7           MR. MALIONEK:  Again, Mr. Kernen, if you're going

8  to -- I'm sorry, Your Honor, if I may?  And, again, I hate to

9  interrupt, but if you are going to go into detail with

10 respect to the different entities, again, I would ask that

11 the org chart, which I believe is Debtors' Exhibit 9, be put

12 up to the extent that that would be helpful.

13          If you're not going into that, then no need, but

14 rather than it be a memory contest, I thought that that might

15 be helpful.

16          MR. KERNEN:  No, I'm not going into detail, I just

17 wanted -- in case he needed the org chart to refresh his

18 recollection of which entities he became interim CFO was, I

19 just wanted to confirm for the record the date on which he

20 became interim CFO for each of those entities.

21          MR. MALIONEK:  Thank you, and I apologize for

22 interrupting.

23 BY MR. KERNEN:

24 Q     And so, Mr. Brinkman, with respect to each entity you

25 identified, it was the same date, and what was that date

1  again?

2  A     So I became the interim CFO of MBNF Investments in

3  August of 2019 and that's what I -- I am only interim CFO of

4  that entity, I provide in that capacity services to all of

5  the other entities, if that clarifies or if that helps.

6  Q     And did you begin providing those interim CFO services

7  to all those entities on the date you became interim CFO of

8  MBNF?

9  A     I did.

10  Q     Okay.  Do you have any title or position formally with

11  regard to any of the other entities?

12  A     I do not.

13  Q     Now, you've testified that Ms. Attestatova became

14  interim CEO of, I thought it was various MBNF entities, do

15  you recall that?

16  A     I'm sorry, Mr. Kernen, you broke up on me.

17  Q     You testified that Ms. Attestatova became an interim

18  CEO of certain MBNF entities, do you recall that?

19  A     I do.  She became interim CEO of MBNF Investments as

20  well and she provided services in that capacity to all the

21  other entities.

22  Q     Did she become interim -- what date did she become

23  interim CEO of MBNF?

24  A     I don't recall the exact date, but it was the end of

25  the third quarter, early fourth quarter of 2020.

1 Q    And did she begin providing interim CEO services to the

2 other entities the same time she became interim CEO of MBNF?

3 A    She did.

4 Q    Okay.  You referred to certain Paladin expenses being

5 allocated to other entities, do you recall that?

6 A    I'm sorry, will you repeat that?

7 Q    You referred -- you testified under Mr. Minuti's

8 questions to Paladin expenses being allocated to other

9 entities, do you recall that testimony?

10 A    Well, I don't believe I testified the Paladin expenses

11 are allocated.  There's a cost-of-work agreement that relates

12 to Paladin services that are provided, is that what you're

13 referring to?

14 Q    I think that's right, yes.

15 A    Okay.

16 Q    But you referred to an allocation of those services,

17 correct?

18 A    Correct.

19 Q    And to what other entities were those services

20 allocated?

21 A    Well, the allocation that I was referring to, Mr.

22 Kernen, is that, for example, I believe I mentioned that Mr.

23 Freedman's time is part of that allocation, that cost-of-work

24 reimbursement.  Not all of Mr. Freedman's time, for example,

25 is then included in the cost-of-work reimbursement.  I don't

1  recall the exact percentage off the top of my head as we

2  changed it over time and as the work has gone up and down,

3  but, for example, approximately 90 percent of Mr. Freedman's

4  time would be allocated in this cost-of-work agreement, and

5  that's the allocation I was referring to.

6  Q    Okay.

7        MR. KERNEN:  If we could put Exhibit 2 back up on

8  the screen?  It's the $2.5 million note.

9        MR. MALIONEK:  Just to clarify, you're saying

10  Debtors' Exhibit 2 --

11        MR. KERNEN:  Correct.

12        MR. MALIONEK:  -- not Movants' Exhibit 2?

13        MR. KERNEN:  Yes.  And if we could scroll down to

14  the attachment with the list of the lenders?

15        (Pause)

16  BY MR. KERNEN:

17  Q    Mr. Brinkman, do you know how much Latham & Watkins has

18  been paid to date?

19  A    I don't, not without looking.

20  Q    Do you know how much Jigsaw Advisers has been paid to

21  date?

22  A    Not off the top of my head.

23  Q    Can you approximate it?

24  A    Approximately 250 to $300,000.

25  Q    Again, back to Latham, I know you don't have a precise

1  number, but can you approximate how much they've been paid to

2  date?

3  A     I can't.

4  Q     How about Paladin Healthcare Capital, how much have

5  they been paid to date, approximately?

6  A     I would be simply guessing if I gave you a number, Mr.

7  Kernen.

8  Q     Okay, we don't want you to guess.

9        And how about Sonsara Management, can you give us a

10 reasonable approximation of what they've been paid to date?

11 A     I can't without looking at the detail or doing the

12 math.

13 Q     All right, you can put that down.

14       Now, the Newmark firm, I think you testified, that's

15 the broker that's been hired and charged with attempting to

16 sell the property, the Broad Street properties?

17 A     Newmark was retained as broker and they also provide

18 management services of the buildings.

19 Q     And they earn a monthly fee for the management

20 services?

21 A     They do.

22 Q     Each month -- the longer they're providing those

23 services, they get paid each month, correct?

24 A     They're paid on a monthly basis for the services

25 provided.

1  Q    And they also get paid a fee in connection with the

2  sale of the properties?

3  A    They would.  In the successful sale of the properties,

4  they would earn a success fee for that, yes.

5  Q    Okay.  Do you recall testimony regarding the proposed

6  $17.5 million loan from Gordon Brothers to the Broad Street

7  entities?  Okay.

8  A    Yes.

9  Q    Yeah.  I just want to clean something up.  I think

10 someone might have misspoke, but am I correct that

11 Philadelphia Academic Health Holdings, or PAHH, is the

12 guarantor for the proposed $17.5 million loan?

13 A    That is correct.

14 Q    And I think you also testified that the current unpaid

15 expenses for Jigsaw will be paid off if the Gordon Brothers'

16 loan comes through, paid off in full?

17 A    That is what's contemplated, yes.

18 Q    And you were asked if you had a personal income in --

19 interest in the outcome of this motion, and you responded

20 that your firm will get paid, correct?

21 A    I believe I responded something to that nature, yes.

22 Q    And I just want to confirm, you're the only partner in

23 Jigsaw, correct?

24 A    I am.

25 Q    A hundred percent owner?

1    A      I am.

2            MR. KERNEN:  That's all I have.

3            THE WITNESS:  Thank you, Mr. Kernen.

4            THE COURT:  Any other cross?  Any redirect?

5            MR. MALIONEK:  Yes, Your Honor, relatively brief.

6    Thank you.

7            If we could please start by putting up, Gayle, if

8    you could put up on the screen, I believe it's Defendants'

9    Exhibit 9, which is the org chart that you were shown, Mr.

10   Brinkman.  Maybe we can make that a bit larger.

11       (Pause)

12           MR. MALIONEK:  All right.  Can we put it so that

13   it's -- fills the screen without having to -- oh, maybe we

14   can't do it -- there we go.

15                         CROSS-EXAMINATION

16   BY MR. MALIONEK:

17   Q    Can you see that, Mr. Brinkman?

18   A      I can.  Thanks.

19   Q    Okay.  And you recall being asked questions about

20   this --

21   A      I do.

22   Q    -- on your -- thank you.

23           And this is dated December 2017, do you see that on the

24   bottom right-hand corner?

25   A      I do.

1  Q      Is that still an accurate org chart as of today?

2  A      I believe it is, yes.

3  Q      Which of these entities are the MBNF non-debtor

4  parties, as have been referred to during the examination

5  today?

6  A      So the MBNF non-debtor parties would include, starting

7  at the top, MBNF Investments, American Academic Health

8  System, Philadelphia Academic Health Holdings; then down

9  below that would be the Philadelphia Academic Risk Retention

10 Group; and then, if you follow down to the middle of the

11 page, the Front Street Health Care Properties, Front Street

12 II, the Broad Street Health Care Properties, the Broad II,

13 the Broad III.  Those are the MBNF non-debtor entities.

14 Q      Thank you.

15        Are the Movants -- and, when I say the Movants, do you

16 understand I mean the Broad Street entities and PAHH, as I'll

17 refer to it -- are the Movants (indiscernible) -- subject of

18 the comfort motion, is that correct?

19 A      I'm sorry, will you repeat that, please?

20 Q      And a lien as to the financing that's proposed in the

21 comfort motion, that is a lien as to those properties?

22 A      That is correct.

23 Q      Okay.  Just to be clear, the debtors -- do the debtors

24 own those properties?

25 A      The debtors do not own those properties.

1  Q    Can you identify which are the debtors are on this org

2  chart?

3  A    So on the org chart, starting in the upper left-hand

4  corner or side, Philadelphia Academic Health System,

5  Philadelphia Academic Medical Associates, St. Christopher's

6  Healthcare, Center City Healthcare, and then, I believe,

7  Physician Performance Network of Philadelphia are the debtor

8  entities, along with all of the boxes in blue, which are

9  physician groups down at the bottom.

10  Q    Okay.  And just to be clear then, so the MBNF assets

11  that we were just referring to, the properties, those are not

12  -- are those owned by any of those debtors?

13  A    They are not owned by any of the debtors.

14  Q    Okay, thank you.

15        MR. MALIONEK:  We can take that down.

16  BY MR. MALIONEK:

17  Q    Now, Mr. Brinkman, you were asked some questions about

18  the amounts owed to various different professionals,

19  including Jigsaw, Sonsara, and Latham & Watkins, among

20  others, do you recall that?

21  A    I do.

22  Q    And Jigsaw is, as was referred to, your company?

23  A    It is my firm, correct.

24  Q    What services has Jigsaw actually performed with

25  respect to the MBNF non-debtor parties?

1  A    Jigsaw has provided interim chief financial services,

2  restructuring advisory services to the non-debtors.

3  Q    And I believe Mr. Kernen just asked you this question,

4  but Jigsaw has provided those services since when?

5  A    Beginning in August of 2019.

6  Q    And has been paid approximately how much?

7  A    Somewhere between 250 and $300,000, is my recollection.

8  Q    And when was the last time Jigsaw was paid for any of

9  its services?

10  A    Jigsaw was last paid in December of 2019.

11  Q    And how much is Jigsaw still owed for the services that

12  it's been providing?

13  A    A little south of $700,000.

14  Q    And, Mr. Brinkman, can you identify, who's obligated to

15  pay the amounts that are owed to Jigsaw?

16       MR. MINUTI:  I object to that question, Your

17  Honor, to the extent it calls for a legal conclusion.

18       MR. MALIONEK:  Your Honor, if I could respond just

19  briefly?

20       THE COURT:  Yes.

21       MR. MALIONEK:  Mr. Brinkman was asked an enormous

22  number of questions with respect to who is obligated to make

23  payments with respect to all of these different amounts, I'm

24  simply redirecting on a topic that was -- where the door was

25  opened.

1          MR. MINUTI:  Your Honor, that's not true.  He's

2  got an engagement letter, they wouldn't provide the

3  engagement letter to us; my guess is the engagement letter

4  spells out who's obligated.  If they're not going to give us

5  the engagement letter, it's not fair for them to ask these

6  questions, so we would object.

7          THE COURT:  I'm going to overrule and allow him to

8  answer.

9          Mr. Brinkman?

10          THE WITNESS:  I believe that all of the entities

11  that receive my services are -- you know, are obligated to

12  pay.  And that's how we evaluate our invoices internally when

13  we look at professional services or any services provided,

14  who received the benefit, so it's the contribution, the

15  benefit that's then allocated.  So it would be all of the

16  entities.

17  BY MR. MALIONEK:

18  Q    And when you refer to allocated, because you were asked

19  many questions about the allocation process by Mr. Minuti and

20  by Mr. Kernen as well, can you explain what the allocation

21  process means with respect to the Movants' obligations to

22  make any of those payments to Jigsaw?

23  A    So the Movants, being PAHH and the Broad entities, as

24  it relates to Jigsaw, we have identified and reached the

25  business conclusion that, you know, a proper and fair and

1  equitable allocation of my time -- or Jigsaw's time would be

2  approximately 40 percent of the time and costs to the Broad

3  entities and approximately 20 percent of the time and costs

4  to the PAHH entity.

5  Q    And is that based on your business judgment?

6  A    It is, and it's based on the experience of the last two

7  years in terms of where time was spent and an estimate and

8  trying to put those into equitable buckets.

9  Q    And I'm going to ask you just the same questions with

10 respect to -- and I'll go through the next two -- Sonsara,

11 who is obligated to make the payments that have been

12 identified with respect -- that are still owed to Sonsara?

13             MR. MINUTI:  For the record, Your Honor, same

14 objection.

15             THE COURT:  I'll overrule.

16             THE WITNESS:  The entities receiving the services,

17 including the Broads, the Front entities, and PAHH.

18 BY MR. MALIONEK:

19 Q    Okay.  And the same question, Mr. Brinkman, if you

20 could explain, please, the allocation of those amounts owed

21 to the Movants?

22 A    To Sonsara in particular?

23 Q    Yes.

24 A    It's similar to what I just described for Jigsaw, it's

25 approximately -- or 40 percent allocated to the Broad

1  entities and 20 percent allocated to the PAHH entities.

2  Q    Okay.  Thank you.

3       And, just to be clear, with respect to Jigsaw's

4  services, does Jigsaw provide services to Paladin?

5  A    I have not.

6  Q    Does Jigsaw provide services to Mr. Freedman?

7  A    I have not.

8  Q    To Ms. Attestatova?

9  A    No.

10 Q    To Mr. Schmidt?

11 A    I have not.

12 Q    How about does Jigsaw provide services to you with

13 respect to this matter?

14 A    No.

15 Q    Same questions with respect to Sonsara.  Does Sonsara

16 provide services to Paladin?

17 A    Sonsara Management does provide services to Paladin

18 under a separate engagement letter, is my understanding.

19 Q    Separate from related to this matter?

20 A    Separate relating to this matter, different

21 compensation agreement, et cetera, yes.

22 Q    Thank you.  Does Sonsara represent Mr. Freedman with

23 respect to this matter?

24 A    No.

25 Q    Does Sonsara represent Ms. Attestatova herself with

1  respect to this matter?

2  A     No.

3  Q     Does Sonsara represent Mr. Schmidt with respect to

4  this?

5  A     No.

6  Q     Or does Sonsara represent you with respect to this?

7  A     No.

8  Q     And I'm going to ask you the same questions with

9  respect to the amounts owed to Latham & Watkins.  Who's

10 responsible -- who is obligated to make the payments that are

11 owed to Latham & Watkins, Mr. Brinkman?

12         MR. MINUTI:  Same objection, Your Honor.

13         THE COURT:  Overruled.

14         THE WITNESS:  The entities responsible are the

15 entities receiving the benefit of the services, including the

16 Broad entities, the Front entities, and PAHH.

17 BY MR. MALIONEK:

18 Q     Okay.  And I have the same question again for you with

19 respect to how it has been determined that the amounts owed

20 are allocated to the Movants.

21 A     So the amounts allocated to Latham & Watkins in this

22 case are specifically identified by Latham & Watkins as part

23 of their invoicing.  We typically -- Ms. Attestatova, myself,

24 and Ms. Muranaga (ph) review those invoices and then also --

25 then we specifically allocate based upon the services

1  provided.

2  Q    Okay, thank you.  And, again, as I asked before, is

3  that based on your business judgment?

4  A    It is.

5  Q    And also, just to be clear, because you've been asked

6  many questions now about certain individuals, are you an

7  indemnified party with respect to your work in this matter?

8  A    I am.

9         MR. MINUTI:  Objection, Your Honor, it calls for a

10  legal conclusion.

11         MR. MALIONEK:  It's a contractual matter, Your

12  Honor.

13         THE COURT:  I'll allow it.  I think he can answer.

14         MR. MALIONEK:  Thank you.

15  BY MR. MALIONEK:

16  Q    Is Mr. Freedman an indemnified party with respect to

17  this matter?

18         MR. MINUTI:  Same objection.

19         THE WITNESS:  I believe he is.

20  BY MR. MALIONEK:

21  Q    Same question with respect to --

22         THE COURT:  I'll sustain the objection as to Mr.

23  Freedman.  He can state whether he has an agreement of

24  indemnification, but I don't think he can testify as to

25  whether others do.  And it is a legal conclusion otherwise.

1    MR. MALIONEK:  Your Honor, may I ask the witness

2  if he understands if there is an agreement of indemnification

3  with respect to the others?

4    THE COURT:  You may ask.

5  BY MR. MALIONEK:

6  Q    Mr. Brinkman, do you understand if there is an

7  agreement of indemnification, to provide indemnification to

8  Mr. Freedman with respect to these matters?

9  A    Yes.

10  Q    And do you have an understanding of whether there is an

11  agreement to provide indemnification to Ms. Attestatova with

12  respect to these matters?

13  A    Yes.

14  Q    The same question with respect to Mr. Schmidt.

15  A    Yes.

16  Q    And I believe I asked this, but just to be clear, same

17  question with respect to you yourself, personally, I think

18  you said yes?

19  A    Yes.

20  Q    And you also said that Latham & Watkins has represented

21  these individuals, in what capacity has Latham & Watkins

22  represented these individuals, you, Mr. Freedman, Ms.

