# EXHIBIT C

Form of Open-End Mortgage and Security Agreement

<u>After recording, please return to</u>:

Saul Ewing Arnstein & Lehr LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Attention: Martin J. Doyle, Esq.

<u>Mortgaged Property Addresses</u>:

222-248 N. Broad Street
221-223 N. 15th Street
325 N. 15th Street
Philadelphia, PA

<u>Tax Parcel Nos</u>.:

772025002
772028498
881038202

---

**THIS IS AN OPEN-END MORTGAGE AND SECURES FUTURE ADVANCES.  THE MAXIMUM PRINCIPAL AMOUNT SECURED BY THIS OPEN-END MORTGAGE IS SUCH AMOUNT AS MAY BE DUE AND OWING ON THE NOTE DESCRIBED HEREIN, NOT TO EXCEED $5,600,000 PLUS ACCRUED AND UNPAID INTEREST AND ALL OTHER COSTS AND INDEBTEDNESS DESCRIBED IN 42 Pa. C.S. §8143 AND C.S. §8144.**

---

**OPEN-END MORTGAGE AND SECURITY AGREEMENT** (the "**Mortgage**"), made as of _____ ___, 2022 and effective as of _____ ___, 2022 (the "**Effective Date**"), given by **BROAD STREET HEALTHCARE PROPERTIES, LLC**, a Delaware limited liability company ("**Mortgagor**"), in favor of **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC**, a Delaware limited liability company ("**Mortgagee**").

**W I T N E S S E T H:**

**WHEREAS**, Mortgagor is the owner of those certain parcels of improved real property located at 222-248 N. Broad Street, 221-223 N. 15th Street and 325 N. 15th Street in the City and County of Philadelphia, Commonwealth of Pennsylvania, as more particularly described in Schedule A attached hereto and made a part hereof;

**WHEREAS**, Mortgagor, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (collectively, jointly and severally, "**Borrower**") have executed a Secured Promissory Note dated as of the Effective Date, in favor of Mortgagee in the original principal amount of Five Million Six Hundred Thousand Dollars ($5,600,000.00) (such Secured Promissory Note, together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter referred to as the "**Note**");

**WHEREAS**, this Mortgage is given to secure certain loans (collectively, the "**Loan**") in the original maximum principal sum of Five Million Six Hundred Thousand and No/100 Dollars ($5,600,000) advanced and to be advanced to Borrower by the Mortgagee pursuant to and evidenced by the Note;

**WHEREAS**, in addition to this Mortgage, the Note is also secured pursuant to that certain Open-End Mortgage and Security Agreement dated of even date herewith made by Broad Street Healthcare Properties II, LLC in favor of Mortgagee and that certain  Open-End Mortgage and Security Agreement dated of even date herewith made by Broad Street Healthcare Properties III, LLC in favor of Mortgagee;

**WHEREAS**, in order to induce Mortgagee to make the Loan, Mortgagor has agreed to secure the Note by granting this Mortgage in favor of Mortgagee, pursuant to the terms and provisions set forth herein;

**WHEREAS**, Mortgagor hereby acknowledges that it has and shall receive substantial financial benefits as a result of the Loan from Mortgagee to Borrower;

**WHEREAS**, the Recitals and Exhibits to this Mortgage are hereby incorporated in this Mortgage; and

**WHEREAS**, capitalized terms used in this Mortgage that are not otherwise defined herein shall have the meaning set forth in the Note.

## Certain Definitions

As used in this Mortgage, unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and to the plural forms of such terms.

"**Agreements**" shall mean all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications, warranties, guarantees, and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements, or respecting any of Mortgagor's business or activity conducted at the Premises or any part thereof, or relating to any of the Fixtures, and all right, title and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the happening of an Event of Default hereunder, to receive and collect any sums payable to Mortgagor thereunder.

"**Co-Borrower Mortgages**" shall mean those certain Open-End Mortgages and Security Agreements, made effective on or about the date hereof, given by the other entities comprising

2

Borrower in favor of Mortgagee, as amended, restated, supplemented or otherwise modified from time to time, together with all extensions, renewals, replacements, restatements or modifications thereof.

"**Code**" shall mean the Uniform Commercial Code in effect in the Commonwealth of Pennsylvania, as amended from time to time.

"**Default Rate**" shall mean the interest rate set forth in Section 2 of the Note applicable following the occurrence and during the continuance of an Event of Default.

"**Easements**" shall mean all easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights, mineral rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and/or the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interest, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Mortgagor of, in and to the Land and/or the Improvements and every part and parcel thereof, with the appurtenances thereto.

"**Event of Default**" shall have the meaning accorded such term in Section 2.01 of this Mortgage.

"**Fixtures**" shall mean all equipment now owned, or the ownership of which is hereafter acquired, by Mortgagor which is so related to the Land and/or Improvements that it is deemed fixtures or real property under the law of the particular state in which the equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation at the Premises, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Premises, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Mortgagor's interest therein) and all other utilities whether or not situated in Easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof. Notwithstanding the foregoing, "Fixtures" shall not include any property which tenants are entitled to remove pursuant to Leases at the Premises, except to the extent that Mortgagor shall have any right or interest therein.

"**Future Advances**" shall mean future advances (whether such advances are obligatory or are made at the option of Mortgagee or otherwise) made by Mortgagee pursuant to and under the Note, this Mortgage or any other Loan Document, to the same extent as if such future advances were made on the date of the execution of this Mortgage. Funds disbursed that, in the reasonable exercise of Mortgagee's judgment, are needed to complete Improvements or to protect Mortgagee's security interest in the Mortgaged Property, are to be deemed obligatory advances hereunder, and will be added to the Secured Obligations and secured by this Mortgage, and the Secured Obligations shall be increased accordingly.

"**Improvements**" shall mean all structures, buildings, additions, extensions, modifications, and all other improvements of any kind whatsoever, and replacements of any of the foregoing, now or hereafter located at or upon the Land.

"**Insolvency Proceeding**" means (a) any voluntary or involuntary case or proceeding under the United States Bankruptcy Code with respect to any entity comprising Borrower, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any entity comprising Borrower or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of any entity comprising Borrower whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any entity comprising Borrower, in each case, whether pending within any U.S. or foreign jurisdiction.

"**Interest Rate**" shall mean the interest rate in accordance with Section 2 of the Note.

"**Land**" shall mean the real property described in Schedule A attached hereto and by this reference made a part hereof, including, without limitation, all of the air space, easements, rights, privileges, royalties and appurtenances thereunto belonging or in anywise appertaining thereto, and all of the estate, right, title, interest, claim or demand whatsoever of Mortgagor therein and in the streets, alleys and ways adjacent thereto, either at law or in equity, in possession or expectancy, now or hereafter acquired.

"**Leases**" shall have the meaning given to such term in Section 1.14 hereof.

"**Loan**" shall mean the loan from Mortgagee to Borrower evidenced by the Note, which is being secured by, among other things, this Mortgage.

"**Loan Documents**" shall mean this Mortgage, the Note, the Co-Borrower Mortgages, all Uniform Commercial Code financing statements in respect of the Mortgaged Property and all other documents, agreements, instruments, certificates, title policies and the like securing and/or evidencing the Loan and other Secured Obligations and/or executed and/or delivered by or on behalf of Mortgagor in connection with the closing of the Loan or at any time thereafter.

"**Mortgaged Property**" shall have the meaning accorded such term in the Granting Clause of this Mortgage.

"**Permitted Encumbrances**" shall mean all matters set forth on Schedule B attached hereto and made a part hereof.

"**Person**" shall mean an individual, a corporation, a partnership, a joint venture, a limited liability company, a trust, an unincorporated association, any governmental authority or any other entity.

"**Property Condition Evaluation**" shall mean that certain Property Condition Evaluation dated June 2, 2017, prepared by EMG for Paladin Healthcare Capital, LLC regarding a property condition assessment of Hahnemann University Hospital, 230 North Broad Street, Philadelphia, PA 19102 (Project 125119.17R000-001.047).

"**Power of Sale**" shall mean the right, power and authority of Mortgagee to sell or cause the sale of the Mortgaged Property and/or a part or parts thereof, at public sale or auction after the happening of any Event of Default and during its continuance in accordance with and pursuant to any statute or law of the state or jurisdiction in which the Premises are located permitting the sale of property subject to a mortgage or security agreement in a non-judicial foreclosure sale, as any such statute or law may be in effect on the date hereof, or may be hereinafter enacted and/or modified or amended, or any successor statute or statutes, and/or under and pursuant to any other laws or regulations now in effect and/or hereafter enacted, which provides for and/or enables the property encumbered by a mortgage to be sold by a mortgagee and/or its agents and/or representatives in a public and/or private non-judicial sale.

"**Premises**" shall mean, collectively, the Land and the Improvements.

"**Secured Obligations**" shall mean, collectively, all of the following:

(i)     Payment and performance of all obligations of Mortgagor under this Mortgage;

(ii)    Payment of all obligations of Borrower under the Note or any of the other Loan Documents;

(iii)   All of the present and future obligations of Borrower arising from, or owing under or pursuant to the Note, the Co-Borrower Mortgages or any of the other Loan Documents;

(iv)    All other obligations of Borrower relating to (ii) and (iii) set forth above in this definition of Secured Obligations (including, reasonable and documented out-of-pocket attorney's fees and expenses and any interest, fees, or expenses that accrue after the filing of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any Insolvency Proceeding);

(v)     Payment and performance of all Future Advances and other obligations that Mortgagor or any successor in ownership of all or part of the Mortgaged Property may agree to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Mortgagee, when a writing evidences the parties' agreement that the advance or obligation be secured by this Mortgage; and

(vi)    Payment and performance of all modifications, amendments, extensions, and renewals, however evidenced, of any of (i) through (v) set forth above in this definition of Secured Obligations.

"**Zoning Reports**" shall mean the Zoning Report dated July 13, 2017, prepared by EMG (Project No. 12551.17R000-001.259).

Except as otherwise expressly provided herein, all terms of this Mortgage not defined above shall have the respective meanings accorded such terms in this Mortgage.

## Granting Clause

**NOW, THEREFORE**, Mortgagor, in consideration of the premises and in order to secure payment of the Secured Obligations, Future Advances and the performance and observance of all the other provisions hereof, of the Note, and the other Loan Documents, hereby mortgages, gives, grants, bargains, sells, warrants, aliens, remises, releases, conveys, assigns, transfers, hypothecates, deposits, pledges, sets over and confirms unto Mortgagee, with respect to or otherwise holding any of the Secured Obligations, all Mortgagor's estate, right, title and interest in, to and under any and all of the following described property (collectively, the "**Mortgaged Property**"), whether now owned or held or hereafter acquired:

(a)    the Land;

(b)    the Improvements;

(c)    the Easements;

(d)    the Fixtures;

(e)    the Agreements;

(f)    all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Premises, whether from the exercise of the right of eminent domain or condemnation (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Premises;

(g)    all proceeds in respect of the Mortgaged Property under any insurance policies covering the Mortgaged Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property;

(h)    all refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Premises as a result of tax certiorari or any applications or proceedings for reduction or otherwise;

(i)    all Leases and all right, title and interest of Mortgagor therein and thereunder, including, without limitation, cash, letters of credit or securities deposited thereunder

to secure the performance by the Lessees (as defined in Section 1.14) of their Secured Obligations thereunder and all rents, additional rents, revenues, income, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements (collectively, the "Rents") and all proceeds from the sale or other disposition of the Leases;

(j)     the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of Mortgagee in the Mortgaged Property; and

(k)     all proceeds of any of the foregoing converted into cash, property, and claims or otherwise.

**TO HAVE AND TO HOLD** unto Mortgagee and its successors and assigns, forever to its and their own proper use and behoof; and Mortgagor also does for itself, its successors and assigns, covenant with Mortgagee, and their successors and assigns, that at and until the ensealing of these presents, it is well seized of the Premises in fee simple of title, and has good right to mortgage, bargain and sell the same and that the same are free from all encumbrances whatsoever except for the Permitted Encumbrances.

PROVIDED ALWAYS, and this instrument is created upon the express condition that, if Mortgagor pays or causes to be paid to Mortgagee, the Secured Obligations, in accordance with the provisions of the Note, this Mortgage and the other Loan Documents, at the times and in the manner specified without deduction, fraud or delay, and Mortgagor performs and complies with or causes to be performed and complied with all the agreements, conditions, covenants, provisions and stipulations contained herein and in the Note, then this Mortgage and the estate hereby granted shall cease and become void.

