## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) Case No. 19-11466 (MFW) |
| *al*.,[1] | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) **Related to Docket Nos. 4128, 4129, 4130 and 4152** |

**DECLARATION OF ALLEN WILEN IN SUPPORT OF
DEBTORS' MOTION FOR ORDERS:  (I) APPROVING MEMORANDUM
OF UNDERSTANDING RE GLOBAL SETTLEMENT AMONG, *INTER ALIA*,
DEBTORS, DEBTORS' SUBSIDIARIES, COMMITTEE, TENET, CONIFER,
MBNF PARTIES, HSRE ENTITIES AND CONA PARTIES, WHICH PROVIDES
FOR, *INTER ALIA*, RESOLUTION OF ADVERSARY PROCEEDINGS,
WITHDRAWAL OF CLAIMS, ALLOCATION AND DISTRIBUTION OF
ASSETS FROM RRG AND CONSENSUAL SUBSTANTIVE CONSOLIDATION
OF CERTAIN ASSETS, CONTRACTS AND LIABILITIES OF
NON-DEBTOR BROAD STREET PROPCOS WITH DEBTOR CENTER CITY
HEALTHCARE, LLC, AND GRANTING RELATED RELIEF; AND (II) APPROVING
RELATED SETTLEMENT AGREEMENT AND RELEASE WITH
<u>TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA</u>**

I, Allen Wilen, hereby declare the following, under the penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") of the above captioned debtors (the

"**Debtors**") in these chapter 11 cases (the "**Chapter 11 Cases**").

2.      I am a Partner at EisnerAmper and serve as the national director of EisnerAmper's

financial advisory services group.  I have more than twenty-seven years of financial and

accounting experience, as well as extensive experience advising insolvent and troubled

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).

companies, including companies in the healthcare industry, in turnaround and crisis situations and navigating such companies through turnaround, sale and liquidation processes. I have frequently been involved in complex matters requiring expertise in forensic accounting and operational analysis and have been qualified as an expert in numerous state and federal courts throughout the United States, including the district of Delaware.

3.     I began serving as the CRO of the Debtors on April 8, 2019. In such capacity, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

4.     I am familiar with the *Debtors' Motion for Orders (I) Approving Memorandum of Understanding Re Global Settlement Among, Inter Alia, Debtors, Debtors' Subsidiaries, Committee, Tenet, Conifer, MBNF Parties, HSRE Entities and CONA Parties, Which Provides For, Inter Alia, Resolution of Adversary Proceedings, Withdrawal of Claims, Allocation and Distribution of Assets from RRG and Consensual Substantive Consolidation of Certain Assets, Contracts and Liabilities of Non-Debtor Broad Street PropCos with Debtor Center City Healthcare, LLC, and Granting Related Relief; and (II) Approving Related Settlement Agreement and Release with Travelers Casualty and Surety Company of America* (the "**Motion**").[2] Along with Mr. John DiNome, who is serving as the Debtors' Manager, I authorized the filing of the Motion.

5.     The MOU and Travelers Settlement, attached as exhibits to the proposed orders approving the Motion, are true and correct copies of the MOU and Travelers Settlement signed

---

[2]     Capitalized terms not otherwise defined in this Declaration shall have the meaning set forth in the Motion or the *Memorandum of Understanding RE Global Settlement Among, Inter Alia, Debtors, Debtors' Subsidiaries, Committee, Tenet, Conifer, MBNF Parties, HSRE Entities and CONA Parties* (the "**MOU**") or the *Settlement Agreement and Release* (the "**Travelers Settlement**") with Travelers Casualty and Surety Company of America ("**Travelers**").

2

by me on behalf of Debtors and signed by the other Mediation Parties and Travelers.[3]

6.    I participated in the Mediations and was personally involved in the negotiation of the MOU and Travelers Settlement and am familiar with their terms and conditions.

## BACKGROUND

### A.    The ASA Transaction

7.    On February 15, 2017, Paladin signed a letter of intent with certain of the Tenet entities for the proposed purchase of the Hospitals and certain real property.  It is my understanding that Paladin subsequently designated this letter of intent to PAHH.  Both Paladin and PAHH are directly or indirectly owned by Mr. Freedman.

8.    On August 31, 2017, certain entities controlled by PAHH, certain of the HSRE Entities and Tenet entered into the ASA.  In connection with the ASA and the closing thereon, the assets were allocated among (i) "OpCo" entities (the Debtors in the Chapter 11 Cases) to purchase, *inter alia*, the operating assets of the Hospitals and (ii) several "PropCo" entities to purchase certain associated real estate, including the real estate underlying the Hospitals. Separately, PAHH and one of the HSRE Entities created the Joint Venture to purchase, pursuant to the ASA, through separate special purpose vehicles, certain other associated real estate owned by Tenet.

9.    Specifically, the Broad Street PropCos, which are owned and controlled by PAHH, were created to acquire the Real Estate.

