## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) Case No. 19-11466 (MFW) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et* | ) |
| *al.*,[1] | ) Jointly Administered |
| | ) |
| Debtors. | ) **Hearing Date: February 23, 2023 at 11:30 a.m. (EST)** |
| | ) **Objection Deadline: January 20, 2023 at 4:00 p.m. (EST)** |

### APPLICATION OF DEBTORS FOR ORDER AUTHORIZING (I) RETENTION AND EMPLOYMENT BY CENTER CITY HEALTHCARE, LLC OF SSG ADVISORS, LLC AND NEWMARK SOUTH REGION LLC AS JOINT BROKERS, AND (II) A WAIVER OF COMPLIANCE WITH CERTAIN REQUIREMENTS OF LOCAL RULE 2016-2

Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**") and its

affiliated debtors and debtors in possession (the "**Debtors**"), by and through their undersigned

counsel, hereby file this application (the "**Application**"), pursuant to sections 327(a) and 328(a)

of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2014(a) and 2016 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2014-1 and 2016-2

of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court

for the District of Delaware (the "**Local Rules**"), for entry of an order, substantially in the form

attached hereto as **Exhibit A** (the "**Proposed Order**"), in the above-captioned chapter 11 cases

(the "**Chapter 11 Cases**"), authorizing CCH to employ and retain SSG Advisors, LLC ("**SSG**")

and Newmark South Region LLC d/b/a Newmark Real Estate ("**Newmark**"), on a joint basis, as

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 216 North Broad Street, 4th Floor, Philadelphia, Pennsylvania 19102.

brokers to the Debtors.  In support of this Application, the Debtors rely on the *Declarations* of J. Scott Victor and David Dolan, as attached hereto as **Exhibits B and C**, respectively, the "**Declarations**").  In further support of this Application, the Debtors respectfully represent as follows:

## JURISDICTION

1.      The Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The basis for relief sought in this Application is Bankruptcy Code sections 327 and 328, Bankruptcy Rules 2014(a) and 2016 and Local Rules 2014-1 and 2016-2

## BACKGROUND

5.      On June 30, 2019 and July 1, 2019 (together, the "**Petition Date**"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On July 15, 2019, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors of Center City Healthcare d/b/a Hahnemann University Hospital, et al. (the "**Committee**").

6.      A description of the Debtors' businesses as of the Petition Date is set forth in the *Declaration of Allen Wilen in Support of First Day Relief* (the "**First Day Declaration**") [D.I. 2].

7.      As of the Petition Date, the Debtors operated, among other things, two major hospitals in Philadelphia, Pennsylvania: Hahnemann University Hospital ("**Hahnemann**") and St. Christopher's Hospital for Children ("**STC**").  While, since the outset of these cases, the Debtors believed that STC and its related physician practices were viable and valuable entities that could be preserved through a sale pursuant to section 363 of the Bankruptcy Code, the Debtors concluded that Hahnemann and its related physician practices were not viable or saleable as a going concern. As such, at the outset of these Chapter 11 Cases, the Debtors implemented a closure plan for Hahnemann while pursuing a sale transaction for STC.

8.      On September 27, 2019, the Court entered an *Order under 11 U.S.C. § 105, 363, 365, 503 and 507 (A) Approving Asset Purchase Agreement with STC OpCo, LLC (B) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtors' Executory Contracts, and (D) Granting Related Relief* [D.I. 795], pursuant to which the Court authorized the sale (the "**STC Sale**") of substantially all assets of St. Christopher's Healthcare, LLC and certain related Debtors to STC OpCo, LLC.  The STC Sale closed effective as of December 15, 2019.

9.      The STC Sale occurred with the assistance of SSG, which had been retained by the Debtors pursuant to the Court's *Order Authorizing (I) the Employment and Retention of SSG Advisors, LLC as Investment Banker to the Debtors Nunc Pro Tunc to the Petition Date and (II) A Waiver of Compliance with Certain Requirements of Local Rule 2016-2* [Docket No. 339].  SSG has been provisionally paid all amounts due for its services under such prior retention, which payment is subject to final allowance upon application to the Court.

