**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| CENTER CITY HEALTHCARE, LLC | : | Case No. 19-11466 (MFW) |
| d/b/a HAHNEMANN UNIVERSITY | : |  |
| HOSPITAL, et al., | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : | Related to Docket No. 4468 |
|  | : |  |
|  | : | Hearing Date: February 9, 2023, at 10:30 a.m. |
|  | : | Objection Deadline: February 2, 2023 |

**OBJECTION OF IS BBFB LLC AND IS 245 NORTH 15TH LLC
TO DEBTORS' MOTION FOR ORDER (I) ENFORCING THE
AUTOMATIC STAY AND (II) AWARDING DAMAGES**

IS 245 North 15th LLC (the owner of 225-251 N. 15th St. in Philadelphia, also known as

Parcel B and the New College Parcel) and IS BBFB LLC (the owner of 216-220 N. Broad St. in

Philadelphia, also known as Parcel C and the Bobst Feinstein Parcel) (collectively the "**IS**

**Owners**"),[1] by and through their undersigned attorneys, hereby object to the motion (the

"**Motion**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**")

for an order enforcing the automatic stay and awarding damages [D.I. 4468], and respectfully

represent as follows:

**PRELIMINARY STATEMENT**

1.      In July 2021, *post*-bankruptcy petition, the IS Owners purchased from non-debtor

entities two real estate parcels which were previously part of the former Hahnemann Hospital.

These parcels, together with four other parcels on the relevant square block in Center City

---

[1] The Motion (D.I. 4468) is directed, in part, against "Iron Stone Real Estate Partners." There is no such entity. IS BBFB LLC and IS 245 North 15th LLC are the property owners of the subject properties and are the correct respondents.

Philadelphia were, and continue to be, governed by recorded instruments, discussed at length below, which created certain easements, obligations, and maintenance rights for each of the parcel owners and which require that the parcels — which are acknowledged in those instruments to be "physically and functionally dependent on one another" — be maintained in a "first class condition" and adhere to a certain "operating standard" for the benefit of all parcel owners.

2.       Prior to August 29, 2022, the remaining four (4) parcels located on the Hahnemann block and which are subject to the recorded easements and other obligations were owned by non-debtors Broad Street Healthcare Properties, LLC (the record owner of Parcels A and F) and Broad Street Healthcare Properties III, LLC (the record owner of Parcels D and E) (collectively, "**Broad Street PropCos**").

3.       On August 29, 2022, this Court entered an order (the "**MOU Order**") [D.I. 4216] approving a memorandum of understanding concerning a global settlement between the Debtors and various non-debtor parties (the "**MOU**"), including the Broad Street PropCos. A copy of the MOU Order together with the MOU is attached as **Exhibit 1**.

4.       Pursuant to the MOU Order, the real properties of the Broad Street PropCos were consolidated with the assets of Center City Healthcare, LLC ("**CCH**"), one of the Debtors. These properties are sometimes referred to herein as the "**CCH Real Estate**" even though they are still titled to the Broad Street PropCos.

5.       As noted in the Motion, the IS Owners filed an objection to the approval of the MOU [D.I. 4184] in which they sought to ensure that the rights of the IS Owners were fully preserved under the recorded instruments, including an Easement & Unity of Use Statement (the "**EUU**" attached as **Exhibit 2**), and a Reciprocal Easement and Operating Agreement (the "**REA**"

attached as **Exhibit 3**), and other instruments relevant to the operation, maintenance and upkeep of the various parcels.

6.       The concerns of the IS Owners, as expressed in their objection, were resolved in the MOU Order as entered by this Court. Specifically:

a.       Paragraph 6 of the MOU Order "substantively consolidate[s]" the assets of the Broad Street PropCos with the assets of CCH "*subject to* all … agreements/encumbrances running with the land (including, for the avoidance of doubt, *the REAs and Unity of Use Agreements*);" (emphasis supplied) and

b.       Paragraph 23 of the MOU Order clarified that the transactions contemplated by the MOU did not undermine or otherwise affect the rights and interests of the IS Owners under the Easement Agreement and the related instruments by stating that "the rights and interests" of the IS Owners "shall not be impaired by any prior order of the Court, this Order, the MOU or the substantive consolidation of the Real Estate with CCH."

