# Exhibit 11

December 14, 2022, letter from Respondent's counsel (the "**IS Owner's Letter Response**").

# JOKELSON LAW GROUP, P.C.
ATTORNEYS AT LAW
230 South Broad St., 10th Fl.
Philadelphia, PA 19102

Tel. (215) 735-7556
Fax (215) 985-0476

David E. Jokelson
Derek E. Jokelson
Debra M. Jokelson*
* Of Counsel

December 14, 2022

Via Email Mark.Minuti@saul.com
Mark Minuti, Esquire
Saul Ewing
1201 North Market Street, Suite 2300
Wilmington, DE 19801

Re:     Continued harmonious use, maintenance, and development of properties pursuant to
        that certain Easement & Unity of Use Statement recorded January 18, 2018, in the
        Philadelphia County Office of Recorder of Deeds as Document No. 53316752 (**EUU**)
        and the requirements of the Reciprocal Easement and Operating Agreement recorded
        January 18, 2018, in the Philadelphia County Office of Recorder of Deeds as
        Document No. 53316755 (**REA**), binding upon the owners of the following
        properties comprising the block bounded by Broad, 15th, Race, and Vine Streets:

|          |                  |                     |
|----------|------------------|---------------------|
| Parcel A | 222-248 N. Broad | North & South Tower |
| Parcel B | 225-251 N. 15th  | New College         |
| Parcel C | 216-220 N. Broad | Bobst/Feinstein     |
| Parcel D | 200-214 N. Broad | Surface Lot         |
| Parcel E | 201-219 N 15th   | SHSH                |
| Parcel F | 221-223 N. 15th  | HUH Lot             |

Dear Mr. Minuti,

        I represent IS 245 North 15th LLC (owner of Parcel B also called New College) and IS BBFB
LLC (owner of Parcel C also called Bobst/Feinstein). I am in receipt of your December 9, 2022,
correspondence to Jeffrey Kurtzman, Esquire. At the time of receipt of your letter, I had been
drafting a letter concerning the failure of Center City Healthcare, LLC (**CCH**), Broad Street
Healthcare Properties, LLC (**BSHP**) (record deed owner of Parcels A and F) and Broad Street
Healthcare Properties III, LLC (**BSHP III**) (record deed owner of Parcels D and E) to properly
maintain the Parcel E in accordance with the requirements of the EUU and REA recorded

Mark Minuti, Esquire
December 14, 2022
Page 2 of 12

instruments identified above, as well as to raise certain concerns over the potential future development of Parcels A, D, E and F for purposes inconsistent with the EUU and REA.[1]

I understand that you represent CCH and that CCH has responsibility for management of the BSHP, BSHP II, and BSHP III properties pursuant to an Order entered at Doc. 4216 in the bankruptcy styled *In re: Center City Healthcare, LLC d/b/a Hahnemann University Hospital, et al.*, pending in the United States Bankruptcy Court for the District of Delaware, Case No. 19-11466 (the **Order**).[2] The Order approves, and attaches as Exhibit 1, a document titled *Memorandum of Understanding Re Global Settlement Among, Inter Alia, Debtors, Debtors' Subsidiaries, Committee, Tenet, Conifer, MBNF Parties, HSRE Entities and CONA Parties* (the **MOU**).

Paragraph 6 of the Order "substantively consolidate[s]" the assets of BSHP, BSHP II, and BSHP III (collectively the **Broad Street PropCos**) with the assets of debtor CCH "subject to all … agreements/encumbrances running with the land (**including**, for the avoidance of doubt, the REAs and Unity of Use Agreements)."

Paragraph 7 of the Order states that "CCH shall have the sole and exclusive authority to use, possess, lease, encumber, sell, transfer, assign, convey, or otherwise dispose of the Real Estate" and that "the Real Estate shall be managed … by CCH, together with the Committee, Tenet and the HSRE Entities."

Paragraph 23 of the Order further specifically confirms that the "rights and interests" of my clients "shall not be impaired by any prior order of the Court, this Order, the MOU or the substantive consolidation of the Real Estate with CCH."

