## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) Case No. 19-11466 (MFW) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Related to Docket Nos. 4468 and 4490** |
| | ) **Hearing Date: February 9, 2023 @ 10:30 a.m.** |
| | ) |

### DEBTORS' REPLY IN SUPPORT OF MOTION FOR ORDER:
### (I) ENFORCING THE AUTOMATIC STAY AGAINST IRONSTONE
### REAL ESTATE PARTNERS, IS BBFB LLC AND IS 245 NORTH 15TH LLC;
### AND (II) AWARDING DAMAGES FOR DEBTORS AND AGAINST IRONSTONE
### REAL ESTATE PARTNERS, IS BBFB LLC AND IS 245 NORTH 15TH LLC
### FOR THEIR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY

Center City Healthcare, LLC d/b/a Hahnemann University Hospital ("**CCH**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Reply in further support of their *Motion for Order: (I) Enforcing the Automatic Stay Against Ironstone Real Estate Partners, IS BBFB LLC and IS 245 North 15th LLC; and (II) Awarding Damages For Debtors and Against Ironstone Real Estate Partners, IS BBFB LLC and IS 245 North 15th LLC For Their Willful Violations of The Automatic Stay* [Docket No. 4468] (the "**Motion**")[2] and in response to the *Objection of IS BBFB LLC and IS 245 North 15th LLC* to Debtors' *Motion for Order: (I) Enforcing*

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540).   The Debtors' mailing address is 216 N. Broad Street, 4th Floor, Philadelphia, Pennsylvania 19102.

[2]  Capitalized terms not defined herein have the meanings given to them in the Motion.

*the Automatic Stay and (II) Awarding Damages* [Docket No. 4490] (the "**Ironstone Objection**").

In support, the Debtors respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      Although Ironstone uses 26 pages to try to defend its actions, the dispute before the Court is not that complicated.  In fact, the essentials of this dispute are straight-forward.  Ironstone contends that it has the right to make what it believes are improvements or repairs to a portion of the real estate that was substantively consolidated with the CCH bankruptcy estate pursuant to the MOU approved by the Court on August 29, 2022.  In support of its position, Ironstone relies upon certain documents – what it defines as the "EUU" and the "REA" – and contends that the subject property has not been maintained in accordance with the requisite "Operating Standard" and that the property's condition has "significantly deteriorate[d]" since, presumably, Ironstone acquired its interest in the properties it purchased.  These contentions are wrong.

2.      The "Operating Standard" to which Ironstone refers expressly takes into account both "the age of the applicable facilities" – here, many decades – and "ordinary wear and tear."  In fact, there has been no significant deterioration in the condition of the subject real estate in the time period relevant to this dispute.  Moreover, and in any event, the documents at issue do not give Ironstone the right to take the actions it has taken, and that it intends to take.

3.      Ironstone also contends that the automatic stay was not violated because its actions were permissible under the REA and EUU, because the property at issue was substantively consolidated with the CCH estate post-petition, and because such substantive consolidation was subject to the REA and the EUU.  Again, this is incorrect.  The fact that this dispute has arisen post-petition and that the substantive consolidation of the subject real estate with the CCH bankruptcy estate occurred post-petition pursuant to Court order, does not mean that the automatic

41118953.5 02/06/2023

stay does not apply.  Put simply, section 362(a)(3) of the Bankruptcy Code protects property of the estate; whether or not such property became property of the estate pre- or post-petition is not relevant. The CCH Real Estate is, and at all times material to the Motion has been, property of the Debtors' estates.  For Ironstone to seriously argue that the automatic stay does not apply demonstrates a fundamental misunderstanding of 11 U.S.C. § 362(a)(3).

4.    In sum, Ironstone has no right under the REA, the EUU or the automatic stay to take the actions it has taken, and clearly intends to continue to take, with respect to the parking lot, walls, sidewalk and other elements on Debtors' Lot E.  Ironstone's unilateral actions makes clear why Court intervention is necessary.

## **REPLY**

### A.    **Ironstone's Right to "Self-Help"**

5.    Without question, Ironstone's unilateral actions with respect to Lot E constitute "self-help+-"; that is, Ironstone contends that because of the Debtors' alleged failure to maintain Lot E, it could do so itself.  The issue of self-help is expressly addressed in the REA.  Section 11(b) (entitled "Remedies; Self-Help") provides as follows:

> The failure of any Owner to perform any of its obligations hereunder shall entitle the intended **Benefited Owner** to undertake the performance of such obligations if, after the expiration of thirty (30) days following the giving of notice as provided in Section 14 hereof (except in the case of an Emergency, in which event no notice shall be required), the Owner so obligated shall have failed to effect such cure (or, if effecting such cure would take in excess of thirty (30) days, shall have failed to commence such cure or shall have failed to proceed thereafter diligently to complete such cure) and such Owner does not notify such Benefitted Owner in writing that it disputes the alleged failure to perform its obligations (which notice shall set forth in reasonable detail the basis for such dispute), and the cost of effecting such cure shall be paid by the party so obligated within thirty (30) days of a presentation of a bill therefor.  (emphasis added)

