# EXHIBIT C

230 N Broad St. 4th Floor Admin  ◆  Philadelphia, PA 19102  ◆  (215) 762-7000

**Via FedEx and Electronic Mail**

**Ms. Linda Ramsey**
**524 Strathmore Road**
**Havertown, PA 19083**

Re:  **Demand for Legal Malpractice Claim re Hahnemann University Hospital**

Dear Ms. Ramsey:

I serve as the bankruptcy court authorized Chief Restructuring Officer for Center City Healthcare, LLC, Philadelphia Academic Health System, LLC, St. Christopher's Healthcare, LLC, Philadelphia Academic Medical Associates, LLC, HPS of PA, L.L.C., SCHC Pediatric Associates, L.L.C., St. Christopher's Pediatric Urgent Care Center, L.L.C., SCHC Pediatric Anesthesia Associates, L.L.C., StChris Care at Northeast Pediatrics, L.L.C., TPS of PA, L.L.C., TPS II of PA, L.L.C., TPS III of PA, L.L.C., TPS IV of PA, L.L.C., and TPS V of PA, L.L.C. (collectively, the "**Debtors**"), each of which filed for bankruptcy before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on June 30, 2019 or July 1, 2019.  The Debtors' bankruptcy cases are jointly administered at Case Number 19-11466 (MFW) (collectively, the "**Bankruptcy Case**").

The purpose of this letter is to let you know that the Debtors are pursuing a claim against you for legal malpractice, the effect of which was to cost the Debtors millions of dollars to rectify your error and mistake.  Please immediately put your malpractice carrier on notice regarding this claim.

A.  **The Debtors' Hospitals.**

As you know, Debtor Center City Healthcare, LLC, doing business as Hahnemann University Hospital ("**HUH**"), owned and operated a 496-bed tertiary care academic medical center in center city Philadelphia.  HUH's Graduate Medical Education Residency Program was one of the largest in the United States, comprising approximately 573 residents and more than 100 fellows practicing in a wide range of medical specialties.  Unfortunately, the Debtors were unable to reorganize or sell HUH as a going concern and the operations of HUH were ultimately wound down during the Bankruptcy Case.  By August of 2019, HUH had ceased providing medical care to patients and all of HUH's residents and fellows had terminated their employment with HUH.

Debtor St. Christopher's Healthcare, LLC, doing business as St. Christopher's Hospital for Children ("**STC**"), owned and operated a 188-bed free-standing pediatric hospital in North Philadelphia.  Like HUH, STC was an academic medical center, supporting academic programs with a number of parties.  STC's pediatric residency program included approximately 125 residents and fellows per year.

In December of 2019, the Debtors sold the operating assets of STC to a purchaser, who continued the employment of STC's existing residents and fellows. As part of this sale, the purchaser agreed to obtain necessary professional liability insurance for the residents and fellows who accepted employment with the purchaser, including coverage for acts or omissions which occurred while the residents and fellows were employed by the Debtors.

**B.**     **The Debtors' Professional Liability Insurance Coverage.**

At the time of the filing of the Bankruptcy Case, the Debtors maintained, *inter alia*, Healthcare Professional Liability, Physician Professional Liability and Non-Healthcare Professional Liability insurance coverage through Policy No. PARRG-2019 (the "**PARRG Policy**") issued by Philadelphia Academic Risk Retention Group, LLC ("**PARRG**"), a copy of which is attached hereto as **Exhibit A**. As you will see, the PARRG Policy was a "claims made" policy, covering claims first made during the term of the PARRG Policy. The PARRG Policy was originally set to expire on January 11, 2020. The Debtors did not plan to incur the significant cost to extend the policy or to purchase "tail insurance," as the Debtors shut down HUH and sold the operating assets of STC.

**C.**     **The Motions.**

On December 11, 2019, an Ad Hoc Committee of Hahnemann Residents and Fellows (the "**Ad Hoc Committee**") and the Pennsylvania Department of Health (collectively with the Ad Hoc Committee, the "**Movants**") filed motions (each a "**Motion**," collectively, the "**Motions**") in the Bankruptcy Case, seeking to compel the Debtors to, *inter alia*, continue to provide certain professional liability insurance. Copies of the Motions are attached hereto as **Exhibits B and C**. In the Ad Hoc Committee Motion, the Ad Hoc Committee alleges, *inter alia*, that "[t]he Debtors breached their Resident Contracts by purchasing narrower, and presumably cheaper, claims made [insurance] policies." At a hearing before the Bankruptcy Court on December 12, 2019 counsel to the Ad Hoc Committee further alleged that residents were "lied to" about the insurance purchased on their behalf. Tr. of December 12, 2019 Hearing, at 49:15-18, 22-25, 50:1-8.

**D.**     **Your Legal Error/Malpractice.**

In light of the Motions, the Debtors looked into the allegations and learned that the Debtors' residents and fellows were party to written House Staff Employment Agreements (each, an "**Employment Agreement**"); which agreements were renewed each year. In early 2019, the Debtors changed the form of the Employment Agreement. William Boyer, who at the time served as the Debtors' Chief Academic Officer, was in charge of updating the Employment Agreement Dr. Boyer relied upon the advice and guidance of the Debtors' legal department. Specifically, he relied upon your input as Assistant General Counsel and Vice President of Insurance Portfolio.

The new form of Employment Agreement used for the 2019 – 2020 academic year at HUH and STC is attached as Exhibit A to the Ad Hoc Committee's Motion (**Exhibit B** hereto). As you will see, section 3. D. of the form Employment Agreement provides that "Hospital shall provide **occurrence-based professional liability insurance coverage** for House Staff's acts and omissions, within the scope of the Program, that occur during the Training Period." (emphasis added). As we are sure you are aware, occurrence-based insurance coverage would provide

coverage for acts and omissions during the course of a resident's or fellow's employment, even if a claim was first made after the insurance policy term had expired. Based upon the language of the Employment Agreement, residents and fellows would have no reason to believe that there was any risk that they would not have insurance coverage.

The reference to "occurrence-based" coverage in the Employment Agreement was not correct and is inconsistent with the claims made coverage under the PARRG Policy. When you asked about this issue, you admitted to making a mistake in helping to draft, review and approve the form Employment Agreement. While you reviewed the form Employment Agreement to ensure the coverage limits were consistent with the coverage in the PARRG Policy, you admitted that you never checked the type of coverage and overlooked that the form Employment Agreement provided for occurrence-based coverage.

**E.      Damages.**

The reference to occurrence-based coverage in the Employment Agreements was significant. Originally, the Debtors opposed the Motions, arguing that the Debtors' obligation to purchase tail insurance coverage for residents and fellows constituted a pre-bankruptcy claim entitling resident and fellows to, at best, the same, anticipated small distribution to be received by all other holders of pre-bankruptcy, unsecured claims. In light of the language in the Employment Agreement, however, the Bankruptcy Court entered the *Order to Show Cause* attached hereto as **Exhibit D**, clearly demonstrating the court's view that insurance coverage needed to be maintained, and the Movants argued, persuasively, that the Debtors had a post-bankruptcy duty to maintain insurance coverage.

In early January, the Debtors were forced to pay the PARRG $487,500.00 (the "**Extension Fee**") to extend the coverage under the PARRG Policy for approximately thirty (30) days to provide the Debtors with time to investigate this matter and attempt to resolve the Motions.

Ultimately, the Debtors were forced to purchase "tail insurance" to resolve the Motions. The cost of purchasing tail insurance for former residents and fellows was approximately $4.1 million (approximately thirty percent (30%) of which is to be funded by the PARRG from excess premiums). Upon information and belief, the cost of purchasing tail insurance coverage was significantly higher than if the Debtors had addressed this issue in early 2019, when the form Employment Agreement was being revised (the "**Insurance Cost Increase**"). Had the Debtors changed to occurrence-based coverage then, the purchaser of STC would not have had to obtain prior acts coverage for the residents and fellows it hired, and upon information and belief, would have paid the Debtors more for the STC operating assets (the "**Purchase Price Reduction**"). The Debtors also incurred significant fees and expenses in dealing with, and ultimately resolving, the Motions (the "**Fees and Costs**").

While the insurance coverage issues raised in the Motions extended beyond residents and fellows, the majority of the damages suffered by the Debtors are a result of your malpractice error related to coverage for residents and fellows. Accordingly, the Debtors hold you liable for the Purchase Price Reduction and a significant portion of the Extension Fee, the Increased Insurance Costs and the Fees and Costs incurred constitute a Loss or Losses.

Given the above, the Debtors hereby demand reimbursement, as compensatory damages, in an amount of no less than $6 million dollars to cover the damages they have suffered as a result of your errors and failure to perform legal services rendered to the HUH.  As such, the Debtors request immediate reimbursement in the amount to avoid litigation.  Failure to respond or pay within 21 days will be considered a declination of this demand.  Similarly, neither HUH and/or the Debtors will indemnify you for this demand.  In addition, the Debtors advise you to put your malpractice carrier on notice immediately of the Debtors claim.  Please advise the Debtors when this has been done.

We look forward to your prompt response.

Very Truly Yours,

Allen Wilen
Chief Restructuring Officer

Enclosures

cc:    John Dinome, Esq. (via e-mail, w/o encl.)

# ~ Exhibit A ~

This policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your State. State insurance insolvency guaranty funds are not available for your risk retention group.

# HEALTHCARE PROFESSIONAL LIABILITY, PHYSICIAN PROFESSIONAL LIABILITY, NON-HEALTHCARE PROVIDER PROFESSIONAL LIABILITY AND GENERAL LIABILITY POLICY

## DECLARATIONS

**Issuing Company:**   Philadelphia Academic Risk Retention Group, LLC

**Policy Number:**  PARRG - 2019

| | | | |
|---|---|---|---|
| Item 1 | **First Named Insured:** | | Philadelphia Academic Health System, LLC. |
| Item 2 | **Policy Period** | | January 11, 2019 to January 11, 2020 both days at 12:01 a.m. |
| Item 3 | **Coverage Parts Selected** | Healthcare Professional Liability | Claims Made and Reported |
| | | Physician Professional Liability | Claims Made and Reported |
| | | Non-Healthcare Provider Professional Liability | Claims Made and Reported |
| | | General Liability | Occurrence |
| | | Employee Benefits Liability | Claims Made and Reported |
| Item 4 | **Retroactive Date** | Healthcare Professional Liability | January 11, 2018 |
| | | Physician Professional Liability | January 11, 2018 |
| | | Non-Healthcare Provider Professional Liability | January 11, 2018 |
| | | General Liability | Not Applicable |
| | | Employee Benefits Liability | January 11, 2018 |
| Item 5 | **Limits of Liability** | *Healthcare Professional Liability* | |
| | | Per Hospital Per Event Limit | $500,000 |
| | | Per Hospital Aggregate Limit | $2,500,000 |
| | | | |
| | | *Physician Professional Liability* | |
| | | Per Event Limit | $500,000 |
| | | Per Aggregate Limit | $1,500,000 |
| | | | |
| | | Non-Healthcare Provider Professional Liability | |
| | | Per Event Limit | $1,000,000 |
| | | Per Aggregate Limit | $3,000,000 |
| | | | |
| | | *General Liability* | |
| | | Each Occurrence | $1,000,000 |
| | | Damage to Rented Premise | $300,000 |
| | | Personal and Advertising Injury | $1,000,000 |
| | | General Aggregate | $3,000,000 |
| | | Product/Completed Operations Aggregate | Included in General Aggregate |

| | | | Employee Benefits Liability | |
| | | | Per Event Limit | $1,000,000 |
| | | | Aggregate Limit | $3,000,000 |
| | | | | $5,850,000 |
| | | | Refer to Attached Schedule of Forms and Endorsements | |

4/23/19

## COMMON POLICY PROVISIONS AND CONDITIONS

In consideration of the payment of the premium due, and in reliance upon the representations of all **insureds**, the **company** and all **insureds** agree as follows, subject to the terms and conditions of this policy, including the applicable Limits of Liability:

## I  DEFINITIONS

A) **Additional insured** means any person or organization with which the insured has entered into a written contract or agreement prior to the loss agreeing:

    1)  to add the person or organization as an additional insured; or
    2)  to hold harmless or indemnify such person or organization.

However, such person or organizations is not an **additional insured** with respect to losses arising from, or in connection with, any acts or omission alleged to have been committed by that **additional insured**.

B) **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about any **named insured's** goods, products, or services for the purpose of attracting customers or supporters.

C) **Authorized insured** means any **insured** authorized by the **first named insured** to give notice of a **claim** or **potential claim** to the **company.**

D) **Automobile** or **auto** means:

    1)  any land motor vehicle, trailer or semi-trailer, including any attached machinery and equipment, designed for use on public roads; or

    2)  any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, **automobile** or **auto** does not include **mobile equipment.**

E) **Bodily injury** means any damage to the human body, including sickness or disease and any mental injury, shock, emotional distress, or death arising therefrom.

F) **Case Management** means identifying patients with specific health care needs and developing a plan to ensure an efficient use of resources to achieve the best outcome.

G) **Claim** means an express, written demand upon an **insured** for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies are alleged. Suit also includes an arbitration or other alternative dispute resolution proceeding in which such damages are claimed and to which an **insured** must submit or does submit with the **company's** consent.

H) **Claim expense** means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any **claim,** suit or **potential claim.**

I) **Company** means the Issuing Company shown on the Declarations.

J) **Employee** means any person who receives a W-2 or 1099 IRS tax form from any **named insured** that is an organization, and who was acting within the scope of his or her duties on behalf of that **named insured** at the time of the **event**, offense, **health care event** or any other act or omission that results in a **claim** or **potential claim** that is otherwise covered under this policy. **Employee** also includes any leased worker, temporary worker or volunteer so long as such person is or was acting within the scope of his or her duties on behalf of a **named insured** that is an organization.

K) **Event** means an accident. All injuries arising out of, or in connection with:

   1) The same or related acts or omissions; or
   2) The continuous or repeated exposure to substantially the same harmful conditions.

L) **Extended Reporting Period** means the period of time after the cancellation or nonrenewal of any Coverage Part shown on the Declarations or any endorsement as "Claims-Made and Reported" during which an **insured** may report a **claim** or **potential claim.**

M) **First named insured** means the person or organization shown as the First Named Insured on the Declarations.

N) **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing **professional services** shall be considered one **health care event**. However, if a **health care event** results in injury to more than one person, except all injuries to a mother and fetus (or fetuses) from conception through delivery which constitute one **event**, the **company** shall consider it to be one **health care event** only upon written request from an **authorized insured.**

O) **Insured means:**

   1) The first named insured;

   2) Any named insured;

   3) Any employee;

   4) Any physician, resident, intern, extern, fellow podiatrist, dentist, nurse midwife or certified registered nurse anesthetist if included on the schedule of covered providers;

   5) Members of your boards and committees, but only for conduct arising out of their duties as board or committee members and those who execute orders from your boards or committees, but only while in the course and scope of executing those orders;

   6) Any of your authorized volunteer workers, but only while acting within the scope of their duties as such and at your direction.  Your authorized workers do not include any physician, resident, intern, extern, fellow, podiatrist, dentist, nurse midwife or certified nurse anesthetist;

   7) any administrator, partner, superintendent, director, officer, member, trustee, stockholder, medical director, department head or head of the medical staff, student, board or committee member or staff member, but only to the extent that he or she is acting within the scope of his or her duties on behalf of any **named insured**. As used to define **insured**, student means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by any **named insured** that is an organization relative to the delivery of **professional services;**

   8) any spouse or domestic partner of any individual **insured**, but only with respect to the

conduct of the business of a **named insured** that is an organization. As used in this definition, "domestic partner" means any person qualifying as such under any federal, state or local laws or under a **named insured's** employee benefit plans or employee benefits program;

9) any organization formed or acquired by a **named insured** that is an organization during the **policy period**, over which that **named insured** maintains at least majority ownership.

10) **Non-Healthcare Provider** means a person or entity that does not meet the definition of a health care provider in the PA Medical Care Availability and Reduction of Error (MCARE) Act of 2002, and is designated as an **Insured** on the schedule of **Insureds** on file with the Company. If a licensed healthcare provider who is not required to participate in MCare is named in a claim individually and their hospital employer is not also named in the claim, the Professional Liability Non-Healthcare Provider limit of coverage will apply.

P) **Insured contract** means:

1) a contract for a lease of premises, except for that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with permission of the owner;

2) an agreement between a railroad and an **insured** under which the **insured** will hold the railroad harmless for certain liability arising out of the use of a sidetrack;

3) any easement or license agreement, except in connection with construction or demolition operations on, or within 50 feet of, a railroad;

4) an obligation, as required by ordinance, law or regulation, to indemnify a municipality, except in connection with work for a municipality;

5) any agreement to maintain an elevator;

6) any provision in any other contract or agreement pertaining to an **insured's** business (including an indemnification of a municipality in connection with work performed for a municipality) under which an **insured** assumes the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization. As used in this definition, "tort liability" means a liability that would be imposed by law in the absence of any contract or agreement. This does not include any provision:

a) that indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

b) that indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(1) preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(2) giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

c) under which the **insured**, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the **insured's** rendering or failure to render professional services, including those listed in b. above and supervisory, inspection, architectural or engineering activities.

Q) **Loading or unloading** means the handling of property:

1) after it is moved from the place where it is accepted for movement into or onto an aircraft,

watercraft, or **auto;**

2) while it is in or on an aircraft, watercraft, or **auto**; or

3) while it is being moved from an aircraft, watercraft, or **auto** to the place where it is finally delivered.

It does not include the movement of property by means of a mechanical device, other than a hand truck, which is not attached to the aircraft, watercraft or auto.

R) **Location** means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

S) **Loss** means civil damages, including prejudgment interest, which an insured becomes legally obligated to pay through adjudication or settlement.

T) **Managed care services** means services provided to manage and/or administer a health care plan. As used in this definition "health care plan" means a medical benefits plan administered by a health maintenance organization, preferred provider organization, or other similar organization which provides, or arranges to provide, healthcare services to members under a written contract or agreement.

U) **Mobile Equipment** means the following types of land vehicles, including any attached machinery or equipment:

1) bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads.

2) vehicles maintained for use only on, or next to, premises owned or rented by a **named insured.**

3) vehicles that travel on crawler treads.

4) vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted.

5) vehicles not described in subparagraphs 1.a, b, c, or d above, that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment.

V) **Named Insured** means any of the following, but only if listed on a Schedule of Named Insured.

1) If the **Named insured** is an individual, then the individual and the individual's spouse are **Insureds**, but only with respect to the conduct of your business of which you are the sole owner.

2) If the **Named Insured** is a partnership or joint venture, then your members, your partners and their spouses are also **Insureds**, but only with respect to the conduct of your business.

3) If the **Named Insured** is a limited liability company, your members are also **Insureds,** but only with respect to the conduct of your business. Your managers are **Insureds**, but only with respect to their duties as your managers.

4) If the **Named Insured** is not a partnership, joint venture, or limited liability company, then your executive officers and directors are **Insureds**, but only with respect to their duties as your officers or directors. Your stockholders are **Insureds,** but only with respect to their liability as stockholders.

W) **Personal and advertising injury** means injury, including consequential bodily injury, arising from one or more of the following offenses:

1) false arrest, detention, or imprisonment;

2) malicious prosecution;

3) the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;

4) oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

5) oral or written publication, in any manner, of material that violates a person's right of privacy; or the use of another's advertising idea in the **insured's advertisement.**

X) **Pollutants** means any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleum, chemicals or waste. As used in this definition, "waste" means medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

Y) **Policy Period** means the period of time shown on the Declarations as the Policy Period. However, if the policy is terminated before the later of the dates shown on the Declarations, **policy period** means the period between the first date shown on the Declarations and the date the policy was terminated.

Z) **Potential Claim** means an **event**, including an incident arising from, or in connection with, that **event**, which an **insured** knows or reasonably should know is likely to result in a **claim.**

AA) **Professional Services or Treatment** means:

1) medical, surgical, dental, mental health, or nursing services, including those rendered in connection with a clinical trial. This shall also include first aid rendered at the scene of an accident without expectation of monetary compensation, unless such accident occurred on the premises.

2) the provision of medical examinations, opinions, or consultations regarding a person's medical condition within an **insured's** practice as a licensed health care provider.

3) postmortem handling of bodies, including autopsies, organ donation or harvesting or other procedures.

4) the furnishing of any of the following but only as it related to the rendering of medical, surgical, dental or nursing services:

   a) food and beverage,

   b) blood, blood products, medications, supplies, equipment, or appliances, or

   c) counseling or other social services.

   As used in this definition, "clinical trials" means a structured study with predetermined protocols approved by an institutional review board, and independent ethics committee, an ethical review board or research ethics board which has been formally designated to approve, monitor, and review research involving humans in order to develop effectiveness or safety data or treatment plans, pharmaceutical products or medical devices.

5) "peer review" means the evaluation of a health care provider's fitness and qualification to provide treatment by a professional review board or committee through formally adopted, written procedures for the purposes of granting, determining or revoking clinical staff privileges at a hospital, clinic, or other medical facility that is a named insured, and which results in a patient alleging damages arising from a health care event; and

6) "utilization management" means the process of evaluating treatment to a patient for its

appropriateness or necessity which results in a patient alleging damages arising from a health care event.  In clarification and not in limitation of the foregoing, utilization management will include the prospective review of proposed treatment, concurrent review of treatment, retrospective review of already rendered treatment, disease management, case management, and the use of predictive modeling to identify individuals or populations for disease management or case management.

BB) **Property Damage** means:

1) Physical injury to tangible property, including any resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2) Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the event that caused it.

## II  DEFENSE AND SUPPLEMENTAL PAYMENTS

These provisions apply to all Coverage Parts:

A) When the Company has a duty to defend any claim, the Company will defend such claim against the Insured for a covered claim seeking damages on account of a medical incident, bodily injury, property damage, personal injury or advertising injury even if such claim or suit is groundless, false or fraudulent.  The company will not settle any claim without obtaining consent from the first Named Insured.

B) In addition to the Limits of Insurance applicable to this Policy, **the Company** shall pay, with respect to any **claim the Company** defends:

1) All expenses the Company incurs including defense costs.

2) All reasonable expenses incurred by an **Insured** at **the company's** request to assist **the company** in the investigation or defense of the **claim.**

3) Pre-judgment interest awarded against the **Insured** on that part of the judgment the **company** pays.  If prior to judgment, **the company** makes an offer to pay the applicable Limit of Insurance, **the company** will not pay any pre-judgment interest based on that period of time after the offer.

4) All interest on the full amount of any judgment that accrues after entry of the judgment and before **the company** has paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

5) All costs taxed against the **Insured** in the **claim.**

6) Premiums on appeal bonds required by law to appeal any **claim** the **company** defends, but only for bond amounts within the applicable Limits of Insurance.  **The company** is not obligated to apply for or furnish any such bond.

## III EXCLUSIONS

A) **ADA:** Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** duty to comply with the Americans with Disabilities Act of 1990 (ADA). This also includes any amendment or regulation that applies thereto or any comparable federal, state, or local law. This exclusion does not apply to any such **claim** or **potential claim** that is based on an **insured's** alleged negligence in the rendering of or failure to render **professional services**

B) **BUSINESS PRACTICES:** Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** billing practices or advertising activities. However, this exclusion does not apply to the coverage provided under the Personal and Advertising Injury Liability Insuring Clause.

C) **CLAIM OR POTENTIAL CLAIM REPORTED OR DISCOVERED PRIOR TO THE POLICY PERIOD:** Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported:

1) any **claim** or **potential claim** which has or which should have been reported to any insurer, including through any self-insured or captive program, prior to the **policy period**; and

2) any **potential claim** that was first known about or discovered, or should reasonably have been known about or discovered by, an **authorized insured** prior to the **policy period**

D) **CRIMINAL ACTS:** Any **claim** or **potential claim** arising out of, or in connection with, any criminal act committed by, or at the direction of, the **insured.**

E) **DISCRIMINATION:** Any **claim** or **potential claim** arising out of, or in connection with, the violation of any statute, law, ordinance or regulation prohibiting discrimination or humiliation because of race, creed, color, national origin, religion, age, gender or any other protected class as defined by statute, law, ordinance or regulation. This exclusion does not apply to any such **claim** or **potential claim** that is based on an **insured's** alleged negligence in the rendering of or failure to render **professional services.**

F) **EMPLOYEE BENEFITS LIABILITY:** Any **claim** or **potential claim** arising out of, or in connection with, any group benefits administered on behalf of a **named insured's employees**, including:

1) Group insurance plans or programs such as life, health, accident, dental or legal advice;

2) individual retirement accounts, salary reduction plans under I.R.S. Code 401(k), or any amendment thereto, savings plans, or employee stock subscription plans;

3) travel or vacation plans; or

4) workers' compensation, occupational disease, unemployment, Social Security or disability benefits insurance.

G) **EMPLOYERS LIABILITY:** Any **claim** or **potential claim** arising out of, or in connection with, **bodily injury** to:

1) An employee of a named insured arising out of, or in connection with, and in the course of:
   a) Employment by that named insured; or
   b) Performing duties related to the conduct of that named insured's business; or

2) The spouse, child, parent, brother or sister of that employee.

This exclusion shall apply whether a **named insured** may be held liable as an employer, or in any other capacity, and to any obligation to share damages with, or repay someone else who must pay damages, because of the injury. This exclusion does not apply to liability assumed by an **insured** under an **insured contract.**

H) **EMPLOYMENT PRACTICES:** Any **claim** or **potential claim** brought by an **employee**, or applicant for employment, which alleges an **insured:**

1) Breached an actual or implied contract of employment;

2) Violated an anti-discrimination statute;

3) Engaged in any form of harassment;

4) Engaged in libel or slander related to an employment relationship;

5) Retaliated for the exercise of a public right or duty;

6) engaged in intentional or negligent infliction of emotional distress arising out of, or in connection with, an employment relationship;

7) wrongfully failed to hire, promote, or grant tenure;

8) wrongfully demoted or terminated employment.

I) **ERISA:** Any **claim** or **potential claim** seeking to impose liability under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto.

J) **FRADULENT CLAIMS:** Any **claim** or **potential claim** made by an **insured** who knows that the **claim** or **potential claim** is false or fraudulent, as regards to amount or otherwise.

K) **INSURED VERSUS INSURED:** Any **claim** or **potential claim** initiated, alleged, or caused to be brought about, by any **insured** covered by this policy against any other **insured** covered by this policy. This exclusion does not apply if the **claim** or **potential claim** arises out of an **insured** providing **professional services** to another **insured.**

L) **MEDICARE OR MEDICAID:** Any **claim** or **potential claim** arising out of, or in connection with, any Medicare/Medicaid Claim. As used in this exclusion, a "Medicare/Medicaid Claim" means a claim based on or arising out of, or in connection with, any actual or alleged violation of law, regulation or rule with respect to Medicare, Medicaid, Tricare or any similar federal, state or local governmental program.

M) **NUCLEAR ENERGY LIABILITY:** Any **damages:**

1) for which an insured has coverage under a nuclear energy liability issued by the:
   a) Nuclear Energy Liability Insurance Association;
   b) Mutual Atomic Energy Liability Underwriters;
   c) Nuclear Insurance Association of Canada; or
   d) Any successor or assign of the entities set forth in the subparagraphs above.

This policy also does not apply if such coverage did exist, but was terminated by the exhaustion of the **insured**'s limit of liability.

2) Resulting from the hazardous properties of nuclear material for which an **insured:**
   a) Was required to maintain financial protection under the Atomic Energy Act of 1954 or any amendment or regulation that applies thereto; or

    b)  Was entitled to indemnify by the United States government or any agency thereof or would have been entitled to had this policy not been issued.

However, this exclusion does not apply to a **claim** or **potential claim** arising from **professional services** provided by an Insured involving nuclear medicine or nuclear medical radiology or radiation oncology

N) **Workers' Compensation and Other Similar Laws:** Any claim or potential claim arising out of, or in connection with, any obligation or damages arising under any law related to:
1) Workers' compensation;
2) Occupational disease;
3) Unemployment compensation;
4) Disability benefits;
5) Or similar law that provides for scheduled benefits as a result of an injury or disease.

## IV  CONDITIONS

A) **Assistance and Cooperation** the Insured shall:

1) Cooperate with the company in the investigation, settlement, or defense of the claim or suit, and
2) Assist the company, upon our request, in the enforcement of any rights against any person or organization which may be liability to the insured because of injury or damage to which the insurance may also apply.

B) **Cancellation, Nonrenewal and/or Termination of Coverage**

1) This policy may be canceled by the **first named insured**. The **first named insured** shall provide written notice to the **company** requesting cancellation. The cancellation shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

2) Any coverage contained within this policy may be terminated by the **first named insured**. The **first named insured** shall provide written notice to the **company** requesting the coverage termination. The termination shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

3) This policy, or any coverage contained therein, may also be canceled, terminated or nonrenewed by the **company**. The **company** will send notice to the **first named insured** at the last address on record with the **company.**

4) If the **first named insured** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed in accordance with the standard short rate tables and procedure. If the **company** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed pro rata. Premium adjustments shall be made within a reasonable period of time after cancellation. However, payment or tender of unearned premium shall not be a condition of cancellation.

5) If the **company** cancels or non-renews an **insured's** policy for any reason other than non-payment of premium, the **company** shall provide written notice to the **first named insured** not less than 90 days prior to the effective date of such cancellation or nonrenewal. If the **company** cancels an **insured's** policy for nonpayment of premium, the **company** shall

provide written notice to the **first named insured** not less than 10 days prior to the effective date of such cancellation or nonrenewal.

6) If the **company** cancels or non-renews this policy, coverage under the policy shall terminate on the earlier of:
    a) The date stated on the cancellation or nonrenewal notice; or
    b) The date the insured procures replacement coverage.

C) **Coverage Territory:** This policy applies to **claims** or **potential claims** arising from acts, omissions, occurrences or offenses (including offenses that take place through the Internet or similar electronic means of communication) occurring anywhere in the world, with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America, provided that the **claim** or **potential claim** is made and any legal proceedings are pursued within the United States, its territories and possessions, including Puerto Rico.

D) **Extended Reporting Period:** Only with respect to any Coverage Part shown on the Declaration as "Claims Made and Reported", the following provisions apply:

1) Automatic Limited Extended Reporting Period

    a) In the event that coverage under this policy is terminated for any reason, the **company** will provide an automatic limited **extended reporting period** of 30 days, starting with the end of the **policy period**, during which **claims** and **potential claims** arising out of any specific coverage(s) may be reported to the **company** in writing. However, the **claim** must have been first made against an **insured** during the **policy period**, or the **potential claim** must have been first discovered by an **insured** during the **policy period**.

    b) This automatic limited **extended reporting period** shall not extend the **policy period** or change the scope of the coverage provided. Any **claim** or **potential claim** first reported to the **company** during the automatic limited **extended reporting period** will be deemed to have been made on the last date on which this policy is in effect. The Limits of Liability that apply at the end of the **policy period** are not renewed or increased for **claims** or **potential claims** first reported during the automatic limited **extended reporting period**.

2) Optional Extended Reporting Period

    a) The **company** shall, upon written request by or on behalf of the **first named insured**, make an offer for an **extended reporting period** to the **first named insured** if coverage is or will be canceled or nonrenewed, subject to the following:

        (1) any such written request by or on behalf of the first named insured must be received by the company no later than 30 days after the cancellation or nonrenewal of the coverage;

        (2) the company shall be required to send the offer for an extended reporting period only to the first named insured or its authorized representative; and

        (3) the coverage has been or will be canceled or nonrenewed with respect to the entire policy or a Coverage Part.

    b) The **first named insured** may accept the **company's** offer of an **extended reporting period** by paying the premium due within 30 days from either the date on which the policy expires or the date on which the **company** receives the request for

an **extended reporting period**, whichever is later. Failure to pay the full premium within this 30-day period will be deemed a rejection of the offer.

c) In the event of the purchase of an **extended reporting period**, the entire premium for such **extended reporting period** shall be deemed earned at its commencement.

d) If an **extended reporting period** is purchased, a **claim** or **potential claim** otherwise covered by this policy may be reported for the period of time set forth in the applicable **extended reporting period** endorsement issued after termination of the **policy period**. The **extended reporting period** will begin at the end of the **policy period**. However, the **extended reporting period** shall not

(1) extend the **policy period;**
(2) apply to any **claim** or **potential claim** that took place after the **policy period**; or
(3) otherwise expand the coverage provided under this policy.

E) **First Named Insured:**

1) The **first named insured** shall be authorized to act on behalf of all **insureds** with respect to this policy, with full authority to bind all **insureds.**
2) The **first named insured** shall notify the **company** in writing of any changes that might affect the insurance provided under this policy, including cancellation and nonrenewal.

F) **Inspection and Audit:** The **company** shall be permitted, at its own discretion and for its own benefit, to audit an **insured's** property, operations, and any business records. The **company** shall also have the right to obtain a copy of any current or prior insurance records. Any findings or recommendations made by the **company** as a result of an audit shall inure only to the **company's** benefit. As a result, they may not be used as evidence of the **insured's** compliance with any safety regulations or other industry standards.

G) **Modifications:** Except as provided herein, this policy may not be modified except by written endorsement attached to and made a part of this policy by the **company**. The **company's** decision not to insist on an **insured's** compliance with any provision of this policy shall not operate to waive, modify, or void that provision, or any other provision, condition or term of this policy.

H) **Non-Assignability:** No interest of an **insured** under this policy shall be assignable without the prior written consent of the **company**. However, if the **insured** is a person and dies, the coverage afforded by this policy shall inure to the benefit of that **insured's** estate.

I) **Separation of Insured:** Except for any duties specifically assigned to the first named insured and Limits of Liability applicable to any insured, this policy applies:

1) separately to each **insured** against whom a **claim** or **potential claim** is made; and
2) as if each **insured** were the only **insured** under this policy.

J) **Settlement:** The company may only settle a **claim, potential claim**, or other matter brought against a named insured listed in the Schedule of Insureds with the consent of the First **Named Insured**.

K) **Subrogation:** The **company** shall be subrogated to the rights of any **insured** to the extent of any payments made, or as allowed by law. **Insureds** shall do nothing to prejudice those rights.

At the **company's** request, an **insured** shall bring suit or transfer those rights to the **company**. **Insureds** shall also help the **company** enforce its rights.

I ) **Terms Conform to Statute or Regulation:** If any term of this policy, or any duty arising therefrom, would cause the **company** to violate any federal, state or local law or regulation, the policy is amended to bring the **company** into compliance with such statute or regulation.

## HEALTHCARE PROFESSIONAL LIABILTY COVERAGE PART

This coverage part provides claims made and reported coverage only.  Coverage is limited to liability for claims made against an insured during the policy period or an extended reporting period, if application.

### I.  INSURING AGREEMENT

The **company** will pay on behalf of any **insured** all **loss** and **claims expenses** up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations.

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an insured is required by written contract or agreement to provide that **additional insured**. Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured.**

In addition to the Limits of Liability, the **Insurer** will have the right and duty to defend any **Claim** brought against the **Insured,** and will do so even if any of the allegations of the **Claim** are groundless, false, or fraudulent.

### II.  EXCLUSIONS

The coverage under this Coverage Part does not apply to:

A)  **Intentional Acts:**  Any loss for any claim or potential claim arising out of, or in connection with, any act listed below:

1)  Any criminal, intentional, dishonest or fraudulent act;
2)  Any willful violation of law, statue or regulation.

However, the company will pay claim expense to defend any **insured** against any **claim or potential claim** involving any excluded act listed above when intertwined with any other act triggering any insuring agreement.

B)  **Privacy:** Any **claim** or **potential claim** arising out of, or in connection with, any disclosure of or access to any person's or organization's confidential, proprietary or personal information, including personally identifiable information, financial information, patents, trade secrets, processing methods, customer lists, credit card information, health information, or any other type of nonpublic information. This exclusion applies even if the **claim** or **potential claim** is for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other **loss**, **claims expense**, cost or expense incurred by an **insured** or others resulting from the excluded **claims** or **potential claims** This exclusion does not apply to any such **claim** or **potential claim** that is based on an **insured's** alleged negligence in the rendering of or failure to render **professional services**

### III. LIMITS OF LIABILITY

A) **Per Event Limit**:  The Per Event Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense**, for any **health care event** regardless of the number of:

   1) **Insureds** who share a Per Event Limit;
   2) Claims made or potential claims first discovered; or
   3) Persons or organizations making **claims or potential claims.**

B) **Aggregate Limit:**  The Aggregate Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense**, for all **health care events** regardless of the number of:

   1) **Health care events**;
   2) **Insured** who share an aggregate limit;
   3) Claims made or potential claims first discovered;
   4) Persons or organizations making **claims or potential claims.**


Defense Expenses are paid in addition to the **Insurer's** Limit of Liability, and payment of Defense Expenses by the **Insurer** shall not reduce or exhaust the applicable Limit of Liability.

## PHYSICIAN PROFESSIONAL LIABILTY COVERAGE PART

This coverage part provides claims made and reported coverage only.  Coverage is limited to liability for claims made against an insured during the policy period or an extended reporting period, if application.

I.  **INSURING AGREEMENT**

The **company** will pay on behalf of any **insured** all **loss** and **claims expenses** up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations.

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an insured is required by written contract or agreement to provide that **additional insured.** Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured.**

In addition to the Limits of Liability, the **Insurer** will have the right and duty to defend any **Claim** brought against the **Insured,** and will do so even if any of the allegations of the **Claim** are groundless, false, or fraudulent.

II.  **EXCLUSIONS**

The coverage under this Coverage Part does not apply to:

A) **Intentional Acts:**  Any loss for any claim or potential claim arising out of, or in connection with, any act listed below:

   1)  Any criminal, intentional, dishonest or fraudulent act;
   2)  Any willful violation of law, statue or regulation.

However, the company will pay claim expense to defend any **insured** against any **claim or potential claim** involving any excluded act listed above when intertwined with any other act triggering any insuring agreement.

B) Privacy: Any claim or potential claim arising out of, or in connection with, any disclosure of or access to any person's or organization's confidential, proprietary or personal information, including personally identifiable information, financial information, patents, trade secrets, processing methods, customer lists, credit card information, health information, or any other type of nonpublic information. This exclusion applies even if the claim or potential claim is for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, claims expense, cost or expense incurred by an insured or others resulting from the excluded claims or potential claims. This exclusion does not apply to any such claim or potential claim that is based on an insured's alleged negligence in the rendering of or failure to render professional services

### III.  LIMITS OF LIABILITY

A) **Per Event Limit**:  The Per Event Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense**, for any **health care event** regardless of the number of:

   1) **Insureds** who share a Per Event Limit
   2) Claims made or potential claims first discovered; or
   3) Persons or organizations making **claims or potential claims**

B) **Aggregate Limit**:  The Aggregate Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense**, for all **health care events** regardless of the number of:

   1) **Health care events**;
   2) **Insured** who share an aggregate limit;
   3) Claims made or potential claims first discovered; and
   4) Persons or organizations making **claims or potential claims.**

Defense Expenses are paid in addition to the **Insurer's** Limit of Liability, and payment of Defense Expenses by the **Insurer** shall not reduce or exhaust the applicable Limit of Liability.

## NON-HEALTHCARE PROVIDER PROFESSIONAL LIABILITY COVERAGE PART

This coverage part provides claims made and reported coverage only. Coverage is limited to liability for claims made against an insured during the policy period or an extended reporting period, if application.

### I.    INSURING AGREEMENT

The **company** will pay on behalf of any **insured** all **loss** and **claims expenses** up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care** event that took place on or after the applicable Retroactive Date shown on the Declarations.

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an insured is required by written contract or agreement to provide that **additional insured**. Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured**.

In addition to the Limits of Liability, the **Insurer** will have the right and duty to defend any **Claim** brought against the **Insured,** and will do so even if any of the allegations of the **Claim** are groundless, false, or fraudulent.

### II.    EXCLUSIONS

The coverage under this Coverage Part does not apply to:

A)  **Intentional Acts**: Any loss for any claim or potential claim arising out of, or in connection with, any act listed below:

1)  Any criminal, intentional, dishonest or fraudulent act;
2)  Any willful violation of law, statute or regulation.

However, the company will pay claim expense to defend any **insured** against any **claim or potential claim** involving any excluded act listed above when intertwined with any other act triggering any insuring agreement.

B)  **Privacy:** Any **claim** or **potential claim** arising out of, or in connection with, any disclosure of or access to any person's or organization's confidential, proprietary or personal information, including personally identifiable information, financial information, patents, trade secrets, processing methods, customer lists, credit card information, health information, or any other type of nonpublic information. This exclusion applies even if the **claim** or **potential claim** is for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other **loss, claims expense,** cost or expense incurred by an **insured** or others resulting from the excluded **claims** or **potential claims.** This exclusion does not apply to any such **claim** or

**potential claim** that is based on an **insured's** alleged negligence in the rendering of or failure to render **professional services**

### III.    LIMITS OF LIABILITY

A) **Per Event Limit**: The Per Event Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense**, if shown on the Declarations as "Defense Within Limits," for any **health care event** regardless of the number of:

1) **Insureds** who share a Per Event Limit
2) Claims made or potential claims first discovered; or
3) Persons or organizations making **claims** or **potential claims**.

B) **Aggregate Limit**: The Aggregate Limit shown on the Declarations is the most the company will pay under this Coverage Part for **loss** and **claims expense**, for all **health care events** regardless of the number of:

1) **Health care events**;
2) **Insured** who share an aggregate limit;
3) Claims made or potential claims first discovered;
4) Persons or organizations making **claims or potential claims**.


Defense Expenses are paid in addition to the **Insurer's** Limit of Liability, and payment of Defense Expenses by the **Insurer** shall not reduce or exhaust the applicable Limit of Liability.

# GENERAL LIABILTY COVERAGE PART

This coverage part provides Occurrence coverage only.

## I.    INSURING CLAUSES

A)   Bodily Injury and Property Damage Liability

The **company** will pay on behalf of an **insured** all **loss** and **claims expense** up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from an **event** resulting in **bodily injury** or **property damage** that occurred during the **policy period.** An **event** will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the **event.**

B)   Personal and Advertising Injury Liability

The **company** will pay on behalf of an **insured** all **loss** and **claims expense** up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from an **event** resulting in **bodily injury** or **property damage** that occurred during the **policy period.** An **event** will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the **event.** An offense will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the offense .

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an insured is required by written contract or agreement to provide that **additional insured.** Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured.**

In addition to the Limits of Liability, the **Insurer** will have the right and duty to defend any **Claim** brought against the **Insured,** and will do so even if any of the allegations of the **Claim** are groundless, false, or fraudulent.

## II.    EXCLUSIONS

A)    The coverage under this Coverage Part does not apply to:

1. **Contractual Liability:**  Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** obligation to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    1)   That the insured would have in the absence of the contact or agreement; or

2) Assumed in a contract or agreement that is an insured contract, provided that the bodily injury, property damage or personal and advertising injury occurred subsequent to the execution of the contract or agreement.

    **2. Employees:** Any **claim** or **potential claim** arising out of, or in connection with, the acts or omissions of an **employee**, involving:

      a. Bodily injury or personal and advertising liability

        (1) To another employee or agent of the named insured.
        (2) To the spouse, relative or dependent as a consequence of subparagraph a(1) above. or
        (3) For which there is a duty to share damages or loss with, or repay, another party related for the loss as a consequence of subparagraphs a(1) and a(2).

      b. Property damage to property
        (1) Owned, occupied or used by an insured;
        (2) Rented to an insured; or
        (3) In the care, custody or control of an insured.

    **3. Professional Liability:** any claim or potential claim arising out of, or in connection with a health care event.

B) The coverage provided under the Bodily Injury and Property Damage Liability Insuring claims does not apply to:

    **1. Aircraft, auto or watercraft: Bodily injury** or **property damage** arising out of, or in connection with, the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft owned or operated by or rented to or loaned to any **insured**. Use includes operation and **loading or unloading, provided however, that this exclusion will not apply to any Claim arising out of a Medical Professional Incident in connection with the loading or unloading of a patient.**

    **2. Asbestos:** Any **claim** or **potential claim** arising out of, or in connection with, asbestos, or any materials containing asbestos in whatever form or quantity.

    **3. Damage to Impaired Property or Property Not Physically Injured**

    **Property damage** to **impaired property** or property that has not been physically injured arising out of, or in connection with:

      a. A defect, deficiency, inadequacy, or dangerous condition in the **insured's product** or **insured's work;** or
      b. A delay or failure by an **insured** to perform under the terms of a contract or agreement.

      This exclusion does not apply to the loss of use of other property arising out of, or in connection with, sudden and accidental physical injury to the **insured's product** or the **insured's work** after it has been put to its intended use.

4.   **Damage to the Insured's Product**

**Property damage** to the **insured's product** arising out of, or in connection with, it or any part of it.

5.   **Damage to the Insured's Work**

**Property damage** to the insured's **work arising** out of, or in connection with, the insured's **work or** any part of it, and included in the **products completed operations hazard.** This exclusion does not apply if the damaged work, or the work out of which the damage arises, was performed by a subcontractor on behalf of the **insured.**

6.   **Damage to Property**

**Property damage to:**

a.   Property an **insured** owns, rents, or occupies, including any costs or expenses incurred by an **insured**, or any other person or organization for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

b.   Premises an **insured** sells, gives away, or abandons if the property damage arises out of, or in connection with, any part of those premises;

c.   Property loaned to an **insured**;

d.   Personal property in the care, custody, or control of an **insured**;

e.   That particular part of real property on which an **insured** or any contractors or subcontractors, working directly or indirectly on behalf of an **insured**, are performing operations if the **property damage** arises out of those operations; or

f.   That particular part of any property that must be restored, repaired, or replaced because the **insured's work** was incorrectly performed on it.

Subparagraphs a,c, and d of this exclusion do not apply to **property damage** (other than damage by fire) to a premises, including the contents of such premises, rented to an **insured** for a period of 7 or fewer consecutive days. A separate limit of liability applies to the Damage to Premises Rented to an insured as described in the Limits of Liability provision.

Subparagraph b of this exclusion does not apply if the premises are the insured's work and were never occupied, rented, or held for rental by an **insured.**

Subparagraph f of this exclusion does not apply to **property damage** included in the **products completed operations hazard.**

7. **Liquor Liability**

**Bodily injury or property damage arising out of, or in connection with, any insured's liability by reason of:**

a. Causing or contributing to the intoxication of any person;

b. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

c. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

   This exclusion applies only if the **insured is** in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

8. **Mobile Equipment**

**Bodily injury** or **property damage** arising out of, or in connection with;

a. The transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to an **insured;** or

b. The use of **mobile equipment** in, while in practice for, or while being prepared for any prearranged racing, speed, demolition, or stunting activity.

9. **Personal and Advertising Injury**

**Injury**, including consequential injury arising out of, or in connection with, **personal and advertising injury.**

10. **Pollution**

a. Any **bodily injury** or **property damage** arising out of, or in connection with, the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants;**

   (1) at or from any premises, site, or location that is or was at any time owned or occupied by or rented or loaded to any **insured.** However, this does not apply to:

      a) **bodily injury** if sustained within a building and caused by smoke, fumes, vapor, or soot produced by or originated from equipment that is used to heat, cool, or dehumidify the building or equipment that is used to heat water for personal use by the building's occupants or guests;

      b) **bodily injury** or **property damage** for which an **insured** may be held liable, if it is a contractor, and the owner or lessee of such premises, site, or location has been added to the policy as an **additional insured** with respect to an **insured's** ongoing operations performed for that **additional insured** at that premises, site, or

location, and such premises, site, or location that is not or never was owned or occupied by or rented or loaded to any **insured**, other than that additional insured; or

   c) **bodily injury** or **property damage** arising out of, or in connection with, heat, smoke, or fumes from a fire that becomes uncontrollable or breaks out from where it was intended to be.

(2) at or from any premises, site, or location that is or was at any time used by or for any **insured** or others for the handling, storage, disposal, processing, or treatment of waste.

(3) which are or were at any time transported, handled, stored, treated, disposed of or processed as waste by or for any **insured** or any other person or organization for whom an **insured** may be legally responsible.

(4) at or from any premises, site, or location on which any **insured** or any contractors or subcontractors, working directly or indirectly on any **insured's** behalf, are performing operations if the **pollutants** were brought on or to the premises, site, or location in connection with such operations by such **insured,** contractor, or subcontractor.  However, this subparagraph does not apply to:

   a) **bodily injury** or **property damage** arising out of, or in connection with, the escape of fuels, lubricants, or other operating fluids, which are needed to perform the normal electrical, hydraulic, or mechanical functions necessary for the operation of **mobile equipment** or its parts, if such fuels, lubricants, or other operating fluids escape from a vehicle part designed to hold, store, or receive them.  This exception does not apply if the **bodily injury** or **property damage** arises out of the intentional discharge, dispersal, or release of fuels, lubricants, or other operating fluids or if such fuels, lubricants, or other operating fluids are brought on or to the premises, site, or location with the intent that they be discharged, dispersed, or released as part of the operations being performed by such **insured,** contractor, or subcontractor;

   b)  **bodily injury** or **property damage** sustained within a building and caused by the release of gases, fumes, or vapors from materials brought into the building in connection with operations being performed by an **insured,** or on its behalf by a contractor of subcontractor; or

   c) **bodily injury** or **property damage** arising out of, or in connection with, heat, smoke, or fumes from a fire that becomes uncontrollable or breaks out from where it was intended to be.

(5) (a)arising out of, or in connection with, any premises, site, or location on which any insured or any contractors or subcontractors, working directly or indirectly on any insured's behalf, are performing operations if such operations are to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any other way respond to or assess the effects of, pollutants.

   (b)  Any damage, loss, cost or expense arising out of, or in connection with, any:

(1) request, demand, order, or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effects of, **pollutants;** or

(2) **claim** or **potential claim** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of **pollutants**.

However, this subparagraph does not apply to liability for damages because of **property damage** than an **insured** would have in the absence of such request, demand, order, or statutory or regulatory requirement, or such **claim** or **potential claim** by or behalf of a governmental authority.

## 11. Recall of Products, Work, or Impaired Property

Any **claim or potential claim** arising out of, or in connection with any loss, cost, or expense incurred by an **insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of:

a.   The **insured's product**;

b.   The **insured's work**; or

c.   **Impaired property**

If such product, work, or property is withdrawn or recalled from the market or from use due to a known or suspected defect, deficiency, inadequacy, or dangerous condition to it.

## 12. Expected or Intended Injury:

**Bodily Injury, Property Damage,** Fire Damage, **or Personal or Advertising Injury** expected or intended from the standpoint of the **Insured**, provided, however, that this exclusion shall not apply to **Bodily Injury** resulting from the use of reasonable force to protect any person or property from injury or damage.

## 13. Fungi and Bacteria:

a)   **Bodily injury** or **property damage** arising out of, or in connection with, the actual, alleged or threatened inhalation of, injection of, contact with, exposure to, existence of, or presence of any fungi or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b) Any **loss**, cost or expense arising out of, or in connection with, the abating, testing, monitoring, cleaning, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to, or assessing the effects of, fungi or bacteria, by any **insured** or by any other person or organization.

This exclusion shall not apply to any fungi or bacteria contained in a good or product intended for bodily consumption. For the purposes of this exclusion, the term fungi includes any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents, or byproducts produced or released by fungi.

14. **Silica:** Any claim or potential claim arising out of, or in connection, with silica, including but not limited to:

a) inhaling, ingesting or physical exposure to silica directly or through any goods, products, structures, real estate or land containing silica;

b) the use or presence of silica in any process or operation of any type, including but not limited to construction, manufacturing, sandblasting, cleaning, drilling, farming or mining;

c) the use or presence of silica in any good, product, structure, real estate or land, or any component part of any good, product, structure, real estate or land;

d) the manufacture, sale, transportation, handling, storage or disposal of silica or any goods, products, structures, real estate or land containing silica;

e) any disease actually or allegedly caused by, contributed to or aggravated by silica, including but not limited to silicosis, chronic silicosis, accelerated silicosis, acute silicosis, conglomerate silicosis, any auto-immune disorder, tuberculosis, silicoproteinosis, cancer, scleroderma, emphysema, pneumoconiosis, pulmonary fibrosis, progressive massive fibrosis, any lung disease or any other ailment actually or allegedly caused by, contributed to or aggravated by silica;

f) any costs of medical or other testing, monitoring or diagnosis arising out of, or in connection with, any actual, alleged, threatened or feared bodily injury arising in whole or in part, directly or indirectly, out of silica; or

g) any costs of investigations, feasibility studies, cleaning, removal or remediation of the actual or alleged presence of silica in or on any goods, products structures, real estate or land.

C) The coverage provided under the Personal and Advertising Injury Liability Insuring claims does not apply to:

1. **Breach of Contract:  Personal and advertising injury** arising out of, or in connection with, a breach of contract, except an implied contract to use another's advertising idea in an **insured's advertisement.**

2. **Knowing Violation of Rights of Others:  Personal and advertising injury** caused by, or at the direction of, an **insured** with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury.**

3.  **Material Published Prior to Policy:**  Only with respect to any Coverage Part shown on the Declarations as "Occurrence," **personal and advertising injury** arising out of, or in connection with, oral or written publication of material whose first publication took place prior to the **policy period**.

4.  **Materials Published with Knowledge of Falsity:  Personal and advertising injury** arising out of, or in connection with, oral or written publication of material if done by, or at the direction of, an **insured** with knowledge of its falsity.

III    **LIMITS OF LIABILITY**

A. **Per Event Limit:**  The Per Event Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense** for any **health care event** regardless of the number of:

1)  **Insureds** who share a Per Event Limit

2)  Claims made or potential claims first discovered; or

3)  Persons or organizations making **claims or potential claims**

B) **Aggregate Limit:**  The Aggregate Limit shown on the Declarations is the most the **company** will pay under this Coverage Part for **loss** and **claims expense** for all **Events** regardless of the number of:

1)  **Events**

2)  **Insured** who share an aggregate limit

3)  Claims made or potential claims first discovered

4)  Persons or organizations making **claims or potential claims.**

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an insured is required by written contract or agreement to provide that **additional insured**.  Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured.**

Defense Expenses are paid in addition to the **Insurer's** Limit of Liability, and payment of Defense Expenses by the **Insurer** shall not reduce or exhaust the applicable Limit of Liability.

# ENDORSEMENT NO. 1

**This endorsement, effective 12:01 a.m.:** January 11, 2019

**Forms a part of policy no:** PARRG – 2019

**Issued to:** Philadelphia Academic Health System

**By:** Philadelphia Academic Risk Retention Group, LLC

## Retroactive Date Endorsement

The Policy is amended as follows:

The DECLARATIONS, Item 5. LIMITS OF INSURANCE Healthcare Professional Liability is amended by adding the following:

| Insured | Description of Operations | Professional Liability and Employee Benefits Liability Retroactive Date |
|---|---|---|
| Philadelphia Academic Health System, LLC | Parent company of hospitals and associated physician groups | 1/11/2018 |
| St. Christopher's Healthcare, LLC | Hospital operating company | 1/11/2018 |
| Center City Healthcare, LLC | Hospital operating company | 1/11/2018 |
| Broad Street Healthcare Properties III, LLC | Medical group operating company | 1/11/2018 |
| Broad Street Healthcare Properties II, LLC | Medical group operating company | 1/11/2018 |
| Philadelphia Academic Medical Associates, LLC | Medical group manager | 1/11/2018 |
| MBNF Investments, LLC | Holding company | 1/11/2018 |

| | | |
|---|---|---|
| American Academic Health System, LLC | Parent company to all subsidiaries | 1/11/2018 |
| Philadelphia Academic Health Holdings, LLC | Holding company and purchaser representative for asset sale agreement | 1/11/2018 |
| Front Street Healthcare Properties, LLC | Retained property operating company | 1/11/2018 |
| Front Street Healthcare Properties II, LLC | Retained property operating company | 1/11/2018 |
| Broad Street Healthcare Properties, LLC | Retained property operating company | 1/11/2018 |
| HSRE-PAHH I, LLC | Property company joint venture | N/A – General Liability coverage only |
| PAHH New College MOB, LLC | Special purpose entity | N/A – General Liability coverage only |
| PAHH Bellet MOB, LLC | Special purpose entity | N/A – General Liability coverage only |
| PAHH Feinstein MOB, LLC | Special purpose entity | N/A – General Liability coverage only |
| PAHH Broad Street MOB, LLC | Special purpose entity | N/A – General Liability coverage only |
| PAHH Wood Street Garage, LLC | Special purpose entity | N/A – General Liability coverage only |
| PAHH Erie Street Garage, LLC | Special purpose entity | N/A – General Liability coverage only |
| Physicians Clinical Network, LLC | Holding Company | 1/11/2018 |
| Physicians Performance Network of Philadelphia, LLC | Physician Operating Co | 1/11/2018 |
| HPS of PA, LLC | Medical group operating company | 1/11/2018 |
| SCHC Pediatric Associates, LLC | Medical group operating company | 1/11/2018 |

| | | |
|---|---|---|
| St Christopher's Pediatric Urgent Care Center, LLC | Medical group operating company | 1/11/2018 |
| SCHC Pediatric Anesthesia Associates, LLC | Medical group operating company | 1/11/2018 |
| StChris Care at Northeast Pediatrics, LLC | Medical group operating company | 1/11/2018 |
| TPS of PA, LLC | Medical group operating company | 1/11/2018 |
| TPS II of PA, LLC | Medical group operating company | 1/11/2018 |
| TPS III of PA, LLC | Medical group operating company | 1/11/2018 |
| TPS IV of PA, LLC | Medical group operating company | 1/11/2018 |
| TPS V of PA, LLC | Medical group operating company | 1/11/2018 |

All other terms, conditions and exclusions of the policy remain unchanged.

ENDORSEMENT NO. 2

**This endorsement, effective 12:01 a.m.:** January 11, 2019

**Forms a part of policy no:** PARRG – 2019

**Issued to:** Philadelphia Academic Health System

**By:** Philadelphia Academic Risk Retention Group, LLC

## Separate Limit and Retroactive Date Endorsement

The Policy is amended as follows:

The DECLARATIONS, Item 5. LIMITS OF INSURANCE Healthcare Professional Liability is amended by adding the following:

Pursuant to the PA Medical Care Availability and Reduction of Error (MCARE) Act of 2002, each eligible Insured listed below is subject to Separate Healthcare Professional Liability Limits as scheduled:

| Insured | Description of Operations | Professional Liability and Employee Benefits Liability Retroactive Date |
|---|---|---|
| St. Christopher's Healthcare, LLC | Hospital operating company | 1/11/2018 |
| Center City Healthcare, LLC | Hospital operating company | 1/11/2018 |

All other terms, conditions and exclusions of the policy remain unchanged.

ENDORSEMENT NO. 3

**This endorsement, effective 12:01 a.m.:** January 11, 2019

**Forms a part of policy no:** PARRG – 2019

**Issued to:** Philadelphia Academic Health System

**By:** Philadelphia Academic Risk Retention Group, LLC

## Separate Limit and Retroactive Date Endorsement

The Policy is amended as follows:

The DECLARATIONS, Item 5. LIMITS OF INSURANCE Physician Professional Liability is amended by adding the following:

Pursuant to the PA Medical Care Availability and Reduction of Error (MCARE) Act of 2002, each eligible Insured per physician list on file with Administration is subject to Separate Physician Professional Liability Limits as scheduled.

All other terms, conditions and exclusions of the policy remain unchanged.

# ENDORSEMENT NO. 4

**This endorsement, effective 12:01 a.m.:** January 11, 2019

**Forms a part of policy no:** PARRG – 2019

**Issued to:** Philadelphia Academic Health System

**By:** Philadelphia Academic Risk Retention Group, LLC

## Employee Benefits Liability Endorsement

NOTICE:  This endorsement contains claims-made and reported coverage.

The following provision is added to the Insuring Clauses section of the General Liability Coverage Part:

2)    EMPLOYEE BENEFITS LIABILITY

Claims Made and Reported

This coverage part provides claims made coverage only.  Coverage is limited to liability for claims first made against and insured during the policy period or an extended reporting period, if application.

The **company** will pay on behalf of any **insured** all **loss** and **claims expenses** up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations.

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions.

**Administration** means:

1. Providing information to employees, including their dependent and beneficiaries, with respect to eligibility for or scope of employee benefits program;

2. Handling records in connection with an employee benefits program; or

3. Effective, continuing, or terminating any employee's participation in any employee benefits program.

**Administration** does not include handling payroll deductions.

Employee benefits means any group benefits administered on behalf of a named insured's employees, including:

1.  Group insurance plans or programs, such as life, health, accident, dental or legal advice;

2.  Individual retirement accounts, salary reduction plans under I.R.S. Code 401(k) or any amendment thereto, savings plan, or employee stock subscription plans;

3.  Travel or vacation plans; or

4.  Workers' compensation, occupational disease, unemployment, Social Security or disability benefits insurance.

The following provisions are added to the Exclusions section of the General Liability Coverage Part:

EXCLUSIONS APPLICABLE TO THE EMPLOYEE BENEFIT LIABILTIY INSURING CLAUSE

The coverage provided under the Employee Benefits Liability Insuring Clause does not apply to:

1.  Bodily Injury, Property Damage and Personal Advertising Injury

    Any **claim** arising from, or in connection with, **bodily injury**, **property damage**, or **personal and advertising injury.**

2.  Claim for benefits where funds available with reasonable cooperation

    Any **claim** for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the **insured** from the applicable funds accrued or collectible insurance.

3.  Collective bargaining

    Any **claim** arising from, or in connection with, the breach of any collective bargaining agreement.

4.  ERISA

    Any claim arising from, or in connection with, an insured's duty as a sponsor of an employee benefit plan under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto.  However, this exclusion is limited to:

    a.  An insured's failure or inability to fund the plain in accordance with the plan document or any applicable low or regulation; and

    b.  Liability for the payment of benefits owed to a participant or beneficiary of the plan that have been paid or may lawfully be paid from the plan's funds or those of other employee programs.

5.  Failure to Perform under a Contract

    Damages arising out of the failure of an insurer to perform under a contract

6.  Health Care Event

Any **claim** arising from, or in connection with, any **health care event**.

7.  Performance of investments and advice given regarding employee benefits

Any **claim** arising from, or in connection with:

      a.    Errors in providing information on past performance of investment vehicles; or

      b.    Advice given to any person with respect to that person's decision to participate or not to participate in any **employee benefits** plan

8.  Unpaid obligations under employee benefit plan

Any **claim** arising from, or in connection with, damages arising out of an insufficiency of funds to meet any obligations under any plan included as an **employee benefit**.

The following provisions are added to the Limits of Liability Section of the General Liability Coverage Part:

EMPLOYEE BENEFITS LIABILITY PER EVENT LIMIT

The Employee Benefits Liability Per Event Limit is the most the company will pay for loss and claim expense under the Employee Benefits Liability Insuring Clause because of bodily injury arising out of any one event.

EMPLOYEE BENEFITS LIABILITY AGGREGATE LIMIT

The Employee Benefits Liability Aggregate Limit shown on the Declarations is the most the company will pay for loss and claim expense, because of bodily injury included in the Employee Benefits Liability Insuring Clause.

Only respect to the Employee Benefits Liability Insuring Clause, the Settlement condition in the Conditions section of the Common Policy Provisions and Conditions is deleted and replaced by the following:

SETTLEMENT

The company may settle any claim, potential claim, or other matter brought against an insured as the company deems expedient.  However, the company shall first provide written notice to the first named insured.

## ENDORSEMENT NO. 5

**This endorsement, effective 12:01 a.m.:** January 11, 2019

**Forms a part of policy no:** PARRG – 2019

**Issued to:** Philadelphia Academic Health System

**By:** Philadelphia Academic Risk Retention Group, LLC

### Entities included in Non-Healthcare Provider Limit Endorsement

The Policy is amended as follows:

The entities noted below are included in the Non-Healthcare Provider Professional Liability coverage limit shown on the policy declarations.

**Insured**
- Philadelphia Academic Medical Associates, LLC
- HPS of PA, LLC
- SCHC Pediatric Associates, LLC
- SCHC Pediatric Anesthesia Associates, LLC
- St Chris Care at Northeast Pediatrics, LLC
- TPS of PA, LLC
- TPS II of PA, LLC
- TPS III of PA, LLC
- TPS IV of PA, LLC
- TPS V of PA, LLC
- Physicians Clinical Network, LLC
- Physicians Performance Network of Philadelphia, LLC

# ~ Exhibit B ~

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466 (KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, | ) | Jointly Administered |
| *et al.*,[1] | ) |  |
| Debtors. | ) |  |

## EMERGENCY MOTION OF AD HOC COMMITTEE OF HAHNEMANN RESIDENTS AND FELLOWS TO COMPEL DEBTORS TO PROVIDE PROFESSIONAL LIABILITY INSURANCE IN ACCORDANCE WITH RESIDENT EMPLOYMENT AGREEMENTS

The Ad Hoc Committee of Hahnemann Residents and Fellows (the "Ad Hoc Resident Committee"),[2] by its undersigned counsel, submits this emergency motion (this "Motion") to require the Debtors to comply with their obligation under their contracts (the "Resident Contracts") with their residents, fellows and interns (collectively, the "Residents") that have been displaced as a result of the closing of Hahnemann University Hospital (the "Hospital") to provide a professional liability insurance tail to the Residents. In support of this Motion, the Ad Hoc Resident Committee states as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] The Initial Members of the Ad Hoc Resident Committee are Randol Hooper, Jen Schwartz, Ashley Lentini, Erika Correa, and Lynn Mackovick. More than 100 requests to join the Ad Hoc Resident Committee have come in since the its formation. The Ad Hoc Resident Committee will file a Rule 2019 statement reflecting its current membership this afternooon.

## PRELIMINARY STATEMENT

The Ad Hoc Resident Committee brings this Motion because the Debtors have willfully created a crisis that threatens the livelihood of nearly 1,000 Residents and poses a severe threat to the Pennsylvania medical system.  The Residents need relief from this Court immediately.  The professional liability insurance that covers their time at Hahnemann expires on January 10, 2020. Unless the Debtors honor their contractual obligations to purchase tail insurance for the Residents, the Residents will have no professional liability insurance covering their work at Hahnemann from January 10, 2018 through the closure of Hahnemann.  The consequences are dire.  Without tail coverage, the Residents may no longer be licensed to practice medicine.  The cost of obtaining tail coverage on their own ranges from prohibitive at best to impossible depending on their specialties.[3] These are newly practicing doctors with modest salaries and for many, hundreds of thousands in debt.

This is an emergency solely of the Debtors' making.  The origins of this emergency started in January 2018 with the Debtors' decision to ignore their contractual obligations to purchase occurrence based insurance.  Instead, they prioritized cost savings over contract and purchased cheaper claims made insurance.  The emergency became more acute as the Debtors abjectly failed this fall to give all affected Residents adequate notice that their professional liability coverage was ending and that **tail insurance needed to be procured and that Hahnemann would not honor its obligations to do so**.  Upon information and belief, despite the extraordinary efforts of certain Residents, the Philadelphia and Pennsylvania medical communities and the various professional and accrediting associates have undertaken, many Residents remain unaware that their ability to practice medicine is in peril as of January 10, 2020.

---

[3]     One Resident was quoted a cost of over $65,000 to obtain tail insurance.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory basis for the relief sought herein is 11 U.S.C. §§ 363, 365 and 503(b).

## BACKGROUND

**A.     The Residents**

3.      Between January 10, 2018 and August 9, 2019, the Hospital employed the Residents.  Given the period that the Debtors operated the Hospital, the Residents fall into one or more of the following categories:  those that were residents at the Hospital in the 2017-2018 residency year; those who were residents in the 2018-2019 residency year; and those who had Resident Contracts for the 2019-2020 residency year.  Regardless of the category or categories to which the Residents belong, they are all newly trained medical professionals at the beginning of their careers.

4.      The Debtors' employed the Residents primarily pursuant to the Resident Contracts, most of which were identified as Graduate Medical Education House Staff Employment Agreements.  A copy of the template used to create these agreements is attached as **Exhibit A** (the "Resident Contract Template").

**B.     The Debtors' Obligations to Provide Professional Liability Insurance to the Residents**

5.      The Pennsylvania General Assembly has declared a public interest in ensuring the availability of health care throughout the state.  40 P.S. § 1303.102(1).  To achieve that goal, "medical professional liability insurance has to be obtainable at an affordable and reasonable cost in every geographic region of this Commonwealth."  *Id.*  1303.102(3).  Pennsylvania law requires a health care provider, including residents, providing health care services within the state to

purchase medical professional liability insurance from an approved insurer.  *Id.* § 1303.711(a).
Pennsylvania defines "medical professional liability insurance" as "[i]nsurance against liability on
the part of a health care provider arising out of any tort or breach of contract causing injury or
death resulting from the furnishing of medical services which were or should have been provided."
*Id.* §1303.702.  Medical professional liability insurance cannot be offered on a "claims made"
basis unless the insurer guarantees that coverage will continue to be available "subsequent to the
discontinuance of professional practice by the health care provider or the termination of the
insurance policy by the insurer or the health care provider for so long as there is a reasonable
probability of a claim for injury for which the health care provider may be held liable."  *Id.*
§ 1303.742.

6.       In recognition of Pennsylvania's public policy and the need to provide medical
professional liability insurance to all physicians, including the Residents, section 3.D. of the
Resident Contract Template requires the Hospital to "provide occurrence-based professional
liability insurance coverage for [Resident]'s acts and omissions, within the scope of the [graduate
medical education training] Program, that occur during the Training Period."  Resident Contract
Template, at § 3.D.  Such insurance would provide protection against any claims reported or filed
during the Resident's employment with the Hospital as well as any later-filed claims that were
based on incidents that occurred during the period of employment.  *Id.*  The Hospital's obligation
to provide this insurance "shall survive expiration or termination of this Agreement regardless of
the cause of such termination."  *Id.* at § 15.

7.       In addition to the Resident Contracts, the Debtors' House Staff Manual, a copy of
which is attached hereto as **Exhibit B** (the "Resident Manual"), also emphasizes their intent to
provide Residents with professional liability insurance.  In particular, section 25 of GME 12:

Specific Policies provides that Residents will be provided with professional liability insurance consistent with the requirements of Pennsylvania law during the course of their employment. Resident Manual, at 54.  Importantly, "[t]his coverage will provide legal defense and protection against claims arising while participating in the program, **including claims not reported or filed until after the completion of graduate medical education**.")  *Id.*  Occurrence-based malpractice insurance is specifically identified as a "House Staff Benefit" in the Resident Manual.  *Id.* at 55.

**C.     The End of Resident Insurance Coverage**

8.     The Debtors acquired the Hospital from the former owner on or about January 10, 2018.  At that time, the Hospital switched the Residents' insurance from occurrence based policies to claims made policies, notwithstanding the Debtors' commitment under the Resident Contracts, *See* November 11, 2019 email to Residents (the "November 11 Email"), attached as **Exhibit C** hereto.  This oversight by the Debtors is critical because without a "tail," the claims made policy will only protect the Residents for claims that are made during the insurance period.  It also violates Pennsylvania law, which bars the use of claims made insurance without an appropriate tail.  40 P.S. § 1303.742.  The Debtors are undoubtedly aware of this legal obligation because they are subject to the same regulations.

9.     Because the policy covering the Residents apparently expires on January 10, 2020,[4] the Residents will no longer be covered for claims related to their time at the Hospital after that date.  November 11 Email.  The harm to the Residents from the Debtors' failure to comply with their contractual obligations is obvious and could also have a catastrophic effect on the medical services community in Philadelphia, given the adverse results under Pennsylvania law.

---

[4]     Notably, the Debtors have not yet informed the Residents of the pending expiration of their insurance coverage.  The Ad Hoc Resident Committee understands that the Debtors intend to provide such notice after the closing of the sale of St. Christopher's Sale (as defined below), during the holiday season with less than one month's notice.  This Motion should not be used to prejudice the rights of any of the Residents to argue that the notice of termination of insurance was not effective under applicable law.

D.      **The Sale of the Resident Program**

10.     On June 30 and July 1, 2019 (collectively, the "Petition Date"), each of the Debtors

filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the

"Court").  The Debtors are operating their businesses and managing their affairs as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     On July 15, 2019, the Office of the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "Official Committee") consisting of (a) Confier Revenue

Cycle Solutions, LLC; (b) Medline Industries, Inc.; (c) Veolia Energy Philadelphia, Inc.; (d)

Medtronic USA, Inc.; (e) Crothall Healthcare, Inc.; (f) Global Neurosciences Institute, LLC; and

(g) Pennsylvania Association of Staff Nurses and Allied Professionals.  No Residents are

represented on the Official Committee.

12.     On July 9, 2019, the Debtors filed their bidding procedures motion proposing to

sell their residency placement slots at the Hospital and related assets (the "Resident Assets").  *See*

D.I. 142.  Overruling several objections, this Court approved the bidding procedures on July 19,

2019 in its *Order (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors'*

*Resident Program Assets, Including Approving a Break-Up Fee, (B) Establishing Procedures*

*Relating to the Assumption and Assignment of Certain Executory Contracts, Including Notice of*

*Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D)*

*Scheduling a Hearing to Consider the Proposed Sale* [D.I. 249] (the "Bidding Procedures Order").

13.     Pursuant to the Bidding Procedures Order, the Debtors conducted an auction on

August 8, 2019 and declared Thomas Jefferson University Hospitals, Inc. the successful bidder

("Jefferson").[5]   The United States vehemently objected to the proposed sale of the Resident

Assets,[6] but following a lengthy hearing on September 10, 2019, the Court overruled that

objection, and others, and entered an order approving the sale.[7]   A critical factor in the Court's

approval of the Sale Order was the fact that it provided needed tail insurance for the Residents.

*See* Hearing Tr., Sept. 5, 2019. At 9:10-15 ("Number four, the benefit to the community from the

sale, if approved, is that it will provide placement of resident doctors within Philadelphia and its

environs thereby assisting in the delivery of healthcare in the immediate area and Philadelphia in

particular.  In addition, the sale provides needed tail insurance for residents.").

14.     The United States subsequently appealed and sought a stay of the Sale Order.[8]  On

September 16, 2019, the District Court for the District of Delaware (the "District Court") issued

an order staying the Sale Order, pending appeal.  *See* Notice of Stay.  As of the date of this Motion,

the appeal is still pending, and the Debtors recently requested oral argument on November 20,

2019.  In the meantime, the Hospital began winding down its operations in late July and is no

longer operating. *See* United States' Objection, at ¶29.

15.     Since the stay of the Sale Order, the Debtors have subsequently received approval

to sell their assets related to St. Christopher's Healthcare, LLC and certain of its affiliates (the "St.

Christopher's Sale").  *See* [D.I. 795].  In connection with that sale, the Philadelphia Academic

---

[5]       *See Certification of Counsel regarding Auction Relating to the Sale of the Debtors' Residents Program Assets* [D.I. 590].

[6]       *See Objection of the United States to Debtors' Motion for Entry of Order Approving the Sale of the Debtors' Resident Program Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests to Jefferson as Set Forth in the Asset Purchase Agreement* [D.I. 633] (the "United States' Objection").

[7]       *See Order Under 11 U.S.C. § 105, 106, 363, 365, 503, 507, and 525 (A) Approving Asset Purchase Agreement with Thomas Jefferson University Hospitals, Inc., (B) Authorizing Sale of Certain of Debtor's Assets Free and Clean of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtor's Executory Contracts, and (D) Granting Related Relief* [D.I. 681] (the "Sale Order").

[8]       *See Status Report Regarding Stay Pending Appeal of Hahnemann Sale Order Entered by District Court* [D.I. 761] (the "Notice of Stay").

Health System Physician Practice Plan Physicians (the "PAHSPPP Physicians") filed a limited objection arguing that the Debtors' were required to provide them with professional liability tail insurance.  *See generally* [D.I. 699] (the "PAHSPPP Objection").  Likewise, the American Medical Association, The Pennsylvania Medical Society, and the Philadelphia County Medical Society, collectively, submitted an *amicus* brief in support PAHSPPP Objection, which outlined the adverse effects to the doctors, and the Philadelphia medical community generally, if the Debtors did not live up to their obligations to provide the PAHSPPP Physicians with required tail insurance.  *See* [D.I. 729-1] (the "Amicus Brief").  The St. Christopher's Sale is scheduled to close on December 13, 2019, which led the PAHSPPP Physicians to file an emergency motion seeking to require the Debtors to provide them with tail insurance as part of the St. Christopher's Sale.  A hearing on that emergency motion is scheduled for December 12, 2019 at 9:30 a.m.

## RELIEF REQUESTED

16.    The Ad Hoc Resident Committee requests that this Court compel the Debtors to comply with their obligations under the Resident Contracts and Pennsylvania law by requiring the Debtors to purchase tail policies for Residents to the extent necessary to make sure that all Residents are covered by professional liability insurance during their respective periods of employment with the Hospital between January 11, 2018, when the Debtors purchased the Hospital, and August 9, 2019, when the Hospital closed.

## **BASIS FOR RELIEF**

17.     As noted above, the Resident Contracts, as well as the Debtors' own internal policies, require the Debtors to purchase occurrence-based professional liability insurance for the Residents.   The Debtors have breached the Resident Contracts by purchasing narrower, and presumably cheaper, claims made policies.   Without a tail, those insurance policies deprive the Residents of the benefit of their bargain and place their careers, and their livelihood, at risk.   To date, the Debtors have refused to purchase the necessary tail insurance, and as of January 10, 2020, the Residents will no longer be covered against claims related to their acts or omissions during their employment at the Hospital.

18.     If a debtor elects to continue to receive benefits from the other party to an executory contact pending a decision to reject or assume the contract, the debtor is obligated to pay for the reasonable value of those services.  *See Philadelphia Co. v. Dipple,* 312 U.S. 168, 174 (1941).  The Debtors have not rejected the Resident Contracts, and even if they did, their obligations to provide the required insurance survives the expiration or termination of the Resident Contracts.  *See* Template Resident Contract, at § 15.  Had the Debtors purchased the required occurrence-based policies from the outset of the applicable Resident's employment, the Debtors would not now need to incur the additional expense of purchasing tail coverage.  Nevertheless, the Debtors' intentional actions have imposed upon them the post-petition obligation to purchase tail insurance to fulfill their ongoing obligations under the Resident Contracts.  This Court should not permit the Debtors to shirk these obligations and shift the risks of non-insurance to the Residents.

19.     While some of the harms to the Residents from the loss of their professional liability insurance may be obvious—exposure to malpractice claims that have not yet been filed—a number of other harms could potentially be career-ending, or at least career-altering.  For example, many

states, including Pennsylvania, and employers require physicians to have malpractice insurance

from all their prior employers in order to be eligible for continued and future employment.  *See,*

*e.g.*, 40 P.S. § 1303.711(a).[9]  At a minimum, the Residents would be at risk of discipline before

the Pennsylvania state board due to lack of insurance, and their medical license could be suspended

or revoked.  *Id.* § 1303.711(c).[10]  Pennsylvania also requires this insurance before a physician will

qualify for supplemental malpractice insurance under state law.  *See Id.* § 1303.712 (establishing

a special fund to be used to pay claims awarded in medical malpractice actions in excess of basic

insurance coverage).  These harms are irreparable and cannot be cured by monetary damages or

claims alone.

20.     Assuming the Residents are even aware of the need to purchase this insurance for

themselves,[11] they must ensure their insurance coverage remains in place, given the irreparable

harms to the Residents identified above.  Sadly, given the salary of most residents in the Mid-

Atlantic region (usually between $55,000 and $75,000) and the significant student loan debt for

many Residents, many, and likely most, Residents will be unable to acquire the necessary

insurance on their own.  Although premiums for tail coverage vary based upon location and type

of practice, it is possible an individual Resident could be charged tens of thousands of dollars for

such coverage (which, in the case of junior Residents, could equal or exceed their annual

---

[9]     The consequences, if any, of a cessation of malpractice insurance on a Resident's ability to obtain future employment is unknown at present; this Motion should not be used to prejudice the rights of any of the Residents to argue that the cessation of insurance should have no effect on their future employment.

[10]     For a sampling of even more significant potential risks, including such discipline being reflected on the Resident's permanent record, see Amicus Brief, at 9.

[11]     The November 11 Email suggests that contact information for the Residents may be inaccurate (email addresses may no longer be valid).  As a result, there may be Residents who have no idea that their coverage may soon lapse.  While the Ad Hoc Resident Committee, as well as a number of other pro-Resident associations are trying to spread the word about this issue, there is no guarantee that all Residents will be successfully contacted in time to take action.

salaries).[12] As noted in the Amicus Brief, "the typical calculation for cost of tail coverage is 200%-350% of the cost of an annual policy for the basic insurance coverage layer." Amicus Brief, at 7. And that amount is based on a situation where the physician planned for and anticipated that he or she would be responsible for such coverage. *Id.* That is not the case here, where the Resident Contracts place the burden upon the Debtors to purchase the required insurance. Finally, even if a Resident has the financial wherewithal to purchase the necessary insurance, insurers may be unwilling to underwrite such coverage. *Id.* at 6 ("[I]t is generally extremely difficult for a physician to obtain affordable tail coverage from a different insurer because the different insurer never had an opportunity to impact the risk that it is being asked to cover.").

21.    The Residents are not the only group harmed by the Debtors unwillingness to satisfy their obligations to provide professional liability insurance; the Philadelphia community, as well as the national medical community will also be harmed. As noted above, the Pennsylvania General Assembly has declared a public policy in favor of providing physicians with affordable professional liability insurance. 40 P.S. § 1303.102. The availability of insurance not only provides physicians with protection in the event of a malpractice claim, but it also ensures that injured patients will be covered in the event of a legitimate claim. In 2018, malpractice payments in Pennsylvania averaged $405,978. Amicus Brief, at 8. Given the Resident's limited assets, these claims would go unsatisfied in the absence of insurance. If Residents lose their medical licenses due to the loss of insurance, the medical community would also lose hundreds of otherwise qualified physicians at a time where doctors are already in short supply. *See id.* at 9 (noting that the United States faces a current doctor shortage of 95,900 with an anticipated shortage of 122,000

---

[12]    Background on malpractice insurance premiums, generally, can be found at the American Medical Association's website: https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/government/advocacy/policy-research-perspective-liability-insurance-premiums.pdf.

doctors by 2032). This effect would be especially acute in the Philadelphia medical community, where the doctor shortage is expected to reach 10,000 doctors in the next 5 years. *Id.*

22.    While the irreparable harm to the Residents and the Philadelphia community, standing alone, warrants the grant of this Motion, the Debtors and their estates also benefit from keeping the Residents' insurance in place. In contrast to the obvious harms faced by the Residents and the Philadelphia community, the Debtors clearly benefitted from maintaining the Resident Contracts. Keeping the Resident Contracts in place was one of the Debtors' covenants in connection with the sale of the Resident Program Assets to Jefferson. *See* Asset Purchase Agreement by and between Center City Healthcare, LLC and Thomas Jefferson University Hospitals, Inc. [D.I. 681-1] (the "APA"), at § 6.2 ("Seller shall use its commercially reasonable efforts to preserve it relationships with Residents at Hahnemann University Hospital and the graduate medical educational programs at [the Hospital]."). As part of maintaining those relationships, the Debtors were required to obtain a "Tail Coverage Endorsement" to provide the Residents with appropriate professional liability insurance. *Id.* at § 6.11. "Tail Coverage Endorsement" is defined as

> a reporting endorsement to insure against resident professional liability claims that have not yet been reported against the Residents related to any period of Resident employment from January 11, 2018 until the termination of Resident's employment from Hahnemann University Hospital. Such endorsement shall provide for Pennsylvania statutory limits of Five-Hundred Thousand Dollars ($500,000) per occurrence and One Million Five-Hundred Thousand Dollars ($1,500,000) annual aggregate for each MCARE eligible Resident only.

*Id.* at Article I (Definitions). Jefferson agreed to reimburse the Debtors for up to $1 million for tail coverage costs paid by the Debtors in obtaining such an endorsement. *Id.* at § 3.2(d). The availability of tail insurance for Residents under Jefferson's proposal was a critical factor in the Court's approval of the sale of the Resident Assets. *See* Hearing Tr., Sept. 5, 2019. At 9:10-15.

23.    Although the Sale Order has been appealed,[13] if the sale to Jefferson is ultimately affirmed, the Debtors stand to receive $54 million from Jefferson, in addition to the tail insurance reimbursement.  *See id.*, at § 3.1.  Per the terms of the APA, the Debtors' failure to provide for sufficient tail coverage for the Residents would appear to result in a material breach of the APA, perhaps placing the entire sale, and $54 million in sale proceeds at risk.  Thus, providing the Residents with their contractually-entitled insurance would honor the Debtors obligations under both the Resident Contracts and the APA, while also benefitting their estates and all their creditors, including the Residents.  The Debtors efforts to both avoid its obligations to provide the Residents with tail insurance while simultaneously prosecuting an appeal of a sale that contemplates the provision of such insurance can only be described as baffling.

24.    Given the benefits to the Debtors' estates from not breaching their ongoing obligations under the Resident Contracts and preserving the potential sale to Jefferson, there can be little doubt that the Residents would be entitled to administrative expense claims under the Resident Agreements for the purchase of tail insurance, if they can locate and afford such insurance.  Even assuming all Residents were aware of the pending lapse of their insurance and were able to locate and afford such insurance on an individual basis, that process is inefficient and would result in a waste of estate and judicial resources.  Rather than requiring the Debtors, and this Court, to parse through hundreds of individual requests for administrative expenses, the Debtors should simply negotiate for, and obtain one all-encompassing tail policy covering all Residents.  Not only could the Debtors obtain the necessary coverage on a more cost-efficient basis

---

[13]    It remains unclear whether the APA remains live.  The APA set an "Outside Closing Date" of September 6, 2019, but the Sale Order was not entered until September 10, 2019.  APA, at Art. I (Definitions).  Closing clearly has not occurred, but termination due to the passage of the Outside Closing Date is optional to both the Debtors and Jefferson.  *Id.* at § 9.1(b).  In the absence of any notice that the APA has been abandoned and with the appeal still pending, the Sale Order remains in effect.

by negotiating a group rate, but they also would receive reimbursement up to $1 million from Jefferson for the costs of obtaining such coverage.  Even if the new coverage required a cash outlay of more than $1 million, the upside of preserving the $54 million in sale proceeds under the APA, as well as the savings in legal fees from not reviewing (and possibly objecting to) hundreds of administrative claim requests weighs heavily in favor of requiring the Debtors to purchase the insurance required under Pennsylvania law and the Resident Contracts.

## NOTICE

25.    Notice of this Motion is being provided to (a) counsel to the Debtors, (b) counsel to the Official Committee, (c) counsel to the Office of the United States Trustee, and all parties entitled to service pursuant to Bankruptcy Rule 2002.  Under the circumstances, the Ad Hoc Resident Committee submits that no further service is required.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Resident Committee respectfully requests that this Court:  (a) require the Debtors to purchase tail insurance for all Residents, as required by the Resident Contracts and (b) grant such other and further relief as is consistent with this Motion and as may be just and appropriate in the circumstances.

Dated:  December 11, 2019
   Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ Jeremy W. Ryan*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
1313 North Market Street, Sixth Floor
Wilmington, DE  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

*Attorneys for Ad Hoc Committee of Hahnemann Residents*

# EXHIBIT A

**GRADUATE MEDICAL EDUCATION**
**HOUSE STAFF EMPLOYMENT AGREEMENT**

This Graduate Medical Education House Staff Employment Agreement ("Agreement") is made and entered into by and between Center City Healthcare, LLC d/b/a Hahnemann University Hospital with an address location of 230 N. Broad Street, Philadelphia, PA 19102, a Delaware limited liability company ("Hospital") and **<<FirstName>> <<MiddleName>> <<LastName>>, <<Credentials>>** ("House Staff") (each a "Party" and, collectively, the "Parties").

Hospital is recognized and accredited by the Accreditation Council for Graduate Medical Education ("ACGME") as the institutional sponsor for one or more residency programs, which are overseen by the Hospital's Graduate Medical Education Committee ("GMEC"), its Designated Institutional Official ("DIO") and its Program Director ("Program Director"). Hospital hereby employs House Staff to receive training in connection with Hospital's residency program designated in Section 1 below, subject to and in accordance with the terms and conditions set forth herein.

1. **Employment.** Hospital hereby employs House Staff as a post graduate year ("PGY") **[<<INSERT YEAR>>]** in the **[<<INSERT NAME OF PROGRAM>>]** graduate medical education ("GME") training program (the "Program") for the period of time beginning on **[<<INSERT START DATE>>]** ("Start Date") and ending on **[<<INSERT END DATE>>]** ("End Date"), which period of time shall be referred to as the training period ("Training Period"). House Staff shall report to the Hospital on the Start Date for mandatory House Staff orientation.

2. **Responsibilities of House Staff.** House Staff shall comply with all Hospital and Program requirements, including, but not limited to, the following:

   A. **Pre-Employment Requirements.** House Staff understand and acknowledge that this Agreement and House Staff's participation in the Program is contingent upon House Staff satisfying certain pre–employment requirements established by Hospital, state and federal laws prior to the Start Date, including, but not limited to, fulfilling all of the pre-employment checks set forth below in (i) through (vii). These requirements are continuing obligations of House Staff during the Training Period. Failure of House Staff to continue to adhere to any of the below-referenced requirements for the term of the Training Period will be cause for immediate termination of the Agreement by Hospital without any right to due process in accordance with the policies and procedures set forth in the GME House Staff Manual, which will be provided to House Staff on the Start Date.

      i. Documentation of identity verification and eligibility for employment, including work authorization and training visa status, if applicable;
      ii. Documentation of receipt of immunizations or signed declinations (required pursuant to Hospital policy);
      iii. Passing laboratory screening tests for the abuse of controlled substances;
      iv. Passing criminal background check;
      v. Documentation of occupational health screening;
      vi. Obtaining and maintaining a Pennsylvania medical training license; and
      vii. Proof of graduation from an accredited medical or osteopathic school, in accordance with the eligibility requirements set forth in the GME House Staff Manual.

      House Staff acknowledges and agrees that if all pre-employment requirements are not met prior to the Start Date, this Agreement may be either (i) delayed without pay to House Staff until all such pre-employment requirements have been met, or (ii) terminated by Hospital; in either case without the provision of due process, as set forth in the GME House Staff Manual.

   B. **Education and Professional Duties.** House Staff shall fulfill all educational and professional duties, obligations and assignments in accordance with the ACGME requirements for graduate medical education, the American Osteopathic Association's ("AOA") Basic Standards for Postdoctoral Training, and the American Dental Association ("ADA") and/or Council on Podiatric Medical Education's ("CPME") training requirements in addition to all other applicable training and accreditation requirements.

   C. **Manuals, Policies and Regulations.** House Staff shall be responsible for reading, understanding and abiding by all Hospital and Program policies, manuals, rules and regulations as they now exist and as they may be amended from time-to-time in Hospital's sole discretion.

   D. **Licensure.** House Staff shall obtain and maintain at all times during the Training Period a current license to practice medicine (either an educational limited training license or a full medical license) in the Commonwealth of Pennsylvania ("State"). House Staff must provide documentation of such licensure to Hospital upon request and shall immediately notify Hospital if any such license, permit or certification becomes restricted, revoked, suspended, or not renewed either prior to the Start Date of this Agreement or at any time during the Training Period. House Staff understand and acknowledge that failure to maintain current medical licensure will result in immediate suspension from the Program without pay until either (i) House Staff's license is renewed, or (ii) this Agreement is terminated in Hospital's sole discretion .

E. **Drug Enforcement Administration.** To the extent House Staff possesses a full medical license in the State, House Staff shall maintain an unrestricted Drug Enforcement Administration ("DEA") registration number.

F. **USMLE STEP 3 and COMLEX LEVEL 3 TESTING.** If applicable, House Staff acknowledges that Hospital policy requires House Staff to pass the United States Medical Licensing Examination ("USMLE") Step 3 or the Comprehensive Osteopathic Medical Licensing Examination ("COMLEX") Level 3 by the end of PGY 2 before House Staff will be eligible for promotion to PGY 3. Failure to pass the USMLE Step 3 or COMLEX Level 3 may result in disciplinary action up to and including termination of House Staff from the Program in accordance with Hospital policy.

G. **Confidentiality and HIPAA.** House Staff shall keep strictly confidential and hold in trust all confidential information of Hospital and/or its patients and not disclose or reveal any confidential information to any third party without the express prior written consent of Hospital. House Staff shall not disclose the terms of this Agreement to any person who is not a party to this Agreement, except to House Staff's legal and financial advisors, as required by law or as otherwise authorized in writing by Hospital. Unauthorized disclosure of confidential information or of the terms of this Agreement shall be a material breach of this Agreement. House Staff acknowledges that many healthcare providers are "covered entities" as that term is defined at 45 C.F.R. § 160.103. House Staff agrees to comply with the Health Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"), the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. 1320d, *et seq.* ("HIPAA"), and all current and future regulations promulgated under the HITECH Act or HIPAA. House Staff agrees not to use or further disclose any Protected Health Information ("PHI") as defined in 45 C.F.R. §160.103, including Electronic Health Information, other than as permitted by applicable laws and the terms of this Agreement.

H. **Extramural Professional Activities ("Moonlighting").** House Staff understands and acknowledges that Moonlighting outside the scope of the Program is prohibited unless specifically approved in advance in writing by Hospital, Hospital's DIO and the Program Director in accordance with Hospital and Program policies and procedures as set forth in the GME House Staff Manual. House Staff agrees, understands and acknowledges that Moonlighting outside the scope of the Program is not covered by the Hospital's professional liability insurance program. House Staff engaged in unapproved Moonlighting activities will be terminated in accordance with Hospital and Program policies and procedures.

3. **Responsibilities of Hospital.**

A. **Education Program.** Hospital shall provide and maintain a [NAME PROGRAM] GME program accredited by ACGME, AOA, ADA and/or CPME.

B. **GME House Staff Manual**. Hospital shall make available to House Staff online an electronic manual of written policies and procedures defining the duties and privileges of House Staff participating in the Program (the "GME House Staff Manual"), including, but not limited to requirements relating to employee physical and drug screenings, dress code, impairment and substance abuse, disabilities and sexual harassment.

C. **Conditions for Reappointment and Promotion**. Hospital shall provide continuation of employment, training and/or promotion to House Staff that is contingent upon satisfactory academic and professional performance as determined by the Program Director, Program faculty and in accordance with the policies and procedures described in the GME House Staff Manual. Measures of performance and promotion shall include, but not be limited to, achievement of competency-based goals and objectives for each level of training and specialty-specific milestones. Hospital is not obligated to renew or extend this Agreement for subsequent training levels in the event that House Staff's academic and professional performance is determined to be unsatisfactory, subject to the applicable provisions of due process set forth in the GME House Staff Manual. Hospital shall provide notice to House Staff prior to the End Date of this Agreement regarding promotion to the next year of training or graduation from the Program. If House Staff is denied promotion, Hospital shall endeavor to provide reasonable notice to House Staff as circumstances permit prior to the End Date of this Agreement. Disputes that arise from Hospital's promotion or graduation decisions shall be directed through the grievance and due process procedures described in the GME House Staff Manual.

D. **Professional Liability Insurance.** Hospital shall provide occurrence-based professional liability insurance coverage for House Staff's acts and omissions, within the scope of the Program, that occur during the Training Period. Such coverage will provide legal defense and protection against awards from claims reported or filed during or after the completion of the Program, if and only if, the alleged omissions of House Staff occurred during the term of the Training Period and are/were within the scope of the Program. The minimum amount of coverage amount will be the limits as required by the Pennsylvania Medical Care Availability and Reduction of Error (MCARE) Act of 2002. Such professional liability coverage provided for the purpose of Program training does not extend to Moonlighting activities as described in Section 2(H) of this Agreement and/or other activities by House Staff.

E. **Eligibility for Specialty Board Examinations.** Hospital shall provide information to House Staff related to eligibility for specialty-specific board examinations.

F. **Clinical Experience and Educational Work Hours ("Duty Hours").** Hospital shall be responsible for promoting patient safety and a high quality learning environment for education through carefully constructed "Duty Hour" assignments that comply with current ACGME requirements. Duty Hour assignments shall include any approved Moonlighting activities in accordance with ACGME requirements as set forth in the policies and procedures in the GME House Staff Manual.  Such policies and procedures shall govern professional activities performed by House Staff outside the scope of this Agreement.

4. **Grievance and Due Process.** The Parties agree to comply with all grievance and due process policies and procedures set forth in the GME House Staff Manual to address House Staff disputes or disagreements, including proposed suspension, non-renewal, non-promotion or dismissal of House Staff.

5. **House Staff Compensation and Benefits.**

   A. **Base Salary.** Hospital shall pay House Staff an annual base salary commensurate with the House Staff's PGY status, as set forth in Exhibit A attached hereto and made a part hereof.

   B. **General Benefits.**  Hospital shall provide House Staff with benefits as set forth in Exhibit A attached hereto and made a part hereof.

   C. **Vacation Time, Sick Time and Leaves of Absence.**  The benefits set forth in Exhibit A attached hereto and made a part hereof include, among other things, vacation time, sick time, parental and other approved leaves of absence, including educational leave as described in the GME House Staff Manual. All leaves of absence taken by House Staff must be approved by the Program Director in coordination with the DIO. House Staff will not be reimbursed as cash or cash equivalent for leaves of absence not taken during the Training Period upon termination or expiration of this Agreement or otherwise be permitted to carryover to any subsequent contract year vacation time or leave of absences not taken. Hospital shall provide information to House Staff regarding the impact that any such leave(s) of absence may have on House Staff's ability to satisfy the requirements for completion of the Program.

   D. **Compensation in Full.**  House Staff understands and acknowledges that the base salary and benefits described in Exhibit A attached hereto and incorporated herein are the sole compensation for participation in Program and services furnished by House Staff under this Agreement.  House Staff agrees not to bill or collect from any patient or third-party payor for any services provided pursuant to this Agreement or to accept fees in any form from Hospital patients. The Parties acknowledge that none of the benefits granted hereunder are conditioned on any requirement that House Staff make referrals to, be in a position to make or influence referrals to, or otherwise generate business for Hospital.

6. **General Provisions.**

   A. **Falsification of Information by House Staff.**  House Staff's falsification of any information supplied to the Program or Hospital, or House Staff assisting others in doing so, as part of House Staff's entrance requirements into the Program shall constitute grounds for immediate dismissal of House Staff from the Program and immediate termination of this Agreement, regardless of when such falsification is discovered.

   B. **Records.**  Hospital and the Program expressly acknowledge their obligations as providers of health care and as an academic medical center to maintain as confidential the applicable educational records and evaluations of House Staff. These educational records and evaluations may be delivered to other health care treatment institutions or prospective employers only upon written request to the Program or Hospital's GME Office and upon written consent by House Staff; provided, however, records may be furnished to appropriate government agencies or third parties, as required by law.

7. **Compliance with Laws, Regulations, Accreditation and Program Policies.**

   A. House Staff shall be automatically upon the Start Date provided access to the GME House Staff Manual, as well as Hospital's specialty-specific program manual ("Program Manual").  House Staff shall abide by Hospital's Medical Staff Bylaws, Rules and Regulations, applicable Hospital policies and procedures, applicable Program policies and procedures, including the GME House Staff Manual and Program Manual, and all applicable federal and state laws. House Staff acknowledges that Hospital has certain obligations in connection with applicable laws, regulations and accreditation standards, including but not limited to obligations to: (i) the State, where Hospital is located; (ii) the Occupational Safety and Health Administration; (iii) the Office of Inspector General; (iv) Medicare and Medicaid; (v) The Joint Commission; (iv) the ACGME, AOA, ADA and/or CPME, as applicable; and (vii) all applicable labor, employment and civil rights laws.  House Staff further acknowledges that Hospital from time-to-time may adopt policies, procedures and/or documentation requirements in connection with the implementation of such laws, regulations and accreditation standards. House Staff agrees to cooperate fully with Hospital in its compliance with all applicable laws, regulations and accreditation standards, as may be enacted or amended from time to time.  House Staff will conduct himself/herself in a professional manner consistent with Hospital standards. The Parties shall not

discriminate on the basis of race, color, national origin, religion, sex, age (40 and older), sexual orientation, citizenship status, veteran status, disability or any other legally protected classification.

B.  The Parties shall comply with applicable policies and procedures of the National Resident Match Program ("NRMP"), including any waiver requirements relating to the termination of this Agreement or release of House Staff to seek employment elsewhere. Any alleged breach or determined violation of the NRMP match results for failure to extend or accept appointment may result in serious consequences taken by the NRMP, per NRMP's policies and procedures.

## 8.  Notices.

All notices provided under or in conjunction with this Agreement shall be delivered (a) personally, (b) by certified U.S. mail, return receipt requested, postage paid, or (c) by reputable overnight courier (such as Federal Express). Any delivery other than a personal delivery to House Staff shall be made to House Staff's residential address currently on file with Hospital. All notices to Hospital shall be delivered to the addresses below.

*If to Hospital:*                                                      *Copy to:*
Hahnemann University Hospital                          Hahnemann University Hospital
230 N. Broad Street                                            Office of Graduate Medical Education
Philadelphia, PA 19102                                       Attn: Chief Academic Officer/DIO
Attn: Chief Executive Officer                             230 N. Broad Street
                                                                         Philadelphia, PA 19102

*Copy to:*                                                            *If to House Staff:*
American Academic Health System                    [<<INSERT HOUSE STAFF NAME>>]
Center Square West                                            [<<INSERT HOUSE STAFF ADDRESS>>]
1500 Market Street, 24th Floor
Philadelphia, PA 19102
Attn: Legal Department

Any notice shall be deemed to have been duly given three (3) United States Post Office delivery days following the date of mailing.  Overnight mail shall be deemed to have been given on the next business day following the date of mailing.  Any notice delivered in person shall be deemed given upon delivery.  Either party may change the address for the service of notice by providing written notice to the other in the manner herein provided for the provision of such notice.

## 9.  Term and Termination.

A.  **Term.** If not earlier terminated as otherwise provide in this Agreement, this Agreement shall terminate as of the End Date.  Termination of this Agreement for any reason shall immediately terminate House Staff's appointment to the Program.

B.  **Termination for Cause.** The DIO and/or Hospital may immediately terminate this Agreement for any of the following reasons with respect to House Staff:

  i.  Professional incompetence, as determined solely by Hospital's Clinical Competency Committee;

  ii.  Failure to obtain and maintain, or the denial, suspension, revocation, termination, restriction, lapse or voluntary relinquishment (under threat of disciplinary action) of House Staff's license to practice medicine and/or DEA registration, as applicable;

  iii.  Substantial breach of the terms of this Agreement;

  iv.  Serious neglect of duty or violation of Hospital or Program rules, regulations, policies or procedures, including but not limited to those relating to the use of drugs and alcohol;

  v.  House Staff's failure to follow Hospital's policies and procedures and other rules of conduct applicable to all employees of Hospital, including, without limitation, policies prohibiting sexual harassment;

  vi.  House Staff engaging in Medicare or Medicaid fraud and abuse, including violations of the Anit-Kickback Statute and Stark Law;

  vii.  Becoming uninsurable by Hospital's selected insurance provider for any reason;

  viii.  Convicted of a felony or other serious crime, as determined by Hospital;

  ix.  Conduct that Hospital reasonably determines to be prejudicial to the best interests of Hospital or the Program;

x. Action or inaction reasonably determined by Hospital to involve inadvisable decisions that reflect poorly on Hospital/Program or that are contrary to the best interests of patient care or Hospital;

xi. Unapproved leave of absence from the Program;

xii. Failure to progress satisfactorily in the Program's educational and clinical program;

xiii. Death or total disability as defined by Hospital's employment policies and procedures, or inability to perform duties required hereunder for a designated period of time in accordance with Hospital's employment policies and procedures;

xiv. House Staff's conviction of an offense related to health care or House Staff's listing by a federal agency as being debarred, excluded, or otherwise ineligible for federal health care program participation;

xv. Any changes in law or economics which materially reduces or eliminates government support on which Hospital relies in order to operate the Program;

xvi. Engaging in unapproved Moonlighting or other external activities;

xvii. Material failure to comply with any specific obligations or intent of this Agreement as determined solely by Hospital; or

xviii. The breach by House Staff of the confidentiality and HIPAA provisions of this Agreement.

C. **Termination Without Cause.** House Staff may terminate this Agreement without cause for any reason or no reason by giving Hospital at least ninety (90) days' prior written notice, provided that such termination complies with NRMP requirements.

D. **Termination for Program Closure or Reduction.** In the event the Program is closed or reduced, Hospital shall use its best efforts to allow House Staff to complete the Program at Hospital. In the event that continuation of the Program is untenable by Hospital, Hospital shall utilize its best efforts to transfer House Staff to another program at Hospital or elsewhere. If Hospital loses its accreditation during House Staff's Training Period, on the effective date of any loss of such accreditation, House Staff shall be immediately released from this Agreement, the Agreement shall terminate and Hospital and its personnel shall provide references in connection with House Staff's application to enter an appropriate program elsewhere.

E. **Termination for Changes in Law.** This Agreement is intended to comply with all applicable laws, rules and regulations. If at any time Hospital determines that the Agreement does not, in any respect, comply with such laws, rules, and regulations, House Staff agrees to cooperate with Hospital to negotiate a new agreement which fully complies with such laws, rules and regulations. If the Parties cannot reach agreement within thirty (30) days, then Hospital may immediately terminate this Agreement.

F. **Effect of Termination.** As of the effective date of termination of this Agreement, neither Party shall have any further rights or obligations hereunder, except (a) as otherwise provided herein (including the survival provisions of Section 15); (b) for rights and obligations accruing prior to such effective date of termination (including accrued but unpaid compensation); or (c) arising as a result of any breach of this Agreement.

10. **Intellectual Property.** All patents, formulae, ideas, inventions, processes, copyrights, know-how, proprietary information, trademarks, trade names, or other developments for future improvements to patients that are conceived through House Staff's work during the Training Period shall be the property of Hospital, and all royalties, fees, or other income attributable to it will be the sole property of the Hospital. This provision shall not apply where any such patents, formulae, ideas, inventions, processes, copyrights, know-how, proprietary information, trademarks, trade names, or other developments for future improvements to patients that are conceived or related to research conducted with Drexel University College of Medicine faculty. House Staff shall promptly disclose in writing to House Staff's Program Director and department chair all patents, formulae, ideas, inventions, processes, copyrights, know-how, proprietary information, trademarks, trade names, or other developments for future improvements to patients that are conceived through the House Staff's work during the Training Period. House Staff shall execute, from time to time, during or after termination of this Agreement, all documents, including without limitation, applications for letters of patent and assignment thereof, as may be deemed necessary or desirable by Hospital to effectuate the provisions of this Section 10. This Section 10 shall survive the expiration or termination of this Agreement for any reason.

11. **Warranty that House Staff is not Excluded from Federal Healthcare Programs.** House Staff represents and warrants to Hospital that House Staff (i) is not currently excluded, debarred, or otherwise ineligible to participate in any federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) ("Federal Healthcare Programs"), (ii) has not been convicted of a criminal offense related to the provision of healthcare items or services, and (iii) is not, to the best of House Staff's

knowledge or belief, under investigation or otherwise aware of any circumstances which may result in House Staff being excluded from participation in Federal Healthcare Programs. This shall be an ongoing representation and warranty by House Staff during the Training Period and House Staff shall immediately notify Hospital of any change in the status of the representations and warranties set forth in this Section 11. Notwithstanding any provision of this Agreement to the contrary, any breach of this Section 11 shall be cause for immediate termination of this Agreement by Hospital, in its sole discretion.

12. **Entire Agreement; Modifications; Governing Law; Counterparts; Waiver; Assignment; Third Party Beneficiaries.** This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the Parties relating to the subject matter hereof. This Agreement may not be amended or modified except by mutual written agreement of the Parties. This Agreement shall be construed in accordance with the laws of the State which provision shall survive the expiration or other termination of this Agreement. This Agreement may be executed in one or more counterparts, all of which together shall constitute only one Agreement. A waiver by either party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure. House Staff shall not assign or transfer, in whole or in part, this Agreement or any of House Staff's rights, duties or obligations under this Agreement without the prior written consent of Hospital, and any assignment or transfer by House Staff without such consent shall be null and void. This Agreement is assignable by Hospital without consent or notice. Nothing in this Agreement, either expressly or implicitly, confers, or intends to confer, any rights or remedies upon any person or entity not a party to this Agreement, except as otherwise specifically stated herein.

13. **Compliance Obligations**. House Staff represents that House Staff has received, read, understands and shall abide by Hospital's Standards of Conduct and Hospital's Compliance Program. Additionally, House Staff shall comply and abide by Hospital's policies and procedures related to the prevention of fraud and abuse as well as all applicable laws and regulations, including the Anti-Kickback Statute and Stark Law. Hospital's Standards of Conduct, summaries of the Compliance Program, policies and procedures, including a summary of the Federal False Claims Act and any applicable state false claims laws (collectively, "False Claims Laws") with descriptions of penalties and whistleblower protections pertaining to such laws shall be made available to House Staff upon request.

14. **Arbitration.** Subject to the foregoing, any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by arbitration in Philadelphia County, Pennsylvania, in accordance with the rules of the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration and applying the laws of the State. Any award rendered by the arbitrator shall be final and binding upon each of the Parties, and judgment thereof may be entered in any court having jurisdiction thereof. The costs of the arbitrator shall in all instances be borne equally by each party hereunder. Prior to initiating and pursuing arbitration under this Section 14, House Staff must have exhausted all other procedural remedies set forth in this Agreement applicable to the dispute or controversy.

15. **Survival.** The provisions of Sections 2.g., 3.D., 5, 6.B., 7.B., 8, 10, 12, and 14 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

*[Remainder of page left intentionally blank. Signature page to follow.]*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement effective on the date first written below.

House Staff

_____    Date: _____

Hospital:

_____ Date: _____    _____ Date: _____
William C. Boyer, DHSc, MS, CHSE                Suzanne Richards
Chief Academic Officer                          Chief Executive Officer
Designated Institutional Official

**EXHIBIT A – BASE SALARY AND BENEFITS**

**Graduate Medical Education
House Staff Employment Agreement**

**A.  House Staff Base Salary for Academic Year 2019 – 2020**

   i.   Hospital shall pay to House Staff an annual base salary of **[<<INSERT SALARY>>]** which corresponds with House Staff's post graduate year ("PGY") as set forth in Section 1 of the Agreement ("Base Salary").  The Base Salary shall be paid bi-weekly in accordance with Hospital policies as may be in effect from time to time Any compensation paid under this Agreement shall always remain consistent with fair market value as required by applicable law.

   ii.  House Staff shall be required to have direct deposit, instructions for which shall be provided to House Staff at the mandatory House Staff orientation.

**B.  House Staff Benefits**

   Benefits shall include, but not be limited to, the following which are subject to change in accordance with Hospital's benefits plans that may be in effect from time to time:

   i.   **Health Benefits and Voluntary Plans.** Commencing on the Start Date, House Staff will be eligible for the same medical, dental, vision and other voluntary plans as are available to other Hospital employees, as further described in the GME House Staff Manual and applicable Human Resources documents. House Staff is required to complete enrollment for health benefits within thirty (30) days from the Start Date in accordance with Hospital policies and procedures.

   ii.  **Paid Time Off**. House Staff shall have twenty (20) days of paid time off ("PTO") each academic year, from July 1 to June 30 (the "Academic Year"). PTO does not carry over to the next Academic Year and PTO will not be paid out in cash at the expiration or termination of the Agreement.

   iii. **Leaves of Absence.**  House Staff shall be eligible for vacation, sick, parental and other preapproved leaves of absence, as well as educational leave as described in the GME House Staff Manual. All leaves of absence must be approved by the Program Director in coordination with the DIO.

   iv.  **Disability.**

        a.   **Short-Term Disability.**  Upon satisfying eligibility requirements, House Staff will be enrolled in Hospital's Short-Term Disability insurance program under the same options, rates, terms and conditions available to all other Hospital employees and as further described in the GME House Staff Manual.

        b.   **Long-Term Disability.**  Upon satisfying eligibility requirements, House Staff will be enrolled in Long-Term Disability insurance program under the same options, rates, terms and conditions available to all other Hospital employees and as further described in the GME House Staff Manual.

   v.   **House Staff Education Stipend.**  House Staff shall receive an annual education stipend in the amount of One Thousand and 00/100 Dollars ($1,000.00). This stipend will be disbursed to House Staff during the month of September and is provided to cover individual expenses associated with, but not limited to, the following:

        a.   Educational materials
        b.   Professional membership dues
        c.   USMLE STEP 3/COMLEX Level 3
        d.   Board examination fees
        e.   Conference and travel expenses not covered by the Program

   vi.  **House Staff Recruitment.**  House Staff may be requested from time to time to participate in the recruitment activities of potential applicants to the Program at the direction of the Program Director for the benefit of the Hospital and the Program.

   vii. **Program Graduation.**  At the completion of House Staff's training, Hospital and/or the Program may invite House Staff to attend a graduation event or ceremony and/or present House Staff with a one-time graduation gift.

Case 19-11466-KW    Doc 4564-3    Filed 03/20/23    Page 69 of 194

viii.   **Licensure.**  Hospital will pay for House Staff's Educational Limited License during the Training Period. House Staff shall initiate procedures to obtain such license as soon as House Staff is qualified to do so.

ix.   **Required Certification.**  Hospital shall provide all certification courses and any related materials required by Hospital and/or the Program, including but not limited to, Basic Life Support (BLS), and Advanced Cardiac Life Support (ACLS), pursuant to the Program Manual.

x.   **In-Service Examinations.**  In accordance with the GME House Staff Manual, Hospital shall pay for in-training examinations required by each Program and their specialty Boards.

xi.   **Uniforms.**  Hospital shall provide House Staff two laboratory coats per Academic Year.  After each PGY, one laboratory coat will be provided to House Staff each Academic Year. Hospital shall provide scrubs to House Staff in accordance with Hospital policy and procedure.

xii.   **Support Services.**  Hospital shall provide access to appropriate and confidential counseling, medical and psychological support services according to Hospital's benefits program as may be in effect from time to time.

xiii.   **Worker's Compensation.**  Hospital shall provide House Staff with worker's compensation insurance, consistent with Hospital's benefits programs as may be in effect from time to time.

xiv.   **Ground Transportation Reimbursement**. Hospital shall reimburse House Staff for reasonable ground transportation expenses (to include a cab or other preapproved ride share service) for fatigued House Staff, in accordance with Hospital's and Program's policies and procedures in effect from time to time which shall be made available to House Staff upon request. Hospital's reimbursement for these expenses is not intended to reward or encourage referrals and has not been determined in any manner that takes into account the volume or value of any referrals.

**EXHIBIT B – ACKNOWLEDGMENT OF HOUSE STAFF**

**I, <<First Name>> <<Middle Name>> <<Last Name>>, <<Credentials>>, hereby acknowledge my understanding that the following documents, some of which have been referenced in the Graduate Medical Education House Staff Employment Agreement, are available to me at the following indicated sites**:

1. House Staff Manual is available for review at www.new-innovations.com.

2. Employee Handbook is available for review in the Human Resources Department.

3. Medical Staff Bylaws and Rules and Regulations are available for review in Hospital's Medical Staff Office.

4. Hospital Policy and Procedures Manual is available for review in the Human Resources Department.

5. Open Door and Fair Treatment Process is available in the Human Resources Department.

In addition, I hereby acknowledge my understanding that I must comply with Hospital's annual PPD and Flu Shot policy in order to remain employed by Hospital and a participant in the GME Training Program.

**<<First Name>> <<Middle Name>> <<Last Name>>, <<Credentials>>**

_____
Print Name:

_____                    _____
Signature                                            Date

# EXHIBIT B

Case 19-11466-KG    Doc 1564-2    Filed 03/20/23    Page 72 of 109



# House Staff Manual

# 2018-2019



**Welcome**

On behalf of the staff at Hahnemann University Hospital and the faculty of Drexel University College of Medicine, we welcome you to the Residency and Fellowship Programs of Drexel University College of Medicine.  We look forward to a fruitful and productive relationship as you enter the next phase of your medical career.

Kindly take time to read this manual carefully.  After you have read it, please sign the acknowledgment form in the back and return it to the Office of Graduate Medical Education upon receipt.

This manual provides important employment information, outlining benefits, policies and procedures that will answer questions you may have to situations you may encounter during your residency and/or fellowship training.  Also information on various clinical departments is included.

You will find we have the structure, facilities, faculty and staff to provide the highest quality medical education and the most skilled, advanced clinical care in the region.  We are glad that you have joined us and we look forward to helping you achieve your educational and service goals.

If you have any questions or need any assistance, please feel free to contact us.

_____            _____
Jay M. Yanoff, Ed.D.                                    Alicia P. Carter
Chief GME Officer (DIO)                              Director of GME
Hahnemann University Hospital                  Hahnemann University Hospital

Case 19-11466-KW    Doc 4564-3    Filed 03/20/23    Page 74 of 194

**TABLE OF CONTENTS**

WELCOME ....................................................................................................................................................................................

**Introduction:**
    About Hahnemann University Hospital and Drexel University College of Medicine .................................................................. 3

**CONTACT INFORMATION**
    Administration ............................................................................................................................................................. 4
    Clinical Service Chiefs ................................................................................................................................................ 4
    Clinical Chairs ............................................................................................................................................................. 5
    Program Directors ...................................................................................................................................................... 5
    HUH Departmental Phone List .................................................................................................................................. 7

**GRADUATE MEDICAL EDUCATION**
    Graduate Medical Education Committee .................................................................................................................... 8
    Graduate Medical Education Office ............................................................................................................................ 8
    GME Office Areas of Responsibility .......................................................................................................................... 9

**GENERAL INFORMATION**
    Cafeteria ..................................................................................................................................................................... 11
    Dialysis, apheresis, CVVH/CVVHD Catheter ........................................................................................................... 11
    Media Relations ......................................................................................................................................................... 11
    Support Services Contact Numbers ........................................................................................................................... 11
    Employee Health Service ........................................................................................................................................... 11
    Identification Badge ................................................................................................................................................... 12
    Library Service ........................................................................................................................................................... 12
    Life Support Training .................................................................................................................................................. 12
    Mailroom .................................................................................................................................................................... 13
    Parking ....................................................................................................................................................................... 13
    Paycheck and W-2 Form ............................................................................................................................................ 13
    Risk Management/Liability Insurance ........................................................................................................................ 13
    Safety & Security ........................................................................................................................................................ 14
    Smoking Policy ........................................................................................................................................................... 16
    Telephone Service Paging System ............................................................................................................................ 16

**PATIENT CARE RESPONSIBILITIES**
    Abuse Reporting ........................................................................................................................................................ 17
    Bloodless Program ..................................................................................................................................................... 17
    Infection Prevention and Epidemiology Department .................................................................................................. 18
    Health Information Management ................................................................................................................................ 20
    Pharmacy ................................................................................................................................................................... 24
    Restraints ................................................................................................................................................................... 28
    Core Measures – Evidence Based Medicine ............................................................................................................. 29
    Surgical Care Infection Prevention (SCIP) ................................................................................................................ 30

| | | |
|---|---|---|
| **GME 01** | Institutional Commitment and GME Program Administration | 31 |
| **GME 02** | Sponsoring Institution | 32 |
| | GME Programs (Attachment A) | 33 |
| | PHEC Certification (Attachment B) | 34 |
| | PHEC Board of Trustees Resolution (Attachment B) | 35 |
| | Hahnemann University Hospital Board of Governors Resolution (Attachment C) | 36 |
| **GME 03** | Office of Graduate Medical Education (GME) | 37 |
| **GME 04** | Graduate Medical Education Committee (GMEC) | 38 |
| **GME 05** | House Staff Representation on GMEC | 40 |
| **GME 06** | Annual Reports, Special Review Processes | 41 |
| **GME 07** | GME Program Size/Program Approval Process | 44 |
| **GME 08** | Core Curriculum | 45 |
| **GME 09** | Institutional Agreements | 47 |
| **GME 10** | House Staff Members Eligibility, Recruitment & Selection | 48 |
| **GME 11** | House Staff Training License, USMLE or COMLEX and National Provider Identifier | 50 |
| **GME 12** | Specific Policies | 51 |
| | Overview of House Staff Benefits | 54 |
| **GME 13** | House Staff Members' Participation in Educational Activities and Faculty Evaluations | 56 |
| **GME 14** | Corrective and Disciplinary Actions | 57 |
| **GME 15** | Temporary Administrative Leave | 61 |
| **GME 16** | Grievances | 62 |
| **GME 17** | Appeals of Disciplinary Actions and Non-Reappointment | 63 |
| **GME 18** | Moonlighting, Volunteering and Other Employment | 65 |
| | House Staff Approval of Other Employment Form | 67 |
| **GME 19** | Work Hours, On-Call and Sleep Rooms | 69 |
| **GME 20** | Confidentiality | 72 |
| **GME 21** | Medical Records Completion Policy | 73 |
| **GME 22** | House Staff Evaluation | 74 |
| **GME 23** | Satisfactory Completion of Rotation/Program and Final Evaluation | 75 |
| **GME 24** | Outside Rotations | 76 |
| | Request for Clinical Rotation Form | 78 |
| **GME 25** | Paid-Time-Off, Leave Policy, and Employee Assistance | 80 |
| **GME 26** | Granting of Certificate of Completion of GME Program | 83 |
| **GME 27** | Meal Allowance | 85 |
| **GME 28** | House Staff Appearance, Attire and Hygiene | 86 |
| **GME 29** | Electronic Communication and Social Media Policy | 87 |
| **GME 30** | Scholarly Activity | 88 |
| **GME 31** | Financial Support for Presentations of Research | 89 |
| **GME 32** | Accreditation Site Visits | 90 |
| **GME 33** | Disaster Policy | 91 |
| **GME 34** | Pharmacy and Medical Device Policy | 93 |
| **GME 35** | Resident/Fellow Forum | 94 |
| | A C K N O W L E D G E M E N T   F O R M | 95 |

**Introduction**

The Graduate Medical Education (GME) programs at Drexel University College of Medicine and Hahnemann University Hospital are a combined, mutual effort providing the highest quality education, service delivery, and academic clinical environment possible. We train house staff to be excellent clinicians who are prepared to pass their Boards and provide compassionate care to their patients.

**Hahnemann University Hospital**

Hahnemann University Hospital is a 496-bed academic medical center and a tertiary care institution that specializes in cardiac services, heart failure and transplantation, obstetrics and gynecology, orthopedics, medical, surgical and radiation oncology, bone marrow transplantation, renal dialysis and kidney/pancreas/liver transplantation.  Located in Center City Philadelphia, the hospital annually admits over 18,000 inpatients, treats over 100,000 outpatients and sees more than 40,000 visitors in its Emergency Department.

The Hospital also offers a comprehensive range of orthopedic services to treat disorders and diseases affecting the bones, muscle and connective tissue, with specialties including the spine and sports medicine.

Women's services are also offered at Hahnemann, including leading-edge diagnostic and treatment approaches to everything from gynecology and primary care medicine to gynecologic oncology, high-risk obstetrical services, infertility, genetic counseling services, and surgery and comprehensive, family-centered maternity care and neonatal services.

**Drexel University College of Medicine**

Drexel University College of Medicine continues the proud tradition of two distinguished and historic medical institutions: Hahnemann Medical College, established in 1848, and Woman's Medical College of Pennsylvania, established in 1850 and the first medical college in the world for women.

In 2002, the College of Medicine became part of Drexel University, an institution with its own century-long tradition of innovative, technological education. Drexel University provides College of Medicine students and faculty with unprecedented collaborative research opportunities.

Drexel University College of Medicine, one of the largest private medical schools in the United States, offers residents and fellows a full range of training at primary and affiliated hospital and ambulatory sites located throughout the Philadelphia region.

## CONTACT INFORMATION

ADMINISTRATION

| Name | Telephone Number |
|------|------------------|
| Michael P. Halter, FACHE, Chief Executive Officer | 215-762-7167 |
| James B. Burke, Chief Operating Officer | 215-762-8918 |
| Richard Imbimbo, CPA, Chief Financial Officer | 215-762-3680 |
| Rose Mary Dunn, DRNP, MBA, RN, Chief Nursing Officer | 215-762-3726 |
| George Amrom, MD, Medical Director | 215-762-3830/8174 |
| Robert Pavlich, Chief Business Development Officer | 215-762-7323 |
| Marie (Dottie) Gemmell, Director, Medical Staff Affairs | 215-762-1020 |
| Joann Lucas, Director, Clinical Quality Improvement/Joint Commission/Patient Safety Officer | 215-762-4783 |
| Andrea Mokrzycki, Director, Risk Management | 215-762-4659 |
| Ayanna Weber, Esq., Chief Human Resource Officer | 215-762-1373 |
| Irv Fisher, Director, Information Services/Technology | 215-762-1646 |
|  |  |

### CLINICAL SERVICE CHIEFS

| Department | Chief | MS | Telephone | E-Mail |
|------------|-------|-----|-----------|--------|
| Anesthesia | Michael Green, DO | 310 | (215) 762- 7922 | michael.green@drexelmed.edu |
| Cardiothoracic Surgery | Glenn Laub, MD | 111 | (215) 762- 7802 | glenn.laub@drexelmed.edu |
| Dermatology | Herbert Allen, MD | 478 | (215) 762-5554 | herbert.allen@drexelmed.edu |
| Emergency Medicine | Eric Stander, MD | 1011 | (215) 762-2527 | eric.stander@drexelmed.edu |
| Family Medicine | Eugene Hong, MD | | (215) 482-1234 | ehong@drexelmed.edu |
| Medicine | Ellie Kelepouris, MD | 437 | (215) 762-1172 | ellie.kelepouris@drexelmed.edu |
| Neurology | Gliebus Gediminas, MD | 423 | (215) 762-4592 | ricardo.cruciani@drexelmed.edu |
| Neurosurgery | Erol Veznedaroglu, MD | 423 | (215) 557-7227 | erol.veznedaroglu@drexelmed.edu |
| OB/GYN | Owen Montgomery, MD | 495 | (215) 762-1838 | owen.montgomery@drexelmed.edu |
| Ophthalmology | David Stein, MD | 209 | (215) 762-3937 | david.stein@drexelmed.edu |
| Orthopedics | Norman Johanson, MD | 420 | (215) 762-1954 | norman.johanson@drexelmed.edu |
| Otolaryngology | Robert Sataloff, MD | 933 | (215) 790-5165 | robert.sataloff@drexelmed.edu |
| Pathology | Cheryl Hanau, MD | 435 | (215) 762-3747 | chanau@drexelmed.edu |
| Podiatry | Steven F. Boc, DPM | 300 | (215) 762-8174 | sfbocdpm1 @comcast.net |
| Pediatrics | Endla Anday, MD | 492 | (215) 762-6562 | endla.anday@drexelmed.edu |
| Psychiatry | Maryanne Delaney, MD | 403 | 215) 831-4628 | mary.delaney@drexelmed.edu |
| Radiation Oncology | Lydia Komarnicky , MD | 200 | (215) 762-4984 | lydia.t.komarnicky@drexelmed.edu |
| Radiology | Douglas Parrillo, MD | 206 | (215) 762-6934 | douglas.parrillo@tenethealth.com |
| Surgery | George Amrom, MD | 413 | (215) 762-8174 | george.amrom@tenethealth.com |

CLINICAL CHAIRS

| Department | Name | Number |
|---|---|---|
| Anesthesiology | Michael Green, DO | 215-762-7922 |
| Cardiovascular Medicine & Surgery | Glenn Laub, MD | 215-762-4955 |
| Dermatology | Mark Abdelmalek, MD | 215-762-5554 |
| Emergency Medicine | Richard Hamilton, MD | 215-762-2527 |
| Family Community and Preventive Medicine | Eugene Hong, MD | 215-482-1234 |
| Internal Medicine | Ellie Kelepouris, MD | 215-762-1172 |
| Neurology | Gliebus Gediminas, MD | 215-762-7090 |
| Obstetrics and Gynecology | Owen Montgomery, MD | 215-762-1838 |
| Ophthalmology | David Stein, MD | 215-762-3937 |
| Orthopedic Surgery | Norman Johanson, MD | 215-762-1954 |
| Otolaryngology, Head and Neck Surgery | Robert T. Sataloff, MD, DMA | 215-790-5165 |
| Pathology and Laboratory Medicine | Cheryl Hanau, MD | 215-762-8375 |
| Psychiatry | Maryanne Delaney, MD | 215-831-7930 |
| Radiation Oncology | Lydia Komarnicky, MD | 215-762-4984 |
| Radiology | Douglas Parrillo, MD | 215-762-1808 |
| Surgery | David Stein, MD | 215-762-3937 |

PROGRAM DIRECTORS

| Department | Name | Contact Number | E-Mail Address |
|---|---|---|---|
| Anesthesiology | Michael Green, DO | 215-762-7922 | michael.green @drexelmed.edu |
| Cardiac Electrophysiology | Steve Kutalek, MD | 215-762-3457 | steve.kutalek @drexelmed.edu |
| Cardiovascular Disease | Benjamin SIlverman, DO | 215-762-4641 | benjamin.silverman @drexelmed.edu |
| Child Psychiatry | Ayesha Waheed, MD | 215-831-4021 | ayesha.waheed @drexelmed.edu |
| Cytopathology | Beth Mapow, DO | 215-762-4698 | beth.mapow @drexelmed.edu |
| Dermatology | Carrie Cusack, MD | 215-762-5554 | carrie.cusack @drexelmed.edu |
| Dermatopathology | Herbert Allen, MD | 215-762-5554 | herbertallen @drexelmed.edu |
| Diagnostic Radiology | Robert Koenigsberg, DO | 215-762-8804 | robert.koenigsberg @drexelmed.edu |
| Emergency Medicine | Ernest Leber, MD | 215-762-2365 | ernest.leber @drexelmed.edu |
| Emergency Medicine Toxicology | David J. Vearrier, MD | 215-427-2368 | dvearrier @drexelmed.edu |
| Endocrinology | Barbara Simon, MD | 215-762-4438 | barbara.simon @drexelmed.edu |
| Family Medicine | Leon McCrea II, MD | 215-967-1632 | leon.mccrea @drexelmed.edu |
| Primary Care/ Sports Medicine | Thomas Trojian, MD | 215-967-1632 | thomas.trojian @drexelmed.edu |
| Female Pelvic Medicine /Reconstructive Surgery | Kristene Whitmore, MD | 215-863-8100 | bladder1@aol.com |
| Gastroenterology | Asyia Ahmad, MD | 215-762-6072 | asyia.Ahmad @drexelmed.edu |
| Hematology/Oncology | Michael Styler, MD | 215-762-7026 | mstyler @drexelmed.edu |
| Hematopathology | J. Steve Hou, MD | 215-762-3753 | j.hou@drexelmed.edu |
| Hospice and Palliative Medicine | Brent Simmons, MD | 215-482-1234 | Bsimmons @drexelmed.edu |
| Internal Medicine | Richard Paluzzi, MD | 215-762-7916 | rpaluzzi@drexelmed.edu |

| Department | Name | Contact Number | E-Mail Address |
|---|---|---|---|
| Infectious Diseases | Dong Lee, MD | 215-762-3489 | dong.lee @drexelmed.edu |
| Interventional Cardiology | Gary S. Ledley, MD | 215-762-7591 | gary.ledley @drexelmed.edu |
| Laryngology | Robert Sataloff, MD | 215-790-5165 | office@phillyent.com |
| Nephrology | Ellie Kelepouris, MD | 215-762-8520 | ellie.kelepouris @drexelmed.edu |
| Neurology | Michelle Dougherty, MD | 215-762-6144 | michelle.dougherty @drexelmed.edu |
| Neurophysiology | Jyoti Pillai, MD | 215-762-7037 | jyoti.pillai @drexelmed.edu |
| Neuroradiology | Robert Koenigsberg, DO | 215-762-8804 | robert.koenigsberg @drexelmed.edu |
| Obstetrics/Gynecology | Kelli Daniels, MD | 215-762-8220 | owen.montgom @drexelmed.edu |
| Ophthalmology | Nancy Crawford, MD | 215-762-6800 | robert.spector@drexel med.edu |
| Oral and Maxillofacial Surgery | Michael Bianchi, DDS | 215-561-0562 | michael.bianchi @drexelmed.edu |
| Orthopaedic Surgery | Martin Herman, MD | 215-762-8168 | Martin1.herman@tenet health.com |
| Pathology & Lab Medicine | Beth Mapow, DO | 215-762-8375 | beth.mapow @drexelmed.edu |
| Podiatric Medicine & Surgery with Reconstructive Rearfoot/Ankle Surgery | Steven Boc, DPM | 215-586-3510 | sfbocdpm1 @comcast.net |
| Psychiatry - Adult | Wei Du, MD | 215-831-7846 | wei.du @drexelmed.edu |
| Pulmonary Diseases/ Critical Care Medicine | Michael Stephen, MD | 215-762-7013 | michael.stephen @drexelmed.edu |
| Radiation Oncology | Jon Strasser, MD | 302-463-8464 | jstrasser@christianacar e.org |
| Rheumatology | Arundathi Jayatilleke, MD | 215-762-8114 | Arundathi.jaytilleke @drexelmed.edu |
| Sleep Medicine | Anita Ko, MD | 215-762-8872 | joanne.getsy @drexelmed.edu |
| Surgery-General | Andres Castellanos, MD | 215-762-4890 | andres.castellanos @drexelmed.edu |
| Urology | Lawrence Belkoff, DO | (610)-762-3200 | lbelkoff@ucsepa.com |

| DEPARTMENT | PHONE EXT: | NURSING DEPARTMENT | PHONE EXT: |
|---|---|---|---|
| ADMISSIONS | 7651 | 21 CCU | 7575 |
| ANGIOGRAPHY | 8363 | 21 ACUTE TELEMETRY | 7543 |
| BLOOD BANK | 7920 | 21 HEART FAILURE | 8115 |
| CASE MANAGEMENT | 7842 | 20 NT | 7500 |
| CARDIAC CATH LAB | 4782 | 19 NT | 7503/7505 |
| CAT SCAN | 4702 | 18 NT | 7530 |
| CHEMISTRY | 3428 | 17 NT | 7525 |
| COAGULATION | 7909 | 17 ST | 6162/2214 |
| CYTOLOGY | 8169 | 16 NT  MOTHER INFANT UNIT | 1416 |
| (FERSENIUS) DIALYSIS OUT PATIENT | 7038 | 16 ST  MOTHER INFANT UNIT | 3955 |
| (DAVITA) DIALYSIS IN PATIENT | 8138 | 16 L & D | 1042 |
| EKG/ECG READING ROOM | 4293 | 16 NT  WELL BABY  NURSERY | 1604 |
| ECHO LAB | 8258 | 16 ST  NEONATAL NURSERY | 1809 |
| EEG/EMG | 7035 | 15 NT | 7507/7508/7509 |
| ENDOSCOPY PROCED AREA | 1738 | 14 NT | 7521/22/23 |
| ENTRY ROOM | 7593 | 12 MICU CENTRAL | 7571 |
| HEART STATION IN PATIENT | 1022 | 12 MICU EAST  RM 1248-1257 | 8200 *CLOSED* |
| HEMATOLOGY | 7724 | 12 MICU WEST | 4673/4967 |
| HLA LAB | 8602 | 11 PSYCH | 7411 |
| INFORMATION SERVICES/TECHNOLOGY | 4357 | 8 STICU - ZONE 1  RM 0001-0008 | 7619/7355 |
| LAB SUPV HOT PAGER # | 41361 | 12 PCU | 2126/2001 |
| MAIN CLINICAL  STAT LAB | 7100 | 8 STICU - ZONE 2  RM 0009-0016 | 1612/1613 |
| MEDICAL RECORDS | 7680 | 12 MICU EAST  RM 1248-1257 | 8200 |
| MICROBIOLOGY | 8383 | 8 STICU - ZONE 3  RM 0017-0022 | 1611/1651 |
| MRI | 4805 | OR 3 | 8190 |
| NUCLEAR CARDIOLOGY LAB | 8580 | OR 8 | 7955 |
| NUCLEAR MEDICINE | 7676 | PACU 8 | 8194 |
| NURSING | 7640 | PACU 3 SDS | 1756 |
| NUTRITION CONSULTS | 8311 | 4 NT PCU | 2126/2001 |
| PATHOLOGY | 7991 | 4 NT PPU | 4585 |
| PATIENT TRANSPORT | 7836 | 4 NT DIRECT ADMISSIONS | 1210 |
| PHARMACY 17 | 7068 | INFECTION CONTROL | 4632 |
| PHYSICAL THERAPY | 8165 | VASCULAR STUDIES  APPTS | 3502 |
| PSYCH CONSULT PAGER # | 41280 | VIROLOGY | 8385 |
| RADIATION THERAPY | 8409 | | |
| RADIOLOGY FRONT DESK | 8335 | | |
| REHABILITATION | 8165 | | |
| STAFF ED & TRAINING | 7377 | | |
| TOXICOLOGY (CHEMISTRY) | 3428 | | |
| TRANSFER CENTER | 7585 | | |
| ULTRASOUND | 8765 | | |
| AMERICAN RENAL ASSOCIATION | 215-563-9383 | | |
| | | | |

## GRADUATE MEDICAL EDUCATION

**GRADUATE MEDICAL EDUCATION COMMITTEE**

The Graduate Medical Education Committee (GMEC) is an institutional committee that has the responsibility for monitoring and advising on all aspects of graduate medical education in accredited and unaccredited programs.  The committee meets the second Tuesday of each month.  The GMEC assists the Graduate Medical Education Office in developing policies that affect all residency/fellowship programs, including the quality of education, house staff involvement in patient care, and the academic environment.  The role of the GMEC is defined by the Accreditation Council for Graduate Medical Education (ACGME), and can be found in the General Essentials of the ACGME.  House Staff have four (4) elected, voting members and four (4) alternates to the GMEC.  Their names are available in the GME Office. See GME 04 in the Policy and Procedures of this Handbook for more specifics regarding the GMEC.

**GRADUATE MEDICAL EDUCATION OFFICE**

The Graduate Medical Education (GME) Office is charged with overall administrative responsibilities of house staff (this includes Interns, Residents and Fellows).  The office is located on the 4th floor South Tower.  All documents relating to tenure as a House Staff member (contract, licensing, visa, etc.) are processed and maintained in the GME Office.  To ensure that records are up-to-date, please report any changes in name, address, telephone number or other personal information to the GME Office.  Student Loan Deferment forms are also processed through this office.  The GME Office provides an array of services to house staff physicians, including processing visas, licenses, grievances, and verifications to name a few.

House staff members are asked to observe the walk-in hours when visiting the GME Office. If the walk-in hours are inconvenient, kindly call the GME Office to make an appointment to see one of the GME Office Program Coordinators.

| **Alicia P. Carter,** Director of Graduate Medical Education (GME) alicia.carter@tenethealth.com Phone:  215-762-2612 | **TBD,** Chief GME Officer – Designated Institutional Official (DIO) Phone: 215-762-2609 |
|---|---|
| Operational Activities: | Program Directors |
| GME Office and Staff | Educational Programs |
| DUCOM Program Coordinators | Site Visits – Accreditation (NAS) |
| House Staff Contract/Licensure/Visas | CLER Reviews |
| Certificates/Lab Coats/ Verifications | Educational Corrective Action |
| Duty Hour Oversight | Core Curriculum |
| Budgetary Oversight | Recruitment |
| Preparation of GME Office Budget | House Staff issues |
| Preparation of House Staff Salary Budget | Policies and Procedures |
| Payroll/ScanPlus | Affiliation Agreements |
| On-call Rooms | Monitor ACGME Regulations |
| ACGME Accreditation Data System (Web ADS) | Special Reviews |
| GME Track (Freida Online) | |
| NRMP Administrator/ERAS | |

**JOINT ACTIVITIES**

CAP Compliance
Maximizing Reimbursement
Orientation
House Staff Manual
Graduate Medical Education Committee
Chief Lunch

These responsibilities are performed with the collaboration of
Sharon Griswold, M.D.
Sharon.griswold-theodorson@drexelmed.edu
Phone: (215) 762-2368
Special Reviews
Affiliation Promotion, Publications, Research Initiatives
House Staff and Faculty Issues
Promotion of Academic Excellence
Chair- Graduate Medical Education Committee
Report to DUCOM Dean and Academic Affairs

| Name | Areas of Responsibility |
| --- | --- |
| **Bianca Davies, Program Coordinator**<br>Phone: 215-762-2623<br>bianca.davies@tenethealth.com | House Staff Last Name A – Ha<br>House Staff Verifications A-Ha<br>Duty Hours<br>Database Management<br>Malpractice Insurance Reconciliation |
| **TBD, Program Coordinator**<br>Phone: 215-762-2632 | House Staff Last Name He - Patel<br>House Staff Verifications He - Patel<br>Rotators<br>DUCOM Physician Refresher Course<br>Scan Plus<br>Certificates of Completion |
| **Michelle Buado, Program Coordinator**<br>Phone: 215-762-2624<br>michelle.buado@tenethealth.com | House Staff Last Name Patheja - Z<br>House Staff Verifications Patheja-Z<br>Lab Coats/Scrubs<br>State Board of Medicine Account<br>    Reconciliation<br>On-Call Rooms<br>On-boarding |
| **Kisha Walker, Administrative Assistant**<br>Phone: 215-762-2618<br>Kisha.walker@tenethealth.com | General Office Activities<br>Conference Planning<br>GMEC Minutes<br>Chief Lunch Minutes<br>Accounting and Purchasing Activities<br>Orientation<br>Coordinator and House Staff Manual<br>Life Support Training Registration<br>GME Monthly Reports/Rosters |

**GME Office Location**
**Hahnemann University Hospital**
**4th Floor, South Tower, MS # 623**
**Departmental Fax Number: 215-762-2620**
**Walk In Hours:**
**10:00am-11:30am**
**2:30pm-3:30pm**

**GENERAL INFORMATION**

*Cafeteria*

Hahnemann's cafeteria is located on the 2nd floor of the Hospital and is open during the following hours:

Monday – Friday

| | |
|---|---|
| Breakfast | 6:30 a.m. – 10:00 a.m. |
| Lunch | 11:00 a.m. – 2:00 p.m. |
| Lite Lunch | 2:00 p.m. – 3:00 p.m. |
| Dinner | 3:30 p.m. – 7:00 p.m. |
| Over Night | 2:00 a.m. – 4:00 a.m. |

Saturday – Sunday

| | |
|---|---|
| Breakfast | 8:00 a.m. – 10:00 a.m. |
| Lunch | 11:00 a.m. – 2:00 p.m. |

Starbucks Café
Located in the Cafeteria will be open 7 days a week from 6:30 am to 8:00 pm and will accept ScanPlus Cards.

Geary Lobby- New College Building: Monday-Friday 6:30am-5:30pm

*Dialysis, Apheresis, CVVH/CVVHD Catheter*

Temporary or permanent catheters placed specifically for dialysis, apheresis, or CVVH/CVVHD shall be restricted for designated treatment. These catheters shall be accessed only by individuals who have received specialized training and have demonstrated competence. Refer to policy 7.051 for more details.

*Media Relations*

The Public Relations and Marketing Department is continually looking for medical stories for media coverage. If you have an interesting story, procedure or patient, call 215-762-7235.

Handling media inquiries regarding Hahnemann, our patients and our physicians is the responsibility of the Public Relations and Marketing Department.  Physicians should not talk to any member of the media without first consulting Public Relations and Marketing at 215-762-7235 or pager 43308.

*Support Services Contact Numbers*

| | |
|---|---|
| Environmental Services : | 215-762-4700 |
| Help Desk | 215-762-HELP (4357) |
| Pharmacy: | 215-762-3591 |
| Maintenance/Engineering : | 215-762-3000 |
| Transport : | 215-762-7836 |

*Employee Health Services*

The HUH Employee Health Department (WORKNET) is located in the Bobst Building Room 133, telephone number 215-762-8590.  Their hours of operation are Monday-Friday 7:30am-4:00pm.

All new residents are required to complete a physical examination including a urine drug test as a condition for employment on the first day of your orientation.  An appointment time will be given at orientation.
PPD must be taken annually and completed by March 31st each year.  Flu vaccine must be taken annually during the month of October.

A confidential medical record is maintained for all house staff, which includes the medical history, immunizations and physical examination required initially as well as subsequent periodic testing and immunizations.  Also, all work-related illnesses, exposures to blood borne pathogens and other hazardous materials or elements are maintained in a Worker's Compensation chart.

As an employee, house staff are covered for work-related injuries/illnesses under our Workers' Compensation Program, which will pay medical expenses and statutory benefits in the case of a work-related injury.

All work-related injuries experienced in the conduct of work at HUH including contraction of disease or infection resulting from on-the-job contacts must be reported immediately in writing on a Tenet Employee Incident Report Form TS2353.  These reports are located at the nursing stations or from Human Resources.  Employees sustaining a needle stick or other body fluid exposure or having a work-related injury should be seen by a health professional as soon as possible in the Occupational Medicine Department (WORKNET), or in the Emergency Department at night or on weekends. Any employee seen in the Emergency Department must make a follow up appointment with the Occupational Medicine Department (WORKNET). Needle stick/ blood and body fluid injuries require additional follow-up appointments at established intervals.   Injury Reports <u>MUST</u> be forwarded to the Workers' Compensation Case Manager, within 48 hours of the time of the incident and signed by your chief

resident. Failure to report work-related incidents could jeopardize workers' compensation coverage. If following medical evaluation, the employee is unable to return to work, the employee must notify the Workers' Compensation Case Manager at 215-255-3394.

Assistance with depression or other personal crises can be obtained by calling Guidance Resources, 844-416-1158, anytime for confidential assistance. Faculty in the Department of Psychiatry is also available.

### Identification Badge

Security rules require that all employees, students and staff wear their identification badge at all times and must be displayed if requested by a member of Security. House Staff are required to obtain a photo identification badge at the beginning of their training. The identification badge is used to enter critical areas of the institution utilizing a state-of-the-art card access system. The Security Office will program the house staff identification badge to authorize access to specific areas. A signed authorization form from the director of the secured area or the GME Office must be presented when requesting access. Forms are available from the Security Office.

House staff on call at HUH who qualify for a meal allowance will obtain meal service with their ID badge.

If you lose your identification badge, report it to the Security Department at HUH 215-762-7111 and the GME Office. The fee is $20.00 to replace a lost ID badge.

### Library Service

Hahnemann University Hospital
Drexel University Health
Sciences Libraries,
Hahnemann Library
1st and 2nd Floor, NCB

215-762-7631
www.library.drexel.edu

General Hours:
Mon. – Thurs. 7:45 am to 11 pm
Fri.- 7:45 am to 8 pm
Sat. and Sun. 10 am to 10 pm
24-hour Study Area (with access to computers and printer)

The library houses up-to-date collections and the most current technologies, enabling house staff to access a full range of printed and electronic resources to support their research and learning.

The Hahnemann Library, located on the first and second floors of the New College Building, which is attached to HUH, contains materials in clinical medicine, the health professions, and the basic sciences.

The Queen Lane Library, located on the Drexel University Queen Lane Medical campus, houses a collection focused on the basic sciences, including research literature in biochemistry, microbiology/immunology, neuroscience, physiology, molecular biology and cell biology, as well as clinical materials for first and second year medical students.

The Libraries provide web access, both on-campus and remotely, to over 80,000 electronic books, 21,500 journals and 500 databases. These include key medical resources such as Clinical Key (journals, textbooks and procedural videos), Dynamed (clinical decision-making tool), Epocrates (point-of-care clinical information), Science Direct (full-text scientific journals), MEDLINE and PsycINFO.

Residents have borrowing privileges at both medical libraries as well as at Drexel University's Hagerty Library, located on the University City campus in West Philadelphia.
Librarians offer reference services and hands-on instruction on-site, and will provide group training by arrangement.

In addition to the resources available at Drexel, access to collections at many Pennsylvania academic libraries is provided by cooperative agreements, including interlibrary loan.

### Life Support Training

Life support training is a requirement of the Joint Commission for all house staff members who perform patient care activities in a hospital setting. Life support training classes are provided complimentary; however, it is the house staff member's responsibility to make certain certification is current/valid throughout the residency/fellowship training. The following classes are provided complimentary when it is a requirement for the discipline:

Basic Cardiac Life Support (BCLS) – all disciplines
Advanced Cardiac Life Support (ACLS) – where required
Advanced Trauma Life Support (ATLS) – where required
Pediatric Advanced Life Support (PALS) – where required
Neo-Natal Advance Life Support (NALS) – where required

*A Comprehensive life support training policy is available in the GME Office.

*Mailroom*

Hahnemann University Hospital; Bobst Building, 5th Floor 215-762-8301
Hours:  6:00 a.m. – 4:30 p.m. Monday through Friday

House Staff members are assigned a mailbox that is located in their department. You are encouraged to check your mailbox as frequently as possible.

*Parking*

Hahnemann University Hospital
Safety and Security Operations Command Center
Basement, Bobst Building, Room B25 A - E
For parking concerns call 215-762-PARK

Complimentary parking is provided to all house staff member as one of the many benefits.  A driver's license, car, and current vehicle registration are required.

House staff members are assigned complimentary parking in various parking lots where contractual agreements are made by the Hospital. A parking card or identification badge is required for entrance to the assigned parking lot.

Parking in any lot should occur when house staff members are scheduled to work at Hahnemann University Hospital.  The parking garages should not be used to store a vehicle.  Cars will be towed and/or ticketed if kept in parking lot beyond 48 hours.  Parking cards or identification badges are not to be given to friends or relatives to park in either lot. Violation of parking guidelines will result in parking privileges being rescinded for the remainder of the training period.

*Paycheck and W-2 Form*

Pay day for hospital employees is every two weeks on a Friday. House staff members are paid for 80 hours every two weeks.  Additional hours are not paid when on-call for evenings or weekends.

House staff members who have direct deposit can view and print their paystubs from online at www.etenet.com. Sign in with password, click on individual home page tab at the top of the page, enter password again, and click on paystub on the left hand side of the page.

House staff members who do not have direct deposit will receive a paper check on payday. The GME Office will have paychecks by 10:00 am on payday. The house staff member, program coordinator, or designee must pick up paychecks on payday. Failure to do so will result in the paycheck being returned to payroll.

Direct deposit is highly recommended for its convenience.  It is the house staff member's responsibility to make certain that his/her paycheck is received and reviewed each pay period.  Any mistake should be reported to the GME Office immediately. House Staff Members must to report any overpayment of salary to the GME Office and will be expected to repay the amount in full within a time frame to be determined by the GME Office and Payroll department.

House staff members must register on-line to receive their W-2 electronically. This method is highly recommended in order to receive a W-2 in a timely manner. Register on-line at the same location to pick up paychecks, www.etenet.com.

*Risk Management/Liability Insurance*

Risk Management
Functions to protect the human, physical and financial assets of the organization by identifying significant risks and hazards, developing and implementing risk prevention programs, minimizing the occurrence of adverse events and successfully managing and resolving claims and lawsuits.

Incident Reports
Incidents are events, which are not consistent with the routine operation of the hospital, having the potential for or resulting in an injury to a patient.  Incidents must be reported and all members of the institution are responsible for doing so. Incident reports are submitted in the ESRM computer system.  House Staff may report incidents verbally by calling the Risk Management Department at 215-762-3655 at HUH.  The hospital has a policy that offers a detailed description of the incident reporting process.

Incident reports are reviewed to identify and analyze problems.  When possible, steps are taken to prevent recurrence.  Whenever an event occurs which is not consistent with the routine operation of the Hospital or routine care of a particular patient, an Incident Report must be filed either verbally or by computerized incident report.  It is extremely important the incident be reported factually and completely.  In most cases, the attending physician or resident should be called to examine the patient.

Many incidents are investigated through personal interviews with involved staff members.  You may be interviewed or requested to speak to investigators.  However, these requests will always be made by staff of the Risk Management Department and you should not speak to any attorney or investigator without such authorization.

Important Information to Remember

Computerized incident reports are confidential documents and must not be copied.

Reporting language should be factual and objective.

**Never** write in the medical record that an incident report was completed; but you must still document all of the care and treatment of the patient in the medical record. Medical records are clinical tools, incident reports are administrative tools.

Do not discard medical devices or items related to an incident which may have caused injury or death to a patient. Notify the Clinical Engineering Department and Risk Management immediately.


Professional Liability Insurance

Professional liability (medical malpractice) insurance coverage is provided for all graduate trainees for the performance of any and all activities within the scope of the graduate training program. The coverage applies to any action that occurred while the resident was an employee of HUH. In addition, as required by Pennsylvania law, all licensed or license-eligible graduate trainees are afforded additional coverage through the Pennsylvania MCARE Fund.

Licensed or license-eligible graduate trainees must provide the GME Office with their Pennsylvania medical license number or medical trainee license number. Failure to do so may jeopardize coverage. The licensing information is necessary to effect coverage and must be submitted to the Pennsylvania MCARE Fund. Residents are also responsible for notifying the GME Office within 30 days of receipt of an unrestricted license. The unrestricted license number must be registered. Failure to do so within 30 days of receipt may jeopardize your license to practice medicine in the Commonwealth of Pennsylvania. Residents in all ACGME accredited programs must have a valid Medical Training (MT) license, even if they hold an unrestricted license.

Insurance coverage does not extend to professional activities outside of the scope of the graduate training program. As Pennsylvania law requires physicians to maintain coverage at all times, it is the responsibility of the graduate trainee to obtain coverage for moonlighting activities. (See GME 18 of handbook for specifics.)

Any questions regarding malpractice insurance coverage should be directed to the Risk Management Department or the GME Office.

Claims Management

In the event of notification of a claim or lawsuit, please notify the Risk Management Department immediately. The handling of all professional liability claims, including investigation and assignment of cases to defense counsel, is managed by the Hahnemann Risk Management Office. If house staff receive any legal papers or are contacted by an attorney or other individual regarding care or treatment rendered to a patient during the duration of your contract, immediately notify Risk Management at Hahnemann 215-762-3655.

### Safety & Security

Hahnemann University Hospital
Safety & Security Operations Command Center
Basement, Bobst Building, Room B25 A - E
For Safety concerns, call 215-762-8617
For Security concerns, call 215-762-7111


The Security office operates 24 hours per day at HUH. House staff must have a current identification card to gain entry to the facility. If there is a security concern or require assistance, contact the Security Department at 215- 762-7111.


House Staff must wear his/her identification badge at all times while on the premises, to report any illegal or suspected illegal activity to security and assist all patients and visitors with security issues by directing them to call the security operations center at the above numbers.

The Security Office acts as a clearing center for items lost or found. Please turn in anything found to the security office and inquire there when you have lost something.


Security Related Procedures

Pedestrian Escort Program

A walking escort is available from 7 PM to 6 AM, 7 days a week. A Security Officer will be made available to walk with a house staff member anywhere within a three-block radius of HUH, including our parking facilities. Call Security at 215-762-7111, 10 minutes prior.


Vehicle Escorts

The HUH Security Vehicle is available for escorts to areas surrounding the institution; such as, Suburban Station from 7 PM to 6 AM, 7 days a week. Call Security at 215-762-7111, 10 minutes prior.


Bicycles

Bicycle racks are available in the Bobst Parking Lot area and on the first floor of the Wood Street Garage. This is the only authorized area in which bicycles can be parked on the institution's grounds. HUH offers bicycle parking as a service only and assumes no responsibility for lost, stolen, or damaged bicycles or personal property. Bicycles and personal property affixed are the sole responsibility of the owner.

<u>Safety Related procedures</u>
Fire Alarms
*It is mandatory for all personnel to follow fire alarm procedures during all fire alarms (including fire drills).*

**Emergency Codes**
| | |
|---|---|
| Condition Red: | Fire / Smoke / Explosion |
| Condition White: | Evacuation |
| Condition Orange Internal: | Bomb Threat / Utility Failure / Hazardous Material Spill |
| Condition Orange External: | Involves ER staff on duty, possible trauma or decon team |
| Condition Orange External II: | Involves entire hospital, Command Center activated |
| Condition Pink: | Infant Abduction |
| Condition Green: | All Clear |
| Condition Purple: | Maximum Capacity Alert: Discharges Needed |
| Code 99: | Respiratory / Cardiac arrest |
| Code 11: | Psychiatric Emergency Assistance |
| Code Silver: | Active Shooter on Campus |
| Code Rover: | Locating and retrieving high risk patient |

**If a fire condition exists, follow the RACE acronym:**

**R** – Rescue – rescue individuals in immediate danger
**A** – Alarm – activate alarm system
**C** – Contain – contain fire by closing doors, windows, turn off electrical equipment
**E** – Extinguish/Evacuate – extinguish the fire if able or evacuate area
     If using a fire extinguisher, follow the PASS acronym:

**P** – Pull – pull the pin
**A** – Aim – aim at the base of the fire
**S** – Squeeze – squeeze the handle
**S** – Sweep – sweep from side to side

<u>Hospital Building Evacuation Procedures</u>
First, evacuate horizontally, move on same floor through smoke barriers
Second, evacuate vertically, to floor below
Last, total evacuation, leave the building

<u>Material Safety Data Sheets (MSDS)</u>
Master copies of Material Safety Data Sheets (MSDS's) are located in the Environmental Health & Safety Office. Additionally, all departments have an updated chemical inventory list and MSDS binder located centrally in their department which is accessible to all employees. Fax on demand is also available for MSDS's by dialing 1-800-451-8346.

<u>Other Services Available through the Environmental Health & Safety Department</u>
Fire and Life Safety Education
Indoor Air Quality Monitoring and Investigation
Hazardous Materials and Waste Removal and Spill Management
Hazwoper and HazMat Technician Training
OSHA, EPA, PADP, Joint Commission, L&I and other Regulating Agency Information
Laboratory Safety Program
Contractor Safety Program
BioSafety Compliance Education
Ergonomic Assessments
Exposure Monitoring / Industrial Hygiene Services
High Angle and Confined Space Rescue
Patient Decontamination

<u>Environment of Care Programs</u>
This is a red manual that is centrally located in all departments and is available for all employees.
The Environment of Care is divided into 7 disciplines. The acronym BUSHELS is used to aid in remembering these disciplines.

**B** – Biomedical Equipment
**U** – Utility Systems
**S** – Security
**H** – Hazardous Materials and Waste
**E** – Emergency Preparedness
**L** – Life Safety (Fire Prevention)
**S** – Safety

Environment of Care Manual
This is a red manual that is centrally located in all departments and is available for all employees.

### Smoking Policy

Smoking throughout all campuses is prohibited. Violators of this hospital policy will be prosecuted in accordance with Human Resources procedures and can include reprimands up to and including termination.

A designated smoking area is located outside the Bobst Building. Smoking is not allowed in areas surrounding the entrances to the hospital buildings.

### Telephone Service Paging System

Hahnemann University Hospital
19th floor, South Tower
Operator: 215-762-7000

Emergencies
Emergencies are covered by Code Group Pagers assigned to each emergency. Most of these pagers are rotating code pagers which must be carried in addition to your individual pager. When on call at night, house staff will occupy an assigned room with a telephone number extension.

Letting the page operator know the room number and telephone number extension is helpful as a backup to the pager and/or code pager, especially if on a Code Team. When ever a house staff member leaves the Hospital and signs out to another doctor, even for a short period, it is that person's responsibility to change the status of his/her pager by dialing the Beeper Status Line at 762-2611: and follow the prompts. Also inform the operator as a backup.

Overhead paging is to be kept to a minimum and requires permission from Administration from 8:00 a.m. to 5:00 p.m. and Nurse Shift Director from 5:00 p.m. to 8:00 a.m.
Page the individual directly by dialing 53 and follow the prompts. If the beeper number is unknown, you may call '0' and ask the operator to look up the pager number in the directory. Personal calls should be as brief as possible and not to exceed five minutes.

The following are the type of pages that may be received and how to answer the call:

In-house extension: dial the extension directly. Outside telephone number: dial '0' and the operator will dial local numbers for you.
Pages will display as a 4 digit number "24XX." (meet me page) If you are in-house, dial that number directly. If off-site, dial 215-762-1800 and follow the prompts.

Most members of the House Staff have pagers. All pagers are paid for by Telecommunications Department and distributed from the Telephone Room after the doctor has signed a responsibility form for appropriate pagers. Pagers can be obtained from the Telephone Room on the 19th floor, South Tower. Replacement batteries for pagers can be obtained 24 hours per day at the same location. Upon leaving Hahnemann, the pagers must be returned to the Telephone Room. **Lost or stolen pagers are the responsibility of the individual doctor.**

The pager that was provided is a very important and valuable piece of equipment and should be treated as such. The initial investment by Hahnemann University Hospital was great and if lost you will be financially responsible to replace it. **The cost to replace lost or stolen pagers is $50.00.** Please keep this pager on your person or in a safe place when not using it.

The Access Number is: 215-762-7243
To beep a pager from any Tenet facility, dial the word "PAGE" (7243), this will direct a call to the paging system. When outside of the hospital and in the local dialing areas (215, 610, 267, 484), to beep someone dial 215-762-7243.
When outside and calling from out of the local dialing areas (215, 610, 267, and 484) or from another state to beep someone dial 1-215-762-7243.

For a house staff member to be reached, the caller should dial directly into the paging system by dialing 215-762-7243. Or dial the main hospital number, 215-762-7000.

The telephones are for hospital business purposes and about 80% of the phones are restricted to in-house usage only. If using a phone that is restricted and there is a need to make an emergency call, just let the operator know it's an emergency. Otherwise, please use the phones designated by the service chief or the residency coordinator.

When placing a call to area codes 215, 610, 267 & 484, please remember to dial the number nine (9) to obtain an outside line, then the three (3) digit area code number, then the seven (7) digit phone number.

Do not dial the one (1) before the area code (e.g. 9, 215, 555-1212).

When placing a call to anywhere else in the state or country, dial the number nine (9) to obtain an outside line, then the three (3) digit area code number, then the seven (7) digit phone number. (e.g. 9, 1, 717, 555-1212.)

When placing a business related long distance call, dial the telephone operator at the hospital where assigned for assistance.


## PATIENT CARE RESPONSIBILITIES

### Abuse Reporting
Pennsylvania child abuse legislation requires physicians, dentists, osteopaths, chiropractors, psychologists, interns, registered nurses, licensed practical nurses and hospital personnel engaged in the admission, examination, care and treatment of children, to report to the Department of Health and Human Services suspected physical or mental injuries that cannot be explained as "accidental" by available medical history and that occur to all persons under 18 years of age.  The Pennsylvania Department of Health and Human Services operates a statewide toll-free system for receiving reports of suspected child abuse, "CHILDLINE" at 1-200-932-0313.  Required reporters must call "Childline," but can also call the local child protective services agency to file a report of suspected abuse.  Reporting abuse is a serious professional responsibility.  Contact the Social Services Department for assistance.

### Bloodless Medicine & Surgery
The Center for Bloodless Medicine and Surgery ("CBMS") provides care for any competent adult patient who requests not to receive a blood transfusion **("Bloodless")** or any competent adult patient who prefers to avoid blood transfusions **("Blood Conservation").** A **blood Transfusion** refers to the administration of whole blood, red cells, white cells, platelets or plasma.

All CBMS patients are required to complete a CBMS Medical Directive/Release form that delineates the patient's decisions regarding procedures, treatment, blood and blood fractions. A program coordinator will complete these forms with the patient and thereafter place them in the Consents Section of the chart for medical staff review. The coordinator will provide the "**Bloodless**" patient with a "**No Blood**" armband and chart sticker. The "**Blood Conservation**" will receive a **"Blood Conservation"** chart sticker.

House staff should:
- Perform a methodical history and physical examination to identify abnormalities of coagulation and previous treatments that may increase risk of blood loss
- Consult hematology in the event of anemia or other senior staff with experience in blood management
- Restrict diagnostic phlebotomy, minimize iatrogenic blood loss
- Maintain surveillance for signs and symptoms of blood loss or physiological deterioration

House staff should contact the bloodless program coordinator on-call in the event of:
- **"Bloodless"** patient decides to accept a blood transfusion
- Patient and/or family crisis intervention or questions about Program
- Request by patient/patient's authorized representative to participate in Program

House staff should not:
- Order a blood transfusion or type and cross patients participating in the **"Bloodless"** program
- Pressure patients to change their minds regarding their transfusion preference

The Program Director or Coordinator is available 24 hours a day/7 days a week and is to be paged in case of the following events (x42006):


**Randall M. Thomas,** *Administrative Director*
**Center for Bloodless Medicine & Surgery**
**Hahnemann University Hospital**
**Broad and Vine Streets**
**514 – 514 A Bobst Building**
**MS 333**
**Philadelphia PA 19102**
**Phone: 215.762.2272**
**Fax:   215.762.2060**
randall.thomas@tenethealth.com

**Infection Prevention and Epidemiology Department** –
524 Bobst Bldg, Mail Stop 302, Main telephone number 215-762-4632

| Deparment Personnel | Name | Telephone | Pager |
|---|---|---|---|
| Hospital Epidemiologist | | 215-762-6555 | 42316 |
| Director, Infection Prevention | Barbara Fry-Arrighy BS, MBA, CIC | 215-762-3606 | 41567 |
| Infection Preventionist | Tania Ciolko, BA, MT, CIC | 215-762-3736 | No Pager |
| Infection Preventionist | Parimala Sarvareddi, BS MT (ASCP) | 215-762-2211 | No Pager |
| Infection Preventionist | Margaret McAllister, AS (ASCP) | 215-762-8362 | No Pager |

The department can assist you with:
-Isolation and reporting of communicable diseases
-Surveillance for hospital acquired infections and outbreak investigation
-Infection prevention and control policies/governmental regulations, and education

**Hospital & Infection Prevention and Control Policies** – Click on the HUH Resources desktop icon on any hospital PC.

**Employee Health Issues**

*WorkNet* Occupational/Employee Health, located on the 1st floor of the Bobst Building, is open Mon.- Fri. 8:00 a.m. to 4:00 p.m. The Emergency Department handles bloodborne pathogen
(sharps/splash) and communicable disease exposures/evaluations after hours and on weekends/holidays.
*WorkNet* Occupational/Employee Health department can assist you with:

- Pre-employment physical exams, TB screening, required immunizations: Rubella, Measles, Mumps, Varicella, Pertussis, and Tetanus
- Hepatitis B and annual influenza vaccines (highly recommended) are administered for free
- Bloodborne pathogen (sharps/splash injury) and communicable disease exposure follow up and treatment
- Clearance to return to work if you have had a communicable disease or MDRO

**Exposure or Injury Involving Sharps, Splash, and/or Blood/body Fluid/Other Potentially Infectious Material** should be reported and treated, **immediately**. After any exposure/ injury, wash area with large amounts of water and soap. In case of eye or mucous membrane exposure, use eyewash to clean the area. When reporting to Occupational Health, remember to have a completed injury employee incident report form with you. On weekends, evening, or holidays or when Occupational Health is closed, report to the Emergency Department on the 1st floor of the North Hospital Tower for evaluation and treatment immediately. Report to Occupational Health the next business day for follow-up.

**Sharps Safety - Never recap needles.** Discard disposable sharps immediately after use in leak/puncture proof containers, conveniently located inpatient care areas. Do not leave on patient's bed. Reusable sharps must be placed in a leak/puncture proof container for safe transport to the SPD reprocessing area.

**Physician Responsibilities for Prevention and Control of Infections**

Perform **hand hygiene:**
When hands are visibly **dirty** or **contaminated** or are visibly **soiled with blood or body fluids**
Before and after having **direct contact with any patient** (e.g. when taking vital signs, examining, lifting a patient, etc.)
Before **entering certain units** (e.g. NICU, OR)
Before donning **sterile gloves**
Before **inserting** and when **handling** invasive **devices** (i.e. Foley, PIV, ventilation devices, CVC, etc)
After **contact with** body fluids or excretions, mucous membranes, non-intact skin, and wound dressings
If moving **from a contaminated-body site to a clean-body site** during patient care
After **contact with inanimate objects** (including medical equipment) in the immediate vicinity of the patient
After **removing gloves** and other personal protective equipment (PPE)
After **contact with contaminated/infectious equipment** or items
After using a **restroom**
 *Note - alcohol waterless hand sanitizers are not appropriate when hands are visibly dirty or contaminated with proteinaceous materials or when caring for patients who have or are suspected of having *C. difficile*-related diarrhea. Washing hands with **soap and water** in these situations is necessary.

**Standard Precautions -** Wear proper personal protective equipment (PPE) such as gloves, gowns, masks, and face shields to protect against exposure to infectious materials. The type of PPE worn depends on the task or procedure being preformed. Handle *ALL* blood and body fluids of *ALL* patients as potentially infected with a bloodborne pathogen.

**Invasive Devices** (CVC, Foley, Vent) – Document daily assessment for continued need. Remove as soon as no longer needed. Use maximal barrier precautions for all CVC insertions.

**Disinfect reusable patient care equipment** (i.e. stethoscope, Ultrasite, etc) between each patient.

**Follow Isolation Policies** (Refer to isolation policy for complete list of infectious diseases and isolation precautions)

- **Order** appropriate isolation precautions via "Patient Factors" screen in *Invision* **as soon as suspected or known**.
- Patient infected or colonized with multi-drug resistant (MDRO) organism(s) (MRSA, VRE, MDR GNR) **or a history of such** require **contact precautions** upon diagnosis and/or **readmission**.
- Wear PPE according to isolation precautions upon entry to patient room/bay and according to task or procedure being performed.
- N95 respirator mask fit testing or training on use of the PAPR is required prior to use.
- Respiratory precautions is required for patients with known or suspected: pulmonary or laryngeal TB disease, measles, varicella, or zoster in the immunocompromised patient or if disseminated.
- **Droplet** precautions are required for suspected or known **Influenza**.
- Patients with diarrhea due to, or suspected of having **C. difficile** are placed on **contact precautions until** signs/symptoms resolve (at least **two consecutive formed stools** – do not need multiple negative toxin assays).

---

Report Diseases & Conditions: PHILADELPHIA DEPT OF PUBLIC HEALTH DIVISION OF DISEASE CONTROL DDC
Report to: 215-685-6748 (or 215 686-1776 after hours (ask for Division of Disease Control on-call staff

| | |
|---|---|
| Acquired Immune Deficiency Syndrome (AIDS/HIV)‡ | Malaria |
| Amebiasis | **Measles (rubeola) *** |
| Animal bites (wild/stray/domestic) | Meningitis (all types) |
| **Anthrax *** | **Meningococcal infections *** |
| **Botulism *** | Mumps |
| **Brucellosis *** | Pelvic inflammatory disease |
| Campylobacteriosis | Pertussis (whooping cough) |
| *Chlamydia trachomatis* incl lympogranuloma venerum (LGV) | **Plague *** |
| Chancroid | **Poliomyelitis *** |
| **Cholera *** | Psittacosis (ornithosis) |
| Creutzfeldt-Jacob disease | **Rabies *** |
| Cryptosporidiosis | Richettsial diseases |
| Cyclosporiasis | **Rubella (German Measles) $ Congenital Rubella *** |
| **Diphtheria *** | Severe Acute Respiratory Syndrome (SARS) * |
| Ehrlichiosis | Salmonellosis |
| **Encephalitis including all arboviruses *** | Shigellosis |
| **Escherichia coli O157:H7 *** | **Smallpox *** |
| **Food poisoning *** | *Staphylococcus aureus*, Vancomycin insensitive |
| Giardiasis | Streptococcal disease, invasive Group A |
| Gonococcal infection | *Streptococcus pneumoniae*, invasive disease |
| Guillan-Barré syndrome | Syphilis |
| ***Haemophilus influenzae*, invasive disease *** | Tetanus |
| **Hantavirus Pulmonary Syndrome *** | Toxic Shock Syndrome |
| Hepatitis A | Trichinosis |
| Hepatitis B | Tuberculosis # |
| Hepatitis C | **Tularemia *** |
| Hepatitis, other  viral | **Typhoid (Salmonella typhi and paratyphi) *** |
| Histoplasmosis | **West Nile Virus *** |
| Influenza – pediatric mortality and institutional outbreaks | Varicella, including zoster |
| Lead poisoning | **Yellow Fever and other viral hemorrhagic fevers *** |
| **Legionnaires' disease *** | |
| Leprosy (Hansen's disease) | |
| Leptospirosis (Weil's disease) | |
| **Listeriosis *** | |
| Lyme diseases | |

---

**\* Report suspected and confirmed cases within 24 hrs**
‡ Report to AIDS Activities Coordinating Office at 215 685 4781    # Report to TB control program at 215 685 6744 or 68

**Tuberculosis (TB) Patients** – Consult Case Management to enroll patient in Department of Health's Directly Observed Therapy (DOT) program.

**Use Antibiotics judiciously** by obtaining a current copy of the **Antibiogram** from Pharmacy, which lists commonly isolated organisms and their susceptibility patterns. Restricted antibiotics require authorization for use from Infectious Diseases.

**Pennsylvania Acts 13 and 52** require hospitals to deem all Centers for Disease Control and Prevention defined hospital-acquired infections as serious events and report these events to the Pennsylvania Patient Safety Authority. In addition, the hospital shall provide written notification to the affected patient, or with the consent of the patient, to an available family member or designee.

<u>Health Information Management</u>

Hahnemann University Hospital
Dept. of Health Information Management
New College Building, Basement
215-762-7680

<u>Medical Record Completion Policies</u>
**The Hahnemann University Hospital Medical Staff Bylaws, Rules and Regulations require House Staff to complete records within 5 days of discharge.** All medical records should be completed at point of care as much as possible. The following are completion requirements of the medical record.

<u>Patient Assessment</u>
The history and physical must be completed and signed by the house staff member and the attending physician within 24 hours of admission. If the patient is readmitted within 7 days of discharge for the same diagnosis a copy of the previous patient assessment with an addition of a note with the patient's present condition is acceptable.
The patient assessment includes: Chief Complaint, History of Present Illness, Past Medical/Surgical History, Medicine/Allergies, Social/Family History, Review of Systems, Physical Examination, Clinical Data and Summary, Impression and Plan. The Core Measure progress note and Present on Intake Assessment must also be initiated within 24 hours.

<u>Entries</u>
Any individual documenting in the patient record must document legibly, sign, date and time all entries. All entries must be authenticated by the person making the entry. Entries made into the record should be entered as soon as possible from point of care.

<u>Progress Notes</u>
Progress Notes are to be written as often as indicated by the patient's condition but minimally on a daily basis. Updates to the Core Measure Progress Note (s) are also to be written as often as indicated by the patient's condition. All medical students' progress notes must be countersigned by their resident. A final complete progress note must be written on the day of patient discharge, death or discharge against medical advice. All electronic progress notes <u>must</u> be authenticated at the conclusion of the note and not "saved". A new progress note can be added if the physician needs to add additional documentation at a later time.

<u>Preliminary Cause of Death (PCOD)</u>

The Preliminary Cause of Death (PCOD) must be completed electronically in Cerner for all expirations except those in the emergency room for Meaningful Use. Nursing will send a message in the Cerner message center to the resident who completes the death report. A "dictation" deficiency will be assigned in HPF although the completion is in Cerner. The physician should complete the deficiency in HPF when the PCOD is completed in Cerner. This will alert Health Information Management to remove the dictation deficiency in HPF.

<u>Patient Care Orders</u>
Upon Admission, Service Transfer and Discharge it is the responsibility of the resident to specify the attending physician in the patient care orders.

<u>Operative Notes</u>
Operative progress note should be entered immediately after surgery and should include:
      names of the primary surgeon, co-surgeon and assistants
      procedure date

procedures performed
description of the procedures
findings
estimated blood loss
specimens removed
preoperative diagnosis
postoperative diagnosis

Operative Report
An operative report is to be dictated **immediately** after surgery by the primary surgeon, unless directed otherwise by the primary surgeon.  (See DICTATION - Instructions on using the dictation system and format of report.)

Consults
Requests for consultations must be initiated or approved by the attending physician/dentist or his/her designee and answered by the attending physician/dentist of whom the consultation is requested or by his/her group/service.   The physician will complete the standard consultation request form and indicate on the order sheet the name of the consultant/group and brief reason for consultation.  If the initial consultation was answered by a resident, the attending physician shall examine the patient, co-sign the resident's note and write a note within 24 hours of the consult that demonstrates agreement with the note's contents.

Discharge Diagnoses and Patient Instruction Sheet
The resident physician must complete the Patient Instruction Sheet with the appropriate copies given to the patient for follow up care and the attending physician at discharge.

Discharge Summary
The discharge summary is to be dictated **at patient discharge** and is required for all patients inclusive of observation patients and those admitted to the hospital.  The summary concisely recapitulates the reason for hospitalization, findings, procedures performed, treatment rendered including a list of all pending reports/studies which are not available at the time of discharge, condition of patient at discharge, and all diagnoses including etiology of symptoms. The discharge summary must be available to the referring physician for follow-up appointments upon discharge. A list of all indicated discharge summaries regardless of discharge date is sent to program directors on a weekly basis.

(See DICTATION - Instructions on using the dictation system and format of report.) After dictating, please record the date dictated, your initials, and the job number on the last page of the progress notes of the medical record.)

Any records for which there are questions on the assignment of record deficiencies are to be referred to the Health Information Management Department.

Alterations/Corrections To The Medical Record
Never obliterate an entry on the record by scratching out or using white out.  Never place stickers over any entries.  To correct any errors:

Draw a _single_ line through each line of the inaccurate documentation.
Above the error, write CORRECTION and enter the correct entry.
Date and initial it.
CORRECTION
Example: The patient had an EKG.  _4/14/98 DTM_  _(resident initials)_

Suspension of Clinical Privileges Policies
A weekly notice is sent to the Chief Medical Officer, program directors, program coordinators, and internal medicine chiefs informing them of all house staff who have any dictation assignments for discharge summaries that are six or more days from discharge. Being offsite at affiliated hospitals does not relieve anyone of their chart completion responsibilities.  The assignments are available in HPF.

Digital Dictation Instructions
House staff are issued ID numbers that are needed in order to gain access to the telephone dictation system.
Reports may be dictated from any telephone.  Dial ext. 7343 from any in-house hospital telephone and 215-762-7343 from any telephone outside the hospital.

When prompted, enter your User ID followed by the # key.
When prompted, press # 1 to dictate or # 3 to listen.
When prompted, enter the work type followed by the # key.
Press 1 for Discharge Summary
Press 2 for Operative Report
Press 3 for Consultation

Press 4 for Admit Note
When prompted, enter the encounter number followed by the # key.
To begin dictating, press 2.
To obtain the report confirmation number at the end of each dictation, press # #.

| Special Keys | Functions |
|---|---|
| 1 = Hold | Places dictation on hold for up to five minutes, Press 2 to remove hold. |
| 2 = Record/Pause | Press 2 to record dictation and 2 again to pause briefly. |
| 3 = Review | Reviews the last four seconds of dictation.  Press repeatedly to reverse further.  Press 2 to resume dictation. |
| 44 = Forward | Forwards to the last dictated word. |
| 5 = Disconnect | Press 5 before hanging up |
| 77 = Rewind | Takes you to the beginning of your dictation. |
| 8 = Multiple Reports | Ends dictation and prompts you for the next dictation.  For assistance: 215-762-3648 |

Physician Query Process

Physician queries are generated for both retrospective and concurrent admissions by Clinical Documentation Specialist and Coders, based on specific, existing clinical documentation, and present facts from the medical record.  This allows physicians to make a clinical interpretation and to document a specific diagnosis/procedure using their independent, professional judgment when documentation in the medical record is illegible, unclear, inconsistent, imprecise or incomplete (as defined by AHIMA) AND only when there is evidence that the condition or finding in question was tested, treated or clinically evaluated.

Physician responses may be documented directly on the query form or when the patient is still in-house, in another suitable location in the medical record (e.g. progress notes, discharge summary, etc.).

A concurrent query must be answered within 24 hours after posting in patient's record on the floors.

Dictation Tips
Follow the standard dictation format for Discharge Summaries and Operative Reports.
Include the spelling of the patient's last and first name and encounter number.
Once dictation is complete, enter your initials and date of the dictation, and the report confirmation # on the last progress note. (To obtain the report confirmation number at the end of each dictation, press # # before hanging up). If the confirmation number is not noted, the HIM staff will assume that the report has not been dictated, and a dictation deficiency will be entered under the house staff member's name.  Remember that discharge summaries and operative reports can be dictated from any house phone located in the hospital.

All transcribed reports containing five or more blanks will be reassigned back to the physician who dictated the report.  The notification will be in HPF with an assignment of "dictation".  The physician will have the option of redictating the report or editing the report.  Editing the report can only be done in the Health Information Management Department within the transcription system.  Please call the Chart Completion section of HIM at x3644 if you wish to edit the report.

Standard Format For Dictating Discharge Summaries
Instructions - All categories must be included in the dictation.  After dictating, please indicate on the last progress note of the record the date of dictation, job number, and your initials.

**Identification** - This is Dr. [say and spell name] dictating a discharge summary for [say and spell patient's name], a [patient's age, race, sex], encounter number [state encounter number].  State the name of the Attending physician that will be responsible for signing the report.
**Admission Date** - State admission date.
**Discharge Date** - State discharge date.
**Admitting Diagnosis** - List all diagnoses at time of admission.
**Final Diagnoses** - List all diagnoses, with principal diagnosis first.
**Procedures** - List all procedures performed during this admission.

**Chief Complaint** - This is the *[Nth - state number, if known]* admission to HUH for this *[patient's age, race, sex]* admitted for *[state the chief complaint only - problem and duration]*.

**History of the Present Illness** - Give a brief, narrative history of the pertinent events related to the Chief complaint.

**Past Medical History** - Relate a brief summary of the patient's past medical and surgical history, including other illnesses and therapies.  Be sure to include all medications being taken at the time of admission.

**Family History** - Relate family history as appropriate.

**Social History** - Relate social history as appropriate.

**Physical Examination** – Describe in appropriate detail the patient's physical examination on admission, including vital signs and measurements.  Pertinent physical findings, positive and negative, related to the chief complaint, must be described.

**Laboratory Studies on Admission** – State pertinent positive and negative results of laboratory tests done at admission.  Any results that were not available immediately after admission may be reported in the "HOSPITAL COURSE" section below.

**Pending Reports/Studies** - State any reports or studies that are not available at the time of discharge.

**Hospital Course** - Describe the patient's Hospital course, including pertinent physical findings, laboratory studies, procedures and therapies, etc., logically in chronological sequence.  It is acceptable to separate the patient's course into multiple "problems" and describe the course of each problem separately.  In that case, the problems should be numbered and named (e.g., "Problem #1 - Respiratory system.").

**Condition on Discharge** - State the patient's condition at discharge.  Avoid using terms such as "improved".

**Medications at Discharge** - List all medications that the patient is instructed to take at the time of discharge.

**Discharge Disposition** - The patient was discharged to *[state location]* (home, another Hospital, nursing home, etc.) on *[state date]*.  If patient is deceased, state when family was informed of patient's demise and if the case was referred to Pathology or Medical Examiner for autopsy.

**Follow-up Arrangements** - State instructions given to the patient for follow-up care. Include physical activity and diet restrictions.  Give the name of the physician and date of appointment, if known.

**CC** – State physician names and complete fax numbers for referring physicians who are not on the Hahnemann medical staff.

Standard Format For Dictating Operative Reports

Instructions - All categories must be included in the dictation. Those categories with an asterisk (*) state "none" if there is no information pertinent to the patient's procedure.

All information must be indicated by square brackets [   ].

Operative reports must be dictated immediately after surgery.

After dictating, please indicate on in the progress notes of the record the date of dictation, your initials, and the job number.

**Identification** - This is Dr. *[say and spell your name]* dictating an operative report [say and spell patient's name], medical record number *[state medical record number]*.

**Date** - State the date of the operation .

**Service** - State name of specialty service (ENT, Ortho., Dental)

**Surgeon** - State the full name of all surgeons.

**Assistants** - State the full name of all assistants.

**Anesthesia** - State the type of anesthesia (general, local, etc.).

**Anesthetist** - State the full name of the anesthetist.

**Pre-Operative Diagnosis** - State the pre-operative diagnosis of the patient. If the patient has a pre-operative diagnosis of cancer and definitive surgery is being performed, the preoperative diagnosis must include the AJCC clinical T, N, and M.

**Post-Operative Diagnosis** - State the post-operative diagnosis of the patient.  If unchanged from pre-op diagnosis, state "same."

**Procedures** - State the full name of all procedures performed.

**Estimated Blood Loss** - State the estimated blood loss of the patient during the procedure.

**Findings** - State any unusual findings (bleeding, adhesions).  If none, state "normal."

**Specimens Removed** - State any specimens removed as well as their destination for analysis.

**Complications** - State any adverse reactions or complications arising during the operative procedure (lacerations, cardiac arrest).

**Procedure** - State the unique elements in the course of the procedures performed on the patient, any unusual events during the course of the procedure, and the patient's clinical condition.  Describe the course of the procedure.

Documentation Principles

Abbreviations - Only abbreviations approved for use by HUH are to be used in the medical record.  Multi-disciplinary concurrent review of medical records is performed on an ongoing basis to monitor quality of documentation.  Completeness, accuracy, timeliness, and legibility are criterion included in the monthly review required by the Joint Commission.  Information regarding medical record documentation is retained and shared with outside institutions as a component of a reference check when you apply for privileges.

<u>Diagnoses</u> – The History & Physical should document why the patient is admitted to an acute inpatient level of care.  The etiology of symptoms should be stated (e.g. "syncope due to bradycardia").  If the etiology is unknown, state unknown (e.g. "chest pain, unknown cause").  State "acute" and "chronic" whenever possible.  Specify organisms causing infections.  Do not substitute events in place of diagnoses (e.g. "S/P MVA" is not a diagnosis; "head injury due to MVA" is a diagnosis).

<u>Patient Identification and Verification for All Surgical Invasive Procedures</u>
All patients undergoing surgical or invasive procedures will be properly identified using two unique identifiers. All procedural sites involving right/left distinction, multilevel procedures and those involving multiple structures shall be marked prior to the procedure. All members of the procedural team will take a "time out" prior to the procedure to confirm that the correct patient, site and procedure is about to be performed.

Prior to the start of any surgical or invasive procedure, informed consent including discussion of the risks, benefits and alternatives must be completed. Refer to Inform Consent policy # 7.002 for detailed process.

Identify the patient using two unique identifiers as described in the above definition. Mark the intended procedural site and involve the patient in the process. The word YES should be written on the intended procedure site. It is not acceptable to mark the non-procedural site with an X or NO. Prior to the start of the procedure perform a final verification process "time out." All staff involved in the procedure should pause, that is to take a "time out" to verify that this is the correct patient, the correct procedure and the correct site.

The procedure should be stated out loud exactly as it is stated on the informed consent.  All team members must agree that this is the correct patient, procedure and site in an active voice.

For those procedures being performed with only one operator and no assistants, someone from the unit with knowledge of the patient should be asked to participate in this process.

In the event that any discrepancy is found with the patient identification, procedure or procedural site, the procedure must not begin until all members of the team are confident that all discrepancies are resolved.

**Pharmacy**
Hahnemann University Hospital, Pharmacy, 24 hour services, ext. 7068

| Location: | Hours of Service/Extension: |
|---|---|
| <u>Main Pharmacy and Pharmacy Administration,</u> | 7:30 am to 5:00 pm |
| <u>Basement of North Tower</u> | ext. 7933 |
| <u>IV Admixture</u> | 7:00 am to 3:30 am 7 days/week |
| | ext. 8489; beeper 41425 |
| <u>8th Floor Patient Care Area Pharmacy</u> | 6:00 am to 5:00 pm, M-F |
| (OR's, PACU, SDS, CTICU) | 7:30 am to 4:00 pm, S&S |
| | ext. 7928, beeper 41350 |
| <u>12th Floor Patient Care Area Pharmacy</u> | 7:00 am to 11:00 pm, M-F |
| (11 Psych, 12, 14) | 7:00 am to 3:30 pm, S&S |
| | ext. 7609, beeper 42731 |
| <u>15th Floor Patient Care Area Pharmacy</u> | 8:00 am to 4:30 pm 7 days/week |
| (Hem/Onc, CEOU) | ext. 4331, beeper 41870 |
| <u>17th floor Patient Care Area Pharmacy</u> | open 24 hours daily |
| (17, 18, 19, and when other PCAPs are closed) | ext. 7068, 7069; beeper 41795 |
| <u>21st floor Patient Care Area Pharmacy</u> (20, 21) | 7:00 am to 3:30 pm, 7 days/week |
| | ext. 1663; beeper 42717 |
| <u>Outpatient/Employee Pharmacy</u> | 8:30 am to 5:00 pm, M-F, ext. 4395, 8901 |

<u>Formulary Drugs</u>
The contents of the Formulary and its revisions are determined by the Pharmacy and Therapeutics Committee, a medical staff committee, in an effort to provide rational and cost-efficient drug therapy.

All formulary drugs ordered by physician and non-physician providers will be stocked in, and dispensed by the Pharmacy under the generic name to eliminate confusion. When ordering medication for a patient, the prescriber will find it advantageous to order medication by the generic name.

<u>Non-Formulary Drugs</u>
The physician who orders Formulary drugs will find these to be the most expedient and economical. A medication is considered non Formulary if it is not available to order in invision.

Non-formulary drugs are those that have not been approved by the Pharmacy and Therapeutics Committee. This includes any drug other than those classified as Formulary Drug, Therapeutic Evaluation Drug, or Investigational Drug.
Non-formulary drugs are not routinely stocked by the Pharmacy and may create delays of up to 2 days for receipt of some drug products.

When a prescriber wishes to order a non-formulary drug, they are required to contact a pharmacist who will review with the prescriber the reason(s) for the requested medication, and to discuss the use of alternative agents which are available on the Formulary.  If the prescriber determines that the non-formulary drug is medically necessary for the patient, the pharmacist shall complete the Non-formulary Drug Request Form and enter the non-formulary medication into the Invision system as a verbal order. All verbal orders must be co-signed within 24 hours of initiation of the order. If the patient has been receiving the medication on an outpatient basis, the physician may request that the pharmacist write a verbal order for the patient to use his or her own supply until the drug is ordered and received by the Pharmacy

The Pharmacy and Therapeutics Committee review all Non-formulary Request forms. If there is a recurring need for Non-formulary medication, consideration will be given to its addition to the Formulary.
To request that a medication be evaluated for formulary addition, please contact Pharmacy Administration at x7933. A formulary request form will need to be completed, and the request will be presented to the P&T Commit

<u>Automatic Stop/Rewriting Medication Orders</u>
The Pharmacy and Therapeutics Committee has established a 30 day automatic stop order policy for all medications with the exception of the following potentially toxic, dangerous, or addictive drugs, to promote patient safety. This policy prevents the inadvertent continuation of drug therapy for longer periods than necessary.

**HAHNEMANN UNIVERSITY HOSPITAL- ANTIBIOTIC MANAGEMENT PROGRAM**

**Restricted Antibiotic Approval Pager # 44444**

Hours 8am -10pm

1) Ordering physicians must call the antimicrobial approval pager #44444 for restricted antibiotics between 9am and 9pm seven days a week. Pharmacy will dispense the first dose for all restricted antimicrobials/antifungals without approval but will not dispense further doses until approval is obtained.
2) Antibiotics ordered between 9pm and 9am will be dispensed without approval but will require an approval the following day for further doses to be dispensed.
3) The antimicrobial approval pager #44444 is a separate service from the Infectious Disease Consult service. For an Infectious Diseases Consult please call Pager # 43911.
4) For further information on antibiotic dosing and hospital protocols please refer to the Bug Drug Folder under Physician Resources/HUH Guidelines and Protocols (\\tenhahthgps01\share\BugDrug) or call the ID pharmacist at Pager 44444 or x4125
5) Antibiotic orders placed in Cerner should include both indications and lengths of therapy to expedite approval process and subsequent pharmacy verification

**RESTRICTED ANTIMICROBIAL AGENTS**

| Infectious Diseases Consultation NOT REQUIRED | | Infectious Diseases Consultation REQUIRED | |
|---|---|---|---|
| **Antibiotics:** | **Antifungals:** | **Antibiotics:** | **Antifungals:** |
| Aztreonam | Liposomal-Amphotericin | Ceftaroline | Isavuconazonium |
| Ciprofloxacin | Micafungin | Ceftolozane/tazobactam | Posaconazole |
| Doripenem | Voriconazole IV and PO | Colistin | |
| Ertapenem | (Not prophylaxis) | Ceftazidime/avibactam | |
| Fidaxomicin | | Daptomycin | |
| Imipenem/cilastin | | Polymyxin B | |
| Levofloxacin | | Quinupristin/dalfopristin | |
| Linezolid | | Tigecycline | |
| Meropenem | | | |
| Peramivir | | | |

No antibiotic approval needed for the following indications and patient populations. The indication must be placed in the comment section of the order

1) Febrile Neutropenia – approval only needed when using carbapenems
2) Cystic Fibrosis
3) Ertapenem- 1 dose for surgical prophylaxis
4) Voriconazole 200 mg PO Q12- for prophylaxis in AML/ALL/BMT patients
5) ID Pharmacist:

Outpatient Prescriptions
There are two types of prescription pads used in the Hospital. The Green prescription pad is for DEA scheduled drugs only. The White prescription pad is for all other medications. All prescriptions must contain the prescriber's legal signature, printed name, and state license number.

Controlled Substances for Outpatients
Prescriptions for controlled substances may be written on green HUH prescription pads. These prescriptions must contain the full name and address of the patient, the printed name, legal signature, and DEA and Pennsylvania medical license number of the prescriber. House staff must have all outpatient DEA-scheduled medication prescriptions countersigned by a licensed physician with a valid DEA number. The printed name of the prescriber must be written underneath the legal signature.

Controlled Substances for Inpatients
House staff may utilize the DEA registration of HUH for ordering controlled substances while under the supervision of a licensed physician. This applies to inpatients only.

<u>Application for DEA Numbers</u>
Each Physician with an unrestricted license in the Commonwealth of Pennsylvania is required to have a DEA number in order to prescribe controlled substances.  Applications may be obtained from the Pharmacy Administration or by contacting:

>       Drug Enforcement Administration
>       600 Arch Street, Room 10224
>       Philadelphia, PA 19106
>       Telephone: (215) 597-9540

<u>Controlled Substance by DEA Schedule</u>
The designation "Controlled Substance" applies to all narcotics, barbiturates, amphetamine, and psychotherapeutics which have been placed in one of five schedules by the Drug Enforcement Administration.

<u>Adverse Drug Reaction Reporting</u>
Please call Clinical Director of Pharmacy at ext. 4474 to report a suspected adverse drug reaction.
Please leave the patient's name, room number, the drug, and the suspected reaction along with your name and extension or beeper number.  A pharmacist will review the information.

**Do Not Use Abbreviations**
HUH has developed a list of abbreviations, symbols and acronyms that will be considered unacceptable in any communication including physician orders, physician progress notes, nursing clinical daily records, diagnostic reports, labels for drug storage areas and pre-printed orders and protocols.

| Unacceptable Abbreviation or Designation | Corrective Action |
|---|---|
| U or u or IU | Spell out "units" |
| Zero after decimal point (e.g. 2.0) | Do not use trailing zero when specifying a whole number (e.g. 2) |
| No zero before decimal point (e.g. .5) | Use zero before a decimal point when dose is less than one (e.g. 0.5) |
| Q.D. | Spell out "daily" |
| Q.O.D. | Spell out "every other day" |
| MS: $MSO_4$:$MgSO_4$ | Spell out morphine sulfate and magnesium sulfate |

**Restraints**

<u>Overview</u>
All physicians must be familiar with the restraint policy #7.007

All Non Violent Restraints must be ordered using the restraint pathway in the Computerized Physician Order Entry (CPOE) system. Emergency Department orders will be placed using an equivalent CPOE system.

The goal of the institution is to reduce the use of restraints. Restraints should only be used when all attempts at alternatives have failed and the patient is a danger to self or others or interfering with medical care, which could lead to worsened condition. The use of restraints should be discontinued as soon as possible. All orders for restraints must be based upon individualized patient assessment.

Chemical restraints, e.g. the use of medications solely to restrain a patient, are prohibited in this hospital.  Medications should be used only to treat disease and its accompanying symptoms, including behaviors associated with psychiatric illness.

The use of seclusion as a means of restraint is also prohibited.

There are two types of restraints **violent** and **nonviolent.** It is the behavior of the patient that determines the type of restraint to be used, not the clinical setting.

**Side rails and elbow immobilizers can be considered restraints if the intent of either is to restrain a patient. (Requires CPOE order)**
**If a patient is released from restraints and then displays behavior that indicates the need to use restraints again, then a new order and face-to-face evaluation is needed.**

*Restraints cannot be ordered PRN or "as needed."*

### Nonviolent Restraints (Medical)

The Cerner physician order for restraints and the face-to-face evaluation for justification of restraints need to be completed within four hours of the application of the restraints. A new order and face-to-face evaluation must be documented in the progress notes daily.

Ordering steps in Cerner are detailed below

- Step 1) Go to the Inpatient Summary of the patient's chart.
- Step 2) Click Shared in New Order Entry
- Step 3) Under the Shared button, type "*Richard MD, Scott*", and select the name as seen highlighted in blue below.
- Step 4) Select the folder titled My Plan Favorites.
  (This is where all Med Exec Committee approved order sets reside.)
- Step 5) Find PowerPlan titled *HAH – Non Violent Non Self Destructive – Soft Limb* or *HAH – Non Violent Non Self Destructive – Hand Mittens*.
- Step 6) Click *Order* to the right of the needed plan.
- Step 7) Click the green inbox to the top right, and then click *Modify* in the window that appears.
- Step 8) Complete the order details for the Initiation order.
- Step 9) Click *Initiate*.
- Step 10) The order *Contact Physician for Evaluation of Restraint Renewal* is then triggered to request date/ time to obtain renewal order by.
- Step 11) Click *Orders for Signature* and *Sign*

### Violent Restraints (Behavioral)

Physicians must complete a face-to-face evaluation of the patient within one hour of restraint application. A STAT psychiatric consult should be ordered whenever Violent Restraints are ordered. An order for violent restraints must be placed immediately on the paper violent restraint order sheet. After the initial order, the physician must perform a face-to-face evaluation of the patient every four hours ordered.

Violent restraint orders have the following maximum time restrictions related to patient age. Lesser times are allowed if deemed clinically appropriate.

**Adults: 4 hours**
**Children ages 9-17: 2 hours Children under 9: 1hour**


**Evidence Based Medicine Core Measures**

(Document contraindications to standard of care for all elements)

### AMI

- ✓  ASA with in 24 hrs of arrival
- ✓  Discharge on ACEI or ARB
- ✓  ASA at discharge.
- ✓  Beta Blocker at discharge.
- ✓  Lipid treatment at discharge regardless of LDL
- ✓  Smoking cessation documentation (For smoking at anytime during 1 year prior to admission)

### HF

- ✓  LVF assessment (ejection fraction %)
  (Done during the current admission or from a previous study)
- ✓  Discharged on ACEI or ARB
- ✓  Beta Blocker at discharge (for LVEF < 40%)
- ✓  Anticoagulation for all patients with atrial fibrillation or history of atrial fibrillation
- ✓  Smoking cessation documentation (for smoking at anytime during 1 year prior to admission)

- ✓  Written discharge instructions addressing:
  - Diet
  - Activity
  - Daily weight
  - Follow-up appointment

Case 19-11466-MFW    Doc 4564-3    Filed 03/20/23    Page 103 of 194

- What to do if S/S worsen
- Medications

**PNA**

✓ Oxygen assessment within 24 hrs of arrival.
✓ Blood cultures on arrival for all ICU patients.
✓ Blood cultures before first dose antibiotics.
✓ Antibiotics received within 4 hours of arrival to hospital.
✓ Proper antibiotic selection.
✓ Pneumococcal vaccination.
✓ Influenza vaccination (October-February).
✓ Smoking cessation counseling (For smoking at anytime during 1 year prior to admission)

Reference:  ACC/AHA 2005 Guideline Update.  Management of Chronic Heart Failure in the Adult
ACC/AHA 2005 Guidelines for Unstable Angina Non-ST-Segment Elevation MI
ACC/AHA 2004 Guidelines for Management of Patients with ST-Elevation MI
Infectious Disease Society of America
American Thoracic Society
Centers for Disease Control FORM # PI-002 06/200

**Surgical Care Infection Prevention** *(SCIP)*

| | |
|---|---|
| 1.) **Prophylactic Antibiotics**<br>within 1 hour prior to surgical incision<br>(Occurs in OR for the following):<br><br>✔ CT Surgery<br>✔ Hip Arthroplasty<br>✔ Colon Surgery<br>✔ Knee Arthroplasty<br>✔ Hysterectomy<br>✔ Vascular Surgery | 2.) **Prophylactic Antibiotic Selection**<br><br>(Occurs in OR for the following):<br><br>✔ CT Surgery<br>✔ Hip Arthroplasty<br>✔ Colon Surgery<br>✔ Knee Arthroplasty<br>✔ Hysterectomy<br>✔ Vascular Surgery |
| 3.) **Discontinue Prophylactic**<br>Antibiotics<br><br>✔ CABG Surgery        48 hours post-op<br>✔ Hip Arthroplasty    24 hours post-op<br>✔ Colon Surgery       24 hours post-op<br>✔ Knee Arthroplasty  24 hours post-op<br>✔ Hysterectomy       24 hours post-op<br>✔ Vascular Surgery   24 hours post-op | 4.) **Control Serum Glucose**<br>(less than 200 mg/dl)<br>POD 1 & POD 2 for Cardiac Surgery & Cardiac Procedure patients<br><br>✔ CT Surgery<br>✔ Cath Lab Procedures such as:<br><br>✔ Cardiac Caths<br>✔ IABP<br>✔ Ablations<br><br>✔ Cardiac procedures outside of cath lab |
| 5.) **Colorectal Surgery**<br>(PACU)<br>✔ Normothermic immediately Post-op<br>(96.8 F – 100.4 F) | 6.) **Patients receiving Beta Blocker**<br>Therapy Pre-Admission will:<br><br>☐ Receive Beta Blocker during peri-<br>operative   period (Day of Surgery through<br>end of PACU) |
| 7.) **Venous Thromboembolic Events**<br>(VTE) Prophylaxis<br>☐ VTE Ordered<br>☐ VTE initiated during time frame of<br>24 hours pre-op to 24 hours post-op | 8.) **Hair Removal (In OR)**<br><br>✔ Use clipper only<br>✔ NEVER SHAVE! |

Reference: ACC/AHA 2005 Guideline Update.  Management of Chronic Heart Failure in the Adult.
ACC/AHA 2005 Guidelines for unstable Angina Non-ST-Segment Elevation MI
ACC/AHA 2004 Guidelines for Management of Patients with ST-Elevation MI
Infectious Disease Society of America
American Thoracic Society
http://www.medqic.org/dcs/ContentServer?cid=1089815966976&pagename=Medqic/Content/ParentShellTemplate&parentName=Setting&c=MQParents

**GME 01:  INSTITUTIONAL COMMITMENT AND GRADUATE MEDICAL EDUCATION   PROGRAM ADMINISTRATION**

**POLICY:**

Hahnemann University Hospital (HUH) is the Sponsoring Institution and accepts responsibility for providing the resources to support GME and enable DUCOM to achieve compliance with ACGME and other accrediting bodies Institutional Requirements. Hahnemann University Hospital (HUH) is committed to provide the administrative authority for its Graduate Medical Education (GME) programs. This authority resides with the CEO of HUH.

Drexel University College of Medicine (DUCOM) is committed to provide the administrative authority for its Graduate Medical Education (GME) programs.  This authority resides with the Dean of the School of Medicine.

The purpose of GME is to provide an organized educational program with guidance and supervision of the house staff, facilitating the house staff's ethical, professional and personal development while ensuring safe and appropriate care for patients.

DUCOM and HUH are committed to supporting GME programs and providing resources to achieve compliance with their respective Residency Review Committees' (RRCs') program requirements.

**PROCEDURES:**

1.   The Associate Dean for GME, appointed by the Dean of the College of Medicine, and the Chief GME Officer and Director of GME hired by HUH, will provide the oversight, leadership and administrative support for all GME programs.

2.   The Chief GME Officer, Associate Dean, and Manager of GME will perform the following:
     a.   Assure the provision of an ethical and professional environment for GME programs.
     b.   Monitor GME programs as delineated in the ACGME, CODA and CPME Institutional requirements.
     c.   Develop an annual budget for GME activities to be approved by HUH in collaboration with DUCOM.
     d.   Present the annual salary budget to the Graduate Medical Education Committee (GMEC).

3.   The Chief GME Officer will serve as the Designated Institutional Official (DIO) and have the authority and responsibility for oversight and administration of the GME programs and responsibility for assuring compliance with ACGME, CODA and CPME Institutional requirements.  The specific responsibilities of the Chief GME Officer and Director of GME are set forth in Graduate Medical Education section of this Manual.

4.   Issues which cannot be resolved by the Chief GME Officer or Director of GME or the Associate Dean will be referred to the Academic Affiliations Committee as specified in the Comprehensive Affiliation Agreement effective November 11, 1999.

**GME 02:  SPONSORING INSTITUTION**

**POLICY:**

Hahnemann University Hospital (HUH) is the sponsoring institution for ACGME, CODA and CPME programs and will be appropriately organized for the conduct of GME in a scholarly and clinical environment.  The HUH is committed to excellence in both medical education and patient care.

**PROCEDURES:**

1.    Attachment A is the Board's Commitment as the sponsoring institution.

2.    Hahnemann University Hospital ensures that the Institutional Requirements are in compliance with the ACGME, CODA, and CPME.

3.    The attached GME programs operate under the oversight of DUCOM. (Attachment B)

4.    DUCOM will be in substantial compliance with the Accreditation Council for Graduate Medical Education (ACGME), Commission on Dental Accreditation (CODA), and Council on Podiatric Medical Education (CPME) Institutional Requirements and ensure that the accredited programs are in substantial compliance with the Program Requirements of the ACGME, CODA and CPME.

5.    The institutional commitments to GME activities (Attachments A, C and D) are supported by the governing authorities and the administrations of DUCOM and HUH.

6.    HUH and DUCOM provide the leadership to insure ACGME, CODA and CPME programmatic compliance as per GME policy GME 01.

7.    HUH and DUCOM recognize failure to comply with the Institutional and Program Requirements may jeopardize the accreditation of any or all of the sponsored accredited programs.

8.    HUH will ensure the payment of all ACGME, CODA and CPME fees to maintain program accreditation.

9.     HUH, as the Sponsoring Institution, provides sufficient institutional resources to include GME staff, space, equipment, supplies, and time to allow for effective oversight of the GME programs.  In addition, there will be sufficient institutional resources to ensure the effective implementation and development of the GME programs in compliance with the Program and Institutional Requirements.

10.   The DIO, GME staff and personnel, Program Directors and Coordinators, faculty and house staff will have access to adequate communication resources and technological support.  This will include, at a minimum, computers and access to the Internet.

**ATTACHED:**

    A.    Hahnemann University Hospital Board of Governors Resolution and Organizational Chart
    B.    List of Residency and Fellowship Training Programs
    C.    Philadelphia Health & Education Corporation Certification and Board of Trustees Resolution:  Statement of Commitment to Graduate Medical Education.

**Resolution:**

Statement of Commitment to Graduate Medical Education

Attachment A

Hahnemann University Hospital
Board of Governors

## HAHNEMANN UNIVERSITY HOSPITAL
## BOARD OF GOVERNORS

### UNANIMOUS WRITTEN CONSENT
### OF THE MEMBERS

The Accreditation Council of Graduate Medical Education (ACGME) Guidelines require a sponsoring institution to issue a Statement of Commitment to Graduate Medical Education. In accordance with this ACGME requirement and in keeping with Hahnemann University Hospital's commitment to the community it serves and Drexel University College of Medicine, the Board of Governors hereby makes the following Statement of Commitment:

STATEMENT OF COMMITMENT:

The Board of Governors, Hospital Administration and Graduate Medical Education Administration of Hahnemann University Hospital are committed to work in conjunction with the Drexel University College of Medicine to provide the necessary educational, financial and human resources to support the Graduate Medical Education programs of its hospital.

Pursuant to motion made, seconded and unanimously adopted by the members at its September 26, 2016 meeting,

NOW, THEREFORE, BE IT:

RESOLVED, that the Statement of Commitment to Graduate Medical Education as set forth above is hereby adopted.

IN WITNESS WHEREOF, the Hahnemann University Hospital Board of Governors hereby adopts the foregoing Resolution.

HAHNEMANN UNIVERSITY HOSPITAL
BOARD OF GOVERNORS

By: _____
Michael P. Halter, FACHE
Chief Executive Officer

By: _____
Thomas A. Leonard, Esquire
Chairman

By: _____
Jay M. Yanoff, Ed.D.
Chief GME Officer (DIO)

Dated: September 26, 2016

Attachment B

**GME Residency and Fellowship Training Programs**

Anesthesiology
Cardiovascular Disease*
Child and Adolescent Psychiatry*
Clinical Cardiac Electrophysiology*
Clinical Neurophysiology*
Cytopathology*
Dermatology
Dermatopathology*
Emergency Medicine
Emergency Medicine/Toxicology*
Endocrinology, Diabetes and Metabolism*
Family Medicine
Female Pelvic Medicine and Reconstructive Surgery*
Gastroenterology*
Hematology and Oncology*
Hematopathology*
Hospice and Palliative Medicine*
Infectious Disease*
Internal Medicine
Interventional Cardiology*
Laryngology* (Medical training license will be issued under Surgery)
Nephrology*
Neurology
Neuroradiology*
Obstetrics and Gynecology
Ophthalmology
Oral and Maxillofacial Surgery
Orthopaedic Surgery
Pathology-Anatomic and Clinical
Podiatric Medicine and Surgery with Reconstructive Rearfoot/Ankle Surgery
Primary Care Sports Medicine*
Psychiatry
Pulmonary Disease and Critical Care Medicine*
Radiation Oncology
Radiology-Diagnostic
Rheumatology*
Sleep Medicine*
Surgery
Urology

*Fellowship programs

Case 19-11466-MFW    Doc 1564-3    Filed 02/10/23    Page 308 of 100

Attachment B

Attachment C

Case 2:19-cv-11466-MFW   Doc 4564-3   Filed 03/20/23   Page 109 of 194

## PHEC Certification

**DREXEL UNIVERSITY**
**BOARD OF TRUSTEES**

**ANNUAL MEETING**
**MAY 13, 2015**

**Resolution:**

**Statement of Commitment to Graduate Medical Education**

**INTENTION:**

Pursuant to guidelines of the Accreditation Council of Graduate Medical Education (ACGME), the College of Medicine is required to issue an official statement of institutional commitment to Graduate Medical Education.  The Graduate Medical Education Committee and the Executive Committee of the Faculty of the College of Medicine have approved a statement of commitment to Graduate Medical Education, as set forth below.  The administration seeks approval of this statement of commitment to Graduate Medical Education so that it can be submitted to the ACGME and other relevant accrediting agencies.

**RESOLVED**, that the following statement of the College of Medicine's commitment to Graduate Medical Education is hereby approved:

*"The Drexel University College of Medicine is committed to the continuum of medical education from undergraduate to graduate through lifelong continuing medical education.  Drexel University College of Medicine fully supports the education and training of resident physicians in ACGME accredited residency programs, as well as other appropriate accrediting bodies.  Drexel University College of Medicine working with its faculty, administration, and affiliated academic and health care delivery partners will design and undertake Graduate Medical Education programs which meet or exceed the general and special requirements of the ACGME or other accrediting agencies.  All educational, clinical and research components necessary to sponsor Graduate Medical Education training programs will be supported through the integration of these educational programs into the College of Medicine and affiliated clinical facilities in the most cost effective manner."*

R - GME Commitment 5.13.2015.v1

Attachment D

**Board of Trustees**



*Board of Trustees*

<u>**CERTIFICATION**</u>

This is to certify that:

A true and correct copy of the Resolution of the Board of Trustees of Drexel University, captioned "**Statement of Commitment to Graduate Medical Education**", is attached to this certification. This Resolution was duly approved in accordance with the Articles of Incorporation and By-Laws of the Corporation at a meeting of the Corporation's Board of Trustees held on May 13, 2015.

Michael J. Exler
Secretary
Drexel University

SEAL

12/21/15
Date

**GME 03:  OFFICE OF GRADUATE MEDICAL EDUCATION**

**POLICY:**

HUH as the Sponsoring Institution designates the HUH Office of Graduate Medical Education (GME) to be the administrative system to oversee all graduate medical education programs.

**PROCEDURES:**

1.    The Chief GME Officer (DIO) and Director of GME oversee the Office of GME and administer the GME programs in collaboration with the individual Program Directors.

2.    Access to adequate communication technologies and technical support for all officials and administrators, Program Directors, faculty, and house staff members is provided by HUH as a function of GME activities and is ensured by the Office of GME.

3.    All correspondence with the ACGME or individual RRC's, CODA or CPME from the Sponsoring Institution or its GME programs must be reviewed and co-signed by the DIO.

4.    The DIO will present an Annual Institutional Review (AIR) to the Board of Governors of the Sponsoring institution and representatives of all the major participating institutions.  This report will review the activities of the GMEC during the past year with attention to accreditation issues, house staff supervision, house staff responsibilities, house staff evaluation, and work hours.  The RRC accreditation letters received during that year will be reviewed including actions taken in response to any citations or concerns listed in these letters.  The GMEC will review concerns related to the items listed above and, in confidence, any instances when house staff have failed to meet standards of patient care.

5.    The Associate Dean for GME, and The Chair of the Graduate Medical Education Committee (GMEC), will present an Annual Institutional Review to the Educational Committee of the Faculty (ECOF) of the Participating Institution (DUCOM).  This report will include an evaluation of the educational and financial resources available for the programs and the effectiveness of the programs as related to the mission and goals of the Sponsoring Institution.  The activities of the GMEC during the past year will be included in the report.  The institution's Letter of Report from the Institutional Review Committee (IRC) will be reviewed including actions taken by the GMEC in response to any citations or concerns and progress made to improve the performance of the institution and its educational programs.

6.    The Annual Institutional Review to the Sponsoring Institution and Participating Institution will be combined and presented at the first meeting in September following the academic year.

**GME 04:  GRADUATE MEDICAL EDUCATION COMMITTEE (GMEC)**

**POLICY:**

Hahnemann University Hospital (HUH) delegates the Graduate Medical Education Committee (GMEC) under the leadership of the Associate Dean for GME (or designee), Chief GME Officer (DIO) and Director of GME.  This team supports HUH with the responsibility to monitor the quality of GME and advising on all aspects of house staff education.

**PROCEDURES:**

1.  The GMEC will include house staff nominated by their peers, all Program Directors and other appropriate members of the faculty, and accountable institutional officials.
    a.  The Chair is appointed by the Dean of the School of Medicine.  (The Associate Dean for GME or his designee serves as Chair of the GMEC.)
    b.  Each ACGME, CODA and CPME approved residency program including subspecialties will have one voting representative appointed to the committee.  The representative must attend at least six of the twelve monthly GMEC meetings annually.
    c.  The Chief GME Officer (DIO), Director of GME, and the CEO of HUH Hospital (or designee) will be voting members of GMEC.
    d.  There will be 12 resident representatives selected by their peers as voting members of the GMEC as set forth in GME 05. If a representative is unable to attend the GMEC, his/her alternative may serve.
    e.  The Directors of GME of institutions with significant affiliations with the GME programs and DUCOM Program Coordinators will be invited guests.

2.  The GMEC will meet monthly with written minutes documenting fulfillment of the committee's responsibilities being forwarded to the Associate Dean, DUCOM, as well as the Medical Executive Committee of HUH.
    a.  The GMEC responsibilities include:
        i.  Establish and implement policies and procedures that affect all GME programs regarding the quality of education and the work environment for the house staff in the GME programs.
        ii.  Create and maintain appropriate liaisons with Program Directors and personnel.
        iii.  Review annually house staff compensation, benefits, and funding for house staff positions to assure that these are reasonable and fair and make recommendations to the Sponsoring Institution.
        iv.  Establish and maintain appropriate oversight of and liaison with Program Directors and assure that Program Directors establish and maintain proper oversight of and liaison with appropriate personnel of other institutions participating in GME programs sponsored by the institutions.
        v.  Review any disciplinary issues or actions.
        vi.  Establish and implement formal written institutional policies governing house staff work hours that foster resident education and facilitate the care of patients.

        vii.  The GMEC will assure that the following requirements are met:
            1.  Each GME program will establish formal written policies governing resident work hours that are consistent with the Institutional Requirements (GME 19) and the Program Requirements for each specialty and subspecialty program.  These formal policies will apply to all participating sites used by the house staff.
            2.  The educational goals of the programs and learning objectives of programs will not be compromised by excessive reliance on house staff to fulfill institutional service obligations.  Work hours reflect the fact that responsibilities for continuing patient care are not automatically discharged at specific times.  GME programs will ensure that house staff are provided appropriate backup support when patient care responsibilities are especially difficult or prolonged; and
            3.  House staff work hours and on call time periods must not be excessive and must be consistent with GME 19.  The structuring of work hours and on-call schedules must focus on the needs of the patient, continuity of care, and the educational needs of the house staff members.
            4.  All annual reports are mandated by accrediting bodies.
        viii.  The GMEC will regularly monitor house staff work hours and moonlighting for compliance with institutional policies and the ACGME, CODA and CPME's Institutional and Program Requirements.
    b.  DUCOM will assure that GME programs provide appropriate supervision for all house staff that is consistent with proper patient care, the educational needs of the house staff and the applicable Program Requirements.  Supervision of house staff will address the following requirements:
        i.  House staff will be supervised by teaching staff in such a way that the house staff members assume progressively increasing responsibility according to their level of education, ability, and experience. (GME: 12-9)
        ii.  On-call schedules for teaching staff will be structured to ensure that supervision is readily available to house staff members on duty.

    iii.    The level of responsibility accorded to each house staff member will be determined by the teaching staff and Program Director consistent with the level of the State training license and house staff contract.

    iv.    Assure that each program provides a curriculum and an evaluation system to ensure that house staff members demonstrate competence in the six general competencies listed as defined in each set of Program Requirements (patient care, medical knowledge, interpersonal and communication skills, professionalism, practice based learning and systems based practice) and the program's milestones.

c.    DUCOM will ensure that each ACGME, CODA and CPME accredited program has defined, in accordance with its Program Requirements, the specific knowledge, skills and attitudes required and provide educational experiences as needed in order for house staff members to demonstrate the following:

    i.    Patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health.

    ii.    Medical knowledge about established and evolving biomedical, clinical, and cognate (e.g. epidemiological and social-behavioral) sciences and the application of this knowledge to patient care.

    iii.    Practice based learning and improvement that involves investigation and evaluation of their own patient care, appraisal and assimilation of scientific evidence, and improvements in patient care.

    iv.    Interpersonal and communication skills that result in effective information exchange and teaming with patients, their families, and other health professionals.

    v.    Professionalism, as manifested through a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population.

    vi.    Systems based practice, as manifested by actions that demonstrate an awareness of and responsiveness to the larger context and system for health care and the ability to effectively call on system resources to provide care that is of optimal value.

d.    DUCOM will ensure that all house staff members:

    i.    Develop a personal program of learning to foster continued professional growth with guidance from the teaching staff.

    ii.    Participate fully in the educational and scholarly activities for their program and as required, assume responsibility for teaching and supervising other house staff members and students.

    iii.    Participate on appropriate committees and councils whose actions affect their education and/or patient care.

    iv.    Participate in an educational program regarding physician impairment including substance abuse.

    v.    Receive instruction in quality assurance/performance improvement and patient safety.

    vi.    Perform autopsies when possible and appropriate.  House staff members will receive autopsy reports in a timely manner on the patients that were under their care.

    vii.    Participate in educational program regarding sleep deprivation and its effect on patient care.

e.    DUCOM ensures that house staff members submit to the Program Director at least annually confidential written evaluations of the faculty and of the educational experiences.

f.    The GMEC will ensure that formal written institutional policies for the selection, evaluation, promotion, and dismissal of house staff members are in compliance with the Institutional and Program Requirements.

g.    The GMEC will regularly review all program accreditation letters and monitor action plans for the correction of concerns or areas of noncompliance. Special Reviews will be initiated where issues are identified.

h.    The GMEC will regularly review the Sponsoring Institution's Letter of Report from the IRC and develop and monitor action plans for the correction of concerns or areas of noncompliance.

i.    The GMEC will review all applications for accreditation of new programs, requests to reactivate a program, requests to change house staff numbers, requests for voluntary withdrawals of  programs, progress reports requested by either the RRCs or IRC, and responses to all proposed adverse actions prior to submission.

j.    The GMEC will oversee and be responsible for conducting the appropriate Special Reviews of all accredited and non-accredited GME programs including subspecialty programs to assess their compliance with the Institutional Requirements and the Program Requirements of the respective RRCs or certifying Boards. (GME 06)

**GME 05:  HOUSE STAFF REPRESENTATION ON GMEC**

**POLICY:**

House staff members of the GMEC shall be selected from their peers in accordance with ACGME, AOA, CODA and CPME requirements.

**PROCEDURES:**
**Resident/Fellow Representation on Graduate Medical Education Committee (GMEC)**

Effective July 1, 2017, each of the major programs will designate both a Representative and an alternate (back-up) for the Graduate Medical Education Committee (GMEC) which meets the second Tuesday of each month from 4:00 to 5:30 P.M.  If the resident representative cannot attend, then the alternate should attend.  By June 1 of each year, the following programs need to send the names of both a GMEC Representative and an alternate to the Office of GME.  Note: PGY level is for 2017-2018 academic year.

---

1.  Internal Medicine        Sneha Patel, MD (PGY 3)              Jennifer Schwartz, DO (PGY 2)

2.  Family Medicine          Michael Schmitz, MD (PGY 3)          Abhishek Seth, MD (PGY 3)

3. Anesthesiology            Farshad Rashidian, DO (PGY 4)        Maimouna Bah, MD (PGY 4)

4. Psychiatry                Charles Wisniewski, DO (PGY 4)       Kathryn Tracy, DO (PGY 4)

                                                                 Stephanie Taormina, MD (PGY4)
5.  Surgery                  Jessica Fazendin, MD (PGY 4)

6.  Neurology                Leo Estofan, MD (PGY 3)              Jeff Lahrman, MD (PGY 3)

7.  Pathology                Colin Kanach, MD (PGY 3)             Shraddah Patel, MD (PGY 3)

                                                                 Ashley Lentini, MD (PGY 3)

8.  Emergency Medicine    Alex Asp, MD (PGY 3)                    Eric Ho, DO (PGY 3)

                                                                 Dana Riley, MD (PGY 3)

9.  Obstetrics and Gynecology   Sumra Tayebaly, MD (PGY 4)       Rachel Deanis, MD (PGY 4)

10. Radiology                Shima Aran, MD (PGY 4)               Ajay Kohli, MD (PGY 3)

11. Fellows representing at least 2 IM fellowships (to be determined by the Department Chair)

        Rheumatology Fellow                      Scott Pompa, MD (PGY 5)

        Gastroenterology Fellow                  Stanley Pietrak, MD (PGY 6)
                                                 Shelini Sooklal, MD (PGY 6)

**GME 06: ANNUAL REPORTS AND SPECIAL REVIEW PROCESSES**

**POLICY:**

The GMEC conducts and documents Annual Program Evaluations (APE), Annual Program Reviews (APR) and Special Reviews of all accredited and non-accredited graduate medical education programs to assess compliance with both the Institutional Requirements and the Program Requirements of the ACGME, CODA and CPME and other relevant residency and fellowship review committees.

**PROCEDURES:**

1. **In preparation for a program's Self-Study, programs will complete the following annually:**

   a. **Program Evaluation Committee (PEC)**

   Committee in each program that provides information for the APE.  Should meet at least two times per year.  The minutes of this program committee should be kept by the program with ideas, issues, action plans and results to date.

   b. **Annual Program Evaluation (APE)**

   Completed by each Program Director annually.  Format for APE provided by the Office of GME.  **Due by July 31**

   c. **Annual Program Review (APR)**

   Each program reviewed annually by a designated Program Director from a different discipline.  Form for the APR is provided by the Office of GME.  Once completed, the APR is sent to the program reviewed and the Office of GME for GMEC review.  **Due by September 30**

   d. **Annual Institutional Review (AIR)**

   Completed by the DIO and given to the Boards of HUH and DUCOM.  Presented at September or October Board Meetings.

   e. When a program is identified with having problems, a Special Review may be indicated.

2. At its monthly meeting, the Chief GME Officer (DIO) will present the updated schedule of Special Reviews to the GMEC.

3. Criteria which would indicate need for a GMEC Special Review:

   a. Concerns raised by the required Annual Program Evaluation (APE) and/or Annual Program Report (APR)
   b. Concern indicated on required Program and Institutional Requirement Assessment (PIRA) Report
   c. Non-attendance at monthly Graduate Medical Education Committee (GMEC)
   d. Resident/Fellow and Faculty Survey findings
   e. Non-compliance with Work Hour requirements
   f. Resident/Fellow Forum concerns
   g. ADS concerns
   h. Supervision issues
   i. Any ACGME, CODA or CPME reports or concerns
   j. Major changes in the program in the past academic year
   k. New program or New Program Director
   l. Others as indicated to the DIO and/or the Associate Dean for GME (Chair of GMEC)
      *Note: If no Special Review has been indicated by the GMEC previously, a General Special Review will be held at least every five (5) years which will include separate meetings with (1) Program Director and Coordinator, (2) Faculty, (3) Residents/Fellows and (4) Department Chair.

   This process is meant to be helpful and constructive to the Program Director and is non-adversarial.  The Chief GME Officer (DIO) in the Office of GME will facilitate the Special Review Process. Every Review will have a house staff representative member of the team. Program Directors are expected to Chair and be members of a Review when needed.

4.   The Reviews will be conducted as follows:

The Special Review will be conducted by the Associate Dean for GME and the Chief GME Officer (DIO). A Program Director from a department different than the program being reviewed may be asked to participate in the Special Review. Every Review will have a house staff member representative as a member of the team. The Chief GME Officer (DIO) will do the following:

a.   Select team for the review process to include a house staff member from a
     department different from that being reviewed.
b.   Determine with the Program Director a date for the Review.
c.   Oversee the review with the Associate Dean for GME.
d.   The DIO will draft the Review preliminary report and circulate to the committee.
e.   Complete report with signatures of members of the committee.
f.   Send final report to Program Director, Associate Dean for GME, and Office of GME.
g.   Submit report to the GMEC.


5.   The following items are needed for a Special Review:
a.   Latest accreditation letter
b.   Response and update each citation
c.   ACGME Program Summary Report
d.   Completed Program and Institutional Requirement Assessment  (PIRA)

     i.    The Program Director should go to the ACGME, AOA, CODA or CPME website and print out the latest
           program requirements.
     ii.   Submit a line-by-line assessment of the requirements by placing a mark in the margin (in red) for each
           requirement as follows:
                + = fully compliant
                * = non-compliant
                N = needs further improvement

e.   Copy of evaluation forms
f.   Previous two years as well as the most recent ACGME resident and faculty survey reports
g.   Copy of up to date Program Letters of Agreement (PLAs)
h.   Latest Annual Program Review (APR)
i.   Latest Annual Program Evaluation (APE)
j.   Goals and objectives for each rotation and by each post graduate year

6.   The Review process should occur as follows:
a.   The Chief GME Officer (DIO) will notify the program at least six weeks notice prior to the meeting with the Special
     Review Committee (SRC).

7.   The Special Review Committee (SRC) should receive and review the materials at least three weeks prior to the Special
     Review Committee meeting.

8.   The Special Review Committee should meet with the following individuals:
a.   Program Director
b.   Program Coordinator
c.   Faculty member(s) without Program Director or Coordinator in attendance
d.   Peer selected house staff members representing each post graduate level from the program without faculty.
e.   Program Director or Coordinator in attendance.

9.   The Chief GME Officer (DIO) will generate a preliminary report.  The report should contain a program's response to each
     accrediting body citation, summary of the program's strengths, areas needing improvement as well as recommendations
     to the program and the Program Director.

10.  A draft of the Review Report should be sent to members of the Special Review Committee for review, editing and
     questions.

11.  A final report should be completed, signed by all members of the Special Review Committee, and sent to the GMEC for
     approval.

Case 19-11466-KW    Doc 1554-3    Filed 03/20/23    Page 117 of 194

12. The Program Director should give a report of the findings to the GMEC and plans for remediation and action plans for remediation of any suggestions by the Special Review Committee.

13. Copies of the final report should be sent to the Program Director and the Office of GME.

14. The Program Director will provide an Action Plan to the GMEC for each of the recommendations on the final report.

15. The final report of all Reviews will be maintained in the Office of GME.

**GME 07:  GME PROGRAM SIZE/PROGRAM APPROVAL PROCESS**

**POLICY:**

Determination of house staff numbers for each program shall be set by the Program Director and GMEC following discussions with the Associate Dean for GME, Chief GME Officer (DIO) and Director of GME .

**PROCEDURES:**

| PROCEDURE STEP | | RESPONSIBILITY |
|---|---|---|
| The timetable for setting resident numbers for each academic year shall be | | |
| March (-15m) | Residency Program Directors propose optimal resident numbers for each program to the GMEC | Program Directors, GMEC |
| April (-14m) | GMEC reconcile resident numbers distribution | GMEC |
| May (-13m) | GMEC propose optimal resident numbers to the HUH CEO and CFO | GMEC |
| June (-12m) | HUH CEO and CFO reconcile resident numbers and propose optimal number to GMEC | GMEC, Associate Dean, HUH CEO and CFO |
| July (-11m) | Final numbers confirmed by GMEC and Dean | GMEC, Dean |

**Graduate Medical Education (GME) Program Approval Process**:

The following process is to be followed when applying for a new GME program or when a program wants to increase its number of residents.  The following procedure must be followed in order to start a new GME program or to receive approval for a numbers increase:

1) New program concept is presented to the sponsoring Department for approval including
    A. Faculty
    B. Number of patient base
    C. Source(s) of funding
2) New Program Concept is presented to the GMEC and requests a review of the program.
3) The review and further recommendation is presented to the GMEC for assessment.
4) Programs that achieve a positive recommendation from the GMEC are then to be presented by the Associate Dean of GME to the Clinical Chairs Meeting for input and recommendation to the Dean for approval.
5) Since HUH is the Sponsoring Institution and the employer of residents, for funding to occur, all programs must be approved by senior administration at HUH.
6) With approval by the Dean's office, Clinical Chairs, and HUH administration, the Office of GME will make recommendation back to the proposed program to proceed with accreditation process of the ACGME or other accrediting agency application.
7) Program may not begin until accrediting agency officially approves.
8) Increase in numbers may not occur until accrediting agency officially approves.

Programs that have not gone through the above process will not receive sponsorship from DUCOM nor funding from HUH until all of these steps have been successfully completed.

**GME 08:  CORE CURRICULUM**

**POLICY:**

DUCOM assures that the house staff members' curriculum includes a regular review of the ethical, professional, socioeconomic, medical/legal, and cost efficient provision of health care issues that affect graduate medical education and the practice of medicine. The house staff member will receive appropriate instructions on research, statistical design, and other skills for life long learning. The house staff will receive instruction in the six ACGME General Competency Requirements.

**PROCEDURES:**

1.   The Core Curriculum will be integrated into the teaching and learning process of the house staff members' didactic and clinical educational experiences.

2.   The Core Curriculum takes place at two levels of the GME program: (1) across all programs and (2) within each program.

3.   Across All Programs
     a.   All interns, residents and fellows will be required to participate in a core curriculum while in graduate medical education training at DUCOM.  In each academic year, there will be required workshops and on-line programs.  Every resident or fellow is expected to participate in core curricular sessions in a three-year period.
     b.   The following are topics that will be covered during the three-year period:
          i.     Ethics
          ii.    Health Care Management/Cost Containment
          iii.   Professionalism
          iv.    Teaching Skills
          v.     Public Presentation Skills
          vi.    Research, Writing and Publishing Skills
          vii.   Time Management Skills
          viii.  Conflict Resolution and Communication Skills
          ix.    Medical Legal Issues
          x.     Diversity Issues
          xi.    Leadership Skills
          xii.   HIPAA
          xiii.  Preparing to Practice as a Physician
          xiv.   Sleep Deprivation and Its Effect on Patient Care
     c.   The dates of the presentations will not conflict with new house staff beginning their programs or with senior house staff graduating.  Program Directors will be expected to schedule all house staff members such that only those out of the region during the dates will be excused from attending.  Program Directors will schedule their entire house staff member's component into one of the sessions when the Core Curriculum is being offered.  Attendance will be taken to assure that house staff members participate.  Sessions will be recorded and placed on the GME website for viewing by those unable to attend or for review by others.  Non-participation of a house staff member is grounds for corrective and/or disciplinary action as outlined in the Policies and Procedures Manual GME 14.
     d.   House staff members will be provided with educational experiences, knowledge, skills and competencies addressing the six ACGME general competencies:
          i.     Patient care skills
          ii.    Medical knowledge
          iii.   Interpersonal and communication skills
          iv.    Professionalism
          v.     Practice based learning and improvement
          vi.    Systems-based learning

4.   Within Each Program:
     a.   Within each program, the six ACGME general competencies noted in 3.d. above will be integrated into the expectations, experiences and evaluation of all house staff.
     b.   The Program Director is responsible to plan, develop, implement the general competencies into the program and provide the following:
          i.     Documented evidence of a curriculum with goals and objectives for the general competencies currently implemented;
          ii.    Documented evidence of the evaluation tools used that he/she has listed;

  iii.  The status of developing and using dependable measures to assess a house staff member's competence in these areas; and,

  iv.  The status of developing a process that links educational outcomes with program improvement.

**GME 09:  INSTITUTIONAL AGREEMENTS**

**POLICY:**

Participating and affiliated institutions must be approved by the Chief GME Officer (DIO) and Associate Dean for GME.  Institutional agreements must exist between HUH and all major participating institutions/sites as outlined by the ACGME, CODA, or CPME.  When GME occurs in a participating institution/site, DUCOM continues to have responsibility for the quality of that educational experience and retains authority over the house staff member's activities as outlined by the Institutional Requirements.  Program Directors must send Program Letters of Agreement (PLAs) to the receiving institution's/site's educational contact.

**PROCEDURES:**

<u>Affiliation Agreements</u>:

1.    Program Director(s) must submit a written Request for Clinical Out Rotation form to the Office of GME at least three months in advance.

2.    Written requests are approved by the Chief GME Officer (DIO) or the Director of GME, the Associate Dean, the local CEO and CFO, and the legal department of HUH.

3.    All new relationships must be reported to the GMEC.

4.    Institutional/site written agreements must contain the following:
      a.    Identification of the officials at the participating institution/site who will assume administrative, educational and supervisory responsibilities for house staff member.
      b.    Outline the educational goals and objectives to be obtained within the participating institution.
      c.    Specify the period of assignment to the participating institutions/sites, the financial arrangement, and details for the coverage of insurance and benefits. (Outside rotations will only be approved when receiving institution/site reimburses sending institution. Exceptions are rare – when the Chief GME Officer (DIO) determines that it is a requirement of the program and cannot be completed within the home institution/site. All electives must be reimbursed by receiving institution/site.)
      d.    Determine the participating institution's/site's responsibilities for teaching, supervision and formal evaluation of the house staff member's performance.
      e.    Establish with the participating institution the policies and procedures that govern the residents education while rotating to the participating institution/site.

5.    No house staff member may go on an outside rotation until there is an affiliation agreement completed.

6.    If an affiliation agreement is not renewed by either party upon expiration, the house staff may not continue to go to that site.

<u>Program Letters of Agreement</u>:

Program Letters of Agreement are completed and sent by the Program Director to the receiving site's educational contact.  Program Letters of Agreement must be sent to each participating site that provides an educational experience for a resident that is one (1) month in duration or longer.  The particulars for these letters are as follows:

1.    Identify the faculty who will assume educational and supervisory responsibility for residents and specify the faculty responsibilities for teaching, supervision, and formal evaluation of the resident performance per the Program Requirements.

2.    Outline the educational goals and objectives to be attained by the resident during the assignment.

3.    Specify the period of resident assignment.

4.    Establish the policies and procedures that will govern the resident education during the assignment.

**GME 10:  HOUSE STAFF MEMBERS ELIGIBILITY, RECRUITMENT & SELECTION**

**POLICY:**

DUCOM recruitment and appointment of house staff members complies with the standards established and put forth by the ACGME, CODA and CPME.  All house staff in DUCOM GME programs must fulfill the requirements for Pennsylvania training licensure except OMFS and Podiatric Surgery where training licenses do not apply.  The Office of GME monitors DUCOM programs for compliance with these standards and the GMEC provides oversight.

**PROCEDURES:**

1.  <u>House Staff Member Eligibility</u>:  Prior to acceptance into a GME training program, each Program Director and the Office of GME confirms that each prospective house staff member is eligible for PA Licensure and fulfils one of the following criteria:
    a.   A graduate of a United States or Canadian medical school accredited by the Liaison Committee for Medical Education (LCME).
    b.   A graduate of a United States college of osteopathic medicine accredited by the American Osteopathic Association (AOA).
    c.   For OMFS, a graduate of a North American dental school.
    d.   For podiatric surgery, a graduate of a United States or Canadian podiatry school.
    e.   A graduate of a medical school outside the United States or Canada who
        i.    Has a current valid certificate from the Education Commission for Foreign Medical Graduates (ECFMG), or
        ii.   Has a full and unrestricted license to practice medicine in a United States licensing jurisdiction.
    f.   A graduate of a medical school outside the United States or Canada who has completed the "fifth pathway" program provided by an LCME accredited medical school.

2.  <u>Recruitment</u>
    a.   Each of the GME programs will provide complete and accurate information to interviewees, including a sample contract and the institution's policies on visa status and eligibility for appointment to a residency or fellowship position as applicable.  This information will be communicated to interviewees in writing prior to the rank order list certification deadline.  Each program will obtain a signed acknowledgement of such communication from each applicant who interviews with such program.
    b.   The listing of an applicant by a program on its certified rank order list or of a program by an applicant on the applicant's certified rank order list establishes a binding commitment to offer or to accept an appointment if a match results.  Each such appointment is subject to the official policies of the appointing institution in effect on the date the program submits its rank order list and is contingent upon the matching applicant meeting all eligibility requirements imposed by those policies.  Those requirements will be communicated to applicants in writing prior to the rank order list certification deadline.  Each program will obtain a signed acknowledgement of such communication from each applicant who interviews with such program.
    c.   Resident Transfer:  To determine the appropriate level of education for a resident who is transferring from another residency program, the Program Director must receive written verification of the previous educational experiences and a statement regarding the performance evaluation of the transferring resident, including an assessment of competence in the six general competencies areas, prior to acceptance into the program.  All transfers must be presented by the Program Director and approved by the Chief GME Officer (DIO) prior to the offer being made to the candidate.
    d.   In order to be eligible for a position at DUCOM/HUH, a candidate must disclose at the time of the interview that he/she is off cycle for any reason and will be unable to start the program on time.

3.  <u>House Staff Selection</u>
    a.   DUCOM ensures that programs select among eligible applicants on the basis of their preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity.  Programs will not discriminate with regard to sex, race, age, religion, color, national origin, disability, or veteran status.
    b.   DUCOM resident education programs select house staff members from qualified candidates by participating in organized matching programs such as the National Resident Matching Program where applicable.
    c.   As employer of house staff, offer letters must come from the HUH Office of GME and signed by the Chief GME Officer (DIO).  Offers can only be made to candidates when it is determined to be within the cap for the program.  If an offer letter is sent by a Program Director, it is invalid and will not be honored by HUH.
    d.   Advanced level credit may be given only upon entrance into a program.  The Program Director may request from their respective Board and the State that an individual entering the program has previous experience which warrants advanced placement.  If advanced placement is granted by both their Board and the State, academic credit will be granted toward full completion of the program.  Advanced placement  must be in advance of starting a program and may not be requested nor granted once a person has begun his/her program.

e.    Programs may not require a house staff member to have an unrestricted license or DEA number.  (Exceptions are OMFS and Podiatric Surgery where training licenses do not exist.)

f.    No house staff members may use their own unrestricted license or DEA number while performing duties of the residency. Using the personal unrestricted license or DEA number is outside the scope of residency duties or malpractice coverage. However, an individual may use the unrestricted license or DEA in moonlighting situations (see GME 18).

4.    <u>Fellowship Eligibility:</u>  Exceptions may be approved by the GMEC after review by a sub-committee composed of the Chief GME Officer (DIO), Associate Dean for GME, a Program Director for another discipline and a resident representative.

5.    <u>Enrollment of Non-eligible Applicants</u>:  Non-eligible applicants may not be enrolled in DUCOM graduate training programs.

**GME 11:  HOUSE STAFF TRAINING LICENSES, USMLE OR COMLEX AND NATIONAL PROVIDER IDENTIFIER (NPI)**

**POLICY:**

It is the policy of HUH and DUCOM that each house staff member must have the appropriate Commonwealth of Pennsylvania training license.  It is a state regulation that house staff must successfully pass USMLE Step 2 or COMLEX Step 2 by the end of the PGY 1 contract year and USMLE Step 3 or COMLEX Step 3 (Osteopathic) by the end of the PGY 2 contract year or earlier if specifically required by the program. Residents will be dismissed from the program if not complaint.

**PROCEDURES:**

1.  All house staff physicians (allopathic and osteopathic) must have a Commonwealth of Pennsylvania training license. (The exceptions are OMFS and Podiatric Surgery residents who have unrestricted licenses.  However, while in the residency training program, the OMFS and Podiatric Surgery programs must treat these licenses as if they were a training license.  Also, the Pennsylvania State Board of Dentistry must give approval for a resident to participate in the OMFS training program.)  All GME activities in the internship, residency or fellowship training program are to be authorized by the training license.  Even though a resident or fellow may apply for and receive an unrestricted license, any activities while in the GME program are permitted only under the training license.  However, the unrestricted license is one criteria necessary for approval to moonlight (GME 18).

2.  It is illegal for a resident to perform medical activities that are above his/her level listed on the training license and House Staff Employment Agreement.  Residents are insured for malpractice at their level of training noted on both the House Staff Employment Agreement and license.  For a resident to perform clinical activities above his/her level of licensure is to jeopardize him/her and the program as well as to compromise the institution.

3.  House staff must always work under the direct supervision of an attending physician.

4.  For a house staff member to train at a PGY 1 level he/she must have a passing score on USMLE or COMLEX Step 1, to train at a PGY2 level, must have a passing score on Step 2.  To participate in graduate medical training at a third-year level or higher, the licensee must secure a passing score on the USMLE Step 3 or COMLEX Step 3.  If an individual is scheduled to go into a second or third-year level of graduate medical training and is awaiting his/her results, the individual may not begin training at a second or third year level until the individual has notified the state licensing Board that Step 2 or 3 has been passed and the Board has issued the appropriate license.  An individual cannot advance academically to the next level of training nor function clinically at a more advanced level until he/she has met the requirements and obtained the training license for that level.

5.  Step 3 of the USMLE or COMLEX should be passed no later than 120 days before the end of the PGY 2 academic year or earlier at the discretion of the Program Director.  If passage of Step 3 is being required earlier, it should be included in the Residency Program Manual which is provided to the resident by the program at the beginning of the academic year.  The Program Director should notify the resident of intent not to renew the contract based upon the program's requirement for the next academic year due to non-passage of USMLE or COMLEX Step 3.

6.  The Office of GME will authorize issuance of a Certificate of Completion from the program only after all academic years of the program and all criteria noted in GME 12 and 26 have satisfactorily been completed.

7.  The National Provider Identifier (NPI) is a unique 10-digit identification number used in the administrative and financial transactions adopted under the Health Insurance Portability and Accountability Act (HIPAA). The NPI is required. Once assigned, a health provider's NPI is permanent - it remains with the provider regardless of job, specialty, or location changes. The use of and reliance on this identifier is of paramount importance under the Affordable Care Act and required by the ACGME.

8.  The ACGME believes that the NPI is a more robust, reliable identifier than those used for residents and fellows in the past. These NPIs are now mandatory in ADS for new residents and fellows beginning July 2015 as the aim is to make the NPI number the ACGME primary physician identifier by 2017.

**GME 12:   SPECIFIC POLICIES**

**POLICY:**

It is the policy of HUH and DUCOM that all house staff will abide fully with the contract, policies and procedures, and the Rules and Regulations of the Hospital.  Non-compliance may lead to disciplinary action and/or dismissal from the GME program.  House staff members are full time employees of HUH.  HUH does not employ house staff in part time positions.

**PROCEDURES:**

1.  <u>PGY Level</u>: The PGY level in the GME training program will be determined by the Program Director and Office of GME based upon the level of educational training (level of training license and contract) not by years of previous experience.

2.  <u>Duration of Contract</u>:  All house staff education contracts are 52 weeks (plus orientation) in duration.  Any time missed due to illness, disciplinary action, pregnancy, leave of absence, etc., must be appropriately remediated to be considered a full academic year for the purpose of credit or certification.  No one will receive credit for completion of the academic year until all 52 weeks have been satisfactorily completed or accounted for by the Program Director and the Office of GME.

3.  <u>Length of Training Program</u>:
    a.  In order for a resident to complete an ACGME, CODA or CPME residency training program and receive a certificate of completion, he/she must have the total number of years required by the ACGME, CODA or CPME for that program.
    b.  Each year is distinct, separate and progressive and must match the Commonwealth of Pennsylvania training license and the HUH House Staff Employment Agreement.
    c.  A year is defined as 12 months with vacation. Vacation <u>cannot</u> be accumulated or used to shorten the period of training.
    d.  For purposes of the house staff accounting, "business days" means Monday through Friday and "calendar days" include Saturday and Sunday.
    e.  Any academic time missed must be remediated in order for the academic year to be completed.
    f.  A year of the program may be waived only if the Board of that specialty gives credit for previous experience in writing prior to that year being waived and it is approved in advance by the GMEC as well as the RRC of the ACGME, CODA or CPME.
    g.  While sitting for a Board may be allowed after a total number of months in a training program, the total months do not necessarily constitute completion of the program.
    h.  If a resident starts off-cycle, the resident will complete the program off-cycle.

4.  <u>Final Year of Program</u>: The last year of the program must be a full year as defined in # 2 above and according to the ACGME, CODA or CPME program requirement.  (Example:  For a 4 year program, the resident must spend the last 12 months as a PGY 4 as per both the   training license and contract.)

5.  <u>Orientation</u>: House staff members are required to participate in orientation prior to the start of the training program and are paid accordingly.

6.  <u>House Staff Cooperation</u>: House staff will cooperate with the Office of GME by providing, in a timely manner, all information necessary and required to process, on the house staff member's behalf, a request to the Commonwealth of Pennsylvania for a graduate training license as appropriate and all other administrative requests, including recording and monitoring of work hours.

7.  <u>Training Licenses</u>: House staff members are always working under the Commonwealth of Pennsylvania medical training license. (Exceptions are OMFS and Podiatric Surgery.) House staff will notify the Office of GME in writing immediately if house staff member's medical license is denied, revoked or otherwise restricted or if an application for a temporary license is denied. The house staff member acknowledges and agrees that any revocation, restriction or denial of his/her training license or temporary license shall cause the House Staff Employment Agreement Contract to cease and the house staff member will be terminated automatically.

8.  <u>Level of Work</u>: Housestaff may only work at the level listed on the training license and contract, not at any level above.

9.  <u>Supervision of House Staff</u>: Whether on a training or unrestricted license, house staff always work under the direction and supervision of an attending physician. The level of supervision for all house staff  who care for patients must be assigned by the Program Director are:

a. <u>Direct</u>- supervising physician is physically present.
b. <u>Indirect</u>- direct supervision immediately available or immediately available by telephone or electronic modality
c. <u>Oversight</u>- review of procedure/encounter with feedback provided after care is delivered.

PGY 1 residents should be supervised either directly or indirectly with direct supervision immediately available. House staff must communicate directly with the supervising attending physician when transferring a patient to the ICU or end of life decisions.

10. <u>Transition of Care (Hand-over) Policy:</u>  Program Directors must design clinical assignments in such a way as to minimize the number of transitions in patient care. The GMEC, through the Annual Program Evaluation and Annual Program Review process, will monitor each program's hand-over processes to facilitate both continuity of care and patient safety. Programs must evaluate each resident on his/her competency in communicating with team members in the handover process. Each program must ensure the availability of its schedules that inform members of the health care team of attending physicians and residents currently responsible for each patient's care.

11. <u>Required Annual PPDs</u>: House staff are required for each year after their first academic year to have a PPD annually. This is to be completed by March 31st  of each year.

12. <u>Professional Behavior</u>: House staff members agree to comply with the requirements of the GME program and the Hospital. House staff are expected to work with all Hospital personnel (physicians, nurses, administration, ancillary health personnel, Coordinators, housekeeping, etc.) in a cordial and professional manner and to dress appropriately (GME 28).

13. <u>Reappointment and Non-Reappointment of House Staff</u>: House staff members who have July 1 appointments will be notified in writing by the Program Director and/or the Office of GME by the last day of February of the preceding year (at least 120 calendar days in advance) if his/her services are not to be renewed for the next year of a given residency training program (not the preliminary year).  The preliminary year is a one-year contract only.  Those house staff who are off cycle and whose services will not be renewed at the end of a given contract year will be notified in writing at least 120 calendar days in advance of the non-renewal.  Upon satisfactory completion of an academic year, the Program Director will submit a recommendation for advancement to the next academic year.  The house staff member may use the appeal procedures outlined in GME 17 if he/she has received a written notice of intent not to renew his/her house staff employment agreement.

14. <u>House Staff Resignation</u>: House staff have an obligation in the matter of resignation.  Except in case of resignation for health or other reasons beyond the control of the house staff member, it is expected that he/she will continue to serve the full term of his/her appointment.

15. <u>Notification of Corrective Measures</u>: Whenever it becomes apparent that a house staff member is not achieving satisfactory standards of performance, the deficiencies should be brought to his/her attention at the earliest time in order to assist in the development of corrective measures.

16. <u>Prohibit Work Stoppage</u>: House staff may not engage in any strike, work stoppage, slowdown, illegitimate sick days or similar negative action or inaction that would directly or indirectly impact upon the care of patients or Hospital operations.

17. <u>Disciplinary Action</u>: House staff may be disciplined or discharged for cause as set forth in GME 14.

18. <u>Following of Directions</u>: House staff must follow the directions of the department staff, attending physicians, Program Director, Program Director designees, Chairpersons, Chief GME Officer (DIO), Associate Dean for GME or Director of GME , and all administrative persons responsible for the conduct of his/her GME training program.

19. <u>Sleep or Rest Quarters</u>: Sleep or rest quarters will be provided when the house staff member is tired or required by the program to be physically present overnight at the Hospital. Such quarters are to be occupied only at those times when the house staff member is scheduled for oversight duty or is allowed to rest per the Program Director. Sleep or rest quarters are never to be used as a residence or office. (See GME 19)

20. <u>Physical Examination and Drug Screening</u>: One free physical examination, post offer must be completed prior to the commencement of employment. The Hospital will reasonably accommodate any disabilities of the house staff member that affect his/her ability to perform the essential functions of his/her position.  Pre-employment testing by Employee Health will include testing for all drugs (both prescription and non-prescription).  Prior to such testing, there must be complete disclosure of any and all medications being taken, as well as the submission to Employee Health of any and all prescriptions for such medications.  House staff members must disclose in confidence to the Chief GME Officer or Director of GME  if he/she is being monitored in Pennsylvania or any other state for drug and/or alcohol abuse.  The use of any prescription medication without a current prescription or non-reporting of drug/alcohol monitoring may be grounds for rescission of an employment offer or dismissal from the program.

21. <u>Guidance Resource</u>: House staff members are eligible for the Hospital's Guidance Resources which provides access to confidential counseling, medical and psychological support services. The contact number is 1-800-697-0353 or 844-416-1158.

22. <u>House Staff Impairment</u>: The Office of GME and Human Resources will coordinate assistance for those who may have abusive alcohol or drug problems, whether it be use, possession or distribution of alcohol or drugs or disruptive behavior. The abusive use of alcohol and other drugs has a corrosive effect on the capacity and performance of house staff and is prohibited.  If a Program Director suspects that a house staff member is abusing alcohol or drugs, a screening by Employee Health may be requested to the Chief GME Officer or Director of GME . Physicians identified as affected by substance abuse will be referred to the Pennsylvania State Medical Society's Physician's Health Programs (PHP) for remediation.  If a house staff member is already in a drug treatment or monitoring program in Pennsylvania or another state, this must be reported in confidence to the Chief GME Officer or Director of GME .  The house staff member must complete an Employee Monitoring Agreement and remain under the monitoring of PHP throughout the training program. If a house staff member has disruptive behavior, the individual may be referred to PHP for evaluation. The Office of GME will follow the recommendations of PHP and the house staff member must follow all the stipulations set forth by PHP. Non-compliance with this policy is grounds for disciplinary action including termination of employment. The house staff member should refer to the HUH Employee Handbook or speak with the Chief GME Officer or Director of GME for more specifics.

23. <u>Residency Closure/Reduction Policy</u>:  Any decision to reduce the size or close an existing house staff training program is considered to be serious action that must receive approval of the GMEC, the Medical Executive Committee and the HUH Board of Governors and will be conducted in accordance with the procedures outlined in the American Medical Association's Graduate Medical Education Directory:  "If an institution intends to reduce the size of a residency program or to close a residency program the institution should inform the residents as soon as possible.  In the event of such a reduction or closure, institutions should make every effort to allow residents already in the program to complete their education.  If any residents are displaced by the closure of a program or in the reduction in the number of residents, the institution should make every effort to assist the residents in identifying a program in which they can continue their education."

24. <u>Paychecks</u>: House staff will receive a paycheck on every other Friday. Direct deposit to a financial institution of choice is offered to house staff with a copy of the deposit available online. Direct deposit is highly encouraged and recommended. House staff are encouraged to review their paystubs regularly to check for accuracy. If a house staff member has a discrepancy regarding their paycheck, they should contact the Director of GME immediately. Once discovered, any overpayments will be deducted from the upcoming paychecks until the full amount has been recovered. If the overpayment is discovered post-graduation, the house staff member is responsible for repaying the funds in the full amount within 30 days of first notice. If full payment is to receive within 30 days, the GME Office will not complete any training verifications for or on behalf of the house staff person.

25. <u>Insurance</u>:  House staff are provided with professional liability insurance at limits which are not less than mandated by the Pennsylvania HealthCare Services Malpractice Act of 1976 for the services performed by house staff in performing his/her duties under the Program.  This coverage will provide legal defense and protection against claims arising while participating in the program, including claims not reported or filed until after completion of graduate medical education. The house staff member must realize and recognize that such professional liability insurance covers only (a) those activities and services within the scope of the house staff duties under the program as defined by the Program Director at or for University and Hospital, (b) only those activities at the level of training per the training license and contract, and (c) those outside activities and services at another facility when specifically approved in writing by the Program Director and Chief GME Officer (DIO).  House Staff member agrees to cooperate fully with University's and the Hospital's insurance company in the defense of any liability claims asserted against University or Hospital, the house staff member, the teaching staff, or any member of the Hospital's attending staff.  Insurance does not cover house staff for moonlighting. (GME 18)

26. <u>Preliminary Year</u>:  The preliminary year is a one-year program only.  The year is designed as a prerequisite toward entry into a residency training program or experience prior to entering a categorical program.  As a one year program, the preliminary year is not subject to the 120-day notification of non-renewal.

27. <u>Equal Employment Opportunity Policy</u>:  All house staff members are entitled to equal employment opportunities by the Hospital which will not discriminate against employees or applicants for employment on the basis of race, religion, color, national origin, age, gender, ancestry, Vietnam veteran status or sexual preference.  Furthermore, no otherwise qualified handicapped individual shall solely by reason of his or her handicap be subjected to discrimination. As required by law, reasonable accommodations will be made for qualified house staff with disabilities.

28. <u>Harassment Policy</u>:
    a.  HUH is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age, religion, sexual orientation or any other legally protected characteristic will not be tolerated.  As an example, sexual harassment (both overt and subtle) is a form of employee misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and it is strictly prohibited.
    b.  Sexual harassment is a violation of Section 703 of Title VII of the U.S. Civil Rights Act, as amended, Section 5(a) of the Pennsylvania Human Rights Act, and other local, state, and federal laws.
    c.  A house staff member who encounters an incident of alleged sexual or other unlawful harassment should promptly report the matter to his or her supervisor.  If the supervisor is unavailable or the employee believes it would be inappropriate to contact the supervisor, the employee should immediately contact the Human Resources Department or the Office of GME.  House staff members may raise concerns and make reports of unlawful harassment without fear of reprisal.
    d.  Anyone engaging in sexual or other unlawful harassment will be subject to corrective action, up to and including termination of employment.

29. <u>Non-competition</u>: Neither Hahnemann University Hospital nor Drexel University College of Medicine and its accredited graduate medical education programs will require a resident/fellow to sign a non-competition guarantee or restrictive covenant.

30. <u>Food and Drink</u>: Hahnemann University Hospital is committed to providing a professional, safe, and sanitary environment for patients, staff, and visitors. In order to maintain this commitment, the consumption and storage of food and drink by staff is prohibited in all patient care areas including the OR, ED, and while rounding on patients.

    While at Hahnemann, meals, snacks, and beverages may be enjoyed in the cafeteria, faculty dining room, rooms booked for catered events, or in departmental conference rooms, lounges, and offices which are out of public view. Please refer to policy 3.043 Food Control for details.

31. <u>Overview of House Staff Benefits</u>: Benefits for house staff are provided according to the following overview of house staff benefits.

**Health Insurance**
Health benefits become effective on the first day of hire which is usually the first day of orientation. Deductions for health benefit premiums are post tax prior to the 31st day of employment. After the 31st day of employment, deductions for health benefit premiums are pre-tax/ Health insurance can also be purchases for domestic partners.

In order to comply with the IRS nondiscrimination testing rules, AAHS is required to impute the full premium amount for the first 30 days as income based on the benefit coverage tier (i.e. EE Only, EE+Spouse, EE+Child(ren) or EE+Family). The amount will appear as an off-set in the earnings and deductions section of the paycheck.  This is a one-time occurrence that will affect net-pay since it is a taxable amount.

It is important to note that house staff must contact My Benefits Hotline (1-855-474-1128) immediately after a lifestyle change. Examples include: marriage, divorce, and immediately after the birth of a child. Failure to make the change/addition within 30 days after the event will result in not having medical coverage for the change/addition. Missing this deadline will require waiting until the next enrollment period. Medical coverage during open enrollment becomes effective January 1st of the following year.

**Malpractice Insurance**
House staff occurrence-based malpractice insurance for the full time of employment only while engaged in activities necessary for the competition of the residency. Those house staff are covered for claims after completion of the program. Any work outside the scope of residency program ("Moonlighting") requires separate malpractice insurance.

**Prescription Drug Coverage**
Prescription drug coverage is included with each Tenet Select medical option and is only available if a medical option is chosen.

**Vision**
House staff will be required to contribute toward the premium.  Contributions are deducted on a pre-tax basis.

**Dental Insurance**
House staff will be required to contribute toward the premium.  Contributions are deducted on a pre-tax basis.

**Life and Personal Accidental Insurance (Pal)**
In addition to the basic life insurance paid by the hospital, supplemental life insurance may also be purchased equal to 1, 2, 3, or 4 times the annual benefit pay.

**Paid-time-off**
House staff members will receive 30 days off (Monday through Friday) with pay per contract year.  Twenty (20) days can be allocated as sick leave, vacation, or educational time. There are seven (7) paid holidays that are observed: New Years' Day, Martin Luther King, Jr. Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Additionally, three paid days off are available for administrative or educational leave. If a house staff person is scheduled to work on a designated HUH observed holiday, a floating holiday must be added to their Paid Time Off Days to be used at another time during the contract year. A doctor's note is required when taking more than five continuous sick days.  Time off must be scheduled and approved by the Program Director.

If a program gives permission for a house staff member to exceed the 30 PTO days (23 plus 7 holidays) with pay for any reason, the program is responsible to pay HUH for the salary, benefits, and malpractice costs accrued during the period for which there is no reimbursement.

**Manager's Disability Plan (Physician Certification Required)**
This plan replaced the long-term disability and salary continuation plans. It includes short-term disability coverage that provides income replacement after 30 days of being unable to work. House staff members must purchase disability coverage in order to receive short-term disability coverage at no additional cost.

**Other Benefits**
- Meal allowance when on-call
- Lab Coats
- Guidance Resources
- Life Support Training (BLS, ACLS, ATLS, etc.)
- Free Parking while on duty at HUH
- 401(k) Plan –AAHS matches 50% of up to 6% of employee contribution
- Social events
- Payment for attending Orientation
- MT license renewals (one renewal per PGY level, house staff responsible for initial MT license)
- Educational Stipend ($500/year)
- Research Funding for presenting at National Meetings and Professional Conferences
- Educational seminars
- Saris Award- grant for child care support

**\*Benefits are subject to amendment at anytime.**

**GME 13:  HOUSE STAFF MEMBERS' PARTICIPATION IN EDUCATIONAL ACTIVITIES AND FACULTY EVALUATIONS**

**POLICY:**

DUCOM ensures that house staff members have the opportunity to foster continued professional growth and to participate in safe, effective, and compassionate patient care under appropriate supervision.  House staff members are to participate in educational and scholarly activities of their program and may participate on institutional committees whose actions affect their education.  House staff members must have annual, confidential, written evaluations of the faculty and the educational experience.

**PROCEDURES:**

DUCOM GME Programs ensure that house staff members achieve the following:
1.   Develop a personal program of learning that fosters continued professional growth with guidance from the teaching staff.

1.   Participate in safe, effective, and compassionate patient care under supervision, commensurate with their level of training license, achievement and responsibility.

2.   Participate fully in the educational and scholarly activities of their program as required and assume responsibility for teaching and supervising other house staff members and medical students.

3.   Participate on institutional committees and councils whose actions affect their education and/or patient care.

4.   Submit to the Program Director at least annually, confidential and anonymous written evaluations of the faculty and of the educational experiences.
    a.   The house staff members will evaluate the clinical faculty annually. The house staff member's evaluation of the faculty is integral to the Program Director's evaluation of the faculty as it relates to the ongoing evaluation of the GME Program.
    b.   The evaluations are based on the ability of each faculty member as a clinician/teacher, their instruction based upon the goals and objectives of the rotation and in the quality of their performance by the Program Director and the Department Chairperson on their academic pursuits such as accepted articles in peer reviewed journals, chapters in books and research.
    c.   The results of the faculty evaluations will be used as feedback to improve instruction by the clinical faculty.

**GME 14:  CORRECTIVE AND DISCIPLINARY ACTIONS**

**POLICY:**

HUH and DUCOM recognize that the Program Directors, Department Chairs, Hospital administration, and the Chief GME Officer and Director of GME  have authority to take corrective and/or disciplinary action against a house staff member for academic, behavioral, or clinical care issues as well as issues relating to terms and conditions of employment. This policy establishes the standards and procedures that will be followed by the Hospital and DUCOM when initiating corrective and disciplinary actions against a house staff member.

Under this policy, there are two categories of corrective and/or disciplinary action:

(1)   <u>Academic Action</u>: A corrective or disciplinary action is considered to be an "Academic Action" whenever it involves the house staff member's academic or clinical performance in the GME program. Academic Actions are initiated and processed by DUCOM.  Academic Action is determined by the Program Director who oversees the GME program.  Examples of matters that are considered Academic Action include, but are not limited to:

    a.   Failure to meet academic or educational requirements and expectations for house staff members

        i.    Failure to meet patient care needs appropriately
        ii.   Not achieving adequate level of medical knowledge
        iii.  Unprofessional behavior
        iv.   Not communicating with staff, colleagues or patients appropriately
        v.    Failure to comply with systems based practice
        vi.   Failure to achieve competency in practice based learning
        vii.  Dishonesty

    b.   Use of inappropriate clinical judgment
    c.   Not meeting scholarly activity expectations of program
    d.   Not teaching medical students appropriately
    e.   Failure to comply with the program's administrative requirements such as data collection, reporting, etc.

(2)   <u>Employment Action</u>.  A corrective or disciplinary action is considered an "Employment Action" whenever a house staff member engages in, makes or exhibits acts, statements, demeanor or professional conduct, either within or outside the Hospital, which is, or is reasonably likely to be, detrimental to patient safety or to the delivery of quality patient care, disruptive to the Hospital's operations or an impairment to the community's confidence in the Hospital, and/or is non-compliant with the policies and regulations of either the Hospital and/or DUCOM's GME program.   Employment Actions are initiated and processed by the Hospital.  Examples of matters that are considered Employment Actions include, but are not limited to:

- Disruptive behavior
- Engaging in illegal discrimination or harassment
- Breach of patient confidentiality
- Criminal activity of any sort
- Use, possession, or distribution of drugs or alcohol in the workplace
- Working under the influence of drugs or alcohol
- Reckless endangerment of life, limb or property
- Violent or aggressive behavior –bullying
- Theft of hospital materials, supplies or property
- Unprofessional behavior
- Altering medical records
- Dishonesty
- Inappropriate or non-recording of duty hours

**PROCEDURES:**

1.   All Hospital or DUCOM physicians, faculty, staff and administrators who have concerns about the academic or employment performance of a house staff member should notify the Program Director, Chief GME Officer (DIO) or Director of GME .  The Program Director and the GME Office will promptly notify each other of concerns that are received about a house staff member.

2.   For any severe incidents (academic, behavioral or clinical) involving a house staff member, the following individuals or offices will be notified of the incident as well:

    a.   Program Chair
    b.   Associate Dean for GME
    c.   Vice Dean for Educational Affairs

  d. Director of Human Resources at HUH
  e. HUH Legal Department
  f. DUCOM General Counsel's Office

3. The first step in any corrective or disciplinary action is to determine if the problem is an Academic Action or an Employment Action or both.  This determination is made initially by the Program Director or GME Office Chief or Director who initiates.  In cases where there is question about how to classify the action, the Associate Dean for GME and the Chief GME Officer (DIO) will be consulted and determine how the action should be classified.   This determination will dictate which process will be followed.

4. The steps to be utilized for Academic Actions are set forth in Appendix A and for Employment Actions in Appendix B.

5. <u>Corrective Action</u>.  Ordinarily, corrective action is a process intended to inform the house staff member of deficiencies in academic, behavioral or clinical care performance in order to provide the house staff member with an opportunity to correct such deficiencies before more serious disciplinary action is instituted.

  a. <u>Single Complaint</u>:  Corrective Actions for Academic Actions are determined by the Program Director and for Employment Actions by the Chief GME Officer or Director of GME .  These informal early interventions should be conducted in private and are designed to correct and remediate a problem as early as possible.  Corrective actions are intended as an educational experience aimed at improving the house staff member's performance in a particular area.  All proceedings should be documented and kept in the house staff member's permanent department file or GME Office file in accordance with this policy.

  b. <u>Multiple Complaints and/or Severe Complaint</u>:  A more formal counseling session should be conducted whenever more than one complaint or a single severe complaint has been received regarding a house staff member who reflects either a pattern of unacceptable behavior or action or a severe complaint.  The Program Director should report to the Chair of the Department and review the problem and discuss strategies for improvement as well as outlining a time period for such improvement.  The Office of GME should be informed that there is a problem.

  c. <u>Acceleration of Disciplinary Process</u>.  For multiple complaints or single complaints of a severe nature, the Program Director or the GME Office may elect to skip the Corrective Action step and proceed immediately to Disciplinary Action.

  d. All proceedings must be documented and kept in the house staff member's permanent department file.

6. <u>Disciplinary Action</u>.  Disciplinary Action can be imposed when previous Corrective Actions have failed to adequately remediate deficiencies in academic, behavioral or clinical care performance when more then one Corrective Action has previously been taken against a house staff member; or when a single severe incident has been reported.

Disciplinary Action may take one or more of four forms:
a. Written Reprimand
b. Suspension without pay
c. Termination
d. Other penalty or sanctions

  (a) <u>Written Reprimand</u>:  A reprimand will be a written warning to the house staff member stating that his/her behavior does not meet expectations.  This letter will state the deficiencies for which the house staff member is being reprimanded.  It shall further provide the duration of the reprimand; what, if any, assistance may be made available to help the house staff member in meeting expectations; detail the mechanism of evaluation to determine improvement and inform the house staff member of the potential consequences if expectations are not met.  A letter of reprimand should be taken seriously as an official warning which allows the house staff member an opportunity to correct behaviors during the period noted.  If the behavior is not corrected, the house staff member's conduct could ultimately result in his/her suspension or termination.

  (b) <u>Leave or Suspension without pay</u>:  A  leave or suspension period without pay may be imposed by the Program Director or the Chief GME Officer (DIO).  Time off will not be credited towards the completion of the residency experience and may result in temporary suspension of the right to practice medicine in the Commonwealth of Pennsylvania.  This action will become part of the house officer's permanent record at the State Licensing Board, an event which must be reported on all future applications and verifications for training, licensure, or hospital privileges.  If at the end of this suspension designed to resolve the matter, the Chief GME Officer (DIO) (for Employment Actions) or the Program Director (for Academic Actions) may extend the suspension without pay or progress to a termination.

  (c) <u>Termination</u>:  A termination constitutes that action taken by the Hospital or DUCOM, through the Program Director (for Academic Actions) or Chief GME Officer (DIO) (for Employment Actions), by which the house officer is entirely and

irrevocably relieved of his/her responsibilities within the Hospital and dismissed from the residency program.  After the date of the termination, the house officer will no longer be a resident in the DUCOM program or an employee of the Hospital.  All salary and other employment benefits shall cease immediately on the date of termination.

    (d)   Other Penalty or Sanctions:  As determined by the Program Director (for Academic Actions) or Chief GME Officer (DIO) (for Employment Actions).

7.    The following individuals must be notified of any Disciplinary Action regarding a house staff member:
    a.   Program Director
    b.   Department Chair
    c.   Chief GME Officer (DIO) in the Office of GME
    d.   Associate Dean for GME
    e.   Vice Dean for Educational Affairs
    f.   Hospital Chief Human Resources Officer

8.    All disciplinary action must be reported to the GMEC.

11.    Retention of Records: All materials related to a Disciplinary Action and Disciplinary Action proceedings will remain in the house staff member's GME Office and department files and will be reported accordingly where required by the State and when release of information is granted by the house staff member.  All Disciplinary Action obligations must be fulfilled before the house staff member will receive the official certificate of completion of training.

12.    The ACGME has an Office of Resident Services to deal with resident issues and concerns. (312) 755-7119.

**APPENDICES:  Flow Charts for Corrective and Disciplinary Actions**

**A.  Academic Actions**

Sequence:

1.    Problem identified by Program Director

2.    Corrective Action:  Program Director attempts to correct internally by

    a.   Written feedback to house staff member;
    b.   Written Corrective Action Plan put into effect;
    c.   Warning and Departmental Probation:  A warning and departmental probation is a form of Corrective Action and will be in writing to the house staff member.  This letter will state the deficiencies for which the house staff member has been counseled and given warning.  It shall further state a period of time of probation; what, if any assistance may be made available to help the house staff member in meeting expectations; detail the mechanism of evaluation to determine improvement; and inform the house staff member of the possible consequences if expectations are not met.  A warning letter should be taken seriously as it allows the house staff member an opportunity to correct behaviors during the period of probation.  If the behavior is not corrected, the house staff member's conduct and behavior could ultimately result in Disciplinary Action with reprimand, suspension or termination.  Warning and departmental probation files are kept in the department only and are not reportable unless Disciplinary Action, noted below, is warranted; and/or
    d.   Other penalty or sanction as determined by the Program Director.

3.    If issue is resolved to satisfaction of the Program Director, the matter goes no farther. If not resolved in the department or repeats, Disciplinary Action may be taken by the Program Director.

4.    Only Disciplinary Action, not Corrective Action, may be appealed by the house staff member per GME 17.  Corrective Action may be grieved by the house staff member by following the appeal process noted in #6 below.

5.    Disciplinary Action at level of Department – Program Director may impose any of the following:

    a.   Written reprimand
    b.   Leave/Suspension without pay
    c.   Termination
    d.   Other disciplinary penalty or sanction as determined by the Program Director.

6.  Corrective Actions may be grieved by the house staff member to the Department Chair first and, if not satisfied with the decision, may be further grieved to the Associate Dean for GME and then to the Dean if necessary.  The decision of the Dean is final and concludes the grievance process.

7.  Disciplinary Actions may be appealed by the house staff member per the process outlined in House Staff Manual - Policy and Procedure GME 17.

8.  The implementation of a Corrective or Disciplinary Action will not be stayed or halted merely because the action is being grieved or appealed by the house staff member.

9.  All proceedings must be documented and kept in the house staff member's file.

**B.  Employment Actions**

Sequence:

1.  Problem identified by Hospital personnel.

2.  Corrective Action:
    a.  Hospital attempts to correct internally by Chief GME Officer or Director of GME , meeting with house staff member to understand problem and give feedback
    b.  Written Corrective Action Plan put into effect
    c.  Department Program Director and Chair notified
    d.  Associate Dean for GME notified
    e.  House staff member may be given written Warning
    f.  If issue resolved, goes no farther.  If not resolved or house staff member repeats, Disciplinary Action is required.

3.  Disciplinary Action at level of Office of GME – any of the following:
    a.  Written reprimand
    b.  Leave/Suspension without pay
    c.  Termination
    d.  Other disciplinary sanction as determined by a Chief GME Officer or Manager of GME .

4.  Only Disciplinary Action, not Corrective Action, may be appealed by the house staff member per process in the AAHS Fair Treatment Process outlined in the HUH Employee Handbook.  House staff members are encouraged to use the Hospital's Open Door Policy to discuss any problems, concerns or disputes regarding Corrective Action.

5.  Final recommendation made by the Fair Treatment Committee and sent to the Hospital CEO.

6.  Final decision by the Hospital CEO with a copy to the Chief GME Officer (DIO), Associate Dean for GME and Dean.

7.  End point:  If house staff member is not satisfied with final decision by the Hospital CEO, then house staff member may pursue Final and Binding Arbitration by the American Arbitration Association using steps as noted in the HUH AAHS Employee Handbook

**GME 15:  TEMPORARY ADMINISTRATIVE LEAVE**

**POLICY:**

Temporary Administrative Leave is not a punitive action and is used as a "time out" for investigative purposes. Both HUH and/or DUCOM reserve the right to temporarily suspend a house staff member from academic or clinical responsibilities in order to enforce compliance with either/or both the clinical and educational duties of being a house officer. This leave allows for an internal investigation into allegations pending initiation of Corrective Action or Disciplinary Action.

**PROCEDURES:**

The period of Temporary Administrative Leave should normally be no longer than necessary for the completion of an investigation or the house staff member has remediated the misconduct.

The decision to impose a Temporary Administrative Leave is made by the Program Director or Associate Dean for GME for Academic Actions and by the Chief GME Officer or Director of GME  for Employment Actions. The period of Temporary Administrative Leave should not ordinarily exceed thirty (30) calendar days. However, the Associate Dean to GME, the Dean and Chief GME Officer may determine to extend the Temporary Administrative Leave when awaiting a recommendation or solution to a problem.

The GME Office shall determine whether the period of Temporary Administrative Leave will be with or without pay.

Any academic time missed due to Temporary Administrative Leave will need to be remediated in order for a house staff member to complete his/her graduate medical education training program.

**GME 16:  GRIEVANCES**

**POLICY:**

HUH and DUCOM assure an educational environment in which house staff members may raise and resolve issues or complaints and can have grievances without fear of intimidation or retaliation applicable to their GME programs.

**PROCEDURES:**

1.  <u>Academic Matters</u>.  Should a house staff member have a complaint or grievance against the program or DUCOM concerning an academic or clinical matter, the house staff member shall first submit a written grievance to his or her Program Director within thirty (30) calendar days of the occurrence of the matter being grieved. If the grievance is not resolved by the Program Director to the satisfaction of the house staff member within twenty (20) business days after its submission, then the house staff member may appeal in writing to the Department Chair.  If the grievance is not resolved by the Department Chair to the house staff member's satisfaction within twenty (20) business days after the appeal is submitted, then the house staff member may appeal in writing to the Associate Dean for GME.  The Associate Dean for GME will make a decision on the appeal within fifteen (15) business days of receipt.  The decision of the Associate Dean for GME will be sent to the Vice Dean for Educational Affairs for the final decision within DUCOM on the grievance.

2.  <u>Employment Matters</u>.  Non-academic actions of employment, including, but not limited to salary, benefits, insurance, discrimination and sexual harassment shall be adjudicated through the AAHS Employee Fair Treatment Process as detailed in the House Staff Employment Agreement, House Staff Manual and HUH Employee Handbook.  House staff members are encouraged to use the Hospital's Open Door Policy to discuss any problems, concerns or disputes regarding Corrective Action.

3.  <u>Confidentiality</u>.   Grievance proceedings shall be considered confidential and not disclosed by the Hospital and DUCOM except to persons with a need to know or to respond to the house staff member's disclosure of the proceedings.

**GME 17:  APPEALS OF DISCIPLINARY ACTIONS AND NON-REAPPOINTMENT**

**POLICY:**

Appeals of Disciplinary Actions imposed by HUH or DUCOM shall use the procedures set forth in this policy.

**PROCEDURES:**

1.  <u>Appeal of Academic Actions or Non-reappointment Decisions</u>:  The following is the institutional procedure to be used for appeals by a house staff member of Actions imposed pursuant to GME 14 or for the appeal of a decision to non-renew a house staff member's appointment in the program:

    a.  In order to commence an appeal of an Academic Action or non-reappointment, the house staff member must submit a signed written request (not e-mail) for an appeal of the decision to the Department Chair within fifteen (15) business days from receipt of written notification of the Disciplinary Action or notice of non-reappointment.  The house staff member's written request must include a full and detailed explanation of the reason(s) why the decision should be reversed.

    b.  The appeal shall be submitted to an Ad-Hoc Departmental Hearing Committee (Ad Hoc Committee).  The Ad Hoc Committee will be appointed by the Department Chair and shall consist of two (2) members of the teaching faculty from the house staff member's department, and one (1) senior house staff member from the program.  The Committee shall elect a member from the group to preside at the hearing.  A house staff member may challenge the appointment of a member of the Ad Hoc Committee by proving to the Department Chair that the member has actual bias or prejudice against the house staff member.  If the Department Chair determines the challenge is merited, he or she shall appoint another member to serve on the Ad Hoc Committee.  However, the mere fact that an Ad Hoc Committee member has previously worked with, supervised or evaluated the house staff member shall not prove adequate grounds for removal of an appointed member.

    c.  The Committee shall convene the hearing within twenty (20) business days of the house staff member's written request and shall notify the house staff member in writing of the date, time and place for the hearing as soon as reasonably possible, but not less than seventy-two (72) hours in advance of the hearing unless the house staff member shall waive such requirement in writing.

    d.  The house staff member and his or her Program Director or designee shall have the opportunity to be present at the hearing and each shall present such information or materials (oral or written) as they wish to support their case.  Each party may also request that witnesses be permitted to present information to the Ad Hoc Committee.  Such requests must be made by submitting to the Chair of the Ad Hoc Committee at least twenty four (24) hours prior to the start of the hearing a written list of the proposed witnesses and a description of the information the witnesses are expected to provide.  The Ad Hoc Committee shall rule on such requests and may, on its own initiative, request the attendance of other persons to give information.  However, the Ad Hoc Committee has no authority to compel the attendance of any witnesses.  The Ad Hoc Committee may limit introduction of documents or information by the parties or witnesses on grounds of relevancy, repetition or for other good cause.  Parties shall be present at all times during the hearing but are not permitted to directly question each other or witnesses during the hearing.  The Chief GME Officer (DIO) will be present to advise the Chair of the Ad Hoc Committee and to ensure the process is followed.  No other representatives for the parties shall be present during the hearing.  Unless the Ad Hoc Committee rules otherwise, each party must submit all written documents it wishes to present at the hearing to the Chair of the Ad Hoc Committee at least twenty-four (24) hours prior to the start of the hearing.  Each party shall be permitted to review all materials submitted to the Ad Hoc Committee prior to and during the hearing.  No party shall be permitted to make a recording or transcription of the hearing.  The Ad Hoc Committee may adjourn a hearing to a later date(s) if it determines such action is necessary in order to permit a full presentation of information on the appeal.  Any and all procedural matters arising before or during the hearing will be determined by majority vote of the members of the Ad Hoc Committee.

    e.  A majority vote of the Ad Hoc Committee shall decide the issue(s) before it.  The Ad Hoc Committee shall render a decision affirming, reversing, or modifying the action appealed.

    f.  No party shall be allowed to vote or to participate in the Ad Hoc Committee's deliberations.

    g.  Regardless of the outcome of the hearing, the Ad Hoc Committee will provide the house staff member and Program Director with a written statement of its decision and the reason(s) for such decision within ten (10) business days from the date of the conclusion of the hearing.  If written materials are submitted to the Ad Hoc Committee, such materials shall be appended to the Ad Hoc Committee's report.

    h.  The house staff member or Program Director may appeal the Ad Hoc Committee's decision to the GMEC within ten (10) business days of receipt of the Ad Hoc Committee's decision by written notification to the Associate Dean for GME specifying the reason(s) for the appeal.

    i.  The Associate Dean for GME or, in his or her absence, the Chair of the GMEC, will appoint a GMEC Sub-committee ("Sub-committee") to be convened to evaluate any such appeal.  This Sub-committee shall consist of three graduate medical education training Program Directors and two senior house staff members from programs other than the program involved in the appeal.  The Sub-committee shall elect a member from the group to act as chair.

j.  The Sub-committee shall review the findings of the Ad-Hoc Departmental Hearing Committee and may, at its option, request the house staff member, the Program Director, and any other persons it deems necessary to appear before the Sub-Committee or to provide additional written information or documents to the Sub-committee.  The Chief GME Officer (DIO) will be present to advise the Chair of the Sub-committee and to ensure the process is followed.  No other representatives of the parties shall be present during any appearance before the Sub-committee.   Any and all procedural matters arising before or during the review will be determined by majority vote of the members of the Sub-committee.

k.  Upon completing its review, the Sub-committee shall by the majority vote of its members recommend whether the decision of the Ad Hoc Committee should be affirmed, reversed, or modified.

l.  A written report should be prepared by the Sub-committee chair and submitted to the GMEC at its next meeting date.

m. The GMEC will review the Sub-committee report and issue its decision in writing within a reasonable time which will not exceed thirty (30) business days from the submission of the Sub-Committee report.

n.  A final appeal may be made to the Vice Dean for Educational Affairs and the Dean with a briefing by the Associate Dean for GME.

o.  The Vice Dean for Educational Affairs will affirm, reverse or modify the GMEC Sub-committee decision.

p.  The opinion and decision of the Vice Dean for Educational Affairs and the Dean is final and concludes the process.

2.  Appeal of Employment Actions:  For Appeals of Disciplinary Actions imposed from Employment Actions, the house staff member will follow the AAHS Fair Treatment Process outlined in the Employee Handbook.

**GME 18: MOONLIGHTING, OTHER EMPLOYMENT AND VOLUNTEERING**

**POLICY:**

It is the policy of HUH to discourage house staff from engaging in other employment outside the responsibilities, demands and stress of the GME program.  In some instances, the Program Director may allow outside employment as long as it does not interfere in any way with the full time residency training program, the house staff member follows the procedure for permission, and the house staff member is in full compliance with the ACGME duty hour requirements.  Every house staff member must notify the Office of GME that he/she is or is not in compliance by completing one of the two attached forms.  Any changes from non-moonlighting to moonlighting must be approved.  Other employment is defined as any activities other than those required by the Program Director, either within the Hospital or outside, for which the house staff member is being paid by someone other than GME.  Moonlighting is one form of other employment.

**PROCEDURES:**

1.  House staff may participate in other employment either within an AAHS facility or outside only after having satisfied all the requirements set forth in this policy and with the permission of the Program Director, Department Chair and the Chief GME Officer (DIO).

2.  Recognizing that house staff are full time employees of the Hospital, other employment refers to any activities other than those required by the Program Director, either within the Hospital or outside, for which the house staff member is being paid by someone other than GME.  At any time that academic or Hospital performance is deemed unsatisfactory or the house staff member is not in compliance with this policy, permission for other employment may be revoked by the Program Director, Department Chair or Chief GME Officer (DIO).

3.  House staff are paid fully by HUH through the Office of GME.  House staff members may not receive any additional compensation for any services or time spent while on an educational rotation.

4.  All house staff members engaged in moonlighting must have an unrestricted license for unsupervised medical practice in the state where the moonlighting occurs and where applicable comply fully with visa regulations, guidelines and limitations.  A copy of the unrestricted license must be submitted with the request for other employment/moonlighting.

5.  Federal Regulations governing exchange visitor physicians documented by Form IAP-66 authorizes a specific training activity and associated financial compensation.  Federal Regulations do not permit activity and/or financial compensation outside the defined parameters of the training program.  Thus, house staff on J-1 visa status may not be involved in other employment or moonlighting.

6.  The official HUH and DUCOM "House Staff Approval of Other Employment Form" must be completed for each moonlighting site.  (House staff member must complete a separate form for each service to be covered in a single site if more than one.)  A house staff member may be approved to participate in other employment only after this form has been completed with all accompanying materials, signed by the Program Director, Department Chair and the Chief GME Officer (DIO) and the form is returned to the house staff member.

7.  Even though approved by the Office of GME, the house staff member may not begin to moonlight until credentialed with privileges delineated by the institution where service is to be provided including HUH.  When moonlighting, the house staff member is working as an independent contractor on an unrestricted license (not a training license) and may not begin to work until credentialed at the institution where he/she will be moonlighting.  The house staff member must be credentialed at each institution where approved to work and for each service he/she is covering.

8.  Professional liability coverage for any other employment is the sole responsibility of the house staff member and not HUH.  A copy of the liability coverage must be submitted with the Form and verified before approval will be granted for other employment.  If a DUCOM house staff member is permitted to moonlight at another AAHS facility and is paid by that facility (not a private practice), AAHS malpractice policy covers that house staff member at the AAHS hospital where the moonlighting occurs if approved by the Office of GME and the individual is credentialed by the hospital for limitation of privileges.  The house staff liability insurance authorized through the Office of GME does not in any way constitute malpractice coverage for any moonlighting or other employment activities.

9.  If a house staff member is in one program and has approval to moonlight and moves to a new program, he/she needs to complete new paperwork and have approval from his/her present Program Director.  The same is true if a Program Director is replaced and a new one starts.  (Example – if a person receives permission to moonlight while in the Internal Medicine program and then goes into a fellowship, he/she needs permission from the fellowship Program Director to moonlight.)

10. Any house staff member found having other employment without having completed the House Staff Employment Form and been granted official permission is subject to dismissal from the GME program as set forth in GME 14.

11. Other employment will not be allowed during regular working hours (7:30 a.m. to 5:00 p.m. Monday through Friday), during on-call assignments, or if it any way interferes with other established working hours as set forth by the Program Director. Moonlighting is considered within the ACGME 80 duty hour requirements and must be recorded on work hour monitoring system. (GME 19)

12. Decisions of the Program Director, Department Chair or the Chief GME Officer (DIO) are final and not grievable with respect to other employment and/or moonlighting.

13. Program Directors are responsible for monitoring moonlighting and other employment hours and the house staff member's compliance within the ACGME duty hour requirements. (GME 19-2)

14. Volunteering: Sometimes house staff members want to volunteer as a community service. All volunteering must be first approved by the Program Director and the Office of GME. The house staff member must have his/her unrestricted license and independent malpractice insurance (provided by the house staff member or the agency where he/she will be volunteering). When volunteering, the house staff member is an independent provider and not his/her graduate medical education training program. The residency/fellowship malpractice policy only covers the house staff member when on official rotations of the program not volunteering.

**HAHNEMANN UNIVERSITY HOSPITAL**
**DREXEL UNIVERSITY COLLEGE OF MEDICINE**

**House Staff Approval of Other Employment Form**

Name: _____    Date: _____

Residency Program: _____ PGY Level:____ Visa Status:_____ Beeper #:_____

Name of Employer:_____ Telephone: _____

Address: _____

Type of Work to be Performed: _____

Days and Hours of Work: _____

Period of Other Employment:  From: _____ To: _____

Insurance Carrier:_____ Policy Number: _____

**Attach a Copy of the Malpractice Insurance Policy and Unrestricted Medical License.**

I attest that the information provided above is true.  The other employment noted above does not constitute a conflict of interest and will not interfere with the performance of my duties in my graduate medical education.  I have read and accept the guidelines set forth in GME 18.

Resident Signature: _____    Date: _____

APPROVALS

Program Director:_____    Date: _____

Department Chair:_____    Date: _____

Chief GME Officer (DIO):  _____    Date: _____

**Approval is granted only after all signatures have been completed and the Office of Graduate Medical Education has returned a copy of this form to the house staff member.**
**House staff must be credentialed at the institution where he/she is moonlighting.**

**Hahnemann University Hospital**
**Drexel University College of Medicine**
**Graduate Medical Education**

**Non-Moonlighting Form**

To be completed by <u>all</u> house staff members who are not involved in other employment or moonlighting.

Print Name:_____

Program:_____

PGY Level:_____

Beeper #:_____

"I am not doing any other employment or moonlighting at this time.  I will complete the proper form, supply required documents, and receive permission from the Program Director, Department Chairperson and Chief GME Officer (DIO) <u>prior</u> to doing any moonlighting in the future.  I understand that any moonlighting done without prospective approval as noted above is grounds for removal from the graduate medical education training program."

_____        _____
House Staff Member Signature                                    Date

The original of this form should be sent to Dr. Jay Yanoff in the Office of GME when signing of initial contract.  A copy should remain in the Department file.

**GME 19:  WORK HOURS, ON-CALL AND SLEEP ROOMS**

**POLICY:**

It is the policy of HUH and DUCOM to set forth and monitor the duty hours and schedules of house staff as well as on-call coverage of the Hospital in compliance with all regulatory agencies. **Work hours for a particular month must be logged by the fifth day of the following month.  For example, work hours for July must be logged by August 5th.**

**PROCEDURES:**

1.  The Program Director is expected to establish and oversee work hours for residents on service in HUH/DUCOM programs.

2.  Work Hours
    a.  Work hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities and all moonlighting.
    b.  Moonlighting and other employment must be counted toward the 80-hour maximum weekly hour limit.
    c.  Residents must be scheduled a minimum of one day free of work every week (when averaged over four weeks). At home call cannot be assigned on these free days.
    d.  Work periods of PGY 2 residents and above may be scheduled to a maximum of 24 hours of continuous duty in the hospital.
    e.  Residents must not be assigned additional clinical responsibilities after 24 hours of continuous in-house duty.
    f.  Residents must not be scheduled for more than six consecutive nights of night float.
    g.  Residents must be scheduled for in-house call more frequently than every-third night (when averaged over a four-week period).
    h.  Time spent in the hospital on at-home call must count towards the 80-hour maximum weekly hour limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one-day- in- seven free of duty, when averaged over four weeks.
    i.  Residents should have 10 hours free of work, and must have eight hours between scheduled work periods. They must have at least 14 hours of work free after 24 hours of in-house duty.
    j.  Strategic napping, especially after 16 hours of continuous work and between the hours of 10:00 p.m. and 8:00 a.m., is strongly suggested.
    k.  In unusual circumstances, residents, on their own initiative, may remain beyond their scheduled period of work to continue to provide care to a single patient. Justifications for such extensions of work are limited to reasons of required continuity for a severely ill or unstable patient, academic importance of the events transpiring, or humanistic attention to the needs of a patient or family.

3.  Emergency medicine house staff members who work in hospitals with more than 15,000 unscheduled patient visits a year should have shifts limited to 12 consecutive hours.

4.  The Chief GME Officer (DIO) is responsible for monitoring and enforcing compliance with the duty hour requirements.  This is both an academic and an employment issue.  There must be accurate accounting, monitoring and compliance with the duty hour requirements as well as investigation, problem solving and enforcement when there are violations.

<u>Monitoring:</u>

All house staff must accurately report their hours of work based upon the criteria of the ACGME requirements noted under GME 19 above.  **The purpose of the monitoring system is to determine if there are any violations and to rectify the problem.   House staff should help by honestly and accurately reporting their times and to identify any issues causing non-compliance with these work hours so that they can be fixed.** The Office of GME will be alerted when an individual house staff member has not reported his/her duty hours on time or is out of compliance with work hour requirements.  If a house staff member is found to be dishonest in accurately reporting work hours, this is subject to disciplinary action as set forth in the House Staff Manual (GME 14).

**In all instances, the Program Director will notify the GME office of any work hour violations so that the Chief GME officer can do an investigation to determine if disciplinary actions needed.**

<u>Enforcement:</u>

**House Staff – 3 scenarios**

**(1) If House Staff Member is not reporting data on time or is recording information incorrectly.**

Step 1    Results of the Program Director's investigation should lead to solving the issue and result in subsequent compliance.
Step 2
Step 3    If still not reporting data on time, house staff member may be placed on Suspension without pay until such time as the data is reported accurately.
Step 4    If house staff member continues to not comply, disciplinary action may be warranted.

**(2) If House Staff Member is violating work hours because of faculty member fault.**

If the Program Director determines that a faculty member made the house staff member be out of compliance, refer to the section below regarding the process for dealing with the faculty member found not to be in compliance.

**(3) If House Staff Member not in compliance due to own reason.**

Step 1    If Program Director determines that the house staff member is in violation due to his/her own reason, the results of the Program Director's investigation should lead to compliance.
Step 2    If still out of compliance, a Warning Letter will be sent from the Program Director to house staff member with copy to the Office of GME.
Step 3    If second time out of compliance, the house staff member will be sent a letter from Office of GME notifying the individual that there is intent for disciplinary action if this occurs again.  Copy to the Program Director and Associate Dean for GME.
Step 4    If third time out of compliance, corrective and disciplinary action will be initiated as spelled out in GME 14.

**If Faculty member found not to be in compliance**.

Step 1    If the Program Director finds the faculty member is not in compliance with the duty hour requirements noted above, the results of the investigation and the Program Director's action plan will be reported to the GMEC.  An attempt should be made to resolve the issue at the department level.
Step 2    If faculty member remains not in compliance, the GMEC will vote whether to issue a Warning Letter to be sent to the faculty member from the DIO and Associate Dean for GME to remain within duty hour requirements or house staff will not be sent to that rotation.  Faculty member will be required to submit a report back to the GMEC at its next meeting indicating how duty hour compliance will be rectified on his/her rotation. Copy of the Warning Letter and faculty member response will be sent to Program Director, Departmental Chair, Dean and CEO of HUH.
Step 3    If second time not in compliance, GMEC will vote whether the faculty member should be sent a letter from the DIO and Associate Dean for GME which will indicate that house staff will no longer be going to that rotation.  The rotation may only be reinstated with approval from the GMEC and a reinstatement letter from the DIO and Associate Dean.  Copy of the Suspension Letter will be sent to Program Director, Chair, Dean and CEO of HUH.

5.    All requests for exception to the 80-hour work week must be submitted in writing by the Program Director to the GMEC.  The request for exception can only be for a weekly limit on duty hours up to 10% or up to a maximum of 88 hours and must be based upon sound educational rationale.  The request will be reviewed at the next GMEC Meeting following the submission of the request.  The following items must be addressed in the request and ample documentation must be attached.

        a.    Proof of Necessity
            i.  Program schematic for service coverage.
            ii. List of outside rotations and reasons for these rotations.
            iii. Names of all residents approved for moonlighting within the department.
        b.    Rational for Extension
        c.    Educational Impact
        d.    Implementation process
        e.    Duty Hours Monitoring System

    If not approved by the GMEC, the program must comply with the 80-hour work week.  If the exception is approved by the GMEC, the request will then be submitted to the RRC for its approval or rejection.  No exceptions to the 80-hour resident duty hour policy are permitted until official notification is received by the Program Director and the Office of GME from the RRC.

6.    House staff members are expected to be on service as assigned.  House staff members are expected to be awake, alert and available for patient care, teaching and learning.  Any absence that is not approved by the Program Director or the Office of GME is an unexcused absence without pay. In accordance with the intent of the GME programs and good patient care, the house staff member will be allowed to leave the Hospital only if all the work for the day has been adequately completed.  A house staff member should "sign out" (hand-off) his/her area of service to the house staff member responsible for covering his/her patients or service.  In all instances that a house staff member is out of the Hospital when expected to be on duty, the

house staff member must notify the attending physician on the service and the Program Director regarding his/her absence and designee coverage.

7.  In some instances, certain residency programs allow for call from home. Residents called in from home must count those hours toward duty hour limits.

8.  Sleep rooms (formerly on-call rooms) are to be occupied at those times when the house staff member is officially scheduled by the program for on-call coverage or for fatigued residents. Sleep rooms are not to be used as a residence, lounge, study area, rest area or conference room during the working day.  Generally, sleep rooms are to be vacant from 7:30 a.m. to 5:00 p.m. so that housekeeping may clean rooms.  Clothing and personal items may be left in the room during the on-call shift, however they should be locked as housekeeping will have access to the room.  Any problems with sleep rooms should be reported directly to the Directot of GME in the Office of GME as soon as possible. There are a sufficient number of sleep rooms to allow Program Directors to schedule and accommodate for any gender or religious issues.

9.  If a house staff member is fatigued or feels sleep deprived, he/she should notify the Program Director.  The sleep room may then be used to rest.  A "Do Not Disturb" sign should be placed on the door.  At the end of the rest period, the house staff member should (1) notify the Program Director, and (2) remove the "Do Not Disturb" sign.  If the room has not already been cleaned, it is the house staff member's responsibility to notify housekeeping at ext 6006. The sleep room check out notification was implemented December 2012. When the room has already been serviced, the next person using the room should notify housekeeping to re-clean the room at EXT 6006.

10.  If there are any problems with the conditions of the sleep rooms, contact the Director of GME.

**GME 20:  CONFIDENTIALITY**

**POLICY:**

It is the policy of HUH and DUCOM that all house staff maintain the confidentiality of all patient and administrative information.

**PROCEDURES:**

1.  All house staff of HUH and DUCOM shall read and familiarize themselves with the confidentiality provisions as detailed in the Employee Handbook.

2.  Unless circumstances require, discussions regarding patients should be limited to those directly involved in the care of patients and should not take place outside of "staff only" areas.  For example, discussions should not take place in elevators, cafeteria, or other public places.

3.  House staff, including students under their guidance, are expected to maintain the security of all documents containing administrative and patient information.  Copies of such documents shall be made and distributed only under the guidance of the Program Director, Legal Department or Office of GME.  Such documents should not be displayed or left in public places such as elevators, classrooms, restrooms, cafeteria, etc.

4.  Medical records and other material concerning patients are not to be taken out of the Hospital, placed on any electronic devices or individual external storage devices.

5.  All inquiries from attorneys from outside of HUH, the press, other media or issues related to liability are to be referred to Risk Management immediately.  The house staff member must notify the Program Director and either the Director of GME  or Chief GME Officer (DIO) of any such inquiries.

6.  HIPAA: The privacy regulations of the Health Insurance Portability and Accountability Act (HIPAA) took effect April 14, 2003. These regulations establish rules and procedures for most health care providers to follow in order to protect the privacy of patient information identifiable to particular patients.
    a.  All new house staff members are required to complete the Tenet HIPAA training within the first four (4) weeks in the program.  The directions for logging on ".edu" on e-Tenet.com can be obtained from the Office of GME.  A house staff member not completing the training will be removed from service with pay suspended; any unpaid days will not be recaptured once the training has occurred.
    b.  House staff members are required to honor all the HIPAA regulations and procedures.  Non-compliance is subject to corrective and/or disciplinary action as outlined in GME 14.

7.   Remote Access for Patient Care: With the advancement of electronic records systems, it is now possible to access hospital and patient records, charts and computer-based order entry systems at remote locations. Remote locations can include any location within the hospital (sleep rooms, library, lounge, etc.) or any location outside of the hospital. It is the duty of every house officer to provide the highest level of appropriate patient care to every patient and all patient care information must be handled confidentially and with discretion. Inappropriate use of remote access for order entry or any aspect of patient care will not be accepted by any residency/fellowship training program or the institution. If a house staff member is found to be providing substandard or inappropriate use or care via remote access, the individual will be subject to corrective and/or disciplinary action.

**GME 21:  MEDICAL RECORDS COMPLETION POLICY**

**POLICY:**

It is the policy of HUH and DUCOM's GME programs that house staff are to legibly, comprehensively and in a timely fashion document all patient care activities whether they are providing care at Tenet facilities or at an outside institution.  Failure to complete a patient's record within the time frame established by the institution will result in the suspension of the house staff member, without pay, until such time as the record(s) is completed or corrective action has been instituted.

**PROCEDURES:**

1.  House staff receive instruction in proper medical record documentation at orientation and the procedures are outlined for completing the medical record in a timely fashion.  House staff may not give his/her data entry code to another individual.  Likewise, house staff are prohibited to use another individual's data entry code to the medical record.

2.  Completion of the medical record includes, but is not limited to, signing all verbal orders within twenty-four (24) hours of issuance as well as dictation of discharge summaries and operative notes at HUH and outside institutions for all patients for whom the house staff member was involved in rendering care.

    a.  Discharge summaries should be dictated at the time of discharge, but must be completed within 5 days of discharge.
    b.  Operative notes should be dictated at the time of surgery but must be dictated within 24 hours of surgery.
    c.  The dictation job number should be listed on the chart by the dictating physician.

3.  House staff who do not complete medical records as stated above and elsewhere in the House Staff Manual are subject to corrective and/or disciplinary action including suspension without pay as outlined in GME 14.  Arrangements to have a medical record pulled should be made by calling the Medical Records Department during normal business working hours.

    a.  House staff are prohibited from obtaining medical records in any form concerning any patient without appropriate authority from that patient and the attending physician, unless access to those medical records is necessary for patient care, approved research purposes, or educational rounds.
    b.  Breach of confidentiality is a serious offense which may lead to disciplinary action up to and including termination from the GME program as outlined in GME 14.

4.  Medical records are legal documents.  Any alteration of a medical record or consent form is a criminal offense and will be dealt with accordingly.  See disciplinary actions in GME 14 of this handbook.

5.  Completion certificates will not be issued by the Program Director until he/she has signed off that all medical records have been completed satisfactorily.

**GME 22:  HOUSE STAFF EVALUATION**

**POLICY:**

It is the policy of HUH and DUCOM that each house staff member be evaluated fairly, be given feedback, and be apprised of his/her evaluation for each rotation.

**PROCEDURES:**

1.  It is the responsibility of the Program Director in concert with the Office of GME to develop mechanisms for and insure the compliance of house staff evaluation for each rotation.

2.  House staff evaluations are carried out in accordance with applicable ACGME,CODA and CPME guidelines.  House staff are evaluated on reaching the goals and objectives of the rotation, their knowledge of basic and clinical sciences, clinical skills, core competencies, interpersonal skills, professionalism, and continuing scholarship.  House staff should be evaluated on each rotation.

3.  House staff should be evaluated and be given feedback verbally by the attending physician during and at the end of each rotation.  If a house staff member is having any problems during a rotation, the faculty member should bring this to his/her attention.  There should be no surprises in the final rotation evaluation that were not discussed during the rotation with the house staff member and documented by the faculty member. The house staff member should be advised of the caliber of his/her performance at the end of each rotation and summarized at the formal evaluation by the Program Director.  If necessary, recommendations for improvement should be made at these times.  At all times, the house staff member has complete access to view and receive a copy of his/her performance evaluations.

4.  House staff must be apprised individually at least twice a year (at the mid-point and end of the year) by the Program Director regarding their rotational evaluations and general assessment in the program.  House staff must sign the clinical evaluations to indicate that they have seen the evaluation.  The signature is not a verification that the house staff member agrees with the evaluation but that he/she has seen it.  Rotations are considered complete only after the house staff member has signed the evaluation.

5.  The Program Director must also provide a final written evaluation for each house staff member who completes the program (GME 23).  The evaluation must include a review of the house staff member's performance during the final period of training and should verify that the house staff member has demonstrated sufficient professional ability and has mastered the core competencies in order to advance into a categorical program, advance into a fellowship program, or is ready to practice in that specialty.  Whenever a house staff member leaves the program, either voluntarily or otherwise, the Program Director will determine at what level of training the house staff member was achieving.  As well, the Program Director will determine the PGY level completed and the rotations completed for purposes of communicating to another GME Program Director, Boards, or verifications.

6.  HUH and DUCOM monitor compliance with these procedures by means of its mechanisms for program review, Internal Special Reviews, and ongoing evaluations performed by the GMEC.

**GME 23:   SATISFACTORY COMPLETION OF ROTATION/PROGRAM AND FINAL EVALUATION**

**POLICY:**

It is the policy of HUH and DUCOM that house staff must satisfactorily complete all rotations and years required by the Program Director, ACGME, CODA and CPME and the Office of GME before the individual is eligible to receive a certificate of completion from the GME program.

**PROCEDURES:**

1.    At the completion of each rotation, the house staff member is evaluated by the designated attending physicians and staff. House staff must satisfactorily meet the expectations for all rotations assigned by the Program Director in order for the individual to be considered for completion of the academic year.  Satisfactory completion of the rotation means ratings of the following:  "Expected," "Average," "More than Expected," "Consistently exceeds Expectations," "Far above Expectations," "Uniquely Qualified" or other terms indicating at or above average.  Ratings of "Below Expectation," "Below Par," "Unsatisfactory," "Less than Expected" or other terms indicating below average are considered as unsatisfactory and, therefore, constitute non-completion of the rotation.

2.    All rotation evaluations are reviewed by the Program Director.  Any unsatisfactory ratings will be reviewed with the house staff member.  All unsatisfactory ratings must be remediated prior to completion of the program.  The house staff member may require remedial training and the program may need to be extended for remedial academic or clinical work at the Program Director's discretion and with the approval of the Office of GME.  More than one unsatisfactory evaluation will lead to review by the Department with notification of the Office of GME.  More than one unsatisfactory rating can lead to dismissal from the GME program.

3.    All academic recommendations and requirements of the Program Director, Department and Office of GME must be satisfactorily met prior to the completion of the program.

4.    Note: The last year of the program must be a full year as defined in GME 12 (2, 3 and 4).

5.    <u>Final Evaluation Verification by the Program Director</u>:  The Program Director must provide a final evaluation using verification of Graduate Medical Education and Training form  for each resident who completes the program.  The verification must include a review of the resident's performance during the final period of education and must verify ("yes" or "no") that the resident has demonstrated sufficient competence to practice competently and independently.  The final verification letter must be part of the resident's permanent record maintained by the Office of GME.  The original of this Final Verification Letter must be sent to the Office of GME prior to the resident receiving the Certificate of Completion from the program.  The program should keep a copy of this Final Verification Letter.

**GME 24: OUTSIDE ROTATIONS**

**POLICY:**

HUH and DUCOM must approve all rotations outside of HUH that are required or permitted (electives) by the program and Program Director in compliance with ACGME, CODA or CPME policy and RRC requirements.

**PROCEDURES:**

1. Whenever possible, house staff are encouraged to seek outside (elective) rotations within one of the AAHS Healthcare facilities. If an elective rotation cannot be satisfied within the institution, the following information must be provided for approval to be granted for an outside rotation:

   a. Elective Title
   b. Requirement by ACGME, CODA or CPME, RRC, Program or Program Director
   c. Sponsoring Institution and Responsible Party
   d. Length of Rotation and Dates
   e. Special Requirements
   f. Financial Arrangements

2. The Request for Clinical Rotation Form (Attached) must be completed and submitted at least ninety (90) days prior to the start of the rotation. Completion of this form does not constitute approval or acceptance of the outside rotation.

3. Outside rotations will only be approved when receiving institution reimburses sending institution or house staff member agrees to no salary during the rotation. HUH will maintain benefits and malpractice insurance for the approved rotation.

4. If a department sends a house staff member on an out rotation without written permission of the Office of GME and an affiliation agreement in place, the department shall be responsible for the salary, benefits and malpractice insurance costs during the period for which there is no reimbursement.

5. The house staff member or Program Director may not enter into any independent agreements. A house staff member will be allowed to go to the outside rotation (required or elective) only after all the appropriate signatures have been affixed on the form, there is an affiliation agreement in place, and the form returned to the Program Director.

6. HUH malpractice insurance covers only domestic approved rotations.

7. International Rotations: International experiences in the past have been limited to resident vacation time (with pay and benefits, without malpractice insurance and without official approval from our institutions). International rotations have not been allowed for several reasons:

   a. HUH malpractice insurance covers only domestic approved rotations.
   b. HUH employee benefits only extend to national experiences (including workman's compensation).
   c. Hospital is not reimbursed for the resident's time away.
   d. ACGME RRC approval is needed in advance for the time and experience to meet the guidelines for completions of their respective residency/fellowship training.
   e. Requirement for house staff member to pay for evacuation insurance.
   f. Safety and security issues in the international environment at the rotation site.
   g. Appropriate mentor must be determined for the educational experience.

   However, international out rotations may offer a valid and legitimate educational experience that could not be met in the United States. In order to facilitate these opportunities, the following particulars and decision criteria must be met in order for an international rotation to occur:

   a. House staff member must apply for such a rotation at a date no later than 3 months in advance.
      i. The application must identify the rotation, rationale for the experience, and all the particulars of the site, mentor, etc.
      ii. The application must have signed approval by the Program Director.
      iii. The application must be submitted to the Office of Graduate Medical Education for further processing.
   b. ACGME RRC approval needed in advance for academic credit to be received.
   c. Rotations may occur in benign, stable parts of the world based upon State Department advice. Rotations will not be approved to countries on the State Department's Travel Warning and Travel Alerts lists.

d.  Program Director must have a Program Letter of Agreement (PLA) between himself/herself and the mentor of the receiving institution outlining all the details of the expectations of the rotation.

e.  House staff member must agree to pay all expenses of the rotation and show that he/she has received independent international malpractice, workman's compensation and evacuation insurance for the time of the rotation.

f.  House staff member must agree to do rotation without salary from HUH.

g.  House staff member must agree to assume the risk of war, terrorism, political unrest, natural catastrophes, disease outbreak, or health conditions.

h.  House staff member must complete a Release of Liability form for both DUCOM and HUH.

i.  HUH Employee Health must receive notice that all recommended vaccinations have been obtained by the house staff member. Upon return from rotation, Employee Health must verify that the house staff member is safe to return to duty.

j.  A GME review committee will examine the particulars of the rotation and determine whether Drexel University College of Medicine (DUCOM) and Hahnemann University Hospital (HUH) will approve the rotation. The review committee will be composed of the following individuals:
    i.   Chief GME Officer (HUH)
    ii.  Associate Dean for GME (DUCOM)
    iii. DUCOM HR Director or his/her representative
    iv.  Chief HR Officer (HUH) or his/her representative
    v.   Two other Program Directors
    vi.  One GMEC resident representative

k.  No international outside rotations may occur without prior approval in writing from the GME review committee and finalizing the Release of Liability form.

**HAHNEMANN UNIVERSITY HOSPITAL**
**DREXEL UNIVERSITY COLLEGE OF MEDICINE**
**Request for Clinical Out-Rotation**

**INSTRUCTIONS:**

1.  Information for an out-going rotation must be received from the Program Director or Coordinator for the process to begin.
2.  The request form with the required attachments must be submitted to and approved by the Office of Graduate Medical Education (GME) at least **90 days prior** to the start of the rotation.
3.  A Program Director's Letter of Agreement with the institution/physician must be signed by both parties and attached to this request.
4.  If the house staff member(s) will rotate with the physician to another facility, please provide agreement giving physician permission to bring house staff member on site.
5.  Affiliation agreements must be approved by the Office of GME.
6.  Incomplete request will be returned to sender.  Approval of rotation may be delayed.

**ALL FIELDS ON THIS FORM NEED TO BE COMPLETED** (Print Clearly)**:**

**Ambulatory**_____   **Rotation** _____ (RRC Program Requirement)   **Elective** _____

DUCOM Residency Program: _____
Name of Rotation: _____

❑  If Single Resident Rotation                    ❑  If Multiple Resident Rotation
Resident Name: _____                 Attach List of names with PGY level, and visa status
PGY Level:_____  Pager Number:_____         (if applicable).
Duration of this rotation (hours/weeks/months):      Duration of this rotation (hours/weeks/months):
_____            _____

Visa        ❑  H –1B     ❑  J -1     ❑  J - 2    ❑  OPT    ❑  Other:
Status:                                                      _____
                                                              Identify Other

**FINANCIAL INFORMATION**
Can this rotation occur at another AAHS facility?
        ❑  Yes      if yes, where _____
        ❑  No       if no, why not _____

Will receiving facility reimburse for salary, benefits, malpractice insurance?   ❑  Yes        ❑  No
DUCOM Program Director: _____
                                        (Print Name)
_____          _____
(Signature)                                           (Date)

**INFORMATION ABOUT RECEIVING INSTITUTION/AMBULATORY FACILITY:**

Check one:    ❏  New agreement needed        ❏  Existing agreement in place

**If Hospital, complete the following:**

Institution:_____
Address:_____
_____
City:    _____
State: _____ Zip Code:_____
GME Director:_____
Telephone: _____ Fax:_____
Other Contact: _____
Telephone: _____ Fax:_____
Employer Identification Number (EIN): _____

**If Physician/Ambulatory Facility, complete the following:**

Physician/Facility:_____
Physician:_____
Business Name: _____
Contact for processing contract:_____
Address:_____
_____
City:    _____
State: _____ Zip Code: _____
Telephone: _____ Fax:_____
E-Mail:_____
Tax I.D. #:_____

**Attachments Required for Outgoing Rotation**
1.    Educational goals and objectives
2.    Program Director Letter of Agreement
3.    List of resident(s) name with PGY Level, and visa status (if applicable)
4.    Out-of-State MT License required?        ❏  Yes        ❏  No

Graduate Medical Education Official: _____

❏  Approved                    ❏  Denied

Signature: _____    Date: _____ _____

Comments: _____ _____

_____ _____

❏  Return to Requestor

O:\OGMEDATA\out rotation request.doc

**GME 25:  PAID-TIME-OFF, LEAVE POLICY AND EMPLOYEE ASSISTANCE**

**POLICY:**

It is the policy of HUH and DUCOM to provide time off from training; including holidays and leaves of absence as set forth in this policy.

**PROCEDURES:**

**Paid-time-off (PTO)**

1.  House staff members receive 30 days off (Monday through Friday) with pay per contract year.  Twenty (20) of these days can be allocated as sick leave, vacation, or educational time. A doctor's note is required when taking more than five continuous sick days.  Seven (7) days are paid holidays as listed in number 3 below. Three (3) additional administrative or educational days may be taken at the discretion of the Program Director. Time off must be scheduled and approved by the Program Director and is subject to the requirements of the specific Residency Review Committee (RRC) of the ACGME, CODA, or CPME, and the requirements of the training program.

2.  Any time that the Program Director is aware of an illness, the Program Director may require the house staff member to provide a letter from the house staff member's physician for clearance to return to full duty.

3.  Paid Holidays (7):  New Years Day, Martin Luther King Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day are observed holidays.  These seven holidays are to be taken at the discretion of the Program Director due to the schedule of the program. Any time a house staff member is scheduled to work or take call on a designated HUH Holiday, an additional floating holiday must be added to their Paid Time Off.

4.  Manager's Disability Plan (Physician Certification Required)
    a.  This plan replaced the long-term disability and salary continuation plans.  It includes   short-term disability coverage that provides income replacement after 30 days of being unable to work. House staff members must purchase disability coverage in order to receive short-term disability coverage at no additional cost.
    b.  All house staff must notify the Program Director or his/her designee as soon as possible if the house staff member will be out for sickness or disability.  If the house staff member is out beyond a five (5) day excused absence period, the Program Director will notify the Office of GME immediately.  A house staff member may not return to part-time or restricted duty.  Any academic/clinical time missed under this clause will need to be remediated as determined by the Program Director.
    c.  House staff must complete a Request for Family or Medical Leave of Absence Form and a Certification of Health Provider Form.  The Leave of Absence Form must be approved by the Program Director and then forwarded to the Office of GME.  The Certification of Health Care Provider Form must be submitted to the Department of Employee and Student Health at HUH.  These forms are available in the Human Resources Department at HUH, as well as in the Office of GME.
    d.  House staff should be aware that each RRC and Specialty Board have minimum requirements on number of days worked in each post graduate year in order to receive training credit and become Board eligible.  See Section 9 below for further detail regarding academic credit.  This should be discussed with the Program Director.

5. General Leave of Absence:

   a. House staff may request a General Leave of Absence. A General Leave may be granted for reasons other than one's own serious health condition or disability or one's need to fulfill family obligations relating directly to childbirth, adoption, or placement of a foster child; or to care for a child, spouse, or parent with a serious health condition. (House staff requiring leave for those reasons should apply for Family Leave or Medical Leave.) General Leave of Absence may be granted for a period of up to 30 business days. The leave may be extended at the discretion of the Program Director beyond the initial 30 business days under special circumstances, as determined on an individual basis by the Department Chair, Program Director, Chief GME Officer, Director of GME and the Human Resource Director.

   b. During the General Leave, the house staff member will not be paid and insurance benefits will not be subsidized by HUH. The house staff member will become responsible for the full leave of absence cost of benefits if he/she wishes coverage to continue during such leave. A Leave of Absence Requests Form must be submitted in writing and must be approved in writing by the Program Director, the Office of GME, and the Human Resources Department before the leave begins. General leaves may not be used to extend vacations or other paid time off. The house staff member may return to the same position when the leave ends if there is an available position and at the educational level and status at the discretion of the Program Director. If the house staff member fails to return at the approved time, he/she will be terminated from employment and the GME training program. Leave of absence may have an impact on the ability to complete the training depending upon the specialty.

6. Family & Medical Leave
   The Family and Medical Leave Act (FMLA) enables eligible employees (see paragraph below regarding eligibility) to take a leave of absence from employment for up to twelve (12) weeks per year as provided for by law in the event of one of the following:

   a. The birth or adoption of a child (including foster child) and in order to care for such child;

   b. The serious health condition of a spouse, dependent or parent which requires the employee to be the care-giver;

   c. A serious health condition that makes the employee unable to perform the functions of the position.

   d. Eligible employees are defined as regular full-time and part-time employees (scheduled hours of 20 per week or more), are eligible after one (1) year of service, and must have completed at least 1250 hours of work in the twelve (12) months immediately preceding the request for leave.

   e. A house staff member on FMLA approved leave is entitled to maintain his/her health care benefits on the same basis as if the employee had continued working and will be reinstated to his/her former position.

   f. Please note that the house staff member may or may not receive salary during the time you are on FMLA. See GME 25 (3.a) above for details.

   g. Any training missed for FMLA will need to be remediated in order to complete the program.

7. Medical/Non-FMLA Leave

   a. Medical leave occurs when a house staff member is absent from work with a serious health condition that renders him/her unable to perform the essential function of the job and the house staff member has either exhausted their FMLA entitlement or is not eligible for FMLA leave. A Medical/Non-FMLA leave cannot exceed 12 months including the 12 weeks of FMLA time and is subject to department approval.

   b. House staff should contact the HUH Human Resources Department immediately to obtain the necessary paperwork.

   c. The house staff member may return to the same position when the leave ends if there is an available position and at the educational level and status at the discretion of the Program Director.

   d. House staff should be aware that each RRC and Specialty Board have minimum requirements on number of days worked in each post graduate year in order to receive training credit and become board eligible. This should be discussed with your Program Director.

8. House staff members must notify the Office of GME in writing regarding any extension of his/her vacation or leave for any reason. Pay will cease for such extensions. If the Office of GME is not notified appropriately and resident receives pay, he/she is responsible for repayment of these funds to the hospital in order to return as an employee and continue in the GME program.

9. Academic Credit

   a. Each RRC and Specialty Board has minimum requirements on the number of days/months worked in each post graduate year in order to receive training credit and become board eligible. All house staff must complete all of the time requirements of the program to receive the certificate of completion from the program.

   b. All unexcused absences must be remediated. Unexcused absences may lead to corrective and/or disciplinary action as outlined in GME 14.

   c. Any time missed for excused absence will be evaluated for loss of academic credit. If an absence or repeated absences for any reason extends beyond the time period considered by the Program Director to achieve the academic and educational goals of the program, the house staff member may be required to make up such time. Additional time

may be necessary in order to adhere to the specialty Board requirements or it may be deemed appropriate by the Program Director in order to achieve the educational goals of the GME training program.

10. Guidance Resources: (1-800-697-1158). All house staff members are eligible to use the Guidance Resources; a free, confidential, voluntary and professional counseling service administered by guidance Resources. House Staff, their spouses and other eligible dependents are entitled to use this service. The goal of the Guidance Resources is to offer the support, information and guidance individuals may need to improve their particular problem/situation, which will help them to achieve their highest level of performance on and off the job. A total of up to five (5), free, face-to-face sessions per issue raised are available in addition to unlimited telephone contacts. For Impaired Physicians, see GME 12 (21) for specifics.

**GME 26: GRANTING OF CERTIFICATE OF COMPLETION OF GRADUATE MEDICAL EDUCATION PROGRAM**

**POLICY:**

It is the policy of HUH and DUCOM to grant a certificate of completion of graduate medical education when the house staff member has fully met all of the expectations of the ACGME, CODA and CPME accredited program, the Commonwealth of Pennsylvania, the Hospital, the Program Director, and the Office of GME.

**PROCEDURES:**

As an accredited training program of the ACGME, CODA or CPME, upon satisfactory completion of the entire GME-training program, DUCOM and HUH will grant a signed certificate authenticating satisfactory completion of the program. Such certificates will be granted to the individual only after all of the following requirements have been met:

1. All clinical rotation performance evaluations are received and document all weeks of training have been satisfactorily met in accordance with the ACGME, CODA and CPME and the Program Director (See GME 12 (4) regarding final year in program).

2. All academic expectations, including scholarly activity and iHelp project completed as determined by the Program Director.

3. Any remediation has been satisfied and verified by the Program Director.

4. Any disciplinary action measures taken have been satisfied.

5. Any appeals have been completed, actions required have been satisfied, and the completion has been reported to the Office of GME.

6. All service evaluations by the house staff member have been signed, all faculty evaluations and any required papers are completed and submitted and approved by the Program Director.

7. All procedures that are standard at the closing of the program have been satisfactorily completed.

8. All Hospital supplies, materials, equipment, books, beepers, passes, identification badge and records have been satisfactorily returned and verified.

9. All medical records for patients assigned to the house staff member have been satisfactorily completed at the Hospital.

10. Exit interview has been completed with the Program Director, if applicable.

11. Program and institutional evaluations have been completed.

12. All the years of the GME training program have been completed with a Pennsylvania State Training License and contract for each progressive year of training.

13. For residency and fellowship programs, the house staff member must be eligible for an unrestricted license in the Commonwealth of Pennsylvania.

14. The program must provide the residents with information related to access to eligibility by the relevant certifying Board.

15. Other requirements by the Program Director, ACGME, CODA and CPME, Commonwealth, Hospital, or Office of GME are satisfactorily completed and verified.

**Note:** If a house staff member does not complete the program for any reason, the Office of GME will provide a letter of verification of time spent in the program and PGY level (not a certificate). Programs are prohibited from providing their own certificates of completion for any reason or time period a house staff member may have spent in the training program.

The Office of GME will have the certificate of completion produced. When the Program Director and the Chief GME Officer (DIO) in the Office of GME determine that all the requirements have been satisfactorily completed, the certificate may be issued. The name of the program listed on the completion certificate will be the official name indicated by the ACGME, CODA, CPME or other accrediting body for that GME training program.

Case 19-11466-MFW    Doc 4564-2    Filed 03/20/23    Page 158 of 194

16.  Criteria for receiving a Chief Resident's Certificate:

Appointed by the Program Director, the Chief resident/fellow is part of administrative team with duties related to the management of the residency training program.  The Chief resident will:

1.  Communicate with the house staff members in the program.
2.  Enforce Office of GME and program expectations.
3.  Bring problems from the house staff and proposed solutions to the Office of GME and Program Director.
4.  Must attend a minimum of 50% of the monthly Chief Residents' Meetings

**GME 27:  MEAL ALLOWANCE**

**POLICY:**

It is the policy of HUH and DUCOM to provide house staff with a meal allowance for each 14 or 24 hour continuous work rotation at the Hahnemann campus.

**PROCEDURES:**

Hahnemann University Hospital provides house staff with a meal allowance for each 14 or 24 hours of continuous working in-house at the hospital. Meal allowances are not transferable and are for house staff use only. Meal allowance cannot be used when taking call from home.

No later than June 1st of each year, each program is responsible for providing a summary of the 14 or 24 hour work schedule for their house staff to the GME Office. The program submits to the GME Office the number of 14 and/or 24 hour shifts per house staff member. Based on this summary, the GME Office will compile a list of funds to be allocated to each house staff member. Those working 14 continuous hours will receive $7.00 per days worked, and those working 24 continuous hours will receive $12.00 per days worked. The Chief GME Officer will review this list. Once the list has been approved, it will be submitted to Food Services. The meal allowance is made available through the I.D. badge. The meal allowance must be used during the academic year; there is no roll over. The meal allowance should be used throughout the year. Stockpiling at the end of the year will not be allowed.

Incoming rotators may receive meal allowance if they take 14 or 24 hour continuous duty during their rotation. The program should notify the GME Office of the continuous duty hours being covered by the rotator as well as which house staff member the rotator is replacing so that the funds for that house staff member can be reduced accordingly.

**GME 28:  HOUSE STAFF APPEARANCE, ATTIRE, AND HYGIENE**

**POLICY:**

It is the policy of HUH and DUCOM that all house staff are expected to maintain high professional standards of dress, appearance, and hygiene at all times and to have an official identification badge in view whenever in the Hospital or ambulatory settings.

**PROCEDURES:**

1.     House Staff affects the overall image of the facility in the eyes of patients and the community. House staff are required to present a clean and neat appearance and dress according to the requirements of your position.

2.     House staff are requested to be aware of and conscientious about their personal hygiene, neatness of attire and cleanliness of apparel. Strong odors or excessive use of perfumes or cologne are inappropriate.

3.     If house staff member fails to follow appearance and hygiene guidelines, he/she will be sent home and directed to return to work in proper form.

4.     Each facility where house staff rotates reserve the right to determine the appropriateness of house staff member attire and appearance and implement specific policies. Failure to comply with this policy or the Facility's policy may result in corrective action up to and including termination of employment.

5.     All house staff are required to wear professional attire while in the Hospital and on ambulatory rotations.  Appropriate male attire includes clean shirt with tie, dress slacks or trousers, socks and shoes.  Appropriate female attire includes dresses, skirts or slacks with a blouse or sweater, hosiery and appropriate shoes.  "Dungarees" or other denim apparel or sweat shirts should not be worn.  A white lab coat should be worn whenever in the Hospital or in an ambulatory setting.  These are the policies unless otherwise directed by the Program Director.

6.     The HUH nametag/identification badge must be worn and in view at all times.

7.     Procurement of white lab coats is coordinated through the Office of GME before beginning the first year and each subsequent year of training.

8.     Scrub suits must be worn in the operating and labor rooms and must not be worn away from the operating or labor room unless covered by a white lab coat.  Scrub suits are only to be worn when required by other services in the Hospital (for example, Emergency Room, ICU).  Scrub suits are not to be worn at the discretion of the house staff member.  Scrub suits are never to be worn in an ambulatory setting or outside the Hospital.  House staff should wear street clothing and change into and out of scrub suits in the Hospital.  Scrub suits are the property of the Hospital and are to be worn only when required on that service.  Removing scrub suits from the Hospital facilities is considered a theft and will be dealt with accordingly.

9.     Failure of house staff members to abide by the stated standards of attire, appearance and hygiene are subject to the corrective actions policy in the House Staff Manual.

**GME 29: ELECTRONIC COMMUNICATION AND SOCIAL MEDIA POLICY**

**POLICY:**

All house staff are required to be enrolled and utilize the DUCOM electronic communication system (e-mail account) and abide by the HUH Social Media policy for employees.

**PROCEDURES:**

To facilitate the communication between all house staff within their department, the Office of GME, and the DUCOM Dean's Office, all house staff must utilize the DUCOM electronic communication system, as follows:

1.  All house staff are required to maintain a Drexel Electronic Communication Account.  The account can be opened by completing a Non-Employee Associate Form from the Office of GME.

2.  House staff may have this account forwarded to other personal accounts, however this account will be the one utilized for major communication between house staff members,    the University, the Hospital, and the Office of GME.

3.  Communication accounts are required to be set up by the house staff member upon    matriculation into the GME program and will be governed by the policies of the University.

4.  If an electronic communication account lapses or becomes inactive as a fault of the house staff member, the individual will lose the privileges of the account and will need to get reinstated for employment and benefit functions.

5.  House Staff are expected to abide by the HUH Social Media Policy for Employees  (HR.ERW.20)

6.  House staff are expected to act in a professional manner with regard to use of social media contacts. House staff may not use social media for transmission of patient data or information. House staff should refrain from contact with patients through social media. House staff members accept this responsibility and policy by signing their annual contract.

**GME 30:  SCHOLARLY ACTIVITY**

**POLICY:**

As an academic medical center, it is the policy of DUCOM and HUH to (1) encourage scholarly activity, (2) train all house staff members in research skills including presentation and publications and (3) require all residents and fellows (excluding preliminary year interns and residents) to complete a scholarly project as a criterion for completion of their GME training program in accordance with the ACGME, CODA and CPME Institutional Requirements.

**PROCEDURES:**

1.  Programs will include the development of research, presentation and publishing skills as a component of their curriculum.

2.  All non-preliminary house staff members must complete training for DUCOM IRB and HIPAA certification by the end of the second month of beginning the program.

3.  All non-preliminary residents and fellows are expected to complete a scholarly project as a criterion for completion of their GME program.  The Program Director will certify the completion of the research project and attest for the house staff member to receive a Certificate of Completion from the program.

4.  Scholarly projects may include the following:
    a.  Review of literature
    b.  Case study
    c.  Retrospective chart review and analysis
    d.  Clinical trial in conjunction with a faculty physician
    e.  Bench research including basic, applied or clinical research
    f.  Other Clinical Care Application Reviews as approved by the Program Director

5.  Opportunities of sharing scholarly projects internally include:
    a.  Drexel University Research Day (every April)
    b.  Drexel University College of Medicine Research Day – "Discovery Day" (every October)
    c.  DUCOM Research Journal – DrexelMed Journal
    d.  Program Research Day as directed by each individual department

6.  House staff are encouraged to submit their scholarly findings externally to local, state and national meetings, conferences, and publications.

7.  Support for presentation at national meetings is described in GME 31.

8.  At the end of each academic year, the Program Directors will submit an annual report to the July meeting of the GMEC with a listing of the scholarly project titles completed by each graduating house staff member.

9.  House staff scholarly activity, research and publishing will be examined at each program's Special Review.

**GME 31: FINANCIAL SUPPORT FOR PRESENTATIONS OF RESEARCH**

**POLICY:**

The HUH Office of GME will provide financial support to a house staff member who is engaged in quality research (as determined by the Program Director) and has been selected to present a paper at a peer-reviewed, domestic, national conference and whose paper has the potential to be submitted for publication.

This financial support will be provided in collaboration with the Department that is requesting the funding.  The Department must agree in advance to pay registration fee(s) for the individual(s) attending the conference and also agree to pay hotel expenses.  The house staff member or faculty can not be required to pay these expenses.

**PROCEDURES:**

1.    The Office of GME will budget a maximum amount of $12,000 each academic year to support this scholarly activity.

2.    Requests for funding must be submitted on department letterhead at least 90 days before   planned travel.  The letter must be signed by the Program Director or Chairperson of the department.

3.    Approval or denial of the request will be returned to the Program Director within two weeks from receipt.

4.    The total funds of $12,000 will be evenly distributed to four blocks of GME programs (as indicated below) as per the delineation of representation of house staff on the GMEC.  (See GME Policy 05)

                        a.    Block One: $3,000.00
                        b.    Block Two: $3,000.00
                        c.    Block Three: $2,500.00
                        d.    Block Four: $3,500.00

| BLOCK 1 | BLOCK 3 |
|---|---|
| Diagnostic Radiology | Cardiovascular Disease |
| Dermatology | Endocrinology |
| Family Medicine | Gastroenterology |
| Neurology | Cardiac EP |
| Clinical Neurophysiology | Hematology and Oncology |
| Cytopathology | Interventional Cardiology |
| Hematopathology | Emergency Medicine/Toxicology |
| Pathology | Infectious Disease |
| Child and Adolescent Psychiatry | Nephrology |
| Psychiatry | Pulmonary Disease and Critical Care |
| Neuroradiology | Rheumatology |
| Radiation Oncology | Sleep Medicine |
| Dermatopathology | |
| Family Medicine/Sports Medicine | **BLOCK 4** |
| Hospice and Palliative Medicine | Anesthesiology |
| | Emergency Medicine |
| | Podiatric Medicine and Surgery-36 |
| **BLOCK 2** | OB/GYN |
| Internal Medicine | Ophthalmology |
| | OMFS |
| | Orthopedic Surgery |
| | General Surgery |
| | Female Pelvic Medicine/ Reconstructive Surgery |
| | Urology |

5.  Within each block, a program with a total of 20 or more house staff can recommend a maximum of three house staff members in an academic year for GME financial support. Those programs with less than 20 house staff can recommend a maximum of two per academic year.

6.  The house staff member must make his/her own travel arrangement. The GME Office will reimburse up to $400 for the transportation cost after returning from the presentation.

7.  House staff members who receive financial support must wait two years before requesting additional funding. This requirement is made in light of the total number of house staff members in our system and to allow as many as possible to receive this additional financial support.

8.  Funding will be granted on a first come-first serve basis within a block until the $2,500 budgeted amount is exhausted. Unused money in an academic year will not rollover to the next academic year.

9.  Requests for reimbursement of travel expenses must be submitted electronically through the Concur System within 30 days of returning. The following must be uploaded with your reimbursement request:
    a.  Proof of attendance:  certificate or name tag
    b.  Proof of travel:  airplane/train boarding pass
    c.  Proof of payment: copy of bank/credit card statement of cancelled check showing both front and back of check

**GME 32:  ACCREDITATION SITE VISITS**

**POLICY:**

It is the policy of DUCOM and HUH to follow all the guidelines set forth by the accrediting bodies for each of the GME programs. The GMEC monitors compliance with the accrediting body requirements and oversees remediation of any concerns or citations through communication with the Program Director.

**PROCEDURES:**

1. A GME program receives notification of the date of a site visit by its accrediting body.

2. The Program Director is responsible for completing all of the accreditation forms and materials as requested.

3. The Program Director should review Section 6 of the Program Director Handbook for suggestions in preparing for the accreditation site visit.

4. If materials are to be submitted to the accrediting body, they must be given to the DIO no later than four (4) weeks prior to the site visit.  The DIO reviews the materials prior to submission to the accrediting agency and returns to the Program Director for completion of a final copy for submission.

5. Any major changes to a program must be reviewed by the DIO and the Associate Dean for GME and must be approved by senior leadership and the GMEC prior to being submitted to outside accrediting agency.

6. Official signatures must be included on the final copy prior to submission.  In the case of the ACGME, DIO must sign.

7. The Program Director must send the completed accreditation forms to the site reviewer on time and in the format requested.

8. On the day of the site visit, the Program Director must follow all of the specific instructions of the site visitor.  All materials of the program should be easily accessible for the site visitor preferably in the room of the reviewer.

9. Once the accreditation notice letter is received, it is presented to the next GMEC meeting by the Program Director detailing the status of the program, accreditation length, list of citations, and any requirements such as any request for progress report.

10. The Program Director must also submit action plans in writing and present them to the GMEC within two (2) months of receiving the letter outlining specific measures to remediate each citation noted on the accreditation notice letter.

11. The accreditation notice letter and the program's reaction and action plans to concerns or citations will be examined when the next program Special Review is completed.

**GME 33:  DISASTER POLICY**

Philadelphia Graduate Medical Education Coalition for Disaster Planning

**POLICY:**

The ACGME requires that the sponsoring institution have a policy that addresses the administrative support for GME programs and house staff in the event of a disaster or interruption in patient care. This policy includes assistance for continuation of house staff assignments.

If a disaster occurs at any one of the institutions in the Coalition, the other local institutions in the Coalition will pool resources to facilitate the education of the house staff within its capacity.

Membership in the Coalition requires that all parties agree to use Program Letters of Agreement for expedited movement of residents between institutions.

---

**SCOPE:**

This policy applies to participating training programs in the Philadelphia Coalition. The Philadelphia Coalition comprises the following institutions in the Philadelphia region:
1.   Drexel University College of Medicine/Hahnemann University hospital
2.   University of Pennsylvania Health System
3.   Thomas Jefferson  University Hospital
4.   Temple University Health System
5.   Abington Memorial Hospital
6.   Mercy Health System
7.   Einstein Medical Center
8.   St. Christopher's Hospital for Children
9.   Lankenau Hospital/Bryn Mawr Hospital
10.  Children's Hospital of Philadelphia
11.  Crozer-Keystone Health System
12.  Cooper University Hospital
13.  Christiana Care Health System
14.  Bryn Mawr Hospital

**IMPLEMENTATION:**

The implementation of this policy and the monitoring of compliance with this policy is the responsibility of the ACGME Designated Institutional Official (DIO) and the Chief Medical Officers. The DIO will involve his/her appropriate academic and employment leadership at the institution as needed (ie. Associate Dean for GME, Dean, CEO, CFO, etc.).

**PROCEDURE:**
This policy includes three (3) disaster scenarios:
1.   A disaster at single or multiple sponsoring institutions in the Philadelphia region that results in permanent destruction of the facilities rendering them unusable for training.
2.   A disaster at single or multiple sponsoring institutions in the Philadelphia region that results in temporary suspension of training while repairs are made.
3.   A disaster for the entire region.

Disaster resulting in temporary destruction of a sponsoring institution(s):

The members of the Coalition will meet to implement this policy and develop specific plans for any given situation as well as involve other representatives from the respective institutions as necessary.

General principles:

1.   House staff in ACGME accredited programs will have their salary, benefits and malpractice insurance continued by the sponsoring institution.

2.  If the duration of the disaster exceeds 30 days, every attempt will be made to relocate the residents to an alternate training facility within the Coalition.

3.  The receiving institution must have the opportunity to review the credentials of the residents proposed for relocation to their institution and based on such review can decline to accept individual residents.

4.  Any master affiliation or program letters of agreement will be expedited during the disaster using the PLA specifically developed for disasters.

5.  Institutions receiving residents under this disaster policy will be able to claim the training time on their CMS cost report. The sponsoring institution will adjust its CMS cost report accordingly.

6.  Once the sponsoring institution is able to resume its' training activities, the residents will immediately resume training at their sponsoring institution.

7.  Programs currently under a proposed or actual adverse accreditation decision by the ACGME will not be eligible to participate in accepting residents.

<u>Disaster resulting in permanent destruction of a sponsoring institution(s):</u>

The members of the Coalition will meet to implement this policy and develop specific plans for any given situation as well as involve other representatives from the respective institutions as necessary.

General principles:

1.  House staff in ACGME accredited programs will have their salary and benefits continued by the sponsoring institution for up to 60 days while permanent training opportunities are located.

2.  House staff will be orphaned by their sponsoring institution to the receiving institution under the following process:

    A.  House staff are eligible to be orphaned due to closing of a program or hospital.

    B.  Program Director and/or DIO of the receiving institution will contact the ACGME to request an increase in resident complement during the disaster period.

    C.  Receiving institution agrees to take resident.

    D.  Sponsoring institution sends a letter to the receiving institution indicating orphan status.

    E.  Receiving institution signs the letter and returns it to sponsoring institution.

    F.  Copy of the signed letter given to the DIO of sponsoring institution.

    G.  Sponsoring institution DIO and CFO sends a copy of the letter to CMS noting orphan status of involved residents and a statement that the sponsor will not claiming reimbursement for remainder of resident's training.

    H.  Receiving institution sends copy of the letter to its CMS intermediary to indicate that it is now claiming reimbursement for the displaced, orphaned resident.

<u>Disaster for the Entire Region:</u>

Due to the size of the Philadelphia region, should a disaster occur for the entire region, it is impossible to have all programs to be encompassed in a single area or institution. Each member of the Coalition should have a mutual agreement with another institution outside this region should the entire Philadelphia area have a disaster or the other institutions are unable to accommodate the needs of the closed institution(s). The DUCOM/HUH program has such a mutual agreement with St. Louis University Hospital.

**GME 34: PHARMACY AND MEDICAL DEVICE POLICY**

**POLICY:**

It is the policy of DUCOM and HUH that house staff physicians act in a professional manner and adhere to the industry relations compliance policies and standards set forth by the University and HUH as to what a house staff member may receive with respect to education, research or consulting grants, gifts, scholarships, fees or other monies in cash or in kind from outside industries or agencies. It is further expected that a resident may never solicit any of the same nor should their interaction with industry have any adverse effect on their education or the education of others in their program.

**PROCEDURE:**

House staff members may not receive funding for education, research, consulting grants, food, gifts, scholarships, fees or other monies in cash or in kind from pharmacy or medical device industry representatives without approval from the Program and the Hospital.

All offers from pharmacy or medical device industry must be in writing and must be approved by the Program Director.

The approval must then be sent to the Hospital Compliance Officer for adherence to this policy.

If there is any doubt that an offer is legitimate and appropriate, the house staff member is responsible to check with the Program Director and the Hospital Compliance Officer in advance, prior to receiving any compensation or accepting any offer.

Violation of this policy is subject to corrective and disciplinary action for non-professional behavior as referenced in GME 14 of the House Staff Manual.

References:

The Code of Ethics for PHRMA (Pharmaceutical Industry) and AdvaMed (Medical Device Industry) are located in the Office of Graduate Medical Education and the Hospital Compliance Officer.

The DUCOM Compliance Policies are maintained in the DUCOM HR and student manuals.

**GME 35: RESIDENT/FELLOW FORUM**

1.  DUCOM/HUH maintains a Resident/Fellow Forum that allows residents and fellows from all programs to communicate and exchange information relevant to their ACGME accredited programs and their clinical learning experiment.

2.  The Forum will be co-led by two peer selected leaders.

3.  The dates, times and location of the Forum will be determined by the two co-leaders.

4.  Any resident or fellow from one of the ACGME accredited programs must have the opportunity to raise concern to the Forum.

5.  Residents/fellows attending a meeting the Forum must have the option to meet without the Chief Graduate Medical Education Officer (DIO), faculty members, or other administrators present.

6.  A meeting space and technological support will be provided for the Forum. The DIO and the Manager of GME  are available for support of the Forum if requested by either of the co-leaders.

7.   A secure platform can be a chat room restricted to residents and fellows; however other social media platforms such as Facebook and Twitter do not meet that expectation.

8.  Resident/Fellow Forum reports by one of the co-leaders or their representative will be on the agenda of the monthly Chief Residents and GMEC meetings.

**RESIDENT PHYSICIAN HOUSE STAFF MANUAL**
**ACKNOWLEDGMENT FORM**

I acknowledge that I have received information regarding how to access an electronic copy of the 2016-2017 House Staff Manual via (New Innovations or our Sharepoint site)*. I understand that I may print all or parts of the manual for my use. I further understand that the manual contains important information about the Hospital's and University's general personnel policies, procedures, privileges and obligations as a Hahnemann University Hospital employee and house staff member. I further understand and acknowledge that I am governed by the contents of the House Staff Manual and that I am expected to read, understand, familiarize myself with and comply with the policies and procedures contained in it.

I also understand that the Hospital or University may change, rescind or add to any of the policies, procedures, benefits, or practices described in the House Staff Manual with or without prior notice. I understand that the Hospital or University may advise house staff members from time to time of material changes to the policies, procedures, benefits or practices described in the Manual.

In addition, I acknowledge that I may obtain a copy of Tenet's Fair Treatment Process via the company's Intranet.

_____
House Staff Member Signature                            Date

_____
House Staff Member (please print)

**\*How to access the House Staff Manual via New Innovations**

1. **Log In to New Innovations to access the home screen**
2. **Select "More"**
3. **Select "Resources"**
4. **Select "Department Manuals"**
5. **Select "House Staff Manual"**
6. **Double click to open the PDF file**

# **EXHIBIT C**

**From:** Aizenberg,David <dja77@drexel.edu>
**Sent:** Monday, November 11, 2019 12:15 PM
**To:** Jayatilleke,Arundathi <aj475@drexel.edu>; Waheed,Ayesha <aw66@drexel.edu>; Ko,Anita <agk24@drexel.edu>; Ahmad,Asyia <asa39@drexel.edu>; Mapow,Beth <beth.mapow@drexel.edu>; McCracken,Brenden <bkm56@drexel.edu>; Ward,Kristine <kmw36@drexel.edu>; Brendan Mccracken <Brendan.Mccracken@americanacademic.com>; Simmons,B Brent <bbs36@drexel.edu>; Vearrier,David <djv27@drexel.edu>; Lee,Dong <dhl27@drexel.edu>; Kelepouris,Ellie <ek375@drexel.edu>; Leber,Ernest <ehl22@drexel.edu>; Ledley,Gary <gsl28@drexel.edu>; Pillai,Jyoti <jap48@drexel.edu>; Daniels,Kelli <ked33@drexel.edu>; Kristene Whitmore <bladder1@aol.com>; Laurence Belkoff <lbelkoff@ucsepa.com>; McCrea,Leon <lm978@drexel.edu>; Famador,Mark <mbf32@drexel.edu>; Bianchi,Michael <mab336@drexel.edu>; Stephen,Michael <mjs493@drexel.edu>; Nancy Crawford <nancy.crawford@mooreeye.com>; Bhat,Rekha <rrb42@drexel.edu>; Robert Koenigsberg <Robert.Koenigsberg@americanacademic.com>; Koenigsberg,Robert <rk26@drexel.edu>; Cho,Sung-Hae <sc55@drexel.edu>; Shelley George <Shelley.George@americanacademic.com>; Steve Boc <sfbocdpm1@comcast.net>; Trojian,Thomas <tht34@drexel.edu>; rkoenigsberg@me.com <rkoenigsberg@me.com>; Hamilton,Richard <rh35@drexel.edu>; McCracken,Brenden <bkm56@drexel.edu>; Missri,Jose <jm4439@drexel.edu>; Barbara.Simon2@comcast.net <Barbara.Simon2@comcast.net>
**Subject:** Malpractice Issue for Hahnemann Residents/Fellows

Dear Former PD's,

I don't know who is still around or if these emails still work…

I'm sure many of you are aware of the malpractice issue that has come up. I sent the following email to our residents today. I know that AAHS will be trying to notify everyone also – but they probably have out of date contact information. I do not think that there is any coordinated effort from Drexel or anyone else to try to get more updated contact info. I will be speaking to the ACGME about contacting all residents/fellows who were orphaned, but they will not have information on those who graduated prior to HUH's closure. I am more than happy to be the point person on some of this – but will need help getting email addresses of trainees.

If you can:
- Please read the email below for details.
- Reply to me if you have received the email
- In that reply please include a list of email contacts for your former residents who worked at HUH for any period of time between 1/11/2018-8/9/2019

Thanks,
Dave

Email to IM residents today:
Dear Former Residents,

I am sending this email broadly and it is only **relevant to residents who worked at Hahnemann for ANY period of time between January 11, 2018 through August 6, 2019**. Please read this email carefully.

Some of you may have received notification from PAHS that they will not be purchasing something called "tail" malpractice insurance for any of their employees. **This is a significant issue.**

PAHS employees were covered by the Philadelphia Academic Risk Retention Group (PARRG) with a Claims Made (CM) policy. A CM policy covers you for claims when the event occurs and the claim is made, *as long as you are still employed*. When you leave an employer and are covered by a claims made policy, you need to have tail coverage. Tail coverage basically converts your CM policy to an occurrence policy. This means the policy will cover you for any claim related to care while you were employed, no matter when the claim is made.

After 1/10/20, there will be no tail coverage available for the period of your residency at Hahnemann from 1/11/18 through the date you graduated, left, or the program closed. For example, if a claim is filed for malpractice and the allegation is related to care while you were employed on 4/1/19, and it is filed on 12/1/19, then the PARRG will provide tail coverage. However, if that same claim for alleged malpractice on 4/1/19 is filed on 2/1/20, you will not have insurance coverage to protect your interests. You will also have to pay for an attorney to defend you against the claim.

Without tail insurance, individuals are open to significant personal liability. Furthermore, Pennsylvania requires individuals to carry tail malpractice insurance from all of their previous employers in order to qualify for supplemental malpractice coverage called Mcare. Individuals who do not acquire tail malpractice within 120 days of lapsed coverage do not qualify for Mcare coverage going forward even though the premium was paid. Lastly, many states and employers require you to have tail malpractice insurance from all of your previous employers.

This entire situation is problematic for health care providers who will not have coverage and patients who may have a reason for compensation.

The PAHS insurance will lapse on January 10, 2020. There are multiple things going on to try to help rectify this situation, but I am not optimistic about any of them. The bankruptcy court is reviewing a brief that was filed in order to try to compel the owners to purchase the insurance. I have contacted our representative in Congress Dwight Evans who is reviewing the issue. We have also been in contact with several insurance brokers in order to get a competitive price for people to purchase the insurance either as a group or on their own. Multiple organizations (ACGME, ECFMG, AMA, Philadelphia County Medical Society etc) will be on a conference call this week to discuss options.

The cost of purchasing tail malpractice insurance depends on your specialty and the amount of time being covered. Some of you (2019 interns) will only need coverage for 2 weeks or so. Others will need the entire period covered. Note that Tenet purchased occurrence insurance for the time period prior to January 11, 2018, so you will not need tail for any time before 1/11/18. The cost will vary widely and could be several thousand dollars.

I wanted you to know about this now because you may see reports in the media about this. Please know that we are working on clarifying all of this information and clarifying a clear option for all of you to take. You will also be receiving an official communication from Linda Ramsey regarding this. Her email will include some very important details – so please look out for that.

Harold Brubaker of the Philadelphia Inquirer, who has reported on many issues that have surrounded the closure of Hahnemann, is interested in hearing from you about this. I think it is important for the public to know about what is going on and encourage anyone who feels comfortable, to reach out to him. His email is: hbrubaker@inquirer.com

I also would encourage you to reach out to Congressman Dwight Evans:
https://evans.house.gov/contact
You should use Hahnemann's zipcode: 19102

In regards to next steps, you will hear from me or someone else at Drexel in the next 1-2 weeks with an update. If nothing pans out with the courts or other means, we will include suggestions regarding purchasing tail malpractice insurance yourself (you may also ask your current employer to purchase it). At least one of the brokers with whom we have been talking has guaranteed that if AAHS ends up paying for this, they will refund anything paid to them from individuals.

I honestly thought all of the craziness was over, but alas, the challenges continue. I will continue to advocate on your behalves and try to find the best path to take. Stay tuned and check your email.


DJA


David J. Aizenberg, M.D.
Recovering Program Director, Internal Medicine Residency
Associate Professor of Medicine
Drexel University College of Medicine
dja77@drexel.edu

# ~ Exhibit C ~

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, | ) | Case No. 19-11466 (KG) |
| LLC d/b/a HAHNEMANN | ) |  |
| UNIVERSITY HOSPITAL, *et al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## THE COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF HEALTH'S MOTION FOR AN ORDER
## COMPELLING DEBTORS TO OBTAIN
## POST-CLOSURE TAIL INSURANCE COVERAGE

The Commonwealth of Pennsylvania Department of Health ("PA DOH"), by and

through undersigned counsel, by way of *The Commonwealth of Pennsylvania Department of*

*Health's Motion for an Order Compelling Debtors to Obtain Post-Closure Tail Insurance*

*Coverage* (the "Motion"), hereby states:

### BACKGROUND

1.      On June 30, 2019 (the "Petition Date"), Center City Healthcare, LLC d/b/a

Hahnemann University Hospital, and its affiliated debtors and debtors in possession

(collectively, the "Debtors") filed voluntary petitions in the United States Bankruptcy Court for

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax
identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health
System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical
Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527),
St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia
Associates, L.L.C. (2326), St. Chris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA,
L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C.
(5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad
Street, Philadelphia, Pennsylvania 19102.

the District of Delaware (the "Court") seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.      On June 30, 2019, the Debtors filed the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a), 363, and 1108 of the Bankruptcy Code (A) Authorizing the Debtors to Implement a Plan of Closure for Hahnemann University Hospital and (B) Scheduling a Final Hearing* [Doc. No. 15] (the "Closure Motion").

3.      On July 3, 2019, PA DOH, with the agreement of the Debtors, installed a temporary manager to oversee closure of Hahnemann and, thereafter, PA DOH worked diligently with the Debtors toward finalizing a closure plan, which plan was finalized on August 7, 2019 and approved by PA DOH (the "Closure Plan").

4.      Pursuant to the Closure Plan, the Debtors were to cease all operations and close Hahnemann as an acute care hospital as of September 6, 2019.

5.      On September 10, 2019, the Court entered an *Order Under 11 U.S.C. §§ 105, 106, 363, 365, 503, 507, and 525 (A) Approving Asset Purchase Agreement with Thomas Jefferson University Hospitals, Inc., (B) Authorizing Sale of Certain of Debtor's Assets Free and Clear of Interests, (C) Authorizing Assumption and Assignment of Certain of the Debtor's Executory Contracts, and (D) Granting Related Relief* [Doc. No. 681] (the "Residents Sale Order").

6.      Among other things, the Residents Sale Order provides that it is not "intended to abrogate or limit the authority or discretion of the Pennsylvania Department of Health over regulatory matters such as closure and licensing of health care facilities." Residents Sale Order at ¶ 22.

7.      On September 16, 2019, the United States District Court for the District of Delaware issued an Order staying the Residents Sale Order pending an appeal of the Residents Sale Order by the federal government. *United States of America v. Center City Healthcare, LLC, et al.*, C.A. No. 19-1711 (UNA), Doc. No. 17 (D. Del. Sept. 16, 2019).

8.      Effective November 1, 2019, PA DOH revoked Hahnemann University Hospital's state hospital license.

9.      On September 27, 2019, the Court entered an order approving the sale of certain assets of St. Christopher's Healthcare, LLC and certain other Debtors (together, "St. Christopher's") to STC OpCo, LLC [Doc. No. 795].

10.      PA DOH brings this motion pursuant to its statutory and regulatory authority, and in its capacity of *parens patriae,* to protect the citizens of the Commonwealth of Pennsylvania.

11.      Pursuant to its police powers, and statutory and regulatory authority, PA DOH has determined that it is in the best interests of the public, including but not limited to the Debtors' patients, employees, and other hospital staff, for the Debtors to obtain tail insurance covering former residents, fellows, and medical staff of Hahnemann and former residents, fellows, and medical staff of St. Christopher's, including those who will not be employed by the new owners and for whom the new owners apparently do not intend to buy tail insurance.

### Relief Requested

12.      PA DOH seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), compelling the Debtors to obtain tail insurance sufficient to provide coverage for any and all claims asserted against former residents, fellows, and medical staff of Hahnemann and former residents, fellows, and medical staff of St. Christopher's, including those

3

who will not be employed by the new owners and for whom the new owners apparently do not

intend to buy tail insurance, for work done during the course of their employment by the

Debtors.

## Jurisdiction and Venue

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).[2]

14.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The bases for the relief requested herein are Sections 105 and

1112(b)(4)(C) of the Bankruptcy Code.

## Argument

16.     The statutory mission of the PA DOH is to promote healthy behaviors,

prevent injury and disease, and assure the safe delivery of quality health care for all people in the

Commonwealth of Pennsylvania.  *See* https://www.health.pa.gov/About/Pages/About.aspx ; *see*

*also* Act of April 27, 1905, P.L 312, modified through the Administrative Code of 1929 and Act

87 of July 2, 1996, P.L. 518.

17.     PA DOH is responsible for the licensing and oversight of hospitals within

the Commonwealth of Pennsylvania.

---

[2] Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the
United States Bankruptcy Court for the District of Delaware (the "Local Rules"), PA DOH
hereby expressly confirms its consent to the entry of a final order by the Court in connection
with this Motion if it is later determined that the Court, absent consent of the parties, cannot
enter final orders or judgment in connection therewith consistent with Article III of the United
States Constitution.

18.     Pursuant to the Pennsylvania Health Care Facilities Act, 35 P.S §§ 448.101, *et seq.* (the "Act"), PA DOH is "the sole statewide health planning and development agency" in the Commonwealth of Pennsylvania. *See Grandview Surgical Center, Inc. v. Holy Spirit Hospital of Sisters of Christian Charity*, 533 A.2d 796, 799 (Pa. Commw. Ct. 1987) (citing 35 P.S. § 448.201, which outlines the powers and duties of PA DOH and provides, among other things, that PA DOH has the "exclusive jurisdiction over health care providers" in accordance with the provisions of the Act).

19.     The Act is intended to "enhance the public health and welfare" of the Commonwealth of Pennsylvania's citizens and to "provide[] for quality care at appropriate health care facilities throughout the Commonwealth." *See Rehab Hosp. Servs. Corp. v. Health Sys. Agency*, 475 A.2d 883, 885-86 (Pa. Commw. Ct. 1984) (*quoting* 35 P.S. § 448.102).

20.     Additionally, the Act charges PA DOH with ensuring that the Commonwealth's health care system is "responsive and adequate to the needs of its citizens," that healthcare facilities "meet high quality standards," and that "all citizens receive humane, courteous, and dignified treatment." *Id.*

21.     Chapter 8 of the Act governs the Commonwealth's licensing of Pennsylvania health care facilities, including hospitals, and sets the standards for issuance of licenses with which health care providers must comply. *See* 35 P.S. §§ 448.801 *et seq.*

22.     The purposes of Chapter 8 of the Act are, *inter alia*, "to protect and promote the public health and welfare through the establishment and enforcement of regulations setting minimum standards in the construction, maintenance and operation of health care facilities" and to "assure quality health care . . . with due regard to the protection of the health and rights of privacy of patients . . . ." 35 P.S. § 448.801a.

23.     The Act grants PA DOH the authority to implement and enforce the purposes of Chapter 8 within the Commonwealth.

24.     Pursuant to the above-summarized statutory framework, PA DOH is charged both with overseeing the safe operation of all health care facilities within the Commonwealth of Pennsylvania and with ensuring the health and safety of those members of the public, including patients, employees, and other hospital staff, who come into contact with health care facilities in the Commonwealth of Pennsylvania.

25.     PA DOH, in its capacity of *parens patriae,* likewise can act to protect the health, safety, and welfare of the public at large. As with police powers, the Commonwealth must act on behalf of all of its citizens. *See, e.g.*, *Adams Sanitation Co., Inc. v. Commonwealth of Pennsylvania, Dep't of Environmental Protection*, 715 A.2d 390, 395 (Pa. 1998) (internal citations omitted).

26.     Pursuant to its police powers and statutory and regulatory authority, PA DOH has determined that it is in the best interests of the public, including but not limited to Hahnemann and St. Christopher's patients, employees, and other hospital staff, for the Debtors to obtain tail insurance covering former residents, fellows, and medical staff of Hahnemann and former residents, fellows, and medical staff of St. Christopher's, including those who will not be employed by the new owners and for whom the new owners apparently do not intend to buy tail insurance.

27.     Currently, the Debtors provide their current and former residents, physicians, and other health care professionals medical malpractice insurance coverage through several claims-made insurance policies that are set to expire in January, 2020.

28.     However, on information and belief, the Debtors notified its former residents, fellows, and physicians that insurance coverage will terminate on January 11, 2020, and that the Debtors will not be purchasing tail insurance coverage for any of their former employees.

29.     As a result, PA DOH is concerned that inadequate protections are in place to ensure that funds are available for any claims that may be asserted against Hahnemann or St. Christopher's, including claims against their former residents, physicians, and other health care professionals, by members of the public, which arose or may arise during the pendency of or following the closure of Hahnemann, or which arose or may arise during the Debtors' ownership of St. Christopher's.

30.     As acknowledged by the Debtors in the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor the Terms of Premium Financing Agreement and Pay Premiums Thereunder; and (IV) Enter into New Premium Financing Agreements in the Ordinary Course of Business* [Doc. No. 13] (the "Insurance Motion"), "in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the Office of the United States Trustee's requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case." *See* Insurance Motion, Doc. No. 13, at ¶ 13.

31.     Pursuant to the applicable Operating Guidelines for Chapter 11 Cases, during the pendency of a chapter 11 case, debtors "must maintain … insurance coverage … as is

customary in the debtor's business." U.S. Department of Justice, Operating Guidelines for

Chapter 11 Cases, Region 3, District of Delaware, at ¶ 3.

32.    Further, section 1112(b)(4)(C) of the Bankruptcy Code provides that

"failure to maintain appropriate insurance that poses a risk to the estate *or to the public*" is

"cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C)

(emphasis supplied). *See also In re Delta AG Grp., LLC*, 596 B.R. 186, 196 (Bankr. W.D. La.

2019) (dismissing debtor's chapter 11 bankruptcy case for cause where debtor failed to maintain

appropriate insurance on its grain storage bins) (citing *Gilroy v. Ameriquest Mortgage Co.*, No.

NH 07-054, 2008 Bankr. Lexis 3968 (1st Cir. BAP Aug. 4, 2008) (failure to maintain property

and liability insurance for five condominiums constitutes cause for dismissal); *Derivium Capital*

*LLC v. U.S. Trustee*, No. 5 Civ. 10845, 2006 U.S. Dist. LEXIS 31427, 2006 WL 1317021, *11

(S.D.N.Y. May 12, 2006) (affirming bankruptcy court's decision to convert chapter 11 case

partially because debtor lacked proper insurance coverage); *In re Van Eck*, 425 B.R. 54, 60-61

(Bankr. D. Conn. 2010) (finding that cause existed, in part, because debtor failed to show that

there was insurance on residential property)).

33.    Under 28 Pa. Code § 101.31(10)(xv), hospitals within the Commonwealth

of Pennsylvania are required to maintain "[m]inimum supportive capabilities," including

"[c]omprehensive policies and standards for assuring the safety of patients, employees and

visitors and for protection against malpractice and negligence."

34.    Further, state regulations governing the operations of hospitals within the

Commonwealth of Pennsylvania provide:

> There should be an insurance program which provides for the
> protection of the physical and financial resources of the hospital.
> There should be appropriate coverage of the buildings and
> equipment and adequate comprehensive liability insurance or an

equivalent self-insurance plan covering members of the governing body and appropriate medical and administrative personnel.

28 Pa. Code § 103.43.

35.     Although Hahnemann is no longer a licensed facility, the past licensed operation of the hospital presents a potential for continuing claims to be asserted by patients, against former residents, fellows, and medical staff of Hahnemann based on occurrences arising prior to or during the pendency of the closure of the hospital.

36.     This is because the operation of a hospital carries certain inherent risks. Among many other things, there are the risks to patients attendant to the performance of any number of medical procedures, including invasive surgeries. Such claims, although arising prior to the closure of Hahnemann, may continue to be asserted well after closure.

37.     St. Christopher's is faced with the same inherent risks for an occurrence during the Debtors' ownership of the hospital and potentially even greater risk as the applicable statute of limitations to bring a claim relating to an injury of a minor does not begin to run until the minor is emancipated at age 18.

38.     The provision of tail insurance coverage is critical to ensure that funding is in place for the adequate and equal treatment of any such claims. *See In re Baltimore Emergency Services II, LLC*, 334 B.R. 164, 167 (Bankr. D. Md. 2005) (noting inequity of unequal treatment of pre- and post-petition malpractice claims asserted against debtor hospitals that could arise in absence of sufficient existing insurance policies and tail insurance coverage).

39.     Moreover, the Commonwealth of Pennsylvania's MCARE Act requires Pennsylvania physicians to maintain insurance coverage, including tail coverage. *See* 40 P.S. §1303.711; 40 P.S. §1303.742. Therefore, those of the Debtors' former residents, fellows, and physicians who are unable to obtain tail coverage on their own, would be at risk of losing their

ability to provide medical care in the Commonwealth of Pennsylvania due to lack of insurance coverage. A physician's medical license "shall" be suspended or revoked by the relevant Commonwealth of Pennsylvania state licensing board if the physician fails to comply with the required insurance provisions of the Act. *See* 40 P.S. §1303.711(c).

40. Thus, hundreds of the Debtors' former residents, fellows, and physicians may be prevented from providing medical care in the Commonwealth of Pennsylvania at a time when the Commonwealth of Pennsylvania is experiencing a shortage of physicians. *See* Amici Brief previously filed by the American Medical Association, the Pennsylvania Medical Society, and the Philadelphia County Medical Society (collectively the "Amici Curiae"), which brief is at Docket 729.

41. In addition, the Debtors' former residents, fellows, and physicians may have additional state medical licenses, such as in Delaware, New Jersey, or Maryland. If a physician with multiple medical licenses is disciplined by the Pennsylvania state licensing board, then the physician may also be subject to discipline by the other state boards where he maintains a medical license; there often are reciprocal reporting and discipline requirements. Further, discipline by a Pennsylvania state medical board would also result in a report to the National Practitioners' Data Bank, which becomes a permanent part of the physician's record. This avalanche effect could impact whether a physician is able to continue to practice medicine. *See* Amici Brief previously filed by the Amici Curiae.

42. Pursuant to Section 105 of the Bankruptcy Code, this Court has authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]," including Section 1112(b)(4)(C)'s requirement that chapter 11 debtors maintain appropriate insurance coverage under the circumstances of the case.

43. Thus, this Court has the authority to order the Debtors to obtain tail insurance coverage to ensure the protection of the public in connection with claims relating to the Debtors' operations, regardless of whether those claims are asserted prior to the expiration of the current coverage period.

44. Further, it is within the purview of PA DOH and its statutory, regulatory and *parens patriae* authority to oversee the safety of all hospitals within the Commonwealth, and to ensure that adequate insurance is available to provide for any claims that may be asserted against the Debtors, including against former residents, fellows, and the medical staff of the Debtors.

45. In light of Hahnemann's and St. Christopher's roles as public institutions and providers of services intended to benefit the health and welfare of the populace at large, the circumstances of this bankruptcy, the closing of Hahnemann and the sale of St. Christopher's present a unique case of particular concern to PA DOH and the Commonwealth of Pennsylvania.

46. Because of PA DOH's above-described statutory, regulatory, and *parens patriae* authority, PA DOH is uniquely positioned as the most appropriate party-in-interest to invoke the applicable protections of the Bankruptcy Code and petition this Court for the relief requested herein.

47. In order to enable PA DOH to fulfill its statutory, regulatory, and *parens patriae* responsibility to ensure the health, safety, and welfare of the public and to oversee the operation and licensing of the Commonwealth's hospitals, PA DOH respectfully requests that this Court enter an Order compelling the Debtors to obtain tail insurance covering former residents, fellows, and medical staff of Hahnemann and former residents, fellows, and medical staff of St. Christopher's, including those who will not be employed by the new owners and for

whom the new owners apparently do not intend to buy tail insurance, for a sufficient period of time to ensure adequate funding for potential claims asserted against Hahnemann and St. Christopher's by members of the public.

48.     Requiring the Debtors to obtain any necessary tail insurance coverage (i) is within this Court's Section 105 equitable power to ensure the Debtors' compliance with Section 1112(b)(4)(C) of the Bankruptcy Code and (ii) will further the public interest and assist PA DOH in its mission to protect the health, safety, and welfare of the public.

49.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (i) Office of the United States Trustee; (ii) the Debtors; (iii) the Unsecured Creditors' Committee; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. PA DOH submits that no other or further notice is necessary.

WHEREFORE, PA DOH respectfully requests that the Court enter the Order

attached hereto as **Exhibit A**.


Dated:  December 11, 2019                      By:   /s/ Richard A. Barkasy
                                               Richard A. Barkasy (#4683)
                                               SCHNADER HARRISON SEGAL & LEWIS LLP
                                               824 North Market Street, Suite 800
                                               Wilmington, DE 19801
                                               Telephone: (302) 888-4554
                                               Facsimile:  (302) 888-1696
                                               rbarkasy@schnader.com

                                               -and-

                                               David Smith (admitted *pro hac vice*)
                                               Nicholas J. LePore, III (admitted *pro hac vice*)
                                               Ira Neil Richards (admitted *pro hac vice*)
                                               SCHNADER HARRISON SEGAL & LEWIS LLP
                                               1600 Market Street, Suite 3600
                                               Philadelphia, PA 19103-7286
                                               Telephone: (215) 751-2000
                                               Facsimile: (215) 751-2205
                                               dsmith@schnader.com
                                               nlepore@schnader.com
                                               irichards@schnader.com

                                               *Counsel for the Commonwealth of Pennsylvania*
                                               *Department of Health*

13

Case 19-11466-WG   Doc 5941-1   Filed 12/12/19   Page 9 of 8

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER CITY HEALTHCARE, | ) | Case No. 19-11466 (KG) |
| LLC d/b/a HAHNEMANN | ) |  |
| UNIVERSITY HOSPITAL, *et al.*,[1] | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## ORDER COMPELLING DEBTORS TO OBTAIN
## POST-CLOSURE TAIL INSURANCE COVERAGE

Upon *The Commonwealth of Pennsylvania Department of Health's Motion for an Order Compelling Debtors to Obtain Post-Closure Tail Insurance Coverage for Hahnemann Hospital* (the "Motion");[2] and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, its creditors, and other parties-in-interest; and the Court having found that PA DOH provided

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 230 North Broad Street, Philadelphia, Pennsylvania 19102.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the relevant proceedings with respect to the Motion, if any, before the Court; after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Debtors shall promptly take all necessary steps to obtain tail insurance sufficient to provide coverage for any and all claims asserted against former residents, fellows, and medical staff of Hahnemann and former residents, fellows, and medical staff of St. Christopher's, including those who will not be employed by the new owners and for whom the new owners apparently do not intend to buy tail insurance, for work done during the course of their employment by the Debtors.

3.      The terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

4.      The Court shall retain jurisdiction with respect to all matters arising from or related to the Motion and implementation of this Order.

# ~ Exhibit D ~

Case 19-11466-KG Doc 1169 Filed 12/16/19 Page 1 of 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) | Case No. 19-11466(KG) |
| HAHNEMANN UNIVERSITY HOSPITAL, | ) | (Jointly Administered) |
| *et al.,* | ) | |
| | ) | |
| Debtors. | ) | |

<u>ORDER FOR RULE TO SHOW CAUSE DIRECTED TO DEBTORS</u>

At the hearing scheduled for Tuesday, December 17, 2019, the Court directs Debtors to show cause why their Chapter 11 (11 U.S.C. § 101, *et seq.*) cases should not be converted to cases under Chapter 7 of the Bankruptcy Code. Debtors appear to have failed to maintain appropriate insurance, *i.e.,* tail insurance, for physicians they employed which would give rise to conversion pursuant to 11 U.S.C. § 1112(b)(4)(C). The Court will conduct an evidentiary hearing on the insurance issue on December 17. In addition, Debtors appear to have substantial and continuing loss to and diminution of Debtors' estates and no reasonable likelihood of rehabilitation, thereby subjecting them to conversion pursuant to 11 U.S.C. § 112(b)(4)(A).

SO ORDERED.

December 16, 2019

KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE