## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CENTER CITY HEALTHCARE, LLC, | : | Case No. 19-11466 (MFW) |
| d/b/a HAHNEMANN UNIVERSITY | : | |
| HOSPITAL, et al., | : | (Jointly Administered) |
| | : | |
| *Debtors*. | : | |
| | : | |
| IS BBFB LLC, and | : | |
| IS 245 NORTH 15TH LLC, | : | |
| *Plaintiffs*, | : | Adv. Pro. No. |
| | : | |
| v. | : | |
| | : | |
| CENTER CITY HEALTHCARE, LLC, | : | |
| *Defendant*. | : | |
| | : | |

## COMPLAINT FOR DECLARATORY AND RELATED RELIEF

IS BBFB LLC and IS 245 North 15th LLC (**Plaintiffs**), by and through their undersigned attorneys, as and for their complaint against Center City Healthcare, LLC (**CCH** or the **Defendant**), aver as follows:

## NATURE OF THE ACTION

1.    This is an adversary proceeding commenced pursuant to Part VII of the Federal Rules of Bankruptcy Procedure to recover damages against CCH resulting from CCH's material breaches of an Easement & Unity of Use Agreement (**EEU**) (**Exhibit 1**) and a Reciprocal Easement and Operating Agreement (**REA and, collectively with the EEU, the Agreements**) (**Exhibit 2**) as more particularly described herein, for a declaratory judgment determining the Plaintiffs' rights and interests with respect to certain real property and improvements owned or

controlled by CCH, for damages resulting from a nuisance by reason of CCH's failure to maintain its properties, and for related relief.

2.        More specifically, as set forth below, CCH owns or controls four parcels of real estate subject to the EUU and REA while Plaintiffs own the remaining two parcels. Since taking control of its four parcels, CCH has breach the EUU and REA by, *inter alia*,

(a)        refusing to recognize Plaintiffs' ongoing and perpetual rights to accessory parking and accessory signage for Plaintiffs' benefit on two of CCH's parcels (Parcels D and E);

(b)        refusing to recognize Plaintiffs' ongoing and perpetual rights to access across one of its Parcels (Parcel E) for ingress and egress to Plaintiffs' buildings;

(c)        permitting nuisances on their properties including uncontrolled graffiti;

(d)        failing to maintain their properties thereby allowing defective, code violating conditions violating the "Operating Standard" required by the REA and forcing Plaintiffs to repair CCH's property; and

(e)        Other breaches as described below.

all to Plaintiffs' great loss and detriment. As such, Plaintiffs seek a declaration of their ongoing and perpetual rights under the EUU and REA for accessory parking, accessory signage, and access across CCH's properties, a declaration that Plaintiffs repairs to CCH's property was required to make the properties safe and permitted pursuant to the REA, as well as all damages for CCH's breaches of the Agreements and for the nuisances created by CCH.

2

## JURISDICTION

3.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§157(b), 1334(b), 2201 and 959, F.R.Civ. P. 57 and Federal Rule of Bankruptcy Procedure 7001.

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1409(a).

5.    This is a core proceeding under 28 U.S.C. §§157(b)(2)(A) and (O).

## PARTIES

6.    Plaintiff IS 245 North 15th LLC is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania, which owns real property located at 225-251 N. Broad St., Philadelphia, Pennsylvania (identified as **Parcel B** in the EUU and REA).

7.    Plaintiff IS BBFB LLC, is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania, which owns real property located at 216-220 N. Broad St., Philadelphia, Pennsylvania, (identified as **Parcel C** in the EUU and REA).

8.    Upon information and belief, CCH is a limited liability company organized and existing under the laws of the State of Delaware. CCH is a debtor-in-possession in the above captioned Chapter 11 cases. Pursuant to this Court's prior Order [D.I. 4216], and as described more fully below, CCH is also the beneficial owner responsible for the maintenance and management of real estate identified as Parcels A, D, E, and F in the EUU and REA.

## STATEMENT PURSUANT TO
## FEDERAL RULE OF BANKRUPTCY PROCEDURE 7008

9.    The Plaintiffs consent to the entry of a final judgment by this Court.

## PRE-BANKRUPTCY BACKGROUND

10.    Hahnemann Hospital was located in center city Philadelphia with its main campus including all of the real estate on the square block bounded by Broad, 15th, Race and Vine Streets (the **Former Hahnemann Properties**). Although made up of numerous individual parcels of real estate, this assemblage of properties, including multiple interconnected buildings, functioned as a fully integrated and interdependent medical facility, including shared utility, signage, parking, loading docks, and other services, such that each parcel in the assemblage was functionally dependent on the others.

11.    Upon information and belief, up to January 2018, the Former Hahnemann Properties were owned by Tenet Health Systems Hahnemann, LLC (**Tenet**).

12.    In January 2018, simultaneous with the recording of the EUU and REA, the Former Hahnemann Properties were consolidated into six (6) separate parcels (Parcels A-F) as follows:

| PARCEL | ADDRESS | BUILDINGS |
|--------|---------|-----------|
| Parcel A | 222-248 N. Broad | North Tower & South Tower |
| Parcel B | 225-251 N. 15th | New College |
| Parcel C | 216-220 N. Broad | Bobst and Feinstein |
| Parcel D | 200-214 N. Broad | Surface Lot |
| Parcel E | 201-219 N. 15th | SHSH |
| Parcel F | 221-223 N. 15th | HUH Lot |

and sold by Tenant to four (4) separate owners as follows:

| Owner | Entity Name | Parcels |
|-------|-------------|---------|
| 1 | Broad Street Healthcare Properties, LLC (**BSHP**) | Parcels A & F |
| 2 | PAHH New College MOB LLC | Parcel B |
| 3 | PAHH Feinstein MOB, LLC | Parcel C |
| 4 | Broad Street Healthcare Properties, LLC (**BSHP III**) | Parcels D & E |

13.    The sale of the Former Hahnemann Properties described above occurred in the context of Tenet's sale of Hahnemann Hospital to debtor CCH.

4

14.    The EUU and the REA govern the use and maintenance of the Former Hahnemann Properties, which parcels are approximately depicted on Exhibit C of the REA as follows:



Exhibit 2 at page 39 of 46.

PHIL1 5037276v.1

15.     The above parcels are more specifically described and depicted in the City of Philadelphia's Approved Plans issued with the Zoning Permit for all six parcels in January 2018 in conjunction with the creation of the EUU and REA and attached as **Exhibit 3** (the **City's Approved Plan**).

