**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CENTER CITY HEALTHCARE, LLC d/b/a | ) |
| HAHNEMANN UNIVERSITY HOSPITAL, *et al.*,[1] | ) Case No. 19-11466 (MFW) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) **Related to Docket Nos. 5765, 5892, 5898 and 5986** |

**DECLARATION OF ALLEN WILEN IN**
**SUPPORT OF DEBTORS' SALE MOTION**
**[North/South Towers and Race Street Assemblage]**

I, Allen Wilen, hereby declare the following, under the penalty of perjury:

1. I am the Chief Restructuring Officer ("**CRO**") of the above captioned debtors (the "**Debtors**") in these chapter 11 cases.

2. I am a Partner at Eisner Advisory Group, LLC ("**Eisner**") and serve as the national director of Eisner's financial advisory services group. I have more than thirty years of financial and accounting experience, as well as extensive experience advising insolvent and troubled companies, including companies in the healthcare industry, in turnaround and crisis situations and navigating such companies through turnaround, sale and liquidation processes. I have frequently been involved in complex matters requiring expertise in forensic accounting and operational analysis and have been qualified as an expert in numerous state and federal courts throughout the United States, including the district of Delaware.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Center City Healthcare, LLC (3341), Philadelphia Academic Health System, LLC (8681), St. Christopher's Healthcare, LLC (8395), Philadelphia Academic Medical Associates, LLC (8165), HPS of PA, L.L.C. (1617), SCHC Pediatric Associates, L.L.C. (0527), St. Christopher's Pediatric Urgent Care Center, L.L.C. (6447), SCHC Pediatric Anesthesia Associates, L.L.C. (2326), StChris Care at Northeast Pediatrics, L.L.C. (4056), TPS of PA, L.L.C. (4862), TPS II of PA, L.L.C. (5534), TPS III of PA, L.L.C. (5536), TPS IV of PA, L.L.C. (5537), and TPS V of PA, L.L.C. (5540). The Debtors' mailing address is 216 N. Broad Street, 4th Floor, Philadelphia, Pennsylvania 19102.

3. I began serving as the CRO of the Debtors on April 8, 2019. In such capacity, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

4. I have read the *Debtors' Motion for Entry of (I) an Order (A) Scheduling a Hearing to Consider Approval of the Sale of Certain Real Estate, (B) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (C) Approving Bid Protections, and (D) Granting Related Relief; and (II) an Order (A) Approving the Sale of Certain Real Estate, Free and Clear of Certain Liens, Claims and Encumbrances, and (B) Granting Related Relief* [Docket No. 5765] (the "**Sale Motion**" or the "**Motion**") and submit this Declaration in support of that Motion.[2]

5. As detailed in the Sale Motion, the Debtors settled significant litigation pursuant to the MOU, which contemplated the marketing and sale of the Real Estate, which consists of the following parcels:

| Property Name | Philadelphia, PA Address | OPA |
|---|---|---|
| North Tower, South Tower | 222-248 N. Broad Street | 772025002 |
| Land next to SHSH Building | 221-223 N. 15th Street | 772028498 |
| Redevelopment land/surface parking (city block) | 200-214 N. Broad Street | 885467862 |
| SHSH Building (city block) | 201-219 N. 15th Street | 772028496 |

6. On January 1, 2023, the Debtors filed the *Application of Debtors for Order Authorizing (1) Retention and Employment by Center City Healthcare, LLC of SSG Advisors, LLC and Newmark South Region LLC as Joint Brokers, and (II) a Waiver of Compliance with Certain Requirements of Local Rule 2016-2* [Docket No. 4448], pursuant to which the Debtors sought

---

[2] Capitalized terms not otherwise defined in this Declaration shall have the meaning set forth in the Motion.

to hire SSG and Newmark to serve as co-brokers to market and sell the Real Estates which was formerly associated with the operations of Hahnemann University Hospital. The Court approved the Application by order dated February 10, 2023 [Docket No. 4517]. Subsequently, the engagement of the Brokers was revised such that SSG became the sole Broker with respect to the Real Estate in March of 2024. [Docket No. 5205].

7. As detailed in the Motion, SSG, first with Newmark and later on its own, spearheaded an all-inclusive marketing process, and solicited interest from potential financial and strategic investors for bids for the Real Estate.

8. On or about March 9, 2025, the Debtors received offers from 222 North Broad LLC, 200 North Broad LLC and 201 North 15th LLC (together, the "**Stalking Horse Purchasers**") to purchase the Real Estate. Following extensive good faith negotiations, on April 28, 2025, the Debtors and the Stalking Horse Purchasers entered into the Stalking Horse Agreements, copies of which were attached to the Motion at Exhibits B and C. The Stalking Horse Agreements were subsequently amended to reflect an additional closing condition, extensions of the Due Diligence Period and certain adjustments to the Purchase Price (both as defined therein) [D.I. 5892].