23  Attestatova, and Mr. Schmidt?

24  A    So my understanding is Latham & Watkins represents Mr.

25  Freedman generally and as an indemnified party.  Latham &

1   Watkins has represented me and my firm for a very specific

2   purpose as it relates to this proceeding and the motions to

3   quash.  And I believe that Latham & Watkins has represented

4   Ms. Attestatova and Mr. Schmidt as it relates to the

5   mediation and the adversary proceeding situation.

6   Q     And do you have an understanding of whether Latham &

7   Watkins represents them as indemnified parties?

8   A     My understanding is that they do.

9   Q     Okay.  Thank you.

10        If we can show you your exhibit, Movants' Exhibit 2,

11  your declaration.

12        (Pause)

13  Q     And if we can go to, I believe it's the last page,

14  which is the exhibit, the sources and uses that you've been

15  shown with respect to the financing.

16        Now, Mr. Brinkman, I could go through each one of these

17  individually, but can you let me know, are each of these

18  amounts that are identified here in the -- thank you, Gayle

19  -- in the -- one, two -- fourth column from the left, do you

20  see that, starting with $175,000?

21  A     I do.

22  Q     Okay.  And moving down to add up to $17.5 million, do

23  you see that?

24  A     I do.

25  Q     Okay.  Are those obligations to be paid by the Movants?

1  A    Yes.

2  Q    Now, there's a reference over on the right-hand side to

3  a 15-month reserve -- two references -- a few references to

4  15-month reserves, do you see those?

5  A    I do.

6  Q    Now, if the loan is paid off earlier than 15 months,

7  what happens with those reserves?

8  A    Any residual amounts left in those reserves would be

9  returned to -- returned to the borrower --

10 Q    So earlier --

11 A    -- or --

12 Q    -- than 15 -- I'm sorry --

13 A    I'm sorry.

14 Q    -- I'm sorry.

15 A    Or otherwise made available.  Sorry for interrupting.

16 Q    Okay.  So it could be sooner than 15 months if there's

17 a transaction that's closed, is that right?

18 A    That is correct, and that's our hope and expectation.

19 Q    Okay.

20          MR. MALIONEK:  I have no other questions, Your

21 Honor -- oh, actually, Your Honor, you know what?  I

22 apologize.  A lawyer should never say that, that I have no

23 more questions, just as they should never say I have only one

24 more.  I'd like to say I have only one more, but I have just

25 a couple more maybe.

1  BY MR. MALIONEK:

2  Q    You were asked some questions, Mr. Brinkman, with

3  respect to a $14 million loan from Front Street, do you

4  remember that?

5  A    I do.

6  Q    What is the source of the funds that were used to --

7  for Front to provide that $14 million loan?

8  A    The source of the funds were the sale of Front Street

9  properties, primarily the St. Christopher's Children's

10  Hospital.

11  Q    Okay, thank you.

12        MR. MALIONEK:  Now I have no further questions,

13  Your Honor.  Thank you for your courtesy.

14        THE COURT:  All right.  Redirect?

15        MR. MINUTI:  Your Honor, I do have some recross

16  based upon the --

17        THE COURT:  Excuse me --

18        MR. MINUTI:  -- redirect.

19        THE COURT:  -- recross.  Thank you.

20        MR. MINUTI:  Thank you, Your Honor.  Again, for

21  the record, Mark Minuti.

22                    REDIRECT EXAMINATION

23  BY MR. MINUTI:

24  Q    So, Mr. Brinkman, what exactly is the agreement

25  pursuant to which the Broad Street entities have to indemnify

1  Mr. Freedman?

2  A    It's the operating agreement of the Broad Street

3  entities.

4  Q    Okay.  And when did you last look at that agreement?

5  A    I don't recall a specific date.

6  Q    And what is the date of that agreement?

7  A    I don't recall the specific date, but the operating

8  agreement was created around the time of the transaction,

9  probably, likely before the transaction in early 2018 when

10 those entities were created.

11 Q    And, under that agreement, what are the Broad Street

12 entities obligated to indemnify Mr. Freedman for?

13 A    I don't recall specifically.

14 Q    So you don't know?

15 A    I --

16 Q    As you sit here today, you don't know, right?

17 A    I'm sorry, repeat the question?

18 Q    Sure.  As you sit here today, you don't know what that

19 agreement provides in terms of indemnification, correct?

20 A    I don't recall the details, no.

21 Q    Okay.  What specific document or agreement exists

22 pursuant to which the Broad Street entities are required to

23 indemnify Ms. Attestatova?

24 A    Same answer (indiscernible) Ms. Attestatova's

25 engagement letter.

1   Q     Okay.  And who was her engagement letter with?

2   A     I don't recall, but MBNF and potentially other

3   entities.

4   Q     All right.  Well, if you don't recall, is it fair to

5   say that you don't know whether there is an obligation on the

6   part of the Broad Street entities under that agreement to

7   indemnify Ms. Attestatova?

8   A     Based upon my conversations with counsel in reviewing

9   this, you know, previously, I do believe that there is an

10  indemnification, based upon my review of those documents in

11  the past, I just don't recall the details.

12  Q     What documents are you talking about?

13  A     The operating agreements, the engagement letters, those

14  documents that would dictate the indemnification provisions.

15  Q     Okay, I thought we were talking about the engagement

16  letter.  Do you know what the engagement letter provides in

17  terms of indemnification?

18  A     Not -- not --

19          MR. MALIONEK:  Objection -- I'm sorry --

20  objection, Your Honor, to the extent -- I believe that that

21  misstates the witness' response.  He testified not only to

22  engagement letters, but also to operating agreements.

23          THE COURT:  Well, as to Ms. Attestatova, he only

24  said the engagement letter, am I right?  Okay, I think that's

25  what he's asking about now.

1          MR. MALIONEK:  Understood.  Thank you.

2          MR. MINUTI:  Correct.

3   BY MR. MINUTI:

4   Q     What does the engagement letter say about the Broad

5   Street entities' obligation to indemnify Ms. Attestatova, do

6   you know?

7   A     Well, Ms. Attestatova's engagement letter is joint and

8   several with all the entities, so it provides indemnification

9   in the event that, you know, she is sued or her entity is

10  sued or some claim against her, but I don't recall the

11  details.

12  Q     Okay.  And that indemnification would cover causes of

13  action that relate to conduct prior to the bankruptcy case,

14  is that what you're saying?

15  A     I believe it would.

16  Q     Okay.  And with respect to the operating agreement, why

17  does the Broad Street entities' operating agreements provide

18  for indemnification of Ms. Attestatova?

19  A     Standard language in kind of concept within the

20  operating agreements to provide indemnification for people

21  such as officers, its representatives, that sort of thing.

22  Q     Okay.  And so is it your testimony that Ms. Attestatova

23  was an officer or a member of the Broad Street entities?

24  A     Well, she's not a member.  I don't know, you know,

25  legally, if she's an officer.  She's an officer of MBNF as

1  the chief executive officer, but, again, her engagement

2  letter encompasses -- is joint and several among all the

3  entities, is my understanding.

4  Q    I'm trying to understand the operating agreement.  Why

5  does the operating agreement provide for indemnification of

6  Ms. Attestatova?

7  A    It's --

8  Q    How is she covered?

9  A    Based upon the language of the agreement that relates

10 to the indemnification provisions.

11 Q    What does the language say?

12 A    I don't recall off the top of my head, I'd have to look

13 at it, Mr. Minuti.

14 Q    Okay, all right.  How about Mr. Schmidt, what

15 specifically -- is there an agreement other than the

16 operating agreements that provides for some sort of

17 indemnification by the Broad Street entities of Mr. Schmidt?

18 A    I believe Mr. Schmidt has an agreement as well.

19 Q    With who?

20 A    I don't know who the parties are, I don't recall.  I

21 don't believe I've seen that agreement.

22 Q    Okay.  So, if you don't know who the parties are, is it

23 fair to say, sir, that you have no idea whether there is a

24 separate agreement that provides for the Broad Street

25 entities to indemnify Mr. Schmidt, is that fair?

1  A      I don't know if one exists or not.

2  Q      Okay.  So now let's talk about the operating agreement,

3  is it your testimony that, under the Broad Street entities'

4  operating agreement, the Broad Street entities have an

5  obligation to indemnify Mr. Schmidt?

6  A      That's my understanding, yes.

7  Q      Okay.  And why is that?

8  A      The language included in the agreement that provides

9  indemnification to a party such as Mr. Schmidt.

10  Q      Well, when you say "party such as Mr. Schmidt," what do

11  you mean by that?

12  A      An employee, an adviser, however defined.

13  Q      Is Mr. Schmidt an employee of the Broad Street

14  entities?

15  A      There are no employees of the Broad Street entities

16  currently.

17  Q      Okay.  Is he an officer?

18  A      No, he's not.

19  Q      Is he a manager?

20  A      He's not.

21  Q      Okay.  Is he a member?

22  A      He's not.

23  Q      Okay.  And so -- but he is an adviser to the Broad

24  Street entities?

25  A      He is in his capacity, he provides advisory services.

1  Q      Okay.  And do the Broad Street entities pay him

2  directly for those advisory services?

3  A      They do not.

4  Q      All right.  Is there a written advisory agreement?

5  A      My understanding is yes.

6  Q      Okay.  Between who?

7  A      I believe it's between Mr. Schmidt and Paladin

8  Healthcare Capital or Management, and Mr. Schmidt's time then

9  is reimbursed as part of the cost-of-work agreement that we

10 discussed earlier.

11 Q      Okay.  So he's an adviser to Paladin Healthcare

12 Capital, correct?

13 A      He is.

14 Q      All right.  And Paladin Healthcare Capital provides his

15 services to the Broad Street entities; that's your testimony,

16 correct?

17 A      That is correct.

18 Q      All right.  And so -- and, again, what is the specific

19 language in the Broad Street entities' operating agreements

20 that provides for indemnification of advisers, what does it

21 say?

22 A      Without reviewing, Mr. Minuti, I can't say.

23 Q      Okay.  You don't know?  Is that your testimony, you

24 don't know?

25 A      I can't say without looking at it.

1  Q    Okay.

2         MR. MINUTI:  No further questions, Your Honor.

3         MR. MALIONEK:  No redirect, Your Honor.

4         MR. KERNEN:  I have brief follow-up, Your Honor.

5         THE COURT:  All right, Mr. Kernen.

6                    RECROSS-EXAMINATION

7  BY MR. KERNEN:

8  Q    Mr. Brinkman, with regard to the $14 million Front

9  Street loan to the Broad Street entities, did Ms. Attestatova

10 have a position as officer of any of the entities under the

11 MBNF umbrella at the time of the loan?

12 A    Uh, I don't -- so -- sorry, Mr. Kernen -- that loan, I

13 believe, was created in January of 2020.  So, if that's the

14 case, then Ms. Attestatova would have been the interim CEO of

15 MBNF Investments, if my timing is correct.

16 Q    And she continued to be interim CEO of MBNF Investments

17 when those monies were spent by the Broad Street entities in

18 the ordinary course?

19 A    She's been the interim CEO since that period of time

20 and in 2020.

21 Q    Okay.  Now, you testified that Jigsaw does not provide

22 any services to Mr. Freedman, is that right?

23 A    That's correct.

24 Q    But you also testified on cross that you spent a lot of

25 your time on tax services, do you recall that?

1  A      Well, I didn't say a lot -- I mean, a substantial

2  amount of my time, but yes.

3  Q      A substantial amount of your time is spent providing

4  tax services to the MBNF entities?

5  A      Tax and accounting, we group those together, that's

6  correct, yeah.

7  Q      And isn't it true that Mr. Freedman would benefit

8  personally from your tax services that you're providing to

9  the MBNF entities?

10  A      I mean, Mr. Freedman is the ultimate taxpayer with MBNF

11  being the tax filer.  So, you know, our work is to prepare

12  the returns for MBNF as the tax filer.

13  Q      Okay.  And to the extent your work results in favorable

14  tax consequences for MBNF, then it results in favorable tax

15  consequences for Mr. Freedman personally?

16  A      Any sort of benefit or detriment would flow through to

17  the members, including Mr. Freedman.

18  Q      Okay.

19             MR. KERNEN:  That's all I have.

20             MR. MALIONEK:  Again, no redirect, Your Honor.

21             THE COURT:  All right.  Anyone else?

22        (No verbal response)

23             THE COURT:  All right.  Thank you, Mr. Brinkman,

24  you may be excused.

25             THE WITNESS:  Thank you, Your Honor.

1      (Witness excused)

2           MR. MINUTI:  Your Honor, I would like -- it's Mark

3  Minuti, for the record -- I would like to cross-examine Mr.

4  Freedman.

5           THE COURT:  All right.  Let's have him sworn.

6           MR. FREEDMAN:  Good morning, Your Honor.

7           THE COURT:  Good morning.

8           THE ECRO:  Okay, raise your right hand.

9            JOEL L. FREEDMAN, WITNESS, AFFIRMED

10          THE ECRO:  Please state your full name and spell

11  your last name for the record.

12          THE WITNESS:  Joel Lawrence Freedman, F-r-e-e-d-m-

13  a-n.

14          THE COURT:  Mr. Freedman, just for the record, is

15  the declaration that was filed on your behalf what you would

16  have testified to on direct had you been called?

17          THE WITNESS:  Yes, it is.

18          THE COURT:  Are there any changes or corrections

19  you wish to make to that?

20          THE WITNESS:  No, Your Honor.

21          THE COURT:  All right.  All right, I'll turn it

22  over for cross.

23          MR. MINUTI:  Thank you, Your Honor.

24  //

25  //

```
 1                      CROSS-EXAMINATION
 2  BY MR. MINUTI:
 3  Q     Good morning, Mr. Freedman, Mark Minuti.
 4  A     Good morning, Mr. Minuti.
 5            MR. MALIONEK:  I'm sorry --
 6  BY MR. MINUTI:
 7  Q     Now, you are a manager --
 8            THE COURT:  Wait a minute.  Mr. Malionek, did you
 9  have something?
10            MR. MALIONEK:  Yeah.  Can you hear me?
11            THE COURT:  Yeah, hold on.  We're getting an echo
12  now.
13       (Pause)
14            MR. MALIONEK:  Is that any better?
15            THE COURT:  That's much better.
16            MR. MALIONEK:  I apologize.  I'd ask for the same
17  thing, Your Honor, that because Exhibit 1, Movants' Exhibit 1
18  has already been admitted, which is Mr. Freedman's
19  declaration, that he be allowed to -- if he has it available
20  to him, that he be allowed to have that in front of him.
21            THE COURT:  All right, he may.
22            MR. MALIONEK:  Mr. Freedman, do you have that
23  available?
24            THE WITNESS:  I do.
25            MR. MALIONEK:  Okay.  Thank you, Your Honor.
```

1    THE COURT:  All right.  Go ahead, Mr. Minuti.

2    MR. MINUTI:  Thank you, Your Honor.

3  BY MR. MINUTI:

4  Q    Mr. Freedman, where are you located right now?

5  A    I'm at my home in Hermosa Beach, California.

6  Q    All right.  And is anybody in the room with you?

7  A    No.

8  Q    And what documents do you have in front of you other

9  than your declaration?

10 A    Uh, there are various other documents that are in a

11 binder that includes my declaration.  I can't recall each of

12 the documents.  I can remove just the declaration and get rid

13 of the other documents, if you'd prefer.

14 Q    Why don't we go ahead and do that.

15 A    Okay.

16    (Pause)

17 A    Okay.

18 Q    Okay, thank you.

19    Now, you're the manager, a member, and president of

20 MBNF Investments, LLC, correct?

21 A    Yes, that's correct.

22 Q    And you're also an officer of each of the moving Broad

23 Street entities, correct?

24 A    Yes, that's correct.

25 Q    And if you have your declaration in front of you, if

1   you could turn to paragraph number 6?

2        And I'm paraphrasing and you can read it, but at

3   paragraph 6 you state that it was your idea to secure the

4   various professional fees by a lien on the real estate owned

5   by the Broad Street entities' properties, correct?

6   A    Yes.

7   Q    Now, are the service providers listed in paragraph 6 of

8   your declaration, can we agree that those service providers

9   have provided services to you personally?

10  A    They have not --

11  Q    Okay.

12  A    -- with the exception of Mr. Schmidt, who's employed by

13  Paladin and from time to time does work on matters that don't

14  relate to the MBNF non-debtor parties.  Sonsara, to a very

15  limited degree, provides some services via a separate

16  engagement letter to Paladin as well.  I don't believe

17  anybody represents me personally --

18  Q    Latham & Watkins --

19  A    -- other than --

20  Q    -- Latham & Watkins --

21  A    -- other than in my capacity as an indemnified party to

22  the MBNF entities.

23  Q    Latham & Watkins doesn't represent you personally?

24  A    As an indemnified party, they did.

25  Q    Okay.  In connection with what matter?

1  A      In connection with the matters related to the non-

2  debtor parties.

3  Q      Okay.  And do any of those professionals that are

4  identified in subsection -- or paragraph 6 represent Mrs.

5  Freedman?

6  A      Solely in her capacity as an indemnified party.

7  Q      Okay.  In connection with what matters?

8  A      The non-debtor party matters.

9  Q      And what are they?

10  A      The various operational activities and requirements of

11  the MBNF non-debtor parties.