## ARTICLE I

## PARTICULAR COVENANTS OF MORTGAGOR

Mortgagor represents, warrants, covenants and agrees as follows:

SECTION 1.01

(a)     Mortgagor represents, warrants and covenants that (a) from and after the Effective Date, subject to the Permitted Encumbrances and the express provisions of this Mortgage, Mortgagor shall not cause or permit any lien, charge or encumbrance by, through or under Mortgagor to encumber the Mortgagor's fee simple estate in the Premises, (b) from and after the Effective Date, subject to the Permitted Encumbrances and the express provisions of this Mortgage, Mortgagor shall not cause or permit any lien, charge or encumbrance by, through or under Mortgagor to encumber the Mortgagor's title to the Fixtures, and (c) it has the full power and authority to own the Mortgaged Property and carry on its business as presently conducted and by the execution, delivery, and performance of its Secured Obligations under this Mortgage, the Note or the other Loan Documents will not result in Mortgagor being in default under any provisions of any document that evidences or establishes the existence of Mortgagor or of any mortgage, credit or other agreement to which Mortgagor is a party or by which it is bound or that

affects Mortgagor or the Premises, or any part thereof; that it will preserve its current title in the Premises and the Fixtures, and will forever warrant and defend the same unto Mortgagee and its successors and assigns, and will forever warrant and defend the validity and priority of such lien hereof against the claims of all Persons and parties whomsoever, subject only to the Permitted Encumbrances.

(b)     This Mortgage is subject to and benefitted by the terms and conditions of that certain Second Amended and Restated Subordination Agreement dated on or about the date hereof and effective as of the date hereof (the "**Intercreditor Agreement**"), by and among Mortgagee, PALADIN HEALTHCARE CAPITAL, LLC, a Delaware limited liability company, in its capacity as administrative agent for the Tranche II Debt (as defined in the Intercreditor Agreement), PALADIN HEALTHCARE CAPITAL, LLC, a Delaware limited liability company, in its capacity as administrative agent for the Tranche III Debt (as defined in the Intercreditor Agreement), FRONT STREET HEALTHCARE PROPERTIES, LLC, a Delaware limited liability company, and Mortgagor.

SECTION 1.02

(a)     Mortgagor will, at the sole cost and expense of Mortgagor, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as Mortgagee shall from time to time reasonably require, for the better assuring, conveying, mortgaging, assigning, transferring and confirming unto Mortgagee, the property and rights hereby conveyed, mortgaged or assigned or intended now or hereafter so to be, or that Mortgagor may be or may hereafter become bound to convey, mortgage or assign to Mortgagee, or for more effectively carrying out the intention or facilitating the performance of the terms of this Mortgage, or for filing, registering or recording this Mortgage and, on demand, will execute and deliver, appropriate security instruments to evidence more effectively the lien hereof upon the Mortgaged Property or any part thereof, provided that they do not materially increase the liabilities or decrease the rights of Mortgagor as provided in this Mortgage. Mortgagor will also, at Mortgagee's request, sign any affidavits or other documents or instruments which may be necessary to maintain the priority of the lien of this Mortgage with respect to the Mortgaged Property or any part thereof, or to release or enforce such lien, including but not limited to any amendments, corrections, deletions or additions to this Mortgage.

(b)     Mortgagor expressly agrees, intending that Mortgagee rely thereon, that this Mortgage shall also constitute a "**security agreement**," as such term is defined in the Code with respect to the Fixtures and other Mortgaged Property. Mortgagor further expressly agrees, intending that Mortgagee rely thereon, that this Mortgage, to the extent permitted by law, shall also constitute a "**financing statement**," as such term is defined in the Code with respect to the Fixtures. By its execution of this Mortgage, Mortgagor hereby authorizes Mortgagee to file and/or record this Mortgage as a security instrument and fixture filing with respect to the Mortgaged Property or any part thereof and agrees that Mortgagee, on the Effective Date, may file a financing statement filed as a fixture filing with respect to Mortgaged Property to be filed in the Department of Records of the City of Philadelphia (the "**Fixture Filing**") and a financing statement with respect to Mortgaged Property to be filed in the Office of Secretary of State of the State of Delaware (the "**State Financing Statement**" together with the Fixture Filing, collectively, the

"**Financing Statements**"), any reasonable and necessary amendments to the Financing Statements provided that they do not materially increase the liabilities or decrease the rights of Mortgagor as provided in this Mortgage hereunder, and any continuation statements required to continue the effectiveness of the Financing Statements under the Code for so long as the Secured Obligations remain outstanding. *[NTD: File in DE with respect to security interest in Agreements.]*

SECTION 1.03

(a)     Mortgagor forthwith upon the execution and delivery of this Mortgage, and thereafter from time to time, will cause this Mortgage, and any other security instrument creating a lien or evidencing the lien hereof upon the Fixtures, and each instrument of further assurance to be filed, registered and/or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien hereof upon, and the interest of Mortgagee in, the Mortgaged Property.

(b)     Mortgagee will pay all filing, registration or recording fees, taxes and other charges, and all reasonable costs and expenses incident to the execution, acknowledgment, delivery and recording and/or filing of this Mortgage, the other Loan Documents, any mortgage supplemental hereto, any security instrument with respect to the Fixtures, and any instrument of further assurance, and all Federal, state, county and municipal stamp taxes and other taxes, duties, impositions, assessments and charges arising out of or in connection with the execution and delivery of the Note, this Mortgage or any mortgage supplemental hereto, any security instrument with respect to the Fixtures, any other Loan Document or any instrument of further assurance.

(c)     Upon Mortgagor's full satisfaction of the Secured Obligations, at Mortgagor's sole cost and expense (including, without limitation, the payment of all reasonable legal fees and disbursements related thereto), Mortgagee shall execute and deliver to Mortgagor a release of the lien of this Mortgage and termination statements as to any Uniform Commercial Code financing statements filed by Mortgagee in respect of the Mortgaged Property. Mortgagor shall be responsible for the recordation and filing of such release and termination statements.

SECTION 1.04     Mortgagor will pay and perform all the Secured Obligations under and in accordance with the express terms and conditions of the Note.

SECTION 1.05     Mortgagor will, so long as it is the owner of the Mortgaged Property or any part thereof, do all reasonable things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges as a business or stock corporation under the laws of the state of its incorporation or as a limited liability company under the state of its formation, or as a limited or general partnership, trust or other entity under the state of its formation, as the case may be and will materially comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental authority or court applicable to Mortgagor or to the Mortgaged Property or any part thereof.

SECTION 1.06     All right, title and interest of Mortgagor in and to all extensions, improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to, the Mortgaged Property hereafter acquired by, or released to, Mortgagor, or constructed, assembled or placed by Mortgagor on the Premises or any part thereof, and all

conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by Mortgagor, shall become subject to the lien of this Mortgage as fully and completely, and with the same effect, as though now owned by Mortgagor and specifically described in the Granting Clause hereof, but at any and all times Mortgagor will execute and deliver to Mortgagee any and all such further assurances, mortgages, conveyances or assignments thereof as the Mortgagee may require for the purpose of expressly and specifically subjecting the same to the lien of this Mortgage.

SECTION 1.07

(a)     To the extent provided in any Budget and advanced by Mortgagee, Mortgagor, from time to time, but in all events at a time before any applicable penalty and/or interest would accrue for the non-payment of such, will pay and discharge all taxes of every kind and nature, all general and special assessments, levies, permits, inspection and license fees, all water and sewer rents and charges, and all other public charges whether of a like or different nature, imposed upon or assessed against the Mortgaged Property, or any part thereof, or upon the revenues, rents, issues, income and profits of the Mortgaged Property, or any part thereof, or arising in respect of the occupancy, use or possession thereof.  Mortgagor will, upon the request of Mortgagee, deliver to Mortgagee receipts evidencing the payment of all such taxes, assessments, levies, fees, rents and other public charges imposed upon or assessed against the Mortgaged Property, or any part thereof, or the revenues, rents, issues, income or profits thereof. *[NTD: deleted the "Except as set forth ....". There should be no exceptions to covenant to pay when provided in a Budget and advanced by Mortgagee.  Same comment applies in all similar instances.]*

(b)     To the extent provided in any Budget and advanced by Mortgagee, Mortgagor will pay, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers and others, which claims and demands, if unpaid, might result in, or permit the creation of, a lien on the Mortgaged Property or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general will do or cause to be done everything necessary so that the lien of this Mortgage shall be fully preserved, at the sole cost and expense of Mortgagor, without expense to Mortgagee.

(c)     Nothing in this Section 1.07 shall require the payment or discharge of any Secured Obligation imposed upon Mortgagor by this Section so long as (i) with Mortgagee's consent, Mortgagor shall in good faith and in accordance with applicable laws and at its own cost and expense contest the same or the validity thereof by appropriate legal proceedings that shall operate to prevent the collection thereof or other realization thereon and the sale or forfeiture of the Premises or any part thereof to satisfy the same; and provided further that if, at any time, payment of any Secured Obligation imposed upon Mortgagor by subsection (a) of this Section shall become necessary to prevent the delivery of a tax deed, or its equivalent, conveying the Premises or any other part of the Mortgaged Property, or any part thereof, because of non-payment, then, and provided such amount shall be advanced by Mortgagee, Mortgagor shall pay the same in sufficient time to prevent the delivery of such tax deed or its equivalent.

SECTION 1.08      To the extent provided in any Budget and advanced by Mortgagee, Mortgagor will pay any and all taxes, charges, fees and/or levies by reason of Mortgagee's ownership of and interest in the Note, this Mortgage or the other Loan Documents, except for income taxes.  Taxes, charges, costs fees and/or levies arising from the exercise by Mortgagee of any of its rights and/or remedies provided for under this Mortgage, shall constitute Secured Obligations.  The Secured Obligations assumed by Mortgagor pursuant to this Section 1.08 shall survive the exercise by Mortgagee of any of its rights and/or remedies under this Mortgage.

SECTION 1.09

(a)      To the extent provided in any Budget and advanced by Mortgagee, Mortgagor shall keep the Premises and Fixtures insured against such perils and hazards, and in such amounts and with such limits, as Mortgagee may from time to time require, and in any event will continuously maintain, at Mortgagor's sole cost and expense with the funds provided by Mortgagee under the Note, the following described policies of insurance (collectively, the "**Insurance Policies**"):

(i)      Property insurance insuring the Improvements and Fixtures against loss and damage by fire and other hazards on an "all risk" policy form, covering insurance risks covered by a standard extended coverage insurance policy, and covering such other risks as Mortgagee may reasonably require, in amounts equal to the full replacement cost of the Improvements and Fixtures, including, without limitation, fixtures, Mortgagor's interest in any leasehold improvements, and the cost of debris removal, with an agreed amount endorsement and inflation guard endorsement;

(ii)      Commercial general liability insurance with respect to the Premises, including death, bodily injury and broad form property damage coverage with a combined single limit in an amount not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate, as well as One Million Dollars ($1,000,000) in property damage, for any policy year;

(iii)      If the Premises, or any part thereof, are located in an area that has been identified by the Federal Emergency Management Agency as being located in a special flood hazard area, Mortgagor will keep, for as long as any Secured Obligations remains unpaid, the Improvements covered by flood insurance in an amount equal to the lesser of (A) the full replacement cost of the Premises or (B) the maximum limit of coverage available for the Premises under the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as the same may have been or may hereafter be amended or modified (and any successor act thereto); and

(iv)      Such other types and amounts of insurance coverage as shall be reasonably requested by Mortgagee and are customarily (A) maintained by owners or operators of properties similarly situated to the Premises or (B) required by institutional lenders in like transactions ("Market Standard").

(b)     Not later than the Effective Date, each of the Insurance Policies shall be endorsed to name Mortgagee and its successors and assigns, as mortgagee or lender loss payee, with loss payable to Mortgagee and its successors and assigns, without contribution or assessment, pursuant to a standard first mortgage endorsement in the form of, or substantially equivalent to, the standard mortgagee or lender loss payee endorsement used in the Commonwealth of Pennsylvania, provided that with respect to liability insurance or other policies of insurance required hereunder where a mortgagee or lender loss payee endorsement is not available, Mortgagee shall, to the fullest extent available, be named as an additional insured in any such Insurance Policies.  All Insurance Policies and endorsements required pursuant to this Section 1.09 shall be payable on terms acceptable to Mortgagee, nonassessable and contain such provisions and expiration dates and be in such form and amounts as indicated above and shall be issued by an insurance company (and/or insurance captive) reasonably acceptable to Mortgagee.  Without limiting the foregoing, each policy shall specifically provide that (A) such policy may not be cancelled except upon thirty (30) days' prior written notice to Mortgagee and that no act or thing done by Mortgagor shall invalidate the policy as against Mortgagee and (B) any and all insurance proceeds will be paid to Mortgagee for application to the amounts owed under the Note, so long as Mortgagee certifies to the insurer that Mortgagor, with the consent of Mortgagee, has certified it will not use the proceeds to repair the Mortgaged Property.  In addition, from time to time, upon occurrence of any change in the use, operation or value of the Premises, or in the availability of insurance in the area in which the Premises are located, Mortgagor shall, within five (5) days after demand by Mortgagee, take out such additional amounts and/or such other kinds of insurance as Mortgagee may reasonably require to comply with Market Standard.  Mortgagor shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 1.09, unless Mortgagee is included thereon as a named insured with loss payable to Mortgagee, under the standard mortgage endorsement of the character above described.  Mortgagor shall immediately notify Mortgagee whenever any such separate insurance is taken out and shall promptly deliver to Mortgagee the policy or policies of such insurance.