10.    The Front Street Entities, which are also owned and controlled by PAHH, were created to acquire the Front Street Real Estate, all of which was later sold by the Front Street Entities during the Chapter 11 Cases to third parties.

---

[3]    A fully executed version of the MOU was filed by the Debtors on August 9, 2022 [Docket No. 4152].

39991030.8 08/26/2022

11.    Further, the Joint Venture, owned by one of the HSRE Entities, as majority owner, and PAHH, as minority owner, was created to acquire, through separate special purpose vehicles (each a Master Landlord), the JV Real Estate.  Other than one parking garage located on the STC campus, all of the JV Real Estate is physically adjacent to or near HUH.  Title to each parcel of the JV Real Estate was held by one of the Master Landlords, each of which was owned and controlled by the Joint Venture.

12.    The funds to close the ASA Transaction were provided from four primary sources: (a) the HSRE-PAHH Loan from one of the HSRE Entities to PAHH, which the Debtors and the Committee assert was for the purchase of, among other things, the Real Estate and the Front Street Real Estate (which assertion is disputed by the MBNF Parties and the HSRE Entities); (b) the CapOne Loan; (c) an approximate $49.4 million draw on the Debtors' asset-based revolving credit facility with Midcap Financial Trust and/or certain of its affiliates, which was guaranteed by PAHH (and later guaranteed by the Broad Street PropCos) and secured by the Real Estate; and (d) $17.5 million of take-back financing from Tenet, secured by a mortgage lien on the Front Street Real Estate.

13.    Although the Joint Venture was the borrower with respect to the CapOne Loan, the Debtors assert that the debt service payments for this loan were effectively to be funded by the Debtors in the form of "rent" payable under the Master Leases with the Master Landlords (which assertion is disputed by the MBNF Parties, the HSRE Entities and the CONA Parties).  In addition to rent, the Debtors were obligated to pay all taxes, insurance and other operating costs for the leased space under the Master Leases, which are absolute net leases.

14.    STC's obligations under each of the Master Leases was guaranteed by PAHH and Paladin.

15.    The ASA required CCH to become a participant in the Pension Fund, a multi-employer pension plan, in accordance with Section 4204 of ERISA.

16.    It is my understanding that under Section 4204, if, among other things, CCH complied with certain statutory obligations under ERISA (including maintaining a security bond in the amount of $5.0 million for the benefit of the Pension Fund) and made all required payments to the Pension Fund for five years, Tenet would be relieved of potential "withdrawal liability" to the Pension Fund.  Otherwise, it is my understanding that Tenet may be secondarily liable to the Pension Fund for withdrawal liability and could assert indemnification claims against the Debtors and certain MBNF Entities.

17.    The ASA Transactions closed on January 11, 2018.

18.    The Debtors' financial and operational struggles began as soon as the Closing.  They ultimately filed for bankruptcy less than eighteen months later.

19.    With no meaningful prospect of a sale and no viable sources for additional public or private funding, the Debtors concluded that the closure of HUH was necessary.  The closure of HUH led to the disruption of lives and professional careers and the loss of an important hospital for the Philadelphia community.  STC remained open and was sold as a going concern during the Chapter 11 Cases.

**B.**    **The Debtors' and Committee's Investigation and the Adversary Complaints**

20.    Beginning in the spring of 2020, the Debtors and the Committee, working cooperatively and collectively, investigated the ASA Transactions and the events leading up to the Debtors' Chapter 11 Cases.  This joint investigation included interviews with a number of key witnesses, the review of tens of thousands of the Debtors' internal documents and the review of tens of thousands of additional documents produced by certain of the MBNF Parties.

39991030.8 08/26/2022

21.　On June 29, 2021, the Debtors filed the MBNF Complaint under seal.  The MBNF Complaint includes claims for (a) avoidable transfers pursuant to 11 U.S.C. §§ 548 and 550 related to (i) certain payments made in connection with the ASA Transaction and the Debtors payments and obligations incurred under the Master Leases and (ii) services allegedly provided by the Debtors to certain of the MBNF Parties; (b) avoidable transfers under 11 U.S.C. §§ 547, 548 and 550 related to certain payments to vendors; (c) breaches of certain duties; (d) unjust enrichment; (e) substantive consolidation against, *inter alia*, the Broad Street PropCos; and (f) piercing the corporate veil, as well as certain other claims.

22.　The MBNF Parties deny and dispute the allegations in the MBNF Complaint. Further, the MBNF Parties dispute the causes of the Debtors' financial distress, as well as the Debtors' arguments for substantively consolidating the Broad Street PropCos with the Debtors under applicable law.  Finally, the MBNF Parties have informed the Debtors that they believe that they have counterclaims, cross claims, and third party claims, as well as certain claims against the Debtors and certain of the Representatives, all of which such alleged counterclaims, cross claims and third party claims are disputed by the Debtors and the Committee.