-3-

10.     Subsequent to the STC Sale, the Debtors engaged in various tasks, including investigating potential claims and causes of actions against various parties.  On June 29, 2021, the Debtors filed under seal a multiple-count complaint instituting Adversary Proceeding No. 21-50991 (MFW) against certain co-called "MBNF Parties" including Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (collectively, the "**Broad Street PropCos**").  On June 29, 2021, the Debtors also filed under seal a multiple-count complaint instituting Adversary Proceeding No. 21-50993 (MFW) against Harrison Street Real Estate ("**HSRE**") and various of its affiliates and other parties. Each of these Adversary Proceedings was stayed while the Debtors, the applicable defendants and certain other parties mediated their disputes before The Honorable Kevin J. Carey (ret.).

11.     The foregoing mediation resulted in a "Memorandum of Understanding" ("**MOU**") among the parties, which was approved by the Court by Order entered August 29, 2022.  See *Order (I) Approving Memorandum of Understanding Re Global Settlement Among, Inter Alia, Debtors, Debtors' Subsidiaries, Committee, Tenet, Conifer, MBNF Parties, HSRE Entities and CONA Parties, Which Provides For, Inter Alia, Resolution of Adversary Proceedings, Withdrawal Of Claims, Allocation and Distribution of Assets From RRG and Consensual Substantive Consolidation of Certain Assets, Contracts and Liabilities of Non-Debtor Broad Street PropCos With Debtor Center City Healthcare, LLC, and Granting Related Relief; and (II) Approving Related Settlement Agreement and Release With Travelers Casualty and Surety Company of America* [D.I. 4216] (the "**MOU Order**").

12.     Pursuant to the MOU Order and the settlement approved therein, the following parcels of real estate (the "**Real Estate**"), owned as of the Petition Date by the Broad Street PropCos, were substantively consolidated with the estate of Debtor CCH:

40912224.8 01/06/2023

| Property Name | Philadelphia, PA Address | OPA |
|---|---|---|
| North Tower, South Tower | 222-248 N. Broad Street | 772025002 |
| (Land next to SHSH Building) | 221-223 N. 15th Street | 772028498 |
| Stiles Alumni Hall Underground | 325 N. 15th Street | 881038202 |
| Martinelli Park | 300-304 N. Broad Street | 885620242 |
| (redevelopment land/surface parking) (city block) | 200-214 N. Broad Street | 885467862 |
| SHSH Building (city block) | 201-219 N. 15th Street | 772028496 |

13.     As further set forth therein, the MOU contemplates, among other things, the sale of the Real Estate and the sharing of its net sale proceeds among certain of the parties to the MOU, including the Debtors.   Moreover, certain decisions regarding the Real Estate are to be made by an "Oversight Committee" created under the MOU.  Per Schedule 3(b) of the MOU, the Oversight Committee consists of three constituents:  (i) the Debtors/Committee; (ii) HSRE; and (iii) Tenet Business Services Corporation ("**Tenet**").[2]  Among other things, a majority of the members of the Oversight Committee must agree upon the selection of a broker for the sale of the Real Estate. After participating in multiple interviews of prospective brokers, each member of the Oversight Committee (along with CONA) has agreed upon the selection of SSG and Newmark (collectively, the "**Advisors**"), on a joint basis, pursuant to the terms of proposed retention described herein.

## RELIEF REQUESTED

14.     Pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rules 2014, 2016, 5002 and 6003, the Debtors seek entry of an Order (i) authorizing CCH's

---

[2]      Capital One Bank, National Association ("**CONA**") has observation rights with respect to the Oversight Committee.

employment and retention of the Advisors, jointly, as its brokers in the Chapter 11 Cases, pursuant to the terms and conditions of the engagement agreement with the Advisors dated as of January 6, 2023, a copy of which is attached hereto as **Exhibit D** (the "**Engagement Letter**"); and (ii) granting a waiver of compliance with the information requirements relating to compensation requests set forth in Local Rule 2016-2 to the extent requested herein.