7.       At set forth in detail below, the IS Owners have been diligent stewards of their properties. At the same time, the properties now controlled by Debtors have been allowed to significantly deteriorate, thereby harming the entire assemblage in violation of the EUU and REA recorded instruments. Instead of working with the IS Owners to maintain the properties as required by the recorded instruments, the Debtors have brought the instant Motion accusing the IS Owners of trespass and fails to note that the EUU and REA explicitly allow for the IS Owners to make the improvements complained about. Moreover, the Debtors assert jurisdiction in this Court claiming that the IS Owners' conduct is a violation of the automatic stay. The automatic stay, however, does not apply to this post-petition issue, especially where the Court's prior MOU Order specifically states that the consolidation of the real estate into Debtor's estate is "subject to" the terms of the

EUU and REA and that the rights of the IS Owners "shall not be impaired" by these bankruptcy court proceedings.

## RELIEF REQUESTED

### A.   The Automatic Stay is Inapplicable

8.      While section 362(a) enumerates eight separate categories of conduct subject to the automatic stay, Debtor's Motion relies on a single theory, which is that the IS Owners have somehow acted to obtain possession of Debtors' Property under subsection (a)(3). 11 U.S.C. §362(a)(3) (stay applies to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.").

9.      As a result, this Court must determine whether the automatic stay applies to this purely post-petition dispute and, if so, whether the Debtors have met their burden of demonstrating that the IS Owners have misappropriated estate property or *improperly* exercised control. The Court's frame of reference in analyzing those issues should be the MOU Order, the EUU and the REA, which memorialize the rights of the IS Owners to take certain actions in furtherance of their ownership rights, which rights were explicitly recognized and preserved by the MOU Order.

10.     As a threshold matter, the MOU Order specifically included language that made the estate's interest in the CCH Real Estate subject to the EUU and REA and preserved all of the IS Owners' rights:

> 6. … the Assets of Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (collectively, the "Broad Street PropCos") … including, without limitation, the Real Estate … shall be substantively consolidated with the assets of Debtor CCH, **subject to all** liens (other than the liens to be satisfied and/or released pursuant to the MOU), **agreements/encumbrances running with the land** (**including**, for the avoidance of doubt, **the REAs and Unity of Use Agreements)**.
>
> 23. **The rights and interests**, if any, **of IS BBFB LLC and IS 245 North 15th LLC** in the Real Estate shall **not be impaired by any prior order of the Court,**

4

**this Order, the MOU or the substantive consolidation of the Real Estate with CCH**, provided, however, that any such rights or interests are subject to all claims, defenses, affirmative defenses, counterclaims, rights, setoffs and recoupments, all of which shall be substantively consolidated with, and may be asserted by, CCH.

MOU Order [D.I. 4216] (emphasis supplied).

11.     The foregoing language in the MOU Order was specifically bargained for by the IS Owners (and agreed to by Debtors) in order to preserve the IS Owners' interests in their property as well as the benefits of the EUU and REA agreements (discussed below) requiring each owner of the parcels covered by these agreements to maintain its properties and allowing maintenance by adjacent property owners in order maintain a first-class assemblage. Accordingly, as a threshold matter, the relief sought in the Motion is misguided since the automatic stay is inapplicable to the conduct at issue here.

12.     As a factual matter, the IS Owners are left to wonder what specific estate property the Debtors allege has been appropriated or how the Debtors have been divested of control, particularly in a situation, detailed below, in which the EUU and REA create and implement broad use rights by all owners of the affected parcels with respect to the entire assemblage and where this Court has already ruled that Debtors' rights to the real estate are subject to the recorded instruments running with the land. The IS Owners submit that the Debtors will be unable to meet their burden since, even if this Court determines that the stay is applicable, no facts exist which support the assertion that a stay violation has occurred.

13.     Rather, the IS Owners submit that the Motion is informed by the Debtors' realization that their marketing efforts are and necessarily will continue to be affected by the fact that the IS Owners, as parties to the EUU and REA, have certain rights which may not be fully aligned with the Debtors' interests at all times and for all purposes. However, that fact, standing alone, does not give rise to a stay violation, as the Debtors would have this Court believe.

**B.    The Is Owners Rights and Conduct Pursuant To The EUU And REA**

14.    The EUU and REA resulted from the former owners' recognition that all of the affected parcels were operated as a fully "integrated and interdependent" medical facility, including shared utility and other services, such that each parcel in the assemblage was "functionally dependent" on the others. EUU exordium ¶E ("the uses of the Parcels affected by this easement are integrated and interdependent"); REA Background ¶H ("[t]he Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another" such that the REA was entered into "for the purpose of facilitating the harmonious use and operation of the Entire Project, all as more particularly set forth [t]herein.").