---

[1] The concerns raised with regard to the development of Parcels A, D, E, and F are similar to concerns over development of Martinelli Park at 300-304 North Broad Street whose record owner is Broad Street Healthcare Properties II, LLC (**BSHP II**) which is subject to an Easement and Unity of Use Statement recorded January 18, 2018, in the Philadelphia County Office of Recorder of Deeds as Document No. 53316750, and the requirements of the Parking, Access and Utilities Easement recorded January 18, 2018, in the Philadelphia County Office of Recorder of Deeds as Document No. 53316753. In this regard, I also represent IS3 West Girard LLC, the owner of the Wood Street Garage at 306-320 N. Broad Street, which is also subject to the foregoing recorded instruments and abuts Martinelli Park.

[2] That Order is titled *Order Approving Memorandum of Understanding Re Global Settlement Among, Inter Alia, Debtors, Debtors' Subsidiaries, Committee, Tenet, Conifer, MBNF Parties, HSRE Entities and CONA Parties, Which Provides For, Inter Alia, Resolution of Adversary Proceedings, Withdrawal Of Claims, Allocation and Distribution of Assets From RRG and Consensual Substantive Consolidation of Certain Assets, Contracts and Liabilities of Non-Debtor Broad Street PropCos With Debtor Center City Healthcare, LLC, and Granting Related Relief.*

Mark Minuti, Esquire
December 14, 2022
Page 3 of 12

My clients lease Parcel B to Drexel's Medical School and are in the process of developing that portion of Parcel C formerly known as the Bobst Building—and now known as Race Street Laboratories (**RSL**)—as medical laboratory space and for other uses consistent with a first class medical/educational/office real estate project.

Please note that historically, and continuing through to the present, the Bobst Building's sole exterior ingress and egress was and is on the south side of that building and that access to this sole point of exterior ingress and egress was, and is, by the fire lane/driveway/pedestrian walkway running north and south from Race Street (to the south) through Parcel E (the SHSH Lot) to the front of the Bobst Building (to the north) (the **Bobst Access Ramp**, which you refer to as the CCH Parking Lot Ramp in your December 9, 2022, correspondence). I also note that Exhibit E to the EUU, the approved Zoning Plan, prepared by Pennoni Engineering and adopted by the Board of Surveyors on December 2, 2017, reflects three off street parking spots on the property of Parcel C (the **Bobst Parking Spaces**), which are only accessible *via* the Bobst Access Ramp.

All of the Parcels (Parcels A–F) on this contiguous square block (the **Former Hospital Properties**) were formerly integrated parts of Hahnemann Hospital. I understand that prior to 2018, these properties were all owned by a single entity and were used as a hospital, medical offices, a medical college, and parking and related uses. I further understand the prior owner transferred the Former Hospital Properties to separate owners in or around January 2018:

| Owner | Parcels |
|---|---|
| BSHP (**Owner 1**) | Parcels A & F |
| PAHH New College MOB, LLC (**Owner 2**) | Parcel B |
| PAHH Feinstein MOB, LLC (**Owner 3**) | Parcel C |
| BSHP III (**Owner 4**) | Parcels D & E |

On December 30, 2017, and effective January 11, 2018, Owners 1–4 entered into the REA and EUU. These recorded instruments recognized that "the uses of the Parcels affected by this Easement are integrated and interdependent" (EUU exordium ¶E), and that "[t]he Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another" (REA Background ¶H), such that the REA was entered into between all property owners of the Parcels "for the purpose of facilitating the harmonious use and operation of the Entire Project, all as more particularly set forth [t]herein." *Id.*

The terms of these recorded instruments "run with the land" and are "binding upon" all successors, assigns, and transferees. EUU exordium ¶E ("this Easement must be recorded against the Property and run with the land."); EUU §4.2 ("The provisions of this Easement run with the land and shall inure to the benefit of or be binding upon and enforceable against the Owners of the Parcels, their heirs, personal representatives, successors and assigns."); REA §18 ("All the covenants, easements and other provisions of this Agreement (including, but not limited to, the benefits and burdens hereof) shall run with the land with respect to the Project Parcel and shall be

Mark Minuti, Esquire
December 14, 2022
Page 4 of 12

binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. Upon the transfer of ownership of any area subject to any easement hereunder, the transferee shall be deemed to have assumed the obligations of the transferor arising from and after the date of transfer …").