6.      As highlighted above, the REA only gives a "Benefitted Owner" the right to self-help, after the provision of requisite notice.  The term "Benefitted Owner" is defined in the REA (*see* Paragraph 1(b) at page 2) as:

> [W]ith respect [to] any easement expressly granted under this Agreement[3], an Owner who is expressly entitled pursuant to the terms and conditions of this Agreement to the use, benefit or enjoyment of a **Shared Facility, Separate Facility or Encroachments and Support Elements that is located upon another Owner's Lot**.

7.      Significantly, the Debtors' parking lot, walls and sidewalk on Lot E are not included in the definition of Shared Facility, Separate Facility or Encroachments and Support Elements. Specifically:

a.      they are not "**Shared Facilities**" because they are not "Shared Interior Accessways[4]," they are not the "Shared Loading Dock[5]" and they are not "Shared Utility Facilities[6]."

b.      they are not "**Separate Facilities**" because they are not "facilities that are located upon one Lot and are intended pursuant to this Agreement to provide the

---

[3]      Notably, neither the REA nor the EUU expressly grants Ironstone an easement with respect to the Debtors' property that is subject to the Motion.  As to the "easement by necessity" doctrine referenced in the Ironstone Objection, the Debtors note that the Bobst Building is accessible through the Feinstein Building (also owned by Ironstone), which fronts Broad Street, that the Bobst Building connects with the New College Building (also owned by Ironstone), that the Bobst Building has direct access to 15th Street, via a walkway over property owned by Ironstone, and that the Bobst Building is accessible via the Shared Loading Dock.

[4]      The REA defines "**Shared Interior Accessways**" (see Paragraph 1(ee) of the REA at page 6) as "the interior doorways, hallways and passageways that currently provide interior access, circulation and passage ways (including emergency access and egress, to the extent required by applicable Legal Requirements) between adjoining Buildings located on adjacent Lots, substantially as the same are currently configured and available to and utilized by the Permittees of such Buildings on the Effective Date."

[5]      The REA defines "**Shared Loading Dock**" at Paragraph 1(ff) on page 6 as "the underground loading dock and related facilities (including trash and refuse compactors) located primarily on the Feinstein/Bobst Lot, together with the ramp providing short-term truck staging and vehicular and pedestrian access to such facilities from Race Street over and across the HUH Lot E, in the approximate locations depicted on Exhibit C-1 and C-2 of the Site Plan, which currently serve and provide off-street loading, shipping and receiving facilities for the Buildings located on the New College Lot, the North/South Tower Lot and the Feinstein/Bobst Lot."

[6]      The REA defines "**Shared Utility Facilities**" (see Paragraph 1(gg) of the REA at page 6) as "any Utility Facilities that are located on one Lot and serve multiple Lots (including, if applicable, the Lot on which such Utility Facilities are located)."

applicable services for the exclusive benefit of one (I) other Lot, such as the Helipad or emergency power supply or other Utility Facilities that serves only one Lot though located on a different Lot." (REA, at Paragraph 1(cc)); and

c.      they are not "**Encroachments and Support Elements**" because they are not "(i) any aboveground or underground portion or appurtenances of a Building that is located on one Lot, which encroaches onto an adjacent Lot, and (ii) any Building or other improvement that is located on one Lot, which provides necessary structural support for a Building on an adjacent Lot . . . but only to the extent necessary to provide continuing structural support." (REA, at ¶1(h)).

8.      Thus, even if it had given the requisite notice required under Section 11(b) of the REA – and it did not[7] – Ironstone had no right to exercise self-help.   This explains, presumably, why Ironstone does not cite to, or rely upon, Section 11(b) in its Objection.

**B.      Ironstone's Right to "Maintenance"**

9.      Ironstone argues, instead, that it has the right to take control of and reconfigure or re-construct Lot E based on Paragraph 5(a) of the REA.  Paragraph 5(a) provides in relevant part:

> [E]ach Owner shall be responsible for Maintaining[8], cleaning, keeping free from debris, removing snow and ice from (as it relates to surface areas which involve pedestrian or vehicular traffic) and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements: . . . the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas *located on or immediately adjacent to such Owner's Lot*; . . . . (emphasis supplied).

---

[7]      Other than a letter from Ironstone's counsel sent on December 14, 2022 (well after Ironstone began the actions described in the Debtors' Motion), all written communications between the parties regarding this dispute have taken place by email.  Paragraph 13 of the REA provides that notice, if given by email, must "specifically state[ ] that it is intended to be notice."  Even if Ironstone's email communications with the Debtors otherwise satisfied the notice requirements of Paragraph 5(a) of the REA (and they did not), none of Ironstone's emails so indicated.