16.     The EUU and REA resulted from the recognition that all of the affected parcels were operated as a fully "integrated and interdependent" medical facility, including shared parking, signage, utility and other services, such that each parcel in the assemblage was "functionally dependent" on the others. EUU exordium ¶E ("the uses of the Parcels affected by this easement are integrated and interdependent"); REA Background ¶H ("[t]he Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another" such that the REA was entered into "for the purpose of facilitating the harmonious use and operation of the Entire Project, all as more particularly set forth [t]herein.").

17.     The EUU and the REA are recorded instruments which "run with the land," and are "binding upon and enforceable against" all successors, assigns, and transferees. EUU exordium ¶E ("this Easement must be recorded against the Property and run with the land."); EUU §4.2 ("The provisions of this Easement run with the land and shall inure to the benefit of or be binding upon and enforceable against the Owners of the Parcels, their heirs, personal representatives, successors and assigns."); REA §18 ("All the covenants, easements and other provisions of this Agreement (including, but not limited to, the benefits and burdens hereof) shall run with the land with respect to the Project Parcel and shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. Upon the transfer of ownership of any area subject to any easement hereunder, the transferee shall be

deemed to have assumed the obligations of the transferor arising from and after the date of transfer …").

18.    The EUU created "reciprocal easements" for "the benefit of" the current and future owners of all six parcels to 1) "use and enjoy all common areas" and, separately to 2) "use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in [the REA]":

> 1.1 Easement. Owners hereby establish and create, for the benefit of all six (6) Parcels, reciprocal easements that allow all six (6) Parcels to use and enjoy all common areas, and use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in an Operation and Reciprocal Easement Agreement among the Owners, to be recorded immediately hereafter.

19.    Integral to facilitating "the harmonious use and operation" of these integrated and interdependent Parcels was the "acknowledg[ment] and agree[ment]" of each Parcel Owner "that the Entire Project is intended to be a **first class medical/educational/office real estate project** and that the operation and Maintenance of each Property in accordance with [a certain] Operating Standard benefits the Entire Project and is essential to each other Owner." REA §5(a) (emphasis supplied). The **Operating Standard** is defined by the parties in the REA to mean:

> [T]he standards of operations, cleanliness, security, appearance, repair and Maintenance generally applicable to similarly situated hospitals, educational and medical office facilities in the 'Center City', Philadelphia area, with due consideration to the age of the applicable facilities. At a minimum, the Operating Standard requires that the applicable Lots, Buildings, and Shared Facilities within the Entire Project shall at all times be operated and Maintained in good working order and condition, ordinary wear and tear excepted, and in compliance with all applicable Legal Requirements.

REA§1(t).

20.    The REA defines "Maintenance" and "Maintain" to include "operation, maintenance, repair, reconditioning, refurbishing … and replacement … of … other elements of the Entire Project" which "shall also include the right of access for any of the above purposes":

"Maintenance" or "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.

REA§1(o).

21.    Section 2 of the REA provides a "Grant of Easements" which, at subsection (a), addresses the allocation of shared utility consumption costs:

(a) <u>Shared Utility Facilities and Separate Facilities</u>. … If and to the extent that any Lot receives utility service through Shared Utility Facilities located on another Lot (such as domestic water, steam, chilled water, electricity, gas, oil, telecommunication services or other consumable utilities), the Benefited Owner shall pay for the costs of such utility consumption either (a) directly to the utility company that provides such utility service, if and to the extent that such utility consumption is metered or submetered and billed directly to such Benefited Owner by the utility provider, (b) to the Providing Owner of such utility service, if and to the extent that such utility consumption is not separately metered and billed by the utility provider to the Benefited Owner's Property, in which case (x) **if the utility consumption is submetered** to the Benefited Owner's Property, then the Benefited Owner's share of the utility consumption cost shall be determined by the actual quantity of utilities consumed and the actual costs per unit charged to the Providing Owner by the utility provider, or (y) if the utility consumption is not submetered to the Benefited Owner's Property, then as soon as practicable after the date hereof the Providing Owner shall install (at the sole cost and expense of the Benefited Owner) a meter or submeter to determine the actual amount of the applicable utility service that is consumed at the Benefited Owner's Property, and **until such meter or submeter is installed and operating the actual utility consumption costs shall be allocated among the Properties receiving such utility service proportionately on the basis of the Lot Floor Area[1] of each such Property**, and subject to compliance with applicable Legal Requirements.

(Emphasis supplied).

---

[1] Lot Floor Area is defined in the REA as follows:

"<u>Lot Floor Area</u>" shall mean, with respect to any Lot, the actual "Gross Floor Area" (as defined and measured in accordance with the Philadelphia Zoning Code) of all Buildings and other improvements located on such Lot (including for these purposes all Buildings and improvements under construction for which a building permit has been issued).

8

22.     Section 4 of the REA addresses maintenance of certain Shared Facilities (including Shared Utilities and an underground Loading Dock), while *Section 5* of the REA addresses the Operations and Maintenance of the "Entire Project" (*i.e.*, all six parcels) more generally.

23.     Section 5 of the REA mandates that "[n]o Owner shall permit any … condition that, under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance under common law, to exist upon or emanate from the Property owned by such Owner." REA §5(b).

24.     Section 5 further provides that each owner shall be responsible for "Maintaining …. and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements," not only its own "respective Lot" but also "the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on *or immediately adjacent to such Owner's Lot*":

> [E]ach Owner shall be responsible for Maintaining, cleaning, keeping free from debris, removing snow and ice from (as it relates to surface areas which involve pedestrian or vehicular traffic) and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements: (I) its respective Lot and the Buildings and other improvements located thereon from time to time; (ii) the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas located on *or immediately adjacent to such Owner's Lot*;

REA §5(a) (emphasis supplied).

### The Bobst Access Ramp

25.     Of particular relevance to this complaint is an area on Parcel E defined below as the **Bobst Access Ramp**, which provides necessary life safety, ingress and egress for multiple buildings on this assemblage including the New College Building (Parcel B), the Bobst Building (Parcel C), the Feinstein Building (Parcel C) and the SHSH Building (Parcel E).

9

26.     In this regard, Parcel E contains on its west side a former nursing home building known as the SHSH building. The eastern-most side of Parcel E has an access ramp down to a shared loading dock used by all of the buildings in the assemblage. The center portion of Parcel E contains a vehicular and pedestrian access ramp from Race Street to the front entrance to the Bobst building (the **Bobst Access Ramp**), which also provides access to three (3) vehicular parking spaces located on the Bobst property (the "**Bobst Parking Spaces**").

27.     Below is an annotated extract from the City's Approved Plan with that portion of the Bobst Access Ramp located on Parcel E shaded in green:



a.    This configuration is also depicted on the Google Earth satellite image reproduced below:



PHIL1 5037276v.1

28.     The Bobst Access Ramp on Parcel E is an officially designated City of Philadelphia Fire Lane which provides required access for fire equipment to the New College Building (Parcel B), the Bobst and Feinstein buildings (Parcel C), and the SHSH building (Parcel E) as well as access for Fire Department equipment to the Auto Sprinkler and Standpipe/Fire Service Connection location at the entrance to the Bobst Building.