9. In particular, the Stalking Horse Agreements were amended to include the Iron Stone Settlement Condition, a condition precedent requiring that, on or before Closing, the Court must approve a settlement of certain claims and causes of action between IS BBFB, LLC and IS 245 North 15th LLC (collectively, "**Iron Stone**") on the one hand, and the Debtors and Broad Street Healthcare Properties, LLC, Broad Street Healthcare Properties II, LLC and Broad Street Healthcare Properties III, LLC on the other hand, as more fully described in the Stalking Horse Agreements.

3

10. The Debtors have reached an agreement in principal with Iron Stone to satisfy the Iron Stone Settlement Condition and expect to document that agreement and to file a motion for Court approval of that agreement shortly.

11. Notwithstanding continued marketing efforts following the entry of the Bid Procedures Order, no additional bids for the Real Estate were received by the Bid Deadline. Thus, the Stalking Horse Purchasers were declared the Successful Bidders for the Real Estate.

**A.    The Sale of the Real Estate to the Stalking Horse Purchasers is a Sound Exercise of the Debtors' Business Judgment.**

12. Based on my knowledge and experience and the facts and circumstances of these chapter 11 cases, I believe that the proposed sale of the Real Estate to the Stalking Horse Purchasers is a sound exercise of the Debtors' business judgment and will maximize the value of the Real Estate.

13. The Purchase Prices offered by the Stalking Horse Purchasers -- which contemplate cash consideration of $7,050,000 for the North and South Towers and $4,450,000 for the Race Street Assemblage – are the highest and best offers received for the Real Estate. Moreover, insofar as the Stalking Horse Agreements contain the Iron Stone Settlement Condition, the agreements also benefit the Debtors' estates because they helped to facilitate the resolution of the significant ongoing and costly litigation of the Debtors' disputes with Iron Stone, for the benefit of the Debtors' estates and creditors.

14. Based on my professional experience and expertise, I believe the sale process was effective in testing the market value of the Real Estate, the time period for marketing Real Estate was adequate, and the outcome from the sale process yielded the highest and best value for the Real Estate. To my knowledge, the sale process was conducted in a non-collusive, arms-length, fair, impartial and good-faith manner during all stages of the sale process, and a reasonable

56290933.3 09/17/2025

opportunity was provided to bidders to submit Qualified Bids and to make higher or otherwise better offers for the Real Estate.

15. Given the extensive marketing process, I do not believe that further marketing of the Real Estate will lead to additional offers or higher and better offers while acting in accordance with approved Bidding Procedures. Rather, I believe further marketing would only serve to increase the carrying costs and other expenses incurred by the Debtors' estates while depressing value further and/or risking the loss of the sale altogether, to the detriment of the Debtors' estates and creditors.

16. Further, I am informed and believe the Stalking Horse Purchasers have sufficient cash and financing resources for the transactions and are able to close by the outside closing date specified in the Stalking Horse Agreements. Moreover, it is my understanding that the Stalking Horse Purchasers would not have entered into the Stalking Horse Agreements or otherwise consummate the transactions contemplated therein if the Sale was not free and clear of all Encumbrances, other than Permitted Exceptions.

**B.     The Proposed Sale was Negotiated in Good Faith and Purchaser is a Non-Insider that is Not a Successor to the Debtors**.

17. I was personally involved in the negotiations with the Stalking Horse Purchasers, along with the SSG and the Debtors' other professionals. I would characterize the negotiations with the Stalking Horse Purchasers as hard-fought, but done at arms-length and in good faith, and not the product of collusion.

18. To my knowledge, the Stalking Horse Purchasers and their owners, officers and principals are not in any way affiliated with the Debtors, their owners, offices or principals. The Stalking Horse Purchasers are not a mere continuation of the Debtors or their estates, and there is no continuity of enterprise between the Stalking Horse Purchasers and any Debtor. The Stalking

Horse Purchasers are not holding themselves out to the public as a continuation of any Debtor, nor are they a successor to any of the Debtors or their estates.

19. The Stalking Horse Agreements were not entered into, and none of the Debtors or the Stalking Horse Purchasers have entered into the Stalking Horse Purchasers or propose to consummate the Sale, for the purpose of (i) escaping liability for debts of any Debtors, or (ii) hindering, delaying, or defrauding present or future creditors of any Debtors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under any other laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

20. The Debtors maintain the requisite corporate power and authority to execute, deliver and perform their obligations under the Stalking Horse Agreements, and to take any other actions needed to consummate the Sale.

21. For the foregoing reasons, I believe the relief requested in the Sale Motion, and, more particularly, the sale of the Real Estate to the Stalking Horse Purchasers, is in the best interests of the Debtors' estates, reflects a sound exercise of the Debtors' business judgment, and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Executed on September 17, 2025

*/s/ Allen Wilen*  
Allen Wilen, Chief Restructuring Officer