12  Q      Okay.  Do they represent, for example, Mrs. Freedman or

13  you in connection with these bankruptcy cases?

14  A      The indemnification provisions in the various operating

15  agreements, and I think also in the Paladin services

16  agreement to PAHH, would cover the services that are

17  provided.  I do rely on counsel to determine, you know, the

18  nature of those indemnities and what is and isn't covered.

19  Q      Mr. Freedman, it was -- the question is, does Latham &

20  Watkins represent you personally in connection with this

21  bankruptcy case?

22  A      Yes, as an indemnified party, they do.

23  Q      Okay.  And they represent you in connection with the

24  mediation too, correct?

25  A      I don't recall specifically in connection with the

1  mediation, but I would suspect that's the case.

2  Q    Okay.  Well, who represents you personally in the

3  mediation?

4  A    As an indemnified party, I would be represented by

5  Latham & Watkins predominantly.

6  Q    Okay.  Same questions as to Mrs. Freedman, does Latham

7  & Watkins represents Mrs. Freedman in these bankruptcy cases?

8  A    Again, I can't -- I can't interpret that specifically,

9  I would rely on counsel as to the scope and nature of the

10 indemnification to Mrs. Freedman, but she is represented as

11 an indemnified party.

12 Q    Okay.  By Latham & Watkins, correct?

13 A    By Latham & Watkins, yes.

14 Q    Okay.  What about Ms. Attestatova, is she represented

15 by Latham & Watkins?

16 A    I don't recall.  I believe she is an indemnified party

17 as well.

18 Q    Okay.  And by that answer do you mean that she's

19 represented by Latham & Watkins?

20 A    I believe she is, as an indemnified party.  And I

21 believe Sonsara also, as an indemnified party, would be

22 represented as well.

23 Q    What about Paladin Healthcare Capital, does Latham &

24 Watkins represent Paladin Healthcare Capital?

25 A    It would be the same answer; as an indemnified party,

1  they do.

2  Q    Okay.  And I'm correct, sir, that you personally have

3  not paid any legal fees to any of the professionals that are

4  identified in paragraph 6 of your declaration?

5  A    As it relates to MBNF matters, that would be a correct

6  statement.

7  Q    Okay.  And when you say MBNF matters, what are you

8  referring to?

9  A    The various operational activities relating to MBNF and

10  its non-debtor party subsidiaries.

11  Q    And were -- and forgive me, because I couldn't see who

12  was on the hearing earlier, but were you participating in the

13  hearing during Mr. Brinkman's testimony?

14  A    I came in late, approximately 9:30 Eastern time.  I did

15  hear the balance of his testimony.

16  Q    Okay.  And this isn't a trick question.  We've

17  identified and moved into exhibits evidence -- the Debtors'

18  Exhibits Number 2 and 3 and that -- number 2 is the Broad

19  Street entities' amended and restated demand and secured

20  promissory note dated October 28th, 2021, and Exhibit Number

21  3 is the Broad Street entities' demand and secured promissory

22  note dated October 28th, 2021.

23       Were you in the courtroom when we admitted those two

24  exhibits?

25  A    I think I might have missed that, but I did hear them

1  referenced in the testimony of Mr. Brinkman.

2  Q    Okay.

3       MR. MINUTI:  Let me ask Mr. Collins then to put up

4  Debtors' Exhibit Number 2.

5       (Pause)

6  BY MR. MINUTI:

7  Q    Are you familiar with this document, Mr. Brinkman?  I'm

8  sorry, Mr. Freedman.

9  A    Yes, I am.

10 Q    I apologize.  Okay.

11      MR. MINUTI:  And let me ask Mr. Collins to put up

12 Exhibit Number 3.

13      (Pause)

14 BY MR. MINUTI:

15 Q    Are you familiar with this document?

16 A    Yes, I am.

17 Q    All right.  And, again, if I could ask you to turn to

18 your declaration, and you'll see on paragraph 6 -- this is in

19 your declaration you should have before you --

20 A    Yes.

21 Q    -- the last sentence says, "Prior to execution of the

22 promissory notes," and then it goes on.  Do you see that?

23 A    I do.

24 Q    Okay.  Are the promissory notes referenced in paragraph

25 6 of your declaration the documents we've identified as

1  Debtors' Exhibits 2 and 3?

2  A     Yes, they are.

3  Q     Now, you personally negotiated these notes on behalf of

4  the Broad Street entities, correct?

5  A     I did, with the support of counsel.

6  Q     Okay.  What counsel are you talking about?

7  A     Stephan Pahides of MKB.

8  Q     Okay.  And what exactly did Mr. Pahides do?

9  A     Well, he reviewed the changes to the documents and

10 overall form of the documents in this case.  They had been

11 based on a prior note that was -- I believe representation at

12 the time the prior note had been put together, it was either

13 O'Melveny or Latham, I can't recall the timing, but they were

14 -- you know, they were existing and there were changes to

15 those notes to ultimately result in the current notes.  And

16 those changes, along with the notes overall, had been

17 reviewed by MKB prior to execution of the agreements.

18 Q     And, based upon the testimony in paragraph 6, you'll

19 agree with me that Mr. Pahides' role was a limited one,

20 correct?

21 A     Well, limited in the sense that he reviewed the

22 agreements and provided his input on behalf of the lenders in

23 this case.

24 Q     All right.  And that was a limited --

25 A     And (indiscernible) --

1  Q      -- review -- that was limited --

2  A      -- on behalf --

3  Q      I'm sorry, go ahead.

4  A      That's on behalf of the borrower in this case.

5  Q      And that was a limited review, correct?

6  A      Yes.

7  Q      I'm now going to ask Mr. Collins to put up on the

8  screen what we've marked as Debtors' Exhibit Number 4.  This

9  is the Gordon Brothers' term sheet.

10         (Pause)

11 Q      Tell me if you recognize this document.

12 A      I do.

13 Q      And what is this document?

14 A      This is the term sheet relating to the proposed loan

15 from the Gordon Brothers to the Broad entities.

16 Q      And did you sign this document on behalf of the

17 borrowers?

18 A      I did.

19 Q      And are you familiar with the terms?

20 A      I am.

21 Q      And is it fair to say that you contemplate that the

22 proposed loan that's referenced in this term sheet is going

23 to be paid back from the sale of the Broad Street entities'

24 properties?

25 A      Most likely, yes.

1  Q     Now, incidentally, when was the last time you visited,

2  you personally visited the Broad Street entities' properties?

3  A     I believe it was May of 2019, the last time I was in

4  Philadelphia.

5  Q     Okay.  Now, if we could -- on the term sheet, if we

6  could go to page 2?  And you'll see there's a column that

7  says "Term."  Can you see that okay?

8  A     Yes.

9          MR. MINUTI:  Okay, there you go.  Thank you.

10 BY MR. MINUTI:

11 Q     Under the heading "Term," there's a reference to

12 "commercially-reasonable milestones to be agreed upon between

13 Gordon Brothers and the borrowers," do you see that?

14 A     I do.

15 Q     And have the parties, being the lenders and the

16 borrowers, reached any agreement on what those milestones

17 will be?

18 A     Not as yet, no.

19 Q     Okay.  And what do you contemplate those milestones

20 will be?

21 A     I can't speculate.

22 Q     So you have -- from your perspective, you have no idea

23 what they will be?

24 A     I anticipate they'll be commercially reasonable and

25 fairly standard for loans of this type.  I've had a lot of

1   experience during the last 30 years in negotiating loan

2   agreements with comparable lenders, so I assume they'll be

3   fairly standard milestones; hiring a broker, going to market,

4   actively pursuing the sale of the assets, et cetera.

5   Q    Okay.

6           MR. MINUTI:  Let me ask Mr. Collins to put up on

7   the screen the document we've identified in the Debtors'

8   Exhibit list as document number 7.

9        (Pause)

10          MR. MINUTI:  Maybe we could blow that up and move

11  it up a little bit to see the body.

12          MR. MALIONEK:  Your Honor, the Movants have an

13  objection to the use of this exhibit.  Can I be heard?

14          THE COURT:  You may be heard.

15          MR. MALIONEK:  So, Your Honor, when we were before

16  you on November 19th, you made a ruling with respect to

17  various categories of relevance, and on page 48 of the

18  transcript from that hearing you said that, "with respect to

19  the inquiring into the negotiations with Gordon Brothers and

20  what other options the Movants had, I don't think that's

21  relevant at all to the motion.  I don't think that

22  questioning their business judgment is relevant to the

23  motion; they are not entities in bankruptcy."

24          Now, Your Honor, this exhibit is exactly what was

25  contemplated, I believe, with respect to that category, which

1  is this is an alternative proposed financing by the debtors

2  and, Your Honor, I believe you already ruled that that which

3  would bring you to question, purportedly, the Movants'

4  business judgment with respect to the selection of financing

5  and considering what other options it had should be -- this

6  exhibit should be excluded and questioning based on it.

7             THE COURT:  Mr. Minuti?

8             MR. MINUTI:  Your Honor, the key wording of what

9  Mr. Malionek said is that Your Honor ruled -- that the other

10  options they had leading up to the Gordon Brothers term sheet

11  Your Honor ruled were irrelevant, but we have to take a step

12  back, Your Honor.  This entire day is about a motion for

13  relief from the automatic stay based on cause, right?  Cause

14  being that they need to get this loan.  And that calls into

15  question the reasonableness of the loan that's currently

16  available and I believe, if there are other options, we

17  should be able to explore that, particularly from the debtor.

18             And so I do believe it's relevant to today's

19  hearing for Your Honor to understand the option that's

20  available.  Now, look, Mr. Freedman is free to say why this

21  other option doesn't make any sense and why his business

22  judgment is that he should proceed with the Gordon Brothers

23  term sheet, but I think I'm allowed to question him about

24  other options that are available.

25             I should also point out, Your Honor, that on

1  November 29th they filed a declaration for Mr. Freedman where

2  he commented on this very proposal.

3        So, Your Honor, I think it's fair game; I think it

4  goes to cause, I think it goes to the reasonableness of what

5  they're trying to do because, again, when we get to the

6  argument on cause, it's all about balancing the harms, that

7  specifically calls into question the reasonableness of

8  proceeding with the proposal today if there's another option.

9        So, again, Your Honor, Mr. Freedman can explain

10  why this doesn't make any sense from his perspective, but we

11  should be able to ask him questions about it.

12        MR. MALIONEK:  Your Honor, may I briefly?

13        THE COURT:  You may.

14        MR. MALIONEK:  Mr. Minuti is adding words to what

15  your ruling was.  It does not say that it's -- that your

16  ruling was limited only to options the Movants had up until

17  the time that it entered into the term sheet with the Gordon

18  Brothers.  I think that the point, your Honor, and what we

19  have tried to abide by with respect to your ruling is that

20  the business judgment, including the selection of which

21  financing is the best financing that the Movants believe is

22  going to be best for themselves and all of their

23  constituents, they're not entities in this bankruptcy and so

24  that's not -- that's not in question.

25        And by the way, Your Honor, Mr. Freedman's

1  declaration does not have that paragraph in it with respect

2  to any reference to this document.  Mr. Freedman was

3  questioned at length, despite Your Honor's ruling, with

4  respect to this and other options and negotiations with

5  respect to Gordon Brothers and other options, sale processes,

6  et cetera, all of which went far outside what we believe,

7  Your Honor, respectfully, you had ruled upon, all of which we

8  believe is relevant only to questioning their business

9  judgment and all of which we believe is off limits.

10       Mr. Wilen had submitted a declaration for purposes

11  of this hearing in which he would have, as CFO of the

12  debtors, in which he had proposed to testify that, in his

13  opinion, this alternative financing is a better alternative

14  for the Movants.  That, Your Honor, we believe, given that

15  Mr. Wilen has zero responsibility with respect to exercising

16  business judgment on behalf of the Movants, who are not

17  debtors, is something that we objected to because it's

18  irrelevant, and immediately the debtors withdrew Mr. Wilen's

19  declaration.  I think that that speaks volumes as to what

20  exactly is relevant or not relevant here.  And as soon as

21  they did that, Your Honor, we updated Mr. Freedman's

22  declaration because there was then no need to be able to go

23  into responding to Mr. Wilen.

24       MR. MINUTI:  Your Honor, if I may be heard in

25  response?

1          THE COURT:  You may.

2          MR. MINUTI:  Your Honor, the reason we withdrew

3  Mr. Wilen's declaration when we first filed it is because the

4  MBNF parties believed it contained confidential information.

5  So we withdrew it from the docket, but re-filed it, Your

6  Honor, under seal.  And so that -- we didn't remove it

7  because we thought it was irrelevant.

8          Number two, Your Honor, what Mr. Malionek did not

9  say is that they did file a declaration of Mr. Freedman on

10 the 29th where he talked specifically about the offer made by

11 the debtors.  Now, for strategic reasons and I'm sure the

12 ability to make this argument that they're making right now,

13 they withdrew Mr. Freedman's declaration.  But it is a prior

14 statement of Mr. Freedman, he goes into this issue, he's

15 familiar with it.

16         And then finally, Your Honor, with respect to

17 business judgment, you know, normally -- normally, folks are

18 entitled to the benefit of the business judgment, but not

19 when you're conflicted, Your Honor.  And what we're talking

20 about here is a loan that's going to pay off the notes that

21 have been placed on this property by Mr. Freedman, notes, by

22 the way, in favor of Paladin Capital, his company, Your

23 Honor.  So he stands on both sides of the transaction.

24         So I don't believe he gets the benefit of the

25 business judgment rule here.  He can explain to Your Honor

1  why the proposal makes no sense, but, ultimately, I think

2  it's up to Your Honor to determine whether in fact the term

3  loan with Gordon Brothers is reasonable and this is a pretty

4  important data point, Your Honor.

5          THE COURT:  I agree with debtor --

6          MR. MALIONEK:  Your Honor --

7          THE COURT:  No, I'm going to -- I agree with the

8  debtor, I'm going to allow questioning on this point.

9          MR. MINUTI:  Thank you, Your Honor.

10 BY MR. MINUTI:

11 Q    So, Mr. Freedman, are you familiar with this document?

12 A    Until my deposition, I hadn't seen it directly, I had

13 only discussed it with counsel.

14 Q    Okay.  But you've now seen it?

15 A    I've now seen it, yes.

16 Q    Okay.  And so you're aware that the debtors made a

17 proposal to finance the cost to maintain the Broad Street

18 entities' real estate on November 17th, correct?

19 A    I'm not sure of the date, I don't think it specifies

20 the date on what I'm seeing on the document, but I will --

21 Q    Well, let's -- I'm sorry.

22 A    Okay.

23 Q    Let's page up so you can see the date.

24 A    Okay, thank you.  Yes, November 17th.

25 Q    Okay.  And you'll agree, will you not, that this

1  proposal doesn't include a transaction fee like the Gordon

2  Brothers proposal, correct?

3  A    Yes, that's true.

4  Q    Okay.  And this proposal does not include a termination

5  fee, correct?

6  A    Not that I see.  The proposal is very cursory and, you

7  know, I don't know what ultimate proposals or definitive

8  documentations may look like or any ongoing negotiations,

9  but, based on what's contained in this letter, that would be

10 correct.

11 Q    Okay.  And there's no make-whole provision requested,

12 correct?

13 A    I don't see that, no.

14 Q    And you'll agree with me, sir, that under this proposal

15 the interest rate is lower than the interest rate proposed by

16 Gordon Brothers, correct?

17 A    Yes, that's correct.

18 Q    And the amount to be loaned by the debtors here is

19 lower than the Gordon Brothers' proposal, but that's because

20 the terms of the loan are tied to a shorter period to sell

21 the property, correct?

22 A    I don't know how the 5.6 million was determined by the

23 debtors, so I can't speak to that.

24 Q    Okay, but you see in the body of the email, right, it

25 talks about a sale process of six months, correct?

1  A     Yes.

2  Q     Okay.  And you'll also agree with me, sir, that the

3  loan -- and if you have to read the exhibit, feel free to go

4  ahead and do so -- the loan contemplates payments to the

5  pension liability during the time period that the property is

6  marketed, correct?

7  A     It does.  I was a little confused by the wording as it

8  provided the "not to exceed 250k," which isn't sufficient to

9  cover the withdrawal liability, but if I'm interpreting it

10  right, it does reference it, it's just inadequate to meet the

11  requirements under the settlement agreement with the pension.

12  Q     Okay.  Well, if you look closely, sir, you'll see that

13  the $250,000 references defense costs related to litigation

14  brought against the Broad Street entities.

15  A     And it says, "and for funding, when due, quarterly

16  withdrawal settlement payments."

17  Q     Okay, fair enough.  And can we agree that if a global

18  resolution were reached which did not require the payment of

19  pensions, the proposed debtor loan proceed would last even

20  longer, correct?

21  A     Can you repeat that question, please?

22  Q     Sure.  If there was a global resolution, for example,

23  at the mediation, that didn't require the pension payments to

24  be made, the proceeds of this loan would last even longer,

25  correct?

1    A      Well, if there was a mediation settlement that didn't

2    require the pension payments to be made, I doubt if we would

3    have entered into it because the pension payments are

4    obligations of the control group.