(c)     [Reserved]

(d)     Upon Mortgagor's actual knowledge, Mortgagor shall give Mortgagee prompt written notice of any damage to, or destruction of, the Improvements, or any part thereof, or of any other casualty or loss at or affecting the Premises or the Fixtures.  Provided that no Event of Default has occurred and is continuing, if the Improvements have been damaged or destroyed, Mortgagee shall allow Mortgagor to use any such insurance proceeds for the restoration of the Improvements, provided that Mortgagee shall reasonably determine that the insurance proceeds shall be sufficient to complete the restoration, or if the amount of such insurance proceeds shall be insufficient to complete such restoration, Mortgagor deposits an amount equal to the difference between Mortgagee's estimated cost of such restoration and the insurance proceeds received.  Mortgagee shall have the right to join Mortgagor in adjusting any insurance claim in respect of any such damage, destruction, casualty or loss constituting a Major Work (as defined below).  To the fullest extent permitted by applicable law, the proceeds of any insurance coming into the possession of Mortgagee in respect of any damage, destruction, casualty or loss shall not be deemed trust funds.

(e)     Unless the Secured Obligations are paid in full to Mortgagee within thirty (30) days of the date of any damage, destruction, loss or other casualty to the Improvements, and

provided that casualty insurance proceeds are made available to Mortgagor, Mortgagor or a Permitted Tenant in accordance with Section 3.23 below, shall promptly commence and diligently continue to perform the repairs, restoration and rebuilding of the portion of the Improvements so damaged or destroyed (hereinafter the "**Work**") so as to restore the Improvements and Fixtures to a condition that is substantially similar to, or better than, the condition that existed immediately prior to such damage by restoring the Premises to substantially the same design and configuration and as good (or better) condition that existed immediately prior to such damage or destruction and to a value which shall not be less than the value of the Premises prior to such fire or other casualty, and if such damage or destruction, in the reasonable judgment of Mortgagee, shall exceed Five Million and No/100 Dollars ($5,000,000) (hereinafter, collectively "**Major Work**"), Mortgagor shall, prior to the commencement of the Major Work, furnish to Mortgagee for its approval: (1) complete plans and specifications for the Major Work, with satisfactory evidence of the approval thereof (i) by all governmental authorities whose approval is required and (ii) by Mortgagee's inspector or an architect satisfactory to Mortgagee (hereinafter, the "Architect") and which shall be accompanied by the Architect's signed estimate, bearing the Architect's seal, of the entire cost of completing the Major Work; (2) certified or photostatic copies of all permits and approvals required by law in connection with the commencement and conduct of the Major Work; and (3) a lien and, with the funds advanced by Mortgagee, completion bond in an amount equal to one hundred and fifteen percent (115%) of the estimated cost of the Major Work, to insure Mortgagee against any liability for mechanic's and materialmen's liens and to insure completion of the Work.  Mortgagor shall not commence any of the Major Work until Mortgagor shall have complied with applicable requirements referred to in this subsection (e), and after commencing the Major Work, Mortgagor shall perform the Major Work diligently and in a good and workmanlike manner in accordance with the plans and specifications referred to in this subsection (e), if applicable.

(f)     During any period that Work is being performed at the Premises, Mortgagor, at its sole cost and expense, with the funds advanced by Mortgagee, shall maintain in full force and effect a builder's "all risk" insurance policy insuring the Improvements against such risks on a replacement cost basis (including, without limitation, fire and extended coverage and collapse of the Improvements to agreed limits) as Mortgagee may reasonably request.  Such policy shall be deemed an Insurance Policy hereunder for all purposes and shall fully comply with the provisions of Section 1.09(a) hereof.

Subject to Mortgagor's compliance with this clause (g), Mortgagee shall pay over to Mortgagor from time to time, upon the following terms, any moneys which may be received by Mortgagee from property insurance provided by Mortgagor, but in no event to any extent or in any sum exceeding the amount actually collected by Mortgagee upon the loss; provided, however, that Mortgagee, before paying such moneys over to Mortgagor, shall be entitled to reimburse or pay itself therefrom to the extent, if any, of the reasonable expenses paid or incurred by Mortgagee in the collection of such moneys (including reasonable attorneys' fees and costs allocable to inspecting the Work and the plans and specifications therefor).  Mortgagee shall pay to Mortgagor, as herein provided, the aforesaid insurance proceeds which may be received by Mortgagee to be applied towards the cost of the Work.  Prior to performing any Work, Mortgagor shall furnish Mortgagee with an estimate of the cost of such Work, prepared by a licensed third party architect or contractor selected by Mortgagor and reasonably approved by Mortgagee.  Subject to Mortgagor's compliance with this clause (g), such insurance moneys

shall be paid to Mortgagor (or, at Mortgagee's option, directly to the party to whom such payment is due) from time to time thereafter in installments as the Work progresses, but in no event more frequently than once per calendar month, within ten (10) business days after application to be submitted by Mortgagor to Mortgagee showing the cost of labor and material incorporated in the Work, or incorporated therein since the last previous application (assuming such proceeds are available from the insurer).  If, in connection with the Work, any vendor's, mechanic's, laborer's, or materialman's lien is filed against the Premises or any part thereof, or if any public improvement lien is created or permitted to be created by Mortgagor and/or is filed against Mortgagee, or any assets of, or funds appropriated to, Mortgagee, Mortgagor shall not be entitled to receive any further installment for the Work until such lien is paid and satisfied in full and discharged and released of record, unless such lien is contested by Mortgagor in good faith and Mortgagor has obtained and delivered a bond issued by a surety, in an amount and in form otherwise satisfactory to Mortgagee in its reasonable discretion.  The amount of any installment to be paid to Mortgagor shall be such proportion of the total insurance moneys received by Mortgagee as the cost of labor and materials theretofore incorporated by Mortgagor in the Work bears to the total estimated cost of the Work by Mortgagor, less all payments theretofore made to Mortgagor out of said insurance proceeds.  Each payment to be made to Mortgagor (or to any other party) as provided in this clause (g) is subject to the following conditions precedent, any of which Mortgagee may freely waive, at Mortgagee's sole discretion:

> (i)     If the Work to be done is Major Work, as determined by Mortgagee, the Architect shall monitor and, to the extent the applicable professional standards governing Architect's work require, be in charge of such Major Work;

> (ii)     Each request for payment shall be accompanied by a certificate of Mortgagee's inspector or the Architect if one is required under Section 1.09(e) above, otherwise by a certificate of an officer of Mortgagor or a Permitted Tenant in accordance with Section 3.23 below, if such Permitted Tenant is performing the Work, stating (A) that all of the Work completed has been done in compliance with the approved plans and specifications, if any be required under said Section 1.09(e) above, and in accordance with all provisions of law; (B) the sum requested is justly required to reimburse Mortgagor or such Permitted Tenant for payments by Mortgagor or such Permitted Tenant to, or is justly due to, such Permitted Tenant, the contractor, subcontractor, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Work (giving a brief description of such services and materials), and that when added to all sums, if any, previously paid out by Mortgagee does not exceed the value of the Work done to date of such certificate; and (C) that the amount of such proceeds and other deposits remaining in the hands of Mortgagee will be sufficient on completion of the Work to pay for the same in full (giving in such reasonable detail as Mortgagee may require an estimate of the cost of such completion);

> (iii)     Each request shall be accompanied by waivers of liens reasonably satisfactory to Mortgagee covering that part of the Work previously paid for, if any, and by a search prepared by a title company selected by Mortgagee or by other evidence satisfactory to Mortgagee, that there has not been filed with respect to the Premises or any part thereof any mechanic's lien or other lien or instrument for the

retention of title in respect of any part of the Work not discharged of record and that there exist no encumbrances on or affecting the Premises or any part thereof or any part of the other Mortgaged Property, other than the Permitted Encumbrances, if any;

(iv)    The request for any payment after the Work has been completed shall be accompanied by a copy of all certificates, permits, licenses, waivers and/or other documents required by law to render occupancy of the Premises legal; and

(v)    Upon completion of the Work and payment in full therefor, or upon failure on the part of Mortgagor to commence, as provided in Section 1.09(e) above, or diligently to continue the Work, or at any time upon request by Mortgagor, Mortgagee may apply the amount of any such proceeds then or thereafter in the hands of Mortgagee to the payment of the Secured Obligations.

(g)    Notwithstanding anything to the contrary in this Section 1.09, at the time when Mortgagee receives a judgment in mortgage foreclosure from the court with applicable jurisdiction of the foreclosure action on the Mortgaged Properties or takes a deed in lieu of foreclosure for the Mortgaged Properties in accordance with the terms of this Mortgage, Mortgagee, in its sole discretion, shall have the option to apply any insurance proceeds it may receive pursuant hereto or otherwise to the payment of the Secured Obligations or to allow all or a portion of such proceeds to be used for the restoration of the Mortgaged Property.  In the event any such insurance proceeds shall be used to reduce the Secured Obligations, the same shall be applied by Mortgagee, after the deduction therefrom and repayment to Mortgagee of any and all costs incurred by Mortgagee in the recovery thereof (including reasonable attorneys' fees and disbursements), in accordance with the terms of the Note.

SECTION 1.10    If Mortgagor shall fail to perform any of the covenants contained in Sections 1.01, 10.03 or 1.05 and Mortgagee reasonably determines the same to be necessary for the protection of the Mortgaged Property or the lien of this Mortgage, Mortgagee may make advances to perform the same on its behalf upon ten (10) days' prior written notice to Mortgagor and all sums so advanced shall be a lien upon the Mortgaged Property and shall be added to and part of the Secured Obligations secured hereby.

SECTION 1.11    Intentionally omitted.

SECTION 1.12    Mortgagor will not unreasonably commit any waste on the Mortgaged Property, or any part thereof, or make any change in the use of the Mortgaged Property, or any part thereof, or operate or manage the Mortgaged Property, or any party thereof, in any manner which will or may, in the reasonable judgment of Mortgagee, materially impair the value of the Mortgaged Property or the security of this Mortgage or materially increase the risk of fire or other hazard or casualty arising out of construction or operation.  Mortgagor will, at all times, maintain the Improvements in as good operating order and condition as such were as of the Effective Date and will promptly make, from time to time, all repairs, renewals, replacements, additions and improvements in connection therewith which are necessary or desirable to such end for events arising from and after the Effective Date.  The Improvements shall not be demolished or substantially altered, nor shall any Fixtures be removed without the prior written consent of

Mortgagee, except (a) where appropriate replacements free of superior title, liens and claims are immediately made having value at least equal to the value of the removed Fixtures and (b) for the donation of the tangible personal property of Mortgagor to Pegasus Therapeutic Riding Academy, Inc., to the extent such property, with the prior written approval of Mortgagee, includes Fixtures.

SECTION 1.13    Mortgagor, promptly upon obtaining knowledge of the institution of any proceedings for the condemnation of the Premises or any part thereof, will notify Mortgagee of the pendency of such proceedings.  In the event of such condemnation proceedings, the award or compensation payable is hereby assigned to and shall be paid to Mortgagee.  Provided that no Event of Default has occurred and is continuing, the proceeds of any award or compensation so received shall be applied first, to the restoration of the Improvements (in the case of a partial condemnation that affects the Improvements in such a way that restoration is required to such Improvements) and second, towards the payment of the Secured Obligations in the order set forth in the Note.  If an Event of Default has occurred and is continuing, the proceeds of any award or compensation so received shall at the option of Mortgagee, either be applied toward the payment of the Secured Obligations in the order set forth in the Note and/or to the restoration of the Improvements (in the case of a partial condemnation that affects the Improvements in such a way that restoration is required to such Improvements).  Any proceeds of any award or compensation received by Mortgagee in excess of the costs of restoration shall be paid to Mortgagee, in an amount not to exceed the outstanding Secured Obligations and the remainder shall be promptly paid or assigned to Mortgagor.  Mortgagor, upon request by Mortgagee, shall make, execute and deliver any and all instruments requested for the purpose of confirming the assignment of the aforesaid awards and compensation to Mortgagee free and clear of any liens, charges or encumbrances of any kind or nature whatsoever.  Mortgagee shall not be limited to the interest paid on the proceeds of any award or compensation, but shall be entitled to the payment by Mortgagor of interest at the applicable rate provided for in the Note.