23.　Also on June 29, 2021, the Debtors filed the HSRE Complaint under seal.  By the HSRE Complaint, the Debtors sought to recover damages from certain of the HSRE Entities and CONA and to subordinate the HSRE Claims under various legal theories, including claims as against the HSRE Entities for (a) avoidable transfers under 11 U.S.C. §§ 548 and 550 related to payments made and obligations incurred under the Master Leases; (b) unjust enrichment; and (c) certain other claims.

24.　The HSRE Entities and the CONA Parties deny and dispute the allegations in the HSRE Complaint and have informed the Debtors that they believe they have counterclaims, cross

claims and third party claims, all of which such alleged counterclaims, cross claims and third party claims are disputed by the Debtors and the Committee.

**C.      The MBNF Claims and the HSRE Claims**

25.      The Debtors' bankruptcy filings have resulted in creditors asserting approximately $11.5 billion in face amount of (largely duplicative) claims against the Debtors' estates, including the MBNF Claims and the HSRE Claims.

26.      The MBNF Claims include approximately $64 million in asserted administrative and priority claims and in excess of $500 million in contingent and non-contingent claims asserted (many of them jointly and severally) against one or more of the Debtors, and appear to assert largely duplicative claims in the aggregate face amount of approximately $8.1 billion.

27.      In addition to the MBNF Parties' unsecured claims, the MBNF Parties have asserted the MBNF Asserted Administrative Claims, which fall into the following four alleged categories: (i) claims assigned to the MBNF Parties as a result of payment of those claims by the MBNF Parties; (ii) administrative expense claims arising under the leases with the Debtors for postpetition rent; (iii) indemnity claims for (a) taxes owed by the Debtors and (b) claims against the MBNF Parties that arose postpetition; and (iv) other claims that may be collected from the MBNF Parties. The Debtors and the Committee dispute the MBNF Asserted Administrative Claims.

28.      Included among the MBNF Asserted Administrative Claims are the Pension Fund Claims originally asserted against the Debtors by the Pension Fund for alleged missed pension fund contributions (asserted as priority claims ($1,302,530.47) and administrative claims ($540,183.13)) and claims for approximately $22.6 million in withdrawal liability (part of which

amount was asserted as an administrative expense claim) (the "**Withdrawal Liability Claims**").

All of such claims arise from, or relate to, the Pension Plan.

29.     The Pension Fund Claims and other related claims filed by the Pension Fund were assigned to certain of the MBNF Parties pursuant to the Pension Agreement.  Upon information and belief, among other things, the Pension Agreement requires periodic payments to be made to the Pension Fund through October 2027 for the Withdrawal Liability Claims.  It is my understanding that Tenet, as the former participant in the Pension Plan, may remain potentially responsible for the Pension Fund Claims.

30.     Also included among the MBNF Asserted Administrative Claims is the Hahnemann Administrative Rent Claim on account of alleged postpetition rent arising under that certain lease, dated as of January 11, 2018, between Broad Street Healthcare Properties, LLC and CCH, which alleged claim consists of (i) $438,530.25 in real estate taxes; (ii) $831.79 in business use and occupancy taxes; (iii) $83,179.84 of Center City District taxes; (iv) $578,858.76 in water charges; (v) $816,134.90 in repairs and deferred maintenance required under the lease; (vi) $0.69 in base rent; (vii) $142,988.36 in mechanics' liens against the relevant premises; and (viii) indemnifiable losses not less than $33,218.55 relating to the relevant premises arising from the Debtors' failure to pay for postpetition services.  The MBNF Parties allege that the Hahnemann Administrative Rent Claim is entitled to administrative expense priority under not only Section 365(d)(3) but also Section 503(b)(1).  The Debtors and the Committee dispute the Hahnemann Administrative Rent Claim.

31.     The HSRE Claims include approximately $433 million in contingent and non-contingent claims asserted (many of them jointly and severally) against one or more of the Debtors, which appear to assert largely duplicative claims in the aggregate face amount of

8

approximately $2.6 billion.  The HSRE Claims include pre-petition reimbursement claims and claims for damages allegedly caused by the Debtors' rejection, pursuant to section 365 of the Bankruptcy Code, of each of the Master Leases.  The HSRE Claims also assert liability against the Debtors for indemnification.

32.     Separately, certain of the HSRE Entities assert that the Debtors owe additional amounts to them, on an administrative basis, pursuant to the Court's *Order Approving Stipulation Between Debtors and Master Landlords Regarding Rejection of Leases and Allowed Administrative Expense Claim* [Docket No. 1057], which among other things recognized a negotiated,  allowed administrative claim in the amount of $2.6 million on account of unpaid post-Petition Date rent under the Master Leases.   Although the Debtors believe that they have satisfied their obligations under such order, the HSRE Entities contend that the Debtors have yet to pay them approximately $750,000 of their allowed administrative claim.  Certain of the HSRE Entities also have sought an administrative claim in connection with litigation asserted against them by a third party that allegedly provided snow removal services at the HUH campus.  *See Application of Master Landlords for Entry of an Order Allowing and Directing Payment of Administrative Expense Claim* [Docket No. 1578].[4]  The Debtors and the Committee dispute all of the HSRE Claims.