## THE ADVISORS

### A.    Qualifications

15.    *SSG*.  SSG, which is well known to the Court, is an internationally recognized investment banking firm with an office in West Conshohocken, Pennsylvania.  Since its founding in 2001, SSG has completed over 400 investment banking assignments in North America and Europe.  SSG's professionals have expertise in special situations mergers and acquisitions, private placements, financial restructurings, valuations, and financial advisory services.  Moreover, SSG has substantial expertise in brokering complex real estate sales arising out of bankruptcies[3], and is well suited to market, and assist with the contemplated sale of, the Real Estate.

16.    As described  in the Declaration of J. Scott Victor attached hereto as Exhibit B, SSG previously was engaged by the Debtors effective as of May 31, 2019 to provide investment banking services.  As a result of this prior engagement, SSG is familiar with the Real Estate and is well-suited to provide the Debtors with the services contemplated by the Engagement Letter.

17.    *Newmark*.  Newmark is a commercial real estate advisory firm founded in 1929, with 180 offices worldwide.  Newmark's business segments include investment sales, capital

---

[3]    See, e.g., *In re Nighthawk Royalties LLC*, Case No. 18-10989 (BLS) (Bankr. D.Del.); *In re North Philadelphia Health System*, Case No. 16-18931 (MDC) (Bankr. D.Del.); *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (CTG) (Bankr. D.Del.); *In re D.C. Dev., LLC*, Case No. 11-30548 (WIL) (Bankr. D.Md.); *In re Sno Mountain, LP*, Case No. 12-19726 (JKF) (Bankr. E.D.Pa.); *In re Woodcrest Country Club*, Case No. 12-22055 (JHW) (Bankr. D.N.J.); *In re Edgmont Country Club*, Case No. 13-19359 (BIF) (Bankr. E.D.Pa.); *In re Electric Last Mile Solutions, Inc.*, Case No. 22-10537 (MFW) (Bankr. D. Del.).

markets and valuation specialties. Newmark's investment sales segment has closed 962 transactions covering 1771 properties. This segment closed $51 billion in sales transactions in 2019. Newmark's professionals have expertise in real estate brokerage, asset sales, capital markets (including investment sales), global corporate services, property management, valuation and advisory services and real estate management technology systems.

18.     As set forth in the Newmark Declaration, Newmark previously was engaged by or on behalf of the Broad Street PropCos to sell the Real Estate. Its prior engagement expired on or about June 3, 2021. Although no sale was consummated, as a result of its prior engagement Newmark is intimately familiar with the Real Estate, and is well-suited to provide the Debtors with the services contemplated by the Engagement Letter.

**B.     Services to Be Provided**

19.     Subject to Court approval of this Application, and consistent with the terms of the Engagement Letter, the Advisors will provide such broker services as the Advisors and the Debtors deem appropriate, including but not limited to the following in connection with the contemplated sale and marketing process and closing on a Court-approved sale of the Real Estate:[4]

   a.  Prepare an information memorandum describing the Real Estate;

   b.  In consultation with CCH, develop a list of suitable potential buyers who will be contacted on a discreet and confidential basis and only after approval by CCH;

   c.  Coordinate the execution of confidentiality agreements, in a form approved by CCH, for potential buyers wishing to review the information memorandum;

   d.  Assist CCH in coordinating site visits for interested buyers and work with the management team to develop appropriate presentations for such visits;

---

[4]     The summary set forth herein is qualified in its entirety by the terms of the Engagement Letter, and the terms of the Engagement Letter shall control in the event of a conflict. Capitalized terms not otherwise defined in this section shall have the meaning ascribed to them in the Engagement Letter.

e.   Solicit competitive offers from potential buyers;

f.   Advise and assist CCH in structuring the Sale(s) (as such term is defined in the Engagement Letter), as the term is hereafter defined, and negotiating the Sale(s) agreements;

g.   If requested by CCH and, if necessary, approved by the Bankruptcy Court, conduct an auction of some or all of the Real Estate;

h.   Provide testimony in connection with any hearings on, or regarding, the Sale(s) and/or the process by which the Sale(s) is/are to be conducted.

i.   Otherwise assist CCH, its attorneys and advisors, as necessary, through closing on a best efforts basis; and

j.   Communicate with CCH and the sale process manager (as referenced in Schedule 3(b) to the MOU (as defined below)) on a regular basis regarding inquiries, offers, and the status of negotiations for a Sale.