15.    These recorded instruments "run with the land," and are "binding upon and enforceable against" all successors, assigns, and transferees. EUU exordium ¶E ("this Easement must be recorded against the Property and run with the land."); EUU §4.2 ("The provisions of this Easement run with the land and shall inure to the benefit of or be binding upon and enforceable against the Owners of the Parcels, their heirs, personal representatives, successors and assigns."); REA §18 ("All the covenants, easements and other provisions of this Agreement (including, but not limited to, the benefits and burdens hereof) shall run with the land with respect to the Project Parcel and shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. Upon the transfer of ownership of any area subject to any easement hereunder, the transferee shall be deemed to have assumed the obligations of the transferor arising from and after the date of transfer …").

16.     The EUU created "reciprocal easements" for "the benefit of" the current and future owners of all six parcels to 1) "use and enjoy all common areas"[2] and, separately to 2) "use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in [the REA]":

> 1.1 Easement. Owners hereby establish and create, for the benefit of all six (6) Parcels, reciprocal easements that allow all six (6) Parcels to use and enjoy all common areas, and use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in an Operation and Reciprocal Easement Agreement among the Owners, to be recorded immediately hereafter.[3]

17.     Integral to facilitating "the harmonious use and operation" of these integrated and interdependent Parcels was the "acknowledg[ment] and agree[ment]" of each Parcel Owner "that the Entire Project is intended to be a **first class medical/educational/office real estate project** and that the operation and Maintenance of each Property in accordance with [a certain] Operating

---

[2] The term "common areas" is not defined in the EUU or the REA. In Pennsylvania, terms which are not defined in an easement are given their ordinary meaning. See *Moody v. Allegheny Valley Land Tr.*, 976 A.2d 484, 490 (Pa. 2009) ("In construing a[n easement] it is not what the parties may have intended by the language used but what is the meaning of the words that determines what interest is conveyed therein.") (cleaned up). As noted above, the EUU recites that "the uses of the Parcels affected by this Easement are integrated and interdependent" while in the REA, the Parcel Owners expressly recognized and acknowledged that "[t]he Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another" (REA Background ¶H). As set forth more fully below, the area of improvement at issue in Debtor's Motion, the Bobst Access Ramp, is the sole vehicular entrance to the Bobst Building and three parking spaces on the Bobst Parcel (owned by Respondent) as well as a fire land and emergency egress from the Bobst and New College buildings, and is also necessary for access to the SHSH parking area such that it must be shared by all of these properties (*i.e.*, a shared, or "common" area). *See e.g.*, Merriam-Webster's Collegiate Dictionary (11th Ed., 2012) at definition 2(a) of "common" ("belonging to *or* shared by two or more individuals or by all members of a group") (emphasis supplied).

[3] In addition to, and/or in the alternative, it would appear that the IS Owners have an easement by necessity over and through the Bobst Access Ramp for ingress to and egress from the Bobst Building and the Bobst Parking Spaces. See *Bartkowski v. Ramondo*, 219 A.3d 1083, 1092 (Pa. 2019) ("the three fundamental requirements for an easement by necessity are 1) the titles to the alleged dominant and servient properties must have been held by one person; 2) this unity of title must have been severed by a conveyance of one of the tracts; and 3) the easement must be necessary in order for the owner of the dominant tenement to use his land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.") (cleaned up).

Standard benefits the Entire Project and is essential to each other Owner." REA §5(a) (emphasis

supplied). The **Operating Standard** is defined by the parties in the REA to mean:

> [T]he standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to similarly situated hospitals, educational and medical office facilities in the 'Center City,' Philadelphia area, with due consideration to the age of the applicable facilities. At a minimum, the Operating Standard requires that the applicable Lots, Buildings, and Shared Facilities within the Entire Project shall at all times be operated and Maintained in good working order and condition, ordinary wear and tear excepted, and in compliance with all applicable Legal Requirements.

REA§1(t).

18.     The REA defines "Maintenance" and "Maintain" to include "operation,

maintenance, repair, reconditioning, refurbishing … and replacement … of … other elements of

the Entire Project" which "shall also include the right of access for any of the above purposes":

> "Maintenance" or "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.

REA§1(o).

19.     *Section 4* of the REA (the section on which CCH exclusively focuses) addresses

maintenance of certain Shared Facilities (including the Loading Dock underneath the entrance to

the Bobst building), while *Section 5* of the REA addresses the Operations and Maintenance of the

"Entire Project" (*i.e.*, all six parcels) more generally.

20.     Section 5 of the REA mandates that "[n]o Owner shall permit any … condition that,

under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance

under common law, to exist upon or emanate from the Property owned by such Owner." REA

§5(b).