The EUU created "reciprocal easements" for "the benefit of" the current and future owners of all six parcels to 1) "use and enjoy all common areas" and, separately to 2) "use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in [the REA]":

> 1.1 Easement. Owners hereby establish and create, for the benefit of all six (6) Parcels, reciprocal easements that allow all six (6) Parcels to use and enjoy all common areas, and use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in an Operation and Reciprocal Easement Agreement among the Owners, to be recorded immediately hereafter.

The term "common areas" is not defined in the EUU (or the REA). Terms which are not defined in an easement are given their ordinary meaning. *See Moody v. Allegheny Valley Land Tr.*, 976 A.2d 484, 490 (Pa. 2009) ("In construing a[n easement] it is not what the parties may have intended by the language used but what is the meaning of the words that determines what interest is conveyed therein.") (cleaned up). As noted above, the EUU recites that "the uses of the Parcels affected by this Easement are integrated and interdependent" while in the REA, the Parcel Owners expressly recognized and acknowledged that "[t]he Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another" (REA Background ¶H). The Bobst Access Ramp appears to me to be an example of an area shared by the Parcel owners— including for access to the Bobst (RSL) Building and the Bobst Parking Spaces, and is indeed an area necessary for ingress to and egress from the Bobst (RSL) building and the Bobst Parking Spaces, while also being used for access to the SHSH parking area (*i.e.*, a shared, or "common" area). *See e.g.*, Merriam-Webster's Collegiate Dictionary (11th Ed., 2012) at definition 2(a) of "common" ("belonging to *or* shared by two or more individuals or by all members of a group").

I struggle to understand any other meaning of the easement "to use and enjoy all common areas" in the context of the EUU and would be curious to know how your client may interpret that term. At the very least, in addition to, and/or in the alternative, it would appear that the owner of Parcel C (my client) has an easement by necessity over and through the Bobst Access Ramp for ingress to and egress from the Bobst Building and the Bobst Parking Spaces. See *Bartkowski v. Ramondo*, 219 A.3d 1083, 1092 (Pa. 2019) ("the three fundamental requirements for an easement by necessity are 1) the titles to the alleged dominant and servient properties must have been held by one person; 2) this unity of title must have been severed by a conveyance of one of the tracts; and 3) the easement must be necessary in order for the owner of the dominant tenement to use his land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.") (cleaned up).

Mark Minuti, Esquire
December 14, 2022
Page 5 of 12

The EUU further creates a unity of use for all of the Former Hospital Properties requiring that the Parcels "shall be used in such a manner as if [they] were one zoning property" reciting that the "current" and future "proposed use" for "Hospital, Group Medical, Dental, and Health Practitioners, Educational Facilities, Accessory Offices, Building Services, Accessory Surface Parking Lot, Wireless/cellular Antennas, Accessory Signs and Building ID Signs purposes":

> For purposes of zoning, exclusively, all four (4) Owners hereby agree and state that the Parcels shall be considered one contiguous parcel of land. In connection therewith, Owners hereby agree and covenant that the Parcels shall be used in such a manner as if the six (6) parcels that comprise the Property were one zoning property. Such current and proposed use of the Property is for Hospital, Group Medical, Dental, and Health Practitioners, Educational Facilities, Accessory Offices, Building Services, Accessory Surface Parking Lot, Wireless/cellular Antennas, Accessory Signs and Building ID Signs purposes.

EUU §2.1.

Integral to facilitating the harmonious use and operation of these integrated and interdependent Parcels was the "acknowled[ment] and agree[ment]" of each Parcel Owner "that the Entire Project is intended to be a **first class medical/educational/office real estate project** and that the operation and Maintenance of each Property in accordance with [a certain] Operating Standard benefits the Entire Project and is essential to each other Owner." REA §5(a) (emphasis supplied). The **Operating Standard** is defined by the REA to mean:

> [T]he standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to similarly situated hospitals, educational and medical office facilities in the 'Center City', Philadelphia area, with due consideration to the age of the applicable facilities. At a minimum, the Operating Standard requires that the applicable Lots, Buildings, and Shared Facilities within the Entire Project shall at all times be operated and Maintained in good working order and condition, ordinary wear and tear excepted, and in compliance with all applicable Legal Requirements.