[8]      The term "Maintenance" or "Maintain" is defined by the REA (at Paragraph 1(o), page 3) to mean:

> [T]he operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.

41118953.5 02/06/2023

10.     Clearly, Ironstone's Paragraph 5(a) rights are limited.  Specifically, with respect to "sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas," they must be "**immediately adjacent**" to Ironstone's Lots.  Under no reasonable analysis could the parking lot, walls and sidewalk on Lot E that Ironstone seeks to reconstruct be deemed to be "immediately adjacent" to Ironstone's properties.

11.     Indeed, certain of the improvements that Ironstone seeks to make (or is making) are on portions of Lot E that are not adjacent to any Ironstone property at all – such as the ramp, ramp walls and sidewalk.  The ramp that Ironstone is paving, for example – conveniently labeled the "Bobst Access Ramp" in the Ironstone Objection[9] – is in the middle of Lot E, and extends to Race Street, which is one-half of a city block from the closest Ironstone property.  The parking lot at issue extends to Race Street as well.  Although a portion of the parking lot (located on Lot E) touches the edge of Ironstone property, the term "immediately adjacent" cannot reasonably be interpreted as extending to the entirety of this property; to do so would result in absurd consequences, given the checkerboard nature of the ownership of the square block at issue, in which each party's Lots adjoin another's.  That is, if the entire parking lot on Lot E is "immediately adjacent" to an Ironstone Lot, literally every Lot on the project is as well.  This would give Ironstone the right – indeed, the *obligation* – under paragraph 5(a) of the REA to "Maintain" all surface areas of the entire project.  It would similarly give the Debtors the right and obligation to do the same.  Respectfully, this interpretation would make no sense, and would render specific language of the REA meaningless; again, the REA uses the term "immediately adjacent," rather than "adjacent."

---

[9]     The term "Bobst Access Ramp" is not used in either the REA or the EUU.  As best the Debtors can tell, it is a self-serving, and self-proclaimed, term invented by Ironstone.

41118953.5 02/06/2023

## C.   The "Operating Standard"

12.   Underlying much of the parties' disputes is the term "Operating Standard."  In fact, the obligation in Section 5(a) of the REA for each party to "Maintain" its properties is specifically with reference to the "Operating Standard" (". . . each Owner covenants and agrees that it . . . shall use, develop, occupy and Maintain its Property, at such Owner's sole cost and expense, in accordance with the Operating standard").  The term "Operating Standard" is defined by the REA (see Paragraph 1(t), page 5) as:

> [T]he standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to similarly situated hospitals, educational and medical office facilities in the "Center City", Philadelphia area, ***with due consideration to the age of the applicable facilities***. At a minimum, the Operating Standard requires that the applicable Lots, Buildings, and Shared Facilities within the Entire Project shall at all times be operated and Maintained in good working order and condition, ***ordinary wear and tear excepted***, and in compliance with all applicable Legal Requirements.  (emphasis supplied).

13.   As previously noted, the improvements on Lot E were literally *decades* old when the REA was executed in 2018.  To argue (as Ironstone does) that the relatively modest defects alleged in the surfaces of Lot E do not represent ordinary wear and tear – or that they occurred "[s]ince the Debtors' bankruptcy filings" (Ironstone Objection, at ¶ 23(h)), is preposterous.  In fact, the surface of and walls bordering the ramp on Lot E have not materially deteriorated in the approximate five months since Debtors acquired rights in the CCH Real estate pursuant to this Court's August 29, 2022 Order, since Ironstone acquired its Lots in July 2021, since the Debtors filed for bankruptcy, or at any time relevant to this dispute.  To the extent any deterioration has occurred, it is within the "ordinary wear and tear" provision of the definition of Operating Standard or has been caused by Ironstone's construction activity, which has involved the placement,

removal and storage of multiple commercial dumpsters on Lot E as well as trucks delivering construction materials to the Bobst Building, and other related construction activity.

14.     Tellingly, and in any event, the scope of improvements contemplated by Ironstone on Lot E extend well beyond repair of the handful of potholes identified in the Ironstone Objection. Attached to the Debtors' Motion, as Exhibit C, is a rendering contained on Ironstone's website (www.racestreetlabs.com).  This rendering shows that Ironstone is not merely patching potholes or defects in a cement driveway.  To the contrary, it intends to create a grand entrance to its newly-created "Race Street Labs" *on property belonging to the Debtors' estate*.  Why else would it pave the entire ramp or the SHSH parking lot, encase the walls adjoining the ramp or install a "Race Street Labs" sign (with planters and the like) – all on the Debtors' property?  Although Ironstone's plan is proffered as a "benefit" to the Debtors and the estate, it is not for Ironstone to decide what is in the best interests of the estate or to "improve" the Debtors' property, and the agreements cited by Ironstone give it no such right.  Neither does the automatic stay.