29.     In addition to being a designated Fire Lane, the Bobst Ramp on Parcel E serves as an area of refuge, as well as ingress and egress for the New College Building (Parcel B), the SHSH building (Parcel E) and the Bobst and Feinstein buildings (Parcel C).

30.     The Bobst Access Ramp on Parcel E is also the sole vehicular access to the entrance to the Bobst Building and the Bobst Parking Spaces located on Parcel C.

31.     The Bobst Access Ramp on Parcel E is also necessary for pedestrian access (and ADA compliant pedestrian access) to the Bobst Building.

32.     The Bobst Access Ramp on Parcel E, together with a narrow raised sidewalk on Parcel E (which is not ADA compliant) located just east of the loading dock ramp (the **East Sidewalk**), are also the sole pedestrian access ways to and from the Bobst building (Parcel C) as well as emergency exits from the New College Building (Parcel B), the Feinstein building (Parcel C), and the SHSH building (Parcel E).

**Accessory Parking and Signage**

33.     Historically, there was signage on Parcels D and E accessory to the buildings on Parcel B and C.

34.     Historically, there was vehicular parking on Parcels D and E accessory to the buildings on Parcel B and C.

12

35.     The EUU makes clear that Parcels D and E contain Accessory Surface Parking and Accessory Sign rights available to all of the property owners of the Former Hahnemann Properties, which accessory use was to continue in perpetuity:

> Exordium ¶D. Owner 4 owns certain real property, Parcel D and Parcel E described on Exhibit D attached hereto and made a part hereof, having addresses of 200-14 N. Broad Street, Philadelphia, Pennsylvania, which is OPA Account Number 88-5-4678-62, and 201-19 N. 15th Street, Philadelphia, Pennsylvania, which is OPA Account Number 77-2-0284-96, respectively, comprised of approximately 27,491.71 and 38,821.60 square feet, respectively, and currently used for the following purposes: **Accessory Surface Parking Lot and Accessory Signs with respect to Parcel D** and Educational Facilities, **Accessory Surface Parking Lot, and Accessory Signs with respect to Parcel E**, with a proposed use of: **Accessory Surface Parking Lot and Accessory Signs with respect to Parcel D and Educational Facilities, Accessory Surface Parking Lot, and Accessory Signs with respect to Parcel E.**

> Section 2.1 <u>Unity of Use</u>. For purposes of zoning, exclusively, **all four (4) Owners hereby agree and state that the Parcels shall be considered one contiguous parcel of land**. In connection therewith, Owners hereby agree and covenant that the **Parcels shall be used in such a manner as if the six (6) parcels that comprise the Property were one zoning property. Such current and proposed use of the Property is for** Hospital, Group Medical, Dental, and Health Practitioners, Educational Facilities, Accessory Offices, Building Services, **Accessory Surface Parking Lot**, Wireless/cellular Antennas, Accessory Signs **and Building ID Signs purposes**.

(Emphasis supplied).

36.     The Accessory Parking and Accessory Signage rights on Parcels D and E "run with the land and shall inure to the benefit of or be binding upon and enforceable against the Owners of the Parcels, their heirs, personal representatives, successors and assigns." EUU §4.2.

37.     Below is an annotated extract from the City's Approved Plan with those portions of Parcels D and C containing the Accessory Parking shaded in blue:



## BANKRUPTCY AND SUBSEQUENT EVENTS

38.    On June 30, 2019, CCH, together with certain of its affiliates (collectively with CCH, the **Debtors**), filed a voluntary petition for reorganization pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

39.    Upon information and belief, as of the commencement of the Chapter 11 cases, the property owners of Parcels A-F (identified as Owners 1-4 above) (collectively, Broad Street PropCos) were non-debtor entities.

40.    In July 2021, Plaintiffs acquired Parcels B and C, which include the New College Building (Parcel B), the Bobst building (Parcel C) and the Feinstein building (Parcel C).

41.    Plaintiff IS 245 North 15th LLC leases the New College building (Parcel B) to Drexel University's School of Medicine. The Bobst Access Ramp is an emergency egress and

Fire Lane serving a portion of the New College Building (including a large public gathering and event space known as the Klahr Auditorium, which directly abuts Parcel E).

42.     Plaintiff IS BBFB LLC is developing the Bobst building (a part of Parcel C) into laboratory space for lease by health care tenants and renaming the building Race Street Labs (**RSL**). Interior construction will be advanced enough in the next few weeks such that Plaintiff IS BBFB LLC is about to market lab space in the Bobst/RSL building for lease to prospective life science tenants.

43.     As noted above, Plaintiffs' buildings— the New College Building (Parcel B), the Bobst building (Parcel C) and the Feinstein building (Parcel C)—are dependent upon use of the Bobst Access Ramp and the East Sidewalk for life/safety purposes, including ingress, egress, and fire department access. Such use has been ongoing by invitees and licensees of the New College, Bobst and Feinstein buildings for more than 21 years.

44.     Upon information and belief, there was contentious litigation between, *inter alia*, CCH, BSHP, and BSHP III (the owners of Parcels A, D, E and F) including one or more adversary proceedings to determine whether those Parcels should be considered assets of the Debtors' estates. Upon information and belief, these disputes were resolved in a Memorandum of Understanding (**MOU**) pursuant to which, subject to Court approval, Parcels A, D, E and F (hereinafter referred to as the **CCH Real Estate**) would be consolidated with the assets of CCH.

45.     In response to the Debtors' August 8, 2022, motion for the entry of an order approving the MOU [D.I. 4128], Plaintiffs filed an objection [D.I. 4184], in which they sought to ensure that the rights and responsibilities of each property owner under the EUU and REA would be fully preserved and continue from and after the approval of the MOU.

46.      The concerns articulated by the Plaintiffs in their objection were incorporated into a revised proposed order approving the MOU, including provisions clarifying that the consolidation of the CCH Real Estate into the Debtors' estate, as provided in the MOU, was in all respects "subject to" the EUU and REA, and that the MOU would not operate to modify or impair the Plaintiffs' rights under the Agreements.

47.      The Court entered an Order on August 29, 2022, approving the MOU (the **MOU Order**) [D.I. 4216].

48.      Pursuant to the MOU Order, Parcels A, D, E and F, were consolidated with the assets of CCH, although, to date, no deeds appear to have been recorded effectuating the conveyance of title with respect to the CCH Real Estate.