5    Q      Now, you believe that the six-month term offered by the

6    debtors is irresponsible because, in your view, the debtors

7    could foreclose on the property at the end of that six-month

8    period, correct?

9    A      Well, I think there's a variety of reasons why it would

10   be irresponsible, that would be among them.

11   Q      Okay.  Now, but this proposal doesn't say it's a take-

12   it-or-leave-it offer, does it?

13   A      What do you mean by take it or leave it?

14   Q      In other words, there's no indication in this proposal

15   that the debtors weren't prepared to negotiate, can we agree

16   on that?

17   A      I can't speak for the debtors' perspective on that.

18   Q      I'm asking you whether -- what the document provides.

19   Does it in any way indicate that it's a take-it-or-leave-it

20   offer?

21   A      It doesn't indicate one way or the other.

22   Q      Okay.  And you never responded to this proposal,

23   correct?

24   A      That would relate to conversations with counsel that I

25   believe are privileged.

1  Q    Well, you personally never talked to anybody at the

2  debtor about this, right?

3  A    Personally, I did not.

4  Q    Okay.  And you never expressed any concerns to the

5  debtor until your declaration was filed on the 29th, correct?

6  A    I don't know what conversations counsel, my counsel may

7  have had with counsel of the debtors, so I can't speak to

8  that specifically, but I personally did not.

9  Q    Okay.  And you never engaged with anyone at the debtors

10  to see if the debtors could satisfy any concerns you had

11  regarding their proposal, is that fair?

12  A    Again, that would have been conversations among

13  counsel, so I can't speak to it.

14        MR. MINUTI:  Your Honor, I have no further

15  questions of Mr. Freedman.  I would move into evidence

16  Exhibit Number 7, which is the email we were just looking at.

17        MR. MALIONEK:  Your Honor, we made our objection,

18  but we recognize the Court's ruling with respect to that.

19        THE COURT:  All right, it will be admitted then.

20      (Debtors' Exhibit 7 received in evidence)

21        THE COURT:  Mr. Kernen, did you have any

22  additional questions?

23        MR. KERNEN:  Yes, very brief, Your Honor.

24        If we could put Exhibit 2 back up on the screen?

25      (Pause)

1                        CROSS-EXAMINATION

2   BY MR. KERNEN:

3   Q      Now, Mr. Freedman, you see there's a reference to El

4   Segundo, California on this exhibit, dated October 28, 2021.

5   Whose offices, if any, were located in El Segundo, California

6   at that time?

7   A      Paladin leased space and that space was also used from

8   time to time for activities relating to MBNF.

9   Q      And was the lease still active at that time?

10  A      As of October 28th, 2021, it was not.

11  Q      When did it cease becoming an active lease?

12  A      I don't recall when the lease expired, I believe it was

13  sometime over the past six months, give or take.

14  Q      Okay.

15          MR. KERNEN:  That's all I have.

16          THE COURT:  Anybody else?  No?

17          Any redirect, Mr. Malionek?

18          MR. MALIONEK:  No redirect, Your Honor.

19          THE COURT:  All right.  Thank you, Mr. Freedman,

20  you may be excused.

21          THE WITNESS:  Thank you, Your Honor.  I appreciate

22  it.

23      (Witness excused)

24          THE COURT:  Any further evidence that the Movants

25  wish to present?

1          MR. MALIONEK:  No, Your Honor.  We understand that

2     the debtors and the committee have evidence that they wish to

3     present, at least that's our understanding, in which case

4     we'll reserve and ask questions at that point, but we do not

5     have any more affirmative evidence.

6          THE COURT:  All right.  Mr. Minuti?

7          MR. MINUTI:  Thank you, Your Honor, Mark Minuti on

8     behalf of the debtors.

9          Your Honor, we did file last night under seal a

10    declaration of Allen Wilen, we would ask that that

11    declaration be admitted into evidence and serve as a proffer

12    of Mr. Wilen's testimony today.  Mr. Wilen is in the virtual

13    courtroom, he is available for cross-examination, and to

14    answer any of the questions the Court may have.

15         MS. QUARTAROLO:  And, Your Honor, this is Amy

16    Quartarolo on behalf of the Movants.  We don't have any issue

17    with his declaration or portions of his declaration coming

18    into evidence as his proffered testimony.  We would -- I want

19    to discuss some objections we have to specific language

20    that's included in the declaration, and also we would want

21    the ability to cross-examine Mr. Wilen.

22         THE COURT:  Well, any questions about the language

23    in the declaration you can raise on cross, can't you?

24         MS. QUARTAROLO:  Oh, I'm sorry, I should -- they

25    are evidentiary objections.  So, while we may probe into

1  certain of the -- certain of the statements, to the extent

2  they're admitted, I would like at the outset, just as they

3  did for the declaration of Mr. Brinkman, to address those

4  evidentiary objections at the outset.

5          THE COURT:  All right, go ahead.

6          MS. QUARTAROLO:  Thank you.

7          THE COURT:  Let's pull up his declaration -- or I

8  can pull it up on my screen.

9          MR. MINUTI:  Thank you, Your Honor.

10         MS. QUARTAROLO:  Sure.  And actually, Your Honor,

11 just because that declaration was filed under seal, I would

12 prefer not to bring it up on the screen, if that's -- if

13 you're able to access it.  I believe it's Docket Number 3212.

14         THE COURT:  I have it.  Will the questions you

15 have raise any confidentiality issues?

16         MS. QUARTAROLO:  I hope not.

17         THE COURT:  All right.  I have it in front of me

18 then.

19         MS. QUARTAROLO:  Thank you.  So, first, for

20 paragraph 5, this is not a confidential paragraph, but it

21 reads generally that he's read the objection and the facts

22 set forth therein are true and correct, we would object to

23 that as lacking foundation.  It's unclear what facts he's

24 purporting to verify are true and accurate.

25         MR. MINUTI:  Your Honor, the statement is he read

1 the objection, the objection includes asserted facts, and

2 he's testifying that, to his knowledge, the facts therein are

3 true and correct.  I don't know what other foundation is

4 needed.  He's the CRO of the debtor.

5         THE COURT:  Yeah, I'm going to overrule that

6 objection.

7         MS. QUARTAROLO:  Thank you, Your Honor.

8         And as to paragraphs 7, 8, and 10, those refer to

9 and discuss the adversary complaint that has been sealed and

10 the claims that are asserted therein, we would object to that

11 on the basis of relevance.

12         MR. MINUTI:  Your Honor, when we get to argument

13 with respect to whether the automatic stay applies in this

14 case, the allegations of the complaint are directly relevant

15 to the debtors' assertion that they have an equitable

16 interest in these properties; that is the relevance.

17         MS. QUARTAROLO:  Again, I think we've addressed

18 this in the briefing, but there's -- we don't believe that

19 the adversary complaint has any relevance to the relief

20 that's being sought in the motion.

21         THE COURT:  Well, isn't the best evidence of

22 what's in the adversary complaint the adversary complaint

23 itself, not what he might -- how he might interpret that?

24         MS. QUARTAROLO:  We would agree with that, Your

25 Honor.

1        MR. MINUTI:  Your Honor, if I could just respond?

2   If Your Honor looks at the paragraphs that have been

3   highlighted here, all he is testifying to is that he's

4   familiar with it, that it is -- that obviously the complaint

5   there was sealed, and he goes on to say he's familiar with

6   the property.  So I don't --

7        THE COURT:  Well, I'm going to -- I think

8   paragraph 10 is the objectionable one, isn't it?

9        MS. QUARTAROLO:  Correct.

10        MR. MINUTI:  Well, if I -- Your Honor, as long as

11   we're going to be able to refer to the adversary proceeding,

12   that's fine, Your Honor.

13        THE COURT:  All right, I will strike paragraph 10.

14        MS. QUARTAROLO:  Thank you, Your Honor.

15        And, lastly, focusing on paragraph 12, our view is

16   that this paragraph is objectionable in its entirety as it

17   includes improper lay opinion in violation of Federal Rule of

18   Evidence 701.

19        MR. MINUTI:  I don't think that's correct, Your

20   Honor.  He's commenting on the Gordon Brothers' term sheet,

21   just like Mr. Freedman commented on the debtors' proposal.

22        THE COURT:  Yeah, I'll overrule.

23        (Declaration of Allen Wilen received in evidence)

24        MR. MINUTI:  Thank you.

25        THE COURT:  He can give his objection on behalf of

1  the debtor, if you will, on the terms of the Gordon Brothers'

2  term sheet.

3        MS. QUARTAROLO:  Thank you, Your Honor.

4        THE COURT:  Any others?

5        MS. QUARTAROLO:  No, I'm ready to proceed with

6  questioning, if it's okay with the Court.

7        THE COURT:  All right, you may proceed.

8        MS. QUARTAROLO:  Thank you.

9                    CROSS-EXAMINATION

10 BY MS. QUARTAROLO:

11 Q    Mr. Wilen, you became chief restructuring officer of

12 the debtors in April of 2019, is that correct?

13 A    Yes, it is.

14        THE WITNESS:  Just as a point of procedure, do you

15 want to swear me in?

16        THE COURT:  Oh, yeah.  I'm sorry.

17        MS. QUARTAROLO:  Let's do that, yes.

18         ALLEN WILEN, DEBTORS' WITNESS, AFFIRMED

19        THE ECRO:  Please state your full name and spell

20 your last name for the record.

21        THE WITNESS:  Allen Wilen, W-i-l-e-n.

22        THE COURT:  All right.  Again, Mr. Wilen, are the

23 statements you made in your declaration true and correct to

24 the best of your knowledge and would they be what you would

25 have testified to had you been called on direct?

1      THE WITNESS:  Yes, Your Honor.

2      THE COURT:  Any corrections?

3      THE WITNESS:  No.

4      THE COURT:  All right.  You may proceed with

5 cross.

6      MS. QUARTAROLO:  Thank you, Your Honor.

7 BY MS. QUARTAROLO:

8 Q    So, Mr. Wilen, you testified before you were sworn in,

9 but I want to make sure we capture it with you being sworn

10 under oath, that you became the chief restructuring officer

11 of the debtors in April of 2019, correct?

12 A    That is correct.

13 Q    And in that role you familiarized yourself even prior

14 to the commencement of these cases in July of 2019 with the

15 debtors' operations, right?

16 A    Yes.

17 Q    And also you familiarized yourself with the debtors'

18 business and financial affairs, and books and records, is

19 that correct?

20 A    Yes.

21 Q    And you recognize, don't you, that the underlying real

22 estate assets that are at issue here in connection with

23 today's hearing, which is the real property on which the

24 Hahnemann University Hospital is located, is held by non-

25 debtor entities, correct?

1  A     Correct.

2  Q     And those are the Movants that -- or include the

3  Movants in connection with today's hearing, correct?

4  A     Yes.

5  Q     And that's consistent with representations that the

6  debtors have made throughout these cases, isn't that true?

7  A     Yes.

8  Q     And the org chart -- were you present during the

9  earlier testimony?

10  A     Yes, I was.

11  Q     And the org chart that was put up, which I believe was

12  the Debtors' Exhibit 9, that org chart reflects that the real

13  estate is held by non-debtor entities, correct?

14  A     Yes.

15  Q     And statements in your first day declaration also

16  confirm that the properties are held by non-debtor entities,

17  correct?

18  A     Yes.

19           MR. MINUTI:  Your Honor, if I could interrupt, I'd

20  like to -- if we're going to ask questions about specific

21  statements in the declaration, I think it's fair to have it

22  in front of the witness.

23           MS. QUARTAROLO:  Sure.  Happy to do so.

24           Ms. Reiser, can you, for me, pull up Movants'

25  Exhibit 5.

1        (Pause)

2   BY MS. QUARTAROLO:

3   Q    Mr. Wilen, to you recognize this as the first day

4   declaration that you submitted in this matter?

5   A    Yes, it is.

6            MS. QUARTAROLO:  And Ms. Reiser, if I could have

7   you assist with scrolling to paragraph 10 of the declaration.

8            THE COURT:  And can you blow it up a little bit.

9   Thank you.  Thank you for all of us.

10  BY MS. QUARTAROLO:

11  Q    And, Mr. Wilen, in this paragraphs of the declaration,

12  you confirmed that CCH leases the real property on which HUH

13  is located, from the Broad Street Healthcare Properties, LLC,

14  a nondebtor affiliate.

15       Do you see that?

16  A    Yes.

17  Q    And that's an accurate statement?

18  A    It was at the time, yes.

19  Q    Do you have a reason to believe it's not accurate

20  today?

21  A    We no longer lease the property.

22  Q    Okay.  But you don't have a reason to believe that the

23  property is owned by the Broad Street Healthcare Properties,

24  LLC, correct?

25  A    That's correct.

1   Q     That is still a true statement today?

2   A     Yes.

3          MS. QUARTAROLO:  Ms. Reiser, if you could scroll

4   to page 13 and blow up note 6.

5   BY MS. QUARTAROLO:

6   Q     And, Mr. Wilen, can you read this aloud.

7   A     "As previously noted, one of these entities, Broad

8   Street Healthcare Properties, LLC, owned the real estate

9   where HUH is located."

10  Q     And that's an accurate statement, Mr. Wilen?

11  A     Yes.

12  Q     Thank you.

13         MS. QUARTAROLO:  Ms. Reiser, you can take that

14  document down.

15         If, Ms. Reiser, you could call up Movants'

16  Exhibit 6.

17  BY MS. QUARTAROLO:

18  Q     Mr. Wilen, do you recognize this document as schedules

19  for -- and it may be difficult to discern which debtor -- but

20  these are schedules that are filed in this bankruptcy on

21  behalf of debtor Center City Healthcare, LLC.

22         Do you recognize this document?

23  A     It's the first page of the document, yes.

24  Q     Okay.

25         MS. QUARTAROLO:  And if, Ms. Reiser, you could

1  scroll to page 16.

2  BY MS. QUARTAROLO:

3  Q    And while she's doing that, Mr. Wilen, as the debtors'

4  CRO, you are involved in the debtors' schedules that were

5  filed in this case, correct?

6  A    Correct.

7        MS. QUARTAROLO:  And if you could actually blow

8  up, Ms. Reiser, question 54, under part 9.

9  BY MS. QUARTAROLO:

10  Q    And in submitting these schedules, the debtor

11  confirmed --

12        MS. QUARTAROLO:  Actually, we didn't capture the

13  below section.  Ms. Reiser, if you can grab -- there we go.

14  Thank you.

15  BY MS. QUARTAROLO:

16  Q    You confirmed that the debtor leases property, but

17  there is no property listed as the property the debtor owns,

18  correct?

19  A    Correct.

20        MS. QUARTAROLO:  You can take that down.

21        And Ms. Reiser, if you can pull up Movants'

22  Exhibit 7.

23  BY MS. QUARTAROLO:

24  Q    And Mr. Wilen, do you recognize this as the front page

25  for the schedules for another of the debtors' entities,

1  debtor St. Christopher's Healthcare, LLC.

2       And if we need to scroll to the next page, you got it.

3  A    Yeah, can you scroll to the next page, please.

4  Q    Yep.

5  A    It's one of the entities.  It doesn't say which entity

6  here.

7  Q    On this page.

8       I will represent to you that this the schedules that

9  were filed in this case.  It's on behalf of the debtor St.

10 Christopher, LLC.

11      But you do recognize this as among the schedules filed

12 on behalf of the debtor entities, don't you, Mr. Wilen?

13 A    Yes, I do.

14           MS. QUARTAROLO:  And, Ms. Reiser, I'll ask you the

15 same thing, to scroll to page 16 and page 17 and to highlight

16 or blow up the same questions as we did before.

17 BY MS. QUARTAROLO:

18 Q    And here, Mr. Wilen, you now see that this is debtor --

19 this is listed as St. Christopher healthcare, LLC.

20      Do you see that at the bottom?

21 A    Yes.

22 Q    Thank you.  And this also lists -- and I think we need

23 to actually scroll down to capture the remaining response --

24 but you would agree that in these schedules, the debtors

25 confirmed that while there is leased real property, or was at

1  the time, that there is no property owned by the debtor,

2  correct?

3  A    Yes.

4  Q    Thank you.

5         MS. QUARTAROLO:  You can take that down,

6  Ms. Reiser.  Thank you.

7  BY MS. QUARTAROLO:

8  Q    Mr. Wilen, did you assist with the preparation of the

9  debtors' proposed plan and disclosure statement that were

10 filed earlier in these cases?

11 A    Yes, I did.

12 Q    And you're familiar with the statements contained in

13 those documents?

14 A    Yes, it's been quite a while, but yes.

15 Q    And you reviewed them before they were filed?

16 A    Yes.

17 Q    And attempted to ensure they were accurate and

18 complete?

19 A    Yes.

20        MS. QUARTAROLO:  Gail, can you please pull up

21 Movants' Exhibit 11.

22 BY MS. QUARTAROLO:

23 Q    Mr. Wilen, do you recognize this as the disclosure

24 statement that was filed by the debtors?

25 A    Yes.

1          MS. QUARTAROLO:  And Ms. Reiser, can you scroll,

2   please, to page 13 of the PDF, which is labeled page 10 of

3   the disclosure statement and can you highlight the first

4   paragraph under Section C.

5   BY MS. QUARTAROLO:

6   Q    Mr. Wilen, can you please read aloud, the second

7   sentence of this paragraph.