SECTION 1.14

(a)    Mortgagor will not (i) execute an assignment of any Lease (a "**Lease**") affecting the Premises or any part thereon, or the Rents, or any part thereof, from the Premises, except in favor of Mortgagee, or (ii) except where the lessee under any Lease ("**Lessee**") is in default thereunder or has the express right to do so, terminate or consent to the cancellation or surrender of any such Lease, now existing or hereafter entered into, having an unexpired term of one (1) year or more, except that any Lease may be cancelled provided that promptly after the cancellation or surrender thereof a new Lease is entered into with a new Lessee having a credit standing, in the reasonable judgment of Mortgagee, at least equivalent to that of the Lessee whose lease was cancelled, on substantially the same or better terms as the terminated or cancelled Lease, or (iii) modify any such Lease in a manner adverse to the interests of the Mortgagee except with the written consent of the Mortgagee, or (iv) accept prepayments of any installments of Rents to become due under such Leases, except prepayments in the nature of security for the performance of the Lessees thereunder.

(b)    Mortgagor will at all times promptly and faithfully perform, or cause to be performed promptly, all of the covenants, conditions and agreements contained in all Leases of the Premises, or any part thereof, now or hereafter existing, on the part of the lessor thereunder to be kept and performed and will at all times do all things necessary to compel performance by the

16

Lessee under each Lease of all Secured Obligations, covenants and agreements by such Lessee to be performed thereunder.  If any of such Leases provide for the giving by the Lessee of an estoppel certificate with respect to the status of any such Leases, Mortgagor shall exercise its right to request such certificates within ten (10) days of any demand therefor by Mortgagee.

(c)    If there are any Leases on the Premises or any part thereof, Mortgagor shall furnish to Mortgagee, within ninety (90) days after the end of each fiscal year, a written statement containing the names of all Lessees of the Improvements and Premises or any part thereof, the terms of their respective leases, the space occupied and the rentals payable thereunder.

SECTION 1.15    Unless otherwise prohibited by applicable law, each Lease of the Premises, or of any part thereof, shall provide that, in the event of the enforcement by Mortgagee of the remedies provided for by law or by this Mortgage, the Lessee thereunder will, upon request of any Person succeeding to the interest of Mortgagor as a result of such enforcement, automatically become the Lessee of said successor in interest, without change in the terms or other provisions of such Lease; provided, however, that said successor in interest shall not be bound by (i) any payment of rent or additional rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by said Lessee of its Secured Obligations under said Lease, or (ii) any material amendment or modification of the Lease made without the consent of Mortgagee or such successor in interest.  Each such Lease shall provide that upon request by such successor in interest, such Lessee shall execute and deliver an instrument or instruments confirming such attornment.

SECTION 1.16    Mortgagor hereby agrees that if in connection with the closing of the Loan (a) any of the Loan Documents executed by Mortgagor materially and adversely misstates or inaccurately reflects the true and correct terms and provisions of the Loan, or (b) Mortgagor failed to execute any documents or instruments that should have been executed by Mortgagor (regardless of whether said misstatement, inaccuracy or failure was due to the unilateral mistake of Mortgagee , the mutual mistake of Mortgagor, on the one hand, and Mortgagee, on the other hand, or clerical error), then in such event, Mortgagor shall, within ten (10) days of Mortgagee's request, and in order to correct any such misstatement, inaccuracy or failure, execute such new Loan Documents as Mortgagee may deem necessary or desirable to remedy said inaccuracy, mistake or failure, provided that they do not materially increase the liabilities or decrease the rights of Mortgagor as provided in this Mortgage or any other Loan Documents.

SECTION 1.17    Intentionally omitted.

SECTION 1.18    Intentionally omitted.

SECTION 1.19    To the extent that Mortgagee advances funds to Mortgagor to pay any contractor, subcontractor, materialman or other claimant asserting a lien by virtue of any work performed at the Premises or materials provided to Mortgagor or to any other party in connection with the Premises, Mortgagor shall indemnify and hold Mortgagee, its successors and assigns harmless against any loss or liability, cost or expense, including without limitation, any judgments, reasonable attorneys' fees, costs of appeal bonds and printing costs, arising out of or relating to any proceedings instituted by such party based on a failure to pay the advanced funds to such party.

SECTION 1.20        Intentionally omitted.

SECTION 1.21        Mortgagor expressly covenants and agrees that the Secured Obligations shall include the reasonable fees and expenses of Mortgagee's outside counsel that arise in connection with the enforcement of any document executed in connection with the Loan, including without limitation all costs and expenses associated with exercise of Mortgagee's remedies under Article II of this Mortgage.  These amounts shall be deemed advances of the Loan secured by this Mortgage.

SECTION 1.22

(a)        Mortgagor covenants that, except as necessary or appropriate for the business operations of Mortgagor and in accordance with Environmental Laws, (i) the Premises shall be kept free of, and shall not be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with, Hazardous Materials, and (ii) Mortgagor shall not cause or permit, as a result of any intentional or unintentional act or omission on the part of Mortgagor or any tenant, subtenant, occupant, or invitee, any release, storage, placement, or disposal of Hazardous Materials into the environment at or from the Premises or affecting any "natural resources" (as such term is defined in CERCLA (as hereafter defined)) or suffer the presence of Hazardous Materials on the Premises.  Mortgagor agrees to comply, and to ensure compliance by all tenants, subtenants, occupants, and invitees, with all applicable state, federal or local laws relating to Hazardous Materials or to the protection of the environment (collectively, "**Environmental Laws**").  For the purposes of this Mortgage, the term "Environmental Laws" shall include, without limitation, laws relating to the generation, storage, treatment and disposal of any medical, biological, infectious, and chemotherapeutic waste. Mortgagor shall keep the Premises and the other Mortgaged Property free and clear of any liens or assessments imposed pursuant to any Environmental Laws relating to matters and conditions not existing at the Premises prior to the Effective Date.  Acting in accordance with all applicable Environmental Laws, Mortgagor shall conduct and complete all investigations, studies, sampling, and testing, and all remedial, removal, and other actions necessary to clean up and remove all Hazardous Materials on, from or affecting the Mortgaged Property or any part thereof which were not upon the Premises prior to the Effective Date (the "**Mortgagor's Environmental Secured Obligation**").  To the extent Mortgagor is not precluded from doing so by any Environmental Laws or by prior issuance to Mortgagor of an administrative or judicial order compelling action which would satisfy Mortgagor's Environmental Secured Obligation, Mortgagor shall satisfy Mortgagor's Environmental Secured Obligation voluntarily, by acting under the Pennsylvania Land Recycling and Environmental Remediation Standards Act, as amended ("**Act 2**"), 35 P.S. §§ 6026.101 et seq., in the manner required by Act 2 and this Section 1.22, to attain at the Mortgaged Property an environmental remediation standard or standards established by Act 2. Before Mortgagor submits to the Pennsylvania Department of Environmental Protection ("**PADEP**") a notice of intent to remediate all or any part of the Mortgaged Property pursuant to Act 2, and before Mortgagor takes any other step to satisfy Mortgagor's Environmental Secured Obligation voluntarily, as allowed by Act 2, Mortgagor shall (a) provide written notice to Mortgagee of Mortgagor's intent to attain an environmental remediation standard or standards established under Act 2; (b) identify to Mortgagee the environmental remediation standard or standards established under Act 2 which Mortgagor seeks to attain and the environmental medium to which Mortgagor proposes to apply each such standard; (c) outline briefly to Mortgagee the

18

way in which Mortgagor proposes to attain such standard at such medium; and (d) obtain the written consent of Mortgagee to the attainment of such standard at such medium in such manner except to the extent such consent is not required pursuant to Section 1.22(e).  Mortgagee shall not unreasonably withhold, delay or condition any consent required under this Section 1.22 but may condition its consent on the continuation or availability, after an environmental remediation standard is attained, of any non-residential use of the Mortgaged Property which is available for or made of the Mortgaged Property as of the Effective Date.  After having given Mortgagor any consent(s) required by this Section 1.22, Mortgagee shall execute such documents as may be required for any remedial activities, including but not limited to, deed notices and activity and use limitations, undertaken by Mortgagor to comply with Act 2 or any other applicable Environmental Laws.  For the purposes of this Mortgage, "**Hazardous Materials**" shall mean: (A) any hazardous or toxic waste, substance, or material defined by or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("**CERCLA**"), 42 U.S.C. § 9601 et seq., and/or the Resource Conservation and Recovery Act, as amended ("**RCRA**"), 42 U.S.C. § 6901 et seq., and/or the Hazardous Materials Transportation Act, as amended ("**HMTA**"), 49 U.S.C. § 1801 et seq., and/or the Toxic Substances Control Act, as amended ("**TSCA**"), 15 U.S.C. § 2601 et seq., and/or the Clean Air Act, as amended ("**CAA**"), 42 U.S.C. § 7401 et seq., and/or the Clean Water Act, as amended ("**CWA**"), 33 U.S.C. § 1251 et seq., and/or any state law corresponding to CERCLA, RCRA, HMTA, TSCA, CAA, or CWA; (B) any "regulated substance" as defined by Act 2; (C) any asbestos-containing material; (D) medical, biological, infectious or chemotherapeutic waste; (D) polychlorinated biphenyls; (E) petroleum products, including gasoline, fuel oil, crude oil, heating oil, and any of the various constituents of any such products; and (F) any other chemicals, materials or substances, exposure to which is prohibited, limited or regulated by any Environmental Laws.  The Secured Obligations and liabilities of Mortgagor shall survive any foreclosure involving the Mortgaged Property or the delivery of a deed in lieu of foreclosure, but only with respect to actions or occurrences prior to such foreclosure or delivery of a deed in lieu of foreclosure, and shall remain in effect until the occurrence of each of the following events: (i) satisfaction of and payment of all Secured Obligations under this Mortgage; and (ii) fulfillment of Mortgagor's Environmental Secured Obligation through attainment of any environmental remediation standard or standards and/or the termination or satisfaction of any administrative or judicial order which may have been issued to Mortgagor after the Effective Date concerning any release to the environment of Hazardous Materials introduced onto or at the Mortgaged Property after the Effective Date.

(b)    Mortgagor hereby releases Mortgagee, its successors and assigns from, and shall protect, indemnify and hold harmless Mortgagee, its successors and assigns from and against, all liabilities, Secured Obligations, claims, assessments, damages, penalties, causes of action, costs and expenses (including without limitation reasonable attorneys' fees and expenses), which may be imposed upon, incurred by, or asserted against Mortgagee by reason of (i) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Materials in, on, above, under, from or affecting the Premises or any other property or natural resources; (ii) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Materials; (iii) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Materials; or (iv) any violation or breach of Environmental Laws or of Mortgagor's Environmental Secured Obligation.

(c)     Mortgagor shall, to the extent it has notice or knowledge, give prompt written notice to Mortgagee of: (i) any proceeding or inquiry by any governmental authority with respect to the presence of any Hazardous Materials on the Mortgaged Property or the migration thereof from or to other property; (ii) all claims made or threatened by any person against Mortgagor or the Mortgaged Property relating to any loss or injury resulting from any Hazardous Materials; and/or (iii) the storage, production, release, discharge or disposal of any Hazardous Materials at the Premises after the Effective Date other than with respect to Hazardous Materials used, generated, treated, stored, or disposed of in accordance with applicable Environmental Laws as part of business operations at the Premises; and/or (iv) Mortgagor's discovery of any occurrence or condition that could cause the Mortgaged Property or any part thereof to be subject to any restrictions on ownership, occupancy, transferability, or use under any Environmental Law.

(d)     Mortgagor shall promptly provide to Mortgagee copies of all written notices or other communications received by Mortgagor from any governmental agency, tenant, subtenant, occupant or invitee with respect to Hazardous Materials at, in, on, under or otherwise affecting the Mortgaged Property or any part thereof, including without limitation, any notices or other communication relating to any actual or threatened inquiry, investigation, claim, proceeding or action concerning Hazardous Materials or other environmental conditions affecting the Premises.