**D.     The RRG**

33.     Prior to, and after, the Petition Date, the Debtors maintained insurance coverage for healthcare professional liability, physician professional liability, non-healthcare provider professional liability and general liability through the Policies issued by the RRG, a Vermont-based risk retention group, 90% of which is owned by PAHH, 5% of which is owned by debtor

---

[4]     The HSRE Entities have informed the Debtors that they reserve all rights regarding my description of the HSRE Claims and the foregoing order.

PAHS, and 5% of which is owned by PAHS's wholly owned subsidiary, debtor Philadelphia Academic Medical Associates, LLC.

34.    By motion filed on February 20, 2020 [Docket No. 1418], the Debtors sought Bankruptcy Court approval to purchase "tail coverage" from the RRG, which had agreed to allow the Debtors to pay the premium for such coverage in three equal installments over approximately eight (8) months and which also had agreed, subject to regulatory approval, to use its surplus as a premium credit in an amount equal to one-third of the total cost of the tail coverage, and if such approval was not obtained, to satisfy the payment of the one-third of the total coverage cost through the provision of a letter of credit or from escrowed funds.  This motion was approved by Order entered March 4, 2020 [Docket No. 1447].

35.    The Debtors subsequently purchased the above-described tail insurance from the RRG and made all premium payments required of them with respect to such coverage.  Consistent with the parties' agreement, PAHH funded $3,198,750 into escrow, which amount was provided to the RRG to apply to the premium payments for such coverage, as had been agreed by the parties, subject to an agreement of the members of the RRG to repay such amount from the RRG on a priority basis from the RRG's surplus capital distributions.

36.    In accordance with the parties' agreement, upon the regulators' approval of the surplus distribution in the amount of $487,500, PAHH has been repaid $438,750.00 on a priority basis, with $2,760,000 of PAHH's priority contribution remaining unpaid to date, and PAHH and the Debtors have received $43,875.00 and $4,875, respectively, from such surplus distribution on a non-priority ratable membership interests basis.

37.    By order dated March 14, 2022 [Docket No. 3710], the Court authorized the Debtors to enter into the ASC Agreement.  Pursuant to the ASC Agreement, ASC agreed to

assume and take over responsibility for the Policies on a novation basis.  The parties closed on the ASC Agreement on or about March 31, 2022.

**E.**     **The Chapter 11 Trustee Motion**

38.     As early as March 2020, PAHH, as sole member of PAHS, and Mr. Freedman, as manager and chairman of PAHS, raised issues concerning the governance of PAHS and the alleged failure to report to PAHS's Board of Managers and to comply with its alleged obligations under the PAHS Operating Agreement to provide supporting tax information to PAHH.

39.     On June 30, 2021, the MBNF Parties filed the Chapter 11 Trustee Motion.  The Chapter 11 Trustee Motion was filed under seal and has been stayed pursuant to the parties' standstill arrangements.

40.     The Debtors and the Committee dispute PAHH's and Mr. Freedman's allegations and the Chapter 11 Trustee Motion.

**F.**     **The MBNF Parties, HSRE Entities, Tenet and Conifer Related Litigation**

41.     Certain of the MBNF Parties, on the one hand, and Tenet and Conifer, on the other hand, have asserted the MBNF/Tenet/Conifer Claims against one another.  Generally, these claims are based on alleged breaches of the ASA and/or agreements entered into as a result of, or in connection with, the ASA.  The MBNF Parties, Tenet and Conifer each deny and dispute the claims and counterclaims asserted against them.

42.     Likewise, certain of the MBNF Parties, on the one hand, and certain of the HSRE Entities, on the other hand, have asserted various JV Real Estate-related claims against each other, including, without limitation, (i) those claims asserted in the matter captioned *HSRE-PAHH I, LLC et al. v. Philadelphia Academic Health Holdings, LLC et al.*, Case ID 200300202 (Ct. Com. Pl. Phila. Cty. – Commerce Program); and (ii) those claims asserted in the matter captioned

*PAHH Broad Street MOB, LLC et al v. Philadelphia Academic Health Holdings, LLC et al.*, Case ID 190804677 (Ct. Com. Pl. Phila. Cty. – Commerce Program).  Generally, these claims are based on guarantees of the Master Leases and seek the release of certain funds escrowed at the Closing of the ASA Transactions.  The MBNF Parties and the HSRE Entities each deny and dispute the claims asserted against them.

**G.    The Travelers Policy**

43.    It is the Debtors' position that certain of the Debtors' claims against the MBNF Parties have implicated certain directors' and officers' liability coverage.  Specifically, Travelers issued the Travelers Policy to PAHH as the Named Insured for the claims-made Policy Period from January 11, 2019 to January 11, 2020, with an Extended Reporting Period from January 11, 2020 to January 11, 2021.  The Travelers Policy has a $10 million limit of liability, and there are two excess policies issued by other insurers.