20.    The Debtors require qualified professionals to render these essential services.  As noted above, the Advisors have substantial expertise in all areas for which they are proposed to be retained.  Accordingly, the Debtors submit that the Advisors are well qualified and best suited to perform these services and to assist the Debtors in the sale of the Real Estate.

21.    The services that the Advisors will provide to the Debtors are necessary to enable the Debtors, and the other members of the Oversight Committee, to identify the highest and best bid for the sale of the Real Estate, which is in the best interests of the Debtors' estates, creditors and parties in interest.

22.    The Engagement Letter provides, among other things, that the Advisors are to work as a cohesive team.  The Engagement Letter requires SSG and Newmark to establish and comply with mutually agreed-upon protocols to perform their obligations thereunder, which protocols shall include, without limitation, the coordination of all activities required or desirable under the Engagement Letter and the provision to each other full, complete and timely cooperation and communication with respect to all activities performed in connection with the Engagement Letter.

**C.      Professional Compensation**

23.      Subject to this Court's approval and as set forth in the Engagement Letter, the Debtors and the Advisors have agreed to the following compensation and expense structure (the "**Fee and Expense Structure**") in consideration for the services to be rendered by the Advisors in the Chapter 11 Cases:[5]

       a.      <u>Sale Fee.</u>  Upon the consummation of Sale(s) to any party, Advisors shall, in the aggregate, be entitled to a fee (the "Sale Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Sale, equal to three percent (3.0%) of Total Consideration (as such term is defined in the Engagement Letter) up to and including $40,000,000; plus three and one half percent (3.5%) of Total Consideration over $40,000,000 and less than $60,000,000 plus four percent (4.0%) of Total Consideration over $60,000,001.  Advisors shall each receive one-half of the Sale Fee, with such payments being made at closing(s) to each.

       b.      In addition to the foregoing Sale Fee noted above whether or not a Sale(s) is consummated, Advisors will be entitled to reimbursement for all of Advisors' reasonable, documented, out-of-pocket expenses, including but not limited to legal expenses and travel costs incurred in connection with the subject matter of the Engagement Letter provided, however, that Advisors shall obtain prior written approval for any individual expense in excess of $5,000 and all expenses in excess of $20,000.

24.      The Fee and Expense Structure described above is comparable to compensation generally charged by brokers and investment banking firms for comparable engagements, both in and out of court.  The Fee and Expense Structure is also consistent with the Advisors' normal and customary billing practices for matters of this size and complexity that require the level and scope of services outlined.  The Advisors and the Debtors also believe that the Fee and Expense Structure is reasonable and at favorable market rates.

---

[5]      The summary set forth herein is qualified in its entirety by the terms of the Engagement Letter, and the terms of the Engagement Letter shall control in the event of a conflict.

**D.     Waiver of Compliance with Requirements Regarding Time Entry Detail**

25.     The Advisors' industry and/or restructuring experience, and their experience in complex commercial real estate transactions and the marketing thereof, were important factors in determining the Fee and Expense Structure.  In fact, the ultimate benefit of the Advisors' services cannot be measured merely by reference to the number of hours to be expended by professionals in the performance of such services.  Moreover, the Fee and Expense Structure takes into consideration the Advisors' anticipation that they will need to provide a substantial commitment of professional time and effort in order to perform their duties under the Engagement Letter and the fact that performance of the Advisors' commitments under the Engagement Letter may foreclose the Advisors from other opportunities.