21.    Section 5 further provides that each owner shall be responsible for "Maintaining ....

and otherwise keeping in compliance with the Operating Standard and all applicable Legal

Requirements," not only its own "respective Lot" but also "the sidewalks, walkways, driveways,

parking areas and other exterior pedestrian areas and vehicular areas located on *or immediately*

*adjacent to such Owner's Lot*":

> [E]ach Owner shall be responsible for Maintaining, cleaning, keeping free from
> debris, removing snow and ice from (as it relates to surface areas which involve
> pedestrian or vehicular traffic) and otherwise keeping in compliance with the
> Operating Standard and all applicable Legal Requirements: (I) its respective Lot
> and the Buildings and other improvements located thereon from time to time; (ii)
> the sidewalks, walkways, driveways, parking areas and other exterior pedestrian
> areas and vehicular areas located on *or immediately adjacent to such Owner's Lot*;

REA §5(a) (emphasis supplied).

22.    For their part, the IS Owners have been focused on three initiatives relating to the

properties since the entry of the MOU Order. The first is to maximize the value of the entire

assemblage through a strategic capital improvements program, which inures to the direct benefit

of both the IS Owners and the Debtors. The second is to enlist the Debtors' assistance and

cooperation in implementing critical upgrades to the properties, including surface parking areas

and external facades, the present condition of which is deplorable based on the failure or

unwillingness of both Broad Street PropCos and the Debtors to perform even basic maintenance

functions. The third is to engage with the Debtors in reconciling and properly allocating the utility

costs applicable to the properties as a whole, with respect to which efforts the Debtors have been

uncooperative.[4]

---

[4]All parcels are served by a common utility plant and interconnected utilities infrastructure, which are
defined in REA as "Shared Utilities Facilities." The REA sets forth the rights and obligations of the
respective owners of the affected parcels and established a framework for utility cost allocation among the
owners, including the Broad Street PropCos, based on the actual usage incurred by each owner. REA §4(d).
certain utility services benefitting the parcels are provided by Vicinity Energy Philadelphia, Inc.
*(continued)*

23.     With regard to the instant dispute forming the basis of the Motion, the Debtors claim that the IS Owners trespassed on CCH Real Estate without authority by improving a driveway traversing Parcel E (part of the CCH Real Estate) which provides pedestrian and vehicular access to the Bobst building and which is owned by one of the IS Owners, and that such actions are "outside the scope of the Easement Agreement." The Debtors ignore relevant history and facts as set forth below.

a.     The EUU and the REA govern the use and maintenance of the entirety of the square block in Center City Philadelphia bounded by Broad, 15th, Race and Vine Streets (the "**Former Hahnemann Properties**") identified as follows:

| PARCEL | ADDRESS | NAME |
|--------|---------|------|
| Parcel A | 222-248 N. Broad | North & South Tower |
| Parcel B | 225-251 N. 15th | New College |
| Parcel C | 216-220 N. Broad | Bobst/Feinstein |
| Parcel D | 200-214 N. Broad | Surface Lot |
| Parcel E | 201-219 N 15th | SHSH |
| Parcel F | 221-223 N. 15th | HUH Lot |

And which is approximately depicted on Exhibit C of the REA as follows:

---

("**Vicinity**"). On August 9, 2022, Vicinity issued its most recent invoice to the IS Owners reflecting an aggregate balance due in the amount of $829,422.77. Based on the attributes of the IS Properties, including the relative energy usage attributable to each parcel, the IS Owners have concluded that a substantial portion of the Vicinity billing amount is allocable to the parcels consolidated into the Debtor's Estate. To date, despite numerous efforts by the IS Owners to engage with the Debtors to reconcile the respective energy usage allocation, the Debtors have simply failed and refused to do so. Most recently, counsel for the IS Owners requested that Debtors execute an authorization to obtain billing, usage, and other data from Vicinity. The IS Owners reserve their rights with regard to this utility billing allocation matter.



Exhibit 3 at page 39 of 46.

11

b.      The above parcels are more specifically described and depicted in the City of Philadelphia's Approved Plans issued with the Zoning Permit for all six parcels in January 2018 in conjunction with the creation of the EUU and REA and attached as **Exhibit 4** (the "**City's Approved Plan**").

c.      Parcel C (owned by the IS Owners) includes two buildings known as the Bobst building and the Feinstein building.

d.      Parcel E (part of the CCH Real Estate) contains on its west side a former nursing home building known as the SHSH building (pronounced "*shush*"). The eastern-most side of Parcel E has an access ramp down to a shared loading dock used by all of the buildings in the assemblage.

e.      The center portion of Parcel E contains a vehicular and pedestrian access ramp from Race Street to the front entrance to the Bobst building (the "**Bobst Access Ramp**"), which also provides access to three vehicular parking spaces located on the Bobst property (the "**Bobst Parking Spaces**"). The Bobst Access Ramp also provides access to a parking lot adjacent to the SHSH building.