REA§1(t).

The REA defines "Maintenance" and "Maintain" to include "operation, maintenance, repair, reconditioning, refurbishing … and replacement … of … other elements of the Entire Project" which "shall also include the right of access for any of the above purposes":

> "Maintenance" or "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning,

Mark Minuti, Esquire
December 14, 2022
Page 6 of 12

> painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.

REA§1(o).

Section 4 of the REA addresses Maintenance of certain Shared Facilities (including the Loading Dock underneath the entrance to the Bobst (RSL) building, while Section 5 of the REA addresses the Operations and Maintenance of the "Entire Project" (*i.e.*, all six Parcels) more generally. In this section, the REA recites that "each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Property, at such Owner's sole cost and expense, in accordance with the Operating Standard" (REA §5(a)), and that "No Owner shall permit any … condition that, under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance under common law, to exist upon or emanate from the Property owned by such Owner." REA §5(b). This section of the REA further provides that each owner shall be responsible for "Maintaining .... and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements," not only its own "respective Lot" but also "the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or *immediately adjacent to* such Owner's Lot":

> [E]ach Owner shall be responsible for Maintaining, cleaning, keeping free from debris, removing snow and ice from (as it relates to surface areas which involve pedestrian or vehicular traffic) and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements: (I) its respective Lot and the Buildings and other improvements located thereon from time to time; (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on or *immediately adjacent to* such Owner's Lot; …

REA §5(a) (emphasis supplied).

Unfortunately, the CCH managed Parcels are not being used, maintained and operated consistent with a "first class medical/educational/office real estate project" or in accordance with the requisite Operating Standard and these failures are having deleterious effects on my clients.

## A.     GRAFFITI AND HOMELESS INTRUSIONS — PARCEL E

Parcel E includes the SHSH building. I understand that due to neglect, this building was allowed to be occupied by homeless persons for a substantial period of time. While my clients appreciate past efforts to clear the building of trespassers, the building is still a magnet for homeless

Mark Minuti, Esquire
December 14, 2022
Page 7 of 12

persons and the building itself is now boarded up with unsightly plywood and covered with graffiti, as demonstrated by the photographs below, which is not reflective of a "first class medical/educational/office real estate project":




This condition directly abuts Parcel C which my clients are presently renovating and which they will be marketing to prospective tenants consistent with the Operating Standard in the very near future. The condition of the SHSH building detracts from (and potentially destroys) my clients' ability to attract first class tenants for their property. On numerous prior occasions, my clients asked CCH to remedy this lack of maintenance at the SHSH property and those conditions unfortunately persist. I note that my clients informed CCH of the graffiti and other issues on Parcel E at least over two months ago on October 4, 2022, and on many occasions thereafter, but CCH has, to date, failed to correct these conditions. On October 18, 2022, my clients specifically noted that:

> There are also undisputed obligations related to managing the Operating Standard which are not being upheld, most notably by the heavily vandalized SHSH Building.

These requests, and others, for corrective action have not been complied with. As such, please consider this letter to be further notice of a violation of the REA and a formal request to immediately remediate this condition.

## B.    POT HOLES AND DANGEROUS SURFACE CONDITIONS — PARCEL E

There were and are also numerous surface conditions including potholes, exposed rebar, and other conditions on the pedestrian and vehicular ways on and through the CCH managed Parcels, including on the Bobst Access Ramp, examples of which appear below:

Mark Minuti, Esquire
December 14, 2022
Page 8 of 12



As you are also aware, the substandard conditions were also causing leaking from the upper Bobst Access Ramp area down into the subsurface loading dock area. I also note a lack of adequate lighting in Bobst Access Ramp area.