**D.     The Automatic Stay**

15.     Section 362(a)(3) provides that the filing of a petition for relief under any chapter of the Bankruptcy Code operates as a stay, applicable to all entities of "an act to obtain possession of property of the estate or of property of the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  "Property of the estate" is addressed in section 541 of the Bankruptcy Code and expressly includes "[a]ny interest in property that the estate acquires after the commencement of the case."  11 U.S.C. § 541(a)(7).

16.     Clearly, the CCH Real Estate constitutes property of the Debtors' estates.   And clearly, the CCH Real Estate is subject to the automatic stay.  Equally clear is the fact that Ironstone's actual and intended actions – exercising purported remedies under the REA in order

to pave the Debtors' ramp and parking lot, reconstruct a sidewalk and certain walls on the Debtors' property, and install signage over the objection of the Debtors – constitute the exercise of control over property of the estate, and violate Section 362(a)(3) of the Bankruptcy Code.

17.    Significantly, Ironstone's actions would violate the automatic stay **even if** they are permitted under the REA, EUU or otherwise (although they are not).  As the Court is aware, post-petition creditors, contract parties and other parties-in-interest routinely seek Court permission to exercise remedies against a debtor-in-possession's assets – even if those remedies are based on post-petition events and agreements, and even if those remedies are contained in agreements approved by the Court.  To take but one example, debtor-in-possession lenders often insist upon, as a condition to their loans, relief from the automatic stay to exercise remedies in the case of a debtor's default for this very reason.  Thus, even if Ironstone's actions are permitted by the REA and/or EUU (and they are not), they still needed prior Court approval.  Without question, Ironstone's actions violate the automatic stay.

**E.    Other Matters:  SHSH Building and Steam Disputes**

18.    Although it has no relevance to the instant dispute, Ironstone alleges that the Debtors have been derelict in their maintenance of the so-called "SHSH Building."  This is despite the fact that the Debtors have, in the short time period since such property was substantively consolidated with the CCH estate in mid-September 2022, spent over $200,000 on boarding-up the lower floors of the SHSH Building with heavy-duty plywood, securing multiple access points to the building, removing ladders providing access to the building, increasing security and obtaining multiple quotes for – when the weather permits – the potential painting of portions of the exterior.  With the assistance and cooperation of local community services, the Debtors also arranged for the removal of squatters from the building.  The foregoing actions, which addressed

conditions that largely pre-existed the substantive consolidation of the subject properties with the CCH bankruptcy estate, were taken promptly after the MOU Implementation Date (as defined in the MOU), which occurred on September 13, 2022.

19.     Ironstone also alleges that the Debtors have "simply failed and refused" to engage with Ironstone to reconcile certain disputes between the parties involving steam usage.  Again, this is not correct.  In fact, the Debtors have given these steam disputes significant attention.  Among other things, they engaged (through counsel) a steam expert, conducted analyses, and arranged a December 2, 2022 meeting with Ironstone at which the parties' consultants would inspect the premises in the hope of clarifying various issues regarding steam usage.   The afternoon before the scheduled meeting, Ironstone cancelled it.  To date, Ironstone has made no effort to reschedule. In any event, the Debtors firmly disagree with the assertion that they owe Ironstone a "substantial portion" of the $829,422.77 that Vicinity reportedly has billed Ironstone for alleged steam use.  In reality, even after netting electrical service used by the Debtors but billed to Ironstone, as of October 31, 2022 Ironstone owes the Debtors approximately $366,000 for water service billed to the Debtors but used in Ironstone's properties.

*[The remainder of this page is intentionally left blank.]*

41118953.5 02/06/2023

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached to the Motion as <u>Exhibit A</u>, granting the Motion, and granting such other and further relief as is just and proper.

Dated:  February 6, 2023

**SAUL EWING LLP**

By: */s/ John D. Demmy*
     Mark Minuti (DE Bar No. 2659)
     John D. Demmy (DE Bar No. 2802)
     Monique B. DiSabatino (DE Bar No. 6027)
     1201 N. Market Street, Suite 2300
     P.O. Box 1266
     Wilmington, DE 19899
     Telephone: (302) 421-6840
     Fax: (302) 421-6813
     mark.minuti@saul.com
     john.demmy@saul.com
     monique.disabatino@saul.com


     -and-

     Jeffrey C. Hampton
     Adam H. Isenberg
     Centre Square West
     1500 Market Street, 38th Floor
     Philadelphia, PA 19102
     Telephone: (215) 972-7777
     Fax: (215) 972-7725
     jeffrey.hampton@saul.com
     adam.isenberg@saul.com

     *Counsel for Debtors and Debtors in Possession*

41118953.5 02/06/2023