49.      The MOU Order specifically included language that made the estate's interest in the CCH Real Estate subject to the EUU and REA and preserved all of Plaintiffs' rights:

> 6. … the Assets of Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC (collectively, the "Broad Street PropCos") … including, without limitation, the Real Estate … shall be substantively consolidated with the assets of Debtor CCH, **subject to all** liens (other than the liens to be satisfied and/or released pursuant to the MOU), **agreements/encumbrances running with the land** (**including**, for the avoidance of doubt, **the REAs and Unity of Use Agreements)**.
>
> 23. **The rights and interests**, if any, **of IS BBFB LLC and IS 245 North 15th LLC** in the Real Estate shall **not be impaired by any prior order of the Court, this Order, the MOU or the substantive consolidation of the Real Estate with CCH**, provided, however, that any such rights or interests are subject to all claims, defenses, affirmative defenses, counterclaims, rights, setoffs and recoupments, all of which shall be substantively consolidated with, and may be asserted by, CCH.

MOU Order [D.I. 4216] (emphasis supplied).

50.      The MOU Order gave CCH the sole authority to use, possess, and sell the CCH Real Estate and further made all costs associated therewith the sole liability of CCH:

7. Pursuant to Section 3(a)(vi) of the MOU, CCH shall have the sole and exclusive authority to use, possess, lease, encumber, sell, transfer, assign, convey, or otherwise dispose of the Real Estate and/or such other Assets, and to execute any and all necessary and/or desirable bills of sale, deeds and other documents and agreements effectuating any such use, possession, lease, encumbrance, sale, transfer, assignment, conveyance and/or other disposition, in the name, and on behalf, of the Broad Street PropCos and/or CCH, subject to the terms of the MOU and further order of the Bankruptcy Court or the Plan, as applicable. Further, as set forth in Schedule 3(b) of the MOU, the Real Estate shall be managed, marketed and sold by CCH, together with the Committee, Tenet and the HSRE Entities (with CONA having observation rights). Any Financial Liability resulting from CCH's exercise of its powers, rights, and/or privileges in respect of the Assets shall be the Financial Liability solely of CCH, and no Financial Liability shall be incurred by any Broad Street PropCo to any third party or otherwise as a result of CCH's exercise of such powers, rights, and/or privileges.

9. On the MOU Implementation Date, the liabilities relating to the preservation and maintenance of the Real Estate and such other liabilities, solely as described on Schedule 3(a)(vii) to the MOU shall be substantively consolidated with the postpetition liabilities of CCH such that the liabilities set forth on Schedule 3(a)(vii) to the MOU shall become payable by CCH if past due, due or otherwise payable as incurred in the ordinary course.

MOU Order [D.I. 4216].

51.     Notwithstanding the relevant provisions of the MOU Order which subjected CCH to the obligations of the Broad Street PropCos under the EUU and REA, CCH materially breached and continues to breach the Agreements.

### Failure to Allow Accessory Parking and Accessory Signage

52.     Since taking over Parcels D and E, CCH has repeatedly informed Plaintiffs that Plaintiffs cannot use the accessory parking on Parcels D and E and that they cannot place or maintain accessory signage identifying the entrance to Plaintiffs' buildings on Parcels D and E.

53.     CCH's steadfast refusal to allow accessory parking and accessory signage on Parcels D and E constitutes a breach of the EUU.

54.     Section 5(e) of the REA provides that "Each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Lot and the Buildings and other improvements located thereon from time to time in compliance with the Unity of Use

Agreement, so long as the Unity of Use Agreement remains in effect and applies to the applicable Lot." Accordingly, CCH's breach of the EUU is also a breach of the REA.

55.     CCH's breaches of the EUU and REA are harming Plaintiffs as it diminishes the value of Plaintiffs' property, deprives Plaintiffs and Plaintiffs' invitees and licensees of accessory parking rights, and creates confusion for Plaintiffs' invitees and licensees as appropriate signage for Plaintiffs' buildings are not being allowed.

**Failure to Maintain the CCH Real Estate in Accordance with the EUU and REA**

56.     Parcel E includes the SHSH building.

57.     Upon information and belief, the SHSH building is filled with asbestos-containing materials and in a deteriorated condition not suitable for human occupation.

58.     Upon information and belief, prior to the MOU Order, the Broad Street PropCos allowed homeless persons to take up residence in the SHSH building and further allowed the exterior of the SHSH building to be covered on all sides with a substantial amount of graffiti.

59.     The condition of the SHSH building and parcel E does not comply with the REA Operating Standard.

60.     Upon information and belief, since entry of the MOU Order, CCH made efforts to remove trespassers from the SHSH building and boarded up the building with unsightly plywood. Additionally, in violation of the Operating Standard, CCH allowed graffiti to continue to accumulate on the building and on other areas of Parcel E, all of which was unsightly.

61.     Starting in at least October 2022, Plaintiff has requested that CCH comply with the Operating Standard and remediate the graffiti and unsightly conditions on Parcel E.

62.    On December 14, 2022, counsel for Plaintiffs wrote to counsel for CCH requesting that these conditions be remediated immediately as it was impacting Plaintiffs' ability to develop and market Plaintiffs' properties:

> Parcel E includes the SHSH building. I understand that due to neglect, this building was allowed to be occupied by homeless persons for a substantial period of time. While my clients appreciate past efforts to clear the building of trespassers, the building is still a magnet for homeless persons and the building itself is now boarded up with unsightly plywood and covered with graffiti, as demonstrated by the photographs below, which is not reflective of a "first class medical/educational/office real estate project":

 

> This condition directly abuts Parcel C which my clients are presently renovating and which they will be marketing to prospective tenants consistent with the Operating Standard in the very near future. The condition of the SHSH building detracts from (and potentially destroys) my clients' ability to attract first class tenants for their property. On numerous prior occasions, my clients asked CCH to remedy this lack of maintenance at the SHSH property and those conditions unfortunately persist. I note that my clients informed CCH of the graffiti and other issues on Parcel E at least over two months ago on October 4, 2022, and on many occasions thereafter, but CCH has, to date, failed to correct these conditions. …

> These requests, and others, for corrective action have not been complied with. As such, please consider this letter to be further notice of a violation of the REA and a formal request to immediately remediate this condition.

**Exhibit 4**.

63.     The graffiti, boarded up plywood, and other conditions on the CCH Real Estate constitute a nuisance and violates the Operating Standard.

64.     CCH has failed to remediate the graffiti despite their duties under the REA.

65.     The Philadelphia Property Maintenance Code requires property owners (including those in control of maintenance of property such as CCH) to remove graffiti:

> **PM-302.9 Defacement of property.** No person shall willfully or wantonly damage, mutilate  or deface any exterior surface of any structure or building on any private or public property by placing thereon any marking, carving, or graffiti.
>
> It shall be the responsibility of the owner to restore said surface to an approved state of maintenance and repair.