8   A    Several of the purchasers were operating entities;

9   generally, the debtors, herein, and other entities,

10  nondebtors, generally owning the real estate which the

11  hospital businesses were, as of the date of the acquisition,

12  nonoperating entities.

13  Q    And that was an accurate statement, as of the time of

14  the filing?

15  A    Yes.

16          MS. QUARTAROLO:  Ms. Reiser, can you please scroll

17  down to page 79 of the PDF.

18  BY MS. QUARTAROLO:

19  Q    And while she's doing that, Mr. Wilen, just to orient

20  ourselves, you understand that the debtors' proposed plan was

21  actually an attachment to the disclosure statement, correct?

22  A    Yes.

23  Q    So, what we're going to look at now is actually the

24  plan of liquidation that was attached to that disclosure

25  statement.

1      Do you see that on the cover page on the screen?

2  A      Yes, I do.

3          MS. QUARTAROLO:  And Ms. Reiser, can you please

4  now scroll to page 92 of the PDF, which is page 9 of the plan

5  and highlight Section 1.83, titled, "Nondebtor Real Estate."

6  BY MS. QUARTAROLO:

7  Q      And Mr. Wilen, I won't make you read into the record,

8  the entirety of this paragraph, but you would agree that this

9  section describes real estate owned by, among other entities,

10  the Movants, here, as nondebtor real estate, correct?

11  A      Yes.

12  Q      Thank you.

13          MS. QUARTAROLO:  You can take that down,

14  Ms. Reiser.

15  BY MS. QUARTAROLO:

16  Q      Mr. Wilen, I'd like to turn for a moment and ask you a

17  few questions about the -- and actually, I apologize.

18          MS. QUARTAROLO:  Ms. Reiser, can we stop sharing

19  the screen for just a moment.  Thanks.

20  BY MS. QUARTAROLO:

21  Q      So, Mr. Wilen, I'd like to ask you just a few questions

22  about the November 17th proposal that is referred to in your

23  declaration.  Do you know what I'm referring to?

24  A      Yes, I do.

25  Q      And you recall that the Movants filed their comfort

1  motion, their motion that's at issue today on October 29th,

2  correct?

3  A     That's correct.

4  Q     And you were aware that the Movants were seeking

5  financing, even before that motion was filed, right?

6  A     Yes.

7  Q     And the debtors never made any proposal until sending

8  that November 17th email, correct?

9  A     I'd had a general discussion with Mr. Freedman at a

10  meeting we had out in Los Angeles about that issue, but

11  (audio interference) not made a formal proposal.

12  Q     And that was first made on November 17th, correct?

13  A     The formal proposal, yes.

14  Q     And whose idea was it to make that proposal?

15  A     Mine.

16  Q     Why did the debtors make that proposal?

17  A     Because the financing in place that was being put in

18  place was going to erode away the value of the assets that

19  would be available if we were successful in our litigation

20  that's in the complaint that's sealed.

21  Q     And you understand that any loan that would be made by

22  the debtors would have to be subject to Court approval,

23  right?

24  A     Correct.

25  Q     And the debtors haven't either sought or obtained that

1  approval from the Court, as we sit here today, right?

2  A      No.

3  Q      And I know you weren't copied on the November 17th

4  email.

5           MS. QUARTAROLO:  Which we can actually bring up on

6  the screen, if you have it, Gail.  I believe it's Debtors'

7  Exhibit 7.

8  BY MS. QUARTAROLO:

9  Q      Do you see that on the screen now, Mr. Wilen?

10  A      Yes.

11  Q      So, I know you weren't copied on this email, but you --

12  did you review it before it was sent?

13  A      I had discussions with counsel about it, yes.

14  Q      And you reviewed the substance of the proposal?

15  A      Yes.

16  Q      And I want to talk -- I have a few questions, actually,

17  about the substance of the proposal.  And if, at any point,

18  you want portions of this blown up, we can do so.

19           This proposal contemplates that the debtors would

20  receive a first lien position, with respect to all real

21  property owned by the entities, as well as a first priority

22  lien on all other assets owned by the PropCos; is that

23  correct?

24  A      Yes.

25  Q      But you're aware there is already a first lien mortgage

1  on the property, right?

2  A     Yes.

3  Q     And this proposal doesn't provide for satisfaction or

4  removal of that existing first lien mortgage, right?

5  A     Correct.

6  Q     And you're aware that there's also an existing second

7  lien mortgage on the property, right?

8  A     Yes.

9  Q     And the debtors' proposal contemplates that the debtors

10 would receive a lien in favor that would have priority over

11 the existing first and second lien mortgages on the property,

12 right?

13 A     Yes, the Freedman lien and the professionals' lien,

14 yes.

15 Q     And next, the proposal offers a loan of 5.6 million,

16 correct?

17 A     Correct.

18 Q     And that's, as opposed to the Gordon Brothers'

19 facility, which is at 17 and a half million, correct?

20 A     Correct.

21 Q     Who selected the 5.6-million-dollar amount?

22 A     We put that number together based on a number of

23 factors, but the biggest issue here is we calculated out what

24 we thought six months' worth of operating expenses and, you

25 know, two or three payments to the pension fund and the

1    $250,000 for operating expenses would equate to with a little

2    bit of wiggle room for us in that process.

3    Q    And was that -- was there any budget that was provided

4    to the Movants in connection with this proposal?

5    A    No.

6    Q    And this proposal contemplates no allowance for payment

7    to professionals for prior amounts owed by the Movants,

8    correct?

9    A    Correct.

10   Q    And this proposal is for -- it has a six-month maturity

11   date, right?

12   A    Yes.

13   Q    And that's as opposed to the 15-month maturity date on

14   the Gordon Brothers loan, right?

15   A    Correct.

16   Q    And during those six months, it's contemplated that the

17   Movants would conduct a sales process for the real property?

18   A    Correct, in an accelerated process.  The market -- the

19   property that has been market for a long as time.  This is

20   the Philadelphia piece of property that, you know, the known

21   parties are out there who might be interested in this

22   property and, you know, quite frankly, you know, an empty

23   building doesn't get better with time.

24        You know, the only thing that goes on with an empty

25   building is the value goes down as the time slips by, as well

1  as the costs of operating start to eat and erode it away,

2  especially, you know, when you've got, you know, 10-plus

3  percent money, you know, equity-type returns, you know, for a

4  loan on the real estate.

5  Q    So, respectfully, Mr. Wilen, you're not a real estate

6  broker, right?

7  A    I'm not a real estate broker, but I actually am heavily

8  involved with the real estate group within my firm, so I do

9  advise real estate clients in our firm on a regular basis.

10 Q    And you've never been qualified by a Court as an expert

11 in real estate sales?

12 A    No, I have not.

13 Q    And if after six months, if the financing contemplated

14 under this email was not paid off, the debtors would have the

15 ability to foreclose on the real estate, correct?

16 A    Correct.

17 Q    And Mr. Wilen, in your declaration that you submitted,

18 you stated that you believe the Gordon Brothers loans puts

19 the Broad Street PropCos properties at substantial risk of a

20 forced sale to satisfy the proposed term loans, do you

21 recall -- excuse me -- do you recall that?

22 A    Yes.

23 Q    And that was in connection with the sale process that

24 was up to 15 months, correct?

25 A    Correct.

1  Q    And you believe that running a 15-month sale process

2  could put the property at a substantial risk of a forced

3  sale; is that your testimony?

4  A    Yes, it is.

5  Q    But under the debtors' proposal, you're proposing a

6  marketing process of no less than six months, correct?

7  A    Correct.

8  Q    But, Mr. Wilen, you're not an officer of any of the

9  Movants, are you?

10  A    No, I am not.

11  Q    And you hold know role in any capacity, with respect to

12  any of the Movants, correct?

13  A    Correct.

14  Q    And you don't have any role, pursuant to which you

15  would exercise business judgment on behalf of the Movants,

16  right?

17  A    Correct.

18  Q    And that also means that you don't play any role on

19  behalf of the Movants, in terms of selecting the best

20  financing options that they believe are available to them,

21  right?

22  A    Correct.

23        MS. QUARTAROLO:  Thank you.  I don't have any

24  further questions at this time.

25        THE COURT:  Thank you.

1            Any redirect?

2        (No verbal response)

3            THE COURT:  Mr. Minuti, you're muted.

4            MR. MINUTI:  Sorry.  Can you hear me now, Your

5    Honor?

6            THE COURT:  I can, yes.

7            MR. MINUTI:  My lawn care people decided to come

8    right behind me, right in the middle of the hearing.

9            THE COURT:  I wondered what that was.

10            MR. MINUTI:  So, perfect timing.  I apologize for

11    that.

12            Your Honor, if I could ask opposing counsel to put

13    back up on the screen the first day declaration in the case.

14            MS. QUARTAROLO:  Ms. Reiser, I'll ask you to do

15    that.  I believe it is Movants' Exhibit 5.

16            MR. MINUTI:  Thank you, Your Honor.

17                       REDIRECT EXAMINATION

18    BY MR. MINUTI:

19    Q    All right.  Mr. Wilen, can you see that?

20    A    Yes, I can.

21    Q    Okay.  And when was this declaration signed, do you

22    know, or do you recall?

23    A    At the time of the filing, July 1st, June 30th, that

24    time period.

25    Q    Okay.  2019; is that correct?

1  A    Correct.

2  Q    And how many days had you been on the job at that

3  point?

4  A    Sixty, maybe.

5  Q    And in terms of the information that's contained in the

6  declaration, where did you obtain that information?

7  A    Primarily from the people at the debtor, including,

8  primarily, Ms. Attestatova and Mr. Freedman and Mr. Schmidt.

9  Q    Thank you.

10        MR. MINUTI:  If we could put on the screen, let's

11  put on the screen, the disclosure statement, please.

12        MS. REISER:  This is Ms. Reiser.

13        I'm not sure which exhibit the disclosure

14  statement is.

15        MR. MINUTI:  Maybe Ms. Quartarolo can help me.

16        THE COURT:  I think it's Exhibit 11.

17        MS. QUARTAROLO:  Yes, thank you, Your Honor.

18        MR. MINUTI:  Okay.  And let's see, can you blow

19  that up, please.

20        All right.  Then, I believe -- if we could -- I

21  believe the plan is attached to that document.  Can we go

22  forward to the plan.  It should be attached as an exhibit to

23  this document.

24        MS. QUARTAROLO:  Mr. Minuti, I apologize for

25  interrupting.  Just to help Ms. Reiser out, as she assists,

1  the plan begins at page 79 of the PDF.

2             MR. MINUTI:  Thank you.  There we go.

3  BY MR. MINUTI:

4  Q    And, Mr. Wilen, you're familiar with this document?

5  A    Yes, I am.

6             MR. MINUTI:  Okay.  And if we could -- and I'm not

7  going to know the page here -- but there's an Exhibit B to

8  the plan titled, "Preserved Causes of Action."  Can we jump

9  to that.

10            MS. QUARTAROLO:  Mr. Minuti, I don't think

11 Ms. Reiser is going to know where to locate additional

12 documents within.

13            MR. MINUTI:  Very well.  Maybe it's easier, then,

14 if we pull up my version.

15            Let me ask Mr. Collins to pull up -- give me one

16 moment.

17            THE WITNESS:  It's on the screen right now.

18            MR. MINUTI:  There you go -- okay.  There you go.

19            Okay.  If we would blow that up.

20 BY MR. MINUTI:

21 Q    So, you'll recall that Ms. Quartarolo, Mr. Wilen, asked

22 you a bunch of questions about statements in the disclosure

23 statement regarding the properties, correct?

24 A    That's correct.

25 Q    Okay.  And Exhibit B to the plan lists the preserved

1  causes of action; do you see that?

2  A     Yes, I do.

3  Q     Okay.  And what is your understanding of what's listed

4  here on Exhibit B?

5  A     These are all the causes of action we have against

6  parties that we are preserving as part of the bankruptcy

7  estate.

8  Q     Okay.  And if you look at Number 1 there, can you read

9  that.

10  A     "Any and all causes of action, or other rights to

11  recovery or avoidance, including, without limitation, the

12  nondebtor real estate litigation against any of the MBNF

13  nondebtor parties."

14  Q     Okay.

15          MR. MINUTI:  And if we could turn back earlier at

16  the beginning of the plan so we can look at the definitions.

17  And let's scroll ahead to the definition of "nondebtor real

18  estate litigation."

19          UNIDENTIFIED:  Sir, repeat which definition you'd

20  like.

21          MR. MINUTI:  Yes:  Nondebtor real estate

22  litigation.

23          Forgive me.  This could be in the disclosure

24  statement.  If we could go back to the beginning of the

25  disclosure statement.  There we go.

1  BY MR. MINUTI:

2  Q      Do you see that, Mr. Wilen?

3  A      Yes, I do.

4  Q      And, obviously, the Court can read it, but what is your

5  understanding of the nondebtor real estate litigation that's

6  been referred to in the plan?

7  A      That is the litigation, primarily, against -- that's

8  sealed -- against Mr. Freedman and all the nondebtors.

9  Q      Okay.  So, is it your testimony that the disclosure

10 statement and plan detail the litigation that's preserved

11 against the MBNF nondebtor parties?

12            MS. QUARTAROLO:  Objection; leading.

13            THE COURT:  Overruled.  I'll allow it.

14            THE WITNESS:  Yes, it does.

15            MR. MINUTI:  Thank you.

16 BY MR. MINUTI:

17 Q      Now, Mr. Wilen, Ms. Quartarolo asked you some questions

18 about the ability of the debtor, if the MBNF were to go along

19 with and move forward with the proposal that the debtors made

20 for financing, Ms. Quartarolo asked you some questions about

21 whether the debtors couldn't foreclose at the end of that

22 six-month period.

23      Do you remember that testimony?

24 A      Yes.

25 Q      Okay.  And what do the debtors intend to do, following

1  that six-month period?

2  A    The intention is to maximize the value of the real

3  estate and if it means negotiating additional extension to

4  get this deal done and get our real estate sold, we could do

5  that.  The idea is to actually get the properties sold to

6  maximize value.

7  Q    Okay.  And so, if you reach the end of the six-month

8  period and let's say the property hasn't sold, what are you

9  going to do?

10  A    The goal is to work with everyone to try to get a

11  property sale, you know, going forward, and if it means

12  extend more money, it means extend some more money to get to

13  a sale.

14  Q    Okay.

15          MR. MINUTI:  Your Honor, I have no further

16  questions.

17          THE COURT:  Thank you.

18          Mr. Kernen, I -- sorry, I ignored you -- do you

19  have any questions for Mr. Wilen?

20          MR. KERNEN:  No, Your Honor, no follow-up.

21          THE COURT:  All right.  Any additional cross?

22          MS. QUARTAROLO:  No additional cross, Your Honor.

23  Thank you.

24          THE COURT:  All right.  Thank you, Mr. Wilen.  You

25  may be excused.

1        (Witness excused)

2                THE COURT:  Any other --

3                MR. MINUTI:  And, Your Honor -- yeah, I'm sorry,

4    Your Honor -- again, Mark Minuti for the record.  We have no

5    additional rebuttal evidence, Your Honor.

6                THE COURT:  All right.  Well, any -- so, we're

7    done with evidence.  I'll hear brief argument, then, for the

8    Movants.

9                MS. UHLAND:  Thank you, Your Honor.

10               Suzanne Uhland from Latham & Watkins, for the

11   Movants.  I do want to note that I will be -- I'd like to

12   propose my brief argument and then have a short ability to

13   respond to the objectors.  There is an issue that the Dovel &

14   Luner firm may need to respond to objections raised by Tenet,

15   because my firm is not in a position to do that.  So, I just

16   wanted to note that for the record.

17               THE COURT:  Okay.

18               MS. UHLAND:  Thank you, Your Honor.

19               So -- and I have a lot to say, but I will try to

20   be brief in light of the time -- why are we here seek this

21   comfort order, and it is a comfort order.

22               We're here because our proposed lender is

23   requiring that we get clarity on this point regarding a

24   nonviolation of the automatic stay in the debtors' case so

25   they can avoid spurious litigation in the future.  They

1  understand this has been a very litigious Chapter 11 case and

2  they didn't want to take any risks with respect to additional

3  legal expenses and costs and getting dragged into further

4  litigation.  That's why we're here.

5          Other lenders, the related-party prior lenders and

6  the purchasers of the Front Street properties previously were

7  never before this Court.  Those loans were made because those

8  parties were comfortable and not concerned about the property

9  of the estate issues.  And it wasn't that they weren't

10  concerned about the property of the estate issues; they

11  weren't concerned about spurious litigation being raised

12  about those issues.

13          And so, there has been ordinary course

14  transactions with respect to these properties for the last

15  two years and we have heard nothing from the debtors

16  challenging or arguing that the stay should be impose or the

17  stay should void any of these prior transactions, with

18  respect to these properties.

19          As the Court is aware, the relief we're seeking

20  is -- I'd like to say it's original -- it's actually well-

21  precedented, particularly the alternative relief that we're

22  seeking -- that we're seeking by motion, either a

23  determination that the stay does not apply or, in the

24  alternative, relief from the stay, to the extent applicable.