(e)     Mortgagor shall keep Mortgagee apprised of the status of any governmental inquiry or investigation relating to Hazardous Materials at the Premises, any enforcement, clean-up, removal, remediation or other governmental proceedings or actions threatened, instituted or completed or pursuant to any Environmental Laws with respect to the Mortgaged Property or any part thereof, and any voluntary effort by Mortgagor to attain an environmental remediation standard or standards under Act 2 at the Mortgaged Property, as well as any other claims, actions or proceedings with respect to the Premises relating to environmental matters.  Mortgagor shall not enter into or record any settlement, agreement, consent decree, deed notice or other arrangement or compromise with respect to any effort to attain an environmental remediation standard under Act 2 or with respect to any governmental inquiry, investigation, proceeding or action, or other claim, action or proceeding relating to Hazardous Materials and/or the clean-up or remediation of the Premises without Mortgagee's prior written consent, which shall not be unreasonably withheld, conditioned, or delayed, except that Mortgagee's consent shall not be required for (i) any settlement, agreement, consent decree, or other arrangement that involves only the payment of money or does not affect the continued use of the Premises as presently used or intended to be used by Mortgagor or (ii) matters to the extent required to satisfy an existing contractual obligation of Mortgagor.  Mortgagee may, but shall not be required to, participate in any inquiry, investigation, or proceeding or action with respect to the Premises in connection with any Environmental Law or Hazardous Materials, at Mortgagee's sole cost and Mortgagor will control any and all negotiations relating to such matter subject to the protections provided to Mortgagee in this Section 1.22 concerning continued or available non-residential use of the Mortgaged Property.

(f)     After the occurrence of an Event of Default that remains uncured after the expiration of any applicable notice and cure period or if Mortgagee has notified Mortgagor of a purported Event of Default by Mortgagor in accordance with the Note, Mortgagee may, at any time prior to either foreclosing on the Premises or taking a deed to the Premises in lieu of foreclosure, demand in writing that Mortgagor provide to Mortgagee complete copies of the

following documents (hereinafter collectively referred to as the "**Mortgagor's Environmental Information**") produced at Mortgagor's direction and to the extent applicable to the Premises: (i) any analytical results of any sampling undertaken at any time of any environmental medium at, under, or from the Premises at Mortgagor's direction which are held by Mortgagor or, to the extent reasonably obtainable, any consultant who is working or has worked for Mortgagor; (ii) any reports generated by any laboratory which analyzed any environmental medium sampled at, under, or from the Premises before or after the Effective Date; (iii) any draft or final environmental reports, studies, and Phase I or Phase II environmental site assessments of the Premises which are held by Mortgagor or, to the extent reasonably obtainable, by any consultant who is working or has worked for Mortgagor as of the date on which Mortgagee's demand for any of Mortgagor's Environmental Information is received by Mortgagor, regardless of the date of such reports, studies or assessments; (iv) any report to a regulatory agency of a release of any Hazardous Materials to the environment at, under, or from the Premises which is made after the Effective Date and which is in the possession of Mortgagor or, to the extent reasonably obtainable, any agent of Mortgagor, regardless of whether such report was made by or for Mortgagor; and (v) any communication, notice of violation, administrative or judicial order, request for information, or demand issued or made after the Effective Date by any environmental regulatory agency or any other person which concerns any release or threat of release to the environment at, under, or from the Premises of any Hazardous Materials, regardless of when such Hazardous Materials were released or threatened to be released to the environment and regardless of whether any such Hazardous Materials were known to be present at, under, or from the Premises as of the Effective Date.  Mortgagee may follow any initial written demand to Mortgagor for Mortgagor's Environmental Information with subsequent written demands for any additional Mortgagor's Environmental Information consistent with the provisions of this Section 1.22(f).

      SECTION 1.23      Intentionally omitted.

      SECTION 1.24      Mortgagor agrees as follows:

      (a)      Mortgagor agrees that it shall use commercially reasonable efforts to cause the Premises to materially comply, to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, as amended from time to time, the Fair Housing Amendments Act of 1988, as amended from time to time, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities, as amended from time to time (collectively, "**Access Laws**").  Notwithstanding anything to the contrary in this Section, the provisions and Secured Obligations of this Section 1.24(a) shall not apply to any matters or conditions identified in the Zoning Reports or Property Condition Evaluation, or to any matter or conditions which otherwise existed prior to the Effective Date.

      (b)      Notwithstanding any provisions set forth herein or in any other documents regarding Mortgagee's approval or alterations of the Premises, Mortgagor shall not alter the Premises in any manner that would materially increase Mortgagor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Mortgagee, which approval Mortgagee shall not unreasonably withhold, condition or delay.  The foregoing shall apply to tenant improvements constructed by Mortgagor or by any of its tenants.  Mortgagee

may condition any such approval upon receipt of a certificate of Access Laws compliance from an architect, engineer, or other Person reasonably acceptable to Mortgagee.

(c)     Mortgagor agrees to give prompt notice to Mortgagee of the receipt by Mortgagor of any written complaints by governmental authorities related to violations of any Access Laws and of commencement of any governmental proceedings or investigations related to compliance with applicable Access Laws.

SECTION 1.25     Except as set forth in Section 14(p) of the Note, Mortgagor shall not sell, convey, dispose of, alienate, hypothecate, lease (except to space tenants in accordance with the provisions of Section 1.14 hereof), assign, pledge, mortgage, encumber or otherwise transfer (each a "**Transfer**" and, collectively, "**Transfers**") the Premises, or any part thereof or interest therein, in any manner or way, whether voluntarily or involuntarily, without Mortgagee's prior written consent and any such Transfer shall constitute an Event of Default hereunder giving Mortgagee the right, at its sole option, to exercise Mortgagee's remedies under Article II of this Mortgage.

SECTION 1.26     [Reserved]

SECTION 1.27     [Reserved]

SECTION 1.28     [Reserved]

SECTION 1.29     If at any time after the occurrence and during the continuance of an Event of Default, Mortgagee shall deem it necessary to obtain a current appraisal of the Premises, Mortgagee may, at Mortgagee's sole cost and expense, engage the services of an appraiser to provide a current appraisal of the Premises, and Mortgagor shall cooperate with providing timely access  to such appraiser.

SECTION 1.30     Mortgagor represents and warrants that Mortgagor it is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order of the President of the United States (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any applicable law that is enforced or administered by the Office of Foreign Assets Control, and is not engaging in the transactions contemplated by the Loan Documents, directly or indirectly, on behalf of, or instigating or facilitating the Loan transactions, directly or indirectly, on behalf of, any such person, group, entity or nation.

SECTION 1.31     The parties hereto agree that, if the obligations under the Note shall be declared to be immediately due and payable as the result of an occurrence of an Event of Default or if the obligations under the Note are not paid in full at maturity, then all sums that become available to Mortgagee as a result of the foreclosure of this Mortgage shall be applied to the Secured Obligations in the order set forth in the Note.

SECTION 1.32     Repayment obligations with respect to the Loan shall not be subject to setoff, counterclaim, recoupment or deduction of any kind.

(End of Article I)

## ARTICLE II

## EVENT OF DEFAULT AND REMEDIES

SECTION 2.01

(a)    Upon the occurrence of an Event of Default, Mortgagee shall have all of the remedies set forth in Section 2.02 below.  An "Event of Default" shall be any of the following:

(i)    The failure by Mortgagor to keep, perform, or observe any covenant, condition or agreement on the part of Mortgagor in any of Section 1.07, 1.08, 1.09 or 1.25 of this Mortgage;

(ii)    The failure by Mortgagor to keep, perform or observe any covenant, condition or agreement on the part of Mortgagor in this Mortgage, other than as set forth in clause (i) above, which failure continues for more than thirty (30) days after the date that Mortgagor received notice from Mortgagee of such failure; and

(iii)    The occurrence of an "Event of Default" under and as defined in the Note or Event of Default beyond any applicable cure period under any of the other Loan Documents.

(b)    <u>Acceleration of the Secured Obligations</u>.  During the continuance of any such Event of Default, Mortgagee, by written notice given to Mortgagor, may declare the entire principal of the Loan then outstanding (if not then due and payable), and all accrued and unpaid interest thereon, together with all other Secured Obligations, to be due and payable immediately, notwithstanding anything to the contrary herein or in the Note or the other Loan Documents;

(c)    <u>Possession of the Mortgaged Property</u>.  During the continuance of any Event of Default, with or without the appointment of a receiver, or an application therefor, Mortgagee personally, or by its agents or attorneys, may enter into and upon all or any part of the Premises, and each and every part thereof, and may exclude Mortgagor, its agents and servants wholly therefrom; and having and holding the same, may use, operate, manage and control the Premises and conduct the business thereof, either personally or by its superintendents, managers, agents, servants, attorneys or receivers; and upon every such entry, Mortgagee, at the expense of Mortgagor, from time to time, either by purchase, repairs or construction, may maintain and restore the Mortgaged Property, whereof it shall become possessed as aforesaid, may complete the construction of any of the Improvements and in the course of such completion may make such changes in the contemplated Improvements as it may deem desirable and may insure the same; and likewise, from time to time, at the expense of Mortgagor, Mortgagee may procure title reports, title insurance, surveys, appraisals and such other reports as Mortgagee, in its sole discretion, shall deem necessary, and make all necessary or proper repairs, renewals and such useful alterations, additions, betterments and improvements thereto and thereon as to it may deem advisable; and in every such case Mortgagee shall have the right to manage and operate the Premises and to carry on the business thereof and exercise all rights and powers of Mortgagor with respect thereto either

23

in the name of Mortgagor or otherwise as it shall deem best; and Mortgagee shall be entitled to collect and receive all earnings, revenues, rents, issues, profits and income of the Premises and every part thereof, all of which shall for all purposes constitute property of Mortgagor; and in furtherance of such right Mortgagee may collect the Rents payable under all Leases of the Premises directly from the Lessees thereunder upon notice to each such Lessee that an Event of Default exists hereunder accompanied by a demand on such Lessee for the payment to Mortgagee of all Rents due and to become due under its Lease, and Mortgagor, for the benefit of Mortgagee and each such Lessee, hereby covenants and agrees that the Lessee shall be under no duty to question the accuracy of Mortgagee's statement of default and shall unequivocally be authorized to pay said Rents to Mortgagee without regard to the truth of Mortgagee's statement of default and notwithstanding notices from Mortgagor disputing the existence of an Event of Default such that the payment of Rent by the Lessee to Mortgagee pursuant to such a demand shall constitute performance in full of the Lessee's obligations under the Lease for the payment of Rents by the Lessee to Mortgagor; and after deducting the expenses of conducting the business thereof and of all maintenance, repairs, renewals, replacements, alterations, additions, betterments and improvements and amounts necessary to pay for taxes, assessments, insurance and prior or other proper charges upon the Mortgaged Property, or any part thereof, as well as just and reasonable compensation for the services of Mortgagee and for all servants and other employees by it properly engaged and employed in connection therewith, Mortgagee shall apply the moneys arising as aforesaid to the Secured Obligations in the order set forth in the Note.

Notwithstanding anything to the contrary in this Mortgage or the Note, including the existence of any Event of Default, or event which with the passage of time or the giving of notice will constitute an Event of Default, Mortgagee shall not exercise any right or take any action set forth in this paragraph (c) with respect to the Mortgaged Property or any portion thereof prior to the fifteenth (15th) month anniversary from the Effective Date.

      (d)    <u>Foreclosure, Etc.</u>  Mortgagee, with or without entry, personally or by its agents or attorneys, insofar as applicable, may:

      (i)    sell (and, in the case of any default by any purchaser, resell) the Mortgaged Property, or any part thereof, to the extent permitted and pursuant to the procedures provided by law, and all estate, right, title and interest, claim and demand therein, and right of redemption thereof, at one or more sales as an entirety or in parcels, and at such time and place upon such terms and after such notice thereof as may be determined by Mortgagee or as required or permitted by law; or

      (ii)    institute proceedings for the complete or partial foreclosure of this Mortgage; or

      (iii)    take such steps to protect and enforce its rights whether by action, suit or proceeding in equity or at law for the specific performance of any covenant, condition or agreement in the Note, this Mortgage or the other Loan Documents, or in aid of the execution of any power herein granted, or for any foreclosure hereunder, or for the enforcement of any other appropriate legal or equitable remedy or otherwise as Mortgagee shall elect.

Notwithstanding anything to the contrary in this Mortgage or the Note, including the existence of any Event of Default, or event which with the passage of time or the giving of notice will constitute an Event of Default, Mortgagee shall not exercise any right or take any action to foreclose on the Mortgaged Property or any portion thereof, or any right of power of sale or take any action to exercise such right with respect to the Mortgaged Property or any portion thereof, prior to the fifteenth (15th) month anniversary from the Effective Date.

(e)     Power of Sale.  Mortgagor hereby unconditionally and irrevocably gives, grants, sets over and confirms unto Mortgagee, the Power of Sale, to the fullest extent such remedy is then available from and after the date hereof under the laws of the Commonwealth of Pennsylvania, which Power of Sale may be unconditionally exercised at any time or times after the happening of an Event of Default and during its continuance and in connection therewith, Mortgagor hereby (a) consents to any one or more adjournments of the sale date which Mortgagee may grant, consent to and/or schedule, whether or not Mortgagor is notified of such adjournment (except when expressly required by applicable law) and (b) waives, to the extent permitted by applicable law, any and all objections Mortgagor may have to the date of sale, the place of sale, the terms of sale and any other matter selected by Mortgagee.  The sale by Mortgagee of less than the whole of the Mortgaged Property shall not exhaust the right to sell any remainder of the Mortgaged Property, and Mortgagee is specifically empowered to make a successive sale or sales until the whole of the Mortgaged Property shall be sold.  If the proceeds of the sale of less than the whole of the Mortgaged Property is less than the aggregate of the Secured Obligations and other Secured Obligations secured hereby and payable under the Note, then this Mortgage and the lien hereof shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale had been made.