44.    The Debtors have asserted that certain of the claims set forth in the MBNF Complaint are "covered claims" under the Travelers Policy and, as detailed in the Travelers Settlement, Travelers was provided notice of such claims.

45.    Travelers disputed coverage for part or all of the allegations in the MBNF Complaint on various grounds.  It also reserved all of its rights, including rights for potential recoupment and potential subrogation.

**H.    The Real Estate**

46.    The Broad Street PropCos have legal title to valuable Real Estate in Center City, Philadelphia.

47.    Pursuant to the Stay Order, the Court found that the automatic stay of 11 U.S.C. §362(a) covers, *inter alia*, the Real Estate.  The Stay Order is the subject of a pending appeal filed by the Broad Street PropCos and PAHH.

48.    The Broad Street PropCos needed funds to maintain the Real Estate.  Accordingly, by Orders dated March 31, 2022 [Docket No. 3811] and April 21, 2022 [Docket No. 3892], the Court authorized debtor PAHS to make the PAHS Loan to the Broad Street PropCos.  The PAHS Loan is secured by, *inter alia*, mortgages on the Real Estate.

49.    The Real Estate is allegedly further encumbered by, *inter alia*, mortgages securing the Broad Street Notes.  The Broad Street Lenders subordinated their mortgages and security interests in the Real Estate to the PAHS Loan.  The PAHS Loan was made without prejudice to the Debtors' and Committee's asserted position, among other things, that the alleged liens and security interests granted by the Broad Street PropCos to the Broad Street Lenders violated the automatic stay of 11 U.S.C. § 362(a) and are void ab initio.  The Broad Street Lenders have disputed the Debtors' and Committee's position.

50.    Each of the Debtors, Tenet/Conifer, and the HSRE Entities assert rights in, or claims against, the Broad Street PropCos and/or their Real Estate, and each views the Real Estate as a critical source of recovery for their various competing claims against certain of the MBNF Parties.  The MBNF Parties dispute the foregoing assertions.

**I.    The Mediations**

51.    By Orders dated February 23, 2021 [Docket No. 2119] and July 28, 2021 [Docket No. 2648], Judge Carey was appointed as mediator over the disputes and competing claims by and among the Debtors, the Committee, the MBNF Parties and the HSRE Entities detailed in this Declaration.

52.     Since the Adversary Complaints were filed, they have remained sealed and stayed by agreement while the parties engaged in the Judge Carey Mediation.  With the consent of Judge Carey and the parties to the mediation, the CONA Parties, who have liens on the HSRE Claims, also participated in the Judge Carey Mediation.

53.     Separately, the Honorable Joseph J. Farnan, Jr. (ret.) was appointed to mediate the MBNF/Tenet/Conifer Claims.

54.     With the agreement of all Mediation Parties, Judge Carey and Judge Farnan coordinated when appropriate, and the Mediation Parties communicated directly regarding issues affecting, or common to, both Mediations.

55.     The Mediation Parties spent many thousands of hours on the Mediations, with the Debtors and certain other parties exchanging lengthy mediation statements and responses, as well as supporting documents and other information, and attending numerous conference calls, Zoom mediation sessions and nine, full day, in person mediation sessions in New York.

56.     Travelers voluntarily participated in the Mediations when appropriate.

**J.     The MOU and the Travelers Settlement**

57.     With the guidance of Judge Carey and Judge Farnan, and as a result of the Mediations process and extensive arms'-length negotiations, the Mediation Parties have reached agreement on the terms of the MOU, which resolves all of the claims and related issues between and among the Mediation Parties, subject to Court approval.  Separately, the Debtors, the Committee, the MBNF Parties and Travelers reached agreement on the terms of the Travelers Settlement, subject to Court approval.

58.     Pursuant to the MOU and the related Travelers Settlement, the Debtors are to receive (a) all equitable and other interests in, control over, and significant proceeds from the

ultimate Sale or disposition of, the Real Estate, with the involvement of the Committee, Tenet and the HSRE Entities (and with CONA having observation rights) as set forth in Schedule 3(b) to the MOU, but without the involvement of the MBNF Parties, (b) payment of $2,950,000 from Travelers, (c) distributions from the RRG projected to exceed $2,760,000, (d) payment from the HSRE Entities of $143,000, (e) reimbursement of a portion of the cost of the Judge Carey Mediation from the HSRE Entities, (f) approximately $700,000 of the cash collateral supporting a bond posted in connection with the Pension Plan, (g) general releases from the other Mediation Parties, but subject to the claims recognized or provided for in the MOU, (h) a release from Travelers; (i) the dismissal of the contested matters and other proceedings detailed in Section 15 of the MOU; (j) the benefits of satisfaction of the Withdrawal Liability Claims by Tenet; and (k) the withdrawal of billions in the face amount of claims filed by certain of the Mediation Parties, including the MBNF Claims, the HSRE Claims and significant Pension Fund Claims, which are being satisfied by Tenet or otherwise withdrawn by the MBNF Parties.