26.     Because of the Advisors' expertise, commitment of resources to this engagement to the exclusion of other possible employment, and the time that the Advisors will devote to this engagement, the Debtors request that the Court approve the Fee and Expense Structure pursuant to section 328(a) of the Bankruptcy Code, and that the Court evaluate the compensation and reimbursement of expenses for the Advisors under the standards of section 328(a) of the Bankruptcy Code, rather than under those of section 330 of the Bankruptcy Code.

27.     The Advisors will file with the Court one or more fee applications for interim and/or final allowance of compensation and reimbursement of expenses with respect to services rendered in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the applicable guidelines for compensation and reimbursement of expenses established by the U.S. Trustee (the "**UST Guidelines**"), and any applicable orders of the Court.  The Debtors are advised by the Advisors, however, that it is not the general practice of brokers to keep detailed time records similar to those customarily kept by attorneys or to keep time records on a "project

category" basis. Furthermore, the Fee and Expense Structure provides for a flat fee based on the occurrence of a Sale.

28. Because the Advisors' compensation will be calculated based upon the purchase price of the Real Estate, the Advisors have requested that they not be required to file time records in accordance with Local Rule 2016-2 and the UST Guidelines. Instead, and notwithstanding that neither of the Advisors charges for its services on an hourly basis, each will maintain records in half (.50) hour increments (in summary format) of its services rendered for the Debtors, including descriptions of those services, the time expended in providing those services and the individuals who provided those services, and will present such records together with its applications filed with the Court.

29. The Advisors have informed the Debtors that neither has shared or agreed to share any compensation to be paid under the Engagement Letter with any other person, other than their principals, employees and/or licensed brokers/salespersons, in accordance with section 504 of the Bankruptcy Code. Neither SSG nor Newmark will share in any of the compensation received by the other.

**E.      Indemnification**

30. The Engagement Letter further provides, generally, that CCH will indemnify, defend and hold harmless the Advisors and their affiliates, partners, members, directors, officers, agents and employees (each, an "**Indemnified Party**," and collectively, the "**Indemnified Persons**"), from and against any and all losses, claims, damages, liabilities or costs, as and when incurred, to which an Indemnified Person may become subject or which are asserted against any Indemnified Person, directly or indirectly, in any way related to Advisors' acting for CCH under the Engagement Letter (and that CCH will reimburse the Indemnified Parties for any legal or other expenses incurred by them, as and when, incurred, in connection with investigating, preparing or

defending any such losses, claims, damages or liabilities or any action in respect thereof), provided, however, that CCH shall not be liable for indemnification for any liability to the extent that such liability is found, by final judgment, to have resulted primarily from any Advisors' gross negligence, bad faith or willful misconduct in the performance of its duties under the Engagement Letter (such obligations being referred to as the "**Indemnification Provisions**"), which provisions are set forth in greater detail in the Engagement Letter.

31.     The Indemnification Provisions are standard indemnification terms, both in chapter 11 cases and outside chapter 11, and reflect the qualifications and limits on such terms that are customary for brokers as approved in this and other jurisdictions. The Indemnification Provisions were fully negotiated between CCH and the Advisors at arm's length and the Debtors respectfully submit that the Indemnification Provisions are reasonable and in the best interests of the Debtors, their estates, and creditors. Accordingly, as part of this Application, the Debtors request that this Court approve the Indemnification Provisions.

**F.      Advisors' Disinterestedness**

32.     To the best of the Debtors' knowledge, and as disclosed herein and in the Declarations:[6] (i) each of the Advisors is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and does not hold or represent any interest adverse to the Debtors' estates; and (ii) the Advisors have no connection to the Debtors, their creditors or related parties, except as may be disclosed in the Declarations.

---

[6]      As explained in Exhibit C, as of the filing of this Application, Newmark has not completed its conflict check with respect to the  within proposed engagement.  Newmark will supplement its disclosures, as currently set forth in Exhibit C, when it has completed its internal review of the parties on the Potential Interested Parties List (as defined in the Declarations).

33.    Each of the Advisors has informed the Debtors that it will review its files against any updated Potential Interested Parties List (as defined in the Declarations) received from the Debtors from time to time during the pendency of the Chapter 11 Cases pursuant to the procedures described in the Declarations. If any new relevant facts or relationships are discovered or arise in such review, the Advisors will use reasonable efforts to identify such further developments and will file promptly a supplemental declaration where appropriate.