f.      Below is an annotated extract from the City's Approved Plan with that portion of the Bobst Access Ramp located on the SHSH Parcel shaded in green:



g.      This configuration is also depicted on the Google Earth satellite image reproduced below:



h.      Since the Debtors' bankruptcy filings, the Broad Street PropCos, and then the Debtors, have allowed the Bobst Access Ramp, which is also a designated by the City of Philadelphia as a Fire Lane, to deteriorate, making it unsafe for vehicular passage as shown, in part, in the below photograph taken on November 18, 2022:



i.    It is the IS Owners' December 2022 improvement of the Bobst Access Ramp which is the basis of the Motion. The Is Owners' improvements to the Bobst Access Ramp, as of December 31, 2022, are shown in the photograph below:



j.      The IS Owners acquired the New College Parcel and the Bobst/Feinstien Parcel in July, 2021, with the intent to operate the buildings as a "first class medical/educational/office real estate project," consistent with the EUU and REA, including the REA Operating Standard.

k.      The IS Owners lease the New College building (Parcel A) to Drexel University's School of Medicine. The Bobst Access Ramp is an emergency egress and Fire Lane serving a portion of the New College building.

l.      The IS Owners are also developing the Bobst building (a part of Parcel C) into laboratory space for lease by health care tenants and renaming the building Race Street Labs ("**RSL**").

m.      As noted above, the Bobst building and the Bobst Parking Spaces are only accessible by pedestrians and vehicular traffic *via* the Bobst Access Ramp.

n.      After taking possession of the New College and Bobst/Feinstein Parcels, the IS Owners initiated communications with CCH over concerns with the maintenance of the SHSH lot. For instance, on October 4, 2022, Matthew Canno (an IS Owner representative) emailed John DiNome (a CCH representative), expressing concern over the maintenance of the SHSH property (Parcel E), which during the bankruptcy proceeding has deteriorated to the point that it had become a homeless encampment covered in graffiti:

> I texted Griffin about the vandalism and inhabitants of the SHSH Building on 9/20. There is a group of people active in that building. Please send us an update on the property being secured and the cleanup of the graffiti on the windows and facade. As you know, we are under construction on a new laboratory building in the former Bobst Building. It is very important that all exterior areas of the property are maintained per the terms of the easement agreement. We will be doing some exterior work and cleanup in the next few months in addition to modernizing our lobby and several lab floors. Our leasing efforts will be significantly impeded if the property looks and feels unsafe, vandalized, and poorly maintained.

16

It has been a very difficult year for us due to our reprobate neighbor. Having a largely unsecured, vacant, poorly maintained building and property that is connected with our property, presents significant costs and risks. We look forward to working with you and having all parties adhere to the Operating Standard as set forth in the agreement.

**Exhibit 5**.

      o.     While CCH has made some efforts to remove homeless persons from the SHSH

Property, it has not taken any steps to clean the graffiti from its property as shown by the

photograph below taken of the SHSH building from the area just east of the Bobst Access Ramp

on or about January 25, 2023:[5]



---

[5] Despite repeated request by the IS Owners to the Debtors to remove this graffiti as required by the EUU and REA, the Debtors have failed or refused to do so and, on January 31, 2023, delivered an email as "formal notification to the IS Owners that they "are not permitted to paint the [SHSH] building and we [the Debtors] object to any work being planned or executed upon our property by Ironstone." **Exhibit 12**.

p.     In addition to the uncontrolled and increasing graffiti on the SHSH property, the paving on the SHSH Lot, including on the Bobst Access Ramp, has deteriorated to unsafe conditions, including crumbled macadam, crumbling concrete, and exposed rebar on the Bobst Access Ramp, posing a hazard not only to the tires of cars traversing the Bobst Access Ramp, but also to pedestrians trying to access the facilities:



q.     On November 1, 2022, in a series of emails, the IS Owners dutifully informed CCH by email of their construction plans for the Bobst (RSL) building, including "repav[ing] the existing driveway and walkway" (i.e., the Bobst Access Ramp), noting that "[d]uring construction and after construction, we will be using it for access as it has always been used - for vehicular and pedestrian traffic." **Exhibit 6**. CCH asked for a timetable for this work, and on November 3, 2022,

the IS Owners responded that the repaving "will be done by January" and that the "goal is to get

it started and ended quickly but it is very weather dependent." **Exhibit 7**.


r.      On November 9, 2022, CCH asked the IS Owners to explain their position that

pedestrian and vehicular access to the Bobst building *via* the Bobst Access Ramp was allowed

under the REA and EUU. The IS Owners responded as follows:

> I believe that it is clear that Bobst (RSL) has access rights for several
> reasons including but not limited to:
>
> 1.      Paragraph 3 of the attached easement agreement discusses the
> purpose of the document. Namely, the purpose of the document is to memorialize
> the practical way that the building operates and has always operated. The front door
> of Bobst is clearly accessed through Race Street for pedestrians and vehicles and
> always has been.
>
> 2.      This area is legally necessary for emergency vehicles to access
> Bobst and portions of NCB.
>
> 3.      This area is legally necessary for the egress for people in an
> emergency. For various reasons (there is covering and it already serves as egress
> for Klahr Auditorium [part of the New College Building the IS Owners rent to
> Drexel's School of Medicine] and SHSH building), pedestrian egress is only legal
> from RSL to Race Street.
>
> 4.      See page 39 of the attached. It looks like RSL controls several
> parking spaces along its building. It would make no sense for RSL to have parking
> without a way to getting to the parking spaces.
>
> 5.      Because of the obvious history of the use of the building and the
> legal necessity for egress and access, it would make no sense that pedestrians and
> vehicles access would be limited.
>
> 6.      As a practical matter, there are other examples of how the Towers
> and NCB and RSL operate that are not 100% memorialized in the easement
> document.

**Exhibit 8**.

s.      On November 17, 2022, the IS Owners informed CCH that an $817,000

construction contract, including the repaving work for the Bobst Access Ramp, had been executed

and that "[t]he paving itself is supposed to be done in the next three weeks as asphalt work generally cannot happen after December 10 due to cold weather" and that "delays would significantly delay our project and would put us in default of the contract we already signed." The IS Owners went on to notify CCH that:

> [T]he appearance of this entranceway does not adhere to the Operating Standard as set forth in the REA and that it would be reasonable for me to demand that you pay for the paving. I further indicated that I would incur significant damages if you physically stop this construction contract, which will improve the aesthetics of the campus and would have no negative impact on your parcel (and that I am fully paying for).

**Exhibit 9**.

t.      On November 18, 2022, CCH responded, objecting to any paving and noting its understanding of the REA.  CCH stated that, to the extent the IS Owners proceed with paving, it would be at the IS Owners' own peril and expense, and that any such work would not modify the rights of the parties in any way:

> The property lines of our respective fee parcels are what they are and there is no "joint ownership" of any land. There is the REA, which is limited in scope and does not provide IronStone any parking or related rights on our parcels.

> More specifically, Ironstone has no rights to the "SHSH lot" and certainly no right to repave any portion of that lot or any other Center City Healthcare("CCH") property. We have not granted Ironstone permission to do any work in or on our property. To the extent that you choose to repave any land not owned by Ironstone, you do so at your own peril and your sole cost and expense, and any such work shall not serve to modify the rights of the parties or to impose any obligations whatsoever on CCH including any obligation to permit Ironstone to park on the CCH lots in the future.

**Exhibit 10**.

u.      The IS Owners responded by reminding CCH of its obligations to keep the Bobst Access Ramp in good repair, in a condition consistent with the Operating Standard, and confirming

that the IS Owners' repaving of the Bobst Access Ramp would "neither enhance [n]or restrict any rights that either party has under the REA or any other document":

> As a reminder, I am planning to pay for this 100% of this paving, which will make the area safer and presentable. I have also offered to confirm, in writing, that the paving will neither enhance or restrict any rights that either of party has under the REA or any other document.

*Id.* Later on November 18, the IS Owners added that:

> this fire lane and driveway are not being maintained in accordance with the REA. Your failure to maintain this to the Operating Standard is a breach.

and that:

> I am PAVING an area that needs to be paved AND agreeing that, in doing so, no rights of either party will be expanded or contracted.

*Id.*

      v.      At no point has CCH or the Broad Street PropCos presented a plan to remediate the defective condition of the Bobst Access Ramp (not to mention the graffiti that the Debtors have allowed to accumulate for years on their property in violation of the EUU and REA).

      w.      On November 29, 2022, the parties met at the properties. During the meeting, the IS Owners detailed their plans, including the repaving work on the Bobst Access Ramp, and walked the property with CCH's representatives noting defects in the Access Ramp including paving defects, drainage issues causing damage to the underground loading dock area, as well as the continued problems with homeless persons and uncontrolled graffiti on and around the SHSH building.

      x.      On December 9, 2022, CCH's counsel wrote to counsel for the IS Owners. In this letter, CCH took the position that the IS Owners have "no right, under the REA or otherwise, to perform" improvements to the Bobst Access Ramp. CCH attaches its letter to the Motion as Debtor Exhibit D, and heavily relies upon its letter. The Motion, however, did not outline any of the

foregoing prior history. More concerningly, the Debtors do not reference or attach the IS Owners' detailed twelve page response dated December 14, 2022. **Exhibit 11**. (the "**IS Owner's Letter Response**").