These conditions are 1) not reflective of a "first class medical/educational/office real estate project," 2) a violation of the Philadelphia Property Maintenance Code, 3) dangerous for persons and vehicles traversing these areas including those accessing my clients' properties, and 4) a violation of the Operating Standard.

In your December 9, 2022, correspondence, you state that my client "has no right, under the REA or otherwise, to perform" work to correct the deficient condition of the Bobst Access Ramp. The REA however, provides that "[e]ach Owner shall be responsible for Maintaining … and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements: (i) its respective Lot and the Buildings and other improvements located thereon from time to time; [and] (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on *or immediately adjacent to* such Owner's Lot." (Emphasis supplied). The Bobst Access Ramp is such an exterior pedestrian and vehicular area immediately adjacent to my client's property.

My clients also dutifully informed CCH by email on November 1, 2022, of its construction plans for the Bobst (RSL) Building including "repav[ing] the existing driveway and walkway" (i.e., the Bobst Access Ramp), noting that "[d]uring construction and after construction, we will be using it for access as it has always been used - for vehicular and pedestrian traffic." Mr. DiNome asked for a timetable for this work and on November 3, 2022, my clients responded that the repaving "will be done by January" and that the "goal is to get it started and ended quickly but it is very weather dependent."

On November 5, 2022, my clients noted to Mr. DiNome that "we believe that pedestrian and vehicle access is already permitted." On November 9, Mr. DiNome asked my clients to explain that

Mark Minuti, Esquire
December 14, 2022
Page 9 of 12

position, and my clients responded as follows:

> I believe that it is clear that Bobst (RSL) has access rights for several reasons including but not limited to:

> 1. Paragraph 3 of the attached easement agreement discusses the purpose of the document. Namely, the purpose of the document is to memorialize the practical way that the building operates and has always operated. The front door of Bobst is clearly accessed through Race Street for pedestrians and vehicles and always has been.

> 2. This area is legally necessary for emergency vehicles to access Bobst and portions of NCB.

> 3. This area is legally necessary for the egress for people in an emergency. For various reasons (there is covering and it already serves as egress for Klahr Auditorium and SHSH building), pedestrian egress is only legal from RSL to Race Street.

> 4. See page 39 of the attached. It looks like RSL controls several parking spaces along its building. It would make no sense for RSL to have parking without a way to getting to the parking spaces.

> 5. Because of the obvious history of the use of the building and the legal necessity for egress and access, it would make no sense that pedestrians and vehicles access would be limited.

> 6. As a practical matter, there are other examples of how the Towers and NCB and RSL operate that are not 100% memorialized in the easement document.

On November 17, 2022, my clients informed Mr. DiNome that an $817,000 construction contract including the paving work had been executed and that "[t]he paving itself is supposed to be done in the next three weeks as asphalt work generally cannot happen after December 10 due to cold weather" and that "delays would significantly delay our project and would put us in default of the contract we already signed." Mr. Canno went on to notify CCH that:

> [T]he appearance of this entranceway does not adhere to the Operating Standard as set forth in the REA and that it would be reasonable for me to

Mark Minuti, Esquire
December 14, 2022
Page 10 of 12

demand that you pay for the paving. I further indicated that I would incur significant damages if you physically stop this construction contract, which will improve the aesthetics of the campus and would have no negative impact on your parcel (and that I am fully paying for).

On November 18, Mr. DiNome responded with his understanding of the REA and noting that to the extent that my clients chose to proceed with paving, it would be at my client's own peril and expense, and that any such work would not modify the rights of the parties in any way:

The property lines of our respective fee parcels are what they are and there is no "joint ownership" of any land. There is the REA, which is limited in scope and does not provide IronStone any parking or related rights on our parcels.

More specifically, Ironstone has no rights to the "SHSH lot" and certainly no right to repave any portion of that lot or any other Center City Healthcare("CCH") property. We have not granted Ironstone permission to do any work in or on our property. To the extent that you choose to repave any land not owned by Ironstone, you do so at your own peril and your sole cost and expense, and any such work shall not serve to modify the rights of the parties or to impose any obligations whatsoever on CCH including any obligation to permit Ironstone to park on the CCH lots in the future.