Philadelphia Property Maintenance Code.

66.     Under CCH's stewardship, the graffiti continued to accumulate. For instance, below is a photograph of the east façade of the SHSH building (the façade facing the Bobst Access Ramp and the entryway to the Bobst/RSL building) taken on or about January 25, 2023:



67.     Indeed, upon information and belief, due to CCH's failure to remediate the graffiti as it was required to do under both the REA and Philadelphia's Property Maintenance Code, the City of Philadelphia Community Life Improvement Program (CLIP) *sua sponte* painted the lower portion of the east façade as pictured in the photograph below taken on February 18, 2023.



68.     Plaintiffs have been continually asking CCH to remediate the appearance of their buildings to maintain the necessary Operating Standard under the REA, but CCH has taken no further action.

69.      Plaintiffs have been damaged by CCH's failure to adhere to the Operating Standard and maintain its properties.

70.     Plaintiffs' ability to attract tenants is severely hampered and damaged by CCH's failure to maintain its properties.

**Access Across the Bobst Access Ramp and**
**Pot Holes and Dangerous Surface**
**Conditions on Parcel E Including the Bobst Access Ramp**

71.     Prior to the entry of the MOU Order, the Broad Street PropCos allowed the condition of their properties to deteriorate as a result of a lack of maintenance, including deterioration of the sidewalks surrounding Parcel E and surface of the parking lot and the Bobst Access Ramp on Parcel E.

72.     CCH allowed these conditions to persist since the entry of the MOU Order, as exemplified in the photographs below taken in November and December 2022:



73.     These conditions are not code-compliant, and it was CCH's responsibility to maintain and repair its defective sidewalks and driveways. See *e.g.*, Philadelphia Property Maintenance Code, PM-302.3 ("Sidewalks and driveways. All sidewalks, walkways, stairs, driveways, parking spaces and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions.").

74.     These conditions are a nuisance and unsafe for pedestrians needing to access Plaintiffs' buildings and are especially dangerous as they are in an area of refuge and ingress and egress and along a designated Fire Lane.

22

75.     Upon information and belief, the broken-up surface conditions on the Bobst Access ramp and on other portions of Parcel E were also causing leaks through the surface into the underground loading dock, which is a shared facility pursuant to the REA.

76.     At no time did the Broad Street PropCos or CCH take any action to ameliorate or remediate these code violating, defective, and dangerous surface conditions.

77.     Plaintiffs dutifully informed CCH by email on November 1, 2022, of their construction plans for the Bobst (RSL) Building, including "repav[ing] the existing driveway and walkway" (i.e., the Bobst Access Ramp), noting that "[d]uring construction and after construction, we will be using it for access as it has always been used - for vehicular and pedestrian traffic."

78.     CCH has refused to recognize that Plaintiffs have the right to traverse the Bobst Access Ramp for ingress to and egress from Plaintiffs' buildings and has further refused to recognize Plaintiffs' rights to parking on Parcels D and E.

79.     CCH has refused and failed to bring the Bobst Access Ramp and the East Sidewalk into compliance with the Operating Standard.

80.     For instance, on November 11, 2022, CCH emailed Plaintiffs stating, *inter alia*, that the REA does "not include undefined cross-access rights, nor does it grant any parking rights to Ironstone," and that CCH was only "willing to discuss with Ironstone agreed-upon specific *temporary* parking and access rights." (emphasis supplied).

81.     On November 17, 2022, the Plaintiffs informed CCH that an $817,000 construction contract, including the repaving work for the Bobst Access Ramp, had been executed, that the work was scheduled for the next few weeks, and that delays would significantly damage Plaintiffs.

23

82.     On November 18, 2022, CCH responded that, to the extent the Plaintiffs proceeded with paving, it would be at the Plaintiffs' own peril and expense, and that any such work would not modify the rights of the parties in any way.

> The property lines of our respective fee parcels are what they are and there is no "joint ownership" of any land. There is the REA, which is limited in scope and does not provide IronStone any parking or related rights on our parcels.
>
> More specifically, Ironstone has no rights to the "SHSH lot" and certainly no right to repave any portion of that lot or any other Center City Healthcare ("CCH") property. We have not granted Ironstone permission to do any work in or on our property. To the extent that you choose to repave any land not owned by Ironstone, you do so at your own peril and your sole cost and expense, and any such work shall not serve to modify the rights of the parties or to impose any obligations whatsoever on CCH including any obligation to permit Ironstone to park on the CCH lots in the future.

83.     At no point has CCH or the Broad Street PropCos presented a plan to remediate the defective conditions on its properties.

84.     On November 29, 2022, the parties met at the properties. During the meeting, the Plaintiffs detailed their plans, including the repaving work on the Bobst Access Ramp, and walked the property with CCH's representatives noting defects in the Bobst Access Ramp, including paving defects, drainage issues causing damage to the underground loading dock area, as well as the continued problems with homeless persons and uncontrolled graffiti on and around the SHSH building.

85.     After this meeting, CCH's counsel wrote to counsel for Plaintiffs and took the position that the Plaintiffs have "no right, under the REA or otherwise, to perform" improvements to the Bobst Access Ramp.

86.     December 14, 2022, Plaintiffs responded by letter which detailed, *inter alia*, two main rights of the IS Owners in connection with access across and maintenance of the Bobst Access Ramp. Exhibit 4.

(a)      *First*, Plaintiffs noted that the EUU created an easement for all common areas which Plaintiffs understand to include the Bobst Access Ramp:

> The EUU created "reciprocal easements" for "the benefit of" the current and future owners of all six parcels to 1) "use and enjoy all common areas" and, separately to 2) "use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in [the REA]":

>> 1.1 Easement. Owners hereby establish and create, for the benefit of all six (6) Parcels, reciprocal easements that allow all six (6) Parcels to use and enjoy all common areas, and use the Property as if it were comprised of one parcel for zoning purposes, as more specifically described in an Operation and Reciprocal Easement Agreement among the Owners, to be recorded immediately hereafter.