25          We're not asking to quiet title.  We're not asking

1 that the Court determine who is the party who owns the

2 property; we're simply arguing or asking for a finding that

3 the stay does not apply to this, which is appropriate to be

4 heard by motion.  And that preliminary -- that primary relief

5 that we're seeking, the Court can enter on this record today.

6 　　　　　I would point Your Honor to the decision by your

7 colleague, who's soon to be, I think, sitting on a Singapore

8 bench, Judge Sontchi, in Downey Financial, which was a

9 similar relief.  It was seeking that the automatic stay did

10 not bar application of insurance proceeds on behalf of

11 directors and officers or, alternatively, relief from stay.

12 　　　　　And in that case, the first part of his decision,

13 the judge analyzed the contractual provisions of the

14 insurance policy to determine that the estate did not have an

15 interest in those particular proceeds and that they -- so,

16 therefore, the stay was not applicable.

17 　　　　　In this particular situation, the Court can reach

18 the same determination, that the stay does not apply to these

19 assets and it's far simpler here.  The debtors have

20 repeatedly acknowledged that these assets are owned by the

21 nondebtors.  The schedules and statements, the more recent

22 "after the investigation" disclosure statement and that

23 Mr. Wilen testified that those are all correct.

24 　　　　　We can't, today, take the position that the

25 estate's interests in this property is not an actual, quote,

1  unquote, interested property.  They are a litigant against

2  the debtor.  Being a mere litigant against -- sorry, against

3  the Movants -- and being a mere litigant against the Movants

4  and have a collateral type of claim against the Movant is not

5  something that gives the debtor an interest in property.

6          They have asserted and cited a case -- it's from

7  California -- that such a claim may give rise to a *lis*

8  *pendens*, but a *lis pendens* is just a notification of a

9  lawsuit.  They didn't need to file a *lis pendens* here because

10  their lawsuit is well-known (audio interference) -- I don't

11  know why it echoed all of a sudden -- and we would not

12  dispute that they may be able to get a *lis pendens*, but a *lis*

13  *pendens* is not an interest in property that is entitled to

14  create the force of injunction of the automatic stay.

15          And so, Your Honor, I would take the position that

16  you need not even get to the second alternative relief.  In

17  this case, it is the case that the property is the property

18  of the Movants.  The stay does not apply to these assets.

19          And, Your Honor, I think it may -- when I was

20  reviewing the prior decisions reaching this, it may be

21  preferable to reword the relief that we sought to conform to

22  the relief that was found in Downey Financial, that was

23  simply that the automatic stay does not bar the relief

24  seeking.  That is all we want from the Court, is that the

25  stay doesn't bar the imposition of financing and the other

1   actions that were seeking in the motion.

2            Equally, Your Honor, and actually even more

3   forcefully, we are entitled to the alternative relief of

4   relief from stay and I'd like to remind the Court of the

5   burden here.  Yes, the automatic stay is a very broad and

6   important protection for the debtor, but it doesn't just

7   trample the property rights of every other entity.  And it is

8   the debtors' burden, one once a *prima facie* case is made, to

9   establish that the imposition of the stay is warranted.

10           And Ms. Reiser, if you could pick up Slide 2, it's

11  a cite to the -- just a quote on the legislative history

12  here.  The legislative history in the Howser (phonetic)

13  Court.  It is an injunction and in the injunction setting,

14  typically, the party seeking the injunction has the burden of

15  proof, but here, the proceedings is different in that the

16  party that has to initiate this is the party trying to defeat

17  the injunction.

18           But in order to continue to impose the injunction,

19  it remains on the debtor -- the debtors in this case.  It is

20  not our burden.  It is their burden to show that they must

21  continue to oppose the stay on us.  And further, in the

22  context of that decision, the Court should be focused on the

23  issue of the stay.

24           And, Ms. Reiser, if you could go to the next

25  slide.

1          Often in these relief from stay matters, there may

2   be issues of a secured creditor, where the debtor has issues

3   against the -- avoidance claims against a secured creditor,

4   but that's not the purpose -- deciding that issue is not the

5   purpose of the stay here.

6          The stay hearing, as indicated in the legislative

7   history, is not the appropriate time to bring in other

8   issues, such as power claims against the creditor, on largely

9   unrelated matters.  And, Your Honor, that is exactly what the

10  debtors are trying to do here and the other objectors.

11         In this case -- you can take that down,

12  Ms. Reiser -- we're -- I think we've all agreed that the

13  question is:  Is there cause for relief from stay?

14         And the courts have indicated three factors,

15  starting with the Rexene case and its progeny, to determine

16  whether there's cause in this scenario:  whether there's

17  great prejudice to the debtors, the balance of hardship, and

18  the likelihood of success on the merits.

19         Your Honor, they -- the debtors and other

20  objectors fail all three.  There is no great prejudice to the

21  debtors.  Great prejudice to the debtors has been hailed to

22  be either impairment to a reorganization or an undisputed and

23  certain financial detriment.

24         In this case, the debtors aren't reorganizing, so

25  it can't be a reorganization issue.  And there's no immediate

1  and actual financial impact; in fact, they've only a purely,

2  speculative, contingent, potential impact on the debtors

3  because the debtors have not established anything with

4  respect to their litigation and, therefore, they have no

5  basis to assert that they have any stake in these properties.

6          This is directly relevant to a balancing test.

7  The declaration of Mr. Brinkman sets out -- that's admitted

8  into evidence -- sets out the damage that will befall these

9  buildings, should they be unable to obtain financing.  They

10 have to maintain their utilities.  They have to maintain

11 their security.  These are vacant buildings in the critical,

12 important, central area in Philadelphia.  It's important to

13 the health and safety of the area, the neighbors that the

14 pipes not explode, that there not be fire risks, that they

15 not be vandalized.

16          On the other hand, again, the debtors' interests

17 is purely speculative.  The hardship to them is a "maybe" if

18 they win the litigation and if the financing somehow results

19 in less value to the property than more value to the

20 property, which our client's business judgment disputes --

21 anyway, it's like an if and an if and an if and an if that we

22 don't even think it's possible, then they have harm.  You

23 cannot balance a speculative harm against material, actual

24 harm.

25          The weight is unbalanced that that goes in our

1   client's favor and this point, again, is one made by Judge

2   Sontchi in the <u>Downey Financial</u> case, that you do not -- you

3   cannot equally balance hypothetical hardship against real

4   hardship.

5           And, finally, there's the factor of likelihood of

6   success on the merits.  And I'll admit, Your Honor, that one

7   is a -- it's sort of a square peg in a round hole in this

8   particular matter.  It is applied sort of more naturally in

9   the cases where a party is seeking relief from stay to pursue

10  litigation against the estate and have their claim liquidated

11  in another court.  It's a little more difficult to apply

12  here.

13          The debtors assert that it is the merits of the

14  loan and Mr. Minuti has said in this hearing that cause calls

15  into question the reasonableness of the proposed financing.

16  And, frankly, Your Honor, I don't really understand how

17  likelihood of success of the merits calls into the question

18  of reasonableness of the proposed financing.

19          But let's start with one element here.  First,

20  this factor, likelihood of success on the merits, the courts

21  have said repeatedly in both, <u>Rexene</u> and <u>SCO Group</u>, which is

22  395 B.R. 852, that it's a modest showing.  This isn't the

23  primary element.  It's only a modest showing that even comes

24  into this factor.

25          And, again, the burden here is on the party

1  seeking to impose the stay.  This is the debtors' and other

2  objectors' burden to show that the stay should be continued.

3  And we have a modest showing of a likelihood of success.

4          The reasonableness of the financing is determined

5  by the business judgment of the debtors, saying that somehow

6  there should be no deference to the business judgment of

7  management because, you know, of the -- the standard of

8  business judgment and deference and conflict in a completely

9  different scenario, with respect to fiduciary duties under

10  Delaware law is another complete red herring here, with

11  respect to what is relevant.

12          The truth is that the Movants exercised their

13  business judgment.  They went and obtained a proposal.  It

14  was the best one after a material period of time and the fact

15  that the debtors have offered, through counsel -- never

16  communicating it directly principal to principal -- a

17  proposal that is not approved by the Court, is not even

18  possible to execute on, because it calls for a first lien

19  when there's already a first lien on the property, is

20  completely irrelevant to this matter and whether the

21  existing, actual financing proposal that is proposed by a

22  financial institution is reasonable.

23          Your Honor, I think we need to recognize what's

24  going on here and that is that these parties are trying to

25  block our debtor -- our Movants from getting financing so

1 that they could obtain leverage in other matters.  There's a

2 mediation ongoing.  There's an adversary proceeding that's

3 sealed.  And, yes, if it could be -- you know, if there are

4 no alternatives for our client, because he can't obtain

5 financing or they cannot obtain financing, they may have to

6 compromise other rights in other unrelated matters and that

7 is truly an improper purpose to continue the stay.

8           So, unless Your Honor has any questions, I'll

9 respond and reply after the objectors proceed.

10          THE COURT:  No.  Thank you.

11          Mr. Minuti?

12          MR. MINUTI:  Your Honor, before I start my

13 argument, at the outset, I do need some guidance from the

14 Court, because I do need to talk about some of the claims

15 that are set forth in the adversary proceeding, because that

16 forms the basis for the argument that the debtors have an

17 equitable interest in this property.  So, I would ask for

18 some guidance from the Court as to how I can proceed.

19          THE COURT:  Well, I don't want you to get into the

20 details of the adversary.  I don't think it's necessary.

21          MR. MINUTI:  I'm not -- Your Honor, I'm not

22 planning on getting into the details of the adversary, but I

23 do need to speak about a particular claim that's brought in

24 the adversary, the fact that it is pled in that adversary.

25          THE COURT:  Well, let me ask, because I know that

1  you have asserted that you have an equitable interest in the

2  property because of the allegations in the adversary,

3  correct, that's your argument?

4          MR. MINUTI:  (Indiscernible.)

5          THE COURT:  But maybe you can answer a question I

6  have:  How does an allegation, itself, alone, establish an

7  equitable interest?

8          Don't you actually have to win that?

9          MR. MINUTI:  Well, I don't think so, Your Honor,

10  and here's where the problem is.  In order for me to convince

11  Your Honor why, I need to talk about a couple of cases that

12  have asserted similar types of claims.  And so, in order for

13  me to discuss those cases and the claims they deal with --

14          THE COURT:  I think you can say them, generally,

15  can't you?

16          MR. MINUTI:  Well -- and, look, I'm not trying to

17  be difficult to the Movants, Your Honor.  I'm not trying to

18  be difficult to the Court.  I don't think that I can.  I

19  don't think that I can, because the cases that I'm talking

20  about, particularly one of them, Your Honor, specifically

21  addresses a certain type of claim and why that is an interest

22  in property.

23          THE COURT:  Well, is it a claim or is it after a

24  ruling on that claim?

25          Just the mere allegation of a claim --

1           MR. MINUTI:  And -- I'm sorry, Your Honor.

2           THE COURT:  Let's just do it generically.  If you

3  alleged that you owned the real estate, point-blank, does

4  that mere allegation mean that you have an interest

5  cognizable by 541 or 362?

6           MR. MINUTI:  I think it entirely depends upon the

7  claim that you're asserting.  Let me try to do it

8  generically, and I'll get to it, Your Honor.

9           THE COURT:  Yeah.

10          MR. MINUTI:  But first, Your Honor, at the outset,

11 before I really get into my argument, Ms. Uhland started out

12 her presentation by talking about Gordon Brothers' motivation

13 or other people's motivation.  There's no evidence in the

14 record, Your Honor.  This idea that they want to do it

15 because they don't want to get involved in spurious

16 litigation, there's no evidence in the record.  The Gordon

17 Brothers are big players, Your Honor.  You could just as

18 easily reach the conclusion that the reason we're here today,

19 Your Honor, is because they agree that the automatic stay

20 must be lifted.

21          But my point is, Your Honor, you should disregard

22 those statements.  There was no evidence to support that.

23          Now, Your Honor, relevant, obviously, to today's

24 argument are the claims that are made in the complaint.  I'm

25 not going to get into those right now, as we talked about.

1          But what's important, Your Honor, is that nowhere

2   in the motion do they mention those claims.  Also missing

3   from the motion is any mention that the day before the motion

4   was filed, they filed these secret Paladin liens; those are

5   the two notes that we've been talking about at this hearing.

6   They don't talk about the fact that 5.5 million in secured

7   liens were placed on the Broad Street PropCo's real estate in

8   favor of Paladin, the MBNF nondebtor parties' professionals

9   without a comfort order or without relief from the automatic

10  stay.

11         There's no question, Your Honor, that the value of

12  the Broad Street properties real estate is critical to

13  settling the parties' disputes and if they're not going to be

14  settled, Your Honor, they have a source of recovery in order

15  for the debtor to recover on its claims.

16         Now, by the comfort -- and, Your Honor, I'm going

17  to try to move quickly here, but there's a lot, so I'm going

18  to ask for the Court's indulgence -- by the motion, Your

19  Honor, they're seeking a comfort order and the lift stay

20  order, Your Honor, or I guess they're pleading those in the

21  alternative.

22         In our view, that's extraordinary and broad

23  relief.  They want a comfort order that the automatic stay

24  does not apply in these particular cases.

25         In the alternative, they're moving for relief from

1  the automatic stay, and just to be clear, Your Honor, they

2  want the relief from the automatic stay not only to proceed

3  with the loan to Gordon Brothers, but the proposed order goes

4  much further than that.  They want an order lifting automatic

5  stay so they can, quote, sale, transfer, or otherwise

6  encumber the property.  So, we're not just talking about the

7  Gordon Brothers loan in these cases.  I don't want the Court

8  to lose sight of that.

9         But let me take their -- the relief they're

10  seeking one at a time.  First, the Movants are requesting a

11  comfort order.  On that basis, alone, Your Honor, we believe

12  the complaint should be summarily defined -- denied.  While

13  (indiscernible) as a comfort order, that's really not what's

14  requested here.  They want Your Honor to make a determination

15  as to whether the debtor has an interest in these properties

16  or not.

17         The Bankruptcy Rules are crystal clear on that

18  position, Your Honor.  An action to quiet title or to

19  determine an interest in property requires, under Bankruptcy

20  Rule 7002, an adversary proceeding.  We don't have an

21  adversary proceeding here.  On that basis, alone, Your Honor,

22  the motion can be denied.

23         Another way to look at this, Your Honor, is

24  they're really asking Your Honor for an advisory opinion.

25  They want to sell, transfer, or encumber this property in the

1   future and they want Your Honor to decide now that whatever

2   they do down the road, whatever the facts are, they should be

3   allowed to do it.

4           In my view, Your Honor, that is an advisory

5   opinion.  This Court is not in the business of giving

6   advisory opinions.  That request is inappropriate and that,

7   too, should be denied.

8           Now, in their objection, Your Honor, they reply

9   that an adversary proceeding is not necessary, for all

10  they're seeking is relief from the stay, and we agree with

11  that statement.  But, again, they're not just seeking relief

12  from the automatic stay.  And Ms. Uhland just said it, you

13  don't even have to get to the automatic stay, Your Honor.

14  They believe they're entitled to the other relief.  Well, if

15  that's the case, Your Honor, then it has to be done by an

16  adversary proceeding.

17          Now, in reply, and Ms. Uhland talked about this

18  cases, they cited several cases for this idea that a so-

19  called comfort order is appropriate, without an adversary

20  proceeding.  Well, when you look at the facts of those cases,

21  Your Honor, they're not on all fours here.  I mean, they're

22  D&O claims, where you're talking about the proceeds of a D&O

23  policy, right, and the facts there do not even seem to be in

24  dispute.  That's the Downey Financial Corporation case or the

25  Allied Digital case.

1           We're going to be talking about the Levitz case,

2  Your Honor.  The Levitz case, Your Honor, was in the context

3  of an adversary proceeding.

4           So, bottom line here, Your Honor, the request for

5  this comfort order is procedurally improper.  The alternative

6  relief should be denied.

7           Now, in their motion, Your Honor, they claim that

8  the debtors here are asking for an injunction.  We're not

9  seeking an injunction at all, Your Honor.  362 is an

10  injunction.  The question here is whether the stay applies

11  and should be lifted to let them proceed with this financing.

12          So, let me get to the issue of the automatic stay.

13  We start with the proposition that Section 362 of the

14  Bankruptcy Code is one of the most fundamental pillars of the

15  Bankruptcy Code.  It provides a breathing spell.  It provides

16  for equitable treatment among similarly situated creditors.

17  And the case law makes very clear that it is not likely to be

18  cast aside.

19          It cannot be debated, Your Honor, that the

20  automatic stay protects the property of the estate.  Now,

21  property of the estate is defined broadly under Section 541

22  to include property wherever located and by whomever held,

23  and it encompasses all legal or equitable interests in

24  property as of the commencement of the case.

25          Now, case law also makes clear that the definition

1  of property of the estate is not -- is to be interpreted

2  broadly and it includes every conceivable interest both,

3  tangible and intangible.  It includes future, non-possessory,

4  contingent, speculative interests, derivative interests, any

5  type of interest, Your Honor.  Case law is also clear that

6  legal title alone is not determinative of whether property

7  constitutes property of the estate.

8          Now, in the adversary proceeding, Your Honor, the

9  debtors have, in fact, instituted specific claims.  Your

10  Honor, I hope, has seen the adversary proceeding.  I'm going

11  to choose my words carefully, based on Your Honor's

12  directive.