Notwithstanding anything to the contrary in this Mortgage or the Note, including the existence of any Event of Default, or event which with the passage of time or the giving of notice will constitute an Event of Default, Mortgagee shall not exercise any right or take any action to foreclose on the Mortgaged Property or any portion thereof, or any right of power of sale or take any action to exercise such right with respect to the Mortgaged Property or any portion thereof, prior to the fifteenth (15th) month anniversary from the Effective Date.

(f)     [Reserved].

(g)     Appointment of Receiver.  After the happening of any Event of Default (other than a default in payment of obligations of Borrower under the Note or any of the other Loan Documents) and during its continuance after the expiration of any applicable cured period, or upon the commencement of any proceedings to foreclose this Mortgage or to enforce the specific performance hereof or in aid thereof or upon the commencement of any other judicial proceeding to enforce any right of Mortgagee, Mortgagee shall be entitled, as a matter of right, if it shall so elect, without the giving of notice to any other party and without regard to the adequacy or inadequacy of any security for the Secured Obligations, forthwith either before or after declaring the unpaid principal of the Note to be due and payable, and without requirement for a bond, to the appointment of a receiver or receivers in respect of the Mortgagee, the Premises and/or the Mortgaged Property, and Mortgagor hereby consents to the appointment of such receiver or receivers.

(h)    <u>Equitable Relief</u>.  Upon the occurrence of any Event of Default, or if Mortgagor is in material breach of any of the terms and conditions of this Mortgage, Mortgagor and Mortgagee agree that Mortgagee will suffer damages in amounts which are not readily ascertainable and thus, in each instance, Mortgagee shall be entitled to be granted specific performance of Mortgagor's obligation to execute, deliver, and otherwise perform its obligations as contained hereunder; provided, however, that Mortgagee shall not be entitled to specific performance under this subparagraph (h) in order to obtain any remedy to the extent that Mortgagee has agreed not to exercise such remedy pursuant to any other provision of this Mortgage.

(i)    <u>Rights of a Secured Party</u>.  Mortgagee shall also have such other rights and/or remedies provided to a mortgagee and/or a secured party by the Code.

SECTION 2.02

(a)    Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(b)    Upon the completion of any sale or sales made by Mortgagee under or by virtue of this Article II, Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold and shall execute and deliver to the appropriate governmental authority any affidavit, instrument, document and/or filing required pursuant to any applicable statute, ordinance, rule and/or regulation, of the Commonwealth of Pennsylvania.  Nevertheless, Mortgagor, if so requested by Mortgagee, shall ratify and confirm any such sale or sales by executing and delivering to Mortgagee or to such purchaser or purchasers all such instruments as may be advisable, in the reasonable judgment of Mortgagee, for that purpose, and as may be designated in such request.  Any such sale or sales made under or by virtue of this Article II, whether made under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Mortgagor and against any and all Persons claiming or who may claim the same, or any part thereof, from, through or under Mortgagor.

(c)    In the event of any sale made under or by virtue of this Article II (whether made under or by virtue of judicial proceedings, a judgment or decree of foreclosure or a Power of Sale), the entire principal of, and interest on, the obligations under the Note, if not previously due and payable, and all other sums required to be paid by Mortgagor pursuant to this Mortgage, immediately thereupon, shall, anything in the Note or this Mortgage to the contrary notwithstanding, become due and payable.

(d)    The purchase money proceeds or avails of any sale made under or by virtue of this Article II, together with any other sums which then may be held by Mortgagee under this

26

Mortgage, whether under the provisions of this Article II or otherwise, shall be applied to the Secured Obligations in the order set forth in the Note.

(e)     Upon any sale made under or by virtue of this Article II, whether made under or by virtue of judicial proceedings, a judgment or decree of foreclosure and sale, or a Power of Sale, Mortgagee may, to the extent not prohibited by applicable law, bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor, Mortgagee shall be entitled, to make settlement for the purchase price by crediting upon the Secured Obligations of Mortgagor secured by this Mortgage the net sales price after deducting therefrom the reasonable expenses of the sale and the costs of the action and any other sums which Mortgagee is authorized to deduct under this Mortgage.

SECTION 2.03

(a)     In case of the commencement of any case against Mortgagor under any applicable bankruptcy, insolvency, or other similar law now or hereafter in effect or any proceedings for its reorganization or involving the liquidation of its assets, then Mortgagee shall be entitled to prove the whole amount of principal and interest due under the Note to the full amount thereof, and all other payments, charges and costs due under this Mortgage, without deducting therefrom any proceeds obtained from the sale of the whole or any part of the Mortgaged Property; provided, however, that in no case shall Mortgagee receive a greater amount than the outstanding Secured Obligations from the aggregate amount of the proceeds of the sale of the Mortgaged Property and the distribution from the estate of Mortgagor.

(b)     No recovery of any judgment by Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Mortgagor shall affect in any manner or to any extent, the lien of this Mortgage upon the Mortgaged Property, or any part thereof, of any liens, rights, powers or remedies of Mortgagee hereunder, but such liens, rights, powers and remedies of Mortgagee shall continue unimpaired as before.

(c)     Any moneys thus collected by Mortgagee under this Section 2.03 shall be applied to the Secured Obligations secured hereby by Mortgagee in the order set forth in the Note.

SECTION 2.04     Intentionally omitted.

SECTION 2.05     Notwithstanding the appointment of any receiver, liquidator or trustee of Mortgagor, or of any of its property, or of the Mortgaged Property or any part thereof, Mortgagee shall be entitled to retain possession and control of all property now or hereafter held under this Mortgage.

SECTION 2.06     No remedy herein conferred upon or reserved to Mortgagee is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.  No delay or omission of Mortgagee to exercise any right or power accruing upon the occurrence and during the continuance of any Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Event of Default or any acquiescence therein; and every power and remedy given by this Mortgage to Mortgagee may be exercised from time to time as often as may be deemed expedient by Mortgagee.  Nothing

in this Mortgage or in the Note shall affect the Secured Obligation of Mortgagor to pay the principal of, and interest on, the obligations under the Note in the manner and at the time and place therein respectively expressed.

SECTION 2.07    Mortgagor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Mortgage, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; nor, after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof and Mortgagor hereby expressly waives, to the extent permitted by applicable laws, all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any power herein granted or delegated to Mortgagee, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted.  Mortgagor, for itself and all who may claim under it, waives, to the extent that it lawfully may, all right to have the Mortgaged Property, or any part thereof, marshaled upon any foreclosure hereof.

SECTION 2.08    Notwithstanding anything to the contrary in this Mortgage or the Note, Mortgagee agrees that no Event of Default, or event which with the passage of time or the giving of notice will constitute an Event of Default, shall exist that arises from or relates to the nonpayment of the items set forth in any Budget, and that have not been advanced by Mortgagee to Mortgagor if and as required under the Note.

SECTION 2.09    Notwithstanding anything to the contrary set forth herein, no covenant or any other provision of this Mortgage shall survive repayment in full of the Secured Obligations from the proceeds of Mortgaged Property.

(End of Article II)

## ARTICLE III

## MISCELLANEOUS

SECTION 3.01    In the event any one or more of the provisions contained in this Mortgage or in the Note shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall, at the option of Mortgagee, not affect any other provision of this Mortgage, but this Mortgage shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

SECTION 3.02    All notices hereunder (including any notices to Mortgagee under 42 Pa. C.S.A. § 8143) shall be in writing, addressed to the parties at the following addresses:

If to Mortgagee:

Philadelphia Academic Health System, LLC
216 N. Broad Street, 4th Floor
Philadelphia, PA  19102

If to Mortgagor:

Broad Street Healthcare Properties, LLC
21143 Hawthorne Blvd. #505
Torrance, CA 90503

and shall be deemed to have been properly given when made as provided in Section [13(a)] of the Note, unless a specific provision of this Mortgage provides for notice, in which case, such other provision shall apply to the notice stated therein.

SECTION 3.03    All covenants hereof shall be construed as affording to Mortgagee rights additional to and not exclusive of the rights conferred under the provisions of the laws of the Commonwealth of Pennsylvania or any other applicable law.

SECTION 3.04    All of the grants, terms, conditions, provisions and covenants of this Mortgage shall run with the land, shall be binding upon Mortgagor and shall inure to the benefit of Mortgagee, subsequent holders of this Mortgage and their respective successors and assigns. This Mortgage may not be assigned by Mortgagee prior to the fifteenth (15th) month anniversary of the Effective Date without the prior written consent of Mortgagor, not to be unreasonably withheld, and any such purported assignment without such consent shall be null and void; provided that the foregoing restriction shall not apply to any assignment by Mortgagee to any direct or indirect wholly owned subsidiary of Mortgagee, which Mortgagee shall be permitted to effect without consent of Mortgagor.  For the purpose of this Mortgage, the term "Mortgagor" shall include and refer to the mortgagor named herein, any subsequent owner of the Mortgaged Property, or any part thereof, and their respective heirs, executors, legal representatives, successors and assigns.  If there is more than one Mortgagor, all their undertakings hereunder shall be deemed joint and several.

SECTION 3.05    The enforcement of this Mortgage shall be governed, construed and interpreted by the laws of the Commonwealth of Pennsylvania (without giving effect to Pennsylvania's principles of conflicts of law) and Mortgagor and Mortgagee agree that the creation, perfection and priority of the lien of this Mortgage on the Mortgaged Property shall be governed by the laws of the Commonwealth of Pennsylvania.  Nothing in this Mortgage, the Note or in any other Loan Documents between Mortgagor, on the one hand, and Mortgagee, on the other hand, shall require Mortgagor to pay, or Mortgagee to accept, interest in an amount which would subject Mortgagee to any penalty or forfeiture under applicable law.  In the event that the payment of any charges, fees or other sums due hereunder or under the Note or any other Loan Documents, which are or could be held to be in the nature of interest and which would subject Mortgagee to any penalty or forfeiture under applicable law, then, ipso facto, the Secured Obligations of Mortgagor to make such payment shall be reduced to the highest rate authorized under applicable law.  Should Mortgagee receive any payment which is or would be in excess of the highest rate

29

authorized under law, such payment shall have been, and shall be deemed to have been, made in error, and shall automatically be applied to reduce the outstanding principal balance of the Secured Obligations.

SECTION 3.06    This Mortgage and all of the terms, covenants, provisions, conditions and grants contained in this Mortgage cannot be altered, amended, waived, modified or discharged orally, and no executory agreement shall be effective to modify, waive or discharge, in whole or in part, anything contained in this Mortgage unless it is in writing and signed by the party against whom enforcement of the modification, alteration, amendment, waiver or discharge is sought.

SECTION 3.07    Mortgagor acknowledges that it has received a true copy of this Mortgage.

SECTION 3.08    Time is of the essence as to each of Mortgagor's Secured Obligations under this Mortgage.

SECTION 3.09    The information set forth on the cover hereof is hereby incorporated herein.

SECTION 3.10    The Mortgaged Property includes, and shall be deemed to include, inter alia, the Fixtures, regardless of whether they are held or hereafter acquired, by Mortgagor in, to and under the Mortgaged Property.  By executing and delivering this Mortgage, Mortgagor has granted, in the same manner and with the same effect described in the Granting Clause hereof, to Mortgagee, as additional security, a security interest in the Fixtures which are subject to the Code. If any Event of Default shall occur, Mortgagee shall have, in addition to any and all other rights and remedies set forth in this Mortgage, and may exercise without demand, any and all rights and remedies granted to a secured party under the Code, including, but not limited to, the right to take possession of the Fixtures, or any part thereof, and the right to advertise and sell the Fixtures, or any part thereof, pursuant to and in accordance with the power of sale provided for in this Mortgage.  Mortgagor agrees that any notice of sale or other action intended by Mortgagee with respect to the Fixtures, or any part thereof, shall constitute reasonable notice if it is sent to Mortgagor not less than ten (10) days prior to any such sale or intended action.  The proceeds of any such sale of the Fixtures, or any part thereof, shall be applied to the Secured Obligations in the order set forth in the Note.

SECTION 3.11    The lien of this Mortgage shall remain in effect until the last dollar of the Secured Obligations is paid in full and all of Mortgagor's obligations under the Note have been terminated.