59.    In return, the Debtors have agreed to (a) pay the Debtor Settlement Payment and the Settlement Balancing Payment, which Settlement Balancing Payment will be repaid from the proceeds of the Sale of the Real Estate prior to any sharing with Tenet and the HSRE Entities, (b) provide the HSRE Entities with a general unsecured claim in the total amount of $30 million, (c) provide Tenet with a general unsecured claim in the total amount of $30 million, (d) subject to the conditions set forth in the MOU, provide Tenet with a portion of any proceeds received by the Debtors on account of the HPP Notes; (e) grant the other Mediation Parties general releases, including the release of the claims set forth in the Adversary Complaints; (f) grant Travelers a release, and (g) reimburse the MBNF Parties for the Pension Plan bond renewal amount previously paid by the MBNF Parties, net of the MBNF Parties' share of any bond premium

refund.  In addition, CCH has agreed to  assume from the MBNF Parties the PAHS Loan and

PAHS has agreed to assume the HSRE-PAHH Note.

60.     The Committee is a party to both the MOU and the Travelers Settlement and is

granting releases thereunder.

61.     The Debtor Settlement Payment and the Settlement Balancing Payment represent

aggregate settlement consideration tied to a number of factors, including, but not limited to, the

withdrawal of the MBNF Claims,  tax issues relating to the Debtors' business operations, and,

the MBNF Parties' agreement to walk away from control of, involvement in, and sharing in the

recovery from the Sale of the Real Estate.  As previously mentioned, the Settlement Balancing

Payment will be recovered from the Sale of the Real Estate.

62.     Pursuant to the MOU and the Travelers Settlement, Paladin, PAHH, and/or other

MBNF Entities designated by the MBNF Parties are to receive (a) the Debtor Settlement Payment

and the Settlement Balancing Payment, (b) proceeds from the dissolution of the RRG of up to

$2,760,000 to essentially reimburse a portion of the premium payment for the tail insurance,

(c) the  Tenet  Paladin  Settlement  Payment,  (d)  the  Tenet  Net  Settlement  Payment,

(e) reimbursement of a portion of the cost of the Judge Carey Mediation from the HSRE Entities,

and (f) approximately $300,000, of the cash collateral supporting a bond posted in connection

with the Pension Plan.  Additionally, pursuant to the MOU and the Travelers Settlement, one or

more of the MBNF Parties are to receive (i) the benefits of satisfaction of the Withdrawal Liability

Claims by Tenet, (ii) general releases from the other Mediation Parties, including the release of

the claims asserted in the MBNF Complaint, the HSRE MBNF Claims, the CONA MBNF

Claims, the Tenet/Conifer Indemnification Claims and the Tenet/Conifer MBNF Claims, (iii) a

release from Travelers, (iv) the dismissal of the contested matters and other proceedings detailed

16

in Section 15 of the MOU, (v) reimbursement from the Debtors for the Pension Plan bond renewal amount previously paid by the MBNF Parties, net of the MBNF Parties' share of any bond premium refund, and (vi) assumption by the Debtors of the PAHS Loan and the HSRE-PAHH Note as noted above (with recourse only to the Real Estate proceeds in accordance with Schedule 3(b)).

63.     In return, the MBNF Parties have agreed to (a) walk away from controlling and/or receiving any value from the Real Estate (b) forego any claims to additional proceeds from the dissolution of the RRG, (c) grant the other Mediation Parties general releases, which include, the MBNF HSRE Claims, MBNF CONA Claims and the MBNF Tenet/Conifer Claims, (d) grant Travelers a release; (e) withdraw the MBNF Claims; and (f) permanently separate themselves from the ownership and management of the Debtors.

64.     Pursuant to the MOU, the HSRE Entities are to receive, subject to the liens of the CONA Parties, (a) a portion of the net proceeds of the Sale of the Real Estate as set forth on Schedule 3(b) to the MOU, (b) the release of $5,625,000, plus interest that has been held in escrow since the Closing of the ASA Transaction, (c) a general unsecured claim against the Debtors in the total amount of $30 million, (d) and, together with the CONA Parties, general releases from the other Mediation Parties, including the release of the claims set forth in the HSRE Complaint and the MBNF HSRE Claims, and (e) the dismissal of the contested matters and other proceedings detailed in Section 15 of the MOU.

65.     In return, the HSRE Entities and the CONA Parties have agreed to (a) grant the other Mediation Parties general releases, which include the release of the CONA MBNF Claims and the HSRE MBNF Claims, (b) reimburse or pay a portion of the costs of the Judge Carey

Mediation; (c) withdraw the HSRE Claims filed against the Debtors; and (d) pay the Debtors $143,000 towards certain unpaid water bills.