**BASIS FOR RELIEF**

34.    Section 327(a) of the Bankruptcy Code provides that a debtor, subject to court approval:

> [M]ay employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under [the Bankruptcy Code].

11 U.S.C. § 327(a).

35.    Section 328(a) of the Bankruptcy Code provides, in relevant part, that:

> The [debtor] . . . with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . of this title . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

36.    In addition, Bankruptcy Rule 2014(a) requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a).

37.     The resources, capabilities, and experience of the Advisors in advising CCH will be crucial during the Chapter 11 Cases.  The Advisors and their professionals have extensive experience and excellent reputations, as well as significant knowledge of the Real Estate, and will be well suited to provide the services contemplated by the  Engagement Letter.

38.     Furthermore, in the event this Application is not granted, the Debtors and their estates would be significantly harmed.  Among other things, CCH would be forced to locate a new broker, which almost certainly will lack the Advisors' knowledge and experience with respect to the Real Estate.  For these reasons, the Debtors believe that the retention of the Advisors is in the best interest of their estates and that the Application should be granted.

39.     As stated in the Declarations, both SSG and Newmark are "disinterested persons" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and do not hold or represent an interest adverse to the Debtors' estates and have no connection to the Debtors, their creditors or related parties except as may be disclosed in the Declarations.  The Debtors also believe that the Fee and Expense Structure is reasonable and should be approved by the Court under section 328(a) of the Bankruptcy Code in light of: (a) the nature of services to be provided; (b) the Advisors' substantial experience with respect to real estate sales; (c) fee and expenses provisions typically utilized by the Advisors and other leading

brokers, which do not bill their time on an hourly basis and generally are compensated on a transactional basis; and (d) the complexity and scope of work anticipated to be performed.

40.      Moreover, as noted above, the Indemnification Provisions are standard terms, both in chapter 11 cases and outside chapter 11, and reflect the qualifications and limits on such terms that are customary for the Advisors and other similar professionals as approved in this and other jurisdictions.  *See United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 234 (3d Cir. 2003) (finding that indemnification agreement between debtor and financial advisor was reasonable under section 328 of the Bankruptcy Code).  Indeed, courts in this jurisdiction and others have granted similar relief.  *See, e.g.*, *In re A123 Systems, Inc.*, No. 12-12859 (KJC); *In re CHL, Ltd.*, No. 12-12437 (KJC); *In re Int'lMedia Group, Inc.*, No. 12¬10140 (MFW).

41.      For the foregoing reasons, the Debtors submit that the retention of the Advisors as brokers for the sale of the Real Estate is warranted and satisfies the requirements of sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a).

## NOTICE

42.      The Debtors have provided notice of the filing of this Application to: (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to MidCap Funding IV Trust; (iv) Drexel University d/b/a Drexel University College of Medicine; (v) the Debtors' unions; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii) the United States Department of Justice; (ix) the Pennsylvania Attorney General's Office; (x) the Pennsylvania Department of Health; (xi) the City of Philadelphia; (xii) counsel to HSRE; (xiii) counsel to CONA; (xiv) counsel to Tenet; and (xv) any party that has requested notice pursuant to Bankruptcy Rule 2002.

40912224.8 01/06/2023

**WHEREFORE**, the Debtors respectfully request the entry of an order, substantially in the form of the Proposed Order (i) authorizing the Debtors to retain and employ SSG and Newmark as real estate brokers to the Debtors, on the terms set forth in the Engagement Letter, (ii) waiving compliance with certain requirements of Local Rule 2016-2, and (iii) granting such other and further relief as this Court deems just and proper.

Dated: January 6, 2023

Philadelphia Academic Health System, LLC
(for itself and on behalf of its affiliated
Debtors as debtors and debtors in
possession)

By: */s/ Allen Wilen*_____
    Name: Allen Wilen
    Title: Chief Restructuring Officer

40912224.8 01/06/2023