y.    The IS Owners' Letter Response detailed, *inter alia*, two main rights of the IS Owners in connection with access across and maintenance of the Bobst Access Ramp. *First*, the IS Owners' Letter Response noted that the EUU created an easement for all common areas which the IS Owners understand to include the Bobst Access Ramp:

> The EUU created "reciprocal easements" for "the benefit of" the current and future owners of all six parcels to 1) "use and enjoy all common areas" and, separately to 2) "use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in [the REA]":

> > 1.1 Easement. Owners hereby establish and create, for the benefit of all six (6) Parcels, reciprocal easements that allow all six (6) Parcels to use and enjoy all common areas, and use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in an Operation and Reciprocal Easement Agreement among the Owners, to be recorded immediately hereafter.

> The term "common areas" is not defined in the EUU (or the REA). Terms which are not defined in an easement are given their ordinary meaning. See *Moody v. Allegheny Valley Land Tr.*, 976 A.2d 484, 490 (Pa. 2009) ("In construing a[n easement] it is not what the parties may have intended by the language used but what is the meaning of the words that determines what interest is conveyed therein.") (cleaned up). As noted above, the EUU recites that "the uses of the Parcels affected by this Easement are integrated and interdependent" while in the REA, the Parcel Owners expressly recognized and acknowledged that "[t]he Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another" (REA Background ¶H). The Bobst Access Ramp appears to me to be an example of an area shared by the Parcel owners— including for access to the Bobst (RSL) Building and the Bobst Parking Spaces, and is indeed an area necessary for ingress to and egress from the Bobst (RSL) building and the Bobst Parking Spaces, while also being used for access to the SHSH parking area (i.e., a shared, or "common" area). *See e.g.*, Merriam-Webster's Collegiate Dictionary (11th Ed., 2012) at definition 2(a) of "common" ("belonging to or shared by two or more individuals or by all members of a group").

> I struggle to understand any other meaning of the easement "to use and enjoy all common areas" in the context of the EUU and would be curious to know

how your client may interpret that term. At the very least, in addition to, and/or in the alternative, it would appear that the owner of Parcel C (my client) has an easement by necessity over and through the Bobst Access Ramp for ingress to and egress from the Bobst Building and the Bobst Parking Spaces. See *Bartkowski v. Ramondo*, 219 A.3d 1083, 1092 (Pa. 2019) ("the three fundamental requirements for an easement by necessity are 1) the titles to the alleged dominant and servient properties must have been held by one person; 2) this unity of title must have been severed by a conveyance of one of the tracts; and 3) the easement must be necessary in order for the owner of the dominant tenement to use his land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.") (cleaned up).

*Id.* at 4.

*Second*, the IS Owner's Letter Response explained that the REA created maintenance rights allowing the IS Owners to repair and replace the elements of the Bobst Access Ramp, as the REA included not only the right to maintain each parcel owner's "respective Lot", but also "the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas *located on or immediately adjacent to such Owner's Lot*":

> The REA defines "Maintenance" and "Maintain" to include "operation, maintenance, repair, reconditioning, refurbishing ... and replacement ... of ... other elements of the Entire Project" which "shall also include the right of access for any of the above purposes":
>
> > "Maintenance" or "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.
>
> REA§1(o).
>
> Section 4 of the REA addresses Maintenance of certain Shared Facilities (including the Loading Dock underneath the entrance to the Bobst (RSL) building, while **Section 5 of the REA addresses the Operations and Maintenance of the "Entire Project" (i.e., all six Parcels) more generally**. In this section, the REA recites that "each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Property, at such Owner's sole cost and expense,

in accordance with the Operating Standard" (REA §5(a)), and that "No Owner shall permit any ... condition that, under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance under common law, to exist upon or emanate from the Property owned by such Owner." REA §5(b). This section of the REA further provides that each owner shall be responsible for "Maintaining .... and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements," not only its own "respective Lot" but also "the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or immediately adjacent to such Owner's Lot":

> [E]ach Owner shall be responsible for Maintaining, cleaning, keeping free from debris, removing snow and ice from (as it relates to surface areas which involve pedestrian or vehicular traffic) and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements: (I) its respective Lot and the Buildings and other improvements located thereon from time to time; (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or *immediately adjacent to* such Owner's Lot; ...

REA §5(a) (emphasis supplied).