Mr. Canno responded reminding CCH of its obligations to keep the Bobst Access Ramp in good repair and in a condition consistent with the Operating Standard, concluding that:

As a reminder, I am planning to pay for this 100% of this paving, which will make the area safer and presentable. I have also offered to confirm, in writing, that the paving will neither enhance or restrict any rights that either of party has under the REA or any other document.

Later on November 18, my clients added that:

this fire lane and driveway are not being maintained in accordance with the REA. Your failure to maintain this to the Operating Standard is a breach.

And that:

I am PAVING an area that needs to be paved AND agreeing that, in doing so, no rights of either party will be expanded or contracted.

Mark Minuti, Esquire
December 14, 2022
Page 11 of 12

At no point has CCH presented a plan to remediate the defective condition of the Bobst Access Ramp. Moreover, my client is entitled under the REA to Maintain the area which is an "exterior pedestrian area[] and vehicular area[] located on or immediately adjacent to [my client's] Lot."

While CCH has allowed its properties to fall out of compliance with the Operating Standard and to Maintain a first class medical/educational/office real estate project, my clients have been actively making improvements which benefits all owners of this integrated and functionally interdependent medical campus, while confirming that "in doing so, no rights of either party will be expanded or contracted."

## C.    USE, DEVELOPMENT AND PLANS FOR PARCELS A, D, E, AND F

I also note that while my clients have explained their intended use and development of their Parcels, CCH has not disclosed its intended plans for its Parcels beyond mentioning that it has been interviewing real estate brokers for sale of some or all of the Parcels consolidated into the CCH bankruptcy estate.

As CCH should be aware from the requirements of the EUU and REA—which run with the land, and are binding on all present and future owners—the use of these properties is limited to "Hospital, Group Medical, Dental, and Health Practitioners, Educational Facilities, Accessory Offices, Building Services, Accessory Surface Parking Lot, Wireless/cellular Antennas, Accessory Signs and Building ID Signs purposes." EUU §2.1. *See also* REA § 5(e) ("Each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Lot and the Buildings and other improvements located thereon from time to time in compliance with the Unity of Use Agreement, so long as the Unity of Use Agreement remains in effect and applies to the applicable Lot.").

Please confirm debtors' plans for development, use, sale, and disposition of the Parcels (Parcels A, D, E and F) consolidated into debtors' Estate.

I note that paragraph 16 of the Order authorizes the employment of 1) Albert A. Mezzaroba as "sale process manager"; and 2) G&E Real Estate Management Services, Inc. d/b/a Newmark Knight Frank (**NKF**) to manage the Real Estate. Likewise, MOU Schedule 3(b) identifies Anthony Perno as the individual responsible to "supervise the Property Manager." And, as referenced above, Paragraph 7 of the Order states "the Real Estate shall be managed … by CCH, together with the Committee, Tenet and the HSRE Entities." As such, I ask that you deliver a copy of this letter to Messrs. Mezzaroba and Perno, NKF, the Committee, Tenet and the HSRE Entities. I also ask that you ensure that all prospective brokers for, or potential purchasers of Parcels A, D, E and/or F are aware of the terms of the EUU, the REA, and the Zoning Permit which collectively set forth that these Parcels are "integrated," "interdependent properties" which are "physically and functionally

Mark Minuti, Esquire
December 14, 2022
Page 12 of 12

dependent on one another," and to be used for "Hospital, Group Medical, Dental, and Health Practitioners, Educational Facilities, Accessory Offices, Building Services, Accessory Surface Parking Lot, Wireless/cellular Antennas, Accessory Signs and Building ID Signs purposes."

**CONCLUSION**

My clients hope that we can work amicably together in a way that is consistent with the recorded instruments. The entire campus will benefit from continued harmonious use, and the proper maintenance of access, ingress, egress, facades, walkways, driveways, and the other elements of the Parcels as they would be in a first class campus.

Very Truly Yours,

Derek E. Jokelson

cc:     Jeffrey Kurtzman, Esquire (*via* email kurtzman@kurtzmansteady.com).