> The term "common areas" is not defined in the EUU (or the REA). Terms which are not defined in an easement are given their ordinary meaning. See *Moody v. Allegheny Valley Land Tr.*, 976 A.2d 484, 490 (Pa. 2009) ("In construing a[n easement] it is not what the parties may have intended by the language used but what is the meaning of the words that determines what interest is conveyed therein.") (cleaned up). As noted above, the EUU recites that "the uses of the Parcels affected by this Easement are integrated and interdependent" while in the REA, the Parcel Owners expressly recognized and acknowledged that "[t]he Lots and the improvements constructed thereon are in certain respects physically and functionally dependent on one another" (REA Background ¶H). The Bobst Access Ramp appears to me to be an example of an area shared by the Parcel owners— including for access to the Bobst (RSL) Building and the Bobst Parking Spaces, and is indeed an area necessary for ingress to and egress from the Bobst (RSL) building and the Bobst Parking Spaces, while also being used for access to the SHSH parking area (i.e., a shared, or "common" area). *See e.g.*, Merriam-Webster's Collegiate Dictionary (11th Ed., 2012) at definition 2(a) of "common" ("belonging to or shared by two or more individuals or by all members of a group").

> I struggle to understand any other meaning of the easement "to use and enjoy all common areas" in the context of the EUU and would be curious to know how your client may interpret that term. At the very least, in addition to, and/or in the alternative, it would appear that the owner of Parcel C (my client) has an easement by necessity over and through the Bobst Access Ramp for ingress to and egress from the Bobst Building and the Bobst Parking Spaces. See *Bartkowski v. Ramondo*, 219 A.3d 1083, 1092 (Pa. 2019) ("the three fundamental requirements for an easement by necessity are 1) the titles to the alleged dominant and servient properties must have been held by one person; 2) this unity of title must have been severed by a conveyance of one of the tracts; and 3) the easement must be

necessary in order for the owner of the dominant tenement to use his land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.") (cleaned up).

*Id.* at 4.

(b)     *Second*, Plaintiffs explained that the REA created maintenance rights allowing the Plaintiffs to repair and replace the elements of the Bobst Access Ramp, as the REA included not only the right to maintain each parcel owner's "respective Lot", but also "the sidewalks, walkways, driveways, parking areas and other exterior pedestrian areas and vehicular areas *located on or immediately adjacent to such Owner's Lot*":

> The REA defines "Maintenance" and "Maintain" to include "operation, maintenance, repair, reconditioning, refurbishing … and replacement … of … other elements of the Entire Project" which "shall also include the right of access for any of the above purposes":
>
>> "Maintenance" or "Maintain" shall mean the operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation, restoration, reconstruction and replacement (when necessary or desirable) of Shared Facilities or other elements of the Entire Project (as the context requires), and shall also include the right of access for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Agreement.

REA§1(o).

Section 4 of the REA addresses Maintenance of certain Shared Facilities (including the Loading Dock underneath the entrance to the Bobst (RSL) building, while **Section 5 of the REA addresses the Operations and Maintenance of the "Entire Project" (i.e., all six Parcels) more generally**. In this section, the REA recites that "each Owner covenants and agrees that it and its Permittees shall use, develop, occupy and Maintain its Property, at such Owner's sole cost and expense, in accordance with the Operating Standard" (REA §5(a)), and that "No Owner shall permit any … condition that, under the circumstances, is inconsistent with the Operating Standard or constitutes a nuisance under common law, to exist upon or emanate from the Property owned by such Owner." REA §5(b). This section of the REA further provides that each owner shall be responsible for "Maintaining .... and otherwise keeping in compliance with the Operating Standard and all applicable Legal Requirements," not only its own "respective Lot" but also "the sidewalks, walkways, driveways, parking areas and

26

other exterior pedestrian areas and vehicular areas located on or immediately
adjacent to such Owner's Lot":

> [E]ach Owner shall be responsible for Maintaining, cleaning,
> keeping free from debris, removing snow and ice from (as it relates
> to surface areas which involve pedestrian or vehicular traffic) and
> otherwise keeping in compliance with the Operating Standard and
> all applicable Legal Requirements: (I) its respective Lot and the
> Buildings and other improvements located thereon from time to
> time; (ii) the sidewalks, walkways, driveways, parking areas and
> other exterior pedestrian areas and vehicular areas located on or
> *immediately adjacent to* such Owner's Lot; …

REA §5(a) (emphasis supplied).

      (c)     After detailing the foregoing terms of the EUU and REA and the history

of communications outlined above, Plaintiffs' December 14, 2022, letter concluded that

Plaintiffs were specifically permitted by the EUU and REA to repave the Bobst Access Ramp:

> In your December 9, 2022, correspondence, you state that my client "has
> no right, under the REA or otherwise, to perform" work to correct the deficient
> condition of the Bobst Access Ramp. The REA however, provides that "[e]ach
> Owner shall be responsible for Maintaining … and otherwise keeping in
> compliance with the Operating Standard and all applicable Legal Requirements:
> (i) its respective Lot and the Buildings and other improvements located thereon
> from time to time; [and] (ii) the sidewalks, walkways, driveways, parking areas
> and other exterior pedestrian areas and vehicular areas located on or immediately
> adjacent to such Owner's Lot." (Emphasis supplied). The Bobst Access Ramp is
> such an exterior pedestrian and vehicular area immediately adjacent to my client's
> property.

*Id.* at 8.

> At no point has CCH presented a plan to remediate the defective condition
> of the Bobst Access Ramp. Moreover, my client is entitled under the REA to
> Maintain the area which is an "exterior pedestrian area []and vehicular area[]
> located on or immediately adjacent to [my client's] Lot."

> While CCH has allowed its properties to fall out of compliance with the
> Operating Standard and to Maintain a first class medical/educational/office real
> estate project, my clients have been actively making improvements which benefits
> all owners of this integrated and functionally interdependent medical campus,
> while confirming that "in doing so, no rights of either party will be expanded or
> contracted."

*Id.* at 11.

87.    Despite Plaintiffs' clearly and specifically delineating their rights under the EUU and REA, CCH did not respond to Plaintiffs December 14, 2022 letter.

88.    Instead, CCH waited over a month while Plaintiffs continued the repaving work on the Bobst Access Ramp before filing a motion asserting that the Plaintiff has committed a violation of the automatic stay on January 19, 2023 (Motion) [D.I. 4468].

89.    Not only did CCH delay filing the Motion for well over a month while Plaintiffs continued the costly improvement of the Bobst Access Ramp (which benefits all parties), but the Motion completely ignored and failed to reference or attach Plaintiff's December 14, 2022 correspondence or even to address any of the legal arguments contained therein.

90.    Prior to CCH filing its Motion, Plaintiffs substantially improved the surface condition of the Bobst Access Ramp, making it much safer for pedestrians and vehicular traffic as shown in the photograph below:



91.    For safety and code reasons, Plaintiffs' additional plans for the Bobst Access Ramp includes stamping the asphalt with a marked area to indicate the pedestrian walkways.

92.    The work also includes cladding the ramp walls to include lighting to illuminate the walkways at night, which is also required for code and safety reasons (and as the pre-existing lighting along the prior walkway was non-functional and CCH had taken no efforts to repair the pre-existing defective lighting).