13          But in that adversary proceeding, Your Honor, we

14  make out specific claims and I'll explain to Your Honor in a

15  minute why we believe that leads to an economic interest or

16  an equitable interest in the property.  Given the broad

17  definition of property of the estate under Section 541, the

18  debtors' claim, Your Honor, in and of itself, is an interest

19  in that property.  It's direct claim against the real estate.

20  It constitutes an equitable interest.  It's property of the

21  estate.  And it's protected by the automatic stay even though

22  the claim might be disputed and not yet adjudicated.

23          Now, look, Your Honor, we'll concede that the fact

24  pattern here is not one that arises every day, but we found

25  two compelling cases, Your Honor, that we've cited in our

1    pleadings that are directly on point that lead to the

2    conclusion, Your Honor, that, in fact, the debtor has an

3    interest in this property.  The first, Your Honor, is In re

4    Prototype Engineering and Manufacturing, Inc. v Leya Techs,

5    LLC.  That's a case from the bankruptcy -- from the District

6    of California.  It's a 2020 case.

7            In that case, Your Honor, certain nondebtor

8    defendants were being sued by a Chapter 7 Trustee and they

9    sought to expunge a *lis pendens* filed against their real

10   property under California law.  In that case, Your Honor, the

11   trustee had previously filed a number of claims against those

12   defendants, including the specific claim the debtors had

13   filed in the adversary proceeding.

14           Now, interestingly, in that case, that particular

15   claim had previously been dismissed by the Court with leave

16   to amend to bring again.  Now, the trustee in that case put a

17   cloud on certain of the defendants' real estate by filing a

18   *lis pendens* under California law, based, in part, on that

19   particular claim.

20           Now, under California law, a *lis pendens* is

21   appropriate if the trustee was asserting, quote, a real

22   property claim within the meaning of California's *lis pendens*

23   statute.

24           Now, the defendants in that case asked the

25   Bankruptcy Court to expunge the *lis pendens* on several

1  grounds, including that that specific claim was not a, quote,

2  real property claim, within the meaning of the California *lis*

3  *pendens* statute.

4          Well, the California Bankruptcy Court was called

5  upon to analyze the true nature of that particular claim.

6  First, the Court recognized that the definition of "property

7  of the estates" is very broad.  The Court then recognized

8  that the Bankruptcy Court had the equitable power under

9  Section 105 to grant relief in connection with that specific

10 claim.  And the Court, then, looked to the nature of that

11 specific claim.

12         And when it looked to the nature of that specific

13 claim, Your Honor, it quoted a Third Circuit case, Your

14 Honor, that talked about that specific claim and what that

15 specific claim really does, Your Honor.  And because bringing

16 that specific claim, Your Honor, would, in fact, have an

17 impact on the property held by the defendants in that case --

18 and this is, Your Honor, where I'm really handicapped because

19 of Your Honor's ruling -- but because if that relief was

20 ultimately granted, it would have an impact on that real

21 property.

22         The Court in that case said, that is an interest

23 in real property.  That's a claim to that real property.

24         Now, we're not here to -- we're citing that case,

25 Your Honor, not for the proposition of, you know, what does

1  California law define under the *lis pendens* statute, but it's

2  that analysis that I think is relevant to today.

3       Let me talk about the other case we cited, Your

4  Honor, and this one, I think I can do a little bit better,

5  given the instructions.  We also found the case of In re New

6  Jersey Affordable Homes.  That's a case out of the Bankruptcy

7  Court of the District of New Jersey.  It's a 2006 opinion.

8       That case involved an elaborate real estate Ponzi

9  scheme involving hundreds of properties, some of which were

10  titled in the debtors' name and others of which were title in

11  the names of nondebtor parties or were subject to liens in

12  favor of nondebtor parties.  In that case, the Chapter 7

13  Trustee brought a sale motion, a bid procedures and sale

14  motion and said, look, the most equitable way to deal with

15  this is to sell all these properties, get the money in, and

16  we're going to fight about it later, right.  We're going to

17  figure out how to whack up the proceeds later.  That's what

18  was going on.

19       Now, remember, that sale motion dealt with

20  properties that were not titled in the debtors' name and it

21  involved liens in favor of third parties.  Although the

22  trustee argued and asserted claims to those properties, the

23  trustee had brought no adversary proceedings, no rulings had

24  been made that there was any equitable interest or legal

25  interests in those properties.  The trustee had yet to bring

1  any of that litigation.

2          In overruling the various objections to the sale,

3  the Court in that case specifically held that the concept of

4  property of the estate is very broad, that the Bankruptcy

5  Court was not concerned with the technicalities of title, and

6  that the trustee's asserted claims alone against the

7  property, even though undisputed, was a sufficient interest

8  in the property so that those properties constituted -- so

9  that the estate had an equitable interest in the properties.

10 That equitable interest was property of the estate, and,

11 therefore, the Court overruled the objections and allowed the

12 trustee to sell those properties, even though, at that point,

13 Your Honor, he had only made a claim of an interest in those

14 properties.

15          So, applying the reasoning of those cases to the

16 present case, Your Honor, leads to the conclusion that the

17 debtors' claim, the specific claim that we're talking about

18 that's in the adversary proceeding, that claim is an

19 equitable interest in the Broad Street PropCo's real estate.

20 That means that that property is property of the estate.

21 That means the automatic stay applies.  And now we get to

22 whether the automatic stay ought to be lifted or not in these

23 cases.

24          Your Honor, I'm going to spend two seconds talking

25 about their arguments of judicial *estoppel* and *res judicata*.

1  I think these are red herrings, Your Honor.

2          They try to cite the bid procedures order that was

3  entered by Judge Gross for this proposition that somehow

4  that's, you know, that's *res judicata* in these cases.  First

5  of all, Your Honor, that particular bid procedures order

6  dealt with St. Christopher's properties, not Broad Street

7  properties.

8          Next, Your Honor, the specific section of the bid

9  procedures order that they're quoting from addresses, quote,

10 the fee interest in the property.  The debtors don't claim a

11 legal interest or legal title to the property, Your Honor.

12 We've claimed an equitable interest in the properties.

13         Third, the bid procedures order was not the

14 product of a disputed or contested matter over whether or not

15 the nondebtors held title to -- or excuse me -- the debtors

16 held title to the property.  The specific language quoted by

17 the Movants was requested by the creditors' committee and was

18 designed to ensure that because of conflicts, Mr. Freedman

19 was not going to be involved in the debtors' sale of its

20 asset.  That order was entered on consent; it wasn't

21 contested, Your Honor.

22         And, fourth, the order was entered long before,

23 Your Honor, the debtors and committee had conducted its

24 investigation.  It discovered these claims and brought the

25 litigation.  So, in summary, Your Honor, there's no contested

1   matter.  There was no controversy.  There is no *res judicata*.

2           Next, they argue they should be judicially

3   *estopped* from asserting an interest in the property and they

4   cited a couple of documents.  Here, Your Honor, again, the

5   essence of a judicial *estoppel*, Your Honor, is you've got a

6   party that's taking inconsistent positions.  It's fair to do

7   that.  They have to bear the burden of showing bad faith,

8   Your Honor.  There's no bad faith evidence in this case, Your

9   Honor.  There's really no inconsistent positions.

10          Okay.  At the time the schedules were filed, we

11  indicated that they didn't have a legal title to a particular

12  property.  Those schedules, Your Honor, contained the same

13  reservation of rights and notes that Your Honor has seen a

14  thousand times, saying things may develop later to cause this

15  to change this, number one.

16          They quoted the plan.  They quoted the disclosure

17  statement.  I showed Your Honor in the plan and disclosure

18  statement where the very claims we're talking about were

19  specifically reserved, talked about, and put out to everybody

20  else.  There's no judicial *estoppel* in this case, Your Honor.

21  There's no inconsistent positions taken.  There is no bad

22  faith, so on and so forth.

23          So, let's turn (audio interference) to the relief

24  that's being requested here, which is that the automatic stay

25  ought to be lifted.  The Movants and the debtors both cite

1  the factors for the Court to consider in determining whether

2  to lift the automatic stay.  As the Court is well aware,

3  cause is not defined in Section 362.  It's really left for

4  the courts to determine on a case-by-case basis.

5          And the Movants cite to a three-prong (audio

6  interference) trying to fit a square peg in a round hole in

7  connection with this case.  And the reason I say that, Your

8  Honor, is when you look at the cases that really deal with

9  that prong, those are cases where a litigation party is

10  seeking relief from the automatic stay to continue litigation

11  or bring litigation.  I don't think that really applies in

12  this case at all.  I think it really comes down to, Your

13  Honor, a balancing of the harms here, to the Movants, as well

14  as the other parties in this case, the objectors in this

15  case.

16          Now, the Movants did spend a fair bit of time,

17  Your Honor, on the merits of the claim that's asserted in the

18  adversary proceeding, but now is not the time for the Court

19  to determine the merits of that claim.  By agreement, Your

20  Honor, that adversary proceeding has been stayed since the

21  day it was filed.  All the parties have been mediating.

22  There's been no discovery in connection with that adversary

23  proceeding.  Those arguments are a red herring.

24          So, again, Your Honor, it all comes down to a

25  balancing of harms.  This puts directly at issue, as I said

1  before, the reasonableness of the financing.  Is it

2  appropriate?  Is it too expensive?  Is there a better, viable

3  alternative?

4          Here, the evidence shows that the proposed

5  financing is unreasonable and the motion should be denied.

6  First, Your Honor, the loan is too expensive; $2.7 million in

7  interest fees and commissions for a loan that, at best, will

8  result in proceeds of approximately $6.5 million, dedicating

9  to preserving the value of those properties going forward.

10  That was Mr. Brinkman's testimony.

11          There is a better alternative being offered by the

12  debtor.  The debtor is offering $5.6 million.  It's cheaper,

13  much lower interest rate.  It's a reasonable period of time:

14  six months.  It permits the payment of pension obligations

15  during that period of time.  It is sufficient to preserve the

16  value of the property while it's being marketed and sold.

17  And, remember, the testimony is that these properties have

18  already been marketed for a year, Your Honor.  Six months

19  should be sufficient.

20          It is absolutely not the case that the debtors'

21  proposal is design -- it is absolutely not the case, Your

22  Honor, that -- bear with me one moment, Your Honor.

23      (Pause)

24          MR. MINUTI:  Oh, excuse me.  They're trying to

25  argue, Your Honor, that we're somehow trying to steal the

1  property.  That is not the case at all, Your Honor.  The

2  debtors' proposal is designed to preserve the value of the

3  property for the benefit of the legitimate creditors of the

4  Broad Street entities.

5          Now, what the debtors' proposal does not do and

6  what the debtors are not prepared to do, Your Honor, is fund

7  a Hail Mary sale process that puts creditor recoveries at

8  risk for Mr. Freedman's personal benefit or permits

9  inappropriate deterioration of the value of those properties

10  for fees, costs, and expenses that didn't benefit those

11  properties.  A    six-month sale process is more than

12  sufficient for all the reasons that I've already indicated,

13  Your Honor.

14          Now, contrary to the Movants' arguments, Your

15  Honor, Mr. Wilen and the debtors' CRO knows these properties

16  well, and, equally important, Your Honor, he's in this

17  market.  So, I think his testimony should provide some weight

18  here.

19          Now, next, Your Honor, approximately $3.2 million

20  of the proposed loan from Gordon Brothers is being used to

21  immediately retire secured debt put in place on the property,

22  the day prior to the motion being filed.  Now, today's

23  evidence, Your Honor, if anything, made crystal clear that

24  that has nothing to do with preserving the value of these

25  properties going forward.  It represents amounts allegedly

1  due to Paladin.

2          All of the MBNF parties' professionals, including

3  Mr. Freedman, Ms. Attestatova, Mrs. Freedman, and

4  Mr. Schmidt, there was absolutely no competent evidence

5  presented to the Court on what specific services were

6  provided, how much these fees and costs were actually

7  necessary -- or how much of these feces and costs were

8  actually necessary to benefit the Broad Street properties,

9  what portion, if any, of these allocated fees relate to the

10 Broad Street properties, and why it makes any sense at all to

11 burden the Broad Street properties, alone, with all of these

12 fees and costs.

13         Third, Your Honor, the proposed financing has

14 earmarked the funds so-called pension liabilities, but I

15 would submit this is a misnomer.  The funds are actually

16 being used to fund the contractual liabilities under a

17 settlement agreement with the pension fund.

18         There's been no competent evidence today, Your

19 Honor, about how that settle came about, why certain parties

20 were released, why other parties were made liable, and,

21 importantly, why the Broad Street entities, going forward,

22 must bear sole responsibility to make all the payments, Your

23 Honor.  None.

24         Fourth, the proposed loan contemplates that the

25 properties will be marketed for up to 15 months.  We've

1    already talked about that, Your Honor.  It's way too long.

2    These are empty properties, Your Honor, with significant

3    carrying costs.  Common sense would tell you that the longer

4    this goes, the worse everybody is going to be, Your Honor,

5    everybody.

6              But, of course, the longer marketing period, Your

7    Honor, only hurts the legitimate creditors of the Broad

8    Street entities.  Mr. Freedman is happy to use the value of

9    those properties, Your Honor, if there's a process by where,

10   at the end of the day, he's going to improve his position.

11             Now, counsel said, Your Honor, we're trying to

12   prejudice them or gain some leverage over them.  And that may

13   be true, Your Honor, if we were here today trying to defeat

14   this motion and not offering a better alternative.  But we've

15   offered a better alternative, Your Honor.  We're prepared to

16   negotiate a better alternative.

17             It is in our best interests, our or the debtors'

18   best interests to preserve the value of these properties for

19   everybody.  We could fight about who gets it later, but it's

20   in our best interests.  We're not trying to gain any leverage

21   here, Your Honor.  What we're trying to prevent is devaluing

22   these properties for things that have nothing to do with

23   preserving the value of these properties.  That only hurts

24   the legitimate creditors of these entities.

25             So, there's no question that granting the

1  automatic stay to allow this term lender to go forward will

2  have a drastic, negative impact on the debtors and the other

3  creditors of these entities.

4  According to Mr. Brinkman, Your Honor, in his

5  declaration, the Front Street PropCos have little money left.

6  The value of the Broad Street real estate may be the only

7  significant assets available to fund the settlement, Your

8  Honor, and if there's not going to be a settlement, to

9  address the wrongs that have been committed in these cases

10  that the debtors are trying to recover for.

11  Now, conversely, Your Honor, there is no harm to

12  the Movants.  The debtors are prepared to make the loan, Your

13  Honor.  The debtors are prepared to negotiate the loan.  The

14  debtors are prepared to provide the funds necessary, of

15  course, all subject to Court approval, to preserve the value

16  of these properties going forward.

17  Now, again, Your Honor, they want to say that

18  we're trying to substitute our judgment, our business

19  judgment for their business judgment, and as I indicated

20  before, Your Honor, Mr. Freedman is making the call here.

21  He's on both sides of the transaction.  I don't think he gets

22  the benefit of the business judgment rule in this

23  circumstance.

24  There is a reason, Your Honor, why virtually every

25  creditor of the Movants oppose the relief requested today.

1          Finally, Your Honor, we cite cases in our joint

2    objection that the Court can rely upon to deny the relief

3    requested, based upon the Movants' lack of candor to the

4    Court and unclean hands.  The examples of that, Your Honor,

5    are, as we pointed out on Mr. Brinkman's cross-examination,

6    they claimed in the motion they paid $2.1 million for things

7    the debtors should have paid.  It was untrue, Your Honor.

8    They never corrected that statement when we were before you

9    on the 19th.  They try to correct it now, but they never paid

10   that amount, Your Honor.

11         Next, they filed the motion to recover the

12   remediation, Your Honor.  They relied upon the debtors not

13   proceeding with the adversary proceeding and now they're

14   trying to seek to take advantage of that.  I mean, look, what

15   they're trying to say to Your Honor is, Hey, they only have a

16   claim.  They only have a claim.  They have no interest in

17   this property.

18         Well, part of the reason why we only have a claim,

19   Your Honor, is because we have been mediating in good faith.

20   The complaint was stayed.  We thought everybody understood

21   that, Your Honor.

22         Next, they never disclosed in the motion that the

23   debtors' adversary proceeding included the specific claim

24   that we've been talking about.  They never close that HSRE or

25   Tenet have made claims against these properties.  They never

1   told the Court that the day before the motion was filed, they

2   put these liens on the properties in favor of the

3   professionals.

4           And they want to say, Well, look, the debtors'

5   proposal makes no sense because they want a first lien.

6   There's already a lien on the property.  I think Your Honor

7   gets it.  There's already a first lien on the property

8   because they set it up that way, Your Honor, and that lien

9   has nothing to do with preserving the value of these

10  properties going forward.

11          So, we think this is all pretty outrageous and

12  while the motion, we believe, should be denied on the merits,

13  these specific examples, Your Honor, provide additional or

14  alternative relief for the Court to deny the relief

15  requested.  It has been a long hearing.  I do appreciate the

16  Court's time.

17          I'm done, unless the Court has any questions of

18  me.