SECTION 3.12    Mortgagor hereby irrevocably submits to the nonexclusive jurisdiction of any state or federal court sitting in the Commonwealth of Pennsylvania in the City of Philadelphia, County of Philadelphia, over any suit, action or proceeding arising out of or relating to this Mortgage and any other Loan Documents, and Mortgagor hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any state or federal court sitting in the Commonwealth of Pennsylvania in the City of Philadelphia, County of Philadelphia, may be

made by certified or registered mail, return receipt requested, or overnight delivery service, directed to Mortgagor at the following address and service so made shall be complete five (5) days after the same shall have been so mailed: Broad Street Healthcare Properties, LLC, c/o Paladin Healthcare Capital, LLC, 21143 Hawthorne Blvd. #505, Torrance, CA 90503.

SECTION 3.13    By inspecting the Premises or other Mortgaged Property, or by accepting or approving anything required to be observed, performed or fulfilled by Mortgagor or to be given to Mortgagee pursuant to this Mortgage or any of the other Loan Documents, Mortgagee shall not be deemed to have warranted or represented the condition, sufficiency, legality, effectiveness or legal effect of the same, and such acceptance or approval shall not constitute any warranty or representation with respect thereto by Mortgagee.

SECTION 3.14    Mortgagor acknowledges and agrees that Mortgagor and the other entities comprising Borrower are jointly and severally liable for the payment of the Secured Obligations in accordance with the Note and that this Mortgage secures the Secured Obligation of Mortgagor and the other entities comprising Borrower, jointly and severally, to pay the Secured Obligations.  If any entity comprising Borrower fails to pay fully, when due, any amount payable to Mortgagee under any Loan Document, then Mortgagee may elect, in its discretion, to treat that amount as being due and owing by all entities comprising Borrower on a joint and several basis; to enforce its rights and remedies against and collect such amounts from each entity comprising Borrower on a joint and several basis; and, in addition to any and all other remedies available to Mortgagee hereunder or under any of the other Loan Documents or at law or in equity, to recover such amounts from the value of the Mortgaged Property and the property secured by the Co-Borrower Mortgages, on a pro rata basis or otherwise, as determined by Mortgagee in its reasonable discretion.  Mortgagor acknowledges that this Mortgage is a Loan Document and agrees that any Event of Default under this Mortgage will constitute an "**Event of Default**" under the Co-Borrower Mortgages, the Note and the other Loan Documents.

SECTION 3.15    MORTGAGOR, AND BY ITS ACCEPTANCE HEREOF, MORTGAGEE, EACH HEREBY KNOWINGLY AND WILLINGLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO KNOWINGLY AND WILLINGLY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO (OR ACCEPT) THIS MORTGAGE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 3.16    Intentionally omitted.

SECTION 3.17    Intentionally omitted.

SECTION 3.18    Intentionally omitted.

31

SECTION 3.19          Intentionally omitted.

SECTION 3.20          Covenant Running With the Land.  Any act or agreement to be done or performed by Mortgagor hereunder shall be construed as a covenant running with the land and shall be binding upon Mortgagor and its successors and assigns as if they had executed such agreement (including, without limitation, any purchaser of the Mortgaged Property, or any part thereof).

SECTION 3.21          Purchase Money Mortgage.  To the extent all or any part of the Secured Obligations secured by this Mortgage were used in whole or in part to fund the acquisition of all or any part of the Mortgaged Property, this Mortgage shall be a "purchase money mortgage" within the meaning of 42 Pa. C.S.A. Sec. 8141 and shall be accorded the lien priority provided for therein.

SECTION 3.22          Counterparts.  This Mortgage may be executed in any number of counterparts, and each of such counterparts shall for all purposes be deemed to be an original and all such counterparts shall together constitute but one and the same mortgage.

SECTION 3.23          Delegations of Performance.  Any Secured Obligation of Mortgagor under this Mortgage or the Loan Documents may, with the prior written consent of Mortgagee, not to be unreasonably withheld, conditioned or delayed, be performed in accordance with the terms and conditions of this Mortgage by Mortgagor's tenants or subtenants (each a "Permitted Tenant"); provided, however, that such consent by Mortgagee to Mortgagor's delegation of any Secured Obligation of Mortgagor under this Mortgage to a Permitted Tenant shall not in any respect discharge or relieve Mortgagor of all or any of its Secured Obligations under this Mortgage, all of which shall remain in full force and effect notwithstanding such delegation.

(End of Article III)

## ARTICLE IV

## STATE SPECIFIC PROVISIONS

SECTION 4.01          Principles of Construction.  In the event of any inconsistencies between the terms and conditions of this ARTICLE IV and the terms and conditions of this Mortgage, the terms and conditions of this ARTICLE IV shall control and be binding.

SECTION 4.02          Advance Money Mortgage.  This is an Open-End Mortgage and it secures future advances made pursuant to this Mortgage, the Note, and the Loan Documents. Without limiting the foregoing, this Mortgage secures all advances made by Mortgagee of any kind or nature described in 42 PA. C.S.A. § 8143.  Notwithstanding anything herein to the contrary, it is agreed that the maximum principal amount of the Secured Obligations, including all advances, at any one time shall not exceed the face amount of the Note plus accrued interest; provided that in no event shall the Mortgagee be obligated to advance to or for the benefit of the Borrower in excess of the stated principal amount of the Note.  This Mortgage shall secure the payment of all loans and advances made pursuant to the terms and provisions of the Note and the Loan Documents, whether such loans and advances are made as of the date hereof or at any time in the

future, and whether such future advances are obligatory or are to be made at the option of Mortgagee or otherwise, to the same extent as if such future advances were made on the date of the execution of this Mortgage.  The lien of this Mortgage shall be valid as to all obligations, including future advances, from the time of its filing of record in the office of the Recorder of Deeds of the County in which the Mortgaged Property is located.  Mortgagor and Mortgagee agree that all advances and re-advances shall be secured by this Mortgage and relate back to the date of this Mortgage and intend that this Mortgage be an open-end mortgage.

SECTION 4.03    Other Advances under 42 Pa.C.S.A. §8144.  This Mortgage secures, and the Secured Obligations includes (i) all advances made by Mortgagee with respect to any of the Mortgaged Property for the payment of Impositions, maintenance charges, insurance premiums or costs incurred for the protection of any of the Mortgaged Property or the lien of this Mortgage, except to the extent such advance is included in a Budget in respect of such Impositions, maintenance charges, insurance premiums or other costs and Mortgagee has failed to fund such advance, (ii) all expenses incurred by Mortgagee by reason of an Event of Default hereunder, and (iii) all advances made by Mortgagee to enable completion of construction of any project for which an advance shall be made.  As provided in 42 Pa.C.S.A. §8144, this Mortgage shall constitute a lien on the Mortgaged Property from the time this Mortgage is left of record (or, if this is a purchase money mortgage, from the time of delivery hereof to Mortgagee) for, among other things, all such advances and expenses, plus interest thereon, regardless of the time when such advances are made or such expenses are incurred.

SECTION 4.04    Mortgagee Address.  Mortgagee's address for notices under the Pennsylvania Open-End Mortgage statute is set forth in Section 3.02 of this Mortgage.

SECTION 4.05    Effect of Notice Limiting Advances.  If Mortgagor sends a written notice to Mortgagee which purports to limit the indebtedness secured by this Mortgage and to release the obligation of Mortgagee to make any additional advances to or for the benefit of Mortgagor, such a notice shall be ineffective as to any future advances made:  (i) to enable completion of the improvements on the Mortgaged Property for which the loan secured hereby was originally made; (ii) to pay taxes, assessments, maintenance charges and insurance premiums; (iii) for costs incurred for the protection of the Mortgaged Property or the lien of this Mortgage; (iv) on account of expenses incurred by Mortgagee by reason of a default hereunder or under the Note and the Loan Documents; and (v) on account of any other costs incurred by Mortgagee to protect and preserve the Mortgaged Property or the lien of this Mortgage.  It is the intention of the parties hereto that any such advance made by Mortgagee after any such notice by Mortgagor shall be secured by the lien of this Mortgage on the Mortgaged Property.

SECTION 4.06    Non-Recourse.

(a)    Recourse against Mortgagor is limited solely to the Mortgaged Property, and except as provided otherwise in that certain Guaranty Agreement dated as of the date hereof by and between Philadelphia Academic Health Holdings, LLC and Mortgagee, as the same may be amended, restated, supplemented or otherwise modified from time to time, (i) no member of Mortgagor, (ii) no person owning, directly or indirectly, any legal or beneficial interest in Mortgagor or a member of Mortgagor, (iii) no partner, manager, principal, officer, controlling person, beneficiary, trustee, advisor, representative, or other similar fiduciary, shareholder,

33

employee, agent, affiliate or director of any person described above, and (iv) none of their respective successors and assigns, shall have any personal liability for the payment or performance of any of the obligations or otherwise under the Note or Mortgage (other than indirectly by virtue of the liability of Mortgagor through the resulting loss of value of ownership investment by such person therein).

(b)     Notwithstanding the foregoing, nothing herein shall serve to limit Mortgagee's right to seek any personal judgment against Mortgagor solely to the extent such judgment or decree may be necessary to foreclose and bar Mortgagor's interests in the Mortgaged Property; and further provided that nothing herein stated or set forth in the Note shall: (a) release, impair or otherwise affect the Note or this Mortgage; nor (b) impair or otherwise affect the validity or the lien of the Note or this Mortgage; nor (c) impair the right of Mortgagee to accelerate the maturity of the Note (or to avail itself of any of its other rights and remedies) in accordance with the terms hereof; nor (d) relieve the Mortgagor from personal liability for, nor impair the right of this Mortgagee to proceed against or recover from the Mortgagor for any fraud.  Any loss or cost in connection with the enforcement of any claims associated with the foregoing matters including, but not limited to, reasonable attorneys' fees, shall constitute Secured Obligations.  The Loan is non-recourse except as provided in this Mortgage.

[NO FURTHER TEXT ON THIS PAGE; SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, this Mortgage has been duly executed by Mortgagor as of the day and year first above written.

**MORTGAGOR:**

**BROAD STREET HEALTHCARE PROPERTIES, LLC,** a Delaware limited liability company

By:_____
Name: Joel Freedman
Title:  Chief Executive Officer
and President

STATE OF _____    )
          ) SS:
COUNTY OF_____    )

   I, _____, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that _____, the _____ of Broad Street Healthcare Properties, LLC, a Delaware limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act and as the free and voluntary act of said _____, for the uses and purposes therein set forth.

   GIVEN under my hand and Notarial Seal this _____ day of _____, 2022.

My Commission Expires:

_____          _____
                Notary Public

## **CERTIFICATION OF MORTGAGEE ADDRESS**

The address of Mortgagee is: 216 N. Broad Street, 4th Floor, Philadelphia, PA  19102]


By:_____
Name: _____
Title:_____

## SCHEDULE A
## Legal Description of the Premises

**TRACT I:**

**Parcel A:**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL — PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF VINE STREET (ON CITY PLAN, LEGALLY OPEN, VARIABLE WIDTH) WHERE IT INTERSECTS WITH THE WESTERLY SIDE OF BROAD STREET (ON CITY PLAN, LEGALLY OPEN, 113' WIDE) AND RUNNING:

1) THENCE: ALONG SAID WESTERLY SIDE OF BROAD STREET, S11°21'00"W, A DISTANCE OF 257.406' TO A POINT COMMON TO PARCEL C;

2) THENCE: ALONG PARCEL C, N78°59'00"W, A DISTANCE OF 121.833' TO A POINT;

3) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 94.348' TO A POINT;

4) THENCE: CONTINUING ALONG SAME, N78°39'00"W, A DISTANCE OF 32.915' TO A POINT;

5) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 42.110' TO A POINT;

6) THENCE: CONTINUING ALONG SAME, N78°39'00"W, A DISTANCE OF 46.670' TO A POINT;

7) THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 1.740' TO A POINT COMMON TO THE EASTERLY LINE OF PARCEL B;

8) THENCE: ALONG THE NORTHERLY LINE OF PARCEL B, N78°39'00"W, A DISTANCE OF 20.198' TO A POINT;

9) THENCE: CONTINUING ALONG SAME, N11°21'00"E, A DISTANCE OF 122.199' TO A POINT ON THE SOUTHERLY SIDE OF VINE STREET;

US-DOCS\130525876.439697426.8
39697426.11
US-DOCS\130525876.1039697426.14

10)   THENCE: ALONG THE SOUTHERLY SIDE OF VINE STREET, S78°59'00"E, A DISTANCE OF 27.619' TO A POINT;

11)   THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 0.094' TO A POINT;

12)   THENCE: CONTINUING ALONG THE SOUTHERLY SIDE OF VINE STREET, S78°59'00"E, A DISTANCE OF 194.00' TO THE POINT AND PLACE OF BEGINNING.