66.     Pursuant to the MOU, Tenet and/or Conifer are to receive (a) a portion of the net proceeds of the Sale of the Real Estate as set forth on Schedule 3(b) to the MOU, (b) a general unsecured claim against the Debtors in the total amount of $30 million, (c) subject to the conditions set forth in the MOU, a portion of the proceeds from the sale of the HPP Notes, (d) general releases from the other Mediation Parties, including the release of the MBNF Tenet/Conifer Claims, and (e) the dismissal of the contested matters and other proceedings detailed in Section 15 of the MOU.

67.     In return, Tenet and/or Conifer have agreed to (a) satisfy the Withdrawal Liability Claims, (b) pay the Tenet Paladin Settlement Payment, (c) pay the Tenet Net Settlement Payment, and (d) grant the other Mediation Parties general releases, including the release of the Tenet/Conifer Indemnification Claims and the Tenet/Conifer MBNF Claims.

## THE MOU AND TRAVELERS SETTLEMENT SERVE THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES

68.     Although the MOU is a long document given the number of parties and issues involved, the settlements detailed in the MOU are relatively straightforward.  By the MOU and related Travelers Settlement, the Mediation Parties and Travelers are resolving, subject to Court approval, a number of complex and contested claims, in exchange for various payments and claims, the consensual substantive consolidation of the Assets and certain liabilities of the Broad Street PropCos with debtor CCH, and the granting of various, mutual general releases.

69.     Among other things, the settlement and consensual substantive consolidation provided for in the MOU resolves the dispute over the Debtors' asserted interest in the Real Estate and provides for the Debtors, together with the Committee, Tenet and the HSRE Entities (with

CONA having observation rights), to manage, market, sell and retain the value of the Real Estate without any involvement of, or sharing in proceeds by, any of the MBNF Parties.

70.    The MOU and related Travelers Settlement are the product of good faith, arm's length, protracted and at times contentious, negotiations among the Mediation Parties and Travelers.  Ultimately, and due to the tireless efforts of Judge Carey and Judge Farnan, the Mediation Parties and Travelers were able to resolve their disputes and differences as set forth in the MOU and related Travelers Settlement.

71.    In my view, the agreements embodied in the MOU and the related Travelers Settlement are fair, reasonable and in the best interests of the Debtors, their estates and creditors.

72.    While the Debtors feel strongly that they would ultimately prevail in litigation regarding the claims at issue in the Adversary Complaints, the MBNF Claims and the HSRE Claims, the MBNF Parties and the HSRE Entities have informed the Debtors that they feel equally strongly about their legal and factual positions.  Furthermore, the outcome of litigation is never certain and the compromises set forth in the MOU and related Travelers Settlement are an appropriate resolution of disputed claims, taking into account the defenses likely to be asserted by the defendants (each of which is disputed by the Debtors), including that (a) the Debtors were not insolvent or inadequately capitalized at the time of certain transfers attacked in the Adversary Complaints;  (b) the Debtors received reasonably equivalent value in exchange for the transfers attacked in the Adversary Complaints; (c) the conduct of certain individuals attacked in the MBNF Complaint are protected by the business judgment rule; (d) the Debtors cannot meet the burden of proof necessary to prevail on certain of their claims in the Adversary Complaints; (e) the Debtors' operating agreements superseded the default fiduciary duties of care and loyalty;

Case 19-11466-MFW    Doc 4200    Filed 08/26/22    Page 20 of 24

and (f) there is nothing inherently improper about an acquisition involving "Opco" and "Propco" entities.

73.    Absent settlement, there is risk that many of the defendants named in the Adversary Complaints will be without assets sufficient to satisfy any meaningful judgments entered on the Adversary Complaints.  With respect to the MBNF Complaint, it is unclear whether any of the defendants hold assets sufficient to satisfy significant judgments, beyond the Real Estate; the value of which could be diminished during the pendency of prolonged litigation.

74.    Further, and as set forth in the Motion, Tenet, Conifer and certain of the HSRE Entities have asserted their own claims directly against the Broad Street PropCos and/or claim a direct or indirect interest in the Real Estate.  The settlement embodied in the MOU resolves these competing claims and assures that the Debtors will obtain a recovery from the Real Estate.

75.    While the Debtors believe that the Travelers' Policy, and other policies, provide insurance coverage for certain of the claims asserted in the MBNF Complaint, Travelers has denied coverage and/or reserved its rights as to what, if any, claims asserted are covered by the Travelers Policy.

76.    As to the HSRE Complaint, it is not clear which, if any, of the HSRE Entities hold assets available to satisfy meaningful judgments.

77.    Further, the claims asserted in the Adversary Complaints implicate issues of corporate duties, reasonably equivalent value, equitable remedies, corporate separateness, valuation, including solvency and adequate capitalization, and transaction analysis, all of which are factually and legally complex.  Discovery alone could exceed a year and will cost the Debtors' estates many hundreds of thousands of dollars, if not more.  Further, certain of the claims will

require expensive expert witness testimony and reports, as well as extensive legal briefing and argument.