*Id.* at 6.

z.     After detailing the foregoing terms of the EUU and REA and the history of communications outlined above, the IS Owners' Letter Response concluded that the IS Owners were specifically permitted by the EUU and REA to repave the Bobst Access Ramp:

> In your December 9, 2022, correspondence, you state that my client "has no right, under the REA or otherwise, to perform" work to correct the deficient condition of the Bobst Access Ramp. The REA however, provides that "[e]ach Owner shall be responsible for Maintaining … and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements: (i) its respective Lot and the Buildings and other improvements located thereon from time to time; [and] (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or immediately adjacent to such Owner's Lot." (Emphasis supplied). The Bobst Access Ramp is such an exterior pedestrian and vehicular area immediately adjacent to my client's property.

*Id.* at 8.

At no point has CCH presented a plan to remediate the defective condition of the Bobst Access Ramp. Moreover, my client is entitled under the REA to

> Maintain the area which is an "exterior pedestrian area []and vehicular area[] located on or immediately adjacent to [my client's] Lot."
>
> While CCH has allowed its properties to fall out of compliance with the Operating Standard and to Maintain a first class medical/educational/office real estate project, my clients have been actively making improvements which benefits all owners of this integrated and functionally interdependent medical campus, while confirming that "in doing so, no rights of either party will be expanded or contracted."

*Id.* at 11.

aa.    Despite delineating the IS Owner's rights under the EUU and REA, CCH never responded to the IS Owners' Letter Response.

bb.    Instead, CCH waited over a month while the IS Owners continued the repaving work on the Bobst Access Ramp before filing the Motion on January 19, 2023.

cc.    Not only did CCH delay filing the Motion for well over a month while the IS Owners continued the costly improvement of the Bobst Access Ramp (which benefits all parties), but the Motion completely ignores and fails to reference or attach the IS Owners' Letter Response or to even address any of the legal arguments contained therein. Clearly, CCH has opted to present only selective information to this Court.

dd.    For instance, CCH raises a straw man in the Motion, claiming that because Maintenance Rights under *Section 4* of the REA are limited to Shared Utility Facilities and Shared Facilities, the IS Owners have no right to repave the Bobst Access Ramp. This sole reliance on Section 4 of the REA by CCH mischaracterizes and completely ignores the IS Owners' Letter Responses, which relies upon the easement over common areas created by the EUU, as well as the more general grant of maintenance rights to the IS Owners under *Section 5* of the REA (which the Debtors completely fail to reference) to Maintain (including the right to "repair" and "reconstruct") the "sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and

vehicular areas located on or *immediately adjacent to* such Owner's Lot." (emphasis supplied). REA §§ 1(o) and 5(a).

24.     In light of the foregoing, this Court must conclude that no "stay violation" has occurred since the IS Owners have not exercised dominion or control over estate property within the meaning of section 362(a)(3) of the Bankruptcy Code.  To the contrary, the Debtors have breached, and continue to breach, material terms of the EUU and the REA by neglecting entirely their maintenance and other obligations under those instruments for which the IS Owners have been damaged.

25.     The IS Owners expressly reserve all of their rights and remedies against the Debtors, including the right to seek specific performance, damages, attorneys' fees and costs.

## CONCLUSION

26.     For the foregoing reasons, the relief requested in the Motion should be denied in its entirety. The MOU Order specifically preserved the IS Owners' rights under the EUU and REA and pursuant to those recorded instruments the IS Owners are entitled to maintain the Bobst Access Ramp, especially where Debtors and their predecessors failed to do so.

WHEREFORE, the IS Owners respectfully request the entry of an Order denying the relief sought in the Motion, and granting such other and further relief as is just and proper.

Dated: February 2, 2023

**LEECH TISHMAN FUSCALDO & LAMPL**

By: ___*/s/ Jeffrey M. Carbino*_____
Jeffrey M. Carbino, Esquire
(DE No. 4062)
1007 N. Orange Street, Suite 420
Wilmington, DE 19801
Telephone: (302) 985-0985

-   and  -

**JOKELSON LAW GROUP, P.C.**
Derek E. Jokelson, Esquire
230 South Broad Street, 10th Floor
Philadelphia, PA 19102
Telephone: (215) 757-7556
Email: dej@jokelson.com
(*Motion for Pro Hac Vice Admission forthcoming*)

**KURTZMAN | STEADY, LLC**
Jeffrey Kurtzman, Esquire
555 City Avenue, Suite 480
Bala Cynwyd, PA 19004
Telephone: (215) 839-1222
Email:  kurtzman@kurtzmansteady.com
(*Admitted Pro Hac Vice*)

*Attorneys for IS BBFB LLC and
IS 245 North 15th LLC*