93.    Plaintiffs' planned, completed, and not yet completed, work to the Bobst Access Ramp is necessary to protect the health, safety, and welfare of persons accessing the area and their building, and for egress and refuge in case of a fire or other emergency. This work is also required for compliance with applicable municipal life/safety, construction, maintenance and fire codes.

94.    Plaintiffs previously supplied CCH with their plans to complete the work and informed CCH that Plaintiffs would effectuate any reasonable modification of the plans as Plaintiffs' sole intention is to provide safe, code-compliant ingress and egress for pedestrians and vehicular traffic. all consistent with the Operating Standard.

95.    CCH has not consented to the completion of the work on the Bobst Access Ramp, which leaves the ramp area out of compliance with code and creates a safety hazard.

96.    In sum, CCH has refused to repair its own land and has stymied Plaintiffs' efforts to effectuate proper repairs.

97.    CCH also continues to refuse to recognize Plaintiffs' rights to access their buildings through the Bobst Access Ramp and the East Sidewalk. For instance, in the Motion, CCH reserved its position on this issue as follows:

> [I]t appears that Ironstone believes that it has the right to access the "Race Street Labs" building, previously known as the "Bobst Building" (located on Lot C), by

a ramp extending north from Race Street, approximately half-way between Broad and 15th Streets. The Debtors reserve all rights regarding Ironstone's rights, if any, to use such ramp, which is part of the CCH Real Estate.

[D.I. 4468 at 7, fn. 2].

98.    Plaintiffs are trying to market their properties to prospective tenants and are being damaged as 1) there is not code-compliant access to their buildings, 2) CCH refuses to maintain its properties consistent with the Operating Standard, 3) CCH refuses to recognize that Plaintiffs and Plaintiffs' tenants, invitees, and licensees have access across the Bobst Access Ramp and East Sidewalk; and as CCH has repeatedly attempted to impede Plaintiffs' ability to complete the repairs which were CCH's responsibility in the first place.

### Vicinity Steam Bills

99.    The Former Hahnemann Properties utilize steam supplied by Vicinity Energy Philadelphia, Inc. (**Vicinity**).

100.    Since purchasing Parcels B and C, Vicinity has billed Plaintiffs $2,188,041 for steam usage at the Former Hahnemann Properties.

101.    CCH has previously requested payment from Plaintiffs in the amount of $315,545.27 for water service charges for a shared water utility unrelated to the steam utility.

102.    On February 9, 2023, Plaintiffs wrote to CCH enclosing an engineering report allocating Vicinity's charges amongst various property owners pursuant to the REA and detailing that approximately $775,693 of Vicinity's billings went to heat buildings on Parcel A for which CCH is responsible as set forth in section 2(a) of the REA. **Exhibit 5.**

103.    Plaintiff's February 9, 2023 letter demanded payment from CCH of $460,147.73 (representing $775,693 of Vicinity's billings owed by CCH less $315,454.27 which CCH claims is due from Plaintiffs for water service). *Id.*

104.    CCH has not paid its share of the Vicinity charges.

105.    Pursuant to the terms of the REA, CCH's payment was due within thirty (30) days of presentation of the bill from Plaintiffs.

106.    Additionally, since June 30, 2023, Plaintiffs have also requested that CCH execute an authorization allowing Vicinity to release CCH's bills, usage, demand, hourly and other meter data for all meters for the period of June 30, 2021 to the present.

107.    CCH has never responded to Plaintiffs' requests for an authorization, even though steam is a Shared Utility Facility in the building and Plaintiffs are entitled to such information in order to analyze Vicinity's billings.

## Bad Faith Denial of Access to the Data Room

108.    The MOU Order consolidated the CCH Real Estate into the Debtors' estate with a view towards the sale of this real estate for the benefit of the creditors of the estate.

109.    Plaintiffs already own two of the six parcels on the square block of the main Hahnemann Campus discussed above.

110.    Plaintiffs' affiliated company, IS PAHH OZ LLC, also owns a property known as the Wood Street Garage, which is one of three properties on another assemblage of properties formerly owned by Tenet just north of the main Hahnemann Campus, which is subject to a separate Easement and Unity of Use Agreement and a separate Parking, Access and Utilities Easement Agreement (which is similar in many respects to the REA). The other two properties on this assemblage (a Drexel dormitory known as Stiles Hall and a private park known as Martinelli Park) were also consolidated into the Debtors' estate pursuant to the MOU Order with a view towards those two properties also being sold for the benefit of the creditors of the estate.

31

111.    As such. Plaintiffs are potentially interested buyers of the real estate which CCH is presently marketing for sale.

112.    Upon information and belief, the Court authorized CCH to market the real estate for sale using Newmark Knight Frank (**Newmark**) as its real estate broker in conjunction with SSG Capital Advisors (**SSG**).

113.    In late January 2023, Plaintiffs expressed interest in potentially purchasing real estate from Debtors' estate by registering for access to a Virtual Deal Room (the **Data Room**) established by Newmark and SSG.

114.    On January 27, 2023, Newmark and SSG acknowledged Plaintiffs' interest in the properties stating that "Your access has been <u>APPROVED</u>. The Offering Materials will be provided when available." (emphasis in original).

115.    However, when Plaintiffs tried to access the Data Room, there were no materials available to review.

116.    On February 10, 2023, SSG supplied Plaintiffs with an Offering Memorandum, which disclaimed containing complete information, and SSG advised that "[t]he data room should be available next week."

117.    By February 16, 2023, Plaintiffs were still not able to see any information in the Data Room. As such, Plaintiffs reached out to Scott Victor at SSG to inquire about the lack of information in the Data Room. Mr. Victor advised that Plaintiffs' access to the Data Room had been restricted upon instructions from CCH's counsel and that Plaintiffs were the only buyer prospect subject to such restrictions.

118.    Accordingly, on February 16, 2023, Plaintiffs' counsel emailed CCH's counsel asking them to "[p]lease provide confirmation of whether or not my clients' access is being

restricted and …. if my client's access to documents in the Data Room is being restricted, please have their access unrestricted or confirm that CCH is not interested in my clients being potentially interested buyers."

119.    CCH did not respond to Plaintiffs' February 16, 2023, inquiry about restricted access to the Data Room. Accordingly, Plaintiffs' counsel emailed CCH's counsel again on March 9, 2023, asking CCH's counsel to "please respond to my February 16 email below to provide confirmation of whether or not access to the Data Room is restricted for my clients who are potentially interested buyers of the CCH Real Estate. If their access is being restricted, I would like to know the rationale and be provided with an inventory of documents and information in the Data Room to which my clients are not being allowed access."