19          THE COURT:  No, I have no questions.

20          MR. MINUTI:  Thank you.

21          THE COURT:  Mr. Brown, did you want to be heard?

22          MR. BROWN:  I do, but I would defer to

23  Mr. Sherman, as he is a joint party with the debtors in the

24  objection, Your Honor.

25          THE COURT:  All right.  Mr. Sherman?

1        MR. SHERMAN:  Thank you, Your Honor.

2        I just want to make three brief points.  One is I

3  want to, for the record, join in and adopt the statements of

4  Mr. Minuti during the hearing and echo the comments of the

5  drastic effect this could have on the estates and the

6  creditors, as far as trying to create value (audio

7  interference).

8        The testimony you heard, Your Honor, is that this

9  will sort of change the dynamics of the bankruptcy case and

10  the effect, and I would ask the Court to (audio interference)

11  urge that the Court to consider that in any decision.  I was

12  going to say this morning, but now, it's afternoon.

13        Second, Your Honor, I wanted to briefly respond to

14  Your Honor's question of Mr. Minuti sort of right at the get-

15  go, as to how do you determine an interest in property or

16  whether a claimant -- and that goes back to the procedural

17  impropriety of where we are, Your Honor.

18        In order to respond to Your Honor's question, "How

19  do we determine the interest of the property?"  Congress set

20  that out in 7001 of the Bankruptcy Rules.  So, what we have

21  here is sort of short-circuiting the process that Congress

22  determined and most courts will require is when you're trying

23  to determine an interest in property, 7001 provides for that

24  mechanism, not a 9014 contested matter.

25        The third point, Your Honor, gets to -- well, to

1  the extent that the Court is considering any type of

2  financing here and allowing the type of relief requested, we

3  would simply urge the Court to try to limit it to actual

4  expenses incurred by the Broad Street entities.

5          You heard a lot of testimony this morning, Your

6  Honor, on allocation and business judgment.  But I think in

7  Your Honor's ruling on the discovery is Your Honor wanted

8  proof as to how these entities are liable.  The only evidence

9  that we've heard today is in the debtors' business judgment,

10  they allocated this cost on this 40:40:20 split.  We asked

11  for documents.  We didn't get it.  We asked for sort of proof

12  as to how these entities are liable.

13          I think Mr. Brinkman talked about it in agreements

14  in which he referred to, but obviously, we don't have those

15  agreements.  There has to be an actual evidence how these

16  Broad Street entities are actually going to be liable or

17  incurring debt for which they're liable.

18          So, from a lack of proof, Your Honor, there's no

19  substantiation of how those entities are liable.  So, physics

20  that any financing is approved by this Court, it should be

21  limited to what those entities are actually liable for and

22  there needs to be some demonstration of proof, rather than

23  just sort of a deference to a business judgment in the

24  amorphous of this 40:40:20 split.

25          It's -- to the extent that they're coming to this

1   Court seeking relief, there had to be a level of proof.  And

2   I think what you heard this morning and early into this

3   afternoon is there's no proof on the allocation point.

4           Other than that, Your Honor, again, we would join

5   in the comments of Mr. Minuti and urge the Court to deny the

6   motion.

7           MR. BROWN:  If I may proceed, Your Honor?

8           THE COURT:  Yes, you may.

9           MR. BROWN:  For the record, Stuart Brown, DLA

10  Piper, on behalf of the Harrison Street entities.

11          Your Honor, the record in these cases is muddy.  I

12  think that the most significant issue that Your Honor needs

13  to address in the context of this motion and the objections

14  is the extent to which Your Honor has jurisdiction to enter

15  any order on this motion.  And then once Your Honor, should

16  the Court determine that it has jurisdiction to consider this

17  motion, then consider the extent to which the extant

18  mediation order doesn't cover every single issue that the

19  parties have raised in the context of this motion and the

20  objections and the evidence.

21          Your Honor, I could tell you lots of things that

22  have been discussed in the context of mediation that speak

23  directly to evidence in support of and (audio interference)

24  objecting to these proceedings, but it's inappropriate,

25  because they're all subject to mediation privilege.

1            I think that if Your Honor were to do anything in

2   the context of these motions, it would be to send it to

3   mediation because that's where all these other issues that

4   are related and tangentially and collaterally related are

5   pending and the parties are in the midst of discussion.

6            This motion, in my mind, is nothing more than an

7   end runaround the mediation process in order to gain or

8   attempt to gain undue leverage in those discussions.

9            Your Honor, Harrison Street filed a joinder to the

10  debtors' and committee's objection.  We join in the objection

11  to approval of the motion.  We don't join, necessarily, in

12  their position in argument in the context that the estates

13  have an interest in the real estate.

14           If Your Honor will refer to the organizational

15  chart, Harrison Street entities that are to the right of

16  PAHH, which is the parent holding company of all of the

17  debtor entities, are the single largest creditors of PAHH.

18  Having asserted liquidated claims of approximately

19  $60 million and unliquidated claims of approximately

20  $400 million, we clearly are the largest creditors of the

21  MBNF nondebtor entities, and that would include Paladin, to

22  the extent people don't include the Paladin entities as part

23  of the MBNF entities.

24           Your Honor, I'll leave my remarks there --

25           MR. FREEDMAN:  (Indiscernible.)  Huh?

1           THE COURT:  Who is that speaking?

2           UNIDENTIFIED:  I'm sorry, Mr. Freedman was unmuted

3   briefly.

4           THE COURT:  Good.

5           MR. BROWN:  In closing -- Your Honor, thank you --

6   but in closing, we reserve our rights.  We reserve our legal

7   positions with respect to whether or not the stay exists,

8   whether or not Your Honor may make certain findings relative

9   to the adequacy of the financing or whether it's in the best

10  interests of the MBNF parties or the debtors' estates and

11  committee, and, again, Your Honor, urge that if you are to

12  exercise jurisdiction over the motion, that the result be

13  that the issues raised in the motion be sent into the

14  mediation process.  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          Anybody else?

17          MR. KOENIG:  Your Honor, it's Chris Koenig from

18  Kirkland & Ellis, on behalf of Tenet Business Services

19  Corporation.  May I be heard?

20          THE COURT:  You may.

21          MR. KOENIG:  Thank you, Your Honor.

22          Again, for the record, Chris Koenig, representing

23  Tenet Business Services Corporation and Conifer Revenue Cycle

24  Solutions, LLC.  We filed an objection at Docket Number 3102.

25          I don't want to belabor the point too much this

1  morning, so I'll join in the arguments of Mr. Minuti and the

2  others that are opposing the motion, but just very briefly,

3  Your Honor, as detailed in our objection, we have commenced

4  litigation against the MBNF parties in Delaware Superior

5  Court.  We and the MBNF parties are engaged in mediation

6  regarding those matters and put simply, as we mentioned in

7  our papers, we think this motion is a pretense and that the

8  Movants are simply trying to obtain leverage over Tenet,

9  Conifer, and the other parties in the mediation.

10          We think that that's improper and the Court

11  shouldn't bless these transactions in that way.  Put

12  candidly, we're concerned that Mr. Freedman is trying to

13  grant these liens in order to hinder, delay, or defraud the

14  various entities that have sued him.

15          While that is certainly not for today, that's the

16  reason why we filed the objection and that's why we joined in

17  Mr. Minuti's opposition and the opposition of the other

18  parties this morning and this afternoon.

19          And if Your Honor decides to grant the motion for

20  a comfort order, we'd respectfully request that the Court's

21  ruling be narrowly tailored to make clear that the ruling is

22  only with respect to the automatic stay issue and that all

23  parties' rights are reserved to challenge these liens and

24  loans on other grounds in an appropriate forum and at an

25  appropriate time.

1          THE COURT:  Thank you.

2          MR. KOENIG:  Thank you, Your Honor.

3          MR. ADAMS:  Your Honor, good afternoon.  Julien

4  Adams.  I'm also appearing on behalf of the MBNF nondebtor

5  parties.

6          Can you hear me, Your Honor?

7          THE COURT:  I can.

8          MR. ADAMS:  And, Your Honor, our firm was

9  specifically retained to address the objection that the Tenet

10  and Conifer entities lodged and at Docket 3193, you will find

11  our specific objection to their -- our reply to their

12  objection.

13          Your Honor, I'm not going to repeat what we wrote

14  in our reply, but I just want to note that to the extent that

15  counsel had just raised the arguments, our reply adequately

16  addresses each of the arguments that they raised and we stand

17  on that written reply and we would ask the Court to deny

18  their -- to reject their objection or overrule it and then to

19  grant the motion, the comfort motion.

20          THE COURT:  All right.  Thank you.

21          MS. HARPER:  Good afternoon, Your Honor.  This is

22  Megan Harper, on behalf of the City of Philadelphia.  If I

23  may just briefly be heard?

24          THE COURT:  You may.

25

1          MS. HARPER:  The City of Philadelphia filed a

2   limited objection to the relief sought in the motion

3   requesting clarification and any proposed form of order

4   submitted on a motion, to the extent relief is granted.  We

5   sought clarifying language with respect to the City's liens

6   and I believe as of this morning, we are resolved, with an

7   agreed amendment to any order to be submitted to the Court.

8   I just wanted to put that on the record.

9          Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MS. UHLAND:  Your Honor, if appropriate, may I

12   proceed to a short reply?

13          THE COURT:  You may.

14          MS. UHLAND:  Thank you, Your Honor.

15          In the first instance, with respect to the alleged

16   equitable interest in the property, I will just repeat

17   briefly what I said before.  The <u>Prototype</u> case talked about

18   a *lis pendens*.  *lis pendens* is a notification of a claim.

19          The reason that case said that there should be a

20   *lis pendens*, a notification of the claim is, if successful,

21   it would result in a real estate claim and under California

22   law, a mere allegation of something that is a real estate

23   claim, all you have to have is an allegation.  And if you

24   look at the California very liberal demurrer statute on that,

25   it's a very low threshold to get a *lis pendens*.

1          That is not the situation here.  We're not talking

2   about whether there should be a notice of a lawsuit.  We're

3   talking about whether a mere allegation creates an interest

4   in property.

5          Taking this logic to its conclusion, a debtor

6   would be able to impose the automatic stay, a broad

7   injunction on any defendant, based on any lawsuit that

8   related to real estate.  It's got to be different than that.

9   It can't be that a mere allegation creates an in property

10  against a defendant.  That's not what the law does, nor

11  should it.

12         The other thing to remember here is, as I said

13  before, yes, the injunction is broad, is an important

14  protection.  But there are third-party rights, third-party

15  property rights.  And while Mr. Minuti says that the property

16  should be preserved for the legitimate creditors, implying

17  that he is one of the legitimate creditors, I will remind you

18  that he is a contingent creditor; he is not an actual

19  creditor of the Movants.

20         Where we are right now is, let's look at the

21  actual balance of hardship and I, again, go back to, he is a

22  contingent, potential creditor who may have an interest in

23  this property and then may be harmed if, under a certain set

24  of facts, there is less value available, based on this

25  financing and the marketing by the people who own the

1  property.  That's a lot of ifs.

2         That's very contingent against the real harm.  The

3  real harm is that without this financing, this property could

4  be lost to tax liens or other liens for failure to pay their

5  utilities or other fines or other ramifications from the

6  failure to comply with the health and safety code in this

7  state and in the city.

8         Now, I remind you, Your Honor, he also talked

9  about the liabilities of Broad Street and the obligations of

10  the Broad Street entities, saying that there's not evidence.

11  Your Honor, the very documents that were presented in this

12  court and admitted into evidence, are promissory notes of the

13  Broad Street entities that she that they owe money.  That is

14  in the record.

15         Now, the fact that those entities may have

16  reimbursement rights against, as assets, against related

17  parties, that's -- that is true and that makes this a more

18  fair transaction, overall, but the truth is, whose

19  obligations are they?

20         They are Broad Street's obligations today and they

21  must be repaid by this financing.

22         Finally, Your Honor, I just want to state that,

23  you know, the Fifth Amendment is not a popularity contest.

24  You have property rights if you have property rights and your

25  property rights are entitled to protection, even if parties

1   suing you get together and decide that they want to get

2   leverage off of you or on you in connection with other

3   litigation.  And I think the Court should ignore that.

4          I also think the Court should think about who we

5   aren't hearing from, who's not objecting.  The pension fund

6   of the debtors' employees who were terminated; they're not

7   here complaining.  The neighbors from this -- you know, from

8   these empty, vacant buildings, they're not complaining that

9   the property be maintained.

10          What we're hearing is these contingent creditors,

11  these litigants are -- were hoping for some contingent

12  interest in this property.  They're the ones who are here

13  trying to stop this financing that will, in fact, preserve

14  value, in fact, provide for the legitimate creditors of the

15  Movants.

16          Thank you, Your Honor.

17          THE COURT:  Thank you, Your Honor.

18          And I'm sorry about my cold here.

19          All right.  Let me make my ruling, then.  With

20  respect to the comfort order, I'm going to deny the motion.

21  While the debtor admits that it has no legal interests in the

22  properties and that they are titled in the Broad Street

23  PropCos -- I'll use the parties' terms -- there is currently

24  an adversary pending that puts title to the properties at

25  issue.  And based on the specific claims, I can find that

1  just based on the allegation -- and while it is true that a

2  mere allegation is not sufficient, normally, for a party to

3  actually have an interest in property, I think the Bankruptcy

4  Code, by its expansive definition of "property of the estate"

5  under 541, and the scope of the automatic stay, does

6  implicate such a claim.

7           Normally, I would, however, limit that and require

8  the action proceed, but the parties have stipulated that the

9  action should not proceed while they try and settle the

10 various claims and, therefore, I don't think the debtor

11 should be prejudiced by its failure to prosecute its claims

12 asserting an interest in the properties.

13          And without prejudging the debtors' possibility of

14 success on that litigation or the PropCos' and other

15 nondebtor entities' response, I think it is sufficient

16 questionable that the Court is prepared to find that the

17 automatic stay covers these properties.

18          And, again, while the Fifth Amendment protects

19 property rights, it cuts both ways; the property rights of

20 the debtors, which are expanded and protected by the

21 Bankruptcy Code, as well as the property rights of title

22 holders.

23          So, let's talk to -- let's go to the issue of

24 whether or not I should grant relief from the stay today.  I

25 find that the argument that there will be no prejudice to the

1  debtors or, by the way, to Tenet, because the loan will

2  preserve the value of the properties has not been established

3  here.  The fact that the loan proceeds -- the loan will be in

4  the amount of $17.5 million and the amount of the proceeds

5  that will directively provide for maintenance of these

6  properties while they're being sold or while the litigation

7  is going forward, I think it is in both parties' interests to

8  get them sold, but at any rate, the proceeds are allocated.

9          The prior expenses are allocated to expenses that,

10  although the debtors' witnesses testified is the allocation

11  that has been used in the past, the Court cannot make a

12  determination that those expenses directly benefit the

13  properties.  And, in part, it's because the Court found that

14  discovery on that issue was not appropriate, but at any rate,

15  it is clear that there is a big question as to what amount of

16  the loan -- of a loan is necessary and also there is a

17  question as to the length of the loan that is necessary to

18  preserve and to maximize the value of those properties.

19          So, I think balancing the prejudice, there's a

20  severe prejudice to the Movants if I grant -- there's a

21  severe prejudice to the debtor if I grant the Movants' motion

22  for relief from stay because the issue will be over.

23          With respect to the prejudice to the Movants,

24  there is some prejudice, but I did hear about the specific

25  short-term prejudice that will occur and that the Movants do

1  not have any other options to finding funds to preserve the

2  property.  I think that what I'm going to recommend is that

3  the parties go back to the mediator and see if they can

4  mediate a solution.

5         If the debtor is willing to provide funds that are

6  sufficient to pay the specific maintenance costs for these

7  properties -- and I'm not going to say that no payments to

8  those named as defendants in the litigation can be made --

9  I'm not going to make that statement, because I can foresee

10 that legitimate expenses and legitimate services may be

11 provided by those entities to preserve -- to the preservation

12 of these properties.

13        But I think that rather than me making a business

14 decision as to the proper amount of the loan and that uses of

15 the loan, I think the parties ought to go back to the

16 mediator or ought to talk between themselves as to how to do

17 that.  So, I will deny the motion for relief from the stay,

18 without prejudice, but I think it is important that the

19 parties try and resolve this if they can, without the Court's

20 input.

21        But I am available if the parties need me, but I

22 don't think you want my business judgment to reign.  So, I

23 will ask that counsel for the debtor to present a form of

24 order after circulating it with other interested counsel.

25        MR. MINUTI:  We will, Your Honor.

1          Thank you, again, to your time today.

2          THE COURT:  Yeah, and, again, I'm sorry for my

3  voice.

4          We'll stand adjourned, then.

5          COUNSEL:  Thank you, Your Honor.

6      (Proceedings concluded at 1:34 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATION</u>

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ Coleen Rand _____          December 1, 2021

8    Coleen Rand, CET-341

9    Certified Court Transcriptionist

10   For Reliable

11

12

13   /s/ Tracey J. Williams _____          December 1, 2021

14   Tracey J. Williams, CET-914

15   Certified Court Transcriptionist

16   For Reliable

17

18

19   /s/ William J. Garling _____          December 1, 2021

20   William J. Garling, CET-543

21   Certified Court Transcriptionist

22   For Reliable

23

24

25