PARCEL A BEING known and assessed as 222-48 North Broad Street

BEING OPA Parcel No. 77-2-0250-02

**Parcel A Easement Parcel:**

TOGETHER WITH the reciprocal easements set forth in Reciprocal Easement and Operating Agreement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated 12/30/2017 and recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No.      53316755.

AND

**Parcel F:**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL — PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EASTERLY SIDE OF NORTH 15TH STREET, (ON CITY PLAN, LEGALLY OPEN, 70' WIDE), SAID POINT BEING LOCATED N 11°21'00" E, A DISTANCE OF 167.831' FROM THE INTERSECTION OF SAID EASTERLY SIDE OF NORTH 15TH STREET AND THE NORTHERLY SIDE OF RACE STREET, (ON CITY PLAN, LEGALLY OPEN, 50' WIDE) AND RUNNING;

1)   THENCE ALONG SAID EASTERLY SIDE OF NORTH 15TH STREET, LOCATED N 11°21'00" E, A DISTANCE OF 32.841' TO A POINT;

2)   THENCE: LEAVING SAID EASTERLY SIDE OF 15th STREET AND ALONG THE SOUTHERLY LINE OF PARCEL B, S78°59'00"E, A DISTANCE OF 65.000' TO A POINT COMMON CORNER TO PARCEL E;

3)    THENCE: ALONG THE PARCEL E, S11°21'00"W, A DISTANCE OF 14.659' TO A POINT;

4)    THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 25.578' TO A POINT;

5)    THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 13.296' TO A POINT;

6)    THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 8.528' TO A POINT;

7)    THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 4.886' TO A POINT;

8)    THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 30.894' TO THE POINT AND PLACE OF BEGINNING.

PARCEL F BEING known and assessed as 221-23 N. 15th Street.

BEING OPA Parcel No. 77-2-0284-98.

**Parcel F Easement Parcel:**

TOGETHER WITH the reciprocal easements set forth in Reciprocal Easement and Operating Agreement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated 12/30/2017 and recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316755.

**AND**

**Lot 3 —HUH North:**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND SITUATE, LYING AND BEGINNING IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AS SHOWN ON A PLAN BY PENNONI ASSOCIATES ENTITLED "HAHNEMANN UNIVERSITY HOSPITAL — EXISTING CONDITIONS/ PROPOSED SUBDIVISION PLAN" BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF WOOD STREET (40' WIDE) WHERE IT INTERSECTS WITH THE EASTERLY SIDE OF 15th STREET (72' WIDE) AND RUNNING:

US-DOCS\130525876.439697426.8
39697426.11
US-DOCS\130525876.1039697426.14

1)    THENCE: ALONG SAID SOUTHERLY SIDE OF WOOD STREET, S78°59'00"E, A DISTANCE OF 197.920' TO A POINT COMMON TO LOT 2;

2)    THENCE: ALONG THE WESTERLY LINE OF LOT 2, S11°21'00"W, A DISTANCE OF 54.327' TO A POINT;

3)    THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 33.740' TO A POINT;

4)    THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 29.468' TO A POINT;

5)    THENCE: CONTINUING ALONG SAME, N78°59'00"W, A DISTANCE OF 6.460' TO A POINT;

6)    THENCE: CONTINUING ALONG SAME, S11°21'00"W, A DISTANCE OF 22.779' TO A POINT COMMON TO THE NORTHERLY LINE OF LOT 1;

7)    THENCE: ALONG THE NORTHERLY LINE OF LOT 1, N78°59'00"W, A DISTANCE OF 31.720' TO A POINT;

8)    THENCE: N11°21'00"E, A DISTANCE OF 20.325' TO A POINT ON THE NORTHERLY SIDE OF PEARL STREET (18' WIDE);

9)    THENCE: ALONG THE SAID NORTHERLY SIDE OF PEARL STREET, N78°59'00"W, A DISTANCE OF 126.000' TO A POINT ON THE SAID EASTERLY SIDE OF 15th STREET;

10)   THENCE: ALONG THE SAID EASTERLY SIDE OF 15th STREET, N11°21'00"E, A DISTANCE OF 86.250' TO THE FIRST MENTIONED POINT OF BEGINNING.

EXCEPTING THEREOUT AND THEREFROM:

ALL THAT CERTAIN lot or piece of ground lying above a horizontal plane 36.50 feet above Philadelphia City Datum, said elevation being the top of the structural floor slab at the first floor level.

BEGINNING at the point of intersection of the Southerly side of Wood Street (40 feet wide) with the Easterly side of 15th Street (72 feet wide); thence from said point of beginning extending the following four courses and distances:

1.    Along the said side of Wood Street South 78 degrees 59 minutes 00 seconds East 197 feet, 9 inches to a point;

2.    South 11 degrees 21 minutes 00 seconds West 54 feet, 3-1/2 inches to a point;

39697426.4

Schedule A - 4

3.     North 78 degrees 59 minutes 00 seconds West approximately along the Southerly face of a 16 story building 197 feet, 9 inches to a point on the Easterly side of 15th Street;

4.     Along the said side of 15th Street North 11 degrees 21 minutes 00 seconds East 54 feet, 3-1/2 inches to the first mentioned point and place of beginning.

AND limited to all vertical area within the confines of the above horizontal boundaries up to an elevation of 205 feet above Philadelphia City Datum.

LOT 3 — HUH NORTH BEING known and assessed as 325 N. 15th St.

BEING OPA Parcel No. 88-1-0382-02.

**Lot 3 —HUH North Easement Parcel:**

TOGETHER WITH the reciprocal easements set forth in Parking, Access And Utilities Easement Agreement made by and between PAHH Wood Street Garage, LLC, Broad Street Healthcare Properties, LLC and Broad Street Healthcare Properties II, LLC dated 12/30/2017 and recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316753.

## SCHEDULE B
## Permitted Encumbrances

1.  Taxes for the year 2019, and subsequent years, not yet due and payable.

2.  Right of First Refusal between Philadelphia Charitable Holdings Corporation and Tenet HealthSystem Hahnemann, L.L.C. and Drexel University, dated 10/7/2003 and recorded 10/16/2003 as Document No. 50782334. (Affects TRACT I, Lot 3- HUH North)

3.  Declaration of Easement between Hahnemann University and the Pennsylvania Higher Educational Facilities Authority recorded 10/4/1988 in Deed Book FHS 1189 page 70, as affected by Amendment to Easement by Tenet HealthSystem Hahnemann, L.L.C. dated 10/6/2010 and recorded 10/8/2010 as Document No. 52268742. (Affects TRACT I, Lot 3- HUH North)

4.  Declaration of Air Space Parcel, Easements, Covenants and Restrictions by Philadelphia Charitable Holdings Corporation and Tenet HealthSystem Hahnemann, L.L.C., dated 10/7/2003 and recorded 10/16/2003 as Document No. 50782331 and as approximately shown on that certain ALTA/NSPS Land Title Survey of Hahnemann University Hospital made by Pennoni Associates, Inc., dated January 3, 2018, last revised September 19, 2018, and designated Project No. PALHC17001 (the "Survey"). (Affects TRACT I, Lot 3- HUH North)

5.  Agreement by and between Hahnemann Medical College and Hospital of Philadelphia and The City of Philadelphia dated 3/20/1979 and recorded 4/5/1979 in Deed Book DCC 1918 page 420. (Affects TRACT I, Parcel A)

6.  The premises at 325 North 15th Street (of which the premises described in Schedule A as (Affects Lot 3-HUH North is a part) has, through the 2017 tax year, been entirely assessed as a single OPA tax account 881038200 owned by Tenet Health System Hahnemann, despite the previous severance in 2005 of the premises into the surface and below owned by Tenet HealthSystem Hahnemann, LLC, and the above surface "air space" containing the improvements owned by Drexel University).

7.  The following conditions set forth on the Survey:

    a.  Party walls shared with premises adjoining on the West and South (Affects TRACT I, Parcel A), and
    b.  Handicap ramp encroaches into the bed of Wood Street, a public right of way (Affects TRACT I, Lot 3- HUH North)

8.  Parking, Access And Utilities Easement Agreement made by and between PAHH Wood Street Garage, LLC, Broad Street Healthcare Properties, LLC and Broad Street Healthcare Properties II, LLC dated 12/30/2017 and recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316753 and as approximately shown on the Survey. (Affects TRACT I, Lot 3- HUH North)

US-DOCS\130525876.439697426.8
39697426.11
US-DOCS\130525876.1039697426.14

9.    Easement & Unity of Use Statement made by and between PAHH Wood Street Garage, LLC, Broad Street Healthcare Properties, LLC and Broad Street Healthcare Properties II, LLC dated 12/30/2017 and recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316750. (Affects TRACT I, Lot 3- HUH North)

10.   Reciprocal Easement and Operating Agreement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties Ill, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated 12/30/2017 and recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316755. (Affects TRACT I, Parcels A and F)

11.   Easement & Unity of Use Statement made by and between Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties III, LLC, PAHH Feinstein MOB, LLC and PAHH New College MOB, LLC dated 12/30/2017 and recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316752. (Affects TRACT I, Parcels A and F)

12.   Purchase option set forth in Section 25(q) of that certain unrecorded Lease dated November 10, 1998, as restated April 25, 2002, between Tenet HealthSystem Hahnemann, LLC and Philadelphia Health & Education Corporation, as the same has been and may be amended from time to time, as affected by that certain waiver of right of first refusal as set forth in letter dated January 11, 2018, from Drexel University, as successor by merger to Philadelphia Health & Education Corporation and by that certain Amended and Restated Lease dated January 11, 2018, by and between Broad Street Healthcare Properties, LLC and Drexel University, as successor by merger to Philadelphia Health & Education Corporation. (Affects TRACT I, Parcels A and F)

13.   Recognition Agreement made by and among Center City Healthcare, LLC, a Delaware limited liability company, ("Sublandlord"), Drexel University, a Pennsylvania non-profit corporation, ("Subtenant") and Broad Street Healthcare Properties, LLC, a Delaware limited liability company, ("Master Landlord") dated 12/30/2017, recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316784. (Affects TRACT I, South Tower)

14.   Recognition Agreement made by and among Center City Healthcare, LLC, a Delaware limited liability company, ("Sublandlord"), Drexel University, a Pennsylvania non-profit corporation, ("Subtenant") and Broad Street Healthcare Properties, LLC, a Delaware limited liability company, ("Master Landlord") dated 12/30/2017, recorded 1/18/2018 in the Office of the Recorder of Deeds for the County of Philadelphia as Document No. 53316785. (Affects TRACT I, North & South Tower)

15.   $2,500,000.00 (Open-End Mortgage and Security Agreement) – Broad Street Healthcare Properties, LLC, a Delaware limited liability company to Joel Freedman, dated 1/7/2020,

effective 1/8/2020 and recorded 1/14/2020 in Document ID #53618447; Assigned to Paladin Healthcare Capital, LLC, a Delaware limited liability company recorded 11/2/2021 in Document ID #53899050.

Amended and Restated 11/2/2021 in Document ID #53899053.

16.  $3,000,000.00 (Open-End Mortgage and Security Agreement) – Broad Street Healthcare Properties, LLC, a Delaware limited liability company to Paladin Healthcare Capital, LLC, a Delaware limited liability company dated 10/27/2021, effective 10/28/2021 and recorded 11/2/2021 in Document ID #53899056.

17.  Center City District vs Broad Street Healthcare; Assessment Lien entered in the amount of $16,064.73, filed 7/19/2019, in Case ID #190702440.

18.  Center City District vs Broad Street Healthcare P; Assessment Lien entered in the amount of $571.71, filed 2/26/2021, in Case ID #210202625.

19.  Otis Elevator Company vs Broad Street Healthcare Properties, LLC and Tenet Healthsystem Hahnemann LLC; Mechanics Lien, filed 9/20/2019, in Case ID #1909M0021.

20.  City of Philadelphia vs Broad Street Healthcare Properties LLC; Real Estate Tax Lien for $139,069.88, filed 2/13/2022, in Case ID #2202R21561110.

21.  City of Philadelphia vs Broad Street Healthcare Properties LLC; Real Estate Tax Lien for $5,791.72, filed 2/15/2020, in Case ID #2002R19478793.

22.  City of Philadelphia vs Broad Street Healthcare Properties LLC; Real Estate Tax Lien for $40,152.87, filed 2/13/2022, in Case ID #2202R21562930.

23.  Any other lien or encumbrance arising from or relating to the nonpayment of the items set forth in any Budget and that have not been advanced by Mortgagee if required under the Note.

*[**NTD**: Please provide current title reports][NTD: WE HAVE LIEN SEARCHES, ABOVE REFLECTS SAME.]*