78.     Regardless of whether, absent settlement, the Debtors prevail in opposing any dispositive motions filed by the defendants to the Adversary Complaints, such motions are sure to be filed, resulting in additional costs and delays.  Realistically, and absent settlement, it is my experience that trials on the types of claims set forth in the Adversary Complaints may not be scheduled for an extended period of time, perhaps sometime in 2024, at the earliest, or beyond.

79.     Given the complexity of the issues and the costs and delays inherent in litigating the Adversary Complaints and the contested MBNF Claims and HSRE Claims, it is my view that the settlement embodied in the MOU and related Travelers Settlement is a far better path for the Debtors, their estates and creditors.

80.     It is also my view that the paramount interest of the Debtors' creditors is best served by approval of the MOU and related Travelers Settlement, as the Debtors' creditors will clearly benefit from the prompt settlement embodied in the MOU and related Travelers Settlement, the Sale of the Real Estate, the withdrawal or satisfaction of billions in claims filed against the Debtors' estates, the receipt of the Travelers' settlement payment and distributions from the RRG and the Debtors' ability to diligently pursue a liquidating plan that enjoys the support of the other Mediation Parties.

81.     The Debtors' estates are administratively solvent and approval of the MOU and related Travelers Settlement will not render them administratively insolvent.  In fact, the net settlement payments under the MOU and Travelers Settlement will result in an increase to the Debtors' cash on hand.

82.     For purposes of the MOU and this Motion, the Mediation Parties, including the Broad Street PropCos, subject to Schedule 3(b) to the MOU, have consented to the substantive consolidation of the Assets and certain Broad Street PropCos' liabilities with debtor CCH.

83.     The Debtors' creditors will benefit from substantive consolidation because the Debtors will receive a portion of the value of the Real Estate pursuant to Schedule 3(b) of the MOU for ultimate distribution to the Debtors' creditors.

84.     None of the third-party creditors of the Broad Street PropCos will suffer any harm because the Real Estate is being substantively consolidated subject to existing third-party liens and the Debtors' obligation to pay in full all existing and ongoing third-party claims related to the Real Estate.  Payment of many of such third-party claims is critical to maintaining the value of the Real Estate and for that reason, will benefit the Debtors' creditors.

85.     Upon the MOU Implementation Date, the Assets, including the Real Estate, will be substantively consolidated with CCH's estate and will be controlled and sold as previously described and as set forth in Schedule 3(b) to the MOU.

86.     Given the size and location of the Real Estate in the heart of Center City Philadelphia and its proximity to the Pennsylvania Convention Center, the Debtors expect the Sale process to be active and the Sale price to be substantial.

87.     The Sale process will be managed by Albert Mezzaroba, who will serve as the "Sale Process Manager." Mr. Mezzaroba is a former Independent Manager of the Debtors.  He is a lawyer and consultant in Philadelphia, the former President and CEO of the Pennsylvania Convention Center and the former Chief Counsel to the City Council of Philadelphia.  Mr. Mezzaroba is familiar with the Real Estate and the process for selling and developing real estate in Center City Philadelphia.  Mr. Mezzaroba has a high degree of credibility in Philadelphia and

the local real estate development community.  In my view, Mr. Mezzaroba is an excellent choice to lead this process.  To be clear, Mr. Mezzaroba will manage and facilitate the Sale process, but he will have no decision making authority for the Debtors.

88.     The MOU contains a number of provisions designed to separate PAHS and the other Debtors from the MBNF Parties, with respect to, among other things, ownership, governance and taxation.  As part of this process, PAHH will transfer its membership interest in PAHS to a new entity, PAHS Equity Buyer LLC, which will ultimately be owned and controlled by Steven Mitnick, Esquire a principal with SM Financial Services Corporation.

89.     Mr. Mitnick is a lawyer in New Jersey and a principal in SM Financial Services Corporation, an entity formed to invest in and manage the purchased of financial assets.  Mr. Mitnick has served in a fiduciary role in over 300 cases, including serving as a Chapter 11 Trustee, a Receiver, a Special Fiscal Agent and as an Assignee for the benefit of creditors in over 300 cases.

90.     Although it is too early to predict with certainty the amount to be distributed to general unsecured creditors, the Debtors expect there to be a distribution to unsecured creditors.

91.     As set forth in the MOU, the MOU will be incorporated into a Plan.  The Debtors, in close consultation with the Committee, anticipate filing a Plan in the fall of 2022.

92.     In summary, because the MOU and related Travelers Settlement will result in significant benefits to the Debtors, their estates and their creditors, and importantly, permit the Debtors to control and sell the Real Estate with the Committee, Tenet and the HSRE Entities (and subject to CONA's observation rights) and move forward toward proposing and seeking confirmation of a liquidating plan in these Chapter 11 Cases, I respectfully encourage the Court to approve the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Executed on August 26, 2022

By: _____
    Allen Wilen, Chief Restructuring Officer