120.    On or about March 25, 2023, Scott Victor reached out to counsel for Plaintiffs and asked if Plaintiffs were interested in bidding on any of the properties. Counsel advised Mr. Victor that Plaintiffs' ability to bid on the properties might prove challenging as Plaintiffs' access to the Data Room had been restricted.

121.    On March 28, 2023, Plaintiffs were granted limited access to the data room. Mr. Victor advises that there are approximately six categories of documents in the Data Room for prospective buyers to which Plaintiff's access has not been granted pursuant to the instructions of CCH and their counsel.

122.    Despite request, CCH has refused to grant access to these documents and has further failed to even provide an inventory of these documents.

123.    Upon information and belief, CCH has repeatedly refused to provide Plaintiffs access to material information and documentation in the Data Room which are relevant to Plaintiffs ability to bid on the CCH Real Estate.

124.    Without having all of the data in available for potential purchasers, Plaintiffs are at an unfair disadvantage in the bidding process. This unfair disadvantage is magnified as, upon information and belief, the bid submission deadline is May 3, 2023 which is just weeks away.

125.    CCH has acted in bad faith by instructing its brokers SSG and Newmark to withhold information from Plaintiffs.

126.    CCH's bad faith actions have or may affect the bidding process and may well result in a less favorable outcome for creditors of the bankruptcy estate.

## FIRST CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant to 28 U.S.C. §2201)

127.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully set forth herein at length.

128.    Plaintiffs request that the Court declare that:

(a)    Plaintiffs are entitled to ongoing accessory surface parking on Parcels D and E of the CCH Real Estate.

(b)    Plaintiffs are entitled to ongoing accessory signage on Parcels D and E of the CCH Real Estate.

(c)    By virtue of the terms of the EUU and REA, the Bobst Access Ramp and the East Sidewalk are common areas equally accessible to all Parcel Owners of the Former Hahnemann Properties, as well as their invitees, and licenses.

(d)    By virtue of the terms of the EUU and REA, the Bobst Access Ramp and the East Sidewalk are part of the ingress and egress for the New College, Bobst and Feinstein buildings and are, and shall remain in perpetuity, accessible to Plaintiffs and all invitees and licensees of those buildings.

34

(e)     Plaintiffs and their invitees and licensees have an easement (either express, prescriptive, implied, by necessity, or otherwise) over and through the Bobst Access Ramp area as well as the East Sidewalk.

(f)     Plaintiffs were within their rights to repair the Bobst Access Ramp and may fully complete their repairs of the Bobst Access Ramp and may further repair the East Sidewalk.

**WHEREFORE**, Plaintiffs request that the court enter a declaratory judgment in favor of Plaintiffs as set forth above.

**SECOND CLAIM FOR RELIEF**
**(CCH's Breaches of the EUU and REA)**

129.     Plaintiffs incorporate all prior and subsequent paragraphs as if fully set forth herein at length.

130.     CCH has breached the terms of the EUU and REA. CCH's breaches include, but are not limited to:

(a)     Failing to recognize the Bobst Access Ramp and East Sidewalk as common areas over which Plaintiffs may traverse and/or to which Plaintiffs have an easement.

(b)     Failing to operate and maintain their premises in a condition consistent with the Operating Standard.

(c)     Permitting nuisances.

(d)     Operating their premises in a manner which creates a risk of harm and to Plaintiffs and Plaintiffs' invitees and licensees.

(e)     Operating their premises in a manner that violates the pertinent property maintenance, building, fire and life safety codes.

(f)     Refusing to allow accessory parking and accessory signage on Parcels D and E for the benefit of Plaintiffs and Plaintiffs invitees and licensees.

(g)     Failing to pay for their portion of the Shared Utility costs including the Vicinity charges.

(h)     Failing to provide written authorization to obtain more detailed information from Vicinity related to the Vicinity charges.

131.    Plaintiffs have been damaged by CCH's breaches of the EUU and REA.

132.    Plaintiffs' damages include, but are not limited to, expenses to maintain CCH's property including the work to repair the Bobst Access Ramp, loss of accessory parking and signage, the claim by Vicinity for steam utility charges attributable to CCH, loss of value of Plaintiffs' properties, increased marketing expenses to rent Plaintiffs' properties due to the graffiti and nuisances permitted by CCH, increased maintenance and/or security costs, and such other damages as may be determined.

133.    Plaintiffs are entitled to specific enforcement of the REA and the EUU.

134.    Plaintiffs are also entitled to recover their costs, including reasonable attorneys' fees. See REA §12 ("Any Owner may enforce this Agreement by appropriate action and, in the event that it prevails in such action, shall recover as part of its cost a reasonable attorney's fee from such parties against whom such enforcement was successfully sought and obtained.").

**WHEREFORE**, Plaintiffs request all available damages and remedies, including, but not limited to, money damages, specific performance, payment of Plaintiffs' legal fees and costs, and interest.

### THIRD CLAIM FOR RELIEF
### <u>(Nuisance)</u>

135.    Plaintiffs incorporate all prior and subsequent paragraphs as if fully set forth herein at length.

136.    CCH's maintenance and operation of the CCH Real Estate constitute a nuisance.

137.    CCH's maintenance and operation of the CCH Real Estate – including its failure to properly maintain its sidewalks (including the East Sidewalk) and the Bobst Access Ramp, its failure to remediate graffiti, its tolerance of trespassers, and its failure and refusal to either allow Plaintiffs to complete the Bobst Access Ramp work or to otherwise make the Bobst Access Ramp code- compliant and safe–violates the Philadelphia Property Maintenance Code, life safety codes, and the Operating Standard set forth in the REA.

138.    Plaintiffs have been harmed by CCH's nuisance.

**WHEREFORE**, Plaintiffs that the Court enter judgment in favor of Plaintiffs, award Plaintiff damages, and require CCH to remedy all nuisance conditions on their properties.


Dated:  April 12, 2023                    **LEECH TISHMAN FUSCALDO & LAMPL**


By: /s/ Jeffrey M. Carbino_____
    Jeffrey M. Carbino, Esquire
    (DE No. 4062)
    1007 N. Orange Street, Suite 420
    Wilmington, DE 19801
    Telephone: (302) 985-0985

      - and -

**JOKELSON LAW GOUP, P.C.**
    Derek E. Jokelson, Esquire
    230 South Broad Street, 10th Floor
    Philadelphia, PA 19102
    Telephone : (215) 757-7556

PHIL1 5037276v.1

**KURTZMAN | STEADY, LLC**
Jeffrey Kurtzman, Esquire
555 City Avenue, Suite 480
Bala Cynwyd, PA 19004
Telephone: (215) 839-1222

Attorneys for Plaintiff

PHIL1 5037276v.1